UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————
)
ROBERT FIREMAN and ANN RAIDER,    )
)
    Plaintiffs,    )
)
    v.    )    CIVIL ACTION NO. 05-1740MLW
)
NEWS AMERICA MARKETING IN-STORE,  )
INC.,    )
)
    Defendant.    )
———————————————————)

## ROBERT FIREMAN AND ANN RAIDER'S MOTION TO COMPEL RESPONSES TO DISCOVERY REQUESTS FROM DEFENDANT NEWS AMERICA MARKETING IN-STORE, INC. (MEMORANDUM INCORPORATED)

Plaintiffs Robert Fireman and Ann Raider hereby move under Federal Rule of Civil Procedure 37(a) and Local Rule 37.1 for an order compelling Defendant News America Marketing In-Store, Inc. ("NAM") to respond fully to Robert Fireman and Ann Raider's First Set of Requests for Production of Documents and Things to Defendant. As grounds for this motion, Plaintiffs state that NAM has refused to produce requested documents, specifically electronic documents that exist only on daily e-mail backup tapes and year-end backup tapes, that are highly relevant to issues in this litigation and may either be admissible evidence in this action or lead to the discovery of admissible evidence. Plaintiffs' document requests are attached as Exhibit A. NAM's responses to these document requests are attached hereto as Exhibit B.

## FACTUAL AND PROCEDURAL BACKGROUND

In August of 1999, Plaintiffs and Defendant finalized a Stock Purchase Agreement and the Defendant agreed it would commit its resources and run Plaintiffs' company, Consumer Card Marketing Inc. ("CCMI") in such a way as to permit it to continue its growth and execute its business plan. The purpose of the agreement was to combine CCMI's product line with NAM's sales force and relationships and allow CCMI's business to continue to grow. As part of the contract and based on Defendant's agreement to commit the resources necessary for CCMI to continue to grow, the Plaintiffs agreed to received part of their compensation through earn-outs based on CCMI or its successors' Gross Margin as defined in the Stock Purchase Agreement.

Instead, upon the sale of CCMI, the business plan was ignored, promised resources were withheld, and key staff was siphoned off to other aspects of NAM's business. The Defendant marginalized the role of the Plaintiffs in the company, damaged the brand equity and name recognition CCMI had built over eight years, cancelled all trade advertising, failed to provide sales support to grow the business, and failed to fund necessary software development. Predictably, the Plaintiffs were unable to meet financial targets all parties had agreed were readily achievable, and Plaintiffs lost millions of dollars in bonuses and earn-out payments.[1]

---

[1]     Defendants claim that they had the right to take actions that destroyed Plaintiffs' ability to realize the financial benefit of their bargain by virtue of a provision in their asset purchase agreement. The provision states:

It is the buyer's current intention to provide support to the business of the Company by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, Buyer shall be freed to operate the Company and its Affiliates in its sole and unfettered judgment and Sellers shall have no claim against Buyer in connection therewith as a result of the preceding sentence. Buyer hereby agrees that the direct sales expenses

2

In August of 2005, Plaintiffs filed suit against Defendant in Massachusetts state court.   The case was removed to this Court and discovery has been ongoing since mid-2006.  Plaintiffs served their first document requests on Defendant on June 1, 2006 and Defendant responded on August 8, 2006.  Plaintiffs' document request included requests for relevant electronic documents.  See Exhibit A.  Defendant has not searched for critical responsive and highly relevant e-mails and electronic documents that are very likely located in its daily e-mail backup tapes and year-end backup tapes.

## ARGUMENT

On March 27, 2007, Alfred A. McBean, Jr. appeared on behalf of the Defendant in a keeper of the records deposition, a copy of which is attached as Exhibit C.  In this deposition ("McBean Dep."), Mr. McBean, the vice president of Windows technology at News America Marketing, testified as to the existence of year-end backup tapes which included a full back-up of the servers, including any e-mail on those servers.  McBean Dep. At 80-81.  An inventory of these year-end tapes is kept offsite at the same locations where the backup tapes are stored.  Id. at 87.  It is possible for these backup tapes to be restored and searched for relevant documents.  Id. at. 88-89.

Plaintiffs later learned from opposing counsel after the McBean deposition that NAM also backed up all of its e-mail daily on backup tapes.  This piece of information

---

for the first and second Base Earn-Out Periods shall not exceed $1.0 million and $1.4 million, respectively, unless otherwise agreed by Buyer, on the one hand, and Fireman and Raider, on the other hand.

This provision, however, does not allow NAM to violate the covenant of good faith and fair dealing.  See Speakman v. Allmerica Financial Life Ins., 367 F.Supp.2d 122, 132 (D. Mass. 2005) ("the essential inquiry [in determining whether a breach of the covenant occurred] is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance."); In re Gulf Oil/Cities Tender Offer Litigation, 725 F.Supp. 712, 736 (S.D.N.Y. 1989) ("merely conferring an express power is insufficient to bar consideration of whether the party exercised the power in good faith.")

was not revealed by Mr. McBean despite repeated questioning on all of the locations of

relevant e-mail.  <u>See</u> McBean Dep. at 42, 58, 80-81, 97.  Mr. McBean did not disclose

the daily e-mail backups when he was asked about the locations where one could recover

e-mail from a critical period in the case.  <u>Id.</u> at 97.  Opposing counsel has disclosed that

the daily back up tapes date back to at least 2000.  Also, when discussing the archiving

and maintaining of backup tapes which were not overwritten, Mr. McBean did not

disclose the existence of the daily backup tapes of e-mail in NAM's possession.  <u>Id.</u> at

80-81.  These daily backup tapes containing e-mail from the relevant time period in this

case must be searched to uncover responsive and relevant documents critical to resolving

this case.

     Plaintiffs request that the Court order the Defendant to search the daily e-mail

backup tapes and year-end backup tapes which very likely contain information

responsive to Plaintiffs' document requests and highly relevant to this case.  The e-mails

and other electronic documents on these backup tapes are not available from any other

source and a search will almost undoubtedly discover responsive and relevant documents.

Requests for documents under Federal Rule of Civil Procedure Rule 34 apply to

electronic documents as well as paper documents.  <u>See</u> <u>Williams v. Massachusetts Mut.</u>

<u>Life Ins. Co.</u>, 226 F.R.D. 144, 145-46 (D. Mass. 2005); <u>Rowe Entm't Inc. v. William</u>

<u>Morris Agency, Inc.</u>, 205 F.R.D. 421, 428 (S.D.N.Y. 2002).  This includes electronic

documents that may have been deleted and only reside on backup disks.  <u>See</u> <u>Zubulake v.</u>

<u>UBS Warburg LLC</u>, 217 F.R.D. 309, 317 (S.D.N.Y. 2003) (citing <u>Anitoch Co. v.</u>

<u>Scrapbook Borders, Inc.</u>, 210 F.R.D. 645, 652 (D.Minn. 2002); <u>Simon Property Group</u>

<u>L.P. v. mySimon, Inc.</u>, 194 F.R.D. 639, 640 (S.D. Ind. 2000)). The daily e-mail and year-

end backup tapes that are in NAM's possession contain e-mails and other documents
from the period of time when Plaintiffs were employed by NAM and when NAM
executives were making critical decisions on the direction of CCMI and its successors.
See McBean Dep. at 96-97.

The likelihood that these daily e-mail backups and year-end backup tapes contain
information relevant to the claims in this case is high. During the critical time period of
this case, 1999-2004, any e-mails or electronic documents relating to the management or
direction of the Plaintiffs' company purchased by Defendant would be highly relevant to
Plaintiffs' claims that Defendant failed to comply with their obligations created under the
contract between the parties to sell CCMI to NAM.

Importantly, these e-mails and electronic documents are not available from other
sources. See Fed R. Civ. P. 26(b)(2)(C). Mr. McBean testified (and Plaintiffs learned
later through supplemental information received from opposing counsel) that outside of
e-mail files that may exist on end user's computers, the only source for the e-mails from
the relevant time period is on the daily e-mail backup tapes and year-end backup tapes.
McBean Dep. at 97. As it is and was at the end user's discretion while employed at
NAM whether or not to archive documents locally on their own computer, the backup
tapes are a significantly more reliable source for e-mail and other electronic documents
that were created during the time period critical to this case. Id. at 62, 97.

While the process of retrieving data from the backup tapes is somewhat more
complicated than simply searching a server, in this case it is a necessary step considering
the importance of these e-mails and electronic documents in resolving the issues. Mr.
McBean testified that there is a procedure for retrieving the data on the year-end backup

5

tapes and that after recovery it would be possible to search the data for responsive documents. McBean Dep. at 87-92. Based on this, it is clear that a targeted search of the daily e-mail backup tapes later disclosed could also be executed by NAM as well using a similar procedure.

Any potential expense or burden[2] in searching these tapes is significantly outweighed by the benefit of recovering highly relevant electronic documents from the critical time period of this case. As it is extremely likely that a search of these electronic documents targeted at the key figures in this case will contain relevant documents, it is fair that NAM, a large corporation with significant resources, be required to search the backup tapes at its own expense. See McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001) (holding that "the more likely it is that a backup tape contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense"). NAM itself has created this situation where a large amount of relatively recent and undoubtedly critically relevant e-mails are only accessible through its daily e-mail backup tapes and year-end backup tapes. While there is some burden involved in searching these tapes, it is the only way to recover the e-mails and other electronic documents that are critical to resolving the issues in this case. The importance of recovering these e-mails and other electronic documents concerning discussions and decisions about the future of CCMI and its successors by key NAM executives outweighs any burden created by NAM's procedure for archiving its electronic documents. This case involves millions of dollars in damages and data that in all likelihood contain key electronic documents that go to the core of this case has yet to be searched. As no other

---

[2] Under Fed. R. Civ. P. Rule 26(b)(2)(B), it is Defendant's burden, not the Plaintiff's, to show that the backup tapes are not reasonably accessible because of undue burden or cost

source for these documents exists, the search will not be cumulative or duplicative and is absolutely necessary to uncover critical documents.[3]

## **CONCLUSION**

For all of the reasons stated above, Plaintiffs' Ann Raider and Robert Fireman respectfully request that the Court order Defendants to fully respond to Plaintiffs' discovery requests by searching its daily e-mail backup tapes and year-end backup tapes for electronic documents responsive to all of Plaintiffs' document requests.

## **REQUEST FOR HEARING**

The Plaintiffs request a hearing on the within Motion. As grounds, the Plaintiffs state that they believe a hearing will be of assistance to the Court.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,

/s/ David H. Rich
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Charles H. Roumeliotis (BBO #657553)
Todd & Weld LLP
28 State Street
Boston, MA  02109
Dated:  May 9, 2007                          (617) 720-2626

---

[3] Plaintiffs strongly believe that because of the high likelihood that a search of the backup tapes will produce large amounts of relevant and responsive materials the Court should order all of the tapes to be searched immediately. However, should the Court feel that is not immediately appropriate, Plaintiffs offer a solution in the alternative consisting of searching a sample of the backup tapes as an initial procedure. As

## CERTIFICATION PURSUANT TO LOCAL RULES 7.1 and 37.1

I, Kevin T. Peters, hereby certify pursuant to Rules 7.1 and 37.1 of the Local Rules of the United States District Court for the District of Massachusetts that I have made a reasonable and good faith effort to reach agreement with counsel for News America Marketing In-Store, Inc., on the matter that is the subject of this Motion. I spoke with Gordon Katz in person on May 1, 2007, but we were unable to resolve the matter.

/s/ Kevin T. Peters
Kevin T. Peters

## CERTIFICATE OF SERVICE

I, David H. Rich hereby certify that this Robert Fireman and Ann Raider's Motion to Compel Responses to Discovery Request From Defendant News America Marketing In-Store, Inc., filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 9, 2007.

/s/ David H. Rich
David H. Rich

Dated: May 9, 2007

noted above, this should be done at Defendant's expense, as they have created the situation where these backup tapes are the only source for these documents and they have the resources to execute such a search.

**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>   Plaintiffs,<br><br>  v.<br><br>NEWS AMERICA MARKETING IN-STORE,<br>INC.,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 05-11740MLW<br>)<br>)<br>)<br>)<br>)<br>) |

## ROBERT FIREMAN AND ANN RAIDER'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 34, the plaintiffs, Robert Fireman ("Fireman") and Ann Raider ("Raider") hereby requests that Defendant News America Marketing In-Store, Inc. ("NAM") produce for inspection and copying the documents requested below. The production of documents requested herein shall take place at the offices of Todd & Weld LLP, 28 State Street, 31st Floor, Boston, Massachusetts, within the time permitted by Rule 34.

### INSTRUCTIONS

1. In producing documents in response to this request, NAM is required to furnish all documents, including electronic media, in its possession, custody or control that are known or available to it, regardless of whether those documents are possessed by NAM, or by any agent, attorney, parent, subsidiary, representative, affiliate or employee. NAM must make a diligent search of its records and of other papers and materials in its possession or available to it or its attorneys or other representatives.

2. When responding to this request for production of documents, NAM is requested to respond in writing and state as to each of the requests:

(a) that there are documents responsive to the request, and that they will be produced;

(b) that there are documents responsive to the request, but that NAM refuses to produce them because of a claim of privilege or for some other reason; or

(c) that there are no documents responsive to the request.

3. If NAM asserts any privilege in responding to this request, specify in each instance the type of privilege asserted, specify the basis for the assertion, state all facts relied upon in support of the claim of privilege or related thereto and identify, to the fullest extent short of waiver, all communications and documents as to which NAM claims a privilege.

4. As to any document called for in this request which no longer exists, but which NAM is aware existed at one time, please identify such document(s) and, in addition, identify the last known location and the reason such document(s) is no longer in existence.

5. In the event NAM objects to any request set forth below on the basis of a contention that it is overbroad for any reason, please respond to that request as narrowed in such a way as to render it not overbroad and state the extent NAM have narrowed that request for purposes of the response.

6. In producing documents pursuant to this request, please indicate to which numbered request such document is responsive. If a document or any other item is produced pursuant to more than one request, please so designate.

7. The document requests contained herein shall be deemed to be continuing; that

is, NAM must supplement its response if it obtains any additional documents between the time the responses to these requests are served and the time of trial. Such additional responses shall be served and additional documents produced from time to time, but no later than fourteen (14) days after such additional documents are discovered, obtained or received.

8. Unless otherwise specified, the documents to be provided in response to the requests contained herein include any and all information that was generated or received or otherwise came into existence at any time prior to and including the date of responding.

**DEFINITIONS**

As used herein, the words and phrases set out below shall have the following meanings:

1. "Communication" means any correspondence, contact, discussion, or any other kind of written or oral exchange or transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a document or documents, whether directly or through "cc" copying.

2. "Document" shall have the meaning set forth in Rule 34(a) of the Massachusetts Rules of Civil Procedure and shall therefore include, without limitation, any writing, recording, photograph, computer data base, or other item containing information of any kind or nature, however produced or reproduced, whether an original or a duplicate, whatever its origin or location, and regardless of the form in which such information exists or is maintained.

3. "Person" means any natural person or any legal or business entity.

4. A "representative" of a person means any officer, director, agent, employee, attorney, or other representative of such person.

5. An "affiliate" of any entity means any person who, directly or indirectly, controls, or is controlled by, or is under common control with such entity. The term "control" and is correlatives, as used above, means the possession, whether direct or indirect, or the power to direct or to cause the direction of the management and policies of a person, whether through ownership of an entity interest, by corporate position, by contract, or otherwise.

6. "Concerning" means relating to, referring to, describing, evidencing, or constituting.

7. "Robert Fireman" means Robert Fireman, any agent, employee, attorney or other representative of Robert Fireman.

8. "Ann Raider" means Ann Raider, any agent, employee, attorney, or other representative of Ann Raider.

9. "NAM" means News America Marketing In Store, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

10. Consumer Card Marketing, Inc. ("CCMI") means CCMI, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

11. SmartSource Direct means SmartSource Direct, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

12. SmartSource iGroup means SmartSource iGroup, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

13.    "You" or "Your" means NAM.

## REQUESTS

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and NAM, on the other.

10.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.  This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

11.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

12.    All documents which refer, reflect or relate to the "Base Earn-Out Amount" component of the August 13, 1999 Stock Purchase Agreement.  This

request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13. All documents utilized to calculate the Base Earn Out Amount at any time.

14. All documents which refer, reflect or relate to the "First-Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

15. All documents utilized to calculate the First Year Bonus Amount at any time.

16. All documents which refer, reflect or relate to the "Second Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

17. All document utilized to calculate the Second Year Bonus Amount at any time.

18. All documents which refer, reflect or relate to the "Third Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

19. All document utilized to calculate the Third Year Bonus Amount at any time.

20. All documents which refer, reflect or relate to the "Fourth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

21. All document utilized to calculate the Fourth Year Bonus Amount at any time.

22. All documents which refer, reflect or relate to the "Fifth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft

calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

23.     All document utilized to calculate the Fifth Year Bonus Amount at any time.

24.     All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

25.     All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

26.     Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

27.     Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

28.     All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

29.     All organizational charts of NAM prepared at any time from 1999 to the present.

30.     Ann Raider's personnel file.

31.     Robert Fireman's personnel file.

32.     All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

33.     All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

34.     All contracts, agreement or understandings between NAM and Ann Raider.

35.     All contracts, agreements or understandings between NAM and Robert Fireman.

36.     Any and all financial statements of NAM from 1999 to 2004.

37.    Any and all financial statements of CCMI, SmartSource Direct or SmartSource iGroup from 1999 to the present.

38.    All documents which refer, reflect or relate to NAM's decision to change the name of CCMI.

39.    All documents which refer, reflect or relate to Ann Raider or Robert Fireman.

40.    All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,

_____ /s David H. Rich _____
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on 6/1/06

Dated:  June 1, 2006

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>Plaintiffs,<br><br>v.<br><br>NEWS AMERICA MARKETING IN-STORE,<br>INC ,<br><br>Defendant. | Civil Action No. 05-11740-MLW |

**DEFENDANT NEWS AMERICA MARKETING IN-STORE, INC.'S**
**RESPONSES TO ROBERT FIREMAN AND ANN RAIDER'S FIRST**
**SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

News America Marketing In-Store, Inc. ("NAM") hereby responds to the separately-

numbered requests of Plaintiffs' First Requests for Production of Documents (the "Requests") as

follows:

GENERAL RESPONSES AND OBJECTIONS

The following General Responses and Objections are applicable to and are hereby

incorporated by reference into each of NAM's specific responses to each document request

contained in the Requests.

A.    NAM objects to the Requests' Defintions and Instructions to the extent they

exceed the requirements of the Federal Rules of Civil Procedure.

B.    NAM is providing this response to the Requests without waiver of or prejudice to

its right, at any later time, to raise objections to (a) the relevance, materiality, or admissibility of

(i) the Requests or any part thereof, (ii) statements made in this response to the Requests or any

part thereof, or (iii) any document produced pursuant to this response, or (b) any further demand

for discovery involving or relating to the matters raised in the Requests.

C.    The Specific Responses set forth below and any production NAM undertakes to make pursuant thereto are based upon information now available to it after having made a diligent search within the time available of the files in its possession, custody or control that reasonably relate to one or more of the specific document production requests contained in the Requests. NAM may, in the future, obtain or locate additional documents responsive to the Requests and may identify or determine additional information relevant to its Specific Responses to the document production requests contained in the Requests. NAM objects to the Requests to the extent they purport to demand production of documents not in NAM's possession, custody, or control or to require a search that does not reasonably relate to one or more of the specific document production requests contained in the Requests. NAM reserves the right at any time to revise, correct, add to, supplement, modify, or clarify the Specific Responses set forth below or the production made pursuant thereto.

D.    NAM objects to the Requests to the extent they demand production of any document covered by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or doctrine recognized by Fed. R. Civ. P. 26, including the doctrine relating to documents prepared in anticipation of litigation. In the event any privileged document is produced by NAM, its production is inadvertent and does not consitute a waiver of any privilege.

E.    NAM objects to the Requests to the extent that they are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

F.    NAM objects to the Requests to the extent they purport to seek documents evidencing, referring, relating, pertaining to or created by any expert, as that term is used in Fed. R. Civ. P. 26 or his/her representative, or that describes, summarizes, evidences or sets forth any

communications by and between NAM and any such expert, or his/her representative, beyond those Plaintiff is entitled to receive pursuant to Mass. R. Civ. P. 26.

G.    NAM objects to the production of any documents falling within one of the General Objections set forth above or one of the Specific Objections set forth below. In the event any document falling within such an objection is or may be produced by NAM, its production is inadvertent and does not constitute a waiver of the objection with respect to the produced document or any other document. Moreover, a statement by NAM that it will produce all documents responsive to a particular request or falling within a particular description means that NAM will produce all documents within its possession, custody, or control that (a) are responsive to the particular request or fall within the particular description in question; (b) have been located by NAM after diligent search, and (c) do not fall within one of the General Objections set forth above or within any of the objections contained in the Specific Responses set forth below. Further, such a statement is not an acknowledgment or an admission that any document responsive to the particular request or falling within the particular description in question currently exists or has ever existed.

H.    Production of all documents is subject to entry of a confidentiality stipulation and order.

SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST NO. 1**

All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

**RESPONSE NO. 1**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 2

All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

## RESPONSE NO. 2

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily available unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 3

All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

## RESPONSE NO. 3

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily available unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 4

All documents which refer, reflect or relate to any business plans of CCMI.

## RESPONSE NO. 4

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily

available unprivileged documents, to the extent they exist, as may be relevant to the issues raised

in the complaint

**REQUEST NO. 5**

All documents which refer, reflect or relate to any business plans prepared or reviewed
prior to the acquisition of CCMI relating to the business of CCMI.

**RESPONSE NO. 5**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

**REQUEST NO. 6**

For the years 1999 to 2004, all documents which refer, reflect or relate to any annual
business plans which relate, reflect or refer to the business of CCMI, SmartSource Direct or
SmartSource iGroup.

**RESPONSE NO. 6**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

**REQUEST NO. 7**

All documents utilized, reviewed or prepared in connection with the preparation of the
business plans sought by Request No. 6.

**RESPONSE NO. 7**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

## REQUEST NO. 8

All documents which refer, reflect or relate to any due diligence performed on CCMI
prior to the acquisition in 1999.

## RESPONSE NO. 8

NAM objects to the above request on the grounds that the request is vague and

ambiguous and the documents sought are protected by the attorney-client privilege and not

calculated to lead to the discovery of admissible evidence in this action. Without waiving the

objection, NAM will produce unprivileged due diligence documents.

## REQUEST NO. 9

All documents which reflect communications between Raider and/or Fireman, on one
hand, and NAM, on the other.

## RESPONSE NO. 9

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

## REQUEST NO. 10

All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase
Agreement between NAM, Fireman and Raider. This request includes, but is not limited to pro
formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal
communications regarding the Stock Purchase Agreement.

## RESPONSE NO. 10

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 11

All documents which refer, reflect or relate to the earn-out component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

## RESPONSE NO. 11

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 12

All documents which refer, reflect or relate to the "Base Earn-Out Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

## RESPONSE NO. 12

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 13

All documents utilized to calculate the Base Earn-Out Amount at any time.

**RESPONSE NO. 13**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

**REQUEST NO. 14**

All documents which refer, reflect or relate to the "First-Year Bonus Amount"
component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not
limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets,
electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 14**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

**REQUEST NO. 15**

All documents utilized to calculate the First Year Bonus Amount at any time.

**RESPONSE NO. 15**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

**REQUEST NO. 16**

All documents which refer, reflect or relate to the "Second Year Bonus Amount"
component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not
limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets,
electronic mail, notes of communications, both internal and external communications.

# 3926418_v1

8

**RESPONSE NO. 16**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 17**

All document utilized to calculate the Second Year Bonus Amount at any time.

**RESPONSE NO. 17**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 18**

All documents which refer, reflect or relate to the "Third Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 18**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 19**

All document utilized to calculate the Third Year Bonus Amount at any time.

**RESPONSE NO. 19**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 20**

All documents which refer, reflect or relate to the "Fourth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 20**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 21**

All document utilized to calculate the Fourth Year Bonus Amount at any time.

**RESPONSE NO. 21**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome  Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 22**

All documents which refer, reflect or relate to the "Fifth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 22**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 23**

All document utilized to calculate the Fifth Year Bonus Amount at any time.

**RESPONSE NO. 23**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 24**

All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

**RESPONSE NO. 24**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 25**

All NAM or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

## RESPONSE NO. 25

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible

evidence.

## REQUEST NO. 26

Minutes or notes of any meeting of any NAM or News Corp. executive, manager or
member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI,
Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

## RESPONSE NO. 26

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible

evidence.

## REQUEST NO. 27

Materials generated or reviewed during any portion of any meeting where Ann Raider,
Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned
or referenced.

## RESPONSE NO. 27

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

## REQUEST NO. 28

All proposed or adopted organizational charts of CCMI, SmartSource Direct or
SmartSource iGroup prepared at any time.

**RESPONSE NO. 28**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 29**

All organizational charts of NAM prepared at any time from 1999 to the present.

**RESPONSE NO. 29**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Without waiving the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 30**

Ann Raider's personnel file.

**RESPONSE NO. 30**

NAM will produce the requested documents.

**REQUEST NO. 31**

Robert Fireman's personnel file.

**RESPONSE NO. 31**

NAM will produce the requested documents.

**REQUEST NO. 32**

All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

**RESPONSE NO. 32**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and seek privileged information. Without waiving the

13

objection, NAM will produce such readily available unprivileged documents to the extent they exist.

## REQUEST NO. 33

All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

## RESPONSE NO. 33

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 34

All contracts, agreement or understandings between NAM and Ann Raider.

## RESPONSE NO. 34

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such documents to the extent they exist.

## REQUEST NO. 35

All contracts, agreements or understandings between NAM and Robert Fireman.

## RESPONSE NO. 35

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such documents to the extent they exist.

## REQUEST NO. 36

Any and all financial statements of NAM from 1999 to 2004.

## RESPONSE NO. 36

NAM objects to the above request on the ground that it is overly broad and not

reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 37

Any and all financial statements of CCMI, SmartSource Direct or SmartSource iGroup
from 1999 to the present.

## RESPONSE NO. 37

NAM objects to the above request on the ground that it is overly broad. Without waiving

the objection, NAM will produce such readily available documents to the extent they exist.

## REQUEST NO. 38

All documents which refer, reflect or relate to NAM's decision to change the name of
CCMI.

## RESPONSE NO. 38

NAM objects to the above request on the ground that it is overly broad. Without waiving

the objection, NAM will produce such readily available documents to the extent they exist.

## REQUEST NO. 39

All documents which refer, reflect or relate to Ann Raider or Robert Fireman.

## RESPONSE NO. 39

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

documents, to the extent they exist, as may be relevant to the issues raised in the complaint and

are readily available.

## REQUEST NO. 40

All documents which refer, reflect or relate to the loyalty marketing industry, including
but not limited to business plans, reports, studies or surveys received or prepared at any time
from 1997 to the present.

**RESPONSE NO. 40**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Tara L. Myslinski (BBO #644936)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: September 8, 2006
       Boston, Massachusetts

*I hereby certify that a true copy of the above document(s) was served upon all parties of record in this case on 8/13/06 (by Hand)(by Mail)*

# Exhibit C

McBean, Jr., Alfred A.

New York, NY

March 27, 2007

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------x

ROBERT FIREMAN and ANN RAIDER,    :

               Plaintiffs,    :    Civil Action No.

      -vs.-    :    05-1740 MLW

NEWS AMERICA MARKETING IN-STORE, :

INC.,    Defendant.    :

--------------------------------x

      Deposition of ALFRED A. McBEAN, JR., taken in

the above-entitled matter before RICH GERMOSEN,

Certified Court Reporter, (License No. XI01847),

Certified Realtime Court Reporter-NJ, (License No.

XR00168), NCRA Registered Professional Reporter, NCRA

Certified Realtime Reporter, Certified LiveNote

Reporter, and a Notary Public within and for the

States of New York and New Jersey, taken at the

offices of News America, Incorporated, 1211 Avenue of

the Americas, 3rd Floor, New York, New York

10036-8701, on Tuesday, March 27, 2007, commencing at

11:02 a.m.

McBean, Jr., Alfred A.                        March 27, 2007
                New York, NY

2 (Pages 2 to 5)

---

**2**

```
1        APPEARANCES
2   Attorney for the Plaintiffs:
3     KEVIN T. PETERS, ESQ
4     TODD & WELD LLP
5     28 State Street - 31st Floor
6     Boston, MA 02109-1775
7     (617) 720-2626
8
9   Attorney for the Defendant:
10    GORDON P. KATZ, ESQ
11    HOLLAND & KNIGHT LLP
12    10 St. James Avenue - 11th Floor
13    Boston, MA 02116-3889
14    (617) 573-5839
15
16
17  ALSO PRESENT:
18  J. JORDAN LIPPNER, ESQ., News America Incorporated
19
20
21
22
```

**4**

```
1        IT IS HEREBY STIPULATED AND AGREED, by
2   and between the attorneys for the respective parties
3   herein, that filing and sealing be and the same are
4   hereby waived.
5        IT IS FURTHER STIPULATED AND AGREED
6   that all objections, except as to the form of the
7   question, shall be preserved to the time of trial.
8        IT IS FURTHER STIPULATED AND AGREED
9   that the within deposition may be signed and sworn
10  to before any officer authorized to administer an
11  oath, with the same force and effect as if signed
12  and sworn to before the officer before whom the
13  within deposition was taken.
14
15
16
17
18
19
20
21
22
```

---

**3**

```
1        CONTENTS
2   WITNESS: ALFRED A. McBEAN, JR.        PAGE
3     Examination By Mr. Peters ............. 005
4
5        EXHIBITS
6   NUMBER   DESCRIPTION        PAGE  LINE
7   1    (Exhibit 1 for identification,
8         four-page document entitled
9         Notice of Taking Deposition,
10        not bearing Bates stamps) ... 010 - 017
11
12
13
14
15
16
17
18
19
20
21
22
```

**5**

```
1        PROCEEDINGS
2        (Whereupon, the court reporter
3   administers the oath to the witness.)
4     ALFRED A. McBEAN, JR,
5   conducting business at News America Marketing,
6   20 Westport Road, 1st Floor, Wilton, Connecticut
7   06897, residing at 29 Thompson Street, Fairfield,
8   Connecticut 06825, having been first duly sworn
9   or affirmed by a Notary Public within and for the
10  States of New York and New Jersey, was examined
11  and testified as follows:
12        EXAMINATION BY MR. PETERS:
13    Q.   Good morning.
14    A.   Good morning.
15    Q.   We met briefly a moment ago. I'm
16  Kevin Peters. I represent the Plaintiffs in this
17  case. I appreciate you taking the time to get
18  ready for this deposition and appearing today.
19        Would you introduce yourself to
20  us, give the name and the spelling of your name.
21    A.   Alfred McBean, A-l-f-r-e-d,
22  M-c-B-e-a-n.
```

---

McBean, Jr., Alfred A.
New York, NY
March 27, 2007

3 (Pages 6 to 9)

6

1    Q.    Where do you work, sir?
2    A.    News America Marketing.
3    Q.    What is your job?
4    A.    I'm the vice-president of Windows
5    technology.
6    Q.    What are your job
7    responsibilities?
8    A.    Managing the Windows environment
9    from an end user experience and operations side
10   as far as maintaining the functionality of all
11   the Windows servers.
12   Q.    Okay. How long have you had the
13   job?
14   A.    Under the current title two years.
15   Q.    Okay.
16         How long have you worked for News
17   America?
18   A.    I started in June of 2000.
19   Q.    Okay.
20         Did you replace someone? Did
21   someone have your job?
22   A.    No. At the time that I was hired

7

1    I believe that this was a new head count.
2    Q.    Okay.
3         Who was in charge of technology or
4    IT before you came on board if you know?
5    A.    I could only tell you who my
6    hiring manager was.
7    Q.    Why don't you tell me that?
8    A.    Sunnel Sajnani.
9    Q.    Could you spell that, please?
10   A.    S-u-n --
11   Q.    The questions only get easier.
12   A.    Yeah, I know. Hold on.
13   S-u-n-n-e-l. Hold on. I'll have to get back to
14   you on his first name. His last name is
15   S-a-j-n-a-n-i.
16   Q.    S-a-j --
17   A.    S-a-j-n-a-n-i.
18   Q.    Okay.
19         And what was his position?
20   A.    Vice-president of technology.
21   Q.    Okay.
22         Is he still with the company?

8

1    A.    No, he's not.
2    Q.    Okay. Do you know where he went?
3    A.    He went to Fox.
4    Q.    Okay.
5         So he's still within the News
6    America family of companies?
7         MR. KATZ: Objection.
8    A.    Yes.
9    Q.    Okay.
10        Do you know what his job is
11   presently?
12   A.    Yes.
13   Q.    What is it?
14   A.    He's the vice-president of
15   technology for Fox.
16        MR. KATZ: Yeah, you know, before
17   we go any further should we put some stipulations
18   on the record?
19        MR. PETERS: Okay.
20        MR. KATZ: Sounds like a good idea.
21        MR. PETERS: Why not. I've done
22   that.

9

1         MR. KATZ: Okay. We've done it
2    before.
3         MR. PETERS: We've done it before.
4         MR. KATZ: And the two of us have
5    done it several times.
6         MR. PETERS: That's right.
7         Why don't we reserve objections
8    except as to the form of the question until the
9    time of trial or use of the transcript in a
10   dispositive motion like a summary judgment motion,
11   for instance, and why don't we reserve motions to
12   strike until the time of trial or use of the
13   transcript in a dispositive motion. The witness
14   will want to read and sign I'm sure, Gordon, but
15   we'd waive Notary.
16        Does that cover the waterfront?
17        MR. KATZ: I think so with the
18   exception that the only objections we're not
19   reserving and the only motions to strike we're not
20   reserving would be those as to form.
21        MR. PETERS: Only as to form.
22        MR. KATZ: Let me just add one

McBean, Jr., Alfred A.                                      March 27, 2007
New York, NY

4 (Pages 10 to 13)

| 10 | 12 |
|---|---|
| 1  further thing as a preliminary matter | 1        MR. KATZ: The person who has |
| 2        As you know we sent you certain | 2  knowledge on the subject as I've indicated in the |
| 3  objections to your 30(b)(6) deposition, that is | 3  letter of January 26th, 2007 is me. |
| 4  the 30(b)(6) deposition under which Mr. McBean is | 4        MR. PETERS: So there's no |
| 5  appearing here today in a letter dated January | 5  corporate person who was responsible for |
| 6  26th, 2007. I'm not going to repeat those here, | 6  coordinating the effort to collect electronic |
| 7  but I just want to incorporate by reference that | 7  documents or paper documents? |
| 8  letter dated January 26th, 2007 and if you'd like | 8        MR. KATZ: That -- the person who |
| 9  we can mark it as an exhibit. I don't happen to | 9  is responsible for the coordination of the effort |
| 10  have a clean copy of it with me today, but we can | 10  to collect electronic documents or paper documents |
| 11  amend the record when we return to Boston if you'd | 11  has been me. |
| 12  like to do that. | 12        MR. PETERS: Okay. |
| 13        MR. PETERS: Well, why don't we do | 13 |
| 14  this: | 14  BY MR. PETERS: |
| 15        Would you mark as the first exhibit | 15        Q.    Well, let me just ask the witness, |
| 16  a Notice of Deposition. | 16  did you collect any documents and provide them to |
| 17        (Whereupon, four-page document | 17  Mr. Katz electronic or otherwise? |
| 18  entitled Notice of Taking Deposition, not bearing | 18        A.    In relation to Number 5? |
| 19  Bates stamps, is received and marked as McBean | 19        Q.    Just generally in relation to this |
| 20  Exhibit 1 for Identification.) | 20  litigation? |
| 21        COURT REPORTER: Number 1. | 21        A.    Yes, I collected documents where I |
| 22 | 22  provided it to him. |

| 11 | 13 |
|---|---|
| 1  BY MR. PETERS: | 1        Q.    Okay. |
| 2        Q.    Mr. McBean, I'm showing you a copy | 2        What categories of documents did |
| 3  of a Notice of Deposition. | 3  you provide? |
| 4        Would you take a look at it and | 4        A.    Documents that he had requested |
| 5  see if you recognize the document. | 5  from me. |
| 6        A.    Yes, I recognize the document. | 6        Q.    Do you recall what they are? |
| 7        Q.    Okay. | 7        A.    One was previous deposition and |
| 8        Is this deposition notice the | 8  documents pertaining to corporate policies. |
| 9  notice that brings you here today? | 9        Q.    Okay. |
| 10        A.    Yes. | 10        Anything else, any other |
| 11        Q.    Okay. | 11  categories of documents? |
| 12        MR. PETERS: Now, Gordon, your | 12        A.    No. |
| 13  objections as I understand, as I understand them | 13        Q.    Okay. |
| 14  to be pertain to 5, category 5? | 14        Can you define with more precision |
| 15        MR. KATZ: Principally. For | 15  the documents pertaining to corporate policies? |
| 16  present discussion that's the one that is most | 16        A.    Policies, News Corp. policies on |
| 17  significant and that is that Mr. McBean is not | 17  records management and computer usage. |
| 18  testifying as a corporate representative with | 18        Q.    Did you review those documents in |
| 19  respect to Number 5 on Exhibit 1. | 19  advance of today's deposition? |
| 20        MR. PETERS: Okay. | 20        A.    Yes. |
| 21        Is there another person that's | 21        Q.    Are you familiar with the |
| 22  available to testify on that? | 22  substance of those documents in a general way? |

5  (Pages 14 to 17)

14

1      A.    Yes.
2      Q.    Okay.
3            So if we ask questions later on in
4    the deposition about corporate policies, you'll
5    have a working knowledge of those documents?
6      A.    No.  I mean I know what the
7    documents are about, but I don't know them
8    verbatim.
9      Q.    Okay.  We'll just get into that.
10           In any event, we were talking
11   about your job responsibilities and your hire
12   back in 2000.
13           When you were hired what were you
14   hired to do?
15     A.    My first position with News
16   America Marketing was a senior technologist.
17     Q.    What were your job
18   responsibilities?
19     A.    Job responsibilities were to chart
20   technology mostly in the Windows space and
21   introduce them into News America Marketing.
22     Q.    What does that mean, to chart

15

1    technology?
2      A.    For instance, one of my first
3    projects was to look at the way that the
4    organization is receiving faxes and figure out a
5    way to automate them.  So we looked at a product,
6    looked at several products, isolated it down to a
7    product and then I did a pilot, internal pilot
8    and we went to full production as far as being
9    able to automatically send faxes out on behalf of
10   our users electronically.
11     Q.    Okay.
12           Have your job responsibilities
13   changed over the years?
14     A.    Yes.
15     Q.    Can you tell me how they've
16   evolved?
17     A.    I went from senior technologist to
18   director of Windows technology.  I want to say
19   that happened in 2001.  And then in 2005 I became
20   a vice-president of Windows technology.
21     Q.    What were your job
22   responsibilities as a director of Windows

16

1    technology?
2      A.    I managed the Windows, the entire
3    Windows environment for News America Marketing,
4    the end user experience as far as applications
5    that are hosted on the Windows servers and the
6    operational stability of the environment.  So
7    anything that was Microsoft Windows related from
8    an application or server perspective I was
9    directly responsible for.
10     Q.    And this was for News America, the
11   company?
12     A.    This is for News America
13   Marketing.
14     Q.    News America Marketing.
15           And so did that cover News America
16   Marketing In-Store, Inc.?
17     A.    Yes.
18     Q.    Is that a company familiar to you?
19           Are you familiar with a company or
20   division called SmartSource Direct?
21     A.    Yes.
22     Q.    Are you responsible for their

17

1    data?
2      A.    Yes.
3      Q.    And the SmartSource I Group, are
4    you familiar with that?
5      A.    Yes.
6      Q.    Were you responsible for the
7    Windows environment for the SmartSource I Group?
8      A.    Yes.
9      Q.    And was that the case from did you
10   say June of 2000?
11     A.    No.
12     Q.    When did you start?
13     A.    That would have taken place 2001.
14     Q.    Okay.
15           So let me see if I have this.  You
16   became responsible for the Windows environment
17   for the SmartSource I Group, Smart Source Direct
18   in 2001?
19     A.    Yes.
20     Q.    And that's when you became the
21   director of Windows technology?
22     A.    Correct.

McBean, Jr., Alfred A.

New York, NY

March 27, 2007

6 (Pages 18 to 21)

18

1    Q.    Okay.
2         So before you became the director
3    of Windows technology and you were a senior
4    technician, you were not responsible for the
5    Windows environments of any News America
6    Marketing division, is that correct?
7    A.    Correct.
8    Q.    Okay.
9         Who was responsible for those
10   environments prior to you?
11   A.    Prior to me PJ Paple.
12   Q.    How do you spell -- is it a man or
13   a woman?
14   A.    It's a man.
15   Q.    How do you spell his last name?
16   A.    P-a-p-l-e.
17   Q.    Okay.
18        What was his job title?
19   A.    I am not sure, but I believe it
20   was vice-president of operations.
21   Q.    Do you know what his job
22   responsibilities were vis-a-vis information

19

1    technology for News America Marketing and the
2    divisions of that?
3    A.    I don't have his total job
4    responsibilities, I do know that he was manager
5    of the Windows environment.
6    Q.    Okay.
7         Does he still work for News
8    America Marketing?
9    A.    Yes, he does.
10   Q.    Do you know what his position is
11   currently?
12   A.    Vice-president of database
13   technology.
14   Q.    Okay.
15        To whom does he report?
16   A.    Today he reports to William
17   Christie.
18   Q.    To whom do you report?
19   A.    I report into William Christie.
20   Q.    Okay.
21        What are Mr. Paple's job
22   responsibilities presently if you know?

20

1    A.    He's vice-president of databases.
2    He manages News America Marketing's databases so
3    Oracle databases.
4    Q.    Okay.
5         Are you responsible for purchasing
6    hardware?
7    A.    Not entirely.
8    Q.    Okay.
9         Is there one person that has
10   responsibility for hardware purchases?
11   A.    No.
12   Q.    Okay.
13        What are your job responsibilities
14   in terms of purchasing hardware?
15   A.    I recommend hardware to be
16   purchased.
17   Q.    Does News America Marketing have
18   any preferred vendors of hardware?
19   A.    Yes.
20   Q.    Who are those vendors?
21   A.    For the hardware that I recommend
22   purchases for predominantly it's HP.

21

1    Q.    Okay.
2         So are the servers that you --
3    I'll ask this question: Do you manage the
4    servers?
5    A.    Yes.
6    Q.    Okay.
7         Are the servers HP servers?
8    A.    Yes.
9    Q.    Would you tell me what model
10   numbers? Do you know what, that's probably a bit
11   of an unfair question.
12        Let me ask you this question: How
13   many servers do you oversee?
14   A.    Today?
15   Q.    Yes.
16   A.    Roughly two hundred and -- roughly
17   two hundred.
18   Q.    Where are they located?
19   A.    Across the United States. Across
20   North America.
21   Q.    How many offices do you have job
22   responsibilities for?

22

```
1       A.    Fifteen.
2       Q.    Okay.
3             And each of these offices has its
4   own servers?
5       A.    Correct.
6       Q.    And are they networked?
7       A.    I take that back. It's more like
8   twenty offices.
9       Q.    Twenty.
10            Are they networked?
11      A.    Yes.
12      Q.    Are they networked to
13  headquarters?
14      A.    It's a fully mesh network so
15  all -- all connections -- all cities connected to
16  the mesh connect to each other. So all cities
17  connect to each other.
18      Q.    Okay.
19            And we'll get into backing up, but
20  is all the backup done in one location?
21      A.    No.
22      Q.    It's all backed up in the separate
```

23

```
1   offices?
2       A.    Correct.
3       Q.    Okay.
4             Is there a central backup?
5       A.    No.
6       Q.    In other words, twenty offices,
7   twenty backups?
8       A.    No.
9       Q.    Okay.
10            Why don't we take that more
11  incrementally and get back into the hardware.
12            The servers, are they particular
13  models of HP servers or do they vary widely?
14      A.    They vary widely, however, of
15  recent we've been ordering standardizing on a
16  type of model server.
17      Q.    And what is that?
18      A.    It's a Compaq DL360, or HP DL360.
19      Q.    Okay.
20            What were the servers in 2000 when
21  you joined the company?
22      A.    It was a mix between Compaq and
```

24

```
1   Dell and there might have been one or two
2   Gateways as well.
3       Q.    Was all the data on those servers
4   migrated over to the HP servers at some point
5   over time?
6       A.    Data that -- well, depending on
7   what the business case was.
8       Q.    Are there separate servers that
9   manage E-mail?
10      A.    There are separate servers that
11  manage E-mail, I don't understand the question.
12      Q     Where does the E-mail for the News
13  America reside?
14      A.    In one of four different cities.
15      Q.    What are the cities?
16      A.    Toronto, Chicago, Wilton and New
17  York.
18      Q.    Okay.
19            Are those the cities where the
20  E-mail is stored presently?
21      A.    Correct.
22      Q.    Has that been the case since 2000
```

25

```
1   when you joined the company?
2       A.    With the exception of Wilton, yes.
3       Q.    Okay.
4             And is all the E-mail -- well, let
5   me ask this: How does it break down from a
6   territorial perspective? What does New York
7   cover? What does Wilton cover? What does
8   Chicago cover and what does Toronto cover in
9   terms of E-mail?
10      A.    Today?
11      Q.    Yes, right now.
12      A.    I don't know.
13      Q.    Okay. Do you know what it was in
14  2000?
15      A.    No.
16      Q.    Am I correct that the different
17  cities manage the E-mail for different parts of
18  the country?
19      A.    Correct, but not always the case.
20      Q     What are the rules on that?
21      A.    The exceptions could be employees
22  that transfer from one office to the other, their
```

McBean, Jr., Alfred A.　　　　　　　　　　　　　　　　March 27, 2007

New York, NY

8 (Pages 26 to 29)

| 26 |
|---|
| 1　E-mail in some cases may not transfer over. |
| 2　　　Q.　Okay. |
| 3　　　　　And the E-mail that is in resides |
| 4　on those servers, when you went from the Compaq |
| 5　and Dell servers to the HP servers, was that |
| 6　E-mail transferred to the new servers? |
| 7　　　A.　When we -- |
| 8　　　Q.　I'm talking about the legacy |
| 9　E-mail. |
| 10　　　A.　When we performed upgrades to our |
| 11　E-mail environment, mail that is on the mail |
| 12　servers is transferred from the legacy server to |
| 13　the new server. |
| 14　　　Q.　Okay. |
| 15　　　　　What happens to the legacy |
| 16　servers? |
| 17　　　A.　They're either repurposed or, you |
| 18　know, if they're end of life then we will dispose |
| 19　of them. |
| 20　　　Q.　Are there old servers in New York |
| 21　from the case of the Compaq and Dell generation |
| 22　hardware? |

| 28 |
|---|
| 1　break it down. |
| 2 |
| 3　BY MR. PETERS: |
| 4　　　Q.　Well, the New York E-mail is on |
| 5　the New York server, correct? |
| 6　　　A.　Not always the case. |
| 7　　　Q.　But generally? |
| 8　　　A.　That's usually the mode of |
| 9　operation, but not always the case. |
| 10　　　Q.　And the Boston E-mail, is that on |
| 11　the New York server? |
| 12　　　A.　Not always the case. |
| 13　　　Q.　Is that generally the case? |
| 14　　　A.　No. |
| 15　　　Q.　Where does that reside? |
| 16　　　A.　Today? |
| 17　　　Q.　Yes. |
| 18　　　A.　I want to say Chicago. |
| 19　　　Q.　Okay. |
| 20　　　A.　But I need to verify that. |
| 21　　　Q.　Okay. |
| 22　　　　　Now, what legacy servers did |

| 27 |
|---|
| 1　　　A.　In relation to E-mail? |
| 2　　　Q.　Yes, sir. |
| 3　　　A.　I do know that at the time New |
| 4　York was running on Dell equipment. So those |
| 5　servers are no longer available. Those are done. |
| 6　We dumped them. |
| 7　　　Q.　So they're no longer in your |
| 8　possession? |
| 9　　　A.　That's correct. |
| 10　　　Q.　Okay. |
| 11　　　A.　They were very old Dell systems. |
| 12　　　Q.　Now, the E-mail I'm obviously most |
| 13　interested in is the E-mail that was in New York |
| 14　and in Boston. |
| 15　　　A.　Right. |
| 16　　　Q.　Would that be on the New York |
| 17　server more likely than not? |
| 18　　　MR. KATZ:　Objection. |
| 19　　　　　You're referring to the New York |
| 20　E-mail or are you referring to the Boston E-mail? |
| 21　　　MR. PETERS:　Both. |
| 22　　　MR. KATZ:　So maybe you should |

| 29 |
|---|
| 1　Chicago have before you migrated over to HP? |
| 2　　　A.　Dell. |
| 3　　　Q.　Okay. |
| 4　　　　　Do you know whether or not any of |
| 5　those servers in Chicago still exist? |
| 6　　　A.　The Dell servers, no. |
| 7　　　Q.　Do you know what happened to them? |
| 8　　　A.　We dumped them. |
| 9　　　Q.　Do you know when? |
| 10　　　A.　No. I can approximate and say |
| 11　probably 2002. Probably about 2002. |
| 12　　　Q.　Okay. |
| 13　　　　　And the desktops, are they these |
| 14　days also generally HP? |
| 15　　　A.　What we're buying today is |
| 16　ninety-five percent HP. |
| 17　　　Q.　Okay. |
| 18　　　　　What was the case back in 2000 |
| 19　when you joined the company? |
| 20　　　A.　In 2000 we were purchasing Dell, |
| 21　HP and IBM. |
| 22　　　Q.　What was in New York for the most |

McBean, Jr., Alfred A.

New York, NY

March 27, 2007

9  (Pages 30 to 33)

|  | 30 |
|---|---|
| 1 | part? |
| 2 | A.   I do not know. |
| 3 | Q.   What's the average life of a |
| 4 | desktop at News America Marketing? |
| 5 | A.   Between three and five years. |
| 6 | Q.   What happens to the old desktops |
| 7 | once they're decommissioned or no longer used? |
| 8 | A.   They're dumped. |
| 9 | Q.   What does that mean literally? |
| 10 | A.   We load them up into dumpsters and |
| 11 | they get hauled away. |
| 12 | Q.   Before the desktops are hauled |
| 13 | away is the information that resides on the |
| 14 | desktops' hard drive backed up? |
| 15 | MR. KATZ:  Objection. |
| 16 | As a matter of policy? |
| 17 | MR. PETERS:  Yes. |
| 18 | |
| 19 | BY MR. PETERS: |
| 20 | Q.   As a matter of policy when a |
| 21 | desktop is decommissioned is the data on that |
| 22 | desktop imaged or backed up? |

|  | 32 |
|---|---|
| 1 | Q.   Yes, sir. |
| 2 | Is that also the case with E-mail? |
| 3 | A.   Yes. |
| 4 | Q.   Which Windows operating system are |
| 5 | you running presently? |
| 6 | A.   Windows 4.0, Windows 95, Windows |
| 7 | 2000, Windows 2000 server, Windows server 2003, |
| 8 | Windows server 2003R2, Windows XP, Windows Vista |
| 9 | I think those are all the ones we are running. |
| 10 | Q.   Okay |
| 11 | Have -- has News America Marketing |
| 12 | been a Windows -- has News America Marketing used |
| 13 | a Windows environment since 2000? |
| 14 | A.   Yes. |
| 15 | Q.   Okay. |
| 16 | Has there been any other operating |
| 17 | system that you know of or that pre-dates you? |
| 18 | Linux, for example? |
| 19 | A.   From a Windows perspective the |
| 20 | only other item would be Windows 351. |
| 21 | Q.   But News America Marketing has |
| 22 | been an entity that uses a Windows environment |

|  | 31 |
|---|---|
| 1 | A.   There is no policy to that effect. |
| 2 | Q.   Okay. |
| 3 | Do you know what happens as a |
| 4 | general rule by virtue of your job |
| 5 | responsibilities? |
| 6 | MR. KATZ:  Objection. |
| 7 | A.   The data is presented to -- |
| 8 | actually the manager gets involved and decides |
| 9 | whether or not they want to keep the data on the |
| 10 | disk. |
| 11 | Q.   If data is kept where is it kept? |
| 12 | A.   It's given to the manager. |
| 13 | Q.   Okay. |
| 14 | Is it -- in what form is it given? |
| 15 | Optimal disk or tape? |
| 16 | A.   It all depends on the manager. |
| 17 | They may ask us to burn it to CD.  They may ask |
| 18 | us to drop it in their home directory.  They may |
| 19 | ask us to hold it there for a new employee that's |
| 20 | coming in.  It all depends on what the manager |
| 21 | would like us to do with it.  It's at the |
| 22 | manager's discretion. |

|  | 33 |
|---|---|
| 1 | whatever Windows version that is for as long as |
| 2 | you know? |
| 3 | A.   Uh-huh. |
| 4 | Q.   Is that a correct statement? |
| 5 | A.   For as long as I know, correct. |
| 6 | Q.   Okay. |
| 7 | A.   Which would be from 2000. |
| 8 | Q.   But you don't know of any other |
| 9 | operating system that pre-dates you, do you? |
| 10 | A.   Novell, but that's not a Windowing |
| 11 | environment, but I can't speak beyond Novell. |
| 12 | Q.   Got it. |
| 13 | And -- |
| 14 | A.   These other -- oh, we also use |
| 15 | today outside of Windows Sun. |
| 16 | Q.   What's Sun used for?  What |
| 17 | applications? |
| 18 | A.   It's an operating system that we |
| 19 | run our main -- several applications on. |
| 20 | Q.   Right. |
| 21 | Do you know what applications are |
| 22 | run off of Sun? |

McBean, Jr., Alfred A.                     March 27, 2007
                    New York, NY

10 (Pages 34 to 37)

Page 34

1      A.   Oracle.
2      Q.   Okay. Is it mostly for
3   accounting?
4      A.   No.
5      Q.   Could you just tell me the purpose
6   of the applications that run off of the Oracle
7   database?
8      A.   Our ERP system.
9      Q.   ERP stands for?
10      A.   Enterprise -- I'm sorry, I don't
11   recall the acronym, but the line of applications
12   that are on the Sun platform would be our
13   financial systems, our line of business
14   applications, the in-store business, for example,
15   would be on there, our FSI business would be on
16   there.
17      Q.   When you say the business would be
18   on there what do you mean?
19      A.   The in-store business.
20      Q.   I don't know what you mean by
21   that. I'm sorry. I don't mean to be obtuse.
22      A.   The application --

Page 35

1      Q.   Financials, all of their
2   applications?
3      A.   I don't know. That you're going
4   to have to take up with PJ. I don't -- all I
5   know is that the in-store business what our sales
6   reps used to enter orders, order management
7   system.
8      Q.   Okay. That helps.
9          In terms of internal and external
10   communication E-mail, for instance, that's done
11   from a Windows environment?
12      A.   That's correct.
13      Q.   Okay.
14          Can you tell me what software,
15   what Windows software is run on the server level
16   at News America Marketing? And if that's going
17   to require you to speak for the next twenty
18   minutes I'm going to withdraw the question. I'll
19   let you know right now.
20      A.   I was going to ask you to rephrase
21   the question because --
22      Q.   Yeah, in other words --

Page 36

1      A.   -- because you're asking me what
2   Windows software runs at the server level. I
3   mean Windows server runs at the server level. So
4   I guess --
5      Q.   But you run Outlook from the
6   server, don't you?
7      A.   No. You run that from a desktop.
8      Q.   That's my question then.
9          So the only application on the
10   server is the server application itself? No
11   software resides on the server other than server
12   level software, in other words --
13      A.   No.
14      Q.   -- Office and --
15      A.   In some instances Office is
16   installed on the server to fit end user's needs.
17   So let's say, for instance, there's a user that
18   does not have Microsoft Office on their computer
19   that can use it off the server.
20      Q.   Right.
21      A.   So --
22      Q.   Okay.

Page 37

1          Do you have remote access?
2      A.   Yes.
3      Q.   Okay.
4          Is that stored on the server?
5          It's got to be.
6      A.   No. Well, remote access is
7   governed by the network, not necessarily the
8   server. The servers provide the application.
9      Q.   Right.
10      A.   Regardless of whether you're on
11   our network or if you are connecting in remotely.
12      Q.   Okay.
13          What remote access application
14   does News America presently use?
15          MR. KATZ: Do you understand the
16   question?
17      A.   Cisco VPN.
18      Q.   Okay.
19          Is that application the same
20   application that was in use in 2000 when you
21   joined the company?
22      A.   No.

38

| 1 | Q. | What was being used back then? |
|---|---|---|
| 2 | A. | Nortel. |
| 3 | Q. | What version? |
| 4 | A. | Do not remember. Do not recall. |
| 5 | Q. | When did you switch over from |
| 6 | Nortel to Cisco VPN? | |
| 7 | A. | Do not recall. |
| 8 | Q. | Was it during your tenure? |
| 9 | A. | Yes. |
| 10 | Q. | Obviously. |
| 11 | A. | (Indicating.) |
| 12 | Q. | Okay. |

13          What software or applications are
14 used at News America Marketing? Can you list
15 them for me? Windows I'm talking about.
16     A.   It's going to take twenty minutes.
17     Q.   It is. Well, let me ask you
18 some -- then let me ask you some questions that
19 matter to me, okay?
20          Do you use Outlook?
21     A.   Yes.
22     Q.   Okay.

39

1          Do you use Word?
2     A.   Yes.
3     Q.   Do you use PowerPoint?
4     A.   Yes.
5     Q.   Do you use Excel?
6     A.   Yes.
7     Q.   Okay.
8          Do you use any other type of Word
9 application for communicating --
10          Pardon me.
11          Do you use any other Windows
12 application for communicating internally other
13 than Outlook?
14     A.   Define communicating.
15     Q.   If I want to ask you a question
16 electronically --
17     A.   Okay.
18     Q.   -- I can E-mail you?
19     A.   That's correct.
20     Q.   Can I IM you?
21     A.   Yes, you can.
22     Q.   Okay.

40

1          Q.   What's the IM application?
2          A.   Windows Messenger.
3               MR. KATZ: Alfred, this is off the
4 record.
5               (Whereupon, a discussion is held
6 off the record.)
7               MR. PETERS: Let's go back on the
8 record.
9
10 BY MR. PETERS:
11     Q.   So we were talking about Windows
12 applications that can be used to communicate
13 internally. One of them is Outlook and that's
14 E-mail. The other is IM Messenger, okay.
15          Are there other Windows
16 applications that are generally used for internal
17 communication?
18     A.   Live Meeting.
19     Q.   Live Meeting?
20     A.   Uh-huh.
21     Q.   Anything else?
22     A.   For person to person communication

41

1 I think that covers it.
2     Q.   Do you presently do Web meetings?
3     A.   That's Live Meeting.
4     Q.   That's Live Meeting. Okay.
5          Were there other applications used
6 for internal communications that have been
7 decommissioned during your tenure?
8     A.   No.
9     Q.   Okay.
10          So at all times since 2000 Outlook
11 has been the E-mail application?
12     A.   Correct.
13     Q.   And IM Messenger has been the
14 application for instant messaging?
15     A.   Not since 2000, but yes.
16     Q.   Okay.
17          When did that start, the IM
18 Messenger?
19     A.   I don't recall.
20     Q.   Okay.
21     A.   I don't recall.
22     Q.   Okay.

McBean, Jr., Alfred A.                                      March 27, 2007
                        New York, NY

12  (Pages 42 to 45)

| 42 |
|---|
| 1       Is Outlook backed up? |
| 2    A.    No. |
| 3    Q    Is IM Messenger backed up? |
| 4    A.    The server is backed up, but the |
| 5 data that goes through the server is not. |
| 6    Q.    Differentiate that for me |
| 7    A.    The conversations are not backed |
| 8 up, they are not recorded. |
| 9    Q.    Okay |
| 10      And the E-mail itself, the Outlook |
| 11 E-mail itself, that's not backed up? |
| 12    A.    That is backed up. Well, Exchange |
| 13 is a server. So the Exchange server is backed |
| 14 up. |
| 15    Q.    Okay. |
| 16    A.    But Outlook is not backed up. |
| 17    Q.    So E-mail itself, the |
| 18 communications are saved for some period of time? |
| 19    A.    Mail that flows through the |
| 20 Exchange servers are backed up. |
| 21    Q.    Okay. |
| 22      And Live Meeting, is there any |

| 44 |
|---|
| 1 that are used presently? |
| 2    A.    Project is the only one that I'm |
| 3 aware of. |
| 4    Q.    How long has Project been in use? |
| 5    A.    I don't know. I don't know. |
| 6    Q.    Has it been around since you |
| 7 joined the company in 2000? |
| 8    A.    Project has been around since I've |
| 9 joined the company in 2000, however, I cannot |
| 10 speak to how long or who uses it. |
| 11    Q.    And is that data backed up? |
| 12    A.    If the Project documents are |
| 13 stored on our file servers then, yes, that would |
| 14 be backed up. |
| 15    Q.    Do you use Primavera or Microsoft |
| 16 Visio, V-i-s-i-o? |
| 17    A.    Visio. |
| 18    Q.    Visio? Pardon me. |
| 19    A.    Visio we do use. |
| 20    Q.    Okay. |
| 21    A.    What was the first one? |
| 22    Q.    Primavera? |

| 43 |
|---|
| 1 backup of that data? |
| 2    A.    I don't back that up. That's a |
| 3 hosted solution provided by Microsoft. |
| 4    Q.    Right |
| 5      So it's not -- it doesn't reside |
| 6 on the server for any period of time? |
| 7    A.    Doesn't reside -- it's not even |
| 8 here. I don't manage it or maintain it. We pay |
| 9 for that service. |
| 10    Q.    All right. Understood. |
| 11      What is the accounting, Windows |
| 12 accounting application or applications that are |
| 13 used? |
| 14    A.    QuickBooks or it might be Quicken |
| 15 if they're the same thing. That's the only thing |
| 16 from an accounting perspective that I recall. |
| 17    Q.    Okay. |
| 18      Is there any project planning |
| 19 software used like Microsoft Project? |
| 20    A.    Yes. |
| 21    Q.    Okay. |
| 22      What are the planning applications |

| 45 |
|---|
| 1    A.    I'm not familiar with that one. |
| 2    Q.    Okay. |
| 3      And Visio is used for project |
| 4 planning? |
| 5    A.    Visio is used for diagramming |
| 6 which is I guess a form of project planning so |
| 7 you can see what your before and after results |
| 8 are. |
| 9    Q.    Okay. |
| 10    A.    It's also used for flow charting |
| 11 which is obviously part of project planning. |
| 12    Q.    Are there any News America |
| 13 Marketing specific applications that are run on |
| 14 the desktop only, systems that have been |
| 15 developed directly only for News America |
| 16 Marketing that run in a Windows environment? |
| 17    A.    Yes. |
| 18    Q.    Okay. |
| 19      Are any of those applications used |
| 20 for communicating back and forth or can they be? |
| 21    A.    Yes. |
| 22    Q.    Could you tell me what those |

46

1  applications are called?
2      A.    Our ordinary management
3  application. In-store order management
4  application.
5      Q.    Okay.
6      A.    Our FSI application.
7      Q.    What's that stand for?
8      A.    Freestanding insert.
9      Q.    What's that for?
10      A.    It's for the — the education on
11  the company, but the freestanding inserts is for
12  the SmartSource coupons that are in the Sunday
13  newspapers.
14      Q.    Okay.
15      A.    So that's the order management
16  system.
17      Q.    Any other enterprise systems?
18      A.    Our field system.
19      Q.    Field?
20      A.    Yeah.
21      Q.    What is that?
22      A.    Our field system manages our field

47

1  force for the in-store management system. So
2  when we say put a coupon machine here, we have
3  people that go out and do that. So that system
4  manages that body of people.
5      Q.    How does it do that? In other
6  words, what's the — is it a — does it
7  communicate an order to someone in the field?
8      A.    Correct.
9      Q.    And when it is communicated where
10  is it received? On a handheld device?
11      A.    Yes, but there are some orders
12  that are received via computer and then printed
13  to paper.
14      Q.    All right.
15          But that's all directing your
16  field representatives on what to do, is that a
17  fair sort of thirty thousand foot view of that
18  application?
19      A.    It's communication.
20      Q.    Okay.
21          What other legacy or, pardon me,
22  enterprise applications are used at News America

48

1  Marketing for communicating?
2      A.    Our Oracle system which is our
3  financial system. Our actuate reporting system.
4  Our global reporting system.
5      Q.    And this is reporting on what?
6  Financial results?
7      A.    Business results. It all depends
8  on what data folks are going after.
9      Q.    Okay.
10          Does that cover it?
11      A.    No. There's Smart Matrix.
12      Q.    What is that?
13      A.    That's our customer interface
14  system. Our customers do event planning I
15  believe with that system. I've never been asked
16  to list them all out so just give me a second if
17  you need all of them.
18      Q.    No, that's another rule. Take as
19  much time as you need. And I'm not looking for
20  every application, you know, just to remind you
21  and maybe put a finer point on it, I'm really
22  looking for applications that are used to

49

1  communicate internally where someone from Chicago
2  might communicate with someone from Boston or New
3  York.
4      A.    If it's person to person —
5      Q.    That's really what I'm looking
6  for.
7      A.    — then these systems don't
8  communicate person to person.
9      Q.    Okay.
10      A.    Because they communicate problems
11  and issues from an order perspective or from an
12  accounting perspective.
13      Q.    Right.
14      A.    And those systems then E-mail, you
15  know, internal custodians on there's an issue or
16  problem that needs to be vetted.
17      Q.    Uh-huh. Okay.
18          MR. KATZ: Kevin, can you take a
19  break for a second?
20          MR. PETERS: Sure.
21          (Whereupon, a short recess is
22  taken.)

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

14 (Pages 50 to 53)

50

```
 1          MR. PETERS: Let's go back on the
 2  record
 3
 4  BY MR. PETERS:
 5      Q     We were talking before we broke
 6  about applications used to communicate and you
 7  were good enough to give me a list of
 8  applications that are used for communicating
 9  orders, for communicating accounting information
10  They were the order management software, the
11  field system software, et cetera  I want to
12  refocus my question a little bit.
13          The only software I'm interested
14  in at the moment is software where one person in
15  the company communicates with another person in
16  the company  And you've listed a few, Outlook,
17  IM and Live Meeting.
18          Are there other applications that
19  employees use to speak with employees one-on-one?
20      A.    One-on-one, yeah.  The Field
21  Handheld System would be the only additional
22  where there is a one-on-one action there.
```

51

```
 1      Q     And what is that?
 2      A.    It allows the field rep to speak
 3  to their managers and support to talk about
 4  installation issues or problems.
 5      Q     Do News America employees or any
 6  segment of them, News America Marketing
 7  employees, have Blackberries or other types of
 8  handheld devices?
 9      A.    Yes.
10      Q     Is that something that is given
11  out to management?
12      A.    Upon request, yes.
13      Q     Okay.
14          Was that the case in 2000 as well?
15      A.    In 2000 Blackberry technology
16  wasn't used.
17      Q     Was there any other type of remote
18  communication device used for data such as E-mail
19  when you joined the company in 2000?
20      A.    Not that I was aware of, no.
21      Q     Is there voice mail at News
22  America Marketing?
```

52

```
 1      A.    Yes, there is.
 2      Q     Is it digital?
 3      A.    I don't know.
 4      Q     Do you know if it's backed up?
 5  Let me ask the first question:  Does the voice
 6  mail reside on the server?
 7      A.    I'm sure it resides within the
 8  telephone system, but I don't manage the
 9  telephone system.
10      Q     Okay.
11          So you don't know whether or not
12  that data is backed up, voice mail?
13      A.    I do not believe it is, but I
14  don't manage that system.
15      Q     Okay.  Who does?
16      A.    Victor Sinanski.
17      Q     Spell his last name, please.
18      A.    S-i-n-a-n-s-k-i.
19      Q     Are there contact managers used
20  such as ACT or Goldmine?
21      A.    I haven't heard that name in
22  years.  I believe that was used, but I don't
```

53

```
 1  remember by who, but that's going back many years
 2  ago.
 3      Q     Okay.
 4          I'm interested now back in 2000
 5  when you joined the company was there a contact
 6  manager that was generally used, ACT, Goldmine or
 7  anything else?
 8      A.    ACT rings a bell with me, but I
 9  can't conclusively say who used it.
10      Q     Do you recall whether or not there
11  was any contact manager that was used on a
12  company-wide basis?
13      A.    There was a homegrown contact
14  manager system that interfaced with Outlook and
15  my recollection was to, it was to help I don't
16  want to use the word consolidate, help the end
17  users manage their contacts as opposed to going
18  out to applications like an ACT or Intellisync or
19  all the different versions of managing contacts.
20      Q     Okay.
21          Were there applications used to
22  keep notes of conversations and reminders of
```

54

1  meetings?
2      A.   We provide a series of
3  applications. I don't know if they were actually
4  used. I mean obviously there's -- there's the
5  Microsoft Office products. There's, you know,
6  Outlook which keeps notes as well.
7      Q.   Okay.
8          Was that the case in 2000 when you
9  joined the company?
10     A.   That is correct.
11     Q.   Okay.
12         But there's no one application
13  that was used on an enterprise-wide basis for
14  maintaining notes of communications with
15  contacts?
16     A.   Not that I'm aware of, no, there
17  wasn't.
18     Q.   And the homegrown application, did
19  it have a name?
20     A.   I want to say it was the sales
21  call reporting system. They used it to manage
22  contacts for, you know, all prospects and client

55

1  prospects, customers.
2      Q.   Was that retired?
3      A.   Yes.
4      Q.   When was that?
5      A.   Don't recall the exact date.
6      Q.   Was it replaced by some other
7  functionality?
8      A.   Siebel.
9      Q.   Spell that. C-e --
10     A.   S-i-e-b-e-l.
11     Q.   Okay.
12     A.   Siebel.
13     Q.   And that's a Windows application?
14     A.   Correct.
15     Q.   What's its function?
16     A.   It's our customer relationship
17  management application.
18     Q.   And was information from the sales
19  call reporting system migrated to Siebel when
20  that system went online?
21     A.   I don't know. I did not manage
22  that engagement.

56

1      Q.   Okay.
2          Is Siebel the customer management
3  application presently used?
4      A.   That is correct.
5      Q.   Does it have a version that you
6  can tell me about?
7      A.   It's version 7 something. I don't
8  know the exact version number.
9      Q.   Okay.
10         And that is a server side
11  application?
12     A.   It's a client and server side.
13     Q.   Okay.
14         And it's backed up, data is backed
15  up when the servers are backed up?
16     A.   That is correct.
17     Q.   Do you, that is does News America
18  Marketing have a document management system such
19  as CDoCs or iManage?
20     A.   No.
21     Q.   Is there a document retention
22  policy that covers both electronic documents and

57

1  paper documents?
2      A.   Yes.
3      Q.   Are they different policies?
4      A.   No.
5      Q.   Can you tell me the document
6  retention policy for electronic documents?
7      A.   The document retention policies go
8  into how long you should hold financial
9  information for, HR information, contracts.
10  That's all I can recall.
11     Q.   Is there a document retention
12  policy that covers E-mail?
13     A.   Not explicitly.
14     Q.   Is there one that implicitly
15  pertains to E-mail?
16         MR. KATZ: Objection.
17     A.   Policy as far as personal use, the
18  policies do provide a guideline on how much
19  personal use is allowed by an employee and other
20  types of conduct uses of the E-mail.
21     Q.   Okay.
22         I'm more interested in the

McBean, Jr., Alfred A.                                    March 27, 2007
                        New York, NY

16 (Pages 58 to 61)

---

**58**

1  retention policy, not the use policy. In other
2  words, is there a policy that covers how long
3  E-mail is retained by News America?
4          MR. KATZ: Kevin, can I ask are you
5  asking for the time period when your clients were
6  associated with News America Marketing?
7          MR. PETERS: Yeah.
8          MR. KATZ: Do you want to limit it
9  to that?
10         MR. PETERS: Why don't we do that.
11
12 BY MR. PETERS:
13     Q.    Which would be -- well, for your
14 perspective it would be 2000 until 2004.
15         MR. KATZ: 2004  I think September
16 2004.
17     A.    There are no policies in place.
18     Q.    So everyone kept his or her own
19 E-mail as he or she saw fit?
20     A.    Correct.
21     Q.    There was no policy that said
22 delete your deleted E-mail, delete your sent

---

**59**

1  E-mail, delete your in-box?
2      A.    Correct.
3      Q.    In any amount of time?
4          Were employees limited to an
5  amount of E-mail that they could store on their
6  desktops?
7      A.    Yes.
8      Q.    Okay.
9          What was the limit?
10     A.    On their desktops they had no
11 limit. On the servers the limit was, and again
12 it differed by employee, but the general limit,
13 it was about eighty meg.
14     Q.    Okay.
15         And did the server automatically
16 purge E-mail?
17     A.    No.
18     Q.    How did the policy get enforced,
19 the eighty meg policy? Was there a rule?
20     A.    Yeah, there's a rule that if the
21 mailbox reached a particular threshold that
22 warning messages are sent. Once the E-mail

---

**60**

1  reaches the next threshold then the mailbox is,
2  the ability to send E-mail is disallowed and then
3  if it hits the third threshold then the mailbox
4  shuts off.
5      Q.    What are the thresholds? Is
6  eighty meg the first?
7      A.    I think eighty meg is the last.
8  So the first threshold I want to say is around
9  seventy megs is the warning and then seventy-five
10 is the, stops the sending. However, it's a
11 guideline that we used. It's the default
12 setting.
13     Q.    Okay.
14         There were ways to -- there were
15 ways around the setting?
16     A.    Uh-huh.
17     Q.    And that could be done on an
18 individual-by-individual basis?
19     A.    Correct.
20     Q.    And so if someone wanted to exceed
21 the limit they would approach you or some
22 administrator?

---

**61**

1      A.    They would approach an
2  administrator on my team or a manager depending
3  on who would then present either can you increase
4  my limit or a business case on why they need to
5  have their limits increased.
6      Q.    Okay, but there was no limit on
7  what could be stored on the desktop other than,
8  of course, the disk size?
9      A.    Correct.
10     Q.    Now, but if they wanted to store
11 their E-mail on their C drive they would have to
12 migrate it over?
13     A.    Outlook has a provision to create
14 what's called a personal storage file where you
15 can move mail from the Exchange server to the
16 personal, to your personal folders and there was
17 no limitation of it as far as how many personal
18 folders a user could have on their desktop.
19     Q.    Okay.
20         I haven't done it, but it's a drag
21 application?
22     A.    They can drag it or they can tell

---

**62**

1  Outlook to just copy all the E-mail from the
2  server and put it into a personal folder.
3      Q.    Okay.
4            When -- when archives at News
5  America Marketing, when archives is E-mailed is
6  that archived to the C drive?
7      A.    By definition they're storing it
8  on their C drive. Whether they choose to archive
9  it that's on them. If they're holding it for
10  their own personal reasons, that's at the user's
11  discretion.
12     Q.    Right.
13           But you can set up your Outlook to
14  archive automatically periodically?
15     A.    Yeah, that would be at the user's
16  discretion.
17     Q.    And when that's done that's
18  archived on the desktop side, not the server
19  side, correct?
20     A.    That is correct.
21     Q.    There's no limitation on how much
22  you can archive?

**63**

1      A.    No, there isn't.
2      Q.    And that was the case in 2000 when
3  you joined, correct?
4      A.    That is correct.
5      Q.    That hasn't changed over time?
6      A.    No, it hasn't.
7      Q.    We were talking about the document
8  retention policy and we drifted off to E-mail
9            The document retention policy that
10  you are familiar with pertains to financials,
11  human resources material, contracts. Does it
12  pertain to anything else?
13     A.    I'm sure it does. I just don't
14  have it in front of me to tell you verbatim what
15  it pertains to.
16     Q.    Can you tell me in a general way
17  what the document retention policy is regarding
18  those types of documents?
19     A.    I want to say it's seven to ten
20  years for financials. You know, seven to ten
21  years for HR related stuff. Contracts I would
22  imagine it's for at least the length of the

**64**

1  contract.
2            MR. KATZ: Don't guess
3            MR. LIPPNER: Are you guessing?
4      A.    I can't tell you verbatim unless I
5  see the actual document.
6
7  BY MR. PETERS:
8      Q.    Let me suggest to you that it's
9  for the statute of limitations.
10           I'm kidding, but, yeah, no, that's
11  fine.
12           Again, the policy pertains to both
13  electronic documents and paper documents.
14  There's no differentiation as far as you know?
15     A.    That is my opinion. I mean
16  regardless if it's paper or electronic, if it's
17  an HR-related document regardless if it's in
18  electronic form or paper form it still has to be
19  maintained.
20     Q.    Okay.
21           And is there any automatic purging
22  of E-mail set up on the server side?

**65**

1      A.    No.
2      Q.    And again there's no automatic
3  purging set up on the desktop side either?
4      A.    That's at the user's discretion.
5      Q.    In other words, there's no
6  corporate policy on that?
7      A.    There's no corporate policy.
8      Q.    Okay.
9            And is there any policy about
10  renaming file extensions, in other words,
11  changing a DOC to some other extension so that
12  the documents move somewhere else or are visible
13  when opened up?
14     A.    There is no policy for that.
15     Q.    Okay.
16           In other words, let me put a finer
17  point on my question which really shouldn't be
18  hard
19           Word documents, the extension is
20  DOC, Excel documents the extension is XLS.
21           On a company-wide basis have you
22  instructed employees not to change those

McBean, Jr., Alfred A.                                        March 27, 2007
New York, NY

18  (Pages 66 to 69)

| 66 | 68 |
|---|---|
| 1  extensions? | 1  use presently for backing up and archiving data? |
| 2     A.   No, we have not. | 2     A.   We -- |
| 3     Q.   Okay. | 3         MR. KATZ:  You're asking for |
| 4         Does News America Marketing use | 4  multiple, any multiple softwares or different |
| 5  data compression software. | 5  functions? |
| 6     A.   Yes. | 6         MR. PETERS:  Yeah. |
| 7     Q.   Was that the case when you joined | 7     Q.   What applications are used to back |
| 8  the company in 2000? | 8  up the servers? |
| 9     A.   Yes. | 9     A.   **Backup Exec.** |
| 10    Q.   What software is used for data | 10    Q.   E-x? |
| 11  compression? | 11    A.   **E-x-e-c.** |
| 12    A.   **WinZip and WinRAR.** | 12    Q.   Okay.  What version? |
| 13    Q.   Win? | 13    A.   **What time period?** |
| 14    A.   **W-i-n-R-A-R.  Those are the two** | 14    Q.   Presently. |
| 15  **that I am familiar with.** | 15    A.   **10, Version 10.** |
| 16    Q.   What data is compressed typically? | 16    Q.   Okay. |
| 17    A.   **Typically any -- well, any type of** | 17        Was Backup Exec the application |
| 18  **data.** | 18  used when you joined the company in 2000? |
| 19    Q.   Could be any. | 19    A.   Yes. |
| 20        When are these applications used | 20    Q.   Okay.  And are you aware of any |
| 21  generally? | 21  other applications used for backing up software |
| 22    A.   **It's at the user's discretion.** | 22  prior to News America Marketing's use of Backup |

| 67 | 69 |
|---|---|
| 1     Q.   Okay. | 1  Exec? |
| 2         Does the data compression software | 2     A.   Yes. |
| 3  WinZip and WinRAR, does it reside at the server | 3     Q.   What application or applications? |
| 4  level, the desktop level or both? | 4     A.   **This is a guess, but I believe it** |
| 5     A.   Both. | 5  **was ARC Serve for the Novell servers.** |
| 6     Q.   Is data compression used for | 6     Q.   A-R-C? |
| 7  backup? | 7     A.   **A-R-C, ARC Serve.** |
| 8     A.   Yes. | 8     Q.   For Novell? |
| 9     Q.   Which application or applications | 9     A.   **Novell.  And presently today our** |
| 10  are used for data compression in backing up? | 10  **Oracle system, Sun Systems utilize Net Backup for** |
| 11    A.   **The tape backup programs have** | 11  **their backup, for their data backups.** |
| 12  **compressionability in and also the tape backup** | 12    Q.   I'm sorry, say that again, please. |
| 13  **devices utilize compression for backup.** | 13    A.   **Net Backup, N-e-t, Backup, Net** |
| 14    Q.   What do they use? | 14  **Backup.** |
| 15    A.   **The tape backup systems use** | 15    Q.   Okay. |
| 16  **whatever is the quantum standard which is DLT and** | 16        But the Windows applications |
| 17  **SDLT and DAT, the compression standards that are** | 17  during the time that you have been involved with |
| 18  **located in there.  If there -- and also Backup** | 18  managing that environment have been backed up |
| 19  **Exec has its own compression, if the tape device** | 19  using Backup Exec? |
| 20  **for whatever reason can't do compression, it can** | 20    A.   **Correct.** |
| 21  **also compress data.** | 21    Q.   Various versions of that now up to |
| 22    Q.   Could you tell me what software is | 22  Version 10? |

19 (Pages 70 to 73)

|  | 70 |
|---|---|

1       A.    That is correct.
2       Q.    Okay.
3             And what are the machines that are
4   used for backing up, what's the hardware?
5       A.    Today we leverage Compaq DL360s.
6       Q.    Prior to moving to DL360s what was
7   being used?
8       A.    I don't recall the models, but it
9   was a mix between Dell and Compaq.
10      Q.    When did you move over to the
11  Compaq DL360s?
12      A.    I don't recall the actual dates.
13  They were done various, over the last six years.
14      Q.    Okay.
15            And again these systems backed up
16  in twenty locations?
17      A.    No.  In each of the locations,
18  again depending on year, either back --
19  maintained their own backup.  In recent years
20  we've replicated data from the remote offices to
21  Wilton, Connecticut.
22      Q.    Okay.

|  | 72 |
|---|---|

1   do you need the each individual office?
2       Q.    No.  I just -- other locations, in
3   other words, I'm trying to understand
4   generally --
5       A.    They back up -- the Wilton office
6   backs up all offices in the United States that
7   are not New York and Chicago.
8       Q.    Okay.
9             So backup, Wilton backs up Boston?
10      A.    Wilton backs up Boston.
11      Q.    Okay.
12            And how long has Wilton backed up
13  Boston?
14      A.    I'm going to say roughly two
15  years.
16      Q.    Okay.
17            And prior to that did Boston back
18  up its own data?
19      A.    Yes.
20      Q.    And did it back up its own data
21  using a Dell or a Compaq backup device?
22      A.    Correct.

|  | 71 |
|---|---|

1             So Wilton backs up for the other
2   offices?
3       A.    No.  Only the offices that are
4   denoted as remote offices.
5       Q.    What are they?
6       A.    All of our sales offices.  So
7   Montreal, Mississauga.  There are various sales
8   offices across the country that Wilton backs up.
9   Each of the core offices maintain their own
10  backups.
11      Q.    And those core offices are the
12  twenty offices that you gave me earlier?
13      A.    No, those are Wilton, Chicago, New
14  York and Toronto.
15      Q.    Okay.  Those are the four core
16  offices?
17      A.    Those are the four core.
18      Q.    And Wilton backs up you said, for
19  example, Mississauga and some other places?
20      A.    Wilton backs up --
21      Q.    And I know this is presently.
22      A.    Yeah, presently Wilton backs up --

|  | 73 |
|---|---|

1       Q.    Okay.  And New York backs itself
2   up?
3       A.    Yes.
4       Q.    Okay.
5             Does New York reach out to any of
6   the remote offices and backup those offices?
7       A.    This is where it gets a little
8   complicated.  The remote sales offices probably
9   for a span of about two years prior to Wilton
10  managed their full backups which took -- which
11  took place once a week, the daily backups where
12  it could have been backed up by either Wilton,
13  New York or Chicago.
14      Q.    So there was a daily backup and a
15  weekly backup, correct?
16      A.    Uh-huh.
17      Q.    The daily backup of the remote
18  offices was done from either Wilton, Chicago or
19  New York?
20      A.    Correct.
21      Q.    So Wilton, Chicago and New York
22  had the ability to reach into --

McBean, Jr., Alfred A.                              March 27, 2007
New York, NY

20  (Pages 74 to 77)

|  | 74 |
|---|---|
| 1 | A.   Correct. |
| 2 | Q.   -- those remote servers and backup |
| 3 | that data? |
| 4 | A.   Correct. |
| 5 | Q.   Okay. |
| 6 | And was that also the case for |
| 7 | Boston? |
| 8 | A.   Rephrase the question. |
| 9 | Q.   Sure. |
| 10 | Well, when I use Boston I guess I |
| 11 | need to understand, is Boston considered a remote |
| 12 | sales office? |
| 13 | A.   Yes. |
| 14 | Q.   Okay. So Boston had a weekly |
| 15 | backup -- |
| 16 | A.   Correct. |
| 17 | Q.   -- prior to two years ago? |
| 18 | A.   Correct. |
| 19 | Q.   And Boston was also backed up |
| 20 | daily, remotely? |
| 21 | A.   When Boston was doing its weekly |
| 22 | backup it was backed up daily remotely. |

|  | 76 |
|---|---|
| 1 | You can answer. |
| 2 | A.   You need to rephrase. A backup |
| 3 | doesn't overwrite anything. |
| 4 | Q.   It just adds on? |
| 5 | MR. KATZ: Objection. |
| 6 | A.   I don't understand the question. |
| 7 | Q.   When you're backing up the data, |
| 8 | you're backing up to tape? |
| 9 | A.   Right. |
| 10 | Q.   Okay. |
| 11 | Are you overwriting data? |
| 12 | A.   On the data? |
| 13 | Q.   Right. |
| 14 | A.   Yes. |
| 15 | Q.   What are you overwriting? |
| 16 | A.   The previous backup that was on |
| 17 | the tape. |
| 18 | Q.   Right. Okay. |
| 19 | The backups in Boston that were |
| 20 | done on a daily basis -- |
| 21 | Strike that. |
| 22 | The backups of Boston that were |

|  | 75 |
|---|---|
| 1 | Q.   It was backed up daily remotely. |
| 2 | It was backed up daily remotely either by |
| 3 | Chicago, Wilton or New York. |
| 4 | A.   Correct. |
| 5 | Q.   Okay. |
| 6 | And what was backed up daily from |
| 7 | Boston? |
| 8 | A.   Differential data. So any data |
| 9 | that has changed since the full backup or the |
| 10 | weekend backup is backed up by one of the core |
| 11 | offices. |
| 12 | Q.   Okay. |
| 13 | A.   So as an example the office does |
| 14 | their full backup on Friday. Monday night's |
| 15 | backup happens let's say out of Chicago. It's |
| 16 | only going to back up the delta between the full |
| 17 | backup which took place over the weekend and what |
| 18 | was changed on Monday. |
| 19 | Q.   Right. It doesn't overwrite the |
| 20 | entire file, right? It just adds on to it? Or |
| 21 | changes what's been changed? |
| 22 | MR. KATZ: Objection. |

|  | 77 |
|---|---|
| 1 | done on a daily basis, where were they kept? |
| 2 | A.   New York, Wilton or Chicago. |
| 3 | Q.   And how long were they kept for? |
| 4 | A.   No more than four to five weeks. |
| 5 | Q.   And then what happened to those |
| 6 | tapes? |
| 7 | A.   They were overwritten. |
| 8 | Q.   They were overwritten with another |
| 9 | full backup? |
| 10 | A.   No, with another -- with another |
| 11 | backup. I can't tell you if it was a full or a |
| 12 | differential backup, but another backup. |
| 13 | Q.   But you weren't overwriting -- you |
| 14 | were archiving data -- let me put it this way: |
| 15 | If someone had an E-mail in New York -- |
| 16 | A.   Okay. |
| 17 | Q.   -- and that E-mail was backed up |
| 18 | from June of 2001, okay? |
| 19 | A.   Okay. |
| 20 | Q.   Five weeks comes by, would that |
| 21 | E-mail be backed up yet again if it still resided |
| 22 | on the server? |

**78**

1    A.   Yes.
2    Q.   Okay.
3         So even though it's being
4    overwritten you're overwriting it with the same
5    E-mail?
6    A.   Correct.
7    Q.   Okay.
8         MR. PETERS: Let's go off the
9    record.
10        (Whereupon, the witness is
11   excused.)
12        (Whereupon, a luncheon recess is
13   taken at 12:16 p.m.)
14
15
16
17
18
19
20   A F T E R N O O N   S E S S I O N
21   (12:39 p.m.)
22        MR. PETERS: Let's go back on the

**79**

1    record.
2
3    A L F R E D   A.   M c B E A N ,   J R ,
4    conducting business at News America Marketing,
5    20 Westport Road, 1st Floor, Wilton, Connecticut
6    06897, residing at 29 Thompson Street, Fairfield,
7    Connecticut 06825, having been previously duly
8    sworn or affirmed by a Notary Public within and
9    for the States of New York and New Jersey, resumed
10   and continued to testify further as follows:
11   CONTINUED EXAMINATION BY MR. PETERS:
12   Q.   Mr. McBean, we were discussing
13   backups and I want to get back into that now.
14        In 2000 were offices backed up
15   daily and weekly?
16   A.   The remote offices were instructed
17   to backup daily. I don't have record of how well
18   they were doing their backups.
19   Q.   Okay.
20        And did they overwrite their tapes
21   as well?
22   A.   Yes.

**80**

1    Q.   How frequently?
2    A.   Usually -- it's about weekly and
3    then we got them on to a three-week rotation and
4    then they went to a four-week rotation and then
5    as we progressed we finally got to the point
6    where one of the central offices, one of the core
7    offices would then manage the backup.
8    Q.   Okay.
9         Was a set of tapes archived that
10   was not overwritten as a matter of policy?
11   A.   For the remote offices they were
12   instructed to hold on to tapes, their fiscal and
13   their -- actually end of year tapes.
14   Q.   Okay.
15   A.   And in some cases it was done --
16   it wasn't a formal policy. Through, you know,
17   standardizing the organization we eventually got
18   there by taking on the responsibility of backing
19   up the remote offices.
20   Q.   Okay.
21        What is the policy for maintaining
22   a set of tapes that is not overwritten?

**81**

1    A.   We hold on to our year-end tapes
2    to keep us in line with the records retention
3    policy as far as holding on to, you know, our HR
4    and our financial records and stuff like that.
5    Q.   Okay.
6         But the year-end tapes are a full
7    backup of the server?
8    A.   Correct.
9    Q.   So they would have all the E-mail,
10   for example, that was on the server at the time
11   of the year-end backup?
12   A.   Correct.
13   Q.   And where are those year-end tapes
14   maintained?
15   A.   In various locations across the --
16   across different, either different cities and/or
17   hosting facilities.
18   Q.   And is there a policy for
19   maintaining those year-end tapes for a period of
20   time?
21   A.   Yes, it's in the record retention
22   policy.

McBean, Jr., Alfred A.          March 27, 2007

New York, NY

22 (Pages 82 to 85)

**82**

1     Q.    How long are year-end tapes kept?
2     A.    Typically no more than seven
3  years. Again, I have to refer to the policy.
4     Q.    Okay.
5         Is that your disaster recovery,
6  those year-end tapes or is there some other form
7  of disaster recovery tape?
8     A.    Our disaster recovery tapes are
9  daily tapes that we backup daily. So if there is
10  an emergency where we have to do a recovery we
11  can go back to our daily tapes to do the
12  recovery.
13    Q.    Okay.
14        Is there any backing up to some
15  remote site, you know, a co-location facility,
16  for example?
17    A.    No, we don't back up to a
18  co-location, but our co-location site does have a
19  backup to back up the data that's in the
20  co-location.
21    Q.    Okay.
22    A.    We don't have a DR site from a

**83**

1  co-location perspective.
2    Q.    Where is the co-lo?
3    A.    The co-lo is in Elmsford,
4  Connecticut.
5    Q.    Okay.
6    A.    It's a remote hosting site where
7  we host our --
8    Q.    It's a website?
9    A.    Our websites.
10    Q.    Okay.
11        So the annual tapes are kept in
12  various locations?
13    A.    (Indicating.)
14    Q.    Where are the New York tapes kept?
15  In this building?
16    A.    If -- no. I believe they're kept
17  off-site in a company by the name of Recall.
18    Q.    What is that?
19    A.    That's a tape storage facility.
20    Q.    Where are they located? In New
21  York?
22    A.    The greater New York area. Thank

**84**

1  you.
2    Q.    And the tapes, are they -- the
3  annual tapes, are they large capacity tapes?
4    A.    Varies. Recent years, yes,
5  they're large capacity.
6    Q.    Are they DLT, LTO? What are they?
7    A.    They're DLT and SDLT.
8    Q.    And what were they when you
9  started back in 2000?
10    A.    DLT.
11    Q.    Okay
12        MR. PETERS: Gordy, we may be
13  talking about those tapes and we may be coming up
14  on seven years. So I assume that there's a
15  provision in place that these tapes are not
16  being -- these annual tapes are not being
17  destroyed?
18        MR. KATZ: Ask the witness.
19
20  BY MR. PETERS:
21    Q.    Will you keep these annual tapes
22  and not destroy them?

**85**

1    A.    I can make sure that that happens.
2    Q.    All right.
3        I'm just talking about the annual
4  tapes now. I'm not talking about changing any of
5  your backup policies and procedures, but the
6  annual tapes that are at --
7    A.    Recall.
8    Q.    -- Recall or wherever else they're
9  maintained throughout the country, will you
10  maintain those?
11        MR. KATZ: These are the two-day,
12  two-day a year --
13    A.    This is the annual tapes, the
14  year-end tapes.
15    Q.    Yes.
16        MR. KATZ: Yes.
17    A.    Yes.
18    Q.    Okay.
19        (Request for production of
20  documentation or information.)
21
22  BY MR. PETERS:

**86**

1    Q.    Are there databases, catalogs or
2  other listings of the backups that you maintain?
3    A.    I don't understand the question.
4    Q.    Okay.
5          When the tapes are backed up
6  either daily or weekly, is there a catalog
7  maintained of what's been backed up?
8    A.    Yes.
9    Q.    Okay.
10          Can you describe that for me?
11    A.    The backup system records the
12  files that it stores on tapes and places them in
13  its catalog that it manages.
14    Q.    Okay.
15          And then is that catalog
16  maintained separately, printed out, for example?
17    A.    No.
18    Q.    Maintained on the system?
19    A.    Correct.
20    Q.    And does the catalog change every
21  time a backup occurs?
22    A.    Yes.

**87**

1    Q.    To reflect the new backup?
2    A.    To reflect the data that's in the
3  backup.
4    Q.    Okay.
5          Is there a catalog of the annual
6  tapes?
7    A.    No.
8    Q.    Okay.
9          Is there an inventory of those
10  tapes that's maintained either electronically or
11  on paper?
12    A.    Yes, there's an inventory for the
13  New York tapes at Recall. It's not detailed from
14  the end point of saying what's on the tapes.
15    Q.    What would it take to these what's
16  on those annual tapes? Would we have to put them
17  on a computer?
18    A.    We would have to put them onto a
19  DLT backup system, load software and then go
20  through a recovery process.
21    Q.    How much time would that take?
22    A.    I would need the infrastructure to

**88**

1  recover to. So you need resources and then
2  depending on -- well, if you're recovering
3  everything that's on the New York side it all
4  depends on how much data we're backing up and
5  what types of systems I'm restoring to. So I
6  can't answer that question without actually
7  looking at what I'm going to restore.
8    Q.    When you put the tape in, these
9  annual tapes, you can look just at the Outlook
10  files, is that correct?
11    A.    No.
12    Q.    How is it organized?
13    A.    Well, Outlook -- well, I think I'm
14  going to go out on a limb and say you're probably
15  talking about the Exchange server, correct?
16    Q.    Yes. Yes.
17    A.    The Exchange server data is stored
18  in an Exchange database and that data -- in order
19  to recover the data that's in the databases you
20  have to rebuild the Exchange environment as it
21  stood in that time frame and then restore the
22  data and then at that point you would then have

**89**

1  the ability to use tools, whatever the case might
2  be, to do a search.
3    Q.    See the mailboxes, for example?
4    A.    You can see the mailboxes.
5    Q.    Okay.
6          So what would it take to rebuild
7  that environment in your experience?
8    A.    It would -- we would have to learn
9  about what the environment was at that time, get
10  the appropriate resources, pull back the tapes
11  and then go through a restore.
12    Q.    And by the environment you mean
13  you'd need the right Exchange --
14    A.    Version.
15    Q.    -- version?
16    A.    Uh-huh.
17    Q.    What else would you need?
18    A.    The directory environment. Back
19  then in 2000 News America Marketing was an NT40
20  environment. We're now a 2003 environment. So
21  we would have to restore or rebuild the
22  environment as it stood back then.

McBean, Jr., Alfred A.

March 27, 2007

New York, NY

24 (Pages 90 to 93)

90

```
 1      Q.   Don't you continue to use NT40?
 2      A.   Uh-huh, we do.
 3      Q.   Okay.
 4           So that environment is available
 5  to News America?
 6      A.   The operating system is, but we
 7  would have to rebuild the domain structure. The
 8  domain as it stood back then, it doesn't exist,
 9  it doesn't exist today.
10      Q.   What would that involve?
11      A.   We would also have to recover the
12  domain environment from tape as well and rebuild
13  that.
14      Q.   What was the domain environment?
15      A.   It was running on NT40.
16      Q.   Okay.
17      A.   We have legacy systems that run on
18  Windows server 4.0 that are -- which is not our
19  E-mail system which is not our domain
20  environment.
21      Q.   Okay.
22           But if you had to look at those
```

91

```
 1  backup tapes, that's something that could be
 2  done, you have the resources to do that?
 3           MR. KATZ: Objection.
 4      A.   No, I'd have to acquire the
 5  resources to go through and look at that data.
 6      Q.   And what resources would you have
 7  to acquire?
 8           You have NT40, right?
 9      A.   Right. I have NT40. I would have
10  to build the environment and then recover the
11  data and at that point the Exchange server will
12  be up for lack of a better term.
13      Q.   Okay.
14           And accessible LAN tools can be
15  used?
16      A.   That is correct.
17           There's one small note. I have to
18  do that for three to four offices because I don't
19  know where the Boston data is stored.
20      Q.   Okay.
21           Now, if I were to provide you with
22  a list of mailboxes, would you be able to tell me
```

92

```
 1  what tapes those mailboxes may be on?
 2      A.   No. I have to go through the
 3  recovery process in order to tell you whose
 4  mailbox is stored where.
 5      Q.   Why is that?
 6      A.   Because the data is within -- the
 7  data is within a database. What the backup does
 8  is it backs up the database so in order to see
 9  the data within the database I have to first
10  recover the database, then in Exchange I can open
11  up and see, gee, is that mailbox here or not? If
12  it's there then I can tell you who was on that,
13  on that Exchange server.
14      Q.   But if the employee is employed
15  out of New York, works in New York, isn't it more
16  likely than not that his or her mailbox will be
17  in on a New York server?
18      A.   In 2000?
19      Q.   Yes.
20      A.   No.
21      Q.   Where would -- why is that?  I
22  mean where would the mailbox be located for a New
```

93

```
 1  York employee?
 2      A.   It could be either New York or
 3  Chicago.
 4      Q.   Those two places?
 5      A.   Correct.
 6      Q.   And is there any logical way to
 7  determine where an employee's mailbox will be
 8  either in New York or Chicago?
 9      A.   It's based on the employee's
10  history with the company.
11      Q.   Can you put a finer point on that?
12  What about their history?
13      A.   News America Marketing came
14  together as through a series of acquisitions and
15  the in-store division was centered in
16  Connecticut. The FSI division is centered in New
17  York and then the merchandising division is in
18  Chicago.
19           So as the company grew, 2000
20  forward, employees shifted from office to office.
21  So it was very hard for me to tell you that a
22  hundred percent of the New York City employees
```

94

1  are in New York where, versus Connecticut versus
2  Chicago. It's more apparent with New York and
3  Connecticut only because, you know, the employees
4  went back and forth continuously so.
5      Q.   So if you knew an employee's
6  history with the company, in other words, where
7  he came from, where he worked you could speculate
8  with some accuracy about where his mailbox is
9  located?
10     A.   Speculate, but again there was no
11 hard and fast rule that said mailbox is here
12 versus there versus -- there was never a hard and
13 fast rule.
14     Q.   Okay.
15         So, I'm sorry, if I asked you this
16 question, Mr. McBean, is there any type of
17 inventory of these annual tapes? I think you
18 told me that it's maintained at Recall?
19     A.   For New York it's maintained at
20 Recall. In other offices it's either we have
21 them on-site or they're maintained by, you know,
22 by their Iron Mountain and there might be one

95

1  other -- Meyer is another tape storage company.
2      Q.   Meyer?
3      A.   Meyer.
4      Q.   Where are they?
5      A.   They're in Connecticut.
6      Q.   Whose tapes do they maintain?
7      A.   Predominantly Wilton.
8      Q.   Did these companies that store
9  your tapes Meyer, Iron Mountain, recall, do they
10 provide you with some electronic or paper
11 inventory?
12     A.   They provide us with electronic
13 inventory telling us what tapes they have of ours
14 by tape number.
15     Q.   Okay.
16         And where are those inventories
17 maintained on the server?
18     A.   Electronically each one of the
19 hosting facilities.
20     Q.   Do you have access to all of those
21 inventories?
22     A.   Yes.

96

1      Q.   You could get to those
2  inventories?
3      A.   I can get to them. I may not have
4  direct access, but I can get to those
5  inventories, yes.
6      Q.   Okay.
7          Do you use a particular brand of
8  backup tape?
9      A.   I don't know. I mean it's a DLT
10 tape. I never stopped to see who made it.
11     Q.   Okay.
12         Is there a central log of your
13 backups?
14     A.   No.
15     Q.   So am I correct that the most --
16         Strike the question.
17         Am I correct then if documents
18 exist from the years 1999 and 2000 the only place
19 they're going to be are on those annual tapes,
20 they are not otherwise backed up at any location?
21     A.   Data can exist on the file servers
22 that stretch back as far as 1999. So if it's

97

1  still on our file servers today it's online or it
2  could be on the year-end tapes.
3      Q.   Okay.
4          But E-mail from that time period,
5  the only place that's going to be is on those
6  tapes, right?
7      A.   E-mail from that time period would
8  be on those tapes or in Outlook PST files that
9  may exist on end users' computers.
10     Q.   Right.
11         If the end user archived the
12 E-mail themselves then they exist on the computer
13 still?
14     A.   Uh-huh.
15     Q.   Correct?
16     A.   (Indicating.)
17     Q.   Otherwise they're on those tapes?
18     A.   Correct.
19         MR. KATZ: Assuming they haven't
20 been deleted.
21         MR. PETERS: Well --
22         THE WITNESS: I said E-mail.

McBean, Jr., Alfred A.                                    March 27, 2007
                        New York, NY

26  (Pages 98 to 101)

| 98 |
|---|
| 1  BY MR. PETERS: |
| 2      Q.   Those tapes haven't been deleted. |
| 3  they exist. Whatever E-mails exists on those |
| 4  tapes is still there? |
| 5      A.   Whatever E-mail that existed in |
| 6  that time period would be on the year-end backup. |
| 7      Q.   Can you tell me the people who are |
| 8  responsible for network supervision? |
| 9          In other words, let me put it |
| 10  another way: Who reports to you? First give me |
| 11  a number of people. |
| 12      A.   Eight. |
| 13      Q.   Okay. Then I can ask you this |
| 14  question without feeling guilty. Who reports to |
| 15  you? |
| 16      A.   Kevin Barrett, Jason Magill, |
| 17  Christopher Adami, Gabe Martinez, Martin Puzan, |
| 18  Victor Yang, Bradford Heines. |
| 19          How many do I have? |
| 20      Q.   Seven. |
| 21      A.   Oh, Ulrich Patzer. |
| 22      Q.   And do all these folks have the |

| 99 |
|---|
| 1  same job responsibilities albeit for different |
| 2  parts of the company? |
| 3      A.   They report into me. They help me |
| 4  manage the Windows layer. They are assigned |
| 5  different responsibilities based on business |
| 6  need. |
| 7      Q.   Okay. |
| 8          Are any of these folks responsible |
| 9  for backup? |
| 10      A.   Yes. |
| 11      Q.   Who is that? |
| 12      A.   Ulrich Patzer, Martin Puzan, |
| 13  Victor Yang, Chris Adami. Those are the key |
| 14  backup. |
| 15      Q.   Okay. |
| 16          Who was responsible for backing up |
| 17  in 2000 when you joined the company? |
| 18      A.   In 2000 Bob Rizzo, Jane Hogan, |
| 19  Jesse Leo. |
| 20      Q.   Are these folks still at News |
| 21  America Marketing? |
| 22      A.   No, they're not. |

| 100 |
|---|
| 1      Q.   None of them? |
| 2      A.   None of them. |
| 3      Q.   Do you know if they're in the New |
| 4  York area? |
| 5      A.   I have no clue. |
| 6      Q.   Were they working in New York? |
| 7      A.   Well, I do know that one of them |
| 8  was in the Chicago area. |
| 9      Q.   Who is that? |
| 10      A.   Bob Rizzo. |
| 11      Q.   Bob Rizzo? |
| 12      A.   Bob Rizzo. |
| 13      Q.   You don't happen to know if he has |
| 14  a middle initial, do you? |
| 15      A.   (Indicating.) |
| 16      Q.   Okay. |
| 17      A.   I think his official name is |
| 18  Robert Rizzo. |
| 19      Q.   Were or are handheld devices |
| 20  synchronized with the server? |
| 21      A.   What time period? |
| 22      Q.   Currently. |

| 101 |
|---|
| 1      A.   Currently, yes. |
| 2      Q.   Okay. |
| 3          When did that begin, that process? |
| 4      A.   Automatic synchronization, I don't |
| 5  have an exact time. I want to say it was |
| 6  probably about three to four years ago. |
| 7      Q.   Okay. |
| 8      A.   And that's with the introduction |
| 9  of the Blackberries. |
| 10      Q.   Okay. |
| 11          So then that data once |
| 12  synchronized would also be backed up daily, |
| 13  weekly, annually? |
| 14      A.   Well, the data on the Blackberry |
| 15  was not backed up. The data in the E-mail system |
| 16  was. |
| 17      Q.   Sure. |
| 18          But once the sync happened then |
| 19  whatever was on the Blackberry was on the server, |
| 20  right? |
| 21      A.   No. |
| 22      Q.   It didn't work that way? |

McBean, Jr., Alfred A.

New York, NY

March 27, 2007

27 (Pages 102 to 105)

---

102

1    A.    No, because you can store data on
2  your Blackberry that is not —
3    Q.    That was on its own drive. Okay
4        And there was no procedure for
5  backing up data that was stored just on the
6  Blackberry?
7    A.    There is a procedure. It's
8  defined in the manual. It was at the user's
9  discretion.
10   Q.    Okay
11       Which Exchange version was being
12 used when you started? Was that the 4 0?
13   A.    It was Exchange Version 5.5.
14   Q.    That's in 2000?
15   A.    That's in 2000.
16   Q.    And can you give me the
17 progression?
18   A.    We went from Exchange 5.5 to
19 Exchange 2000 and then we went from Exchange 2000
20 to Exchange 2003.
21   Q.    Did you go to 2000 around 2000?
22   A.    No. I believe that took place

---

103

1  around either late 2001 or 2002.
2    Q.    Okay.
3        And the 2003 migration, when did
4  that happen?
5    A.    Probably either late 2003 or 2004.
6  I don't have an exact date on either.
7    Q.    Okay.
8        Can all of the servers be accessed
9  from a central location?
10       MR. KATZ: You're talking about
11 today?
12       MR. PETERS: Today.
13   A.    For the most part, yes.
14
15 BY MR. PETERS:
16   Q.    Is the data that's only available
17 locally?
18       MR. KATZ: I don't understand the
19 question.
20   Q.    What I'm getting at is I'm picking
21 on your qualifier for the most part.
22       Can you sit in your office or sit

---

104

1  in some location and access every server in the
2  country?
3    A.    Yes.
4    Q.    And, therefore, you can access
5  what's ever on that server?
6    A.    Correct.
7    Q.    Okay.
8        Is there a policy about password
9  protecting documents?
10   A.    Password protecting documents?
11   Q.    Word documents, for instance, or
12 Excel documents?
13   A.    I think that goes back to our
14 computer usage document. I can't articulate
15 what's in that document verbatim, but I believe
16 it does make mention of what to do with sensitive
17 material.
18   Q.    Okay.
19       And are passwords maintained in
20 one location for documents or is there a standard
21 password that's used?
22   A.    No. Not — no, not at all.

---

105

1    Q.    Okay.
2        In this written policy can you
3  describe it for me as a one document, the
4  computer usage policy?
5    A.    Yes. That I'm aware of it's a
6  document that's produced by News Corporation.
7    Q.    Okay.
8        And is it the same, excuse me, is
9  there a separate document that covers document
10 retention?
11   A.    Yes.
12   Q.    And have you seen that document,
13 the document retention policy?
14   A.    Yes.
15   Q.    How long is it?
16   A.    In pages?
17   Q.    Yes.
18   A.    I don't — I don't know. Two,
19 three pages. I don't know.
20   Q.    Okay.
21       And how far back does the document
22 retention policy go? In other words, when did

---

McBean, Jr., Alfred A.                                    March 27, 2007
                        New York, NY

28 (Pages 106 to 109)

116

1   the document retention policy go into effect?
2       A.   I don't have an exact date, but
3   sometime 2005.
4       Q.   Was there a document retention
5   policy in 2000 when you joined the company?
6       A.   None that I can recall, no.
7            MR. KATZ:  Let me just interject, I
8   think that you asked him before lunch about
9   document retention and I think he testified that
10  there was no document retention policy during the
11  period of time that your clients were involved
12  with News America Marketing and I think you've
13  just testified again that this document retention
14  policy came into effect in 2005 again after they
15  were gone for a considerable period of time from
16  News America Marketing.
17           So I don't know if there's any
18  further need for you to explore the current
19  document retention policy because it doesn't
20  really deal with the situation we have in this
21  case.
22           MR. PETERS:  No, I agree with that.

108

1       Q.   Can you tell me about that, what
2   did you migrate and when?
3       A.   Exchange from, you know, version
4   55 to 2000.  Exchange from 2000 to 2003.  These
5   are enterprise-type transitions.
6       Q.   When you migrated the data from 55
7   to 2000 did you do it by tape?
8       A.   No.
9       Q.   How was it done?
10      A.   As part of the migration
11  instructions it tells you how to do it, you know,
12  going from version, from the previous version to
13  the later version.
14      Q.   Okay.
15           But prior to migrating the data
16  from 55 to 2000 did you make the complete backup
17  of the data on 55 in case the migration failed?
18      A.   By virtue of our backup
19  procedures, yes.  So we didn't go out and make an
20  explicit backup of the environment.  We just
21  leveraged our procedures.
22      Q.   All right.

107

1   I go back and talk about the document retention
2   policy because for lack of a better description I
3   find it hard to believe there was no document
4   retention policy in a company this size.  I
5   haven't come across that before so, but it is what
6   it is.
7
8   BY MR. PETERS:
9       Q.   Have there been any large-scale
10  migrations of data that have required News
11  America to use backup tapes in order to move
12  from, for example, one version of an application
13  to another?
14      A.   No, not that I can recall, no.
15      Q.   Have you changed any applications
16  that required you to migrate data --
17      A.   Yes.
18      Q.   -- since your tenure?
19      A.   Yes.
20      Q.   And have you had to migrate data
21  on an enterprise-wide basis?
22      A.   Yes.

109

1            So there's no backup tape that
2   exists, for example, that corresponds to the time
3   you migrated 55 to 2000 and 2000 to 2003?
4       A.   No, there isn't and that's because
5   of the length of time that these types of
6   enterprise changes, when you do a migration, it's
7   not a one night deal.  It takes several weeks to
8   do.
9       Q.   Right.
10           So but I think you answered my
11  question.  I apologize for asking it again.  You
12  didn't image any drives in that process to make
13  sure that you had the data available in the event
14  of a failed migration or a part of it failed?
15      A.   No.
16           MR. PETERS:  That's all I have.
17           MR. KATZ:  Okay.
18           MR. LIPPNER:  Wow, that does it.
19           (Time noted:  1:10 p.m.)
20
21
22

Henderson Legal Services
(202) 220-4158

McBean, Jr., Alfred A.

New York, NY

March 27, 2007

29 (Pages 110 to 111)

110

```
 1
 2
 3
 4
 5
 6
 7        _____
 8            ALFRED A. McBEAN, JR.
 9
10   Subscribed and sworn to before me
11   this _____ day of _____ 2007.
12
13   _____
14   /
15   /
16
17
18
19
20            .
21
22
```

111

```
 1        C E R T I F I C A T E
 2   STATE OF _____)
 3                          ) :ss.
 4   COUNTY OF _____)
 5        I, RICH GERMOSEN, a Certified Court
 6   Reporter, NCRA Certified Realtime Reporter,
 7   Certified LiveNote Reporter, and Notary Public
 8   within and for the States of New York and New
 9   Jersey, do hereby certify:
10        That ALFRED A. McBEAN, JR., the witness
11   whose deposition is hereinbefore set forth, having
12   been duly sworn by a Notary Public of the States of
13   New York and New Jersey, and that such deposition is
14   a true record of the testimony of said witness
15        I further certify that I am not related
16   to any of the parties to this action by blood or
17   marriage, and that I am in no way interested in the
18   outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set
20   my hand this ____ day of _____ 2007.
21
21   _____
     RICH GERMOSEN, CCR, CRCR, RPR, CRR, CLR
     LICENSE NO. XI01847
22   LICENSE NO. XR00168
```

Henderson Legal Services
(202) 220-4158