UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

## OPPOSITION TO PLAINTIFFS' MOTION TO
## COMPEL RESPONSES TO DISCOVERY REQUESTS FROM DEFENDANT

NEWS AMERICA MARKETING IN-STORE,
INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 4, 2007
Boston, Massachusetts

# 4566725_v8

## Table of Contents

**Introduction** ..............................................................................................................1

**Preliminary Statement** ............................................................................................1

**Factual Background** .................................................................................................2

    **A.**      NAM And The Plaintiffs Execute The Stock Purchase Agreement. ......................2

    **B.**      The Plaintiffs Expressly Agree Not To Challenge NAM's Decision-Making, And Agree That NAM Will Be Free To Operate In Accordance With NAM's "Sole And Unfettered Judgment." ......................................3

    **C.**      NAM Fully Performs Under The Parties' Agreement, And The Plaintiffs Enjoy Material Earn-Out Payments. ....................................................6

**Procedural Posture Of The Present Motion** ............................................................7

    **A.**      The Plaintiffs' Serve Broad Document Requests. ....................................7

    **B.**      NAM Provides A Full And Fair Production, With Supplementations. ..................7

    **C.**      NAM's Production Includes A Range Of Responsive ESI, From Live Locations And Archived Locations On NAM's Network. ......................................8

    **D.**      NAM's Network Rules Do Not Require Users To Rely On Tape Backups; It Is Difficult, Time-Consuming, And Expensive To Retrieve Information From These Tapes, And These Constraints Increase Significantly As A Tape Ages Beyond Four To Five Weeks. ................................................9

    **E.**      The Plaintiffs Conduct A Cursory Review Of NAM's Production. ....................11

    **F.**      The Plaintiffs Demand ESI Stored In NAM's Backup Tapes. ..........................11

    **G.**      In Response, NAM Retains An Expert, Who Quantifies The Costs And Burdens Of Producing The ESI The Plaintiffs Demand. ......................................12

    **H.**      NAM Informs The Plaintiffs That Their Requests For ESI From Backup Tapes Will Cost Over $13 Million; The Plaintiffs File The Present Motion. ........14

    **I.**      In Their Motion, The Plaintiffs Identify No "Gaps" Or Missing Information In NAM's Production. ......................................................15

**Legal Argument** ...................................................................................................17

**I.**      Under Either The New Rules Or Pre-Existing Case Law, The Plaintiffs' Motion Must Be Denied. ................................................................................17

**II.**      NAM's Backup Tapes Are Not Reasonably Accessible. ..................................17

**III.**      No "Good Cause" Exists To Support The Plaintiffs' Requests. ........................20

    **A.**      The Plaintiffs' Requests Are Not "Narrowly Tailored," And They Make No Attempt To Specify The Relevance Or Importance Of These Requests To The Case. ................................................................................21

**B.**    The Plaintiffs Have Enjoyed Ample Discovery........................................................22

**C.**    The Plaintiffs Do Not Show How The Requested ESI Discovery Differs In Any Material Respect From The Full Discovery NAM Has Already Provided. ........................................................................................................23

**D.**    NAM Has Produced Extensive, Responsive ESI From Online And Archived Sources, And The Plaintiffs' Claims That NAM's Backup Tapes Offer The "Only Source" For Responsive ESI Are Flatly Incorrect.....................24

**E.**    There Is No Basis -- As A Matter Of Law – To The Plaintiffs' Claims That ESI Discovery Will "Likely" Generate Relevant Documents. .............................25

**IV.**    The Plaintiffs' Claims Have No Substantive Merit, And This Fact Alone Requires Denial Of The Present Motion. ..........................................................................................26

**A.**    The Stock Agreement Bars The Plaintiffs' Claims. ...............................................26

**B.**    The Plaintiffs Failed to Follow the Agreement's Mandatory Objection Procedures.............................................................................................................28

**C.**    The Plaintiffs Accepted NAM's Earn-Out Payments, And Are Now Barred From Challenging These Payments. .......................................................................28

**D.**    The Plaintiffs Have Not and Cannot Establish any Damages...............................29

**Conclusion**...................................................................................................................................**32**

**Request for Hearing**..................................................................................................................**32**

**Introduction**

Defendant News America Marketing In-Store, Inc. ("NAM")[1] hereby opposes the Motion to Compel of the Plaintiffs, Robert Fireman ("Fireman") and Anne Raider ("Raider").  The Plaintiffs seek to compel NAM to restore and search -- at a cost of over $13 million -- electronically stored information ("ESI") dated beginning in 1999 and located on (a) approximately 5,000 daily backup tapes covering NAM's email system; and (b) over 150 year-end backup tapes covering NAM's full computer network.  In their Motion, the Plaintiffs:

> (i)     ignore the extensive production they have already received of NAM's paper files, online ESI files, and archived ESI files;

> (ii)    fail to identify how this full production is deficient in any manner;

> (iii)   indeed, decline to limit their original, expansive, and vague document requests in any way; and

> (iv)    advance no justification for the overwhelming, disproportionate burden they seek to impose on NAM, in light of the meritless nature of their claims and no more than speculative suggestion of damages.

Accordingly, as detailed below (a) ESI on NAM's backup tapes is not reasonably accessible, and (b) the Plaintiffs have not demonstrated the necessary "good cause" to require the restoration and searching of these tapes.

The Plaintiffs' Motion to Compel, therefore, must be denied.

**Preliminary Statement**

Six years after Plaintiffs Bob Fireman and Ann Raider sold their company to defendant NAM, they instituted this lawsuit because, in a nut shell, they have sellers' remorse.  After lengthy contract negotiations and having been fully represented by Goodwin Procter LLP, these

---

[1] NAM is a national marketing services company.  Its customers are large retailers (such as grocery store chains) and consumer packaged goods manufacturers.  As part of its business, NAM develops overall marketing strategies for prospective and current customers; establishes and maintains strategic business relationships; and implements such strategies through the sale of marketing products such as free standing inserts in newspapers, coupon dispensers on store shelves, and other forms of in-store marketing to customers.

two very experienced business people sold their company to NAM in 1999.  In so doing

Plaintiffs:  (i) did not contractually require NAM to do anything with regard to how NAM ran

the acquired business assets – nowhere in the Stock Purchase Agreement is there any express

requirement that NAM provide any specific kind of support, be it financial or manpower, or that

NAM do anything specific with the acquired business; (ii) expressly granted NAM the right to be

"free" to operate the acquired business "in its sole and unfettered judgment;" and (iii) expressly

agreed that it would have "no claim" against NAM based on NAM's exercise of that unfettered

judgment in running the business.  Disappointed in how the business deal ultimately turned out,

Plaintiffs sue, claiming NAM breached *implied* obligations it owed them.  These alleged *implied*

obligations, however, fail as a matter of law since they necessarily contradict the *express* written

terms of the parties' contract.  Knowing this lawsuit skirts the bounds of Rule 11, Plaintiffs now

bring the instant baseless motion in an effort to extort a settlement, attempting to force NAM to

choose between spending more than $13 million dollars on ESI discovery or paying Plaintiffs

millions of dollars to go away.  This Motion, like the entire suit, should be rejected.

## **Factual Background**

### A.     **NAM And The Plaintiffs Execute The Stock Purchase Agreement.**

As an experiment to get a toehold in electronic commerce, NAM in August 1999

acquired all the stock of Consumer Card Marketing, Inc. ("CCMI").  CCMI's business, at the

time of the acquisition, focused on the implementation of loyalty card programs for grocery

stores chains.[2]  Such loyalty cards permit the store to generate a database of shoppers and their

respective product preferences.  In connection with this acquisition, NAM and the Plaintiffs

(among others) executed a Stock Purchase Agreement, dated August 13, 1999 (the "Stock

---

[2] See Exhibit ("Ex.") 1, NAM Due Diligence Memo dated May 27, 1999, bates numbered NAM3157-3159 ("NAM Due Diligence Memo").

2

Purchase Agreement").[3]  CCMI's performance before the acquisition was modest if not failing.

For example, for fiscal year 1998, CCMI experienced a loss of approximately $150,000 on gross

revenues of approximately $4 million.  For the first quarter of 1999 – shortly before NAM's

acquisition – CCMI had generated gross revenue of only $766,420.[4]

Under the terms of the Stock Purchase Agreement, NAM paid CCMI shareholders $2.8

million in cash.[5]  In addition to this compensation, and among other benefits, the Plaintiffs each

received five-year employment agreements and, most relevant for this dispute, the possibility of

receiving earn-out payments, based on the performance of the acquired business.[6]

> **B.    The Plaintiffs Expressly Agree Not To Challenge NAM's Decision-Making,
> And Agree That NAM Will Be Free To Operate In Accordance With NAM's
> "Sole And Unfettered Judgment."**

Without proper limiting language, earn-out provisions -- of the type provided in the Stock

Purchase Agreement -- can provide fertile ground for disputes.  Assume an earn-out provision

that is based on the achievement of certain performance milestones.  Assume further that the

achievement of these performance milestones is determined, as is always the case, by, in part,

business decisions made by the party responsible for paying the earn-outs (the "Payor").

Without proper limiting language, the potential beneficiary of the earn-out provision is free to

challenge and disrupt any number of the Payor's business decisions.  The potential beneficiary

will claim that the Payor's business decisions failed to optimize performance for achievement of

the requisite performance milestones, and failed to generate for the beneficiary the maximum

sought-after earn-out payments.  An improperly structured earn-out provision, therefore, can

---

[3] *See* Ex. 2, Stock Purchase Agreement.

[4] Ex. 1, NAM Due Diligence Memo, Financial Statements of CCMI for 1998, Q1 1999.

[5] Ex. 2, Stock Purchase Agreement, §2.1.

[6] Ex. 2, Stock Purchase Agreement, §2.3.

allow a beneficiary to "second guess" management, disrupt proper operations of the Payor, and demand performance-based earn-outs irrespective of actual performance.

Well aware of the dangers of an improperly structured earn-out provision, NAM required that the Stock Purchase Agreement contain two key provisions: (i) a provision expressly granting NAM "sole and unfettered" decisionmaking regarding the acquired business together with a clause expressly preventing the Plaintiffs from *challenging* NAMs' "sole and unfettered" decisionmaking; and (ii) a provision requiring the Plaintiffs to raise objections to their earn-out payments within twenty business days of the payment, and resolve any disputes through accountant-run arbitration. Accordingly, Section 6.8 of the Stock Purchase Agreement provides, in relevant part, as follows:

> It is Buyer's [NAM's] current intention to provide support to the business of the Company [CCMI] by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, *Buyer shall be free to operate the Company and its Affiliates in its sole and unfettered judgment and Sellers [Fireman and Raider] shall have no claim against Buyer in connection therewith* as a result of the preceding sentence."[7] (emphasis added)

---

[7] Ex. 2, Stock Purchase Agreement, §6.8 (emphasis added). The Plaintiffs appear to claim that pre-existing, extrinsic documents or discussions alter this express language of the Stock Purchase Agreement. *See* Motion to Compel at 2 ("the Defendant agreed it would commit its resources and run Plaintiffs' company [CCMI] in such a way as to permit it to continue its growth and execute its business plan").

The Plaintiffs are incorrect. The Stock Purchase Agreement contains an "integration clause." It states: "This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters." Ex. 2, Stock Purchase Agreement, §8.1.

This clause operates as a *complete bar* to any claim that prior exchanges between the Plaintiffs and NAM alter the Agreement. *See, e.g., Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (1997) ("[T]he purpose of a general merger provision, typically containing the language found in the clause of the parties' 1995 Agreement that it 'represents the entire understanding between the parties,' is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing ..."). *See also Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387 (1981) (where plaintiff enjoys "sole discretion" to "direct the 'order or manner of the disposition'" of collateral pledged by defendant under integrated security agreement, defendant precluded from "attempt[ing] to establish the existence of an oral agreement" that "clearly contravenes the express terms of these agreements and completely negates the plaintiff's right under the

4

Nowhere in the Stock Purchase Agreement is there even a single express requirement as to how NAM was to supposed to run or support the acquired business.  Plaintiffs, two sophisticated business people who were represented by the firm of Goodwin Procter LLP throughout the sale negotiations, freely bargained away any such express limitations on NAM and expressly agreed that NAM was "free" to run the acquired the business in its "sole and unfettered judgment."

In addition, Section 2.3(c) provides, in relevant part:

> In the event that the Principal Sellers [the Plaintiffs] desire to dispute any Buyer's Calculation [concerning the earn-out payments], the Principal Sellers shall, within twenty (20) Business Days following receipt of such Buyer's Calculation, deliver to Buyer written notice setting forth, in detail, their objections to such Buyer's Calculation (the "Objection Notice"), which dispute shall be resolved in accordance with the procedure outlined in Section 2.2(b) [providing for accountant-run arbitration].[8]

The accountant-run arbitration provision required each party to *designate* an accounting firm to resolve earn out disputes that remained after the parties had discussed them.[9]  If, after 30 days, the two accounting firms were unable to resolve the disputed issue, then that dispute was to be submitted for a final and binding decision to a third nationally recognized independent accounting firm.  Once the third accountant made his final and binding decision, the earn out would be paid with interest at 150 basis points above prime from the applicable base earn out payment date. Ex. 2, § 2.2(b).

The Stock Purchase Agreement thus protects NAM against the potential risks, outlined above, of earn-out provisions by (a) preventing the Plaintiffs from challenging NAM's exercise

---

defendant's security agreement to release and apply the [] collateral as it deemed appropriate."); *Unisys Corp. v. Hercules Inc.*, 224 A.D.2d 365, 368 (N.Y. App. Div. 1st Dept. 1996) ("Having declared the contract to be the entire agreement, the law regards it as not merely the best but the *exclusive evidence* of the parties' intent ...") (prohibiting plaintiff from introducing extrinsic evidence to contradict the terms of an integrated agreement) (emphasis supplied).

[8] Ex. 2, Stock Purchase Agreement, §2.3(c) (emphasis added).

[9] Ex. 2, Stock Purchase Agreement, §2.2(b).

of its "sole and unfettered" judgment, (b) requiring the Plaintiffs to bring any disputes over the calculation of their earn-out to NAM's attention, for prompt resolution, and (c) providing that any dispute that cannot be so resolved by the principals must be resolved by accountants chosen by the parties.

> ### C.    NAM Fully Performs Under The Parties' Agreement, And The Plaintiffs Enjoy Material Earn-Out Payments.

NAM has fully performed under the Stock Purchase Agreement.  Indeed, during the five-year earn-out term, NAM paid Plaintiffs earn-out payments totaling $771,985.[10]  The Plaintiffs, in addition, employed Section 2.3(c)'s dispute procedures frequently.  Yet in no case did the Plaintiffs bother to take any grievance to accountant arbitration.[11]  They worked out any issues with NAM management and accepted without reservation the earn-out payments wire-transferred into their accounts.

In August 2005, approximately one year after expiration of the five-year earn-out period, and the five-year term of their NAM employment agreements, the Plaintiffs filed this action, claiming that NAM's business decisions regarding CCMI resulted in the Plaintiffs' not receiving as much in earn-out payments as they had wished.  According to their Motion and deposition testimony, Plaintiffs believe that the Stock Purchase Agreement contains *implicit* obligations and restrictions on how NAM was supposed to support and run the acquired business -- ignoring the *express* "sole and unfettered judgment" language of Section 6.8 and the integration clause -- and that NAM breached these implicit obligations.  As is readily apparent, these alleged implicit obligations conflict directly with the express language of the parties' contract.

---

[10] Ex. 3, Tabulation of Earn-Out Payments.

[11] Ex. 4, Fireman Depo. Excerpts, at 181:17-183:23.

## Procedural Posture Of The Present Motion

### A.    The Plaintiffs' Serve Broad Document Requests.

In June, 2006, the Plaintiffs served their First Set of Requests for Production of Documents and Things (the "Requests for Production").  The Requests for Production contained forty (40) separately numbered requests, and sought an expansive range of information, with requests such as the following:[12]

| Request No. | Text of Request |
| --- | --- |
| 1 | All documents that refer, reflect or relate to Consumer Card Marketing Inc. ("CCMI"). |
| 39 | All documents which refer, reflect or relate to Ann Raider or Robert Fireman. |
| 40 | All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies, or surveys received or prepared at anytime from 1997 to the present. |

### B.    NAM Provides A Full And Fair Production, With Supplementations.

NAM responded to these Requests, raised certain objections,[13] and compiled responsive documents and materials.  Specifically, in September, 2006, NAM made its initial production materials available to the Plaintiffs for review.  This initial production consisted of (i) 60 labeled three-ring binders of documents; (ii) 5 redwelds of non-privileged documents from the files of Deborah Wolfe, Esquire (transaction counsel for NAM); and (iii) 17 banker's boxes containing (a) the working files of Raider and Fireman, (b) promotional materials, and (c) other materials. These banker's boxes contained over 290 separate files of requested materials.[14]

---

[12] Ex. 5, Requests for Production.

[13] Ex. 6, Responses to Requests for Production.

[14] Declaration of N. Hulme ("Hulme Decl."), ¶¶4-9.

In early 2007, NAM supplemented this initial production, and made further documents and materials available to the Plaintiffs. This supplementary production consisted of (i) 18 additional labeled binders of documents; (ii) 3 redwelds of additional identified documents from Henri Lellouche; (iii) one redweld of identified documents from Marty Garofalo; and (iv) one redweld of meeting minutes.[15] In April of 2007, NAM further supplemented its responses, to include additional meeting minutes.[16]

### C.    NAM's Production Includes A Range Of Responsive ESI, From Live Locations And Archived Locations On NAM's Network.

NAM included responsive Electronically Stored Information ("ESI") in its production. Henri Lellouche ("Lellouche"), the Plaintiffs' primary supervisor at NAM, for example, retained in his network account all important email and other documents he generated or received.[17] Lellouche runs the vast majority of his projects using digital files, and not paper files. Lellouche, therefore, took care to retain all important digital files.[18] Upon being presented with the Plaintiffs' Requests for Production, Lellouche searched the hard drive of his computer, and the network shared drives to which he had access, using keywords tailored to the Plaintiffs' Requests.[19] Lellouche conducted these searches in all online, "live" locations, as well as all archived locations, covering the period 1999 through 2004.[20] These searches uncovered responsive ESI.

At Lellouche's direction, the NAM IT Department conducted similar ESI searches, using similar keywords. The NAM IT Department similarly uncovered responsive information from

---

[15] Hulme Decl., ¶¶14-16.

[16] Hulme Decl., ¶22.

[17] Declaration of H. Lellouche ("Lellouche Decl."), ¶8-11.

[18] Lellouche Decl., ¶10.

[19] Lellouche Decl., ¶12.

[20] Lellouche Decl., ¶13-14.

NAM's online and archived accounts.[21]  This ESI was included in the productions made

available and provided to the Plaintiffs.[22]

> **D.    NAM's Network Rules Do Not Require Users To Rely On Tape Backups; It Is Difficult, Time-Consuming, And Expensive To Retrieve Information From These Tapes, And These Constraints Increase Significantly As A Tape Ages Beyond Four To Five Weeks.**

The documents sought by the Plaintiffs fall under the so-called "Windows environment"

at NAM, which is concerned with the creation, modification, saving, and backing up of Word

documents, Excel documents, Email (including attachments), and Power Point documents.[23]

The Windows environment at NAM is extensive, and consists of approximately 200 servers,

arranged in a "meshed" network, and located in approximately 20 office locations throughout

North America.[24]

Users save and archive files and email in the Windows environment to their local hard

drives, and to shared network drives.[25]  Files and email in NAM's Windows environment are

then backed-up to sets of backup tapes.  The tapes are created on certain cycles (ranging from

daily to year-end), from servers located in various NAM offices.  They are retained for differing

periods of time, depending upon the nature of the information.[26]  Restoring these backup tapes is

a complex process.[27]  Presented with a backup tape from 2000, for example, the IT Department

---

[21] Lellouche Decl., ¶¶15-16.

[22] Lellouche Decl., ¶¶17-18.

[23] Declaration of A. McBean ("McBean Decl."), ¶¶5-6.

[24] Ex. 7, Deposition Transcript of A. McBean ("McBean Depo.") at 21:12-22:17.

[25] Ex. 7, McBean Depo. at 96:17-97:18.

[26] Ex. 7, McBean Depo. at 70:15-71:14 (method for backing up the 20 offices); 72:2-72:20 (backup structure over time); 73:17-74:22 (frequency of backups); 75:6-75:18 (incremental vs. full system backup).

[27] Ex. 7, McBean Depo. at 87:9-88:11; 90:22-91:19.

would need to re-create and "build" the environment and infrastructure that existed in 2000 in order simply to recover the data before commencing any searches.[28]

Even for recent backup tapes – those created within the past four to five weeks, where re-creating a legacy environment is *not* required – NAM's IT Department will *not* restore or search the tape unless there is a strong business justification, and the user provides pinpoint information either (a) identifying the location of the file that is the target of the search; (b) supplying the date of the email that is the target of the search; or (c) providing other specific information to allow a targeted search.[29]  As a rule, NAM's IT Department will not restore recent backup tapes if the user requests a broad search -- such as a search using keywords -- due to the time-consuming and resource-intensive nature of the process.  It is, accordingly, uncommon for a backup tape older than four to five weeks to be the subject of restoration efforts.[30]

In any event, NAM's network rules do *not* require users to rely on backup tapes in any way.  Users, instead, are able to retain files in NAM's Windows environment indefinitely.[31]  For example, if a user retains a file from 1999, that file will exist today in at least two locations:  the file will reside (i) live on the shared network drives (or the user's hard drive or archives), and (ii)

---

[28] *See* Ex. 7, McBean Depo. at 87:15-88:11 ("Q. What would it take to these what's on those annual tapes? Would we have to put them on a computer?  A. *We would have to put them onto a DLT backup system, load software and then go through a recovery process*.  Q. How much time would that take?  A. *I would need the infrastructure to recover to*.  So you need resources and then  depending on -- well, if you're recovering everything that's on the New York side *it all depends on how much data we're backing up and what types of systems I'm restoring to*.  So I can't answer that question without actually looking at what I'm going to restore.  Q. When you put the tape in, these annual tapes, you can look just at the Outlook files, is that correct?  A. *No*."); *id.* at 90:22-91:12 ("Q.  But if you had to look at those backup tapes, that's something that could be done, you have the resources to do that? ... A. *No, I'd have to acquire the resources to go through and look at that data*.  Q. And what resources would you have to acquire?  You have NT40, right?  A. Right.  I have NT40.  *I would have to build the environment and then recover the data and at that point the Exchange server will be up for lack of a better term*.") (emphasis added).

[29] McBean Decl., ¶¶7-9.

[30] McBean Decl., ¶10.

[31] Ex. 7, McBean Depo. at 59:4-59:13 ("Q: Were employees limited to an amount of E-mail that they could store on their desktops?  A. Yes.  Q. Okay.  What was the limit?  A. *On their desktops they had no limit.  On the servers the limit was, and again it differed by employee, but the general limit, it was about eighty meg*.") (emphasis added).

in the backup tapes.[32]  These are the network rules that Lellouche employed, for example, to retain CCMI-related and Plaintiffs-related ESI online (and in his archives).

### E.    The Plaintiffs Conduct A Cursory Review Of NAM's Production.

The Plaintiffs reviewed NAM's original production on September 28, 2006, for a few hours.  The Plaintiffs then requested that NAM copy just 3,532 pages out of this production.[33] By way of rough comparison, a banker's box, reasonably packed, holds approximately 3,500 documents, and NAM's production consisted of documents in 60 binders, 17 banker's boxes, and 5 redwelds.  The Plaintiffs spent similar efforts reviewing NAM's supplementation to its initial production.  On February 1, 2007, the Plaintiffs reviewed the supplemental production, and also requested that the initial production be made available for their review, a second time.[34]  At this review session, the Plaintiffs again spent a few hours.  The Plaintiffs later requested 1,108 pages of documents.[35]

As discussed below, the Plaintiffs have made little apparent effort to review or digest the documents NAM has produced.

### F.    The Plaintiffs Demand ESI Stored In NAM's Backup Tapes.

During the period October 2006 through January 2007, the parties exchanged correspondence concerning the breadth of the Plaintiffs' Requests for Production, NAM's

---

[32] Ex. 7, McBean Depo. at 96:17-97:18 ("Q.  Am I correct then if documents exist from the years 1999 and 2000 the only place they're going to be are on those annual tapes, they are not otherwise backed up at any location? A. *Data can exist on the file servers that stretch back as far as 1999.  So if it's still on our file servers today it's online* or it could be on the year-end tapes.  Q. Okay.  But E-mail from that time period, the only place that's going to be is on those tapes, right?  A.  E-mail from that time period would be on those tapes or *in Outlook PST files that may exist on end users' computers*.  Q. Right. *If the end user archived the E-mail themselves then they exist on the computer still?  A.  Uh-huh*. Q. Correct?  A. (Indicating.)  Q. Otherwise they're on those tapes?  A. Correct.") (emphasis added).

[33] These documents were bates numbered NAM00325 – NAM03857.  Hulme Decl., ¶12.

[34] Hulme Decl., ¶¶17-18.

[35] These documents were sequentially numbered NAM03858 – NAM04966.  Hulme Decl., ¶¶19-20. Rather than inspect the materials supplemented in April, the Plaintiffs asked that they be copied in their entirety. These documents were sequentially numbered NAM04967 – NAM07225.  Hulme Decl., ¶22.

production, the inclusion of ESI, and related points.[36] The Plaintiffs claimed, for example, that the production lacked sufficient ESI in the form of email communications, and lacked sufficient meeting minutes. NAM responded to these claims, in part, by conducting further paper and ESI searches. As a result of these additional efforts, NAM located and produced, for example, additional meeting minutes.[37] NAM also informed the Plaintiffs that ESI resident on backup tapes was not reasonably accessible.[38]

When the Plaintiffs continued to remain dissatisfied with the production, and to demand ESI resident on backup tapes, NAM produced Alfred McBean ("McBean"), its Vice President of Windows Technology, to testify concerning NAM's ESI practices, and tape backup practices.[39] Yet deposing McBean did not satisfy the Plaintiffs, and they continued to demand production of ESI stored on NAM's backup tapes.

**G. In Response, NAM Retains An Expert, Who Quantifies The Costs And Burdens Of Producing The ESI The Plaintiffs Demand.**

Given the Plaintiffs' demands for ESI from backup tapes, NAM engaged an electronic discovery and forensic expert, Richard Davis ("Davis"), an attorney and former IBM engineer.[40] Davis's assignment consisted of (i) reviewing the Plaintiffs' Requests for Production; and (ii) estimating the costs of restoring NAM's backup tapes, and searching the resulting files to potentially locate and produce further materials potentially responsive to these Requests.[41] Davis interviewed various NAM Information Technology ("IT") personnel; reviewed NAM's

---

[36] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz; Ex. 9, Letter dated 12/12/06 from Katz to Rich; Ex. 10, Letter dated 1/5/07 from Rich to Katz; Ex. 11, Letter dated 1/26/07 from Katz to Rich.

[37] These meeting minutes are numbered NAM04967 – NAM07225. Hulme Decl., ¶22.

[38] *E.g.,* Ex. 9, Letter dated 12/12/06 from Katz to Rich at 2; Declaration of G. Katz ("Katz Decl."), ¶15.

[39] The deposition transcript of Mr. McBean is Ex. 7.

[40] *See* Declaration of Richard Davis ("Davis Decl."). Mr. Davis' CV is appended as Exhibit A, thereto.

[41] Davis Decl., ¶5.

network structure, particularly the Windows environment;[42] and reviewed NAM's backup systems in detail, with a particular focus on (i) the year end full system tapes (the "Year-End Full-System Tapes"), and (ii) the daily backup tapes for the Email system, which is resident on Exchange Servers (the "Daily Exchange Tapes").[43]

Davis determined that these two forms of backup were not duplicative, and would *both* need to be searched to comply with the Plaintiffs' Requests. NAM's Year-End Full-System Tapes represent a "snapshot," on a annual basis, of the entire NAM network. In contrast, NAM's Daily Exchange Tapes constitute a "moving picture" series of images – on a daily basis – of a portion of the NAM network. As determined by Davis, the Daily Exchange Tapes provide a more complete view of NAM email communications over time than the Year-End Full-System Tapes, while the Year-End Full-System Tapes provide a more complete view of the overall NAM network.[44]

Davis then determined that Year-End Full-System Tapes and Daily Exchange Tapes potentially relevant to the Plaintiffs' broad Requests for Production were located in four NAM offices -- Chicago, New York, Toronto, and Wilton, Connecticut -- and determined that 154 Year-End Full-System Tapes, and over 5,000 Daily Exchange Backup Tapes would need to be analyzed to comply with the Plaintiffs' Requests.[45] Davis then compiled information on the steps necessary (i) to restore these tapes, to allow a review of the information they contain; (ii) to search the resulting restored data sets; (iii) to locate materials responsive to the Plaintiffs' Requests for Production; and (iv) to produce relevant documents.[46] Based on this analysis,

---

[42] NAM's Windows Environment is described in further detail above, in the text surrounding footnote 23.

[43] Davis Decl., ¶¶7-9.

[44] Davis Decl., ¶12.

[45] Davis Decl., ¶¶10-11, 13, 20, 27.

[46] Davis Decl., ¶¶14-15, 19-25 (for Year-End Full-System Tapes), 26-33 (for Daily Exchange Tapes).

Davis concluded that a "defensible, forensically sound processing of data" in accordance with the Plaintiffs' demands would require the following expenditures:

| | |
|---|---|
| Year-End Full-System Tapes:[47] | $4.5 million |
| Daily Exchange Tapes:[48] | $9.1 million |
| Total Costs:[49] | $13.6 million |

The Plaintiffs' Requests, therefore, presented a staggering burden to NAM.[50]  (Further, the $13.6 million cost does *not* include NAM's cost to review the search results for privileged communications.)

### H.    NAM Informs The Plaintiffs That Their Requests For ESI From Backup Tapes Will Cost Over $13 Million; The Plaintiffs File The Present Motion.

On April 27, 2007, counsel for the parties met in person at Plaintiffs' counsel's office to discuss their positions concerning the production of ESI from the backup tapes.[51]  Defendant's counsel disclosed that NAM had retained an electronic discovery and forensic expert (Mr. Davis), in light of the Plaintiffs' demands for ESI from backup tapes, and the inaccessible nature of this information.[52]  Defendant's counsel stated that this expert had determined (a) that restoring and searching for potentially responsive ESI from the year-end, full system backup tapes would cost approximately $4.5 million; and (b) that restoring and searching for potentially

---

[47] Davis Decl., ¶24.

[48] Davis Decl., ¶32.

[49] Davis Decl., ¶46.

[50] In a concluding footnote, the Plaintiffs suggest that a "sampling" of the backup tapes should be conducted, as an "initial procedure."  Motion at 7, n.3.  The Plaintiffs provide no guidance as to what this sampling would cover, and suggest that such a sampling is straightforward.  Anticipating such a request, and wanting to provide a complete assessment in any event, Davis had already performed various analyses to determine the requirements and costs of an approach that would rely on initial sampling.  In his analysis of an initial sampling, Davis did the following:  (i) he limited the sample to Year-End Full-System backup tapes, and (ii) he limited the scope of the sample to just 26 tapes.  Using the same methodologies he employed for the complete analysis, Davis concluded that the costs of even this limited sampling would be *$1.1 million*.  Davis Decl., ¶¶13, 34-43.

[51] Katz Decl., ¶13.

[52] Katz Decl., ¶15.

responsive ESI from the daily email backup tapes would cost approximately $9.1 million.[53]

Without further substantive discussion, the Plaintiffs shortly thereafter filed the present

Motion.[54]

> **I.     In Their Motion, The Plaintiffs Identify No "Gaps" Or Missing Information In NAM's Production.**

In their Motion, the Plaintiffs choose *not* to identify – within their broad requests – *any*

specific documents that they assert are missing from NAM's production.[55]  Instead, they falsely

assert that backup tapes are the *only* source for locating possible responsive documents that

might not already have been produced.[56]  As demonstrated by McBean's testimony,[57]

Lellouche's testimony,[58] and the production itself, the Plaintiffs' "sole source" claim is wildly

incorrect.

For example, the Plaintiffs originally claimed that NAM's production lacked responsive

email,[59] and lacked meeting minutes.[60]  On the assumption that the Plaintiffs continue to seek

---

[53] Katz Decl., ¶¶16-17.

[54] Notably, Plaintiffs failed to disclose this overwhelming cost to the Court in their Motion or that they had been *informed* of this cost prior to the Motion's filing.

[55] The Plaintiffs do not identify a document request or requests by number, and do not identify any keywords they wish searched.  Instead, they claim that all daily and year-end backup tapes must be searched. Motion to Compel at 4 ("These *daily backup tapes* containing e-mail from the relevant time period in this case *must be searched to uncover responsive and relevant documents* critical to resolving this case"); *id.* at 4 ("Plaintiffs request that the Court order the Defendant to *search the daily e-mail backup tapes and year-end backup tapes* which very likely contain information responsive to Plaintiffs' document requests and highly relevant to this case") (emphasis added).

[56] *See, e.g.,* Motion to Compel at 1 ("NAM has refused to produce requested documents, specifically *electronic documents that exist only on daily e-mail backup tapes and year-end backup tapes*"); *id.* at 4 ("The e-mails and other electronic documents on these backup tapes *are not available from any other source* and a search will almost undoubtedly discover responsive and relevant documents"); *id.* at 5 ("Importantly, *these e-mails and electronic documents are not available from other sources*"); *id.* at 6-7 ("*As no other source* for these documents exists, the search will not be cumulative or duplicative and is absolutely necessary to uncover critical documents") (emphasis added).

[57] *See* the discussion, above, surrounding footnotes 31 & 32.

[58] *See* the discussion, above, surrounding footnotes 17 through 22.

[59] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz at 1 ("While certain limited *emails* and documents were made available (in non electronic form) for our review, we were unable to located [sic] any files belonging to any of the following individuals…") (emphasis added).

additional – albeit entirely undefined – email and meeting minutes, NAM's counsel has compiled a review of the internal email and the meeting minutes contained within the production.[61]  Over 1,800 internal emails – meaning emails between NAM employees – are included in NAM's production.[62]  These emails reference over 244 NAM personnel, and cover the period beginning in 1999 and continue beyond the expiration of the Plaintiffs' contracts in 2004.[63]  In addition, over 570 meeting minutes are included in the production.  These minutes similarly cover the period beginning in 1999 and continue beyond the expiration of the Plaintiffs' contracts in 2004.[64]

As a further example, the Plaintiffs make certain specific claims in their Answers to Interrogatories.  These include claims concerning loyalty marketing services,[65] the Hispanic market,[66] and gift card programs.[67]  A review of file folders produced to the Plaintiffs reveals numerous files that discuss these issues.[68]

---

[60] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz at 2 ("In addition, my clients believe that NAM has failed to produce *all meeting minutes* for meetings attended by Ann Raider or Robert Fireman") (emphasis added).

[61] In light of the silence of the Plaintiffs' Motion, it is unclear whether the Plaintiffs (a) have abandoned their objections concerning email and meeting minutes, or (b) instead include these objections generally within their demands for "ESI on backup tapes."

[62] Ex. 12 lists all of these email by date.  *See* Hulme Decl., ¶¶27-28.

[63] Ex. 13 (listing addressees on internal email).  *See* Hulme Decl., ¶29.

[64] Ex. 14 (listing meeting minutes).  *See* Hulme Decl., ¶31.

[65] *See* Ex. 15, Fireman's Answers to First Set of Interrogatories Propounded by the Defendant ("Fireman Ans. to Ints.") at  9 and 13 ("NAM eliminated Ms. Raider and Mr. Fireman's position as a 'thought leader' for *loyalty marketing* – CCMI spent years developing a reputation as a leader in *loyalty marketing*...NAM eliminated the Marketing Analysis (MAS) tool with no other product to replace it – CCMI had over 1,000 supermarkets using the MAS software to track their *loyalty card holder programs*") (emphasis added).

[66] *See* Ex. 15, Fireman Ans. to Ints. at 14-15 ("The *Hispanic Market* was large and growing and the community had a real need for a stored value money card.  Even when CCMI fostered relationships with the White House, built relationships with major banks to process the transactions and the Mexican business leaders who would promote the product, NAM refused to provide the internal resources or sales support to launch the program") (emphasis added).

[67] *See* Ex. 15, Fireman Ans. to Ints. at 14 ("NAM did not fund the expansion of the business to keep pace with market trends – CCMI was prevented from expanding the *gift card program* for retailers") (emphasis added).

[68] *See* Hulme Decl., ¶¶8-9; Ex. 19, Index of Files - File No. 4 (loyalty marketing); File No. 12 (gift card program); File No. 15 (loyalty marketing); File No. 20 (loyalty marketing); File No. 21 (loyalty marketing); File No.

<u>**Legal Argument**</u>

**I.    Under Either The New Rules Or Pre-Existing Case Law, The Plaintiffs' Motion Must Be Denied.**

Whether the Court analyzes the present Motion under the new Federal Rules concerning Electronically Stored Information ("ESI"), or analyzes the Motion under pre-existing case law, the result is the same:  the Plaintiffs' Motion to Compel is groundless and must be denied.

**II.    NAM's Backup Tapes Are Not Reasonably Accessible.**

It is black-letter law that a party is *not* required to provide discovery of electronically stored information from sources that are not reasonably accessible, due to either undue burden or undue cost.  Fed. R. Civ. P. 26(b)(2)(B); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003).  The party opposing such discovery – here, NAM – bears the initial burden of demonstrating that the requested ESI is not reasonably accessible.  Fed. R. Civ. P. 26(b)(2)(B) ("[T]he party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost").  NAM has met this burden.

First, ESI stored on *backup* tapes presumptively qualifies as "not reasonably accessible." *See Zubulake*, 217 F.R.D. at 320 ("Backup tapes must be restored ... fragmented data must be de-fragmented, and erased data must be reconstructed, all before the data is usable.  That makes such data *inaccessible*."); *Quinby v. Westlb AG*, 2005 WL 3453908, at *7 n.8 (S.D.N.Y. 2005) ("Back-up tapes are considered an *inaccessible format* and not readily usable") (emphasis added throughout).  "Data on backup tapes used for disaster recovery purposes is usually regarded as

---

22 (loyalty marketing); File No. 23 (loyalty marketing); File No. 87 (loyalty marketing); File No. 88 (loyalty marketing); File No. 151 (Hispanic market); File No. 163 (loyalty marketing); File No. 175 (loyalty marketing); File No. 181 (loyalty marketing); File No. 183 (loyalty marketing); File No. 183 (gift card program); File No. 200 (loyalty marketing); File No. 201 (loyalty marketing); File No. 204 (loyalty marketing); File No. 209 (loyalty marketing); File No. 213 (loyalty marketing); File No. 218 (gift card program); File No. 222 (gift card program); File No. 228 (loyalty marketing); File No. 229 (loyalty marketing); File No. 229 (gift card program); File No. 241 (loyalty marketing); File No. 244 (gift card program); File No. 246 (gift card program); File No. 248 (gift card program); File No. 253 (loyalty marketing); File No. 254 (gift card program); File No. 262 (loyalty marketing); File No. 266 (loyalty marketing).

inaccessible, because such tapes function to quickly undo catastrophic systems failure, not as a filing cabinet."  Grant J. Esposito and Thomas M. Mueller, *Backup Tapes, You Can't Live With Them and You Can't Toss Them; Strategies for Dealing with the Litigation Burdens Associated with Backup Tapes Under the Amended Rules of Civil Procedure*, 13 RICH. J.L. & TECH. at p. 3 (2006).[69]  *See also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 2007 WL 684001, at *15 (D. Colo. 2007) ("One … source of [not reasonably accessible] information might be *backup tapes*").  *See generally* Shira A. Scheindlin, *Moore's Federal Practice, E-Discovery: The Newly Amended Federal Rules of Civil Procedure* at pp. 15-16 (2006) ("[E]xamples of [not reasonably accessible] sources, given today's technology, might include *back-up tapes*").

Second, the burden of restoring, searching, locating, and producing potentially responsive ESI from NAM's backup tapes is overwhelming, and far out of proportion to the claims in this action.  The Windows environment at NAM – which houses data covered by the Plaintiffs' requests – resides on approximately 200 servers, located in 20 offices throughout North America.[70]  Given the Plaintiffs' Requests, locating responsive ESI requires resort to 154 Year-End Full-System Tapes that backup this full system, and over 5,000 Daily Exchange Tapes that backup the email system.[71]  Each of these tapes would need to be "restored" – meaning rebuilt,

---

[69] *See also, Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 205 F.R.D. 421, 429 (S.D.N.Y. 2002) ("Backup-up tapes, for example, are not archives from which documents may easily be retrieved.  The data on backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading onto a computer system.  Therefore, the organization of the data mirrors the computer's structure, not the human records management structure, if there is one.") (internal citations omitted); *Wiginton v. Ellis*, 2003 WL 22439865, at *3 (N.D. Ill. 2003) ("[Defendant's] backup system is not an archiving system that would preserve all information going into [its] computers.  Rather, it is a disaster recovery system that takes only snapshots of [the Defendant's] computer files so that if a catastrophic event occurs, the information from the immediately preceding period can be reloaded.").

[70] *See* the discussion, above, surrounding footnotes 23 & 24.

[71] *See* the discussion, above, surrounding footnotes 43 through 45.

using the version of the software, and related infrastructure, that existed as of the time the tape was created.[72]  Indeed, restoring backup tapes at NAM is a complex process.[73]

   As emphasized above, the Plaintiffs' demands for ESI on NAM's backup tapes entails staggering effort.  It also entails huge financial cost.  To comply with Plaintiffs' demands would require the expenditure of approximately *$13.6 million*.[74]  This $13.6 million figure is based on "forensically sound" data processing methods, and a close analysis of NAM's backup structures.[75]  The figure represents the costs -- to a reasonable degree of certainty and in accordance with standard practices in the electronic data industry – to restore and search (a) NAM's year-end full-system backup tapes, and (b) NAM's daily email backup tapes, in order to locate and produce potentially responsive documents as requested by the Plaintiffs.[76]

   Before filing the instant Motion to Compel, the Plaintiffs knew of the extreme burden, and $13.6 million cost their demands presented[77] and, having taken the deposition of McBean, they knew (or should have known) of the extreme technical burdens their demands posed.  Yet in their Motion, the Plaintiffs (a) present no forensic or other evidence to challenge Davis' industry-standard calculation of $13.6 million in compliance costs,[78] and (b) make no offer to assume all

---

[72] *See* the discussion, above, surrounding footnote 28.

[73] *See* the discussion, above, surrounding footnote 27.

[74] *See* the discussion, above, surrounding footnote 49.

[75] Davis Decl., ¶¶25, 33, 45.

[76] The Plaintiffs request restoration and searching of both (a) the daily email backups and (b) the year-end backups.  Motion to Compel at 1 (demands "daily e-mail backup tapes and year-end backup tapes"); at 6 (same).

[77] *See* the discussion, above, surrounding footnote 53.

[78] The Plaintiffs claim – without support -- that restoring the multitude of backup tapes at issue will pose little burden.  Motion to Compel at 3 ("*It is possible for these backup tapes to be restored and searched for relevant documents.*"); *id.* at 5 ("While the process of *retrieving data from the backup tapes is somewhat more complicated than simply searching a server*, in this case it is a necessary step considering the importance of these e-mails and electronic documents in resolving the issues."); *id.* at 6 ("While *there is some burden involved in searching these tapes*, it is the only way to recover the e-mails and other electronic documents that are critical to resolving the issues in this case.") (emphasis added).  These assertions have no factual or expert support, and must be disregarded.

19

or a portion of these costs.[79]  In fact, in a questionable act of misdirection Plaintiffs argue to this Court that such a search will not be burdensome on NAM, knowing full well that their Motion comes with a $13 million price tag.  In short, the Plaintiffs make no credible argument to rebut NAM's case concerning accessibility, or to alleviate the extreme burdens their demands entail. As discussed below, Plaintiffs offer no valid reason, indeed any reason, for engaging in this $13 million ESI discovery project in the context of this litigation.

### III.    No "Good Cause" Exists To Support The Plaintiffs' Requests.

The Plaintiffs can show no "good cause" to warrant an order compelling discovery of the requested ESI.  Fed. R. Civ. P. 26(b)(2)(B).  Given the requested ESI's inaccessibility, the burden of proving the existence of "good cause" lies solely on the Plaintiffs.  *Id.*  In determining "good cause," courts evaluate a range of factors, including (i) the specificity of the discovery request; (ii) the importance of the proposed discovery in resolving the issues, (iii) whether the request is unreasonably cumulative or duplicative; (iv) whether the party seeking discovery has had ample opportunity by discovery to obtain the information sought; (v) the amount in controversy; and (vi) whether the burden or expense of the proposed discovery outweighs its likely benefit.  *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); Fed. R. Civ. P. 26(b)(2)(B) Advisory Committee Note of 2006, Subdivision (b)(2).

As demonstrated below, the Plaintiffs (i) ignore the full ESI and paper production they have already received; (ii) decline to identify how this full production is deficient in any manner; and (iii) advance no justification for the dramatic burden they seek to impose on NAM, in light of the meritless nature of their claims.  In short, no "good cause" exists.

---

[79] Given the wholesale "fishing expedition" and "ESI-discovery-as-leverage" nature of this Motion, this Court should deny the Motion outright, and not consider any cost allocation between the parties.

**A.    The Plaintiffs' Requests Are Not "Narrowly Tailored," And They Make No Attempt To Specify The Relevance Or Importance Of These Requests To The Case.**

To establish "good cause," a party *must* show that its discovery requests are "*narrowly tailored* to seek *only* information relevant" to the disputed point at issue. *Ameriwood Indus., Inc. v. Liberman*, 2007 WL 496716, at *1 (E.D. Mo. 2007); *see* B.J. Rothstein, R. J. Hedges, and E. C. Wiggins, *Managing Discovery of Electronic Information: A Pocket Guide for Judges* at 9 (Federal Judicial Center 2007) (the party requesting not-reasonably-accessible ESI must make a specific and tailored discovery request). In *Ameriwood*, for example, the Court ruled that the requesting party failed to meet the "good cause" threshold with a discovery request for "all plaintiff's documents and communications concerning [its] business" over a *five month period*. 2007 WL 496716 at *1. Here, as just a single example, the Plaintiffs seek "all documents" concerning the "loyalty marketing industry" from 1997 to the present.[80]

In addition to requiring narrowly tailored ESI requests, courts also require that a party specifically demonstrate the relevance of the requested information. *See Balfour Beatty Rail, Inc. v. Vaccarello*, 2007 WL 169628, at *2 (M.D. Fla. 2007). In *Balfour Beatty Rail*, for example, the plaintiff sought to obtain copies of the defendant's computer hard drives, but did not specify why this access was necessary. In denying the plaintiff's motion, the *Balfour Beatty Rail* Court reasoned that:

> *Plaintiff does not provide any information regarding what it seeks to discover from the hard drives* nor does it make any contention that Defendants have failed to provide requested information contained on these hard drives ... *[A]llowing Plaintiff to gain access to Defendants' hard drives in this case would permit Plaintiff to engage in a fishing expedition.*

---

[80] *See* the discussion, above, surrounding footnotes 12 & 13.

21

*Id.* at *2 (emphasis added). As in *Balfour Beatty Rail*, the Plaintiffs here fail to show what relevance -- if any-- the requested additional discovery presents. Seen for what it is, the request to search all NAM backup tapes is a $13 million global fishing expedition in pursuit of nothing in particular. *Accord Hedenburg v. Aramark Am. Food Servs.,* 2007 WL 162716, at *2 (W.D. Wash. 2007) (denying motion to compel plaintiff to produce a "mirror image" of its hard drive) ("Here, the central claims in the case are wholly unrelated to the contents of plaintiff's computer. Defendant is hoping blindly to find something useful in its impeachment of the plaintiff … Defendant essentially seeks a search warrant to confirm that Plaintiff has not memorialized statements contrary to her testimony in this case. If the issue related instead to a lost paper diary, the court would not permit the Defendant to search the plaintiff's property to ensure that her search was complete.")

## B.    The Plaintiffs Have Enjoyed Ample Discovery.

Courts deny requests for not-reasonably-accessible ESI where the party seeking the discovery has had "ample opportunity by discovery ... to obtain the information sought." Fed. R. Civ. P. 26(b)(2)(C)(ii). *See, e.g., Cognex Corp. v. Elec. Scientific Indus., Inc.*, 2002 WL 32309413 (D. Mass. 2002). Here, NAM has provided the Plaintiffs with substantial, full, and robust discovery.[81] When the Plaintiffs complained about purported "gaps" in the production, NAM responded either (a) by pointing out where the claimed missing information in fact was located in the production (and making previously produced documents – that the Plaintiffs had

---

[81] The plaintiffs appear to claim that they are justified in seeking ESI from backup tapes because McBean did not disclose the structure for backing up email. This is incorrect. First, McBean testified that the email system was backed up. Ex. 1, McBean Depo. at 42:3-43:9 ("Q. And the *E-mail itself, the Outlook E-mail* itself, that's not backed up? A. *That is backed up.* Well, Exchange is a server. So *the Exchange server is backed up.* Q. Okay. A. But Outlook is not backed up. Q. So E-mail itself, the communications are saved for some period of time? A. *Mail that flows through the Exchange servers are backed up.*") (emphasis added). Second, despite Plaintiffs' Counsel's decision to refrain from further questions as to this backup structure (or failure to ask further questions), Defendant's counsel subsequently affirmatively and voluntarily educated Plaintiffs' counsel concerning the email backup structure, in an effort to avoid the present Motion to Compel. *See* Katz Decl., ¶14.

not copied on their first review-- again available for inspection and copying), or (b) by searching

for, locating, and producing additional materials.[82]   Indeed, the Plaintiffs do not in their Motion

identify – in any way – information they claim is missing from NAM's discovery responses.[83]

The Plaintiffs, therefore, have had ample opportunity to obtain – and have fully obtained – the

information sought.[84]

    **C.**    **The Plaintiffs Do Not Show How The Requested ESI Discovery Differs In Any Material Respect From The Full Discovery NAM Has Already Provided.**

The Plaintiffs, moreover, do not specify in their Motion how, or if, the requested ESI will

differ in any material respect from the information they have already obtained.  Fed. R. Civ. P.

26(b)(2)(C)(i) (required "good cause" is not shown where the ESI discovery "is unreasonably

cumulative or duplicative").  Indeed, the Plaintiffs' position is highly analogous to the plaintiff's

unsuccessful position in *Cognex Corp. v. Electro Scientific Indus., Inc.*  2002 WL 32309413 (D.

Mass. 2002).

In *Cognex Corp.*, the plaintiff moved to compel the production of ESI that was stored on

820 back-up tapes created by the defendant.  2002 WL 32309413, at *1.  The defendant

estimated that these tapes contained "almost three billion pages of documents." *Id.*  Recognizing

that "the cost of the search sought by [plaintiff] would likely be astronomical," the Court

declined to order the production that was sought, even though the plaintiff had offered to assume

any cost of production. *Id.* at *3, 6.  In analyzing the Rule 26(b)(2)(C) factors, the *Cognex* court

recognized "that a search of back-up tapes would uncover documents not already produced." *Id.*

at *4.  The Court reasoned, however, that such a search was still not appropriate because the

---

[82] *See* the discussion, above, surrounding footnotes 13 through 16.

[83] *See* the discussion, above, surrounding footnote 55.

[84] The Plaintiffs, it appears, have spent little time or effort in reviewing this production.  *See* the discussion, above, surrounding footnotes 33 through 35.

23

defendant had "*already conducted an extensive search for relevant documents*," the record did not reflect the conscious destruction of documents, and the case was not one in which one would expect the most relevant emails to be deleted around the time they were written. *Id.* at *5. The Court accordingly denied the motion, emphasizing that:

> At some point, the adversary system needs to say *'enough is enough'* and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable.

*Id.* (emphasis added). Like the defendant in *Cognex*, NAM has "already conducted an extensive search for relevant documents," has produced these relevant documents, and has twice supplemented its production in part in response to exchanges with Plaintiffs' counsel. As found by the *Cognex* Court, "enough is enough."

**D.    NAM Has Produced Extensive, Responsive ESI From Online And Archived Sources, And The Plaintiffs' Claims That NAM's Backup Tapes Offer The "Only Source" For Responsive ESI Are Flatly Incorrect.**

The Plaintiffs seek to meet their "good cause" burden -- not by identifying components allegedly missing from the production, and demonstrating the relevance and materiality of these components – but by claiming that backup tapes are the "only source" for the (unidentified) documents they seek.[85] This claim is patently false.

McBean testified that users retain documents and email on their desktops and on NAM's servers, and that these materials are *not* on backup tapes alone.[86] Lellouche – the Plaintiffs' primary supervisor -- testified that as a rule he retained *all important documents* in digital form on his desktop and network drives, that he thoroughly searched his desktop and network drives for responsive information, and that he produced this information to the Plaintiffs. Moreover, Lellouche testified that, under his supervision, NAM's IT Department searched others' online and

---

[85] *See* the discussion, above, surrounding footnote 56.

[86] *See* the discussion, above, surrounding footnotes 31 & 32.

archived accounts, and produced responsive electronically stored information from these sources as well.[87]  Finally, a review of the substance of NAMs' production -- in light of what appear to be the Plaintiffs assertions -- demonstrates that the production responds in full, on all points.[88]

Indeed, even the Plaintiffs appear to acknowledge the inaccuracy of their claims that backup tapes provide the "only source" for the requested information.[89]  In sum, the tapes are not the only source for the requested information, and NAM has already produced all requested, discoverable information.

### E.    There Is No Basis -- As A Matter Of Law – To The Plaintiffs' Claims That ESI Discovery Will "Likely" Generate Relevant Documents.

Knowing they cannot win this lawsuit on the merits in light of the unambiguous, express contractual rights they freely granted to NAM in the Stock Purchase Agreement – forgive the repetition, but there is no room for Plaintiffs "implicit" obligations where they contradict NAM's express right of "sole and unfettered judgment" – Plaintiffs seek to use the instant motion to extort a settlement out of NAM.  Without any showing of deficiencies in NAM's production, and without any analysis of whether the requested ESI will produce non-cumulative information, the Plaintiffs seek settlement leverage in this litigation by trying to force NAM to restore and review extensive backup tapes, based on a claim that relevant information will "likely" be found.[90]  In essence, Plaintiffs hope to force NAM to choose between either incurring $13 million in

---

[87] *See* the discussion, above, surrounding footnotes 17 through 22.

[88] *See* the discussion, above, surrounding footnotes 59 through 68.

[89] Motion to Compel at 5 ("*[O]utside of e-mail files that may exist on end user's computers*, the only source for the e-mails from the relevant time period is on the daily e-mail backup tapes and year-end backup tapes") (emphasis added).

[90] Motion to Compel at 5 ("The *likelihood* that these daily e-mail backups and year-end backup tapes contain information relevant to the claims in this case is high."); *id.* at 6 ("data that *in all likelihood* contain key electronic documents that go to the core of this case has yet to be searched.") (emphasis added).

25

unnecessary discovery costs or paying them millions of dollars to settle.  Courts recognize this tactic, and reject it for what it is.  In *McPeek v. Ashcroft*, for example, the Court reasoned that:

> [E]conomic considerations have to be pertinent if the court is to remain faithful to its responsibility to *prevent 'undue burden or expense'* ... If *the likelihood of finding something was the only criterion*, there is a risk that someone will have to spend hundreds of thousands of dollars to produce a single e-mail.  That is an awfully expensive needle to justify searching a haystack.  It must be recalled that ordering the producing party to restore backup tapes upon a *showing of likelihood* that they will contain relevant information in every case gives the plaintiff a gigantic club with which to beat his opponent into settlement.  *No corporate president in her right mind would fail to settle a lawsuit for $100,000 if the restoration of backup tapes would cost $300,000.  While that scenario might warm the cockles of certain lawyers' hearts, no one would accuse it of being just.*

202 F.R.D. 31, 34-35 (D.D.C. 2001) (emphasis added.)  The *McPeek* analysis is resonant here. The instant Motion is an extortionate attempt to force NAM to settle a claim, that is, as discussed below, entirely without merit and should never have been brought.

**IV.    The Plaintiffs' Claims Have No Substantive Merit, And This Fact Alone Requires Denial Of The Present Motion.**

An evaluation of  the substance of the Plaintiffs' claims further demonstrates that Plaintiffs' Motion to Compel must be denied. Fed. R. Civ. P. 26(b)(2)(C)(iii) (in assessing "good cause," courts evaluate whether the burden or expense of the proposed discovery outweighs its likely benefit).

**A.    The Stock Agreement Bars The Plaintiffs' Claims.**

The Plaintiffs in this action seek to second-guess NAM's business judgment in running their former company.  However, the Stock Purchase Agreement, section 6.8, affirmatively prevents such a claim.  This section provides (i) that NAM "*shall be free to operate the Company and its Affiliates in its sole and unfettered judgment*" and (ii) that the Plaintiffs "*shall have no*

*claim*" against NAM for the exercise of this sole and unfettered judgment.[91]  This language precludes the Plaintiffs' claims.

Moreover, even in the absence of such unequivocal language, NAM's business judgment would be immune from attack by the Plaintiffs.  Both NAM and Plaintiffs had an economic incentive to maximize the acquired company's (CCMI's) profits.  With those economic interests aligned, as a matter of black-letter New York law,[92] the Plaintiffs have no right to challenge NAM's unfettered judgment.  *See, e.g., The Interpublic Group of Companies, Inc. v. Fratarcangelo*, 2002 WL 31682389, at *14-15 (S.D.N.Y. 2002) (only where interests of party holding discretion differ from those of the contractual venture will a court scrutinize the motivation behind an exercise of business judgment because "[s]elf-interest ensures that the goal of profit maximization for the venture, not bad faith, guides that party's decisions.").  *See also Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (holding that where a "promoter stands to share in the profits of the joint venture" it is appropriate for a court to "rely on the promoter's self-interest to ensure that the goal of profit maximization guides its business decisions.").[93]

There is no ESI in backup tapes or elsewhere that will overcome this fatal flaw in the Plaintiffs' claims.

---

[91] Ex. 2, Stock Purchase Agreement, §6.8 (emphasis added).

[92] The Stock Purchase Agreement stipulates New York law as governing its interpretation. Ex. 2, § 8.2.

[93] The cases cited by Plaintiffs to support the "substantive" merits of their claims -- *Speakman v. Allmerica Financial Life Insurance* and *In re Gulf Oil/Cities Service Tender Offer Ligitation* – in fact support *NAM's* position, as these cases hold that parties *possess the power* affirmatively to contract away obligations set by the implied covenant of good faith and fair dealing.  For example, the *Gulf Oil* case explicitly states that a contractual provision "*may obliterate implied good faith* because of the clause's language or because of the nature of the power."  725 F. Supp. 712, 736 (S.D.N.Y. 1989) (holding that "the trick is to tell *when* a contract has been so drawn ...") (internal citations omitted) (emphasis added).  Likewise, the *Speakman* case makes it clear that "[t]he requirement of good faith performance is, however, circumscribed by obligations in the contract ... Thus, *the covenant may not be invoked to create rights and duties not contemplated by provisions of the contract or the contractual relationship*." 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (emphasis added).

**B.    The Plaintiffs Failed to Follow the Agreement's Mandatory Objection Procedures.**

Plaintiffs' claims must also fail for another reason.  Section 2.2(b) and 2.3(c) of the Agreement contain detailed and mandatory dispute resolution procedures that Plaintiffs did not follow in this case.  Indeed, the earn-out calculations Plaintiffs are disputing here have long since become immune to challenge.  Pursuant to the Agreement, Plaintiffs could only have challenged these calculations if, in addition to objecting in writing within twenty days of receiving NAM's calculation, they submitted the dispute to accountant arbitration for resolution if the objections were not resolved by discussions between the parties.  Plaintiffs admit that they never exercised the accountant arbitration procedure for any of the five separate earn out years.[94]  Accordingly, Plaintiffs are now precluded from revisiting the propriety of these calculations through the instant litigation.  *See Excel Group, Inc. v. New York Transit Auth.*, 814 N.Y.S.2d 220, 222-223 (N.Y. App. Div. 2d Dep't April 25, 2006) (barring contractor from pursuing breach of contract claim, where it failed to follow dispute resolution period provided by parties contract); *153 Hudson Dev., LLC v. DiNunno*, 778 N.Y.S.2d 482, 482 (N.Y. App. Div. 1st Dep't 2004) (barring plaintiff from seeking recovery against defendant where plaintiff failed to invoke the claim resolution provision of its contract with defendant).  Nothing contained in NAM's backup tapes could excuse Plaintiffs' failure to follow these mandatory procedures.

**C.    The Plaintiffs Accepted NAM's Earn-Out Payments, And Are Now Barred From Challenging These Payments.**

Plaintiffs are estopped from disputing the amount of the earn-out payments.  By accepting and enjoying the fruits of 5 years of earn-out payments, Plaintiffs acquiesced in, or ratified, the amount that had been paid by NAM.  *See Savasta v. 470 Newport Assoc.*, 579

---

[94] Ex. 4, Fireman Depo. at 181:17-183:23.

N.Y.S.2d 167, 169 (N.Y. App. Div. 2d Dep't 1992), *aff'd* 82 N.Y.2d 763 (1993) ("Estoppel will

lie when an individual has accepted the benefits of an agreement ..."); *Banque Nationale de Paris*

*v. 1567 Broadway Ownership Assocs.*, 625 N.Y.S.2d 152, 154 (N.Y. App. Div. 1st Dep't 1995)

(party ratified mortgage modification by enjoying financial benefits of modification for two

years before repudiation); *Reda v. Love Taxi, Inc.*, 608 N.Y.S.2d 656, 658 (N.Y. App. Div. 1st

Dep't 1994) (taxi drivers estopped from objecting to deductions taken from vouchers where they

accepted fruits of vouchers with full knowledge of the deductions).  The Plaintiffs ratified

NAM's actions by accepting NAM's earn-out payments.

     ESI on backup tapes cannot alter this fact.

### D.    The Plaintiffs Have Not and Cannot Establish any Damages.

     The Plaintiffs' damages are zero.

     Although they apparently claim damages of $15 million,[95] Plaintiffs have provided no

explanation, support, or calculations for this figure,[96] and have not designated an expert to testify

as to damages or any underlying theories.[97]  The Scheduling Order required the Plaintiffs to

---

[95] Ex 16, Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006 at 12 ("At this time, Mr. Fireman and Ms. Raider are unable to quantify their damages suffered as a result of News America Marketing In-Store, Inc.'s misconduct.  Further responding, News America Marketing's own records demonstrate that Ms. Raider and Mr. Fireman are owed in excess of $15,000,000.").  The plaintiffs did not provide the required *damages computation* in this disclosure and have not amended this  initial disclosure on damages to provide any additional information regarding how they believe their damages ought to be calculated.  Moreover, NAM has requested that a formal damages computation be submitted, but none has been offered to date.

[96] *See* Ex. 15, Fireman Answers to Ints, Int. No. 20 ("[d]escribe in detail any an all damages you seek in this lawsuit.").  In responding, the Plaintiffs provide no detail to their damages claim.  *See* Ex. 15 Fireman Answers to Ints., Int. No. 20 ("CCMI had established itself as the industry leader in an emerging marketplace.  If NAM had proceeded in good faith, the Plaintiff would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula.  The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative *guestimate* of revenue that would be paid to Plaintiffs.  This projection was over Fifteen Million (15m) dollars.  Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.") (emphasis added);  *see* Raider Answers to Ints., Int. No. 20 (same), Exh. 17.

[97] *See* Ex. 15, Fireman and Raider, Int. No. 1 (requesting that Plaintiffs identify each expert witness they intend to call at trial).  The Plaintiffs responded by stating that they had not yet determined which, if any, experts they intended to call.

designate their experts, and provide all requisite expert disclosures, by March 30, 2007. No such designation was made; the Plaintiffs, therefore, are precluded from offering expert testimony.

Without expert testimony, any damages case dissolves. The Plaintiffs apparently would seek to show that, had NAM had acted differently, CCMI would have "achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula."[98] Presumably, these claims at a minimum would require (a) a reconstruction of the loyalty card industry, and related markets during 1999 to 2004; (b) an evaluation of the impact of the "dotcom bubble" and its "bursting" and 9-11 on these industries; (c) testimony concerning the alternative steps that NAM "should" have taken, instead of the strategy it in fact followed; and (d) testimony concerning the financial impact that these different steps would have had on CCMI's financial performance, in light of the relevant 1999-2004 markets. The Plaintiffs' damages claims, therefore, would require "sophisticated" and extensive *expert* testimony concerning market reconstruction (during a significant downturn); at least five years of "what if" projections for CCMI revenues and expenses, and a wide range of detailed, micro- and macro-economic assumptions and industry analysis. The Plaintiffs are now barred from making any such showing (were such showing possible).

Indeed, it is doubtful that Plaintiff could have proved damages even *with* an expert. To be admissible, any damages showing by the Plaintiffs *must* be "capable of measurement based upon *known reliable factors* without undue speculation." *Kidder, Peabody & Co. Inc. v. IAG Int'l Acceptance Group N.V.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998), *aff'd* 205 F.3d 1323 (2d Cir. 1999) (plaintiff's failure to prove damages to a reasonable certainty precluded recovery) (emphasis added); *Zink v. Mark Goodson Prods., Inc.*, 689 N.Y.S.2d 87, 88 (N.Y. App. Div. 1st

---

[98] Ex. 15 Fireman Answers to Ints., Int. No. 20.

Dep't 1999) (damages claim based on assumptions, speculation and conjecture properly

dismissed); *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (N.Y.

App. Div. 1st Dep't 1990) (evidence of lost profits was too speculative to support a damages

award).  Without expert testimony, the Plaintiffs cannot even begin to meet this burden.[99]

      Moreover, it is black-letter law that a plaintiff's own general conclusions, estimates, and

opinions as to damages are *not* competent evidence, and cannot sustain a damage award.  *See*

*Clarke v. Bank of New York*, 687 F. Supp. 863, 871 (S.D.N.Y. 1988) (where plaintiff was not an

expert on the valuation of stocks and bonds, his opinion as to damages he suffered was not

binding on the court); *Alexander's Dep't Stores, Inc. v. Ohrbach's Inc.*, 56 N.Y.S.2d 173, 183-

184 (N.Y. App. Div., 1st Dep't 1945); *Philman v. Connery*, 111 N.Y.S. 654, 654 (App. Term.

1908) (party's conclusion or general estimate as to damages was not competent evidence and

should not have been permitted).  In *Alexander's Dep't Stores, Inc.*, for example, the only

evidence to sustain a particular damages claim was the opinion of the plaintiff's president.  *See*

*Alexander's Dep't Stores, Inc.*, 56 N.Y.S.2d at 184.  The court found that there was "no

sufficient basis of facts proved or assumed in [the] record to support the opinion of the interested

witness as to the amount of damage sustained."  *Id*.[100]

      In sum, Plaintiffs have no expert, and the Plaintiffs cannot rely on their own testimony to

establish damages.

---

[99] *See also Lowrie v. Castle*, 225 Mass. 37, 51 (Mass. 1916) ("[D]amages cannot be recovered when they
are remote, speculative, hypothetical, and not within the realm of reasonable certainty") (lost profit damages could
not be awarded where such damages would be uncertain or conjectural); *Pierce v. Clark*, 66 Mass. App. Ct. 912,
914, (2006) (affirming denial of damages where plaintiff's suggested amount of damages was "purely speculative
and not proven to a reasonable certainty by sufficient or substantial evidence"); *Connolly v. Suffolk County Sheriff's
Dep't*, 62 Mass. App. Ct. 187, 198-199 (2004) (affirming denial of compensatory damage award where such
damages would be speculative).

[100] *Williamson v. Feinstein*, 311 Mass. 322, 324 (Mass. 1942) (finding that "[t]he estimate of the witness
was hardly more than his opinion as to the amount of his loss...A plaintiff should not be permitted to fix his own
damages.  There was error in the admission of this evidence"); *Giuliano v. Vacca*, 2004 Mass. App. Div. 154 (Mass.
App. Div. 2004) (damage award could not stand "because it was based on virtually no foundational evidence" where
the only measure of damages was the plaintiff's opinion).

## **Conclusion**

The Plaintiffs ask this Court to order NAM to comply with expansive, untailored discovery requests; to search ESI stored on daily and year-end backup tapes; and to incur resulting costs of over $13 million.  The Plaintiffs, however, fail to identify how NAM's existing production is deficient in any respect.  More fundamentally, the Plaintiffs provide no legitimate justification for imposing a $13 million expense on NAM in light of their actual case:  a case asserting earn-out claims that are contractually barred, and allegations of damages unsupported by any competent evidence.  When the Court weighs all of the factors set forth in Rule 26, there is not the slightest justification for ordering NAM to incur a $13 million expense to restore and search 5 years of, and more than 5000 actual, backup tapes.

For the above reasons, NAM respectfully requests that this Court deny the Plaintiffs' Motion to Compel.[101]

## **Request for Hearing**

The Defendant requests a hearing on the present Motion.  As grounds, the Defendant states that it believes a hearing will be of assistance to the Court.

---

[101] NAM also respectfully suggests that, under Fed. R. Civ. P. 37(a)(4)(B), it should be awarded the reasonable expenses, including attorney's fees, it has incurred in opposing Plaintiffs' Motion to Compel.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,


/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 4, 2007
       Boston, Massachusetts


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 4th day of June, 2007.

/s/ Gordon P. Katz
Gordon P. Katz


# 4566725_v8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

**DEFENDANT'S EXHIBITS IN SUPPORT OF**
**OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

NEWS AMERICA MARKETING IN-STORE,
INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Ben McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 4, 2007
        Boston, Massachusetts

# 4573248_v2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 4th day of June, 2007.

<u>/s/ Gordon P. Katz</u>
Gordon P. Katz

| Exhibit No. | Description |
|---|---|
| 1 | NAM Due Diligence Memo, May 27, 1999, NAM Bates Pages 3157-3159 |
| 2 | Stock Purchase Agreement, dated August 13, 1999, between NAM and the Plaintiffs (among others) |
| 3 | Tabulation of Earn-Out Payments made by NAM to the Plaintiffs |
| 4 | Fireman Deposition Excerpt at 181:17 – 183:23 |
| 5 | Plaintiffs' First Set of Requests for Production of Documents and Things |
| 6 | Defendant's Responses to Requests for Production |
| 7 | Deposition Transcript of A. McBean |
| 8 | Letter dated 10/30/06 from Rich to Katz |
| 9 | Letter dated 12/12/06 from Katz to Rich |
| 10 | Letter dated 1/5/07 from Rich to Katz |
| 11 | Letter dated 1/26/07 from Katz to Rich |
| 12 | Listing of Internal Email |
| 13 | List of Names from Email |
| 14 | List of Meeting Minutes |
| 15 | Robert Fireman's Answers to First Set of Interrogatories Propounded by the Defendant |
| 16 | Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006 |
| 17 | Email dated 5/25/2007 from Katz to Peters and Rich, attaching *Cognex* case |
| 18 | File Index: Binders Produced |
| 19 | Index of Files from Fireman and Raider Working Files and Related Materials |
| 20 | Letter dated 10/26/2006 from Hulme to Rich |
| 21 | Letter dated 2/9/07 from Hulme to Rich |
| 22 | Letter dated 4/17/07 from Hulme to Rich |
| 23 | Copies of Binder Labels of Binders made available for review |
| 24 | Cost Estimate for Year-End Full-System Tapes for the Complete Period |
| 25 | Cost Estimate for Daily Exchange Tapes for the Complete Period |
| 26 | Cost Estimate for Year-End Full-System Tapes for the Sampling Period |

# EXHIBIT 1

**News America Marketing**

To:     Dave DeVoe
cc:     Heather Harde
From:   Julie Openshaw          REDACTED
Date:   05/27/99
Re:     CCMI Due Diligence

Joe Sebena, Jon Rubin and I visited the offices of CCMI in Braintree, MA on May 24-25. I conducted a general business and contractual due diligence. Below is a summary of my general business findings.

1.  Loyalty Card Implementation
  • CCMI does not draft contracts for card implementations, but works directly from proposals.
  • **New implementations generate most revenue** - During 1998 CCMI implemented 7 new loyalty card programs and serviced 13 others with additional card production or data entry. Revenue from new card programs was $1.6million, or 65% of total implementation revenue of $2.4 million. $1.1 million of this was from 2 retail clients; Fry's with $672K and Jitney Jungle with $434K.
  • **Most revenue generated from one or two clients** - In Q1 99, CCMI has completed 1 new implementation for Wegmans, which generated $383K or 67% of the total $574K revenue for the quarter.

2.  Database Management Contracts
  • CCMI has 7 active contracts with retail chains for database management services.  Of these contracts, 2 are serviced in house at CCMI and the remainder are located at the retailers' sites and license the software from CCMI. Contracts do not clearly differentiate between in house and out of house clients. (Note that the financial model assumes a 50:50 split between in house and in store systems.)
  • All agreements, with the exception of Star Market, include the Customer Information System (CIS) and the Marketing Analysis System (MAS). The CIS is a software system that manages a database of cardholder names, addresses and demographic information. The MAS is an open-architecture software system designed to assist retail executives in the analysis and communication to their customers based on purchase data. Star Market is using the CIS only.
  • In 1998, database management generated $1.2 million in revenues. CCMI earned almost 70% of its database management revenue from 3 clients. The Company earned $350K from Bruno's, a retailer that has subsequently gone bankrupt, $263K from Nash Finch, a grocery wholesaler and ongoing client, and $230K from Nature's Fresh, an ongoing retail client.
  • CCMI did not implement any new database management programs during Q1 99 and revenue for the period was $140K. This revenue was generated from maintenance fees for the 7 active clients.
  • CCMI is attempting to lengthen contract terms, as evidenced by the two most recent deals, Nash Finch (7/98), and Blue Square (11/98), an Israeli supermarket chain, for 3 years with automatic 1 year renewals.
    See attachment for further details.

• Page 1



NAM03154

3. Consulting
- CCMI currently generates its consulting revenues from Ann Raider offering loyalty marketing advice to clients for one or two day periods. Other revenue in 98 was for national change of address services, where CCMI checks name and address lists against a US Postal Service database. The total revenue of $72K for 98 was not significant and did not have signed agreements. CCMI could probably charge more for these small consulting projects.
- During Q1 $40K of the total $52K of consulting revenue was from a movie ticket enhancement program for Jitney Jungle. This deal did not have a signed proposal, but was supported by invoices. See attached schedule for details.

4. Leases and Licenses
- **Fleet National Bank Lease of Computer Equipment** – CCMI has a 3-year lease for computer equipment from Fleet Bank effective 2/99. CCMI has insured this equipment through the Connecticut Indemnity Company for $27K.
- **AT&T Computer Lease** – CCMI has a 3 year lease effective 10/97. This equipment is covered under general insurance for office equipment of $60K through Public Service Mutual Insurance Company.
- **Car Financing** – CCMI purchased a car in 11/97 and financed $16K.
- **Note payable** – CCMI borrowed $85K from Fleet Bank in 9/97, payable over 5 years.
- **Building Lease** – CCMI has a renewable 4 year lease for its office space at 165 Wood Road which expires 12/31/99. The annual rent is $72K and the lessor is Harry Fireman.
- **Internet service agreement @work** – CCMI has a one year internet service agreement effective through 6/24/99.
- **Arbor Software License** – Effective 7/96, CCMI has a three-year license with one-year renewal options for Essbase, a programming tool around which the CIS and MAS applications are built. CCMI then sublicenses the software to its clients as allowed by the lease terms.

5. Third Party Agreements
- **Loyalty Card Production** – CCMI outsources all loyalty card production, but does not have written agreements with any firms. Per review of invoices, one of the most frequently used vendors is Arthur Blank. CCMI selects vendors on an order by order basis.
- **Decision Support Technology (DST)** – CCMI contracted with DST in 11/97 to develop and design software products including the CIS and MAS. Recently, CCMI has stopped using DST (contract allows 30 days notice for termination) as they have been dissatisfied with the Company's performance, and is using Unmanned Balloon instead.
- **Unmanned Balloon (Division of Ockham's Razor, Inc.)** – CCMI uses this Toronto based software programming firm for database management related programming. Bob Fireman has a long-standing relationship with Unmanned Balloon and there is no contract between the firms, rather, CCMI is billed on a monthly basis for work performed.
- **Polk** – CCMI has been using Polk since inception for all data entry services relating to loyalty card implementation. There is no written contract, but Polk bills services regularly on a monthly basis.

6. Other Agreements
- **Overlap Consulting** – Overlap is a Spanish promotions firm with which CCMI has an ongoing agreement that Overlap has exclusive rights in Spain and non-exclusive rights in South America to promote CCMI's products and services. Fees will be on a deal by deal basis.
- **National Association of Chain Drug Stores (NACDS)** – CCMI contracted with the NACDS in 1/99 to license NACDS' name and logos as it signs up drug stores to participate in its database

● Page 2

NAM03155

management program. CCMI must pay 4 % of revenues from the program to the NACDS. Currently CCMI is in the process of signing 4 small chains (300-500 stores) for the program.

7. Litigation
- **Patent infringement suit** – The Credit Verification Corporation filed a patent infringement suit in 1/96, but they have not taken any action since 8/96.
- **Business Software Alliance** – In 2/99, CCMI received allegations of using software without proper licenses. The Business Software Alliance has asked CCMI to conduct an audit.
- **Disputed recruitment fee** – Interpros is suing for collection of a $38K recruitment fee for a CIO who left CCMI shortly after being hired. Bob Fireman is expecting to settle by mid June.

8. Personnel
- CCMI currently has 16 employees and is planning to hire more.
- CCMI pays employees base salaries with no formal bonus structure. However, in 1997 CCMI paid $285K in employee bonuses because it had a good year.
- The Board of Directors is Ann Raider, Bob Fireman, and Les Charm. The Board receives no compensation.

9. Equity
- The sole investors, Curtis Smith and John Boyles have invested $1 million in CCMI.
- Robert Fireman has invested additional paid in capital of $92K.
- CCMI granted 20,000 stock options to Robert Coughlin and 60,000 to William Adam in 3/97. The options are 50% exercisable after 1 year and fully exercisable after 3 years

See attached schedule for details

• Page 3

NAM03156

**CCMI Due Diligence**
**Loyalty Card Program Implementation**

| Client | Status | Cards | 1998 Revenue Data Entry | Total | Q1 1999 Revenue Total |
|--------|--------|-------|------------|-------|------------|
| A&P | New in 1998 | $ 41,700 | $ - | 41,700 | $ - |
| Brunos | New in 97, now inactive | 132,900 | 39,340 | 172,240 | - |
| Carlton Cards | Inactive | - | 176,750 | 176,750 | 720 |
| Coborns | Active | - | 4,350 | 4,350 | 840 |
| Delchamps | New in 98, now inactive | 222,360 | | 222,360 | - |
| City Market | | 9,320 | | 9,320 | - |
| Fry's | New in 98, active | 252,180 | 420,000 | 672,180 | 107,560 |
| Jitney Jungle | New in 98, active | 190,400 | 244,450 | 434,850 | 37,260 |
| King Sooper | New in 98 | 57,420 | | 57,420 | - |
| Kroger | | 22,330 | | 22,330 | - |
| Lucky - Northern | New in 97, now inactive | 191,370 | 32,920 | 224,290 | - |
| Lucky - Southern | New in 97, now inactive | 29,460 | 150 | 29,610 | - |
| Nash Finch | Active | | | | 4,890 |
| Natures Fresh | New in 98, active | 26,140 | 3,660 | 29,800 | 820 |
| Shaw's | New in 97, active | - | 38,160 | 38,160 | 6,290 |
| Smart & Final | | 3,680 | | 3,680 | - |
| Star Market | New in 98, active | 59,210 | 70,970 | 130,180 | 12,430 |
| Sullivans | New in 98, active | 16,940 | - | 16,940 | - |
| Wegmans | New in 99, active | | | | 383,450 |
| Western Foods | | 9,930 | | 9,930 | - |
| Wild Oats | New in 98, active | 62,700 | 51,070 | 113,770 | 19,740 |
| Misc. | | | | 12,906 | |
| | | | | | |
| Total | | 1,328,040 | 1,081,820 | 2,422,766 | 574,000 |

NAM03157

CCAI Due Diligence
Database Management

**Active Clients**

| Retail Client | Agreement Date | Network Size | Location | Services | Placement | Agreement Length | Revenue 1998 | Q1 1999 |
|---|---|---|---|---|---|---|---|---|
| Star Market | Nov-95 | 52 stores | Massachusetts | CIS, cards | At store | 3 years renewable | $ 30,780 | $ 8,520 |
| Sullivan foods | 1996 | 11 stores | Illinois | CIS, MAS | At store | 1 year | 8,330 | - |
| Coborns | Oct-97 | 21 stores | Minnesota, North Dakota and Iowa | CIS, MAS | In house | 1 year renewable | 72,890 | 13,960 |
| Wild Oats | Nov-97 | 58 stores | Colorado | CIS, MAS | In house | 1 year renewable | 159,770 | 44,910 |
| Nature's Fresh | Jun-98 | 7 stores | Pacific NW | CIS, MAS, cards | At Store | 1 year | 230,000 | - |
| Nash Finch (Grocery Wholesaler) | Jul-98 | services 3,000 stores operates 97 stores | National | CIS, MAS | At Store | 3 years, automatic renewals | 262,500 | 20,000 |
| Blue Square | Nov-98 | 150 stores | Israel | CIS, MAS | At Store | 3 years, automatic renewals | - | 55,000 |
| | | | | | | | $ 763,450 | $ 140,390 |

**Inactive Clients**

| | |
|---|---|
| Brunos | 354,190 |
| Carlton Cards | 8,690 |
| Lucky Stores Southern Division | 60,210 |
| ABT Assoc. | 51,520 |
| Misc. | 9,058 |
| **Total Revenue** | **$1,247,118** |

NAM03158

**CCMI Due Diligence**
**Consulting Services**

| Client | Description of Service | Revenue | |
|---|---|---|---|
| | | 1998 | 1999 |
| Jitney Jungle | Movie ticket enhancement program | $ | 38,920 |
| Natures Fresh | Consulting on system startup | 24,000 | 8,000 |
| Publix | National Change of Address | 11,820 | |
| Star Market | National Change of Address | 7,400 | |
| Wild Oats | Ann's time | 5,000 | |
| Meijers | Ann's time | 4,500 | |
| Longo's | Ann and Jerry Clapp's time | 4,000 | |
| Remke | Ann's time assisting with loyalty strategy | 2,750 | 5,110 |
| Kellogg's | Ann's time | 2,500 | |
| Mettler-Toledo | Ann's time | 2,500 | |
| NRI | Ann's time | 2,500 | |
| Misc. | | 4,978 | |
| | | | |
| Total Revenue | | $ 71,948 | $ 52,030 |

NAM03159

Stockholders of Consumer Card Marketing, Inc. (12/31/98)

| Name | Common Stock | Preferred Stock |
|------|-------------|-----------------|
| Robert Fireman | 4,200,000 | - |
| Ann Raider | 2,800,000 | - |
| Curtis R. Smith | 456,858 | 248,000 |
| John H. Boyles | 167,142 | 62,000 |
| Total | 7,624,000 | 310,000 |

| Schedule of Investment | | Shares Common | Preferred | Total Investment |
|------------------------|--|--------|-----------|-------|
| Dec-97 CCMI borrowed $500,000 from Curtis Smith and John Boyles | | | | |
| Feb-98 10,000 shares of common stock authorized | | | | |
| | Robert Fireman | 2,100,000 | | |
| | Ann Raider | 1,400,000 | | |
| Feb-98 The $500,000 note was converted to 312,000 shares of common stock | | | | |
| | 80% Smith | 228,429 | | $ 500,000 |
| | 20% Boyles | 83,571 | | |
| Feb-98 $250,000 investment from Smith and Boyles, CCMI issued | | | | $ 250,000 |
| 155,000 shares of preferred stock | 80% Smith | | 124,000 | |
| | 20% Boyles | | 31,000 | |
| May-98 $250,000 investment from Smith and Boyles, CCMI issued | | | | $ 250,000 |
| 155,000 shares of preferred stock | 80% Smith | | 124,000 | |
| | 20% Boyles | | 31,000 | |
| May-98 2 for 1 stock split | Fireman | 2,100,000 | | |
| | Raider | 1,400,000 | | |
| | Smith | 228,429 | 248,000 | |
| | Boyles | 83,571 | 62,000 | |
| Total shares outstanding | | 7,624,000 | 620,000 | $ 1,000,000 |
| Additional Paid In Capital | | | | $ 91,139 |

NAM03160

# EXHIBIT 2

STOCK PURCHASE AGREEMENT

between

ROBERT FIREMAN,

ANN RAIDER,

CURTIS R. SMITH,

JOHN H. BOYLES

and

NEWS AMERICA MARKETING IN-STORE INC.

August 13, 1999



DEPOSITION
EXHIBIT
RAIDER (38)
MRW 5/17/07

297099 v.12 [6D8R12!.WPD]

NAM04566
Confidential

# TABLE OF CONTENTS

Page

1.  Purchase and Sale of Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1  Purchase and Sale of Shares. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  Consideration for Transfer of the Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1  Purchase Price  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.2  Purchase Price Adjustment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.3  Earn-Out. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.  Closing Documents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.1  Deliveries by Sellers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.2  Deliveries by Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  Representations and Warranties of the Principal Sellers and the Sellers . . . . . . . . . . . . 8
    4.1   The Company's Organization and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.2   Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.3   Freedom to Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.4   Title to Shares  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.5   Capitalization; Subsidiaries  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    4.6   Financial Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.7   Absence of Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.8   No Material Adverse Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.9   Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.10  Title to and Condition of Assets; Encumbrances, etc  . . . . . . . . . . . . . . . . . . . 14
    4.11  Contracts and Commitments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.12  Licenses and Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.13  Employee Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.14  Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    4.15  Compliance with Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    4.16  Software and Information Systems  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.17  Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    4.18  Trade Secrets  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    4.19  Tax Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    4.20  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    4.21  Transactions with Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    4.22  Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.23  Accounts Receivable, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.24  Brokers' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.25  Suppliers and Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    4.26  Year 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    4.27  Books and Records  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    4.28  Disclosure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i    NAM04567
Confidential

5.  Representations and Warranties of Buyer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
    5.1  Buyer's Organization and Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
    5.2  Authorization of Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
    5.3  Freedom to Contract  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
    5.4  Brokers' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    5.5  Financing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    5.6  Investment Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
    5.7  Litigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

6.  Additional Agreements between the Parties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
    6.1  Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
    6.2  Noncompetition; Nonsolicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
    6.3  Equitable Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33
    6.4  Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
    6.5  Tax Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
    6.6  Public Announcement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
    6.7  Accounts Receivable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
    6.8  Conduct of the Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

7.  Indemnification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
    7.1  Indemnification by the Principal Sellers and the Sellers  . . . . . . . . . . . . . . . . . .37
    7.2  Indemnification by Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
    7.3  Notice to the Indemnitor  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
    7.4  Rights of Parties to Settle or Defend  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
    7.5  Limitations on Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
    7.6  Reimbursement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
    7.7  Survival of Representations and Warranties  . . . . . . . . . . . . . . . . . . . . . . . . . . .40

8.  Miscellaneous  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    8.1  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    8.2  Governing Law; Jurisdictions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    8.3  Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    8.4  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
    8.5  Severability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
    8.6  Amendment; Waiver  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    8.7  Assignment and Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    8.8  No Benefit to Others  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    8.9  Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43
    8.10 Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44
    8.11 Interpretation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
    8.12 Arrangements Among Sellers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51

NAM04568
Confidential

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT made as of the 13th day of August, 1999, by and among Robert Fireman ("Fireman"), Ann Raider ("Raider" and together with Fireman, the "Principal Sellers"), Curtis R. Smith and John H. Boyles (each a "Seller" and collectively, the "Sellers") , and News America Marketing In-Store Inc., a Delaware corporation ("Buyer").

### W I T N E S S E T H :

WHEREAS, the Sellers collectively own all of the issued and outstanding capital stock of Consumer Card Marketing, Inc., a Massachusetts corporation (the "Company");

WHEREAS, the Company specializes in database marketing and provides customer loyalty programs for retail chains through frequent shopper programs;

WHEREAS, upon the terms and conditions set forth herein, the Sellers desire to sell and Buyer desires to purchase all of the shares of capital stock of the Company (the "Shares"); and

WHEREAS, certain terms used in this Agreement are defined in Section 9.10 hereof;

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    _Purchase and Sale of Shares._

1.1    _Purchase and Sale of Shares._  Upon the terms and subject to the conditions set forth in this Agreement, concurrently with the execution of this Agreement, the Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from the Sellers, all of the Shares by delivery to Buyer of certificates representing the Shares, duly endorsed in blank or with duly executed stock powers attached, in proper form for transfer, free and clear of any and all Liens.

NAM04569
Confidential

2.    Consideration for Transfer of the Shares.

2.1    Purchase Price. In consideration for the sale and transfer of the Shares, on the terms and subject to the conditions set forth in this Agreement, concurrently with the execution of this Agreement, Buyer shall pay in cash by wire transfer of immediately available funds the sum of $2,800,000 (the "Closing Payment") (which amount is subject to adjustment post-closing in accordance with the provisions of Sections 2.2 and 2.3 hereof, the "Purchase Price"). The Purchase Price shall be paid to the Sellers in the amounts and in accordance with the instructions set forth on Schedule 2.1.

2.2    Purchase Price Adjustment. After the Closing, the Purchase Price will be adjusted as follows:

(a)    Working Capital Adjustment. As soon as practicable following the date hereof, Buyer shall prepare, or cause to be prepared, and deliver to the Principal Sellers, a balance sheet reflecting the Company's business as of the date hereof (the "Closing Date Balance Sheet"). The Closing Date Balance Sheet shall be prepared in accordance with GAAP consistent with past practices and shall be certified on behalf of Buyer by Buyer's Chief Financial Officer or other executive officer responsible for financial or accounting matters. If the Working Capital as reflected on the Closing Date Balance Sheet is less than zero by an amount in excess of $200,000 (the "Excess Shortfall"), then the Purchase Price shall be reduced by the amount of such Excess Shortfall and, in such case, the Principal Sellers shall, subject to Section 2.3(d)(ii) hereof, pay Buyer, by wire transfer of immediately available funds, within five (5) Business Days following the later to occur of the date on which the Closing Date Balance Sheet becomes final pursuant to Section 2.2 (b) hereof, or the final resolution of any dispute as provided in Section 2.2(b) hereof, the amount of such Excess Shortfall. The Principal Sellers shall be jointly and severally liable to Buyer for the amount of any

NAM04570
Confidential

Excess Shortfall. If the Working Capital as reflected on the Closing Date Balance Sheet is less than zero by an amount less than $200,000 (the "Deficiency"), then the Purchase Price shall be increased by the amount equal to such Deficiency and, in such case, Buyer shall pay to the Principal Sellers by wire transfer of immediately available funds, within five (5) Business Days following the later to occur of the date on which the Closing Date Balance Sheet becomes final pursuant to Section 2.2(d) hereof, or the final resolution of any dispute as provided in Section 2.2(b) hereof, the amount of such Deficiency. The Deficiency shall be paid to Sellers in the proportions and in accordance with the instructions set forth on Schedule 2.1. The Principal Sellers, and if the Principal Sellers deem appropriate, the Company's former independent accountants on the Principal Seller's behalf, shall be entitled to make an independent review of the Closing Date Balance Sheet and the related calculation of the Working Capital and shall, during the ten (10) Business Days following the delivery of the Closing Date Balance Sheet (or twenty (20) Business Days if the Closing Date Balance Sheet is delivered more than sixty (60) days after the date hereof), have prompt access to all relevant financial information and records and all internal and external work papers used to prepare and support the Buyer's certification of the Closing Date Balance Sheet.

(b)    Disagreements Regarding Adjustment. The Closing Date Balance Sheet shall become final and binding upon the Sellers unless the Principal Sellers deliver written notice of their disagreement (a "Notice of Disagreement") with respect to the Closing Date Balance Sheet within twenty (20) Business Days following receipt of the Closing Date Balance Sheet (or thirty (30) Business Days if the Closing Date Balance Sheet is delivered more than sixty (60) days after the date hereof). During the 15-Business Day period following the delivery of a Notice of Disagreement, Buyer and the Principal Sellers shall attempt to resolve in good faith any differences which they may have with respect to any matter specified in such Notice of Disagreement, and to reduce to writing

3

NAM04571
Confidential

such resolution. At the end of such 15-Business Day period any unresolved matters shall be submitted to Arthur Andersen LLP and a certified public accounting firm selected by the Principal Sellers (which may be the Company's former accounting firm) (the "Sellers' Accountant") which accounting firms shall attempt to resolve in good faith all unresolved matters within thirty (30) Business Days following the date on which the matter is submitted to them. If, at the end of such 30-Business Day period, Arthur Andersen LLP and the Sellers' Accountant have been unable to resolve all unresolved matters, the dispute shall be submitted, within five (5) Business Days following the end of such 30-Business Day period, to a nationally recognized independent accounting firm (the "Third Accountant"), to be selected by a consensus of Arthur Andersen LLP and the Sellers' Accountant. The Third Accountant shall render a written decision to the Principal Sellers and Buyer within thirty (30) Business Days after it has been retained, which decision shall be final and binding upon the parties hereto. The costs and expenses of Arthur Andersen LLP and the Sellers' Accountant shall be borne by Buyer and the Principal Sellers, respectively, and the costs and expenses of the Third Accountant, if any, shall be borne equally by Buyer and the Principal Sellers. Any and all Purchase Price adjustment obligations of the Principal Sellers will bear interest at the rate of 150 basis points above the Prime Rate (as defined) from the date hereof until paid in full, and the payment of interest shall be made together with the underlying obligation.

(c)    In no event shall (i) the cancellation or write-off of the accounts or notes receivable owing to the Company by Raider in the aggregate amount of $181,524 (the "Raider Receivable"), or (ii) more than fifty percent (50%) of $145,000, which shall be paid by the Company to Raider not later than April 1, 2000 and will be accrued as an obligation of the Company to Raider as of the date hereof (the "Raider Bonus"), be given effect in the calculation of Working Capital in

NAM04572
Confidential

Section 2.2(a) hereof. It is agreed that fifty percent (50%) of the Raider Bonus shall be included in the calculation of Working Capital under Section 2.2(a) hereof.

    2.3    Earn-Out.

        (a)    Earn-Out Amount. The Purchase Price shall be increased by an amount equal to 16.8%, 14.5%, 13.75%, 13.3% and 12.9% of the Gross Margin of the Company (the "Base Earn-Out Amount"), in respect of each of the first, second, third, fourth and fifth twelve-month periods, respectively, commencing on October 1, 1999 (the "Base Earn-Out Amount") (each a "Base Earn-Out Period"). In addition, the Purchase Price shall be increased (i) by $1.5 million if the Gross Margin for the twelve-month period commencing October 1, 1999 (the "First-Year Bonus Period") exceeds $2.1 million, or by $2.5 million if the Gross Margin in the First-Year Bonus Period exceeds $3.1 million (in either case, the "First-Year Bonus Amount") and (ii) by $1.5 million if the Gross Margin for the twelve-month period commencing October 1, 2000 (the "Second-Year Bonus Period") exceeds $6 million, or by $2.5 million if the Gross Margin in the Second-Year Bonus Period exceeds $7.5 million (in either case, the "Second-Year Bonus Amount").

        (b)    Payment of Earn-Out Amount. Within forty-five (45) days following each Base Earn-Out Period (each a "Base Earn-Out Payment Date"), Buyer shall deliver to the Principal Sellers the Base Earn-Out Amount payable in respect of the Base Earn-Out Period then ended. In addition, within forty-five (45) days following the end of the First-Year Bonus Period (the "First-Year Bonus Payment Date"), Buyer shall deliver to the Principal Sellers the First-Year Bonus Amount, if any, and within forty-five (45) days following the end of the Second-Year Bonus Period (the "Second-Year Bonus Payment Date"), Buyer shall deliver to the Principal Sellers the Second-Year Bonus Amount, if any. All payments to the Principal Sellers under this Section 2.3(b) (each an "Earn-Out Payment") shall be made in cash by wire transfer of immediately available funds in

IAM04573
Confidential

the proportions, and in accordance with, the instructions set forth on Schedule 2.3(b). The Earn-Out

Payment shall be delivered together with a statement, certified by Buyer and signed by Buyer's Chief

Financial Officer or other executive officer responsible for financial or accounting matters, reflecting

Buyer's Calculation of the Gross Margin for the applicable period (each a "Buyer's Calculation"),

which statement shall be delivered whether or not Buyer determines that an Earn-Out Payment is

due. The Principal Sellers, and if the Principal Sellers deem appropriate, the Company's former

independent accountants on the Principal Sellers' behalf, shall be entitled to make an independent

review of the Buyer's Calculation and the related calculation of the Earn-Out Payment and shall,

during the ten (10) Business Days following the delivery of the Buyer's Calculation, have prompt

access to all relevant financial information and records and all internal and external work papers used

to prepare and support the Buyer's certification of the Buyer's Calculation.

        (c)    Dispute Over Earn-Out Amount. In the event that the Principal Sellers desire

to dispute any Buyer's Calculation, the Principal Sellers shall, within twenty (20) Business Days

following receipt of such Buyer's Calculation, deliver to Buyer written notice setting forth, in detail,

their objections to such Buyer's Calculation (the "Objection Notice"), which dispute shall be

resolved in accordance with the procedure outlined in Section 2.2(b) hereof. Any and all Earn-Out

Payments will bear interest at the rate of 150 basis points above the Prime Rate from the applicable

Base Earn-Out Payment Date, the First-Year Bonus Payment Date, or the Second-Year Bonus

Payment Date, as the case may be, unless such amount is not required to be paid in accordance with

Section 2.3(d) hereof.

        (d)    Offset Against Earn-Out Payments.

        (i)    Subject to Subsection (ii) below, each Earn-Out Payment shall, after

compliance with the applicable procedures set forth Sections 2.2, 6.5 or 7.1, be subject to offset for

NAM04574
Confidential

any amounts owed (at the time as such Earn-Out Payment is due) by the Sellers to Buyer under and pursuant to the terms of Sections 2.2, 6.5 or 7.1 hereof.

(ii)    To the extent that an Excess Shortfall is on account of the Raider Bonus (the "Raider Shortfall"), (A) such Raider Shortfall shall be deducted from the First-Year Bonus Amount otherwise payable to the Principal Sellers by Buyer, if any, and (B) if such First-Year Bonus Amount is insufficient to offset the entire Raider Shortfall, the balance shall be deducted from the Second-Year Bonus Amount otherwise payable to the Principal Sellers by Buyer, if any, and (C) if such Second-Year Bonus Amount is insufficient to offset the entire remaining Raider Shortfall, the amount of the Raider Shortfall still owing shall be deducted from the Base Earn-Out Amount payable in respect of the third Base Earn-Out Period. If and to the extent that the Earn-Out Payments described in the preceding sentence are insufficient to offset the entire Raider Shortfall, the Principal Sellers shall pay to Buyer such excess by wire transfer of same day funds within ten (10) Business Days following the date on which the third Base Earn-Out Amount would have been paid had the offset not been made against it.

3.    Closing Documents.

3.1    Deliveries by Sellers. Concurrently with the execution of this Agreement, Sellers shall deliver to Buyer:

(a)    a certificate or certificates representing the Shares, duly endorsed in blank or with stock powers attached in accordance with Section 1.1 hereof;

(b)    a legal opinion of Goodwin, Procter & Hoar, LLP addressed to Buyer, in form reasonably acceptable to Buyer, that the Company is a corporation validly existing and in good standing under the laws of the State of Delaware, and that the Shares are duly authorized, validly issued, fully paid and nonassessable;

NAM04575
Confidential

      (c)     certificates of good standing for the Company issued by its jurisdiction of incorporation and each jurisdiction in which the Company is qualified to do business as a foreign corporation;

      (d)     Employment Agreements, duly executed by each of Fireman and Raider;

      (e)     all written consents and approvals listed on Schedule 4.3 hereto; and

      (f)     written letters of resignation, dated the date hereof, of each officer and director of the Company.

    3.2    <u>Deliveries by Buyer</u>. Concurrently with the execution of this Agreement, Buyer shall deliver to Sellers:

      (a)     a wire transfer to such account(s) as shall be designated in writing by the Sellers in an aggregate amount equal to the Closing Payment;

      (b)     a legal opinion of Squadron, Ellenoff, Plesent & Sheinfeld, LLP addressed to Sellers, in form reasonably acceptable to Sellers, that the Company is a corporation validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; and

      (c)     duly executed Employment Agreements for each of Fireman and Raider.

4.    <u>Representations and Warranties of the Principal Sellers and the Sellers</u>. Each of the Principal Sellers, jointly and severally, hereby represents and warrants to Buyer that the statements contained in this Section 4 are true, correct and complete as of the date hereof, except as disclosed in the Schedules referred to herein. Each of the Sellers, severally and not jointly, represents and warrants to Buyer, as to himself or herself, that the statements contained in Sections 4.2, 4.3 and 4.4 are true, correct and complete as of the date hereof, except as disclosed in the Schedules referred to herein.

NAM04576
Confidential

Nothing contained in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such exception is identified with reasonable particularity and detail.

4.1     The Company's Organization and Authority.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as it has been and is currently being conducted and has all necessary licenses and permits material to such business as it is currently being conducted, and to own, operate and lease its assets. The Company is duly qualified or licensed to do business as a foreign corporation and is in good standing as a foreign corporation in each jurisdiction in which the ownership, operation or lease of its assets or the conduct of its business or location of its properties requires qualification or licensing to do business as a foreign corporation and in which the failure to qualify could have an effect that is materially adverse to the business, assets, properties or condition (financial or otherwise) of the Company (a "Material Adverse Effect").

4.2     Authorization.  Each Seller has the capacity and authority to execute and deliver this Agreement, and to perform such Seller's obligations hereunder.  This Agreement constitutes the valid and legally binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.3     Freedom to Contract.  Subject to receipt of the consents and approvals described on Schedule 4.3 hereto, the execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby will not: (i) violate or conflict with any

9

NAM04577
Confidential

provision of the certificate of incorporation or by-laws or other charter documents of the Company, each as amended or amended and restated to the date hereof, (ii) violate any of the terms, conditions or provisions of any law, rule, statute, regulation, order, writ, injunction, judgment or decree of any court or Governmental Authority to which the Company or such Seller may be subject, or (iii) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice or give rise to a loss of any benefit under any of the terms, conditions or provisions of any contract, lease, sublease, license, sublicense, franchise, permit, note, bond, indenture, debenture, mortgage, permit, guaranty, joint venture agreement, security agreement, trust agreement, lien or other agreement, instrument, arrangement or obligation, oral or written, to which the Company or any Seller is a party (whether as an original party or as an assignee or successor) or by which the Company or any of its assets or properties are bound. Except as set forth on Schedule 4.3 hereto, no authorization, approval, order, license, permit, franchise or third party consent, and no registration, declaration or filing with any court or Governmental Authority, is required in connection with each Seller's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

4.4   Title to Shares. Each Seller, on the date hereof, owns beneficially and of record, free and clear of any Lien, and has full power and authority to convey free and clear of any Lien, the Seller's Shares set forth opposite such Seller's name on Schedule 4.4 hereto, such Shares constitute all of the Shares owned beneficially or of record by such Seller and, upon delivery of the Purchase Price for such Seller's Shares as herein provided, Buyer will acquire good and valid title thereto, free and clear of any Lien other than any Lien resulting from any acts of Buyer or its representatives. Except as set forth on Schedule 4.4 hereto, there are no existing agreements, subscriptions, options,

NAM04578
Confidential

warrants, calls, commitments or other rights of any kind whatsoever to purchase or otherwise acquire from such Seller at any time any of Seller's Shares or other securities of the Company. Each Seller has the percentage interest in the Company's capital stock set forth opposite such Seller's name on Schedule 4.4 hereto.

4.5    Capitalization; Subsidiaries.

(a)    The authorized capital stock of the Company is as set forth on Schedule 4.5 hereto, and the Shares represent all of the issued and outstanding shares of such capital stock. The Shares have been duly and validly issued, are fully paid and nonassessable, with no personal liability attached to the ownership thereof.

(b)    As of the date hereof, no shares of capital stock are held in the treasury of the Company and, except as set forth on Schedule 4.5, there are no outstanding (i) securities convertible into or exchangeable for capital stock of the Company; (ii) options, warrants or other rights to purchase, redeem, repurchase or subscribe to capital stock of the Company or securities convertible into or exchangeable for capital stock of the Company; or (iii) contracts, commitments, agreements, understandings or arrangements of any kind, including, without limitation, any stock option plans, relating to the issuance of any capital stock of the Company, any such convertible or exchangeable securities or any such options, warrants or rights.

(c)    The Company does not own, directly or indirectly, any capital stock or other equity securities of any corporation or have any direct or indirect ownership interest in any other business or entities, including, without limitation, any limited liability company, partnership, or joint venture.

NAM04579
Confidential

4.6     Financial Statements.

(a)     Attached hereto as Schedule 4.6 hereto are true and complete copies of the following financial statements of the Company:

(i)     a balance sheet of the Company as of December 31,1998 and statements of income, cash flows and changes in stockholders' equity for the fiscal year then ended, certified by the Company's Treasurer; and

(ii)     an unaudited balance sheet (the "Interim Balance Sheet") of the Company as of June 30, 1999 (the "Balance Sheet Date"), certified by the Company's Treasurer.

(b)     The foregoing financial statements are complete and correct in all respects and have been prepared in accordance with GAAP, consistently applied and fairly present the financial condition of the Company at the dates and the results of operations for the periods set forth therein.

4.7     Absence of Undisclosed Liabilities.  Except as set forth on Schedule 4.7 hereto, the Company has no direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility of any nature whatsoever, with respect to the Company's business whether known or unknown, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise, including, without limitation, liabilities on account of taxes, other governmental charges or lawsuits brought ("Liabilities"), other than those Liabilities that (i) are fully and adequately reflected on the Interim Balance Sheet, (ii) have arisen after the Balance Sheet Date in the ordinary course of the Company's business consistent with past practice (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, claim or lawsuit), (iii) Liabilities under the Company's contracts and commitments (A) set forth on Schedule 4.11(a) hereto, or (B) not required to be set forth on Schedule 4.11(a) hereto, in each case

NAM04580
Confidential

for which GAAP does not require the recordation of a financial liability, and (iv) other liabilities set forth on Schedule 4.7 hereto.

4.8    No Material Adverse Change.  Except as set forth on Schedule 4.8 hereto, since the Balance Sheet Date, the Company has conducted its business only in the ordinary course of business consistent with past practice and there has not been (a) any event or occurrence outside of the ordinary course of business which has resulted in a Material Adverse Effect, except for the continuation of operating losses incurred historically to the date hereof, (b) any damage, destruction or loss affecting the assets, properties, business or condition of the Company, whether or not covered by insurance, (c) any discharge or satisfaction of any Lien or any capital expenditure or payment of an obligation or liability, except in the ordinary course of business, (d) any transfer, sale or assignment of assets (tangible or intangible) used in connection with the Company's business, except in the ordinary course of its businesses, (e) any cancellation or write-off of any debt, claim, note or account receivable, except for the cancellation or write-off of the Raider Receivable, (f)  any incurrence of debt for borrowed money or other liability, other than as incurred in the ordinary course of business, (g) any guarantee of any obligation of any employee, Affiliate or other third party to any person, (h) any mortgage or pledge of the Company's properties or assets, (i) any loan or other advance made to any of the Company's employees, investors or Affiliates, (j) any dividend, distribution, withdrawal or removal by any other means of any of the Company's assets, except for payments to employees and payments made on account of trade payables, notes payable and accrued expenses, in each case, in the ordinary course of business, and forgiveness or cancellation of the Raider Receivable and the payment or accrual of the Raider Bonus, (k) any change in the general character or conduct of the Company's business, (l) any acquisition of, or agreement to acquire, all or substantially all of the assets or stock of another entity, or (m) any issuance or sale of capital stock

13

NAM04581
Confidential

or other securities or other membership or ownership interests, exchangeable or convertible securities, options, warrants, puts, calls or other rights to acquire capital stock or other securities or other ownership interests in the Company.

4.9     Real Estate.  The Company does not own any real property.  Schedule 4.9 hereto sets forth a list and summary description of all real property leased or used by the Company in connection with its business (the "Leased Property").  Schedule 4.9 also sets forth a list of each contract pursuant to which the Company has leased or subleased any Leased Property (the "Leases").  There are no (i) options held by the Company or contractual obligations on the part of the Company to purchase or acquire any interest in real property, or (ii) options granted by the Company or contractual obligations on the part of the Company to sell or dispose of any interest in real property.  A true and complete copy of each Lease or other agreement with respect to the leasing of the Leased Property has heretofore been delivered to Buyer.  Each of the Leases is valid and effective in accordance with its terms, and no default has been declared with respect to any Lease, and, to the Sellers' best knowledge, no event has occurred that constitutes, or with due notice or lapse of time or both would constitute, a default under any such Lease.  The Leased Property constitutes, in the aggregate, all of the real property used to conduct the Company's business as it has been and is currently being conducted, other than home offices in which there are no material assets of the Company.

4.10     Title to and Condition of Assets; Encumbrances, etc.  Except as set forth on Schedule 4.10 hereto, the Company has good and marketable title to, or a valid leasehold interest in, all of the assets and properties used by it, located on its premises or shown on the Interim Balance Sheet or acquired thereafter, including, without limitation, all equipment and devices (including data processing hardware and related telecommunications equipment, media and tools), free and clear of any mortgage, pledge, security interest, title defect or objection, lien, charge, claim, restriction,

14

NAM04582
Confidential

option, commitment or encumbrance of any kind (collectively, "Liens"), except for Permitted Liens. All assets material to the conduct of the Company's business as presently conducted owned, leased or used by the Company are in good operating condition and repair (except for normal wear and tear), are suitable for the purposes used and are adequate and sufficient for the operations of the Company as currently conducted.

4.11    Contracts and Commitments.

(a)    Except as listed on Schedule 4.11(a) hereto, the Company is not a party to any written or oral:

(i)    contract, commitment or arrangement relating to the Company's business or the Intellectual Property, or the Company's properties or assets, involving in any one case a remaining obligation of $5,000 or more, including without limitation, contracts, commitments or arrangements with such a remaining obligation (A) respecting the ownership, license, acquisition, design, development, distribution, marketing, use or maintenance of computer program code, related technical or user documentation, and databases, in each case relating to or arising out of the Company's business, (B) relating to the employment of any officer, individual employee or other person on a full-time, part-time, consulting or other basis, or (C) respecting the ownership or rights of any holder of shares of the Company's capital stock, including, without limitation, shareholder, voting and registration rights agreements.

(ii)    contract, commitment or arrangement which would restrain the Company or any Affiliate of the Company from engaging in any business; or

(iii)    contract, commitment, or arrangement with remaining obligations not made in the ordinary course of its business.

NAM04583
Confidential

(b)    Except as described in the Schedules hereto, all contracts (oral or written) pursuant to which Company operates its business are valid and effective in accordance with their respective terms, and there is not, under any of such contracts, documents or agreements or any obligation, covenant or condition contained therein, any existing default by the Company or, to the Sellers' best knowledge, by any other party, or, to the Sellers' best knowledge, any event which, with notice, lapse of time, or both, would constitute such default. True and complete copies of all written contracts which are listed on any Schedule hereto and a summary of the terms of each oral contract listed on any Schedule hereto have heretofore been made available to Buyer or its counsel.

4.12    Licenses and Permits. The Company has, possesses or maintains or has been granted all licenses, permits, certificates, franchises and other authorizations or inspections (collectively, "Licenses") of any Governmental Authority which, to the Sellers' best knowledge, are necessary to the ownership or use of the Company's assets or to the conduct of Company's business. Except as disclosed on Schedule 4.12, all the Licenses are in full force and effect and no proceeding is pending or, to the Sellers' best knowledge, threatened seeking the revocation or limitation of any such License.

4.13    Employee Matters.

(a)    (i)    Except as set forth on Schedule 4.13(a) hereto, the Company does not and has not, within the last two years, for the benefit of current or former employees, maintain, administer or contribute to any "employee benefit plans" ("Benefit Plans") within the meaning of Section 3(3) of ERISA.

(ii)    Except as set forth on Schedule 4.13(a) hereto, the Company is not a party to any (A) employment or similar contracts; (B) severance arrangements, (C) bonus or other incentive compensation arrangements; (D) fringe benefit or perquisite plans or arrangements;

NAM04584
Confidential

(E) deferred compensation arrangements; (F) non-competition arrangements; or (G) other remunerative arrangements ("plans, contracts and arrangements").

(iii)    The Sellers have provided Buyer copies or descriptions of such Benefit Plans and plans, contracts and arrangements set forth on Schedule 4.13(a) hereto. All Benefit Plans and other plans, contracts and arrangements set forth on Schedule 4.13(a) are and have been maintained in compliance with their terms and all requirements of applicable law.

(b)    There are no collective bargaining or other agreements between the Company and any union or other employee organizations relating to the Company's employees (the "Employees") whether such agreements are with the Company or, to the Sellers' knowledge, with any independent contractor or management company providing employees to the Company.

(c)    Except as set forth on Schedule 4.13(c) hereto, neither the Company nor any member of Company's Group has, within the preceding seven years, contributed to, or had an obligation to contribute to, any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA which is subject to Title IV of ERISA. As used in the preceding sentence, the "Company's Group" includes any person who is, or was at the relevant time, a member of the same "controlled group of corporations" as the Company (within the meaning of Section 414(b) of the Code), or under "common control" with the Company (within the meaning of Section 414(c) of the Code).

(d)    (i)    The Company is in compliance with all applicable laws relating to the employment practices, terms and conditions of employment and wages and hours with respect to the Employees; (ii) there are no controversies pending or, to the Sellers' best knowledge, threatened, between the Company and any of the Employees, prospective employees, former employees or retirees; and (iii) the Company has paid in full all wages, salaries, commissions,

NAM04585
Confidential

bonuses, benefits and other compensation due and payable to their respective employees, including those arising under any policy, practice, agreement, program, statute or other law.

(e)    Schedule 4.13(e) hereto contains a correct and complete list of (i) the names and current annual salary rates of all the Employees; (ii) the names and amounts, if any, paid, accrued or to be paid to all the Employees under any bonus, incentive or similar plans; (iii) all vacation and sick pay accrued (if any) in respect of the Employees; and (iv) the names of all employees receiving or entitled to elect the continuation of group health plan benefits pursuant to Section 4980B(f) of the Code.

4.14    Litigation.  Except as set forth on Schedule 4.14 hereto, the Company has received no notice of any pending or threatened action, suit, inquiry, litigation, proceeding or investigation ("Proceeding") by or before any referee, mediator or arbitrator, or any court or governmental or other regulatory or administrative agency or commission against or involving the Company in respect of the Company's assets or business. The Company is not subject to any judgment, order or decree entered in any lawsuit or proceeding that might adversely affect Buyer's rights in the Company's business or assets or Buyer's ability to conduct the Company's business after the date hereof.

4.15    Compliance with Law.

(a)    The Company has complied with, and is not in violation of any, law, ordinance or governmental rule or regulation (including, without limitation, any applicable business and zoning ordinances) to which the Company's business or its assets are subject.

(b)    Except as set forth on Schedule 4.15(b) hereto, the Company has not received any claim or notice of any violation of any building, zoning, fire, health, employment or environmental laws, codes, ordinances, rules or regulations relating to the Company's properties, premises, business or employees.

NAM04586
Confidential

4.16    Software and Information Systems. The Company has all right, title and interest to all computer software programs and software and information systems, in any media, including, without limitation, all program specifications, charts, procedures, input data, databases, compilations, routines, tool sets, compilers, higher level or "proprietary" languages, report layouts and formats, record file layouts, diagrams, functional specifications and narrative descriptions, flow charts and related documentation and materials, whether in source code, object code or human readable form, and all other related material used by the Company (collectively, the "Software"), other than Software licensed by the Company from others, as disclosed on Schedule 4.16. With respect to the Software:

(a)    Schedule 4.16 sets forth an accurate and complete list of all Software and identifies (i) Software that is owned by the Company and any licenses or other rights granted by the Company with respect to the Software; (ii) Software that is licensed to the Company, the licensor of the Software, and, if different, the owner thereof, to the extent known to the Company, and whether any copies of the licensed Software have been made, other than in connection with the licensed use thereof or for backup or archival purposes; (iii) any other Software in which the Company has any use, possessory or proprietary rights, the manner in which the Company acquired rights and the owner of the Software; and (iv) all pending Software development projects, together with a description of such projects and the stage of their development, an identification of the persons undertaking the projects, and a description of any Software licensed for use in the projects;

(b)    Except as set forth on Schedule 4.16 or as provided in contracts identified on Schedules 4.11 and 4.16, (i) the Software is not subject to any transfer, assignment, source code escrow agreement, reversion, site, equipment, or other operational limitations; (ii) the Company has maintained, protected and distributed the Software with appropriate copyright notices; (iii) the source

NAM04587
Confidential

code for the Software has been protected by having all persons having access executing confidentiality and non-disclosure agreements prior to gaining access thereto; (iv) the Software is protectable under applicable copyright law and has not been forfeited to the public domain; (v) the Company has copies of all releases or separate versions of the Software, other than versions or releases which have been discarded in the ordinary course of business, and source code for the same, so that the same may be registered in the United States Copyright Office; (vi) Software developed by the Company internally has been developed without the aid or use of any consultants, agents, independent contractors or persons (other than employees of the Company); (vii) Software commissioned for development by the Company and its predecessors has been developed subject to written agreements whereby the ownership of the Software vested immediately in the Company and, to the extent that vesting did not occur, the developer is required to assign all ownership to the Company without further consideration; and (viii) the Company has not registered any copyrights of the Software with the United States Copyright Office and no applications are pending therewith;

(c)        All Software documentation is sufficient in detail and content to identify and explain the nature thereof, and to allow its full and proper use by the Company without reliance on the special knowledge or memory of others, and includes pertinent commentary and explanation used for the development, implementation, maintenance and use thereof;

(d)        Except as set forth on Schedule 4.16, the Company's rights in the Software are free and clear of any liens, encumbrances, restrictions, or legal or equitable claims of others and there are no agreements or arrangements in effect with respect to the marketing, distribution, licensing, sale, resale or promotion of the Software between the Company and any other person;

NAM04588
Confidential

(e)    Except as set forth on Schedule 4.16, the Company has received no notice of any violation of patent, trade secret rights, copyrights or other proprietary rights with respect to any Software and knows of no basis therefor;

(f)    Except as set forth on Schedule 4.16, any copies of Software are in the Company's possession and control, except for certain copies of Software in the possession of customers pursuant to the Company's licensing agreements identified on Schedule 4.16 or in the possession of contract developers under consulting agreements identified on Schedule 4.16.

(g)    The Software owned by the Company contains no timer, virus, copy protection device, disabling code, clock, counter or similar routine that causes the Software (or any operation thereof) or become erased, inoperable, impaired, or otherwise incapable of being used in the full manner for which it was contemplated for use; and

(h)    The Software does not contain any encryption, cryptographic or other technology which is prohibited by law, including, but not limited to, regulations of the United States Department of Commerce, the United States State Department or any other applicable laws or regulations.

4.17    Intellectual Property.    Schedule 4.17 sets forth an accurate and complete list and description (showing, in each case, any product, device, process, service or publication covered thereby, the registered or other owner, registration number and registration or other expiration date, if any) of all Trademarks and Copyrights in marketing materials utilized by or in which the Company has an interest (the "Intellectual Property"). The Company does not own, utilize or have an interest in any Patent Rights. With respect to the Intellectual Property:

(a)    Except as set forth on Schedule 4.17, which Schedule sets forth with specificity the nature of the Company's rights (or grant of rights), any limitations thereon, the owner

21                NAM04589
Confidential

of such rights (or the licensee or grantee of such rights and the nature of such grant), the term of the relevant agreement(s) pursuant to which the Company obtained (or granted) such rights, the Company is the sole and exclusive owner of the Intellectual Property and has the sole and exclusive right to use the Intellectual Property;

(b)     Except as set forth on Schedule 4.17, with respect to the Intellectual Property, no action, suit, proceeding or investigation is pending or, to the Company's knowledge, threatened, against the Company, that the Intellectual Property owned by the Company, or owned by third parties and licensed to the Company, interferes with, infringes upon, conflicts with or otherwise violates the rights of others or is being interfered with or infringed upon by others;

(c)     Except as set forth on Schedule 4.17, the Company is not subject to any judgment, order, writ, injunction or decree of any court or any Federal, state, local or other governmental agency or instrumentality, domestic or foreign, or any arbitrator, nor is it a party to any contract which, in either case, restricts or impairs the Company's use of any Intellectual Property owned by the Company;

(d)     The Company has all right, title and interest necessary for the publication, reproduction, preparation of derivative works and distribution of the Intellectual Property owned by the Company;

(e)     Except as set forth on Schedule 4.17, during the preceding five (5) years, the Company has not been known by or done business under any other name not listed on such Schedule;

(f)     For purposes of this Agreement and the provisions of this Section, the following terms shall have the following meanings:

NAM04590
Confidential

(i)    "Copyrights" means United States and foreign copyrights, copyrightable works, and mask works, whether registered or unregistered, and pending applications to register the same;

(ii)    "Patent Rights" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether or not patented) or improvements thereto; and

(iii)    "Trademarks" means United States, state and foreign trademarks, service marks, logos, trade dress, trade styles, trade names (including all assumed or fictitious names under which the party is conducting business or has within the past five years conducted business), product designations, logos, brands and any other source-identifying devices or symbols, and any combination or variations thereof, whether registered or unregistered, and pending applications to register the foregoing and all registrations thereof.

4.18    Trade Secrets. Schedule 4.18 sets forth an accurate and complete list of all customer and prospective customer lists of the Company that may provide the Company with an advantage over competitors who did not know or use them (the "Trade Secrets"). With respect to the Trade Secrets:

(a)    they are owned solely and exclusively by the Company and the Company, or its independent contractors, agents or consultants who were subject to written agreements whereby the ownership of the Trade Secrets vested immediately in the Company, is solely responsible for development of the Trade Secrets;

(b)    they are documented in sufficient detail and content to identify and explain the nature thereof and in condition readily usable by the Company;

NAM04591
Confidential

(c)      they have been maintained and protected with all reasonable precautions to protect their secrecy, confidentiality and value; and

(d)      they are not part of the public knowledge or literature and, to the Company's knowledge, have not been used, divulged or appropriated either for the benefit of any third party or to the detriment of the Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

4.19    Tax Matters.

(a)      Except as set forth on Schedule 4.19, the Company has duly and timely filed or caused to be filed all Federal, state, local and foreign income, franchise, excise, payroll, sales and use, property and withholding tax returns, reports, estimates and information and other statements or returns (collectively "Tax Returns") required to be filed by or on behalf of it prior to the date hereof pursuant to any applicable federal, state, local or foreign tax laws for all years and periods for which such Tax Returns have become due, except where the time for filing any such Tax Return has been extended in accordance with applicable law. All such Tax Returns were correct in all material respects as filed and correctly reflect the Federal, state, local and foreign income, franchise, excise, payroll, sales and use, property, withholding and other taxes, duties, imposts and governmental charges (and charges in lieu of any thereof), together with interest, additions to tax and penalties (collectively "Taxes") required to be paid or collected by (or allocable to) the Company.

(b)      There are no Liens for Taxes upon any property of the Company except for Permitted Liens. All amounts required to be withheld by the Company from its employees for income taxes, social security and other payroll Taxes, including all amounts resulting from the consummation of the transactions contemplated hereby or referred to in the Schedules hereto, have been collected and withheld, and paid to the respective governmental agencies, or set aside in

NAM04592
Confidential

accounts for such purpose, or accrued, reserved against and entered upon the Company's books and records.

(c)    Except as set forth on Schedule 4.19, no written claim has ever been made by a taxing authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to Taxes assessed by such jurisdiction.

(d)    Except as set forth on Schedule 4.19, the Company (i) has paid or caused to be paid all Taxes required to be paid by it through the date hereof and (ii) has, in accordance with GAAP consistently applied, accrued on its Interim Balance Sheet referred to in Section 4.6 above, all Taxes for any period from the date of the last reporting period covered by any Tax Returns up to and including the Balance Sheet Date.

(e)    There is no pending or potential audit, dispute or claim concerning any Tax Return or Tax liability of the Company now in progress or, to the Sellers' best knowledge, threatened against the Company.

(f)    The Company will not be required to pay any Taxes as a result of the consummation of the transactions contemplated hereby, except for any Taxes that might be due in connection with the write-off or cancellation of the Raider Receivable or the accrual or payment of the Raider Bonus.

(g)    The Company is not and has not been a party to any Tax sharing agreement.

(h)    The Company has not incurred any obligation to make (or, to the Sellers' best knowledge, possibly make) any payments that (A) will be non-deductible under, or would otherwise constitute a "parachute payment" within the meaning of, Section 280G of the Internal Revenue Code of 1986, as amended (the "Code") (or any corresponding provision of state, local or foreign income

NAM04593
Confidential

Tax law) or (B) are or may be subject to the imposition of an excise tax under Section 4999 of the Code.

       (i)      The Company has never been included in a consolidated, unitary, combined or other such Tax Return with another entity. The Company has no liability for the Taxes of any other person (other than the Company) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee or successor by contract or otherwise.

      4.20     Insurance.  Schedule 4.20 hereto contains a correct list of all policies or binders of insurance held by or on behalf of the Company relating to its businesses, or providing coverage for any of its properties or assets (in each case specifying the insurer, the amount of coverage, the type of insurance, the risks insured, the expiration date, and the policy number) and, except as set forth on such Schedule, all premiums due prior to the date hereof with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation or termination has been received with respect to any such policy. All such policies are in full force and effect and provide insurance including, without limitation, liability insurance, in such amounts against such risks as is customary for companies engaged in similar businesses to the Company to protect the employees, properties, assets, businesses and operations of the Company, in each case naming the Company as beneficiary. To the Sellers' best knowledge, no state of fact exists and no event has occurred which reasonably might form the basis of any claim against the Company relating to its business which might substantially increase the insurance premiums payable under or result in the cancellation or nonrenewal of any of the policies or binders listed on Schedule 4.20.

      4.21     Transactions with Affiliates.  Except as described on Schedule 4.21 hereto, no Seller owns, directly or indirectly, or has any interest in, any business, corporate or otherwise, which is a

NAM04594
Confidential

party to any agreement, business arrangement or course of dealing with the Company relating to the Company's business.

4.22    Environmental Matters.

(a)    The Company is in compliance with all Environmental Laws applicable to the Company's business. There are no Environmental Claims relating to the Company's business pending or, to the Sellers' best knowledge, threatened against or involving the Company.

(b)    Except as set forth on Schedule 4.22 hereto, to the Sellers' knowledge, no underground tank or other underground storage receptacle for Hazardous Substances is currently located at any Leased Property and to the Sellers' knowledge, there have been no releases of any Hazardous Substances at any Leased Property. True and correct copies of all Environmental Reports have been made available to Buyer.

4.23    Accounts Receivable, etc. Schedule 4.23 hereto accurately sets forth the aging of the accounts receivable of the Company  with respect to the Company's business, each as of a recent date. All of the accounts receivable to be reflected on the Closing Date Balance Sheet shall have arisen in the ordinary course of business for goods sold or services performed and shall be fully collectible within 120 days following the date hereof, subject to a 3% allowance for returns and reserve for uncollectible and bad debts against the accounts receivable to be reflected on the Closing Date Balance Sheet (the "Reserve"). The Reserve shall be adequate to cover all returns and uncollectible receivables.

4.24    Brokers' Fees. Neither the Company nor any Seller has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

NAM04595
Confidential

4.25    Suppliers and Customers. Schedule 4.25 hereto sets forth a list of the ten largest customers and the ten largest suppliers of the Company by dollar volume of revenues for the year ended December 31, 1998. Except as set forth on Schedule 4.25, no single supplier or customer is of material importance to the Company's business. To the Sellers' best knowledge, the relationships of the Company with its suppliers and customers are good commercial working relationships and no such supplier or customer has canceled or otherwise terminated, or threatened in writing to cancel or otherwise terminate, its relationship with the Company or has during the last twelve (12) months decreased materially, or threatened to decrease or limit materially, its services, supplies or materials to the Company or its usage of the Company's services or products, as the case may be. The Company has received no notice that any such supplier or customer intends to cancel or otherwise modify its relationship with the Company or to decrease materially or limit its services, supplies or materials to the Company or its usage of the services or products of the Company.

4.26    Year 2000. All of the Company's products currently being sold or licensed and under development, including the Software, and all of the Company's computer software and hardware (including microcode, firmware, system and application programs, files, databases, computer services and microcontrollers), processes, data and operating systems are, to the Sellers' best knowledge, Year 2000 Compliant. To the Sellers' best knowledge, all of the software, products, data and operating systems of third parties, if any, used by the Company or otherwise interfaced with the Company's software, products, data or operating systems are Year 2000 Compliant. For purposes of this Agreement, the "Year 2000 Compliant" shall mean that such (a) products, processes, software, and data and operating systems, individually and in combination, completely and accurately record, store, process, calculate, transmit, display and present calendar dates on or after, and, if applicable, spans of time including, January 1, 2000; (b) the occurrence in or use by any

NAM04596
Confidential

products, processes, software, or data and operating systems, individually and in combination, of dates before, on or after January 1, 2000 will not adversely affect the performance of such products, processes, software, or data and operating systems, with respect to date-dependent data, computations, output, or other functions, including, without limitation, calculating, comparing, and sequencing; (c) products, processes, software, or data and operating systems will not abnormally end or provide invalid or incorrect results as a result of date-dependent data; and (d) products, processes, software, or data and operating systems can accurately recognize, manage, accommodate, and manipulate date-dependent data, including, without limitation, single and multi-century formulas and leap years.

4.27    Books and Records. All constituent documents, business licenses, minute books, stock certificate books and stock transfer ledgers of the Company (collectively, the "Records") have been made available to Buyer or its counsel maintained in accordance with sound business practices and laws, rules and regulations applicable to the Company or its properties or assets. The Records are complete and accurate in all respects and contain all matters required to be dealt with in such Records.

4.28    Disclosure. The representations, warranties and statements contained in this Agreement and in the certificates, exhibits and schedules delivered to Buyer by the Sellers pursuant to this Agreement do not contain any untrue statement of a material fact, and, when taken together, do not omit to state a material fact required to be stated therein or necessary in order to make such representations, warranties or statements not misleading in light of the circumstances under which they were made.

5.    Representations and Warranties of Buyer. Buyer hereby represents and warrants to the Sellers that the statements contained in this Section 5 are true, correct and complete as of the date

NAM04597
Confidential

hereof, except as disclosed in the Schedules referred to herein. Nothing contained in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such exception is identified with reasonable particularity and detail.

5.1    *Buyer's Organization and Authority*. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform fully its obligations hereunder.

5.2    Authorization of Agreement. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action of Buyer. This Agreement constitutes, and each document and instrument contemplated by this Agreement to be executed by Buyer, when executed and delivered in accordance with the provisions thereof shall constitute, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

5.3    Freedom to Contract. The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated hereby will not: (i) violate or conflict with any provision of the certificate of incorporation or by-laws or other charter documents of Buyer, each as amended or amended and restated to the date hereof, (ii) violate any of the terms, conditions or provisions of any law, rule, statute, regulation, order, writ, injunction, judgment or decree of any court or Governmental Authority to which Buyer may be subject, or (iii) conflict with,

NAM04598
Confidential

result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice of give rise to a loss of any benefit under any of the terms, conditions or provisions of any contract, lease, sublease, license, sublicense, franchise, permit, note, bond, indenture, debenture, mortgage, permit, guaranty, joint venture agreement, security agreement, trust agreement, lien or other agreement, instrument, arrangement or obligation, oral or written, to which Buyer is a party (whether as an original party or as an assignee or successor) or by which Buyer or any of its assets or properties are bound. Except as set forth on Schedule 5.3, no authorization, approval, order, license, permit, franchise or third party consent, and no registration, declaration or filing with any court or Governmental Authority, is required in connection with Buyer's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

5.4     Brokers' Fees.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

5.5     Financing.  The Buyer has all funds necessary to pay the Closing Payment and will continue to have all funds necessary to pay the Earn-Out Payments (if any) and comply with the covenants with respect to the Earn-Out Payments.

5.6     Investment Intent.  The Buyer is acquiring the Shares solely for investment and not with a view to, or for offer or sale in connection with, any distribution.

5.7     Litigation.  There in no Proceeding against the Buyer which would have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement.

NAM04599
Confidential

6.    Additional Agreements between the Parties.

6.1    Expenses.  The parties to this Agreement shall, except as otherwise specifically provided herein, bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of brokers, agents, representatives, counsel and accountants, *provided,* that legal fees and disbursements incurred on behalf of Sellers and reflected on an invoice submitted to Buyer by Sellers' counsel at least one day prior to Closing shall be paid at Closing by the Company or by Buyer for the Company's account which amount shall, be reflected as a liability on the Closing Date Balance Sheet.

6.2    Noncompetition; Nonsolicitation.  Each of the Principal Sellers hereby agrees, that neither such Principal Seller nor any of such Principal Seller's Affiliates shall, from and after the date hereof, for the Non-Compete Term (as defined in respective the Employment Agreements dated as of the date hereof between Buyer and each of the Principal Sellers), Participate In any business which is competitive with (a) the business of the Company as conducted on the date hereof, (b) any of the following businesses in which Buyer currently is or intends to be engaged: (i) selling in-store media, (ii) selling sampling and merchandising services,  (iii) selling free-standing inserts, and (iv) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (c) any other business conducted by Buyer in which such Principal Seller participates in as an employee of Buyer or otherwise has access to confidential information of the Company or the Buyer relating to such business through his or her employment by the Company or the Buyer ("Buyer's Business"). Without limiting the scope of the foregoing, neither Principal Seller nor any of such Principal Seller's Affiliates shall, during the Non-Compete Term, directly or indirectly, (i) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for

employment, any person who currently is an employee of Buyer, including, without limitation, those employees who are hired in connection with the transactions contemplated by this Agreement, (ii) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of Buyer, including, without limitation, those employees who are hired in connection with the transactions contemplated by this Agreement, or (iii) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of Buyer with respect to (A) the business of the Company as conducted on the date hereof, or (B) the Buyer's Business, including those customers or suppliers acquired in connection with the transactions contemplated by this Agreement.

6.3    Equitable Remedy. Each Principal Seller acknowledges and agrees that, in the event such Principal Seller shall breach or threaten to breach any of the terms of Section 6.2 hereof, Buyer shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a threatened breach and to have the provisions of such Section specifically enforced by a court having jurisdiction, it being acknowledged and agreed by each Principal Seller that any such breach or threatened breach will cause immediate irreparable damage to Buyer and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to Buyer at law or in equity. Each Principal Seller and Buyer agree that the provisions of this Section 6.3 are necessary and reasonable to protect Buyer in the conduct of the Company's business and that the covenants set forth in Section 6.2 hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard

NAM04601
Confidential

to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

6.4    Further Assurances. From and after the date hereof, the Sellers, on the one hand, and Buyer, on the other, agree to execute and deliver such further documents and instruments and to do such other acts and things as Buyer or the Sellers, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement. Following the date hereof, the parties will cooperate with each other in connection with any tax and in the defense of any legal proceedings relating to the Company's business or its assets to the extent such cooperation does not cause unreasonable expense, unless such expense is borne by the requesting party.

6.5    Tax Matters.

(a)    Responsibility for Taxes. Notwithstanding anything else to the contrary in this Agreement, subject to the procedures and limitations set forth in Section 7 hereof, the Principal Sellers will pay and be responsible for, and will indemnify and hold Buyer harmless from and against any Losses related to:

(i)    any and all Taxes attributable to or arising out of the operations or activities of the Company or otherwise incurred in connection with the Company's assets for any Tax period (or portion thereof) ending on or before the date hereof; and

(ii)    any and all Taxes, including, but not limited to, sales, use and real property transfer taxes, attributable to or arising out of the transactions contemplated in this Agreement, which Taxes are not accrued on the Closing Date Balance Sheet.

NAM04602
Confidential

(b)    Cooperation on Tax Matters. Buyer and the Sellers will cooperate fully, as

and to the extent reasonably requested by the other party, in connection with the preparation and

filing of any Tax Return and any audit, litigation or other proceeding with respect to Taxes. Such

cooperation will include (i) the retention and (upon the other party's request) the provision of records

and information which are reasonably relevant to any such audit, litigation or other proceeding for

a period of seven (7) years, and (ii) making themselves, their employees and agents available on a

mutually convenient basis to provide additional information and explanation of any material

provided hereunder.

6.6    Public Announcements. Each party to this Agreement shall consult with each other

before issuing any press release or otherwise making any public statements with respect to this

Agreement or any transaction contemplated hereby and shall not issue any such press release or make

any such public statement without the prior consent of the other party (unless required by law),

which consent shall not be unreasonably withheld. The parties hereto further agree to cooperate to

prepare a joint press release to be issued on the date hereof or as soon as practicable hereafter.

6.7    Accounts Receivable.

(a)    After the date hereof, the Company shall collect its accounts receivable

reflected on the Closing Date Balance Sheet (the "Accounts Receivable") in a commercially

reasonable fashion in the ordinary course of business consistent with past practices. Buyer shall

furnish Sellers with all such records and other information as Sellers may reasonably require to

verify the amounts collected by Buyer with respect to the Accounts Receivable. For the purpose of

determining amounts collected by Buyer with respect to the Accounts Receivable, (i) if a payment

is specified by an account debtor as being in payment of a specific invoice of Buyer or Sellers, as the

case may be, the payment shall be applied to that invoice and (ii) in the absence of a bona fide

NAM04603
Confidential

dispute between an account debtor and Sellers, all payments by an account debtor that are not specified as being in payment of a specific invoice shall first be applied to the oldest outstanding invoice due from that account debtor. Notwithstanding the foregoing, Buyer shall not be required to retain a collection agency, bring any suit or take any other action out of the ordinary course of business to collect any of the Accounts Receivable. Buyer shall not compromise, settle or adjust the amount of any of the Accounts Receivable without the prior written consent of the Sellers, which consent shall not be withheld unreasonably.

(b)    To the extent that Buyer has not collected the full amount of the Accounts Receivable (net of the allowance for returns and reserve for uncollectible and bad debts referred to in Section 4.23) shown on the Closing Date Balance Sheet (the "Full Amount") within 120 days after the date hereof, the Principal Sellers thereupon shall pay to Buyer by wire transfer of same day funds, the amount of such deficiency and, concurrently with the payment by the Principal Sellers thereof, Buyer (or the Company) shall assign to the Principal Sellers all uncollected Accounts Receivable. Buyer agrees that, to the extent it is actually paid by any Principal Seller with respect to any account receivable (including by way of the calculation of the Shortfall), whether such amount is applied against the Deductible (as defined herein), it shall have no rights or obligations with respect to any such account receivable and shall pay to Sellers any amounts received thereafter on such account receivable.

6.8    Conduct of the Business. It is Buyer's current intention to provide support to the business of the Company by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, Buyer shall be free to operate the Company

NAM04604
Confidential

and its Affiliates in its sole and unfettered judgment and Sellers shall have no claim against Buyer in connection therewith as a result of the preceding sentence. Buyer hereby agrees that the direct sales expenses for the first and second Base Earn-Out Periods shall not exceed $1.0 million and $1.4 million, respectively, unless otherwise agreed by Buyer, on the one hand, and Fireman and Raider, on the other hand.

7.      Indemnification.

        7.1      Indemnification by the Principal Sellers and the Sellers. Subject to Section 7.5 hereof and the last sentence of this Section 7.1, the Principal Sellers jointly and severally agree to indemnify Buyer and hold it harmless at all times from and after the date hereof against and in respect to any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, damages, losses, liabilities, Taxes and deficiencies and penalties and interest thereon and costs and expenses, including reasonable attorneys' fees and expenses (collectively, "Losses") resulting from any breach of any representation or warranty contained in Section 4 hereof, or the breach of any covenant or agreement of the Sellers in this Agreement, and (b) any claim arising from or relating to any Proceeding listed on Schedule 4.14 hereto except to the extent that an accrual in respect of the Company's entire liability for any such Proceeding is reflected on the Closing Date Balance Sheet. Each of the Sellers severally and not jointly agree to indemnify Buyer and hold it harmless at all times from and after the date hereof against and in respect to any and all Losses resulting from any breach of any of such Seller's representation or warranty contained in Section 4.2, 4.3 or 4.4 hereof.

        7.2      Indemnification by Buyer. Subject to Section 7.5 hereof, Buyer agrees to indemnify the Sellers and hold them harmless at all times from and after the date hereof against and in respect to any and all Losses resulting from any breach of any representation or warranty contained in Section 5 hereof or the breach of any covenant or agreement of Buyer in this Agreement.

NAM04605
Confidential

7.3     Notice to the Indemnitor. Promptly after the assertion of any claim by a third party or occurrence of any event which may give rise to a claim for indemnification from an indemnitor (the "Indemnitor") under this Section, an indemnified party (the "Indemnified Party") shall notify the Indemnitor in writing of such claim (the "Claims Notice"). The Claims Notice shall describe the asserted liability in reasonable detail, and shall indicate the amount (estimated, if necessary and to the extent feasible) of the Loss that has been or may be suffered by the Indemnified Party. Failure by the Indemnified Party to give a Claims Notice to the Indemnitor in accordance with the provisions of this Section 7.3 shall not relieve the Indemnitor of its obligations hereunder except to the extent that the Indemnitor has been actually prejudiced by such failure.

7.4     Rights of Parties to Settle or Defend. The Indemnitor may elect to compromise or defend, at its own expense, by its own counsel, any asserted liability. If the Indemnitor elects to compromise or defend such asserted liability, it shall, within thirty (30) calendar days following the date of the Claims Notice (or sooner, if the nature of the asserted liability so requires), notify the Indemnified Party of its intent to do so, and the Indemnified Party shall cooperate, at the expense of the Indemnitor, in the compromise of, or defense against, such asserted liability. If the Indemnitor elects to defend any claim, the Indemnified Party shall make available to the Indemnitor any books, records or other documents within its control that are necessary or appropriate for such defense. If the Indemnitor elects not to compromise or defend the asserted liability or fails to notify the Indemnified Party of its election as herein provided, the Indemnified Party may pay, compromise or defend (at the expense of the Indemnitor) such asserted liability as the Indemnified Party considers appropriate. The parties agree to cooperate fully with one another in the defense, settlement or comprise of any asserted liability. Notwithstanding the foregoing, neither the Indemnitor nor the Indemnified Party may settle or compromise any claim over the objection of the other; *provided,* that

NAM04606
Confidential

consent to settlement or compromise shall not be unreasonably withheld. In any event, the Indemnified Party and the Indemnitor may participate, at their own expense, in the defense of such asserted liability.

7.5    Limitations on Indemnification.  Notwithstanding the foregoing, the right of an Indemnified Party to indemnification under Sections 7.1 or 7.2 of this Agreement shall be subject to the following provisions:

(a)    The indemnification obligations of an Indemnified Party pursuant to Sections 7.1 and 7.2 shall not be effective until the aggregate dollar amount of all Losses that would otherwise be indemnified pursuant to such section exceeds $50,000 (the "Deductible"), and then only to the extent such aggregate amount exceeds the Deductible.  In no event shall the aggregate amount required to be paid by either party to the other under Section 7.1 or 7.2 of this Agreement exceed the Purchase Price; *provided*, however, that this limitation shall not apply to Sellers' indemnification obligations arising from a breach of any representation or warranty contained in Sections 4.2 or 4.4 hereof; and *provided*, further, that the Sellers shall be severally and not jointly liable to Buyer for any breach of any representation or warranty contained in Sections 4.2 or 4.4 made by each Seller with respect to himself or herself.

(b)    For purposes of this Section 7.5, in computing such individual or aggregate amounts of claims, the amount of any insurance proceeds (which the Indemnified Party agrees to use commercially reasonable efforts to pursue) and any indemnity, contribution or other similar payment actually received by an Indemnified Party from any third party with respect thereto shall be deducted from each such claim.

7.6    Reimbursement.  At the time that the Indemnified Party shall suffer a loss because of a breach of any warranty, representation or covenant by the Indemnitor or at the time the amount

39                              NAM04607
Confidential

of any liability on the part of the Indemnitor under this Section is determined (which in the case of

payments to third persons shall be the earlier of (i) the date of such payments, or (ii) the date that a

court of competent jurisdiction shall enter a final judgment, order or decree, the Indemnitor shall

forthwith, upon notice from the Indemnified Party, pay to the Indemnified Party by wire transfer of

same day funds, the among of the indemnity claim which is in excess of the Deferred Amount. If

such amount is not paid forthwith, then the Indemnified Party may, at its option, take legal action

against the Indemnitor for reimbursement in the amount of the indemnity claim which is in excess

of the Deferred Amount. For purposes hereof, the indemnity claim shall include the amounts so paid

(or determined to be owing) by the Indemnified Party together with costs and reasonable attorneys'

fees and interest on the foregoing items at the rate of 150 basis points above the Prime Rate from the

date the obligation is due from the Indemnitor to the Indemnified Party, as hereinabove provided,

until the indemnity claim shall be paid, irrespective of whether Buyer's claims for indemnification

are paid in cash or by the reduction of the Earn-Out Payments due pursuant to Section 2.3 hereof.

    7.7    Survival of Representations and Warranties. Notwithstanding any right of Buyer to

investigate the affairs of the Company's business, Buyer has the right to rely fully upon the

representations, warranties, covenants and agreements of the Sellers contained in this Agreement.

All representations and warranties made by each party in this Agreement or in any certificate,

document or written statement referred to herein or furnished or delivered in connection with this

Agreement shall survive the date hereof, and shall remain in full force and effect until eighteen (18)

months after the date hereof; *provided*, that all representations and warranties contained in Sections

4.4, 4.5, 4.13, 4.19 shall survive for the applicable statute of limitations; and *provided, further*, that

all other covenants and agreements shall survive the execution and delivery hereof and shall

thereafter terminate and expire in accordance with the terms thereof, or, if no such expiration time

NAM04608
Confidential

is stated, when the liability to which any such covenant or agreement may relate is barred by the applicable statute of limitations. No claim for breaches of representations or warranties in this Agreement, or indemnification in respect of the same, may be made unless and only to the extent that the party claiming a breach, or requesting indemnification, gives written notice of such breach pursuant to Section 7.3 hereof to the breaching party on or prior to the date that the representation or warranty at issue ceases to survive as provided in this Section 7.7.

8.    Miscellaneous.

    8.1    Entire Agreement. This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters.

    8.2    Governing Law; Jurisdictions. This agreement shall be governed by, and construed and enforced in accordance with the laws of the State of New York. The parties hereto irrevocably consent to the jurisdiction of the courts of the State of New York and any Federal court located in such State in connection with any action or proceeding arising out of or relating to this Agreement, or the transaction contemplated hereby.

    8.3    Headings. The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

    8.4    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally, mailed by registered or certified mail, return receipt requested, or sent by recognized overnight delivery service to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

NAM04609
Confidential

If to any Seller, to:

> such Seller's address set forth on the signature page hereto.

*with a copy to:*

> each other Seller at the address specified on the signature page hereto.

If to Buyer, to:

> News America Marketing In-Store, Inc.
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: David DeVoe, Jr.

*with copies to:*

> The News Corporation Limited
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: Lawrence A. Jacobs, Esq.

*and:*

> Squadron, Ellenoff, Plesent & Sheinfeld, LLP
> 551 Fifth Avenue
> New York, New York 10176
> Attention: Deborah R. Wolfe, Esq.

8.5    <u>Severability</u>.  If at any time any of the covenants or the provisions contained herein shall be deemed invalid or unenforceable by the laws of the jurisdiction wherein it is to be enforced, by reason of being vague or unreasonable as to duration, geographic scope, scope of activities restricted or for any other reason, such covenants or provisions shall be considered divisible as to such portion and such covenants or provisions shall become and be immediately amended and reformed to include only such covenants or provisions as are enforceable by the court or other body having jurisdiction of this Agreement; and the parties agree that such covenants or provisions, as so

NAM04610
Confidential

amended and reformed, shall be valid and binding as though the invalid or unenforceable portion had not been included herein.

8.6     Amendment; Waiver. No provision of this Agreement may be amended or modified except by an instrument or instruments in writing signed by the parties hereto. No waiver of any provision hereof shall be construed as a waiver of any other provision. Any waiver must be in writing.

8.7     Assignment and Binding Effect. None of the parties hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other; *provided*, that Buyer may assign any of its rights or delegate any of its duties to any Affiliate of Buyer following written notice to the Sellers and without relieving Buyer from any liability or obligations hereunder; *provided*, that such assignee agrees in writing for the benefit of the Sellers, to assume the obligations of Buyer set forth in this Agreement. All of the terms and provisions of this Agreement shall be binding on, and shall inure to the benefit of, the respective successors and permitted assigns of the parties.

8.8     No Benefit to Others. The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their respective successors and assigns and they shall not be construed as conferring and are not intended to confer any rights on any other persons.

8.9     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and each party may become a party hereto by executing a counterpart hereof. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.

NAM04611
Confidential

8.10    Certain Definitions.    The following terms, as used herein, have the following meanings:

"Affiliate" means with respect to any person or entity, means any person or entity directly or indirectly controlling, controlled by or under common control with such person or entity.

"Balance Sheet Date" shall have the meaning set forth in Section 4.6(a)(ii) hereof.

"Base Earn-Out Amount" shall have the meaning set forth in Section 2.3(a) hereof.

"Base Earn-Out Payment Date" shall have the meaning set forth in Section 2.3(b) hereof.

"Base Earn-Out Period" shall have the meaning set forth in Section 2.3(a) hereof.

"Benefit Plans" shall have the meaning set forth in Section 4.13(a) hereof.

"Business Day" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York on which banking institutions located in such state are closed.

"Buyer" shall have the meaning set forth in the preamble.

"Buyer's Business" shall have the meaning set forth in Section 6.2 hereof.

"Buyer's Calculation" shall have the meaning set forth in Section 2.3(b) hereof.

"Cap" shall have the meaning set forth in the definition of "Gross Margin."

"Claims Notice" shall have the meaning set forth in Section 7.3 hereof.

"Closing Date Balance Sheet" shall have the meaning set forth in Section 2.2(a) hereof.

"Closing Payment" shall have the meaning set forth in Section 2.1 hereof.

"Code" shall have the meaning set forth in Section 4.19(f).

"Company" shall have the meaning set forth in the first recital hereof.

NAM04612
Confidential

"Company's Group" shall have the meaning set forth in Section 4.13(c) hereof.

"Deductible" shall have the meaning set forth in Section 7.5(a) hereof.

"Deferred Amount" shall have the meaning set forth in Section 3.2(d) hereof.

"Deficiency" shall have the meaning set forth in Section 2.2(a) hereof.

"Earn-Out Payment" shall have the meaning set forth in Section 2.3(b) hereof.

"Employees" shall have the meaning set forth in Section 4.13(b) hereof.

"Environmental Claims" means all accusations, allegations, notices of violation,

Liens, claims, demands, suits, or causes of action for any damage, including, without limitation,

personal injury, property damage (including, without limitation, any depreciation or diminution of

property values), lost use of property or consequential damages, based upon Environmental Laws

or principles of common law relating to pollution or exposure to Hazardous Substances. By way of

example only (and not by way of limitation), Environmental Claims include (i) actions alleging

actual or threatened damages to natural resources and seeking recovery pursuant to Environmental

Laws, (ii) claims for nuisance or its statutory equivalent, (iii) claims for the recovery of response

costs, or administrative or judicial orders directly related to the performance of investigations,

responses or remedial actions under any Environmental Law, (iv) requirements to implement

"corrective action" pursuant to any order or permit issued pursuant to the Resource Conservation and

Recovery Act, as amended, or similar provisions of applicable state law, (v) claims based upon

Environmental Laws or principles of common law relating to pollution or exposure to Hazardous

Substances for restitution, contribution, or indemnity, (vi) fines, penalties or liens of any kind against

property based upon Environmental Laws or principles of common law relating to pollution or

exposure to Hazardous Substances, (vii) claims based upon Environmental Laws or principles of

common law relating to pollution or exposure to Hazardous Substances for injunctive relief or other

NAM04613
Confidential

orders or notices of violation from federal, state or local agencies or courts and (viii) with regard to any present or former employees, claims relating to exposure to or injury from Hazardous Substances based upon principles of common law relating to pollution or exposure to Hazardous Substances.

"Environmental Laws" means all applicable federal, state, district and local laws, all rules or regulations promulgated thereunder, and all orders, consent orders or judgments issued, promulgated or entered pursuant thereto, relating to pollution or protection of the environment (including, without limitation, ambient air, surface water, ground water, land surface, or subsurface strata), including, without limitation, (i) laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, industrial materials, wastes or other hazardous or toxic substances into the environment and (ii) laws relating to the identification, generation, manufacture, processing, distribution, use, treatment, storage, disposal, recovery, transport or other handling of pollutants, contaminants, chemicals, industrial materials, wastes or other hazardous or toxic substances. Environmental Laws shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Toxic Substances Control Act, as amended, the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended ("RCRA"), the Clean Water Act, as amended, the Safe Drinking Water Act, as amended, the Clean Air Act, as amended, the Atomic Energy Act of 1954, as amended, the Occupational Safety and Health Act, as amended, and all analogous laws promulgated or issued by any state or other governmental authority.

"Environmental Reports" means any and all written analyses, summaries or explanations, in the possession or control of the Company, of (a) the condition of the environment on or about any Leased Property or (b) the Company's compliance with Environmental Laws.

NAM04614
Confidential

"ERISA" means the Employee Retirement and Income Security Act of 1974, as amended.

"Excess Shortfall" shall have the meaning set forth in Section 2.2(a) hereof.

"First-Year Bonus Amount" shall have the meaning set forth in Section 2.3(a) hereof.

"First-Year Bonus Payment Date" shall have the meaning set forth in Section 2.3(b) hereof.

"First-Year Bonus Period" shall have the meaning set forth in Section 2.3(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" means any domestic or foreign administrative or regulatory agency, bureau, board, commission, officer, authority, department or other governmental body or agency.

"Gross Margin" shall mean "gross margin" as defined by GAAP, and shall include all revenues in respect of the Company or any successor (by law or otherwise) to the Company's business for the relevant period, less:

(a)    Costs of goods sold relating to such revenues for such period as determined by GAAP, which for clarification purposes includes the following expenses which are not meant to be an inclusive list of all costs of goods sold: (i) card implementation expenses, (ii) software development and database programming, storage and management expenses for customer specific projects, (iii) third party license fees for software resold to clients, (iv) commission payments to retailers, and (v) data rights fees. Notwithstanding the preceding sentence, it is not the intention of the parties to deduct expenses as costs of goods sold unless such expenses are costs of goods sold in accordance with GAAP. Based on the Company's current operations, Sellers agree that the expenses in items (i) through (v) above are costs of goods sold in accordance with GAAP.

NAM04615
Confidential

(b)    Direct selling, advertising and marketing expenses, salaries of direct full-time Company sales personnel and their related direct expenses (excluding compensation paid to Fireman and Raider and any related direct expenses), direct sales public relations expenses, direct sales professional services expenses, direct sales trade show expenses and direct sales presentation materials expenses. These expenses are direct Company expenses without allocation or mark-up from Buyer or its Affiliates and will not include any sales expense (including sales, travel, commission or other expenses) for Buyer, its Affiliates or their respective employees, notwithstanding the fact that it is intended that the Company will utilize the sales personnel of Buyer and its Affiliates after the date hereof.

(c)    All investments by Buyer in the Company in the relevant period, which shall not include (i) amounts invested in the Company to fund the Working Capital deficiency reflected on the Closing Date Balance Sheet, (ii) the first $1.5 million invested by Buyer following the date hereof (the "Cap"), and (iii) and any amount paid in respect of the Raider Bonus. For capital expenses in excess of the Cap, related depreciation expenses shall be included in the calculation of Gross Margin and such expenses shall be (A) based on reasonable estimates of the useful life of the relevant assets, and (B) accounted for in accordance with GAAP. Investments in respect of non-capital assets in excess of the Cap will be included in the calculation of Gross Margin as a dollar for dollar basis. For purposes of applying investments in the relevant period toward the Cap, investments in respect of non-capital assets shall be included first.

"Hazardous Substances" means all pollutants, contaminants, chemicals, wastes, and any other carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials (whether solids, liquids or gases) subject to regulation, control or remediation under Environmental Laws. By way of example only, the term Hazardous Substances includes petroleum,

NAM04616
Confidential

urea formaldehyde, flammable, explosive and radioactive materials, PCBs, pesticides, herbicides, asbestos, sludge, slag, acids, metals, solvents and waste waters.

"Indemnified Party" shall have the meaning set forth in Section 7.3 hereof.

"Indemnitor" shall have the meaning set forth in Section 7.3 hereof.

"Intellectual Property" shall have the meaning set forth in Section 4.17(a) hereof.

"Interim Balance Sheet" shall have the meaning set forth in Section 4.6(a)(ii) hereof.

"Leases" shall have the meaning set forth in Section 4.9 hereof.

"Leased Property" shall have the meaning set forth in Section 4.9 hereof.

"Liabilities" shall have the meaning set forth in Section 4.7 hereof.

"Licenses" shall have the meaning set forth in Section 4.12 hereof.

"Liens" shall have the meaning set forth in Section 4.10 hereof.

"Losses" shall have the meaning set forth in Section 7.1 hereof.

"Material Adverse Effect" shall have the meaning set forth in Section 4.1 hereof.

"Non-Compete Payment" shall have the meaning set forth in Section 2.1 hereof.

"Notice of Disagreement" shall have the meaning set forth in Section 2.2(b) hereof.

"Participate In" shall mean to engage or participate, directly or indirectly, in any capacity whatsoever, whether compensated or not, for his or her own benefit or for, with or through any other person, firm, corporation or other entity, in the ownership, management, operation or control of, or to be connected as a director, officer, employee, partner, proprietor, consultant, principal, agent, shareholder, investor, independent contractor or otherwise with, or acquiesce in the use of his or her name in connection with the business of, any other person, firm, corporation or other entity; *provided*, however, that ownership of not more than 1% of a publicly traded entity shall be excluded from this definition.

NAM04617
Confidential

"Permitted Liens" means liens or other encumbrances securing taxes, assessments, governmental charges or levies, or the claims of materialmen, carriers, landlords and like persons, all of which are not yet due and payable or are being contested in good faith.

"Plans, contracts and arrangements" shall have the meaning set forth in Section 4.13(a)(ii).

"Prime Rate" shall mean the prime rate of interest as published in *The Wall Street Journal*.

"Principal Sellers" shall have the meaning set forth in the preamble.

"Proceeding" shall have the meaning set forth in Section 4.14 hereof.

"Proprietary Software" shall have the meaning set forth in Section 4.16 hereof.

"Purchase Price" shall have the meaning set forth in Section 2.1 hereof.

"Raider Bonus" shall have the meaning set forth in Section 2.2(c) hereof.

"Raider Receivable" shall have the meaning set forth in Section 2.2(c) hereof.

"Records" shall have the meaning set forth in Section 4.27 hereof.

"Reserve" shall have the meaning set forth in Section 4.23 hereof.

"Seller" and "Sellers" shall have the meaning set forth in the preamble hereto.

"Second-Year Bonus Amount" shall have the meaning set forth in Section 2.3(a) hereof.

"Second-Year Bonus Payment Date" shall have the meaning set forth in Section 2.3(b) hereof.

"Second-Year Bonus Period" shall have the meaning set forth in Section 2.3(a) hereof.

"Shares" shall have the meaning set forth in the third recital hereto.

NAM04618
Confidential

"Software" shall have the meaning set forth in Section 4.16(a) hereof.

"Taxes" shall have the meaning set forth in Section 4.19(a).

"Tax Returns" shall have the meaning set forth in Section 4.19(a).

"Working Capital" shall mean the Company's total current assets, less the Company's total current liabilities reflected on the Closing Date Balance Sheet prepared in accordance with GAAP; *provided*, however, that (i) the cancellation or write-off of the Raider Receivable shall not be included in the calculation of Working Capital, (ii) an amount equal to fifty percent (50%) of the Raider Bonus shall be included in the calculation of Working Capital, (iii) any income tax refund owing to the Company arising from the carry back of the 1998 operating loss to the 1997 tax year shall be included in the calculation of Working Capital, and (iv) no amount in respect of deferred tax benefit shall be included in the calculation of Working Capital.

"Year 2000 Compliant" shall have the meaning set forth in Section 4.26 hereof.

8.11  Interpretation. Article titles, headings to sections and any table of contents are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation hereof. The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. As used herein, "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; the singular includes the plural and vice versa; references to any agreement or other document are to such agreement or document as amended and supplemented from time to time.

8.12  Arrangements Among Sellers. Each of the Sellers and the Buyer acknowledge and agree that no provision set forth in this Agreement shall impact or have any effect upon any agreement, arrangement or understanding among any two or more of the Sellers with respect to the

51

NAM04619
Confidential

allocation of, and contribution arrangements with respect to, the relative rights, risks and responsibilities (including without limitation indemnification obligations and the obligation to repay the Shortfall, if any) among the Sellers.

NAM04620
Confidential

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement as of the date first above written.

_____
**ROBERT FIREMAN**

Address:  241 Perkins St. #D-104
          Jamaica Plains, MA 02130

_____
**ANN RAIDER**

Address:  46 Ivy Road
          Wellesley, MA 02181

_____
**CURTIS R. SMITH**

Address:  9 Wingate Road
          Wellesley, MA 02181

_____
**JOHN H. BOYLES**

Address:  39 Westcott Road
          Harvard, MA 01451

**NEWS AMERICA MARKETING IN-STORE, INC.**

By:_____
          Name:  David DeVoe, Jr.
          Tile:   Executive Vice President

NAM04621
Confidential

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement as of the date first above written.

**ROBERT FIREMAN**

Address: 241 Perkins St. #D-104
Jamaica Plains, MA 02130

**ANN RAIDER**

Address: 46 Ivy Road
Wellesley, MA 02181

**CURTIS R. SMITH**

Address: 9 Wingate Road
Wellesley, MA 02181

**JOHN H. BOYLES**

Address: 39 Westcott Road
Harvard, MA 01451

**NEWS AMERICA MARKETING IN-STORE, INC.**

By:_____

Name: David DeVoe, Jr.
Tile:   Executive Vice President

NAM04622
Confidential

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement

as of the date first above written.

ROBERT FIREMAN

Address:  241 Perkins St. #D-104
          Jamaica Plains, MA 02130

ANN RAIDER

Address:  46 Ivy Road
          Wellesley, MA 02181

CURTIS R. SMITH

Address:  9 Wingate Road
          Wellesley, MA 02181

JOHN H. BOYLES

Address:  39 Westcott Road
          Harvard, MA 01451

NEWS  AMERICA  MARKETING  IN-STORE,
INC.

By:

Name: David DeVoe, Jr.
Tile:    Executive Vice President

NAM04623
Confidential

**CCMI**
**DISCLOSURE MEMORANDUM**
**TO**
**STOCK PURCHASE AGREEMENT**
**AS OF AUGUST 13, 1999**


The capitalized terms used in this Disclosure Memorandum, unless otherwise defined herein, have the meaning specified in the Agreement. For convenience, disclosures under one section or a subsection may be cross-referenced to one or more other sections or subsections of this Disclosure Memorandum. If a matter is disclosed in the Disclosure Memorandum, it shall be deemed to have been disclosed with respect to all Sections of the Agreement for which the disclosure satisfies the requirements for such Section, and its relevance is evident from the disclosure.

**CCMI**
**SCHEDULE 2.1**

**PURCHASE PRICE**

With regard to Section 2.1, the following are instructions for the disbursement of the Purchase Price.

| Name | Wire Instructions | Proportionate Share |
|------|-------------------|---------------------|
| Robert N. Fireman | Fleet Bank, ABA #011000138 for further credit to Robert N. Fireman, 165 Wood Road, Braintree, MA 02184, Account No. 93744 84119 | $1,380,000 |
| Ann M. Raider | Fleet Bank, ABA#011000138, Credit to Ann M. Raider, 46 Ivy Road, Wellesley, MA 02181, Account No. 02149 01526 | $920,000 |
| Curtis R Smith | U.S. Trust ABA#011001331 for further credit to Curtis R. Smith, Anne B. Smith, 9 Wingate Road, Wellesley, MA 02181 Account No. 001 1544137 | $400,000 |
| John H. Boyles | BankBoston ABA#011000390 for further credit to John H. Boyles, 39 Westcott Road, Harvard, MA 01451, Account number 83034260 | $100,000 |
| TOTAL CLOSING PAYMENTS: | | $2,800,000 |

**CCMI**
**SCHEDULE 2.3(b)**

## PAYMENT OF EARN-OUT AMOUNT

With regard to Section 2.3(b), the following are instructions for the disbursement of each Earn-Out Payment:

| Name | Wire Instructions* | Proportionate Share |
|------|-------------------|---------------------|
| Robert N. Fireman | Sames as 2.1 | 60% |
| Ann M. Raider | Same as 2.1 | 40% |
| | | 100%. |

*Unless any Seller notifies Buyer of a change in wire instructions thirty (30) days prior to payment of each Earn-Out Payment.

**CCMI**
**SCHEDULE 4.3**

**FREEDOM TO CONTRACT**

In connection with this transaction, immediately prior to closing, the following documents and agreements will have been terminated, and all responsibilities, rights and liabilities thereunder will be waived:

Registration Rights Agreement between the Company, Curtis R. Smith, and John H. Boyles, dated as of February 11, 1998;

Stock Purchase Agreement among the Company and Curtis R. Smith, John H. Boyles, Robert N. Fireman, and Ann M. Raider, dated as of February 11, 1998;

Stockholders' Agreement, dated as of February 11, 1998, by and among the Company, Curtis R. Smith, John H. Boyles, Robert N. Fireman, and Ann M. Raider;

The Stock Pledge Agreement between the Company and Ann M. Raider, dated as of February 1998;

Promissory Note between the Company and Ann M. Raider; and

The Company's Employee Stock Option Plan, and the outstanding common stock options granted under the plan to employees William Adam and Robert M. Coughlin, in the amounts of 30,000 and 10,000 respectively, for a total of 40,000 options.

In connection with this transaction, immediately prior to closing, all responsibilities, rights, and liabilities of the Company under the following certificate will have been waived by the holders of all issued and outstanding shares of preferred stock:

Certificate of Designations, Preferences and Rights of a Series of Preferred Stock, dated as of February 11, 1998.

The Company has received a consent from Fleet Bank with regard to the outstanding loan, pursuant to which the bank has waived the acceleration clause and has released its first lien on the business assets of the Company.

**CCMI**
**SCHEDULE 4.4**

**TITLE TO SHARES**

With regard to Section 4.4, the following lists the name of each Seller, their respective shares of stock and the percentage interest in the Company's capital stock.

| Name | Type | Shares | Percent Outstanding |
|------|------|--------|---------------------|
| Curtis R. Smith | Preferred | 248,000 | 80% |
| John H. Boyles | Preferred | 62,000 | 20% |
| | | 310,000 | 100% |

| Name | Type | Shares | Percent Outstanding |
|------|------|--------|---------------------|
| Robert N. Fireman | Common | 2,100,000 | 60% |
| Ann M. Raider | Common | 1,400,000 | 40% |
| | | 3,500,000 | 100% |

In connection with this transaction, immediately prior to closing, Curtis R. Smith and John H. Boyles will have contributed their 228,429 and 83,571 shares of common stock, respectively, to the Company as a capital contribution for no consideration.

See also Schedule 4.3 hereto.

**CCMI**
*SCHEDULE 4.5*

<u>**CAPITALIZATION, SUBSIDIARIES**</u>

(a) With regard to Section 4.5, the following lists the total authorized capital stock of the Company:

| <u>Type</u> | <u>Authorized</u> |
|---|---|
| Preferred | 1,000,000 |
| Common | 5,000,000 |

In connection with this transaction, immediately prior to closing, Curtis R. Smith and John H. Boyles will have contributed their 228,429 and 83,571 shares of common stock, respectively, to the Company as a capital contribution for no consideration.

(b)(ii) Preferred stock is convertible. See also Schedule 4.3 hereto.

(b)(iii) See Schedule 4.3 hereto.

**CCMI**
**SCHEDULE 4.6**

<u>**FINANCIAL STATEMENTS**</u>

Attached with regard to Section 4.6 are true and complete copies of financial statements of the Company.

4.6(a)(i) a balance sheet of the company as of December 31, 1998: statements of income, cash flows and changes in stockholders' equity for the fiscal year then ended.

4.6(a)(ii) Interim Balance Sheet as of June 30, 1999.

CONSUMER CARD MARKETING, INC.
BALANCE SHEET
FOR THE PERIOD ENDED DECEMBER 31, 1998

ASSETS

Current Assets
Cash                                        $        784,209.19

Receivables

Accounts Receivable                                  508,697.16
Suspense                                                404.70
Prepaid Freight Receivable                             6,562.41
Income  Tax Refund                                    71,272.00

Total Receivables                                    586,936.27

Total Current Assets                               1,371,145.5

Property, Plant & Equipment                          444,208.50
Accumulated Depreciation                            (174,992.05)

Net Property, Plant & Equipment                      269,216.45

Other Assets

Notes Receivable Stockholder                         185,416.09
Prepaid Expenses                                     112,496.14

Total Other Assets                                   297,912.23

TOTAL ASSETS                                $      1,938,274.14

CONFIDENTIAL INFORMATION

**CONSUMER CARD MARKETING, INC.**
**BALANCE SHEET**
**FOR THE PERIOD ENDED DECEMBER 31, 1998**

LIABILITIES & EQUITY

Current Liabilities

| | | |
|---|---|---:|
| Accounts Payable | $ | 795,054.30 |
| Accrued Payroll | | 41,503.76 |
| Accrued Expenses | | 125,053.98 |
| Deferred Revenue | | 270,420.00 |
| Payroll Taxes Payable | | 2,188.72 |
| State Withholding Taxes | | 9,930.79 |
| FICA/Medicare Payable | | 4,881.24 |
| Sales Tax Payable | | 2,718.63 |
| Current Portion Long Term Debt | | 19,881.53 |
| **Total Current Liabilities** | | 1,271,632.95 |
| | | |
| Long Term Liabilities | | |
| Notes Payable Bank | | 35,416.89 |
| Notes Payable Chase | | 10,353.47 |
| **Total Long Term Liabilities** | | 45,770.36 |
| | | |
| **Total Liabilities** | | 1,317,403.31 |
| | | |
| Equity | | |
| Preferred Stock | | 3,100.00 |
| Common Stock | | 4,120.00 |
| Add'l Paid in Capital | | 1,059,717.82 |
| Retained Earnings | | (277,000.56) |
| Current Year's Income/Loss | | (169,066.43) |
| **Total Equity** | | 620,870.83 |
| | | |
| **TOTAL LIABILITIES & EQUITY** | $ | 1,938,274.14 |

*CONFIDENTIAL INFORMATION*

# CONSUMER CARD MARKETING, INC.
## INCOME STATEMENT
### FOR THE YEAR ENDED DECEMBER 31,1998

|  | TOTAL | % |
|---|---|---|
| **GROSS REVENUE** | | |
| BUILD THE CUSTOMER DATABASE | $ 2,422,766 | 64.8% |
| DATA BASE MANAGEMENT | 1,247,118 | 33.3% |
| DATA BASE MARKETING/OTHER | 71,773 | 1.9% |
| TOTAL GROSS REVENUE | 3,741,657 | 100.0% |
| | | |
| **COST OF SALES** | | |
| BUILD THE CUSTOMER DATABASE | 1,543,934 | 41.3% |
| DATA BASE MANAGEMENT | 217,069 | 5.8% |
| TOTAL COST OF SALES | 1,761,003 | 47.1% |
| | | |
| **GROSS PROFIT** | 1,980,654 | 52.9% |
| | | |
| **OPERATING EXPENSES** | | |
| SALARIES & WAGES | 1,089,685 | 29.1% |
| PAYROLL TAXES | 79,276 | 2.1% |
| RENT/COMMON AREA | 83,431 | 2.2% |
| TELEPHONE | 50,023 | 1.3% |
| POSTAGE & DELIVERY | 8,660 | 0.2% |
| OFFICE EXPENSES | 49,779 | 1.3% |
| LEASED EQUIPMENT | 4,984 | 0.1% |
| CONSULTING FEES | 274,171 | 7.3% |
| OUTSIDE SERVICES | 49,906 | 1.3% |
| TRAVEL & ENTERTAINMENT | 146,127 | 3.9% |
| TRADE SHOWS/CONFERENCES | 32,052 | 0.9% |
| PRESENTATION MATERIALS | 10,428 | 0.3% |
| ADVERTISING | 17,261 | 0.5% |
| PROMOTION EXPENSES | 85,094 | 2.3% |
| DUES & SUBSCRIPTIONS | 8,054 | 0.2% |
| PROFESSIONAL FEES | 8,795 | 0.2% |
| DEPRECIATION & AMORTIZATION | 81,791 | 2.2% |
| UTILITIES | 13,954 | 0.4% |
| RECRUITMENT COSTS | 39,600 | 1.1% |
| INSURANCE | 53,326 | 1.4% |
| BAD DEBT EXPENSE | 44,315 | 1.2% |
| OTHER | 18,085 | 0.5% |
| TOTAL OPERATING EXPENSES | 2,248,797 | 60.1% |
| | | |
| **NET OPERATING INCOME** | (268,143) | -7.2% |
| | | |
| **OTHER INCOME (EXPENSES)** | | |
| NET INTEREST INCOME (EXPENSE) | 27,805 | 0.7% |
| FEDERAL INCOME TAX PROVISION | 71,272 | 1.9% |
| | | |
| **INCOME (LOSS) BEFORE TAXES** | $ (169,066) | -4.5% |

*CONFIDENTIAL INFORMATION*

## CONSUMER CARD MARKETING, INC.
## STATEMENT OF CASH FLOWS
### FOR THE YEAR ENDED DECEMBER 31, 1998

CASH FLOWS FROM OPERATING ACTIVITIES:

| | |
|---|---:|
| NET INCOME (LOSS) | $ (169,066) |
| ADJUSTMENTS TO RECONCILED NET INCOME (LOSS) TO NET CASH USED BY OPERATING ACTIVITIES: | |
| DEPRECIATION AND AMORTIZATION | 81,791 |
| (INCREASE) DECREASE IN ACCOUNTS RECEIVABLE | 354,141 |
| (INCREASE) DECREASE IN INCOME TAX REFUND | (71,272) |
| DECREASE (INCREASE) IN PREPAID EXPENSES | 111,564 |
| INCREASE (DECREASE) IN ACCOUNTS PAYABLE | (392,743) |
| INCREASE (DECREASE) IN PAYROLL TAXES PAYABLE | (3,363) |
| (DECREASE) INCREASE IN DEFERRED INCOME | (63,355) |
| INCREASE (DECREASE) IN INCOME TAXES PAYABLE | (105,498) |
| INCREASE (DECREASE) IN OTHER CURRENT LIABILITIES | 2,719 |
| INCREASE (DECREASE) IN ACCRUED EXPENSES | (247,299) |
| NET CASH PROVIDED BY OPERATIONS | (502,381) |

CASH FLOWS FROM INVESTING ACTIVITIES:

| | |
|---|---:|
| PURCHASE OF PROPERTY AND EQUIPMENT | (188,993) |
| SALE OF COMPANY STOCK | 974,799 |
| NET CASH USED BY INVESTING ACTIVITIES | 785,806 |

CASH FLOWS FROM FINANCING ACTIVITIES:

| | |
|---|---:|
| PROCEEDS OF NOTES PAYABLE | (3,254) |
| PAYMENT OF NOTES PAYABLE STOCKHOLDER | (138,282) |
| PAYMENT OF NOTES PAYABLE | (519,838) |
| NET CASH PROVIDED (USED) BY FINANCING ACTIVITIES | (661,374) |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | (377,949) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 1,162,158 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 784,209 |

## CONSUMER CARD MARKETING, INC.
## BALANCE SHEET
### FOR THE SIX MONTHS ENDED JUNE 30, 1999

ASSETS

Current Assets
Cash                                          $       71,533.92

Receivables

| | |
|---|---|
| Accounts Receivable | 538,885.91 |
| Suspense | 8,675.41 |
| Deferred Tax Benefit | 71,845.00 |
| Current Prepaids | 36,906.94 |
| Income  Tax Refund | 71,272.00 |
| Total Receivables | 727,585.26 |

Total Current Assets                                  799,119.18

| | |
|---|---|
| Property, Plant & Equipment | 452,905.94 |
| Accumulated Depreciation | (220,566.55) |
| Net Property, Plant & Equipment | 232,339.39 |

Other Assets

| | |
|---|---|
| Notes Receivable Stockholder | 181,524.00 |
| Prepaid Expenses | 250,182.35 |
| Total Other Assets | 431,706.35 |

TOTAL ASSETS                            $    1,463,164.92

CONFIDENTIAL INFORMATION

**CONSUMER CARD MARKETING, INC.**
**BALANCE SHEET**
**FOR THE SIX MONTHS ENDED JUNE 30, 1999**

*LIABILITIES & EQUITY*

Current Liabilities
| | | |
|---|---|---|
| Accounts Payable | $ | 367,388.92 |
| Accrued Payroll | | 35,907.68 |
| Accrued Expenses | | 261,142.39 |
| Deferred Revenue | | 146,268.88 |
| Postage Escrow | | 15,896.41 |
| Payroll Taxes Payable | | 2,423.67 |
| Sales Tax Payable | | 0.00 |
| Current Portion Long Term Debt | | 20,028.50 |
| | | |
| Total Current Liabilities | | 849,056.45 |
| | | |
| Long Term Liabilities | | |
| Notes Payable Bank | | 26,916.93 |
| Notes Payable Chase | | 9,158.37 |
| | | |
| Total Long Term Liabilities | | 36,075.30 |
| | | |
| Total Liabilities | | 885,131.75 |
| | | |
| Equity | | |
| Preferred Stock | | 3,100.00 |
| Common Stock | | 4,120.00 |
| Add'l Paid in Capital | | 1,059,717.82 |
| Retained Earnings | | (446,066.99) |
| Current Year's Income/Loss | | (42,837.66) |
| | | |
| Total Equity | | 578,033.17 |
| | | |
| TOTAL LIABILITIES & EQUITY | $ | 1,463,164.92 |

*CONFIDENTIAL INFORMATION*

**CCMI**
**SCHEDULE 4.7**

**ABSENCE OF UNDISCLOSED LIABILITIES**

With regard to Section 4.7, the following list represents undisclosed liabilities:

> Accrued vacation time
> Additional costs related to this stock purchase transaction.

> Also see Section 4.14.

In connection with this transaction immediately prior to closing, the following liabilities will be waived:

> Accrued Dividends Preferred Stock
> Additional Payment to initial investors for legal work.

**CCMI**
**SCHEDULE 4.8**

## NO MATERIAL ADVERSE CHANGE

None.

**CCMI**
*SCHEDULE 4.9*

<u>REAL ESTATE</u>

The Company's Corporate Headquarters consists of 8,000± square feet of office space located at 165 Wood Road, Braintree, MA  02184, leased by the Company from Harry Fireman, pursuant to an Indenture of Lease dated as of January 2, 1996, and amended by an Extension Agreement dated as of December 15, 1998, and by an Amendment of Lease dated as of July 14, 1999.

CCMI
SCHEDULE 4.10

TITLE TO AND CONDITION OF ASSETS, ENCUMBRANCES, ETC.

With regard to Section 4.10, the following lists assets that are the personal furniture and fixtures of Robert N. Fireman and Ann M. Raider:

Pictures in offices
Couches
Desk sets in Bob's, Ann's, Bill's, Barry's, Michael's, Susan's offices
Vase
All conference tables and chairs
Reception area chairs
Steelcase sectionals
All bookshelves
Telephone system

All of the above assets, except for the personalty and desks sets of Robert Fireman and Ann Raider, that are used for the operations of the Company may be used by the Company consistently with past practice.

The Company has received a consent from Fleet Bank with regard to the outstanding loan, pursuant to which the bank has waived the acceleration clause and has released its first lien on the business assets of the Company.

From time to time, the Company has in its possession computer equipment and peripherals belonging to its customers for purposes of installing programs and or integration testing. Currently, the Company has in its possession the following:

IBM AS400
Digital Alpha Server

CCMI
SCHEDULE 4.11

CONTRACTS AND COMMITMENTS

(i)(A) Obligation of the Company:

All Recurring Accounts Payable
Such as telephone, utilities, equipment leases etc.
TimeOut Devices, Inc.
Ockham's Razor
Hyperion (Arbor)
NACDS
Polk
Arthur Blank
Century Mailing
Expérian
Figel, Inc.
Decision Support Technologies (DST)
SSI
Estate of Harry Fireman
Personix
AT&T Financial Lease
Fleet Equipment Lease
Fleet Loan
Fleet ancillary documents
Chase Auto Loan
ATT Equipment Lease Financing
Non-monetary Confidentiality Agreements which have been delivered to Buyer.

Obligations to the Company:

*Sullivan's
*Blue Square
*Nash Finch
*Coborn's
*Star Market
*Wild Oats
*Wegmans
*Jitney Jungle
*RMG
*Duane Reade
*Lewis Drug
*May's Drug Stores, Inc.
**Alberto Culver
**Fuji Film
**L'Eggs Products
***Decision Support Technologies (DST)
****Ockham's Razor
****TimeOut Devices, Inc.

| | |
|---|---|
| * | Retail Clients |
| ** | Manufacturer Clients |
| *** | Contract Software Developer obligated to complete certain software modules to receive final payments. |
| **** | Current CCMI software contractors. |

(i)(B) None.

(i)(C) See also Schedule 4.3 hereto.

**CCMI**
**SCHEDULE 4.12**

**LICENSES AND PERMITS**

None.

**CCMI**
**SCHEDULE 4.13**

**EMPLOYEE MATTERS**

(a)(i)The Company has or currently maintains or contributes to:

Principle Financial (health insurance plan)
Blue Cross/Blue Shield (health insurance)
Guardian Insurance (long and short term disability)
Phoenix Insurance (life insurance)
The Company's 401K Plan
Section 125 Benefit Plan. (pre tax health insurance deduction)

(a)(ii) (A) None.

(B) None.

(C) At the Company's discretion, all current employees are eligible to participate in a bonus or other incentive plan based in part on the Company's and the employee's performance.

The Company has adopted an Employee Stock Option Plan under which options have been granted. The following options which were outstanding under the plan, will have been terminated prior to the closing of this transaction:

| Plan Employee | Type | Quantity |
|---|---|---|
| William Adam | Common | 30,000 |
| Robert M. Coughlin | Common | 10,000 |
| Total Options | | 40,000 |

(D) All eligible employees are able to participate in the Company-provided health plan, long and short-term disability insurance, life insurance, vacation policy, sick time, 401K Plan, and holiday time.

(E) None.

(F) The Company has confidentiality agreements that include a non-compete clause with the following current employees:

| | | |
|---|---|---|
| Adam, William | Adam, Elizabeth | Coughlin, Robert |
| Bowker, Christine | Clapp, H.W. | Crowther, Jonathan |
| Geswell, Linda | Hoeft, Christine | Hughes, Michael |
| Hill, Reva | Joress, Craig | McAndrew, Kathy |
| McManama, Michael | Pappas, Charles | Robinson, Barry |
| Young, Susan | | |

CCMI
SCHEDULE 4.13

EMPLOYEE MATTERS (CONTINUED)

(G) None.

(c) None.

(e)(i)

| Name | Annual Salary as of 7/1/99 |
|---|---|
| ADAM, WILLIAM | 85,000.00 |
| ADAM, ELIZABETH | 50,000.00 |
| BOWKER, CHRISTINE | 50,000.00 |
| CLAPP, H.W. | 101,000.00 |
| COUGHLIN, ROBERT | 60,000.00 |
| CROWTHER, JONATHAN | 30,000.00 |
| FIREMAN, ROBERT | 153,000.00 |
| GESWELL, LINDA | 42,000.00 |
| HILL, REVA | 33,000.00 |
| HOEFT, CHRIS | 36,000.00 |
| MCANDREW, KATHLEEN | 27,500.00 |
| MCMANAMA, MICHAEL | 105,000.00 |
| PAPPAS, CHARLES | 50,000.00 |
| RAIDER, ANN | 153,000.00 |
| ROBINSON, BARRY | 98,400.00 |
| YOUNG, SUSAN | 68,250.00 |
| HUGHES, MICHAEL | 44,000.00 |
| JORESS, CRAIG | 36,000.00 |

(ii)    None.

**CCMI**
**SCHEDULE 4.13**

**EMPLOYEE MATTERS (CONTINUED)**

(iii)    The Company tracks vacation, holiday, and sick pay for each employee, but has not accrued for it on the balance sheet.

(iv)    Adam, William                    Joress, Craig
      Bowker, Chris                    Pappas, Charles
      Clapp, H.W.                      Raider, Ann
      Crowther, Jonathan               Geswell, Linda
      Fireman, Robert                  Hughes, Michael.
      Hoeft, Chris

**CCMI**
**SCHEDULE 4.14**

**LITIGATION**

Interpros, dispute regarding recruiting fees.

Business Software Alliance, software review.

Credit Verification Corporation, patent infringement.

Ronald Lunde, dispute regarding consulting fees. Mr. Lunde a consultant, whose arrangement was terminated in October of 1998, has recently made a claim that he is owed additional fees in the range of $27,000 to $64,000, which the company vigorously disputes.

A disputed claim for an old matter relative to a suit for a telephone consultant in 1992 or 1993 for approximately $6,000. When the Company relocated to its current location the file was misplaced. The Company has not received any information regarding this claim for at least the last five years.

CCMI
SCHEDULE 4.15(b)

## COMPLIANCE WITH LAW

None.

**CCMI**
**SCHEDULE 4.16**

## SOFTWARE AND INFORMATION SYSTEMS

(a)(i)Customer Information System (CIS)
    Marketing Analysis System (MAS)
    Campaign Manager (CM)
    Promotional Analysis (PA)
    Instore Promotional Dispenser (IPD)
    POS Interfaces
    For licenses and rights see Decision Support Technologies, and Retailer System Agreements, which have been made available to Buyer.

(a) (ii)

| | | | |
|---|---|---|---|
| Windows NT (Microsoft) | Group 1 (AccuMail) | MS SQL (Microsoft) | MS Windows 95 (Microsoft) |
| NT 4.0 Server (Microsoft) | Fox Pro (Microsoft) | McAfee Anti-Virus (McAfee.com Corp.) | Adobe Illustrator (Adobe) |
| MS Office 97 (Microsoft) | Visio (Visio) | EudoraPro (Qualcomm) | Adobe Go Live (Adobe) |
| PC Anywhere (Symantec) | AltaVista Tunnel (Digital Compaq) | Great Plains Dynamic (GP) | Adobe Image Styler (Adobe) |
| Essbase (Hyperion) | Power Chute (APC) | Quark Express (QuarkXPress) | Adobe Image Ready (Adobe) |
| Brio (Brio) | Act! 3.0 (Symantec) | MS Windows 98 (Microsoft) | Oracle8 (Oracle) |
| Power Builder (Sybase) | | | |

The Company cannot locate Certificates of Authenticity or original diskettes, for 15 user licenses for MS Office and 5 licenses for PC Anywhere. If the Company cannot locate these, it intends to purchase new licenses.

(a)(iii) None.

(a)(iv) Ongoing Software Development – Continued building, upgrading and enhancement of CCMI CIS, MAS, Campaign Manager and Promotional Analysis Modules

NACDS Drug Store Project – Customized MAS for drug chain stores. Build warehouse for multiple drug chain store data.

**CCMI**
**SCHEDULE 4.16**

**SOFTWARE AND INFORMATION SYSTEMS (CONTINUED)**

Enhancements for Nash Finch members – Customized interfaces to balance store data; adding additional features.

Work for the above being performed by CCMI staff, Ockham's Razor, TimeOut Devices and DST.

(b)(i) None.

(b)(ii) Yes.

(b)(iii) Some employees may have gained access to source code prior to executing confidentiality and non-disclosure agreements. The Company does not believe this to be significant. All current employees have signed a Confidentiality Agreement and Non Disclosure Agreement with regard to the source code.

(b)(iv) Yes.

(b)(v) Yes.

(b)(vi) Yes.

(b)(vii) Yes except DST, a contract developer retained some minor rights as set forth in the DST Agreement.

(b)(viii) Yes.

(d) Fleet Bank's lien on the Company's assets will have been discharged prior to the closing of this transaction.

(e) Credit Verification Corporation (1996 Patent Claim); Business Software Alliance (claim for office software compliance).

(f) Certain companies have not renewed annual maintenance and support fees. As a result, there may be a question about their continued right to hold and use the software. These companies had old versions in object code, not source code.

**CCMI**
**SCHEDULE 4.17**

**INTELLECTUAL PROPERTY**

Trademark: Company's Logo, which is the initials CCMI, with a UCC Bar Code underneath.

Copyright: Company's marketing materials describing the Company's experience, products and services.

(a) None.
(b) None.
(c) None.
(e) None

**CCMI**
**SCHEDULE 4.18**

**TRADE SECRETS**

Company's customer list and customer prospect list.

**CCMI**
**SCHEDULE 4.19**

**TAX MATTERS**

(a) With regard to Section 4.19(a) the Company made no quarterly estimated Federal or State income tax payments during 1998 or 1999 because the amount of taxes due, if any, could not be reasonably determined.

The Company has not filed any sales or use tax returns or collected any sales tax for sales or services delivered outside of the Commonwealth of Massachusetts.

(c) None.

(d)(i) During 1997, ADP did not deduct certain payroll taxes from the Company's bank account. ADP was notified. Employee wages and withholdings were reported correctly. These charges have been subsequently removed to accurately reflect payroll taxes due on the balance sheet.

**CCMI**
**SCHEDULE 4.20**

**INSURANCE**

| Insurance Co. | Amt. | Type/ Risks Insured | Expires | Policy # |
|---|---|---|---|---|
| Metropolitan Ins. | $1,000,000 | Term Life Robert N. Fireman | 5/25/48 | 940550213P |
| United of Omaha | $1,000,000 | Term Life Robert N. Fireman | 2/3/44 | BU1050702 |
| The Guardian | $1,000,000 | Term Life Ann M. Raider | 6/23/47 | 3799957 |
| The Guardian | $1,500,000 | Term Life Ann M. Raider | | |
| Public Svs. Mut. Ins. | $1,500,000 | Workers Compensation | 3/12/00 | 03-264408-99 |
| Nat'l Grange Mut. | $20,000 | 401K Crime Policy | none | F222545 |
| Provident L&A Co. | $5,000/M | Disability-Robert N. Fireman | 9/6/23 | 0004253121 |
| The Guardian Ins. | $5,000/M | Disability Ann M. Raider | 3/25/12 | G-659118 |
| Public Svs. Mu. Ins. | $50,000 | Business Pers. Prop. | 9/10/99 | 00-74-328259 |
| | $1,000,000 | General Liability | | |
| | $40,000 | Computer Hardware | | |
| | $10,000 | Computer Software | | |
| | $10,000 | Computer Transit Coverage | | |
| The Connecticut Indemnity Co. | $22,000 (Cover Fleet Leased Equip.) | Scheduled Property | 3/4/00 | SP-91-41-05 |

**CCMI**
**SCHEDULE 4.21**

**TRANSACTIONS WITH AFFILIATES**

The Fireman family owns the building in which the Company's office is leased.

$181,524.00 Promissory Note between the Company and Ann M. Raider which will have been forgiven by the Company prior to the closing of this transaction.

The Company owns a 1995 Saab financed with Chase Automotive Finance, which is being used by Ann M. Raider.

**CCMI**
**SCHEDULE 4.22**

**ENVIRONMENTAL MATTERS**

None.

**CCMI**
**SCHEDULE 4.23**

**ACCOUNTS RECEIVABLE**

Attached with regard to Section 4.23 is a list of Accounts Receivables as of June 30, 1999, including the aging thereof:

| | |
|---|---|
| mer ID:        First - Last | ZIP Code:      First - Last |
| mer Class:     First - Last | State:         First - Last |
| rson ID:       First - Last | Telephone:     First - Last |
| Territory:     First - Last | Posting Date: First - 7/1/99 |
| Defined 1:     First - Last | Short Name:    First - Last |
| nt Type:       All | Aging Date:    7/1/99 |
| mer Name:      First - Last | |

: Zero Balance, No Activity, Fully Paid Documents, Multicurrency Info
r: by Customer ID
t: by Document Number

| r    Name | Account Type | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |
|---|---|---|---|---|---|
| The Great Atlantic & Pacific    Open Item | | | | | |
| -Defined 1: | Salesperson:          Territory: | | | | |
| : Ms. Susan Hamilton | (201) 930-8139  Ext. 0000 | | | | |
| Due Upon Receipt | Totals:   $6,599.99 | ($0.01) | $0.00 | $0.00 | $6,600.00 |
| Unlimited | | | | | |
| REN    A.J. Biren & Company    Open Item | | | | | |
| -Defined 1: | Salesperson:          Territory: | | | | |
| : | (000) 000-0000  Ext. 0000 | | | | |
| Due Upon Receipt | Totals:   $1,593.84 | $1,593.84 | $0.00 | $0.00 | $0.00 |
| Unlimited | | | | | |
| B lue Square - Isreal, Ltd.    Open Item | | | | | |
| -Defined 1: | Salesperson:          Territory: | | | | |
| :: Mr. Daniel Moshaioff | (011) 972-3928  Ext. 2420 | | | | |
| Due Upon Receipt | Totals:   $3,567.99 | $0.00 | $0.00 | $0.00 | $3,567.99 |
| Unlimited | | | | | |
| BRUNO'S INC.    Open Item | | | | | |
| -Defined 1: | Salesperson:          Territory: | | | | |
| :: ROBERT COLE | (205) 940-9400  Ext. 0000 | | | | |
| Due Upon Receipt | Totals:   $52,260.00 | $52,260.00 | $0.00 | $0.00 | $0.00 |
| : Unlimited | | | | | |
| 'S    COBORN'S INC.    Open Item | | | | | |
| r-Defined 1: | Salesperson:          Territory: | | | | |
| :: TOM COBORN | (205) 912-4639  Ext. 0000 | | | | |
| Due Upon Receipt | Totals:   $9,545.43 | $6,623.61 | $0.00 | $4,672.22 | ($1,750.40) |
| : Unlimited | | | | | |
| Conair Corporation    Open Item | | | | | |
| r-Defined 1: | Salesperson:          Territory: | | | | |
| t: Mr. Ronald T. Diamond | (  )  -    Ext. | | | | |
| Due Upon Receipt | Totals:   $22,500.00 | $22,500.00 | $0.00 | $0.00 | $0.00 |
| : Unlimited | | | | | |
| FRY'S FOOD STORES OF ARIZONA    Open Item | | | | | |
| r-Defined 1: | Salesperson:          Territory: | | | | |
| t: Mr. Jim Nygren | (000) 000-0000  Ext. 0000 | | | | |
| Due Upon Receipt | Totals:   $87,395.88 | $30,837.99 | $23,431.69 | $33,126.20 | $0.00 |
| : Unlimited | | | | | |
| Fuji Photo film USA, Inc    Open Item | | | | | |
| r-Defined 1: | Salesperson:          Territory: | | | | |

SUMMARY CUSTOMER AGED TRIAL BALANCE
Receivables Management

| r | Name | Account Type | | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |
|---|------|--------------|---|-----------|--------------|--------------|-------------|
| | Due Upon Receipt | ( ) - Ext. Totals: $22,500.00 | | $22,500.00 | $0.00 | $0.00 | $0.00 |
| | Unlimited | | | | | | |
| | JITNEY JUNGLE STORE OF AMERICA | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| t: MR. WILL STEPHENSON | | (601) 346-2189 Ext. 0000 | | | | | |
| | Due Upon Receipt | Totals: $26,110.36 | | $12,267.64 | $9,962.72 | $0.00 | $3,880.00 |
| | Unlimited | | | | | | |
| | THE KROGER COMPANY | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| t: MR. RICH STERN | | ( ) - Ext. | | | | | |
| | Due Upon Receipt | Totals: $4,056.50 | | $4,056.50 | $0.00 | $0.00 | $0.00 |
| | Unlimited | | | | | | |
| | L'eggs Products | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| t: | | (336) 519-3359 Ext. 0000 | | | | | |
| | Due Upon Receipt | Totals: $25,000.00 | | $25,000.00 | $0.00 | $0.00 | $0.00 |
| | Unlimited | | | | | | |
| INCH | NASH FINCH COMPANY | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| t: MS. PATTY DILL | | (000) 000-0000 Ext. 0000 | | | | | |
| | Due Upon Receipt | Totals: $108,531.70 | | $866.83 | $106,312.50 | $0.00 | $1,352.37 |
| | Unlimited | | | | | | |
| :'S | NATURE'S FRESH NORTHWEST | Open Item | | | | | |
| er-Defined 1: | | Salesperson: | Territory: | | | | |
| t: MR. SCOTT GRAY | | (503) 670-6038 Ext. 1010 | | | | | |
| | Due Upon Receipt | Totals: $21,633.66 | | $110.78 | $555.43 | $95.00 | $20,872.45 |
| | Unlimited | | | | | | |
| | Response Marketing Group | Open Item | | | | | |
| er-Defined 1: | | Salesperson: | Territory: | | | | |
| t: | | (804) 968-7300 Ext. 0000 | | | | | |
| | Due Upon Receipt | Totals: $11,621.75 | | $5,837.06 | $5,784.69 | $0.00 | $0.00 |
| | Unlimited | | | | | | |
| 0 | SHAW'S SUPERMARKET, INC. | Open Item | | | | | |
| er-Defined 1: | | Salesperson: | Territory: | | | | |
| ct: MR. ALFRED RYAN | | (508) 378-3020 Ext. 0000 | | | | | |
| | Due Upon Receipt | Totals: $1,649.52 | | $1,649.52 | $0.00 | $0.00 | $0.00 |
| | Unlimited | | | | | | |
| 0 | STAR MARKET COMPANY | Open Item | | | | | |
| er-Defined 1: | | Salesperson: | Territory: | | | | |
| ct: MR. MICHAEL SULLIVAN | | (617) 528-2550 Ext. 2824 | | | | | |
| | Due Upon Receipt | Totals: $5,317.07 | | $4,844.57 | $0.00 | $0.00 | $472.50 |
| | Unlimited | | | | | | |
| VANS | SULLIVAN'S FOODS | Open Item | | | | | |
| er-Defined 1: | | Salesperson: | Territory: | | | | |

SUMMARY HISTORICAL AGED TRIAL BALANCE

8/5/99                                    Receivables Management                         Page:    3

| er         Name | Account Type | | | | |
|---|---|---|---|---|---|
| | | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |

MR. SCOTT SULLIVAN               (  )  -      Ext.
Due Upon Receipt                      Totals:    $8,325.00          $0.00         $0.00      $8,325.00          $0.00
Unlimited

L RETAIL   Tatical Retailing Solutions    Open Item
r-Defined 1:                     Salesperson:          Territory:

t:                               (860) 677-6975  Ext. 0000
Due Upon Receipt                      Totals:    $5,168.09       $5,168.09          $0.00         $0.00          $0.00
Unlimited

TOFFICE    US POSTAL SERVICE           Open Item
r-Defined 1:                     Salesperson:          Territory:

:t:                              (  )  -      Ext.
Due Upon Receipt                      Totals:    $1,082.50        $232.50          $0.00         $0.00        $850.00
Unlimited

IS         Wegmans                      Open Item
r-Defined 1:                     Salesperson:          Territory:

:t:                              (716) 328-2550  Ext. 0000
Due Upon Receipt                      Totals:   $97,453.60      $19,252.94     $13,340.83     $54,486.74     $10,373.09
Unlimited

D          WILD OATS MARKETS, INC.        Open Item
er-Defined 1:                     Salesperson:          Territory:

ct: MR. JAY ROBINSON             (303) 440-5220  Ext. 0000
Due Upon Receipt                      Totals:   $16,973.03       $3,973.03          $0.00     $13,000.00          $0.00
Unlimited

21 Customer(s)                   Grand Totals:   $538,885.91     $219,574.89    $159,387.86    $113,705.16     $46,218.00

**CCMI**
**SCHEDULE 4.25**

<u>**SUPPLIERS AND CUSTOMERS**</u>

With regard to Section 4.25, the following lists the ten largest customers and the ten largest suppliers of the Company by dollar volume of revenues for the year ended December 31, 1998:

| <u>Customers</u> | <u>Suppliers</u> |
|---|---|
| Fry's | SSI |
| Brunos/filed for bankruptcy | Polk |
| Jitney Jungle | Personix |
| Wild Oats/Halted Loyalty Program | DST |
| Nature's Fresh/Acquired by Wild Oats | TimeOut Devices |
| Nash Finch | Arthur Blank and Company |
| Lucky's Stores | Versatile Card Technology |
| Delchamps/Acquired by Jitney Jungle | Ockham's Razor |
| Carlton Cards | Direct Resources |
| Star Markets | American Spirit Graphics |

# EXHIBIT 3

**FIREMAN/RAIDER**
**NEWS AMERICA MARKETING**
**EARN-OUT SUMMARY**

| | SUMMARY YEAR 1<br>9/30/00 | SUMMARY YEAR 2<br>10/1/00-9/30/01 | SUMMARY YEAR 3<br>10/1/01-9/30/02 | SUMMARY YEAR 4<br>10/01/02-09/30/03 | SUMMARY YEAR 5<br>10/1/03-9/30/04 |
|---|---|---|---|---|---|
| GROSS MARGIN | $1,740,172.00 | $1,550,372.00 | $1,632,368.00 | $466,247.00 | $1,042,946.00 |
| | | | | | |
| BASE EARN-OUT | $265,545.00 | $177,172.00 | $139,182.00 | $62,011.00 | $128,075.00 |
| | | | | | |
| | | | | | |
| ALLOCATION OF BASE<br>EARN OUT | | | | | |
| 60% FIREMAN | $159,327.00 | $106,303.00 | $83,509.00 | $37,207.00 | $76,845.00 |
| 40% RAIDER | $106,218.00 | $70,869.00 | $55,673.00 | $24,804.00 | $51,230.00 |



DEPOSITION
EXHIBIT 46
BAIDER
MRW 5/17/07

4549099_1.XLS

# EXHIBIT 4

0524FIRE.txt

UNEDITED ROUGH TRANSCRIPT

1

1                              Volume:  I
2                              Pages:  1-
3                              Exhibits:  62-141
4
5              UNITED STATES DISTRICT COURT
6           FOR THE DISTRICT OF MASSACHUSETTS
7    Civil Action No. 05-1740 MLW
8    - - - - - - - - - - - - - - - - - - - - - x
9    ROBERT FIREMAN and ANN RAIDER,
10                  Plaintiffs,
11        v.
12   NEWS AMERICA MARKETING IN-STORE, INC.,
13                  Defendant.
14   - - - - - - - - - - - - - - - - - - - - - x
15
16            DEPOSITION OF ROBERT N. FIREMAN
17               Thursday, May 24, 2007
18               10:08 a.m. to 6:32 p.m.
19               HOLLAND & KNIGHT, LLP
20           Ten St. James Avenue, 11th Floor
21                 Boston, Massachusetts
22
23
24        Reporter:  Marianne R. Wharram, CSR/RPR

JONES REPORTING COMPANY
617-451-8900

UNEDITED ROUGH TRANSCRIPT

2

1    A P P E A R A N C E S

Page 1

0524FIRE.txt

UNEDITED ROUGH TRANSCRIPT

181

1      A.   No, there were adjustments against us.   I

2   believe that they were using the accounts

3   receivable that were outstanding?

4      Q.   Just --

5      A.   No, I don't believe they were fair.

6      Q.   They were always courteous to you, they

7   being the NAM executives who you dealt with on your

8   earn-out; isn't that right?

9      A.   You mean it wasn't courteous?

10      Q.   Yeah.   They were courteous?

11      A.   They just did what they wanted to do, they

12   took the positions they wanted to take, and they

13   were inflexible on the issues that were important

14   to us.   Did they yell at us?   I don't remember any

15   screaming sessions.   Courteous?   They politely blew

16   a lot of money for themselves and us.

17      Q.   Now, you never engaged an accountant to

18   discuss disputed issues with NAM's accountant

19   pursuant to the Stock Purchase Agreement's earn-out

20   dispute resolution procedure?

21      A.   Engage an accountant?

22      Q.   Yes.

23      A.   No.

24      Q.   And of course, there was never a need to

JONES REPORTING COMPANY
617-451-8900

UNEDITED ROUGH TRANSCRIPT

182

1   engage a third accountant to resolve any disputes

Page 161

0524FIRE.txt
2    between the accountants, right?

3        A.   Right.   The issues were settled, but they

4    weren't according to GAAP.   I mean, if we worked

5    according to GAAP --

6        Q.   You've answered the question.   And you

7    never brought suit against NAM regarding any of the

8    complaints which you expressed in your letters

9    following the years one and two earn-out

10   calculations?

11       A.   I've already testified a different suit

12   that wasn't served.

13       Q.   But that was before the year one earn-out

14   calculation, right?

15       A.   Yes.

16       Q.   Okay.   So after the year one earn-out

17   calculation, you never brought suit, right?

18       A.   Until the present day.

19       Q.   Until the present day?

20       A.   Right.

21       Q.   You never brought suit against NAM until

22   after your five-year employment agreement was over,

23   right?

24               MR. PETERS:   Inconsistent with his

UNEDITED ROUGH TRANSCRIPT

183

1    testimony.

2        A.   I didn't --

3        Q.   Apart from the '99 suit, which was never

4    served?

5        A.   I testified Ann Raider had two kids in
                     Page 162

0524FIRE.txt

6    college and we waited until she was out of harm's

7    way.

8        Q.  Okay.  And you've retained every dollar

9    paid you by NAM, correct?

10       A.  I don't understand the question.

11       Q.  You didn't offer to give back any of the

12   money that NAM paid you?

13       A.  No, I didn't give NAM back any money.

14       Q.  If they would undo the deal?

15       A.  Never was discussed.

16       Q.  You personally never offered to give back

17   what they received in stock -- received for your

18   stock if they would undo the deal, just yes or no?

19       A.  I would have done that in a heartbeat if

20   they could undo the deal.  They couldn't give me

21   back what I gave them.

22            MR. PETERS:  Just yes or no.

23       A.  No.

24       Q.  Okay.  I'm going to show you a document

JONES REPORTING COMPANY
617-451-8900

UNEDITED ROUGH TRANSCRIPT

184

1    marked Exhibit 80 and can you identify this

2    document for us?  Is this your handwriting?  Hello?

3            MR. PETERS:  He's reading.

4            MR. KATZ:  Okay.

5        Q.  Is this your handwriting?

6        A.  Yes.

7        Q.  Okay

8        A.  I believe so.

Page 163

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, )<br><br>Plaintiffs, )<br><br>v. )<br><br>NEWS AMERICA MARKETING IN-STORE, )<br>INC., )<br><br>Defendant. ) | CIVIL ACTION NO. 05-11740MLW |

## ROBERT FIREMAN AND ANN RAIDER'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 34, the plaintiffs, Robert Fireman ("Fireman") and Ann Raider ("Raider") hereby requests that Defendant News America Marketing In-Store, Inc. ("NAM") produce for inspection and copying the documents requested below. The production of documents requested herein shall take place at the offices of Todd & Weld LLP, 28 State Street, 31st Floor, Boston, Massachusetts, within the time permitted by Rule 34.

## INSTRUCTIONS

1. In producing documents in response to this request, NAM is required to furnish all documents, including electronic media, in its possession, custody or control that are known or available to it, regardless of whether those documents are possessed by NAM, or by any agent, attorney, parent, subsidiary, representative, affiliate or employee. NAM must make a diligent search of its records and of other papers and materials in its possession or available to it or its attorneys or other representatives.

2.  When responding to this request for production of documents, NAM is requested to respond in writing and state as to each of the requests:

(a)  that there are documents responsive to the request, and that they will be produced;

(b)  that there are documents responsive to the request, but that NAM refuses to produce them because of a claim of privilege or for some other reason; or

(c)  that there are no documents responsive to the request.

3.  If NAM asserts any privilege in responding to this request, specify in each instance the type of privilege asserted, specify the basis for the assertion, state all facts relied upon in support of the claim of privilege or related thereto and identify, to the fullest extent short of waiver, all communications and documents as to which NAM claims a privilege.

4.  As to any document called for in this request which no longer exists, but which NAM is aware existed at one time, please identify such document(s) and, in addition, identify the last known location and the reason such document(s) is no longer in existence.

5.  In the event NAM objects to any request set forth below on the basis of a contention that it is overbroad for any reason, please respond to that request as narrowed in such a way as to render it not overbroad and state the extent NAM have narrowed that request for purposes of the response.

6.  In producing documents pursuant to this request, please indicate to which numbered request such document is responsive.  If a document or any other item is produced pursuant to more than one request, please so designate.

7.  The document requests contained herein shall be deemed to be continuing; that

is, NAM must supplement its response if it obtains any additional documents between the time the responses to these requests are served and the time of trial. Such additional responses shall be served and additional documents produced from time to time, but no later than fourteen (14) days after such additional documents are discovered, obtained or received.

8. Unless otherwise specified, the documents to be provided in response to the requests contained herein include any and all information that was generated or received or otherwise came into existence at any time prior to and including the date of responding.

## DEFINITIONS

As used herein, the words and phrases set out below shall have the following meanings:

1. "Communication" means any correspondence, contact, discussion, or any other kind of written or oral exchange or transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a document or documents, whether directly or through "cc" copying.

2. "Document" shall have the meaning set forth in Rule 34(a) of the Massachusetts Rules of Civil Procedure and shall therefore include, without limitation, any writing, recording, photograph, computer data base, or other item containing information of any kind or nature, however produced or reproduced, whether an original or a duplicate, whatever its origin or location, and regardless of the form in which such information exists or is maintained.

3. "Person" means any natural person or any legal or business entity.

4. A "representative" of a person means any officer, director, agent, employee, attorney, or other representative of such person.

5. An "affiliate" of any entity means any person who, directly or indirectly, controls, or is controlled by, or is under common control with such entity. The term "control" and is correlatives, as used above, means the possession, whether direct or indirect, or the power to direct or to cause the direction of the management and policies of a person, whether through ownership of an entity interest, by corporate position, by contract, or otherwise.

6. "Concerning" means relating to, referring to, describing, evidencing, or constituting.

7. "Robert Fireman" means Robert Fireman, any agent, employee, attorney or other representative of Robert Fireman.

8. "Ann Raider" means Ann Raider, any agent, employee, attorney, or other representative of Ann Raider.

9. "NAM" means News America Marketing In Store, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

10. Consumer Card Marketing, Inc. ("CCMI") means CCMI, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

11. SmartSource Direct means SmartSource Direct, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

12. SmartSource iGroup means SmartSource iGroup, its employees, agents, principals, subsidiaries, successors, shareholders, members, officers and directors.

13.    "You" or "Your" means NAM.

## REQUESTS

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and NAM, on the other.

10.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

11.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

12.    All documents which refer, reflect or relate to the "Base Earn-Out Amount" component of the August 13, 1999 Stock Purchase Agreement.  This

request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13. All documents utilized to calculate the Base Earn Out Amount at any time.

14. All documents which refer, reflect or relate to the "First-Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

15. All documents utilized to calculate the First Year Bonus Amount at any time.

16. All documents which refer, reflect or relate to the "Second Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

17. All document utilized to calculate the Second Year Bonus Amount at any time.

18. All documents which refer, reflect or relate to the "Third Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

19. All document utilized to calculate the Third Year Bonus Amount at any time.

20. All documents which refer, reflect or relate to the "Fourth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

21. All document utilized to calculate the Fourth Year Bonus Amount at any time.

22. All documents which refer, reflect or relate to the "Fifth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft

calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

23. All document utilized to calculate the Fifth Year Bonus Amount at any time.

24. All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

25. All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

26. Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

27. Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

28. All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

29. All organizational charts of NAM prepared at any time from 1999 to the present.

30. Ann Raider's personnel file.

31. Robert Fireman's personnel file.

32. All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

33. All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

34. All contracts, agreement or understandings between NAM and Ann Raider.

35. All contracts, agreements or understandings between NAM and Robert Fireman.

36. Any and all financial statements of NAM from 1999 to 2004.

37.    Any and all financial statements of CCMI, SmartSource Direct or SmartSource iGroup from 1999 to the present.

38.    All documents which refer, reflect or relate to NAM's decision to change the name of CCMI.

39.    All documents which refer, reflect or relate to Ann Raider or Robert Fireman.

40.    All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,

     /s David H. Rich
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated:  June 1, 2006

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

## DEFENDANT NEWS AMERICA MARKETING IN-STORE, INC.'S RESPONSES TO ROBERT FIREMAN AND ANN RAIDER'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

News America Marketing In-Store, Inc. ("NAM") hereby responds to the separately-numbered requests of Plaintiffs' First Requests for Production of Documents (the "Requests") as follows:

### GENERAL RESPONSES AND OBJECTIONS

The following General Responses and Objections are applicable to and are hereby incorporated by reference into each of NAM's specific responses to each document request contained in the Requests.

A.    NAM objects to the Requests' Defintions and Instructions to the extent they exceed the requirements of the Federal Rules of Civil Procedure.

B.    NAM is providing this response to the Requests without waiver of or prejudice to its right, at any later time, to raise objections to (a) the relevance, materiality, or admissibility of (i) the Requests or any part thereof, (ii) statements made in this response to the Requests or any part thereof, or (iii) any document produced pursuant to this response, or (b) any further demand for discovery involving or relating to the matters raised in the Requests.

C.     The Specific Responses set forth below and any production NAM undertakes to make pursuant thereto are based upon information now available to it after having made a diligent search within the time available of the files in its possession, custody or control that reasonably relate to one or more of the specific document production requests contained in the Requests.  NAM may, in the future, obtain or locate additional documents responsive to the Requests and may identify or determine additional information relevant to its Specific Responses to the document production requests contained in the Requests.  NAM objects to the Requests to the extent they purport to demand production of documents not in NAM's possession, custody, or control or to require a search that does not reasonably relate to one or more of the specific document production requests contained in the Requests.  NAM reserves the right at any time to revise, correct, add to, supplement, modify, or clarify the Specific Responses set forth below or the production made pursuant thereto.

D.     NAM objects to the Requests to the extent they demand production of any document covered by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or doctrine recognized by Fed. R. Civ. P. 26, including the doctrine relating to documents prepared in anticipation of litigation.  In the event any privileged document is produced by NAM, its production is inadvertent and does not consitute a waiver of any privilege.

E.     NAM objects to the Requests to the extent that they are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

F.     NAM objects to the Requests to the extent they purport to seek documents evidencing, referring, relating, pertaining to or created by any expert, as that term is used in Fed. R. Civ. P. 26 or his/her representative, or that describes, summarizes, evidences or sets forth any

2

communications by and between NAM and any such expert, or his/her representative, beyond those Plaintiff is entitled to receive pursuant to Mass. R. Civ. P. 26.

G.     NAM objects to the production of any documents falling within one of the General Objections set forth above or one of the Specific Objections set forth below.  In the event any document falling within such an objection is or may be produced by NAM, its production is inadvertent and does not constitute a waiver of the objection with respect to the produced document or any other document.  Moreover, a statement by NAM that it will produce all documents responsive to a particular request or falling within a particular description means that NAM will produce all documents within its possession, custody, or control that (a) are responsive to the particular request or fall within the particular description in question; (b) have been located by NAM after diligent search, and (c) do not fall within one of the General Objections set forth above or within any of the objections contained in the Specific Responses set forth below.  Further, such a statement is not an acknowledgment or an admission that any document responsive to the particular request or falling within the particular description in question currently exists or has ever existed.

H.     Production of all documents is subject to entry of a confidentiality stipulation and order.

<div align="center">SPECIFIC RESPONSES AND OBJECTIONS</div>

**REQUEST NO. 1**

All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

**RESPONSE NO. 1**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 2**

All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

**RESPONSE NO. 2**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily available unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 3**

All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

**RESPONSE NO. 3**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily available unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 4**

All documents which refer, reflect or relate to any business plans of CCMI.

**RESPONSE NO. 4**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily

# 3926418_vl

4

available unprivileged documents, to the extent they exist, as may be relevant to the issues raised

in the complaint.

## REQUEST NO. 5

All documents which refer, reflect or relate to any business plans prepared or reviewed
prior to the acquisition of CCMI relating to the business of CCMI.

## RESPONSE NO. 5

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 6

For the years 1999 to 2004, all documents which refer, reflect or relate to any annual
business plans which relate, reflect or refer to the business of CCMI, SmartSource Direct or
SmartSource iGroup.

## RESPONSE NO. 6

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

readily available documents, to the extent they exist, as may be relevant to the issues raised in

the complaint.

## REQUEST NO. 7

All documents utilized, reviewed or prepared in connection with the preparation of the
business plans sought by Request No. 6.

## RESPONSE NO. 7

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

# 3926418_v1

readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 8

All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

## RESPONSE NO. 8

NAM objects to the above request on the grounds that the request is vague and ambiguous and the documents sought are protected by the attorney-client privilege and not calculated to lead to the discovery of admissible evidence in this action. Without waiving the objection, NAM will produce unprivileged due diligence documents.

## REQUEST NO. 9

All documents which reflect communications between Raider and/or Fireman, on one hand, and NAM, on the other.

## RESPONSE NO. 9

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 10

All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider. This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

## RESPONSE NO. 10

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-client privilege. Without waiving the objections, NAM will produce such readily available

# 3926418_v1

6

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 11

All documents which refer, reflect or relate to the earn-out component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

## RESPONSE NO. 11

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 12

All documents which refer, reflect or relate to the "Base Earn-Out Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

## RESPONSE NO. 12

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, unduly burdensome, and that the documents sought are protected by the attorney-

client privilege. Without waiving the objections, NAM will produce such readily available

unprivileged documents, to the extent they exist, as may be relevant to the issues raised in the

complaint.

## REQUEST NO. 13

All documents utilized to calculate the Base Earn-Out Amount at any time.

**RESPONSE NO. 13**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 14**

All documents which refer, reflect or relate to the "First-Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 14**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 15**

All documents utilized to calculate the First Year Bonus Amount at any time.

**RESPONSE NO. 15**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 16**

All documents which refer, reflect or relate to the "Second Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 16**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 17**

All document utilized to calculate the Second Year Bonus Amount at any time.

**RESPONSE NO. 17**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 18**

All documents which refer, reflect or relate to the "Third Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 18**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 19**

All document utilized to calculate the Third Year Bonus Amount at any time.

**RESPONSE NO. 19**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 20**

All documents which refer, reflect or relate to the "Fourth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

**RESPONSE NO. 20**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 21**

All document utilized to calculate the Fourth Year Bonus Amount at any time.

**RESPONSE NO. 21**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 22**

All documents which refer, reflect or relate to the "Fifth Year Bonus Amount" component of the August 13, 1999 Stock Purchase Agreement. This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

# 3926418_v1

10

**RESPONSE NO. 22**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 23**

All document utilized to calculate the Fifth Year Bonus Amount at any time.

**RESPONSE NO. 23**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 24**

All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

**RESPONSE NO. 24**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 25**

All NAM or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

**RESPONSE NO. 25**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 26**

Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, *Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.*

**RESPONSE NO. 26**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 27**

Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

**RESPONSE NO. 27**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

**REQUEST NO. 28**

All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

**RESPONSE NO. 28**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 29**

All organizational charts of NAM prepared at any time from 1999 to the present.

**RESPONSE NO. 29**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Without waiving the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 30**

Ann Raider's personnel file.

**RESPONSE NO. 30**

NAM will produce the requested documents.

**REQUEST NO. 31**

Robert Fireman's personnel file.

**RESPONSE NO. 31**

NAM will produce the requested documents.

**REQUEST NO. 32**

All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

**RESPONSE NO. 32**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and seek privileged information. Without waiving the

# 3926418_v1

13

objection, NAM will produce such readily available unprivileged documents to the extent they exist.

## REQUEST NO. 33

All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

## RESPONSE NO. 33

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence. Without waiving the objections, NAM will produce such readily available documents, to the extent they exist, as may be relevant to the issues raised in the complaint.

## REQUEST NO. 34

All contracts, agreement or understandings between NAM and Ann Raider.

## RESPONSE NO. 34

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such documents to the extent they exist.

## REQUEST NO. 35

All contracts, agreements or understandings between NAM and Robert Fireman.

## RESPONSE NO. 35

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, and unduly burdensome. Without waiving the objection, NAM will produce such documents to the extent they exist.

## REQUEST NO. 36

Any and all financial statements of NAM from 1999 to 2004.

**RESPONSE NO. 36**

NAM objects to the above request on the ground that it is overly broad and not

reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 37**

Any and all financial statements of CCMI, SmartSource Direct or SmartSource iGroup
from 1999 to the present.

**RESPONSE NO. 37**

NAM objects to the above request on the ground that it is overly broad. Without waiving

the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 38**

All documents which refer, reflect or relate to NAM's decision to change the name of
CCMI.

**RESPONSE NO. 38**

NAM objects to the above request on the ground that it is overly broad. Without waiving

the objection, NAM will produce such readily available documents to the extent they exist.

**REQUEST NO. 39**

All documents which refer, reflect or relate to Ann Raider or Robert Fireman.

**RESPONSE NO. 39**

NAM objects to the above request on the grounds that it is overly broad, vague and

ambiguous, and unduly burdensome. Without waiving the objections, NAM will produce such

documents, to the extent they exist, as may be relevant to the issues raised in the complaint and

are readily available.

**REQUEST NO. 40**

All documents which refer, reflect or relate to the loyalty marketing industry, including
but not limited to business plans, reports, studies or surveys received or prepared at any time
from 1997 to the present.

**RESPONSE NO. 40**

NAM objects to the above request on the grounds that it is overly broad, vague and ambiguous, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Tara L. Myslinski (BBO #644936)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: September 8, 2006
Boston, Massachusetts

*I hereby certify that a true copy of the above document(s) was served upon all parties of record in this case on 8/13/06 by Hand by Mail*

# EXHIBIT 7

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------x

ROBERT FIREMAN and ANN RAIDER,    :

                Plaintiffs,    :    Civil Action No.

       -vs.-    :    05-1740 MLW

NEWS AMERICA MARKETING IN-STORE, :

INC.,    Defendant.    :

--------------------------------x

      Deposition of ALFRED A. McBEAN, JR., taken in

the above-entitled matter before RICH GERMOSEN,

Certified Court Reporter, (License No. XI01847),

Certified Realtime Court Reporter-NJ, (License No.

XR00168), NCRA Registered Professional Reporter, NCRA

Certified Realtime Reporter, Certified LiveNote

Reporter, and a Notary Public within and for the

States of New York and New Jersey, taken at the

offices of News America, Incorporated, 1211 Avenue of

the Americas, 3rd Floor, New York, New York

10036-8701, on Tuesday, March 27, 2007, commencing at

11:02 a.m.

McBean, Jr., Alfred A.                    March 27, 2007
New York, NY

2 (Pages 2 to 5)

2

1        A P P E A R A N C E S
2    Attorney for the Plaintiffs:
3        KEVIN T. PETERS, ESQ.
4        TODD & WELD LLP
5        28 State Street - 31st Floor
6        Boston, MA 02109-1775
7        (617) 720-2626
8
9    Attorney for the Defendant:
10       GORDON P. KATZ, ESQ.
11       HOLLAND & KNIGHT LLP
12       10 St. James Avenue - 11th Floor
13       Boston, MA 02116-3889
14       (617) 573-5839
15
16
17   ALSO PRESENT:
18   J. JORDAN LIPPNER, ESQ., News America Incorporated
19
20
21
22

4

1            IT IS HEREBY STIPULATED AND AGREED, by
2    and between the attorneys for the respective parties
3    herein, that filing and sealing be and the same are
4    hereby waived.
5            IT IS FURTHER STIPULATED AND AGREED
6    that all objections, except as to the form of the
7    question, shall be preserved to the time of trial.
8            IT IS FURTHER STIPULATED AND AGREED
9    that the within deposition may be signed and sworn
10   to before any officer authorized to administer an
11   oath, with the same force and effect as if signed
12   and sworn to before the officer before whom the
13   within deposition was taken.
14
15
16
17
18
19
20
21
22

3

1          C O N T E N T S
2    WITNESS: ALFRED A. McBEAN, JR.          PAGE
3        Examination By Mr. Peters ................. 005
4
5          E X H I B I T S
6    NUMBER    DESCRIPTION         PAGE LINE
7    1    (Exhibit 1 for identification,
8         four-page document entitled
9         Notice of Taking Deposition,
10        not bearing Bates stamps.) ...... 010 .. 017
11
12
13
14
15
16
17
18
19
20
21
22

5

1          P R O C E E D I N G S
2            (Whereupon, the court reporter
3    administers the oath to the witness.)
4        A L F R E D  A.  M c B E A N ,  J R .,
5    conducting business at News America Marketing,
6    20 Westport Road, 1st Floor, Wilton, Connecticut
7    06897, residing at 29 Thompson Street, Fairfield,
8    Connecticut  06825, having been first duly sworn
9    or affirmed by a Notary Public within and for the
10   States of New York and New Jersey, was examined
11   and testified as follows:
12           EXAMINATION BY MR. PETERS:
13       Q.    Good morning.
14       A.    Good morning.
15       Q.    We met briefly a moment ago.  I'm
16   Kevin Peters.  I represent the Plaintiffs in this
17   case.  I appreciate you taking the time to get
18   ready for this deposition and appearing today.
19           Would you introduce yourself to
20   us, give the name and the spelling of your name.
21       A.    Alfred McBean, A-l-f-r-e-d,
22   M-c-B-e-a-n.

Henderson Legal Services
(202) 220-4158

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

**6**

1    Q.    Where do you work, sir?
2    **A.    News America Marketing.**
3    Q.    What is your job?
4    **A.    I'm the vice-president of Windows**
5    **technology.**
6    Q.    What are your job
7    responsibilities?
8    **A.    Managing the Windows environment**
9    **from an end user experience and operations side**
10    **as far as maintaining the functionality of all**
11    **the Windows servers.**
12    Q.    Okay.  How long have you had the
13    job?
14    **A.    Under the current title two years.**
15    Q.    Okay.
16          How long have you worked for News
17    America?
18    **A.    I started in June of 2000.**
19    Q.    Okay.
20          Did you replace someone?  Did
21    someone have your job?
22    **A.    No.  At the time that I was hired**

**7**

1    **I believe that this was a new head count.**
2    Q.    Okay.
3          Who was in charge of technology or
4    IT before you came on board if you know?
5    **A.    I could only tell you who my**
6    **hiring manager was.**
7    Q.    Why don't you tell me that?
8    **A.    Sunnel Sajnani.**
9    Q.    Could you spell that, please?
10    **A.    S-u-n —**
11    Q.    The questions only get easier.
12    **A.    Yeah, I know.  Hold on.**
13    **S-u-n-n-e-l.  Hold on.  I'll have to get back to**
14    **you on his first name.  His last name is**
15    **S-a-j-n-a-n-i.**
16    Q.    S-a-j --
17    **A.    S-a-j-n-a-n-i.**
18    Q.    Okay.
19          And what was his position?
20    **A.    Vice-president of technology.**
21    Q.    Okay.
22          Is he still with the company?

**8**

1    **A.    No, he's not.**
2    Q.    Okay.  Do you know where he went?
3    **A.    He went to Fox.**
4    Q.    Okay.
5          So he's still within the News
6    America family of companies?
7          MR. KATZ:  Objection.
8    **A.    Yes.**
9    Q.    Okay.
10          Do you know what his job is
11    presently?
12    **A.    Yes.**
13    Q.    What is it?
14    **A.    He's the vice-president of**
15    **technology for Fox.**
16          MR. KATZ:  Yeah, you know, before
17    we go any further should we put some stipulations
18    on the record?
19          MR. PETERS:  Okay.
20          MR. KATZ:  Sounds like a good idea.
21          MR. PETERS:  Why not.  I've done
22    that.

**9**

1          MR. KATZ:  Okay.  We've done it
2    before.
3          MR. PETERS:  We've done it before.
4          MR. KATZ:  And the two of us have
5    done it several times.
6          MR. PETERS:  That's right.
7          Why don't we reserve objections
8    except as to the form of the question until the
9    time of trial or use of the transcript in a
10    dispositive motion like a summary judgment motion,
11    for instance, and why don't we reserve motions to
12    strike until the time of trial or use of the
13    transcript in a dispositive motion.  The witness
14    will want to read and sign I'm sure, Gordon, but
15    we'd waive Notary.
16          Does that cover the waterfront?
17          MR. KATZ:  I think so with the
18    exception that the only objections we're not
19    reserving and the only motions to strike we're not
20    reserving would be those as to form.
21          MR. PETERS:  Only as to form.
22          MR. KATZ:  Let me just add one

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

4  (Pages 10 to 13)

|  | 10 |
|---|---|
| 1 | further thing as a preliminary matter. |
| 2 | As you know we sent you certain |
| 3 | objections to your 30(b)(6) deposition, that is |
| 4 | the 30(b)(6) deposition under which Mr. McBean is |
| 5 | appearing here today in a letter dated January |
| 6 | 26th, 2007. I'm not going to repeat those here, |
| 7 | but I just want to incorporate by reference that |
| 8 | letter dated January 26th, 2007 and if you'd like |
| 9 | we can mark it as an exhibit. I don't happen to |
| 10 | have a clean copy of it with me today, but we can |
| 11 | amend the record when we return to Boston if you'd |
| 12 | like to do that. |
| 13 | MR. PETERS: Well, why don't we do |
| 14 | this: |
| 15 | Would you mark as the first exhibit |
| 16 | a Notice of Deposition. |
| 17 | (Whereupon, four-page document |
| 18 | entitled Notice of Taking Deposition, not bearing |
| 19 | Bates stamps, is received and marked as McBean |
| 20 | Exhibit 1 for Identification.) |
| 21 | COURT REPORTER: Number 1. |
| 22 |  |

|  | 12 |
|---|---|
| 1 | MR. KATZ: The person who has |
| 2 | knowledge on the subject as I've indicated in the |
| 3 | letter of January 26th, 2007 is me. |
| 4 | MR. PETERS: So there's no |
| 5 | corporate person who was responsible for |
| 6 | coordinating the effort to collect electronic |
| 7 | documents or paper documents? |
| 8 | MR. KATZ: That -- the person who |
| 9 | is responsible for the coordination of the effort |
| 10 | to collect electronic documents or paper documents |
| 11 | has been me. |
| 12 | MR. PETERS: Okay. |
| 13 |  |
| 14 | BY MR. PETERS: |
| 15 | Q.    Well, let me just ask the witness, |
| 16 | did you collect any documents and provide them to |
| 17 | Mr. Katz electronic or otherwise? |
| 18 | A.    In relation to Number 5? |
| 19 | Q.    Just generally in relation to this |
| 20 | litigation? |
| 21 | A.    Yes, I collected documents where I |
| 22 | provided it to him. |

|  | 11 |
|---|---|
| 1 | BY MR. PETERS: |
| 2 | Q.    Mr. McBean, I'm showing you a copy |
| 3 | of a Notice of Deposition. |
| 4 | Would you take a look at it and |
| 5 | see if you recognize the document. |
| 6 | A.    Yes, I recognize the document. |
| 7 | Q.    Okay. |
| 8 | Is this deposition notice the |
| 9 | notice that brings you here today? |
| 10 | A.    Yes. |
| 11 | Q.    Okay. |
| 12 | MR. PETERS: Now, Gordon, your |
| 13 | objections as I understand, as I understand them |
| 14 | to be pertain to 5, category 5? |
| 15 | MR. KATZ: Principally. For |
| 16 | present discussion that's the one that is most |
| 17 | significant and that is that Mr. McBean is not |
| 18 | testifying as a corporate representative with |
| 19 | respect to Number 5 on Exhibit 1. |
| 20 | MR. PETERS: Okay. |
| 21 | Is there another person that's |
| 22 | available to testify on that? |

|  | 13 |
|---|---|
| 1 | Q.    Okay. |
| 2 | What categories of documents did |
| 3 | you provide? |
| 4 | A.    Documents that he had requested |
| 5 | from me. |
| 6 | Q.    Do you recall what they are? |
| 7 | A.    One was previous deposition and |
| 8 | documents pertaining to corporate policies. |
| 9 | Q.    Okay. |
| 10 | Anything else, any other |
| 11 | categories of documents? |
| 12 | A.    No. |
| 13 | Q.    Okay. |
| 14 | Can you define with more precision |
| 15 | the documents pertaining to corporate policies? |
| 16 | A.    Policies, News Corp. policies on |
| 17 | records management and computer usage. |
| 18 | Q.    Did you review those documents in |
| 19 | advance of today's deposition? |
| 20 | A.    Yes. |
| 21 | Q.    Are you familiar with the |
| 22 | substance of those documents in a general way? |

**14**

1     A.   Yes.
2     Q.   Okay.
3          So if we ask questions later on in
4   the deposition about corporate policies, you'll
5   have a working knowledge of those documents?
6     A.   No.  I mean I know what the
7   documents are about, but I don't know them
8   verbatim.
9     Q.   Okay.  We'll just get into that.
10         In any event, we were talking
11  about your job responsibilities and your hire
12  back in 2000.
13         When you were hired what were you
14  hired to do?
15    A.   My first position with News
16  America Marketing was a senior technologist.
17    Q.   What were your job
18  responsibilities?
19    A.   Job responsibilities were to chart
20  technology mostly in the Windows space and
21  introduce them into News America Marketing.
22    Q.   What does that mean, to chart

**15**

1   technology?
2     A.   For instance, one of my first
3   projects was to look at the way that the
4   organization is receiving faxes and figure out a
5   way to automate them.  So we looked at a product,
6   looked at several products, isolated it down to a
7   product and then I did a pilot, internal pilot
8   and we went to full production as far as being
9   able to automatically send faxes out on behalf of
10  our users electronically.
11    Q.   Okay.
12         Have your job responsibilities
13  changed over the years?
14    A.   Yes.
15    Q.   Can you tell me how they've
16  evolved?
17    A.   I went from senior technologist to
18  director of Windows technology.  I want to say
19  that happened in 2001.  And then in 2005 I became
20  a vice-president of Windows technology.
21    Q.   What were your job
22  responsibilities as a director of Windows

**16**

1   technology?
2     A.   I managed the Windows, the entire
3   Windows environment for News America Marketing,
4   the end user experience as far as applications
5   that are hosted on the Windows servers and the
6   operational stability of the environment.  So
7   anything that was Microsoft Windows related from
8   an application or server perspective I was
9   directly responsible for.
10    Q.   And this was for News America, the
11  company?
12    A.   This is for News America
13  Marketing.
14    Q.   News America Marketing.
15         And so did that cover News America
16  Marketing In-Store, Inc.?
17    A.   Yes.
18    Q.   Is that a company familiar to you?
19         Are you familiar with a company or
20  division called SmartSource Direct?
21    A.   Yes.
22    Q.   Are you responsible for their

**17**

1   data?
2     A.   Yes.
3     Q.   And the SmartSource I Group, are
4   you familiar with that?
5     A.   Yes.
6     Q.   Were you responsible for the
7   Windows environment for the SmartSource I Group?
8     A.   Yes.
9     Q.   And was that the case from did you
10  say June of 2000?
11    A.   No.
12    Q.   When did you start?
13    A.   That would have taken place 2001.
14    Q.   Okay.
15         So let me see if I have this.  You
16  became responsible for the Windows environment
17  for the SmartSource I Group, Smart Source Direct
18  in 2001?
19    A.   Yes.
20    Q.   And that's when you became the
21  director of Windows technology?
22    A.   Correct.

McBean, Jr., Alfred A.                              March 27, 2007
                          New York, NY

6 (Pages 18 to 21)

|  | 18 |
|---|---|
| 1 | Q.    Okay. |
| 2 | So before you became the director |
| 3 | of Windows technology and you were a senior |
| 4 | technician, you were not responsible for the |
| 5 | Windows environments of any News America |
| 6 | Marketing division, is that correct? |
| 7 | **A.    Correct.** |
| 8 | Q.    Okay. |
| 9 | Who was responsible for those |
| 10 | environments prior to you? |
| 11 | **A.    Prior to me PJ Paple.** |
| 12 | Q.    How do you spell -- is it a man or |
| 13 | a woman? |
| 14 | **A.    It's a man.** |
| 15 | Q.    How do you spell his last name? |
| 16 | **A.    P-a-p-l-e.** |
| 17 | Q.    Okay. |
| 18 | What was his job title? |
| 19 | **A.    I am not sure, but I believe it** |
| 20 | **was vice-president of operations.** |
| 21 | Q.    Do you know what his job |
| 22 | responsibilities were vis-a-vis information |

|  | 19 |
|---|---|
| 1 | technology for News America Marketing and the |
| 2 | divisions of that? |
| 3 | **A.    I don't have his total job** |
| 4 | **responsibilities.  I do know that he was manager** |
| 5 | **of the Windows environment.** |
| 6 | Q.    Okay. |
| 7 | Does he still work for News |
| 8 | America Marketing? |
| 9 | **A.    Yes, he does.** |
| 10 | Q.    Do you know what his position is |
| 11 | currently? |
| 12 | **A.    Vice-president of database** |
| 13 | **technology.** |
| 14 | Q.    Okay. |
| 15 | To whom does he report? |
| 16 | **A.    Today he reports to William** |
| 17 | **Christie.** |
| 18 | Q.    To whom do you report? |
| 19 | **A.    I report into William Christie.** |
| 20 | Q.    Okay. |
| 21 | What are Mr. Paple's job |
| 22 | responsibilities presently if you know? |

|  | 20 |
|---|---|
| 1 | **A.    He's vice-president of databases.** |
| 2 | **He manages News America Marketing's databases so** |
| 3 | **Oracle databases.** |
| 4 | Q.    Okay. |
| 5 | Are you responsible for purchasing |
| 6 | hardware? |
| 7 | **A.    Not entirely.** |
| 8 | Q.    Okay. |
| 9 | Is there one person that has |
| 10 | responsibility for hardware purchases? |
| 11 | **A.    No.** |
| 12 | Q.    Okay. |
| 13 | What are your job responsibilities |
| 14 | in terms of purchasing hardware? |
| 15 | **A.    I recommend hardware to be** |
| 16 | **purchased.** |
| 17 | Q.    Does News America Marketing have |
| 18 | any preferred vendors of hardware? |
| 19 | **A.    Yes.** |
| 20 | Q.    Who are those vendors? |
| 21 | **A.    For the hardware that I recommend** |
| 22 | **purchases for predominantly it's HP.** |

|  | 21 |
|---|---|
| 1 | Q.    Okay. |
| 2 | So are the servers that you -- |
| 3 | I'll ask this question: Do you manage the |
| 4 | servers? |
| 5 | **A.    Yes.** |
| 6 | Q.    Okay. |
| 7 | Are the servers HP servers? |
| 8 | **A.    Yes.** |
| 9 | Q.    Would you tell me what model |
| 10 | numbers?  Do you know what, that's probably a bit |
| 11 | of an unfair question. |
| 12 | Let me ask you this question: How |
| 13 | many servers do you oversee? |
| 14 | **A.    Today?** |
| 15 | Q.    Yes. |
| 16 | **A.    Roughly two hundred and -- roughly** |
| 17 | **two hundred.** |
| 18 | Q.    Where are they located? |
| 19 | **A.    Across the United States.  Across** |
| 20 | **North America.** |
| 21 | Q.    How many offices do you have job |
| 22 | responsibilities for? |

McBean, Jr., Alfred A.                                March 27, 2007
                    New York, NY

7 (Pages 22 to 25)

---

**22**

1    A.    Fifteen.
2    Q.    Okay.
3          And each of these offices has its
4    own servers?
5    A.    Correct.
6    Q.    And are they networked?
7    A.    I take that back.  It's more like
8    twenty offices.
9    Q.    Twenty.
10         Are they networked?
11   A.    Yes.
12   Q.    Are they networked to
13   headquarters?
14   A.    It's a fully mesh network so
15   all -- all connections -- all cities connected to
16   the mesh connect to each other.  So all cities
17   connect to each other.
18   Q.    Okay.
19         And we'll get into backing up, but
20   is all the backup done in one location?
21   A.    No.
22   Q.    It's all backed up in the separate

---

**23**

1    offices?
2    A.    Correct.
3    Q.    Okay.
4          Is there a central backup?
5    A.    No.
6    Q.    In other words, twenty offices,
7    twenty backups?
8    A.    No.
9    Q.    Okay.
10         Why don't we take that more
11   incrementally and get back into the hardware.
12         The servers, are they particular
13   models of HP servers or do they vary widely?
14   A.    They vary widely, however, of
15   recent we've been ordering standardizing on a
16   type of model server.
17   Q.    And what is that?
18   A.    It's a Compaq DL360, or HP DL360.
19   Q.    Okay.
20         What were the servers in 2000 when
21   you joined the company?
22   A.    It was a mix between Compaq and

---

**24**

1    Dell and there might have been one or two
2    Gateways as well.
3    Q.    Was all the data on those servers
4    migrated over to the HP servers at some point
5    over time?
6    A.    Data that -- well, depending on
7    what the business case was.
8    Q.    Are there separate servers that
9    manage E-mail?
10   A.    There are separate servers that
11   manage E-mail, I don't understand the question.
12   Q.    Where does the E-mail for the News
13   America reside?
14   A.    In one of four different cities.
15   Q.    What are the cities?
16   A.    Toronto, Chicago, Wilton and New
17   York.
18   Q.    Okay.
19         Are those the cities where the
20   E-mail is stored presently?
21   A.    Correct.
22   Q.    Has that been the case since 2000

---

**25**

1    when you joined the company?
2    A.    With the exception of Wilton, yes.
3    Q.    Okay.
4          And is all the E-mail -- well, let
5    me ask this:  How does it break down from a
6    territorial perspective?  What does New York
7    cover?  What does Wilton cover?  What does
8    Chicago cover and what does Toronto cover in
9    terms of E-mail?
10   A.    Today?
11   Q.    Yes, right now.
12   A.    I don't know.
13   Q.    Okay.  Do you know what it was in
14   2000?
15   A.    No.
16   Q.    Am I correct that the different
17   cities manage the E-mail for different parts of
18   the country?
19   A.    Correct, but not always the case.
20   Q.    What are the rules on that?
21   A.    The exceptions could be employees
22   that transfer from one office to the other, their

---

Henderson Legal Services
(202) 220-4158

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

8 (Pages 26 to 29)

---

**26**

1  E-mail in some cases may not transfer over.
2      Q.    Okay.
3            And the E-mail that is in, resides
4  on those servers, when you went from the Compaq
5  and Dell servers to the HP servers, was that
6  E-mail transferred to the new servers?
7      A.    When we --
8      Q.    I'm talking about the legacy
9  E-mail.
10     A.    When we performed upgrades to our
11 E-mail environment, mail that is on the mail
12 servers is transferred from the legacy server to
13 the new server.
14     Q.    Okay.
15           What happens to the legacy
16 servers?
17     A.    They're either repurposed or, you
18 know, if they're end of life then we will dispose
19 of them.
20     Q.    Are there old servers in New York
21 from the case of the Compaq and Dell generation
22 hardware?

---

**27**

1      A.    In relation to E-mail?
2      Q.    Yes, sir.
3      A.    I do know that at the time New
4  York was running on Dell equipment. So those
5  servers are no longer available. Those are done.
6  We dumped them.
7      Q.    So they're no longer in your
8  possession?
9      A.    That's correct.
10     Q.    Okay.
11     A.    They were very old Dell systems.
12     Q.    Now, the E-mail I'm obviously most
13 interested in is the E-mail that was in New York
14 and in Boston.
15     A.    Right.
16     Q.    Would that be on the New York
17 server more likely than not?
18           MR. KATZ: Objection.
19           You're referring to the New York
20 E-mail or are you referring to the Boston E-mail?
21           MR. PETERS: Both.
22           MR. KATZ: So maybe you should

---

**28**

1  break it down.
2
3  BY MR. PETERS:
4      Q.    Well, the New York E-mail is on
5  the New York server, correct?
6      A.    Not always the case.
7      Q.    But generally?
8      A.    That's usually the mode of
9  operation, but not always the case.
10     Q.    And the Boston E-mail, is that on
11 the New York server?
12     A.    Not always the case.
13     Q.    Is that generally the case?
14     A.    No.
15     Q.    Where does that reside?
16     A.    Today?
17     Q.    Yes.
18     A.    I want to say Chicago.
19     Q.    Okay.
20     A.    But I need to verify that.
21     Q.    Okay.
22           Now, what legacy servers did

---

**29**

1  Chicago have before you migrated over to HP?
2      A.    Dell.
3      Q.    Okay.
4            Do you know whether or not any of
5  those servers in Chicago still exist?
6      A.    The Dell servers, no.
7      Q.    Do you know what happened to them?
8      A.    We dumped them.
9      Q.    Do you know when?
10     A.    No. I can approximate and say
11 probably 2002. Probably about 2002.
12     Q.    Okay.
13           And the desktops, are they these
14 days also generally HP?
15     A.    What we're buying today is
16 ninety-five percent HP.
17     Q.    Okay.
18           What was the case back in 2000
19 when you joined the company?
20     A.    In 2000 we were purchasing Dell,
21 HP and IBM.
22     Q.    What was in New York for the most

---

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

9 (Pages 30 to 33)

---

30

1    part?
2        A.    I do not know.
3        Q.    What's the average life of a
4    desktop at News America Marketing?
5        A.    Between three and five years.
6        Q.    What happens to the old desktops
7    once they're decommissioned or no longer used?
8        A.    They're dumped.
9        Q.    What does that mean literally?
10       A.    We load them up into dumpsters and
11   they get hauled away.
12       Q.    Before the desktops are hauled
13   away is the information that resides on the
14   desktops' hard drive backed up?
15           MR. KATZ:  Objection.
16           As a matter of policy?
17           MR. PETERS:  Yes.
18
19   BY MR. PETERS:
20       Q.    As a matter of policy when a
21   desktop is decommissioned is the data on that
22   desktop imaged or backed up?

---

31

1        A.    There is no policy to that effect.
2        Q.    Okay.
3            Do you know what happens as a
4    general rule by virtue of your job
5    responsibilities?
6            MR. KATZ:  Objection.
7        A.    The data is presented to --
8    actually the manager gets involved and decides
9    whether or not they want to keep the data on the
10   disk.
11       Q.    If data is kept where is it kept?
12       A.    It's given to the manager.
13       Q.    Okay.
14           Is it -- in what form is it given?
15   Optimal disk or tape?
16       A.    It all depends on the manager.
17   They may ask us to burn it to CD.  They may ask
18   us to drop it in their home directory.  They may
19   ask us to hold it there for a new employee that's
20   coming in.  It all depends on what the manager
21   would like us to do with it.  It's at the
22   manager's discretion.

---

32

1        Q.    Yes, sir.
2            Is that also the case with E-mail?
3        A.    Yes.
4        Q.    Which Windows operating system are
5    you running presently?
6        A.    Windows 4.0, Windows 95, Windows
7    2000, Windows 2000 server, Windows server 2003,
8    Windows server 2003R2, Windows XP, Windows Vista
9    I think those are all the ones we are running.
10       Q.    Okay.
11           Have -- has News America Marketing
12   been a Windows -- has News America Marketing used
13   a Windows environment since 2000?
14       A.    Yes.
15       Q.    Okay.
16           Has there been any other operating
17   system that you know of or that pre-dates you?
18   Linux, for example?
19       A.    From a Windows perspective the
20   only other item would be Windows 351.
21       Q.    But News America Marketing has
22   been an entity that uses a Windows environment

---

33

1    whatever Windows version that is for as long as
2    you know?
3        A.    Uh-huh.
4        Q.    Is that a correct statement?
5        A.    For as long as I know, correct.
6        Q.    Okay.
7        A.    Which would be from 2000.
8        Q.    But you don't know of any other
9    operating system that pre-dates you, do you?
10       A.    Novell, but that's not a Windowing
11   environment, but I can't speak beyond Novell.
12       Q.    Got it.
13           And --
14       A.    These other -- oh, we also use
15   today outside of Windows Sun.
16       Q.    What's Sun used for?  What
17   applications?
18       A.    It's an operating system that we
19   run our main -- several applications on.
20       Q.    Right.
21           Do you know what applications are
22   run off of Sun?

---

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

10 (Pages 34 to 37)

---

**34**

1    A.    Oracle.
2    Q.    Okay. Is it mostly for
3  accounting?
4    A.    No.
5    Q.    Could you just tell me the purpose
6  of the applications that run off of the Oracle
7  database?
8    A.    Our ERP system.
9    Q.    ERP stands for?
10   A.    Enterprise -- I'm sorry, I don't
11 recall the acronym, but the line of applications
12 that are on the Sun platform would be our
13 financial systems, our line of business
14 applications, the in-store business, for example,
15 would be on there, our FSI business would be on
16 there.
17   Q.    When you say the business would be
18 on there what do you mean?
19   A.    The in-store business.
20   Q.    I don't know what you mean by
21 that. I'm sorry. I don't mean to be obtuse.
22   A.    The application --

---

**35**

1    Q.    Financials, all of their
2  applications?
3    A.    I don't know. That you're going
4  to have to take up with PJ. I don't -- all I
5  know is that the in-store business what our sales
6  reps used to enter orders, order management
7  system.
8    Q.    Okay. That helps.
9          In terms of internal and external
10 communication E-mail, for instance, that's done
11 from a Windows environment?
12   A.    That's correct.
13   Q.    Okay.
14         Can you tell me what software,
15 what Windows software is run on the server level
16 at News America Marketing? And if that's going
17 to require you to speak for the next twenty
18 minutes I'm going to withdraw the question. I'll
19 let you know right now.
20   A.    I was going to ask you to rephrase
21 the question because --
22   Q.    Yeah, in other words --

---

**36**

1    A.    -- because you're asking me what
2  Windows software runs at the server level. I
3  mean Windows server runs at the server level. So
4  I guess --
5    Q.    But you run Outlook from the
6  server, don't you?
7    A.    No. You run that from a desktop.
8    Q.    That's my question then.
9          So the only application on the
10 server is the server application itself? No
11 software resides on the server other than server
12 level software, in other words --
13   A.    No.
14   Q.    -- Office and --
15   A.    In some instances Office is
16 installed on the server to fit end user's needs.
17 So let's say, for instance, there's a user that
18 does not have Microsoft Office on their computer
19 that can use it off of the server.
20   Q.    Right.
21   A.    So --
22   Q.    Okay.

---

**37**

1          Do you have remote access?
2    A.    Yes.
3    Q.    Okay.
4          Is that stored on the server?
5          It's got to be.
6    A.    No. Well, remote access is
7  governed by the network, not necessarily the
8  server. The servers provide the application.
9    Q.    Right.
10   A.    Regardless of whether you're on
11 our network or if you are connecting in remotely.
12   Q.    Okay.
13         What remote access application
14 does News America presently use?
15         MR. KATZ: Do you understand the
16 question?
17   A.    Cisco VPN.
18   Q.    Okay.
19         Is that application the same
20 application that was in use in 2000 when you
21 joined the company?
22   A.    No.

---

McBean, Jr., Alfred A.                        March 27, 2007

New York, NY

11 (Pages 38 to 41)

**38**

1    Q.   What was being used back then?
2    **A.   Nortel.**
3    Q.   What version?
4    **A.   Do not remember.  Do not recall.**
5    Q.   When did you switch over from
6  Nortel to Cisco VPN?
7    **A.   Do not recall.**
8    Q.   Was it during your tenure?
9    **A.   Yes.**
10   Q.   Obviously.
11   **A.   (Indicating.)**
12   Q.   Okay.
13       What software or applications are
14  used at News America Marketing? Can you list
15  them for me? Windows I'm talking about.
16   **A.   It's going to take twenty minutes.**
17   Q.   It is. Well, let me ask you
18  some -- then let me ask you some questions that
19  matter to me, okay?
20       Do you use Outlook?
21   **A.   Yes.**
22   Q.   Okay.

**39**

1       Do you use Word?
2    **A.   Yes.**
3    Q.   Do you use PowerPoint?
4    **A.   Yes.**
5    Q.   Do you use Excel?
6    **A.   Yes.**
7    Q.   Okay.
8       Do you use any other type of Word
9  application for communicating --
10      Pardon me.
11      Do you use any other Windows
12  application for communicating internally other
13  than Outlook?
14   **A.   Define communicating.**
15   Q.   If I want to ask you a question
16  electronically --
17   **A.   Okay.**
18   Q.   -- I can E-mail you?
19   **A.   That's correct.**
20   Q.   Can I IM you?
21   **A.   Yes, you can.**
22   Q.   Okay.

**40**

1       What's the IM application?
2    **A.   Windows Messenger.**
3       MR. KATZ: Alfred, this is off the
4  record.
5       (Whereupon, a discussion is held
6  off the record.)
7       MR. PETERS: Let's go back on the
8  record.
9
10  BY MR. PETERS:
11    Q.   So we were talking about Windows
12  applications that can be used to communicate
13  internally. One of them is Outlook and that's
14  E-mail. The other is IM Messenger, okay.
15      Are there other Windows
16  applications that are generally used for internal
17  communication?
18   **A.   Live Meeting.**
19   Q.   Live Meeting?
20   **A.   Uh-huh.**
21   Q.   Anything else?
22   **A.   For person to person communication**

**41**

1  **I think that covers it.**
2    Q.   Do you presently do Web meetings?
3    **A.   That's Live Meeting.**
4    Q.   That's Live Meeting. Okay.
5       Were there other applications used
6  for internal communications that have been
7  decommissioned during your tenure?
8    **A.   No.**
9    Q.   Okay.
10      So at all times since 2000 Outlook
11  has been the E-mail application?
12   **A.   Correct.**
13   Q.   And IM Messenger has been the
14  application for instant messaging?
15   **A.   Not since 2000, but yes.**
16   Q.   Okay.
17      When did that start, the IM
18  Messenger?
19   **A.   I don't recall.**
20   Q.   Okay.
21   **A.   I don't recall.**
22   Q.   Okay.

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

12 (Pages 42 to 45)

|  | 42 |
|---|---|
| 1 | Is Outlook backed up? |
| 2 | A. No. |
| 3 | Q. Is IM Messenger backed up? |
| 4 | A. The server is backed up, but the |
| 5 | data that goes through the server is not. |
| 6 | Q. Differentiate that for me. |
| 7 | A. The conversations are not backed |
| 8 | up, they are not recorded. |
| 9 | Q. Okay. |
| 10 | And the E-mail itself, the Outlook |
| 11 | E-mail itself, that's not backed up? |
| 12 | A. That is backed up. Well, Exchange |
| 13 | is a server. So the Exchange server is backed |
| 14 | up. |
| 15 | Q. Okay. |
| 16 | A. But Outlook is not backed up. |
| 17 | Q. So E-mail itself, the |
| 18 | communications are saved for some period of time? |
| 19 | A. Mail that flows through the |
| 20 | Exchange servers are backed up. |
| 21 | Q. Okay. |
| 22 | And Live Meeting, is there any |

|  | 43 |
|---|---|
| 1 | backup of that data? |
| 2 | A. I don't back that up. That's a |
| 3 | hosted solution provided by Microsoft. |
| 4 | Q. Right. |
| 5 | So it's not -- it doesn't reside |
| 6 | on the server for any period of time? |
| 7 | A. Doesn't reside -- it's not even |
| 8 | here. I don't manage it or maintain it. We pay |
| 9 | for that service. |
| 10 | Q. All right. Understood. |
| 11 | What is the accounting, Windows |
| 12 | accounting application or applications that are |
| 13 | used? |
| 14 | A. QuickBooks or it might be Quicken |
| 15 | if they're the same thing. That's the only thing |
| 16 | from an accounting perspective that I recall. |
| 17 | Q. Okay. |
| 18 | Is there any project planning |
| 19 | software used like Microsoft Project? |
| 20 | A. Yes. |
| 21 | Q. Okay. |
| 22 | What are the planning applications |

|  | 44 |
|---|---|
| 1 | that are used presently? |
| 2 | A. Project is the only one that I'm |
| 3 | aware of. |
| 4 | Q. How long has Project been in use? |
| 5 | A. I don't know. I don't know. |
| 6 | Q. Has it been around since you |
| 7 | joined the company in 2000? |
| 8 | A. Project has been around since I've |
| 9 | joined the company in 2000, however, I cannot |
| 10 | speak to how long or who uses it. |
| 11 | Q. And is that data backed up? |
| 12 | A. If the Project documents are |
| 13 | stored on our file servers then, yes, that would |
| 14 | be backed up. |
| 15 | Q. Do you use Primavera or Microsoft |
| 16 | Visio, V-i-s-i-o? |
| 17 | A. Visio. |
| 18 | Q. Visio? Pardon me. |
| 19 | A. Visio we do use. |
| 20 | Q. Okay. |
| 21 | A. What was the first one? |
| 22 | Q. Primavera? |

|  | 45 |
|---|---|
| 1 | A. I'm not familiar with that one. |
| 2 | Q. Okay. |
| 3 | And Visio is used for project |
| 4 | planning? |
| 5 | A. Visio is used for diagramming |
| 6 | which is I guess a form of project planning so |
| 7 | you can see what your before and after results |
| 8 | are. |
| 9 | Q. Okay. |
| 10 | A. It's also used for flow charting |
| 11 | which is obviously part of project planning. |
| 12 | Q. Are there any News America |
| 13 | Marketing specific applications that are run on |
| 14 | the desktop only, systems that have been |
| 15 | developed directly only for News America |
| 16 | Marketing that run in a Windows environment? |
| 17 | A. Yes. |
| 18 | Q. Okay. |
| 19 | Are any of those applications used |
| 20 | for communicating back and forth or can they be? |
| 21 | A. Yes. |
| 22 | Q. Could you tell me what those |

McBean, Jr., Alfred A.                                    March 27, 2007
                          New York, NY

13 (Pages 46 to 49)

---

46

1  applications are called?
2      A.    Our ordinary management
3  application. In-store order management
4  application.
5      Q.    Okay.
6      A.    Our FSI application.
7      Q.    What's that stand for?
8      A.    Freestanding insert.
9      Q.    What's that for?
10     A.    It's for the -- the education on
11 the company, but the freestanding inserts is for
12 the SmartSource coupons that are in the Sunday
13 newspapers.
14     Q.    Okay.
15     A.    So that's the order management
16 system.
17     Q.    Any other enterprise systems?
18     A.    Our field system.
19     Q.    Field?
20     A.    Yeah.
21     Q.    What is that?
22     A.    Our field system manages our field

---

47

1  force for the in-store management system. So
2  when we say put a coupon machine here, we have
3  people that go out and do that. So that system
4  manages that body of people.
5      Q.    How does it do that? In other
6  words, what's the -- is it a -- does it
7  communicate an order to someone in the field?
8      A.    Correct.
9      Q.    And when it is communicated where
10 is it received? On a handheld device?
11     A.    Yes, but there are some orders
12 that are received via computer and then printed
13 to paper.
14     Q.    All right.
15         But that's all directing your
16 field representatives on what to do, is that a
17 fair sort of thirty thousand foot view of that
18 application?
19     A.    It's communication.
20     Q.    Okay.
21         What other legacy or, pardon me,
22 enterprise applications are used at News America

---

48

1  Marketing for communicating?
2      A.    Our Oracle system which is our
3  financial system. Our actuate reporting system.
4  Our global reporting system.
5      Q.    And this is reporting on what?
6  Financial results?
7      A.    Business results. It all depends
8  on what data folks are going after.
9      Q.    Okay.
10         Does that cover it?
11     A.    No. There's Smart Matrix.
12     Q.    What is that?
13     A.    That's our customer interface
14 system. Our customers do event planning I
15 believe with that system. I've never been asked
16 to list them all out so just give me a second if
17 you need all of them.
18     Q.    No, that's another rule. Take as
19 much time as you need. And I'm not looking for
20 every application, you know, just to remind you
21 and maybe put a finer point on it, I'm really
22 looking for applications that are used to

---

49

1  communicate internally where someone from Chicago
2  might communicate with someone from Boston or New
3  York.
4      A.    If it's person to person --
5      Q.    That's really what I'm looking
6  for.
7      A.    -- then these systems don't
8  communicate person to person.
9      Q.    Okay.
10     A.    Because they communicate problems
11 and issues from an order perspective or from an
12 accounting perspective.
13     Q.    Right.
14     A.    And those systems then E-mail, you
15 know, internal custodians on there's an issue or
16 problem that needs to be vetted.
17     Q.    Uh-huh. Okay.
18         MR. KATZ: Kevin, can you take a
19 break for a second?
20         MR. PETERS: Sure.
21         (Whereupon, a short recess is
22 taken.)

---

McBean, Jr., Alfred A.            March 27, 2007
New York, NY

14 (Pages 50 to 53)

**50**

1         MR. PETERS: Let's go back on the
2 record.
3
4 BY MR. PETERS:
5      Q.    We were talking before we broke
6 about applications used to communicate and you
7 were good enough to give me a list of
8 applications that are used for communicating
9 orders, for communicating accounting information.
10 They were the order management software, the
11 field system software, et cetera. I want to
12 refocus my question a little bit.
13        The only software I'm interested
14 in at the moment is software where one person in
15 the company communicates with another person in
16 the company. And you've listed a few, Outlook,
17 IM and Live Meeting.
18        Are there other applications that
19 employees use to speak with employees one-on-one?
20      **A.    One-on-one, yeah. The Field**
21 **Handheld System would be the only additional**
22 **where there is a one-on-one action there.**

**51**

1      Q.    And what is that?
2      **A.    It allows the field rep to speak**
3 **to their managers and support to talk about**
4 **installation issues or problems.**
5      Q.    Do News America employees or any
6 segment of them, News America Marketing
7 employees, have Blackberries or other types of
8 handheld devices?
9      **A.    Yes.**
10      Q.    Is that something that is given
11 out to management?
12      **A.    Upon request, yes.**
13      Q.    Okay.
14        Was that the case in 2000 as well?
15      **A.    In 2000 Blackberry technology**
16 **wasn't used.**
17      Q.    Was there any other type of remote
18 communication device used for data such as E-mail
19 when you joined the company in 2000?
20      **A.    Not that I was aware of, no.**
21      Q.    Is there voice mail at News
22 America Marketing?

**52**

1      **A.    Yes, there is.**
2      Q.    Is it digital?
3      **A.    I don't know.**
4      Q.    Do you know if it's backed up?
5 Let me ask the first question: Does the voice
6 mail reside on the server?
7      **A.    I'm sure it resides within the**
8 **telephone system, but I don't manage the**
9 **telephone system.**
10      Q.    Okay.
11        So you don't know whether or not
12 that data is backed up, voice mail?
13      **A.    I do not believe it is, but I**
14 **don't manage that system.**
15      Q.    Okay. Who does?
16      **A.    Victor Sinanski.**
17      Q.    Spell his last name, please.
18      **A.    S-i-n-a-n-s-k-i.**
19      Q.    Are there contact managers used
20 such as ACT or Goldmine?
21      **A.    I haven't heard that name in**
22 **years. I believe that was used, but I don't**

**53**

1 remember by who, but that's going back many years
2 ago.
3      Q.    Okay.
4        I'm interested now back in 2000
5 when you joined the company was there a contact
6 manager that was generally used, ACT, Goldmine or
7 anything else?
8      **A.    ACT rings a bell with me, but I**
9 **can't conclusively say who used it.**
10      Q.    Do you recall whether or not there
11 was any contact manager that was used on a
12 company-wide basis?
13      **A.    There was a homegrown contact**
14 **manager system that interfaced with Outlook and**
15 **my recollection was, to it was to help I don't**
16 **want to use the word consolidate, help the end**
17 **users manage their contacts as opposed to going**
18 **out to applications like an ACT or Intellisync or**
19 **all the different versions of managing contacts.**
20      Q.    Okay.
21        Were there applications used to
22 keep notes of conversations and reminders of

McBean, Jr., Alfred A.                           March 27, 2007
New York, NY

15 (Pages 54 to 57)

54

1  meetings?
2      A.    We provide a series of
3  applications. I don't know if they were actually
4  used. I mean obviously there's -- there's the
5  Microsoft Office products. There's, you know,
6  Outlook which keeps notes as well.
7      Q.    Okay.
8            Was that the case in 2000 when you
9  joined the company?
10     A.    That is correct.
11     Q.    Okay.
12           But there's no one application
13 that was used on an enterprise-wide basis for
14 maintaining notes of communications with
15 contacts?
16     A.    Not that I'm aware of, no, there
17 wasn't.
18     Q.    And the homegrown application, did
19 it have a name?
20     A.    I want to say it was the sales
21 call reporting system. They used it to manage
22 contacts for, you know, all prospects and client

55

1  prospects, customers.
2      Q.    Was that retired?
3      A.    Yes.
4      Q.    When was that?
5      A.    Don't recall the exact date.
6      Q.    Was it replaced by some other
7  functionality?
8      A.    Siebel.
9      Q.    Spell that. C-e --
10     A.    S-i-e-b-e-l.
11     Q.    Okay.
12     A.    Siebel.
13     Q.    And that's a Windows application?
14     A.    Correct.
15     Q.    What's its function?
16     A.    It's our customer relationship
17 management application.
18     Q.    And was information from the sales
19 call reporting system migrated to Siebel when
20 that system went online?
21     A.    I don't know. I did not manage
22 that engagement.

56

1      Q.    Okay.
2            Is Siebel the customer management
3  application presently used?
4      A.    That is correct.
5      Q.    Does it have a version that you
6  can tell me about?
7      A.    It's version 7 something. I don't
8  know the exact version number.
9      Q.    Okay.
10           And that is a server side
11 application?
12     A.    It's a client and server side.
13     Q.    Okay.
14           And it's backed up, data is backed
15 up when the servers are backed up?
16     A.    That is correct.
17     Q.    Do you, that is does News America
18 Marketing have a document management system such
19 as CDoCs or iManage?
20     A.    No.
21     Q.    Is there a document retention
22 policy that covers both electronic documents and

57

1  paper documents?
2      A.    Yes.
3      Q.    Are they different policies?
4      A.    No.
5      Q.    Can you tell me the document
6  retention policy for electronic documents?
7      A.    The document retention policies go
8  into how long you should hold financial
9  information for, HR information, contracts.
10 That's all I can recall.
11     Q.    Is there a document retention
12 policy that covers E-mail?
13     A.    Not explicitly.
14     Q.    Is there one that implicitly
15 pertains to E-mail?
16           MR. KATZ: Objection.
17     A.    Policy as far as personal use, the
18 policies do provide a guideline on how much
19 personal use is allowed by an employee and other
20 types of conduct uses of the E-mail.
21     Q.    Okay.
22           I'm more interested in the

McBean, Jr., Alfred A.                                      March 27, 2007
                              New York, NY

16  (Pages 58 to 61)

---

**58**

1   retention policy, not the use policy.  In other
2   words, is there a policy that covers how long
3   E-mail is retained by News America?
4        MR. KATZ:  Kevin, can I ask are you
5   asking for the time period when your clients were
6   associated with News America Marketing?
7        MR. PETERS:  Yeah.
8        MR. KATZ:  Do you want to limit it
9   to that?
10       MR. PETERS:  Why don't we do that.
11
12  BY MR. PETERS:
13       Q.    Which would be -- well, for your
14  perspective it would be 2000 until 2004.
15       MR. KATZ:  2004.  I think September
16  2004.
17       A.    There are no policies in place.
18       Q.    So everyone kept his or her own
19  E-mail as he or she saw fit?
20       A.    Correct.
21       Q.    There was no policy that said
22  delete your deleted E-mail, delete your sent

---

**59**

1   E-mail, delete your in-box?
2        A.    Correct.
3        Q.    In any amount of time?
4        Were employees limited to an
5   amount of E-mail that they could store on their
6   desktops?
7        A.    Yes.
8        Q.    Okay.
9        What was the limit?
10       A.    On their desktops they had no
11  limit.  On the servers the limit was, and again
12  it differed by employee, but the general limit,
13  it was about eighty meg.
14       Q.    Okay.
15       And did the server automatically
16  purge E-mail?
17       A.    No.
18       Q.    How did the policy get enforced,
19  the eighty meg policy?  Was there a rule?
20       A.    Yeah, there's a rule that if the
21  mailbox reached a particular threshold then
22  warning messages are sent.  Once the E-mail

---

**60**

1   reaches the next threshold then the mailbox is,
2   the ability to send E-mail is disallowed then
3   if it hits the third threshold then the mailbox
4   shuts off.
5        Q.    What are the thresholds?  Is
6   eighty meg the first?
7        A.    I think eighty meg is the last.
8   So the first threshold I want to say is around
9   seventy megs is the warning and then seventy-five
10  is the, stops the sending.  However, it's a
11  guideline that we used.  It's the default
12  setting.
13       Q.    Okay.
14       There were ways to -- there were
15  ways around the setting?
16       A.    Uh-huh.
17       Q.    And that could be done on an
18  individual-by-individual basis?
19       A.    Correct.
20       Q.    And so if someone wanted to exceed
21  the limit they would approach you or some
22  administrator?

---

**61**

1        A.    They would approach an
2   administrator on my team or a manager depending
3   on who would then present either can you increase
4   my limit or a business case on why they need to
5   have their limits increased.
6        Q.    Okay, but there was no limit on
7   what could be stored on the desktop other than,
8   of course, the disk size?
9        A.    Correct.
10       Q.    Now, but if they wanted to store
11  their E-mail on their C drive they would have to
12  migrate it over?
13       A.    Outlook has a provision to create
14  what's called a personal storage file where you
15  can move mail from the Exchange server to the
16  personal, to your personal folders and there was
17  no limitation of it as far as how many personal
18  folders a user could have on their desktop.
19       Q.    Okay.
20       I haven't done it, but it's a drag
21  application?
22       A.    They can drag it or they can tell

---

62

1   Outlook to just copy all the E-mail from the
2   server and put it into a personal folder.
3       Q.   Okay.
4           When -- when archives at News
5   America Marketing, when archives is E-mailed is
6   that archived to the C drive?
7       A.   By definition they're storing it
8   on their C drive.  Whether they choose to archive
9   it that's on them.  If they're holding it for
10  their own personal reasons, that's at the user's
11  discretion.
12      Q.   Right.
13          But you can set up your Outlook to
14  archive automatically periodically?
15      A.   Yeah, that would be at the user's
16  discretion.
17      Q.   And when that's done that's
18  archived on the desktop side, not the server
19  side, correct?
20      A.   That is correct.
21      Q.   There's no limitation on how much
22  you can archive?

63

1       A.   No, there isn't.
2       Q.   And that was the case in 2000 when
3   you joined, correct?
4       A.   That is correct.
5       Q.   That hasn't changed over time?
6       A.   No, it hasn't.
7       Q.   We were talking about the document
8   retention policy and we drifted off to E-mail.
9           The document retention policy that
10  you are familiar with pertains to financials,
11  human resources material, contracts.  Does it
12  pertain to anything else?
13      A.   I'm sure it does.  I just don't
14  have it in front of me to tell you verbatim what
15  it pertains to.
16      Q.   Can you tell me in a general way
17  what the document retention policy is regarding
18  those types of documents?
19      A.   I want to say it's seven to ten
20  years for financials.  You know, seven to ten
21  years for HR related stuff.  Contracts I would
22  imagine it's for at least the length of the

64

1   contract.
2           MR. KATZ:  Don't guess.
3           MR. LIPPNER:  Are you guessing?
4       A.   I can't tell you verbatim unless I
5   see the actual document.
6
7   BY MR. PETERS:
8       Q.   Let me suggest to you that it's
9   for the statute of limitations.
10          I'm kidding, but, yeah, no, that's
11  fine.
12          Again, the policy pertains to both
13  electronic documents and paper documents.
14  There's no differentiation as far as you know?
15      A.   That is my opinion.  I mean
16  regardless if it's paper or electronic, if it's
17  an HR-related document regardless if it's in
18  electronic form or paper form it still has to be
19  maintained.
20      Q.   Okay.
21          And is there any automatic purging
22  of E-mail set up on the server side?

65

1       A.   No.
2       Q.   And again there's no automatic
3   purging set up on the desktop side either?
4       A.   That's at the user's discretion.
5       Q.   In other words, there's no
6   corporate policy on that?
7       A.   There's no corporate policy.
8       Q.   Okay.
9           And is there any policy about
10  renaming file extensions, in other words,
11  changing a DOC to some other extension so that
12  the documents move somewhere else or are visible
13  when opened up?
14      A.   There is no policy for that.
15      Q.   Okay.
16          In other words, let me put a finer
17  point on my question which really shouldn't be
18  hard.
19          Word documents, the extension is
20  DOC, Excel documents the extension is XLS.
21          On a company-wide basis have you
22  instructed employees not to change those

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

18  (Pages 66 to 69)

66

1   extensions?
2       A.    No, we have not.
3       Q.    Okay.
4             Does News America Marketing use
5   data compression software.
6       A.    Yes.
7       Q.    Was that the case when you joined
8   the company in 2000?
9       A.    Yes.
10      Q.    What software is used for data
11  compression?
12      A.    WinZip and WinRAR.
13      Q.    Win?
14      A.    W-i-n-R-A-R.  Those are the two
15  that I am familiar with.
16      Q.    What data is compressed typically?
17      A.    Typically any -- well, any type of
18  data.
19      Q.    Could be any.
20            When are these applications used
21  generally?
22      A.    It's at the user's discretion.

67

1       Q.    Okay.
2             Does the data compression software
3   WinZip and WinRAR, does it reside at the server
4   level, the desktop level or both?
5       A.    Both.
6       Q.    Is data compression used for
7   backup?
8       A.    Yes.
9       Q.    Which application or applications
10  are used for data compression in backing up?
11      A.    The tape backup programs have
12  compressionability in and also the tape backup
13  devices utilize compression for backup.
14      Q.    What do they use?
15      A.    The tape backup systems use
16  whatever is the quantum standard which is DLT and
17  SDLT and DAT, the compression standards that are
18  located in there.  If there -- and also Backup
19  Exec has its own compression, if the tape device
20  for whatever reason can't do compression, it can
21  also compress data.
22      Q.    Could you tell me what software is

68

1   use presently for backing up and archiving data?
2       A.    We --
3             MR. KATZ:  You're asking for
4   multiple, any multiple softwares or different
5   functions?
6             MR. PETERS:  Yeah.
7       Q.    What applications are used to back
8   up the servers?
9       A.    Backup Exec.
10      Q.    E-x?
11      A.    E-x-e-c.
12      Q.    Okay.  What version?
13      A.    What time period?
14      Q.    Presently.
15      A.    10, Version 10.
16      Q.    Okay.
17            Was Backup Exec the application
18  used when you joined the company in 2000?
19      A.    Yes.
20      Q.    Okay.  And are you aware of any
21  other applications used for backing up software
22  prior to News America Marketing's use of Backup

69

1   Exec?
2       A.    Yes.
3       Q.    What application or applications?
4       A.    This is a guess, but I believe it
5   was ARC Serve for the Novell servers.
6       Q.    A-R-C?
7       A.    A-R-C, ARC Serve.
8       Q.    For Novell?
9       A.    Novell.  And presently today our
10  Oracle system, Sun Systems utilize Net Backup for
11  their backup, for their data backups.
12      Q.    I'm sorry, say that again, please.
13      A.    Net Backup, N-e-t, Backup, Net
14  Backup.
15      Q.    Okay.
16            But the Windows applications
17  during the time that you have been involved with
18  managing that environment have been backed up
19  using Backup Exec?
20      A.    Correct.
21      Q.    Various versions of that now up to
22  Version 10?

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

19 (Pages 70 to 73)

---

**70**

1     A.    That is correct.
2     Q.    Okay.
3           And what are the machines that are
4  used for backing up, what's the hardware?
5     A.    Today we leverage Compaq DL360s.
6     Q.    Prior to moving to DL360s what was
7  being used?
8     A.    I don't recall the models, but it
9  was a mix between Dell and Compaq.
10    Q.    When did you move over to the
11 Compaq DL360s?
12    A.    I don't recall the actual dates.
13 They were done various, over the last six years.
14    Q.    Okay.
15          And again these systems backed up
16 in twenty locations?
17    A.    No.  In each of the locations,
18 again depending on year, either back --
19 maintained their own backup.  In recent years
20 we've replicated data from the remote offices to
21 Wilton, Connecticut.
22    Q.    Okay.

---

**71**

1           So Wilton backs up for the other
2  offices?
3     A.    No.  Only the offices that are
4  denoted as remote offices.
5     Q.    What are they?
6     A.    All of our sales offices.  So
7  Montreal, Mississauga.  There are various sales
8  offices across the country that Wilton backs up.
9  Each of the core offices maintain their own
10 backups.
11    Q.    And those core offices are the
12 twenty offices that you gave me earlier?
13    A.    No, those are Wilton, Chicago, New
14 York and Toronto.
15    Q.    Okay.  Those are the four core
16 offices?
17    A.    Those are the four core.
18    Q.    And Wilton backs up you said, for
19 example, Mississauga and some other places?
20    A.    Wilton backs up --
21    Q.    And I know this is presently.
22    A.    Yeah, presently Wilton backs up --

---

**72**

1  do you need the each individual office?
2     Q.    No.  I just -- other locations, in
3  other words, I'm trying to understand
4  generally --
5     A.    They back up -- the Wilton office
6  backs up all offices in the United States that
7  are not New York and Chicago.
8     Q.    Okay.
9           So backup, Wilton backs up Boston?
10    A.    Wilton backs up Boston.
11    Q.    Okay.
12          And how long has Wilton backed up
13 Boston?
14    A.    I'm going to say roughly two
15 years.
16    Q.    Okay.
17          And prior to that did Boston back
18 up its own data?
19    A.    Yes.
20    Q.    And did it back up its own data
21 using a Dell or a Compaq backup device?
22    A.    Correct.

---

**73**

1     Q.    Okay.  And New York backs itself
2  up?
3     A.    Yes.
4     Q.    Okay.
5           Does New York reach out to any of
6  the remote offices and backup those offices?
7     A.    This is where it gets a little
8  complicated.  The remote sales offices probably
9  for a span of about two years prior to Wilton
10 managed their full backups which took -- which
11 took place once a week, the daily backups where
12 it could have been backed up by either Wilton,
13 New York or Chicago.
14    Q.    So there was a daily backup and a
15 weekly backup, correct?
16    A.    Uh-huh.
17    Q.    The daily backup of the remote
18 offices was done from either Wilton, Chicago or
19 New York?
20    A.    Correct.
21    Q.    So Wilton, Chicago and New York
22 had the ability to reach into --

---

Henderson Legal Services
(202) 220-4158

McBean, Jr., Alfred A.                                    March 27, 2007
                          New York, NY

20  (Pages 74 to 77)

|  | 74 |
|---|---|
| 1 | **A.  Correct.** |
| 2 | Q.  -- those remote servers and backup |
| 3 | that data? |
| 4 | **A.  Correct.** |
| 5 | Q.  Okay. |
| 6 | And was that also the case for |
| 7 | Boston? |
| 8 | **A.  Rephrase the question.** |
| 9 | Q.  Sure. |
| 10 | Well, when I use Boston I guess I |
| 11 | need to understand, is Boston considered a remote |
| 12 | sales office? |
| 13 | **A.  Yes.** |
| 14 | Q.  Okay.  So Boston had a weekly |
| 15 | backup -- |
| 16 | **A.  Correct.** |
| 17 | Q.  -- prior to two years ago? |
| 18 | **A.  Correct.** |
| 19 | Q.  And Boston was also backed up |
| 20 | daily, remotely? |
| 21 | **A.  When Boston was doing its weekly** |
| 22 | **backup it was backed up daily remotely.** |

|  | 76 |
|---|---|
| 1 | You can answer. |
| 2 | **A.  You need to rephrase.  A backup** |
| 3 | **doesn't overwrite anything.** |
| 4 | Q.  It just adds on? |
| 5 | MR. KATZ:  Objection. |
| 6 | **A.  I don't understand the question.** |
| 7 | Q.  When you're backing up the data, |
| 8 | you're backing up on to tape? |
| 9 | **A.  Right.** |
| 10 | Q.  Okay. |
| 11 | Are you overwriting data? |
| 12 | **A.  On the data?** |
| 13 | Q.  Right. |
| 14 | **A.  Yes.** |
| 15 | Q.  What are you overwriting? |
| 16 | **A.  The previous backup that was on** |
| 17 | **the tape.** |
| 18 | Q.  Right.  Okay. |
| 19 | The backups in Boston that were |
| 20 | done on a daily basis -- |
| 21 | Strike that. |
| 22 | The backups of Boston that were |

|  | 75 |
|---|---|
| 1 | Q.  It was backed up daily remotely. |
| 2 | It was backed up daily remotely either by |
| 3 | Chicago, Wilton or New York. |
| 4 | **A.  Correct.** |
| 5 | Q.  Okay. |
| 6 | And what was backed up daily from |
| 7 | Boston? |
| 8 | **A.  Differential data.  So any data** |
| 9 | **that has changed since the full backup or the** |
| 10 | **weekend backup is backed up by one of the core** |
| 11 | **offices.** |
| 12 | Q.  Okay. |
| 13 | **A.  So as an example the office does** |
| 14 | **their full backup on Friday.  Monday night's** |
| 15 | **backup happens let's say out of Chicago.  It's** |
| 16 | **only going to back up the delta between the full** |
| 17 | **backup which took place over the weekend and what** |
| 18 | **was changed on Monday.** |
| 19 | Q.  Right.  It doesn't overwrite the |
| 20 | entire file, right?  It just adds on to it?  Or |
| 21 | changes what's been changed? |
| 22 | MR. KATZ:  Objection. |

|  | 77 |
|---|---|
| 1 | done on a daily basis, where were they kept? |
| 2 | **A.  New York, Wilton or Chicago.** |
| 3 | Q.  And how long were they kept for? |
| 4 | **A.  No more than four to five weeks.** |
| 5 | Q.  And then what happened to those |
| 6 | tapes? |
| 7 | **A.  They were overwritten.** |
| 8 | Q.  They were overwritten with another |
| 9 | full backup? |
| 10 | **A.  No, with another -- with another** |
| 11 | **backup.  I can't tell you if it was a full or a** |
| 12 | **differential backup, but another backup.** |
| 13 | Q.  But you weren't overwriting -- you |
| 14 | were archiving data -- let me put it this way: |
| 15 | If someone had an E-mail in New York -- |
| 16 | **A.  Okay.** |
| 17 | Q.  -- and that E-mail was backed up |
| 18 | from June of 2001, okay? |
| 19 | **A.  Okay.** |
| 20 | Q.  Five weeks comes by, would that |
| 21 | E-mail be backed up yet again if it still resided |
| 22 | on the server? |

McBean, Jr., Alfred A.                                          March 27, 2007
                        New York, NY

78

1       A.    Yes.
2       Q.    Okay.
3             So even though it's being
4   overwritten you're overwriting it with the same
5   E-mail?
6       A.    Correct.
7       Q.    Okay.
8             MR. PETERS:  Let's go off the
9   record.
10            (Whereupon, the witness is
11  excused.)
12            (Whereupon, a luncheon recess is
13  taken at 12:16 p.m.)
14
15
16
17
18
19
20  A F T E R N O O N   S E S S I O N
21  (12:39 p.m.)
22            MR. PETERS:  Let's go back on the

79

1   record.
2
3   A L F R E D   A.   M c B E A N,   J R.,
4   conducting business at News America Marketing,
5   20 Westport Road, 1st Floor, Wilton, Connecticut
6   06897, residing at 29 Thompson Street, Fairfield,
7   Connecticut  06825, having been previously duly
8   sworn or affirmed by a Notary Public within and
9   for the States of New York and New Jersey, resumed
10  and continued to testify further as follows:
11  CONTINUED EXAMINATION BY MR. PETERS:
12      Q.   Mr. McBean, we were discussing
13  backups and I want to get back into that now.
14           In 2000 were offices backed up
15  daily and weekly?
16      A.    The remote offices were instructed
17  to backup daily.  I don't have record of how well
18  they were doing their backups.
19      Q.   Okay.
20           And did they overwrite their tapes
21  as well?
22      A.   Yes.

80

1       Q.    How frequently?
2       A.    Usually -- it's about weekly and
3   then we got them on to a three-week rotation and
4   then they went to a four-week rotation and then
5   as we progressed we finally got to the point
6   where one of the central offices, one of the core
7   offices would then manage the backup.
8       Q.    Okay.
9             Was a set of tapes archived that
10  was not overwritten as a matter of policy?
11      A.    For the remote offices they were
12  instructed to hold on to tapes, their fiscal and
13  their -- actually end of year tapes.
14      Q.    Okay.
15      A.    And in some cases it was done --
16  it wasn't a formal policy.  Through, you know,
17  standardizing the organization we eventually got
18  there by taking on the responsibility of backing
19  up the remote offices.
20      Q.    Okay.
21            What is the policy for maintaining
22  a set of tapes that is not overwritten?

81

1       A.    We hold on to our year-end tapes
2   to keep us in line with the records retention
3   policy as far as holding on to, you know, our HR
4   and our financial records and stuff like that.
5       Q.    Okay.
6             But the year-end tapes are a full
7   backup of the server?
8       A.    Correct.
9       Q.    So they would have all the E-mail,
10  for example, that was on the server at the time
11  of the year-end backup?
12      A.    Correct.
13      Q.    And where are those year-end tapes
14  maintained?
15      A.    In various locations across the --
16  across different, either different cities and/or
17  hosting facilities.
18      Q.    And is there a policy for
19  maintaining those year-end tapes for a period of
20  time?
21      A.    Yes, it's in the record retention
22  policy.

McBean, Jr., Alfred A.                                    March 27, 2007
                        New York, NY

22  (Pages 82 to 85)

|  | 82 |
|---|---|
| 1 | Q.    How long are year-end tapes kept? |
| 2 | A.    Typically no more than seven |
| 3 | years.  Again, I have to refer to the policy. |
| 4 | Q.    Okay. |
| 5 | Is that your disaster recovery, |
| 6 | those year-end tapes or is there some other form |
| 7 | of disaster recovery tape? |
| 8 | A.    Our disaster recovery tapes are |
| 9 | daily tapes that we backup daily.  If there is |
| 10 | an emergency where we have to do a recovery we |
| 11 | can go back to our daily tapes to do the |
| 12 | recovery. |
| 13 | Q.    Okay. |
| 14 | Is there any backing up to some |
| 15 | remote site, you know, a co-location facility, |
| 16 | for example? |
| 17 | A.    No, we don't back up to a |
| 18 | co-location, but our co-location site does have a |
| 19 | backup to back up the data that's in the |
| 20 | co-location. |
| 21 | Q.    Okay. |
| 22 | A.    We don't have a DR site from a |

|  | 84 |
|---|---|
| 1 | you. |
| 2 | Q.    And the tapes, are they -- the |
| 3 | annual tapes, are they large capacity tapes? |
| 4 | A.    Varies.  Recent years, yes, |
| 5 | they're large capacity. |
| 6 | Q.    Are they DLT, LTO?  What are they? |
| 7 | A.    They're DLT and SDLT. |
| 8 | Q.    And what were they when you |
| 9 | started back in 2000? |
| 10 | A.    DLT. |
| 11 | Q.    Okay. |
| 12 | MR. PETERS:  Gordy, we may be |
| 13 | talking about those tapes and we may be coming up |
| 14 | on seven years.  So I assume that there's a |
| 15 | provision in place that these tapes are not |
| 16 | being -- these annual tapes are not being |
| 17 | destroyed? |
| 18 | MR. KATZ:  Ask the witness. |
| 19 | |
| 20 | BY MR. PETERS: |
| 21 | Q.    Will you keep these annual tapes |
| 22 | and not destroy them? |

|  | 83 |
|---|---|
| 1 | co-location perspective. |
| 2 | Q.    Where is the co-lo? |
| 3 | A.    The co-lo is in Elmsford, |
| 4 | Connecticut. |
| 5 | Q.    Okay. |
| 6 | A.    It's a remote hosting site where |
| 7 | we host our -- |
| 8 | Q.    It's a website? |
| 9 | A.    Our websites. |
| 10 | Q.    Okay. |
| 11 | So the annual tapes are kept in |
| 12 | various locations? |
| 13 | A.    (Indicating.) |
| 14 | Q.    Where are the New York tapes kept? |
| 15 | In this building? |
| 16 | A.    If -- no.  I believe they're kept |
| 17 | off-site in a company by the name of Recall. |
| 18 | Q.    What is that? |
| 19 | A.    That's a tape storage facility. |
| 20 | Q.    Where are they located?  In New |
| 21 | York? |
| 22 | A.    The greater New York area.  Thank |

|  | 85 |
|---|---|
| 1 | A.    I can make sure that that happens. |
| 2 | Q.    All right. |
| 3 | I'm just talking about the annual |
| 4 | tapes now.  I'm not talking about changing any of |
| 5 | your backup policies and procedures, but the |
| 6 | annual tapes that are at -- |
| 7 | A.    Recall. |
| 8 | Q.    -- Recall or wherever else they're |
| 9 | maintained throughout the country, will you |
| 10 | maintain those? |
| 11 | MR. KATZ:  These are the two-day, |
| 12 | two-day a year -- |
| 13 | A.    This is the annual tapes, the |
| 14 | year-end tapes. |
| 15 | Q.    Yes. |
| 16 | MR. KATZ:  Yes. |
| 17 | A.    Yes. |
| 18 | Q.    Okay. |
| 19 | (Request for production of |
| 20 | documentation or information.) |
| 21 | |
| 22 | BY MR. PETERS: |

McBean, Jr., Alfred A.                                March 27, 2007
New York, NY

23 (Pages 86 to 89)

| 86 | 88 |
|---|---|
| 1    Q.   Are there databases, catalogs or<br>2 other listings of the backups that you maintain?<br>3    **A.   I don't understand the question.**<br>4    Q.   Okay.<br>5        When the tapes are backed up<br>6 either daily or weekly, is there a catalog<br>7 maintained of what's been backed up?<br>8    **A.   Yes.**<br>9    Q.   Okay.<br>10       Can you describe that for me?<br>11   **A.   The backup system records the**<br>12 **files that it stores on tapes and places them in**<br>13 **its catalog that it manages.**<br>14   Q.   Okay.<br>15       And then is that catalog<br>16 maintained separately, printed out, for example?<br>17   **A.   No.**<br>18   Q.   Maintained on the system?<br>19   **A.   Correct.**<br>20   Q.   And does the catalog change every<br>21 time a backup occurs?<br>22   **A.   Yes.** | 1 **recover to. So you need resources and then**<br>2 **depending on -- well, if you're recovering**<br>3 **everything that's on the New York side it all**<br>4 **depends on how much data we're backing up and**<br>5 **what types of systems I'm restoring to. So I**<br>6 **can't answer that question without actually**<br>7 **looking at what I'm going to restore.**<br>8    Q.   When you put the tape in, these<br>9 annual tapes, you can look just at the Outlook<br>10 files, is that correct?<br>11   **A.   No.**<br>12   Q.   How is it organized?<br>13   **A.   Well, Outlook -- well, I think I'm**<br>14 **going to go out on a limb and say you're probably**<br>15 **talking about the Exchange server, correct?**<br>16   Q.   Yes. Yes.<br>17   **A.   The Exchange server data is stored**<br>18 **in an Exchange database and that data -- in order**<br>19 **to recover the data that's in the databases you**<br>20 **have to rebuild the Exchange environment as it**<br>21 **stood in that time frame and then restore the**<br>22 **data and then at that point you would then have** |

| 87 | 89 |
|---|---|
| 1    Q.   To reflect the new backup?<br>2   **A.   To reflect the data that's in the**<br>3 **backup.**<br>4   Q.   Okay.<br>5       Is there a catalog of the annual<br>6 tapes?<br>7   **A.   No.**<br>8   Q.   Okay.<br>9       Is there an inventory of those<br>10 tapes that's maintained either electronically or<br>11 on paper?<br>12   **A.   Yes, there's an inventory for the**<br>13 **New York tapes at Recall. It's not detailed from**<br>14 **the end point of saying what's on the tapes.**<br>15   Q.   What would it take to these what's<br>16 on those annual tapes? Would we have to put them<br>17 on a computer?<br>18   **A.   We would have to put them onto a**<br>19 **DLT backup system, load software and then go**<br>20 **through a recovery process.**<br>21   Q.   How much time would that take?<br>22   **A.   I would need the infrastructure to** | 1 **the ability to use tools, whatever the case might**<br>2 **be, to do a search.**<br>3   Q.   See the mailboxes, for example?<br>4   **A.   You can see the mailboxes.**<br>5   Q.   Okay.<br>6       So what would it take to rebuild<br>7 that environment in your experience?<br>8   **A.   It would -- we would have to learn**<br>9 **about what the environment was at that time, get**<br>10 **the appropriate resources, pull back the tapes**<br>11 **and then go through a restore.**<br>12   Q.   And by the environment you mean<br>13 you'd need the right Exchange --<br>14   **A.   Version.**<br>15   Q.   -- version?<br>16   **A.   Uh-huh.**<br>17   Q.   What else would you need?<br>18   **A.   The directory environment. Back**<br>19 **then in 2000 News America Marketing was an NT40**<br>20 **environment. We're now a 2003 environment. So**<br>21 **we would have to restore or rebuild the**<br>22 **environment as it stood back then.** |

24  (Pages 90 to 93)

|  | 90 |
|---|---|
| 1 | Q.    Don't you continue to use NT40? |
| 2 | A.    Uh-huh, we do. |
| 3 | Q.    Okay. |
| 4 |        So that environment is available |
| 5 | to News America? |
| 6 | A.    The operating system is, but we |
| 7 | would have to rebuild the domain structure.  The |
| 8 | domain as it stood back then, it doesn't exist, |
| 9 | it doesn't exist today. |
| 10 | Q.    What would that involve? |
| 11 | A.    We would also have to recover the |
| 12 | domain environment from tape as well and rebuild |
| 13 | that. |
| 14 | Q.    What was the domain environment? |
| 15 | A.    It was running on NT40. |
| 16 | Q.    Okay. |
| 17 | A.    We have legacy systems that run on |
| 18 | Windows server 4.0 that are -- which is not our |
| 19 | E-mail system which is not our domain |
| 20 | environment. |
| 21 | Q.    Okay. |
| 22 |        But if you had to look at those |

|  | 92 |
|---|---|
| 1 | what tapes those mailboxes may be on? |
| 2 | A.    No.  I have to go through the |
| 3 | recovery process in order to tell you whose |
| 4 | mailbox is stored where. |
| 5 | Q.    Why is that? |
| 6 | A.    Because the data is within -- the |
| 7 | data is within a database.  What the backup does |
| 8 | is it backs up the database so in order to see |
| 9 | the data within the database I have to first |
| 10 | recover the database, then in Exchange I can open |
| 11 | up and see, gee, is that mailbox here or not?  If |
| 12 | it's there then I can tell you who was on that, |
| 13 | on that Exchange server. |
| 14 | Q.    But if the employee is employed |
| 15 | out of New York, works in New York, isn't it more |
| 16 | likely than not that his or her mailbox will be |
| 17 | in on a New York server? |
| 18 | A.    In 2000? |
| 19 | Q.    Yes. |
| 20 | A.    No. |
| 21 | Q.    Where would -- why is that?  I |
| 22 | mean where would the mailbox be located for a New |

|  | 91 |
|---|---|
| 1 | backup tapes, that's something that could be |
| 2 | done, you have the resources to do that? |
| 3 |        MR. KATZ:  Objection. |
| 4 | A.    No, I'd have to acquire the |
| 5 | resources to go through and look at that data. |
| 6 | Q.    And what resources would you have |
| 7 | to acquire? |
| 8 |        You have NT40, right? |
| 9 | A.    Right.  I have NT40.  I would have |
| 10 | to build the environment and then recover the |
| 11 | data and at that point the Exchange server will |
| 12 | be up for lack of a better term. |
| 13 | Q.    Okay. |
| 14 |        And accessible LAN tools can be |
| 15 | used? |
| 16 | A.    That is correct. |
| 17 |        There's one small note.  I have to |
| 18 | do that for three to four offices because I don't |
| 19 | know where the Boston data is stored. |
| 20 | Q.    Okay. |
| 21 |        Now, if I were to provide you with |
| 22 | a list of mailboxes, would you be able to tell me |

|  | 93 |
|---|---|
| 1 | York employee? |
| 2 | A.    It could be either New York or |
| 3 | Chicago. |
| 4 | Q.    Those two places? |
| 5 | A.    Correct. |
| 6 | Q.    And is there any logical way to |
| 7 | determine where an employee's mailbox will be |
| 8 | either in New York or Chicago? |
| 9 | A.    It's based on the employee's |
| 10 | history with the company. |
| 11 | Q.    Can you put a finer point on that? |
| 12 | What about their history? |
| 13 | A.    News America Marketing came |
| 14 | together as through a series of acquisitions and |
| 15 | the in-store division was centered in |
| 16 | Connecticut.  The FSI division is centered in New |
| 17 | York and then the merchandising division is in |
| 18 | Chicago. |
| 19 |        So as the company grew, 2000 |
| 20 | forward, employees shifted from office to office. |
| 21 | So it was very hard for me to tell you that a |
| 22 | hundred percent of the New York City employees |

McBean, Jr., Alfred A.                                        March 27, 2007
New York, NY

25 (Pages 94 to 97)

| 94 |
|---|

1    are in New York where, versus Connecticut versus
2    Chicago. It's more apparent with New York and
3    Connecticut only because, you know, the employees
4    went back and forth continuously so.
5        Q.    So if you knew an employee's
6    history with the company, in other words, where
7    he came from, where he worked you could speculate
8    with some accuracy about where his mailbox is
9    located?
10       A.    Speculate, but again there was no
11   hard and fast rule that said mailbox is here
12   versus there versus -- there was never a hard and
13   fast rule.
14       Q.    Okay.
15           So, I'm sorry, if I asked you this
16   question, Mr. McBean, is there any type of
17   inventory of these annual tapes? I think you
18   told me that it's maintained at Recall?
19       A.    For New York it's maintained at
20   Recall. In other offices it's either we have
21   them on-site or they're maintained by, you know,
22   by their Iron Mountain and there might be one

| 95 |
|---|

1    other -- Meyer is another tape storage company.
2        Q.    Meyer?
3        A.    Meyer.
4        Q.    Where are they?
5        A.    They're in Connecticut.
6        Q.    Whose tapes do they maintain?
7        A.    Predominantly Wilton.
8        Q.    Did these companies that store
9    your tapes Meyer, Iron Mountain, recall, do they
10   provide you with some electronic or paper
11   inventory?
12       A.    They provide us with electronic
13   inventory telling us what tapes they have of ours
14   by tape number.
15       Q.    Okay.
16           And where are those inventories
17   maintained on the server?
18       A.    Electronically each one of the
19   hosting facilities.
20       Q.    Do you have access to all of those
21   inventories?
22       A.    Yes.

| 96 |
|---|

1        Q.    You could get to those
2    inventories?
3        A.    I can get to them. I may not have
4    direct access, but I can get to those
5    inventories, yes.
6        Q.    Okay.
7            Do you use a particular brand of
8    backup tape?
9        A.    I don't know. I mean it's a DLT
10   tape. I never stopped to see who made it.
11       Q.    Okay.
12           Is there a central log of your
13   backups?
14       A.    No.
15       Q.    So am I correct that the most --
16           Strike the question.
17           Am I correct then if documents
18   exist from the years 1999 and 2000 the only place
19   they're going to be are on those annual tapes,
20   they are not otherwise backed up at any location?
21       A.    Data can exist on the file servers
22   that stretch back as far as 1999. So if it's

| 97 |
|---|

1    still on our file servers today it's online or it
2    could be on the year-end tapes.
3        Q.    Okay.
4            But E-mail from that time period,
5    the only place that's going to be is on those
6    tapes, right?
7        A.    E-mail from that time period would
8    be on those tapes or in Outlook PST files that
9    may exist on end users' computers.
10       Q.    Right.
11           If the end user archived the
12   E-mail themselves then they exist on the computer
13   still?
14       A.    Uh-huh.
15       Q.    Correct?
16       A.    (Indicating.)
17       Q.    Otherwise they're on those tapes?
18       A.    Correct.
19           MR. KATZ: Assuming they haven't
20   been deleted.
21           MR. PETERS: Well --
22           THE WITNESS: I said E-mail.

Henderson Legal Services
(202) 220-4158

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

26 (Pages 98 to 101)

| 98 |
|---|
| 1 BY MR. PETERS: |
| 2    Q.   Those tapes haven't been deleted, |
| 3 they exist. Whatever E-mails exists on those |
| 4 tapes is still there? |
| 5    **A.**   **Whatever E-mail that existed in** |
| 6 **that time period would be on the year-end backup.** |
| 7    Q.   Can you tell me the people who are |
| 8 responsible for network supervision? |
| 9       In other words, let me put it |
| 10 another way: Who reports to you? First give me |
| 11 a number of people. |
| 12    **A.**   **Eight.** |
| 13    Q.   Okay. Then I can ask you this |
| 14 question without feeling guilty. Who reports to |
| 15 you? |
| 16    **A.**   **Kevin Barrett, Jason Magill,** |
| 17 **Christopher Adami, Gabe Martinez, Martin Puzan,** |
| 18 **Victor Yang, Bradford Heines.** |
| 19       **How many do I have?** |
| 20    Q.   Seven. |
| 21    **A.**   **Oh, Ulrich Patzer.** |
| 22    Q.   And do all these folks have the |

| 99 |
|---|
| 1 same job responsibilities albeit for different |
| 2 parts of the company? |
| 3    **A.**   **They report into me. They help me** |
| 4 **manage the Windows layer. They are assigned** |
| 5 **different responsibilities based on business** |
| 6 **need.** |
| 7    Q.   Okay. |
| 8       Are any of these folks responsible |
| 9 for backup? |
| 10    **A.**   **Yes.** |
| 11    Q.   Who is that? |
| 12    **A.**   **Ulrich Patzer, Martin Puzan,** |
| 13 **Victor Yang, Chris Adami. Those are the key** |
| 14 **backup.** |
| 15    Q.   Okay. |
| 16       Who was responsible for backing up |
| 17 in 2000 when you joined the company? |
| 18    **A.**   **In 2000 Bob Rizzo, Jane Hogan,** |
| 19 **Jesse Leo.** |
| 20    Q.   Are these folks still at News |
| 21 America Marketing? |
| 22    **A.**   **No, they're not.** |

| 100 |
|---|
| 1    Q.   None of them? |
| 2    **A.**   **None of them.** |
| 3    Q.   Do you know if they're in the New |
| 4 York area? |
| 5    **A.**   **I have no clue.** |
| 6    Q.   Were they working in New York? |
| 7    **A.**   **Well, I do know that one of them** |
| 8 **was in the Chicago area.** |
| 9    Q.   Who is that? |
| 10    **A.**   **Bob Rizzo.** |
| 11    Q.   Bob Rizzo? |
| 12    **A.**   **Bob Rizzo.** |
| 13    Q.   You don't happen to know if he has |
| 14 a middle initial, do you? |
| 15    **A.**   **(Indicating.)** |
| 16    Q.   Okay. |
| 17    **A.**   **I think his official name is** |
| 18 **Robert Rizzo.** |
| 19    Q.   Were or are handheld devices |
| 20 synchronized with the server? |
| 21    **A.**   **What time period?** |
| 22    Q.   Currently. |

| 101 |
|---|
| 1    **A.**   **Currently, yes.** |
| 2    Q.   Okay. |
| 3       When did that begin, that process? |
| 4    **A.**   **Automatic synchronization, I don't** |
| 5 **have an exact time. I want to say it was** |
| 6 **probably about three to four years ago.** |
| 7    Q.   Okay. |
| 8    **A.**   **And that's with the introduction** |
| 9 **of the Blackberries.** |
| 10    Q.   Okay. |
| 11       So then that data once |
| 12 synchronized would also be backed up daily, |
| 13 weekly, annually? |
| 14    **A.**   **Well, the data on the Blackberry** |
| 15 **was not backed up. The data in the E-mail system** |
| 16 **was.** |
| 17    Q.   Sure. |
| 18       But once the sync happened then |
| 19 whatever was on the Blackberry was on the server, |
| 20 right? |
| 21    **A.**   **No.** |
| 22    Q.   It didn't work that way? |

McBean, Jr., Alfred A.                                     March 27, 2007
                          New York, NY

                                      27 (Pages 102 to 105)

---

102

1      A.    No, because you can store data on
2  your Blackberry that is not --
3      Q.    That was on its own drive.  Okay.
4          And there was no procedure for
5  backing up data that was stored just on the
6  Blackberry?
7      A.    There is a procedure.  It's
8  defined in the manual.  It was at the user's
9  discretion.
10     Q.    Okay.
11         Which Exchange version was being
12 used when you started?  Was that the 4.0?
13     A.    It was Exchange Version 5.5.
14     Q.    That's in 2000?
15     A.    That's in 2000.
16     Q.    And can you give me the
17 progression?
18     A.    We went from Exchange 5.5 to
19 Exchange 2000 and then we went from Exchange 2000
20 to Exchange 2003.
21     Q.    Did you go to 2000 around 2000?
22     A.    No.  I believe that took place

---

103

1  around either late 2001 or 2002.
2      Q.    Okay.
3          And the 2003 migration, when did
4  that happen?
5      A.    Probably either late 2003 or 2004.
6  I don't have an exact date on either.
7      Q.    Okay.
8          Can all of the servers be accessed
9  from a central location?
10         MR. KATZ:  You're talking about
11 today?
12         MR. PETERS:  Today.
13     A.    For the most part, yes.
14
15 BY MR. PETERS:
16     Q.    Is the data that's only available
17 locally?
18         MR. KATZ:  I don't understand the
19 question.
20     Q.    What I'm getting at is I'm picking
21 on your qualifier for the most part.
22         Can you sit in your office or sit

---

104

1  in some location and access every server in the
2  country?
3      A.    Yes.
4      Q.    And, therefore, you can access
5  what's ever on that server?
6      A.    Correct.
7      Q.    Okay.
8          Is there a policy about password
9  protecting documents?
10     A.    Password protecting documents?
11     Q.    Word documents, for instance, or
12 Excel documents?
13     A.    I think that goes back to our
14 computer usage document.  I can't articulate
15 what's in that document verbatim, but I believe
16 it does make mention of what to do with sensitive
17 material.
18     Q.    Okay.
19         And are passwords maintained in
20 one location for documents or is there a standard
21 password that's used?
22     A.    No.  Not -- no, not at all.

---

105

1      Q.    Okay.
2          In this written policy can you
3  describe it for me as a one document, the
4  computer usage policy?
5      A.    Yes.  That I'm aware of it's a
6  document that's produced by News Corporation.
7      Q.    Okay.
8          And is it the same, excuse me, is
9  there a separate document that covers document
10 retention?
11     A.    Yes.
12     Q.    And have you seen that document,
13 the document retention policy?
14     A.    Yes.
15     Q.    How long is it?
16     A.    In pages?
17     Q.    Yes.
18     A.    I don't -- I don't know.  Two,
19 three pages.  I don't know.
20     Q.    Okay.
21         And how far back does the document
22 retention policy go?  In other words, when did

---

McBean, Jr., Alfred A.                                    March 27, 2007
New York, NY

28  (Pages 106 to 109)

<table>
<tr><td>

**106**

1    the document retention policy go into effect?
2        A.    I don't have an exact date, but
3    sometime 2005.
4        Q.    Was there a document retention
5    policy in 2000 when you joined the company?
6        A.    None that I can recall, no.
7            MR. KATZ:  Let me just interject, I
8    think that you asked him before lunch about
9    document retention and I think he testified that
10   there was no document retention policy during the
11   period of time that your clients were involved
12   with News America Marketing and I think you've
13   just testified again that this document retention
14   policy came into effect in 2005 again after they
15   were gone for a considerable period of time from
16   News America Marketing.
17           So I don't know if there's any
18   further need for you to explore the current
19   document retention policy because it doesn't
20   really deal with the situation we have in this
21   case.
22           MR. PETERS:  No, I agree with that.

</td><td>

**108**

1        Q.    Can you tell me about that, what
2    did you migrate and when?
3        A.    Exchange from, you know, version
4    55 to 2000.  Exchange from 2000 to 2003.  These
5    are enterprise-type transitions.
6        Q.    When you migrated the data from 55
7    to 2000 did you do it by tape?
8        A.    No.
9        Q.    How was it done?
10       A.    As part of the migration
11   instructions it tells you how to do it, you know,
12   going from version, from the previous version to
13   the later version.
14       Q.    Okay.
15           But prior to migrating the data
16   from 55 to 2000 did you make the complete backup
17   of the data on 55 in case the migration failed?
18       A.    By virtue of our backup
19   procedures, yes.  So we didn't go out and make an
20   explicit backup of the environment.  We just
21   leveraged our procedures.
22       Q.    All right.

</td></tr>
<tr><td>

**107**

1    I go back and talk about the document retention
2    policy because for lack of a better description I
3    find it hard to believe there was no document
4    retention policy in a company this size.  I
5    haven't come across that before so, but it is what
6    it is.
7
8    BY MR. PETERS:
9        Q.    Have there been any large-scale
10   migrations of data that have required News
11   America to use backup tapes in order to move
12   from, for example, one version of an application
13   to another?
14       A.    No, not that I can recall, no.
15       Q.    Have you changed any applications
16   that required you to migrate data --
17       A.    Yes.
18       Q.    -- since your tenure?
19       A.    Yes.
20       Q.    And have you had to migrate data
21   on an enterprise-wide basis?
22       A.    Yes.

</td><td>

**109**

1            So there's no backup tape that
2    exists, for example, that corresponds to the time
3    you migrated 55 to 2000 and 2000 to 2003?
4        A.    No, there isn't and that's because
5    of the length of time that these types of
6    enterprise changes, when you do a migration, it's
7    not a one night deal.  It takes several weeks to
8    do.
9        Q.    Right.
10           So but I think you answered my
11   question.  I apologize for asking it again.  You
12   didn't image any drives in that process to make
13   sure that you had the data available in the event
14   of a failed migration or a part of it failed?
15       A.    No.
16           MR. PETERS:  That's all I have.
17           MR. KATZ:  Okay.
18           MR. LIPPNER:  Wow, that does it.
19           (Time noted:  1:10 p.m.)
20
21
22

</td></tr>
</table>

McBean, Jr., Alfred A.                                    March 27, 2007
                          New York, NY

                                    29 (Pages 110 to 111)

110

8                      ————————————————
                       ALFRED A. McBEAN, JR.

10  Subscribed and sworn to before me
11  this _____ day of _____ 2007.

13  ————————————————————————
14  /
15  /

111

1              C E R T I F I C A T E
2   STATE OF _____ )
3                ) :ss.
4   COUNTY OF _____ )
5          I, RICH GERMOSEN, a Certified Court
6   Reporter, NCRA Certified Realtime Reporter,
7   Certified LiveNote Reporter, and Notary Public
8   within and for the States of New York and New
9   Jersey, do hereby certify:
10         That ALFRED A. McBEAN, JR., the witness
11  whose deposition is hereinbefore set forth, having
12  been duly sworn by a Notary Public of the States of
13  New York and New Jersey, and that such deposition is
14  a true record of the testimony of said witness.
15         I further certify that I am not related
16  to any of the parties to this action by blood or
17  marriage, and that I am in no way interested in the
18  outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20  my hand this____ day of_____ 2007.
21

    ————————————————————————
21  RICH GERMOSEN, CCR, CRCR, RPR, CRR, CLR
    LICENSE NO. XI01847
22  LICENSE NO. XR00168

Henderson Legal Services
(202) 220-4158

# EXHIBIT 8

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

DAVID H. RICH
Email: drich@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

October 30, 2006

**VIA FACSIMILE AND**
**FIRST CLASS MAIL**

Gordon Katz, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116

Re:    Robert Fireman and Ann Raider v. News America Marketing In-Store, Inc.
       Civil Action No. 05-11740-MLW

Dear Gordon:

I write to follow up on our brief discussion concerning News America Marketing In-Store, Inc.'s ("NAM") recent document production. Based upon our review, it would appear that many of your client's responsive documents have not been produced.

First, my clients seek NAM's complete email database in electronic form. I am willing discuss appropriate search terms, but quite clearly we would like any emails which reference, refer or relate to Ann Raider, Robert Fireman, Consumer Card Marketing, Inc (or CCMI), SmartSource Direct or SmartSource iGroup. Not only has this information been requested, but its production will soon be explicitly mandated by the revised Federal Rules of Civil Procedure, (although "documents" have included electronic documents for years). To the extent NAM possesses a document retention policy and/or an electronic data retention policy, I would ask that it be produced as well.

While certain limited emails and documents were made available (in non electronic form) for our review, we were unable to located any files belonging to any of the following individuals: David DeVoe (including memos, notes and emails), Marty Garofolo (including memos, notes and emails), Heather Hearty (including memos, notes and emails), Mike Gafney (including memos, notes and emails), Dominic Portco (including memos, notes and emails), Mike Racono (including memos, notes and emails), Jennifer Jane (including memos, notes and emails), Jeff Jenson (including memos, notes and emails) and John Rubin (including memos, notes and emails). Moreover, it seems readily apparent to us that large portions of Chris Mixon and Henri Lellouche's files, including memos, notes and electronic files, were simply not produced. You will see from my clients' document production that numerous emails and other

Gordon Katz, Esq.
October 30, 2006
Page 2 of 3

documents were sent to or received from Mr. Mixon and/or Mr. Lellouche and simply not produced within your client's document production.

Among these files should include documents reflecting specific discussions concerning who should run CCMI, particularly between August and December, 1999. We understand that documents also exist concerning the breaking up of CCMI personnel, how to move Bill Adam to Connecticut, Mr. Fireman's job responsibilities (or lack of job responsibilities), among other documents generally concerning CCMI, Mr. Fireman and Ms. Raider.

In addition, my clients believe that NAM has failed to produce all meeting minutes for meetings attended by Ann Raider or Robert Fireman. Likewise, NAM has failed to produce all meeting minutes at which Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct or SmartSource iGroup were mentioned or discussed. We have observed that NAM did not produce a single document reflecting notes taken at any meeting during which Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct or SmartSource iGroup were mentioned or discussed. This would include, but is not limited to, minutes or notes from any NAM executive management meeting, any NAM executive committee meeting and/or any SmartSource iGroup executive meeting. Given my clients' experience with NAM, these meetings took place on a weekly basis, meeting minutes and agendas were created, circulated and maintained and individual attendees routinely took notes. By way of example only, NAM held an executive meeting every Monday attended by Mr. Carlucci, Mr. Porco, Mr. Mixon, Mr. Garofalo, Mr. Campanelli, Ms. Jane, NAM's Chief Financial Office and NAM's human resources director, among others.

We were also unable to locate complete documents concerning the due diligence performed by NAM concerning CCMI. For example, we did not receive documents concerning any studies, strategic plans, projections or internal analysis performed by NAM concerning the potential acquisition on CCMI. We are aware that such reports were prepared and circulated within NAM prior to the execution of the Stock Transfer Agreement. Along the same lines, we did not receive NAM's strategic plan, analysis or report concerning NAM's potential acquisitions of Planet U, Softcard and CCMI. Again, we believe such documents do exist and were circulated within NAM in 1999. Finally, we did not receive any internal communications, including but not limited to email communications, relating to the potential acquisition of CCMI by NAM.

Lastly, to the extent NAM has withheld any documents on the basis of an applicable privilege, we will require a privilege log.

Thank you for your attention to this matter and please let this letter serve as the initiation of a discovery conference pursuant to Local Rule 7.1.

Gordon Katz, Esq.
October 30, 2006
Page 3 of 3

Very Truly Yours,

David H. Rich

cc:    Kevin T. Peters, Esq.

**EXHIBIT 9**

# Holland+Knight

Tel   617 523 2700
Fax  617 523 6850

Holland & Knight LLP
10 St. James Avenue
Boston. MA 02116-3889
www.hklaw.com

Gordon P. Katz
617 573 5839
gordon.katz@hklaw.com

December 12, 2006

**VIA E-MAIL and FIRST CLASS MAIL**

David H. Rich, Esq.
Todd & Weld LLP
28 State Street
Boston MA  02109

Re:    Robert Fireman and Ann Raider v. News America Marketing In-Store, Inc.
        Civil Action No. 05-11740-MLW

Dear David:

I am responding to your letter of October 30, 2006.  Since receiving your letter, we have spent considerable time interviewing News America Marketing ("NAM") personnel, considering your new requests for information, reviewing our prior production, and seeking additional documents in order to make this response.

A.    *Overview.*

Let me note at the outset that in September, 2006 we made available for your review approximately 70,000 pages of documents, contained in roughly 64 binders, 5 redwelds, and 17 boxes.  The documents came from the NAM-archived paper files of your clients, as well as the paper and electronic files of Henri Lellouche, paper files of NAM personnel John Linguiti, Wayne Campanelli, Donald Jack, and paper files of one of NAM's outside corporate counsel, Deborah Wolfe.  On September 28, 2006, you and your clients inspected this material at our office.  Of the documents made available for your review, you requested copies of only 3,857 pages.  These copies were delivered to you in October.

Since that time, we have obtained further documents from the electronic files of Henri Lellouche and also paper files from Marty Garofalo.  These amount to approximately 5 boxes of documents.  They are available for your review at our office at your convenience.

B.    *Response to Requests in October 30, 2006 Letter.*

Now let me respond to the specific requests in your October 30 letter.

David H. Rich, Esq.
December 12, 2006
Page 2

1.      First, you request "NAM's complete e-mail data base in electronic form." This request is far too broad, far too burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Indeed, as discussed below, the request seeks *inaccessible* information. We, therefore, decline to make the requested production.

The requested electronic production is not required under either the old or new federal rules regulating electronic discovery. Under new Rule 26(b)(2)(B), electronic discovery from inaccessible sources is not required. "[J]ust because ESI [electronically stored information] exists on some source stored somewhere should not necessarily mean that it has to be retrieved and produced regardless of burden and expense." S. Scheindlin, *Electronic Discovery: The Newly Amended Federal Rules of Civil Procedure, at 15 (2006)*.

As you will see below, we have already provided the ESI information of Henri Lellouche, your clients' immediate supervisor at NAM. We have located additional electronic material from Mr. Lellouche and paper files of Mr. Garofalo, which are available for you to review at our office (as was done previously).

There are no accessible ESI files for the other individuals you name in your October 30, 2006 letter. All of those individuals (with the exception of Mr. Mixon) ceased their employment with NAM before receipt of your document production request.[1] Their electronic files were not maintained after their departures. As for Mr. Mixon, we have checked, and he has not personally retained any material, electronic or otherwise, relating to your clients or CCMI.

2.      Second, you ask whether NAM possesses a document retention policy and/or an electronic data retention policy. The answer is "no" with respect to both.

3.      Third, you inquire as to existence of CCMI-related files for the following individuals:

- David Devoe, Jr.;
- Marty Garofalo;
- Heather Harde;
- Michael Gaffney;
- Dominic Porco;
- Jennifer Jehn;
- Jeff Jensen;
- Jon Rubin; and
- Chris Mixon

We have checked to determine if any of these individuals retained or "left" files relating to this matter. We use the word, "left," because all but Chris Mixon and Marty Garofalo ceased their employment with NAM at some point prior to receipt of your document production request.

---

[1] Mr. Rubin has since rejoined NAM.

David H. Rich, Esq.
December 12, 2006
Page 3

There are no existing files belonging to these individuals, except as noted in the next paragraph, below.

We further point out that some of the individuals listed above had no substantive involvement during their employment with CCMI or Fireman or Raider – e.g., Heather Harde, Jeff Jensen or Jennifer Jehn. Documents from others -- namely, former accounting and finance personnel Mike Gaffney and Michael Racano -- were included, to the extent they existed, in the Don Jack-supplied material, which you reviewed on September 28, 2006.

4.    With respect to your general assertion that the entirety of certain individuals' files were not produced, please remember that the events at issue in this litigation took place primarily in 1999 – 2000. It cannot reasonably be expected that all of NAM's documents would be maintained intact for, in some cases, over five years.

As I think you would agree, NAM had no obligation to preserve any such documents. Certainly (1) NAM did not anticipate this litigation, and (2) even if litigation had been anticipated, which it was not and could not reasonably have been, the documents you seek could not reasonably have been anticipated to be relevant to this litigation. *See, e.g., Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (the duty to preserve documents attaches "when a party should have known that the evidence may be relevant to future litigation"). *See also Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893, at *21 (N.D.Cal. 2006) (the future litigation must be "probable," i.e., "more than a possibility"); *Smith v. City of New York*, 388 F. Supp. 2d 179, 189 (S.D.N.Y. 2005) (stating that "[t]he obligation to preserve evidence may arise through a discovery request, through information alleged in the complaint, or prior to the initiation of litigation where a party is on notice that legal proceedings are likely . . . [t]here must be a factual basis for a party to be on notice that litigation is likely to be commenced").

5.    Let me now turn to your assertions that NAM has "failed to produce all meeting minutes" from meetings attended by Fireman and Raider, that "NAM did not produce document[s] reflecting notes taken at any meeting during which Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct, or SmartSource iGroup were mentioned or discussed or that NAM failed to produce any due diligence documents." These claims are simply untrue.

For example, the following documents produced contained "minutes" documents:

- Binders 4.01.01 and 4.01.02 (2000-2001 Highlights and Minutes);

- Binder 4.02 (2001 Salespeople Highlights and Calendars);

- Binder 4.22 (Retail Meeting Minutes); and

- Binder 4.30 (various minutes).

Indeed, you selected for copying some meeting minutes, including those that are bates stamped NAM 00051-58; NAM 00059-61 (containing handwritten notes); NAM 00064-73 (these contain

David H. Rich, Esq.
December 12, 2006
Page 4

handwritten notes); NAM 00090-91 (containing handwritten notes); NAM 00097-99; NAM 00104-106 (containing handwritten notes); NAM02221-27; NAM03660-3663 and NAM03677–3685.

With respect to your assertion that NAM did not produce "studies, strategic plans, projections, or internal analy[ses]" or "internal communications" concerning the potential acquisition of CCMI, I direct you to the following documents:

- the 5/14/99 memo from DeVoe to John Nallen et al., regarding the potential acquisition of CCMI and attaching an internal NAM analysis of CCMI.  (Wolfe redweld, Vol. I; produced to you as NAM01474-1480);

- the 5/27/99 memo from Julie Openshaw to Dave DeVoe, Jr. regarding findings of NAM's due diligence site visit to CCMI (Wolfe redweld, Vol. IV); and

- the 6/9/99 memo from Charlotte Edelman, to D. Wolfe et al., regarding due diligence and the acquisition of CCMI (Wolfe redweld, Vol. II).

Further, the documents produced to you and bates stamped NAM03599 - NAM03621 include the following additional "due diligence" documents:

- a business overview of CCMI discussing, among other things, value for NAM in acquiring CCMI, with attached financial results and projections;

- a memo from "Joe" to "Dave" summarizing Joe's trip to CCMI on 5/25/99, and his discussions with Robert Coughlin regarding the business practices and "overall business health" of CCMI;

- a memo dated 6/21/99 (incorrectly dated 6/21/98) from Ram Rao to Dave Devoe, Jr., attaching a detailed review of CCMI per Mr. Rao's due diligence session on 6/5/99; and

- a 6/17/99 memo from Gary Beck to Dave Devoe, Jr. and Jon Rubin summarizing a meeting regarding "CCMI credentials" with Ann Raider and Bill Adams.

6.    Finally, you requested a privilege log.  As you know, we forwarded you our privilege log on November 6, 2006.

David H. Rich, Esq.
December 12, 2006
Page 5

     Please let me know if you have any additional questions or if you would like to discuss any issue further.

                  Very truly yours,

                  Gordon P. Katz

# 4227040_v1

# EXHIBIT 10

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

DAVID H. RICH
Email: drich@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

January 5, 2007

**VIA ELECTRONIC MAIL
AND FIRST CLASS MAIL**

Gordon Katz, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116

> Re:    Robert Fireman and Ann Raider v. News America Marketing In-Store, Inc.
>        Civil Action No. 05-11740-MLW

Dear Gordon:

I write to follow up on a few pending matters concerning News America Marketing In-Store's ("NAM") document production and related issues.

First, your December 12, 2006 letter notes that approximately five boxes of additional documents are available for review. My clients and I would like to come to your office to review these documents on January 19th at 10 AM. If possible, we would like the materials previously produced to be made available again. Please let me know if this works for you and your staff.

Second, in my letter of October 30, 2006, I specifically raised the issue of meeting minutes and notes. You responded by stating that certain meeting minutes were produced within the document production. Most respectfully, your written response has missed the point. My clients have requested, and are entitled to review, all meeting minutes at which Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct or SmartSource iGroup were mentioned or discussed.

Nowhere in the "70,000 pages of documents" produced by your client did NAM produce a single meeting minute or note from NAM's executive management meetings, which were routinely held from 8 AM to 11 AM every Monday. These meetings were attended by, among others, Mr. Carlucci, Mr. Porco, Mr. Mixon, Mr. Garafalo, Mr. Jenson, Mr. Klein, Ms. Jehn, Mr. Campelli and Mr. Davoe, Jr. Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct and/or SmartSource iGroup were discussed during these meetings and minutes and notes reflecting discussions on these topics were documented and recorded. To date, nothing has been produced.

Gordon Katz, Esq.
January 5, 2007
Page 2 of 2

Likewise, NAM did not produce a single record, minute or note from its weekly division meetings (sometimes called the "new ventures group meetings" or later, "SmartSource iGroup meetings"). These meetings were attended by individuals such as Mr. Davoe Jr., Mr. Lellouche, Ms. Heardy, Mr. Rubin, Mr. Mixon, Mr. Garofalo, Mr. Campanelli, Mr. Racano and others. Again, there can be no dispute that Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct and/or SmartSource iGroup were routinely discussed during these meetings and minutes and notes reflecting discussions on these topics were documented. At these meetings the strategic plan for the acquisition of CCMI, Planet U and Softcard, Inc. were discussed. Moreover, in these meetings NAM decided how to manage (or not manage) all aspects of CCMI, the Plaintiffs and all other personnel. These materials are relevant to the litigation and must be produced for inspection.

Along the same lines, your letter goes to great lengths to identify various due diligence documentation provided within the document production but nowhere do you represent that _all_ due diligence materials have been produced. As I informed you in October, studies, strategic plans, projections or internal analysis were performed by NAM concerning the potential acquisition on CCMI. These documents were prepared and circulated within NAM prior to the execution of the Stock Transfer Agreement. None of these materials have been produced. Along the same lines, nowhere does your letter address my clients' request for NAM's strategic plan, analysis or report concerning NAM's potential acquisitions of Planet U, Softcard and CCMI. Again, these documents existed at one time. If the documents no longer exist, please so state and identify when they were destroyed. If the documents currently exist (and we have reason to believe that they do), please produce them.

Concerning the issues set forth in your letter concerning electronic data retention, my clients intend to notice a Rule 30(b)(6) deposition on this topic. I will forward to you shortly a deposition notice. I would like to work cooperatively with you to schedule the deposition for a date convenient to all. We have also identified the first four individuals we intend to depose. I am happy to share the identities of these individuals so we can begin the process of working to scheduling these depositions in the most efficient manner possible.

Thank you.

Very truly yours,

David H. Rich

cc:    Kevin T. Peters, Esq.

# EXHIBIT 11

# Holland+Knight

Tel  617 523 2700
Fax 617 523 6850

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116-3889
www.hklaw.com

Gordon P. Katz
617 573 5839
gordon.katz@hklaw.com

January 26, 2007

<u>VIA E-MAIL and FIRST CLASS MAIL</u>

David H. Rich, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

> Re:    *Robert Fireman, et al. v. News America Marketing In-Store, Inc.*
>        Civil Action No. 05-11740-MLW

Dear David:

I write in response to your letter of January 5, 2007 concerning outstanding discovery issues in the above-referenced case.

1.    First, I can confirm that we will make all of NAM's responsive, non-privileged documents available for your review (again) on February 1, 2007 at 10 a.m. in our office.

2.    With respect to the requested executive committee meeting minutes, we are still working to determine whether any such minutes from the relevant time frame exist. The many persons whom we have contacted to date have not had possession of these documents; however, we are continuing to track down other persons who might have possession of such minutes. We will continue to update you on this issue, and to the extent that any relevant executive committee meeting minutes surface, we will produce them to you.

3.    With respect to minutes from "weekly division meetings" of the "new ventures group," I can confirm that no such minutes exist. We have been informed by NAM that such meetings did not take place in a group format where minutes were recorded.

4.    I can also confirm that all existing documents in NAM's possession, custody or control relating to minutes of meetings of the Smart Source iGroup have already been produced to you. Similarly, we can confirm that all existing unprivileged due diligence documents in NAM's possession, custody or control relating to NAM's acquisition of CCMI or NAM's

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Lakeland • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland • San Francisco
Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

David H. Rich, Esq.
January 26, 2007
Page 2

"strategic plan" concerning its acquisition of CCMI, Planet U and Softcard have already been
produced to you. Consistent with our prior letter, NAM has indeed produced studies, strategic
plans, projections and internal analyses concerning the CCMI acquisition. Further, I will also
remind you that the due diligence documents you seek would have been at least six years old at
the time of the filing of this suit.

5.      We are also in receipt of the plaintiffs' Rule 30(b)(6) notice regarding NAM's
electronic data retention. We have several objections to the scope of the notice. These include,
but are not limited to:

- **The notice is overbroad, in several respects.**

  - First, the notice seeks information regarding *all* technology used at
    NAM. If you seek to learn the technology used by certain persons
    employed by NAM, then please amend the notice to say that. As
    currently phrased, the notice encompasses a number of topics that
    are not reasonably calculated to lead to the discovery of admissible
    evidence.

  - Second, even if plaintiffs tailor this request to the technology used
    by certain individuals, the request is still overly broad. For
    example, any information sought *to the present* is overbroad, with
    the exception of the storage capabilities on certain employees'
    computers. Information concerning NAM's networking
    capabilities, e-mail systems, and archiving/storage of information
    created *after* the departure of the plaintiffs from the organization
    would generally be outside the scope of reasonable discovery.

- **The notice seeks information protected by the attorney work-product
  doctrine.** I, personally, have coordinated the search for documents
  responsive to plaintiffs' requests in NAM's possession, custody or control.
  There is no one at NAM who has been coordinating this production apart
  from me, and my work in this regard is protected from disclosure by the
  attorney work-product doctrine.

- **The deposition will likely take place in southern Connecticut or New
  York City.** The person who appears at present to be the most
  knowledgeable regarding the information sought in the proposed Rule
  30(b)(6) deposition notice divides his time between Wilton, Connecticut
  and New York City. Thus, the deposition will likely have to be in one of
  these two locations.

Subject to the above concerns, NAM will produce a witness in response to the proposed Rule
30(b)(6) notice. NAM also reserves its right to assert at the deposition additional objections to

David H. Rich, Esq.
January 26, 2007
Page 3

the scope of the deposition and otherwise.  I will get back to you shortly with more information regarding possible dates and location.

Finally, please *do* provide us with the names of the first four witnesses whose depositions you seek to take.  We will be glad to work with you regarding mutually convenient dates and locations for their depositions.

Please be aware that we, too, intend to notice several depositions in the near future.  At present, we have determined that our initial deponents will be each of the two plaintiffs, Les Charm, and Robert Coughlin, although not necessarily in that order.  We, of course, reserve the right to take additional depositions.

Very truly yours,

Gordon P. Katz

GPK/me-b

cc:    Tara J. Myslinski, Esq.

# EXHIBIT 12

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | | Lellouche | Mixson, Garofalo | Raider | Krasdale |
| E-mail | | Ludwig | Raider | | Documents Supplied by Don Jack, January 2006- |
| E-mail | | Ludwig | Bruther | | Documents Supplied by Don Jack, January 2006- |
| E-mail | | Raider | Jack and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | | Ludwig | Tripp and Fireman | | Documents Supplied by Don Jack, January 2006- |
| E-mail | | Tripp | Mason, Silk, Michels, and Lellouche | Sellinger and Casey | Miscellaneous Meeting Minute E-mails |
| E-mail | | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 6/2/1999 | Wolfe | Willis | | Deb Wolfe Documents V. 1 |
| E-mail | 6/9/1999 | Wolfe | Willis | | Deb Wolfe Documents V. 1 |
| E-mail | 6/15/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 2 |
| E-mail | 6/15/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 1 |
| E-mail | 6/18/1999 | DeVoe, Jr. | Colovos | | Deb Wolfe Documents V. 5 |
| E-mail | 6/18/1999 | DeVoe, Jr. | Colovos | | Deb Wolfe Documents V. 1 |
| E-mail | 7/12/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 5 |
| E-mail | 7/12/1999 | DeVoe | Willis | | Deb Wolfe Documents V. 5 |
| E-mail | 7/12/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 1 |
| E-mail | 7/12/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 1 |
| E-mail | 7/13/1999 | Connolly | Fireman | | Deb Wolfe Documents V. 2 |
| E-mail | 7/13/1999 | Connolly | Fireman | | Deb Wolfe Documents V. 1 |
| E-mail | 7/14/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 1 |
| E-mail | 7/20/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 2 |
| E-mail | 7/20/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 1 |
| E-mail | 7/21/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 2 |
| E-mail | 7/21/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 2 |
| E-mail | 7/22/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 5 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| E-mail | 7/23/1999 | DeVoe, Jr. | Willis | | Deb Wolfe Documents V. 5 |
| E-mail | 7/23/1999 | Fireman | DeVoe, Jr. | | Deb Wolfe Documents V. 1 |
| E-mail | 7/26/1999 | Fireman | Connolly, Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 7/27/1999 | DeVoe, Jr. | Edelman, Openshaw, Rubin | Connolly | Deb Wolfe Documents V. 4 |
| E-mail | 7/28/1999 | DeVoe, Jr. | Charm | Fireman, Rubin | Deb Wolfe Documents V. 5 |
| E-mail | 7/28/1999 | Fireman | Connolly | | Deb Wolfe Documents V. 2 |
| E-mail | 7/31/1999 | DeVoe, Jr. | Fireman | | Deb Wolfe Documents V. 5 |
| E-mail | 7/31/1999 | DeVoe, Jr. | Fireman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/2/1999 | Willis | Edelman | | Deb Wolfe Documents V. 5 |
| E-mail | 8/2/1999 | Willis | Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 8/2/1999 | Willis | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/3/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/5/1999 | DeVoe, Jr. | Edelman | Moore | Deb Wolfe Documents V. 4 |
| E-mail | 8/5/1999 | DeVoe, Jr. | Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 8/13/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 5 |
| E-mail | 8/13/1999 | Edelman | Fireman | | Deb Wolfe Documents V. 5 |
| E-mail | 8/13/1999 | Edelman | Fireman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/13/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/13/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/16/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 5 |
| E-mail | 8/16/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/17/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 5 |
| E-mail | 8/17/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/17/1999 | Fireman | Edelman | | Deb Wolfe Documents V. 1 |
| E-mail | 8/18/1999 | DeVoe, Jr. | Edelman, Rubin | | Deb Wolfe Documents V. 4 |
| E-mail | 8/18/1999 | DeVoe, Jr. | Edelman, Rubin | | Deb Wolfe Documents V. 4 |
| E-mail | 8/30/1999 | DeVoe, Jr. | Edelman | | Deb Wolfe Documents V. 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 8/30/1999 | DeVoe, Jr. | Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 9/7/1999 | DeVoe, Jr. | Edelman | Mallen | Deb Wolfe Documents V. 4 |
| E-mail | 9/8/1999 | DeVoe, Jr. | Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 9/8/1999 | DeVoe, Jr. | Edelman | | Deb Wolfe Documents V. 4 |
| E-mail | 9/14/1999 | Gaffney | Borzumato | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/21/1999 | Gaffney | Fireman | Schena, Rubin, DeVoe, and Borzumato | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/22/1999 | Gaffney | Fireman and Coughlin | Schena, DeVoe, Borzumato, and Rubin | Documents Supplied by Don Jack, January 2006- |
| E-mail | 10/7/1999 | Gaffney | DeVoe and Campanelli | Schena, Bruchowsky, and Borzumato | Documents Supplied by Don Jack, January 2006- |
| E-mail | 12/7/1999 | DeVoe | Raider | Fireman and Moore | Documents Produced by Wanye Campanelli |
| E-mail | 12/16/1999 | DeVoe | Bacher | | Documents Produced by Wanye Campanelli |
| E-mail | 12/20/1999 | Gaffney | Wolfe and Edelman | DeVoe, Campanelli, Fireman, Raider, and Coughlin | Documents Produced by Wanye Campanelli |
| E-mail | 1/27/2000 | DeVoe | Fireman and Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 2/1/2000 | DeVoe | Lellouche | | Staffing Emails - Volume 1 |
| Email | 2/12/2000 | Bruther | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 2/14/2000 | Suarez | Lellouche and Raider | Moore | Staffing Emails - Volume 2 |
| Email | 2/16/2000 | Nicks | Lellouche, Moore, DeVoe and Raider | | Staffing Emails - Volume 2 |
| Email | 2/17/2000 | Nicks | Raider and Lellouche | | Staffing Emails - Volume 2 |
| Email | 2/28/2000 | DeGiorgio | Raider | Lellouche and Nicks | Staffing Emails - Volume 2 |
| Email | 2/28/2000 | Suarez | Lellouche | Raider | Staffing Emails - Volume 2 |
| E-mail | 4/4/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 4/6/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 4/10/2000 | Raider | Lellouche | | Staffing Emails - Volume 1 |
| E-mail | 4/10/2000 | DeVoe | Colovos | | Documents Produced by Wanye Campanelli |
| E-mail | 4/17/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 4/17/2000 | Lellouche | DeVoe | | TRS and Entrance Targeting - Volume 2 |
| Email | 5/1/2000 | Suarez | Lellouche | | Staffing Emails - Volume 2 |
| Email | 5/4/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/11/2000 | Tripp | Garofalo | Raider, Lellouche, Treharne, LeWorthy, Martin | 2001-2001 Salespeople Highlights and Calendar |
| Email | 5/19/2000 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| E-mail | 5/19/2000 | Fontaine | Lellouche | | Henri Lellouche Document Production General Bi |
| Email | 5/22/2000 | Suarez | Coughlin | Lellouche | Staffing Emails - Volume 2 |
| Email | 5/23/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 5/26/2000 | Mercure | LeWorthy | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 5/30/2000 | DeVoe | Lellouche and Openshaw | Mixson | TRS and Entrance Targeting - Volume 2 |
| Email | 5/31/2000 | Adam | Lellouche, Roseman | | ABT Project |
| Email | 5/31/2000 | Mercure | LeWorthy | Lellouche | Staffing Emails - Volume 2 |
| Email | 6/2/2000 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| E-mail | 6/2/2000 | Fontaine | Lellouche | | Henri Lellouche Document Production General Bi |
| Email | 6/8/2000 | Fontaine | LeWorthy | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 6/8/2000 | Nicks | Lellouche | | Staffing Emails - Volume 2 |
| Email | 6/16/2000 | Fontaine | Lellouche | | Staffing Emails - Volume 1 |
| Email | 6/16/2000 | Fontaine | Lellouche | | Staffing Emails - Volume 1 |
| E-mail | 6/16/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 6/19/2000 | Mixson | Lellouche | DeVoe | ABT Project |
| Email | 6/29/2000 | Weiss | Mosa | Suarez, Frauenhoffer, Moore and Lellouche | Staffing Emails - Volume 2 |
| E-mail | 6/30/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 7/5/2000 | Mosa | Lellouche | Nicks | Staffing Emails - Volume 2 |
| Email | 7/7/2000 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 7/7/2000 | Nicks | Lellouche and Raider | | Staffing Emails - Volume 2 |
| Email | 7/14/2000 | Fontaine | LeWorthy and Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| E-mail | 7/17/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 7/18/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |
| Email | 7/20/2000 | LeWorthy | Nicks | Mixson and Lellouche | Staffing Emails - Volume 1 |
| Email | 7/21/2000 | Fontaine | Mixson | | 2000 – 2001 Highlights and Minutes - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 7/21/2000 | Tripp | Garofalo | Raider, Lellouche, Treharne, LeWorthy | 2001-2001 Salespeople Highlights and Calendar |
| Email | 7/28/2000 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 7/28/2000 | Fireman | Lellouche | | Staffing Emails - Volume 2 |
| Email | 8/4/2000 | Fontaine | Serio, Lellouche and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 8/4/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/11/2000 | Fontaine | Lellouche and Serio | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/11/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/17/2000 | Serio | Lellouche | | Staffing Emails - Volume 2 |
| Email | 8/18/2000 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/18/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/25/2000 | Fontaine | Serio, Fireman, Bruther and Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 8/25/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/29/2000 | Mumm | Fireman, Raider | Lellouche, Adam | Krasdale |
| Email | 8/29/2000 | Fireman | Lellouche | | Retail Emails - Volume 2 |
| Email | 8/30/2000 | Fontaine | Mumm, Fireman, Raider | Lellouche, Adam | Krasdale |
| Email | 8/30/2000 | Mumm | Lellouche | | Krasdale |
| Email | 8/30/2000 | Mumm | Crowther | Geswell, Raider, Fireman | Produce Warehouse |
| Email | 8/30/2000 | Adam | Treiber, Mumm, Hughes, Roseman | Lellouche, Fireman | Produce Warehouse |
| Email | 8/31/2000 | Roseman | Lellouche | | Retail Emails - Volume 3 |
| Email | 9/1/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/1/2000 | McAndrew | Serio, Fireman, Bruther, Lellouche, Mumm, Stappler, Mercure | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/1/2000 | Mumm | Lellouche | | Krasdale |
| Email | 9/1/2000 | Weeden | Eckman | Nesprido, Lellouche and Wogan | Retail Emails - Volume 4 |
| Email | 9/5/2000 | Adam | Roseman and Lellouche | | Retail Emails - Volume 4 |
| Email | 9/7/2000 | Mumm | Lellouche | | Produce Warehouse |
| Email | 9/8/2000 | Fontaine | Serio, Lellouche, Bruther and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/8/2000 | Fireman | Lellouche | | Retail Emails - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 9/11/2000 | Tripp | Hughes | Adam, Roseman, Sellinger, Lellouche, Raider | Retail Emails - Volume 7 |
| Email | 9/11/2000 | Tripp | Hughes | Adam, Roseman, Sellinger, Lellouche, Raider | Retail Emails - Volume 7 |
| Email | 9/11/2000 | Coughlin | Fireman, Raider, Lellouche, Adam, Crowther, Roseman, Hughes | | Retail Emails - Volume 8 |
| Email | 9/12/2000 | Raider | Lellouche, Adam, Roseman | Fireman, Crowther, Mumm, Coughlin, Geswell, Treiber | Produce Warehouse |
| Email | 9/13/2000 | Fireman | Lellouche | | ABT Project |
| Email | 9/13/2000 | Hughes | Coughlin | Adam, Roseman, Lellouche and Crowther | Retail Emails - Volume 6 |
| Email | 9/13/2000 | Tripp | Hughes | Adam, Roseman, Sellinger, Lellouche, Raider | Retail Emails - Volume 7 |
| Email | 9/14/2000 | Fireman | Lellouche | | Retail Emails - Volume 7 |
| Email | 9/15/2000 | Fontaine | Serio, Lellouche, Bruther and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/15/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/18/2000 | Adam | Fireman, Raider, Coughlin, Crowther, Roseman and Lellouche | | Retail Emails - Volume 4 |
| Email | 9/18/2000 | Adam | Coughlin, Crowther | Raider, Fireman, Roseman, Lellouche and Hughes | Retail Emails - Volume 6 |
| Email | 9/18/2000 | Roseman | Hughes and Raider | Adam and Lellouche | Retail Emails - Volume 6 |
| Email | 9/18/2000 | Fontaine | Lellouche | | Staffing Emails - Volume 2 |
| Email | 9/19/2000 | Tripp | Hughes | Roseman, Lellouche, Sellinger | Retail Emails - Volume 7 |
| Email | 9/22/2000 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/22/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 9/22/2000 | Fireman | DeVoe | | Stored Value Programs - Volume 4 |
| Email | 9/25/2000 | Mixson | Lellouche | DeVoe, Benson and Mattimore | Staffing Emails - Volume 2 |
| Email | 9/29/2000 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/29/2000 | Tripp | Garofalo | Lellouche, Raider, Sellinger, Treharne, Serio | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/30/2000 | Adam | Raider | Lellouche, Roseman | Freeride |
| Email | 10/3/2000 | Roseman | Lellouche | | Produce Warehouse |
| Email | 10/3/2000 | Mixson | Lellouche | Mattimore | Staffing Emails - Volume 2 |
| Email | 10/4/2000 | Fontaine | Lellouche, Roseman | Adam | Freeride |
| Email | 10/4/2000 | Raider | Lellouche | | Staffing Emails - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 10/4/2000 | Fontaine | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 10/4/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 10/6/2000 | Fontaine | Serio, Lellouche, Bruther and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 10/6/2000 | Tripp | Garofalo | Lellouche, Raider, Sellinger, Treharne, Serio | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 10/6/2000 | Henderson | Lellouche and Fireman | Constantine | Stored Value Programs - Volume 1 |
| E-mail | 10/8/2000 | Fireman | Henderson and Lellouche | Constantine | Stored Value Programs - Volume 1 |
| Email | 10/9/2000 | Coughlin | Lellouche, Fireman | | Retail Emails - Volume 1 |
| E-mail | 10/9/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 10/11/2000 | Fireman | Lellouche | Mixson and Raider | Retail Emails - Volume 4 |
| E-mail | 10/11/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 10/11/2000 | Lellouche | Fireman and Raider | | Stored Value Programs - Volume 4 |
| Email | 10/12/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/12/2000 | Hughes | Adam, Coughlin, Raider, Roseman, Reed, Lellouche, Fireman | | Retail Emails - Volume 8 |
| Email | 10/13/2000 | Fontaine | Serio, Lellouche, Bruther and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 10/13/2000 | Coughlin | Reed | Adam, Roseman, Fireman, Lellouche, Raider, Crowther | Retail Emails - Volume 8 |
| Email | 10/16/2000 | Treiber | Adam | Roseman, Lellouche, Raider, Fireman, Stappler | Retail Emails - Volume 1 |
| Email | 10/17/2000 | Treiber | Adam | Roseman, Lellouche, Raider, Fireman and Stappler | Retail Emails - Volume 6 |
| E-mail | 10/18/2000 | Constantine | Fireman | Lellouche | Staffing Emails - Volume 1 |
| E-mail | 10/18/2000 | Fireman | Constantine | Lellouche and Raider | Stored Value Programs - Volume 1 |
| E-mail | 10/18/2000 | Fireman | Evans | Lellouche | Stored Value Programs - Volume 3 |
| E-mail | 10/19/2000 | Evans | Fireman and Crowther | Lellouche | Stored Value Programs - Volume 3 |
| Email | 10/20/2000 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 10/20/2000 | Tripp | Garofalo | Lellouche, Raider, Sellinger, Treharne, Serio | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/23/2000 | Mattimore | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 10/23/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 10/23/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| Email | 10/24/2000 | Fireman | Lellouche | | iBelong |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 10/26/2000 | Evans | Sturdivant | Newman, Lellouche, Coughlin, and Gaffney | Stored Value Programs - Volume 3 |
| E-mail | 10/26/2000 | Sturdivant | Evans | Newman, Lellouche, Coughlin, and Gaffney | Stored Value Programs - Volume 3 |
| E-mail | 10/26/2000 | Coughlin | Evans | Fireman, Lellouche, Crowther, and Racano | Stored Value Programs - Volume 4 |
| Email | 10/27/2000 | McAndrew | Serio, Lellouche and Bruther | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/27/2000 | McAndrew | Serio, Lellouche and Bruther | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/27/2000 | DeVoe | Lellouche and Mixon | | Retail Emails - Volume 6 |
| E-mail | 10/27/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 10/30/2000 | Mixson | Lellouche | | Retail Emails - Volume 2 |
| Email | 10/30/2000 | Constantine | Lellouche | Fireman | Retail Emails - Volume 6 |
| Email | 10/30/2000 | Mixson | Mattimore | Moore and Lellouche | Staffing Emails - Volume 2 |
| Email | 10/30/2000 | Mixson | DeVoe | Carlucci and Lellouche | Staffing Emails - Volume 2 |
| E-mail | 10/31/2000 | Fireman | Lellouche and Raider | Coughlin | Stored Value Programs - Volume 1 |
| E-mail | 11/1/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 11/2/2000 | Fireman | Lellouche | | iBelong |
| E-mail | 11/2/2000 | Fireman | Racano | Lellouche | Stored Value Programs - Volume 1 |
| E-mail | 11/2/2000 | Fireman | Racano | Lellouche | Stored Value Programs - Volume 1 |
| Email | 11/3/2000 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/3/2000 | Fireman | Lellouche | Evans | ABT Project |
| Email | 11/3/2000 | Hughes | Evans | Coughlin and Lellouche | Retail Emails - Volume 6 |
| E-mail | 11/3/2000 | Fireman | Lellouche and Mixson | | Stored Value Programs - Volume 1 |
| E-mail | 11/3/2000 | DeVoe | Lellouche | Campanelli | TRS and Entrance Targeting - Volume 2 |
| Email | 11/5/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/6/2000 | Fireman | Lellouche | | ABT Project |
| E-mail | 11/6/2000 | Grieco | Campanelli and Racano | Lellouche, Ruchalski, and Bruther | Stored Value Programs - Volume 1 |
| E-mail | 11/6/2000 | Bruther | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 11/6/2000 | Roseman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 11/7/2000 | Lellouche | O'Connell | Mixson | Braintree to Boston Office Move |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 11/7/2000 | Fontaine | Lellouche | | Braintree to Boston Office Move |
| Email | 11/10/2000 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/10/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/12/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/15/2000 | Fireman | Lellouche, Raider and Tripp | Mixson and Nicks | Staffing Emails - Volume 2 |
| Email | 11/15/2000 | Nicks | Lellouche, Raider, Fireman and Tripp | Mixson, Sheridan and Moore | Staffing Emails - Volume 2 |
| Email | 11/16/2000 | Stappaer | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/17/2000 | Fontaine | Serio, Lellouche, Bruther and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/17/2000 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/17/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/21/2000 | Tripp | Garofalo | Lellouche, Raider, Sellinger, Marmo, Lubin, Treharne, Serio | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/21/2000 | Fireman | Raider, Lellouche | | iBelong |
| Email | 11/22/2000 | Fireman | Lellouche | Mixson, Raider, Tripp, Roseman, Harde, Garofalo, Adam | iBelong |
| Email | 11/29/2000 | Fontaine | Lellouche | | Retail Emails - Volume 7 |
| Email | 11/30/2000 | Neff | Trippler, Fontaine | Lellouche, Myer, O'Connell | Braintree to Boston Office Move |
| Email | 11/30/2000 | Neff | O'Connell | Mixson, Lellouche, Moore, Liebergall, Leprine | Braintree to Boston Office Move |
| Email | 11/30/2000 | Bruther | Lellouche | | Retail Emails - Volume 3 |
| Email | 11/30/2000 | Bruther | Lellouche, Campanelli and Grieco | | Retail Emails - Volume 7 |
| Email | 11/30/2000 | Raider | Lellouche, Roseman, Adam, Treiber | Stappler, Bruther | Retail Emails - Volume 8 |
| Email | 11/30/2000 | Nicks | Lellouche and Garofolo | Mixson and Mattimore | Staffing Emails - Volume 2 |
| Email | 12/1/2000 | Fontaine | Serio | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 12/1/2000 | Bruther | Lellouche and Grieco | | Retail Emails - Volume 5 |
| Email | 12/1/2000 | Roberts | Raider | Lellouche and Sheridan | Staffing Emails - Volume 1 |
| Email | 12/1/2000 | Roberts | Raider and Lellouche | | Staffing Emails - Volume 2 |
| Email | 12/1/2000 | Garofalo | Nicks and Lellouche | Mixson and Mittimore | Staffing Emails - Volume 2 |
| E-mail | 12/1/2000 | Jack | Gaffney | Ludwig and McMellon | Documents Supplied by Don Jack, January 2006- |
| Email | 12/4/2000 | O'Connell | Lellouche | | Braintree to Boston Office Move |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 12/5/2000 | Fireman | Lellouche | | ABT Project |
| E-mail | 12/5/2000 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 12/5/2000 | Lewen | Lellouche and Fireman | Mixson | Stored Value Programs - Volume 4 |
| Email | 12/6/2000 | Evans | Coughlin, Raider and Bruther | Lellouche and Gaffney | Retail Emails - Volume 5 |
| Email | 12/7/2000 | Harde | Lellouche, Fireman | | Infospace |
| Email | 12/7/2000 | Harde | Lellouche, Fireman | | Infospace |
| Email | 12/7/2000 | Adam | Roseman, Lellouche, Harde, Fireman | | Infospace |
| Email | 12/7/2000 | Fireman | Harde, Lellouche | | Infospace |
| Email | 12/8/2000 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 12/8/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 12/8/2000 | Racano | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 12/8/2000 | Racano | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 12/11/2000 | Henderson | Lellouche | Constantine | TRS and Entrance Targeting - Volume 2 |
| E-mail | 12/12/2000 | Jack | Coughlin | Gaffney and Ludwig | Documents Supplied by Don Jack, January 2006- |
| Email | 12/13/2000 | Evans | Raider | Coughlin, Bruther, Lellouche, Gaffney | Retail Emails - Volume 1 |
| Email | 12/15/2000 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 12/15/2000 | Tripp | Garofalo | Lellouche, Raider, Treharne, Serio, Sellinger, Lubin, Marmo | 2001-2001 Salespeople Highlights and Calendar |
| Email | 12/19/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 12/19/2000 | Fontaine | Lellouche | | iBelong |
| Email | 12/19/2000 | Serio | Garofalo, Lellouche and Harde | | Staffing Emails - Volume 1 |
| Email | 12/21/2000 | Bruther | Lellouche | | Braintree to Boston Office Move |
| Email | 12/21/2000 | Fontaine | Lellouche | | Braintree to Boston Office Move |
| Email | 12/21/2000 | Fontaine | Lellouche | | Braintree to Boston Office Move |
| Email | 12/21/2000 | Fontaine | Serio, Lellouche, Fireman | Bruther, Mumm, Stappler, London | Braintree to Boston Office Move |
| Email | 12/21/2000 | Fontaine | Lellouche | | Braintree to Boston Office Move |
| Email | 12/21/2000 | Sinansky | Lellouche, O'Connell | Fontaine, Leprine, Neff, Sanjani | Braintree to Boston Office Move |
| E-mail | 12/21/2000 | Gaffney | Anello | Jack | Documents Supplied by Don Jack, January 2006- |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|-----|
| E-mail | 12/21/2000 | Hughes | Sabino | | Documents Supplied by Don Jack, January 2006 |
| Email | 12/29/2000 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 1/4/2001 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| E-mail | 1/4/2001 | DeVoe | Fireman and Raider | Carlucci and Wolfe | Documents Produced by Wanye Campanelli |
| E-mail | 1/4/2001 | DeVoe, Jr. | Fireman, Raider | Carlucci, Wolfe | Deb Wolfe Documents V. 1 |
| Email | 1/5/2001 | Fontaine | Serio and Lelllouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 1/5/2001 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 1/5/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 1/8/2001 | Raider | DeVoe, Fireman | Carlucci, Wolfe | Deb Wolfe Documents V. 1 |
| Email | 1/12/2001 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 1/17/2001 | Stern | Lellouche | | Portal Development |
| Email | 1/17/2001 | Taylor | Lellouche | Harde, Rainforth, Stern | Portal Development |
| Email | 1/17/2001 | Mumm | Raider | Adam and Lellouche | Retail Emails - Volume 5 |
| Email | 1/18/2001 | Adam | Fireman, Harde, Lellouche | Roseman | Portal Development |
| Email | 1/19/2001 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 1/19/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 1/19/2001 | Bruther | Lellouche | | Retail Emails - Volume 1 |
| Email | 1/19/2001 | Fireman | Lellouche, Mumm, Adam | Crowther, Coughlin, Raider | Retail Emails - Volume 1 |
| Email | 1/19/2001 | Raider | Mumm, Lellouche, Adam | | Retail Emails - Volume 2 |
| Email | 1/20/2001 | Mumm | Adam, Lellouche | Raider | Retail Emails - Volume 8 |
| E-mail | 1/23/2001 | Benson | DeVoe and Racano | Benson | Documents Supplied by Don Jack, January 2006- |
| Email | 1/24/2001 | Mixson | Carlucci | Lellouche | ABT Project |
| Email | 1/24/2001 | Serio | NAM-I Group/all | | Braintree to Boston Office Move |
| Email | 1/24/2001 | Hughes | Lellouche | | Retail Emails - Volume 4 |
| Email | 1/24/2001 | Mumm | Lellouche | Raider | Retail Emails - Volume 8 |
| Email | 1/26/2001 | Fontaine | Serio, Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 1/26/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|----|----|---|
| Email | 1/26/2001 | Serio | NAM-I Group/all, Cleary | | Braintree to Boston Office Move |
| Email | 1/29/2001 | Bruther | Lellouche | Raider | Retail Emails - Volume 5 |
| Email | 1/29/2001 | Hughes | Lellouche | | Retail Emails - Volume 7 |
| Email | 2/1/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 2/6/2001 | Mumm | Raider | Adam and Lellouche | Retail Emails - Volume 6 |
| Email | 2/7/2001 | Fireman | Adam | Lellouche | Portal Development |
| Email | 2/9/2001 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 2/9/2001 | Tripp | Garofalo | Lellouche, Raider, Sellinger, Lubin, Marmo, Dilts, Steinmetz, Treharne, Serio | 2001-2001 Salespeople Highlights and Calendar |
| Email | 2/9/2001 | Bruther | Lellouche | | Retail Emails - Volume 1 |
| Email | 2/9/2001 | Bruther | Raider | Lellouche | Retail Emails - Volume 1 |
| E-mail | 2/16/2001 | Tripp | Lellouche and Fireman | Raider and Bruther | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/16/2001 | Racano | Fireman and Raider | DeVoe | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/16/2001 | Racano | Fireman and Raider | DeVoe | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/16/2001 | Racano | Fireman, Raider | DeVoe, Jr. | Deb Wolfe Documents V. 1 |
| Email | 2/20/2001 | Fontaine | Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 2/20/2001 | Roseman | Lellouche | | Retail Emails - Volume 2 |
| Email | 2/20/2001 | Raider | Fireman, Lellouche and Mixson | Nicks | Staffing Emails - Volume 1 |
| E-mail | 2/20/2001 | Tripp | Lellouche | Raider and Fireman | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/21/2001 | Tripp | Lellouche | Raider and Fireman | TRS and Entrance Targeting - Volume 1 |
| E-mail | 2/21/2001 | Tripp | Lellouche | Raider and Fireman | TRS and Entrance Targeting - Volume 2 |
| Email | 2/22/2001 | Fontaine | Lellouche | | Retail Emails - Volume 8 |
| Email | 2/23/2001 | Fontaine | Serio and Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 2/23/2001 | Fontaine | Bruther | Lellouche | Retail Emails - Volume 1 |
| E-mail | 2/26/2001 | Tripp | Raider, lellouche, and Fireman | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 2/28/2001 | Fireman | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| Email | 3/2/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 3/2/2001 | Fontaine | Evans | Lellouche, Tripp, Bruther | Retail Emails - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 3/2/2001 | Fontaine | Bruther | Lellouche | Retail Emails - Volume 5 |
| E-mail | 3/2/2001 | Fireman | Lellouche | Constantine | TRS and Entrance Targeting - Volume 1 |
| Email | 3/5/2001 | Raider | Lellouche, Fireman and Mixson | Nicks | Staffing Emails - Volume 1 |
| E-mail | 3/5/2001 | Raider | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| Email | 3/6/2001 | Roseman | Lellouche | Adam | Retail Emails - Volume 3 |
| Email | 3/6/2001 | Mumm | Raider | Cleary, Crowther, Coughlin and Lellouche | Retail Emails - Volume 4 |
| Email | 3/6/2001 | Hughes | Raider | Roseman, Lellouche, Evans, Treiber | Retail Emails - Volume 7 |
| E-mail | 3/6/2001 | Racano | Fireman and Raider | DeVoe | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/6/2001 | Racano | Fireman, Raider | DeVoe, Jr. | Deb Wolfe Documents V. 1 |
| Email | 3/7/2001 | Raider | Lellouche | | Aspen - Volume 3 |
| Email | 3/8/2001 | Fireman | Lellouche | | iBelong |
| E-mail | 3/8/2001 | Racano | Wolfe | | Deb Wolfe Documents V. 1 |
| Email | 3/9/2001 | Fontaine | Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 3/9/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 3/9/2001 | Racano | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/9/2001 | Racano | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/9/2001 | Racano | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/9/2001 | Bruther | Hurme | Roseman and Lellouche | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/9/2001 | Racano | DeVoe | Wolfe | Documents Produced by Wanye Campanelli |
| E-mail | 3/12/2001 | Goodstadt | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 3/14/2001 | Evans | Lellouche | | ABT Project |
| Email | 3/16/2001 | Fontaine | Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| E-mail | 3/16/2001 | Benson | Mixson | Devoe, Harde, Lellouche, and Benson | TRS and Entrance Targeting - Volume 2 |
| E-mail | 3/16/2001 | Mixson | DeVoe | Lellouche, Campanelli, Benson, and Carlucci | TRS and Entrance Targeting - Volume 2 |
| Email | 3/20/2001 | Roberts | Raider and Lellouche | | Staffing Emails - Volume 2 |
| Email | 3/23/2001 | Fontaine | Serio, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 3/23/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| Email | 3/23/2001 | Fireman | Constantine | Lellouche | iBelong |
| Email | 3/26/2001 | Evans | Lellouche and Bruther | | Retail Emails - Volume 7 |
| Email | 3/26/2001 | Bruther | Evans and Lellouche | | Retail Emails - Volume 7 |
| E-mail | 3/26/2001 | Evans | Hurme | | Documents Supplied by Don Jack, January 2006 |
| Email | 3/27/2001 | Mixson | Carlucci, DeVoe, Benson | Lellouche | Krasdale |
| E-mail | 3/28/2001 | Bruther | Lellouche | Mixson | TRS and Entrance Targeting - Volume 2 |
| E-mail | 3/29/2001 | Adam | Lellouche | Harde | TRS and Entrance Targeting - Volume 1 |
| E-mail | 3/29/2001 | Bruther | Mixson and Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 3/30/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 3/30/2001 | Fireman | Lellouche and Bruther | Raider, Mumm and Coughlin | Retail Emails - Volume 4 |
| Email | 4/2/2001 | Fontaine | Lellouche, Fireman, Campanelli, Grieco and Raider | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| E-mail | 4/2/2001 | Adam | Harde and Lellouche | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 4/3/2001 | Mixson | Carlucci and DeVoe | Benson, Campanelli, and Lellouche | TRS and Entrance Targeting - Volume 1 |
| Email | 4/6/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 4/6/2001 | Mixson | Murdoch | Carlucci, Lellouche, and Lipsher | TRS and Entrance Targeting - Volume 2 |
| Email | 4/10/2001 | Harde | Benson, Mixson and Lellouche | Adam, Bruther and Goodkin | Staffing Emails - Volume 2 |
| E-mail | 4/11/2001 | Mixson | Garofalo, Lellouche, and Tripp | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 4/11/2001 | Adam | Lellouche | Hughes and Treiber | TRS and Entrance Targeting - Volume 1 |
| Email | 4/12/2001 | Fireman | Lellouche | | Staffing Emails - Volume 1 |
| Email | 4/12/2001 | Mixson | Campanelli | DeVoe, Lellouche, Raider and Garofalo | Staffing Emails - Volume 2 |
| Email | 4/13/2001 | Fontaine | Lellouche, Fireman, Campanelli and Grieco | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 4/13/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 4/17/2001 | Serio | Lellouche | | Staffing Emails - Volume 2 |
| Email | 4/17/2001 | Roberts | Raider and Lellouche | | Staffing Emails - Volume 2 |
| Email | 4/17/2001 | Roberts | Lellouche and Raider | | Staffing Emails - Volume 2 |
| Email | 4/18/2001 | Adam | Lellouche | | Aspen - Volume 1 |
| Email | 4/20/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 4/20/2001 | Adam | Treiber, Hughes | Benson, Lellouche | Aspen - Volume 4 |
| Email | 4/20/2001 | Raider | Lellouche | | Promotions |
| Email | 4/20/2001 | Raider | Lellouche | | Promotions |
| Email | 4/20/2001 | Raider | Lellouche | | Promotions |
| Email | 4/20/2001 | Raider | Lellouche | | Promotions |
| Email | 4/20/2001 | Litwin | Lellouche and Raider | | Retail Emails - Volume 6 |
| E-mail | 4/20/2001 | Litwin | Raider | | Henri Lellouche Disc Production - Volume III |
| Email | 4/23/2001 | Raider | Fireman and Lellouche | | Retail Emails - Volume 6 |
| E-mail | 4/23/2001 | Evans | Jack | | Documents Supplied by Don Jack, January 2006- |
| Email | 4/24/2001 | Fireman | Lellouche | | iBelong |
| Email | 4/24/2001 | Fireman | Lellouche | | iBelong |
| Email | 4/24/2001 | Nicks | Lellouche | Mixson and Roberts | Staffing Emails - Volume 1 |
| E-mail | 4/24/2001 | Jack | Gaffney and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| Email | 4/26/2001 | Fontaine | Lellouche, Fireman, Raider, Tripp, Cleary, Coughlin, Campanelli and Adam | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| E-mail | 4/26/2001 | Maguire | Jack | | Documents Supplied by Don Jack, January 2006- |
| Email | 4/27/2001 | Fontaine | Lellouche, Fireman, Bruther, Campanelli, Grieco and Serio | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 4/27/2001 | Tripp | Garofolo and Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 4/27/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 4/30/2001 | Porlein | Lellouche | Luh | TRS and Entrance Targeting - Volume 2 |
| E-mail | 5/2/2001 | Fireman | Lellouche | Mixson and Raider | Stored Value Programs - Volume 4 |
| Email | 5/4/2001 | Fontaine | Serio and Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 5/4/2001 | Fontaine | Serio and Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 5/4/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 5/4/2001 | Geswell | Lellouche | | Aspen - Volume 1 |
| Email | 5/8/2001 | Adam | Raider, Tripp | Lellouche, Hughes, Treiber | Aspen - Volume 4 |
| E-mail | 5/8/2001 | Geswell | Lellouche | | TRS and Entrance Targeting - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/9/2001 | Treiber | Breslin | Raider, Adam, Lellouche | Aspen - Volume 4 |
| Email | 5/11/2001 | Fontaine | Serio, Lellouche and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 5/11/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 5/14/2001 | Cleary | Evans, Treiber, Hughes, Reed and Adam | Coughlin, Crowther, Lellouche and Raider | Retail Emails - Volume 5 |
| E-mail | 5/15/2001 | Evans | Fireman, Bruther, and Raider | Cleary, Coughlin, and Lellouche | Stored Value Programs - Volume 1 |
| E-mail | 5/15/2001 | Adam | Raider, Benson, Litwin, Tripp, Harde, Lellouche, and Treiber | | TRS and Entrance Targeting - Volume 1 |
| Email | 5/16/2001 | Serio | Lellouche | | Retail Emails - Volume 1 |
| Email | 5/16/2001 | Raider | Fireman and Lellouche | | Retail Emails - Volume 3 |
| Email | 5/16/2001 | Fireman | Coughlin, Lellouche and Cleary | | Retail Emails - Volume 3 |
| Email | 5/16/2001 | Raider | Lellouche | | Retail Emails - Volume 7 |
| E-mail | 5/16/2001 | Fireman | Lellouche and Constantine | | Stored Value Programs - Volume 3 |
| Email | 5/17/2001 | Aversano | Bielot, Landy, Tibbs, Ringus, Mattimore, Arcuri, Roseman, Rubin, Fireman and Lellouche | | Retail Emails - Volume 5 |
| E-mail | 5/17/2001 | Bruther | Cleary, Fireman, Coughlin, and Evans | Lellouche, Campanelli, and Grieco | Stored Value Programs - Volume 1 |
| Email | 5/18/2001 | Fontaine | Serio, Lellouche, Fireman, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 5/18/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 5/18/2001 | Adam | Benson, Lellouche | | Aspen - Volume 3 |
| Email | 5/18/2001 | Bruther | Coughlin, Cleary | Lellouche, Campanelli, Grieco | Retail Emails - Volume 1 |
| Email | 5/18/2001 | Aversano | Lellouche | | Retail Emails - Volume 3 |
| Email | 5/18/2001 | Cleary | Lellouche, Raider, Evans, Coughlin, Adam, Hughes, Reed and Treiber | | Retail Emails - Volume 5 |
| Email | 5/18/2001 | Roseman | Lellouche and Fireman | Aversano | Retail Emails - Volume 6 |
| Email | 5/18/2001 | Cleary | Lellouche | | Retail Emails - Volume 7 |
| Email | 5/21/2001 | Fireman | Lellouche | | Retail Emails - Volume 7 |
| Email | 5/22/2001 | Litwin | Cleary, Raider, Lellouche | | Retail Emails - Volume 7 |
| E-mail | 5/22/2001 | Fireman | Coughlin, Bruther, Evans, Cleary, and Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 5/22/2001 | Fireman | Coughlin, Bruther, Lellouche, Cleary, and Evans | | Stored Value Programs - Volume 3 |
| Email | 5/23/2001 | Cleary | Coughlin, Reed and Hughes | Adam, Treiber, Lellouche and Mumm | Retail Emails - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/23/2001 | Raider | Fireman and Lellouche | | Retail Emails - Volume 5 |
| Email | 5/23/2001 | Cleary | Coughlin, Reed and Hughes | Adam, Treiber, Lellouche and Mumm | Retail Emails - Volume 6 |
| Email | 5/23/2001 | Bruther | Lellouche, Cleary, Coughlin, Crowther | Campanelli, Grieco | Retail Emails - Volume 7 |
| Email | 5/24/2001 | Fireman | Litwin, Raider, Lellouche | | OnVantage |
| Email | 5/24/2001 | Fireman | Litwin, Bruther, Raider, Lellouche | | OnVantage |
| Email | 5/24/2001 | Bruther | Lellouche and Raider | Campanelli, Cleary, Coughlin, Grieco and Evans | Retail Emails - Volume 5 |
| Email | 5/24/2001 | Fontaine | Lellouche, Aversano, Bielot, Landy, Tibbs, Ringus, Mattimore and Roseman | Arcuri, Rubin, Mixson, Garofalo, Raider and Porco | Retail Emails - Volume 5 |
| E-mail | 5/24/2001 | DeVoe | Gaffney | | Documents Supplied by Don Jack, January 2006- |
| Email | 5/25/2001 | Fontaine | Lellouche, Fireman and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 5/25/2001 | Tripp | Garofolo | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 5/29/2001 | Raider | Lellouche | | Retail Emails - Volume 1 |
| Email | 5/29/2001 | Gilleaudeau | Aversano, Molligo, Mattimore, Lellouche and Landy | | Retail Emails - Volume 5 |
| Email | 5/30/2001 | Bruther | Lellouche, Raider, Cleary and Coughlin | Campanelli and Grieco | Retail Emails - Volume 5 |
| Email | 5/31/2001 | Adam | Roseman | Benson, Lellouche, Hughes, Bowker | Aspen - Volume 1 |
| Email | 5/31/2001 | Landy | Aversano, Lellouche and Mattimore | | Retail Emails - Volume 3 |
| Email | 6/1/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 6/1/2001 | Fireman | Aversano | Lellouche | Retail Emails - Volume 4 |
| Email | 6/5/2001 | Cleary | Evans and Raider | Bruther, Gaffney, Lellouche and Coughlin | Retail Emails - Volume 6 |
| Email | 6/5/2001 | Cleary | Lellouche, Benson and Giovannone | Adam | Staffing Emails - Volume 2 |
| Email | 6/6/2001 | Cleary | Hughes, Coughlin, Treiber, Reed, Adam | Lellouche | Retail Emails - Volume 1 |
| Email | 6/7/2001 | Cleary | Lellouche, Hughes, Coughlin, Treiber, Reed and Adam | | Retail Emails - Volume 6 |
| Email | 6/7/2001 | Landy | Lellouche, Fireman, Aversano, Mattimore, Roseman, Molligo and Schulman | | Retail Emails - Volume 6 |
| Email | 6/7/2001 | Bruther | Campanelli, Lellouche | Grieco, Cleary | Retail Emails - Volume 8 |
| Email | 6/8/2001 | Fontaine | Lellouche, Fireman, Campanelli and Bruther | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 6/8/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 6/8/2001 | Raider | Lellouche, Fireman | | Aspen - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 6/8/2001 | Raider | Lellouche | | Aspen - Volume 3 |
| Email | 6/8/2001 | Landy | Aversano, Mattimore, Fireman, Lellouche, Nelson and Roseman | | Retail Emails - Volume 5 |
| Email | 6/11/2001 | Cleary | Frauenhoffer | Lellouche | Staffing Emails - Volume 2 |
| Email | 6/12/2001 | Landy | Aversano, Mattimore, Fireman, Lellouche, Roseman and Schulman | | Retail Emails - Volume 5 |
| Email | 6/13/2001 | Bruther | Cleary and Coughlin | Lellouche, Campanelli and Grieco | Retail Emails - Volume 4 |
| Email | 6/13/2001 | Tripp | Lellouche | | Staffing Emails - Volume 1 |
| Email | 6/14/2001 | Treiber | Raider | Lellouche, Adam | Retail Emails - Volume 1 |
| Email | 6/15/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco, Litwin, Mum and McKenna | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 6/15/2001 | Tripp | Lellouche | Raider, Mason, Sellinger | 2001-2001 Salespeople Highlights and Calendar |
| Email | 6/18/2001 | Cleary | Lellouche, Fireman, Raider and Coughlin | | Retail Emails - Volume 4 |
| Email | 6/18/2001 | Cleary | Fireman, Lellouche, Raider and Coughlin | | Retail Emails - Volume 6 |
| Email | 6/18/2001 | Fireman | Cleary, Lellouche, Raider and Coughlin | | Retail Emails - Volume 6 |
| Email | 6/18/2001 | Raider | Cleary, Lellouche, Fireman and Coughlin | | Retail Emails - Volume 6 |
| Email | 6/19/2001 | Serio | Lellouche and Meyer | | Staffing Emails - Volume 1 |
| Email | 6/20/2001 | Adam | Lellouche | | Aspen - Volume 1 |
| E-mail | 6/20/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 6/21/2001 | Raider | Lellouche, Adam and Benson | | Retail Emails - Volume 5 |
| Email | 6/22/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 6/22/2001 | Tripp | Lellouche | Raider, Sellinger, Mason | 2001-2001 Salespeople Highlights and Calendar |
| Email | 6/22/2001 | Bruther | Coughlin, Cleary | Lellouche, Grieco | Retail Emails - Volume 1 |
| Email | 6/22/2001 | Raider | Lellouche | | |
| Email | 6/26/2001 | Treiber | Benson | Lellouche | Aspen - Volume 3 |
| E-mail | 6/26/2001 | Coughlin | Gaffney | Cleary, Campanelli, Lellouche, and Grieco | Stored Value Programs - Volume 3 |
| Email | 6/27/2001 | Treiber | Tripp, Sellinger | Raider, Lellouche, Adam, Hughes | Retail Emails - Volume 1 |
| Email | 6/27/2001 | Treiber | Lellouche | | Retail Emails - Volume 1 |
| Email | 6/28/2001 | Treiber | Raider | Lellouche, Adam, Hughes | Aspen - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 6/28/2001 | Litwin | Bruther, Campanelli, Grieco | Lellouche, Fireman, Raider | iBelong |
| E-mail | 6/28/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| Email | 6/29/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 7/2/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 7/2/2001 | Palko | Lellouche | | Retail Emails - Volume 1 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 1 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 1 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 1 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 2 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 3 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 3 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 3 |
| Email | 7/5/2001 | Litwin | Lellouche | | Aspen - Volume 4 |
| Email | 7/6/2001 | Fontaine | Lellouche, Fireman, Raider, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 7/6/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 7/6/2001 | Roberts | Lellouche | | Staffing Emails - Volume 2 |
| Email | 7/9/2001 | Fontaine | Lellouche and Carlucci | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 7/10/2001 | Bruther | Raider | Lellouche | Aspen - Volume 1 |
| Email | 7/10/2001 | Treiber | Adam | Raider, Lellouche, Hughes and Reed | Retail Emails - Volume 4 |
| Email | 7/11/2001 | Coughlin | Lellouche | | Retail Emails - Volume 4 |
| Email | 7/12/2001 | Litwin | Charboneau, Breslin, Fishkin, Raider, Lellouche | Fontaine, Geswell | Aspen - Volume 1 |
| Email | 7/12/2001 | Litwin | Raider, Fontaine, Sellinger, Hughes, Adam, Lellouche, Bisram, Bowker, Tripp, Treiber | Fireman, McKenna, Mumm | Aspen - Volume 1 |
| Email | 7/12/2001 | Treiber | Raider | Adam, Lellouche | Aspen - Volume 1 |
| Email | 7/12/2001 | Raider | Adam, Litwin | Fireman, Lellouche, Tripp | Aspen - Volume 1 |
| Email | 7/13/2001 | Fontaine | Lellouche, Fireman, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 7/13/2001 | Tripp | Lellouche | Raider, Sellinger, Mason, Silk | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 7/13/2001 | Cleary | Treiber, Reed | MacArthur, Hughes, Raider, Lellouche | Retail Emails - Volume 7 |
| Email | 7/16/2001 | Fontaine | Lellouche | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 7/17/2001 | Treiber | Raider | Lellouche | Retail Emails - Volume 3 |
| Email | 7/17/2001 | Treiber | Raider | Adam, Lellouche and Hughes | Retail Emails - Volume 5 |
| E-mail | 7/17/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 7/18/2001 | Raider | Lellouche, Fireman | | Aspen - Volume 4 |
| Email | 7/18/2001 | Adam | Raider | Treiber and Lellouche | Retail Emails - Volume 4 |
| Email | 7/19/2001 | Raider | Adam, Treiber, Hughes | Lellouche | Aspen - Volume 1 |
| Email | 7/19/2001 | Treiber | Raider, Lellouche | Hughes, Adam | Aspen - Volume 1 |
| Email | 7/19/2001 | Geswell | Lellouche, Hurme and Raider | Cleary and Bruther | Retail Emails - Volume 6 |
| Email | 7/19/2001 | Gaffney | Lellouche and Hurme | Cleary, Bruther, Geswell and Raider | Retail Emails - Volume 6 |
| Email | 7/19/2001 | Porco | Lellouche | | Retail Emails - Volume 6 |
| Email | 7/20/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 7/22/2001 | Litwin | Fishkin | Raider, Adam, Hughes, Lellouche | Aspen - Volume 1 |
| Email | 7/23/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 7/23/2001 | Raider | Roberts | Lellouche | Staffing Emails - Volume 1 |
| Email | 7/23/2001 | Mumm | Raider | Lellouche | Staffing Emails - Volume 2 |
| Email | 7/24/2001 | Cleary | Raider | Lellouche | Retail Emails - Volume 5 |
| Email | 7/24/2001 | Treiber | Adam | Lellouche | Retail Emails - Volume 8 |
| Email | 7/25/2001 | Coughlin | Campanelli | Raider, Cleary, Lellouche, Grieco and Bruther | Retail Emails - Volume 6 |
| Email | 7/27/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco, Litwin and McKenna | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/1/2001 | Pacca | Lellouche | Luteyn | Aspen - Volume 1 |
| Email | 8/1/2001 | Fireman | Raider, Bruther, Tripp, Lellouche | | Retail Emails - Volume 1 |
| Email | 8/1/2001 | Fireman | Raider, Lellouche, Tripp and Bruther | | Retail Emails - Volume 3 |
| Email | 8/3/2001 | Fontaine | Lellouche, Fireman, Bruther, Campanelli, Grieco, Litwin and McKenna | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/3/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 8/6/2001 | Fontaine | Lellouche | | Retail Emails - Volume 3 |
| Email | 8/6/2001 | Fireman | Lellouche | | Retail Emails - Volume 6 |
| Email | 8/7/2001 | Bruther | Lellouche, Benson | Goodkin | Aspen - Volume 1 |
| Email | 8/7/2001 | Pardo | Lellouche | Constantine, Frances, Raider | Aspen - Volume 3 |
| Email | 8/7/2001 | Bruther | Campanelli, Lellouche | Coughlin, Raider | Retail Emails - Volume 1 |
| Email | 8/7/2001 | Coughlin | Bruther | Cleary, Raider, Lellouche | Retail Emails - Volume 1 |
| Email | 8/7/2001 | Adam | Lellouche | | Retail Emails - Volume 4 |
| Email | 8/7/2001 | Bruther | Lellouche, Fireman, Raider and Tripp | Campanelli and Grieco | Retail Emails - Volume 4 |
| Email | 8/8/2001 | Raider | Lellouche | | Retail Emails - Volume 3 |
| Email | 8/8/2001 | Coughlin | Lellouche | | Retail Emails - Volume 3 |
| Email | 8/8/2001 | Hardy | Raider and Fireman | Lellouche and Bruther | Staffing Emails - Volume 1 |
| Email | 8/8/2001 | Bruther | Lellouche and Campanelli | | Retail Emails - Volume 5 |
| E-mail | 8/8/2001 | Fireman | Lellouche and Constantine | Campanelli | Stored Value Programs - Volume 3 |
| Email | 8/10/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco, Campanelli, Litwin and McKenna | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/10/2001 | Tripp | Lellouche | Raider, Sellinger, Silk, Mason | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/10/2001 | Bruther | Lellouche and Campanelli | | Retail Emails - Volume 4 |
| Email | 8/10/2001 | Tripp | Lellouche | Bruther, Fireman and Raider | Retail Emails - Volume 5 |
| Email | 8/10/2001 | Fireman | Lellouche | Campanelli and Constantine | Retail Emails - Volume 6 |
| Email | 8/10/2001 | Tripp | Lellouche | | Retail Emails - Volume 6 |
| E-mail | 8/10/2001 | Fireman | Lellouche | Constantine and Campanelli | Stored Value Programs - Volume 3 |
| Email | 8/13/2001 | Adam | Litwin, Raider, Lellouche, Hughes, Treiber, Bisram, Bowker | Benson | Aspen - Volume 4 |
| Email | 8/13/2001 | Litwin | Lellouche | Raider | Aspen - Volume 4 |
| Email | 8/13/2001 | Tripp | Nicks | Lellouche and Roberts | Staffing Emails - Volume 1 |
| Email | 8/14/2001 | Cleary | Lellouche, Raider, Fireman, Tripp, Treiber, Adam, Coughlin, Bruther, Hughes, Reed | | Retail Emails - Volume 1 |
| E-mail | 8/14/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 8/15/2001 | Fireman | Lellouche, Trip, Raider, and Campanelli | | Retail Emails - Volume 3 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 8/15/2001 | Tripp | Fireman | Raider and Lellouche | |
| E-mail | 8/15/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 8/17/2001 | Fontaine | Lellouche, Fireman, Raider, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 8/17/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 8/17/2001 | Fireman | Crowther, Cleary, Coughlin, Bruther, Lellouche, and Raider | | Stored Value Programs - Volume 3 |
| Email | 8/20/2001 | Bruther | Cleary and Coughlin | Lellouche | Retail Emails - Volume 4 |
| Email | 8/20/2001 | Coughlin | McKenna and Lellouche | Raider, Cleary and Adam | Retail Emails - Volume 6 |
| E-mail | 8/20/2001 | Hurme | Lellouche, Cleary, Bruther, and Campanelli | MacArthur | Stored Value Programs - Volume 4 |
| E-mail | 8/20/2001 | Cleary | Hurme, Bruther, and Campanelli | MacArthur and Lellouche | Stored Value Programs - Volume 4 |
| Email | 8/21/2001 | Raider | Lellouche, Fireman, Adam | | Aspen - Volume 3 |
| Email | 8/21/2001 | Litwin | Lellouche, Raider | | Aspen - Volume 3 |
| Email | 8/21/2001 | Litwin | Lellouche | Raider, Fireman, Adam | Aspen - Volume 4 |
| Email | 8/21/2001 | Adam | Lellouche and McKenna | Benson and Christie | Retail Emails - Volume 4 |
| Email | 8/21/2001 | Adam | Benson, Lellouche, McKenna, Christie | | Retail Emails - Volume 8 |
| Email | 8/21/2001 | Roberts | Christie and Lellouche | | Staffing Emails - Volume 2 |
| Email | 8/23/2001 | Cleary | Raider, Tripp, Lellouche, Coughlin, Fireman | Bruther, MacArthur, Hughes, Treiber, Adam, Reed | Retail Emails - Volume 1 |
| Email | 8/23/2001 | Cleary | Reed, Treiber, Adam and Hughes | Raider, Lellouche, Benson and Coughlin | Retail Emails - Volume 6 |
| Email | 8/24/2001 | Fontaine | Christie, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 8/24/2001 | Mason | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/24/2001 | Silk | Lellouche | Tripp | 2001-2001 Salespeople Highlights and Calendar |
| Email | 8/27/2001 | Nicks | Tripp | Lellouche and Roberts | Staffing Emails - Volume 2 |
| Email | 8/28/2001 | Litwin | Raider, Adam, McKenna, Hughes, Tripp, Lellouche, Fireman | | Aspen - Volume 1 |
| Email | 8/28/2001 | Treiber | Adam, Hughes, Lellouche | | Aspen - Volume 4 |
| Email | 8/28/2001 | Roberts | Lellouche, Nicks and Tripp | | Staffing Emails - Volume 2 |
| Email | 8/29/2001 | Bruther | Fireman | Lellouche | Aspen - Volume 4 |
| Email | 8/29/2001 | Fireman | Lellouche and Christie | | Retail Emails - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 8/29/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 8/29/2001 | Rochelle | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 8/30/2001 | Raider | Lellouche and Bruther | | Retail Emails - Volume 3 |
| E-mail | 8/30/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 8/30/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| Email | 8/31/2001 | Fontaine | Christie, Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 8/31/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 9/4/2001 | Cleary | Fireman | Bruther, Lellouche and Campanelli | Stored Value Programs - Volume 3 |
| E-mail | 9/4/2001 | Fireman | Bruther | Lellouche, Campanelli, and Cleary | Stored Value Programs - Volume 3 |
| E-mail | 9/5/2001 | Fireman | Cleary and Bruther | Lellouche and Campanelli | Stored Value Programs - Volume 3 |
| Email | 9/6/2001 | Treiber | Raider, Adam, Reed, Bowker, Joress, Lellouche, Gilpin, Leo, Litwin, Guttmann, Poulos, Bisram, Reale, Doyle, Crane | | Aspen - Volume 1 |
| Email | 9/6/2001 | Treiber | Christie, Lellouche, Raider, Litwin | Adam, Hughes | Aspen - Volume 1 |
| Email | 9/7/2001 | Fontaine | Christie, Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/7/2001 | Cleary | Lellouche, Fireman, Raider, Tripp, Coughlin, Adam, Bruther, Treiber, Carlucci, Christie and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 9/7/2001 | McKenna | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/7/2001 | Tripp | Lellouche | Raider, Sellinger, Mason, Silk, Christie | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/7/2001 | Hughes | McBean, Raider, Adam, Reed, Bowker, Joress, Lellouche, Gilpin, Leo, Litwin, Guttmann, Poulos, Bisram, Reale, Treiber, Doyle, Crane | | Aspen - Volume 1 |
| E-mail | 9/7/2001 | Cleary | Lellouche, Fireman, Raider, Tripp, Coughlin, Adam, Bruther, Treiber, Carlucci, Christie, and Campanelli | Carlucci, Christie, Campanelli, and Grieco | |
| Email | 9/10/2001 | Cleary | Schulze and Lellouche | | Staffing Emails - Volume 1 |
| Email | 9/10/2001 | Bruther | Lellouche | | Staffing Emails - Volume 2 |
| Email | 9/11/2001 | Cleary | Meyer | Christie and Lellouche | Staffing Emails - Volume 2 |
| Email | 9/13/2001 | Adam | Lellouche, Raider, Tripp | Cleary, Treiber, Hughes | Aspen - Volume 3 |
| Email | 9/13/2001 | Raider | Lellouche | | Retail Emails - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 9/13/2001 | Cleary | Bruther | Lellouche and Coughlin | Retail Emails - Volume 5 |
| Email | 9/13/2001 | Cleary | Lellouche | | Retail Emails - Volume 5 |
| Email | 9/13/2001 | Bruther | Campanelli and Lellouche | Cleary | Retail Emails - Volume 6 |
| Email | 9/13/2001 | Tripp | Lellouche | Bruther and Raider | Staffing Emails - Volume 2 |
| Email | 9/13/2001 | Raider | Lellouche | Bruther | Staffing Emails - Volume 2 |
| Email | 9/14/2001 | Fontaine | Christie, Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 9/14/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/14/2001 | Ma | Lellouche | Gaffney, Borzumato, McMellin, Sanjani, Christie, Harde, Bruther, Campanelli, Benson | Aspen - Volume 1 |
| Email | 9/14/2001 | Bruther | Lellouche and Campanelli | Tripp | Retail Emails - Volume 6 |
| Email | 9/17/2001 | Bruther | Lellouche and Campanelli | | Retail Emails - Volume 3 |
| Email | 9/17/2001 | Lellouche | Bruther | | Retail Emails - Volume 7 |
| Email | 9/18/2001 | Bruther | Lellouche, Treiber, Raider, Adam | | Aspen - Volume 4 |
| Email | 9/18/2001 | Bruther | Lellouche, Treiber, Raider, Adam | | Aspen - Volume 4 |
| Email | 9/19/2001 | Treiber | Lellouche, Raider, Adam, Bruther | | Aspen - Volume 4 |
| Email | 9/19/2001 | Treiber | Lellouche | Raider, Adam, Reed and Cleary | Retail Emails - Volume 6 |
| Email | 9/19/2001 | Raider | Treiber, Lellouche | Adam, Reed, Cleary | Retail Emails - Volume 7 |
| Email | 9/20/2001 | McKenna | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/20/2001 | McKenna | Adam | Lellouche | Retail Emails - Volume 2 |
| Email | 9/20/2001 | Adam | Lellouche and McKenna | | Retail Emails - Volume 3 |
| Email | 9/20/2001 | Cleary | Sheridan | Lellouche | Staffing Emails - Volume 2 |
| E-mail | 9/20/2001 | Jack | Bruther | | Documents Supplied by Don Jack, January 2006- |
| Email | 9/21/2001 | Fontaine | Christie, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 9/21/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/21/2001 | Treiber | Lellouche | Raider | Aspen - Volume 4 |
| Email | 9/21/2001 | Conn | Dittrich, Mason, Litwin and Bedell | Roberts, Belka and Lellouche | Staffing Emails - Volume 1 |
| E-mail | 9/21/2001 | Fontaine | Christie, Lellouche, Fireman, and Campanelli | Bruther, Grieco, and Litwin | Henri Lellouche Document Production General Bi |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 9/25/2001 | Treiber | Cleary, Lellouche, Fireman, Raider, Tripp, Coughlin, Adam, Bruther, Christie, Campanelli | | Aspen - Volume 1 |
| Email | 9/25/2001 | Fontaine | Lellouche | | Retail Emails - Volume 1 |
| Email | 9/27/2001 | McKenna | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 9/27/2001 | Cleary | Lellouche | | Retail Emails - Volume 7 |
| E-mail | 9/27/2001 | Cleary | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 9/28/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 9/28/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| E-mail | 9/28/2001 | Fireman | Lellouche | | |
| E-mail | 9/28/2001 | Fireman | Grieco | Lellouche and Bruther | Stored Value Programs - Volume 3 |
| E-mail | 9/28/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli, and Grieco | Bruther, Litwin, and McKenna | Henri Lellouche Document Production General Bi |
| Email | 10/2/2001 | Litwin | Lellouche | | Retail Emails - Volume 2 |
| Email | 10/2/2001 | Litwin | Lellouche | | Retail Emails - Volume 3 |
| E-mail | 10/2/2001 | Bruther | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/2/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 4 |
| Email | 10/3/2001 | Treiber | Lellouche | Adam, Raider | Aspen - Volume 1 |
| Email | 10/3/2001 | Litwin | Treiber | Raider, Lellouche, Adam | Aspen - Volume 4 |
| Email | 10/3/2001 | Treiber | Lellouche | | Aspen - Volume 4 |
| Email | 10/5/2001 | Fontaine | Christie, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 10/5/2001 | McKenna | Fontaine | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/5/2001 | Raider | Lellouche, Campanelli | | Retail Emails - Volume 1 |
| Email | 10/5/2001 | McKenna | Lellouche | | Retail Emails - Volume 3 |
| Email | 10/5/2001 | Coughlin | McKenna | Geswell, Cleary and Lellouche | Retail Emails - Volume 4 |
| E-mail | 10/5/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/5/2001 | Fontaine | Christie, Lellouche, Fireman, and Campanelli | Grieco, Bruther, Litwin, and McKenna | Henri Lellouche Document Production General Bi |
| Email | 10/8/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/9/2001 | Treiber | Raider, Lellouche | Adam | Aspen - Volume 3 |
| E-mail | 10/9/2001 | Bruther | Lellouche | | Stored Value Programs - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| E-mail | 10/9/2001 | Fireman | Christie | Lellouche | Stored Value Programs - Volume 3 |
| Email | 10/10/2001 | Raider | Bruther | Cleary, Lellouche | Aspen - Volume 1 |
| Email | 10/10/2001 | Treiber | McKenna | Raider, Lellouche, Adam | Retail Emails - Volume 1 |
| Email | 10/10/2001 | Treiber | McKenna | Raider, Lellouche, Adam | Retail Emails - Volume 1 |
| E-mail | 10/10/2001 | Bruther | Fireman and Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/10/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 10/11/2001 | Treiber | Christie, Lellouche, Fireman, Raider, Cleary, Tripp, Coughlin | Grieco, Adam, Bruther, Campanelli | Aspen - Volume 1 |
| Email | 10/11/2001 | Lellouche | Raider | Treiber | Aspen - Volume 4 |
| Email | 10/12/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 10/12/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/12/2001 | Tripp | Roberts | Conn and Lellouche | Staffing Emails - Volume 2 |
| E-mail | 10/12/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/12/2001 | Lellouche | Constantine | Fireman | Stored Value Programs - Volume 3 |
| E-mail | 10/12/2001 | Constantine | Lellouche and Campanelli | Christie and Fireman | Stored Value Programs - Volume 4 |
| E-mail | 10/12/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli, and Grieco | Bruther, Litwin, and McKenna | Henri Lellouche Document Production General Bi |
| Email | 10/15/2001 | Raider | Lellouche | Adam | Aspen - Volume 3 |
| E-mail | 10/15/2001 | Fireman | Lellouche | Bruther and Campanelli | Stored Value Programs - Volume 3 |
| Email | 10/16/2001 | Adam | Lellouche | | Aspen - Volume 3 |
| E-mail | 10/16/2001 | Fireman | Lellouche, Campanelli, and Bruther | Constantine | Stored Value Programs - Volume 3 |
| E-mail | 10/16/2001 | Fireman | Lellouche and Constantine | | Stored Value Programs - Volume 3 |
| E-mail | 10/16/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 10/17/2001 | Cleary | McKenna and Coughlin | Lellouche | Retail Emails - Volume 6 |
| Email | 10/18/2001 | McKenna | Lellouche | Litwin, Fontaine | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/18/2001 | Roberts | Lellouche | | Staffing Emails - Volume 1 |
| E-mail | 10/18/2001 | Fireman | Lellouche, Christie, Campanelli | Constantine | Stored Value Programs - Volume 3 |
| E-mail | 10/18/2001 | Constantine | Fireman and Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/18/2001 | Fireman | Constantine | Lellouche and Christie | Stored Value Programs - Volume 3 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 10/19/2001 | Fontaine | Christie, Lellouche, Campanelli and Fireman | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 10/19/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/19/2001 | Treiber | Bruther, Adam | Lellouche | Aspen - Volume 4 |
| Email | 10/19/2001 | Kroc | Lellouche | Garofalo | Retail Emails - Volume 8 |
| E-mail | 10/19/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/19/2001 | Fontaine | Christie, Lellouche, Campanelli, Fireman | Grieco, Bruther, Litwin, and McKenna | Henri Lellouche Document Production General Bi |
| Email | 10/22/2001 | Treiber | Lellouche | | Aspen - Volume 4 |
| Email | 10/22/2001 | Treiber | Lellouche | | Aspen - Volume 1 |
| Email | 10/22/2001 | Coughlin | Lellouche | | Retail Emails - Volume 3 |
| Email | 10/22/2001 | McKenna | Cleary | Coughlin and Lellouche | Retail Emails - Volume 4 |
| Email | 10/22/2001 | Tripp | Lellouche and Raider | Silk | Staffing Emails - Volume 1 |
| E-mail | 10/22/2001 | Moreno | Lellouche | Cole | Stored Value Programs - Volume 3 |
| E-mail | 10/22/2001 | Christie | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 10/23/2001 | Coughlin | Geswell | McKenna and Lellouche | Retail Emails - Volume 4 |
| E-mail | 10/23/2001 | Fireman | Lellouche, Christie, and Geswell | | Stored Value Programs - Volume 2 |
| E-mail | 10/23/2001 | DeVoe | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/23/2001 | Fireman | Cleary, Lellouche, and Bruther | | Stored Value Programs - Volume 3 |
| E-mail | 10/23/2001 | Constantine | Lellouche and Campanelli | Constantine, Christie, and Fireman | Stored Value Programs - Volume 3 |
| E-mail | 10/24/2001 | Fireman | Lellouche, Constantine, and Campanelli | Christie | Stored Value Programs - Volume 3 |
| E-mail | 10/24/2001 | Fireman | Lellouche, Constantine, and Campanelli | Christie | Stored Value Programs - Volume 3 |
| E-mail | 10/25/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/25/2001 | Aversano | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/25/2001 | Bruther | Lellouche and Campanelli | | Stored Value Programs - Volume 3 |
| E-mail | 10/25/2001 | Rochelle | Lellouche | Christie and Constantine | Stored Value Programs - Volume 3 |
| E-mail | 10/25/2001 | Russo | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/25/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 10/26/2001 | Fontaine | Christie, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 10/26/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/26/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 10/26/2001 | Roberts | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 10/26/2001 | Fontaine | Christie, Lellouche, Fireman, and Campanelli | Bruther, Grieco, Litwin, McKenna, and LeJeunesse | Henri Lellouche Document Production General Bi |
| Email | 10/29/2001 | LeJeunesse | Lellouche | | Aspen - Volume 4 |
| Email | 10/30/2001 | Fontaine | Lellouche | | Retail Emails - Volume 1 |
| Email | 10/30/2001 | Fontaine | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 10/30/2001 | Christie | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/30/2001 | Christie | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 10/30/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 10/31/2001 | Christie | Carlucci | Lellouche | Stored Value Programs - Volume 2 |
| Email | 11/1/2001 | McKenna | Lellouche | Fontaine, Litwin, LeJeunesse | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/1/2001 | Adam | Benson, Lellouche | Treiber | Aspen - Volume 3 |
| Email | 11/1/2001 | Adam | Reale, Gilpin, Treiber | Benson, Lellouche, Litwin, Raider | Aspen - Volume 4 |
| Email | 11/1/2001 | Treiber | Benson, Lellouche, Raider, Litwin | Adam | Aspen - Volume 4 |
| Email | 11/1/2001 | Coughlin | McKenna | Lellouche and Cleary | Retail Emails - Volume 4 |
| E-mail | 11/1/2001 | Davenport | Lellouche | | Stored Value Programs - Volume 2 |
| Email | 11/2/2001 | LeJeunesse | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/2/2001 | Silk | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/2/2001 | Silk | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/2/2001 | Mason | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/2/2001 | Mason | Lellouche, Tripp | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/2/2001 | Treiber | Raider | Adam and Lellouche | Retail Emails - Volume 6 |
| Email | 11/5/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/5/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/5/2001 | Bruther | Raider | Lellouche | iBelong |
| E-mail | 11/5/2001 | Fontaine | Lellouche, Fireman, Bruther, Grieco, and Campanelli | Litwin, McKenna, and LeJeunesse | Henri Lellouche Document Production General Bi |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 11/6/2001 | Bruther | Raider, Lellouche | | iBelong |
| Email | 11/6/2001 | Fireman | Raider, Lellouche, Bruther | | Retail Emails - Volume 2 |
| Email | 11/7/2001 | Raider | Lellouche | | Retail Emails - Volume 2 |
| Email | 11/7/2001 | Crowther | Lellouche | | Retail Emails - Volume 5 |
| E-mail | 11/7/2001 | Bruther | Breece | Lellouche and Campanelli | Stored Value Programs - Volume 3 |
| E-mail | 11/8/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/8/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/8/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/8/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/8/2001 | Fireman | Bruther and Lellouche | | Stored Value Programs - Volume 3 |
| Email | 11/9/2001 | Fontaine | Christie, Lellouche, Fireman and Campanelli | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 11/9/2001 | LeJeunesse | SS I Group-Direct | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/9/2001 | McKenna | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/9/2001 | Tripp | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/9/2001 | Litwin | Raider, McKenna, Lellouche, LeJeunesse, Bruther, Treiber, Campanelli, Gillin | | Promotions |
| Email | 11/9/2001 | Treiber | Lellouche, Adam and McKenna | | Retail Emails - Volume 4 |
| Email | 11/9/2001 | Cleary | Christie, Lellouche, Tripp, Silk, Mason, Michaels, Bruther, Sonsky, and Sellinger | Campanelli | Retail Sales Meetings 2002-2003 |
| Email | 11/9/2001 | Cleary | Christie, Lellouche, Raider, McKenna, LeJeunesse, Gillin, Litwin, Coughlin, Treiber and Bruther | Garofalo, Campanelli, Grieco and Fontaine | Retail Sales Meetings 2002-2003 |
| E-mail | 11/9/2001 | Fireman | Bruther, Cleary, Lellouche, Crowther, and Coughlin | | Stored Value Programs - Volume 3 |
| E-mail | 11/9/2001 | Fireman | Cleary, Bruther, Lellouche, Crowther, and Coughlin | Campanelli | Stored Value Programs - Volume 3 |
| E-mail | 11/9/2001 | Fontaine | Christie, Lellouche, Fireman, and Campanelli | Bruther, Litwin, and Grieco | Henri Lellouche Document Production General Bi |
| E-mail | 11/9/2001 | Cleary | Christie, Lellouche, Tripp, Silk, Mason, Michels, Bruther, Sonsky, and Sellinger | Campanelli and Mixson | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/12/2001 | Holzhacker | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/12/2001 | Holzhacker | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 11/13/2001 | Treiber | Adam | Hughes, Raider and Lellouche | Retail Emails - Volume 6 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 11/13/2001 | Adam | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 11/13/2001 | Gaffney | Jack | Racano | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/13/2001 | Sellinger | Christie, Lellouche, Tripp, Campanelli, Bruther, Cleary, Silk, Mason, Michels, and Sonsky | | Miscellaneous Meeting Minute E-mails |
| Email | 11/14/2001 | Bruther | Lellouche | | Retail Emails - Volume 5 |
| E-mail | 11/14/2001 | Tripp | Lellouche | Adam and Silk | TRS and Entrance Targeting - Volume 2 |
| Email | 11/15/2001 | LeJeunesse | Lellouche | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/15/2001 | LeJeunesse | Adam | Lellouche | Retail Emails - Volume 1 |
| Email | 11/15/2001 | Raider | Lellouche, Campanelli | Bruther, Fireman, Tripp | Retail Emails - Volume 1 |
| Email | 11/15/2001 | McKenna | Constantine | Lellouche | Retail Emails - Volume 3 |
| Email | 11/15/2001 | McKenna | Coughlin | Lellouche and Cleary | Retail Emails - Volume 6 |
| Email | 11/15/2001 | Coughlin | McKenna | Lellouche and Cleary | Retail Emails - Volume 6 |
| E-mail | 11/15/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 11/15/2001 | Harde | Adam, Tripp, and Lellouche | Silk | TRS and Entrance Targeting - Volume 2 |
| Email | 11/16/2001 | Fontaine | Christie, Lellouche, Bruther, Campanelli and Grieco | | 2000 – 2001 Highlights and Minutes - Volume 1 |
| Email | 11/16/2001 | Mason | Lellouche, Tripp | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/16/2001 | McKenna | Lellouche | Fontaine, Gillin, Litwin, LeJeunesse | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/16/2001 | Michels | Lellouche, Tripp | | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/16/2001 | Treiber | Raider | Lellouche, Adam | Retail Emails - Volume 1 |
| Email | 11/16/2001 | Bruther | Lellouche | Raider | Retail Emails - Volume 5 |
| Email | 11/16/2001 | McKenna | Coughlin | Lellouche and Cleary | Retail Emails - Volume 6 |
| Email | 11/16/2001 | Fontaine | Lellouche | | Retail Sales Meetings 2002-2003 |
| E-mail | 11/16/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 11/16/2001 | Holzhacker | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 11/16/2001 | Fontaine | Christie, Lellouche, Bruther, Campanelli, and Grieco | Litwin and Fireman | Henri Lellouche Document Production General Bi |
| Email | 11/19/2001 | Tripp | Lellouche | Raider, Sellinger, Mason, Silk, Michels, Christie | 2001-2001 Salespeople Highlights and Calendar |
| Email | 11/19/2001 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 11/20/2001 | McKenna | Lellouche | | Retail Emails - Volume 3 |
| Email | 11/20/2001 | McKenna | Lellouche and Coughlin | Cleary, Adam and Treiber | Retail Emails - Volume 6 |
| Email | 11/20/2001 | Coughlin | McKenna and Lellouche | Cleary, Adam and Treiber | Retail Emails - Volume 6 |
| Email | 11/21/2001 | LeJeunesse | SS I Group-Direct | | Retail Sales Meetings 2002-2003 |
| E-mail | 11/23/2001 | Fireman | Lellouche | Christie | Stored Value Programs - Volume 3 |
| Email | 11/26/2001 | Fontaine | Lellouche and Christie | | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Email | 11/26/2001 | Fontaine | Christie, Lellouche, Fireman | Bruther, Litwin, LeJeunesse, Gillin, Grieco, Campanelli, LeWorthy | Retail Sales Meetings 2002-2003 |
| Email | 11/26/2001 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, LeWorthy, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 11/26/2001 | Gillin | Lellouche | McKenna, LeJeunesse and Litwin | Retail Sales Meetings 2002-2003 |
| Email | 11/26/2001 | McKenna | Lellouche | Fontaine, Gillin, LeJeunesse and Litwin | Retail Sales Meetings 2002-2003 |
| Email | 11/26/2001 | LeWorthy | Annis-Lopez | Christie, Harde, Lellouche and Jenson | Staffing Emails - Volume 2 |
| E-mail | 11/26/2001 | Fontaine | Lellouche | Fireman, Raider, Cleary, Adam, Treiber, Coughlin, Tripp, Bruther, and LeWorthy | Henri Lellouche Document Production General Bi |
| E-mail | 11/26/2001 | Sellinger | Christie, Lellouche, Tripp, Campanelli, Cleary, Bruther, Silk, Mason, Michels, Sonksy | | Miscellaneous Meeting Minute E-mails |
| Email | 11/28/2001 | Treiber | Lellouche | Raider, Adam | Retail Emails - Volume 1 |
| E-mail | 11/28/2001 | Adam | Christie | Benson, Harde, and Lellouche | TRS and Entrance Targeting - Volume 1 |
| E-mail | 11/28/2001 | Sellinger | Christie, Lellouche, Tripp, Campanelli, Cleary, Bruther, Silk, Mason, Michels, Sonksy | | Miscellaneous Meeting Minute E-mails |
| Email | 11/29/2001 | Raider | Lellouche | Adam, Hughes, Treiber | Retail Emails - Volume 1 |
| Email | 11/29/2001 | Treiber | Lellouche | Adam | Retail Emails - Volume 1 |
| Email | 11/29/2001 | Cleary | Lellouche | Coughlin | Staffing Emails - Volume 2 |
| Email | 11/30/2001 | Treiber | Tripp, Raider | Lellouche, Adam, Hughes, Sellinger | Retail Emails - Volume 1 |
| Email | 11/30/2001 | LeJeunesse | Lellouche, Christie | | Retail Emails - Volume 7 |
| Email | 11/30/2001 | LeJeunesse | Christie, Lellouche | | Retail Emails - Volume 7 |
| Email | 11/30/2001 | Fontaine | Lellouche, Campanelli, Bruther, Fireman, Grieco, Litwin | | Retail Sales Meetings 2002-2003 |
| Email | 11/30/2001 | Lellouche | SS I Group-Direct | | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 11/30/2001 | Bruther | Fireman and Lellouche | Campanelli and Christie | Stored Value Programs - Volume 1 |
| Email | 12/2/2001 | Treiber | Lellouche and Raider | Adam, Hughes, Reale and Cleary | Retail Emails - Volume 6 |
| Email | 12/3/2001 | LeJeunesse | Lellouche and Christie | | Retail Emails - Volume 4 |
| Email | 12/3/2001 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, LeWorthy, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 12/3/2001 | Gillin | Lellouche | McKenna and LeJeunesse | Retail Sales Meetings 2002-2003 |
| Email | 12/3/2001 | McKenna | Lellouche | Fontaine, Gillin, Litwin and LeJeunesse | Retail Sales Meetings 2002-2003 |
| E-mail | 12/3/2001 | Fireman | Lellouche and Bruther | | Stored Value Programs - Volume 1 |
| Email | 12/4/2001 | Treiber | Raider and Lellouche | Adam | Retail Emails - Volume 4 |
| E-mail | 12/4/2001 | Fireman | Constantine | Lellouche | Stored Value Programs - Volume 1 |
| Email | 12/5/2001 | Litwin | Lellouche | Adam, Raider | Aspen - Volume 4 |
| Email | 12/5/2001 | Tripp | Mason, Silk, Michels | Lellouche | Donations Direct |
| Email | 12/6/2001 | Gillin | Adam | Lellouche and Coughlin | Retail Emails - Volume 4 |
| Email | 12/7/2001 | Cleary | Raider, Lellouche, Adam, Treiber, Reed | Coughlin | Retail Emails - Volume 1 |
| Email | 12/7/2001 | Hughes | Benson, Raider and Lellouche | Adam and Litwin | Retail Emails - Volume 6 |
| Email | 12/7/2001 | Gillin | Lellouche | McKenna and LeJeunesse | Retail Sales Meetings 2002-2003 |
| Email | 12/7/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | Bruther, Litwin, McKenna, LeJeunesse and Gillin | Retail Sales Meetings 2002-2003 |
| Email | 12/7/2001 | LeJeunesse | SS I Group-Direct | | Retail Sales Meetings 2002-2003 |
| Email | 12/9/2001 | McKenna | Lellouche | Gillin, Litwin, Fontaine and LeJeunesse | Retail Sales Meetings 2002-2003 |
| Email | 12/11/2001 | Adam | Lellouche, Fireman, Raider, McKenna, Treiber, Litwin, LeJeunesse, Gillin | Benson | Microsites |
| Email | 12/11/2001 | Yarzynski | Lellouche, Christie, Jenson | | Retail Emails - Volume 7 |
| E-mail | 12/11/2001 | Sellinger | Christie, Lellouche, Tripp, Michels, Silk, Mason, Cleary, Bruther, Sonksy, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 12/12/2001 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 12/13/2001 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 4 |
| Email | 12/14/2001 | Adam | Lellouche | Benson | Retail Emails - Volume 4 |
| Email | 12/14/2001 | Treiber | McKenna | Adam, Lellouche | Retail Emails - Volume 7 |
| Email | 12/14/2001 | Fontaine | Lellouche | | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 12/14/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | Bruther, Litwin, LeJeunesse, McKenna and Gillin | Retail Sales Meetings 2002-2003 |
| Email | 12/14/2001 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | Bruther, McKenna, Gillin and LeJeunesse | Retail Sales Meetings 2002-2003 |
| Email | 12/14/2001 | Gillin | Lellouche | Litwin, McKenna and LeJeunesse | Retail Sales Meetings 2002-2003 |
| E-mail | 12/14/2001 | Fireman | Constantine | Lellouche | Stored Value Programs - Volume 1 |
| E-mail | 12/14/2001 | Adam | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 12/14/2001 | Bruther | Adam, Lellouche, and Campanelli | | TRS and Entrance Targeting - Volume 2 |
| Email | 12/17/2001 | Treiber | Lellouche | | Retail Emails - Volume 7 |
| Email | 12/17/2001 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, LeWorthy, Litwin, McKenna, Raider and Treiber | Campanelli, Cleary, Fontaine, Garofalo and Grieco | Retail Sales Meetings 2002-2003 |
| E-mail | 12/17/2001 | Fireman | Constantine | Lellouche and Fontaine | Stored Value Programs - Volume 2 |
| E-mail | 12/17/2001 | Bruther | Adam | Lellouche and Campanelli | TRS and Entrance Targeting - Volume 2 |
| E-mail | 12/18/2001 | Christie | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| Email | 12/19/2001 | Bruther | Lellouche | | Aspen - Volume 1 |
| Email | 12/19/2001 | Bruther | LeJeunesse | Lellouche | Aspen - Volume 4 |
| E-mail | 12/19/2001 | Fireman | Constantine and Lellouche | | Stored Value Programs - Volume 1 |
| Email | 12/20/2001 | Bruther | Raider, McKenna, LeJeunesse, Gillin | Lellouche, Christie | Aspen - Volume 1 |
| Email | 12/20/2001 | Litwin | Lellouche | Raynforth | Aspen - Volume 1 |
| Email | 12/20/2001 | Adam | Raider, Fireman, Litwin, McKenna, LeJeunesse, Gillin | Lellouche, Treiber | Microsites |
| Email | 12/20/2001 | Gillin | Christie, Lellouche | | Retail Sales Meetings 2002-2003 |
| E-mail | 12/20/2001 | Sellinger | Christie, Lellouche, Tripp, Michels, Silk, Mason, Cleary, Bruther, and Sonsky | | Miscellaneous Meeting Minute E-mails |
| Email | 12/21/2001 | Tripp | Lellouche | Fireman | Donations Direct |
| Email | 12/21/2001 | Bruther | Treiber, Cleary, Adam and LeJeunesse | Lellouche | Retail Emails - Volume 3 |
| Email | 12/21/2001 | Gillin | Lellouche | LeJeunesse and McKenna | Retail Sales Meetings 2002-2003 |
| E-mail | 12/21/2001 | Bruther | Christie and Lellouche | Campanelli | TRS and Entrance Targeting - Volume 2 |
| Email | 12/26/2001 | McKenna | Lellouche | Fontaine, Gillin, LeJeunesse and Litwin | Retail Sales Meetings 2002-2003 |
| Email | 12/26/2001 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 12/28/2001 | LeJeunesse | Lellouche | | Retail Emails - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| Email | 1/3/2002 | Raider | Christie, Lellouche | | Retail Emails - Volume 1 |
| E-mail | 1/3/2002 | Litwin | Lellouche | Fireman, Fontaine and Raider | Stored Value Programs - Volume 2 |
| E-mail | 1/3/2002 | Sellinger | Christie, Lellouche, Tripp, Cleary, Bruther, Sonsky, Silk, Mason, Michels, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 1/4/2002 | Treiber | Lellouche | | Retail Emails - Volume 3 |
| Email | 1/4/2002 | Treiber | Lellouche and Raider | Adam and Hughes | Retail Emails - Volume 6 |
| Email | 1/4/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, LeWorthy, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 1/4/2002 | Fontaine | Christie, Lellouche, Fireman, McKenna, Litwin, LeJeunesse, Gillin | Bruther, Grieco and Campanelli | Retail Sales Meetings 2002-2003 |
| Email | 1/4/2002 | Gillin | Lellouche | McKenna, LeJeunesse and Raider | Retail Sales Meetings 2002-2003 |
| E-mail | 1/4/2002 | Adam | Lellouche, Bruther, and Raider | Harde | TRS and Entrance Targeting - Volume 1 |
| E-mail | 1/4/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/4/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/4/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/4/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/4/2002 | Racano | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 1/4/2002 | Racano | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 1/4/2002 | Racano | Ludwig | | Deb Wolfe Documents V. 1 |
| Email | 1/7/2002 | Fontaine | Lellouche, Fireman | | Donations Direct |
| Email | 1/7/2002 | Litwin | Lellouche | | Microsites |
| Email | 1/7/2002 | Litwin | Lellouche, Raider, Adam | | Retail Emails - Volume 1 |
| Email | 1/7/2002 | McKenna | Lellouche | Gillin, Raider, Fontaine, LeJeunesse, Litwin and LeWorthy | Retail Sales Meetings 2002-2003 |
| Email | 1/7/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 1/8/2002 | Gillin | Lellouche | | Retail Emails - Volume 7 |
| Email | 1/9/2002 | Tripp | Mason, Silk, Michels | Sellinger, Lellouche | Donations Direct |
| Email | 1/9/2002 | Adam | Gillin, Lellouche | | Microsites |
| Email | 1/9/2002 | Adam | Lellouche | | Microsites |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| Email | 1/9/2002 | Adam | Gillin, Lellouche | | Microsites |
| Email | 1/9/2002 | Adam | Gillin, Lellouche | | Microsites |
| Email | 1/9/2002 | Raider | Bruther, Lellouche | Quinn | Retail Emails - Volume 1 |
| E-mail | 1/9/2002 | Jack | Racano | Ludwig | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/9/2002 | Jack | Racano | Ludwig | Documents Supplied by Don Jack, January 2006- |
| E-mail | 1/9/2002 | Jack | Racano | Ludwig | Documents Supplied by Don Jack, January 2006 |
| E-mail | 1/9/2002 | Jack | Racano | Ludwig | Deb Wolfe Documents V. 1 |
| Email | 1/11/2002 | LeJeunesse | Adam, Christie, Fireman, Jenson, Lellouche, Tripp | | Retail Emails - Volume 7 |
| Email | 1/11/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli and Grieco | Bruther and Litwin | Retail Sales Meetings 2002-2003 |
| Email | 1/12/2002 | McKenna | Lellouche | Fontaine, LeJeunesse, Litwin and Gillin | Retail Sales Meetings 2002-2003 |
| Email | 1/14/2002 | Cleary | Lellouche | | Retail Emails - Volume 2 |
| Email | 1/14/2002 | Fontaine | Lellouche | | Retail Sales Meetings 2002-2003 |
| Email | 1/14/2002 | Gillin | Lellouche, LeJeunesse, McKenna, Raider | Kroc and Sutherland | Retail Sales Meetings 2002-2003 |
| Email | 1/14/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| E-mail | 1/14/2002 | Michels | Tripp and Lellouche | Mason, Silk, Raider, Sellinger, and Christie | Miscellaneous Meeting Minute E-mails |
| Email | 1/15/2002 | Adam | Lellouche | | Microsites |
| Email | 1/15/2002 | Adam | Lellouche | | Microsites |
| E-mail | 1/15/2002 | Peiser | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 1/15/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Bruther, Campanelli, Sonsky | | Miscellaneous Meeting Minute E-mails |
| Email | 1/16/2002 | Fireman | Lellouche | | Donations Direct |
| Email | 1/16/2002 | Adam | Lellouche | | Microsites |
| Email | 1/16/2002 | Adam | Lellouche | | Microsites |
| Email | 1/16/2002 | Raider | Lellouche | | Microsites |
| Email | 1/16/2002 | Harde | Lellouche, Raider, Adam | Litwin, Fireman | Microsites |
| Email | 1/16/2002 | Stasiewicz | Lellouche | Adam | Microsites |
| Email | 1/16/2002 | Bruther | Lellouche | Adam and Campanelli | Retail Emails - Volume 6 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 1/16/2002 | Coughlin | Reed | Cleary, Hughes, Gillin and McMellin | Retail Emails - Volume 6 |
| Email | 1/16/2002 | Coughlin | Gillin and Lellouche | Cleary | Retail Emails - Volume 6 |
| Email | 1/16/2002 | Gillin | Kroc, Sutherland, Webber, Emmel, Eckman | Lellouche | Retail Sales Meetings 2002-2003 |
| Email | 1/17/2002 | Tripp | Cleary, Coughlin | Lellouche | Donations Direct |
| Email | 1/17/2002 | Tripp | Mason, Silk, Michels | Sellinger, Lellouche, Sonsky | Donations Direct |
| Email | 1/17/2002 | Tripp | Lellouche | | Donations Direct |
| Email | 1/17/2002 | Litwin | Raynforth | Lellouche | Microsites |
| E-mail | 1/17/2002 | Bruther | Gillin, LeJeunesse, Mason, Michels, Sellinger. Silk, Tripp, Cleary, Coughlin, Sonsky, Raider, and McKenna | Christie and Lellouche | Miscellaneous Meeting Minute E-mails |
| Email | 1/18/2002 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 4 |
| Email | 1/18/2002 | Coughlin | Lellouche, Bruther and Campanelli | | Retail Emails - Volume 6 |
| Email | 1/18/2002 | Fontaine | Christie, Lellouche, Campanelli, Grieco, Bruther | Litwin, McKenna, LeJeunesse, Gillin | Retail Sales Meetings 2002-2003 |
| Email | 1/18/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, LeWorthy, Litwin, McKenna, Raider and Treiber | Campanelli, Cleary, Fontaine, Garofalo and Grieco | Retail Sales Meetings 2002-2003 |
| Email | 1/18/2002 | Gillin | Lellouche | McKenna, LeJeunesse, Raider, Kroc, Eckman and Rubber | Retail Sales Meetings 2002-2003 |
| Email | 1/18/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 1/21/2002 | LeJeunesse | Lellouche | | Retail Emails - Volume 7 |
| Email | 1/23/2002 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 4 |
| Email | 1/23/2002 | Raider | Lellouche | | Retail Emails - Volume 5 |
| Email | 1/23/2002 | LeJeunesse | Treiber and Adam | Lellouche and Litwin | Retail Emails - Volume 5 |
| Email | 1/23/2002 | Hurme | Cleary, Bruther and Ludwig | Sellinger, Coughlin, Lellouche, Gillin and Cappucci | Retail Emails - Volume 6 |
| Email | 1/23/2002 | Benson | Adam and Lellouche | | Retail Emails - Volume 7 |
| Email | 1/23/2002 | LeJeunesse | Lellouche | Litwin | Retail Sales Meetings 2002-2003 |
| Email | 1/23/2002 | McKenna | Lellouche | Raider, Litwin, LeJeunesse, Gillin, Fontaine | Retail Sales Meetings 2002-2003 |
| E-mail | 1/23/2002 | Fontaine | Lellouche and Fireman | | Stored Value Programs - Volume 2 |
| E-mail | 1/23/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 1/23/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 1/23/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 1/23/2002 | Fontaine | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 1/24/2002 | Borrow | Lellouche, Raider | Campanelli, Racano, Quinn | Retail Emails - Volume 1 |
| Email | 1/24/2002 | Treiber | Lellouche | Adam, Hughes and Reale | Retail Emails - Volume 3 |
| Email | 1/25/2002 | Gillin | Adam, Lellouche | | Microsites |
| Email | 1/25/2002 | Treiber | LeJeunesse | Lellouche and Adam | Retail Emails - Volume 6 |
| Email | 1/25/2002 | Treiber | Lellouche | Adam, Hughes, Reale and LeJeunesse | Retail Emails - Volume 7 |
| Email | 1/25/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| E-mail | 1/25/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Campanelli, and Bruther | | Miscellaneous Meeting Minute E-mails |
| Email | 1/26/2002 | Litwin | Lellouche | Adam, Lear | EDialog |
| Email | 1/28/2002 | Fontaine | Lellouche, Christie, Bruther, Campanelli, Grieco | | Retail Sales Meetings 2002-2003 |
| Email | 1/28/2002 | Fontaine | Lellouche, Christie, Bruther, Campanelli, and Grieco | | Retail Sales Meetings 2002-2003 |
| Email | 1/28/2002 | Gillin | Lellouche, LeJeunesse, McKenna and Raider | Kroc, Eckman, Webber and Sutherland | Retail Sales Meetings 2002-2003 |
| Email | 1/29/2002 | Fireman | Lellouche | | Donations Direct |
| Email | 1/29/2002 | Raider | Lellouche | | Retail Emails - Volume 1 |
| Email | 1/29/2002 | Cleary | McKenna | Rainforth, Lellouche, Bruther and Coughlin | Retail Emails - Volume 6 |
| Email | 1/29/2002 | LeJeunesse | Lellouche | Litwin | Retail Sales Meetings 2002-2003 |
| Email | 1/29/2002 | Christie | Roberts, Harde, Jenson and Lellouche | | Staffing Emails - Volume 1 |
| Email | 1/30/2002 | Litwin | Lellouche | Taylor | Microsites |
| Email | 1/30/2002 | Christie | Harde, Lellouche | | Microsites |
| Email | 1/31/2002 | Cleary | Raider | Coughlin, Crowther, Lellouche | Retail Emails - Volume 7 |
| Email | 1/31/2002 | LeJeunesse | Lellouche | Litwin | Retail Sales Meetings 2002-2003 |
| Email | 1/31/2002 | Michaels | Lellouche | | Staffing Emails - Volume 2 |
| Email | 2/1/2002 | Fontaine | Lellouche, Fireman, Campanelli, Litwin | Christie, Bruther, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 2/1/2002 | Fontaine | Lellouche, Fireman, Campanelli and Litwin | Christie, Bruther and Grieco | Retail Sales Meetings 2002-2003 |
| Email | 2/1/2002 | Gillin | Lellouche, LeJeunesse, McKenna and Raider | Eckman, Kroc and Wogan | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| Email | 2/1/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 2/1/2002 | Christie | Harde and Lellouche | | Staffing Emails - Volume 1 |
| E-mail | 2/1/2002 | LeJeunesse | Lellouche, Raider, Gillin, and McKenna | Litwin | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/1/2002 | McKenna | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/1/2002 | Jack | Racano | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/1/2002 | Jack | Cappucci | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/1/2002 | Racano | Jack | Ludwig | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/1/2002 | Jack | Racano | | Deb Wolfe Documents V. 1 |
| Email | 2/4/2002 | Taylor | Raider | Harde, Lellouche | Microsites |
| Email | 2/4/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider and Treiber | Campanelli, Cleary, Fontaine, Garofalo and Grieco | Retail Sales Meetings 2002-2003 |
| E-mail | 2/4/2002 | Adam | Bruther | Lellouche | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/4/2002 | Racano | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/4/2002 | Adam | Jack | Bruther | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/4/2002 | Sellinger | Christie, Lellouche, Tripp, Michels, Silk, Mason, Cleary, Sonsky, Campanelli, and Bruther | | Miscellaneous Meeting Minute E-mails |
| Email | 2/6/2002 | LaJeunesse | Lellouche | | Retail Emails - Volume 5 |
| Email | 2/6/2002 | Gillin | Raider, LeJeunesse, McKenna, Litwin | Lellouche, Fireman | Retail Sales Meetings 2002-2003 |
| Email | 2/6/2002 | McKenna | Gillin, Raider, LeJeunesse, Litwin | Lellouche, Fireman | Retail Sales Meetings 2002-2003 |
| E-mail | 2/6/2002 | Bruther | Adam | Campanelli and Lellouche | TRS and Entrance Targeting - Volume 2 |
| E-mail | 2/6/2002 | Bruther | Raider and Lellouche | | John Linguiti File |
| Email | 2/8/2002 | Adam | Bruther, Lellouche | Raider, Benson | Retail Emails - Volume 1 |
| Email | 2/8/2002 | Raider | Adam, Bruther and Lellouche | Benson | Retail Emails - Volume 6 |
| Email | 2/8/2002 | Fontaine | Lellouche, Fireman, Campanelli, Grieco, Bruther | Christie, Litwin, LeJeunesse, McKenna, Gillin | Retail Sales Meetings 2002-2003 |
| Email | 2/11/2002 | Adam | Harde, Lellouche | | Microsites |
| Email | 2/11/2002 | Adam | Harde | Lellouche | Microsites |
| Email | 2/11/2002 | Adam | Raider | Lellouche | Retail Emails - Volume 1 |
| Email | 2/11/2002 | McKenna | Lellouche | Fontaine, Raider, LeJeunesse, Gillin and Litwin | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 2/11/2002 | Gillin | Lellouche | Raider, LeJeunesse, McKenna, Kroc, Logan and Siemsen | Retail Sales Meetings 2002-2003 |
| Email | 2/11/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider and Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 2/11/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 2/12/2002 | Adam | Lellouche | | Microsites |
| Email | 2/12/2002 | Adam | Lellouche | | Microsites |
| Email | 2/12/2002 | Bruther | Lellouche | Campanelli | Retail Emails - Volume 1 |
| E-mail | 2/13/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 2/14/2002 | Bruther | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 2/18/2002 | Harde | Borthwick | Lellouche, Christie | Microsites |
| Email | 2/18/2002 | Harde | Lellouche, Adam, Christie | | Microsites |
| Email | 2/18/2002 | Raider | Lellouche | Adam, Bruther | Retail Emails - Volume 1 |
| Email | 2/19/2002 | Raider | Adam, Hughes | Lellouche, Bruther | Aspen - Volume 3 |
| Email | 2/19/2002 | Cleary | Lellouche | | Donations Direct |
| Email | 2/19/2002 | Adam | Lellouche | | Microsites |
| Email | 2/19/2002 | Adam | Harde, Lellouche | | Microsites |
| Email | 2/19/2002 | Fontaine | Lellouche | | Retail Emails - Volume 1 |
| Email | 2/19/2002 | McKenna | Lellouche | Fontaine, Raider, Litwin, Gillin and LeJeunesse | Retail Sales Meetings 2002-2003 |
| Email | 2/19/2002 | Fontaine | Lellouche, Christie, Litwin, Campanelli, Cleary, Bruther and Grieco | | Retail Sales Meetings 2002-2003 |
| Email | 2/19/2002 | Gillin | Lellouche | Raider, McKenna, Kroc, Eckman, Emmel, Wogan and LeJeunesse | Retail Sales Meetings 2002-2003 |
| E-mail | 2/19/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 2/20/2002 | Treiber | Raider | Adam, Lellouche | Retail Emails - Volume 1 |
| Email | 2/20/2002 | Treiber | Adam and Lellouche | | Retail Emails - Volume 5 |
| Email | 2/20/2002 | Hughes | Treiber, Lellouche | Raider, Adam, Coughlin, Litwin, Bruther | Retail Emails - Volume 7 |
| Email | 2/20/2002 | Harding | Lellouche | | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 2/22/2002 | Borthwick | Lellouche | | Donations Direct |
| Email | 2/22/2002 | Campanelli | Lellouche | | Donations Direct |
| Email | 2/22/2002 | Campanelli | Lellouche | | Donations Direct |
| Email | 2/22/2002 | Christie | Lellouche | Roberts | Staffing Emails - Volume 2 |
| Email | 2/23/2002 | Harde | Christie | Benson, Adam, Lellouche | Microsites |
| Email | 2/24/2002 | Harde | Lellouche | Christie, Adam, Benson | Microsites |
| Email | 2/25/2002 | McKenna | Lellouche | | Retail Emails - Volume 4 |
| Email | 2/25/2002 | Fontaine | Christie, Lellouche, Fireman, Litwin, Bruther, Grieco, Campanelli | | Retail Sales Meetings 2002-2003 |
| Email | 2/25/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber, Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 2/25/2002 | Crowther | Lellouche, Christie, Raider, Bruther, Gillin, LeJeunesse, Litwin, McKenna, Treiber | Campanelli, Cleary, Fontaine, Coughlin, Garofalo | Retail Sales Meetings 2002-2003 |
| Email | 2/25/2002 | Gillin | Lellouche | Kroc, Wogan, Siemsen, Raider, LeJeunesse and McKenna | Retail Sales Meetings 2002-2003 |
| E-mail | 2/25/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Campanelli, and Bruther | | Miscellaneous Meeting Minute E-mails |
| Email | 2/26/2002 | Tripp | Lellouche | | Retail Emails - Volume 1 |
| E-mail | 2/26/2002 | Ludwig | Raider | Bruther and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/26/2002 | Ludwig | Raider | Bruther and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/26/2002 | Ludwig | Raider | Bruther and Jack | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/26/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Campanelli, and Bruther | | Miscellaneous Meeting Minute E-mails |
| Email | 2/27/2002 | Tripp | Lellouche | | Donations Direct |
| Email | 2/27/2002 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 5 |
| Email | 2/27/2002 | Tripp | LeJeunesse | Lellouche | Retail Emails - Volume 7 |
| E-mail | 2/27/2002 | Gillin | Raider, Rainforth, Litwin, and Fireman | Lellouche | Stored Value Programs - Volume 2 |
| Email | 2/28/2002 | LeJeunesse | Lellouche | | Retail Emails - Volume 3 |
| Email | 2/28/2002 | Tripp | Roberts | Lellouche | Staffing Emails - Volume 2 |
| E-mail | 2/28/2002 | Ludwig | Raider | | Documents Supplied by Don Jack, January 2006- |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 2/28/2002 | Raider | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/28/2002 | Raider | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/28/2002 | Ludwig | Raider | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 2/28/2002 | Raider | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 2/28/2002 | Raider | Ludwig | | Deb Wolfe Documents V. 1 |
| Email | 3/1/2002 | Litwin | Lellouche | | Microsites |
| Email | 3/1/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli | Grieco, Bruther, Litwin | Retail Sales Meetings 2002-2003 |
| Email | 3/1/2002 | Gillin | Lellouche | LeJeunesse, McKenna, Raider, Kroc and Siemsen | Retail Sales Meetings 2002-2003 |
| E-mail | 3/1/2002 | Ludwig | Raider | Racano and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Raider | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/1/2002 | Mason | Tripp and Lellouche | | Miscellaneous Meeting Minute E-mails |
| E-mail | 3/1/2002 | Racano | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 3/1/2002 | Racano | Ludwig | | Deb Wolfe Documents V. 1 |
| Email | 3/4/2002 | Litwin | Lellouche, Tripp | | Donations Direct |
| Email | 3/4/2002 | Harde | Lellouche | | Microsites |
| Email | 3/4/2002 | Treiber | McKenna and Lellouche | Adam | Retail Emails - Volume 4 |
| Email | 3/4/2002 | Tripp | Lellouche | | Retail Sales Meetings 2002-2003 |
| Email | 3/4/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber, Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 3/4/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber and Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 3/5/2002 | Harde | McKenna | Lellouche, Christie | Microsites |
| Email | 3/5/2002 | Raider | Lellouche | | Retail Emails - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| Email | 3/5/2002 | Treiber | Lellouche and McKenna | Adam | Retail Emails - Volume 4 |
| Email | 3/6/2002 | Adam | Lellouche | | Microsites |
| Email | 3/6/2002 | Treiber | Lellouche | McKenna | Retail Emails - Volume 3 |
| Email | 3/7/2002 | LeJeunesse | Lellouche | | Retail Emails - Volume 7 |
| Email | 3/7/2002 | Crowther | Christie, Lellouche, Raider, McKenna, Gillin, LeJeunesse, Cleary, Coughlin, Litwin, Treiber, Bruther | Campanelli, Garofalo | Retail Sales Meetings 2002-2003 |
| E-mail | 3/7/2002 | Ludwig | Racano | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/7/2002 | Ludwig | Racano | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/7/2002 | Ludwig | Racano | | Deb Wolfe Documents V. 1 |
| Email | 3/8/2002 | Tripp | Lellouche, Raider | | Retail Emails - Volume 1 |
| Email | 3/8/2002 | Coughlin | McKenna | Lellouche, Cleary and Bruther | Retail Emails - Volume 4 |
| E-mail | 3/8/2002 | Sellinger | Christie, Lellouche, Tripp, Cleary, Michels, Silk, Mason, Sonsky, Coughlin, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 3/11/2002 | Tripp | Mason, Silk, Michels | Sellinger, Lellouche, Cleary, Cohen | Donations Direct |
| Email | 3/11/2002 | Tripp | Mason, Silk, Michels | Lellouche, Sellinger | Donations Direct |
| Email | 3/11/2002 | Gillin | Lellouche | LeJeunesse, McKenna, Raider | Microsites |
| Email | 3/11/2002 | Fontaine | Lellouche, Bruther, Campanelli, Christie | Fireman | Retail Sales Meetings 2002-2003 |
| Email | 3/11/2002 | Gillin | Lellouche | Kroc, LeJeunesse and McKenna | Retail Sales Meetings 2002-2003 |
| E-mail | 3/11/2002 | Ludwig | Blanco | Ruchalski and Racano | Documents Supplied by Don Jack, January 2006- |
| Email | 3/14/2002 | Tripp | Lellouche | | Retail Emails - Volume 6 |
| Email | 3/15/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Grieco, Bruther, Litwin | | Retail Sales Meetings 2002-2003 |
| E-mail | 3/17/2002 | Ludwig | Raider and Fireman | Coughlin, Racano, Jack, and Bruther | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/17/2002 | Ludwig | Raider and Fireman | Coughlin, Racano, Jack, and Bruther | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/17/2002 | Ludwig | Raider and Fireman | Coughlin, Racano, Jack, and Bruther | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/17/2002 | Ludwig | Raider, Fireman | Coughlin, Racano, Jack, Bruther | Deb Wolfe Documents V. 1 |
| E-mail | 3/17/2002 | Ludwig | Raider. Fireman | Coughlin, Racano, Jack, Bruther | Deb Wolfe Documents V. 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 3/18/2002 | LeJeunesse | Adam, Cleary, Coughlin, Gillin, Lellouche, Litwin, McKenna, Raider, Treiber, Tripp | | Retail Sales Meetings 2002-2003 |
| Email | 3/18/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| Email | 3/18/2002 | Gillin | Lellouche | McKenna, LeJeunesse, Kroc and Siemsen | Retail Sales Meetings 2002-2003 |
| E-mail | 3/18/2002 | Sellinger | Christie, Lellouche, Tripp, Cleary, Michels, Silk, Mason, Sonsky, Coughlin, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 3/19/2002 | Sellinger | Lellouche | | Retail Emails - Volume 7 |
| Email | 3/19/2002 | Treiber | Raider | Adam | Retail Emails - Volume 7 |
| E-mail | 3/19/2002 | Jack | Coughlin | Ludwig | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/20/2002 | Coughlin | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/20/2002 | Coughlin | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/20/2002 | Coughlin | Jack | | Deb Wolfe Documents V. 1 |
| E-mail | 3/21/2002 | Jack | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/21/2002 | Raider | Ludwig and Fireman | Racano, Bruther, Coughlin, and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/21/2002 | Jack | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/21/2002 | Raider | Ludwig, Fireman | Racano, Bruther, Coughlin, Jack | Deb Wolfe Documents V. 1 |
| E-mail | 3/21/2002 | Jack | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 3/21/2002 | Ludwig | Raider, Fireman | Racano, Bruther, Coughlin, Jack | Deb Wolfe Documents V. 1 |
| Email | 3/22/2002 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 4 |
| Email | 3/22/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Bruther, Grieco, Litwin | | Retail Sales Meetings 2002-2003 |
| Email | 3/22/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber | Campanelli, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| E-mail | 3/22/2002 | Jack | Luwig | Bruther | Documents Supplied by Don Jack, January 2006 |
| Email | 3/24/2002 | Gillin | Lellouche | | Retail Emails - Volume 7 |
| Email | 3/24/2002 | Gillin | Lellouche | | Retail Sales Meetings 2002-2003 |
| Email | 3/25/2002 | LeJeunesse | Lellouche and Garofalo | | Retail Emails - Volume 5 |
| E-mail | 3/25/2002 | Ludwig | Jack | | Documents Supplied by Don Jack, January 2006 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 3/25/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Campanelli, Bruther, Cleary, Coughlin, Sonsky, and Casey | | Miscellaneous Meeting Minute E-mails |
| Email | 3/26/2002 | Treiber | Christie, Lellouche, Raider, McKenna, Gillin, LeJeunesse, Coughlin, Litwin, Bruther | Campanelli, Cleary, Fontaine, Garofalo, Grieco, Adam | Aspen - Volume 1 |
| Email | 3/26/2002 | Treiber | McKenna | Adam, Lellouche and Christie | Retail Emails - Volume 4 |
| Email | 3/27/2002 | Treiber | Cleary | Lellouche and McKenna | Retail Emails - Volume 3 |
| Email | 3/27/2002 | Coughlin | Lellouche, Christie, Raider, McKenna, Litwin, Adam, Bruther, Gillin, LeJeunesse | Cleary, Campanelli, Coughlin | Retail Sales Meetings 2002-2003 |
| E-mail | 3/27/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 3/27/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 3/28/2002 | Coughlin | McKenna | Lellouche, Cleary, Crowther, Rainforth | Retail Emails - Volume 1 |
| Email | 3/28/2002 | Rainforth | Crowther, McKenna | Coughlin, Lellouche, Messenger | Retail Emails - Volume 1 |
| Email | 3/28/2002 | Coughlin | Rainforth | Messenger, Lellouche, McKenna, Cleary | Retail Emails - Volume 1 |
| Email | 3/28/2002 | Messinger | Coughlin | Rainforth, McKenna and Lellouche | Retail Emails - Volume 6 |
| Email | 3/28/2002 | Gillin | Kroc, Lellouche | | Retail Emails - Volume 8 |
| E-mail | 3/28/2002 | Raider | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/28/2002 | Raider | Ludwig | Fireman, Bruther, Coughlin, and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 3/28/2002 | Raider | Ludwig | | Deb Wolfe Documents V. 1 |
| E-mail | 3/28/2002 | Raider | Ludwig | | Deb Wolfe Documents V. 1 |
| Email | 3/29/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Bruther, Grieco, Litwin | | Retail Sales Meetings 2002-2003 |
| Email | 3/29/2002 | LeJeunesse | Casey | Lellouche | Retail Sales Meetings 2002-2003 |
| Email | 3/29/2002 | Tripp | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 3/29/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| E-mail | 3/29/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Bruther, Campanelli, Cleary, Casey, and Sonsky | | Miscellaneous Meeting Minute E-mails |
| Email | 4/1/2002 | Raider | Lellouche | Fireman | Retail Emails - Volume 5 |
| Email | 4/1/2002 | Gillin | Lellouche | McKenna, LeJeunesse and Raider | Retail Sales Meetings 2002-2003 |
| E-mail | 4/1/2002 | Raider | Ludwig | Benson, Fireman, Coughlin, and Bruther | Documents Supplied by Don Jack, January 2006- |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 4/1/2002 | Raider | Ludwig | Benson, Fireman, Coughlin, Bruther | Deb Wolfe Documents V. 1 |
| E-mail | 4/2/2002 | Raider | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/2/2002 | Raider | Ludwig | | Deb Wolfe Documents V. 1 |
| Email | 4/3/2002 | Cleary | Lellouche, Bruther | | Retail Emails - Volume 7 |
| Email | 4/4/2002 | Harde | Lellouche | | Microsites |
| Email | 4/5/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli | Litwin, Bruther, Grieco, Casey | Retail Sales Meetings 2002-2003 |
| Email | 4/8/2002 | Hughes | Raider, Adam, Christie, Bruther, Sellinger, Lellouche, McKenna, Tripp, Gillin, Treiber, Cleary, LeJeunesse, Coughlin, Fireman, Silk | | Aspen - Volume 4 |
| Email | 4/8/2002 | Messinger | Lellouche | McKenna | Retail Emails - Volume 4 |
| Email | 4/8/2002 | Treiber | McKenna | Lellouche | Retail Emails - Volume 8 |
| Email | 4/8/2002 | Coughlin | Bruther, Christie, Gillin, LeJeunesse, Lellouche, Litwin, McKenna, Raider, Treiber | Campanelli, Casey, Cleary, Fontaine, Garofalo, Grieco | Retail Sales Meetings 2002-2003 |
| E-mail | 4/8/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Cleary, Coughlin, Sonsky, Casey, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/9/2002 | Fontaine | Lellouche | | iBelong |
| E-mail | 4/9/2002 | Lellouche | Raider and Quinn | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/9/2002 | Lellouche | Raider and Quinn | | John Linguiti File |
| Email | 4/10/2002 | Tripp | Lellouche | Bruther | Donations Direct |
| Email | 4/10/2002 | Adam | Harde, Lellouche, Gillin, Raider, Taylor | | Retail Emails - Volume 8 |
| Email | 4/10/2002 | Tripp | Roberts | Lellouche | Staffing Emails - Volume 2 |
| Email | 4/11/2002 | Tripp | Roberts | Lellouche | Staffing Emails - Volume 2 |
| Email | 4/12/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli | Casey, Grieco, Bruther, Litwin | Ann Raider Highlights 2002-2003 |
| E-mail | 4/12/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| Email | 4/15/2002 | Tripp | Lellouche | Bruther | Donations Direct |
| E-mail | 4/15/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Bruther, Campanelli, and Casey | | Miscellaneous Meeting Minute E-mails |
| Email | 4/16/2002 | Gillin | Lellouche, Adam, Stasiewicz, Taylor, Rainforth, Janik, Gillin, Raider, Litwin | Harde | Retail Emails - Volume 8 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 4/16/2002 | Racano | Ludwig and Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/16/2002 | Racano | Jack and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/16/2002 | Racano | Jack and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/16/2002 | Racano | Ludwig and Jack | | Documents Supplied by Don Jack, January 2006- |
| Email | 4/17/2002 | Cleary | Lellouche, Gillin | | Retail Emails - Volume 8 |
| Email | 4/17/2002 | Litwin | Lellouche, Gillin, Rainforth, Harde, Janik, Taylor, Raider | | Retail Emails - Volume 8 |
| E-mail | 4/17/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Cleary, Coughlin, Sonsky, Casey, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/18/2002 | Janik | Gillin | Rainforth, Harde, Lellouche, Stasiewicz | Retail Emails - Volume 8 |
| Email | 4/19/2002 | Adam | Campanelli, Bruther, Christie, Benson, Harde, Lellouche | | Aspen - Volume 3 |
| Email | 4/19/2002 | Nesbitt | Lellouche | | Retail Emails - Volume 3 |
| Email | 4/19/2002 | Gillin | Lellouche, Adam, Litwin, Raider, Harde | Janik, Rainforth | Retail Emails - Volume 8 |
| Email | 4/21/2002 | Coughlin | Raider, Lellouche, Gillin, McKenna, Christie, Bruther, Litwin, Treiber, LeJeunesse | Cleary, Casey, Fontaine, Campanelli, Grieco, Coughlin | Retail Sales Meetings 2002-2003 |
| Email | 4/22/2002 | Fontaine | Christie, Lellouche, Litwin | Casey | Ann Raider Highlights 2002-2003 |
| Email | 4/22/2002 | Fontaine | Christie, Lellouche, Campanelli, Fireman | Bruther, Grieco, Casey, Litwin | Ann Raider Highlights 2002-2003 |
| Email | 4/22/2002 | Rainforth | Lellouche | | Retail Emails - Volume 1 |
| Email | 4/22/2002 | Cleary | Lellouche | | Retail Emails - Volume 3 |
| Email | 4/22/2002 | Nesbitt | Lellouche | | Retail Emails - Volume 4 |
| Email | 4/22/2002 | Nesbitt | Lellouche | | Retail Emails - Volume 4 |
| Email | 4/24/2002 | McKenna | Treiber | Adam, Bisram, Reale, Hughes, Lellouche, Cleary, Coughlin, Harde and Litwin | Retail Emails - Volume 6 |
| Email | 4/24/2002 | McKenna | Treiber | Adam, Bisram, Reale, Hughes, Lellouche, Cleary, Coughlin, Harde and Litwin | Retail Emails - Volume 6 |
| Email | 4/24/2002 | Treiber | McKenna | Adam, Bisram, Reale, Hughes, Lellouche, Cleary, Coughlin, Harde and Litwin | Retail Emails - Volume 6 |
| Email | 4/24/2002 | Treiber | Raider | Adam, Lellouche | Retail Emails - Volume 7 |
| Email | 4/26/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Grieco | Bruther, Litwin, Casey | Ann Raider Highlights 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 4/26/2002 | Raider | Lellouche | | Retail Emails - Volume 3 |
| Email | 4/26/2002 | Messinger | Treiber and Lellouche | Rainforth and Reale | Retail Emails - Volume 6 |
| Email | 4/28/2002 | Coughlin | Christie, Lellouche, Raider, Bruther, McKenna, Litwin, LeJeunesse, Gillin, Treiber | Fontaine, Campanelli, Casey, Cleary, Coughlin | Retail Sales Meetings 2002-2003 |
| Email | 4/29/2002 | Wogan | Lellouche | | Retail Emails - Volume 3 |
| E-mail | 4/29/2002 | Racano | Borrow | Ludwig, Newman, and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/29/2002 | Racano | Borrow | Ludwig, Newman, and Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/29/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Cleary, Coughlin, Sonsky, Casey, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/30/2002 | LeJeunesse | Bruther, Lellouche and Adam | Treiber | Retail Emails - Volume 7 |
| Email | 5/1/2002 | LeJeunesse | Lellouche and Christie | | Retail Emails - Volume 5 |
| Email | 5/1/2002 | LeJeunesse | Lellouche, Bruther and Adam | Treiber | Retail Emails - Volume 7 |
| Email | 5/1/2002 | Treiber | Lellouche | | Retail Emails - Volume 7 |
| Email | 5/1/2002 | Tripp | Mason, Silk, Michels | Lellouche, Sellinger, Sonsky, LeJeunesse | Retail Emails - Volume 8 |
| Email | 5/2/2002 | LeJeunesse | Lellouche, Treiber and Bruther | | Retail Emails - Volume 4 |
| Email | 5/2/2002 | Roberts | Tripp and Lellouche | | Staffing Emails - Volume 2 |
| Email | 5/2/2002 | Roberts | Tripp and Lellouche | | Staffing Emails - Volume 2 |
| Email | 5/3/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Grieco | Bruther, Litwin, Casey | Ann Raider Highlights 2002-2003 |
| Email | 5/6/2002 | Litwin | Raider, LeJeunesse, McKenna, Gillin | Lellouche, Treiber, Hughes, Adam, Tripp | Aspen - Volume 1 |
| Email | 5/6/2002 | Gillin | Lellouche | | Retail Emails - Volume 1 |
| E-mail | 5/6/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 5/6/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 5/6/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| Email | 5/7/2002 | Moreno | Lellouche, Adam and LeJeunesse | Siemsen | Retail Emails - Volume 5 |
| E-mail | 5/7/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 5/7/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| Email | 5/9/2002 | McKenna | Lellouche | | Promotions |
| Email | 5/9/2002 | Raider | Litwin, Gillin, McKenna, LeJeunesse | Lellouche | Promotions |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/9/2002 | Adam | Raider | Bruther, Lellouche | Retail Emails - Volume 1 |
| E-mail | 5/9/2002 | Racano | Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 5/9/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| E-mail | 5/9/2002 | Ludwig | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 5/9/2002 | Racano | Ludwig | Jack | Documents Supplied by Don Jack, January 2006- |
| Email | 5/10/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Grieco, Bruther | Litwin, Casey | Ann Raider Highlights 2002-2003 |
| Email | 5/10/2002 | Moreno | Lellouche | Siemsen, Adam and Christie | Retail Emails - Volume 3 |
| E-mail | 5/10/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| Email | 5/13/2002 | Coughlin | Lellouche, Raider, Christie, Gillin, McKenna, Litwin, Bruther and LeJeunesse | Casey and Fontaine | Retail Sales Meetings 2002-2003 |
| Email | 5/14/2002 | McKenna | Lellouche | | Retail Emails - Volume 3 |
| Email | 5/14/2002 | Casey | Lellouche | | Retail Emails - Volume 7 |
| Email | 5/14/2002 | Tripp | Roberts and Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 5/14/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 3 |
| Email | 5/15/2002 | Cleary | Lellouche, McKenna, Quinn, Racano and Bruther | | Retail Emails - Volume 4 |
| Email | 5/15/2002 | Rainforth | Lellouche and McKenna | Janik, Stasiewicz, Hardy, O'Neil and Keltz | Retail Emails - Volume 4 |
| Email | 5/15/2002 | Tripp | Roberts and Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 5/15/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Cleary, Coughlin, Sonsky, Casey, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 5/16/2002 | Roberts | Lellouche | Christie | Staffing Emails - Volume 2 |
| Email | 5/17/2002 | Bruther | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 5/17/2002 | Adam | Lellouche, Campanelli, Bruther, Christie, and McKenna | | TRS and Entrance Targeting - Volume 1 |
| E-mail | 5/17/2002 | Racano | Raider | Ludwig, Fireman, and Jack | Documents Supplied by Don Jack, January 2006- |
| Email | 5/20/2002 | Coughlin | Lellouche, Raider, McKenna, Litwin, Bruther, Treiber, Christie | Campanelli, Fontaine, Casey | Retail Sales Meetings 2002-2003 |
| Email | 5/21/2002 | Lellouche | Teeter | Keltz, Lellouche | Microsites |
| E-mail | 5/21/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/22/2002 | Cleary | Lellouche, Raider, Crowther, Borrow, Fitzpatrick, Bruther and Coughlin | | Retail Emails - Volume 6 |
| Email | 5/23/2002 | Roberts | Lellouche | | Staffing Emails - Volume 1 |
| Email | 5/24/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Bruther, Grieco | Litwin, Casey | Ann Raider Highlights 2002-2003 |
| Email | 5/28/2002 | Raider | Lellouche | | Promotions |
| Email | 5/28/2002 | Raider | Lellouche | | Retail Emails - Volume 1 |
| Email | 5/28/2002 | Skarnulis | Lellouche | | Retail Emails - Volume 3 |
| Email | 5/28/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 5/28/2002 | Raider | Kroc | Lellouche | Retail Emails - Volume 8 |
| E-mail | 5/28/2002 | Rainforth | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| Email | 5/29/2002 | Skarnulis | Lellouche | Wogan | Retail Emails - Volume 7 |
| E-mail | 5/29/2002 | Racano | Jack and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| Email | 5/30/2002 | Skarnulis | Lellouche | Wogan | Retail Emails - Volume 7 |
| Email | 5/30/2002 | Gogan | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 5/30/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Bruther, Campanelli, and Casey | | Miscellaneous Meeting Minute E-mails |
| Email | 5/31/2002 | Fontaine | Christie, Lellouche, Fireman, Campanelli, Grieco | Casey, McKenna | Ann Raider Highlights 2002-2003 |
| Email | 5/31/2002 | D'Onofrio | Lellouche | | Retail Emails - Volume 1 |
| Email | 5/31/2002 | D'Onofrio | Lellouche | | Retail Emails - Volume 1 |
| Email | 6/1/2002 | Kroc | Garofalo | Lellouche, Sutherland, Raider | Retail Emails - Volume 8 |
| Email | 6/3/2002 | Sellinger | Lellouche | | Retail Emails - Volume 6 |
| E-mail | 6/3/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 6/3/2002 | Jack | Bruther | | Documents Supplied by Don Jack, January 2006- |
| Email | 6/4/2002 | Moreno | Lellouche | Adam, Christie and Siemsen | Retail Emails - Volume 3 |
| Email | 6/4/2002 | Wogan | Lellouche | Skarnulis | Retail Emails - Volume 7 |
| Email | 6/4/2002 | Raider | Lellouche | | Retail Emails - Volume 8 |
| E-mail | 6/4/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 6/5/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 6/5/2002 | Jack | Racano and Ludwig | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 6/5/2002 | Jack | Martins | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 6/5/2002 | Jack | Martins | | Documents Supplied by Don Jack, January 2006- |
| Email | 6/6/2002 | Treiber | McKenna | Adam and Lellouche | Retail Emails - Volume 5 |
| E-mail | 6/6/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Michels, Mason, Cleary, Coughlin, Sonsky, Casey, Bruther, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 6/7/2002 | Messenger | Lellouche | | Aspen - Volume 1 |
| Email | 6/7/2002 | Raider | Fireman, Lellouche, Christie | Kroc, Sutherland, Garofalo | Retail Emails - Volume 8 |
| E-mail | 6/7/2002 | Jack | Racano | | Documents Supplied by Don Jack, January 2006- |
| Email | 6/11/2002 | Cleary | Lellouche and Roberts | | Staffing Emails - Volume 2 |
| E-mail | 6/12/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 6/13/2002 | Adam | Lellouche | | Retail Emails - Volume 5 |
| E-mail | 6/14/2002 | Adam | Lellouche and Litwin | Benson | TRS and Entrance Targeting - Volume 1 |
| Email | 6/18/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 6/18/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 6/18/2002 | Roberts | Lellouche | | Staffing Emails - Volume 2 |
| Email | 6/19/2002 | Coughlin | Lellouche | | Retail Emails - Volume 7 |
| E-mail | 6/19/2002 | Litwin | Lellouche | | TRS and Entrance Targeting - Volume 2 |
| E-mail | 6/19/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Bruther, Campanelli, Casey | | Miscellaneous Meeting Minute E-mails |
| Email | 6/20/2002 | Keltz | Lellouche | | Microsites |
| Email | 6/20/2002 | Roberts | Nave, Dietrich, Mason, Litwin, Melvin, Lellouche and Tripp | | Staffing Emails - Volume 2 |
| E-mail | 6/20/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 6/20/2002 | Fireman | Lellouche and Raider | | Stored Value Programs - Volume 2 |
| Email | 6/24/2002 | Crowther | Lellouche, Raider, McKenna, Litwin, Treiber, Coughlin | Garofalo, Casey, Campanelli, Cleary | Retail Sales Meetings 2002-2003 |
| Email | 6/25/2002 | Harde | Raider | Lellouche | Microsites |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 6/25/2002 | Christie | Lellouche | | TRS and Entrance Targeting - Volume 1 |
| Email | 6/28/2002 | McKenna | Cleary | Bruther and Lellouche | Retail Emails - Volume 4 |
| Email | 6/28/2002 | Cleary | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 7/1/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 7/2/2002 | Hughes | Lellouche | Adam and Treiber | Retail Emails - Volume 4 |
| Email | 7/2/2002 | Fireman | Lellouche and Raider | | Retail Emails - Volume 5 |
| Email | 7/2/2002 | Roberts | Christie, Harde, Lellouche and Jenson | Casey | Staffing Emails - Volume 1 |
| Email | 7/2/2002 | Roberts | Tripp | Lellouche | Staffing Emails - Volume 2 |
| Email | 7/2/2002 | Roberts | Tripp | Lellouche | Staffing Emails - Volume 2 |
| Email | 7/2/2002 | Roberts | Tripp | Lellouche | Staffing Emails - Volume 2 |
| E-mail | 7/2/2002 | Roberts | H.R. Admin -- Full time | | Ann Raider Documents |
| Email | 7/3/2002 | Harde | Lellouche | | Microsites |
| Email | 7/3/2002 | Fireman | Lellouche, Raider, Adam | | Retail Emails - Volume 2 |
| Email | 7/3/2002 | Taylor | Lellouche | Christie and Harde | Retail Emails - Volume 6 |
| Email | 7/8/2002 | Fontaine | Garofalo, Lellouche, Fireman | Gogan | Ann Raider Highlights 2002-2003 |
| Email | 7/8/2002 | Fireman | Lellouche | | Retail Emails - Volume 2 |
| Email | 7/8/2002 | Constantine | Lippner | Lellouche | Retail Emails - Volume 3 |
| Email | 7/8/2002 | Fireman | Lippner and Lellouche | | Retail Emails - Volume 5 |
| Email | 7/8/2002 | Fireman | Lellouche | | Retail Emails - Volume 7 |
| E-mail | 7/8/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Casey, Campanelli, and Bruther | | Miscellaneous Meeting Minute E-mails |
| Email | 7/9/2002 | Tripp | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/9/2002 | Fireman | Crowther | Lellouche and Raider | Retail Emails - Volume 5 |
| Email | 7/9/2002 | Fireman | Lippner | Lellouche | Retail Emails - Volume 5 |
| Email | 7/9/2002 | Lippner | Lellouche and Fireman | | Retail Emails - Volume 5 |
| Email | 7/9/2002 | Treiber | McKenna | Lellouche, Adam and Cleary | Retail Emails - Volume 6 |
| Email | 7/9/2002 | Adam | Lellouche | | Retail Emails - Volume 7 |
| E-mail | 7/9/2002 | Fireman | Lippner | Lellouche | Stored Value Programs - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 7/9/2002 | Fireman | Racano | Lellouche and Bruther | Stored Value Programs - Volume 3 |
| Email | 7/10/2002 | Fireman | Lellouche | | Retail Emails - Volume 2 |
| Email | 7/10/2002 | Adam | Fireman and Raider | Bruther and Lellouche | Retail Emails - Volume 5 |
| Email | 7/10/2002 | Bruther | Lellouche and Adam | Campanelli | Retail Emails - Volume 5 |
| Email | 7/10/2002 | Fireman | Lippner and Lellouche | | Retail Emails - Volume 7 |
| Email | 7/10/2002 | Fireman | Lippner, Lellouche | | Retail Emails - Volume 7 |
| Email | 7/10/2002 | Roberts | Meyer, Stewarts, Christie and Garofalo | Lellouche, Tripp, Annis-Lopez, Casey and Gogan | Staffing Emails - Volume 1 |
| Email | 7/10/2002 | Roberts | Meyer, Christie and Garofalo | Lellouche, Tripp and Annis-Lopez, Casey and Gogan | Staffing Emails - Volume 2 |
| E-mail | 7/10/2002 | Racano | Campanelli, Bruther, and Lellouche | Linguiti | Stored Value Programs - Volume 3 |
| Email | 7/11/2002 | Fireman | Lellouche | | Retail Emails - Volume 2 |
| Email | 7/11/2002 | Raider | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/11/2002 | Fireman | Lellouche, Fontaine, Crowther and Raider | | Retail Emails - Volume 5 |
| Email | 7/11/2002 | Bruther | Raider | Lellouche, Campanelli and Adam | Retail Emails - Volume 5 |
| Email | 7/12/2002 | Keltz | Lellouche, Moreno | Siemsen, Litwin | Microsites |
| Email | 7/13/2002 | Rainforth | McKenna, Lellouche, Coughlin | | Retail Emails - Volume 2 |
| Email | 7/15/2002 | Raider | Lellouche | | Promotions |
| Email | 7/15/2002 | Raider | Lellouche | | Promotions |
| Email | 7/15/2002 | Raider | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/15/2002 | Fireman | Lellouche | | Retail Emails - Volume 5 |
| Email | 7/15/2002 | Borrow | Lellouche | | Retail Emails - Volume 6 |
| E-mail | 7/15/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Casey, Campanelli, Bruther, Cleary, Coughlin, and Ekendahl | | Miscellaneous Meeting Minute E-mails |
| Email | 7/16/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/16/2002 | Hardy | Lellouche and Adam | | Retail Emails - Volume 4 |
| Email | 7/16/2002 | Fireman | Lellouche | | Retail Emails - Volume 7 |
| Email | 7/17/2002 | Coughlin | Norin | Raider, Lellouche, Cleary, Hughes, Adam, Treiber, Taylor and Keltz | Retail Emails - Volume 4 |
| Email | 7/17/2002 | Fireman | Lellouche | | Retail Emails - Volume 5 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 7/17/2002 | Adam | Lellouche | McKenna, Treiber | Retail Emails - Volume 7 |
| E-mail | 7/17/2002 | Racano | Wolfe | | Deb Wolfe Documents V. 1 |
| E-mail | 7/17/2002 | Racano | Wolfe | | Deb Wolfe Documents V. 1 |
| E-mail | 7/17/2002 | Ludwig | Wolfe | Racano, Jack | Deb Wolfe Documents V. 1 |
| E-mail | 7/17/2002 | Ludwig | Wolfe | Racano, Jack | Deb Wolfe Documents V. 1 |
| Email | 7/18/2002 | Fontaine | Lellouche | | Aspen - Volume 4 |
| Email | 7/18/2002 | McKenna | Coughlin, Treiber and Cleary | Adam, Lellouche and Wogan | Retail Emails - Volume 6 |
| Email | 7/18/2002 | Bruther | McKenna | Cleary, Lellouche and Wogan | Retail Emails - Volume 6 |
| Email | 7/18/2002 | Treiber | Lellouche | Adam and McKenna | Retail Emails - Volume 6 |
| Email | 7/19/2002 | Adam | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/19/2002 | Coughlin | McKenna, Lellouche and Treiber | Cleary | Retail Emails - Volume 5 |
| Email | 7/19/2002 | Cleary | McKenna | Lellouche and Wogan | Retail Emails - Volume 6 |
| Email | 7/19/2002 | McKenna | Lellouche and Adam | | Retail Emails - Volume 6 |
| Email | 7/20/2002 | Treiber | Lellouche | Adam | Retail Emails - Volume 1 |
| Email | 7/20/2002 | Treiber | Lellouche | Adam | Retail Emails - Volume 2 |
| Email | 7/22/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/22/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/22/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/22/2002 | Cleary | Noran | McKenna, Coughlin and Lellouche | Retail Emails - Volume 4 |
| Email | 7/22/2002 | Coughlin | Lellouche, McKenna and Treiber | Cleary and Hughes | Retail Emails - Volume 7 |
| Email | 7/24/2002 | Cleary | Lellouche | Adam | Retail Emails - Volume 2 |
| Email | 7/24/2002 | Adam | Lellouche | | Retail Emails - Volume 4 |
| Email | 7/24/2002 | Litwin | Lellouche | | Retail Emails - Volume 7 |
| Email | 7/25/2002 | Fireman | Lellouche | | Retail Emails - Volume 1 |
| Email | 7/25/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 7/25/2002 | Coughlin | Lellouche, Cleary, Adam, Hughes, Norin, Taylor and Hardy | | Retail Emails - Volume 4 |
| Email | 7/25/2002 | Hughes | Noren | Cleary, Lellouche, Christie, Coughlin | Retail Emails - Volume 7 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 7/26/2002 | McKenna | Bruther | Adam, Lellouche | Retail Emails - Volume 1 |
| Email | 7/26/2002 | Fireman | Lellouche | | Retail Emails - Volume 2 |
| Email | 7/26/2002 | Fireman | Cleary | Lellouche, Coughlin and Adam | Retail Emails - Volume 5 |
| Email | 7/26/2002 | McKenna | Bruther | Adam and Lellouche | Retail Emails - Volume 6 |
| Email | 7/26/2002 | Raider | Lellouche | Cleary, Bruther | Retail Emails - Volume 7 |
| Email | 7/26/2002 | Raider | Kroc, Garofalo, Lellouche | Fireman | Retail Emails - Volume 8 |
| Email | 7/29/2002 | Bruther | Lellouche, Treiber and Adam | | Retail Emails - Volume 7 |
| E-mail | 7/29/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Michels, Cleary, Coughlin, Sonsky, Bruther, Campanelli, Ekendahl, and Casey | | Miscellaneous Meeting Minute E-mails |
| Email | 7/31/2002 | Norin | Lellouche, Christie, Hardy, Taylor, Coughlin, Cleary, Hughes, Keltz and Treiber | | Retail Emails - Volume 4 |
| Email | 8/2/2002 | Moreno | Lellouche, Cleary | Siemsen, Kroc, Adam | Retail Emails - Volume 2 |
| Email | 8/5/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 8/5/2002 | McKenna | Adam and Treiber | Lellouche and Wogan | Retail Emails - Volume 4 |
| Email | 8/5/2002 | Treiber | McKenna | Lellouche, Wogan and Adam | Retail Emails - Volume 6 |
| E-mail | 8/5/2002 | Litwin | Lellouche | | Stored Value Programs - Volume 2 |
| Email | 8/7/2002 | Adam | Lellouche | | Retail Emails - Volume 1 |
| Email | 8/7/2002 | Ekendahl | Lellouche | Tripp, Cleary and Sellinger | Retail Emails - Volume 4 |
| Email | 8/9/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 8/9/2002 | Litwin | Lellouche | | Retail Emails - Volume 1 |
| Email | 8/9/2002 | Cleary | Roberts | Lellouche and Schulze | Staffing Emails - Volume 2 |
| Email | 8/10/2002 | Treiber | McKenna and Bisram | Lellouche, Benson and Adam | Retail Emails - Volume 4 |
| Email | 8/13/2002 | McKenna | Treiber and Bisram | Lellouche, Benson, Adam and Wogan | Retail Emails - Volume 4 |
| Email | 8/13/2002 | Raider | Cleary | Lellouche, Coughlin, Adam, Treiber, Bruther | Retail Emails - Volume 7 |
| Email | 8/13/2002 | Cleary | Raider | Lellouche, Coughlin, Adam, Treiber, Bruther | Retail Emails - Volume 7 |
| Email | 8/13/2002 | Roberts | Meyer, Campanelli and Christie | Tripp and Lellouche | Staffing Emails - Volume 2 |
| Email | 8/15/2002 | Treiber | Adam, Lellouche | | Aspen - Volume 3 |
| Email | 8/15/2002 | Keltz | Lellouche | | Microsites |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 8/15/2002 | Keltz | Lellouche | | Microsites |
| Email | 8/16/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 8/19/2002 | McKenna | Lellouche | | Retail Emails - Volume 1 |
| E-mail | 8/19/2002 | Cleary | Fireman, Raider, and Lellouche | Bruther | Stored Value Programs - Volume 1 |
| Email | 8/21/2002 | Litwin | Raider, Lellouche | | Aspen - Volume 1 |
| E-mail | 8/22/2002 | Lellouche | Raider | Frauenhoffer and Kroc | Ann Raider Documents |
| E-mail | 8/23/2002 | Kahn | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 8/23/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Britton, Cleary, Ekendahl, Bruther, Casey, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/28/2002 | Fireman | Siemsen | Lellouche | Stored Value Programs - Volume 2 |
| Email | 8/29/2002 | Bruther | Coughlin | Lellouche, Cleary | Retail Emails - Volume 1 |
| Email | 8/30/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 9/3/2002 | Fireman | Cleary | Lellouche | Retail Emails - Volume 3 |
| Email | 9/3/2002 | Cleary | Raider, Lellouche | Coughlin, Bruther | Retail Emails - Volume 7 |
| Email | 9/4/2002 | Fireman | Coughlin | Cleary, Lellouche | Retail Emails - Volume 2 |
| Email | 9/4/2002 | Conn | Lellouche | | Staffing Emails - Volume 1 |
| Email | 9/5/2002 | Fireman | Coughlin | Cleary, Lellouche, Bruther | Retail Emails - Volume 1 |
| Email | 9/6/2002 | Treiber | Benson, Lellouche, Adam | | Aspen - Volume 1 |
| Email | 9/6/2002 | Coughlin | Lellouche | | Retail Emails - Volume 5 |
| Email | 9/10/2002 | Litwin | Treiber | Reale, Raider, Lellouche | Retail Emails - Volume 1 |
| Email | 9/12/2002 | Raider | Fireman, Garofalo, Kroc, Lellouche, Christie, Coughlin, Cleary | Bruther | Ann Raider Highlights 2002-2003 |
| Email | 9/12/2002 | Treiber | Lellouche | | Retail Emails - Volume 3 |
| Email | 9/13/2002 | Treiber | Benson, Lellouche, Adam | | Aspen - Volume 1 |
| Email | 9/13/2002 | Litwin | Lellouche, Raider and Adam | Treiber | Retail Emails - Volume 5 |
| E-mail | 9/17/2002 | Coughlin | Dipilato | Raider | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/17/2002 | Coughlin | Dipilato | Raider | John Linguiti File |
| Email | 9/18/2002 | Fireman | Bruther, Coughlin, Cleary and Lellouche | | Retail Emails - Volume 3 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 9/18/2002 | Fireman | Coughlin and Cleary | Lellouche | Retail Emails - Volume 5 |
| Email | 9/18/2002 | Litwin | Raider, Adam and Treiber | Lellouche | Retail Emails - Volume 6 |
| Email | 9/18/2002 | Roberts | Lellouche | | Staffing Emails - Volume 2 |
| E-mail | 9/18/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 9/18/2002 | Dipilato | Fireman | Quinn, Borrow, Raider, and Lellouche | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/18/2002 | Raider | Jack | Fireman | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/18/2002 | Dipilato | Fireman | Quinn, Borrow, Raider, and Lellouche | John Linguiti File |
| Email | 9/19/2002 | Fireman | Lellouche | | Retail Emails - Volume 4 |
| Email | 9/19/2002 | Treiber | Raider | Lellouche, Adam, Litwin | Retail Emails - Volume 7 |
| E-mail | 9/19/2002 | Fireman | Siemsen | Lellouche and Kroc | Stored Value Programs - Volume 1 |
| E-mail | 9/20/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 9/20/2002 | Fireman | Lellouche and Raider | | Stored Value Programs - Volume 2 |
| E-mail | 9/20/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Britton, Bruther, Campanelli, Cleary, Ekendahl, Zitofsky, Casey | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/20/2002 | Sellinger | Christie, Lellouche, Tripp, Silk, Mason, Britton, Bruther, Campanelli, Cleary, Ekendahl, Zitofsky, Casey | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/23/2002 | Silk | Raider | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/23/2002 | Silk | Raider | | John Linguiti File |
| E-mail | 9/24/2002 | Raider | Cleary | Bruther | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/24/2002 | Raider | Cleary | Bruther | John Linguiti File |
| E-mail | 9/24/2002 | Sellinger | Christie, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Ekendahl, Cleary, Mason, Silk, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 9/25/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 9/26/2002 | Treiber | Benson, Lellouche, Adam | | Aspen - Volume 1 |
| Email | 9/26/2002 | Treiber | Raider, Cleary, Bruther | Lellouche, Adam | Retail Emails - Volume 1 |
| Email | 9/27/2002 | Treiber | Raider | Adam, Lellouche | Retail Emails - Volume 1 |
| Email | 9/30/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 9/30/2002 | Sellinger | Christie, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Mason, Silk, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 10/2/2002 | Sanjani | Christie | Benson, Adam, Harde, Lellouche, Papalli, Doyle, McBean | Aspen - Volume 3 |
| Email | 10/2/2002 | Siemsen | Lellouche | | Promotions |
| Email | 10/3/2002 | Treiber | McKenna, Cleary | Adam | Retail Emails - Volume 2 |
| Email | 10/4/2002 | Fontaine | Locke, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 10/4/2002 | Treiber | Benson, Lellouche, Adam | | Aspen - Volume 1 |
| Email | 10/4/2002 | Cleary | McKenna | Lellouche, Wogan, Bruther and Ruchalski | Retail Emails - Volume 6 |
| Email | 10/4/2002 | Tripp | Lellouche and Roberts | | Staffing Emails - Volume 2 |
| Email | 10/8/2002 | Adam | Sanjani, Papalli, McBean, Doyle | Benson, Lellouche, Christie, Litwin, Treiber, Reale, Hughes | Retail Emails - Volume 1 |
| Email | 10/8/2002 | Adam | Lellouche | | Retail Emails - Volume 2 |
| Email | 10/9/2002 | Frances | Lellouche | Moss | Aspen - Volume 3 |
| Email | 10/9/2002 | Frances | Lellouche | Moss | Aspen - Volume 3 |
| Email | 10/10/2002 | Litwin | Raider | Treiber, Lellouche | Retail Emails - Volume 1 |
| Email | 10/14/2002 | Cleary | McKenna, Lellouche and Wogan | Slink, Bruther and Ruchalski | Retail Emails - Volume 4 |
| Email | 10/15/2002 | Lellouche | Messinger | | Retail Emails - Volume 5 |
| Email | 10/17/2002 | Harde | Raider | Lellouche | Microsites |
| Email | 10/17/2002 | Siemsen | Tripp, Lellouche | | Retail Emails - Volume 7 |
| Email | 10/17/2002 | Roberts | Sommer and Verdun | Tripp and Lellouche | Staffing Emails - Volume 2 |
| Email | 10/18/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 10/22/2002 | Raider | Litwin, Adam, Treiber | Lellouche | Retail Emails - Volume 1 |
| E-mail | 10/23/2002 | Sellinger | Christie, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 10/24/2002 | Ruchalski | Christie, Lellouche, Meyer and Garofalo | Sheridan | Staffing Emails - Volume 2 |
| Email | 10/25/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 10/25/2002 | Coughlin | Fireman, Lellouche and Cleary | | Retail Emails - Volume 5 |
| Email | 10/30/2002 | Fireman | Lellouche | | Retail Emails - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 10/31/2002 | Cleary | Coughlin, Sellinger, Slake, Dinafflio, Leonard, Ekendahl and Zitofsky | Lellouche and Marciello | Staffing Emails - Volume 2 |
| E-mail | 10/31/2002 | Cleary | Dipilato, Borrow, and Quinn | Raider, Lellouche, Ruchalski, and Bruther | Documents Supplied by Don Jack, January 2006 |
| E-mail | 10/31/2002 | Cleary | Dipilato, Borrow, and Quinn | Raider, Lellouche, Ruchalski, and Bruther | John Linguiti File |
| E-mail | 11/4/2002 | Raider | Fireman | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/4/2002 | Raider | Fireman | | John Linguiti File |
| E-mail | 11/5/2002 | Raider | Ruchalski | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/5/2002 | Raider | Ruchalski | | John Linguiti File |
| Email | 11/6/2002 | Tripp | Lellouche | | Staffing Emails - Volume 2 |
| Email | 11/6/2002 | Sheridan | Lellouche | | |
| Email | 11/11/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 11/12/2002 | Jack | Fireman and Raider | Linguiti and Ludwig | Documents Supplied by Don Jack, January 2006 |
| Email | 11/13/2002 | Treiber | Raider | Litwin, Cleary, Adam, Lellouche | Retail Emails - Volume 1 |
| E-mail | 11/13/2002 | Jack | Brooks | | Documents Supplied by Don Jack, January 2006 |
| Email | 11/15/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 11/15/2002 | Treiber | Reale, Cleary | Raider, Lellouche, Adam | Retail Emails - Volume 7 |
| Email | 11/18/2002 | Raider | Cleary | Lellouche | Ann Raider Highlights 2002-2003 |
| Email | 11/18/2002 | Treiber | Siemsen | Lellouche | Aspen - Volume 4 |
| Email | 11/18/2002 | Dipilato | McKenna and Beck | Wogan, Morrow, Quinn, Lellouche and Cleary | Retail Emails - Volume 4 |
| Email | 11/18/2002 | Beck | Dipilato | Borrow, Quinn, Wogan, Lellouche, Cleary, Newman and Parniawski | Retail Emails - Volume 6 |
| Email | 11/19/2002 | Raider | Garofalo, Lellouche, Wogan | | Ann Raider Highlights 2002-2003 |
| E-mail | 11/19/2002 | Sellinger | Christie, Siemsen, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 11/20/2002 | Raider | Cleary | Lellouche | Ann Raider Highlights 2002-2003 |
| E-mail | 11/20/2002 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| Email | 11/21/2002 | Raider | Kroc, Wogan | Lellouche, Fireman | Ann Raider Highlights 2002-2003 |
| E-mail | 11/21/2002 | Sellinger | Silk, Mason, Britton, Siemsen | Lellouche and Tripp | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 11/22/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 11/22/2002 | Tripp | Borrow and Quinn | Lellouche and Raider | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/22/2002 | Tripp | Borrow and Quinn | Lellouche and Quinn | John Linguiti File |
| Email | 11/25/2002 | Treiber | Benson, Lellouche, Adam | | Aspen - Volume 1 |
| Email | 11/27/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 12/2/2002 | Raider | Cleary | Bruther | John Linguiti File |
| Email | 12/3/2002 | Fireman | Lellouche | | Retail Emails - Volume 3 |
| Email | 12/4/2002 | Fontaine | Lellouche | | Retail Emails - Volume 7 |
| Email | 12/4/2002 | Rainforth | McKenna | Lellouche, Messenger | Retail Emails - Volume 7 |
| Email | 12/4/2002 | Zitofsky | Lellouche | Cleary | Retail Emails - Volume 7 |
| E-mail | 12/5/2002 | Sellinger | Christie, Siemsen, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 12/6/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 12/9/2002 | Raider | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 12/10/2002 | Treiber | Lellouche | | Retail Emails - Volume 4 |
| E-mail | 12/10/2002 | Sellinger | Christie, Siemsen, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 12/13/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 12/13/2002 | Treiber | Raider | Adam, Lellouche, Benson | Retail Emails - Volume 7 |
| Email | 12/16/2002 | Raider | Adam, Treiber, Litwin | Bruther, Lellouche, Cleary | Ann Raider Highlights 2002-2003 |
| Email | 12/17/2002 | Litwin | Treiber, Reale | Raider, Lellouche | Retail Emails - Volume 1 |
| Email | 12/17/2002 | Treiber | Raider and Lellouche | Adam, Litwin and Cleary | Retail Emails - Volume 6 |
| Email | 12/17/2002 | Litwin | Treiber | Lellouche, Reale, Raider and Adam | Retail Emails - Volume 6 |
| Email | 12/17/2002 | Treiber | Litwin | Lellouche, Reale, Raider, Granger and Adam | Retail Emails - Volume 6 |
| Email | 12/17/2002 | Litwin | Treiber | Lellouche, Reale, Raider, Adam and Granger | Retail Emails - Volume 6 |
| Email | 12/18/2002 | Raider | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 12/18/2002 | Raider | Lellouche | | Ann Raider Highlights 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 12/19/2002 | Raider | Lellouche | | Aspen - Volume 1 |
| Email | 12/19/2002 | Reale | Litwin, Treiber | Raider, Lellouche | Aspen - Volume 4 |
| Email | 12/19/2002 | Litwin | Reale, Treiber | Raider, Lellouche | Aspen - Volume 4 |
| Email | 12/19/2002 | Litwin | McKenna | Lellouche | Retail Emails - Volume 4 |
| Email | 12/19/2002 | Treiber | Lellouche | Raider, Adam and Benson | Retail Emails - Volume 6 |
| E-mail | 12/19/2002 | Sellinger | Christie, Siemsen, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 12/20/2002 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 12/20/2002 | Cleary | Fireman, Bruther, Lellouche, Christie, Ludwig, and Campanelli | Constantine and Raider | Documents Supplied by Don Jack, January 2006- |
| Email | 12/23/2002 | Treiber | Benson, Adam | Lellouche | Aspen - Volume 4 |
| E-mail | 12/23/2002 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| Email | 12/24/2002 | Treiber | McKenna | Adam, Lellouche and Cleary | Retail Emails - Volume 4 |
| E-mail | 12/30/2002 | Cleary | Lellouche and Raider | | Stored Value Programs - Volume 4 |
| E-mail | 12/30/2002 | Cleary | Lellouche and Raider | | Stored Value Programs - Volume 4 |
| E-mail | 12/30/2002 | Cleary | Raider and Lellouche | | Stored Value Programs - Volume 4 |
| Email | 1/2/2003 | McKenna | Litwin | Logan, Lellouche and Adam | Retail Emails - Volume 3 |
| Email | 1/2/2003 | McKenna | Lellouche | Wogan | Retail Emails - Volume 4 |
| Email | 1/2/2003 | McKenna | Treiber | Litwin, Adam, Lellouche and Wogan | Retail Emails - Volume 4 |
| Email | 1/3/2003 | Benson | Campanelli, Lellouche | Ruchalski | Greenpoints |
| Email | 1/6/2003 | Adam | Lellouche | Benson | Retail Emails - Volume 3 |
| E-mail | 1/6/2003 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 1/7/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Mason, Silk, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 1/9/2003 | Raider | Lellouche | Christie | Ann Raider Highlights 2002-2003 |
| Email | 1/10/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 1/10/2003 | McGill | Lellouche | | Retail Emails - Volume 4 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|----|----|-|
| Email | 1/10/2003 | McGill | Lellouche | | Retail Emails - Volume 4 |
| Email | 1/14/2003 | Raider | Gogan, Kroc, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 1/14/2003 | Schroeder | Bielot | Garofalo, Lellouche, Wogan | Retail Emails - Volume 8 |
| Email | 1/15/2003 | Raider | Lellouche | | Greenpoints |
| Email | 1/15/2003 | Treiber | Lellouche and Adam | Benson | Retail Emails - Volume 4 |
| Email | 1/15/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk and Campanelli | | Retail Sales Meetings 2002-2003 |
| Email | 1/16/2003 | Raider | Cleary | Lellouche | Ann Raider Highlights 2002-2003 |
| Email | 1/16/2003 | Rainforth | Raider and Lellouche | | Retail Emails - Volume 5 |
| Email | 1/17/2003 | Lellouche | Raider | Lippner, Garofalo, Christie | Ann Raider Highlights 2002-2003 |
| E-mail | 1/21/2003 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 1/22/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 1/24/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 1/27/2003 | Cleary | Lellouche | | Retail Emails - Volume 1 |
| Email | 1/28/2003 | Treiber | Lellouche | | Retail Emails - Volume 3 |
| Email | 1/29/2003 | Treiber | Benson | Lellouche | Retail Emails - Volume 4 |
| Email | 1/29/2003 | Treiber | Hughes | Lellouche and Benson | Retail Emails - Volume 6 |
| E-mail | 1/29/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 1/30/2003 | Benson | Campanelli, Lellouche and Christie | | Retail Emails - Volume 4 |
| Email | 1/31/2003 | Zitofsky | Lellouche and Cleary | | Retail Emails - Volume 3 |
| Email | 1/31/2003 | Hughes | Treiber | Lellouche and Benson | Retail Emails - Volume 6 |
| E-mail | 2/6/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 2/7/2003 | Raider | Gogan, Kroc, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 2/10/2003 | Christie | Lellouche and Harde | | Staffing Emails - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 2/11/2003 | Raider | Lellouche and Cleary | | Stored Value Programs - Volume 4 |
| E-mail | 2/14/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 2/21/2003 | Fontaine | Gogan, Kroc, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 2/23/2003 | Lellouche | Campanelli, Christie, Linguiti, Benson | | Greenpoints |
| Email | 2/24/2003 | Sheridan | Lellouche and Tripp | Christie | Staffing Emails - Volume 2 |
| Email | 2/26/2003 | Fireman | Lellouche | | Retail Emails - Volume 7 |
| Email | 2/28/2003 | Fontaine | Gogan, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 2/28/2003 | Cleary | Raider, Lellouche | | Retail Emails - Volume 1 |
| E-mail | 3/3/2003 | Cleary | Campanelli, Lellouche, Ruchalski, Coppola, Newman, Fitzpatrick, Dipilato, and Quinn | Raider | Stored Value Programs - Volume 4 |
| E-mail | 3/3/2003 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 3/6/2003 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 3/7/2003 | Sheridan | Lellouche | | Staffing Emails - Volume 2 |
| Email | 3/10/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 3/12/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 3/14/2003 | Raider | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 3/14/2003 | Cleary | Lellouche | | Stored Value Programs - Volume 4 |
| E-mail | 3/18/2003 | Cleary | Constantine | Lellouche and Campanelli | Stored Value Programs - Volume 4 |
| E-mail | 3/19/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 3/20/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 3/25/2003 | Benson | Lellouche | Campanelli | Retail Emails - Volume 6 |
| E-mail | 3/25/2003 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |
| E-mail | 3/25/2003 | Fireman | Lellouche | | Stored Value Programs - Volume 1 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|-----|-----|---|
| E-mail | 3/25/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 3/28/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 3/28/2003 | Cleary | Lellouche | | Retail Emails - Volume 1 |
| E-mail | 4/1/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/4/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 4/8/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/10/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 4/14/2003 | Cleary | Dipilato, Quinn, Ruchalski, Coppola and Lellouche | | Retail Emails - Volume 4 |
| E-mail | 4/15/2003 | Bruther | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/15/2003 | Bruther | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/15/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 4/16/2003 | Jack | Dipilato | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 4/18/2003 | Coppola | Jack | | Documents Supplied by Don Jack, January 2006- |
| Email | 4/22/2003 | Cleary | Lellouche | Ekendahl | Retail Emails - Volume 3 |
| E-mail | 4/22/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/29/2003 | Cleary | Lellouche | | Retail Emails - Volume 1 |
| E-mail | 4/29/2003 | Sellinger | Coppola, Christie, Siemsen, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 4/30/2003 | Cleary | Lellouche | | Retail Emails - Volume 3 |
| Email | 5/1/2003 | Fontaine | Gogan, Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 5/2/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 5/7/2003 | Sellinger | Coppola, Fontaine, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, Mason, Silk and Campanelli | | Retail Sales Meetings 2002-2003 |
| Email | 5/8/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 5/8/2003 | Silk | Fontaine | | Henri Lellocuhe Disc 2 - Volume II |
| E-mail | 5/9/2003 | Cardoni | Fontaine | | Henri Lellocuhe Disc 2 - Volume II |
| E-mail | 5/9/2003 | Tripp | Fontaine | | Henri Lellocuhe Disc 2 - Volume II |
| E-mail | 5/13/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 5/15/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| Email | 5/22/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 5/27/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/28/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 6/3/2003 | Cleary | Lellouche | | Staffing Emails - Volume 1 |
| E-mail | 6/3/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 6/6/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 6/6/2003 | Sellinger | Coppola, Fontaine, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cardoni, Cleary, and Mason | | Miscellaneous Meeting Minute E-mails |
| E-mail | 6/17/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 6/26/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 6/27/2003 | Fontaine | Lellouche | | Ann Raider Highlights 2002-2003 |
| E-mail | 7/2/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 7/9/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 7/24/2003 | Cleary | Fireman | Lellouche | Retail Emails - Volume 7 |
| E-mail | 8/5/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Russo, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/12/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Russo, Mason, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/22/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendhal, Cardoni, Cleary, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/26/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Russo, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/5/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendhal, Cleary, Russo, Mason, Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/11/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Ruchalski, Russo, Mason, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 9/18/2003 | Cleary | Frauenhoffer and Sheridan | Lellouche | Staffing Emails - Volume 2 |
| Email | 9/18/2003 | Cleary | Frauenhoffer and Sheridan | Lellouche | Staffing Emails - Volume 2 |
| E-mail | 9/18/2003 | Sellinger | Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Ruchalski, Russo, Mason, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/23/2003 | Machado | Jaworoski | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/23/2003 | Ekendahl | Tripp, Sellinger, Coppola, Sheridan, Russo, Lellouche, Porco, Campanelli, Ruchalski, Cleary, Mason, Briratin, Zitofsky, Fontaine, and Slink | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/29/2003 | Gleason | Jack | Sevic and Liotta | Documents Supplied by Don Jack, January 2006- |
| E-mail | 9/30/2003 | Sellinger | Hay, Coppola, Fontaine, Porco, Britton, Lellouche, Sheridan, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Ruchalski, Russo, Mason, and Campanelli | | Miscellaneous Meeting Minute E-mails |
| Email | 10/3/2003 | Cleary | Sheridan | Lellouche | Staffing Emails - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| Email | 10/6/2003 | Cleary | Lellouche, Fireman, Raider, Ruchalski and Coppola | Fontaine, Zitofsky, Slink and Mochlas | Retail Emails - Volume 6 |
| E-mail | 10/23/2003 | Sellinger | Britton, Campanelli, Cleary, Coppola, Ekendahl, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, and Zitofsky | | Miscellaneous Meeting Minute E-mails |
| E-mail | 10/24/2003 | Coppola | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 10/27/2003 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 10/27/2003 | Sellinger | Lellouche | | Miscellaneous Meeting Minute E-mails |
| Email | 10/28/2003 | Raynforth | Lellouche | | Coupon Card Program |
| Email | 10/28/2003 | Raynforth | Jensen | Lellouche, Harde | Coupon Card Program |
| Email | 10/30/2003 | Cleary | Lellouche | | Coupon Card Program |
| Email | 10/30/2003 | Fireman | Lellouche | Cleary, Harde, Jenson | Coupon Card Program |
| Email | 10/31/2003 | Fireman | Raynforth, Lellouche | | Coupon Card Program |
| E-mail | 11/4/2003 | Sellinger | Britton, Campanelli, Cleary, Coppola, Ekendhal, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, Zitofsky | | Miscellaneous Meeting Minute E-mails |
| Email | 11/5/2003 | Raynforth | Lellouche | | Coupon Card Program |
| Email | 11/7/2003 | Cleary | Lellouche, Ruchalski, Coppola, Mochlas | Fireman | Retail Emails - Volume 7 |
| Email | 11/13/2003 | Janik | Lellouche | | Coupon Card Program |
| E-mail | 11/14/2003 | Jack | Raider and Fireman | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/14/2003 | Jack | Raider and Fireman | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/14/2003 | Jack | Raider and Fireman | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/14/2003 | Ekendahl | Sellinger, Tripp, Lellouche, Russo, Cleary, Slink, Zitofsky, Mason, Britton, Campanelli, Garofalo, Ruchalski, Sheridan, and Coppola | | Miscellaneous Meeting Minute E-mails |
| Email | 11/17/2003 | Raynforth | Lellouche | | Coupon Card Program |
| E-mail | 11/21/2003 | Ekendahl | Ekendahl, Sellinger, Tripp, Lellouche, Russo, Cleary, Slink, Zitofsky, Mason, Glitton, Campanelli, Garofalo, Ruchalski, Sheridan, and Coppola | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/24/2003 | Raider | Ludwig and Jack | Fireman | Documents Supplied by Don Jack, January 2006- |
| E-mail | 12/1/2003 | Sellinger | Britton, Campanelli, Cleary, Coppola, Ekendahl, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, Zitofsky | | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 12/4/2003 | Carriero | Middlebrook, Jack, and Haga | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/5/2003 | Sellinger | Britton, Campanelli, Cleary, Coppola, Ekendahl, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, Zitofsky | | Miscellaneous Meeting Minute E-mails |
| Email | 12/8/2003 | Britton | Lellouche | Sheridan and Roberts | Staffing Emails - Volume 1 |
| E-mail | 12/10/2003 | Ludwig | Raider | Fireman, Linguiti, and Jack | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/10/2003 | Raider | Jack | Fireman, Linguiti, and Ludwig | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/10/2003 | Raider | Ludwig | Linguiti, Fireman, and Jack | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/10/2003 | Ludwig | Raider | Linguiti, Fireman, and Jack | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/10/2003 | Ludwig | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/10/2003 | Jack | Ludwig | | Documents Supplied by Don Jack, January 2006 |
| Email | 12/15/2003 | Raynforth | Lellouche, Russo | | Coupon Card Program |
| E-mail | 12/24/2003 | Ekendhal | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, Zitofsky | | Miscellaneous Meeting Minute E-mails |
| Email | 12/30/2003 | Raynforth | Lellouche | | Coupon Card Program |
| Email | 1/8/2004 | Dietrich | Meyer | Roberts, Parniawsky, Lellouche, Garofalo and Maze | Staffing Emails - Volume 2 |
| E-mail | 1/9/2004 | Ekendahl | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Sheridan, Slink, Tripp, Zitofsky, and Philipps | | Miscellaneous Meeting Minute E-mails |
| Email | 1/13/2004 | Ekendahl | Lellouche, Cleary | | Retail Emails - Volume 1 |
| E-mail | 1/14/2004 | Ludwig | Raider | Jack and Linguiti | Documents Supplied by Don Jack, January 2006 |
| E-mail | 1/26/2004 | Fontaine | Lellouche | | Miscellaneous Meeting Minute E-mails |
| E-mail | 1/26/2004 | Fontaine | Carlucci, Mixon, Lellouche, Tripp, Mason, Russo, Philipps, and Ruchalski | | Miscellaneous Meeting Minute E-mails |
| E-mail | 1/26/2004 | Fontaine | Lellouche, Cleary, Tripp, Mason, Philipps, Russo, and Coppola | | Miscellaneous Meeting Minute E-mails |
| E-mail | 2/2/2004 | Fontaine | Lellouche | | Miscellaneous Meeting Minute E-mails |
| Email | 2/10/2004 | Colovos | Lellouche | | Staffing Emails - Volume 2 |
| Email | 2/10/2004 | Colovos | Lellouche | | Staffing Emails - Volume 2 |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 2/10/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Ruchalski, Russo, Zitofsky, and Philipps | | Miscellaneous Meeting Minute E-mails |
| E-mail | 2/23/2004 | Raider | Ludwig | Fireman | John Linguiti File |
| E-mail | 3/3/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, and Philipps | | Miscellaneous Meeting Minute E-mails |
| E-mail | 3/5/2004 | Ludwig | Linguiti | | John Linguiti File |
| E-mail | 3/23/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, and Philipps | | Miscellaneous Meeting Minute E-mails |
| E-mail | 4/6/2004 | Frauenhoffer | Meyer and Garofalo | | Ann Raider Documents |
| E-mail | 4/7/2004 | Cleary | Campanelli, Cleary, Coppola, Garofalo, Llelouche, Mason, Ruchalski, Russo, Zitofsky, and Philipps | | Miscellaneous Meeting Minute E-mails |
| E-mail | 4/15/2004 | Meyer | Garofalo and Frauenhoffer | | Ann Raider Documents |
| E-mail | 4/19/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, and Brady | | Miscellaneous Meeting Minute E-mails |
| E-mail | 4/27/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, and Brady | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/3/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 5/4/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/11/2004 | Cleary | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, and Brady | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/17/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/20/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 5/25/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 5/26/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 5/27/2004 | Raider | Jack | | Documents Supplied by Don Jack, January 2006- |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|-----------|------|------|----|----|--|
| E-mail | 5/27/2004 | Jack | Raider and Fireman | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 6/14/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 6/16/2004 | Fireman | Raider | Garofalo | Marty Garofalo Disc Production |
| E-mail | 6/21/2004 | Fireman | Garofalo, Lellouche, and Raider | | Marty Garofalo Disc Production |
| E-mail | 6/22/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 6/23/2004 | Lellouche | Frauenhoffer and Garofalo | | |
| E-Mail | 6/29/2004 | Fireman | Lellouche | Philipps, Raider, and Garofalo | Marty Garofalo Disc Production |
| E-mail | 6/30/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 7/14/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 7/21/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Mason, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 7/21/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/2/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Mason, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 8/16/2004 | | | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 8/17/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Mason, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 8/17/2004 | Slink | Campanelli, Cleary, Coppola, Garofalo, Lellouche, Mason, Ruchalski, Russo, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/30/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | |
| E-mail | 9/1/2004 | Liotta | Jack | | Documents Supplied by Don Jack, January 2006- |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 9/2/2004 | Jack | Raider and Fireman | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 9/9/2004 | Frauenhoffer | H.R. Admin – Full time | Meyer and Sole | Robert Fireman Documents |
| E-mail | 9/9/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 9/9/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/17/2004 | Fireman | Cleary | Raider, Lellouche, and Garofalo | Marty Garofalo Disc Production |
| E-mail | 9/17/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 9/23/2004 | Fireman | Garofalo | Casey | Marty Garofalo Disc Production |
| E-mail | 9/28/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 9/28/2004 | Fireman | Garofalo | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 9/28/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/29/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 9/30/2004 | Fireman | Garofalo | | Marty Garofalo Disc Production |
| E-mail | 9/30/2004 | Fireman | Raider | Garofalo | Marty Garofalo Disc Production |
| E-mail | 10/6/2004 | Raider | Carr, Lellouche, and Dipilato | | Stored Value Programs - Volume 1 |
| E-mail | 10/7/2004 | Liotta | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/2/2004 | Slink | Cleary, Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/2/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/9/2004 | Raider | Jack | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/9/2004 | Slink | Cleary, Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/9/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/10/2004 | Jack | Raider | | Documents Supplied by Don Jack, January 2006- |
| E-mail | 11/12/2004 | Sellinger | Christie, Bruther, Casey, Britton, Lellouche, Zitofsky, Tripp, Slink, Ekendahl, Cleary, Mason, Silk, Campanelli | | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 11/16/2004 | Slink | Cleary, Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/16/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/22/2004 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/23/2004 | Slink | Cleary, Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/23/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/30/2004 | Liotta | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 11/30/2004 | Liotta | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 12/7/2004 | Slink | Cleary, Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 12/7/2004 | Slink | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 12/20/2004 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Cleary, Russo, Coppola, Hazen, Philipps, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 12/20/2004 | | | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 12/20/2004 | Cleary | Cleary, Campanelli, Garofalo, Lellouche, Ruchalski, Russo, Coppola, Zitofsky, Philipps, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 1/4/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 1/4/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, and Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 1/11/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 1/11/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, and Meth | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 1/11/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazan, Brady, Meth | | Miscellaneous Meeting Minute E-mails |
| E-mail | 2/7/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 2/7/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 2/8/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/9/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/17/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/17/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/17/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/17/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 2/23/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 2/23/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 2/24/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/1/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/3/2005 | Raider | Jack | | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/4/2005 | Raider | Ludwig | Jack and Linguiti | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/4/2005 | Raider | Ludwig | Jack | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/4/2005 | Ludwig | Raider | Jack and Linguiti | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/4/2005 | Ludwig | Raider | Jack and Linguiti | Documents Supplied by Don Jack, January 2006 |
| E-mail | 3/7/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Cleary | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/7/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/7/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Cleary | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/7/2005 | Cleary | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Alesio | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/15/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, and Cleary | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/15/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, Alesio, and Cleary | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 3/15/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Coppola, Hazen, Brady, Meth, Alesio, and Cleary | | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 4/4/2005 | Frauenhoffer | H.R. Admin – Full time | Glick, Sole, and Sevick | Ann Raider Documents |
| E-mail | 6/9/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, and Westrell | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 6/9/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, LaValle, Lonergan, Mullin, Weeden, and Westrell | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 6/14/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, and Westrell | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 6/14/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, LaValle, Lonergan, Mullin, Weeden, and Westrell | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 7/5/2005 | Cleary | Lavalle and Lellouche | | Stored Value Programs - Volume 2 |
| E-mail | 8/9/2005 | Alesio | Garofalo, Lellouche, Campanellio, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, Westrell, and Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 8/29/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, LaValle, Lonergan, Mullin, Weeden, Westrell, and Lewen | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 8/29/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan Mullin, Weeden, Westrell, and Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/8/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, LaValle, Lonergan, Mullin, Weeden, Westrell, Silverman, and Lewen | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 9/8/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazan, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 9/14/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Henri Lellouche Disc Production |
| E-mail | 10/21/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazan, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/4/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazan, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Internal E-mails Exhibit

| Doc. Type | Date | From | To | CC | |
|---|---|---|---|---|---|
| E-mail | 11/22/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazan, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/23/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Lavalle, Lonergan, Mullin, Weeden, Westrell, Silverman, and Lewen | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/23/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, LaValle, Lonergan, Mullin, Weeden, Westrell, Silverman, and Lewen | | Henri Lellocuhe Disc 2 - Volume III |
| E-mail | 11/23/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazan, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |
| E-mail | 11/30/2005 | Alesio | Garofalo, Lellouche, Campanelli, Ruchalski, Russo, Hazen, Brady, Pagnani, Levalle, Lonergan, Mullin, Weeden, Westrell, Silverman, Lewen | | Miscellaneous Meeting Minute E-mails |

# EXHIBIT 13

Adam
Alesio
Anello
Annis-Lopez
Arcuri
Aversano
Bacher
Beck
Bedell
Belka
Benson
Bielot
Bisram
Blanco
Borrow
Borthwick
Borzumato
Bowker
Brady
Breece
Breslin
Britton
Brooks
Bruchowsky
Bruther
Campanelli
Cappucci
Cardoni
**Carlucci**
Carr
Carriero
Casey
Charboneau
Charm
Christie
Cleary
Cohen
Cole
Colovos
Conn
Connolly
Constantine
Coppola
Coughlin
Crane

Crowther
D'Onofrio
Davenport
DeGiorgio
**DeVoe**
Dietrich
Dilts
Dinafflio
Dipilato
Doyle
Eckman
Edelman
Ekendahl
Emmel
Evans
Fireman
Fishkin
Fitzpatrick
Fontaine
Frances
Frauenhoffer
**Gaffney**
**Garofolo**
Geswell
Gilleaudeau
Gillin
Gilpin
Giovannone
Gleason
Glick
Glitton
Gogan
Goodkin
Goodstadt
Granger
Grieco
Guttmann
H.R.Admin–Fulltime
Haga
**Harde**
Harding
Hay
Hazan
Henderson
Henderson

Holzhacker
Hughes
Hurme
Jack
Janik
Jaworoski
**Jenson**
Joress
Kahn
Keltz
Kroc
LaJeunesse
Landy
Lavalle
Lear
**Lellouche**
Leo
Leonard
Leprine
Lewen
LeWorthy
Liebergall
Linguiti
Liotta
Lippner
Litwin
Locke
Logan
London
Lonergan
Lubin
Ludwig
Luh
Luteyn
Ma
MacArthur
Machado
Maguire
Mallen
Marciello
Marmo
Martins
Mason
Mattimore
Maze

McAndrew
McBean
McGill
McKenna
McMellin
Melvin
Mercure
Messenger
Meth
Meyer
Michels
Middlebrook
**Mixson**
Mochlas
Molligo
Moore
Moreno
Morrow
Mosa
Moss
Mullin
Mumm
Murdoch
NAM-IGroup/all
Nave
Neff
Nelson
Nesbitt
Nesprido
Newman
Nicks
Norin
O'Connell
O'Neil
Openshaw
Pacca

Pagnani
Palko
Papalli
Pardo
Parniawski
Peiser
Philipps
**Porco**
Porlein
Poulos
Quinn
**Racano**
Raider
Rainforth
Reale
Reed
Ringus
Roberts
Rochelle
Roseman
Rubber
**Rubin**
Ruchalski
Russo
Sabino
Sanjani
Schena
Schroeder
Schulman
Schulze
Schulze
Sellinger
Serio
Sevick
Sheridan
Siemsen

Silk
Silverman
Sinansky
Skarnulis
Slink
Sole
Sommer
Sonsky
SSIGroup-Direct
Stappler
Stasiewicz
Stasiewicz
Stasiewicz
Steinmetz
Stern
Stewarts
Sturdivant
Suarez
Sutherland
Taylor
Teeter
Tibbs
Treharne
Treiber
Tripp
Trippler
Verdun
Webber
Weeden
Weiss
Westrell
Willis
Wogan
Wolfe
Yarzynski
Zitofsky

# 4544401_v1

# EXHIBIT 14

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 6/21/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/22/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 6/28/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/28/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 6/29/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/6/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/6/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/6/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/12/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/12/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/13/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/19/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/19/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/20/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/20/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/26/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/26/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/27/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/2/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/2/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/3/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/9/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/9/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/10/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/16/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/16/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/17/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/23/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/23/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/24/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/30/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/30/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/31/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/7/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/7/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 9/8/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/13/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/13/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 9/13/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 9/14/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/20/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/20/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 9/21/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/28/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/4/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/4/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 10/4/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 10/5/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/11/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/11/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/11/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/11/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 10/12/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/18/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/18/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/19/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/25/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/25/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/25/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 10/26/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/1/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/1/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/1/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 11/2/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/8/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/8/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/8/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 11/9/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/15/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/15/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/15/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 11/15/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 11/16/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/22/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/22/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/22/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 11/23/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/29/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/29/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/29/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 11/30/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/6/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/6/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/6/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 12/7/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/13/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/13/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/13/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 12/14/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/20/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/20/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/20/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 12/21/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/27/1999 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/27/1999 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/27/1999 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 12/28/1999 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 1/3/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 1/3/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 1/3/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 1/4/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 1/10/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 1/10/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 1/10/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 1/11/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 1/17/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 1/17/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 1/17/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 1/18/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 1/24/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 1/24/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 1/25/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 1/31/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 1/31/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 1/31/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 2/1/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 2/7/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 2/7/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 2/8/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 2/14/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 2/14/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 2/14/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 2/14/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 2/15/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 2/22/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 2/22/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 2/22/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 2/23/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 2/28/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 2/28/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 2/28/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 2/29/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 3/6/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 3/6/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 3/7/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 3/13/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 3/13/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 3/13/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 3/13/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 3/14/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 3/20/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 3/20/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 3/20/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 3/21/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 3/27/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 3/27/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 3/27/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 3/28/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 4/3/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 4/3/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 4/3/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 4/4/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 4/10/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 4/10/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 4/10/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 4/11/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 4/17/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 4/17/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 4/17/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 4/18/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 4/24/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 4/24/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 4/24/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 4/25/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 5/1/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 5/1/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 5/1/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 5/2/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 5/8/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 5/8/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 5/9/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 5/9/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 5/15/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 5/15/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 5/15/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 5/16/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 5/22/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 5/22/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 5/22/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 5/23/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 5/30/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 5/30/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 5/30/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 5/31/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 6/5/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/5/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 6/5/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 6/6/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 6/12/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/12/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 6/12/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 6/13/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 6/19/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/19/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 6/19/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 6/20/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 6/26/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 6/26/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 6/26/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 6/27/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/5/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/5/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/5/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/10/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/10/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/10/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/11/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/17/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/17/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/17/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/17/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/18/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/24/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/24/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/24/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 7/25/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 7/31/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 7/31/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 7/31/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/1/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/7/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/7/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 8/7/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/8/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/14/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/14/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 8/15/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/21/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 8/21/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 8/21/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/21/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/22/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 8/28/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 8/28/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 8/28/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 8/29/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/5/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/5/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 9/5/2000 | Management Council Meeting | NAM Management Council Meeting (6/28/99 – 9/5/00) |
| Meeting Minute | 9/6/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/11/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/11/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 9/12/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 9/18/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/25/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 9/25/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 9/26/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/2/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/2/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/3/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/9/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/9/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/10/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/16/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/16/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/17/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/23/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/23/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/23/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 10/30/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 10/30/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 10/31/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/6/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/6/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/7/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/13/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 11/13/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/14/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/20/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/20/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/21/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 11/27/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 11/27/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 11/28/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/4/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/4/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/5/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/11/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/11/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/12/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/18/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/18/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 12/19/2000 | In-Store Executive Committee | NAM In-Store Executive Committee (6/22/99 – 12/19/00) |
| Meeting Minute | 12/26/2000 | Executive Committee | NAM Executive Committee Meeting (6/21/99 – 12/26/00) |
| Meeting Minute | 12/26/2000 | FSI Executive Committee | NAM FSI Executive Committee (7/6/99 – 12/26/00) |
| Meeting Minute | 4/24/2001 | SSD Executive Meeting | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Meeting Minute | 5/29/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/4/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/11/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/18/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/25/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/25/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/16/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/23/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/30/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/6/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/13/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/27/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/4/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/5/2001 | Smart Source Direct Executive | 2000 – 2001 Highlights and Minutes - Volume 2 |
| Meeting Minute | 9/5/2001 | SmartSource Direct Executive Committee Meetin | Henri Lellouche Document Production General Binder |
| Meeting Minute | 9/10/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/17/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/24/2001 | SmartSource IGroup Executive Committee Meeti | Henri Lellocuhe Disc 2 - Volume III |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 11/5/2001 | Smart Source Direct Manufacturing Sales Meetin | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 11/5/2001 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 11/5/2001 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/12/2001 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 11/19/2001 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/20/2001 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 11/26/2001 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 12/10/2001 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 12/10/2001 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/17/2001 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/2/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 1/2/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/7/2002 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 1/13/2002 | Smart Source Direct Manufacturing Sales Meetin | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 1/14/2002 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 1/14/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/14/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/28/2002 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 2/4/2002 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 2/4/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/11/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/19/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 2/19/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/25/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/4/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 3/4/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/11/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 3/11/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/18/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 3/18/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/25/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 3/25/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/1/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 4/1/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/8/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/15/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 4/15/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/22/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 4/22/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/6/2002 | Smart Source Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 5/13/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 5/13/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/28/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/4/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/10/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/17/2002 | SmartSource Direct Retail Sales Meeting | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 6/17/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/24/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/8/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/23/2002 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/16/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/16/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 10/21/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/11/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/18/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/2/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/9/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/16/2002 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/21/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/27/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/3/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/10/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/10/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/17/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/24/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/31/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/7/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/14/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/21/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/28/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/6/2003 | Smart Source Direct Manufacturing Sales Meetin | Retail Sales Meetings 2002-2003 |
| Meeting Minute | 5/12/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 5/12/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/19/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 5/19/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/27/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 5/27/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/2/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 6/2/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/16/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 6/16/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/23/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/30/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 6/30/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/7/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 7/7/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/4/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 8/4/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/11/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 8/11/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/18/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 8/18/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/25/2003 | SmartSource Direct Manufacturing Minute | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 8/25/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/2/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 9/2/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/8/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 9/15/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 9/15/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/22/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 9/22/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/29/2003 | SmartSource Direct Manufacturing Sales Meeting | Henri Lellocuhe Disc 2 - Volume II |
| Meeting Minute | 10/27/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/3/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/10/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/17/2003 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/24/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/1/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/12/2003 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/9/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 2/9/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/1/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/22/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/5/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 4/19/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 4/26/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/3/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/10/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/17/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 5/24/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/14/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/21/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 6/28/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/6/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/12/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/12/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/19/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/19/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/19/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 7/26/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/2/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/9/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/16/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/16/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/23/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/30/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/30/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/7/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/7/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/7/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/13/2004 | | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/13/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/13/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/20/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/27/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/27/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/27/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 10/4/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 10/6/2004 | | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/10/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/11/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 10/18/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 10/25/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/1/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/1/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/1/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/8/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/8/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/8/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/15/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/15/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/15/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/22/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/22/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/22/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/29/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/6/2004 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 12/6/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/6/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/13/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/20/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/20/2004 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/27/2004 | Executive Committee | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/3/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 1/3/2005 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/10/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 1/10/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 1/10/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 1/21/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/5/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/10/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/10/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/18/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/22/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/22/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/28/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/28/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/28/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 2/28/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 3/4/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 3/14/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 3/14/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 3/14/2005 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 3/18/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 3/21/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 3/21/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/1/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/4/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/4/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/8/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/11/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 4/11/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/2/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/2/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/6/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/9/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/13/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/16/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/16/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/23/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/23/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/27/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/31/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/31/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/31/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 5/31/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/3/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/6/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/10/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/13/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/13/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/20/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 6/27/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/1/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/5/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/11/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/15/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 7/21/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 7/25/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/1/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/4/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/8/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/8/2005 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 8/11/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/22/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/25/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/29/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/29/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 8/29/2005 | SmartSource Direct Manufacturer Sales Meeting | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/6/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/6/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/6/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/6/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/12/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/12/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/12/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/15/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/19/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/19/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 9/19/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 9/22/2005 | Direct Mail Weekly Status Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/3/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/10/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/17/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/17/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 10/24/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/31/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 10/31/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/21/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/21/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/21/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/21/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 11/28/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 11/28/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |
| Meeting Minute | 12/5/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 12/12/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |

# NAM / Fireman and Raider: Meeting Minutes Exhibit

| Document Type | Date | Type of Meeting Minute | Binder |
|---|---|---|---|
| Meeting Minute | 12/19/2005 | SmartSource Direct Manufacturer Sales Meeting | Henri Lellocuhe Disc 2 - Volume III |
| Meeting Minute | 12/19/2005 | Manufacturer Sales Meeting Minutes | Miscellaneous Meeting Minute E-mails |

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## ROBERT FIREMAN'S ANSWERS TO FIRST SET OF INTERROGATORIES
## PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Robert Fireman ("Mr. Fireman") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") First Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Mr. Fireman's Specific Answers and Objections to each Interrogatory:

1.      Mr. Fireman objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.      Mr. Fireman objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Mr. Fireman objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.    Mr. Fireman objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on him beyond those included in Mass. R. Civ. P. 26 and 33.

5.    Mr. Fireman objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.    Mr. Fireman's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial.

7.    The information disclosed below has been provided after a diligent search. Mr. Fireman reserves the right to supplement these answers.

8.    Mr. Fireman reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

## ANSWERS TO INTERROGATORIES

## INTERROGATORY NO.: 1

State the name and current address of each and every expert witness that you intend to call at the trial of this matter, including in your answer:

(a)    the subject matter of the facts and opinions to which each person is expected to testify;

2

(b)        the substance of the facts and opinions to which each person is
expected to testify;

(c)        a summary of the grounds for each opinion, and

(d)        the education, business, professional or other experience, as well as
any other facts that will be offered at trial to prove the
qualifications of each expert

## ANSWER NO.: 1

Mr. Fireman has not determined which expert(s), if any, he intends to call as witness(es) on his behalf at the trial in this matter. Mr. Fireman agrees to supplement this answer in compliance with any Pre-Trial Order or Rule of Court.

## INTERROGATORY NO.: 2

Describe in detail any and all contracts, agreements or understandings between you and NAM.

## ANSWER NO.: 2

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman further objects by noting that there were countless "contracts, agreements or understandings between me and NAM." It is impossible to recount, in the form of an interrogatory answer, all "contracts, agreements or understandings" reached over several years. Mr. Fireman also incorporates by reference his interrogatory responses 5-7 and10-12. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman responds as follows:

Consumer Card Marketing, Inc. ("CCMI") was operating as a profitable

company generating over $8 million dollars in sales in 1999 with a national reputation in the supermarket and other channels as a leader in loyalty marketing. To accelerate its growth and continue to maintain a leadership position, CCMI sought a business relationship with a highly visible national company which could provide sales and financial and other support to deliver on CCMI's five (5) year business plan. NAM approached CCMI, reviewed CCMI's business plan (which was designed to achieve $50 million in sales growth within five years) and NAM agreed to purchase CCMI with the agreement that it would commit its resources and run CCMI in such a way as to permit it to execute the plan.

NAM agreed to provide CCMI with the use of its expansive retailer and manufacturer sales force who was selling their current products, and expose CCMI to NAM's relationships with worldwide affiliates of News Corporation and the Fox Entertainment Network. The entire premise upon which CCMI entered into the August 13, 1999 Stock Purchase Agreement with NAM was NAM's express agreement, commitment and representation to use its sales force and relationships to support CCMI and sell CCMI's product line to reach the $50 million sale figure.

NAM represented and agreed that CCMI would continue to operate as an autonomous division of NAM and benefit from its operational and financial support. NAM agreed that Mr. Fireman and Ms. Raider would continue to manage the CCMI's business unit including sales, operations, personnel, and budgets. By way of example only, in a letter dated October 13, 1999, Ms. Raider wrote to Jennifer Jane confirming the parties' agreement that the CCMI name would be maintained and operate as a separate division. This document is incorporated herein by reference pursuant to Fed.

4

R. Civ. P 33(c).

According to a press release issued by NAM on August 19, 1999, "Consumer Card Marketing, Inc. represents an exciting opportunity for New America ... not only does it complement our existing in-store marketing services but provides retailers with the foundation to build customer loyalty and aid them in increasing profits through targeted loyalty programs." This message was delivered loudly and publicly by Paul Carlucci but NAM never delivered on its promises and commitments.

Further responding, various agreements and contracts were executed by the Plaintiffs in connection with the August 13, 1999 Stock Purchase Agreement and the Stock Purchase Agreement and subsidiary agreements executed in connection with the Stock Purchase Agreement are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 3**

Describe in detail any and all prospects or actual clients of CCMI, SmartSource Direct, or SmartSource iGroup.

**ANSWER NO.: 3**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman also objects to this request because this information is already within NAM's files and therefore the request is unreasonable and harassing. Upon a narrowing of this Interrogatory, Mr. Fireman will reconsider and respond appropriately.

**INTERROGATORY NO.: 4**

Describe in detail all sales forecasts, budgets, or projections; financial statements; annual gross, net sales and/or profit; customers; and business plans for CCMI, SmartSource Direct and/or SmartSource iGroup.

**ANSWER NO.: 4**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman also objects to this request this information is already within NAM's files and therefore the request is unreasonable and harassing. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference NAM's annual business plans, which have been produced by both NAM and the Plaintiffs in this matter. Further responding, NAM's business plans demonstrate conclusively NAM violated its agreement to grow CCMI's business consistent with CCMI's business plan. The business plans have been produced in discovery and are within the files of NAM. These documents are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 5**

Describe in detail any differences in the manner in which CCMI was operated, funded, or managed once it was acquired by NAM versus the way in which it was operated, funded or managed prior to the acquisition.

**ANSWER NO.: 5**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Mr.

6

Fireman also incorporates by reference his interrogatory responses 2, 6-7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states as follows:

Prior to the sale, CCMI was operated by Mr. Fireman and Ms. Raider with advice from its Board Members. Upon the sale, control of the business was lost. Mr. Fireman and Ms. Raider wrote the business plan. They hired the staff, built relationships with clients, attended trade shows, created products, developed a relationship with the press and advertised to the market place the value of its products and services. All actions of the company were designed to generate sales and profits based upon the market needs, to update the product lines and to expand market segments. CCMI had no debt.

Upon sale of the company, the business plan was ignored by NAM. NAM consciously elected not to "run" CCMI at all, but rather to use CCMI's parts to enhance and promote other aspects of NAM's business.

NAM dictated to CCMI all decision concerning staffing and salary and imposed their hiring freeze on CCMI's group. NAM set CCMI's budget, then fired staff and consolidated jobs to NAM, thus taking key pieces of CCMI's business and moving them to make NAM's other divisions more profitable. NAM took these actions while leaving no dedicated, trained staff in place for CCMI. NAM dictated how CCMI could interact with NAM's sales staff, who CCMI could hire as consultants, how to negotiate with vendors, the development plan for software, how and when CCMI could attend trade shows, on changing the company name and on CCMI's annual budgets. NAM provided little or no support for finance, dictated when and how speaking engagements would run and the roles and responsibilities for Mr. Fireman and Ms. Raider.

**INTERROGATORY NO.: 6**

Describe in detail each business decision that NAM made relating to CCMI that you assert caused injury to you.

**ANSWER NO.: 6**

Mr. Fireman objects to this Interrogatory as there are literally hundreds of business decisions made by NAM which caused injury and these decisions were made literally on a daily basis. Mr. Fireman also incorporates by reference his interrogatory responses 2, 5, 7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman provides the following examples of instances where NAM's decision caused the Plaintiffs harm:

- <u>NAM marginalized the role of Mr. Fireman and Ms. Raider</u> - Within a few months of the sale, NAM modified the CCMI's reporting structure. CCMI went from reporting to David DeVoe Jr., the CFO to Henri Lellouche, Vice President, then promoted Mr. Lellouche to Senior Vice President. Mr. DeVoe then created the Smart Source iGroup. By the end of the year, NAM had taken away much of CCMI's sales staff and support structure. Shortly thereafter, CCMI's General Manager Fireman had no direct reports, no ability to control CCMI's budget and numerous projects.

- Ms. Raider and Mr. Fireman were excluded from strategy sessions about the business. On more than one occasion Paul Carlucci declared that he saw no future in targeted direct mail, which was the backbone of CCMI's business and the key to achieving the $50 million dollar plan. His comments and

8

actions were consistent with the marginalization of Mr. Fireman and Ms. Raider's roles and responsibilities and NAM's intent not fulfill CCMI's business plan, but rather to break off CCMI's valuable pieces and use them to develop NAM's business elsewhere.  Mr. Carlucci's comments also had the practical effect of sending a strong message to the sales staff that CCMI was not an important aspect of NAM's business and that others within the company would be ill served to support CCMI and assist in growing the business.

- NAM eliminated Ms. Raider and Mr. Fireman's position as a "thought leader" for loyalty marketing - CCMI spent years developing a reputation as a leader in loyalty marketing.  Ms. Raider and Mr. Fireman attended trade shows, built client relationships and spoke at domestic and international conferences on the subject.  Within one year after the sale, all trade shows were eliminated and all speaking engagements cancelled.  Ms. Raider and Mr. Fireman were silenced in the marketplace and the brand equity and name recognition which CCMI had built over the preceding eight (8) plus years simply evaporated.  Then NAM changed CCMI's name.

- NAM cancelled any and all trade advertising - As early as October 1999, CCMI was precluded from placing any trade advertising about its products under the CCMI name.  NAM informed CCMI that there was no budget.  Ms. Raider raised this issue with the Executive Vice President of Marketing who said CCMI would have support through their Public Relations firm.  The Public Relations firm provided no assistance.

9

- <u>NAM did not provide the sales support to grow the business</u> - The NAM sales force was reorganized in 1999. Chris Mixon directed the sales force to focus on NAM's sales goals which did not include CCMI products. Human Resources did not provide the required assistance to locate CCMI salespersons to call upon retailers. For example, CCMI was only provided with one new sales person after seven months of joining NAM. This failure caused CCMI to lose the ability to identify opportunities and close business transactions because there was no sales support to perform the sales function.

- For at least the first year after the purchase, the NAM sales force received little or no training concerning CCMI's product lines. NAM sales management refused to provide the time for the sales force to be trained and, as a result, the sales force had no knowledge (or financial incentive) to sell CCMI products.

- In the year 2000, NAM set in place a hiring freeze which precluded CCMI from hiring staff.

- Other than a few individuals for at least one year, the duties of CCMI's manufacturer sales force were performed by the SmartSource.com sales force. The SmartSource.com sales force was directed to focus its selling their products as a priority, to their manufacturer clients and not CCMI's core clients.

- Without input from CCMI, the CCMI retail sales force was eliminated by NAM.

- CCMI was never permitted by NAM to be part of NAM's sales tracking

data base.

- <u>CCMI did not have the required financial administrative support</u> – The finance department was initially run by CCMI's Controller. While he was reassigned to the position of Vice President of Operations, for the following year he remained responsible for executing CCMI's accounts receivable and accounts payable function. NAM refused to provide additional personnel to CCMI to perform these functions. When the function was finally turned over to the NAM organization, they paid little attention to CCMI's accounts receivable and as a result they did not collect all the funds (or funds on time) and did not bill properly for items, resulting in decreased revenue.

- <u>NAM controlled CCMI's staffing and salaries</u> - All technical jobs at CCMI in Boston were eliminated and two employees were relocated to Connecticut. One individual was, in theory, to continue to help CCMI, but the other was to work on NAM projects. This resulted in a loss of CCMI's intellectual capital. NAM hired consultants to do this work instead of full time staff and this expense was charged against CCMI's allotted consulting fees. It was clear and agreed between CCMI and NAM that the consultant fees were to be used for marketing consulting. This misallocation of fees caused CCMI to be unable to retain proper marketing consultants necessary to expand the business. It was also used as a charge to CCMI causing Plaintiffs harm in the earn out calculation.

- In addition, CCMI's Vice President of Information Services was paid a salary of approximately $80,000. After the sale, and upon conducting a review of salary levels, CCMI determined that this employee's salary was

too low and should be adjusted to reflect the market rate for an employee of his skill. NAM refused to adjust his salary. However, within 30 days, NAM offered this individual a $50,000 salary increase to move to Connecticut to work for NAM's Information Services department. He accepted. This void left CCMI with no senior technical person in Boston. Within a few short months, this Vice President of Information Services was spending less than 50% of his time on CCMI projects and focusing the majority of his time for SmartSource.com. This is just one of many examples of NAM effectively taking valuable resources of CCMI and utilizing them to grow other aspects of NAM's business, all the while not making any effort whatsoever to replace the resources usurped from CCMI's operations.

- Ms. Raider and Mr. Fireman were prevented from hiring the sales staff they wanted. They were likewise precluded from determining when staff could be added and the salary necessary to attract quality employees. In fact, the personnel shortage was so substantial that CCMI was forced to "borrow" sales people from SmartSource.com to call on CCMI's manufacturer clients. Clearly, these sales people's focus was their own products and CCMI's sales objectives were never achieved.

- The company's reporting functions were divided so there was not one group driving the plan - The CCMI retailer and manufacturer sales forces were divided within NAM. Ms. Raider was in fact the only sales person on the retail sales force from CCMI remaining after one year and she reported to various people in

12

NAM such as Henri Lellouche, Pat Crock and Marty Garofolo. The CCMI manufacturer sales force continued to report to NAM's Henri Lellouche and then onto Marty Garofolo. There was no focus to drive the CCMI business plan as one company and as a result, the company suffered.

- NAM eliminated the Marketing Analysis (MAS) tool with no other product to replace it – CCMI had over 1,000 supermarkets using the MAS software to track their loyalty card holder programs. NAM unilaterally decided that CCMI would no longer support the software although CCMI had no other internal product to offer clients. CCMI spent the next sixty (60) days directing clients to other companies. CCMI lost client relationships and income as a result of NAM's decision not to "run" CCMI.

- NAM also delayed in funding software development and then mismanaged it. In particular, NAM refused to allow CCMI move forward with completing negotiations to upgrade its proprietary Customer Relationship Marketing Software. NAM required CCMI to wait until they hired a new Chief Information Office and Vice President of Information Services before proceeding. NAM eliminated all technology staff in Boston and forced the move of several technical people to Connecticut to work on NAM's base business and not CCMI.

- The contract to expand the software for CCMI was integrated into NAM's overall plans. As a result, CCMI was required to purchase more "seats" for the software than CCMI required. Nevertheless, CCMI was required to bear an unfair burden of the cost without the benefit. NAM's management of the project was inadequate, since no one at NAM had ever performed

13

support software, the integration of CCMI's product to the new platform was delayed eighteen (18) months. Thereafter, the software possessed numerous technical issues. The delay left CCMI without a primary tool for its core loyalty management services resulting in a huge loss of business to its competitors Catalina Marketing and Valassis..

- NAM's Senior Management seemed to have little or no interest in assisting CCMI to thwart competition – For example, when CCMI faced competition from Catelina at Pathmark, CCMI requested that Mr. Porco assist in scheduling a meeting with the President of Pathmark to defuse competition. He refused to do so but instead sent a sales representative days later. By this time, the business was already lost.

- NAM did not fund the expansion of the business to keep pace with market trends – CCMI was prevented from expanding the gift card program for retailers. Even when CCMI identified a large market trend in "retailers" gift cards and prepaid products and services, and even where there was no capital outlay required. NAM refused to support CCMI. By way of example, when CCMI was awarded a $30 million dollars, five (5) year contract to Ahold, NAM ordered CCMI to withdraw from that business as an accommodation to Safeway Marketing Services to secure other business opportunities for NAM, all to the detriment of CCMI and its strategic vendors.

- The Hispanic Market was large and growing and the community had a real need for a stored value money card. Even when CCMI fostered relationships with the White House, built relationships with major banks to

process the transactions and the Mexican business leaders who would

promote the product, NAM refused to provide the internal resources or sales

support to launch the program.

There are numerous other examples and Mr. Fireman reserves the right to

supplement this response or otherwise discuss them in response to questions during

deposition.

**INTERROGATORY NO.: 7**

Describe in detail your job at CCMI (or its successor(s)) after it was acquired by

NAM and how that job description differed from what you expected that job to be before

you started it.

**ANSWER NO.: 7**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague.  Mr.

Fireman also incorporates by reference his interrogatory responses 2, 5-6 and 10-12.

Subject to these, as well as the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman states as follows:

Robert Fireman was the President and CEO of CCMI prior to the acquisition.

NAM agreed that Mr. Fireman would continue to be the General Manager of the CCMI

business unit.  His employment contract confirms this position.  Notwithstanding these

indisputable facts, without discussion or agreement, Mr. Fireman's authority to manage

the business, sales, personnel, finance, technology, strategy was removed and taken

over by other NAM employees.  Major business decisions were made without his

knowledge or consent.  Other employees were even given business cards similar to Mr.

Fireman's, listing the same job title.  Mr. Fireman was not allowed to continue to work

15

on the core businesses of CCMI  He was provided no budget, his administrative staff was removed, and at some point he was ordered not to be present in his Boston office.

Ann Raider was the co-founder of CCMI and the Executive Vice President. All of Sales Staff and Marketing reported to her. Her role included managing the retailer and manufacturer sales forces. All product development, creative services, client services, public relationships and strategic business relationships were led by her. Ms. Raider also managed the P&L. After being acquired, Ms. Raider no longer had any sales or marketing staff reporting to her and no P&L responsibility.  She no longer managed any public relations and had no control over strategic business relationships to lead the sales and marketing for CCMI. Given NAM's commitments to her made in the context of the CCMI acquisition, Ms. Raider was supposed to manage an expanded sales force and interact with the national NAM and News Corp sales teams. She was to be actively involved in the product development and marketing execution. She was to continue to develop the consultative technological sales strategy of CCMI. She was to continue to support the Supermarket and Drug Chain Store associations with strategies to reach CCMI's retail base. After the sale, Ms. Raider's authority in all of these matters was either removed or marginalized to the point of irrelevance. Her consulting team was separated. She never got the time or the attention of any of the NAM's sales forces. Ms. Raider was not allowed to hire the sales people, and all these decisions were made by NAM. As budgets continued to be cut, Ms. Raider did not receive any of the staff necessary to implement the business plan. She was then directed to spend her time supporting the NAM retail sales team to sell products other than those of CCMI. To the marketplace, Ms. Raider was the Senior Vice President of News

America as witnessed in her business cards, but she was given essentially none of the attendant job functions or autonomy.

**INTERROGATORY NO.: 8**

Describe in detail any efforts by Plaintiffs to build a sales force for CCMI.

**ANSWER NO.: 8**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his Interrogatory Responses 2, 5-7 and 10-12. Further responding, and as discussed in the preceding interrogatory responses, the Plaintiffs were not allowed to hire their own sales team and NAM's promised sales force was directed to focus their efforts on selling products other than CCMI's products and services. Any effort to argue for more support from NAM resulted in threatened reprimands.

**INTERROGATORY NO.: 9**

Describe in detail any communications relating to any offers to form an alliance or business relationship with CCMI or to acquire or merge with CCMI, including but not limited to any and all terms of any such offers, the identify of the parties making such an offer, and CCMI's reasons for accepting or rejecting any such offers.

**ANSWER NO.: 9**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman responds as follows:

CCMI was being sought for acquisition by companies looking to move into direct marketing and customer loyalty business sectors. They included First Data Corporation, Valasis, Catalina Marketing, Donnelly, RL POLK, GUS, Experian, and a venture group organizing a public company rollup.

The Plaintiffs broke off negotiations and discussions with these groups when NAM made their commitments, promises and agreements with CCMI.

**INTERROGATORY NO.: 10**

Describe in detail any assertions, promises, commitments, assurances, statements, representations, declarations or communications (collective as used in this interrogatory, "promises") that NAM made to CCMI, Raider or Fireman, as alleged anywhere in the Complaint or elsewhere, including but not limited to any promises made by NAM relating to a plan to operate CCMI as an autonomous division; to allow Fireman or Raider to continue to manage CCMI from Boston; Raider's or Fireman's role after the acquisition of CCMI, including but not limited to Raider's and/or Fireman's involvement in budgeting, projections, sales goals, making decision, management, strategy, technology purchase, hiring/firing/relocation of employees, or otherwise, including in your response, as to each promise, where such promise was made, to whom it was made, in what medium was it made, and whether there were any witnesses to such a promise.

**ANSWER NO.: 10**

Mr. Fireman objects to this Interrogatory as it is overbroad. Further objecting, it is unreasonable and harassing to require Mr. Fireman to identify "any assertions, promises, commitments, assurances, statements, representations, declarations or communications" between CCMI and NAM. Subject to these, as well as the above listed

18

General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12 which identify numerous "assertions, promises, commitments, assurances, statements, representations, declarations or communications." These "assertions, promises, commitments, assurances, statements, representations, declarations or communications" were made numerous times at CCMI's office in Braintree, Massachusetts, on the telephone and in New York and Connecticut's NAM offices. These assertions, promises, commitments, assurances, statements, representations, declarations or communications were made by, among others, NAM's acquisition team, including but not limited to David Devoe Jr., Henri Lellouche and John Rubin. The assertions, promises, commitments, assurances, statements, representations, declarations or communications were confirmed several times by phone and at meetings and luncheons in New York at NAM's corporate offices attended by Paul Carlucci, Dominick Porco, Christopher Mixon, Jennifer Jenn, Wayne Campanelli, among others.

The financial plan approved by NAM upon the purchase of the business and specifically the budget developed in October 1999 demonstrate conclusively that CCMI was to be run separately, with CCMI using NAM's sales force. This is evidenced by, among other things, the lack of a large manufacturer sales force head count in the budget.

**INTERROGATORY NO.: 11**

Describe in detail what would have been necessary for CCMI to make an $8.2 million sales goal from August 1999 to October 2000, as alleged in paragraph 10 of the Complaint, as well as your alleged reasons that CCMI did not make that goal.

**ANSWER NO.: 11**

Mr. Fireman objects to this Interrogatory as it is overbroad. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. Further responding, CCMI could have met its sales goals of $8.2M if NAM had provided the sales and financial support as set out in the plan and run CCMI's business in good faith and as promised. Instead NAM stripped CCMI of its resources and further bogged down CCMI's remaining personnel with unnecessary corporate interference. Among other things, NAM immediately sought to move CCMI's corporate offices, offered CCMI's technical team jobs in Connecticut or terminated them without providing replacement personnel, limited the amount of trade shows and conferences CCMI could attend, refused to hire personnel the Plaintiffs requested, focused the Plaintiffs and CCMI's personnel on the problems of other business units within NAM, and refused to allow CCMI to have the support of the NAM sales force. These and other actions threatened most of the CCMI personnel causing loss of focus and performance. Efforts to argue to keep the CCMI's unit cohesive and together were met with reprimands from NAM executive management. The earnout numbers were negotiated and agreed upon based upon CCMI's historic earnings trajectory. The numbers were chosen as easy targets because the money was intended to be the second half of the purchase price for the business.

By way of example only, per Ms. Raider and Mr. Fireman's letter to David DeVoe Jr. dated October 22, 1999, CCMI was not attaining its goals that CCMI set out to achieve and as promised by NAM. By its letter of December 7, 1999, CCMI sought an

20

extension of the earnout date based upon NAM's admitted failure to provide the support

promised and required. NAM admitted the problem and extended the earnout date.

NAM's misconduct is further evidences by Mr. Fireman and Ms. Raider's January 25,

2000 letter to David DeVoe Jr. These documents are incorporated herein by reference

pursuant to Fed. R. Civ. P 33(c).

**INTERROGATORY NO.: 12**

Describe in detail your allegations, in paragraphs 13 and 15 of the Complaint,

that NAM dismantled CCMI and/or made it impossible for Fireman and Raider to earn

their bonuses; withheld the resources CCMI needed to grow its business; overpaid for

software; used software purchased for the use of CCMI (or its successor(s)) to support

other computer systems within NAM; refused input from Fireman and Raider relating to

software or technology; "ostracized" Raider and Fireman; agreed to pursue new

products but did not; assimilated CCMI into its other businesses; undermined Raider's

and Fireman's role in managing CCMI, either by not including them in strategy

decisions or budget approvals, or otherwise; and/or that NAM "forbade" Raider and

Fireman from working on products.

**ANSWER NO.: 12**

Mr. Fireman objects to this Interrogatory as it is overbroad. Subject to this, as

well as the above listed General Objections, which are specifically incorporated herein by

reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and

10-12 and further responds as follows:

CCMI was among a very few nationally known leaders of Card Marketing in the

supermarket industry. Initial efforts to support the marketing of electronic gift cards into

21

the supermarket industry were rejected by NAM. This became a multi-million dollar win for CCMI competitors. CCMI tried to salvage some of this marketplace when it won the Ahold Contract for prepaid goods and services. NAM, without the Plaintiffs' knowledge and consent, pulled this business from CCMI in an unethical and possibly illegal side deal with a CCMI's competitor to the direct advantage and benefit of NAM's other business units. This is an example of how NAM cast aside and ignored CCMI's business interests for the benefit of NAM. The details of the events set forth herein are described in memoranda dated October 16, 2000 and January 24, 2001 to Chris Mixon. These memoranda are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

Further responding, rather than expand the proprietary software that was developed by CCMI, NAM made the decision to buy an off-the-shelf CRM software, Epiphany. David Benson, NAM's Chief Information Officer, made this decision, not because it would assist CCMI's business (which it did not), but rather because it supported the interests of NAM in that the software had numerous applications which would support and assist NAM. These applications were of no value to CCMI.

Mr. Fireman was not allowed to be involved in the negotiations for the software. Without the Plaintiffs' knowledge or consent, NAM purchased the software from Epiphany for an exorbitant price so the software would have unlimited users and licenses. This was totally unnecessary for CCMI's needs. More importantly, it utilized virtually the entire budget allowance for CCMI's business plan as set forth in the Acquisition Agreement. This also put CCMI in a negative cash position within the Acquisition Document and cost the Plaintiffs hundreds of thousands of dollars on their annual earn out formula.

## INTERROGATORY NO.: 13

Describe in detail your allegation in paragraph 15 (ii) of the Complaint that "CCMI's key personnel were relocated or fired," including in that description the identity of such person, their current address and telephone number, and whether you believe that NAM "relocated or fired" them in bad faith, arbitrarily or irrationally.

## ANSWER NO.: 13

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. Further responding, other than Bill Adam, Mr. Fireman is currently endeavoring to recall the names of the individuals and will supplement this response.

## INTERROGATORY NO.: 14

Describe in detail any and all conduct of NAM relating to the allegations of your Complaint, that you assert were undertaken in bad faith, arbitrarily, irrationally or with any intent to injure Raider or Fireman.

## ANSWER NO.: 14

Mr. Fireman objects to this Interrogatory as it is overbroad. It is unduly burdensome and arguably vexatious to seek a detailed description of all of the bad faith conduct that took place over the years NAM employed Mr. Fireman in an interrogatory response. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. These interrogatory responses provide

23

substantial detail concerning NAM's arbitrary irrational and bad faith conduct, conduct which caused Plaintiffs substantial damages.

## INTERROGATORY NO.: 15

Describe in detail whether you assert that you performed satisfactorily, after CCMI was purchased by NAM, your job responsibilities at CCMI (or it successor(s)), including but not limited to whether you met sales targets or quotas.

## ANSWER NO.: 15

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states that both he and Ms. Raider performed exemplary in their job responsibilities. To the extent sales targets or quotas were not achieved, it was due to the breaches and bad faith of NAM.

## INTERROGATORY NO.: 16

Any and all documents relating to your allegation, in paragraph 15(v) of the Complaint, that changing CCMI's name resulted in losses of CCMI's good will.

## ANSWER NO.: 16

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states as follows:

Partnerships are created to achieve better business results than would otherwise be accomplished alone. They accelerate time to market and expedite expansion which would result in increased sales and profits. NAM took CCMI's people, trade relationships and market intelligence for their best interest and not a partnership to drive CCMI. The market statistics demonstrate conclusively that repetition improves

overall ability to recognize brand claims and brand is associated with memory. A brand is an asset of a company which drives value to the corporation itself.

The CCMI brand was eliminated by NAM. CCMI was an independent company that had achieved an international reputation as a leader in loyalty marketing and had earned the respect of the retailers and manufactures as a company they could trust in executing programs and holding customer data. The changing of CCMI's name caused at least two events to occur. First, CCMI no longer had a presence in the market place so the customers in the marketplace were not sure our entity even existed in the loyalty marketing industry. Plaintiffs missed out on sales opportunities since NAM refused to provide sales force and did not allow Plaintiffs to retain their presence at trade shows. Competitors aggressively built their businesses and took market share. The name change added confusion because Smart Source Direct was perceived as part of NAM, not an independent company with all the integrity and reputation as an industry leader.

**INTERROGATORY NO.: 17**

Describe in detail the basis for your assertion, in paragraph 17 of the Complaint, that NAM miscalculated CCMI's "Gross Margin" and/or Earn Out" or bonus payments pursuant to the Stock Purchase Agreement.

**ANSWER NO.: 17**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated. The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of

good faith and fair dealing precluded and prevented them from achieving the earn-out figures. Further responding and among other things, Plaintiffs do contend that NAM added expenses to the calculation which caused the earnout thresholds to be missed.

**INTERROGATORY NO.: 18**

Describe in detail the value of CCMI, including but not limited to any appraisals or studies, prior to its sale to NAM.

**ANSWER NO.: 18**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO.: 19**

Describe in detail any and all payments you received from NAM, including but not limited to salary, bonus payments, "earn out" payments, commissions, other payments, including payments made for the acquisition of CCMI.

**ANSWER NO.: 19**

Mr. Fireman objects to this Interrogatory inasmuch as this information is already within the possession of NAM. To seek information from the Plaintiffs which NAM already possesses is harassing.

**INTERROGATORY NO.: 20**

Describe in detail any and all damages you seek in this lawsuit.

**ANSWER NO.: 20**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states that CCMI had established itself as the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

26

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

**INTERROGATORY NO.: 21**

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

**ANSWER NO.: 21**

Mr. Fireman objects to this Interrogatory as unduly burdensome and vexatious. He also objects to the extent it purports to seek the disclosure of conversations he had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

Signed under the pains and penalties of perjury this _____ day of November,

2006

Robert Fireman

Attorney as to Objections

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated:  November 27, 2006

CERTIFICATE OF SERVICE
i hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on 11/27/06

28

# EXHIBIT 16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT FIREMAN and ANN RAIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-11740MLW |
| | ) | |
| NEWS AMERICA MARKETING IN-STORE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ROBERT FIREMAN AND ANN RAIDER'S INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)

Robert Fireman ("Mr. Fireman") and Ann Raider ("Ms. Raider") hereby disclose

the following pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and Local

Rule 26.2. Mr. Fireman and Ms. Raider reserve their right to supplement these disclosures

as necessary.

A.    **Individuals Likely to Have Discoverable Information That Mr. Fireman and Ms. Raider May Use To Support Their Claims**

1.    Paul Carlucci
Chairman
News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Carlucci possesses information relative to News America Marketing's
purchase of Consumer Card Marketing, Inc. ("CCMI"), including but not
limited to the negotiations with CCMI and its principals regarding the
purchase. Mr. Carlucci possesses knowledge of CCMI's (which later
became Smart Source Direct) operations and the operations of News
America Marketing as it affected CCMI.

2.    Henri Lellouche
Senior Vice President

News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Lellouche possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Lellouche possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

3.    John Rubin
       Senior Vice President
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

Mr. Rubin possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Rubin possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

4.    Gene Kline
       Executive Vice President
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

Mr. Kline possesses information relative to News America Marketing's purchase of CCMI. Mr. Kline possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

5.    Chris Mixon
       Executive Vice President
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

Mr. Mixon possesses information relative to News America Marketing's purchase of CCMI. Mr. Mixon possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

6.    Bill Chrisie
       Chief Information Officer

2

News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Christie possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

7.    David Devoe Sr.
      Chief Financial Officer
      News Corp.

      Mr. Devoe possesses information relative to News America Marketing's purchase of CCMI. Mr. Devoe possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

8.    Peter Chernin
      President
      News Corp.

      Mr. Chernin possesses information relative to News America Marketing's purchase of CCMI. Mr. Chernin possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

9.    Lachlan Murdock
      News Corp.

      Mr. Murdock possesses information relative to News America Marketing's purchase of CCMI. Mr. Murdock possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

10.   David Benson
      Chief Information Officer
      News Corp

      Mr. Benson possesses information relative to News America Marketing's purchase of CCMI. Mr. Benson possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

11.   Rich Roseman
      Vice President of Information Services
      News America Marketing

1211 Avenue of the Americas
New York, New York

Mr. Roseman possesses knowledge of CCMI's (which later became Smart
Source Direct) operations and the operations of News America Marketing
as it affected CCMI.

12.    Marty Garofalo
Former Executive Vice President of Sales
News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Garofalo possesses knowledge of CCMI's (which later became Smart
Source Direct) operations and the operations of News America Marketing
as it affected CCMI.

13.    Wayne Campanili
News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Campanili possesses knowledge of CCMI's (which later became Smart
Source Direct) operations and the operations of News America Marketing
as it affected CCMI. Mr. Campanili possesses information relating to News
America Marketing's contracts, including its contract with Ms. Raider and
Mr. Fireman.

14.    John Linguini
News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Linguini possesses information relating to News America
Marketing's finances in 2002 and possesses information relating to News
America Marketing's contract with Ms. Raider and Mr. Fireman and the
payout provision. Mr. Linguini possesses knowledge of CCMI's (which
later became Smart Source Direct) operations and the operations of News
America Marketing as it affected CCMI.

15.    David Devoe Jr.
Chief Financial Officer
News Corp.
Avenue of the Stars
Los Angeles, CA

Mr. Devoe possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Devoe possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

16.    Heather Harde
       News Corp.
       Avenue of the Stars
       Los Angeles, CA

       Ms. Harde possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Ms. Harde possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing, including but not limited to www.smartsource.com.

17.    Mike Ricanno
       Chief Financial Officer
       News Corp.
       New York, New York

       Mr. Ricanno possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Mr. Ricanno possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

18.    Dominick Porco
       New York, New York

       Mr. Porco possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Mr. Porco possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

19.    Jennifer Jehn
       Florida

       Mr. Jehn possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

20.    Chris Bruther

Connecticut

Mr. Bruther possesses knowledge of CCMI's (which later became Smart Source Direct) operations, including its finances, and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

21.    Mike Cleary
former VP of Smart Source Direct
General Manager of Mobile Media
Connecticut

Mr. Cleary possesses knowledge of CCMI's (which later became Smart Source Direct) operations, including its finances, and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

22.    Ed Wogan
Vertis Corp.
250 West Pratt
Baltimore, MD

Mr. Wogan possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

23.    Jan Constantine, Esquire
Address unknown

Ms. Constantine possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the business operations of News America Marketing as it affected CCMI.

24.    Deborah Wolf, Esq.
Formerly of Squadron, Ellenoff, Plesent & Sheinfeld
551 Fifth Ave
New York, New York

Ms. Wolf possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase.

25.    Les Charm
Professor
Babson College
Wellesley, MA

6

Mr. Charm possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Charm possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

26.    Diana Fontaine
       Plymouth, MA

       Ms. Fontaine possesses information relative to CCMI's operations.

27.    Robert Coughlin
       Boston, MA

       Mr. Coughin possesses information relative to CCMI's operations, particularly its finances.

28.    Kevin Tripp
       The Gillette Company
       Prudential Center
       Boston, MA

       Mr. Tripp possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Tripp possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

29.    Bill Adam
       Connecticut

       Mr. Adam possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Adam possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

30.    Barry Robinson
       President, Targeted Solutions
       Eliot, Maine

       Mr. Robinson possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

7

31.   Kevin McKenna
      San Antonio, TX

      Mr. McKenna possesses knowledge of CCMI's (which later became Smart
      Source Direct) operations and the operations of News America Marketing
      as it affected CCMI.  Mr. McKenna also possesses knowledge of the loyalty
      marketing industry.

32.   David Henkin, Esq.
      Goodwin Procter
      Boston, MA

      Ms. Henkin possesses information relative to News America Marketing's
      purchase of CCMI, including but not limited to the negotiations between
      CCMI and New America Marketing.

33.   Kevin Bridgewater
      Vice President
      Marsh Super Markets
      Indianapolis, Indiana

      Mr. Bridgewater possesses information relative to CCMI's business as well
      as information relating to the loyalty marketing industry.

34.   David Chincao
      The Kroger Company
      Cincinnati, Ohio

      Mr. Chincao possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

35.   Rich Sterling
      The Kroger Company
      Cincinnati, Ohio

      Mr. Sterling possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

36.   Steve Denny
      Vice President
      The Kroger Company
      Cincinnati, Ohio

      Mr. Denny possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

37.   Christie Coleman
      Bashas Supermarket
      Phoenix, AZ

      Ms. Coleman possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

38.   Jim Nygrin, VP
      Frys Supermarkets
      Phoenix, AZ

      Mr. Nygrin possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

39.   Frank Jack, Controller
      Longs Drugs
      California

      Mr. Jack possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

40.   Steve Prebble Vice President
      Albertsons
      Boise, ID

      Mr. Prebble possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

41.   David Henry, Executive Vice President
      Winn Dixie
      Jacksonville, FL

      Mr. Henry possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

42.   Barry Berman, Executive Vice President
      Stop & Shop Supermarkets
      Braintree, MA

      Mr. Berman possesses information relative to CCMI's business as well as
      information relating to the loyalty marketing industry.

43.   Kathy Harkins, Director
      Bilo Supermarkets
      South Carolina

Mr. Harkins possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

44.     John Wiley, VP
        Grocery Outlet Stores
        California

        Mr. Wiley possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

45.     Eric Blank, President
        Arthur Blank and Co.
        Massachusetts

        Mr. Blank possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

46.     Ron Goad, President
        Oklahoma City, OK

        Mr. Goad possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

47.     Alan Biren, President
        AJ Biren & CO
        Westborough MA

        Mr. Biren possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

48.     Seth Epstein, President
        Tactical Retail Solutions
        Hartford, CT

        Mr. Epstein possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

49.     Carline Thissen
        Retail Solutions
        Naples, FL

        Ms. Thissen possesses information relating to the loyalty marketing industry generally.

50.     David Diamond
        Diamond, Inc.

New York, New York

Mr. Diamond possesses information relating to the loyalty marketing industry generally.

51.    Brian Wolf
        North Carolina

        Mr. Wolf possesses information relating to the loyalty marketing industry.

52.    Ann Raider
        c/o Todd & Weld LLP
        28 State Street, 31st Floor
        Boston, MA 02109

        Ms. Raider possesses information relating to the facts as alleged in her complaint.

53.    Robert Fireman
        c/o Todd & Weld LLP
        28 State Street, 31st Floor
        Boston, MA 02109

        Mr. Fireman possesses information relating to the facts as alleged in his complaint.

54.    Michael Gafney
        New York, New York

        Mr. Gafney possesses information relative to the due diligence performed on CCMI.

**B.    Documents, Data Compilations and Tangible Things In the Possession, Custody or Control of Mr. Fireman and Ms. Raider That They May Use To Support Their Claims**

The following is a description by category and location of all documents, data compilations and tangible things within Mr. Fireman and Ms. Raider's possession, custody or control that they may use to support their claims. Unless otherwise noted, the identified categories of documents are located either with counsel or at Ms. Raider and Mr. Fireman's residence.

These documents include:

1.    Records of CCMI prior to the sale

11

2.    Stock Purchase Agreement

3.    Correspondences protesting lack of action by News America Marketing and earn out issues

4.    PowerPoint Presentations to customers

5.    Trade Journals which describe the market growth and competitors' positions

6.    Original Press Releases of CCMI

7.    Email correspondences and other documentary exchanges between CCMI later Smart Source Direct.

8.    Fiscal Year Planning Documents and Budgets

**C.    Computation Of Any Category of Damages**

At this time, Mr. Fireman and Ms. Raider are unable to quantify their damages suffered as a result of News America Marketing In-Store, Inc.'s misconduct. Further responding, News America Marketing's own records demonstrate that Ms. Raider and Mr. Fireman are owed in excess of $15,000,000.

**D.    Insurance Agreement**

Mr. Fireman and Ms. Raider are plaintiffs in this case and therefore have no insurance agreements relative to this dispute.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,


_____/s David H. Rich_____
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
Dated:  June 1, 2006                    (617) 720-2626

# EXHIBIT 17

## Katz, Gordon (BOS - X75839)

| | |
|---|---|
| **From:** | Katz, Gordon (BOS - X75839) |
| **Sent:** | Friday, May 25, 2007 7:30 PM |
| **To:** | 'Peters, Kevin'; 'Rich, David H.' |
| **Subject:** | Fireman/Raider - NAM Litigation: Cognex Corp. v. Electro Scientific Indus. Inc. -- Motion to Compel Restoration and Search of Backup Tapes |
| **Importance:** | High |
| **Attachments:** | Westlaw_Document_10_02_41_4456.doc; Gordon P Katz.vcf |

Kevin,

I know that we have gone back and forth, and have discussed the backup tape issue thoroughly.  But I again write to request that you withdraw your pending motion to compel production of backup tapes.

I am forwarding a copy of Judge Lindsay's decision in the *Cognex Corp*. case.  I think it is on all fours with the situation we have here.  Please consider this decision, and let me know as soon as possible if you will  withdraw the pending motion -- so that NAM can avoid incurring unnecessary attorneys fees in preparing its opposition.

Many thanks.

Gordon

Gordon P. Katz
Holland & Knight, LLP
10 St. James Avenue
Boston, Ma  02116
617.573.5839
617.523.6850 (fax)
gordon.katz@hklaw.com
www.hklaw.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.  Thank You.

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Cognex Corp. v. Electro Scientific Industries, Inc.
D.Mass.,2002.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
COGNEX CORPORATION, Plaintiff,
v.
ELECTRO SCIENTIFIC INDUSTRIES, INC., Defendant.
**No. Civ.A. 01CV10287RCL.**

Filed Feb. 14, 2001.
July 2, 2002.

represented by Victor H. Polk, Jr., Bingham McCutchen LLP, Boston, MA, Attorney to be Noticed, for Victor H. Polk, Jr., Special Master.
represented by John L. Capone, Cesari & McKenna, LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, Kevin Gannon, Michael E. Attaya, Thomas C. O'Konski, Cesari & McKenna, LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, for Cognex Corporation, Plaintiff.
represented by Claire Laporte, John M. Granberry, Michael V. Dowd, Foley Hoag LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, Mitchell J. Matorin, Foley Hoag LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, Peter B. Ellis, Robert L. Bocchino, Jr., Foley Hoag LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, for Electro Scientific Industries, Inc., Defendant.
represented by Claire Laporte, Michael V. Dowd, Peter B. Ellis, (See above for address), Lead Attorney, Attorney to be Noticed, for Electro Scientific Industries, Inc., Counter Claimant.
represented by Martin J. O'Donnell, Cesari & McKenna, LLP, Boston, MA, Lead Attorney, Attorney to be Noticed, Michael E. Attaya, (See above for address), Lead Attorney, Attorney to be Noticed, for Cognex Corporation, Counter Defendant.
represented by Michael E. Attaya, Thomas C. O'Konski, (See above for address), Lead Attorney, Attorney to be Noticed, for Cognex Corporation, Counter Defendant.

*MEMORANDUM AND RULING OF DISCOVERY MASTER ON MOTION TO COMPEL SEARCH OF ELECTRONIC BACK-UP TAPES*

LINDSAY, J.
**\*1** Plaintiff Cognex Corporation ("Cognex") has informally moved to compel a search by defendant Electro Scientific Industries, Inc. ("ESI") of its electronic backup tapes for documents responsive to Cognex's requests for production of documents. While conceding that it has not searched the subject back-up tapes, ESI opposes Cognex's motion on the basis that it has already conducted an extensive "reasonable" search for documents and that the cost and burden of the search sought by Cognex is unreasonable.

*Factual Background*

*ESI's Document Search*

ESI's document production and search efforts to date have been extensive. ESI's document search efforts included two attorneys from Foley Hoag traveling to ESI's facilities in Ann Arbor, Michigan and meeting with ESI personnel to devise a comprehensive search plan. Letter of Claire Laporte to Victor H. Polk, Jr., dated June 5, 2002 (the "Laporte Letter") at 1-2.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

As a result, ESI produced both paper and electronic files from every current employee who had worked on ESI's CorrectPlace product and all former employees who had worked on the product and whose files could be located. Declaration of Patrick Leonard ("Leonard Dec.") ¶ ¶ 8-12. ESI also searched central paper and electronic repositories identified by employees for files related to CorrectPlace. *Id.* at ¶ ¶ 15, 19-20. After the discovery of the Wilson memorandum which has been the subject of previous motions, ESI further searched for documents from the files of those listed as recipients on the memo even if they had not worked on the CorrectPlace product. *Id.* at 16. ESI also searched every box kept in off-site storage in Ann Arbor, Michigan for documents relating to CorrectPlace. *Id.* at 17. Lastly, ESI searched for documents in its Portland, Oregon facility, where only a small amount of work on the CorrectPlace product had been done and only a few strategic planning meetings focused on the product had occurred. *Id.* at 14.

As far as hard-copy documents are concerned, the search yielded approximately twenty full boxes of material, of which about ten full boxes turned out to be responsive. Laporte Letter at 2. As far as electronically stored documents are concerned, Foley Hoag received approximately eight CDs of electronic files from ESI, which yielded, after screening for responsiveness, more than thirty full boxes of printed documents. *Id.* Foley Hoag also received and produced electronic copies of multiple versions of source code. *Id.*

The present motion is directed to 820 of ESI's electronic back-up tapes. These tapes were created as information back-ups for the possibility that the company's computers crashed or information otherwise was lost. These tapes cover a period from 1992 through 2001.

It is asserted by ESI that these tapes contain approximately 4 terabytes of data-more than 6000 CD-ROMs. Laporte Letter at 3. If printed, the tapes would yield almost three billion pages of documents. *Id.*

**\*2** ESI concedes that these tapes have not been searched for relevant documents. As generalized system back-ups, they may well contain relevant documents. In arguing that it has already conducted a reasonable search, however, ESI provides specifics as to the extent and nature of the search it has already conducted in responding to Cognex's document requests, and the burden the further search sought by Cognex would entail.

In providing detail as to the burden it would incur in conducting such a review, ESI points to the search it did conduct of back-up tapes from the 1988 to 1991 timeframe-tapes covering a time period immediately prior to Cognex's patent filing. Laporte Letter at 3-4. ESI searched these tapes only for source code files, which ESI claims were in a readily recognizable file format that could be isolated relatively quickly. *Id.* at 4.

Even so, it took a seven-person team of Foley Hoag lawyers and paralegals approximately ten weeks' of work to produce the documents, already pre-screened by the client to some degree, contained on the eight CDs produced by ESI to Foley Hoag. *Id.* Even one back-up tape could contain as much as 70 gigabytes of data, or 100 CDs' worth of data, suggesting that the review of the recovered material would consume a substantial amount of time. *Id.*

### *Cognex Back-Up Tapes*

Cognex has also detailed its search for documents responsive to ESI's request. See Affidavit of Arthur O'Dea, Esq. ("O'Dea Aff."). With regard to its search of its back-up tapes, within Cognex it is the policy of the Information Technology group to back up specific systems onto tape daily. O'Dea Aff. ¶ 10. These systems include Cognex's e-mail and file servers, as well as its many PCs and workstations. *Id.* In accordance with that policy, the back-up tapes go off site for storage, and are retained for four months. *Id.* After four months, the back-up tapes come back to Cognex to be recycled-erased and reused for the next backup. *Id.*

Cognex's source code archives are exempt from the four-month retention policy since the entire source code archive for all products is continuously maintained. *Id.* ¶ 11. Certain source code archive files, however, were lost in a 1995 change of Cognex's source code storage system. *Id.* ¶ 12.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

*Discussion*

While ESI's principal arguments have to do with the nature of the search it has already conducted and the burden of the further search Cognex now seeks, ESI also argues that the search should not be ordered because the responsive and non-privileged documents uncovered would "likely be duplicative." The fact that ESI has conducted a thorough search of ESI's existing files does not, however, suggest that a search of back-up files would only uncover duplicative documents. The nature of electronic snapshots inherent in back-up tapes-here covering a nine-year period-suggests that material would be caught in those snapshots which, for whatever reason, is no longer available or not stored in a manner that ESI's search previously uncovered. In addition, in light of the sheer volume of data on the **back-up tapes**, it is virtually inconceivable that they do not contain additional relevant material which would be appropriate for **production**.

*3 The fact that the back-up tapes are believed to contain relevant documents does not end the inquiry. <u>Federal Rule of Civil Procedure 26</u> was specifically drafted to allow the District Court control over the scope and extent of discovery in light of the burden and cost of such discovery. As stated in the 1993 Advisory Committee note to <u>Rule 26</u>, Section b: "The information explosion of recent decades has greatly increased both the potential cost of wide-ranging discovery and the potential for discovery to be used as an instrument for delay or oppression ... The revisions in <u>Rule 26(b)(2)</u> are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery."

In relevant part, <u>Rule 26(b)(2)</u> provides: "The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines ... that the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

Were the issue simply whether ESI should be compelled at its own cost and expense to undertake the search requested by Cognex, the answer would be obvious in light of the facts and circumstances here. ESI has established the substantial efforts it has already undertaken to produce extensive documents to Cognex. The search it has already conducted appears to have exceeded any traditional standard for reasonableness. Moreover, the cost of the search sought by Cognex would likely be astronomical. ESI has already utilized the services of an independent electronic discovery consultant and presumably would utilize one for this project. Given the nature of the search already conducted and the burden of providing what is being sought, the burden and expense of the proposed discovery outweighs its likely benefit.

Making the issue here far more difficult is Cognex's willingness to bear the burden of the search it seeks. In its written submissions, Cognex proposes as an alternative to ESI's bearing the cost of the search that the court order the parties to split the cost. Cognex has also indicated that is would, if required, bear the full burden and costs of such a search.

For purposes of this analysis, it is assumed that an order could be crafted so as to substantially shift the economic costs of the proposed search to Cognex while protecting ESI's right to review its documents prior to production. Such an order could provide for the selection of an independent electronic discovery consultant, a mechanism for determining the searches to be conducted, an ability of ESI's counsel to review the designated documents for relevance and privilege and Cognex's payment of the costs of the electronic discovery consultant and even ESI's time in reviewing the documents. *See, e.g., <u>Rowe Entertainment, Inc. v. William Morris Agency, Inc.,</u>* 205 F.R.D. 421 (S.D.N.Y.2002) (providing a detailed discussion of the rationale and appropriateness of cost-shifting in various electronic discovery circumstances and containing a protocol for such discovery).<u>FN1</u>

> <u>FN1.</u> It has also been argued that cost-shifting, especially with regard to electronic data, serves an important purpose of counterbalancing the tendency to ask for more discovery material than economic efficiency would justify because the cost of producing is not being borne by the party making the request. *See* M.H. Pulver, *Electronic Media Discovery: The Economic Benefit of Pay-Per-View,* 21 Cardozo L.Rev. 1379 (2000).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

**\*4** The parties were asked to provide case law concerning whether ESI's objection to such discovery would be obviated by an order shifting the cost to Cognex. None of the cases provided by the parties are terribly helpful on this issue:
• *Pew v. Scopino,* 904 F.Supp. 18 (D.Me.1995). Upon a party's representation that all documents had been produced and a reasonable search conducted, the court refused to order a re-search for documents. The fact that certain documents may have been missed (as suggested by a third party production) did not justify the burden of re-searching the documents. Unlike *Pew,* however, ESI cannot certify that the back-up tapes were searched and Cognex has offered to incur the expense of a search.
• *Simon Property Group L.P. v. MySimon, Inc.* 194 F.R.D. 639 (S.D.Ind.2000). In this case, plaintiff was allowed at its own cost to search defendant's computers and to re-create deleted files. In so ordering, however, the court noted that plaintiff had shown "troubling discrepancies with respect to defendant's document production." No such showing has been made here.
• *Playboy Enterprises, Inc. v. Welles,* 60 F.Supp.2d 1050 (S.D.Cal.1999). The court also allowed plaintiff at its own cost to search defendant's hard drive for deleted emails. The court noted that few emails had been produced by defendant and defendant had a policy (that continued throughout the litigation) of deleting emails without regard to relevance to the pending document request. No such similar circumstance exists here.


The most closely analogous case cited by the parties is *McPeek v. Ashcroft,* 202 F.R.D. 31 (D.D.C.2001). That case involved claims of retaliation against plaintiff for his making prior claims of sexual harassment. Defendant had searched and produced electronic and paper documents. Plaintiff sought to force defendant to search its back-up tapes for documents that were ultimately deleted but stored in the back-up tapes. As stated by the court:
There is certainly no controlling authority for the proposition that restoring all backup tapes is necessary in every case. The Federal Rules of Civil Procedure do not require such a search, and the handful of cases are idiosyncratic and provide little guidance.

202 F.R.D. at 33. After detailing various considerations in these circumstances, the court ordered a limited search with costs to be allocated later based upon what was found.

The Discovery Master believes that Cognex's willingness to pay for the search of ESI's back-up tapes makes the question of whether ESI should be required to search these tapes a close call. On the record in this case as a whole, however, the Discovery Master will not order the search sought by Cognex.

On the one hand, there is no question in my mind that a search of **back-up tapes** would uncover documents not already **produced**. While ESI has undertaken an extensive search, the very nature of the snapshots reflected in back-up tapes suggests that documents will exist thereon which are no longer in ESI's electronic files. By offering to pay the costs of the search, Cognex greatly diminishes the concern about the burden upon ESI.

**\*5** In finding the search to be unwarranted here under the standards set forth in Rule 26(b)(2), however, I rely upon the following considerations:

1. ESI has already conducted an extensive search for relevant documents. At some point, the adversary system needs to say "enough is enough" and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable. This concept is reflected in Rule 26 itself and made express in the Comments thereto.

2. This is not a case where the record reflects the conscious destruction of documents even after receipt of a document request (as in *Welles* ) or serious discrepancies in discovery (as in *MySimon* ). There is no question but that counsel for plaintiff believes that there has been bad faith in how counsel for defendant has conducted discovery in this case. I disagree. The failure to search back-up tapes itself cannot have been bad faith-the case law does not establish a general duty to search back-up tapes. *See McPeek v. Ashcroft,* 202 F.R.D. at 33. While Cognex complains about the timing of the disclosure of the existence of the tapes, the fact is that ESI did disclose this information and our system of discovery does not provide an automatic mechanism for determining precisely how a search was conducted. The fact that ESI would have failed earlier to disclose the existence of these un-searched back-up tapes does not suggest bad faith.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

3. This is not the type of case where one would expect the most relevant emails to be deleted at the time. In an employment situation (as in *McPeek* ), it is precisely the informal emails evidencing intent that in the normal course would be destroyed and not kept in company records.

4. There is something inconsistent with our notions of fairness to allow one party to obtain a heightened level of discovery because it is willing to pay for it. There are limits on the number of depositions and interrogatories even though more might well produce relevant information. There is no exception to those limitations based upon one party's willingness to pay. The sense of fairness underpinning our system of justice will not be enhanced by the courts participating in giving strategic advantage to those with deeper pockets. In the cases discussed above where cost-shifting was deemed appropriate, the specific circumstances justifying the discovery appear to be stronger than presented here.

5. I also give weight to the fact that Cognex, by corporate policy, destroys its back-up tapes after four months. There is nothing inherently wrong in the adoption of such a policy and there has been no suggestion of any improper action by Cognex in either the adoption or practice of its policy. The practical effect of such a policy, however, is to preclude others from conducting precisely the type of search sought here-even in those types of cases where back-up tapes would be expected to uncover highly relevant information. In the context of this case and the search already conducted by ESI, having adopted such a policy, Cognex should not be heard to require such a search from ESI without more of a showing than here.

*Ruling*

**\*6** For the foregoing reasons, Cognex's informal motion to compel ESI to search its back-up tapes is hereby DENIED.

D.Mass.,2002.
Cognex Corp. v. Electro Scientific Industries, Inc.
Not Reported in F.Supp.2d, 2002 WL 32309413 (D.Mass.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 18

## Files Reviewed by Fireman and Raider

**4.0**        **HENRI LELLOUCHE DOCUMENT PRODUCTION**

    **4.01**    **2000 – 2001 Highlights and Minutes**
           **4.01.01**        **Volume 1**
           **4.01.02**        **Volume 2**

    **4.02**    **2001-2001 Salespeople Highlights and Calendar**
    **4.03**    **Ann Raider Highlights 2002-2003**
    **4.04**    **ASpen**
           **4.04.01**        **Volume 1**
           **4.04.02**        **Volume 2**
           **4.04.03**        **Volume 3**
           **4.04.04**        **Volume 4**

    **4.05**    **ABT Project**
    **4.06**    **Braintree to Boston Office Move**
    **4.07**    **Coupon Card Program**
    **4.08**    **Donations Direct**
    **4.09**    **EDialog**
    **4.10**    **Freeride**
    **4.11**    **Greenpoints**
    **4.12**    **iBelong**
    **4.13**    **Infospace**
    **4.14**    **Krasdale**
    **4.15**    **Microsites**
    **4.16**    **OnVantage**
    **4.17**    **Produce Warehouse**
    **4.18**    **Promotions**
    **4.19**    **Portal Development**
    **4.20**    **QSI Payments**
    **4.21**    **Retail Emails**
           **4.21.01**        **Volume 1**
           **4.21.02**        **Volume 2**
           **4.21.03**        **Volume 3**
           **4.21.04**        **Volume 4**
           **4.21.05**        **Volume 5**
           **4.21.06**        **Volume 6**
           **4.21.07**        **Volume 7**
           **4.21.08**        **Volume 8**

    **4.22**    **Retail Sales Meetings 2002-2003**
    **4.23**    **Shopease Program**
    **4.24**    **Staffing Emails**
           **4.24.01**        **Volume 1**
           **4.24.02**        **Volume 2**

    **4.25**    **Stored Value Programs**
           **4.25.01**        **Volume 1**

# Files Reviewed by Fireman and Raider

|            |          |
|------------|----------|
| 4.25.02    | Volume 2 |
| 4.25.03    | Volume 3 |
| 4.25.04    | Volume 4 |

**4.26** **Toshiba Project**
**4.27** **TRS and Entrance Targeting**

|         |          |
|---------|----------|
| 4.27.01 | Volume 1 |
| 4.27.02 | Volume 2 |

**4.28** **Vortal Pages**
**4.29** **Henri Lellouche Document Production General Binder**
**4.30** **Henri Lellouche Document Production General Binder**

**7.0** **ROBERT FIREMAN DOCUMENTS**

**8.0** **ANN RAIDER DOCUMENTS**

**9.0** **DOCUMENTS SUPPLIED BY DON JACK, JANUARY 2006**

| 9.01 | Volume 1 |
|------|----------|
| 9.02 | Volume 2 |
| 9.03 | Volume 3 |
| 9.04 | Volume 4 |
| 9.05 | Volume 5 |
| 9.06 | Volume 6 |
| 9.07 | Volume 7 |
| 9.08 | Volume 8 |
| 9.09 | Volume 9 |
| 9.10 | Volume 10 |

**11.0**

**11.01** **Acquisition of Consumer Card Marketing, Inc. by News America Marketing In-Store, Inc., August 13, 1999**

**12.0** **DOCUMENTS PRODUCED BY WANYE CAMPANELLI**

**13.0** **BUDGETS, 2000-2003**

**14.0** **JOHN LINGUITI FILE**

**20.0** **FURTHER DOCUMENTS SUPPLIED BY NEWS AMERICA**

**20.01** **Henri Lellouche Disc Production**

| 20.01.01 | Volume I |
|----------|----------|
| 20.01.02 | Volume II |
| 20.01.03 | Volume III |
| 20.01.04 | Volume IV |

## Files Reviewed by Fireman and Raider

20.01.05  Volume V
20.01.06  Volume VI
20.01.07  Volume VII
20.01.08  Volume VIII
20.01.09  Volume IX
20.01.10  Volume X
20.01.11  Volume XI
20.01.12  Volume XII
20.01.13  Volume XIII
20.01.14  Volume XIV
20.01.15  Volume XV
20.01.16  Volume XVI
20.01.17  Volume XVII
20.01.18  Volume XVIII

20.02  **Henri Lellouche Disc 2**

20.02.01  Volume I
20.02.02  Volume II
20.02.03  Volume III

20.03  **Marty Garofalo Disc Production**

20.04  **Miscellaneous Meeting Minute E-mails**

20.05  **NAM Executive Committee Meeting (6/21/99 – 12/26/00)**

20.06  **NAM FSI Executive Committee (7/6/99 – 12/26/00)**

20.07  **NAM In-Store Executive Committee (6/22/99 – 12/19/00)**

20.08  **NAM Management Council Meeting (6/28/99 – 9/5/00)**

20.09  **Deborah Wolfe Documents Produced for Review**

20.09.01  Volume I
20.09.02  Volume II
20.09.03  Volume III
20.09.04  Volume IV
20.09.05  Volume V

# 4573504_v1

# EXHIBIT 19

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 1. | 1 | 1998-2000 | Michigan State University | Letters/other documents re: MSU's Food Industry Management Program |
| 2. | 1 | 1998-1999 | Michigan State University | Letters/other documents re: CCMI contacts through MSU's Food Industry Management Program |
| 3. | 1 | | | Loose pamphlets and brochures re: marketing for food and cards |
| 4. | 1 | 1998-1999 | Duane Reade | Various letters/notes re: partnership between News America Marketing/SMARTSOURCE and Duane Reade; Duane Reade's participation in Loyalty Marketing Program and various materials re: the Marketing Program; marketing documents |
| 5. | 1 | 1998 | Danier Leather | Danier Leather Database Plan and CCMI proposal |
| 6. | 1 | 2000 | Giant Bonus Card | Various proposals and plans regarding Giant Bonus Card |
| 7. | 1 | 1999 | Jingle Ball Sweepstakes | Documents re: tie-in between Duane Reade and Jingle Ball tickets |
| 8. | 1 | 1999 | Speaker Handouts | NACDS Conference for Regional Chains featuring the Technology Theater - Speaker Handouts |
| 9. | 1 | 1999 | Toys 'R Us | Letters/handouts re: presentation to Toys 'R Us |
| 10. | 1 | 1993-1995 | Taco Bell | Frequency Program and Rewards Program reports/questionnaires |
| 11. | 1 | 2000 | SWOCC.com | Business Plan and notes |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 12. | 1 | 1998-1999 | Meijer | Proposal/analysis re: Gift Card program; various notes |
| 13. | 1 | | Michigan State University | MSU Food Industry Coalition brochures |
| 14. | 1 | 1998 | Kids Zone | Notes/analysis re: Application software for data tracking purposes |
| 15. | 1 | 1998 | Lids | Loyalty Marketing Program proposal/notes |
| 16. | 1 | 1999 | Modern Women | Notes/power point re: database marketing options |
| 17. | 1 | 2000 | Neiman Marcus | InCircle Membership Benefits and Preview Book |
| 18. | 1 | 1999-2000 | Old Navy | Postcard Coupons |
| 19. | 1 | 1999 | Old Navy / GAP | Notes/Presentations re: card proposal for Old Navy (GAP) |
| 20. | 1 | 1999 | Payless ShoeSource | Customer Loyalty Marketing Proposal materials |
| 21. | 1 | 1998 | ShopKo | Materials re: history of ShopKo; Loyalty Program presentation materials |
| 22. | 1 | 1997-1999 | Shoppers Drug Mart | Proposals/notes re: Customer Loyalty Program; communications re: initial meetings |
| 23. | 1 | 2000 | I Belong | Materials re: presentation/notes for Loyalty Program |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 24. | 1 | 2000 | Giant | Materials re: Introduction of Giant BonusCard |
| 25. | 1 | 1998-1999 | Kroger | Notes/communication re: production of Employee Benefit and Customer cards |
| 26. | 1 | 1998 | Jitney Jungle | Information re: Customer Information Management System |
| 27. | 1 | 2000 | Houchens | Communication/proposals re: Targeted Marketing Program |
| 28. | 1 | | | Various loose brochures |
| 29. | 2 | | | This box is all Actmedia, Inc. not CCMI |
| 30. | 2 | 1990-1991 | Sampling | Conocraft and Kellog's materials re: samples/coupon devices |
| 31. | 2 | 1992-1993 | Sampling Machine | Materials re: Sampling Machine development |
| 32. | 2 | 1990-1991 | Satellite | Marketing materials re: Satellite Technology & Research; also includes folder re: Telecast U.S.P ("A Unique Growth Opportunity for Actmedia, Inc.) |
| 33. | 2 | 1994 | Signals | Letter re: end of relationship between Actmedia and Signals |
| 34. | 2 | 1991 | Seven 11 | 7/11 Annual Report; also includes file: "On-Site Media" newspaper re: competition |
| 35. | 2 | 1991 | On-Shelf | Potential "On-Shelf" electric advertising; Includes materials re: talking Shelftalk |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|-------|-------|--------------|-------------|
| 36. | 2 | 1992 | Statistics | Various materials re: statistics regarding shopping traits |
| 37. | 2 | 1992-1993 | Technologies | Various marketing materials re: new products |
| 38. | 2 | 1992 | Tannehill | Materials re: new Ad Screen for in store use (contains various Confidentiality Agreements) |
| 39. | 2 | 1991 | Telephone Services | Folders for: "Southwestern Bell," "Sprint Telemedia," and "Telepromotions" - includes materials re: potential partnerships for telepromotion purposes |
| 40. | 2 | 1992 | Television Monitors | Magazine: "ResonseTV" re: home shopping |
| 41. | 2 | | Trade Shows/Seminars | Various materials re: Comdex trade show |
| 42. | 2 | 1993 | Trends in Marketing | Newspaper article trend to "clear" plastics |
| 43. | 2 | 1991 | VBI Data Broadcasting | Communication regarding desire to market product for in-store use in association with ActMedia, Inc. |
| 44. | 2 | 1991 | Videos | Materials re: Video Advertising for in-store use |
| 45. | 2 | 1991 | Auto. Viedo Rental CNT | Marketing materials re: Keyosk automated video rental units |
| 46. | 2 | | On-Site Media | (EMPTY) |
| 47. | 2 | 1991 | Previewtech Video | Communications re: potential sales agreement re: electronic sales |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 48. | 2 | 1991 | Video Vending Machines | Notes re: opportunity for video vending machines |
| 49. | 2 | 1992 | Worldlink | Notes/communication re: LED signs that ActMedia borrowed from WorldLink for test purposes |
| 50. | 2 | | Advanced Promotion Technologies | Prospectus for Advanced Promotion Technologies |
| 51. | 2 | | Audio Systems | List of various audio systems |
| 52. | 2 | 1991 | Instore Satellite Net | Marketing Materials re: "Instore Satellite Network |
| 53. | 2 | 1991 | Talking Shelftalker | Letter re: Specifications for unit |
| 54. | 2 | 1992 | Carts | Communications/notes re: advertising on carts |
| 55. | 2 | 1992 | Cart Clip | Communication/notes re: cart clip system |
| 56. | 2 | 1991 | Rolling Researcher | Articles about new technology for cart advertising |
| 57. | 2 | 1988-1991 | Supersign | Notes/materials re: Supersign advertising services |
| 58. | 2 | 1992 | Carts - Legal | Confidentiality Agreement re: Shopping Cart displays with Tannehill |
| 59. | 2 | | Checkouts | Marketing materials re: signage at checkout locations |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 60. | 2 | 1991 | Automated Checkout Machine | Various articles about automated check out registers and purchase of automated checkout company |
| 61. | 2 | 1991 | Checkstands | Article about new technology for marketing coupons |
| 62. | 2 | | ESP Card | (EMPTY) |
| 63. | 2 | 1992 | Checks/Couponing | Marketing materials re: samples for Certificates/Coupons |
| 64. | 2 | 1993 | Couponing | Various articles/materials re: coupon options |
| 65. | 2 | 1991 | 1991 Couponing GDE | Materials re: coupon history |
| 66. | 3 | | | This box is all Actmedia, Inc. not CCMI |
| 67. | 3 | 1997 | Research Services | Research materials from "The Computer Board" and "Compuserve" including LexisNexis introductory materials |
| 68. | 3 | 1996 | SSN | Materials re: partnership with Supermarket Shopping Network, Inc. for on-line marketing tools |
| 69. | 3 | 1996 | Target Rx | Materials re: Target Rx marketing program; includes materials about in-store Kiosks |
| 70. | 3 | 1996-1997 | Peapod | Numerous materials re: partnership with Peapod; includes products, marketing plans, notes/emails, articles |
| 71. | 3 | 1996 | Retail | Includes materials re: marketing trends via survey; workers and responsible zones; also included is a folder marked confidential with documents re: office heirarchy |

## FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 72. | 3 | | Technology Review | Article (charts) re: communications market |
| 73. | 3 | | | Loose Documents |
| 74. | 4 | 1998 | Bank Information | |
| 75. | 4 | 1998 | | Tax, Income Information - includes invoices, analysis, reports |
| 76. | 4 | 1999 | | Various bank account information |
| 77. | 4 | 1998 | CCMI 1998 Invoices | |
| 78. | 4 | 1992-1994 | Accounts Receivable | |
| 79. | 4 | 2001 | SmartSource iGroup Product Sampling Overview | Includes various product samples |
| 80. | 4 | | VCT Presentation | Versatile Card Technology Product Presentation for CCMI |
| 81. | 4 | 2000 | Purchase Orders | |
| 82. | 4 | 1999 | Purchase Orders | |
| 83. | 4 | 1996 | Financial Analysis | Various reviews of financial information for various accounts |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 84. | 5 | 2001 | ASPen Data Services Workbook | Includes directions for using various services |
| 85. | 5 | 1997-1999 | Business Cards | |
| 86. | 5 | | Unlabelled Folder | Various documents: does not seem to have a clear focus - lots of mention of card opportunities but includes various other things |
| 87. | 5 | 2004 | Harper Collins | Materials related to Customer Loyalty Marketing Program (especially consumer cards) |
| 88. | 5 | | Loyalty Marketing Products | Binder with SmartSource Direct's Loyalty Marketing Products |
| 89. | 6 | 1996 | ActPromote | Various materials (proposals and analysis) re: electronic paperless coupons |
| 90. | 6 | 1996 | ACV | Information re: Retail Marketing Analysis |
| 91. | 6 | 1994-1997 | Interactive Services Assoc. | Articles and Reports from Interactive Services Association (seems to be a consumer report service) |
| 92. | 6 | 1996 | Competitive Overview | ActMedia, Inc. Selected Competitive Overview Report |
| 93. | 6 | 1996 | chConferences | Various materials from Food Retail Conferences |
| 94. | 6 | | Event Marketing | (EMPTY) |
| 95. | 6 | 1997 | FMI | Documents from FMI Supermarket Industry Convention & Educational Exposition |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 96. | 6 | 1992 | ICM Texh | Instant Coupon Machine Marketing Plan |
| 97. | 6 | 1995 | ICM vs FSI | Notes re: comparison of two potential product providers |
| 98. | 6 | 1996 | Impact | Analysis of sales force |
| 99. | 6 | 1996 | Industry - PROMO | Promotional Practices surveys and analysis |
| 100. | 6 | 1996 | Internet | Numerous documents re: potential of internet for marketing strategies/how to attack internet re: coupons/ads/etc. |
| 101. | 6 | 1996-1997 | Internet-Retailing | Various materials re: development of home grocery shopping (ie internet orders) |
| 102. | 6 | 1996 | Local Marketing | Various articles re: spread of AdCart advertising |
| 103. | 6 | 1997 | Meal Solutions | Various documents about potential co-marketing with online "meal idea" company |
| 104. | 6 | 1996-1997 | Memos In | Numerous Memos received re: different topics |
| 105. | 6 | 1996 | NVG - Schedules | Documents re: sales meeting agenda/results and other documents re: sales force/personnel |
| 106. | 6 | 1995-1996 | POPAI | Documents from the Point-of-Purchase Advertising Institute (POPAI) - studies/surveys about the consumer marketplace |
| 107. | 6 | | Position Papers | ActMedia's position papers related to various alliances/marketplace conditions |

## FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|-------|-------|--------------|-------------|
| 108. | 6 | 1996 | Research Brain Reserve | Documents from presentation by BrainReserve re: marketing ideas |
| 109. | 7 | 1998 | General Posting Journal | |
| 110. | 7 | 1999 | Payables Journal | |
| 111. | 7 | | Meijer | Binder of documents related to Meijer account |
| 112. | 7 | 1998 | CCMI Financials | |
| 113. | 7 | 1998 | Invoices | |
| 114. | 8 | | Data Entry Record Layouts | Record Layouts for various businesses |
| 115. | 8 | | Wegmans Customer File | Various documents related to the Wegmans account. |
| 116. | 8 | 1999 | Performance Printing Company Quality Manual | Company and Product Information presentation manual |
| 117. | 8 | 1999 | Bank Information | |
| 118. | 8 | 1999 | January-June General Posting Journal | |
| 119. | 9 | 1995 | County Store List | List of Counties and types of stores by County |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 120. | 9 | | Aislevision Resource Directory | List of Ad types available at Aislevision |
| 121. | 9 | 1993-1995 | Aislevision Issues | Documents related to financial issues of Aislevision (declining revenue but important tool) |
| 122. | 9 | 1994-1995 | Freezervision | Documents related to Freezervision (point-of-purchase advertising in freezer section) |
| 123. | 9 | | Cause Marketing | Various documents related to "cause marketing" (cross promotional marketing with such groups as the Muscular Dystrophy Association or March of Dimes) |
| 124. | 9 | 1994 | Venture | Materials related to partnership with Venture Stores |
| 125. | 9 | 1994 | Mass Merchandise Test | Documents regarding Massachusetts Merchandise Tests (stocks at various stores) |
| 126. | 9 | 1995 | Wal-Mart | Materials related to test/results of in-store marketing at WalMart stores |
| 127. | 9 | 1994 | KMart | Various letters re: apparent "unauthorized use of ActMedia's marks and products" in Kmart stores |
| 128. | 9 | 1995-1996 | DCD | Product materials and test results re: Data Collection Device (electronic - handheld) |
| 129. | 9 | | | Loose documents: Documents relate to Venture Stores, plus random coupons |
| 130. | 10 | 1992 | Retail Software | Brochure from MarketWare Corporation that does retail software |
| 131. | 10 | 1991-1993 | Retail | Various articles and brochures re: retail marketing |

11

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 132. | 10 | 1992 | Promotions - Electronic | Brochure from Electronic Sales Promotions company - presents Targeted Shopper's List Program |
| 133. | 10 | 1991 | Publications/ Publishers | Various files for multiple potential marketing partners |
| 134. | 10 | | Pop Times In-Store Guide | EMPTY |
| 135. | 10 | 1991 | Photography | Communications re: 3-D photo technology |
| 136. | 10 | 1992 | Outdoor Advertising | Letter from MEI re: outdoor signage opportunities |
| 137. | 10 | | Non-electronic Signs | Various product descriptions for non-electronic sign options |
| 138. | 10 | 1991 | Newspaper Advertising | Company info re: company that "delivers" newspaper readers as consumers |
| 139. | 10 | 1990 | New Products Misc. | Product material re: Electronic Sales Promotions new ideas and freezer product |
| 140. | 10 | 1992 | Mobile Freezers | In-Store Sales, Inc. presentation binder; letter re: partnership |
| 141. | 10 | 1990-1992 | Media One | Notes and material re: Decision Point Media, Inc. Business Plan |
| 142. | 10 | 1992 | Market Imaging Systems | Letter re: reasons for working together (MIS is a pre-visit customer targeter) |
| 143. | 10 | | Marketing | EMPTY |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|-------|-------|--------------|-------------|
| 144. | 10 | 1993 | L.E.D. Signs | Notes/presentation materials re: L.E.D. signs |
| 145. | 10 | 1992 | Kiosks | Product information for various Kiosk options |
| 146. | 10 | 1992 | Joint Ventures | News articles of CBS, Nabisco joint venture |
| 147. | 10 | 1993 | Interactive | Product information about various in-store interactive marketing products |
| 148. | 10 | | Home Shopping | Articles/materials re: home shopping options |
| 149. | 10 | 1992 | National Cash Register | Communication re: discussions about new shopping cart marketing option |
| 150. | 10 | | Hi-Tech/Electronic Programs | EMPTY |
| 151. | 10 | 1992 | Hispanic Programs | Materials re: advertising in Spanish |
| 152. | 10 | 1992 | Hansmann's Mills | Materials regarding potential relationship between ActMedia and Hansmann's.  Includes various business plans. |
| 153. | 10 | 1991 | Ideas In-Store | Product descriptions for in-store promotion options (games and sweepstakes included) |
| 154. | 10 | 1992 | FSI's - Sullivan's Marketing | Article about competitor |
| 155. | 10 | 1993 | Frequent Shopper Programs | Articles about frequent shopper programs |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 156. | 10 | 1992 | FMI | Product brochures for in-store handheld data collecting machines |
| 157. | 10 | 1993 | FMI | Information re: Food Marketing Institute Seminar |
| 158. | 10 | 1992 | Electric Signs | Various product descriptions for electric signs |
| 159. | 10 | 1993 | Display Network, Inc. | Notes/Confidentialy Agreement between ActMedia and Display Network, Inc. |
| 160. | 11 | 2003 | KVAT | Documents regarding various projects that SmartSource is doing with KVAT Food Stores.  Includes proposals and product information, communications, and other material. |
| 161. | 11 | 2002 | KVAT | Materials re: stored value and promotional programs for KVAT |
| 162. | 11 | 2001 | UNLABELLED | Appear to be documents related to the National Association of Chain Drug Stores Annual Meeting and preparation by SmartSource for the meeting |
| 163. | 11 | 2001 | AHOLD | Personal Savings System and Loyalty Marketing proposals for AHOLD. Also includes numerous e-mail discussions between Raider, Fireman, Lellouche and others |
| 164. | 11 | 2001 | NACDS Annual Meeting | Documents re: National Association of Chain Drug Stores Annual Meeting |
| 165. | 11 | 2000 | NACDS | Documents re: National Association of Chain Drug Stores Annual Meeting |
| 166. | 11 | 1999 | Doug Harvey | Various materials relating to Doug Harvey & Associates who appears to be a partner in marketing SmartSource products |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 167. | 11 | | UNLABELLED | Various articles/materials (produced by SmartSource) regarding some of the types of programs they offer. |
| 168. | 11 | 2000 | Retail Systems / Portal | Numerous introductory letters to various companies re: CCMI's potential product help.  (In response to to Retail trade show?)<br><br>Potential webpage portal graphics for SmartSource and partners. |
| 169. | 11 | 1998 | Data Mining | Booklets of strategy/purpose of database mining |
| 170. | 11 | | Co-Branded Credit Cards | CCMI documents re: Co-Branding |
| 171. | 11 | | | LOOSE CCMI Presentation documents |
| 172. | 11 | | Investor Presentations | Investor Presentation powerpoint pages |
| 173. | 11 | | Frequent Shopper Data | Powerpoint presentation re: Frequent Shopper Data |
| 174. | 11 | 2002 | Ice Age Video | Various documents related to the promotional activity involving CCMI and Ice Age |
| 175. | 11 | 2002 | Best Practices | CCMI flyers and booklets re: Loyalty Marketing Best Practices/Objectives and Measurements |
| 176. | 11 | 2000 | Pizza Hut | Promotional materials re: Pizza Hut |
| 177. | 11 | 2001 | Catalina | Contract, proposals, product information for Catalina Marketing Corporation; Powerpoint presentation |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 178. | 11 | 2002/2001 | Digital Kiosk / Platform Entrance Marketing | Digital Kiosk Product flyers<br><br>IGroup Offer Issuance Platform Booklet |
| 179. | 11 | 2001 | Elrick & Lavidge | Documents discussing partnership possibilities; includes proposals for utilizing retailers' databases. |
| 180. | 11 | 2001 | Browser | Materials re: Web Browser and Desk Top marketing tools |
| 181. | 11 | 2004 | Warner Brothers | Communications and proposal re: Warner Brothers loyalty marketing program |
| 182. | 11 | 2001 | Pizza Hut | Notes re: Pizza Hut opportunities |
| 183. | 11 | 1998-2000 | Long's | Communications with Long Drug Stores re: SmartSource Loyalty Marketing and Gift Card programs; also includes a powerpoint presentation |
| 184. | 11 | 2001 | Pathmark | Pathmark introduction booklet (produced by Catalina Marketing Corporation) |
| 185. | 12 | 1998 | CCMI Invoices | Doesn't look like its actually invoices - More likely Bank Transaction Posting Journal |
| 186. | 12 | 1998 | Transaction Posting Journal | |
| 187. | 12 | 1998 | Purchase Orders | |
| 188. | 12 | 1998 | Account Analysis | |
| 189. | 12 | 1995 | Account Analysis | |

16

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 190. | 12 | | Plastic Card Printing | Product examples |
| 191. | 12 | 1995 | CCMI Presentation Materials | |
| 192. | 12 | 2000 | Fry's Food Stores Account Binder | |
| 193. | 13 | 2001 | DMA Conference & Exhibition - Chicago | Various programs, guides, and brochures from convention |
| 194. | 13 | 2000 | | LOOSE - documents re: Rick Brittain Files |
| 195. | 13 | 2000 | Sandy | Personnel File: includes evaluation and tracking for Sandra (Sandy) London the Sales Director |
| 196. | 13 | 2003 | Winn Dixie | Reports re: products/financial analysis |
| 197. | 13 | 2002-2003 | Winn Dixie | Various documents re: Winn Dixie Customer File; includes proposals, communications, etc. |
| 198. | 13 | 2002 | Warner Brothers | Notes, communications, brochures re: possible promotional tie-ins with Warner Brothers |
| 199. | 13 | 2002 | Wallace Seminar & Trade Show | Documents/products from Wallace convention |
| 200. | 13 | 1998 | Sprint | Proposal and presentation re: Loyalty Marketing for Sprint |
| 201. | 13 | 2001-2003 | Sutton Place Gourment | Communications, proposals, notes regarding Sutton Place Gourmet Loyalty Program products |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 202. | 13 | 2003 | Travel Club | Product brochure re: Ahold Travel Club card |
| 203. | 13 | 2002 | Stop & Shop | Various communications/product proposals for tie-ins with Stop & Shop |
| 204. | 13 | 2002 | J. Caputo/MC Program | New loyalty marketing option pitched to News America. |
| 205. | 13 | 2003 | MGM | File re: potential tie-in with movie "Good Boy!" |
| 206. | 13 | 2003 | Marathon Oil | Communications re: estimates for consumer card |
| 207. | 13 | 2001-2002 | Kroger | Notes, communications, proposals re: Kroger Marketing Programs |
| 208. | 13 | 2003 | Floral Show | Various materials re: "The Super Floral Show" convention |
| 209. | 13 | 2002 | Flemming | Presentation materials re: Fleming Loyalty Marketing |
| 210. | 13 | 2002 | Happy Harrys | Materials re: Happy Harry's retail store |
| 211. | 13 | 2004 | Kmart | Presentation Materials re: Marketing Options |
| 212. | 13 | 2001-2002 | Foot Locker | Communications, notes, proposals re: marketing relationship with Foot Locker |
| 213. | 13 | 2002 | Foot Locker Pilot | Documents re: installation of customer loyalty marketing plan |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|-------|-------|--------------|-------------|
| 214. | 13 | 2001-2002 | CVS | Notes, proposals re: marketing program |
| 215. | 13 | 2002 | BJ | Notes, proposal for BJ's |
| 216. | 13 | | Class Action | Notes, documents re: SmartSource's solution to the problem of class action suits filed by customers |
| 217. | 13 | 2003 | Ahold Promotion | Documents re: Travel Club Card promotion for Ahold |
| 218. | 13 | 2003 | Ahold Promotion | Documents re: potential travel gift certificate for Ahold |
| 219. | 14 | | UNLABELLED | Appears to be loose documents regarding a variety of things.  Includes approvals/invoices/other documents |
| 220. | 14 | | GE Financial | Presentation from GE Financial re: insurance |
| 221. | 14 | | LOOSE | Rest of the documents are loose magazines, brochures, variety of other documents - doesn't seem to be anything specific |
| 222. | 15 | | LOOSE | Borders and Pampers gift products |
| 223. | 15 | 2001/2002 | UNLABELLED | Executive Committee meeting notes and agenda |
| 224. | 15 | 2002 | Ann Notes | Communications/notes re: multiple potential programs |
| 225. | 15 | 2002 | UNLABELLED | Notes, agendas, and highlight reports re: accounts and sales |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 226. | 15 | 2001 | Duane Reed | Communications, notes, proposals re: Duane Reed electronic card and promotional programs |
| 227. | 15 | | Duane Reed | More documents re: Duane Reed programs |
| 228. | 15 | 2000 | Bashas | Notes and proposals re: Bashas' Customer Loyalty program |
| 229. | 15 | 1999 | Brooks | Electronic Gift Card and Loyalty Marketing Proposals for Brooks pharmacy; also, notes |
| 230. | 15 | 2002 | FMI Advertising Conference | Materials from the Advertising and Marketing Conference |
| 231. | 15 | 2003 | FMI | Materials from Supermarket Industry Convention & Educational Exposition |
| 232. | 15 | 2001 | FMI Advertising Conference | Materials from the Advertising and Marketing Conference |
| 233. | 15 | 2002 | DMS Show | Materials from Direct Marketing Association Show |
| 234. | 15 | 1999 | Market Tech Visitors List | List of retailers and non-retail visitors to Market Tech Show |
| 235. | 15 | 1999 | Markettechnics | Various documents related to Markettechnics show |
| 236. | 15 | 2000 | Sales Meeting | Materials from Nov. '00 Sales Meeting |
| 237. | 15 | 2000 | Sales Meeting | Handouts from Sept. '00 Sales Meeting |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 238. | 15 | 2002 | Markettechnics | Materials from Markettechnics Show |
| 239. | 15 | 2002 | FMI - Chicago | Materials from FMI Show |
| 240. | 15 | 2004 | Payroll Card | SmartSource Payroll Card Program proposals |
| 241. | 15 | 2002 | NAM Training | Presentation materials re: targeted e-mailing and loyalty programs |
| 242. | 15 | 2003-2004 | Plan | Notes and Presentations re: Business and Sales Plans |
| 243. | 15 | 2002 | Retail Sales Meetings | Various materials including e-mails, notes, and agendas re: sales meeting |
| 244. | 15 | 2002-2003 | Duane Reade | Communications, proposals re: Electronic Gift Card Program |
| 245. | 15 | | UNLABELLED | Appear to be documents related to sales performance of Ann Raider |
| 246. | 16 | 2005 | AARP | Gift Card proposal, communications for AARP |
| 247. | 16 | 2005 | Retail Trade Diner Mail | List of retailers and form letter for sales prospects |
| 248. | 16 | 2002 | Home Depot | Letters to Home Depot personnel re: gift card |
| 249. | 16 | 2004 | Bilo | Redlined version of some contract; documents related to Bi-Lo cellular phone card |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 250. | 16 | 2003, 2005 | HEB | Communications, proposals re: desire to provide card products and services |
| 251. | 16 | 2004 | Reid Petro. | E-mail re: contact at new company - possible future relatonship |
| 252. | 16 | 2004 | Sutton Place | E-mails re: card pricing and samples |
| 253. | 16 | 2005 | S&H Loyalty Cards | Letter of Commitment with Longs Drug Store |
| 254. | 16 | 2004 | Service Master | Potential for gift card program with Servicemaster |
| 255. | 16 | 2005 | Pepsi | Proposals, presentations re: stored value product capabilities for PepsiCo |
| 256. | 16 | 2005 | Albertsons | Communications, materials about SmartSource Direct's ability to work with Albertsons |
| 257. | 16 | 2005 | Bi-Lo | Notes re: presentation to Bi-Lo |
| 258. | 16 | 2003 | Irving Oil | Incomplete Products Survey from SmartSource |
| 259. | 16 | | LOOSE | Various materials (articles, products, communications) - no common element |
| 260. | 16 | | UNLABELLED | Various materials - not specific to a particular account |
| 261. | 16 | 2000-2002 | Business Cards | Binder with business cards |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 262. | 16 | | Loyalty Marketing Products | Binder with various options for loyalty marketing products |
| 263. | 16 | 2001 | Concord | Brochure: "Buypass ISO 8583 Message Format Specifications |
| 264. | 16 | 2000 | CompUSA | Notes, proposals, communications re: CompUSA account |
| 265. | 16 | | LOOSE | Loose documents re: Irving Oil and Foot Locker |
| 266. | 16 | 2005 | USA Draig | Notes, presenation re: Loyalty/Stored Value Programs |
| 267. | 16 | 2001 | E-mail Market | General documents about market for e-mail targeting |
| 268. | 17 | | UNLABELLED | Various documents re: prepaid cell phone program |
| 269. | 17 | 1999 | Promotional Analysis | CCMI Promotion Analysis portion of User's Guide; e-mails other documents re: same |
| 270. | 17 | | UNLABELLED | Articles re: Marketing |
| 271. | 17 | 1998 | Markettechnics | Various documents from Markettechnics Show |
| 272. | 17 | | UNLABELLED | Presentations re: SmartSource products |
| 273. | 17 | | Ahold Trageted Direct Mail | Communications re: mail program |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|-------|-------|--------------|-------------|
| 274. | 17 | 2004 | Papa Gino's | Articles, presentations re: stored value cards |
| 275. | 17 | 2002 | FMI Show | Documents from FMI Show |
| 276. | 17 | 2002 | Ahold Card Orders | Card production materials |
| 277. | 17 | 2002 | Ahold RFP | Materials re: beginning of rel'p between Ahold and SmartSource |
| 278. | 17 | 2002 | Ahold RFP | Materials re: proposals and products for Ahold |
| 279. | 17 | 2004 | NGA | Documents re: presentation to National Grocers Association |
| 280. | 17 | 2003 | NGA | Notes re: meeting with NGA representative |
| 281. | 17 | 2002 | Marathon Oil | Presentation, proposals, communications, notes re; Marathon Oil account |
| 282. | 17 | 2002 | Marathon Tech Doc's | Documents re: points storing and accrual with card |
| 283. | 17 | 2000 | Epiphany | Company information, presentation, proposals re: E.piphany |
| 284. | 17 | 2000 | Rich Roseman | File with documents re: Rich Roseman |
| 285. | 17 | 2001 | Target Connections | Materials re: retailers with connections at Target |

FILES RECEIVED FROM NEWS AMERICA

| # | BOX # | DATES | FOLDER TITLE | DESCRIPTION |
|---|---|---|---|---|
| 286. | 17 | 2000 | | Materials re: employee Jim Mumm - work to improve performance |
| 287. | 17 | 2001 | UNLABELLED | Executive Review of Ann Raider |
| 288. | 17 | 2001 | Litwin | Communications involving Jim Litwin |
| 289. | 17 | 2002 | Appraisal | Appraisal of Ann Raider |
| 290. | 17 | 2001 | Appraisal | Appraisal of Ann Raider |
| 291. | 17 | | LOOSE | Documents re: Trade Shows |

# 4573493_v1

# EXHIBIT 20

# Holland+Knight

| | |
|---|---|
| Tel  617 523 2700 | Holland & Knight LLP |
| Fax  617 523 6850 | 10 St. James Avenue |
| | Boston. MA 02116-3889 |
| | www.hklaw.com |

Nathaniel F. Hulme
617 305 2117
nathaniel.hulme@hklaw.com

October 26, 2006

VIA HAND DELIVERY

David H. Rich, Esq.
Todd & Weld LLP
28 State Street
Boston, MA  02109

     Re:    News America Marketing Documents

Dear Mr. Rich:

     Enclosed please find the copies you requested from the various News America Marketing documents that were made available to you.  They are bates-stamped NAM00325 – NAM03857. As previously agreed, please provide Holland & Knight reimbursement in the amount of $811.65 for the production of these documents.

     Additionally, please find enclosed documents produce by Robert Coughlin in response to his document subpoena.  They are bates-stamped RC 0001 – RC 0140.  These are being provided without any charge.

     Please contact me with any questions you might have.

                  Very truly yours,

                  Nathaniel F. Hulme

Cc: Gordon Katz, Esq. (*w/o encl.*)

# EXHIBIT 21

# Holland+Knight

Tel  617 523 2700
Fax  617 523 6850

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116-3889
www.hklaw.com

Nathaniel F. Hulme
617 305 2117
nathaniel.hulme@hklaw.com

February 9, 2007

VIA MAIL

David H. Rich, Esq.
Todd & Weld LLP
28 State Street
Boston, MA  02109

      Re:    News America Marketing Documents

Dear Mr. Rich:

     Enclosed please find the copies you requested from the various News America Marketing documents that were made available to you on Thursday, February, 1.  They are bates-stamped NAM03858 – NAM04966.  As previously agreed, please provide Holland & Knight reimbursement in the amount of $88.64 for the production of these documents.

     Please contact me with any questions you might have.

Very truly yours,

Nathaniel F. Hulme
Paralegal

Cc: Gordon Katz, Esq. (*w/o encl.*)

# EXHIBIT 22

# Holland+Knight

|  |  |
|---|---|
| Tel  617 523 2700 | Holland & Knight LLP |
| Fax  617 523 6850 | 10 St. James Avenue |
|  | Boston. MA 02116-3889 |
|  | www.hklaw.com |

Nathaniel F. Hulme
617 305 2117
nathaniel.hulme@hklaw.com

April 17, 2007

VIA MAIL

David H. Rich, Esq.
Todd & Weld LLP
28 State Street
Boston, MA  02109

    Re:    News America Marketing Documents

Dear Mr. Rich:

    Enclosed please find the copies of the various News America Marketing Meeting Minutes recently located in our review of News America Marketing's files.  They are bates-stamped NAM04967 – NAM07255.  As previously agreed, please provide Holland & Knight reimbursement in the amount of $451.60 for the production of these documents.

    Please contact me with any questions you might have.

                  Very truly yours,

                  Nathaniel F. Hulme
                  Paralegal

Cc: Gordon Katz, Esq. (*w/o encl.*)

# EXHIBIT 23

News America Marketing

RE: Henri Lellouche
Document Production

2000-2001 Highlights
And Minutes – Vol. 1

Client No: 104308-00001

GPK

4.01.01

News America Marketing

**RE: Henri Lellouche
Document Production**

**2000-2001 Highlights
And Minutes – Vol. 2**

Client No: 104308-00001

**GPK**

**4.01.02**

**4.02**

*News America Marketing*

**RE: Henri Lellouche**
**Document Production**

2001-2001 Salespeople
Highlights and Calendar

Client No: 104308-00001

**GPK**

News America Marketing

RE: Henri Lellouche
Document Production

Ann Raider Highlights
2002-2003

Client No: 104308-00001

GPK

4.03

News America Marketing

RE: Henri Lellouche
Document Production

ASpen

Client No: 104308-00001

GPK

4.04.01

News America Marketing

RE: Henri Lellouche
Document Production

Aspen Vol. 2

Client No: 104308-00001

GPK

4.04.02

4.04.03

News America Marketing
RE: Henri Lellouche
Document Production
Aspen Vol. 3
Client No: 104308-00001

GPK



News America Marketing

RE: Henri Lellouche
Document Production

<u>Aspen Vol. 4</u>

Client No: 104308-00001

GPK

4.04.04

NEWS AMERICA MARKETING
– RE: Henri Lellouche Document Production
◄ ABT Project

4.05

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
<u>Braintree to Boston Office Move</u>

4.06

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
<u>**Coupon Card Program**</u>

4.07

News America Marketing

RE: Henri Lellouche
Document Production

**Donations Direct**

Client No: 104308-00001

GPK

4.08

**4.09**

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
EDialog

**4.10**

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
Freeride

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
Greenpoints

4.11

News America Marketing

RE: Henri Lellouche
Document Production

iBelong

Client No: 104308-00001

GPK

4.12

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
Infospace

4.13

4.14

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
Krasdale

**4.15**

News America Marketing

RE: Henri Lellouche
Document Production

__Microsites__

Client No: 104308-00001

GPK

4.16

NEWS AMERICA MARKETING
RE: Henri Lellouche Document Production
OnVantage

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
**Produce Warehouse**

4.17

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
<u>**Promotions**</u>

**4.18**

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
<u>**Portal Development**</u>

4.19

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
**QSI Payments**

4.20

**News America Marketing**

**RE: Henri Lellouche**
**Document Production**

**Retailer Emails Vol. 1**

**Client No: 104308-00001**

**GPK**

**4.21.01**

4.21.02

News America Marketing

RE: Henri Lellouche
Document Production

Retailer Emails Vol. 2

Client No: 104308-00001

GPK

**News America Marketing**

**RE: Henri Lellouche
Document Production**

<u>**Retailer Emails Vol. 3**</u>

**Client No: 104308-00001**

**GPK**

**4.21.03**

News America Marketing

RE: Henri Lellouche
Document Production

Retailer Emails Vol. 4

Client No: 104308-00001

GPK

4.21.04

4.21.05

News America Marketing

RE: Henri Lellouche
Document Production

Retailer Emails Vol. 5

Client No: 104308-00001

GPK

News America Marketing

RE: Henri Lellouche
Document Production

Retailer Emails Vol. 6

Client No: 104308-00001

GPK

4.21.06

4.21.07

News America Marketing

RE: Henri Lellouche
Document Production

Retailer Emails Vol. 7

Client No: 104308-00001

GPK

**News America Marketing**

**RE: Henri Lellouche**
**Document Production**

**Retailer Emails Vol. 8**

**Client No: 104308-00001**

**GPK**

**4.21.08**

**News America Marketing**

**RE: Henri Lellouche
Document Production**

**Retail Sales Meetings
2002-2003**

**Client No: 104308-00001**

**GPK**

**4.22**

News America Marketing

RE: Henri Lellouche
Document Production

Shopease Program

Client No: 104308-00001

GPK

4.23

News America Marketing

RE: Henri Lellouche
Document Production

Staffing Emails Vol. 1

Client No: 104308-00001

GPK

4.24.01

News America Marketing

RE: Henri Lellouche
Document Production

Staffing Emails Vol. 2

Client No: 104308-00001

GPK

4.24.02

News America Marketing

RE: Henri Lellouche
Document Production

Stored Value Programs

Client No: 104308-00001

GPK

4.25.01

News America Marketing

RE: Henri Lellouche
Document Production

**Stored Value Programs
Vol. 2**

Client No: 104308-00001

GPK

**4.25.02**



News America Marketing

RE: Henri Lellouche
Document Production

**Stored Value Programs**
**Vol. 3**

Client No: 104308-00001

**GPK**

4.25.03

**NEWS AMERICA MARKETING**
**RE: Henri Lellouche Document Production**
Stored Value Programs Vol. 4

4.25.04

**4.26**

*News America Marketing*

**RE: Henri Lellouche**
**Document Production**

<u>Toshiba Project</u>

Client No: 104308-00001

**GPK**

4.27.01

*News America Marketing*

RE: Henri Lellouche
Document Production

TRS and Entrance
Targeting

Client No: 104308-00001

GPK

4.27.02

News America Marketing

RE: Henri Lellouche
Document Production

TRS and Entrance
Targeting Vol. 2

Client No: 104308-00001

GPK

NEWS AMERICAN MARKETING
RE: Henri Lellouche Document Production
Vortal Pages

4.28

News America Marketing

RE: Henri Lellouche
Document Production

Client No: 104308-00001

GPK

4.29

News America Marketing

RE: Henri Lellouche
Document Production

Client No: 104308-00001

GPK

4.30

ROBERT FIREMAN DOCUMENTS
News America Marketing
GPK                    104308-00001

7.0

ANN RAIDER DOCUMENTS
News America Marketing
GPK

104308-00001

8.0

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001                    GPK


VOLUME 1


**9.01**

9.02

VOLUME 2

GPK                10308-00001
News America/Fireman & Raider

DON JACK, JANUARY 2006
DOCUMENTS SUPPLIED BY

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001                    GPK

VOLUME 3

9.03

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001                    GPK

VOLUME 4

9.04



**DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006**

*News America/Fireman & Raider*
**104308-00001          GPK**

**VOLUME 5**

**9.05**

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001          GPK

VOLUME 6

**9.06**

**DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006**

**News America/Fireman & Raider
104308-00001                GPK**

**VOLUME 7**

**9.07**

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001

GPK

VOLUME 8

9.08

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

News America/Fireman & Raider
104308-00001            GPK

VOLUME 9

9.09

**9.10**

VOLUME 10

News America/Fireman & Raider

104308-00001    GPK

DOCUMENTS SUPPLIED BY
DON JACK, JANUARY 2006

**11.01**

104308-00001

News America Marketing
Re: Fireman & Raider
Acquisition of Consumer Card Marketing, Inc. by
News America Marketing In-Store, Inc. 8/13/99

12.0

Documents Produced by Wayne Campanelli
News America Marketing RE: Fireman & Raider
GPK
104308-00001



13.0

GFK                                      104308-00001
News America Marketing RE: Fireman & Raider
Budgets, 2000-2003

104308-00001                                    **GPK**
News America re: Fireman & Raider
John Linguitti File



104308-00001                                    GPK
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume I: NAM03858 – NAM04503

20.01.01

20.01.02

104308-00001
GPK

News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume II: NAM04504 – NAM05266

104308-00001                          **GPK**
**News America Marketing**
**RE: Fireman and Raider**
**Documents Produced by News America Marketing**
**Henri Lellouche Disc Production**
**Volume III: NAM05267 – NAM05880**

20.01.03

20.01.04

104308-00001

GPK

*News America Marketing*
**RE: Fireman and Raider**
**Documents Produced by News America Marketing**
**Henri Lelloucbe Disc Production**
**Volume IV: NAM05881 ~ NAM06399**

20.01.05

104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume V: NAM06400 – NAM06922

GPK

104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume VI: NAM06923 – NAM07485

GPK

20.01.06



104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume VII: NAM07486 – NAM07970

GPK

20.01.07

20.01.08

GPK

104308-00001

News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume VIII: NAM07971 – NAM08570

104308-00001                          **GPK**
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume IX: NAM08571 – NAM09003

20.01.09

20.01.10

104308-00001                                                    GPK

News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume X: NAM09004 – NAM09549

20.01.11

GPK

104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XI: NAM09550 – NAM10148

20.01.12

104308-00001

GFK

News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XII: NAMI0149 – NAMI0838

104308-00001                              GPK
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XIII: NAM10839 – NAM11441

20.01.13

104308-00001                                 **GPK**
**News America Marketing**
**RE: Fireman and Raider**
**Documents Produced by News America Marketing**
**Henri Lellouche Disc Production**
**Volume XIV: NAM11442 – NAM11969**

20.01.14

20.01.15

Volume XV: NAM11970 – NAM12612
Henri Lellouche Disc Production
Documents Produced by News America Marketing
RE: Fireman and Raider
News America Marketing
104308-00001
GPK

104308-00001
News America Marketing                    GPK
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XVI: NAMI2613 – NAMI3271

20.01.16

20.01.17

GFK

104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XVII: NAM13272 – NAM13901

104308-00001
News America Marketing
RE: Fireman and Raider
Documents Produced by News America Marketing
Henri Lellouche Disc Production
Volume XVIII: NAM13902 – NAM14422

GPK

20.01.18

20.02.01

Henri Lellouche Disc 2 – Volume I

RE: Fireman and Raider

News America Marketing

GPK

104308-00001

104308-00001                                        GPK

News America Marketing

RE: Fireman and Raider

Henri Lellouche Disc 2 – Volume II

**20.02.02**

104308-00001                                    GPK

News America Marketing

RE: Fireman and Raider

Henri Lellouche Disc 2 – Volume III

20.02.03

**20.03**

Marty Garofalo Disc Production

RE: Fireman and Raider

News America Marketing

GPK

104308-00001

**20.04**

Miscellaneous Meeting Minutes (via E-mail)

RE: Fireman and Raider

*News America Marketing*

104308-00001                                                    GPK

104308-00001

GPK

News America Marketing

RE: Fireman and Raider

NAM Executive Committee (6/21/99 – 12/26/00)

**20.05**

104308-00001                                    GPK

News America Marketing

RE: Fireman and Raider

NAM FSI Executive Committee (7/6/99 – 12/26/00)

**20.06**

104308-00001                                    GPK

News America Marketing

RE: Fireman and Raider

NAM In-Store Executive Committee (6/22/99 –
12/19/00)

**20.07**

104308-00001                              **GPK**

**News America Marketing**

**RE: Fireman and Raider**

**NAM Management Council Meeting (6/28/99 –
9/5/00)**

**20.08**

GPK

108262-00001

News America re: Raider & Fireman

Deb Wolfe – Produced Documents

Volume I

20.09.01

**20.09.02**

108262-00001                              **GPK**

**News America re: Raider & Fireman**

**Deb Wolfe – Produced Documents**

**Volume II**

Volume III

Deb Wolfe – Produced Documents

News America re: Raider & Fireman

108262-00001    GPK

20.09.03

**20.09.04**

108262-00001                    GPK

News America re: Raider & Fireman

Deb Wolfe -- Produced Documents

Volume IV

Volume V

Deb Wolfe – Produced Documents

News America – Fireman & Raider

104308-00001    GPK

20.09.05

# EXHIBIT 24

CONFIDENTIAL

PRIVILEGED WORK PRODUCT

## STAGE 1
### ESI RESTORATION

### Option 1
**Tape restoration cost, if outsourced**

| 1 | | 2 | | 3 | |
|---|---|---|---|---|---|
| Total year end tapes currently available for Chicago, New York, Toronto & Wilton. | | Avg. cost per tape to restore. | | Total tape restoration cost. | |
| 154 | x | $    500.00 | = | $    77,000.00 | |

YEAR END TAPE RESTORATION ANALYSIS - 154 TAPES

### Option 2
**Tape restoration cost, if done in-house**

| 1 | | 2 | | 3 | |
|---|---|---|---|---|---|
| Cost of data storage servers - 2 dual processor CPU's & two thirty TB RAID arrays. One CPU Array for the pristine data set and one for the working data set. | | 5 - 6 man weeks of tech time. This includes a mix of CAAS' Director and Technical Specialist time. | | Total hardware and personnel cost. | |
| $    85,000.00 | + | $    48,000.00 | = | $    133,000.00 | |

## STAGE 2
### OBJECTIVE CULLING, METADATA EXTRACTION, DE-DUPING & KEYWORD / CUSTODIAN SEARCHING

**Processing, common to both in-house and outsourced restoration - (cull, de-dedupe, index & search). This is outsourced**

| 1 | | 2 | | 3 | | 4 |
|---|---|---|---|---|---|---|
| Total number of tapes | | Number of uncompressed gigabytes per tape to process (cull, de-dedupe, index & search) | | Cost per gigabyte to process | | Total data culling cost. |
| 154 | x | 140 | x | $    200.00 | = | $    4,312,000.00 |

CONFIDENTIAL

PRIVILEGED  WORK PRODUCT



## STAGE 3
### PRODUCTION
### Image generation & endorsing.

| 1 | | 2 | | 3 | | 4 |
|---|---|---|---|---|---|---|
| Total number of GB responsive (.001% of original 21,560 GB restored). | | Number of pages per GB (estimated) | | Cost per page | | Total image generation & endorsing. |
| 21.56 | x | 60,000 | x | $        0.09 | = | $      116,424.00 |

## ESTIMATED TOTAL COST OF THE TAPE RESTORATION INITIATIVE

| Total cost to defensibly restore and search data. This does not include attorney review time. | = | $ 4,561,424.00 | In house restoration |
|---|---|---|---|
| | | $ 4,505,424.00 | Outsourced restoration |

CONFIDENTIAL                                                            PRIVILEGED  WORK PRODUCT

## SYNOPSIS

### STAGE I - RESTORATION

#### OPTION I - Outsourced tape restoration

**1 -** The assumptions are that all 154 tapes have been  targeted for full restoration and that they contain potentially responsive semi-structured (exchange email) and unstructured (pst's & loose electronic documents) ESI to be restored. Based on conversations with Alfred McBean, this tape count is expected to increase.

**2 -** The price reflects common industry pricing for the restoration of backup tapes. Pricing ranges from $250 per tape to $800. The restoration vendor selected would ensure there is full chain of custody documentation of all steps and processes.

**3 -** Hardware compression creates data storage efficiencies that it can quadruple a tapes normal storage capacity. Compression ratios may vary significantly based on the type of data that is on the tape and the hardware device that is writing the data to backup tape. Consequently, the compressed data on backup tapes may yield significantly more data for "processing" than is currently estimated. If the backed up data was already compressed while in an on-line state, the resulting data multiple could even go as high as 6 times that which is reported on the media. Based on the discussion that I had with Alfred McBean, I am using a multiple of two.

#### OPTION II - Outsourced tape restoration

1 - This is the estimated cost of the hardware to required to conduct the initiative if the restoration process is done internally. This assumes that there are enough tape drives to support day to day operational requirements as well as this discovery initiative. If a pristine on-line data set is kept, the cost would double and would be in the $100k range.

2 - This is the estimated amount of time / money that it would take for 1 supervised technician to be allocated to this initiative. It takes into account data transfer rates of the tape data as well as the workflow to mount, dismount, track and deal with problem tapes.

**3** - Total cost for the hardware and man hours.

### STAGE II - PROCESSING

**1 -** The assumptions are that all 154 tapes have been  targeted for full restoration and that they contain potentially responsive semi-structured (exchange email) and unstructured (pst's & loose electronic documents) ESI to be restored.

**2 -** The data on the backup tapes is written and stored in compressed format. The data compression ratios are expected to range from 2:1 to 4:1. For the purposes of this estimate I used the 2:1 ratio. Assuming each backup tape contains 70 GB of compressed data, the uncompressed data will be >= 140GB per unit.

**3** - The average price for processing (objective culling; the removal of know non-responsive file types, key word searching, md-5 hash based de-duplication and near de-duplication ranges from $200 - $1200 / gb. The price quoted here reflects a good faith estimate based on CAAS' ability to negotiate pricing for these services. This price range is dependent on the type of email systems and loose electronic file data types involved. This also presupposes that the restoration process, as it relates to emails / exchange servers, generated RFC 822 (industry standard) single message format extraction of emails. Given the dynamic nature of the NAM infrastructure and the heterogeneous nature of the data that is backed up, it is difficult to account for every iteration of production, testing and development data type and or associated application that may be required to render the data in a normalized form that would lend itself to a streamlined indexing, searching and review process. This number could increase significantly if unanticipated variables such as data encryption or corruption are encountered.

**4** - This is the price for the defensible, forensically sound processing of all the data on the backup tapes to provide reasonable certainty that potentially responsive information has not been overlooked.

### STAGE III - PRODUCTION

Assuming that of the 21560 GB that have been restored, only ~20 GB's of data is responsive (.001%), it would cost approximately $90,000 to generate images and endorse. This assumes the scenario of  60,000 pages per gb and a tif generation / endorsement charge of $.09 / page.

Currently the NAM IT organization has no bandwidth to accommodate this initiative, thus the outsourcing of the restoration would be the most viable option, barring data security concerns that would preclude or militate against sending the tapes off-site to a vendor. A12

# EXHIBIT 25

CONFIDENTIAL
PRIVILEGED WORK PRODUCT



| | STAGE 1 |
|---|---|
| | ESI RESTORATION |
| | **Exchange Backup Tape Restoration** |
| | CHART 1 DATA |

| Backup Tape Volume Ranges | Highest number of tapes in the range. | Cost per tape within the indicated ranges |
|---|---|---|
| **A** | **B** | **C** |
| 1 | 1 to 250 | 250 | $ 500.00 |
| 2 | 251 to 500 | 500 | $ 480.00 |
| 3 | 501 to 1000 | 1000 | $ 455.00 |
| 4 | 1001 to 2000 | 2000 | $ 425.00 |
| 5 | 2001 to 3000 | 3000 | $ 380.00 |
| 6 | > 3000 (5000) | 5000 | $ 320.00 |

CHART 1 - Volume discount tape restoration pricing

CHART 2 DATA

| | Number of tapes restored | Extended cost based on volume discount |
|---|---|---|
| | **A** | **B** |
| 1 | 250 | $ 125,000.00 |
| 2 | 500 | $ 240,000.00 |
| 3 | 1000 | $ 455,000.00 |
| 4 | 2000 | $ 850,000.00 |
| 5 | 3000 | $ 1,140,000.00 |
| 6 | **5000** | **$ 1,600,000.00** |



CHART 2 - Aggregate tape restoration cost based on # tapes restored

| | STAGE 2 |
|---|---|
| | EXCHANGE SERVER RECREATION, CUSTODIAN MAILBOX EXTRACTION, OBJECTIVE CULLING, METADATA EXTRACTION, DE-DUPING & KEYWORD SEARCHING |
| | Processing, common to both in-house and outsourced restoration - (cull, de-dedupe, index & search). This is outsourced |

| 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | 7 | | 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exchange server instances to be re-created from restored data. | | Flat cost per server to restore, scan and rip target mailboxes or email items from each instance of exchange server. | | Total mailbox extraction cost. | | Number of responsive mailboxes per exchange server (estimate). | | Total number of mailboxes to be "processed" from all restored servers. | | Average size of mailbox (GB) | | Cost per GB to process | | Total cost |
| 1000 | x | $ 125.00 | = | $ 125,000.00 | | 7 | | 7,000 | x | 0.75 | x | $ 200.00 | = | $ 7,350,000.00 |

CONFIDENTIAL

PRIVILEGED WORK PRODUCT



| STAGE 3 | | | |
|---|---|---|---|
| PRODUCTION | | | |
| Image generation & endorsing. | | | |
| **1** | **2** | **3** | **4** |
| Total number of GB responsive mailboxes (.001% of original 5,000 GB of Outlook email restored). | Number of pages per GB (estimated) | Cost per page | Total image generation & endorsing. |
| 5 | 60,000 | $  0.09 | $  27,000.00 |

5  x  60,000  x  $ 0.09  =  $ 27,000.00    =

**ESTIMATED TOTAL COST OF THE TAPE RESTORATION INITIATIVE**

| Total cost to defensibly restore and search data. This does not include attorney review time. | = | $ 9,102,000.00 | Outsourced exchange backup tape and server restoration |
|---|---|---|---|

**SYNOPSIS**

**STAGE I - RESTORATION**

Outsourced tape restoration

1 - The assumptions are that 5000 exchange backup tapes will yield 1000 servers (5:1 ratio).  Table 1, value 6C used for 5000 tapes, resulting in value contained in Table 2, cell 6B.

2 - The price reflects common industry pricing for the restoration of backup tapes. Pricing ranges from $250 per tape to $800. The restoration vendor selected would ensure there is full chain of custody documentation of all steps and processes.

3 - Hardware compression creates data storage efficiencies that it can quadruple a tapes normal storage capacity. Compression ratios may vary significantly based on the type of data that is on the tape and the hardware device that is writing the data to backup tape. Consequently, the compressed data on backup tapes may yield significantly more data for "processing" than is currently estimated. If the backed up data was already compressed while in an on-line state, the resulting data multiple could even go as high as 6 times that which is reported on the media. Based on the discussion that I had with Alfred McBean, I am using a multiple of two.

**STAGE II - PROCESSING**

1 - 1000 servers , restored at $ 125 / server,  yielding 7 mailboxes each, with an average size of .75 gb will generate 5250 gb of data.

2 - 5250 gb processed at 200 / GB will cost $7,350,000 as indicated by Stage 2 column 8.

3 - This is the price for the defensible, forensically sound processing of all the data on the backup tapes.

**STAGE III - PRODUCTION**

Production estimates are based on standard page counts per gb.

Pricing is based on expedited delivery of data as anticipated in the context of litigation and may vary based on additional parameters not presently considered.

EXHIBIT 26

CONFIDENTIAL

PRIVILEGED  WORK PRODUCT



YEAR END TAPE
RESTORATION ANALYSIS -
26 TAPES



CONFIDENTIAL                                                                                     PRIVILEGED  WORK PRODUCT



### STAGE 3

**PRODUCTION (NEGLIGIBLE)**

*Image generation & endorsing.*

| 1 | | 2 | | 3 | | 4 |
|---|---|---|---|---|---|---|
| Total number of GB responsive (.001% of original 21,560 GB restored). | | Number of pages per GB (estimated) | | Cost per page | | Total image generation & endorsing. |
| 0.0328 | x | 60,000 | x | $          0.09 | = | $          177.12 |

### ESTIMATED TOTAL COST OF THE TAPE RESTORATION INITIATIVE

| Total cost to defensibly restore and search data. This does not include attorney review time. | = | $ 1,131,230.00 | In house restoration |
|---|---|---|---|
| | | $ 1,105,000.00 | Outsourced restoration |

CONFIDENTIAL                                                              PRIVILEGED  WORK PRODUCT

## SYNOPSIS

### STAGE I - RESTORATION

#### OPTION I - Outsourced tape restoration for a subset of year end tapes

1 -  The assumptions are that the following end of year (EOY) tapes have been restored: 8 from New York, fiscal year 2002; 11 from Wilton, fiscal year 2003; 4 from Chicago fiscal year 2003 and 3 from Toronto fiscal year 2003 have been  targeted for full restoration and that they contain responsive semi-structured (exchange email) and unstructured (pst's & loose electronic documents) ESI to be restored.

2 - The restoration price reflects common industry pricing for the restoration of backup tapes. Tape restoration prices generally range from $250 per tape to $800. The restoration vendor selected would ensure there is full chain of custody documentation of all steps and processes.

3 - Hardware compression creates data storage efficiencies that it can quadruple a tape's normal storage capacity. Compression ratios may vary significantly based on the type of data that is on the tape and the hardware device that is writing the data to backup tape. Consequently, the compressed data on backup tapes may yield significantly more data for "processing" than is currently estimated. If the backed up data was already compressed while in an on-line state, the resulting data multiple could even go as high as 6 times that which is reported on the media. Based on the discussion that I had with Alfred McBean, I am using a multiple of two.

#### OPTION II - In-house tape restoration for a subset of year end tapes

1 - This option covers the estimated cost of the hardware to required to conduct the initiative if the restoration process is done internally. This assumes that there are enough tape drives to support day to day operational requirements as well as this discovery initiative.

2 - This is the estimated amount of time / money that it would take for 1 supervised technician to be allocated to this initiative. It takes into account data transfer rates of the tape data as well as the workflow to mount, dismount, track and deal with problem tapes.

3 - Total cost for the hardware and man hours.

### STAGE II - PROCESSING

1 -  The assumptions are that all 26 tapes have been  targeted for full restoration and that they contain semi-structured (exchange email) and unstructured (pst's & loose electronic documents) ESI to be restored.

2 - The data on the backup tapes is written and stored in compressed format. The data compression ratios are expected to range from 2:1 to 4:1. For the purposes of this estimate I used the 2:1 ratio. Assuming each backup tape contains 70 GB of compressed data, the uncompressed data will be >= 140GB per unit.

3 - The average price for processing (objective culling; the removal of know non-responsive file types, key word searching, md-5 hash based de-duplication and near de-duplication ranges from $200 - $1200 / gb. The price that I am quoting reflects a good faith estimate based on CAAS' ability to negotiate pricing for these services. This price range is dependent on the type of email systems and loose electronic file data types involved. This also presupposes that the restoration process, as it relates to emails / exchange servers, generated RFC 822 (industry standard) single message format extraction of emails. Given the dynamic nature of the NAM infrastructure and the heterogeneous nature of the data that is backed up, it is difficult to account for every iteration of production, testing and development data type and or associated application that may be required to render the data in a normalized form that would lend itself to a streamlined indexing, searching and review process. This number could increase significantly if unanticipated variables such as data encryption or corruption are encountered.

4 - This is the price for the defensible, forensically sound processing of all the data on the backup tapes to provide reasonable degree of certainty that there is nothing potentially responsive in the collection.

### STAGE III - PRODUCTION

Production costs are a relatively small dollar amount.

Currently the NAM IT organization has no bandwidth to accommodate this initiative, thus the outsourcing of the restoration would be the most viable option, barring data security concerns that would preclude or militate against sending the tapes off-site to a vendor.