UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>Plaintiffs,<br><br>v.<br><br>NEWS AMERICA MARKETING IN-STORE, INC.,<br><br>Defendant. | Civil Action No. 05-11740-MLW |

## DECLARATION OF RICHARD DAVIS

1.  I am Director of Litigation Risk Management Services for Constantine & Aborn Advisory Services. I make this declaration based on my personal knowledge, interviews of News America Marketing In-Store, Inc. ("NAM") personnel, a review of NAM's records and computer systems, and publicly available pricing information. This declaration responds to assertions in the Plaintiffs' Motion to Compel.

### Qualifications

2.  In the early 1990s, I worked as a software and hardware engineer for IBM, in New York. I received my J.D. from Pace University School of Law in 1998.

3.  I have worked as an employee and consultant for a number of law firms, and litigation support companies on electronic discovery and related matters. Law firms that have employed me in this capacity include Patterson, Belknap, Webb & Tyler, LLP; Cravath, Swaine & Moore; and Kenyon & Kenyon, LLP.

4.  I have attached to this Declaration, as Exhibit A, a copy of my most recent Curriculum Vitae.

## **CERTIFICATE OF SERVICE**

   I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 4th day of June, 2007.

                    /s/ Gordon P. Katz
                    Gordon P. Katz

## Assignment

5. Outside litigation counsel for NAM in this matter tasked me with (i) reviewing the Plaintiffs' First Set of Requests for Production of Documents and Things to Defendant (the "Requests for Production"), and (ii) estimating the costs of restoring NAM's backup tapes, and searching the resulting files to potentially locate and produce additional materials responsive to the Requests for Production.

## The Process I Employed To Carry Out This Assignment

6. To carry out my assignment, I took the following steps:

7. I interviewed Alfred A. McBean, Jr., currently NAM's Vice President of Windows Technology, among other IT personnel from NAM.

8. I reviewed NAM's network structure, particularly the Windows environment responsible for the creation, modification, saving, and backing up of Word documents, Excel documents, Email (including attachments), and Power Point documents.

9. I reviewed the NAM's backup systems in detail, with a particular focus on (i) the year end full system tapes (the "Year-End Full-System Tapes"), and (ii) the daily backup tapes for the Email system, which is resident on Exchange Servers (the "Daily Exchange Tapes").

10. I determined that potentially relevant backup tapes were stored in Chicago, Illinois; New York, New York, Toronto, Ontario; and Wilton, Connecticut.

11. After determining the location of potentially relevant backup tapes, I determined, and estimated, the number of Year-End Full-System Tapes and the number of Daily Exchange Tapes that would likely be required to address the Plaintiffs' Requests for Production.

12. I determined that the Year-End Full-System Tapes and the Daily Exchange Tapes are not duplicative systems, as follows. The Year-End Full-System Tapes represent a "snapshot" on a annual basis, of the entire NAM network. In contrast, the Daily Exchange Tapes constitute

2

a "moving picture" series of images – on a daily basis – of a portion of the NAM network. The Daily Exchange Tapes provide a more complete view of NAM email communications over time than the Year-End Full-System Tapes, while the Year-End Full-System Tapes provide a more complete view of the overall NAM network. Accordingly, I included both systems in my calculations.

13.    In determining the required number of backup tapes, I reviewed backup protocols for the period of time the Plaintiffs were employed by NAM: 1999 through 2004 (the "Complete Period"). In addition, I analyzed these protocols for a "sampling" of backup tapes, to determine the estimated costs of a less-than-complete review of electronically stored information potentially responsive to the Plaintiffs' Requests for Production (the "Sampling Period").

14.    In addition to evaluating the number of potentially relevant backup tapes, I also compiled information on the steps necessary to restore these tapes, to allow a review of the information they contain.

15.    In connection with these the steps, I also compiled information on the steps necessary to search the resulting restored data sets, to locate materials responsive to the Plaintiffs' Requests for Production, and to produce the relevant documents.

16.    Finally, I compiled and generated estimated pricing for the various tasks associated with this work.

## Conclusions

17.    Having completed the above procedures, I reached my conclusions, and embodied these conclusions in three sets of calculations:

    (i)    A calculation for the Year-End Full-System Tapes for the Complete Period, embodied in a spreadsheet report, included as Exhibit 24 in the Defendant's Exhibit Binder;

  (ii) A calculation for the Daily Exchange Tapes for the Complete Period, embodied in a spreadsheet report, included as Exhibit 25 in the Defendant's Exhibit Binder; and

  (iii) A calculation for the Year-End Full-System Tapes, but only for the Sampling Period, embodied in a spreadsheet report, included as Exhibit 26 in the Defendant's Exhibit Binder.

18. I broke each of these three calculations into three stages. Stage 1 consisted of restoring the backup tapes. Stage 2 consisted of placing the resulting data set in a form that could be searched for materials responsive to the Plaintiffs' Requests for Production, including objective culling of the data set; extraction of requisite metadata, de-duplication of records, and keyword and custodian searching. State 3 consisted of placing responsive materials into a form for production to the Plaintiffs.

### Year-End Full-System Tapes, for the Complete Period

19. Exhibit 24 provides my calculations for the restoration and searching of the Year-End Full-System Tapes for the Complete Period.

20. In the locations that house backup tapes -- Chicago, New York, Toronto, and Wilton -- there are 154 available Year-End Full-System Tapes that may contain information responsive to the Plaintiffs' Requests for Production.

21. In Exhibit 24, I calculated the "Stage 1" costs of restoring the Year-End Full-System Tapes using two methods: (a) assuming that NAM outsourced the work ("Option 1"), and (b) assuming that NAM performed the work using in-house assets ("Option 2"). Based on the assumptions stated in Exhibit 24, I determined that it would cost $77,000.00 to outsource the restoration of these Tapes, and $133,000.00 to perform this work in-house.

22. I then calculated the "Stage 2" costs of formatting and searching the data set. I estimated 140 uncompressed gigabytes per tape, at a cost of $200.00 per gigabyte to process. I also made certain assumptions concerning the percentage of responsive materials within the data

set and, based on that assumption, estimated the "Stage 3" costs of producing images of these documents. These assumptions and calculations are further detailed in Exhibit 24.

23. These are standard assumptions in the context of recovering, restoring, and searching electronic documents.

24. Based on these assumptions and calculations, I concluded that to restore and search the Year-End Full-System Tapes for the Complete Period, and to produce responsive materials, it would cost the following amounts:

    (a) For in-house restoration: $4,561,424.00

    (b) For outsourced restoration: $4,505,424.00

25. These figures, in my opinion, represent the costs of defensible, forensically sound processing of data on the Year-End Full-System Tapes, to locate and produce, with a reasonable degree of certainty, documents responsive to the Plaintiffs' Discovery Requests.

### Daily Exchange Tapes, for the Complete Period

26. Exhibit 25 provides my calculations for the restoration and searching of the Daily Exchange Tapes for the Complete Period.

27. In the locations that house backup tapes – Chicago, New York, Toronto, and Wilton -- I estimated that there were over 5,000 Daily Exchange Tapes that would need to be cataloged and/or restored to respond to the Plaintiffs' Requests for Production.

28. In Exhibit 25, I calculated the "Stage 1" costs of restoring the Daily Exchange Tapes, using an assumption that volume discounts could be obtained for the number of tapes at issue. Based on the assumptions stated in Exhibit 25, I determined that it would cost approximately $1.6 million to restore these Tapes.

29. In "Stage 2," I evaluated the restored data set, and estimated that there would be approximately 1,000 instances of Exchange email servers that may contain information

5

responsive to the Plaintiffs' Requests for Production, and that would need to be re-created from the restored data.

30.  I then calculated the "Stage 2" costs of formatting and searching the data set. I estimated that if there were 7 target custodian mailboxes per server, that the total cost to extract these 7 mailboxes from each Exchange server would be I estimated that the average size of the mailboxes would be approximately 0.75 gigabytes, and estimated that the cost to process the mailboxes would be $200.00 per gigabyte. I then calculated the State 3 estimated costs to produce. I also made certain additional assumptions, detailed in Exhibit 24.

31.  These are standard assumptions in the context of recovering and restoring electronic documents.

32.  Based on these assumptions and calculations, I concluded that to restore and search the Daily Exchange Tapes for the Complete Period, and to produce responsive materials, it would cost the following amounts:

    For Daily Exchange Tape restoration:    $9,102,000.00

33.  These figures, in my opinion, represent the costs of defensible, forensically sound processing of data on the Daily Exchange Tapes, to locate and produce, with a reasonable degree of certainty, documents responsive to the Plaintiffs' Discovery Requests.

### Year-End Full-System Tapes, for the Sampling Period

34.  Exhibit 26 provides my calculations for the restoration and searching of the Year-End Full-System Tapes for the Sampling Period only.

35.  I understand that the Plaintiffs, in their Motion to Compel, suggest that a "sampling" structure be employed in restoring and searching tape backups. *See* Motion to Compel, at 7 n.3. The Plaintiffs do not specify whether they believe this sampling should cover the Year-End Full-System Tapes, the Daily Exchange Tapes, or both. The Plaintiffs similarly do

not state the time periods or methods for determining the sample for the backup tapes to be restored. Accordingly, I have employed a sampling structure that I developed, based on standard industry practices.

36.  The sampling structure relies entirely on Year-End Full-System Tapes, and assumes these tapes contain semi-structured (exchange email) and unstructured (loose electronic documents) electronically stored information. I selected 26 Tapes for restoration, searching, and production, as follows:

| Backup Location | Number of Tapes to Restore | Fiscal Year |
| --- | --- | --- |
| New York | 8 | 2002 |
| Wilton, Ct. | 11 | 2003 |
| Chicago | 4 | 2003 |
| Toronto | 3 | 2003 |
| Total: | 26 | |

37.  I reached my decision concerning the selection of these tapes as follows: I first reviewed and evaluated information provided by NAM's IT Department concerning tapes housed in the identified locations. Based on this information and my review, I then selected tapes that, in my professional opinion, would be representative of the population of tapes at that particular location.

38.  After selecting the Tapes for sampling, I calculated the "Stage 1" costs of restoring this sampling of Year-End Full-System Tapes using two methods: (a) assuming that NAM outsourced the work ("Option 1"), and (b) assuming that NAM performed the work using in-house assets ("Option 2"). Based on the assumptions stated in Exhibit 26, I determined that, for the sampling, it would cost $13,000.00 to outsource the restoration of these Tapes, and $39,230.00 to perform this work in-house.

39.  I then calculated the "Stage 2" costs of formatting and searching the sampled data set. I estimated 140 uncompressed gigabytes per tape, at a cost of $300.00 per gigabyte to process. Due to the lower volume of Tapes in this sampling, as compared to my calculations on Exhibit 24, I assumed that discounts down to $200.00 per gigabyte to process would not be available.

40.  I then estimated the "Stage 3" costs of producing images of these documents, and determined that these costs would be minimal. These assumptions and calculations are further detailed in Exhibit 26.

41.  These are standard assumptions in the context of recovering, restoring, and searching a sampling of electronic documents.

42.  Based on these assumptions and calculations, I concluded that to restore and search the Year-End Full-System Tapes for the Sampling Period, and to produce responsive materials, it would cost the following amounts:

    (a)    For in-house restoration:    $1,131,230.00

    (b)    For outsourced restoration:    $1,105,000.00

43.  These figures, in my opinion, represent the costs of defensible, forensically sound processing of a sampling of data on the Year-End Full-System Tapes, to locate and produce, with a reasonable degree of certainty, a sampling of documents responsive to the Plaintiffs' Discovery Requests.

### Summary of Conclusions

44.  In sum, based on the above procedures, and as further detailed in Exhibits 24 through 26, I reached the following conclusions:

45. To conduct a defensible, forensically sound processing of data on the identified backup tapes, and to locate and produce, with a reasonable degree of certainty, documents responsive to the Plaintiffs' Discovery Requests will require the following expenditures:

**Year-End Full-System Tapes**
    In-House Restoration      $4,561,424.00
    Outsourced Restoration      $4,505,424.00

**Daily Exchange Tapes**
    Outsourced Restoration      $9,102,000.00

**Sampling of Year-End Full-System Tapes**
    In-House Restoration      $1,131,230.00
    Outsourced Restoration      $1,105,000.00

46. Combining restoration and searching of the Year-End Full-System Tapes with restoration and searching of the Daily Exchange Tapes would provide the most complete review and production. Therefore, assuming outsourced restoration, in my opinion, to a reasonable degree of certainty and in accordance with standard practices in the electronic data industry, restoring and searching NAM's backup tapes to locate and produce potentially responsive documents as requested by the Plaintiffs would cost as follows:

| Tapes | Costs |
| --- | --- |
| Year-End Full-System Tapes (outsourced restoration): | $4,505,424.00 |
| Daily Exchange Tapes | $9,102,000.00 |
| Total: | $13,607,424.00 |

Signed under the penalties of perjury this 4th day of June, 2007.

_____
Richard Davis

<mark>
</mark>
<mark>
</mark>

**Exhibits**

| Exhibit | Description |
|---|---|
| A. | CV of Richard Davis |

# 4582883_v1

Case 1:05-cv-11740-MLW    Document 23-2    Filed 06/04/2007    Page 1 of 5

R.E. DAVIS
DAVIS@CAASNY.COM

Home Telephone: (646) 457-9052    Mobile Phone: (917) 524-1327

## SKILL SET SYNOPSIS

Richard Davis is a former IBM mainframe engineer who is currently the Director of Litigation Risk Management Services for Constantine & Aborn Advisory Services. He articles on litigation technology management have appeared in The Corporate Compliance and Regulatory Newsletter, e-Discovery Law & Strategy, the New York Law Journal and he has been cited and quoted in numerous publications.

Today, Mr. Davis works primarily with corporations and law firms to help them institute policy driven risk mitigation strategies for data management. Prior to this role, he founded the Practice Management Department for Kenyon & Kenyon, LLP, an intellectual property law firm based in New York. His role at Kenyon involved advising Fortune 1000 clients of the firm with respect to data management policies. Mr. Davis helped the firms client base mitigate the risks related to spoliation as well as facilitate compliance within the various regulatory schemes that the various client entities were subject to. Most notably, he created an "Infrastructure Assessment Protocol" that helped counsel conduct detailed analysis of the global technical infrastructure of client and adversary organizations. This process, involved the mapping of network infrastructure with organizational management information to identify areas that contain the highest likelihood of responsive information to litigation. While at Kenyon, his day to day activities included vetting data restoration and conversion vendors for all facets of complex litigation data lifecycle management.

Prior to working at Kenyon & Kenyon, Mr. Davis was a consultant (Litigation Logistics, LLC) & V.P. of Business Development for National Data Conversion (NDC), one the most reputable tape restoration and legacy data conversion and media recovery specialists in the United States. While at National Data Conversion, he was responsible for moving the company from a 3,500 sq. foot facility in Union Square New York to its current 15,000 sq. foot flagship facility on Madison Avenue. Mr. Davis was also responsible for writing documentation describing the methods of extraction data from tape for ingestion by data compliance management systems developed by Iron Mountain, KVS & Ilumin (the latter 2 companies and associated products were acquired by Symantec) as well as the staffing and training of personnel.

He has spoken at several conferences related to corporate risk mitigation strategies, compliance, document retention, enterprise data/document management and has published articles related to aforementioned topics.

# R.E. DAVIS
## DAVIS@CAASNY.COM

Home Telephone: (646) 457-9052            Mobile Phone: (917) 524-1327

**Work Experience:**

### Constantine & Aborn Advisory Services, LLC      9/06 to Present
*Director of Litigation Risk Management* – Given a mandate to build out the electronic discovery practice for CAAS.
- Developed a corporate enterprise electronic discovery platform for a Fortune 100 corporation.
- Retained by Fortune 100 corporation to provide email backup tape archive restoration cost analysis.
- Retained by AMLAW 200 firm to perform discovery on exchange backup tapes
- Retained by major direct bank to provide forensic accountants with information from SQL based accounting and transaction system.
- Retained by Fortune 100 corporation to conduct electronic discovery across the enterprise.
- Retained by Fortune 100 corporation to implement litigation cost control plan and manage vendors.
- Developed artificial intelligence based document analysis and auto-coding tool.

### Kenyon & Kenyon, LLP      1/05 to 9/06
*Manager of Practice Support* – Founded the Practice Support Group at Firm. Staffed, trained and built out the technical infrastructure responsible for developing data acquisition, auditing protocols and strategies for Global 1000 clients and counsel related to patent litigation, compliance and risk management. Manage document databases, design, implementation and maintenance, trial/hearing presentation, trial site build out, technology platforms and logistics. Provide training and support to Attorneys firm wide. Liaise with IS department to provide technology support to all departments within the firm. Provide support to Marketing Department with research database design and gathering of metrics from disparate sources. Develop automated patent portfolio management tools as well as database of firm experts. Designed and implemented a browser based Practice Management and Reporting Tools which integrates data from various SQL based system to generate on demand performance metrics and reporting.

### Litigation Logistics, LLC      1/03 to 12/04
*Director of Business Development* – Developed tactical litigation & practice support services with emphasis on back litigation data workflow management. Provided consulting and due diligence services for Electronic Discovery Process Management, Corporate Risk management (Disaster Recovery & Business Continuity) for Amlaw 100 law firms and vendors (primarily National Data Conversion). Developed, conducted presentations and training on corporate risk management, disaster recovery, business continuity strategies and technology. Developed electronic discovery best practices and train lawyers, clients and corporate administrative groups. Consulted with organizations understand the technical implications of litigation and compliance processes. Developed staffing plans and marketing materials for companies providing services in the legal services & compliance arenas.

### Planet Data Solutions, Inc.      9/01 to 1/03
*Chief Operating Officer* – Created scalable operational infrastructure for a litigation support services company providing rapid turnaround scanning, coding, computer forensic and electronic discovery services to Amlaw 200 law firms. Ensure that operational infrastructure can support all company service offerings. Implement discovery services related to searching email and servers for specific litigation and or compliance related data for the SEC, FTC, N.Y. Attorney General or other parties pursuant to court orders.

### Cravath, Swaine & Moore, New York, New York      10/98 to 9/01
*Manager of Technical Litigation Support*
Managed a team of Imaged Litigation Document Database and Electronic Discovery analysts. Worked with vendors and clients to price and implement imaging, coding, system migrations and upgrade projects. Work with opposing counsel to coordinate reciprocal document productions. E-tech (ORACLE based) database developer. Provided remote trial site support, interface with phone company; build high speed remote networks. Developed trial presentations and conducted them in court.

*Manager of User Support Services*
Managed 25-30 Hardware Analysts, & Call Center Specialists in demanding 24x7 support center environment. Develop & evangelize Support Services vision in firm. Implement, maintain & upgrade internal customer call tracking system (HEAT). Generate HEAT reports (Crystal 8) for SQL based system to identify support requirements, trends and organizational exposure. Coordinated & implemented IT support for satellite offices in London & Hong Kong. Implemented thin client methodologies to monitor customer calls from remote locations as well as implement Knowledgebase to build expedite handling of operational issues affecting the firm.

**Patterson, Belknap, Webb & Tyler, LLP, New York, New York**                9/95 to 10/98
*Practice Support Analyst* - Summation, Concordance and Access database administrator and trainer. Resolved imaging and network issues as to litigation databases. Designed and implemented applications for litigators, administration and staff with MS Access 2.0 and 97. Troubleshooted network issues, developed weekly PC Docs, Groupwise and WordPerfect class offerings for firm personnel, wrote documentation for software and system processes. Trained help desk staff on Summation and other document management applications.

**N.Y.S. Unified Court System**                                              10/94 to 10/95
Administrative Judges Office, 9th Judicial District, White Plains, New York
*Personal Computer Analyst* - Train Judge's, Court Attorney's, Law Secretaries and support staff in the use of Windows applications - WordPerfect 6.1, Westlaw, etc. Configure PC hardware and peripherals in the New York State and Court System of Westchester, Rockland, Dutchess, Putnam and Orange counties.

**IBM**

    **US Marketing and Services**, Harrison, New York                    2/91 to 10/94
*Availability Services Marketing Specialist*
Developed and implemented marketing strategies to protect & grow $57,000,000 annual services revenue stream in territory. Priced and propose and IBM services for IBM and OEM software and hardware.

*Customer Engineer*
Installed, troubleshooted and serviced mainframes in IBM Enterprise System Accounts with ES 9000, 3090 mainframes and related subsystems in IBM based data center environments. Designed and Implemented Physical and Logical changes to hardware and software configurations as required by customer applications and business needs.

    **World Manufacturing Headquarters**, Purchase, New York
*Pre-professional Programmer* - Gave technical support at new product demonstrations to IBM Sr. V.P., Terry Lautenbach. Was chief technician for the Purchase site's $3,200,0000 "PS/2 Rollout." Coordinated with customers & Service reps. the delivery of $2,800,000 in hardware/software assets.

    **Pace University**, Pleasantville, New York                        11/89 to 3/91
*Assistant to Systems Analyst* - Installed, troubleshooted and maintained hardware and software for Pace University and Pace University Law School. Assessed end-user requirements and submitted findings to supervisor.

**Education:**

    **PACE UNIVERSITY SCHOOL OF LAW,** White Plains, New York                5/98
      Juris Doctorate

    **PACE UNIVERSITY Lubin School of Business**, White Plains, New York    6/92
      BBA, International Management, Minor in Italian; Cum Laude.

**Languages:**

English, fluent Italian, conversational German.

## ELECTRONICALLY STORED INFORMATION ON TAPE

Outline of the process to restore, de-duplicate, groom and index structured and unstructured data. The result is the reduction of archive size as well as the enablement of archive data discoverability.



CAAS Confidential, all rights reserved 2007.