UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, )<br><br>Plaintiffs, )<br><br>v. )<br><br>NEWS AMERICA MARKETING IN-STORE, )<br>INC., )<br><br>Defendant. ) | CIVIL ACTION NO. 05-1740MLW<br>Leave to file granted June 12, 2007 |

---

## ROBERT FIREMAN AND ANN RAIDER'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANT

In a lengthy opposition to Plaintiffs' motion to compel Defendant to search its backup tapes for material responsive to Plaintiffs' document requests, Defendant attempts to obscure the key issues by focusing on documents it has already produced, and by essentially ignoring or dismissing the inevitability that critical email and electronic documents exist only on daily email and year-end backup tapes that News America Marketing In-Store, Inc. ("NAM") has never searched. While NAM maintains that all relevant electronic documents must still exist on the company's live servers, it has presented nothing beyond vague assertions that its employees keep all "important" documents on its servers, and extrapolates that the backup tapes are not the only source for critical deleted email and electronic documents. The notion that NAM produced all responsive documents without ever searching its backup tapes is inconceivable. The fundamental question is the one posed by Rule 26 – on balance, does the need for the

documents justify the burden of production. See Fed. R. Civ. P. 26(b)(2)(C). The answer here is yes. The internal communications of key executives are critical to proving that NAM did not exercise its obligations under the parties' Stock Purchase Agreement and Employment Agreements in good faith, and it is likely that the vast majority of these communications exist only on NAM's daily e-mail and year-end backup tapes. Plaintiffs therefore respectfully submit that NAM must be ordered to search a subset of the tapes and produce documents responsive to the Plaintiffs' document requests.[1]

## I.    NAM'S Production To Date Is Incomplete.

NAM insists that Plaintiffs' assertion that the backup tapes are the only source for retrieving critical responsive documents that have not been produced is "wildly incorrect." Opposition to Plaintiffs' Motion to Compel Responses To Discovery Requests From NAM ("Opposition") at 15. To support this predicate defense, NAM simply points to the materials it has already produced, and to the affidavit of only one of its executives in which he states that *he* retained all "important" documents. From this, NAM extrapolates that all e-mail and other electronic documents from 1999-2004 necessarily exist on servers it has already searched. The argument contradicts the testimony of NAM's Rule 30(b)(6) witness on the topic, NAM's vice president of Windows technology, Alfred McBean Jr. McBean states that outside of e-mail files that may or may not exist on end user's computers, the only source for e-mails is the backup tapes. McBean Dep. At 97 (attached as Exhibit A to Robert Fireman and Ann Raider's Motion to Compel Responses to Discovery Requests from News America Marketing In-Store

---

[1]    This subset could be limited to the backup tapes for New York and Connecticut – a fraction of the overall tapes NAM claims will cost $13 million to restore. Plaintiffs are also willing to limit the search to tapes generated from 1999 through 2002 NAM has been unwilling to search a single tape.

Inc. ("Motion to Compel").[2]  More importantly, the argument is, charitably put,

counterintuitive.

NAM apparently believes that because theoretically every e-mail and electronic

document can exist on the file servers back to 1999 if they were not deleted that it

somehow follows that they do in fact exist.  It relies on the testimony of Mr. McBean

stating that "[d]ata can exist on the file servers that stretch back as far as 1999. So if it's

still on our file servers today it's online or it could be on the year-end tapes." McBean

Dep. at 96-97 (emphasis added); Opposition at n.32.  This testimony is far from the

statement NAM wants it to be, that everything on the backup tapes exists also on the file

servers.  McBean simply stated that data, if it has been retained, could conceivably still

be on the file servers.  This observation does nothing to disprove the basic proposition

that items that may have been on servers in the past and permanently deleted from those

servers, are now only captured on backup tapes NAM refuses to search.  NAM essentially

contends only this: that if users chose to retain files, those files, and only those files, will

still exist on NAM's network drives.  Opposition at 10 ("For example, *if* a user retains a

file from 1999, the file will exist today in at least two locations:…") (emphasis added).

This is likely a marginal fraction of the responsive documents NAM has retained.

Unvarnished, NAM argues that the only relevant documents in its eyes are those

which its employees decided to retain, and expects Plaintiffs and the Court to believe that

all communications concerning the future direction of CCMI and other critical issues in

---

[2]    The argument also seems belied by the fact that NAM did not produce a single electronic
document despite its promise and obligation to do so.  See July 27, 2006 e-mail correspondence between
Kevin Peters, Esq., and Gordon Katz, Esq., attached as Exhibit ("Ex.") A to the Declaration of Charles H.
Roumeliotis, Esq. ("Roumeliotis Decl.") filed herewith.  Mr. Katz responded to this email "roger."

the case were necessarily retained by its employees for years. Basic common sense suggests that it is far more likely that e-mails and electronic documents concerning the issues pertinent to Plaintiffs' claims have been deleted and are only captured in the backup tapes. As McBean confirmed, the backup tapes are the only source for the documents that end user's chose not to retain. McBean Dep. at 97.

In addition, NAM relies on Henri Lellouche's testimony and declaration that he "retains electronic copies of all files that I view as important, and define 'important' by whether I believe I will need to refer to the materials again." Declaration of Henri Lellouche ("Lellouche Decl.") at ¶ 9. How either the Plaintiffs or the Court are supposed to make a logical leap from the assertion that all "important" documents represent all responsive documents to Plaintiffs' document requests is unclear. Also, there is no indication that any of the other key current and former NAM executives who play a critical role in this case, including Paul Carlucci and David Devoe among others, retained all responsive documents, let alone so-called "important" ones. A targeted search of the backup tapes is critical to uncover the internal communications that were not retained by users. In a case such as this, which centers on NAM's refusal to act in good faith, it is very likely internal communications exist which, quite deliberately, were not retained by end users on NAM servers, and shed light NAM's conduct and its motivation.

It is for that reason that NAM's reliance on <u>Cognex Corp. v. Electro Scientific Industries, Inc.</u> is inapposite. The Court is <u>Cognex</u> specifically states as one of its reasons for denying the search of backup tapes that:

> [t]his is not the type of case where one would expect the most relevant emails to be deleted at the time. In an employment situation (as in

4

> McPeek), *it is precisely the informal emails evidencing intent that in the normal course would be destroyed and not kept in company records.*

Cognex Corp. v Electro Scientific Industries, Inc., 2002 WL 32309413 at *5 (emphasis added). In this case, Plaintiffs are seeking precisely the informal emails evidencing the intent of NAM executives to ignore CCMI's business plan, siphon off key staff and withhold promised resources, which one would expect to be deleted from the servers. As in Cognex, there is no doubt that a search of backup tapes will uncover documents not already produced. As that court stated, "the very nature of the snapshots reflected in back-up tapes suggests that documents will exist thereon which are no longer in [NAM]'s electronic files." Id. at *4.

Here, where internal communications evidencing intent play such a large role in the claims of this case, a request to search the backup tapes does not present a situation where "enough is enough", as NAM posits. To the contrary, the day-to-day history of a business relationship that started with great promise and rapidly deteriorated into an abject failure, and the motivations that illuminate that history, exist pristinely on tapes NAM will not search. The request, in short, is not cumulative and duplicative; the documents sought are not available from any other source, and inasmuch as NAM has made no attempt to retrieve these deleted electronic documents, it is inconceivable that NAM could argue otherwise. See Fed. R. Civ. P. 26(b)(2)(C). In a case such as this, where informal emails evidencing intent are at the core of Plaintiffs' claims, there is good cause for this Court to require a search of the backup tapes for responsive documents, or at the very least require NAM to search a sample of the tapes to confirm that critical responsive documents exist. See Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 324 (S.D.N.Y. 2003); McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001).

## II.    Plaintiffs' Requests Are Narrowly Tailored To Discover Responsive Documents

NAM misapprehends its, and Plaintiffs', obligation under Rule 34. It argues that Plaintiffs must point to specific documents it has failed to produce, or "gaps" in NAM's production, in order to be entitled to discovery of further relevant information on the backup tapes. This perspective flips Rules 26 and 34 on their head. If NAM's re-formulation of its discovery obligation were at all weight bearing it could for instance ignore a warehouse of paper documents, produce what it believes is "important", and then shift the burden to the Plaintiffs to specify what is missing. The absurdity of this position is no less because the documents sought are electronic rather than paper. Again, the issue of burden is relevant, but not dispositive. This is no less true when dealing with paper. The first question is the one already posed above – are the documents available anywhere other than on the tapes? This motion was necessitated by the plain fact that it is highly unlikely that NAM executives kept all of their relevant e-mail and electronic documents evidencing among other things, their intent in managing CCMI and its resources. But these documents still exist on the backup tapes, and go to the core of Plaintiffs' claims.

Fundamentally, there is no way for Plaintiffs to know definitively, and pinpoint with the precision NAM would impose on them, which e-mail and electronic documents exist on the backup tapes. And there is no requirement under the Federal Rules that Plaintiffs do so.

Plaintiffs request NAM only to conduct a targeted search of its year-end and daily email backup tapes for documents responsive to its document requests. Yet NAM characterizes Plaintiffs' requests as a fishing expedition apparently looking for every

6

single document that exists on NAM's backup tapes. NAM's reliance on <u>Balfour Beatty</u> <u>Realty, Inc. v. Vaccarello</u>, 2007 WL 169928 (M.D. Fla. 2007), belies this point. In <u>Balfour</u>, the Plaintiff simply requested the defendant's computer hard drives without specifying what documents it sought from those hard drives. <u>Balfour</u>, 2007 WL 169928 at *3. That case has nothing in common with what Plaintiffs seek here. Plaintiffs have not asked NAM to produce all of its backup tapes; they are requesting that NAM conduct a targeted search for responsive documents just as it says it did when it searched for them on its live servers.

The Declaration of Henri Lellouche illustrates how NAM can undertake a search of its backup tapes for documents responsive to Plaintiffs' document requests. In the Declaration, Mr. Lellouche explains how he "searched for all documents that reference CCMI, Smart Source, Fireman, Raider, or other individuals that worked on CCMI-related projects" and instructed NAM IT personnel to do the same. Lellouche Dec., ¶¶ 12-18. In the same manner, NAM's IT department could certainly conduct a targeted search for e-mails and electronic documents that reference CCMI, Smart Source, Fireman, Raider, or other individuals that worked on CCMI-related projects. This type of search will inevitably turn up relevant documents. Again, Plaintiffs will work with NAM to define a reasonable sample set of tapes to be searched initially. This narrowing of the search could include searching a sample set of the tapes originating from the New York office for an agreed upon list of terms, and for a limited period of time.

### III.    The Burden Of The Proposed Discovery Does Not Outweigh the Likely Benefit Of The Proposed Discovery Given The Importance Of The Proposed Discovery In Resolving the Issues

Much of the opposition centers on the cost of production. Although the documents are available, as a technical matter, NAM basically argues that this lawsuit does not justify the effort or expense. In fact, inasmuch as NAM has not produced a single electronic document until today notwithstanding a request, and agreement, to do so, this philosophy seems to have permeated NAM's entire production effort.[3]

The standard NAM asks this Court to apply in assessing the worthiness of Plaintiffs' complaint disregards both the law and the merits of Plaintiffs' case. In substance, NAM argues that the Stock Purchase Agreement bars Plaintiffs' claims, relying on a section of the agreement which states in part that NAM shall be free to operate CCMI in its "sole and unfettered judgment." The argument ignores the law of New York, and the primary thrust of Plaintiffs' case. Even in contracts which allow discretion to one party, the implied duty of good faith and fair dealing requires that party to use its discretion so as not to deprive the other party of its benefits under the contract. As stated in Richbell Information Services, Inc. v. Jupiter Partners, 209 A.D.2d 288, 302 (N.Y. App. Div. 2003), "even where one has an apparently unlimited right under a contract, that right may not be exercised solely for personal gain in such a way as to deprive the other party of the fruits of the contract." Under New York law, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995).

---

[3] Earlier today, NAM produced a single PowerPoint document in electronic form.

Simply stated, the clause NAM advances as dispositive not only of this motion but also the case did not give NAM free reign to destroy the benefit of the bargain. And yet that is precisely what NAM did. Without burdening the Court with a full recitation of what NAM's partial discovery has disclosed, to date this much is clear:

NAM acquired CCMI based on the promise to foster its growth in the nascent field of targeted loyalty marketing.[4] At the time of due diligence and acquisition, CCMI was one of the leading companies in this burgeoning field. The market for CCMI's products (existing and planned) was enormous. NAM recognized this, and also recognized that it could acquire CCMI for a fraction of its value. An internal memorandum from NAM describing the opportunity and assessing CCMI's value confirms NAM's view that the cost to acquire CCMI was well in excess of nine million dollars in total cash payments, and that it could acquire CCMI for an initial investment of a fraction of that price if it made up the balance of the value (and more) with an earn-out right. See May 14, 1999 News American Marketing memorandum (Roumeliotis Decl. Ex. B).

The earn-out was to be achieved over five years, and was based on targets both companies agreed would almost certainly be achieved if NAM provided certain resources. NAM is and was nationally recognized as a leader in direct-mail marketing. It had a strong sales force and significant financial resources, and committed to use both to drive CCMI's business plan. See Deposition of Ann Raider ("Raider Dep.") at 59-60

---

[4]    Loyalty marketing involves, *inter alia*, generating marketing programs using information collected at the point of sale. This is done by monitoring individual purchase behavior (what a customer buys) using loyalty cards the store provides to its customers. Once a store, or manufacturer, knows what brands a customer prefers, it is able to target market those products to the customer. CCMI was one of the first architects of this form of marketing.

(Roumeliotis Decl. Ex. C). The business plan was conservative, and was the key to achieving the financial targets necessary to trigger the additional $5 million in earn-out payments. In fact, the earn-out provision was specifically tailored to the business plan NAM embraced. Id. During the negotiations that led to the acquisition, NAM committed to implementing the business plan. Id. It never did.

The destruction of CCMI's business started early and effectively ended when NAM threw Fireman out of his office with almost one year on his employment contract. See Deposition of Robert Fireman ("Fireman Dep.") at 143-147 (Roumeliotis Decl. Ex. D). In very broad terms:

- Not only did NAM ignore the CCMI business plan, it effectively dismantled the company. Robert Fireman was hired, as his employment contract reflects (Roumeliotis Decl. Ex. E), as the General Manager of the business unit. As the General Manager he was to run all of the business aspects of CCMI, as he had prior to the purchase. Ann Raider was hired as a Senior Vice President in charge of CCMI's sales and marketing, with responsibilities consistent with those she had before she sold her interest to NAM. Within the first several months, NAM gave Fireman's position to an internal candidate with no experience in direct loyalty marketing, Henri Lellouche. Lellouche confirmed in deposition that as between he and Fireman, Fireman had significantly more experience in the business (inasmuch as Lellouche had none). Deposition of Henri Lellouche ("Lellouche Dep.") at 101, 142 (Roumeliotis Decl. Ex. F). That notwithstanding, NAM made decisions critical to the business without

ever consulting Fireman. Fireman's job responsibilities were increasingly diminished, he was increasingly marginalized, and virtually all important decisions about CCMI's business were made without his input and without consulting him. See Fireman Dep. at 245-46 (Roumeliotis Decl. Ex. D). Meeting minutes reflect that by 2002 "[s]upervisory reorganization relieves Fireman of Operations and Raider of Retail Sales responsibilities." March 14, 2002 Meeting Minutes (Roumeliotis Decl. Ex. G).

- Raider, like Fireman, was rapidly marginalized, and was kept from driving sales. Although given the title "Senior Vice President" over sales, she was effectively stripped of any real authority. Decisions within the scope of her job title were made without her input. Essential resources were withheld. Soon after the sale, she had no sales staff reporting to her, and was relegated to reporting to another Senior Vice President. Although she was to be responsible for CCMI's sales force, ultimately she was a sales force of one. Many of these issues are discussed in Fireman's and Raider's depositions, and are also outlined in the Plaintiffs' response to Interrogatories, particularly interrogatory number 6. Ann Raider's Answers to First Set of Interrogatories Propounded by the Defendant ("Raider's Answers to Interrogatories"); Robert Fireman's Answers to First Set of Interrogatories Propounded by the Defendant ("Fireman's Answers to Interrogatories") (Roumeliotis Decl. Ex. H and Ex. I); Raider

Dep. at 59-60 (Roumeliotis Decl. Ex. C) ; Fireman Dep. at 245-46
(Roumeliotis Decl. Ex. D).

- NAM refused to use its sales force to promote CCMI's products with
  manufacturers. This precluded CCMI's growth in this essential sector,
  and therefore cost CCMI tens of millions of dollars in revenue. See
  Raider's Answers to Interrogatories at 10-11 (Roumeliotis Decl. Ex. H).

- NAM broke apart CCMI's core team very early in the relationship. One
  CCMI employee, William Adam, was essential to the success of the
  company. Adam was a key architect to the software that analyzed the data
  obtained at the point of sale, and was an essential part of the team that
  made sales pitches to stores to license this technology. After denying
  Adam a deserved raise to continue his critical work with CCMI, NAM
  offered him a substantial raise to leave CCMI and move to Connecticut.
  CCMI never recovered from his loss. See Raider's Answers to
  Interrogatories at 11-12 (Roumeliotis Decl. Ex. H); Raider Dep. at 304-05
  (Roumeliotis Decl. Ex. C); Fireman Dep. at 150 (Roumeliotis Decl. Ex.
  D).

- In order to grow the business, CCMI needed key employees. NAM
  refused to fill the necessary positions. It claimed that it had a hiring
  freeze, and that it had a policy that precluded it from adding "head count"
  unless revenues increased to the point where it met its internal criterion.
  See Raider's Answers to Interrogatories at 10-12 (Roumeliotis Decl. Ex.

H); Raider Dep. at 82-83 (Roumeliotis Decl. Ex. C); Fireman Dep. at 282-83 (Roumeliotis Decl. Ex. D). NAM knew, of course, before acquiring CCMI that in order to achieve the goals of the business plan CCMI needed to hire. Once it owned the company, however, NAM abandoned that commitment. In basic terms, NAM knew that CCMI could not grow without staff, but would not get staff without growth. This necessarily frustrated Plaintiffs' ability to drive sales and collect their earn-out payments.

These examples are emblematic of a business relationship defined by an abject refusal to act in good faith.[5] NAM plainly saw the "sole discretion" provision as a license to deny Plaintiffs any opportunity to achieve the purchase price the parties negotiated. It now uses that same provision to deny Plaintiffs discovery of the only contemporaneous "fossil record" of what NAM was thinking and doing while CCMI floundered and failed. The law of New York does not, contrary to NAM's depiction, support this perspective. See Richbell, 209 A.D. at 302 (This limitation on an apparently unfettered contract right may be grounded . . . on the purely contractual rule that even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement."); TIG Ins. Co. v. Newmont

---

[5] Mr. Lellouche in his deposition specifically testified to this refusal, stating:

> Q.  Do you believe News America marking had an obligation to try this good faith to increase CCMI's revenue.
>         MR. KATZ: Objection.
>     A.  No.

Lellouche Dep. at 74 (Roumeliotis Decl. Ex. F).

Mining Corp, 413 F. Supp. 2d 273, 281 (S.D.N.Y. 2005) ("One party's discretion cannot go so far as to enable the party to eviscerate a term of the contract and frustrate a fundamental purpose underlying the agreement." (Quotations and citations omitted.)); Hirsch v. Food Resources, Inc., 24 A.D.3d 293, 296 (N.Y. App. Div. 2005) (implied covenant breached where unfettered contractual right exercised so as to "frustrate the basic purpose of the agreement").

In sum, the application of the implied covenant of good faith and fair dealing enforces NAM's obligation under the contract not to use its discretion to frustrate one of the basic purposes of the agreement, to grow CCMI and allow the Plaintiffs to receive the balance of the purchase price for their company. As stated by the Court in T.R. McClure & Co., Inc. v. TMG Acquisition Co. , applying New York law:

> Finding [defendant] liable of a breach of its contractual obligations to plaintiff if it acted in bad faith by setting unreasonable prices and unacceptable schedules, or undercapitalizing New McClure, even though the Earn-Out Agreement does not set forth any minimal requirements, would not be tantamount to rewriting the contract or adding additional terms. Rather, it would simply be enforcing [defendant's] obligation to act reasonably and in good faith in fulfilling the parties' expectations.

1999 WL 692683, *7 (E.D. Pa. Sept. 7, 1999) (attached as Exhibit A).

Of course, all of these issues will be more fully vetted in opposition to NAM's planned motion for summary judgment, and likely at trial.[6] For the immediate purposes, Plaintiffs respectfully submit that it is enough to point out that even before NAM has produced what are likely to be the most revealing documents, Plaintiffs have a compelling case. The cost of complying with NAM's discovery obligations does not outweigh Plaintiffs' right to try its case informed by documents that are nowhere else

---

[6]    NAM has already confirmed that it will not engage in settlement discussions.

available. The emails and other electronic documents NAM insists it has no obligation

even to *sample*, are exactly the kind of communications that would not normally be

retained by executives, and thus it is clear that this proposed discovery would be critical

in resolving the issues in this case. See Fed. R. Civ. P. 26(b)(2)(C).

     For all the foregoing reasons and those discussed in Plaintiffs' original Motion to

Compel, this Court should grant Plaintiffs' motion to compel and require NAM's to

search it's year-end and daily e-mail backup tapes for documents responsive to Plaintiffs'

document requests.

                         Respectfully submitted:

                         ANN RAIDER AND ROBERT FIREMAN

                         By their attorneys,

                         /s/ Charles H. Roumeliotis
                         Kevin T. Peters (BBO #550522)
                         David H. Rich (BBO #634275)
                         Charles H. Roumeliotis (BBO #657553)
                         Todd & Weld LLP
                         28 State Street
                         Boston, MA 02109
Dated: June 15, 2007            (617) 720-2626

---

### CERTIFICATE OF SERVICE

    I, Charles H. Roumeliotis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: June 15, 2007               /s/ Charles H. Roumeliotis
                                 Charles H. Roumeliotis

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
T.R. McClure & Co., Inc. Liquidating Trust v. TMG
Acquisition Co.
E.D.Pa.,1999.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
    T.R. MCCLURE & CO., INC. LIQUIDATING
                    TRUST, Plaintiff,
                          v.
    TMG ACQUISITION CO., et al., Defendants.
                  **No. CIV. A. 99-537.**

                    Sept. 7, 1999.

                    MEMORANDUM
ROBRENO.
**\*1** Plaintiff T.R. McClure & Co., Inc. Liquidating
Trust brought this breach of contract action naming
as defendants TMG Acquisition Co. ("TMG") and
DIMAC Corp. ("DIMAC"). Specifically, plaintiff
alleged that defendants breached their duty of good
faith and fair dealing. Prior to any discovery being
taken, defendants filed the instant motion for
summary judgment, relying solely upon their
interpretation of the contract at issue. The case
originally was assigned to the Honorable Robert S.
Gawthrop, III, however, due to Judge Gawthrop's
unexpected and unfortunate death, the case was
transferred to this court. For the following reasons,
defendants' motion for summary judgment will be
denied.

                    I. FACTS

The following facts are not in dispute or are
construed in the light most favorable to the plaintiff.
On September 29, 1995, defendant DIMAC and its
subsidiary, defendant TMG, purchased T.R. McClure
& Co., Inc. ("Old McClure"). The parties executed
the transaction pursuant to an Asset Purchase
Agreement ("APA"), which included a separate Earn-
Out Agreement. Under the terms of the APA,
DIMAC purchased all of the assets of Old McClure
for $16 million. The new company, The McClure
Group ("New McClure"), retained Old McClure's
management team and is now a wholly owned
subsidiary of DIMAC. Plaintiff is the successor in
interest to Old McClure.

The Earn-Out Agreement provided that DIMAC
would pay quarterly to plaintiff additional sums for
four years (4) following the sale. The payments were
to be calculated in two components-"recaptured
revenue" and "EBITDA." [FN1] The "recaptured
revenue" provision reads, in pertinent part:

            FN1. "EBITDA" is the acronym for
            "earnings before interest expense, taxes,
            depreciation, and amortization."

"Recaptured Revenue" shall mean revenue ...
collected ..., in connection with work generated by
clients of New McClure and brokered by New
McClure to the Parent Corporation [DIMAC] or a
subsidiary of the Parent Corporation after the date of
this Agreement.
Earn-Out Agreement, § 1(f). The Earn-Out
Agreement provides that plaintiff would receive
twelve percent (12%) of all recaptured revenue. The
EBITDA provision provides that plaintiff would
receive approximately fifty percent (50%) of New
McClure's EBITDA-based earnings over a base level
of $3 million. Earn-Out Agreement, § 1(d).

The Earn-Out Agreement specifies that DIMAC's
recaptured revenue and EBITDA-based payments to
plaintiff are to be made quarterly. If plaintiff fails to
submit a written notice of objection to DIMAC's
determination of the amount of the earn-out payments
within twenty (20) business days after receipt of the
determination, the determination is deemed final and
binding. Earn-Out Agreement, § 3(a). If plaintiff
does submit a notice of objection to DIMAC's
determination, the parties must negotiate for fifteen
(15) days to resolve the dispute, and if no resolution
is reached, the dispute shall be submitted to
arbitration for resolution. Earn-Out Agreement, §
3(b).

**\*2** On February 24, 1998, plaintiff timely objected to
DIMAC's recaptured revenue earn-out payments for
the fourth quarter of 1997. On March 6, 1998,
plaintiff also objected to the recaptured revenue earn-
out payments for the period from October, 1995
through September, 1997. Subsequently, on April 24,
1998 and August 10, 1998, respectively, plaintiff
timely objected to the recaptured revenue earn-out
payments for the first and second quarters of 1998.
Plaintiff's objections alleged that, in addition to work

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

actually performed by DIMAC, the earn-out payments also should include all work brokered by New McClure to DIMAC, even if DIMAC ultimately failed to perform, as well as any work that New McClure was unable to broker to DIMAC due to DIMAC's allegedly unreasonable prices and schedules or past poor performance. In addition, on March 31, 1998, plaintiff notified DIMAC of its claim for $97,500 for lost EBITDA-based earnings for the fourth quarter of 1997 as a result of DIMAC's failure to infuse capital into the expansion of New McClure's telemarketing services. Pursuant to the Earn-Out Agreement, plaintiff sought arbitration of all of the objections it had asserted to DIMAC's earn-out payments.

Initially, DIMAC agreed to arbitrate only plaintiff's claims that related to the recaptured revenue earn-out payments for the fourth quarter of 1997 and first and second quarters of 1998. DIMAC, however, subsequently changed its mind and refused to submit any of plaintiff's claims to arbitration. DIMAC contended that plaintiff's claims relating to the period from October, 1995 through September, 1997 were not subject to the arbitration provision because plaintiff's objections were untimely. DIMAC also reasoned that plaintiff's timely filed claims, relevant to the fourth quarter of 1997 and the first and second quarters of 1998, were not arbitrable because "Section 3 of the Earn-Out Agreement does not contemplate arbitration of these sorts of disputes. Section 3 is addressed to the resolution of disputes regarding 'the *determination* of the amount of the Earn-Out Payments.' " Pl.'s Resp., Ex. S (emphasis in original). DIMAC characterized plaintiff's claims as alleging a breach of the duty of good faith and fair dealing "that go beyond the accuracy of the calculation of the amount of the Earn-Out Payment." *Id.* For these reasons, DIMAC concluded that plaintiff's claims were not proper matters for arbitration under the Earn-Out Agreement. As a result, plaintiff filed the instant action.

It is the theory of plaintiff's complaint that DIMAC breached its implied duty of good faith and fair dealing by failing to undertake, or by undertaking in an inadequate fashion, certain of its obligations under the Earn-Out Agreement. In essence, the complaint represents a concession by plaintiff that its prior objections to the earn-out payments due are not arbitrable under § 3(b) of the Earn-Out Agreement because the objections did not implicate the *method* of calculating the earn-out payments. Rather, it now acknowledges that the disagreement between the parties concerns the defendants' *conduct* that

allegedly resulted in the determination of lower earn-out payments than would have been granted had the defendants not breached.

**\*3** In response, and before the completion of any discovery in this case, DIMAC filed the instant motion for summary judgment arguing that: (1) plaintiff's claims based on the recaptured revenue earn-out payments for the period from October, 1995 through September, 1997 are barred as a matter of law because plaintiff's notices of objections were untimely; (2) plaintiff's timely claims based on the recaptured revenue earn-out payments for the fourth quarter of 1997 and first and second quarters of 1998 are barred because the Earn-Out Agreement provided that plaintiff would only receive additional payments for the revenue DIMAC actually collected for work in fact performed; and (3) plaintiff's claim for lost EBITDA-based payments are barred as a matter of law because the Earn-Out Agreement does not require DIMAC to infuse capital into the expansion of New McClure's services. In turn, plaintiff replies that: (1) section 3 of the Earn-Out Agreement, including the 20-day notice provision and the arbitration provision, does not apply to plaintiff's claims alleging breach of the duty of good faith and fair dealing; (2) DIMAC is estopped from relying on the 20-day notice provision as a defense; and (3) DIMAC waived the use of the 20-day notice provision as a defense.

## II. LEGAL STANDARD

Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court must accept the non-movant's version of the facts as true, and resolve conflicts in the non-movant's favor. *See Big Apple BMW, Inc. v. BMW of N. Amer., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has done so, however, the non-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

moving party cannot rest on its pleadings. *See* Fed.R.Civ.P. 56(e). Rather, the non-movant must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. ANALYSIS [FN2]

> FN2. The parties do not dispute that, pursuant to the terms of the Earn-Out Agreement, New York law governs this action. Earn-Out Agreement, § 4(g).

#### A. *Timeliness of Plaintiff's Objections.*

*4 Several undisputed facts are particularly relevant to an analysis of DIMAC's motion for summary judgment: (1) plaintiff submitted a timely notice of objection to the recaptured revenue earn-out payments for the fourth quarter of 1997 and first and second quarters of 1998; (2) plaintiff's notice of objection to the earn-out payments for the period from October, 1995, through September, 1997 were untimely, as defined in the Earn-Out Agreement; and (3) all of plaintiff's objections relate not to the determination of the amount of the earn-out payments, but, rather, to DIMAC's alleged breach of its duty of good faith and fair dealing.

DIMAC contended that none of plaintiff's claims were arbitrable because plaintiff's objections did not qualify as "Disputed Matters" under section 3 of the Earn-Out Agreement. Section 3 of the Earn-Out Agreement states, in part:
The *determinations of the amount* of the Earnout Payments shall be submitted to the Seller Group Representative within 60 days after the end of the applicable Payment Period.... If the Seller Group Representative does not *object to the determination* by the Parent Corporation of the applicable Earn-out Payment by written notice of objection (the "Notice of Objection") delivered to the Parent Corporation within 20 business days after receipt by McClure & Co. of such determination, the proposed Earn-out Payment shall be deemed final and binding.

Earn-Out Agreement, § 3(a) (emphasis added). Section 3 of the Earn-Out Agreement further provides:If the Seller Group Representative delivers a

*Notice of Objection to the determination of the Earn-out Payments* within the appropriate time period, [and] ... [i]f after 15 business days following such notice (the "Negotiation Period") any of such objections have not been resolved (the "Disputed Matters"), then such Disputed Matters shall be submitted to arbitration in St. Louis, Missouri.

*Id.*, § 3(b) (emphasis added).

Interpreting § § 3(a) and (b), DIMAC defined "Disputed Matters" as "limited to objections to the determination of the Earn-Out Payments that have been the subject of a *timely* 'Notice of Objection' under Section § 3(a)." Pl.'s Resp., Ex. S (emphasis in original). As a result, DIMAC contended that plaintiff's claims were not arbitrable because plaintiff's untimely objections were barred by the 20-day notice provision, as set forth in § 3(a), and plaintiff's timely objections did not qualify as challenges to the determination of the earn-out payments, as set forth in § 3(b). DIMAC asserts that although *all* objections to the earn-out payments are subject to the 20-day notice provision of § 3(a), only *some* claims are subject to arbitration under § 3(b), namely, claims challenging the determination of the amount of the earn-out payment.

*5 The court disagrees. Just as the plain language of § 3(b) specifies that only objections pertaining to "the determination of the amount" (and not the conduct that underlies the mathematical determination) of the earn-out payments are subject to arbitration, § 3(a) also indicates that only those objections pertaining to "the determination" are subject to the 20-day notice provision. The contract term, "the determination of the amount," should be given the same meaning whether interpreting § 3(a), the 20-day notice provision, or § 3(b), the arbitration provision.[FN3] *See Dore v. Pierre*, 226 N.Y.S.2d 949, 952 (N.Y.Sup.Ct.1962) (citing *White v. Knickerbocker Ice Co.*, 254 N.Y. 152, 172 N.E. 452, 454 (N.Y.1930)) ("A word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons.") Since it is undisputed that all of plaintiff's claims relate to DIMAC's alleged breach of the duty of good faith and fair dealing, i.e., the conduct of the defendants, and not to the determination of the amount of the earn-out payments, neither the 20-day notice provision nor the arbitration provision applies.[FN4] Therefore, plaintiff's claims pertaining to the earn-out payments for the period from October, 1995 through September, 1997 are not barred by the 20-day notice provision of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Earn-Out Agreement.[FN5]

FN3. DIMAC asserts that absent a timely notice of objection, "the plain language of section 3(a) requires that the earn-out payments be deemed final and binding regardless of the nature of the claim raised." Defs.' Reply, at 5-6. The court's determination that the 20-day notice provision of § 3(a) applies only to claims related to the determination of the amount of the earn-out payments does not, as DIMAC suggests, render the "final and binding" provision a nullity. To the contrary, if plaintiff was challenging DIMAC's determination of the amount of the recaptured revenue earn-out payments for the period from October, 1995 through September, 1997, plaintiff's claims would be barred as untimely. Under such circumstances, the determination of the amount of the earn-out payment would be final and binding.

FN4. The court agrees with DIMAC's assertion that plaintiff's claims alleging a breach of the duty good faith and fair dealing are not covered by § 3(b), which refers to arbitration only those disputes that challenge the determination of the amount of the earn-out payment. "Although the good faith and fair dealing claim is casually related to the computation of [the earnout payment], it is not within the scope of the arbitration clause." See *Blutt v. Integrated Health Services,* No. 96-3612, 1996 WL 389292, at *3 (S.D.N.Y. July 11, 1996) (holding that the arbitration provision in an earnout agreement is limited to accuracy of calculation of payment). In any event, plaintiff argues only that its claims are not barred by the 20-day notice provision. Plaintiff does not contend that its claims should be subject to arbitration.

FN5. Given the court's finding, the court need not address plaintiff's arguments concerning estoppel and waiver.

### B. Breach of the Duty of Good Faith and Fair Dealing.

**\*6** In its complaint, plaintiff avers that DIMAC breached its duty of good faith and fair dealing "by refusing to take New McClure's business; by pricing New McClure's business so high that New McClure has had to send its business elsewhere or risk losing customers; by being unwilling or unable to meet New McClure's scheduling requirements so New McClure had to send its business elsewhere; and by performing New McClure's work in such a shoddy manner that customers of New McClure refused to allow DIMAC to do their work and New McClure had to send that work elsewhere." Pl.'s Compl., at ¶ 15. With respect to plaintiff's lost EBITDA-based payments, plaintiff alleges that "DIMAC breached the Earn-Out Agreement by failing to adequately capitalize New McClure's business operations, thereby reducing [plaintiff's] EBITDA-based earn-out payments." *Id.* at ¶ 19.

DIMAC asserts that it is entitled to judgment as a matter of law as to plaintiff's claims concerning the recaptured revenue earn-out payments because: (1) the Earn-Out Agreement is the complete integration of the parties' intent; (2) the implied duty of good faith and fair dealing cannot add material terms to the contract; and (3) plaintiff has produced no evidence that DIMAC breached its duty of good faith and fair dealing. DIMAC also seeks summary judgment as to plaintiff's allegations concerning alleged lost EBITDA-based payments because the Earn-Out Agreement does not require that DIMAC infuse a specific amount of capital into New McClure's operations.

Under New York law, "implicit in every contract is a covenant of good faith and fair dealing ... which encompasses any promises that a reasonable promisee would understand to be included." *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 769 (N.Y.1995) (citations omitted). Accordingly, "contracting parties' fields of discretion under a contract are bounded by the parties' mutual obligation to act in good faith." *Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2nd Cir.1989) "[N]either party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's presumed or reasonable expectations *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (citations omitted).

Although it is true that the implied covenant of good faith and fair dealing cannot "create an additional benefit for which [the plaintiff] did not bargain," *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1519 (S.D.N.Y.1989), it also "ensures

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

that parties to a contract perform the substantive, bargained-for terms of their agreement." *Id.* at 1517 (citation omitted). The duty of good faith, however, cannot add to, detract from, or alter the terms of the contract itself. *See National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 679 (S.D.N.Y.1991) ("The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith.")

*7 The implied covenant of good faith and fair dealing "surfaces when, while the express terms [of the contract] may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits." *Metropolitan Life,* 716 F.Supp. at 1517. "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." *Cross & Cross Properties,* 886 F.2d at 502.

In this case, the Earn-Out Agreement evidences the parties' intent to spread the balance of DIMAC's purchase of Old McClure over a five-year period. Indeed, the Earn-Out Agreement states that "payments under the Earn-Out Agreement shall be additional purchase price consideration for the Assets ... of [Old McClure]." Earn-Out Agreement, Recital B. Although the Earn-Out Agreement does not explicitly state the amount of consideration owed by DIMAC, it does evidence the parties' intent that DIMAC would make additional earn-out payments to plaintiff premised upon performance by both New McClure and DIMAC. Thus, the Earn-Out Agreement's terms envision that DIMAC would, if feasible, act so as to generate additional purchase price consideration. It is reasonable to require that, in doing so, DIMAC act in good faith to make the parties' expectations come to fruition.[FN6] Finding DIMAC liable of a breach of its contractual obligations to plaintiff if it acted in bad faith by setting unreasonable prices and unacceptable schedules, or undercapitalizing New McClure, even though the Earn-Out Agreement does not set forth any minimal requirements, would not be tantamount to rewriting the contract or adding additional terms. Rather, it would simply be enforcing DIMAC's obligation to act reasonably and in good faith in fulfilling the parties' expectations.

FN6. Plaintiff, however, cannot argue that DIMAC was obligated to accept all of the work brokered to it by New McClure, or, for

that matter, any of it. Nor can plaintiff claim that DIMAC was required to capitalize New McClure with a sum certain. To do so would be asking this court to add additional terms to the Earn-Out Agreement, which would have been included in the contract had the parties so intended. *See Keene Corp. v. Bogan,* No. 88-0217, 1990 WL 1864, at *11 (S.D.N.Y. Jan. 11, 1990) ("The alleged agreement[ ] that [plaintiff] would ... guarantee earn-out payments [is] so related to provisions of [the Earn-Out Agreement] that a reasonable person would expect [it] to be embodied in that agreement.") Further, the Earn-Out Agreement includes an integration clause that states that the agreement "constitutes the entire agreement of the parties hereto relating to the subject matter hereof, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement that are not set forth herein." Earn-Out Agreement, § 4(f). Indeed, DIMAC could have failed to perform all of the work brokered to it by New McClure or failed to infuse capital into New McClure without breaching the contract, so long as DIMAC's conduct was undertaken in good faith.

*8 The record, however, is insufficiently developed so as to support a finding by the court that DIMAC is entitled to judgment as a matter of law on these claims. DIMAC argues that "[e]ven if these alleged implied obligations of DIMAC were legally cognizable, plaintiff's claims are still deficient because they have not come forward with evidence that DIMAC breached those obligations." Defs.' Reply, at 14. However, the instant motion for summary judgment was filed before discovery in this case had even begun. This ruling, however, is without prejudice to DIMAC's ability to press its argument at the close of discovery. Thus, the court will deny DIMAC's motion for summary judgment and allow the parties to proceed with discovery.

An appropriate order follows.

### ORDER

AND NOW, this 2nd day of September, 1999, upon consideration of defendants' motion for summary judgment (doc. no. 11), plaintiff's reply (doc. no. 13), and defendants' response (doc. no. 14), it is hereby

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

ORDERED that defendants' motion for summary judgment is DENIED.

AND IT IS SO ORDERED.

E.D.Pa.,1999.
T.R. McClure & Co., Inc. Liquidating Trust v. TMG Acquisition Co.
Not Reported in F.Supp.2d, 1999 WL 692683 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.