## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                )
ROBERT FIREMAN and ANN RAIDER,                  )
                                                )
              Plaintiffs,                        )
                                                )
       v.                                        )        CIVIL ACTION NO. 05-1740MLW
                                                )
                                                )
NEWS AMERICA MARKETING IN-STORE,                )
INC.,                                            )
                                                )
              Defendant.                         )
_____)

## DECLARATION OF CHARLES H. ROUMELIOTIS, ESQ.

1.     I am an attorney at Todd & Weld LLP who represents Plaintiffs Robert Fireman

and Ann Raider in the above-captioned matter. I am licensed to practice in the Commonwealth

of Massachusetts, Board of Bar Overseers Number 657553. I am currently in good standing in

with all Courts in which I have been licensed to practice including the Commonwealth of

Massachusetts, The United States District Court for the District of Massachusetts and The First

Circuit Court of Appeals. I have personal knowledge of the matters stated in this declaration or

am informed and believe them to be true based upon pleadings and/or deposition transcripts from

the present case.

2.     Attached hereto at Exhibit A is a true and accurate copy of e-mail correspondence

between Plaintiffs' attorneys Kevin Peters and David H. Rich and Defendant's attorney Gordon

P. Katz.

3.     Attached hereto at Exhibit B is a true and accurate copy of a May 14, 1999 News

American Marketing memorandum concerning the purchase of CCMI, Bates labeled

NAM01474-NAM001480.

4.     Attached hereto at Exhibit C is a true and accurate copy of excerpts of the

Deposition of Ann Raider, dated May 17, 2007.

5.      Attached hereto at <u>Exhibit D</u> is a true and accurate copy of excerpts of the

Deposition of Robert Fireman, dated May 24, 2007.

6.      Attached hereto at <u>Exhibit E</u> is a true and accurate copy of an employment

contract between News America Marketing In-Store, Inc. and Robert Fireman, dated August 13,

1999, Bates labeled FR0001-FR0006.

7.      Attached hereto at <u>Exhibit F</u> is a true and accurate copy of excerpts of the

Deposition of Henri Lellouche, dated May 25, 2007.

8.      Attached hereto at <u>Exhibit G</u> is a true and accurate copy of a document containing

an organizational chart and meeting minutes, dated March 14, 2002, Bates labeled FR3740.

9.      Attached hereto at <u>Exhibit H</u> is a true and accurate copy of Ann Raider's

Answers to First Set of Interrogatories Propounded by the Defendant.

10.     Attached hereto at <u>Exhibit I</u> is a true and accurate copy of Robert Fireman's

Answers to First Set of Interrogatories Propounded by the Defendant.


    SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 15th DAY OF
JUNE, 2007

_____
Charles H. Roumeliotis, Esq. (BBO #657553)


CERTIFICATE OF SERVICE

    I, Charles H. Roumeliotis, hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on this date.

Date:  June 15, 2007                    <u>/s/ Charles H. Roumeliotis</u>
                                        Charles H. Roumeliotis

## Peters, Kevin

| | |
|---|---|
| **From:** | Peters, Kevin |
| **Sent:** | Thursday, July 27, 2006 3:55 PM |
| **To:** | 'gordon.katz@hklaw.com' |
| **Cc:** | Rich, David H. |
| **Subject:** | RE: Fireman/News America Marketing |

The extension is fine. Gordy, we'll be looking for email in electronic form. We'll have to manage the documents electronically, just FYI

Kevin T. Peters, Esq.
Todd & Weld LLP
28 State Street
Boston, Massachusetts  02109
617-720-2626 (Telephone)
617-624-4855 (Facsimile)

> -----Original Message-----
> **From:** gordon.katz@hklaw.com [mailto:gordon.katz@hklaw.com]
> **Sent:** Thursday, July 27, 2006 3:52 PM
> **To:** Peters, Kevin
> **Subject:** RE: Fireman/News America Marketing
>
> Yes.
>
> G
>
> **From:** Peters, Kevin [mailto:kpeters@toddweld.com]
> **Sent:** Thursday, July 27, 2006 3:50 PM
> **To:** gordon.katz@hklaw.com
> **Subject:** RE: Fireman/News America Marketing
>
> Gordy, is this the date you are proposing to produce documents?
>
> Kevin T Peters, Esq.
> Todd & Weld LLP
> 28 State Street
> Boston, Massachusetts  02109
> 617-720-2626 (Telephone)
> 617-624-4855 (Facsimile)
>
>> -----Original Message-----
>> **From:** gordon.katz@hklaw.com [mailto:gordon.katz@hklaw.com]
>> **Sent:** Thursday, July 27, 2006 12:22 PM
>> **To:** Peters, Kevin

**Cc:** Rich, David H.
**Subject:** FW: Fireman/News America Marketing
**Importance:** High

Kevin,

It occurred that David might be out on vacation this week. Can you act on my request, should that be the case. Hope all is well.

Regards.

Gordon

---

**From:**  Katz, Gordon (BOS - X75839)
**Sent:**  Thursday, July 27, 2006 9:37 AM
**To:**  'Rich, David H.'
**Subject:**  Fireman/News America Marketing
**Importance:**  High

David,

Another request for additional time. I have been flat out all summer and August is looking to be about the same. Can we agree to further extend our response date for document production, etc. to after Labor Day, say September 8. Let me know. Many thanks.

Regards.

Gordon

# Holland + Knight

## Gordon P. Katz

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon.katz@hklaw.com

www.hklaw.com

**NOTICE:** This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to

protect confidentiality

<<Gordon P Katz.vcf>>

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

## NEWS AMERICA MARKETING

**DATE:**   5/14/99

**TO:**     JOHN NALLEN, LON JACOBS

**CC:**     PAUL CARLUCCI

**FROM:**   DAVID DEVOE JR.

**RE:**     CCMI

News America Marketing has reached verbal agreement to acquire CCMI, a company specializing in database marketing and providing customer loyalty programs for retail chains through the frequent shopper programs. The acquisition is strategic in nature as CCMI is the only full service retail loyalty marketing company that has not been acquired over the past year. Catalina Marketing acquired two companies in the past nine months – Market Logic and DCI Card Marketing. The acquisition is also a strategic fit with two other investments that are in negotiation – Softcard Systems and PlanetU.

The business has operated at essentially break even the past three years and most of the asset value is inherent in software development utilized to interface with retailer point of sale systems to segment consumer purchase histories enabling targeted marketing programs from both manufacturers and retailers. The economics of the business are forecasted to improve as a result of new electronic distribution channels that were not available on a wide scale three years ago.

Attached is an overview of the Company along with estimated financial projections of the business over the next five years. We are planning to begin due diligence next week and would like to begin negotiation of a definitive agreement next week as well.

Please let me know when we can review this proposed transaction.

Confidential

CONFIDENTIAL

NAM01474

## Acquisition of Consumer Card Marketing, Inc.

### 1. Business Overview

CCMI was founded in 1992. The Company specializes in database marketing, customer loyalty programs for retailers and targeted marketing programs for manufacturers. CCMI currently offers the following products and services:

- *Loyalty card program implementation* - CCMI provides all of the loyalty card products and services needed to introduce and operate a retail loyalty program (grocery, department stores and others).
- *Database Management* - CCMI offers database management tools, including internally developed software, for marketers that provide easy access to customer purchase data and have the capability to analyze customer-specific purchase data.
- *Consulting and Marketing Programs* - CCMI utilizes actual purchase data provided by retailers to develop effective targeted marketing programs. Data is analyzed using CCMI's advanced software tools to help build programs to meet the various needs of promotions clients (trial, continuity, competitive targets, etc.). CCMI provides turnkey targeted programs, from data analysis and promotion planning, to program execution and results measurement.

**Management team:** Robert Fireman is the President of CCMI and Ann Raider is Executive Vice President. Both have developed strong relationships with retailers and packaged goods manufacturers based on their expertise in data management and targeted marketing. Ann worked for several years as a group brand manager for Gillette and also spent time in the electronic banking industry.

**Recent Financial Results** (in thousands)

| For years ended 12/31 | 1996 | 1997 | 1998 |
|---|---|---|---|
| Revenue | $2,539 | $7,944 | $4,187 |
| Cost of Goods | 1,663 | 5,298 | 1,765 |
| Operating Expense | 948 | 2,242 | 2,209 |
| Net Operating Income | $(72) | $403 | $212 |

**Consolidated Balance Sheet**
- As of 12/31/98, CCMI had total assets of $1.9 million , including cash in the amount of $800K and $500K of other current assets.
- The Company has current liabilities of $800K and long term debt in the amount of $66K.

### 2. Opportunity for News America Marketing and CCMI
- **Full Service Provider:** CCMI's consulting and marketing services are strategically important because the Company offers highly targetable promotion services not readily available in the retail marketplace today. CCMI's backward integration into database management and loyalty card issuance enables CCMI to offer a full-service solution for clients.
- **Retail Expansion Opportunities:** News America's strong relationships with supermarket retailers and consumer packaged goods manufacturers offer significant expansion opportunities for CCMI. CCMI's efforts with other retail categories can help News America expand into other classes of trade.
- **Targeted Market Expertise:** CCMI's management expertise and specialized software will be an asset to News America Marketing as it attempts to grow its In Store portfolio of highly targeted promotions services.
- **Sales Force Economies:** By leveraging a coordinated sales effort, News America's sales force will be trained to incorporate CCMI's products into its single source portfolio. CCMI will be substantially more profitable and demonstrate increased growth as a subsidiary of News America Marketing.
- **NWS Database Opportunities:** Other businesses within News Corporation may be able to leverage CCMI's database management and marketing programs to enhance their own affinity programs. (Fox Sports, Fox Family, Harper Collins, etc.)

Page 1



CONFIDENTIAL

NAM01475

## Projected Results (see appendix for detail)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Revenue | $ 13,092 | $ 20,124 | $ 26,556 | $ 30,898 | $ 35,220 |
| Total Cost of Goods | 9,358 | 14,039 | 17,968 | 19,514 | 20,450 |
| Gross Margin | 3,734 | 6,085 | 8,588 | 11,384 | 14,770 |
| Other Expenses | 2,372 | 3,337 | 4,517 | 5,130 | 5,635 |
| Operating Profit | $ 1,362 | $ 2,748 | $ 4,072 | $ 6,255 | $ 9,135 |
| Percentage | 10% | 14% | 15% | 20% | 26% |
| Free cash flow after taxes | 146 | 1,005 | 1,730 | 3,009 | 4,575 |

## Model Assumptions

- Revenue is generated from consulting, database management and loyalty card implementation services.
- Card implementation revenue is based on 850 stores in year 1, growing to 1,800 by year 5 and assumes 10,000 cards per store. Revenue is earned on a per card basis for issuance and data input. Revenue in year 1 is $4.3 million, growing to $9.2 million by year 5. This segment has a 25% gross margin.
- Database management revenue is generated from licensing fees of software and data maintenance. It is assumed that 80% of the contracts last for 5 years, with the remainder being 1 year deals. Revenue for year 1 is assumed to be $1.2 million based on 8 new systems, growing to $7.8 million by year 5 for 51 total systems, with a gross margin of 74%.
- Consulting revenue is based on targeted direct-mail and electronically delivered promotions. In year 1, consulting revenue is $7.6 million, growing to $18.3 million by year 5, with a gross margin of 46%.
- News America's model assumes a valuation range of $40.7 million to $58.4 million based on a 15% discount rate and an 8X to 12X EBITDA multiple.
- Based on the deal structure outlined below, News America's model assumes the cost to acquire CCMI is $9.8 million in total cash payments. These payments have a present value of $6.6 million using a 15% discount rate.
- Additional capital expenditures are estimated to be approximately $1.5 million.
- CCMI's Model: The model prepared by CCMI assumes a total of $70 million in gross margins over 5 years and the achievement of both full bonus payments (see deal structure). Based on these assumptions, the cost to acquire CCMI is $16.4 million in total cash payments, or a present value of $10.5 million at a 15% discount rate.

## 3. Deal Structure

The acquisition of the stock of CCMI has been agreed to based upon the following terms:

- **Up-front payment:** A payment in the amount of $3 million at closing.
- **Profit Sharing/Earn-out:** For a five-year period from the effective date of contract, CCMI will receive 12% of the gross margin, mutually defined as revenues less the direct cost of goods sold.
- **Bonus payment opportunities:**
  - **Year 1:** If the gross margin for the first 12 month period (estimated to start on October 1, 1999) exceeds $4 million a $2.5 million bonus payment will be made; if $3 million or more, a $1.5 million payment will be made.
  - **Year 2:** If the gross margin for the second 12 month period exceeds $9 million a $2.5 million bonus payment will be made; if the margin is $7.5 million or more, a $1.5 million payment will be made.
- **Employment contracts:** Five-year employment contracts including non-compete agreements for CCMI's top management. Agreements include base salary of $160K, with annual adjustments consistent with company practice, 20% bonus targets, $900/month car allowance, eligibility to participate in News Corp Stock Option Program and News America benefit program. Further details to be discussed.

## 4. Timing and Next Steps

- News America Marketing made a verbal offer to CCMI on 5/7/99, which was verbally agreed to by the Company on 5/10/99.
- Over the next month it will be necessary to develop a definitive agreement and complete due diligence.
- CCMI's target closing date is 6/15/99.

Page 2

CONFIDENTIAL

NAM01476

CONSUMER CARD MARKETING, INC.

**APPENDIX**

Summary Statements of Profit and Loss

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| *Implementation* | | | | | |
| Grocery | $ 4,033,150 | $ 6,344,800 | $ 6,656,360 | $ 7,335,600 | $ 8,544,980 |
| Other classes of trade | 240,000 | 254,000 | 284,000 | 616,000 | 648,000 |
| Total Implementation Revenue | 4,273,150 | 6,600,800 | 6,939,360 | 7,851,600 | 9,192,980 |
| *Database Management* | | | | | |
| Grocery | 1,103,700 | 2,039,090 | 3,339,224 | 4,953,406 | 6,693,033 |
| Other classes of trade | 135,500 | 271,000 | 474,250 | 745,250 | 1,084,000 |
| Total Database Management Revenue | 1,239,200 | 2,310,890 | 3,812,474 | 5,698,358 | 7,767,033 |
| *Consulting and Marketing Programs* | | | | | |
| Grocery | 4,690,000 | 6,960,000 | 8,735,000 | 9,504,000 | 9,360,000 |
| Other classes of trade | 2,800,000 | 5,044,000 | 6,769,000 | 7,544,000 | 9,400,000 |
| Enhancement programs | 100,000 | 200,000 | 300,000 | 400,000 | 500,000 |
| Total Consulting/Marketing Revenue | 7,590,000 | 12,204,000 | 15,804,000 | 17,440,000 | 19,260,000 |
| **Total Revenue** | $ 13,092,350 | $ 20,123,690 | $ 26,555,834 | $ 30,987,958 | $ 35,219,993 |
| **Cost of Goods Sold** | | | | | |
| *Implementation* | | | | | |
| Grocery | $ 3,024,863 | $ 4,009,600 | $ 4,916,520 | $ 5,501,700 | $ 6,409,720 |
| Other classes of trade | 180,000 | 198,000 | 288,000 | 387,000 | 485,000 |
| Total Implementation Costs | 3,204,863 | 4,208,600 | 6,204,620 | 5,888,700 | 6,894,720 |
| *Database Management* | | | | | |
| Grocery | 285,582 | 518,592 | 837,432 | 1,210,719 | 1,651,724 |
| Other classes of trade | 32,900 | 65,800 | 115,150 | 180,950 | 263,200 |
| Total Database Management Costs | 318,482 | 584,382 | 952,582 | 1,391,669 | 1,924,924 |
| *Consulting and Marketing Programs* | | | | | |
| Grocery | 3,120,000 | 4,565,000 | 5,501,000 | 5,791,000 | 5,187,000 |
| Other classes of trade | 1,750,000 | 3,110,250 | 4,113,000 | 4,266,500 | 4,275,000 |
| Retail commissions | 915,000 | 1,455,800 | 1,886,800 | 1,975,200 | 1,938,000 |
| Enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 250,000 |
| Total Consulting/Marketing Costs | 5,885,000 | 9,250,850 | 11,910,800 | 12,232,200 | 11,650,560 |
| **Total Cost of Goods Sold** | $ 9,358,345 | $ 14,038,842 | $ 17,967,702 | $ 19,513,569 | $ 20,450,144 |
| **Gross Profit** | $ 3,734,005 | $ 6,084,848 | $ 8,588,132 | $ 11,604,388 | $ 14,769,849 |
| percentage | 29% | 30% | 32% | 37% | 42% |
| Sales and Marketing | 1,273,196 | 1,833,358 | 2,481,729 | 2,796,943 | 3,112,939 |
| G&A | 1,047,330 | 1,435,690 | 1,903,281 | 2,239,131 | 2,445,777 |
| Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Total operating expenses | 2,374,526 | 3,336,047 | 4,616,511 | 5,129,634 | 5,635,215 |
| operating expenses as a percentage of revenue | 18% | 17% | 17% | 17% | 16% |
| **Contribution before tax** | $ 1,362,479 | $ 2,747,000 | $ 4,071,622 | $ 6,254,756 | $ 9,134,634 |
| percentage | 10% | 14% | 15% | 20% | 26% |
| Gross Profit - Implementation | 1,089,288 | 1,402,200 | 1,734,840 | 1,862,900 | 2,298,240 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| Gross Profit - Database Management | 920,718 | 1,726,490 | 2,859,892 | 4,206,690 | 5,842,109 |
| Percentage | 74% | 75% | 75% | 75% | 75% |
| Gross Profit - Consulting/Marketing | 1,745,000 | 2,953,150 | 3,893,400 | 5,214,800 | 6,629,500 |
| Percentage | 23% | 24% | 25% | 30% | 35% |
| **CCMI Projections** | | | | | |
| Revenues | 7,975,800 | 21,623,000 | 31,629,400 | 40,052,500 | 58,016,500 |
| Gross Margin | 3,191,380 | 9,009,800 | 13,560,640 | 17,977,440 | 25,914,500 |
| Percentage | 40% | 42% | 43% | 45% | 45% |
| Revenue variance to NAM model | (5,116,550) | 1,499,310 | 5,068,566 | 9,780,361 | 20,796,607 |
| Margin variance to NAM model | (542,625) | 2,924,952 | 4,972,508 | 6,593,060 | 11,144,651 |
| **Valuation** | | | | | |
| Contribution margin | $ 1,362,479 | $ 2,747,900 | $ 4,071,622 | $ 6,254,795 | $ 9,134,634 |
| Assumed tax rate | 44% | 44% | 44% | 44% | 44% |
| Contribution margin net of tax | 762,988 | 1,538,824 | 2,280,108 | 3,502,688 | 5,115,395 |
| Addback: Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Less: Increase in Non-Cash Working Capital | 467,529 | 351,587 | 321,697 | 217,106 | 216,102 |
| Less: Capital expenditures | 200,000 | 250,000 | 300,000 | 350,000 | 400,000 |
| Free cash flow | 146,463 | 1,005,257 | 1,729,001 | 3,009,079 | 4,574,795 |
| Cumulative cash flow | 146,463 | 1,151,720 | 2,881,721 | 5,890,800 | 10,465,593 |

6 Year discounted cash flow (no terminal value)    $    6.0  million

| Rate | Multiple of EBITDA in millions | | | |
|---|---|---|---|---|
| | 8 | 10 | 12 | 14 |
| 15% | $ 40.6 | $ 49.5 | $ 59.1 | $ 66.8 |
| 17.5% | $ 35.4 | $ 43.7 | $ 51.4 | $ 69.0 |
| 20% | $ 30.9 | $ 38.9 | $ 45.6 | $ 52.2 |

Page 1 of 4

CONFIDENTIAL

NAM01477

**CONSUMER CARD MARKETING, INC.**
Loyalty Card Implementation

| Assumptions | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Current NAM grocery network | 15,000 | | | | | |
| Retailers offering loyalty programs | 66% | 70% | 72% | 75% | 76% | 80% |
| Participation as of 12/98 | 60% | | | | | |
| Average shoppers per store | 10,000 | | | | | |
| | | | | | | |
| Percentage of NAM's network serviced | | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| Corresponding stores serviced | | 315 | 432 | 563 | 702 | 840 |
| | | | | | | |
| Retail/Department stores - stores per chain | | 25 | | | | |
| Chain implementations per year | | 2 | 2 | 3 | 6 | 5 |
| | | | | | | |
| CCMI grocery stores implemented per year | | 500 | 600 | 700 | 700 | 800 |
| | | | | | | |
| Cards per store | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Revenue per card - issue | | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Revenue per card - data | | $ 0.18 | $ 0.18 | $ 0.18 | $ 0.18 | $ 0.18 |
| Reorder percentage | | 10% | 10% | 10% | 10% | 10% |
| Cost Assumptions | | | | | | |
| Card cost | | $ 0.23 | $ 0.23 | $ 0.23 | $ 0.23 | $ 0.23 |
| Data entry cost (7c per 100 keystrokes) | | $ 0.14 | $ 0.14 | $ 0.14 | $ 0.14 | $ 0.14 |

**Statement of Profit and Loss**

| Revenue | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **NAM network** | | | | | |
| Card products and services | $ 945,000 | $ 1,296,000 | $ 1,687,500 | $ 2,106,000 | $ 2,520,000 |
| Data entry | 567,000 | 777,000 | 1,012,500 | 1,263,000 | 1,512,000 |
| Residual | | 151,200 | 207,360 | 270,000 | 336,960 |
| Subtotal | $ 1,512,000 | $ 2,224,050 | $ 2,907,360 | $ 3,639,000 | $ 4,368,960 |
| **CCMI grocery** | | | | | |
| Card products and services | $ 1,520,000 | $ 1,800,000 | $ 2,100,000 | $ 2,100,000 | $ 2,400,000 |
| Data entry | 900,000 | 1,080,000 | 1,260,000 | 1,260,000 | 1,440,000 |
| Residual | 121,150 | 240,000 | 288,000 | 336,000 | 336,000 |
| Subtotal | $ 2,521,150 | $ 3,120,000 | $ 3,648,000 | $ 3,696,000 | $ 4,176,000 |
| **Retail/Department stores** | | | | | |
| Card products and services | $ 150,000 | $ 180,000 | $ 225,000 | $ 300,000 | $ 375,000 |
| Data entry | 90,000 | 90,000 | 135,000 | 180,000 | 225,000 |
| Residual | | 24,000 | 24,000 | 38,000 | 48,000 |
| Subtotal | $ 240,000 | $ 264,000 | $ 384,000 | $ 518,000 | $ 648,000 |
| **Total Implementation Revenue** | $ 4,273,150 | $ 5,608,050 | $ 6,939,360 | $ 7,851,000 | $ 9,192,960 |

**Cost of Goods Sold**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **NAM Network** | | | | | |
| Card products and services | $ 708,750 | $ 972,000 | $ 1,265,625 | $ 1,579,500 | $ 1,890,000 |
| Data entry | 425,250 | 583,290 | 760,375 | 947,700 | 1,134,000 |
| Residual | | 113,400 | 155,520 | 202,500 | 252,720 |
| Subtotal | $ 1,134,000 | $ 1,668,690 | $ 2,180,520 | $ 2,729,700 | $ 3,276,720 |
| **CCMI grocery** | | | | | |
| Card products and services | $ 1,125,000 | $ 1,350,000 | $ 1,575,000 | $ 1,575,000 | $ 1,800,000 |
| Data entry | 675,000 | 810,000 | 945,000 | 945,000 | 1,080,000 |
| Residual | 90,863 | 180,000 | 216,000 | 252,000 | 252,000 |
| Subtotal | $ 1,890,863 | $ 2,340,000 | $ 2,736,000 | $ 2,772,000 | $ 3,132,000 |
| **Retail/Department stores** | | | | | |
| Card products and services | $ 112,500 | $ 112,500 | $ 168,750 | $ 225,000 | $ 281,250 |
| Data entry | 67,500 | 67,500 | 101,250 | 135,000 | 168,750 |
| Residual | | 18,000 | 18,000 | 27,000 | 36,000 |
| Subtotal | $ 180,000 | $ 198,000 | $ 288,000 | $ 387,000 | $ 486,000 |
| **Total CGS Implementation** | $ 3,204,863 | $ 4,206,690 | $ 5,204,520 | $ 5,888,700 | $ 6,894,720 |
| | | | | | |
| **Gross Margin** | $ 1,068,288 | $ 1,402,260 | $ 1,734,840 | $ 1,962,300 | $ 2,298,240 |
| | | | | | |
| Percentage | 25% | 25% | 25% | 25% | 25% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenue | 3,279,000 | 5,700,000 | 7,823,000 | 9,550,000 | 12,452,000 |
| Margin | 819,000 | 1,425,000 | 1,890,000 | 2,388,000 | 3,108,000 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| | | | | | |
| Revenue variance to NAM model | $ (997,150) | $ 91,950 | $ 983,640 | $ 1,700,400 | $ 3,259,040 |
| Margin variance to NAM model | (248,290) | 22,860 | 154,160 | 426,100 | 809,760 |

Page 2 of 4

CONFIDENTIAL

NAM01478

**CONSUMER CARD MARKETING, INC.**
Database Management

| Assumptions | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Client base     (assuming 1 system each 100 stores) | | | | | | |
| 50% of card implementations from NAM's store network | | 2 | 2 | 3 | 4 | 4 |
| 50% of card implementations from CCMI's store network | | 3 | 3 | 4 | 4 | 4 |
| Additional NAM network percentage | 15,000 | 2% | 2% | 3% | 4% | 5% |
| Number of systems | | 3 | 3 | 5 | 6 | 8 |
| 50% of current year retail card implementations | | 1 | 1 | 2 | 2 | 3 |
| % of short term agreements | 20% | | | | | |
| Short term agreement length in months | 12 | | | | | |
| Long term agreement length in months | 80 | | | | | |

| Instore systems | | | Cost Assumptions | |
|---|---|---|---|---|
| Set up fee | 50,000 | | License fee (out of house clients only) | 30,000 |
| License fee (out of house clients only) | 150,000 | | Set up fee | 25,000 |
| Clients assumed to be out of house | 60% | | Quarterly maintenance | 3,750 |
| Hardware (VAR - Essbase license) | 25,000 | | Monthly inhouse storage | 2,800 |
| Quarterly maint. (out of house clients only) | 15,000 | | Hardware (VAR - Essbase license) | 18,000 |
| Inhouse systems | | | | |
| Set up fee | 50,000 | | | |
| Monthly inhouse storage | 13,000 | | | |

| | 1 year | 5 year | |
|---|---|---|---|
| | Total | Total | Annual |
| Total revenue for 1 inhouse system | 208,000 | 830,000 | 166,000 |
| Total cost of goods sold | 58,200 | 181,000 | 36,200 |
| Margin | 149,800 | 649,000 | 129,800 |
| Percentage | 73% | 78% | 78% |
| | | | |
| Total revenue for 1 instore system | 270,000 | 525,000 | 105,000 |
| Total cost of goods sold | 84,250 | 148,000 | 29,600 |
| Margin | 185,750 | 377,000 | 75,400 |
| Percentage | 69% | 72% | 72% |

**Statement of Profit and Loss**

| Revenue | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| In-house systems | | | | | |
| Grocery | $ 615,525 | $ 1,179,700 | $ 1,932,292 | $ 2,861,424 | $ 3,969,318 |
| Other classes of trade | 83,000 | 166,000 | 290,500 | 458,500 | 684,000 |
| Total | 698,525 | 1,345,700 | 2,222,792 | 3,317,924 | 4,653,318 |
| In-store systems | | | | | |
| Grocery | 488,175 | 860,190 | 1,385,933 | 1,891,685 | 2,723,715 |
| Other classes of trade | 52,500 | 105,000 | 183,750 | 288,750 | 420,000 |
| Total | 540,675 | 965,190 | 1,569,683 | 2,280,435 | 3,143,715 |
| Total revenue | 1,239,200 | 2,310,890 | 3,812,474 | 5,598,359 | 7,797,033 |
| Cost of Goods Sold | | | | | |
| In-house systems | | | | | |
| Grocery | 142,208 | 266,452 | 437,534 | 638,659 | 881,123 |
| Other classes of trade | 18,100 | 36,200 | 63,300 | 99,550 | 144,000 |
| Total | 160,308 | 302,652 | 501,284 | 738,219 | 1,025,923 |
| In-store systems | | | | | |
| Grocery | 143,375 | 249,130 | 399,408 | 572,050 | 780,601 |
| Other classes of trade | 14,800 | 29,600 | 51,800 | 81,400 | 118,400 |
| Total | 158,175 | 278,730 | 451,208 | 653,450 | 899,001 |
| Total cost of goods | 318,482 | 581,382 | 952,582 | 1,391,669 | 1,924,924 |
| Gross Margin | $ 920,718 | $ 1,729,498 | $ 2,859,892 | $ 4,206,690 | $ 5,842,109 |
| Percentage | 74.3% | 74.8% | 75.0% | 75.1% | 75.2% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenues | 1,070,000 | 2,680,000 | 4,516,000 | 6,094,000 | 9,704,000 |
| Margin | 739,750 | 1,904,000 | 3,344,800 | 5,035,200 | 7,245,200 |
| Percentage | 69% | 71% | 72% | 73% | 74% |
| | | | | | |
| Revenue variance to NAM model | (169,200) | 369,110 | 603,526 | 1,295,641 | 2,018,967 |
| Margin variance to NAM model | (180,968) | 174,502 | 484,908 | 828,510 | 1,403,091 |

Page 3 of 4

CONFIDENTIAL

NAM01479

**CONSUMER CARD MARKETING, INC.**
Consulting and Marketing Programs

| | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|
| **Assumptions** | | | | | | | | |
| Direct mail delivery | Revenue | $ | 0.60 | 100% | 95% | 90% | 70% | 50% |
| | Cost | $ | 0.45 | | | | | |
| Electronic delivery | Revenue | $ | 0.12 | 0% | 5% | 10% | 30% | 50% |
| | Cost | $ | 0.02 | | | | | |
| Grocery | | | | 13 | 20 | 26 | 33 | 39 |
| Pharmacy / mass merchandise | | | | 5 | 8 | 12 | 15 | 20 |
| Department stores | | | | 2 | 4 | 6 | 8 | 10 |

| Set up fees | | Coupons | Revenue | Cost | Reach |
|---|---|---|---|---|---|
| Short term program | Grocery | 1 | 80,000 | 15,000 | 500,000 |
| Long term program | Other | 2 | 100,000 | 25,000 | 250,000 |

Retail commissions            15%

Stores per program            1,000
Percentage of shoppers reached    5%

| Short term program | 100% DM | 50% Mix | | Long term program | | 100% DM | 50% Mix |
|---|---|---|---|---|---|---|---|
| Revenue | 360,000 | 240,000 | | Revenue | | 400,000 | 280,000 |
| Cost | 240,000 | 132,500 | | Cost | | 250,000 | 142,500 |
| Retail commissions | 45,000 | 33,750 | | Retail commissions | | 45,000 | 27,000 |
| Margin | 75,000 | 73,750 | | Margin | | 105,000 | 110,500 |
| Percentage | 21% | 31% | | Percentage | | 26% | 39% |

| General Consulting/enhancement programs | | | | 2 | 4 | 6 | 8 | 10 |
|---|---|---|---|---|---|---|---|---|
| Revenue per program | | $ | 50,000 | | | | | |
| Cost per program | | $ | 25,000 | | | | | |

| Statements of Profit and Loss | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Grocery | $ 4,880,000 | $ 8,980,000 | $ 8,788,000 | $ 9,504,000 | $ 9,360,000 |
| Mass merchandise | 2,000,000 | 3,492,000 | 4,512,000 | 4,920,000 | 5,800,000 |
| Department stores | 600,000 | 1,552,000 | 2,256,000 | 2,624,000 | 2,800,000 |
| General/enhancement programs | 100,000 | 200,000 | 300,000 | 400,000 | 500,000 |
| Total | 7,580,000 | 12,204,000 | 15,804,000 | 17,448,000 | 18,260,000 |
| | | | | | |
| Cost of goods | | | | | |
| Grocery distribution | 3,120,000 | 4,585,000 | 5,681,000 | 5,791,500 | 5,167,500 |
| Mass merchandise distribution | 1,250,000 | 2,157,250 | 2,742,000 | 2,782,500 | 2,650,000 |
| Department stores distribution | 500,000 | 857,000 | 1,371,000 | 1,484,000 | 1,425,000 |
| Retail commission | 915,000 | 1,455,600 | 1,866,600 | 1,975,200 | 1,938,000 |
| General/enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 250,000 |
| Total | 5,835,000 | 9,250,850 | 11,810,600 | 12,233,200 | 11,630,500 |
| | | | | | |
| Margin | $ 1,745,000 | $ 2,953,150 | $ 3,993,400 | $ 5,214,800 | $ 6,629,500 |
| Percentage | 23% | 24% | 25% | 30% | 36% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenues | 3,629,800 | 13,243,000 | 19,376,400 | 23,547,900 | 33,800,500 |
| Margin | 1,632,630 | 5,680,800 | 8,307,840 | 10,464,240 | 15,561,300 |
| Percentage | 45% | 43% | 43% | 44% | 46% |
| | | | | | |
| Revenue variance to NAM model | (3,950,200) | 1,039,000 | 3,572,400 | 6,099,900 | 15,540,500 |
| Margin variance to NAM model | $ (112,370) | $ 2,727,650 | $ 4,314,440 | $ 5,249,440 | $ 8,931,800 |

Page 4 of 4

CONFIDENTIAL

NAM01480

Ann M. Raider

1

1    Volume:  I

2    Pages:  1-333

3    Exhibits:  38-61

4

5    UNITED STATES DISTRICT COURT

6    FOR THE DISTRICT OF MASSACHUSETTS

7    Civil Action No. 05-1740 MLW

8    - - - - - - - - - - - - - - - - - - - - - - - - x

9    ROBERT FIREMAN and ANN RAIDER,

10    Plaintiffs,

11    v.

12    NEWS AMERICA MARKETING IN-STORE, INC.,

13    Defendants.

14    - - - - - - - - - - - - - - - - - - - - - - - - x

15

16    DEPOSITION OF ANN M. RAIDER

17    Thursday, May 17, 2007

18    10:01 a.m. to 5:19 p.m.

19    HOLLAND & KNIGHT, LLP

20    Ten St. James Avenue, 11th Floor

21    Boston, Massachusetts

22

23

24    Reporter:  Marianne R. Wharram, CSR/RPR

Ann M. Raider

59

1    received the opportunity to receive earn-out

2    payments, right?

3        A.   Yes, that is correct.

4        Q.   And again, you received the opportunity to

5    receive a bonus on top of the earn-out if the gross

6    margin exceeded certain benchmarks in years one and

7    two after the acquisition, right?

8        A.   Yes.

9        Q.   What's the purpose of an earn-out from a

10   buyer's perspective?

11             MR. RICH:   Objection.

12       Q.   (BY MR. KATZ)   Not your perspective, but

13   from a buyer's perspective.

14       A.   In my opinion, the purpose of an earn-out

15   in the buyer's perspective is it is to facilitate

16   the growth of the company that they buy and to

17   jointly share in the profits.

18       Q.   There was no guarantee of any earn-out

19   payment in the Stock Purchase Agreement, correct?

20       A.   I do not know that.  There was a commitment

21   by News America Marketing to buy Consumer Card

22   Marketing.  So that we could grow the business to

23   $50 million, they needed to perform certain actions

24   in order to ensure that we would grow profitably

60

1   together, and we had an understanding that that --

2   the market was growing, we had a leadership share

3   in the market, we had outstanding customer

4   relationships in the market, we had a business

5   plan, which David DeVoe agreed to, which said if

6   they did certain things to support our growth, we

7   would together enjoy all the revenue and share in

8   that increased sales and profit, and therefore, an

9   earn-out calculation was agreed upon based on the

10   commitments that they made to us to help us grow

11   our business to $50 million.

12      Q.  Could you go back to the Stock Purchase

13   Agreement?  I think you have it in front of you.

14   Could you show me where there's any language that

15   talks about what you just mentioned?

16      A.  Well, it will take me a long time to read

17   the whole document, so we could be here for a

18   while.

19      Q.  We can be here as long as we need to be.

20          MR. RICH:  That's not entirely true.

21      A.  At the time of the sale of the --

22      Q.  (BY MR. KATZ)  No, no, no, no.  I just want

23   to know what -- I don't want a speech.  I just want

24   you to answer the question.  I asked you to show me

Ann M. Raider

82

1    accept your opinion, did it?

2        A.    It had to accept our opinion.

3        Q.    In point of fact, NAM did consult with you,

4    and neither you nor Mr. Fireman were bashful in

5    letting the senior executives at NAM know your

6    views on the operation of what had been CCMI,

7    right?

8            MR. RICH:    Objection to the form of the

9    question.

10           MR. KATZ:    Yeah, I can break it down,

11   because I think it's a compound question.

12       Q.    (BY MR. KATZ)    In point of fact, NAM did

13   consult with you about the operation of the CCMI

14   business, did it not?

15       A.    I'm not sure what your definition of

16   consult means.

17       Q.    Well, what's your definition of consult?

18       A.    NAM did not ask us in advance for our

19   opinions when they made decisions, so for example,

20   they put a hiring freeze in the company.    They did

21   not tell -- ask us whether that hiring freeze

22   should or should not apply to us.    NAM made the

23   decision to reorganize their sales force, which was

24   the sales force that we were to use to call on

Ann M. Raider

83

1    manufacturers.  They did not ask our permission

2    that they were going to reorganize the sales force,

3    and therefore, we had no access to people who they

4    had promised us we would have access to.  So NAM

5    did not consult with us about things that they did

6    that directly impacted our business.  NAM made a

7    decision to take our technical people to

8    Connecticut to help them run other parts of the

9    business.  They made that decision.  They did not

10   consult with us.

11       Q.  But they did consult with you on other

12   thing, didn't they?

13       A.  I'm not sure what other things.

14       Q.  Did you ever attend strategy sessions?

15       A.  No.

16            MR. KATZ:  Let's mark as exhibit next

17   in order a document called Summary and Next Steps,

18   CCMI Strategy Session, 11/17/99, and that is

19   Exhibit 48.

20            (Exhibit 48 marked for identification.)

21       Q.  (BY MR. KATZ)  You have Exhibit 48 in front

22   of you?

23       A.  Mm-hmm.

24       Q.  Exhibit 48 are meeting notes of a meeting

Ann M. Raider

304

1   of my time at a senior vice president level to be

2   making calls for collections when supposedly News

3   America Marketing has an entire group of people

4   whose sole responsibility it is to properly collect

5   on time for everyone else?

6       Q.   But you had an interest in the timeliness

7   of the collection?

8       A.   I did have an interest.

9       Q.   And so there was nothing to keep you from

10  making that call, taking five minutes and calling

11  somebody at the limited number of customers that

12  SmartSource Direct had and asking that they pay

13  their bills, right?

14      A.   Do you know how long a collection call

15  takes?

16      Q.   Unfortunately, yes.

17      A.   Are you sure it takes five minutes?

18      Q.   Generally.

19      A.   Really?

20      Q.   And with e-mails, it sometimes takes even

21  less.

22      A.   Really?  Well, I would like to learn about

23  that.

24      Q.   You complain that Bill Adam was offered a

Ann M. Raider

305

1    salary increase to move to Wilton?

2        A.  Yes, sir.

3        Q.  Now, nothing in the Stock Purchase

4    Agreement prevented News America Marketing from

5    offering Bill Adam a salary increase, right?

6        A.  That was not specifically stated in the

7    agreement, but there was a question of integrity.

8    Why on one day would Jon Rubin tell us no salary

9    increases for your people, they're paid properly,

10   and then the next day offer him $50,000 more to go

11   to Connecticut?  Doesn't sound like great integrity

12   on Jon Rubin's part or a representative of the

13   company.

14       Q.  You allege that Bill Adam focused the

15   majority of his time on SmartSource dot com once in

16   Wilton?

17       A.  That is correct.

18       Q.  Didn't this occur, if it occurred at all,

19   after the Aspen system was abandoned?

20       A.  No.

21       Q.  Your testimony is that it occurred before

22   the Aspen system was abandoned?

23       A.  Yes.

24       Q.  You say that NAM eliminated the Marketing

**6/5/2007  Depo of Robert Fireman Vol. I**

```
       0001
```

```
1                                     Volume:  I
2                                     Pages:   1-354
3                                     Exhibits: 62-141
4
5                     UNITED STATES DISTRICT COURT
6                  FOR THE DISTRICT OF MASSACHUSETTS
7         Civil Action No. 05-1740 MLW
8         - - - - - - - - - - - - - - - - - - - - - x
9         ROBERT FIREMAN and ANN RAIDER,
10                        Plaintiffs,
11              v.
12        NEWS AMERICA MARKETING IN-STORE, INC.,
13                        Defendant.
14        - - - - - - - - - - - - - - - - - - - - - x
15
16                  DEPOSITION OF ROBERT N. FIREMAN
17                      Thursday, May 24, 2007
18                     10:08 a.m. to 6:32 p.m.
19                      HOLLAND & KNIGHT, LLP
20              Ten St. James Avenue, 11th Floor
21                      Boston, Massachusetts
22
23
24            Reporter:  Marianne R. Wharram, CSR/RPR
```

1    what other --

2        Q.   (BY MR. KATZ)   What other purpose?   I'm

3    getting a speech.   I just want an identification of

4    any other purpose besides profit maximization.

5        A.   Yeah, we were a nuisance.   Mr. Carlucci

6    said he didn't agree to direct marketing.

7    Mr. Carlucci never gave access to the sales force.

8    Mr. Carlucci marginallized everything we did and he

9    had to do it intentionally.

10       Q.   You never heard him say you were a

11   nuisance, did you?

12       A.   Yes.   Mr. Carlucci said he didn't like us,

13   that he didn't believe in our business.   When he

14   was coming to the Boston office, Mr. Lellouche

15   would instruct me to not be there when he would

16   come visit, the chairman, to talk about a town

17   meeting.   I was instructed to leave the premises.

18   And ultimately, I was instructed to leave my own

19   office with my employment contract and work at home

20   and work anywhere you want.

21       Q.   And why was that?

22       A.   No explanation.   And I could only imagine

23   it's because Mr. Carlucci in his -- just told him

24   get him gone, and everyone, in fear of this man, is

1    a little tin solder, and they just were in fear of

2    him.  I dealt with Marty Garofalo off site.  Why?

3    No reason why.  Just because someone said it was,

4    and we all knew who it was, so I was asked to

5    vacate back in '03, '04.  Finally, it's like we

6    want to buy you out of your contract or we're going

7    to force you out of the office.

8         Q.  Did anybody say that to you directly?

9         A.  Yes.

10        Q.  Who said that?

11        A.  Marty Garofalo.

12        Q.  What did he tell you?

13        A.  He showed up in Boston with a release in

14   his pocket.  First we went out and we laughed and

15   we talked about the business and all the good

16   things ongoing.  We came upstairs and he looked at

17   me and he said I have a terrible thing to do today.

18   I believe in you, but you have to leave.  When?

19   Today.  What do you mean today?  I've got all this

20   business going on.  I've got all these things going

21   on.  He says I'm sorry, but I have instructions.

22   You have to leave the office.  I have an employment

23   agreement.  I have an earn-out thing.  How can you

24   throw the general manager out of the thing for no

1    reason at all?  Do you have a reason?  No.

2        Q.   When did this consider occur?

3        A.   '03, '04.

4        Q.   And where did it occur?

5        A.   In the Hancock Tower.

6        Q.   You said you went out to dinner with

7    Mr. Garofalo?

8        A.   I went down for lunch, told him about all

9    the stuff going on.  He got excited about

10   everything I was doing.  He knew I knew what I was

11   doing, but he couldn't do anything about it.

12       Q.   It's your testimony that Mr. Garofalo came

13   back to the office and then said I have something

14   bad that I have to do?  Is that what he --

15       A.   Wanted buy me out of my employment

16   agreement with no consideration for the earn-out.

17       Q.   So tell --

18       A.   I said I'm here trying to get money for the

19   company.  He says I know it doesn't make any sense,

20   but I have to do it.  And then he got HR on the

21   phone in New York and got me a extension.  An

22   extension why?  And he said just lay low and do the

23   stuff and try to pull these deals in.  At that

24   point in time, I had been completely marginallized

1    from the operation.  I had no secretary.  I had no

2    support.  I had no creative.  And I was forged to

3    do all these stored value things with strategic

4    partners and on my own.  If I needed something, I

5    could try to get Henri to get me some support.  I

6    was completely a one-man operation as part of this

7    $40 billion gorilla, and I was doing pretty good.

8    In fact, that's this news release you tell me.  I

9    got -- with people like Airtime, we landed a

10   $50 million contract with Ahold in the other

11   emerging marketplace.  We were the pioneers --

12       Q.  I'm going to cut you off here, because I'm

13   just interested in your conversation with

14   Mr. Garofalo.  So it's your testimony that

15   Mr. Garofalo came to Boston to attempt to persuade

16   you to leave News America Marketing?  Is that

17   right?

18       A.  First to attempt to sign it and they would

19   prepay me through the September employment

20   agreement.

21       Q.  Through September 2004?

22       A.  I don't know.  It was the last year.  And

23   sign a release.  And when I said I'm not doing that

24   because I have a contract and an earn-out, he

1    initially got me a -- they waived it. He says I'll

2    work with you alone and let's get some of these

3    things going.

4        Q.  Okay.

5        A.  At a subsequent period of time, they called

6    and said you have to be out today. I mean, just

7    embarrassing, humiliating, no reason, no cause, no

8    -- no anything other than get out or security will

9    have to take you to the door. And then I was told

10   to work -- I didn't even know on what basis. I

11   didn't sign the release. I didn't sign the

12   contract. I was completely humiliated within the

13   company. And I was told -- Marty said don't worry

14   about it; we'll do some stuff. You can come to the

15   New York office but you just can't come to the

16   Boston office.

17       Q.  Did he say why?

18       A.  No. Just do it. Do some good stuff; I'll

19   get you reinstated. And I already knew why. I

20   knew why, because it was Paul Carlucci. Now,

21   Mr. Carlucci and I didn't have a lot of dialog, but

22   I'm sure that other people in the company were

23   casting Ann and I in a bad light, you know, and

24   what was getting back to higher-ups was probably

1    to finalize the acquisition of the company.  He had

2    just purchased two other companies and he invited

3    us to meet Mr. Carlucci and Mr. Porco, Chris

4    Mixson, the executive group.

5        Q.  Okay.  Let me rephrase my question.  Did

6    Mr. Carlucci ever express to you directly a

7    negative view of either yourself or Ms. Raider?

8        A.  Yes.

9        Q.  When?

10       A.  When we objected to the break-up of our

11   core unit of Bill Adam, Ann and I.

12       Q.  Was that the only time?

13       A.  I don't remember.

14       Q.  And going back to the time when you

15   expressed concern about what you called the

16   break-up of your group of you, Ann and Bill Adam,

17   what specifically did Mr. Carlucci say to you?

18       A.  At that time?

19       Q.  Yes.

20       A.  We were called to go to the chairman's

21   office in New York.

22       Q.  And can you date that time?

23       A.  November '99.

24       Q.  Okay.  And what did Mr. Carlucci say?

6/5/2007  Depo of Robert Fireman Vol. I

1    turned around fast enough.

2        Q.   Wasn't it your responsibility to have the

3    cards processed correctly at the point in time that

4    the Giant roll-out occurred?

5        A.   No.   I think it was already taken from me.

6    But these were my friends at the manufacturer, so

7    DEPS wasn't making the card.   DEPS was a key entry

8    place.

9        Q.   Is it your testimony that you had no

10   responsibility whatsoever for the problems that

11   occurred in connection with the Giant roll-out?

12       A.   You know, I used to say as general manager

13   I'm responsible for everything in the company, but

14   as the general manager of this company, everyone

15   had been taken from me, no one reported to me, and

16   they only asked me to help when there was a

17   problem.   I stepped into this, gave my best advice.

18   If there was a problem at a card factory, I stepped

19   in because I probably still knew the owners or

20   people that respected me, and that's it.   So if you

21   tell me the specific problem with Giant and who did

22   it, I would try to remember what my involvement

23   was, but if you're saying that I was the head of

24   operations, not true.

6/5/2007 Depo of Robert Fireman Vol. I

1      Q.  Prior to Mike Cleary's arrival, weren't you
2   responsible for operations?
3      A.  I was responsible for everything if I was
4   the true general manager.
5      Q.  But putting aside your view --
6      A.  No, I wasn't.  I wasn't.  From the
7   beginning, I was taken off of everything.
8      Q.  Didn't Mr. Coughlin report to you for a
9   significant period of time?
10     A.  Before the acquisition?
11     Q.  Before Mr. Cleary came on board.
12     A.  When did Mr. Cleary come on board?
13     Q.  Well, when do you think he came on board?
14     A.  I don't remember.  When did he come on
15  board?
16     Q.  No, you have to answer the question to the
17  best of your ability.
18     A.  Oh, I don't know.
19     Q.  So in your view, you had no responsibility
20  whatsoever for anything that went wrong in
21  connection with the roll-out of the Giant program?
22            MR. PETERS:  Objection to the form of
23  the question.  I think he's answered it and I think
24  he's asked you to point to a particular program.

```
1     somehow decided to cut expenses and they merged the
2     retail with the manufacturer, and the 200 people we
3     thought were going to help us were now cut loose
4     for some other reason.  And they knew about it
5     before the sale and they didn't tell us.
6          Q.  How do you know that they knew about it
7     before the sale?
8          A.  Because it happened just after.
9          Q.  When did it happen?
10         A.  I don't know.  Just after the sale.  I
11    can't tell you when.
12         Q.  How do you know that they knew before --
13         A.  Because they told us, because of that, they
14    can't do it.  There was a hiring freeze.  We were
15    supposed to run as an independent unit.  We were
16    supposed to grow it, feed it.  We weren't -- we
17    were making a technical consultative sale, not
18    selling coupons and machines.  We thought they
19    understood that dynamically we were a different
20    entity and we had different needs and
21    responsibilities, that the people that worked for
22    us had to have a broader understanding of what was
23    happening.  And it was happening.  And Gordon, it
24    happened.  It's a 500 million to billion dollar
```

1    business.  The stored value card grew to 55

2    billion.  It didn't exist in '99.  We were there.

3    The use of cards, of prepaid debit, I mean, it's

4    huge.  The window was lost.

5        Q.  Let me show you --

6            (Off the record.)

7            (Recess taken.)

8            (Exhibit 121 marked for identification.)

9        Q.  (BY MR. KATZ)  Exhibit 121 is an e-mail

10    from Ann Raider to you, Mr. Fireman, dated August

11    23rd, 2001.  And in this e-mail, Ms. Raider says

12    the corporation's plan is obvious.  Consolidate all

13    work, New York City, Connecticut and eliminate the

14    Boston office.  Do you see that in the next to last

15    paragraph of the e-mail?  Do you see it?

16        A.  Yes.

17        Q.  Okay.  And you can't point to anything in

18    the Stock Purchase Agreement which prevented News

19    America Marketing from making such a consolidation,

20    can you?

21            MR. PETERS:  I think it's been asked

22    and answered.  Objection.

23            MR. KATZ:  I don't think we've ever

24    discussed consolidation.

NEWS AMERICA MARKETING IN-STORE, INC.
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

August 13, 1999

Robert Fireman
241 Perkins St., # D-104
Jamaica Plains, Massachusetts 02130

Dear Bob:

This letter, when executed by both you and News America Marketing In-Store, Inc. (hereinafter referred to as the "Company"), will confirm this agreement (this "Agreement") between you and the Company relating to your employment by the Company.

1. (a) The Company hereby employs you for the period commencing on the date hereof and ending September 30, 2004; *provided, however,* that the Company shall have the right to terminate this Agreement upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination), in the event that amounts determined to be owing to the Company under and in accordance with, and in compliance with the provisions of, Sections 2.2(a), 7.1 or 6.7 of the Stock Purchase Agreement between, among others, the Company and you, dated the date hereof (the "Stock Purchase Agreement"), remain unpaid following the date on which such amounts were required to be paid by the Principal Sellers (as defined in the Stock Purchase Agreement), whether by offset against amounts due to the Principal Sellers under Section 2.3 of the Stock Purchase Agreement or otherwise and such amounts remain unpaid at the end of such 30 day period; *provided, however,* that in the event any such unpaid amounts remain subject to a good faith dispute among the parties to the Stock Purchase Agreement no such notice may be delivered to you.

(b) If you continue in the employ of the Company after the end of the above term, your employment shall be on an at-will basis at the weekly salary rate paid during your last regular pay period hereunder.

2. You shall perform such duties consistent with your position set forth in Paragraph 3(a) hereof, as are assigned to you from time to time (and agree to take such trips both within and

304007 v 4 [6$KN04¹ WPD]

Robert Fireman
August 13, 1999
Page 2

outside the United States as may be reasonably requested by the Company in connection with the performance of your duties hereunder).

3. (a) You shall serve as the General Manager and you shall be assigned to work in the Company's offices in the Boston vicinity. You shall report directly to the Executive Vice President and Chief Financial Officer of the Company or such other senior executive officer as shall be determined by the Company's Board of Directors.

(b) If you are elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, you accept such capacity or capacities without additional compensation.

4. You hereby accept such employment and agree to devote the time and attention necessary to fulfill the duties of your employment hereunder.

5. (a) For your services hereunder, the Company will, during the term of your employment as described in Paragraph 1(a) hereof, pay you a base salary at the rate of $163,000 per annum (the "Base Salary") in accordance with the Company's standard payroll practices and subject to all legally required or customary withholdings. The Base Salary shall be reviewed annually in accordance with the standard practice of the Company. Notwithstanding the foregoing, your Base Salary for any given year shall not be less than your Base Salary for the previous year.

(b) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will be eligible to receive an annual cash bonus ("Bonus"), payable at the end of each calendar year, in an amount equal to a maximum of 20% of your then current Base Salary. The amount of your Bonus, if any, will be determined in the sole discretion of the Company's Board of Directors, or a committee thereof, and shall be based on, among other factors, your performance and the Company's performance.

(c) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will receive a monthly car allowance of $900 per month, following the termination of any car lease arrangement for which the Company is responsible as of the date hereof.

6. (a) You hereby agree that, during the time of your employment, and for the Applicable Period (as defined in Paragraph 6(b) below) following the termination thereof (the "Non-

304007 v 4 [6SKNC4! WPD]


Robert Fireman
August 13, 1999
Page 3

Compete Term"), neither you nor your affiliates shall Participate In (as such term is defined in the Stock Purchase Agreement) any business which is competitive with (i) the business of Consumer Card Marketing Inc. ("CCMI") as conducted on the date hereof or (ii) any of the following businesses in which the Company is currently or intends to be engaged: (A) selling in-store media, (B) selling sampling and merchandising services, (C) selling free-standing inserts, and (D) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (iii) any other business conducted by the Company in which you participate in as an employee of the Company or otherwise have access to confidential information of the Company relating to such business through your employment by the Company (the "Company's Business"). Without limiting the scope of the foregoing, during the Non-Compete Term, neither you nor your affiliates shall, directly or indirectly, (1) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for employment, any person who currently is an employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, (2) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, or (3) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of the Company, with respect to (x) the business of CCMI as conducted on the date hereof, or (y) the Company's Business, including those customers or suppliers acquired in connection with the transactions contemplated by the Stock Purchase Agreement.

(b) The Applicable Period shall be the entire period during or in respect of which the Company is paying you in accordance with Section 5(a) hereof, whether or not you are employed by the Company at such time. In addition, in the event that you voluntarily terminate your employment with the Company prior to the second anniversary of the date hereof, the Applicable Period shall be two (2) years following the effective date of your resignation and, in the event that you voluntarily terminate your employment with the Company following the second anniversary of the date hereof, the Applicable Period shall be six (6) months following the effective date of such resignation.

(c) You acknowledge and agree that, in the event that you breach or threaten to breach any of the terms of Paragraph 6(a) hereof, the Company shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a threatened breach and to have the provisions of such Paragraph specifically enforced by a court having jurisdiction, it being acknowledged and agreed by you that any such

Robert Fireman
August 13, 1999
Page 4

breach or threatened breach will cause immediate irreparable damage to the Company and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. You agree that the provisions of this Paragraph are necessary and reasonable to protect the Company and the covenants set forth in Paragraph 6(a) hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(d) Enclosed is a copy of the Company's Standards of Business Conduct. You agree to abide by the provisions of this statement at all times during your employment by the Company.

7. (a) You acknowledge that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligations to you are exclusively contractual in nature. The Company shall be the sole owner of the fruits and proceeds of your services hereunder, including, but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which you may create in connection with and during the term of your employment hereunder, free and clear of any claims by you (or anyone claiming under you) of any kind or character whatsoever (other than your right to compensation hereunder). You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b) All memoranda, notes, records and other documents made or compiled by you, or made available to you during the term of this Agreement concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time on request. You shall keep in confidence and shall not use for yourself or others, or divulge to others, any information concerning the business not publicly available and which is obtained by you as a result of your employment, including but not limited to, trade secrets or processes

304007 v 4 [6SKN04! WPD]

Robert Fireman
August 13, 1999
Page 5

and information deemed by the Company to be proprietary in nature, unless disclosure is permitted by the Company or required by law.

(c) The Company shall have the right to use your name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

(d) The covenants set forth above in this paragraph shall survive the termination of this Agreement.

8. You shall be eligible to participate in all employee benefit plans of the Company available to other comparable executives of the Company, including four weeks of vacation per year, and your eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

9. The services to be furnished by you hereunder and the rights and privileges granted to the Company by you are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by you of any of the provisions contained herein will cause the Company irreparable injury and damage. You expressly agree that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by you. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

10. You agree that, if you continue in the employ of the Company after the end of this Agreement, your employment shall be at will and shall otherwise be in accordance with the provision of such then existing Company policies as may then be in effect applicable to comparable executives of the Company.

11. This Agreement shall be governed by the laws of the State of New York applicable to contracts performed entirely therein.

304007 v 4 [6SKN041.WPD]

Robert Fireman
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

                              Sincerely,

                              NEWS AMERICA MARKETING IN-STORE, INC.

                              By: _____
                                 Name: David DeVoe, Jr.
                                 Title:  Executive Vice President and Chief
                                         Financial Officer

                                 _____August 13, 1999_____
                                 Date

THE FOREGOING IS AGREED TO:


_____
Robert Fireman


_____
Date

304007 v 4 [6SKN04! WPD]

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1          A.     Yes.

2          Q.     Do you believe that News America

3     Marketing had an obligation to be fair to Ann Raider and

4     Bob Fireman.

5                 MR. KATZ:  Objection.

6          A.     No.

7          Q.     Do you believe that News America

8     Marketing invariably acted in good faith toward Ann

9     Raider and Bob Fireman?

10         A.     Absolutely.

11         Q.     Do you believe that all of the decisions

12    News America Marketing made regarding CCMI's business

13    had business justifications?

14         A.     To the best of the knowledge at the time.

15         Q.     So the answer is yes?

16         A.     Yes.

17         Q.     Do you believe News America marking had

18    an obligation to try this good faith to increase CCMI's

19    revenue.

20                MR. KATZ:  Objection.

21         A.     No.

22         Q.     Do you believe that News America

23    Marketing was obliged to provide support to CCMI?

24                MR. KATZ:  Objection.

Page 101

1              Q.    As between you and Bob Fireman who had

2      expertise in loyalty marketing?

3              A.    Say that to me one more time.

4              Q.    As between anyone at NAM and Robert

5      Fireman in July of 2001 who had the expertise, who was

6      the expert, in loyalty marketing relying on data

7      acquired at the point of sale?

8              A.    I wouldn't call it expertise.  I would

9      call it ineptitude.

10             Q.    I would call that nonresponsive.  My

11     question is, I'm making a comparison.  I'm asking you to

12     tell me who had more expertise than Bob Fireman at News

13     America Marketing in July of 2001 on loyalty marketing

14     relying on data acquired at the point of sale?

15             A.    And I'm saying that expertise is

16     debatable because performance proved the latter, he was

17     not an expert.

18             Q.    Who had more experience in loyalty

19     marketing relying on information generated at the point

20     of sale in July of 2001, who, was it Mike Cleary?

21             A.    Bob Fireman had more experience.

22             Q.    Did anyone at News America have more

23     experience than Bob Fireman?

24             A.    No.

Page 142

1          A.    Oh, yeah, and on the retail side it just

2    was a similar situation.  I had extensive background in

3    retail sales and it was just a direction we chose.

4          Q.    Did Mr. Garofalo have any experience in

5    loyalty programs, the types of things that you were

6    trying to sell for CCMI?

7          A.    No.

8                MR. KATZ:  Objection, but you can

9    proceed.

10         Q.    And I think you've already told me you

11   didn't have any experience either in loyalty programs

12   meaning programs relying on data generated at the point

13   of sale; is that correct?

14         A.    That is correct.

15         Q.    Prior to removing these responsibilities

16   from Ann Raider did you have any conversation with her

17   about the plan to do so?

18         A.    I don't recall.

19         Q.    Do you think it made sense to talk to Ann

20   Raider prior to taking these responsibilities away from

21   her to solicit her input or insight?

22         A.    I think that the decision to move the

23   sales force supervision to me was a decision that was

24   conveyed to Ann, not discussed with her.

# SmartSource Direct Strategies
## March 14, 2002
## Management Overview



**FY 2002 Year In Review**

➤ Supervisory re-organization relieves Fireman of Operations and Raider of Retail Sales responsibilities.

➤ Re-organization of the Operations Team and knowledge transfer of CCMI operational expertise is complete.

➤ Full Staffing (short of headcount freeze positions) was achieved in October 2001 for the first time since acquisition of CCMI in 1999.

➤ Henri Lellouche becomes direct supervisor of individual Retail Sales Staff. Lellouche manages Tripp, the three retail AD's and Raider directly.

➤ Average tenure of the Retail and Mfr. AD's is approaching seven months. Sales data suggests that sales productivity becomes meaningful after six months of individual service.

➤ Sales Performance Statistics
   o Average Manufacturer Sales Calls/Week – 9.4 for AD's; 6.3 for Tripp
   o Average Retail Sales Calls/Week – 3.4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
ROBERT FIREMAN and ANN RAIDER,      )
                                    )
        Plaintiffs,                 )
                                    )
    v                               )    CIVIL ACTION NO. 05-1740MLW
                                    )
                                    )
NEWS AMERICA MARKETING IN-STORE,    )
INC.,                               )
                                    )
        Defendant.                  )
                                    )
```

### ANN RAIDER'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Ann Raider ("Ms. Raider") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") First Set of Interrogatories as set forth below.

### GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Ms. Raider's Specific Answers and Objections to each Interrogatory:

1. Ms. Raider objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2. Ms. Raider objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Ms. Raider objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.    Ms. Raider objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on her beyond those included in Mass. R. Civ. P. 26 and 33.

5.    Ms. Raider objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.    Ms. Raider's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial.

7.    The information disclosed below has been provided after a diligent search. Ms. Raider reserves the right to supplement these answers.

8.    Ms. Raider reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

## ANSWERS TO INTERROGATORIES

## INTERROGATORY NO.: 1

State the name and current address of each and every expert witness that you intend to call at the trial of this matter, including in your answer:

(a)    the subject matter of the facts and opinions to which each person is expected to testify;

2

(b)       the substance of the facts and opinions to which each person is expected to testify;

(c)       a summary of the grounds for each opinion, and

(d)       the education, business, professional or other experience, as well as any other facts that will be offered at trial to prove the qualifications of each expert

## ANSWER NO.: 1

Ms. Raider has not determined which expert(s), if any, she intends to call as witness(es) on his behalf at the trial in this matter. Ms. Raider agrees to supplement this answer in compliance with any Pre-Trial Order or Rule of Court

## INTERROGATORY NO.: 2

Describe in detail any and all contracts, agreements or understandings between you and NAM.

## ANSWER NO.: 2

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Ms. Raider further objects by noting that there were countless "contracts, agreements or understandings between me and NAM." It is impossible to recount, in the form of an interrogatory answer, all "contracts, agreements or understandings" reached over several years. Ms. Raider also incorporates by reference her interrogatory responses 5-7 and 10-12. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider responds as follows:

Consumer Card Marketing, Inc. ("CCMI") was operating as a profitable

company generating over $8 million dollars in sales in 1999 with a national reputation in the supermarket and other channels as a leader in loyalty marketing. To accelerate its growth and continue to maintain a leadership position, CCMI sought a business relationship with a highly visible national company which could provide sales and financial and other support to deliver on CCMI's five (5) year business plan. NAM approached CCMI, reviewed CCMI's business plan (which was designed to achieve $50 million in sales growth within five years) and NAM agreed to purchase CCMI with the agreement that it would commit its resources and run CCMI in such a way as to permit it to execute the plan.

NAM agreed to provide CCMI with the use of its expansive retailer and manufacturer sales force who was selling their current products, and expose CCMI to NAM's relationships with worldwide affiliates of News Corporation and the Fox Entertainment Network. The entire premise upon which CCMI entered into the August 13, 1999 Stock Purchase Agreement with NAM was NAM's express agreement, commitment and representation to use its sales force and relationships to support CCMI and sell CCMI's product line to reach the $50 million sale figure.

NAM represented and agreed that CCMI would continue to operate as an autonomous division of NAM and benefit from its operational and financial support. NAM agreed that Mr. Fireman and Ms. Raider would continue to manage the CCMI's business unit including sales, operations, personnel, and budgets. By way of example only, in a letter dated October 13, 1999, Ms. Raider wrote to Jennifer Jane confirming the parties' agreement that the CCMI name would be maintained and operate as a separate division. This document is incorporated herein by reference pursuant to Fed

4

R. Civ P 33(c).

According to a press release issued by NAM on August 19, 1999, "Consumer Card Marketing, Inc represents an exciting opportunity for New America ... not only does it complement our existing in-store marketing services but provides retailers with the foundation to build customer loyalty and aid them in increasing profits through targeted loyalty programs " This message was delivered loudly and publicly by Paul Carlucci but NAM never delivered on its promises and commitments.

Further responding, various agreements and contracts were executed by the Plaintiffs in connection with the August 13, 1999 Stock Purchase Agreement and the Stock Purchase Agreement and subsidiary agreements executed in connection with the Stock Purchase Agreement are incorporated herein by reference pursuant to Fed. R. Civ P 33(c).

**INTERROGATORY NO.: 3**

Describe in detail any and all prospects or actual clients of CCMI, SmartSource Direct, or SmartSource iGroup.

**ANSWER NO.: 3**

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Ms. Raider also objects to this request because this information is already within NAM's files and therefore the request is unreasonable and harassing. Upon a narrowing of this Interrogatory, Ms. Raider will reconsider and respond appropriately.

## INTERROGATORY NO.: 4

Describe in detail all sales forecasts, budgets, or projections; financial statements; annual gross, net sales and/or profit; customers; and business plans for CCMI, SmartSource Direct and/or SmartSource iGroup.

## ANSWER NO.: 4

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Ms. Raider also objects to this request this information is already within NAM's files and therefore the request is unreasonable and harassing. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider incorporates by reference NAM's annual business plans, which have been produced by both NAM and the Plaintiffs in this matter. Further responding, NAM's business plans demonstrate conclusively NAM violated its agreement to grow CCMI's business consistent with CCMI's business plan. The business plans have been produced in discovery and are within the files of NAM. These documents are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

## INTERROGATORY NO.: 5

Describe in detail any differences in the manner in which CCMI was operated, funded, or managed once it was acquired by NAM versus the way in which it was operated, funded or managed prior to the acquisition.

## ANSWER NO.: 5

Ms. Raider objects to this Interrogatory as it is overbroad and vague. Ms. Raider

also incorporates by reference her interrogatory responses 2, 6-7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider states as follows:

Prior to the sale, CCMI was operated by Mr. Fireman and Ms. Raider with advice from its Board Members. Upon the sale, control of the business was lost. Mr. Fireman and Ms. Raider wrote the business plan. They hired the staff, built relationships with clients, attended trade shows, created products, developed a relationship with the press and advertised to the market place the value of its products and services. All actions of the company were designed to generate sales and profits based upon the market needs, to update the product lines and to expand market segments. CCMI had no debt.

Upon sale of the company, the business plan was ignored by NAM. NAM consciously elected not to "run" CCMI at all, but rather to use CCMI's parts to enhance and promote other aspects of NAM's business.

NAM dictated to CCMI all decision concerning staffing and salary and imposed their hiring freeze on CCMI's group. NAM set CCMI's budget, then fired staff and consolidated jobs to NAM, thus taking key pieces of CCMI's business and moving them to make NAM's other divisions more profitable. NAM took these actions while leaving no dedicated, trained staff in place for CCMI. NAM dictated how CCMI could interact with NAM's sales staff, who CCMI could hire as consultants, how to negotiate with vendors, the development plan for software, how and when CCMI could attend trade shows, on changing the company name and on CCMI's annual budgets. NAM provided little or no support for finance, dictated when and how speaking engagements would run and the roles and responsibilities for Mr. Fireman and Ms. Raider.

7

**INTERROGATORY NO.: 6**

Describe in detail each business decision that NAM made relating to CCMI that you assert caused injury to you.

**ANSWER NO.: 6**

Ms. Raider objects to this Interrogatory as there are literally hundreds of business decisions made by NAM which caused injury and these decisions were made literally on a daily basis. Ms. Raider also incorporates by reference her interrogatory responses 2, 5, 7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider provides the following examples of instances where NAM's decision caused the Plaintiffs harm:

- NAM marginalized the role of Mr. Fireman and Ms. Raider - Within a few months of the sale, NAM modified the CCMI's reporting structure. CCMI went from reporting to David DeVoe Jr., the CFO to Henri Lellouche, Vice President, then promoted Mr. Lellouche to Senior Vice President. Mr. DeVoe then created the Smart Source iGroup. By the end of the year, NAM had taken away much of CCMI's sales staff and support structure. Shortly thereafter, CCMI's General Manager Fireman had no direct reports, no ability to control CCMI's budget and numerous projects.

- Ms. Raider and Mr. Fireman were excluded from strategy sessions about the business. On more than one occasion Paul Carlucci declared that he saw no future in targeted direct mail, which was the backbone of CCMI's business and the key to achieving the $50 million dollar plan. His comments and actions were consistent with the marginalization of Mr. Fireman and Ms.

8

Raider's roles and responsibilities and NAM's intent not fulfill CCMI's

business plan, but rather to break off CCMI's valuable pieces and use them

to develop NAM's business elsewhere.    Mr. Carlucci's comments also had

the practical effect of sending a strong message to the sales staff that CCMI

was not an important aspect of NAM's business and that others within the

company would be ill served to support CCMI and assist in growing the

business.

- NAM eliminated Ms. Raider and Mr. Fireman's position as a "thought leader" for
loyalty marketing - CCMI spent years developing a reputation as a leader in

loyalty marketing.  Ms. Raider and Mr. Fireman attended trade shows, built client

relationships and spoke at domestic and international conferences on the subject.

Within one year after the sale, all trade shows were eliminated and all speaking

engagements cancelled.  Ms. Raider and Mr. Fireman were silenced in the

marketplace and the brand equity and name recognition which CCMI had built

over the preceding eight (8) plus years simply evaporated.  Then NAM changed

CCMI's name.

- NAM cancelled any and all trade advertising - As early as October 1999, CCMI
was precluded from placing any trade advertising about its products under the

CCMI name.  NAM informed CCMI that there was no budget.  Ms Raider raised

this issue with the Executive Vice President of Marketing who said CCMI would

have support through their Public Relations firm.  The Public Relations firm

provided no assistance.

- NAM did not provide the sales support to grow the business - The NAM sales

force was reorganized in 1999. Chris Mixon directed the sales force to focus on NAM's sales goals which did not include CCMI products. Human Resources did not provide the required assistance to locate CCMI salespersons to call upon retailers. For example, CCMI was only provided with one new sales person after seven months of joining NAM. This failure caused CCMI to lose the ability to identify opportunities and close business transactions because there was no sales support to perform the sales function.

- For at least the first year after the purchase, the NAM sales force received little or no training concerning CCMI's product lines. NAM sales management refused to provide the time for the sales force to be trained and, as a result, the sales force had no knowledge (or financial incentive) to sell CCMI products.

- In the year 2000, NAM set in place a hiring freeze which precluded CCMI from hiring staff.

- Other than a few individuals for at least one year, the duties of CCMI's manufacturer sales force were performed by the SmartSource.com sales force. The SmartSource.com sales force was directed to focus its selling their products as a priority, to their manufacturer clients and not CCMI's core clients.

- Without input from CCMI, the CCMI retail sales force was eliminated by NAM.

- CCMI was never permitted by NAM to be part of NAM's sales tracking data base.

10

- <u>CCMI did not have the required financial administrative support</u> – The finance department was initially run by CCMI's Controller. While he was reassigned to the position of Vice President of Operations, for the following year he remained responsible for executing CCMI's accounts receivable and accounts payable function. NAM refused to provide additional personnel to CCMI to perform these functions. When the function was finally turned over to the NAM organization, they paid little attention to CCMI's accounts receivable and as a result they did not collect all the funds (or funds on time) and did not bill properly for items, resulting in decreased revenue.

- <u>NAM controlled CCMI's staffing and salaries</u> - All technical jobs at CCMI in Boston were eliminated and two employees were relocated to Connecticut. One individual was, in theory, to continue to help CCMI, but the other was to work on NAM projects. This resulted in a loss of CCMI's intellectual capital. NAM hired consultants to do this work instead of full time staff and this expense was charged against CCMI's allotted consulting fees. It was clear and agreed between CCMI and NAM that the consultant fees were to be used for marketing consulting. This misallocation of fees caused CCMI to be unable to retain proper marketing consultants necessary to expand the business. It was also used as a charge to CCMI causing Plaintiffs harm in the earn out calculation.

- In addition, CCMI's Vice President of Information Services was paid a salary of approximately $80,000. After the sale, and upon conducting a review of salary levels, CCMI determined that this employee's salary was too low and should be adjusted to reflect the market rate for an employee of

11

his skill. NAM refused to adjust his salary. However, within 30 days, NAM offered this individual a $50,000 salary increase to move to Connecticut to work for NAM's Information Services department. He accepted. This void left CCMI with no senior technical person in Boston. Within a few short months, this Vice President of Information Services was spending less than 50% of his time on CCMI projects and focusing the majority of his time for SmartSource.com. This is just one of many examples of NAM effectively taking valuable resources of CCMI and utilizing them to grow other aspects of NAM's business, all the while not making any effort whatsoever to replace the resources usurped from CCMI's operations.

- Ms. Raider and Mr. Fireman were prevented from hiring the sales staff they wanted. They were likewise precluded from determining when staff could be added and the salary necessary to attract quality employees. In fact, the personnel shortage was so substantial that CCMI was forced to "borrow" sales people from SmartSource.com to call on CCMI's manufacturer clients. Clearly, these sales people's focus was their own products and CCMI's sales objectives were never achieved.

- The company's reporting functions were divided so there was not one group driving the plan - The CCMI retailer and manufacturer sales forces were divided within NAM. Ms. Raider was in fact the only sales person on the retail sales force from CCMI remaining after one year and she reported to various people in NAM such as Henri Lellouche, Pat Crock and Marty Garofolo. The CCMI

12

manufacturer sales force continued to report to NAM's Henri Lellouche and then onto Marty Garofolo. There was no focus to drive the CCMI business plan as one company and as a result, the company suffered.

- <u>NAM eliminated the Marketing Analysis (MAS) tool with no other product to replace it</u> – CCMI had over 1,000 supermarkets using the MAS software to track their loyalty card holder programs. NAM unilaterally decided that CCMI would no longer support the software although CCMI had no other internal product to offer clients. CCMI spent the next sixty (60) days directing clients to other companies. CCMI lost client relationships and income as a result of NAM's decision not to "run" CCMI.

- NAM also delayed in funding software development and then mismanaged it. In particular, NAM refused to allow CCMI move forward with completing negotiations to upgrade its proprietary Customer Relationship Marketing Software. NAM required CCMI to wait until they hired a new Chief Information Office and Vice President of Information Services before proceeding. NAM eliminated all technology staff in Boston and forced the move of several technical people to Connecticut to work on NAM's base business and not CCMI.

- The contract to expand the software for CCMI was integrated into NAM's overall plans. As a result, CCMI was required to purchase more "seats" for the software than CCMI required. Nevertheless, CCMI was required to bear an unfair burden of the cost without the benefit. NAM's management of the project was inadequate, since no one at NAM had ever performed support software, the integration of CCMI's product to the new platform

13

was delayed eighteen (18) months. Thereafter, the software possessed numerous technical issues. The delay left CCMI without a primary tool for its core loyalty management services resulting in a huge loss of business to its competitors Catalina Marketing and Valassis.

- <u>NAM's Senior Management seemed to have little or no interest in assisting CCMI to thwart competition</u> – For example, when CCMI faced competition from Catelina at Pathmark, CCMI requested that Mr. Porco assist in scheduling a meeting with the President of Pathmark to defuse competition. He refused to do so but instead sent a sales representative days later. By this time, the business was already lost.

- <u>NAM did not fund the expansion of the business to keep pace with market trends</u> – CCMI was prevented from expanding the gift card program for retailers. Even when CCMI identified a large market trend in "retailers" gift cards and prepaid products and services, and even where there was no capital outlay required. NAM refused to support CCMI. By way of example, when CCMI was awarded a $30 million dollars, five (5) year contract to Ahold, NAM ordered CCMI to withdraw from that business as an accommodation to Safeway Marketing Services to secure other business opportunities for NAM, all to the detriment of CCMI and its strategic vendors.

- The Hispanic Market was large and growing and the community had a real need for a stored value money card. Even when CCMI fostered relationships with the White House, built relationships with major banks to process the transactions and the Mexican business leaders who would

14

promote the product, NAM refused to provide the internal resources or sales support to launch the program.

There are numerous other examples and Ms. Raider reserves the right to supplement this response or otherwise discuss them in response to questions during deposition.

**INTERROGATORY NO.: 7**

Describe in detail your job at CCMI (or its successor(s)) after it was acquired by NAM and how that job description differed from what you expected that job to be before you started it

**ANSWER NO.: 7**

Ms. Raider objects to this Interrogatory as it is overbroad and vague. Ms. Raider also incorporates by reference her interrogatory responses 2, 5-6 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider states as follows:

Robert Fireman was the President and CEO of CCMI prior to the acquisition. NAM agreed that Mr. Fireman would continue to be the General Manager of the CCMI business unit. His employment contract confirms this position. Notwithstanding these indisputable facts, without discussion or agreement, Mr. Fireman's authority to manage the business, sales, personnel, finance, technology, strategy was removed and taken over by other NAM employees. Major business decisions were made without his knowledge or consent. Other employees were even given business cards similar to Mr. Fireman's, listing the same job title. Mr. Fireman was not allowed to continue to work on the core businesses of CCMI. He was provided no budget, his administrative staff

15

was removed, and at some point he was ordered not to be present in his Boston office.

Ann Raider was the co-founder of CCMI and the Executive Vice President. All of Sales Staff and Marketing reported to her. Her role included managing the retailer and manufacturer sales forces. All product development, creative services, client services, public relationships and strategic business relationships were led by her. Ms. Raider also managed the P&L. After being acquired, Ms. Raider no longer had any sales or marketing staff reporting to her and no P&L responsibility. She no longer managed any public relations and had no control over strategic business relationships to lead the sales and marketing for CCMI. Given NAM's commitments to her made in the context of the CCMI acquisition, Ms. Raider was supposed to manage an expanded sales force and interact with the national NAM and News Corp sales teams. She was to be actively involved in the product development and marketing execution. She was to continue to develop the consultative technological sales strategy of CCMI. She was to continue to support the Supermarket and Drug Chain Store associations with strategies to reach CCMI's retail base. After the sale, Ms. Raider's authority in all of these matters was either removed or marginalized to the point of irrelevance. Her consulting team was separated. She never got the time or the attention of any of the NAM's sales forces. Ms. Raider was not allowed to hire the sales people, and all these decisions were made by NAM. As budgets continued to be cut, Ms. Raider did not receive any of the staff necessary to implement the business plan. She was then directed to spend her time supporting the NAM retail sales team to sell products other than those of CCMI. To the marketplace, Ms. Raider was the Senior Vice President of News America as witnessed in her business cards, but she was given essentially none of the

16

attendant job functions or autonomy.

**INTERROGATORY NO.: 8**

Describe in detail any efforts by Plaintiffs to build a sales force for CCMI.

**ANSWER NO.: 8**

Ms. Raider objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider incorporates by reference her Interrogatory Responses 2, 5-7 and 10-12. Further responding, and as discussed in the preceding interrogatory responses, the Plaintiffs were not allowed to hire their own sales team and NAM's promised sales force was directed to focus their efforts on selling products other than CCMI's products and services. Any effort to argue for more support from NAM resulted in threatened reprimands.

**INTERROGATORY NO.: 9**

Describe in detail any communications relating to any offers to form an alliance or business relationship with CCMI or to acquire or merge with CCMI, including but not limited to any and all terms of any such offers, the identify of the parties making such an offer, and CCMI's reasons for accepting or rejecting any such offers.

**ANSWER NO.: 9**

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider responds as follows:

CCMI was being sought for acquisition by companies looking to move into

17

direct marketing and customer loyalty business sectors. They included First Data Corporation, Valasis, Catalina Marketing, Donnelly, RL POLK, GUS, Experian, and a venture group organizing a public company rollup.

The Plaintiffs broke off negotiations and discussions with these groups when NAM made their commitments, promises and agreements with CCMI.

## INTERROGATORY NO.: 10

Describe in detail any assertions, promises, commitments, assurances, statements, representations, declarations or communications (collective as used in this interrogatory, "promises") that NAM made to CCMI, Raider or Fireman, as alleged anywhere in the Complaint or elsewhere, including but not limited to any promises made by NAM relating to a plan to operate CCMI as an autonomous division; to allow Fireman or Raider to continue to manage CCMI from Boston; Raider's or Fireman's role after the acquisition of CCMI, including but not limited to Raider's and/or Fireman's involvement in budgeting, projections, sales goals, making decision, management, strategy, technology purchase, hiring/firing/relocation of employees, or otherwise, including in your response, as to each promise, where such promise was made, to whom it was made, in what medium was it made, and whether there were any witnesses to such a promise

## ANSWER NO.: 10

Ms Raider objects to this Interrogatory as it is overbroad. Further objecting, it is unreasonable and harassing to require Ms. Raider to identify "any assertions, promises, commitments, assurances, statements, representations, declarations or communications" between CCMI and NAM. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider

incorporates by reference her interrogatory responses 2, 5-7 and 10-12 which identify numerous "assertions, promises, commitments, assurances, statements, representations, declarations or communications." These "assertions, promises, commitments, assurances, statements, representations, declarations or communications" were made numerous times at CCMI's office in Braintree, Massachusetts, on the telephone and in New York and Connecticut's NAM offices  These assertions, promises, commitments, assurances, statements, representations, declarations or communications were made by, among others, NAM's acquisition team, including but not limited to David Devoe Jr., Henri Lellouche and John Rubin  The assertions, promises, commitments, assurances, statements, representations, declarations or communications were confirmed several times by phone and at meetings and luncheons in New York at NAM's corporate offices attended by Paul Carlucci, Dominick Porco, Christopher Mixon, Jennifer Jenn, Wayne Campanelli, among others.

The financial plan approved by NAM upon the purchase of the business and specifically the budget developed in October 1999 demonstrate conclusively that CCMI was to be run separately, with CCMI using NAM's sales force  This is evidenced by, among other things, the lack of a large manufacturer sales force head count in the budget.

**INTERROGATORY NO.: 11**

Describe in detail what would have been necessary for CCMI to make an $8.2 million sales goal from August 1999 to October 2000, as alleged in paragraph 10 of the Complaint, as well as your alleged reasons that CCMI did not make that goal.

**ANSWER NO.: 11**

Ms. Raider objects to this Interrogatory as it is overbroad  Subject to this, as well

19

as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider incorporates by reference her interrogatory responses 2, 5-7 and 10-12  Further responding, CCMI could have met its sales goals of $8 2M if NAM had provided the sales and financial support as set out in the plan and run CCMI's business in good faith and as promised. Instead NAM stripped CCMI of its resources and further bogged down CCMI's remaining personnel with unnecessary corporate interference. Among other things, NAM immediately sought to move CCMI's corporate offices, offered CCMI's technical team jobs in Connecticut or terminated them without providing replacement personnel, limited the amount of trade shows and conferences CCMI could attend, refused to hire personnel the Plaintiffs requested, focused the Plaintiffs and CCMI's personnel on the problems of other business units within NAM, and refused to allow CCMI to have the support of the NAM sales force   These and other actions threatened most of the CCMI personnel causing loss of focus and performance. Efforts to argue to keep the CCMI's unit cohesive and together were met with reprimands from NAM executive management.   The earnout numbers were negotiated and agreed upon based upon CCMI's historic earnings trajectory. The numbers were chosen as easy targets because the money was intended to be the second half of the purchase price for the business.

By way of example only, per Ms Raider and Mr. Fireman's letter to David DeVoe Jr. dated October 22, 1999, CCMI was not attaining its goals that CCMI set out to achieve and as promised by NAM  By its letter of December 7, 1999, CCMI sought an extension of the earnout date based upon NAM's admitted failure to provide the support promised and required   NAM admitted the problem and extended the earnout date

NAM's misconduct is further evidences by Mr. Fireman and Ms. Raider's January 25, 2000 letter to David DeVoe Jr. These documents are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 12**

Describe in detail your allegations, in paragraphs 13 and 15 of the Complaint, that NAM dismantled CCMI and/or made it impossible for Fireman and Raider to earn their bonuses; withheld the resources CCMI needed to grow its business; overpaid for software; used software purchased for the use of CCMI (or its successor(s)) to support other computer systems within NAM; refused input from Fireman and Raider relating to software or technology; "ostracized" Raider and Fireman; agreed to pursue new products but did not; assimilated CCMI into its other businesses; undermined Raider's and Fireman's role in managing CCMI, either by not including them in strategy decisions or budget approvals, or otherwise; and/or that NAM "forbade" Raider and Fireman from working on products.

**ANSWER NO.: 12**

Ms. Raider objects to this Interrogatory as it is overbroad. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider incorporates by reference her interrogatory responses 2, 5-7 and 10-12 and further responds as follows:

CCMI was among a very few nationally known leaders of Card Marketing in the supermarket industry. Initial efforts to support the marketing of electronic gift cards into the supermarket industry were rejected by NAM. This became a multi-million dollar win for CCMI competitors. CCMI tried to salvage some of this marketplace when it won the

Ahold Contract for prepaid goods and services. NAM, without the Plaintiffs' knowledge and consent, pulled this business from CCMI in an unethical and possibly illegal side deal with a CCMI's competitor to the direct advantage and benefit of NAM's other business units. This is an example of how NAM cast aside and ignored CCMI's business interests for the benefit of NAM. The details of the events set forth herein are described in memoranda dated October 16, 2000 and January 24, 2001 to Chris Mixon. These memoranda are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

Further responding, rather than expand the proprietary software that was developed by CCMI, NAM made the decision to buy an off-the-shelf CRM software, Epiphany. David Benson, NAM's Chief Information Officer, made this decision, not because it would assist CCMI's business (which it did not), but rather because it supported the interests of NAM in that the software had numerous applications which would support and assist NAM. These applications were of no value to CCMI.

Mr. Fireman was not allowed to be involved in the negotiations for the software. Without the Plaintiffs' knowledge or consent, NAM purchased the software from Epiphany for an exorbitant price so the software would have unlimited users and licenses. This was totally unnecessary for CCMI's needs. More importantly, it utilized virtually the entire budget allowance for CCMI's business plan as set forth in the Acquisition Agreement. This also put CCMI in a negative cash position within the Acquisition Document and cost the Plaintiffs hundreds of thousands of dollars on their annual earn out formula.

**INTERROGATORY NO.: 13**

Describe in detail your allegation in paragraph 15 (ii) of the Complaint that "CCMI's key personnel were relocated or fired," including in that description the identity of such person, their current address and telephone number, and whether you believe that NAM "relocated or fired" them in bad faith, arbitrarily or irrationally.

**ANSWER NO.: 13**

Ms Raider objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms Raider incorporates by reference her interrogatory responses 2, 5-7 and 10-12 Further responding, other than Bill Adam, Ms. Raider is currently endeavoring to recall the names of the individuals and will supplement this response.

**INTERROGATORY NO.: 14**

Describe in detail any and all conduct of NAM relating to the allegations of your Complaint, that you assert were undertaken in bad faith, arbitrarily, irrationally or with any intent to injure Raider or Fireman.

**ANSWER NO.: 14**

Ms Raider objects to this Interrogatory as it is overbroad. It is unduly burdensome and arguably vexatious to seek a detailed description of all of the bad faith conduct that took place over the years NAM employed Ms. Raider in an interrogatory response Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider incorporates by reference her interrogatory responses 2, 5-7 and 10-12. These interrogatory responses provide substantial detail concerning NAM's arbitrary irrational and bad faith conduct, conduct which caused Plaintiffs substantial damages.

23

**INTERROGATORY NO.: 15**

Describe in detail whether you assert that you performed satisfactorily, after CCMI was purchased by NAM, your job responsibilities at CCMI (or it successor(s)), including but not limited to whether you met sales targets or quotas.

**ANSWER NO.: 15**

Ms. Raider objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Ms Raider states that both she and Mr. Fireman performed exemplary in their job responsibilities. To the extent sales targets or quotas were not achieved, it was due to the breaches and bad faith of NAM.

**INTERROGATORY NO.: 16**

Any and all documents relating to your allegation, in paragraph 15(v) of the Complaint, that changing CCMI's name resulted in losses of CCMI's good will.

**ANSWER NO.: 16**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Ms Raider states as follows: Partnerships are created to achieve better business results than would otherwise be accomplished alone. They accelerate time to market and expedite expansion which would result in increased sales and profits. NAM took CCMI's people, trade relationships and market intelligence for their best interest and not a partnership to drive CCMI. The market statistics demonstrate conclusively that repetition improves overall ability to recognize brand

claims and brand is associated with memory  A brand is an asset of a company which drives value to the corporation itself.

The CCMI brand was eliminated by NAM   CCMI was an independent company that had achieved an international reputation as a leader in loyalty marketing and had earned the respect of the retailers and manufactures as a company they could trust in executing programs and holding customer data.  The changing of CCMI's name caused at least two events to occur   First, CCMI no longer had a presence in the market place so the customers in the marketplace were not sure our entity even existed in the loyalty marketing industry   Plaintiffs missed out on sales opportunities since NAM refused to provide sales force and did not allow Plaintiffs to retain their presence at trade shows.   Competitors aggressively built their businesses and took market share. The name change added confusion because Smart Source Direct was perceived as part of NAM, not an independent company with all the integrity and reputation as an industry leader

**INTERROGATORY NO.: 17**

Describe in detail the basis for your assertion, in paragraph 17 of the Complaint, that NAM miscalculated CCMI's "Gross Margin" and/or Earn Out" or bonus payments pursuant to the Stock Purchase Agreement.

**ANSWER NO.: 17**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated  The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of good

faith and fair dealing precluded and prevented them from achieving the earn-out

figures. Further responding and among other things, Plaintiffs do contend that NAM

added expenses to the calculation which caused the earnout thresholds to be missed.

## INTERROGATORY NO.: 18

Describe in detail the value of CCMI, including but not limited to any appraisals

or studies, prior to its sale to NAM.

## ANSWER NO.: 18

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither

relevant nor likely to lead to the discovery of admissible evidence.

## INTERROGATORY NO.: 19

Describe in detail any and all payments you received from NAM, including but

not limited to salary, bonus payments, "earn out" payments, commissions, other

payments, including payments made for the acquisition of CCMI.

## ANSWER NO.: 19

Ms. Raider objects to this Interrogatory inasmuch as this information is already

within the possession of NAM. To seek information from the Plaintiffs which NAM

already possesses is harassing.

## INTERROGATORY NO.: 20

Describe in detail any and all damages you seek in this lawsuit.

## ANSWER NO.: 20

Subject to the above listed General Objections, which are specifically

incorporated herein by reference, Ms. Raider states that CCMI had established itself as

the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

**INTERROGATORY NO.: 21**

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

**ANSWER NO.: 21**

Ms. Raider objects to this Interrogatory as unduly burdensome and vexatious. She also objects to the extent it purports to seek the disclosure of conversations she had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

Signed under the pains and penalties of perjury this _ 27th _ day of November,

2006

_____

Ann Raider

Attorney as to Objections

_____

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: November 27, 2006

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand-on _Email & Mail_
__11/27/06__

28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————
                          )
ROBERT FIREMAN and ANN RAIDER,  )
                          )
       Plaintiffs,           )
                          )
     v.                   )   CIVIL ACTION NO. 05-1740MLW
                          )
                          )
NEWS AMERICA MARKETING IN-STORE, )
INC.,                     )
                          )
       Defendant.        )
———————————————————)

### ROBERT FIREMAN'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Robert Fireman ("Mr. Fireman") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") First Set of Interrogatories as set forth below.

### GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Mr. Fireman's Specific Answers and Objections to each Interrogatory:

1.    Mr. Fireman objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.    Mr. Fireman objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Mr. Fireman objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.    Mr. Fireman objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on him beyond those included in Mass. R. Civ. P. 26 and 33.

5.    Mr. Fireman objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.    Mr. Fireman's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial.

7.    The information disclosed below has been provided after a diligent search. Mr. Fireman reserves the right to supplement these answers.

8    Mr. Fireman reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

**ANSWERS TO INTERROGATORIES**

**INTERROGATORY NO.: 1**

State the name and current address of each and every expert witness that you intend to call at the trial of this matter, including in your answer:

(a)    the subject matter of the facts and opinions to which each person is expected to testify;

(b)   the substance of the facts and opinions to which each person is
     expected to testify;

(c)   a summary of the grounds for each opinion, and

(d)   the education, business, professional or other experience, as well as
     any other facts that will be offered at trial to prove the
     qualifications of each expert

## ANSWER NO.: 1

Mr. Fireman has not determined which expert(s), if any, he intends to call as witness(es) on his behalf at the trial in this matter. Mr. Fireman agrees to supplement this answer in compliance with any Pre-Trial Order or Rule of Court.

## INTERROGATORY NO.: 2

Describe in detail any and all contracts, agreements or understandings between you and NAM.

## ANSWER NO.: 2

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman further objects by noting that there were countless "contracts, agreements or understandings between me and NAM." It is impossible to recount, in the form of an interrogatory answer, all "contracts, agreements or understandings" reached over several years. Mr. Fireman also incorporates by reference his interrogatory responses 5-7 and 10-12. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman responds as follows:

Consumer Card Marketing, Inc. ("CCMI") was operating as a profitable

3

company generating over $8 million dollars in sales in 1999 with a national reputation in the supermarket and other channels as a leader in loyalty marketing. To accelerate its growth and continue to maintain a leadership position, CCMI sought a business relationship with a highly visible national company which could provide sales and financial and other support to deliver on CCMI's five (5) year business plan. NAM approached CCMI, reviewed CCMI's business plan (which was designed to achieve $50 million in sales growth within five years) and NAM agreed to purchase CCMI with the agreement that it would commit its resources and run CCMI in such a way as to permit it to execute the plan.

NAM agreed to provide CCMI with the use of its expansive retailer and manufacturer sales force who was selling their current products, and expose CCMI to NAM's relationships with worldwide affiliates of News Corporation and the Fox Entertainment Network. The entire premise upon which CCMI entered into the August 13, 1999 Stock Purchase Agreement with NAM was NAM's express agreement, commitment and representation to use its sales force and relationships to support CCMI and sell CCMI's product line to reach the $50 million sale figure.

NAM represented and agreed that CCMI would continue to operate as an autonomous division of NAM and benefit from its operational and financial support. NAM agreed that Mr. Fireman and Ms. Raider would continue to manage the CCMI's business unit including sales, operations, personnel, and budgets. By way of example only, in a letter dated October 13, 1999, Ms. Raider wrote to Jennifer Jane confirming the parties' agreement that the CCMI name would be maintained and operate as a separate division. This document is incorporated herein by reference pursuant to Fed

4

R. Civ. P 33(c).

According to a press release issued by NAM on August 19, 1999, "Consumer Card Marketing, Inc. represents an exciting opportunity for New America . . not only does it complement our existing in-store marketing services but provides retailers with the foundation to build customer loyalty and aid them in increasing profits through targeted loyalty programs." This message was delivered loudly and publicly by Paul Carlucci but NAM never delivered on its promises and commitments.

Further responding, various agreements and contracts were executed by the Plaintiffs in connection with the August 13, 1999 Stock Purchase Agreement and the Stock Purchase Agreement and subsidiary agreements executed in connection with the Stock Purchase Agreement are incorporated herein by reference pursuant to Fed. R. Civ. P 33(c)

**INTERROGATORY NO.: 3**

Describe in detail any and all prospects or actual clients of CCMI, SmartSource Direct, or SmartSource iGroup.

**ANSWER NO.: 3**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman also objects to this request because this information is already within NAM's files and therefore the request is unreasonable and harassing. Upon a narrowing of this Interrogatory, Mr. Fireman will reconsider and respond appropriately.

5

**INTERROGATORY NO.: 4**

Describe in detail all sales forecasts, budgets, or projections; financial statements; annual gross, net sales and/or profit; customers; and business plans for CCMI, SmartSource Direct and/or SmartSource iGroup.

**ANSWER NO.: 4**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman also objects to this request this information is already within NAM's files and therefore the request is unreasonable and harassing. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference NAM's annual business plans, which have been produced by both NAM and the Plaintiffs in this matter. Further responding, NAM's business plans demonstrate conclusively NAM violated its agreement to grow CCMI's business consistent with CCMI's business plan. The business plans have been produced in discovery and are within the files of NAM. These documents are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 5**

Describe in detail any differences in the manner in which CCMI was operated, funded, or managed once it was acquired by NAM versus the way in which it was operated, funded or managed prior to the acquisition.

**ANSWER NO.: 5**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Mr.

6

Fireman also incorporates by reference his interrogatory responses 2, 6-7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states as follows:

Prior to the sale, CCMI was operated by Mr. Fireman and Ms. Raider with advice from its Board Members. Upon the sale, control of the business was lost. Mr. Fireman and Ms. Raider wrote the business plan. They hired the staff, built relationships with clients, attended trade shows, created products, developed a relationship with the press and advertised to the market place the value of its products and services. All actions of the company were designed to generate sales and profits based upon the market needs, to update the product lines and to expand market segments. CCMI had no debt.

Upon sale of the company, the business plan was ignored by NAM. NAM consciously elected not to "run" CCMI at all, but rather to use CCMI's parts to enhance and promote other aspects of NAM's business.

NAM dictated to CCMI all decision concerning staffing and salary and imposed their hiring freeze on CCMI's group. NAM set CCMI's budget, then fired staff and consolidated jobs to NAM, thus taking key pieces of CCMI's business and moving them to make NAM's other divisions more profitable. NAM took these actions while leaving no dedicated, trained staff in place for CCMI. NAM dictated how CCMI could interact with NAM's sales staff, who CCMI could hire as consultants, how to negotiate with vendors, the development plan for software, how and when CCMI could attend trade shows, on changing the company name and on CCMI's annual budgets. NAM provided little or no support for finance, dictated when and how speaking engagements would run and the roles and responsibilities for Mr. Fireman and Ms. Raider.

7

**INTERROGATORY NO.: 6**

Describe in detail each business decision that NAM made relating to CCMI that you assert caused injury to you.

**ANSWER NO.: 6**

Mr. Fireman objects to this Interrogatory as there are literally hundreds of business decisions made by NAM which caused injury and these decisions were made literally on a daily basis. Mr. Fireman also incorporates by reference his interrogatory responses 2, 5, 7 and 10-12. Subject to these, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman provides the following examples of instances where NAM's decision caused the Plaintiffs harm:

- <u>NAM marginalized the role of Mr. Fireman and Ms. Raider</u> - Within a few months of the sale, NAM modified the CCMI's reporting structure. CCMI went from reporting to David DeVoe Jr., the CFO to Henri Lellouche, Vice President, then promoted Mr. Lellouche to Senior Vice President. Mr. DeVoe then created the Smart Source iGroup. By the end of the year, NAM had taken away much of CCMI's sales staff and support structure. Shortly thereafter, CCMI's General Manager Fireman had no direct reports, no ability to control CCMI's budget and numerous projects.

- Ms. Raider and Mr. Fireman were excluded from strategy sessions about the business. On more than one occasion Paul Carlucci declared that he saw no future in targeted direct mail, which was the backbone of CCMI's business and the key to achieving the $50 million dollar plan. His comments and

8

actions were consistent with the marginalization of Mr. Fireman and Ms. Raider's roles and responsibilities and NAM's intent not fulfill CCMI's business plan, but rather to break off CCMI's valuable pieces and use them to develop NAM's business elsewhere. Mr. Carlucci's comments also had the practical effect of sending a strong message to the sales staff that CCMI was not an important aspect of NAM's business and that others within the company would be ill served to support CCMI and assist in growing the business.

- <u>NAM eliminated Ms. Raider and Mr. Fireman's position as a "thought leader" for loyalty marketing</u> - CCMI spent years developing a reputation as a leader in loyalty marketing. Ms. Raider and Mr. Fireman attended trade shows, built client relationships and spoke at domestic and international conferences on the subject. Within one year after the sale, all trade shows were eliminated and all speaking engagements cancelled. Ms. Raider and Mr. Fireman were silenced in the marketplace and the brand equity and name recognition which CCMI had built over the preceding eight (8) plus years simply evaporated. Then NAM changed CCMI's name.

- <u>NAM cancelled any and all trade advertising</u> - As early as October 1999, CCMI was precluded from placing any trade advertising about its products under the CCMI name. NAM informed CCMI that there was no budget. Ms. Raider raised this issue with the Executive Vice President of Marketing who said CCMI would have support through their Public Relations firm. The Public Relations firm provided no assistance.

9

- <u>NAM did not provide the sales support to grow the business</u> - The NAM sales force was reorganized in 1999. Chris Mixon directed the sales force to focus on NAM's sales goals which did not include CCMI products.  Human Resources did not provide the required assistance to locate CCMI salespersons to call upon retailers. For example, CCMI was only provided with one new sales person after seven months of joining NAM.  This failure caused CCMI to lose the ability to identify opportunities and close business transactions because there was no sales support to perform the sales function.

- For at least the first year after the purchase, the NAM sales force received little or no training concerning CCMI's product lines.  NAM sales management refused to provide the time for the sales force to be trained and, as a result, the sales force had no knowledge (or financial incentive) to sell CCMI products.

- In the year 2000, NAM set in place a hiring freeze which precluded CCMI from hiring staff.

- Other than a few individuals for at least one year, the duties of CCMI's manufacturer sales force were performed by the SmartSource.com sales force  The SmartSource.com sales force was directed to focus its selling their products as a priority, to their manufacturer clients and not CCMI's core clients.

- Without input from CCMI, the CCMI retail sales force was eliminated by NAM

- CCMI was never permitted by NAM to be part of NAM's sales tracking

10

data base.

- <u>CCMI did not have the required financial administrative support</u> – The finance department was initially run by CCMI's Controller. While he was reassigned to the position of Vice President of Operations, for the following year he remained responsible for executing CCMI's accounts receivable and accounts payable function. NAM refused to provide additional personnel to CCMI to perform these functions. When the function was finally turned over to the NAM organization, they paid little attention to CCMI's accounts receivable and as a result they did not collect all the funds (or funds on time) and did not bill properly for items, resulting in decreased revenue.

- <u>NAM controlled CCMI's staffing and salaries</u> - All technical jobs at CCMI in Boston were eliminated and two employees were relocated to Connecticut. One individual was, in theory, to continue to help CCMI, but the other was to work on NAM projects. This resulted in a loss of CCMI's intellectual capital. NAM hired consultants to do this work instead of full time staff and this expense was charged against CCMI's allotted consulting fees. It was clear and agreed between CCMI and NAM that the consultant fees were to be used for marketing consulting. This misallocation of fees caused CCMI to be unable to retain proper marketing consultants necessary to expand the business. It was also used as a charge to CCMI causing Plaintiffs harm in the earn out calculation.

- In addition, CCMI's Vice President of Information Services was paid a salary of approximately $80,000. After the sale, and upon conducting a review of salary levels, CCMI determined that this employee's salary was

11

too low and should be adjusted to reflect the market rate for an employee of his skill. NAM refused to adjust his salary. However, within 30 days, NAM offered this individual a $50,000 salary increase to move to Connecticut to work for NAM's Information Services department. He accepted. This void left CCMI with no senior technical person in Boston. Within a few short months, this Vice President of Information Services was spending less than 50% of his time on CCMI projects and focusing the majority of his time for SmartSource.com. This is just one of many examples of NAM effectively taking valuable resources of CCMI and utilizing them to grow other aspects of NAM's business, all the while not making any effort whatsoever to replace the resources usurped from CCMI's operations.

- Ms. Raider and Mr. Fireman were prevented from hiring the sales staff they wanted. They were likewise precluded from determining when staff could be added and the salary necessary to attract quality employees. In fact, the personnel shortage was so substantial that CCMI was forced to "borrow" sales people from SmartSource.com to call on CCMI's manufacturer clients. Clearly, these sales people's focus was their own products and CCMI's sales objectives were never achieved.

- The company's reporting functions were divided so there was not one group driving the plan - The CCMI retailer and manufacturer sales forces were divided within NAM. Ms. Raider was in fact the only sales person on the retail sales force from CCMI remaining after one year and she reported to various people in

12

NAM such as Henri Lellouche, Pat Crock and Marty Garofolo. The CCMI manufacturer sales force continued to report to NAM's Henri Lellouche and then onto Marty Garofolo. There was no focus to drive the CCMI business plan as one company and as a result, the company suffered.

- <u>NAM eliminated the Marketing Analysis (MAS) tool with no other product to replace it</u> – CCMI had over 1,000 supermarkets using the MAS software to track their loyalty card holder programs. NAM unilaterally decided that CCMI would no longer support the software although CCMI had no other internal product to offer clients. CCMI spent the next sixty (60) days directing clients to other companies. CCMI lost client relationships and income as a result of NAM's decision not to "run" CCMI.

- NAM also delayed in funding software development and then mismanaged it. In particular, NAM refused to allow CCMI move forward with completing negotiations to upgrade its proprietary Customer Relationship Marketing Software. NAM required CCMI to wait until they hired a new Chief Information Office and Vice President of Information Services before proceeding. NAM eliminated all technology staff in Boston and forced the move of several technical people to Connecticut to work on NAM's base business and not CCMI.

- The contract to expand the software for CCMI was integrated into NAM's overall plans. As a result, CCMI was required to purchase more "seats" for the software than CCMI required. Nevertheless, CCMI was required to bear an unfair burden of the cost without the benefit. NAM's management of the project was inadequate, since no one at NAM had ever performed

support software, the integration of CCMI's product to the new platform was delayed eighteen (18) months. Thereafter, the software possessed numerous technical issues. The delay left CCMI without a primary tool for its core loyalty management services resulting in a huge loss of business to its competitors Catalina Marketing and Valassis.

- <u>NAM's Senior Management seemed to have little or no interest in assisting CCMI to thwart competition</u> – For example, when CCMI faced competition from Catelina at Pathmark, CCMI requested that Mr. Porco assist in scheduling a meeting with the President of Pathmark to defuse competition. He refused to do so but instead sent a sales representative days later. By this time, the business was already lost

- <u>NAM did not fund the expansion of the business to keep pace with market trends</u> – CCMI was prevented from expanding the gift card program for retailers. Even when CCMI identified a large market trend in "retailers" gift cards and prepaid products and services, and even where there was no capital outlay required. NAM refused to support CCMI. By way of example, when CCMI was awarded a $30 million dollars, five (5) year contract to Ahold, NAM ordered CCMI to withdraw from that business as an accommodation to Safeway Marketing Services to secure other business opportunities for NAM, all to the detriment of CCMI and its strategic vendors.

- The Hispanic Market was large and growing and the community had a real need for a stored value money card. Even when CCMI fostered relationships with the White House, built relationships with major banks to

14

process the transactions and the Mexican business leaders who would

promote the product, NAM refused to provide the internal resources or sales

support to launch the program.

There are numerous other examples and Mr. Fireman reserves the right to

supplement this response or otherwise discuss them in response to questions during

deposition

**INTERROGATORY NO.: 7**

Describe in detail your job at CCMI (or its successor(s)) after it was acquired by

NAM and how that job description differed from what you expected that job to be before

you started it

**ANSWER NO.: 7**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Mr.

Fireman also incorporates by reference his interrogatory responses 2, 5-6 and 10-12.

Subject to these, as well as the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman states as follows:

Robert Fireman was the President and CEO of CCMI prior to the acquisition.

NAM agreed that Mr. Fireman would continue to be the General Manager of the CCMI

business unit. His employment contract confirms this position. Notwithstanding these

indisputable facts, without discussion or agreement, Mr. Fireman's authority to manage

the business, sales, personnel, finance, technology, strategy was removed and taken

over by other NAM employees  Major business decisions were made without his

knowledge or consent  Other employees were even given business cards similar to Mr.

Fireman's, listing the same job title. Mr. Fireman was not allowed to continue to work

on the core businesses of CCMI  He was provided no budget, his administrative staff was removed, and at some point he was ordered not to be present in his Boston office.

Ann Raider was the co-founder of CCMI and the Executive Vice President. All of Sales Staff and Marketing reported to her  Her role included managing the retailer and manufacturer sales forces  All product development, creative services, client services, public relationships and strategic business relationships were led by her  Ms. Raider also managed the P&L  After being acquired, Ms  Raider no longer had any sales or marketing staff reporting to her and no P&L responsibility.  She no longer managed any public relations and had no control over strategic business relationships to lead the sales and marketing for CCMI  Given NAM's commitments to her made in the context of the CCMI acquisition, Ms  Raider was supposed to manage an expanded sales force and interact with the national NAM and News Corp sales teams  She was to be actively involved in the product development and marketing execution  She was to continue to develop the consultative technological sales strategy of CCMI  She was to continue to support the Supermarket and Drug Chain Store associations with strategies to reach CCMI's retail base  After the sale, Ms  Raider's authority in all of these matters was either removed or marginalized to the point of irrelevance  Her consulting team was separated  She never got the time or the attention of any of the NAM's sales forces  Ms  Raider was not allowed to hire the sales people, and all these decisions were made by NAM  As budgets continued to be cut, Ms  Raider did not receive any of the staff necessary to implement the business plan  She was then directed to spend her time supporting the NAM retail sales team to sell products other than those of CCMI  To the marketplace, Ms  Raider was the Senior Vice President of News

America as witnessed in her business cards, but she was given essentially none of the attendant job functions or autonomy.

**INTERROGATORY NO.: 8**

Describe in detail any efforts by Plaintiffs to build a sales force for CCMI.

**ANSWER NO.: 8**

Mr Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his Interrogatory Responses 2, 5-7 and 10-12. Further responding, and as discussed in the preceding interrogatory responses, the Plaintiffs were not allowed to hire their own sales team and NAM's promised sales force was directed to focus their efforts on selling products other than CCMI's products and services. Any effort to argue for more support from NAM resulted in threatened reprimands.

**INTERROGATORY NO.: 9**

Describe in detail any communications relating to any offers to form an alliance or business relationship with CCMI or to acquire or merge with CCMI, including but not limited to any and all terms of any such offers, the identify of the parties making such an offer, and CCMI's reasons for accepting or rejecting any such offers.

**ANSWER NO.: 9**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman responds as follows:

CCMI was being sought for acquisition by companies looking to move into direct marketing and customer loyalty business sectors. They included First Data Corporation, Valasis, Catalina Marketing, Donnelly, RL POLK, GUS, Experian, and a venture group organizing a public company rollup.

The Plaintiffs broke off negotiations and discussions with these groups when NAM made their commitments, promises and agreements with CCMI.

**INTERROGATORY NO.: 10**

Describe in detail any assertions, promises, commitments, assurances, statements, representations, declarations or communications (collective as used in this interrogatory, "promises") that NAM made to CCMI, Raider or Fireman, as alleged anywhere in the Complaint or elsewhere, including but not limited to any promises made by NAM relating to a plan to operate CCMI as an autonomous division; to allow Fireman or Raider to continue to manage CCMI from Boston; Raider's or Fireman's role after the acquisition of CCMI, including but not limited to Raider's and/or Fireman's involvement in budgeting, projections, sales goals, making decision, management, strategy, technology purchase, hiring/firing/relocation of employees, or otherwise, including in your response, as to each promise, where such promise was made, to whom it was made, in what medium was it made, and whether there were any witnesses to such a promise.

**ANSWER NO.: 10**

Mr. Fireman objects to this Interrogatory as it is overbroad. Further objecting, it is unreasonable and harassing to require Mr. Fireman to identify "any assertions, promises, commitments, assurances, statements, representations, declarations or communications" between CCMI and NAM. Subject to these, as well as the above listed

18

General Objections, which are specifically incorporated herein by reference, Mr. Fireman
incorporates by reference his interrogatory responses 2, 5-7 and 10-12 which identify
numerous "assertions, promises, commitments, assurances, statements, representations,
declarations or communications." These "assertions, promises, commitments,
assurances, statements, representations, declarations or communications" were made
numerous times at CCMI's office in Braintree, Massachusetts, on the telephone and in
New York and Connecticut's NAM offices. These assertions, promises, commitments,
assurances, statements, representations, declarations or communications were made by,
among others, NAM's acquisition team, including but not limited to David Devoe Jr.,
Henri Lellouche and John Rubin. The assertions, promises, commitments, assurances,
statements, representations, declarations or communications were confirmed several
times by phone and at meetings and luncheons in New York at NAM's corporate offices
attended by Paul Carlucci, Dominick Porco, Christopher Mixon, Jennifer Jenn, Wayne
Campanelli, among others.

The financial plan approved by NAM upon the purchase of the business and
specifically the budget developed in October 1999 demonstrate conclusively that CCMI
was to be run separately, with CCMI using NAM's sales force. This is evidenced by,
among other things, the lack of a large manufacturer sales force head count in the budget.

### INTERROGATORY NO.: 11

Describe in detail what would have been necessary for CCMI to make an $8.2
million sales goal from August 1999 to October 2000, as alleged in paragraph 10 of the
Complaint, as well as your alleged reasons that CCMI did not make that goal

**ANSWER NO.: 11**

Mr. Fireman objects to this Interrogatory as it is overbroad. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. Further responding, CCMI could have met its sales goals of $8.2M if NAM had provided the sales and financial support as set out in the plan and run CCMI's business in good faith and as promised. Instead NAM stripped CCMI of its resources and further bogged down CCMI's remaining personnel with unnecessary corporate interference. Among other things, NAM immediately sought to move CCMI's corporate offices, offered CCMI's technical team jobs in Connecticut or terminated them without providing replacement personnel, limited the amount of trade shows and conferences CCMI could attend, refused to hire personnel the Plaintiffs requested, focused the Plaintiffs and CCMI's personnel on the problems of other business units within NAM, and refused to allow CCMI to have the support of the NAM sales force. These and other actions threatened most of the CCMI personnel causing loss of focus and performance. Efforts to argue to keep the CCMI's unit cohesive and together were met with reprimands from NAM executive management. The earnout numbers were negotiated and agreed upon based upon CCMI's historic earnings trajectory. The numbers were chosen as easy targets because the money was intended to be the second half of the purchase price for the business.

By way of example only, per Ms. Raider and Mr. Fireman's letter to David DeVoe Jr. dated October 22, 1999, CCMI was not attaining its goals that CCMI set out to achieve and as promised by NAM. By its letter of December 7, 1999, CCMI sought an

extension of the earnout date based upon NAM's admitted failure to provide the support

promised and required. NAM admitted the problem and extended the earnout date.

NAM's misconduct is further evidences by Mr. Fireman and Ms. Raider's January 25,

2000 letter to David DeVoe Jr. These documents are incorporated herein by reference

pursuant to Fed. R. Civ. P 33(c).

**INTERROGATORY NO.: 12**

Describe in detail your allegations, in paragraphs 13 and 15 of the Complaint,

that NAM dismantled CCMI and/or made it impossible for Fireman and Raider to earn

their bonuses; withheld the resources CCMI needed to grow its business; overpaid for

software; used software purchased for the use of CCMI (or its successor(s)) to support

other computer systems within NAM; refused input from Fireman and Raider relating to

software or technology; "ostracized" Raider and Fireman; agreed to pursue new

products but did not; assimilated CCMI into its other businesses; undermined Raider's

and Fireman's role in managing CCMI, either by not including them in strategy

decisions or budget approvals, or otherwise; and/or that NAM "forbade" Raider and

Fireman from working on products.

**ANSWER NO.: 12**

Mr. Fireman objects to this Interrogatory as it is overbroad. Subject to this, as

well as the above listed General Objections, which are specifically incorporated herein by

reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and

10-12 and further responds as follows:

CCMI was among a very few nationally known leaders of Card Marketing in the

supermarket industry. Initial efforts to support the marketing of electronic gift cards into

the supermarket industry were rejected by NAM. This became a multi-million dollar win for CCMI competitors. CCMI tried to salvage some of this marketplace when it won the Ahold Contract for prepaid goods and services. NAM, without the Plaintiffs' knowledge and consent, pulled this business from CCMI in an unethical and possibly illegal side deal with a CCMI's competitor to the direct advantage and benefit of NAM's other business units. This is an example of how NAM cast aside and ignored CCMI's business interests for the benefit of NAM. The details of the events set forth herein are described in memoranda dated October 16, 2000 and January 24, 2001 to Chris Mixon. These memoranda are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

Further responding, rather than expand the proprietary software that was developed by CCMI, NAM made the decision to buy an off-the-shelf CRM software, Epiphany. David Benson, NAM's Chief Information Officer, made this decision, not because it would assist CCMI's business (which it did not), but rather because it supported the interests of NAM in that the software had numerous applications which would support and assist NAM. These applications were of no value to CCMI.

Mr. Fireman was not allowed to be involved in the negotiations for the software. Without the Plaintiffs' knowledge or consent, NAM purchased the software from Epiphany for an exorbitant price so the software would have unlimited users and licenses. This was totally unnecessary for CCMI's needs. More importantly, it utilized virtually the entire budget allowance for CCMI's business plan as set forth in the Acquisition Agreement. This also put CCMI in a negative cash position within the Acquisition Document and cost the Plaintiffs hundreds of thousands of dollars on their annual earn out formula.

22

**INTERROGATORY NO.: 13**

Describe in detail your allegation in paragraph 15 (ii) of the Complaint that "CCMI's key personnel were relocated or fired," including in that description the identity of such person, their current address and telephone number, and whether you believe that NAM "relocated or fired" them in bad faith, arbitrarily or irrationally

**ANSWER NO.: 13**

Mr Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12 Further responding, other than Bill Adam, Mr. Fireman is currently endeavoring to recall the names of the individuals and will supplement this response.

**INTERROGATORY NO.: 14**

Describe in detail any and all conduct of NAM relating to the allegations of your Complaint, that you assert were undertaken in bad faith, arbitrarily, irrationally or with any intent to injure Raider or Fireman.

**ANSWER NO.: 14**

Mr Fireman objects to this Interrogatory as it is overbroad It is unduly burdensome and arguably vexatious to seek a detailed description of all of the bad faith conduct that took place over the years NAM employed Mr. Fireman in an interrogatory response. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. These interrogatory responses provide

substantial detail concerning NAM's arbitrary irrational and bad faith conduct, conduct which caused Plaintiffs substantial damages

**INTERROGATORY NO.: 15**

Describe in detail whether you assert that you performed satisfactorily, after CCMI was purchased by NAM, your job responsibilities at CCMI (or it successor(s)), including but not limited to whether you met sales targets or quotas.

**ANSWER NO.: 15**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman states that both he and Ms. Raider performed exemplary in their job responsibilities. To the extent sales targets or quotas were not achieved, it was due to the breaches and bad faith of NAM.

**INTERROGATORY NO.: 16**

Any and all documents relating to your allegation, in paragraph 15(v) of the Complaint, that changing CCMI's name resulted in losses of CCMI's good will.

**ANSWER NO.: 16**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states as follows:

Partnerships are created to achieve better business results than would otherwise be accomplished alone. They accelerate time to market and expedite expansion which would result in increased sales and profits. NAM took CCMI's people, trade relationships and market intelligence for their best interest and not a partnership to drive CCMI The market statistics demonstrate conclusively that repetition improves

24

overall ability to recognize brand claims and brand is associated with memory. A brand is an asset of a company which drives value to the corporation itself.

The CCMI brand was eliminated by NAM. CCMI was an independent company that had achieved an international reputation as a leader in loyalty marketing and had earned the respect of the retailers and manufactures as a company they could trust in executing programs and holding customer data. The changing of CCMI's name caused at least two events to occur. First, CCMI no longer had a presence in the market place so the customers in the marketplace were not sure our entity even existed in the loyalty marketing industry. Plaintiffs missed out on sales opportunities since NAM refused to provide sales force and did not allow Plaintiffs to retain their presence at trade shows. Competitors aggressively built their businesses and took market share. The name change added confusion because Smart Source Direct was perceived as part of NAM, not an independent company with all the integrity and reputation as an industry leader.

**INTERROGATORY NO.: 17**

Describe in detail the basis for your assertion, in paragraph 17 of the Complaint, that NAM miscalculated CCMI's "Gross Margin" and/or Earn Out" or bonus payments pursuant to the Stock Purchase Agreement.

**ANSWER NO.: 17**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated. The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of

good faith and fair dealing precluded and prevented them from achieving the earn-out figures. Further responding and among other things, Plaintiffs do contend that NAM added expenses to the calculation which caused the earnout thresholds to be missed.

**INTERROGATORY NO.: 18**

Describe in detail the value of CCMI, including but not limited to any appraisals or studies, prior to its sale to NAM.

**ANSWER NO.: 18**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO.: 19**

Describe in detail any and all payments you received from NAM, including but not limited to salary, bonus payments, "earn out" payments, commissions, other payments, including payments made for the acquisition of CCMI.

**ANSWER NO.: 19**

Mr. Fireman objects to this Interrogatory inasmuch as this information is already within the possession of NAM. To seek information from the Plaintiffs which NAM already possesses is harassing.

**INTERROGATORY NO.: 20**

Describe in detail any and all damages you seek in this lawsuit.

**ANSWER NO.: 20**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states that CCMI had established itself as the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

## INTERROGATORY NO.: 21

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

## ANSWER NO.: 21

Mr. Fireman objects to this Interrogatory as unduly burdensome and vexatious. He also objects to the extent it purports to seek the disclosure of conversations he had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

Signed under the pains and penalties of perjury this _____ day of November,

2006

Robert Fireman

Attorney as to Objections

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: November 27, 2006

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on 11/27/06

28