UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

    Plaintiffs,

v.                                                    Civil Action No. 05-11740-MLW

NEWS AMERICA MARKETING IN-STORE,
INC.,

    Defendant.

## OPPOSITION TO ROBERT FIREMAN AND
## AN RAIDER'S MOTION TO MODIFY SCHEDULING ORDER

### Introduction

Defendant News America Marketing In-Store, Inc. ("NAM") hereby opposes the June 8,

2007 Motion to Modify Scheduling Order of the Plaintiffs, Robert Fireman ("Fireman") and Ann

Raider ("Raider"). Viewed in the context of this particular case, the Plaintiffs' Motion to Modify

Scheduling Order ("Motion to Modify") is concerned with a single issue: permission from this

Court to construct a belated damages case with *expert* testimony.

The Plaintiffs raise the issue of extending the expert disclosure deadline for the first time

*now*: over two months *after* the March 30, 2007 Plaintiffs' expert disclosure deadline has passed

and more than *21 months* after Plaintiffs filed the instant lawsuit. In this Court's May 30, 2006

Scheduling Order (appended hereto as Attachment A), the Court directed the Plaintiffs to make

all expert disclosures "*by March 30, 2007*." Perhaps more important, the Plaintiffs raise their

"need for an expert" only *after* NAM -- in its Opposition to the Plaintiffs' Motion to Compel --

noted that, in addition to the myriad elements demonstrating the groundless nature the Plaintiffs'

claims of liability, the Plaintiffs had no viable basis for demonstrating any damages.

The Plaintiffs seek to address this point after the clock has already struck midnight and, with their Motion, to obtain permission to build a still undisclosed expert case. Such an extension would be improper. Indeed, NAM submits that the Plaintiffs' inattention to their expert case accurately reflects the level of attention properly due to the Plaintiffs' claims generally: the claims are, as discussed in NAM's opposition to Plaintiffs' Motion to Compel, without merit[1] (and should be dismissed upon NAM's anticipated motion for summary judgment). Moreover, Plaintiffs have absolutely no justification for the extension of expert discovery – the issue of calculating Plaintiffs alleged damages is not, nor has it ever been, dependent at all on any documents Defendant could produce; rather it is and has always been solely a function of Plaintiffs' theory of the case and of information already in their possession. Accordingly, as demonstrated below, the Plaintiffs' request to designate is too late, too

---

[1] The Plaintiffs' claims are built on rewriting the parties' 1999 Stock Purchase Agreement through the guise of an alleged implicit obligation of good faith. This they cannot do. The governing law of the contract is New York, and the New York Court of Appeals has held: "The covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 304-05 (1983) (appended as Attachment B). Here, in the parties' Stock Purchase Agreement, the Plaintiffs expressly contracted away their right to sue Defendant based on how Defendant managed the Plaintiffs' acquired business. The Agreement **contained an _express waiver_ of claims by Fireman and Raider against NAM regarding any issue concerning NAM's "support to the business"** following its acquisition. By this lawsuit, Plaintiffs pretend as if they did not agree to that contractual waiver. *See* Stock Purchase Agreement, § 6.8, second sentence (appended as Attachment C). Notably, "[c]ovenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York." *Kamfar v. New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 50 (S.D.N.Y. 1998*)* (citations omitted).

In addition, §,6.8 of the Stock Purchase Agreement further expressly gave NAM the "*sole and unfettered discretion*" to manage the acquired business. Yet, by this lawsuit, Plaintiffs improperly seek to impose limits on the exercise of that discretion. Even where a party does not have unfettered discretion or an express waiver as in this case, New York courts have been unwilling to find a violation of the implied covenant where the parties acted according to the contract. *Keene Corp. v. Bogan*, 1990 WL 1864 (S.D.N.Y. 1990) (appended as Attachment D). *Keene,* similar to here, involved an asset purchase agreement and the potential for "earn out" payments. The defendant alleged that the plaintiff's mismanagement of the company -- by "willfully destroy[ing] the value of his earn-out payments by reducing his authority and otherwise ruining the company" -- violated the implied duty of good faith. 1990 WL 1864 at *14. The court granted the plaintiff's motion for summary judgment on the defendant's breach of the implied covenant of good faith claim, reasoning that "when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, *the express terms of the contract override the implied covenant*, and 'grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.'" *Id.* (emphasis added) (citations omitted).

prejudicial, and unwarranted in light of the groundless nature of the case. The Motion, therefore, should be denied.

### The Context and Actual Scope of the Plaintiffs' Motion

In their Motion to Modify filed on June 8, 2007, the Plaintiffs purport to seek two forms of relief: (1) a reinstatement of the discovery period for roughly six-weeks to July 20, 2007 from the expired discovery deadline of May 31, 2007; and (2) a reinstatement of the expert designation period, and a roughly three-month extension from the expired Plaintiffs' expert disclosure deadline of March 30, 2006 to July 2, 2007. *See* Motion to Modify at 2, 5.

Well before the current Motion was filed, NAM agreed to allow the Plaintiffs to complete, after the expiration of the May 31 discovery deadline, all deposition discovery that plaintiffs had properly noticed and served before the May 31 deadline.[2] The Plaintiffs make no claim that this agreement-between-the-parties is *insufficient* for their purposes. They identify no "new" witnesses they wish to depose. Accordingly, there is no need whatsoever to reopen discovery generally. The only reason for – and the true scope of – the present Motion to Modify is the Plaintiffs' request that this Court permit them to construct a belated *expert* case.

### Argument

**I.    The Plaintiffs Chose to Ignore This Court's Scheduling Order Concerning Expert Disclosures "At Their Peril."**

This Court holds "*formidable* case-management authority." *See Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998) (emphasis supplied). In exercising this authority, "trial judges enjoy great latitude," and this latitude includes the power to set and enforce case management deadlines. *Id.* (internal citations omitted). Accordingly, it is black-letter law that "a litigant who ignores a case management deadline does so *at his peril.*" *Id.* It is undisputed that

---

[2] To that end, the deposition of David DeVoe, Jr. took place on June 13. The remaining three depositions are scheduled to be completed by mid-July.

the Plaintiffs allowed *their* expert disclosures deadline (*and* the discovery deadline) to lapse before taking any action. Indeed, the Plaintiffs' expert disclosures deadline expired roughly two-and-a-half months ago.

The Plaintiffs, therefore, "act[ed] at their peril," and, as demonstrated below, no legitimate cause justifies their disregard of this deadline.

## II.     The Plaintiffs Do Not Have "Good Cause" To Justify Reinstating And Extending The Plaintiffs' Expert Disclosure Period.

A party seeking a modification of a scheduling order must establish "good cause" for the modification, supported by affidavits or other evidentiary material. *See* Fed. R. Civ. P. 16(b) (stating that scheduling orders "shall not be modified except upon a showing of good cause *and* by leave of the district judge, or when authorized by local rule, a magistrate judge.") (emphasis supplied); Local Rule 16.1(G) ("The scheduling order shall specify that its provisions, including any deadlines, having been established with the participation of all parties, can be modified only by order of the judge ... *and only* upon a showing of good cause supported by affidavits, other evidentiary materials, or references to pertinent portions of the record.") (emphasis supplied)

Indeed, courts in the First Circuit routinely *reject* motions to modify scheduling orders where litigants have failed to establish good cause for such modification. *See Laplace-Bayard v. Battle*, 295 F.3d 157, 162 (1st Cir. 2002) (rejecting as "woefully inadequate" plaintiffs' assertion that "the likelihood of settlement with all of the defendants" justified a late expert disclosure) ("Plaintiffs simply chose to postpone the costs associated with retaining an expert in an attempt to increase, in their view, the likelihood of settlement. In doing so, they assumed the risk that their delayed trial preparation would compromise their ability to put on their best case. To excuse their belated disclosures now would relieve them of the consequences of the risk they assumed.") (emphasis supplied); *See Riofrio Anda v. Ralston Purina Co.*, 959 F.2d 1149, 1154-1155 (1st Cir.

1992) (affirming district court denial of motion to amend the complaint submitted two months

after deadline set by scheduling order); *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138,

140-141 (D. Me. 1985) (rejecting joint motion to extend discovery deadline and pretrial motions

for lack of good cause shown) ("The motion makes no showing that the complete lack of

attention paid to this case over a period of some four months was due to any mistake, excusable

neglect or any other factor which might understandably account for the failure of counsel to

undertake to comply with the Scheduling Order ... The motion obviously comes in hurried

response to the Court's notification of a final pretrial conference date) ("The Magistrate's

Scheduling Order is not a frivolous piece of paper, idly entered, which can be cavalierly

disregarded by counsel without peril.").

   As demonstrated below, the Plaintiffs have not made, and cannot make, a "good cause"

showing here.  Their Motion to Modify must therefore be denied.

### A. The Plaintiffs Are Inaccurate In Their Claims That "Discovery Delays" Justify Their Motion.

   The Plaintiffs insincerely claim that the timing of discovery justifies their requested

reinstatement and extension of the expert disclosures period.  Indeed, the Plaintiffs go so far as to

assert that they were unable to "conclude expert disclosures" or "expert reports" due to their

purported inability to obtain documents and depositions.[3]  NAM vigorously contends that it fully

and timely complied with all discovery obligations, and that the Plaintiffs are incorrect in their

claims as to any disadvantageous timing or conduct of discovery.  That false assertion is nothing

---

[3] Motion to Modify at 3, ¶2 ("*The failure to obtain documents in a timely manner* made it impractical for the Plaintiffs to commence deposition discovery and conclude expert disclosures as contemplated by the Schedule Order"); *id.* at 4, ¶6 ("In short, the Plaintiffs have accommodated Defendants at every turn [concerning deposition scheduling].  The Plaintiffs' courtesy however should not be used against them as a basis to deny them the opportunity to *conclude discovery and collect the information necessary to conclude its expert reports*.") (emphasis added).

but subterfuge meant to distract the Court from the real issue – namely, Plaintiffs' total lack of excuse for not naming a damage expert.

The pertinent issue here is not any discovery delay issues *per se*; instead, the key issue is the Plaintiffs' contention as to the *cause* of the present Motion.  Even if one were to assume *arguendo* that all of the Plaintiffs' discovery delay contentions were correct (and they unequivocally are not correct), these discovery issues were *not the cause* of the present Motion, and the Plaintiffs' assertions otherwise are wrong.

First, the Plaintiffs allowed *both* the expert disclosures deadline and the discovery deadline to expire without ever raising the present assertion that "more time is needed for experts."  If the Plaintiffs at the time actually believed that they needed additional time to obtain information in order to fulfill their expert disclosure obligations, the Plaintiffs should have made their position known *then -- i.e., prior* to March 30, 2007.  They did not do it then; they did not even raise the issue prior to April 30th; nor prior to May 30th for that matter.  There is a simple explanation for this – the alleged fact-discovery delays had nothing to do with their inexcusable failure to engage in expert discovery.  There is a material difference in credibility between the following two situations:  (a) prior to March 30, Plaintiffs state "dependencies will prevent us from meeting our March 31st deadline"; and (b) at June 8th Plaintiffs state "prior to March 30th we silently and secretly believed that dependencies will prevent us from meeting our March 30th deadline."

Second, the Plaintiffs' present Motion itself belies their claims that "the need for discovery" caused them to miss their expert disclosure deadline."  The Plaintiffs seek reinstatement and an extension of their expert disclosure period through *July 2, 2007*.  In contrast, the Plaintiffs seek reinstatement and an extension of the discovery period through July

20, roughly two weeks later – clearly nothing the Plaintiffs could learn in *fact* discovery *after* July 2 will aid them in their ability to find an expert *prior* to July 2.[4]  More importantly, the Plaintiffs largely *ignore* the relationship between (a) damage experts and (b) discovery with respect to the over $13 million of electronically stored information ("ESI") they seek from NAM, in the Motion to Compel pending before this Court.[5]  While the Plaintiffs ask (i) that the July 20 discovery deadline be extended to an indefinite date to allow further discovery based on ESI obtained from NAM's backup tapes,[6] they (ii) make no request that ties this material to their desired experts.

> **B.**    **There Is Absolutely *No Relationship* Between Fact Discovery Of NAM And Plaintiffs' Ability To Obtain Damage Experts.**

It is of utmost importance that the Court recognize that Plaintiffs completely fail to explain how it is that their ability to retain a damage expert and have that expert prepare an expert damage report is dependent upon information they need or needed in discovery from NAM.  The simple reason for this failure is that there is *no* such information.  There is not a single NAM document that could enlighten the Plaintiffs on how they could prove putative damages.  Most telling along these lines is the fact that Plaintiffs point to *no category of requested documents* allegedly in NAM's possession which are relevant to their damages theory and do not identify *any prospective questions* to NAM witnesses regarding their damages theory.

---

[4] Motion to Modify, at 5.

[5] Motion to Modify, at 5 ("if and when the Court allows the Plaintiffs' pending motion to compel electronic discovery, the Plaintiffs shall be permitted to seek a brief *enlargement of the discovery deadlines* to undertake discovery limited to issues set forth in the newly disclosed evidence") (emphasis added).  The Plaintiffs expressly do *not* propose an extension of the specified July 2 "Expert Disclosures" deadline.

[6] Either the Plaintiffs place little value on the additional ESI -- casting further significant doubt on the purported "good cause" (*i.e.*, the claimed discovery delays) underlying their pending Motion to Compel -- or the Plaintiffs place value on the ESI, but believe that this "valuable" discovery is irrelevant for their expert case – casting further significant doubt on the purported "good cause" underlying this Motion.  The Plaintiffs place themselves in this bind due to the fact that:  the cause of the present Motion is totally unrelated to discovery.

That NAM has no such documents to produce is obvious: simply put, this is a case where Plaintiffs claim if only NAM had *not* done *A, B* and *C,* and had done *X, Y* and *Z* following Plaintiffs' sale of their company to NAM, they would have earned more money through the earn-out provisions in the Stock Purchase Agreement. NAM has no documents that address what might have happened if it had done *X, Y* or *Z* and, logically, there is no reason for Plaintiffs to believe that NAM would have any such documents. In other words, even if the Court were to assume *arguendo* that NAM were somehow at least partially responsible for alleged fact discovery delays, that would be irrelevant for purposes of the instant motion because there is ***absolutely no*** connection between Plaintiffs' ability to retain an expert and produce an expert report, *and* any delays in fact discovery. Indeed, Plaintiffs identified no such connection.

In fact, prior to receiving a single discovery document or taking a single deposition, Plaintiffs *knew* exactly what they *thought* the CCMI business *could* have been after CCMI was acquired by NAM. Plaintiffs, in numerous pre-litigation letters and in their interrogatory answers in this litigation, set forth in great detail the NAM business decisions they believed prevented them from maximizing their earn out payments. Indeed, during the first years of NAM's acquisition of CCMI, Raider and Fireman raised the same complaints about NAM management as are alleged in this case (under, of course, the gross misconception that, after they *sold* the business to NAM they *still* retained the power and authority to manage it). *See* Fireman to Mixson Memo, October 17, 2000 (Fireman Depo Exh. 106) (appended as Attachment E). "The issues," as they described them *then* were:

- "• NAM never provided the resources it promised that were necessary to grow the business.

- "• NAM never empowered us to run the business.

- "• NAM divided and assimilated CCMI's technology, personnel, resources, and know how.

- "• NAM seldom included our input into any key decision relative to the business.

- "• We have had no involvement in the approval of budgets or projections and, to this date, have never seen financials sufficient to calculate our earnout.

- "• NAM removed all control and ability for us to drive the business and make the agreed upon Plan or earnout.

- "• We had to fight to keep our presence at our Industry Trade Shows. All our advertising and public relations was stopped.

- "• NAM created its own Financial Plan for revenue and resources. This Plan will not allow us to make our bonuses or projected earnout.

- "• Any action by us to object was considered action against the company and we were isolated and even reported to the Chairman for reprimanding.

- "• The Company as defined in our agreement is now the SmartSource iGroup; our name was changed; our new products never built; our technology removed; key personnel of CCMI have been relocated and terminated. Our ideas were placed on hold."

These very *same* complaints that were expressed in 2000 are the core of Plaintiffs' interrogatory answers, submitted within the past six months. *See* Exhs. H and I to Affidavit of Charles H. Roumeliotis, filed June 15, 2007.

In short, there was nothing Plaintiffs needed from NAM in fact discovery that prevented them from obtaining an expert. There is an absolute *disconnect* between fact discovery of NAM (which, in actual fact, as shown in our opposition to the pending Motion to Compel, has been responsive and full), *and* Plaintiffs' ability to find an expert. Thus, Plaintiffs have no explanation whatsoever for their failure to engage in expert discovery. There is no basis for this Court to excuse Plaintiffs' voluntary and knowing decision to ignore this Court's scheduling order.

**C.    It Was Only NAM's Recent Demonstration To This Court Of The Plaintiffs' Non-Existent Damages Case That Roused The Plaintiffs From Their Inattention.**

The *timing* of Plaintiffs' Motion is due *not* to their imagined inability to engage in expert discovery due to purported delays in fact discovery; rather, it is due to the showing NAM made in its Opposition to the Plaintiffs' Motion to Compel, filed on June 4, 2007.  There, NAM demonstrated (i) that the Plaintiffs' liability claims have no merit,[7] and (ii) that the Plaintiffs' damages case has no merit, in part due to the Plaintiffs' decision not to proffer an expert on what could only be an extremely complex damages theory.[8]  NAM noted, for example, the need for expert testimony on the Plaintiffs' purported damages theories:

> Without expert testimony, any damages case dissolves.  The Plaintiffs apparently would seek to show that, had NAM had acted differently, CCMI would have "achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula."  Presumably, these claims at a minimum would require (a) a reconstruction of the loyalty card industry, and related markets during 1999 to 2004; (b) an evaluation of the impact of the "dotcom bubble" and its "bursting" and 9-11 on these industries; (c) testimony concerning the alternative steps that NAM "should" have taken, instead of the strategy it in fact followed; and (d) testimony concerning the financial impact that these different steps would have had on CCMI's financial performance, in light of the relevant 1999-2004 markets.  The Plaintiffs' damages claims, therefore, would require "sophisticated" and extensive *expert* testimony concerning market reconstruction (during a significant downturn); at least five years of "what if" projections for CCMI revenues and expenses, and a wide range of detailed, micro- and macro-economic assumptions and industry analysis.  The Plaintiffs are now barred from making any such showing (were such showing possible).[9]

In short, Plaintiffs, to show damages, would need multiple experts on both industry-specific and financial effect issues.  Notably, none of these issues are dependent on documents from NAM.

---

[7] Opposition to Motion to Compel, Section IV(A) through (C), at 26-28.

[8] Opposition to Motion to Compel, Section IV(D), at 29-32.

[9] Opposition to Motion to Compel, Section IV(D) at 29-30.

It was only after NAM made this filing, and demonstrated the flaws in Plaintiffs' damages claims (among other fatal flaws), that Plaintiffs either (a) awoke from their inattention to this Court's discovery deadlines, or (b) reassessed their earlier strategic decision to forego an expert case. In either case, the timing of Plaintiffs' present Motion decidedly does not bear any relation to anything other than NAM's recent showing that Plaintiffs cannot establish damages. This is *not* "good cause."

It bears repeating: the Plaintiffs shoulder an "*unflagging duty to comply with clearly communicated case management orders.*" *See Rosario-Diaz,* 140 F.3d at 315 (internal citations omitted) (emphasis supplied). The Scheduling Order is crystal clear and was issued by this Court more than *one year prior* to Plaintiffs' instant motion. The Plaintiffs have not complied, and offer no good cause for their non-compliance. Their Motion, therefore, must be denied.

### D.    The Relief Requested Will Prejudice NAM.

In the Motion to Modify, the Plaintiffs continue to disregard this Court's Scheduling Order. The Scheduling Order establishes March 30, 2007 as the deadline for the Plaintiffs' expert disclosures. *See* Scheduling Order of May 30, 2006, at 2, ¶5. The Order then provides *the Defendant* with roughly an additional month, through April 27, 2007, to make rebuttal expert disclosures. *Id.* In their Motion to Modify, the Plaintiffs ignore this sequencing, and request without comment that *all* expert disclosures take place by July 2, 2007. Although this prejudice could perhaps be remedied by modifying the Plaintiffs' request to re-insert the omitted original sequencing, this omission further demonstrates the Motion's lack of merit. In their haste to convince this Court that their request will not extend deadlines "that much," the Plaintiffs fail to inform the Court of a key sequencing right held by the Defendant.

Yet independent of these sequencing issues, the key prejudice to NAM here is the prolongation of this frivolous matter and the burden of additional wasteful expense. Again, this

11

is a case where Plaintiffs protest how NAM managed their acquired business, yet in the Stock Purchase Agreement, Plaintiffs expressly waived any claim over how NAM managed the acquired business. (Section 6.8: "*Sellers [Fireman and Raider] shall have no claim against Buyer*" with regard to how NAM runs the business.) Plaintiffs, two sophisticated and experienced business people, represented by Goodwin Procter, failed to negotiate any exceptions to their waiver of claims in 1999. They may not now, 8 years later, do so by this lawsuit.

NAM has been through enough ill-conceived and costly litigation. NAM has already been forced to expend substantial resources in defending this action and complying with Plaintiffs' broad document discovery requests. It has been required to spend significant resources, financial and otherwise, to defend Plaintiffs' broad, unsupported assertions seeking to force NAM to incur over $13 million to restore ESI on backup tapes, even though Plaintiffs can point to no gap in the voluminous production already made available. When NAM responded with careful arguments, presented with detailed, record support, alerting the Plaintiffs and the Court as to the significant flaws in the Plaintiffs' case, the Plaintiffs *then* for the first time seek permission to "have another bite at this apple" and seek to correct some of these flaws with expert testimony. Like the situation in the *Cognex* case, "enough is enough." *Cognex Corp. v. Electro Scientific Indus., Inc.,* 2002 WL 32309413, at *5 (D. Mass. 2002).

## III.    Exclusion Of Experts Is The Consequence Of The Plaintiffs' Disregard Of The Scheduling Order.

Exclusion of expert testimony is the appropriate and natural consequence of the Plaintiffs' failure to comply with their expert disclosure obligations. *See* Fed. R. Civ. P. 16(f) (stating that "[i]f a party or a party's attorney fails to obey a scheduling order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2) (B), (C), (D)." *See also* Fed. R. Civ. P. 37(b)(2)

(permitting this Court to enter orders (1) refusing to allow the disobedient party from supporting designated claims; (2) prohibiting the disobedient party from introducing designated matters into evidence; or (3) dismissing the action).

Indeed, preclusion of expert testimony is the *required* consequence for the failure to timely disclose an expert. *See Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este*, 456 F.3d 272, 275-277 (1st Cir. 2006) (affirming district court exclusion of expert testimony where the plaintiff failed "timely to disclose the identity of her expert and to furnish a proper expert witness report") ("We begin our substantive discussion with the bedrock proposition that federal courts possess wide-ranging power to sanction parties who repeatedly balk at complying with court imposed deadlines ... This authority extends to the enforcement of case-management orders.") ("Whenever a party, without good cause, neglects to comply with reasonable deadlines, the court's ability to manage its docket is compromised.  Courts are entitled to take sensible measures to guard against such debilitating occurrences.") (identifying "mandatory preclusion" of expert testimony as the "required sanction in the ordinary case" of tardy disclosure); *Primus v. United States*, 389 F.3d 231, 234 (1st Cir. 2004) (affirming district court denial of motion to allow designation of an additional expert witness three months after deadline) ("The adoption of Rule 37(c)(1) in 1993 'gave teeth to a significantly broadened duty' to comply with case management orders ... and '*mandatory preclusion [is] 'the required sanction in the ordinary case*.'") (emphasis supplied) (internal citations omitted).

Accordingly, a denial of the Plaintiffs' Motion properly excludes expert testimony from the case.

### Conclusion

For the above reasons, NAM respectfully requests that this Court deny the Plaintiffs' Motion to Modify.

**Request for Hearing**

The Defendant requests a hearing on the present Motion.  As grounds, the Defendant

states that it believes a hearing will be of assistance to the Court.

> NEWS AMERICA MARKETING IN-STORE,
> INC.
>
> By its attorneys,
>
>
> /s/ Gordon P. Katz
> Gordon P. Katz (BBO# 261080)
> Ieuan G. Mahony (BBO# 552349)
> Benjamin M. McGovern (BBO# 661611)
> HOLLAND & KNIGHT LLP
> 10 St. James Avenue
> Boston, MA 02116
> (617) 523-2700

Dated: June 20, 2007
      Boston, Massachusetts

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants on this 20th day of June, 2007.

> /s/ Gordon P. Katz
> Gordon P. Katz

# ATTACHMENT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ROBERT FIREMAN et al
            Plaintiff(s)

        v.                        CIVIL ACTION
                                  NO. _05-11740_____


NEWS AMERICA et al
            Defendant(s)


SCHEDULING ORDER

WOLF, D.J.


        This case is governed procedurally by the 1992 Amendments to
the Local Rules of the United States District Court for the
District of Massachusetts (the "Local Rules"), which implement the
District's Civil Justice Expense and Delay Reduction Plan. Counsel
must, therefore, comply with the relevant Local Rules in the
litigation of this case.

        It is hereby ORDERED pursuant to Fed. R. Civ. P. 16(b) and
Local Rule 16(f) that:

[X] 1. Any Motion to Amend the pleadings, or any Motion to File
additional pleadings, shall be filed by_ JULY 31, 2006, and
responses shall be filed as required by the applicable provisions
of the Federal Rules of Civil Procedure.

[X] 2. The parties shall by_ JUNE 15, 2006 make the automatic
document disclosure required by Local Rule 26.2(A) and, if
applicable, disclose the information required by Local Rule 35.1

[X] 3. The parties shall by_JUNE 15, 2006_ make the disclosure
authorized by Local Rule 26.1(B)(1) and (2).

[X] 4. Counsel for the parties shall meet at least once to
explore the possibility of settlement and report to the court by
JANUARY 9, 2007_ the status and prospects for settlement.

        If the case is not settled, the parties shall report whether
they wish to participate in mediation to be conducted by a
magistrate judge or attorney on the Court's panel of mediators.

[X]  5.  Plaintiff(s)  and/or  Counterclaim  or  Third Party
Plaintiff(s)  shall  by MARCH 30, 2007  designate experts and
disclose the information described in Fed. R. Civ. P. 26(a)(2),
concerning each expert. Each other party shall by APRIL 27, 2007
designate expert(s) and disclose the information described in Fed.
R. Civ. P. 26(a)(2).

[X]  6.  All discovery shall be complete by MAY 31, 2007.

[X]  7.  Counsel for the parties shall confer and, by JUNE 21,
2007, file a report as to the prospects for settlement and whether
either party feels there is a proper basis for filing a motion for
summary judgment.

[X]  8.  A scheduling conference will be held on JUNE 26, 2007
at 4:00 PM  and must be attended by trial counsel with full
settlement authority or with their client(s). If appropriate, a
schedule  for  filing  motions  for  summary  judgment  will  be
established at this conference.

[X]  9.  A final pretrial conference will be held on AUGUST 8,
2007 at 4:00 PM   and must be attended by trial counsel with full
settlement authority or with their client.  Counsel shall be
prepared to commence trial as of the date of the final pretrial
conference.

[X]  10.  Trial shall commence on AUGUST 20, 2007   .

    All provisions and deadlines contained in this Order having
been established with the participation of the parties to this
case, any requests for modification must be presented to the judge
or magistrate judge, if referred for case management proceedings.
Any requests for extension will be granted only for good cause
shown supported by affidavits, other evidentiary materials, or
reference to pertinent portions of the record.  The request shall
be made by motion and shall contain the reasons for the request, a
summary of the discovery which remains to be taken, and a date
certain when the requesting party will complete the additional
discovery.
    Counsel are encouraged to seek an early resolution of this
matter. Additional case management conferences may be scheduled by
the Court or upon the request of counsel.


                              By the Court,
                              DENNIS P. O'LEARY


May 30, 2006                  /s/ Dennis O'Leary
Date                          Deputy Clerk


                              2

58 N.Y.2d 293

Joseph MURPHY, Appellant,

v.

AMERICAN HOME PRODUCTS
CORPORATION, Respondent.

Court of Appeals of New York.

March 29, 1983.

Discharged employee brought action to
recover for abusive discharge, prima facie
tort, intentional infliction of emotional dis-
tress, breach of contract, and age discrimi-
nation. The Supreme Court, New York
County, Beatrice Shainswit, J., 112 Misc.2d
507, 447 N.Y.S.2d 218, dismissed all causes
of action except that for abusive discharge.
The Supreme Court, Appellate Division, 88
A.D.2d 870, 451 N.Y.S.2d 770, modified by
dismissing all causes of action and affirmed.
The Court of Appeals, Jones, J., held that:
(1) New York court did not recognize cause
of action for abusive discharge; (2) any
change in the law in that regard is for the
legislature; (3) complaint did not state
cause of action for prima facie tort or inten-
tional infliction of emotional distress; (4)
there is no implied obligation of good faith
in at-will contract of employment; but (5)
three-year statute of limitations for liability
founded upon statute is applicable to civil
court action for age discrimination.

Modified.

Meyer, J., dissented in part and filed an
opinion.

**1. Master and Servant ⟲20**
    Where an employment is for an indefi-
nite term, it is presumed to be a hiring at
will which may be freely terminated by
either party at any time for any reason or
even for no reason.

**2. Master and Servant ⟲36**
    New York courts will not recognize
cause of action for abusive discharge.

**3. Constitutional Law ⟲70.1(11)**
    Any change in the law to recognize
cause of action for abusive discharge should

be made by the legislature, not by the
court

**4. Damages ⟲149**
    To survive motion to dismiss, claim for
intentional infliction of emotional distress
must set forth extreme and outrageous con-
duct intentionally or recklessly causing se-
vere emotional distress.

**5. Damages ⟲50.10**
    Allegation by employee that he was
discharged because he brought to the atten-
tion of corporate officers certain accounting
improprieties which allowed high-ranking
officers to reap unwarranted bonuses from
a management incentive plan did not set
forth a cause of action for intentional inflic-
tion of emotional distress.

**6. Damages ⟲50.10**
    Claim of intentional affliction of emo-
tional distress cannot be used to subvert the
traditional rule that an at-will employee
may be terminated at any time for any rea-
son or for no reason.

**7. Torts ⟲26(1)**
    In the absence of allegation that dis-
charge of employee who brought to the
attention of corporate officers certain
accounting improprieties which allowed var-
ious officers to reap unwarranted benefits
from management incentive program was
without economic or social justification, it
did not state a cause of action for prima
facie tort; conclusory allegation of malice
did not supply the deficiency.

**8. Master and Servant ⟲36**
    Cause of action for prima facie tort
cannot be used to circumvent the unavaila-
bility of a tort claim for wrongful discharge
or the contract rule against liability for
discharge of an at-will employee.

**9. Contracts ⟲168**
    New York law recognizes that, under
appropriate circumstances, obligation of
good faith and fair dealing on the part of a
party to a contract may be implied and, if
implied, enforced.

**10. Master and Servant** ⊜3(2)

No implied obligation of good faith and fair dealing exists with respect to at-will contract of employment.

**11. Frauds, Statute of** ⊜49

At-will contract of employment was not one which, by its terms, could not have been performed within one year for purposes of statute of frauds. McKinney's General Obligations Law § 5–701, subd. a, par. 1.

**12. Action** ⊜64

Civil action is not instituted by the filing of complaint; it is commenced by the service, delivery, or filing of the summons. McKinney's CPLR 203(b).

**13. Civil Rights** ⊜68

One-year period of limitations for filing of discrimination complaints applies only to the filing of complaints with Division of Human Rights and not to the filing of court actions. McKinney's Executive Law § 297, subd. 5.

**14. Civil Rights** ⊜68

Three-year period of limitations applicable to actions to recover upon liability imposed by statute is the appropriate statute of limitations for a court action based on claim of age discrimination. McKinney's CPLR 214, subd. 2; McKinney's Executive Law § 297, subd. 9.

---

Melvyn I. Weiss, Richard M. Meyer and Jeremy Heisler, New York City, for appellant.

Samuel W. Murphy, Jr., Paul A. Crotty and David L. Suggs, New York City, for respondent.

## OPINION OF THE COURT

JONES, Judge.

This court has not and does not now recognize a cause of action in tort for abusive or wrongful discharge of an employee; such recognition must await action of the Legislature. Nor does the complaint here state a cause of action for intentional inflic-

tion of emotional distress, for prima facie tort, or for breach of contract. These causes of action were, therefore, properly dismissed. Appellant's cause of action based on his claim of age discrimination, however, should be reinstated. The period of time for commencement of a judicial action for unlawful discrimination in employment is the three-year period of CPLR 214 (subd. 2) and not the one-year period prescribed in subdivision 5 of section 296 of the Executive Law.

Plaintiff, Joseph Murphy, was first employed by defendant, American Home Products Corp., in 1957. He thereafter served in various accounting positions, eventually attaining the office of assistant treasurer, but he never had a formal contract of employment. On April 18, 1980, when he was 59 years old, he was discharged.

Plaintiff claims that he was fired for two reasons: because of his disclosure to top management of alleged accounting improprieties on the part of corporate personnel and because of his age. As to the first ground, plaintiff asserts that his firing was in retaliation for his revelation to officers and directors of defendant corporation that he had uncovered at least $50 million in illegal account manipulations of secret pension reserves which improperly inflated the company's growth in income and allowed high-ranking officers to reap unwarranted bonuses from a management incentive plan, as well as in retaliation for his own refusal to engage in the alleged accounting improprieties. He contends that the company's internal regulations required him to make the disclosure that he did. He also alleges that his termination was carried out in a humiliating manner.

As to the second basis for his termination, plaintiff claims that defendant's top financial officer told him on various occasions that he wished he could fire plaintiff but that, because to do so would be illegal due to plaintiff's age, he would make sure by confining him to routine work that plaintiff did not advance in the company. Plaintiff also asserts that a contributing factor to his dismissal was that he was over 50 years of age.

On April 14, 1981, plaintiff filed a summons in the present action with the New York County Clerk pursuant to CPLR 203 (subd. [b], par. 5). The summons described the action as a suit "to recover damages for defendant's wrongful and malicious termination of plaintiff's employment". Another summons and a complaint were served on defendant on June 5, 1981. The complaint set up four causes of action. As his first cause of action, plaintiff alleged that his discharge "was wrongful, malicious and in bad faith" and that defendant was bound "not to dismiss its employees for reasons that are contrary to public policy". In his second cause of action, plaintiff claimed that his dismissal "was intended to and did cause plaintiff severe mental and emotional distress thereby damaging plaintiff". His third claim was based on an allegation that the manner of his termination "was deliberately and viciously insulting, was designed to and did embarrass and humiliate plaintiff and was intended to and did cause plaintiff severe mental and emotional distress thereby damaging plaintiff". In his fourth cause of action, plaintiff asserted that, although his employment contract was of indefinite duration, the law imposes in every employment contract "the requirement that an employer shall deal with each employee fairly and in good faith". On that predicate he alleged that defendant's conduct in stalling his advancement and ultimately firing him for his disclosures "breached the terms of its contract requiring good faith and fair dealing toward plaintiff and damaged plaintiff thereby". Plaintiff demanded compensatory and punitive damages.

Following a stipulation extending defendant's time to answer or to move with respect to the complaint, defendant moved on July 27, 1981 to dismiss the complaint on the grounds that it failed to state a cause of action and that the fourth cause of action was barred by the Statute of Frauds. Defendant contended that plaintiff was an at-will employee subject to discharge at any time, that New York does not recognize a tort action for abusive or wrongful discharge, and that the prima facie tort and

intentional infliction of emotional distress claims were unavailable and insufficient.

On October 16, 1981, plaintiff served an amended complaint with his opposing papers on the motion. The amended complaint, among other things, added a fifth cause of action, alleging that plaintiff was denied advancement due to his age which constituted "illegal employment discrimination on the basis of age in violation of New York Executive Law § 296".

Special Term denied defendant's motion to dismiss the wrongful discharge tort claim but granted the motion as to the causes of action for breach of contract, prima facie tort, intentional infliction of emotional distress and age discrimination. Although the court noted that New York had not yet adopted the doctrine of abusive discharge, it declined to put plaintiff out of court before he had had opportunity by means of disclosure procedures to elicit evidence which might put his claim on firmer footing. Special Term held the cause of action for breach of contract barred by the Statute of Frauds. As to the second and third causes of action the court ruled that plaintiff's allegations as to the manner of his dismissal were not sufficient to support causes of action for intentional infliction of emotional distress or for prima facie tort. Finally, applying the one-year period set out in the Executive Law (§ 297, subd. 5), Special Term ruled that plaintiff's age discrimination claim was untimely because the amended complaint was served over a year after his dismissal and could not be related back to the original complaint because "[n]othing in either summons or the first complaint gave notice to the defendant of the age discrimination cause of action" (112 Misc.2d 507, 511, 447 N.Y.S.2d 218).

On cross appeals, the Appellate Division modified, to the extent of granting the motion to dismiss the first cause of action, and otherwise affirmed the order of Special Term. The court noted that it does not appear that New York recognizes a cause of action for abusive discharge and that, in any event, plaintiff had failed to show the type of violation of penal law or public

## MURPHY v. AMERICAN HOME PRODUCTS CORP.    N.Y.  89
### Cite as 448 N.E.2d 86 (N.Y. 1983)

policy that has been held sufficient in other jurisdictions to support a cause of action for abusive discharge. According to the appellate court, plaintiff's charge that the corporation's records were not kept in accordance with generally accepted accounting principles appeared to involve a dispute over a matter of judgment as to the proper accounting treatment to be given the terms involved and not a dispute over false book entries. As to the other causes of action, the court ruled that Special Term had properly dismissed them either for failure to state a cause of action, failure to comply with the Statute of Frauds or, regarding the age discrimination claim, failure to assert it within the statutory time period (88 A.D.2d 870, 451 N.Y.S.2d 770). We modify the order of the Appellate Division from which plaintiff appeals by reinstating the fifth cause of action for age discrimination and otherwise affirm.

[1–3]  With respect to his first cause of action, plaintiff urges that the time has come when the courts of New York should recognize the tort of abusive or wrongful discharge of an at-will employee. To do so would alter our long-settled rule that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason (see *Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 42 N.E. 416; *Parker v. Borock*, 5 N.Y.2d 156, 182 N.Y.S.2d 577, 156 N.E.2d 297). Plaintiff argues that a trend has emerged in the courts of other States to temper what is perceived as the unfairness of the traditional rule by allowing a cause of action in tort to redress abusive discharges. He accurately points out that this tort has elsewhere been recognized to hold employers liable for dismissal of employees in retaliation for employee conduct that is protected by public policy. Thus, the abusive discharge doctrine has been applied to impose liability on employers where employees have been discharged for disclosing illegal activities on the part of their employers (*Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 427 A.2d 385; *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.

Dec. 13, 421 N.E.2d 876; *Harless v. First Nat. Bank in Fairmont*, 246 S.E.2d 270 [W.Va.1978]), where employees have been terminated due to their service on jury duty (*Nees v. Hocks*, 272 Or. 210, 536 P.2d 512), and where employees have been dismissed because they have filed workers' compensation claims (*Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353; *Frampton v. Central Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425). Plaintiff would have this court adopt this emerging view. We decline his invitation, being of the opinion that such a significant change in our law is best left to the Legislature.

Those jurisdictions that have modified the traditional at-will rule appear to have been motivated by conclusions that the freedom of contract underpinnings of the rule have become outdated, that individual employees in the modern work force do not have the bargaining power to negotiate security for the jobs on which they have grown to rely, and that the rule yields harsh results for those employees who do not enjoy the benefits of express contractual limitations on the power of dismissal. Whether these conclusions are supportable or whether for other compelling reasons employers should, as a matter of policy, be held liable to at-will employees discharged in circumstances for which no liability has existed at common law, are issues better left to resolution at the hands of the Legislature. In addition to the fundamental question whether such liability should be recognized in New York, of no less practical importance is the definition of its configuration if it is to be recognized.

Both of these aspects of the issue, involving perception and declaration of relevant public policy (the underlying determinative consideration with respect to tort liability in general, see, e.g., *Pulka v. Edelman*, 40 N.Y.2d 781, 390 N.Y.S.2d 393, 358 N.E.2d 1019; Prosser, Torts [4th ed], § 3, pp 14–16) are best and more appropriately explored and resolved by the legislative branch of our government. The Legislature has infinitely greater resources and procedural means to discern the public will, to examine

the variety of pertinent considerations, to elicit the views of the various segments of the community that would be directly affected and in any event critically interested, and to investigate and anticipate the impact of imposition of such liability. Standards should doubtless be established applicable to the multifarious types of employment and the various circumstances of discharge. If the rule of nonliability for termination of at-will employment is to be tempered, it should be accomplished through a principled statutory scheme, adopted after opportunity for public ventilation, rather than in consequence of judicial resolution of the partisan arguments of individual adversarial litigants.

Additionally, if the rights and obligations under a relationship forged, perhaps some time ago, between employer and employee in reliance on existing legal principles are to be significantly altered, a fitting accommodation of the competing interests to be affected may well dictate that any change should be given prospective effect only, or at least so the Legislature might conclude.

For all the reasons stated, we conclude that recognition in New York State of tort liability for what has become known as abusive or wrongful discharge should await legislative action.[1]

[4–6] Plaintiff's second cause of action is framed in terms of a claim for intentional infliction of emotional distress. To survive a motion to dismiss, plaintiff's allegations must satisfy the rule set out in Restatement of Torts, Second, which we adopted in *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 373 N.E.2d 1215, that: "One

who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress" (§ 46, subd [1]). Comment *d* to that section notes that: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community". The facts alleged by plaintiff regarding the manner of his termination fall far short of this strict standard. Further, in light of our holding above that there is now no cause of action in tort in New York for abusive or wrongful discharge of an at-will employee, plaintiff should not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress (cf. *Fischer v. Maloney*, 43 N.Y.2d 553, 557–558, 402 N.Y.S.2d 991, 373 N.E.2d 1215, *supra*).

[7, 8] Plaintiff's third cause of action was also properly dismissed. If considered, as plaintiff would have us, as intended to allege a prima facie tort it is deficient inasmuch as there is no allegation that his discharge was without economic or social justification (*Morrison v. National Broadcasting Co.*, 24 A.D.2d 284, 287, 266 N.Y.S.2d 406, revd. on other grounds 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572; see *Drago v. Buonagurio*, 46 N.Y.2d 778, 779, 413 N.Y.S.2d 910, 386 N.E.2d 821). Moreover, we held in *James v. Board of Educ.*, 37 N.Y.2d 891, 892, 378 N.Y.S.2d 371, 340 N.E.2d 735, which also involved the exercise

---

1. Employees in New York have already been afforded express statutory protection from firing for engaging in certain protected activities (e.g., Judiciary Law, § 519 [prohibiting discharge of employee due to absence from employment for jury service]; Executive Law, § 296, subd. 1, par. [e] [barring discharge of employees for opposing unlawful discriminatory practices or for filing a complaint or participating in a proceeding under the Human Rights Law]; Labor Law, § 215 [proscribing discharge of employee for making a complaint about a violation of the Labor Law or for participating in a proceeding related to the Labor Law]).

In fact, legislation has been proposed but not adopted which would protect employees who have been terminated for taking actions which benefit the general public or society in general (e.g., 1981 NY Assembly Bill A 2566), for disclosure of violations of law or regulation which pose a substantial and impending danger to public health or safety (e.g., 1982 N.Y. Senate-Assembly Bill S 9566, A 12451), or for disclosure of certain illegal or hazardous activities of their employers (e.g., 1983 N.Y. Senate Bill S 1159).

of an unrestricted right to discharge an employee, that: "Plaintiff cannot, by the device of an allegation that the sole reason for the termination of his employment by these public officials acting within the ambit of their authority was to harm him without justification (a contention which could be advanced with respect to almost any such termination), bootstrap himself around a motion addressed to the pleadings". Nor does the conclusory allegation of malice by plaintiff here supply the deficiency. As with the intentional infliction of emotional distress claim, this cause of action cannot be allowed in circumvention of the unavailability of a tort claim for wrongful discharge or the contract rule against liability for discharge of an at-will employee.

Plaintiff's fourth cause of action is for breach of contract. Although he concedes in his complaint that his employment contract was of indefinite duration (inferentially recognizing that, were there no more, under traditional principles his employer might have discharged him at any time), he asserts that in all employment contracts the law implies an obligation on the part of the employer to deal with his employees fairly and in good faith and that a discharge in violation of that implied obligation exposes the employer to liability for breach of contract. Seeking then to apply this proposition to the present case, plaintiff argues in substance that he was required by the terms of his employment to disclose accounting improprieties and that defendant's discharge of him for having done so constituted a failure by the employer to act in good faith and thus a breach of the contract of employment.

**[9, 10]** No New York case upholding any such broad proposition is cited to us by plaintiff (or identified by our dissenting colleague) and we know of none. New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced (e.g., *Wood v. Duff-Gordon*, 222 N.Y. 88, 118 N.E. 1082; *Pernet v. Peabody*

*Eng. Corp.*, 20 A.D.2d 781, 248 N.Y.S.2d 132). In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship. Thus, in the case now before us, plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. In the context of such an employment it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination. The parties may by express agreement limit or restrict the employer's right of discharge, but to imply such a limitation from the existence of an unrestricted right would be internally inconsistent. In sum, under New York law as it now stands, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired.

Of course, if there were an express limitation on the employer's right of discharge it would be given effect even though the employment contract was of indefinite duration. Thus, in *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441, cited by plaintiff, we recently held that, on an appropriate evidentiary showing, a limitation on the employer's right to terminate an employment of indefinite duration might be imported from an express provision therefor found in the employer's handbook on personnel policies and procedures. Plaintiff's attempts on this appeal to bring himself within the beneficial scope of that holding must fail, however. There is here no evidence of any such express limitation. Although general references are to be found in his brief in our court to an employer's "manual", no citation is furnished to any provision therein pertinent to the employer's right to terminate his employment, and the alleged manual was not submitted with his affidavit in opposition to the motion to dismiss his complaint.

[11]   Accordingly, the fourth cause of action should have been dismissed for failure to state a cause of action.[2]

As to his fifth cause of action for age discrimination, plaintiff correctly contends that in dismissing this cause of action as barred by the Statute of Limitations the courts below applied the wrong statute. They invoked the one-year period prescribed in subdivision 5 of section 297 of the Executive Law: "Any complaint filed pursuant to this section must be * * * filed within one year after the alleged unlawful discriminatory practice". The Legislature clearly intended this restriction to apply to complaints of discrimination filed with the Division of Human Rights under subdivision 1 of section 297 of the Executive Law. The issue presented in this case is whether it was intended that the one-year period should also apply to civil actions brought under subdivision 9 of section 297.[3]

[12, 13]   Initially it is to be observed that a civil action is not instituted by the "filing of a complaint". Rather a civil action is commenced by service, delivery, or filing of a summons (or in some instances by an order for a provisional remedy) (CPLR 203, subd. [b] ).  More significant, there are persuasive reasons why provision should be made for different periods of time within which claims for unlawful discrimination may be made—one for administrative relief, the other for judicial remedy.  The procedures, practices, and remedies, indeed the entire perspective of administrative intervention under the Human Rights Law, differ radically from the traditional course of judicial adjudication.  Moreover, in this instance, subdivision 9 expressly provides that where the division, on the grounds of administrative convenience, dismisses a complaint filed with it, the complainant may then bring a civil suit.  This possibility suggests the practical desirability if not necessity of staggered periods of limitation, with a longer period fixed for the commencement of civil actions.  (Relief in the reverse order is not permitted; initiation of a civil action forecloses all recourse to the

---

2.   Both courts below dismissed this cause of action under the Statute of Frauds.  This appears to have been error, inasmuch as the contract of employment was not one which by its terms could not have been performed within one year (General Obligations Law, § 5–701, subd. a, par. 1) and does not otherwise come within the reach of the Statute of Frauds (*Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 463, 457 N.Y.S.2d 193, 443 N.E.2d 441).

We reject the view of the dissenter that a good faith limitation should now be judicially engrafted on what in New York has been the unfettered right of termination lying at the core of an employment at will (*Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 467, 457 N.Y.S.2d 193, 443 N.E.2d 441 [dissenting opn] ).  We do so for precisely the reasons which persuade him as well as the other members of the court that we should now refrain from judicial recognition of the tort action for abusive discharge.  As the dissenter is at pains to note, there has been much criticism of the traditional conception of the legal obligations and rights which attach to an employment at will.  It may well be that in the light of modern economic and social considerations radical changes should be made.  As all of us recognize, however, resolution of the critical issues turns on identification and balancing of fundamental components of public policy.  Recognition of an implied-in-law obligation of good faith as restricting the employer's right to terminate is as much a part of this

matrix as is recognition of the tort action for abusive discharge.  We are of the view that this aggregate of rights and obligations should not be approached piecemeal but should be considered in its totality and then resolved by the Legislature (see at pp. 301–302, 461 N.Y. S.2d at pp. 235–236, 448 N.E.2d at pp. 89–90 *supra*).

3.   Subdivision 9 provides "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate, unless such person had filed a complaint hereunder or with any local commission on human rights, or with the superintendent pursuant to the provisions of section two hundred ninety-six-a of this chapter, provided that, where the division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed. No person who has initiated any action in a court of competent jurisdiction or who has an action pending before any administrative agency under any other law of the state based upon an act which would be an unlawful discriminatory practice under this article, may file a complaint with respect to the same grievance under this section or under section two hundred ninety-six-a ''

Division of Human Rights [§ 297, subd. 9].)
We conclude, therefore, that the one-year
period of subdivision 5 was intended to ap-
ply only to the filing of complaints with the
Division of Human Rights.

[14]  In enacting subdivision 9 of section
297, the Legislature created a new cause of
action not previously cognizable, but, in do-
ing so, provided no specific period of limita-
tions for such action.  Consequently the
institution of civil actions to recover dam-
ages for unlawful discriminatory practices
under subdivision 9 is governed by the
three-year period of limitations prescribed
in CPLR 214 (subd. 2) applicable to "an
action to recover upon a *liability*, penalty or
forfeiture created or imposed by statute"
(emphasis added; contrast *State of New
York v. Cortelle Corp.*, 38 N.Y.2d 83, 86, 378
N.Y.S.2d 654, 341 N.E.2d 223 [holding that
statutory provisions did not create "new
claims but only provide particular remedies
and standing in a public officer"]).  It was,
therefore, error to dismiss plaintiff's cause
of action for age discrimination as barred
by the one-year period prescribed in subdi-
vision 5 of section 297.

For the reasons stated, the order of the
Appellate Division should be modified, with

1.  *Martin v. New York Life Ins. Co.*, 148 N.Y.
117, 121, 42 N.E. 416 accepted as correct the
rule stated in section 136 of Wood, Master and
Servant (2d ed) that "the fact that the compen-
sation is measured at so much a day, month or
year does not necessarily make such hiring a
hiring for a day, month or year, but that in all
such cases the contract may be put an end to
by either party at any time, unless the time is
fixed".  Though later stated to have been "de-
liberately adopted, all the judges concurring, to
settle the differences of opinion which had pre-
vailed in the lower courts" (*Watson v. Gugino*,
204 N.Y. 535, 541–542, 98 N.E. 18), *Martin's*
adoption of the rule may fairly be characterized
as bizarre in light of (1) Wood's concession
that "In England it is held that a general hiring,
or a hiring by the terms of which no time is
fixed, is a hiring by the year", (2) the contrary
statement of the rule in *Adams v. Fitzpatrick*,
125 N.Y. 124, 26 N.E. 143 in reliance upon the
English cases cited at pages 128 and 130 and
the New York cases cited at page 130, 26 N.E.
143 (see, also, *Davis v. Gorton*, 16 N.Y. 255;
and *Bleeker v. Johnson*, 51 How.Prac. 380), (3)
the fact, documented in the Annotation at 11
A.L.R. 469, 476, and in a number of the articles
referred to in footnote 4 below, that Wood's

costs, to reinstate plaintiff's fifth cause of
action for age discrimination.

MEYER, Judge (dissenting in part).

The harshness of a rule which permits an
employer to discharge with impunity a 30-
year employee one day before his pension
vests (see *United Steelworkers of Amer.,
Local No. 1617 v. General Fireproofing Co.*,
464 F.2d 726 (6th Cir.1972); and *Savodnick
v. Korvettes, Inc.*, 488 F.Supp. 822) or for
no other reason than that he filed a com-
pensation claim (2A Larson, Workmen's
Compensation Law, § 68.36), the bizarre or-
igin of the termination-at-will rule,[1] the
change of economic and constitutional phi-
losophy that has occurred since its
adoption,[2] the exclusion of a substantial
segment of the working community from
its effects through "just cause" limitations
upon the right to fire resulting from collec-
tive bargaining, and the inconsistency of
the rule not only with the common law of
England and with earlier New York deci-
sions but also with the law of most industri-
al countries of the world,[3] have caused an
outpouring of judicial and scholarly writ-
ings intended to ameliorate, if not abolish,

rule was not supported by any of the cases
cited by him, and (4) the logical inconsistency
of a rule the ultimate statement of which is that
"permanent employment means nothing more
than that the employment is to continue indefi-
nitely and until one or the other of the parties
wishes for some good reason to sever the rela-
tion" (*Arentz v. Morse Dry Dock & Repair Co.*,
249 N.Y. 439, 444, 164 N.E. 342).

2.  The concept that a restriction upon an em-
ployer's right to terminate was a violation of
due process (*Adair v. United States*, 208 U.S.
161, 28 S.Ct. 277, 52 L.Ed. 436; *Coppage v.
Kansas*, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441)
has long since given way to decisions uphold-
ing the constitutionality not only of various
labor acts but also of restrictions upon dis-
charge for reasons of race, sex, age, political
affiliation and the like (see n. 5 below).

3.  (Report of Committee on Labor and Employ-
ment Law, At-Will Employment and the Prob-
lem of Unjust Dismissal, 36 Record of Assn. of
Bar of City of New York [hereafter "Committee
Report"] 170, 175 ff.)

the rule.[4] I agree with the majority that we should not now adopt the tort remedies proposed in those writings, because such remedies are essentially grounded in public policy, the declaration of which is a function of both the Legislature and the courts, because the New York Legislature has not been reticent in the area,[5] and because of the difficulty encountered by the courts adopting such remedies in articulating the exact nature of the public policy which will bring them into play (compare *Adler v. American Std. Corp.,* 291 Md. 31, 432 A.2d 464, with *Hinrichs v. Tranquilaire Hosp.,* 352 So.2d 1130 [Ala.1977]; and see De Giuseppe, 10 Ford Urban LJ, at p 36 ff).

I agree also with so much of the majority opinion as holds the fourth cause of action not barred by the Statute of Frauds and the

fifth cause of action not barred by the Statute of Limitations. I cannot, however, accept the majority's refusal to follow precedent decisional law recognizing an implied-in-law obligation on the part of the employer not to discharge an employee for doing that which the employment contract obligated him to do or to differentiate between that existing contract obligation and the public policy laden tort of abusive discharge (at pp. 305–306, n. 2, 461 N.Y.S.2d at pp. 237–238, n. 2, 448 N.E.2d at pp. 91–92, n. 2). Plaintiff's complaint alleges that "defendant's internal regulations * * * required that plaintiff report any deviation from proper accounting practice to defendant's top management" and that he was dismissed as a result of his doing just that. Because those allegations sufficiently state a cause of action for breach of contract not

---

4. (Committee Report, *op. cit.;* Blades, Employment At Will vs. Individual Freedom: On Limiting The Abusive Exercise of Employer Power, 67 Col.L.Rev. 1404; Blumrosen, Workers' Rights Against Employers and Unions: Justice Francis—A Judge For Our Season, 24 Rutgers L.Rev. 480; Christiansen, A Remedy for The Discharge Of Professional Employees Who Refuse To Perform Unethical Or Illegal Acts: A Proposal In Aid of Professional Ethics, 28 Vand.L.Rev. 805; Conway, Protecting The Private Sector At Will Employee Who "Blows The Whistle": A Cause Of Action Based On Determinants Of Public Policy, 1977 Wis.L.Rev. 777; De Giuseppe, Effect of the Employment-At-Will Rule on Employee Rights to Job Security and Fringe Benefits, 10 Ford Urban LJ 1; Feerick, Continued Erosion of Employment-At-Will, NYLJ, Feb. 4, 1983, p. 1, col. 1; Feinman, Development of the Employment at Will Rule, 20 Am.J.Leg.Hist. 118; Gelb, Non-Statutory Causes of Action For an Employer's Termination of an "At Will" Employment Relationship: A Possible Solution to the Economic Imbalance in the Employer-Employee Relationship, 24 N.Y.L. School L.Rev. 743; Glendon and Lev, Changes In the Bonding of the Employment Relationship: An Essay on the New Property, 20 BC L.Rev. 457; Harmon and Kolko, Developments In the Law Covering Abusive Discharges, NYLJ, Aug. 26, 1982, p. 1, col. 3; Madison, Employee's Emerging Right To Sue For Arbitrary Or Unfair Discharge, 6 Employee Relations L.J. 422; Mathews, A Common Law Action for The Abusively Discharged Employee, 26 Hastings L.J. 1435; Peck, Unjust Discharges From Employment: A Necessary Change In The Law, 40 Ohio St.L.J. 1; Peck, Some Kind of Hearing For Persons Discharged From Private Employment, 16 San Diego L.Rev. 313; Shapiro and Tune, Implied Con-

tract Rights To Job Security, 26 Stanford L.Rev 335; Shemaria-Weber, A Remedy for Malicious Discharge of the At-Will Employee, 7 Conn.L.Rev. 758; Summers, Individual Protection Against Unjust Dismissal: Time For A Statute, 62 Va.L.Rev. 481; Travis, Abusive Discharge Cases To Test Common-Law Rule, NYLJ. Sept. 24, 1982, p. 1, col. 2; Vernon and Gray, Termination At Will—The Employer's Right to Fire, 6 Employee Relations LJ 25; Weyand, Present Status of Individual Employee Rights, NYS 22d Annual Conf. on Labor, p. 171; Willis, Contracts—Employee's Discharge Motivated By Bad Faith, Malice or Retaliation Constitutes a Breach of an Employment Contract Terminable at Will, 43 Ford L.Rev. 300; Note, Protecting At Will Employees Against Wrongful Discharge: The Duty To Terminate Only In Good Faith, 93 Harv.L.Rev. 1816; in addition to the articles listed, pertinent annotations will be found at 51 A.L.R.2d 742; 63 A.L.R.3d 979; 93 A.L.R.3d 659; 9 A.L.R.4th 329; 12 A.L.R.4th 544.)

The judicial writings are too numerous to list, but see Committee Report (at p. 211, n. 130) and De Giuseppe (10 Ford Urban L.J., at p. 23, n. 101).

5. (E.g., Civil Rights Law, §§ 47–a, 79–i; Civil Service Law, §§ 75–76; CPLR 5252; Election Law, § 17–154, subd. 3; Executive Law, §§ 292, 296; General Obligations Law, § 5–301; Labor Law, § 27–a, subd. 10; § 662, subd. 1; § 704, subd. 8; §§ 736, 880, subd. 3; Military Law, §§ 317, 318; Workers' Compensation Law, § 120.) A "whistle-blower" bill (A12451; S9566) failed to pass the 1982 Legislature, but has been reintroduced at the present session (Legislative Gazette, Feb. 7, 1983, p. 9).

only under decisions of other States [6] but as a matter of New York law as well, I dissent from the majority's affirmance of the dismissal of the fourth cause of action.

I do not gainsay that *Martin v. New York Life Ins. Co.,* 148 N.Y. 117, 42 N.E. 416, however questionable its origin and continued existence, is the New York rule concerning employment contracts of unspecified duration. So in *Haines v. City of New York,* 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 364 N.E.2d 820 we took pains to point out that unlike other contracts of unspecified duration, as to which the law will imply that the parties "intended performance to continue for a reasonable time", that rule "[f]or compelling policy reasons * * * has not been, and should not be, applied to contracts of employment". But the policy reasons behind refusing to read a durational term into employment contracts do not require reading out of such contracts the "implied covenant of fair dealing and good faith" which "is implicit in all contracts" (*Van Valkenburgh, Nooger & Neville v. Hayden Pub. Co.,* 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142; accord *Kirke La Shelle Co. v. Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163) and is "a contractual obligation of universal force which underlies all written agreements" (*Brassil v. Maryland Cas. Co.,* 210 N.Y. 235, 241, 104 N.E. 662).

I refer not to the promise that each party will use reasonable efforts to carry out the contract purpose, which may be implied-in-fact from the contract negotiations to establish consideration though the writing was "imperfectly expressed" in that respect (*Wood v. Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214), but to the covenant implied by the law that the parties will not "frustrate the contracts into which they have entered" and that one party will "not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part" (*Grad v. Roberts,* 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 198 N.E.2d 26) or that may hinder or obstruct his doing that which the contract stipulates he should do (*Patterson v. Meyerhofer,* 204 N.Y. 96, 101, 97 N.E. 472).

Under this principle it was held in *Meyerhofer* that by entering into a contract to purchase from plaintiff property which defendant knew plaintiff would have to buy at a foreclosure sale in order to convey, defendant impliedly agreed that she would do nothing to prevent him from acquiring the property at such sale and, having outbid him at the sale, was liable to him for the difference between the contract price and the price she paid to the referee in foreclosure. Indeed, more than 100 years ago we applied the principle to a broker's commission contract, though terminable at will, holding in *Sibbald v. Bethlehem Iron Co.,* 83 N.Y. 378, 384 that "Where no time for the continuance of the contract is fixed by its terms, either party is at liberty to terminate it at will *subject only to the ordinary requirements of good faith*" (emphasis supplied; see, also, *Goodman v. Marcol, Inc.,* 261 N.Y. 188, 184 N.E. 755; *Carns v. Bassick,* 187 App.Div. 280, 175 N.Y.S. 670). And though a broker's employment is occasional rather than continuous, we have recognized the role of good faith even as it relates to continuous employment, saying in *Arentz v. Morse Dry Dock & Repair Co.,* 249 N.Y. 439, 444, 164 N.E. 342 with respect to a

---

6. (*Pugh v. See's Candies,* 116 Cal.App.3d 311, 171 Cal.Rptr. 917; *Cleary v. American Airlines,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722; *Magnan v. Anaconda Inds.,* 37 Conn.Sup. 38, 429 N.Y.S.2d 492; *Higdon Food Serv. v. Walker,* 641 S.W.2d 750 [Ky.1982]; *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251; *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880; *Gates v. Life of Mont. Ins. Co.,* Mont., 638 P.2d 1063; *Cloutier v. Great Atlantic & Pacific Tea Co.,* 121 N.H. 915, 436 A.2d 1160; *Pierce v. Ortho Pharm. Corp.,* 84 N.J. 58, 417 A.2d 505; *Rees v.*

*Bank Bldg. & Equip. Corp. of Amer.,* 332 F.2d 548 (7th Cir.1964) [applying Mo. law]; but see *Whittaker v. Care-More, Inc.,* 621 S.W.2d 395 [Tenn.1981].) For discussion of the implied obligation of good faith as a limitation upon the right to terminate an at-will employee see Committee Report (at p. 182 ff; De Giuseppe, 10 Ford Urban LJ, at p. 24; Glendon and Lev, 20 B.C L.Rev., at pp. 471–472; Madison, 6 Employee Relations L.J., 422; Note, 93 Harv.L. Rev. 1816; Comment: Employment Contracts—Implied Covenant of Good Faith, 62 Mass.L.Q. 241).

claimed contract of permanent employment of a general manager that "Plaintiff was not obliged to stay with the defendant for life, neither was defendant obliged to employ him beyond the time when *in good faith* it had no further use for his services" (emphasis supplied).

The principle, moreover, is espoused by the Restatement of Contracts, Second (§ 205), which flatly states that "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," and which in Comment *e* and the Reporter's Notes thereto indicates its application to the "abuse of a power * * * to terminate the contract" (at p 102) including "an express power to terminate a contract at will" (at p 104). It is recognized as well in section 1–203 of the Uniform Commercial Code and by Williston, Contracts (3d ed, §§ 670, 1295), which tells us in section 1295 (vol 11, p 39) that: "Wherever, therefore, a contract cannot be carried out in the way in which it was obviously expected that it should be carried out without one party or the other performing some act not expressly promised by him, a promise to do that act must be implied." The same reasoning that reads into an output contract the requirement that the manufacturing plant continue to perform in good faith (*Feld v. Levy & Sons,* 37 N.Y.2d 466, 471, 373 N.Y.S.2d 102, 335 N.E.2d 320) and into the contract of an employee hired to invent that the resulting patent belongs to the employer (*Cahill v. Regan,* 5 N.Y.2d 292, 296, 184 N.Y.S.2d 348, 157 N.E.2d 505) though no express provision to such effect be contained in the contract requires reading into the contract the present plaintiff alleges a provision that he will not be terminated for doing that which the parties have expressly contracted he shall do.[7] To be borne in mind is the fact that we deal not with a contract which by its expressed term authorizes the employer to terminate with-

out cause, but with one in which, because no durational term has been expressed, the law implies a right of termination. In the latter situation only the strongest of policy reasons can sustain reading the *implied* right of termination as a limitation upon the *express* obligation imposed upon the employee (see Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv L Rev 369, 399–401; Summers, General Duty of Good Faith—Its Recognition and Conceptualization, 67 Cornell L.Rev. 810, 827; Summers, "Good Faith" In General Contract Law and the Sales Provisions of The Uniform Commercial Code, 54 Va.L.Rev. 195, 251).

There is, moreover, no compelling policy reason to read the implied obligation of good faith out of contracts impliedly terminable at will. To do so belies the "universal force" of the good faith obligation which, as we have seen, the law reads into "*all contracts.*" Nor can credence be given the *in terrorem* suggestion that to limit terminable-at-will contracts by good faith will drive industry from New York (see *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 469, 457 N.Y.S.2d 193, 443 N.E.2d 441 [dissenting opn] ). That is no more than speculation and hardly appears acceptable in the face of (1) the recognition without apparent industrial exodus of the even more burdensome tort remedy for discharge of at-will employees by such industrial States as California, Connecticut, Illinois, Indiana, Maryland, Massachusetts, Michigan, New Jersey, Pennsylvania and Wisconsin (see Committee Report, at p. 211, n. 130; and De Giuseppe, 10 Ford Urban L.J., at p. 23, n. 101), and (2) the responses reported in Ewing, What Business Thinks About Employee Rights, a Harvard Business Review survey of employers reprinted in Individual Rights In The Corporation: A Reader On Employee Rights (Westin & Salisbury eds.), at page

---

7. Ironically, the employer's implied absolute right to terminate at-will employment for any reason or for no reason had its origin in the necessity of according the *employer* mutuality with the right of the *employee* to quit his job at any time (Blades, 67 Col.L.Rev., at p. 1419). Logically, of course, the same principle of mu-

tuality requires that if, as plaintiff alleges and must prove in order to succeed, defendant's contract with him required him to report to defendant's top management any deviation from proper accounting practice, plaintiff's employment not be terminated because he did so.

21. The more particularly is this so because collective bargaining "just cause" provisions, which impose a greater burden on employers than does a good faith limitation (see *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880) have not done so, and because employees can obtain a large measure of protection by expressly reserving in the employment contract the right to terminate without cause.[8]

The fact that the Legislature has limited at-will discharge in the several ways listed in footnote 5 above but has not expressly established a breach of contract action for termination of at-will employment which violates the implied-in-law obligation of good faith provides no reason to await action by the Legislature. The at-will rule was created by the courts and can properly be changed by the courts but, more importantly, as demonstrated above, the rule has for at least a century been subject to the "universal force" of the good faith rule. The Legislature, therefore, had no reason before the present decision to believe that action on its part was required.

Nor ought we succumb to any "floodgates" argument. "This court has rejected as a ground for denying a cause of action that there will be a proliferation of claims. It suffices that if a cognizable wrong has been committed that there must be a remedy, whatever the burden on the courts" (*Tobin v. Grossman,* 24 N.Y.2d 609, 615, 301 N.Y.S.2d 554, 249 N.E.2d 419; accord Prosser, Torts [4th ed.], p. 51). The argument is, moreover, specious. It is plaintiff's burden if he is to avoid summary judgment to come forward with admissible evidence that he was terminated because he reported, as required, a deviation from proper accounting practice (*Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573) and it will be his burden to establish that fact before the jury (see *Goodman v. Marcol, Inc.,* 261 N.Y. 188, 184 N.E. 755, *supra; Sibbald v. Bethlehem Iron Co.,* 83 N.Y. 378, 390, *supra; McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668). And though the burden of going forward, once plaintiff establishes a prima facie case, will shift to defendant (see *Matter of Axel v. Duffy-Mott Co.,* 47 N.Y.2d 1, 9, 416 N.Y.S.2d 554, 389 N.E.2d 1075; cf. *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471; Committee Report. at p. 195), it will remain the plaintiff's burden to convince the jury that he was fired for the reason he alleged, not the employer's burden to convince them that he had other good cause to fire the employee (see Blades, 67 Col.L.Rev., at p. 1429). True, the evidence presented by an employer in such a situation will normally be of other cause to fire, but there is no reason to believe that under proper instruction from the court as to burden of proof (cf. PJI 4:31) a jury cannot be trusted to determine the good faith issue thus presented as they now regularly do in all the other good faith situations presented to them.

It may well be that plaintiff's fourth cause of action will not survive a motion for summary judgment or, if it does, will not succeed before a jury. To dismiss it at this stage, on the pleadings alone, is, however, wholly inconsistent with the prior holdings of this and other courts with respect to the implied-in-law obligation of good faith. I therefore, cannot vote for doing so.

COOKE, C.J., and JASEN, WACHTLER, FUCHSBERG and SIMONS, JJ., concur with JONES, J.

MEYER, J., dissents in part and votes to further modify by reinstating the fourth cause of action in a separate opinion.

Order modified, with costs to appellant, by reinstating the fifth cause of action and, as so modified, affirmed.



---

8. Such a contract is not per se unconscionable (*Zapatha v. Dairy Mart,* 381 Mass. 284, 408

N.E.2d 1370).

# ATTACHMENT C

6.8    Conduct of the Business. It is Buyer's current intention to provide support to the business of the Company by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, Buyer shall be free to operate the Company and its Affiliates in its sole and unfettered judgment and Sellers shall have no claim against Buyer in connection therewith as a result of the preceding sentence. Buyer hereby agrees that the direct sales expenses for the first and second Base Earn-Out Periods shall not exceed $1.0 million and $1.4 million, respectively, unless otherwise agreed by Buyer, on the one hand, and Fireman and Raider, on the other hand.

# ATTACHMENT D



Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

▷
Keene Corp. v. Bogan
S.D.N.Y.,1990.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
KEENE CORPORATION, Plaintiff,
v.
John BOGAN, Defendant.
**No. 88 CIV. 0217 (MBM).**

Jan. 11, 1990.

<u>Steven M. Pesner</u>, <u>Edward Tessler</u>, <u>David M. Zensky</u>, <u>Jordan W. Siev</u>, Anderson Kill Olick & Oshinsky, P.C., New York City, for plaintiff.
<u>Aaron H. Simon</u>, <u>Michael L. Goldberg</u>, Greene, Broillet, Paul, Simon & Wheeler, Los Angeles, Cal., for defendant.
<u>Jerrold T. Doros</u>, Doros & Brescia, P.C., New York City, for defendant.

OPINION AND ORDER

<u>MUKASEY</u>, District Judge.
**\*1** This action arises out of plaintiff Keene Corporation's 1984 purchase of a company, SRS Industries, and the Asset Purchase Agreement (APA) entered into at that time by Keene and defendant John Bogan, one of the sellers of SRS. Belaboring not only each other but also the court with voluminous briefs and exhibits, the parties move and cross-move for summary judgment on various claims.

Keene sues Bogan to collect money allegedly due under a promissory note Bogan signed in connection with the sale of SRS. Keene asserts also that Bogan committed fraud and breach of warranty by misrepresenting the condition of assets owned by SRS at the time of the sale. Further, Keene alleges that Bogan breached his fiduciary duties and that its termination of Bogan's employment at SRS was lawful. Keene moves for summary judgment on its promissory note claim; Bogan seeks summary judgment dismissing the misrepresentation claim.

Bogan counterclaims against Keene, alleging that Keene breached separate oral agreements it made with him at the time of the asset sale, fraudulently induced him into entering the APA, and breached the covenant of good faith implied in that contract. Bogan seeks summary judgment to prevail on his counterclaim, while Keene moves for summary judgment dismissing the counterclaim.

Because there are no genuine issues of material fact as to all but one of the claims, Keene's motion is granted in its entirety and Bogan's motion is granted in part and denied in part.

I.

John Bogan, the defendant, co-owned SRS Industries, a California based company that manufactured parts for the aerospace and defense industry. SRS developed a product using a technology called EMI shielding and applied for a patent in January, 1983. During 1983, Bogan and his co-owner, Robert Meeks, entered into negotiations with Keene Corporation, a New York corporation, for the sale of SRS to Keene.

Keene entered into an Asset Purchase Agreement (APA) with Bogan and Meeks in June, 1984, and on the same date Bogan executed a promissory demand note to SRS which was then assigned to Keene. A letter executed by Bogan and Keene that same day provided that the note would be paid out of the "earn-out" payments due to Bogan under the APA. The APA § 3(a) provided that the earn-out payments would be paid annually for the following five

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

years, calculated as $.50 for each $1 of earnings in excess of ten percent of sales before interest and taxes.   Bogan elected to take these earn-out payments, but less cash up front, in exchange for his interest in SRS, while Meeks took more cash and cut his ties with SRS.

SRS became a division of Keene after the sale, and Bogan became its president.   He remained in that position until September, 1985, when he was replaced and demoted to a sales position.   Bogan claims that even before then, Keene had deprived him of actual authority.   He claims also that Keene seriously mismanaged SRS, as reflected in its arbitrary pricing policies, knowing shipment and re-marking of defective parts, missed shipment deadlines and failure to defend the patent on the EMI shielding process.   After one negligible payment, SRS's earnings remained insufficient to trigger Bogan's earn-out payments.   In June, 1986, Keene fired Bogan.

**\*2** In January, 1988, Keene filed suit seeking payment of its promissory note and claiming that Bogan had made misrepresentations about the company-specifically about the EMI shielding patents and about the condition of certain equipment-before the parties signed the APA.   Bogan counterclaimed, alleging that Keene:  (1) fraudulently induced him into selling SRS by making promises it never intended to keep;  (2) breached alleged oral agreements guaranteeing Bogan's employment as president of SRS, his earn-out payments and the separate identity of SRS;  and (3) violated the covenant of good faith implied in the APA.

Keene now seeks summary judgment to collect on the promissory note and to dismiss Bogan's counterclaim. Bogan seeks summary judgment to dismiss Keene's misrepresentation claim and to prevail on his counterclaim for fraud, breach of oral agreements and bad faith.   For the reasons set forth below, Keene's motion is granted in its entirety.   Bogan's motion is granted in part, with a portion of Keene's misrepresentation claim dismissed and the remainder to be heard by the trier of fact.

## II.

Keene has asked for leave to amend its answer to one of Bogan's counterclaims, which charges Keene with breaching, or fraudulently inducing Bogan to enter into, various separate agreements.   (Amended Answer, ¶  56) Keene seeks to add to its answer the affirmative defense of the statute of frauds, which must be pleaded specifically under Fed.R.Civ.P. 8(c).   Plaintiff's motion is granted, and its answer is deemed amended to include the affirmative defense of the statute of frauds.

Fed.R.Civ.P. 15(a) mandates that leave to amend "shall be freely given when justice so requires."   The Supreme Court explained in *Foman v. Davis,* 371 U.S. 178, 182 (1962), that in "the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.' " *Foman,* 371 U.S. at 182.

Here, Bogan gives no convincing reason to deny plaintiff's motion.   He asserts that because the statute of frauds was not pleaded, he could not be expected to produce written evidence of the alleged separate agreements during discovery.   Keene, however, specifically requested such documents during discovery;  thus, Bogan was on notice that he was expected to produce such documents if they existed.   He has proffered no such documents on this motion.

Plaintiff's motion for leave to amend its answer is granted, and the answer will be deemed amended for the purposes of considering the parties' motions for summary judgment.

## III.

Before addressing the merits of each party's claims, it is necessary to resolve a choice of law issue that added substantial bulk to the briefs on these motions.   Section 15 of the APA provides that the agreement "shall be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 3
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

governed by and construed in accordance with the laws of the State of New York, including those relating to conflicts of law." Bogan argues that the unusual second clause in this provision mandates application of California law rather than New York law. Bogan argues that this clause shows the parties clearly intended that the conflict of law provision should supersede the general New York law provision, because under New York law, specific contractual provisions control more general provisions. _Waldman v. New Phone Dimensions, Inc.,_ 109 A.D.2d 702, 487 N.Y.S.2d 29, 31 (1st Dep't 1985), _appeal dismissed,_ 65 N.Y.2d 784 (1985). Bogan argues that New York choice of law principles require the application of California law because California has more significant contacts with the contract. _See Auten v. Auten,_ 308 N.Y. 155, 124 N.E.2d 99 (1924).

*3 Bogan's interpretation of the choice of law provision, if followed, would frustrate the purpose of such a provision, and would render meaningless the first and obviously major clause of the provision. If the court were to read the second clause in a vacuum and apply New York's conflict of law rules without regard to the parties' specific decision that New York law governs the contract, California law might apply because of that state's significant contacts with the contract. _See Index Fund, Inc., v. Ins. Co. of North America,_ 580 F.2d 1158, 1162 (2d Cir.1978). In order to determine the parties' intent, however, one should not rip text from context and read a single clause without reference to the agreement-or even the paragraph-as a whole. Further, considering that the clause is followed in the very same paragraph with a provision adopting New York courts as the forum for any contractual dispute, Bogan's interpretation defies common sense.

Under New York choice of law principles, the "contractual selection of governing law is generally determinative so long as the chosen state has sufficient contacts with the transaction, absent fraud or violation of public policy." _Capital National Bank of New York v. McDonald's Corp.,_ 625 F.Supp. 874 (S.D.N.Y.1986). _See Hawes Office Systems, Inc. v. Wang Labs, Inc.,_ 537 F.Supp. 939 (E.D.N.Y.1982); _Nakhleh v. Chemical Construction Corp.,_ 359 F.Supp. 357, 359 (S.D.N.Y.1973); _Reger v. Nat. Ass'n of Bedding Mfrs.,_ 83 Misc.2d 527, 372 N.Y.S.2d 97, 114 (S.Ct. Westchester 1975). The Restatement (Second) of Conflict of Laws explains that the law of the state chosen by the parties will be applied unless either the chosen state,

"has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or ... application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties."

Restatement (Second) of Conflict of Laws § 187 at 134 (Supp.1988). By inserting "including those [laws] relating to conflicts of law" into the choice of law provision, the parties appear to have recognized that in limited circumstances, a court may determine that the law chosen by the parties should not apply. The second provision thus describes what happens if a court finds that applying New York law would violate public policy, or that another state has a much greater interest in the contract. That court-presumably a New York court, since the parties have chosen New York as a forum-would then apply New York choice of law principles to determine which state's law would control. Thus, while Bogan's interpretation of the provision would contradict the entire first clause, an interpretation allowing for the application of New York law except in limited circumstances would contradict no provision. [FN1]

*4 Furthermore, directly following the choice of law provision, the APA contains a choice of forum provision in which the parties specifically consent to the jurisdiction of New York courts over any "action relating or incident to this Agreement." To read the choice of law provision as Bogan does would produce the anomaly of parties specifying that New York courts repeatedly would have to apply the unfamiliar law of California. Parties should not lightly be presumed to have intended anomalous results when a more reasonable interpretation may be inferred. _Kemelhor v. Penthouse Int'l Ltd.,_ 689 F.Supp. 205, 212-13 (S.D.N.Y.1988), _aff'd,_ 873 F.2d 1435 (2d Cir.1989).

New York, as the domicile of one of the parties and the state where some of the Keene's alleged misconduct took place, bears a reasonable relation to the APA. Therefore, in deciding this particular motion, I must follow what I perceive as the parties' decision to apply New York law to the contract. Although the second clause of the provision thus is rendered inapplicable to this particular case, it does not become devoid of meaning, and does not undermine the manifest intent of the parties to apply New York law to the APA. Bogan's reading would rob the first clause of any meaning, and undo the parties' apparent intent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 4
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Bogan argues also that California law must apply to the alleged separate oral agreements-that he would be employed as president of SRS with full authority for 5 years and that Keene would maintain SRS's separate identity and provide SRS with sufficient resources-because such agreements are distinct from the APA and thus not controlled by its choice of law provision. There is no need, however, to decide any choice of law issue as to these three oral separate agreements, because, as discussed in greater detail below, all of them are unenforceable under both the New York and California statutes of frauds. Under both statutes, a contract that cannot be performed within one year is unenforceable unless it is in writing and signed by the party to be charged. See Cal.Civ.Code § 1624(a); N.Y.Gen.Oblig.Law § 5-701(a)(1).<u>FN2</u> As discussed below, Bogan has asserted that each of these alleged agreements by its terms was to last through a five-year period in which he allegedly would be the president of SRS. Because these separate oral agreements are unenforceable under either New York or California law, no further discussion about choice of law is relevant or necessary.

IV.

Keene sues to recover the outstanding balance, $202,174, of the promissory note that Bogan executed on the same day that the parties entered into the APA, and now moves for summary judgment on this issue. Bogan opposes, arguing that the ambiguity of the note and accompanying letter presents a genuine issue of fact that must be resolved by extrinsic evidence of the parties' intent. Bogan argues that the note and accompanying letter may be interpreted to require repayment solely out of his earn-out <u>FN3</u> payments, an interpretation that excuses him from personal liability for amounts due under the note. Because the note and letter unambiguously provide for Bogan's repayment of the amount borrowed, and rely on Bogan's earnings under the earn-out provision as but one method of repayment, plaintiff's motion for summary judgment on the note is granted.

*5 Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." <u>Anderson v. Liberty Lobby,</u> 477 U.S. 242, 250 (1986). In determining whether a genuine issue of material fact has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>United States v. Diebold, Inc.,</u> 369 U.S. 654, 655 (1962) (per curiam), <u>cited in</u> <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs.,</u> 834 F.2d 54, 57 (2d Cir.1987). Nonetheless, in order to defeat a motion for summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " <u>Matsushita Elec. Ind. Co. v. Zenith Radio,</u> 475 U.S. 574, 586-87 (1986).

That the document at issue here is a promissory note favors interpreting the note and the accompanying letter according to their ordinary meaning without resort to extrinsic evidence of intent, because by agreeing to sign what is explicitly labelled a "promissory note," Bogan himself endorsed a description of his agreement that can have few alternative meanings. In a case with similar facts, <u>Hanam B.V. v. Kittay,</u> 589 F.Supp. 1042 (S.D.N.Y.1984), this court rejected defendant's claim that a note was never intended to be repaid as written, or to be treated separately from the parties' relationship, as follows:

"uncontradicted proof is that [defendant] was represented by an attorney in connection with the preparation of the Agreement and of the Promissory Notes.... Nothing in any of the opposing affidavits spells out factually, with admissible evidence, that the Notes were not intended to be repaid or were not intended to be binding. Furthermore, no ambiguity appears on the face of the contract or of the estoppel certificate on the contract, signed by [defendant] or on the Notes themselves. Therefore, even if extrinsic evidence suggesting a contrary intent of one of the parties existed, it would be inadmissible in evidence. Parol may not be used to create an ambiguity where none exists."

<u>Hanam B.V.,</u> 589 F.Supp. at 1047.

Here, there is nothing in the promissory note or the letter that suggests that the earn-out set-offs would be the exclusive source for repaying the note. Instead, every agreement between Bogan and Keene evidences the parties' intent to treat the note as an ordinary promissory note, and to consider the note and letter as the only evidence of the parties' agreement. Section 7(a)(vii)(E) of the APA states that the notes "constitute the legally binding obligation of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Bogan and Meeks." The note itself declares that "no waiver whatever or modification of the terms hereof shall be valid unless in writing signed by the holder of this note and then only to the extent therein set forth.[FN4] This Note shall be assignable to Keene Corporation ... and to none other. Once so assigned, this note may not be further negotiated."

**\*6** The letter that accompanied the note, signed by both parties on the same day as the APA, states, in pertinent part:

"With respect to payment of the amounts due under the Note, Keene Corporation ("Keene") and you have agreed that such payment shall be made by setting off against the amounts which become payable to you as assignee of the Earn Out (as defined in the Asset Purchase Agreement dated June 26, 1984 among Keene, SRS Industries, Inc., John Bogan and Robert Meeks). Such payment under the Earn Out shall be applied against the amounts payable under the Earn Out as such amounts become payable. *For example, no amounts shall be paid to you under the Earn Out until the amount of all amounts due under the Note have been earned by you under the Earn Out and applied and paid to Keene.*

In addition, you have agreed to provide Keene within two weeks from the date hereof with security satisfactory to Keene to secure payment of the Note." (emphasis added)

Bogan cites the underlined example as implying that the only source for repaying the note would be his earn-out payments. Yet, in so arguing, Bogan reads into the letter an implication that is not there, and disregards specific language that is present in both the letter and the note. Simply because the letter states that Bogan will not receive earn-out payments until the note is paid does not logically mean that earn-out payments are the *only* source from which the note is to be paid. The letter's requirement that Bogan secure the note with his personal residence is further evidence that the parties regarded the note as an agreement to repay a loan. Bogan attempts to explain in his deposition that Keene requested the security as "a formality ... so you [Bogan] don't quit and we [Keene] are left stuck with the $248,000." (Bogan Tr. 83). Yet this unconvincing oral evidence contradicts the plain meaning of the letter and, under the parol evidence rule, cannot be considered to explain the parties' subjective intent.

Bogan claims that extrinsic evidence of the parties' intent will support his otherwise baseless interpretation of the letter and the note. Under New York's parol evidence rule, however, extrinsic evidence may not be offered to shed light on the subjective intent of the parties to a contract if the contract is unambiguous on its face. *Leumi-Financial Corp. v. Richter,* 17 N.Y.2d 166, 269 N.Y.S.2d 409 (1966); *General Phoenix Corp. v. Cabot,* 300 N.Y. 87, 92, 89 N.E.2d 238 (1949). Whether or not a document is ambiguous must be determined by the court as a matter of law on the face of the document by giving the words of the contract their ordinary and reasonable meaning. *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460 (1982). Thus, on a motion for summary judgment addressed to the terms of a contract, when "the determination of that question may be reached by reference to and a consideration of the plain and unambiguous wording of the contract, the question, as one of law, should be then and there resolved." *Janos v. Peck,* 21 A.D.2d 529, 532, 251 N.Y.S.2d 254 (First Dep't 1964), *aff'd,* 15 N.Y.2d 509, 254 N.Y.S.2d 115 (1964). *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* No. 89-7466, slip op. at 364 (2d Cir. Nov. 20, 1989).

**\*7** A contract term is deemed ambiguous not when the parties themselves ascribe different meanings to the term, but when the term is "susceptible to at least two reasonable meanings." *Kemelhor v. Penthouse,* 689 F.Supp. 205, 212 (S.D.N.Y.1988), *aff'd mem.,* 873 F.2d 1435 (1989). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[ ] the contract language beyond its reasonable and ordinary meaning.' " *Hunt,* 89-7466, slip. op at 364, *quoting Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93 (1957). Defendant has failed to present a reasonable interpretation of the note that would cast doubt on the plain meaning of its provisions. Therefore, plaintiff's motion for summary judgment on the promissory note is granted.

V.

In its second and third claims against Bogan, Keene bottoms both a fraud claim and a breach of warranty claim on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 6
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

its assertion that Bogan misrepresented: (1) the status of the patent on the "EMI shielding process," a technology that allegedly attracted Keene to this deal in the first place; and (2) the condition and value of SRS's machinery and equipment. Bogan moves for summary judgment dismissing this claim, while Keene asserts that there are genuine issues to be brought to trial. Because genuine issues of fact exist only as to one alleged misrepresentation concerning the patent, Bogan's motion is granted in part and denied in part.

Keene's fraud and breach of warranty claims, unlike Bogan's fraudulent inducement claims discussed below, are not based upon promises of future action, but rather upon representations of present knowledge. Keene claims that Bogan violated assurances in the APA that he knew of no infringement by third parties on SRS's patent, (APA § 5(j)(iii)), and that certain items of SRS's machinery had been well maintained and were in good operating condition and repair (APA § 5(i)). Keene asserts that there is evidence from which a rational factfinder could conclude that Bogan knew competitors were infringing the patent prior to signing the APA, and that he knew that various pieces of machinery needed substantial repairs. Keene asserts also that Bogan fraudulently failed to disclose material facts about the patent-namely, that the patent application was defective and that sales of the patented product took place more than one year prior to the filing of the patent application.

Keene's breach of warranty claim arises from the alleged falsity of Bogan's representations in the APA and from APA Section 8(b), which holds the seller liable for misrepresentations to the buyer about the company. Keene's fraud claim is based on New York tort law, which allows recovery for fraud if plaintiff can show a representation of a material fact, falsity, intent to deceive or knowledge by the party making the representation that it is false, reliance by the person to whom the representation is made and damages. *See Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123 (1981). *See also Ministry of Christ Church v. Mallia,* 148 A.D.2d 784, 538 N.Y.S.2d 367, 369 (Third Dep't 1989); *Lyons v. Quandt,* 91 A.D.2d 709, 710, 457 N.Y.S.2d 615 (Third Dep't 1982). Under *Anderson,* 477 U.S. at 254, the court must consider the evidence on a summary judgment motion "through the prism of the substantive evidentiary burden." When, as in this case, the claim is fraud, each essential element must be proved by clear and convincing evidence. *Rudman v. Cowles,* 30 N.Y.2d 1, 9, 330 N.Y.S.2d 33, 39 (1972).

**\*8** As discussed more fully below, Keene has submitted evidence that Bogan knew before signing the agreement about possible infringement of the patent by competitors, including drafts of letters from Bogan to competitors warning them to stop infringing. Because Keene has submitted enough evidence to create a genuine issue of material fact regarding both fraud and breach of warranty, Bogan's motion for summary judgment on that specific patent issue is denied. However, Bogan's motion for summary judgment dismissing Keene's claim that the actual patent application was defective and that Bogan knew of sales of the patented product made more than one year prior to the filing of the patent application is granted. Further, Bogan's motion for summary judgment dismissing Keene's claim that Bogan made misrepresentations about equipment is granted.

1. *The Patent*

Keene alleges three instances in which Bogan defrauded Keene and breached his warranty in the APA regarding the state of the patent, but only one presents a genuine issue of fact that survives summary judgment. First, Keene alleges that SRS sold patented products more than one year prior to the date of the patent application. Such a sale would violate the on-sale bar in the patent laws, 32 U.S.C. § 102(b), and, if proved by clear and convincing evidence, would render the patent invalid.[FN5] Keene asserts also that a critical step in the patented process was left out of the patent application, thus rendering the patent worthless. Such arguments, however, go to the validity of the patent, something that Bogan did not warrant in the APA. In Section 5(j)(i) of the APA, Bogan warrants that an attached schedule-Schedule VI-correctly lists the company's intellectual property rights. In Schedule VI, however, Bogan does not represent that the patent has been obtained or is valid, but rather that:

Serial 455,662 filed 1/5/83 in Patent Office; petition to make special filed 5/6/83: In two rounds of argument the Patent Office has refused to grant any patent; however, based on the Patent Office's arguments and on our test data and arguments in reply April 30, we are optimistic. The third Patent-Office action is expected around mid-July. (Def. Mem. at 9)

Therefore, regardless of whether or not the patent, which eventually was issued in 1986, was invalid as a result of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

the on-sale bar, there is no evidence to support a breach of warranty claim.    Keene cannot assert an action for fraudulent inducement based on Bogan's representations that the patent was valid, because any extrinsic evidence that Bogan made such representations would run afoul of the parol evidence rule, as discussed extensively above.

Keene claims also that Bogan knew before he signed the APA that competitors were infringing or using the technology that was the subject of the patent.    In Section 5(j)(iii) of the APA, Bogan warranted that he had "no knowledge of any infringement or improper use by any third party of the Intellectual Property, including without limitation the Proprietary Rights and Processes, during the five (5) years prior to the closing date."

**\*9** Meeks, in his deposition, testified that Bogan had contacted attorneys about a competitor's possible infringement of the patent, and acknowledged that "yes, I think that Chromerics had done it, because I think at that time we had sent them a letter or something that they were infringing on our patent." (Pl.Exh.H, Tr. at 25, 29) Furthermore, there is also evidence, in the depositions of Chester Pizac (Pl.Exh. F, Tr. at 416) and Gary Sites (Pl.Exh. C, Tr. at 211), that the competitor, Chromerics, was placing advertisements in which it "contended" that it was using a process similar to the patented technology at issue.    Finally, a draft letter dated April 14, 1983 written by SRS's attorney to the Chairman of Chromerics seems to reflect a knowledge on the part of officials at SRS that Chromerics might be infringing SRS's pending patent.[FN6] Pl.Exh. I)

Bogan argues that this evidence shows neither that Chromerics actually was infringing the pending patent, nor that Bogan knew about such potential infringement.    Bogan claims that there is no evidence he knew of infringements of the patent before the acquisition, and that in fact, when he told Keene later about infringements, Keene refused to defend the patent.    He claims that drafts of letters to competitors warning them to stop infringing do not demonstrate infringement because there is no evidence the letters actually were sent.

Although this evidence does not conclusively show actual infringement or Bogan's knowledge, it does raise an issue about Bogan's possible misrepresentation such that a reasonable jury could find breach of warranty and fraud. Therefore, with respect to this claim, Bogan's motion for summary judgment is denied.

*2) The Equipment*

In Section 5 of the APA, Bogan warrants that certain equipment has been well maintained and is in good operating condition, and that he knows of no machinery needing repairs that would cost more than $1,500.    A schedule of all equipment with book value exceeding $2,500 is attached to the APA.    Keene asserts that less than 5 months after the acquisition, SRS had to refurbish machinery that was unsuitable for use, lower a ground press, and make additional expenditures, and claims that Bogan breached the warranty.    Bogan has presented affidavits from two former SRS employees familiar with the condition of the equipment at the time of the acquisition, who aver that the equipment was well maintained, and seeks summary judgment dismissing Keene's claim.    (Def.Exh. E (Ramsey Aff.) ¶ 6; Def.Exh. F (Pixley Aff.) ¶ 4)

Keene relies on two documents and a snippet of testimony from yet another employee to create an issue of fact to defeat summary judgment.    One of the documents is a memorandum dated May 29, 1984 that outlines a proposed revamping of the organizational structure in the machine shop due to alleged ineffectiveness of the prior structure. (Pl.Exh. VV)    The exhibit, even charitably read, does not show that equipment was poorly maintained simply because the structure of the organization performing maintenance was considered ineffective.    The second document is a Project Authorization Request dated January 2, 1985 seeking funds to upgrade certain equipment. (Pl.Exh. N)    Yet even the most damning portion of this document from Bogan's standpoint shows only that one reason for the requested refurbishment was that the machines in question "are no longer able to hold the close tolerances necessary to produce SRS tooling."    There is not a word in this document to show that such inability resulted from poor maintenance, as opposed to normal wear and tear, or that the machines were not in good operating condition at the time of the acquisition.    Indeed, the remainder of the document makes clear that "limited memory capacity" and "frequent down-times, due to the unreliability of a constant electrical current flow provided by the local public utility" were the major reasons for the proposed upgrading, and that the machines in question were simply obsolete.    Finally, Keene cites the testimony of one Kenneth Rily (Simon Aff.Exh. A, pp. 48-49) to the effect that the SRS equipment was "very outdated ... the technology was very old...."    Such testimony, however, does not prove that this outdated equipment was poorly maintained, or not in operating condition.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 8
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*10 Keene argues that it has not had a chance to cross-examine the affiants proffered by Bogan, and that there is at least a material issue as to whether Bogan has breached the warranty in the APA relating to the condition of the equipment such that Bogan's summary judgment motion as to this claim by Keene must be denied.   However, in order to defeat a summary judgment motion supported by apparently sufficient affidavits, Keene must offer more than the hope that it can shake Bogan's affiants on cross-examination.   It must offer evidence that would justify a jury finding that Bogan had breached the warranty as to the condition of the equipment. _Matsushita Elec. Ind. Co.,_ _475 U.S. at 586-87._   Yet Keene's evidence is devoid of probative force, and could not justify a jury verdict in its favor.   Accordingly, Bogan's motion to dismiss this breach of warranty claim will be granted.

VI.

Bogan asserts counterclaims based on Keene's alleged misconduct after purchasing SRS and supposed misrepresentations during the contract negotiations.   Bogan asserts that Keene made-and later breached-separate oral agreements regarding his employment and resource allocation, fraudulently induced him to accept the APA, and breached the APA itself by not acting in good faith.

A. *Alleged Separate Agreements*

Bogan bases his first counterclaim on Keene's alleged breach of agreements between the parties that are both separate from the APA and not evidenced by any writings.   Bogan claims that he entered into "separate agreements" with Keene that:

"he would be assigned the earn-out payments and would be employed by Keene as President of SRS Industries Division for the five year earn-out period at substantial salary, benefits and raises;  as President, he wold have full authority and control of SRS Industries Division for the five year earn-out period and would have sufficient resources and support from Keene to maximize the before tax earnings;  the earn-out payments would be computed by applying the specified percentage to annual, before tax earnings of the SRS Industries Division, as adjusted;  Keene would maintain the separate identity of SRS, its assets, liabilities, operations, personnel, events, transactions, sales, expenses and earnings according to generally accepted accounting principles traditionally used in maintaining and accounting for a separate business entity;  and that based thereon the earn-out payments to Bogan were anticipated and projected to exceed Three Million Dollars on the law side, and Five Million Dollars on the high side." (Answer ¶ 56)

He claims that he relied on these agreements when he accepted certain non-favorable conditions of the sale, and that he complied with all conditions until Keene violated its agreements with him.   He contends that Keene planned these violations from the very beginning and thus fraudulently induced him to accept the APA.   Keene's alleged misconduct includes:

a) plotting to transfer SRS's "sole source" defense business to other divisions of Keene to absorb their costs and expenses;

*11 b) removing Bogan's authority and then his title;

c) running SRS into the ground by improperly allocating expenses, reducing sales, restricting productivity and transferring operations to other Keene divisions.

Bogan sues for breach of the alleged oral contracts, fraudulent inducement to enter into the APA, and a number of alleged wrongs unknown to the law, including loss of reputation, "tortious, willful and malicious injury to Bogan's rights, interests, benefits and person under the law and under the agreements," (Answer at ¶ 65), and "personal injuries, including pain, distress and humiliation." [FN7] (Answer ¶ 68).   Both Bogan and Keene have moved for summary judgment on this counterclaim.

The separate agreements that Bogan alleges he and Keene entered-namely, that he would be employed as president

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of SRS with full authority for five years and that Keene would maintain SRS's separate identity and provide SRS with sufficient resources to ensure maximum short term profitability-do not appear anywhere in the APA. In fact, the APA contains a lengthy merger and integration clause providing, *inter alia,* that "[n]either party hereto shall be bound by or charged with any verbal or written agreement, representation, warranty, statement, promise, information, arrangement or understanding not specifically set forth in this Agreement or Schedules and instruments delivered on the Closing Date pursuant to this Agreement, other than any written agreement delivered on or after the Closing Date between Buyer and Bogan and Meeks." APA § 20 (Pl.Exh. A)

Bogan presents no evidence establishing a genuine issue of fact as to the existence of separate agreements between Keene and himself.[FN8] He not only cannot show such agreements in writing, but he also cannot show anything at all in writing that confirms or refers to these agreements. A worksheet on which a Keene representative figured out the possible earn-out payments that Bogan would receive under the plan reflects mere speculation, and does not evidence a guarantee that Bogan would receive these payments. Bogan's assertion of these separate agreements based solely on his testimony that oral agreements were made thus violates the parol evidence rule as well as the statute of frauds.

Both the APA's integration clause and its lack of ambiguity preclude evidence of any extrinsic agreements that one reasonably would expect to be included in the APA. *See Fogelson v. Rackfay Constr. Co.,* 300 N.Y. 334, 90 N.E.2d 881 (1950); *Barclay's Bank v. Goldman,* 517 F.Supp. 403, 412 (S.D.N.Y.1981). When a contract contains an integration clause, extrinsic evidence may not be admitted to prove different or additional terms in the contract, although such evidence may be admitted to interpret ambiguous terms of an integrated contract. *Proteus Books Ltd. v. Cherry Lane Music,* 873 F.2d 502, 509-10 (2d Cir.1989). *See* 4 S. Williston, *A Treatise on the Law of Contracts,* § 631 (3d ed. 1957 & Supp.1988). The alleged agreements that Keene would provide sufficient resources, maintain SRS's identity and guarantee earn-out payments are so related to provisions of the APA [FN9] that a reasonable person would expect them to be embodied in that agreement.

**\*12** Bogan argues that these alleged agreements concerned a "subject matter" different from that of the APA, and therefore neither the APA's merger clause nor the parol evidence rule would exclude testimony about these agreements. Yet, the only agreement that conceivably concerns a different subject matter, or that one would not expect to have been integrated into the APA, is the alleged employment agreement. Even if the employment agreement were admissible into evidence as a separate agreement, however, the statute of frauds would prevent its enforcement. Therefore, Bogan has presented no material issue of fact regarding separate agreements sufficient to prevent summary judgment in Keene's favor.

The alleged oral agreement that Bogan would be employed for five years violates the New York statute of frauds because it could not be performed within one year. New York's statute of frauds provides, in pertinent part, that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: (1) By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime." N.Y.Gen.Oblig.Law § 5-701(a)(1).

Therefore, absent a writing, Bogan cannot assert a claim based on the alleged five-year contract. *See Boening v. Kirsch Beverages,* 63 N.Y.2d 449, 483 N.Y.S.2d 164 (1984); *Cunnison v. Richardson Greenshields Securities, Inc.,* 107 A.D.2d 50, 52, 485 N.Y.S.2d 272 (1st Dep't 1985); *City of Yonkers v. Otis Elevator,* 649 F.Supp. 716 (S.D.N.Y.1986), *aff'd,* 844 F.2d 42 (1988). Without an employment contract, Bogan was an at-will employee under New York law, and could be fired at any time. *Murphy v. American Home Products,* 58 N.Y.2d 293, 300, 561 N.Y.S.2d 232 (1983); *Gould v. Community Health Plan, Inc.,* 99 A.D.2d 479, 470 N.Y.S.2d 415, 417 (2d Dep't 1984). Therefore, he cannot maintain an action against Keene for firing him without cause. [FN10] If the alleged oral agreement had provided that Keene could fire Bogan for cause at any time, then arguably it could have been completed or performed within one year and thus would not be barred by the statute of frauds. *See Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 107 (2d Cir.1985). Here, none of the alleged oral agreements contain such an exception; indeed, Bogan asserts in his counterclaim that the alleged oral agreement included that "he would be assigned the earn-out payments and would be employed by Keene as President of SRS Industries Division for the five year earn out period at substantial salary, benefits and raises; as President, he would have full authority and control of SRS Industries Division for the five year earn-out period...." (Answer ¶ 56)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

B. *Fraudulent Inducement*

Bogan claims also that he was fraudulently induced into signing the APA by Keene's promise to employ him to run SRS at maximum productivity for the five-year earn-out period and by Keene's other representations in the alleged oral agreements.   Bogan asserts that he may rely on these alleged extraneous oral promises to establish Keene's fraud, because the parol evidence rule does not bar proof that a contract was induced by fraud.   Bogan is correct to the extent that he may use evidence of these alleged oral promises to prove fraud and thus rescind the entire APA, but in that case he could not assert breach of contract.   *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714.   Proof of fraud in the inducement may be used to nullify an entire contract, but not to disavow only one part of it.   *Meinrath v. Singer Co.,* 482 F.Supp. 457 (S.D.N.Y.1979), *aff'd mem.,* 697 F.2d 293 (2d Cir.1982).

*\*13* Even allowing the introduction of parol evidence, however, would not save Bogan's fraudulent inducement claim.   Bogan has failed to present a genuine issue of material fact regarding alleged fraudulent inducement, as he presents no evidence that Keene intended to renege on its alleged promises.

Under New York law, "one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability *in tort* whether the agreement is enforceable or not."   *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259 (1958) (emphasis in original).   Absent a showing that plaintiff had no intention of performing the promise, however, defendant is asserting merely that plaintiff failed to perform, which is an assertion of breach of contract and not fraud.   *Marcella,* 778 F.2d at 119;   *Rudman,* 30 N.Y.2d 1, 330 N.Y.S.2d 33.   "Although New York recognizes a cause of action for fraud or deceit in inducing a contract, this cause of action cannot be based solely upon a mere failure to perform promises of future acts.   A failure so to perform is merely a breach of contract, which must be enforced by an action on that contract."   *Wegman v. Dairylea,* 50 A.D.2d 108, 376 N.Y.S.2d 728, 734 (Fourth Dep't 1975).

Intent, in fact, is but one of the elements Bogan must prove in order to prevail on a claim of fraudulent inducement.   The essential elements of a fraudulent inducement claim are:  (1) the party made a representation as to a material fact, (2) which was false, (3) and known to be false by the party, (4) and that the representation was made for the purpose of inducing the other party to rely upon it, (5) and that the other party justifiably did rely on it, (6) to his or her detriment.   *Channel Master Corp.,* 4 N.Y.2d at 406-407.   As discussed above, *supra* p. 15, each essential element must be proved by clear and convincing evidence, *Rudman,* 30 N.Y.2d at 10, a high standard by which the evidence adduced to oppose a defendant's summary judgment motion also must be judged.   *See Anderson,* 477 U.S. at 254.

Bogan, the plaintiff on the counterclaim, has failed to show enough evidence of fraudulent intent or justifiable reliance-two essential elements of fraudulent inducement-to defeat a summary judgment motion and bring the claim before a jury.   Bogan argues that one may infer Keene's fraudulent intent from the immediacy with which the new Keene management isolated Bogan from his job.   As discussed above, however, evidence of mere failure to perform an agreement may sustain a breach of contract claim but not a fraud claim.

Bogan fails also to present sufficient evidence that his reliance on Keene's alleged representations was "justifiable," in view of the explicit merger clause in the contract stating that "[t]he parties ... have not in any way relied, and will not in any way rely, upon verbal or written agreements, representations, warranties, statements, promises, information, arrangements or understandings, express or implied, which are not specifically set forth in this Agreement or in such Schedules or instruments."   APA § 20.   As Judge Weinfeld wrote in *Meinrath,* "If allegations of alleged fraudulent conduct are accepted as the basis of his claim ... they stand the contracts entered into after extended negotiations over a six-month period on their head and reduce them to a mere scrap of paper."   482 F.Supp. at 459-460.   Because Bogan has not brought to the court's attention any evidence that would permit a properly instructed jury to find that Keene fraudulently induced him to enter into the APA, Keene's motion for summary judgment on Bogan's fraud claim is granted.

*\*14* C. *Good Faith Covenant Implied in the APA*

Bogan asserts that Keene's misconduct in running SRS breached an implied covenant of good faith.   Because Bogan

Not Reported in F.Supp.                                                                                    Page 11
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

fails to adduce evidence from which a rational trier of fact could infer a breach of this implied covenant, Keene's motion for summary judgment dismissing this claim is granted.

Under New York law, an implied covenant of good faith and fair dealing attaches to the performance of a contract, preventing the destruction of the other party's right "to receive the fruits of the contract." *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163 (1933).   *See Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 68, 412 N.Y.S.2d 827 (1978); *Cross & Cross Properties v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir.1989).   Such a covenant is violated when a party promises commissions or profits and then does not act in good faith to permit such commissions or profits to be earned, thereby depriving the other party of the "benefit of the bargain." *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773 (S.D.N.Y.1969); *Greenwich Village Assoc. v. Salle,* 110 A.D.2d 111, 115, 493 N.Y.S.2d 461 (First Dep't 1985); *Pernet v. Peabody Engineering Corp.,* 20 A.D.2d 781, 248 N.Y.S.2d 132 (First Dep't 1964).

The implied covenant of good faith, however, does not give parties rights that are inconsistent with the express terms of the contract.   "The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other ... The mere exercise of one's contractual rights, without more, cannot constitute such a breach." *Broad v. Rockwell Int'l,* 642 F.2d 929, 957 (5th Cir.1981) (applying New York law) (citations omitted), *cert. denied,* 454 U.S. 965 (1981).   Courts generally have been reluctant to find a breach of an implied covenant of good faith when doing so reads so much into the contract as to create a new term or when the alleged misconduct is expressly allowed by the contract.   Therefore, when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, the express terms of the contract override the implied covenant, and "grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing." *VTR,* 303 F.Supp. at 777.   Even if an implied covenant does not directly contradict terms of the contract, it cannot be used to add wholly new terms to the contract. *Metropolitan Life v. RJR Nabisco,* 716 F.Supp. 1504, 1519 (S.D.N.Y.1989).

Bogan claims that Keene violated the good faith covenant when it willfully destroyed the value of his earn-out payments by reducing his authority and otherwise ruining the company.   He claims there is much undisputed evidence of this willful ruination, and cites testimony from employees that Keene created a "massive accounting department" and implemented misguided pricing programs.   Bogan also cites Keene's knowing shipment of defective parts and irregular shipment schedules after the buy-out.   Bogan asserts that this mismanagement reveals Keene's "reckless disregard" of his rights under the earn-out agreement, which is enough to trigger an inference of Keene's bad faith.

**\*15** Keene argues that all the evidence which Bogan claims betrays Keene's bad faith reveals instead its attempt to turn SRS around.   Keene argues also that by asserting breach of the implied covenant of good faith, Bogan is attempting to add an express term to the contract in contravention of the reasoning of *Metropolitan Life,* and that if the parties had agreed to and bargained for a guaranteed earn-out, such a term would have been specified in an express provision in the APA.

Bogan's claim does not necessarily transform an implied covenant into an express contractual provision; rather, it is a valid application of New York law, which implies a covenant of good faith when one party maintains control over the benefits that the other party is supposed to receive under the contract.   However, Bogan fails to establish a genuine issue of fact regarding this claim, as there is no evidence upon which a rational trier of fact may base an inference of bad faith.

Bogan's argument that he need not demonstrate Keene's intent to harm his interest in the earn-out payments so long as he can show its reckless disregard for his interests paints only half the picture.   Conduct which reaches the level of reckless disregard may be sufficient to evidence a breach of the implied covenant of good faith, but only if it is severe enough to warrant an inference that the party acted in bad faith, or intended to do harm.   In *Pernet,* the Appellate Division, First Department explained that "if the bankruptcy or other termination ... was brought about by defendant with intent to deprive plaintiff of its rights under the agreements to which defendant was a party;  or, if the same was brought about by conduct of the defendant in such reckless or neglectful disregard of plaintiff's contract rights *as to justify an inference of bad faith;* then, the defendant would be liable to plaintiff for breach of contract. Generally, in every case, the question would be one of fact." *Pernet,* 20 A.D.2d at 782 (emphasis added).   Thus, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 12
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

order to survive Keene's cross-motion for summary judgment dismissing Bogan's claim of breach of the implied covenant of good faith, Bogan must present evidence of such reckless disregard that a rational trier of fact would be able to infer that Keene acted in bad faith. Bogan fails to present such evidence, and thus does not establish a genuine issue regarding breach of the implied covenant. Therefore, not only must I deny Bogan's claim for summary judgment on this issue, but also I must grant Keene's cross-motion for summary judgment.

None of the evidence that Bogan presents about Keene's alleged mismanagement raises the implication that Keene intended to lose money, or even acted in reckless disregard of obtaining profits. In fact, all of Bogan's claims-that Keene brought in many accountants, maintained poor quality control, changed the company's pricing policies, and did not adhere to contract delivery schedules-plausibly reveal only that Keene was trying to make SRS profitable by expanding and speeding up shipments. Bogan argues that Keene's introduction of these new policies over the objections of Bogan and other pre-buy-out SRS employees indicates Keene's reckless disregard or bad faith. Yet, without a showing that Keene adopted these policies with the purpose of or with reckless disregard for losing money, the mere failure to adopt the opinions of veteran employees does not prompt a rational inference that Keene intended to deprive Bogan of the fruits of the contract.

**\*16** In fact, Bogan fails to show any economic incentive for Keene to lose money; he has presented no evidence that Keene officials intended to shift SRS's business to other Keene divisions nor that they planned to make up for lost profits after they ousted Bogan from the company. A rational factfinder could conclude, from the evidence presented, only that Keene intended to make money, a conclusion fully supported by Bogan's own statements. At his own deposition, Bogan explained that the number of defective parts shipped out increased because the "personnel at SRS were driven by forecasts to produce so many dollars per month, so many dollars per quarter, there was literally hell to pay, by the chairman of the board, and there were careers made and broke, if those dollars and those profits were not achieved." (Bogan Dep. at 121, Pl.Exh. A) That Keene's policies were misguided or ignorant or even merely negligent does not show a breach of the implied covenant of good faith. In order for a jury to return a verdict for Bogan on this claim, it would have to find that Keene acted contrary to its apparent self-interest such that it would lose more by its alleged misconduct than it saved in payments to Bogan. There is no evidence to support this bizarre scenario. Therefore, Bogan's motion for summary judgment on his claim of breach of the implied covenant is denied, and Keene's motion for summary judgment dismissing that claim is granted.


Because defendant has failed to establish genuine issues of material fact regarding his obligations under the promissory note, plaintiff's motion for summary judgment to collect sums due under the note is granted. Plaintiff's motion for summary judgment dismissing Bogan's counterclaims-namely, that plaintiff breached separate agreements, fraudulently induced him to enter into the APA and breached the good faith covenant-also is granted.

Because plaintiff has failed to establish genuine issues of material fact with regard to all but one of its claims of fraud and breach of warranty against Bogan, Bogan's motion for summary judgment is granted dismissing Keene's claims that he misrepresented the condition of equipment, that SRS sold patented products more than one year prior to the date of the patent application, and that a critical step in the patented process was left out of the patent application. Bogan's motion for summary judgment is denied insofar as it seeks dismissal of plaintiff's claim that Bogan was aware before signing the APA that competitors were using the technology that was the subject of the patent. That claim will proceed to trial, along with Keene's fourth and fifth claims for relief, which were not mentioned or argued in either party's papers.

Keene, in its fourth claim, alleges that Bogan deliberately breached his fiduciary duties. (Compl. ¶¶ 41-43) In its fifth claim, which also was not attacked, Keene alleges that "an actual and justiciable controversy exists between Keene and Bogan with respect to the lawfulness of Keene's termination of Bogan" (Compl. ¶¶ 44-45), and requests that this court declare that Bogan was lawfully terminated. The grant of summary judgment dismissing Bogan's claim that Keene breached the APA when it fired him affects Keene's fifth claim; insofar as that ruling determined that New York law applies to all claims in this case and that Bogan is an at-will employee under New York law, it will be given res judicata effect. However, as other issues with regard to Bogan's termination have not been argued or addressed, Keene's fifth claim will proceed to trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 13
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*17** As set forth above, plaintiff's motion for summary judgment is granted in its entirety and defendant's motion for summary judgment is granted in part and denied in part.

> FN1. To be sure, such an interpretation is open to the criticism that because the second clause merely reflects the applicable New York conflicts of law rule, the same result would follow even without that clause, and therefore the clause adds nothing. True, but as between an interpretation proffered by Bogan that would nullify the parties' direct expression as to the law they chose, and one that merely renders a clause superfluous but contradicts nothing, the choice seems obvious.

> FN2. Cal.Civ.Code § 1624(a) states: "The following contracts are invalid unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: (a) An agreement that by its terms is not to be performed within a year from the making thereof."

> FN3. The earn-out, again, was a provision in the APA which created a form of profit sharing for Bogan, a feature that Bogan apparently chose along with less money up front than his co-owner, Meeks, had received.

> FN4. Because of this term allowing for modification by a writing signed by both parties, the accompanying letter is admissible to shed light on the note. The letter does not run afoul of the parol evidence rule because the note, by its terms, was not an integrated agreement and the letter added additional, but not contradictory, terms. See J. Calamari & J. Perillo, *Contracts* § 3-4 at 145-49 (3d Ed.1987).

> FN5. Section 102(b) of Title 32 states, in pertinent part: "A person shall be entitled to a patent unless ... (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." In order to establish patent invalidity, a party must prove facts supporting invalidity by clear and convincing evidence, *Jamesbury Corp. v. Litton Indus. Products, Inc.,* 756 F.2d 1556, 1559 (Fed.Cir.1985), *cert. denied,* 109 S.Ct. 80 (1988), because under 35 U.S.C. § 282, there is a presumption that patents are valid. *See Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984), *cert. denied,* 469 U.S. 857 (1984).

> FN6. The letter asserts that SRS has applied for a patent on this technology, and asserts that it "has come to our attention that some of your employees or agents have offered certain of our present or prospective customers like services and products."

> FN7. Under New York law, emotional and mental distress is generally not compensable in a breach of contract action. *Marcella v. ARP,* 778 F.2d 112, 119 (2d Cir.1985), *citing Joyce v. Greeley Square Hotel Co.,* 228 N.Y. 106, 111 (1920). Furthermore, damages for loss of reputation generally are not recoverable in breach of contract actions under New York law. *See MacArthur Construction Corp. v. Coleman,* 91 A.D.2d 906, 457 N.Y.S.2d 530, 531 (First Dep't 1983); *Karetsos v. Cheung,* 670 F.Supp. 111, 115 (S.D.N.Y.1987). As discussed below, Bogan's fraudulent inducement claim is really just a breach of contract claim in disguise; therefore, Bogan has presented no cognizable claim that he is entitled to damages for emotional distress or loss of reputation.

> FN8. Whether or not any of these agreements were implied in the terms of the APA will be discussed below.

> FN9. The APA provisions in which these additional agreements would have been embodied if made a part of the agreement are Section 3, which concerns Bogan's Earn-out payments, and Section 6, which sets forth "representations, warranties and covenants of buyer."

> FN10. As discussed above, the result would be the same under California law. Bogan argues that under California law, employees may be fired only for "good cause." Therefore, since Bogan could have been fired for good cause within one year, the alleged contract could have been fully performed within one year, and does not violate the statute of frauds. This argument finds some support in California law. *Foley v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Interactive Data Corp.,* 47 Cal.2d 654, 665-71 (1988); *White Lighting Co. v. Wolfson,* 68 Cal.2d 336, 342 (1968). Those cases, however, still allow the statute of frauds to bar enforcement of contracts "of which it can truly be said *at the very moment it is made,* 'This agreement is not to be performed within one year.' " *White Lighting,* 68 Cal.2d at 340 n. 2 (emphasis in original). Bogan claims again and again that his employment was to last for the complete five year earn-out period. By his own description of the alleged agreement-which was neither implied nor for an indefinite period of time-the contract was not to be performed within one year. Therefore, even the California statute of frauds applies to bar its enforceability.

S.D.N.Y.,1990.
Keene Corp. v. Bogan
Not Reported in F.Supp., 1990 WL 1864 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# ATTACHMENT E



# MEMO

<u>Confidential</u>

TO:       Chris Mixson

FROM:    Bob Fireman

SUBJ:

DATE:     October 17, 2000

I am writing this memo to provide you an overview of the situation Ann and I are now facing with News America. The first period of our earnout was completed this October first. We ask that you investigate what NAM is prepared to do so that we might protect our rights.

With the time to market being critical in light of aggressive competitive actions by Catalina and Valassis, Ann and I agreed to sell Consumer Card Marketing Inc. (CCMI) to NAM. We made it a complete sale rather than other forms of loan, investment, or alliance because we wanted the full commitment of the NAM organization and believed CCMI becoming NAM would be the most powerful message to the marketplace.

Ann and I were going to run the business. NAM would provide capital to expand all our resources: new hires, technology, Sales, Marketing.

The price requested was $8MM cash and a five year earnout based upon the results we could drive. David DeVoe Jr. negotiated the final deal to about $3 million cash and the earnout and replaced the other $5MM cash with earnout bonuses of $2.5 MM in each of the first two years. A three month ramp up period to get the resources together was built in so that the sale in August had the first earnout period ending October 1, 2000 and then annually. Based upon the agreed financial plan this was a $15mm+ deal.

The earnout included 16.8%, 14.5%, 13.75%, 13.3% and 12.9% of the defined gross margin of the Company in each of the following five (5) years beginning October 2000.

The issues:

- NAM never provided the resources it promised that were necessary to grow the business.

- NAM never empowered us to run the business.



FR0041

- NAM divided and assimilated CCMI's technology, personnel, resources, and know how.

- NAM seldom included our input into any key decision relative to the business.

- We have had no involvement in the approval of budgets or projections and, to this date, have never seen financials sufficient to calculate our earnout.

- NAM removed all control and ability for us to drive the business and make the agreed upon Plan or earnout.

- We had to fight to keep our presence at our Industry Trade Shows. All our advertising and public relations was stopped.

- NAM created its own Financial Plan for revenue and resources. This Plan will not allow us to make our bonuses or projected earnout.

- Any action by us to object was considered action against the Company and we were isolated and even reported to the Chairman for reprimanding.

- The Company as defined in our agreement is now the SmartSource iGroup ; our name was changed; our new products never built; our technology removed; key personnel of CCMI have been relocated and terminated. Our ideas were placed on hold.

As a result of NAM's action, News America Marketing and us are a year behind in the development of the required staff, technology and resources to grow this business into a $100M+ business. Our ability to make our earnout to complete the sale has been denied us. Our competitors such as Catalina, Valassis and others have made significant investments and acquisitions in this timeframe and have made a full effort to expand into areas of Loyalty Marketing, CRM technology, database marketing, Internet and In-Store delivery systems. Therefore, our competitors are more formidable than they would have otherwise been..

When we spoke the other day you asked me to lay out the issues. I hope that this memo gives you sufficient background and insight to bring this to a speedy resolution. If there is any other information that you need please ask,

Bob

FR0042