UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>Plaintiffs,<br><br>v.<br><br>NEWS AMERICA MARKETING IN-STORE, INC.,<br><br>Defendant. | Civil Action No. 05-11740-MLW<br>Leave to File Granted June 20, 2007 |

**DEFENDANT'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DISCOVERY RESPONSES FROM DEFENDANT**

**Introduction**

Having utterly failed in their moving brief to establish the necessary "good cause" to require a $13 million-plus restoration and search of Defendant News America Marketing In-Store, Inc.'s ("NAM's") "backup tapes," Plaintiffs, in their reply brief, swing and miss for a second time.

This second attempt also fails to clear the "good cause" bar by a wide margin, as Plaintiffs ignore virtually all of the enumerated "good cause" factors listed in Fed. R. Civ. P. 26(B)(2)(C). These factors are to be used in analyzing whether inaccessible ESI should be made available in discovery. Among the factors *not* discussed by Plaintiffs are: whether the request is unreasonably duplicative, whether the burden of production outweighs the benefit, what are the "needs of the case," what is the relationship of the cost of the requested discovery to the "amount in controversy," and what is "the importance of the proposed discovery in resolving the issues of the litigation."

# 4624172_v2

Knowing that they cannot satisfy these mandatory criteria, Plaintiffs implore this Court to order their requested exorbitant ESI search simply because discovery has now concluded (pending the completion of three depositions) and Plaintiffs are bereft of any evidence of malicious intent on the part of NAM -- which is what they *believe* they need to support their misplaced theory of the case. Cutting through the rhetoric, Plaintiffs seek a Court-ordered ESI fishing expedition in the hopes that they will find a NAM internal email in which one NAM executive covertly plots with another as to how to take advantage of Plaintiffs.

Plaintiffs have no actual basis to believe any such email exists; they simply hope that it does, and that a misguided $13 million ESI search could turn it up. Clearly, this is not a proper use of the electronic discovery rules.

As discussed herein, and in NAM's initial opposition brief, Plaintiffs' motion should be swiftly denied because there is no "good cause" justifying the undisputed[1] $13 million expense which granting the Plaintiffs' motion would require. This conclusion follows because, among other reasons (1) an expense of $13 million cannot be justified in the absence, as is the case here, of any showing of *recoverable damages*, together with the absence of any showing of *significant deficits* in existing document production; and (2) liability against NAM is plainly barred as a matter of New York law.

Each of these topics is discussed below, along with comment on how the Plaintiffs have incorrectly described the technological task they wish to impose on NAM.

---

[1] The Plaintiffs do not dispute the views or cost estimates of Richard Davis, NAM's forensic expert.

## Argument

A.  **An Undisputed Expense of $13 Million for an Indefinite "Fishing Expedition" Cannot Be Justified in the Face of No Showing of Recoverable Damages.**

Plaintiffs do not dispute many important points raised in NAM's opposition papers. First, Plaintiffs do not dispute that backup tapes are intended only for "disaster recovery." Second, Plaintiffs do not dispute that, as a matter of procedural law, "backup tapes" are to be classified as "inaccessible" ESI under Rule 26(b)(2)(B) and (C). Third, Plaintiffs acknowledge that, because they are inaccessible ESI, "backup tapes" are subject to discovery only upon a showing of "good cause." Fourth, Plaintiffs, since they offer no evidence on the subject, do not dispute that the cost of the backup tape restoration and search they propose would exceed $13 million. Most telling, Plaintiffs continue to pursue this motion -- even though they cannot proffer one shred of evidence as to any actual damages they might recover.[2]

No less telling, Plaintiffs do not convey the enormity of the discovery that they are asking the Court to order. The burden of this effort most certainly outweighs the benefit of the indefinite ESI search requested here. The backup tapes at issue number in the multi-thousands; they contain emails and other electronic documents from many different computer systems of the entire company over a multi-year period. Documents generated by thousands of employees are involved. Plaintiffs wrongly suggest in their reply that "NAM [can] conduct a targeted search for responsive documents just as it did when it searched for them on its live servers." Reply Br., at p. 7.

---

[2] Plaintiffs "believe" that they were entitled to receive everything they projected they might have received under the Stock Purchase Agreement earn out clause if their rosy projections had materialized. This is not competent evidence; rather it is mere speculation and conjecture. Moreover, Plaintiffs misrepresent to the Court that NAM held the view that the cost to acquire CCMI was $9 million, based on projections of potential performance. Pl. Reply Br. at 9 and Roumeliotis Decl., Exh. B. As Plaintiffs know, and as the cited NAM memo shows, the purchase price for the stock at CCMI was in the area of $3 million, with additional sums totaling as much as $6 million payable *if*, and *only* if, CCMI revenue projections were met.

Notably, Plaintiffs do not even attempt to explain how such a "targeted search" could be conducted. Defendant certainly has no idea how it could be done. Nor, of course, does the concept of a targeted search have any basis in reality when dealing with backup tapes. Rather, to search the backup tapes involves a complex restoration and search process, described in Richard Davis' Declaration, ¶18, et seq., and in our opening brief (at pp. 18-19).

Moreover, Plaintiffs ignore the voluminous paper and electronic records which NAM has already produced. Indeed, everything relevant has been produced: the emails relating to the negotiation of the Stock Purchase Agreement, thousands of documents relating to post-acquisition CCMI projects during 1999-2004, Plaintiffs' many complaint emails and letters and NAM's responses thereto, Plaintiffs' employment files and evaluations -- and the list could go on.[3]

Plaintiffs are candid that they are looking for "informal email evidencing intent."[4] Pl. Reply Br. at 5. But this is nothing more than a fishing expedition for no purpose. It is a trip across an e-discovery bridge to nowhere. First, there is no predicate showing that NAM executives ever engaged in "informal email evidencing intent" regarding Fireman and Raider. To be perfectly clear, this is not a case where Plaintiffs have uncovered some evidence that the documents they seek -- *i.e.* emails plotting their demise -- actually exist. To the contrary, this is a wild goose chase in its classic sense to be used as leverage to force an unwarranted settlement.

---

[3] Unrelated to the present motion, Plaintiffs also belatedly object to the fact that the multitude of emails produced by NAM were produced in paper form (with Bates numbers), rather than electronic form. This objection is both irrelevant to the present motion and without merit. Notably, nothing in Rule 34, at the time of production in September, 2006, or for that matter after the December 2006 e-discovery amendments, *required* documents to be produced in electronic form. Moreover, *both* Plaintiffs and NAM produced electronic documents in paper form *only*. Months after NAM's extensive paper production of electronic documents had already been made, Plaintiffs requested production in electronic form of the already produced documents. NAM objected in correspondence on December 12, 2006 (Defts. Exh. Binder, Exh. 9). Plaintiffs did not see fit to timely move to compel and only now, at beyond the eleventh hour, do they raise the issue again in their reply brief.

[4] NAM's only purpose was to maximize profit of the CCMI business. Profit maximization was in NAM's and Fireman and Raider's common interest. Thus, it defies logic that NAM would make decisions *knowingly* adverse to the CCMI business.

In fact, NAM's post-acquisition views of Plaintiffs and the CCMI business were expressed in direct and formal documents outlining business objectives, responding to Plaintiffs' complaints, and evaluating Plaintiffs' performance, all of which have been produced and/or were already in Plaintiffs' possession.

There was no secret agenda. It was all out front: as witnessed by the facts (1) that NAM made clear its decisions about CCMI, and (2) that Fireman and Raider complained about those decisions from the start. There is no purpose in the excessively costly journey Plaintiffs wish NAM to take -- other than the improper purpose of forcing NAM to settle rather than incurring the cost.

**B.      The Plaintiffs' Claims Are Barred as a Matter of Law.**

Plaintiffs' attempt to show "good cause" is doomed when the Court considers "the importance of the proposed discovery in resolving the issues ... at stake in the litigation." Rule 26(b)(2)(C). The proposed discovery has *no importance* to the issues in the litigation because Plaintiffs' claims are simply not viable. For this reason alone, the motion to compel should be denied.[5]

    **1.      Waiver of Claim.**

This case begins and ends with the "waiver of claim" to which Plaintiffs themselves expressly agreed in §6.8 of the Stock Purchase Agreement. That paragraph provides:

> 6.8    Conduct of the Business. It is Buyer's current intention to provide support to the business of the Company by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed

---

[5] Denial of the instant motion is consistent with the U.S. Supreme Court's recent decision regarding pleading requirements in *Bell Atlantic Corp. v. Twombly*, 2007 WL 1461066 (May 21, 2007). There, the Court emphasized the necessity of pleading "plausible" grounds of entitlement to relief and the importance of minimizing unnecessary discovery.

>  to expand the Company's business. <u>Notwithstanding the foregoing, Buyer shall be free to operate the Company and its Affiliates in its sole and unfettered judgment and Sellers shall have no claim against Buyer in connection therewith as a result of the preceding sentence</u>. Buyer hereby agrees that the direct sales expenses for the first and second Base Earn-Out Periods shall not exceed $1.0 million and $1.4 million, respectively, unless otherwise agreed by Buyer, on the one hand, and Fireman and Raider, on the other hand.

(emphasis added).

The Plaintiffs' attempt to overlook §6.8 through the guise of an alleged implicit obligation of good faith claim.[6] This construct is untenable. The governing law of the contract is that of New York, and the New York Court of Appeals has long held: "The covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 304-05 (1983). Here, *i.e.* in the parties' Stock Purchase Agreement, the Plaintiffs expressly *contracted away* their right to sue NAM based on how NAM managed the Plaintiffs' acquired business. There is no implicit obligation which can alter that express agreement.

The second clause of the second sentence of §6.8 contains an *express waiver* of claims by Fireman and Raider against NAM regarding any issue concerning NAM's "support to the business" following its acquisition. *See* Stock Purchase Agreement, §6.8 (second sentence) ("[NAM] shall be free to operate [CCMI] in its sole and unfettered judgment and [Fireman and Raider] shall have no claim against [NAM] in connection therewith . . . .").

By this lawsuit, Plaintiffs attempt to avoid the consequences of this explicit agreement not to sue NAM. This they cannot do. "If two parties sign a covenant not to sue each other, then

---

[6] It is notable that Plaintiffs did *not* attach the 1999 Stock Purchase Agreement, with the "waiver of claims" and "sole and unfettered discretion" language, to their Complaint.

a dispute arising out of the conduct covered by that agreement cannot provide the basis for a justiciable controversy, and the case must be dismissed." *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) (internal citations omitted). *See also Kamfar v. New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 50 (S.D.N.Y. 1998) (citations omitted) ("Covenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York."); *Colton v. New York Hosp.*, 414 N.Y.S. 2d 866, 873 (NY. Sup. Ct. 1979) (describing covenant not to sue as a prospective contract that is performed through the "obligor's future forbearance in asserting a claim which exists or may accrue against the obligee").

The covenant not to sue contained within the Stock Purchase Agreement explicitly protects NAM from liability for its management of CCMI. Whether labeled as a breach of the implied covenant of good faith or something else, Fireman and Raider cannot avoid the fatal fact that the claims they are pursuing in this lawsuit are squarely barred by the waiver of claim that was freely bargained for in the Stock Purchase Agreement.[7]

### 2. NAM's "Sole and Unfettered Discretion."

Plaintiffs are also barred by the "sole and unfettered discretion" language of the first clause of the second sentence of §6.8. Case law firmly so holds. *See*, e.g. *Reda v. Eastman Kodak Co.*, 649 N.Y.S. 2d 555, 558 (N.Y. App. Div. 4th Dep't 1996) (holding that defendants did not act in bad faith by using their decision to exercise rights under the contract and liquidate the

---

[7] Moreover, Plaintiffs knew at the outset that they were waiving all claims concerning NAM's operation of the CCMI business. There was a conference call during the negotiation of the 1999 Stock Purchase Agreement where David DeVoe, Jr., NAM's Chief Financial Officer, told the Plaintiffs and their business adviser, Les Charm, that NAM had to have the language in §6.8 because "we [NAM] were buying the business and we needed flexibility ... in how we were going to run the business." Second Declaration of Gordon P. Katz (Second Katz Decl.), Exh. A, p. 72. "Les objected [to § 6.8] fairly strongly ... and Les stat[ed] to Ann and Bob that he thought this was problematic ..." ... *Id*. Ultimately, however, "the term was accepted in the agreement." *Id*, at 75. Charm would describe the situation in an email as follows: "not a lot of protection to Ann and Bob." Second Katz Decl., Exh. B.

venture's assets, where the contract gave them "complete discretion to determine whether to continue funding a venture or to declare an end to its performance cycle"); *National Union Fire Ins. Co. v. Xerox Corp.*, 807 N.Y.S. 2d 344, 345 (N.Y. App. Div. 1st Dep't, 2006) ("the covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights"); *Harris Trust & Sav. Bank v. John Hancock Mut. Life*, 767 F. Supp. 1269, 1281 (S.D.N.Y. 1941) ("a covenant of good faith ... cannot expand contract rights beyond the terms of the contract nor can a party violate that covenant when exercising its rights under the contract").[8]

### 3.    **Plaintiffs Cite No Relevant Authority Supporting Their Claim.**

The two cases cited by Plaintiffs in their Reply brief do not aid their cause. The *T.R. McClure & Co.* case, appended to their reply, is inapposite because the contract there at issue contained no clause similar to §6.8 of the Stock Purchase Agreement. Even so, the *T.R. McClure* Court was clear that "the implied covenant of good faith and fair dealing cannot 'create an additional benefit for which [the plaintiff] did not bargain...'" 1999 WL 692683 at *6 (E.D.Pa. 1999) (*citing Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989)). That is exactly what the Plaintiffs attempt here.

The other case cited by Plaintiffs, *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S. 2d 575, 587 (N.Y. App. Div. 1st Dep't 2003), is also off point. For two reasons Plaintiffs'

---

[8] Even where a party does not have unfettered discretion or an express waiver, as in this case, New York courts have been unwilling to find a violation of the implied covenant where the parties acted according to the contract. *See Keene Corp. v. Bogan*, 1990 WL 1864 (S.D.N.Y. 1990). *Keene*, similar to here, involved an asset purchase agreement and the potential for "earn out" payments. The defendant alleged that the plaintiff's mismanagement of the company -- by "willfully destroy[ing] the value of his earn-out payments by reducing his authority and otherwise ruining the company" -- violated the implied duty of good faith. 1990 WL 1864 at *14. The court granted the plaintiff's motion for summary judgment on the defendant's breach of the implied covenant of good faith claim, reasoning that "when a contract expressly grants a party the right to take actions that otherwise might be considered in breach of the implied covenant of good faith, *the express terms of the contract override the implied covenant*, and 'grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.'" *Id.* (emphasis added) (citations omitted).

reliance on *Richbell* fails. First, the language Plaintiffs cite from *Richbell* is the Court's discussion of a breach of fiduciary duty claim -- which was the focus of that case. *Id.* at 587. Plaintiffs do not and could not make a fiduciary duty claim in this action. Moreover, the *Richbell* claim did not involve an express contractual *waiver of claims*, as here.[9]

### C. There Is No Good Cause for Sampling the Backup Tapes; Any So-Called Sample is Prohibitively Expensive.

As a fallback, Plaintiffs suggest in their reply that the Court should order a sampling of backup tapes. The proposed sample would consist of "tapes generated from 1999 through 2002" or of tapes from New York and Connecticut. Reply Br., at p. 2, n.1.

Notably, Plaintiffs seem to believe that sampling is an easy exercise. It is not. Sampling is a way to gauge (i) the actual costs of a restore; and (ii) the quality of the data that will be recovered. A sampling would show, for example, whether the keywords the requesting party has designated are sufficiently targeted and whether there is a large discrepancy between the documents already produced and the documents on the backups. Because the Plaintiffs do not even attempt to define their proposed "sampling," it is best characterized not as a sampling, but as a "full" search, limited to just a part of the time period at issue.

In any event, there is no "good cause" for such a sampling -- or any sampling -- for the reasons already articulated. Moreover, as a practical matter, the three-year sample proposed in the reply is of 60% of the entire universe of backup tapes and would, therefore, still cost almost

---

[9] It is also worth noting that the *Richbell* decision has been distinguished twice by the same court that issued the decision. *See Sterling fifth Assoc. v. Carpentille Corp., Inc.*, 779 N.Y.S. 485 (N.Y. App. Div. 1st Dep't 2004) ("This case, however, differs from *Richbell*, where there existed a 'secret agreement' and the court found that the defendant exercised a right malevolently for his own gain and to deprive plaintiffs of the benefit of a joint venture...Here, there was no 'secret agreement'" and the terms of the governing agreement allowed for the action at issue) (finding no breach of fiduciary duty); *O'Neill v. Warbug, Pincus & Co.*, 833 N.Y.S. 2d 461, 463 (N.Y. App. Div. 1st Dep't 2007) (In *Richbell*, "under a 'secret agreement,' the defendant exercised a right malevolently for his own gain and to deprive plaintiffs of the benefit of a joint venture. Here, by contrast, Warburg exercised its contractual right in exactly the manner contemplated by the parties.")

$8 million. A New York and Connecticut sample would be similarly extensive and similarly costly.

## Conclusion

In light of Plaintiffs' failure to show "good cause," the Plaintiffs' motion to compel should be denied. A contrary result -- in a case like this where the claim is plainly nullified by the express terms of the parties' agreement -- will improperly convert e-discovery into a weapon to *extort* unjustified settlements from companies, like NAM, which, for disaster recovery reasons, create backup tapes.

This Court should send a strong message that settlement extortion is *not* the intention of the e-discovery provisions of the Federal Rules of Civil Procedure.

    NEWS AMERICA MARKETING IN-STORE, INC.

    By its attorneys,

    /s/ Gordon P. Katz
    Gordon P. Katz (BBO# 261080)
    Ieuan G. Mahony (BBO# 552349)
    Benjamin M. McGovern (BBO# 661611)
    HOLLAND & KNIGHT LLP
    10 St. James Avenue
    Boston, MA 02116
    (617) 523-2700

Dated: June 22, 2007
       Boston, Massachusetts

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 22nd day of June, 2007.

/s/ Gordon P. Katz
Gordon P. Katz

# 4624172_v2

# 4624172_v2

11