UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE, INC.,

Defendant.

Civil Action No. 05-11740-MLW

## SECOND DECLARATION OF GORDON P. KATZ
## IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

I, Gordon P. Katz, on oath, depose and state as follows:

1.    My name is Gordon P. Katz. I am a partner at Holland & Knight LLP and counsel for defendant News America Marketing In-Store, Inc. ("NAM") in the above action. I make this declaration upon personal knowledge.

2.    Appended hereto as Exhibit A are true copies from the pages of the unedited deposition transcript of David DeVoe, taken on June 13, 2007 in New York City.

3.    Appended hereto as Exhibit B is a true copy of an email from Les Charm, Plaintiffs' representative during the negotiations of the 1999 Stock Purchase Agreement.

Signed under the penalties of perjury this 22nd day of June, 2007.

_____
Gordon P. Katz

# 4623483_v1

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 22nd day of June, 2007.

                                          /s/ Gordon P. Katz
                                          Gordon P. Katz

# 4623483_v1

# EXHIBIT A

Case 1:05-cv-11740-MLW   Document 37-2   Filed 06/22/2007   Page 1 of 8

061307 rough draft.TXT

                                                            1

                    UNCERTIFIED TRANSCRIPT

             DISCLAIMER IN THE MATTER OF

        ROBERT FIREMAN and ANN RAIDER,

                         v.

        NEWS AMERICA MARKETING IN-STORE, INC.,

 9             The following transcript of
    proceedings, or any portion thereof, in the
10  above-entitled matter, taken on June 13, 2007, is
    being delivered UNEDITED and UNCERTIFIED by the
11  official court reporter.

12
               The purchaser agrees not to disclose
13  this uncertified and unedited transcript in any form
    (written or electronic) to anyone who has no
14  connection to this case.  This is an unofficial
    transcript, which should NOT be relied upon for
15  purposes of verbatim citation of testimony.

16
               This transcript has not been checked,
17  proofread, or corrected.  It is a draft transcript,
    NOT a certified transcript.  As such, it may contain
18  computer-generated mistranslations of stenotype code
    or electronic transmission errors, resulting in
19  inaccurate or nonsensical word combinations, or
    untranslated stenotype symbols which cannot be
20  deciphered by non-court reporters.  Corrections will
    be made in the preparation of the certified
21  transcript, resulting in differences in content,
    page and line numbers, punctuation and formatting.
22

23             This realtime uncertified and unedited
    transcript contains no appearance page, certificate
24  page, index, or certification.

25


                UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

                                                            2

061307 rough draft.TXT

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

76

1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
2    what they thought they needed to run the business.
3         Q.    Okay.
4               And are you able to recall the
5    details of any of those conversations?
6         A.    No.
7         Q.    Did those communications typically
8    occur over the telephone or in person?
9               MR. KATZ:  Objection.
10        A.    I don't remember.
11        Q.    Okay.
12              Were there multiple communications to
13   the best of your memory?
14        A.    To the best of my knowledge there was
15   a lot of dialogue with Mr. Les Charms.
16        Q.    Okay.  And I think it's actually
17   singular, Charm.
18              (Whereupon, a discussion was held off
19   the record.)
20        Q.    You understood Mr. Charm to be whom?
21        A.    I understand he was representing Ann
22   and Bob along with Goodwin Procter, I believe.
23        Q.    Was he your primary contact on the
24   CCMI side relative to negotiating business terms?
25        A.    Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

061307 rough draft.TXT

77

1      UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
2      Q.      Were there other people with whom you
3  discussed and negotiated business terms?
4      A.      I believe we had calls where Les was
5  on the call along with Ann and Bob and I would be on
6  the phone with Jon Rubin, and there were other
7  calls, I guess, where our respective outside
8  counsels also were involved in dialogue.
9      Q.      Do you remember having any -- and
10 this is leading up to the August 13th, 1999
11 execution of the stock purchase agreement -- did you
12 have private communications with either Ms. Raider
13 or Mr. Fireman?
14     A.      I don't recall.
15     Q.      You don't recall one way or another?
16     A.      No.
17     Q.      I take it from your previous answer
18 there were a number of conversations that you
19 participated in relative to the business terms?
20     A.      Conversations and email if I
21 remember.
22     Q.      We'll get to the documentation
23 shortly but does anything stand out in your mind as
24 being particularly memorable relative to your
25 discussions with Les Charm concerning business

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

78

1      UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

Page 71

```
                    061307 rough draft.TXT
 2   terms?
 3        A.      The only thing I would point out is
 4   because we were getting near the end of the deal and
 5   we were going to make a decision on whether we were
 6   going to proceed or not to go forward with the -- we
 7   were in the process and we had been negotiating for
 8   a while and we just had to decide if we were going
 9   to get the deal done or not.
10                There was a term that Les objected to
11   fairly strongly in the document that enabled
12   News America to have significant flexibility on how
13   they ran the business and I remember Less stating to
14   Ann and Bob that he thought this was problematic and
15   letting them know that he wasn't sure if they should
16   go forward under this because he thought it could
17   impact their ability to run the business.
18                I think at the time we talked about
19   why we needed it, and at the time I think our view,
20   we told him, is that we were trying to move forward
21   on the business and we were hopeful that we were
22   able to build the business together going forward
23   but ultimately we were buying the business and we
24   needed flexibility and in how we were going to run
25   the business.

               UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

                                                          79

 1          UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2                That was a critical point as we got
 3   near the end of the deal and it's just memorable
 4   because I think it was kind of it was either we were
                          Page 72
```

```
                    061307 rough draft.TXT
 5   going to do the deal or we weren't going to do the
 6   deal.  That in particular was a concern for them.
 7          Q.      Now, was this a single conversation
 8   to your memory or was this a series of
 9   conversations?
10          A.      The conversation I remember was a
11   conference call.  I think it was Jon Rubin and
12   myself in my office in, I think it was in Norwalk,
13   Connecticut at the time, and I believe Les, Ann, and
14   Bob.  I don't know, again, the locations, if they
15   were together or not.
16          Q.      Okay.
17                  And this is when the conversation as
18   you described it where Mr. Charm was objecting
19   fairly strongly to a provision that provided NAM
20   significant flexibility.
21                  Is that correct?
22          A.      Yes.  His issue was that issue.  A
23   lot of the other time was really focused on the
24   gross profit calculation.  Those were the two
25   points, as I remember, spending time on with him.

                UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

                                                          80

 1              UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2          Q.      And I think you said that Les
 3   objected fairly strongly and told Ann and Bob this
 4   was problematic?
 5          A.      Yes.
 6          Q.      And he told them that in your
                         Page 73
```

```
                061307 rough draft.TXT
 7   presence or he told you that he had told them that
 8   prior to the conference call?
 9        A.    On the phone.  It was an issue.  It
10   was an issue from a negotiation point that he was
11   representing that it may be a very difficult one to
12   get over.
13        Q.    Okay.
14              And was he having -- and I apologize
15   for what may be a mundane question -- was Mr. Charm
16   having this discussion with Ms. Raider and
17   Mr. Fireman while you were on the phone or was he
18   recounting to you a prior conversation he had had we
19   them?
20        A.    While we were on the phone.
21        Q.    And what was Ms. Raider and
22   Mr. Fireman's response to Mr. Charm's comment that
23   this was problematic?
24        A.    I remember them taking a break to
25   talk about it.


              UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

                                                      81


 1            UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
 2        Q.    Okay.
 3              And did the conference call
 4   terminate?
 5              MR. KATZ:  Ever?
 6        A.    I don't recall exactly.  I believe
 7   that we did get back on the phone.  It was an
 8   outstanding issue.
 9        Q.    So ultimately when the conference
                       Page 74
```

061307 rough draft.TXT

10  call resumed, what, if anything, did Mr. Charm,
11  Ms. Raider, or Mr. Fireman say about this concern
12  that Mr. Charm had raised?
13      A.      I think they were going to -- it
14  wasn't something that they could resolve at that
15  point. It was something that they had to take under
16  further consideration.
17      Q.      Okay.
18              And do you remember any follow-up
19  conversations substantively about this point with
20  anybody on the CCMI side?
21      A.      No.
22      Q.      You never heard back from them one
23  way or the other as to whether --
24      A.      We did hear back because it ended up
25  the term was accepted in the agreement. I just

UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY

82

1           UNCERTIFIED ROUGH DRAFT TRANSCRIPT ONLY
2   don't recall any specific -- I'm certain there must
3   have been conversations after that point regarding
4   that particular language in the document. I just
5   don't recall specific conversations.
6           MR. RICH: Mark this, please, as the
7   next exhibit.
8           (Exhibit DeVoe-18, 1-page fax
9           transmittal sheet dated 7-7-99, 1-page
10          document entitled CCMI Acquisition Open
11          Business Issues, and four fax log reports,

Page 75

# EXHIBIT B

Shan Willis

From: DeVoe Jr, Dave [ddevoe@newsamerica.com]
Sent: Monday, July 12, 1999 1:33 PM
To: Shan Willis
Subject: FW: ccmi

**REDACTED**

> -----Original Message-----
> From: Charmles@aol.com [SMTP:Charmles@aol.com]
> Sent: Sunday, July 11, 1999 9:31 PM
> To:   DeVoe Jr, Dave
> Cc:   rfireman@ccmi-net.com; sduggan@gph.com
> Subject: ccmi
>
> i hope your weekend was a good one.   a few points.    it seems clear
> where
> we are headed.    not a lot of protection to ann and bob.     so give
> us
> as much as you will now and lets not spend a long time talking about.
>
> with respect to the $1,500,000 clause as i call it.     words from you
> would
> be helpful.... like  some words about good faith, no diverting business
> from ccmi to other divisions or taking elsewhere,    state that the plans
> are
> to use sales people of other divisions, no allocation of costs, or
> purchasing
> profits ending up elsewhere   etc.    you no what we need........
>
> since there isn't going to be a lot of protestion   lets deal with the
> budgets in exactly the way you want ...      state in the agreement that
>
> you think the budgets are fair and reasonable from what you know about
> other
> companies in the newsamerica package and that they are reasonable given
> the
> growth rate that everybody is expecting.    it doesn't seem to make a lot
> of
> sense to keep going back on the numbers....  (i still believe that gross
> margin would be a better test)    however i suggest the following
> changes...
>    take your numbers for the budget and compare to the baseline
> computations(oh one exception    -i took out from your budget the taxes
> and
> fringes since and and bob can't control that)    and i computed YEAR BY
> YEAR
> a % which would equate the earnings that would have existed under the base
>
> line and what now exists.    that makes the earning ratio for each of the
> 5
> years--- yr1. - 17.5 %     yr2 -    14.7 %     yr3  - 13.9%    yr4-
>
> 13.4%    etc and you can calculate yr 5 as i am running out of time.

es away from the average calcualation the weighting of the 5th year. i
>
believe you will find this fair as it pays out the same if the numbers all

work out as budgeted.    also agree that first year one time cost what

[Stamp: Charm / EXHIBIT NO. 6 / 4-11-07 / R. MALONEY]

1