UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

                Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

                Defendant.

Civil Action No. 05-11740-MLW

**OPPOSITION OF NEWS AMERICA MARKETING IN-STORE, INC.
TO PLAINTIFFS' MOTION FOR LEAVE
TO DISCLOSE EXPERTS BEYOND EXPERT DISCLOSURE DATE**

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO #261080)
Ieuan G. Mahony (BBO #552349)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

# Table of Contents

Introduction................................................................................................................1

Facts ......................................................................................................................2

I.     The Nature of the Dispute....................................................................................2

II.    The Plaintiffs' Initial Damages Disclosure and Damages Theories....................2

     A.    The Plaintiffs State At The Outset That They Are Unable To Quantify Damages.....................................................................................................3

     B.    The Plaintiffs State That Their Damages Theories Will Require Evidence (i) Concerning The "Emerging" Loyalty Card And Customer Database Management Markets, And (ii) Concerning CCMI's "What If" Performance In This Marketplace....................................................4

III.   Procedural History, And The Parties' Relevant Discovery Conduct. ..................4

     A.    The May 30, 2006 Scheduling Order Requires The Plaintiffs To Designate Experts By March 30, 2007. ..................................................5

     B.    NAM Makes A Full Document Production In September 2006, And Further Supplements This Production In January 2007...........................5

     C.    The Plaintiffs Allow The March 30 Deadline For Expert Disclosures To Pass, And Do Not Either (i) Designate Experts Or (ii) Request An Extension.........................................................................................5

     D.    Although Requesting Dates Earlier, The Plaintiffs First Notice Fact Depositions On May 7, 2007. .................................................................6

     E.    The Plaintiffs Seek To Designate Experts Only After NAM Demonstrates -- In An Opposition Filed June 4, 2007 -- That The Lack Of Expert Testimony Is Fatal To Their Claims. ...................................7

     F.    In Open Court, The Plaintiffs Represent That They Wanted to Belatedly Designate *One* Expert Witness Who Would *Not* Be A Damages Expert; Instead, Their Witness Will Simply Testify Concerning The Industry, And May Not Even Give "True Expert Testimony."....................................7

     G.    This Court Grants The Plaintiffs Leave To File The Present Motion....................8

     H.    The Plaintiffs Offer Experts And Reports That Differ From Earlier Representations. .....................................................................................9

Argument .................................................................................................................10

I.     The Plaintiff's Motion Must Be Denied. ...........................................................10

     A.    There Is No Substantial Justification For The Plaintiffs' Delay. ...........................11

          1.    There Is No Basis For The Plaintiffs' Claimed Assumption That No Expert Testimony Would Be Needed. ..................................11

|  | 2. | There Is No Merit To The Plaintiffs' Claims That The Late Designation Was Required To Provide The Experts With Deposition Discovery..................................................................14 |

|  | 3. | The Plaintiffs' "Justifications" Are Mutually Exclusive, And Logically Inconsistent..................................................................15 |

|  | 4. | NAM's Post-Deadline Demonstration Of The Need For Expert Testimony Is the Real Reason The Plaintiffs Finally Moved To Designate Experts; This Is Not "Substantial Justification."......................16 |

| B. | | The Late Designation Is Not Harmless...................................................17 |

|  | 1. | The Reports Present Unfair Surprise........................................17 |

|  | 2. | The Reports, If Permitted, Will Require NAM To Incur Substantial Additional Expense And Effort...............................................18 |

|  | 3. | The Late Disclosure Compromises The Court's Ability To Control Its Docket.............................................................20 |

II. | | The Plaintiffs' Motion Is Futile, As The Expert Reports Are Inadmissible Under Rule 702, Fed. R. Evid...........................................................20 |

| A. | | The Experts' Method For Selecting "Comparables" Is Subjective, And Unreliable.............................................................22 |

|  | 1. | Diamond's "Comparables" Bear No Relevant Relationship To CCMI.............................................................24 |

|  | 2. | Thissen's "Comparables" Similarly Bear No Relevant Relationship To CCMI or NAM...............................................25 |

|  | 3. | In Any Event, Under Thissen's Comparison, The "Comparable" And CCMI Differ In Performance By A Single Data Point, That Occurred 18 Months After The Relevant Timeframe......................28 |

| B. | | The Experts' Market And Costs Data Has No Source, And Is Unreliable.............29 |

| C. | | The Experts Ignore Without Explanation Core Facts That Are Inconsistent With Their Opinions.............................................................30 |

|  | 1. | Thissen's Damages Conclusions Address The Period 1999-2000; Thissen Overlooks The Fact That She Praises NAM's Commitment To CCMI Through July 2001.............................................30 |

|  | 2. | Diamond's Conclusions Contradict The Revenue Figures Upon Which He Purports To Rely.............................................31 |

III. | | In Any Event, The Proposed Reports Do Not Comply with Rule 26, And Must Be Stricken.............................................................33 |

| A. | | The Proffered Experts Do Not Provide Sources For Key Factual Assertions That Underlie Their Conclusions...................................33 |

|  | 1. | To Establish Market Performance, The Experts Seek To Rely On Data Contained In Trade-Show PowerPoint Presentations. ........34 |

2.    To Show That Many Unrealized Additional Opportunities Existed For CCMI, Thissen Seeks To Rely On An Undated, Unsourced, Word Table. ........................................................................................35

B.    The Reports Are Ambiguous As To Whether The Time Period At Issue Is 1999-2000, 1999-2001, or 2000-2001. ...................................................36

C.    The Reports Provide Vague, Ambiguous And Misleading Information Concerning The Level Of Spending Required For CCMI To Earn The Projected Amounts. ...........................................................................................37

Conclusion ..........................................................................................................................38

**Introduction**

Defendant News America Marketing In-Store, Inc. ("NAM") hereby opposes the Plaintiffs' Motion for Leave to Disclose Experts Beyond Expert Disclosure Date (the "Motion" or the "Motion to Disclose Late"), filed on August 10, 2007. The plaintiffs, Robert Fireman ("Fireman") and Ann Raider ("Raider"), first raised their request to designate experts late on June 8, 2007,[1] over two months *after* the March 30, 2007 Plaintiffs' expert disclosure deadline had expired, and only after *NAM* argued that the plaintiffs' case was defective due to the lack of expert damages and causation testimony.[2]

After a hearing, this Court denied the plaintiffs' original request to designate experts late, and allowed the plaintiffs to file the present Motion. The present Motion to Disclose Late must similarly be *denied,* for the following four reasons:

- First, there is *no substantial justification* for plaintiffs' failure to file their expert disclosures prior to the March 30, 2007 deadline;

- Second, allowance of the motion is *not harmless* -- it would (a) needlessly prolong this action by requiring (i) depositions of plaintiffs' experts, (ii) time for NAM then to secure counter expert(s) and have reports prepared, and (iii) then further depositions, now of NAM's experts; and (b) cause NAM to incur tens of thousands of dollars in additional legal fees and expert fees that it would not otherwise have to incur;

- Third, exclusion of the plaintiff's belatedly proffered experts would have no effect on the outcome of the case because, among other factors, the testimony plaintiffs' experts seek to offer is *inadmissibl*e under the test of Rule 702, Fed. R. Evid. and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993);

- Finally, because the reports of the Plaintiffs' offered experts do *not* comply with the "detailed and complete" requirements of Rule 26(a)(2)(B), the disclosure is defective, and the motion, in turn, futile.

---

[1] *See* Robert Fireman and Ann Raider's Motion to Modify Scheduling Order, filed June 8, 2007. Exhibit 1 in NAM's Exhibit Binder, filed herewith.

[2] *See* Opposition to Plaintiffs' Motion to Compel Responses to Discovery Requests from Defendant ("Opposition to Motion to Compel"), filed June 4, 2007. Exhibit 2 in NAM's Exhibit Binder.

Accordingly, as further demonstrated below, the Motion must be denied.

<u>Facts</u>

**I.    The Nature of the Dispute.**

In August 1999, the plaintiffs sold their stock in their company, Consumer Card Marketing, Inc. ("CCMI"), to NAM for $2.8 million and contingent earnout and bonus payments. Whether an earnout or bonus would be due for any year depended upon the amount of "gross margin" – *i.e.*, profit – the CCMI business earned.

NAM made no promises as to how it would run CCMI once it was acquired. Rather, Fireman and Raider expressly *agreed* that NAM "shall be free to operate [CCMI] and its Affiliates in its sole and unfettered judgment . . . ." Stock Purchase Agreement, §6.8. Plaintiffs further expressly agreed that they "shall have no claim against [NAM] in connection herewith as a result of" how NAM ran the business. *Id.*

Despite this plain language, Fireman and Raider, after *accepting* earnout payments totaling more than $766,000, brought this suit against NAM in August 2005 to extort *more* earnout money. In their complaint, Fireman and Raider allege that NAM violated a claimed duty of good faith by making business decisions which, in Fireman and Raider's view, prevented them from receiving *as much* in earnouts as they had hoped. The claim is entirely without merit, and NAM intends to seek summary judgment now that discovery has concluded.

**II.    The Plaintiffs' Initial Damages Disclosure and Damages Theories.**

At the outset of the case, the plaintiffs disclosed their damages claims and theories. These disclosures are relevant to the present Motion, as follows.

### A.     The Plaintiffs State At The Outset That They Are Unable To Quantify Damages.

In their Initial Disclosures, the plaintiffs stated that they were unable to quantify damages themselves, but believed that their damages exceeded $15 million.  Specifically, the plaintiffs stated:

> At this time, Mr. Fireman and Ms. Raider are *unable to quantify their damages* suffered as a result of News America Marketing In-Store, Inc.'s misconduct.  Further responding, News America Marketing's own records demonstrate that Ms. Raider and Mr. Fireman are owed in excess of $15,000,000.[3]

The plaintiffs' interrogatory answers submitted in November, 2006 subsequently set out the basis for this claimed amount, alleging as follows:

> CCMI had established itself as the industry leader in an *emerging marketplace*.  If NAM had proceeded in good faith, *the Plaintiff would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula*.  The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs.  This projection was over Fifteen Million (15m) dollars.  Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.[4]

As demonstrated below, the damages theory, described above, is the very same theory as that advanced in the reports of the purported experts that the plaintiffs now seek leave to designate.

---

[3] Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006 at 12  (emphasis added), Exhibit 3 in NAM's Exhibit Binder.

[4] Fireman Answers to NAM Interrogatories, Answer to Int. No. 20, dated November 27, 2006 (emphasis added); Raider Answers to Ints., Int. No. 20, dated November 27, 2006 (same).  Exhibits 4 and 5 in NAM's Exhibit Binder.

**B.    The Plaintiffs State That Their Damages Theories Will Require Evidence (i) Concerning The "Emerging" Loyalty Card And Customer Database Management Markets, And (ii) Concerning CCMI's "What If" Performance In This Marketplace.**

Based on these disclosures, the following components of the plaintiffs' damages claims were clear, by November 2006, when they answered interrogatories. First, the plaintiffs believed (rightly or wrongly) -- from the outset -- that discovery concerning an "emerging marketplace" was necessary and relevant to their damages claims. Second, the plaintiffs themselves admitted that this market was at best an "*emerging*" marketplace. An "emerging marketplace" is, by definition, difficult to quantify, and therefore requires expert analysis to evaluate. Third, the plaintiffs adopted an approach of seeking to demonstrate that, if circumstances had developed "properly," they would have "achieved each and every earn out and bonus threshold necessary." The plaintiffs thus understood, at least as early as November 2006, that their damages theory required that they prove a certain threshold performance level for CCMI, in specific markets.[5] Yet, despite all this, at no time during the Court-ordered discovery period did plaintiffs ever engage in this type of discovery.

## III.    Procedural History, And The Parties' Relevant Discovery Conduct.

The following summarizes the relevant procedural background. In their Motion, the plaintiffs contend that "delays" on the part of NAM substantially caused their delays in identifying experts.[6] This *version* of history is not accurate, as indicated below.

---

[5] Although they claimed damages of $15 million, the plaintiffs provided no explanation, support, or calculations for their damages figure -- other than the above assertions -- until the limited speculative explanations that they seek to offer though the purported experts that are the subject of the present Motion.

[6] *See* Motion to Disclose Late at 2 ("Throughout discovery, NAM repeatedly delayed in producing their documents and delayed in producing their witnesses"); at 8 ("their efforts [to obtain discovery] were stymied"); at 9 ("The delay in producing witnesses prevented any expert from considering NAM's version of the relevant events until after" the disclosure deadline). The plaintiffs made the same arguments in their Motion to Modify Scheduling Order, Document No. 28, filed on June 8, 2007.

### A.    The May 30, 2006 Scheduling Order Requires The Plaintiffs To Designate Experts By March 30, 2007.

On May 30, 2006, the Court entered a Scheduling Order in this matter.  This Order required that the plaintiffs "designate experts and disclose the information described in Fed. R. Civ. P. 26(a)(2) concerning each expert" ten months later, by March 30, 2007.[7]

### B.    NAM Makes A Full Document Production In September 2006, And Further Supplements This Production In January 2007.

NAM produced, and plaintiffs twice reviewed, virtually all relevant documents by February 1, 2007.  As demonstrated earlier, in September, 2006, NAM made its initial production materials available to the Plaintiffs for review.  NAM further supplemented this production in January, 2007.  The Plaintiffs reviewed NAM's original production on September 28, 2006, for a few hours, and selected a small fraction of the production for copying and further review.  On February 1, 2007, the Plaintiffs reviewed the supplemental production, and also requested that the initial production be made available for their review a second time.  At this review session, the Plaintiffs again spent a few hours.  The Plaintiffs again requested only a small fraction of the production for copying.[8]

### C.    The Plaintiffs Allow The March 30 Deadline For Expert Disclosures To Pass, And Do Not Either (i) Designate Experts Or (ii) Request An Extension.

The Scheduling Order required the plaintiffs to designate their experts, and provide all requisite expert disclosures, by March 30, 2007.  Plaintiffs did not designate an expert or disclose expert materials by that date.  Nor did plaintiffs, before March 30, 2007 arrived, seek an extension of time to make these disclosures.  Indeed, the plaintiffs entirely ignored this deadline.

---

[7] *See* May 30, 2006 Scheduling Order, Exhibit 6 in NAM's Exhibit Binder.

[8] *See* Opposition to Motion to Compel, at 7-8, 11.

> **D.    Although Requesting Dates Earlier, The Plaintiffs First Notice Fact Depositions On May 7, 2007.**

During most of the period following plaintiffs' review of NAM documents, plaintiffs focused their discovery on obtaining NAM's backup computer tapes.  Accordingly, apart from noticing and taking the deposition of NAM's IT witness, Alfred McBean, in March, 2007, plaintiffs did not notice any other depositions until May 7, 2007, almost a full year after the Court's Scheduling Order.  To be sure, counsel discussed convenient deposition dates prior to May 7; however, it remained unclear until May 7th whether plaintiffs intended to expend the resources to pursue depositions.  At that time, they noticed the following depositions of former or current NAM personnel:

- Heather Harde for May 17 in Los Angeles;

- David DeVoe for May 18 in Los Angeles;

- Chris Mixson for May 24 in Boston;

- Henri Lellouche for May 25 in Boston;

- Jon Rubin for May 29 in New York.[9]

On May 15, 2007, only two weeks before the close of discovery, plaintiffs "changed" this deposition line-up.  They canceled Harde's and Rubin's depositions altogether.[10]  They then added to this deposition list by, for the first time, requesting depositions of Marty Garofalo (NAM's Executive Vice President for Trade) and Paul Carlucci (NAM's CEO).[11]  NAM accommodated the last-minute noticing of these two depositions, although NAM was not able to accommodate the requests within the original discovery deadline.[12]

---

[9] *See* Katz Aff., Exh. A, Notices of Deposition, included as Exhibit 7 to NAM's Exhibit Binder.

[10] Katz Aff., ¶3, Exh. B, Rich email.

[11] *Id.*

[12] All noticed depositions were completed by July 20, 2007, in conformity with the Court's June 28, 2007

**E.** **The Plaintiffs Seek To Designate Experts Only After NAM Demonstrates -- In An Opposition Filed June 4, 2007 -- That The Lack Of Expert Testimony Is Fatal To Their Claims.**

On May 31, 2007, the discovery deadline expired.  The plaintiffs still had not chosen to designate an expert, or to request an extension of the expert deadline.

On June 4, 2007, NAM filed its Opposition to the plaintiffs' Motion to Compel, directed to NAM's backup tapes.  As one of its arguments, NAM pointed out that the plaintiffs had chosen not to designate any experts.  NAM noted that the plaintiffs' damages theories required resort to expert testimony, given the speculative nature of the claims, the detailed market reconstruction evidence, and the "what if" projections these theories appeared to require.  Without expert testimony, NAM noted, the plaintiffs' claims could not proceed.[13]

It was only *after* their expert disclosure deadline had expired, *after* the discovery deadline had expired, and *after* NAM demonstrated that the plaintiffs' claims failed (among numerous other grounds) because they were unsupported by required expert testimony, that the plaintiffs requested permission to designate experts.  Accordingly, on June 8, 2007, plaintiffs filed a Motion to Modify Scheduling Order, to allow late designation.

**F.** **In Open Court, The Plaintiffs Represent That They Wanted to Belatedly Designate *One* Expert Witness Who Would *Not* Be A Damages Expert; Instead, Their Witness Will Simply Testify Concerning The Industry, And May Not Even Give "True Expert Testimony."**

The issue of expert designations was discussed by plaintiffs' counsel at the hearing before the Court on June 26, 2007 in connection with plaintiffs' Motion to Modify the Scheduling Order.  At the hearing, Mr. Rich, in answer to the Court's question as to "how these remaining [fact] witnesses affect your ability to designate experts," stated as follows:

---

Order.  NAM completed its discovery by the May 30, 2007 deadline.  Mr. Carlucci and Mr. Garofalo are the witnesses, for example, referenced in Exhibit H of the plaintiffs' Motion to Modify Scheduling Order.  *See* Motion to Designate Late, at 4 (incorporating Motion to Modify Scheduling Order by reference).

[13] Opposition to Motion to Compel, at 29-32.

> MR. RICH:  And I think that's a fair question, your Honor.  We have retained an expert and our expert intends to talk -- contrary to what you would read in Mr. Katz's paper, *not [as] a damages expert per se* and, in fact, it *may not even be true expert testimony*, although I think we need to disclose something.  What our expert intends to talk about is the industry, what the industry --
>
> THE COURT:  Well, that's expert testimony.  That's *Marks vs. Diner's Club* things like that.
>
> MR. RICH:  Well, that's what our expert intends to testify about.  From our perspective, it's been important for us to get from the defendants what their understanding of the market was and what happened to the market, because from our perspective, it may be that we're in agreement as to what the market is and no expert testimony is required.  Mr. Lellouche testified, yet on the last day of discovery, that this was a 7 million dollar market, which surprised us substantially.  Your Honor -- and I recognize and I'm not suggesting that our expert disclose -- it constitutes an expert disclosure, but the name of our expert was listed in our initial disclosure.[14]

In other words, the plaintiffs represented that they had *one* expert in mind, and that this expert testimony would *not* concern damages "per se" – and might not even *qualify* as expert testimony -- but rather would concern "the industry."

### G.    This Court Grants The Plaintiffs Leave To File The Present Motion.

After hearing argument at the June 26, 2007 hearing, this Court denied the plaintiffs' request to extend the Scheduling Order, without prejudice to the plaintiffs' filing the present Motion.[15]  Pursuant to this Order, on August 10, 2007, the plaintiffs filed their Motion to Disclose Experts Beyond Expert Disclosure Date.

---

[14] Transcript of June 26, 2007 Hearing (the "Hearing Transcript"), at 49:1 – 49:23 (emphasis added), included as Exhibit 8 to NAM's Exhibit Binder.

[15] Hearing Transcript, at 50:9 – 51:6; Order dated June 28, 2007, ¶4, included as Exhibit 9 to NAM's Exhibit Binder.

**H.     The Plaintiffs Offer Experts And Reports That Differ From Earlier Representations.**

Plaintiffs' Expert Disclosure contradicts their representations at the June 26, 2007 hearing.  First, the plaintiffs identified *three*, not one, purported experts:  Carlene Thissen and Barry Kotek (collectively, "Thissen"),[16] and David Diamond ("Diamond").[17]  Together with designating these three proffered experts, the plaintiffs, also pursuant to the Court's June 28, 2007 Order, filed two expert reports from these individuals, purportedly designed to meet the requirements of Rule 26(a)(2)(B)(the "Reports").[18]

Second, the experts offered by the plaintiffs, contrary to plaintiffs' June 26, 2007 representations to the Court, each opine as to the *gross sales* (an issue related to *damages*) that CCMI, according to these witnesses, should have achieved in 1999 and 2000.  Each witness states in effect, that CCMI should have met or exceeded (i) $7.9 million in gross sales in 1999, and (ii) $21.6 million in gross sales in 2000.[19]

---

[16] Thissen's report is also signed by Barry Kotek ("Kotek"), and it appears that the opinions and analysis set out in the report are shared by both Thissen and Kotek.  For convenience, the proffered expert will be referred to simply as "Thissen," and not both Thissen and Kotek.  Thissen describes herself as a food industry consultant.  Since 1989, she reports that she has worked with Retail Consulting Systems ("RCS").  As such, she states that she has been a speaker at conferences and the author of newsletters and other documents.  Her principal area of expertise appears to relate to *implementation* of product scanning and electronic debit and credit card systems.  Thissen does not identify any sales, accounting, or financial experience, or describe the type of fee generating work engaged in by RCS.

[17] Diamond describes himself as a consultant, with experience as an executive for consumer product and marketing companies.

[18] Order dated June 28, 2007, ¶4.

[19] Motion to Designate Late, Exhibit A, Thissen Report ("Thissen Report") at 1 ("CCMI, more probably than not, would have *exceeded $7.9 million in gross sales in 1999 and $21.6 million in gross sales in 2000*, as reflected in the projection we reviewed (NAM01392), had News America Marketing (NAM) provided CCMI with the sales and marketing support outlined in CCMI's business plan (Exhibit A).  Based on our review of the document NAM01392, we believe those numbers were achievable if not conservative, to a reasonable degree of certainty.") (emphasis added); Motion to Designate Late, Exhibit B, Diamond Report ("Diamond Report") at 6 ("I … believe it is highly likely that if CCMI was a stand-alone entity from 1999-2001, CCMI would have achieved revenue of *$7.9 million in year 1*.  And I believe that it is probable that CCMI would have achieved revenue of *$21.6 million in year 2*.") (emphasis added).

To reach these figures, each purported expert (a) "evaluates" certain financial data that attempts to quantify and define a relevant marketplace or industry, (b) identifies a company or companies associated with this industry to act as "yardsticks" for CCMI, and (c) then opines on how CCMI should have performed, in light of selected information and "metrics" associated with the purported yardstick companies.

Notably, neither expert offers an opinion on "gross margin" (or "profit"), the ultimate question as to whether Fireman and Raider suffered any damages.

\*       \*       \*

As discussed below, plaintiffs' instant Motion to Disclose Late should be denied.

## <u>Argument</u>

## I.      **The Plaintiff's Motion Must Be Denied.**

It is black-letter law that, "[e]xcept in certain, specified circumstances, an expert may *not* provide evidence or opinions that were not disclosed as required by Rule 26(a)(2)(B)." *Cell Genesys, Inc. v. Applied Research Sys. ARS Holding*, 2007 WL 2296771, at \*20 (D. Mass. 2007) (Wolf, J.); *Alves v. Mazda Motor of Am., Inc.*, 448 F. Supp.2d 285, 293 (D. Mass. 2006) (Wolf, J.).  Under this rule, the party proposing to rely on expert testimony that it did not properly disclose to its adversary in discovery "bears the burden of demonstrating a 'substantial justification' for the failure to disclose or that such failure was 'harmless.'"  *Cell Genesys, Inc.*, 2007 WL 2296771, at \*20; *Alves*, 448 F. Supp.2d at 293.[20]  The plaintiffs cannot meet this burden.

---

[20] Notably, late disclosure of experts is not substantially justified by "preliminary" disclosure of experts or pending discovery disputes.  *Alves*, 448 F. Supp.2d at 293.

### A.    There Is No Substantial Justification For The Plaintiffs' Delay.

The plaintiffs assert two grounds for their argument of substantial justification for their delay in designating experts.  First, the plaintiffs claim "surprising" testimony related to the size of the loyalty-card market from NAM's Henri Lellouche at the close of discovery.  They claim that this testimony was the first indication to them that expert testimony on the size of this market might be necessary.[21]  Second, the plaintiffs claim that their experts required access to complete deposition discovery, and that this justified their late designation.  As shown below, these claimed justifications (i) are belied by the Reports themselves; (ii) overlook the actual discovery history in this case; and (iii) represent after-the-fact attempts to obfuscate the fact that the real reason the plaintiffs seek to introduce expert testimony late is NAM's demonstration, in its June 4, 2007 Opposition to Plaintiffs' Motion to Compel, that the lack of expert testimony (among other reasons) is fatal to the plaintiffs' claims.

### 1.    There Is No Basis For The Plaintiffs' Claimed Assumption That No Expert Testimony Would Be Needed.

The plaintiffs claim they are substantially justified in designating experts late because they reasonably believed, until "surprise testimony" at the close of discovery, that no expert testimony would be needed concerning the size of the "loyalty marketing industry."  Specifically, the plaintiffs claim:

> [F]or much of the discovery period it was not completely clear what the scope of expert testimony should or could be.  For instance, *it was unclear whether the size and composition of the market for loyalty marketing programs was even controversial*.  The day before the first discovery deadline, one of  NAM's key witnesses Henri Lellouche testified that the loyalty marketing industry consisted of only approximately $17 million dollars in total sales…. *It was only after the deposition of Mr. Lellouche was taken on May 25, 2007 (the last day of*

---

[21] Motion to Designate Late, at 8.

> *discovery) that it became clear that the parties' definition of the loyalty marketing industry differed.*[22]

This assertion has no merit. First, it is inconceivable that the plaintiffs in fact believed there would be no dispute as to the size, nature, and value of the relevant market. Thissen's Report demonstrates in part the potentially vague and broad parameters of this industry. Moreover, from the outset the plaintiffs have conceded that this is an "emerging marketplace," with attendant instability and uncertainty.[23]

Second, many discovery methods apart from depositions -- such as requests to admit -- were available to the plaintiffs to decisively confirm or dispel _assumptions_ they may have held as to how the party they were suing viewed a contentious item such as the size, nature, and value of the "loyalty" market. At best, the plaintiffs were taking a substantial, *voluntary* risk in (a) choosing not to test their assumption as to a key element of the case through written discovery, and (b) silently allowing the expert designation deadline thereafter to expire without seeking an extension.

Third, the "new information" that the plaintiffs claim justified their actions was purportedly the realization that the parties' "definition of the loyalty marketing industry

---

[22] Motion to Designate Late, at 8. The plaintiffs made the same assertion during the June 26 Hearing. Hearing Transcript, at 49:1 – 49:23 (Mr. Rich: "… Well, that's what our expert intends to testify about. From our perspective, *it's been important for us to get from the defendants what their understanding of the market was and what happened to the market, because from our perspective, it may be that we're in agreement as to what the market is and no expert testimony is required.* Mr. Lellouche testified, yet on the last day of discovery, that this was a 7 [sic] million dollar market, which *surprised us substantially*.")(emphasis added).

[23] Fireman Answers to NAM Interrogatories, Answer to Int. No. 20, dated November 27, 2006 ("CCMI had established itself as the industry leader in an *emerging marketplace*. If NAM had proceeded in good faith, the Plaintiff would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula.") (emphasis added); *see also* Raider Answers to Ints., Int. No. 20, dated November 27, 2006 (same). The plaintiffs made the same concession at the June 26 hearing. Hearing Transcript, at 4:22 - 5:2 ("MR. PETERS: ... And this is a notion, a business model and where that was developed by my clients, others, at the same time, *it was an evolving market*, because at the point of purchase, *suddenly* there were machines that could track what you were doing.") (emphasis added).

differed."[24]  If this were truly the reason plaintiffs were unable to timely designate their experts,

then the expert reports and purported testimony would be *limited* solely to the issue of properly

*defining* the loyalty marketing industry.  Indeed, the scope of the reports would precisely mirror

the scope of the unanticipated Lellouche testimony, and be limited to responding to this

unanticipated information.  Yet the Reports extend dramatically beyond that subject matter, to

include substantial damages-related testimony such as:  (a) opinions as to what constitutes

companies comparable to CCMI; (b) evaluations of the performance of these claimed

"comparables" in various endeavors; (c) projections as to gross revenues that CCMI should have

generated during some or all of the years 1999, 2000, and 2001; and (d) analysis of the costs

CCMI would have incurred to generate these revenues.  Either the plaintiffs believed that there

was no dispute on these highly contentious issues, or, more to the point, the plaintiffs'

"justification" based on Lellouche's market-size testimony is mere pretext without credibility.

As is facially apparent, nothing the plaintiffs may have been *surprised* to learn in fact discovery

could have possibly inhibited their ability to designate an expert on damages-related issues.  As

of the date of their initial disclosures, the plaintiffs claimed to know what their damages were;

they therefore have no possible justification for not designating in a timely manner an expert to

discuss issues related to damages.

      Finally, even if these claims were credible -- and they are not -- the plaintiffs still fail to

address the timing of their actions.  Given the plaintiffs' current explanation -- we suffered a

surprise revelation at Mr. Lellouche's May 25 deposition -- one would have expected the

plaintiffs to have notified the defendant *immediately* after the deposition:  "we have been

mistaken in our fundamental assumption that the parties agree on the size, nature, and value of

---

[24] Motion to Designate Late, at 8.

the loyalty marketing industry."  Yet the plaintiffs did not promptly contact defense counsel, or file a motion with this Court to seek more time to address the issue; rather, the Plaintiffs took no steps to extend the discovery deadline for two weeks, and then, only in response to arguments NAM made to the Court.[25]  Even so, the "surprise" testimony of Lellouche was not even mentioned in the plaintiffs' June 8, 2007 Motion to Modify the Scheduling Order.

> **2.**    **There Is No Merit To The Plaintiffs' Claims That The Late Designation Was Required To Provide The Experts With Deposition Discovery.**

The plaintiffs also claim that they are justified in their late designation, because their experts needed *complete* deposition testimony.[26]  This claim is similarly without merit.  First, the Court's Scheduling Order envisioned fact deposition discovery taking place after expert designations.[27]  Second, nothing prevented the plaintiffs from requesting an extension of the expert deadline in a timely manner.

Finally, the alleged need to review NAM depositions is transparently pretextual for yet another reason; neither expert substantively references *any* NAM witness in his or her reports. Thissen does not claim even to have reviewed deposition testimony.  Moreover, it seems clear that, as of June 26, 2007, the plaintiffs had *not yet retained* Diamond.  During the plaintiffs' oral

---

[25] The timing was as follows:  (i) May 25:  the plaintiffs allegedly realize that expert testimony will be needed on the definition of the market; (ii) June 4:  in its Opposition, NAM demonstrates that the plaintiff's case –even if all other fatal flaws were ignored – must be dismissed due to the lack of expert testimony; (iii) June 8: the plaintiffs file their Motion seeking to extend deadlines, and allow them to designate experts.  In sum, no "substantial justification" exists due to the plaintiffs' claimed "assumption" that the parties were in agreement on the highly contentious issue of market definition.

[26] Motion to Designate Late, at 8-9 ("Mr. Diamond requested access to the Defendant's deposition transcripts to have a complete picture of what went wrong with this relationship from both parties' perspectives….  The delay in producing witnesses prevented any expert from considering NAM's version of the relevant events until after the date initially set by the Court for expert disclosures.")

[27] *See* Scheduling Order, where fact discovery continues for two months *after* plaintiffs' expert designation deadline.

argument at the June 26, 2007 hearing the plaintiffs repeatedly reference only *one* expert witness.[28]

The plaintiffs, glaringly, do not disclose when they formally engaged Diamond, seemingly because they retained him *after* the expert disclosure deadline.  If he was retained after the expert disclosure deadline, or more significantly, after the discovery deadline, then this claimed justification similarly evaporates.  While the plaintiffs allege that "we could not provide an expert report on the deadline because depositions were not yet completed, and depositions were necessary for our expert," a more accurate account – it appears – would read: "we could not yet designate an expert since we had not yet engaged an expert at the time the report was due."

### 3.  The Plaintiffs' "Justifications" Are Mutually Exclusive, And Logically Inconsistent.

In any event, the plaintiffs' two claimed justifications are contradictory.  The two justifications can be summarized as follows:

    (i)    Justification I:  we made an assumption that expert testimony was not needed, because we erroneously (and without any basis) believed that the parties must have been in agreement on the key issue.

    (ii)    Justification II:  we needed to wait until depositions were completed in order to retain and provide our expert report.

Under Justification II, the party from the outset understands that expert testimony is needed in the case, and simply wishes to wait until requisite information has been generated for the expert report.  In such a scenario, that party logically requests an extension of the designation deadline *prior to* its expiration, something the plaintiffs here inexcusably did not do.  *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion*

---

[28] *See* Hearing Transcript, at 49:1 – 49:23 ("We have retained *an expert* and *our expert* intends to talk -- contrary to what you would read in Mr. Katz's paper, not [as] a damages expert per se and, in fact, it may not even be true expert testimony….  [T]hat's what *our expert* intends to testify about….  [T]he name of *our expert* was listed in our initial disclosure") (emphasis added).

*Sociedad Anomina v. Titan Int'l Inc.*, 2006 WL 1084422, at *2 (C.D.Ill. 2006) ("'fact discovery 'problems' might explain [a party's] inability to timely disclose experts,' but do not excuse party from seeking an extension prior to the deadline.")  *See also Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 197 (1st Cir. 2006) ("This has not been a tale of lack of effort, of bland disobedience of a series of court orders, or of unsavory scheming, but of what the district court could reasonably view as a *miscalculated strategy topped by an inexcusable failure to observe a long-established deadline*.") (emphasis supplied).

In contrast, under Justification I, the party plans *not* to engage an expert, yet as the plaintiffs readily admit, Thissen was identified, if not retained, at the start of the case.  In sum, the plaintiffs' two stated "justifications" are patently inconsistent; their arguments place them – apparently – in the position of *simultaneously* (a) having believed that expert testimony and a report were needed (but sufficient information was not yet available), and (b) having believed that no expert testimony was needed.  Thus, it would appear that plaintiffs seek "to have their cake and eat it, too."

### 4.    NAM's Post-Deadline Demonstration Of The Need For Expert Testimony Is the Real Reason The Plaintiffs Finally Moved To Designate Experts; This Is Not "Substantial Justification."

As demonstrated above, the plaintiffs' claims for "substantial justification" are groundless.  The catalyst in fact for the plaintiffs' request to designate experts late is NAM's June 4, 2007 Opposition to Plaintiffs' Motion to Compel.  In that Opposition, filed more than two months *after* the expert designation deadline had passed (and in response to plaintiffs' attempt to force NAM to spend over $12 million to reconstruct and search backup tapes), NAM demonstrated that, among a range of other reasons, the lack of expert testimony was fatal to the plaintiffs' claims.  It was only after the plaintiffs received this filing that they sought to introduce an expert case, months after expiration of the deadline for expert designations.  No "substantial

justification" exists where the justification consists of: "I was convinced by my opponent, after expiration of the expert designation deadline, that my case would fail without expert testimony." This Court must therefore deny the plaintiffs' Motion.

### B.    The Late Designation Is Not Harmless.

The plaintiffs similarly fail to meet their burden of demonstrating that the late designation is harmless.  Courts are mindful that the "harmlessness provision is intended 'to avoid unduly harsh penalties in a variety of situations.'"  *Gagnon*, 437 F.3d at 188, 197.  Accordingly, in evaluating harmlessness, a trial judge "must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets."  *Id.* at 197; *Alves*, 448 F. Supp.2d at 295. In striking this balance, a trial judge will review "a multiplicity of pertinent factors," that include the history of the litigation, surprise and prejudice to the opponent, and "an assessment of what the late disclosure portends for the court's docket."  *See Alves*, 448 F. Supp.2d at 295 (internal citations omitted).  Applying these pertinent factors here requires the denial of the Motion.

### 1.    The Reports Present Unfair Surprise.

The offered Reports represent unfair surprise.  The Reports rely heavily on the so-called "comparables" or "yardstick" approach.  The plaintiffs have never indicated an intent to rely on such an approach to their damages claims.  Rebutting a "comparables" approach requires significant preparation and lead-time.  Not only must the opponent analyze and compile data concerning the claimed "comparables," the opponent also potentially must evaluate and prepare additional, competing candidates for the set of "proper comparables."

Notwithstanding the considerable complexity that a "comparables" approach presents -- and thus the required "lead-time" to rebut such an approach – the plaintiffs did not disclose or mention in any way that they intended to rely on this approach in their Initial Disclosures, or

their Interrogatory Answers, for example.[29]  Indeed, even as recently as the June 26, 2007

Hearing, when discussing the subject matter of their proposed expert testimony, the plaintiffs

made *no disclosure* of the fact that they planned to rely on competing companies and purported

comparables as "yardsticks" to measure CCMI's post-acquisition performance.  Instead,

plaintiffs' counsel stated that a single expert would discuss "the market," and stated that this may

not even qualify as "true expert testimony."[30]  These Reports, which introduce expansive and

new theories in the case, represent a dramatic – and unfair – surprise to the defendant.

In addition, at the June 26, 2007 Hearing, the plaintiffs expressly argued that they were

seeking leave to designate *one* expert, not two (or three).  As counsel for plaintiffs quite clearly

stated, "We have retained ***an expert*** and our ***expert*** intends to talk…."  The unfair surprise and

prejudice to NAM of a late designated expert is magnified all the more by the attempted

designation of multiple experts.  Moreover, plaintiffs' counsel also argued to the Court that the

expert (note, singular) they had retained was "not a damages expert."  Yet, the bulk of the two

purported expert reports discuss damages and issues related to damages.

### 2. The Reports, If Permitted, Will Require NAM To Incur Substantial Additional Expense And Effort.

Courts recognize that a late-disclosed opinion will cause the non-moving party to suffer

additional time and expense in defending the lawsuit, and that this effect counters claims of "no

harm."  *See Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Esta*, 456 F.3d 272, 277

(1st Cir. 2006) ("[T]he plaintiff's foot-dragging in announcing her expert and providing his report

deprived the defendants of the opportunity to depose him, impeach his credentials, pursue

countering evidence, or generally prepare their defenses.").  Courts thus reason that in most

---

[29] *See* the discussion at Facts, Section II.

[30] *See* the discussion at Facts, Section III.F.

instances "[t]he omission of the basis and reasons for the [expert's] opinions is *hardly harmless*." *Reed v. Binder*, 165 F.R.D. 424, 430 (D. N.J. 1996) (emphasis supplied).

This rule applies with particular force here: the plaintiffs' late disclosures are hardly harmless. Not only are they late, but the Reports present unsubstantiated – indeed largely untraceable -- factual assertions, and subjective, vague conclusions. Accordingly, addressing these Reports will require some combination, or all, of the following steps:

(i)   fact discovery into the questionable "comparables" upon which the experts purport to rely, requiring third-party fact depositions of individuals employed at these alleged comparable companies;

(ii)  depositions of Thissen[31] and Diamond;

(iii) the retention, preparation, and disclosure of experts to counter the claims of Thissen and Diamond;

(iv)  the identification, analysis and presentation of further "comparables" to temper the claimed "comparables" of Thissen and Diamond;

(v)   the defense of the plaintiffs' depositions of NAM's expert(s); and

(vi)  *Daubert* motion practice to have plaintiffs' experts reports and proposed testimony excluded.

Courts rule that the non-moving party should *not* be required to overcome effects of late disclosure. *See Alves*, 448 F. Supp.2d at 296. Here, NAM should not be obligated to bear, at this late date and well after the close of discovery, the substantial expense and effort of responding to this claimed expert case.[32]

---

[31] To the extent Thissen disclaims responsibility for certain components of the Report -- and places responsibility on her co-signatory, Kotek -- then Kotek would need to be deposed as well.

[32] As this Court has observed, harm occurs where the defendant is unable to timely depose an expert on an undisclosed topic or have its own experts address the undisclosed opinion. *See Cell Genesys, Inc.*, 2007 WL 2296771 ("As indicated earlier, the disputed issues on which [plaintiff] proposes [its expert] opine have been in the case since [plaintiff] filed its Complaint. Thus, they were well-known to [plaintiff] before Dr. Tlsty produced her report. If those opinions had been disclosed during the period provided for discovery, [defendant] could have deposed Dr. Tlsty and had its own experts address her opinions in their reports."). Harm also occurs where defendant is required to find its own expert on short notice or depose plaintiffs' expert on short notice. *See Alves*, 448 F. Supp. 2d at 296.

3.    **The Late Disclosure Compromises The Court's Ability To Control Its Docket.**

Finally, in evaluating whether a moving party has demonstrated "harmlessness," courts include a consideration of their own dockets. Where a motion for late expert disclosure will compromise the court's ability to manage its docket, the court will deny the motion. *See Cell Genesys, Inc.*, 2007 WL 2296771 *22; *Alves*, 448 F. Supp.2d at 296. Discovery in this matter has closed. The expert discovery period has closed. It is time for summary judgment motions. As demonstrated above, allowing the plaintiffs' Motion will significantly delay this matter and, wholly apart from the harm this will cause the parties, the delays will further disrupt this Court's docket. To first begin expert discovery at this date, a time when dispositive motions should be prepared and soon submitted to the Court, would delay the adjudication of this matter for months. The Motion should therefore be denied.

## II.    **The Plaintiffs' Motion Is Futile, As The Expert Reports Are Inadmissible Under Rule 702, Fed. R. Evid.**

Courts deny motions to designate experts late, where the expert testimony would be inadmissible, and thus would not affect outcome of the case in any event. *See Alves*, 448 F. Supp. 2d at 297, 299. That is the case here.

The opinions and proposed testimony of the plaintiffs' purported experts fall well short of the standards for admissibility of expert testimony established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Under the *Daubert/Kumho* standards, expert testimony is admissible only if it is both *reliable* and *relevant* to the issues in the case. *Kumho Tire*, 526 U.S. at 147; *Daubert*, 509 U.S. at 589. In order to be reliable, expert testimony must be supported by an adequate factual basis, data, principles, or methods. *Kumho Tire*, 526 U.S. at 149. Conversely, proposed expert

testimony that is supported merely by bare and untested assertions of the expert is unreliable and therefore inadmissible. *Id.* at 157-58.

The reliability prong of this test serves to ensure that the proposed testimony satisfies an acceptable level of "evidentiary reliability." *Daubert*, 509 U.S. at 590. "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question...the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The fundamental purpose of this inquiry is to "rule out" subjective belief or speculation. *Daubert*, 509 U.S. at 590.[33]

The relevancy prong of the *Daubert/Kumho* test is often stated in terms of "fit." That is,

> [T]he district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue. This second step requires that the district court consider whether the proposed scientific testimony *fits the issue* to which the expert is testifying. In other words, a district court may admit expert testimony only if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue.

*Hall v. U.S.*, 165 F.3d 1095 (7th Cir. 1999) (emphasis added). *Daubert* "requires a valid connection to the pertinent inquiry as a precondition to admissibility." *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Relevance requires that "the expert's opinion must be drawn from the facts of the case, not from the expert's own speculation." *Kent v. Howell Electr. Motors*, 1999 U.S. Dist. LEXIS 10940, *14 (E.D. Pa. 1999).

---

[33] The opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data; (2) it is the product of reliable principles and methods, and (3) the expert has applied the principles and methods reliably to the facts of the case. FED. R. EVID. 702. To determine whether an expert used reliable methodology, the Court considers: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Kumho Tires*, 526 U.S. at 137.

Here, the Reports and proposed testimony of Thissen and Diamond fail each element of the *Daubert/Kumho* test.

> ### A.    The Experts' Method For Selecting "Comparables" Is Subjective, And Unreliable.

Courts employ rigorous tests for determining whether companies are comparable.  In this so-called "yardstick" approach, the economic fortunes of one company – the "yardstick" – are used to project what should have been the fortunes of another company – the plaintiff company. In this approach, courts hold that a business "used as a standard must be as *nearly identical to the plaintiff's as possible*."  *Loeffel Steel Products v. Delta Brands, Inc.,* 387 F. Supp.2d 794, 812 (N.D. Ill. 2005) (emphasis added); *See Schonfeld v. Hillard*, 218 F.3d 164, 174 (2d Cir. 2000) ("[P]rofits of another entity are relevant if 'plaintiff's business *bears a close comparison*' to the proposed business, 'the products or services involved are standardized,' and the profits 'do not depend heavily on local or personal management skills.'").  Experts must examine "such critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the businesses." *Loeffel Steel Products,* 387 F. Supp.2d at 813; *See Home Placement Services., Inc. v. The Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987) ("[P]roduct, firm, and market comparability are all relevant factors in the selection of a proper" comparison company for damages analysis).

Where the required level of comparability is not present, then "a damage model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural." *Loeffel Steel Products,* 387 F. Supp.2d at 812.  *See Schonfeld v. Hillard*, 218 F.3d 164, 172 (2d Cir. 2000) (affirming summary judgment dismissing damage claim for lost profits) ("Projections of future profits based upon 'a multitude of assumptions' that require 'speculation

and conjecture' and few known factors do not provide the requisite certainty.").  Courts thus rule that "care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'"  *Loeffel Steel Products*, at 812; *see also*, *Bic Corp. v. Far Eastern Source Corp.*, 23 F. App'x 36, 38 (2d Cir. 2001).

Thissen and Diamond chose certain market participants, and used their activities as an improper "yardstick," against which to measure CCMI's performance without any explanation of direct comparability.  "[A] threshold question is whether there is ample evidence in the record as to the comparability of the plaintiff's business and the 'yardstick' firm as to permit a legitimate comparison."  *Home Placement Services, Inc.,*, 819 F.2d at 1206 (affirming denial of award of lost profit damages).

The purported "comparables" posited by Thissen and Diamond do not meet the *Daubert* and Rule 702 standard.  *See El Aguila Food Products, Inc. v. Gruma Corp.*, 131 Fed. Appx. 450, 453 (5th Cir. 2005) (affirming exclusion of expert testimony and summary judgment in favor of defendant -- plaintiffs' expert "made no effort to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses whose earnings data he relied on as a benchmark....moreover, by characterizing all variances between the trade association earnings data and plaintiffs' respective earnings as "lost profits," no allowance was made for losses caused by any other factor..."); *Eleven Line Inc. v. North Texas Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000) (reversing a damage judgment for plaintiff where "the projections by [plaintiff indoor soccer arena's expert] are not based on a satisfactory 'yardstick' of performance by 'closely comparable' businesses" where plaintiff's expert "applied average rates of return derived from the experience at other indoor [soccer] arenas around the country" that were owned by plaintiff's owner).

1.      **Diamond's "Comparables" Bear No Relevant Relationship To CCMI.**

Diamond claims three companies as comparable to CCMI:  Catalina Marketing, DCI, and RMS.[34]  Diamond admits that each of these companies differs from each other, and from CCMI. Diamond seeks to characterize these differences merely as "twists on the subject,"[35] or as "differences in strategic foci."[36]   Diamond does not, however, provide any analysis (i) of the magnitude of these admitted differences, (ii) the market impact of these differences, or (iii) the effect of these differences on his analysis.  *See Loeffel Steel Products, Inc.*, 387 F. Supp.2d at 813 ("If [the businesses] are not [true comparables] the comparison is manifestly unreliable and cannot logically advance[] a material aspect of the proposing party's case.").

Even a brief glance at the supporting materials for the Reports shows that differences are manifest.  For example, Thissen admits that RMS was the "dominant industry database vendor," and that it was only in 1999 (after NAM's acquisition) that CCMI first began to effectively compete with RMS.[37]  RMS, moreover, employed a completely different software architecture than CCMI, presumably leading to dramatically different – and incomparable -- maintenance and support agreements, and "lock-in" structures with customers (to name just a few likely differences).[38]

---

[34] Diamond Report, at 3, ¶13.

[35] Diamond Report, at 3, ¶13 ("Each of these companies had their own *twist on the subject*, with DCI focused on cards, RMS focused on providing software to run on client's mainframes, CCMI focused on retailer programs and Catalina focused on manufacturer-funded programs.") (emphasis added).

[36] Diamond Report, at 5 ("There were … four different competitors with *four different strategic foci* (CCMI- Retailer Programs, Catalina – Manufacturer Programs, RMS – Software and DCI – Cards).")  (emphasis added).

[37] Thissen Report, at 4 ("In 1999, CCMI was "*beginning* to effectively compete with RMS, *the dominant industry database vendor*.") (emphasis added).

[38] Thissen Report, Exhibit A (Business Plan) at 10-32 ("CCMI's Data Warehousing solution incorporates all the database management services required by retailers to do effective database marketing.  There are *other companies*, such as *Retail Marketing Systems (RMS)*, that license proprietary software that allows retailers to process their data into customer files and specific reports.  *This [RMS] system is not Windows-based, has no open software architecture, and requires special programming* for ad hoc queries or deviations. … CCMI's Data

Catalina also is characterized in the documents as a fundamentally different business model than CCMI's business model,[39] and DCI's business model is similarly characterized as substantially different than CCMI's model.[40]  Diamond, therefore, has chosen dissimilar entities to compare, and makes no attempt to explain why the admitted differences should be acceptable. It is as if Diamond has compared Coca-Cola to a local start-up cola company, brushed aside the differences and stated that they are comparable because they are each in the cola business.

### 2.    Thissen's "Comparables" Similarly Bear No Relevant Relationship To CCMI or NAM.

Thissen selects Valassis Communications, Inc., a competitor to a sister company of NAM in the Free Standing Inserts ("FSI") market, as a purported comparable to NAM.[41]  Valassis, it appears, is to act as a yardstick for what an *investing* company "should have done" in the electronic marketing arena.

Thissen, however, does not have any data as to the *return* on investment, from either a gross revenue or net revenue basis for Valassis in the electronic marketing sphere.  Thissen's entire report is focused on *investment* in electronic marketing.  Put another way, while Thissen's report discusses the investment Valassis made in the electronic marketing field, it does not discuss at all whether that investment made Valassis a profit, and if so, how much.  Accordingly, for this reason and numerous other reasons, the report sheds no light on what NAM's gross margin should have been in its foray in electronic marketing.

---

Warehouse is Windows-based, open architecture…") (emphasis added).

[39] Thissen Report, Exhibit A (Business Plan) at 10-32 ("Competitors, such as *Catalina Marketing*, have *aligned themselves with consumer goods manufacturers*.  CCMI has aligned itself with *retailers*.  This *strategic position* will be instrumental in creating the necessary trust to hold retailers' customer files and data.") (emphasis added).

[40] Thissen Report, Exhibit A (Business Plan) at 10-32 ("CCMI's execution techniques and revenue producing program elements are *unique to CCMI*.  There are companies, such as *DCI Marketing* …, that are plastic card manufacturers *now trying to be database managers and marketers*.") (emphasis added).

[41] Thissen Report, at 1.

To compare Valassis with NAM, Thissen first defines the activities of the two companies that she deems are comparable ("Comparable Activities") for purposes of her analysis. Thissen uses two criteria, it appears, for determining whether a particular event should be included as a Comparable Activity: there must be (i) an "activity" by either NAM or Valassis; and (ii) a particular target that is the focus of that activity. Actions that meet this first, "activities" criterion consist of (a) "investment in," (b) "acquisition of", (c) "commitment to", or (d) "support of" a company or project.[42] Thissen does not quantify – by a dollar amount, for example – how much "commitment to" or "investment in" a project is necessary to meet this criterion. Accordingly, the criterion for determining the "activity" prong of her definition is subjective and not testable.

The "target" prong of Thissen's definition is similarly broad and subjective. Thissen identifies a wide group of targets, which include the following:

(i)     A software product for "online grocery shopping" for retailers;[43]

(ii)    A distribution system for "internet-based coupon distribution";

(iii)   Technology designed to provide "a targeted shopping list of customer-specific offers" at checkout;

(iv)    A "retailer database system" for frequent shopper programs for grocery stores;

(v)     A system to help grocery retailers use their frequent shopper data;

(vi)    A company "involved in customer relationship marketing";[44]

(vii)   An "operating system for secure promotions on the web";

(viii)  A "smart card" that allows shoppers to interact with shelf dispensers in grocery stores;

(ix)    A transaction to deliver personalized promotions to AOL customers; and

---

[42] Thissen Report at 1 ("investments … in electronic marketing companies"); at 1 ("commitments to electronic marketing"); at 2 (the manner in which "RMS was supported by Valassis"); at 3 ("COMPARATIVE ACQUISITION ACTIVITY AND SUPPORT") (capitalizations in original).

[43] Thissen Report, at 3.

[44] Thissen Report, at 4.

(x)    A transaction involving smart cards and marketing.[45]

Thissen groups this wide range of activities and targets under the general heading of "commitments to electronic marketing companies."[46]  Thissen does not state how she identified these target projects.  It appears they were taken from her company's newsletter,[47] and the newsletter does not identify sources.  From Thissen's report, therefore, it is impossible to determine whether this collection of targets is a fair, accurate, or complete collection of "comparable" activities of NAM and Valassis.  Though she says that Valassis and NAM are comparable companies, Thissen does not report that she interviewed anyone at either NAM or Valassis to gain any informed understanding of what each company did or did not do in any of the aforementioned targeted activities.

Moreover, because Thissen does not reveal the level of commitment to a particular target by NAM or Valassis, it is not possible to compare quantitatively (a) NAM's purported commitment with (b) Valassis' purported commitment.  The methodology thus does not allow one to distinguish between or weigh (a) a party's commitment to "a transaction to deliver personalized promotions to AOL customers"; (b) Valassis' commitment to RMS (the dominant competitor over CCMI), (c) a party's commitment to "a company 'involved in customer relationship marketing'"; and (d) NAM's commitment to CCMI.  The methodology, therefore, relies on entirely subjective comparisons.

---

[45] Thissen Report, at 5.

[46] Thissen Report, at 1 ("News America Marketing (NAM) and Valassis' *commitments to electronic marketing*…") (emphasis added).  Although the targets above fall well beyond the rubric of "electronic marketing," and the term "commitment" does not fairly capture the breadth of the support, investment, and other activities Thissen includes in her definition, for convenience this term – "commitment to electronic marketing companies" – will be used.

[47] *See* Thissen Report, at 3, section B.1 (citing to "Exhibit G"); at 4, section B.2 (similarly citing to "Exhibit G").

Finally, in line with its fundamental subjectivity, the methodology allows only unquantifiable, subjective outputs. Specifically, Thissen draws from the methodology the following:

(i) **IF:** NAM had supported CCMI …

(ii) **AND IF:** that support had paralleled the support Valassis provide RMS …

(iii) **OMITTING CONSIDERATION OF:** (a) a quantification of the type or level of support Valassis in fact provided to RMS, and (b) the reasons for choosing RMS as the relevant "target," and not one of the other dozen or so targets used in the methodology …

(iv) **THEN:** CCMI "would have sold substantial numbers of retailers" CCMI goods and services.[48]

This conclusion -- "CCMI would have made substantial sales" -- does not logically follow: Thissen does not attempt to connect this assertion directly with her claim that CCMI should have grossed $7.6 million in 1999, and $21.6 million in 2000. Thissen's "comparables" methodology and analysis, therefore, is wholly subjective, and would be inadmissible if offered at trial.

> **3.    In Any Event, Under Thissen's Comparison, The "Comparable" And CCMI Differ In Performance By A Single Data Point, That Occurred 18 Months After The Relevant Timeframe.**

Even if Thissen's comparables analysis had some claim to validity – and they have none – the analysis on its face is irrelevant. Thissen compares the activities of Valassis and NAM for the period 1999 through August, 2002.[49] Thissen notes that, in 1999, NAM made "*key investments*" in electronic marketing companies "*similar*" to Valassis.[50] Thissen notes that NAM

---

[48] Thissen Report, at 2 ("had CCMI been supported by NAM in the way their largest competitor, RMS, was supported by Valassis, *CCMI would have sold substantial numbers of retailers* on frequent shopper cards, database Market Analysis System [sic](MAS) and analytic capabilities.") (emphasis added).

[49] Thissen Report, at 3.

[50] Thissen Report, at 4 ("In 1999, … NAM .. made similar key investments").

was committed to "be a leader in [e]-commerce and targeted marketing opportunities."[51]  Thissen then lists the continuing efforts of NAM in 2000 and 2001 in carrying out this commitment.[52]  Thissen opines that it is only *after* July 2001 that NAM's commitment, in her view, almost "drops off the radar screen."[53]

Thissen identifies only one "qualifying" Valassis event after July 2001.  This Valassis event takes place in August 2002.[54]  Thissen does not provide an assessment of "quality" of the two companies' respective activities (and such an assessment is not possible with her purported methodology).  Under a fair reading of her report, she treats the activities as equivalent, until "NAM drops off the radar."  Accordingly, the sole "delta" between the claimed comparables is the single identified August 2002 investment by Valassis, and this investment is well beyond the 1999-2000 "damages period" that is the focus of Thissen's report.  The comparison to Valassis, therefore, is flawed on its face.

### B.    The Experts' Market And Costs Data Has No Source, And Is Unreliable.

Where the plaintiffs' experts purport to rely on factual data, the experts must provide this data in a form that can be tested, or scrutinized.  It is black-letter law that testimony supported by bare and untested assertions is unreliable (and therefore inadmissible), and that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire*, 526 U.S. at 157-58.

---

[51] Thissen Report, at 4.

[52] Thissen Report, at 4-5.

[53] Thissen Report, at 5 ("[NAM] announced in *July 2001* that it had signed a licensing agreement with Welcome Real-time, a French supplier of software and marketing strategies for smart cards.  By August 2001, however, the companies NAM had purchased had almost completely *dropped off the radar screen*.").

[54] *See* Thissen Report, at 4.

Here, the plaintiffs' experts rely on purported actual market data to show that NAM should have acted differently, and to show that CCMI had substantial opportunities available to it. Yet the plaintiffs provide no source for this data, do not discuss how the data was compiled, and provide no straightforward method for testing the reliability, completeness, or provenance of this data. In addition, Thissen relies on a 1995 Business Plan of CCMI to supply cost figures for her 1999 and 2000 (or 2000 and 2001) projections. Thissen does not state why this practice is valid. Courts reject this technique of "mixing and matching" years and figures. *Am. Road Equip. Co. v. Extrusions, Inc.,* 29 F.3d 341, 344-45 (8th Cir. 1994) (reversing part of damages award that was based on the testimony of an expert who assumed without support that 1989 projections were valid for 1990). In sum, the experts' reliance on unsourced, unexplained data precludes introduction of the testimony.

C.    **The Experts Ignore Without Explanation Core Facts That Are Inconsistent With Their Opinions.**

Where there are facts inconsistent with the expert's theory or model, the expert cannot simply ignore them. *See, e.g.*, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 734 (10th Cir. 1993) (expert's projections of large profits were inconsistent with plaintiffs' actual history of losses); *Handi Caddy, Inc. v. Am. Home Prods. Corp.,* 557 F.2d 136, 140-42 (8th Cir. 1977) (actual response rate was materially lower than that assumed by expert). Both experts "simply ignore" facts inconsistent with their theories.

1.    **Thissen's Damages Conclusions Address The Period 1999-2000; Thissen Overlooks The Fact That She Praises NAM's Commitment To CCMI Through July 2001.**

In her comparison of Valassis and NAM, Thissen notes favorably NAM's commitment to electronic marketing (and to CCMI) through July 2001.[55] Thissen thus acknowledged that

---

[55] *See, e.g.,* Thissen Report, at 5 ("[NAM] announced in *July 2001* that it had signed a licensing agreement

NAM's support and investment in this market and CCMI was on track during the 1999-2000 time period.  Yet this 1999-2000 period is the key period upon which Thissen's damages conclusions focus.  These damages conclusions are based on an assertion that "NAM should have done more."  Accordingly, in her purported analysis of the NAM-Valassis relationship, Thissen decisively contradicts her own conclusions as to damages.

### 2.    Diamond's Conclusions Contradict The Revenue Figures Upon Which He Purports To Rely.

Diamond concludes that, once CCMI was acquired by NAM, the business went "downhill quickly."[56]  As the basis for these core conclusions, Diamond provides revenue figures for the period 1996-2000, covering CCMI's performance both before and after NAM's acquisition, as follows:[57]

---

with Welcome Real-time, a French supplier of software and marketing strategies for smart cards.").

[56] *E.g.,* Diamond Report, at 4, ¶17 ("once CCMI was purchased by News America …*things turned downhill quickly*"); at 5, ¶23 ("CCMI *began a significant downturn under News America management*"); at 5, ¶24 (All of the various suppliers were growing well, *with the exception of CCMI after the News America acquisition*. Clearly, *the issue was with News America's management* of CCMI"); at 5, ¶25 (all of these competitors were able to thrive and grow, until CCMI faltered upon being acquired by News America") (emphasis added).

[57] Diamond Report, at 4, ¶17.



As can be seen, these revenue figures do not support an assertion that CCMI "went downhill" after NAM's acquisition. Instead, the figures show a rather dramatic improvement in CCMI's position, trending up *during the damages period* once NAM management was in place.

Moreover, Diamond seeks to use these figures to make comparisons to other companies during the period 1996 through 2001.[58] Yet the mixed nature of CCMI's gross revenue performance, the split between the parties' responsibility for this performance (pre- and post-acquisition), and the limited scope of Diamond's figures, preclude meaningful comparisons to other companies (even if such companies were comparable, which they are not). In short, Diamond ignores glaringly important information, inconsistent with his conclusions as to CCMI's post-acquisition performance.

In sum, neither expert proffered by plaintiffs can survive scrutiny under *Daubert* or Rule 702.

---

[58] Diamond Report, at 5, ¶23.

### III.    In Any Event, The Proposed Reports Do Not Comply with Rule 26, And Must Be Stricken.

Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert disclosure to be "accompanied by a written report" that is "detailed and complete."  *See Cell Genesys, Inc. v. Applied Research Sys. ARS Holding*, 2007 WL 2296771, *20 (D. Mass. 2007) (Wolf, J.); *Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este*, 456 F.3d 272, 272 (1st Cir. 2006).  The rule is designed to prevent "ambush at trial."  *Ortiz-Lopez v. Sociedad Espanola De Auxilio Mutuo Y Beneficiencia De Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001); *see Thibeault v. Square D Co.,* 960 F.2d 239, 244 (1st Cir. 1992) (stating that "[t]his sort of disclosure is consonant with the federal courts' desire to make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent").

A report is sufficiently complete, in particular, where (i) "opposing counsel is *not forced to depose* an expert in order to avoid ambush at trial," and (ii) the report "*shorten[s] or decrease[s]* the need for expert depositions and thus … conserve[s] resources."  *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (emphasis added).[59]  The plaintiffs' proffered Reports fail to meet these requirements.

### A.    The Proffered Experts Do Not Provide Sources For Key Factual Assertions That Underlie Their Conclusions.

Thissen and Diamond each seek to rely on a range of data concerning the claimed market and companies' performance in this market, yet they do not identify the *sources* for this data. For example, Thissen and Diamond both rely on so-called "Frequent Shopper Program" ("FSP") statistics, and Thissen also relies on a so-called "Card-Based Marketing Report" compilation.

---

[59] *See also Reed v. Binder*, 165 F.R.D. 424, 429 (D. N.J. 1996) (The test of a proper report is "whether it [is] sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced.").

The experts do not disclose the sources behind either of these purported data sets.  The Reports are therefore incomplete, and lack required detail.

      **1.**      **To Establish Market Performance, The Experts Seek To Rely On Data Contained In Trade-Show PowerPoint Presentations.**

The proffered experts rely on Frequent Shopper Program data to opine that the relevant market grew substantially during the period 1998 – 2003.[60]  Thissen's company apparently compiled the Frequent Shopper Program data for the period 1997-2000, and 2003, and this data is presented in two PowerPoint presentations, apparently presented at trade shows.[61]  Neither Thissen nor Diamond, however, reveals the sources, collection methods, or quality assurance techniques (if any) used to compile the Frequent Shopper Program data.

Indeed, the proffered experts do not address the large "gaps" in the Frequent Shopper Program data set.  The data set lacks information for 2001 and 2002.  Because each expert's report can be read to opine concerning CCMI's "should-have-achieved" performance in 2001, this omission is particularly problematic.

Moreover, a review of the Frequent Shopper Program data itself raises strong questions as to whether this data has any utility at all.  The Frequent Shopper Program data is divided into regions.  There is wide variation among these regions.[62]  Thissen and Diamond do not discuss CCMI's market penetration by region, and make no attempt to calibrate CCMI's previous market

---

[60] Thissen at 1 Report ("Between 1998 and 2003, the number of supermarket stores offering Frequent Shopper Programs … *grew steadily and predictably*"); Diamond Report at 3, ¶16 ("The decade 1993-2002 represented the *glory days of the expansion of FSP's* in the grocery channel…. [In this] emerging industry, the number of stores fielding these programs *soared*."); Diamond Report at 3, ¶16 ("Throughout this period the market was *expanding dramatically*") (emphasis added throughout).

[61] Thissen Report, at 2 (citing "Retail Store Statistics" figures); Diamond Report at 3, ¶14 (citing the same figures).

[62] In 1999, for example, the variation between region is reported to vary almost a factor of 4. *See* Thissen Report, Ex. E at 3 (Growth by Region 1st Q 1999:  Southwest:  11.1%.  New England: 41.5%).  In 2003, variations between region continue to be reported, verging on a 20% difference between region.  *See* Thissen Report, Ex. D at 9 (Store Count by Region:  West Central: 29%.  New England: 48%.

success with the significant reported variations among region in their data set.  The Report,

therefore, is incomplete.

> 2.   **To Show That Many Unrealized Additional Opportunities Existed For CCMI, Thissen Seeks To Rely On An Undated, Unsourced, Word Table.**

Thissen also relies on a "Card-Based Marketing Report" compilation as the basis for her

conclusion that there was a "substantial potential market" for CCMI.[63]  Thissen claims that the

document shows opportunities for CCMI during the period *1998* to 2000.[64]  Yet it was the

plaintiffs who were in control of CCMI in 1998.  Thissen does not explain how her conclusions

are impacted by this fact.  At a minimum, NAM cannot be responsible for any claimed lost

opportunities in 1998, when the plaintiffs controlled CCMI.[65]  Thissen does not disclose the

"distribution of opportunities" over this three-year period from 1998 through 2000.[66]  Thissen,

instead, apparently attributes all of the claimed "lost opportunities" to NAM without explanation.

Moreover, the document itself does not contain a single reference to CCMI, either as a

"database" vendor, a "supporting vendor," or otherwise.  In contrast, the document contains

numerous references to the companies Thissen and Diamond claim were "comparable" to

CCMI.[67]  Moreover, the document appears to show – contrary to Thissen's conclusion – that

there were few or no available opportunities with the listed grocery chains.

Finally, like the Frequent Shopper Program data, there is no explanation as to the sources,

collection methods, or quality assurance techniques (if any) used to compile this data.

---

[63] Thissen Report, at 1; Thissen Report , Exhibit C.

[64] Thissen Report, at 1 (Exhibit C "shows that several large supermarket chains were in the process of implementing their CRM programs in the *years 1998 to 2000*, representing a substantial potential market for CCMI.") (emphasis added).

[65]  NAM acquired CCMI in August, 1999.

[66] If for example, 90% of the opportunities fell in 1998, then 90% of the claimed lost opportunities cannot fairly be attributed to NAM.

[67] *See* Thissen Report, Exhibit C (references to Catalina, VRMS, and Valassis).

Accordingly, it is not possible to judge, without substantial additional information, the reliability of, and the weight that can or should be placed on, these figures.[68]

The plaintiffs' experts thus have sealed the opaque factual data underlying their analyses. To even begin to understand the nature and reliability of this data would require a detailed deposition of each expert.  These Reports are therefore incomplete and insufficiently detailed. Accordingly, they must be excluded.  *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Expert reports must not be sketchy, vague or preliminary in nature," and must "include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.") (internal citations omitted); *Reed v. Binder*, 165 F.R.D. 424, 430 (D. N.J. 1996) (the omission of "the basis and reasons for the [expert] opinions is hardly harmless.   Nothing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion.").[69]

### B.    The Reports Are Ambiguous As To Whether The Time Period At Issue Is 1999-2000, 1999-2001, or 2000-2001.

The plaintiffs' experts also provide ambiguous, opaque, and incomplete information on the foundational issue of:  what is the *time period* on which the plaintiffs are focused.  Thissen first declares that the time period is 1999-2000.[70]  Thissen states that CCMI should have generated gross revenues of $7.9 million and $21.6 million, respectively, during this period. Diamond then states that the proper time period is 1999-2001, and asserts that CCMI should have earned $7.9 million and $21.6 million, respectively, in "year 1" and "year 2" of this three

---

[68] Although Thissen states that her company compiled the report, she does not identify who at her company did so, or provide the referenced information concerning the report.  *See* Thissen Report, at 6.

[69] There is certainly nothing in the Reports which provide a basis for the authors' gross revenue predictions.

[70] Thissen Report at 1 ("CCMI, more probably than not, would have exceeded $7.9 million in gross sales *in 1999* and $21.6 million in gross sales *in 2000)* (emphasis added).

year period.[71]  However, Diamond does not specify when "year 1" began -- which is problematic

since NAM's acquisition of CCMI took place on August 13, 1999.  Thissen, on the other hand,

suggests that the proper time period is calendar year 2000 and 2001.[72]  The Reports thus fail to

provide a consistent answer to this most fundamental "time frame" definition question.

### C. The Reports Provide Vague, Ambiguous And Misleading Information Concerning The Level Of Spending Required For CCMI To Earn The Projected Amounts.

Thissen opines that, with the proper amount of "sales and marketing support," CCMI

would have generated income of at least $7.9 million and $21.6 million in 1999 and 2000

respectively.[73]  Thissen then refers the reader to a Business Plan of roughly fifty pages, including

numerous costs projections.  The referenced Business Plan is from *August 1995*.[74]  Thissen does

not indicate whether she did any independent analysis to determine, in light of the age and other

factors, if this plan were sound and worthy of being relied upon.

Moreover, Thissen does not indicate which of these differing costs projections in the

Business Plan is the one she believes should apply.[75]  Diamond does not bother to include costs

projections in his Report.  Without these figures, and without a clear designation of what figures

---

[71] Diamond Report at 6, ¶30 ("I … believe it is highly likely that if CCMI was a stand-alone entity *from 1999-2001*, CCMI would have achieved revenue of $7.9 million in *year 1*.  And I believe that it is probable that CCMI would have achieved revenue of $21.6 million *in year 2*.") (emphasis added).

[72] Thissen Report at 2 ("[W]e believe that it is probable that CCMI would have exceeded $7.9 million in gross sales *in 2000* and $21.6 million in gross sales *in 2001*") (emphasis added).

[73] Thissen Report, at 2 ("While we cannot precisely quantify this prediction, we believe that it is probable that CCMI would nave exceeded $7.9 million in gross sales in 2000 and $21.6 million in gross sales in 2001, *had News America Marketing provided CCMI with the sales and marketing support outlined in CCMI's business plan*.") (emphasis added).

[74] *See* Thissen Report, Exhibit A, at 10-0.

[75] The Business Plan gives a "cost of services" in the amount of $31.95 million for 1999, for example, on projected revenue of $57.28 million.  *See* Thissen Report, Exhibit A, at 10-8.  In the alternative, for "year 4" – which appears to correspond to 1999 -- on projected revenues of $42.77 million, the plan projects "sales & marketing" expense of $3.82 million.  *See* Thissen Report, Exhibit A, final spreadsheets, sheet numbered for court-filing purposes "25 of 30."  Thissen's 1999 projected revenue figure is $7.9 million.  Thissen does not explain whether she believes, for example, that costs of $3.82 million in marketing and sales alone would have been required – and advisable -- in order to generate the $7.9 million figure.

within the fifty-page Business Plan are relevant, the Reports are incomplete.  In short, the

Reports, being fatally incomplete and insufficient, should be stricken.[76]  That being the case,

plaintiffs' motion should, in turn, be denied.

**Conclusion**

For all of the above reasons, News America Marketing In-Store, Inc. respectfully

requests that this Court deny the plaintiffs' Motion to Disclose Late.

NEWS AMERICA MARKETING IN-STORE,
INC.

By its attorneys,


/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO #552349)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700


Dated:  September 7, 2007
        Boston, Massachusetts

---

[76] There is an additional ground for striking Diamond's Report:  Diamond fails to identify whether he has testified in other cases.  *See Ortiz-Lopez v. Sociedad Espanola De Auxilio Mutuo Y Beneficiencia De Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001) ("Failure to include information concerning the retained expert that is specifically required by Rule 26(a)(2)(B)-such as 'a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding for years', see Rule 26(a)(2)(B)-frustrates the purpose of candid and cost-efficient expert discovery."); *Santiago-Diaz v. Laboratorio Clinico Y De Referencia Del Este*, 456 F.3d 272, 276 (1st Cir. 2006) (The failure to "enumerate the other cases in which [the witness] testified as an expert" is a "significant omission[].")

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on this 7th day of

September, 2007.

<u>/s/ Gordon P. Katz</u>
Gordon P. Katz

Table of Exhibits

| Ex No. | Description | Ex No. for ESI Opposition Brief |
|---|---|---|
| | Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006 | 16 |
| | Fireman Answers to NAM Interrogatories, Answer to Int. No. 20 | 15 |
| | Raider Answers to Ints., Int. No. 20 | 17 |
| | Scheduling Order dated May 30, 2006 | |
| | Notices of Deposition dated May 7, 2007 | |
| | Notices of Deposition dated May 15, 2007 | |
| | Katz Aff., ¶___, Exh. ___.  (changing depo lineup) | |
| | Transcript of June 26, 2007 Hearing | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

**DEFENDANT'S EXHIBIT BINDER
IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE
TO DISCLOSE EXPERTS BEYOND EXPERT DISCLOSURE DATE**

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO #261080)
Ieuan G. Mahony (BBO #552349)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

TABLE OF EXHIBITS

| Ex No. | Description |
|--------|-------------|
| 1. | Robert Fireman and Ann Raider's Motion to Modify Scheduling Order, filed June 8, 2007. |
| 2. | Opposition to Plaintiffs' Motion to Compel responses to Discovery Requests from Defendant ("Opposition to Motion to Compel"), filed June 4, 2007. |
| 3. | Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006. |
| 4. | Robert Fireman's Answers to First Set of Interrogatories Propounded by the Defendant, dated November 27, 2006 (Answers to Ints. No. 20). |
| 5. | Ann Raider's Answers to First Set of Interrogatories Propounded by the Defendant, dated November 27, 2006 (Answers to Ints. No. 20). |
| 6. | Scheduling Order dated May 30, 2006. |
| 7. | Affidavit of Attorney Katz dated September 7, 2007. |
| 8. | Transcript excerpts of June 26, 2007 Hearing. |
| 9. | Order of June 28, 2007. |

# 4773128_v1

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-11740MLW |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## ROBERT FIREMAN AND ANN RAIDER'S MOTION TO MODIFY SCHEDULING ORDER

Plaintiffs Robert Fireman and Ann Raider respectfully move for an Order modifying the Scheduling Order entered by this Court on May 30, 2006. Despite the parties' best efforts, delays and witness unavailability have prevented the completion of discovery and other milestone dates called for in the Discovery Order. As discussed below, the Plaintiffs seek only a modest modification of the Scheduling Order to reflect the realities associated with the lengthy discovery process which remains ongoing by agreement of the parties. As a practical matter a limited modification to the Scheduling Order will have practically no impact on the general administration of the case as the Defendant has indicated an intent to move for summary judgment at the conclusion of the party deposition phase of the case, which is now scheduled to conclude in mid-July. Presumably, the summary judgment briefing process will necessarily modify the Court's existing pretrial and trial schedule. As further grounds therefore, the Plaintiffs state as follows:

1.    The parties appeared before the Court in May, 2006 for their initial

scheduling conference.  Shortly thereafter, the Court entered a Scheduling Order to

govern the administration of the case.  The Order set the following relevant deadlines:

> Motions to Amend Pleadings by July 31, 2006
> Automatic Disclosures by June 15, 2006
> Expert Disclosures by March 30, 2006
> Discovery Concludes by May 31, 2007
> Scheduling Conference on June 26, 2007
> Final Pretrial Conference on August 8, 2007
> Trial on August 20, 2007

2.    After the issuance of the Scheduling Order, the parties made their required

automatic disclosures and began propounding discovery.  The Plaintiffs each served

Requests for Production of Documents on June 1, 2006.  Defense counsel sought and

obtained a one month extension to respond to the document request.  See Exhibit A

(email request).  Defense counsel sought a second one plus month extension on July 27,

2006 and proposed that responsive documents be produced after Labor Day.  See Exhibit

B (email request).  Additional delays pushed the Defendants' document production into

late September, 2006.  See Exhibit C.  In all, the Defendants documents were not

produced until September 27, 2007, some four months after the document request had

been propounded and five months into discovery.  Even after producing some materials,

discovery disputes followed concerning the scope and breadth of the Defendants'

document production.  These paper discovery disputes spilled into late 2006 and early

2007.  See e.g. Exhibit D (emails reflecting discovery disputes and the identification of

additional responsive documents) and Exhibit E (correspondence reflecting disputes).

While many of these early discovery disputes were worked out between counsel via

further document productions and disclosures, the issue of the Defendants' failure to

produce certain electronic discovery, particularly email back-up tapes, has resulted in a

motion to compel, which is now pending before the Court. The salient point here is that

the overwhelming majority of the one year discovery time limit has been dedicated to

issues relating to the production of the Defendants' documents. The failure to obtain

documents in a timely manner made it impractical for the Plaintiffs to commence

deposition discovery and conclude expert disclosures as contemplated by the Scheduling

Order.

     3.     Further compounding matters is the fact that fact based deposition

discovery in this matter has barely commenced. By letter dated January 5, 2007,

Plaintiffs' counsel informed Defendant's counsel that "we have also identified the first

four individuals we intend to depose. I am happy to share the identities of these

individuals so we can begin the process of working to schedule these depositions in the

most efficient manner possible." See Exhibit E. Unfortunately, defense counsel did not

respond to the scheduling request in a timely manner. See Exhibit F (email dated March

27, 2007 to defense counsel stating "I am still waiting for dates from your folks as well

for depositions"); Exhibit G (email dated April 26, 2007 to defense counsel noting "I

must say that I am finding it increasingly difficult to work to accommodate your

scheduling needs where you have not provided me with a single available date for any of

your witnesses ..."). When counsel did respond with available dates, most of the defense

witnesses were not available to be deposed within the discovery time periods, instead

offering available dates in June and July, 2007. See e.g. Exhibit H (email dated June 4,

2007 from defense counsel offering dates for witnesses on July 6 and July 18, 2007).

4.      Compounding matters, Defendants have required Plaintiffs to travel to New York for all but one of the Defendants' depositions. This process has and will require five (5) separate trips to New York City for depositions as defense counsel reports that witnesses are not available to be deposed within the same time frame.

5.      In all, the Plaintiffs were unable to actually undertake substantive depositions in this matter until May 25, 2007, some six days before the proscribed date for the conclusion of discovery.[1] Plaintiffs have been advised that all other defense witnesses are not available until June and July, 2007, well after the expiration of the discovery deadline. As an accommodation to these defense witnesses, and by agreement of the parties, the Plaintiffs have agreed that these depositions may be taken outside the discovery deadline.

6.      The Plaintiffs, through counsel, have been respectful of scheduling issues, requests for extensions of time and other delays. In short, the Plaintiffs have accommodated Defendants at every turn. The Plaintiffs' courtesy however should not be used against them as a basis to deny them the opportunity to conclude discovery and collect the information necessary to conclude its expert reports.

7.      Defendants have indicated an intent to move for summary judgment shortly after the conclusion of all pending and noticed depositions, now set for mid July. Given this schedule, summary judgment will not be concluded until, at the earliest, September, especially given pre-planned summer vacation schedules of counsel (presumably on both side). This practical reality will necessarily require that the trial date in this matter be moved beyond its scheduled date of August 20, 2007.

4

8.    As a result of these practical realities, Plaintiffs propose that the Court modify the existing Scheduling Order as follows:

Expert Disclosures by July 2, 2007

Discovery shall be concluded by July 20, 2007 however if and when the Court allows the Plaintiffs' pending motion to compel electronic discovery, the Plaintiffs shall be permitted to seek a brief enlargement of the discovery deadlines to undertake discovery limited to issues set forth in the newly disclosed evidence.

Final Pretrial Conference – To be set by Court after summary judgment motions have been addressed.

Trial –To be set by Court after summary judgment motions have been addressed.

The Plaintiffs suggest that the parties proceed with the previously scheduled Status Conference now set to proceed on June 26, 2007 at 4:00 PM so the Court may address these and any other relevant scheduling issues.

WHEREFORE, the Plaintiffs respectfully request that the Court modify the existing Schedule Order as set forth in Paragraph 8 above.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,


/s/ Kevin T. Peters
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Charles H. Roumeliotis (BBO #657553)
Todd & Weld LLP
28 State Street
Boston, MA  02109
Dated:  June 8, 2007                                (617) 720-2626

---

[1]    Plaintiffs did undertake a Rule 30(b)(6) deposition of the Defendant concerning issues relating to electronic and paper document discovery.  This deposition has resulted in the motion to compel currently pending before the Court.

## CERTIFICATION PURSUANT TO LOCAL RULES 7.1 and 37.1

I, Kevin T. Peters, hereby certify pursuant to Rules 7.1 and 37.1 of the Local Rules of the United States District Court for the District of Massachusetts that I have made a reasonable and good faith effort to reach agreement with counsel for News America Marketing In-Store, Inc., on the matter that is the subject of this Request. I spoke with Gordon Katz on June 8, and corresponded by email. Following those discussions, the defendant confirmed that it assents to the motion only to the extent it pertains to extending the pre-trial conference date and the trial date.

/s/ Kevin T. Peters
Kevin T. Peters

## CERTIFICATE OF SERVICE

I, Kevin T. Peters, hereby certify that this Robert Fireman and Ann Raider's Motion to Modify Scheduling Order filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 8, 2007.

/s/ Kevin T. Peters
Kevin T. Peters

Dated:  June 8, 2007

# EXHIBIT A

## Rich, David H.

**From:** gordon.katz@hklaw.com
**Sent:** Monday, June 26, 2006 11:54 AM
**To:** Rich, David H
**Subject:** Fireman & Raider/News America

David,

Good morning

Just a short note to request an additional month extension re: your document request in the above case. Needless to say, we are happy to reciprocate. Let me know if this is acceptable, and we can determine the new response dates all along.

Regards

Gordon

# Holland + Knight

### Gordon P. Katz

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon.katz@hklaw.com

www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else  If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence  If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz vcf>>

6/26/2006

# EXHIBIT B

## Rich, David H.

| | |
|---|---|
| **From:** | gordon katz@hklaw com |
| **Sent:** | Thursday, July 27, 2006 9:37 AM |
| **To:** | Rich, David H |
| **Subject:** | Fireman/News America Marketing |
| **Importance:** | High |

David,

Another request for additional time. I have been flat out all summer and August is looking to be about the same. Can we agree to further extend our response date for document production, etc to after Labor Day, say September 8  Let me know  Many thanks

Regards

Gordon

# Holland + Knight

**Gordon P. Katz**

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon.katz@hklaw.com

www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else  If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence  If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz vcf>>

7/28/2006

# EXHIBIT C

## Rich, David H.

**From:** gordon.katz@hklaw.com
**Sent:** Monday, August 28, 2006 4:52 PM
**To:** Rich, David H.
**Subject:** RE: document review in Fireman/Raider v. Newsamerica

Sounds like a plan.

Gordon

**From:** Rich, David H. [mailto:drich@toddweld.com]
**Sent:** Monday, August 28, 2006 4:32 PM
**To:** gordon.katz@hklaw.com
**Cc:** Peters, Kevin
**Subject:** document review in Fireman/Raider v. Newsamerica

Gordon: My clients and I are available to review your client's document production on September 27th at 10 AM at your office. Please let me know if this works for you. My clients are in the process of collecting their documents and we should be in a position to produce our documents at or around this time as well. Our production should be of a size where it is more economical for you to simply have all our files copied and bate stamped. Thanks

David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

8/29/2006

# EXHIBIT D

## Rich, David H.

| | |
|---|---|
| **From:** | gordon katz@hklaw com |
| **Sent:** | Thursday, November 16, 2006 9:12 AM |
| **To:** | Rich, David H.; Peters, Kevin |
| **Cc:** | tara myslinski@hklaw com; nathaniel hulme@hklaw.com |
| **Subject:** | Fireman/Raider - NAM |

David and Kevin,

My intention was to get back to you by todaay with respect to your recent letter regarding document discovery. I have, however, been swamped with matters in and out of the office. I will try to get you a response before Thanksgiving. I trust that this is ok; please let me know. In general, I think that we should be able to work out any issues which you might have

Regards

Gordon

# Holland + Knight

**Gordon P. Katz**

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon.katz@hklaw com

www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz vcf>>

11/20/2006

**Rich, David H.**

| | |
|---|---|
| **From:** | gordon katz@hklaw com |
| **Sent:** | Wednesday, November 29, 2006 12:03 PM |
| **To:** | Rich, David H |
| **Cc:** | tara myslinski@hklaw.com |
| **Subject:** | Fireman/Raider Litigation -- Response to October 30 Letter |

David,

Just want to keep you posted  Because a number of the people mentioned in your letter have left NAM, it is taking more time than anticipated to determine whether they left files relating to the case.  That being the case, I am virtually certain that I will not have a response to your letter until next week since I do not expect to hear back from everyone this week.

More to come

Gordon


# Holland + Knight

**Gordon P. Katz**

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617 573 5839
Main   617 523 2700
Fax    617 523 6850
Email  gordon.katz@hklaw.com

www.hklaw.com

**NOTICE:** This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else  If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence  If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz vcf>>

11/29/2006

## Rich, David H.

| | |
|---|---|
| **From:** | gordon.katz@hklaw.com |
| **Sent:** | Wednesday, April 04, 2007 4:26 PM |
| **To:** | Rich, David H. |
| **Subject:** | Additional Meeting Minutes |

David,

On another subject: we have been continuing our digging for additional meeting minutes. I think we are now at the absolute end of the road. We have found some additional minutes, and they are ready for you to review. I would estimate that we have a stack of documents about 2 feet high. We can copy them and send them to you, if you would like us to do that. Let me know.

Gordon


Gordon P. Katz
Holland & Knight, LLP
10 St. James Avenue
Boston, Ma 02116
617.573.5839
617.523.6850 (fax)
gordon.katz@hklaw.com
www.hklaw.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You

**From:** Rich, David H. [mailto:drich@toddweld.com]
**Sent:** Wednesday, April 04, 2007 4:20 PM
**To:** gordon.katz@hklaw.com
**Cc:** Peters, Kevin
**Subject:** RE: Confirmation of next weeks depositions

Thanks and let me know if the unexpected becomes the expected. Good luck with your trial.


David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)


4/6/2007

**Rich, David H.**

| | |
|---|---|
| **From:** | gordon.katz@hklaw.com |
| **Sent:** | Tuesday, October 03, 2006 4:07 PM |
| **To:** | Rich, David H. |
| **Cc:** | tara myslinski@hklaw.com |
| **Subject:** | Fireman/Raider - News America -- Discovery |

David,

Are you guys ok with the confidentiality stip I forwarded last week? Let me know. I would like it signed before forwarding copies of the documents you selected.

Also, a couple of additional items:

1. We have located some additional documents from your clients' files at NAM. They are being transmitted to us, and I will let you know when they are ready for viewing

2. When do you anticipate having for us the written discovery and documents we requested. Let me know.

Many thanks

Gordon


# Holland + Knight

**Gordon P. Katz**

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon katz@hklaw.com

www.hklaw.com

**NOTICE:** This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else  If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence  If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz vcf>>


10/3/2006

# EXHIBIT E

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109



DAVID H. RICH
Email: drich@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

January 5, 2007

**VIA ELECTRONIC MAIL**
**AND FIRST CLASS MAIL**

Gordon Katz, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116

  Re: Robert Fireman and Ann Raider v. News America Marketing In-Store, Inc.
    Civil Action No. 05-11740-MLW

Dear Gordon:

  I write to follow up on a few pending matters concerning News America Marketing In-Store's ("NAM") document production and related issues.

  First, your December 12, 2006 letter notes that approximately five boxes of additional documents are available for review. My clients and I would like to come to your office to review these documents on January 19th at 10 AM. If possible, we would like the materials previously produced to be made available again. Please let me know if this works for you and your staff.

  Second, in my letter of October 30, 2006, I specifically raised the issue of meeting minutes and notes. You responded by stating that certain meeting minutes were produced within the document production. Most respectfully, your written response has missed the point. My clients have requested, and are entitled to review, <u>all</u> meeting minutes at which Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct or SmartSource iGroup were mentioned or discussed.

  Nowhere in the "70,000 pages of documents" produced by your client did NAM produce a single meeting minute or note from NAM's executive management meetings, which were routinely held from 8 AM to 11 AM every Monday. These meetings were attended by, among others, Mr. Carlucci, Mr. Porco, Mr. Mixon, Mr. Garafalo, Mr. Jenson, Mr. Klein, Ms. Jehn, Mr. Campelli and Mr. Davoe, Jr. Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct and/or SmartSource iGroup were discussed during these meetings and minutes and notes reflecting discussions on these topics were documented and recorded. To date, nothing has been produced.

Gordon Katz, Esq.
January 5, 2007
Page 2 of 2

Likewise, NAM did not produce a single record, minute or note from its weekly division meetings (sometimes called the "new ventures group meetings" or later, "SmartSource iGroup meetings"). These meetings were attended by individuals such as Mr. Davoe Jr., Mr. Lellouche, Ms. Heardy, Mr. Rubin, Mr. Mixon, Mr. Garofalo, Mr. Campanelli, Mr. Racano and others. Again, there can be no dispute that Ms. Raider, Mr. Fireman, CCMI, SmartSource Direct and/or SmartSource iGroup were routinely discussed during these meetings and minutes and notes reflecting discussions on these topics were documented. At these meetings the strategic plan for the acquisition of CCMI, Planet U and Softcard, Inc. were discussed. Moreover, in these meetings NAM decided how to manage (or not manage) all aspects of CCMI, the Plaintiffs and all other personnel. These materials are relevant to the litigation and must be produced for inspection.

Along the same lines, your letter goes to great lengths to identify various due diligence documentation provided within the document production but nowhere do you represent that all due diligence materials have been produced. As I informed you in October, studies, strategic plans, projections or internal analysis were performed by NAM concerning the potential acquisition on CCMI. These documents were prepared and circulated within NAM prior to the execution of the Stock Transfer Agreement. None of these materials have been produced. Along the same lines, nowhere does your letter address my clients' request for NAM's strategic plan, analysis or report concerning NAM's potential acquisitions of Planet U, Softcard and CCMI. Again, these documents existed at one time. If the documents no longer exist, please so state and identify when they were destroyed. If the documents currently exist (and we have reason to believe that they do), please produce them.

Concerning the issues set forth in your letter concerning electronic data retention, my clients intend to notice a Rule 30(b)(6) deposition on this topic. I will forward to you shortly a deposition notice. I would like to work cooperatively with you to schedule the deposition for a date convenient to all. We have also identified the first four individuals we intend to depose. I am happy to share the identities of these individuals so we can begin the process of working to scheduling these depositions in the most efficient manner possible.

Thank you

Very truly yours,

David H. Rich

cc:    Kevin T. Peters, Esq

# EXHIBIT F

**Rich, David H.**

REDACTED

.

-----Original Message-----
From: Rich, David H. [mailto:drich@toddweld.com]
Sent: Tuesday, March 27, 2007 9:43 AM
To: gordon.katz@hklaw.com
Cc: Peters, Kevin; jlippner@newscorp.com
Subject: RE: Ann Raider's deposition


Gordon - Ms. Raider advises that she is traveling the next few weeks extensively and the
next Monday she is available is April 30th. If you are looking for another day generally,
she is available on April 20th.
If neither of these dates work, we will have to move it to May or keep the date as is. I
hear you on the ints and am working on it.

I am still waiting for dates from your folks as well for depositions.



David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)

-----Original Message-----
From: gordon.katz@hklaw.com [mailto:gordon.katz@hklaw.com]
Sent: Tuesday, March 27, 2007 6:14 AM
To: Rich, David H.
Cc: Peters, Kevin; jlippner@newscorp.com
Subject: Re: Ann Raider's deposition

David,

Actually, can we move Anne's depo to the following Monday?

Also, for both her and Mr. Fireman's depo (the previous Fri), we will need answers to the
2d set of ints. When do you expect that they will be ready for me?

Let me know. Many thanks.

Gordon


Gordon P. Katz
Holland & Knight LLP
10 St. James Avenue

1

Boston, MA  02116
E-Mail: gordon.katz@hklaw.com
Telephone: 617.573.5839
Fax: 617.523.6850
www.hklaw.com

This email is intended solely for the use of the individual to whom it is addressed and
may contain information that is privileged, confidential or otherwise exempt from
disclosure under applicable law
If the reader of this email is not the intended recipient or the employee or agent
responsible for delivering the message to the intended recipient, you are hereby notified
that any dissemination, distribution, or copying of this communication is strictly
prohibited  If you have received this communication in error, please immediately notify
us by telephone and return the original message to us at the listed email address.  Thank
You.

----- Original Message -----
From: Rich, David H. <drich@toddweld.com>
To: gordon.katz@hklaw.com <gordon.katz@hklaw.com>
Sent: Mon Mar 26 12:13:10 2007
Subject: Ann Raider's deposition

Gordon-As you may now have figured out, Ann Raider's deposition falls on the first night
of Passover.  I have checked with Ms. Raider and we are
both fine going until 4 PM but cannot go beyond 4.   I assume that isn't
a problem for you (and that you may have similar time restrictions).



David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)

This e-mail, and any attachments thereto, is intended only for the
addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this e-mail, and any attachments thereto, is
strictly prohibited. If you have received this e-mail in error, please immediately notify
me by return e-mail and permanently delete the original and any copy of this e-mail
message and any printout thereof.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we
inform you that any U.S. tax advice contained in this communication (including any
attachments) is not intended or written to be used, and cannot be used, for the purpose of
avoiding U.S.
tax penalties.



This e-mail, and any attachments thereto, is intended only for the
addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this e-mail, and any attachments thereto, is
strictly prohibited.  If you have received this e-mail in error, please immediately notify
me by return e-mail and permanently delete the original and any copy of this e-mail
message and any printout thereof.

                                      2

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S tax penalties.

**EXHIBIT G**

**Rich, David H.**

**From:** gordon.katz@hklaw.com
**Sent:** Thursday, April 26, 2007 9:08 AM
**To:** Rich, David H
**Subject:** RE: Deposition Dates

I understand  Please tell me what is on the table now   Many thanks

Gordon

**From:** Rich, David H. [mailto:drich@toddweld.com]
**Sent:** Thursday, April 26, 2007 8:55 AM
**To:** gordon.katz@hklaw.com
**Cc:** Peters, Kevin
**Subject:** Deposition Dates

Gordon - I have nothing further beyond the dates I provided you two weeks ago   I have provided you with available dates for Ann Raider beginning a week and a half from now   I am continuing to endeavor to find a closer date for Mr  Fireman   I remind you that both of these depositions were scheduled in March and cancelled by you  Also, while I appreciate your efforts to move things along, I must say that I am finding it increasingly difficult to work to accommodate your scheduling needs where you have not provided me with a single available date for any of your witness, a request which has been outstanding for well over a  month.  I will always attempt to work cooperatively with you, but this must be a two way street.  I'm sure you understand.

David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)

**From:** Rich, David H.
**Sent:** Tuesday, April 10, 2007 4:41 PM
**To:** 'gordon.katz@hklaw.com'
**Cc:** Peters, Kevin
**Subject:** Interrogatory Answers and deposition dates

Gordon - Attached are Robert Fireman's Answers to the Defendants' Second Set of Interrogatories.  Ann Raider is currently traveling and I will forward to you her answers upon her return   You will find that Ms  Raider's interrogatory answers will be virtually identical to Mr  Fireman's responses

Concerning deposition scheduling, Ms  Raider is available to reschedule her deposition on either May 9th, 15th or 17th  Mr  Fireman is available on May 22nd or 24th.  Please let me know which of these dates work for you

Thanks and see you tomorrow at 1 for Mr  Charm's deposition

4/26/2007

David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)

This e-mail, and any attachments thereto, is intended only for the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by return e-mail and permanently delete the original and any copy of this e-mail message and any printout thereof.

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax penalties.

4/26/2007

# EXHIBIT H

## Rich, David H.

| | |
|---|---|
| **From:** | gordon.katz@hklaw.com |
| **Sent:** | Monday, June 04, 2007 5:39 PM |
| **To:** | Peters, Kevin; Rich, David H |
| **Subject:** | Fireman/Raider -- Depos of Paul Carlucci and Marty Garofalo |

Kevin and Dave,

I have checked availabilities and we propose **July 6** for Paul, and July 18 for Marty, both at NAM's offices in New York

Let me know asap if you want to go with these dates. Many thanks

Gordon

# Holland + Knight

**Gordon P. Katz**

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116

Direct 617.573.5839
Main   617.523.2700
Fax    617.523.6850
Email  gordon.katz@hklaw.com

www.hklaw.com

NOTICE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality

<<Gordon P Katz.vcf>>

6/6/2007

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ROBERT FIREMAN and ANN RAIDER,

    Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

    Defendant.

Civil Action No. 05-11740-MLW

---

## OPPOSITION TO PLAINTIFFS' MOTION TO
## COMPEL RESPONSES TO DISCOVERY REQUESTS FROM DEFENDANT

NEWS AMERICA MARKETING IN-STORE,
INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 4, 2007
    Boston, Massachusetts

## Table of Contents

Introduction ...................................................................................................1

Preliminary Statement ................................................................................1

Factual Background ......................................................................................2

    **A.**    NAM And The Plaintiffs Execute The Stock Purchase Agreement. .......................2

    **B.**    The Plaintiffs Expressly Agree Not To Challenge NAM's Decision-Making, And Agree That NAM Will Be Free To Operate In Accordance With NAM's "Sole And Unfettered Judgment." ....................................3

    **C.**    NAM Fully Performs Under The Parties' Agreement, And The Plaintiffs Enjoy Material Earn-Out Payments. ........................................6

Procedural Posture Of The Present Motion ...........................................7

    **A.**    The Plaintiffs' Serve Broad Document Requests. ......................................7

    **B.**    NAM Provides A Full And Fair Production, With Supplementations. ..................7

    **C.**    NAM's Production Includes A Range Of Responsive ESI, From Live Locations And Archived Locations On NAM's Network. ..................................8

    **D.**    NAM's Network Rules Do Not Require Users To Rely On Tape Backups; It Is Difficult, Time-Consuming, And Expensive To Retrieve Information From These Tapes, And These Constraints Increase Significantly As A Tape Ages Beyond Four To Five Weeks. ..................................9

    **E.**    The Plaintiffs Conduct A Cursory Review Of NAM's Production. ......................11

    **F.**    The Plaintiffs Demand ESI Stored In NAM's Backup Tapes. ...........................11

    **G.**    In Response, NAM Retains An Expert, Who Quantifies The Costs And Burdens Of Producing The ESI The Plaintiffs Demand. ..................................12

    **H.**    NAM Informs The Plaintiffs That Their Requests For ESI From Backup Tapes Will Cost Over $13 Million; The Plaintiffs File The Present Motion. .........14

    **I.**    In Their Motion, The Plaintiffs Identify No "Gaps" Or Missing Information In NAM's Production. ..................................15

Legal Argument .........................................................................................17

**I.**    Under Either The New Rules Or Pre-Existing Case Law, The Plaintiffs' Motion Must Be Denied. ..................................17

**II.**    NAM's Backup Tapes Are Not Reasonably Accessible. .....................................17

**III.**    No "Good Cause" Exists To Support The Plaintiffs' Requests. ...........................20

    **A.**    The Plaintiffs' Requests Are Not "Narrowly Tailored," And They Make No Attempt To Specify The Relevance Or Importance Of These Requests To The Case. ..................................21

| | B. | The Plaintiffs Have Enjoyed Ample Discovery | 22 |
| | C. | The Plaintiffs Do Not Show How The Requested ESI Discovery Differs In Any Material Respect From The Full Discovery NAM Has Already Provided. | 23 |
| | D. | NAM Has Produced Extensive, Responsive ESI From Online And Archived Sources, And The Plaintiffs' Claims That NAM's Backup Tapes Offer The "Only Source" For Responsive ESI Are Flatly Incorrect | 24 |
| | E. | There Is No Basis -- As A Matter Of Law -- To The Plaintiffs' Claims That ESI Discovery Will "Likely" Generate Relevant Documents. | 25 |
| IV. | | The Plaintiffs' Claims Have No Substantive Merit, And This Fact Alone Requires Denial Of The Present Motion. | 26 |
| | A. | The Stock Agreement Bars The Plaintiffs' Claims. | 26 |
| | B. | The Plaintiffs Failed to Follow the Agreement's Mandatory Objection Procedures. | 28 |
| | C. | The Plaintiffs Accepted NAM's Earn-Out Payments, And Are Now Barred From Challenging These Payments. | 28 |
| | D. | The Plaintiffs Have Not and Cannot Establish any Damages | 29 |

**Conclusion** ................................................................................................ 32

**Request for Hearing** .................................................................................. 32

## Introduction

Defendant News America Marketing In-Store, Inc. ("NAM")[1] hereby opposes the Motion

to Compel of the Plaintiffs, Robert Fireman ("Fireman") and Anne Raider ("Raider"). The

Plaintiffs seek to compel NAM to restore and search -- at a cost of over $13 million --

electronically stored information ("ESI") dated beginning in 1999 and located on (a)

approximately 5,000 daily backup tapes covering NAM's email system; and (b) over 150 year-

end backup tapes covering NAM's full computer network. In their Motion, the Plaintiffs:

> (i)     ignore the extensive production they have already received of NAM's paper
>         files, online ESI files, and archived ESI files;
>
> (ii)    fail to identify how this full production is deficient in any manner;
>
> (iii)   indeed, decline to limit their original, expansive, and vague document requests
>         in any way; and
>
> (iv)    advance no justification for the overwhelming, disproportionate burden they
>         seek to impose on NAM, in light of the meritless nature of their claims and no
>         more than speculative suggestion of damages.

Accordingly, as detailed below (a) ESI on NAM's backup tapes is not reasonably

accessible, and (b) the Plaintiffs have not demonstrated the necessary "good cause" to require the

restoration and searching of these tapes.

The Plaintiffs' Motion to Compel, therefore, must be denied.

## Preliminary Statement

Six years after Plaintiffs Bob Fireman and Ann Raider sold their company to defendant

NAM, they instituted this lawsuit because, in a nut shell, they have sellers' remorse. After

lengthy contract negotiations and having been fully represented by Goodwin Procter LLP, these

---

[1] NAM is a national marketing services company. Its customers are large retailers (such as grocery store chains) and consumer packaged goods manufacturers. As part of its business, NAM develops overall marketing strategies for prospective and current customers; establishes and maintains strategic business relationships; and implements such strategies through the sale of marketing products such as free standing inserts in newspapers, coupon dispensers on store shelves, and other forms of in-store marketing to customers.

1

two very experienced business people sold their company to NAM in 1999. In so doing

Plaintiffs: (i) did not contractually require NAM to do anything with regard to how NAM ran

the acquired business assets – nowhere in the Stock Purchase Agreement is there any express

requirement that NAM provide any specific kind of support, be it financial or manpower, or that

NAM do anything specific with the acquired business; (ii) expressly granted NAM the right to be

"free" to operate the acquired business "in its sole and unfettered judgment;" and (iii) expressly

agreed that it would have "no claim" against NAM based on NAM's exercise of that unfettered

judgment in running the business. Disappointed in how the business deal ultimately turned out,

Plaintiffs sue, claiming NAM breached *implied* obligations it owed them. These alleged *implied*

obligations, however, fail as a matter of law since they necessarily contradict the *express* written

terms of the parties' contract. Knowing this lawsuit skirts the bounds of Rule 11, Plaintiffs now

bring the instant baseless motion in an effort to extort a settlement, attempting to force NAM to

choose between spending more than $13 million dollars on ESI discovery or paying Plaintiffs

millions of dollars to go away. This Motion, like the entire suit, should be rejected.

## **Factual Background**

### A.    **NAM And The Plaintiffs Execute The Stock Purchase Agreement.**

As an experiment to get a toehold in electronic commerce, NAM in August 1999

acquired all the stock of Consumer Card Marketing, Inc. ("CCMI"). CCMI's business, at the

time of the acquisition, focused on the implementation of loyalty card programs for grocery

stores chains.[2] Such loyalty cards permit the store to generate a database of shoppers and their

respective product preferences. In connection with this acquisition, NAM and the Plaintiffs

(among others) executed a Stock Purchase Agreement, dated August 13, 1999 (the "Stock

---

[2] See Exhibit ("Ex.") 1, NAM Due Diligence Memo dated May 27, 1999, bates numbered NAM3157-3159
("NAM Due Diligence Memo").

2

Purchase Agreement").[3] CCMI's performance before the acquisition was modest if not failing. For example, for fiscal year 1998, CCMI experienced a loss of approximately $150,000 on gross revenues of approximately $4 million. For the first quarter of 1999 – shortly before NAM's acquisition – CCMI had generated gross revenue of only $766,420.[4]

Under the terms of the Stock Purchase Agreement, NAM paid CCMI shareholders $2.8 million in cash.[5] In addition to this compensation, and among other benefits, the Plaintiffs each received five-year employment agreements and, most relevant for this dispute, the possibility of receiving earn-out payments, based on the performance of the acquired business.[6]

**B.    The Plaintiffs Expressly Agree Not To Challenge NAM's Decision-Making, And Agree That NAM Will Be Free To Operate In Accordance With NAM's "Sole And Unfettered Judgment."**

Without proper limiting language, earn-out provisions -- of the type provided in the Stock Purchase Agreement -- can provide fertile ground for disputes. Assume an earn-out provision that is based on the achievement of certain performance milestones. Assume further that the achievement of these performance milestones is determined, as is always the case, by, in part, business decisions made by the party responsible for paying the earn-outs (the "Payor"). Without proper limiting language, the potential beneficiary of the earn-out provision is free to challenge and disrupt any number of the Payor's business decisions. The potential beneficiary will claim that the Payor's business decisions failed to optimize performance for achievement of the requisite performance milestones, and failed to generate for the beneficiary the maximum sought-after earn-out payments. An improperly structured earn-out provision, therefore, can

---

[3] *See* Ex. 2, Stock Purchase Agreement.

[4] Ex. 1, NAM Due Diligence Memo, Financial Statements of CCMI for 1998, Q1 1999.

[5] Ex. 2, Stock Purchase Agreement, §2.1.

[6] Ex. 2, Stock Purchase Agreement, §2.3.

allow a beneficiary to "second guess" management, disrupt proper operations of the Payor, and

demand performance-based earn-outs irrespective of actual performance.

Well aware of the dangers of an improperly structured earn-out provision, NAM required

that the Stock Purchase Agreement contain two key provisions: (i) a provision expressly

granting NAM "sole and unfettered" decisionmaking regarding the acquired business together

with a clause expressly preventing the Plaintiffs from *challenging* NAMs' "sole and unfettered"

decisionmaking; and (ii) a provision requiring the Plaintiffs to raise objections to their earn-out

payments within twenty business days of the payment, and resolve any disputes through

accountant-run arbitration. Accordingly, Section 6.8 of the Stock Purchase Agreement provides,

in relevant part, as follows:

> It is Buyer's [NAM's] current intention to provide support to the business of
> the Company [CCMI] by, among other things, (i) utilizing Buyer's sales
> force in order to promote the sale of the Company's products, (ii) assisting
> the Company in the creation of long-term relationships with retailers, and
> (iii) investing in software and hardware as needed to expand the Company's
> business. Notwithstanding the foregoing, *Buyer shall be free to operate the
> Company and its Affiliates in its sole and unfettered judgment and Sellers
> [Fireman and Raider] shall have no claim against Buyer in connection
> therewith* as a result of the preceding sentence."[7] (emphasis added)

---

[7] Ex. 2, Stock Purchase Agreement, §6.8 (emphasis added). The Plaintiffs appear to claim that pre-existing, extrinsic documents or discussions alter this express language of the Stock Purchase Agreement. *See* Motion to Compel at 2 ("the Defendant agreed it would commit its resources and run Plaintiffs' company [CCMI] in such a way as to permit it to continue its growth and execute its business plan").

The Plaintiffs are incorrect. The Stock Purchase Agreement contains an "integration clause." It states: "This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters." Ex. 2, Stock Purchase Agreement, §8.1.

This clause operates as a *complete bar* to any claim that prior exchanges between the Plaintiffs and NAM alter the Agreement. *See, e.g., Primex Int'l Corp. v. Wal-Mart Stores, Inc.,* 89 N.Y.2d 594, 599 (1997) ("[T]he purpose of a general merger provision, typically containing the language found in the clause of the parties' 1995 Agreement that it 'represents the entire understanding between the parties,' is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing ..."). *See also Marine Midland Bank-Southern v. Thurlow,* 53 N.Y.2d 381, 387 (1981) (where plaintiff enjoys "sole discretion" to "direct the 'order or manner of the disposition'" of collateral pledged by defendant under integrated security agreement, defendant precluded from "attempt[ing] to establish the existence of an oral agreement" that "clearly contravenes the express terms of these agreements and completely negates the plaintiff's right under the

4

Nowhere in the Stock Purchase Agreement is there even a single express requirement as

to how NAM was to supposed to run or support the acquired business.  Plaintiffs, two

sophisticated business people who were represented by the firm of Goodwin Procter LLP

throughout the sale negotiations, freely bargained away any such express limitations on NAM

and expressly agreed that NAM was "free" to run the acquired the business in its "sole and

unfettered judgment."

In addition, Section 2.3(c) provides, in relevant part:

> In the event that the Principal Sellers [the Plaintiffs] desire to dispute any
> Buyer's Calculation [concerning the earn-out payments], the Principal
> Sellers shall, within twenty (20) Business Days following receipt of such
> Buyer's Calculation, deliver to Buyer written notice setting forth, in detail,
> their objections to such Buyer's Calculation (the "Objection Notice"), which
> dispute shall be resolved in accordance with the procedure outlined in
> Section 2.2(b) [providing for accountant-run arbitration].[8]

The accountant-run arbitration provision required each party to *designate* an accounting

firm to resolve earn out disputes that remained after the parties had discussed them.[9]  If, after 30

days, the two accounting firms were unable to resolve the disputed issue, then that dispute was to

be submitted for a final and binding decision to a third nationally recognized independent

accounting firm.  Once the third accountant made his final and binding decision, the earn out

would be paid with interest at 150 basis points above prime from the applicable base earn out

payment date. Ex. 2, § 2.2(b).

The Stock Purchase Agreement thus protects NAM against the potential risks, outlined

above, of earn-out provisions by (a) preventing the Plaintiffs from challenging NAM's exercise

---

defendant's security agreement to release and apply the [] collateral as it deemed appropriate."); *Unisys Corp. v.
Hercules Inc.*, 224 A.D.2d 365, 368 (N.Y. App. Div. 1st Dept. 1996) ("Having declared the contract to be the entire
agreement, the law regards it as not merely the best but the *exclusive evidence* of the parties' intent ...") (prohibiting
plaintiff from introducing extrinsic evidence to contradict the terms of an integrated agreement) (emphasis supplied).

[8] Ex. 2, Stock Purchase Agreement, §2.3(c) (emphasis added).

[9] Ex. 2, Stock Purchase Agreement, §2.2(b).

of its "sole and unfettered" judgment, (b) requiring the Plaintiffs to bring any disputes over the

calculation of their earn-out to NAM's attention, for prompt resolution, and (c) providing that

any dispute that cannot be so resolved by the principals must be resolved by accountants chosen

by the parties.

### C.    NAM Fully Performs Under The Parties' Agreement, And The Plaintiffs Enjoy Material Earn-Out Payments.

NAM has fully performed under the Stock Purchase Agreement.  Indeed, during the five-

year earn-out term, NAM paid Plaintiffs earn-out payments totaling $771,985.[10]  The Plaintiffs,

in addition, employed Section 2.3(c)'s dispute procedures frequently.  Yet in no case did the

Plaintiffs bother to take any grievance to accountant arbitration.[11]  They worked out any issues

with NAM management and accepted without reservation the earn-out payments wire-transferred

into their accounts.

In August 2005, approximately one year after expiration of the five-year earn-out period,

and the five-year term of their NAM employment agreements, the Plaintiffs filed this action,

claiming that NAM's business decisions regarding CCMI resulted in the Plaintiffs' not receiving

as much in earn-out payments as they had wished.  According to their Motion and deposition

testimony, Plaintiffs believe that the Stock Purchase Agreement contains *implicit* obligations and

restrictions on how NAM was supposed to support and run the acquired business -- ignoring the

*express* "sole and unfettered judgment" language of Section 6.8 and the integration clause -- and

that NAM breached these implicit obligations.  As is readily apparent, these alleged implicit

obligations conflict directly with the express language of the parties' contract.

---

[10] Ex. 3, Tabulation of Earn-Out Payments.

[11] Ex. 4, Fireman Depo. Excerpts, at 181:17-183:23.

## Procedural Posture Of The Present Motion

### A.    The Plaintiffs' Serve Broad Document Requests.

In June, 2006, the Plaintiffs served their First Set of Requests for Production of

Documents and Things (the "Requests for Production").  The Requests for Production contained

forty (40) separately numbered requests, and sought an expansive range of information, with

requests such as the following:[12]

| Request No. | Text of Request |
|---|---|
| 1 | All documents that refer, reflect or relate to Consumer Card Marketing Inc. ("CCMI"). |
| 39 | All documents which refer, reflect or relate to Ann Raider or Robert Fireman. |
| 40 | All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies, or surveys received or prepared at anytime from 1997 to the present. |

### B.    NAM Provides A Full And Fair Production, With Supplementations.

NAM responded to these Requests, raised certain objections,[13] and compiled responsive

documents and materials.  Specifically, in September, 2006, NAM made its initial production

materials available to the Plaintiffs for review.  This initial production consisted of (i) 60 labeled

three-ring binders of documents; (ii) 5 redwelds of non-privileged documents from the files of

Deborah Wolfe, Esquire (transaction counsel for NAM); and (iii) 17 banker's boxes containing

(a) the working files of Raider and Fireman, (b) promotional materials, and (c) other materials.

These banker's boxes contained over 290 separate files of requested materials.[14]

---

[12] Ex. 5, Requests for Production.

[13] Ex. 6, Responses to Requests for Production.

[14] Declaration of N. Hulme ("Hulme Decl."), ¶¶4-9.

In early 2007, NAM supplemented this initial production, and made further documents and materials available to the Plaintiffs. This supplementary production consisted of (i) 18 additional labeled binders of documents; (ii) 3 redwelds of additional identified documents from Henri Lellouche; (iii) one redweld of identified documents from Marty Garofalo; and (iv) one redweld of meeting minutes.[15]  In April of 2007, NAM further supplemented its responses, to include additional meeting minutes.[16]

### C.    NAM's Production Includes A Range Of Responsive ESI, From Live Locations And Archived Locations On NAM's Network.

NAM included responsive Electronically Stored Information ("ESI") in its production. Henri Lellouche ("Lellouche"), the Plaintiffs' primary supervisor at NAM, for example, retained in his network account all important email and other documents he generated or received.[17] Lellouche runs the vast majority of his projects using digital files, and not paper files. Lellouche, therefore, took care to retain all important digital files.[18]  Upon being presented with the Plaintiffs' Requests for Production, Lellouche searched the hard drive of his computer, and the network shared drives to which he had access, using keywords tailored to the Plaintiffs' Requests.[19]  Lellouche conducted these searches in all online, "live" locations, as well as all archived locations, covering the period 1999 through 2004.[20]  These searches uncovered responsive ESI.

At Lellouche's direction, the NAM IT Department conducted similar ESI searches, using similar keywords. The NAM IT Department similarly uncovered responsive information from

---

[15] Hulme Decl., ¶¶14-16.

[16] Hulme Decl., ¶22.

[17] Declaration of H. Lellouche ("Lellouche Decl."), ¶8-11.

[18] Lellouche Decl., ¶10.

[19] Lellouche Decl., ¶12.

[20] Lellouche Decl., ¶13-14.

NAM's online and archived accounts.[21]  This ESI was included in the productions made

available and provided to the Plaintiffs.[22]

**D.    NAM's Network Rules Do Not Require Users To Rely On Tape Backups; It Is Difficult, Time-Consuming, And Expensive To Retrieve Information From These Tapes, And These Constraints Increase Significantly As A Tape Ages Beyond Four To Five Weeks.**

The documents sought by the Plaintiffs fall under the so-called "Windows environment"

at NAM, which is concerned with the creation, modification, saving, and backing up of Word

documents, Excel documents, Email (including attachments), and Power Point documents.[23]

The Windows environment at NAM is extensive, and consists of approximately 200 servers,

arranged in a "meshed" network, and located in approximately 20 office locations throughout

North America.[24]

Users save and archive files and email in the Windows environment to their local hard

drives, and to shared network drives.[25]  Files and email in NAM's Windows environment are

then backed-up to sets of backup tapes.  The tapes are created on certain cycles (ranging from

daily to year-end), from servers located in various NAM offices.  They are retained for differing

periods of time, depending upon the nature of the information.[26]  Restoring these backup tapes is

a complex process.[27]  Presented with a backup tape from 2000, for example, the IT Department

---

[21] Lellouche Decl., ¶¶15-16.

[22] Lellouche Decl., ¶¶17-18.

[23] Declaration of A. McBean ("McBean Decl."), ¶¶5-6.

[24] Ex. 7, Deposition Transcript of A. McBean ("McBean Depo.") at 21:12-22:17.

[25] Ex. 7, McBean Depo. at 96:17-97:18.

[26] Ex. 7, McBean Depo. at 70:15-71:14 (method for backing up the 20 offices); 72:2-72:20 (backup structure over time); 73:17-74:22 (frequency of backups); 75:6-75:18 (incremental vs. full system backup).

[27] Ex. 7, McBean Depo. at 87:9-88:11; 90:22-91:19.

would need to re-create and "build" the environment and infrastructure that existed in 2000 in order simply to recover the data before commencing any searches.[28]

Even for recent backup tapes – those created within the past four to five weeks, where re-creating a legacy environment is *not* required – NAM's IT Department will *not* restore or search the tape unless there is a strong business justification, and the user provides pinpoint information either (a) identifying the location of the file that is the target of the search; (b) supplying the date of the email that is the target of the search; or (c) providing other specific information to allow a targeted search.[29] As a rule, NAM's IT Department will not restore recent backup tapes if the user requests a broad search -- such as a search using keywords -- due to the time-consuming and resource-intensive nature of the process. It is, accordingly, uncommon for a backup tape older than four to five weeks to be the subject of restoration efforts.[30]

In any event, NAM's network rules do *not* require users to rely on backup tapes in any way. Users, instead, are able to retain files in NAM's Windows environment indefinitely.[31] For example, if a user retains a file from 1999, that file will exist today in at least two locations: the file will reside (i) live on the shared network drives (or the user's hard drive or archives), and (ii)

---

[28] *See* Ex. 7, McBean Depo. at 87:15-88:11 ("Q. What would it take to these what's on those annual tapes? Would we have to put them on a computer? A. *We would have to put them onto a DLT backup system, load software and then go through a recovery process.* Q. How much time would that take? A. *I would need the infrastructure to recover to.* So you need resources and then depending on -- well, if you're recovering everything that's on the New York side *it all depends on how much data we're backing up and what types of systems I'm restoring to.* So I can't answer that question without actually looking at what I'm going to restore. Q. When you put the tape in, these annual tapes, you can look just at the Outlook files, is that correct? A. *No.*"); *id.* at 90:22-91:12 ("Q. But if you had to look at those backup tapes, that's something that could be done, you have the resources to do that? ... A. *No, I'd have to acquire the resources to go through and look at that data.* Q. And what resources would you have to acquire? You have NT40, right? A. Right. I have NT40. *I would have to build the environment and then recover the data and at that point the Exchange server will be up for lack of a better term.*") (emphasis added).

[29] McBean Decl., ¶¶7-9.

[30] McBean Decl., ¶10.

[31] Ex. 7, McBean Depo. at 59:4-59:13 ("Q: Were employees limited to an amount of E-mail that they could store on their desktops? A. Yes. Q. Okay. What was the limit? A. *On their desktops they had no limit. On the servers the limit was, and again it differed by employee, but the general limit, it was about eighty meg.*") (emphasis added).

in the backup tapes.[32]  These are the network rules that Lellouche employed, for example, to

retain CCMI-related and Plaintiffs-related ESI online (and in his archives).

###### E.    The Plaintiffs Conduct A Cursory Review Of NAM's Production.

The Plaintiffs reviewed NAM's original production on September 28, 2006, for a few

hours.  The Plaintiffs then requested that NAM copy just 3,532 pages out of this production.[33]

By way of rough comparison, a banker's box, reasonably packed, holds approximately 3,500

documents, and NAM's production consisted of documents in 60 binders, 17 banker's boxes, and

5 redwelds.  The Plaintiffs spent similar efforts reviewing NAM's supplementation to its initial

production.  On February 1, 2007, the Plaintiffs reviewed the supplemental production, and also

requested that the initial production be made available for their review, a second time.[34]  At this

review session, the Plaintiffs again spent a few hours.  The Plaintiffs later requested 1,108 pages

of documents.[35]

As discussed below, the Plaintiffs have made little apparent effort to review or digest the

documents NAM has produced.

###### F.    The Plaintiffs Demand ESI Stored In NAM's Backup Tapes.

During the period October 2006 through January 2007, the parties exchanged

correspondence concerning the breadth of the Plaintiffs' Requests for Production, NAM's

---

[32] Ex. 7, McBean Depo. at 96:17-97:18 ("Q. Am I correct then if documents exist from the years 1999 and 2000 the only place they're going to be are on those annual tapes, they are not otherwise backed up at any location? A. *Data can exist on the file servers that stretch back as far as 1999. So if it's still on our file servers today it's online* or it could be on the year-end tapes. Q. Okay. But E-mail from that time period, the only place that's going to be is on those tapes, right? A. E-mail from that time period would be on those tapes or *in Outlook PST files that may exist on end users' computers.* Q. Right. *If the end user archived the E-mail themselves then they exist on the computer still? A. Uh-huh.* Q. Correct? A. (Indicating.) Q. Otherwise they're on those tapes? A. Correct.") (emphasis added).

[33] These documents were bates numbered NAM00325 – NAM03857. Hulme Decl., ¶12.

[34] Hulme Decl., ¶¶17-18.

[35] These documents were sequentially numbered NAM03858 – NAM04966. Hulme Decl., ¶¶19-20. Rather than inspect the materials supplemented in April, the Plaintiffs asked that they be copied in their entirety. These documents were sequentially numbered NAM04967 – NAM07225. Hulme Decl., ¶22.

production, the inclusion of ESI, and related points.[36]  The Plaintiffs claimed, for example, that

the production lacked sufficient ESI in the form of email communications, and lacked sufficient

meeting minutes.  NAM responded to these claims, in part, by conducting further paper and ESI

searches.  As a result of these additional efforts, NAM located and produced, for example,

additional meeting minutes.[37]  NAM also informed the Plaintiffs that ESI resident on backup

tapes was not reasonably accessible.[38]

When the Plaintiffs continued to remain dissatisfied with the production, and to demand

ESI resident on backup tapes, NAM produced Alfred McBean ("McBean"), its Vice President of

Windows Technology, to testify concerning NAM's ESI practices, and tape backup practices.[39]

Yet deposing McBean did not satisfy the Plaintiffs, and they continued to demand production of

ESI stored on NAM's backup tapes.

### G.    In Response, NAM Retains An Expert, Who Quantifies The Costs And Burdens Of Producing The ESI The Plaintiffs Demand.

Given the Plaintiffs' demands for ESI from backup tapes, NAM engaged an electronic

discovery and forensic expert, Richard Davis ("Davis"), an attorney and former IBM engineer.[40]

Davis's assignment consisted of (i) reviewing the Plaintiffs' Requests for Production; and (ii)

estimating the costs of restoring NAM's backup tapes, and searching the resulting files to

potentially locate and produce further materials potentially responsive to these Requests.[41]

Davis interviewed various NAM Information Technology ("IT") personnel; reviewed NAM's

---

[36] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz; Ex. 9, Letter dated 12/12/06 from Katz to Rich; Ex. 10, Letter dated 1/5/07 from Rich to Katz; Ex. 11, Letter dated 1/26/07 from Katz to Rich.

[37] These meeting minutes are numbered NAM04967 – NAM07225.  Hulme Decl., ¶22.

[38] *E.g.,* Ex. 9, Letter dated 12/12/06 from Katz to Rich at 2; Declaration of G. Katz ("Katz Decl."), ¶15.

[39] The deposition transcript of Mr. McBean is Ex. 7.

[40] *See* Declaration of Richard Davis ("Davis Decl.").  Mr. Davis' CV is appended as Exhibit A, thereto.

[41] Davis Decl., ¶5.

network structure, particularly the Windows environment;[42] and reviewed NAM's backup

systems in detail, with a particular focus on (i) the year end full system tapes (the "Year-End

Full-System Tapes"), and (ii) the daily backup tapes for the Email system, which is resident on

Exchange Servers (the "Daily Exchange Tapes").[43]

Davis determined that these two forms of backup were not duplicative, and would *both*

need to be searched to comply with the Plaintiffs' Requests.  NAM's Year-End Full-System

Tapes represent a "snapshot," on a annual basis, of the entire NAM network.  In contrast, NAM's

Daily Exchange Tapes constitute a "moving picture" series of images – on a daily basis – of a

portion of the NAM network.  As determined by Davis, the Daily Exchange Tapes provide a

more complete view of NAM email communications over time than the Year-End Full-System

Tapes, while the Year-End Full-System Tapes provide a more complete view of the overall

NAM network.[44]

Davis then determined that Year-End Full-System Tapes and Daily Exchange Tapes

potentially relevant to the Plaintiffs' broad Requests for Production were located in four NAM

offices -- Chicago, New York, Toronto, and Wilton, Connecticut -- and determined that 154

Year-End Full-System Tapes, and over 5,000 Daily Exchange Backup Tapes would need to be

analyzed to comply with the Plaintiffs' Requests.[45]  Davis then compiled information on the

steps necessary (i) to restore these tapes, to allow a review of the information they contain; (ii) to

search the resulting restored data sets; (iii) to locate materials responsive to the Plaintiffs'

Requests for Production; and (iv) to produce relevant documents.[46]  Based on this analysis,

---

[42] NAM's Windows Environment is described in further detail above, in the text surrounding footnote 23.

[43] Davis Decl., ¶¶7-9.

[44] Davis Decl., ¶12.

[45] Davis Decl., ¶¶10-11, 13, 20, 27.

[46] Davis Decl., ¶¶14-15, 19-25 (for Year-End Full-System Tapes), 26-33 (for Daily Exchange Tapes).

Davis concluded that a "defensible, forensically sound processing of data" in accordance with the

Plaintiffs' demands would require the following expenditures:

| | |
|---|---|
| Year-End Full-System Tapes:[47] | $4.5 million |
| Daily Exchange Tapes:[48] | $9.1 million |
| Total Costs:[49] | $13.6 million |

The Plaintiffs' Requests, therefore, presented a staggering burden to NAM.[50]  (Further,

the $13.6 million cost does *not* include NAM's cost to review the search results for privileged

communications.)

###    H.    NAM Informs The Plaintiffs That Their Requests For ESI From Backup Tapes Will Cost Over $13 Million; The Plaintiffs File The Present Motion.

On April 27, 2007, counsel for the parties met in person at Plaintiffs' counsel's office to

discuss their positions concerning the production of ESI from the backup tapes.[51]  Defendant's

counsel disclosed that NAM had retained an electronic discovery and forensic expert

(Mr. Davis), in light of the Plaintiffs' demands for ESI from backup tapes, and the inaccessible

nature of this information.[52]  Defendant's counsel stated that this expert had determined (a) that

restoring and searching for potentially responsive ESI from the year-end, full system backup

tapes would cost approximately $4.5 million; and (b) that restoring and searching for potentially

---

[47] Davis Decl., ¶24.

[48] Davis Decl., ¶32.

[49] Davis Decl., ¶46.

[50] In a concluding footnote, the Plaintiffs suggest that a "sampling" of the backup tapes should be conducted, as an "initial procedure." Motion at 7, n.3.  The Plaintiffs provide no guidance as to what this sampling would cover, and suggest that such a sampling is straightforward.  Anticipating such a request, and wanting to provide a complete assessment in any event, Davis had already performed various analyses to determine the requirements and costs of an approach that would rely on initial sampling.  In his analysis of an initial sampling, Davis did the following: (i) he limited the sample to Year-End Full-System backup tapes, and (ii) he limited the scope of the sample to just 26 tapes.  Using the same methodologies he employed for the complete analysis, Davis concluded that the costs of even this limited sampling would be *$1.1 million*.  Davis Decl., ¶¶13, 34-43.

[51] Katz Decl., ¶13.

[52] Katz Decl., ¶15.

responsive ESI from the daily email backup tapes would cost approximately $9.1 million.[53]

Without further substantive discussion, the Plaintiffs shortly thereafter filed the present

Motion.[54]

## I.    In Their Motion, The Plaintiffs Identify No "Gaps" Or Missing Information In NAM's Production.

In their Motion, the Plaintiffs choose *not* to identify – within their broad requests – *any*

specific documents that they assert are missing from NAM's production.[55]   Instead, they falsely

assert that backup tapes are the *only* source for locating possible responsive documents that

might not already have been produced.[56]   As demonstrated by McBean's testimony,[57]

Lellouche's testimony,[58] and the production itself, the Plaintiffs' "sole source" claim is wildly

incorrect.

For example, the Plaintiffs originally claimed that NAM's production lacked responsive

email,[59] and lacked meeting minutes.[60]   On the assumption that the Plaintiffs continue to seek

---

[53] Katz Decl., ¶¶16-17.

[54] Notably, Plaintiffs failed to disclose this overwhelming cost to the Court in their Motion or that they had been *informed* of this cost prior to the Motion's filing.

[55] The Plaintiffs do not identify a document request or requests by number, and do not identify any keywords they wish searched.  Instead, they claim that all daily and year-end backup tapes must be searched. Motion to Compel at 4 ("These *daily backup tapes* containing e-mail from the relevant time period in this case *must be searched to uncover responsive and relevant documents* critical to resolving this case"); *id.* at 4 ("Plaintiffs request that the Court order the Defendant to *search the daily e-mail backup tapes and year-end backup tapes* which very likely contain information responsive to Plaintiffs' document requests and highly relevant to this case") (emphasis added).

[56] *See, e.g.,* Motion to Compel at 1 ("NAM has refused to produce requested documents, specifically *electronic documents that exist only on daily e-mail backup tapes and year-end backup tapes*"); *id.* at 4 ("The e-mails and other electronic documents on these backup tapes *are not available from any other source* and a search will almost undoubtedly discover responsive and relevant documents"); *id.* at 5 ("Importantly, *these e-mails and electronic documents are not available from other sources*"); *id.* at 6-7 ("*As no other source* for these documents exists, the search will not be cumulative or duplicative and is absolutely necessary to uncover critical documents") (emphasis added).

[57] *See* the discussion, above, surrounding footnotes 31 & 32.

[58] *See* the discussion, above, surrounding footnotes 17 through 22.

[59] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz at 1 ("While certain limited *emails* and documents were made available (*in non electronic form*) for our review, we were unable to located [sic] any files belonging to any of the following individuals...") (emphasis added).

additional – albeit entirely undefined – email and meeting minutes, NAM's counsel has compiled a review of the internal email and the meeting minutes contained within the production.[61] Over 1,800 internal emails – meaning emails between NAM employees – are included in NAM's production.[62] These emails reference over 244 NAM personnel, and cover the period beginning in 1999 and continue beyond the expiration of the Plaintiffs' contracts in 2004.[63] In addition, over 570 meeting minutes are included in the production. These minutes similarly cover the period beginning in 1999 and continue beyond the expiration of the Plaintiffs' contracts in 2004.[64]

As a further example, the Plaintiffs make certain specific claims in their Answers to Interrogatories. These include claims concerning loyalty marketing services,[65] the Hispanic market,[66] and gift card programs.[67] A review of file folders produced to the Plaintiffs reveals numerous files that discuss these issues.[68]

---

[60] *See* Ex. 8, Letter dated 10/30/06 from Rich to Katz at 2 ("In addition, my clients believe that NAM has failed to produce *all meeting minutes* for meetings attended by Ann Raider or Robert Fireman") (emphasis added).

[61] In light of the silence of the Plaintiffs' Motion, it is unclear whether the Plaintiffs (a) have abandoned their objections concerning email and meeting minutes, or (b) instead include these objections generally within their demands for "ESI on backup tapes."

[62] Ex. 12 lists all of these email by date. *See* Hulme Decl., ¶¶27-28.

[63] Ex. 13 (listing addressees on internal email). *See* Hulme Decl., ¶29.

[64] Ex. 14 (listing meeting minutes). *See* Hulme Decl., ¶31.

[65] *See* Ex. 15, Fireman's Answers to First Set of Interrogatories Propounded by the Defendant ("Fireman Ans. to Ints.") at 9 and 13 ("NAM eliminated Ms. Raider and Mr. Fireman's position as a 'thought leader' for *loyalty marketing* – CCMI spent years developing a reputation as a leader in *loyalty marketing*...NAM eliminated the Marketing Analysis (MAS) tool with no other product to replace it – CCMI had over 1,000 supermarkets using the MAS software to track their *loyalty card holder programs*") (emphasis added).

[66] *See* Ex. 15, Fireman Ans. to Ints. at 14-15 ("The *Hispanic Market* was large and growing and the community had a real need for a stored value money card. Even when CCMI fostered relationships with the White House, built relationships with major banks to process the transactions and the Mexican business leaders who would promote the product, NAM refused to provide the internal resources or sales support to launch the program") (emphasis added).

[67] *See* Ex. 15, Fireman Ans. to Ints. at 14 ("NAM did not fund the expansion of the business to keep pace with market trends – CCMI was prevented from expanding the *gift card program* for retailers") (emphasis added).

[68] *See* Hulme Decl., ¶¶8-9; Ex. 19, Index of Files - File No. 4 (loyalty marketing); File No. 12 (gift card program); File No. 15 (loyalty marketing); File No. 20 (loyalty marketing); File No. 21 (loyalty marketing); File No.

## Legal Argument

### I.    Under Either The New Rules Or Pre-Existing Case Law, The Plaintiffs' Motion Must Be Denied.

Whether the Court analyzes the present Motion under the new Federal Rules concerning

Electronically Stored Information ("ESI"), or analyzes the Motion under pre-existing case law,

the result is the same:  the Plaintiffs' Motion to Compel is groundless and must be denied.

### II.    NAM's Backup Tapes Are Not Reasonably Accessible.

It is black-letter law that a party is *not* required to provide discovery of electronically

stored information from sources that are not reasonably accessible, due to either undue burden or

undue cost.  Fed. R. Civ. P. 26(b)(2)(B); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 320

(S.D.N.Y. 2003).  The party opposing such discovery – here, NAM – bears the initial burden of

demonstrating that the requested ESI is not reasonably accessible.  Fed. R. Civ. P. 26(b)(2)(B)

("[T]he party from whom discovery is sought must show that the information is not reasonably

accessible because of undue burden or cost").  NAM has met this burden.

First, ESI stored on *backup* tapes presumptively qualifies as "not reasonably accessible."

*See Zubulake*, 217 F.R.D. at 320 ("Backup tapes must be restored ... fragmented data must be de-

fragmented, and erased data must be reconstructed, all before the data is usable.  That makes

such data *inaccessible*."); *Quinby v. Westlb AG*, 2005 WL 3453908, at *7 n.8 (S.D.N.Y. 2005)

("Back-up tapes are considered an *inaccessible format* and not readily usable") (emphasis added

throughout).  "Data on backup tapes used for disaster recovery purposes is usually regarded as

---

22 (loyalty marketing); File No. 23 (loyalty marketing); File No. 87 (loyalty marketing); File No. 88 (loyalty marketing); File No. 151 (Hispanic market); File No. 163 (loyalty marketing); File No. 175 (loyalty marketing); File No. 181 (loyalty marketing); File No. 183 (loyalty marketing); File No. 183 (gift card program); File No. 200 (loyalty marketing); File No. 201 (loyalty marketing); File No. 204 (loyalty marketing); File No. 209 (loyalty marketing); File No. 213 (loyalty marketing); File No. 218 (gift card program); File No. 222 (gift card program); File No. 228 (loyalty marketing); File No. 229 (loyalty marketing); File No. 229 (gift card program); File No. 241 (loyalty marketing); File No. 244 (gift card program); File No. 246 (gift card program); File No. 248 (gift card program); File No. 253 (loyalty marketing); File No. 254 (gift card program); File No. 262 (loyalty marketing); File No. 266 (loyalty marketing).

inaccessible, because such tapes function to quickly undo catastrophic systems failure, not as a
filing cabinet." Grant J. Esposito and Thomas M. Mueller, *Backup Tapes, You Can't Live With
Them and You Can't Toss Them; Strategies for Dealing with the Litigation Burdens Associated
with Backup Tapes Under the Amended Rules of Civil Procedure*, 13 RICH. J.L. & TECH. at p. 3
(2006).[69] *See also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 2007 WL 684001, at
*15 (D. Colo. 2007) ("One ... source of [not reasonably accessible] information might be *backup
tapes*"). *See generally* Shira A. Scheindlin, *Moore's Federal Practice, E-Discovery: The Newly
Amended Federal Rules of Civil Procedure* at pp. 15-16 (2006) ("[E]xamples of [not reasonably
accessible] sources, given today's technology, might include *back-up tapes*").

Second, the burden of restoring, searching, locating, and producing potentially responsive
ESI from NAM's backup tapes is overwhelming, and far out of proportion to the claims in this
action. The Windows environment at NAM – which houses data covered by the Plaintiffs'
requests – resides on approximately 200 servers, located in 20 offices throughout North
America.[70] Given the Plaintiffs' Requests, locating responsive ESI requires resort to 154 Year-
End Full-System Tapes that backup this full system, and over 5,000 Daily Exchange Tapes that
backup the email system.[71] Each of these tapes would need to be "restored" – meaning rebuilt,

---

[69] *See also, Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 429 (S.D.N.Y. 2002)
("Backup-up tapes, for example, are not archives from which documents may easily be retrieved. The data on
backup tape are not organized for retrieval of individual documents or files, but for wholesale, emergency uploading
onto a computer system. Therefore, the organization of the data mirrors the computer's structure, not the human
records management structure, if there is one.") (internal citations omitted); *Wiginton v. Ellis*, 2003 WL 22439865,
at *3 (N.D. Ill. 2003) ("[Defendant's] backup system is not an archiving system that would preserve all information
going into [its] computers. Rather, it is a disaster recovery system that takes only snapshots of [the Defendant's]
computer files so that if a catastrophic event occurs, the information from the immediately preceding period can be
reloaded.").

[70] *See* the discussion, above, surrounding footnotes 23 & 24.

[71] *See* the discussion, above, surrounding footnotes 43 through 45.

using the version of the software, and related infrastructure, that existed as of the time the tape was created.[72]  Indeed, restoring backup tapes at NAM is a complex process.[73]

As emphasized above, the Plaintiffs' demands for ESI on NAM's backup tapes entails staggering effort.  It also entails huge financial cost.  To comply with Plaintiffs' demands would require the expenditure of approximately *$13.6 million.*[74]  This $13.6 million figure is based on "forensically sound" data processing methods, and a close analysis of NAM's backup structures.[75]  The figure represents the costs -- to a reasonable degree of certainty and in accordance with standard practices in the electronic data industry – to restore and search (a) NAM's year-end full-system backup tapes, and (b) NAM's daily email backup tapes, in order to locate and produce potentially responsive documents as requested by the Plaintiffs.[76]

Before filing the instant Motion to Compel, the Plaintiffs knew of the extreme burden, and $13.6 million cost their demands presented[77] and, having taken the deposition of McBean, they knew (or should have known) of the extreme technical burdens their demands posed.  Yet in their Motion, the Plaintiffs (a) present no forensic or other evidence to challenge Davis' industry-standard calculation of $13.6 million in compliance costs,[78] and (b) make no offer to assume all

---

[72] *See* the discussion, above, surrounding footnote 28.

[73] *See* the discussion, above, surrounding footnote 27.

[74] *See* the discussion, above, surrounding footnote 49.

[75] Davis Decl., ¶¶25, 33, 45.

[76] The Plaintiffs request restoration and searching of both (a) the daily email backups and (b) the year-end backups.  Motion to Compel at 1 (demands "daily e-mail backup tapes and year-end backup tapes"); at 6 (same).

[77] *See* the discussion, above, surrounding footnote 53.

[78] The Plaintiffs claim – without support -- that restoring the multitude of backup tapes at issue will pose little burden.  Motion to Compel at 3 ("*It is possible for these backup tapes to be restored and searched for relevant documents.*"); *id.* at 5 ("While the process of *retrieving data from the backup tapes is somewhat more complicated than simply searching a server*, in this case it is a necessary step considering the importance of these e-mails and electronic documents in resolving the issues."); *id.* at 6 ("While *there is some burden involved in searching these tapes*, it is the only way to recover the e-mails and other electronic documents that are critical to resolving the issues in this case.") (emphasis added).  These assertions have no factual or expert support, and must be disregarded.

or a portion of these costs.[79]   In fact, in a questionable act of misdirection Plaintiffs argue to this

Court that such a search will not be burdensome on NAM, knowing full well that their Motion

comes with a $13 million price tag.  In short, the Plaintiffs make no credible argument to rebut

NAM's case concerning accessibility, or to alleviate the extreme burdens their demands entail.

As discussed below, Plaintiffs offer no valid reason, indeed any reason, for engaging in this $13

million ESI discovery project in the context of this litigation.

**III.   No "Good Cause" Exists To Support The Plaintiffs' Requests.**

The Plaintiffs can show no "good cause" to warrant an order compelling discovery of the

requested ESI.  Fed. R. Civ. P. 26(b)(2)(B).  Given the requested ESI's inaccessibility, the burden

of proving the existence of "good cause" lies solely on the Plaintiffs.  *Id.*  In determining "good

cause," courts evaluate a range of factors, including (i) the specificity of the discovery request;

(ii) the importance of the proposed discovery in resolving the issues, (iii) whether the request is

unreasonably cumulative or duplicative; (iv) whether the party seeking discovery has had ample

opportunity by discovery to obtain the information sought; (v) the amount in controversy; and

(vi) whether the burden or expense of the proposed discovery outweighs its likely benefit.  *See*

Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); Fed. R. Civ. P. 26(b)(2)(B) Advisory Committee Note of

2006, Subdivision (b)(2).

As demonstrated below, the Plaintiffs (i) ignore the full ESI and paper production they

have already received; (ii) decline to identify how this full production is deficient in any manner;

and (iii) advance no justification for the dramatic burden they seek to impose on NAM, in light

of the meritless nature of their claims.  In short, no "good cause" exists.

---

[79] Given the wholesale "fishing expedition" and "ESI-discovery-as-leverage" nature of this Motion, this
Court should deny the Motion outright, and not consider any cost allocation between the parties.

A.    **The Plaintiffs' Requests Are Not "Narrowly Tailored," And They Make No Attempt To Specify The Relevance Or Importance Of These Requests To The Case.**

To establish "good cause," a party *must* show that its discovery requests are *"narrowly tailored* to seek *only* information relevant"* to the disputed point at issue. *Ameriwood Indus., Inc. v. Liberman*, 2007 WL 496716, at *1 (E.D. Mo. 2007); *see* B.J. Rothstein, R. J. Hedges, and E. C. Wiggins, *Managing Discovery of Electronic Information: A Pocket Guide for Judges* at 9 (Federal Judicial Center 2007) (the party requesting not-reasonably-accessible ESI must make a specific and tailored discovery request). In *Ameriwood*, for example, the Court ruled that the requesting party failed to meet the "good cause" threshold with a discovery request for "all plaintiff's documents and communications concerning [its] business" over a *five month period*. 2007 WL 496716 at *1. Here, as just a single example, the Plaintiffs seek "all documents" concerning the "loyalty marketing industry" from 1997 to the present.[80]

In addition to requiring narrowly tailored ESI requests, courts also require that a party specifically demonstrate the relevance of the requested information. *See Balfour Beatty Rail, Inc. v. Vaccarello*, 2007 WL 169628, at *2 (M.D. Fla. 2007). In *Balfour Beatty Rail*, for example, the plaintiff sought to obtain copies of the defendant's computer hard drives, but did not specify why this access was necessary. In denying the plaintiff's motion, the *Balfour Beatty Rail* Court reasoned that:

> *Plaintiff does not provide any information regarding what it seeks to discover from the hard drives nor does it make any contention that Defendants have failed to provide requested information contained on these hard drives ... [A]llowing Plaintiff to gain access to Defendants' hard drives in this case would permit Plaintiff to engage in a fishing expedition.*

---

[80] *See* the discussion, above, surrounding footnotes 12 & 13.

*Id.* at \*2 (emphasis added). As in *Balfour Beatty Rail*, the Plaintiffs here fail to show what

relevance -- if any-- the requested additional discovery presents. Seen for what it is, the request

to search all NAM backup tapes is a $13 million global fishing expedition in pursuit of nothing

in particular. *Accord Hedenburg v. Aramark Am. Food Servs.*, 2007 WL 162716, at \*2 (W.D.

Wash. 2007) (denying motion to compel plaintiff to produce a "mirror image" of its hard drive)

("Here, the central claims in the case are wholly unrelated to the contents of plaintiff's computer.

Defendant is hoping blindly to find something useful in its impeachment of the plaintiff ...

Defendant essentially seeks a search warrant to confirm that Plaintiff has not memorialized

statements contrary to her testimony in this case. If the issue related instead to a lost paper diary,

the court would not permit the Defendant to search the plaintiff's property to ensure that her

search was complete.")

### B.    The Plaintiffs Have Enjoyed Ample Discovery.

Courts deny requests for not-reasonably-accessible ESI where the party seeking the

discovery has had "ample opportunity by discovery ... to obtain the information sought." Fed. R.

Civ. P. 26(b)(2)(C)(ii). *See, e.g., Cognex Corp. v. Elec. Scientific Indus., Inc.*, 2002 WL

32309413 (D. Mass. 2002). Here, NAM has provided the Plaintiffs with substantial, full, and

robust discovery.[81] When the Plaintiffs complained about purported "gaps" in the production,

NAM responded either (a) by pointing out where the claimed missing information in fact was

located in the production (and making previously produced documents – that the Plaintiffs had

---

[81] The plaintiffs appear to claim that they are justified in seeking ESI from backup tapes because McBean did not disclose the structure for backing up email. This is incorrect. First, McBean testified that the email system was backed up. Ex. 1, McBean Depo. at 42:3-43:9 ("Q. And the *E-mail itself, the Outlook E-mail* itself, that's not backed up? A. *That is backed up.* Well, Exchange is a server. So *the Exchange server is backed up.* Q. Okay. A. But Outlook is not backed up. Q. So E-mail itself, the communications are saved for some period of time? A. *Mail that flows through the Exchange servers are backed up.*") (emphasis added). Second, despite Plaintiffs' Counsel's decision to refrain from further questions as to this backup structure (or failure to ask further questions), Defendant's counsel subsequently affirmatively and voluntarily educated Plaintiffs' counsel concerning the email backup structure, in an effort to avoid the present Motion to Compel. *See* Katz Decl., ¶14.

not copied on their first review-- again available for inspection and copying), or (b) by searching

for, locating, and producing additional materials.[82]    Indeed, the Plaintiffs do not in their Motion

identify – in any way – information they claim is missing from NAM's discovery responses.[83]

The Plaintiffs, therefore, have had ample opportunity to obtain – and have fully obtained – the

information sought.[84]

### C.    The Plaintiffs Do Not Show How The Requested ESI Discovery Differs In Any Material Respect From The Full Discovery NAM Has Already Provided.

The Plaintiffs, moreover, do not specify in their Motion how, or if, the requested ESI will

differ in any material respect from the information they have already obtained.  Fed. R. Civ. P.

26(b)(2)(C)(i) (required "good cause" is not shown where the ESI discovery "is unreasonably

cumulative or duplicative").  Indeed, the Plaintiffs' position is highly analogous to the plaintiff's

unsuccessful position in *Cognex Corp. v. Electro Scientific Indus., Inc.*  2002 WL 32309413 (D.

Mass. 2002).

In *Cognex Corp.*, the plaintiff moved to compel the production of ESI that was stored on

820 back-up tapes created by the defendant.  2002 WL 32309413, at *1.  The defendant

estimated that these tapes contained "almost three billion pages of documents." *Id.*  Recognizing

that "the cost of the search sought by [plaintiff] would likely be astronomical," the Court

declined to order the production that was sought, even though the plaintiff had offered to assume

any cost of production. *Id.* at *3, 6.  In analyzing the Rule 26(b)(2)(C) factors, the *Cognex* court

recognized "that a search of back-up tapes would uncover documents not already produced." *Id.*

at *4.  The Court reasoned, however, that such a search was still not appropriate because the

---

[82] *See* the discussion, above, surrounding footnotes 13 through 16.

[83] *See* the discussion, above, surrounding footnote 55.

[84] The Plaintiffs, it appears, have spent little time or effort in reviewing this production. *See* the discussion, above, surrounding footnotes 33 through 35.

defendant had "*already conducted an extensive search for relevant documents*," the record did

not reflect the conscious destruction of documents, and the case was not one in which one would

expect the most relevant emails to be deleted around the time they were written. *Id.* at *5. The

Court accordingly denied the motion, emphasizing that:

> At some point, the adversary system needs to say *'enough is enough'* and
> recognize that the costs of seeking *every* relevant piece of discovery is not
> reasonable.

*Id.* (emphasis added). Like the defendant in *Cognex*, NAM has "already conducted an extensive

search for relevant documents," has produced these relevant documents, and has twice

supplemented its production in part in response to exchanges with Plaintiffs' counsel. As found

by the *Cognex* Court, "enough is enough."

### D. NAM Has Produced Extensive, Responsive ESI From Online And Archived Sources, And The Plaintiffs' Claims That NAM's Backup Tapes Offer The "Only Source" For Responsive ESI Are Flatly Incorrect.

The Plaintiffs seek to meet their "good cause" burden -- not by identifying components

allegedly missing from the production, and demonstrating the relevance and materiality of these

components – but by claiming that backup tapes are the "only source" for the (unidentified)

documents they seek.[85] This claim is patently false.

McBean testified that users retain documents and email on their desktops and on NAM's

servers, and that these materials are *not* on backup tapes alone.[86] Lellouche – the Plaintiffs'

primary supervisor -- testified that as a rule he retained *all important documents* in digital form

on his desktop and network drives, that he thoroughly searched his desktop and network drives

for responsive information, and that he produced this information to the Plaintiffs. Moreover,

Lellouche testified that, under his supervision, NAM's IT Department searched others' online and

---

[85] *See* the discussion, above, surrounding footnote 56.

[86] *See* the discussion, above, surrounding footnotes 31 & 32.

archived accounts, and produced responsive electronically stored information from these sources as well.[87]  Finally, a review of the substance of NAMs' production -- in light of what appear to be the Plaintiffs assertions -- demonstrates that the production responds in full, on all points.[88]

Indeed, even the Plaintiffs appear to acknowledge the inaccuracy of their claims that backup tapes provide the "only source" for the requested information.[89]  In sum, the tapes are not the only source for the requested information, and NAM has already produced all requested, discoverable information.

### E.    There Is No Basis -- As A Matter Of Law – To The Plaintiffs' Claims That ESI Discovery Will "Likely" Generate Relevant Documents.

Knowing they cannot win this lawsuit on the merits in light of the unambiguous, express contractual rights they freely granted to NAM in the Stock Purchase Agreement – forgive the repetition, but there is <u>no</u> room for Plaintiffs "implicit" obligations where they contradict NAM's express right of "sole and unfettered judgment" – Plaintiffs seek to use the instant motion to extort a settlement out of NAM.  Without any showing of deficiencies in NAM's production, and without any analysis of whether the requested ESI will produce non-cumulative information, the Plaintiffs seek settlement leverage in this litigation by trying to force NAM to restore and review extensive backup tapes, based on a claim that relevant information will "likely" be found.[90]  In essence, Plaintiffs hope to force NAM to choose between either incurring $13 million in

---

[87] *See* the discussion, above, surrounding footnotes 17 through 22.

[88] *See* the discussion, above, surrounding footnotes 59 through 68.

[89] Motion to Compel at 5 ("*[O]utside of e-mail files that may exist on end user's computers,* the only source for the e-mails from the relevant time period is on the daily e-mail backup tapes and year-end backup tapes") (emphasis added).

[90] Motion to Compel at 5 ("The *likelihood* that these daily e-mail backups and year-end backup tapes contain information relevant to the claims in this case is high."); *id.* at 6 ("data that *in all likelihood* contain key electronic documents that go to the core of this case has yet to be searched.") (emphasis added).

25

unnecessary discovery costs or paying them millions of dollars to settle.  Courts recognize this

tactic, and reject it for what it is.  In *McPeek v. Ashcroft*, for example, the Court reasoned that:

> [E]conomic considerations have to be pertinent if the court is to remain
> faithful to its responsibility to *prevent 'undue burden or expense'* ... If *the*
> *likelihood of finding something was the only criterion,* there is a risk that
> someone will have to spend hundreds of thousands of dollars to produce a
> single e-mail.  That is an awfully expensive needle to justify searching a
> haystack.  It must be recalled that ordering the producing party to restore
> backup tapes upon a *showing of likelihood* that they will contain relevant
> information in every case gives the plaintiff a gigantic club with which to
> beat his opponent into settlement.  *No corporate president in her right mind*
> *would fail to settle a lawsuit for $100,000 if the restoration of backup tapes*
> *would cost $300,000.  While that scenario might warm the cockles of*
> *certain lawyers' hearts, no one would accuse it of being just.*

202 F.R.D. 31, 34-35 (D.D.C. 2001) (emphasis added.)  The *McPeek* analysis is resonant here.

The instant Motion is an extortionate attempt to force NAM to settle a claim, that is, as discussed

below, entirely without merit and should never have been brought.

## IV.  The Plaintiffs' Claims Have No Substantive Merit, And This Fact Alone Requires Denial Of The Present Motion.

An evaluation of the substance of the Plaintiffs' claims further demonstrates that

Plaintiffs' Motion to Compel must be denied.  Fed. R. Civ. P. 26(b)(2)(C)(iii) (in assessing "good

cause," courts evaluate whether the burden or expense of the proposed discovery outweighs its

likely benefit).

### A.  The Stock Agreement Bars The Plaintiffs' Claims.

The Plaintiffs in this action seek to second-guess NAM's business judgment in running

their former company.  However, the Stock Purchase Agreement, section 6.8, affirmatively

prevents such a claim.  This section provides (i) that NAM "*shall be free to operate the Company*

*and its Affiliates in its sole and unfettered judgment*" and (ii) that the Plaintiffs "*shall have no*

26

*claim*" against NAM for the exercise of this sole and unfettered judgment.[91] This language

precludes the Plaintiffs' claims.

Moreover, even in the absence of such unequivocal language, NAM's business judgment

would be immune from attack by the Plaintiffs. Both NAM and Plaintiffs had an economic

incentive to maximize the acquired company's (CCMI's) profits. With those economic interests

aligned, as a matter of black-letter New York law,[92] the Plaintiffs have no right to challenge

NAM's unfettered judgment. *See, e.g., The Interpublic Group of Companies, Inc. v.*

*Fratarcangelo*, 2002 WL 31682389, at *14-15 (S.D.N.Y. 2002) (only where interests of party

holding discretion differ from those of the contractual venture will a court scrutinize the

motivation behind an exercise of business judgment because "[s]elf-interest ensures that the goal

of profit maximization for the venture, not bad faith, guides that party's decisions."). *See also*

*Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (holding

that where a "promoter stands to share in the profits of the joint venture" it is appropriate for a

court to "rely on the promoter's self-interest to ensure that the goal of profit maximization guides

its business decisions.").[93]

There is no ESI in backup tapes or elsewhere that will overcome this fatal flaw in the

Plaintiffs' claims.

---

[91] Ex. 2, Stock Purchase Agreement, §6.8 (emphasis added).

[92] The Stock Purchase Agreement stipulates New York law as governing its interpretation. Ex. 2, § 8.2.

[93] The cases cited by Plaintiffs to support the "substantive" merits of their claims -- *Speakman v. Allmerica Financial Life Insurance* and *In re Gulf Oil/Cities Service Tender Offer Ligitation* – in fact support *NAM's* position, as these cases hold that parties *possess the power* affirmatively to contract away obligations set by the implied covenant of good faith and fair dealing. For example, the *Gulf Oil* case explicitly states that a contractual provision "*may obliterate implied good faith* because of the clause's language or because of the nature of the power." 725 F. Supp. 712, 736 (S.D.N.Y. 1989) (holding that "the trick is to tell *when* a contract has been so drawn ...") (internal citations omitted) (emphasis added). Likewise, the *Speakman* case makes it clear that "[t]he requirement of good faith performance is, however, circumscribed by obligations in the contract ... Thus, *the covenant may not be invoked to create rights and duties not contemplated by provisions of the contract or the contractual relationship.*" 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (emphasis added).

**B.    The Plaintiffs Failed to Follow the Agreement's Mandatory Objection
Procedures.**

Plaintiffs' claims must also fail for another reason. Section 2.2(b) and 2.3(c) of the

Agreement contain detailed and mandatory dispute resolution procedures that Plaintiffs did not

follow in this case. Indeed, the earn-out calculations Plaintiffs are disputing here have long since

become immune to challenge. Pursuant to the Agreement, Plaintiffs could only have challenged

these calculations if, in addition to objecting in writing within twenty days of receiving NAM's

calculation, they submitted the dispute to accountant arbitration for resolution if the objections

were not resolved by discussions between the parties. Plaintiffs admit that they never exercised

the accountant arbitration procedure for any of the five separate earn out years.[94]    Accordingly,

Plaintiffs are now precluded from revisiting the propriety of these calculations through the

instant litigation. *See Excel Group, Inc. v. New York Transit Auth.*, 814 N.Y.S.2d 220, 222-223

(N.Y. App. Div. 2d Dep't April 25, 2006) (barring contractor from pursuing breach of contract

claim, where it failed to follow dispute resolution period provided by parties contract); *153*

*Hudson Dev., LLC v. DiNunno*, 778 N.Y.S.2d 482, 482 (N.Y. App. Div. 1st Dep't 2004) (barring

plaintiff from seeking recovery against defendant where plaintiff failed to invoke the claim

resolution provision of its contract with defendant). Nothing contained in NAM's backup tapes

could excuse Plaintiffs' failure to follow these mandatory procedures.

**C.    The Plaintiffs Accepted NAM's Earn-Out Payments, And Are Now Barred
From Challenging These Payments.**

Plaintiffs are estopped from disputing the amount of the earn-out payments. By

accepting and enjoying the fruits of 5 years of earn-out payments, Plaintiffs acquiesced in, or

ratified, the amount that had been paid by NAM. *See Savasta v. 470 Newport Assoc.*, 579

---

[94] Ex. 4, Fireman Depo. at 181:17-183:23.

28

N.Y.S.2d 167, 169 (N.Y. App. Div. 2d Dep't 1992), *aff'd* 82 N.Y.2d 763 (1993) ("Estoppel will

lie when an individual has accepted the benefits of an agreement ..."); *Banque Nationale de Paris*

*v. 1567 Broadway Ownership Assocs.*, 625 N.Y.S.2d 152, 154 (N.Y. App. Div. 1st Dep't 1995)

(party ratified mortgage modification by enjoying financial benefits of modification for two

years before repudiation); *Reda v. Love Taxi, Inc.*, 608 N.Y.S.2d 656, 658 (N.Y. App. Div. 1st

Dep't 1994) (taxi drivers estopped from objecting to deductions taken from vouchers where they

accepted fruits of vouchers with full knowledge of the deductions). The Plaintiffs ratified

NAM's actions by accepting NAM's earn-out payments.

ESI on backup tapes cannot alter this fact.

### D.    The Plaintiffs Have Not and Cannot Establish any Damages.

The Plaintiffs' damages are zero.

Although they apparently claim damages of $15 million,[95] Plaintiffs have provided no

explanation, support, or calculations for this figure,[96] and have not designated an expert to testify

as to damages or any underlying theories.[97] The Scheduling Order required the Plaintiffs to

---

[95] Ex 16, Robert Fireman and Ann Raider's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), dated June 1, 2006 at 12 ("At this time, Mr. Fireman and Ms. Raider are unable to quantify their damages suffered as a result of News America Marketing In-Store, Inc.'s misconduct. Further responding, News America Marketing's own records demonstrate that Ms. Raider and Mr. Fireman are owed in excess of $15,000,000."). The plaintiffs did not provide the required *damages computation* in this disclosure and have not amended this initial disclosure on damages to provide any additional information regarding how they believe their damages ought to be calculated. Moreover, NAM has requested that a formal damages computation be submitted, but none has been offered to date.

[96] *See* Ex. 15, Fireman Answers to Ints, Int. No. 20 ("[d]escribe in detail any an all damages you seek in this lawsuit."). In responding, the Plaintiffs provide no detail to their damages claim. *See* Ex. 15 Fireman Answers to Ints., Int. No. 20 ("CCMI had established itself as the industry leader in an emerging marketplace. If NAM had proceeded in good faith, the Plaintiff would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative *guestimate* of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million (15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.") (emphasis added); *see* Raider Answers to Ints., Int. No 20 (same), Exh. 17.

[97] *See* Ex. 15, Fireman and Raider, Int. No. 1 (requesting that Plaintiffs identify each expert witness they intend to call at trial). The Plaintiffs responded by stating that they had not yet determined which, if any, experts they intended to call.

designate their experts, and provide all requisite expert disclosures, by March 30, 2007. No such designation was made; the Plaintiffs, therefore, are precluded from offering expert testimony.

Without expert testimony, any damages case dissolves. The Plaintiffs apparently would seek to show that, had NAM had acted differently, CCMI would have "achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula."[98] Presumably, these claims at a minimum would require (a) a reconstruction of the loyalty card industry, and related markets during 1999 to 2004; (b) an evaluation of the impact of the "dotcom bubble" and its "bursting" and 9-11 on these industries; (c) testimony concerning the alternative steps that NAM "should" have taken, instead of the strategy it in fact followed; and (d) testimony concerning the financial impact that these different steps would have had on CCMI's financial performance, in light of the relevant 1999-2004 markets. The Plaintiffs' damages claims, therefore, would require "sophisticated" and extensive *expert* testimony concerning market reconstruction (during a significant downturn); at least five years of "what if" projections for CCMI revenues and expenses, and a wide range of detailed, micro- and macro-economic assumptions and industry analysis. The Plaintiffs are now barred from making any such showing (were such showing possible).

Indeed, it is doubtful that Plaintiff could have proved damages even *with* an expert. To be admissible, any damages showing by the Plaintiffs *must* be "capable of measurement based upon *known reliable factors* without undue speculation." *Kidder, Peabody & Co. Inc. v. IAG Int'l Acceptance Group N.V.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998), *aff'd* 205 F.3d 1323 (2d Cir. 1999) (plaintiff's failure to prove damages to a reasonable certainty precluded recovery) (emphasis added); *Zink v. Mark Goodson Prods., Inc.*, 689 N.Y.S.2d 87, 88 (N.Y. App. Div. 1st

---

[98] Ex. 15 Fireman Answers to Ints., Int. No. 20.

Dep't 1999) (damages claim based on assumptions, speculation and conjecture properly

dismissed); *Mehta v. New York City Dep't of Consumer Affairs*, 556 N.Y.S.2d 601, 602 (N.Y.

App. Div. 1st Dep't 1990) (evidence of lost profits was too speculative to support a damages

award). Without expert testimony, the Plaintiffs cannot even begin to meet this burden.[99]

Moreover, it is black-letter law that a plaintiff's own general conclusions, estimates, and

opinions as to damages are *not* competent evidence, and cannot sustain a damage award. *See*

*Clarke v. Bank of New York*, 687 F. Supp. 863, 871 (S.D.N.Y. 1988) (where plaintiff was not an

expert on the valuation of stocks and bonds, his opinion as to damages he suffered was not

binding on the court); *Alexander's Dep't Stores, Inc. v. Ohrbach's Inc.*, 56 N.Y.S.2d 173, 183-

184 (N.Y. App. Div., 1st Dep't 1945); *Philman v. Connery*, 111 N.Y.S. 654, 654 (App. Term.

1908) (party's conclusion or general estimate as to damages was not competent evidence and

should not have been permitted). In *Alexander's Dep't Stores, Inc.*, for example, the only

evidence to sustain a particular damages claim was the opinion of the plaintiff's president. *See*

*Alexander's Dep't Stores, Inc.*, 56 N.Y.S.2d at 184. The court found that there was "no

sufficient basis of facts proved or assumed in [the] record to support the opinion of the interested

witness as to the amount of damage sustained." *Id.*[100]

In sum, Plaintiffs have no expert, and the Plaintiffs cannot rely on their own testimony to

establish damages.

---

[99] *See also Lowrie v. Castle*, 225 Mass. 37, 51 (Mass. 1916) ("[D]amages cannot be recovered when they
are remote, speculative, hypothetical, and not within the realm of reasonable certainty") (lost profit damages could
not be awarded where such damages would be uncertain or conjectural); *Pierce v. Clark*, 66 Mass. App. Ct. 912,
914, (2006) (affirming denial of damages where plaintiff's suggested amount of damages was "purely speculative
and not proven to a reasonable certainty by sufficient or substantial evidence"); *Connolly v. Suffolk County Sheriff's
Dep't*, 62 Mass. App. Ct. 187, 198-199 (2004) (affirming denial of compensatory damage award where such
damages would be speculative).

[100] *Williamson v. Feinstein*, 311 Mass. 322, 324 (Mass. 1942) (finding that "[t]he estimate of the witness
was hardly more than his opinion as to the amount of his loss...A plaintiff should not be permitted to fix his own
damages. There was error in the admission of this evidence"); *Giuliano v. Vacca*, 2004 Mass. App. Div. 154 (Mass.
App. Div. 2004) (damage award could not stand "because it was based on virtually no foundational evidence" where
the only measure of damages was the plaintiff's opinion).

## Conclusion

The Plaintiffs ask this Court to order NAM to comply with expansive, untailored

discovery requests; to search ESI stored on daily and year-end backup tapes; and to incur

resulting costs of over $13 million. The Plaintiffs, however, fail to identify how NAM's existing

production is deficient in any respect. More fundamentally, the Plaintiffs provide no legitimate

justification for imposing a $13 million expense on NAM in light of their actual case: a case

asserting earn-out claims that are contractually barred, and allegations of damages unsupported

by any competent evidence. When the Court weighs all of the factors set forth in Rule 26, there

is not the slightest justification for ordering NAM to incur a $13 million expense to restore and

search 5 years of, and more than 5000 actual, backup tapes.

For the above reasons, NAM respectfully requests that this Court deny the Plaintiffs'

Motion to Compel.[101]

## Request for Hearing

The Defendant requests a hearing on the present Motion. As grounds, the Defendant

states that it believes a hearing will be of assistance to the Court.

---

[101] NAM also respectfully suggests that, under Fed. R. Civ. P. 37(a)(4)(B), it should be awarded the reasonable expenses, including attorney's fees, it has incurred in opposing Plaintiffs' Motion to Compel.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,


/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: June 4, 2007
      Boston, Massachusetts

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 4th day of June, 2007.

/s/ Gordon P. Katz
Gordon P. Katz

# 4566725_v8

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 05-11740MLW |
| | ) |
| NEWS AMERICA MARKETING IN-STORE, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |

**ROBERT FIREMAN AND ANN RAIDER'S INITIAL
DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)**

Robert Fireman ("Mr. Fireman") and Ann Raider ("Ms. Raider") hereby disclose

the following pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and Local

Rule 26.2. Mr. Fireman and Ms. Raider reserve their right to supplement these disclosures

as necessary.

A.    **Individuals Likely to Have Discoverable Information That Mr. Fireman and
       Ms. Raider May Use To Support Their Claims**

1.    Paul Carlucci
       Chairman
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

       Mr. Carlucci possesses information relative to News America Marketing's
       purchase of Consumer Card Marketing, Inc. ("CCMI"), including but not
       limited to the negotiations with CCMI and its principals regarding the
       purchase. Mr. Carlucci possesses knowledge of CCMI's (which later
       became Smart Source Direct) operations and the operations of News
       America Marketing as it affected CCMI.

2.    Henri Lellouche
       Senior Vice President

News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Lellouche possesses information relative to News America Marketing's
purchase of CCMI, including but not limited to the negotiations with CCMI
and its principals regarding the purchase. Mr. Lellouche possesses
knowledge of CCMI's (which later became Smart Source Direct) operations
and the operations of News America Marketing as it affected CCMI.

3.    John Rubin
      Senior Vice President
      News America Marketing
      1211 Avenue of the Americas
      New York, New York

      Mr. Rubin possesses information relative to News America Marketing's
      purchase of CCMI, including but not limited to the negotiations with CCMI
      and its principals regarding the purchase. Mr. Rubin possesses knowledge
      of CCMI's (which later became Smart Source Direct) operations and the
      operations of News America Marketing as it affected CCMI.

4.    Gene Kline
      Executive Vice President
      News America Marketing
      1211 Avenue of the Americas
      New York, New York

      Mr. Kline possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Kline possesses knowledge of CCMI's (which later
      became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

5.    Chris Mixon
      Executive Vice President
      News America Marketing
      1211 Avenue of the Americas
      New York, New York

      Mr. Mixon possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Mixon possesses knowledge of CCMI's (which
      later became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

6.    Bill Chrisie
      Chief Information Officer

2

News America Marketing
1211 Avenue of the Americas
New York, New York

Mr. Christie possesses knowledge of CCMI's (which later became Smart
Source Direct) operations and the operations of News America Marketing
as it affected CCMI.

7.    David Devoe Sr.
      Chief Financial Officer
      News Corp.

      Mr. Devoe possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Devoe possesses knowledge of CCMI's (which
      later became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

8.    Peter Chernin
      President
      News Corp.

      Mr. Chernin possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Chernin possesses knowledge of CCMI's (which
      later became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

9.    Lachlan Murdock
      News Corp.

      Mr. Murdock possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Murdock possesses knowledge of CCMI's (which
      later became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

10.   David Benson
      Chief Information Officer
      News Corp

      Mr. Benson possesses information relative to News America Marketing's
      purchase of CCMI. Mr. Benson possesses knowledge of CCMI's (which
      later became Smart Source Direct) operations and the operations of News
      America Marketing as it affected CCMI.

11.   Rich Roseman
      Vice President of Information Services
      News America Marketing

3

1211 Avenue of the Americas
New York, New York

Mr. Roseman possesses knowledge of CCMI's (which later became Smart
Source Direct) operations and the operations of News America Marketing
as it affected CCMI.

12.    Marty Garofalo
       Former Executive Vice President of Sales
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

       Mr. Garofalo possesses knowledge of CCMI's (which later became Smart
       Source Direct) operations and the operations of News America Marketing
       as it affected CCMI.

13.    Wayne Campanili
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

       Mr. Campanili possesses knowledge of CCMI's (which later became Smart
       Source Direct) operations and the operations of News America Marketing
       as it affected CCMI. Mr. Campanili possesses information relating to News
       America Marketing's contracts, including its contract with Ms. Raider and
       Mr. Fireman.

14.    John Linguini
       News America Marketing
       1211 Avenue of the Americas
       New York, New York

       Mr. Linguini possesses information relating to News America
       Marketing's finances in 2002 and possesses information relating to News
       America Marketing's contract with Ms. Raider and Mr. Fireman and the
       payout provision. Mr. Linguini possesses knowledge of CCMI's (which
       later became Smart Source Direct) operations and the operations of News
       America Marketing as it affected CCMI.

15.    David Devoe Jr.
       Chief Financial Officer
       News Corp.
       Avenue of the Stars
       Los Angeles, CA

4

Mr. Devoe possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Devoe possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

16. Heather Harde
    News Corp.
    Avenue of the Stars
    Los Angeles, CA

    Ms. Harde possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Ms. Harde possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing, including but not limited to www.smartsource.com.

17. Mike Ricanno
    Chief Financial Officer
    News Corp.
    New York, New York

    Mr. Ricanno possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Mr. Ricanno possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI, including but not limited to its finances.

18. Dominick Porco
    New York, New York

    Mr. Porco possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the due diligence of CCMI. Mr. Porco possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

19. Jennifer Jehn
    Florida

    Mr. Jehn possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

20. Chris Bruther

5

Connecticut

Mr. Bruther possesses knowledge of CCMI's (which later became Smart
Source Direct) operations, including its finances, and the operations of
News America Marketing as it affected CCMI, including but not limited to
its finances.

21.     Mike Cleary
        former VP of Smart Source Direct
        General Manager of Mobile Media
        Connecticut

        Mr. Cleary possesses knowledge of CCMI's (which later became Smart
        Source Direct) operations, including its finances, and the operations of
        News America Marketing as it affected CCMI, including but not limited to
        its finances.

22.     Ed Wogan
        Vertis Corp.
        250 West Pratt
        Baltimore, MD

        Mr. Wogan possesses knowledge of CCMI's (which later became Smart
        Source Direct) operations and the operations of News America Marketing
        as it affected CCMI, including but not limited to its finances.

23.     Jan Constantine, Esquire
        Address unknown

        Ms. Constantine possesses knowledge of CCMI's (which later became
        Smart Source Direct) operations and the business operations of News
        America Marketing as it affected CCMI.

24.     Deborah Wolf, Esq.
        Formerly of Squadron, Ellenoff, Plesent & Sheinfeld
        551 Fifth Ave
        New York, New York

        Ms. Wolf possesses information relative to News America Marketing's
        purchase of CCMI, including but not limited to the negotiations with CCMI
        and its principals regarding the purchase.

25.     Les Charm
        Professor
        Babson College
        Wellesley, MA

6

Mr. Charm possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Charm possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

26.     Diana Fontaine
        Plymouth, MA

        Ms. Fontaine possesses information relative to CCMI's operations.

27.     Robert Coughlin
        Boston, MA

        Mr. Coughin possesses information relative to CCMI's operations, particularly its finances.

28.     Kevin Tripp
        The Gillette Company
        Prudential Center
        Boston, MA

        Mr. Tripp possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Tripp possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

29.     Bill Adam
        Connecticut

        Mr. Adam possesses information relative to News America Marketing's purchase of CCMI, including but not limited to the negotiations with CCMI and its principals regarding the purchase. Mr. Adam possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

30.     Barry Robinson
        President, Targeted Solutions
        Eliot, Maine

        Mr. Robinson possesses knowledge of CCMI's (which later became Smart Source Direct) operations and the operations of News America Marketing as it affected CCMI.

31.    Kevin McKenna
       San Antonio, TX

       Mr. McKenna possesses knowledge of CCMI's (which later became Smart
       Source Direct) operations and the operations of News America Marketing
       as it affected CCMI. Mr. McKenna also possesses knowledge of the loyalty
       marketing industry.

32.    David Henkin, Esq.
       Goodwin Procter
       Boston, MA

       Ms. Henkin possesses information relative to News America Marketing's
       purchase of CCMI, including but not limited to the negotiations between
       CCMI and New America Marketing.

33.    Kevin Bridgewater
       Vice President
       Marsh Super Markets
       Indianapolis, Indiana

       Mr. Bridgewater possesses information relative to CCMI's business as well
       as information relating to the loyalty marketing industry.

34.    David Chincao
       The Kroger Company
       Cincinnati, Ohio

       Mr. Chincao possesses information relative to CCMI's business as well as
       information relating to the loyalty marketing industry.

35.    Rich Sterling
       The Kroger Company
       Cincinnati, Ohio

       Mr. Sterling possesses information relative to CCMI's business as well as
       information relating to the loyalty marketing industry.

36.    Steve Denny
       Vice President
       The Kroger Company
       Cincinnati, Ohio

       Mr. Denny possesses information relative to CCMI's business as well as
       information relating to the loyalty marketing industry.

8

37.     Christie Coleman
        Bashas Supermarket
        Phoenix, AZ

        Ms. Coleman possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

38.     Jim Nygrin, VP
        Frys Supermarkets
        Phoenix, AZ

        Mr. Nygrin possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

39.     Frank Jack, Controller
        Longs Drugs
        California

        Mr. Jack possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

40.     Steve Prebble Vice President
        Albertsons
        Boise, ID

        Mr. Prebble possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

41.     David Henry, Executive Vice President
        Winn Dixie
        Jacksonville, FL

        Mr. Henry possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

42.     Barry Berman, Executive Vice President
        Stop & Shop Supermarkets
        Braintree, MA

        Mr. Berman possesses information relative to CCMI's business as well as
        information relating to the loyalty marketing industry.

43.     Kathy Harkins, Director
        Bilo Supermarkets
        South Carolina

Mr. Harkins possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

44.    John Wiley, VP
       Grocery Outlet Stores
       California

       Mr. Wiley possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

45.    Eric Blank, President
       Arthur Blank and Co.
       Massachusetts

       Mr. Blank possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

46.    Ron Goad, President
       Oklahoma City, OK

       Mr. Goad possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

47.    Alan Biren, President
       AJ Biren & CO
       Westborough MA

       Mr. Biren possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

48.    Seth Epstein, President
       Tactical Retail Solutions
       Hartford, CT

       Mr. Epstein possesses information relative to CCMI's business as well as information relating to the loyalty marketing industry.

49.    Carline Thissen
       Retail Solutions
       Naples, FL

       Ms. Thissen possesses information relating to the loyalty marketing industry generally.

50.    David Diamond
       Diamond, Inc.

New York, New York

Mr. Diamond possesses information relating to the loyalty marketing industry generally.

51.    Brian Wolf
       North Carolina

       Mr. Wolf possesses information relating to the loyalty marketing industry.

52.    Ann Raider
       c/o Todd & Weld LLP
       28 State Street, 31st Floor
       Boston, MA 02109

       Ms. Raider possesses information relating to the facts as alleged in her complaint.

53.    Robert Fireman
       c/o Todd & Weld LLP
       28 State Street, 31st Floor
       Boston, MA 02109

       Mr. Fireman possesses information relating to the facts as alleged in his complaint.

54.    Michael Gafney
       New York, New York

       Mr. Gafney possesses information relative to the due diligence performed on CCMI.

**B.    Documents, Data Compilations and Tangible Things In the Possession, Custody or Control of Mr. Fireman and Ms. Raider That They May Use To Support Their Claims**

The following is a description by category and location of all documents, data compilations and tangible things within Mr. Fireman and Ms. Raider's possession, custody or control that they may use to support their claims.  Unless otherwise noted, the identified categories of documents are located either with counsel or at Ms. Raider and Mr. Fireman's residence.

These documents include:

1.    Records of CCMI prior to the sale

    2.    Stock Purchase Agreement

    3.    Correspondences protesting lack of action by News America Marketing and earn out issues

    4.    PowerPoint Presentations to customers

    5.    Trade Journals which describe the market growth and competitors' positions

    6.    Original Press Releases of CCMI

    7.    Email correspondences and other documentary exchanges between CCMI later Smart Source Direct.

    8.    Fiscal Year Planning Documents and Budgets

**C.**    **Computation Of Any Category of Damages**

At this time, Mr. Fireman and Ms. Raider are unable to quantify their damages suffered as a result of News America Marketing In-Store, Inc.'s misconduct. Further responding, News America Marketing's own records demonstrate that Ms. Raider and Mr. Fireman are owed in excess of $15,000,000.

**D.**    **Insurance Agreement**

Mr. Fireman and Ms. Raider are plaintiffs in this case and therefore have no insurance agreements relative to this dispute.

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,


_____/s David H. Rich_____
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
Dated:  June 1, 2006                (617) 720-2626

**<u>EXHIBIT 4</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## ROBERT FIREMAN'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Robert Fireman ("Mr. Fireman") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") First Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Mr. Fireman's Specific Answers and Objections to each Interrogatory:

1.     Mr. Fireman objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.     Mr. Fireman objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

good faith and fair dealing precluded and prevented them from achieving the earn-out

figures. Further responding and among other things, Plaintiffs do contend that NAM

added expenses to the calculation which caused the earnout thresholds to be missed.

## INTERROGATORY NO.: 18

Describe in detail the value of CCMI, including but not limited to any appraisals

or studies, prior to its sale to NAM.

## ANSWER NO.: 18

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither

relevant nor likely to lead to the discovery of admissible evidence.

## INTERROGATORY NO.: 19

Describe in detail any and all payments you received from NAM, including but

not limited to salary, bonus payments, "earn out" payments, commissions, other

payments, including payments made for the acquisition of CCMI.

## ANSWER NO.: 19

Mr. Fireman objects to this Interrogatory inasmuch as this information is already

within the possession of NAM. To seek information from the Plaintiffs which NAM

already possesses is harassing.

## INTERROGATORY NO.: 20

Describe in detail any and all damages you seek in this lawsuit.

## ANSWER NO.: 20

Subject to the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman states that CCMI had established itself as

the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

26

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

### INTERROGATORY NO.: 21

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

### ANSWER NO.: 21

Mr. Fireman objects to this Interrogatory as unduly burdensome and vexatious. He also objects to the extent it purports to seek the disclosure of conversations he had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

27

Signed under the pains and penalties of perjury this _____ day of November,

2006

Robert Fireman

Attorney as to Objections

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: November 27, 2006

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on 11/27/06

28

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.                              ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC.,                           ) | |
| ) | |
| Defendant.        ) | |

## ANN RAIDER'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Ann Raider ("Ms. Raider") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") First Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Ms. Raider's Specific Answers and Objections to each Interrogatory:

1.      Ms. Raider objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.      Ms. Raider objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

faith and fair dealing precluded and prevented them from achieving the earn-out figures. Further responding and among other things, Plaintiffs do contend that NAM added expenses to the calculation which caused the earnout thresholds to be missed.

## INTERROGATORY NO.: 18

Describe in detail the value of CCMI, including but not limited to any appraisals or studies, prior to its sale to NAM.

## ANSWER NO.: 18

Ms. Raider objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence.

## INTERROGATORY NO.: 19

Describe in detail any and all payments you received from NAM, including but not limited to salary, bonus payments, "earn out" payments, commissions, other payments, including payments made for the acquisition of CCMI.

## ANSWER NO.: 19

Ms. Raider objects to this Interrogatory inasmuch as this information is already within the possession of NAM. To seek information from the Plaintiffs which NAM already possesses is harassing.

## INTERROGATORY NO.: 20

Describe in detail any and all damages you seek in this lawsuit.

## ANSWER NO.: 20

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider states that CCMI had established itself as the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

26

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

**INTERROGATORY NO.: 21**

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

**ANSWER NO.: 21**

Ms. Raider objects to this Interrogatory as unduly burdensome and vexatious. She also objects to the extent it purports to seek the disclosure of conversations she had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

27

Signed under the pains and penalties of perjury this $\underline{24^{th}}$ day of November,

2006

_____

Ann Raider

Attorney as to Objections

_____

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: November 27, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail hand on ~~mail & mail~~

_____11/27/06_____

28

**<u>EXHIBIT 6</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ROBERT FIREMAN et al
            Plaintiff(s)

        v.                          CIVIL ACTION
                                    NO.  05-11740


NEWS AMERICA et al
            Defendant(s)


SCHEDULING ORDER

WOLF, D.J.


        This case is governed procedurally by the 1992 Amendments to
the Local Rules of the United States District Court for the
District of Massachusetts (the "Local Rules"), which implement the
District's Civil Justice Expense and Delay Reduction Plan.  Counsel
must, therefore, comply with the relevant Local Rules in the
litigation of this case.

        It is hereby ORDERED pursuant to Fed. R. Civ. P. 16(b) and
Local Rule 16(f) that:

[X]  1.   Any Motion to Amend the pleadings, or any Motion to File
additional pleadings, shall be filed by  JULY 31, 2006, and
responses shall be filed as required by the applicable provisions
of the Federal Rules of Civil Procedure.

[X]  2.   The parties shall by  JUNE 15, 2006 make the automatic
document disclosure required by Local Rule 26.2(A) and, if
applicable, disclose the information required by Local Rule 35.1

[X]  3.   The parties shall by  JUNE 15, 2006  make the disclosure
authorized by Local Rule 26.1(B)(1) and (2).

[X]  4.   Counsel for the parties shall meet at least once to
explore the possibility of settlement and report to the court by
JANUARY 9, 2007  the status and prospects for settlement.

        If the case is not settled, the parties shall report whether
they wish to participate in mediation to be conducted by a
magistrate judge or attorney on the Court's panel of mediators.

[X]    5.   Plaintiff(s)   and/or   Counterclaim   or   Third Party
Plaintiff(s)   shall   by _MARCH 30, 2007_   designate   experts   and
disclose the information described in Fed. R. Civ. P. 26(a)(2),
concerning each expert.  Each other party shall by_APRIL 27, 2007_
designate expert(s) and disclose the information described in Fed.
R. Civ. P. 26(a)(2).

[X]    6.   All discovery shall be complete by_MAY 31, 2007_.

[X]    7.   Counsel for the parties shall confer and, by_JUNE 21,
2007_, file a report as to the prospects for settlement and whether
either party feels there is a proper basis for filing a motion for
summary judgment.

[X]    8.   A scheduling conference will be held on_JUNE 26, 2007_
at_4:00 PM_  and must be attended by trial counsel with full
settlement authority or with their client(s). If appropriate, a
schedule  for  filing  motions  for  summary  judgment  will  be
established at this conference.

[X]    9.   A final pretrial conference will be held on_AUGUST 8,
2007_at_4:00 PM___  and must be attended by trial counsel with full
settlement  authority  or  with  their  client.   Counsel  shall  be
prepared to commence trial as of the date of the final pretrial
conference.

[X]    10.  Trial shall commence on_AUGUST 20, 2007_  .

     All provisions and deadlines contained in this Order having
been established with the participation of the parties to this
case, any requests for modification must be presented to the judge
or magistrate judge, if referred for case management proceedings.
Any requests for extension will be granted only for good cause
shown supported by affidavits, other evidentiary materials, or
reference to pertinent portions of the record.  The request shall
be made by motion and shall contain the reasons for the request, a
summary of the discovery which remains to be taken, and a date
certain when the requesting party will complete the additional
discovery.
     Counsel are encouraged to seek an early resolution of this
matter.  Additional case management conferences may be scheduled by
the Court or upon the request of counsel.


                              By the Court,
                              DENNIS P. O'LEARY


May 30, 2006_____        /s/ Dennis O'Leary_____
Date                              Deputy Clerk


                                2

**EXHIBIT 7**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

### AFFIDAVIT OF GORDON P. KATZ

I, Gordon P. Katz, on oath, depose and state as follows:

1.      My name is Gordon P. Katz.  I am a partner at Holland & Knight LLP and

counsel for defendant News America Marketing In-Store, Inc. ("NAM") in this action.  I make

this affidavit upon personal knowledge in connection with NAM's Opposition to Plaintiffs'

Motion for Leave to Disclose Experts Beyond Experts Disclosure Date.  In particular, I wish to

point out certain facts relating to the timing of discovery in this case in order to set the record

straight.

2.      Although there had been discussion between counsel regarding the taking of

depositions of non-IT[1] NAM personnel during the early months of 2007, plaintiffs did not serve

notices of deposition until May 7, 2007.  *See* Exhibit A hereto.  On that date, plaintiffs' noticed

the deposition of five present or former NAM officials:  Heather Harde, David DeVoe, Jr.,

Christopher Mixson, Henry Lellouche, and John Rubin.

3.      On May 15, 2007, plaintiffs emailed that "there has been a change in our lineup in

terms of depositions."  Counsel stated that Mr. Rubin's deposition was being canceled, and that

---

[1] Plaintiffs took the deposition of Alfred McBean, a NAM IT official, in March, 2007.

# 4770993_v1

plaintiffs wished to take the deposition of Marty Garofalo (NAM's Executive Vice President for Trade) and Paul Carlucci (NAM's CEO). *See* Exhibit B, hereto. Based on my memory and review of my file, this was the *first* communication regarding the taking or scheduling of the depositions of Mr. Garofalo or Mr. Carlucci. Subsequently, plaintiffs indicated that they were abandoning the taking of Ms. Harde's deposition. All of the remaining depositions were completed by July 20, 2007.

Signed under the penalties of perjury this 7th day of September, 2007.

Gordon P. Katz

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this ___ day of September, 2007.

/s/ Gordon P. Katz
Gordon P. Katz

# 4770993_v1

2

**<u>EXHIBIT A</u>**

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

DAVID H. RICH
Email: drich@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

May 7, 2007

**VIA EMAIL AND
FIRST CLASS MAIL**

Gordon Katz, Esq.
Holland & Knight, LLP
10 St. James Avenue
Boston, MA 02116

Re:    Robert Fireman and Ann Raider v. News America Marketing In-Store, Inc.
Civil Action No. 05-11740-MLW

Dear Gordon:

Enclosed please find the following notices of deposition:

May 17, 2007 – Deposition of Heather Harde (Los Angeles, CA);

May 18, 2007 – Deposition of David Davoe, Jr. (Los Angeles, CA);

May 24, 2007 – Deposition of Chris Mixon (Todd & Weld LLP in Boston, MA);

May 25, 2007 – Deposition of Henri Lellouche (Todd & Weld LLP in Boston, MA) (beginning at 8 AM); and

May 29, 2007 – Deposition of John Rubin (New York, New York).

You will note that I have yet to identify a specific office location for the out of state depositions. My intention is to confirm dates prior to arranging for court reporters and conference rooms. As we discussed last week, please let me as soon as possible whether the proposed dates are acceptable and please know which of these individuals will require a formal subpoena to compel their deposition appearance.

Thank you.

Very truly yours,

David H. Rich

Gordon Katz, Esq.
May 7, 2007
Page 2 of 2

cc:    Kevin T. Peters, Esq.

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

### NOTICE OF TAKING DEPOSITION

TO:    Gordon Katz, Esq.
       Holland & Knight, LLP
       10 St. James Avenue
       Boston, MA 02116

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, Robert Fireman and Ann

Raider, by and through their attorneys, will take the deposition upon oral examination of Heather

Harde on May 17, 2007, **commencing at 10:00 a.m.**, at the offices of _____, Los

Angeles, CA before a notary public or other person authorized by law to administer oaths. The

examination will continue from day to day until completed. You are invited to attend. The

witness will be required to bring with her the documents identified on the attached Schedule A.

ANN RAIDER AND ROBERT FIREMAN,

By their attorneys,

Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated: May 7, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was forwarded this date to counsel for Defendants by first class mail.

Kevin T. Peters

## SCHEDULE A

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and any representative of NAM, on the other.

10.    All documents which reflect communications concerning Raider, Fireman, CCMI, Smartsource Direct and/or SmartSource iGroup, including but not limited to electronic communications.

11.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

12.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13.    All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

14.     All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

15.     Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

16.     Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

17.     All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

18.     All organizational charts of NAM prepared at any time from 1999 to the present.

19.     All documents reflecting or concerning Ann Raider or Robert Fireman.  This request includes, but is not limited to emails.

20.     All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

21.     All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

22.     All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT FIREMAN and ANN RAIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-1740MLW |
| | ) | |
| | ) | |
| NEWS AMERICA MARKETING IN-STORE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF TAKING DEPOSITION

TO:    Gordon Katz, Esq.
       Holland & Knight, LLP
       10 St. James Avenue
       Boston, MA 02116

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, Robert Fireman and Ann Raider, by and through their attorneys, will take the deposition upon oral examination of David Davoe, Jr. on May 18, 2007, **commencing at 10:00 a.m.**, at the offices of _____ Los Angeles, CA before a notary public or other person authorized by law to administer oaths. The examination will continue from day to day until completed. You are invited to attend. The witness shall be required to bring with him to the deposition the documents identified on the attached Schedule A.

ANN RAIDER AND ROBERT FIREMAN,

By their attorneys,

Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated:  May __, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was forwarded this
date to counsel for Defendants by first class mail.

Kevin T. Peters

## **SCHEDULE A**

1.     All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.     All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.     All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.     All documents which refer, reflect or relate to any business plans of CCMI.

5.     All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.     For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.     All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.     All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.     All documents which reflect communications between Raider and/or Fireman, on one hand, and any representative of NAM, on the other.

10.    All documents which reflect communications concerning Raider, Fireman, CCMI, Smartsource Direct and/or SmartSource iGroup, including but not limited to electronic communications.

11.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

12.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13.    All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

14.     All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

15.     Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

16.     Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

17.     All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

18.     All organizational charts of NAM prepared at any time from 1999 to the present.

19.     All documents reflecting or concerning Ann Raider or Robert Fireman.  This request includes, but is not limited to emails.

20.     All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

21.     All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

22.     All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT FIREMAN and ANN RAIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-1740MLW |
| | ) | |
| | ) | |
| NEWS AMERICA MARKETING IN-STORE, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF TAKING DEPOSITION

TO:    Gordon Katz, Esq.
       Holland & Knight, LLP
       10 St. James Avenue
       Boston, MA 02116

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, Robert Fireman and Ann

Raider, by and through their attorneys, will take the deposition upon oral examination of

Christopher Mixon on May 24, 2007, **commencing at 10:00 a.m.**, at the offices of Todd &

Weld, LLP, 28 State Street, Boston, MA 02109 before a notary public or other person authorized

by law to administer oaths.  The examination will continue from day to day until completed.

You are invited to attend.   The witness shall be required to bring with him to the deposition the

documents identified on the attached Schedule A.

ANN RAIDER AND ROBERT FIREMAN,

By their attorneys,

Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated: May 7, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was forwarded this date to counsel for Defendants by first class mail.

Kevin T. Peters

## **SCHEDULE A**

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and any representative of NAM, on the other.

10.    All documents which reflect communications concerning Raider, Fireman, CCMI, Smartsource Direct and/or SmartSource iGroup, including but not limited to electronic communications.

11.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

12.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13.    All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

14.    All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

15.    Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

16.    Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

17.    All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

18.    All organizational charts of NAM prepared at any time from 1999 to the present.

19.    All documents reflecting or concerning Ann Raider or Robert Fireman. This request includes, but is not limited to emails.

20.    All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

21.    All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

22.    All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,            ) | |
|                ) | |
|        Plaintiffs,              ) | |

ROBERT FIREMAN and ANN RAIDER,  )
                                )
          Plaintiffs,           )
                                )
     v.                         )   CIVIL ACTION NO. 05-1740MLW
                                )
                                )
NEWS AMERICA MARKETING IN-STORE, )
INC.,                           )
                                )
          Defendant.            )
                                )

## <u>NOTICE OF TAKING DEPOSITION</u>

TO:    Gordon Katz, Esq.
        Holland & Knight, LLP
        10 St. James Avenue
        Boston, MA 02116

      PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, Robert Fireman and Ann Raider, by and through their attorneys, will take the deposition upon oral examination of Henri Lellouche on May 25, 2007, **commencing at 8:00 a.m.**, at the offices of Todd & Weld, LLP, 28 State Street, Boston, MA 02109 before a notary public or other person authorized by law to administer oaths. The examination will continue from day to day until completed. You are invited to attend. The witness shall be required to bring with him to the deposition the documents identified on the attached <u>Schedule A</u>.

ANN RAIDER AND ROBERT FIREMAN,

By their attorneys,

Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated: May 7, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was forwarded this date to counsel for Defendants by first class mail.

Kevin T. Peters

## SCHEDULE A

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and any representative of NAM, on the other.

10.    All documents which reflect communications concerning Raider, Fireman, CCMI, Smartsource Direct and/or SmartSource iGroup, including but not limited to electronic communications.

11.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

12.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13.    All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

14.     All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

15.     Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

16.     Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

17.     All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

18.     All organizational charts of NAM prepared at any time from 1999 to the present.

19.     All documents reflecting or concerning Ann Raider or Robert Fireman.  This request includes, but is not limited to emails.

20.     All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

21.     All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

22.     All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT FIREMAN and ANN RAIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-1740MLW |
| | ) | |
| | ) | |
| NEWS AMERICA MARKETING IN-STORE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF TAKING DEPOSITION

TO:    Gordon Katz, Esq.
        Holland & Knight, LLP
        10 St. James Avenue
        Boston, MA 02116

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30, Robert Fireman and Ann Raider, by and through their attorneys, will take the deposition upon oral examination of John Rubin on May 29, 2007, **commencing at 10:00 a.m.**, at the offices of _____, New York, New York before a notary public or other person authorized by law to administer oaths. The examination will continue from day to day until completed. You are invited to attend. The witness shall be required to bring with him to the deposition the documents identified on the attached Schedule A.

ANN RAIDER AND ROBERT FIREMAN,

By their attorneys,

Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated: May 7, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was forwarded this date to counsel for Defendants by first class mail.

Kevin T. Peters

## SCHEDULE A

1.    All documents which refer, reflect or relate to Consumer Card Marketing, Inc. ("CCMI").

2.    All documents which refer, reflect or relate to SmartSource Direct from 1999 to 2004.

3.    All documents which refer, reflect or relate to SmartSource iGroup from 1999 to 2004.

4.    All documents which refer, reflect or relate to any business plans of CCMI.

5.    All documents which refer, reflect or relate to any business plans prepared or reviewed prior to the acquisition of CCMI relating to the business of CCMI.

6.    For the years 1999 to 2004, all documents which refer, reflect or relate to any annual business plans which relates, reflects or refers to the business of CCMI, SmartSource Direct or SmartSource iGroup.

7.    All documents utilized, reviewed or prepared in connection with the preparation of the business plans sought by Request No. 6.

8.    All documents which refer, reflect or relate to any due diligence performed on CCMI prior to the acquisition in 1999.

9.    All documents which reflect communications between Raider and/or Fireman, on one hand, and any representative of NAM, on the other.

10.    All documents which reflect communications concerning Raider, Fireman, CCMI, Smartsource Direct and/or SmartSource iGroup, including but not limited to electronic communications.

11.    All documents which refer, reflect or relate to the August 13, 1999 Stock Purchase Agreement between NAM, Fireman and Raider.   This request includes, but is not limited to pro formas, drafts, notes, memoranda, facsimile, electronic mail and both external and internal communications regarding the Stock Purchase Agreement.

12.    All documents which refer, reflect or relate to the earn out component of the August 13, 1999 Stock Purchase Agreement.  This request includes, but is not limited to, pro formas, calculations, draft calculations, memoranda, facsimile, spreadsheets, electronic mail, notes of communications, both internal and external communications.

13.    All documents which refer, reflect or relate to any budgets or projections relating to CCMI, including drafts thereof.

14.    All NAME or News Corp. board of director's meeting minutes where CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

15.    Minutes or notes of any meeting of any NAM or News Corp. executive, manager or member of the finance or accounting department where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

16.    Materials generated or reviewed during any portion of any meeting where Ann Raider, Robert Fireman, CCMI, Smartsource Direct or SmartSource iGroup were discussed, mentioned or referenced.

17.    All proposed or adopted organizational charts of CCMI, SmartSource Direct or SmartSource iGroup prepared at any time.

18.    All organizational charts of NAM prepared at any time from 1999 to the present.

19.    All documents reflecting or concerning Ann Raider or Robert Fireman.  This request includes, but is not limited to emails.

20.    All documents which refer, reflect or relate to the negotiations between CCMI and NAM regarding the sale of CCMI's stock to NAM.

21.    All documents relating to CCMI, SmartSource Direct or SmartSource iGroup's operations.

22.    All documents which refer, reflect or relate to the loyalty marketing industry, including but not limited to business plans, reports, studies or surveys received or prepared at any time from 1997 to the present.

**EXHIBIT B**

Katz, Gordon (BOS - X75839)

-----Original Message-----
From: Rich, David H. [mailto:drich@toddweld.com]
Sent: Tuesday, May 15, 2007 4:21 PM
To: gordon.katz@hklaw.com
Cc: Peters, Kevin
Subject: RE: Fireman Litigation

Thanks Gordon.  I will send over the subpoena shortly.  There has been a change in our
line up in terms of depositions.  We do not wish to go forward with Mr. Rubin's deposition
but instead wish to depose Marty Garafolo and Paul Carlucci.  We are prepared to do one or
both of these depositions on the 30th of May in NYC if it works for these witnesses.
Thanks.


David H. Rich, Esquire
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626
(617) 227-5777 (fax)


-----Original Message-----
From: gordon.katz@hklaw.com [mailto:gordon.katz@hklaw.com]
Sent: Tuesday, May 15, 2007 10:54 AM
To: Rich, David H.
Subject: Fireman Litigation

Dave,

We will accept the DeVoe subpoena.

Gordon


Gordon P. Katz
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116
E-Mail: gordon.katz@hklaw.com
Telephone: 617.573.5839
Fax: 617.523.6850
www.hklaw.com

**EXHIBIT 8**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 1:05-cv-11740-MLW


ROBERT FIREMAN and ANN RAIDER,
          Plaintiffs

vs.


NEWS AMERICA MARKETING IN-STORE, INC.,
          Defendant


* * * * * * * *


For Hearing Before:
Chief Judge Mark L. Wolf


Motion Session


United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, June 26, 2007


* * * * * * *


REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5200, Boston, MA 02210
(617) 737-0370

1    possibility of motions for summary judgment.  I find,

2    however, that I have the plaintiffs' motions to compel

3    production of backup tapes and also a request to extend

4    the time for discovery.  I'm skeptical about the merits

5    of either of the motions, but I'll need to know more

6    about the case and I'll hear your arguments first on the

7    motion to compel, the plaintiffs' motion.

8             MR. PETERS:  Thank you, your Honor.  Your

9    Honor, I'll give you a brief background as to what the

10   case is about so that you can understand the motion in

11   context.  This is a case involving a company that

12   pioneered what is now known as loyalty marketing and the

13   best way I can describe what that is is to show you my

14   Shaw's card.  That at the point of purchase, you swipe

15   the card and the database keeps track of all the items

16   that you purchase and then companies can do direct

17   marketing.

18            THE COURT:  You told me this last year.  For

19   example, they'll send you coupons.  If you buy Sanka,

20   they'll send you a coupon for Sanka, to try to get you

21   in the store.

22            MR. PETERS:  Exactly.  You don't get Maxwell

23   House, you get Sanka.  And this is a notion, a business

24   model and where that was developed by my clients,

25   others, at the same time, it was an evolving market,

1  because at the point of purchase, suddenly there were

2  machines that could track what you were doing.

3       And at the time, my clients -- my clients were

4  Fireman and Raider and they were running a company

5  called CCMI, Credit Card Marketing Incorporated, were

6  doing fine, but were looking to take it to the next

7  level, as the business euphemism goes, and were looking

8  for buyers, were looking for strategic partners, and we

9  came across News America Marketing who, of course, is

10  the largest marketer or, if you will, coupon mailer, I

11  think, in the country, hundreds of millions of dollars

12  in the Sunday newspapers, et cetera.  So the fit seemed

13  like a perfectly excellent fit from my client's

14  perspective and at least they thought News America's

15  perspective as well.  They entered into negotiations and

16  they agreed upon the sale of CCMI to News America

17  Marketing.

18       In basic terms, the purchase price, which is a

19  defined term under the asset purchase agreement was in

20  three forms, there were three components.  The first was

21  a 2.8 million dollar up-front payment.  The next was

22  bonuses, as they're called under the APA, and certain

23  financial benchmarks for that.  And the third is

24  percentages over a 5-year period based on gross margin.

25  And it probably doesn't need to be more detailed than

1          MR. RICH:  And I think that's a fair question,

2     your Honor.  We have retained an expert and our expert

3     intends to talk -- contrary to what you would read in

4     Mr. Katz's paper, not a damages expert per se and, in

5     fact, it may not even be true expert testimony, although

6     I think we need to disclose something.  What our expert

7     intends to talk about is the industry, what the industry

8     --

9          THE COURT:  Well, that's expert testimony.

10    That's **Marks vs. Diner's club**, things like that.

11         MR. RICH:  Well, that's what our expert

12    intends to testify about.  From our perspective, it's

13    been important for us to get from the defendants what

14    their understanding of the market was and what happened

15    to the market, because from our perspective, it may be

16    that we're in agreement as to what the market is and no

17    expert testimony is required.  Mr. Lellouche testified,

18    yet on the last day of discovery, that this was a 7

19    million dollar market, which surprised us

20    substantially.  Your Honor -- and I recognize and I'm

21    not suggesting that our expert disclose -- it

22    constitutes an expert disclosure, but the name of our

23    expert was listed in our initial disclosure.

24         THE COURT:  That doesn't satisfy the

25    requirements of Rule 26.

1          MR. RICH:  No, absolutely not, and I'm not

2   suggesting that it does, but I'm simply responding to

3   the point that Mr. Katz has made in their brief that we

4   simply woke up one morning and realized that we didn't

5   have an expert and we needed one.  So we have had this

6   expert and we've been waiting for the depositions to --

7          THE COURT:  Well, here, it's 25 minutes to

8   6:00.  I'm going to help you.

9       I'm denying this motion without prejudice.  Now

10  we're going to do it my way because I think your

11  briefing, and I apologize if I miss something, wasn't

12  really framed in the -- in the proper context.  If you

13  want to disclose an expert late or an opinion late, you

14  have to meet the requirements of Rule 37(c).  Have you

15  briefed 37(c)?  No.  Have you read my *Alves* decision

16  from last August talking extensively about 37(c)?  No.

17  Okay.  All discovery is to be complete by July 20th.

18  And the only remaining discovery is what, three more

19  depositions of defendants' witnesses?

20         MR. RICH:  That's all I think there is.

21         THE COURT:  Okay.  July 20.  Then if the

22  plaintiff wants to renew the motion to designate an

23  expert late, the plaintiff shall, by August 10th, file

24  that motion probably -- well, with the expert's

25  disclosure, and you're going to have to address the

```
 1    requirements of Rule 37(c) as I've discussed them in
 2    Alves, 448 F. Supp. 2nd 285.  You're going to have to
 3    show either that there was substantial justification for
 4    the late disclosure or that the failure to disclose
 5    earlier is harmless.  And then the defendant is going to
 6    have to answer that by August 24th, two weeks later.
 7         And, you know, I may say what's the harm?  And
 8    you'll say "Oh, it's going to reopen discovery.  It's
 9    going to cost us a fortune.  The case is supposed to be
10    over and I'm supposed to be moving this case."
11         Then you're going to do what I ordered you to do
12    even if there are motions for more discovery.  One,
13    you're going to meet and confer about settling this
14    case, seriously, and talk about whether you want to go
15    to mediation, because I've been educated to understand
16    that I'm going to have to allow a motion for summary
17    judgment and the motion for summary judgment might
18    involve Daubert.  That's why it's, in part, essential
19    that the defendants have the expert disclosure there in
20    early August.  They may say "You can't consider that on
21    summary judgment."  I mean, they may just be saying
22    "There's no bad faith."  I have read the -- I mean,
23    "There's no out for bad faith, alleged bad faith, or
24    there's no evidence of bad faith."  But I can foresee
25    you're going to be disputing whether that expert
```

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN & ANN RAIDER )
Plaintiffs, )
)
        v. ) Civ. A. No. 05-11740-MLW
)
News America Marketing In-Store, )
Inc., )
Defendant )

ORDER

WOLF, D.J.                                                    June 28, 2007

For the reasons stated in court on June 26, 2007, it is hereby
ORDERED that:

1.    Plaintiffs' Motion to Compel Responses to Discovery
Requests (Docket No. 17) is DENIED.

2.    Plaintiffs' Motion to Modify Scheduling Order (Docket No.
28) is DENIED without prejudice.

3.    The parties shall complete discovery by July 20, 2007.

4.    If plaintiffs wish to renew their motion to designate
an expert late, they shall, by August 10, 2007, file a motion,
affidavit(s), memorandum, and expert disclosure in order to attempt
to show either that they have a substantial justification for
designating their expert late or that designating their expert late
is harmless. See Fed.R.Civ.P. 37(c); Alves v. Mazda Motor of Am.,
Inc., 448 F. Supp. 2d 285, 293 (D. Mass. 2006).

5.    Defendant shall respond to any such motion by
August 24, 2007.

6.    The parties shall meet and confer regarding settlement

or mediation of this dispute, and report to the court by September 14, 2007 as to settlement, mediation, and whether any basis for a summary judgment motion exists.

    7.   Counsel shall attend a conference on October 4, 2007 at 3:30 p.m., with their clients.

_____   /s/_____ MARK L. WOLF_____
                                           UNITED STATES DISTRICT JUDGE