UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

        Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

        Defendant.

Civil Action No. 05-11740-MLW

## MEMORANDUM OF NEWS AMERICA MARKETING IN-STORE, INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

NEWS AMERICA MARKETING IN-STORE,
INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: October 31, 2007
Boston, Massachusetts

Table of Contents

I.      Introduction..................................................................................................1

II.     Statement of Facts.......................................................................................3

        A.      The Stock Purchase Agreement.......................................................3

        B.      NAM's Management of the CCMI Business......................................6

III.    Summary Judgment Standard......................................................................11

IV.     Summary of Argument...............................................................................12

V.      Argument...................................................................................................13

        A.      Section 6.8 Of The Agreement Bars Plaintiffs' Breach Of The Duty Of
                Good Faith And M.G.L. C. 93A Claims, Because Plaintiffs Agreed That
                NAM Would Have The Sole And Unfettered Right To Manage CCMI
                After Acquiring Its Stock.............................................................13

                1.      The Clear and Unambiguous Language of Section 6.8 Acts as a
                        Firewall to Preclude Plaintiffs' Claims.....................................13

                2.      Under New York Law, Plaintiffs' Agreement that NAM Had "Sole
                        and Unfettered" Power to Run the CCMI Business Overrides Any
                        Implied Duty of Good Faith Relating to NAM's Management of
                        CCMI.................................................................................15

                3.      New York Courts Routinely Reject Efforts to Circumvent
                        Contractual Firewalls Similar to Section 6.8...........................17

        B.      Even In The Absence Of Section 6.8, Plaintiffs Can Point To No Evidence
                To Support A Claim For Breach Of The Covenant Of Good Faith And
                Fair Dealing With Respect To Their Earn-Outs..................................21

        C.      Plaintiffs Agreed That They Had No Right To Sue NAM With Respect To
                NAM's Operation Of The CCMI Business, And Therefore, Their Claims
                Under Counts I And II Are Barred.....................................................25

        D.      Plaintiffs Are Estopped From Asserting Their Claims Because They
                Accepted Without Reservation Their Earn-Out Payments For All Five
                Years.............................................................................................26

        E.      Plaintiffs' G.L. C. 93A Claim (Count II) Is Barred Because New York
                Law Controls And Plaintiffs' Claims Arise Out Of An Intra-Enterprise
                Dispute..........................................................................................27

        F.      Count III Of The Complaint (Declaratory Judgment) Is Barred (1) Because
                The Claim Was Subject To The Agreement's Accounting Arbitration
                Dispute Resolution Procedure, Which Plaintiffs Declined To Exercise, (2)
                There Is No Evidence, In Any Event, That Any Revenues Were
                Improperly Omitted From The Plaintiffs' Earn-out Calculation...........29

VI.    Conclusion ...........................................................................................................30

# I.
## Introduction

Advised by a business consultant and the prominent Boston law firm, Goodwin Procter LLP, plaintiffs Robert Fireman ("Fireman")[1] and Ann Raider ("Raider"), two sophisticated business people, sold the stock in their company, Consumer Card Marketing, Inc. ("CCMI") to defendant News America Marketing, Inc. ("NAM") in August 1999, pursuant to a written stock purchase agreement (the "Stock Purchase Agreement" or the "Agreement"). They received substantial cash up-front (almost $3 million), five-year employment agreements which paid them each six-figure salaries, and an opportunity to receive earn-out payments and bonuses contingent on CCMI's post-acquisition performance.

The Stock Purchase Agreement defines the entire universe of obligations between the parties following the acquisition and, as is clear upon reading the Agreement, NAM, in purchasing the stock of CCMI, did not make *any* promises to Fireman and Raider as to how it would operate CCMI after the acquisition was completed. To the contrary, Fireman and Raider expressly agreed in the Agreement that NAM "shall be free to operate [CCMI] in its sole and unfettered judgment and [that Fireman and Raider] shall have no claim against [NAM] in connection" with its operation of CCMI.

Between 1999 and 2004, Fireman and Raider received annual earn-out payments. They also received salary and other benefits under their employment agreements, which salary increased over time as a result of *discretionary* salary increases and bonuses awarded them by NAM.

---

[1] Fireman is also an attorney who has been in practice continuously since 1974. Fireman Depo., at 23.

Approximately one year after their earn-out period ended, and following their cessation of employment with NAM, Fireman and Raider in August 2005 brought this suit in Massachusetts Superior Court. The action was thereafter removed to this Court with jurisdiction based on diversity of citizenship. The complaint, phrased in three counts, alleges, in essence, that the manner in which NAM operated the CCMI business after NAM acquired it prevented plaintiffs from receiving the proper amount of earn-out and bonus money under the Stock Purchase Agreement. Such actions, they contend, were in violation of what they claim is an implied duty of good faith and fair dealing contained in the Agreement (Count I) and in violation of M.G.L. c. 93A (Count II).[2] The complaint also seeks a declaratory judgment (Count III), based on the claim that revenues from other NAM units should have been included in their earn-out calculations.

Fact discovery has now been completed, and plaintiffs have made their expert disclosures. As discussed below, the record demonstrates that there is no genuine issue of material fact to be tried, and each of plaintiffs' three claims should be dismissed as a matter of law. A review of the record facts, against the requirements of the applicable New York[3] substantive law, "fails to yield a trial worthy issue . . . ." *See Zambrana-Manero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999). *See also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990); *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). Accordingly, summary judgment should enter for NAM on all three counts of the complaint.

---

[2] While they made money, plaintiffs criticize certain of NAM's business decisions and, on the basis of that critique, sue because they feel they should have made more money.

[3] The Stock Purchase Agreement provides that New York law governs. Stock Purchase Agreement, §8.2.

## II.
## Statement of Facts

**A.    The Stock Purchase Agreement**

NAM is a national marketing servicing company and is recognized as the leading company in its industry.  Its customers are large retailers (such as grocery store chains) and consumer packaged goods manufacturers.  As part of its business, NAM develops overall marketing strategies for prospective and current customers; establishes and maintains strategic business relationships; and implements these strategies through the sale of marketing products such as free standing inserts in newspapers, coupon dispensers on store shelves, and other forms of in-store marketing to customers.  Affidavit of Gordon P. Katz ("Katz Aff."), Exh. 8.

As part of an attempt to obtain a toehold in electronic commerce, NAM in August 1999 acquired all the stock of CCMI.  Henri Lellouche ("Lellouche") Depo., at 48.[4]  CCMI's business, at the time of the acquisition, focused on the implementation of loyalty card programs for grocery stores chains.  CCMI Acquisition Memo dated May 14, 1999, appended to Katz Aff. at Exh. 1.  Loyalty cards permit a retail store to generate a database of shoppers and their respective product preferences.  *Id*.

In connection with the acquisition, NAM and the plaintiffs executed the Stock Purchase Agreement on or about August 13, 1999.  Under the terms of the Stock Purchase Agreement, NAM paid CCMI shareholders, principally Fireman and Raider, $2.8 million in cash.  Stock Purchase Agreement, §2.1, appended to Katz Aff. at Exh. 2.  In addition to compensation for their stock, and among other benefits, Fireman and Raider each received five-year employment

---

[4] NAM executive Henri Lellouche explained NAM's acquisition of CCMI as follows:  "We were investing on the come because it was unknown what was going to happen in the future, and we wanted to have our bit of experience, or our toe in the water if you will, in these different areas."  Lellouche Depo., at 48.

agreements.  Employment Agreements, appended to Katz. Aff at Exhs. 3 and 4.    Plaintiffs also

received the possibility of earn-out payments and bonuses based on the performance of the

acquired business.  Stock Purchase Agreement, §2.3.[5]

Nowhere in the Stock Purchase Agreement were there *any* requirements spelling out how

NAM was to run or support the acquired business.  Rather, plaintiffs *agreed* that NAM would

have "sole and unfettered judgment" in its operation of CCMI.  Specifically, Section 6.8 of the

Stock Purchase Agreement, entitled "Conduct of the Business," and most relevant to the present

dispute, provided, in pertinent part, as follows:

> It is Buyer's [NAM's] *current intention* to provide support to the business of
> the Company [CCMI] by, among other things, (i) utilizing Buyer's sales
> force in order to promote the sale of the Company's products, (ii) assisting
> the Company in the creation of long-term relationships with retailers, and
> (iii) investing in software and hardware as needed to expand the Company's
> business.  Notwithstanding the foregoing, *Buyer shall be free to operate the
> Company and its Affiliates in its sole and unfettered judgment and Sellers
> [Fireman and Raider] shall have no claim against Buyer in connection
> therewith* as a result of the preceding sentence."  (emphasis added)

In addition, Section 8.1 of the Agreement, entitled "Entire Agreement," states that:

> This Agreement (together with the Schedules hereto) contain, and are
> intended as, a complete statement of all of the terms of the arrangements
> between the parties with respect to the matters provided for, and supersedes
> any previous agreements and understandings between the parties with
> respect to those matters.

Accordingly, the parties *agreed* that Section 6.8 was not to be "supplemented" by any *alleged*

"pre-acquisition" oral promises.

Plaintiffs were ably assisted in their negotiation of the Agreement.  They were

represented by the law firm of Goodwin Procter LLP during its negotiation and drafting.

---

[5] With respect to the earn-out and bonuses, the interests of the plaintiffs and NAM were identical.  "When
we made good numbers, they were making good numbers."  Fireman Depo., at 212-213.

Fireman Depo., at 79-80.  They were further assisted and advised in the negotiations by Leslie

Charm, a business consultant, and faculty member at Babson College.  Leslie Charm Depo., at 9-

10, 31-32.  Indeed, Fireman himself was, and is, a lawyer.  Fireman Depo., at 23.

     Section 2.3(c) of the Agreement anticipated disputes regarding earn-out calculations and

provided, in relevant part:

> In the event that the Principal Sellers [the Plaintiffs] desire to dispute any
> Buyer's Calculation [concerning the earn-out payments], the Principal
> Sellers shall, within twenty (20) Business Days following receipt of such
> Buyer's Calculation, deliver to Buyer written notice setting forth, in detail,
> their objections to such Buyer's Calculation (the "Objection Notice"), which
> dispute shall be resolved in accordance with the procedure outlined in
> Section 2.2(b) [providing for accountant-run arbitration].

Stock Purchase Agreement, §2.3(c) (emphasis added).  The accountant-run arbitration provision

required each party to *designate* an accounting firm to resolve earn-out disputes that remained

after the parties had discussed them.  Stock Purchase Agreement, §2.2(b).  If, after 30 days, the

two accounting firms were unable to resolve the disputed issue, then that dispute was to be

submitted for a final and binding decision to a third nationally recognized independent

accounting firm.  Once the third accountant made his final and binding decision, the earn-out

would be paid with interest at 150 basis points above prime from the applicable base earn-out

payment date.  Stock Purchase Agreement, § 2.2(b).

     During the five-year earn-out term, NAM paid plaintiffs an earn-out each year.  The

payments totaled $771,985.[6]  In addition, plaintiffs were paid for the entirety of their five-year

employment agreements, during which period they received discretionary salary increases and

bonuses.  Raider Depo., at 44-49.  The plaintiffs employed Section 2.3(c)'s dispute procedures

frequently – that is, they objected and negotiated back and forth with NAM on specific revenue

---

[6] Tabulation of Earn-Out Payments, appended to Katz Aff. at Exh. 5.

or expense items that went into the calculation of each year's earn-out.  Raider Depo., at 214.[7]  In

no year did the plaintiffs elect to take any grievance to accountant arbitration.  They worked out

any issues with NAM management and accepted without simultaneous reservation the earn-out

payments wire-transferred into their accounts.[8]  Plaintiffs knew they needed to follow the

Agreement's earn-out dispute resolution procedures or they would "lose the right to appeal."

Robert Coughlin Depo., at 196-197 and Ex. 33 (Fireman email).

B.    **NAM's Management of the CCMI Business**

At the time of its acquisition in 1999, CCMI had three sources of business:  (1) loyalty

card implementation; (2) data management (or data housing) for retail stores' loyalty card data;

and (3) marketing and consulting.  CCMI Acquisition Memo, at 2, appended to Katz Aff. at Exh.

1.

For the fiscal calendar year ended December 31, 1998, the last calendar year before the

acquisition, CCMI had the following gross revenue by source of business:

|  | Total | % |
|---|---|---|
| Loyalty and Implementation | $2,422,766 | 64.8% |
| Data Base Management | 1,247,118 | 33.3% |
| Data Base Marketing/Other | 71,723 | 1.9% |
| Total | $3,741,657 | 100% |

Stock Purchase Agreement, Schedule §4.6 (1998 Income Statement).

CCMI's revenue production before the acquisition, as shown above, was modest; as to

profits, CCMI was "break even," at best.  For example, on 1998 gross revenues of approximately

---

[7] As Ms. Raider admitted:  "There was a tremendous amount of discussion, dialogue, documents produced, multiple people involved and issues regarding each year of the earnout calculation."  Raider Depo., at 214.

[8] Fireman Depo., at 181-183.

$3.7 million (shown above), CCMI experienced an operating loss of approximately $268,143. *Id.* Agreement, (Schedule §4.6). For the first quarter of 1999 – shortly before NAM's acquisition – CCMI had generated gross revenue of only $766,420. NAM Due Diligence Memo, May 27, 1999, Financial Statements of CCMI for 1998, Q1 1999, pp. NAM 3157-3159, appended to Katz Aff. at Exh. 6.

With the goal of building CCMI revenue and improving CCMI profits, NAM, after its acquisition of CCMI in August, 1999, took the following steps, among others:

(a)    it rebranded CCMI as Smart Source Direct ("SSD"), "Smart Source" being the brand utilized by NAM in its well-known FSI and store coupon businesses;[9]

(b)    it made SSD part of NAM's iGroup, a new operational unit headed by senior NAM executives Christopher Mixson ("Mixson")[10] and Marty Garofalo ("Garofalo");[11]

(c)    it invested over $1 million in new computer technology for SSD in an attempt to upgrade SSD's data management capacity;[12]

(d)    it hired additional sales personnel dedicated to selling both SSD's retail products and direct marketing contracts to consumer products goods manufacturers; and[13]

---

[9] Lellouche Depo., at 124-125.

[10] Prior to joining NAM, Mixson was Vice President, National Accounts Director, of Citicorp POS ("Point of Sale") Information Services. Mixson Depo., at 8. Citicorp POS Information Services was "the pioneer in database marketing." Mixson Depo., at 49. "Database marketing" – or targeted marketing – was the type of business which Fireman and Raider hoped CCMI would evolve into under NAM ownership. Raider Depo., at 201-202.

[11] Garofalo Depo., at 32; Mixson Depo., at 63.

[12] Fireman Depo., at 230-231 and Ex. 98 thereto.

[13] Mixson Depo, at 23-26; Raider Depo., at 269-270.

(e)    it informed members of NAM's existing sales force of SSD's products, instructed them to be alert to cross-selling opportunities of SSD's products, and rewarded them when such sales closed.[14]

In addition to the three areas of business CCMI pursued at the time of its acquisition, NAM added a *new* fourth area of business to the SSD portfolio:  provision and transaction processing of stored value or e-gift cards.  Affidavit of Henri Lellouche ("Lellouche Aff."), ¶3; Fireman Depo., at 226.  Even though CCMI had no such stored value or e-gift card business prior to NAM's acquisition of CCMI in 1999, revenue from SSD's new stored value or e-gift card business was *included* by NAM in the calculation of Fireman and Raider's earn-out payments.  CCMI/SSD Revenue Spreadsheets, appended to Katz Aff. at Exh. 7.

One of the most substantial SSD revenue items during plaintiffs' five-year earn-out period was revenue derived from a stored value card project for Toshiba.  Katz Aff., Exh. 7.  The project involved the implementation of a Toshiba gift card distributed to, and transactions processed on behalf of, members of a national consumer class as settlement of a class action litigation.  Mixson Depo., at 104; Raider Depo., at 273.  SSD's Toshiba business was generated via a lead to NAM from News Corporation, NAM's parent company.  Fireman Depo., at 226.

The Toshiba e-gift card project generated revenue of:

| | |
|---|---|
| 1999-2000: | $312,000 |
| 2000-2001: | $2,013,741 |
| 2002-2003: | $1,499,855 |

---

[14] Garofalo Depo., at 27-28; Mixson Depo., at 38, 42.

All of this new revenue counted in Fireman and Raider's favor in their earn-out calculation. Katz

Aff., Ex. 7. NAM, however, was under no obligation to have directed the Toshiba opportunity to

its SSD unit. *See* Stock Purchase Agreement, §6.8.

The CCMI/SSD business had mixed results during the earn-out period.[15] Loyalty card

implementation business declined during the five year earn-out period. This decline occurred

because retailers "went direct to the factories" to purchase the cards and "directly to the data

entry facilities" for loyalty card application processing. Lellouche Depo., at 130.

In addition, SSD's data management business dried up. Although NAM invested

substantial monies and human resources in developing new technology to exploit a hoped-for

---

[15] SSD had the following total *gross revenue* by area of business (where data available) for the five earn-out years between 1999-2004:

|  |  |
|---|---|
| <u>Year One</u> (1999-2000) | $4,362,054 |
| <u>Year Two</u> (2000-2001) |  |
|    Loyalty Card Implementation and E-gift Card | $5,340,639 |
|    Data Management | 783,142 |
|    Marketing and Consulting | <u>983,143</u> |
|      Total | $7,121,924 |
| <u>Year Three</u> (2001-2002) |  |
|    Loyalty Card Implementation and E-gift Card | $4,745,182 |
|    Data Management | 461,153 |
|    Marketing and Consulting | <u>3,127,126</u> |
|      Total | $8,323,451 |
| <u>Year Four</u> (2002-2003) |  |
|    Loyalty Card Implementation and E-gift Card | $3,794,700 |
|    Direct Mail | <u>3,700,520</u> |
|      Total | $7,495,220 |
| <u>Year Five</u> (2003-2004) |  |
|    Loyalty Card Implementation | $3,449,541 |
|    Direct Mail | <u>2,750,341</u> |
|      Total | $6,146,844 |

Katz Aff., Ex. 7, CCMI/SSD Revenue Spreadsheets.

SSD data management business, it found that "there was no appetite in the marketplace amongst the large retailers for an ASP-hosted solution [*i.e.*, third-party management of retailers' consumer preference information]. In fact, they all built their own data warehouses, bought or licensed or developed their own software . . . it was just a miss by a mile." Lellouche Depo., at 153-154. In addition, the "new technology" recommended by Fireman (known as the "Epiphany" product) and purchased by NAM "was inadequate and not capable of managing the data sets involved in supermarket transactions." *Id.*

During the same time period, SSD's "targeted marketing" revenue increased. Virtually non-existent in 1999, SSD's "targeted marketing" revenue grew from virtually zero to $3,700,520 by year four of the earn-out period. Katz Aff., Exh. 7.

Apart from the revenue-generating businesses listed above, NAM, in an effort to grow the SSD business, invested resources in several potential *new* areas of SSD business which were unsuccessful. Among such "experiments" was the use of "kiosks" at retail store entrances to dispense electronic coupons. This experiment did not work – kiosks "continue to show to be failures, over and over again." Lellouche Depo., at 67. NAM also supported efforts (promoted by Fireman) for SSD to develop a "money transfer card" to be used by the Hispanic population in the U.S. to transfer money to family members in Latin American countries. After substantial work, it was learned that the project was not viable because "as [Fireman] went around to retailers [it was] found out that Western Union had [an] *exclusive* on money transfer." Fireman Depo., at 306 (emphasis added).

In short: while plaintiffs would have apparently preferred that NAM have made certain other efforts with regard to the CCMI/SSD business, it is beyond reasonable dispute that during

the five-year earn-out period, NAM made serious efforts to grow the CCMI business and produce profits.[16]

### III.
### Summary Judgment Standard

"In civil procedure, summary judgment's role is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *O'Connor v. Steeves*, 1992 WL 391331, at *6 (D. Mass. 1992), vacated in part on other grounds, 994 F.2d 905 (1st Cir. 1993), *quoting Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). "When requesting summary judgment, the moving party must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" *Id., quoting Garside*, 895 F.2d at 48, *quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "To defeat a summary judgment motion, the non-moving party must then 'document some factual disagreement sufficient to deflect brevis disposition.'" *Id., quoting Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991).

"As the First Circuit has noted: [n]ot every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment; the disagreement must relate to some genuine issue of material fact." *Id.* (citation omitted). "For a plaintiff in a civil case to defeat a motion for summary judgment, for example, the plaintiff must demonstrate a genuine issue of material fact on every element essential to his case in chief." *Id.* (citation omitted). A fact is material "if, based on the substantive law at issue, it might affect the outcome of the case." *Puerto Rico Elec. Power v. Action Refund*, 483 F. Supp.2d 153, 158 (D.P.R. 2007). "A genuine issue of material fact, in other words, is not the stuff of an opposing party's dreams. On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent

---

[16] Notably, plaintiffs, at deposition, stated that they were aware of no NAM goal for CCMI other than the maximizing of CCMI profit. Raider Depo., at 87.

evidence to rebut the motion." *O'Connor*, 1992 WL 391331, at *6, *quoting Mesnick*, 950 F.2d at 822.[17]

Indeed, "[e]ven in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Comm-Tract Corp. v. Northern Telecom, Inc.*, 1996 WL 11953, at *5 (D. Mass. 1996), *quoting Medina-Munoz v. R.J. Reynolds Tobacco Company*, 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). *See also, Mesnick*, 950 F.2d at 822.

## IV.
## Summary of Argument

NAM's right under §6.8 of the Stock Purchase Agreement to use its "sole and unfettered judgment" to conduct the [post-acquisition] business of CCMI mandates that summary judgment enter against Fireman and Raider on their claims for an alleged breach of the implied covenant of good faith and violation of G.L. c. 93A. Simply put, under the Stock Purchase Agreement, NAM had the right to run the acquired business in any manner it deemed appropriate; indeed, nowhere in the Agreement is there any requirement that NAM affirmatively do or refrain from doing anything with regard to the management and running of the acquired business. The clear language of Section 6.8 cannot be overlooked and must be enforced.

However, even in the absence of §6.8's "sole and unfettered judgment" clause, plaintiffs' claims fail. In order to show a breach of the implied covenant of good faith in the earn-out

---

[17] In the First Circuit, it has been recognized that "[o]ver time, summary judgment has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick*, 950 F.2d at 822. The precise quantum of evidence necessary in order to survive a pretrial Rule 56 motion "is not susceptible to formulaic quantification." *Id.* at 825. Rather, the determination "must be made case by case, in light of the principles undergirding summary judgment, the evidentiary record, and the substantive rules of law applicable to a given case." *Id.*

context, plaintiffs need to show that NAM "intentionally sought" to lose money or had a

"reckless disregard" as to losing money, and there is no such evidence.  Moreover, plaintiffs'

claims are barred for the additional reasons that plaintiffs agreed that they would not sue NAM

with respect to NAM's operation of the CCMI business and because plaintiffs accepted without

reservation five years of earn-out payments (and are therefore estopped at this late date from

seeking more).

Specific to plaintiffs' c. 93A theory, plaintiffs' claim is barred because New York law

governs this controversy, and, even if it did not, plaintiffs' c. 93A claim is a non-actionable

"intra-enterprise dispute."

Finally, plaintiffs' Count III "accounting" claim is barred because plaintiffs failed to

exercise the accounting arbitration remedy spelled out in the agreement, and, in any event, there

is no evidence of any error in the earn-out calculations.

Each of these summary judgment grounds is discussed below.

## V.
## Argument

**A.    Section 6.8 Of The Agreement Bars Plaintiffs' Breach Of The Duty Of Good Faith And M.G.L. C. 93A Claims, Because Plaintiffs Agreed That NAM Would Have The Sole And Unfettered Right To Manage CCMI After Acquiring Its Stock.**

**1.    The Clear and Unambiguous Language of Section 6.8 Acts as a Firewall to Preclude Plaintiffs' Claims.**

The gravamen of plaintiffs' claim in this action is their *belief* that NAM did not properly

manage CCMI, and thereby prevented plaintiffs from receiving proper earn-out and bonus

payments.  Under the plain language of the Agreement, no claim may be based on such

allegations.

Section 6.8 of the Agreement, entitled "Conduct of the Business," reposes in NAM "the *free[dom]* to operate [CCMI] in its *sole and unfettered judgment . . . .*" (emphasis added). Plaintiffs, in other words, agreed in their contract that they would *not* have the power to *second guess* any of the post-acquisition decisions NAM made in running the CCMI business.[18]

There is nothing ambiguous regarding these straight-forward words, and they should be enforced as written. "As a general matter, the objective of contract interpretation is to give effect to the expressed intentions of the parties . . . . Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment." *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1st Dept. 1990).

In this case, the above-quoted language from the second sentence of Section 6.8 of the Agreement acts as a firewall to prevent plaintiffs' assertion of their Count I claim for breach of

---

[18] Without proper limiting language, earn-out provisions – of the type provided in the Stock Purchase Agreement – can provide fertile ground for disputes. Assume an earn-out provision that is based on the achievement of certain performance milestones. Assume further that the achievement of these performance milestones is determined, as is always the case, by, in part, business decisions made by the party responsible for paying the earn-outs (the "Payor"). Without proper limiting language, the potential beneficiary of the earn-out provision is free to challenge and disrupt any number of the Payor's business decisions. The potential beneficiary will claim that the Payor's business decisions failed to optimize performance for achievement of the requisite performance milestones, and failed to generate for the beneficiary the maximum sought-after earn-out payments. An improperly structured earn-out provision, therefore, can allow a beneficiary to "second guess" management, disrupt proper operations of the Payor, and demand performance-based earn-outs irrespective of actual performance.

Well aware of the dangers of an improperly structured earn-out provision, NAM required that the Stock Purchase Agreement contain two key provisions: (i) a provision expressly granting NAM "sole and unfettered" decision-making regarding the acquired business together with a clause expressly preventing the plaintiffs from challenging NAM's "sole and unfettered" decision-making; and (ii) a provision requiring the plaintiffs to raise objections to their earn-out payments within twenty business days of the payment, and resolve any disputes through accountant-run arbitration.

the implied covenant of good faith and fair dealing regarding the "conduct of the [CCMI] business."

2. **Under New York Law, Plaintiffs' Agreement that NAM Had "Sole and Unfettered" Power to Run the CCMI Business Overrides Any Implied Duty of Good Faith Relating to NAM's Management of CCMI.**

To be sure, "New York does recognize that in *appropriate circumstances* an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983) (emphasis added). However, as New York's highest state court has held, New York law does not permit an obligation to be implied that "would be inconsistent with other terms of the contractual relationship." *Murphy*, 58 N.Y.2d at 304 (holding that "to imply such a limitation from the existence of an unrestricted right would be internally inconsistent"). *Accord Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 558 (N.Y. App. Div. 4th Dep't 1996) (rejecting breach claim where party had "complete discretion," holding "a court should not construe a contract as implying an obligation that would be inconsistent with other terms of the contract"). "A claim for breach of the implied covenant of good faith and fair dealing cannot substitute for an unsustainable breach of contract claim." *Skillgames LLC v. Brody*, 767 N.Y.S.2d 418, 423 (N.Y. App. Div. 1st Dep't 2003) (claim for continued employment could not be sustained in light of status as an at will employee).

Significantly, New York law permits parties (particularly sophisticated parties such as the plaintiffs) to c*ontract away* the implied covenant of good faith and fair dealing. Parties "may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing." *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 775 (S.D.N.Y. 1969).

That is the case here:  NAM was granted by the plaintiffs the right to operate CCMI in its "sole and unfettered" judgment.  Such language "*override[s]* the implied covenant" and trumps any good faith obligations regarding operation of CCMI which NAM might otherwise have had.  *Keene Corp. v. Bogan*, 1990 WL 1864, at *14 (S.D.N.Y. 1990) (Mukasey, J.) (emphasis added).

Indeed, it is illogical and inconsistent for plaintiffs to have agreed, on the one hand, that NAM could run the CCMI business in its "sole and unfettered judgment," and then, on the other hand, to claim, as they do now, that there are limitations on NAM's "sole and unfettered judgment." [19]  The word "unfettered" means "not restrained or limited."  *Webster's Third New*

---

[19] As the following excerpt from Ms. Raider's deposition vividly indicates, plaintiffs simply refuse to recognize the reality of the agreement which they signed:

Q.  The second sentence [of §6.8] says that NAM has the freedom to operate the CCMI business in its sole and unfettered judgment.  Aren't those what the words say?
A.  The words say buyer shall be free to operate the company and its affiliates in its sole and unfettered judgment.
Q.  That's what the words say?
A.  Those are the words.
Q.  You don't dispute that?
A.  I do not dispute the words.
Q.  Now, insofar as the agreement was concerned, NAM management was free to make mistakes in its management of the CCMI business, was it not?
A.  No, sir, it was not.
  *    *    *
Q.  NAM was free to set the budgets of the CCMI business, was it not?
A.  No.
Q.  NAM was free to decide where to make capital expenditures, was it not?
A.  No.
Q.  NAM was free to decide when to make capital expenditures, was it not?
A.  No.
Q.  NAM was free to decide when to make additional hires, was it not?
A.  No.
Q.  NAM was free to choose who would be your supervisors, was it not?
A.  No.
Q.  NAM was free to determine who, if anyone, you would supervise, was it not?
A.  No.
Q.  NAM was free to choose what areas of CCMI's business would be pursued in the future, was it not?
A.  No.
Q.  NAM was free to discontinue business activities of CCMI that were no longer profitable, was it not?
A.  No.
Q.  NAM was free to discontinue business activities of CCMI even if they were profitable, was it not?
A.  No.

Raider Depo., at 77-80.

*Int'l Dictionary* (1961), p. 2495.  It is untenable that plaintiffs expressly agreed in writing that

NAM had no restriction in how it ran the CCMI business, but somehow NAM was still bound by

an implied restriction.  Such a contention is (a) illogical; (b) at variance with the maxim that "[a]

reading of the contract should not render any portion meaningless…"  *Beal Sav. Bank v. Somer*,

8 N.Y. 3d 318, 324 (2007); and (c) in direct conflict with the New York Court of Appeals'

holding that no obligation can be implied that "would be inconsistent with other terms of the

contractual relationship."  *Murphy*, 58 N.Y.2d at 304.

### 3.  New York Courts Routinely Reject Efforts to Circumvent Contractual Firewalls Similar to Section 6.8.

New York case law is replete with examples where the implied covenant of good faith

and fair dealing in the earn-out or commission context has been *overridden* by specific language

in the parties' contract.  The following are just a few cases in point.

In *VTR Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 775 (S.D.N.Y. 1969),

defendant Goodyear acquired plaintiff's tire business through an agreement similar to the one at

issue here.  As part of the deal, the plaintiff in *VTR, Inc.* was to be paid commissions calculated

in accordance with defendant's future tire sales.  The agreement between the parties granted the

defendant wide discretion to operate its newly acquired business in any way that it saw fit,

stating that Goodyear "may make decisions solely in the light of [defendant's] own interest and

without liability or obligation of any kind to [plaintiff] in connection therewith, except to pay

commissions as above provided ..." *Id.* at 775-776.

Plaintiff subsequently became dissatisfied with defendant's operation of its former

business, and brought a suit alleging that defendant had breached the implied covenant of good

faith and fair dealing.  In particular, plaintiff alleged that defendant had "failed to operate the

business in good faith and willfully caused the business to deteriorate and its tire sales to

diminish thus depriving [plaintiff] of part of the consideration to be paid for such business and

impairing its overall value and the plaintiff's property interest therein..."  *Id.* at 776.  The court

rejected the argument and granted Goodyear summary judgment, holding that parties "may, by

express provisions of the contract, grant the right to engage in the very acts and conduct which

would otherwise have been forbidden by an implied covenant of good faith and fair dealing."  *Id.*

at 777.  The court went on to note:

> No case has been cited and I know of none which holds that there is a
> breach of an implied covenant of good faith and fair dealing where a party
> to a contract has done what *the provisions of the contract expressly give him
> the right to do* ...  As to acts and conduct authorized by the express
> provisions of the contract, no covenant of good faith and fair dealing can be
> implied which forbids such acts and conduct. And if defendants were given
> the right to do what they did by the express provisions of the contract, there
> can be no breach.

*Id.* at 778. (emphasis added)[20]

Likewise, in *Tagare v. Nynex Network Sys. Co.*, 994 F. Supp. 149, 153 (S.D.N.Y. 1997),

the court granted summary judgment to the defendant corporation, which had engaged the

plaintiff as a consultant in a contract that allowed for a potential bonus contingent on certain

levels of sales made by the plaintiff.  In particular, the contract provided for incentives that

would pay plaintiff "a bonus of $500,000 for $800 million in capacity sales, an additional

---

[20] The court further observed that plaintiff, who had "entered into this contract with its eyes open" through an arms length negotiation, could not seek to escape the bargain it had struck through the implied covenant of good faith.  *See VTR, Inc., 303* F. Supp. at 780.  In so doing, the court relied upon the fact that defendant had the right under the agreement to engage in all of the acts and conduct attacked by plaintiff, because the agreement gave defendant the right "to make decisions solely in its own interest, whatever that interest might be, without obligation to [plaintiff]; if it decided that its interests lay in that course, it had the right to pursue it."  *Id.*  Accordingly, the fact that defendant may have pursued a business plan for the purpose of building up their pre-existing line of business to the detriment of plaintiff was irrelevant.  *See id.*

$600,000 bonus for $1.0 billion in sales, and an additional $700,000 bonus for $1.2 billion in sales." *Id.*

Just like the plaintiffs here, the plaintiff in *Tagare* argued that the defendant breached the implied covenant of good faith and fair dealing by preventing him from reaching the target sales levels by providing him with inadequate staffing, restricting his travel and denying him the information he needed to secure sufficient sales. *Id.* at 159. The court rejected the arguments, reasoning that the claims were barred because "nothing in the Agreement prohibited the conduct [plaintiff] complains of; in fact, it appears to have *authorized* much of it." *Id.* at 160 (emphasis added) ("For example, the Agreement provided that [defendant] would authorize the work to be performed under the Agreement ... the Agreement specifically stated that [plaintiff] would conduct marketing activities *'as authorized* by [defendant]', and [defendant] would be responsible only for 'expenses associated with such marketing and business development activities which it has approved and authorized.") (emphasis added)

The result was the same in *Liu v. Beth Israel Med. Ctr.*, 2003 WL 21488081, at *1 (S.D.N.Y. 2003). There, the plaintiff entered into an employment agreement with the defendant hospital that, in addition to his base salary, would also compensate him according to a formula that would fluctuate "based on the collection [defendant] made for Medical services [plaintiff] had rendered." This employment contract also stated that defendant was authorized to "bill and collect" for plaintiff's medical services "in any manner considered appropriate by" defendant. *Id.*

Dissatisfied with his compensation, plaintiff brought a claim for breach of the implied covenant of good faith against defendant, alleging that defendant "collected an unacceptably low percentage of his yearly billings" because it was "inefficient in its collection process." *See id.* ("Among the problems were its deviation for the industry standards for credentialing physicians,

which led to delays in processing bills; delays of up to six months in entering a charge in the

billing system; requirements that a complete operative report be prepared before any surgical

procedures could be billed; inadequate training of doctors in the coding of procedures; an

absence of procedures at the 'front desk' to insure that the necessary insurance information was

obtained from patients prior to rendering treatment; and inadequate procedures to ensure that

insurance claims complied with all requirements before they were submitted for payment.")  The

court rejected this argument.

Because the plaintiff had agreed to "express language that gave his employer the right to

collect his billings" *in any manner considered appropriate*, the court concluded that he could not

sustain a claim for breach of the implied covenant of good faith, and granted defendant's motion

for summary judgment.

Another example of the same analysis is found in *Reda v. Eastman Kodak Co.*, 649

N.Y.S.2d 555 (N.Y. App. Div. 4th Dep't 1996).  In *Reda*, the parties entered into a joint venture

agreement that gave "defendants complete discretion to determine whether to continue funding a

venture or to declare an end to its performance cycle [and] [i]n the latter event, defendants had

complete discretion whether to incorporate the venture as a subsidiary ... merge it into

[defendant's] main line businesses, sell it as an ongoing business, or liquidate it and sell its

assets."  Reasoning that a contract cannot be construed as "implying an obligation that would be

inconsistent with other terms of the contract," the court concluded that plaintiff could not be held

liable for breach of the implied covenant of good faith by virtue of exercising the explicit rights

listed above.  *See id at 558.*

In sum:  when absolute management power and discretion is consensually conferred on

one party, as here, there can be no claim for breach of good faith with respect to the management

at issue.  As Judge (now Justice) Scalia observed in *Tymshare, Inc. v. Covell*, 727 F.2d 1145

(D.C. Cir. 1984):  "[i]t is possible to so draw a contract as to leave decisions absolutely to the

uncontrolled discretion of one of the parties and in such a case the issue of good faith is

*irrelevant*."  *Id.* at 1153 (*quoting MacDougald Constr. Co. v. State Highway Dep't*, 188 S.E.2d

405, 407 (Ga. 1972) (emphasis added).

Accordingly, plaintiffs' claim for breach of the implied covenant of good faith and fair

dealing (Count I) must fail; likewise, plaintiffs' claim for violation of G.L. c. 93A (Count II),

because it is based on the same breach of good faith allegations, must also fail.

**B.     Even In The Absence Of Section 6.8, Plaintiffs Can Point To No Evidence To Support A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing With Respect To Their Earn-Outs.**

Even without the "sole and unfettered judgment" language of Section 6.8, plaintiffs

cannot sustain a claim for breach of good faith in connection with their earn-out and bonus

payments.  Plaintiffs are unable, as they must, to point to any probative evidence that NAM

breached the duty of good faith, insofar as that duty might apply to an earn-out claim.

To begin with, as the Stock Purchase Agreement makes quite clear, plaintiffs cannot

claim that any action or inaction relating to CCMI management, much less any level of earn-out

payment, was *promised* in the Stock Purchase Agreement.  Simply put, such terms do not exist in

the Agreement, and because of the Agreement's integration clause, they may not be added by

parol or extrinsic evidence.[21]

---

[21] As noted earlier, the Stock Purchase Agreement's "integration clause" states: "This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters."  Stock Purchase Agreement, §8.1.

This provision operates as a *complete bar* to any claim that prior discussions between the plaintiffs and NAM alter the Agreement.  *See, e.g., Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (1997) ("[T]he purpose of a general merger provision, typically containing the language found in the clause of the parties'

Nor may such terms be injected into the Agreement under the heading of "the implied covenant of good faith." "Even if . . . [a purported] implied covenant [of good faith] does not directly contradict terms of the contract, it cannot be used to add wholly new terms to the contract." *Keene Corp. v. Bogan*, 1990 WL 1864, at *14, *citing Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989). Moreover, "[t]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Ferguson v. Lion Holding*, 478 F. Supp. 2d 455, 468-469 (S.D.N.Y. 2007), *citing M/A Com. Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

Most importantly, in the earn-out (or other profit-contingent payment) context, a breach of the implied covenant of good faith and fair dealing requires a showing that the defendant "*intended* to lose money or acted in *reckless disregard* in obtaining profits." *Keene Corp.*, 1990 WL 1864, at *15 (Mukasey, J.) (emphasis added). In *Keene Corp.*, the defendant, Bogan, was a co-owner of SRS, a company that was acquired by plaintiff Keene. The asset purchase agreement provided for potential "earn-out" payments to Bogan contingent on certain sales figures. SRS became a division of Keene after the sale, and Bogan became SRS's president. In his counterclaim, Bogan alleged that Keene mismanaged SRS, rendering its earnings insufficient

---

1995 Agreement that it 'represents the entire understanding between the parties,' is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing ..."). *See also Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387 (1981) (where plaintiff enjoys "sole discretion" to "direct the 'order or manner of the disposition'" of collateral pledged by defendant under integrated security agreement, defendant precluded from "attempt[ing] to establish the existence of an oral agreement" that "clearly contravenes the express terms of these agreements and completely negates the plaintiff's right under the defendant's security agreement to release and apply the [] collateral as it deemed appropriate."); *Unisys Corp. v. Hercules Inc.*, 638 N.Y.S.2d 461, 463 (N.Y. App. Div. 1st Dept. 1996) ("Having declared the contract to be the entire agreement, the law regards it as not merely the best but the *exclusive evidence* of the parties' intent ...") (prohibiting plaintiff from introducing extrinsic evidence to contradict the terms of an integrated agreement) (emphasis supplied).

to trigger any bonus payments.  He alleged the existence of agreements with Keene separate from the asset purchase agreement.  Those agreements promised that Keene would maintain SRS's separate identity, that Bogan would have full authority to run SRS for five years, and that Keene would provide SRS with resources sufficient to ensure short term profitability.  The court rejected these assertions based on the parol evidence rule and granted Keene's motion for summary judgment on his breach of the implied covenant of good faith, holding that even if Keene's policies were misguided, negligent, or ignorant, that did not make them conducted in "bad faith."  *Id.* at *14.

As may be anticipated here, Bogan argued that the "introduction of new [management policies] over the objections of Bogan and other pre-buyout SRS employees indicate[d] Keene's reckless disregard or bad faith."  *Id.*  Judge Mukasey swiftly rejected this argument, stating "without a showing that Keene adopted these policies with *the purpose of* or with *reckless disregard* for *losing money*, the mere failure to adopt the opinions of veteran employees does not prompt a rational inference that Keene intended to deprive Bogan of the fruits of the contract." *Id.* (emphasis added).

The *Keene Corp.* court went on to state:

> In fact Bogan fails to show any economic incentive for Keene to lose money; he has presented no evidence that Keene officials intended to shift SRS business to other divisions nor that they planned to make up for lost profits after they ousted Bogan from the company.  A rational fact finder could conclude from the evidence presented only that Keene intended to make money, a conclusion supported by Bogan's own statements.

*Id.* at *16.[22]

---

[22] Where, as here, the interests of a party exercising discretion are in line with that of the other party to the contract, a court will not scrutinize the motivation behind a party exercising discretion.  *See The Interpublic Group of Companies, Inc. v. Fratarcangelo*, 2002 WL 31682389, at *14-15 (S.D.N.Y. 2002) (only where interests of party holding discretion differs from those of the contractual venture will a court scrutinize the motivation behind an

So, too, here. There is no evidence in the record that NAM did anything with CCMI but attempt to earn a profit. There is no evidence that NAM attempted to shift CCMI revenue to other divisions or that it planned to make up for lost profits after the earn-out period expired.

To the contrary, the evidence shows that NAM made substantial efforts to fuel CCMI revenue. It placed its top executives in charge of CCMI; it rebranded CCMI as SSD to take advantage of the "name recognition" goodwill attendant to NAM's other products; it invested over $1 million in new computer technology for SSD in an attempt to upgrade SSD's data management capacity; it hired additional sales personnel dedicated to selling both SSD's retail products and direct marketing contracts to consumer products goods manufacturers; and it informed members of NAM's existing sales force of SSD's products, instructed them to be alert to cross-selling opportunities, and provided incentives for them to do so. See, e.g., Fireman Depo., at 230-231; Mixson Depo., at 23-26, 38, 42; Raider Depo., at 269-270.

Indeed, in addition to the three areas of business CCMI pursued at the time of its acquisition, NAM added a *new* fourth area of business to the SSD portfolio: the provision and transaction processing of stored value (or e-gift) card. Even though CCMI had no such business prior to NAM's acquisition of CCMI in 1999, Lellouche Aff., ¶¶3, 5, revenue from SSD's new stored value or e-gift card business was *included* by NAM in the calculation of Fireman and Raider's earn-out payments. Katz Aff., Exh. 1; Katz Aff., Exh. 8. Moreover, NAM invested

---

exercise of business judgment because "[s]elf-interest ensures that the goal of profit maximization for the venture, not bad faith, guides that party's decisions"). *See also Tagare*, 994 F. Supp. at 160-161 (reasoning that plaintiff's assertion that corporation tried to under-budget marketing department "to spite him" was inconsistent with corporation's incentive to increase sales); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (stating that, typically, "the promoter stands to share in the profits of the joint venture, [such that] we can rely on the promoter's self-interest to ensure that the goal of profit maximization guides its business decisions"). In *Interpublic*, the court dismissed the plaintiff's implied covenant of good faith claim. 2002 WL 31682389, at *14-15. The court held that the plaintiff's allegations that the venture's parent company was trying to drive subsidiary company into the ground to force its prior owner to buy it back "defie[d] common sense and economic reality" because the parent's economic interests were aligned with the subsidiary and the subsidiary's former owner. *Id*.

money and manpower in developing *other* stored value card projects: namely, Kiosk-distributed electronic coupons and a money transfer card to be used by the Hispanic population; while these experiments failed to generate revenue, they demonstrate NAM's good faith in attempting to do so.

There is, in short, no evidence, and (viewing the record as a whole) no plausible argument, that NAM intended to lose money in its running of the SSD business. Fireman and Raider cannot dispute this assessment. Their complaint is merely a sour grapes claim that NAM "did what they wanted to do, . . . took the positions they wanted to take, and . . . were inflexible on the issues that were important to us." Fireman Depo., at 181. This is no more than an internal disagreement over management, and does not give rise to a legal claim.

\* \* \* \*

Apart from the contract language and failure of proof which bar plaintiffs' "good faith" and derivative c. 93A claims, *other* reasons, discussed in the following sections of the memorandum, lead to the same conclusion.

## C.    Plaintiffs Agreed That They Had No Right To Sue NAM With Respect To NAM's Operation Of The CCMI Business, And Therefore, Their Claims Under Counts I And II Are Barred.

In the first sentence of Section 6.8 of the Stock Purchase Agreement, NAM stated that it was its "current intention to provide support to the business of [CCMI]." However in the second sentence of Section 6.8, Fireman and Raider *agreed* that they "shall have no claim against [NAM] in connection [with the first sentence]."

Plaintiffs' claims in Count I and II, however, are both claims *relating to NAM's support* of the CCMI (or re-named, SSD) business – *i.e.*, claims relating to the first sentence of Section 6.8. By contract these claims are barred. "If two parties sign a covenant not to sue each other,

then a dispute arising out of the conduct covered by that agreement cannot provide the basis for a justiciable controversy, and the case must be dismissed." *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) (internal citations omitted). *See also Kamfar v. New Work Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 50 (S.D.N.Y. 2004) (citations omitted) ("Covenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York."); *Colton v. New York Hosp.*, 414 N.Y.S.2d 866, 874 (NY. Sup. Ct. 1979) (describing covenant not to sue as a prospective contract that is performed through the "obligor's future forbearance in asserting a claim which exists or may accrue against the obligee") (enforcing patient's covenant not to sue hospital for injuries arising from experimental surgery).

Accordingly, Counts I and II of the Complaint are barred because plaintiffs have waived such claims by contract.

**D.    Plaintiffs Are Estopped From Asserting Their Claims Because They Accepted Without Reservation Their Earn-Out Payments For All Five Years.**

Plaintiffs' claims are barred for another reason – their own conduct. Plaintiffs, after objecting and negotiating back and forth with NAM (Raider Depo., at 214), accepted and enjoyed without any simultaneous "reservation of right" all earn-out payments that NAM issued to them.

Plaintiffs, therefore, are estopped from disputing the amount of the earn-out payments. By accepting and enjoying the fruits of five years of earn-out payments, plaintiffs acquiesced in, or ratified, the amounts that had been paid them by NAM. *See Savasta v. 470 Newport Assocs.*, 579 N.Y.S.2d 167, 169 (N.Y. App. Div. 2d Dep't 1992), *aff'd* 82 N.Y.2d 763 (1993) ("Estoppel will lie when an individual has accepted the benefits of an agreement ..."); *Banque Nationale de*

*Paris v. 1567 Broadway Ownership Assocs.*, 625 N.Y.S.2d 152, 154 (N.Y. App. Div. 1st Dep't 1995) (party ratified mortgage modification by enjoying financial benefits of modification for two years before repudiation); *Reda v. Love Taxi, Inc.*, 608 N.Y.S.2d 656, 658 (N.Y. App. Div. 1st Dep't 1994) (taxi drivers estopped from objecting to deductions taken from vouchers where they accepted fruits of vouchers with full knowledge of the deductions).

Having ratified NAM's actions by accepting NAM's earn-out payments to them, plaintiffs are barred from seeking more.

**E.    Plaintiffs' G.L. C. 93A Claim (Count II) Is Barred Because New York Law Controls And Plaintiffs' Claims Arise Out Of An Intra-Enterprise Dispute.**

Plaintiffs' G.L. c. 93A claim fails for two independent reasons apart from the arguments advanced above.

First, plaintiffs' c. 93A claim is not viable because New York,[23] not Massachusetts, law governs.  Where alleged "contract violations [are] at the core of [plaintiffs'] c. 93A claims" and where another state's law has been chosen to govern the contract, Chapter 93A does not apply. *Worldwide Commodities, Inc. v. J. Amicone Co., Inc.*, 36 Mass. App. Ct. 304, 308 (1994) (c. 93A violations barred by New York choice of law provision in contract since "the contract violations were at the core" of c. 93A claims).  *Accord Northeast Data Sys. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 608-610 (1st Cir. 1993) (where Chapter 93A claim "amounts to embroidered breach of contract claim, the contractual choice of law position must govern").  Here, plaintiffs' Chapter 93A claim is entirely derivative of plaintiffs' *contract* claim – *i.e.*, that NAM breached the Stock Purchase Agreement's implied covenant of good faith and fair dealing – and the parties' agreement specifies New York as the governing law.

---

[23] The Stock Purchase Agreement provided at Section 8.2 that "this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York."

Second, plaintiffs' c. 93A claim is barred because it arises out of an *intra-enterprise* dispute, and not in connection with "trade or commerce" (as that term has been defined in the c. 93A context). "It is well established that disputes between parties in the same venture do not fall within the scope of G.L. c. 93A." *Szalla v. Locke*, 421 Mass. 448, 451-452 (1995). *See Ray-Tex Servs., Inc. v. Parker*, 64 Mass. App. Ct. 165, 170 (2005) ("The Judge found a variety of unfair and deceptive acts, such as refusing to provide documentation of costs and expenses, falsifying financial information, lying about special pricing, and lying about the necessity for a noncompetition agreement. All such actions occurred within the joint venture and therefore do not give rise to G.L. c. 93A claims.") *See also Petricca Dev. Ltd. v. Pioneer Dev. Co.*, 214 F.3d 216, 223 (1st Cir. 2000) (no c. 93A claim even though parties remained distinct business entities for the first thirty days of their contractual relationship; even if no joint venture had yet been formed, acts committed during these thirty days were outside 93A because they pertained to the details of the future joint venture); *Saint Louis v. Baystate Medical Ctr., Inc.*, 30 Mass. App. Ct. 393, 404 (1991) (holding that "c. 93A does not apply to intra-enterprise disputes").

Plaintiffs' claim in this action focuses on what NAM "did or did not do" in managing the acquired CCMI business. Plaintiffs' claim is an entirely internal dispute among the three parties (NAM, Fireman and Raider) which shared in CCMI's profits during the period 1999-2004. Accordingly, the dispute in this case does not pertain to "trade or commerce," and, therefore, is not subject to G.L. c. 93A.

**F.** **Count III Of The Complaint (Declaratory Judgment) Is Barred (1) Because The Claim Was Subject To The Agreement's Accounting Arbitration Dispute Resolution Procedure, Which Plaintiffs Declined To Exercise, (2) There Is No Evidence, In Any Event, That Any Revenues Were Improperly Omitted From The Plaintiffs' Earn-out Calculation.**

In Count III of the Complaint, plaintiffs seek a declaratory judgment that "revenues generated by [other business units of NAM] must be included in the calculation of the Gross Margin that determines the [earn-out] amounts due to Fireman and Raider under the Agreement." Compl., ¶32.

This claim, too, fails for two reasons: (1) the claim was subject to the Agreement's accountant arbitration dispute resolution procedure, which plaintiffs' declined to exercise, and (2) there is *no evidence* of any such unaccounted revenue in any event.

As to the first argument, Section 2.2(b) and 2.3(c) of the Agreement contain detailed and mandatory dispute resolution procedures, culminating in accountant arbitration which plaintiffs never exercised during any of the five earn-out years. Indeed, the earn-out calculations plaintiffs are disputing here have long since become immune to challenge. Pursuant to the Agreement, plaintiffs could only have challenged these calculations if, in addition to objecting in writing within twenty days of receiving NAM's calculation, they submitted the dispute to accountant arbitration for resolution if the objections were not resolved by discussions between the parties. Plaintiffs admit that they never exercised the accountant arbitration procedure for any of the five separate earn-out years. Accordingly, plaintiffs are now precluded from revisiting the propriety of these calculations through the instant litigation. *See Excel Group, Inc. v. New York Transit Auth.*, 814 N.Y.S.2d 220, 222-223 (N.Y. App. Div. 2d Dep't 2006) (barring contractor from pursuing breach of contract claim, where it failed to follow dispute resolution period provided by parties' contract); *153 Hudson Dev., LLC v. DiNunno*, 778 N.Y.S.2d 482, 482 (N.Y. App. Div.

1st Dep't 2004) (barring plaintiff from seeking recovery against defendant where plaintiff failed to invoke the claim resolution provision of its contract with defendant).

Second, there is no evidence – not a scintilla – that any revenue was improperly withheld from the calculation of plaintiffs' earn-out in any year.  Indeed, in Plaintiffs' Answer to NAM's Second Set of Interrogatories, plaintiffs state that they "do not contend in this law suit that there was an error in the mathematical formula by which the earn out was calculated."  (Answer No. 4, April 11, 2007).

Accordingly, there is nothing to Count III of the Complaint, and it should be dismissed.

## VI.
## Conclusion

For the foregoing reasons, summary judgment should be granted for the defendant and the complaint dismissed in its entirety.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: October 31, 2007
          Boston, Massachusetts

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 31st day of October, 2007.

/s/ Gordon P. Katz
Gordon P. Katz

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

               Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

               Defendant.

Civil Action No. 05-11740-MLW

**DEFENDANT'S EXHIBIT BINDER**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO #261080)
Ieuan G. Mahony (BBO #552349)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
(617) 523-2700

Dated: October 31, 2007
Boston, Massachusetts

## TABLE OF EXHIBITS

| Tab | Description |
|---|---|
| A. | Affidavit of Gordon P. Katz, dated October 26, 2007 and Exhibits Thereto |
| B. | Affidavit of Henri F. Lellouche, dated October 26, 2007 |
| C. | Excerpted Testimony and Exhibits From the May 24, 2007 Deposition of Robert N. Fireman |
| D. | Excerpted Testimony From the May 17, 2007 Deposition of Ann M. Raider |
| E. | Excerpted Testimony From the July 18, 2007 Deposition of Christopher Mixson |
| F. | Excerpted Testimony From the May 25, 2007 Deposition of Henri F. Lellouche |
| G. | Excerpted Testimony From the July 17, 2007 Deposition of Martin Garofalo |
| H. | Excerpted Testimony From the April 11, 2007 and May 1, 2007 Deposition of Leslie Charm |
| I. | Excerpted Testimony and Exhibits From the April 12, 2007 Deposition of Robert M. Coughlin |
| J. | Robert Fireman's Answers to Second Set of Interrogatories Propounded By the Defendants, dated April 1, 2007 |
| K. | Ann Raider's Answers to Second Set of Interrogatories Propounded By the Defendants, dated April 11, 2007 |

# 4885929_v1

**TAB A TO EXHIBIT BINDER**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

               Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

               Defendant.

Civil Action No. 05-11740-MLW

## AFFIDAVIT OF GORDON P. KATZ

1.     I, Gordon P. Katz, depose and state as follows:

2.     I am a partner at Holland & Knight, LLP, and am counsel for News America Marketing In-Store, Inc. ("NAM") in this action.

3.     I make this affidavit based on my personal knowledge and a review of records concerning this litigation.

4.     Exhibit 1 hereto is a true and accurate copy of a May 14, 1999 Memorandum regarding NAM's interest in acquiring Consumer Card Marketing, Inc. ("CCMI").

5.     Exhibit 2 hereto is a true and accurate copy of the Stock Purchase Agreement, dated August 13, 1999, between NAM and the plaintiffs (among others).

6.     Exhibit 3 hereto is a true and accurate copy of the August 13, 1999 Employment Agreement between NAM and plaintiff Robert Fireman.

7.     Exhibit 4 hereto Binder is a true and accurate copy of the August 13, 1999 Employment Agreement between NAM and plaintiff Ann Raider, as amended on April 9, 2004.

8.      Exhibit 5 hereto is a true and accurate copy of a tabulation of earn-out payments made by NAM to the plaintiffs.

9.      Exhibit 6 hereto is a true and accurate copy of a May 27, 1999 NAM Memorandum regarding NAM's Due Diligence on the CCMI Acquisition.

10.      Exhibit 7 hereto are true and accurate copies of CCMI (later renamed Smart Source Direct) revenue summary documents during the plaintiffs' earn-out period.

11.      Exhibit 8 hereto is a true and accurate copy of pages from NAM's web site describing NAM's business.

12.      Also included in NAM's Exhibit Binder are true and accurate copies of pages from the depositions of Henri Lellouche, Robert Fireman, Leslie Charm, Ann Raider, Robert Coughlin, Christopher Mixson, and Marty Garofalo, along with plaintiffs' Answers to NAM's Second Set of Interrogatories.

Signed under the penalties of perjury this 26th day of October, 2007.


Gordon P. Katz

# 4884412_v1

**EXHIBIT 1 TO AFFIDAVIT**

## NEWS AMERICA MARKETING

**DATE:**   5/14/99

**TO:**     JOHN NALLEN, LON JACOBS

**CC:**     PAUL CARLUCCI

**FROM:**   DAVID DEVOE JR

**RE:**     CCMI

News America Marketing has reached verbal agreement to acquire CCMI, a company specializing in database marketing and providing customer loyalty programs for retail chains through the frequent shopper programs. The acquisition is strategic in nature as CCMI is the only full service retail loyalty marketing company that has not been acquired over the past year. Catalina Marketing acquired two companies in the past nine months – Market Logic and DCI Card Marketing. The acquisition is also a strategic fit with two other investments that are in negotiation – Softcard Systems and PlanetU.

The business has operated at essentially break even the past three years and most of the asset value is inherent in software development utilized to interface with retailer point of sale systems to segment consumer purchase histories enabling targeted marketing programs from both manufacturers and retailers. The economics of the business are forecasted to improve as a result of new electronic distribution channels that were not available on a wide scale three years ago.

Attached is an overview of the Company along with estimated financial projections of the business over the next five years. We are planning to begin due diligence next week and would like to begin negotiation of a definitive agreement next week as well.

Please let me know when we can review this proposed transaction.

*Confidential*

CONFIDENTIAL

NAM01474

## Acquisition of Consumer Card Marketing, Inc.

### 1. Business Overview

CCMI was founded in 1992. The Company specializes in database marketing, customer loyalty programs for retailers and targeted marketing programs for manufacturers. CCMI currently offers the following products and services:

- *Loyalty card program implementation* - CCMI provides all of the loyalty card products and services needed to introduce and operate a retail loyalty program (grocery, department stores and others).
- *Database Management* - CCMI offers database management tools, including internally developed software, for marketers that provide easy access to customer purchase data and have the capability to analyze customer-specific purchase data.
- *Consulting and Marketing Programs* - CCMI utilizes actual purchase data provided by retailers to develop effective targeted marketing programs. Data is analyzed using CCMI's advanced software tools to help build programs to meet the various needs of promotions clients (trial, continuity, competitive targets, etc.). CCMI provides turnkey targeted programs, from data analysis and promotion planning, to program execution and results measurement.

**Management team:** Robert Fireman is the President of CCMI and Ann Raider is Executive Vice President. Both have developed strong relationships with retailers and packaged goods manufacturers based on their expertise in data management and targeted marketing. Ann worked for several years as a group brand manager for Gillette and also spent time in the electronic banking industry.

**Recent Financial Results** (in thousands)

| For years ended 12/31 | 1996 | 1997 | 1998 |
|---|---|---|---|
| Revenue | $2,539 | $7,944 | $4,187 |
| Cost of Goods | 1,663 | 5,298 | 1,765 |
| Operating Expense | 948 | 2,242 | 2,209 |
| Net Operating Income | $(72) | $403 | $212 |

### Consolidated Balance Sheet

- As of 12/31/98, CCMI had total assets of $1.9 million , including cash in the amount of $800K and $500K of other current assets.
- The Company has current liabilities of $800K and long term debt in the amount of $66K.

### 2. Opportunity for News America Marketing and CCMI

- **Full Service Provider:** CCMI's consulting and marketing services are strategically important because the Company offers highly targetable promotion services not readily available in the retail marketplace today. CCMI's backward integration into database management and loyalty card issuance enables CCMI to offer a full-service solution for clients.
- **Retail Expansion Opportunities:** News America's strong relationships with supermarket retailers and consumer packaged goods manufacturers offer significant expansion opportunities for CCMI. CCMI's efforts with other retail categories can help News America expand into other classes of trade.
- **Targeted Market Expertise:** CCMI's management expertise and specialized software will be an asset to News America Marketing as it attempts to grow its In Store portfolio of highly targeted promotions services.
- **Sales Force Economies:** By leveraging a coordinated sales effort, News America's sales force will be trained to incorporate CCMI's products into its single source portfolio. CCMI will be substantially more profitable and demonstrate increased growth as a subsidiary of News America Marketing.
- **NWS Database Opportunities:** Other businesses within News Corporation may be able to leverage CCMI's database management and marketing programs to enhance their own affinity programs. (Fox Sports, Fox Family, Harper Collins, etc.)

CONFIDENTIAL

NAM01475

MAY-25-99   15:25   From:NEWS AMERICA PUB.      2128527214      T-154   P.03   Job-922

**Projected Results (see appendix for detail)**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Revenue | $ 13,092 | $ 20,124 | $ 26,556 | $ 30,898 | $ 35,220 |
| Total Cost of Goods | 9,358 | 14,039 | 17,968 | 19,514 | 20,450 |
| Gross Margin | 3,734 | 6,085 | 8,588 | 11,384 | 14,770 |
| Other Expenses | 2,372 | 3,337 | 4,517 | 5,130 | 5,635 |
| Operating Profit | $ 1,362 | $ 2,748 | $ 4,072 | $ 6,255 | $ 9,135 |
| Percentage | 10% | 14% | 15% | 20% | 26% |
| Free cash flow after taxes | 146 | 1,005 | 1,730 | 3,009 | 4,575 |

**Model Assumptions**

- Revenue is generated from consulting, database management and loyalty card implementation services.
- Card implementation revenue is based on 850 stores in year 1, growing to 1,800 by year 5 and assumes 10,000 cards per store. Revenue is earned on a per card basis for issuance and data input. Revenue in year 1 is $4.3 million, growing to $9.2 million by year 5. This segment has a 25% gross margin.
- Database management revenue is generated from licensing fees of software and data maintenance. It is assumed that 80% of the contracts last for 5 years, with the remainder being 1 year deals. Revenue for year 1 is assumed to be $1.2 million based on 8 new systems, growing to $7.8 million by year 5 for 51 total systems, with a gross margin of 74%.
- Consulting revenue is based on targeted direct-mail and electronically delivered promotions. In year 1, consulting revenue is $7.6 million, growing to $18.3 million by year 5, with a gross margin of 46%.
- News America's model assumes a valuation range of $40.7 million to $58.4 million based on a 15% discount rate and an 8X to 12X EBITDA multiple.
- Based on the deal structure outlined below, News America's model assumes the cost to acquire CCMI is $9.8 million in total cash payments. These payments have a present value of $6.6 million using a 15% discount rate.
- Additional capital expenditures are estimated to be approximately $1.5 million.
- CCMI's Model: The model prepared by CCMI assumes a total of $70 million in gross margins over 5 years and the achievement of both full bonus payments (see deal structure). Based on these assumptions, the cost to acquire CCMI is $16.4 million in total cash payments, or a present value of $10.5 million at a 15% discount rate.

### 3. Deal Structure
The acquisition of the stock of CCMI has been agreed to based upon the following terms:

- **Up-front payment:** A payment in the amount of $3 million at closing.
- **Profit Sharing/Earn-out:** For a five-year period from the effective date of contract, CCMI will receive 12% of the gross margin, mutually defined as revenues less the direct cost of goods sold.
- **Bonus payment opportunities:**
  - **Year 1:** If the gross margin for the first 12 month period (estimated to start on October 1, 1999) exceeds $4 million a $2.5 million bonus payment will be made; if $3 million or more, a $1.5 million payment will be made.
  - **Year 2:** If the gross margin for the second 12 month period exceeds $9 million a $2.5 million bonus payment will be made; if the margin is $7.5 million or more, a $1.5 million payment will be made.
- **Employment contracts:** Five-year employment contracts including non-compete agreements for CCMI's top management. Agreements include base salary of $160K, with annual adjustments consistent with company practice, 20% bonus targets, $900/month car allowance, eligibility to participate in News Corp Stock Option Program and News America benefit program. Further details to be discussed.

### 4. Timing and Next Steps
- News America Marketing made a verbal offer to CCMI on 5/7/99, which was verbally agreed to by the Company on 5/10/99.
- Over the next month it will be necessary to develop a definitive agreement and complete due diligence.
- CCMI's target closing date is 6/15/99.

CONFIDENTIAL

NAM01476

MAY-25-99 15:25 From:NEWS AMERICA PUB.                2128527214                T-154 P.04 Job-922

**CONSUMER CARD MARKETING, INC.**
Summary Statements of Profit and Loss                                                    **APPENDIX**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| **Implementation** | | | | | |
| Grocery | $ 4,033,150 | $ 6,344,800 | $ 6,555,360 | $ 7,335,600 | $ 8,544,980 |
| Other classes of trade | 240,000 | 384,000 | 384,000 | 616,000 | 648,000 |
| Total Implementation Revenue | 4,273,150 | 6,658,800 | 6,939,360 | 7,851,600 | 9,192,980 |
| | | | | | |
| **Database Management** | | | | | |
| Grocery | 1,103,700 | 2,009,850 | 3,338,224 | 4,852,108 | 6,693,033 |
| Other classes of trade | 155,500 | 271,000 | 474,250 | 745,250 | 1,084,000 |
| Total Database Management Revenue | 1,259,200 | 2,310,850 | 3,812,474 | 5,598,358 | 7,767,033 |
| | | | | | |
| **Consulting and Marketing Programs** | | | | | |
| Grocery | 4,680,000 | 6,960,000 | 8,736,000 | 9,504,000 | 9,360,000 |
| Other classes of trade | 2,800,000 | 5,044,000 | 6,768,000 | 7,544,000 | 8,400,000 |
| Enhancement programs | 100,000 | 200,000 | 300,000 | 400,000 | 500,000 |
| Total Consulting/Marketing Revenue | 7,580,000 | 12,204,000 | 15,804,000 | 17,448,000 | 18,260,000 |
| | | | | | |
| **Total Revenue** | $ 13,092,350 | $ 20,123,640 | $ 26,555,834 | $ 30,897,958 | $ 35,219,999 |
| | | | | | |
| **Cost of Goods Sold** | | | | | |
| **Implementation** | | | | | |
| Grocery | $ 3,024,853 | $ 4,006,600 | $ 4,916,520 | $ 5,591,700 | $ 6,408,720 |
| Other classes of trade | 180,000 | 198,000 | 288,000 | 387,000 | 486,000 |
| Total Implementation Costs | 3,204,853 | 4,206,600 | 5,204,620 | 5,999,700 | 6,894,720 |
| | | | | | |
| **Database Management** | | | | | |
| Grocery | 285,582 | 518,582 | 837,432 | 1,210,719 | 1,661,724 |
| Other classes of trade | 32,906 | 69,000 | 115,150 | 180,960 | 263,200 |
| Total Database Management Costs | 318,482 | 581,382 | 952,582 | 1,391,669 | 1,924,924 |
| | | | | | |
| **Consulting and Marketing Programs** | | | | | |
| Grocery | 3,120,000 | 4,585,000 | 5,681,000 | 8,731,000 | 5,187,000 |
| Other classes of trade | 1,760,000 | 3,110,250 | 4,113,000 | 4,255,500 | 4,275,000 |
| Retail commissions | 915,000 | 1,455,000 | 1,888,000 | 1,975,000 | 1,938,000 |
| Enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 250,000 |
| Total Consulting/Marketing Costs | 5,855,000 | 9,250,250 | 11,876,000 | 12,253,247 | 11,632,506 |
| | | | | | |
| **Total Cost of Goods Sold** | $ 9,358,345 | $ 14,038,642 | $ 17,987,702 | $ 18,513,559 | $ 20,450,144 |
| | | | | | |
| **Gross Profit** | $ 3,734,005 | $ 6,084,848 | $ 8,565,132 | $ 11,364,399 | $ 14,769,855 |
| percentage | 29% | 30% | 32% | 37% | 42% |
| | | | | | |
| Sales and Marketing | 1,273,198 | 1,633,358 | 2,481,729 | 2,796,943 | 3,112,939 |
| G&A | 1,047,330 | 1,435,690 | 1,363,281 | 2,226,131 | 2,448,777 |
| Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Total operating expenses | 2,371,528 | 3,336,947 | 4,616,511 | 5,129,574 | 5,638,215 |
| operating expenses as a percentage of revenue | 18% | 17% | 17% | 17% | 16% |
| | | | | | |
| **Contribution before tax** | $ 1,362,478 | $ 2,747,900 | $ 4,071,622 | $ 6,254,786 | $ 9,134,834 |
| percentage | 10% | 14% | 15% | 20% | 26% |
| | | | | | |
| Gross Profit - Implementation | 1,068,298 | 1,400,200 | 1,734,860 | 1,892,900 | 2,298,240 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| Gross Profit - Database Management | 920,718 | 1,729,498 | 2,859,892 | 4,206,680 | 5,842,109 |
| Percentage | 74% | 75% | 75% | 78% | 75% |
| Gross Profit - Consulting/Marketing | 1,745,000 | 2,953,150 | 3,993,400 | 5,214,600 | 6,625,500 |
| Percentage | 23% | 24% | 25% | 30% | 36% |
| | | | | | |
| **CCMI Projections** | | | | | |
| Revenues | 7,975,800 | 21,623,000 | 31,624,400 | 40,063,300 | 64,915,018 |
| Gross Margin | 3,191,380 | 9,009,800 | 13,500,640 | 17,937,440 | 25,914,600 |
| Percentage | 40% | 42% | 43% | 45% | 46% |
| | | | | | |
| Revenue variance to NAM model | (5,116,550) | 1,499,910 | 5,068,566 | 9,165,361 | 29,696,097 |
| Margin variance to NAM model | (542,625) | 2,924,952 | 4,972,508 | 6,593,050 | 11,144,651 |
| | | | | | |
| **Valuation** | | | | | |
| Contribution margin | $ 1,362,478 | $ 2,747,900 | $ 4,071,622 | $ 6,254,786 | $ 9,134,834 |
| Assumed tax rate | 44% | 44% | 44% | 44% | 44% |
| Contribution margin net of tax | 762,988 | 1,528,824 | 2,260,108 | 3,502,686 | 5,115,585 |
| Add-back: Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Less: Increase in Non-Cash Working Capital | 467,528 | 351,567 | 521,607 | 217,106 | 219,102 |
| Less: Capital expenditures | 200,000 | 250,000 | 300,000 | 350,000 | 400,000 |
| | | | | | |
| Free cash flow | 146,463 | 1,005,257 | 1,729,001 | 3,009,079 | 4,574,785 |
| Cumulative cash flow | 146,463 | 1,151,729 | 2,881,721 | 5,890,800 | 10,466,583 |

6 Year discounted cash flow (no terminal value)          $          6.9   million

| Rate | \multicolumn{4}{c}{Multiple of EBITDA in millions} | | | |
|---|---|---|---|---|
| | 8 | 10 | 12 | 14 |
| 15% | $ 40.5 | $ 49.5 | $ 58.1 | $ 66.8 |
| 17.5% | $ 35.4 | $ 43.7 | $ 51.4 | $ 59.0 |
| 20% | $ 30.9 | $ 38.3 | $ 45.6 | $ 52.2 |

CONFIDENTIAL

NAM01477

MAY-25-99  15:26  From:NEWS AMERICA PUB.                    2129527214                T-154  P.05    Job-922

**CONSUMER CARD MARKETING, INC.**
Loyalty Card Implementation

| Assumptions | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Current NAM grocery network | 15,000 | | | | |
| Retailers offering loyalty programs | 64% | 70% | 72% | 75% | 78% | 80% |
| Participation as of 12/98 | 65% | | | | |
| Average shoppers per store | 10,000 | | | | |
| | | | | | |
| Percentage of NAM's network serviced | | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% |
| Corresponding stores serviced | | 315 | 432 | 563 | 702 | 840 |
| | | | | | |
| Retail/Department stores - stores per chain | | 25 | | | | |
| Chain implementations per year | | 2 | 2 | 3 | 4 | 5 |
| | | | | | |
| CCMI grocery stores implemented per year | | 500 | 600 | 700 | 700 | 800 |
| | | | | | |
| Cards per store | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Revenue per card - issue | $ | 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 |
| Revenue per card - data | $ | 0.18 | $ 0.18 | $ 0.18 | $ 0.18 | $ 0.18 |
| Reorder percentage | | 10% | 10% | 10% | 10% | 10% |
| *Cost Assumptions* | | | | | | |
| Card cost | $ | 0.23 | $ 0.23 | $ 0.23 | $ 0.23 | $ 0.23 |
| Data entry cost (7c per 100 keystrokes) | $ | 0.14 | $ 0.14 | $ 0.14 | $ 0.14 | $ 0.14 |

**Statement of Profit and Loss**

*Revenue*
*NAM network*

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Card products and services | $ 945,000 | $ 1,296,000 | $ 1,687,500 | $ 2,106,000 | $ 2,520,000 |
| Data entry | 567,000 | 777,000 | 1,012,500 | 1,263,600 | 1,512,000 |
| Residual | | 151,200 | 207,360 | 279,000 | 336,960 |
| **Subtotal** | $ 1,512,000 | $ 2,224,800 | $ 2,907,360 | $ 3,638,800 | $ 4,388,960 |

*CCMI grocery*

| | | | | | |
|---|---|---|---|---|---|
| Card products and services | $ 1,500,000 | $ 1,800,000 | $ 2,100,000 | $ 2,100,000 | $ 2,450,000 |
| Data entry | 900,000 | 1,080,000 | 1,260,000 | 1,260,000 | 1,440,000 |
| Residual | 121,180 | 240,000 | 288,000 | 338,000 | 338,000 |
| **Subtotal** | $ 2,521,150 | $ 3,120,000 | $ 3,648,000 | $ 3,698,000 | $ 4,178,000 |

*Retail/Department stores*

| | | | | | |
|---|---|---|---|---|---|
| Card products and services | $ 150,000 | $ 150,000 | $ 225,000 | $ 300,000 | $ 375,000 |
| Data entry | 90,000 | 90,000 | 135,000 | 180,000 | 225,000 |
| Residual | | 24,000 | 24,000 | 36,000 | 48,000 |
| **Subtotal** | $ 240,000 | $ 264,000 | $ 384,000 | $ 516,000 | $ 648,000 |

| **Total Implementation Revenue** | $ 4,273,150 | $ 5,608,800 | $ 6,939,360 | $ 7,851,800 | $ 9,182,960 |

*Cost of Goods Sold*
*NAM Network*

| | | | | | |
|---|---|---|---|---|---|
| Card products and services | $ 708,750 | $ 972,000 | $ 1,265,625 | $ 1,579,500 | $ 1,890,000 |
| Data entry | 426,260 | 663,260 | 768,375 | 947,700 | 1,134,000 |
| Residual | | 113,400 | 155,528 | 202,000 | 282,729 |
| **Subtotal** | $ 1,134,000 | $ 1,668,500 | $ 2,190,520 | $ 2,729,700 | $ 3,276,729 |

*CCMI grocery*

| | | | | | |
|---|---|---|---|---|---|
| Card products and services | $ 1,125,000 | $ 1,350,000 | $ 1,575,000 | $ 1,575,000 | $ 1,900,000 |
| Data entry | 675,000 | 810,000 | 945,000 | 945,000 | 1,090,000 |
| Residual | 90,863 | 180,000 | 216,000 | 252,000 | 252,000 |
| **Subtotal** | $ 1,890,863 | $ 2,340,000 | $ 2,736,000 | $ 2,772,000 | $ 3,332,000 |

*Retail/Department stores*

| | | | | | |
|---|---|---|---|---|---|
| Card products and services | $ 112,500 | $ 112,500 | $ 168,750 | $ 225,000 | $ 281,250 |
| Data entry | 67,500 | 67,500 | 101,250 | 135,000 | 168,750 |
| Residual | | 18,000 | 18,000 | 27,000 | 36,000 |
| **Subtotal** | $ 180,000 | $ 198,000 | $ 288,000 | $ 387,000 | $ 486,000 |

| **Total CGS Implementation** | $ 3,204,863 | $ 4,206,500 | $ 5,204,520 | $ 5,888,700 | $ 6,894,720 |

| **Gross Margin** | $ 1,068,288 | $ 1,402,288 | $ 1,734,840 | $ 1,962,900 | $ 2,288,240 |

| **Percentage** | 25% | 25% | 25% | 25% | 25% |

**CCMI Projections**

| | | | | | |
|---|---|---|---|---|---|
| Revenue | 3,275,000 | 5,700,000 | 7,602,000 | 9,550,000 | 12,420,000 |
| Margin | 819,000 | 1,426,000 | 1,899,000 | 2,388,000 | 3,108,000 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| | | | | | |
| Revenue variance to NAM model | $ (997,150) | $ 91,200 | $ 683,640 | $ 1,709,420 | $ 3,239,040 |
| Margin variance to NAM model | (249,288) | 22,800 | 164,150 | 426,100 | 809,760 |

Page 2 of 4

CONFIDENTIAL

NAM01478

MAY-25-99  15:26  From:NEWS AMERICA PUB.                    2128527214                T-154  P.06   Job-922

**CONSUMER CARD MARKETING, INC.**
Database Management

|  |  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Assumptions** |  |  |  |  |  |  |
| Client base    (assuming 1 system each 100 stores) |  |  |  |  |  |  |
| 50% of card implementations from NAM store network |  | 2 | 2 | 3 | 4 | 4 |
| 50% of card implementations from CCMI's store network |  | 3 | 3 | 4 | 4 | 4 |
| Additional NAM network percentage | 15,000 | 2% | 2% | 3% | 4% | 5% |
| Number of systems |  | 3 | 3 | 5 | 6 | 8 |
| 50% of current year retail card implementations |  | 1 | 1 | 2 | 2 | 3 |
| % of short term agreements | 20% |  |  |  |  |  |
| Short term agreement length in months | 12 |  |  |  |  |  |
| Long term agreement length in months | 60 |  |  |  |  |  |

| Instore systems |  | Cost Assumptions |  |
|---|---|---|---|
| Set up fee | 50,000 | License fee (out of house clients only) | 30,000 |
| License fee (out of house clients only) | 100,000 | Set up fee | 25,000 |
| Clients assumed to be out of house | 60% | Quarterly maintenance | 3,750 |
| Hardware (VAR - Ecsbase license) | 25,000 | Monthly inhouse storage | 2,600 |
| Quarterly maint. (out of house clients only) | 15,000 | Hardware (VAR - Ecsbase license) | 18,000 |
| Inhouse systems |  |  |  |
| Set up fee | 50,000 |  |  |
| Monthly inhouse storage | 13,000 |  |  |

|  | 1 year | 5 year |  |
|---|---|---|---|
|  | Total | Total | Annual |
| Total revenue for 1 inhouse system | 206,000 | 930,000 | 186,000 |
| Total cost of goods sold | 58,200 | 191,000 | 38,200 |
| Margin | 149,800 | 649,000 | 129,800 |
| Percentage | 73% | 78% | 76% |
|  |  |  |  |
| Total revenue for 1 instore system | 270,000 | 525,000 | 105,000 |
| Total cost of goods sold | 84,250 | 148,000 | 29,600 |
| Margin | 185,750 | 377,000 | 75,400 |
| Percentage | 69% | 72% | 72% |

**Statement of Profit and Loss**

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenue** |  |  |  |  |  |
| **In-house systems** |  |  |  |  |  |
| Grocery | $ 615,525 | $ 1,178,709 | $ 1,932,232 | $ 2,861,424 | $ 3,959,318 |
| Other classes of trade | 83,000 | 166,000 | 290,500 | 458,500 | 664,000 |
| Total | 698,525 | 1,346,709 | 2,222,732 | 3,317,924 | 4,623,318 |
| **In-store systems** |  |  |  |  |  |
| Grocery | 486,175 | 860,190 | 1,385,933 | 1,991,685 | 2,723,715 |
| Other classes of trade | 62,500 | 105,000 | 183,750 | 288,750 | 420,000 |
| Total | 540,675 | 965,190 | 1,569,683 | 2,280,435 | 3,143,715 |
| **Total revenue** | 1,239,200 | 2,310,890 | 3,812,474 | 5,598,359 | 7,767,033 |
| **Cost of Goods Sold** |  |  |  |  |  |
| **In-house systems** |  |  |  |  |  |
| Grocery | 142,208 | 266,462 | 437,534 | 638,669 | 881,123 |
| Other classes of trade | 18,100 | 36,220 | 63,360 | 99,550 | 144,800 |
| Total | 160,308 | 302,682 | 501,284 | 738,219 | 1,025,923 |
| **In-store systems** |  |  |  |  |  |
| Grocery | 143,375 | 249,130 | 399,498 | 572,050 | 780,601 |
| Other classes of trade | 14,800 | 28,600 | 51,800 | 81,400 | 118,400 |
| Total | 158,175 | 278,730 | 451,298 | 653,450 | 899,091 |
| **Total cost of goods** | 318,482 | 581,392 | 952,582 | 1,391,869 | 1,924,524 |
| **Gross Margin** | $ 920,718 | $ 1,729,498 | $ 2,859,892 | $ 4,206,690 | $ 5,842,109 |
| **Percentage** | 74.3% | 74.8% | 75.0% | 75.1% | 75.2% |

| **CCMI Projections** |  |  |  |  |  |
|---|---|---|---|---|---|
| Revenues | 1,070,000 | 2,680,000 | 4,616,000 | 6,894,000 | 9,784,000 |
| Margin | 739,750 | 1,904,000 | 3,344,800 | 5,035,280 | 7,245,200 |
| Percentage | 69% | 71% | 72% | 73% | 74% |
|  |  |  |  |  |  |
| Revenue variance to NAM model | (169,200) | 369,110 | 803,526 | 1,295,641 | 2,016,967 |
| Margin variance to NAM model | (180,968) | 174,502 | 484,908 | 828,510 | 1,403,091 |

CONFIDENTIAL

NAM01479

**CONSUMER CARD MARKETING, INC.**
Consulting and Marketing Programs

| | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|
| *Assumptions* | | | | | | | | |
| Direct mail delivery | Revenue | $ | 0.60 | 100% | 95% | 50% | 70% | 50% |
| | Cost | $ | 0.45 | | | | | |
| Electronic delivery | Revenue | $ | 0.12 | 0% | 5% | 10% | 30% | 50% |
| | Cost | $ | 0.02 | | | | | |
| Grocery | | | | 13 | 20 | 26 | 33 | 39 |
| Pharmacy/ mass merchandise | | | | 5 | 8 | 12 | 15 | 20 |
| Department stores | | | | 2 | 4 | 6 | 8 | 10 |

| Set up fees | | Coupons | Revenue | Cost | Reach |
|---|---|---|---|---|---|
| Short term program | Grocery | 1 | 80,000 | 15,000 | 500,000 |
| Long term program | Other | 2 | 100,000 | 25,000 | 250,000 |

| | |
|---|---|
| Retail commissions | 15% |
| Stores per program | 1,000 |
| Percentage of shoppers reached | 5% |

| Short term program | 100% DM | 50% Mix | Long term program | 100% DM | 50% Mix |
|---|---|---|---|---|---|
| Revenue | 360,000 | 240,000 | Revenue | 400,000 | 280,000 |
| Cost | 240,000 | 132,000 | Cost | 250,000 | 142,500 |
| Retail commissions | 45,000 | 33,750 | Retail commissions | 45,000 | 27,000 |
| Margin | 75,000 | 73,750 | Margin | 105,000 | 110,500 |
| Percentage | 21% | 31% | Percentage | 26% | 39% |

| General Consulting/enhancement programs | | | 2 | 4 | 6 | 8 | 10 |
|---|---|---|---|---|---|---|---|
| Revenue per program | $ | 50,000 | | | | | |
| Cost per program | $ | 25,000 | | | | | |

| Statements of Profit and Loss | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Grocery | $ 4,680,000 | $ 8,960,000 | $ 8,736,000 | $ 9,504,000 | $ 9,360,000 |
| Misc merchandise | 2,000,000 | 3,492,000 | 4,512,000 | 4,920,000 | 5,600,000 |
| Department stores | 800,000 | 1,552,000 | 2,256,000 | 2,624,000 | 2,800,000 |
| General/enhancement programs | 100,000 | 200,000 | 300,000 | 400,000 | 500,000 |
| Total | 7,580,000 | 12,204,000 | 15,804,000 | 17,448,000 | 18,260,000 |
| **Cost of goods** | | | | | |
| Grocery distribution | 3,120,000 | 4,585,000 | 5,681,000 | 5,791,500 | 5,187,500 |
| Misc merchandise distribution | 1,250,000 | 2,153,250 | 2,742,000 | 2,782,500 | 2,850,000 |
| Department stores distribution | 500,000 | 957,000 | 1,371,000 | 1,484,000 | 1,425,000 |
| Retail commission | 915,000 | 1,455,600 | 1,866,800 | 1,975,200 | 1,938,000 |
| General/enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 250,000 |
| Total | 5,835,000 | 9,250,850 | 11,810,800 | 12,233,200 | 11,650,500 |
| Margin | $ 1,745,000 | $ 2,953,150 | $ 3,993,400 | $ 5,214,800 | $ 6,629,500 |
| Percentage | 23% | 24% | 25% | 30% | 36% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenues | 3,829,800 | 13,243,000 | 18,376,400 | 23,547,900 | 33,800,500 |
| Margin | 1,632,630 | 5,680,800 | 8,307,840 | 10,464,240 | 12,001,000 |
| Percentage | 45% | 43% | 43% | 44% | 46% |
| | | | | | |
| Revenue variance to NAM model | (3,950,200) | 1,039,000 | 3,572,400 | 6,099,900 | 15,540,500 |
| Margin variance to NAM model | $ (112,370) | $ 2,727,650 | $ 4,314,440 | $ 5,249,440 | $ 8,931,800 |

CONFIDENTIAL

NAM01480

**EXHIBIT 2 TO AFFIDAVIT**

ACQUISITION OF CONSUMER CARD MARKETING, INC.

BY NEWS AMERICA MARKETING IN-STORE, INC.

August 13, 1999

INDEX

| Document | Tab |
|---|---|
| Stock Purchase Agreement, dated as of August 13, 1999, among Robert Fireman ("Fireman"), Ann Raider ("Raider"), Curtis R. Smith ("Smith"), John H. Boyles ("Boyles") and News America Marketing In-Store, Inc ("Buyer"). ........................... | 1 |
| Disclosure Schedules to the Stock Purchase Agreement ........................... | 2 |
| Employment Agreement, dated August 13, 1999, between Fireman and Buyer ........... | 3 |
| Employment Agreement, dated August 13, 1999, between Raider and Buyer ........... | 4 |
| Certificate evidencing 2,100,00 shares of common stock of Consumer Card Marketing, Inc. ("CCMI"), Irrevocable Assignment of Shares of Common Stock made by Fireman and Receipt from Buyer acknowledging receipt of certificate ........................... | 5 |
| Certificate evidencing 1,400,000 shares of common stock of CCMI, Irrevocable Assignment of Shares of Common Stock made by Raider and Receipt from Buyer acknowledging receipt of certificate ........................... | 6 |
| Certificates evidencing 248,000 shares of preferred stock of CCMI, Irrevocable Assignment of Shares of Common Stock made by Smith and Receipt from Buyer acknowledging receipt of certificates ........................... | 7 |
| Certificates evidencing 62,000 shares of preferred stock of CCMI, Irrevocable Assignment of Shares of Preferred Stock by Boyles and Receipt from Buyer acknowledging receipt of certificates ........................... | 8 |
| Cancelled certificate evidencing 228,429 shares of common stock of CCMI and letter, dated August 13, 1999, by Smith acknowledging contribution of shares to CCMI for no consideration ........................... | 9 |
| Cancelled certificate evidencing 83,571 shares of common stock of CCMI and letter, dated August 13, 1999, by Boyles acknowledging contribution of shares to CCMI for no consideration ........................... | 10 |

STOCK PURCHASE AGREEMENT

between

ROBERT FIREMAN,

ANN RAIDER,

CURTIS R. SMITH,

JOHN H. BOYLES

and

NEWS AMERICA MARKETING IN-STORE INC.

August 13, 1999

## TABLE OF CONTENTS

**Page**

1.  Purchase and Sale of Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1    Purchase and Sale of Shares. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  Consideration for Transfer of the Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1    Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.2    Purchase Price Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.3    Earn-Out. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.  Closing Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.1    Deliveries by Sellers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.2    Deliveries by Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  Representations and Warranties of the Principal Sellers and the Sellers . . . . . . . . . . . . . 8
    4.1    The Company's Organization and Authority . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.2    Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.3    Freedom to Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    4.4    Title to Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.5    Capitalization; Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    4.6    Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.7    Absence of Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.8    No Material Adverse Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    4.9    Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    4.10   Title to and Condition of Assets; Encumbrances, etc . . . . . . . . . . . . . . . . 14
    4.11   Contracts and Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    4.12   Licenses and Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.13   Employee Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    4.14   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    4.15   Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    4.16   Software and Information Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    4.17   Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    4.18   Trade Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    4.19   Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    4.20   Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    4.21   Transactions with Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    4.22   Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.23   Accounts Receivable, etc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.24   Brokers' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    4.25   Suppliers and Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    4.26   Year 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    4.27   Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    4.28   Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

5.    Representations and Warranties of Buyer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
      5.1    Buyer's Organization and Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      5.2    Authorization of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      5.3    Freedom to Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      5.4    Brokers' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      5.5    Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      5.6    Investment Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      5.7    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

6.    Additional Agreements between the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      6.1    Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      6.2    Noncompetition; Nonsolicitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
      6.3    Equitable Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      6.4    Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      6.5    Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      6.6    Public Announcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      6.7    Accounts Receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
      6.8    Conduct of the Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

7.    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      7.1    Indemnification by the Principal Sellers and the Sellers . . . . . . . . . . . 37
      7.2    Indemnification by Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
      7.3    Notice to the Indemnitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      7.4    Rights of Parties to Settle or Defend . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      7.5    Limitations on Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      7.6    Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      7.7    Survival of Representations and Warranties . . . . . . . . . . . . . . . . . . . . . 40

8.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      8.1    Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      8.2    Governing Law; Jurisdictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      8.3    Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      8.4    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      8.5    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      8.6    Amendment; Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      8.7    Assignment and Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      8.8    No Benefit to Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      8.9    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      8.10   Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      8.11   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
      8.12   Arrangements Among Sellers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>STOCK PURCHASE AGREEMENT</u>

STOCK PURCHASE AGREEMENT made as of the 13th day of August, 1999, by and among Robert Fireman ("Fireman"), Ann Raider ("Raider" and together with Fireman, the "Principal Sellers"), Curtis R. Smith and John H. Boyles (each a "Seller" and collectively, the "Sellers") , and News America Marketing In-Store Inc., a Delaware corporation ("Buyer").

<u>W I T N E S S E T H</u>:

WHEREAS, the Sellers collectively own all of the issued and outstanding capital stock of Consumer Card Marketing, Inc., a Massachusetts corporation (the "Company");

WHEREAS, the Company specializes in database marketing and provides customer loyalty programs for retail chains through frequent shopper programs;

WHEREAS, upon the terms and conditions set forth herein, the Sellers desire to sell and Buyer desires to purchase all of the shares of capital stock of the Company (the "Shares"); and

WHEREAS, certain terms used in this Agreement are defined in Section 9.10 hereof;

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Purchase and Sale of Shares.</u>

1.1    <u>Purchase and Sale of Shares</u>.  Upon the terms and subject to the conditions set forth in this Agreement, concurrently with the execution of this Agreement, the Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from the Sellers, all of the Shares by delivery to Buyer of certificates representing the Shares, duly endorsed in blank or with duly executed stock powers attached, in proper form for transfer, free and clear of any and all Liens.

2.    Consideration for Transfer of the Shares.

2.1    Purchase Price. In consideration for the sale and transfer of the Shares, on the terms and subject to the conditions set forth in this Agreement, concurrently with the execution of this Agreement, Buyer shall pay in cash by wire transfer of immediately available funds the sum of $2,800,000 (the "Closing Payment") (which amount is subject to adjustment post-closing in accordance with the provisions of Sections 2.2 and 2.3 hereof, the "Purchase Price"). The Purchase Price shall be paid to the Sellers in the amounts and in accordance with the instructions set forth on Schedule 2.1.

2.2    Purchase Price Adjustment. After the Closing, the Purchase Price will be adjusted as follows:

(a)    Working Capital Adjustment. As soon as practicable following the date hereof, Buyer shall prepare, or cause to be prepared, and deliver to the Principal Sellers, a balance sheet reflecting the Company's business as of the date hereof (the "Closing Date Balance Sheet"). The Closing Date Balance Sheet shall be prepared in accordance with GAAP consistent with past practices and shall be certified on behalf of Buyer by Buyer's Chief Financial Officer or other executive officer responsible for financial or accounting matters. If the Working Capital as reflected on the Closing Date Balance Sheet is less than zero by an amount in excess of $200,000 (the "Excess Shortfall"), then the Purchase Price shall be reduced by the amount of such Excess Shortfall and, in such case, the Principal Sellers shall, subject to Section 2.3(d)(ii) hereof, pay Buyer, by wire transfer of immediately available funds, within five (5) Business Days following the later to occur of the date on which the Closing Date Balance Sheet becomes final pursuant to Section 2.2 (b) hereof, or the final resolution of any dispute as provided in Section 2.2(b) hereof, the amount of such Excess Shortfall. The Principal Sellers shall be jointly and severally liable to Buyer for the amount of any

Excess Shortfall. If the Working Capital as reflected on the Closing Date Balance Sheet is less than zero by an amount less than $200,000 (the "Deficiency"), then the Purchase Price shall be increased by the amount equal to such Deficiency and, in such case, Buyer shall pay to the Principal Sellers by wire transfer of immediately available funds, within five (5) Business Days following the later to occur of the date on which the Closing Date Balance Sheet becomes final pursuant to Section 2.2(d) hereof, or the final resolution of any dispute as provided in Section 2.2(b) hereof, the amount of such Deficiency. The Deficiency shall be paid to Sellers in the proportions and in accordance with the instructions set forth on Schedule 2.1. The Principal Sellers, and if the Principal Sellers deem appropriate, the Company's former independent accountants on the Principal Seller's behalf, shall be entitled to make an independent review of the Closing Date Balance Sheet and the related calculation of the Working Capital and shall, during the ten (10) Business Days following the delivery of the Closing Date Balance Sheet (or twenty (20) Business Days if the Closing Date Balance Sheet is delivered more than sixty (60) days after the date hereof), have prompt access to all relevant financial information and records and all internal and external work papers used to prepare and support the Buyer's certification of the Closing Date Balance Sheet.

(b)    Disagreements Regarding Adjustment. The Closing Date Balance Sheet shall become final and binding upon the Sellers unless the Principal Sellers deliver written notice of their disagreement (a "Notice of Disagreement") with respect to the Closing Date Balance Sheet within twenty (20) Business Days following receipt of the Closing Date Balance Sheet (or thirty (30) Business Days if the Closing Date Balance Sheet is delivered more than sixty (60) days after the date hereof). During the 15-Business Day period following the delivery of a Notice of Disagreement, Buyer and the Principal Sellers shall attempt to resolve in good faith any differences which they may have with respect to any matter specified in such Notice of Disagreement, and to reduce to writing

such resolution. At the end of such 15-Business Day period any unresolved matters shall be submitted to Arthur Andersen LLP and a certified public accounting firm selected by the Principal Sellers (which may be the Company's former accounting firm) (the "Sellers' Accountant") which accounting firms shall attempt to resolve in good faith all unresolved matters within thirty (30) Business Days following the date on which the matter is submitted to them. If, at the end of such 30-Business Day period, Arthur Andersen LLP and the Sellers' Accountant have been unable to resolve all unresolved matters, the dispute shall be submitted, within five (5) Business Days following the end of such 30-Business Day period, to a nationally recognized independent accounting firm (the "Third Accountant"), to be selected by a consensus of Arthur Andersen LLP and the Sellers' Accountant. The Third Accountant shall render a written decision to the Principal Sellers and Buyer within thirty (30) Business Days after it has been retained, which decision shall be final and binding upon the parties hereto. The costs and expenses of Arthur Andersen LLP and the Sellers' Accountant shall be borne by Buyer and the Principal Sellers, respectively, and the costs and expenses of the Third Accountant, if any, shall be borne equally by Buyer and the Principal Sellers. Any and all Purchase Price adjustment obligations of the Principal Sellers will bear interest at the rate of 150 basis points above the Prime Rate (as defined) from the date hereof until paid in full, and the payment of interest shall be made together with the underlying obligation.

(c)    In no event shall (i) the cancellation or write-off of the accounts or notes receivable owing to the Company by Raider in the aggregate amount of $181,524 (the "Raider Receivable"), or (ii) more than fifty percent (50%) of $145,000, which shall be paid by the Company to Raider not later than April 1, 2000 and will be accrued as an obligation of the Company to Raider as of the date hereof (the "Raider Bonus"), be given effect in the calculation of Working Capital in

Section 2.2(a) hereof. It is agreed that fifty percent (50%) of the Raider Bonus shall be included in the calculation of Working Capital under Section 2.2(a) hereof.

2.3    Earn-Out.

(a)    Earn-Out Amount. The Purchase Price shall be increased by an amount equal to 16.8%, 14.5%, 13.75%, 13.3% and 12.9% of the Gross Margin of the Company (the "Base Earn-Out Amount"), in respect of each of the first, second, third, fourth and fifth twelve-month periods, respectively, commencing on October 1, 1999 (the "Base Earn-Out Amount") (each a "Base Earn-Out Period"). In addition, the Purchase Price shall be increased (i) by $1.5 million if the Gross Margin for the twelve-month period commencing October 1, 1999 (the "First-Year Bonus Period") exceeds $2.1 million, or by $2.5 million if the Gross Margin in the First-Year Bonus Period exceeds $3.1 million (in either case, the "First-Year Bonus Amount") and (ii) by $1.5 million if the Gross Margin for the twelve-month period commencing October 1, 2000 (the "Second-Year Bonus Period") exceeds $6 million, or by $2.5 million if the Gross Margin in the Second-Year Bonus Period exceeds $7.5 million (in either case, the "Second-Year Bonus Amount").

(b)    Payment of Earn-Out Amount. Within forty-five (45) days following each Base Earn-Out Period (each a "Base Earn-Out Payment Date"), Buyer shall deliver to the Principal Sellers the Base Earn-Out Amount payable in respect of the Base Earn-Out Period then ended. In addition, within forty-five (45) days following the end of the First-Year Bonus Period (the "First-Year Bonus Payment Date"), Buyer shall deliver to the Principal Sellers the First-Year Bonus Amount, if any, and within forty-five (45) days following the end of the Second-Year Bonus Period (the "Second-Year Bonus Payment Date"), Buyer shall deliver to the Principal Sellers the Second-Year Bonus Amount, if any. All payments to the Principal Sellers under this Section 2.3(b) (each an "Earn-Out Payment") shall be made in cash by wire transfer of immediately available funds in

the proportions, and in accordance with, the instructions set forth on Schedule 2.3(b). The Earn-Out Payment shall be delivered together with a statement, certified by Buyer and signed by Buyer's Chief Financial Officer or other executive officer responsible for financial or accounting matters, reflecting Buyer's Calculation of the Gross Margin for the applicable period (each a "Buyer's Calculation"), which statement shall be delivered whether or not Buyer determines that an Earn-Out Payment is due. The Principal Sellers, and if the Principal Sellers deem appropriate, the Company's former independent accountants on the Principal Sellers' behalf, shall be entitled to make an independent review of the Buyer's Calculation and the related calculation of the Earn-Out Payment and shall, during the ten (10) Business Days following the delivery of the Buyer's Calculation, have prompt access to all relevant financial information and records and all internal and external work papers used to prepare and support the Buyer's certification of the Buyer's Calculation.

(c)    Dispute Over Earn-Out Amount. In the event that the Principal Sellers desire to dispute any Buyer's Calculation, the Principal Sellers shall, within twenty (20) Business Days following receipt of such Buyer's Calculation, deliver to Buyer written notice setting forth, in detail, their objections to such Buyer's Calculation (the "Objection Notice"), which dispute shall be resolved in accordance with the procedure outlined in Section 2.2(b) hereof. Any and all Earn-Out Payments will bear interest at the rate of 150 basis points above the Prime Rate from the applicable Base Earn-Out Payment Date, the First-Year Bonus Payment Date, or the Second-Year Bonus Payment Date, as the case may be, unless such amount is not required to be paid in accordance with Section 2.3(d) hereof.

(d)    Offset Against Earn-Out Payments.

(i)    Subject to Subsection (ii) below, each Earn-Out Payment shall, after compliance with the applicable procedures set forth Sections 2.2, 6.5 or 7.1, be subject to offset for

any amounts owed (at the time as such Earn-Out Payment is due) by the Sellers to Buyer under and pursuant to the terms of Sections 2.2, 6.5 or 7.1 hereof.

(ii)    To the extent that an Excess Shortfall is on account of the Raider Bonus (the "Raider Shortfall"), (A) such Raider Shortfall shall be deducted from the First-Year Bonus Amount otherwise payable to the Principal Sellers by Buyer, if any, and (B) if such First-Year Bonus Amount is insufficient to offset the entire Raider Shortfall, the balance shall be deducted from the Second-Year Bonus Amount otherwise payable to the Principal Sellers by Buyer, if any, and (C) if such Second-Year Bonus Amount is insufficient to offset the entire remaining Raider Shortfall, the amount of the Raider Shortfall still owing shall be deducted from the Base Earn-Out Amount payable in respect of the third Base Earn-Out Period. If and to the extent that the Earn-Out Payments described in the preceding sentence are insufficient to offset the entire Raider Shortfall, the Principal Sellers shall pay to Buyer such excess by wire transfer of same day funds within ten (10) Business Days following the date on which the third Base Earn-Out Amount would have been paid had the offset not been made against it.

3.    Closing Documents.

3.1    Deliveries by Sellers. Concurrently with the execution of this Agreement, Sellers shall deliver to Buyer:

(a)    a certificate or certificates representing the Shares, duly endorsed in blank or with stock powers attached in accordance with Section 1.1 hereof;

(b)    a legal opinion of Goodwin, Procter & Hoar, LLP addressed to Buyer, in form reasonably acceptable to Buyer, that the Company is a corporation validly existing and in good standing under the laws of the State of Delaware, and that the Shares are duly authorized, validly issued, fully paid and nonassessable;

7

(c)      certificates of good standing for the Company issued by its jurisdiction of incorporation and each jurisdiction in which the Company is qualified to do business as a foreign corporation;

(d)      Employment Agreements, duly executed by each of Fireman and Raider;

(e)      all written consents and approvals listed on Schedule 4.3 hereto; and

(f)      written letters of resignation, dated the date hereof, of each officer and director of the Company.

3.2      _Deliveries by Buyer._ Concurrently with the execution of this Agreement, Buyer shall deliver to Sellers:

(a)      a wire transfer to such account(s) as shall be designated in writing by the Sellers in an aggregate amount equal to the Closing Payment;

(b)      a legal opinion of Squadron, Ellenoff, Plesent & Sheinfeld, LLP addressed to Sellers, in form reasonably acceptable to Sellers, that the Company is a corporation validly existing and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; and

(c)      duly executed Employment Agreements for each of Fireman and Raider.

4.      _Representations and Warranties of the Principal Sellers and the Sellers._ Each of the Principal Sellers, jointly and severally, hereby represents and warrants to Buyer that the statements contained in this Section 4 are true, correct and complete as of the date hereof, except as disclosed in the Schedules referred to herein. Each of the Sellers, severally and not jointly, represents and warrants to Buyer, as to himself or herself, that the statements contained in Sections 4.2, 4.3 and 4.4 are true, correct and complete as of the date hereof, except as disclosed in the Schedules referred to herein.

Nothing contained in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such exception is identified with reasonable particularity and detail.

4.1    The Company's Organization and Authority. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as it has been and is currently being conducted and has all necessary licenses and permits material to such business as it is currently being conducted, and to own, operate and lease its assets. The Company is duly qualified or licensed to do business as a foreign corporation and is in good standing as a foreign corporation in each jurisdiction in which the ownership, operation or lease of its assets or the conduct of its business or location of its properties requires qualification or licensing to do business as a foreign corporation and in which the failure to qualify could have an effect that is materially adverse to the business, assets, properties or condition (financial or otherwise) of the Company (a "Material Adverse Effect").

4.2    Authorization. Each Seller has the capacity and authority to execute and deliver this Agreement, and to perform such Seller's obligations hereunder. This Agreement constitutes the valid and legally binding obligation of each Seller, enforceable against such Seller in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.3    Freedom to Contract. Subject to receipt of the consents and approvals described on Schedule 4.3 hereto, the execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby will not: (i) violate or conflict with any

provision of the certificate of incorporation or by-laws or other charter documents of the Company, each as amended or amended and restated to the date hereof, (ii) violate any of the terms, conditions or provisions of any law, rule, statute, regulation, order, writ, injunction, judgment or decree of any court or Governmental Authority to which the Company or such Seller may be subject, or (iii) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice or give rise to a loss of any benefit under any of the terms, conditions or provisions of any contract, lease, sublease, license, sublicense, franchise, permit, note, bond, indenture, debenture, mortgage, permit, guaranty, joint venture agreement, security agreement, trust agreement, lien or other agreement, instrument, arrangement or obligation, oral or written, to which the Company or any Seller is a party (whether as an original party or as an assignee or successor) or by which the Company or any of its assets or properties are bound.  Except as set forth on Schedule 4.3 hereto, no authorization, approval, order, license, permit, franchise or third party consent, and no registration, declaration or filing with any court or Governmental Authority, is required in connection with each Seller's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

      4.4   <u>Title to Shares</u>.  Each Seller, on the date hereof, owns beneficially and of record, free and clear of any Lien, and has full power and authority to convey free and clear of any Lien, the Seller's Shares set forth opposite such Seller's name on Schedule 4.4 hereto, such Shares constitute all of the Shares owned beneficially or of record by such Seller and, upon delivery of the Purchase Price for such Seller's Shares as herein provided, Buyer  will acquire good and valid title thereto, free and clear of any Lien other than any Lien resulting from any acts of Buyer or its representatives. Except as set forth on Schedule 4.4 hereto, there are no existing agreements, subscriptions, options,

warrants, calls, commitments or other rights of any kind whatsoever to purchase or otherwise acquire from such Seller at any time any of Seller's Shares or other securities of the Company. Each Seller has the percentage interest in the Company's capital stock set forth opposite such Seller's name on Schedule 4.4 hereto.

4.5     Capitalization; Subsidiaries.

(a)     The authorized capital stock of the Company is as set forth on Schedule 4.5 hereto, and the Shares represent all of the issued and outstanding shares of such capital stock. The Shares have been duly and validly issued, are fully paid and nonassessable, with no personal liability attached to the ownership thereof.

(b)     As of the date hereof, no shares of capital stock are held in the treasury of the Company and, except as set forth on Schedule 4.5, there are no outstanding (i) securities convertible into or exchangeable for capital stock of the Company; (ii) options, warrants or other rights to purchase, redeem, repurchase or subscribe to capital stock of the Company or securities convertible into or exchangeable for capital stock of the Company; or (iii) contracts, commitments, agreements, understandings or arrangements of any kind, including, without limitation, any stock option plans, relating to the issuance of any capital stock of the Company, any such convertible or exchangeable securities or any such options, warrants or rights.

(c)     The Company does not own, directly or indirectly, any capital stock or other equity securities of any corporation or have any direct or indirect ownership interest in any other business or entities, including, without limitation, any limited liability company, partnership, or joint venture.

4.6    Financial Statements.

(a)    Attached hereto as Schedule 4.6 hereto are true and complete copies of the following financial statements of the Company:

(i)    a balance sheet of the Company as of December 31,1998 and statements of income, cash flows and changes in stockholders' equity for the fiscal year then ended, certified by the Company's Treasurer; and

(ii)    an unaudited balance sheet (the "Interim Balance Sheet") of the Company as of June 30, 1999 (the "Balance Sheet Date"), certified by the Company's Treasurer.

(b)    The foregoing financial statements are complete and correct in all respects and have been prepared in accordance with GAAP, consistently applied and fairly present the financial condition of the Company at the dates and the results of operations for the periods set forth therein.

4.7    Absence of Undisclosed Liabilities. Except as set forth on Schedule 4.7 hereto, the Company has no direct or indirect indebtedness, liability, claim, loss, damage, deficiency, obligation or responsibility of any nature whatsoever, with respect to the Company's business whether known or unknown, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise, including, without limitation, liabilities on account of taxes, other governmental charges or lawsuits brought ("Liabilities"), other than those Liabilities that (i) are fully and adequately reflected on the Interim Balance Sheet, (ii) have arisen after the Balance Sheet Date in the ordinary course of the Company's business consistent with past practice (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, claim or lawsuit), (iii) Liabilities under the Company's contracts and commitments (A) set forth on Schedule 4.11(a) hereto, or (B) not required to be set forth on Schedule 4.11(a) hereto, in each case

for which GAAP does not require the recordation of a financial liability, and (iv) other liabilities set forth on Schedule 4.7 hereto.

4.8    <u>No Material Adverse Change</u>. Except as set forth on Schedule 4.8 hereto, since the Balance Sheet Date, the Company has conducted its business only in the ordinary course of business consistent with past practice and there has not been (a) any event or occurrence outside of the ordinary course of business which has resulted in a Material Adverse Effect, except for the continuation of operating losses incurred historically to the date hereof, (b) any damage, destruction or loss affecting the assets, properties, business or condition of the Company, whether or not covered by insurance, (c) any discharge or satisfaction of any Lien or any capital expenditure or payment of an obligation or liability, except in the ordinary course of business, (d) any transfer, sale or assignment of assets (tangible or intangible) used in connection with the Company's business, except in the ordinary course of its businesses, (e) any cancellation or write-off of any debt, claim, note or account receivable, except for the cancellation or write-off of the Raider Receivable, (f) any incurrence of debt for borrowed money or other liability, other than as incurred in the ordinary course of business, (g) any guarantee of any obligation of any employee, Affiliate or other third party to any person, (h) any mortgage or pledge of the Company's properties or assets, (i) any loan or other advance made to any of the Company's employees, investors or Affiliates, (j) any dividend, distribution, withdrawal or removal by any other means of any of the Company's assets, except for payments to employees and payments made on account of trade payables, notes payable and accrued expenses, in each case, in the ordinary course of business, and forgiveness or cancellation of the Raider Receivable and the payment or accrual of the Raider Bonus, (k) any change in the general character or conduct of the Company's business, (l) any acquisition of, or agreement to acquire, all or substantially all of the assets or stock of another entity, or (m) any issuance or sale of capital stock

or other securities or other membership or ownership interests, exchangeable or convertible securities, options, warrants, puts, calls or other rights to acquire capital stock or other securities or other ownership interests in the Company.

    4.9    <u>Real Estate</u>.  The Company does not own any real property.  Schedule 4.9 hereto sets forth a list and summary description of all real property leased or used by the Company in connection with its business (the "Leased Property").  Schedule 4.9 also sets forth a list of each contract pursuant to which the Company has leased or subleased any Leased Property (the "Leases").  There are no (i) options held by the Company or contractual obligations on the part of the Company to purchase or acquire any interest in real property, or (ii) options granted by the Company or contractual obligations on the part of the Company to sell or dispose of any interest in real property.  A true and complete copy of each Lease or other agreement with respect to the leasing of the Leased Property has heretofore been delivered to Buyer.  Each of the Leases is valid and effective in accordance with its terms, and no default has been declared with respect to any Lease, and, to the Sellers' best knowledge, no event has occurred that constitutes, or with due notice or lapse of time or both would constitute, a default under any such Lease.  The Leased Property constitutes, in the aggregate, all of the real property used to conduct the Company's business as it has been and is currently being conducted, other than home offices in which there are no material assets of the Company.

    4.10    <u>Title to and Condition of Assets; Encumbrances, etc</u>.  Except as set forth on Schedule 4.10 hereto, the Company has good and marketable title to, or a valid leasehold interest in, all of the assets and properties used by it, located on its premises or shown on the Interim Balance Sheet or acquired thereafter, including, without limitation, all equipment and devices (including data processing hardware and related telecommunications equipment, media and tools), free and clear of any mortgage, pledge, security interest, title defect or objection, lien, charge, claim, restriction,

(b)      Except as described in the Schedules hereto, all contracts (oral or written) pursuant to which Company operates its business are valid and effective in accordance with their respective terms, and there is not, under any of such contracts, documents or agreements or any obligation, covenant or condition contained therein, any existing default by the Company or, to the Sellers' best knowledge, by any other party, or, to the Sellers' best knowledge, any event which, with notice, lapse of time, or both, would constitute such default. True and complete copies of all written contracts which are listed on any Schedule hereto and a summary of the terms of each oral contract listed on any Schedule hereto have heretofore been made available to Buyer or its counsel.

4.12    Licenses and Permits. The Company has, possesses or maintains or has been granted all licenses, permits, certificates, franchises and other authorizations or inspections (collectively, "Licenses") of any Governmental Authority which, to the Sellers' best knowledge, are necessary to the ownership or use of the Company's assets or to the conduct of Company's business. Except as disclosed on Schedule 4.12, all the Licenses are in full force and effect and no proceeding is pending or, to the Sellers' best knowledge, threatened seeking the revocation or limitation of any such License.

4.13    Employee Matters.

(a)      (i)      Except as set forth on Schedule 4.13(a) hereto, the Company does not and has not, within the last two years, for the benefit of current or former employees, maintain, administer or contribute to any "employee benefit plans" ("Benefit Plans") within the meaning of Section 3(3) of ERISA.

(ii)      Except as set forth on Schedule 4.13(a) hereto, the Company is not a party to any (A) employment or similar contracts; (B) severance arrangements, (C) bonus or other incentive compensation arrangements; (D) fringe benefit or perquisite plans or arrangements;

(E) deferred compensation arrangements; (F) non-competition arrangements; or (G) other remunerative arrangements ("plans, contracts and arrangements").

(iii)    The Sellers have provided Buyer copies or descriptions of such Benefit Plans and plans, contracts and arrangements set forth on Schedule 4.13(a) hereto. All Benefit Plans and other plans, contracts and arrangements set forth on Schedule 4.13(a) are and have been maintained in compliance with their terms and all requirements of applicable law.

(b)    There are no collective bargaining or other agreements between the Company and any union or other employee organizations relating to the Company's employees (the "Employees") whether such agreements are with the Company or, to the Sellers' knowledge, with any independent contractor or management company providing employees to the Company.

(c)    Except as set forth on Schedule 4.13(c) hereto, neither the Company nor any member of Company's Group has, within the preceding seven years, contributed to, or had an obligation to contribute to, any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA which is subject to Title IV of ERISA. As used in the preceding sentence, the "Company's Group" includes any person who is, or was at the relevant time, a member of the same "controlled group of corporations" as the Company (within the meaning of Section 414(b) of the Code), or under "common control" with the Company (within the meaning of Section 414(c) of the Code).

(d)    (i)    The Company is in compliance with all applicable laws relating to the employment practices, terms and conditions of employment and wages and hours with respect to the Employees; (ii) there are no controversies pending or, to the Sellers' best knowledge, threatened, between the Company and any of the Employees, prospective employees, former employees or retirees; and (iii) the Company has paid in full all wages, salaries, commissions,

bonuses, benefits and other compensation due and payable to their respective employees, including those arising under any policy, practice, agreement, program, statute or other law.

   (e) Schedule 4.13(e) hereto contains a correct and complete list of (i) the names and current annual salary rates of all the Employees; (ii) the names and amounts, if any, paid, accrued or to be paid to all the Employees under any bonus, incentive or similar plans; (iii) all vacation and sick pay accrued (if any) in respect of the Employees; and (iv) the names of all employees receiving or entitled to elect the continuation of group health plan benefits pursuant to Section 4980B(f) of the Code.

  4.14 <u>Litigation</u>. Except as set forth on Schedule 4.14 hereto, the Company has received no notice of any pending or threatened action, suit, inquiry, litigation, proceeding or investigation ("Proceeding") by or before any referee, mediator or arbitrator, or any court or governmental or other regulatory or administrative agency or commission against or involving the Company in respect of the Company's assets or business. The Company is not subject to any judgment, order or decree entered in any lawsuit or proceeding that might adversely affect Buyer's rights in the Company's business or assets or Buyer's ability to conduct the Company's business after the date hereof.

  4.15 <u>Compliance with Law</u>.

   (a) The Company has complied with, and is not in violation of any, law, ordinance or governmental rule or regulation (including, without limitation, any applicable business and zoning ordinances) to which the Company's business or its assets are subject.

   (b) Except as set forth on Schedule 4.15(b) hereto, the Company has not received any claim or notice of any violation of any building, zoning, fire, health, employment or environmental laws, codes, ordinances, rules or regulations relating to the Company's properties, premises, business or employees.

4.16    <u>Software and Information Systems</u>. The Company has all right, title and interest to all computer software programs and software and information systems, in any media, including, without limitation, all program specifications, charts, procedures, input data, databases, compilations, routines, tool sets, compilers, higher level or "proprietary" languages, report layouts and formats, record file layouts, diagrams, functional specifications and narrative descriptions, flow charts and related documentation and materials, whether in source code, object code or human readable form, and all other related material used by the Company (collectively, the "Software"), other than Software licensed by the Company from others, as disclosed on Schedule 4.16. With respect to the Software:

(a)    Schedule 4.16 sets forth an accurate and complete list of all Software and identifies (i) Software that is owned by the Company and any licenses or other rights granted by the Company with respect to the Software; (ii) Software that is licensed to the Company, the licensor of the Software, and, if different, the owner thereof, to the extent known to the Company, and whether any copies of the licensed Software have been made, other than in connection with the licensed use thereof or for backup or archival purposes; (iii) any other Software in which the Company has any use, possessory or proprietary rights, the manner in which the Company acquired rights and the owner of the Software; and (iv) all pending Software development projects, together with a description of such projects and the stage of their development, an identification of the persons undertaking the projects, and a description of any Software licensed for use in the projects;

(b)    Except as set forth on Schedule 4.16 or as provided in contracts identified on Schedules 4.11 and 4.16, (i) the Software is not subject to any transfer, assignment, source code escrow agreement, reversion, site, equipment, or other operational limitations; (ii) the Company has maintained, protected and distributed the Software with appropriate copyright notices; (iii) the source

code for the Software has been protected by having all persons having access executing confidentiality and non-disclosure agreements prior to gaining access thereto; (iv) the Software is protectable under applicable copyright law and has not been forfeited to the public domain; (v) the Company has copies of all releases or separate versions of the Software, other than versions or releases which have been discarded in the ordinary course of business, and source code for the same, so that the same may be registered in the United States Copyright Office; (vi) Software developed by the Company internally has been developed without the aid or use of any consultants, agents, independent contractors or persons (other than employees of the Company); (vii) Software commissioned for development by the Company and its predecessors has been developed subject to written agreements whereby the ownership of the Software vested immediately in the Company and, to the extent that vesting did not occur, the developer is required to assign all ownership to the Company without further consideration; and (viii) the Company has not registered any copyrights of the Software with the United States Copyright Office and no applications are pending therewith;

(c)     All Software documentation is sufficient in detail and content to identify and explain the nature thereof, and to allow its full and proper use by the Company without reliance on the special knowledge or memory of others, and includes pertinent commentary and explanation used for the development, implementation, maintenance and use thereof;

(d)     Except as set forth on Schedule 4.16, the Company's rights in the Software are free and clear of any liens, encumbrances, restrictions, or legal or equitable claims of others and there are no agreements or arrangements in effect with respect to the marketing, distribution, licensing, sale, resale or promotion of the Software between the Company and any other person;

(e)    Except as set forth on Schedule 4.16, the Company has received no notice of any violation of patent, trade secret rights, copyrights or other proprietary rights with respect to any Software and knows of no basis therefor;

(f)    Except as set forth on Schedule 4.16, any copies of Software are in the Company's possession and control, except for certain copies of Software in the possession of customers pursuant to the Company's licensing agreements identified on Schedule 4.16 or in the possession of contract developers under consulting agreements identified on Schedule 4.16.

(g)    The Software owned by the Company contains no timer, virus, copy protection device, disabling code, clock, counter or similar routine that causes the Software (or any operation thereof) or become erased, inoperable, impaired, or otherwise incapable of being used in the full manner for which it was contemplated for use; and

(h)    The Software does not contain any encryption, cryptographic or other technology which is prohibited by law, including, but not limited to, regulations of the United States Department of Commerce, the United States State Department or any other applicable laws or regulations.

4.17    Intellectual Property.    Schedule 4.17 sets forth an accurate and complete list and description (showing, in each case, any product, device, process, service or publication covered thereby, the registered or other owner, registration number and registration or other expiration date, if any) of all Trademarks and Copyrights in marketing materials utilized by or in which the Company has an interest (the "Intellectual Property"). The Company does not own, utilize or have an interest in any Patent Rights. With respect to the Intellectual Property:

(a)    Except as set forth on Schedule 4.17, which Schedule sets forth with specificity the nature of the Company's rights (or grant of rights), any limitations thereon, the owner

of such rights (or the licensee or grantee of such rights and the nature of such grant), the term of the relevant agreement(s) pursuant to which the Company obtained (or granted) such rights, the Company is the sole and exclusive owner of the Intellectual Property and has the sole and exclusive right to use the Intellectual Property;

(b)    Except as set forth on Schedule 4.17, with respect to the Intellectual Property, no action, suit, proceeding or investigation is pending or, to the Company's knowledge, threatened, against the Company, that the Intellectual Property owned by the Company, or owned by third parties and licensed to the Company, interferes with, infringes upon, conflicts with or otherwise violates the rights of others or is being interfered with or infringed upon by others;

(c)    Except as set forth on Schedule 4.17, the Company is not subject to any judgment, order, writ, injunction or decree of any court or any Federal, state, local or other governmental agency or instrumentality, domestic or foreign, or any arbitrator, nor is it a party to any contract which, in either case, restricts or impairs the Company's use of any Intellectual Property owned by the Company;

(d)    The Company has all right, title and interest necessary for the publication, reproduction, preparation of derivative works and distribution of the Intellectual Property owned by the Company;

(e)    Except as set forth on Schedule 4.17, during the preceding five (5) years, the Company has not been known by or done business under any other name not listed on such Schedule;

(f)    For purposes of this Agreement and the provisions of this Section, the following terms shall have the following meanings:

(i)     "Copyrights" means United States and foreign copyrights, copyrightable works, and mask works, whether registered or unregistered, and pending applications to register the same;

(ii)     "Patent Rights" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether or not patented) or improvements thereto; and

(iii)     "Trademarks" means United States, state and foreign trademarks, service marks, logos, trade dress, trade styles, trade names (including all assumed or fictitious names under which the party is conducting business or has within the past five years conducted business), product designations, logos, brands and any other source-identifying devices or symbols, and any combination or variations thereof, whether registered or unregistered, and pending applications to register the foregoing and all registrations thereof.

4.18    Trade Secrets.  Schedule 4.18 sets forth an accurate and complete list of all customer and prospective customer lists of the Company that may provide the Company with an advantage over competitors who did not know or use them (the "Trade Secrets"). With respect to the Trade Secrets:

(a)     they are owned solely and exclusively by the Company and the Company, or its independent contractors, agents or consultants who were subject to written agreements whereby the ownership of the Trade Secrets vested immediately in the Company, is solely responsible for development of the Trade Secrets;

(b)     they are documented in sufficient detail and content to identify and explain the nature thereof and in condition readily usable by the Company;

(c)    they have been maintained and protected with all reasonable precautions to protect their secrecy, confidentiality and value; and

(d)    they are not part of the public knowledge or literature and, to the Company's knowledge, have not been used, divulged or appropriated either for the benefit of any third party or to the detriment of the Company. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

4.19    Tax Matters.

(a)    Except as set forth on Schedule 4.19, the Company has duly and timely filed or caused to be filed all Federal, state, local and foreign income, franchise, excise, payroll, sales and use, property and withholding tax returns, reports, estimates and information and other statements or returns (collectively "Tax Returns") required to be filed by or on behalf of it prior to the date hereof pursuant to any applicable federal, state, local or foreign tax laws for all years and periods for which such Tax Returns have become due, except where the time for filing any such Tax Return has been extended in accordance with applicable law. All such Tax Returns were correct in all material respects as filed and correctly reflect the Federal, state, local and foreign income, franchise, excise, payroll, sales and use, property, withholding and other taxes, duties, imposts and governmental charges (and charges in lieu of any thereof), together with interest, additions to tax and penalties (collectively "Taxes") required to be paid or collected by (or allocable to) the Company.

(b)    There are no Liens for Taxes upon any property of the Company except for Permitted Liens. All amounts required to be withheld by the Company from its employees for income taxes, social security and other payroll Taxes, including all amounts resulting from the consummation of the transactions contemplated hereby or referred to in the Schedules hereto, have been collected and withheld, and paid to the respective governmental agencies, or set aside in

accounts for such purpose, or accrued, reserved against and entered upon the Company's books and records.

(c)    Except as set forth on Schedule 4.19, no written claim has ever been made by a taxing authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to Taxes assessed by such jurisdiction.

(d)    Except as set forth on Schedule 4.19, the Company (i) has paid or caused to be paid all Taxes required to be paid by it through the date hereof and (ii) has, in accordance with GAAP consistently applied, accrued on its Interim Balance Sheet referred to in Section 4.6 above, all Taxes for any period from the date of the last reporting period covered by any Tax Returns up to and including the Balance Sheet Date.

(e)    There is no pending or potential audit, dispute or claim concerning any Tax Return or Tax liability of the Company now in progress or, to the Sellers' best knowledge, threatened against the Company.

(f)    The Company will not be required to pay any Taxes as a result of the consummation of the transactions contemplated hereby, except for any Taxes that might be due in connection with the write-off or cancellation of the Raider Receivable or the accrual or payment of the Raider Bonus.

(g)    The Company is not and has not been a party to any Tax sharing agreement.

(h)    The Company has not incurred any obligation to make (or, to the Sellers' best knowledge, possibly make) any payments that (A) will be non-deductible under, or would otherwise constitute a "parachute payment" within the meaning of, Section 280G of the Internal Revenue Code of 1986, as amended (the "Code") (or any corresponding provision of state, local or foreign income

Tax law) or (B) are or may be subject to the imposition of an excise tax under Section 4999 of the Code.

(i)    The Company has never been included in a consolidated, unitary, combined or other such Tax Return with another entity. The Company has no liability for the Taxes of any other person (other than the Company) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee or successor by contract or otherwise.

4.20    Insurance. Schedule 4.20 hereto contains a correct list of all policies or binders of insurance held by or on behalf of the Company relating to its businesses, or providing coverage for any of its properties or assets (in each case specifying the insurer, the amount of coverage, the type of insurance, the risks insured, the expiration date, and the policy number) and, except as set forth on such Schedule, all premiums due prior to the date hereof with respect thereto covering all periods up to and including the date hereof have been paid, and no notice of cancellation or termination has been received with respect to any such policy. All such policies are in full force and effect and provide insurance including, without limitation, liability insurance, in such amounts against such risks as is customary for companies engaged in similar businesses to the Company to protect the employees, properties, assets, businesses and operations of the Company, in each case naming the Company as beneficiary. To the Sellers' best knowledge, no state of fact exists and no event has occurred which reasonably might form the basis of any claim against the Company relating to its business which might substantially increase the insurance premiums payable under or result in the cancellation or nonrenewal of any of the policies or binders listed on Schedule 4.20.

4.21    Transactions with Affiliates. Except as described on Schedule 4.21 hereto, no Seller owns, directly or indirectly, or has any interest in, any business, corporate or otherwise, which is a

party to any agreement, business arrangement or course of dealing with the Company relating to the Company's business.

4.22    Environmental Matters.

(a)    The Company is in compliance with all Environmental Laws applicable to the Company's business. There are no Environmental Claims relating to the Company's business pending or, to the Sellers' best knowledge, threatened against or involving the Company.

(b)    Except as set forth on Schedule 4.22 hereto, to the Sellers' knowledge, no underground tank or other underground storage receptacle for Hazardous Substances is currently located at any Leased Property and to the Sellers' knowledge, there have been no releases of any Hazardous Substances at any Leased Property. True and correct copies of all Environmental Reports have been made available to Buyer.

4.23    Accounts Receivable, etc. Schedule 4.23 hereto accurately sets forth the aging of the accounts receivable of the Company with respect to the Company's business, each as of a recent date. All of the accounts receivable to be reflected on the Closing Date Balance Sheet shall have arisen in the ordinary course of business for goods sold or services performed and shall be fully collectible within 120 days following the date hereof, subject to a 3% allowance for returns and reserve for uncollectible and bad debts against the accounts receivable to be reflected on the Closing Date Balance Sheet (the "Reserve"). The Reserve shall be adequate to cover all returns and uncollectible receivables.

4.24    Brokers' Fees. Neither the Company nor any Seller has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

4.25     Suppliers and Customers. Schedule 4.25 hereto sets forth a list of the ten largest customers and the ten largest suppliers of the Company by dollar volume of revenues for the year ended December 31, 1998. Except as set forth on Schedule 4.25, no single supplier or customer is of material importance to the Company's business. To the Sellers' best knowledge, the relationships of the Company with its suppliers and customers are good commercial working relationships and no such supplier or customer has canceled or otherwise terminated, or threatened in writing to cancel or otherwise terminate, its relationship with the Company or has during the last twelve (12) months decreased materially, or threatened to decrease or limit materially, its services, supplies or materials to the Company or its usage of the Company's services or products, as the case may be. The Company has received no notice that any such supplier or customer intends to cancel or otherwise modify its relationship with the Company or to decrease materially or limit its services, supplies or materials to the Company or its usage of the services or products of the Company.

4.26     Year 2000. All of the Company's products currently being sold or licensed and under development, including the Software, and all of the Company's computer software and hardware (including microcode, firmware, system and application programs, files, databases, computer services and microcontrollers), processes, data and operating systems are, to the Sellers' best knowledge, Year 2000 Compliant. To the Sellers' best knowledge, all of the software, products, data and operating systems of third parties, if any, used by the Company or otherwise interfaced with the Company's software, products, data or operating systems are Year 2000 Compliant. For purposes of this Agreement, the "Year 2000 Compliant" shall mean that such (a) products, processes, software, and data and operating systems, individually and in combination, completely and accurately record, store, process, calculate, transmit, display and present calendar dates on or after, and, if applicable, spans of time including, January 1, 2000; (b) the occurrence in or use by any

products, processes, software, or data and operating systems, individually and in combination, of dates before, on or after January 1, 2000 will not adversely affect the performance of such products, processes, software, or data and operating systems, with respect to date-dependent data, computations, output, or other functions, including, without limitation, calculating, comparing, and sequencing; (c) products, processes, software, or data and operating systems will not abnormally end or provide invalid or incorrect results as a result of date-dependent data; and (d) products, processes, software, or data and operating systems can accurately recognize, manage, accommodate, and manipulate date-dependent data, including, without limitation, single and multi-century formulas and leap years.

4.27    Books and Records.  All constituent documents, business licenses, minute books, stock certificate books and stock transfer ledgers of the Company (collectively, the "Records") have been made available to Buyer or its counsel maintained in accordance with sound business practices and laws, rules and regulations applicable to the Company or its properties or assets.  The Records are complete and accurate in all respects and contain all matters required to be dealt with in such Records.

4.28    Disclosure.  The representations, warranties and statements contained in this Agreement and in the certificates, exhibits and schedules delivered to Buyer by the Sellers pursuant to this Agreement do not contain any untrue statement of a material fact, and, when taken together, do not omit to state a material fact required to be stated therein or necessary in order to make such representations, warranties or statements not misleading in light of the circumstances under which they were made.

5.    Representations and Warranties of Buyer.  Buyer hereby represents and warrants to the Sellers that the statements contained in this Section 5 are true, correct and complete as of the date

hereof, except as disclosed in the Schedules referred to herein. Nothing contained in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless such exception is identified with reasonable particularity and detail.

5.1    <u>Buyer's Organization and Authority</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform fully its obligations hereunder.

5.2    <u>Authorization of Agreement</u>. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all necessary corporate action of Buyer. This Agreement constitutes, and each document and instrument contemplated by this Agreement to be executed by Buyer, when executed and delivered in accordance with the provisions thereof shall constitute, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting creditors' rights generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

5.3    <u>Freedom to Contract</u>. The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated hereby will not: (i) violate or conflict with any provision of the certificate of incorporation or by-laws or other charter documents of Buyer, each as amended or amended and restated to the date hereof, (ii) violate any of the terms, conditions or provisions of any law, rule, statute, regulation, order, writ, injunction, judgment or decree of any court or Governmental Authority to which Buyer may be subject, or (iii) conflict with,

result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, require any notice of give rise to a loss of any benefit under any of the terms, conditions or provisions of any contract, lease, sublease, license, sublicense, franchise, permit, note, bond, indenture, debenture, mortgage, permit, guaranty, joint venture agreement, security agreement, trust agreement, lien or other agreement, instrument, arrangement or obligation, oral or written, to which Buyer is a party (whether as an original party or as an assignee or successor) or by which Buyer or any of its assets or properties are bound. Except as set forth on Schedule 5.3, no authorization, approval, order, license, permit, franchise or third party consent, and no registration, declaration or filing with any court or Governmental Authority, is required in connection with Buyer's execution, delivery and performance of this Agreement or the consummation of the transactions contemplated hereby.

     5.4   <u>Brokers' Fees</u>. Buyer has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

     5.5   <u>Financing</u>. The Buyer has all funds necessary to pay the Closing Payment and will continue to have all funds necessary to pay the Earn-Out Payments (if any) and comply with the covenants with respect to the Earn-Out Payments.

     5.6   <u>Investment Intent</u>. The Buyer is acquiring the Shares solely for investment and not with a view to, or for offer or sale in connection with, any distribution.

     5.7   <u>Litigation</u>. There in no Proceeding against the Buyer which would have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement.

6.    Additional Agreements between the Parties.

6.1    Expenses.  The parties to this Agreement shall, except as otherwise specifically provided herein, bear their respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including, without limitation, all fees and expenses of brokers, agents, representatives, counsel and accountants, *provided,* that legal fees and disbursements incurred on behalf of Sellers and reflected on an invoice submitted to Buyer by Sellers' counsel at least one day prior to Closing shall be paid at Closing by the Company or by Buyer for the Company's account which amount shall, be reflected as a liability on the Closing Date Balance Sheet.

6.2    Noncompetition; Nonsolicitation.  Each of the Principal Sellers hereby agrees, that neither such Principal Seller nor any of such Principal Seller's Affiliates shall, from and after the date hereof, for the Non-Compete Term (as defined in respective the Employment Agreements dated as of the date hereof between Buyer and each of the Principal Sellers), Participate In any business which is competitive with (a) the business of the Company as conducted on the date hereof, (b) any of the following businesses in which Buyer currently is or intends to be engaged: (i) selling in-store media, (ii) selling sampling and merchandising services, (iii) selling free-standing inserts, and (iv) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (c) any other business conducted by Buyer in which such Principal Seller participates in as an employee of Buyer or otherwise has access to confidential information of the Company or the Buyer relating to such business through his or her employment by the Company or the Buyer ("Buyer's Business"). Without limiting the scope of the foregoing, neither Principal Seller nor any of such Principal Seller's Affiliates shall, during the Non-Compete Term, directly or indirectly, (i) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for

employment, any person who currently is an employee of Buyer, including, without limitation, those employees who are hired in connection with the transactions contemplated by this Agreement, (ii) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of Buyer, including, without limitation, those employees who are hired in connection with the transactions contemplated by this Agreement, or (iii) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of Buyer with respect to (A) the business of the Company as conducted on the date hereof, or (B) the Buyer's Business, including those customers or suppliers acquired in connection with the transactions contemplated by this Agreement.

6.3    <u>Equitable Remedy</u>. Each Principal Seller acknowledges and agrees that, in the event such Principal Seller shall breach or threaten to breach any of the terms of Section 6.2 hereof, Buyer shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a threatened breach and to have the provisions of such Section specifically enforced by a court having jurisdiction, it being acknowledged and agreed by each Principal Seller that any such breach or threatened breach will cause immediate irreparable damage to Buyer and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to Buyer at law or in equity. Each Principal Seller and Buyer agree that the provisions of this Section 6.3 are necessary and reasonable to protect Buyer in the conduct of the Company's business and that the covenants set forth in Section 6.2 hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard

to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

6.4    <u>Further Assurances</u>. From and after the date hereof, the Sellers, on the one hand, and Buyer, on the other, agree to execute and deliver such further documents and instruments and to do such other acts and things as Buyer or the Sellers, as the case may be, may reasonably request in order to effectuate the transactions contemplated by this Agreement. Following the date hereof, the parties will cooperate with each other in connection with any tax and in the defense of any legal proceedings relating to the Company's business or its assets to the extent such cooperation does not cause unreasonable expense, unless such expense is borne by the requesting party.

6.5    <u>Tax Matters</u>.

(a)    <u>Responsibility for Taxes</u>. Notwithstanding anything else to the contrary in this Agreement, subject to the procedures and limitations set forth in Section 7 hereof, the Principal Sellers will pay and be responsible for, and will indemnify and hold Buyer harmless from and against any Losses related to:

(i)    any and all Taxes attributable to or arising out of the operations or activities of the Company or otherwise incurred in connection with the Company's assets for any Tax period (or portion thereof) ending on or before the date hereof; and

(ii)    any and all Taxes, including, but not limited to, sales, use and real property transfer taxes, attributable to or arising out of the transactions contemplated in this Agreement, which Taxes are not accrued on the Closing Date Balance Sheet.

(b)    Cooperation on Tax Matters.  Buyer and the Sellers will cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of any Tax Return and any audit, litigation or other proceeding with respect to Taxes. Such cooperation will include (i) the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding for a period of seven (7) years, and (ii) making themselves, their employees and agents available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

6.6    Public Announcements. Each party to this Agreement shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or any transaction contemplated hereby and shall not issue any such press release or make any such public statement without the prior consent of the other party (unless required by law), which consent shall not be unreasonably withheld. The parties hereto further agree to cooperate to prepare a joint press release to be issued on the date hereof or as soon as practicable hereafter.

6.7    Accounts Receivable.

(a)    After the date hereof, the Company shall collect its accounts receivable reflected on the Closing Date Balance Sheet (the "Accounts Receivable") in a commercially reasonable fashion in the ordinary course of business consistent with past practices. Buyer shall furnish Sellers with all such records and other information as Sellers may reasonably require to verify the amounts collected by Buyer with respect to the Accounts Receivable. For the purpose of determining amounts collected by Buyer with respect to the Accounts Receivable, (i) if a payment is specified by an account debtor as being in payment of a specific invoice of Buyer or Sellers, as the case may be, the payment shall be applied to that invoice and (ii) in the absence of a bona fide

dispute between an account debtor and Sellers, all payments by an account debtor that are not specified as being in payment of a specific invoice shall first be applied to the oldest outstanding invoice due from that account debtor. Notwithstanding the foregoing, Buyer shall not be required to retain a collection agency, bring any suit or take any other action out of the ordinary course of business to collect any of the Accounts Receivable. Buyer shall not compromise, settle or adjust the amount of any of the Accounts Receivable without the prior written consent of the Sellers, which consent shall not be withheld unreasonably.

(b)      To the extent that Buyer has not collected the full amount of the Accounts Receivable (net of the allowance for returns and reserve for uncollectible and bad debts referred to in Section 4.23) shown on the Closing Date Balance Sheet (the "Full Amount") within 120 days after the date hereof, the Principal Sellers thereupon shall pay to Buyer by wire transfer of same day funds, the amount of such deficiency and, concurrently with the payment by the Principal Sellers thereof, Buyer (or the Company) shall assign to the Principal Sellers all uncollected Accounts Receivable. Buyer agrees that, to the extent it is actually paid by any Principal Seller with respect to any account receivable (including by way of the calculation of the Shortfall), whether such amount is applied against the Deductible (as defined herein), it shall have no rights or obligations with respect to any such account receivable and shall pay to Sellers any amounts received thereafter on such account receivable.

6.8      Conduct of the Business. It is Buyer's current intention to provide support to the business of the Company by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, Buyer shall be free to operate the Company

and its Affiliates in its sole and unfettered judgment and Sellers shall have no claim against Buyer in connection therewith as a result of the preceding sentence. Buyer hereby agrees that the direct sales expenses for the first and second Base Earn-Out Periods shall not exceed $1.0 million and $1.4 million, respectively, unless otherwise agreed by Buyer, on the one hand, and Fireman and Raider, on the other hand.

7.    Indemnification.

    7.1    Indemnification by the Principal Sellers and the Sellers. Subject to Section 7.5 hereof and the last sentence of this Section 7.1, the Principal Sellers jointly and severally agree to indemnify Buyer and hold it harmless at all times from and after the date hereof against and in respect to any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, damages, losses, liabilities, Taxes and deficiencies and penalties and interest thereon and costs and expenses, including reasonable attorneys' fees and expenses (collectively, "Losses") resulting from any breach of any representation or warranty contained in Section 4 hereof, or the breach of any covenant or agreement of the Sellers in this Agreement, and (b) any claim arising from or relating to any Proceeding listed on Schedule 4.14 hereto except to the extent that an accrual in respect of the Company's entire liability for any such Proceeding is reflected on the Closing Date Balance Sheet. Each of the Sellers severally and not jointly agree to indemnify Buyer and hold it harmless at all times from and after the date hereof against and in respect to any and all Losses resulting from any breach of any of such Seller's representation or warranty contained in Section 4.2, 4.3 or 4.4 hereof.

    7.2    Indemnification by Buyer. Subject to Section 7.5 hereof, Buyer agrees to indemnify the Sellers and hold them harmless at all times from and after the date hereof against and in respect to any and all Losses resulting from any breach of any representation or warranty contained in Section 5 hereof or the breach of any covenant or agreement of Buyer in this Agreement.

7.3     Notice to the Indemnitor.  Promptly after the assertion of any claim by a third party or occurrence of any event which may give rise to a claim for indemnification from an indemnitor (the "Indemnitor") under this Section, an indemnified party (the "Indemnified Party") shall notify the Indemnitor in writing of such claim (the "Claims Notice"). The Claims Notice shall describe the asserted liability in reasonable detail, and shall indicate the amount (estimated, if necessary and to the extent feasible) of the Loss that has been or may be suffered by the Indemnified Party. Failure by the Indemnified Party to give a Claims Notice to the Indemnitor in accordance with the provisions of this Section 7.3 shall not relieve the Indemnitor of its obligations hereunder except to the extent that the Indemnitor has been actually prejudiced by such failure.

7.4     Rights of Parties to Settle or Defend.  The Indemnitor may elect to compromise or defend, at its own expense, by its own counsel, any asserted liability. If the Indemnitor elects to compromise or defend such asserted liability, it shall, within thirty (30) calendar days following the date of the Claims Notice (or sooner, if the nature of the asserted liability so requires), notify the Indemnified Party of its intent to do so, and the Indemnified Party shall cooperate, at the expense of the Indemnitor, in the compromise of, or defense against, such asserted liability. If the Indemnitor elects to defend any claim, the Indemnified Party shall make available to the Indemnitor any books, records or other documents within its control that are necessary or appropriate for such defense. If the Indemnitor elects not to compromise or defend the asserted liability or fails to notify the Indemnified Party of its election as herein provided, the Indemnified Party may pay, compromise or defend (at the expense of the Indemnitor) such asserted liability as the Indemnified Party considers appropriate. The parties agree to cooperate fully with one another in the defense, settlement or comprise of any asserted liability. Notwithstanding the foregoing, neither the Indemnitor nor the Indemnified Party may settle or compromise any claim over the objection of the other; *provided*, that

consent to settlement or compromise shall not be unreasonably withheld. In any event, the Indemnified Party and the Indemnitor may participate, at their own expense, in the defense of such asserted liability.

7.5    Limitations on Indemnification. Notwithstanding the foregoing, the right of an Indemnified Party to indemnification under Sections 7.1 or 7.2 of this Agreement shall be subject to the following provisions:

(a)    The indemnification obligations of an Indemnified Party pursuant to Sections 7.1 and 7.2 shall not be effective until the aggregate dollar amount of all Losses that would otherwise be indemnified pursuant to such section exceeds $50,000 (the "Deductible"), and then only to the extent such aggregate amount exceeds the Deductible. In no event shall the aggregate amount required to be paid by either party to the other under Section 7.1 or 7.2 of this Agreement exceed the Purchase Price; *provided*, however, that this limitation shall not apply to Sellers' indemnification obligations arising from a breach of any representation or warranty contained in Sections 4.2 or 4.4 hereof; and *provided*, further, that the Sellers shall be severally and not jointly liable to Buyer for any breach of any representation or warranty contained in Sections 4.2 or 4.4 made by each Seller with respect to himself or herself.

(b)    For purposes of this Section 7.5, in computing such individual or aggregate amounts of claims, the amount of any insurance proceeds (which the Indemnified Party agrees to use commercially reasonable efforts to pursue) and any indemnity, contribution or other similar payment actually received by an Indemnified Party from any third party with respect thereto shall be deducted from each such claim.

7.6    Reimbursement. At the time that the Indemnified Party shall suffer a loss because of a breach of any warranty, representation or covenant by the Indemnitor or at the time the amount

of any liability on the part of the Indemnitor under this Section is determined (which in the case of payments to third persons shall be the earlier of (i) the date of such payments, or (ii) the date that a court of competent jurisdiction shall enter a final judgment, order or decree, the Indemnitor shall forthwith, upon notice from the Indemnified Party, pay to the Indemnified Party by wire transfer of same day funds, the among of the indemnity claim which is in excess of the Deferred Amount. If such amount is not paid forthwith, then the Indemnified Party may, at its option, take legal action against the Indemnitor for reimbursement in the amount of the indemnity claim which is in excess of the Deferred Amount. For purposes hereof, the indemnity claim shall include the amounts so paid (or determined to be owing) by the Indemnified Party together with costs and reasonable attorneys' fees and interest on the foregoing items at the rate of 150 basis points above the Prime Rate from the date the obligation is due from the Indemnitor to the Indemnified Party, as hereinabove provided, until the indemnity claim shall be paid, irrespective of whether Buyer's claims for indemnification are paid in cash or by the reduction of the Earn-Out Payments due pursuant to Section 2.3 hereof.

 7.7 <u>Survival of Representations and Warranties</u>. Notwithstanding any right of Buyer to investigate the affairs of the Company's business, Buyer has the right to rely fully upon the representations, warranties, covenants and agreements of the Sellers contained in this Agreement. All representations and warranties made by each party in this Agreement or in any certificate, document or written statement referred to herein or furnished or delivered in connection with this Agreement shall survive the date hereof, and shall remain in full force and effect until eighteen (18) months after the date hereof; *provided*, that all representations and warranties contained in Sections 4.4, 4.5, 4.13, 4.19 shall survive for the applicable statute of limitations; and *provided, further*, that all other covenants and agreements shall survive the execution and delivery hereof and shall thereafter terminate and expire in accordance with the terms thereof, or, if no such expiration time

is stated, when the liability to which any such covenant or agreement may relate is barred by the applicable statute of limitations. No claim for breaches of representations or warranties in this Agreement, or indemnification in respect of the same, may be made unless and only to the extent that the party claiming a breach, or requesting indemnification, gives written notice of such breach pursuant to Section 7.3 hereof to the breaching party on or prior to the date that the representation or warranty at issue ceases to survive as provided in this Section 7.7.

8.    Miscellaneous.

    8.1    Entire Agreement. This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters.

    8.2    Governing Law; Jurisdictions. This agreement shall be governed by, and construed and enforced in accordance with the laws of the State of New York. The parties hereto irrevocably consent to the jurisdiction of the courts of the State of New York and any Federal court located in such State in connection with any action or proceeding arising out of or relating to this Agreement, or the transaction contemplated hereby.

    8.3    Headings. The Section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

    8.4    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally, mailed by registered or certified mail, return receipt requested, or sent by recognized overnight delivery service to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to any Seller, to:

> such Seller's address set forth on the signature page hereto.

*with a copy to*:

> each other Seller at the address specified on the signature page hereto.

If to Buyer, to:

> News America Marketing In-Store, Inc.
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: David DeVoe, Jr.

*with copies to:*

> The News Corporation Limited
> 1211 Avenue of the Americas
> New York, New York 10036
> Attention: Lawrence A. Jacobs, Esq.

*and:*

> Squadron, Ellenoff, Plesent & Sheinfeld, LLP
> 551 Fifth Avenue
> New York, New York 10176
> Attention: Deborah R. Wolfe, Esq.

8.5    <u>Severability</u>.  If at any time any of the covenants or the provisions contained herein shall be deemed invalid or unenforceable by the laws of the jurisdiction wherein it is to be enforced, by reason of being vague or unreasonable as to duration, geographic scope, scope of activities restricted or for any other reason, such covenants or provisions shall be considered divisible as to such portion and such covenants or provisions shall become and be immediately amended and reformed to include only such covenants or provisions as are enforceable by the court or other body having jurisdiction of this Agreement; and the parties agree that such covenants or provisions, as so

amended and reformed, shall be valid and binding as though the invalid or unenforceable portion had not been included herein.

8.6    Amendment; Waiver. No provision of this Agreement may be amended or modified except by an instrument or instruments in writing signed by the parties hereto. No waiver of any provision hereof shall be construed as a waiver of any other provision. Any waiver must be in writing.

8.7    Assignment and Binding Effect. None of the parties hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other; *provided*, that Buyer may assign any of its rights or delegate any of its duties to any Affiliate of Buyer following written notice to the Sellers and without relieving Buyer from any liability or obligations hereunder; *provided*, that such assignee agrees in writing for the benefit of the Sellers, to assume the obligations of Buyer set forth in this Agreement. All of the terms and provisions of this Agreement shall be binding on, and shall inure to the benefit of, the respective successors and permitted assigns of the parties.

8.8    No Benefit to Others. The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and their respective successors and assigns and they shall not be construed as conferring and are not intended to confer any rights on any other persons.

8.9    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and each party may become a party hereto by executing a counterpart hereof. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.

8.10    <u>Certain Definitions</u>.    The following terms, as used herein, have the following meanings:

"<u>Affiliate</u>" means with respect to any person or entity, means any person or entity directly or indirectly controlling, controlled by or under common control with such person or entity.

"<u>Balance Sheet Date</u>" shall have the meaning set forth in Section 4.6(a)(ii) hereof.

"<u>Base Earn-Out Amount</u>" shall have the meaning set forth in Section 2.3(a) hereof.

"<u>Base Earn-Out Payment Date</u>" shall have the meaning set forth in Section 2.3(b) hereof.

"<u>Base Earn-Out Period</u>" shall have the meaning set forth in Section 2.3(a) hereof.

"<u>Benefit Plans</u>"shall have the meaning set forth in Section 4.13(a) hereof.

"<u>Business Day</u>" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York on which banking institutions located in such state are closed.

"<u>Buyer</u>" shall have the meaning set forth in the preamble.

"<u>Buyer's Business</u>" shall have the meaning set forth in Section 6.2 hereof.

"<u>Buyer's Calculation</u>" shall have the meaning set forth in Section 2.3(b) hereof.

"<u>Cap</u>" shall have the meaning set forth in the definition of "Gross Margin."

"<u>Claims Notice</u>" shall have the meaning set forth in Section 7.3 hereof.

"<u>Closing Date Balance Sheet</u>" shall have the meaning set forth in Section 2.2(a) hereof.

"<u>Closing Payment</u>" shall have the meaning set forth in Section 2.1 hereof.

"<u>Code</u>" shall have the meaning set forth in Section 4.19(f).

"<u>Company</u>" shall have the meaning set forth in the first recital hereof.

"Company's Group" shall have the meaning set forth in Section 4.13(c) hereof.

"Deductible" shall have the meaning set forth in Section 7.5(a) hereof.

"Deferred Amount" shall have the meaning set forth in Section 3.2(d) hereof.

"Deficiency" shall have the meaning set forth in Section 2.2(a) hereof.

"Earn-Out Payment" shall have the meaning set forth in Section 2.3(b) hereof.

"Employees" shall have the meaning set forth in Section 4.13(b) hereof.

"Environmental Claims" means all accusations, allegations, notices of violation, Liens, claims, demands, suits, or causes of action for any damage, including, without limitation, personal injury, property damage (including, without limitation, any depreciation or diminution of property values), lost use of property or consequential damages, based upon Environmental Laws or principles of common law relating to pollution or exposure to Hazardous Substances. By way of example only (and not by way of limitation), Environmental Claims include (i) actions alleging actual or threatened damages to natural resources and seeking recovery pursuant to Environmental Laws, (ii) claims for nuisance or its statutory equivalent, (iii) claims for the recovery of response costs, or administrative or judicial orders directly related to the performance of investigations, responses or remedial actions under any Environmental Law, (iv) requirements to implement "corrective action" pursuant to any order or permit issued pursuant to the Resource Conservation and Recovery Act, as amended, or similar provisions of applicable state law, (v) claims based upon Environmental Laws or principles of common law relating to pollution or exposure to Hazardous Substances for restitution, contribution, or indemnity, (vi) fines, penalties or liens of any kind against property based upon Environmental Laws or principles of common law relating to pollution or exposure to Hazardous Substances, (vii) claims based upon Environmental Laws or principles of common law relating to pollution or exposure to Hazardous Substances for injunctive relief or other

orders or notices of violation from federal, state or local agencies or courts and (viii) with regard to any present or former employees, claims relating to exposure to or injury from Hazardous Substances based upon principles of common law relating to pollution or exposure to Hazardous Substances.

"Environmental Laws" means all applicable federal, state, district and local laws, all rules or regulations promulgated thereunder, and all orders, consent orders or judgments issued, promulgated or entered pursuant thereto, relating to pollution or protection of the environment (including, without limitation, ambient air, surface water, ground water, land surface, or subsurface strata), including, without limitation, (i) laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, industrial materials, wastes or other hazardous or toxic substances into the environment and (ii) laws relating to the identification, generation, manufacture, processing, distribution, use, treatment, storage, disposal, recovery, transport or other handling of pollutants, contaminants, chemicals, industrial materials, wastes or other hazardous or toxic substances. Environmental Laws shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Toxic Substances Control Act, as amended, the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended ("RCRA"), the Clean Water Act, as amended, the Safe Drinking Water Act, as amended, the Clean Air Act, as amended, the Atomic Energy Act of 1954, as amended, the Occupational Safety and Health Act, as amended, and all analogous laws promulgated or issued by any state or other governmental authority.

"Environmental Reports" means any and all written analyses, summaries or explanations, in the possession or control of the Company, of (a) the condition of the environment on or about any Leased Property or (b) the Company's compliance with Environmental Laws.

"ERISA" means the Employee Retirement and Income Security Act of 1974, as amended.

"Excess Shortfall" shall have the meaning set forth in Section 2.2(a) hereof.

"First-Year Bonus Amount" shall have the meaning set forth in Section 2.3(a) hereof.

"First-Year Bonus Payment Date" shall have the meaning set forth in Section 2.3(b) hereof.

"First-Year Bonus Period" shall have the meaning set forth in Section 2.3(a) hereof.

"GAAP" shall mean generally accepted accounting principles in the United States.

"Governmental Authority" means any domestic or foreign administrative or regulatory agency, bureau, board, commission, officer, authority, department or other governmental body or agency.

"Gross Margin" shall mean "gross margin" as defined by GAAP, and shall include all revenues in respect of the Company or any successor (by law or otherwise) to the Company's business for the relevant period, less:

(a)    Costs of goods sold relating to such revenues for such period as determined by GAAP, which for clarification purposes includes the following expenses which are not meant to be an inclusive list of all costs of goods sold: (i) card implementation expenses, (ii) software development and database programming, storage and management expenses for customer specific projects, (iii) third party license fees for software resold to clients, (iv) commission payments to retailers, and (v) data rights fees. Notwithstanding the preceding sentence, it is not the intention of the parties to deduct expenses as costs of goods sold unless such expenses are costs of goods sold in accordance with GAAP. Based on the Company's current operations, Sellers agree that the expenses in items (i) through (v) above are costs of goods sold in accordance with GAAP.

297099 v.12 [6D8R12!.WPD]

(b)    Direct selling, advertising and marketing expenses, salaries of direct full-time Company sales personnel and their related direct expenses (excluding compensation paid to Fireman and Raider and any related direct expenses), direct sales public relations expenses, direct sales professional services expenses, direct sales trade show expenses and direct sales presentation materials expenses.  These expenses are direct Company expenses without allocation or mark-up from Buyer or its Affiliates and will not include any sales expense (including sales, travel, commission or other expenses) for Buyer, its Affiliates or their respective employees, notwithstanding the fact that it is intended that the Company will utilize the sales personnel of Buyer and its Affiliates after the date hereof.

(c)    All investments by Buyer in the Company in the relevant period, which shall not include (i) amounts invested in the Company to fund the Working Capital deficiency reflected on the Closing Date Balance Sheet, (ii) the first $1.5 million invested by Buyer following the date hereof (the "Cap"), and (iii) and any amount paid in respect of the Raider Bonus.  For capital expenses in excess of the Cap, related depreciation expenses shall be included in the calculation of Gross Margin and such expenses shall be (A) based on reasonable estimates of the useful life of the relevant assets, and (B) accounted for in accordance with GAAP.  Investments in respect of non-capital assets in excess of the Cap will be included in the calculation of Gross Margin as a dollar for dollar basis.  For purposes of applying investments in the relevant period toward the Cap, investments in respect of non-capital assets shall be included first.

"Hazardous Substances" means all pollutants, contaminants, chemicals, wastes, and any other carcinogenic, ignitable, corrosive, reactive, toxic or otherwise hazardous substances or materials (whether solids, liquids or gases) subject to regulation, control or remediation under Environmental Laws. By way of example only, the term Hazardous Substances includes petroleum,

48

297099 v.12 [6D8R12!.WPD]

urea formaldehyde, flammable, explosive and radioactive materials, PCBs, pesticides, herbicides, asbestos, sludge, slag, acids, metals, solvents and waste waters.

"Indemnified Party" shall have the meaning set forth in Section 7.3 hereof.

"Indemnitor" shall have the meaning set forth in Section 7.3 hereof.

"Intellectual Property" shall have the meaning set forth in Section 4.17(a) hereof.

"Interim Balance Sheet" shall have the meaning set forth in Section 4.6(a)(ii) hereof.

"Leases" shall have the meaning set forth in Section 4.9 hereof.

"Leased Property" shall have the meaning set forth in Section 4.9 hereof.

"Liabilities" shall have the meaning set forth in Section 4.7 hereof.

"Licenses" shall have the meaning set forth in Section 4.12 hereof.

"Liens" shall have the meaning set forth in Section 4.10 hereof.

"Losses" shall have the meaning set forth in Section 7.1 hereof.

"Material Adverse Effect" shall have the meaning set forth in Section 4.1 hereof.

"Non-Compete Payment" shall have the meaning set forth in Section 2.1 hereof.

"Notice of Disagreement" shall have the meaning set forth in Section 2.2(b) hereof.

"Participate In" shall mean to engage or participate, directly or indirectly, in any capacity whatsoever, whether compensated or not, for his or her own benefit or for, with or through any other person, firm, corporation or other entity, in the ownership, management, operation or control of, or to be connected as a director, officer, employee, partner, proprietor, consultant, principal, agent, shareholder, investor, independent contractor or otherwise with, or acquiesce in the use of his or her name in connection with the business of, any other person, firm, corporation or other entity; *provided*, however, that ownership of not more than 1% of a publicly traded entity shall be excluded from this definition.

"Permitted Liens" means liens or other encumbrances securing taxes, assessments, governmental charges or levies, or the claims of materialmen, carriers, landlords and like persons, all of which are not yet due and payable or are being contested in good faith.

"Plans, contracts and arrangements" shall have the meaning set forth in Section 4.13(a)(ii).

"Prime Rate" shall mean the prime rate of interest as published in *The Wall Street Journal*.

"Principal Sellers" shall have the meaning set forth in the preamble.

"Proceeding" shall have the meaning set forth in Section 4.14 hereof.

"Proprietary Software" shall have the meaning set forth in Section 4.16 hereof.

"Purchase Price" shall have the meaning set forth in Section 2.1 hereof.

"Raider Bonus" shall have the meaning set forth in Section 2.2(c) hereof.

"Raider Receivable" shall have the meaning set forth in Section 2.2(c) hereof.

"Records" shall have the meaning set forth in Section 4.27 hereof.

"Reserve" shall have the meaning set forth in Section 4.23 hereof.

"Seller" and "Sellers" shall have the meaning set forth in the preamble hereto.

"Second-Year Bonus Amount" shall have the meaning set forth in Section 2.3(a) hereof.

"Second-Year Bonus Payment Date" shall have the meaning set forth in Section 2.3(b) hereof.

"Second-Year Bonus Period" shall have the meaning set forth in Section 2.3(a) hereof.

"Shares" shall have the meaning set forth in the third recital hereto.

"Software" shall have the meaning set forth in Section 4.16(a) hereof.

"Taxes" shall have the meaning set forth in Section 4.19(a).

"Tax Returns" shall have the meaning set forth in Section 4.19(a).

"Working Capital" shall mean the Company's total current assets, less the Company's total current liabilities reflected on the Closing Date Balance Sheet prepared in accordance with GAAP; *provided*, however, that (i) the cancellation or write-off of the Raider Receivable shall not be included in the calculation of Working Capital, (ii) an amount equal to fifty percent (50%) of the Raider Bonus shall be included in the calculation of Working Capital, (iii) any income tax refund owing to the Company arising from the carry back of the 1998 operating loss to the 1997 tax year shall be included in the calculation of Working Capital, and (iv) no amount in respect of deferred tax benefit shall be included in the calculation of Working Capital.

"Year 2000 Compliant" shall have the meaning set forth in Section 4.26 hereof.

8.11    Interpretation. Article titles, headings to sections and any table of contents are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation hereof. The Schedules referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. As used herein, "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; the singular includes the plural and vice versa; references to any agreement or other document are to such agreement or document as amended and supplemented from time to time.

8.12    Arrangements Among Sellers. Each of the Sellers and the Buyer acknowledge and agree that no provision set forth in this Agreement shall impact or have any effect upon any agreement, arrangement or understanding among any two or more of the Sellers with respect to the

allocation of, and contribution arrangements with respect to, the relative rights, risks and responsibilities (including without limitation indemnification obligations and the obligation to repay the Shortfall, if any) among the Sellers.

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement as of the date first above written.

_____
**ROBERT FIREMAN**

Address:  241 Perkins St. #D-104
          Jamaica Plains, MA 02130

_____
**ANN RAIDER**

Address:  46 Ivy Road
          Wellesley, MA 02181

_____
**CURTIS R. SMITH**

Address:  9 Wingate Road
          Wellesley, MA 02181

_____
**JOHN H. BOYLES**

Address:  39 Westcott Road
          Harvard, MA 01451

**NEWS AMERICA MARKETING IN-STORE, INC.**

By:_____
     Name:  David DeVoe, Jr.
     Tile:    Executive Vice President

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement as of the date first above written.

_____

**ROBERT FIREMAN**

Address:  241 Perkins St. #D-104
Jamaica Plains, MA 02130


_____

**ANN RAIDER**

Address:  46 Ivy Road
Wellesley, MA 02181

_____

**CURTIS R. SMITH**

Address:  9 Wingate Road
Wellesley, MA 02181


_____

**JOHN H. BOYLES**

Address:  39 Westcott Road
Harvard, MA 01451


**NEWS AMERICA MARKETING IN-STORE, INC.**

By:_____
Name:  David DeVoe, Jr.
Tile:    Executive Vice President

52

IN WITNESS WHEREOF, the undersigned have executed this Stock Purchase Agreement as of the date first above written.

**ROBERT FIREMAN**

Address:  241 Perkins St. #D-104
            Jamaica Plains, MA 02130

**ANN RAIDER**

Address:  46 Ivy Road
            Wellesley, MA 02181

**CURTIS R. SMITH**

Address:  9 Wingate Road
            Wellesley, MA 02181

**JOHN H. BOYLES**

Address:  39 Westcott Road
            Harvard, MA 01451

**NEWS AMERICA MARKETING IN-STORE, INC.**

By:_____

      Name: David DeVoe, Jr.
      Tile:  Executive Vice President

**CCMI**
**DISCLOSURE MEMORANDUM**
**TO**
**STOCK PURCHASE AGREEMENT**
**AS OF AUGUST 13 , 1999**

The capitalized terms used in this Disclosure Memorandum, unless otherwise defined herein, have the meaning specified in the Agreement. For convenience, disclosures under one section or a subsection may be cross-referenced to one or more other sections or subsections of this Disclosure Memorandum. If a matter is disclosed in the Disclosure Memorandum, it shall be deemed to have been disclosed with respect to all Sections of the Agreement for which the disclosure satisfies the requirements for such Section, and its relevance is evident from the disclosure.

CCMI
SCHEDULE 2.1

PURCHASE PRICE

With regard to Section 2.1, the following are instructions for the disbursement of the Purchase Price.

| Name | Wire Instructions | Proportionate Share |
|---|---|---|
| Robert N. Fireman | Fleet Bank, ABA #011000138 for further credit to Robert N. Fireman, 165 Wood Road, Braintree, MA  02184, Account No. 93744 84119 | $1,380,000 |
| Ann M. Raider | Fleet Bank, ABA#011000138, Credit to Ann M. Raider, 46 Ivy Road, Wellesley, MA  02181, Account No. 02149 01526 | $920,000 |
| Curtis R Smith | U.S. Trust ABA#011001331 for further credit to Curtis R. Smith, Anne B. Smith, 9 Wingate Road, Wellesley, MA  02181 Account No. 001 1544137 | $400,000 |
| John H. Boyles | BankBoston ABA#011000390 for further credit to John H. Boyles, 39 Westcott Road, Harvard, MA  01451, Account number 83034260 | $100,000 |

TOTAL CLOSING
PAYMENTS:                                                          $2,800,000

**CCMI**
**SCHEDULE 2.3(b)**

**PAYMENT OF EARN-OUT AMOUNT**

With regard to Section 2.3(b), the following are instructions for the disbursement of each Earn-Out Payment:

| Name | Wire Instructions* | Proportionate Share |
|------|--------------------|--------------------|
| Robert N. Fireman | Sames as 2.1 | 60% |
| Ann M. Raider | Same as 2.1 | 40% |
| | | 100%. |

*Unless any Seller notifies Buyer of a change in wire instructions thirty (30) days prior to payment of each Earn-Out Payment.

**CCMI**
**SCHEDULE 4.3**

**FREEDOM TO CONTRACT**

In connection with this transaction, immediately prior to closing, the following documents and agreements will have been terminated, and all responsibilities, rights and liabilities thereunder will be waived:

Registration Rights Agreement between the Company, Curtis R. Smith, and John H. Boyles, dated as of February 11, 1998;

Stock Purchase Agreement among the Company and Curtis R. Smith, John H. Boyles, Robert N. Fireman, and Ann M. Raider, dated as of February 11, 1998;

Stockholders' Agreement, dated as of February 11, 1998, by and among the Company, Curtis R. Smith, John H. Boyles, Robert N. Fireman, and Ann M. Raider;

The Stock Pledge Agreement between the Company and Ann M. Raider, dated as of February 1998;

Promissory Note between the Company and Ann M. Raider; and

The Company's Employee Stock Option Plan, and the outstanding common stock options granted under the plan to employees William Adam and Robert M. Coughlin, in the amounts of 30,000 and 10,000 respectively, for a total of 40,000 options.

In connection with this transaction, immediately prior to closing, all responsibilities, rights, and liabilities of the Company under the following certificate will have been waived by the holders of all issued and outstanding shares of preferred stock:

Certificate of Designations, Preferences and Rights of a Series of Preferred Stock, dated as of February 11, 1998.

The Company has received a consent from Fleet Bank with regard to the outstanding loan, pursuant to which the bank has waived the acceleration clause and has released its first lien on the business assets of the Company.

**CCMI**
**SCHEDULE 4.4**

<u>**TITLE TO SHARES**</u>

With regard to Section 4.4, the following lists the name of each Seller, their respective shares of stock and the percentage interest in the Company's capital stock.

| <u>Name</u> | <u>Type</u> | <u>Shares</u> | <u>Percent Outstanding</u> |
|------|------|------|------|
| Curtis R. Smith | Preferred | 248,000 | 80% |
| John H. Boyles | Preferred | 62,000 | 20% |
| | | 310,000 | 100% |

| <u>Name</u> | <u>Type</u> | <u>Shares</u> | <u>Percent Outstanding</u> |
|------|------|------|------|
| Robert N. Fireman | Common | 2,100,000 | 60% |
| Ann M. Raider | Common | 1,400,000 | 40% |
| | | 3,500,000 | 100% |

In connection with this transaction, immediately prior to closing, Curtis R. Smith and John H. Boyles will have contributed their 228,429 and 83,571 shares of common stock, respectively, to the Company as a capital contribution for no consideration.

See also Schedule 4.3 hereto.

**CCMI**
**SCHEDULE 4.5**

**CAPITALIZATION, SUBSIDIARIES**

(a) With regard to Section 4.5, the following lists the total authorized capital stock of the Company:

| Type | Authorized |
|------|------------|
| Preferred | 1,000,000 |
| Common | 5,000,000 |

In connection with this transaction, immediately prior to closing, Curtis R. Smith and John H. Boyles will have contributed their 228,429 and 83,571 shares of common stock, respectively, to the Company as a capital contribution for no consideration.

(b)(ii) Preferred stock is convertible.  See also Schedule 4.3 hereto.

(b)(iii) See Schedule 4.3 hereto.

**CCMI**
**SCHEDULE 4.6**

**FINANCIAL STATEMENTS**

Attached with regard to Section 4.6 are true and complete copies of financial statements of the Company.

4.6(a)(i) a balance sheet of the company as of December 31, 1998: statements of income, cash flows and changes in stockholders' equity for the fiscal year then ended.

4.6(a)(ii) Interim Balance Sheet as of June 30, 1999.

**CONSUMER CARD MARKETING, INC.**
**BALANCE SHEET**
**FOR THE PERIOD ENDED DECEMBER 31, 1998**

ASSETS

| | | |
|---|---|---:|
| Current Assets | | |
| Cash | $ | 784,209.19 |
| | | |
| Receivables | | |
| | | |
| Accounts Receivable | | 508,697.16 |
| Suspense | | 404.70 |
| Prepaid Freight Receivable | | 6,562.41 |
| Income Tax Refund | | 71,272.00 |
| | | |
| Total Receivables | | 586,936.27 |
| | | |
| Total Current Assets | | 1,371,145.5 |
| | | |
| Property, Plant & Equipment | | 444,208.50 |
| Accumulated Depreciation | | (174,992.05) |
| | | |
| Net Property, Plant & Equipment | | 269,216.45 |
| | | |
| Other Assets | | |
| | | |
| Notes Receivable Stockholder | | 185,416.09 |
| Prepaid Expenses | | 112,496.14 |
| | | |
| Total Other Assets | | 297,912.23 |
| | | |
| TOTAL ASSETS | $ | 1,938,274.14 |

CONFIDENTIAL INFORMATION

CONSUMER CARD MARKETING, INC.
BALANCE SHEET
FOR THE PERIOD ENDED DECEMBER 31, 1998

LIABILITIES & EQUITY

| | | |
|---|---|---|
| Current Liabilities | | |
| Accounts Payable | $ | 795,054.30 |
| Accrued Payroll | | 41,503.76 |
| Accrued Expenses | | 125,053.98 |
| Deferred Revenue | | 270,420.00 |
| Payroll Taxes Payable | | 2,188.72 |
| State Withholding Taxes | | 9,930.79 |
| FICA/Medicare Payable | | 4,881.24 |
| Sales Tax Payable | | 2,718.63 |
| Current Portion Long Term Debt | | 19,881.53 |
| Total Current Liabilities | | 1,271,632.95 |
| Long Term Liabilities | | |
| Notes Payable Bank | | 35,416.89 |
| Notes Payable Chase | | 10,353.47 |
| Total Long Term Liabilities | | 45,770.36 |
| Total Liabilities | | 1,317,403.31 |
| Equity | | |
| Preferred Stock | | 3,100.00 |
| Common Stock | | 4,120.00 |
| Add'l Paid in Capital | | 1,059,717.82 |
| Retained Earnings | | (277,000.56) |
| Current Year's Income/Loss | | (169,066.43) |
| Total Equity | | 620,870.83 |
| TOTAL LIABILITIES & EQUITY | $ | 1,938,274.14 |

*CONFIDENTIAL INFORMATION*

**CONSUMER CARD MARKETING, INC.**
**INCOME STATEMENT**
**FOR THE YEAR ENDED DECEMBER 31,1998**

|  | TOTAL | % |
|---|---|---|
| **GROSS REVENUE** | | |
| BUILD THE CUSTOMER DATABASE | $      2,422,766 | 64.8% |
| DATA BASE MANAGEMENT | 1,247,118 | 33.3% |
| DATA BASE MARKETING/OTHER | 71,773 | 1.9% |
| TOTAL GROSS REVENUE | 3,741,657 | 100.0% |
| | | |
| **COST OF SALES** | | |
| BUILD THE CUSTOMER DATABASE | 1,543,934 | 41.3% |
| DATA BASE MANAGEMENT | 217,069 | 5.8% |
| TOTAL COST OF SALES | 1,761,003 | 47.1% |
| | | |
| **GROSS PROFIT** | 1,980,654 | 52.9% |
| | | |
| **OPERATING EXPENSES** | | |
| SALARIES & WAGES | 1,089,685 | 29.1% |
| PAYROLL TAXES | 79,276 | 2.1% |
| RENT/COMMON AREA | 83,431 | 2.2% |
| TELEPHONE | 50,023 | 1.3% |
| POSTAGE & DELIVERY | 8,660 | 0.2% |
| OFFICE EXPENSES | 49,779 | 1.3% |
| LEASED EQUIPMENT | 4,984 | 0.1% |
| CONSULTING FEES | 274,171 | 7.3% |
| OUTSIDE SERVICES | 49,906 | 1.3% |
| TRAVEL & ENTERTAINMENT | 146,127 | 3.9% |
| TRADE SHOWS/CONFERENCES | 32,052 | 0.9% |
| PRESENTATION MATERIALS | 10,428 | 0.3% |
| ADVERTISING | 17,261 | 0.5% |
| PROMOTION EXPENSES | 85,094 | 2.3% |
| DUES & SUBSCRIPTIONS | 8,054 | 0.2% |
| PROFESSIONAL FEES | 8,795 | 0.2% |
| DEPRECIATION & AMORTIZATION | 81,791 | 2.2% |
| UTILITIES | 13,954 | 0.4% |
| RECRUITMENT COSTS | 39,600 | 1.1% |
| INSURANCE | 53,326 | 1.4% |
| BAD DEBT EXPENSE | 44,315 | 1.2% |
| OTHER | 18,085 | 0.5% |
| TOTAL OPERATING EXPENSES | 2,248,797 | 60.1% |
| | | |
| **NET OPERATING INCOME** | (268,143) | -7.2% |
| | | |
| **OTHER INCOME (EXPENSES)** | | |
| NET INTEREST INCOME (EXPENSE) | 27,805 | 0.7% |
| FEDERAL INCOME TAX PROVISION | 71,272 | 1.9% |
| | | |
| **INCOME (LOSS) BEFORE TAXES** | $      (169,066) | -4.5% |

*CONFIDENTIAL INFORMATION*

**CONSUMER CARD MARKETING, INC.**
**STATEMENT OF CASH FLOWS**
**FOR THE YEAR ENDED DECEMBER 31, 1998**

| | | |
|---|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| NET INCOME (LOSS) | $ | (169,066) |
| ADJUSTMENTS TO RECONCILED NET INCOME | | |
| (LOSS) TO NET CASH USED BY OPERATING ACTIVITIES: | | |
| | | |
| DEPRECIATION AND AMORTIZATION | | 81,791 |
| (INCREASE) DECREASE IN ACCOUNTS RECEIVABLE | | 354,141 |
| (INCREASE) DECREASE IN INCOME TAX REFUND | | (71,272) |
| DECREASE (INCREASE) IN PREPAID EXPENSES | | 111,564 |
| INCREASE (DECREASE) IN ACCOUNTS PAYABLE | | (392,743) |
| INCREASE (DECREASE) IN PAYROLL TAXES PAYABLE | | (3,363) |
| (DECREASE) INCREASE IN DEFERRED INCOME | | (63,355) |
| INCREASE (DECREASE) IN INCOME TAXES PAYABLE | | (105,498) |
| INCREASE (DECREASE) IN OTHER CURRENT LIABILITIES | | 2,719 |
| INCREASE (DECREASE) IN ACCRUED EXPENSES | | (247,299) |
| | | |
| NET CASH PROVIDED BY OPERATIONS | | (502,381) |
| | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| PURCHASE OF PROPERTY AND EQUIPMENT | | (188,993) |
| SALE OF COMPANY STOCK | | 974,799 |
| | | |
| NET CASH USED BY INVESTING ACTIVITIES | | 785,806 |
| | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| PROCEEDS OF NOTES PAYABLE | | (3,254) |
| PAYMENT OF NOTES PAYABLE STOCKHOLDER | | (138,282) |
| PAYMENT OF NOTES PAYABLE | | (519,838) |
| | | |
| NET CASH PROVIDED (USED) BY FINANCING ACTIVITIES | | (661,374) |
| | | |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | | (377,949) |
| | | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | | 1,162,158 |
| | | |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ | 784,209 |

**CONSUMER CARD MARKETING, INC.**
**BALANCE SHEET**
**FOR THE SIX MONTHS ENDED JUNE 30, 1999**

ASSETS

| | | |
|---|---|---:|
| Current Assets | | |
| Cash | $ | 71,533.92 |
| | | |
| Receivables | | |
| Accounts Receivable | | 538,885.91 |
| Suspense | | 8,675.41 |
| Deferred Tax Benefit | | 71,845.00 |
| Current Prepaids | | 36,906.94 |
| Income Tax Refund | | 71,272.00 |
| Total Receivables | | 727,585.26 |
| | | |
| Total Current Assets | | 799,119.18 |
| | | |
| Property, Plant & Equipment | | 452,905.94 |
| Accumulated Depreciation | | (220,566.55) |
| Net Property, Plant & Equipment | | 232,339.39 |
| | | |
| Other Assets | | |
| Notes Receivable Stockholder | | 181,524.00 |
| Prepaid Expenses | | 250,182.35 |
| Total Other Assets | | 431,706.35 |
| | | |
| TOTAL ASSETS | $ | 1,463,164.92 |

*CONFIDENTIAL INFORMATION*

**CONSUMER CARD MARKETING, INC.**
**BALANCE SHEET**
**FOR THE SIX MONTHS ENDED JUNE 30, 1999**

LIABILITIES & EQUITY

| | | |
|---|---|---:|
| Current Liabilities | | |
| Accounts Payable | $ | 367,388.92 |
| Accrued Payroll | | 35,907.68 |
| Accrued Expenses | | 261,142.39 |
| Deferred Revenue | | 146,268.88 |
| Postage Escrow | | 15,896.41 |
| Payroll Taxes Payable | | 2,423.67 |
| Sales Tax Payable | | 0.00 |
| Current Portion Long Term Debt | | 20,028.50 |
| Total Current Liabilities | | 849,056.45 |
| Long Term Liabilities | | |
| Notes Payable Bank | | 26,916.93 |
| Notes Payable Chase | | 9,158.37 |
| Total Long Term Liabilities | | 36,075.30 |
| Total Liabilities | | 885,131.75 |
| Equity | | |
| Preferred Stock | | 3,100.00 |
| Common Stock | | 4,120.00 |
| Add'l Paid in Capital | | 1,059,717.82 |
| Retained Earnings | | (446,066.99) |
| Current Year's Income/Loss | | (42,837.66) |
| Total Equity | | 578,033.17 |
| TOTAL LIABILITIES & EQUITY | $ | 1,463,164.92 |

*CONFIDENTIAL INFORMATION*

**CCMI**
**SCHEDULE 4.7**

**ABSENCE OF UNDISCLOSED LIABILITIES**

With regard to Section 4.7, the following list represents undisclosed liabilities:

Accrued vacation time
Additional costs related to this stock purchase transaction.

Also see Section 4.14.

In connection with this transaction immediately prior to closing, the following liabilities will be waived:

Accrued Dividends Preferred Stock
Additional Payment to initial investors for legal work.

**CCMI**
**SCHEDULE 4.8**

<u>NO MATERIAL ADVERSE CHANGE</u>

None.

**CCMI**
**SCHEDULE 4.9**

**REAL ESTATE**

The Company's Corporate Headquarters consists of 8,000± square feet of office space located at 165 Wood Road, Braintree, MA  02184, leased by the Company from Harry Fireman, pursuant to an Indenture of Lease dated as of January 2, 1996, and amended by an Extension Agreement dated as of December 15, 1998, and by an Amendment of Lease dated as of July 14, 1999.

**CCMI**
**SCHEDULE 4.10**

<u>**TITLE TO AND CONDITION OF ASSETS, ENCUMBRANCES, ETC.**</u>

With regard to Section 4.10, the following lists assets that are the personal furniture and fixtures of Robert N. Fireman and Ann M. Raider:

Pictures in offices
Couches
Desk sets in Bob's, Ann's, Bill's, Barry's, Michael's, Susan's offices
Vase
All conference tables and chairs
Reception area chairs
Steelcase sectionals
All bookshelves
Telephone system

All of the above assets, except for the personalty and desks sets of Robert Fireman and Ann Raider, that are used for the operations of the Company may be used by the Company consistently with past practice.

The Company has received a consent from Fleet Bank with regard to the outstanding loan, pursuant to which the bank has waived the acceleration clause and has released its first lien on the business assets of the Company.

From time to time, the Company has in its possession computer equipment and peripherals belonging to its customers for purposes of installing programs and or integration testing. Currently, the Company has in its possession the following:

IBM AS400
Digital Alpha Server

**CCMI**
**SCHEDULE 4.11**

**CONTRACTS AND COMMITMENTS**

(i)(A) Obligation of the Company:                    Obligations to the Company:

All Recurring Accounts Payable
Such as telephone, utilities, equipment leases etc.        *Sullivan's
TimeOut Devices, Inc.                                *Blue Square
Ockham's Razor                                       *Nash Finch
Hyperion (Arbor)                                     *Coborn's
NACDS                                                *Star Market
Polk                                                 *Wild Oats
Arthur Blank                                         *Wegmans
Century Mailing                                      *Jitney Jungle
Expérian                                             *RMG
Figel, Inc.                                          *Duane Reade
Decision Support Technologies (DST)                  *Lewis Drug
SSI                                                  *May's Drug Stores, Inc.
Estate of Harry Fireman                              *^Alberto Culver
Personix                                             **Fuji Film
AT&T Financial Lease                                 **L'Eggs Products
Fleet Equipment Lease                                ***Decision Support Technologies (DST)
Fleet Loan                                           ****Ockham's Razor
Fleet ancillary documents                            ****TimeOut Devices, Inc.
Chase Auto Loan
ATT Equipment Lease Financing
Non-monetary Confidentiality Agreements which have been delivered to Buyer.


*        Retail Clients
**       Manufacturer Clients
***      Contract Software Developer obligated to complete certain software modules to receive final
         payments.
****     Current CCMI software contractors.

(i)(B) None.

(i)(C) See also Schedule 4.3 hereto.

**CCMI**
**SCHEDULE 4.12**

**LICENSES AND PERMITS**

None.

CCMI
SCHEDULE 4.13

EMPLOYEE MATTERS

(a)(i)The Company has or currently maintains or contributes to:

Principle Financial (health insurance plan)
Blue Cross/Blue Shield (health insurance)
Guardian Insurance (long and short term disability)
Phoenix Insurance (life insurance)
The Company's 401K Plan
Section 125 Benefit Plan. (pre tax health insurance deduction)

(a)(ii) (A) None.

(B) None.

(C) At the Company's discretion, all current employees are eligible to participate in a bonus or other incentive plan based in part on the Company's and the employee's performance.

The Company has adopted an Employee Stock Option Plan under which options have been granted. The following options which were outstanding under the plan, will have been terminated prior to the closing of this transaction:

| Plan Employee | Type | Quantity |
|---|---|---|
| William Adam | Common | 30,000 |
| Robert M. Coughlin | Common | 10,000 |
| Total Options | | 40,000 |

(D) All eligible employees are able to participate in the Company-provided health plan, long and short-term disability insurance, life insurance, vacation policy, sick time, 401K Plan, and holiday time.

(E) None.

(F) The Company has confidentiality agreements that include a non-compete clause with the following current employees:

| | | |
|---|---|---|
| Adam, William | Adam, Elizabeth | Coughlin, Robert |
| Bowker, Christine | Clapp, H.W. | Crowther, Jonathan |
| Geswell, Linda | Hoeft, Christine | Hughes, Michael |
| Hill, Reva | Joress, Craig | McAndrew, Kathy |
| McManama, Michael | Pappas, Charles | Robinson, Barry |
| Young, Susan | | |

**CCMI**
**SCHEDULE 4.13**

**EMPLOYEE MATTERS (CONTINUED)**

(G) None.

(c) None.

(e)(i)

| Name | Annual Salary as of 7/1/99 |
|---|---|
| ADAM, WILLIAM | 85,000.00 |
| ADAM, ELIZABETH | 50,000.00 |
| BOWKER, CHRISTINE | 50,000.00 |
| CLAPP, H.W. | 101,000.00 |
| COUGHLIN, ROBERT | 60,000.00 |
| CROWTHER, JONATHAN | 30,000.00 |
| FIREMAN, ROBERT | 153,000.00 |
| GESWELL, LINDA | 42,000.00 |
| HILL, REVA | 33,000.00 |
| HOEFT, CHRIS | 36,000.00 |
| MCANDREW, KATHLEEN | 27,500.00 |
| MCMANAMA, MICHAEL | 105,000.00 |
| PAPPAS, CHARLES | 50,000.00 |
| RAIDER, ANN | 153,000.00 |
| ROBINSON, BARRY | 98,400.00 |
| YOUNG, SUSAN | 68,250.00 |
| HUGHES, MICHAEL | 44,000.00 |
| JORESS, CRAIG | 36,000.00 |

(ii)    None.

**CCMI**
**SCHEDULE 4.13**

**EMPLOYEE MATTERS (CONTINUED)**

(iii)    The Company tracks vacation, holiday, and sick pay for each employee, but has not accrued for it on the balance sheet.

(iv)    Adam, William                    Joress, Craig
         Bowker, Chris                    Pappas, Charles
         Clapp, H.W.                      Raider, Ann
         Crowther, Jonathan               Geswell, Linda
         Fireman, Robert                  Hughes, Michael.
         Hoeft, Chris

**CCMI**
**SCHEDULE 4.14**

**LITIGATION**

Interpros, dispute regarding recruiting fees.

Business Software Alliance, software review.

Credit Verification Corporation, patent infringement.

Ronald Lunde, dispute regarding consulting fees.  Mr. Lunde a consultant, whose arrangement was terminated in October of 1998, has recently made a claim that he is owed additional fees in the range of $27,000 to $64,000, which the company vigorously disputes.

A disputed claim for an old matter relative to a suit for a telephone consultant in 1992 or 1993 for approximately $6,000.  When the Company relocated to its current location the file was misplaced.  The Company has not received any information regarding this claim for at least the last five years.

**CCMI**
**SCHEDULE 4.15(b)**

**COMPLIANCE WITH LAW**

None.

**CCMI**
**SCHEDULE 4.16**

**SOFTWARE AND INFORMATION SYSTEMS**

(a)(i) Customer Information System (CIS)
Marketing Analysis System (MAS)
Campaign Manager (CM)
Promotional Analysis (PA)
Instore Promotional Dispenser (IPD)
POS Interfaces
For licenses and rights see Decision Support Technologies, and Retailer System Agreements, which have been made available to Buyer.

(a) (ii)

| | | | |
|---|---|---|---|
| Windows NT (Microsoft) | Group 1 (AccuMail) | MS SQL (Microsoft) | MS Windows 95 (Microsoft) |
| NT 4.0 Server (Microsoft) | Fox Pro (Microsoft) | McAfee Anti-Virus (McAfee.com Corp.) | Adobe Illustrator (Adobe) |
| MS Office 97 (Microsoft) | Visio (Visio) | EudoraPro (Qualcomm) | Adobe Go Live (Adobe) |
| PC Anywhere (Symantec) | AltaVista Tunnel (Digital Compaq) | Great Plains Dynamic (GP) | Adobe Image Styler (Adobe) |
| Essbase (Hyperion) | Power Chute (APC) | Quark Express (QuarkXPress) | Adobe Image Ready (Adobe) |
| Brio (Brio) | Act! 3.0 (Symantec) | MS Windows 98 (Microsoft) | Oracle8 (Oracle) |
| Power Builder (Sybase) | | | |

The Company cannot locate Certificates of Authenticity or original diskettes, for 15 user licenses for MS Office and 5 licenses for PC Anywhere. If the Company cannot locate these, it intends to purchase new licenses.

(a)(iii) None.

(a)(iv) Ongoing Software Development – Continued building, upgrading and enhancement of CCMI CIS, MAS, Campaign Manager and Promotional Analysis Modules

NACDS Drug Store Project – Customized MAS for drug chain stores. Build warehouse for multiple drug chain store data.

**CCMI**
**SCHEDULE 4.16**

**SOFTWARE AND INFORMATION SYSTEMS (CONTINUED)**

Enhancements for Nash Finch members – Customized interfaces to balance store data; adding additional features.

Work for the above being performed by CCMI staff, Ockham's Razor, TimeOut Devices and DST.

(b)(i) None.

(b)(ii) Yes.

(b)(iii) Some employees may have gained access to source code prior to executing confidentiality and non-disclosure agreements.  The Company does not believe this to be significant.  All current employees have signed a Confidentiality Agreement and Non Disclosure Agreement with regard to the source code.

(b)(iv) Yes.

(b)(v) Yes.

(b)(vi) Yes.

(b)(vii) Yes except DST, a contract developer retained some minor rights as set forth in the DST Agreement.

(b)(viii) Yes.

(d) Fleet Bank's lien on the Company's assets will have been discharged prior to the closing of this transaction.

(e) Credit Verification Corporation (1996 Patent Claim); Business Software Alliance (claim for office software compliance).

(f) Certain companies have not renewed annual maintenance and support fees.  As a result, there may be a question about their continued right to hold and use the software.  These companies had old versions in object code, not source code.

**CCMI**
**SCHEDULE 4.17**

<u>**INTELLECTUAL PROPERTY**</u>

Trademark: Company's Logo, which is the initials CCMI, with a UCC Bar Code underneath.

Copyright: Company's marketing materials describing the Company's experience, products and services.

(a)  None.
(b)  None.
(c)  None.
(e)  None

**CCMI**
**SCHEDULE 4.18**

**TRADE SECRETS**

Company's customer list and customer prospect list.

**CCMI**
**SCHEDULE 4.19**

**TAX MATTERS**

(a)  With regard to Section 4.19(a) the Company made no quarterly estimated Federal or State income tax payments during 1998 or 1999 because the amount of taxes due, if any, could not be reasonably determined.

The Company has not filed any sales or use tax returns or collected any sales tax for sales or services delivered outside of the Commonwealth of Massachusetts.

(c) None.

(d)(i) During 1997, ADP did not deduct certain payroll taxes from the Company's bank account. ADP was notified.  Employee wages and withholdings were reported correctly.  These charges have been subsequently removed to accurately reflect payroll taxes due on the balance sheet.

**CCMI**
**SCHEDULE 4.20**

**INSURANCE**

| Insurance Co. | Amt. | Type/ Risks Insured | Expires | Policy # |
|---|---|---|---|---|
| Metropolitan Ins. | $1,000,000 | Term Life Robert N. Fireman | 5/25/48 | 940550213P |
| United of Omaha | $1,000,000 | Term Life Robert N. Fireman | 2/3/44 | BU1050702 |
| The Guardian | $1,000,000 | Term Life Ann M. Raider | 6/23/47 | 3799957 |
| The Guardian | $1,500,000 | Term Life Ann M. Raider | | |
| Public Svs. Mut. Ins. | $1,500,000 | Workers Compensation | 3/12/00 | 03-264408-99 |
| Nat'l Grange Mut. | $20,000 | 401K Crime Policy | none | F222545 |
| Provident L&A Co. | $5,000/M | Disability-Robert N. Fireman | 9/6/23 | 0004253121 |
| The Guardian Ins. | $5,000/M | Disability Ann M. Raider | 3/25/12 | G-659118 |
| Public Svs. Mu. Ins. | $50,000 | Business Pers. Prop. | 9/10/99 | 00-74-328259 |
| | $1,000,000 | General Liability | | |
| | $40,000 | Computer Hardware | | |
| | $10,000 | Computer Software | | |
| | $10,000 | Computer Transit Coverage | | |
| The Connecticut Indemnity Co. | $22,000 (Cover Fleet Leased Equip.) | Scheduled Property | 3/4/00 | SP-91-41-05 |

**CCMI**
**SCHEDULE 4.21**

**TRANSACTIONS WITH AFFILIATES**

The Fireman family owns the building in which the Company's office is leased.

$181,524.00 Promissory Note between the Company and Ann M. Raider which will have been forgiven by the Company prior to the closing of this transaction.

The Company owns a 1995 Saab financed with Chase Automotive Finance, which is being used by Ann M. Raider.

**CCMI**
**SCHEDULE 4.22**

**ENVIRONMENTAL MATTERS**

None.

**CCMI**
**SCHEDULE 4.23**

**ACCOUNTS RECEIVABLE**

Attached with regard to Section 4.23 is a list of Accounts Receivables as of June 30, 1999, including the aging thereof:

8/5/99    2:46:21 PM
:e: 8/5/99

SUMMARY HISTORICAL AGED TRIAL BALANCE
Receivables Management

| | | |
|---|---|---|
| xmer ID: First - Last | ZIP Code: First - Last | |
| xmer Class: First - Last | State: First - Last | |
| sperson ID: First - Last | Telephone: First - Last | |
| s Territory: First - Last | Posting Date: First - 7/1/99 | |
| -Defined 1: First - Last | Short Name: First - Last | |
| nt Type: All | Aging Date: 7/1/99 | |
| omer Name: First - Last | | |

: Zero Balance, No Activity, Fully Paid Documents, Multicurrency Info
r: by Customer ID
t: by Document Number

| r    Name | Account Type | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |
|---|---|---|---|---|---|

The Great Atlantic & Pacific    Open Item
-Defined 1:                        Salesperson:              Territory:

| : Ms. Susan Hamilton | (201) 930-8139 Ext. 0000 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $6,599.99 | ($0.01) | $0.00 | $0.00 | $6,600.00 |
| Unlimited | | ============== | ============== | ============== | ============== |

REN    A.J. Biren & Company    Open Item
-Defined 1:                        Salesperson:              Territory:

| : | (000) 000-0000 Ext. 0000 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $1,593.84 | $1,593.84 | $0.00 | $0.00 | $0.00 |
| Unlimited | | ============== | ============== | ============== | ============== |

B lue Square - Isreal, Ltd.    Open Item
--Defined 1:                        Salesperson:              Territory:

| :: Mr. Daniel Moshaioff | (011) 972-3928 Ext. 2420 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $3,567.99 | $0.00 | $0.00 | $0.00 | $3,567.99 |
| : Unlimited | | ============== | ============== | ============== | ============== |

BRUNO'S INC.    Open Item
--Defined 1:                        Salesperson:              Territory:

| :: ROBERT COLE | (205) 940-9400 Ext. 0000 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $52,260.00 | $52,260.00 | $0.00 | $0.00 | $0.00 |
| Unlimited | | ============== | ============== | ============== | ============== |

'S    COBORN'S INC.    Open Item
r-Defined 1:                        Salesperson:              Territory:

| t: TOM COBORN | (205) 912-4639 Ext. 0000 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $9,545.43 | $6,623.61 | $0.00 | $4,672.22 | ($1,750.40) |
| : Unlimited | | ============== | ============== | ============== | ============== |

Conair Corporation    Open Item
r-Defined 1:                        Salesperson:              Territory:

| t: Mr. Ronald T. Diamond | (  )  - Ext. | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $22,500.00 | $22,500.00 | $0.00 | $0.00 | $0.00 |
| : Unlimited | | ============== | ============== | ============== | ============== |

FRY'S FOOD STORES OF ARIZONA    Open Item
r-Defined 1:                        Salesperson:              Territory:

| t: Mr. Jim Nygren | (000) 000-0000 Ext. 0000 | | | | |
|---|---|---|---|---|---|
| Due Upon Receipt | Totals: $87,395.88 | $30,837.99 | $23,431.69 | $33,126.20 | $0.00 |
| : Unlimited | | ============== | ============== | ============== | ============== |

Fuji Photo film USA, Inc    Open Item
:r-Defined 1:                        Salesperson:              Territory:

| :r Name | Account Type | | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |
|---|---|---|---|---|---|---|
| :: | ( ) - Ext. | | | | | |
| Due Upon Receipt | Totals: | $22,500.00 | $22,500.00 | $0.00 | $0.00 | $0.00 |
| : | Unlimited | | | | | |
| JITNEY JUNGLE STORE OF AMERICA | Open Item | | | | | |
| r-Defined 1: | Salesperson: | Territory: | | | | |
| t: MR. WILL STEPHENSON | (601) 346-2189 Ext. 0000 | | | | | |
| Due Upon Receipt | Totals: | $26,110.36 | $12,267.64 | $9,962.72 | $0.00 | $3,880.00 |
| : | Unlimited | | | | | |
| THE KROGER COMPANY | Open Item | | | | | |
| r-Defined 1: | Salesperson: | Territory: | | | | |
| t: MR. RICH STERN | ( ) - Ext. | | | | | |
| Due Upon Receipt | Totals: | $4,056.50 | $4,056.50 | $0.00 | $0.00 | $0.00 |
| : | Unlimited | | | | | |
| L'eggs Products | Open Item | | | | | |
| r-Defined 1: | Salesperson: | Territory: | | | | |
| t: | (336) 519-3359 Ext. 0000 | | | | | |
| Due Upon Receipt | Totals: | $25,000.00 | $25,000.00 | $0.00 | $0.00 | $0.00 |
| : | Unlimited | | | | | |
| FINCH NASH FINCH COMPANY | Open Item | | | | | |
| er-Defined 1: | Salesperson: | Territory: | | | | |
| t: MS. PATTY DILL | (000) 000-0000 Ext. 0000 | | | | | |
| : Due Upon Receipt | Totals: | $108,531.70 | $866.83 | $106,312.50 | $0.00 | $1,352.37 |
| :: | Unlimited | | | | | |
| :'S NATURE'S FRESH NORTHWEST | Open Item | | | | | |
| er-Defined 1: | Salesperson: | Territory: | | | | |
| t: MR. SCOTT GRAY | (503) 670-6038 Ext. 1010 | | | | | |
| : Due Upon Receipt | Totals: | $21,633.66 | $110.78 | $555.43 | $95.00 | $20,872.45 |
| t: | Unlimited | | | | | |
| Response Marketing Group | Open Item | | | | | |
| er-Defined 1: | Salesperson: | Territory: | | | | |
| ct: | (804) 968-7300 Ext. 0000 | | | | | |
| : Due Upon Receipt | Totals: | $11,621.75 | $5,837.06 | $5,784.69 | $0.00 | $0.00 |
| t: | Unlimited | | | | | |
| 0 SHAW'S SUPERMARKET, INC. | Open Item | | | | | |
| er-Defined 1: | Salesperson: | Territory: | | | | |
| ct: MR. ALFRED RYAN | (508) 378-3020 Ext. 0000 | | | | | |
| : Due Upon Receipt | Totals: | $1,649.52 | $1,649.52 | $0.00 | $0.00 | $0.00 |
| t: | Unlimited | | | | | |
| 10 STAR MARKET COMPANY | Open Item | | | | | |
| er-Defined 1: | Salesperson: | Territory: | | | | |
| ct: MR. MICHAEL SULLIVAN | (617) 528-2550 Ext. 2824 | | | | | |
| :: Due Upon Receipt | Totals: | $5,317.07 | $4,844.57 | $0.00 | $0.00 | $472.50 |
| | Unlimited | | | | | |
| :VANS SULLIVAN'S FOODS | Open Item | | | | | |
| :er-Defined 1: | Salesperson: | Territory: | | | | |

: 8/5/99    SUMMARY HISTORICAL AGED TRIAL BALANCE
Receivables Management

| er | Name | Account Type | | 0-30 Days | 31 - 60 Days | 61 - 90 Days | 91 and Over |
|---|---|---|---|---|---|---|---|
| t: | MR. SCOTT SULLIVAN | ( ) - Ext. | | | | | |
| | Due Upon Receipt    Unlimited | Totals: | $8,325.00 | $0.00 | $0.00 | $8,325.00 | $0.00 |
| : | | | | | | | |
| L RETAIL | Tatical Retailing Solutions | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| t: | | (860) 677-6975  Ext. 0000 | | | | | |
| | Due Upon Receipt    Unlimited | Totals: | $5,168.09 | $5,168.09 | $0.00 | $0.00 | $0.00 |
| : | | | | | | | |
| TOFFICE | US POSTAL SERVICE | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| :t: | | ( ) - Ext. | | | | | |
| | Due Upon Receipt    Unlimited | Totals: | $1,082.50 | $232.50 | $0.00 | $0.00 | $850.00 |
| :: | | | | | | | |
| IS | Wegmans | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| :t: | | (716) 328-2550  Ext. 0000 | | | | | |
| : | Due Upon Receipt    Unlimited | Totals: | $97,453.60 | $19,252.94 | $13,340.83 | $54,486.74 | $10,373.09 |
| t: | | | | | | | |
| O | WILD OATS MARKETS, INC. | Open Item | | | | | |
| r-Defined 1: | | Salesperson: | Territory: | | | | |
| ct: | MR. JAY ROBINSON | (303) 440-5220  Ext. 0000 | | | | | |
| : | Due Upon Receipt    Unlimited | Totals: | $16,973.03 | $3,973.03 | $0.00 | $13,000.00 | $0.00 |
| t: | | | | | | | |
| 21 Customer(s) | | Grand Totals: | $538,885.91 | $219,574.89 | $159,387.86 | $113,705.16 | $46,218.00 |

**CCMI**
**SCHEDULE 4.25**

<u>**SUPPLIERS AND CUSTOMERS**</u>

With regard to Section 4.25, the following lists the ten largest customers and the ten largest suppliers of the Company by dollar volume of revenues for the year ended December 31, 1998:

| <u>Customers</u> | <u>Suppliers</u> |
|---|---|
| Fry's | SSI |
| Brunos/filed for bankruptcy | Polk |
| Jitney Jungle | Personix |
| Wild Oats/Halted Loyalty Program | DST |
| Nature's Fresh/Acquired by Wild Oats | TimeOut Devices |
| Nash Finch | Arthur Blank and Company |
| Lucky's Stores | Versatile Card Technology |
| Delchamps/Acquired by Jitney Jungle | Ockham's Razor |
| Carlton Cards | Direct Resources |
| Star Markets | American Spirit Graphics |

NEWS AMERICA MARKETING IN-STORE, INC.
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

August 13, 1999

Robert Fireman
241 Perkins St., # D-104
Jamaica Plains, Massachusetts 02130

Dear Bob:

This letter, when executed by both you and News America Marketing In-Store, Inc. (hereinafter referred to as the "Company"), will confirm this agreement (this "Agreement") between you and the Company relating to your employment by the Company.

1. (a) The Company hereby employs you for the period commencing on the date hereof and ending September 30, 2004; *provided, however,* that the Company shall have the right to terminate this Agreement upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination), in the event that amounts determined to be owing to the Company under and in accordance with, and in compliance with the provisions of, Sections 2.2(a), 7.1 or 6.7 of the Stock Purchase Agreement between, among others, the Company and you, dated the date hereof (the "Stock Purchase Agreement"), remain unpaid following the date on which such amounts were required to be paid by the Principal Sellers (as defined in the Stock Purchase Agreement), whether by offset against amounts due to the Principal Sellers under Section 2.3 of the Stock Purchase Agreement or otherwise and such amounts remain unpaid at the end of such 30 day period; *provided, however,* that in the event any such unpaid amounts remain subject to a good faith dispute among the parties to the Stock Purchase Agreement no such notice may be delivered to you.

(b) If you continue in the employ of the Company after the end of the above term, your employment shall be on an at-will basis at the weekly salary rate paid during your last regular pay period hereunder.

2. You shall perform such duties consistent with your position set forth in Paragraph 3(a) hereof, as are assigned to you from time to time (and agree to take such trips both within and

304007 v.4 [6$KN04!.WPD]

Robert Fireman
August 13, 1999
Page 2

outside the United States as may be reasonably requested by the Company in connection with the performance of your duties hereunder).

3. (a) You shall serve as the General Manager and you shall be assigned to work in the Company's offices in the Boston vicinity. You shall report directly to the Executive Vice President and Chief Financial Officer of the Company or such other senior executive officer as shall be determined by the Company's Board of Directors.

   (b) If you are elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, you accept such capacity or capacities without additional compensation.

4. You hereby accept such employment and agree to devote the time and attention necessary to fulfill the duties of your employment hereunder.

5. (a) For your services hereunder, the Company will, during the term of your employment as described in Paragraph 1(a) hereof, pay you a base salary at the rate of $163,000 per annum (the "Base Salary") in accordance with the Company's standard payroll practices and subject to all legally required or customary withholdings. The Base Salary shall be reviewed annually in accordance with the standard practice of the Company. Notwithstanding the foregoing, your Base Salary for any given year shall not be less than your Base Salary for the previous year.

   (b) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will be eligible to receive an annual cash bonus ("Bonus"), payable at the end of each calendar year, in an amount equal to a maximum of 20% of your then current Base Salary. The amount of your Bonus, if any, will be determined in the sole discretion of the Company's Board of Directors, or a committee thereof, and shall be based on, among other factors, your performance and the Company's performance.

   (c) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will receive a monthly car allowance of $900 per month, following the termination of any car lease arrangement for which the Company is responsible as of the date hereof.

6. (a) You hereby agree that, during the time of your employment, and for the Applicable Period (as defined in Paragraph 6(b) below) following the termination thereof (the "Non-

304007 v.4 [6SKN04!.WPD]

Robert Fireman
August 13, 1999
Page 3

Compete Term"), neither you nor your affiliates shall Participate In (as such term is defined in the Stock Purchase Agreement) any business which is competitive with (i) the business of Consumer Card Marketing Inc. ("CCMI") as conducted on the date hereof or (ii) any of the following businesses in which the Company is currently or intends to be engaged: (A) selling in-store media, (B) selling sampling and merchandising services, (C) selling free-standing inserts, and (D) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (iii) any other business conducted by the Company in which you participate in as an employee of the Company or otherwise have access to confidential information of the Company relating to such business through your employment by the Company (the "Company's Business"). Without limiting the scope of the foregoing, during the Non-Compete Term, neither you nor your affiliates shall, directly or indirectly, (1) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for employment, any person who currently is an employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, (2) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, or (3) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of the Company, with respect to (x) the business of CCMI as conducted on the date hereof, or (y) the Company's Business, including those customers or suppliers acquired in connection with the transactions contemplated by the Stock Purchase Agreement.

(b) The Applicable Period shall be the entire period during or in respect of which the Company is paying you in accordance with Section 5(a) hereof, whether or not you are employed by the Company at such time. In addition, in the event that you voluntarily terminate your employment with the Company prior to the second anniversary of the date hereof, the Applicable Period shall be two (2) years following the effective date of your resignation and, in the event that you voluntarily terminate your employment with the Company following the second anniversary of the date hereof, the Applicable Period shall be six (6) months following the effective date of such resignation.

(c) You acknowledge and agree that, in the event that you breach or threaten to breach any of the terms of Paragraph 6(a) hereof, the Company shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a threatened breach and to have the provisions of such Paragraph specifically enforced by a court having jurisdiction, it being acknowledged and agreed by you that any such

Robert Fireman
August 13, 1999
Page 4

breach or threatened breach will cause immediate irreparable damage to the Company and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. You agree that the provisions of this Paragraph are necessary and reasonable to protect the Company and the covenants set forth in Paragraph 6(a) hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(d) Enclosed is a copy of the Company's Standards of Business Conduct. You agree to abide by the provisions of this statement at all times during your employment by the Company.

7. (a) You acknowledge that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligations to you are exclusively contractual in nature. The Company shall be the sole owner of the fruits and proceeds of your services hereunder, including, but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which you may create in connection with and during the term of your employment hereunder, free and clear of any claims by you (or anyone claiming under you) of any kind or character whatsoever (other than your right to compensation hereunder). You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b) All memoranda, notes, records and other documents made or compiled by you, or made available to you during the term of this Agreement concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time on request. You shall keep in confidence and shall not use for yourself or others, or divulge to others, any information concerning the business not publicly available and which is obtained by you as a result of your employment, including but not limited to, trade secrets or processes

Robert Fireman
August 13, 1999
Page 5

and information deemed by the Company to be proprietary in nature, unless disclosure is permitted by the Company or required by law.

(c) The Company shall have the right to use your name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

(d) The covenants set forth above in this paragraph shall survive the termination of this Agreement.

8. You shall be eligible to participate in all employee benefit plans of the Company available to other comparable executives of the Company, including four weeks of vacation per year, and your eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

9. The services to be furnished by you hereunder and the rights and privileges granted to the Company by you are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by you of any of the provisions contained herein will cause the Company irreparable injury and damage. You expressly agree that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by you. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

10. You agree that, if you continue in the employ of the Company after the end of this Agreement, your employment shall be at will and shall otherwise be in accordance with the provision of such then existing Company policies as may then be in effect applicable to comparable executives of the Company.

11. This Agreement shall be governed by the laws of the State of New York applicable to contracts performed entirely therein.

304007 v.4 [6$KN04!.WPD]

Robert Fireman
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By: _____
    Name: David DeVoe, Jr.
    Title:  Executive Vice President and Chief
            Financial Officer

    _____August 13, 1999_____
    Date

THE FOREGOING IS AGREED TO:

_____

Robert Fireman

_____

Date

Robert Fireman
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.


By:_____
        Name: David DeVoe, Jr.
        Title:  Executive Vice President and Chief
                Financial Officer


        ____August 13, 1999____  _____
        Date


THE FOREGOING IS AGREED TO:

_____
Robert Fireman

____August 13, 1999_____
Date

304007 v.4 {6$KN04!.WPD]

NEWS AMERICA MARKETING IN-STORE, INC.
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

August 13, 1999

Ann Raider
46 Ivy Road
Wellesley, MA 02181

Dear Ann:

This letter, when executed by both you and News America Marketing In-Store, Inc. (hereinafter referred to as the "Company"), will confirm this agreement (this "Agreement") between you and the Company relating to your employment by the Company.

1. (a)   The Company hereby employs you for the period commencing on the date hereof and ending September 30, 2004; *provided, however,* that the Company shall have the right to terminate this Agreement upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination), in the event that amounts determined to be owing to the Company under and in accordance with, and in compliance with the provisions of, Sections 2.2(a), 7.1 or 6.7 of the Stock Purchase Agreement between, among others, the Company and you, dated the date hereof (the "Stock Purchase Agreement"), remain unpaid following the date on which such amounts were required to be paid by the Principal Sellers (as defined in the Stock Purchase Agreement), whether by offset against amounts due to the Principal Sellers under Section 2.3 of the Stock Purchase Agreement or otherwise and such amounts remain unpaid at the end of such 30 day period; *provided, however,* that in the event any such unpaid amounts remain subject to a good faith dispute among the parties to the Stock Purchase Agreement no such notice may be delivered to you.

   (b)   If you continue in the employ of the Company after the end of the above term, your employment shall be on an at-will basis at the weekly salary rate paid during your last regular pay period hereunder.

2.   You shall perform such duties consistent with your position set forth in Paragraph 3(a) hereof, as are assigned to you from time to time (and agree to take such trips both within

Ann Raider
August 13, 1999
Page 2

and outside the United States as may be reasonably requested by the Company in connection with the performance of your duties hereunder).

3. (a) You shall serve as a Senior Vice President of Sales and Marketing and you shall be assigned to work in the Company's offices in the Boston vicinity. You shall report directly to the Executive Vice President and Chief Financial Officer of the Company or such other senior executive officer as shall be determined by the Company's Board of Directors.

(b) If you are elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, you accept such capacity or capacities without additional compensation.

4. You hereby accept such employment and agree to devote the time and attention necessary to fulfill the duties of your employment hereunder.

5. (a) For your services hereunder, the Company will, during the term of your employment as described in Paragraph 1(a) hereof, pay you a base salary at the rate of $163,000 per annum (the "Base Salary") in accordance with the Company's standard payroll practices and subject to all legally required or customary withholdings. The Base Salary shall be reviewed annually in accordance with the standard practice of the Company. Notwithstanding the foregoing, your Base Salary for any given year shall not be less than your Base Salary for the previous year.

(b) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will be eligible to receive an annual cash bonus ("Bonus"), payable at the end of each calendar year, in an amount equal to a maximum of 20% of your then current Base Salary. The amount of your Bonus, if any, will be determined in the sole discretion of the Company's Board of Directors, or a committee thereof, and shall be based on, among other factors, your performance and the Company's performance.

(c) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will receive a monthly car allowance of $900 per month, following the termination of any car lease arrangement for which the Company is responsible as of the date hereof.

306905 v.1 [6KT501!.WPD]

Ann Raider
August 13, 1999
Page 3

6. (a) You hereby agree that, during the time of your employment, and for the Applicable Period (as defined in Paragraph 6(b) below) following the termination thereof (the "Non-Compete Term"), neither you nor your affiliates shall Participate In (as such term is defined in the Stock Purchase Agreement) any business which is competitive with (i) the business of Consumer Card Marketing Inc. ("CCMI") as conducted on the date hereof or (ii) any of the following businesses in which the Company is currently or intends to be engaged: (A) selling in-store media, (B) selling sampling and merchandising services, (C) selling free-standing inserts, and (D) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (iii) any other business conducted by the Company in which you participate in as an employee of the Company or otherwise have access to confidential information of the Company relating to such business through your employment by the Company (the "Company's Business"). Without limiting the scope of the foregoing, during the Non-Compete Term, neither you nor your affiliates shall, directly or indirectly, (1) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for employment, any person who currently is an employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, (2) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, or (3) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of the Company, with respect to (x) the business of CCMI as conducted on the date hereof, or (y) the Company's Business, including those customers or suppliers acquired in connection with the transactions contemplated by the Stock Purchase Agreement.

(b) The Applicable Period shall be the entire period during or in respect of which the Company is paying you in accordance with Section 5(a) hereof, whether or not you are employed by the Company at such time. In addition, in the event that you voluntarily terminate your employment with the Company prior to the second anniversary of the date hereof, the Applicable Period shall be two (2) years following the effective date of your resignation and, in the event that you voluntarily terminate your employment with the Company following the second anniversary of the date hereof, the Applicable Period shall be six (6) months following the effective date of such resignation.

(c) You acknowledge and agree that, in the event that you breach or threaten to breach any of the terms of Paragraph 6(a) hereof, the Company shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a

306905 v.1 [6KT501!.WPD]

Ann Raider
August 13, 1999
Page 4

threatened breach and to have the provisions of such Paragraph specifically enforced by a court having jurisdiction, it being acknowledged and agreed by you that any such breach or threatened breach will cause immediate irreparable damage to the Company and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. You agree that the provisions of this Paragraph are necessary and reasonable to protect the Company and the covenants set forth in Paragraph 6(a) hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(d)   Enclosed is a copy of the Company's Standards of Business Conduct. You agree to abide by the provisions of this statement at all times during your employment by the Company.

7.   (a)   You acknowledge that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligations to you are exclusively contractual in nature. The Company shall be the sole owner of the fruits and proceeds of your services hereunder, including, but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which you may create in connection with and during the term of your employment hereunder, free and clear of any claims by you (or anyone claiming under you) of any kind or character whatsoever (other than your right to compensation hereunder). You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b)   All memoranda, notes, records and other documents made or compiled by you, or made available to you during the term of this Agreement concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time on request. You

Ann Raider
August 13, 1999
Page 5

shall keep in confidence and shall not use for yourself or others, or divulge to others, any information concerning the business not publicly available and which is obtained by you as a result of your employment, including but not limited to, trade secrets or processes and information deemed by the Company to be proprietary in nature, unless disclosure is permitted by the Company or required by law.

(c) The Company shall have the right to use your name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

(d) The covenants set forth above in this paragraph shall survive the termination of this Agreement.

8. You shall be eligible to participate in all employee benefit plans of the Company available to other comparable executives of the Company, including four weeks of vacation per year, and your eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

9. The services to be furnished by you hereunder and the rights and privileges granted to the Company by you are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by you of any of the provisions contained herein will cause the Company irreparable injury and damage. You expressly agree that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by you. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

10. You agree that, if you continue in the employ of the Company after the end of this Agreement, your employment shall be at will and shall otherwise be in accordance with the provision of such then existing Company policies as may then be in effect applicable to comparable executives of the Company.

11. This Agreement shall be governed by the laws of the State of New York applicable to contracts performed entirely therein.

306905 v.1 [6KTS01!.WPD]

Ann Raider
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By:_____
    Name: David DeVoe, Jr.
    Title:   Executive Vice President and Chief
           Financial Officer

_____August 13, 1999_____
Date

THE FOREGOING IS AGREED TO:

_____

Ann Raider

_____

Date

Ann Raider
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By:_____

      Name: David DeVoe, Jr.
      Title:  Executive Vice President and Chief
            Financial Officer

        August 13, 1999
Date

THE FOREGOING IS AGREED TO:

_____
Ann Raider

    August 13, 1999
Date



## IRREVOCABLE ASSIGNMENT OF SHARES OF COMMON STOCK

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to News America Marketing In-Store, Inc., a Delaware Corporation (the "Buyer"), pursuant to and in accordance with the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and the Buyer, on the other hand, dated as of August 13, 1999, 2,100,000 shares of common stock in Consumer Card Marketing, Inc. (the "Company"), par value $.01 per share, standing in the undersigned's name on the books of said Company represented by Certificate No. 1 herewith, and does hereby irrevocably constitute and appoint _____ as its Attorney-in-Fact to transfer said shares on the books of the Company with full power of substitution in the premises.

IN WITNESS WHEREOF, the undersigned has caused this power to be executed as of this 13th day of August, 1999.

Robert N. Fireman
c/o Consumer Card Marketing, Inc.
165 Wood Road
Braintree, MA 02184

IN PRESENCE OF:

Witness Signature

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

DOCSC\778492.2

## RECEIPT

Pursuant to the terms of the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and News America Marketing In-Store, Inc. ("News America"), on the other hand, the undersigned, David DeVoe, Jr., a duly elected representative of News America hereby acknowledges receipt from Robert N. Fireman of certificates No. 1 representing 2,100,0000[1] shares of the Consumer Card Marketing, Inc. common stock.

NEWS AMERICA MARKETING IN-STORE, INC.

BY: _____

Name:  David DeVoe, Jr.
Title:   Executive Vice President
Date:   As of August 13, 1999

DOCSC\780765.1

---

[1] By virtue of Consumer Card Marketing, Inc.'s Amended and Restated Certificate of Incorporation which, among other things, converted each share of issued and outstanding common stock, par value $1.00 per share, into 3,500 shares of common stock, par value $.01 per share, stock certificate No.1, which on its face represents 600 shares of common stock, par value $1.00 per share, actually represents 2,100,000 shares of common stock, par value $.01 per share.



## IRREVOCABLE ASSIGNMENT OF SHARES OF COMMON STOCK

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to News America Marketing In-Store, Inc., a Delaware Corporation (the "Buyer"), pursuant to and in accordance with the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and the Buyer, on the other hand, dated as of August __, 1999, 1,400,000 shares of common stock in Consumer Card Marketing, Inc. (the "Company"), par value $.01 per share, standing in the undersigned's name on the books of said Company represented by Certificate No. 2 herewith, and does hereby irrevocably constitute and appoint _____ as its Attorney-in-Fact to transfer said shares on the books of the Company with full power of substitution in the premises.

IN WITNESS WHEREOF, the undersigned has caused this power to be executed as of this 13th day of August, 1999.

_____

Ann M. Raider
c/o Consumer Card Marketing, Inc.
165 Wood Road
Braintree, MA 02184

IN PRESENCE OF:

_____
Witness Signature

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

DOCSC\778503.2

## RECEIPT

Pursuant to the terms of the Stock Purchase Agreement, by and among Robert N.

Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and News

America Marketing In-Store, Inc. ("News America"), on the other hand, the undersigned,

David DeVoe, Jr., a duly elected representative of News America hereby acknowledges receipt

from Ann M. Raider of certificate No. 2 representing 1,400,000[1] shares of Consumer Card

Marketing Inc. common stock.


NEWS AMERICA MARKETING IN-STORE, INC.

BY: _____

Name:  David DeVoe, Jr.
Title:   Executive Vice President
Date:   As of August 13, 1999


DOCSC\780778.1

_____

[1] By virtue of Consumer Card Marketing, Inc.'s Amended and Restated Certificate of
Incorporation which, among other things, converted each share of issued and outstanding
common stock, par value $1.00 per share, into 3,500 shares of common stock, par value $.01
per share, stock certificate No.2, which on its face represents 400 shares of common stock, par
value $1.00 per share, actually represents 1,400,000 shares of common stock, par value $.01
per share.





## IRREVOCABLE ASSIGNMENT OF SHARES OF PREFERRED STOCK

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to News America Marketing In-Store, Inc., a Delaware Corporation (the "Buyer"), pursuant to and in accordance with the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and the Buyer, on the other hand, dated as of August 13, 1999, 248,000 shares of preferred stock in Consumer Card Marketing, Inc. (the "Company"), par value $.01 per share, standing in the undersigned's name on the books of said Company represented by Preferred Certificates No. 1 and No. 3 herewith, and does hereby irrevocably constitute and appoint _____ as its Attorney-in-Fact to transfer said shares on the books of the Company with full power of substitution in the premises.

IN WITNESS WHEREOF, the undersigned has caused this power to be executed as of this 13th day of August, 1999.

_____
Curtis R. Smith
9 Wingate Road
Wellesley, MA 02181


IN PRESENCE OF:

_____
Witness Signature

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

DOCSC\779729.2

### RECEIPT

Pursuant to the terms of the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and News America Marketing In-Store, Inc. ("News America"), on the other hand, the undersigned, David DeVoe, Jr., a duly elected representative of News America hereby acknowledges receipt from Curtis R. Smith of certificates No. 1 and 3 representing 248,000 shares of Consumer Card Marketing Inc. preferred stock.

NEWS AMERICA MARKETING IN-STORE, INC.

BY: _____

    Name:    David DeVoe, Jr.
    Title:   Executive Vice President
    Date:    As of August 13, 1999

DOCSC\780796.1



TRANSFER RESTRICTED – SEE REVERSE SIDE HEREOF



## IRREVOCABLE ASSIGNMENT OF SHARES OF PREFERRED STOCK

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to News America Marketing In-Store, Inc., a Delaware Corporation (the "Buyer"), pursuant to and in accordance with the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and the Buyer, on the other hand, dated as of August 13, 1999, 62,000 shares of preferred stock in Consumer Card Marketing, Inc. (the "Company"), par value $.01 per share, standing in the undersigned's name on the books of said Company represented by Preferred Certificates No. 2 and No. 4 herewith, and does hereby irrevocably constitute and appoint _____ as its Attorney-in-Fact to transfer said shares on the books of the Company with full power of substitution in the premises.

IN WITNESS WHEREOF, the undersigned has caused this power to be executed as of this 13th day of August, 1999.

_John H Boyle_ (signature)

John H. Boyles
39 Westcott Road
Harvard, MA 01451

IN PRESENCE OF:

_Nancy A Anderson_ (signature)
Witness Signature

Notice: The signature to this assignment must correspond with the name as written upon the face of the certificate, in every particular, without alteration or enlargement, or any change whatever.

DOCSC\779737.2

## RECEIPT

Pursuant to the terms of the Stock Purchase Agreement, by and among Robert N. Fireman, Ann M. Raider, Curtis R. Smith and John H. Boyles, on the one hand, and News America Marketing In-Store, Inc. ("News America"), on the other hand, the undersigned, David DeVoe, Jr., a duly elected representative of News America hereby acknowledges receipt from John H. Boyles of certificates No. 2 and 4 representing 62,000 shares of Consumer Card Marketing, Inc. preferred stock.

NEWS AMERICA MARKETING IN-STORE, INC.

BY: _____

Name:    David DeVoe, Jr.
Title:    Executive Vice President
Date:    As of August 13, 1999

DOCSC\780784.1



CONSUMER CARD MARKETING, INC.

Incorporated under the laws of the State of

No. -5-

-228,429- Shares

$.01 par Value

SHARES PAID

Curtis R. Hall

is the owner of

Two Hundred Twenty Eight Thousand Four Hundred and Twenty Nine xxxxxxxxxxx

Shares of the Capital Stock of

CONSUMER CARD MARKETING, INC.

Common Stock $.01 par value

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this ___ day of February, A.D. 1998

Treasurer

CANCELLED
CANCELLED

August 13, 1999

Consumer Card Marketing, Inc.
165 Wood Road
Braintree, MA 02184
Attention: Bob Fireman, President

Dear Bob,

Enclosed please find my share certificate number 5 for 228,429 shares of common stock, par value $.01 per share (collectively, the "Shares") in Consumer Card Marketing, Inc. (the "Company"). I hereby contribute the Shares as a capital contribution to the Company for no consideration.

Thank you for your attention to this matter.

Sincerely,

Curtis R. Smith

enclosure

DOCSC\778190.2



CONSUMER CARD MARKETING, INC.

State of Delaware

NO. 6

CANCELLED

CANCELLED

CONSUMER CARD MARKETING, INC.

83,571 Shares

TRANSFER RESTRICTED — SEE REVERSE SIDE HEREOF

John H. Boyle

is the owner of

Eighty Three Thousand Five Hundred and Seventy One —— Shares of the Capital Stock of

CONSUMER CARD MARKETING, INC.

Common Stock, $.01 par value

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

In WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

this _____ 11th _____ day of February A.D. 1998

_____ SECRETARY

_____ TREASURER

Shares

$.10 Par Value

Each

August 13, 1999

Consumer Card Marketing, Inc.
165 Wood Road
Braintree, MA 02184
Attention: Bob Fireman, President

Dear Bob,

Enclosed please find my share certificate number 6 for 83,571 shares of common stock, par value $.01 per share (collectively, the "Shares") in Consumer Card Marketing, Inc. (the "Company"). I hereby contribute the Shares as a capital contribution to the Company for no consideration.

Thank you for your attention to this matter.

Sincerely,

John H. Boyles

enclosure

DOCSC\778293.2

**EXHIBIT 3 TO AFFIDAVIT**

NEWS AMERICA MARKETING IN-STORE, INC.
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

August 13, 1999

Robert Fireman
241 Perkins St., # D-104
Jamaica Plains, Massachusetts 02130

Dear Bob:

This letter, when executed by both you and News America Marketing In-Store, Inc. (hereinafter referred to as the "Company"), will confirm this agreement (this "Agreement") between you and the Company relating to your employment by the Company.

1. (a) The Company hereby employs you for the period commencing on the date hereof and ending September 30, 2004; *provided, however,* that the Company shall have the right to terminate this Agreement upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination), in the event that amounts determined to be owing to the Company under and in accordance with, and in compliance with the provisions of, Sections 2.2(a), 7.1 or 6.7 of the Stock Purchase Agreement between, among others, the Company and you, dated the date hereof (the "Stock Purchase Agreement"), remain unpaid following the date on which such amounts were required to be paid by the Principal Sellers (as defined in the Stock Purchase Agreement), whether by offset against amounts due to the Principal Sellers under Section 2.3 of the Stock Purchase Agreement or otherwise and such amounts remain unpaid at the end of such 30 day period; *provided, however,* that in the event any such unpaid amounts remain subject to a good faith dispute among the parties to the Stock Purchase Agreement no such notice may be delivered to you.

   (b) If you continue in the employ of the Company after the end of the above term, your employment shall be on an at-will basis at the weekly salary rate paid during your last regular pay period hereunder.

2. You shall perform such duties consistent with your position set forth in Paragraph 3(a) hereof, as are assigned to you from time to time (and agree to take such trips both within and



DEPOSITION
EXHIBIT
FIREMAN (76
MRW 5/24/07

Robert Fireman
August 13, 1999
Page 2

outside the United States as may be reasonably requested by the Company in connection with the performance of your duties hereunder).

3. (a) You shall serve as the General Manager and you shall be assigned to work in the Company's offices in the Boston vicinity. You shall report directly to the Executive Vice President and Chief Financial Officer of the Company or such other senior executive officer as shall be determined by the Company's Board of Directors.

   (b) If you are elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, you accept such capacity or capacities without additional compensation.

4. You hereby accept such employment and agree to devote the time and attention necessary to fulfill the duties of your employment hereunder.

5. (a) For your services hereunder, the Company will, during the term of your employment as described in Paragraph 1(a) hereof, pay you a base salary at the rate of $163,000 per annum (the "Base Salary") in accordance with the Company's standard payroll practices and subject to all legally required or customary withholdings. The Base Salary shall be reviewed annually in accordance with the standard practice of the Company. Notwithstanding the foregoing, your Base Salary for any given year shall not be less than your Base Salary for the previous year.

   (b) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will be eligible to receive an annual cash bonus ("Bonus"), payable at the end of each calendar year, in an amount equal to a maximum of 20% of your then current Base Salary. The amount of your Bonus, if any, will be determined in the sole discretion of the Company's Board of Directors, or a committee thereof, and shall be based on, among other factors, your performance and the Company's performance.

   (c) For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will receive a monthly car allowance of $900 per month, following the termination of any car lease arrangement for which the Company is responsible as of the date hereof.

6. (a) You hereby agree that, during the time of your employment, and for the Applicable Period (as defined in Paragraph 6(b) below) following the termination thereof (the "Non-

Robert Fireman
August 13, 1999
Page 3

Compete Term"), neither you nor your affiliates shall Participate In (as such term is defined in the Stock Purchase Agreement) any business which is competitive with (i) the business of Consumer Card Marketing Inc. ("CCMI") as conducted on the date hereof or (ii) any of the following businesses in which the Company is currently or intends to be engaged: (A) selling in-store media, (B) selling sampling and merchandising services, (C) selling free-standing inserts, and (D) selling internet coupons and promotions to consumer packaged goods companies or retailers, or (iii) any other business conducted by the Company in which you participate in as an employee of the Company or otherwise have access to confidential information of the Company relating to such business through your employment by the Company (the "Company's Business"). Without limiting the scope of the foregoing, during the Non-Compete Term, neither you nor your affiliates shall, directly or indirectly, (1) solicit for employment, or assist any other person, firm, corporation or other entity in soliciting for employment, any person who currently is an employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, (2) employ or assist any other person, firm, corporation, or other entity in employing any person who currently is a non-administrative employee of the Company, including, without limitation, those employees who are hired in connection with the transactions contemplated by the Stock Purchase Agreement, or (3) solicit the business of, or assist any other person, firm, corporation or other entity in soliciting the business of, any customer or supplier of the Company, with respect to (x) the business of CCMI as conducted on the date hereof, or (y) the Company's Business, including those customers or suppliers acquired in connection with the transactions contemplated by the Stock Purchase Agreement.

(b)   The Applicable Period shall be the entire period during or in respect of which the Company is paying you in accordance with Section 5(a) hereof, whether or not you are employed by the Company at such time. In addition, in the event that you voluntarily terminate your employment with the Company prior to the second anniversary of the date hereof, the Applicable Period shall be two (2) years following the effective date of your resignation and, in the event that you voluntarily terminate your employment with the Company following the second anniversary of the date hereof, the Applicable Period shall be six (6) months following the effective date of such resignation.

(c)   You acknowledge and agree that, in the event that you breach or threaten to breach any of the terms of Paragraph 6(a) hereof, the Company shall be entitled, in addition to any other right and remedy available to it, to an injunction restraining such breach or a threatened breach and to have the provisions of such Paragraph specifically enforced by a court having jurisdiction, it being acknowledged and agreed by you that any such

304007 v.4 [6$KN041.WPD]

Robert Fireman
August 13, 1999
Page 4

breach or threatened breach will cause immediate irreparable damage to the Company and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. You agree that the provisions of this Paragraph are necessary and reasonable to protect the Company and the covenants set forth in Paragraph 6(a) hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(d) Enclosed is a copy of the Company's Standards of Business Conduct. You agree to abide by the provisions of this statement at all times during your employment by the Company.

7. (a) You acknowledge that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligations to you are exclusively contractual in nature. The Company shall be the sole owner of the fruits and proceeds of your services hereunder, including, but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which you may create in connection with and during the term of your employment hereunder, free and clear of any claims by you (or anyone claiming under you) of any kind or character whatsoever (other than your right to compensation hereunder). You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b) All memoranda, notes, records and other documents made or compiled by you, or made available to you during the term of this Agreement concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time on request. You shall keep in confidence and shall not use for yourself or others, or divulge to others, any information concerning the business not publicly available and which is obtained by you as a result of your employment, including but not limited to, trade secrets or processes

304007.v.4 [6SKN04!.WPD]

Robert Fireman
August 13, 1999
Page 5

and information deemed by the Company to be proprietary in nature, unless disclosure is permitted by the Company or required by law.

(c) The Company shall have the right to use your name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

(d) The covenants set forth above in this paragraph shall survive the termination of this Agreement.

8. You shall be eligible to participate in all employee benefit plans of the Company available to other comparable executives of the Company, including four weeks of vacation per year, and your eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

9. The services to be furnished by you hereunder and the rights and privileges granted to the Company by you are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by you of any of the provisions contained herein will cause the Company irreparable injury and damage. You expressly agree that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by you. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

10. You agree that, if you continue in the employ of the Company after the end of this Agreement, your employment shall be at will and shall otherwise be in accordance with the provision of such then existing Company policies as may then be in effect applicable to comparable executives of the Company.

11. This Agreement shall be governed by the laws of the State of New York applicable to contracts performed entirely therein.

304007 v.4 [6SKN04!.WPD]

Robert Fireman
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By: _____

Name: David DeVoe, Jr.
Title: Executive Vice President and Chief Financial Officer

August 13, 1999
Date

THE FOREGOING IS AGREED TO:

_____
Robert Fireman

_____
Date

304007 v.4 [6SKN04!.WPD]

Robert Fireman
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By:_____
      Name: David DeVoe, Jr.
      Title:   Executive Vice President and Chief
               Financial Officer

      _____August 13, 1999_____
      Date

THE FOREGOING IS AGREED TO:

_____
Robert Fireman

_____August 13, 1999_____
Date

304007 v.4 [6SKN04!.WPD]

**<u>EXHIBIT 4 TO AFFIDAVIT</u>**

NEWS AMERICA MARKETING IN-STORE, INC.
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

August 13, 1999

Ann Raider
46 Ivy Road
Wellesley, MA 02181

Dear Ann:

   This letter, when executed by both you and News America Marketing In-Store, Inc. (hereinafter referred to as the "Company"), will confirm this agreement (this "Agreement") between you and the Company relating to your employment by the Company.

1.   (a)   The Company hereby employs you for the period commencing on the date hereof and ending September 30, 2004; *provided, however,* that the Company shall have the right to terminate this Agreement upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination), in the event that amounts determined to be owing to the Company under and in accordance with, and in compliance with the provisions of, Sections 2.2(a), 7.1 or 6.7 of the Stock Purchase Agreement between, among others, the Company and you, dated the date hereof (the "Stock Purchase Agreement"), remain unpaid following the date on which such amounts were required to be paid by the Principal Sellers (as defined in the Stock Purchase Agreement), whether by offset against amounts due to the Principal Sellers under Section 2.3 of the Stock Purchase Agreement or otherwise and such amounts remain unpaid at the end of such 30 day period; *provided, however,* that in the event any such unpaid amounts remain subject to a good faith dispute among the parties to the Stock Purchase Agreement no such notice may be delivered to you.

   (b)   If you continue in the employ of the Company after the end of the above term, your employment shall be on an at-will basis at the weekly salary rate paid during your last regular pay period hereunder.

2.   You shall perform such duties consistent with your position set forth in Paragraph 3(a) hereof, as are assigned to you from time to time (and agree to take such trips both within

306905 v.1 [6KT501!.WPD]



DEPOSITION
EXHIBIT
RAIDER (41)
MRW 5/17/07

Ann Raider
August 13, 1999
Page 2

and outside the United States as may be reasonably requested by the Company in connection with the performance of your duties hereunder).

3.  (a)  You shall serve as a Senior Vice President of Sales and Marketing and you shall be assigned to work in the Company's offices in the Boston vicinity. You shall report directly to the Executive Vice President and Chief Financial Officer of the Company or such other senior executive officer as shall be determined by the Company's Board of Directors.

    (b)  If you are elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, you accept such capacity or capacities without additional compensation.

4.  You hereby accept such employment and agree to devote the time and attention necessary to fulfill the duties of your employment hereunder.

5.  (a)  For your services hereunder, the Company will, during the term of your employment as described in Paragraph 1(a) hereof, pay you a base salary at the rate of $163,000 per annum (the "Base Salary") in accordance with the Company's standard payroll practices and subject to all legally required or customary withholdings. The Base Salary shall be reviewed annually in accordance with the standard practice of the Company. Notwithstanding the foregoing, your Base Salary for any given year shall not be less than your Base Salary for the previous year.

    (b)  For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will be eligible to receive an annual cash bonus ("Bonus"), payable at the end of each calendar year, in an amount equal to a maximum of 20% of your then current Base Salary. The amount of your Bonus, if any, will be determined in the sole discretion of the Company's Board of Directors, or a committee thereof, and shall be based on, among other factors, your performance and the Company's performance.

    (c)  For your services hereunder, during the term of your employment as described in Paragraph 1(a) hereof, you will receive a monthly car allowance of $900 per month, following the termination of any car lease arrangement for which the Company is responsible as of the date hereof.

306905 v.1 [6KT5011.WPD]

Ann Raider
August 13, 1999
Page 3

6. (a)  You hereby agree that, during the time of your employment, and for the Applicable
        Period (as defined in Paragraph 6(b) below) following the termination thereof (the
        "Non-Compete Term"), neither you nor your affiliates shall Participate In (as such term
        is defined in the Stock Purchase Agreement) any business which is competitive with
        (i) the business of Consumer Card Marketing Inc. ("CCMI") as conducted on the date
        hereof or (ii) any of the following businesses in which the Company is currently or
        intends to be engaged: (A) selling in-store media, (B) selling sampling and
        merchandising services, (C) selling free-standing inserts, and (D) selling internet
        coupons and promotions to consumer packaged goods companies or retailers, or (iii)
        any other business conducted by the Company in which you participate in as an
        employee of the Company or otherwise have access to confidential information of the
        Company relating to such business through your employment by the Company (the
        "Company's Business"). Without limiting the scope of the foregoing, during the Non-
        Compete Term, neither you nor your affiliates shall, directly or indirectly, (1) solicit
        for employment, or assist any other person, firm, corporation or other entity in
        soliciting for employment, any person who currently is an employee of the Company,
        including, without limitation, those employees who are hired in connection with the
        transactions contemplated by the Stock Purchase Agreement, (2) employ or assist any
        other person, firm, corporation, or other entity in employing any person who currently
        is a non-administrative employee of the Company, including, without limitation, those
        employees who are hired in connection with the transactions contemplated by the Stock
        Purchase Agreement, or (3) solicit the business of, or assist any other person, firm,
        corporation or other entity in soliciting the business of, any customer or supplier of the
        Company, with respect to (x) the business of CCMI as conducted on the date hereof,
        or (y) the Company's Business, including those customers or suppliers acquired in
        connection with the transactions contemplated by the Stock Purchase Agreement.

   (b)  The Applicable Period shall be the entire period during or in respect of which the
        Company is paying you in accordance with Section 5(a) hereof, whether or not you are
        employed by the Company at such time. In addition, in the event that you voluntarily
        terminate your employment with the Company prior to the second anniversary of the
        date hereof, the Applicable Period shall be two (2) years following the effective date
        of your resignation and, in the event that you voluntarily terminate your employment
        with the Company following the second anniversary of the date hereof, the Applicable
        Period shall be six (6) months following the effective date of such resignation.

   (c)  You acknowledge and agree that, in the event that you breach or threaten to breach any
        of the terms of Paragraph 6(a) hereof, the Company shall be entitled, in addition to any
        other right and remedy available to it, to an injunction restraining such breach or a

Ann Raider
August 13, 1999
Page 4

threatened breach and to have the provisions of such Paragraph specifically enforced by a court having jurisdiction, it being acknowledged and agreed by you that any such breach or threatened breach will cause immediate irreparable damage to the Company and that money damages in an action at law will not provide an adequate remedy. No bond or other security shall be required in connection with the issuance of an injunction. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. You agree that the provisions of this Paragraph are necessary and reasonable to protect the Company and the covenants set forth in Paragraph 6(a) hereof are reasonable and valid in temporal scope and in all respects. The invalidity or unenforceability of any part of such covenant or any other provision hereof shall not affect the remainder of such covenant or such other provision, which shall be given full effect, without regard to the invalid portions, and the invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of this Agreement, or any provision hereof, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(d)  Enclosed is a copy of the Company's Standards of Business Conduct. You agree to abide by the provisions of this statement at all times during your employment by the Company.

7.  (a)  You acknowledge that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligations to you are exclusively contractual in nature. The Company shall be the sole owner of the fruits and proceeds of your services hereunder, including, but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which you may create in connection with and during the term of your employment hereunder, free and clear of any claims by you (or anyone claiming under you) of any kind or character whatsoever (other than your right to compensation hereunder). You shall, at the request of the Company, execute such assignments, certificates or other instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b)  All memoranda, notes, records and other documents made or compiled by you, or made available to you during the term of this Agreement concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time on request. You

306905 v.1 [6KTS01!.WPD]

Ann Raider
August 13, 1999
Page 5

shall keep in confidence and shall not use for yourself or others, or divulge to others, any information concerning the business not publicly available and which is obtained by you as a result of your employment, including but not limited to, trade secrets or processes and information deemed by the Company to be proprietary in nature, unless disclosure is permitted by the Company or required by law.

(c)  The Company shall have the right to use your name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

(d)  The covenants set forth above in this paragraph shall survive the termination of this Agreement.

8.  You shall be eligible to participate in all employee benefit plans of the Company available to other comparable executives of the Company, including four weeks of vacation per year, and your eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

9.  The services to be furnished by you hereunder and the rights and privileges granted to the Company by you are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by you of any of the provisions contained herein will cause the Company irreparable injury and damage. You expressly agree that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by you. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

10. You agree that, if you continue in the employ of the Company after the end of this Agreement, your employment shall be at will and shall otherwise be in accordance with the provision of such then existing Company policies as may then be in effect applicable to comparable executives of the Company.

11. This Agreement shall be governed by the laws of the State of New York applicable to contracts performed entirely therein.

Ann Raider
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By: _____
    Name: David DeVoe, Jr.
    Title: Executive Vice President and Chief
           Financial Officer

    _____August 13, 1999_____
Date

THE FOREGOING IS AGREED TO:

_____

Ann Raider

_____

Date

306905 v.1 [6KTS01!.WPD]

Ann Raider
August 13, 1999
Page 6

12. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which this Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated. Except as herein provided, this Agreement shall be nonassignable.

Sincerely,

NEWS AMERICA MARKETING IN-STORE, INC.

By:_____
        Name:  David DeVoe, Jr.
        Title:   Executive Vice President and Chief
                    Financial Officer

        _____August 13, 1999_____
        Date

THE FOREGOING IS AGREED TO:

_____
Ann Raider

_____August 13, 1999_____
Date

306905 v.1 [6KT501!.WPD]

## AMENDMENT TO EMPLOYMENT AGREEMENT

THIS Amendment (the "Amendment") to the Employment Agreement dated August 13, 1999 (the "Employment Agreement") by and between News America Marketing In-Store, Inc. (the "Company") and Ann Raider ("you" or "your") is entered into as of April 9, 2004 and shall become effective when signed by both parties, as of October 1, 2004.

1.    Section 1 (a) of the Employment Agreement is hereby deleted in its entirety and replaced by the following:

"The Company hereby employs you for the period commencing on October 1, 2004 and ending on the close of business on September 30, 2006, *provided, however,* that the Company shall have the right to terminate this Agreement (i) as provided for in Section 13 below, or (ii) upon thirty (30) days' notice to you without any further obligation to you (other than for the payment of any Base Salary accrued prior to such termination). Your base salary shall be reviewed for potential increases at such time and in such amount as is the standard practice of the Company.

2.    In the third line of Section 5 (b) of the Employment Agreement, "20%" is replaced by "30%".

3.    The following "Section 13" is added to the Employment Agreement:

"13 (a)  This Agreement, and all obligations of the Company hereunder, shall terminate immediately upon your death. In the event that you are, due to any physical or mental injury, illness, defect or other incapacitating condition, unable to perform your duties and responsibilities for either (i) 85 consecutive days or (ii) an aggregate of 90 days in any consecutive 12-month period, the Company may, in its discretion, terminate this Agreement at any time thereafter by giving you notice thereof, and upon the giving of such notice, the Company shall have no further obligation or liability to you under this Agreement, excepts as provided in Section 13(b) below.

(b)  In the event that this Agreement is terminated due to your death or disability, the Company shall pay you or your designee all compensation, benefits, commissions and reimbursements that may have accrued and been earned through the date of such termination. In the event this Agreement is terminated as a result of disability as defined in Section 13(a) above, the fact of such termination shall not disqualify you from eligibility for benefits under any of the Company's disability benefits programs for which you have applied and for which you meet the necessary eligibility criteria.

(c)  Any other provision hereof to the contrary notwithstanding, the Company may terminate this Agreement (i) at any time without notice or liability (other than for salary and earned and accrued benefits and commissions, and approved reimbursements accrued through



DEPOSITION EXHIBIT
RAIDER 42
MRW 5/17/07

the date of such termination), if your employment is terminated by the Company for "cause," as defined below, or (ii) at any time, upon thirty (30) days notice to you, for any reason other than "cause," death or disability, in which case only, the Company shall continue to pay to you under Section 5(a), and in lieu of any other damages or remedy to which you may otherwise be entitled, salary continuation and group medical coverage for a period of six (6) months, at your then current base salary, less applicable benefit deductions and withholdings required by law. In addition, you may terminate the Employment Agreement for "Good Reason," as defined below, in which case, the Company shall continue to pay to you under Section 5(a), and in lieu of any other damages or remedy to which you may otherwise be entitled, salary continuation and group medical coverage for a period of six (6) months, at your then current base salary, less applicable benefit deductions and withholdings required by law. You acknowledge and agree that if your employment is terminated for a reason other than "cause," death or disability, you will have no right to any damages other than the aforementioned six (6) months of salary continuation and six (6) months of group medical coverage, and you expressly waive any additional rights you may have under this Amendment and/or the Employment Agreement. For purposes of this Agreement, "cause" shall mean, in *addition* to any meanings that term may have at common law: (i) you are convicted of, or plead guilty or *nolo contendere* to, a felony or misdemeanor; (ii) you engage in conduct that constitutes willful neglect or willful misconduct in carrying out your duties under this Agreement; (iii) you breach any representation, warranty, covenant or term of this Agreement and such breach remains uncured following twenty (20) days prior written notice given by the Company to you; and/or (iv) you engage in conduct which impacts negatively on the Company's reputation. For purposes of this Agreement, "Good Reason" shall mean that the Company has breached a material term or condition of the Employment Agreement and such material breach remains uncured for twenty (20) days following actual receipt by the Chief Executive Officer and the President of the Company of written notice from you outlining such material breach.

4.    All other terms and conditions of the Employment Agreement shall remain unchanged and in full force and effect. This Amendment, along with the Employment Agreement, constitute the entire understanding between you and the Company concerning your employment and supersede all prior and contemporaneous discussions, representations and agreements between you and the Company and may not be modified or amended except by written agreement signed by both you and an authorized representative of the Company.

5.    This Amendment will not become legally binding and effective until it has been signed by both you and an authorized Company representative. This Amendment and the Employment Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

6.    Section 6(b) of the Employment Agreement is deleted and replaced in its entirety as follows:

"The Applicable Period for the purposes of the Employment Agreement shall be the entire period during or in respect for which the Company is paying you any remuneration, whether or not you are employed by the Company at such time. In addition, in the event you voluntarily terminate your employment with the Company at any time, the Applicable Period

shall be the entire period of time through March 31, 2007, or six (6) months from the date of your termination, whichever comes first.

ACCEPTED and AGREED TO:

NEWS AMERICA MARKETING IN-STORE, INC.          ANN RAIDER

By: *Rita Meyer*                                    *Ann Raider*

Date: *April 15, 2004*                              Date: *Apue 9, 04*

**EXHIBIT 5 TO AFFIDAVIT**

FIREMAN/RAIDER
NEWS AMERICA MARKETING
EARN-OUT SUMMARY

| | SUMMARY YEAR 1 9/30/00 | SUMMARY YEAR 2 10/1/00-9/30/01 | SUMMARY YEAR 3 10/1/01-9/30/02 | SUMMARY YEAR 4 10/01/02-09/30/03 | SUMMARY YEAR 5 10/1/03-9/30/04 |
|---|---|---|---|---|---|
| GROSS MARGIN | $1,740,172.00 | $1,550,372.00 | $1,632,368.00 | $466,247.00 | $1,042,946.00 |
| | | | | | |
| BASE EARN-OUT | $265,545.00 | $177,172.00 | $139,182.00 | $62,011.00 | $128,075.00 |
| | | | | | |
| ALLOCATION OF BASE EARN OUT | | | | | |
| 60% FIREMAN | $159,327.00 | $106,303.00 | $83,509.00 | $37,207.00 | $76,845.00 |
| 40% RAIDER | $106,218.00 | $70,869.00 | $55,673.00 | $24,804.00 | $51,230.00 |


DEPOSITION
EXHIBIT
RAIDER 46
MRW 5/17/07

4549099_1.XLS

**<u>EXHIBIT 6 TO AFFIDAVIT</u>**

**News America Marketing**

| | |
|---|---|
| **To:** | Dave DeVoe |
| **cc:** | Heather Harde |
| **From:** | Julie Openshaw |
| **Date:** | 05/27/99 |
| **Re:** | CCMI Due Diligence |

REDACTED

Joe Schena, Jon Rubin and I visited the offices of CCMI in Braintree, MA on May 24-25. I conducted a general business and contractual due diligence. Below is a summary of my general business findings.

1. Loyalty Card Implementation
- CCMI does not draft contracts for card implementations, but works directly from proposals.
- **New implementations generate most revenue** – During 1998 CCMI implemented 7 new loyalty card programs and serviced 13 others with additional card production or data entry. Revenue from new card programs was $1.6 million, or 65% of total implementation revenue of $2.4 million. $1.1 million of this was from 2 retail clients; Fry's with $672K and Jitney Jungle with $434K.
- Most revenue generated from one or two clients – In Q1 99, CCMI has completed 1 new implementation for Wegmans, which generated $383K or 67% of the total $574K revenue for the quarter.

2. Database Management Contracts
- CCMI has 7 active contracts with retail chains for database management services.  Of these contracts, 2 are serviced in house at CCMI and the remainder are located at the retailers' sites and license the software from CCMI. Contracts do not clearly differentiate between in house and out of house clients. (Note that the financial model assumes a 50:50 split between in house and in store systems.)
- All agreements, with the exception of Star Market, include the Customer Information System (CIS) and the Marketing Analysis System (MAS). The CIS is a software system that manages a database of cardholder names, addresses and demographic information. The MAS is an open-architecture software system designed to assist retail executives in the analysis and communication to their customers based on purchase data. Star Market is using the CIS only.
- In 1998, database management generated $1.2 million in revenues. CCMI earned almost 70% of its database management revenue from 3 clients. The Company earned $350K from Bruno's, a retailer that has subsequently gone bankrupt, $263K from Nash Finch, a grocery wholesaler and ongoing client, and $230K from Natures Fresh, an ongoing retail client.
- CCMI did not implement any new database management programs during Q1 99 and revenue for the period was $140K. This revenue was generated from maintenance fees for the 7 active clients.
- CCMI is attempting to lengthen contract terms, as evidenced by the two most recent deals, Nash Finch (7/98), and Blue Square (11/98), an Israeli supermarket chain, for 3 years with automatic 1 year renewals.
  See attachment for further details.

• Page 1



DEPOSITION
EXHIBIT
FIREMAN 85
MRW 5/24/07

NAM03154

3.  Consulting
  - CCMI currently generates its consulting revenues from Ann Raider offering loyalty marketing advice to clients for one or two day periods. Other revenue in 98 was for national change of address services, where CCMI checks name and address lists against a US Postal Service database. The total revenue of $72K for 98 was not significant and did not have signed agreements. CCMI could probably charge more for these small consulting projects.
  - During Q1 $40K of the total $52K of consulting revenue was from a movie ticket enhancement program for Jitney Jungle. This deal did not have a signed proposal, but was supported by invoices. See attached schedule for details.

4.  Leases and Licenses
  - **Fleet National Bank Lease of Computer Equipment** – CCMI has a 3-year lease for computer equipment from Fleet Bank effective 2/99. CCMI has insured this equipment through the Connecticut Indemnity Company for $27K.
  - **AT&T Computer Lease** – CCMI has a 3 year lease effective 10/97. This equipment is covered under general insurance for office equipment of $60K through Public Service Mutual Insurance Company.
  - **Car Financing** – CCMI purchased a car in 11/97 and financed $16K.
  - **Note payable** – CCMI borrowed $85K from Fleet Bank in 9/97, payable over 5 years.
  - **Building Lease** – CCMI has a renewable 4 year lease for its office space at 165 Wood Road which expires 12/31/99. The annual rent is $72K and the lessor is Harry Fireman.
  - **Internet service agreement** @work – CCMI has a one year internet service agreement effective through 6/24/99.
  - **Arbor Software License** – Effective 7/96, CCMI has a three-year license with one-year renewal options for Essbase, a programming tool around which the CIS and MAS applications are built. CCMI then sublicenses the software to its clients as allowed by the lease terms.

5.  Third Party Agreements
  - **Loyalty Card Production** – CCMI outsources all loyalty card production, but does not have written agreements with any firms. Per review of invoices, one of the most frequently used vendors is Arthur Blank. CCMI selects vendors on an order by order basis.
  - **Decision Support Technology (DST)** – CCMI contracted with DST in 11/97 to develop and design software products including the CIS and MAS. Recently, CCMI has supported using DST (contract allows 10 days notice for termination) as they have been dissatisfied with the Company's performance and is using Unmanned Balloon instead.
  - **Unmanned Balloon (Division of Ockham's Razor, Inc.)** – CCMI uses this Toronto based software programming firm for database management related programming. Bob Fireman has a long-standing relationship with Unmanned Balloon and there is no contract between the firms, rather, CCMI is billed on a monthly basis for work performed.
  - **Polk** – CCMI has been using Polk since inception for all data entry services relating to loyalty card implementation. There is no written contract, but Polk bills services regularly on a monthly basis.

6.  Other Agreements
  - **Overlap Consulting** – Overlap is a Spanish promotions firm with which CCMI has an ongoing agreement that Overlap has exclusive rights in Spain and non-exclusive rights in South America to promote CCMI's products and services. Fees will be on a deal by deal basis.
  - **National Association of Chain Drug Stores (NACDS)** – CCMI contracted with the NACDS in 1/99 to license NACDS' name and logos as it signs up drug stores to participate in its database.

• Page 2

NAM03155

management program. CCMI must pay 4 % of revenues from the program to the NACDS. Currently CCMI is in the process of signing 4 small chains (300-500 stores) for the program.

7. Litigation
   - **Patent infringement suit** – The Credit Verification Corporation filed a patent infringement suit in 1/96, but they have not taken any action since 8/96.
   - **Business Software Alliance** – In 2/99, CCMI received allegations of using software without proper licenses. The Business Software Alliance has asked CCMI to conduct an audit.
   - **Disputed recruitment fee** – Interpros is suing for collection of a $38K recruitment fee for a CIO who left CCMI shortly after being hired. Bob Fireman is expecting to settle by mid June.

8. Personnel
   - CCMI currently has 16 employees and is planning to hire more.
   - CCMI pays employees base salaries with no formal bonus structure. However, in 1997 CCMI paid $285K in employee bonuses because it had a good year.
   - The Board of Directors is Ann Raider, Bob Fireman, and Les Charm. The Board receives no compensation.

9. Equity
   - The sole investors, Curtis Smith and John Boyles have invested $1 million in CCMI.
   - Robert Fireman has invested additional paid in capital of $92K.
   - CCMI granted 20,000 stock options to Robert Coughlin and 60,000 to William Adam in 3/97. The options are 50% exercisable after 1 year and fully exercisable after 3 years

See attached schedule for details

Page 3

NAM03156

CCM Due Diligence
Loyalty Card Program Implementation

| Client | Status | 1998 Revenue | | | Q1 1999 Revenue |
|---|---|---|---|---|---|
| | | Cards | Data Entry | Total | Total |
| A&P | New in 1998 | $ 41,700 | $ – | 41,700 | $ – |
| Brunos | New in 97, now inactive | 132,900 | 39,340 | 172,240 | – |
| Carlton Cards | Inactive | – | 176,750 | 176,750 | 720 |
| Coborns | Active | – | 4,350 | 4,350 | 840 |
| Delchamps | New in 98, now inactive | 222,360 | | 222,360 | – |
| City Market | | 9,320 | | 9,320 | – |
| Fry's | New in 98, active | 252,180 | 420,000 | 672,180 | 107,560 |
| Jitney Jungle | New in 98, active | 190,400 | 244,450 | 434,850 | 37,260 |
| King Sooper | New in 98 | 57,420 | | 57,420 | – |
| Kroger | | 22,330 | | 22,330 | – |
| Lucky – Northern | New in 97, now inactive | 191,370 | 32,920 | 224,290 | – |
| Lucky – Southern | New in 97, now inactive | 29,460 | 150 | 29,610 | – |
| Nash Finch | Active | | | | 4,890 |
| Natures Fresh | New in 98, active | 26,140 | 3,660 | 29,800 | 820 |
| Shaw's | New in 97, active | – | 38,160 | 38,160 | 6,290 |
| Smart & Final | | 3,680 | | 3,680 | – |
| Star Market | New in 95, active | 59,210 | 70,970 | 130,180 | 12,430 |
| Sullivans | New in 98, active | 16,940 | – | 16,940 | – |
| Wegmans | New in 99, active | | | | 383,450 |
| Western Foods | | 9,930 | | 9,930 | – |
| Wild Oats | New in 98, active | 62,700 | 51,070 | 113,770 | 19,740 |
| Misc. | | | | 12,906 | |
| Total | | 1,328,040 | 1,081,820 | 2,422,766 | 574,000 |

NAM03157

CCRsi Due Diligence
Database Management

**Active Clients**

| Retail Client | Agreement Date | Network Size | Location | Services | Placement | Agreement Length | Revenue 1998 | Q1 1999 |
|---|---|---|---|---|---|---|---|---|
| Star Market | Nov-95 | 52 stores | Massachusetts | CIS, cards | At store | 3 years renewable | $ 30,780 | $ 8,520 |
| Sullivan foods | 1996 | 11 stores | Illinois | CIS, MAS | At store | 1 year | 8,330 | – |
| Coborns | Oct-97 | 21 stores | Minnesota, North Dakota and Iowa | CIS, MAS | In house | 1 year renewable | 72,890 | 13,960 |
| Wild Oats | Nov-97 | 58 stores | Colorado | CIS, MAS | In house | 1 year renewable | 159,770 | 44,910 |
| Nature's Fresh | Jun-98 | 7 stores | Pacific NW | CIS, MAS, cards | At Store | 1 year | 238,000 | – |
| Nash Finch (Grocery wholesaler) | Jul-98 | services 3,000 stores operates 57 stores | National | CIS, MAS | At Store | 3 years, automatic renewals | 252,500 | 20,000 |
| Blue Square | Nov-98 | 150 stores | Israel | CIS, MAS | At Store | 3 years, automatic renewals | – | 55,000 |
| | | | | | | | $ 763,650 | $ 140,390 |

**Inactive Clients**

| | |
|---|---|
| Brunos | 354,190 |
| Carlton Cards | 8,690 |
| Lucky Stores Southern Division | 68,230 |
| ABT Assoc. | 51,520 |
| Misc. | 3,858 |
| **Total Revenue** | **$1,247,118** |

NAM03158

**CCMI Due Diligence**
**Consulting Services**

| Client | Description of Service | Revenue 1998 | Revenue 1999 |
|---|---|---|---|
| Jitney Jungle | Movie ticket enhancement program | | $ 38,920 |
| Natures Fresh | Consulting on system startup | 24,000 | 8,000 |
| Publix | National Change of Address | 11,820 | |
| Star Market | National Change of Address | 7,400 | |
| Wild Oats | Ann's time | 5,000 | |
| Meijers | Ann's time | 4,500 | |
| Longo's | Ann and Jerry Clapp's time | 4,000 | |
| Remke | Ann's time assisting with loyalty strategy | 2,750 | 5,110 |
| Kellogg's | Ann's time | 2,500 | |
| Mettler-Toledo | Ann's time | 2,500 | |
| NRI | Ann's time | 2,500 | |
| Misc. | | 4,978 | |
| **Total Revenue** | | **$ 71,948** | **$ 52,030** |

5/27/99 10:47 AM

NAM03159

Stockholders of Consumer Card Marketing, Inc. (12/31/98)

| Name | Common Stock | Preferred Stock |
|------|--------------|-----------------|
| Robert Fireman | 4,200,000 | – |
| Ann Raider | 2,800,000 | – |
| Curtis R. Smith | 456,858 | 248,000 |
| John H. Boyles | 167,142 | 62,000 |
| Total | 7,624,000 | 310,000 |

Schedule of Investment

| | | Shares | | Total |
|---|---|---|---|---|
| | | Common | Preferred | Investment |
| Dec-97 CCMI borrowed $500,000 from Curtis Smith and John Boyles | | | | |
| Feb-98 10,000 shares of common stock authorized | Robert Fireman | 2,100,000 | | |
| | Ann Raider | 1,400,000 | | |
| Feb-98 The $500,000 note was converted to 312,000 shares of common stock | | | | |
| | 80% Smith | 228,429 | | $ 500,000 |
| | 20% Boyles | 83,571 | | |
| Feb-98 $250,000 investment from Smith and Boyles, CCMI issued | | | | $ 250,000 |
| 155,000 shares of preferred stock | 80% Smith | | 124,000 | |
| | 20% Boyles | | 31,000 | |
| May-98 $250,000 investment from Smith and Boyles, CCMI issued | | | | $ 250,000 |
| 155,000 shares of preferred stock | 80% Smith | | 124,000 | |
| | 20% Boyles | | 31,000 | |
| May-98 2 for 1 stock split | Fireman | 2,100,000 | | |
| | Raider | 1,400,000 | | |
| | Smith | 228,429 | 248,000 | |
| | Boyles | 83,571 | 62,000 | |
| Total shares outstanding | | 7,624,000 | 620,000 | $ 1,000,000 |
| Additional Paid In Capital | | | | $ 91,139 |

NAM03160

**EXHIBIT 7 TO AFFIDAVIT**

**CCMI EARN-OUT**
**GROSS MARGIN**

| | F'00 | Q1, 01 | Adjustments | Year 1 |
|---|---|---|---|---|
| **Revenue** | 1,743,081 | 2,298,418 | 320,554 | ~~4,362,054~~ |
| | | | | |
| **Production Expenses** | | | | |
| Card Production Expense | 482,279 | 1,084,587 | 6,799 | 1,573,665 |
| Data Entry Expense | 219,085 | 51,320 | | 270,405 |
| Database Materials | 24,658 | 5,409 | | 30,067 |
| Database Marketing | 5,444 | 5,350 | | 10,794 |
| Reimbursable Program Supplies | - | 1,650 | | 1,650 |
| Software Development | - | 1,500 | | 1,500 |
| Direct Mail Expense | - | 30,623 | | 30,623 |
| Production Printing | - | 19,045 | | 19,045 |
| **Total Production Expenses** | 731,465 | 1,199,484 | 6,799 | 1,937,748 |
| | | | | |
| **Salaries & Fringe** | | | | |
| Brittain | 30,712 | - | | 30,712 |
| Geswell | 28,215 | 15,093 | | 43,308 |
| London | - | 5,231 | | 5,231 |
| Mumm | 30,937 | 42,500 | | 73,437 |
| Sellinger | - | 8,931 | | 8,931 |
| Stappler | - | 19,223 | | 19,223 |
| Tripp | 128,245 | 46,522 | | 174,767 |
| **Total Salaries** | 218,110 | 137,500 | - | 355,610 |
| | | | | |
| **Travel & Expense** | | | | |
| Brittain | 7,963 | 2,951 | | 10,915 |
| Geswell | 300 | 207 | | 507 |
| London | - | 710 | | 710 |
| Mumm | 4,817 | 9,651 | | 14,468 |
| Sellinger | - | 243 | | 243 |
| Stappler | - | 2,553 | | 2,553 |
| Tripp | 16,433 | 5,373 | | 21,806 |
| Robinson | 3,334 | - | | 3,334 |
| **Total T&E** | 32,847 | 21,690 | - | 54,538 |
| | | | | |
| **Other Selling & Marketing** | | | | |
| Promotion Expense | 32,005 | 4,434 | | 36,439 |
| Trade Show Expense | 16,664 | 12,223 | | 28,887 |
| Consulting Expense | 217,530 | 51,496 | (71,005) | 198,021 |
| Legal Expense - Toshiba | 7,783 | 34,773 | (31,917) | 10,639 |
| **Total Other S&M** | 273,982 | 102,926 | (102,922) | 273,986 |
| | | | | |
| **GROSS MARGIN** | 486,677 | 836,818 | 416,677 | 1,740,172 |

CONFIDENTIAL
NAM50000

**Fiscal 2000 - Full Year**

| Posting Account | Account Description | F'2000 GL | Q1 | Q2-G |
|---|---|---|---|---|
| **Revenue** | **Revenue** | | | |
| 08-81-9601 4000 0000 | REVENUE | (386,146) | 210 719 | 175,42- |
| 08-81-9601 4000 1535 | REVENUE | (7,969) | | |
| 08-81-9601 4000 1536 | REVENUE | (1,650) | | |
| 08-81-9601 4000 1537 | REVENUE | (8,446) | | |
| 08-81-9601 4000 1538 | REVENUE | (203,003) | | |
| 08-81-9601 4000 1545 | REVENUE | (58,112) | | |
| 08-81-9601 4000 1547 | REVENUE | (3,515) | | |
| 08-81-9601 4000 1548 | REVENUE | (6,845) | | |
| 08-81-9601 4000 1560 | REVENUE | (20,216) | | |
| 08-81-9601 4000 1562 | REVENUE | (23,920) | | |
| 08-81-9606 4000 0000 | REVENUE | (178,221) | 31,639 | 146,587 |
| 08-81-9606 4000 1500 | REVENUE | (82,143) | | |
| 08-81-9606 4000 1526 | REVENUE | (18,062) | | |
| 08-81-9606 4000 1532 | REVENUE | (34,908) | | |
| 08-81-9606 4000 1534 | REVENUE | (2,513) | | |
| 08-81-9606 4000 1540 | REVENUE | (14,025) | | |
| 08-81-9621 4000 0000 | REVENUE | (224,250) | | |
| 08-81-9621 4000 1559 | REVENUE | (15,000) | | |
| 08-81-9622 4000 0000 | REVENUE | (1,500) | 1,500 | — |
| 08-81-9622 4000 1540 | REVENUE | (7,243) | | |
| 08-81-9622 4000 1556 | REVENUE | (7,000) | | |
| 08-81-9622 4000 1561 | REVENUE | (18,000) | | |
| 08-81-9623 4000 0000 | REVENUE | (104,683) | 9,500 | 95,193 |
| 08-81-9623 4000 1501 | REVENUE | (210,150) | | |
| 08-81-9624 4000 0000 | REVENUE | (52,108) | | |
| 08-81-9624 4000 1501 | REVENUE | (71,200) | | |
| 08-81-9624 4000 1526 | REVENUE | (450) | | |
| 08-81-9624 4000 1540 | REVENUE | (25,813) | | |
| 08-81-9624 4000 1543 | REVENUE | (8,325) | | |
| 08-81-9624 4000 1551 | REVENUE | (99,771) | | |
| 08-81-9624 4000 1558 | REVENUE | (265) | | |
| 08-81-9642 4000 0000 | REVENUE | (40,944) | | |
| 08-81-9642 4000 1502 | REVENUE | (2,866) | | |
| 08-81-9653 4000 0000 | REVENUE | (7,866) | 1,420 | 6,446 |
| 08-81-9653 4000 1527 | REVENUE | (1,919) | | |
| 08-81-9653 4000 1540 | REVENUE | (48,813) | | |
| | **TOTAL REVENUE** | (1,997,859) | | |

= 254,778

= 1,743,081

FY00

CONFIDENTIAL
NAM50001

Fiscal 2001

| Posting Account | Account Description | Ending Balance |
|---|---|---|
| **Revenue** | **Revenue** | |
| 08-81-9601 4000 1501 | REVENUE | (4,256) |
| 08-81-9601 4000 1537 | REVENUE | (2,043) |
| 08-81-9601 4000 1538 | REVENUE | (57,558) |
| 08-81-9601 4000 1545 | REVENUE | (7,404) |
| 08-81-9601 4000 1562 | REVENUE | (2,036) |
| 08-81-9601 4000 1563 | REVENUE | (312,480) |
| 08-81-9601 4000 1565 | REVENUE | (1,208,846) |
| 08-81-9603 4000 1545 | REVENUE | (32,842) |
| 08-81-9606 4000 1500 | REVENUE | (18,993) |
| 08-81-9606 4000 1501 | REVENUE | (8,216) |
| 08-81-9606 4000 1526 | REVENUE | (851) |
| 08-81-9606 4000 1532 | REVENUE | (13,008) |
| 08-81-9606 4000 1536 | REVENUE | (71,125) |
| 08-81-9606 4000 1540 | REVENUE | (822) |
| 08-81-9606 4000 1563 | REVENUE | (137,500) |
| 08-81-9606 4000 1565 | REVENUE | (51,462) |
| 08-81-9622 4000 1504 | REVENUE | (11,550) |
| 08-81-9622 4000 1561 | REVENUE | (9,000) |
| 08-81-9624 4000 1501 | REVENUE | (126,025) |
| 08-81-9624 4000 1540 | REVENUE | (4,625) |
| 08-81-9640 4000 1529 | REVENUE | (18,739) |
| 08-81-9640 4000 1567 | REVENUE | (31,080) |
| 08-81-9641 4000 1558 | REVENUE | (265) |
| 08-81-9650 4000 1551 | REVENUE | (93,902) |
| 08-81-9650 4000 1565 | REVENUE | (9,105) |
| 08-81-9651 4000 1530 | REVENUE | (10,000) |
| 08-81-9651 4000 1561 | REVENUE | (9,000) |
| 08-81-9652 4000 1505 | REVENUE | (14,000) |
| 08-81-9652 4000 1552 | REVENUE | (31,686) |
| | | (2,298,418) Q1,01 |

CONFIDENTIAL
NAM50002

| Dimension ID | Name / Description | Abbreviation |
|---|---|---|
| 1500 | D READE DATA ENTRY | DREADEDATA |
| 1501 | D READE CIS/MAS SERV AGRE | DREADESEAG |
| 1502 | D READE QTRLY MAGAZINE | DREADEQTRL |
| 1503 | D READE CONTINUITY PROG | DR CONTINU |
| 1504 | DUANE READE REPLENISHMENT  CARD | DR REPLENI |
| 1505 | DUANE READE SWEEPSTAKES MKTG | DR SWEEPST |
| 1526 | STAR MKT DATA ENTRY | STAR DATA |
| 1527 | STAR MKT CIS | STAR CIS |
| 1528 | PRODUCE WAREHOUSE | PROD WHSE |
| 1529 | STAR REORDER (CARDS) | STAR REORD |
| 1530 | ABT ASSOC GVT WIC SAVES | WIC SAVES |
| 1531 | PRODUCE WAREHOUSE LOYALTY MKTG | PW LOYALTY |
| 1532 | J JUNGLE DATA ENTRY | JJNGL DATA |
| 1533 | J JUNGLE LOYALTY EVENTS | JNGLLOYALT |
| 1534 | HAGGEN INC DATA ENTRY | HAGGENDATA |
| 1535 | WEGMANS WEEKLY READERS | WGMN WKLY |
| 1536 | WEGMANS INSTORE REPLNSH | WGMNISREPL |
| 1537 | WEGMANS TESLIN KEYTAGS | WGMNTESLIN |
| 1538 | FRYS FOOD STORES - IN STORE REPLEN | FRYSREPLE |
| 1539 | FRYS EMPLOYEE CARDS | FRY EMPLOY |
| 1540 | NASH FINCH CIS/MAS AGREE | NF AGREEMT |
| 1542 | BLUE SQUARE SVC AGREE | BLUESQAGRE |
| 1543 | SULLIVANS FOODS MAS | SULLIVANS |
| 1544 | FRYS PLATIMUM PROGRAM | FRYS PLAT |
| 1545 | MEIJER GIFT CARD PROG | MEIJERGIFT |
| 1546 | COMP USA E GIFT PROGRAM | COMP USA |
| 1547 | MUGAR-STARFISH MKT PROJ | MUGAR S/M |
| 1548 | REY'S-LOYALTY CARDS | REYS LOYAL |
| 1549 | TRADE FAIR LOYALTY CARD | TRADE FAIR |
| 1550 | MARKETECHNIC 2000 FMI FEB | FMI2000 |
| 1551 | CAMPBELL TOP SHOPPER | CPBL TSHOP |
| 1552 | CAMPBELL-SWEEPSTAKE PROG | CPBLSWEEPS |
| 1554 | GEMCOM GROC MFG OF AMER TRADE SHOW | |
| 1555 | RETAIL SYSTEMS 2000 | |
| 1556 | TOPS MKT-SPRING/SUMMER LOYALTY | |
| 1557 | CENTRAL SOUTH MUSIC (CARDS) | CENTSOMUSI |
| 1558 | REMKE MKTS LOYALTY EVENTS | |
| 1559 | PEETS SYSTEM PROJECT | |
| 1560 | P SCHULTZ AD/DO IT BEST | |
| 1561 | WHITE ROSE MKTING PLAN | |
| 1562 | PW SUPERMKTS-LOYALTY PROGRM | |
| 1563 | TOSHIBA CLASS ACTION SETTLEMENT | TOSHIBA |
| 1564 | GIANT FOODS WEB BASED (CARDS) | GNTFDSWEB |
| 1565 | GIANT | GIANT |
| 1566 | UNILEVER DIRECT MAIL MKTG | UNLR DMAIL |
| 1567 | IVES FINE FOODS (MARKETING) | IVESFINEFD |
| 1568 | GILLETTE DIRECT MAIL (MKTG PROG) | GILLETTEDM |
| 1569 | HAGGEN | HAGGEN |
| 1570 | CAMPBELL TOP SHOPPER NOV | CMPBL NOV |
| 1571 | CAMPBELL FOODLION COOKBOOK MKTG | CPBL FDLN |
| 1572 | DELMONTE | DELMONTE |
| 1573 | GIANT DATA ENTRY | GIANT DATA |
| 1575 | GIANT CARD REPLACEMENT | GIANT REPL |

CONFIDENTIAL
NAM50003

## SCMi EARN OUT
## YEAR 1
## FINAL ADJUSTMENT

**Deferred Revenue (b) (i)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deferred Revenue recognized to P&L | (149,654) | / | 5 | = | 149,654 | x | 16.8% | = | 25,142 |
| Deferred Revenue impact to working capital | | | | | (29,931) | x | 16.8% | = | (5,028) |
| Prepaid Expense recognized to P&L | 6,799 | / | 5 | = | (6,799) | x | 16.8% | = | (1,142) |
| Prepaid Expense impact to working capital | | | | | 1,360 | x | 16.8% | = | 228 |
| | | | | | | | | | 19,200 |

**Deferred Revenue (b) (2)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Pro rating legal costs | (31,917) | / | 5 | = | 31,917 | x | 16.8% | = | 5,362 |
| Deferring legal costs impact to working capital | | | | | (6,383) | x | 16.8% | = | (1,072) |
| | | | | | | | | | 4,290 |

**Deferred Revenue (b)(3)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Recognizing Meijer's program | (170,900) | / | 5 | = | 93,947 | x | 16.8% | = | 15,783 |
| Eliminating Meijer's costs | | | | | 76,953 | x | 16.8% | = | 12,928 |
| Impact of Meijer's adjustments on Work. Cap. | | | | | (34,180) | x | 16.8% | = | (5,742) |
| | | | | | | | | | 22,969 |

**Consultants**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Non revenue related consultant costs | | | | | 63,146 | x | 16.8% | = | 10,609 |
| 1/13 of Time-Out Devices costs | | | | | 7,859 | x | 16.8% | = | 1,320 |
| | | | | | | | | | 11,929 |

**Cumulative Investment (c)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Closing Date Balance Sheet negative working capital | 200,000 | / | 5 | = | 40,000 | x | 16.8% | = | 6,720 |
| Change in Cash during Period | 154,810 | / | 5 | = | 30,962 | x | 16.8% | = | 5,202 |
| Impact of Meijer's adjustments on Work. Cap. | (72,500) | / | 5 | = | (14,500) | x | 16.8% | = | (2,436) |
| | | | | | | | | | 9,486 |

**Cumulative Investment (c)**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Incurred capitalization (opening balance sheet | 168,907 | / | 5 | = | 33,781 | x | 16.8% | = | 5,675 |

**Total Final Adjustment**   73,549

Prime Rate   8.50%
plus 150 basis points   10.00%

Accumulated Interest since 9/30/00   3,339

**Cash Payment Due 3/14/01**   76,888

| Due to: | Robert Fireman | 46,133 |
|---|---|---|
| | Ann Raider | 30,755 |

320 551

CONFIDENTIAL
NAM50004

**SSD, Inc Revenue**
**10/01/00-09/30/01**

| | |
|---|---|
| 07/01/00-09/30/00 | 2,298,418.00 |
| 07/01/00-06/30/01 | 8,027,992.86 |
| 07/01/01-09/30/01 | 1,396,112.00 |
| Total Revenue 10/01/00-09/30/01 Per G/L | 7,125,686.86 |
| Total Revenue 10/01/00-09/30/01 Per Bruther Schedule | 7,121,924.00 |
| Total Revenue 10/01/00-09/30/01 Per G/L | 7,125,686.86 |
| Year One Earn-Out Adj | (270,554.00) |
| Total Revenue Per CCMI EARN-OUT | 6,855,132.86 |

*Proposed adj =*

*Reduce Revenue By $180,000*

*See last Page*

CONFIDENTIAL
NAM50005

NAMOGA MARKETING
## SMART SOURCE DIRECT
### REVENUE BY CLIENT
Oct 1 2000 - Sep 30 2001

| Customer | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fry's Employee Cards | $110,903 | $8,800 | | | | | | | | | | | $88,004 |
| Fry's Multi Shopper | $153,605 | $111,600 | | | | | | | | | | | $327,848 |
| Toshiba | | $170,737 | | | | | | | | | | | $2,013,741 |
| **Client** | | | | | | | | | | | | | |
| Giant (Web Based) | $332,532 | $52,417 | $78,800 | $120,067 | $128,417 | $128,567 | $428 | $53,010 | ($351,615) | $30 | $51,615 | $400,909 | 484,452 |
| Duane Reade Replenishment | $45,000 | $51,133 | ($401,963) | $220,075 | $220,075 | | $13,890 | $129,917 | $509,645 | $3,713 | | | $2,012,741 |
| Meijer | | | ($374,401) | | | | $130,064 | ($218,617) | | | | | |
| Central South E-Gift | | | | $11,550 | $45,000 | $11,550 | $0 | $7,500 | | $50,715 | $54,000 | | 18,784 |
| Do It Best | | $25,450 | | $34,680 | $243,398 | $1,115 | ($81,115) | $40,660 | | | | | $504,645 |
| Trade Fair | | | | | ($20,729) | $508 | ($508) | | | | | | $241,248 |
| Wegmans | | $1,200 | | $3,756 | $21,408 | | | | | | | | $39,601 |
| Produce Warehouse | $23,108 | $24,901 | $5,630 | $515 | | | | ($33) | $133 | | | | $22,070 |
| Produce Warehouse Loyalty | $3,000 | | | $3,000 | $220 | | | $123 | $472 | | $87 | $20 | $10,966 |
| Comp USA E-Gift | | $38,449 | $65,042 | $37,559 | $46,820 | | ($4,520) | $3,711 | $22,329 | | $15,596 | | $18,896 |
| Wegmans Replenishment | | | | | | | ($53,000) | ($53,000) | | | | | $71,682 |
| Wegmans Keytags | $1,623 | $328 | $4,256 | | | | $0 | $45,289 | ($96,125) | | $22,863 | $6,621 | $0 |
| Penmark | | | | | | | | | | | | | $236,513 |
| Wallace | | | | | | | | | | | | | $0 |
| | | | | | | | | | | | | | $16,236 |
| | | | | | | | | | | | | | $176,675 |
| **Total Cards** | $669,988 | $440,813 | ($324,376) | $220,085 | $657,071 | $40,600 | $286,212 | $208,076 | $175,576 | $112,602 | $92,990 | ($35,933) | $1,886,006 |
| Giant Data Entry | $0 | $0 | $402,805 | $172,000 | $134,676 | $203,748 | $417,102 | $286,631 | $179,902 | $167,113 | $337,821 | $337,617 | $4,291,370 |
| Spectra | $110,027 | | | | | | | | | | | | $852,748 |
| Duane Reade Data Entry | $0 | $312,055 | $5,994 | $8,106 | $13,361 | $13,167 | $11,992 | $220,221 | $820,076 | $0 | $38,894 | $15,472 | $170,301 |
| Star | $1,123 | $4,894 | | $0 | | $17,617 | $8,571 | $20,765 | $13,477 | $0 | $0 | $10,301 | $132,112 |
| Harris Teeter | | | | | | | | | $9,993 | $17,860 | $54,057 | $56,000 | $0 |
| Jitney Jungle | | | $1,822 | $1,543 | | | | | | | $0 | | $10 |
| Produce Warehouse | | | | | | | | $8,271 | | $3,204 | $8,578 | $4,010 | $28,070 |
| **Total Data Entry** | $11,155 | $17,849 | $411,081 | $81,649 | $148,937 | $30,784 | $20,661 | ($483,765) | | $742 | $742 | $0 | $88,647 |
| **Total Card Implementation** | $881,123 | $499,982 | $176,703 | $312,634 | $865,108 | $234,532 | $467,666 | $1193,572 | $23,440 | $11,606 | $214 | $0 | ($580,625) |
| ABT Associates | $15,000 | $24,575 | | $16,200 | $51,752 | $8,000 | $15,000 | $460,203 | $343,516 | $184,719 | $863,741 | $37,738 | $1,049,166 |
| Neutrogena Direct Mail | | | | | | | | | | $293,282 | $290,392 | $413,416 | $4,340,629 |
| White Rose Mall | | | | | | | | | $0 | | | | $110,827 |
| White Rose | | | | | $1,250 | | | $8,545 | | | | | $8,546 |
| Lynn Veggie Cuisine | $16,168 | | | $1,750 | $0 | ($18,000) | $2,000 | $46,475 | | | | | $48,475 |
| Liberty Farm Direct Mail | | | | | | | | | | | | | ($315,000) |
| Gillette List Generation | | | | | | | | $1,000 | | $146,887 | | | $1,240 |
| Dannon Direct Mail | $164,751 | $54,000 | | | | | $3,500 | | | | | | $1,750 |
| Campbell Foodton Cookbook | | | $12,700 | | | | $6,000 | | | | | | $15,140 |
| Unilever DM | | $92,887 | | $0 | | | | | | | | | $146,887 |
| SC Johnson Sweepstakes | $301 | $805 | | | | | | $3,765 | | | | | $388,000 |
| DoubleDay | | | | | $0 | | $0 | | | | | | $170,781 |
| Duane Reade Nicorette | | | | | $43,250 | | | | | | | | $12,700 |
| Campbell Soup | $0 | $30,000 | | | | | $6,250 | | | | | | $192,887 |
| Campbell Soup Foodlion Labels | | | | | | | | | | | | | $3,766 |
| Campbell Friends & Family | | | | | | | | | | | | | $805 |
| Campbell's Stop & Shop | | | | | | | | | ($1,700) | | | | $443,250 |
| Quilin Reade Sweep/Asian/Card | $56,240 | $48,245 | $285 | ($3,000) | | $3,265 | | $1,700 | | | | | $18,250 |
| Kraft GFIC | | | | | | | | ($3,000) | | | | | $0 |
| Relax Moist Loyalty Events | | | | | | | | | | | | $135,500 | $30,000 |
| Campbell Soup Top Shopper | | | | | | | | | $3,265 | | | | $134,600 |
| **Total Marketing & Consulting** | $281,460 | $285,964 | $12,988 | $14,950 | $76,262 | ($6,736) | $32,760 | $60,486 | $1,866 | $144,887 | $136,600 | $136,600 | $793 |
| Duane Reade | $51,267 | $51,267 | $46,411 | $53,217 | $53,192 | $53,067 | $53,067 | ($38,216) | $108,608 | $11,687 | $146,625 | $138,400 | $112,466 |
| Software MAS | | | | | | | $32,315 | | | | | | $393,743 |
| Peers Group Mgmt | $23,276 | $122 | $190 | | $25,000 | | $237 | | | | | | $678,497 |
| Nash Finch | $74,442 | $51,288 | $46,671 | $63,217 | $74,192 | $43,087 | $40,679 | ($38,216) | $66,963 | $11,687 | $3,363 | $150 | $2,378 |
| **Total Data Management** | | | | | | | | | | | | $46,278 | ($516,000) |
| | | | | | | | | | | | | | $122,270 |
| | | | | | | | | | | | | | $186,142 |
| **SmartSource Direct Totals** | $1,017,125 | $906,018 | $227,386 | $390,801 | $959,062 | $230,684 | $511,004 | $612,472 | $1,029,582 | $343,673 | $440,355 | $405,180 | $7,121,524 |

CONFIDENTIAL
NAM50006

NEWS AMERICA MARKE[...]
SMART SOURCE DIRE[...]
REVENUE BY CLIEN[...]
OCT FY'02 - SEPTEMBER

| Customer | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | August | September | Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wakms | $76,326 | ($282,135) | $302,324 | $496,627 | $177,138 | $156,303 | $252,579 | $52,191 | $32,164 | $106,650 | $434,626 | $291,966 | $1,256,521 |
| Dress Ready Replacement | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6 |
| Vaskm | $241,667 | $141,667 | $55,000 | $185,000 | $0 | $141,666 | $0 | $141,666 | $111,666 | $41,191 | $172,000 | $70,630 | $1,400,653 |
| Loup E-Cat | $0 | $0 | $0 | $0 | $0 | $0 | $141,666 | $0 | $0 | $0 | $0 | $0 | $0 |
| Petsmart | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales Place Loyalty | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Five Mth Shopper | ($35,475) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | (56,466) |
| Produce Warehouse Loyalty | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Wagmans Savings | $0 | $0 | $0 | $0 | $0 | ($161,100) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Giant Web Based | $11,723 | $0 | $4,616 | $1,081 | $1,687 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $19,106 |
| Comp USA E-Cat | $17,874 | $13,961 | $10,066 | $8,070 | $0 | $0 | $0 | $0 | $0 | $0 | $2,416 | $0 | $21,133 |
| Coshad South E-Cat | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $61,461 |
| Do it Best | $0 | $289 | $26 | $22 | $0 | $30 | $26 | $20,000 | $0 | $0 | $0 | ($2,566) | $52,935 |
| Key Foods | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $39,303 |
| Trade Fall | $0 | $0 | $161,800 | $50,000 | $94,564 | $68,205 | $0 | $0 | $0 | $0 | $0 | $0 | $405,949 |
| 302.8 Thd Party (MPD) | $0 | $45,254 | $0 | $0 | $0 | $0 | $0 | $0 | $7,725 | $0 | $0 | $0 | $7,725 |
| Ford Dynasty | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $45,254 |
| Sales Place E-Cat | $0 | $10,000 | $0 | $10,000 | $10,000 | $0 | $0 | $21,500 | $0 | $0 | $0 | $0 | $21,500 |
| **Total Cards** | $342,177 | ($66,860) | $634,622 | $762,666 | $426,666 | $382,177 | $402,366 | $443,830 | $262,794 | $447,344 | $634,424 | $360,666 | $50,000 |
| Giant Data Entry | $31,944 | $18,645 | $15,214 | $11,911 | $14,780 | $14,216 | $10,545 | $0 | $14,827 | $0 | $34,701 | ($6,674) | $167,656 |
| Sales Place | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,000 | $0 | $0 | $0 | $0 | $327 |
| Do it Best | $327 | $0 | $0 | $0 | $0 | $0 | $17,090 | $34,955 | $0 | $0 | $19,637 | $0 | $171,317 |
| Key Foods | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,000 |
| Ford Dynasty | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,000 | $0 | $0 | $0 | $0 | $41,394 |
| Demo Ready Data Entry | $10,326 | $14,810 | $8,766 | $2,637 | $260 | $0 | $2,061 | $1,523 | ($5) | $1,164 | $0 | $0 | $23,795 |
| Sparise Data Entry | $10,466 | $4,525 | $2,547 | $3,661 | $2,600 | $4,707 | $0 | $10,526 | $0 | $0 | $0 | $0 | $228 |
| Produce Warehouse | $0 | $0 | $0 | $0 | $228 | $0 | $0 | $0 | $12,463 | $0 | $0 | $10,917 | $73,618 |
| Hanis Teeter | $4,716 | $7,711 | $8,405 | $5,487 | $0 | $7,256 | $56,203 | $0 | $0 | $0 | $0 | $0 | |
| **Total Data Entry** | $62,371 | $48,601 | $36,402 | $34,720 | $21,674 | $24,192 | $37,602 | $62,464 | $18,622 | $18,661 | $66,434 | $66,066 | $264,792 |
| **Total Card Implementation** | $399,696 | ($10,460) | $666,022 | $606,726 | $447,920 | $276,804 | $440,646 | $367,371 | $190,162 | $296,617 | $443,676 | $369,646 | $4,746,149 |
| Dremat Direct Mail | $0 | $0 | $0 | $4,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,000 |
| Oneton Gas Owens Ltd | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $36,615 |
| Kraft GFC | $169,653 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $26,912 | $0 | $0 | $0 | $197,199 |
| Dremat Ready Mesrerke | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $7,537 | $0 | $0 | $0 | $0 | $379 |
| Dremat Ready Regroe | $35,494 | $0 | $0 | $0 | $8,346 | $0 | $279 | $0 | $0 | $0 | $0 | $0 | $41,642 |
| Dremat Ready Mini | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Wish Direct Mail | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Aprotax | $35,132 | $0 | $0 | $0 | $0 | $0 | $0 | $12,812 | $0 | $0 | $0 | $0 | $17,911 |
| Vemax | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $35,132 |
| Kraft Fresh Creations 6 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,000 | $0 | $0 | $0 | $6,000 |
| Linzeld | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $28,670 | $0 | $0 | $0 | $28,610 |
| Pharmesile | $0 | $0 | $28,776 | $0 | $0 | $0 | $0 | $0 | $246,395 | $0 | $0 | $0 | $248,305 |
| Kraft Fresh Creations | $0 | $0 | $0 | $18,005 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $18,170 |
| Direct Exposure (Mind 4 Home) | $0 | $0 | $10,000 | $10,000 | $4,950 | $0 | $11,825 | $0 | $0 | $0 | $0 | $0 | $28,870 |
| Vons Veggie Cuisine | $0 | $0 | $0 | $0 | $0 | ($7,025) | $0 | $0 | $2,661 | $22,995 | $0 | $0 | $27,814 |
| Kraft Markethouse | $0 | $167,013 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $224,643 |
| P&G Always | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $36,470 | $0 | $0 | $0 | $0 | $467,870 |
| Dairy Ease | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $462,690 | $0 | $563,001 |
| Campbell Soup | $0 | $71,601 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $990,177 | $0 | $90,127 |
| Campbell Soup | $0 | $0 | $0 | $0 | $56,000 | $0 | $6,000 | $0 | $0 | $0 | $0 | $0 | $63,001 |
| Campbell Soup Stop & Shop | $0 | $0 | $0 | $14,650 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $14,650 |
| Nestle Orage Frozen | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $66,662 | $0 | $0 | $0 | $0 | $81,770 |
| Nestle Orage Chilron | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $61,770 |
| Simms | $0 | $0 | $0 | $0 | $56,377 | $0 | $0 | $14,646 | $0 | $0 | $0 | $0 | $124,366 |
| Kal Kan | $0 | $0 | $0 | $0 | $70,654 | $0 | $0 | $2,376 | $0 | $0 | $0 | $0 | $79,230 |
| Liberty Perk Direct Mail | $0 | $0 | $0 | $142,167 | $0 | $0 | $0 | $301,367 | $0 | $0 | $0 | $0 | $443,534 |
| Stash Giant Mail | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Reddit Smoother Dye Mignsi | $0 | $36,830 | ($22,275) | $0 | $0 | $166,100 | $66,670 | $0 | $0 | $0 | $0 | $0 | $299,676 |
| Sushi Sausan Iced | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $32,165 |
| Lenil | $0 | $193,313 | $0 | $4,681 | $0 | $102,030 | $0 | $0 | $0 | $0 | $0 | $0 | $189,705 |
| Matism | $0 | $0 | $0 | $0 | $0 | $15,003 | $0 | $0 | $0 | $0 | $0 | $0 | $324,604 |
| Scrolyons Ice Cream | $0 | $0 | $0 | $13,500 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $117,003 |
| Kal Age | $0 | $0 | $0 | $0 | $33,600 | $17,000 | $0 | $0 | $0 | $0 | $0 | $0 | $2,900 |
| **Total Marketing & Consulting** | $296,473 | $348,622 | $34,791 | $69,674 | $227,115 | $282,116 | $118,677 | $596,833 | $196,666 | $219,008 | $2,996 | $866,667 | $50,006 |
| Demo Ready | $56,475 | $50,150 | $56,475 | $6,400 | $2,225 | ($4,250) | $0 | $0 | $0 | $0 | $0 | $0 | $6,427,126 |
| Giant Data Request (Zips) | $5,827 | $0 | $0 | $4,045 | $0 | $0 | ($52,000) | $2,000 | $0 | $0 | ($4,095) | $0 | $171,409 |
| Sales Place Gromal | $0 | $0 | $10,000 | $0 | ($10,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,061 |
| Key Foods | $0 | $0 | $0 | $0 | $0 | $0 | $15,000 | $0 | $0 | $0 | $0 | $0 | $327 |
| Petmarket | $0 | $0 | $0 | $0 | $5,678 | $55,000 | $75,000 | $16,660 | $30,750 | $30,750 | $0 | $0 | $102,250 |
| Stash Firch | $0 | $0 | $22,536 | $0 | $0 | $0 | $1,757 | $0 | $21,700 | $18,250 | $0 | $0 | $134,074 |
| A3Port Allocation | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $124,295 |
| **Total Data Management** | $61,642 | $66,162 | $68,015 | $4,666 | $4,206 | ($6,676) | $68,860 | $90,787 | $52,604 | $92,409 | $66,666 | $32,606 | $46,666 |
| **SmartSource Direct Totals** | $691,270 | $367,706 | $764,732 | $692,096 | $690,400 | $691,960 | $664,225 | $617,641 | $611,250 | $627,336 | $679,473 | $1,968,191 | $6,223,461 |

CONFIDENTIAL
NAM50007

**NEWS AMERICA MARKETING**
**SMARTSOURCE DIRECT**
**ACTUAL VARIABLE MARGIN BY PROJECT**
**10/1/03 - 6/30/04**

| Project Code | Project Description | Oct | Nov | Dec | Jan | Feb | Mar | April | May | June | July | August | September | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1704 | Spartan Data Entry | $539 | $63 | | | | | | | | | | | $602 |
| 1705 | Do It Best Data Entry | $1,019 | | | | | | | | | | | | $1,019 |
| 1707 | Sutton Place Data Entry | | | | | | | | | | | | | $0 |
| | Pipeline Estimate | | | | | | | | | | | | | $0 |
| | **Total Data Entry** | **$1,558** | **$63** | | | | | | | | | | | **$1,621** |
| 1708 | Sutton Place E-Clin Trans | $2,198 | $8,684 | $655 | | $1,418 | $2,278 | | | | | | | $15,883 |
| 1708 | Longs Drug E-Clin Trans | $4,520 | $5,656 | $6,738 | | $18,381 | $5,963 | | | | | | $50,549 | $91,195 |
| 1702 | Giant Web Based | | | | | | | | | | | | | $0 |
| | Pipeline Estimate | | | | | | | | | | | | | $0 |
| | **Total E-Clin** | **$7,118** | **$16,270** | **$8,031** | | **$19,809** | **$8,241** | | | | | | **$50,549** | **$107,067** |
| 1703 | Kroger Loyalty Cards | $355,044 | $667,955 | $338,559 | $734,317 | $578,403 | $282,960 | $0 | $19,883 | $21,817 | | | $6,549 | $2,817,878 |
| 1701 | Do It Best Loyalty Cards | $95,343 | $163,830 | | $234,344 | $118,708 | $13,677 | $7,741 | | | | $14,142 | $48,043 | $885,858 |
| | Penmark Loyalty Cards | | | $989 | | | | | | | | | | $989 |
| 1706 | Ralphs Loyalty Cards | | | | | | | | | $150,000 | | | | $150,000 |
| 1712 | Longs Drug Loyalty Cards | | | | | | | | | | | | | $0 |
| | Pipeline Estimate | | | $31,298 | | | | | | | | | | $31,298 |
| | **Total Loyalty Cards** | **$450,387** | **$831,658** | **$370,718** | **$968,661** | **$637,111** | **$296,937** | **$7,741** | **$19,883** | **$171,817** | **$27,850** | **$14,142** | **$6,549** | **$3,886,021** |
| | **Total Data Entry & Cards** | **$452,863** | **$837,028** | **$378,785** | **$988,661** | **$656,920** | **$304,858** | **$7,741** | **$19,883** | **$171,817** | **$27,850** | **$14,142** | **$98,692** | **$3,794,700** |
| 1640 | Pfizer Listerine DM | | | | | | | | | $72,489 | | | | $72,489 |
| 1633 | Hormel MV Bacom DM | | | | | | | | | | | | | $0 |
| 1638 | Land O Lakes DM | | | | | | | | | | | | | $0 |
| 1642 | Campbells EAM | | $8,398 | | | $6,125 | | | | $844 | | | | $15,025 |
| 1645 | Matrix | | | | | | | | | $7,878 | | | | $17,878 |
| 1648 | P&G Always Maxi | $813,231 | $26,797 | | | | | | | ($14,770) | | | | $937,248 |
| 1648 | GSK-Contac | $16,662 | | | | | | | | ($49) | | | | $16,838 |
| 1651 | Commodity Tabasco American Gravy | | | | | | | | | | | | | $0 |
| 1662 | Hormel/Kice Kitchen | | | | | $112,990 | | | | $34,228 | | | | $149,218 |
| 1654 | Hormel/Dinty Moore | | | | | $100,528 | | | | $40,758 | | | | $140,282 |
| 1653 | Community Coffee | | | $14,758 | | | | | | ($32,633) | | | | $12,125 |
| 1657 | HP Care Countdown | | | | | $15,734 | | | | $21,887 | | | | $370,016 |
| 1653 | Coca-Cola-Hebrew/National | | | | | | | | | $8,050 | | | | $40,510 |
| 1655 | P&G Pampers Cruisers | | | | | | | | | $4,127 | | | | $160,898 |
| 1653 | Klokman | | | | | | | | | ($32,300) | | | | $1,040,043 |
| 1658 | Tennessee Pride | | | | | | $22,415 | | $26,942 | $4,646 | | | | $26,437 |
| 1661 | Campbells/Diskette | | | | | | $35,296 | | $14,098 | $0 | | | | $14,098 |
| 1668 | Kraft - Ahols | | | | | | $55,439 | | $31,063 | ($51,414) | | | | $23,649 |
| 1668 | Community Coffee #2 | | | | | | $308,303 | | $31,050 | $31,850 | | | | $31,850 |
| 1670 | HP Care Countdown #2 | | | | | | | | $10,125 | $28 | | | | $10,125 |
| 1671 | J Brown/ Darmon | | | | | | | | $14,672 | $4,928 | | | | $19,900 |
| 1672 | Langlen | | | | | | | | $53,064 | $0 | | | | $53,064 |
| 1683 | International Delight | | | | | | | | $32,000 | $12 | | | | $32,012 |
| 1663 | Tyson | | | | | | | | | $834 | | | | $45,722 |
| 1669 | Del Monte Savory Sides | | | | | | | $44,888 | | ($51,913) | | | | $44,433 |
| 1675 | Fuji - Wave 1 | | | | | | | $376,346 | | $30,674 | | | | $30,674 |
| 1671 | Lenzer | | | | | | | | | $4,000 | | | | $4,000 |
| 1655 | Cucumber Melon Sample | | | | | | | | | $9,001 | | | | $9,001 |
| 1681 | Barber | | | | | | | $37,620 | | $14,088 | | | $18,000 | $14,088 |
| 1691 | Sutton Place DM | | | | | $1,369 | | | | $20,848 | | | | $22,848 |
| 1682 | NY Poet | | | | | $38,000 | | | | $7,590 | | | | $45,210 |
| 1674 | Botek Quattro | | | | | | | | | | | | | $1,359 |
| 1647 | Campbells EAM | | | | | | | | | | | | | $39,900 |
| 1676 | Fuji - Wave 2 | | | | | | | | | | $138,020 | $15,300 | $18,000 | $154,020 |
| 1677 | Sotola Quattro | | | | | | | | | | | $48,897 | | $13,300 |
| 1678 | McKenzie - Enfamil | | | | | | | | | | | $19,000 | | $146,632 |
| 1676 | Hormel Samsclick | | | | | | | | | | | $60,200 | | $19,800 |
| | Other | | | | | | | | | | | $9,625 | | $342,923 |
| | | | | | | | | | | | | | | $147,500 |
| | | | | | | | | | | | | | | $9,625 |
| | **Total Direct Mail** | **$429,915** | **$35,043** | **$116,000** | **$0** | **$278,645** | **$441,423** | **$895,494** | **$241,984** | **$407,434** | **$134,020** | **$221,177** | **$299,668** | **$3,700,520** |
| | **Total SSD** | **$1,092,476** | **$722,071** | **$899,864** | **$988,661** | **$935,565** | **$746,231** | **$904,235** | **$261,847** | **$675,253** | **$165,870** | **$335,258** | **$398,240** | **$17,485,220** |

CONFIDENTIAL
NAM50008

SMART SOURCE DIRECT
As of 09/30/03

| Customer | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6040 Sutton Place - E-Gift | $0 | $0 | $0 | $29,000 | $7,814 | $2,670 | $2,855 | $2,481 | $2,854 | $2,507 | $0 | $0 |
| 5363 Toshiba | $70,000 | $0 | $70,000 | $40,000 | $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5628 Longs E-Gift | $415,000 | $0 | $90,460 | $0 | $42,221 | $4,904 | $5,144 | $5,252 | $5,194 | $5,281 | $0 | $2,670 |
| 5639 West Marine E-Gift | $55,350 | $0 | ($631) | $0 | ($45,209) | ($31) | $0 | $0 | $0 | $0 | $0 | $0 |
| 5384 Key Foods | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5393 1034 The Party (?#2) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($5,000) | $0 | $0 | $0 | $0 |
| 9713 Food Dynasty | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 9951 Sutton Place E-Gift | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| A/R Write-Offs (West Marine (-45.3bk) | $0 | $0 | $0 | ($25,000) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total E-Gift Cards** | $548,350 | $0 | $168,428 | $66,000 | ($154) | $7,844 | $8,079 | $2,833 | $7,846 | $7,794 | $0 | $2,670 |
| 9811 Sutton Place - Loyalty | $0 | $39,330 | $0 | $0 | $3,284 | | | | | | | |
| 5366 Paul Schultz | $23,652 | ($2,184) | $21,876 | $0 | | | $9,576 | $19,180 | $19,160 | $4,003 | $1,482 | $0 |
| 7565 Wallace | $63,420 | $400,296 | $0 | $52,106 | $269,442 | $224,826 | $177,228 | $72,000 | $74,711 | $215,673 | $196,797 | $154,048 |
| 644 & 5565 Giant Web Based | $0 | $0 | $0 | $0 | $48,063 | $78,739 | $12,425 | $12,425 | $15,375 | $44,853 | $54,302 | $49,396 |
| 4549 Trade Fair | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| A/R Write-Offs (Wallace -$194) | $0 | $0 | $0 | $0 | | | | | | $156 | $741 | |
| **Total Loyalty Cards** | $167,072 | $437,352 | $21,876 | $52,106 | $316,613 | $303,365 | $196,229 | $103,605 | $199,264 | $263,129 | $252,581 | $243,444 |
| 5482 Do It Best | $0 | $0 | $0 | $0 | $20 | $0 | $0 | $64 | $237 | $0 | $156 | $741 |
| 5561 Spartan Data Entry | $0 | $2,415 | $606 | $0 | $331 | $436 | $0 | $401 | $229 | $160 | $285 | $162 |
| 5632 Sutton Place | $0 | $1,100 | $1,198 | $0 | $364 | $155 | $155 | $386 | $216 | $316 | $251 | |
| 5573 Giant Data Entry | $58,440 | $15,032 | $15,465 | $14,905 | $12,760 | $6,117 | $11,473 | $0 | | | | |
| 5584 Key Foods | $3,567 | $0 | $22,161 | $0 | $1,425 | $781 | | | | | | |
| 5644 Harris Teeter | $22,924 | $0 | $10,937 | $3,802 | $6,745 | $0 | | | | | | |
| **Total Data Entry** | $67,961 | $18,547 | $50,395 | $18,587 | $21,905 | $7,605 | $0 | $12,344 | $457 | $490 | $682 | $923 |
| **Total Card Implementation** | $739,383 | $456,299 | $238,300 | $136,695 | $348,564 | $317,996 | $204,308 | $116,742 | $117,571 | $275,413 | $263,273 | $252,637 |
| 6923 Direct Exposure (Med 4 Home) | $0 | $0 | $0 | $0 | $0 | $0 | | | | | | |
| 5584 Dairy Gem | $126,070 | ($11,321) | $5,271 | | | | | | | | | |
| 5524 P&G Always | $422,393 | ($29,075) | $23,251 | ($70,860) | $26,000 | | | | | | | |
| 21 & 5621 Levezzo - | $0 | $0 | $0 | $0 | | $378,900 | | | | | | |
| 5573 Campbell | ($51,026) | $0 | $0 | $0 | | | | | | | | |
| 6923 Campbell Soup | $26,270 | $26,270 | ($26,270) | $0 | | | | | | | | |
| 9908 Stick Direct Mail | $0 | $0 | $0 | $0 | $410 | | | | | | | |
| 5864 Sutton Place | $0 | $32,687 | $0 | $0 | | | | | | | | |
| 5628 Glenn - Abreva | $100,000 | $79,938 | $0 | $0 | | | | | | | | |
| 9628 Glenn | $0 | $12,009 | $2,828 | $0 | | | | | | | | |
| 9422 Electrowl | $78,640 | $139,300 | $0 | ($9,640) | | | | | | | | |
| 5419 Barber Foods | $0 | $0 | $20,500 | $0 | | | | | $3,000 | | | |
| 5634 Simba Salaries | $0 | $0 | $47,375 | $13,696 | | | | | | | | |
| 5620 Dermco Geo-Demo Lists | $9,144 | $0 | $0 | $0 | | | | ($20,000) | | | | |
| 5517 Ice Age | $30,000 | $0 | $30,000 | ($20,000) | | | | | | | | |
| 5961 White Rose Marketing | $0 | | | | | | $167,175 | | | | | |
| 5922 Community Coffee | $0 | $0 | $0 | $0 | $43,396 | | | | | $29,760 | | |
| 5632 Hormel Bacon | $0 | | | $64,905 | | | | | | | | |
| 5924 Claint | $0 | | | $0 | | | | | | | | |
| 5566 Needles Ortega | $0 | $0 | $0 | $0 | | | $254,232 | | $11,587 | | | |
| 5540 Prized/Jeterine | | | | | $65,436 | | | | | | | |
| 5641 NY Post | | | | | $24,000 | | | | | | | |
| 5644 Campbell's Prego | | | | | | | $31,148 | $33,000 | | | | |
| 5434 Land O Lakes | | | | | | | $17,526 | | | | | |
| 5643 Tyson Roasted Chicken | | | | | | | $15,964 | | | $112,164 | | |
| 5642 John B San Filippo | | | | | | | | | | $202,550 | | |
| 5645 Meniec | | | | | | | | | | | $25,630 | |
| 5640 P&G Always Mail | | | | | | | $176,700 | | | | | |
| 5544 Reddit Vest | | | | | | | | | | | | |
| 5630 Veal | | | | | | | | ($931) | | | | |
| **Total Direct Mail** | $664,391 | $243,916 | $112,553 | ($12,297) | $69,696 | $378,900 | $204,611 | $426,425 | $50,743 | $65,347 | $274,714 | $30,830 |
| -TOP LEVEL | | $31,622 | ($28,620) | | | | | | | | | |
| **arce Direct Totals before ASPen &** | $1,534,774 | $731,439 | $322,233 | $106,396 | $409,390 | $696,796 | $420,919 | $545,667 | $668,314 | $336,760 | $637,947 | $291,667 |
| 5565 Key Foods | $30,750 | $30,750 | $0 | ($103,750) | $0 | | | | | | | |
| Large Drugs | $15,000 | $0 | $0 | $0 | | | | | | | | |
| Quane Reade | $0 | $43,000 | $0 | ($45,000) | | | | | | | | |
| 5403 Sutton Place Gourmet | $0 | $0 | $0 | $5,850 | $3,060 | $0 | | | | | | |
| 5698 Foottocker | $5,850 | $5,850 | $0 | $5,850 | | | | | | | | |
| 5548 Hush Flush | $0 | $0 | $0 | $0 | $0 | | | | | | | |
| **Total Data Management** | $51,600 | $79,600 | $0 | ($190,800) | $3,060 | $0 | | | | | | |
| **Total SSD DIRECT** | $1,586,374 | $811,439 | $322,233 | ($84,506) | $413,050 | $696,796 | $420,919 | $545,607 | $668,314 | $336,760 | $637,947 | $291,667 |

CONFIDENTIAL
NAM50009

**EXHIBIT 8 TO AFFIDAVIT**

# Company Description

News America Marketing® is the nation's leading marketing services company with over $1 billion in annual revenue. We offer advertisers a broad portfolio of in-store, home-delivered and online media that helps brands stand out in today's cluttered marketplace. Our powerful advertising and promotion programs—united under the SmartSource® brand name—are relied upon by the country's largest packaged goods manufactures for their unparalleled consumer reach.

## Parent Company

News America Marketing is a subsidiary of News Corporation, one of the world's largest media and entertainment companies. News America Marketing's sister companies include:

- Twentieth Century Fox Film Corporation

- Fox Broadcasting Company

- HarperCollins Publishers Inc.

- DirecTV, Inc.

- *New York Post*

## Clients

News America Marketing's client base includes many of the nation's most recognized companies:*

| | |
|---|---|
| Campbell Soup Company | L'Oréal |
| The Clorox Company | MasterFoods USA |
| Coca-Cola Enterprises, Inc. | Nestlé USA, Inc. |
| Colgate-Palmolive Company | PepsiCo, Inc. |
| ConAgra Foods | The Procter & Gamble Company |
| Del Monte Foods | Reckitt Benckiser |
| Georgia-Pacific | S.C. Johnson & Son |
| General Mills, Inc. | Tyson Foods, Inc. |
| Kellogg USA, Inc. | Unilever |

*Partial List

# Business opportunities

A subsidiary of News Corporation, News America Marketing is the largest distributor of consumer packaged goods promotions in the U.S. Under the SmartSource® brand, we insert coupons in over 1,160 weekend newspapers, place bright red coupon machines, cart, shelf, and floor ads in 33,000 stores, and provide printable coupons across more than 80 leading websites on the internet. Our portfolio of marketing solutions reaches consumers at every point of decision.

**News America Marketing will give your brand the reach it deserves.** Click on any of the following opportunities to have your email directed to the appropriate contact.

**ONLINE | MEDIA**
------------------------------

### Want to Distribute Your Coupon Across the Internet? The SmartSource Savings
network will promote your product across 80+ websites reaching 50 million households.
Click here.

### Want to Add Value to Your Website with Free Printable Coupons? Provide
valuable grocery savings to your customers, members or subscribers.
Click here.

### Want to Advertise Online?
Get your marketing message in front of female head-of-household shoppers.
Click here.

**PRINT | MEDIA**
------------------------------

### Want to Distribute Your Coupon in Sunday Newsapers? SmartSource
Magazine reaches 68 million households across 1,160+ newspapers.
Click here.

### Want to Advertise In-Store? Highlight your product to 80
million households via 33,000 U.S. grocery, drug, and mass merchant retailers.
Click here.

**TAB B TO EXHIBIT BINDER**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.                                                    Civil Action No. 05-11740-MLW

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

## AFFIDAVIT OF HENRI LELLOUCHE

I, Henri Lellouche, on oath, depose and state as follows:

1.    My name is Henry Lellouche. I am currently Senior Vice President of the Smart Source Group, a division of News America Marketing ("NAM"). I make this affidavit on personal knowledge.

2.    I was personally involved with the acquisition of CCMI by NAM in 1999, and subsequently was the manager of CCMI after its acquisition.

3.    Following the acquisition of CCMI by NAM, CCMI (which we had rebranded as Smart Source Direct ("SSD")) developed a new business centering around the provision of stored value or e-gift cards and transaction processing for such cards.

4.    During plaintiffs Robert Fireman's and Ann Raider's earn-out years, we developed significant business in this new area from Toshiba and the Long's Drug Store chain.

5.    Transaction processing for stored value cards had never been done by CCMI prior to the NAM acquisition.

Signed under the pains and penalties of perjury this 26 day of October, 2007.

Henri Lellouche

**TAB C TO EXHIBIT BINDER**

Page 1

```
 1                                  Volume:   I

 2                                  Pages:   1-354

 3                                  Exhibits:  62-141

 4

 5            UNITED STATES DISTRICT COURT

 6          FOR THE DISTRICT OF MASSACHUSETTS

 7      Civil Action No. 05-1740 MLW

 8      - - - - - - - - - - - - - - - - - - - - - x

 9      ROBERT FIREMAN and ANN RAIDER,

10                  Plaintiffs,

11           v.

12      NEWS AMERICA MARKETING IN-STORE, INC.,

13                  Defendant.

14      - - - - - - - - - - - - - - - - - - - - - x

15

16            DEPOSITION OF ROBERT N. FIREMAN

17              Thursday, May 24, 2007

18             10:08 a.m. to 6:32 p.m.

19              HOLLAND & KNIGHT, LLP

20         Ten St. James Avenue, 11th Floor

21              Boston, Massachusetts

22

23

24      Reporter:  Marianne R. Wharram, CSR/RPR
```

Page 22

1    Q.   -- you had the Fireman & Orlandi firm?
2    A.   No.
3    Q.   Did you have any associates?
4    A.   It was -- there were lawyers in the suite
5    and we were all independents.
6    Q.   Did you use the services of any of the
7    other lawyers?
8    A.   Oh, sure.
9    Q.   On work that you generated?
10   A.   Sure.
11   Q.   And you were telling us that in the early
12   1990's, you created CCMI right?
13   A.   Correct.
14   Q.   Would you continue to tell us what jobs you
15   had during the CCMI period and afterwards?
16        MR. PETERS:  Objection.
17   A.   I don't understand what jobs --
18   Q.   (BY MR. KATZ)  Okay.  Let me --
19   A.   What is a job?
20   Q.   Well, let me back up a second.
21   A.   Jobs as in --
22        MR. PETERS:  Wait, wait.
23   Q.   (BY MR. KATZ)  Only one of us can talk at a
24   time.

Page 23

1    A.   Sorry.
2        MR. PETERS:  Bob thought it was him.
3    Q.   (BY MR. KATZ)  You told us that you were in
4    the private practice of law before CCMI, right?
5    A.   Yes.
6    Q.   Okay.  And that you've really continuously
7    been in the private practice of law from 1974 to
8    the present, correct?
9    A.   Correct.
10   Q.   Okay.
11   A.   And continue to be in the private practice
12   of law --
13   Q.   Yes.
14   A.   -- to the present.
15   Q.   To the present.  And you told us that CCMI
16   started while you were in your law office at Three
17   Center Plaza, correct?
18   A.   Yes.
19   Q.   Okay.  And at some point, your activity,
20   your time became much more focused on CCMI?  Fair
21   statement?
22   A.   Correct.
23   Q.   Okay.  And ultimately, you sold CCMI, as we
24   know, to News America Marketing, right?

Page 24

1    A.   Correct.
2    Q.   And you had an employment agreement with
3    News America Marketing, right?
4    A.   Correct.
5    Q.   We'll get into that in more detail later.
6    And then at some point, in approximately 2004, you
7    left News America Marketing, correct?
8    A.   I was no longer there.
9    Q.   Okay.
10   A.   Whether I left or was asked to leave is a
11   whole other question.
12   Q.   What did you do following your cessation of
13   employment by News America Marketing?
14   A.   Well, I had -- I opened -- I went into a
15   friend's office in Weston, Massachusetts.
16   Q.   And who is the friend?
17   A.   A fellow named Robert Bickford.
18   Q.   And what did you do there?
19   A.   Well, I continued to work on some of the
20   ideas in card marketing.  Robert Bickford had a
21   company that had a Visa platform.
22   Q.   What is the name of the company?
23   A.   Compass Cards.
24   Q.   And what did you do?

Page 25

1    A.   Well, I wasn't working.  I mean, I was
2    trying to help him build ideas for the use of
3    private label debit cards.
4    Q.   Were you --
5    A.   And when I was -- when I was asked to not
6    -- when I was told I couldn't come to the News
7    America office any more, notwithstanding my
8    employment agreement, I went there to try to
9    continue to do some of the work that I was doing
10   for News America Marketing.
11   Q.   And when would you date your first going to
12   Mr. Bickford's office in Weston?
13   A.   Oh, I don't know.  2004.
14   Q.   When in 2004?
15   A.   Whenever I was told I couldn't come to work
16   any more.
17        (Mr. Lellouche enters deposition.)
18        MR. PETERS:  Will Mr. Lellouche be
19   introduced on the record?
20        MR. KATZ:  Mr. Henri Lellouche has just
21   entered the room.
22        MR. PETERS:  Mr. Lellouche is a witness
23   in a deposition tomorrow.  I understand Mr. Katz's
24   position that he's the corporate representative for

7 (Pages 22 to 25)

Page 78

1   called the Business Software Alliance?
2       A. Is that the Microsoft thing?
3       Q. Yeah, it's -- Microsoft is part of the BSA.
4       A. Yeah.
5       Q. Now, prior to its acquisition by NAM, CCMI
6   had been contacted by the BSA because it had
7   pirated the Office software; is that not correct?
8           MR. PETERS: Objection.
9       A. That's not correct. Gordon, you know --
10  why do you have to characterize it as pirating?
11          MR. PETERS: Let's get through this,
12  Bob.
13      Q. (BY MR. KATZ) You had told others in your
14  office, did you not, to copy existing copies of
15  Microsoft Office because it was cheaper to do that
16  than to go out and obtain additional licenses;
17  isn't that true?
18      A. Untrue. Absolutely totally untrue.
19      Q. Do you know who the employee was who
20  informed the BSA of CCMI?
21      A. No idea.
22      Q. And how much did CCMI have to pay to BSI --
23  how much did CCMI have to pay the BSA in order to
24  resolve the issues that had been raised?

Page 79

1       A. De minumus, as far as I know. As far as I
2   remember, we bought some computers from some
3   private vendors that said it was licensed, and some
4   of these issues came up because the computer comes
5   with a set of Office. I don't remember, but if it
6   was more than three or four or 5,000, I'd be
7   surprised.
8       Q. I'm going to hand you what's already been
9   marked as Exhibit 38. It is the Stock Purchase
10  Agreement between Robert Fireman, Ann Raider,
11  Curtis Smith, John H. Boyles and News America
12  Marketing In-Store, Inc., dated August 13th, 1999.
13  This agreement was entered into almost eight years
14  ago, correct?
15      A. August 13th, 1999.
16      Q. And on page 52, you signed it? And there
17  is a counterpart page 52, so don't be confused.
18      A. Yes.
19      Q. Both Ms. Raider and you were advised by
20  counsel at Goodwin, Procter & Hoar throughout the
21  preparation of the document?
22      A. Yes.
23      Q. Goodwin Procter reviewed drafts of the
24  agreement, made comments and gave you advice,

Page 80

1   right?
2       A. Correct.
3       Q. And you believe you received very good
4   advice from Goodwin Procter in connection with the
5   agreement, right?
6       A. I don't know.
7       Q. You have some questions as to whether the
8   advice you received from Goodwin Procter was good?
9       A. Yes.
10      Q. What are the issues that concerned you with
11  respect to the advice that you got from Goodwin
12  Procter?
13      A. Oh, I don't know. I think it should have
14  been written stronger in our favor, but whatever.
15      Q. Okay. You also received advice regarding
16  the agreement from Les Charm, one of your
17  directors, right?
18      A. Correct.
19      Q. And Mr. Charm negotiated on your behalf
20  with Mr. DeVoe from News America Marketing, right?
21      A. Yes.
22      Q. And Mr. Coughlin also had discussions with
23  representatives of NAM prior to the agreement being
24  signed, right?

Page 81

1       A. Yes.
2       Q. Okay. Do you know whether the other two
3   shareholders of CCMI, Curtis Smith and John Boyles,
4   had any discussions with representatives of NAM
5   prior to the agreement being signed?
6       A. I don't recall.
7       Q. And the purpose of the agreement was to
8   document the terms of the sale of your stock in
9   CCMI to NAM, right?
10      A. I would say so.
11      Q. Okay. The Stock Purchase Agreement of
12  August 13th, 1999 was a very important agreement
13  for you, correct?
14      A. It was an agreement.
15      Q. Okay. Had you ever been a party to an
16  agreement that was as important to you as this one?
17      A. Many, yes.
18      Q. Okay. At what time?
19      A. Over the course of time.
20      Q. Have you been a party to any agreement
21  other than this that enabled you to receive over a
22  million dollars?
23      A. Yes.
24      Q. Identify them, please.

21 (Pages 78 to 81)

Page 98

1  -- she's talking. I couldn't create Julie's
2  spreadsheet. I mean, the memo talks like these are
3  her numbers and he was raising some issues within
4  it.
5     Q. Okay. Well, irrespective of the answer to
6  that question, let me ask you a few other
7  questions.
8     A. And obviously, the earn-out summaries that
9  are attached here from years later were not part of
10 the memo.
11    Q. No question. We don't disagree.
12    A. So you've attached a lot of documents that
13 aren't germane to the memo.
14    Q. Well, let's go to my questions, because
15 they're less related to the memo than they are to
16 some facts. In 1997, according to the documents
17 here, CCMI's earnings were just barely $400,000 on
18 gross revenue of $7.9 million. Do you see where
19 that's reflected on FR 2677?
20    A. I see the number 403K on the bottom, if
21 that's what you're referring to.
22    Q. Okay. And you see on the total revenue
23 line the number of 7,916,762? Do you see that?
24    A. Yes.

Page 99

1     Q. Would you agree with me that CCMI's revenue
2  in 1997 was approximately $7.9 million?
3     A. $8 million.
4     Q. $8 million?
5     A. By these numbers, yes.
6     Q. And you don't have any reason to dispute
7  that, right?
8     A. No.
9     Q. And do you believe that in 1997, CCMI had a
10 profit of approximately $403,000?
11    A. I don't know.
12    Q. Okay. In 1996, CCMI's gross revenue was
13 just barely over 2.5 million, right?
14    A. By this document.
15    Q. Do you have any reason to doubt it?
16    A. No.
17    Q. And according to this document, in 1996,
18 CCMI had a loss of $72,000. Do you see that?
19    A. Yes.
20    Q. Okay. Do you have any reason to doubt that
21 CCMI had a loss of $72,000 in 1996?
22    A. Well, I don't -- I would ask you who wrote
23 those numbers and why are they here? They don't --
24    Q. I'm just asking a yes or no question.

Page 100

1     A. Well, I don't know.
2     Q. Okay. How much cash did you receive from
3  the $2.8 million?
4     A. I don't remember.
5     Q. You received $1.3 million; isn't that
6  right?
7     A. Approximately.
8     Q. And did you or Ms. Raider share any
9  of your up-front cash with Mr. Adam or Mr. Coughlin
10 or anyone else from CCMI?
11    A. No.
12    Q. Okay. Now, Mr. Adam expected that he was
13 going to receive something from the proceeds of the
14 sale of the company, did he not?
15    A. You'd have to ask him.
16    Q. Yeah, he discussed this with you, did he
17 not?
18    A. I don't remember. I know that he had some
19 options and there was some discussion, but I don't
20 really remember what happened.
21    Q. Did you ever write Mr. Coughlin or Mr. Adam
22 a check out of the approximately $1.4 million you
23 received --
24    A. I might have.

Page 101

1     Q. -- in consideration of his options --
2     A. I might have.
3     Q. -- or their options?
4     A. I might have.
5     Q. You don't remember as you sit here today?
6     A. No.
7     Q. Now, you had a five-year employment
8  agreement with News America Marketing, right?
9     A. Correct.
10    Q. And you began with a salary of $163,000
11 under your News America Marketing employment
12 agreement, right?
13    A. If that's what it says, yes.
14    Q. You don't have any reason to doubt that?
15    A. No.
16    Q. And News America Marketing gave you a
17 salary increase every year, right?
18    A. Don't remember.
19    Q. And these increases were all discretionary,
20 right?
21    A. I don't remember. I think we were supposed
22 to get treated commensurate to how senior
23 executives in the company were being treated.
24    Q. And salary increases for senior executives

26 (Pages 98 to 101)

Robert N. Fireman

Page 102

1  were discretionary, right?
2     A. I assume, yes.
3     Q. Now in fact, your salary went up
4  immediately upon News America Marketing's
5  acquisition of CCMI, right?
6     A. Don't remember.
7     Q. You were only making $153,000 at the time
8  of the acquisition in 1999, right?
9     A. I don't remember. I mean, I was -- I put
10 up lots of money invested into CCMI.
11    Q. Take a look at Schedule 4.13 of Exhibit 38.
12    A. If it says that was my salary, then that's
13 probably true.
14    Q. Okay, so --
15    A. Whether --
16    Q. Take a look at it and just confirm for me
17 that what you represented that you were making
18 prior to the acquisition was $153,000.
19    A. What number?
20    Q. Schedule 4.13.
21    A. I can't find it.
22    Q. 4.13 of the Stock Purchase Agreement.
23    A. I'm listed at 153,000, correct.
24    Q. Now, besides the $153,000 salary which you

Page 103

1  were receiving from CCMI, did you receive anything
2  else from CCMI prior to the acquisition as
3  compensation?
4     A. I don't remember.
5     Q. Back to your employment agreement with News
6  America Marketing, you received discretionary
7  bonuses under your News America Marketing
8  employment agreement under all but the last of the
9  five years of your employment agreement, right?
10    A. I don't recall.
11    Q. You don't recall NAM granting you as much
12 as about $30,000 as a discretionary bonus in one or
13 more years under your employment agreement?
14    A. No.
15    Q. News America Marketing was not obligated to
16 grant you any discretionary bonuses under your
17 employment agreement, was it?
18    A. I don't know.
19    Q. But you do remember getting bonuses under
20 your employment agreement?
21    A. There was a personal bonus, there was a
22 corporate bonus, there was an annual review, and I
23 participated in it until the end, or until the last
24 year. I think there was another year that I got a

Page 104

1  questionable mark or something.
2     Q. Now, you received formal written
3  evaluations by your superiors at News America
4  Marketing during each of the years of your
5  employment at News America Marketing, right?
6     A. Formal written what?
7     Q. Formal written evaluations.
8     A. There was an appraisal, self-appraisal
9  process, yes.
10    Q. And you received evaluations from your
11 superiors --
12    A. Yes.
13    Q. -- regarding your performance, right?
14    A. Yes, except the last year when I wasn't
15 afforded the process.
16    Q. Okay. For the most part, the reviews News
17 America Marketing gave you were very favorable,
18 were they not?
19    A. Yes.
20    Q. And while you were employed at News America
21 Marketing, you were a managerial employee part of
22 the time, right?
23    A. I was supposed to be.
24    Q. And as a managerial employee, did you

Page 105

1  believe that you had fiduciary duties to News
2  America Marketing?
3        MR. PETERS: Objection.
4     Q. (BY MR. KATZ) It's a yes or no.
5     A. I don't know.
6     Q. Were you bound by a code of ethics while
7  you were at News America Marketing?
8     A. A code?
9     Q. Yes.
10    A. A News America code?
11    Q. Yes.
12    A. That's -- if there was a code of ethics in
13 an employee journal, I don't know. I don't recall.
14    Q. You don't remember reading a code of ethics
15 provided by News America Marketing? Is that what
16 you're saying?
17    A. I don't recall a specific code of ethics
18 document right at this moment, no.
19    Q. But you can't say one way or the other
20 whether or not you actually read it? Is that what
21 you're saying?
22    A. I can't recall actually reading a specific
23 document.
24    Q. Do you ever remember seeing a specific

27 (Pages 102 to 105)

Page 162

1  all our clients. They fractionalized the business,
2  and you know what? They didn't care.
3     Q. And you raised these issues --
4     A. Paul Carlucci said what do I care about
5  another hundred million dollars?
6     Q. Just answer the questions. And you raised
7  these issues each year in your discussions with the
8  financial people at New America Marketing regarding
9  your earn-out; isn't that right?
10    A. Each year we protested the amount of money
11 that had been spent and how the million and a half
12 dollars had been put against our earn-out and how
13 it was unfair.
14    Q. Can you identify any client of CCMI that
15 ceased being a CCMI or SmartSource Direct client
16 after the acquisition?
17    MR. PETERS: At any time after?
18    MR. KATZ: Yes.
19    A. Well, we lost Duane Reade because of the
20 incompetency of what happened, taking away our
21 technology.
22    MR. PETERS: Right now he just wants a
23 list of companies.
24    A. I don't remember. Nash Finch we lost

Page 163

1  because NAM made a decision not to support the
2  Legacy system. Sullivan. We dropped companies.
3  They didn't care. We just dropped people. They
4  didn't care about them. When we were CCMI, we
5  cared about our clients.
6     Q. (BY MR. KATZ) Now, we'll come back to some
7  of these things that we've been talking about
8  briefly, but let me ask you a few other questions.
9  When you were working for News America Marketing
10 under your employment agreement, you were also
11 involved in the practice of law, right?
12    A. No.
13    Q. Okay. You kept your bar membership active,
14 right?
15    A. I kept my bar membership.
16    Q. Right?
17    A. Yes.
18    Q. And Ms. Raider said last week that you
19 continued to do legal work for family and friends
20 after the acquisition. You heard her make that
21 statement, right?
22    A. I heard her.
23    Q. And she was accurate, right?
24    A. I don't know.

Page 164

1     Q. Okay.
2     A. I don't -- you know.
3     Q. You kept your malpractice insurance up to
4  date?
5     A. No.
6     Q. You let your malpractice insurance lapse?
7     A. Yes. I had no active professional
8  practice.
9     Q. You listed your -- your name in the lawyers
10 book at the News America Marketing address at 200
11 Clarendon Street?
12    A. I believe I did, yes.
13    Q. And you did that for several years, right?
14    A. I listed where my office was, yes.
15    Q. Right. You didn't list your home, right?
16    A. No.
17    Q. You could have?
18    A. I never have.
19    Q. Okay. And so is it your testimony that you
20 did not do any legal work during the period of time
21 you were employed by News America Marketing?
22    A. I don't believe I was hired as an attorney
23 by anybody. I mean, did I help my father with his
24 will or his trust or --

Page 165

1     Q. Hadn't your father passed away by the time
2  you were working for News America Marketing?
3     A. Well, during. During.
4     Q. Didn't he pass away in 1997?
5     A. No. It was '99. It was just in the middle
6  of all this. New Year's Eve, '99.
7     Q. New Year's Eve just before year 2000?
8     A. Yeah.
9     Q. So after that point in time, did you do any
10 work for anyone, any legal work for anyone or any
11 legal entity while you were still on the News
12 America Marketing --
13    A. My mother's -- I did personal stuff.
14    Q. Did you receive any fees from any client?
15    A. I don't -- I don't believe so, no.
16    Q. You're not sure?
17    A. You're asking about five years did I do
18 anything for someone? I don't believe so.
19    Q. Did you participate in any business
20 ventures while you were under contract with NAM?
21    A. No. I invested in some things.
22    Q. What did you invest in?
23    A. I don't remember. I was investing in the
24 stock market.

42 (Pages 162 to 165)

Robert N. Fireman

Page 178

1  someone change their soap.
2      Q.  It was all direct -- it was all targeted
3  marketing, right?
4      A.  But it was based on actual purchase
5  behavior, which was available for the first time.
6      Q.  And that's what permitted you to target?
7      A.  Yes.
8      Q.  And there were no products that CCMI
9  offered other than this targeted marketing feature,
10  right?
11     A.  No.
12     Q.  No products to CPG manufacturers other than
13  the targeted marketing?
14     A.  Well, there was participation in the clubs
15  that were being formed around the loyalty programs,
16  kids clubs, promotions.  We now know who had kids
17  and who didn't have kids.  We now could segment
18  best shoppers from no shoppers.  We now could show
19  retailers where their best shoppers were and how
20  much money they spent and how profitable they were
21  on a basket.  We now could show them that their
22  worst customers were in express lines getting good
23  service while their best customers were sitting ten
24  lines deep waiting to be served.

Page 179

1      Q.  But it all boiled down to targeted
2  marketing of retail customers?
3      A.  One-to-one marketing and getting to an
4  actual consumer based on who they are and what they
5  buy.  That was the dynamic of what was happening.
6  And Gordon, when you look at the numbers --
7      Q.  Okay.  There's no question pending.
8      A.  All right.
9      Q.  Let me ask you this question.  You're
10  familiar with the Aspen system, right?
11     A.  I know what it is.
12     Q.  Okay.
13     A.  Familiar?
14     Q.  How many retailers signed on to the Aspen
15  system?
16     A.  I don't know of any.
17     Q.  How many?
18     A.  It was -- it was a disaster.  It never
19  worked.  I don't know of any.  I was removed from
20  that aspect of the business, no one reported to me,
21  and it was 18 months late and it didn't work.  And
22  nobody was responsible.
23     Q.  Mr. Fireman, I'm showing you a document we
24  marked as Exhibit 46.  It is a summary of the

Page 180

1  earn-out payments which you and Ms. Raider
2  received.  Do you remember seeing this document
3  last week?
4      A.  No.
5      Q.  Take a look at it now.  You don't have any
6  reason to question the numbers on Exhibit 46
7  accurately reflect the earn-outs that you received
8  over the five-year earn-out period, right?
9      A.  I have no knowledge.  I don't have any
10  reason to question it if you're telling me that's
11  what they say.
12     Q.  Each of you and Ms. Raider received an
13  earn-out payment each year, right?  Right?
14     A.  I don't know.  One, two, three, four, five
15  -- according to the document, yes.
16     Q.  Okay.  And when we look back at the five
17  years of earn-out discussions, you'd agree with me,
18  would you not, that you and Ms. Raider's exchanges
19  about your disagreements with NAM executives about
20  the earn-out were always professional, right?
21     A.  My dealings with News --
22     Q.  Yes.
23     A.  -- or their dealings with me?
24     Q.  Everyone's dealings were on a professional

Page 181

1  basis?
2      A.  I don't believe that they were fair.  I
3  don't believe that they were open.  I believe that
4  if there was an accounting error within one of the
5  small numbers, they made some adjustments.  I
6  believe that their --
7      Q.  Adjustments in your favor?
8      A.  No, there were adjustments against us.  I
9  believe that they were using the accounts
10  receivable that were outstanding --
11     Q.  Just answer the question.
12     A.  The answer is no, I don't believe they were
13  fair.
14     Q.  They were always courteous to you; they
15  being the NAM executives who you dealt with on your
16  earn-out; isn't that right?
17     A.  You mean it wasn't courteous?
18     Q.  Yeah.  They were courteous?
19     A.  They just did what they wanted to do, they
20  took the positions they wanted to take, and they
21  were inflexible on the issues that were important
22  to us.  Did they yell at us?  I don't remember any
23  screaming sessions.  Courteous?  They politely blew
24  a lot of money for themselves and us.

46 (Pages 178 to 181)

Page 182

1    Q.  Now, you never engaged an accountant to
2  discuss disputed issues with NAM's accountant
3  pursuant to the Stock Purchase Agreement's earn-out
4  dispute resolution procedure, right?
5    A.  Engage an accountant?
6    Q.  Yes.
7    A.  No.
8    Q.  And of course, there was never a need to
9  engage a third accountant to resolve any disputes
10  between the accountants, right?
11    A.  Right.  The issues were settled, but they
12  weren't according to GAAP.  I mean, if we worked
13  according to GAAP --
14    Q.  You've answered the question.  And you
15  never brought suit against NAM regarding any of the
16  complaints which you expressed in your letters
17  following the years one and two earn-out
18  calculations?
19    A.  I've already testified I did bring suit.  I
20  just didn't serve it.
21    Q.  But that was before the year one earn-out
22  calculation, right?
23    A.  Yes.
24    Q.  Okay.  So after the year one earn-out

Page 183

1  calculation, you never brought suit, right?
2    A.  Not until the present day.
3    Q.  Until the present day?
4    A.  Right.
5    Q.  You never brought suit against NAM until
6  after your five-year employment agreement was over,
7  right?
8    MR. PETERS:  Inconsistent with his
9  testimony.
10    A.  I didn't --
11    Q.  (BY MR. KATZ)  Apart from the 1999 suit,
12  which was never served?
13    A.  I testified Ann Raider had two kids in
14  college and we waited until she was out of harm's
15  way.
16    Q.  Okay.  And you've retained every dollar
17  paid you by NAM, correct?
18    A.  I don't understand the question.
19    Q.  You didn't offer to give back any of the
20  money that NAM paid you --
21    A.  No, I didn't give NAM back any money.
22    Q.  -- if they would undo the deal, right?
23    A.  It never was discussed.
24    Q.  You personally never offered to give back

Page 184

1  what you received in stock, or received for your
2  stock if they would undo the deal?  Just yes or no.
3    A.  I would have done that in a heartbeat if
4  they could undo the deal.  They couldn't give me
5  back what I gave them.
6    MR. PETERS:  Just yes or no.
7    A.  No.
8    (Exhibit 80 marked for identification.)
9    Q.  (BY MR. KATZ)  Okay.  I'm going to show you
10  a document marked Exhibit 80, and can you identify
11  this document for us?  Is this your handwriting?
12  Hello?
13    MR. PETERS:  He's reading.
14    MR. KATZ:  Okay.
15    Q.  (BY MR. KATZ)  Is this your handwriting?
16    A.  Yes.
17    Q.  Okay
18    A.  I believe so.
19    Q.  And when did you prepare this document?
20    A.  No idea.
21    Q.  Do you remember why you prepared this
22  document?
23    A.  No.  I mean, I think I wrote this down
24  because I was just general manager of a division

Page 185

1  that's about to be changed into another whole
2  organization and I have no knowledge and consent,
3  and I guess when Henri told me that -- this is the
4  first time, one of the few times he was honest with
5  me -- there's a conflict and he couldn't tell me
6  what it was.
7    Q.  Could you read this into the record?
8    A.  On Monday, executive conference.  I don't
9  know the date.  4/3.  I don't know the year.  I
10  learned that the broadcast -- every Monday they had
11  a --
12    MR. PETERS:  Just read it.
13    A.  SmartSource Interactive had been formed as
14  a division to pursue the original CCMI plan and
15  that Chris Mixson had been appointed president.  I
16  asked Henri Lellouche why I was learning about this
17  key strategic decision when announced to the press.
18  It was only one week earlier that I had told Henri
19  that we needed the support of Chris Mixson and the
20  manufacturers sales force to be successful.  Henri
21  told me at the time that Chris was busy making the
22  company plan of -- it says 370 million or -- I
23  can't read it -- and our business was not a
24  priority.  I guess that wasn't true a week ago.

47 (Pages 182 to 185)

Robert N. Fireman

Page 210

1  about no diverting business from CCMI to other
2  divisions or taking elsewhere, correct?
3      A. That's correct.
4      Q. It goes on to say, Mr. Charm does, state in
5  the agreement that you think the budgets are fair
6  and reasonable from what you know about other
7  companies in the News America package and that they
8  are reasonable given the growth rate that everybody
9  is expecting. Do you see that?
10     A. Yes.
11     Q. Okay. And you'd agree with me, would you
12  not -- again, please answer yes or no -- that there
13  is nothing in the Stock Purchase Agreement that
14  discusses the budgets being fair and reasonable
15  from what you know about other companies in the
16  News America package and that they are reasonable
17  given the growth rate that everybody is expecting?
18         MR. PETERS: Is that language in the
19  contract; that's Mr. Katz's question.
20     A. It's not in the contract. I don't even
21  know what it means.
22     Q. (BY MR. KATZ) I'm going to show you a
23  document that we're marking as Exhibit 90.
24         (Exhibit 90 marked for identification.)

Page 211

1      Q. And it is two e-mails, one from you,
2  Mr. Fireman, to Mr. DeVoe dated Thursday, July
3  29th, 1999, and then a response from Mr. DeVoe
4  dated Saturday, July 31, 1999. Do you remember
5  sending this e-mail to Mr. DeVoe? Have you
6  finished reading the document?
7      A. No.
8      Q. I'm not going to ask you many questions
9  about it, so let me -- in fact, I'm only going to
10  ask you one or two. In your e-mail of Thursday,
11  July 29th, 1999, you were making some suggestions
12  as to how you thought gross margins should be
13  defined in the Stock Purchase Agreement; right?
14     A. No, I think we were trying to define what
15  expenses should come off the top and how GAAP would
16  apply.
17     Q. And that all related to how gross margin
18  was going to be defined in the stock purchase
19  agreement; right?
20     A. No, just in general. I mean, this was more
21  of a business -- get clarity on the basis of the
22  bargain is what I'm talking about today.
23     Q. In any event, isn't it a fact that
24  Mr. DeVoe in his e-mail back to you on Saturday,

Page 212

1  July 31, 1999, basically said no to all your
2  suggestions? He said I believe the margin
3  definition as worded is accurate and represents the
4  deal structure that NAM is willing to close on with
5  CCMI; isn't that right?
6      A. That's what he said at this moment in time.
7      Q. And you interpreted that as a rejection of
8  all the requests that you were making in your
9  e-mail of July 29th, 1999; is that right?
10     A. No. This was everybody working to try to
11  come to an acceptable arrangement. I mean, Les was
12  making suggestions, we were making suggestions, and
13  David was making suggestions. Maybe not here.
14         (Exhibit 91 marked for identification.)
15     Q. Let me show you a document that we've
16  marked as Exhibit 91. This is a letter from you to
17  Mr. DeVoe dated October 22, 1999. The deal had
18  just recently closed, right?
19     A. Yeah.
20     Q. And you wanted more support from NAM more
21  quickly because you wanted to maximize your
22  earn-out numbers, right?
23     A. No. We wanted to build the business and
24  maximize our earn-out numbers. When we made good

Page 213

1  numbers, they were making good numbers.
2      Q. And you know that the hardware for Duane
3  Reade had been ordered, right? I call your
4  attention to the third paragraph. It says the
5  hardware for Duane Reade was finally all ordered on
6  October 18th, right?
7      A. That's what it says. I don't remember
8  exactly what they were talking about, but if you
9  let me read the letter, I'll try.
10     Q. You signed this letter, right?
11     A. Yes.
12     Q. And again, I'm just going to ask you some
13  specific questions. You say that the hardware for
14  Duane Reade was finally all ordered on October
15  18th, right?
16     A. That's what the document says.
17     Q. And the document was a document which you
18  wrote, right?
19     A. Right. Obviously, I was concerned it
20  should have been ordered two months earlier, but
21  whatever.
22     Q. But from your standpoint, it was a good
23  thing that NAM had in fact ordered the hardware for
24  Duane Reade, right?

54 (Pages 210 to 213)

Robert N. Fireman

Page 226

1   you on any of those projects?
2       A. You've got to define the product. What's a
3   NAM logistics group?
4       Q. Well, let me ask you this question. You
5   remember the Toshiba project?
6       A. Yes.
7       Q. When did that first start?
8       A. I don't recall.
9       Q. And that started because you got a lead
10  from News Corporation, right?
11      A. Yes.
12      Q. And that project closed, right?
13      A. Yes. That project closed.
14      Q. And the Toshiba project was the most
15  substantial piece of business CCMI had during the
16  five years after NAM's acquisition of CCMI, right?
17  Just yes or no.
18      A. I don't know, but there was a --
19      Q. Can you think of anything that was more
20  substantial than that during your five years with
21  News America Marketing?
22      A. Seeing our core business was not done, that
23  looked pretty good. I don't know. I didn't have
24  access to the records.

Page 227

1       Q. Okay, but as far as you -- as far as you
2   know, in your own personal experience, the Toshiba
3   business was the best piece of business that you
4   received during the five years after the
5   acquisition?
6       A. You me or you CCMI or SmartSource Direct or
7   who?
8       Q. Well, we'll start with you, Mr. Fireman.
9   It was the best piece of business that you were
10  successful in bringing in?
11      A. No. The best piece of business was the
12  Ahold prepaid cellular contract. That was a $50
13  million piece of business.
14      Q. But that contract was never signed?
15      A. Sure it was.
16      Q. Do you have a copy?
17      A. No.
18      Q. Where would you find a copy?
19      A. In the records of News America Marketing.
20      Q. And if I told you there was no such signed
21  contract, would you agree with me that none
22  existed?
23      A. No.
24      Q. But you don't have a copy yourself?

Page 228

1       MR. PETERS: Asked and answered. The
2   answer is no.
3       Q. (BY MR. KATZ) You don't have personal
4   knowledge that the contract was signed?
5       A. Yes, I do.
6       Q. You weren't there at the time it was
7   signed?
8       A. We rolled out a division of the -- so I
9   assume we had a contract. I negotiated the
10  contract. I think Jordan even helped, and it was
11  signed by -- I believe it was signed and we rolled
12  out the first division, so if it wasn't signed, we
13  had a full implementation going on with a major
14  retailer and we were waiting to roll out the whole
15  other groups.
16      Q. The Toshiba project was a very good thing
17  from your perspective, right?
18      A. The Toshiba project was a part of card
19  marketing and we were the experts in the country.
20      Q. Please just answer the question.
21      A. Yes, of course it was a good thing.
22      Q. And you found it because of a lead from
23  NAM's parent corporation, no?
24      A. We found it because it was either Citibank

Page 229

1   in New York or Citibank in Tokyo were looking for
2   someone to do a coupon delivery to solve a very
3   major problem that Toshiba was having. And
4   obviously, News America Marketing was coupon
5   driven, but --
6       Q. Please just answer the question. You found
7   it because of a lead that was provided you from
8   News America Marketing's parent, correct?
9       A. Don't know. Could have been from News
10  America Marketing.
11      Q. Okay.
12      A. Don't know.
13      Q. But you wouldn't have found it if you were
14  just left to your own devices, right?
15      A. I didn't find it. It found me.
16      Q. Thank you. That answers the question.
17      A. It found us because we were the only ones
18  in the country that could do it.
19          (Exhibit 98 marked for identification.)
20      Q. Let me show you a document which we've
21  marked Exhibit 98. Exhibit 98 is an April 6th,
22  2000 e-mail from Henri Lellouche to -- to Bill Adam
23  and others, or the subject of it is Bill Adam and
24  it's to a number of recipients. And the e-mail

58 (Pages 226 to 229)

Page 230

1  begins -- well, let me ask first, you received a
2  copy of this e-mail, right?
3      A. I don't know.
4      Q. I mean, it says to News America Marketing
5  all. You would have been included in that?
6      A. Should have been, but I don't know what
7  they did. The answer is -- I knew about this.
8  Yes.
9      Q. Okay. What was your e-mail address when
10 you were at News America Marketing?
11     A. R. Fireman at News America dot com.
12     Q. Okay. And the beginning of this e-mail
13 says I am sure that you have all read about our
14 multi-million dollar investment in the Epiphany
15 software and the host at ASP. This represents a
16 major commitment by NAM through the SmartSource
17 Direct division to be a major player in the
18 customer relations marketing, CRM, business and we
19 expect it will generate significant revenue for
20 SmartSource Direct. Do you see that?
21     A. Yes.
22     Q. Did you agree with this statement in
23 April 2000?
24     A. No.

Page 231

1      Q. Why not?
2      A. Because it wasn't true. They signed a
3  contract to do it but the people to do it -- Bill
4  Adams wasn't the person to do this.
5      Q. Why?
6      A. Because he was a -- he wasn't an IT guy.
7  Bill Adams was a creative, consultative guy with
8  knowledge of technology. He would die and did die
9  in that environment. I mean, there wasn't the
10 staff or the dedication or the focus to do this
11 correctly. I was disappointed that it cost multi
12 millions of dollars. I could have bought it for
13 less than 300,000. They spent millions, wiped out
14 my ability to spend any other money under our
15 earn-out, and they never delivered. So this e-mail
16 dated April 2000, I don't think they delivered the
17 product in working fashion ever and they didn't
18 show it to clients for at least a year or so later,
19 and the marketplace moved without us.
20     (Exhibit 99 marked for identification.)
21     Q. Let me show you Exhibit 99, but before I
22 get to that, let me ask you what you meant when you
23 said the marketplace moved without us.
24     A. Other people were actually growing the

Page 232

1  space. We -- when we started with them, probably
2  in -- you could talk about the numbers, but we were
3  -- everyone was just about to go to card programs.
4  We were 50, 60 percent of the marketplace.
5      Q. CCMI was?
6      A. Yes. I mean, if we could just -- Catalina
7  -- there was one other company in America that had
8  the expertise to issue. We invented the key tags.
9  We invented the process of how applications are
10 done and how they're done off-shore. We invented
11 the concept of stored value in the applications for
12 Toshiba. We had software that could analyze the
13 program and do it. And at that time, Catalina,
14 Valassis were acquiring companies and getting into
15 the business and they were investing in trade
16 shows, they were investing in technology, they were
17 actually doing stuff. Instead of keeping our core
18 unit together, we were broken up and destroyed. We
19 were destroyed. So while we're building Aspen for
20 a year and a half, you know, companies with --
21 Market Expert was another software company.
22     Q. You said you had retailers that made up 50
23 to 60 percent of the market share?
24     A. At one time, yeah.

Page 233

1      Q. Please name them for me.
2      A. Lucky Stores, I mean --
3      Q. Name all of them.
4      A. Shaw's, Lucky -- I mean, we were talking to
5  every retailer in the country.
6      Q. But who did you have under contract on an
7  ongoing basis?
8      A. I don't recall.
9      Q. Okay.
10     A. But of the card programs that were out
11 there, we had to have 30 to 60 percent of all those
12 customers, and we had talked to the rest. It was
13 all about to happen. All we had to do is get into
14 a place and do it, and that's a fact.
15     Q. Let's go back to Exhibit 99. Can you
16 identify that for us?
17     A. I can't read it. It's Ann's writing.
18     Q. Have you seen it before?
19     A. April 14th --
20     Q. Well, can you read this?
21     A. I can read parts of it.
22     Q. Okay. Please read it into the record.
23     A. I can't read all of it.
24     Q. Well, read as much as you can, because I

59 (Pages 230 to 233)

Robert N. Fireman

Page 306

1   has grown to 20,000 in Mexico.
2           So we put this program together with
3   some people I met and some partners, again, in the
4   stored value world, and we tried to market it and
5   we -- Henri loved it that I took him to the White
6   House and we had some fun. The issue is we had a
7   lot of support from the Republican Party that was
8   very interested in the Hispanic vote. And part of
9   our team was a bunch of very powerful and public
10  Hispanic people, and we put a figurehead of the
11  former -- a Democrat, but the former head of the
12  U.S. -- CFO of the U.S. Treasury, a guy named
13  George Munios.
14          So we had a winning product. The
15  problem was now we had to show it to retailers.
16  And as I went around to retailers, we found out
17  that Western Union had some exclusive on money
18  transfer, and even though we were on the shelf and
19  not a money transfer depo, they were giving us some
20  trouble, so that's what this is about, the issue of
21  Western Union having -- and there were ways around
22  it and we just didn't keep our wind. And it
23  happened after we stopped doing this. I mean, it
24  became a very big business.

Page 307

1       Q. Who ultimately did it, if anybody?
2       A. Well, a lot of companies got into it, in
3   pockets, but there's a company out in California I
4   met with that has set up a network that's called
5   the Green Dot Network, but In-Com, some of my
6   partners in this deal like In-Com that was in the
7   prepaid market originally with Safeway and other --
8   In-Com did a billion eight hundred million dollars
9   last year, and when I knew them in '99, they were
10  doing 10, $15 million and they've exploded into the
11  gift card, money transfer, prepaid cards. What we
12  were doing here was the beginning of like the Visa
13  debit cards. We were ahead of that, which now are
14  commonplace, but back then was avant garde. It was
15  first generation. It was looking for customer and
16  consumer acceptance and we were filling a need in
17  the marketplace, so Henri must have thought I was
18  doing good.
19      Q. And he says that you're going to be the Don
20  Quixote of the unbanked?
21      A. Yes, could have been.
22      Q. To which you said I deserve it?
23      A. I put a lot of work into this. I dragged
24  --

Page 308

1       Q. Yeah. What percentage of your time did you
2   put into it?
3       A. When? I mean, I don't -- I don't even
4   remember a time.
5       Q. 2002, that's the date of this memorandum.
6       A. Yeah, I was deep into this. I would say at
7   least 40, 50 percent of my time, but it was all
8   about the same thing. Whether I was doing a
9   prepaid card as a gift card, an Afectivo card over
10  a debit network, talking to people about prepaid
11  Visa cards or networks or gift cards or this, the
12  concept of CCMI was card marketing. It was right
13  in our sweet spot. So as long as I had all these
14  partners and friends, let's try to create marketing
15  programs. Technology is only the enabler. It's
16  marketing and business solutions is what this
17  business was about. The software alone didn't do
18  it; the cards didn't do it. The revenue was from
19  the people in the manufacturing side.
20          (Exhibit 129 marked for identification.)
21      Q. Let me show you a document we marked as
22  Exhibit 129, and this is a memo from Ms. Raider,
23  again to you, dated April 26th, 2002, and in it she
24  says hello, I spoke to Henri today and was

Page 309

1   complaining about a lack of support from IS.
2   What's IS?
3       A. IT. The technology group in NAM.
4       Q. What was interesting is that Henri said to
5   me that he has raised the issue to Paul again and
6   Carlucci has acknowledged that there were mistakes
7   but that we needed to determine how to move
8   forward. Do you remember receiving this e-mail?
9       A. No, but it's more of a she was probably
10  complaining about how Aspen didn't get done and IS
11  was not giving us the people and Bill Adams wasn't
12  supporting -- same thing, and sometimes --
13      Q. Same stuff?
14      A. -- Henri took off his corporate whatever
15  and realized that it was true, so obviously, he
16  says he went to Paul and said help.
17          (Exhibit 130 marked for identification.)
18      Q. Let me show you a document we've marked as
19  Exhibit 130, and this is an e-mail from Ms. Raider
20  to you dated June tenth, 2002, and it says, toward
21  the end, he wants us to fail. Do you see that?
22      A. The --
23      Q. Just answer the question.
24      A. Yes, I see it.

HLellouche@newsamer, 06:26 PM 4/6/00 -, Bill Adam

>From HLellouche@newsamerica.com Thu Apr 06 19:54:26 2000
From: HLellouche@newsamerica.com
To: NAMCCMIAll@newsamerica.com
Cc: RRoseman@newsamerica.com, DBENSON@newsamerica com,
    ddevoe@newsamerica.com, lMoore@newsamerica.com, CMixson@newsamerica.com
Subject: Bill Adam
Date: Thu, 6 Apr 2000 18:26:08 -0400
X-Mailer: Internet Mail Service (5.5 2448.0)

Greetings:

I am sure that you have all read about our multi-million dollar investment
in the E.piphany Software and the hosted ASP. This represents a major
commitment by News America Marketing, through the SmartSource Direct
division, to be a major player in the customer relationship marketing (CRM)
business, and we expect it will generate significant revenue for SmartSource
Direct.

To ensure that our investment is in good hands, Bill Adam has been promoted
to an interim position of Vice President – Product Development and Support,
reporting to Rich Roseman, Vice President –Commercial Systems. This new
position will be based in Norwalk, CT. Reporting to Bill will be Michael
Hughes, Reva Hill and Craig Joress.

Bill will be working in this position managing the development and
integration of the E.piphany product with the current SSD software until the
end of calendar 2000, at which point he will move into the role of Vice
President – ASP Services, also located in Norwalk where he will then report
directly to me. In this position, Bill will be working hand-in-hand with the
salesforce driving the ASP business and further developing new opportunities
for SmartSource Direct.

Please join me in congratulating Bill on his promotion and thank him for all
his contributions to-date to SmartSource Direct's success.

Henri


Henri F. Lellouche
Senior Vice President, Venture Group
NEWS AMERICA MARKETING
A NEWS CORPORATION COMPANY
Phone: 203 845.6180
FAX  203.840.5090
Mobile: 917 825.7351
http://www.newsamerica com
http://www.smartsourcedirect.com
http://www.softcardsystems.com
http://www.smartsource.com

Printed for Diana Fontaine <dfontaine@smartsourcedirect.com>                    1



DEPOSITION
EXHIBIT
FIREMAN 98
MRW 5/24/07

FR1256

**TAB D TO EXHIBIT BINDER**

Page 1

```
 1                                    Volume:  I

 2                                    Pages:  1-333

 3                                    Exhibits:  38-61

 4


 5              UNITED STATES DISTRICT COURT

 6           FOR THE DISTRICT OF MASSACHUSETTS

 7     Civil Action No. 05-1740 MLW

 8     - - - - - - - - - - - - - - - - - - - - - x

 9     ROBERT FIREMAN and ANN RAIDER,

10                    Plaintiffs,

11          v.

12     NEWS AMERICA MARKETING IN-STORE, INC.,

13                    Defendants.

14     - - - - - - - - - - - - - - - - - - - - - x

15


16              DEPOSITION OF ANN M. RAIDER

17               Thursday, May 17, 2007

18              10:01 a.m. to 5:19 p.m.

19              HOLLAND & KNIGHT, LLP

20         Ten St. James Avenue, 11th Floor

21              Boston, Massachusetts

22


23


24     Reporter:  Marianne R. Wharram, CSR/RPR
```

Ann M. Raider

Page 42

1   A. You know, I don't recall.
2   Q. And then you had a five-year employment
3   agreement with News America Marketing, right?
4   A. Yes, that is right.
5   Q. And you began with a salary of $160,000,
6   right?
7   A. That's right.
8   Q. And each year News America Marketing gave
9   you a salary increase, right?
10   A. Yes, that's right.
11   Q. And these increases were all discretionary,
12   right?
13   A. I don't understand what discretionary means
14   in your terms.
15   Q. Well, the agreement itself did not obligate
16   News America Marketing to give you a salary
17   increase in each successive year, did it?
18   A. I don't know what the agreement so stated.
19   We'd have to look at the agreement to see those
20   exact words.
21   Q. Well, we are in luck, because we just
22   happen to have a copy of the agreement here. Do
23   you see paragraph 5A?
24   A. Yes. It says the base shall be reviewed

Page 43

1   annually in accordance with the standard practice
2   of the company.
3   Q. And it says the base salary shall be
4   reviewed annually in accordance with the standard
5   practice of the company and notwithstanding the
6   foregoing, your base salary for any given year
7   shall not be less than your base salary for the
8   previous year, right?
9   A. Yes, that is correct.
10   Q. So that meant that they couldn't reduce
11   your base salary?
12   A. That is correct.
13   Q. But there was nothing here that meant --
14   that said that they had to increase your base
15   salary, correct?
16   A. The statement that it could be reviewed in
17   accordance with the standard practice of the
18   company, the company had a standard practice of
19   giving salary increases and bonuses based on
20   performance, so we were in fact reviewed based on
21   the performance of the company as a whole.
22   Q. And your personal performance, right?
23   A. Yes, that is correct.
24   Q. And so if your personal performance and the

Page 44

1   performance of the company was good, you would get
2   a salary increase?
3   A. Yes, that is correct.
4   Q. That was your expectation?
5   A. Yes, that's correct.
6   Q. And in point of fact, in each year of your
7   employment with News America Marketing, you
8   received a salary increase; is that right?
9   A. Yes, that is correct.
10   MR. KATZ: Just for the record, we are
11   marking as Exhibit 41 Ms. Raider's employment
12   agreement with NAM dated August 13, 1999.
13   A. Yes, but they did in fact violate the
14   employment agreement.
15   Q. (BY MR. KATZ) Okay. Well, I'll let your
16   counsel ask you questions about that.
17   MR. RICH: Now, are we marking this?
18   Have we marked this?
19   MR. KATZ: We premarked it, and so that
20   is now Exhibit 41.
21   MR. RICH: Okay. Thank you.
22   Q. (BY MR. KATZ) Now, in fact, your salary
23   went up immediately upon NAM's acquisition of CCMI,
24   right?

Page 45

1   A. Yes.
2   Q. You were only making $153,000 at the time
3   of the acquisition in 1999, right?
4   A. I do not recall that, actually.
5   Q. Well, let's take a look at Schedule 4.13 of
6   the acquisition agreement.
7   MR. RICH: 4.1 -- oh, okay.
8   A. Okay.
9   Q. (BY MR. KATZ) And you've now had a chance
10   to look at Schedule 4.13?
11   A. Yes.
12   Q. And you'll agree with me that you were
13   making $153,000 at the time of the acquisition --
14   A. Yes.
15   Q. -- of CCMI by NAM, correct?
16   A. Yes.
17   Q. Now, apart from the $153,000 in salary, did
18   you receive anything else from CCMI in the way of
19   compensation?
20   A. We had car allowances.
21   Q. How much was that worth?
22   A. I don't recall.
23   Q. And did you receive a car allowance from
24   News America Marketing as well?

12 (Pages 42 to 45)

Ann M. Raider

Page 46

1  A. I did.
2  Q. Apart from the car allowance, did you
3  receive anything else in the way of compensation
4  from CCMI?
5  A. No.
6  Q. Okay. Did you receive any dividends?
7  A. No.
8  Q. You never received any dividends?
9  A. No.
10  Q. So really, after the acquisition by News
11  America Marketing, you not only were getting
12  approximately a million dollars coming from the
13  sale of your stock, right?
14  A. Yes.
15  Q. Okay. Forgiveness of a loan of about
16  $181,000, right?
17  A. Mm-hmm. Yes.
18  Q. Payment of a bonus that was going to come a
19  few months into the acquisition of about $145,000,
20  right?
21      MR. RICH: Objection.
22  Q. (BY MR. KATZ) Right?
23  A. Payment --
24  Q. Payment of a bonus?

Page 47

1  A. Of a bonus, right.
2  Q. Which you actually received?
3  A. I did.
4  Q. And -- and then you were going to get a
5  five-year employment agreement, right?
6  A. That is correct.
7  Q. Now, back to your employment agreement, you
8  received discretionary bonuses under your NAM
9  employment agreement for each of the five years
10  that the agreement was in effect, right?
11  A. According -- I received bonus funds in
12  accordance with the standard practices of NAM as it
13  related to any employee.
14  Q. And all of these bonuses were discretionary
15  under your employment agreement, right?
16  A. I -- yes.
17  Q. Because it says in paragraph 5B the amount
18  of your bonus, if any, will be determined in the
19  sole discretion of the company's board of directors
20  or a committee thereof and shall be based on, among
21  other factors, your performance and the company's
22  performance, right?
23  A. That is correct.
24  Q. And I think we've marked as exhibits

Page 48

1  Exhibits 44, 45 -- maybe just these two.
2      MR. RICH: Which one is --
3      MR. KATZ: 44 is 2003 and 45 is 2004.
4  Q. (BY MR. KATZ) You'd agree with me,
5  Ms. Raider, that in most years, NAM granted you
6  about $30,000 as a discretionary bonus under your
7  employment agreement, correct?
8  A. The bonus target was a percentage of the --
9  of your salary.
10  Q. And just asking a question, in most years
11  during the five years of your employment agreement,
12  you received approximately $30,000 as a
13  discretionary bonus under your employment
14  agreement, right?
15  A. According to these two years, the answer is
16  yes. On 2003 and 2004, that's correct.
17  Q. And in your own memory, isn't it a fact
18  that you received bonuses in the same range, around
19  $30,000, for the other three years as well?
20  A. Probably, yes.
21  Q. Okay. Now, Mr. Fireman had an employment
22  agreement with NAM just like you, right?
23  A. Yes.
24  Q. In fact, he had essentially the same

Page 49

1  agreement, didn't he?
2  A. I believe so.
3  Q. Okay. And he, too, got salary increases
4  from News America Marketing, right?
5  A. I believe he did.
6  Q. And his annual salary from CCMI, like
7  yours, was only $153,000, right?
8  A. Some people would say $153,000 is a very
9  good salary. Only $153,000 I think is a judgmental
10  statement. The answer is $153,000 was a solid
11  salary, and yes, we both had $153,000 in salary.
12  Q. Yeah, I'm not disputing that fact. I agree
13  with you that 153,000 -- I use the word only in
14  comparison to other salaries that are in discussion
15  here today. Now, was Mr. Fireman taking anything
16  else out of the company prior to it being acquired
17  by News America Marketing apart from his $153,000
18  salary?
19      MR. RICH: Objection to the form.
20  A. I do not believe so.
21  Q. (BY MR. KATZ) Okay. He didn't receive
22  dividends?
23  A. I don't believe so.
24  Q. Okay. He did have an interest, did he not,

13 (Pages 46 to 49)

Ann M. Raider

Page 50

1    in the rent that was being paid by the company to
2    the estate of his father?
3        A. We --
4        Q. Did he not?
5        A. We used the building owned by the Fireman
6    Trust to operate our company. We paid the Fireman
7    Trust rent as we would have paid any other
8    landlord. The fact that Mr. Fireman's father owned
9    the building was of a benefit to us, because it was
10   convenient and we could easily move into it at the
11   time that we formed the corporation.
12       Q. But in 1999, at the time the acquisition
13   took place, approximately how much a month was
14   being paid in rent for the premises in Braintree, I
15   believe?
16       A. You know, I don't know. I didn't deal on a
17   day-to-day basis with those expenses. Robert
18   Coughlin watched the expenses. I really dealt with
19   the sales and marketing issues of the company.
20       Q. Okay. Well, let's go back to Mr. Fireman's
21   employment agreement. Mr. Fireman, too, was
22   granted discretionary bonuses under his five-year
23   employment agreement with NAM, was he not?
24       A. I believe that's what his agreement said.

Page 51

1        Q. Okay. And for every year except year five
2    of his employment agreement, he received a
3    discretionary bonus, did he not?
4        A. I believe that's so.
5        Q. And he received salary increases just like
6    you? Isn't that fair to say?
7        A. I believe that's so.
8        Q. And you received formal written evaluations
9    by your superiors at NAM during each of the years
10   of your employment with NAM; isn't that correct?
11       A. Yes.
12       Q. And for the most part, the reviews NAM gave
13   you were very favorable, were they not?
14       A. Yes, they were.
15       Q. And for the most part, the reviews given
16   Mr. Fireman during the five years of his employment
17   agreement by NAM were also favorable, were they
18   not?
19       A. I really don't know about Bob's performance
20   reviews.
21       Q. Did he ever complain to you that his
22   reviews were unfavorable?
23       A. I don't believe so.
24       Q. While you were employed by NAM, you were a

Page 52

1    NAM vice president; isn't that correct?
2        A. No, I was a senior vice president.
3        Q. I was going to ask that next. So you were
4    not just a vice president, but a senior vice
5    president; isn't that correct?
6        A. Yes.
7        Q. Okay. Was Mr. Fireman also a vice
8    president at NAM?
9        A. Mr. Fireman was general manager of
10   SmartSource Direct.
11       Q. And you considered that to be a position of
12   importance to the company, did you not?
13       A. Yes.
14       Q. Now, as vice president of NAM, or senior
15   vice president of NAM, you had a fiduciary duty to
16   NAM, did you not?
17           MR. RICH: Objection.
18       A. I'm not sure what a fiduciary duty meant.
19       Q. (BY MR. KATZ) You had a duty of care and
20   loyalty to the company, did you not?
21       A. I had a duty to perform my responsibilities
22   in my role of sales and marketing.
23       Q. Okay. And didn't you have a duty also to
24   be loyal to the company?

Page 53

1            MR. RICH: Objection.
2        A. I'm not sure what loyal to the company
3    means.
4        Q. (BY MR. KATZ) Okay. So you --
5        A. I am a professional executive who has the
6    responsibility to do my job in the best interest of
7    the company.
8        Q. Let me ask you this question. Did you have
9    a duty to use all of your efforts for the benefit
10   of the company insofar as your professional work
11   was concerned?
12       A. Yes.
13       Q. And Mr. Fireman had the same duty, did he
14   not?
15       A. You need to ask Mr. Fireman.
16       Q. What would be your view?
17       A. Mr. Fireman is a professional who did --
18       Q. No, no, but I'm just asking about duty of
19   loyalty to the company. What was your perception
20   as a senior vice president of News America
21   Marketing of Mr. Fireman's duty of
22   loyalty to News America Marketing?
23           MR. RICH: Objection. You can answer
24   if you can.

14 (Pages 50 to 53)

Page 74

1    Q. And what was the effect in the dot com
2  world as a whole?
3    A. That business continues to operate for NAM
4  today.
5    Q. I'm not talking about NAM, but I'm talking
6  about in the dot com world as a whole where they
7  added head count before they had revenue?
8    A. I do not know the extent of which the
9  market is operating. Many dot com companies are
10  extremely successful today and growing.
11    Q. And you would not dispute that many failed
12  in 2000 and 2001?
13    A. In the press, there were statements that
14  several companies failed, yes.
15    Q. Okay.
16    A. But we are talking about NAM and we are
17  talking about NAM's process and you asked the
18  question specifically about NAM.
19        (Off the record.)
20        (Recess taken.)
21        (Exhibit 47 marked for identification.)
22    Q. (BY MR. KATZ) I've shown you, Ms. Raider,
23  Exhibit 47. Do you have a copy of it?
24    A. Mm-hmm.

Page 75

1    Q. Exhibit 47 was an e-mail which Mr. DeVoe
2  sent to you among others, right?
3    A. Yes.
4    Q. And in fact, this copy came out of your
5  files, right?
6    A. I don't know that.
7    Q. Take a look at the Bates stamp number FR --
8        MR. RICH: Well, it came from
9  Mr. Fireman's or Ms. Raider's, so one of the two.
10        MR. KATZ: Okay.
11    Q. (BY MR. KATZ) If you take a look at the
12  text Exhibit 47, you'll see under the heading Ann's
13  group? Do you see that?
14    A. Yes.
15    Q. And then it talks about manufacturing and
16  sales, Kevin Tripp; do you see that?
17    A. Yes.
18    Q. And then it says hold firm and look to hire
19  additional head count as sales develop; do you see
20  that?
21    A. I see that statement.
22    Q. And you'd agree that that's consistent with
23  the concept of head count following business,
24  right?

Page 76

1        MR. RICH: Objection.
2    A. I do not believe that's consistent at all.
3    Q. (BY MR. KATZ) You don't? Okay. Isn't it
4  a fact that News America Marketing applies the
5  principle of head count following business across
6  the board?
7    A. Not that I recall.
8    Q. Okay. Let's go to the second sentence of
9  paragraph 6.8 in the Stock Purchase Agreement.
10    A. Okay.
11    Q. Okay? You're there?
12    A. Yeah.
13    Q. I'm going to read the second sentence. It
14  says notwithstanding the foregoing, buyer shall be
15  free to operate the company and its affiliates in
16  its sole and unfettered judgement and sellers shall
17  have no claims against buyer in connection
18  therewith as a result of the preceding sentence.
19  Did I read that correctly?
20    A. You read that correctly.
21    Q. And we can agree, can we not, that the
22  second sentence said that you as the buyers had no
23  right to bring a claim concerning how NAM ran the
24  CCMI business?

Page 77

1        MR. RICH: Objection.
2    A. I do not believe that's the intent of this
3  document.
4    Q. (BY MR. KATZ) By entering into the Stock
5  Purchase Agreement, you released CCMI from any
6  future claim regarding how it ran the CCMI
7  business, did you not?
8    A. No, sir, that's not true.
9    Q. The second sentence gave NAM the freedom to
10  operate the CCMI business in its sole and
11  unfettered discretion; isn't that right?
12    A. No, that is not true.
13    Q. Even though the words say that?
14    A. Mr. DeVoe told me --
15    Q. No, no. Just answer my question.
16    A. The word stated that is not the case. The
17  whole context --
18    Q. Just answer my question, please. The
19  second sentence says that NAM has the freedom to
20  operate the CCMI business in its sole and
21  unfettered judgement. Aren't those what the words
22  say?
23        MR. RICH: Objection. That's not what
24  the words say, but --

20 (Pages 74 to 77)

Page 78

1    A. The words --
2    Q. (BY MR. KATZ) It's just a yes or no
3  question.
4    A. The words say buyer shall be free to
5  operate the company and its affiliates in its sole
6  and unfettered judgement.
7    Q. That's what the words say?
8    A. Those are the words.
9    Q. You don't dispute that?
10    A. I do not dispute the words.
11    Q. Now, insofar as the agreement was
12  concerned, NAM management was free to make mistakes
13  in its management of the CCMI business, was it not?
14    A. No, sir, it was not. The intent of this --
15    Q. Just answer my questions yes or no. I'm
16  going to ask you a lot of questions --
17    A. Sure. Sorry.
18    Q. -- and if we get long discussions on each
19  of them that don't answer the question, we're just
20  going to be here longer than we need to be.
21    A. Okay. Sorry.
22    Q. So just listen to my question. If you
23  don't understand it, let me know, but just listen
24  to the question and answer it to the best of your

Page 79

1  ability, okay?
2    A. Okay.
3    Q. NAM was free to set the budgets of the CCMI
4  business, was it not?
5    A. No.
6    Q. NAM was free to decide where to make
7  capital expenditures, was it not?
8    A. No.
9    Q. NAM was free to decide when to make capital
10  expenditures, was it not?
11    A. No.
12    Q. NAM was free to decide when to make
13  additional hires, was it not?
14    A. No.
15    Q. NAM was free to choose who would be your
16  supervisors, was it not?
17    A. No.
18    Q. NAM was free to determine who, if anyone,
19  you would supervise, was it not?
20    A. No.
21    Q. NAM was free to choose what areas of CCMI's
22  business would be pursued in the future, was it
23  not?
24    A. No.

Page 80

1    Q. NAM was free to discontinue business
2  activities of CCMI that were no longer profitable,
3  was it not?
4    A. No.
5    Q. NAM was free to discontinue business
6  activities of CCMI even if they were profitable,
7  was it not?
8    A. No.
9    Q. NAM was accountable only to its directors
10  and shareholders for whatever mistakes it might
11  make in operating the CCMI business, was it not?
12    MR. KATZ: Objection.
13    A. No.
14    Q. (BY MR. KATZ) NAM was not accountable to
15  you or Mr. Fireman for how it operated the business
16  of CCMI after it acquired your stock, was it?
17    A. NAM was accountable to Bob Fireman and I.
18    Q. And where do you derive that conclusion?
19    A. The agreement of this company's sale was in
20  good faith that they would help us with their
21  actions build the company to $50 million. There
22  was a financial document which was approved by
23  David DeVoe which said we had a plan and they were
24  to support that plan.

Page 81

1    Q. And where in the Stock Purchase Agreement
2  do you find any reference to that document?
3    A. That document exists. There are multiple
4  copies of that document. And I'm sure you have it
5  in all of the boxes somewhere and I do not believe
6  it's in this particular statement as it is.
7    Q. So you would agree with me that the
8  document, which I believe you referred to as your
9  business plan, is not incorporated in the 1999
10  stock purchase agreement, correct?
11    MR. RICH: Objection.
12    A. I believe that particular document is not
13  included, but it is the basis upon which in good
14  faith David DeVoe bought our company with the
15  commitment to help it to grow based on that
16  financial agreement, and therefore, their actions
17  were to support us to grow this business.
18    Q. (BY MR. KATZ) NAM did not need to consult
19  you with or Mr. Fireman before making a decision
20  regarding the operation of the CCMI business, did
21  it?
22    A. Yes, it did.
23    Q. If NAM did consult with you regarding the
24  operation of the CCMI business, it did not need to

21 (Pages 78 to 81)

Ann M. Raider

| Page 86 | Page 88 |
|---|---|
| 1  that right? | 1  that does not increase profits; in fact, it takes |
| 2      A.  I had the opportunity to send e-mails and | 2  profits down, so I don't know -- |
| 3  talk with senior executives.  Attending meetings I | 3      Q.  But that's not the intent, right?  The |
| 4  did not do a lot of. | 4  intent is to maximize profit.  You may make the |
| 5      Q.  But you did some of, right? | 5  wrong decision, but your intent is always to |
| 6      A.  Um, meetings -- for what purposes?  Did I | 6  maximize profit, right? |
| 7  attend meetings with other people in News America? | 7      A.  I'm not sure that's an exact statement. |
| 8  Yes. | 8      Q.  I mean, what else does a company do besides |
| 9      Q.  Thank you.  We can agree, can we not, that | 9  maximize profit?  That's the only objective that a |
| 10  all of NAM's business decisions had one purpose, | 10  business entity has; isn't that right? |
| 11  and that was maximizing company profit; isn't that | 11      A.  I don't know that that's true. |
| 12  right? | 12      Q.  But you don't know of any objective that |
| 13          MR. RICH:  Objection. | 13  any New America Marketing executive had in his |
| 14      A.  I don't know that that's the sole stated | 14  management of New America Marketing other than |
| 15  goal of NAM, maximize profit. | 15  maximizing profit? |
| 16      Q.  (BY MR. KATZ)  There's no other goal that | 16      A.  No.  I just said to you that I believe one |
| 17  you're aware of, right? | 17  of their objectives was to increase market share, |
| 18      A.  There's no other -- I don't know that -- I | 18  which does not necessarily mean they would maximize |
| 19  don't know the list of goals.  I know that | 19  profit.  It meant that they would increase share, |
| 20  certainly earning a profit was important. | 20  which would cost them profit in a period of time. |
| 21      Q.  Are you aware of any other goal that New | 21      Q.  But wouldn't be ultimately to gain |
| 22  America Marketing had in connection with any of the | 22  profit in the long term, even if it meant it may be |
| 23  decisions that it made regarding CCMI? | 23  a cost in the shorter term? |
| 24      A.  As it related to CCMI? | 24      A.  Possibly. |

| Page 87 | Page 89 |
|---|---|
| 1      Q.  Yes. | 1      Q.  Okay.  So wouldn't you agree with me that |
| 2      A.  I don't know what their goals were as | 2  every decision that NAM made was for the purpose of |
| 3  related to CCMI, because -- I have -- I am not | 3  maximizing profit? |
| 4  aware of what their goals were with CCMI. | 4          MR. RICH:  Objection. |
| 5      Q.  Okay.  As far as you're concerned, you're | 5      A.  I don't know that to be true. |
| 6  not aware of any goal that any NAM executive had | 6      Q.  (BY MR. KATZ)  But you're not able to |
| 7  other than maximizing profit?  Isn't that a fair | 7  identify any other purpose that NAM had in |
| 8  statement? | 8  connection with the management of its business |
| 9          MR. RICH:  Objection. | 9  other than maximizing profit? |
| 10      A.  NAM's executive goal for -- talked about | 10      A.  No.  I've stated to you three times.  I |
| 11  other topics like increasing market share in their | 11  know that they wanted to increase market share. |
| 12  base business or things like that, so are you -- I | 12  Increasing market share may not be maximizing |
| 13  guess are you talking about NAM, or are you talking | 13  profit; not in the short run, not in the long run. |
| 14  about CCMI? | 14  It may cost them a lot of money to maximize their |
| 15      Q.  (BY MR. KATZ)  I'm talking about NAM.  I'm | 15  market share. |
| 16  talking about NAM.  NAM had one goal, maximize | 16      Q.  Okay.  Well, let me ask this question.  So |
| 17  profit, right? | 17  apart from increasing market share and maximizing |
| 18      A.  I do not believe that's so. | 18  profit, you're not aware of any other purpose that |
| 19      Q.  But what other goal did they have? | 19  executives at New America Marketing had other than |
| 20      A.  They had their goal of increasing market | 20  those? |
| 21  share. | 21      A.  That's not true.  They wanted to penetrate |
| 22      Q.  But isn't increasing market share for the | 22  new channels.  They wanted to penetrate new |
| 23  purpose of maximizing profit? | 23  markets.  They had many, many general goals as a |
| 24      A.  But sometimes you increase market share and | 24  corporation. |

23 (Pages 86 to 89)

Ann M. Raider

Page 198

1    Q. And for year four, you projected that it
2  was going to go up to $11.4 million, right?
3    A. Yes.
4    Q. And then for year five, you projected that
5  it was going to go up to $15.6 million, right?
6    A. Yes.
7    Q. And what research, if any, had you done to
8  determine whether these numbers were anything but
9  mere hopes and aspirations?
10   A. First of all, retailers who chose to
11 implement loyalty programs did need database
12 management services to capture the information that
13 they needed in a usable format, so there was no
14 hope or aspiration that they would use database
15 management services. It was a fact if they wanted
16 to be in the loyalty card business.
17   Second of all, we had a tool that we
18 had built that had been accepted by the people
19 using it and we believed that as more and more
20 retailers embraced loyalty marketing, they would
21 embrace having more database management tools. The
22 database tool could be run as a software licensed
23 or as an ASP model, and we knew that there would be
24 other kinds of database management capabilities

Page 199

1  required as we expanded the business, and
2  therefore, it was not a stagnant I have Product A
3  and Product A is the only thing I'm going to sell
4  over five years at a set price; it was a growth in
5  the consumption of the products we currently sold
6  plus additional products we believed we would sell
7  to additional retailers as they embraced loyalty
8  marketing.
9    Q. But you really didn't know how these
10 numbers were going to be met? You didn't know what
11 products you were going to be selling?
12   A. We knew exactly what products we would be
13 selling in year two and three and we knew what
14 product enhancements we would be building going
15 forward.
16   Q. Well, tell me what those were, please.
17   A. We created campaign management tool, a
18 promotional testing tool. We went into the stored
19 value database business, expanding stored value
20 capability. We knew that we would be linking
21 stored value cards to loyalty cards and that was a
22 capability. We knew that we would be porting to
23 the Internet. So we knew that there was a sequence
24 of database marketing cap-- database management

Page 200

1  capabilities that we would be using to enhance and
2  in fact increase in total numbers.
3    Q. Well, that's what you hoped to do, but you
4  didn't know that you were going to be doing those,
5  right?
6    A. Every business makes a plan and their goal
7  is to make the plan. We made the plan with the
8  intention of making the plan.
9    Q. So this was just a plan?
10   A. This was an action plan to deliver what we
11 believed was the financial success of the business.
12   Q. But you had no commitments from any
13 retailers that they were going to contract with you
14 for your database management services, right?
15   A. I can't testify to that.
16   Q. One way or the another?
17   A. Right. I don't remember who was
18 contracted, who wasn't contracted, were there
19 contracts in place, were there licensing
20 agreements. I don't remember that.
21   Q. Let's turn to consulting marketing. In
22 1988, to recap, you had $72,000 in consulting and
23 marketing revenue, but in year one, after the
24 acquisition, you projected the revenue was going to

Page 201

1  jump to 3.5 million, right?
2    A. No, actually, I have 2.2 million.
3    Q. Well, on FR 2675 --
4    A. Yeah, consulting and database management
5  that year was $2.2 million. Oh, I'm sorry. I
6  looked at the wrong line. I beg your pardon. 3.5,
7  right. I was reading the wrong line.
8    Q. And then in year two, it jumps to
9  $13.2 million for consulting marketing revenue,
10 right?
11   A. Mm-hmm.
12   Q. Year three, it jumps to $19.6 million,
13 right?
14   A. Yes.
15   Q. Year four, it jumps to 23 million, right?
16 And then in year five it jumps to 33 million,
17 right?
18   A. Yes.
19   Q. In other words, you projected that you were
20 going to grow a business you hardly had in 1998 to
21 a $33 million business in five years, right?
22   A. That is correct, and in fact, that is
23 because the consumption of targeted direct mail
24 using retailer databases was exploding, and in

51 (Pages 198 to 201)

Page 202

1  fact, Catalina, Valassis, and other companies
2  achieved those numbers while we stagnated and they
3  took our business apart. Competitors who came into
4  the business after we had already been established
5  and needed to build on it actually achieved more
6  than those numbers. So while you may sit here and
7  look at this permutation as something that's not
8  achievable, other companies who made a focused
9  effort using manufacturing sales forces did
10  accomplish those objectives.
11     Q.  And you've seen their financial statements?
12     A.  They are public record.
13     Q.  Whose financial statements are public
14  record?
15     A.  Catalina and Valassis are public record.
16     Q.  Are they public companies?
17     A.  Yes.
18     Q.  Both of them are public companies?
19     A.  Yes. Catalina may be private, but they
20  reported their growth.
21     Q.  Where was it reported?
22     A.  In the trade press.
23     Q.  Now, prior to the acquisition, what size
24  sales force did you have --

Page 203

1     A.  Excuse me. And News America had access to
2  information about the companies, so I'm sure if you
3  ask them, they would give you the information
4  regarding that, the competitive analysis, because
5  they told -- they reported that they had access to
6  competitors information.
7     Q.  Now, prior to the acquisition, what size
8  sales force did you believe you needed in order to
9  meet the post acquisition projections you'd set for
10  CCMI?
11     A.  We needed access to their entire
12  manufacturing sales force. We wanted everyone in
13  the manufacturing sales force to carry information
14  about executing targeted marketing programs for
15  CCMI.
16     Q.  And how much of their time do you think you
17  needed them to spend in order for you to meet your
18  objectives?
19     A.  I would say that they needed to spend
20  15 percent of their time.
21     Q.  And how many -- how many individuals are we
22  talking about?
23     A.  They had 240 at the time that we sold the
24  business, as far as I recollect, because they had

Page 204

1  the entire ACT media sales force and they had the
2  entire News America sales force. I think they then
3  went down to about 150 people.
4     Q.  But you wanted the entirety of that 240
5  sales force, or 150 sales force, whatever it was,
6  to be spending about 15 percent of their time doing
7  work for CCMI? Is that what you expected?
8     A.  I had an expectation level that their sales
9  force would carry our information when they talked
10  to their customer base to make them aware that we
11  could do targeted marketing programs using retailer
12  databases. In the course of a sales presentation,
13  which may take an hour, they might take 15 minutes
14  and remind them that they have this new capability
15  that they could use.
16     Q.  And you knew that or believed that that was
17  possible and it's what you expected to occur prior
18  to your signing the acquisition agreement in August
19  of 1999?
20     A.  That is correct, because if you look at the
21  financials that David and I -- David DeVoe and I
22  agreed upon, there are no -- there is one or two
23  people in the manufacturing sales force for CCMI
24  direct reports. The rest of the sales force to

Page 205

1  sell our product line were all existing News
2  America people, and that's why David DeVoe and I
3  agreed that we would add no head count, significant
4  head count to our direct head count because we
5  would be leveraging the asset of NAM, which was
6  their sales force.
7     Q.  But you put nothing in the agreement
8  requiring that NAM's sales force spend
9  approximately 15 percent of their time selling CCMI
10  products, right?
11     A.  No, we said that it was their intention,
12  their intention to use their sales force. I didn't
13  feel I had to require them a certain set of time.
14  We're talking about business reasonableness. These
15  are people who are experts at calling on every
16  packaged goods company in America. They are
17  professional salespeople. It is a sales driven
18  company, so it would be our expectation that they
19  would be aware of our -- their product, and it was
20  stated in the agreement it was their intention to
21  use their sales force to represent our product
22  line, their intention. You have to assume it's a
23  good intention, not a bad intention. Otherwise,
24  there's a bad intention permeating in the document.

52 (Pages 202 to 205)

Ann M. Raider

Page 210

1  A. That is correct.
2  Q. And as of that date, there were two
3  remaining unresolved issues, right?
4  A. Yes, according to this memo.
5  Q. And in the memo, or the e-mail, Mr. Racano
6  says we must submit the unresolved issues to Arthur
7  Andersen and the seller's accountant so that the
8  two accounting firms can attempt to resolve in good
9  faith the two remaining unresolved matters, right?
10  A. That's what the memo says.
11  Q. And you did not engage an accountant --
12  A. Not that I --
13  Q. -- to deal with the unresolved issues,
14  right?
15  A. Not that I recall.
16  Q. Okay. And Mr. Fireman, on March eighth,
17  2001, sent an e-mail that said let this e-mail
18  confirm that Ann and I have chosen not to arbitrate
19  whether the calculations that NAM has made are in
20  compliance with GAAP pursuant to paragraph 2.2B of
21  the Stock Purchase Agreement.
22  A. If you tell me that memo exists, I believe
23  that memo exists.
24  Q. Is that consistent with your recollection?

Page 211

1  A. I do not recall that.
2  Q. Let's mark as Exhibit 57 --
3      (Exhibit 57 marked for identification.)
4  Q. Okay. We have Exhibit 57 in front of you,
5  and this is where Mr. Fireman says on March 8th,
6  2001 that Ann and I have chosen not to arbitrate.
7  Do you see that?
8  A. Yes.
9  Q. And then Mr. Fireman goes on to say please
10  wire the funds to our respective accounts? Do you
11  see where he says that?
12  A. I do.
13  Q. And those are the earn-out funds, right?
14  A. Yes.
15  Q. And you received approximately $106,000 in
16  your first year earn-out payment?
17  A. I don't know. You have a chart.
18  Q. Could we have the chart?
19      MR. RICH: Is this something you
20  already marked?
21      MR. KATZ: Yes, I think we premarked
22  it.
23      MR. RICH: Oh. Exhibit 46?
24      MR. KATZ: Yes.

Page 212

1  Q. (BY MR. KATZ) You don't have any doubt
2  that you received approximately $106,000 as your
3  earn-out for year one?
4  A. No.
5  Q. And that Mr. Fireman received approximately
6  $159,000 for his earn-out for year one, right?
7  A. No.
8  Q. Now, in year two, you were told at some
9  point in late 2001 that NAM calculated your second
10  year earn-out at about $71,000 for you and $106,000
11  for Mr. Fireman?  Does that ring a bell?
12  A. The specifics do not ring a bell, but the
13  chart shows that number.
14  Q. Okay. And on Monday, November 19th, 2001,
15  that amount was transmitted into your account by
16  News America Marketing, right?
17  A. If you have the documentation, I believe
18  that's so.
19  Q. Okay. Now, you engaged in numerous
20  discussions with George Ludwig, controller at NAM,
21  and others at NAM in the first half of 2002 with
22  respect to various aspects of your year two
23  earn-out calculation; isn't that right?
24  A. That is correct.

Page 213

1  Q. And some of these discussions were
2  conducted by Mr. Coughlin on your behalf?
3  A. That is correct.
4  Q. Now, he was by then a News America
5  Marketing employee, right?
6  A. He was always a News America Marketing
7  employee. From the day we sold the company, he was
8  a News America Marketing employee.
9  Q. Right. Did you pay him for acting on your
10  behalf in this situation?
11  A. No.
12  Q. Was he acting on your behalf in this
13  situation on company time?
14  A. He was acting on our behalf on personal and
15  company time.
16  Q. But you didn't pay him for his efforts --
17  A. No, I did not.
18  Q. -- in assisting you? On Friday, May 17th,
19  2002, seven years ago from today, Mr. Racano sent
20  you an e-mail saying Ann, this note confirms that
21  we have agreed that there will be no adjustments to
22  the calculation of the SmartSource Direct earn-out
23  calculations for the year ending September 30th,
24  2001. Do you remember receiving that?

54 (Pages 210 to 213)

Page 214

1    A. No, I don't remember that specific memo.
2    Q. But do you remember receiving news to that
3  effect?
4    A. There was a tremendous amount of
5  discussion, dialog, documents produced, multiple
6  people involved and issues regarding every year of
7  the earn-out calculation, and if you have an e-mail
8  that says that Mike Racano said something, then I
9  believe that he said it.
10    (Exhibit 58 marked for identification.)
11    Q. And this is the Friday, May 17th, 2002
12  e-mail?
13    A. I see that.
14    Q. Okay. Now, at this point in time, you had
15  already been paid your earn-out, right? You had
16  already received your year two earn-out?
17    A. I don't know the date that we received the
18  earn-outs. It says the period, but I don't know
19  the date that you received the earn-out, so I can't
20  answer that. It doesn't tell me the date I
21  received it. It just -- it's the date of the
22  period. It doesn't tell me the date the checks
23  were sent.
24    Q. Well, didn't you receive your earn-out for

Page 215

1  year two in November of 2001? That would be
2  approximately two years after the transaction?
3    A. You know, I don't know when we received the
4  earn-outs, the dollar -- I don't know the dates
5  that we received the earn-out dollars. We received
6  earn-out dollars at the conclusion of the period,
7  but I don't know the dates that we received the
8  dollars.
9    Q. Okay. Now, the dispute resolution
10  deadlines in the agreement for challenging the
11  second year earn-out calculation had long passed by
12  May 17th, 2002, right?
13    A. The second year would have closed in
14  September 2001, but there were many questions about
15  the accounts receivable, the accounts payable, the
16  accounting altogether. There were no -- there
17  wasn't documentation on their part. They had very
18  poor records. We had to reconstruct records, so it
19  took months of going through accounts receivable,
20  finding where all the things were, mistakes that
21  had been made by NAM's manufacturing side that cost
22  us credits in the customers' accounts that were
23  totally beyond our control, there were errors made
24  by NAM people outside of our group, so there was a

Page 216

1  lot of dialog and a lot of papers that had to be
2  assembled after the actual date that the year
3  closed.
4    Q. But suffice it to say you never designated
5  an accountant to deal with unresolved issues on
6  your behalf?
7    A. We worked on unresolved issues, Bob and I
8  and Robert Coughlin and Mike Gaffney and George
9  Ludwig and Mike Racano and other people in their
10  organization trying to get facts so we could stay
11  fact-based about what happened.
12    Q. And they dealt with you in good faith
13  during all this, right?
14    MR. RICH: Objection.
15    A. I don't know whether they dealt with me in
16  good faith. They dealt with me when I pushed the
17  answer. If it really was good faith, then why was
18  I even having this problem? They didn't provide
19  any finan-- there was a guy named Chris Bruther who
20  was assigned to us who actually left the company
21  who spent almost all of his time trying to
22  reconstruct basic financial accounting for us that
23  the company never provided because we were so small
24  relative to the billion dollars. So was it good

Page 217

1  faith? I don't know that it was good faith. It
2  was in fact a lack of performance on their part.
3    Q. Well, you say you were so small relative to
4  the billion dollars. What do you mean by that?
5    A. Meaning we did millions of dollars in
6  business and they were a billion dollar concern,
7  and they didn't allocate -- they had a freeze in
8  head count, so they didn't allocate a dedicated
9  financial resource to us to help us. Robert
10  Coughlin was actually doing two jobs instead of one
11  for months on end when they were supposed to have
12  someone, and finally, after we said this is
13  ridiculous; you don't even have ledgers showing us
14  what's going on in the business, we ask for
15  reports; we can't even find them, and so they
16  assigned a gentleman by the name of Chris Bruther
17  to help us reconstruct. It took him months to
18  reconstruct the finances of the accounting within
19  News America. It was difficult to find out what
20  was going on. We did not get regular reports every
21  month on what happened in the finances of the
22  business. And so when you ask whether it was in
23  good faith, I don't know the answer to that
24  question. I know that we pushed to get the facts

55 (Pages 214 to 217)

Ann M. Raider

Page 218

1  **and that after pushing constantly and going through**
2  **every detail did we secure the facts.**
3  Q. And you did secure the facts?
4  **A. We secured the facts to the best of our**
5  **knowledge; that is correct.**
6  Q. And you ultimately discontinued any further
7  investigation once you felt comfortable that you
8  had gotten as much of the facts as you could?
9  **A. That is correct.**
10  Q. Okay. And you never brought a lawsuit
11  against NAM for your claim of inadequate support
12  during the second year of your earn-out period,
13  right?
14  **A. We -- this is the lawsuit that we are**
15  **bringing against NAM right now.**
16  Q. You didn't do so before?
17  **A. No.**
18  Q. You didn't do so at any time while you were
19  still employed by News America Marketing, right?
20  **A. No.**
21  Q. And you did not exercise the arbitration
22  provisions of your agreement at any time to
23  challenge your earn-outs or the bonus in the Stock
24  Purchase Agreement, right?

Page 219

1  **A. No, we did not use arbitration.**
2  **(Exhibit 59 marked for identification.)**
3  Q. You remember the July 15th, 2002 letter
4  that you sent to John Linguiti?
5  **A. I don't recall the letter, but the letter**
6  **is clearly what we wrote.**
7  Q. You wrote it or Mr. Fireman wrote it?
8  **A. We wrote it together.**
9  Q. Okay. You certainly signed it?
10  **A. Yes, I did.**
11  Q. And this is July 15th, 2002, right?
12  **A. It's dated that.**
13  Q. And you are claiming that you dispute the
14  amount paid as your year two earn-out and you make
15  the same claim that you did in your December 13th,
16  2000 letter -- December 13th, 2000 letter? Isn't
17  that right?
18  **A. I would need to see the letter to do the**
19  **comparison.**
20  Q. Okay. We have it here.
21  (Exhibit 60 marked for identification.)
22  **A. Yes, we make the same complaints.**
23  Q. And then on July 15th, 2002, you and
24  Mr. Fireman wrote another letter -- oh, I'm sorry.

Page 220

1  Then on July 19, 2002, Deborah Wolfe at Hogan &
2  Hartson responded to your July 15th, 2002 letter,
3  right?
4  **A. Yes.**
5  Q. And she said that your claims were both
6  untimely and without merit, right?
7  **A. She made those statements.**
8  Q. You did not respond to her, did you?
9  **A. I don't recall.**
10  Q. Mr. Fireman did not respond to her, did he?
11  **A. I don't recall.**
12  Q. Your counsel did not respond to her, did
13  he?
14  **A. I don't recall.**
15  Q. You did not commence arbitration?
16  **A. I do not believe we commenced arbitration.**
17  Q. And you did not bring suit, right?
18  **A. I did not bring suit.**
19  Q. Nor did Mr. Fireman?
20  **A. No. I do not know.**
21  Q. And neither you nor Mr. Fireman returned
22  any money that NAM had paid you, correct?
23  **A. I did not.**
24  Q. And you did not ask for rescission of the

Page 221

1  Stock Purchase Agreement, did you?
2  **A. I don't -- I don't believe so.**
3  Q. During the next three years, neither you
4  nor Mr. Fireman attempted to convince NAM to raise
5  your earn-out amounts for years three, four, five
6  by making the argument that NAM had failed to
7  provide sufficient financial marketing or sales
8  support, did you?
9  MR. RICH: Objection.
10  **A. We constantly raised the issue of the**
11  **concerns we had with the demise of the business.**
12  **They had in years two, three, four and five**
13  **destroyed the -- the database portion of the**
14  **business with lack of support and accuracy that**
15  **cost us customers. They took our staff that was**
16  **trained and had them leave and replaced them with**
17  **people in Connecticut who had no experience. They**
18  **never gave us access to the sales force. We**
19  **constantly raised the questions with people. We**
20  **had several people who we reported to. I reported**
21  **to four or five people during the time that I was**
22  **at NAM that were not even executives in some cases,**
23  **so we raised it every chance we got to raise the**
24  **concerns with various people in the organization.**

56 (Pages 218 to 221)

Page 266

1    Q. You go on to say that NAM dictated when and
2  how speaking engagements would run and the roles
3  and responsibilities for Mr. Fireman and
4  Ms. Raider?
5    **A. That is correct.**
6    Q. Now, NAM had the right to do so under 6.8
7  of the Stock Purchase Agreement and under your and
8  Mr. Fireman's employment agreement; isn't that
9  right?
10   **A. No, that is not right.**
11   Q. Let's go back to your employment agreement,
12 paragraph two. Do you have that in front of you?
13   **A. When you say paragraph two --**
14   Q. Paragraph number two.
15   **A. Okay.**
16   Q. It says you -- meaning you, Ms. Raider --
17 shall perform such duties -- I'm going to eliminate
18 some of the verbiage -- as are assigned to you;
19 isn't that right?
20   **A. Right.**
21   Q. Now, NAM as a company does not view
22 speaking engagements by executives as important to
23 its business, right?
24   **A. I do not know that.**

Page 267

1    Q. Let's go to interrogatory answer number
2  six.
3    **A. Okay.**
4    Q. And under the heading NAM marginalized the
5  role of Mr. Fireman and Ms. Raider, it says by the
6  end of the year 1999 -- I'm inserting 1999 -- NAM
7  had taken away much of CCMI's sales staff and
8  support structure. Who had they taken away?
9    **A. I had no retailer sales force. I had one**
10 **manufacturing salesperson. We had no assistant**
11 **accountant. We had people who were not working on**
12 **the code for the business. There were a list of**
13 **people that they took away.**
14   Q. Weren't those functions being done by
15 people in Wilton?
16   **A. No, they were not.**
17   Q. You say that Mr. Fireman had no direct
18 reports at this point in time. Is that right?
19   **A. I don't know where you're looking at that**
20 **statement.**
21   Q. Okay. It says shortly thereafter, CCMI's
22 general manager Fireman had no direct reports?
23   **A. That's correct. He did not.**
24   Q. What about Mr. Coughlin? Wasn't he a

Page 268

1  direct report to Mr. Fireman?
2    **A. No, he wasn't. It said shortly thereafter.**
3  **At one point, Mr. Coughlin did not report to him.**
4  **He reported to Henri.**
5    Q. Okay, but when did that occur?
6    **A. I don't know.**
7    Q. Now, you say that you and Mr. Fireman were
8  excluded from strategy sessions?
9    **A. Correct.**
10   Q. Didn't you attend weekly meetings?
11   **A. Those weren't strategy sessions. We**
12 **attended weekly reports on activities inside the**
13 **company.**
14   Q. Didn't you give annual presentations to
15 senior management?
16   **A. No.**
17   Q. You claim that Paul Carlucci declared that
18 he saw no future in targeted direct mail?
19   **A. That is correct.**
20   Q. Now, NAM, if it wanted to, was entitled to
21 make this business judgement under Section 6.8 if
22 it wished, was it not?
23   **A. No, it was not.**
24   Q. Where in the Stock Purchase Agreement does

Page 269

1  it say that it didn't have discretion to determine
2  what it wanted to do with respect to targeted
3  direct mail?
4    **A. It had a commitment. It had an intention.**
5  **It bought the company to help the company grow to**
6  **its business plan. It had a commitment as stated**
7  **in its intention to provide sales support to make**
8  **the company grow. Therefore, knowing it was a**
9  **targeted direct mail company, having had direct**
10 **conversations with Mr. Carlucci about the fact that**
11 **it was a targeted direct mail company, he then made**
12 **an arbitrary decision not to support targeted**
13 **direct mail? You have to ask yourself what your**
14 **intentions were for the business to begin with,**
15 **right? It was misrepresenting what was going to**
16 **happen?**
17   Q. Direct mail was part of what you termed
18 marketing and consulting?
19   **A. Yes, that is correct.**
20   Q. And didn't NAM hire a sales force to
21 exploit direct mail?
22   **A. Years after the company was purchased.**
23   Q. Isn't that what Kevin Tripp was hired to
24 do?

68 (Pages 266 to 269)

Page 270

1    A. Kevin Tripp was one person.
2    Q. When was he hired?
3    A. In 2000, I think.
4    Q. And what part of 2000?
5    A. I don't remember.
6    Q. And you were involved in his hiring, right?
7    A. I was.
8    Q. And who worked under him?
9    A. Chris Sellinger.
10   Q. Anybody else?
11   A. No.
12   Q. You say that targeted direct mail was the
13   backbone of CCMI's business?
14   A. Yes.
15   Q. Okay. But in 1998, you did only $72,000 of
16   consulting and marketing out of the total gross
17   revenue of $3.7 million; isn't that right?
18   A. That's correct.
19   Q. And only part of that $72,000 had anything
20   to do with targeted direct mail, right?
21   A. I believe, Mr. Katz, you're
22   misunderstanding the situation, so let me make it
23   clear. The corporation was growing. The market
24   was moving. The market opportunity was to execute

Page 271

1    targeted direct mail using retailer databases for
2    customer specific purchase data. That was
3    exploding and that is in the press. You can read
4    it. It is customer -- other companies who competed
5    against us enjoyed it. And therefore, the growth
6    of our company and the plan for our company was
7    based on executing targeted direct mail using
8    retailer databases in concert with manufacturers.
9    That is the growth potential of the business. That
10   is how we would accelerate to $50 million, and
11   therefore, commenting that our business was small
12   in 1998 was in fact small because we did not have a
13   significant sales force to call on manufacturers,
14   which was the reason we decided to do this
15   transaction with News America.
16   Q. Now, you go on to say in your interrogatory
17   answers Ms. Raider and Mr. Fireman were silenced in
18   the marketplace of loyalty marketing?
19   A. That is correct.
20   Q. Now, Mr. Fireman was never a speaker at
21   seminars like you did, correct?
22   A. Mr. Fireman had relationships with the
23   community, the manufacturing community of loyalty
24   cards and stored value cards, and he had

Page 272

1    relationships with people on the operations side of
2    the loyalty marketing and he was not able to
3    facilitate or build additional relationships or
4    participate in conversations with a lot of people
5    because he was -- was a sole ranger in terms of his
6    day-to-day execution of programs.
7    Q. But he was a sole ranger when he was
8    working for CCMI before the acquisition?
9    A. No, he built strategic relationships with
10   people who were servicing the loyalty marketing
11   space in terms of data entry facilities, in terms
12   of card facilities, in terms of business
13   development and strategic partnerships. He was out
14   in the marketplace on the operations side of the
15   business building those relationships that would
16   make us stronger from a foundation point of view.
17   Q. Well, but he continued to do that after he
18   was employed by News America Marketing?
19   A. No, that's not right.
20   Q. He certainly had relationships with people
21   in the loyalty industry and in the card industry?
22   A. He had relationships with only those people
23   who he had cultivated before the sale. He was not
24   able to facilitate relationships with incremental

Page 273

1    companies and processes going forward. He was
2    taken out of that role.
3    Q. Didn't he expand his view toward other
4    types of stored value cards and develop a new set
5    of relationships?
6    A. He expand -- he didn't expand
7    relationships. He cultivated relationships with
8    people who he knew prior to the sale.
9    Q. And he worked on new projects, right?
10   We'll get to some of them in a few minutes.
11   A. He worked on new projects? What's a new
12   project?
13   Q. The Toshiba project, that was something
14   that was totally different from anything that you
15   had done at CCMI, right?
16   A. Toshiba was a stored value product.
17   Q. Right.
18   A. Toshiba was a customer of Citibank, I
19   believe, which was a bank that was a customer of
20   NAM's, so he worked on a stored value project that
21   NAM asked him to work on. NAM -- I mean, excuse
22   me, News Corp., not NAM.
23   Q. And that worked tremendously to CCMI's
24   benefit, did it not? Because ultimately, the

69 (Pages 270 to 273)

**TAB E TO EXHIBIT BINDER**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

                    Plaintiff,

                              Civil Action No.

         -against-            05-1740MLW


NEWS AMERICA MARKETING IN-STORE,

INC.,

                    Defendant.

----------------------------------------x

                         July 18, 2007

                         11:43 a.m.


        Deposition of CHRISTOPHER MIXSON, taken

    by the Plaintiffs, pursuant to Notice, at the

    offices of News Corp, 1211 Avenue of the

    Americas, New York, New York, before David

    Levy, CSR, a Notary Public of the State of New

    York.

Mixson, Christopher

July 18, 2007

New York, NY

---

**6**

1    Q. What years?

2    A. I would have to take a guess at that.

3  Probably '8 -- roughly '81, part of '82.

4    Q. Can you take me through your job path

5  up to the time that you joined News America

6  Marketing.

7    A. Completely?

8    Q. Yes, please.

9    A. Leaving college, I took a job with a

10  publishing company in Lakewood, Colorado,

11  relatively short-lived situation. Immediately

12  following that, I took an entry-level sales and

13  marketing position with the Quaker Oats Company

14  headquartered out of Chicago, Illinois.

15    I worked in a number of different

16  capacities with Quaker as part of their

17  management training program, including everything

18  from actually calling on retail stores to

19  developing trade promotion programs and other

20  promotional programs for multi-state sales teams

21  within Quaker, working in their human resources

22  department, working in their sales training area,

---

**7**

1  working to some extent in their brand management

2  area, and then I was more or less spun out of

3  that program into a management situation where I

4  ran a ten-person sales team that covered --

5  headquartered out of St. Louis that covered a

6  multistate area.

7    Q. This is still for Quaker?

8    A. Yes, calling on primarily what we

9  would call headquarter accounts on the retail

10  side of the business.

11    After leaving Quaker, I went back to

12  school for a short period of time, left there and

13  took a job with a company called SAMI. SAMI

14  eventually, through acquisition, became SAMI

15  Burke. SAMI was a marketing research company,

16  one of the leading marketing research companies

17  for the packaged goods industry. Burke Marketing

18  Research was probably the state-of-the-art

19  customer research house for the packaged goods

20  industry. Those two companies merged.

21    I took a relatively entry-level

22  position with them, wanted to get into that side

---

**8**

1  of the business, and growing in that side of the

2  business, I was very successful there, graduated

3  within -- was there for approximately five years,

4  graduated to one of their most senior account

5  directors. As I recall, I was the top account

6  director in the organization the year that I was

7  recruited away by a division of Citicorp.

8    I worked for about five years for

9  Citicorp POS Information Services, eventually

10  leaving there as vice president, national account

11  director -- national accounts director, plural.

12  Sorry.

13    That business was eventually shut

14  down by Citicorp and I was picked up -- after

15  doing a little bit of consulting work with Advo,

16  which is the nation's largest direct mail

17  company -- I was recruited by News America FSI

18  and ended up running their Denver office, and

19  have progressed within the News America

20  organization in a variety of different

21  capacities, including, they formed a region

22  around me -- I had some great success early in my

---

**9**

1  tenure in the company -- they formed a region

2  around me called the Rocky Mountain region.

3    That was relatively short-lived as

4  well, and they moved me to restage the Chicago

5  operation for News America FSI as a -- I had

6  various vice president titles here. Some of them

7  are -- I don't know how meaningful one is versus

8  the other, but I was a vice president, group vice

9  president, senior vice president, that kind of

10  thing.

11    In Chicago, successfully restaged

12  that operation and they relocated me back here to

13  New York to head up sales for the entire company,

14  for News America FSI. In 1997 News America FSI,

15  News Corp., acquired Heritage Media primarily to

16  incorporate the Act Media division, which was the

17  in-store marketing division of Heritage Media

18  into the News America enterprise and shortly

19  thereafter, we reintroduced ourselves as News

20  America Marketing.

21    I did that for a number of years,

22  engineered the integration of those two sales

---

3 (Pages 6 to 9)

Mixson, Christopher                                   July 18, 2007

New York, NY

22

1  allows us to have a well-developed sales force
2  represented, certainly, on the manufacturing side
3  of the business. There were some products and
4  services on the retail side of the business which
5  ultimately, you know, had to ultimately changed
6  as well.
7        But we had probably more
8  representation on the retail side of the business
9  than we did on the manufacturing side of the
10  business. And I can't, you know, if you're going
11  to ask me the names of all the people who did
12  that, you're going to be disappointed because I
13  can't remember them, or most of them.
14        Q. Well, at the moment, I'm more
15  interested in the organization. There was a --
16  was there a separate retail sales force and a
17  separate manufacturing sales force?
18        A. Well, again, primarily in the --
19        Q. I should focus you, Mr. Mixson, to
20  the time period of, you know, late '99 through
21  2000; the early years, if you will, of the
22  acquisition of SmartSource Direct, then known as

23

1  CCMI, at least initially.
2        A. Okay. Well, I can only speak to the
3  situation after I was appointed to try to figure
4  out this business.
5        Q. Well, let's take that as a benchmark.
6  When was that?
7        A. I think that was in -- I want to say
8  it was in 2000.
9        Q. Okay.
10        A. And again, we had -- we had -- Henry
11  Lellouche was involved early on. Henry really
12  had responsibility, oversight of that business.
13  And he worked with Ann Raider and other people
14  who were largely recruited from outside the
15  organization to, I believe at the -- at the -- I
16  won't use the word "insistence," but the
17  recommendation of Ann Raider and Bob Fireman. We
18  brought people in from outside of the business to
19  represent that business and sell on the retail
20  side, which is different from the way we normally
21  develop a sales force in our market.
22        Q. Take me through that a little bit,

24

1  please, and we're still just focusing on the
2  retail sales. Your testimony is that Ann Raider
3  provided the identities or the names of people
4  who she thought would be good sales reps to sell
5  to retailers?
6        A. I think there was an -- I think Ann,
7  Bob and Henry were all actively involved in
8  interviewing and extending offers and ultimately
9  hiring people to come on board to support that
10  retail sales force, is my recollection.
11        Q. Is it your belief that the retail
12  sales force was something that needed to be
13  developed at CCMI or SmartSource Direct, back
14  when you came on board in 2000?
15        A. When I came on board in 2000, the
16  mission was to take these properties that we had
17  acquired and grow them into sustainable
18  businesses. So to some extent, any time you're
19  involved in an enterprise like that, you're --
20  there is a little bit of trial and error involved
21  in trying to figure out how you're going to do
22  that.

25

1        I think our plan, and the plan that
2  we pursued, was to bring people on board to
3  represent products that currently existed, and
4  those products were frequent-shopper card -- that
5  we brokered frequent-shopper card relationships
6  between retailers and manufactures of frequent
7  shopper cards.
8        We attempted to sell application
9  processing and to some extent, although the
10  infrastructure wasn't really there to support it,
11  to provide some type of data hosting. So those
12  were products that -- that existed, although, you
13  know, frankly, on a relative basis to other
14  things that were available in the industry, it
15  was a tough sale because they were much less
16  sophisticated than other businesses that were out
17  there.
18        But we did have products, so we did
19  bring people on board to try and grow that part
20  of the business.
21        On the manufacturer side of the
22  business, there really wasn't, you know, a

7 (Pages 22 to 25)

Mixson, Christopher                                July 18, 2007

New York, NY

---

26

1  product, per se, that, you know, you could have
2  people out peddling, although we did -- and it's
3  not inconsistent with the way News America has
4  done marketing in the past, we sometimes try to
5  sell a little -- sell products that we think we
6  can deliver to our major customers. So if we
7  found out that a customer, major packaged goods
8  customer would be interested in a database
9  marketing product, we would try to get as much
10  information as we could on their project and then
11  determine whether or not we thought we might be
12  able to get something going there, so to speak.
13        But that was less of a focus early on
14  because you really don't have a syndicated, you
15  know, a substantial package product that you
16  could introduce into the marketplace, nor do you
17  necessarily have relationships with retailers so
18  you have a ready data stream that's of any size
19  or consequence for those advertisers.
20        So we focused our efforts, as I
21  recall, primarily on the retail side.
22        Q. Let's talk just for a minute about

---

27

1  manufacturing, the sale or lack of sales of
2  products to manufacturers. Your testimony is
3  that you didn't think that there was a salable
4  product; does that accurately encapsulate what
5  you're telling me?
6        A. Yeah. Well, there's different
7  reasons for that but, yes, I think our ability
8  to, you know, you can have the best salesperson
9  in the world but if you don't have a viable
10  product, that salesperson is going to have a
11  difficult time being successful. And I don't
12  think that we had, you know, tremendously viable
13  products at that point in time, because the
14  products were dependent upon both being able to
15  acquire the purchase behavior data you needed to
16  do targeting and being able to process it and
17  execute against it efficiently.
18        Keep in mind, this was early in our
19  development. Today we're very successful in that
20  business. We're growing. But it's taken -- it's
21  taken, you know, the appropriate amount of time
22  to build that reputation, to build the data

---

28

1  accession, and to develop the facility to deliver
2  those types of broad skill programs that
3  manufacturers are looking for.
4        Q. Describe the products, please, that
5  you would have liked to have sold to
6  manufacturers back in 2000 but you believed
7  didn't exist in the CCMI suite of products and
8  sources.
9        MR. KATZ: Objection to form.
10        You can answer the question if you
11  understand it.
12        A. Well, I never worked with CCMI. I
13  always -- CCMI -- I think of CCMI, that's
14  preacquisition.
15        Q. Let's just substitute SmartSource
16  Direct within my question.
17        A. Okay. So the question again is?
18        Q. The question is, what products and
19  services did you hope to sell for SmartSource
20  Direct to manufacturers but were, in your view,
21  unavailable early on, let's say in 2000?
22        A. The types of products that we're

---

29

1  selling now. The types of products that we're
2  selling now have a high degree of customization
3  to them. But they have -- they have scale.
4  Scale was something that we didn't have back in
5  2000. And they have form in the sense that
6  sampling programs, highly targeted consumer
7  promotion programs, all predicated on your
8  ability to slice and dice data in a way that
9  allows you to go in and sell consultatively to
10  customers and help guide their purchase
11  decisions.
12        We didn't have that capability early
13  on in the program. We invested heavily in some
14  technology that would assist us in getting there,
15  but we didn't have it back in 2000.
16        Q. Let me just see if I understand what
17  would have been sold to manufacturers if you
18  thought it was available for sale and in a
19  salable form.
20        Programs designed to market a
21  manufacturer's product, that are designed using
22  information developed at the point of sale that

---

8 (Pages 26 to 29)

Mixson, Christopher                                          July 18, 2007

New York, NY

---

**38**

1  day-to-day consultative selling relationship with
2  Schick -- and you have to keep in mind that we're
3  a very substantial vendor with these major
4  packaged goods players. We have a very good
5  reputation, certainly a reputation that includes
6  keeping information confidential because market
7  information is power, but we're invited in as
8  members of promotion planning and decision
9  groups.
10        When you're invited in to those types
11 of sessions, you become privy to future plans.
12 They might include a database marketing program.
13 We would then -- we don't really have to, you
14 know, be too aggressive in our efforts to get in
15 there because we now have a reputation as
16 executing quality programs, so we're invited in.
17        But we would -- the core salesperson
18 would then alert the specialty salesperson, the
19 SmartSource Direct salesperson, to come in. If
20 they are successful in closing a sale, the volume
21 would be attributed against the specialty
22 salesperson's sales goal and then we would give

---

**39**

1  the -- an override on the volume and also
2  dedicate -- dedicate that override to
3  accomplishment of the core person's sales goal.
4        Q. So --
5        A. So at the end of the year, the
6  salespersons successfully achieve their core
7  product sales goal, they would now be up in the
8  bonus rounds, you know, based on the additional
9  revenue that's being attributed to their
10 territory based on their success in complementing
11 the specialty sales group.
12        Q. So the sales goals are based on
13 target core products.
14        MR. KATZ: Objection.
15        A. I'm sorry, I don't understand the
16 question.
17        Q. The sales goals are set on core
18 products?
19        MR. KATZ: Objection.
20        A. Sales goals are set on all products.
21        Q. Including specialty products?
22        A. Yes.

---

**40**

1        Q. And the manufacturer sales force has
2  sales goals both for core products and specialty
3  products?
4        A. No. Well --
5        Q. The manufacturer --
6        A. Your nomenclature is a little mixed
7  up. Let me help you out. We have what you
8  referred to as our core sales group. They have
9  specific goals. We have specialty areas that
10 have dedicated salespeople. They have their
11 goals. They are both selling to manufacturers.
12 So they are both manufacturer sales reps to an
13 extent.
14        Q. I'm talking now about your core sales
15 force. At least I intended to.
16        A. Yes, they have a specific sales goal
17 for their core products, and then they have an
18 opportunity to not only reach these sales goals,
19 but reach even higher compensation levels by
20 successfully partnering with the specialty
21 salespeople and assisting them in closing
22 specialty sales.

---

**41**

1        Q. Okay. Now, this is the way it's done
2  today.
3        A. That's correct.
4        Q. Is that also the way it was done in
5  2000?
6        A. I can't recall. I mean, the
7  compensation program normally evolves year to
8  year as we figure out ways to do things better.
9  So I'm not exactly sure the way the structure was
10 set up in 2000.
11        Q. What I'm really interested in finding
12 out is whether or not the core sales force sold
13 specialty products, and in this particular
14 instance, SmartSource Direct's products, to the
15 manufacturers in 2000 and 2001.
16        Do you recall that?
17        A. They would certainly complement
18 the -- the sale. I can't give you the specifics
19 of how we constructed the sales goals, bonus
20 plans, compensation plans around that. But, you
21 know, it's -- it's akin to, if you wanted to date
22 a girl, and you didn't know her at all but you

---

11 (Pages 38 to 41)

Mixson, Christopher

July 18, 2007

New York, NY

**42**

1 had a close friend who knew her well, chances are
2 pretty good you'd want to use your close friend
3 to get an introduction to the girl you wanted to
4 date.
5         It's very, very similar in the way we
6 operate the business. It's the core salespeople
7 who have the most day-to-day interaction with the
8 key decisionmakers on the packaged goods side.
9 So it's only natural that our specialty sales
10 teams are going to want to piggyback on those
11 relationships to try and foster successful
12 closure on sales that they are assigned.
13         Q. Is the core sales force directed to
14 try to sell SmartSource Direct's products?
15         A. Yes. I mean, that's why Henry would
16 make, would go around doing his presentations to
17 the various sales offices on what SmartSource
18 Direct is all about, and how they can assist us
19 in successfully growing SmartSource Direct's
20 business.
21         Q. That was your expectation, in other
22 words, it was your expectation that the sales

**43**

1 force would be directed to try to sell
2 SmartSource Direct's products and services?
3         A. Yes.
4         Q. And do you know for a fact that that
5 happened, or do you assume it happened because
6 that's what should have happened?
7         A. No. It happened with varying degrees
8 of success. Again, to be able to sell something,
9 you have to have a product to sell. You know,
10 and I think -- I can't -- well, I have to
11 speculate as to where we were at, at that
12 particular point in time, because I can't recall
13 the exact progression.
14         Q. I show you a document that we've
15 marked in Mr. Garofalo's deposition yesterday --
16         MR. KATZ: Whenever you want to take
17 a break, we can do that, and we'll resolve
18 what we want to do for lunch. I
19 personally am indifferent to what we do.
20 So -- this is off the record.
21         (Discussion off the record.)
22         Q. This is Exhibit 39. We marked that

**44**

1 yesterday at Mr. Garofalo's deposition, and if
2 you take a look at it, Mr. Mixson, the first
3 question is if you saw this before today.
4         A. You want me to go through this?
5         Q. Yes, just take a look at it and
6 familiarize yourself sufficiently to tell me if
7 this is something you recall seeing back in the
8 day or otherwise.
9         (Witness perusing document.)
10         A. I don't recall this particular piece,
11 but I'm conversant in the topics that are
12 addressed in it.
13         Q. I will tell you the properties of the
14 document place this department in the August 1999
15 time frame. But I'll ask you whether or not my
16 observation is consistent with your memory.
17         A. Okay.
18         Q. Is it? Does it look like something
19 that you would have seen --
20         A. I have know --
21         Q. -- might have seen back then?
22         A. It certainly -- it could be something

**45**

1 that I might have seen. I have no specific
2 recollection of this piece, though.
3         Q. Take a look at the page which is
4 third from the --
5         A. The page you're looking at?
6         Q. Third page from the end. It says,
7 "CCMI Full Service Database Marketing Services."
8 Yes, sir.
9         As you look at the PowerPoint
10 presentation that discusses these services that
11 CCMI had to offer, is it consistent with your
12 memory that first off, the program implementation
13 products and services were products and services
14 that were available?
15         A. No.
16         Q. Salable?
17         A. No. I think there's a little bit of
18 progressive thinking that goes into a lot of
19 these things. You're looking at a -- I think
20 you're looking as much as a "wannabe" chart as a
21 "currently is" chart.
22         Q. You say that why? What's the

12 (Pages 42 to 45)

Henderson Legal Services
202-220-4158

Mixson, Christopher                                    July 18, 2007

New York, NY

46

1  basis --
2      A. I say that based on my experience,
3  that this as much represents, you know, where we
4  hope to emerge as where we were currently at, at
5  the time that this slide was put together, I
6  think.
7      Q. Let's take a look first at the first
8  column, "Product Implementation."
9      A. Okay.
10     Q. Tell me what, in your view, doesn't
11  belong there.
12     MR. KATZ: Objection.
13     A. These might be things that we had
14  some competency in doing. Whether or not there
15  was truly a market that we could effectively
16  compete in for these things remained to be
17  discovered, okay, in 1999. Because it certainly
18  remained to be discovered in 2000 and beyond, as
19  we -- as we learned, as we moved through time, a
20  lot of -- a lot of this stuff really ultimately
21  wasn't salable because there wasn't a need in the
22  marketplace for the services that News America

47

1  could provide here.
2      Same thing -- same thing holds true
3  on the data management side of things.
4      Q. Well, I just want to focus just for a
5  minute, Mr. Mixson, on program implementation.
6  And my question is, of the four things listed
7  under "Program Implementation," do you believe
8  that some of them were unavailable, in other
9  words, some of them were not salable?
10     MR. KATZ: Objection.
11     A. I had think -- I think to some
12  degree, all of them were salable. The question
13  is to whom, to what businesses.
14     Q. Well, let's focus on, first,
15  manufacturers. Do you believe --
16     A. Well, I don't think -- I think you're
17  heading in the wrong direction here. The -- if
18  you look at the far left-hand side of this page,
19  it's really not manufacturers that are being
20  addressed here. These are -- these are really
21  retailer-focused components. Okay?
22     If you look to the far right-hand

48

1  side, those are manufacturer-focused components.
2  And if you look at the middle, those are the
3  things that you need to do to bridge the two.
4      Q. Okay.
5      A. Okay?
6      Q. Well then, let's take that
7  understanding. And I'll go with that. The
8  retailers, were all the four issues, were all the
9  four products listed under program implementation
10  available in 1999 and 2000 for sale to retailers?
11     A. Again, you need to -- this is why I'm
12  trying to make sure that you understand -- I
13  think that SmartSource Direct or, back at this
14  time, SmartSource Direct hadn't even been
15  unveiled, I guess this is CCMI. Let me speak of
16  it in terms of SmartSource Direct because this
17  predates me.
18     Q. Right.
19     A. But I'll try so we don't have to come
20  back to this again in the future.
21     We could do frequent-shopper program
22  design. Anybody can. You know, I did that for a

49

1  living for -- for years. I was part of one of
2  the pioneers in development of database marketing
3  and frequent-shopper program creation.
4      Q. Was that at Citibank?
5      A. Yes. Citicorp POS Information
6  Services was the pioneer in database marketing.
7      Application process and card design
8  production, issuance and replenishment, I would
9  say, yes, we could to all those things but on a
10  very small scale, because we didn't have the --
11  on one hand, we didn't have the systems and the
12  competency to handle very large programs and on
13  the other hand, a lot of this stuff was, even at
14  this time, being brought in-house to the very
15  large retailers. They had no need to continue to
16  go through middlemen in order to facilitate these
17  particular requirements. Which is one of the --
18  one of the unfortunate things that we discovered
19  after we had had made the acquisition.
20     There are a lot of things here that I
21  would imagine the people who originally made the
22  decision to buy this company had hoped would

13 (Pages 46 to 49)

Mixson, Christopher                                                July 18, 2007

New York, NY

---

62

1    Q. Personally.
2    A. No.
3    Q. To look into what the company had to
4    offer.
5       A. Well, I would be part of regular
6    weekly meetings where we'd review success against
7    products that currently existed and I would be
8    part of conversations that would be reviewing
9    recommendations that were being made by the
10   people who were managing this on what we needed
11   and where we needed to be to be competitive.
12      But, you know, in terms of doing,
13   roll up my shirt sleeves and do personal analysis
14   below that, no, I had people who worked for me to
15   do that.
16   Q. Who was the person or who were the
17   people that were responsible for inventorying in
18   CCMI?
19      MR. KATZ: Objection.
20   A. I don't follow --
21   Q. And by "inventorying," I mean, I'm
22   looking at an inventory of products and services

---

63

1    now in Exhibit 39. When you bought the company,
2    when News America bought the company, you must
3    have conducted some kind off effort to determine
4    what CCMI had to offer and how robust it was.
5       Do you know who did that work.
6       A. Well, we had a venture group. I
7    mean, the process of acquisition of CCMI, what
8    was that process like? I wasn't really involved
9    in it.
10      My first involvement with the — with
11   the IGroup was after all of these acquisitions
12   had actually been consummated. And I was brought
13   in after the fact and given the assignment of
14   honing them into some type of viable and
15   sustainable business.
16      So — but we would have a venture
17   group who would go out and, you know, I think
18   they dealt more often than not with higher-risk
19   entrepreneurial-type businesses that hadn't
20   really made it big, so there was always some
21   speculative nature to that type of assignment in
22   the first place.

---

64

1       But I think they would be the people
2    that would go through the due diligence to try to
3    ascertain whether or not there was a viable
4    business opportunity there or not.
5       Q. You don't know whether or not the
6    document we've marked as Exhibit 39 effectively
7    reflects --
8       A. That's this document?
9       Q. -- yes, sir, effectively reflects the
10   inventory that CCMI had to offer at the time of
11   the acquisition?
12      A. I think it actually -- accurately
13   reflects -- I would imagine it accurately
14   reflects what we believed to be available at the
15   time of the acquisition. I don't know that it
16   accurately describes those products and services
17   that were determined ultimately to be viable
18   after the acquisition.
19      Q. We'll talk about that in a second,
20   but let me go back to a statement you made a
21   moment ago about your role with the IGroup.
22      A. Um-hum.

---

65

1       Q. My notes reflect, earlier in the
2    deposition, you were brought in to integrate the
3    IGroup as a sustainable business; is that
4    correct?
5       A. Yes.
6       Q. And by "integrate," that means
7    SoftCard, Planet U and what was then CCMI or what
8    soon to become SmartSource Direct, your role was
9    to find the synergy between these three companies
10   and develop a sustainable business?
11      MR. KATZ: Objection.
12      A. I think that was the ultimate goal.
13   I don't think you synergize right out of the box.
14   I think that, you know, each of these businesses
15   had to first and foremost gain some traction
16   independently and as they did that, we would
17   figure out a way to integrate them -- when I say
18   "integration," it's usually, "Integration"
19   usually takes place to some extent on the
20   marketing front. How do we -- how do we
21   integrate businesses into an actionable sales
22   initiative, and then ultimately, are there other

---

17 (Pages 62 to 65)

Mixson, Christopher                                    July 18, 2007
New York, NY

---

70

1  the company might benefit from additional
2  resources; isn't that the process?
3      A. Yes. And I would add to that what
4  the company's currently doing that is correct or
5  incorrect and also, evaluating, you know, after
6  you get more experience with the company, what do
7  you do with it now.
8      Q. Did you learn, ever, what percentage
9  of the market in its market segment CCMI had
10 prior to acquisition?
11     MR. KATZ: Objection.
12     A. I can't recall. My recollection
13 would be that it -- very small.
14     Q. So you didn't learn and you don't
15 believe that it had a significant market share at
16 the time of the acquisition in loyalty card
17 programs?
18     A. You have to explain to me, what
19 market share of what?
20     Q. Well, share of selling loyalty cards
21 that are then used to develop marketing programs
22 by using information developed at the point of

---

71

1  sale.
2      A. I think in retrospect, they may have,
3  you know, their -- their -- I think their primary
4  profit, and I may be mistaken on this, but their
5  primary profit was simply brokering access to
6  plastic frequent-shopper cards. I don't think
7  that a tremendous amount of their market share,
8  if you will, in terms of executing database
9  marketing programs, I think it was
10 infinitesimally small.
11     Q. That was an emerging market back in
12 '99, wasn't it?
13     A. It's still an emerging market.
14     Q. It was a brand-new market
15 effectively.
16     A. In when?
17     Q. '99.
18     A. Absolutely not.
19     Q. How developed was the market compared
20 to today?
21     A. Substantially.
22     Q. Let's talk about your work at, was it

---

72

1  Citicorp, or Citibank?
2      A. Okay.
3      MR. KATZ: You know, before we do
4  that, this is a good time, I just want to
5  take a restroom break. Can we do that,
6  and we can come back and again, I'm
7  totally indifferent on lunch. I can work
8  through it, but you let me know.
9      MR. PETERS: I'm still working on
10 breakfast. We're off.
11     (Recess taken.)
12 EXAMINATION (Cont'd.)
13 BY MR. PETERS:
14     Q. Would you describe your work with
15 Citicorp?
16     A. Citicorp POS Information Services,
17 perhaps the best way to describe my work is to
18 describe Citicorp POS Information Services.
19     Q. Yes.
20     A. Citicorp POS Information Services
21 really, at least within the grocery and drug
22 segments of the industry, invested database

---

73

1  marketing, introduced the first loyalty programs,
2  and indeed, reached relatively significant
3  penetration in the expansion of those programs
4  prior to their ultimate closure in 1991.
5      I went to work for them in, let's
6  say, 1986. I was on the -- I wasn't part of the
7  original start-up, but I was in one of the very
8  first early waves of hires before the company
9  ramped up over the years to eventually having
10 several hundred people in the organization. It
11 was a company that was headquartered actually up
12 in Stamford, Connecticut.
13     Citibank had had a reputation under
14 John Reed, who was the CEO of Citibank at the
15 time, of funding what they called
16 "Intrepreneurial," that's with an I,
17 Intrepreneurial businesses where they would bring
18 on teams of talented people to take a concept,
19 they would fund it and grow that into larger and
20 substantial businesses.
21     The objective of Citicorp at the time
22 was to, one, develop the nation's largest

---

19 (Pages 70 to 73)

74

1  important behavior database, John Reed having a
2  small belief that we'd be able to tap into the
3  latent marketing potential of that data, and
4  remarket that information for packaged goods
5  companies and other marketers for marketing
6  purposes.
7          Secondly, there was a bit of a more
8  abstract agenda that had to do with ultimately
9  converting frequent-shopper cards into credit
10 instruments.  And Citicorp already had this
11 tremendous card base in distribution around the
12 country with frequent-shopper cards.  They would
13 certainly have a leg up on anyone else attempting
14 to make that happen, and I can't give you all the
15 details on this but, you know, that was a
16 challenge back then, still a challenge today for
17 a variety of reasons.  But, you know, included in
18 that is our rather archaic banking laws that are
19 unique to the U.S.
20         The first program that Citicorp
21 initiated was with Ukrops in Richmond, Virginia.
22 After they started Ukrops, that's when I was

75

1  brought on board.  I helped oversee the creation
2  of unique marketing programs and implemented
3  those programs at a variety of retailers
4  including Jewel and Dominick's, which together
5  probably constitute in excess of about 65 of the
6  ACV in the Chicago metro area.
7          We had numerous divisions of Safeway
8  on line, including Vaughn's in California,
9  including Safeway Denver, Safeway Balt-Wash,
10 Safeway Seattle, and a number of other retailers
11 across the country.  So as far as back as that;
12 and there was significant penetration had already
13 started on the frequent-shopper front.
14         We had also actually built
15 applications for the data where we were actually
16 selling applications for the data back to retail
17 customers.  There was a retail sales force at
18 Citicorp POS.  There was a manufacturers' sales
19 force at Citicorp POS.
20         Q.  Why was it shut down when it was so
21 successful?
22         A.  Well, it was shut down because the

76

1  plan that Citibank had behind Citicorp POS, they
2  realized that this business would not -- their
3  forecast for generating a profit that would
4  underwrite the huge investment that was required
5  to get this whole enterprise up and running was a
6  multiyear-payback scheme before they even started
7  to see a return on that investment.  But they
8  were willing to deal with that.  They had a lot
9  of confidence that this was going to be the next
10 big thing.
11         Unfortunately, all of us having lived
12 through that period, the country went into a
13 recession.  Citibank is the largest consumer
14 bank.  I think they were the largest lender to
15 consumers for real estate, and they were the
16 largest lender to developing nations.  And both
17 developing nations, third-world countries,
18 started defaulting an loans, and the real estate
19 market went south.
20         And, as CEOs are wont to do when
21 things like that happen, they have to figure out
22 a way to stop the hemorrhaging.  And one of the

77

1  ways to do it was to take a look at some of these
2  businesses that they had high hopes for but
3  wouldn't see a payback for, for many years.  So
4  ultimately they pulled the plug on the entire
5  project.
6          Now, that left a number of all of
7  these retailers with a huge problem.  They had --
8  they had these very robust frequent-shopper
9  programs, and these were shopper programs that
10 were even back then, you were identifying
11 somewhere around 70 percent of all transactions,
12 close to 90 percent of all volume was actually
13 being -- you could identify down by the household
14 level through the use of frequent shopper cards.
15 So that's -- that's big.
16         Into that void stepped a company that
17 was formed by two brilliant gentleman, John
18 Schultz and Don Irion, who were two of the key
19 early players at Citicorp POS.  They had been
20 moved out of the company by senior Citicorp
21 people prior to the demise of the Citicorp POS
22 Information Services, and they immediately went

20 (Pages 74 to 77)

Mixson, Christopher

New York, NY

July 18, 2007

78

1  to work building, taking advantage of all of
2  their learning at Citicorp, building their own
3  platform. The name of that company they formed
4  was called Retail Marketing Systems. Retail
5  Marketing Systems then, unlike Citicorp, they had
6  no aspirations to own the data. Citibank
7  required that they co-own the data with retailers
8  so they wouldn't be restricted in the application
9  of that -- of those purchase behavior databases.
10  That was a problem for some retailers.
11       John Schultz and Don Irion wanted to
12  take the path of least resistance. They decided
13  they would become primarily a data management
14  company. They would sell software and host that.
15  And they were very successful in expanding the
16  RMS product, which I believe was called Market
17  Expert, to many if not most of those players who
18  had been dependent upon Citicorp POS previously.
19       So your question is, how developed
20  was the business back then? Very developed at
21  that point in time. And frankly, up until the
22  time that I was put over there, and I kept in

79

1  touch with these people, I actually brokered
2  meetings with News America and RMS at one point
3  in time, as a possibility of being interested in
4  partnering with them or even acquiring them up
5  until the time that SmartSource Direct was
6  assigned to me, I'd never heard of CCMI. They
7  weren't -- they were a non-entity in the database
8  marketing business as far as I was concerned.
9       I think their -- I think a lot of the
10  stuff that we had was aspirational stuff, but
11  they may have had some capability of differing
12  on, but the -- their real -- their real business
13  I think was just as the middleman in providing
14  frequent-shopper cards. So -- but my position,
15  back to Citibank, my position was really to, one,
16  develop and manage relationships with retailers;
17  two, manage a group of people who had a similar
18  assignment; three, develop, design, develop and
19  implement unique marketing platforms that a
20  King's Supers in Denver could use to
21  differentiate themselves from Safeway Denver, and
22  then ultimately to try and represent a syndicated

80

1  one-size-fits-all program that would
2  significantly reduce the company's cost
3  associated with hosting all of these disparate
4  platforms across multiple retailers across the
5  country.
6       And that program failed and
7  ultimately they pulled the plug on the entire
8  business. But that is the evolution of the
9  database marketing business in the United States,
10  and it's that same learning that ultimately was
11  exported to Europe and embraced by a company
12  named Dunnhumby, who did a pretty good job of
13  applying those -- that same perspective to
14  businesses in Europe. They were successful
15  there. Kroger has since taken a big piece of
16  that and brought that in-house at Kroger. Those
17  people actually work on-site at Kroger now. So
18  that's kind of what's going on in the industry.
19       Q. How is customer behavior data
20  collected under the Citicorp model? In other
21  words, was it at the point of sale and if so, how
22  did that work?

81

1       A. Well, it's probably different for
2  different retailers. You know, if you -- from a
3  consumer perspective, when you walk into a retail
4  store and you scan an item across a scanner,
5  everything looks neat and clean as long as your
6  receipt comes out and shows you all the items
7  that you bought and the total comes up correctly.
8       In reality, retailers have highly
9  bastardized systems that they have customized to
10  complement whatever their specific needs are in
11  any one given area, and there's an evolution that
12  takes place in the hardware design for front
13  ends. Back when Citicorp first introduced the
14  system, there were some front-end systems that
15  could allow to you design certain marketing
16  programs where you could actually do things like
17  have scan-downs right at the point of sale where
18  the items that normally would have been put on
19  sale at shelf, you could only get those items on
20  sale now if you -- if you showed your card and
21  scanned the item at the front end.
22       IBM had that type of competency. NCR

21 (Pages 78 to 81)

Mixson, Christopher                                           July 18, 2007

New York, NY

---

82

1  had that type of competency, but not across all
2  generations of their equipment. And if you look
3  at a Kroger, for example, and I don't know this
4  for a fact, but my conjunction would be that
5  Kroger across all of their stores probably has
6  multiple generations of front-end systems out
7  there. How those systems are hosted also becomes
8  an issue because the hosting competency of one of
9  their divisions is very different from the
10 hosting competency of another division.
11       So by hook or by crook, we would,
12 Citicorp would eventually get the data. Some of
13 it might be direct feed, some of it might be on
14 computer tapes, and that was part of the problem
15 of the business. The infrastructure costs of
16 trying to sort through all that was, it was very,
17 very expensive at that point in time. It's
18 gotten much better because targeting has come
19 into its own. It's a requirement of most
20 retailers now to at least have that competency in
21 the front end even if they are not capitalizing
22 on it. It comes as part of the standard

---

83

1  software/hardware configurations that most of the
2  retailers buy and put into the front end now.
3       Q. And that wasn't available back in the
4  Citicorp days?
5       A. It was available in some instances
6  and not available in others.
7       Q. So a lot of the data you had to get
8  on purchase behavior, you had to acquire it from
9  the retailer directly.
10      A. Well, there's no difference there
11 now. I mean, the only way you're going to get
12 your data is to acquire it from the retailer.
13      Q. Right.
14      A. It has to come to you from the
15 retailer in some way, shape or form.
16      Q. What's the difference now? When I go
17 through the grocery line, there's a machine there
18 that scans my frequent-shopper card. It knows
19 who I am, it knows all the items I buy; and that
20 information is warehoused presumably somewhere,
21 whether it's at the store level or otherwise.
22 That wasn't really the way it was back in the

---

84

1  Citicorp days, was it?
2       MR. KATZ: Objection.
3       A. Well --
4       Q. It was more primitive than that.
5       A. Well, even now you paint a little bit
6  more of a romantic picture about the data that
7  actually exist.
8       It's not that personal. To say that
9  they know who you are is a misnomer. The way the
10 data is used is for marketing application
11 purposes, they don't really care who you are
12 other than the fact that you are a component in a
13 bucket of consumers who have similar purchase
14 behavior, if that makes any sense. And the
15 bucket is very leaky. You have -- you have can
16 customers who are leaving your franchise or
17 moving out of town and there's all kinds of
18 sanitation efforts that have to go in to keep the
19 data robust and current.
20      And the different retailers have
21 different competencies in how they are able to
22 utilize real-time data. Catalina, for example,

---

85

1  has a reactive system that, you know, you think
2  you're getting that coupon because they know who
3  you are and what you buy. When in reality you're
4  getting that coupon simply because you purchased
5  a product that anybody who scans that product is
6  going to trigger the same response.
7       So it's not, you know, it's not quite
8  as Buck-Rogerish yet as you might conceive it to
9  be, but it has the portent of getting us there
10 some day.
11      Q. Were you involved in any of the
12 technical aspects of developing the applications
13 used to track customer behavior when you were
14 with Citicorp?
15      A. The last thing you would want me to
16 do is be opening up a box and start working on
17 it. No.
18      Q. You were the business guy.
19      A. I would work on the marketing side.
20 My primary responsibility was to create marketing
21 programs, marketing applications for the data,
22 and then to represent the applications of those

---

22 (Pages 82 to 85)

102

1  input, as did I.  Probably relied on their input
2  less and less as time progressed, because their,
3  frankly my own personal point of view is, their
4  credibility became more and more suspect as we
5  moved through the process.
6      I think that, you know, their -- Bob
7  especially has some eccentricities that guide his
8  judgement and I think the judgement often ends up
9  being flawed and, as a consequence, it's like
10  anything else, if you have somebody whom you
11  believe repeatedly brings you valued counsel that
12  helps you form an intelligent opinion that's
13  going to help you successfully drive the
14  business, and their motivation is primarily for
15  the success of the business, you're not only
16  going to invite them into that decision process
17  but encourage them in that process.
18      I think that was probably the
19  relationship that I had with Bob and Ann early in
20  the process.  I think they failed to bring value
21  to the proposition to the extent that I would
22  rely on them as much later in the process.

103

1      Q.  Can you give me specific examples
2  that highlight that?
3      A.  I don't know that I can.  You know,
4  it's something that just occurs on an
5  evolutionary scale as you move through time.
6      Bob, you know, Bob and Ann, as I
7  recall, I think one of their problems was they
8  refused to embrace the standards of the
9  organization.  I know Henry had -- had some
10  problems in terms of getting Ann to adhere to
11  things like call frequency standards; and people
12  that were brought on board who worked for Ann
13  wanted to march to a drummer that was very
14  different than the drummer that beat the beat
15  that News America's sales forces generally
16  followed and were successful doing it.  I think
17  that was frustrating.
18      I know Bob Fireman, you know, Bob had
19  ideas that, as I recall, that were often so far
20  afield of where we wanted to go that, you know,
21  they would not ever be seriously considered as
22  part of an eventual solution for the business.

104

1      Q.  Can you give me an example of that?
2      A.  There -- as I recall, there was a
3  project that he wanted us to get more involved
4  in.  This was going to be a surrogate for
5  traditional Wells Fargo-type money transfers to
6  foreign countries and things like that, taking us
7  in a direction that was far afield from where we
8  wanted to go as an organization.
9      I think there were some instances
10  where Bob worked on projects that were
11  successful.  They were predicated on ideas that
12  didn't originate with Bob Fireman.  They came
13  from other sources, like our Toshiba, there was a
14  settlement for Toshiba, a lawsuit against Toshiba
15  Computers, as I recall, that we ended up
16  facilitating through a card-based program.
17      We -- we had hoped to get -- seemed
18  to be a fairly appealing proposition.  We
19  assigned Bob to try and, you know, take that to
20  the next level.  He wasn't able to do that.  He
21  never gained much traction with that.
22      He -- I can't recall a lot of

105

1  instances, you know, specifically to tell you
2  now, it's been so many years.  But, you know, I
3  just -- let it suffice to say that my reliance on
4  Bob's counsel, you know, waned as we moved
5  through time.
6      Q.  The foreign banking issue that you've
7  referenced briefly in that last response, did
8  that have to do with the Hispanic community?
9      A.  Yes, I believe it did.
10      Q.  And your view was that that was
11  outside of the core business for News America and
12  therefore really was a bad idea?
13      A.  I think we took a look at it and I
14  think we decided to pass on it.
15      I think, you know, it wouldn't be
16  unusual for us to give direction to both Bob and
17  Ann that they would believe they still had, you
18  know, was still under their authority to accept
19  or not accept.  I think Bob and Ann had a hard
20  time dealing with the fact that they worked for
21  News America Marketing and didn't have the
22  independence that they may have craved as owners

27 (Pages 102 to 105)

**TAB F TO EXHIBIT BINDER**

```
1                                    Volume:      I
                                     Pages:       1 to 255
2                                    Exhibits:    1 to 11

3

4
              UNITED STATES DISTRICT COURT
5           FOR THE DISTRICT OF MASSACHUSETTS

6    * * * * * * * * * * * * * * * *
     ROBERT FIREMAN and ANN RAIDER,
7                         Plaintiffs,

8        vs.                              Civil Action
                                          No. 05-1740 MLW
9    NEWS AMERICA MARKETING IN-STORE,
     INC.,
10                       Defendant.
     * * * * * * * * * * * * * * * *
11

12

13

14              DEPOSITION OF HENRI F. LELLOUCHE, a
     witness called on behalf of the Plaintiffs, taken
15   pursuant to the applicable provisions of the
     Massachusetts Rules of Civil Procedure before Cynthia A.
16   Powers, Shorthand Reporter and Notary Public in and for
     the Commonwealth of Massachusetts, at the law offices of
17   Todd & Weld, LLP, 28 State Street, Boston,
     Massachusetts, on Friday, May 25, 2007, commencing at
18   8:07 a.m.

19

20                     * * * * *
21

22
                    KACZYNSKI REPORTING
23            72 CHANDLER STREET, SUITE 3
              BOSTON, MASSACHUSETTS 02116
24                  (617) 426-6060
```

Page 29

1    Q.  And limiting your response to the times
2  prior to acquiring CCMI, can you tell me what Mr. Devoe
3  said in that context?
4    A.  Well, our first interest was buying
5  Catalina Marketing, and that's what spawned the entire
6  subject of loyalty and database marketing.  So I think
7  that is where many of us got the education about that
8  segment was pursuant to that proposed acquisition.
9    Q.  Now let's talk about the exploration of
10  acquiring Catalina.  When did News America Marketing
11  first approach Catalina about acquiring them?
12    A.  Approximately a year after the
13  acquisition of Act Media or Heritage Media.
14    Q.  Give me a year.
15    A.  Late '98, early '99.
16    Q.  Who did the -- let me start a little bit
17  earlier.  What about Catalina made it an attractive
18  acquisition from your perspective?
19    A.  It was the next big opportunity for News
20  America Marketing.
21    Q.  The next big opportunity according to
22  whom?
23    A.  According to the consensus of the group,
24  the venture group.

Page 30

1    Q.  So you, Mr. Rubin, and Ms. Harde all
2  agreed that card programs were the next big opportunity
3  for NAM?
4    MR. KATZ:  Objection.
5    A.  No.
6    Q.  What's wrong about my question?
7    A.  Card programs were ancillary.
8    Q.  What were you interested in?
9    A.  We were interesting in tapping into
10  purchase behavior data.
11    Q.  Why?
12    A.  Because Catalina had developed a passive
13  tap into a large number of retailers and they had direct
14  access to data which enabled them to execute very
15  powerful programs.
16    Q.  How did Catalina acquire purchase
17  behavior data?
18    A.  Oh, through the passive tap.
19    Q.  What was the passive tap?
20    A.  Literally as you would think of a tap,
21  they were listening in to every transaction in every
22  lane in every store they were installed in.
23    Q.  How did they do that?
24    A.  I don't know.

Page 31

1    Q.  What type of information was generated,
2  digital?
3    A.  Data.
4    Q.  How was the data acquired, do you know?
5    A.  Through the passive tap.
6    Q.  Can you describe this for me?
7    A.  I can't.
8    Q.  Did you look into it in the context of
9  acquiring Catalina; in other words, prior to approaching
10  Catalina about possibly acquiring it, did you and your
11  group try to determine how they did what they did?
12    A.  Not really.
13    Q.  At any time after determining that you or
14  News America might be interested in acquiring Catalina,
15  did you do anything to try and figure out how Catalina
16  did what they did?
17    A.  No.
18    Q.  Do you have any understanding as you sit
19  here today as to how Catalina acquired purchase behavior
20  data at the time you were interested in acquiring the
21  company?
22    A.  As I've described, through the passive
23  tap.
24    Q.  But you can't tell me what the passive

Page 32

1  tap is?  You can't tell me whether it's a machine, tape
2  recorder, person, video camera, do you know?
3    A.  I don't know the details of that at all.
4    Q.  You don't know whether or not someone was
5  there with index cards writing information down?
6    A.  I'm pretty certain that wasn't the case.
7    Q.  You think this was information that was
8  processed on a realtime basis by some kind of digital
9  media?
10    A.  I don't know that it was realtime.  I
11  presume that it's digital because they have a data
12  warehouse in Saint Petersburg where the information was
13  transported to.
14    Q.  What about purchase data behavior was
15  interesting to you and your team at the time you were
16  considering acquiring Catalina?
17    A.  Enable targeted marketing on a large
18  scale.
19    Q.  Talk to me about targeted marketing,
20  Mr. Lellouche.  What does that mean in NAM's context?
21    A.  Targeting based on purchase behavior data
22  is a powerful tool that we anchor the SmartSource Direct
23  business in today.
24    Q.  How do you do it?

Page 33

1    A. We submit requests for data to retailers;
2  queries, if you will, associate universal product codes
3  with them, and they send us back lists of households
4  that qualify under those query requests.
5    Q. Coupons are sent to specific houses based
6  on purchase behavior?
7    A. Coupons, samples, other information are
8  sent to those households.
9    Q. Different programs, different products
10  all tied to purchase behavior; is that correct?
11    A. Yes.
12    Q. That's something that News America was
13  interested in as early as late '98?
14    A. Yes.
15    Q. Was anyone doing it at the time, anyone
16  utilizing purchasing behavior to do targeted marketing?
17    A. Catalina Marketing.
18    Q. What about CCMI?
19    A. Just from my due diligence I found out
20  they were doing it on a very small scale.
21    Q. Now, what happened to the approach to
22  Catalina?
23    A. No approach was made.
24    Q. Was anyone from Catalina ever contacted

Page 34

1  about Catalina's interest in being acquired?
2    A. Not by me. I can't speak for others.
3    Q. Do you know if others did?
4    A. I don't know.
5    Q. So what inspired your team to move on
6  from Catalina?
7    A. Move on? I'm not sure I understand.
8    Q. To greener pastures, to companies that
9  can be acquired, to CCMI ultimately?
10    MR. KATZ: Objection.
11    Q. What happened with Catalina that inspired
12  you not to pursue a potential acquisition?
13    A. Presentations were made internally to
14  News America Management, and they rejected the proposal.
15    Q. Who made the presentations?
16    A. Myself, Heather Harde, John Rubin, David
17  Devoe, Jr.
18    Q. Were these presentations in the nature of
19  PowerPoints?
20    A. PowerPoints, probably more like Excel
21  spreadsheets than PowerPoints. There may have been some
22  PowerPoints.
23    Q. Was this something that you were trying
24  to convince the board to pursue, an acquisition that you

Page 35

1  were trying to convince the board to pursue?
2    A. Yes.
3    Q. You believed Catalina was a worthwhile
4  company to pursue?
5    A. Yes.
6    Q. Do you recall why the board rejected your
7  suggestion to acquire Catalina?
8    A. Yes.
9    Q. Why?
10    A. They rejected it for two specific
11  reasons. One was that given our difficulty in the
12  Heritage acquisition with the justice department, they
13  felt that it was going to be rejected. Secondly, we had
14  just absorbed the former Act Media business into our
15  organization just one year earlier and that still needed
16  to be fully integrated.
17    Q. What type of marketing was Act Media
18  doing at the time? Was it the company that was still
19  doing the coupons at the point of sale?
20    A. Yes.
21    Q. And so when had Act Media been acquired?
22    A. The acquisition began in '97 and --
23  pardon me, I'm just reflecting on time lines. It began
24  in early '97 and closed in late '97.

Page 36

1    Q. So more than a year later Act had not
2  been integrated into News America's business?
3    A. It had been integrated; but work flows,
4  sales force allocation, duplication of efforts, other
5  things that you would see happening in a large merger
6  like that were ongoing.
7    Q. How big was the Act acquisition? How
8  much did you pay for it?
9    A. I don't know.
10    Q. Was it a larger acquisition than CCMI?
11    A. Much.
12    Q. And the sales force that was to be
13  utilized to promote Act's products, was that NAM's sales
14  force?
15    A. No.
16    Q. What sales force was going to be used to
17  promote Act's products?
18    A. Act.
19    Q. Act came with its own sales force?
20    A. Yes.
21    Q. When you used the phrase sales force
22  allocation in response to one of my questions a moment
23  ago, what are you referring to?
24    A. Elimination of duplication of effort was

Page 45

1    Q. Was it discussed with Mr. Mixon -- strike
2 the question.
3        Did you have any conversations with
4 Mr. Mixon about forming the iGroup or some entity that
5 would subsequently be named the iGroup prior to
6 acquiring CCMI?
7    A. I was not part of that discussion.
8    Q. Did you know whether or not there was one
9 under way?
10    A. I did not.
11    Q. Have you learned subsequently that prior
12 to acquiring CCMI the plan was to roll these three new
13 media companies together into the iGroup or something
14 else aptly named?
15    A. I don't know of any discussion like that.
16    Q. Okay. So the roll up or the -- I'll
17 leave it there, the roll together, the putting together
18 of CCMI, PlanetU and Softcard, that's something that
19 happened after the companies were acquired?
20    A. Well, we didn't acquire all three of
21 them. We invested in two and acquired one.
22    Q. And my question was poor in any event.
23 I'm going to ask it again in another way. The idea of
24 these three companies being put together in one group,

Page 46

1 do you know of any conversations, any documents,
2 anything at all that suggests to you that that was the
3 plan prior to News America Marketing's acquisition of
4 CCMI?
5    A. I know of no discussion of that kind.
6    Q. When did the idea of rolling these three
7 companies together first occur as best you know?
8    A. Subsequent to the investments and
9 acquisitions and at a time when the notion of the
10 venture group was not necessary anymore and that these
11 businesses needed to be managed and fleshed out.
12    Q. You mention that the venture group became
13 unneeded; my words, not yours. When did that happen and
14 why?
15    A. After the investments and acquisitions
16 were made.
17    Q. There was no further discussion about
18 acquiring additional companies?
19    A. Not through an organized group. We look
20 at businesses week in and week out.
21    Q. What was the specific charter of the
22 venture group?
23        MR. KATZ: Objection.
24    A. I don't know, the charter?

Page 47

1    Q. In other words, what were you trying to
2 accomplish?
3    A. We were trying to, we were trying to
4 simply identify opportunities in new media, look to the
5 future.
6    Q. So it was a new media focused group?
7    A. Yes.
8    Q. How did Mr. Carlucci feel about the new
9 venture group? Did he ever speak with you about it?
10    A. No.
11    Q. Do you know if he ever expressed an
12 opinion about the ventures, venture group?
13    A. No.
14    Q. Now, you mentioned that you were focused
15 on other investments. Were those the PlanetU and
16 Softcard investments?
17    A. Yes.
18    Q. Your professional energy was
19 substantially taken up in those transactions?
20    A. No, mostly on Softcard.
21    Q. Can you describe for me the Softcard
22 investment?
23    A. Softcard Systems was an engineering firm
24 that had a large portfolio of issued and pending patents

Page 48

1 utilizing smart card technology, chip cards, for the
2 purposes of marketing solutions.
3    Q. Did you see any synergies between
4 Softcard and CCMI when you were looking into the
5 Softcard investment?
6    A. Yes.
7    Q. Can you describe those for me?
8    A. Well, card based marketing -- CCMI was
9 card based marketing. Softcard was card based
10 marketing. One involved intelligent cards. The other
11 involved simple striped magnetic cards. It was hard to
12 tell where the industry was doing. We opted to do some
13 R&D investment there.
14    Q. So you thought it might be possible that
15 cards used to acquire data for targeted marketing might
16 be smart cards versus cards with mag strips or codes?
17    A. We didn't know. We were investing on the
18 come because it was unknown what was going to happen in
19 the future, and we wanted to have our bit of experience,
20 or our toe in the water if you will, in these different
21 areas.
22    Q. But the idea was you wanted to collect
23 data at the point of sale ultimately?
24        MR. KATZ: Objection.

1  marketing based on data collected at the point of sale
2  was where your market was going to ultimately go?
3      A.  My market?
4      Q.  The market you were hoping to get into by
5  acquiring CCMI.
6      A.  I believe that the marketplace for
7  purchase behavior data had great promise.
8      Q.  Did you see any studies or other
9  documents from third parties that facilitated that
10  confidence, that gave you additional confidence?
11      A.  At the time?
12      Q.  Prior to acquiring CCMI?
13      A.  I can't recall.
14      Q.  Have you seen any since?
15      MR. KATZ:  At any time since 1999?
16      MR. PETERS:  Yes, sir.
17      A.  I've seen documents and reports that just
18  show that the penetration of loyalty cards in consumers'
19  hands has grown.  I've seen documentation that shows
20  that the percentage of information collected on loyalty
21  cards as a percentage of total transaction has grown.
22      Q.  Do you know how big the market is
23  presently?
24      MR. KATZ:  Objection.  Market for what?

1      Q.  Loyalty marketing programs in which money
2  is generated in loyalty marketing these days using
3  information collected at the point of sale?
4      MR. KATZ:  Objection.  By what category
5  of seller?
6      A.  Are you talking about direct mail or are
7  you talking about point of sale?
8      Q.  I'm talking about all programming done by
9  using information collected at the point of sale whether
10  it be targeted marketing, programming, or otherwise; is
11  there any study that you've seen that shows the size of
12  that collective marketing?
13      MR. KATZ:  Objection.
14      A.  I haven't seen any study like that.
15      Q.  Is it fair to say that the market for
16  loyalty marketing programs is significantly bigger than
17  it was in 1999?
18      A.  Yes.
19      Q.  One hundred times bigger?
20      MR. KATZ:  Objection.
21      A.  No.
22      Q.  Less than one hundred?
23      A.  Substantially less.
24      Q.  Can you put a number on it without

1  devolving into speculation?
2      A.  Well, the direct mail business, which is
3  really the only segment that we have opted to work in,
4  is approximately today, without postage, something in
5  the neighborhood of $35 million, maybe $40 million in
6  total, total industry.
7      Q.  How much of that market does News America
8  have?
9      A.  This year we'll do eight million.
10      Q.  Are there other programs that News
11  America explored using data collected at the point of
12  sale other than direct mail that you know of?
13      A.  Yes.
14      Q.  Can you articulate them, list them?
15      A.  We looked at other contact points,
16  certainly we looked to see whether kiosks, entrance
17  kiosks were going to be a viable opportunity, but they
18  are, they are and they continue to show to be failures,
19  over and over again.  Then of course there was the soft
20  card technology where we were going to literally target
21  at the shelf utilizing the information on the chip
22  cards.  Of course the Internet at some point with the
23  PlanetU technology linked into the purchase behavior
24  data was another way of doing that, but that was really

1  unrelated to CCMI.  They were not necessary to that
2  solution.
3      Q.  You listed three things in addition to
4  direct mail that are the only sources of revenue that
5  News America explored to generate revenue from
6  information collected at the point of sale?
7      A.  That I recall right now.
8      Q.  We'll get into stored value later on in
9  the deposition, but is that also something that News
10  America looked into, generating income by stored value?
11      A.  Stored value is separate from the
12  purchase behavior database marketing solution.  It can
13  be used as a reward and integrated into it.  But even to
14  this day we operate the Long's gift card program, and
15  they don't have a loyalty program.  So they are not
16  dependent on each other by any means.
17      Q.  My question is a little narrower than
18  that.  I'm making sure that I understand that in
19  addition to these four potential sources of revenue
20  generation using cards --
21      A.  Oh.
22      Q.  -- using card, card programs, that
23  another way to generate revenue that News America has
24  explored and used is stored value?

Page 121

1    Q. Okay. So a gross profit prior to any
2  overhead allocation, for example?
3    A. Correct.
4    Q. And I take it that prior to acquiring
5  CCMI, News America Marketing disclosed this to Ann
6  Raider and Bob Fireman so that they could make an
7  intellectual decision about whether or not to sell their
8  company?
9    MR. KATZ: Objection.
10    A. We certainly didn't buy this company to
11  print cards.
12    Q. Yeah, you see, I asked a different
13  question.
14    A. Go ahead. I apologize.
15    Q. My question is this: Prior to
16  negotiating to acquiring Ann Raider's and Bob Fireman's
17  company, do you know whether or not News America
18  Marketing disclosed to them that unless a certain profit
19  level, a specified profit level was reached News America
20  Marketing would not pursue a line of business?
21    A. I don't know the answer to that question.
22    MR. KATZ: That's a yes or no.
23    Q. And did you explore the profitability of
24  the card production? Did you explore the profitability

Page 122

1  of card production prior to acquiring NAM?
2    A. Yes, it was substantially higher prior to
3  the acquisition than it was post acquisition, which was
4  indicative of the demise of that product line.
5    Q. What was it prior?
6    A. It was probably about twenty percent.
7    Q. And then it went to fifteen?
8    A. Then it went down to ten, five, zero, out
9  of the business.
10    Q. Well, you gave me the number of fifteen
11  percent. Where does that number come from?
12    A. Oh, fifteen percent is what we're, is our
13  profit margin on some activity we do at Long's, which is
14  really our only legacy activity on the card and card
15  processing side of the business.
16    Q. Did the profit margin of twenty percent
17  prior to the acquisition of CCMI meet News America
18  Marketing's threshold for investment?
19    A. As a standalone probably not. As a mix
20  of business it was -- as long as the mix of business
21  ended up in a favorable position it was okay, but it was
22  not something that was a feather in our cap.
23    Q. Did you ever disclose or did anyone at
24  News America ever disclose to Bob Fireman and Ann Raider

Page 123

1  that even at twenty percent profit margin card
2  production would not be undertaken?
3    A. It was undertaken.
4    Q. When did News America Marketing stop
5  producing cards by virtue of profitability?
6    A. We have not stopped producing cards.
7    MR. KATZ: Can we take a break whenever
8  it's a convenient point for you?
9    MR. PETERS: Sure.
10    MR. KATZ: Is now a convenient time?
11    MR. PETERS: Sure.
12    (Recess taken)
13  BY MR. PETERS:
14    Q. Mr. Lellouche, was there a business plan
15  in place for CCMI when you took over as its head?
16    A. There was an existing business plan.
17    Q. Was that the business plan that Ann and
18  Bob had prepared?
19    A. Yes.
20    Q. What did it call for?
21    A. It called for increases in card
22  production, retailer activity. It called for increases
23  in application processing. It called for increases in
24  data hosting. It called for increases in marketing

Page 124

1  programs.
2    Q. Were you committed to executing that
3  business plan?
4    A. Yes.
5    Q. Did you have an idea as to how to achieve
6  the increases discussed in the business plan?
7    A. Yes.
8    Q. Did it involve using resources of News
9  America Marketing?
10    A. Yes.
11    Q. Did it involve using News America
12  Marketing's sales force?
13    A. Where necessary and where appropriate.
14    Q. Did you believe that the name Consumer
15  Card Marketing, Inc., had goodwill associated to it,
16  with it, at the time you took over as its head?
17    A. I don't know.
18    Q. Did you undertake any effort to evaluate
19  whether there was goodwill associated with the name
20  CCMI?
21    A. No.
22    Q. The name was changed at some point,
23  wasn't it? Tell me about the name change. When did
24  that happen and what was the reason for it?

## Page 125

1    A. I don't recall when the name change
2 happened, but we changed the company name to SmartSource
3 Direct as part of a corporate rebranding of our entire
4 organization.
5    Q. Was there any discussion in the context
6 of changing CCMI's name to SmartSource Direct as to
7 whether or not there was goodwill associated with CCMI?
8    A. I don't -- I was not involved in any
9 discussion to that end.
10    Q. Do you know whether or not Ann Raider or
11 Bob Fireman were consulted about the name change?
12    A. I don't know the answer to that question.
13    Q. Do you believe they should have been
14 consulted?
15    A. No.
16    Q. There was a change in the reporting
17 structure very shortly after the acquisition. We began
18 to talk about that. You took over for David Devoe; is
19 that correct, in terms of heading up the iGroup?
20    MR. KATZ: Objection.
21    A. That's incorrect.
22    Q. When was the iGroup formed?
23    A. The iGroup was formed on or around 2000
24 and it was headed up by Chris Mixon.

## Page 126

1    Q. Who was in the iGroup?
2    A. I can't name every person that was in the
3 iGroup.
4    Q. I mean entities?
5    A. Oh, Softcard, SmartSource.com, and
6 SmartSource Direct.
7    Q. And who headed up Softcard, you?
8    A. I oversaw Softcard. They had their own
9 management organization. We were a minority investor.
10    Q. Was there any discussion prior to
11 acquiring CCMI about investing in it instead of
12 acquiring it?
13    A. I don't recall any conversation like
14 that.
15    Q. Back to the iGroup. Who headed up
16 SmartSource.com?
17    A. Heather Harde, H A R D E.
18    Q. Ms. Harde reported to Mr. Mixon?
19    A. Yes.
20    Q. And you headed up SmartSource Direct?
21    A. Yes.
22    Q. And you reported to Mr. Mixon?
23    A. Yes.
24    Q. So there are e-mail between you and Mixon

## Page 127

1 discussing the business of SmartSource Direct, I take
2 it?
3    MR. KATZ: Objection.
4    A. Yes.
5    Q. Did you communicate with Mr. Mixon by
6 e-mail?
7    A. Yes.
8    Q. Frequently?
9    A. I don't know.
10    Q. Did you communicate with Mr. Mixon by
11 e-mail back in 2000?
12    A. Minimally.
13    Q. Did Mr. Mixon communicate with you by
14 e-mail?
15    A. Yes.
16    Q. Back in 2000?
17    A. Yes.
18    Q. Was CCMI operated as a standalone
19 business unit at any time after the acquisition?
20    A. I'm not sure I understand the question.
21    Q. In other words, a unit that was
22 autonomous, that was run within News America Marketing
23 as a division?
24    A. Yes.

## Page 128

1    Q. But was run the way it had been run prior
2 to the acquisition?
3    A. No.
4    Q. How did the management of News America
5 Marketing -- pardon me. How did the management of CCMI
6 change in the first year after the acquisition?
7    A. Well, certainly I became involved in
8 SmartSource Direct. Mike Cleary joined the group and
9 eventually headed up operations. The IT or the better
10 part of the IT group moved down to co-locate with our IT
11 organization down in Wilton. Much of the accounting
12 function was absorbed into the News America Marketing
13 accounting organization. That's all I can recall.
14    Q. You testified earlier that you were
15 committed to trying to follow the business plan of CCMI;
16 is that correct?
17    MR. KATZ: Objection.
18    A. You're going to have to read it back to
19 me. I don't know what I said then.
20    Q. You knew there was a business plan at
21 CCMI; right?
22    A. Yes.
23    Q. And that it was an existing business plan
24 that included increasing card production?

Page 129

1    A.  Yes.

2    Q.  Included increasing work with retailers?

3    A.  Yes.

4    Q.  Included work on data hosting?

5    A.  Yes.

6    Q.  Included a variety of marketing programs?

7    A.  Yes.

8    Q.  Okay, and you were going to follow that

9  plan, that was your goal or your intention; right?

10    A.  That was the initial goal, yes.

11    Q.  When did that change?

12    A.  It changed as the marketplace changed.  I

13  don't know the dates.

14    Q.  Which of these goals were abandoned?

15    MR. KATZ:  Objection.

16    A.  Goals?

17    Q.  Yeah, which of these plans were

18  abandoned?

19    MR. KATZ:  Objection.

20    A.  I'm not sure I understand and I want to

21  answer clearly.

22    Q.  Did News America ever abandon any part of

23  CCMI's business plan as best you know?

24    A.  Yes.

Page 130

1    Q.  What aspects of CCMI's business plan did

2  News America Marketing abandon?

3    A.  We abandoned the data -- I'm sorry, we

4  abandoned or began to walk away from the application

5  processing business, because it was literally

6  evaporating before our eyes as retailers decided to go

7  directly to the data entry facilities themselves.  We

8  were desecrated out of the process.  We abandoned the

9  ASP-type data hosting program because it became clear

10  that we had, or I should say Bob and Ann had misjudged

11  the marketplace and the aptitude for ASP-type hosted

12  data solutions.  We slowly walked away from the card

13  business for much the same reason as the applications

14  transactions because that business essentially

15  evaporated also as retailers went direct to the

16  factories.

17    Q.  Would you take a look at Exhibit 1 and

18  turn to the second page of the document?

19    A.  Yes.

20    Q.  The second bullet point from the bottom

21  says, Sales force economies.  Do you see that?

22    A.  Yes.

23    Q.  It reads, By leveraging a coordinated

24  sales effort, News America's sales force will be trained

Page 131

1  to incorporate CCMI's products into its single source

2  portfolio.  CCMI will be substantially more profitable

3  and demonstrate increased growth as a subsidy of News

4  America Marketing.

5    Do you understand what that means in the

6  context of the transaction with CCMI?

7    A.  Yes.

8    Q.  Did that occur?

9    MR. KATZ:  Objection.  Did what occur?

10    Q.  The bullet point I just read, did it come

11  to pass?

12    MR. KATZ:  Whoa, whoa, whoa, time out.

13  There are a number of different things that are

14  indicated in the bullet.  That's my question.  Are you

15  asking did all of these events occur?

16    Q.  Yes, sir.  Did all of them happen?

17    A.  No.

18    Q.  Which part of this bullet point did not

19  occur?

20    A.  CCMI -- News America's sales force is

21  predominantly the CPG sales force.  And the fact of the

22  matter is that CCMI had no product.  There was nothing

23  for them to sell.  There was nothing for them to go out

24  and integrate into a single source portfolio; hence, no

Page 132

1  impact on profitability, no increase in growth.

2    Q.  Well, this document which was authored by

3  and produced by News America Marketing states, News

4  America's sales force will be trained to incorporate

5  CCMI's products into a single source portfolio.

6    Is it your testimony that at the time

7  this document was prepared CCMI had no products?

8    A.  They had no manufacturing products.

9    Q.  Did they have services that could be

10  sold?

11    A.  Not that I know of.

12    Q.  What were you buying, what did you think

13  you were buying when News America Marketing bought CCMI?

14    A.  We were buying the promise of being able

15  to have products to be sold.

16    Q.  And I take it your testimony would be

17  once there were those products they would then be sold

18  by a trained sales force; that was the plan?

19    A.  Say again, please.

20    Q.  I take it your testimony is that once

21  CCMI had products then the sales force would be trained

22  on those products and would sell them?

23    A.  And --

24    Q.  Was that the plan?

Page 153

1  and you thought that was an important thing to do?
2      A.  I'm saying that when they surfaced
3  products we discussed them.  We pursued them if they
4  were, if they held promise.  That was the extent of it.
5      Q.  On the product development side did you
6  oversee the development of Aspen?
7      A.  From a nontechnical standpoint, yes.
8      Q.  What were your responsibilities in terms
9  of overseeing Aspen?
10     A.  Observing it in its development from an
11  IT point of view, sitting in on meetings where the
12  product was being considered for use as a CRM tool after
13  Bob had recommended it, and contributing where I could.
14     Q.  Was it successful?
15     A.  No.
16     Q.  What happened?
17     A.  Bob and Ann misjudged the marketplace.
18  There was no appetite in the marketplace amongst the
19  larger retailers for an ASP-hosted solution.  In fact,
20  they all built, all the large retailers to the CPG
21  companies built their own data warehouses, bought or
22  licensed or developed their own software, and it was
23  just a miss by a mile compounded by the fact that the
24  tool recommended and selected was inadequate and not

Page 154

1  capable of managing the data sets involved in
2  supermarket transactions.  So it had two strikes against
3  it before it even hit the marketplace.
4      Q.  Prior to acquiring or beginning the Aspen
5  development program, did anyone from News America
6  Marketing take a look at Aspen's capability to see
7  whether or not it was robust enough to do what was hoped
8  it could?
9      A.  Yes.
10     Q.  Who?
11     A.  The CIO.
12     Q.  Who was that?
13     A.  David Benson.
14     Q.  Did Mr. Benson come to the conclusion
15  that Aspen was robust enough to perform and function as
16  you hoped it would?
17         MR. KATZ:  Objection.
18     A.  I don't know.
19     Q.  Well, you bought it; right?
20     A.  Yes.
21     Q.  And you don't believe you would have
22  bought it unless Mr. Benson cleared the way; right?
23         MR. KATZ:  Objection.
24     A.  I don't know.

Page 155

1      Q.  So it's possible that Mr. Benson looked
2  at this as the CIO, said it was no good, but it was
3  acquired any way?  You leave room for that possibility?
4      A.  I don't, I don't know.
5      Q.  What's RMS?  Is that acronym meaningful
6  to you?
7      A.  Yes.
8      Q.  What is it?
9      A.  I believe it stands for Retail Marketing
10  Systems.
11     Q.  Is it an application?
12     A.  It's a company.
13     Q.  Company that has an application that
14  hosts data?
15     A.  It does not host data.
16     Q.  What does it do?
17     A.  It's a software that sits on top of a
18  database providing analytic capability.
19     Q.  Does it do what Aspen was supposed to do?
20     A.  No.
21     Q.  Is it a successful software?
22     A.  Yes.
23     Q.  Did you look to acquire RMS?
24     A.  Yes.

Page 156

1      Q.  Was it acquired?
2      A.  No.
3      Q.  Was there an evaluation done in the
4  context of your evaluation as to whether -- strike that.
5          Was there any evaluation done in the
6  marketplace in your effort to acquire RMS?
7      A.  The marketplace?
8      Q.  Right.  A market for the RMS software,
9  did you look at the marketplace before endeavoring to
10  acquire AMS?
11     A.  Yes.
12     Q.  Did you consult any analysis of the
13  marketplace in the context of determining to acquire
14  RMS?
15     A.  Yes.
16     Q.  Who conducted the marketplace analysis?
17     A.  I'm not certain who specifically
18  conducted the analysis.
19     Q.  Was it an outside consultant?
20     A.  Internal.
21     Q.  Was there a document created that
22  reflected the results of this analysis?
23     A.  Yes.
24     Q.  Do you remember in substance what the

**TAB G TO EXHIBIT BINDER**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

      Plaintiff,

         Civil Action No.

   -against-    05-1740MLW


NEWS AMERICA MARKETING IN-STORE,

INC.,

      Defendant.

----------------------------------------x

      July 17, 2007

      10:02 a.m.


   Deposition of MARTIN GAROFALO, taken by

the Plaintiffs, pursuant to Notice, at the

offices of News Corp, 1211 Avenue of the

Americas, New York, New York, before David

Levy, CSR, a Notary Public of the State of New

York.

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007

New York, NY

---

Page 26

1       A. I would say yes, and that -- and the
2   same situation with -- set up with the core sales
3   force of the two hundred or so salespeople, when
4   possible, to open doors.
5       Q. Could you describe that for me? The
6   interaction, in other words, between the small
7   SmartSource Direct sales force and the national
8   sales force of News America Marketing.
9       MR. KATZ: Objection.
10      A. Okay. If I can, and my memory serves
11  me well, in general, the way that we would go to
12  market is, we try to be as valuable as we can to
13  the companies that we call on. So if we could
14  satisfy their needs in various areas, it's our
15  desire to do so.
16      So for instance, you know, one of my
17  previous jobs was heading up what we called the
18  partnership group, which was sports affinities
19  and cause-related marketing. And we would put
20  together a sales piece so when the general sales
21  force were selling, they would get into a
22  discussion, "Oh, I would like to do something

Page 27

1   around the Superbowl or the World Series or the
2   All-Star game," they could pull out a one-page
3   sales sheet essentially and say, "Oh, this is our
4   capabilities in this area; if you're interested I
5   could set you up with a person from the
6   partnership team." And my understanding is that
7   at this time, we developed and had similar
8   materials that the sales force would have for our
9   IGroup portfolio.
10      Q. So there was some type of one-page or
11  two-page overview of what SmartSource Direct had
12  to offer that was provided to the national sales
13  force?
14      A. That's my understanding, yes.
15      Q. how would we describe that piece of
16  paper as between us in this deposition?
17      A. A sales brochure.
18      Q. Sales brochure. Who developed the
19  sales brochure?
20      A. Again, I don't recall the specifics
21  on who did this particular one.
22      Q. Do you know that it happened in this

Page 28

1   case? In other words, was there a SmartSource
2   Direct sales brochure that was provided to the
3   250 or so sales representatives?
4       A. Yes, there was one. And again, I'm
5   not sure on the exact timing of it, or who put it
6   together.
7       Q. Let me ask this:
8       Was it during your time with the
9   IGroup?
10      A. My understanding is yes. My
11  recollection is yes.
12      Q. Do you remember seeing it?
13      A. I do remember vaguely seeing a piece
14  but, again, I don't have any specific
15  recollection of it.
16      Q. Is it fair to say that the vast
17  majority of your attention was spent on
18  SmartSource.com?
19      MR. KATZ: Objection.
20      You can answer.
21      A. I would say the majority of my time
22  was yes, and then trying to develop other

Page 29

1   programs between the three different entities. A
2   large part of the time was spent on a test that
3   we had done at Furrs that was a SoftCard product,
4   and that was a huge amount of time as well.
5       Q. F-u-r-s?
6       A. F-u-r-r-s, I believe.
7       Q. And what was the test, can you
8   describe it for me?
9       A. Sure. It was a coupon machine in the
10  store that would distribute coupons specifically
11  for the shopper.
12      Q. So by -- let me see if I understand
13  this conceptually. SoftCard was intended to be
14  some type of intelligent card; in other words, a
15  card that could store data?
16      A. Exactly.
17      Q. And there were machines that were
18  intended to read that card and provide
19  customer-specific couponing that tracked buying
20  habits; is that a high-level description of what
21  you were trying to accomplish?
22      A. That is a good description, yes.

8 (Pages 26 to 29)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

| Page 30 |
|---|

1    Q. And there was a test at Furrs?
2    A. Yes.
3    Q. Is that a store?
4    A. Yes, it is.
5    Q. How did it work?
6    A. I don't think it worked too well.
7    Q. Do you know what ultimately happened
8    to SoftCard, in other words, whether News America
9    Marketing ultimately went with the investment?
10   A. I don't have any recall on what we
11   did with it.
12   Q. It failed; is that --
13   A. Yes.
14   Q. -- a fair-enough statement?
15   A. Yes.
16   Q. There is no present use of SoftCard
17   within News America Marketing, is there?
18   A. No.
19   Q. And there's no present use of
20   SmartSource.com; is that true?
21   A. SmartSource.com is an ongoing --
22   Q. Is ongoing. But the nexus between

| Page 31 |
|---|

1    SmartSource.com and SoftCard, that never came
2    together; is that true?
3       MR. KATZ: Objection.
4    A. That is true, yes.
5    Q. So your time as the EVP of sales at
6    the IGroup was taken up mostly with
7    SmartSource.com and putting together this test
8    for Furrs, is that true?
9       MR. KATZ: Objection.
10   A. My time?
11   Q. Yes.
12   A. Yes.
13   Q. How much time did you spend on CCMI's
14   business or SmartSource Direct, as it was then
15   known?
16   A. I think it varied greatly from week
17   to week.
18   Q. Sometimes it was 40 hours a week?
19   A. Um -- hum. Conceivably. I'm trying
20   to think back in those days and there was, you
21   know, heavy discussions in terms of what we were
22   trying to do in -- with the entire unit.

| Page 32 |
|---|

1       So I can't recall if it was 40 hours,
2    but we were working many more hours than 40
3    during the week. So it's conceivable that that
4    would be true.
5    Q. But all the work that you were doing,
6    Mr. Garofalo, was to try to develop a business
7    that integrated SmartSource.com, SmartSource
8    Direct and SoftCard; is that true?
9    A. At various times, yes. We were
10   exploring that possibility.
11   Q. Let me back up a little bit. Were
12   you involved in the formation of the IGroup or
13   were you brought in after it already existed?
14   A. I was brought in and told that they
15   were forming an IGroup and they would like me to
16   join.
17   Q. Were you involved in any of the
18   discussions that led to the decision to form the
19   IGroup?
20   A. No, not that I can recall.
21   Q. Did anyone explain to you why the
22   IGroup was formed and, if so, who?

| Page 33 |
|---|

1    A. There was never any explicit purpose
2    given overall that I can recall. No one sat me
3    down and said, "Here's what we're going to do and
4    this is why we're doing it."
5    Q. Was CCMI ever viewed during your
6    tenure with the IGroup as a stand-alone entity
7    with its own products, apart from SoftCard and
8    apart from SmartSource.com?
9       MR. KATZ: Objection.
10   A. I would say yes.
11   Q. So let me explore it another way.
12   Did the effort to develop the IGroup and to get
13   products that the IGroup sold, did that really
14   consume your attention or were you working
15   independently to sell these different things?
16      MR. KATZ: Objection.
17   A. I'd say both. I think what we were
18   trying to do was make money from each of the
19   different entities as best we could while trying
20   to come up with an even bigger plan ultimately,
21   if that would work.
22   Q. How did your time break down in

9 (Pages 30 to 33)

85d36eb8-9df6-4476-b435-8ed61512af8b

**TAB H TO EXHIBIT BINDER**

1                                    VOLUME    1

2                                    PAGES    66

3                                    EXHIBITS  1-11

4

5              UNITED STATES DISTRICT COURT

6          FOR THE DISTRICT OF MASSACHUSETTS

7            CIVIL ACTION NO. 05-1740 MLW

8

9          ROBERT FIREMAN and ANN RAIDER

10                            Plaintiffs

11                       v.

12     NEWS AMERICA MARKETING IN-STORE, INC.

13                            Defendant

14     -------------------------------------

15          DEPOSITION OF: LESLIE CHARM

16            Wednesday, April 11, 2007

17              Holland & Knight LLP

18        10 St. James Avenue - 11th Floor

19            Boston, Massachusetts 02116

20              1:10 p.m. to 2:30 p.m.

21     -------------------------------------

22        Reporter:  Robert K. Maloney, RPR

23    Two Oliver Street, Boston, Massachusetts 02109

24

Page 6

| 1 | |
| 2 | NUMBER          DESCRIPTION          PAGE |
| 3 | DEPOSITION EX. 9      e-mail |
| 4 | 7-12-99          60 |
| 5 | To: Leslie Charm |
| 6 | Frm: David DeVoe, Jr. |
| 7 | DEPOSITION EX. 10      e-mail |
| 8 | 7-13-99          61 |
| 9 | To: David DeVoe, Jr. |
| 10 | Frm: Leslie Charm |
| 11 | Subj: CCMI |
| 12 | DEPOSITION EX. 11      e-mails |
| 13 | 7-12-99 |
| 14 | 7-14-99          63 |
| 15 | To: Leslie Charm |
| 16 | Frm: David DeVoe, Jr. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | *** *** *** |
| 22 | |
| 23 | |
| 24 | |

Page 7

1    MR. KATZ:  On the record.  Would you
2  swear the witness, please.
3  Whereupon,
4          LESLIE CHARM
5  having been first satisfactorily identified by the
6  production of his Massachusetts driver's license
7  and duly sworn by the Notary Public, was examined
8  and testified as follows:
9          DIRECT EXAMINATION
10  BY MR. KATZ:
11    Q.  Good afternoon, Mr. Charm.  My name is
12  Gordon Katz and I represent the defendant, News
13  America Marketing In-Store, Inc. in this litigation
14  in which you have been called as a witness.
15  I am going to be asking you some
16  questions this afternoon.  If any of my questions
17  are unclear or you don't understand any of my
18  questions will you let me know?
19    A.  Yes, sir.
20    MR. KATZ:  Before we begin, the usual
21  stipulations?
22    MR. RICH:  Yes.
23    MR. KATZ:  All objections except as
24  to form and all motions to strike are reserved

Page 8

1  until the time of trial; the witness may read and
2  sign his deposition but the signing need not be in
3  front of a notary.  Is that satisfactory?
4          MR. RICH:  Yes, that is satisfactory.
5    Q.  Mr. Charm, let me ask you to state your
6  name for the record.
7    A.  Leslie Charm.
8    Q.  What is your address?
9    A.  39 Holden Lane, Concord, Massachusetts.
10    Q.  What do you do for a living?
11    A.  I am an advisor to entrepreneurs.
12    Q.  Do you have a business office?
13    A.  I do now.  I reside at Babson College and
14  my business office is there.
15    Q.  What is your educational background?
16    A.  I am a graduate of Newton High School.
17    Q.  North or South?
18    A.  When I was there it was only North.
19  Actually, in my senior year it was both.  I went to
20  Babson College and Harvard Business School.
21    Q.  When did you graduate from Harvard
22  Business School?
23    A.  1967.
24    Q.  Following Harvard Business School what

Page 9

1  did you do?
2    A.  I worked for Prudential Insurance
3  Company.
4    Q.  What did you do for Prudential?
5    A.  I lent money for them.
6    Q.  To what kinds of ventures?
7    A.  Commercial and industrial.
8    Q.  Real estate?
9    A.  No.
10    Q.  Non-real estate?
11    A.  Non-real estate.
12    Q.  How long did you work for Prudential?
13    A.  Five years.
14    Q.  And following that what did you do?
15    A.  I formed Youngman & Charm.
16    Q.  What was the purpose of Youngman & Charm?
17    A.  We are advisors to entrepreneurs, we are
18  professional directors and run some of our own
19  businesses.
20    Q.  Do you have any licenses of any kind?
21    A.  As far as professional licenses?
22    Q.  Yes.
23    A.  No, I don't.
24    Q.  I am not asking about a driver's license

Leslie Charm

Page 10

1  or fishing license or things like that.
2  **A.  I am just being responsive.**
3  Q.  Very good.  Would you just tell me again
4  what the name of your company is?
5  **A.  Youngman, Y-o-u-n-g-m-a-n & Charm.**
6  Q.  Is that company still in existence?
7  **A.  Yes.**
8  Q.  Where is that company located as far as a
9  business office is concerned?
10  **A.  Babson.**
11  Q.  Do you have a partner?
12  **A.  Youngman.**
13  Q.  What is Youngman's full name?
14  **A.  Carl Youngman.**
15  Q.  What do you do?
16  **A.  The same thing.**
17  Q.  Do either of you teach at Babson?
18  **A.  I do.**
19  Q.  What do you teach?
20  **A.  Entrepreneurial Finance.**
21  Q.  How long have you been teaching that?
22  **A.  Approximately - I don't remember exactly**
23  **- 21, 22 years.**
24  Q.  Tell me again the kinds of things that

Page 11

1  Youngman & Charm does?
2  **A.  We do three things:  We run troubled**
3  **companies, we are professional board members - we**
4  **call that advising entrepreneurs - and we have**
5  **owned our own businesses over the years.**
6  Q.  Are you currently a board member now?
7  **A.  Yes.**
8  Q.  Are you a board member of any public
9  companies?
10  **A.  Yes.**
11  Q.  What companies?
12  **A.  International Electronics, Inc.**
13  Q.  Are you a board member of any other
14  public companies?
15  **A.  Yes.**
16  Q.  What companies?
17  **A.  Moto Photo, Inc. and Credit Risk**
18  **Monitor.com.**
19  Q.  Are you a board member of any private
20  companies?
21  **A.  Yes.**
22  Q.  Can you identify what companies those
23  are?
24  **A.  Can I ask a question here?**

Page 12

1  Q.  You certainly may.
2  **A.  I would rather not do that because of a**
3  **confidential relationship but I don't know what the**
4  **legality is here.**
5  Q.  I guess I could require you to do that
6  but I won't.  Let me just ask you how many private
7  companies you are currently a board member of?
8  **A.  Between board member and advisor to the**
9  **owner - because sometimes when you say board**
10  **member, it may be board of advisors and may not be**
11  **board of directors so I want to be as technically**
12  **accurate as I can - probably ten other companies.**
13  Q.  At the present time?
14  **A.  Yes.**
15  Q.  Since Youngman & Charm has been in
16  existence -- again, how many years has that been?
17  **A.  Since '72.**
18  Q.  -- do you have an approximation of how
19  many companies you have been a board member of?
20  **A.  Lots.**
21  Q.  Over a hundred would you say?
22  **A.  Probably not.  Probably 40, 50.  I don't**
23  **know for sure but a hundred sounds like too many.**
24  Q.  How many companies have you been an

Page 13

1  advisor to over that period of time?  Can you give
2  me a ball park figure?
3  **A.  I would be purely guessing.  I have no**
4  **idea.**
5  Q.  Okay.  Have you run any companies
6  yourself?
7  **A.  Yes.**
8  Q.  What companies have you run?
9  **A.  Dr. Pet Centers, Inc.**
10  Q.  Was that a national company?
11  **A.  Yes.**
12  Q.  How many locations?
13  **A.  We were in the franchise business so we**
14  **had about 300.  We're talking 20 years ago.**
15  Q.  How long did you run that company?
16  **A.  Twenty years.**
17  Q.  You ran it for 20 years?
18  **A.  Yes.**
19  Q.  Were you the CEO of the company?
20  **A.  Yes.**
21  Q.  Have you been the CEO of any other
22  companies over your career?
23  **A.  I don't remember whether technically I**
24  **was the CEO or not.**

4 (Pages 10 to 13)

Leslie Charm

Page 30

1      A.    Sorry, I don't remember.
2      Q.    Two years?
3      A.    I don't remember.
4      Q.    Could it have been three years?
5      A.    No, I don't think it was three years. I
6   think it was within twelve to fifteen months but as
7   I sit here today I can't really tell you that. My
8   memory is it was within a twelve or fifteen month
9   period rather than a three-year period.
10     Q.    Do you remember any of the terms of that
11  transaction?
12     A.    No. I thought I already said that.
13     Q.    Was that company in the Midwest a public
14  company?
15     A.    My memory is that it was, yes.
16     Q.    Do you have any recollection as to
17  whether that company was offering stock as opposed
18  to cash?
19     A.    I have said twice now that I don't
20  remember any part of this offer.
21     Q.    Okay. Do you remember the name of anyone
22  who was connected with that company?
23     A.    No. I'm totally blank on this.
24     Q.    Besides that one company from the Midwest

Page 31

1   were there any other companies that you are aware
2   of that expressed interest in CCMI?
3      A.    Yes.
4      Q.    Do you remember the names of any of those
5   companies?
6      A.    None.
7      Q.    Can you describe in any detail anything
8   about any of those other companies that may have
9   expressed an interest --
10     A.    No.
11     Q.    -- in CCMI?
12     A.    No.
13     Q.    I take it you have no memory as to
14  whether or not any of those other companies ever
15  actually made an offer to acquire CCMI?
16     A.    I don't remember.
17     Q.    After you learned that CCMI was in talks
18  to be acquired by News America Marketing were you
19  asked to do anything in particular?
20     A.    Yes.
21     Q.    What was that?
22     A.    My memory is that I was doing the
23  negotiations in the beginning of trying to
24  structure a deal and an offer.

Page 32

1      Q.    Can you describe your role from the
2   beginning of being asked to undertake those tasks
3   until the close of the deal?
4      A.    I think there were three roles that I
5   remember. One is the one that I just described;
6   second is I was reviewing some of the drafts of the
7   documents; and third I was in on some discussions
8   with Bob and Ann and the lawyers talking about
9   parts of words. I think those were the three
10  roles.
11     Q.    Parts of the words in the documents?
12     A.    Yes.
13     Q.    Do you remember speaking with any people
14  in particular at News America Marketing?
15     A.    Yes.
16     Q.    Who do you remember speaking with?
17     A.    David. I can't get you any further than
18  that.
19     Q.    You remember speaking with a David?
20     A.    Yes.
21     Q.    Do you remember speaking with anyone
22  besides David from News America Marketing?
23     A.    Yes, but I cannot tell you who that was.
24     Q.    Male or female?

Page 33

1      A.    Sorry.
2      Q.    You can't remember?
3      A.    I can't remember.
4      Q.    After the transaction closed, that is the
5   transaction between CCMI and News America Marketing
6   -- when I say the transaction between CCMI and
7   News America Marketing I really mean the
8   transaction between the shareholders of CCMI and
9   News America Marketing. Did you speak periodically
10  with Miss Raider and Mr. Fireman about how, I will
11  call it, the acquisition was going?
12     A.    Yes.
13     Q.    Did you get reports from them about what
14  they liked about the new company and what they
15  didn't like?
16     A.    What does the word reports mean?
17     Q.    Did they talk to you about what they
18  liked about News America Marketing and what they
19  didn't like about News America Marketing?
20     A.    Yes.
21     Q.    Did that continue in 1999 and 2000?
22     A.    I don't know when it started so I can't
23  tell you that. We had some conversations about it.
24     Q.    During the first year of the acquisition

9 (Pages 30 to 33)

**TAB I TO EXHIBIT BINDER**

Page 1

1                                  VOLUME    1 of 1

2                                  PAGES     199

3                                  EXHIBITS  12-33

4

5              UNITED STATES DISTRICT COURT

6          FOR THE DISTRICT OF MASSACHUSETTS

7            CIVIL ACTION NO. 05-1740 MLW

8

9          ROBERT FIREMAN and ANN RAIDER

10                           Plaintiffs

11                      v.

12      NEWS AMERICA MARKETING IN-STORE, INC.

13                         Defendant

14      -------------------------------------

15      DEPOSITION OF: ROBERT M. COUGHLIN

16          Thursday, April 12, 2007

17             Holland & Knight LLP

18        10 St. James Avenue - 11th Floor

19         Boston, Massachusetts 02116

20           10:10 a.m to 5:00 p.m.

21      -------------------------------------

22      Reporter:  Robert K. Maloney, RPR

23    Two Oliver Street, Boston, Massachusetts 02109

24

Robert M. Coughlin

Page 18

1 paper.
2    Q.  Who had placed the ad?
3    A.  Someone at CCMI.  It was a help wanted ad
4 in the Globe, I believe.
5    Q.  What were they looking for?
6    A.  I believe it was just a controller.  I
7 don't remember the specifics of the ad or
8 anything.
9    Q.  If my memory serves me correct you think
10 this was somewhere in the 1993, 1994 time range?
11    A.  I believe '94.
12    Q.  I take it that you answered the ad and
13 ultimately got the job?
14    A.  Yes.
15    Q.  Who was the person who hired you?
16    A.  I had met with both Ann Raider and Bob
17 Fireman.
18    Q.  Again, that was about 1993, 1994?
19    A.  That is correct.
20    Q.  At that time where was CCMI located?
21    A.  They were at 165 Wood Road in Braintree.
22    Q.  How many employees were there at that
23 time?
24    A.  Maybe five.

Page 19

1    Q.  Were you one of the five?
2    A.  I believe so.  It was somewhere in that
3 neighborhood.
4    Q.  There was Mr. Fireman, Miss Raider and
5 you.  Who were the other two?
6    A.  There was a secretary.
7    Q.  What was her name?
8    A.  I don't remember her name.
9    Q.  Was she still employed by CCMI at the
10 time CCMI was acquired by News America Marketing?
11    A.  No.
12    Q.  Who was the fifth person?
13    A.  I may have been the fourth.
14    Q.  What's that?
15    A.  I may have been the fourth person.
16    Q.  So it may have been in 1994 there just
17 four employees: Mr. Fireman, Miss Raider, the
18 secretary whose name you can't remember and
19 yourself, is that right?
20    A.  Yes.
21    Q.  How long had CCMI been in business at
22 that particular point in time?
23    A.  I don't recall.
24    Q.  Was it just starting up in 1994?

Page 20

1    A.  I think it had been in business for a
2 couple of years.
3    Q.  At that point in time what did the
4 business of CCMI consist of?
5    A.  We were providing loyalty cards to
6 supermarkets, we had done some marketing programs
7 based on that data for some manufacturers,
8 providing marketing programs to like Shaw's
9 supermarkets.
10    Q.  Anything else?
11    A.  I believe that's it.
12    Q.  Describe for me the loyalty cards that
13 were being provided to supermarkets?
14    A.  You do any shopping?
15    Q.  Yes, I do.
16    A.  It was producing the cards where the
17 supermarkets could identify who the shoppers were
18 and what their traits were.
19    Q.  Are these cards the same cards that I
20 would use now when I go to Shaw's or Stop & Shop?
21    A.  That is correct.
22    Q.  It's the card that I would give the
23 checkout person as I am checking out and they would
24 swipe it and I would get discounts on various

Page 21

1 products?
2    A.  That is correct.
3    Q.  Was CCMI the only company that was in
4 this business in 1993, 1994?
5    A.  I don't believe so, no.
6    Q.  There were other companies that also
7 marketed loyalty cards to supermarkets?
8    A.  I am not exactly sure.  I don't really
9 recall.
10    Q.  By the time that CCMI was acquired by
11 News America Marketing were there other companies
12 that you were aware of that were marketing loyalty
13 cards to supermarkets?
14    A.  Yes.
15    Q.  Can you remember the names of those
16 companies?
17    A.  I believe Catalina.  I don't recall if
18 Valassis did.  They did a lot of the marketing
19 programs but I don't know if they did actually
20 produce the cards or not.
21    Q.  Do you know how to spell Valassis?
22    A.  V-a-l-a-s-s-i-s, I believe.
23    Q.  Were you involved in the actual sale to
24 the supermarkets of the card programs?

6 (Pages 18 to 21)

Robert M. Coughlin

Page 22

1    **A.  The actual selling of programs?**
2    Q.  Yes.
3    **A.  No.**
4    Q.  Is that something that Mr. Fireman or
5  Miss Raider did?
6    **A.  Yes.**
7    Q.  Do you know what their pitch would
8  consist of when they went to a supermarket to try
9  to interest them in this program?
10    **A.  Generally, it would be to describe the**
11  **benefits of being able to identify, you know, the**
12  **purchase behavior of your customers so that you**
13  **could tailor your promotions to them or your**
14  **marketing to them and you could really build a**
15  **two-way street of loyalty.**
16    Q.  What gets recorded on those cards when
17  the cards get swiped?
18    **A.  On the cards?**
19    Q.  On the cards or elsewhere I should say?
20    **A.  On the card itself would be the loyalty**
21  **card number.**
22    Q.  Which I take it identified a particular
23  retail customer?
24    **A.  Yes.**

Page 23

1    Q.  And then does it have that customer's
2  address?
3    **A.  It does not on the card.  On the card**
4  **itself would just be the card number.  Then there**
5  **would be a database that would include the**
6  **customer's name, address, that type of thing.**
7    Q.  And that would be located someplace else?
8    **A.  Correct.**
9    Q.  How would that database be assembled?
10    MR. PETERS:  Are you talking about
11  1994 or now or what?
12    Q.  Well, if it has changed let me know.
13  Let's during '94 to '99?
14    **A.  The customer would go into the**
15  **supermarket to sign up and fill out the**
16  **application.  They would then be given a card that**
17  **went along with the application and that**
18  **information would be data entered into the**
19  **database.**
20    Q.  For the supermarket?
21    **A.  Right.**
22    Q.  Then when the customer uses his card
23  would there be additional information that would be
24  assembled next to that particular customer's name

Page 24

1  on the supermarket's database?
2    **A.  Yes.  You would be able to track what**
3  **that person was buying.**
4    Q.  Would CCMI also get that information or
5  would that information be retained exclusively by
6  the supermarket?
7    **A.  It would be either or.  We would maintain**
8  **some of the databases of the name, address and**
9  **purchase behavior or the supermarkets could.**
10    Q.  Do you remember which clients you
11  maintained - by you I mean CCMI - during the period
12  1994 to 1999, which supermarkets, if any, where the
13  database was in the custody and control of CCMI?
14    **A.  Star Market, as I recall.**
15    Q.  Did any other grocery store customers
16  keep their database with CCMI?
17    **A.  I believe Lucky's supermarket chain did.**
18    Q.  Any others?
19    **A.  Those are the only two that I can**
20  **remember.**
21    Q.  Were there other grocery store customers
22  during the 1994 to 1999 period which kept their
23  database, that is the database derived from the
24  loyalty cards, within their custody and control and

Page 25

1  not accessible to CCMI?
2    **A.  Any of our customers or in general?**
3    Q.  Well, let's try both.  In general tell
4  me?
5    MR. PETERS:  I object to the form of
6  the question.
7    **A.  I would assume.**
8    Q.  Well, specifically were there any of the
9  CCMI grocery store customers that kept their
10  database within their own custody and control
11  during the '94 to '99 period.
12    **A.  I believe Giant Eagle used our software**
13  **and they maintained it in their location.**
14    Q.  What was the name of the company?
15    **A.  Giant Eagle.**
16    Q.  Is that the Giant chain that is in the
17  Washington, D.C. area or is that a different chain?
18    **A.  I believe it's a sister company of them.**
19    Q.  Where was Giant Eagle based to the best
20  of your recollection?
21    **A.  In the Philadelphia market.  I don't**
22  **really recall.**
23    Q.  Any other grocery store chains that kept
24  their database within their own custody and

7 (Pages 22 to 25)

Robert M. Coughlin

Page 194

1    Q.  In Exhibit Number 31 at the bottom of the
2  page it says that Mike Racano mentioned that taking
3  an active approach collecting the receivables was
4  in your best interest.  That is referring to a
5  conversation that Mike Racano had with you, is that
6  correct?
7    **A.  It would have been in discussions, the**
8  **previous earn-out discussions, when we were talking**
9  **about collections and accounts receivable.**
10    Q.  So Mr. Racano was saying to CCMI
11  shareholders that if you guys can accelerate the
12  collection of your receivables that would be to
13  your benefit?
14    **A.  Because it would reverse the negative**
15  **impact on the working capital.**
16        MR. KATZ:  Let's mark as Exhibit
17  Number 32 another e-mail chain with the top e-mail
18  being dated Monday, March 8th, 2004 from you to
19  yourself.
20        (The document was marked Deposition
21  Ex. No. 32.)
22    Q.  Do you see Exhibit Number 32?
23    **A.  I do.**
24    Q.  In the middle of the page there is an

Page 195

1  e-mail that appears to have come from Mr. Fireman
2  that says, "Doesn't look like Ann did much at all."
3  Do you know what that refers to?
4    **A.  I don't recall.**
5    Q.  Is Mr. Fireman suggesting that Miss
6  Raider didn't make the arguments that you had been
7  preparing for in the prior e-mails which we marked
8  as exhibits?
9        MR. PETERS:  Objection.
10    **A.  I don't know.**
11    Q.  You don't know?
12    **A.  No.**
13        MR. KATZ:  Let's mark as Exhibit
14  Number 33 an e-mail chain that has at the top an
15  e-mail dated Monday, November 22nd, 2004 from Ann
16  Raider to Donald Jack.
17        (The document was marked Deposition
18  Ex. No. 33.)
19    Q.  Let me, Mr. Coughlin, call your attention
20  to the e-mail in the middle of the first page from
21  Mr. Fireman on 11-22-04 at 12:56 p.m. to you.  I
22  notice that Mr. Fireman's e-mail address is
23  rfireman@stvpartners.com.  Do you see that?
24    **A.  Yes.**

Page 196

1    Q.  Do you know what STV stands for?
2    **A.  I do not.**
3    Q.  The top subject line says earn out Year
4  6.  Do you see that?
5    **A.  Yes.**
6    Q.  In fact, it is earn out Year 5.  Isn't
7  that what this e-mail or these e-mails are about?
8    **A.  Yes.**
9    Q.  Because there wasn't a Year 6?
10    **A.  Yes.**
11    Q.  Year 5 was the last year?
12    **A.  Yes.**
13    Q.  Going back to the e-mail from Mr. Fireman
14  in the middle of the page on 11-22 at 12:56 it
15  says, "Robert:  We need to respond to NAM this week
16  or lose right to appeal.  Have you figured
17  anything?  Are you around?"  Do you see that?
18    **A.  Yes.**
19    Q.  He was referring to the Year 5 earn-out
20  calculation?
21    **A.  Yes.**
22    Q.  Is that what you understood --
23    **A.  Yes.**
24    Q.  -- it to mean?

Page 197

1    **A.  Yes.**
2    Q.  What did you understand it to mean when
3  he said, "We need to respond to NAM this week or
4  lose right to appeal."
5    **A.  That he needed to reply to them regarding**
6  **the earn-out in that time frame where he had to**
7  **notify them of a dispute.**
8    Q.  If he didn't notify them of a dispute he
9  would lose his right to contest the earn-out
10  numbers that they were proposing, correct?
11        MR. PETERS:  Objection.
12    **A.  That is my understanding, yes.**
13        MR. KATZ:  I don't have any further
14  questions.  Thank you very much, Mr. Coughlin.
15        (Whereupon, at 5:00 o'clock p.m. the
16  deposition was concluded.)
17
18
19
20
21
22
23
24

50 (Pages 194 to 197)

**Raider, Ann**

From:     Raider, Ann
Sent:     Monday, November 22, 2004 8:13 PM
To:       Jack, Donald
Subject:  Earn Out Year 6

Dear Don,

To further clarify the earn out numbers would you:

- please send to me the details of the accounts recievables.
- You show a negative deferred revenue amount. ....why
- You show the accrued legal (the $60,000 from the closing) as a decrease to working capital. NAM lower what we would have received from the sale by the $60,000. We paid t he legeal costs. Therefore, it should be add that back in. That would affect working capital by $12,000 which would result in an additional $1,548.
- We are to pay sales staff expenses when they were working for us to generate revenue. Kevin Tripp received a severance package and if it is in hisnumbers, that the amount should not go against gross revenue as it does not have a direct correlation to sales. He got paid for x months but he did not come into the office. Therefore, you should subtract that amount.

Happy Thanksgiving. Talk to you next week. Ann

Bob Fireman <rfireman@stvpartners.com> on 11/22/2004 12:56:24 PM

To: Robert Coughlin/JLPA@JLPA
cc:

Subject: Fyi

Robert.

We need to respond to NAM this week or lose right to appeal
Have you figured anything?
Are you around?

Bob

--
Robert N. Fireman
Stored Value Partners
506 Boston Post Road
Weston, MA 02493
781-894-2227 x202
617-510-8093 (cell)
rfireman@stvpartners.com



COUGHLIN
EXHIBIT NO. 33
4-12-17
R. MALONEY

2/1/2005

Robert Coughlin
Controller
John Leonard Employment Services, Inc.
75 Federal Street
Boston, MA 02110
617-348-2628
617-451-0384 fax
rcoughlin@johnleonard.com
www.johnleonard.com


------ End of Forwarded Message

2/1/2005

**TAB J TO EXHIBIT BINDER**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## ROBERT FIREMAN'S ANSWERS TO SECOND SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANTS

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Robert Fireman ("Mr. Fireman") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") Second Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Mr. Fireman's Specific Answers and Objections to each Interrogatory:

1.    Mr. Fireman objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.    Mr. Fireman objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.     Mr. Fireman objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.     Mr. Fireman objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on him beyond those included in Mass. R. Civ. P. 26 and 33.

5.     Mr. Fireman objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.     Mr. Fireman's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial.

7.     The information disclosed below has been provided after a diligent search. Mr. Fireman reserves the right to supplement these answers.

8.     Mr. Fireman reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

## ANSWERS TO INTERROGATORIES

## INTERROGATORY NO.: 1

Describe in detail any and all expenses that you assert were wrongfully added to the calculation of CCMI's and/or SSD's Gross Margin for Years 1-5, including in your response:

a)    the amount of each expense, and, if you assert that only part of the

expense was wrongfully charged to CCMI and/or SSD, how much of the

expense was wrongful;

b)    when such expenses were attributed to CCMI, and when such expenses

were paid by NAM and/or CCMI; and

c)    the reasons that you believe the attribution of such expenses to CCMI

and/or SSD was wrongful.

## ANSWER NO.: 1

Mr. Fireman objects to this Request on the grounds that the material sought is

overbroad and unduly burdensome. Mr. Fireman objects to this Request on the

grounds that it seeks expert testimony and information possessed by others. Further

responding, for years one and two, this information was provided to NAM in the form

of formal protest letters. Those letters are incorporated herein by reference pursuant to

Fed. R. Civ. P. 33(c).

Subject to the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman does not contend in this lawsuit that

there was an error in the mathematical formula by which the earnout was calculated.

The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of

good faith and fair dealing precluded and prevented them from achieving the earn-out

figures. Further responding and among other things, Plaintiffs do contend that NAM

added expenses to the calculation which caused the earnout thresholds to be missed.

Those expenses have been articulated in responses to the Defendant's First Set of

Interrogatories and are incorporated herein by reference.

**INTERROGATORY NO.: 2**

Describe in detail any and all other disputed and/or criticisms you have with NAM's calculation of CCMI's and/or SSD's Gross margin for years 1-5 or NAM's attribution of expenses to CCMI's and/or SSD's for years 1-5.

**ANSWER NO.: 2**

Mr. Fireman objects to this Request on the grounds that the material sought is overbroad, vague and unduly burdensome. Mr. Fireman incorporates herein by reference his Answers to NAM's First Set of Interrogatories which set forth in detail his criticism and disputes with NAM's actions. Subject to this, as well as the above listed General Objections, the following are additional, non-exhaustive criticisms and disputes:

- NAM did not help CCMI drive sales. As a result of their hiring freeze, NAM forced CCMI to use of part time sales staff on the retail side who were concentrated on other aspects of NAM's business and had de minimus use of NAM's manufacturing salesforce. NAM refocused CCMI's technical support to other aspects of their business, particularly their dot com sales and discouraged the sales staff not to make sales calls on CCMI's behalf. NAM ignored CCMI's request for assistance with retailers such as with the Senior Vice President of Pathmark to assist them in obtaining lucrative contracts. NAM failed to provide promised support to build the stored value business which required CCMI to use of vendors driving CCMI's prices higher than its competitors. NAM forced the closing of CCMI's software business by failing to deliver timely or provide proper technical support for the software products. This caused the loss of major software customers which was thirty percent (30%) of CCMI's revenue and which was the loss leader for the sale of card products and marketing programs derived from the software database direct marketing business. NAM purchased the Epiphany software license with unlimited seats at a price well beyond CCMI's requirements to perform functions for NAM's other businesses. This purchase was made without the knowledge or consent of the Plaintiffs and effectively used up most of the capital allowance in the Purchase and Sale agreement. CCMI did not possess the needed capital as required by its agreed upon by NAM in the parties' business plan. This expense adversely affected the Plaintiffs in the gross margin calculation and created a negative working capital affecting each annual payment calculations. In addition, NAM was negligent in the collection of CCMI account receivables which also adversely affected the annual calculation.

4

Contrary to the agreed upon plan which was the basis of the Stock Purchase Agreement, the Plaintiffs were not provided with important and relevant information and were excluded from key business decisions for operations, sales, customer service, product development, and marketing. Each of these activities impacted the gross margin calculation.

- In addition, NAM hired consultants rather than staff and charged CCMI for these costs.

- NAM did not provide proper accounting support which reduced the accounts receivables.

- NAM prohibited CCMI from attending trade shows which reduced new business acquisition.

- NAM reassigned Ann Raider to work in the base organization with three different supervisors in three years with a focus on supporting dot com sales.

- NAM isolated and forced me out of any management role notwithstanding his job as general manager of CCMI.

## INTERROGATORY NO.: 3

Describe in detail the parts of CCMI and/or SSD that you assert NAM "assimilated into its other businesses," including in your response the role and value of each sub part of CCMI and/or SSD; how the loss of each such part damaged the Plaintiffs; and your basis for asserting that NAM did not have the authority or discretion to separate each such part from CCMI and/or SSD.

## ANSWER NO.: 3

Mr. Fireman objects to this Request as it is repetitive of previously requested and answered interrogatory requests. The Request is therefore harassing. Mr. Fireman incorporates by reference his First Set of Answers to Interrogatories which provide much of the information sought through this Request. Mr. Fireman also incorporates by reference his response to Interrogatory No. 2 above. Subject to this, as well as the above referenced General Objections, Mr. Fireman responds as follows:

The Stock Purchase Agreement did not provide NAM with the right to break apart CCMI's most valuable components and use them to drive other aspects of their business. While the Agreement provided NAM with some discretion in the running of CCMI, NAM did not have the ability to not run CCMI at all or to take actions to the direct adverse benefit of CCMI, all of which were violative of the covenant of good faith and fair dealing. This conduct made it impossible to achieve the thresholds in the earn out provision.

Among other things, CCMI lost sales revenue because NAM pulled sales support from CCMI and did not allow a full staff of direct sales support for the retailer or manufacture sides of the business. The manufacturing sales people in the first year after the purchase spent at least 50% of their time selling the dot com business. CCMI lost significant sales opportunities because NAM redirected sales staff to focus on other aspects of NAM's business.

CCMI's technical team was disbanded and portions of the staff were sent to Connecticut to work on other projects. NAM's conduct left CCMI with little or poor technical resources and CCMI lost future technical sales.

CCMI did not have the promised support to drive the Hispanic stored value products. After the purchase, NAM forced CCMI to exit much of this business. NAM forced CCMI to stop expanding a successful program for stored value cards.

It was not until year three that the rest of the NAM organization was even made aware of CCMI's capabilities.

NAM also ensured that CCMI had no control over its staff or its staffing needs. CCMI's secretary for example reported to another manager. Ann Raider had no one

6

directly reporting to her on manufacturer side of the business and then loss direct reporting for the retailer side. Ms. Raider too had four supervisors in five years.

NAM also took control over CCMI's quality control including through NAM's refusal to place a senior executive in a position to assist in the development of CCMI's software. This caused delays of many months while NAM ignored CCMI's products, needs and development. NAM took away CCMI's ability to negotiate software contracts which impacted the earn out and the product functionality CCMI needed to complete.

NAM restricted and refused to CCMI from undertaking any advertising or promotion of CCMI and were prohibited from being present at any trade shows. NAM refused to permit CCMI's representatives to attend NAM's executive committee meetings to discuss trends in the market or where the future of the industry was moving. Essentially, CCMI, its business and its leaders were caste aside, marginalized and ignored and not given a chance to grow, develop or benefit from the promises made in connection with the stock purchase. CCMI's most valued components were broken off and used elsewhere to all other aspects of NAM's business to flourish.

**INTERROGATORY NO.: 4**

Describe in detail whether you believe you complied with the dispute resolution provisions of Section 2.3(c) (and, by reference Section 2.2(b)) of the Stock Purchase Agreement, including in your response each and every communication that you assert constitutes compliance with said provisions; or, if you assert that you did not need to follow the requirements of said provisions for any reason, your basis for making such an assertion.

**ANSWER NO.: 4**

Mr. Fireman objects to this Request as it calls for a legal conclusion. Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated. The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of good faith and fair dealing precluded and prevented them from achieving the earn-out figures. As a result, Mr. Fireman was under no obligation to comply with the dispute resolution provisions of Section 2.3(c) (and, by reference Section 2.2(b)) of the Stock Purchase Agreement.

Signed under the pains and penalties of perjury this _10th_ day of April, 2007.

_____
Robert Fireman

Attorney as to Objections

_____
Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: April 9, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on _e mail + mail_ 4/10/07

**TAB K TO EXHIBIT BINDER**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-1740MLW |
| ) | |
| NEWS AMERICA MARKETING IN-STORE, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## ANN RAIDER'S ANSWERS TO SECOND SET OF INTERROGATORIES PROPOUNDED BY THE DEFENDANTS

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Ann Raider ("Ms. Raider") hereby objects and responds to Defendant News America Marketing In-Store, Inc.'s ("NAM") Second Set of Interrogatories as set forth below.

## GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby incorporated by reference into, each and every one of Ms. Raider's Specific Answers and Objections to each Interrogatory:

1.    Ms. Raider objects to the interrogatories to the extent that they seek information which is protected by the attorney-client privilege, which constitutes work product, or which is otherwise protected from discovery.

2.    Ms. Raider objects to the interrogatories to the extent that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

3.    Ms. Raider objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.    Ms. Raider objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on him beyond those included in Mass. R. Civ. P. 26 and 33.

5.    Ms. Raider objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.    Ms. Raider's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial.

7.    The information disclosed below has been provided after a diligent search. Ms. Raider reserves the right to supplement these answers.

8.    Ms. Raider reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO.: 1

Describe in detail any and all expenses that you assert were wrongfully added to the calculation of CCMI's and/or SSD's Gross Margin for Years 1-5, including in your response:

a)   the amount of each expense, and, if you assert that only part of the
     expense was wrongfully charged to CCMI and/or SSD, how much of the
     expense was wrongful;

b)   when such expenses were attributed to CCMI, and when such expenses
     were paid by NAM and/or CCMI; and

c)   the reasons that you believe the attribution of such expenses to CCMI
     and/or SSD was wrongful.

**ANSWER NO.: 1**

Ms. Raider objects to this Request on the grounds that the material sought is
overbroad and unduly burdensome.  Ms. Raider objects to this Request on the grounds
that it seeks expert testimony and information possessed by others.  Further
responding, for years one and two, this information was provided to NAM in the form
of formal protest letters.  Those letters are incorporated herein by reference pursuant to
Fed. R. Civ. P. 33(c).

Subject to the above listed General Objections, which are specifically
incorporated herein by reference, Ms. Raider does not contend in this lawsuit that there
was an error in the mathematical formula by which the earnout was calculated.  The
Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of good
faith and fair dealing precluded and prevented them from achieving the earn-out
figures.  Further responding and among other things, Plaintiffs do contend that NAM
added expenses to the calculation which caused the earnout thresholds to be missed.
Those expenses have been articulated in responses to the Defendant's First Set of
Interrogatories and are incorporated herein by reference.

3

**INTERROGATORY NO.: 2**

Describe in detail any and all other disputed and/or criticisms you have with NAM's calculation of CCMI's and/or SSD's Gross margin for years 1-5 or NAM's attribution of expenses to CCMI's and/or SSD's for years 1-5.

**ANSWER NO.: 2**

Ms. Raider objects to this Request on the grounds that the material sought is overbroad, vague and unduly burdensome. Ms. Raider incorporates herein by reference his Answers to NAM's First Set of Interrogatories which set forth in detail his criticism and disputes with NAM's actions. Subject to this, as well as the above listed General Objections, the following are additional, non-exhaustive criticisms and disputes:

- NAM did not help CCMI drive sales. As a result of their hiring freeze, NAM forced CCMI to use of part time sales staff on the retail side who were concentrated on other aspects of NAM's business and had de minimus use of NAM's manufacturing salesforce. NAM refocused CCMI's technical support to other aspects of their business, particularly their dot com sales and discouraged the sales staff not to make sales calls on CCMI's behalf. NAM ignored CCMI's request for assistance with retailers such as with the Senior Vice President of Pathmark to assist them in obtaining lucrative contracts. NAM failed to provide promised support to build the stored value business which required CCMI to use of vendors driving CCMI's prices higher than its competitors. NAM forced the closing of CCMI's software business by failing to deliver timely or provide proper technical support for the software products. This caused the loss of major software customers which was thirty percent (30%) of CCMI's revenue and which was the loss leader for the sale of card products and marketing programs derived from the software database direct marketing business. NAM purchased the Epiphany software license with unlimited seats at a price well beyond CCMI's requirements to perform functions for NAM's other businesses. This purchase was made without the knowledge or consent of the Plaintiffs and effectively used up most of the capital allowance in the Purchase and Sale agreement. CCMI did not possess the needed capital as required by its agreed upon by NAM in the parties' business plan. This expense adversely affected the Plaintiffs in the gross margin calculation and created a negative working capital affecting each annual payment calculations. In addition, NAM was negligent in the collection of CCMI account receivables which also adversely affected the annual calculation.

4

Contrary to the agreed upon plan which was the basis of the Stock Purchase Agreement, the Plaintiffs were not provided with important and relevant information and were excluded from key business decisions for operations, sales, customer service, product development, and marketing. Each of these activities impacted the gross margin calculation.

- In addition, NAM hired consultants rather than staff and charged CCMI for these costs.

- NAM did not provide proper accounting support which reduced the accounts receivables.

- NAM prohibited CCMI from attending trade shows which reduced new business acquisition.

- NAM reassigned me to work in the base organization with three different supervisors in three years with a focus on supporting dot com sales.

- NAM isolated and forced Robert Fireman out of any management role notwithstanding his job as general manager of CCMI.

## INTERROGATORY NO.: 3

Describe in detail the parts of CCMI and/or SSD that you assert NAM "assimilated into its other businesses," including in your response the role and value of each sub part of CCMI and/or SSD; how the loss of each such part damaged the Plaintiffs; and your basis for asserting that NAM did not have the authority or discretion to separate each such part from CCMI and/or SSD.

## ANSWER NO.: 3

Ms. Raider objects to this Request as it is repetitive of previously requested and answered interrogatory requests. The Request is therefore harassing. Ms. Raider incorporates by reference his First Set of Answers to Interrogatories which provide much of the information sought through this Request. Ms. Raider also incorporates by reference his response to Interrogatory No. 2 above. Subject to this, as well as the above referenced General Objections, Ms. Raider responds as follows:

The Stock Purchase Agreement did not provide NAM with the right to break apart CCMI's most valuable components and use them to drive other aspects of their business. While the Agreement provided NAM with some discretion in the running of CCMI, NAM did not have the ability to not run CCMI at all or to take actions to the direct adverse benefit of CCMI, all of which were violative of the covenant of good faith and fair dealing. This conduct made it impossible to achieve the thresholds in the earn out provision.

Among other things, CCMI lost sales revenue because NAM pulled sales support from CCMI and did not allow a full staff of direct sales support for the retailer or manufacture sides of the business. The manufacturing sales people in the first year after the purchase spent at least 50% of their time selling the dot com business. CCMI lost significant sales opportunities because NAM redirected sales staff to focus on other aspects of NAM's business.

CCMI's technical team was disbanded and portions of the staff were sent to Connecticut to work on other projects. NAM's conduct left CCMI with little or poor technical resources and CCMI lost future technical sales.

CCMI did not have the promised support to drive the Hispanic stored value products. After the purchase, NAM forced CCMI to exit much of this business. NAM forced CCMI to stop expanding a successful program for stored value cards.

It was not until year three that the rest of the NAM organization was even made aware of CCMI's capabilities.

NAM also ensured that CCMI had no control over its staff or its staffing needs. CCMI's secretary for example reported to another manager. I had no one directly

6

reporting to me on manufacturer side of the business and then loss direct reporting for the retailer side. I also had four supervisors in five years.

NAM also took control over CCMI's quality control including through NAM's refusal to place a senior executive in a position to assist in the development of CCMI's software. This caused delays of many months while NAM ignored CCMI's products, needs and development. NAM took away CCMI's ability to negotiate software contracts which impacted the earn out and the product functionality CCMI needed to complete.

NAM restricted and refused to CCMI from undertaking any advertising or promotion of CCMI and were prohibited from being present at any trade shows. NAM refused to permit CCMI's representatives to attend NAM's executive committee meetings to discuss trends in the market or where the future of the industry was moving. Essentially, CCMI, its business and its leaders were caste aside, marginalized and ignored and not given a chance to grow, develop or benefit from the promises made in connection with the stock purchase. CCMI's most valued components were broken off and used elsewhere to all other aspects of NAM's business to flourish.

## INTERROGATORY NO.: 4

Describe in detail whether you believe you complied with the dispute resolution provisions of Section 2.3(c) (and, by reference Section 2.2(b)) of the Stock Purchase Agreement, including in your response each and every communication that you assert constitutes compliance with said provisions; or, if you assert that you did not need to follow the requirements of said provisions for any reason, your basis for making such an assertion.

7

**ANSWER NO.: 4**

Ms. Raider objects to this Request as it calls for a legal conclusion. Subject to the above listed General Objections, which are specifically incorporated herein by reference, Ms. Raider does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated. The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of good faith and fair dealing precluded and prevented them from achieving the earn-out figures. As a result, Ms. Raider was under no obligation to comply with the dispute resolution provisions of Section 2.3(c) (and, by reference Section 2.2(b)) of the Stock Purchase Agreement.

Signed under the pains and penalties of perjury this __11__ day of April, 2007.

Ann Raider

Attorney as to Objections

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on _____

Dated: April 11, 2007

8