UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>               Plaintiffs,<br><br>v.<br><br>NEWS AMERICA MARKETING IN-STORE, INC.,<br><br>               Defendant. | Civil Action No. 05-11740-MLW |

**DEFENDANT'S RULE 56.1 STATEMENT**

Pursuant to Local Rule 56.1, Defendant News America Marketing In-Store, Inc. ("NAM") submits the following Rule 56.1 statement of material facts of record as to which there is no issue to be tried, in support of their motion for summary judgment against plaintiffs Robert Fireman ("Fireman") and Ann Raider ("Raider").

**A.    The Stock Purchase Agreement**

1.    NAM is a national marketing servicing company and is recognized as the leading company in its industry.  Its customers are large retailers (such as grocery store chains) and consumer packaged goods manufacturers.  As part of its business, NAM develops overall marketing strategies for prospective and current customers; establishes and maintains strategic business relationships; and implements these strategies through the sale of marketing products such as free standing inserts in newspapers, coupon dispensers on store shelves, and other forms of in-store marketing to customers.  Affidavit of Gordon P. Katz ("Katz Aff."), Exh. 8.

2.    As part of an attempt to obtain a toehold in electronic commerce, NAM in August 1999 acquired all the stock of Consumer Card Marketing, Inc. ("CCMI").  Henri Lellouche

("Lellouche") Depo., at 48 ("We were investing on the come because it was unknown what was going to happen in the future, and we wanted to have our bit of experience, or our toe in the water if you will, in these different areas").

3. CCMI's business, at the time of the acquisition, focused on the implementation of loyalty card programs for retail (*e.g.*, grocery and drug) store chains. *See* CCMI Acquisition Memo, dated May 14, 1999, at 1, appended to Katz. Aff. at Exh. 1; Robert Coughlin ("Coughlin") Depo., at 20-24.

4. Loyalty cards permit a retail store to generate a database of shoppers and their respective product preferences. This data can be useful for target marketing of consumers by retailers and consumer package goods manufacturers. *Id.*

5. In connection with the acquisition, NAM and the plaintiffs (among others) executed a Stock Purchase Agreement, dated August 13, 1999 (the "Stock Purchase Agreement" or the "Agreement"). *See* Stock Purchase Agreement, appended to Katz. Aff. at Exh. 2.

6. Under the terms of the Stock Purchase Agreement, NAM paid CCMI's shareholders, most notably Fireman and Raider, $2.8 million in cash. Stock Purchase Agreement, §2.1.

7. In addition to compensation for their stock, and among other benefits, Fireman and Raider each received five-year employment agreements with NAM, appended to Katz Aff. at Exhs. 3 and 4.

8. Plaintiffs also received the possibility of receiving earn-out payments and bonuses from NAM, based on the performance of the acquired business. Stock Purchase Agreement, §2.3.

9. In connection with the earn-out and bonuses, the interests of the plaintiffs and NAM were completely aligned. "When we made good numbers, they were making good numbers." Fireman Depo., at 212-213.

10. Nowhere in the Stock Purchase Agreement is there any section or provision expressly requiring NAM to run or support the acquired CCMI business in any specific or general way. Stock Purchase Agreement, *passim*, including §6.8 (second sentence).

11. Rather, plaintiffs agreed that NAM would have "sole and unfettered judgment" in its operation of CCMI. Stock Purchase Agreement, *passim,* including §6.8 (second sentence).

12. Section 6.8 of the Stock Purchase Agreement, titled "Conduct of the Business," provided, specifically, as follows:

> It is Buyer's [NAM's] current intention to provide support to the business of the Company [CCMI] by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, *Buyer shall be free to operate the Company and its Affiliates in its sole and unfettered judgment and Sellers [Fireman and Raider] shall have no claim against Buyer in connection therewith* as a result of the preceding sentence." (emphasis added)

13. The Stock Purchase Agreement also contained an "integration clause." That provision stated: "This Agreement (together with the Schedules hereto) contain, and are intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, and supersedes any previous agreements and understandings between the parties with respect to those matters." Stock Purchase Agreement, §8.1.

14. Plaintiffs were represented by the law firm of Goodwin Procter LLP during negotiations of the Stock Purchase Agreement. Fireman Depo., at 79-80.

15. Plaintiffs were further assisted and advised in the negotiations by Leslie Charm, a business consultant and faculty member at Babson College. Leslie Charm Depo., at 9-10, 31-32.

16.     Mr. Fireman is an attorney, and has continuously been in the private practice of law from 1974 to the present.  Fireman Depo., at 23.

17.     At the time plaintiffs entered into the Stock Purchase Agreement, Fireman and Raider were each sophisticated business people.  Fireman Depo., at 165 (Fireman was an "invest[or] in … things"); Raider Depo., at 53 ("I am a professional executive…").

18.     Section 2.3(c) of the Stock Purchase Agreement anticipated disputes regarding earn-out calculations and provided, in relevant part:

> In the event that the Principal Sellers [the Plaintiffs] desire to dispute any Buyer's Calculation [concerning the earn-out payments], the Principal Sellers shall, within twenty (20) Business Days following receipt of such Buyer's Calculation, deliver to Buyer written notice setting forth, in detail, their objections to such Buyer's Calculation (the "Objection Notice"), which dispute shall be resolved in accordance with the procedure outlined in Section 2.2(b) [providing for accountant-run arbitration].

Stock Purchase Agreement, §2.3(c).

19.     The accountant-run arbitration provision required each party to *designate* an accounting firm to resolve earn-out disputes that remained after the parties had discussed them.  Stock Purchase Agreement, §2.2(b).

20.     If, after 30 days, the two accounting firms were unable to resolve the disputed issue, then that dispute was to be submitted for a final and binding decision to a third nationally recognized independent accounting firm.  *Id.*

21.     Once the third accountant made his final and binding decision, the earn-out would be paid with interest at 150 basis points above prime from the applicable base earn-out payment date.  *Id.*

22.     The Stock Purchase Agreement specified that it was to be governed by the law of New York.  *Id.* at §8.2.

23. During the five-year earn-out term, NAM paid plaintiffs an earn-out each year. The payments totaled $771,985. Tabulation of Earn-Out Payments, appended to Katz. Aff. at Exh. 5.

24. The plaintiffs employed Section 2.3(c)'s dispute procedures frequently – that is, they objected and negotiated back and forth with NAM on specific revenue or expense items that went into the calculation of each year's earn-out. Fireman Depo., at 180-181; Raider Depo., at 214 ("There was a tremendous amount of discussion, dialogue, documents produced, multiple people involved and issues regarding every year of the earn-out calculation….").

25. In no year did the plaintiffs elect to take any earn-out grievance to accountant arbitration. Fireman Depo., at 181-183.

26. Plaintiffs worked out any issues with NAM management and accepted without reservation the earn-out payments wire-transferred into their accounts. Fireman Depo., at 181-183.

27. Plaintiffs knew they needed to follow the Agreement's earn-out dispute resolution procedures or they would "lose the right to appeal." Coughlin Depo., at 196-197, Ex. 33 (Fireman email to Coughlin).

B. **NAM's Conduct of the CCMI Business**

28. At the time of its acquisition in 1999, CCMI had three sources of business: (1) loyalty card implementation; (2) data management (or data housing) for retail stores loyalty card data; and (3) marketing and consulting. Katz Aff., Exh. 1, CCMI Acquisition Memo, at 2.

29. For the fiscal calendar year ended December 31, 1998, the last calendar year before the acquisition, CCMI had the following gross revenue by source of business:

|  | Total | % |
|---|---|---|
| Loyalty and Implementation | $2,422,766 | 64.8% |
| Data Base Management | 1,247,118 | 33.3% |
| Data Base Marketing/Other | 71,723 | 1.9% |
| Total | $3,741,657 | 100% |

Stock Purchase Agreement, Schedule §4.6 (1998 Income Statement).

30. CCMI's overall financial performance before the acquisition was "break even," at best. For example, for fiscal year 1998, CCMI experienced an operating loss of approximately $268,143 on gross revenues (shown above) of slightly over $3.7 million. *Id.*

31. For the first quarter of 1999 – shortly before NAM's acquisition – CCMI had generated gross revenue of only $766,420. Katz Aff., Exh. 6, CCMI Due Diligence Memo, dated May 27, 1999, Financial Statements of CCMI for Q1 1999, pp. NAM 3157-3159.

32. With the goal of building CCMI revenue and improving CCMI profits, NAM, after its acquisition of CCMI in August, 1999, took the following steps, among others:

(a) it rebranded CCMI as Smart Source Direct ("SSD") -- "Smart Source" being the brand utilized by NAM in its well-known FSI and store coupon businesses (Lellouche Depo., at 124-125;

(b) it made SSD part of NAM's iGroup, a new operational unit headed by senior NAM executives Christopher Mixson ("Mixson") and Marty Garofalo ("Garofalo") (Garofalo Depo., at 32; Mixson Depo., at 63);

(c) it invested over $1 million in new computer technology for SSD in an attempt to upgrade SSD's data management capacity (Fireman Depo., at 230-231, and Ex. 98, thereto);

(d)     it hired additional sales personnel dedicated to selling both SSD's retail products and direct marketing contracts to retailers (Mixson Depo., at 23-26) and consumer products goods manufacturers (Raider Depo., at 269-270); and

(e)     it informed members of NAM's existing sales force of SSD's products, instructed them to be alert to cross-selling opportunities of SSD's products (Garofalo Depo., at 27-28; Mixson Depo., at 42), and rewarded them when such sales closed (Mixson Depo., at 38).[1]

33.     Prior to joining NAM, Mixson was Vice President, National Accounts Director, of Citicorp POS ("Point of Sale") Information Services.  Mixson Depo., at 8.  Citicorp POS Information Services was "the pioneer in database marketing."  Mixson Depo., at 49.

34.     By virtue of his experience at Citicorp POS, Mixson was an expert in the area of database marketing.  Mixson Depo., at 72-82.

35.     In addition to the three areas of business CCMI pursued at the time of its acquisition, NAM added a *new* fourth area of business to the SSD portfolio: card supply and transaction processing of stored value or e-gift cards.  Affidavit of Henri Lellouche ("Lellouche Aff."), ¶¶3, 5.  *See* CCMI/SSD Revenue Spreadsheets, appended to Katz. Aff. at Exh. 7.

36.     Even though CCMI had no stored value or e-gift card business of this nature prior to NAM's acquisition of CCMI in 1999 (Lellouche Aff., ¶¶ 3, 5), revenue from SSD's new stored value or e-gift card business was *included* by NAM in the calculation of Fireman and Raider's earn-out payments.  *Id.*

37.     NAM was under no contractual obligation to allocate store value gift cards to SSD and its resultant revenue stream.  Stock Purchase Agreement §6.8 (second sentence).

---

[1] In addition, existing sales force members were provided incentives to sell SSD products.  When "a core salesperson would alert a specialty [*e.g.*, SSD] salesperson" about an opportunity for SSD, a successful . . . closing [of] a sale would be attributed against the specialty salesperson's sales goals and then we would give . . . an override on volume and also . . . dedicate [an] override to accomplishment of the core person's sales goals." Mixson Depo., at 38.

38.    One of the most substantial SSD revenue items during plaintiffs' five-year earn-out period was revenue derived from a *stored value card* project for Toshiba. The project involved the implementation of a Toshiba gift card distributed to members of a national consumer class as settlement of a class action litigation, Mixson Depo., at 104; Raider Depo., at 273.

39.    SSD's Toshiba business was generated via a lead from an executive at News Corporation, NAM's parent company. Fireman Depo., at 226.

40.    The Toshiba e-gift card project generated revenue for SSD of:

    1999-2000:    $ 312,000

    2000-2001:    $2,013,741

    2002-2003:    $1,499,855

Katz Aff., Exh. 7, CCMI/SSD Revenue Spreadsheets.

41.    SSD had the following total *gross revenue* by area of business (where data available) for the five earn-out years between 1999-2004:

| | |
|---|---:|
| <u>Year One</u> (1999-2000) | $4,362,054 |
| | |
| <u>Year Two</u> (2000-2001) | |
|     Loyalty Card Implementation and E-gift Card | $5,340,639 |
|     Data Management | 783,142 |
|     Marketing and Consulting | <u>983,143</u> |
|         Total | $7,121,924 |
| | |
| <u>Year Three</u> (2001-2002) | |
|     Loyalty Card Implementation and E-gift Card | $4,745,182 |
|     Data Management | 461,153 |
|     Marketing and Consulting | <u>3,127,126</u> |
|         Total | $8,323,451 |
| | |
| <u>Year Four</u> (2002-2003) | |
|     Loyalty Card Implementation and E-gift Card | $3,794,700 |
|     Direct Mail | <u>3,700,520</u> |
|         Total | $7,495,220 |

        Year Five (2003-2004)
            Loyalty Card Implementation        $3,449,541
            Direct Mail        2,750,341
            Total        $6,146,844

*Id.*

42.    As the above numbers show, loyalty card implementation business declined over time. This decline occurred over the five-year term of the earn-out because retailers "went direct to the factories" to purchase the cards and "directly to the data entry facilities" for loyalty card application processing. Retailers no longer looked to a third-party, like SSD, to facilitate those transactions. Lellouche Depo., at 130.

43.    In addition, SSD's very modest data management business dried up. Although NAM invested substantial monies (over $1 million) and human resources in developing new technology to exploit a hoped-for SSD data management business, it found that "there was no appetite in the marketplace amongst the large retailers for an ASP-hosted solution. In fact, they [the retailers] all built their own data warehouses, bought or licensed or developed their own software . . . it was just a miss by a mile." In addition, the "new technology" recommended by Fireman (known as the "Epiphany" product) and purchased by NAM "was inadequate and not capable of managing the data sets involved in supermarket transactions." Lellouche Depo., at 153-154.

44.    During the course of the earn-out period, SSD was able to grow the direct marketing (or direct mail) portion of the business. This occurred by NAM's "submit[ting] requests for data to retailers; queries, if you will, associate universal product codes with them, and they send us back lists of households that qualify under those query requests." Lellouche Depo., at 31-33.

45.   Apart from the revenue-generating businesses listed above, SSD invested resources in several potential *new* areas of business for SSD which proved unsuccessful. Among the "experiments" was the use of "kiosks" at retail store entrances to dispense electronic coupons. "[B]ut they [kiosks] are and they continue to show to be failures, over and over again." Lellouche Depo., at 67.

46.   NAM also supported efforts promoted by Fireman for SSD to develop an electronic "money transfer card" to be used by the Hispanic population in the U.S. to transfer money to family members in Latin American countries. After substantial work, it was learned that the project was not viable because "as [Fireman] went around to retailers [it was] found out that Western Union had [an] *exclusive* on money transfer." Fireman Depo., at 306 (emphasis added).

47.   Plaintiffs are aware of no NAM goal for CCMI other than the maximizing of CCMI profit. Raider Depo., at 87.

48.   Plaintiffs were paid for the entirety of their five-year employment agreements, during which period they received *discretionary* salary increases and bonuses. Raider Depo., at 44-49; Fireman Depo., at 101-104.

49.   This suit was brought in August 2005, after the conclusion of plaintiffs' five year employment agreements, after plaintiffs had "settled" all accounting issues without resort to the Agreement's accountant arbitration procedure, and after the plaintiffs accepted without reservation earn-out payments for each of the five earn-out years specified in the Agreement. Complaint, at 1; Fireman Depo., at 180-183; Raider Depo., at 210-221.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,


/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: October 31, 2007
       Boston, Massachusetts

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 31st day of October, 2007.

                                          /s/ Gordon P. Katz
                                          Gordon P. Katz