UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————
)
ROBERT FIREMAN and ANN RAIDER,      )
)
Plaintiffs,      )
)
v.      )   CIVIL ACTION NO. 05-1740MLW
)
NEWS AMERICA MARKETING IN-STORE,  )
INC.,      )
)
Defendant.      )
———————————————————)

## ROBERT FIREMAN AND ANN RAIDER'S OPPOSITION TO NEWS AMERICA MARKETING IN-STORE, INC.'S MOTION FOR SUMMARY JUDGMENT

### Introduction

In August of 1999, Plaintiffs Robert Fireman ("Fireman") and Ann Raider ("Raider") and Defendant News America Marketing In-Store, Inc. ("NAM") finalized a Stock Purchase Agreement (the "Agreement") in which NAM agreed to pay Plaintiffs approximately three million dollars upfront for their company, Consumer Card Marketing Inc., ("CCMI") and agreed to increase the purchase price through earn-out targets that both parties agreed were reasonably achievable based on CCMI or its successor's gross margin. The purpose of the agreement was to combine CCMI's product line with NAM's sales force and relationships and allow CCMI's business to continue to expand. NAM clearly stated its intent to commit the resources necessary for CCMI to grow in the Agreement, subject to its ability to operate CCMI within its discretion in good faith.

1

Upon the sale of CCMI, testimony and documents demonstrate that rather than fulfill its obligations under the Agreement to act in good faith and allow both parties the benefit of the bargain, NAM ignored the business plan both parties agreed was the basis for the earn-out provisions, arbitrarily withheld promised resources, and siphoned off key staff to other aspects of NAM's business.  NAM almost immediately marginalized the role of the Raider and Fireman within the company although they held almost all of the expertise within NAM regarding CCMI's business, damaged the brand equity and name recognition CCMI had built over eight years, cancelled all trade advertising, failed to provide sales support to grow the business, and failed to fund necessary software development.  Predictably, the Plaintiffs were unable to meet financial targets all parties had agreed were readily achievable, and Plaintiffs lost millions of dollars in bonuses and earn-out payments.  NAM's arbitrary and unreasonable operation of CCMI after its purchase denied the Plaintiffs the benefits of the bargain they struck and violated the covenant of good faith and fair dealing which was an inherent part of the Agreement under New York law.  While NAM apparently argues that § 6.8 of the Agreement gave it the right to do anything it wanted with CCMI, New York law is clear that discretion, even sole and unfettered discretion, under a contract must be exercised in good faith.  NAM's actions in essentially destroying CCMI represented a complete failure to meet its obligation to act in good faith and frustrated the basic purpose of the Agreement.  NAM's motion for summary judgment must be denied as numerous issues of material fact exist as to whether NAM acted in good faith in exercising its discretion under the Agreement.

**Factual Background**

In the years leading up to its acquisition by NAM, CCMI was operating as a business with a growing national reputation in the supermarket and other retail channels as a leader in the burgeoning loyalty marketing industry.  See Deposition of Ann M. Raider ("Raider Dep.") at 54 (attached as Ex. A to the Affidavit of Charles H. Roumeliotis ("Roumeliotis Aff.", filed herewith).  Among its offerings were card marketing, database management, and targeted marketing programs.  See CCMI Presentation (Roumeliotis Aff. Ex. B).  As it was growing, Raider and Fireman, the owners of CCMI, were approached by numerous companies with opportunities to continue to expand and grow their business.  See Raider Dep. at 124-30 (Roumeliotis Aff. Ex. A).  In order to do this, they determined that a relationship with a national company which could supply additional sales and financial support would foster this growth and allow CCMI to take advantage of their marketplace position and the expanding loyalty card, database management, and targeted marketing industries.  See id. at 130.

At the same time in 1999, NAM, a company looking to expand its marketing reach to new areas of loyalty and targeted marketing, created a new venture group specifically to search out companies such as CCMI.  Deposition of Henri Lellouche ("Lellouche Dep.") at 25-26 (Roumeliotis Aff. Ex. C).  NAM approached CCMI regarding a potential purchase in 1999, as it looked to expand into loyalty marketing, something it viewed as an emerging technology.  Raider Dep. at. 123 (Roumeliotis Aff. Ex. A); Lellouche Dep. at 26 (Roumeliotis Aff. Ex. C).

Before the acquisition of CCMI was completed by NAM in August 1999, the parties went through months of negotiation and due diligence, with NAM discussing extensively both internally and with Plaintiffs their projections for CCMI's future.  May 14, 1999 News American Marketing memorandum (Roumeliotis Aff. Ex. D); Lellouche Dep. at 55-58 (Roumeliotis Aff. Ex. C).  NAM relied on CCMI's vision and expertise in these negotiations to create a vision of where the marketplace for CCMI's business was going.  Lellouche Dep. at 60 (Roumeliotis Aff. Ex. C).  As an example, a May 1999 NAM internal memorandum describing the opportunity and assessing CCMI's value confirms NAM's view that the cost to acquire CCMI was well in excess of nine million dollars in total cash payments (with a present value of over six million dollars), and that it could acquire CCMI for an initial investment of a fraction of that price if it made up the balance of the value (and more) with an earn-out right.  See May 14, 1999 News American Marketing memorandum (Roumeliotis Aff. Ex. D).  Specifically the memorandum stated that:

> Based on the deal structure outline below, *News America's model* assumes the cost to acquire CCMI is $9.8 million in total cash payments.  These payments have a present value of $6.6 million using a 15% discount rate.

Id. (emphasis added).

The earn-out was to be achieved over five years, and was based on targets both companies agreed would almost certainly be achieved if NAM provided certain resources.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A).  Section 2.3 of the Agreement, entitled "Earn-Out" explicitly stated that "[t]he Purchase Price shall be increased by an amount equal to [agreed-upon percentages] of the Gross Margin of the Company." Affidavit of Gordon P. Katz, Ex. 2.

NAM is and was nationally recognized as a leader in direct-mail marketing.  It had a strong sales force and significant financial resources, and committed to use both to drive CCMI's business plan.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A).  NAM intended at the time of signing of the Agreement to promote the sale of CCMI's products using its sales force.  Deposition of David Devoe, Jr. ("Devoe Dep.") at 120 (Roumeliotis Aff. Ex. E).  The business plan was conservative, and was the key to achieving the financial targets necessary to trigger the additional $5 million in earn-out payments. See Raider Dep. at 59-60. (Roumeliotis Aff. Ex. A). In fact, the earn-out provision was specifically tailored to the business plan NAM embraced.  . See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A); Deposition of Robert N. Fireman ("Fireman Dep.") at 111-12, 174-75 (Roumeliotis Aff. Ex. F); see also Devoe Dep. at 115 (Roumeliotis Aff. Ex. E). During the negotiations that led to the acquisition, NAM committed to implementing the business plan.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A); Robert Fireman's Answers to First Set of Interrogatories Propounded by the Defendant ("Fireman's Answers to Interrogatories") at 3-4 (Roumeliotis Aff. Ex. G).  It never did.

After the purchase of CCMI, NAM effectively dismantled the company almost immediately, put little to no effort into expanding CCMI's business through its sales force, destroyed the brand equity CCMI had built up with years of effort in the loyalty marketing (merging the company's assets into SmartSource Direct and other divisions in the SmartSource iGroup), and marginalized the two people who had the most expertise in the loyalty marketing field, Raider and Fireman, instead choosing to hand the management of CCMI's assets over to someone with no experience in that field whatsoever. Lellouche Dep. at 106, 108 (Roumeliotis Aff. Ex. C); May 14, 1999 News

American Marketing memorandum (Roumeliotis Aff. Ex. D) ("[Raider and Fireman] have developed strong relationships with retailers and packaged goods manufacturers based on their expertise in data management and targeted marketing"). NAM's management of CCMI after the purchase was unreasonable, arbitrary, and failed to give Plaintiffs the benefits of the bargain from the Agreement. It became apparent that NAM almost immediately was not interested in developing CCMI's core business as the Agreement contemplated. See Lellouche Dep. at 196 (Roumeliotis Aff. Ex. C). Rather, NAM was simply interested in leveraging certain pieces of CCMI, completely ignoring its responsibility to allow Plaintiffs to receive the benefit of its bargain and failing even to give them an opportunity to achieve their mutually agreed upon revenue targets.

    Most critically, NAM quickly removed or marginalized all of the expertise and talent which CCMI brought into the company, despite the fact that it recognized that one of the core competencies of CCMI involved its expertise and understanding of the marketplace. Lellouche Dep. at 58 (Roumeliotis Aff. Ex. C). In addition, NAM marginalized this expertise with the knowledge that it had no one else within its organization with expertise in loyalty card programs, the main aspect of CCMI's business. Id. at 71-72. Fireman, one of the founders of CCMI was hired, as his employment contract reflects, as the General Manager of the business unit. Katz Aff., Ex. 3. As the General Manager he was to run all of the business aspects of CCMI, as he had prior to the purchase. Fireman's Answers to Interrogatories at 15-16 (Roumeliotis Aff. Ex. G). Starting nearly immediately however, Fireman's job responsibilities were increasingly diminished, he was increasingly marginalized, and virtually all important decisions about CCMI's business were made without his input and without consulting

him.  See Fireman Dep. at 147, 245-47 (Roumeliotis Aff. Ex. F); Deposition of

Christopher Mixson at 160 (Roumeliotis Aff. Ex. H).  Within the few months after the

acquisition, Fireman's responsibilities were given to Henri Lellouche ("Lellouche"), who

had no experience in direct loyalty marketing.  Lellouche Dep. at 106, 108 (Roumeliotis

Aff. Ex. C).  By July 2001, Fireman's role in the operation of CCMI (which had at this

point been renamed to SmartSource Direct), was essentially eliminated and the

responsibilities he had remaining were given to management who had little experience in

loyalty marketing or loyalty card programs.  Lellouche Dep. at 104 (Roumeliotis Aff.

C).  Marty Garofalo, another NAM employee, also took a management role in CCMI's

business at a later point, and he also had no experience in loyalty programs.  Lellouche

Dep. at 145-46 (Roumeliotis Aff. Ex. C).[1]

    Raider, like Fireman, was rapidly marginalized, and was kept from driving sales.

Lellouche Dep. at 144-45 (Roumeliotis Aff. Ex. C).  Although given the title "Senior

Vice President" over sales, she was effectively stripped of any real authority.  Fireman's

Answers to Interrogatories at 8-9, 16-17 (Roumeliotis Aff. Ex. G).  Decisions within the

scope of her job title were made without her input.  Raider Dep. at 82-83 (Roumeliotis

Aff. Ex. A).  Essential resources were withheld.  Fireman's Answers to Interrogatories at

10 (Roumeliotis Aff. Ex. G)  Soon after the sale, she had no sales staff reporting to her,

and was relegated to reporting to another Senior Vice President.  Id. at 16.

    NAM further decimated CCMI's ability to operate by breaking apart CCMI's core

team soon after the acquisition.  One CCMI employee, William Adam ("Adam"), was

essential to the success of the company.  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C)

---

[1] Garofalo also admitted in deposition that at the time of the CCMI acquisition, only Raider and Fireman
had expertise in card distribution and card marketing.  Deposition of Martin Garofalo at 40 (Roumeliotis

Adam was a key architect to the software that analyzed the data obtained at the point of sale, and was an essential part of the team that made sales pitches to stores to license this technology.  Raider Dep. at 257-59 (Roumeliotis Aff. Ex. A).  After denying Adam a deserved raise to continue his critical work with CCMI, NAM offered him a substantial raise to leave CCMI and move to Connecticut, despite recognizing that he was "a critical part of the CCMI team".  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C); see also Devoe Dep. at 75 (Roumeliotis Aff. Ex. E) ("I believe Bill was an important asset.").  In addition, several other CCMI technical staff employees were shifted out of CCMI to work on NAM's base business. Fireman's Answers to Interrogatories at 13 (Roumeliotis Aff. Ex. G).

Virtually nothing was done to replace these assets and the talent lost, and NAM failed to hire necessary employees to allow CCMI's business to grow.  Fireman's Answers to Interrogatories at 11-12 (Roumeliotis Aff. Ex. G).  NAM claimed that it had a hiring freeze, and that it had a policy that precluded it from adding "head count" unless revenues increased to the point where it met its internal criterion.  See Fireman's Answers to Interrogatories at 10-12 (Roumeliotis Aff. Ex. G); Raider Dep. at 82-83 (Roumeliotis Aff. Ex. A); Fireman Dep. at 281-82 (Roumeliotis Aff. Ex. F).  Full staffing was not even *allegedly* achieved until October 2001, over two years after the acquisition of CCMI in August 1999.  SmartSource Direct Strategies March 14, 2002, Management Overview (Roumeliotis Aff. Ex. J).

In addition to marginalizing key CCMI employees, breaking up the core CCMI employee group, and failing to fulfill necessary staff positions, NAM also refused to use its sales force to promote CCMI's products with manufacturers, essentially making it

Aff. Ex. I).

impossible for CCMI to sell their product to a vast array of potential clients.  This precluded CCMI's growth in this essential sector, and therefore cost CCMI tens of millions of dollars in revenue.  See Fireman's Answers to Interrogatories at 10-11 (Roumeliotis Aff. Ex. G).   Despite NAM's early recognition that "in order for our sales to be helpful at all, they would need to have a better understanding of the product", the main sales force NAM was never trained or utilized to market CCMI's business.  Devoe Dep. at 123 (Roumeliotis Aff. Ex. E); June 1, 2000 e-mail from A. Raider to H. Lellouche (Roumeliotis Aff. Ex. K); Fireman's Answers to Interrogatories at 10 (Roumeliotis Aff. Ex. G).

Further, NAM frequently refused to allow CCMI to exhibit at trade shows, a critical component of building CCMI's business in the loyalty marketing field.  Lellouche Dep. at 170-71 (Roumeliotis Aff. Ex. G); June 1, 2000 e-mail from Raider to Lellouche (Roumeliotis Aff. Ex. L).  Despite the fact that Raider and Fireman made it clear that exhibit at trade shows was critical for building business, Lellouche never even attempted to explore with senior management that due to CCMI's unique products and position in an emerging marketplace, it might be prudent to make an exception to NAM's policy prohibiting trade show exhibitions in this case.  Lellouche Dep. at 171-72 (Roumeliotis Aff. Ex. C).  In fact, Lellouche believed that such shows were irrelevant, in direct contradiction to Raider and Fireman's belief that trade shows were critical to developing CCMI's business in the marketplace.  Similarly, Lellouche refused to even attempt to seek advertising in trade publications.  Id. at 180-81.

In addition, NAM's mishandled CCMI's database technology and unilaterally decided that CCMI would no longer support Marketing Analysis Software (MAS) that

CCMI was using to track its loyalty card program holders although CCMI had no other internal product to offer to its clients, causing the loss of client relationships. Fireman's Answers to Interrogatories at 13-14 (Roumeliotis Aff. Ex. G).    NAM subsequently delayed in the implementation of new software, was unable to resolve the technical issues, and due to the delay left CCMI's business without a tool for its core loyalty management services. Id.   While the new "Epiphany" software was selected by Adam and Fireman, Fireman was marginalized during its implementation and had no opportunity to assist in developing the new product. See Fireman Dep. at 129-130, 179 (Roumeliotis Aff. Ex. F). The new Epiphany software was integrated into other NAM divisions as well, requiring the purchase of additional "seats" for the software which CCMI did not require. Id. at 130-31.  CCMI bore the burden of cost of these additional "seats" while receiving none of the benefit.

All of these issues were repeatedly brought to the attention of NAM executives with no impact.  In a letter sent on October 22, 1999 to David Devoe, CFO at the time of NAM, just months after the acquisition, issues were already being raised evidencing how NAM was completely stifling the growth of CCMI.  October 22, 1999 Letter (Roumeliotis Aff. Ex. M).  NAM was already at this point failing to provide key staff and failing to provide sales support to CCMI.  Id.  Months later, in May 2000, these issues had not been resolved and were brought again to the attention of Lellouche, who at this point had taken over management responsibility of CCMI.  May 18, 2000 Memo (Roumeliotis Aff. Ex. N).  Again, Raider stressed how no staff had cost them hundreds of opportunities and how the lack of advertising and public relations support had decimated CCMI's reputation.  Id. In October 2000, Fireman sent a memo to NAM executive Chris

Mixson, again emphasizing in detail how NAM had completely ignored the expertise of

CCMI's founders, Fireman and Raider, and unreasonably withheld resources, completely

stunting CCMI's ability to even approach the targets contemplated by the Agreement.

October 17, 2000 Memo (Roumeliotis Aff. Ex. O).  Fireman and Raider additionally

continued to raise concerns with David Devoe about NAM's complete lack of

commitment to supporting CCMI's business.  See September 11, 2000 Letter

(Roumeliotis Aff. Ex. P); December 7, 1999 Memo (Roumeliotis Aff. Ex. Q).

As amply demonstrated above, the business relationship between CCMI and

NAM was defined by an abject refusal to act in good faith.  NAM failed completely to

give Plaintiffs and CCMI any opportunity to receive the benefit of their bargain under the

Agreement, and instead actively and unreasonably withheld resources and marginalized

key employees such that CCMI would have no opportunity to achieve the growth which

both parties to the Agreement envisioned.

## Argument

### I.     Summary Judgment Standard

"Summary judgment is proper only if the record, read favorably to the non-

moving party, reflects no genuine issues of material fact and the undisputed facts indicate

that the movant is entitled to judgment as a matter of law." T-Peg, Inc. v. Vermont

Timber Works, Inc., 459 F.3d 97, 111 (1st Cir. 2006) (quoting Hadfield v. McDonough,

407 F.3d 11, 15 (1st Cir.2005)).  If a reasonable fact finder, drawing all reasonable

inferences in the nonmoving parties favor could resolve disputed facts in favor of the

nonmoving party, then summary judgment is inappropriate.  Serapion v. Martinez, 119

F.3d 982, 987 (1st Cir. 1997); Thomas v. Metropolitan Life Ins. Co., 40 F.3d 505, 508

(1st Cir. 1994).  Genuine issues of material fact as to whether a party to a contract acted

in violation of the covenant of good faith and fair dealing must preclude the issuance of

summary judgment.  See Trent Partners and Assoc., Inc. v. Digital Equipment Corp., 120

F.Supp.2d. 84, 101 (D. Mass. 1999).

    **II.**    **There Exist Genuine Issues Of Material Fact As To Whether NAM Did Not Act In Good Faith In Exercising Its Discretion Under The Agreement**

        **a.**    **New York law requires that a party to a contract exercise its discretion in good faith.**

    If NAM's formulation of its rights under the Agreement is credited, then NAM

would have been within its rights to shut CCMI down the day after it purchased the

company.  NAM defines its rights under the Agreement as the right to act in any way it

chose – that it had effectively contracted out of the obligation to act in good faith.

However, the law is plainly contrary.  It is clear under New York law that, "[e]ven when

a contract confers decision-making power on a single party, the resulting discretion is

nevertheless subject to an obligation that it be exercised in good faith."  Travellers Int'l

A.G. v. Trans World Airlines, 41 F.3d 1570, 1575 (2d Cir. 1999) (citing Carvel Corp. v.

Diversified Management Group, Inc., 930 F.2d 228, 231 (2d Cir.1991); Cross & Cross

Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir.1989)).  The implied

covenant of good faith, inherent in every New York contract, does not conflict with

NAM's "sole and unfettered" discretion; rather it requires NAM "to exercise its

discretion in good faith and not to act arbitrarily."  deCiutiis v. NYNEX Corp., 1996 WL

512150, *3 (S.D.N.Y. Sept. 9, 1996) (attached as Exhibit A).  Contrary to NAM's central

argument, "sole discretion is not necessarily the equivalent of for any reason whatsoever,

no matter how arbitrary or unreasonable." Id. (quoting Tymshare, Inc. v. Covell, 727

F.2d 1145, 1154 (D.C. Cir. 1984) (Scalia, J.)) (internal quotations omitted).

   This case law expressly contradicts NAM's contention that it had absolutely no

restriction on how it ran the CCMI business.  While NAM plainly saw the "sole

discretion" provision in § 6.8 of the Agreement as a complete license to deny Plaintiffs

any opportunity to achieve the Purchase Price[2] the parties negotiated, New York is clear

that NAM's sole discretion is bounded by the covenant of good faith and fair dealing.  In

Richbell Information Services, Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302

(N.Y.A.D. 2003), the court expressly stated that "even where one has an apparently

unlimited right under a contract, that right may not be exercised solely for personal gain

in such a way as to deprive the other party of the fruits of the contract."  The court further

held:

> [t]his limitation on an apparently unfettered contract right may be
> grounded…on the purely contractual rule that even an explicitly
> discretionary contract right may not be exercised in bad faith so as to
> frustrate the other party's right to the benefit under the agreement.

Id. see also TIG Ins. Co. v. Newmont Mining Corp, 413 F. Supp. 2d 273, 281 (S.D.N.Y.

2005) ("One party's discretion cannot go so far as to enable the party to eviscerate a term

of the contract and frustrate a fundamental purpose underlying the agreement."

(Quotations and citations omitted.)); Hirsch v. Food Resources, Inc., 24 A.D.3d 293, 296

(N.Y. App. Div. 2005) (implied covenant breached where unfettered contractual right

exercised so as to "frustrate the basic purpose of the agreement").  NAM cannot refute

this law, which clearly contradicts its central contention that it had the unlimited right to

---

[2] The choice of words the parties used to describe (in part) the Earn Out is telling.  The Earn Out was not
simply some ephemeral bonus that might be achieved if fate aligned, but instead was part of the anticipated

operate CCMI in any manner it chose because of the discretion granted to it in § 6.8 of

the Agreement.  Rather, New York law as seen above places limits on a party with

unfettered contract discretion, such as NAM, requiring that NAM exercise that discretion

in good faith so as to not frustrate CCMI's right to the benefit of the bargain.

NAM's reliance on <u>VTR, Inc. v. Goodyear Tire & Rubber Co.</u>, 303 F.Supp. 773,

775 (S.D.N.Y. 1969) is inapposite.  Notwithstanding the fact that as seen above,

numerous cases decided since <u>VTR</u> have recognized that a party must exercise its

discretion in good faith, the <u>VTR</u> holding has been expressly limited to its statement that

"(a)s to acts and conduct authorized by the express provisions of the contract, no

covenant of good faith and fair dealing can be implied which forbids such acts and

conduct." <u>VTR</u>, 303 F.Supp. at 778; <u>see also</u> <u>Zilg v. Prentice-Hall, Inc.</u>, 515 F.Supp. 716,

718 (S.D.N.Y. 1981).  In <u>VTR</u>, the Defendant was expressly given the right to undertake

actively specified activities, such as close stores which it had bought from the Plaintiff

and sell the products it bought from Plaintiff in various other stores.  <u>Id.</u> at 775-76.  The

contract in <u>VTR</u> did not vaguely allow the Defendant to operate the company in its sole

and unfettered judgment as is the case here, but rather expressly outlined the specific

actions and activities over which it had complete discretion.  <u>Id.</u>  In <u>VTR</u>, the express

covenant could not override these detailed, express provisions.

In <u>Zilg v. Prentice-Hall, Inc.</u>, decided after <u>VTR</u>, the court determined that

although the publisher had the discretion to determine the number of copies of a book it

printed and the manner and means of advertising the book among other things, its

discretion was limited by the covenant of good faith and fair dealing.  516 F.Supp. at

---

consideration for the CCMI acquisition.  This further supports the view that NAM was obliged to act in a
way that would allow CCMI to get paid for what it sold.

718-719.  Unlike in VTR, where the implied covenant of good faith could not prevent

VTR from exercising the powers expressly detailed in the contract, in Zilg the covenant

did not conflict with the Defendant's ability to determine the advertising and number of

books it printed.  Critically, the court held that the Defendant in Zilg could make those

determinations, but had to make them in good faith.

Similarly in this matter, NAM had the power under the Agreement to operate

CCMI in its discretion.  Unlike in the VTR matter however, NAM did not expressly in

clear terms within the Agreement have the right to remove all key staff from CCMI, or

the right to completely shut down CCMI, as the contract in the VTR case contemplated.

Rather, as in the Zilg case, the application of the implied covenant of good faith and fair

dealing does not forbid NAM from using its discretion, it merely requires that they

exercise this discretion in good faith.  As the numerous cases cited above illustrate and

contrary to NAM's position, NAM cannot use the discretion it was granted in the

Agreement as a complete firewall to do whatever it pleased with CCMI.  A grant of

discretion does not remove the duty to act in good faith under a contract.  Travellers Int'l

A.G., 41 F.3d at 1575; Carvel Corp 930 F.2d at 231; Cross & Cross Properties, Ltd., 886

F.2d at 502;  TIG Ins. Co., 413 F. Supp. 2d at 281; Hirsch, 24 A.D.3d at 296; Richbell,

309 A.D.2d at 302.

**b.  Issues of material fact exist as to whether NAM exercised its discretion under the Agreement in good faith.**

As New York law plainly imparted an obligation on NAM to exercise its

discretion in operating CCMI in good faith, the remaining question is whether genuine

issues of material fact exist as whether NAM did so.  As detailed in the factual

background above, there is ample evidence which exists under which a reasonable factfinder could find that NAM did not operate CCMI in good faith after the acquisition.

In a broad sense, the question of whether a party to a contract has failed to act in good faith will be a question of fact which is generally not suitable for summary judgment.  See Zilg, 515 F.Supp. at 719.  As the court in Zilg noted in determining whether a court should determine whether a party acted in good faith at the summary judgment stage,

> [t]he burden plaintiff must meet here to prove that the defendant failed to act in good faith is substantial.  However, intent can rarely be established by direct evidence, and must often be proved circumstantially and by inference.  Intent is therefore peculiarly inappropriate to be decided on a motion for summary judgment.

Id.; see also Nynex Corp., 1996 WL 512150 at *4.  Here, Plaintiff have advanced substantial evidence through documents and deposition testimony detailing how NAM dismantled the core of CCMI and failed to support it meaningfully after the acquisition. See Factual Background, supra p. 2-9.  There is no question that based on this evidence, a rational factfinder could make the inference that NAM did not act in good faith in operating CCMI after the acquisition.

Testimony and other discovery have repeatedly demonstrated that the two founders of CCMI who had the only recent expertise in loyalty marketing at the time of the acquisition, Raider and Fireman, were almost immediately marginalized and prevented from using their expertise to grow CCMI as the Agreement contemplated. They were effectively prevented from building their client connections and expanding the company and stifled from having any opportunity to achieve the earn-outs contemplated by § 2.3 of the Agreement.  See, e.g., Fireman Dep. at 147, 245-47 (Roumeliotis Aff. Ex.

16

F); Mixson Dep. at 160 (Roumeliotis Aff. Ex. H); Raider Dep. at 82-83 (Roumeliotis

Aff. Ex. A); Fireman's Answers to Interrogatories at 10 (Roumeliotis Aff. Ex. G).

Furthermore, evidence indicates that NAM unreasonably prevented CCMI from

attending the trade shows and using trade advertising to grow the business. Management

put in charge of CCMI by NAM failed even to attempt to address the issue with senior

management despite the continued protestations of the Raider and Fireman that these

activities were critical for expanding business in the loyalty marketing field. See, e.g.

Lellouche Dep. at 170-72, 180-81 (Roumeliotis Aff. Ex. C); June 1, 2000 e-mail from

Raider to Lellouche (Roumeliotis Aff. Ex. L).

In addition, NAM broke up what it recognized as the critical core of CCMI's

leadership and sales group, sending key employee William Adam out of the company and

failing to replace his expertise. Adam was sent to a different NAM office and was often

unavailable to work with CCMI while he worked on other projects for NAM. See, e.g.,

Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C); Raider Dep. at 257-59 (Roumeliotis Aff.

Ex. A); Devoe Dep. at 75 (Roumeliotis Aff. Ex. E). NAM took over two years to staff

CCMI fully and never gave it the manufacturing sales support it needed to grow its

business. See, e.g., Devoe Dep. at 123 (Roumeliotis Aff. Ex. E); June 1, 2000 e-mail

from A. Raider to H. Lellouche (Roumeliotis Aff. Ex. K); Fireman's Answers to

Interrogatories at 10 (Roumeliotis Aff. Ex. G). NAM delayed in the implementation of

new software, was unable to resolve the technical issues in the software, and due to the

delay left CCMI's business without a tool for its core loyalty management services. See

Fireman's Answers to Interrogatories at 13-14. One NAM executive testified that NAM

did not believe it had to act in good faith, testifying in deposition that he believed that

NAM could have simply abandoned CCMI's business after the acquisition. Devoe Dep. at 135 (Roumeliotis Aff Ex. C). All of these actions without doubt raise at the least an inference that NAM did not fulfill its obligation under the Agreement in good faith and instead looked to dismantle CCMI and leverage some of its assets for itself while ignoring the innumerable opportunities for growth presented by Raider and Fireman.[3]

NAM's reliance on language in Keene Corp. v. Bogan, 1990 WL 1864 (S.D.N.Y. 1989) and its overall contention that it did not intend to lose money fails to recognize the thrust of Plaintiffs' claim. It appears that by NAM's reasoning, it could have bought CCMI, used all its assets and expertise in any way it saw fit to make money, and thus fulfilled its duty of good faith. This line of thought fails for several reasons. One example lies in the evidence surrounding the transfer of key CCMI employee William Adam to another NAM facility. While NAM certainly looked to utilize Adam's expertise and leverage his talents after the transfer for its own purposes, the loss of Adam and other technology staff was a critical blow to the growth of the CCMI business. See Fireman's Answers to Interrogatories at 11-12 (Roumeliotis Aff. Ex. G). For Raider and Fireman to receive the benefits of the bargain they struck with NAM, they needed to act in good faith and not completely stifle Plaintiff's ability to reach the conservative earnings targets expressly contemplated as part of the purchase price under the Agreement in §2.3.

Unlike in Keene, where there was no evidence that the defendant had refused to act in good faith and no evidence that business was shifted to other divisions, here the

---

[3] While the Court has delayed further expert discovery until the conclusion of the summary judgment briefing, Plaintiffs briefly note that the two expert reports submitted both explain how the market in CCMI's industry exploded in the period between 1999-2002 and how CCMI would have experienced the growth envisioned at the time of the acquisition had NAM followed the business plan the parties based the earn-out provision of the Agreement on. See Robert Fireman and Ann Raider's Motion for Leave to Disclose Experts Beyond Expert Disclosure Date, Ex. A and B, filed August 10, 2007.

record is replete with evidence that NAM stifled opportunities for CCMI to grow and shifted key assets to other divisions such as William Adam. See 1990 WL 1864 at *15-16. The evidence presented creates an issue of material fact as to whether NAM was unreasonable in its actions in among other things, marginalizing all of the expertise in loyalty marketing that existed in CCMI, failing to use its large sales force to leverage CCMI products, shifting key assets to other divisions, and refusing to let CCMI use trade shows and advertising to build the business. The sole discretion in a contract does not give NAM the ability to do with CCMI entirely what it pleased at the expense of Raider and Fireman's ability to receive the benefit of their bargain. Nynex Corp., 1996 WL 512150 at *3.

> ### III. The Agreement Did Not Contain An Explicit, Unmistakable, And Unequivocal Statement That Plaintiffs Could Not Bring A Claim Under All Provisions Of The Agreement.

"For a document to constitute a release from liability, it must contain an *explicit, unmistakable and unequivocal* statement by one party that it intends to abandon its right to prosecute a present or future claim against the other party." Joao v. Cenuco, Inc., 376 F.Supp.2d 380, 383 (S.D.N.Y. 2005) (emphasis added). As the "law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing], a release which purports to excuse a party from responsibility for misconduct is subject to the "closest of judicial scrutiny." Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 515 (2d Cir. 2001) (citing Abramowitz v. N.Y. Univ. Dental Ctr., Coll. of Dentistry, 494 N.Y.S.2d 721, 723 (2d Dep't 1985)).

Here, there is no viable argument that the language in § 6.8, which states that "Sellers shall have no claim against Buyer in connection therewith as a result of the

preceding sentence" can be read so broadly or clearly as to represent an explicit,

unmistakable, and unequivocal statement that Raider and Fireman intended to abandon

all its rights under the Agreement.  First, the crux of Raider and Fireman's claims involve

the question of whether NAM exercised its "sole and unfettered discretion" in good faith.

The grant of sole and unfettered discretion in the Agreement is not part of the "preceding

sentence" in § 6.8 and thus claims regarding that exercise of sole and unfettered judgment

are explicitly allowed.  Furthermore, Raider and Fireman's claims are also based on other

portions of the Agreement, such as § 2.3, which contemplates addition to the purchase

price in the form of earn-out payments.  Fundamentally, this case involves NAM's lack

of good faith in allowing Plaintiffs to recognize the benefits of the bargain they struck.

Nowhere does the language NAM relies on stated explicitly or unequivocally that have

no claims whatsoever as to whether NAM acted in good faith in operating CCMI, as it

was required to.  To read such into the language NAM relies upon would be to negate the

implied covenant of good faith and fair dealing altogether, which of course cannot be

done.  NAM should not be absolved from its wrongdoing due to a statement which

clearly does not release NAM of its obligation to act in good faith.  Under New York law,

which requires the language to holdup to the closest of judicial scrutiny, NAM's

argument that it was absolved from acting in good faith cannot stand.  Golden Pacific

Bancorp v. F.D.I.C., 273 F.3d at 515.

IV.    **Plaintiffs Are Not Estopped From Claiming That NAM Did Not Act In Good Faith Under The Agreement**

NAM attempts briefly to argue that Plaintiffs are estopped from arguing whether

NAM acted in good faith under the terms of the Agreement.  For several reasons, this

argument fails.  First, unlike the parties in two of the cases NAM cites supporting its

position, Plaintiffs are not looking to terminate the Agreement.  See Savasta v. 470 Newport Assocs., 579 N.Y.S.2d 167, 169 (1993) (plaintiffs looking to terminate agreement); Banque Nationale de Paris v. 1567 Broadway Ownership Assocs., 625 N.Y.S.2d 152, 154 (N.Y. App. Div. 1st Dep't 1995 (party looking to repudiate contractual commitments).  In Savasta and Banque Nationale, the parties were looking to terminate agreements in which they had accepted benefits.  Id.  Here, Plaintiffs readily admit that there was a valid Agreement and are looking to enforce its terms, primarily NAM's obligation to act in good faith in exercising its discretion under the Agreement. In El Reda v. Love Taxi, Inc., the other case cited by NAM, plaintiffs were attempting to argue that a deduction taken from their salaries for fifteen years was suddenly not acceptable.  608 N.Y.S.2d 656, 657-58 (N.Y. App. Div. 1st Dep't 1994).  The case did not involve the defendant acting in good faith and the court expressly noted that the plaintiffs had never objected to defendant's actions either during the time the deductions were made or in a reasonable time thereafter.  Here, there is ample evidence that Plaintiffs strenuously objected to NAM's actions nearly immediately and brought this action alleging their lack of good faith within the applicable statute of limitations period. NAM has cited no case to support its apparently novel contention that it could be absolved from its obligation to act in good faith under the Agreement because Plaintiffs did not willingly refuse the small benefits they were receiving despite NAM's lack of good faith.[4]

---

[4] Additionally, it is illogical to prevent Plaintiffs from claiming that NAM did not act in good faith when at the time of accepting benefits it did not have all of the facts regarding issues such as NAM's internal communications regarding its operation of CCMI in front of it.  See Int'l Sport Divers Ass'n v. Marine Midland Bank, N.A., 25 F.Supp.2d 101, 111 (E.D.N.Y. 1998) ("while several of the cited cases acknowledge that estoppel can be based upon the acceptance and retention of benefits, they go on to hold that estoppel is appropriate where the party who benefitted had knowledge or notice of information which it later attempts to use to contest the transaction at issue.")

### V.    Plaintiffs' C. 93A Claim Is Not Barred By The Agreement

As to NAM's claim that the choice of law provisions bar Plaintiffs' c. 93A claims, Section 8.2 of the Agreement, entitled "Governing Law; Jurisdictions" states in relevant part that "[t]his *agreement* shall be governed by, and construed and enforced in accordance with the laws of the State of New York." Katz Aff. Ex. __, § 8.2. (emphasis added). Critically, the plain language of this portion of the Agreement does not state that all of the rights of the parties are to be governed by New York law, merely the Agreement. In Jacobson v. Mailboxes, Etc., U.S.A., 419 Mass. 572, 580, n.9 (1995), the Supreme Judicial Court noted the importance of this distinction, stating in the context of interpreting a choice-of-law provision in a contract that,

> The agreement does not state that the rights of the parties are to be governed by California law but only that the agreement is to be governed and construed by California law. *The choice of law clause does not purport to bar the application of G.L. c. 93A to the parties' dealings in Massachusetts.*

See also Stagecoach Transp., Inc. v. Shuttle, 50 Mass. App. Ct. 812, 819 (2001) ("because the choice of law clause does not purport to declare that the rights of the parties are to be governed by New York law, the application of G.L. c. 93A to the parties' dealings is not barred."); 52 MASS. PRAC. § 12.9 ("Where a choice of law clause exists which is limited to the validity, interpretation, or performance of a particular contract, such a clause does not govern choice of law for 93A claims based upon pre-contract wrongs, and probably also does not govern 93A claims based upon performance of the contract itself.")

NAM's second argument as to the c.93A claim, that it fails because it arises out of a venture or "intra-enterprise" dispute, also must fail. The Agreement describes an

22

acquisition of CCMI, not the creation of a joint venture. [5]  In addition, any argument that Plaintiffs are barred from asserting their claims because of the employee-employer relationship that existed between the parties simply misunderstands the claims.  The crux of Plaintiffs' claims lies not in their relationship with NAM as employees, but rather in their relationship with NAM as two parties to a contract in which NAM purchase Plaintiff's business.  As demonstrated above, the claims revolve around NAM's failure to fulfill its obligations under the Agreement, a dispute that unquestionably arises in trade or commerce in the signing of the Agreement.

## VI.    Count III (Declaratory Judgment) Of The Complaint Is Not Barred By The Agreement

NAM's argument that Count III should be dismissed because of the arbitration procedure outlined in the Agreement and because there is no evidence of unaccounted revenue misunderstands the nature of the claim.  Fundamentally, the claim, rather than disputing the specific method or procedure for calculating the earn-out in the Agreement, instead looks to seek an interpretation of the definition of the term "Company" in the Agreement and how its successors should be determined.  Plaintiffs are alleging that the interpretation of "Company" under the Agreement to only include SmartSource Direct when in fact many of the CCMI's company assets were used in other divisions of NAM and thus were "successors" to CCMI misinterprets the language of the Agreement.

---

[5]  If NAM's intent is to implicate that the Agreement in some way created a joint venture between the parties which bars a claim under c. 93A, additional issues of material fact would clearly be raised.  A joint venture is defined as "[a] business undertaking by two or more persons engaged in a single defined project. The necessary elements are: (1) an express or implied agreement; (2) a common purpose that the group intends to carry out; (3) shared profits and losses; and (4) each member's equal voice in controlling the project." Black's Law Dictionary (8th Ed. 2004).  Should this Court determine that the parties may have been (or were) joint adventurers, then they owed each other fiduciary duties.  See Meinhard v. Salmon, 249 N.Y. 458, 463-64 (N.Y. 1928) ("Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty....Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.") (Cardozo, J.)

Evidence exists that key CCMI assets were used in other divisions within the SmartSource iGroup and technology implementation and expenses credited against CCMI's revenues were used by the entire iGroup.  See Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C); see also Devoe Dep. at 75 (Roumeliotis Aff. Ex. E); Fireman's Answers to Interrogatories at 13-14 (Roumeliotis Aff. Ex. G).  Count III does not implicate the arbitration provision of the Agreement because rather than debating the details of earn-out calculations, it seeks a more general declaration that the Agreement contemplated the "Company" and its successors to include the companies using CCMI's assets.

## Conclusion

For all of the foregoing reasons, Plaintiffs respectfully request that Defendant's motion for summary judgment be denied.

Respectfully submitted:

ANN RAIDER AND ROBERT FIREMAN

By their attorneys,


/s/ Charles H. Roumeliotis
Kevin T. Peters (BBO #550522)
David H. Rich (BBO #634275)
Charles H. Roumeliotis (BBO #657553)
Todd & Weld LLP
28 State Street
Boston, MA  02109
Dated:  December 5, 2007              (617) 720-2626

24

<u>CERTIFICATE OF SERVICE</u>

I, Charles H. Roumeliotis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: December 5, 2007                          /s/ Charles H. Roumeliotis
                                                Charles H. Roumeliotis

EXHIBIT A

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1996 WL 512150 (S.D.N.Y.), 12 IER Cases 150
(Cite as: 1996 WL 512150 (S.D.N.Y.))

▷
United States District Court, S.D. New York.
Ernest deCIUTIIS, Plaintiff,
v.
NYNEX CORPORATION, Defendant.
No. 95 Civ. 9745 (PKL).

Sept. 9, 1996.

Mario Aieta, Aieta & Greco, New York City.

Richard H. Wagner, New York City.

Robin Schecter, New York City.

*MEMORANDUM ORDER*

LEISURE, District Judge:

**\*1** Pursuant to Fed.R.Civ.P. 12(b)(6), defendant moves to dismiss all eight of plaintiff's claims for failure to state a claim upon which relief can be granted. The first two claims, for breach of contract and quantum meruit, arise from a controversy distinct from that underlying the remaining claims. The remaining claims can be broken into two groups, three through five, and six through eight, which arise from similar factual transactions and put forward the same legal causes of action. Specifically, these causes of action are breach of contract, breach of the implied covenant of good faith, and unjust enrichment. For the reasons stated below, defendant's motion is granted with respect to claims one, two, three, five, six, and eight, and denied for claims four and seven.

BACKGROUND
Plaintiff, Ernest deCiutiis, was employed by the NYNEX Corporation as a Special Services Technician. His responsibilities in this position did not extend to customer relations. In October 1990, Mr. deCiutiis was invited by the Superintendent of Schools of the Dover Union Free School District to review a proposal being considered by the Board of Cooperative Educational Services of Dutchess County, New York ("B.O.C.E.S."). The proposal, the "Distance Learning Project," involved providing a video link between various schools via the installation of a fiber optic network.

Approximately one month later, Mr. deCiutiis discussed this matter with a supervisor, John Puckharber, who informed him that B.O.C.E.S. was not considering NYNEX for the project. Mr. Puckharber did, however, authorize Mr. deCiutiis to continue pursuing the opportunity on behalf of NYNEX. Between November 1990 and March 1991, plaintiff spent substantial time attempting to get the contract for NYNEX.

In March 1991, plaintiff stated to another official of NYNEX, Tom McCambridge, that he believed that his efforts had taken too much time away from his private life and he could no longer continue without being compensated for them. Mr. McCambridge told plaintiff to continue his activities and assured him that he would be compensated "in a business-like fashion." Mr. deCiutiis continued his involvement with B.O.C.E.S. until September 1992.

In 1992, B.O.C.E.S. chose NYNEX as the contractor for its project, which would eventually earn the company in excess of $6 million in revenue. NYNEX then selected Mr. deCiutiis as a "New York Telephone [FN1] Presidential Award Winner" in recognition of his services in obtaining the contract, indicating that his accomplishments were outside of his normal duties. NYNEX declined to compensate him for his activities. deCiutiis seeks from NYNEX a sum of $600,000 for breach of contract and the same sum under a theory of quantum meruit.

> FN1. New York Telephone has since become the NYNEX Corporation.

Plaintiff's claims three through eight are independent of this dispute concerning the B.O.C.E.S. contract. These claims instead pertain to a suggestion plan initiated by NYNEX. The plan, entitled the "Idea Magic Program," established a procedure for employees to submit suggestions that might benefit the company. In return, the employee would be considered for a cash award of up to $50,000. The specific details of the program were set out in the "Idea Magic Official Rules & Regulations."

**\*2** Plaintiff submitted two different ideas to the program. One idea, submitted on October 21, 1992, suggested the use of video-conferencing equipment in NYNEX's internal employee training programs as a means of saving travel, lodging, and other expenses. Some five months later, NYNEX informed Mr. deCiutiis that his suggestion had been

Not Reported in F Supp                                                                    Page 2
Not Reported in F.Supp., 1996 WL 512150 (S D N Y ), 12 IER Cases 150
(Cite as: 1996 WL 512150 (S.D.N.Y.))

ruled ineligible for consideration under the Idea Magic Program.    During the same month, Mr deCiutiis read in a NYNEX internal newsletter that an employee training program using video-conferencing would be implemented

Mr deCiutiis's other suggestion, submitted on March 23, 1994, proposed the use of "mini-cell" sites in order to make more feasible and cost-effective the widespread installation and operation of transmission sites for cellular telephone signals.    About six months later, NYNEX informed Mr. deCiutiis that this idea would not be adopted.    According to the complaint, in or after the same month, NYNEX in fact adopted the idea by implementing mini-cell sites. Mr   deCiutiis  received   no   award   for   either suggestion.    With regard to the video-conferencing idea, plaintiff asserts claims three, four, and five, namely, breach of contract, breach of the implied covenant of good faith, and unjust enrichment.    With regard to the mini-cell site idea, plaintiff repeats the same causes of action in claims six, seven, and eight. He seeks $50,000 compensation for each idea.

### DISCUSSION
*I. General Standard for a Rule 12(b)(6) Motion to Dismiss*

In deciding defendant's Rule 12(b)(6) motion to dismiss, the Court accepts as true the material facts alleged in the complaint and draws all reasonable inferences in plaintiff's favor.   *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995).    In addition, the Court takes into consideration any document attached to the complaint as an exhibit. *See Brass v. American Film Technologies,* 987 F.2d 142, 150 (2d Cir.1993).    A motion to dismiss cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).    A Rule 12(b)(6) motion cannot be granted simply because recovery appears remote and unlikely on the face of a complaint, because "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer,* 416 U.S. at 236)) (internal quotation marks omitted)

*II Claims One and Two   Breach of Contract and Quantum Meruit in Connection with the B O C E S Project*

Plaintiff's first cause of action against NYNEX is one for breach of contract, claiming that NYNEX is contractually bound to compensate him for negotiating on its behalf.    Section 5-701(a)(10) of New York's General Obligations Law states that an agreement to pay compensation for negotiating a business opportunity is void unless the agreement is in writing.    "Negotiating" includes assisting in the consummation    of    a    transaction.         *See* N.Y.Gen.Oblig.Law   §   5- 701(a)(10).        The New York Court of Appeals has noted that "the scope of the term 'business opportunity' has been differentially applied."   *Freedman v. Chemical Constr. Corp.,* 43 N.Y.2d 260, 266, 372 N.E.2d 12, 16, 401 N.Y.S.2d 176, 181 (1977).    However, New York courts have applied section 5- 701(a)(10) to activities like those alleged in this case.    In *Freedman,* the court found that an agreement by which the plaintiff "was to use his 'connections', his 'ability', and his 'knowledge' to somehow procure" a construction contract for the defendant fell within the statute.   *Id.* at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181

*3 Thus, the statutory provision applies to plaintiff's efforts to obtain the B O C E S contract for NYNEX, and the alleged agreement falls within the reach of the statute of frauds  [FN2]    Because plaintiff does not    allege    that    any    agreement    regarding compensation on the B O.C E.S project was reduced to writing, the alleged agreement for compensation is void under New York's General Obligations Law section 5-701(a)(10).    Accordingly, the motion to dismiss the breach of contract claim is granted

> FN2. Plaintiff argues that his efforts on NYNEX's behalf should be characterized as marketing services rather than as the negotiation of a business opportunity and that such services are outside the scope of § 5-701(a)(10).    This    argument    is unconvincing.   Plaintiff's allegations show that he acted as an intermediary in promoting a specific NYNEX service, in order to procure a specific contract.   As the court in *Freedman* put it, plaintiff's activity is "that of providing 'know-how' or 'know-who' in bringing about between principals an enterprise of some complexity," and thus the services are within the scope of the provision. *Freedman,* 43 N.Y.2d at 267, 372 N.E.2d at 16, 401 N.Y.S.2d at 181

Plaintiff's second cause of action proceeds on a theory of quantum meruit for services rendered in

Not Reported in F Supp                                                                 Page 3
Not Reported in F Supp , 1996 WL 512150 (S D N Y ), 12 IER Cases 150
(Cite as: 1996 WL 512150 (S.D.N.Y.))

obtaining the B O C E S contract   According to the New York Court of Appeals, the purpose of the statute of frauds provision relating to negotiation of a business opportunity is to protect businesses from claims for commission in the absence of a written agreement, and this policy extends to claims stated under a theory of quantum meruit   See *Minichiello v. Royal Business Funds Corp.,* 18 N.Y.2d 521, 525-26, 223 N.E.2d 793, 795, 277 N.Y.S.2d 268, 270-71 (1966) (citing the legislative history of the 1964 amendment of the provision), *cert denied.* 389 U.S. 820 (1967)   Plaintiff cannot circumvent the statute of frauds by merely recharacterizing his contractual claim as one for recovery in quantum meruit  [FN3]   Thus, plaintiff's quantum meruit claim must be dismissed

> FN3. In *Grappo v. Alitalia Linee Aeree Italiane. S.p.A.,* 56 F.3d 427 (2d Cir.1995), the Court of Appeals for the Second Circuit did allow a claim in quantum meruit to proceed despite a valid statute of frauds defense, even though the Court noted that ordinarily "a plaintiff may not escape the Statute of Frauds by simply affixing the label 'quantum meruit' to the very contract claim that is barred "  *Id.* at 433.   However, the contract claim in *Grappo* was barred by section 1-206 of the New York Uniform Commercial Code, and thus the quantum meruit claim was not affected by the policy and legislative history considerations that informed the court in *Minichiello*   Here, the rule of *Minichiello* applies

III  *Claims Three Through Eight   Breach of Contract, Breach of the Implied Covenant of Good Faith, and Unjust Enrichment in Connection with the Idea Magic Program*

A *Breach of Contract*   Plaintiff alleges in claims three and six that NYNEX breached its obligation, as agreed to in the "Idea Magic Official Rules & Regulations," to award plaintiff when it implemented video-conferencing and mini-cell sites   New York courts have treated employee suggestion plans like the Idea Magic Program as creating an enforceable contract between the employer and an employee who submits an idea   See *Didley v. General Motors Corp.,* 837 F.Supp. 535, 539 (W.D.N.Y.1993) (citing *Milich v. Schenley Indus.,* 54 A.D.2d 659, 387 N.Y.S.2d 641 (App.Div.1976))

Plaintiff's contract with NYNEX gives NYNEX "sole, exclusive and complete discretion" as to the eligibility of a suggestion and the amount of any award  Idea Magic Official Rules & Regulations, paras 1 26(b), 1 26(g)   The program's rules further state that "[u]pon receipt of a suggestion, [NYNEX] obtains irrevocable, nonexclusive royalty free rights" in the suggestion, even if the idea is not adopted  *See id* at paras 1 22, 1 24.   The rules do not state that an employee is *entitled* to any award if a suggestion is used; rather, suggestors are eligible for awards at NYNEX's discretion   Thus, even if NYNEX used plaintiff's suggestions, the express terms of the agreement give NYNEX the sole and complete discretion to determine that it would grant no award to Mr deCiutiis

B *Breach of the Implied Covenant of Good Faith*   However, plaintiff also alleges, in claims four and seven, that NYNEX breached its implied covenant of good faith when it failed to grant him an award for suggestions that it adopted   An implied covenant of good faith and fair dealing inheres in every contract  See *Travellers Int'l. A.G. v. Trans World Airlines,* 41 F.3d 1570, 1575 (2d Cir.1994) (applying New York law)   Thus, "[e]ven when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith " *Id*   A court may not imply a covenant that is inconsistent with the express terms of a contract   See *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 300 (2d Cir.1996)   But an implied covenant of good faith does not conflict with NYNEX's "sole, exclusive and complete discretion "  Rather, it requires NYNEX to exercise its discretion in good faith and not to act arbitrarily   As then-Judge Scalia put it, the phrase sole discretion "**is not necessarily the equivalent of 'for any reason whatsoever, no matter how arbitrary or unreasonable ' **" *Tymshare, Inc. v. Covell,* **727 F.2d 1145, 1154 (D.C.Cir.**1984)   Thus, New York courts have imposed an implied covenant of good faith to terms granting sole discretion to one party to a contract   See *Carvel Corp. v. Diversified Management Group,* 930 F.2d 228, 231 (2d Cir.1991) (applying New York law); *Components Direct, Inc. v. European Am. Bank & Trust,* 175 A.D.2d 227, 229-30, 572 N.Y.S.2d 359, 361 (App.Div.1991).

*4 Issues of fact exist as to whether NYNEX exercised that discretion in good faith   The timing of events as alleged by plaintiff suggests that NYNEX may have implemented its video-conferencing and mini-cell site programs based upon Mr deCiutiis's suggestions   Both suggestions had the potential to save NYNEX substantial costs   NYNEX's decision not to give plaintiff any award at all even though it

Not Reported in F Supp                                                                                                    Page 4
Not Reported in F Supp , 1996 WL 512150 (S D N Y ), 12 IER Cases 150
(Cite as: 1996 WL 512150 (S.D.N.Y.))

adopted the suggestions and benefited from substantial savings of costs could be found to have been made in bad faith   It is also entirely possible that NYNEX has acted in good faith   For example, NYNEX might have already been considering implementing video-conferencing before plaintiff submitted his suggestion    Nevertheless, plaintiff's allegations are sufficient to state a cause of action for breach of the implied covenant of good faith as to both suggestions.

Thus, claims three and six for breach of contract must be dismissed because the express terms of the agreement have not been violated   However, claims four and seven for breach of the implied covenant of good faith cannot be dismissed because plaintiff has pleaded facts which, if true, would allow a jury to conclude that NYNEX did not exercise its discretion in good faith

*C  Unjust Enrichment*   Finally, plaintiff alleges in claims five and eight that NYNEX was unjustly enriched when it used Mr  his ideas without giving him compensation   The existence of an enforceable written contract that addresses the subject matter in dispute ordinarily bars recovery under a quasi-contractual theory like unjust enrichment   See *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (1987)   But a plaintiff is not required to elect his remedies, and is permitted to plead a quasi-contractual cause of action in the alternative "where there is a bona fide dispute as to the existence of a contract " *Joseph Sternberg, Inc. v. Walber 36th Street Assocs.,* 187 A.D.2d 225, 228, 594 N.Y.S.2d 144, 146 (App.Div.1993).

In *Joseph Sternberg* the court allowed a claim in quantum meruit to proceed because the contract for commission on the sale of a building was "ambiguous " It named a commission based on a particular sale price, but "[did] not, as a matter of law, bar recovery of a commission based upon a sale at a lesser price " *Id.* at 228-29, 594 N.Y.S.2d at 146 Thus, the case stands for the proposition that a quasi-contractual claim for recovery outside the scope of the contract is not barred by the existence of the contract    In the case at bar however, the recovery that Mr  deCiutiis seeks clearly falls within the scope of the Idea Magic Program   Plaintiff agreed to give NYNEX the royalty-free right to use his suggestions, in return for the chance to receive an award, subject to NYNEX's good faith exercise of discretion    He cannot escape the effect of this agreement by simply restating his claim in terms of unjust enrichment

Therefore, the rule of *Clark-Fitzpatrick* applies to bar Mr  deCiutiis's unjust enrichment claims, and defendant's motion to dismiss these claims is granted

CONCLUSION

 *5 The motion to dismiss for failure to state a claim upon which relief may be granted is HEREBY GRANTED as to claims one, two, three, five, six, and eight.   The motion to dismiss for failure to state a claim upon which relief may be granted is HEREBY DENIED as to claims four and seven

SO ORDERED.

Not Reported in F Supp., 1996 WL 512150 (S D N Y ), 12 IER Cases 150

END OF DOCUMENT

© 2007 Thomson/West  No Claim to Orig  US Gov  Works