UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>NEWS AMERICA MARKETING IN-STORE, )<br>INC., )<br>)<br>Defendant. )<br>) | CIVIL ACTION NO. 05-1740MLW |

## **PLAINTIFFS' RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT**

Pursuant to Local Rule 56.1 for the United States District Court for the District of Massachusetts, plaintiffs Robert Fireman ("Fireman") and Ann Raider ("Raider") (collectively "Plaintiffs") submit this Response to Defendant's Rule 56.1 Statement. Plaintiffs' response corresponds to the numbered paragraphs of Defendant's Statement.

A.   The Stock Purchase Agreement

1.   Admitted.

2.   Admitted, except that Plaintiffs state that when Defendant News America Marketing In-Store, Inc. ("NAM") purchased Consumer Card Marketing, Inc. ("CCMI"), the two parties had a clear plan for the future, with NAM embracing a business plan which envisioned using NAM's sales force and financial resources to drive CCMI's business forward.  See Deposition of Ann M. Raider ("Raider Dep.") at 59-60 (attached as Exhibit A to the Affidavit of Charles H. Roumeliotis) ("Roumeliotis Aff."); Deposition of David Devoe, Jr. ("Devoe Dep.") at 120 (Roumeliotis Aff. Ex. E).

3.   Admitted.

4. Admitted.

5. Admitted.

6. Admitted

7. Admitted.

8. Plaintiffs admit that § 2.3 of the Stock Purchase Agreement describes a system of earn-outs and bonuses that are expressly part of the Purchase Price of CCMI, as that is defined in the Stock Purchase Agreement. The Stock Purchase Agreement states that "[t]he Purchase Price shall be increased" by the earn-out and bonus amounts.

9. Denied. NAM in fact leveraged assets of CCMI for use in other divisions and stifled the growth of CCMI's business. One example lies in the evidence surrounding the transfer of key CCMI employee William Adam to another NAM facility. While NAM looked to utilize Adam's expertise and leverage his talents after the transfer for its own purposes, the loss of Adam was a critical blow to the growth of the CCMI business. See Robert Fireman's Answers to First Set of Interrogatories Propounded by the Defendant ("Fireman's Answers to Interrogatories") at 11-12 (Roumeliotis Aff. Ex. G).

10. Denied, the Stock Purchase Agreement is imbued with a covenant of good faith and fair dealing under New York law, which required NAM to act in good faith in fulfilling the Agreement, including by performing its specific duties under the Stock Purchase Agreement in good faith. Travellers Int'l A.G. v. Trans World Airlines, 41 F.3d 1570, 1575 (2d Cir. 1999) (citing Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 231 (2d Cir.1991); Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir.1989)). Furthermore, the very fact that the parties agreed that a significant amount of the "Purchase Price" would be in the form of an earn out confirms

NAM's express commitment to provide the resources at least minimally necessary to achieve the consideration for the acquisition. Prior to the acquisition, all parties agreed on what those resources would have to be.

11. Plaintiffs admit that NAM could operate CCMI using its sole and unfettered judgment in good faith. Id.

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. The Plaintiffs admit that § 2.3(c) in conjunction with § 2.2(b) of the Stock Purchase Agreement requires that Plaintiffs designate an accounting firm to attempt to resolve earn-out disputes that remained after the parties had discussed them with Arthur Andersen LLP, NAM's chosen accounting firm. Stock Purchase Agreement §§ 2.2(b), 2.3(c).

20. Admitted.

21. Plaintiffs' admit that § 2.3(c) in conjunction with § 2.2(b) of the Stock Purchase Agreement stipulates that once the "Third Accountant" made a final and binding decision regarding the earn-out adjustment, the earn-out would be paid with interest at 150 basis points above prime from the applicable base earn-out payment date. Stock Purchase Agreement §§ 2.2(b), 2.3(c).

22. Admitted.

23. Admitted.

24. Admitted.

25. Admitted.

26. Denied. While Plaintiffs accepted the earn-out payments, they consistently raised their issues on the operation of CCMI by NAM after the acquisition and how it was affecting Plaintiff's ability to achieve their revenue targets. See, e.g., October 22, 1999 Memo (Roumeliotis Aff. Ex. M); May 18, 2000 Memo (Roumeliotis Aff. Ex. N). October 17, 2000 Memo (Roumeliotis Aff. Ex. O); September 11, 2000 Letter (Roumeliotis Aff. Ex. P); December 7, 1999 Memo (Roumeliotis Aff. Ex. Q).

27. Denied. Plaintiffs' admit that they needed to follow the Stock Purchase Agreement's dispute resolution procedures to dispute issues related specifically to the calculation of the earn-out but deny that the deposition and document cited by NAM in any way relate to any waiver of a right to dispute NAM's lack of good faith in operating CCMI after the acquisition.

**B.   NAM's Conduct of the CCMI Business**

28. Admitted.

29. Admitted.

30. Plaintiff admits that for fiscal year 1998, CCMI experience an operating loss of approximately $268,143 on gross revenues of slightly over 3.7 million. CCMI denies that its financial performance before the acquisition was consistently "break even" at best. NAM's own documents reflect that 1997 and 1998, CCMI had net operating

profits of $403,000 and $212,000, respectively.  May 14, 1999 News America Marketing Memorandum (Roumeliotis Aff. Ex. D).

31.     Admitted.

32.     Denied.  Overall NAM actions reflected intent to not fulfill its duty to use its discretion under the Stock Purchase Agreement in good faith.  Specifically responding to the subparts of this paragraph, Plaintiffs state:

(a).    The re-branding of CCMI destroyed eight years of brand equity that had been built into the CCMI brand.  CCMI was recognized as experts in the industry and had a brand everyone recognized.  Raider Dep. at 140 (Roumeliotis Aff. Ex. A); Fireman's Answers to Interrogatories at 24-25 (Roumeliotis Aff. Ex. G).

(b).    NAM quickly removed or marginalized all of the expertise and talent which CCMI brought into the company, despite the fact that it recognized that one of the core competencies of CCMI involved its expertise and understanding of the marketplace.  Deposition of Henri Lellouche ("Lellouche Dep.") at 58 (Roumeliotis Aff. Ex. C).  In addition, NAM marginalized this expertise with the knowledge that it had no one else within its organization with expertise in loyalty card programs, the main aspect of CCMI's business.  Id. at 71-72.

(c).    NAM unilaterally decided that CCMI would no longer support Marketing Analysis Software (MAS) that CCMI was using to track its loyalty card program holders although CCMI had no other internal product to offer to its clients, causing the loss of client relationships.  NAM subsequently delayed in the implementation of new software, was unable to resolve the technical issues, and due to

5

the delay left CCMI's business without a tool for its core loyalty management services. Fireman's Answers to Interrogatories at 13-14 (Roumeliotis Aff. Ex. G).

        (d).  NAM further decimated CCMI's ability to operate by breaking apart CCMI's core team soon after the acquisition.  One CCMI employee, William Adam ("Adam"), was essential to the success of the company.  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C)  Adam was a key architect to the software that analyzed the data obtained at the point of sale, and was an essential part of the team that made sales pitches to stores to license this technology.  Raider Dep. at 257-59 (Roumeliotis Aff. Ex. A). After denying Adam a deserved raise to continue his critical work with CCMI, NAM offered him a substantial raise to leave CCMI and move to Connecticut, despite recognizing that he was "a critical part of the CCMI team".  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C); see also Deposition of David Devoe, Jr. ("Devoe Dep." at 75 (Roumeliotis Aff. Ex. E) ("I believe Bill was an important asset.")

Virtually nothing was done to replace these assets and the talent lost, and NAM failed to hire necessary employees to allow CCMI's business to grow.  Fireman's Answers to Interrogatories at 10-12 (Roumeliotis Aff. Ex. G).  NAM claimed that it had a hiring freeze, and that it had a policy that precluded it from adding "head count" unless revenues increased to the point where it met its internal criterion.  See Fireman's Answers to Interrogatories at 10-12 (Roumeliotis Aff. Ex. G); Raider Dep. at 82-83 (Roumeliotis Aff. Ex. A); Deposition of Robert N. Fireman at 281-82 ("Fireman Dep.") (Roumeliotis Aff. Ex. F).

        (e).    NAM refused to use its sales force to promote CCMI's products with manufacturers, essentially making it impossible for CCMI to sell their product to a

vast array of potential clients. This precluded CCMI's growth in this essential sector, and therefore cost CCMI tens of millions of dollars in revenue. See Fireman's Answers to Interrogatories at 10-11 (Roumeliotis Aff. Ex. G). Despite NAM's early recognition that "in order for our sales to be helpful at all, they would need to have a better understanding of the product", the main sales force NAM was never trained or utilized to market CCMI's business. Devoe Dep. at 123 (Roumeliotis Aff. Ex. E); June 1, 2000 e-mail from A. Raider to H. Lellouche (Roumeliotis Aff. Ex. K); Fireman's Answers to Interrogatories at 10 (Roumeliotis Aff. Ex. G).

     33.     Admitted.

     34.     Denied. The deposition transcript cited by NAM indicates that Mixson had some experience in database marketing prior to joining NAM in 1992, but fails to reflect any evidence that Mixson had any experience in database marketing after that point. Deposition of Christopher Mixson ("Mixson Dep.") (Roumeliotis Aff. Ex. H),

     35.     Denied. The stored value business was an extension of CCMI's loyalty card implementation business which relied heavily on the relationships cultivated and pursued by CCMI prior to the acquisition. Raider Dep. at 199-200, 273 (Roumeliotis Aff. Ex. A).

     36.     Denied. Plaintiff's admit that revenue from stored value and gift cards was included by NAM in the calculation of Fireman and Raider's earn-out payments but as stated above in paragraph 35, states that the stored value business was an extension of CCMI's loyalty card implementation business which relied heavily on the relationships cultivated and pursued by CCMI prior to the acquisition. Raider Dep. at 196-97, 273 (Roumeliotis Aff. Ex. A).

37. Denied. NAM had an obligation to calculate the Gross Margin of the "Company" in good faith under § 2.3 of the Stock Purchase Agreement. The Company is defined in the Stock Purchase Agreement as CCMI. See Stock Purchase Agreement. Stored value cards were generated and sold by CCMI or its successors after the acquisition. See Fireman Dep. at 267 (Roumeliotis Aff. Ex. F).

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

42. Denied. Plaintiffs admit that loyalty card implementation business declined for CCMI's business as time went on after the acquisition, but state that the reason for this is NAM's dismantling of CCMI and lack of support for CCMI's business. See Fireman's Answers to Interrogatories at 8-15 (Roumeliotis Aff. Ex. G).

43. Denied. NAM unilaterally decided that CCMI would no longer support Marketing Analysis Software (MAS) that CCMI was using to track its loyalty card program holders although CCMI had no other internal product to offer to its clients, causing the loss of client relationships. NAM subsequently delayed in the implementation of new software, was unable to resolve the technical issues, and due to the delay left CCMI's business without a tool for its core loyalty management services. Fireman's Answers to Interrogatories at 13-14 (Roumeliotis Aff. Ex. G).

44. Plaintiffs admit that the direct mail portion of the business grew to a limited extent, stifled tremendously by NAM's lack of good faith in exercising its discretion to operate the business. See, e.g., Raider Dep. at 201-202 (Roumeliotis Aff.

Ex. A) ("the consumption of targeted direct mail using retailer databases was exploding, and in fact…other companies achieved those numbers while we stagnated and they took our business apart…other companies made a focused effort using manufacturing sales forces did accomplish those objectives.")

45. Denied. NAM has presented no evidence of "several potential new areas" of business outside of a vague statement regarding kiosks which was instigated by NAM and bore no relationship to the core CCMI business. Also, the "revenue-generating business" referenced were completely stifled by NAM's lack of good faith. See ¶ 44, supra.

46. Denied. Fireman stated that while there issues with Western Union's position in the money transfer market, "there were ways around it and we just didn't keep our wind. And it happened after we stopped doing this. I mean, it became a very big business." Fireman Dep. at 306 (Roumeliotis Aff. Ex. F).

47. Denied. NAM used CCMI assets to benefit other divisions within its company while stifling the growth of CCMI's revenues and profits. An example lies in the evidence surrounding the transfer of key CCMI employee William Adam to another NAM facility. While NAM certainly looked to utilize Adam's expertise and leverage his talents after the transfer for its own purposes, the loss of Adam was a critical blow to the growth of the CCMI business. See Fireman's Answers to Interrogatories at 11-12 (Roumeliotis Aff. Ex. G). NAM in fact took several members of CCMI's administrative and technology staff and moved or fired them, leaving CCMI without an infrastructure to operate properly. Raider Dep. at 256-260 (Roumeliotis Aff. Ex. A). In addition, NAM

consistently stifled CCMI's growth in various ways. See Plaintiffs' Statement of Additional Material Facts About Which There Is A Dispute, ¶¶ 11-28, infra.

48. Admitted.

49. Denied. Plaintiffs admit that they did not use the Stock Purchase Agreement's arbitration procedure, but deny that they accepted the earn-out payments "without reservation". While Plaintiffs accepted the earn-out payments, they consistently raised issues on the operation of CCMI by NAM after the acquisition and how it was affecting Plaintiff's ability to achieve their revenue targets. See, e.g., October 22, 1999 Memo (Roumeliotis Aff. Ex. M); May 18, 2000 Memo (Roumeliotis Aff. Ex. N). October 17, 2000 Memo (Roumeliotis Aff. Ex. O); September 11, 2000 Letter (Roumeliotis Aff. Ex. P); December 7, 1999 Memo (Roumeliotis Aff. Ex. Q).

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS ABOUT WHICH THERE IS A DISPUTE

1. In the years leading up to its acquisition by NAM, CCMI was operating as a business with a growing national reputation in the supermarket and other retail channels as a leader in the burgeoning loyalty marketing industry. See Raider Dep. at 54 (Roumeliotis Aff. Ex. A).

2. NAM, a company looking to expand its marketing reach to new areas of loyalty and targeted marketing, created a new venture group specifically to search out companies such as CCMI. Lellouche Dep. At 25-26 (Roumeliotis Aff. Ex. C).

3. NAM approached CCMI regarding a potential purchase in 1999, as it looked to expand into loyalty marketing, something it viewed as an emerging technology. Raider Dep. at. 123 (Roumeliotis Aff. Ex. A); Lellouche Dep. at 26 (Roumeliotis Aff. Ex. C).

4.  Before the acquisition of CCMI was completed by NAM in August 1999, the parties went through months of negotiation and due diligence, with NAM discussing extensively both internally and with Plaintiffs their projections for CCMI's future. May 14, 1999 News American Marketing memorandum (Roumeliotis Aff. Ex. D); Lellouche Dep. at 55-58 (Roumeliotis Aff. Ex. C).

5.  NAM relied on CCMI's vision and expertise in these negotiations to create a vision of whether the marketplace for CCMI's business was going. Lellouche Dep. at 60 (Roumeliotis Aff. Ex. C).

6.  A May 1999 NAM internal memorandum describing the opportunity and assessing CCMI's value confirmed NAM's view that the cost to acquire CCMI was well in excess of nine million dollars in total cash payments (with a present value of over six million dollars), and that it could acquire CCMI for an initial investment of a fraction of that price if it made up the balance of the value (and more) with an earn-out right. See May 14, 1999 News American Marketing memorandum (Roumeliotis Aff. Ex. D).

7.  The earn-out was to be achieved over five years, and was based on targets both companies agreed would almost certainly be achieved if NAM provided certain resources. See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A). Section 2.3 of the Agreement, entitled "Earn-Out" explicitly stated that "[t]he Purchase Price shall be increased by an amount equal to [agreed-upon percentages] of the Gross Margin of the Company." Affidavit of Gordon P. Katz, Ex. 2; see Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A); Fireman Dep. at 111-12, 174-75 (Roumeliotis Aff. Ex. F)

8.  NAM is and was nationally recognized as a leader in direct-mail marketing. It had a strong sales force and significant financial resources, and committed

11

to use both to drive CCMI's business plan.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A).

9. NAM intended at the time of signing of the Agreement to promote the sale of CCMI's products using its sales force.  Devoe Dep. at 120 (Roumeliotis Aff. Ex. E).

10. The business plan was conservative, and was the key to achieving the financial targets necessary to trigger the additional $5 million in earn-out payments.  See Raider Dep. at 59-60. (Roumeliotis Aff. Ex. A).  The earn-out provision was specifically tailored to the business plan NAM embraced.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A); Fireman Dep. at 111-12, 175 (Roumeliotis Aff. Ex. F); see also Devoe Dep. at 115 (Roumeliotis Aff. Ex. E).  During the negotiations that led to the acquisition, NAM committed to implementing the business plan.  See Raider Dep. at 59-60 (Roumeliotis Aff. Ex. A); Fireman's Answers to Interrogatories at 3-4 (Roumeliotis Aff. Ex. G).

11. NAM quickly removed or marginalized all of the expertise and talent which CCMI brought into the company, despite the fact that it recognized that one of the core competencies of CCMI involved its expertise and understanding of the marketplace.  Lellouche Dep. at 58 (Roumeliotis Aff. Ex. C); Fireman's Answers to Interrogatories at 8-9 (Roumeliotis Aff. Ex. G).  NAM marginalized this expertise with the knowledge that it had no one else within its organization with expertise in loyalty card programs, the main aspect of CCMI's business.  Lellouche Dep. at 71-72 (Roumeliotis Aff. Ex. C).

12. Fireman, one of the founders of CCMI, was hired, as his employment contract reflects, as the General Manager of the business unit.  Katz Aff., Ex. 3.

13. As the General Manager he was to run all of the business aspects of CCMI, as he had prior to the purchase. Fireman's Answers to Interrogatories at 15-16 (Roumeliotis Aff. Ex. G).

14. Fireman's job responsibilities were increasingly diminished, he was increasingly marginalized, and virtually all important decisions about CCMI's business were made without his input and without consulting him. See Fireman Dep. at 147, 245-47 (Roumeliotis Aff. Ex. F); Mixson Dep. at 160 (Roumeliotis Aff. Ex. H).

15. Within the few months after the acquisition, Fireman's responsibilities were given to Henri Lellouche ("Lellouche"), who had no experience in direct loyalty marketing. Lellouche Dep. at 106, 108 (Roumeliotis Aff. Ex. C). Indeed, Lellouche was given the title of General Manager notwithstanding the fact that Fireman's employment contract assigned that job to him.

16. By July 2001, Fireman's role in the operation of CCMI (which had at this point been renamed to SmartSource Direct), was essentially eliminated and the responsibilities he had remaining were given to management who had little experience in loyalty marketing or loyalty card programs. Lellouche Dep. at 104 (Roumeliotis Aff. Ex. C).

17. Marty Garofolo, another NAM employee, also took a management role in CCMI's business at a later point, and he also had no experience in loyalty programs. Lellouche Dep. at 145-46 (Roumeliotis Aff. Ex. C).

18. Raider, like Fireman, was rapidly marginalized, and was kept from driving sales. Lellouche Dep. at 144-45 (Roumeliotis Aff. Ex. C). Although given the title "Senior Vice President" over sales, she was effectively stripped of any real authority.

Fireman's Answers to Interrogatories at 8-9, 16-17 (Roumeliotis Aff. Ex. G).  Decisions within the scope of her job title were made without her input.  Raider Dep. at 82-83 (Roumeliotis Aff. Ex. A).  Essential resources were withheld.  Fireman's Answers to Interrogatories at 10 (Roumeliotis Aff. Ex. G).

19.    One CCMI employee, William Adam ("Adam"), was essential to the success of CCMI.  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C)

20.    Adam was a key architect to the software that analyzed the data obtained at the point of sale, and was an essential part of the team that made sales pitches to stores to license this technology.  Raider Dep. at 257-59 (Roumeliotis Aff. Ex. A).

21.    After denying Adam a deserved raise to continue his critical work with CCMI, NAM offered him a substantial raise to leave CCMI and move to Connecticut, despite recognizing that he was "a critical part of the CCMI team."  Lellouche Dep. at 202 (Roumeliotis Aff. Ex. C); see also Devoe Dep. at 75 (Roumeliotis Aff. Ex. E) ("I believe Bill was an important asset.").

22.    Virtually nothing was done to replace these assets and the talent lost, and NAM failed to hire necessary employees to allow CCMI's business to grow.  Fireman's Answers to Interrogatories at 11-12.  NAM claimed that it had a hiring freeze, and that it had a policy that precluded it from adding "head count" unless revenues increased to the point where it met its internal criterion.  See Fireman's Answers to Interrogatories at 10-12 (Roumeliotis Aff. Ex. G); Raider Dep. at 82-83 (Roumeliotis Aff. Ex. A); Fireman Dep. at 281-82 (Roumeliotis Aff. Ex. F).

23.    NAM refused to use its sales force to promote CCMI's products with manufacturers, essentially making it impossible for CCMI to sell their product to a vast

array of potential clients.  This precluded CCMI's growth in this essential sector, and therefore cost CCMI tens of millions of dollars in revenue.  See Fireman's Answers to Interrogatories at 10-11 (Roumeliotis Aff. Ex. G).

24.     Despite NAM's early recognition that "in order for our sales to be helpful at all, they would need to have a better understanding of the product", NAM's main sales force was never trained or utilized to market CCMI's business.  Devoe Dep. at 123 (Roumeliotis Aff. Ex. E); June 1, 2000 e-mail from A. Raider to H. Lellouche (Roumeliotis Aff. Ex. K); Fireman's Answers to Interrogatories at 10 (Roumeliotis Aff. Ex. G).

25.     NAM frequently refused to allow CCMI to exhibit at trade shows, a critical component of building CCMI's business in the loyalty marketing field.  Lellouche Dep. at 170-71 (Roumeliotis Aff. Ex. C); June 1, 2000 e-mail from Raider to Lellouche (Roumeliotis Aff. Ex. L).

26.     Despite the fact that Raider and Fireman made it clear that exhibit at trade shows was critical for building business, Lellouche never even attempted to explore with senior management that due to CCMI's unique products and position in an emerging marketplace, it might be prudent to make an exception to NAM's policy prohibiting trade show exhibitions in this case.  Lellouche Dep. at 171-72 (Roumeliotis Aff. Ex. C).

27.     Lellouche believed that such shows were irrelevant, in direct contradiction to Raider and Fireman's belief that trade shows were critical to developing CCMI's business in the marketplace.  Similarly, Lellouche refused even to attempt to seek advertising in trade publications.  Id. at 180-81.

28.     NAM unilaterally decided that CCMI would no longer support Marketing Analysis Software (MAS) that CCMI was using to track its loyalty card program holders although CCMI had no other internal product to offer to its clients, causing the loss of client relationships.  NAM subsequently delayed in the implementation of new software, was unable to resolve the technical issues, and due to the delay left CCMI's business without a tool for its core loyalty management services.  Fireman's Answers to Interrogatories at 13-14 (Roumeliotis Aff. Ex. G).

29.     All of the issues outlined above were repeatedly brought to the attention of NAM executives with no impact.  In an memo sent on October 22, 1999 to David Devoe, CFO at the time of NAM, just months after the acquisition, issues were already being raised evidencing how NAM was completely stifling the growth of CCMI.  October 22, 1999 Memo (Roumeliotis Aff. Ex. M).  NAM was already at this point failing to provide key staff and failing to provide sales support to CCMI.  Id.  Months later, in May 2000, these issues had not been resolved and were brought again to the attention of Lellouche, who at this point had taken over management responsibility of CCMI, then known as SmartSource Direct.  May 18, 2000 Memo (Roumeliotis Aff. Ex. N).  Again, Raider stressed how no staff had cost them hundreds of opportunities and how the lack of advertising and public relations support had decimated CCMI's reputation.  Id.  In October 2000, Fireman sent a memo to NAM executive Chris Mixson, again emphasizing in detail how NAM had completely ignored the expertise of CCMI's founders, Fireman and Raider, and unreasonably withheld resources, completely stunting CCMI's ability to even approach the targets contemplated by the Agreement.  October 17, 2000 Memo (Roumeliotis Aff. Ex. O).  Fireman and Raider additionally continued to raise concerns

with David Devoe about NAM's complete lack of commitment to supporting CCMI's business.  See September 11, 2000 Letter (Roumeliotis Aff. Ex. P); December 7, 1999 Memo (Roumeliotis Aff. Ex. Q).

                    Respectfully submitted:

                    ANN RAIDER AND ROBERT FIREMAN

                    By their attorneys,

                    /s/ Charles H. Roumeliotis
                    Kevin T. Peters (BBO #550522)
                    David H. Rich (BBO #634275)
                    Charles H. Roumeliotis (BBO #657553)
                    Todd & Weld LLP
                    28 State Street
                    Boston, MA  02109
Dated:  December 5, 2007        (617) 720-2626

## CERTIFICATE OF SERVICE

    I, Charles H. Roumeliotis, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date:  December 5, 2007                /s/ Charles H. Roumeliotis
                                                             Charles H. Roumeliotis