UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT FIREMAN and ANN RAIDER, <br><br> Plaintiffs, <br><br> v. <br><br> NEWS AMERICA MARKETING IN-STORE, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 05-1740MLW <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF CHARLES H. ROUMELIOTIS

1.    I, Charles H. Roumeliotis, depose and state as follows:

2.    I am an associate at Todd & Weld LLP, and am counsel for Robert Fireman ("Fireman") and Ann Raider ("Raider") (collectively "Plaintiffs") in this action.

3.    I make this affidavit based on my personal knowledge and a review of records concerning this litigation.

4.    Exhibit A hereto is a true and accurate copy of the May 17, 2007 Deposition of Ann M. Raider with highlighted excerpts.

5.    Exhibit B hereto is a true and accurate copy of a presentation prepared by Consumer Card Marketing, Inc. ("CCMI") entitled "Three Essential Elements", Bates-labeled FR4897-4901.

6.    Exhibit C hereto is a true and accurate copy of excerpts of the May 25, 2007 Deposition of Henri F. Lellouche.

7       Exhibit D hereto is a true and accurate copy of a May 14, 1999 Memorandum from David Devoe, Jr. to John Nallen, Lon Jacobs, and Paul Carlucci regarding CCMI, Bates-labeled NAM01474-NAM01480.

8       Exhibit E hereto is a true and accurate copy of excerpts of the June 13, 2007 Deposition of David Devoe, Jr.

9       Exhibit F hereto is a true and accurate copy of the May 24, 2007 Deposition of Robert N. Fireman with highlighted excerpts.

10.     Exhibit G hereto is a true and accurate copy of Robert Fireman's Answers To First Set Of Interrogatories Propounded by the Defendant, dated November 27, 2006.

11.     Exhibit H hereto is a true and accurate copy of excerpts of the July 18, 2007 Deposition of Christopher Mixson.

12.     Exhibit I hereto is a true and accurate copy of excerpts of the July 17, 2007 Deposition of Martin Garofalo.

13.     Exhibit J hereto is a true and accurate copy of a document entitled SmartSource Direct Strategies, March 14, 2002, Management Overview, Bates-labeled FR3740.

14.     Exhibit K hereto is a true and accurate copy of a June 1, 2000 email from Ann Raider to Henri Lellouche with the subject "SSD Recognition", Bates-labeled FR0248.

15.     Exhibit L hereto is a true and accurate copy of a June 1, 2000 email from Ann Raider to Henri Lellouche with the subject "Retailer Summit Meeting", Bates-labeled FR0252.

16.    Exhibit M hereto is a October 22, 1999 letter addressed to David Devoe, Jr., Bates-labeled FR0315.

17.    Exhibit N hereto is a May 18, 2000 Memorandum from Ann Raider to Henri Lellouche, Bates-labeled FR4745

18.    Exhibit O hereto is a October 17, 2000 Memorandum from Bob Fireman to Chris Mixson, Bates-labeled FR0041.

19.    Exhibit P hereto is a September 11, 2000 letter from Robert Fireman and Ann Raider to David Devoe, Jr., Bates-labeled FR0033-FR0035.

20.    Exhibit Q hereto is a December 7, 1999 letter from Ann Raider to David Devoe, Bates-labeled FR0043-FR0045.


Signed under the penalties of perjury this 5th day of December, 2007

_____
Charles H. Roumeliotis

# EXHIBIT A

Fireman/Raider
vs.
News America Marketing In-Store

Ann M. Raider

Volume 1

May 17, 2007
pp. 1-333

JonesReporting
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Ann M. Raider

Page 1

```
 1                              Volume:  I

 2                              Pages:   1-333

 3                              Exhibits:  38-61

 4

 5              UNITED STATES DISTRICT COURT

 6          FOR THE DISTRICT OF MASSACHUSETTS

 7    Civil Action No. 05-1740 MLW

 8    - - - - - - - - - - - - - - - - - - - - - x

 9    ROBERT FIREMAN and ANN RAIDER,

10              Plaintiffs,

11       v.

12    NEWS AMERICA MARKETING IN-STORE, INC.,

13              Defendants.

14    - - - - - - - - - - - - - - - - - - - - - x

15

16          DEPOSITION OF ANN M. RAIDER

17            Thursday, May 17, 2007

18         10:01 a.m. to 5:19 p.m.

19          HOLLAND & KNIGHT, LLP

20      Ten St. James Avenue, 11th Floor

21            Boston, Massachusetts

22

23

24       Reporter:  Marianne R. Wharram, CSR/RPR
```

Ann M. Raider

<table>
<tr><td colspan="2">Page 2</td></tr>
<tr><td>1</td><td>A P P E A R A N C E S</td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td>TODD & WELD, LLP</td></tr>
<tr><td>4</td><td>(BY DAVID H. RICH, ESQ.)</td></tr>
<tr><td>5</td><td>28 State Street</td></tr>
<tr><td>6</td><td>Boston, MA  02109</td></tr>
<tr><td>7</td><td>(617) 720-2626</td></tr>
<tr><td>8</td><td>drich@toddweld.com</td></tr>
<tr><td>9</td><td>Counsel for the Plaintiffs</td></tr>
<tr><td>10</td><td></td></tr>
<tr><td>11</td><td>HOLLAND & KNIGHT, LLP</td></tr>
<tr><td>12</td><td>(BY GORDON P. KATZ, ESQ.)</td></tr>
<tr><td>13</td><td>Ten St. James Avenue</td></tr>
<tr><td>14</td><td>Boston, MA  02116</td></tr>
<tr><td>15</td><td>(617) 854-1408</td></tr>
<tr><td>16</td><td>gordon.katz@hklaw.com</td></tr>
<tr><td>17</td><td>Counsel for the Defendant</td></tr>
<tr><td>18</td><td></td></tr>
<tr><td>19</td><td></td></tr>
<tr><td>20</td><td>ALSO PRESENT:</td></tr>
<tr><td>21</td><td></td></tr>
<tr><td>22</td><td>ROBERT FIREMAN</td></tr>
<tr><td>23</td><td></td></tr>
<tr><td>24</td><td></td></tr>
</table>

Page 4

1     E X H I B I T S, continued
2  NO.        DESCRIPTION              PAGE
3  Exhibit 45 1-page News America Marketing        7
4     Fiscal 2004 Compensation Summary
5  Exhibit 46 1-page Fireman/Raider News America   7
6     Marketing Earn-out Summary
7  Exhibit 47 e-mail from D. DeVoe to J. Rubin    74
8     Dated 11/12/1999, Bates Stamped
9     FR0413
10  Exhibit 48 3-page Summary and Next Steps       83
11  Exhibit 49 1 oversized page, SmartSource      163
12     Direct Billing Report
13  Exhibit 50 2-page e-mail from Stephanie Nix   180
14     To Henri Lellouche Dated 2/8/2000
15     And Attachment
16  Exhibit 51 1-page Memo From Jon Rubin to Steve 183
17     Marquis, et al., Dated 10/18/1999
18  Exhibit 52 1-page Letter Dated 11/10/2000 from 206
19     David DeVoe to Robert Fireman and
20     Ann Raider
21  Exhibit 53 Letter Dated 11/20/2000 from Robert 206
22     Fireman and Ann Raider to David
23     DeVoe Bates Stamped NAM01591
24  Continued.

Page 3

1        I N D E X
2  DEPONENT     DIRECT CROSS   REDIRECT RECROSS
3  ANN M. RAIDER
4  (BY MR. KATZ)      7
5  (BY MR. RICH)       --
6
7        E X H I B I T S
8  NO.        DESCRIPTION              PAGE
9  Exhibit 38 Stock Purchase Agreement Bates       7
10     Stamped NAM04566-623, and
11     Attachments
12  Exhibit 39 9-page Complaint and Jury Demand     7
13  Exhibit 40 28-page Ann Raider's Answers to      7
14     First Set of Interrogatories
15     Propounded by the Defendant
16  Exhibit 41 7-page Letter Dated 8/13/1999        7
17     From David DeVoe, Jr. To Ann Raider
18  Exhibit 42 3-page Amendment to Employment       7
19     Agreement
20  Exhibit 43 1-page News America Marketing        7
21     Fiscal 2001 Compensation Summary
22  Exhibit 44 1-page News America Marketing        7
23     Fiscal 2003 Compensation Summary
24  Continued.

Page 5

1     E X H I B I T S, continued
2  NO.        DESCRIPTION              PAGE
3  Exhibit 54 Letter Dated 12/13/2000 from Robert 206
4     Fireman and Ann Raider to David
5     DeVoe Bates Stamped NAM01560-563
6  Exhibit 55 Letter Dated 1/2/2001 from Michael  209
7     Racano to Robert Fireman and Ann
8     Raider Bates Stamped NAM01564-565
9  Exhibit 56 e-mail from Michael Racano to       209
10     Robert Fireman and Ann Raider
11     Dated 2/16/2001 Bates Stamped
12     NAM00996
13  Exhibit 57 1-page e-mail String Including      211
14     From Michael Racano to David DeVoe
15     Dated 3/9/2001
16  Exhibit 58 e-mail from Michael Racano to Ann   214
17     Raider Dated 3/17/2002 Bates
18     Stamped NAM01226
19  Exhibit 59 Letter Dated 7/15/2002 from Ann     219
20     Raider to John Linguiti Bates
21     Stamped NAM01596-598
22
23  Continued.
24

2 (Pages 2 to 5)

Ann M. Raider

Page 6

1        E X H I B I T S, continued
2  NO.       DESCRIPTION            PAGE
3  Exhibit 60 Letter Dated 7/19/2002 from    219
4        Deborah Wolfe to Robert Fireman
5        And Ann Raider Bates Stamped
6        NAM01393-394
7  Exhibit 61 2-page e-mail String Including   224
8        From Ann Raider to Donald Jack
9        Dated 11/22/2004
10
11
12
13
14
15
16  * Original exhibits retained by Mr. Katz.
17
18
19
20
21
22
23
24

Page 7

1        P R O C E E D I N G S
2        (Exhibits 38 through 46 marked for
3  identification.)
4        ANN M. RAIDER,
5  a witness called on behalf of the Defendant,
6  having first been satisfactorily identified by the
7  production of her Massachusetts driver's license
8        and duly sworn by the Notary Public,
9        was examined and testified as follows:
10        DIRECT EXAMINATION
11  Q. (BY MR. KATZ) Good morning, Ms. Raider.
12  You have to say --
13  A. Good morning.
14  Q. You have to articulate your responses. My
15  name is Gordon Katz and I represent News America
16  Marketing In-Store Inc. in the litigation that's
17  brought us here today. I'm going to be asking you
18  questions today. If any of my questions are
19  unclear, will you let me know?
20  A. I will.
21  Q. Let's begin by me asking to you state your
22  full name for the record.
23  A. Ann Michaels Raider.
24  Q. And where do you live?

Page 8

1  A. Wellesley, Mass.
2  Q. And let's begin by talking about the Stock
3  Purchase Agreement between Robert Fireman, Ann
4  Raider, Curtis Smith, John H. Boyles and News
5  America Marketing In-Store, Inc., dated August 13,
6  1999 and let me hand to you a document which we've
7  premarked as Raider Exhibit Number 38.
8        MR. RICH: Gordon, we're going to do
9  the standard stipulations?
10        MR. KATZ: Yes. While we're taking a
11  look at that document, we'll put the stipulations
12  on the record. All objections and motions to
13  strike except as to form are reserved until the
14  time of trial. The witness may read and sign the
15  deposition transcript, but the signing need not be
16  in front of a notary.
17        MR. RICH: Fair enough.
18  Q. (BY MR. KATZ) Ms. Raider, you've seen the
19  document we've marked as Exhibit 38 before?
20  A. Yes.
21  Q. This was the agreement which you entered
22  into almost eight years ago --
23  A. Yes.
24  Q. -- correct? And if you take a look at page

Page 9

1  52, you will see that you have signed the
2  agreement, correct?
3  A. No.
4  Q. Take a look at the preceding page 52.
5  A. Yes.
6  Q. Okay. So you have no doubt that you signed
7  the Stock Purchase Agreement of August 13th, 1999?
8  A. Yes.
9        MR. RICH: Gordon, can I -- I don't
10  mean to interrupt you. It seems like in the copy
11  you've given to me and the copy you've given to the
12  witness, there seem to be -- why don't we go off
13  the record a second.
14        (Off the record.)
15  Q. (BY MR. KATZ) Okay. Ms. Raider, going
16  back on the record, so we can establish that you
17  signed the 1999 Stock Purchase Agreement?
18  A. Yes.
19  Q. And Mr. Fireman signed it as well?
20  A. Yes.
21  Q. And both of you were advised by counsel at
22  Goodwin Procter & Hoar throughout the preparation
23  of the document; isn't that correct?
24  A. Yes.

3 (Pages 6 to 9)

Ann M. Raider

Page 10

1    Q. Goodwin Procter, the law firm, reviewed
2  drafts of the agreement, made comments and gave you
3  advice, correct?
4    **A. That is correct.**
5    Q. And were you also advised by an accounting
6  firm during the preparation of the 1999 agreement?
7    **A. Not that I recall.**
8    Q. Did you receive advice from any accountants
9  during the course of the preparation of the August
10  13th, 1999 Stock Purchase Agreement?
11    **A. Accountants? Let's see. We had advice**
12  **from our controller and we had advice from Les**
13  **Charm on the financial aspects.**
14    Q. And your controller was Robert Coughlin; is
15  that correct?
16    **A. That is correct.**
17    Q. So both Mr. Coughlin and Mr. Charm provided
18  advice to you during the preparation of the August
19  13, 1999 Stock Purchase Agreement, correct?
20    **A. Yes.**
21    Q. What were the names of the Goodwin Procter
22  lawyers who you worked with?
23    **A. The lead lawyer was David Henken, and I**
24  **don't recall the other lawyers' names at this time.**

Page 11

1    Q. Do you remember how many other lawyers
2  besides Mr. Henken worked on the project advising
3  you, apart from Mr. Henken?
4    **A. At least two.**
5    Q. And as you mentioned, you also received
6  advice regarding the agreement from Les Charm, one
7  of your directors?
8    **A. Yes.**
9    Q. Mr. Charm also negotiated on your behalf
10  with Mr. DeVoe from News America Marketing,
11  correct?
12    **A. Yes.**
13    Q. And I'm going to refer to News America
14  Marketing during this deposition from time to time
15  as NAM, N-A-M. Did the other two shareholders of
16  CCMI, Curtis Smith and John Boyles, have any
17  discussions with representatives of NAM regarding
18  the business of CCMI prior to the agreement being
19  signed?
20    **A. No, not that I recall.**
21    Q. None that you're aware of?
22    **A. Not that I recall.**
23    Q. Okay. Now, the purpose of the agreement --
24  that is, the August 13th, 1999 Stock Purchase

Page 12

1  Agreement -- was to document the terms of the sale
2  of your stock in CCMI to NAM, correct?
3    **A. Yes.**
4    Q. And the agreement covered many subjects
5  relating to the business CCMI, correct?
6    **A. Yes.**
7    Q. Included in the agreement were provisions
8  regarding Year 2K? Do you remember that?
9    **A. Y2K.**
10    Q. Y2K? And that was a big issue prior to
11  January one, 2000, right?
12    **A. I do not recall Y2K being a big issue prior**
13  **to the signing.**
14    Q. Well, but it was a big issue in -- in the
15  economy in general? People were concerned about
16  Year Y2K?
17    **A. There was press written about Y2K, that is**
18  **correct.**
19    Q. And now we can hardly remember it, correct?
20    **A. Right.**
21    Q. Now, the Stock Purchase Agreement of August
22  13, 1999 was a very important agreement for you
23  personally, was it not?
24    **A. Yes.**

Page 13

1    Q. You had never sold a business before?
2    **A. No.**
3    Q. You're agreeing with me that this was the
4  first time you had ever sold a business?
5    **A. This is the first time I had ever sold a**
6  **business.**
7    Q. And you read the agreement very carefully,
8  did you not?
9    **A. I did.**
10    Q. Let's turn to page 41 and paragraph 8.1.
11  Did you read paragraph 8.1 prior to signing the
12  agreement?
13    **A. Yes.**
14    Q. And you understood this clause, correct?
15    **A. Yes.**
16    Q. And you're aware that clauses like this are
17  called integration clauses?
18    **A. No, I'm not.**
19    Q. You've never heard that term used before?
20    **A. No, sir.**
21    Q. During your business life, have you seen
22  other agreements having similar clauses?
23    **A. I do not recall at this time.**
24    Q. Okay. You're unaware as to whether the

4 (Pages 10 to 13)

Ann M. Raider

| Page 14 |
|---|

1  many contracts which you've negotiated with
2  customers have had agreements which have been --
3  which have provisions titled either integration
4  clause or entire agreement?
5  **A. No, sir, I do not recall that specifically.**
6  Q. You don't recall seeing clauses like that
7  previously?
8  **A. No.**
9  Q. Okay. Are you aware that provisions like
10  these are commonplace in formal written contracts?
11  **A. No, sir, I'm not.**
12  Q. Now the provision states in substance that,
13  quote, this agreement is a complete statement of
14  all terms of the arrangements between the parties
15  and supercedes any previous agreements and
16  understandings between the parties with respect to
17  those matters. Did I read that correctly?
18  **A. Yes.**
19  Q. Now, you understood that this provision
20  meant that the terms of the agreement trumped any
21  oral promises that you or Mr. Fireman might have
22  made to Mr. DeVoe or anyone else at NAM about CCMI,
23  correct?
24  **A. No, I'm not.**

| Page 15 |
|---|

1  Q. You weren't aware that that's what the
2  language of paragraph 8.1 meant?
3  **A. No.**
4  Q. Okay. And you understood that the
5  provision meant that the terms of the agreement
6  trumped any oral promises that Mr. Charm might have
7  made to Mr. DeVoe or anyone else at NAM about CCMI?
8  **A. No, I'm not.**
9  Q. And you understood that the provision meant
10  that the terms of the agreement trumped any oral
11  promises that Mr. Coughlin might have made to
12  Mr. DeVoe or anyone else at NAM about CCMI, are you
13  not?
14  **A. No, I'm not.**
15  Q. And you also understood that this provision
16  meant that the terms of the agreement trumped any
17  oral promises that you thought Mr. DeVoe or anyone
18  else from NAM might have made to you or
19  Mr. Fireman?
20  **A. No, I am not. When you enter into an**
21  **agreement to sell a business to a company, you**
22  **enter into a partnership. The partnership is a**
23  **conversation that is about two companies coming**
24  **together for mutual best interest, so this**

| Page 16 |
|---|

1  **statement was about us working together.**
2  Q. When you say this statement, you're
3  referring to the statement in paragraph 8.1?
4  **A. About an agreement to work together, that's**
5  **how I read this, as agreement to work together.**
6  Q. No, no, no, but we're just talking about
7  paragraph 8.1.
8  **A. Right.**
9  Q. What did you think that 8.1 meant?
10  **A. It meant that we had an agreement in**
11  **context for how we would work together.**
12  Q. So is it your view that the language of
13  paragraph 8.1 was subservient to what your
14  understandings were before the agreement was
15  signed? Is that what you're saying?
16  **A. I'm not sure what you mean by subservient.**
17  Q. Well, in your view, did the understandings
18  that you had prior to signing the agreement take
19  precedence over what was in the agreement itself?
20  **A. No, I wouldn't say that.**
21  Q. So you would agree, would you not, that the
22  agreement took precedence over anything that was
23  said prior to the entering into the agreement?
24  **A. I think the agreement was a formality about**

| Page 17 |
|---|

1  **the discussions had between the two companies.**
2  Q. And so in your view, what did paragraph 8.1
3  mean?
4  **A. That we had an agreement to do business**
5  **together.**
6  Q. Did it mean anything more than that?
7  **A. No.**
8  Q. So the words of paragraph 8.1 didn't have
9  the meaning that one would normally expect of the
10  words that are used?
11  **A. I don't know what normally means or I don't**
12  **-- in my context, I believe that what this said is**
13  **we had an agreement to do business together.**
14  Q. Okay. Well, the words that say -- I'll
15  read them again. It says this agreement, together
16  with the schedules hereto, contain and are intended
17  as a complete statement of all the terms of the
18  arrangements between the parties with respect to
19  the matters provided for. Do you understand what
20  that means?
21  MR. RICH: Objection. Asked and
22  answered.
23  Q. (BY MR. KATZ) Do you understand what those
24  words mean?

Ann M. Raider

Page 18

1    A. He just objected. What am I supposed to
2  do?
3         MR. RICH: You can answer if you can.
4    A. I will answer that I believe that what this
5  said was that we had an agreement to do business
6  together.
7    Q. (BY MR. KATZ) So what about the language
8  saying that the agreement together with the
9  schedules is a complete statement of all of the
10  terms of the arrangements between the parties?
11  Isn't that what the language says?
12    A. I don't believe even the Constitution of
13  the United States talks about every possible
14  conversation about anybody doing business together.
15    Q. No, no, but we're not talking about the
16  Constitution. We're just talking about this
17  agreement. Let's go back and I'll say it again.
18  It says this agreement, together with the schedules
19  hereto, contain and are intended as a complete
20  statement of all the terms of the arrangements
21  between the parties. Isn't that obvious as to what
22  this means?
23         MR. RICH: Objection. You can answer.
24    A. I think it says we have an agreement to do

Page 19

1  business together.
2    Q. (BY MR. KATZ) No, doesn't it say that this
3  document is a complete statement of all of the
4  terms of the arrangements between the parties?
5  Aren't those the words used?
6    A. Those are the words that are used.
7    Q. Thank you. And it goes on to say that this
8  agreement supercedes any previous agreements and
9  understandings between the parties with respect to
10  those matters. Doesn't it say that?
11    A. The words are on the page.
12    Q. Okay. And when you use the word
13  supercedes, doesn't that mean that anything that
14  came prior, any previous agreements and
15  understandings between the parties with respect to
16  the matters in the agreement, doesn't this
17  provision mean that any such previous agreements
18  and understandings are no longer in effect because
19  the agreement controls?
20         MR. RICH: Objection.
21    Q. (BY MR. KATZ) Isn't that what this
22  provision means?
23    A. I do not know that to be the case.
24    Q. Do you have any doubt?

Page 20

1         MR. RICH: Objection. You can answer.
2    A. I -- I believe that we -- this statement
3  says we had an agreement to do business together in
4  good faith.
5    Q. (BY MR. KATZ) That's what you think
6  paragraph 8.1 says?
7    A. That is correct.
8    Q. Okay, and where is the word good faith used
9  in paragraph 8.1?
10    A. The word good faith is not stated in that
11  paragraph. It is implied by the nature of two
12  people -- two companies coming together to do
13  business together.
14    Q. Now, you knew also that the agreement could
15  be -- could not be amended except by an instrument
16  in writing? Isn't that a fact?
17    A. I did not know that.
18    Q. Okay. Let's take a look at paragraph 8.6.
19  Could you read that for me?
20    A. No provision in this agreement may be
21  amended or modified except by an instrument or
22  instruments in writing signed by the parties
23  hereto. No waiver of any position here shall be
24  construed as a waiver of any other provision. Any

Page 21

1  waiver must be in writing.
2    Q. So now you'd agree with me, would you not,
3  that the agreement couldn't be amended except by an
4  instrument in writing? Isn't that what this says?
5    A. I believe that's what this says.
6    Q. Okay. Now, let's take a look at paragraph
7  8.2. That refers to governing law. You understood
8  that the agreement was governed by New York law,
9  correct?
10    A. I believe that that's what this says.
11    Q. Okay. And that meant you look to New York
12  law in order to interpret the agreement, right?
13    A. It says New York law and any federal court.
14    Q. Now, it says this agreement shall be
15  governed by and construed and enforced in
16  accordance with the laws of the State of New York?
17    A. And any federal court located in such state
18  in connection with the actions.
19    Q. No, it then goes on to say the parties
20  hereto irrevocably consent to the jurisdiction of
21  the courts of the State of New York and any federal
22  court located in such state in connection with any
23  action or proceeding arising out of or relating to
24  the agreement or the transaction contemplated

Ann M. Raider

Page 22

1  hereby. Isn't that what it says?
2      A. Yes.
3      Q. So there are two different sentences in
4  paragraph 8.2. One relates to substantive law,
5  that's in the first sentence, and the second
6  relates to jurisdiction. Isn't that what paragraph
7  8.2 says?
8      A. I don't know what substantive law means. I
9  don't know what substantive law means.
10     Q. But you do agree with me that the document
11  says that the agreement shall be governed by and
12  construed and enforced in accordance with the laws
13  of the State of New York, right?
14     A. The agreement states that.
15     Q. Okay. And you remember that your side
16  wanted Massachusetts law to govern the agreement,
17  right?
18     A. I don't recall that discussion.
19     Q. Are you aware that Mr. Charm had that
20  discussion with Mr. DeVoe?
21     A. I believe that if he said he did, he did.
22     Q. But you settled on New York, right?
23         MR. RICH: Objection.
24     A. I don't know what I settled on.

Page 23

1      Q. (BY MR. KATZ) Well, you signed an
2  agreement that specified New York as the governing
3  law, right?
4      A. I don't know that that was the settlement,
5  but the answer is we did sign the agreement that
6  says New York.
7      Q. Okay. Now, the four sellers of CCMI --
8  that is, the four sellers of the CCMI stock --
9  agreed to sell their stock for $2.8 million in
10  cash, right?
11     A. Yes.
12     Q. How was the $2.8 million arrived at?
13     A. As I recall, Mr. DeVoe said that he had
14  approved $3 million for investments in each of
15  several companies on a per company basis, that that
16  was about the amount of money he could invest in
17  each of the companies that he was looking to buy,
18  and so the $3 million came -- was derived at what I
19  believe Mr. DeVoe said to me was what he could
20  spend for each company. So knowing that, we then
21  began a discussion about well, the company -- CCMI
22  is today generating over $8 million in sales and
23  has a valuation that is much greater than that, so
24  how do we come to a discussion where we can do

Page 24

1  business together? That's my recollection as of
2  the moment on the $3 million.
3      Q. You said that CCMI had a valuation of much
4  greater than $3 million?
5      A. Yes. We did $8 million in sales.
6  Therefore, by its very definition, the company was
7  worth at least $8 million one times earnings.
8      Q. Yeah, but the sales aren't earnings.
9      A. One times sales. Sorry.
10     Q. So where do you derive that principle of
11  business?
12     A. A company would not sell itself for less
13  than what it does in sales and we did comparisons
14  of other companies in our space who were selling at
15  multiples far greater than sales of one times.
16     Q. And who performed those analyses?
17     A. Bob and I looked at other companies.
18     Q. What other companies did you look at?
19     A. I don't recall at the moment, but we could
20  certainly take a look at discussions we had.
21     Q. As you sit here, you don't remember one
22  company that you looked at in reaching your
23  conclusion that companies sold at least a
24  multiple of one times gross revenue?

Page 25

1      A. At the moment, I do not recall it, but I
2  know that there were discussions and we could
3  probably think about it longer if we --
4      Q. But you don't remember as you sit here now?
5      A. As of the moment, I don't recall. I'm
6  certain that we did that, because we had been
7  talked to by other organizations who were looking
8  at CCMI as a good company to invest in.
9      Q. But you would agree with me that sales
10  don't necessarily mean earnings?
11     A. That's correct. Sales don't necessarily
12  mean earnings.
13     Q. And in fact, let's take a look at
14  Schedule 4.6 of the Stock Purchase Agreement. Do
15  you have that in front of you? It's in the
16  financial statements. And I call your attention to
17  a document that's called Consumer Card Marketing,
18  Inc., income statement for the year ending
19  December 31, 1998.
20     A. Mm-hmm.
21     Q. Have you found it?
22     A. Yes.
23     Q. And this was CCMI's income statement for
24  the year ended December 31, 1998, which CCMI had

7 (Pages 22 to 25)

Ann M. Raider

<table>
<tr><td>

Page 26

1  prepared, correct?
2      A. This is a our income statement. I don't
3  know if we prepared it.
4      Q. If you didn't prepare it, who would have?
5      A. I don't know. You're asking me do I know
6  if we prepared it. The answer is I don't know if
7  we actually prepared it.
8      Q. But it was submitted to News America
9  Marketing in connection with the transaction and it
10  was appended as a financial statement in
11  Schedule 4.6, and it says attached with regard to
12  the Section 4.6 are true and complete copies of the
13  financial statements of the company. Is that not
14  correct?
15      A. This is the financial statement of the
16  company. I just don't know if we prepared it.
17      Q. Well, this -- I mean, you signed the
18  agreement and the agreement said that the agreement
19  incorporated the financial statements of the
20  company, so isn't it a fair statement that at the
21  time you signed the agreement, you believed this to
22  be the income statement for the year --
23      A. I believe this to be the facts, yes.
24      Q. -- you have to let me finish first -- that

</td><td>

Page 28

1  it, I don't think we need to remark it.
2          MR. RICH: Fine.
3          MR. KATZ: There are some documents
4  that we will probably remark simply as a
5  convenience as we march down the road.
6      Q. (BY MR. KATZ) In any event, Ms. Raider,
7  have you seen the document that we've marked here
8  as Coughlin Exhibit 16?
9      A. Have I -- I do not recall seeing this exact
10  document.
11      Q. You see the Bates stamp letters in the
12  corner of the pages? The FR -- the FR letters
13  along with numbers?
14      A. Yes, I do see those.
15      Q. And you'd agree with me that this
16  represents a document that was produced by your
17  counsel on you and Mr. Fireman's behalf, correct?
18      A. Yes.
19      Q. It came from your files?
20      A. Mm-hmm. It's written to Bob.
21      Q. I'd like you to take a look at what is the
22  fourth page, Bates stamped page FR 2677, and if you
23  take a look at this spreadsheet, you'll see that
24  it's a statement of profit and loss. That's what

</td></tr>
<tr><td>

Page 27

1  you believe the document that is included in
2  Schedule 4.6 was an accurate income statement for
3  the year ended December 31, 1998 for Consumer Card
4  Marketing, Inc.?
5      A. Yes.
6      Q. Correct?
7      A. Yes.
8      Q. And you would agree with me that in 1988
9  the total gross revenue for CCMI was approximately
10  $3.7 million?
11      A. Yes.
12      Q. And if you look at the last line of the
13  income statement, CCMI is reported to have had a
14  loss of about $170,000 for the year ended December
15  31, 1998; isn't that correct?
16      A. Yes.
17      Q. Now I'd like you to take a look at a
18  document which we've marked as Coughlin Exhibit 16.
19  I think your counsel has it. I can give you
20  another copy if you'd like.
21          MR. RICH: That's -- if it's handy, but
22  if not, that's okay. And are we not -- we're just
23  using old --
24          MR. KATZ: Since we've already marked

</td><td>

Page 29

1  it says in the upper left-hand corner; do you see
2  that?
3      A. Yes. Yes.
4      Q. And it has actuals for 1996, 1997 and 1998;
5  do you see that?
6      A. Yes.
7      Q. And would you agree with me that this
8  document was prepared by Mr. Coughlin?
9      A. Yes.
10      Q. Okay. And Mr. Coughlin was your
11  controller?
12      A. Yes.
13      Q. He controlled the finances of CCMI?
14      A. Yes.
15      Q. And if you look at 1999 and you go all the
16  way down to the last line, you'll see written the
17  number 239K; do you see that?
18          MR. RICH: I think you meant 1998.
19      Q. (BY MR. KATZ) I'm sorry. 1998. Excuse
20  me.
21      A. Yes, I do see that.
22      Q. And to me, this suggests that he's
23  indicating that there was a profit in 1998 of
24  $239,000?

</td></tr>
</table>

8 (Pages 26 to 29)

Ann M. Raider

Page 30

1        MR. RICH:  Objection.
2        Q.  (BY MR. KATZ)  Do you agree with that?
3        A.  I don't know the math.
4        Q.  Okay.
5        A.  So I don't know what the handwritten notes
6    mean.
7        Q.  Okay, but you would -- as between this
8    239,000 and the $170,000 loss that's recorded on
9    the financial statement that was submitted as an
10   exhibit to the Stock Purchase Agreement, which of
11   those two numbers do you think is accurate?
12       A.  I have no way of knowing at this point in
13   time.
14       Q.  You don't remember?
15       A.  I don't remember.
16       Q.  You don't remember whether you had a profit
17   or a loss in 1998?
18       A.  I do not recall.
19       Q.  Wouldn't that be something that would be
20   important to you to remember?
21       A.  I do not recall what the financial numbers
22   were for 1998.
23       Q.  Now, in 1997, according to Mr. Coughlin's
24   memo, CCMI's earnings were approximately $400,000?

Page 31

1    Do you see that at the bottom of page FR 2677?
2        MR. RICH:  Objection.
3        A.  There is a number on the bottom of the
4    page, $403,000.  I don't know what that number is.
5        Q.  (BY MR. KATZ)  Is that consistent with what
6    your recollection of the earnings, if any, of CCMI
7    were in 1997?
8        A.  I do not recall financials.
9        Q.  You don't recall?
10       A.  No.
11       Q.  Okay, but you do recall, don't you, that in
12   1997, CCMI had gross revenue of about $7.9 million?
13       A.  Yes, I believe that is true.
14       Q.  Okay.  And in 1996, CCMI's gross revenue
15   was only approximately $2.5 million; do you see
16   that?
17       A.  I see the number on the page.  I don't
18   remember the numbers exactly.  I remember it was
19   approaching $8 million in sales as we approached
20   1998, but I don't remember the numbers before that.
21   I concentrated on the sales number.
22       Q.  Not the profit number?
23       A.  Right.  I did not.
24       Q.  And the last year of sales, prior -- the

Page 32

1    last full year of sales prior to the acquisition of
2    CCMI by News America Marketing, you would agree
3    with me that the sales were only $3.7 million?
4        A.  I don't --
5        Q.  That's in exhibit -- that's on Schedule 4.6
6    of the Stock Purchase Agreement.
7        A.  I do not recall the company's sales for
8    that year, nor do I have any recollection that we
9    did not generate consistently the same number of
10   sales year after year, so I can't speak to that.
11       Q.  But you don't doubt the accuracy of what's
12   contained in the Stock Purchase Agreement, do you?
13       A.  No, I do not.
14       Q.  So if the financial statement for CCMI for
15   the year ending December 31, 1998 said $3.7
16   million, you'd accept that number, would you not?
17       A.  Yes.
18       Q.  And that's not $8 million, right?
19       A.  $3.7 million is not $8 million.
20       Q.  Now, you received from the $2.8 million of
21   cash that was paid out when the Stock Purchase
22   Agreement closed approximately $920,000, correct?
23       A.  That is correct.
24       Q.  And Mr. Fireman received $1.38 million?

Page 33

1        A.  I believe that's right.
2        Q.  And Mr. Smith received $400,000?
3        A.  I believe that's right.
4        Q.  And Mr. Boyles received a hundred thousand
5    dollars?
6        A.  Mm-hmm.
7        Q.  Did you or Mr. Fireman share any of the
8    cash that you received up front with Mr. Adam or
9    Mr. Coughlin?
10       A.  Did we -- they had stock in the company.
11       Q.  And what did they receive as a result of
12   the closing?
13       A.  We honored their stock value.
14       Q.  And so what did they receive?
15       A.  I don't remember the number, but we paid
16   them cash.  We paid them for their stock.
17       Q.  And how much did you pay them?
18       A.  I don't recall.
19       Q.  And were Mr. Adam and Mr. Coughlin content
20   with what they were paid?
21       A.  Yes.
22       Q.  You're sure about that?
23       A.  Yes.  They signed releases.
24       Q.  And if they signed releases, in your view,

9 (Pages 30 to 33)

Ann M. Raider

Page 34

1  that ended any claim that they might have with
2  respect to their interest in CCMI?
3      A. Yes, that is correct.
4      Q. Okay. That's what you think a release
5  does? Is that right?
6      MR. RICH: Objection.
7      A. I don't know what a release does. I know
8  that in the case of -- at the time of the sale, Bob
9  and I made a conscious effort to make whole people
10 who worked hard for us, and they had stock that we
11 had issued them and we gave them money for that
12 stock.
13     Q. (BY MR. KATZ) Well, didn't -- really, they
14 had stock options?
15     A. Options, right, whatever.
16     Q. And were -- you don't remember exactly how
17 much they were paid?
18     A. No.
19     Q. Were they paid as much as $10,000?
20     A. I don't know.
21     Q. So they could have been paid less than
22 $10,000?
23     A. I don't know.
24     Q. Okay. Who would know?

Page 35

1      A. I -- I think you've have to ask them.
2      Q. And where did the money come from that was
3  going to fund the payment that they received for
4  their options?
5      A. It would have come from Bob and I.
6      Q. Okay. And so you actually made a payment
7  to Mr. Coughlin and Mr. Adam; is that correct?
8      A. Um, I -- yes, I believe that's right.
9      Q. But as you sit here today, you have no idea
10 as to how much you paid either of them?
11     A. That is correct. I don't.
12     Q. And can you give me any order of magnitude?
13     A. I don't recall.
14     Q. Could it have been as much as a hundred
15 thousand dollars?
16     A. No, I'm sure it wasn't that much.
17     Q. Could it have been as much as $50,000?
18     A. No, I'm sure it wasn't that much.
19     Q. Could it have been as much as $10,000?
20     A. Maybe.
21     Q. Could it have been as much as $20,000?
22     A. I don't remember the exact number. I don't
23 remember how many options they had; I don't
24 remember how we calculated what the value was.

Page 36

1      Q. And do you remember, was it more than
2  $5,000?
3      A. I don't remember the exact number.
4      Q. Well, could it have been as much as $5,000?
5      A. Could it have been?
6      Q. Yes.
7      A. Is it possible that it could have been?
8      Q. No, I'm asking you.
9      A. The answer is I don't remember the amount.
10     Q. Well, wasn't this significant for you
11 because you were receiving $920,000, right? Right?
12     A. I received $920,000.
13     Q. And you were going to have to make a
14 payment to Mr. Coughlin and Mr. Adam because you
15 promised them, right?
16     A. We didn't have to do that. Those options
17 were only if they -- we sold the whole company. We
18 didn't. We only sold a portion of -- we -- those
19 -- I don't remember how the options were
20 constructed that we gave them, but I know that we
21 had no obligation to pay them anything. I remember
22 that Bob and I made a conscious decision to say
23 thank you for their hard work and made a decision
24 to pay them something for those options, and that's

Page 37

1  all I remember.
2      Q. And then I'm asking you how much did you
3  pay them?
4      A. And I've told you six times. Sir, I would
5  tell you the truth. I do not remember.
6      Q. And you can't tell me whether it was more
7  or less than $10,000?
8      A. No, I cannot.
9      Q. Okay. And what -- do you have a record in
10 your checkbook?
11     A. Maybe.
12     Q. Did either Mr. Adam or Mr. Coughlin
13 complain to you that they hadn't been paid as much
14 as they thought they were going to get?
15     A. For what?
16     Q. For their options.
17     A. Not that I recall.
18     Q. Now, what else did you receive from News
19 America Marketing in consideration of the sale of
20 your stock in CCMI?
21     A. I received nothing but the check.
22     Q. Okay. You did receive an employment
23 agreement from News America Marketing, correct?
24     A. I did. Mm-hmm.

10 (Pages 34 to 37)

Ann M. Raider

Page 38

1    Q.  And you received as part of the purchase
2  agreement the possibility of earn-out payments,
3  correct?
4    **A.  Yes, that is correct.**
5    Q.  And you also received the possibility of a
6  bonus on the purchase price if the gross margin
7  exceeded certain benchmarks in year one and two,
8  correct?
9    **A.  Yes, that is correct.**
10    Q.  And you also, received did you not,
11  forgiveness of a loan CCMI had made to you?  Isn't
12  that right?
13    **A.  That is correct.**
14    Q.  And that was worth $181,524, right?
15    **A.  I don't recall the number.**
16    Q.  But there's -- is that approximately
17  correct?
18    **A.  I don't know.  I'd have to look at the**
19  **number.  It's written in the documents.**
20    Q.  Would you take a look at paragraph 4.2.1?
21    **A.  Where would I find 4.2.1?  4.2 --**
22    MR. RICH:  Do you want to give us a
23  page number, if you can --
24    MR. KATZ:  Mm-hmm.

Page 39

1    MR. RICH:  -- just to move it along?
2    **A.  Here's 4.2, but I don't --**
3    MR. RICH:  I think that's 4.20.  I
4  don't know that there is a 4.2.
5    **A.  Point 02?  Is that what we're looking for?**
6      (Off the record.)
7    Q.  (BY MR. KATZ)  You know what?  Let's take a
8  look at page four of the Stock Purchase Agreement,
9  and do you see paragraph C?
10    **A.  Yes.**
11    Q.  And there's reference to something called
12  the Raider receivable?
13    **A.  Yes.**
14    Q.  And it's identified to be in the aggregate
15  amount of $181,524?
16    **A.  Yes.**
17    Q.  And that is the promissory note which was
18  being forgiven; is that right?
19    **A.  Yes.**
20    Q.  And that represented a loan of monies which
21  you had taken from CCMI?
22    **A.  Yes.**
23    Q.  And that was prior to the acquisition?
24    **A.  Yes.**

Page 40

1    Q.  And as part of the acquisition, the new
2  shareholders were agreeing to forgive that
3  indebtedness --
4    **A.  Yes.**
5    Q.  -- of you; is that right?
6    **A.  Yes.**
7    Q.  And why had you taken that money from CCMI?
8    **A.  I took it as a loan.**
9    Q.  And why did you need that?
10    **A.  For personal reasons.**
11    Q.  Okay.  And there was also reference in the
12  Stock Purchase Agreement to something called a
13  Raider bonus.  Do you remember what that is?
14    **A.  I don't know what you're referring to.**
15    Q.  Okay.  If you go down a little bit from --
16  still on page four -- there is a reference to
17  $145,000.  Do you see that?  It's on page four in
18  paragraph C.
19    **A.  Yeah.  Right.**
20    Q.  Which shall be paid by the company to
21  Raider not later than April 1, 2000 and will be
22  accrued as an obligation of the company to Raider
23  as of the date hereof, and then it's defined as the
24  Raider bonus.  Do you see that?

Page 41

1    **A.  Yes, I see that.**
2    Q.  Why was the Raider bonus being granted to
3  you?
4    **A.  They cancelled the loan and gave it back to**
5  **me in the form of a bonus.**
6    Q.  Well, if they cancel a loan, that means you
7  no longer have to pay money back to the company,
8  right?
9    **A.  Right.**
10    Q.  But now here they're going to give you
11  money, aren't they?  Didn't you ultimately receive
12  $145,000 from the company; that is, NAM?
13    **A.  I actually don't remember exactly how much**
14  **I received from NAM.  I did get a check from them.**
15  **If it's exactly $145,000, I don't recall the exact**
16  **number.  They were cancelling the loan and -- and**
17  **giving me this bonus money; that is correct.**
18    Q.  So it was two benefits you were getting;
19  one, the cancellation of the loan, and the second,
20  you were getting a bonus, right?
21    **A.  I believe that's so.**
22    Q.  And again tell me, why was the bonus being
23  given you?  What was the business reason to give
24  you a bonus?

11 (Pages 38 to 41)

Ann M. Raider

Page 42

```
1       A.  You know, I don't recall.
2       Q.  And then you had a five-year employment
3   agreement with News America Marketing, right?
4       A.  Yes, that is right.
5       Q.  And you began with a salary of $160,000,
6   right?
7       A.  That's right.
8       Q.  And each year News America Marketing gave
9   you a salary increase, right?
10      A.  Yes, that's right.
11      Q.  And these increases were all discretionary,
12  right?
13      A.  I don't understand what discretionary means
14  in your terms.
15      Q.  Well, the agreement itself did not obligate
16  News America Marketing to give you a salary
17  increase in each successive year, did it?
18      A.  I don't know what the agreement so stated.
19  We'd have to look at the agreement to see those
20  exact words.
21      Q.  Well, we are in luck, because we just
22  happen to have a copy of the agreement here.  Do
23  you see paragraph 5A?
24      A.  Yes.  It says the base shall be reviewed
```

Page 43

```
1   annually in accordance with the standard practice
2   of the company.
3       Q.  And it says the base salary shall be
4   reviewed annually in accordance with the standard
5   practice of the company and notwithstanding the
6   foregoing, your base salary for any given year
7   shall not be less than your base salary for the
8   previous year, right?
9       A.  Yes, that is correct.
10      Q.  So that meant that they couldn't reduce
11  your base salary?
12      A.  That is correct.
13      Q.  But there was nothing here that meant --
14  that said that they had to increase your base
15  salary, correct?
16      A.  The statement that it could be reviewed in
17  accordance with the standard practice of the
18  company, the company had a standard practice of
19  giving salary increases and bonuses based on
20  performance, so we were in fact reviewed on
21  the performance of the company as a whole.
22      Q.  And your personal performance, right?
23      A.  Yes, that is correct.
24      Q.  And so if your personal performance and the
```

Page 44

```
1   performance of the company was good, you would get
2   a salary increase?
3       A.  Yes, that is correct.
4       Q.  That was your expectation?
5       A.  Yes, that's correct.
6       Q.  And in point of fact, in each year of your
7   employment with News America Marketing, you
8   received a salary increase; is that right?
9       A.  Yes, that is correct.
10          MR. KATZ:  Just for the record, we are
11  marking as Exhibit 41 Ms. Raider's employment
12  agreement with NAM dated August 13, 1999.
13      A.  Yes, but they did in fact violate the
14  employment agreement.
15      Q.  (BY MR. KATZ)  Okay.  Well, I'll let your
16  counsel ask you questions about that.
17          MR. RICH:  Now, are we marking this?
18  Have we marked this?
19          MR. KATZ:  We premarked it, and so that
20  is now Exhibit 41.
21          MR. RICH:  Okay.  Thank you.
22      Q.  (BY MR. KATZ)  Now, in fact, your salary
23  went up immediately upon NAM's acquisition of CCMI,
24  right?
```

Page 45

```
1       A.  Yes.
2       Q.  You were only making $153,000 at the time
3   of the acquisition in 1999, right?
4       A.  I do not recall that, actually.
5       Q.  Well, let's take a look at Schedule 4.13 of
6   the acquisition agreement.
7           MR. RICH:  4.1 -- oh, okay.
8       A.  Okay.
9       Q.  (BY MR. KATZ)  And you've now had a chance
10  to look at Schedule 4.13?
11      A.  Yes.
12      Q.  And you'll agree with me that you were
13  making $153,000 at the time of the acquisition --
14      A.  Yes.
15      Q.  -- of CCMI by NAM, correct?
16      A.  Yes.
17      Q.  Now, apart from the $153,000 in salary, did
18  you receive anything else from CCMI in the way of
19  compensation?
20      A.  We had car allowances.
21      Q.  Okay.  How much was that worth?
22      A.  I don't recall.
23      Q.  And did you receive a car allowance from
24  News America Marketing as well?
```

12 (Pages 42 to 45)

Ann M. Raider

Page 46

1  **A. I did.**
2  Q. Apart from the car allowance, did you
3  receive anything else in the way of compensation
4  from CCMI?
5  **A. No.**
6  Q. Okay. Did you receive any dividends?
7  **A. No.**
8  Q. You never received any dividends?
9  **A. No.**
10  Q. So really, after the acquisition by News
11  America Marketing, you not only were getting
12  approximately a million dollars coming from the
13  sale of your stock, right?
14  **A. Yes.**
15  Q. Okay. Forgiveness of a loan of about
16  $181,000, right?
17  **A. Mm-hmm. Yes.**
18  Q. Payment of a bonus that was going to come a
19  few months into the acquisition of about $145,000,
20  right?
21  MR. RICH: Objection.
22  Q. (BY MR. KATZ) Right?
23  **A. Payment --**
24  Q. Payment of a bonus?

Page 47

1  **A. Of a bonus, right.**
2  Q. Which you actually received?
3  **A. I did.**
4  Q. And -- and then you were going to get a
5  five-year employment agreement, right?
6  **A. That is correct.**
7  Q. Now, back to your employment agreement, you
8  received discretionary bonuses under your NAM
9  employment agreement for each of the five years
10  that the agreement was in effect, right?
11  **A. According -- I received bonus funds in**
12  **accordance with the standard practices of NAM as it**
13  **related to any employee.**
14  Q. And all of these bonuses were discretionary
15  under your employment agreement, right?
16  **A. I -- yes.**
17  Q. Because it says in paragraph 5B the amount
18  of your bonus, if any, will be determined in the
19  sole discretion of the company's board of directors
20  or a committee thereof and shall be based on, among
21  other factors, your performance and the company's
22  performance, right?
23  **A. That is correct.**
24  Q. And I think we've marked as exhibits

Page 48

1  Exhibits 44, 45 -- maybe just these two.
2  MR. RICH: Which one is --
3  MR. KATZ: 44 is 2003 and 45 is 2004.
4  Q. (BY MR. KATZ) You'd agree with me,
5  Ms. Raider, that in most years, NAM granted you
6  about $30,000 as a discretionary bonus under your
7  employment agreement, correct?
8  **A. The bonus target was a percentage of the --**
9  **of your salary.**
10  Q. And just asking a question, in most years
11  during the five years of your employment agreement,
12  you received approximately $30,000 as a
13  discretionary bonus under your employment
14  agreement, right?
15  **A. According to these two years, the answer is**
16  **yes. On 2003 and 2004, that's correct.**
17  Q. And in your own memory, isn't it a fact
18  that you received bonuses in the same range, around
19  $30,000, for the other three years as well?
20  **A. Probably, yes.**
21  Q. Okay. Now, Mr. Fireman had an employment
22  agreement with NAM just like you, right?
23  **A. Yes.**
24  Q. In fact, he had essentially the same

Page 49

1  agreement, didn't he?
2  **A. I believe so.**
3  Q. Okay. And he, too, got salary increases
4  from News America Marketing, right?
5  **A. I believe he did.**
6  Q. And his annual salary from CCMI, like
7  yours, was only $153,000, right?
8  **A. Some people would say $153,000 is a very**
9  **good salary. Only $153,000 I think is a judgmental**
10  **statement. The answer is $153,000 was a solid**
11  **salary, and yes, we both had $153,000 in salary.**
12  Q. Yeah, I'm not disputing that fact. I agree
13  with you that 153,000 -- I use the word only in
14  comparison to other salaries that are in discussion
15  here today. Now, was Mr. Fireman taking anything
16  else out of the company prior to it being acquired
17  by News America Marketing apart from his $153,000
18  salary?
19  MR. RICH: Objection to the form.
20  **A. I do not believe so.**
21  Q. (BY MR. KATZ) Okay. He didn't receive
22  dividends?
23  **A. I don't believe so.**
24  Q. Okay. He did have an interest, did he not,

13 (Pages 46 to 49)

Ann M. Raider

Page 50

1 in the rent that was being paid by the company to
2 the estate of his father?
3   **A. We --**
4   Q. Did he not?
5   **A. We used the building owned by the Fireman**
6 **Trust to operate our company. We paid the Fireman**
7 **Trust rent as we would have paid any other**
8 **landlord. The fact that Mr. Fireman's father owned**
9 **the building was of a benefit to us, because it was**
10 **convenient and we could easily move into it at the**
11 **time that we formed the corporation.**
12   Q. But in 1999, at the time the acquisition
13 took place, approximately how much a month was
14 being paid in rent for the premises in Braintree, I
15 believe?
16   **A. You know, I don't know. I didn't deal on a**
17 **day-to-day basis with those expenses. Robert**
18 **Coughlin watched the expenses. I really dealt with**
19 **the sales and marketing issues of the company.**
20   Q. Okay. Well, let's go back to Mr. Fireman's
21 employment agreement. Mr. Fireman, too, was
22 granted discretionary bonuses under his five-year
23 employment agreement with NAM, as he not?
24   **A. I believe that's what his agreement said.**

Page 51

1   Q. Okay. And for every year except year five
2 of his employment agreement, he received a
3 discretionary bonus, did he not?
4   **A. I believe that's so.**
5   Q. And he received salary increases just like
6 you? Isn't that fair to say?
7   **A. I believe that's so.**
8   Q. And you received formal written evaluations
9 by your superiors at NAM during each of the years
10 of your employment with NAM; isn't that correct?
11   **A. Yes.**
12   Q. And for the most part, the reviews NAM gave
13 you were very favorable, were they not?
14   **A. Yes, they were.**
15   Q. And for the most part, the reviews given
16 Mr. Fireman during the five years of his employment
17 agreement by NAM were also favorable, were they
18 not?
19   **A. I really don't know about Bob's performance**
20 **reviews.**
21   Q. Did he ever complain to you that his
22 reviews were unfavorable?
23   **A. I don't believe so.**
24   Q. While you were employed by NAM, you were a

Page 52

1 NAM vice president; isn't that correct?
2   **A. No, I was a senior vice president.**
3   Q. I was going to ask that next. So you were
4 not just a vice president, but a senior vice
5 president; isn't that correct?
6   **A. Yes.**
7   Q. Okay. Was Mr. Fireman also a vice
8 president at NAM?
9   **A. Mr. Fireman was general manager of**
10 **SmartSource Direct.**
11   Q. And you considered that to be a position of
12 importance to the company, did you not?
13   **A. Yes.**
14   Q. Now, as vice president of NAM, or senior
15 vice president of NAM, you had a fiduciary duty to
16 NAM, did you not?
17     MR. RICH: Objection.
18   **A. I'm not sure what a fiduciary duty meant.**
19   Q. (BY MR. KATZ) You had a duty of care and
20 loyalty to the company, did you not?
21   **A. I had a duty to perform my responsibilities**
22 **in my role of sales and marketing.**
23   Q. Okay. And didn't you have a duty also to
24 be loyal to the company?

Page 53

1     MR. RICH: Objection.
2   **A. I'm not sure what loyal to the company**
3 **means.**
4   Q. (BY MR. KATZ) Okay. So you --
5   **A. I am a professional executive who has the**
6 **responsibility to do my job in the best interest of**
7 **the company.**
8   Q. Let me ask you this question. Did you have
9 a duty to use all of your efforts for the benefit
10 of the company insofar as your professional work
11 was concerned?
12   **A. Yes.**
13   Q. And Mr. Fireman had the same duty, did he
14 not?
15   **A. You need to ask Mr. Fireman.**
16   Q. What would be your view?
17   **A. Mr. Fireman is a professional who did --**
18   Q. No, no, but I'm just asking about duty of
19 loyalty to the company. What was your perception
20 as a senior vice president of News America
21 Marketing of the nature of Mr. Fireman's duty of
22 loyalty to News America Marketing?
23     MR. RICH: Objection. You can answer
24 if you can.

14 (Pages 50 to 53)

Ann M. Raider

Page 54

1    A. Mr. Fireman is a professional. Mr. Fireman
2  came into News America Marketing, as did I, to run
3  and operate our division, to generate profits for
4  mutual best interests of News America Marketing and
5  CCMI. And we conducted ourselves professionally.
6  We had a national reputation of being experts in
7  our field. We used opportunities in building
8  relationships with companies outside of the
9  corporation to do business on behalf of CCMI/NAM,
10  Mr. Fireman is a lawyer by training. He has an
11  impeccable reputation of being an expert in the
12  field of loyalty marketing and has integrity.
13    Q. (BY MR. KATZ) Okay. Well, let me ask you
14  this question. I'll phrase it a different way. If
15  you, Ms. Fireman, or Ms. Raider, as a senior vice
16  president of News America Marketing saw someone in
17  the company taking advantage of what could be a
18  corporate opportunity, did you have a duty to
19  report it to NAM senior executives?
20    MR. RICH: Objection.
21    A. I have no idea what you just asked me, so
22  could you restate the question?
23    Q. (BY MR. KATZ) I certainly can. If you saw
24  someone in the company at News America Marketing

Page 55

1  take advantage of what could be a corporate
2  opportunity for NAM, did you as a senior vice
3  president of NAM have a duty to report it to senior
4  management?
5    MR. RICH: Objection.
6    A. I still don't understand. I'm so sorry.
7  You're asking me if I saw someone who saw an
8  opportunity, but did not work on it?
9    Q. (BY MR. KATZ) No. If you saw someone
10  employed by NAM working on a project that was in
11  the general business area of NAM as a side project
12  for which NAM would receive no revenue, did you
13  have an obligation to report that to a senior
14  management -- to senior management at NAM?
15    MR. RICH: Objection to the form.
16    A. I don't know what -- I still don't know
17  what he's asking me. I still don't understand your
18  question.
19    Q. (BY MR. KATZ) Okay. Let's -- you guys
20  were in the gift card business, right?
21    A. Yes, we were.
22    Q. If you saw someone who was working with you
23  working on a gift card project on the side, having
24  nothing to do with News America Marketing, but this

Page 56

1  individual who was working on the side was employed
2  by News America Marketing, would you have an
3  obligation to report what you saw to senior
4  management at NAM?
5    MR. RICH: Objection.
6    A. I don't think so. People have personal
7  things that we're working on. As long as it has no
8  harm to NAM, I wouldn't report it.
9    Q. (BY MR. KATZ) Even though it's in the
10  business area that NAM is involved in?
11    A. NAM went into the loyalty card business and
12  the gift card business based on the work that we
13  did with a customer base that we had at the time,
14  and we focused on those energies. We worked
15  extremely hard to build loyalty card and gift card
16  products for our customer base, who are retailers.
17    Q. Okay. Now, under your employment
18  agreement, you had a non-competition provision, did
19  you not?
20    A. That is correct.
21    Q. And Mr. Fireman did as well under his
22  employment agreement; is that right?
23    A. If we have exactly the same employment
24  agreement, the answer is yes.

Page 57

1    Q. And you both were subject to a
2  non-competition provision in paragraph 6.2 of the
3  1999 Stock Purchase Agreement, right?
4    A. Yes.
5    Q. Okay. Have you ever purchased stock in
6  News Corp?
7    A. I did not have stock in News Corp. I had
8  options from News Corp.
9    Q. Okay. And how did you receive options in
10  News Corp?
11    A. I was awarded the options every year.
12    Q. Was Mr. Fireman as well?
13    A. I don't know.
14    Q. So that was an additional benefit that you
15  received as a result of selling your stock to News
16  America Marketing; is that right?
17    MR. RICH: Objection.
18    A. I -- I do not believe it had anything to do
19  with my selling my stock. I became an employee of
20  News America Marketing. All senior vice presidents
21  are issued stock.
22    Q. (BY MR. KATZ) You mean issued options?
23    A. Oh, I'm sorry; options, correct. So it had
24  nothing to do with whether I sold the business to

15 (Pages 54 to 57)

Ann M. Raider

Page 58

1  them or not.  I was an employee of their
2  corporation and I was following the rules of their
3  corporation as it related to salary, reviews, stock
4  options.
5      Q.  Right, but by virtue of the acquisition,
6  you received the employment agreement, and by
7  virtue of the employment agreement, you became
8  eligible to receive options in News Corp.; isn't
9  that right?
10     A.  My employment agreement had to do with my
11 working for them under -- as it related to CCMI.
12 My reviews and performance had to do with my being
13 an employee of NAM.  The fact that I became an
14 employee of NAM afforded me these opportunities,
15 yes.  You are correct.
16     Q.  Okay.  Now let's talk about your earn-out,
17 and I'm going to mark as Exhibit 46 a document --
18 oh, this was premarked.  It's a summary of the
19 earn-out payments which you and Mr. Fireman
20 received?
21         MR. RICH:  It's what number?
22         MR. KATZ:  46.
23     Q.  (BY MR. KATZ)  And you've already told us
24 that as part of the Stock Purchase Agreement you

Page 59

1  received the opportunity to receive earn-out
2  payments, right?
3      A.  Yes, that is correct.
4      Q.  And again, you received the opportunity to
5  receive a bonus on top of the earn-out if the gross
6  margin exceeded certain benchmarks in years one and
7  two after the acquisition, right?
8      A.  Yes.
9      Q.  What's the purpose of an earn-out from a
10 buyer's perspective?
11         MR. RICH:  Objection.
12     Q.  (BY MR. KATZ)  Not your perspective, but
13 from a buyer's perspective.
14     A.  In my opinion, the purpose of an earn-out
15 in the buyer's perspective is it is to facilitate
16 the growth of the company that they buy and to
17 jointly share in the profits.
18     Q.  There was no guarantee of any earn-out
19 payment in the Stock Purchase Agreement, correct?
20     A.  I do not know that.  There was a commitment
21 by News America Marketing to buy Consumer Card
22 Marketing.  So that we could grow the business to
23 $50 million, they needed to perform certain actions
24 in order to ensure that we would grow profitably

Page 60

1  together, and we had an understanding that that --
2  the market was growing, we had a leadership share
3  in the market, we had outstanding customer
4  relationships in the market, we had a business
5  plan, which David DeVoe agreed to, which said if
6  they did certain things to support our growth, we
7  would together enjoy all the revenue and share in
8  that increased sales and profit, and therefore, an
9  earn-out calculation was agreed upon based on the
10 commitments that they made to us to help us grow
11 our business to $50 million.
12     Q.  Could you go back to the Stock Purchase
13 Agreement?  I think you have it in front of you.
14 Could you show me where there's any language that
15 talks about what you just mentioned?
16     A.  Well, it will take me a long time to read
17 the whole document, so we could be here for a
18 while.
19     Q.  We can be here as long as we need to be.
20         MR. RICH:  That's not entirely true.
21     A.  At the time of the sale of the --
22     Q.  (BY MR. KATZ)  No, no, no, no.  I just want
23 to know what -- I don't want a speech.  I just want
24 you to answer the question.  I asked you to show me

Page 61

1  where there's any language.  You don't need to tell
2  -- you don't need to say anything more.  Just tell
3  me where there's language and identify it by
4  section number.
5      A.  Will you repeat the question, then, please?
6      Q.  Could you go back to the Stock Purchase
7  Agreement?  Could you show me where there's any
8  language that talks about what you just mentioned?
9      A.  I mentioned that there was a financial
10 document which stated that each year the company
11 was projected to do X amount of sales, and that
12 financial document was agreed to by David DeVoe.
13 It was based on that financial document that an
14 earn-out calculation was listed in 2.3 and a
15 commitment from NAM on 6.8 that would tell -- that
16 we would earn a certain amount of money and they
17 would perform certain actions.
18     Q.  So it's your position that paragraphs 2.3
19 and 6.8 document completely what you believe to
20 have been the arrangement that Mr. DeVoe agreed
21 upon?
22         MR. RICH:  Objection.
23     A.  I do not believe that it documents
24 completely the agreement that Mr. DeVoe agreed

16 (Pages 58 to 61)

Ann M. Raider

Page 62

1  upon.
2      Q.  (BY MR. KATZ)  But it -- the agreement says
3  -- we talked about this earlier in the deposition
4  -- that this -- this agreement, together with the
5  schedules contained and are intended as a complete
6  statement of all the terms of the arrangements
7  between the parties with respect to the matters
8  provided for and supercedes any previous agreements
9  and understandings between the parties with respect
10  to those matters.  That is the language in
11  paragraph 8.1, is it not?
12      A.  Yes, sir.
13      Q.  You would agree with me, would you not,
14  that the earn-out and the bonus were both
15  contingent on how well CCMI performed after the
16  acquisition of your stock, right?
17      A.  Yes, that's correct.
18      Q.  And there was also an agreed procedure to
19  determine the proper amount of earn-out for each
20  year the earn out provision was in effect, right?
21          MR. RICH:  Objection.
22      A.  I'm not sure what proper procedure means,
23  but there was a process.
24      Q.  (BY MR. KATZ)  There was a process, and

Page 63

1  that was in Section 2.3C, correct?
2      A.  The financial calculation is outlined in
3  2.3C.  It does not talk about the process.
4      Q.  Okay.  And let's take a look at 2.3C.  We
5  start, I guess, with 2.3B, and that says within
6  45 days following each base earn-out period, the
7  buyer should deliver to the principal sellers the
8  base earn-out amount payable in respect to the base
9  earn-out period then ended, right?
10      A.  That's what the language says.
11      Q.  And that meant that within 45 days
12  following each base earn-out period the buyer NAM
13  was to deliver to you and Mr. Fireman the earn-out
14  payable with respect to the earn-out period then
15  ended, right?  Isn't that right?
16      A.  Yes.
17      Q.  And then the sellers, that's you, had 20
18  business days following receipt of NAM's
19  calculation to submit to NAM written notice setting
20  forth in detail the seller's objections, if any, to
21  the earn-out calculation, right?
22      A.  Yes.
23      Q.  And then, according to paragraph 2.3C, if
24  you were to dispute any buyer's calculation, the

Page 64

1  dispute was to be resolved in accordance with the
2  procedure outlined in Section 2.2B of the
3  agreement, right?
4      A.  Yes.
5      Q.  And 2.2B applied both to the closing
6  balance sheet for the transaction in 1999 and the
7  earn-out calculations, right?
8      A.  I don't know if it applied to the closing
9  balance sheets.  I'd have to look at that.  I don't
10  know where it says closing balance sheet.  This has
11  to do with earn-out amount and I don't know if it's
12  relevant to the closing balance sheet.
13      Q.  Well, 2.2B is originally intended to deal
14  with disagreements regarding adjustments to the
15  closing balance sheet, is it not?
16      A.  2.3B talks about the payment of the
17  calculation.  2.3C talks about dispute.
18      Q.  No, I'm talking about 2.2B.  2.2B.
19      A.  Okay.
20      Q.  Are you with me now?
21      A.  Yeah.  Got it.
22      Q.  So 2.2B applied to both the closing balance
23  sheet for the transaction 99 and earn-out
24  calculations, right?

Page 65

1      A.  To my knowledge, 2.2B only has to do with
2  the closing balance sheet.
3      Q.  Okay.  Well, let's go back to 2.3C.
4      A.  Mm-hmm.
5      Q.  Just trying to -- I don't think this is
6  controversial, but I just want to make sure we're
7  on the same page.  2.3C --
8      A.  Mm-hmm.
9      Q.  -- says that in the event the principal
10  sellers desire to dispute any buyer's calculation,
11  the principal sellers shall, within 20 business
12  days following receipt of such buyer's calculation,
13  deliver to the buyer written notice setting forth
14  in detail their objections to such buyer's
15  calculation, which dispute shall be resolved in
16  accordance with the procedure allowed -- outlined
17  in Section 2.2B hereof?
18      A.  Yes, that's correct.
19      Q.  So that refers us back to 2.2B.  Okay?
20  Ready to turn the page?
21      A.  Yeah.
22      Q.  Okay.  So we go back to paragraph 2.2B, and
23  if you apply paragraph 2.2B to disputes regarding
24  earn-outs, the provision tells us that during the

17 (Pages 62 to 65)

Ann M. Raider

Page 66

1   15-day -- 15 business day period following the
2   delivery of a notice of disagreement between the
3   buyer and the principal sellers, the buyer and the
4   principal sellers will attempt to resolve in good
5   faith any differences which they may have with
6   respect to any matters specified in such notice of
7   disagreement and to reduce in writing such
8   resolution, right?
9       A. Yes.
10      Q. Okay. So what this meant is that there
11  would be a 15-day -- 15 business day period during
12  which you and Mr. Fireman on the one hand and NAM
13  on the other would attempt to resolve in good faith
14  any differences which you had with respect to your
15  and Mr. Fireman's objections regarding NAM's
16  earn-out calculations?
17          MR. RICH: Objection.
18      Q. (BY MR. KATZ) Isn't that right?
19      A. It says we had 15 days to resolve any
20  unresolved matters, right.
21      Q. Okay. And then, if there were any
22  unresolved matters, after 15 days, the matter would
23  be submitted to Arthur Andersen, LLP, on behalf of
24  NAM, and you would choose a Certified Public

Page 67

1   Accountant who would interact with Arthur Andersen
2   in an attempt to resolve the dispute, right?
3       A. Well, that's a little difficult, because I
4   believe at that time, Arthur Andersen went under --
5   out of business, so.
6       Q. Well, Arthur Andersen was still in business
7   in 1999, right?
8       A. I don't know, but I know that they went out
9   of business, but the answer was that they would
10  provide -- we would go to their accountants or we
11  could pick our own, right.
12      Q. Well, you would each have an accountant?
13      A. Right.
14      Q. And then the accountants would confer?
15      A. Right.
16      Q. And the accountants would attempt to
17  resolve the matter, right?
18      A. Correct.
19      Q. But that was a part of the process, right?
20      A. Yes, that is correct.
21      Q. Okay. No doubt about it?
22      A. That was a part of the process.
23      Q. Okay. And an important part of the process
24  was you had to select an accountant to work with

Page 68

1   Arthur Andersen if after discussing your objections
2   with NAM management you had unresolved matters
3   regarding your earn-out calculation, right?
4       A. It says we had a seller's accountant. It
5   didn't say that we had to select one. Your comment
6   is we had to select one. We had to have an
7   accountant work --
8       Q. You had to designate one?
9       A. We would designate one.
10      Q. Yeah, and if you didn't designate one, the
11  process would stop, right?
12      A. I don't know about the process stopping.
13  It said we would designate an accountant.
14      Q. Okay. Now, if after 30 days the two
15  accounting firms were unable to resolve the
16  disputed issue, then the dispute would be submitted
17  for final and binding decision to a third
18  nationally-recognized independent accounting firm?
19  Isn't that what was called for under the agreement?
20      A. Yes.
21      Q. And then once the third accountant made his
22  final and binding decision, the earn-out would be
23  paid with interest at 150 basis points above prime
24  from the applicable base earn-out payment date.

Page 69

1   Isn't that what the provision provides?
2       A. Yes.
3       Q. Now, let's turn to paragraph 6.8 of the
4   Stock Purchase Agreement, and I'd like you to read
5   that provision carefully.
6       A. Okay.
7       Q. Please read the paragraph carefully.
8       A. Yes. It is the buyer's --
9       Q. You don't need to read it into the record.
10  Just read it to yourself.
11      A. Mm-hmm.
12      Q. You were not happy with the inclusion of
13  this paragraph in the Stock Purchase Agreement in
14  this form, were you?
15      A. That is not an accurate statement.
16      Q. Okay.
17      A. I was happy with the definition of the
18  performance that NAM was to provide the company so
19  that we had a measure in which they were obligated
20  to do the work that they had promised us to do. I
21  was not pleased with the statement part of the
22  paragraph that said that they had sole and
23  unfettered judgement and that they -- and I -- I
24  specifically remember speaking to David DeVoe

18 (Pages 66 to 69)

Ann M. Raider

Page 70

1  directly about this statement and said we were not
2  happy with the way this was worded, and I asked him
3  for a full explanation of what he meant and why it
4  was there or we should strike it.
5        David's comments to me were this. He
6  said he wanted to have it in the agreement. His
7  intention was that NAM had several operating units.
8  We were in this part in the In-Store, News America
9  Marketing In-Store, but they had other legal
10 entities and that he wanted the right to move the
11 new -- the new businesses he was buying to other
12 legal entities if it was in NAM's personal best
13 interest. It was under that discussion and
14 conversation that that particular statement
15 remained in the contract.
16     Q. He was unwilling to take that -- take the
17 language of paragraph 6.8 out, right?
18     A. There were -- I'm -- let's see. He was not
19 -- he was very willing to leave the paragraph
20 stating what we believe were NAM's obligations to
21 CCMI in. He asked to keep the sentence about
22 unfettered judgement in because it had an
23 interpretation from a legal entity point of view,
24 and therefore, he asked to keep it in. And it was

Page 71

1  under my understanding of his intention and his
2  description of his intention that we moved from
3  that point.
4      Q. Now, Les Charm on your behalf objected to
5  paragraph 6.8 to Mr. DeVoe, did he not?
6      A. I believe that's correct.
7      Q. And did you have any conversations with
8  Mr. Charm about paragraph 6.8?
9      A. I do not recall at this time.
10     Q. And is the only conversation that you had
11 with Mr. DeVoe the one that you just recounted a
12 moment ago?
13     A. I had many conversations with Mr. DeVoe on
14 a regular basis as it related to the intention of
15 us selling our business to CCMI -- CCMI to News. I
16 remember this particular conversation because our
17 lawyers shared with us a concern that they had --
18        MR. RICH: Wait a minute. Be very
19 careful not to disclose what your lawyers said to
20 you unless you shared it with Mr. DeVoe.
21     A. Okay. I --
22     Q. (BY MR. KATZ) Well, did you share it with
23 Mr. DeVoe, what your lawyers said?
24     A. I shared with Mr. DeVoe that we had a

Page 72

1  concern, we had a concern about this statement and
2  that Mr. DeVoe specifically gave me clarity on what
3  he meant by this particular statement and that I
4  was satisfied that it was why he wanted it in there
5  and the intentions under which he would use this.
6      Q. Well, let's take a look at the language in
7  paragraph 6.8. It says it is the buyer's current
8  intention to provide support to the business of the
9  company by among other things, one, utilizing
10 buyer's sales force in order to promote the sale of
11 the company's products, two, assisting the company
12 in the creation of long-term relationships with
13 retailers, and three, investing in software and
14 hardware as needed to expand the company's
15 business. I read that correctly, right?
16     A. Yes, sir.
17     Q. In this sentence, NAM does not guarantee
18 that it would provide any particular level of
19 support to the business of the company, right?
20     A. It is the intention means that they --
21     Q. I just -- please just answer my question;
22 yes or no.
23     A. There is no percentage of commitment
24 defined.

Page 73

1      Q. Okay. There is no guarantee of any
2  commitment defined, is there?
3        MR. RICH: Objection.
4      Q. (BY MR. KATZ) The word guarantee does not
5  appear, does it?
6      A. The word guarantee does not appear --
7      Q. Thank you.
8      A. -- but the word intention does.
9      Q. The sentence does not even say that buyer
10 or NAM shall provide support for the business of
11 the company; isn't that correct?
12     A. The word shall is not there.
13     Q. Okay. Now, you have heard, have you not,
14 that it is NAM's policy to add head count only
15 after business materializes?
16     A. I do not know that to be the case.
17     Q. Have you ever heard that expression used --
18     A. No, sir, I have not.
19     Q. -- that head count follows business?
20     A. No, sir. I have not heard that. In fact,
21 quite the contrary. In the dot com business, they
22 hired a lot of people with no revenue, and
23 therefore, that policy was not something that NAM
24 practiced.

19 (Pages 70 to 73)

Ann M. Raider

|  | Page 74 |
|---|---|
| 1 | Q. And what was the effect in the dot com |
| 2 | world as a whole? |
| 3 | A. That business continues to operate for NAM |
| 4 | today. |
| 5 | Q. I'm not talking about NAM, but I'm talking |
| 6 | about in the dot com world as a whole where they |
| 7 | added head count before they had revenue? |
| 8 | A. I do not know the extent of which the |
| 9 | market is operating. Many dot com companies are |
| 10 | extremely successful today and growing. |
| 11 | Q. And you would not dispute that many failed |
| 12 | in 2000 and 2001? |
| 13 | A. In the press, there were statements that |
| 14 | several companies failed, yes. |
| 15 | Q. Okay. |
| 16 | A. But we are talking about NAM and we are |
| 17 | talking about NAM's process and you asked the |
| 18 | question specifically about NAM. |
| 19 | (Off the record.) |
| 20 | (Recess taken.) |
| 21 | (Exhibit 47 marked for identification.) |
| 22 | Q. (BY MR. KATZ) I've shown you, Ms. Raider, |
| 23 | Exhibit 47. Do you have a copy of it? |
| 24 | A. Mm-hmm. |

|  | Page 75 |
|---|---|
| 1 | Q. Exhibit 47 was an e-mail which Mr. DeVoe |
| 2 | sent to you among others, right? |
| 3 | A. Yes. |
| 4 | Q. And in fact, this copy came out of your |
| 5 | files, right? |
| 6 | A. I don't know that. |
| 7 | Q. Take a look at the Bates stamp number FR -- |
| 8 | MR. RICH: Well, it came from |
| 9 | Mr. Fireman's or Ms. Raider's, so one of the two. |
| 10 | MR. KATZ: Okay. |
| 11 | Q. (BY MR. KATZ) If you take a look at the |
| 12 | text Exhibit 47, you'll see under the heading Ann's |
| 13 | group; do you see that? |
| 14 | A. Yes. |
| 15 | Q. And then it talks about manufacturing and |
| 16 | sales, Kevin Tripp; do you see that? |
| 17 | A. Yes. |
| 18 | Q. And then it says hold firm and look to hire |
| 19 | additional head count as sales develop; do you see |
| 20 | that? |
| 21 | A. I see that statement. |
| 22 | Q. And you'd agree that that's consistent with |
| 23 | the concept of head count following business, |
| 24 | right? |

|  | Page 76 |
|---|---|
| 1 | MR. RICH: Objection. |
| 2 | A. I do not believe that's consistent at all. |
| 3 | Q. (BY MR. KATZ) You don't? Okay. Isn't it |
| 4 | a fact that News America Marketing applies the |
| 5 | principle of head count following business across |
| 6 | the board? |
| 7 | A. Not that I recall. |
| 8 | Q. Okay. Let's go to the second sentence of |
| 9 | paragraph 6.8 in the Stock Purchase Agreement. |
| 10 | A. Okay. |
| 11 | Q. Okay? You're there? |
| 12 | A. Yeah. |
| 13 | Q. I'm going to read the second sentence. It |
| 14 | says notwithstanding the foregoing, buyer shall be |
| 15 | free to operate the company and its affiliates in |
| 16 | its sole and unfettered judgement and sellers shall |
| 17 | have no claims against buyer in connection |
| 18 | therewith as a result of the preceding sentence. |
| 19 | Did I read that correctly? |
| 20 | A. You read that correctly. |
| 21 | Q. And we can agree, can we not, that the |
| 22 | second sentence said that you as the buyers had no |
| 23 | right to bring a claim concerning how NAM ran the |
| 24 | CCMI business? |

|  | Page 77 |
|---|---|
| 1 | MR. RICH: Objection. |
| 2 | A. I do not believe that's the intent of this |
| 3 | document. |
| 4 | Q. (BY MR. KATZ) By entering into the Stock |
| 5 | Purchase Agreement, you released CCMI from any |
| 6 | future claim regarding how it ran the CCMI |
| 7 | business, did you not? |
| 8 | A. No, sir, that's not true. |
| 9 | Q. The second sentence gave NAM the freedom to |
| 10 | operate the CCMI business in its sole and |
| 11 | unfettered discretion; isn't that right? |
| 12 | A. No, that is not true. |
| 13 | Q. Even though the words say that? |
| 14 | A. Mr. DeVoe told me -- |
| 15 | Q. No, no. Just answer my question. |
| 16 | A. The word stated that is not the case. The |
| 17 | whole context -- |
| 18 | Q. Just answer my question, please. The |
| 19 | second sentence says that NAM has the freedom to |
| 20 | operate the CCMI business in its sole and |
| 21 | unfettered judgement. Aren't those what the words |
| 22 | say? |
| 23 | MR. RICH: Objection. That's not what |
| 24 | the words say, but -- |

20 (Pages 74 to 77)

Page 78

1    A. The words --
2    Q. (BY MR. KATZ) It's just a yes or no
3 question.
4    A. The words say buyer shall be free to
5 operate the company and its affiliates in its sole
6 and unfettered judgement.
7    Q. That's what the words say?
8    A. Those are the words.
9    Q. You don't dispute that?
10    A. I do not dispute the words.
11    Q. Now, insofar as the agreement was
12 concerned, NAM management was free to make mistakes
13 in its management of the CCMI business, was it not?
14    A. No, sir, it was not. The intent of this --
15    Q. Just answer my questions yes or no. I'm
16 going to ask you a lot of questions --
17    A. Sure. Sorry.
18    Q. -- and if we get long discussions on each
19 of them that don't answer the question, we're just
20 going to be here longer than we need to be.
21    A. Okay. Sorry.
22    Q. So just listen to my question. If you
23 don't understand the question, let me know, but just listen
24 to the question and answer it to the best of your

Page 79

1 ability, okay?
2    A. Okay.
3    Q. NAM was free to set the budgets of the CCMI
4 business, was it not?
5    A. No.
6    Q. NAM was free to decide where to make
7 capital expenditures, was it not?
8    A. No.
9    Q. NAM was free to decide when to make capital
10 expenditures, was it not?
11    A. No.
12    Q. NAM was free to decide when to make
13 additional hires, was it not?
14    A. No.
15    Q. NAM was free to choose who would be your
16 supervisors, was it not?
17    A. No.
18    Q. NAM was free to determine who, if anyone,
19 you would supervise, was it not?
20    A. No.
21    Q. NAM was free to choose what areas of CCMI's
22 business would be pursued in the future, was it
23 not?
24    A. No.

Page 80

1    Q. NAM was free to discontinue business
2 activities of CCMI that were no longer profitable,
3 was it not?
4    A. No.
5    Q. NAM was free to discontinue business
6 activities of CCMI even if they were profitable,
7 was it not?
8    A. No.
9    Q. NAM was accountable only to its directors
10 and shareholders for whatever mistakes it might
11 make in operating the CCMI business, was it not?
12       MR. KATZ: Objection.
13    A. No.
14    Q. (BY MR. KATZ) NAM was not accountable to
15 you or Mr. Fireman for how it operated the business
16 of CCMI after it acquired your stock, was it?
17    A. NAM was accountable to Bob Fireman and I.
18    Q. And where do you derive that conclusion?
19    A. The agreement of this company's sale was in
20 good faith that they would help us with their
21 actions build the company to $50 million. There
22 was a financial document which was approved by
23 David DeVoe which said we had a plan and they were
24 to support that plan.

Page 81

1    Q. And where in the Stock Purchase Agreement
2 do you find any reference to that document?
3    A. That document exists. There are multiple
4 copies of that document. And I'm sure you have it
5 in all of the boxes somewhere and I do not believe
6 it's in this particular statement as it is.
7    Q. So you would agree with me that the
8 document, which I believe you referred to as your
9 business plan, is not incorporated in the 1999
10 stock purchase agreement, correct?
11       MR. RICH: Objection.
12    A. I believe that particular document is not
13 included, but it is the basis upon which in good
14 faith David DeVoe bought our company with the
15 commitment to help it to grow based on that
16 financial agreement, and therefore, their actions
17 were to support us to grow this business.
18    Q. (BY MR. KATZ) NAM did not need to consult
19 you with or Mr. Fireman before making a decision
20 regarding the operation of the CCMI business, did
21 it?
22    A. Yes, it did.
23    Q. If NAM did consult with you regarding the
24 operation of the CCMI business, it did not need to

21 (Pages 78 to 81)

Ann M. Raider

Page 82

1  accept your opinion, did it?
2      **A. It had to accept our opinion.**
3      Q. In point of fact, NAM did consult with you,
4  and neither you nor Mr. Fireman were bashful in
5  letting the senior executives at NAM know your
6  views on the operation of what had been CCMI,
7  right?
8          MR. RICH: Objection to the form of the
9  question.
10         MR. KATZ: Yeah, I can break it down,
11  because I think it's a compound question.
12     Q. (BY MR. KATZ) In point of fact, NAM did
13  consult with you about the operation of the CCMI
14  business, did it not?
15     **A. I'm not sure what your definition of**
16  **consult means.**
17     Q. Well, what's your definition of consult?
18     **A. NAM did not ask us in advance for our**
19  **opinions when they made decisions, so for example,**
20  **they put a hiring freeze in the company. They did**
21  **not tell -- ask us whether that hiring freeze**
22  **should or should not apply to us. NAM made the**
23  **decision to reorganize their sales force, which was**
24  **the sales force that we were to use to call on**

Page 83

1  **manufacturers. They did not ask our permission**
2  **that they were going to reorganize the sales force,**
3  **and therefore, we had no access to people who they**
4  **had promised us we would have access to. So NAM**
5  **did not consult with us about things that they did**
6  **that directly impacted our business. NAM made a**
7  **decision to take our technical people to**
8  **Connecticut to help them run other parts of the**
9  **business. They made that decision. They did not**
10  **consult with us.**
11     Q. But they did consult with you on other
12  thing, didn't they?
13     **A. I'm not sure what other things.**
14     Q. Did you ever attend strategy sessions?
15     **A. No.**
16         MR. KATZ: Let's mark as exhibit next
17  in order a document called Summary and Next Steps,
18  CCMI Strategy Session, 11/17/99, and that is
19  Exhibit 48.
20         (Exhibit 48 marked for identification.)
21     Q. (BY MR. KATZ) You have Exhibit 48 in front
22  of you?
23     **A. Mm-hmm.**
24     Q. Exhibit 48 are meeting notes of a meeting

Page 84

1  which took place on 11/17/99; do you see that?
2      **A. Yes.**
3      Q. And do you see you're listed as an attendee
4  at this meeting?
5      **A. I see I'm listed.**
6      Q. And you remember being present at this
7  meeting?
8      **A. I do not.**
9      Q. You do not?
10     **A. I do not.**
11     Q. Okay. But the attendees listed here are
12  Paul Carlucci, right?
13     **A. Yes.**
14     Q. And he was the chairman of the company,
15  right?
16     **A. Yes.**
17     Q. Dave DeVoe? What was his position?
18     **A. CFO.**
19     Q. Dominick Porco, what was his position?
20     **A. President.**
21     Q. So you are at a meeting, you and
22  Mr. Fireman, because he's also listed there, right?
23     **A. He's listed, right.**
24     Q. Okay. The first thing under the summary is

Page 85

1  that Ann and Bob presented their strategy, which
2  included strategy overview, P&L review, account
3  strategies, and then it goes on for a page
4  describing what you presented, right?
5      **A. Yes.**
6      Q. You don't have any doubt as you sit here
7  today that you participated in the meeting that's
8  reflected in this memorandum, right?
9      **A. I don't recall attending this meeting, but**
10  **if it stated that I was there, I was there.**
11     Q. So that being the case, it's not a correct
12  statement to say that you weren't provided access
13  to company management to provide your view as to
14  what the strategy of CCMI should be, right?
15     **A. One meeting does not constitute providing**
16  **access.**
17     Q. But there were other meetings, too, weren't
18  there?
19     **A. I don't recall other meetings as this -- as**
20  **this meeting.**
21     Q. But you had plenty of opportunity to talk
22  to, send e-mails, attend other executive meetings
23  with News America management during the course of
24  your five years in News America management; isn't

22 (Pages 82 to 85)

Ann M. Raider

Page 86

1 that right?
2    **A. I had the opportunity to send e-mails and**
3 **talk with senior executives. Attending meetings I**
4 **did not do a lot of.**
5    Q. But you did some of, right?
6    **A. Um, meetings -- for what purposes? Did I**
7 **attend meetings with other people in News America?**
8 **Yes.**
9    Q. Thank you. We can agree, can we not, that
10 all of NAM's business decisions had one purpose,
11 and that was maximizing company profit; isn't that
12 right?
13       MR. RICH: Objection.
14    **A. I don't know that that's the sole stated**
15 **goal of NAM, maximize profit.**
16    Q. (BY MR. KATZ) There's no other goal that
17 you're aware of, right?
18    **A. There's no other -- I don't know that -- I**
19 **don't know the list of goals. I know that**
20 **certainly earning a profit was important.**
21    Q. Are you aware of any other goal that New
22 America Marketing had in connection with any of the
23 decisions that it made regarding CCMI?
24    **A. As it related to CCMI?**

Page 87

1    Q. Yes.
2    **A. I don't know what their goals were as**
3 **related to CCMI, because -- I have -- I am not**
4 **aware of what their goals were with CCMI.**
5    Q. Okay. As far as you're concerned, you're
6 not aware of any goal that any NAM executive had
7 other than maximizing profit? Isn't that a fair
8 statement?
9       MR. RICH: Objection.
10    **A. NAM's executive goal for -- talked about**
11 **other topics like increasing market share in their**
12 **base business or things like that, so are you -- I**
13 **guess are you talking about NAM, or are you talking**
14 **about CCMI?**
15    Q. (BY MR. KATZ) I'm talking about NAM. I'm
16 talking about NAM. NAM had one goal, maximize
17 profit, right?
18    **A. I do not believe that's so.**
19    Q. But what other goal did they have?
20    **A. They had their goal of increasing market**
21 **share.**
22    Q. But isn't increasing market share for the
23 purpose of maximizing profit?
24    **A. But sometimes you increase market share and**

Page 88

1 that does not increase profits; in fact, it takes
2 profits down, so I don't know --
3    Q. But that's not the intent, right? The
4 intent is to maximize profit. You may make the
5 wrong decision, but your intent is always to
6 maximize profit, right?
7    **A. I'm not sure that's an exact statement.**
8    Q. I mean, what else does a company do besides
9 maximize profit? That's the only objective that a
10 business entity has; isn't that right?
11    **A. I don't know that that's true.**
12    Q. But you don't know of any objective that
13 any New America Marketing executive had in his
14 management of New America Marketing other than
15 maximizing profit?
16    **A. No. I just said to you that I believe one**
17 **of their objectives was to increase market share,**
18 **which does not necessarily mean they would maximize**
19 **profit. It meant that they would increase share,**
20 **which would cost them profit in a period of time.**
21    Q. But wouldn't that be ultimately to gain
22 profit in the long term, even if it meant it may be
23 a cost in the shorter term?
24    **A. Possibly.**

Page 89

1    Q. Okay. So wouldn't you agree with me that
2 every decision that NAM made was for the purpose of
3 maximizing profit?
4       MR. RICH: Objection.
5    **A. I don't know that to be true.**
6    Q. (BY MR. KATZ) But you're not able to
7 identify any other purpose that NAM had in
8 connection with the management of its business
9 other than maximizing profit?
10    **A. No. I've stated to you three times. I**
11 **know that they wanted to increase market share.**
12 **Increasing market share may not be maximizing**
13 **profit; not in the short run, not in the long run.**
14 **It may cost them a lot of money to maximize their**
15 **market share.**
16    Q. Okay. Well, let me ask this question. So
17 apart from increasing market share and maximizing
18 profit, you're not aware of any other purpose that
19 executives at New America Marketing had other than
20 those?
21    **A. That's not true. They wanted to penetrate**
22 **new channels. They wanted to penetrate new**
23 **markets. They had many, many general goals as a**
24 **corporation.**

23 (Pages 86 to 89)

Ann M. Raider

| Page 90 | Page 92 |
|---|---|
| 1    Q. Are you aware of any other specific goals<br>2 that New America Marketing had other than the ones<br>3 that you've just identified?<br>4    **A. I was not allowed to sit in the strategy**<br>5 **sessions for New America Marketing. I never**<br>6 **attended the strategy sessions for New America**<br>7 **Marketing. Therefore, I can't tell you exactly**<br>8 **what all of their goals are. I can only report to**<br>9 **you what I remember hearing on the management**<br>10 **meeting calls periodically. I did not sit in any**<br>11 **of the New America Marketing strategy sessions as**<br>12 **related to New America Marketing.**<br>13    Q. Okay. For the most part, you'd agree that<br>14 NAM's business decisions were pretty good; isn't<br>15 that a fact?<br>16       MR. RICH: Objection.<br>17    A. I don't -- I don't know what that means.<br>18    Q. (BY MR. KATZ) Well, NAM increased its<br>19 profit every year while you were employed at New<br>20 America Marketing; isn't that right?<br>21    **A. No, I believe that's not right. I believe**<br>22 **one year they lost profits.**<br>23    Q. As a company as a whole?<br>24    **A. Yes, I believe that's right. I think one** | 1 the term marginalized to describe how you felt you<br>2 were being treated by NAM executives, right?<br>3    **A. That's correct.**<br>4    Q. And it's a fair statement that you began to<br>5 feel marginalized even before the deal closed,<br>6 right?<br>7    **A. I don't know that to be true.**<br>8    Q. In fact, you got some bad vibes during the<br>9 negotiation process, didn't you?<br>10    **A. We entered into the negotiation process to**<br>11 **do -- to go forward to build a corporation**<br>12 **together. We would never have consummated the deal**<br>13 **if we thought they were not going to be dealing in**<br>14 **good faith.**<br>15    Q. But there were provisions in the written<br>16 agreement that made you uncomfortable; isn't that<br>17 right?<br>18    **A. There were provisions in the agreement**<br>19 **where I asked for clarification. The whole context**<br>20 **of the agreement was that we would work together to**<br>21 **build profits together as a newly formed group.**<br>22    Q. But the fact that you had to ask for<br>23 clarification made you a little uneasy; isn't that<br>24 right? |

| Page 91 | Page 93 |
|---|---|
| 1 **year they did not do well profit-wise.**<br>2    Q. And what year was that?<br>3    **A. I think it was 2001 or 2002, they had a**<br>4 **difficult year financially.**<br>5    Q. So you would be surprised to learn that<br>6 they've had seven successive years of increased<br>7 profit?<br>8    **A. Yes, I would, because one year I believe**<br>9 **that they had a very difficult time.**<br>10    Q. Okay. Let's take a look at the complaint<br>11 in this case, which I think we've marked as<br>12 Exhibit 39. Ms. Raider, you met with counsel<br>13 before the complaint was filed?<br>14       MR. RICH: You can answer that yes or<br>15 no.<br>16    **A. Yes.**<br>17    Q. (BY MR. KATZ) And the complaint was filed<br>18 on August eighth, 2005?<br>19    **A. Yes.**<br>20    Q. But you -- it's a fair statement that you<br>21 began experiencing the problems you relate in the<br>22 complaint as early as 1999; isn't that right?<br>23    **A. That's correct, yes.**<br>24    Q. And in your interrogatory answers, you use | 1       MR. RICH: Objection.<br>2    **A. I am not a lawyer. I am a business person.**<br>3 **I asked for clarification to make sure that we were**<br>4 **entering into the good faith agreement to build a**<br>5 **company together.**<br>6    Q. (BY MR. KATZ) But you were uneasy, and<br>7 that's why you had to ask for clarification; isn't<br>8 that right?<br>9    **A. I ask a lot of questions.**<br>10    Q. I understand that, but you were uneasy in<br>11 the summer of 1999, and that's why you had to ask<br>12 for clarification; isn't that right?<br>13       MR. RICH: Objection.<br>14    **A. I cannot -- I would not characterize how I**<br>15 **felt in 1997 --**<br>16    Q. (BY MR. KATZ) 1999.<br>17    **A. Right. 1999, as we began this process to**<br>18 **sell the company, I cannot say that I was uneasy.**<br>19 **I was asking for the business clarifications.**<br>20    Q. But as we get toward the signing of the<br>21 agreement and you see paragraph 6.8 and you see the<br>22 power that News America has and you ask for<br>23 clarification, you -- you were concerned; isn't<br>24 that right? |

24 (Pages 90 to 93)

Ann M. Raider

Page 94

1    MR. RICH:  Objection.
2    A. I did not perceive News America to have
3 significant power.  They were buying multiple small
4 businesses which were forward-thinking, which had
5 trends in the industry which they had no experience
6 in, and that they saw there was multiple
7 opportunities, and therefore, I believed that we
8 were entering into an agreement with a corporation
9 that saw the business trends that they had no
10 experience in that they could work with us in one
11 part together to move forward.  I did not see them
12 as a gigantic corporation.  I saw them as a
13 business partner who had the smart sense to want to
14 work with this company to move forward in a part of
15 the business practice where they were not at all
16 having any experience.
17    Q. (BY MR. KATZ)  But you saw that News
18 America Marketing was going to have sole and
19 unfettered discretion to run the business, right?
20 That was in the agreement?
21    MR. RICH:  Objection.
22    A. That was not the intention of the
23 conversation that I had with David DeVoe.  I
24 explained that to you.  There was a precise

Page 95

1 conversation where I asked David, could you please
2 explain why this was here and why we should take it
3 out, and he explained to me that he wanted it in
4 there so that he could change the legal entities in
5 NAM's best interest.  He wanted the right to do
6 that and that's why it was that statement was in
7 there.
8    Q. (BY MR. KATZ)  So you wanted him -- it
9 would have been your preference if he would have
10 taken that statement out?  Is that a fair
11 statement?
12    A. Yes.
13    Q. And you wanted him to take it out?
14    A. I asked him about taking it out.
15    Q. And he said no?
16    A. And he said this is what it means.
17    Q. But he said no?  He said I will not take it
18 out?
19    A. He did not use those words.  He said this
20 is what it means and this is why it is there.  He
21 did not say unequivocally to me.  I mean, he may
22 have said it to someone else.  I do not recall him
23 saying no, I am not taking this out.  I said David,
24 can you explain to me what this means and why is it

Page 96

1 in here and shouldn't we take it out, and he said
2 this is why it's in here and this is why I would
3 like it in here.  He did not say unequivocally to
4 my knowledge that I recall at the moment.
5    Q. And where were you when you had this
6 conversation with Mr. DeVoe?
7    A. I was sitting in the conference room at 165
8 Wood Road, which is CCMI's offices.
9    Q. And where was Mr. DeVoe?
10    A. On the phone.
11    Q. And this was during the summer of 1999?
12    A. Yes.
13    Q. And again, Mr. DeVoe said to you what in
14 response to your request that paragraph 6.8B be
15 taken out?
16    A. I asked -- I asked David -- we worked
17 together on the definition of the performance that
18 NAM would agree to do on behalf of the company so
19 we had some milestones of what they committed to do
20 as we worked together in good faith to get this
21 business transaction done to grow the company.  The
22 goal was to grow the company to $50 million.  That
23 was the plan.  And when the sentence was there, I
24 asked David why is this sentence here and what does

Page 97

1 it mean, and that's when he gave me the answer that
2 I have reported to you.
3    Q. And just so I'm clear, could you give me
4 that answer one more time?
5    A. He said I would like the statement in there
6 because we have different legal entities and I want
7 the right to move you from one legal entity to
8 another and I don't want to have that issue, and
9 that was the explanation that I received.
10    Q. And you accepted it?
11    A. I did.  I trusted the man who I was going
12 to work with to build a company to $50 million.  He
13 committed to performance and I believed that he was
14 acting in good faith that we would move forward
15 together.
16    Q. Now, you had a celebration following the
17 close of the Stock Purchase Agreement?
18    A. I don't know.  I don't remember.
19    Q. You went out to dinner?
20    A. Bob Fireman and I went out to dinner.  No,
21 I don't know if we went to dinner afterwards.  I
22 don't know the answer.
23    Q. Did you celebrate with your family?
24    A. No.  Actually, I was at the Cape.  My

25 (Pages 94 to 97)

Ann M. Raider

Page 98

1   family wasn't there.
2       Q.  But it was a happy day?
3       A.  Selling the business?
4       Q.  Receiving that check for $930,000.
5       A.  Actually, it was a very scary day.
6       Q.  Because?
7       A.  Because I had built a business with Bob
8   that was like a child and we were embarking on
9   growing the company and I, you know, had -- felt
10  remorse, right?  We sold the business.  The child
11  was growing up.
12      Q.  It's like sending it out into the world?
13      A.  Right, going to college.  I cried the day
14  my children went to college.  Same thing.
15      Q.  Right.  It's no longer your baby?
16      A.  Yeah, it's an evolution to an adulthood.
17  Yes.
18      Q.  Now, you read the complaint before it was
19  filed, right?
20      A.  Yes, sir.
21      Q.  And you familiarized yourself with it
22  before it was filed?
23      A.  Yes.
24      Q.  And you understood that it was a serious

Page 99

1   step to file a lawsuit, right?
2       A.  Yes, sir.
3       Q.  Not something to be done casually, right?
4       A.  Filing a lawsuit is a serious matter.
5       Q.  Right.  And you are aware, are you not,
6   that all of NAM's costs and attorneys' fees could
7   be assessed against you if the Court were to find
8   under Rule 11 of the Federal Rules of Civil
9   Procedure that your claims were not warranted under
10  the provisions of the rule?
11      A.  No, I was not aware of that.
12      Q.  And are you aware that NAM's legal costs
13  could be well over a million dollars before this
14  case is over?
15      A.  I have no idea about that.  You must be an
16  expensive lawyer.
17      Q.  In your complaint, you have three counts,
18  right?
19      A.  Yes.
20      Q.  The first count is breach of the covenant
21  of good faith and fair dealing which you claim is
22  implicit in the 1999 Stock Purchase Agreement,
23  right?
24      A.  Yes.

Page 100

1       Q.  And this breach you allege was committed by
2   the NAM executives who ran CCMI after the
3   acquisition?
4       A.  Yes.
5       Q.  And their decisions, you claim, led to the
6   breach of the covenant of good faith and fair
7   dealing, right?
8       A.  Yes.
9       Q.  That's what you claim, am I right?
10      A.  Yes.
11      Q.  And those NAM executives who would have
12  made these decision were all located in either New
13  York or Wilton, Connecticut, right?
14      A.  That is correct.
15      Q.  That's where their offices are located,
16  right?
17      A.  Yes.
18      Q.  None of them are located in Boston or
19  elsewhere in Massachusetts, right?
20      A.  No.
21      Q.  Now, your second count is under
22  Massachusetts General Law 93A, right?
23      A.  Yes.
24      Q.  Do you still make that claim as you sit

Page 101

1   here today?
2       A.  Yes.
3       Q.  Now, your third count is for declaratory
4   judgement, right?
5       A.  Yes.
6       Q.  And here you claim that other News America
7   business units, including the I-Group, are
8   successors to CCMI and that the revenues generated
9   by them must be included in the calculation of
10  gross margin that determines the amounts due to you
11  and Mr. Fireman under the agreement?
12      A.  Yes.
13      Q.  Is that what you contend?
14      A.  Mm-hmm.
15      Q.  Do you still make that claim?
16      A.  Yes.
17      Q.  Okay.  Is there revenue from other NAM
18  business units which should have been included in
19  any of the five earn-out calculations?
20      A.  I was asked to support sales for the dot
21  com group and the base organization, and therefore,
22  my work, which took me away from earning money in
23  my own company to generate sales in other aspects
24  of the news organization should therefore be

26 (Pages 98 to 101)

Ann M. Raider

Page 102

1 counted.
2     Q. And so what you base this claim on is the
3 fact that you did some work for SmartSource dot
4 com?
5     A. Yes.
6     Q. Anything else?
7     A. And then the -- the NAM organization, the
8 base NAM organization.
9     Q. So you did some other work for NAM?
10    A. Yes, that's correct.
11    Q. And what was that other work?
12    A. Introducing them to clients to sell the
13 base products.
14    Q. I see. So you did some introductions?
15    A. Which closed business.
16    Q. And who did you make introductions to?
17    A. I made introductions to retailers.
18    Q. Can you identify them for me, please?
19    A. I don't recall at the moment, and I am sure
20 it's listed in my activity reports.
21    Q. But I'm asking you if you can remember them
22 now.
23    A. I don't recall all the details, but I'm
24 sure it's in all the documents we have.

Page 103

1     Q. Can you identify one retailer to which you
2 introduced other NAM personnel from which revenue
3 was generated as a result of your meeting?
4     A. Yes, I can't -- I know that that occurred
5 and I do not recall the names of the retailers, but
6 I know that there are written documentations that
7 explain the incremental sales that I made for
8 SmartSource dot com.
9     Q. Do you have those documents?
10    A. You must have those documents in all of the
11 materials that were handed to you, and I'm certain
12 that NAM has those documents and that SmartSource
13 dot com has those documents.
14    Q. But you can't as you sit here identify the
15 retailers who you think you should get credit for?
16 Isn't that a fact?
17    A. At the moment, I don't recall the details
18 of those transactions. I know that they did occur.
19 I know that there was reports that were written
20 that state who the retailers were and the
21 manufacturers.
22    Q. Okay. And so is it introducing to
23 retailers and manufacturers?
24    A. Yes.

Page 104

1     Q. So both?
2     A. Yes.
3     Q. Okay. Can you name -- again, I'm going to
4 ask you this again. Can you name one retailer for
5 which work was actually obtained as a result of
6 your introduction?
7     A. I -- I cannot remember at the moment, but
8 there is documentation and it will tell you and NAM
9 has that information.
10    Q. Can you tell me what year that took place?
11    A. I believe it took place beginning in 2000
12 -- 2000/2001 to 2003.
13    Q. And with respect to manufacturers, can you
14 remember any manufacturers that you were
15 responsible for providing the introduction that
16 ultimately led to getting the work?
17    A. Coca-Cola.
18    Q. And when did this take place?
19    A. I don't recall the exact year, but it
20 happened --
21    Q. Was it toward the beginning or toward the
22 end of your tenure with NAM?
23    A. I would say it was in the middle.
24    Q. And did you raise -- well, first of all,

Page 105

1 let me ask you, any other retail manufacturers
2 besides Coca-Cola?
3     A. I'm sure there were several, but I don't
4 recall the details and I know that it's probably
5 sitting in the documents.
6     Q. But as you sit here today, Coca-Cola is the
7 only one that you can remember?
8     A. At the moment, today, Coca-Cola is the one
9 that I remember specifically, but there are other
10 companies and I know that it was reported.
11    Q. Mm-hmm. And you think that whatever work
12 you did in this -- in this regard was over and
13 above your employment agreement and should be
14 credited toward your earn-out?
15    A. Yes, that is correct. My job was to drive
16 the profitability of my group and the sales of my
17 group so that we could mutually take this business
18 to $50 million. I was distracted by being required
19 to go and sell other products and services of NAM
20 to customers I had relationships with.
21    Q. Okay. Did you ever raise this issue in any
22 of your earn-out discussions with officials at NAM?
23    A. We raised many issues about our earn-out.
24    Q. No, I understand that, but did you ever

27 (Pages 102 to 105)

Ann M. Raider

Page 106

1  raise this issue, that your introductions for other
2  NAM business to retailers or manufacturers should
3  be given consideration in the earn-out calculation?
4  Did you ever raise that issue during your earn-out
5  discussions in any of the five earn-out years?
6      **A. I do not recall specifically.**
7      Q. You didn't do so, did you?
8      **A. You asked me a question. I answered it. I**
9  **do not recall specifically. I raised the issue**
10  **about my spending the time working on business that**
11  **had nothing to do with my business and the issues**
12  **related to that. I do not recall specifically.**
13      Q. Well, let's take a look at your employment
14  agreement dated August 13th, 1999. And your duties
15  to New America Marketing In-Store, Inc. is defined
16  in paragraph two of that agreement, is it not?
17      **A. Paragraph two? Which paragraph two? Which**
18  **paragraph exactly are you asking me to read,**
19  **please?**
20      Q. I want you to take a look at paragraph two.
21      **A. Number two?**
22      Q. Paragraph number two.
23      **A. Okay, that's not paragraph two. I just**
24  **want to make sure where you're going.**

Page 107

1      Q. Paragraph numbered two. Not the second
2  paragraph in the letter --
3      **A. Okay.**
4      Q. -- but paragraph number two of your August
5  13th, 1999 employment agreement.
6      **A. Mm-hmm.**
7      Q. This paragraph two defines your job at News
8  America Marketing In-Store, Inc., does it not?
9      **A. All it says is that I'll perform consistent**
10  **with my position set forth in paragraph 3E -- 3A.**
11      Q. No, it says this. Let me read it you. It
12  says you shall perform such duties consistent with
13  your position set forth in paragraph 3A hereof, as
14  are assigned to you from time to time, and agree to
15  take trips both within and outside the United
16  States as may be reasonably requested by the
17  company in connection with the performance of your
18  duties hereunder. And then, in paragraph 3A it
19  says you shall serve as a senior vice president of
20  sales and marketing and you shall be assigned to
21  work in the company's offices in the Boston
22  vicinity. You shall report directly to the
23  executive vice president and chief financial
24  officer of the company or such other senior

Page 108

1  executive officer as shall be determined by the
2  company's board of directors. And that is the
3  entirety of paragraph two and paragraph 3A, is it
4  not?
5      **A. That is the entirety.**
6      Q. Thank you. I take it you cannot tell us,
7  because you can't remember, what year these various
8  additional sums should be added to your earn-out
9  calculation; that is, the additional sums caused by
10  your making introductions to retailers or
11  manufacturers for the purpose of getting business
12  from other NAM divisions?
13      **A. That is correct.**
14      Q. Okay. You'll agree with me that there's no
15  count in your complaint for fraudulent inducement
16  against New America Marketing with respect to the
17  agreement, right?
18          MR. RICH: Objection.
19      **A. The three counts do not state fraud.**
20      Q. (BY MR. KATZ) Right. Nor is there any
21  other count in your complaint for fraud against New
22  America Marketing with respect to the agreement,
23  right?
24          MR. RICH: Objection.

Page 109

1      **A. The three counts do not include fraud.**
2      Q. (BY MR. KATZ) Where were you born?
3      **A. Detroit, Michigan.**
4      Q. When?
5      **A. 1947.**
6      Q. What's your educational background?
7      **A. I have an MBA.**
8      Q. From?
9      **A. Michigan State.**
10      Q. Have you ever been involved in a lawsuit
11  other than this one?
12      **A. No.**
13      Q. This is the first time?
14      **A. Yes.**
15      Q. Okay. Is this the first time you've been a
16  party to a lawsuit?
17      **A. Yes.**
18      Q. Okay. Did CCMI ever bring suit?
19      **A. I don't know.**
20      Q. Did CCMI ever sue Lucky Stores?
21      **A. I don't think so. I don't know. I do not**
22  **recall. At this time, I do not recall.**
23      Q. Do you have any recollection of CCMI suing
24  any retail customer?

28 (Pages 106 to 109)

Ann M. Raider

Page 110

1  A. I do not recall.
2  Q. And I think you told us that you've never
3  sued or been sued other than your participation in
4  this case?
5  A. That is correct.
6  Q. Okay. When did you first enter the work
7  force?
8  A. When I was -- when I was 16.
9  Q. Okay. Well, we'll jump to your MBA. After
10 you received your MBA, what did you do?
11  A. I worked for Stop & Shop supermarkets.
12 Q. Beginning in what year?
13  A. 1970.
14 Q. How long did you work at Stop & Shop?
15  A. A few years.
16 Q. And when did you cease working at Stop &
17 Shop?
18  A. 1972.
19 Q. And what did you do then?
20  A. I worked for Dennison Manufacturing.
21 Q. What was your job at Stop & Shop?
22  A. I went through -- I was a store trainee, I
23 worked on marketing programs, I was a buyer and a
24 merchandiser.

Page 111

1  Q. Did you work at headquarters or did you
2  work in a store?
3  A. Both.
4  Q. Started out in a store and then went to
5  headquarters?
6  A. Yes.
7  Q. And where was Stop & Shop located then?
8  A. 393 D Street, South Boston.
9  Q. Before the move to Quincy?
10  A. That is correct.
11 Q. And so you worked at Stop & Shop for a few
12 years, until approximately 1972?
13  A. Mm-hmm.
14 Q. Is that right? Then you went to work for
15 Dennison Manufacturing?
16  A. That is correct.
17 Q. What does Dennison make? I don't know if
18 they still make anything now.
19  A. They make stationery products.
20 Q. And what were your years there?
21  A. One year.
22 Q. Which year was that?
23  A. '72 to '73.
24 Q. And what was your job there?

Page 112

1  A. I was a product manager.
2  Q. And following Dennison, what did you do?
3  A. I worked for the Gillette Company.
4  Q. What year did that start?
5  A. '74 -- yeah, '74.
6  Q. How long did you work at Gillette?
7  A. A couple of years.
8  Q. And what was your job at Gillette?
9  A. I was a product manager.
10 Q. What product?
11  A. Hyponex.
12 Q. What was that?
13  A. Plant care.
14 Q. Ah, yes. And for how long?
15  A. A couple of years.
16 Q. And following that, what did you do?
17  A. I worked for Colombo Yogurt.
18 Q. And how many years did you work at Colombo?
19  A. A couple years.
20 Q. And what was your job there?
21  A. Key account sales.
22 Q. And who did you sell to?
23  A. Major supermarket chains.
24 Q. Again, this was for, what, a couple of

Page 113

1  years?
2  A. Yes.
3  Q. When did that cease?
4  A. '78, something like that.
5  Q. And following Colombo, your Colombo job,
6  what did you do?
7  A. I worked for Hood. H.P. Hood.
8  Q. And again, what year did that start?
9  A. I don't remember the exact year, but
10 probably 1978, something like that.
11 Q. How long did you work for H.P. Hood?
12  A. Six years.
13 Q. And what did you do?
14  A. I was a product manager and ran the brands.
15 Q. Which brands?
16  A. Ice cream, cultured products and cheese.
17 Q. And what did that entail?
18  A. Running the P&L's, launching new products,
19 creating promotions.
20 Q. Good job?
21  A. Good job.
22 Q. Why did you leave?
23  A. I had an opportunity to work in a new
24 venture.

29 (Pages 110 to 113)

Ann M. Raider

Page 114

1    Q. And what was the new venture?
2    **A. The Coupon Counter.**
3    Q. And what is the coupon counter?
4    **A. It was a company that dispensed coupons at**
5    **the point of sale for manufacturers and**
6    **supermarkets.**
7    Q. Where was it based?
8    **A. Westwood, Massachusetts.**
9    Q. And what was your job?
10   **A. Head of marketing.**
11   Q. Is the company still around?
12   **A. No.**
13   Q. How long did it last?
14   **A. A few years.**
15   Q. And your job there began in what year?
16   **A. 1980-- '84, '85, something like that.**
17   Q. And you left H.P. Hood in order to take
18   this job?
19   **A. Yes, I did.**
20   Q. And the company stayed in business for,
21   what, three years? Is that what you're saying?
22   **A. A couple years.**
23   Q. And it just didn't survive? Is that what
24   happened?

Page 115

1    **A. The private equity group decided not to**
2    **fund an expansion of the business nationwide.**
3    Q. And so the company ultimately folded?
4    **A. Yes.**
5    Q. And what did you do?
6    **A. I went to work for Shawmut Bank.**
7    Q. What did you do at Shawmut Bank?
8    **A. I did strategic planning and I did the**
9    **marketing for self-service banking.**
10   Q. What do you mean by self-service banking?
11   **A. ATM's, voice automation, touch screen**
12   **automation.**
13   Q. And you were involved in marketing that
14   product?
15   **A. Yes, I was.**
16   Q. And this was during what time period?
17   **A. The mid '80's to the late '80's, until**
18   **1990.**
19   Q. And you left that job at some point?
20   **A. Yes.**
21   Q. And why did you leave that job?
22   **A. They merged with Connecticut National Bank**
23   **and my job got moved to Connecticut and I didn't**
24   **move.**

Page 116

1    Q. This takes us up to what year?
2    **A. 1990.**
3    Q. And what did you do then?
4    **A. I met Bob Fireman and we created a**
5    **corporation.**
6    Q. How did you meet Mr. Fireman?
7    **A. I was introduced to him by Carol Goldberg.**
8    Q. From Stop & Shop?
9    **A. That is correct.**
10   Q. And you had -- well, let me ask this
11   question. How many years prior to the founding of
12   CCMI had you met Mr. Fireman?
13   **A. None.**
14   Q. So tell me the circumstances of your
15   meeting.
16   **A. I had met with Carol Goldberg and told her**
17   **that I had been in banking for several years and**
18   **that I saw the opportunity to drive technology at**
19   **the point of sale for supermarkets and that I**
20   **wanted to go back into the supermarket and food**
21   **business because I believed there was a great**
22   **opportunity there. She said that she had seen a**
23   **business plan presented by Mr. Fireman that she**
24   **thought had a lot of merit and that she would ask**

Page 117

1    him if she could confidentially share the plan with
2    me and if we thought that there was an opportunity
3    to work together.
4    Q. And then what happened next?
5    **A. We had the opportunity to meet. We looked**
6    **at his business plan and actually decided there was**
7    **an approach to the business that we felt had a lot**
8    **of merit and we created a pilot program to test the**
9    **validity.**
10   Q. And what did the pilot program consist of?
11   **A. It consisted of building loyalty cards,**
12   **creating databases of shoppers, and executing**
13   **marketing programs.**
14   Q. And this was in what year?
15   **A. '90, '91.**
16   Q. And is that when the company was founded?
17   **A. 1991.**
18   Q. Okay. And who was your first customer?
19   **A. Shaw's.**
20   Q. And what did you do for them?
21   **A. We launched the -- we launched their entire**
22   **loyalty marketing program.**
23   Q. How many cards?
24   **A. Millions.**

30 (Pages 114 to 117)

Ann M. Raider

Page 118

1    Q. Very profitable?
2    **A. Yes.**
3    Q. And what did you do with the profits from
4  that project?
5    **A. Invested it in expanding the business.**
6    Q. In what ways?
7    **A. We used the money to travel to do business**
8  **development work.**
9    Q. How did you and Mr. Fireman divide your
10  roles at CCMI prior to the acquisition by NAM?
11    **A. I was in charge of sales and marketing and**
12  **was the outward face of the company to the**
13  **marketplace, so I spoke, I sat on boards, I visited**
14  **with customers. Mr. Fireman ran the legal**
15  **operations and finance part of the business.**
16    Q. Did you always work full-time for CCMI once
17  it was founded?
18    **A. At the -- when CCMI was first founded, I**
19  **worked on a consulting project for Staples for a**
20  **period of a few months.**
21    Q. Apart from the Staples project, did you
22  always work full-time for CCMI prior to the
23  acquisition?
24    **A. Yes.**

Page 119

1    Q. Did Mr. Fireman always work full-time for
2  CCMI prior to the acquisition?
3    **A. His full-time job was working for CCMI.**
4    Q. Was he involved in other ventures at the
5  same time he was working for CCMI?
6    **A. Yes.**
7    Q. What kind of ventures were these?
8    **A. He worked in a video game venture.**
9    Q. What was the name?
10    **A. You know, I don't recall.**
11    Q. Any other ventures besides the video game
12  venture?
13    **A. No.**
14    Q. Did he continue to practice -- or did he
15  continue to have a private practice of law?
16    **A. No.**
17    Q. No clients during --
18    **A. Only friends and family or favors to**
19  **friend, but he did not practice law.**
20    Q. Did he continue to practice law after the
21  acquisition by NAM of CCMI?
22    **A. No. You know, friends and family. You**
23  **know, if a friend of the family's or, you know,**
24  **something asked Bob to ask a legal opinion, but he**

Page 120

1  **did not -- he was not a practicing attorney.**
2    Q. Did Mr. Fireman participate in any business
3  ventures while he was under contract to NAM?
4    **A. Not that I'm aware of.**
5    Q. Did you participate in any business
6  ventures while you were under contract to NAM?
7    **A. No.**
8    Q. Fair statement that neither you nor
9  Mr. Fireman are computer technology experts?
10      MR. RICH: Objection.
11    **A. I'm not sure what the definition of a**
12  **computer technology expert is.**
13    Q. (BY MR. KATZ) Well, using your definition
14  of it, do you consider yourself to be a computer
15  technology expert?
16    **A. I believe I understand databases and I**
17  **understand database marketing, and in the context**
18  **of what computers are used to do that work, I**
19  **believe I am well-versed. If you're asking me to**
20  **write code, I cannot write code.**
21    Q. Okay. Are you an expert on the marketing
22  analysis software?
23    **A. Yes.**
24    Q. Are you an expert on the Epiphany system?

Page 121

1    **A. I am knowledgeable about the Epiphany**
2  **system.**
3    Q. Okay. Are you an expert on Catalina's RDOL
4  product?
5    **A. I'm not sure what the acronym RDOL product**
6  **is.**
7    Q. So do you know what the product --
8    **A. Catalina has multiple products.**
9    Q. Are you familiar with their products?
10    **A. If you're talking about their database**
11  **product, if that's what RDOL is, I am familiar that**
12  **they have a database product, and if you're talking**
13  **about the Catalina product that they use to**
14  **dispense coupons at the point of sale, I am**
15  **familiar with that product.**
16    Q. Are you an expert on the Market Expert tool
17  which Valassis uses?
18      MR. RICH: Objection.
19    **A. I don't know what your definition of expert**
20  **is. I am aware that Valassis uses the Market**
21  **Expert tool and I am aware of the general**
22  **functionality of the Market Expert tool.**
23    Q. (BY MR. KATZ) In general, you rely on
24  others when it comes to knowledge regarding

Ann M. Raider

Page 122

1  computers and software products, right?
2        MR. RICH:  Objection.
3     A.  Not necessarily.  As the user, I rely on
4  myself to define the requirements of what the
5  technology should do.  I rely on the technologist
6  to build what the user needs.
7     Q.  (BY MR. KATZ)  Neither you nor Mr. Fireman
8  had any educational training with respect to
9  computer technology or website design, right?
10    A.  We have taken seminars.  We have attended
11 seminars.  Do we have an actual degree in those
12 practices?  I do not.
13    Q.  What seminars have you taken that relate to
14 --
15    A.  Epiphany.
16    Q.  -- computers?
17    A.  For example, Epiphany ran seminars.  There
18 were several companies -- IBM ran seminars on their
19 tool sets and how things work.  NCR, IBM, there
20 were several companies where they -- they educated
21 users and business decision-makers about the
22 features and functionality of what technology could
23 do and how it works, and I read a lot about that,
24 and the Direct Marketing Association, so those were

Page 123

1  some of the places where we gained a working
2  knowledge of that.
3     Q.  Is it a fair statement that the business of
4  CCMI prior to the acquisition by NAM never involved
5  access to a website by consumers or retail stores,
6  right?
7     A.  I believe we did not -- our tool set did
8  not have the ability to port information to a
9  website.  I believe that's accurate.
10    Q.  When did you first express an interest to
11 someone at NAM in being acquired?
12    A.  NAM actually expressed an interest to us.
13    Q.  And when did that occur?
14    A.  1999.
15    Q.  And how did it occur?
16    A.  I do not remember the exact process, but
17 the discussion began with Henri Lellouche.
18    Q.  He was the first person who talked to you,
19 talked to -- when I say you, I mean you or
20 Mr. Fireman.
21    A.  It was either Henri Lellouche -- I can't
22 answer if he was the first person.  It was Henri
23 Lellouche or David -- or Jon Rubin.
24    Q.  What do you mean the discussion consisting

Page 124

1  of?
2     A.  David DeVoe had just come to work as the
3  CFO for NAM and he was putting together a group of
4  companies who would be defined as a new ventures
5  group of new technologies and new practices that
6  NAM did not have experience in, and he was buying
7  -- he was making -- had a strong interest in, and
8  based on the discussions with Lachlan Murdoch, that
9  they felt the market was moving away from
10 conventional marketing tools into database and
11 Internet tools and that they were looking for
12 technology companies, marketing -- database
13 marketing companies and Internet companies that
14 were forward-thinking in where they saw the market
15 moving, and that David DeVoe was buying companies
16 and was very interested in buying companies.  That
17 was the context in which the conversation began.
18    Q.  Okay.  And had CCMI been discussing with
19 any other parties the possibility of selling the
20 company to them?
21    A.  Yes.
22    Q.  Who?
23    A.  We talked to The Food Fund.
24    Q.  And who did you speak to at The Food Fund?

Page 125

1     A.  John -- I don't remember his last name.
2     Q.  Where is The Food Fund based?
3     A.  Minneapolis.
4     Q.  And you never received a written offer from
5  The Food Fund to purchase your company, did you?
6     A.  I know that they made -- whether -- I
7  cannot testify that it was actually written.  They
8  made an offer.  Whether it was written or not, I
9  don't remember.
10    Q.  And how much was the offer?
11    A.  It was to buy a percentage of the stock of
12 the company, not the whole company, and I don't
13 remember the financial details.
14    Q.  How much stock and how much -- what were --
15    A.  I don't remember the details.
16    Q.  Were they going to pay you in stock or were
17 they going to pay you in cash?
18    A.  No, they were going to pay us in cash for a
19 percentage of the stock.
20    Q.  A minority position or a majority position?
21    A.  A minority position.
22    Q.  And you have no idea as to how much they
23 were going to pay for the minority position?
24    A.  No, I actually don't.

32 (Pages 122 to 125)

Ann M. Raider

Page 126

1    Q. Apart from Food Fund, anybody else
2  interested in participating in CCMI?
3    A. Yes. Donnelly showed an interest.
4    Q. Do you mean R.R. Donnelly?
5    A. No, the other Donnelly. R.R. Donnelly is
6  the printer. It's Donnelly -- I don't know what
7  it's actually called, actually. It's the other
8  Donnelly. It's not R.R. Donnelly.
9    Q. Mm-hmm.
10    A. Valassis.
11    Q. So what did -- tell me -- let's start with
12  -- let's go back to Donnelly. What were your
13  discussions with Donnelly?
14    A. They wanted a database -- they were
15  considering a database marketing company. They
16  were considering entering into a database marketing
17  company space that could build loyalty programs for
18  retailers. They did not have that.
19    Q. Did they ever make you a firm written offer
20  to purchase any part of the company?
21    A. Not that I recall.
22    Q. Anybody else besides Donnelly and Food Fund
23  express an interest in considering acquiring all or
24  part of CCMI?

Page 127

1    A. There were several companies at the time.
2    Q. Well, that's what I want you to do is
3  identify them.
4    A. Well, I'm not sure I remember all of them.
5    Q. Well, besides Donnelly, besides Food Fund,
6  who do you remember?
7    A. Valassis.
8    Q. And who did you talk with at Valassis?
9    A. The CFO.
10    Q. What was his name?
11    A. Rechia.
12    Q. I'm sorry?
13    A. Rechia.
14    Q. How do you spell that?
15    A. I don't know. I don't know.
16    Q. Phonetically?
17    A. Rechia, R-E --
18    Q. C-H-I-A?
19    A. Something like that, I guess.
20    Q. When did this discussion take place?
21    A. Prior to talking to NAM.
22    Q. Okay. And that discussion did not result
23  in a firm written offer to buy all or part of CCMI,
24  right?

Page 128

1    A. I don't recall if it was written. There
2  were meetings and discussions. Whether it was
3  written, I don't recall.
4    Q. You just don't remember any -- anything
5  about any proposed transaction with them, right?
6    A. Oh, I remember there were serious
7  discussions with them and we met with many people
8  from their organization, but I don't recall if it
9  was written.
10    Q. What -- what was Valassis interested in
11  acquiring, if anything?
12    A. The database company -- the database
13  expertise we had and the retailer relationships.
14    Q. Did they want to buy the whole company as
15  opposed to just a part of it?
16    A. I don't recall.
17    Q. Were they going to give you stock or cash?
18    A. No. They were going to give us cash.
19    Q. Do you remember how much cash?
20    A. No.
21    Q. And you don't remember what percentage of
22  the company they were interested in?
23    A. No, I don't recall the context of that
24  deal.

Page 129

1    Q. So we have Valassis, we have Donnelly, we
2  have Food Forum --
3    A. Food Fund.
4    Q. Food Fund. I'm sorry. Do we have anybody
5  else that you remember who were interested in the
6  company?
7    A. There were other companies who came forth,
8  but I really don't recall.
9    Q. And it's a fair statement that you never
10  received a firm written offer from anyone apart
11  from New America Marketing to buy the company?
12    A. I do not -- I do not know that to be a
13  fact.
14    Q. But you certainly regarded New America
15  Marketing's offer as being the best offer you had
16  available, right?
17    A. I considered New America Marketing's offer
18  to be a good offer because of their commitment to
19  let us use their sales force to grow our company to
20  $50 million.
21    Q. And because you were going to get a million
22  bucks when it closed, correct? Not a bad deal,
23  right?
24    MR. RICH: Objection.

33 (Pages 126 to 129)

Ann M. Raider

Page 130

1      A.  A million dollars at the closing was a
2  terrible deal.  The deal to be made at CCMI was not
3  a million dollars; it was the opportunity to make
4  $50 million.  It was the opportunity for a company
5  that had a national reputation of being experts in
6  their field with impeccable credentials to grow the
7  business when we had a leadership share before
8  other corporations entered into the marketplace.
9  We were at the point of great growth.  New America
10  Marketing came to us with a sales force in place to
11  work with manufacturers to use retailer data, and
12  the commitment to help us accelerate the growth of
13  $50 million so we did not have to build that sales
14  force ourselves.
15          So $1 million was not a good deal.  The
16  deal to be made with CCMI was the opportunity to be
17  a $50 million business and make multiple million
18  dollars.  It was certainly not for the million
19  dollars.
20      Q.  (BY MR. KATZ)  So what was critical for
21  you, if I hear you correctly, is to have the
22  commitment of New America Marketing to use its
23  existing sales force to sell the products which you
24  developed at CCMI; is that right?

Page 131

1      A.  That was one of several critical components
2  and the good faith that they put forth that they
3  would deliver against that commitment.
4      Q.  Okay, but you'll agree with me that there
5  is nothing in the 1999 Stock Purchase Agreement
6  which requires News America Marketing to deploy its
7  sales force to any degree to sell CCMI products,
8  right?
9          MR. RICH:  Objection.
10      A.  I do not agree.
11      Q.  (BY MR. KATZ)  Then please point me to the
12  language.
13      A.  I will point you to the language that says
14  under the good faith that they --
15      Q.  No, no.  You don't need to editorialize.
16  Just point me to the language.
17      A.  It is the buyer's current intention,
18  intention, to provide the support to the business
19  of the company using the buyer's sales force to
20  promote the sale of the company products --
21      Q.  Okay.
22      A.  -- assisting in the creation of long-term
23  relationships with retailers and investing in
24  software as needed to expand the business.  That is

Page 132

1  the conduct of the business that the buyer
2  committed to us and the interpretation by -- by us
3  of them and their good faith discussions with us is
4  that they would live up to that obligation.
5      Q.  Now, at the time you agreed to that
6  language, you were being advised by multiple
7  attorneys at Goodwin Procter & Hoar, right?
8      A.  At the time that we agreed to that
9  language, Goodwin Procter -- I don't know how many
10  lawyers.  You say multiple lawyers.  There were --
11  we were advised by certainly one lawyer as to the
12  contract.
13      Q.  And so you certainly had the ability to ask
14  him what that language meant from a legal
15  standpoint; isn't that right?
16      A.  Our attorneys at Goodwin Procter spoke to
17  the people at News America and News America's
18  lawyers and they understood, as we understood, on
19  what that definition meant.
20      Q.  And did the lawyers at Goodwin Procter
21  explain to you what that language meant from their
22  standpoint?
23          MR. RICH:  Well, wait a minute.  I'm
24  going to object and instruct the witness not to

Page 133

1  answer to the extent you're asking for private
2  communications between Ms. Raider and her lawyer.
3          (Comments off the record.)
4          MR. RICH:  But to the extent the
5  question he just asked --
6      Q.  (BY MR. KATZ)  That's a question that --
7  your counsel is absolutely right; that is, if that
8  calls for -- you have a privilege, but you can
9  waive it if you choose to.
10      A.  No, I'm not going to waive any privilege.
11      Q.  Okay.
12      A.  The contract was presented, reviewed by our
13  lawyers, discussed with the News America lawyers,
14  and the intention was that they would provide
15  services as outlined in that paragraph.
16      Q.  Okay.  Why don't we take a break right
17  here.
18          (Off the record.)
19          (Lunch recess taken.)
20      Q.  (BY MR. KATZ)  Ms. Raider, we're back on
21  the record and you're still under oath.  Let me
22  just ask a question about Goodwin Procter.  Do you
23  believe you got good representation from Goodwin
24  Procter in connection with the Stock Purchase

34 (Pages 130 to 133)

Ann M. Raider

Page 134

1  Agreement?
2  **A. I believe Goodwin Procter is a good law**
3  **firm.**
4  Q. But did they give you good representation
5  in terms of what they did for you in connection
6  with the August 13th, 1999 Stock Purchase
7  Agreement?
8  **A. I believe so.**
9  Q. You were content?
10  **A. Yeah.**
11  Q. That's a yes?
12  **A. Yes. I'm sorry.**
13  Q. Going back to the period prior to the
14  acquisition of CCMI by NAM, you categorized your
15  business into three groups, right?
16  **A. Four.**
17  Q. Okay. Well, that -- let's go back to
18  Mr. Coughlin's memo, if we could. If you could
19  take a look at the second page of Mr. Coughlin's
20  memo, which is Exhibit 16 --
21  **A. Mm-hmm.**
22  Q. -- under revenue, we have three categories;
23  do you see? One is implementation --
24  **A. Oh, I see. He combined consulting and**

Page 135

1  **marketing programs as one group, and I looked at**
2  **them as separate groups, so if you wanted to say**
3  **yes, were there three groups, yes. I mean, the way**
4  **he looked at it was three; the way I looked at it**
5  **was four.**
6  Q. And he was making the projections insofar
7  as future business were concerned?
8  **A. Yes.**
9  Q. So we can agree, can we not, that when he
10  viewed what your business had been and what your
11  business was going to be going forward, he put the
12  business into three categories?
13  **A. Yes, that's fine.**
14  Q. And those were implementation --
15  **A. Yes.**
16  Q. -- database management and consulting
17  marketing services?
18  **A. Yes.**
19  Q. Or consulting marketing programs, right?
20  **A. Yes.**
21  Q. Now, implementation, that was the business
22  focused around retail store loyalty cards, right?
23  **A. That is correct.**
24  Q. And let's, if we can, go back to I guess

Page 136

1  it's the fourth page of Mr. Coughlin's July 6th,
2  1999 memo, which is Exhibit 16, FR 2677. Do you
3  see that?
4  **A. Yes.**
5  Q. And your revenue from the loyalty cards had
6  been about 1.8 million in 1996, right?
7  **A. As it is reported here.**
8  Q. And you don't have any reason to doubt the
9  accuracy of what's reported here, do you?
10  **A. I do not.**
11  Q. And then you had a big spike in 1997 with
12  $6.6 million in implementation revenue; is that
13  right?
14  **A. Yes.**
15  Q. And why was that spike?
16  **A. I do not recall the detail components of**
17  **that spike, but we did sell a very large card**
18  **program to Lucky Stores, and that may have been the**
19  **year that that was actually booked.**
20  Q. Okay. So you think that the 6.6 has to do
21  with a roll-out for Lucky Stores?
22  **A. It may have.**
23  Q. And how many cards were involved with the
24  Lucky Stores roll out?

Page 137

1  **A. Millions.**
2  Q. When you say millions, was it under ten
3  million?
4  **A. Under ten.**
5  Q. Under five?
6  **A. I don't know. I don't know. It -- I don't**
7  **know the answer. It was not ten, but it may have**
8  **been five.**
9  Q. And then you had a big drop in 1998 to 2.4
10  million, right?
11  **A. According to these numbers.**
12  Q. Okay. Now, in 1999, you had only 12 retail
13  customers? That's a fact, too, is it not?
14  **A. I do not know that to be a fact.**
15  Q. Let's take a look at the Stock Purchase
16  Agreement. And if we could go to Schedule 4.1?
17  **A. 4.10? 4.1 --**
18  Q. 4.11.
19  **A. Okay.**
20  Q. And on Schedule 4.11, it was the contracts
21  and commitments?
22  **A. Yes.**
23  Q. Right?
24  **A. Mm-hmm.**

35 (Pages 134 to 137)

Ann M. Raider

Page 138

1    Q. And with respect to retail clients, the
2  number of retail clients listed here is 12; is that
3  right?
4    A. Yes.
5    Q. Okay. Could you tell me the names of all
6  the new retail customers that came on board after
7  the acquisition of CCMI by NAM in 1999?
8    A. No, I cannot tell you the names of all of
9  them.
10    Q. Do you remember how many there were in
11  terms of number?
12    A. No, I do not remember exactly.
13    Q. At some point in time, the name of CCMI was
14  changed to SmartSource Direct, right?
15    A. That is correct.
16    Q. And you didn't lose any customers as a
17  result of the name change, right?
18    MR. RICH: Objection.
19    A. I -- we lost national presence that we were
20  in the business of loyalty cards.
21    Q. (BY MR. KATZ) Okay, but I'm not asking
22  that question. I'm just asking if you lost any
23  customers as a result of the name change.
24    A. If you're asking me if I had a current

Page 139

1  customer and because I changed my name they stopped
2  doing business with us, if that's the question
3  you're asking -- is that the question you're
4  asking?
5    Q. I'll ask that question.
6    A. The answer is if I had a customer who was
7  doing business with CCMI at the time of the name
8  change, I do not believe that I lost a customer --
9    Q. As a result of the name change?
10    A. -- as a result of that name change, right.
11    Q. And you can't name one customer which
12  refused to do business with you because CCMI's name
13  was changed to SmartSource Direct, right?
14    A. I do not recall the answer to that.
15    Q. So you can't as you sit here today name one
16  customer who refused to do business with you
17  because CCMI's name was changed to SmartSource
18  Direct, right?
19    A. I do not know that to be true. There were
20  retailers who did not want to do business with NAM
21  and the name changed to SmartSource Direct and the
22  correlation to NAM may have prevented them from
23  doing business with us as a result of that
24  relationship. I do not recall at this point in

Page 140

1  time who they are.
2    Q. Why wouldn't they want to do business with
3  NAM?
4    A. Because they had not had a good experience
5  with NAM.
6    Q. And so it was your idea to continue to use
7  the name CCMI and keep from them the fact that you
8  were associated with NAM?
9    A. It was my intent to keep the name CCMI as
10  it was agreed to in discussions with the company.
11  There was never a commitment, discussion or
12  anything other that would lead us to believe that
13  they were going to change our name in any way. We
14  had eight years in the industry. We had a brand
15  name everybody recognized. We had a national
16  reputation of being an expert in our field, and no
17  one ever said to us at the time before the sale
18  that there was any discussion about changing the
19  name other than CCMI. Never.
20    Q. Can you show me anything in the agreement
21  which prevented News America Marketing from
22  changing the name to SmartSource Direct or any
23  other name that it thought appropriate?
24    A. We're going to have to stop again. I'm

Page 141

1  going to have to read.
2    Q. Can you find anything?
3    A. David, can I ask you a question privately?
4    Q. Not during the course of the question.
5    A. Okay.
6    MR. RICH: Well, if the question
7  relates to something that might implicate the
8  attorney/client privilege, then you can ask me, but
9  otherwise, answer his question if you can.
10    A. I have a legal question.
11    MR. RICH: Okay.
12    A. So how do I ask you --
13    MR. RICH: Why don't we take a break,
14  then.
15    MR. KATZ: Let the record reflect.
16    (Off the record.)
17    A. Okay. On Section 4.8 it talks about no
18  material adverse change. A brand name is an asset
19  of the company as written. In fact, there are
20  calculations called brand asset valuator, which
21  talks about the value of the brand, and in the
22  agreement on 4.8 it says that there would be no
23  effect on the assets of the business.
24    Q. (BY MR. KATZ) 4.8 doesn't refer to that.

36 (Pages 138 to 141)

Ann M. Raider

Page 142

1   4.8 refers to the fact that CCMI is representing
2   that there's been no adverse -- that it is aware of
3   no material adverse effect with respect to its
4   business during the period of time between the
5   negotiation of the deal and the execution of the
6   agreement?
7       **A. That's correct, and the brand name is the**
8   **asset of the business.  There will be no withdrawal**
9   **or removal or any other means of company assets.**
10  **We did not withdraw our name.**
11      Q.  What language are you referring to?
12      **A.  In 4.8J where it says any dividend**
13  **distribution, withdrawal or removal or any other**
14  **means of company assets.  That meant that the brand**
15  **name was an asset, the asset was in place, and**
16  **therefore, the asset should stay in place.  The**
17  **company's brand name was an asset of the business.**
18      Q.  Look at paragraph -- at the beginning of
19  paragraph four.  Do you see on page eight --
20      **A.  Mm-hmm.**
21      Q.  -- at paragraph four under which paragraph
22  4.8 follows is entitled representations and
23  warranties of the principal sellers and the
24  sellers.  Do you see that?

Page 143

1       **A.  Mm-hmm.**
2       Q.  Now seeing that title, do you now
3   understand that what is being referred to in
4   paragraph 4.8 is the representation that you are
5   making to News America Marketing that except as set
6   forth on Schedule 4.8, since the balance sheet
7   date, the company has conducted its business only
8   in the ordinary course of business consistent with
9   past practice and there has not been -- going to
10  paragraph J -- any dividend distribution or
11  withdrawal or removal by any other means of any of
12  the company's assets except for payments to
13  employees and payments made under notes payable and
14  accrued expenses in each case in the ordinary
15  course of business and forgiveness or cancellation
16  of the regular receivable and the payment or
17  accrual of the rate of the regular bonus, so what
18  that's referring to, is it not, is a representation
19  that you are making to News America Marketing that
20  you haven't taken anything away from the value of
21  the business?
22      **A.  That is correct, and that also includes the**
23  **brand name, which is an asset.**
24      Q.  But that doesn't have anything to do with

Page 144

1   changing the name of -- of CCMI after the
2   acquisition, does it?
3       **A.  No.**
4       Q.  Is there anything else you can point to in
5   the agreement that required News America Marketing
6   to keep the name CCMI?
7       **A.  The agreement was a structured legal**
8   **document that did not really reflect the total**
9   **business opportunity for the corporation.  They**
10  **were taking the assets of CCMI to build upon them,**
11  **and the brand name was an asset of the company.**
12      Q.  So even though the agreement itself says in
13  paragraph 8.1 that it is a complete integration of
14  all the promises that it made, what you're telling
15  me is that the agreement itself is not a complete
16  statement of all the promises that you believe were
17  made?
18          MR. RICH:  Objection.
19      Q.  (BY MR. KATZ)  Is that your position?
20      **A.  My position is that this is a legal**
21  **document and that the spirit of this document was**
22  **to build the corporation together.**
23      Q.  So is it your position that the spirit of
24  the document takes precedence over the precise

Page 145

1   words of the document?
2           MR. RICH:  Objection.
3       **A.  I am saying that the document outlined**
4   **requirements for -- while the document does not say**
5   **they cannot change the name, nor does it say they**
6   **can change the name.  This says that they are**
7   **required to provide a sales force, they are**
8   **required to find cash.  They are required to**
9   **provide relationships.**
10      Q.  (BY MR. KATZ)  Where does it say they're
11  required?  I thought we agreed that the agreement
12  doesn't use the word require.
13      **A.  No.**
14      Q.  It just says it's the current intention.
15  Isn't that the language?
16      **A.  It is the intention, yes; not negative**
17  **intention.  Positive intention to move forward.**
18      Q.  Right, but it doesn't say anywhere that NAM
19  is required to do any of the things you just
20  mentioned, right?
21          MR. RICH:  Objection.
22      **A.  It is the intention.**
23      Q.  (BY MR. KATZ)  Right.
24      **A.  They would not buy a company with bad**

JONES REPORTING COMPANY
617-451-8900

Ann M. Raider

1    intentions; otherwise, that would be bad faith.
2    Otherwise, it would show that they had no
3    intention. The fact is, they never did operate the
4    business. They took it apart in pieces, so --
5        Q. We'll get to your concerns on those
6    subjects, but you'll agree with me that the
7    agreement itself does not use the word requirement
8    with respect to the three things you just
9    mentioned?
10       A. The words in the document say, I believe --
11   I will read them, because I always forget them. It
12   is the buyer's current intention.
13       Q. Not requirement, right?
14       A. Intention.
15       Q. Not requirement, right?
16       A. Intention.
17           MR. RICH: Objection. Asked and
18   answered.
19       Q. (BY MR. KATZ) I'm just asking you to
20   answer yes or no.
21       A. The word they use is intention.
22       Q. It is not requirement, correct?
23       A. The word they did not use is requirement.
24       Q. Okay. We're going to back and now talk a

1    little bit about database management. That can
2    also be referred to as web hosting? Is that a fair
3    statement?
4        A. No.
5        Q. Is web hosting part of database management?
6        A. Web hosting is a distribution method of
7    database management.
8        Q. So it's related to database management?
9        A. It's a point of distribution from which a
10   database can speak.
11       Q. How did you start in the database
12   management business with CCMI?
13       A. Customers were requiring that we take
14   transaction data from the point of sale and put it
15   into a usable format.
16       Q. Have you ever heard of this kind of
17   business being referred to as ASP?
18       A. ASP is a type of way of hosting
19   information.
20       Q. Had you been doing ASP prior to the
21   acquisition with NAM?
22       A. Yes.
23       Q. And you had a web hosting capability
24   located in your Braintree office, right?

1        A. That is correct.
2        Q. But you didn't have any security for this
3    computer system, did you?
4        A. We had absolute security.
5        Q. Tell me about that.
6        A. First of all, the computers were in a
7    secured room.
8        Q. Tell me about the room.
9        A. It was built. It was a room.
10       Q. Was it locked?
11       A. Yes.
12       Q. Who had keys?
13       A. Our electrician and our head of database
14   management.
15       Q. What kind of back-up did you do to the
16   system?
17       A. I can't tell you that specifically.
18       Q. Was any back-up done?
19       A. Yes, it was. I know they backed it up on
20   tapes. Whether they backed it up to other
21   computers, I don't know.
22       Q. How do you know this?
23       A. Because we talked about having a back-up.
24       Q. Who developed or purchased the technology

1    that was used on your system in Braintree?
2        A. Those are two questions.
3        Q. Okay.
4        A. We defined the development of the product
5    and it was actually constructed by a company in
6    Wellesley, Mass.
7        Q. What was the name of the company?
8        A. I don't remember.
9        Q. Okay. And the name of the system was what?
10       A. The MAS, Marketing Analysis System.
11       Q. And how many database management clients
12   did you have prior to the 1999 Stock Purchase
13   Agreement?
14       A. Several.
15       Q. Can you name them?
16       A. Nash Finch was one. Sullivan Stores was
17   another. I don't remember all of them. Duane
18   Reade.
19       Q. They used the MAS system?
20       A. I believe so.
21       Q. So you can't remember any other than Nash
22   Finch, Sullivan and Duane Reade?
23       A. No, and then you had Blue Square. There
24   were others. I do not at this moment recall a

Ann M. Raider

1  comprehensive list, but it is in the documents.
2      Q. But you can only remember four as you sit
3  here today?
4      A. At the moment, four come to mind.
5      Q. How many stores did Nash Finch have?
6      A. I do not recall.
7      Q. And where is Nash Finch located?
8      A. Minneapolis.
9      Q. Just in Minneapolis?
10     A. No, they have stores in -- you asked me
11  where they're headquartered. They're headquartered
12  in Minneapolis. They have stores in many states.
13     Q. Did they use you for all their stores?
14     A. I don't recall.
15     Q. When you say many states, how many states?
16     A. I don't recall. There's several.
17     Q. More than two?
18     A. Yes.
19     Q. And then you don't know how many stores
20  they had total at the time you were doing business
21  with them?
22     A. No, I don't.
23     Q. Okay. Sullivan, what is Sullivan?
24     A. Sullivan's is a supermarket chain.

1      Q. Where?
2      A. They're in the midwest.
3      Q. Where in the midwest?
4      A. I don't know.
5      Q. Have you ever been there?
6      A. No.
7      Q. How many stores?
8      A. I don't recall.
9      Q. How many states?
10     A. I don't know.
11     Q. Duane Reade is located in New York?
12     A. Yes.
13     Q. Just in New York?
14     A. I do not know that for a fact. They are --
15  they're headquartered in New York.
16     Q. How many stores?
17     A. Hundreds.
18     Q. But all in New York?
19     A. I don't know if they're only in New York.
20  They may be in other states.
21     Q. But to your knowledge there aren't any
22  others outside of New York City, really, for that
23  matter?
24     A. I don't know that to be a fact.

1      Q. Do you know that not to be a fact?
2         MR. RICH: Objection.
3      A. I know for a fact that they have them
4  outside of New York City.
5      Q. (BY MR. KATZ) Blue Square, what is Blue
6  Square?
7      A. It's a supermarket chain.
8      Q. Where in?
9      A. In Israel.
10     Q. And how many stores?
11     A. I don't know.
12     Q. What was the dollar value of business that
13  you received from Nash Finch for database
14  management?
15     A. I don't remember.
16     Q. In 1998?
17     A. I do not remember.
18     Q. Now, you were the person responsible for
19  selling all of these accounts, right?
20     A. Yes.
21     Q. But as you sit here now, you don't remember
22  how much business you were getting from any of your
23  database management clients?
24     A. I do not remember the specific information

1  regarding those sales that happened in 1998.
2      Q. Did all of them make use of the MAS system?
3      A. Yes.
4      Q. And if we could go back to Mr. Coughlin's
5  memo, which is Exhibit 16, and if we could look
6  again -- actually, hold off on that for just a
7  second. Who were your competitors in the database
8  management area?
9      A. Market Expert.
10     Q. And who produced that?
11     A. A company called Market Expert.
12     Q. Right. And who used it?
13     A. Several supermarket chains.
14     Q. What chains?
15     A. I don't remember.
16     Q. Did Catalina or Valassis have a presence in
17  this area?
18     A. Not in 19-- not -- well, what time frame
19  are you speaking about?
20     Q. 1999.
21     A. In 1999?
22     Q. Yes.
23     A. Yes, Catalina and -- Catalina was entering
24  into it, and I don't know whether Valassis in 1999

Ann M. Raider

<table>
<tr><td>

Page 154

1  had entered into it or after the fact.
2     Q. Okay, so tell me what you remember about
3  Catalina's entrance into the business.
4     A. They bought a comparable company to CCMI.
5     Q. What was the name of that company?
6     A. I don't remember the exact name.
7     Q. Did you know the people involved in that
8  company?
9     A. I knew the owner.
10    Q. Where was it based?
11    A. New York.
12    Q. And do you know what Catalina paid for it?
13    A. I do not.
14    Q. And the company did something along the
15 lines of what you did insofar as database
16 management is concerned?
17    A. They had a tool that was not as
18 sophisticated as our tool.
19    Q. What was the name of their tool?
20    A. I don't remember.
21    Q. But Marketing Expert was something that was
22 used by stores in-house; is that right?
23    A. Yes. They did not have an ASP model, to my
24 knowledge.

</td><td>

Page 156

1     A. I didn't need new technology. I needed a
2  point of distribution to the Internet, and we felt
3  that it was a good extension of our product to be
4  able to have that functionality.
5     Q. So you wanted to get -- you wanted to have
6  some product that gave you functionality with the
7  Internet?
8     A. Yes, that is correct.
9     Q. Okay. And when did you first make that
10 clear to anyone at News America Marketing?
11    A. Prior to the sale.
12    Q. And who had told you that functionality
13 involving communications with the customer over the
14 Internet was something that was important?
15    A. Customers.
16    Q. Which customers?
17    A. I don't remember the exact list of
18 customers.
19    Q. And when you talk about functionality, by
20 way of communications with the customer over the
21 Internet, are you talking about e-mails or simply
22 access to a website?
23    A. We were talking about e-mails.
24    Q. So the idea would be that you would have a

</td></tr>
<tr><td>

Page 155

1     Q. And who were the stores, to the best of
2  your recollection, that actually used Marketing
3  Expert at this point in time?
4     A. I don't remember their client list. Mostly
5  supermarkets.
6     Q. Big supermarkets?
7     A. Oh, I don't know. Mid-size supermarkets.
8     Q. Not big ones?
9     A. I don't know. I don't remember their
10 client list.
11    Q. Did you know at one time?
12    A. Yes.
13    Q. Were there complaints about the limitation
14 of what you could do with your MAS product?
15    A. Not complaints. A request to expand the
16 service.
17    Q. Okay. And tell me about what the requests
18 -- those requests were, to the best of your
19 recollection, in the 1999 time period.
20    A. The request was to be able to communicate
21 to the customer through the Internet.
22    Q. And did you see that as something that you
23 wanted your new technology, should you get new
24 technology, to be able to do?

</td><td>

Page 157

1  targeted group of customers with e-mail addresses
2  to whom you could send marketing material via
3  e-mail?
4     A. That was one function.
5     Q. And was that something that you pursued
6  once the acquisition took place?
7     A. Yes.
8     Q. And who did you pursue it with?
9     A. We -- Bob had started dialogs with several
10 companies to look at what -- what companies had
11 this kind of capability and understood how to do
12 it, and then he selected a company to work with
13 called Epiphany.
14    Q. Was it your impression that Epiphany had
15 the ability to have this kind of functionality
16 whereby you could direct communications on behalf
17 of a retailer to a customer over the Internet --
18    A. I believe --
19    Q. -- via e-mail?
20    A. I believe that was so.
21    Q. Okay. Your -- going back to Mr. Coughlin's
22 memo and going back to page FR 2677 --
23    A. 2677?
24    Q. Do you see that?

</td></tr>
</table>

40 (Pages 154 to 157)

Ann M. Raider

Page 158

1    A. 2677.
2    Q. Mm-hmm.  Your 1996 revenue for database
3    management was $569,000, approximately, correct?
4    A. Yes.
5    Q. And then, in 1997, it was about 1.2 million
6    dollars, right?
7    A. Correct.
8    Q. And it was about the same amount in 1998,
9    right?  About $1.2 million?
10    A. Apparently.
11    Q. Do you remember what accounted for the jump
12    from 1996 to 1997 from 569,000 to 1.2 million?
13    A. A number of accounts.
14    Q. Do you remember which accounts those were?
15    A. I do not.
16    Q. Let's turn now to consulting and marketing
17    programs.  Could you describe for me what these
18    consisted of?
19    A. Consulting is -- was straight-up advice
20    that we presented to retailers at their request to
21    help them build programs.
22    Q. This is something that you would provide
23    personally in many cases?
24    A. And my team.

Page 159

1    Q. Who was your team?
2    A. Jerry Clapp.
3    Q. Anyone else?
4    A. Mike Forhez.
5    Q. How do you spell Mike's last name?
6    A. F-O-R -- I don't know exactly any more.
7    F-O-R-H-E-Z.
8    Q. And anyone else?
9    A. And Bill Adam.
10    Q. And would you go to a client's location and
11    give a talk or give a presentation for a period of
12    time?
13    A. Yes.
14    Q. And that's typically how you'd earn your
15    fees?
16    A. Yes.
17    Q. Fees would be in the neighborhood of $2,500
18    to maybe higher than that?
19    A. Fees were on -- either on a per diem basis,
20    per person at about $3,000 a day, or they were on a
21    project basis, which could be $50,000.
22    Q. And that was your consulting was?
23    A. That was the consulting practice.
24    Q. And was it for both retailers and

Page 160

1    manufacturers, or for just one of those?
2    A. Mostly retailers.
3    Q. Rarely manufacturers or ever manufacturers?
4    A. No, we did consult with manufacturers, but
5    for the most part, the consulting was done for
6    retailers.
7    Q. Okay.  And apart from your consulting, what
8    else did you do --
9    A. We built programs.
10    Q. -- that fit under the heading consulting
11    and marketing programs?
12    A. We built marketing programs.  We did
13    airline promotions.  We did travel clubs.  We
14    executed targeted direct mail.
15    Q. Who did you do targeted direct mail for?
16    A. Manufacturers.
17    Q. Which manufacturers?
18    A. The Gillette Company, the Kraft Company,
19    Campbell Soup.
20    Q. Was this all prior to the acquisition by
21    News America Marketing in 1999?
22    A. I don't remember which programs were
23    executed in which years.
24    Q. So Gillette and Kraft may have occurred

Page 161

1    after the acquisition?
2    A. Gillette occurred the before the
3    acquisition.
4    Q. How about Kraft?
5    A. I'll have to -- I don't know.
6    Q. Kraft you're not sure?  It could be one way
7    or the other?  Is that what you're saying?
8    A. I don't recall the timing.
9    Q. Okay.  You'd agree with me, though, that
10    your revenue in 1996, '97 and '98 in the consulting
11    and marketing area was small?
12    A. And growing.
13    Q. Well, let's take a look.  In 1996, you had
14    $130,000 in consulting and marketing revenue,
15    right?
16    A. Mm-hmm.
17    Q. Is that a yes?
18    A. Yes.
19    Q. And then it dropped in 1997 to $57,000?
20    A. Yes.
21    Q. And then in 1998 it was $72,000, right?
22    A. Yes.
23    Q. Those are the numbers, right?
24    A. Yeah.

41 (Pages 158 to 161)

Ann M. Raider

Page 162

1    Q. At the time of the acquisition of CCMI on
2  August 13th, 1999, you had only three manufacturing
3  clients; isn't that a fact?
4    A. I don't remember.
5    Q. Let's go to Schedule 4.11 again of the
6  Stock Purchase Agreement. You had three retail
7  clients -- I'm sorry; three manufacturing clients
8  as of the date of the Stock Purchase Agreement,
9  right?
10   A. Yes.
11   Q. They were Alberto Culver, Fuji Film and
12  L'Eggs Products? That's L apostrophe E-G-G-S
13  Products.
14   A. Yes.
15   Q. Could you list for me all the new
16  manufacturing clients CCMI had during the period
17  you were employed with News America Marketing?
18   A. No, I cannot list for you all of them. I
19  can tell you there were several of them.
20   Q. Can you list as many as you can remember
21  sitting here today?
22   A. I will give you a list of some. Campbell
23  Soup was one. A coffee company, Le -- I don't know
24  how to say it, so -- very strong coffee. Coffee

Page 163

1  company was one. Caesar's cat food. I don't
2  remember the others.
3    Q. Let's mark as our next exhibit a
4  SmartSource Direct billing report for approximately
5  2003.
6         (Exhibit 49 marked for identification.)
7    Q. Ms. Raider, if you could take a look at
8  Exhibit 49 and see if that refreshes your
9  recollection as to any additional new retail
10  clients -- I'm sorry; manufacturing clients that
11  came on board with you after the acquisition of
12  CCMI by News America Marketing.
13   A. Well, you have them stated here.
14   Q. Well, tell me what you see.
15   A. You have Glaxo Smithkline, you have
16  Lactaid, you have Tele-Wish, Tele-Friend, you have
17  -- I think that's it.
18   Q. Do you remember any of these projects?
19   A. If the question you're asking me is do I
20  remember that these projects occurred, I remember
21  that they occurred.
22   Q. But these were not projects that you
23  participated in?
24   A. These were not projects that I managed

Page 164

1  beginning to end. In 2000 and -- what year is
2  this? 2003. No manufacturing salespeople in CCMI
3  reported to me in 2003. They reported to other
4  people in the company. I had no control over it.
5    Q. But you received revenue from their efforts
6  insofar as your earn-out was calculated; isn't that
7  right?
8    A. Nominal amount of money. Their efforts
9  were nominal, because there was no major sales
10  force to sell the products and I received revenue
11  as related to what little business did happen.
12   Q. You may have answered this question
13  already, but what about your business do you
14  believe News America Marketing found attractive?
15   A. News America Marketing stated that they
16  found our retailer relationships attractive, and
17  database knowledge attractive, and the belief that
18  manufacturers would execute targeted marketing
19  programs using retailer databases attractive.
20   Q. Let's go back to Mr. Coughlin's memo. Just
21  to recap again, in 1996, gross revenue was
22  $2.5 million for CCMI, right?
23   A. Yes.
24   Q. In 1997, CCMI's total gross revenue was

Page 165

1  $7.9 million, right?
2    A. Yes.
3    Q. And then in 1998, CCMI's total gross
4  revenue slipped to $3.7 million, right?
5    A. Yes.
6    Q. Now, you had a settlement of a lawsuit that
7  year for approximately $445,000; isn't that right?
8    A. I have no recollection of a lawsuit.
9    Q. Okay. And I think you told us that you
10  thought that the revenue was higher in 1997 because
11  of the roll-out of the Lucky Stores loyalty
12  program; is that right?
13   A. I told you that I believed that that could
14  have been the case.
15   Q. You'd agree with me that these numbers
16  reflect that there are ups and downs in business,
17  right?
18   A. These numbers reflect there was an up and
19  down in our business at this point in time.
20   Q. And ups and downs are a part of business
21  life; isn't that right?
22        MR. RICH: Objection.
23   A. Not necessarily so. I don't think Google
24  would appreciate that comment.

42 (Pages 162 to 165)

Ann M. Raider

Page 166

1    Q. (BY MR. KATZ) But the company that you
2  worked at after you left H.P. Hood wasn't a Google,
3  right?
4    A. The company that I worked for after I left
5  H.P. Hood was a very sound business where the
6  investors made a commitment not to fund a national
7  roll-out. There was nothing wrong with the
8  business operation. There was no up and down in
9  that business. There was a straight line up. The
10  discussion about rolling it out is what affected
11  that business. There was no up and down in that
12  business.
13    Q. It was down when it went out of business,
14  wasn't it?
15    A. When they closed the doors, it went to
16  zero. Prior to that, it did not.
17    Q. And you weren't able to find people with
18  money who were willing to put their money on the
19  line in order to advance the business forward;
20  isn't that right?
21    A. No, sir, that's not right.
22    Q. Then why didn't the business go forward?
23    A. First of all, I did not do any of the
24  negotiation. I was not the CEO.

Page 167

1    Q. When I say you, I mean people --
2    A. The company was a hundred percent owned by
3  an investment banking firm who made the decision on
4  where they would put their assets. It had nothing
5  to do with convincing them. They made a decision
6  on where to put their assets.
7    Q. But you'd agree with me, would you not,
8  that there's risk in every business, right?
9    A. Yes.
10    Q. And in every day, every day in business,
11  you risk that your customers might go to a
12  competitor, right?
13    A. Not if they're under contract.
14    Q. Well, not if they're under contract, but
15  when the contract's over, they might go to a
16  competitor, right?
17    A. That is correct.
18    Q. Or they might decide that they don't want
19  the product that you're selling?
20    A. That is an option where someone might buy
21  product from someone else.
22    Q. Or they might choose that they don't want
23  the product at all, right?
24    A. Or that's possible. They may choose they

Page 168

1  don't want any product at all, so they won't buy
2  it.
3    Q. It's just a fact that there are no
4  guarantees in business; isn't that right?
5    A. I think that's a very broad statement that
6  there are no guarantees in business. I think that
7  one could make the argument that there are
8  guarantees in business. There's guarantees that
9  you'll open the door, answer the phone and talk to
10  customers, so I think there are some guarantees in
11  business.
12    Q. Well, you can't guarantee that a business
13  that is here today is going to be here tomorrow,
14  can you?
15    A. You cannot guarantee that a business that
16  is improperly run will not have a future.
17    Q. Now, Mr. Coughlin or others made
18  projections in the summer of 1999 as to what he
19  thought the post-acquisition CCMI business would
20  be, right?
21    A. I don't believe that Mr. Coughlin made
22  projections independent of anyone else.
23    Q. Okay. Did -- let's look at the projections
24  that are contained still on FR 2677. Who made the

Page 169

1  projections that are on FR 2677?
2    A. Well, first of all, 2677 -- oh, you're
3  talking about the projections?
4    Q. Yes.
5    A. Bob Fireman and I worked with Bill Adam and
6  Jerry Clapp and Robert Coughlin to talk about who
7  were the targeted accounts and how the business
8  would grow.
9    Q. And the group of CCMI individuals that you
10  just identified were the people who made the
11  projections that are contained on FR --
12    A. We helped to formulate them, yes.
13    Q. And Mr. Coughlin recorded them for your
14  benefit?
15    A. I believe that's right.
16    Q. Okay. I'm actually going to switch to page
17  FR 2675, which is a year that a set of projections
18  that is the second page of Mr. Coughlin's July
19  sixth, 1999 memo, and I believe is close to if not
20  identical to the projections on FR 2677. Are you
21  with me?
22    A. Well, I don't know if they're -- I assume
23  they are. Your saying they're identical?
24    Q. No, I'm not sure they're identical. I

Ann M. Raider

Page 170

1   haven't checked them one by one, but they're close
2   to identical if not identical. There's no major
3   deviation, correct?
4       A. Well, I don't know. I'd have to look at
5   them in detail.
6       Q. Well, just take a second or two to convince
7   yourself that they're pretty close to the same, if
8   not identical.
9       A. Well, they're -- they're directionally the
10  same. They're not -- so they're somewhere between
11  a half a million and $3 million off, one to the
12  other --
13      Q. Okay. Of the --
14      A. -- on the revenue line.
15      Q. Okay. Do you believe that the more
16  accurate version of your projections is on page two
17  or on -- or rather on page FR 2675 or page FR 2677?
18      A. I can't tell.
19      Q. Okay. You're not sure?
20      A. I'm not sure.
21      Q. Okay. In any event, you reviewed these
22  projections at the time, right?
23      A. Yes.
24      Q. You thought they were correct?

Page 171

1       A. Yes.
2       Q. And you projected that CCMI would have
3   $50 million in sales growth in five years after the
4   acquisition?
5       A. That is correct.
6       Q. Okay. And in fact, in your interrogatory
7   answers, you say that News America Marketing
8   reviewed CCMI's business plan, which was designed
9   to achieve $50 million in sales growth within five
10  years, right?
11      A. That is correct.
12      Q. But by July sixth, 1999, Mr. Coughlin was
13  telling you that according to CCMI's internal
14  projections, you and Mr. Fireman would not meet the
15  gross margin necessary to earn any bonus payments;
16  isn't that right?
17      A. I'm sorry. Could you repeat the question?
18      Q. By July sixth, 1999, Mr. Coughlin was
19  telling you that according to CCMI's internal
20  projections, you and Mr. Fireman would not meet the
21  gross margin necessary to earn any bonus payments?
22      A. We still owned the company in 1999. This
23  had nothing to do with NAM.
24      Q. Well, let me rephrase the question, then.

Page 172

1   By July sixth, 1999, Mr. Coughlin was telling you
2   that post acq-- that according to CCMI's own
3   internal projections for sales, after the
4   acquisition, you and Mr. Fireman would not meet the
5   gross margin necessary to earn any bonus payments?
6       A. I don't believe that to be true.
7       Q. Let's take a look at the first page of
8   Mr. Coughlin's July 6th, 1999 memorandum. Could
9   you read into the record the last sentence of the
10  memo?
11      A. According to this schedule, this schedule
12  meaning not what he put together, but what was
13  prepared by Julie Openshaw, we would not meet the
14  necessary margin. According to the way Julie
15  defined her calculations as was defined by gross
16  margin, there's no correlation between the Stock
17  Purchase Agreement and gross margin. In fact,
18  there's a discrepancy in how Julie did it, and
19  therefore, Robert was alerting us to the fact that
20  given the way that Julie did these numbers, there's
21  an issue.
22      Q. Tell us what was the issue.
23      A. I don't remember.
24      Q. But you knew that someone was telling you

Page 173

1   that there was a very good chance that you were not
2   going to meet the gross margin necessary to earn
3   any bonus payments?
4       MR. RICH: Objection.
5       A. This memo is telling us that the definition
6   of gross margin as I discussed it with David DeVoe
7   was not being reflected in the calculations that
8   Julie was doing.
9       Q. (BY MR. KATZ) And at the end of the day,
10  which margin -- which definition of gross margin
11  prevailed?
12      A. I believe it's the definition of gross
13  margin -- which one?
14      Q. Was it the one that Mr. DeVoe wanted or the
15  one that you wanted?
16      A. I do not recall. Gross margin as we
17  defined it was what was direct expenses we could
18  control. Unfortunately, I believe that other
19  things were added into the reduction of gross
20  margin that were not what we decided should be
21  deducted.
22      Q. Now, let's go back to FR 2675 Mr. Coughlin
23  or -- I use Mr. Coughlin because he's the author of
24  the memo, but it must have been all of you. You

44 (Pages 170 to 173)

Ann M. Raider

Page 174

1  projected a total revenue of $8.3 million for year
2  one, right?
3      A. Yes.
4      Q. And you projected total revenue of
5  $23 million for year two, right?
6      A. Yes.
7      Q. So you remember going to almost triple your
8  gross income in one year, right?
9      A. Yes.
10     Q. How was that going to happen?
11     **A. We were going to have access to the News**
12  **America Marketing manufacturing sales force and**
13  **they were going to help us sell targeted direct**
14  **programs to manufacturers across the United States.**
15     Q. But you had no certainty that they were
16  going to be able to make those sales, right?
17     **A. We had a commitment in good faith that we**
18  **had access to their sales force who calls on**
19  **hundreds of packaged goods manufacturers throughout**
20  **the United States and that they would in fact talk**
21  **to them about our product line so that we could**
22  **make those sales.**
23     Q. But that commitment is nowhere stated in
24  those terms in the Stock Purchase Agreement, is it?

Page 175

1      **A. The commitment stated in the terms says**
2  **that they will -- they have the intention to do it.**
3      Q. That's all it says, right?
4      **A. And I was led to believe in conversations**
5  **with David DeVoe that we would have access to that**
6  **sales organization and we did not.**
7      Q. But there's nothing in the Stock Purchase
8  Agreement that says that News America Marketing
9  commits itself to use its preexisting sales
10  organization to sell CCMI's products; isn't that
11  right?
12     **A. Mr. Katz, you don't sell one business to**
13  **another company with a plan to make it grow**
14  **without a business understanding, regardless of the**
15  **stated document. It said they had the intention.**
16  **If I told you that I had the intention to do**
17  **something, I would believe you that you were going**
18  **to do it, because you're a gentleman and you have**
19  **integrity and you're dealing in honesty, and**
20  **therefore, the discussions regarding the business**
21  **plan as we put it together that they looked at had**
22  **no people assigned for the manufacturing sales**
23  **force. The manufacturing sales force, which was to**
24  **take the -- those products were to be sold by the**

Page 176

1      **News sales organization and that is how the**
2  **business was going to grow, because that is where**
3  **the opportunity was, and that is the focus of News**
4  **America Marketing. They call on manufacturers to**
5  **sell products. And we had the discussions about**
6  **how we would grow our business, and the discussions**
7  **centered around their commitment, written or not,**
8  **about helping us sell our products to their client**
9  **base for which we would get mutual profitable**
10  **benefits.**
11     Q. But isn't it a fact that after the
12  acquisition, News America Marketing went out and
13  hired a sales staff to sell to manufacturers along
14  the lines you've just described full-time?
15     **A. Mr. Katz, from the year -- from 1999,**
16  **September, when we sold the business, we had no**
17  **significant sales force. We had one person calling**
18  **on manufacturers. In fact, before 1999, September,**
19  **News America had made a decision to reorganize**
20  **their sales force with no knowledge to us and they**
21  **were focused on their reorganization and**
22  **eliminating sales positions, which we were never**
23  **aware of, so they in fact cut their sales force,**
24  **reorganized their sales force, and we had no**

Page 177

1  **knowledge they were making those changes, and they**
2  **were in the middle of a major reorganization of**
3  **their sales force, so they did not tell us they**
4  **were going to do that, so we had no previous**
5  **knowledge that they were making those changes in**
6  **their sales force, number one.**
7          **Number two, if you look at the sequence**
8  **of time, we sold the business in August of 1999.**
9  **We in fact had staff taken away from us that went**
10  **to Connecticut. We had no manufacturing sales**
11  **force to speak of of any kind. They said we could**
12  **share other people as part of the organization who**
13  **had no knowledge of our products. They would not**
14  **let us present to the entire sales force what we**
15  **did so we could get them to sell. So when you make**
16  **the statement that they let us hire people, I would**
17  **say maybe they let us hire one or two people in a**
18  **year or two after the company was sold, but**
19  **certainly not in the immediate time frame that**
20  **after which we wanted the business to grow, so I**
21  **think you have to look at the sequence of events in**
22  **terms of timing and intention or not intention.**
23     Q. Okay. Well, let's go back to the numbers
24  again.

45 (Pages 174 to 177)

Ann M. Raider

Page 178

1      MR. RICH: Do you want to take a break?
2  Are you okay?
3      A. I'm fine.
4          (Comments off the record.)
5      Q. (BY MR. KATZ) For year one, you have your
6  revenue projection of 8.3 million dollars, right?
7      A. Yes.
8      Q. You'd agree with me that there was no
9  certainty that that revenue was going to
10 materialize?
11     **A. Oh, absolutely I would not agree with you.**
12 **We had every indication that that sales dollar**
13 **would materialize. We had every belief it would**
14 **materialize. We were so distracted in going to**
15 **meetings, in reorganizing, having people shipped to**
16 **Connecticut, taking down database functions, no**
17 **support, no accounting support. We spent a lot of**
18 **time running around trying to figure out how to get**
19 **the business to stay together. We had a total**
20 **distraction of months of making presentations to**
21 **David DeVoe and creating meetings and that -- all**
22 **of that distraction prohibited us. We believed**
23 **unequivocally we could make that number if we could**
24 **stay focused on running our business and if we got**

Page 179

1  **support from them.**
2      Q. So it was other people's fault you couldn't
3  stay focused? Is that what you're saying?
4      **A. We were distracted by other things related**
5  **to being incorporated into an organization.**
6      Q. And you couldn't manage that distraction so
7  that you could stay focused on doing your business?
8          MR. RICH: Objection.
9      **A. We had no staff, sir, and therefore, we did**
10 **every piece of business seven days a week for weeks**
11 **on end keeping the business moving while we were**
12 **distracted by other things related to being**
13 **incorporated into a corporation.**
14     Q. (BY MR. KATZ) And prior to the
15 acquisition, you didn't see in advance that there
16 was going to be a period of time in which it was
17 going -- in which your time was going to be called
18 for to facilitate the integration? Is that what
19 you're saying?
20     **A. I believe there was a discussion where**
21 **there was a 60-day period when that would -- when**
22 **we would finish all the material things, that we**
23 **would work on some of the corporate stuff.**
24     Q. So you knew in advance that there was going

Page 180

1  to be some period of time that you were going to be
2  distracted as a result of the integration that was
3  necessary for you to join News America Marketing?
4      **A. I did not think I was going to be**
5  **distracted. I believed Bob would be focusing on**
6  **those issues as the CEO of CCMI and that I would be**
7  **able to run the business and have the staff and**
8  **work on hiring people. We were prevented from**
9  **hiring talented people at the time of the**
10 **acquisition because someone in News America didn't**
11 **like this person named Rich Green. We were**
12 **prevented from being -- from getting the sales**
13 **force in News America to even want to know about**
14 **our products because they were busy doing their**
15 **reorganization.**
16     Q. But there were a lot of people that you
17 interviewed that you didn't like, right?
18     **A. We did not have any -- for a period of**
19 **several months, we got no candidates.**
20         (Off the record.)
21         (Exhibit 50 marked for identification.)
22     Q. (BY MR. KATZ) Before we went off the
23 record, you said, Ms. Raider, that we didn't have
24 any candidates for a period of time, and I have

Page 181

1  shown you a document we've marked as Exhibit 50,
2  and I show you page two of Exhibit 50, and page two
3  of Exhibit 50 reflects the fact that beginning in
4  September of -- beginning at least in September of
5  1999, you were reviewing resumes for -- for
6  salespeople; isn't that right?
7      **A. This document shows you that the source of**
8  **the people that they were sending to us were**
9  **Monster people, from Monster, and those people**
10 **really did not have the correct qualifications, so**
11 **where they were getting their source of people was**
12 **not the people who had the right qualifications for**
13 **what we needed for the work that we needed to get**
14 **done, so while they may have secured some resumes,**
15 **they didn't -- they weren't the people who had any**
16 **of the right qualifications. Our requirement for**
17 **staff to do relationship selling was very different**
18 **than the News America organization, which were**
19 **fundamentally order takers.**
20     Q. Yet you wanted that organization to be your
21 sales staff?
22     **A. We wanted that organization to open the**
23 **door to the entire customer base that they had**
24 **access to to make them aware that we had this**

46 (Pages 178 to 181)

Ann M. Raider

Page 182

1  **ability. At the time that the company was sold,**
2  **most of the households in America were going to**
3  **have a loyalty card in their pocket, which gave**
4  **them access to hundreds of millions of people where**
5  **you could track purchase behavior, and**
6  **manufacturers were taking money out of FSI's and**
7  **out of television and putting it into targeted**
8  **direct mail. That was just emerging.**
9      Q. So let me stop you there. I think you just
10  said that at the time the company was sold, most
11  customers in America already had a loyalty card for
12  supermarkets?
13      **A. No, I said it was emerging.**
14      Q. No, I think you said at the time the
15  company was sold, most of the households in
16  America, were going to have a --
17      **A. Were going to have.**
18      Q. I see, so it wasn't that they had then; it
19  was they were going to have?
20      **A. Going to have. And in fact, today,**
21  **85 percent of households have cards.**
22      Q. In 1999, how many had it?
23      **A. I think the penetration rate in 1999 was**
24  **somewhere around 40 to 50 percent of the**

Page 183

1  **supermarkets were issuing cards, were issuing**
2  **cards, and then it went up to a much higher -- like**
3  **80 to 90 percent of the supermarkets were issuing**
4  **cards and those cards were getting into the**
5  **majority of consumer households. So we were at the**
6  **beginning of the upswing. We were just at the**
7  **point where the market was moving faster, which is**
8  **why we wanted to have an alliance with News**
9  **America.**
10      Q. Now, let me show you another document,
11  which we'll mark as Exhibit 51.
12          (Exhibit 51 marked for identification.)
13      Q. And you've seen this document before,
14  right?
15      **A. Apparently.**
16      Q. And the -- you'd agree with me that the
17  people who received these -- this memorandum were
18  News America Marketing salespeople around the
19  country?
20      **A. They were retail salespeople, not**
21  **manufacturing salespeople. There's a big**
22  **difference. I'm not sure if you understand --**
23      Q. No, I do.
24      **A. -- that the retail sales force --**

Page 184

1      Q. Yeah.
2      **A. -- called on retailers, and the**
3  **manufacturing sales force called on manufacturers.**
4  **We needed to access the manufacturing sales force.**
5      Q. You didn't want to -- you didn't care about
6  the retail sales force?
7      **A. We did, but we had great retailer**
8  **relationships.**
9      Q. So you didn't care about them; you really
10  just cared about the manufacturers from the
11  standpoint of utilizing NAM personnel? Is that
12  what you're saying?
13          MR. RICH: Objection.
14      **A. No, that's not what I said. We cared about**
15  **both, but in driving to 50 million, you needed the**
16  **hundred to 250 manufacturing salespeople to call on**
17  **them. If you notice this, it talks about retailer**
18  **driven programs were missing. That's my**
19  **handwriting. It says okay, if you're going to go**
20  **talk to these people, like Ed Wogan and Steve**
21  **Marquis, who by the way left immediately, so he**
22  **wasn't even there, you have to also talk about**
23  **retailer driven programs.**
24      Q. But this memorandum shows, does it not,

Page 185

1  that effort was being made to introduce the CCMI
2  people to the rest of the News America Marketing
3  sales force?
4      **A. No, that is not the rest -- this**
5  **organization --**
6      Q. Well, we'll call -- or at least to the
7  retail operation?
8      **A. Yes.**
9      Q. You'll agree with that?
10      **A. Yes, I will. This memo was a media kit**
11  **that was for a conference call to introduce the**
12  **retailer people.**
13      Q. To you?
14      **A. To us.**
15      Q. Now, going back again to Mr. Coughlin's
16  memo and the projections that are attached to it,
17  we'd established that your year one projection for
18  implementation was -- I'm sorry. Your total --
19  your total revenue for year one was $8.3 million,
20  and then in year -- in year two, it goes up to
21  $23 million or $23.9 million, and then, in year
22  three, according to your projections, your revenue
23  was going to reach $36 million, which was another
24  50 percent increase from the prior year projection,

JONES REPORTING COMPANY
617-451-8900

Ann M. Raider

Page 186

1  right?
2      A. Mm-hmm.
3      Q. And then in year four, according to your
4  projections, your revenue was going to go up to
5  $46 million, right?
6      A. Yes.
7      Q. And then finally, in year five, you were
8  going to have total revenue of $62 million, right?
9      A. According to this chart.
10     Q. Yeah, so from year one to year five, you
11  were going to multiply your gross revenue almost
12  eight-fold, right?
13     A. Yes.
14     Q. And if you look at your 1997 -- 1998
15  revenue of $3.7 million, your estimate of
16  $62 million in revenue five years hence was going
17  to be an almost 16 times jump in revenue from your
18  1998 revenue, right?
19     A. According to your calculation.
20     Q. Well, they weren't mine -- well --
21     A. According to your statement just now. I
22  don't know if it's 16. I'd have to multiply it
23  out, but --
24     Q. But it's approximately right, correct?

Page 187

1      A. Yes.
2      Q. Now, these projections were made in 1999,
3  right?
4      A. Yes.
5      Q. And you didn't do any market research
6  involving interviews of non-client potential
7  customers before you made these projections, right?
8      A. No, you're wrong. We knew exactly which
9  customers had opportunities. We knew the market
10  trend was moving. We knew that retailers had data
11  that manufacturers wanted to access and we knew
12  that we stood and held the data in trust and could
13  execute those programs.
14     Q. Okay. You didn't hire an outside expert to
15  derive your projections, did you?
16     A. We did not hire an outside expert.
17     Q. You didn't ask anyone who was unconnected
18  to the transaction if the numbers you were
19  projecting were reasonable numbers, did you?
20     A. We actually did an analysis ourselves based
21  on the number of accounts, the number of
22  manufacturers, the number of programs and estimated
23  revenue per program.
24     Q. But you didn't ask anybody outside of your

Page 188

1  company if these numbers which you projected were
2  reasonable numbers, did you?
3      A. Yes, I did.
4      Q. Who did you ask?
5      A. I asked Jamie Sims.
6      Q. Who is Jamie Sims?
7      A. He's a business friend who was an
8  investment banker.
9      Q. Where?
10     A. I don't know who he was working for at the
11  time.
12     Q. And what information did you provide to
13  him?
14     A. He looked at reports of other companies, he
15  looked at our calculations.
16     Q. And where is Jamie Sims located now?
17     A. He's an investment banker in Boston.
18     Q. Who does he work for?
19     A. I don't know.
20     Q. Where does he live?
21     A. Dover.
22     Q. And how much time did he spend working
23  analyzing your projections?
24     A. I can't -- I don't know. He did some time

Page 189

1  -- he spent time. If you're asking me to quantify
2  exactly how many hours, days, et cetera, I can't
3  answer that.
4      Q. Did you pay him anything for his efforts?
5      A. No.
6      Q. Did he produce anything in writing
7  reflecting his view?
8      A. I don't know.
9      Q. You don't remember it?
10     A. If he produced specific documents in
11  writing, I do not recall.
12     Q. What specifically did you ask Mr. Sims to
13  do?
14     A. To take a look at our projections.
15     Q. And again, what do you remember Mr. Sims
16  saying to you after he looked at your projections?
17     A. He thought they were reasonable based on
18  the market trends.
19     Q. And did he have experience in your
20  industry?
21     A. Yes.
22     Q. And what did his experience consist of?
23     A. I don't remember.
24     Q. And did anybody besides Mr. Sims take a

48 (Pages 186 to 189)

Ann M. Raider

Page 190

1 look at these projections --
2 **A. Not that I recall.**
3 Q. -- outside your company?
4 **A. Not that I recall.**
5 Q. Now, in 2001, the dot com bubble burst?
6 You'd agree with that?
7 **A. I don't know if that was the year it burst.**
8 Q. But it burst in and around that time
9 period? Maybe it was 2000, maybe it was --
10 **A. What is the definition of the dot com**
11 **bubble burst?**
12 Q. Well, let's just say in 2001, the economy
13 started to go in recession. Would you agree with
14 that statement?
15 **A. If that's in the public domain, I guess I**
16 **would agree.**
17 Q. Okay. And after 9/11, the economy slipped
18 some, too, did it not? Do you remember?
19 **A. I don't know if the total GNP slipped after**
20 **9/11 or not.**
21 Q. Well, the stock market slipped? You agree
22 with that, right?
23 **A. You know, I don't know for sure.**
24 Q. Okay.

Page 191

1 **A. I don't know.**
2 Q. All right. When you were making your
3 projections in 1999, you were making many
4 assumptions, right?
5 **A. We had a list of assumptions.**
6 Q. Okay, so let's talk about some of them.
7 With respect to the implementation revenue, again,
8 keeping our eye on Mr. Coughlin's chart, you
9 assumed that implementation revenue was going to go
10 up from 2.3 million in 1998 to 3.2 million in the
11 first year after the acquisition, right?
12 **A. Yes.**
13 Q. And 5.7 million in the second year, right;
14 7.6 million in the third, 9.5 million in the
15 fourth? Well, I'm going to have to go back and get
16 you to answer yes. Let's start over again. You
17 assume that the implementation revenue was going to
18 go up from 2.3 million in 1998 to 3.2 million in
19 the first year after the acquisition, right?
20 **A. This chart says 3.4, so are we looking at**
21 **the same chart?**
22 Q. Well, I'll stand corrected. 3.4.
23 **A. Are you looking at another chart? You're**
24 **looking --**

Page 192

1 Q. No, we'll look at the same chart.
2 **A. The 3.2 is on the other chart.**
3 Q. Okay, but you -- on the chart on page FR
4 2675, it goes up from 2.3 million in 1998 to 3.4 in
5 the first year after the acquisition, right?
6 **A. Yes. Yes.**
7 Q. Okay. And what does it go up to in the
8 second year for implementation?
9 **A. Eight.**
10 Q. And what does it go up to in the third year
11 for implementation?
12 **A. Nine.**
13 Q. And what does it go up to in the fourth
14 year for implementation?
15 **A. 11.**
16 Q. And in the fifth year?
17 **A. 13.**
18 Q. And if we can take a look at page 26, FR
19 2678, this page demonstrates, does it not, that you
20 expected that you would acquire 6.5 new grocery
21 stores or other retail clients in year one, right?
22 **A. Yes.**
23 Q. And then you were going to acquire 11 new
24 clients in year two, right?

Page 193

1 **A. Yes.**
2 Q. 14 in year three, right?
3 **A. Yes.**
4 Q. And then 16 new grocery store or other
5 retail clients in year four, right?
6 **A. We said new clients. We did not specify**
7 **grocery.**
8 Q. Okay, could be grocery or other retail?
9 **A. Drugs, right.**
10 Q. And then you were going to have 18 new
11 grocery store or other retail clients in year five,
12 right?
13 **A. Correct.**
14 Q. And this was all guesswork, was it not?
15      MR. RICH: Objection.
16 **A. No, we actually had a list of targeted**
17 **accounts that we were going after.**
18 Q. (BY MR. KATZ) But you didn't know you were
19 going to get any of them, right?
20 **A. We had reason to believe that we would get**
21 **them.**
22 Q. You obviously don't get every client you
23 seek, right?
24 **A. You don't get every client you seek, but**

Ann M. Raider

<table>
<tr><td>

Page 194

1  just because there were six clients here doesn't
2  mean we were only calling on six. We probably were
3  calling on 20.
4     Q. Could have, okay, but it was all guesswork
5  as to how many would actually sign up with you,
6  right?
7     A. I'm not sure I would use the word
8  guesswork. I think we would say that we would
9  assign a probability to each opportunity as it
10  presented itself.
11    Q. But you didn't know who those customers
12  were going to be, particularly for the years down
13  the road like years three, four and five, right?
14    A. We had indications of categories of
15  customers. Did we actually specify which
16  customers? I do not recall.
17    Q. Okay. You didn't ask any independent
18  consultant for his view of the reasonableness of
19  these numbers, did you?
20    A. No, we were experts in the industry. We
21  knew exactly what was going on.
22    Q. So you relied on your own independent
23  judgement as to whether or not these numbers
24  regarding new clients in the grocery and other

</td><td>

Page 196

1     Q. But you didn't get everything for Kroger?
2     A. No, we did not get everything, but you're
3  asking about implementation.
4     Q. Right. Anyway, we'll get to Kroger later
5  on in today's discussion, but you couldn't have
6  predicted what you were going to get from Kroger in
7  the summer of 1999, right?
8     A. I wasn't that clairvoyant.
9     Q. In the summer of 1999 when you were doing
10  these projections, you did not have a contract with
11  a single one that projected grocery store or other
12  retail customers that you hoped for to do a new
13  loyalty card program?
14    A. I cannot testify to that. I don't know who
15  I had contracts with, whether there were contracts
16  pending that just hadn't been signed, where there
17  were presentations and we were waiting for
18  approval. I do not recall.
19    Q. But certainly, none of the new customers
20  that you anticipated in year two, three, four and
21  five had contracts with you in the summer of 1999,
22  right?
23    A. I don't know.
24    Q. You think some of them might?

</td></tr>
<tr><td>

Page 195

1  retail chains were concerned, right?
2     A. We had relationships with the Food
3  Marketing Institute, the National Association of
4  Chain Drug, and other industry organizations that
5  tracked the acceptance of loyalty in their trade
6  classes and we had access to all that data and the
7  trends within each of those trade channels.
8     Q. Right, but you didn't have ask anybody from
9  any of those organizations to review your
10  projections on FR 2678 to see if they were
11  reasonable, right?
12    A. No, we did not.
13    Q. And you had a total of almost 60 new retail
14  loyalty card programs that you were going to have
15  to roll out in order to meet your projections;
16  isn't that right?
17    A. Or a combination of larger chains who did
18  more than a million dollars over a hundred stores.
19  Kroger has 4,000 stores. You could have made that
20  number with just doing absolutely everything for
21  Kroger.
22    Q. Right, but that never happened?
23    A. We actually executed the Kroger card
24  program.

</td><td>

Page 197

1     A. I don't know.
2     Q. You can't remember as you sit here now?
3     A. I don't know.
4     Q. As for database management, in 1999, your
5  revenue had been $1.2 million. Now, you projected
6  -- and I mean CCMI -- that revenue was going to go
7  up for database management to $1.3 million in year
8  one, right? And I'm on seven -- FR 2675.
9     A. I'm sorry. Would you ask your question
10  again?
11    Q. Okay. As for database management, in 1999,
12  your revenue had been -- I'm sorry; for database
13  management, in 1998, your revenue had been
14  $1.2 million. You, being CCMI, projected that
15  revenue was going to go up to $1.3 million in year
16  one after the acquisition for database management,
17  right?
18    A. Yes.
19    Q. And for two, you projected that it was
20  going to go up to $4.1 million, right?
21    A. Yes.
22    Q. And for year three, you projected that it
23  was going to go up to $7.5 million, right?
24    A. Mm-hmm.

</td></tr>
</table>

50 (Pages 194 to 197)

Ann M. Raider

Page 198

1    Q. And for year four, you projected that it
2  was going to go up to $11.4 million, right?
3    A. Yes.
4    Q. And then for year five, you projected that
5  it was going to go up to $15.6 million, right?
6    A. Yes.
7    Q. And what research, if any, had you done to
8  determine whether these numbers were anything but
9  mere hopes and aspirations?
10    A. First of all, retailers who chose to
11  implement loyalty programs did need database
12  management services to capture the information that
13  they needed in a usable format, so there was no
14  hope or aspiration that they would use database
15  management services. It was a fact if they wanted
16  to be in the loyalty card business.
17        Second of all, we had a tool that we
18  had built that had been accepted by the people
19  using it and we believed that as more and more
20  retailers embraced loyalty marketing, they would
21  embrace having more database management tools. The
22  database tool could be run as a software licensed
23  or as an ASP model, and we knew that there would be
24  other kinds of database management capabilities

Page 199

1  required as we expanded the business, and
2  therefore, it was not a stagnant I have Product A
3  and Product A is the only thing I'm going to sell
4  over five years at a set price; it was a growth in
5  the consumption of the products we currently sold
6  plus additional products we believed we would sell
7  to additional retailers as they embraced loyalty
8  marketing.
9    Q. But you really didn't know how these
10  numbers were going to be met? You didn't know what
11  products you were going to be selling?
12    A. We knew exactly what products we would be
13  selling in year two and three and we knew what
14  product enhancements we would be building going
15  forward.
16    Q. Well, tell me what those were, please.
17    A. We created campaign management tool, a
18  promotional testing tool. We went into the stored
19  value database business, expanding stored value
20  capability. We knew that we would be linking
21  stored value cards to loyalty cards and that was a
22  capability. We knew that we would be porting to
23  the Internet. So we knew that there was a sequence
24  of database marketing cap-- database management

Page 200

1  capabilities that we would be using to enhance and
2  in fact increase in total numbers.
3    Q. Well, that's what you hoped to do, but you
4  didn't know that you were going to be doing those,
5  right?
6    A. Every business makes a plan and their goal
7  is to make the plan. We made the plan with the
8  intention of making the plan.
9    Q. So this was just a plan?
10    A. This was an action plan to deliver what we
11  believed was the financial success of the business.
12    Q. But you had no commitments from any
13  retailers that they were going to contract with you
14  for your database management services, right?
15    A. I can't testify to that.
16    Q. One way or the another?
17    A. Right. I don't remember who was
18  contracted, who wasn't contracted, were there
19  contracts in place, were there licensing
20  agreements. I don't remember that.
21    Q. Let's turn to consulting marketing. In
22  1988, to recap, you had $72,000 in consulting and
23  marketing revenue, but in year one, after the
24  acquisition, you projected the revenue was going to

Page 201

1  jump to 3.5 million, right?
2    A. No, actually, I have 2.2 million.
3    Q. Well, on FR 2675 --
4    A. Yeah, consulting and database management
5  that year was $2.2 million. Oh, I'm sorry. I
6  looked at the wrong line. I beg your pardon. 3.5,
7  right. I was reading the wrong line.
8    Q. And then in year two, it jumps to
9  $13.2 million for consulting marketing revenue,
10  right?
11    A. Mm-hmm.
12    Q. Year three, it jumps to $19.6 million,
13  right?
14    A. Yes.
15    Q. Year four, it jumps to 23 million, right?
16  And then in year five it jumps to 33 million,
17  right?
18    A. Yes.
19    Q. In other words, you projected that you were
20  going to grow a business you hardly had in 1998 to
21  a $33 million business in five years, right?
22    A. That is correct, and in fact, that is
23  because the consumption of targeted direct mail
24  using retailer databases was exploding, and in

51 (Pages 198 to 201)

Ann M. Raider

Page 202

1  fact, Catalina, Valassis, and other companies
2  achieved those numbers while we stagnated and they
3  took our business apart. Competitors who came into
4  the business after we had already been established
5  and needed to build on it actually achieved more
6  than those numbers. So while you may sit here and
7  look at this permutation as something that's not
8  achievable, other companies who made a focused
9  effort using manufacturing sales forces did
10 accomplish those objectives.
11    Q. And you've seen their financial statements?
12    A. They are public record.
13    Q. Whose financial statements are public
14 record?
15    A. Catalina and Valassis are public record.
16    Q. Are they public companies?
17    A. Yes.
18    Q. Both of them are public companies?
19    A. Yes. Catalina may be private, but they
20 reported their growth.
21    Q. Where was it reported?
22    A. In the trade press.
23    Q. Now, prior to the acquisition, what size
24 sales force did you have --

Page 203

1    A. Excuse me. And News America had access to
2  information about the companies, so I'm sure if you
3  ask them, they would give you the information
4  regarding that, the competitive analysis, because
5  they told -- they reported that they had access to
6  competitors information.
7    Q. Now, prior to the acquisition, what size
8  sales force did you believe you needed in order to
9  meet the post acquisition projections you'd set for
10 CCMI?
11    A. We needed access to their entire
12 manufacturing sales force. We wanted everyone in
13 the manufacturing sales force to carry information
14 about executing targeted marketing programs for
15 CCMI.
16    Q. And how much of their time do you think you
17 needed them to spend in order for you to meet your
18 objectives?
19    A. I would say that they needed to spend
20 15 percent of their time.
21    Q. And how many -- how many individuals are we
22 talking about?
23    A. They had 240 at the time that we sold the
24 business, as far as I recollect, because they had

Page 204

1  the entire ACT media sales force and they had the
2  entire News America sales force. I think they then
3  went down to about 150 people.
4    Q. But you wanted the entirety of that 240
5  sales force, or 150 sales force, whatever it was,
6  to be spending about 15 percent of their time doing
7  work for CCMI? Is that what you expected?
8    A. I had an expectation level that their sales
9  force would carry our information when they talked
10 to their customer base to make them aware that we
11 could do targeted marketing programs using retailer
12 databases. In the course of a sales presentation,
13 which may take an hour, they might take 15 minutes
14 and remind them that they have this new capability
15 that they could use.
16    Q. And you knew that or believed that that was
17 possible and it's what you expected to occur prior
18 to your signing the acquisition agreement in August
19 of 1999?
20    A. That is correct, because if you look at the
21 financials that David and I -- David DeVoe and I
22 agreed upon, there are no -- there is one or two
23 people in the manufacturing sales force for CCMI
24 direct reports. The rest of the sales force to

Page 205

1  sell our product line were all existing News
2  America people, and that's why David DeVoe and I
3  agreed that we would add no head count, significant
4  head count to our direct head count because we
5  would be leveraging the asset of NAM, which was
6  their sales force.
7    Q. But you put nothing in the agreement
8  requiring that NAM's sales force spend
9  approximately 15 percent of their time selling CCMI
10 products, right?
11    A. No, we said that it was their intention,
12 their intention to use their sales force. I didn't
13 feel I had to require them a certain set of time.
14 We're talking about business reasonableness. These
15 are people who are experts at calling on every
16 packaged goods company in America. They are
17 professional salespeople. It is a sales driven
18 company, so it would be our expectation that they
19 would be aware of our -- their product, and it was
20 stated in the agreement it was their intention to
21 use their sales force to represent our product
22 line, their intention. You have to assume it's a
23 good intention, not a bad intention. Otherwise,
24 there's a bad intention permeating in the document.

52 (Pages 202 to 205)

Ann M. Raider

Page 206

1    Q. We're going to change topics. Let's now
2    talk about the earn-out calculations. In year one,
3    you received on November tenth, 2000, a letter from
4    Mr. DeVoe telling you what your earn-out
5    calculation for the first year was, correct?
6    **A. I don't know if that was the date.**
7        **(Exhibit 52 marked for identification.)**
8    Q. So you'd agree with me you received your
9    letter regarding your first year earn-out on
10   November 10th, 2000?
11   **A. That is the letter.**
12   Q. And then you and Mr. Fireman sent a letter
13   on November 20th, 2000 to Mr. DeVoe requesting
14   additional information?
15       (Exhibit 53 marked for identification.)
16   **A. Yes.**
17   Q. And then on December 13th, 2000, you and
18   Mr. Fireman sent another letter to Mr. DeVoe?
19   We'll mark that as our exhibit next in order.
20       (Exhibit 54 marked for identification.)
21   Q. In your December 13th letter, you say on
22   page two, NAM acquired our stock in CCMI by
23   representing that it would provide sufficient
24   financial sales and marketing support to allow us

Page 207

1    to manage CCMI in the implementation of its
2    business plan. It reneged on that commitment and
3    undertook actions that made it impossible for us to
4    earn a gross margin sufficient to trigger NAM's
5    obligation to pay the first year bonus amount. Do
6    you see that? Am I right on that? Did I read that
7    correctly?
8    **A. I'm sorry. You're at the bottom of page**
9    **two?**
10   Q. No, I'm in the middle paragraph.
11   **A. Okay, yes. I see that paragraph.**
12   Q. Okay. And this is the same claim you make
13   in your complaint in this action; is that not
14   correct?
15   **A. It is fundamental complaint -- it is a**
16   **fundamental complaint we are making.**
17   Q. Right, but in December 2000, you are making
18   your present claim in the context of the earn-out
19   dispute procedure spelled out in the stock
20   acquisition agreement; isn't that right?
21       MR. RICH: Objection.
22   **A. I'm sorry. Would you ask the question**
23   **again?**
24   Q. (BY MR. KATZ) Your letter, which you sent

Page 208

1    on December 13th, 2000, which is titled notice of
2    dispute over earn-out and bonus amounts in the
3    first earn-out period --
4    **A. Mm-hmm.**
5    Q. -- begins by saying pursuant to Sections
6    2.3C and 7.7 of the Stock Purchase Agreement, we
7    give notice that we dispute the amount paid as the
8    first year bonus amount under Section 2.3 of the
9    agreement. We object on three bases, and the
10   second bases is the bases that I just quoted?
11   **A. Yes, that's right.**
12   Q. And that's the same bases that you are
13   asserting in the context of this litigation for
14   more money under your earn-out and payment of the
15   bonus?
16   **A. I'm not asserting anything. I'm stating**
17   **the fact that I believe they made a commitment and**
18   **that they did not in good faith deal with us.**
19   Q. Okay, but I'm going to have to go back and
20   ask you to answer my question, that your second
21   objection in your December 13th, 2000 letter --
22   **A. Yes, says that they reneged on the**
23   **commitment that undertook the actions that made it**
24   **possible for us to earn this gross margins.**

Page 209

1    Q. Right, and that's the same claim that
2    you're making in this litigation, right?
3    **A. Yes.**
4    Q. And then, on January 2, 2001, you received
5    a letter from Mike Racano, R-A-C-A-N-O, of News
6    America Marketing, responding to your letter. And
7    we'll mark that as exhibit next in order, and that
8    is Exhibit 55.
9        (Exhibit 55 marked for identification.)
10   Q. And in the January 2, 2001 letter,
11   Mr. Racano says, among other things, we believe
12   your second objection is entirely without merit,
13   right? That's what he said?
14   **A. That's what the letter says.**
15   Q. Okay.
16       (Exhibit 56 marked for identification.)
17   Q. You have Exhibit 56 in front of you, right?
18   **A. Yes.**
19   Q. And that's Mr. Racano's e-mail to you on
20   Friday, February 16th, 2001, right?
21   **A. Yes.**
22   Q. And in the e-mail, it's reflected that
23   you've had discussions regarding issues concerning
24   your earn-out, right?

Ann M. Raider

1    **A. That is correct.**
2    Q. And as of that date, there were two
3    remaining unresolved issues, right?
4    **A. Yes, according to this memo.**
5    Q. And in the memo, or the e-mail, Mr. Racano
6    says we must submit the unresolved issues to Arthur
7    Andersen and the seller's accountant so that the
8    two accounting firms can attempt to resolve in good
9    faith the two remaining unresolved matters, right?
10   **A. That's what the memo says.**
11   Q. And you did not engage an accountant --
12   **A. Not that I --**
13   Q. -- to deal with the unresolved issues,
14   right?
15   **A. Not that I recall.**
16   Q. Okay. And Mr. Fireman, on March eighth,
17   2001, sent an e-mail that said let this e-mail
18   confirm that Ann and I have chosen not to arbitrate
19   whether the calculations that NAM has made are in
20   compliance with GAAP pursuant to paragraph 2.2B of
21   the Stock Purchase Agreement.
22   **A. If you tell me that memo exists, I believe**
23   **that memo exists.**
24   Q. Is that consistent with your recollection?

1    **A. I do not recall that.**
2    Q. Let's mark as Exhibit 57 --
3    (Exhibit 57 marked for identification.)
4    Q. Okay. We have Exhibit 57 in front of you,
5    and this is where Mr. Fireman says on March 8th,
6    2001 that Ann and I have chosen not to arbitrate.
7    Do you see that?
8    **A. Yes.**
9    Q. And then Mr. Fireman goes on to say please
10   wire the funds to our respective accounts? Do you
11   see where he says that?
12   **A. I do.**
13   Q. And those are the earn-out funds, right?
14   **A. Yes.**
15   Q. And you received approximately $106,000 in
16   your first year earn-out payment?
17   **A. I don't know. You have a chart.**
18   Q. Could we have the chart?
19   MR. RICH: Is this something you
20   already marked?
21   MR. KATZ: Yes, I think we premarked
22   it.
23   MR. RICH: Oh. Exhibit 46?
24   MR. KATZ: Yes.

1    Q. (BY MR. KATZ) You don't have any doubt
2    that you received approximately $106,000 as your
3    earn-out for year one?
4    **A. No.**
5    Q. And that Mr. Fireman received approximately
6    $159,000 for his earn-out for year one, right?
7    **A. No.**
8    Q. Now, in year two, you were told at some
9    point in late 2001 that NAM calculated your second
10   year earn-out at about $71,000 for you and $106,000
11   for Mr. Fireman? Does that ring a bell?
12   **A. The specifics do not ring a bell, but the**
13   **chart shows that number.**
14   Q. Okay. And on Monday, November 19th, 2001,
15   that amount was transmitted into your account by
16   News America Marketing, right?
17   **A. If you have the documentation, I believe**
18   **that's so.**
19   Q. Okay. Now, you engaged in numerous
20   discussions with George Ludwig, controller at NAM,
21   and others at NAM in the first half of 2002 with
22   respect to various aspects of your year two
23   earn-out calculation; isn't that right?
24   **A. That is correct.**

1    Q. And some of these discussions were
2    conducted by Mr. Coughlin on your behalf?
3    **A. That is correct.**
4    Q. Now, he was by then a News America
5    Marketing employee, right?
6    **A. He was always a News America Marketing**
7    **employee. From the day we sold the company, he was**
8    **a News America Marketing employee.**
9    Q. Right. Did you pay him for acting on your
10   behalf in this situation?
11   **A. No.**
12   Q. Was he acting on your behalf in this
13   situation on company time?
14   **A. He was acting on our behalf on personal and**
15   **company time.**
16   Q. But you didn't pay him for his efforts --
17   **A. No, I did not.**
18   Q. -- in assisting you? On Friday, May 17th,
19   2002, seven years ago from today, Mr. Racano sent
20   you an e-mail saying Ann, this note confirms that
21   we have agreed that there will be no adjustments to
22   the calculation of the SmartSource Direct earn-out
23   calculations for the year ending September 30th,
24   2001. Do you remember receiving that?

54 (Pages 210 to 213)

Ann M. Raider

Page 214

1    A. No, I don't remember that specific memo.

2    Q. But do you remember receiving news to that

3 effect?

4    A. There was a tremendous amount of

5 discussion, dialog, documents produced, multiple

6 people involved and issues regarding every year of

7 the earn-out calculation, and if you have an e-mail

8 that says that Mike Racano said something, then I

9 believe that he said it.

10        (Exhibit 58 marked for identification.)

11    Q. And this is the Friday, May 17th, 2002

12 e-mail?

13    A. I see that.

14    Q. Okay. Now, at this point in time, you had

15 already been paid your earn-out, right? You had

16 already received your year two earn-out?

17    A. I don't know the date that we received the

18 earn-outs. It says the period, but I don't know

19 the date that you received the earn-out, so I can't

20 answer that. It doesn't tell me the date I

21 received it. It just -- it's the date of the

22 period. It doesn't tell me the date the checks

23 were sent.

24    Q. Well, didn't you receive your earn-out for

Page 215

1 year two in November of 2001? That would be

2 approximately two years after the transaction?

3    A. You know, I don't know when we received the

4 earn-outs, the dollar -- I don't know the dates

5 that we received the earn-out dollars. We received

6 earn-out dollars at the conclusion of the period,

7 but I don't know the dates that we received the

8 dollars.

9    Q. Okay. Now, the dispute resolution

10 deadlines in the agreement for challenging the

11 second year earn-out calculation had long passed by

12 May 17th, 2002, right?

13    A. The second year would have closed in

14 September 2001, but there were many questions about

15 the accounts receivable, the accounts payable, the

16 accounting altogether. There were no -- there

17 wasn't documentation on their part. They had very

18 poor records. We had to reconstruct records, so it

19 took months of going through accounts receivable,

20 finding where all the things were, mistakes that

21 had been made by NAM's manufacturing side that cost

22 us credits in the customers' accounts that were

23 totally beyond our control, there were errors made

24 by NAM people outside of our group, so there was a

Page 216

1 lot of dialog and a lot of papers that had to be

2 assembled after the actual date that the year

3 closed.

4    Q. But suffice it to say you never designated

5 an accountant to deal with unresolved issues on

6 your behalf?

7    A. We worked on unresolved issues, Bob and I

8 and Robert Coughlin and Mike Gaffney and George

9 Ludwig and Mike Racano and other people in their

10 organization trying to get facts so we could stay

11 fact-based about what happened.

12    Q. And they dealt with you in good faith

13 during all this, right?

14        MR. RICH: Objection.

15    A. I don't know whether they dealt with me in

16 good faith. They dealt with me when I pushed the

17 answer. If it really was good faith, then why was

18 I even having this problem? They didn't provide

19 any finan-- there was a guy named Chris Bruther who

20 was assigned to us who actually left the company

21 who spent almost all of his time trying to

22 reconstruct basic financial accounting for us that

23 the company never provided because we were so small

24 relative to the billion dollars. So was it good

Page 217

1 faith? I don't know that it was good faith. It

2 was in fact a lack of performance on their part.

3    Q. Well, you say you were so small relative to

4 the billion dollars. What do you mean by that?

5    A. Meaning we did millions of dollars in

6 business and they were a billion dollar concern,

7 and they didn't allocate -- they had a freeze in

8 head count, so they didn't allocate a dedicated

9 financial resource to us to help us. Robert

10 Coughlin was actually doing two jobs instead of one

11 for months on end when they were supposed to have

12 someone, and finally, after we said this is

13 ridiculous; you don't even have ledgers showing us

14 what's going on in the business, we ask for

15 reports; we can't even find them, and so they

16 assigned a gentleman by the name of Chris Bruther

17 to help us reconstruct. It look him months to

18 reconstruct the finances of the accounting within

19 News America. It was difficult to find out what

20 was going on. We did not get regular reports every

21 month on what happened in the finances of the

22 business. And so when you ask whether it was in

23 good faith, I don't know the answer to that

24 question. I know that we pushed to get the facts

Ann M. Raider

Page 218

1  and that after pushing constantly and going through
2  every detail did we secure the facts.
3      Q. And you did secure the facts?
4      A. We secured the facts to the best of our
5  knowledge; that is correct.
6      Q. And you ultimately discontinued any further
7  investigation once you felt comfortable that you
8  had gotten as much of the facts as you could?
9      A. That is correct.
10     Q. Okay. And you never brought a lawsuit
11 against NAM for your claim of inadequate support
12 during the second year of your earn-out period,
13 right?
14     A. We -- this is the lawsuit that we are
15 bringing against NAM right now.
16     Q. You didn't do so before?
17     A. No.
18     Q. You didn't do so at any time while you were
19 still employed by News America Marketing, right?
20     A. No.
21     Q. And you did not exercise the arbitration
22 provisions of your agreement at any time to
23 challenge your earn-outs or the bonus in the Stock
24 Purchase Agreement, right?

Page 219

1      A. No, we did not use arbitration.
2         (Exhibit 59 marked for identification.)
3      Q. You remember the July 15th, 2002 letter
4  that you sent to John Linguiti?
5      A. I don't recall the letter, but the letter
6  is clearly what we wrote.
7      Q. You wrote it or Mr. Fireman wrote it?
8      A. We wrote it together.
9      Q. Okay. You certainly signed it?
10     A. Yes, I did.
11     Q. And this is July 15th, 2002, right?
12     A. It's dated that.
13     Q. And you are claiming that you dispute the
14 amount paid as your year two earn-out and you make
15 the same claim that you did in your December 13th,
16 2000 letter -- December 13th, 2000 letter? Isn't
17 that right?
18     A. I would need to see the letter to do the
19 comparison.
20     Q. Okay. We have it here.
21        (Exhibit 60 marked for identification.)
22     A. Yes, we make the same complaints.
23     Q. And then on July 15th, 2002, you and
24 Mr. Fireman wrote another letter -- oh, I'm sorry.

Page 220

1  Then on July 19, 2002, Deborah Wolfe at Hogan &
2  Hartson responded to your July 15th, 2002 letter,
3  right?
4      A. Yes.
5      Q. And she said that your claims were both
6  untimely and without merit, right?
7      A. She made those statements.
8      Q. You did not respond to her, did you?
9      A. I don't recall.
10     Q. Mr. Fireman did not respond to her, did he?
11     A. I don't recall.
12     Q. Your counsel did not respond to her, did
13 he?
14     A. I don't recall.
15     Q. You did not commence arbitration?
16     A. I do not believe we commenced arbitration.
17     Q. And you did not bring suit, right?
18     A. I did not bring suit.
19     Q. Nor did Mr. Fireman?
20     A. No. I do not know.
21     Q. And neither you nor Mr. Fireman returned
22 any money that NAM had paid you, correct?
23     A. I did not.
24     Q. And you did not ask for rescission of the

Page 221

1  Stock Purchase Agreement, did you?
2      A. I don't -- I don't believe so.
3      Q. During the next three years, neither you
4  nor Mr. Fireman attempted to convince NAM to raise
5  your earn-out amounts for years three, four, five
6  by making the argument that NAM had failed to
7  provide sufficient financial marketing or sales
8  support, did you?
9         MR. RICH: Objection.
10     A. We constantly raised the issue of the
11 concerns we had with the demise of the business.
12 They had in years two, three, four and five
13 destroyed the -- the database portion of the
14 business with lack of support and accuracy that
15 cost us customers. They took our staff that was
16 trained and had them leave and replaced them with
17 people in Connecticut who had no experience. They
18 never gave us access to the sales force. We
19 constantly raised the questions with people. We
20 had several people who we reported to. I reported
21 to four or five people during the time that I was
22 at NAM that were not even executives in some cases,
23 so we raised it every chance we got to raise the
24 concerns with various people in the organization.

56 (Pages 218 to 221)

Ann M. Raider

1    Q. (BY MR. KATZ) But you didn't make the
2  objection during your discussions with NAM
3  financial people during the earn-out calculation
4  discussions?
5    **A. We had serious discussions with the NAM**
6  **calculation people, people who were participating**
7  **at the closing, people who worked with us after the**
8  **closing, people who worked with us during the first**
9  **couple of years, people who were working with us,**
10 **then had left the company or were not involved or**
11 **were transferred to other divisions, so from their**
12 **perspective, we raised the issues and concerns with**
13 **absolutely every financial group that we worked**
14 **with.**
15   Q. Okay. Let's turn to year three. This year
16 earn-out year ended on 9/30/2002, right?
17   **A. Yes, that would have been year three.**
18   Q. And your earn-out was calculated to be
19 $45,227?
20   **A. If that's the chart. If that's on the**
21 **chart, then that's what it is. In year three, the**
22 **number I have is 55,000.**
23   Q. Right. And that's because after some
24 discussion, NAM adjusted your account -- adjusted

1  your earn-out by $10,446?
2    **A. I don't remember the specifics.**
3    Q. Okay, but these -- the amounts that you and
4  Mr. Fireman received that's reflected on the chart
5  which is Exhibit 46 are accurate, correct?
6    **A. I believe so.**
7    Q. Okay. And then year four, that year ended
8  -- that earn-out year ended 9/30/03, right?
9    **A. Yes.**
10   Q. And what were your and Mr. Fireman's
11 earn-out amounts?
12   **A. Year four?**
13   Q. Year four.
14   **A. Mr. Fireman received $37,000 and I received**
15 **24.**
16   Q. Okay. Now, on year five -- let me see if I
17 have the documents -- at some time in November of
18 2004, Mr. Jack from News America Marketing sent you
19 a memo with a calculation for the year five
20 earn-out and informing you that it was going to be
21 wired. Does that sound right to you?
22   **A. I worked with Don Jack. I don't know the**
23 **dates.**
24   Q. Okay. And looking at the chart, does that

1  tell you how much you and Mr. Fireman received?
2    **A. The chart states amounts of money that we**
3  **received.**
4    Q. And how much was that?
5    **A. Mr. Fireman received 70 -- almost $77,000**
6  **and I received 51.**
7    Q. Now, on November 22, 2004, you received a
8  copy of an e-mail which Mr. Fireman had sent to
9  Mr. Coughlin. Let's mark that as our exhibit next
10 in order.
11       (Exhibit 61 marked for identification.)
12   Q. And in the e-mail, Mr. Fireman wrote
13 Robert, talking to Robert Coughlin, we need to
14 respond to NAM this week or lose right to appeal.
15 Have you figured anything? Do you see that?
16   **A. Bob wrote that to Robert?**
17   Q. Yes.
18   **A. Okay.**
19   Q. And you saw this e-mail, right?
20   **A. I -- I wrote an e-mail to Don Jack and Bob**
21 **wrote an e-mail to Robert Coughlin. I see that.**
22   Q. And did you see Mr. Fireman's e-mail? Have
23 you seen Mr. Fireman's e-mail previous to today?
24   **A. I don't know. I'm not on copy for the**

1  **e-mail, so I would have no idea whether I received**
2  **it or didn't receive it, and he had already left**
3  **the company.**
4    Q. Mr. Coughlin had or Mr. Fireman had, or
5  both?
6    **A. Mr. Fireman certainly had, and based on the**
7  **e-mail, they both had left the company.**
8    Q. They both had? And you don't remember
9  whether or not you were sent a copy of the e-mail
10 or not?
11   **A. I do not recall.**
12   Q. What did you understand -- what do you
13 understand Mr. Fireman to mean by his use of the
14 expression lose right to appeal?
15   **A. I don't know. I mean, you know, Bob talks**
16 **in shorthand a lot.**
17   Q. Let me suggest that you may have received a
18 copy of this e-mail if you note that the e-mail
19 from Mr. Fireman and Mr. Coughlin was on
20 November 22, 2004 at 12:56 and then your e-mail to
21 Mr. Jack is dated November 22, 2004 at 8:13 p.m.
22      MR. RICH: Which is four hours before,
23 right?
24      MR. KATZ: No, I don't think so.

57 (Pages 222 to 225)

Ann M. Raider

1    A. Well, yeah --
2         MR. KATZ:  12:56 p.m. is right after
3    noon.
4    A. I don't know the answer to that.
5    Q. (BY MR. KATZ)  Okay.
6    A. I can't tell you one way or the another.  I
7    don't know the answer to that question.
8    Q. When we look back at the five years of
9    earn-out discussions, you would agree, would you
10   not, that your and Mr. Fireman's exchanges about
11   your disagreements with NAM's executives were
12   always professional?
13   A. We were very professional.
14   Q. As were the people on NAM's side, too,
15   wouldn't you say?
16        MR. RICH:  Objection.
17   A. Well, why don't you give me your definition
18   of professional.
19   Q. (BY MR. KATZ)  Well, let me just ask.  They
20   were always -- NAM executives were always courteous
21   toward you and Mr. Fireman, weren't they?
22   A. No.
23   Q. They were not?
24   A. No.

1    Q. Who was not courteous towards you?
2    A. Mr. Carlucci was not courteous.
3    Q. But he was --
4    A. Mr. Ludwig was not courteous.
5    Q. Mr. Ludwig was not courteous?
6    A. No.
7    Q. Could you describe for me why you believe
8    they were not courteous?
9    A. Mr. Carlucci said there's no room for
10   discussion on any topic.  It's my company.  And he
11   was not open to any discussions.  And if you put
12   anything in an e-mail, you were severely
13   reprimanded.  He directed us not to put anything in
14   an e-mail.  He directed us -- specifically said
15   that to us.  Do not put anything in e-mails.  Do
16   not put any writ-- anything in writing in e-mails.
17   Q. With respect to what?
18   A. Anything; any complaint, any issue with the
19   business.  We were not to put anything in an
20   e-mail.
21   Q. When did this occur?
22   A. It occurred in I would say 2000.
23   Q. And did you follow that instruction
24   thereafter?

1    A. No.
2    Q. So you continued to put the complaints in
3    e-mails?
4    A. Yes.
5    Q. Was Mr. Carlucci disrespectful or
6    discourteous to you in any other way?
7    A. Mr. Carlucci would not honor our requests
8    or concerns, so when we would want to have a
9    discussion about the business issues or the
10   business opportunities, he was not open.  In fact,
11   he was disrespectful in that he came to our offices
12   in Boston and stated that there was no support for
13   direct marketing, which was the foundation of our
14   business to grow, and that it -- he didn't believe
15   there was any future in direct marketing and that
16   it was irrelevant, and that was derogatory against
17   everything that we were trying to accomplish as a
18   division.
19   Q. When did he state this?
20   A. He came to the Boston offices.  You'd have
21   to check his schedule when he came for town
22   meeting.
23   Q. Was it before 9/11 or after 9/11?
24   A. I really don't know.

1    Q. Were you in the Hancock Building or were
2    you in Braintree?
3    A. I was in the Hancock Building.
4    Q. So it was at least after the move to the
5    Hancock Building?
6    A. Yes, it was.
7    Q. Is there anything else about Mr. Carlucci
8    that you'd like to report?
9         MR. RICH:  Objection.
10   A. No.
11   Q. (BY MR. KATZ)  You don't have any other
12   examples of Mr. Carlucci being disrespectful toward
13   you or your business?
14   A. I do not have any recollection -- at the
15   moment, I cannot -- I don't have any other specific
16   examples to give you.
17   Q. Who else was present at the town meeting?
18   A. The entire floor.
19   Q. Were there any other News America Marketing
20   executives besides Mr. Carlucci present?
21   A. I don't recall all the people who were in
22   the room.
23   Q. Was Henri Lellouche there?
24   A. I don't recall.

Ann M. Raider

Page 230

1  Q. Was Chris Mixson?
2  **A. I don't recall. I don't recall.**
3  Q. Did he come up to Boston by himself --
4  **A. I don't know.**
5  Q. -- for this meeting?
6  **A. I don't know.**
7  Q. You don't remember?
8  **A. No.**
9  Q. And I think you told us you don't have any
10 recollection of any other examples besides the ones
11 you just mentioned regarding Mr. Carlucci and his
12 attitude toward you or your business?
13 **A. At the moment, I can't recall specific --**
14 **other specific examples at the moment.**
15 Q. And you mentioned Mr. Ludwig as someone who
16 --
17 **A. Right.**
18 Q. -- you didn't believe was courteous to you?
19 **A. That is correct.**
20 Q. And what's your basis for that?
21 **A. In discussions with Mr. Ludwig where I**
22 **shared with him there were discussion with Mike**
23 **Racano regarding how the earn-out would be**
24 **calculated and issues that we were facing in the**

Page 231

1  **company, he informed me that he was now in charge,**
2  **he didn't care about anybody else, and therefore,**
3  **he was the ultimate financial decision maker and he**
4  **had -- and therefore, anything that I chose to say**
5  **was irrelevant.**
6  Q. But didn't he compromise on some issues
7  that you discussed?
8  **A. I don't know whether he compromised or his**
9  **staff compromised. I don't know who ultimately**
10 **made those decisions.**
11 Q. Do you have anything else with respect to
12 Mr. Ludwig that supports your view that he wasn't
13 always courteous with you?
14 **A. Mr. Ludwig ran all of the financial**
15 **services for the corporation. We were a part of**
16 **that corporation. We did not have appropriate**
17 **financial staff to support our division in terms of**
18 **tracking and reporting accounts receivable,**
19 **accounts payable, discounts, timeliness.**
20 **Therefore, I would say that he was not respectful**
21 **of helping us drive our business forward.**
22 Q. Because your felt you didn't get the
23 services that you needed from Mr. Ludwig? Is that
24 what you're saying?

Page 232

1  **A. That is correct.**
2  Q. Do you have any -- is there anyone else
3  besides Mr. Ludwig or Mr. Carlucci who you think
4  wasn't courteous or respectful toward you?
5  **A. Jon Rubin.**
6  Q. Anybody besides Mr. Rubin?
7  **A. At the moment, I don't recall.**
8  Q. And what was it that Mr. Rubin did or
9  didn't do that troubled you?
10 **A. Mr. Rubin made a claim to Mr. DeVoe that I**
11 **had misrepresented discussions regarding the Duane**
12 **Reade account, and I received a copy of an e-mail**
13 **that he had sent to Dave DeVoe from someone else in**
14 **the company as a warning that this discussion had**
15 **taken place. I then called David DeVoe and**
16 **explained to David DeVoe that if I had something --**
17 **if there was a problem with the Duane Reade account**
18 **or some issue, that I would directly tell David; I**
19 **reported to David at the time and that he would be**
20 **the first to know that. And I believed that Jon**
21 **Rubin's actions were subversive, that he -- his**
22 **intentions were not honorable. And David DeVoe**
23 **told me not to worry about John Rubin; he was**
24 **leaving the company, which he did.**

Page 233

1  **Jon Rubin came to Braintree and said**
2  **one thing to us and did another. He came to**
3  **Braintree and we shared with him concerns about the**
4  **fact that our staff was underpaid and -- relative**
5  **to comparable salaries in the market and that we**
6  **wanted to talk about appropriate compensation as we**
7  **became part of the News America organization to**
8  **other people. He told us oh, that's not the case,**
9  **and yet within 30 days, they gave $50,000 more in**
10 **salary to Bill Adam, so he -- he made**
11 **representations to us, to other people in News**
12 **about our inability to run our business effectively**
13 **to cast dispersions on our character, which other**
14 **people reported to us, which was not the case. So**
15 **Jon Rubin had an agenda about wanting to run**
16 **SmartSource Direct as it was, and in the short**
17 **term, he was asked to leave the company.**
18 Q. How -- over what period of time did Jon
19 Rubin have some supervisory responsibility over
20 you?
21 **A. From the time of the acquisition itself for**
22 **about 90 days, and then he left the company and**
23 **Henri Lellouche was put in charge.**
24 Q. So Jon Rubin's involvement with you was

59 (Pages 230 to 233)

Ann M. Raider

| Page 234 | Page 236 |
|---|---|

**Page 234**

1   really for a very brief period of time?
2       **A. But a very important period of time that**
3   **set the tone. It was Jon Rubin who stated oh, you**
4   **can't talk to the rest of the sales force. They're**
5   **busy with this organizational change. It was Jon**
6   **Rubin who set the tone and cast dispersions on our**
7   **character which lasted with some executives over a**
8   **period of time until we tried to change their**
9   **opinion about what we were trying to accomplish.**
10  **So in the early stages of our acquisition, Jon**
11  **Rubin said things against us, reported things**
12  **against the business which were not accurate, which**
13  **in fact raised questions about our integrity and**
14  **our performance that hurt us inside the**
15  **organization just at the time of the acquisition,**
16  **so his damage far exceeded the time he spent**
17  **working with us directly.**
18      Q. But Mr. DeVoe told you don't worry about
19  what Mr. Rubin said, right?
20      **A. That is correct, after the fact, but**
21  **Mr. Rubin spoke to a lot of people in the company**
22  **and he talked to the executive committee, so we**
23  **have no idea the extent of the damage he caused us.**
24      Q. If any?

**Page 235**

1       **A. Oh, he caused us damage.**
2       Q. What are some of the examples of the
3   damage?
4       **A. He did not let us talk to the rest of the**
5   **sales force. He said they were busy. That was**
6   **severe damage to us.**
7       Q. But after he left --
8       **A. We still didn't talk to the sales force.**
9       Q. And why was that?
10      **A. Because they were busy. I personally went**
11  **to Chris Mixson and asked for help and he said hey,**
12  **I'm busy. I'm running this regular sales force,**
13  **trying to do this consolidation. I don't have time**
14  **for you.**
15      Q. And what was wrong with that?
16      **A. Well, that wasn't the intention of the**
17  **sale.**
18      Q. That's your view?
19      **A. Oh, that is the view as stated. It was the**
20  **intention of the company to provide sales support,**
21  **intention. Good intention; otherwise, it was bad**
22  **intention.**
23      Q. Let's now take a look at your Answers to
24  Interrogatories. This is Exhibit 40. You signed

**Page 236**

1   these under oath, right?
2       **A. I did.**
3       Q. If you can -- if you could take a look at
4   the last page?
5       **A. 28? Is this the last page?**
6       Q. Your signature?
7       **A. Yes.**
8       Q. You signed these under oath?
9       **A. I did.**
10      Q. If we could go to page four, middle of the
11  page, it says NAM agreed to provide CCMI with the
12  use of its expansive retail and manufacturing sales
13  force who was selling their current products and
14  expose CCMI to NAM's relationship with worldwide
15  affiliates of New Corporation and the Fox
16  Entertainment Network, right?
17      **A. That is correct.**
18      Q. There's nothing in the Stock Purchase
19  Agreement that says this, is there?
20          MR. RICH: Objection. Asked and
21  answered.
22      **A. I've answered the question several times.**
23      Q. (BY MR. KATZ) There's nothing in the Stock
24  Purchase Agreement that mentions Fox Entertainment

**Page 237**

1   Network, is there?
2       **A. It says in the Stock Purchase Agreement --**
3   **I believe it says something about News and its**
4   **affiliates, I think it says.**
5       Q. Just so the record is clear, the question
6   that is on the table is that there's nothing in the
7   Stock Purchase Agreement that mentions Fox
8   Entertainment Network, is there?
9       **A. Mr. DeVoe and I had discussions regarding**
10  **promotions for Fox Properties and the retail**
11  **channel. We specifically talked about -- who is**
12  **the cat? Who is the Fox cat, you know, the cat?**
13  **Garfield. That we would put together Garfield**
14  **promotions, so we had discussions regarding using**
15  **Fox Properties and the retail network for loyalty**
16  **card programs.**
17      Q. Nothing in the agreement, right?
18      **A. I didn't go through it.**
19      Q. I'm sorry?
20      **A. I -- I didn't look through the agreement in**
21  **detail. I would assume. Given your question, I do**
22  **not know if it's in the agreement.**
23      Q. Not in the agreement, right?
24      **A. I don't know. I'd have to go through. You**

Ann M. Raider

Page 238

1  want me to go through again? Mr. Katz, I do not
2  believe that every detail that we talked about
3  regarding opportunities for our business were
4  listed in the agreement, such as the Garfield
5  promotions.
6      Q. But you would make every discussion that
7  you had with Mr. DeVoe on the part of
8  News America Marketing? Isn't that your point?
9          MR. RICH: Objection.
10     A. My point is that we had the opportunity to
11  make a $50 million business. He agreed to that
12  opportunity, because he looked at the financials
13  and he accepted them, and it was based on those
14  financials that we entered into the agreement. And
15  in that agreement, it talks about marketing
16  programs and consulting, and marketing programs
17  takes many forms, not the least of which was using
18  NAM properties to create promotions for retailers,
19  and we specifically discussed the Garfield --
20  what's the word -- Garfield property.
21     Q. (BY MR. KATZ) Going back to your
22  interrogatory answers, you also say that NAM
23  represented and agreed that CCMI would continue to
24  operate as an autonomous division of NAM and

Page 239

1  benefit from its operational and financial support,
2  right?
3      A. That is correct.
4      Q. There's nothing in the agreement about CCMI
5  operating as an autonomous division, is there?
6      A. I don't know the answer to your question.
7  I can tell you that it was never discussed at any
8  time that CCMI would not operate as an independent
9  company. It was implied that we would stay in
10  Braintree; it was implied we would always be in
11  Boston. Everything that they said was we would be
12  operating under -- as CCMI in the discussions we
13  had prior to signing the contract. Their actions,
14  however, from the moment the contract was signed
15  were different.
16     Q. But there's nothing in the agreement about
17  CCMI operating as an autonomous division, right?
18     A. And there's nothing in the agreement that
19  says it would not.
20     Q. Right.
21     A. In fact, all discussions, all discussions
22  were that we would; that we had a financial plan,
23  that we had a product line, that we had a plan of
24  action and that we would continue to reside in

Page 240

1  Braintree.
2      Q. But will you read paragraph 8.1 of the
3  Stock Purchase Agreement for me?
4      A. This agreement contains and is intended a
5  complete statement of all terms of the arrangements
6  between the parties in respect to the matter and
7  supersedes any previous agreements and
8  understandings.
9      Q. Is there any more?
10     A. No.
11     Q. That's it? Doesn't that clearly tell you
12  that all of the discussions that you had with
13  Mr. DeVoe prior to the signing of the agreement are
14  trumped by the agreement?
15     A. No. No.
16         MR. RICH: Objection.
17     A. In fact, it was an act of good faith that
18  he built the agreement, that we went into business
19  together, that we were going together to build a
20  company together, so did that mean that I -- that
21  anything he said to me before I would think was a
22  lie or that it was not honest or that it -- or that
23  it was not about how to build a company together?
24  I would say that that's not accurate.

Page 241

1      Q. (BY MR. KATZ) But that it's not a basis to
2  build a lawsuit?
3      A. It is a basis for which they intended to
4  grow the business. They made commitments to grow
5  this business by the very nature that they bought
6  this company, they saw the market growing, they
7  were not a part of it until they acquired us, they
8  wanted our assets to help them and help us grow.
9      Q. And they paid you a lot of money for that?
10     A. No, they paid us insignificant money
11  relative to the business opportunity.
12     Q. You think $2.8 million in cash is
13  insignificant?
14     A. Relative to the business opportunity, yes.
15     Q. The year before you had lost $170,000. How
16  many years could that continue?
17         MR. RICH: Objection.
18     A. I have no comment regarding that financial
19  statement.
20     Q. (BY MR. KATZ) What would have happened to
21  CCMI if News America Marketing hadn't come along?
22     A. I -- that's speculation, sir, and I don't
23  intend to speculate.
24     Q. Now, going back to the statement in your

61 (Pages 238 to 241)

Ann M. Raider

Page 242

1  interrogatory answers about CCMI being allowed to
2  continue to operate as an autonomous division, in
3  fact, CCMI did have some autonomy, didn't it?  You
4  were permitted to remain in the Boston area, right?
5      **A.  Yes.  That was -- yes.**
6      Q.  And there was nothing in the Stock Purchase
7  Agreement that required News America Marketing to
8  allow you to remain in the Boston area?
9      **A.  It was stated that the company would always**
10     **reside in Massachusetts, in Boston.**
11     Q.  Where in the agreement is that?
12     **A.  I don't know where.  You're going to ask me**
13     **to go through every page?**
14     Q.  Yes.
15     **A.  The discussion was that the company would**
16     **always reside in the Boston market.**
17     Q.  But where is that in the agreement?
18     **A.  I don't know, sir, and I will have to go**
19     **through every page.**
20     Q.  And CCMI did in fact benefit from NAM's
21     operational and financial support; isn't that
22     right?
23     **A.  I can't testify to that.**
24     Q.  I mean, NAM did your HR, right?  Right?

Page 243

1          MR. RICH:  Objection.
2      **A.  No.**
3      Q.  (BY MR. KATZ)  It didn't do your HR?
4      **A.  No.**
5      Q.  It paid for your overhead, right?
6      **A.  I don't know what they paid for.**
7      Q.  They paid for your -- they paid for use of
8  space at the John Hancock Building?
9      **A.  The use of space at the John Hancock**
10     **Building was for NAM.  The fact that there was five**
11     **of us sitting there had nothing to do with us.  It**
12     **had to do with the fact that they wanted that space**
13     **for the NAM business.**
14     Q.  Well, before you were in the John Hancock
15     Building and you were in Braintree, it paid -- it
16     paid rent for that space, too, didn't it?
17     **A.  I don't know how that worked, frankly.  I**
18     **don't know how the rent portion of it worked.  I**
19     **don't know what --**
20     Q.  But all of the expenses for the business
21     that you had been conducting at CCMI were being
22     taken care of by NAM --
23     **A.  I am not --**
24     Q.  -- after the acquisition?

Page 244

1      **A.  I am not sure of that statement.**
2      Q.  It wasn't being taken care of by you?
3      **A.  I don't know the answer to your question.**
4      Q.  You think that you were paying for some of
5  the expenses of CCMI after the acquisition?
6      **A.  I don't know the answer to your question.**
7  **I don't know.**
8      Q.  You think you might have been paying for
9  some of the expenses of CCMI post acquisition of
10     your stock by NAM?
11     **A.  Yes.**
12     Q.  Well, what do you think you might have been
13     paying for?
14     **A.  I paid for Kevin Tripp's moving expenses.**
15     Q.  You personally did?
16     **A.  Out of CCMI's budget.**
17     Q.  Yeah, but CCMI's budget was being funded by
18     NAM, right?
19     **A.  CCMI's budget was being funded by the sales**
20     **that we projected.**
21     Q.  Right, but that was all money that was
22     going to NAM, right?
23     **A.  Was it money going to NAM?**
24     Q.  It wasn't going to you?

Page 245

1      **A.  It wasn't going to Bob and I personally,**
2  **no.**
3      Q.  You didn't have an entitlement to that
4  money; you were employees of NAM at that point?
5      **A.  That is correct.**
6      Q.  So it may have been going out of NAM's
7  budget, but it wasn't going out of monies that were
8  either yours or Mr. Fireman's, right?
9      **A.  It wasn't coming -- the monies that were**
10     **operating were not coming out of our direct pocket.**
11     **That is correct.**
12     Q.  It was coming out of NAM's pocket, right?
13     **A.  It was coming out of SmartSource Direct's**
14     **pocket.**
15     Q.  And that was part of NAM?
16     **A.  Yes.**
17     Q.  And everything that what had been CCMI was
18     doing after the acquisition was paid for by NAM,
19     whether it be paper clips, rent, secretaries,
20     travel, you name it.  It was all paid for by NAM,
21     right?
22          MR. RICH:  Objection.
23     **A.  I don't know the answer to that question.**
24     Q.  (BY MR. KATZ)  Who else would have paid it?

62 (Pages 242 to 245)

Ann M. Raider

1    A. Well, I believe that NAM did not
2  arbitrarily pay for everything for us. First of
3  all, you make it sound like they paid all this
4  money for us. We operated the company and
5  generated sales and the cost of doing business was
6  directly deducted from those sales.
7    Q. Going on to your -- going on in your
8  interrogatory answer, you say that NAM agreed that
9  Mr. Fireman and Ms. Raider would continue to manage
10  the CCMI business unit, including sales, operation,
11  personnel and budgets. Right?
12    A. That is our understanding.
13    Q. Okay. But that's not in the Stock Purchase
14  Agreement, is it? Yes or no?
15    A. I don't know.
16    Q. There's no statement in the Stock Purchase
17  Agreement that says that you and Mr. Fireman would
18  continue to manage CCMI's business unit, including
19  sales, operations, personnel and budgets? You can
20  agree with that, can't you?
21    A. I don't know. I don't know if it's stated.
22  I don't know if it's stated. I don't know.
23    Q. Well, take a look and tell me yes or no.
24  It's either there or it's not.

1    A. I cannot find that statement.
2    Q. Okay. You object to the fact that CCMI's
3  name was changed to SmartSource Direct, right?
4    A. Yes.
5    Q. But there was nothing in the Stock Purchase
6  Agreement which prevented NAM from rebranding CCMI,
7  right?
8    A. Consumer Card Marketing was an entity that
9  had a value in the marketplace as a brand. No
10  discussions were ever made --
11    Q. I'm not asking -- that's not my question.
12  Ms. Raider, we don't have that much time left in
13  the day today, and I want you to answer the
14  questions directly and that way we have a chance of
15  finishing, but if you go off and answer questions
16  that aren't asked or give speeches, we're never
17  going to get there. So just answer my questions
18  yes or no or you don't know and I think we'll do
19  much better.
20    You object to the fact that CCMI's name
21  was changed to SmartSource Direct, right?
22    A. Yes.
23    Q. There was nothing in the Stock Purchase
24  Agreement which prevented NAM from rebranding CCMI,

1  right?
2    MR. RICH: Objection. Asked and
3  answered.
4    A. There was nothing in the Stock Purchase
5  Agreement that said they could or they couldn't.
6    Q. (BY MR. KATZ) And the rebranding of CCMI
7  was part of a company-wide rebranding initiative,
8  right?
9    A. Not that I'm aware of.
10    Q. Coupon Machines and S.S.I. were also
11  rebranded SmartSource, weren't they?
12    A. They were already called SmartSource before
13  we went there.
14    Q. Okay, so that was already part of the
15  company-wide brand, right?
16    A. They were part of the company-wide brand.
17    Q. So News America Marketing was simply making
18  you part of the company by giving you this new
19  brand, right?
20    MR. RICH: Objection.
21    A. Taking an established brand and changing
22  its name without supporting it is not making it
23  part of the company.
24    Q. (BY MR. KATZ) Okay. In the next page of

1  your interrogatory answers, you say NAM consciously
2  elected not to run CCMI at all, but rather to use
3  CCMI's parts to enhance and promote other aspects
4  of NAM's business?
5    MR. RICH: What page are you on?
6  Sorry.
7    MR. KATZ: This is on page seven.
8    MR. RICH: Oh, okay. We were on page
9  four.
10    Q. (BY MR. KATZ) What do you mean by this
11  statement?
12    A. Within days of being acquired, they took
13  our technology group to Connecticut to work on the
14  dot com business. They eliminated people in
15  Braintree without properly replacing the services
16  in another part of the corporation, like accounting
17  staff. Those are two examples.
18    Q. Any other?
19    A. I'm sure I will think of more.
20    Q. But you don't know of any others as you sit
21  here now?
22    A. The fact that NAM ignored CCMI is prevalent
23  throughout the five years. They did not actively
24  promote the company to the rest -- our company to

63 (Pages 246 to 249)

Ann M. Raider

Page 250

1 the rest of the business to promote sales of its
2 products.
3     Q.  Now, I think I may have asked you this
4 before, but do you contend that you and Mr. Fireman
5 had the power to -- or should have had the power to
6 continue to manage the CCMI business units,
7 including sales, operations, personnel and budgets?
8     A.  Yes.
9     Q.  Okay.  Can you show me where that's in the
10 Stock Purchase Agreement?
11     A.  I have answered your question before.
12     Q.  And what did you say?
13     A.  I said it is not stated that it can or it
14 cannot.
15     Q.  Okay.  Was it your view that NAM had agreed
16 at some point in time to make any expenditure that
17 you or Mr. Fireman recommended?
18     A.  I'm sorry.  Would you please ask that
19 again?
20     Q.  Is it your position that NAM at some point
21 in time had agreed to make any expenditure that you
22 or Mr. Fireman recommended?
23     A.  Any expenditure?
24     Q.  Yes.

Page 251

1     A.  I'm not sure what any means.
2     Q.  Well, if you recommended that you hire five
3 people, was NAM obligated to hire five people?  Let
4 me give you an example.
5     A.  NAM had a commitment to help us drive our
6 business plan to $50 million, and if that meant
7 hiring five people, they had a requirement to help
8 us to do that.
9     Q.  And how were they to know what it took to
10 get to your business plan?
11     A.  We presented them with a business plan that
12 they agreed upon.
13     Q.  And so getting to your business plan, is it
14 your position that they were obligated to follow
15 all the steps that you thought necessary to get to
16 the business plan?
17     A.  They approved the business plan.  The
18 business plan is a definition of the actions that
19 are required to build the company.
20     Q.  Well, no, the business plan is the
21 objective of getting to $50 million; isn't that
22 right?
23     A.  The business plan stated head count,
24 promotion expense, trade promotion expense, public

Page 252

1 relations expenses, all those things that maintain
2 the brand in the marketplace and build the -- and
3 enable the company to drive sales.
4     Q.  So your position is that NAM was obligated
5 to do everything that was in the business plan?
6     A.  They were obligated to support the business
7 plan.
8     Q.  And does that mean do everything that was
9 stated in the business plan; do all the hires and
10 do all the promotional expenses which you outlined?
11     A.  Yes, that's right.
12     Q.  And where in the Stock Purchase Agreement
13 is that stated?
14     A.  It is stated in the intention to help the
15 business grow.  They intended to help the business
16 grow.  They bought the company.  They -- unless you
17 think they didn't buy the company to make it grow,
18 but you buy a company to make it grow, and the
19 company presents a plan that explains how to make
20 it grow, and in fact, that is standard business
21 practice.  You buy a company to make it grow.
22 However, if you buy the company and take apart the
23 pieces, then was your intention really to make it
24 grow?  I don't know.  I think the answer is not,

Page 253

1 but under the intention to support us with sales,
2 they intended to help us make the company grow.
3     Q.  You don't have any doubt about that?
4     A.  I believe that they have an intention to
5 help us grow based on our business plan.  I believe
6 that that is the condition under which we sold the
7 business and under which they bought the business
8 but did not take the actions to support us, end of
9 statement.
10     Q.  Okay.  You next say on page seven of your
11 interrogatory answers, NAM dictated to CCMI all
12 decisions concerning staffing and salary and
13 imposed their hiring freeze on CCMI's group.  Do
14 you see that?
15     A.  Yes, sir.
16     Q.  Now, NAM had the right to take this action
17 under the Stock Purchase Agreement, did it not?
18     A.  No.  NAM had a commitment to help us
19 execute our plan.
20     Q.  NAM's hiring freeze was a function of the
21 economy, wasn't it?
22     A.  No.  NAM's hiring freeze was a function of
23 the fact that they had lost market share and were
24 not making their profit point and therefore, they

64 (Pages 250 to 253)

Ann M. Raider

Page 254

1   were going to put a hiring freeze on their base
2   business because they were in trouble on their base
3   business. They were losing business.
4     Q. So it's your view that CCMI was to be
5   treated better than the base business? Is that
6   right?
7     A. It is my view that they had an obligation
8   to help CCMI grow as a company.
9     Q. Even if that was at variance with other
10   policies it was taking within -- within the
11   company?
12     A. I don't know what policies were taken
13   within the company.
14     Q. Well, there was a hiring freeze?
15     A. That's not a policy. That's an action.
16     Q. Okay. Well, it's a policy for some period
17   of time? We can agree on that, can't we?
18     A. Yes.
19     Q. And CCMI wasn't singled out within NAM,
20   right?
21     A. No.
22     Q. It was company-wide?
23     A. Yes.
24     Q. And what you're saying is that NAM should

Page 255

1   have made an exception for CCMI?
2     A. Yes, and if they didn't make an exception
3   for CCMI in the hiring freeze, which prevented us
4   from getting our sales, then they should have made
5   an exception on the earn-out calculation that
6   prevented us from getting our sales.
7     Q. And where in the Stock Purchase Agreement
8   is that stated?
9     A. It is stated under the intention that they
10   were to help the company grow. It is stated under
11   the obligation that they would -- to help the
12   company grow and that we would make our earn-out
13   calculations.
14     Q. But your earn-out calculation wasn't
15   guaranteed?
16     A. Our earn-out calculation was a basis on
17   which the company -- otherwise, we would have taken
18   all the cash out at the closing, but David DeVoe
19   couldn't afford that, so we created a mutual
20   agreement where we could take it out over time and
21   help the company grow, and he agreed to that.
22     Q. You next say that NAM set CCMI's budget,
23   then fired staff and consolidated jobs to NAM.
24   Didn't NAM have the right to do this under the

Page 256

1   Stock Purchase Agreement?
2     A. No.
3     Q. It didn't have the right to take this
4   action under 6.8?
5     A. No.
6     Q. What staff were fired?
7     A. They fired creative staff, secretaries,
8   accounting people and programmers.
9     Q. And what jobs were consolidated?
10     A. They consolidated IS -- technology people.
11     Q. And all of those decisions were bad?
12     A. Yes.
13     Q. Why?
14     A. Because they didn't leave an infrastructure
15   in place to help us operate the company properly.
16     Q. You had an assistant, right?
17     A. I had a secretary for a period of time.
18     Q. Didn't you always have a secretary?
19     A. I always had a secretary for a period -- I
20   always had a secretary.
21     Q. And you talk about taking key pieces of
22   CCMI's business and moving them to make NAM's other
23   divisions more profitable. What are you referring
24   to here?

Page 257

1     A. They took our technology expertise to
2   support the dot com business.
3     Q. And by this, are you referring to the move
4   of Bill Adam to Wilton?
5     A. And others.
6     Q. And who are the others?
7     A. There were two other people, Craig Juras
8   and Mike -- I forgot his last name.
9     Q. Wasn't this beneficial to CCMI?
10     A. No, it was not.
11     Q. Wasn't it beneficial for Bill Adam and the
12   others to be with a whole IT department and have
13   the resources of the entire IT staff of News
14   America Marketing instead of being off by himself
15   up here?
16     A. No, it was not.
17     Q. That's your opinion?
18     MR. RICH: Objection.
19     Q. (BY MR. KATZ) Right?
20     A. You asked me a question. I gave you the
21   answer. It was not.
22     Q. But other people could reasonably disagree,
23   couldn't they?
24     A. No, they could not, because the scope of

65 (Pages 254 to 257)

Ann M. Raider

Page 258

1  their jobs changed to support the NAM organization
2  and not CCMI. They were not allowed to go to sales
3  meetings to help us close because they were working
4  on other projects, which stopped us from closing
5  business. At the last minute they were taken off
6  of presentations. They did not complete their work
7  on time to help us facilitate closing sales of
8  customers for software. They were working on other
9  projects. So the answer is they were moved to NAM,
10 but was it in our best interest that they did that?
11 The answer is no, it was not.
12     Q. But couldn't that have been remedied if you
13 understood the technology part of the business
14 better?
15     A. I told you I do not write software code.
16     Q. But did you take any courses to attempt to
17 learn what additional information you might need to
18 know in order to replace Bill Adam's presence at
19 sales meetings?
20     A. I would like to tell you that a technology
21 person needs to talk to a technology person
22 regarding architecture and structure. I am a sales
23 and marketing executive. I know how the product
24 works. I don't need to know exactly what the

Page 259

1  functions are. Technology people want to talk to
2  technology people, and when you are selling systems
3  worth hundreds of thousands of dollars, you need a
4  technology person to talk to a technology person.
5      Q. And so is it your testimony that Bill Adam
6  never spoke to anybody from Duane Reade regarding
7  technology when you were selling Epiphany or
8  selling the Aspen system?
9      A. I believe that Bill Adam's time to help us
10 support sales of the technology products was
11 limited and in some cases not at all.
12     Q. But you're not telling me that he didn't
13 interact with people at Duane Reade regarding
14 Aspen, are you?
15     A. Could you tell me what time frame you are
16 speaking about?
17     Q. The time period you were at News America
18 Marketing.
19     A. I think your question is extremely broad,
20 so could you be very precise?
21     Q. Well, during any period of time, did Bill
22 Adam speak to the technology people at Duane Reade
23 regarding the Aspen system?
24     A. If you are asking at any period of time,

Page 260

1  did he ever talk to anybody at Duane Reade about
2  technology, I would say the answer is yes.
3      Q. And he met with people at Duane Reade
4  regarding the Aspen system, right?
5      A. I can't testify to that.
6      Q. Are you sure about that?
7      A. I don't know if he met with people.
8      Q. Now, you had one other customer, or
9  potential customer for the Aspen system. Do you
10 remember who that was?
11     A. No, I do not.
12     Q. Do you remember any other customer for the
13 Aspen system besides Duane Reade?
14     A. Sutton Place Gourmet. No, excuse me. It
15 was a hardware company. I can't remember the name.
16     Q. So you don't know whether Bill Adam met
17 with people from that retailer or not, right?
18     A. To the best of my knowledge, Bill Adam met
19 with retailers on occasion, but I also know that he
20 was not able to attend meetings with retailers
21 where we could have sold products because he was
22 distracted with other dot com business and was told
23 not to attend, and A&P was one of those customers.
24     Q. When was that meeting scheduled?

Page 261

1      A. I don't recall the exact date.
2      Q. Do you remember what year?
3      A. I do not recall the exact date, but it is
4  written in the documents.
5      Q. Was it a meeting that you were present at?
6      A. It was a meeting that I had scheduled.
7      Q. Did the meeting take place?
8      A. No, it did not.
9      Q. It didn't take place at all?
10     A. No, I don't believe so.
11     Q. So you didn't meet with the sales
12 counterpart that you -- the non-technological sales
13 counterpart that you would ordinarily deal with at
14 A&P?
15     A. I was called at 8 o'clock at night the
16 night before the meeting to tell me that Bill Adam
17 would not be attending the meeting because he was
18 doing things for the dot com business, and I told
19 Henri Lellouche on the phone that if he didn't
20 attend the meeting we would never get the sale
21 because there were technology questions that
22 related to the project, and he said too bad.
23     Q. Did you try to reschedule the meeting?
24     A. It was too late. They were making a

JONES REPORTING COMPANY
617-451-8900

Ann M. Raider

Page 262

1   decision.
2      Q. How do you know that?
3      A. Because they went with somebody else.
4      Q. Who did they go with?
5      A. I don't know.
6      Q. Do you know that they went with anybody?
7      A. Yes, they did.
8      Q. How do you know that?
9      A. Because they have a loyalty card.
10     Q. But how do you know they didn't do it
11  in-house?
12     A. They didn't have the capability to do it
13  in-house.
14     Q. But you don't know who they used?
15     A. I don't remember.
16     Q. You knew at one point?
17     A. Of course I knew at one point.
18     Q. But you don't remember now?
19     A. No, but we could probably -- in all the
20  documents in all of the boxes, I'm sure there's
21  correspondence related to that issue, and if you
22  looked for it, I'm sure you would find it.
23     Q. You also say in your interrogatory answers
24  NAM dictated how CCMI could interact with NAM's

Page 263

1   sales staff, who CCMI could hire as consultants,
2   how to negotiate with vendors, a development plan
3   for software, how and when CCMI could attend trade
4   shows, on changing the name and on CCMI's annual
5   budgets. Do you see that?
6      A. I do.
7      Q. And all of this was permitted under Section
8   6.8 of the Stock Purchase Agreement, was it not?
9      A. No, it was not.
10     Q. NAM as a company does not generally
11  participate in trade shows; is that right?
12     A. NAM companies that they bought did
13  participate in trade shows.
14     Q. But NAM as a company doesn't generally
15  participate in trade shows?
16     A. That is correct.
17     Q. But in the case of CCMI, NAM made
18  exceptions from time to time and supported CCMI
19  going to trade shows; isn't that right?
20     A. NAM supported the new companies that they
21  bought to attend trade shows -- CCMI was one of
22  those companies -- for one year.
23     Q. Now, you go on to say NAM provided little
24  or no support for finance.

Page 264

1      A. I am not sure where you are looking. Okay.
2      Q. Bottom of page seven.
3      A. Okay. Yes.
4      Q. Right? That's what you say?
5      A. Yes, that is correct.
6      Q. But that's patently wrong, is it not?
7      A. No sir, you're wrong.
8      Q. NAM paid for the overhead in Braintree and
9   then in the Hancock Building, right?
10     A. I assume so.
11     Q. It handled HR? You didn't have to handle
12  it, right?
13     A. No, I believe Robert Coughlin handled HR.
14     Q. Okay, and Robert Coughlin was part of NAM,
15  right?
16     A. That is correct.
17     Q. NAM handled accounting, right?
18     A. Such as it was.
19     Q. NAM handled travel arrangements?
20     A. Yes.
21     Q. NAM even paid for your parking at the
22  Hancock Building, right?
23     A. Yes.
24     Q. In fact, I think we talked about this

Page 265

1   before. When you were in Braintree, the landlord
2   was the estate of Mr. Fireman's father, right?
3      A. That is correct.
4      Q. NAM made capital investments for CCMI;
5   isn't that right?
6      A. I don't understand what your question is.
7      Q. Well, it invested over a million dollars,
8   probably close to $2 million for the Epiphany
9   system; isn't that right?
10     A. I don't know that to be the case.
11     Q. Do you have any doubt that that's the case?
12     A. I have a doubt that NAM invested money in
13  Epiphany for the help of CCMI to the extent of the
14  millions of dollars you represent.
15     Q. Well, wasn't the Epiphany system first
16  located by Mr. Adam and Mr. Fireman?
17     A. Yes, it was.
18     Q. And they brought it to the attention of
19  NAM?
20     A. They did.
21     Q. And it was a result of their bringing it to
22  the attention of NAM that it was ultimately
23  acquired; isn't that right?
24     A. That is correct.

Ann M. Raider

Page 266

1  Q. You go on to say that NAM dictated when and
2  how speaking engagements would run and the roles
3  and responsibilities for Mr. Fireman and
4  Ms. Raider?
5  **A. That is correct.**
6  Q. Now, NAM had the right to do so under 6.8
7  of the Stock Purchase Agreement and under your and
8  Mr. Fireman's employment agreement; isn't that
9  right?
10  **A. No, that is not right.**
11  Q. Let's go back to your employment agreement,
12  paragraph two. Do you have that in front of you?
13  **A. When you say paragraph two --**
14  Q. Paragraph number two.
15  **A. Okay.**
16  Q. It says you -- meaning you, Ms. Raider --
17  shall perform such duties -- I'm going to eliminate
18  some of the verbiage -- as are assigned to you;
19  isn't that right?
20  **A. Right.**
21  Q. Now, NAM as a company does not view
22  speaking engagements by executives as important to
23  its business, right?
24  **A. I do not know that.**

Page 267

1  Q. Let's go to interrogatory answer number
2  six.
3  **A. Okay.**
4  Q. And under the heading NAM marginalized the
5  role of Mr. Fireman and Ms. Raider, it says by the
6  end of the year 1999 -- I'm inserting 1999 -- NAM
7  had taken away much of CCMI's sales staff and
8  support structure. Who had they taken away?
9  **A. I had no retailer sales force. I had one
10  manufacturing salesperson. We had no assistant
11  accountant. We had people who were not working on
12  the code for the business. There were a list of
13  people that they took away.**
14  Q. Weren't those functions being done by
15  people in Wilton?
16  **A. No, they were not.**
17  Q. You say that Mr. Fireman had no direct
18  reports at this point in time. Is that right?
19  **A. I don't know where you're looking at that
20  statement.**
21  Q. Okay. It says shortly thereafter, CCMI's
22  general manager Fireman had no direct reports?
23  **A. That's correct. He did not.**
24  Q. What about Mr. Coughlin? Wasn't he a

Page 268

1  direct report to Mr. Fireman?
2  **A. No, he wasn't. It said shortly thereafter.
3  At one point, Mr. Coughlin did not report to him.
4  He reported to Henri.**
5  Q. Okay, but when did that occur?
6  **A. I don't know.**
7  Q. Now, you say that you and Mr. Fireman were
8  excluded from strategy sessions?
9  **A. Correct.**
10  Q. Didn't you attend weekly meetings?
11  **A. Those weren't strategy sessions. We
12  attended weekly reports on activities inside the
13  company.**
14  Q. Didn't you give annual presentations to
15  senior management?
16  **A. No.**
17  Q. You claim that Paul Carlucci declared that
18  he saw no future in targeted direct mail?
19  **A. That is correct.**
20  Q. Now, NAM, if it wanted to, was entitled to
21  make this business judgement under Section 6.8 if
22  it wished, was it not?
23  **A. No, it was not.**
24  Q. Where in the Stock Purchase Agreement does

Page 269

1  it say that it didn't have discretion to determine
2  what it wanted to do with respect to targeted
3  direct mail?
4  **A. It had a commitment. It had an intention.
5  It bought the company to help the company grow to
6  its business plan. It had a commitment as stated
7  in its intention to provide sales support to make
8  the company grow. Therefore, knowing it was a
9  targeted direct mail company, having had direct
10  conversations with Mr. Carlucci about the fact that
11  it was a targeted direct mail company, he then made
12  an arbitrary decision not to support targeted
13  direct mail? You have to ask yourself what your
14  intentions were for the business to begin with,
15  right? It was misrepresenting what was going to
16  happen?**
17  Q. Direct mail was part of what you termed
18  marketing and consulting?
19  **A. Yes, that is correct.**
20  Q. And didn't NAM hire a sales force to
21  exploit direct mail?
22  **A. Years after the company was purchased.**
23  Q. Isn't that what Kevin Tripp was hired to
24  do?

68 (Pages 266 to 269)

Ann M. Raider

Page 270

1    A. Kevin Tripp was one person.
2    Q. When was he hired?
3    A. In 2000, I think.
4    Q. And what part of 2000?
5    A. I don't remember.
6    Q. And you were involved in his hiring, right?
7    A. I was.
8    Q. And who worked under him?
9    A. Chris Sellinger.
10   Q. Anybody else?
11   A. No.
12   Q. You say that targeted direct mail was the
13   backbone of CCMI's business?
14   A. Yes.
15   Q. Okay. But in 1998, you did only $72,000 of
16   consulting and marketing out of the total gross
17   revenue of $3.7 million; isn't that right?
18   A. That's correct.
19   Q. And only part of that $72,000 had anything
20   to do with targeted direct mail, right?
21   A. I believe, Mr. Katz, you're
22   misunderstanding the situation, so let me make it
23   clear. The corporation was growing. The market
24   was moving. The market opportunity was to execute

Page 271

1    targeted direct mail using retailer databases for
2    customer specific purchase data. That was
3    exploding and that is in the press. You can read
4    it. It is customer -- other companies who competed
5    against us enjoyed it. And therefore, the growth
6    of our company and the plan for our company was
7    based on executing targeted direct mail using
8    retailer databases in concert with manufacturers.
9    That is the growth potential of the business. That
10   is how we would accelerate to $50 million, and
11   therefore, commenting that our business was small
12   in 1998 was in fact small because we did not have a
13   significant sales force to call on manufacturers,
14   which was the reason we decided to do this
15   transaction with News America.
16   Q. Now, you go on to say in your interrogatory
17   answers Ms. Raider and Mr. Fireman were silenced in
18   the marketplace of loyalty marketing?
19   A. That is correct.
20   Q. Now, Mr. Fireman was never a speaker at
21   seminars like you did, correct?
22   A. Mr. Fireman had relationships with the
23   community, the manufacturing community of loyalty
24   cards and stored value cards, and he had

Page 272

1    relationships with people on the operations side of
2    the loyalty marketing and he was not able to
3    facilitate or build additional relationships or
4    participate in conversations with a lot of people
5    because he was -- was a sole ranger in terms of his
6    day-to-day execution of programs.
7    Q. But he was a sole ranger when he was
8    working for CCMI before the acquisition?
9    A. No, he built strategic relationships with
10   people who were servicing the loyalty marketing
11   space in terms of data entry facilities, in terms
12   of card facilities, in terms of business
13   development and strategic partnerships. He was out
14   in the marketplace on the operations side of the
15   business building those relationships that would
16   make us stronger from a foundation point of view.
17   Q. Well, but he continued to do that after he
18   was employed by News America Marketing?
19   A. No, that's not right.
20   Q. He certainly had relationships with people
21   in the loyalty industry and in the card industry?
22   A. He had relationships with only those people
23   who he had cultivated before the sale. He was not
24   able to facilitate relationships with incremental

Page 273

1    companies and processes going forward. He was
2    taken out of that role.
3    Q. Didn't he expand his view toward other
4    types of stored value cards and develop a new set
5    of relationships?
6    A. He expand -- he didn't expand
7    relationships. He cultivated relationships with
8    people who he knew prior to the sale.
9    Q. And he worked on new projects, right?
10   We'll get to some of them in a few minutes.
11   A. He worked on new projects? What's a new
12   project?
13   Q. The Toshiba project, that was something
14   that was totally different from anything that you
15   had done at CCMI, right?
16   A. Toshiba was a stored value product.
17   Q. Right.
18   A. Toshiba was a customer of Citibank, I
19   believe, which was a bank that was a customer of
20   NAM's, so he worked on a stored value project that
21   NAM asked him to work on. NAM -- I mean, excuse
22   me, News Corp., not NAM.
23   Q. And that worked tremendously to CCMI's
24   benefit, did it not? Because ultimately, the

69 (Pages 270 to 273)

Ann M. Raider

Page 274

1  Toshiba products brought in a tremendous amount of
2  revenue for CCMI?
3      **A. What's your definition of tremendous?**
4      Q. Well, several millions of dollars over a
5  number of years.
6      **A. I do not believe that's accurate.**
7      Q. Well, we'll ask Mr. Fireman when he's here.
8  I think he'll remember. But wasn't the Toshiba
9  project the largest project, the largest source of
10  revenue that CCMI post-acquisition had during the
11  period of time you and Mr. Fireman were employed by
12  CCMI?
13      **A. I don't believe that's so.**
14      Q. What do you -- how much revenue do you
15  think it brought in?
16      **A. I don't recall.**
17      Q. You have no idea?
18      **A. No.**
19      Q. Nothing prevented you from attending any
20  conference that you wanted to attend, right?
21      **A. That's not true.**
22      Q. NAM never said you can't attend?
23      **A. They did.**
24      Q. When?

Page 275

1      **A. I couldn't attend the NACDS conference.**
2  **There were several conferences where I was told I**
3  **can't go.**
4      Q. And why did they say you can't go?
5      **A. Because NAM had a policy -- excuse me. NAM**
6  **had a perspective that executives who attended**
7  **conferences could be solicited by companies to go**
8  **work for them.**
9      Q. And why didn't they want you to do that?
10      **A. They didn't want me to be in the public**
11  **domain.**
12      Q. And so they had a business reason for not
13  wanting you to attend?
14      **A. Yes.**
15      Q. But you did in fact continue to attend
16  certain conferences; isn't that right?
17      **A. I don't recall.**
18      Q. Didn't you attend chain drugstore
19  conferences and food industry conferences
20  throughout your time at News America Marketing?
21      **A. No, that is not true.**
22      Q. You did attend some, didn't you?
23      **A. I sat on the boards of a couple of women's**
24  **organizations and I attended those board meetings.**

Page 276

1      Q. Didn't you go to the chain drugstore
2  conference at some point?
3      **A. I went to the very first one after the sale**
4  **of the business and none after that.**
5      Q. Didn't you go to a conference in Phoenix
6  relating to the food industry?
7      **A. I don't remember.**
8      Q. You said in your interrogatory that NAM
9  cancelled trade advertising. Do you remember that?
10      **A. Yes.**
11      Q. NAM does not as a company engage in trade
12  advertising; isn't that right?
13      **A. No, that's not true.**
14      Q. Well, tell me why you say it's not true.
15      **A. NAM puts advertising for their products in**
16  **the press. They stopped us from advertising. They**
17  **said they would put it under the NAM logo, but they**
18  **didn't. Our name was never mentioned. I**
19  **specifically spoke to Jennifer Jane about that at**
20  **the time of the sale and she made commitments to me**
21  **that they would include our name in directories for**
22  **products and services that people use as reference**
23  **guides for buying things, and our name was never**
24  **there.**

Page 277

1      Q. You're sure about that?
2      **A. I am sure.**
3      Q. You say that NAM did not provide public
4  relations support?
5      **A. That is correct.**
6      Q. But you'll agree with me, won't you, that
7  NAM issued press releases on the Aspen system when
8  it came out, did it not?
9      **A. NAM released -- NAM had their public**
10  **relations company develop a press release, but they**
11  **did nothing to support getting it into the press**
12  **for it to be any coverage at all.**
13      Q. In your opinion?
14      **A. That's a fact. It was not covered**
15  **anywhere.**
16      Q. NAM did not provide sales support to grow
17  the business. That's another of your contentions,
18  right?
19      **A. That is correct.**
20      Q. And you say that Chris Mixson directed the
21  sales force to focus on NAM's goals, which did not
22  support CCMI's products? Is that your view?
23      **A. That's correct.**
24      Q. And what's the basis for that statement?

70 (Pages 274 to 277)

Ann M. Raider

Page 278

1    A. Chris Mixson was running the sales force on
2  the manufacturing side and he orchestrated the
3  consolidation of ACT Media's sales force into NAM,
4  and he had to make sales goals, and none of those
5  sales goals included our products.
6    Q. How do you know that?
7    A. I asked him. I asked him for help and he
8  said no.
9    Q. When did that occur?
10   A. At a Christmas party in 1999 in New York
11 City.
12   Q. Where in New York City?
13   A. At the NAM Christmas party.
14   Q. Where was it located?
15   A. In New York City.
16   Q. But where in New York City?
17   A. I don't know what hotel it was at.
18   Q. You don't remember?
19   A. I don't remember the name of the hotel.
20   Q. After Mr. Mixson said this to you, what did
21 you do?
22   A. I talked to David DeVoe --
23   Q. And what did he say?
24   A. -- at the Christmas party.

Page 279

1    Q. And what did he say?
2    A. He said he would talk to Chris.
3    Q. And did he talk to Chris?
4    A. I have no idea.
5    Q. Did you ever follow up with Mr. DeVoe?
6    A. We both -- we talked to David constantly
7  about the fact that we were not getting the sales
8  support.
9    Q. At some point in your interrogatory
10 answers, you say other than a few individuals, for
11 at least one year, the duties of CCMI's
12 manufacturer sales source was performed by the
13 SmartSource dot com sales force. Do you remember
14 that?
15   A. Yes.
16   Q. What do you mean by that?
17   A. SmartSource dot com was another business
18 that NAM bought at the same time as they bought
19 CCMI, and those people were to focus on selling
20 their Internet products to manufacturers. They --
21 NAM made the decision instead of having Kevin Tripp
22 have support or being supported by the whole
23 organization for NAM that these brand new people
24 who had just been hired for SmartSource dot com

Page 280

1  would include SmartSource Direct products in their
2  conversation.
3    Q. And did they?
4    A. I don't know.
5    Q. And who were the -- who were the people in
6  the SmartSource dot com sales force?
7    A. I don't remember their names.
8    Q. Did you ever talk to them?
9    A. No.
10   Q. Do you have any idea how many people were
11 in the SmartSource dot com sales force?
12   A. No, because those people reported to Kevin
13 Tripp and Kevin Tripp reported to Marty Garofalo.
14   Q. So you don't know what efforts one way or
15 the other or to what extent these individuals made
16 on behalf of SmartSource Direct?
17   A. I know that Kevin Tripp reported constantly
18 that they were -- they were making no sales and
19 that they were not focused on helping us.
20   Q. Now you had a retail sales force at some
21 point, right?
22   A. I had a few people in the sales force.
23   Q. Who were the people who worked for you?
24   A. Jim Mumm.

Page 281

1    Q. He was in New York, right?
2    A. Yes.
3    Q. You hired him? You hired him, right?
4  Right?
5    A. Yes.
6    Q. After the acquisition, right?
7    A. I did.
8    Q. Okay. Who else?
9    A. Bob Stappler.
10   Q. And where was he?
11   A. I don't remember.
12   Q. How about Kevin McKenna?
13   A. Kevin McKenna.
14   Q. And where was he?
15   A. New York.
16   Q. And he tried to sell Key Foods on the Aspen
17 system?
18   A. He did.
19   Q. But he neglected to tell them that they
20 would be the first customer, right?
21   A. I don't know that to be true.
22   Q. You've heard it stated, though, haven't
23 you?
24   A. No, I have not.

71 (Pages 278 to 281)

Ann M. Raider

Page 282

1    Q. I'm telling you that for the first time?
2    **A. Right.**
3    Q. But Key Foods never signed on for the Aspen
4 system, right?
5    **A. I don't know that.**
6    Q. This was something that you were selling,
7 was it not? Weren't you selling the Aspen system?
8    **A. I was.**
9    Q. And Key Foods was a customer that you tried
10 to get?
11    **A. I didn't call on Key Foods.**
12    Q. Right.
13    **A. I never made a sales call on Key Foods. I**
14 **don't know who the senior management is. I know**
15 **nothing about the details of that.**
16    Q. You delegated that to Kevin McKenna?
17    **A. I did.**
18    Q. And Kevin McKenna never closed the sale,
19 right?
20    **A. I don't believe the sale closed.**
21    Q. You never got a contract?
22    **A. I don't know the answer to that.**
23    Q. You never got any revenue from Key Foods
24 for the Aspen system? Isn't that a fact?

Page 283

1    **A. I don't know the answer to your question.**
2    Q. Okay. Let's talk about Rick Briton. You
3 hired him too, right?
4    **A. I did.**
5    Q. He was out in Los Angeles?
6    **A. That's right.**
7    Q. You had to terminate him because he had an
8 anger management problem; isn't that correct?
9    **A. Yes, sir.**
10    Q. And Mr. Fireman had an anger management
11 problem, too; isn't that correct?
12    **A. Not at all.**
13    Q. Who was Diana Fontaine?
14    **A. Our assistant.**
15    Q. Didn't she complain to you about
16 Mr. Fireman's treatment of her?
17    **A. Not that I recall.**
18    Q. Didn't Ms. Fontaine call Henri Lellouche in
19 tears to complain about Mr. Fireman's treatment of
20 her?
21    **A. Not that I recall.**
22    Q. You never saw any of that?
23    **A. Never saw what?**
24    Q. Any of Ms. Fontaine's concern that she was

Page 284

1 being mistreated by Mr. Fireman?
2    **A. I don't recall that.**
3    Q. You don't recall any of that?
4    **A. Right.**
5    Q. And then ultimately, at some point, what
6 happened to Ms. Fontaine?
7    **A. NAM fired her.**
8    Q. Why?
9    **A. Because they wanted to have someone cheaper**
10 **to the job and they wanted someone who would work**
11 **part-time.**
12    Q. You're sure about that?
13    **A. I am sure about that.**
14    Q. Okay. Now, back to employees, you
15 interviewed many, did you not?
16    **A. I would not say many.**
17    Q. You reviewed many resumes, did you not?
18    **A. What's your definition of many?**
19    Q. Well, what's your definition of many?
20    **A. Many is ten, 20.**
21    Q. You reviewed ten, 20 resumes?
22    **A. No, I did not.**
23    Q. How many resumes did you review?
24    **A. A few.**

Page 285

1    Q. A handful?
2    **A. Probably.**
3    Q. Do we have that exhibit that lists hiring
4 attempts?
5    (Off the record.)
6    (Recess taken.)
7    Q. (BY MR. KATZ) Just taking a look at
8 Exhibit 50, from that document, how many people's
9 resumes did you review during the time period
10 embraced by the document?
11    **A. I don't know exactly what this document**
12 **tells me except a list of people and the date they**
13 **received the resume and the source. I don't know.**
14 **It says Ann NR resume. I have no idea what that**
15 **code is.**
16    Q. How about not recommend? Does that make
17 sense?
18    **A. Maybe, yeah.**
19    Q. Okay. How many -- how many names does the
20 document indicate that -- or how many resumes does
21 the document indicate that you reviewed?
22    **A. That I reviewed?**
23    Q. Yes.
24    **A. 18.**

72 (Pages 282 to 285)

Ann M. Raider

Page 286

1    Q.  And what's the time period that's embraced
2  by this document alone?
3    **A.  Five months.**
4    Q.  And when does the time -- what is the time
5  period?
6    **A.  September to January.**
7    Q.  September '99 to January 2000?
8    **A.  There's no date on here, the ending**
9  **calendar date, so I don't know the answer.**
10    Q.  If you look at page one of the exhibit --
11    **A.  Yeah.**
12    Q.  -- that makes it pretty clear that we're
13  talking about December -- September '99 to January
14  2000, does it not?
15    **A.  Most likely.**
16    Q.  Just to go back to the subject we talked
17  about previously, we -- selling direct mail, did
18  you ever sell direct mail?
19    **A.  Yes.**
20    Q.  Okay.  You need a specialized sales force
21  to sell direct mail, do you not?
22    **A.  No.**
23    Q.  Don't you need to understand targeting when
24  you're selling direct mail?

Page 287

1    **A.  No.**
2    Q.  And don't you need to understand how you
3  minimize the cost of mailing when you're selling
4  direct mail?
5    **A.  You do need to understand the cost of**
6  **direct mail.**
7    Q.  And don't you need to understand targeting?
8    **A.  No.  You can send direct mail that's not**
9  **targeted.**
10    Q.  And why would anybody want to send direct
11  mail that's not targeted?
12    **A.  For geographic reasons.**
13    Q.  Do grocery stores want to do that now?  Or
14  I'm sorry; do manufacturers want to do that?
15    **A.  Sometimes.**
16    Q.  And what's your basis for that?
17    **A.  They're launching a product in the Boston**
18  **market and they want to talk to everybody in the**
19  **Boston market.**
20    Q.  Were you going to make your $33 million by
21  geographic mailings?
22    **A.  In some cases.**
23    Q.  Wasn't targeted mailing going to be the
24  guts of whatever direct mail marketing you were

Page 288

1  going to be doing?
2    **A.  Targeted mailing, either on a geography**
3  **basis or a customer profile basis or a product**
4  **purchase basis were things we would offer.**
5    Q.  Isn't customer profile basis or product
6  purchase basis, particularly product purchase
7  basis, the principle means of getting direct mail
8  business?
9    **A.  It was the lead offer.**
10    Q.  And didn't it require some sophistication
11  on the part of the sales force to understand
12  product purchase basis direct mail marketing?
13    **A.  It required knowledge, not sophistication.**
14    Q.  What kind of knowledge?
15    **A.  That it could take place and that we could**
16  **identify customers based on requirements.**
17    Q.  And how did -- how do you go about doing
18  that?
19    **A.  I don't understand the question.**
20    Q.  How do you go about identifying customers
21  based on requirements?
22    **A.  The manufacturer tells us what their**
23  **requirements are.**
24    Q.  But wouldn't you agree with me that selling

Page 289

1  this kind of direct mail marketing is different
2  from selling the other products that News America
3  Marketing sells to product manufacturers?
4    **A.  No.**
5    Q.  That's your opinion?
6    **A.  Manufacturers distribute coupons to**
7  **customers.  This is just one more avenue.**
8    Q.  We talked a little bit about Jim Mumm.  He
9  was somebody that you hired in New York?
10    **A.  For the New York market.**
11    Q.  Right.  And this was for retail, right?
12    **A.  Yes.**
13    Q.  And in Chicago, you hired Bob Stappler;
14  isn't that right?
15    **A.  Was he in Chicago?**
16    Q.  I'm asking you.
17    **A.  I don't know where he was, but Bob Stappler**
18  **was hired.**
19    Q.  And you hired him, right?
20    **A.  That's right.**
21    Q.  And he resigned at some point in 2001,
22  right?
23    **A.  That's right.  Yes, he did.**
24    Q.  There was an individual named Guesswell.

73 (Pages 286 to 289)

Ann M. Raider

Page 290

1   Do you know who he was or she was?
2       A. No, I don't remember.
3       Q. There was an individual named London. Do
4   you know who he was or she was?
5       A. I don't remember.
6       Q. There was an individual named Robinson. Do
7   you remember a Robinson who worked for you?
8       A. I don't remember.
9       Q. There was an individual named Silk. Do you
10  remember a Silk who worked for you?
11      A. They reported on the manufacturing side and
12  not directly to me on the retail side. They did
13  not work on the retail side.
14      Q. So are those names familiar to you?
15      A. I know the name Terrence Silk, yes.
16      Q. So Silk worked under Kevin Tripp?
17      A. I believe so.
18      Q. How about Robinson?
19      A. I don't remember.
20      Q. You don't remember Robinson?
21      A. No.
22      Q. Sellinger?
23      A. Chris Sellinger worked for Kevin Tripp.
24      Q. Was there someone named London? Does that

Page 291

1   name ring a bell?
2       A. No.
3       Q. It doesn't bring a bell at all?
4       A. No.
5       Q. If London's name was on one of the -- one
6   or more of the statements that you received in
7   connection with your earn-out calculations as an
8   employee whose expense was calculated in terms of
9   gross margin, do you --
10      A. That might be true. I just don't recall it
11  today.
12      Q. You don't remember who he was?
13      A. No, not today. That may be true at the
14  time. Sure.
15      Q. An individual named Mason, do you have any
16  recollection --
17      A. Susan Mason.
18      Q. What did she do?
19      A. She worked on the manufacturing side.
20      Q. Again with Kevin Tripp?
21      A. Correct.
22      Q. An individual name Gillen, G-I-L-L-E-N, who
23  was that?
24      A. He was a salesperson, but I don't know his

Page 292

1   role. I don't remember his role.
2       Q. You don't remember whether he was retail or
3   manufacturing?
4       A. Oh, I think he was manufacturing.
5       Q. And all of these people came on after CCMI
6   was acquired in 1999 by News America Marketing,
7   right?
8       A. But years after.
9       Q. Well, I'm just saying after.
10      A. Years after.
11      Q. There was an individual named -- I'm going
12  to spell his name because I'm not sure I could
13  pronounce it correctly -- L-A-J-E-U-N-E-S-S-E.
14      A. LaJeunesse.
15      Q. Okay. Who was he or she?
16      A. He was a salesperson.
17      Q. In manufacturing?
18      A. I don't remember.
19      Q. You don't remember whether he was in
20  manufacturing or retail?
21      A. No, I don't.
22      Q. Okay. An individual named Michaels, who
23  was he or she?
24      A. He worked on the manufacturing side.

Page 293

1       Q. So another person who was under Kevin
2   Tripp, right?
3       A. Yes, all these people did not work for
4   Kevin Tripp at the same time or for years after the
5   company was sold.
6       Q. Okay. There was an individual named Brady.
7   Who was that?
8       A. I don't know.
9       Q. Name doesn't ring a bell?
10      A. No. Kevin Tripp did not report to me.
11      Q. No, I understand. I understand. But all
12  this direct mail business, to whatever extent CCMI
13  was successful or SmartSource Direct was successful
14  in landing direct mail business, was calculated as
15  revenue for your earn-out, right?
16      A. Yes, and -- that is correct, as poor as it
17  was.
18      Q. Anyway, you don't remember who Brady was?
19      A. I do not.
20      Q. There's an individual whose name was Henry
21  T.H. Does that name ring a bell?
22      A. No.
23      Q. Do you remember the Giant Stores' loyalty
24  card program?

74 (Pages 290 to 293)

Ann M. Raider

Page 294

1   **A. Yes.**
2   Q. This occurred after the acquisition of CCMI
3   by NAM?
4   **A. Yes, it closed afterwards.**
5   Q. Okay. It's a fair statement that your
6   group bungled the Giant Stores loyalty card
7   roll-out program; isn't that right?
8        MR. RICH: Objection.
9   **A. I don't believe that's true.**
10  Q. (BY MR. KATZ) The customer data wasn't
11  inputted correctly; isn't that right?
12  **A. I don't remember the details.**
13  Q. The customer data wasn't inputted timely;
14  isn't that right?
15  **A. I don't remember the details.**
16  Q. You do remember that Giant was infuriated
17  by the debacle, right?
18  **A. I remember that Giant raised a question**
19  **about the processes, but I don't remember it being**
20  **considered a debacle and I don't remember them**
21  **being infuriated, so I don't know the answer to**
22  **your question.**
23  Q. Well, you personally sold the Giant
24  program, did you not?

Page 295

1   **A. I did.**
2   Q. And you knew that there was a near
3   immediate need for Giant to identify all of the
4   card holders because they were going to do drawings
5   and give-aways and things of that nature at the
6   get-go?
7   **A. Yes, that's right. Yes.**
8   Q. And what happened was that a lot of the
9   cards were not processed timely so that many of the
10  people who had cards couldn't participate in the --
11  in the give-aways; isn't that right?
12  **A. I don't know the answer to that. I do know**
13  **that I told Giant they had to wait a period of time**
14  **before they executed any marketing programs to give**
15  **the data entry houses enough time to build the**
16  **databases. I did give them that direct advice. I**
17  **told them not to do it for a while.**
18  Q. Right, but they wanted to do it on their
19  schedule, right?
20  **A. Yes, probably. I don't remember.**
21  Q. That's what the customer wanted; isn't that
22  right?
23  **A. I don't know. I assume. That's what**
24  **you're saying. I don't know.**

Page 296

1   Q. And Giant was a huge account?
2   **A. Giant was a large account.**
3   Q. And they were a division of Ahold, right?
4   **A. That is correct.**
5   Q. Which is one of the largest grocery store
6   chains in the world? Isn't that right?
7   **A. Not in the world. It's one of the larger**
8   **chains in the United States.**
9   Q. Okay. Certainly in the United States?
10  **A. Yes, that's right.**
11  Q. Stop & Shop is part of Ahold?
12  **A. It's Ahold, and the answer is yes.**
13  Q. And the operational work in terms of
14  completing the Giant program was something that was
15  the responsibility of Mr. Fireman and Mr. Coughlin;
16  is that right?
17  **A. That is correct.**
18  Q. And it didn't go well; isn't that right?
19  **A. I don't remember the details of that**
20  **program.**
21  Q. But you do remember that Giant was very
22  upset?
23  **A. No. What I remember is that we had to find**
24  **multiple ways to get the work done quickly because**

Page 297

1   **they had executed promotions and -- against our**
2   **suggestion and we were trying desperately to help**
3   **them get the work done fast enough so that they**
4   **could execute the promotion correctly.**
5   Q. And then there was the problem with Kroger.
6   Do you remember that problem?
7   **A. I don't know which problem you're speaking**
8   **about.**
9   Q. Okay. Kroger was potentially a big
10  account, many millions of cards, right?
11  **A. That is correct.**
12  Q. And Kroger had a specification that
13  required the use of Teslin for its cards? Do you
14  remember that?
15  **A. Yes.**
16  Q. But Bob decided that he could do it cheaper
17  if he used a product called PPS-1 from a company
18  called Performance Printing?
19  **A. That is not accurate.**
20  Q. What's inaccurate about that statement?
21  **A. Bob did not decide that.**
22  Q. Who did?
23  **A. The discussion happened that we went to**
24  **this other company and told them that we wanted to**

Ann M. Raider

Page 298

1  make cards; could they bid on cards for Kroger.
2  And we told them that -- the definition was a
3  Teslin card. That's -- that's what happened.
4      Q. And so is it your testimony that they told
5  you that they would use Teslin and they used
6  something other than Teslin?
7      A. I don't recall the details of that
8  conversation.
9      Q. Were you involved in the interaction with
10 Performance Printing?
11     A. No, not on a day-to-day basis.
12     Q. But did you -- were you involved in
13 negotiating with Teslin at the outset?
14     A. No.
15     Q. I'm sorry; negotiating with Performance
16 Printing at the outset?
17     A. No, I was not involved in those
18 negotiations.
19     Q. Who found Performance Printing?
20     A. I don't recall.
21     Q. Was it either Bob, Mr. Fireman, or
22 Mr. Coughlin?
23     A. It could have been.
24     Q. It wasn't anybody else, was it?

Page 299

1      A. I don't know that.
2      Q. It wasn't Henri Lellouche; that's for sure?
3      A. I don't know the answer to that.
4      Q. Okay. Performance Printing was not
5  qualified to do this work, were they?
6      A. I don't know what that means.
7      Q. They did a terrible job? You could agree
8  on that, right?
9      A. I don't know what terrible job means.
10     Q. Okay. They -- well, how would you describe
11 the job they did?
12     A. Performance Printing had a manufacturing
13 capability issue.
14     Q. Describe it for us.
15     A. Performance Printing did not properly put
16 the sequence numbers on the cards.
17     Q. And what was the impact of that?
18     A. It caused a database problem for Kroger.
19     Q. To a layman, explain what the data
20 processing problem would consist of.
21     A. The cards -- the card numbers did not read
22 correctly at the point of sale.
23     Q. So what did that mean for Kroger?
24     A. It meant that they couldn't execute

Page 300

1  programs properly at the point of sale.
2      Q. So essentially, the cards were meaningless?
3      A. Were not effective.
4      Q. Gave them no information?
5      A. I don't know about that. I'm not the IS
6  person. I know that they wanted to execute
7  promotions at the point of sale and the cards --
8  there was a problem with reading the card number so
9  they couldn't execute the promotion properly.
10     Q. Fair to say that Kroger was very upset?
11     A. Very upset.
12     Q. And in fact, you were upset --
13     A. Yes.
14     Q. -- because Kroger was upset?
15     A. That is correct.
16     Q. And you were upset at Performance Printing?
17     A. I was.
18     Q. As was everybody else, right?
19     A. Yes.
20     Q. And you didn't pay Performance Printing,
21 right?
22     A. I was not responsible for paying or not
23 paying Performance Printing.
24     Q. Now, Performance Printing ultimately sued

Page 301

1  News America, right?
2      A. Yes, that's actually right.
3      Q. And were you involved in the lawsuit?
4      A. No.
5      Q. Were you deposed?
6      A. Yes.
7      Q. You gave testimony under oath?
8      A. I did.
9      Q. But you weren't named as a party in the
10 case?
11     A. I don't think so. I was deposed to give
12 testimony on behalf of NAM.
13     Q. Where were you deposed?
14     A. Boston.
15     Q. Was Mr. Fireman deposed?
16     A. I don't know.
17     Q. You never talked to him about it?
18     A. Not really, no.
19     Q. Was Mr. Coughlin ever deposed?
20     A. I don't know.
21     Q. Now, you complained that NAM was slow to
22 collect CCMI receivables?
23     A. Yes.
24     Q. Right?

76 (Pages 298 to 301)

Ann M. Raider

Page 302

1    A. Yes.
2    Q. How long were CCMI receivables typically
3  outstanding?
4    A. I don't know.
5    Q. Then how do you know that NAM was slow to
6  collect CCMI receivables?
7    A. Because when I got involved in issues where
8  there was receivables not collected that were
9  sitting out there from 90 to 120 days with some
10  manufacturers like Unilever or one of the other
11  manufacturers.
12    Q. Nothing kept you from making collection
13  calls, right?
14    A. I'm a salesperson and a marketing person.
15  My job is not to do collections.  NAM has an entire
16  organization who was supposed to do that work for
17  us.  I didn't even know what the receivables were.
18    Q. Nothing kept you from requesting that
19  information?
20    A. I did.
21    Q. And you got it?
22    A. Not often.
23    Q. But you always got it when you requested
24  it, right?

Page 303

1    A. I got it at the end of our earn-out.  At
2  the end of every quarter, we would ask for the
3  information, and we certainly got it at the end of
4  the earn-out calculation because they were required
5  to tell us,
6    Q. But you could have requested it six months
7  in advance in anticipation?
8    A. We did.  We did.  We asked for the
9  information.
10    Q. And you knew who your customers were,
11  right?
12    A. No, sir, I did not, because these people
13  did not report to me, so I didn't know who the
14  customers were.
15    Q. You knew who the customers that you sold to
16  were?
17    A. I knew the supermarket side.  I did not
18  know the receivables and I certainly did not know
19  the manufacturing side.
20    Q. But you certainly could have asked somebody
21  to give you a list of these so that you could make
22  some collection calls, could you not?
23    A. The answer is I did ask and I did make the
24  calls, but I must say to you that is it a good use

Page 304

1  of my time at a senior vice president level to be
2  making calls for collections when supposedly News
3  America Marketing has an entire group of people
4  whose sole responsibility it is to properly collect
5  on time for everyone else?
6    Q. But you had an interest in the timeliness
7  of the collection?
8    A. I did have an interest.
9    Q. And so there was nothing to keep you from
10  making that call, taking five minutes and calling
11  somebody at the limited number of customers that
12  SmartSource Direct had and asking that they pay
13  their bills, right?
14    A. Do you know how long a collection call
15  takes?
16    Q. Unfortunately, yes.
17    A. Are you sure it takes five minutes?
18    Q. Generally.
19    A. Really?
20    Q. And with e-mails, it sometimes takes even
21  less.
22    A. Really?  Well, I would like to learn about
23  that.
24    Q. You complain that Bill Adam was offered a

Page 305

1  salary increase to move to Wilton?
2    A. Yes, sir.
3    Q. Now, nothing in the Stock Purchase
4  Agreement prevented News America Marketing from
5  offering Bill Adam a salary increase, right?
6    A. That was not specifically stated in the
7  agreement, but there was a question of integrity.
8  Why on one day would Jon Rubin tell us no salary
9  increases for your people, they're paid properly,
10  and then the next day offer him $50,000 more to go
11  to Connecticut?  Doesn't sound like great integrity
12  on Jon Rubin's part or a representative of the
13  company.
14    Q. You allege that Bill Adam focused the
15  majority of his time on SmartSource dot com once in
16  Wilton?
17    A. That is correct.
18    Q. Didn't this occur, if it occurred at all,
19  after the Aspen system was abandoned?
20    A. No.
21    Q. Your testimony is that it occurred before
22  the Aspen system was abandoned?
23    A. Yes.
24    Q. You say that NAM eliminated the Marketing

Page 306

1  Analysis tool with no other products to replace it?
2      A.  That is correct.
3      Q.  What customers were left for Marketing
4  Analysis after the Aspen system was abandoned?
5      A.  I believe Nash Finch.  There were several
6  customers.  Sullivans.
7      Q.  How much revenue did each of those -- did
8  those two clients generate?
9      A.  I do not recall.
10     Q.  Can you give me a ballpark?
11     A.  I can't.
12     Q.  Under $200,000 a year?
13     A.  I don't recall.
14     Q.  So you can't say it wasn't under $200,000 a
15 year, right?
16     A.  I can tell you it was more than $200,000 a
17 year.  I can't tell you the exact amount.
18     Q.  Can you tell me if it was more than
19 $300,000 a year?
20     A.  I don't recall exactly, and I think that
21 there is enough conversation in the documents, I'm
22 sure you'll find the exact answer that you're
23 looking for.
24     Q.  I'm asking you.

Page 307

1      A.  I'm telling you at the moment I can't give
2  you the exact answer.
3      Q.  And NAM was permitted to eliminate the
4  Marketing Analysis tool whenever it wanted under
5  Section 6.8, was it not?
6      A.  No, it was not.
7      Q.  Where in the agreement --
8      A.  In our business plan, it states that
9  they're supposed to help us achieve the plan.
10 Twenty-five percent of our revenue was based on
11 having a tool that would do analysis work for our
12 customers, for our retailer and manufacturer
13 customers.  Eliminating the tool automatically
14 eliminated our revenue opportunity with no
15 replacement, and therefore, continued to harm us in
16 our inability to earn our earn-out and with no
17 compensation or consideration for that.
18     Q.  Where in the agreement does it say that?
19     A.  It says that they have the intention to
20 help us drive the business with sales.
21     Q.  That's all it says, right?
22     A.  It says that they'll invest -- they'll --
23 it says it will assist us, assist us in the
24 company's creation of long-term relationships with

Page 308

1  retailers.  Do you think that going to a retailer
2  and telling them starting effective tomorrow you
3  have no tool and we have no replacement is
4  assisting us in the creation of a long-term
5  relationship with a retailer?  I think it harmed us
6  dramatically.  It says invest in software and
7  hardware as needed to expand the company's
8  business.  By eliminating all hardware and software
9  as needed, I don't believe that helps us expand the
10 company's business.
11     Q.  Let's back up for a second.  You would
12 agree, would you not, that the Marketing Analysis
13 tool was a limited product?
14     A.  The Marketing Analysis tool was an
15 excellent product built for retailers to solve
16 programs.
17     Q.  But it had limitations?
18     A.  It did not have limitations for what it was
19 built for.
20     Q.  But you only had two customers?
21     A.  I don't know that we only had two
22 customers.
23     Q.  After Duane Reade, you only had two
24 customers?

Page 309

1      A.  Well, how many --
2      Q.  You just told me that.
3      A.  I don't know the answer to that.  I did not
4  tell you that I only had two customers.  You asked
5  me what I could recall today and I told you what I
6  could recall today as of this moment.  I don't
7  remember the details.
8      Q.  You can't remember any more than the two
9  customers you identified?
10     A.  At the moment.  There are documents and
11 lists that will tell you exactly which customers we
12 had and exactly how much revenue we had.  At the
13 moment, you're asking me and I do not recall at the
14 moment, but I know it's sitting in the documents
15 and all the other materials.
16     Q.  And you and Mr. Fireman believed that the
17 Marketing Analysis tool needed to be upgraded if
18 you were to grow the business, right?
19     A.  Mr. Fireman and I believed the
20 Marketing Analysis tool could have an additional
21 component to the Internet to be poised for future
22 growth.
23     Q.  And Mr. Fireman and Mr. Adam found the
24 Epiphany product a more sophisticated product and

78 (Pages 306 to 309)

Ann M. Raider

Page 310

1  recommended that NAM purchase it to upgrade your
2  data hosting business, right?
3      A. Mr. Adam and Mr. Fireman recommended the
4  Epiphany product so that our products could port to
5  the Internet. They made a negotiation with
6  Epiphany for just a few hundred thousand dollars to
7  help us directly. It was NAM who took it upon
8  themselves to take the Epiphany product to the rest
9  of the corporation by millions of dollars worth of
10  seats for the company and irregardless of Bob's
11  ability to make a good relationship negotiation
12  with Epiphany. Once Bob selected Epiphany and --
13  with Bill Adam, he was taken out of all
14  conversations and negotiations with Epiphany about
15  what we needed directly and NAM took it upon
16  themselves to take this tool and expand it to the
17  rest of the corporation and subsequently charge us
18  for that.
19      Q. But NAM accepted your recommendation to
20  upgrade the data hosting part of CCMI's business
21  and spent over a million dollars on the Aspen
22  system on hardware features and other features
23  related to Epiphany; isn't that right?
24      A. NAM took it upon themselves to spend that

Page 311

1  level of money without counsel from us or
2  participation from us, because they bought
3  additional seats that had nothing to do with CCMI
4  and they charged us for that.
5      Q. And they leased space in New Jersey at a
6  facility called Exodus to house what on your
7  recommendation was going to be a significant
8  expansion of the data hosting business; isn't that
9  right?
10      A. The data hosting business was for NAM. It
11  was not specifically for CCMI. They did not do
12  that specifically for CCMI.
13      Q. Are you sure about that?
14      A. I think the data hosting business was to be
15  able to support all of NAM in terms of what they
16  were trying to accomplish, not just for CCMI. They
17  bought multiple seats for NAM to use that, not just
18  for us.
19      Q. But wasn't the objective to host at the
20  beginning Duane Reade, Duane Reade's data on the
21  Aspen system? Wasn't Duane Reade identified as the
22  first customer?
23      A. Duane Reade was a very important customer
24  for us, and due to the incompetency of NAM's

Page 312

1  technical staff, they -- the system was delivered a
2  year late, had total number of problems with it,
3  and we lost a three-year contract worth millions of
4  dollars at Duane Reade due to the incompetency of
5  NAM's inability. NAM did not have the staff to do
6  the work. They waited for a new CIO to come on
7  board. There were all kinds of problems with lack
8  of support. They did not hire proper staff. They
9  used consultants. They did not have consistency of
10  code. So they did not perform quality support for
11  us to run our business as it related to Aspen.
12      Q. And you never got a signed agreement with
13  Duane Reade at any time, did you?
14      A. I don't know the answer to that question.
15      Q. Come on.
16      A. I don't know.
17      Q. You never personally saw a signed contract
18  from Duane Reade for the Aspen system, did you?
19      A. I don't know.
20      Q. You think you might have?
21      A. I don't know. I don't have those records.
22  I don't know. NAM has all those records. I don't
23  know.
24      Q. But you don't remember in all your dealings

Page 313

1  with Duane Reade whether or not you had a contract?
2      A. We had a long-term relationship with Duane
3  Reade for multiple years to provide them marketing
4  programs, card programs, and software analysis. I
5  built that relationship with Duane Reade. We
6  launched their card program. It was extremely
7  successful. And it took them an awful lot of time
8  and yelling at us because of our incompetency based
9  on NAM's inability to support that software before
10  they fired us.
11      Q. Well, isn't what happened Gary Scharbino at
12  Duane Reade ultimately chose another company to
13  provide its data management services?
14      A. Yes, because we failed, not because he was
15  searching for it. There was constant conversation
16  about the fact that the product did not function
17  and that we had -- in fact, you will find in all
18  your documents e-mails to exactly that point
19  requested by Chris Mixson at the time that he was
20  president of the I-Group asking for all the
21  problems. There's documentation that he asked for
22  from Rich Roseman, so you will have that
23  documentation that says that NAM failed to support
24  the Aspen product.

79 (Pages 310 to 313)

Ann M. Raider

Page 314

1    Q. And you have that documentation too, right?
2    **A. You have it.**
3    Q. No, but I'm asking you. You have it as
4    well?
5    **A. There's an e-mail in our pile of documents**
6    **that you have.**
7    Q. Now, you and Mr. Fireman felt betrayed by
8    Duane Reade, did you not?
9    **A. No, we felt sad that we lost a**
10   **long-standing customer.**
11   Q. Now, the only other customer you got
12   interested in Aspen was Key Foods, right?
13   **A. I don't know that.**
14   Q. Is there any customer other than Duane
15   Reade that you got interested in Aspen?
16   **A. I know Key Foods was interested in working**
17   **with us, but your comment about was it the only**
18   **other customer, the answer is I don't know that to**
19   **be true.**
20   Q. Well, you were the person selling Aspen,
21   right?
22   **A. I was not the only person selling Aspen.**
23   Q. Who else was selling Aspen?
24   **A. You had Bob Stappler selling Aspen and you**

Page 315

1    had Kevin McKenna selling Aspen and Jim Mumm
2    **selling Aspen. There were other people on the**
3    **retail side who were selling Aspen.**
4    Q. But they all reported to you, did they not?
5    **A. Yes.**
6    Q. And so wouldn't you have known if they had
7    a customer that was interested in Aspen?
8    **A. At the time, I probably did know.**
9    Q. And you don't remember any now?
10   **A. I don't remember the details at the moment.**
11   Q. Now, it was your job to try to sell the
12   Aspen system to other possible customers, right?
13   **A. Yes, and in fact, I called a forum, a**
14   **marketing meeting with major retailers to come**
15   **together for us to have a discussion and to show**
16   **them the Aspen system from several people across**
17   **the United States to come to a meeting and that**
18   **meeting was cancelled.**
19   Q. You tried to sell the Aspen system, right?
20   **A. Yes.**
21   Q. But you just didn't succeed?
22   **A. We -- it's very hard to sell a system that**
23   **doesn't function, and it didn't function because of**
24   **the incompetency and the lack of support that NAM**

Page 316

1    gave us to get it to work.
2    Q. You learned at some point, did you not,
3    that many stores did not want to deliver their
4    customer data to third parties?
5    **A. I never learned that.**
6    Q. You learned, did you not, that many stores
7    were concerned about the security of their data in
8    the hands of third parties, did you not?
9    **A. I find that is not the case, and in fact,**
10   **today, NAM has relationships with stores that**
11   **represent 18,000 supermarket stores where they pull**
12   **their data, their files, to do targeted marketing**
13   **programs 16 years after the sale of the business.**
14   Q. Right, but that is --
15   **A. So your comment about third parties using**
16   **their data is not accurate.**
17   Q. No, I'm talking about -- there's a
18   distinction, is there not, between third parties
19   having what's called a passive tap into someone's
20   database and a third party actually hosting the
21   data? Are you -- do you understand what I'm
22   saying?
23   **A. EDS hosts millions of records today, so I**
24   **think your comment is not accurate.**

Page 317

1    Q. I know it, but CCMI is not EDS, right?
2    **A. I don't understand what that comment means.**
3    **They're a third party company that could have**
4    **hosted customer data.**
5    Q. Let me just say this. A number of
6    companies built their own data hosting systems;
7    isn't that right? And when I say a number of
8    companies, I mean a number of retailers built their
9    own data hosting systems?
10   **A. I don't know that to be true.**
11   Q. Isn't it a fact that Ahold has its own data
12   hosting system?
13   **A. I don't know how their data works today.**
14   Q. And isn't it a fact that Kroger has their
15   own data hosting system?
16   **A. No, that's not accurate. Don Humvee hosts**
17   **their data.**
18   Q. Who does?
19   **A. A third party hosts the Kroger data.**
20   Q. You're sure about that?
21   **A. Yes.**
22   Q. What's the name of the third party?
23   **A. Don Humvee.**
24   Q. And where are they located?

80 (Pages 314 to 317)

Page 318

1    A. Cincinnati.
2    Q. How long have they been hosting Kroger's
3  data?
4    A. Several years.
5    Q. But NAM came to the conclusion that it
6  didn't make sense to store the resources in the
7  Aspen system; isn't that right?
8    A. NAM made the decision to terminate the
9  software.
10    Q. And that was a conclusion that a reasonable
11  business person could make; isn't that right?
12    A. No, that's not accurate.
13    Q. You think that it was unreasonable on NAM's
14  part to make the decision to cease investing
15  further resources in customer data hosting?
16    A. They didn't invest the proper resources to
17  begin with, so they never invested proper resources
18  to begin with. They never supported the product
19  properly when we were trying to get it to work
20  properly, and so they made a business decision
21  based on what they believed was the product not
22  working. The product didn't work because they
23  didn't do the work to make it work. So it wasn't a
24  reasonable decision. It was a decision they made.

Page 319

1    Q. Now, you talk about at page 14 of your
2  interrogatory answers of lost Pathmark business.
3    A. Yes.
4    Q. What were you referring to here?
5    A. Let's see. Yes. Pathmark was putting out
6  to bid their card program, millions of cards. We
7  were bidding on the cards. The president of
8  Catalina called the president of Pathmark and said
9  do business with us and don't do business with News
10  America.
11    Q. How do you know this?
12    A. Because I was told.
13    Q. By whom?
14    A. Someone in Pathmark.
15    Q. Who?
16    A. One of the buyers.
17    Q. Who?
18    A. Trish Guccinelli.
19    Q. Where is she now?
20    A. I have no idea.
21    Q. Is she still with Pathmark?
22    A. No.
23    Q. Okay. Continue.
24    A. She left of her own accord, so the

Page 320

1  implication that she was fired for something
2  inappropriate is not accurate.
3    Q. I'm just asking questions.
4    A. Yes, right.
5    Q. So tell me more about Pathmark.
6    A. So when I found out that the president of
7  Catalina was going to see the president of
8  Pathmark, I called David DeVoe immediately and said
9  we've got to get to Dominick and Dominick needs to
10  go with me to see the president of Pathmark to make
11  sure that he knows we really want their basis and
12  stop Catalina from taking the business away from
13  us.
14    Q. Was this Pathmark's initial foray into
15  loyalty cards?
16    A. No.
17    Q. Who had been doing Pathmark's business
18  prior to that?
19    A. We had.
20    Q. You had been doing Pathmark's --
21    A. Yes, that's right.
22    Q. And was this before the acquisition or
23  after the acquisition?
24    A. I don't recall. I think after.

Page 321

1    Q. So Pathmark became a client of News America
2  Marketing after the acquisition, obviously, and
3  then at some point, Pathmark was going to do
4  another project relating to loyalty cards?
5    A. They were doing the next big order for a
6  year.
7    Q. I see. And they were putting this out to
8  bid?
9    A. Yes.
10    Q. And Catalina wanted that business?
11    A. Yes.
12    Q. And you wanted that business?
13    A. Yes.
14    Q. And so anyway, you tried to get Mr. DeVoe's
15  attention to assist you?
16    A. I went to Mr. DeVoe and he went to
17  Mr. Porco.
18    Q. And then what happened?
19    A. Nothing. Dominick said what's going on --
20  he called. I said listen, they're going to put a
21  lot of pressure on the president of Pathmark right
22  now. They're having a meeting tomorrow. I want us
23  to go to New Jersey and meet with the president of
24  Pathmark and tell him we want to hold on to this

81 (Pages 318 to 321)

Ann M. Raider

Page 322

1  business.
2     Q. And what happened?
3     A. Nothing.
4     Q. Do you know how Catalina's bid compared to
5  your bid?
6     A. Relatively comparable.
7     Q. When you say relatively comparable, what do
8  you mean?
9     A. I believe that our prices were in the same
10  range.
11    Q. But you never saw their bid?
12    A. No, I did not.
13    Q. So you can't say you would have gotten that
14  business even if you made the trip, right?
15    A. I can't commit to it, but I know that I
16  didn't get it and we didn't make the trip.
17    Q. Did you ever have any conversation with
18  anybody at Pathmark afterwards?
19    A. Yes.
20    Q. Who?
21    A. Their buyer.
22    Q. What was the buyer's name?
23    A. Trish Guccinelli.
24    Q. What did she say?

Page 323

1     A. She said that Catalina made it clear that
2  they really wanted the business and we did not.
3     Q. On page 14 of your interrogatory answers,
4  you say CCMI was awarded a $30 million five-year
5  gift card contract to Ahold.
6     A. Yes.
7     Q. Do you see that? This statement is not
8  true; isn't that correct?
9     A. No, that is true.
10    Q. Neither CCMI nor SmartSource Direct were
11  ever awarded such a contract?
12    A. We were awarded the business.
13    Q. What's your basis for that?
14    A. We went through an entire process. We got
15  the first piece of Bi-Lo. Ahold told us we had all
16  of the stored value programs for the Ahold sister
17  companies, and we started the execution.
18    Q. Who would you -- who at Ahold told you
19  this?
20    A. Sharon Wong.
21    Q. And where is she now?
22    A. I don't know.
23    Q. Is she still with Ahold?
24    A. No.

Page 324

1     Q. Was there ever a signed contract?
2     A. I don't know if it was actually signed.
3     Q. Isn't it a fact that at most, you were a
4  finalist with Safeway Marketing for this project?
5     A. No, that is not true. Safeway Marketing
6  was not even involved in the bid process for this
7  business.
8     Q. How do you know that?
9     A. Because there was a list of 14 companies
10  and Safeway Marketing was not a part of that.
11    Q. How about Black Hawk Marketing?
12    A. They were not part of the negotiations, to
13  my knowledge, for this piece of business.
14    Q. How do you know that?
15    A. Because there was a list of companies that
16  they interviewed.
17    Q. And how did you get the list?
18    A. They told everybody who was participating
19  in the negotiation -- in the negotiations.
20    Q. And were you involved in that?
21    A. Yes.
22    Q. Personally?
23    A. Yes.
24    Q. And were you told this at a meeting?

Page 325

1     A. What?
2     Q. Who the other bidders were?
3     A. Yes, they told us who was bidding, and we
4  actually met some of the people in the hallway as
5  we were coming in and they were going out.
6     Q. And Safeway Marketing had substantially
7  more experience than CCMI in doing supermarket gift
8  programs; isn't that correct?
9     A. No, they did not.
10    Q. Safeway Marketing had done the Safeway
11  stores; isn't that right?
12    A. I believe so.
13    Q. And CCMI hadn't done any large retail store
14  with respect to supermarket gift programs?
15    A. That's not true.
16    Q. Well, what had you done?
17    A. We did the gift card for Neiman Marcus. We
18  did the gift card for Comp U.S.A. We did the gift
19  card for -- the boat company. We did multiple gift
20  card programs.
21    Q. And how large were those programs?
22    A. Large.
23    Q. I mean, describe the dollar amount.
24    A. I can't. I don't recall the exact dollar

Ann M. Raider

Page 326

1  amounts.
2     Q. So you're not prepared to say just how
3  large they were; just in your view, they were just
4  large?
5        MR. RICH:  Objection.
6     A. Well, when we were doing all of the gift
7  cards for all of the Comp U.S.A. stores.  That's a
8  lot of gift cards.
9     Q. (BY MR. KATZ)  Are you sure you were doing
10 that?
11    A. Am I sure I was doing the gift cards for
12 Comp U.S.A.?
13    Q. For all of the stores?
14    A. Yes, I am.
15    Q. Ultimately, CCMI got direct mail business
16 from Safeway; isn't that right?
17    A. I don't know the answer.
18    Q. If CCMI got direct mail business from
19 Safeway, that revenue went to CCMI's revenue line;
20 isn't that right?
21    A. If a retailer was doing a program and we
22 had -- and Safeway let us have access to their
23 data, they would be included in a manufacturing
24 program.  I said retailer.  If a manufacturer was

Page 327

1  doing a program and Safeway chose to participate,
2  we would include them in the program and then we
3  would get revenue from that, yes.
4     Q. And that counted towards your earn-out
5  calculation; isn't that right?
6     A. Yes.
7     Q. There's also discussion in your
8  interrogatory answers of the proposed stored value
9  money cards for the Latin American market.  Do you
10 remember that?
11    A. Yes.
12    Q. And the executives at News America
13 Marketing liked this idea, did they not?
14    A. I don't know.
15    Q. Well, this idea was pursued by a number of
16 people besides Mr. Fireman at News America
17 Marketing?
18    A. I don't know that to be true.
19    Q. Mr. Lellouche worked on it, did he not?
20    A. I don't know that to be true.
21    Q. Who do you think worked on this idea?
22    A. Bob, solely.
23    Q. You don't think anybody else did?
24    A. No, I don't.

Page 328

1     Q. Would you be surprised if I told you that
2  Mr. Lellouche and Mr. Garofalo also worked on the
3  idea?
4     A. I'd be very surprised.
5     Q. Would you be surprised if I told you that
6  Mr. Lellouche, Mr. Garofalo and Mr. Fireman
7  presented the idea to various retailers, including
8  Kroger and Safeway?
9     A. I don't recall any of that.
10    Q. Let's talk just a little bit about what the
11 program was.  This was an idea that struck at the
12 monopoly that Western Union has for wiring money,
13 right?
14    A. I don't know what struck at the idea was.
15    Q. Well, it struck at the monopoly that
16 Western Union had?
17    A. This was a card, a stored value card, that
18 enabled people to have a card number that would
19 have multiple access to the card.
20    Q. Right.  And it was -- there was thought to
21 be a market for it because Western Union was
22 charging excessive prices, right?
23    A. There was a market for it because the
24 Hispanic market was large and they were wiring

Page 329

1  tremendous amounts of money.
2     Q. Right, and they did that through Western
3  Union?
4     A. I know that they do it -- did some of it
5  through Western Union, but I don't know how much.
6     Q. And the idea would involve something like
7  this, a situation where there would be
8  mother/daughter cards, for example, where a
9  daughter in the United States could put money on
10 her card at a retail store and then a mother in
11 Latin America could withdraw money on a companion
12 card?  That in essence is the idea, right?
13    A. I think that's right.
14    Q. It involved setting up a network of U.S.
15 retailers and U.S. and Latin American banks, right?
16    A. I would assume so.  I did not work on the
17 project.  I did not have access to the details of
18 the project.  Mr. Fireman was the lead on that
19 project.
20    Q. It was a very complicated project, was it
21 not?
22    A. I don't believe so.
23    Q. Well, it involved accessing the banking
24 system of the United States and whatever other

83 (Pages 326 to 329)

Ann M. Raider

Page 330

1  countries money was going to be wired to, did it
2  not?
3      **A. That's not -- accessing the banking system**
4  **is not complicated and Mr. Fireman had a lot of**
5  **experience in banking and in money transfer prior**
6  **to joining, so I don't know if it was complicated**
7  **and I don't know the details of it.**
8      Q. It was so complicated you had to try to get
9  political support for the idea by meeting with
10  people at the White House; isn't that right?
11     **A. I don't know that to be true. I know that**
12  **they had -- I know that they had a meeting with**
13  **people at the White House, but I don't believe it**
14  **was so complicated. I believe that they had**
15  **meeting with people at the White House to gain**
16  **support for the Hispanic initiative with the**
17  **president of Mexico. That's all I know.**
18     Q. But wasn't the fact of the matter that
19  retailers didn't want any part of the idea?
20     **A. I don't know that to be true.**
21     Q. Have you ever heard of something called the
22  Patriot Act?
23     **A. Yes.**
24     Q. And you're aware that the Patriot Act is

Page 331

1  concerned with things like transferring money
2  abroad?
3      **A. I don't know the specifics of the Patriot**
4  **Act. I heard that there is a Patriot Act. I don't**
5  **know what the details are.**
6      Q. Isn't it a fact that the retailers were
7  concerned that the whole idea, while it might be a
8  good one, had all kinds of complications due to the
9  Patriot Act?
10     **A. I have no knowledge of that detail.**
11         MR. KATZ: We are concluded.
12         (Off the record.)
13         (Whereupon the deposition was adjourned
14  at 5:19 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 332

1  COMMONWEALTH OF MASSACHUSETTS
2  MIDDLESEX, ss.
3
4      I, Marianne R. Wharram, Certified Shorthand
5  Reporter, Registered Professional Reporter and
6  Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that ANN M.
8  RAIDER, the witness whose deposition is
9  hereinbefore set forth, was duly identified and
10  sworn by me and that such deposition is a true
11  record of the testimony given by the witness.
12     I further certify that I am neither related to
13  or employed by any of the parties in this action,
14  nor am I financially interested in the outcome of
15  this action.
16     In witness hereof, I have hereunto set my hand
17  this 29th day of May, 2007.
18
19     _____
20         Marianne R. Wharram, CSR/RPR
21         Notary Public
22         CSR No. 1426S96
23  My commission expires:
24  August 7, 2009

Page 333

1          C E R T I F I C A T E
2      I, ANN M. RAIDER, do hereby certify that I
3  have read the foregoing transcript of my testimony,
4  and further certify under the pains and penalties
5  of perjury that said transcript is a true and
6  accurate record of said testimony, with the
7  exception of the following corrections listed
8  below:
9  Page Line              Correction
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22
23         _____
24                 ANN M. RAIDER
     Dated this ____ day of _____, 2007.

84 (Pages 330 to 333)

EXHIBIT B

# Three Essential Elements





## I. Building the Database
*(Implementation)*
- Enroll customers
- Build demographic profiles
- Issue cards

## II. Managing the Database
*(Management)*
- Capture purchase data
- Consolidate transactions
- Provide decision support systems

## III. Leveraging the Database
*(Marketing)*
- Analyze the data
- Design & execute targeted programs
- Track the results

...representing three revenue streams, plus consulting and related services....



Confidential and Proprietary

FR4897



# Three Revenue Streams

**Marketing revenue:**
List rental
Targeted programs
Quarterly "Magazine
Other

**Management revenue:**
Database set-up
Ongoing processing
Ad hoc research
Other

**Implementation revenue:**
Program set-up
Application processing
Card distribution
Other

Initial revenue spikes offset by long-term sustainable revenue from ongoing database management services, recurring list rental and customized targeted promotional programs.

**Total Revenue per Chain**

Total Revenue per Chain

3. Marketing
2. Management
1. Implementation

Quarters

6-9 Month Sales Cycle

CCMI

Confidential and Proprietary

FR4898

# Database Marketing with Retailers: Revenue Metrics

○ **Customer Loyalty and Sales Programs**

– Targets current spending on various other marketing initiatives

– Average revenue for fee-based programs per program: $25k - $250k

- Frequent shopper
- Loyalty/continuity
- Sales incentives/enhancements
- Promotion research

○ **Cooperative Targeted Promotions**

– Multiple retailers / multiple manufacturers



Confidential and Proprietary

# Database Marketing with Retailers: Revenue Metrics

- ## National Promotional Magazine

  – Targets (replaces) the current $ 7 billion F.S.I. business for supermarkets

  – Cooperative promotion vehicle - multiple manufacturers

  – Assumptions:
    - 6 MM circulation (6-7 retailers)
    - quarterly distribution, with 20 brand promotion pages per issue

  – Annual revenue projection example:
    - 20 pages X $.03/page X 6,000,000 X 4 (issues/yr) = $14.4 million



Confidential and Proprietary

# Database Marketing with Manufacturers: Revenue Metric

**Market potential:**

    12,000   promotions/year/retailer

X    400   retailer chains (FMI data for grocers alone)

= 4,800,000   promotion opportunities

**To meet plan:**
Target 19 Chains
1,700 individual promotions



Chain
Stores
Categories
Brands

100

Confidential and Proprietary

CCMI

FR4901

EXHIBIT C

```
                                         Volume:    I
 1                                       Pages:    1 to 255
                                         Exhibits:  1 to 11
 2

 3

 4
                     UNITED STATES DISTRICT COURT
 5              FOR THE DISTRICT OF MASSACHUSETTS

 6     * * * * * * * * * * * * * * * *
       ROBERT FIREMAN and ANN RAIDER,
 7                          Plaintiffs,

 8          vs.                              Civil Action
                                            No. 05-1740 MLW
 9     NEWS AMERICA MARKETING IN-STORE,
       INC.,
10                          Defendant.
       * * * * * * * * * * * * * * * *
11

12

13

14                     DEPOSITION OF HENRI F. LELLOUCHE, a
       witness called on behalf of the Plaintiffs, taken
15     pursuant to the applicable provisions of the
       Massachusetts Rules of Civil Procedure before Cynthia A.
16     Powers, Shorthand Reporter and Notary Public in and for
       the Commonwealth of Massachusetts, at the law offices of
17     Todd & Weld, LLP, 28 State Street, Boston,
       Massachusetts, on Friday, May 25, 2007, commencing at
18     8:07 a.m.

19

20
                           * * * * *
21

22

23                    KACZYNSKI REPORTING
                  72 CHANDLER STREET, SUITE 3
24                BOSTON, MASSACHUSETTS 02116
                       (617) 426-6060
```

1    exploring an acquisition?

2         A.    No.

3         Q.    Was this something that occurred to you

4    just at the time?

5              MR. KATZ:  Objection.  You can answer.

6         A.    I was working in the trade show looking

7    for opportunities as part of my role in the venture

8    group.

9         Q.    What group was this and what was its job

10   responsibility?

11        A.    The venture group was an entity that was

12   composed of myself, John Rubin, and Heather Harde.  We

13   worked directly for the CFO of the company.

14        Q.    Who is that?

15        A.    David Devoe, Jr.  And our job was to

16   identify opportunities, investments, acquisitions, on

17   behalf of News America.

18        Q.    What about News America made it

19   interesting to you in terms of a potential acquisition?

20             MR. KATZ:  Objection.

21        Q.    Pardon me.  Thank you.  What about CCMI

22   was interesting to you and made it a company worth

23   exploring from your perspective?

24        A.    We had interest in working in new

26

1    technologies and emerging technologies.  It was clear to

2    us that loyalty marketing was an emerging technology,

3    marketing technology.

4              Q.    Did you have a list of companies that

5    were involved in loyalty marketing at the time you

6    approached Bob Fireman at the trade show in Chicago?

7              A.    I didn't have a list.  I knew of some.

8              Q.    You knew of CCMI prior to the show in

9    Chicago?

10             A.    No.

11             Q.    So it was introduced to you, the concept

12   or the company was introduced to you in Chicago?

13             A.    I believe John Rubin suggested that I

14   meet with Bob.  I think John Rubin had known Bob and/or

15   Ann and suggested I stop by and learn more about them.

16             Q.    What other companies did you know of at

17   the time that were involved in loyalty marketing?

18             A.    Of course there was Catalina Marketing

19   and there was RMS and a host of other small companies

20   that did segments of the industry be they database

21   marketing or card manufacturing or application

22   processing.

23             Q.    What companies at the time that you

24   approached Bob Fireman in Chicago did card programs?

55

1        Q.    So of the three entities that were

2    ultimately rolled into the iGroup being CCMI, PlanetU,

3    and Softcard, two of them never got off the ground,

4    Softcard and PlanetU; is that correct?

5        A.    Off the ground?

6        Q.    Off the ground enough to be revenue

7    generating?

8        A.    No, they did not.

9        Q.    Was the initial investment in PlanetU $23

10   million?

11       A.    I don't know.

12             MR. PETERS:  Off the record.

13             (Recess taken)

14   BY MR. PETERS:

15       Q.    Mr. Lellouche, when you were -- let me

16   start over again.  We were talking about NAM's interest

17   in acquiring CCMI.  You spoke with me briefly about

18   meeting Bob Fireman at a trade show in Chicago.  What

19   was the next step in exploring acquiring CCMI?

20       A.    I believe I contacted either Bob or Ann,

21   I don't recall, and asked for an invite to come in to

22   see what was going on.

23       Q.    Okay.

24       A.    And I did do that.

56

1          Q.    Did you speak with anyone about CCMI,

2     anyone on your team?

3          A.    I can't recall specifically anything like

4     that.

5          Q.    And when you visited CCMI did you meet

6     with both Bob and Ann?

7          A.    Yes.

8          Q.    Were you trying to find out about the

9     nature of the business?

10         A.    Yes.

11         Q.    How long did the meeting take?

12         A.    I believe I was there for a day.

13         Q.    And at that time did you find out that

14    CCMI was in the business of doing loyalty marketing?

15         A.    I did.

16         Q.    Did you come away with the view that they

17    were one of the pioneers in loyalty marketing?

18         A.    I wouldn't say pioneers, no.

19         Q.    Do you believe they were one of the

20    pioneers in loyalty marketing?

21         A.    Pioneer is a strange word.  I believe

22    that they worked in it for a fairly long period of time.

23         Q.    By pioneers, I mean those that break

24    ground.  Were they one of the ground breakers in loyalty

57

1    marketing using information collected at the point of

2    sale?

3              A.    No.

4              Q.    You think there were others that broke

5    that ground before them?

6              A.    Certainly.

7              Q.    Catalina?

8              A.    Without a doubt.

9              Q.    Who else?

10             A.    Catalina was the behemoth.  They

11   overshadowed everyone else.

12             Q.    Doing the same type of work that CCMI was

13   doing?

14             A.    I don't know they were doing all the same

15   kind of work they were doing, but in terms of collecting

16   data and using that data for the purposes of remarketing

17   it back to consumers, they were well in advance of CCMI.

18             Q.    What did you learn about CCMI's business

19   that day?

20             A.    I learned the different segments in which

21   they operated.  I had the opportunity to visit their

22   facility.  I had the opportunity to observe a

23   presentation that I believe Ann made on their

24   capabilities.  I think that's the extent of it at that

58

1    point.

2         Q.    What did you believe prior to acquiring

3    CCMI were CCMI's core competencies?

4         A.    I believe the core competencies were in

5    the retailer side of the business which is relating to

6    card marketing, card production, application processing,

7    some very modest data hosting, and expertise and

8    understanding of the marketplace.

9         Q.    What about the marketplace made them

10   experts; their knowledge, that is?

11        A.    Through the presentation I came to

12   understand that they had launched several loyalty

13   programs and that they had ongoing relationships with

14   several retailers, several name plate retailers.  They

15   had launched the Lucky program in California, but it

16   was -- most of this was new to me, so I was listening

17   more than commenting.

18        Q.    I don't want to necessarily limit you to

19   this one meeting, although I have so far.  Let me ask

20   you this.  How many meetings did you have to acquire

21   information about CCMI prior to acquiring it?

22        A.    I couldn't tell you.  As I said, I really

23   passed it on to John Rubin and I exited the process to

24   my recollection.  I may have had some, a few more

60

1    supermarket chains in the country, do you know whether

2    or not Bob Fireman and Ann Raider had met with them to

3    discuss what they had to offer prior to the time that

4    CCMI was acquired by NAM?

5              A.    I think they had met with a number of

6    them.

7              Q.    And did you talk with Bob and Ann about

8    which grocery store chains those were?

9              A.    I'm sure I did.

10             Q.    Same question with respect to drug

11   stores, all the major drug stores Ann and Bob met with,

12   did you know that?

13             A.    My specific recollection is focused on

14   Duane Reade and the NACDS, National Association of Chain

15   Drug Stores.  Beyond that I don't recall any other

16   specific drug chain meetings.

17             Q.    And did you do any work to try to figure

18   out where the market was going for the types of services

19   that News America, I should say CCMI, provided?

20             A.    We were relying on CCMI's vision and

21   expertise to give us an idea of where the marketplace

22   was going.

23             Q.    This is prior to the acquisition?

24             A.    Yes.

104

1    2001.

2          Q.    And I take it Mr. Cleary had had

3    extensive experience in loyalty marketing?

4          A.    No.

5          Q.    I take it he had extensive experience in

6    card programs?

7          A.    No.

8          Q.    I take it he had some experience in card

9    programs?

10         A.    No.

11         Q.    I take it he had some experience in

12   loyalty marketing?

13         A.    No.

14         Q.    How did it make business sense to take

15   away those responsibilities from someone who you've

16   articulated was an expert as compared to anyone else at

17   NAM?

18         A.    Did I articulate as an expert?

19               MR. KATZ:   I'm not sure he said that.

20         Q.    As between you and Bob Fireman who had

21   expertise in loyalty marketing?

22         A.    Say that to me one more time.

23         Q.    As between anyone at NAM and Robert

24   Fireman, in July of 2001 who had the expertise, who was

106

```
 1                    MR. KATZ:  Objection.
 2              Q.    Do you think that made sense?
 3                    MR. KATZ:  Objection.  You can still
 4      answer the question if you understand it.
 5              A.    It made perfect sense to me.
 6              Q.    How much of your business week was
 7      devoted to working on CCMI in 2000 when you first took
 8      over?
 9              A.    I don't know.
10              Q.    Half?
11              A.    At least.
12              Q.    So you went from one hundred percent
13      Softcard to at least fifty percent CCMI?
14              A.    I wouldn't say that's the case.  I think
15      that, you know, often times at News America you're asked
16      to do more.
17              Q.    Is that what happened here?  Did your
18      hours increase, for example?
19              A.    Hours increased, support increased,
20      breadth of coverage increased.
21              Q.    How many hours a week were you working in
22      2000?
23              A.    Oh, anywhere from ten to twelve per day,
24      not per week.
```

1    person at CCMI, what did you do to familiarize yourself

2    with the business?

3         A.    Well, I had been attending meetings, and

4    I had been learning as we went along, but I was quite

5    reliant on the direction that Bob and Ann were providing

6    in terms of the strategic plans of the company, vendor

7    recommendations, retailer opportunities, manufacturer

8    opportunities.

9         Q.    Okay.  So you learned on the job like you

10   did back in the days when you went from Sheraton to Act

11   Media; right?

12        A.    Yes.

13        Q.    You didn't sit down with Bob Fireman or

14   Ann Raider and get sort of a download of information

15   over a period of weeks, did you?

16        A.    Oh, we had constant conversations back

17   and forth.

18        Q.    How long after the acquisition did you

19   become the head of CCMI, period of months; right?

20        A.    Period of months, probably on or around

21   the time it became SmartSource Direct.

22        Q.    So we're talking seven or eight months

23   later?

24        A.    That sounds about right.

144

1          Q.   Did you understand that Ann Raider's role

2     at CCMI prior to the acquisition included managing the

3     retailer and manufacturer sales force of CCMI?

4          A.   Yes.

5          Q.   And after the acquisition she did not

6     have sales staff reporting to her; correct?

7          A.   Yes.

8          Q.   And after the acquisition she did not

9     manage the retailer and manufacturer sales force; right?

10         A.   Sometime after the acquisition.

11         Q.   What was the business justification for

12    the decision to remove those areas of responsibilities

13    from Ann Raider?

14         A.   At our discretion we opted to reorganize

15    the group.

16         Q.   What was the justification other than

17    whim?

18              MR. KATZ:  Objection.

19         A.   I don't think whim would be a word I

20    would use in any business case.

21         Q.   That would be an improper thing to do;

22    right?

23              MR. KATZ:  Objection.

24         Q.   Make a business decision based on whimsy?

145

1        A.    I don't think it's a relevant term to use

2   in this context.

3        Q.    Well, the reason I mention it is because

4   you said at our discretion we changed the

5   responsibilities.  That's what you told me; right?

6        A.    Correct.

7        Q.    My question was, what's the business

8   justification?  There must be a business justification

9   other than discretion.  What was the business

10  justification?

11       A.    Marty Garofalo came over to our group.

12  He was heading up manufacturer sales for both the

13  Internet business as well as the SmartSource Direct

14  business.  So it made sense to have Kevin Tripp, who was

15  the sole manufacturing salesperson for SmartSource

16  Direct, report to him.  He had twenty years of

17  experience calling on packaged goods companies.

18       Q.    Mr. Garofalo did?

19       A.    Oh, yeah, and on the retail side it just

20  was a similar situation.  I had extensive background in

21  retail sales, and it was just a direction we chose.

22       Q.    Did Mr. Garofalo have any experience in

23  loyalty programs, the types of things that you were

24  trying to sell for CCMI?

1          A.    No.

2                MR. KATZ:   Objection, but you can

3     proceed.

4          Q.    And I think you've already told me you

5     didn't have any experience either in loyalty programs,

6     meaning programs relying on data generated at the point

7     of sale; is that correct?

8          A.    That is correct.

9          Q.    Prior to removing these responsibilities

10    from Ann Raider, did you have any conversation with her

11    about the plan to do so?

12         A.    I don't recall.

13         Q.    Do you think it made sense to talk to Ann

14    Raider prior to taking these responsibilities away from

15    her to solicit her input or insight?

16         A.    I think that the decision to move the

17    sales force supervision to me was a decision that was

18    conveyed to Ann, not discussed with her.

19         Q.    My question was, do you think it made

20    sense to discuss this decision with Ann Raider prior to

21    executing it to solicit her insights?

22         A.    No, I don't.

23         Q.    Get her thoughts?

24         A.    No, I don't.

170

1          Q.    Was there any curtailment on the trade

2    shows that she could attend in order to promote CCMI's

3    business?

4                MR. KATZ:   Objection.

5          A.    No.   In fact, she served on the FMI

6    Women's Council which met, I believe, in concurrence

7    with the trade shows.

8          Q.    So you don't remember any complaints that

9    Ann Raider had about the inability to exhibit at shows?

10         A.    Well, that's two different questions.

11         Q.    It may be which is why my client just

12   passed me a note.  Was Ann Raider and Bob Fireman, more

13   specifically CCMI, allowed to exhibit at trade shows?

14         A.    We exhibited in 2001 at Marketechnics,

15   and that was the last opportunity we had to exhibit at a

16   trade show.

17         Q.    You don't recall Ann Raider complaining

18   that she wanted to exhibit at trade shows but was

19   precluded from doing so?

20         A.    No, that was not the question.

21         Q.    But that's the question I'm asking now.

22   Do you remember Ann Raider complaining that she was

23   precluded from exhibiting at trade shows?

24         A.    Frequently.

171

1           Q.    What was the business justification from

2    precluding CCMI from exhibiting at trade shows?

3           A.    News America's policy is not to exhibit

4    at trade shows or participate in trade associations.

5           Q.    Do you know the justification for that

6    policy?

7           A.    I do not.

8           Q.    Have you ever inquired?

9           A.    No.

10          Q.    When Ann Raider asked to exhibit at trade

11   shows your response in substance was what you just told

12   me, which is it's the policy?

13          A.    Yes.

14          Q.    Did you ever explore with senior

15   management the idea that it might be prudent in this

16   emerging market to allow CCMI to exhibit at trade shows?

17          A.    No.

18          Q.    Do you think that would have been a

19   rational thing to do to explore whether or not News

20   America Marketing's policy made sense in the context of

21   emerging technologies?

22          A.    No.

23          Q.    You don't think that made sense?

24          A.    No.

1         Q.    Why not?

2         A.    It was a News America policy that was

3    explained very clearly to me, and it was

4    counterproductive for me to challenge management on this

5    decision.

6         Q.    Every time someone asks for some

7    additional consideration on the matter, do you consider

8    that to be a challenge?

9         A.    No.

10        Q.    There is a way for you to go to senior

11   management and say maybe we should revisit this policy

12   in light of the fact that we're dealing with an emerging

13   technology and have that not be a challenge; right?

14             MR. KATZ:  Objection.

15        A.    I can't speak generally about it.

16        Q.    But you didn't approach senior management

17   because you didn't want to challenge senior management;

18   right?

19        A.    That's not the case.

20        Q.    I'm using the word challenge because it

21   came up in the response that you just gave me.  Did you

22   consider raising the issue but declined to raise the

23   issue because you were afraid or concerned that it would

24   be viewed as a challenge to an existing policy?

180

1    develops?

2            A.    Not necessarily.

3            Q.    Not necessarily?

4            A.    No.

5            Q.    Was CCMI allowed to advertise in trade

6    publications?

7            A.    No.

8            Q.    Why not?

9            A.    News America doesn't advertise in trade

10   publications.

11           Q.    News America Marketing, News America,

12   News Corp.?

13           A.    News America Marketing.

14           Q.    That's a policy?

15           A.    Yes.

16           Q.    And that policy was explained to Ann

17   Raider and Bob Fireman prior to the acquisition?

18           A.    I don't know.

19           Q.    Did Ann Raider approach you about

20   advertising in trade publications?

21           A.    I don't have any specific recollection of

22   that.

23           Q.    Do you have any specific recollection of

24   Bob Fireman approaching you about advertising in trade

181

1    publications?

2              A.    I don't have any specific recollection of

3    that either.

4              Q.    Did you ever go to senior management to

5    try to determine whether or not in this particular case;

6    that is, the case of CCMI or SmartSource Direct, it made

7    sense to raise awareness about the company and its

8    offerings by publishing advertising in trade journals?

9              A.    Say it again, please.

10             Q.    Did you ever approach senior management

11   and say in substance maybe we should advertise?

12             A.    No.

13             Q.    And that's because of this existing

14   policy that was explained to you?

15             A.    Yes.

16             Q.    Did you think it made sense in the

17   context of CCMI's business to keep it out of trade

18   journals?

19                   MR. KATZ:   Objection to form.

20             A.    Can you say that again, please.

21             Q.    Did you think it made sense in this

22   particular context, the context of CCMI, to preclude it

23   from advertising in trade journals?

24             A.    It wasn't my call to make.  It was a

196

1          Q.    When you say over and over and over again
2    that CCMI had no products, have we justified at least
3    one?
4          A.    Not that I would have a 150 percent sales
5    force represent in 1999 when you had a handful of
6    retailers with data available.  As I said, it's
7    emerging.  It hadn't emerged.
8          Q.    It was News America's hope that they
9    would develop that market further?
10         A.    I wouldn't say that's true.
11         Q.    Okay.  News America as far as you know
12   wasn't really concerned about developing the market that
13   now generates eight million dollars?
14         A.    No, they were not.
15         Q.    How many stores had card programs in
16   2001?
17         A.    I haven't the slightest idea.
18         Q.    Isn't that something that's important for
19   you to know before you run a business?
20         A.    You're asking me 1999?
21         Q.    I'm asking 2001, right now, eighteen
22   thousand stores?
23         A.    I have no idea.
24         Q.    How many stores have loyalty cards

202

```
 1    be co-located with them to facilitate the deployment of

 2    that product.

 3         Q.    Did you discuss that decision with Ann

 4    Raider or Bob Fireman before implementing it?

 5         A.    I don't recall.

 6         Q.    Do you recall ever soliciting their input

 7    of the wisdom or insight of breaking up that team?

 8               MR. KATZ:  Objection.

 9         A.    No.

10         Q.    Did Ann Raider tell you that Bill Adam

11    was a critical part of the CCMI team in words or

12    substance?

13         A.    No.

14         Q.    Did Bob Fireman tell you that Bill Adam

15    was a critical part of the CCMI team in words or

16    substance?

17               MR. KATZ:  At any point in time?

18         Q.    Prior to moving him off to Connecticut?

19         A.    He may have.

20         Q.    Did you explore whether or not he was a

21    critical part of the CCMI team?

22         A.    I observed that he was a critical part of

23    the CCMI team.  One of the reasons I wanted to get him

24    out of that is that I feared flight.
```

EXHIBIT D

EXHIBIT NO. 1
5-25-07

# NEWS AMERICA MARKETING

**DATE:**  5/14/99
**TO:**  JOHN NALLEN, LON JACOBS
**CC:**  PAUL CARLUCCI
**FROM:**  DAVID DEVOE JR.
**RE:**  CCMI

News America Marketing has reached verbal agreement to acquire CCMI, a company specializing in database marketing and providing customer loyalty programs for retail chains through the frequent shopper programs. The acquisition is strategic in nature as CCMI is the only full service retail loyalty marketing company that has not been acquired over the past year. Catalina Marketing acquired two companies in the past nine months – Market Logic and DCI Card Marketing. The acquisition is also a strategic fit with two other investments that are in negotiation – Softcard Systems and PlanetU.

The business has operated at essentially break even the past three years and most of the asset value is inherent in software development utilized to interface with retailer point of sale systems to segment consumer purchase histories enabling targeted marketing programs from both manufacturers and retailers. The economics of the business are forecasted to improve as a result of new electronic distribution channels that were not available on a wide scale three years ago.

Attached is an overview of the Company along with estimated financial projections of the business over the next five years. We are planning to begin due diligence next week and would like to begin negotiation of a definitive agreement next week as well.

Please let me know when we can review this proposed transaction.

Confidential

CONFIDENTIAL

## Acquisition of Consumer Card Marketing, Inc.

### 1. Business Overview

CCMI was founded in 1992. The Company specializes in database marketing, customer loyalty programs for retailers and targeted marketing programs for manufacturers. CCMI currently offers the following products and services:

- *Loyalty card program implementation* - CCMI provides all of the loyalty card products and services needed to introduce and operate a retail loyalty program (grocery, department stores and others).
- *Database Management* - CCMI offers database management tools, including internally developed software, for marketers that provide easy access to customer purchase data and have the capability to analyze customer-specific purchase data.
- *Consulting and Marketing Programs* – CCMI utilizes actual purchase data provided by retailers to develop effective targeted marketing programs. Data is analyzed using CCMI's advanced software tools to help build programs to meet the various needs of promotions clients (trial, continuity, competitive targets, etc.). CCMI provides turnkey targeted programs, from data analysis and promotion planning, to program execution and results measurement.

**Management team:** Robert Fireman is the President of CCMI and Ann Raider is Executive Vice President. Both have developed strong relationships with retailers and packaged goods manufacturers based on their expertise in data management and targeted marketing. Ann worked for several years as a group brand manager for Gillette and also spent time in the electronic banking industry.

Recent Financial Results (in thousands)

| For years ended 12/31 | 1996 | 1997 | 1998 | |
|---|---|---|---|---|
| Revenue | $2,539 | $7,944 | $4,187 | |
| Cost of Goods | 1,663 | 5,298 | 1,765 | |
| Operating Expense | 948 | 2,242 | 2,209 | |
| Net Operating Income | $(72) | $403 | $212 | |

### Consolidated Balance Sheet

- As of 12/31/98, CCMI had total assets of $1.9 million , including cash in the amount of $800K and $500K of other current assets.
- The Company has current liabilities of $800K and long term debt in the amount of $66K.

### 2. Opportunity for News America Marketing and CCMI

- **Full Service Provider:** CCMI's consulting and marketing services are strategically important because the Company offers highly targetable promotion services not readily available in the retail marketplace today. CCMI's backward integration into database management and loyalty card issuance enables CCMI to offer a full-service solution for clients.
- **Retail Expansion Opportunities:** News America's strong relationships with supermarket retailers and consumer packaged goods manufacturers offer significant expansion opportunities for CCMI. CCMI's efforts with other retail categories can help News America expand into other classes of trade.
- **Targeted Market Expertise:** CCMI's management expertise and specialized software will be an asset to News America Marketing as it attempts to grow its In Store portfolio of highly targeted promotions services.
- **Sales Force Economies:** By leveraging a coordinated sales effort, News America's sales force will be trained to incorporate CCMI's products into its single source portfolio. CCMI will be substantially more profitable and demonstrate increased growth as a subsidiary of News America Marketing.
- **NWS Database Opportunities:** Other businesses within News Corporation may be able to leverage CCMI's database management and marketing programs to enhance their own affinity programs. (Fox Sports, Fox Family, Harper Collins, etc.)

Page 1



CONFIDENTIAL

NAM01475

### Projected Results (see appendix for detail)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Total Revenue | $ 13,092 | $ 20,124 | $ 26,556 | $ 30,898 | $ 35,220 |
| Total Cost of Goods | 9,358 | 14,039 | 17,968 | 19,514 | 20,450 |
| Gross Margin | 3,734 | 6,085 | 8,588 | 11,384 | 14,770 |
| Other Expenses | 2,372 | 3,337 | 4,517 | 5,130 | 5,635 |
| Operating Profit | $ 1,362 | $ 2,748 | $ 4,072 | $ 6,255 | $ 9,135 |
| *Percentage* | *10%* | *14%* | *15%* | *20%* | *26%* |
| Free cash flow after taxes | 146 | 1,005 | 1,730 | 3,009 | 4,575 |

### Model Assumptions

- Revenue is generated from consulting, database management and loyalty card implementation services.
- Card implementation revenue is based on 850 stores in year 1, growing to 1,800 by year 5 and assumes 10,000 cards per store. Revenue is earned on a per card basis for issuance and data input. Revenue in year 1 is $4.3 million, growing to $9.2 million by year 5. This segment has a 25% gross margin.
- Database management revenue is generated from licensing fees of software and data maintenance. It is assumed that 80% of the contracts last for 5 years, with the remainder being 1 year deals. Revenue for year 1 is assumed to be $1.2 million based on 8 new systems, growing to $7.8 million by year 5 for 51 total systems, with a gross margin of 74%.
- Consulting revenue is based on targeted direct-mail and electronically delivered promotions. In year 1, consulting revenue is $7.6 million, growing to $18.3 million by year 5, with a gross margin of 46%.
- News America's model assumes a valuation range of $40.7 million to $58.4 million based on a 15% discount rate and an 8X to 12X EBITDA multiple.
- Based on the deal structure outlined below, News America's model assumes the cost to acquire CCMI is $9.8 million in total cash payments. These payments have a present value of $6.6 million using a 15% discount rate.
- Additional capital expenditures are estimated to be approximately $1.5 million.
- CCMI's Model: The model prepared by CCMI assumes a total of $70 million in gross margins over 5 years and the achievement of both full bonus payments (see deal structure). Based on these assumptions, the cost to acquire CCMI is $16.4 million in total cash payments, or a present value of $10.5 million at a 15% discount rate.

### 3. Deal Structure

The acquisition of the stock of CCMI has been agreed to based upon the following terms:

- **Up-front payment:** A payment in the amount of $3 million at closing.
- **Profit Sharing/Earn-out:** For a five-year period from the effective date of contract, CCMI will receive 12% of the gross margin, mutually defined as revenues less the direct cost of goods sold.
- **Bonus payment opportunities:**
  - **Year 1:** If the gross margin for the first 12 month period (estimated to start on October 1, 1999) exceeds $4 million a $2.5 million bonus payment will be made; if $3 million or more, a $1.5 million payment will be made.
  - **Year 2:** If the gross margin for the second 12 month period exceeds $9 million a $2.5 million bonus payment will be made; if the margin is $7.5 million or more, a $1.5 million payment will be made.
- **Employment contracts:** Five-year employment contracts including non-compete agreements for CCMI's top management. Agreements include base salary of $160K, with annual adjustments consistent with company practice, 20% bonus targets, $900/month car allowance, eligibility to participate in News Corp Stock Option Program and News America benefit program. Further details to be discussed.

### 4. Timing and Next Steps

- News America Marketing made a verbal offer to CCMI on 5/7/99, which was verbally agreed to by the Company on 5/10/99.
- Over the next month it will be necessary to develop a definitive agreement and complete due diligence.
- CCMI's target closing date is 6/15/99.

Page 2

CONFIDENTIAL

NAM01476

MAY-25-99  15:25  From:NEWS AMERICA PUB.                2128527214                T-154  P 04    Job-922

CONSUMER CARD MARKETING, INC.                                                    APPENDIX
Summary Statements of Profit and Loss

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| *Implementation* | | | | | |
| Grocery | $ 4,033,150 | $ 6,344,800 | $ 6,595,350 | $ 7,335,600 | $ 8,544,960 |
| Other classes of trade | 240,000 | 284,000 | 344,000 | 516,000 | 648,000 |
| Total Implementation Revenue | 4,273,150 | 6,608,800 | 6,939,350 | 7,851,600 | 9,192,960 |
| | | | | | |
| *Database Management* | | | | | |
| Grocery | 1,163,700 | 2,039,000 | 3,338,224 | 4,823,400 | 6,803,033 |
| Other classes of trade | 135,500 | 271,000 | 474,250 | 745,250 | 1,064,000 |
| Total Database Management Revenue | 1,299,200 | 2,310,000 | 3,812,474 | 5,568,350 | 7,767,033 |
| | | | | | |
| *Consulting and Marketing Programs* | | | | | |
| Grocery | 4,660,000 | 6,960,000 | 8,735,000 | 9,504,000 | 8,350,000 |
| Other classes of trade | 2,800,000 | 5,044,000 | 6,769,000 | 7,544,000 | 8,400,000 |
| Enhancement programs | 100,000 | 200,000 | 200,000 | 400,000 | 500,000 |
| Total Consulting/Marketing Revenue | 7,560,000 | 12,204,000 | 15,004,000 | 17,448,000 | 16,250,000 |
| | | | | | |
| **Total Revenue** | $13,082,350 | $20,123,600 | $25,555,824 | $30,857,950 | $33,209,993 |
| | | | | | |
| **Cost of Goods Sold** | | | | | |
| *Implementation* | | | | | |
| Grocery | $ 3,024,863 | $ 4,009,600 | $ 4,916,520 | $ 5,891,700 | $ 6,409,720 |
| Other classes of trade | 180,000 | 198,000 | 288,000 | 307,000 | 485,000 |
| Total Implementation Costs | 3,204,863 | 4,200,000 | 6,204,520 | 5,298,700 | 6,894,720 |
| | | | | | |
| *Database Management* | | | | | |
| Grocery | 285,502 | 518,592 | 837,432 | 1,210,749 | 1,661,724 |
| Other classes of trade | 32,900 | 65,600 | 115,150 | 180,960 | 263,200 |
| Total Database Management Costs | 318,402 | 581,382 | 952,582 | 1,391,669 | 1,924,924 |
| | | | | | |
| *Consulting and Marketing Programs* | | | | | |
| Grocery | 3,120,000 | 4,565,000 | 5,601,000 | 6,791,500 | 5,167,500 |
| Other classes of trade | 1,750,000 | 3,110,250 | 4,113,000 | 4,259,500 | 4,275,000 |
| Retail commissions | 915,000 | 1,455,800 | 1,888,000 | 1,975,200 | 1,938,000 |
| Enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 268,000 |
| Total Consulting/Marketing Costs | 5,835,000 | 9,230,850 | 11,810,800 | 12,233,200 | 11,633,500 |
| | | | | | |
| **Total Cost of Goods Sold** | $ 9,358,345 | $14,038,842 | $17,967,702 | $19,513,569 | $20,450,144 |
| | | | | | |
| Gross Profit | 3,734,005 | 6,084,640 | 6,606,122 | 11,304,300 | 14,769,849 |
| percentage | 29% | 30% | 32% | 37% | 42% |
| | | | | | |
| Sales and Marketing | 1,273,100 | 1,833,368 | 2,461,729 | 2,796,943 | 3,112,939 |
| G&A | 1,047,330 | 1,435,600 | 1,343,321 | 2,238,131 | 2,448,777 |
| Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Total operating expenses | 2,371,430 | 3,336,947 | 4,610,511 | 5,139,594 | 6,636,215 |
| operating expenses as a percentage of revenue | 18% | 17% | 17% | 17% | 16% |
| | | | | | |
| **Contribution before tax** | $ 1,362,470 | $ 2,747,900 | $ 4,071,622 | $ 6,254,756 | $ 9,134,634 |
| percentage | 10% | 14% | 16% | 20% | 26% |
| | | | | | |
| Gross Profit - Implementation | 1,068,288 | 1,402,290 | 1,734,840 | 1,892,900 | 2,285,240 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| Gross Profit - Database Management | 920,718 | 1,729,498 | 2,859,892 | 4,206,690 | 5,042,109 |
| Percentage | 74% | 75% | 75% | 76% | 76% |
| Gross Profit - Consulting/Marketing | 1,745,000 | 2,953,150 | 3,693,400 | 5,214,800 | 5,629,500 |
| Percentage | 23% | 24% | 25% | 30% | 35% |
| | | | | | |
| **CCMI Projections** | | | | | |
| Revenues | 7,975,800 | 21,623,000 | 31,624,400 | 40,043,550 | 55,015,600 |
| Gross Margin | 3,191,350 | 9,500,000 | 13,500,500 | 17,977,440 | 25,914,500 |
| Percentage | 40% | 42% | 43% | 45% | 45% |
| | | | | | |
| Revenue variance to NAM model | (5,116,550) | 1,499,310 | 6,068,568 | 9,185,941 | 20,705,607 |
| Margin variance to NAM model | (542,625) | 2,924,852 | 4,872,568 | 6,593,050 | 11,144,651 |
| | | | | | |
| **Valuation** | | | | | |
| Contribution margin | $ 1,362,470 | $ 2,747,900 | $ 4,071,622 | $ 6,254,756 | $ 9,134,634 |
| Assumed tax rate | 44% | 44% | 44% | 44% | 44% |
| Contribution margin net of tax | 762,988 | 1,538,824 | 2,280,108 | 3,502,664 | 5,115,395 |
| Add-back:   Depreciation | 51,000 | 68,000 | 71,500 | 73,500 | 76,500 |
| Less:   Increase in Non-Cash Working Capital | 467,529 | 351,567 | 321,007 | 217,100 | 216,192 |
| Less:   Capital expenditures | 200,000 | 250,000 | 300,000 | 350,000 | 400,000 |
| | | | | | |
| Free cash flow | 146,463 | 1,005,257 | 1,730,601 | 3,009,079 | 4,574,703 |
| Cumulative cash flow | 146,463 | 1,151,723 | 2,881,721 | 5,890,800 | 10,465,503 |

6 Year discounted cash flow (no terminal value)        $        60 million

| Rate | 8 | | 10 | | 12 | | 14 |
|---|---|---|---|---|---|---|---|
| | | Multiple of EBITDA in millions | | | | | |
| 15% | $ 40.6 | $ | 49.5 | $ | 59.1 | $ | 68.8 |
| 17.5% | $ 35.4 | $ | 43.7 | $ | 51.4 | $ | 60.8 |
| 20% | $ 30.9 | $ | 38.8 | $ | 46.6 | $ | 52.2 |

Page 1 of 4

CONFIDENTIAL

NAM01477

MAY-25-99  15:26  From:NEWS AMERICA PUB.                2128527214                T-154  P.05    Job-922

**CONSUMER CARD MARKETING, INC.**
Loyalty Card Implementation

| Assumptions | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Current NAM grocery network | 15,000 | | | | | |
| Retailers offering loyalty programs | 50% | 70% | 72% | 75% | 70% | 60% |
| Penetration as of 12/98 | 80% | | | | | |
| Average shoppers per store | 10,000 | | | | | |
| | | | | | | |
| Percentage of NAM network serviced | | 2.0% | 4.0% | 6.0% | 6.0% | 7.5% |
| Corresponding stores serviced | | 315 | 432 | 683 | 702 | 840 |
| | | | | | | |
| Retail/department stores - stores per chain | | 25 | | | | |
| Chain implementations per year | | 2 | 2 | 3 | 6 | 5 |
| | | | | | | |
| CCM grocery stores implemented per year | | 500 | 600 | 700 | 700 | 800 |
| | | | | | | |
| Cards per store | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Revenue per card - issue | $ | 0.30 $ | 0.30 $ | 0.30 $ | 0.30 $ | 0.30 |
| Revenue per card - data | $ | 0.18 $ | 0.18 $ | 0.18 $ | 0.18 $ | 0.18 |
| Reorder percentage | | 10% | 10% | 10% | 10% | 10% |
| Cost Assumptions | | | | | | |
| Card cost | $ | 0.23 $ | 0.23 $ | 0.23 $ | 0.23 $ | 0.23 |
| Data entry cost (7c per 100 keystrokes) | $ | 0.14 $ | 0.14 $ | 0.14 $ | 0.14 $ | 0.14 |

**Statement of Profit and Loss**

**Revenue**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| *NAM network* | | | | | | |
| Card products and services | $ | 945,000 $ | 1,296,000 $ | 1,687,500 $ | 2,106,000 $ | 2,520,000 |
| Data entry | | 567,000 | 777,000 | 1,012,500 | 1,263,000 | 1,512,000 |
| Residual | | | 151,200 | 207,360 | 270,000 | 336,960 |
| Subtotal | $ | 1,512,000 $ | 2,224,800 $ | 2,907,360 $ | 3,639,600 $ | 4,368,960 |
| | | | | | | |
| *CCM grocery* | | | | | | |
| Card products and services | $ | 1,500,000 $ | 1,800,000 $ | 2,100,000 $ | 2,100,000 $ | 2,400,000 |
| Data entry | | 900,000 | 1,080,000 | 1,260,000 | 1,260,000 | 1,440,000 |
| Residual | | 121,150 | 240,000 | 288,000 | 336,000 | 336,000 |
| Subtotal | $ | 2,521,150 $ | 3,120,000 $ | 3,648,000 $ | 3,696,000 $ | 4,176,000 |
| | | | | | | |
| *Retail/Department stores* | | | | | | |
| Card products and services | $ | 150,000 $ | 150,000 $ | 225,000 $ | 300,000 $ | 375,000 |
| Data entry | | 90,000 | 90,000 | 135,000 | 180,000 | 225,000 |
| Residual | | | 24,000 | 24,000 | 36,000 | 48,000 |
| Subtotal | $ | 240,000 $ | 264,000 $ | 384,000 $ | 516,000 $ | 648,000 |
| | | | | | | |
| Total Implementation Revenue | $ | 4,273,150 $ | 5,608,800 $ | 6,939,360 $ | 7,851,600 $ | 9,192,960 |

**Cost of Goods Sold**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| *NAM Network* | | | | | | |
| Card products and services | $ | 709,750 $ | 972,000 $ | 1,265,625 $ | 1,579,500 $ | 1,890,000 |
| Data entry | | 425,250 | 583,200 | 759,375 | 947,700 | 1,134,000 |
| Residual | | | 113,400 | 155,520 | 202,500 | 252,729 |
| Subtotal | $ | 1,134,000 $ | 1,668,600 $ | 2,180,520 $ | 2,729,700 $ | 3,276,729 |
| | | | | | | |
| *CCM grocery* | | | | | | |
| Card products and services | $ | 1,125,000 $ | 1,350,000 $ | 1,575,000 $ | 1,575,000 $ | 1,800,000 |
| Data entry | | 675,000 | 810,000 | 945,000 | 945,000 | 1,080,000 |
| Residual | | 90,803 $ | 180,000 $ | 210,000 $ | 252,000 $ | 252,000 |
| Subtotal | $ | 1,890,803 $ | 2,340,000 $ | 2,730,000 $ | 2,772,000 $ | 3,132,000 |
| | | | | | | |
| *Retail/Department stores* | | | | | | |
| Card products and services | $ | 112,500 $ | 112,500 $ | 168,750 $ | 225,000 $ | 281,250 |
| Data entry | | 67,500 | 67,500 | 101,250 | 135,000 | 168,750 |
| Residual | | | 18,000 | 18,000 | 27,000 | 36,000 |
| Subtotal | $ | 180,000 $ | 198,000 $ | 288,000 $ | 387,000 $ | 486,000 |
| | | | | | | |
| Total CGS Implementation | $ | 3,204,803 $ | 4,206,600 $ | 5,204,520 $ | 5,888,700 $ | 6,894,720 |
| | | | | | | |
| Gross Margin | $ | 1,068,288 $ | 1,402,200 $ | 1,734,840 $ | 1,962,900 $ | 2,298,240 |
| | | | | | | |
| Percentage | | 25% | 25% | 25% | 25% | 25% |

| CCM Projections | | | | | |
|---|---|---|---|---|---|
| Revenue | 3,276,000 | 5,700,000 | 7,600,000 | 9,550,000 | 12,430,000 |
| Margin | 819,000 | 1,425,000 | 1,899,000 | 2,388,000 | 3,108,000 |
| Percentage | 25% | 25% | 25% | 25% | 25% |
| | | | | | |
| Revenue variance to NAM model | $ (997,150) $ | 91,200 $ | 660,640 $ | 1,708,400 $ | 3,238,040 |
| Margin variance to NAM model | (249,288) | 22,800 | 164,160 | 425,100 | 809,760 |

Page 2 of 4

CONFIDENTIAL

NAM01478

MAY-25-99  15:26  From:NEWS AMERICA PUB.    2128527214    T-154  P.06    Job-922

**CONSUMER CARD MARKETING, INC.**
Database Management

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Assumptions** | | | | | |
| Client base  (assuming 1 system each 100 stores) | | | | | |
| 50% of card implementations from NAM's store network | 2 | 2 | 3 | 4 | 4 |
| 50% of card implementations from CCMI's store network | 3 | 3 | 4 | 4 | 4 |
| Additional NAM network percentage | 15,000 | 2% | 2% | 3% | 4% | 5% |
| Number of systems | | 3 | 3 | 5 | 6 | 8 |
| 50% of current year retail card implementations | | 1 | 1 | 2 | 2 | 3 |
| % of short term agreements | 20% | | | | | |
| Short term agreement length in months | 12 | | | | | |
| Long term agreement length in months | 60 | | | | | |

| Instore Systems | | Cost Assumptions | |
|---|---|---|---|
| Set up fee | 50,000 | License fee (out of house clients only) | 30,000 |
| License fee (out of house clients only) | 150,000 | Set up fee | 25,000 |
| Clients assumed to be out of house | 60% | Quarterly maintenance | 3,750 |
| Hardware (VAR - Escbose license) | 36,000 | Monthly inhouse storage | 2,000 |
| Quarterly maint. (out of house clients only) | 15,000 | Hardware (VAR - Escbose license) | 18,000 |
| Inhouse systems | | | |
| Set up fee | 50,000 | | |
| Monthly inhouse storage | 13,000 | | |

| | 1 year | 5 year | |
|---|---|---|---|
| | Total | Total | Annual |
| Total revenue for 1 instore system | 205,000 | 800,000 | 165,000 |
| Total cost of goods sold | 58,200 | 191,500 | 38,200 |
| Margin | 149,800 | 649,500 | 129,800 |
| Percentage | 73% | 78% | 78% |
| | | | |
| Total revenue for 1 instore system | 270,000 | 525,000 | 105,000 |
| Total cost of goods sold | 84,250 | 148,000 | 29,600 |
| Margin | 185,750 | 377,000 | 75,400 |
| Percentage | 69% | 72% | 72% |

### Statement of Profit and Loss

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| In-house systems | | | | | |
| Grocery | $ 615,625 | $ 1,173,709 | $ 1,952,232 | $ 2,861,424 | $ 3,963,318 |
| Other classes of trade | 83,000 | 166,000 | 290,500 | 459,500 | 864,000 |
| Total | 698,625 | 1,346,709 | 2,242,782 | 3,371,924 | 4,823,318 |
| In-store systems | | | | | |
| Grocery | 488,175 | 860,190 | 1,385,933 | 1,891,685 | 2,723,715 |
| Other classes of trade | 52,500 | 105,000 | 183,750 | 288,750 | 420,000 |
| Total | 540,675 | 965,190 | 1,569,683 | 2,280,435 | 3,143,715 |
| Total revenue | 1,239,300 | 2,310,899 | 3,812,474 | 5,680,359 | 7,767,033 |
| **Cost of Goods Sold** | | | | | |
| In-house systems | | | | | |
| Grocery | 142,200 | 266,462 | 437,934 | 638,669 | 881,123 |
| Other classes of trade | 18,100 | 36,200 | 63,320 | 99,550 | 144,000 |
| Total | 160,300 | 302,662 | 501,284 | 738,219 | 1,025,123 |
| In-store systems | | | | | |
| Grocery | 143,375 | 249,130 | 399,496 | 572,050 | 780,601 |
| Other classes of trade | 14,800 | 29,600 | 51,800 | 81,400 | 118,400 |
| Total | 158,175 | 278,730 | 451,296 | 653,450 | 899,001 |
| Total cost of goods | 318,482 | 581,392 | 952,532 | 1,391,669 | 1,924,924 |
| **Gross Margin** | $ 920,718 | $ 1,729,498 | $ 2,859,892 | $ 4,208,690 | $ 5,842,109 |
| Percentage | 74.3% | 74.8% | 75.0% | 75.1% | 75.2% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenue | 1,070,000 | 2,600,000 | 4,616,000 | 6,894,000 | 9,784,000 |
| Margin | 739,750 | 1,904,000 | 3,344,000 | 5,035,200 | 7,245,200 |
| Percentage | 69% | 71% | 72% | 73% | 74% |
| | | | | | |
| Revenue variance to NAM model | (169,300) | 323,110 | 803,526 | 1,205,641 | 2,016,967 |
| Margin variance to NAM model | (180,968) | 174,502 | 484,908 | 828,510 | 1,403,091 |

CONFIDENTIAL

NAM01479

MAY-25-99  15:27  From:NEWS AMERICA PUB.                2128527214              T-154  P.07    Job-922

**CONSUMER CARD MARKETING, INC.**
Consulting and Marketing Programs

| | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|
| Assumptions | | | | | | | | |
| Direct mail delivery | Revenue | $ | 0.60 | 100% | 95% | 90% | 70% | 50% |
| | Cost | $ | 0.45 | | | | | |
| Electronic delivery | Revenue | $ | 0.12 | 0% | 5% | 10% | 30% | 50% |
| | Cost | $ | 0.02 | | | | | |
| Grocery | | | | 13 | 20 | 26 | 33 | 39 |
| Pharmacy/ mass merchandise | | | | 5 | 8 | 12 | 15 | 20 |
| Department stores | | | | 2 | 4 | 6 | 8 | 10 |

| Set up fees | | Coupons | Revenue | Cost | Reach | | | |
|---|---|---|---|---|---|---|---|---|
| Short term program | Grocery | 1 | 80,000 | 15,000 | 500,000 | | | |
| Long term program | Other | 2 | 100,000 | 25,000 | 250,000 | | | |
| Retail commissions | | 15% | | | | | | |
| Stores per program | | 1,000 | | | | | | |
| Percentage of shoppers reached | | 5% | | | | | | |

| Short term program | 100% DM | 50% Mix | Long term program | 100% DM | 50% Mix |
|---|---|---|---|---|---|
| Revenue | 360,000 | 240,000 | Revenue | 400,000 | 280,000 |
| Cost | 240,000 | 132,500 | Cost | 250,000 | 142,500 |
| Retail commissions | 45,000 | 33,750 | Retail commissions | 45,000 | 27,000 |
| Margin | 75,000 | 73,750 | Margin | 105,000 | 110,500 |
| Percentage | 21% | 31% | Percentage | 26% | 39% |

| General Consulting/enhancement programs | | | 2 | 4 | 6 | 8 | 10 |
|---|---|---|---|---|---|---|---|
| Revenue per program | $ | 50,000 | | | | | |
| Cost per program | $ | 25,000 | | | | | |

| Statements of Profit and Loss | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Revenues | | | | | |
| Grocery | $ 4,880,000 | $ 8,960,000 | $ 8,736,000 | $ 9,504,000 | $ 9,360,000 |
| Mass merchandise | 2,000,000 | 3,402,000 | 4,512,000 | 4,920,000 | 5,000,000 |
| Department stores | 600,000 | 1,552,000 | 2,256,000 | 2,624,000 | 2,800,000 |
| General/enhancement programs | 100,000 | 200,000 | 300,000 | 400,000 | 500,000 |
| Total | 7,580,000 | 12,204,000 | 15,804,000 | 17,448,000 | 18,260,000 |
| Cost of goods | | | | | |
| Grocery distribution | 3,120,000 | 4,585,000 | 5,661,000 | 5,791,500 | 5,167,500 |
| Mass merchandise distribution | 1,250,000 | 2,153,250 | 2,742,000 | 2,782,500 | 2,950,000 |
| Department stores distribution | 500,000 | 957,000 | 1,371,000 | 1,484,000 | 1,425,000 |
| Retail commission | 915,000 | 1,455,600 | 1,866,600 | 1,975,200 | 1,939,000 |
| General/enhancement programs | 50,000 | 100,000 | 150,000 | 200,000 | 250,000 |
| Total | 5,835,000 | 9,250,850 | 11,810,600 | 12,233,200 | 11,630,500 |
| Margin | $ 1,745,000 | $ 2,953,150 | $ 3,993,400 | $ 5,214,800 | $ 6,629,500 |
| Percentage | 23% | 24% | 25% | 30% | 36% |

| CCMI Projections | | | | | |
|---|---|---|---|---|---|
| Revenues | 3,029,800 | 13,243,000 | 19,376,400 | 23,547,900 | 33,800,500 |
| Margin | 1,032,630 | 5,680,800 | 8,307,840 | 10,404,240 | 15,561,000 |
| Percentage | 45% | 43% | 43% | 44% | 46% |
| Revenue variance to NAM model | (3,050,200) | 1,039,000 | 3,572,400 | 6,099,900 | 15,540,500 |
| Margin variance to NAM model | $ (112,370) | $ 2,727,650 | $ 4,314,440 | $ 5,249,440 | $ 8,931,800 |

CONFIDENTIAL

NAM01480

# EXHIBIT E

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-1740 MLW


- - - - - - - - - - - - - - - - x

ROBERT FIREMAN and ANN RAIDER,  :

            Plaintiffs,      :

     v.                         : Deposition of:

NEWS AMERICA MARKETING         : DAVID F. DeVOE, JR.

IN-STORE, INC.,                 :

           Defendant.       :

- - - - - - - - - - - - - - - - x


     TRANSCRIPT of testimony as taken by and before

MARGE TEILHABER, Certified Shorthand Reporter

(NJ License No. XI00856; CT license No. 446), NCRA

Registered Diplomate Reporter, and notary public of

the states of New York, New Jersey, and Connecticut,

at the offices of NEWS AMERICA, INC., 1211 Avenue of

the Americas, 3rd Floor, New York, New York, on

Wednesday, June 13, 2007, commencing at 10:10 in the

forenoon.

DeVoe, Jr., David F.                                      June 13, 2007

New York, NY

75

1                          Do you see that?

2          **A.**        **Yes, I see it.**

3          Q.          Do you know who Bill Adams is?

4          **A.**        **Yes, I know who Bill Adams is.  He**

5    **was the, I don't know his exact position but I**

6    **believe he was head of the software development, the**

7    **IT area of the company.**

8          Q.          Did you share Mr. Beck's opinion that

9    Bill Adams was a key asset of CCMI?

10         **A.**        **I believe Bill was an important**

11   **asset.**

12         Q.          I promised we'd return to Exhibit 13.

13   Let's get back to that.  The middle of page 2 of

14   Exhibit 13, do you see the reference to the

15   management team?

16                         Do you see that?

17         **A.**        **Yes.**

18         Q.          And you note that Mr. Fireman and

19   Ms. Raider both have developed strong relationships

20   with retailers and packaged good manufacturers based

21   upon their expertise in data management and targeted

22   marketing?

DeVoe, Jr., David F.

June 13, 2007

New York, NY

115

1          A.        Yes.

2          Q.        What is head count?

3          A.        Those would be employees.

4          Q.        Okay.

5                    And there's a reference in sales and

6    marketing, an expense item for trade shows.

7          A.        Yes.

8          Q.        And so would you agree with me that

9    you were at least contemplating through the

10   provision of this spreadsheet that the projections

11   in the budgets were as reflected in this document?

12         A.        These are projections.  I'm not sure

13   these are projections that my group did or

14   projections that CCMI proposed that are summarized

15   below.

16                   I mean they're not agreed-upon

17   budgets.  They were projections used to negotiate

18   the earn-out percentage, the gross profit

19   percentage.

20         Q.        And so regardless of where the data

21   came from, these were numbers that were being used

22   to determine what certain gross margin numbers

DeVoe, Jr., David F.

June 13, 2007

New York, NY

120

1   sales force to mean?

2       A.      It's a generic term for our selling

3   organization.

4       Q.      Okay.

5               And was it News America's intention

6   at the time it signed this agreement to provide

7   support for CCMI by utilizing the sales force to

8   promote the sale of the company's products?

9       A.      Yes.  The current intention at that

10  time was to promote the sale of the company's

11  products being CCMI's.

12      Q.      When did the intention change?

13              MR. KATZ:  Objection.

14      A.      I'm not aware it changed.

15      Q.      So it's your understanding that it

16  was and remains News America's intention to provide

17  support for the business for utilizing New America's

18  sales force in order to promote the sale of the

19  company?

20      A.      Up until I left the company.  I can't

21  speak to after that.

22      Q.      And that's a fair limitation.

DeVoe, Jr., David F.

June 13, 2007

New York, NY

123

1   NAM's sales staff to market CCMI products?

2        A.        I recollect discussion of needing to

3   work with the sales force and try to update them on

4   the products and give them information or training.

5        Q.        Did you talk with Ms. Raider or

6   Mr. Fireman or both?

7        A.        I don't recall.

8        Q.        And there was agreement reached on

9   both sides that that was something that needed to be

10  done?

11                 MR. KATZ:   Objection.

12       A.        I'd say there was an acknowledgement

13  that in order for our sales force to be helpful at

14  all, they would need to have a better understanding

15  of the product.

16       Q.        Was there any discussion about the

17  manner in which that would happen?

18       A.        No.

19       Q.        Not that you recall or no, there were

20  not?

21       A.        I don't recall.

22       Q.        Now, was NAM's sales force being

DeVoe, Jr., David F.                                      June 13, 2007

New York, NY

135

1      Q.      Now, what did you understand this

2  sentence to mean?

3      A.      **Which sentence?**

4      Q.      The sentence that begins

5  "Notwithstanding the foregoing," 6.8, page 36.

6      A.      **It essentially meant that**

7  **News America Marketing could operate the company as**

8  **it saw fit.  It could basically make decisions and**

9  **operate the company as it determined was in the best**

10  **interests of the business.**

11      Q.      Based on your understanding, could

12  News America Marketing have simply abandoned CCMI's

13  business according to this provision?

14          MR. KATZ:  Objection.  You're asking

15      for his understanding?

16          MR. RICH:  Right, as the person who

17      signed the agreement on behalf of News America

18      Marketing.

19      A.      **The way I interpret the agreement is**

20  **yes.**

21      Q.      Okay.

22          And based on your understanding,

EXHIBIT F

0001

| | |
|---|---|
| 1 | Volume:  I |
| 2 | Pages:  1-354 |
| 3 | Exhibits:  62-141 |

4

5            UNITED STATES DISTRICT COURT

6          FOR THE DISTRICT OF MASSACHUSETTS

7    Civil Action No  05-1740 MLW

8    - - - - - - - - - - - - - - - - - - - - - x

9    ROBERT FIREMAN and ANN RAIDER

10              Plaintiffs

11        v.

12   NEWS AMERICA MARKETING IN-STORE  INC .

13              Defendant

14   - - - - - - - - - - - - - - - - - - - - - x

15

16        DEPOSITION OF ROBERT N  FIREMAN

17            Thursday, May 24, 2007

18          10:08 a m  to 6:32 p m

19            HOLLAND & KNIGHT  LLP

20       Ten St  James Avenue  11th Floor

21            Boston  Massachusetts

22

23

24      Reporter:  Marianne R  Wharram, CSR/RPR

---

I N D E X

| DEPONENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ROBERT N  FIREMAN

(BY MR  KATZ)      11

(BY MR  PETERS)

E X H I B I T S

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 62 | 8-page Complaint  Fireman v  Gross | 48 |
| Exhibit 63 | 4-page Defendant G C  Lawson Farms  Inc  Answer  Counterclaim and Jury Claim | 49 |
| Exhibit 64 | 6-page Complaint  Fireman v  Duke C  Ltd | 50 |
| Exhibit 65 | 4-page Complaint  Presidential Financial Corporation v  Fireman | 50 |
| Exhibit 66 | 1-page Judgment by Default | 51 |
| Exhibit 67 | 23-page Complaint  National Business Imaging Systems, Inc  v  Fireman | 52 |
| Exhibit 68 | 34-page Verified Complaint  BayBank Middlesex v  Mandy Trucking  et al | 53 |

Continued

---

A P P E A R A N C E S

2

3            TODD & WELD  LLP

4            (BY KEVIN T  PETERS  ESQ )

5            28 State Street

6            Boston, MA  02109

7            (617) 720-2626

8            kpeters@toddweld com

9            Counsel for the Plaintiffs

10

11           HOLLAND & KNIGHT  LLP

12           (BY GORDON P  KATZ  ESQ )

13           Ten St  James Avenue

14           Boston  MA  02116

15           (617) 854-1408

16           gordon katz@hklaw com

17           Counsel for the Defendant

18

19   ALSO PRESENT:

20

21           HENRI LELLOUCHE

22           JORDAN LIPPNER  ESQ

23

24

---

E X H I B I T S  continued

| NO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 69 | 3-page 10 Mass  Attorney Discipline Reports 97 Excerpt | 54 |
| Exhibit 70 | 8-page Complaint  American Investment Fund  Inc . v  Entertainment Systems Corp . et al | 60 |
| Exhibit 71 | 2-page Agreement for Judgment | 61 |
| Exhibit 72 | 4-page Complaint  Interpros Consulting  Inc . v  Consumer Card Marketing  Inc | 61 |
| Exhibit 73 | 2-page Answer of the Trustee | 62 |
| Exhibit 74 | 15-page Joint Petition and Motion To Confirm Arbitrators' Award | 63 |
| Exhibit 75 | 11-page Verified Amended Complaint And Jury Demand  Fireman v  Blythe Selby  Seltech  Inc  et al | 68 |
| Exhibit 76 | 7-page Letter Dated 8/13/1999 To Robert Fireman from David DeVoe | 69 |
| Exhibit 77 | 5-page Affidavit of Blythe Selby | 71 |
| Exhibit 78 | 2-page Black s Law Dictionary Excerpt | 86 |
| Exhibit 79 | 2-page Press Release | 127 |

Continued

E X H I B I T S. continued

| NO | DESCRIPTION | PAGE |
|----|-------------|------|
| Exhibit 80 | Handwritten Memo Bates Stamped FR0512-513 | 184 |
| Exhibit 81 | Handwritten Notes Bates Stamped FR0508-0511 | 107 |
| Exhibit 82 | e-mail Bates Stamped FR1141 | 190 |
| Exhibit 83 | e-mail Bates Stamped FR1920 | 190 |
| Exhibit 84 | Current CCMI Organization Chart Bates Stamped FR3401 | 191 |
| Exhibit 85 | Memo Dated 5/27/99 from Dave DeVoe to Heather Harde Bates Stamped NAM03154-3160 | 193 |
| Exhibit 86 | e-mail from Dave DeVoe to les Charm Dated 6/23/1999 | 198 |
| Exhibit 87 | Fax Cover Sheet Dated 6/24/99 Bates Stamped FR6846-848 | 202 |
| Exhibit 88 | 3-page e-mail String Including From Dave DeVoe to Shan Willis Dated 7/12/99 | 204 |
| Exhibit 89 | e-mail from Dave DeVoe to Shan Willis Dated 7/12/1999 | 207 |

Continued

E X H I B I T S. continued

| NO | DESCRIPTION | PAGE |
|----|-------------|------|
| Exhibit 101 | e-mail from Mary Ann Mosa to Henri Lellouche Dated 6/28/2000 And Attachment | 238 |
| Exhibit 102 | Letter Dated 9/11/2000 from Bob And Ann to David DeVoe Bates Stamped FR5823-825 | 238 |
| Exhibit 103 | e-mail Bates Stamped FR6658 | 239 |
| Exhibit 104 | e-mail Bates Stamped FR0040 | 241 |
| Exhibit 105 | e-mail Dated 10/11/2000 from Robert Fireman to Henri Lellouche | 242 |
| Exhibit 106 | Memo From Bob Fireman to Chris Mixson Dated 10/17/2000 Bates Stamped FR0041-00423 | 247 |
| Exhibit 107 | e-mail Bates Stamped FR1246 | 251 |
| Exhibit 108 | Letter Dated 12/13/2000 from Robert Fireman and Ann Raider To David DeVoe Bates Stamped NAM01049-051 | 251 |
| Exhibit 109 | Letter Dated 1/2/2001 from Michael Racano to Robert Fireman and Ann Raider Bates Stamped FR5864-865 | 257 |

Continued

E X H I B I T S. continued

| NO | DESCRIPTION | PAGE |
|----|-------------|------|
| Exhibit 90 | 3-page e-mail from Shan Willis To Charlotte Edelman Dated 8/2/1999 | 210 |
| Exhibit 91 | Letter Dated 10/22/1999 from Bob To David DeVoe | 212 |
| Exhibit 92 | 1-page e-mail from David DeVoe To Jon Rubin Dated 11/12/1999 | 215 |
| Exhibit 93 | e-mail String Including From David DeVoe to R Fireman Dated 11/15/1999 Bates Stamped FR0310-313 | 217 |
| Exhibit 94 | 3-page Summary and Next Steps CCMI Strategy Session 11/17/99 | 219 |
| Exhibit 95 | e-mail from Dave DeVoe to Ann Raider Dated 12/7/1999. Bates Stamped NAM 03590-593 | 221 |
| Exhibit 96 | e-mail Bates Stamped FR0021 | 223 |
| Exhibit 97 | e-mail Bates Stamped FR0314 | 224 |
| Exhibit 98 | e-mail Bates Stamped FR1256 | 229 |
| Exhibit 99 | Handwritten Memo Dated 4/16/00 Bates Stamped FR 0330 | 231 |
| Exhibit 100 | Memo Dated 5/3/00 from Ann Raider To Henri Lellouche Bates Stamped FR0317 | 236 |

Continued.

E X H I B I T S. continued

| NO | DESCRIPTION | PAGE |
|----|-------------|------|
| Exhibit 110 | e-mail String Bates Stamped FR6659-661 | 259 |
| Exhibit 111 | e-mail Bates Stamped NAM01567 | 260 |
| Exhibit 112 | Letter Dated 1/11/2001 from Bob and Ann to Michael Racano Bates Stamped FR 5866-870 | 260 |
| Exhibit 113 | e-mail from Robert Fireman to Henri Lellouche Dated 1/19/2001 | 262 |
| Exhibit 114 | e-mail Bates Stamped NAM 02269 | 265 |
| Exhibit 115 | 2000 Performance Appraisal Bates Stamped NAM 000811-817 | 266 |
| Exhibit 116 | 4-page Meeting Minutes 4/24/2001 | 268 |
| Exhibit 117 | 3-page e-mail from Diana Fontaine To Henri Lellouche Dated 3/24/2001 | 269 |
| Exhibit 118 | e-mail from Robert Fireman to Michael Cleary Dated 6/18/2001 | 272 |
| Exhibit 119 | e-mail from Robert Fireman to Gary L Franco Dated 6/27/2001 | 273 |
| Exhibit 120 | e-mail Bates Stamped FR0208 | 274 |
| Exhibit 121 | e-mail Bates Stamped FR0567 | 282 |
| Exhibit 122 | e-mail Bates Stamped FR0165 | 283 |

Continued

```
 1            E X H I B I T S  continued
 2    NO        DESCRIPTION                        PAGE
 3    Exhibit 123 e-mail Bates Stamped FR0159       285
 4    Exhibit 124 e-mail Bates Stamped FR 0812      286
 5    Exhibit 125 2001 Performance Appraisal        294
 6             Bates Stamped NAM00804-810
 7    Exhibit 126 e-mail Bates Stamped FR 1855      302
 8    Exhibit 127 e-mail Bates Stamped FR 1915      303
 9    Exhibit 128 e-mail String Including           304
10             From Robert Fireman to Henri
11             Iellouche Dated 3/29/2002
12    Exhibit 129 e-mail Bates Stamped FR1910       308
13    Exhibit 130 e-mail Bates Stamped FR1908       309
14    Exhibit 131 7-page e-mail from Peter Koo      311
15             To Henri Iellouche Dated
16             10/21/2002 and Attachment
17    Exhibit 132 2002 Performance Appraisal        312
18             Bates Stamped NAM 00797-803
19    Exhibit 133 e-mail Bates Stamped FR1512       313
20    Exhibit 134 e-mail Bates Stamped FR1539-1540  315
21    Exhibit 135 2003 Performance Appraisal        316
22             Bates Stamped NAM 00789-796
23    Exhibit 136 e-mail Bates Stamped RC0041-043   318
24    Continued
```

```
 1            E X H I B I T S  continued
 2    NO        DESCRIPTION                         PAGE
 3    Exhibit 137 e-mail Bates Stamped NAM00765-775  321
 4    Exhibit 138 Letter Dated 11/19/2004 Bates      325
 5             Stamped NAM 00776
 6    Exhibit 139 e-mail Bates Stamped fr1351-52     326
 7    Exhibit 140 e-mail Bates Stamped FR0583        327
 8    Exhibit 141 e-mail Bates Stamped FR1924        311
 9
10
11
12
13    * Original exhibits retained by Mr. Katz.
14
15
16
17
18
19
20
21
22
23
24
```

```
 1             P R O C E E D I N G S
 2         ROBERT N. FIREMAN
 3      a witness called on behalf of the Defendant.
 4    having first been satisfactorily identified by the
 5    production of his Massachusetts driver s license
 6         and duly sworn by the Notary Public.
 7         was examined and testified as follows:
 8         DIRECT EXAMINATION
 9      Q.  (BY MR  KATZ)  Good morning  Mr  Fireman
10      A.  Good morning
11      Q.  My name is Gordon Katz. and as you know. I
12    represent News America Marketing   I m going to be
13    asking you some questions today   If my questions
14    call for a yes or no. will you answer yes or no or
15    I don t know?
16      A.  I don't know.
17      Q.  If any of my questions are unclear. will
18    you let me know?
19      A.  Yes
20      Q.  Only one of us can speak at a time. so will
21    you let me finish my question before you answer?
22      A.  Yes.
23      Q.  And let me remind you that you have to
24    articulate your answer so the court reporter can
```

```
 1    take down your response
 2      A.  I do
 3      Q.  Okay   You understand that?
 4      A.  Yes
 5      Q.  Please state your full name for the record
 6      A.  Robert Neil Fireman
 7      Q.  Have you ever used a name other than Robert
 8    N. Fireman?
 9      A.  No
10      Q.  Are you married?
11      A.  No
12      Q.  Have you ever been married?
13      A.  No
14      Q.  Do you have any children?
15      A.  No
16      Q.  Ever served in the military?
17      A.  No
18      Q.  Have you ever been arrested?
19      A.  No
20      Q.  Have you ever been indicted?
21      A.  No
22      Q.  Ever been charged with a crime?
23         MR  PETERS:  Objection.
24      A.  Speeding?  Is speeding a --
```

```
1      Q   (BY MR. KATZ)  Anything other than
2   speeding?
3      A   No
4      Q   Have you ever been the subject of
5   administrative proceedings begun by a governmental
6   entity?
7          MR. PETERS:  Objection
8      A   I don't recall
9          MR. KATZ:  Okay  And before we go any
10  further, let's just say a word about stipulations
11  I would propose that all objections except as to
12  form and all motions to strike be reserved until
13  the time of trial and that the witness read and
14  sign his transcript, but the signing need not be in
15  front of a notary  Those are the stipulations we
16  used before.  I take it they're acceptable?
17         MR. PETERS:  The only thing I typically
18  add these days is that the objections can also be
19  raised in response to a dispositive motion
20         MR. KATZ:  Sure
21         MR. PETERS:  I'd like to add that
22         MR. KATZ:  No objection on that score
23     Q   (BY MR. KATZ)  Can you tell us where and
24  when you were born?
```

```
1      A   I worked for Milton Kafka. Kafka. Kafka.
2   Kaufman & Kafka.
3      Q   And where were they located?
4      A   Water Street. Boston
5      Q   And what did you do there?
6      A   I was a young attorney   Anything they
7   wanted me to do. I had to do
8      Q   How many years were you there?
9      A   Just a year
10     Q   And then what did you do?
11     A   I went to work for a firm named Ring &
12  Rudnick
13     Q   And where were they located?
14     A   Oh. originally at 89 State Street. which
15  doesn't exist
16     Q   And how many years were you there?
17     A   Four and a half
18     Q   And I take it you passed the bar
19  examination in 1973?
20     A   I think it was '4.
21     Q   In 1974?
22     A   Yeah
23     Q   Did you take the bar exam more than once in
24  order to pass?
```

```
1      A   Brookline. Massachusetts. September sixth.
2   1948
3      Q   What's your educational background?
4      A   Brookline High School. University of
5   Wisconsin for a BA
6      Q   What year?
7      A   '70. 1970. and Suffolk University law
8   School. JD
9      Q   What year?
10     A   '73
11     Q   When did you enter the work force?
12     A   I had jobs in grammar school. high school.
13  college. after college
14     Q   Okay  And what did you do after college?
15     A   I went to law school
16     Q   And then following law school. what did you
17  do?
18     A   I practiced law
19     Q   And where did you practice law?
20     A   In Boston. Massachusetts
21     Q   Were you part of a firm?
22     A   Yes
23     Q   Well. let me ask you this.  What was your
24  first job after graduating law school?
```

```
1      A   Yes
2      Q   So you passed it on your second time?
3      A   Yeah
4      Q   Is that a fair statement?  And so you were
5   at Ring & Rudnick during what years?
6      A   I'm not good on years. Gordon. so we'll
7   have to just go -- I just remembered that far   I
8   want to say '75 to '79. but don't hold me to any of
9   these things. because I have no present memory
10     Q   I understand this is to the best of your
11  recollection --
12     A   Yeah
13     Q   -- as you sit here on May 24th. 19-- or
14  2007. right?
15     A   Right
16     Q   What were your job responsibilities at Ring
17  & Rudnick?
18     A   I helped with client issues from. you know.
19  general practice to real estate to litigation   I
20  was a practicing attorney learning everything I
21  could
22     Q   Did you do any corporate work at that time?
23     A   Some
24     Q   Did you do any buy/sells of businesses?
```

1    A.   Some. yes
2    Q.   And who did you -- did you work under any
3    one particular attorney during your period at Ring
4    & Rudnick?
5    A.   No
6    Q.   You worked under all the partners at Ring &
7    Rudnick?
8    A.   Well. there were four people.
9    Q.   And who were they?
10   A.   Jordan Ring. Leslie Rudnick. Michael
11   Braunstein. myself.  I guess maybe one or two
12   others came and went
13   Q.   And after Ring & Rudnick. what did you do?
14   A.   I opened my own law firm
15   Q.   Where?
16   A.   On School Street
17   Q.   What did your practice consist of?
18   A.   Real estate. general business. some
19   litigation
20   Q.   And where did your clients come from?
21   A.   Where?  They came from Boston. referrals. I
22   mean. referrals from other attorneys. referrals
23   from courts
24   Q.   What kind of cases were referred to you

1    Q.   Okay   Now. you were -- is it a fair
2    statement that you've continuously been in private
3    practice since you left Ring & Rudnick in 1979?
4    A.   Yeah. I mean. I have my bar card and I am a
5    practicing attorney
6    Q.   Okay   And at one point you were on School
7    Street?  Is that a fair statement?
8    A.   School Street
9    Q.   Okay   And at some point you left School
10   Street and moved your office someplace else?
11   A.   I think I went to 141 Tremont Street.
12   Q.   And when did that occur?
13   A.   Do not remember
14   Q.   Can you give me an approximate date?
15   A.   I'd say in the '80's.
16   Q.   How long did you stay at 141 Tremont?
17   A.   I don't know   Five years or more
18   Q.   At some point. you moved your office from
19   141 Tremont to someplace else?
20   A.   Center Plaza   Three Center Plaza
21   Q.   When did that occur?
22   A.   '80's. late '80's.
23   Q.   And how long were you at Three Center
24   Plaza?

1    from courts?
2    A.   Some defense work.
3    Q.   Criminal defense?
4    A.   Criminal defense   I volunteered   I was
5    helping the Boston Legal Assistance Project at the
6    time   I got some stuff from the housing court
7    And then I started to do more business and some
8    international law. had some clients from overseas.
9    so we started to -- I got involved with helping
10   people set up businesses and acquire companies
11   around the United States
12   Q.   Did you ever help people sell companies --
13   A.   Yeah
14   Q.   -- in your -- in your private practice?
15   A.   Yeah
16   Q.   Do you remember any companies which you
17   helped sell during the period of time you were in
18   private practice on School Street?
19   A.   Well   I don't know what's School Street
20   Q.   Or wherever your office may have been
21   located while you were in private practice?
22   A.   I don't remember right at this moment
23   Q.   How long were you in private practice?
24   A.   Well. I'm still in private practice.

1    A.   I was there until Lavinthal and Horvath
2    blew up. that year that they imploded. the
3    accounting the firm.  I was a sublease of them. and
4    -- was that early '90's?  I don't know
5    Q.   You don't remember?
6    A.   No
7    Q.   And following the end of your sublease
8    occasioned by the demise of Lavinthal. where did
9    you move your office?
10   A.   Well. at that point I --
11   MR. PETERS:  Object to the form of the
12   question  Go ahead
13   A.   We started CCMI   CCMI started in my law
14   firm at Center Plaza. and at some point in time. I
15   decided to take that business opportunity and build
16   a business. so I left the law firm. which was an
17   association at that point. shared space and things
18   We were called Fireman & Orlandi at the time. and
19   Roland Orlandi was the former state rep from the
20   North End   But at some point. I left CCMI and we
21   moved to family property in Braintree   I left the
22   law firm to focus on building the business   And we
23   had some empty space in a warehouse out in
24   Braintree   So I really focused on the business and

| | |
|---|---|
| 1 | we moved to Braintree, and that's why we're here |
| 2 | Q.  Okay  Now  Ms. Raider initially had her |
| 3 | office at Three Center Plaza when you started CCMI? |
| 4 | A.  I had an office that I had open that was -- |
| 5 | we used for things -- the venture I was doing, so I |
| 6 | mean, I don't think she had a formal office there |
| 7 | She was part-time in the beginning as we tried to |
| 8 | get this thing together |
| 9 | Q.  Mr. Orlandi, was he your partner? |
| 10 | A.  In name only. |
| 11 | Q.  Did you have any associates who worked with |
| 12 | you? |
| 13 | (Interruption at door.) |
| 14 | (Mr. Lippner enters deposition.) |
| 15 | (Off the record.) |
| 16 | Q.  (BY MR. KATZ)  We were talking about your |
| 17 | law firm  Fireman & Orlandi, and I had asked you if |
| 18 | Mr. Orlandi was your partner |
| 19 | A.  Yes |
| 20 | Q.  And your answer was that he was? |
| 21 | A.  Yes |
| 22 | Q.  Did you have any other partners besides |
| 23 | Mr. Orlandi during the period of time -- |
| 24 | A.  No |

| | |
|---|---|
| 1 | A.  Sorry |
| 2 | MR. PETERS:  Bob thought it was him. |
| 3 | Q.  (BY MR. KATZ)  You told us that you were in |
| 4 | the private practice of law before CCMI, right? |
| 5 | A.  Yes |
| 6 | Q.  Okay  And that you've really continuously |
| 7 | been in the private practice of law from 1974 to |
| 8 | the present, correct? |
| 9 | A.  Correct |
| 10 | Q.  Okay |
| 11 | A.  And continue to be in the private practice |
| 12 | of law -- |
| 13 | Q.  Yes |
| 14 | A.  -- to the present |
| 15 | Q.  To the present  And you told us that CCMI |
| 16 | started while you were in your law office at Three |
| 17 | Center Plaza, correct? |
| 18 | A.  Yes |
| 19 | Q.  Okay  And at some point, your activity, |
| 20 | your time became much more focused on CCMI?  Fair |
| 21 | statement? |
| 22 | A.  Correct |
| 23 | Q.  Okay  And ultimately, you sold CCMI, as we |
| 24 | know, to News America Marketing, right? |

| | |
|---|---|
| 1 | Q.  -- you had the Fireman & Orlandi firm? |
| 2 | A.  No |
| 3 | Q.  Did you have any associates? |
| 4 | A.  It was -- there were lawyers in the suite |
| 5 | and we were all independents |
| 6 | Q.  Did you use the services of any of the |
| 7 | other lawyers? |
| 8 | A.  Oh, sure |
| 9 | Q.  On work that you generated? |
| 10 | A.  Sure |
| 11 | Q.  And you were telling us that in the early |
| 12 | 1990's, you created CCMI right? |
| 13 | A.  Correct |
| 14 | Q.  Would you continue to tell us what jobs you |
| 15 | had during the CCMI period and afterwards? |
| 16 | MR. PETERS:  Objection |
| 17 | A.  I don't understand what jobs -- |
| 18 | Q.  (BY MR. KATZ)  Okay, let me -- |
| 19 | A.  What is a job? |
| 20 | Q.  Well  let me back up a second |
| 21 | A.  Jobs as in -- |
| 22 | MR. PETERS:  Wait, wait |
| 23 | Q.  (BY MR. KATZ)  Only one of us can talk at a |
| 24 | time |

| | |
|---|---|
| 1 | A.  Correct. |
| 2 | Q.  And you had an employment agreement with |
| 3 | News America Marketing, right? |
| 4 | A.  Correct |
| 5 | Q.  We'll get into that in more detail later |
| 6 | And then at some point, in approximately 2004, you |
| 7 | left News America Marketing, correct? |
| 8 | A.  I was no longer there. |
| 9 | Q.  Okay |
| 10 | A.  Whether I left or was asked to leave is a |
| 11 | whole other question |
| 12 | Q.  What did you do following your cessation of |
| 13 | employment by News America Marketing? |
| 14 | A.  Well, I had -- I opened -- I went into a |
| 15 | friend's office in Weston, Massachusetts |
| 16 | Q.  And who is the friend? |
| 17 | A.  A fellow named Robert Bickford |
| 18 | Q.  And what did you do there? |
| 19 | A.  Well, I continued to work on some of the |
| 20 | ideas in card marketing  Robert Bickford had a |
| 21 | company that had a Visa platform |
| 22 | Q.  What is the name of the company? |
| 23 | A.  Compass Cards |
| 24 | Q.  And what did you do? |

1    A    Well. I wasn't working.  I mean. I was
2    trying to help him build ideas for the use of
3    private label debit cards
4    Q    Were you --
5    A    And when I was -- when I was asked to not
6    -- when I was told I couldn't come to the News
7    America office any more. notwithstanding my
8    employment agreement I went there to try to
9    continue to do some of the work that I was doing
10   for News America Marketing
11   Q    And when would you date your first going to
12   Mr. Bickford's office in Weston?
13   A.   Oh. I don't know.  2004
14   Q    When in 2004?
15   A    Whenever I was told I couldn't come to work
16   any more
17            (Mr. Lellouche enters deposition )
18            MR. PETERS:  Will Mr. Lellouche be
19   introduced on the record?
20            MR. KATZ:  Mr. Henri Lellouche has just
21   entered the room
22            MR. PETERS:  Mr. Lellouche is a witness
23   in a deposition tomorrow.  I understand Mr. Katz's
24   position that he's the corporate representative for

1    News America.  I take it. then. that Mr. Lippner is
2    here as an attorney on this litigation.  I
3    personally don't think it's appropriate for Henri
4    to be in the room. he's not a party. but I'll just
5    reserve my right and make the statement on the
6    record.  If he is the corporate rep for News
7    America. I trust that he will be the corporate rep
8    for all such depositions from this point forward.
9    including trial
10            MR. KATZ:  He is a corporate rep.  I'm
11   not going to belabor the conversation any further
12   on this subject
13            MR. PETERS:  No. I don't intend to.
14   either
15   Q    (BY MR. KATZ)  You were telling us.
16   Mr. Fireman. before Mr. Lellouche entered. about
17   your joining Mr. Bickford in his office in Weston?
18   A    That's correct
19   Q    Did you have some entity having the name
20   Stored Value?
21   A    Stored Value Partners is something we
22   created
23   Q    Tell me what Stored Value Partners is
24   A    It was just a d/b/a.

1    Q    Is Stored Value Partners still in
2    existence?
3    A    I don't know
4    Q    Well. was Stored Value Partners a
5    revenue-producing entity?
6    A    Not at that time.
7    Q    At any time?
8    A    Later on it had some customers
9    Q    How much revenue do you believe Stored
10   Value Partners has made in the entirety of its
11   existence?
12   A    You'd have to ask Mr. Bickford. but not --
13   less than a hundred thousand dollars.  I don't
14   know; a hundred thousand plus or minus
15   Q    Are you still actively involved with Stored
16   Value Partners?
17   A    No
18   Q    And when did you cease being involved with
19   Mr. Bickford and Stored Value Partners on an active
20   basis?
21   A    Well. I left there about a year ago
22   November. so when would that be?
23   Q    So that would be November 2005?
24   A    Five. yeah.

1    Q    And what have you done since then?
2    A    I started a new entity
3    Q    What's the name of the new entity?
4    A    Account -- it's called Accounts Receivable
5    Management Solutions. ARMS.
6            MR. PETERS:  Mr. Fireman. before you
7    respond to any questions about what this company
8    does. feel free to talk to me about whether or not
9    you believe it's proprietary. because I want
10   something in the nature of a protective order to
11   cover what you disclose in answer to Mr. Katz's
12   questions
13   Q    (BY MR. KATZ)  Let me ask you first. why
14   did you leave working with Mr. Bickford in
15   connection with Stored Value Partners?
16   A    To start a new entity
17   Q    Did the lack of success of Stored Value
18   Partners have any effect on your decision to start
19   a new enterprise?
20            MR. PETERS:  Objection
21   A    No
22   Q    (BY MR. KATZ)  Did you have --
23   A    I didn't say a lack of success.  I didn't
24   categorize it.  You did

```
 1    Q.  I agree, but I'm just asking the questions.
 2    A.  No, no.  I --
 3    Q.  What was it that made you turn your
 4  attention to an altogether different venture?
 5    A.  It was an opportunity some friends of mine
 6  wanted to get involved in and I decided I would do
 7  it.
 8    Q.  And you'd agree with me that this Accounts
 9  Receivable Management Systems venture has
10  absolutely nothing to do with the business of
11  Stored Value Partners?
12    A.  Oh, I agree.
13    Q.  Totally different kind of business?
14    A.  Totally different.
15    Q.  And who were the friends that asked you to
16  get involved with them with respect to Accounts
17  Receivable Management Systems?
18    A.  John Levino and Angel De la Cruz.  No one
19  related to the past, if that's --
20    Q.  Okay.  Where does Mr. Levine live?
21    A.  He lives in Canton.
22    Q.  And where does Mr. De la Cruz live?
23    A.  Waltham.
24    Q.  And where is the office, if there is one
```

```
 1    A.  I find the question overbroad, but --
 2  there's two things I'm doing with my life?
 3    Q.  Your professional life.
 4    A.  You could say that's what I -- the main --
 5  yes, fine.  Yes.
 6    Q.  Are there any other things that you're
 7  doing with your professional life that aren't
 8  included in my question?
 9    A.  Not within -- anything else is within those
10  two entities.
11    Q.  Okay.  And how much time do you spend
12  practicing law relative to how much time you spend
13  working on Accounts Receivable Management Systems?
14    A.  It varies day-to-day.
15    Q.  Over an average week, how would you break
16  it down?
17    A.  There's no average.
18    Q.  What kind of work, legal work is Fireman &
19  Associates doing?
20    A.  General litigation practice.
21    Q.  Okay.  So it's principally litigation that
22  you're doing?
23    A.  Not me, but the other people.
24    Q.  Are they doing most of the legal work?
```

```
 1  of Accounts Receivable Management Systems?
 2    A.  Needham.
 3    Q.  Where in Needham?
 4    A.  145 Rosemary Street, Needham,
 5  Massachusetts.
 6    Q.  And it's out of this office that you work
 7  today?
 8    A.  Yes.
 9    Q.  And do you conduct your law practice out of
10  that office as well?
11    A.  Yes.  I've set up a law firm called Fireman
12  & Associates.
13    Q.  Do you have any lawyers working with you?
14    A.  Yes.
15    Q.  And who are they?
16    A.  Francis Gamari, Iris Miller, Liz --
17  Elizabeth --
18    Q.  Is there a Liz?
19    A.  Elizabeth Manos, M-A-N-O-S.
20    Q.  So is it a fair statement that there are
21  two things that you're doing with your professional
22  life right now; one is practicing law and the other
23  is working for this entity called Accounts
24  Receivable Management Systems?
```

```
 1    A.  Yes.
 2    Q.  Okay.  And what kind of litigation work are
 3  they doing?
 4    A.  It's involving collecting money for
 5  hospitals, insurance companies, against insurance
 6  companies.
 7    Q.  So it's essentially collection work?  Is
 8  that a fair statement?
 9    A.  Well, it's specializing in no fault
10  insurance, workers comp, statutory collection work.
11    Q.  Is there a relationship between your
12  practice and Accounts Receivable Management
13  Systems?
14    A.  Yeah.  Accounts Receivable is a specialized
15  billing and collection service specializing in
16  those areas.
17    Q.  What do you consider to be your
18  professional strengths?
19         MR. PETERS:  Objection.  Are we talking
20  about the practice of law now, Gordon?
21         MR. KATZ:  No, in general.
22         MR. PETERS:  Well, that doesn't answer
23  my objection, but you can answer.
24    A.  My strength -- it's good to see you, Henri.
```

1    I think my strengths are understanding people,
2    business concepts, use of what the elements of
3    success, understanding legal concepts, business
4    concepts, growth, marketing.  I've been involved in
5    lots of different types of industries and help
6    clients and family and friends be successful in
7    whatever they're doing, or to try to help them if
8    they get into problems and advise them of options,
9    alternatives and things like that.
10       Q.  Anything else?
11       A.  Probably, but not that I can think of right
12   now.
13       Q.  What do you consider your professional
14   weaknesses?
15            MR. PETERS:  Objection.
16       A.  I don't consider them.
17       Q.  (BY MR. KATZ)  Do you think you have any?
18            MR. PETERS:  Objection.
19       A.  I don't want to speculate.
20       Q.  (BY MR. KATZ)  You can't think of any as
21   you sit here today?
22       A.  Well, I think I'm overly trusting of people
23   sometimes --
24       Q.  Anything else?

1    organizational, legal, accounting systems, making
2    sure they have the proper accountants and how
3    everything ties together.  Am I running over?  What
4    was the question?
5        Q.  Just asking you to describe your management
6    --
7        A.  So -- right.  I have
8        Q.  Only one of us can that talk at a time.
9    I'm just asking you to describe your management
10   experience up to today.
11       A.  I help people -- one of the predecessors of
12   this whole CCMI was helping people organize concept
13   around a new technology and how to manage it and
14   grow it.  You know, we were involved in the
15   development of affinity marketing credit card
16   industry, how to define a product, how to figure
17   out its essential unique properties, how to
18   introduce it to organizations and industries and
19   customers, so I think I have wide experience of
20   organizing people from card businesses to real
21   estate businesses to international businesses.  On
22   behalf of some clients of mine, I managed the
23   development of office towers and shopping centers
24   and real estate development.  I was probably

1        A.  -- and that's caused problems for me.
2        Q.  Besides you're overly trusting of people
3    sometimes, can you think of any other professional
4    weaknesses?
5            MR. PETERS:  Objection.
6        A.  Not right now.
7        Q.  (BY MR. KATZ)  Okay.  Can you briefly
8    describe for us what management experience you've
9    -- you have or have had?
10           MR. PETERS:  Objection.
11       A.  In my life?
12       Q.  (BY MR. KATZ)  Yes, since law school.
13       A.  Well, I mean, I was heavily involved in
14   managing the original law firm, Ring & Rudnick.
15       Q.  Even though you were the most junior
16   person?
17       A.  Well, after a year, I was a senior person.
18       Q.  Okay.
19       A.  Understanding the things needed to be
20   organized and set up systems and nomenclatures and
21   reporting systems and organizational things, and
22   then for clients, I've helped many people set up
23   lots of businesses and make sure they have the
24   elements of how to run them from a corporate,

1    involved in the sale of hundreds of millions of
2    dollars worth of real estate with people from all
3    sorts of countries.
4        Q.  As their counsel?
5        A.  As their counsel.
6            MR. PETERS:  Can he finish his answer
7    before he gets on to the next one?  I just think
8    it's going to be difficult to follow the answer if
9    we interrupt the response.
10       A.  I was involved with management of coal
11   mines in West Virginia and Kentucky.
12       Q.  (BY MR. KATZ)  In connection with your law
13   practice?
14       A.  Law practice.  If you can manage a coal
15   mine in West Virginia, you can manage almost
16   anything, Gordon, but you know, from personnel,
17   finance, from operations, from dealing with the UMW
18   strikers and -- so I mean, I have -- that's
19   general.
20       Q.  Did you manage the Buffalo Creek coal
21   mines?
22       A.  No.
23       Q.  You had nothing to do with that?
24       A.  No, never heard of it.

1  Q  Any other management experience?

2  A  Probably lots of them, but you're talking

3  since 1974  I've been involved in a lot of

4  different things  I've helped my family organize

5  businesses and sell businesses  I've helped my

6  cousin, helped with the formation of Reebok and its

7  success  My uncle is involved in international

8  businesses and I've done work with him from time to

9  time  I had an uncle that developed the largest

10  gasoline network in New England  Gibbs Oil Company,

11  so I've been exposed to operations and management

12  in a variety of industries at small levels from a

13  donut shop, bagel store to multinational

14  situations

15  Q  Ever taken any courses on management?

16  A  After law school, no

17  Q  Ever taught any courses or seminars on

18  management?

19  A  No

20  Q  Are you the member of any professional

21  societies?

22  A  I used to be ABA  I don't know if I've

23  formally joined that again

24  Q  You can't think of any professional

1  societies that you've been a member of other than

2  the ABA at one time?

3  A  Mass Bar  Association  Wisconsin Alumni

4  Association

5  Q  Anything else?

6  A  No

7  Q  You're a member of the Massachusetts bar?

8  A  Yes

9  Q  Are you a member of the bar of any other

10  state besides Massachusetts?

11  A  No

12  Q  Okay  And you've continuously been a

13  member of the Massachusetts bar since you passed

14  the bar in 1974, correct?

15  A  Yes

16  Q  Do you invest in the stock market?

17  A  I have

18  Q  Okay  Have you heard of an entity called

19  AEI Associates, Inc ?

20  A  No

21  Q  American Investment and Mortgage Company,

22  does that name ring a bell?

23  A  No

24  Q  Benefits Plus, Inc ?  Does that name ring a

1  bell?

2  A  Benefits Plus?  That has a ring to it

3  Q  Would it surprise you if I told you that

4  you are listed or have been listed in the Secretary

5  of State's office as the secretary of AEI

6  Associates, Inc ?

7  A  Yes

8  Q  And there's an address listed of 306 Beacon

9  Street in Boston  Does that address have any

10  familiarity to you?

11  A  I lived there  I mean, AEI -- that's my

12  former residence

13  Q  You don't live there now?

14  A  No

15  Q  But you don't remember AEI Associates,

16  Inc ?

17  A  Not right this second, no  What did AEI

18  stand for?

19  Q  I don't know  I'm asking you

20  A  I don't remember  I mean, I -- I was -- in

21  my legal practice, I -- I had sometimes took

22  corporate roles in some of the articles of

23  organization that were formed

24  Q  But you don't remember anything about AEI

1  Associates, Inc --

2  A  No

3  Q  -- as you sit here now?  And let me ask you

4  about American Investment and Mortgage Company,

5  Inc  Do you have any recollection of American

6  Investment and Mortgage Company, Inc ?

7  A  No

8  Q  And again, you are listed as the secretary,

9  or have been listed as the secretary of that entity

10  in the Massachusetts Secretary of State's office

11  Does that ring a bell?

12  A  No

13  Q  And let me again draw your attention to

14  Benefits Plus, Inc  and here again, you were

15  listed, according to the Secretary of State's

16  offices, as the secretary or having been the

17  secretary of Benefits Plus, Inc  Can you confirm

18  or deny that fact?

19  A  No

20  Q  You have no recollection of Benefits Plus,

21  Inc  at all?

22  A  That name rings a bell, but I don't right

23  now remember what it was or when it was

24  Q  You don't remember any involvement with

1   Benefits Plus, Inc.?

2         MR. PETERS:  Asked and answered.

3    Q.  (BY MR. KATZ)  Let me turn to another

4   entity for which you're listed as secretary or have

5   been listed as secretary in the Secretary of

6   State's office, and that entity is Contractors Plan

7   Association, Inc.  Does that entity ring a bell

8   with you?

9    A.  No.

10    Q.  Let me turn to another entity for which you

11   either are or have been listed as the secretary

12   with the Massachusetts Secretary of State's office.

13   That entity is called Credit Store, Inc.  Does that

14   entity ring a bell with you?

15    A.  Credit Store, Inc.?  What years are these,

16   Gordon?

17    Q.  I don't know.  I'm asking you.

18    A.  Credit Store, Inc. rings a bell.  That

19   could have been a company that we -- we did -- I

20   did some work with the insurance, marketing of

21   insurance.  We had some entity.  I don't remember

22   Credit Store, Inc.

23    Q.  Were you a shareholder of the Credit Store,

24   Inc.?

1    A.  Could have been.  I don't remember.

2    Q.  What time period did the Credit Store --

3    A.  I don't know.  I'm asking you.

4    Q.  You don't remember as you sit here?

5    A.  I have some memory that -- if that's the

6   one, then we did some of that stuff in Braintree

7   back in the early '90's --

8    Q.  And --

9    A.  -- that had to do with marketing.  I mean,

10   I had been involved with a client that developed a

11   direct marketing concept into the insurance

12   industry.  We used to do affinity marketing to

13   nurses in that industry group, tying the use of

14   credit cards to insurance for single parents that

15   had no credit.  So I think there was something that

16   we did, but I don't remember right now.

17    Q.  So that's what you think the Credit Store,

18   Inc. did?

19    A.  If that was that.  I don't remember right

20   now.

21    Q.  Who was the accountant for the Credit

22   Store, Inc.?

23    A.  I have no idea.

24    Q.  Did the Credit Store, Inc. make any money?

1    A.  No.  If it's the thing I'm thinking of and

2   that's the Credit Store, it -- we didn't get it

3   going.

4    Q.  You are listed, or have been listed at the

5   Secretary of State's office as the president of a

6   company called Entertainment Systems Corp.?

7    A.  Yes.

8    Q.  Do you remember Entertainment Systems

9   Corp.?

10    A.  Yes.

11    Q.  Is that company still in existence?

12    A.  No.

13    Q.  When was that company formed?

14    A.  Don't remember.

15    Q.  When did it go out of business, if it did

16   go out of business?

17    A.  I don't -- it's out of business.

18    Q.  What was the purpose of the company?

19    A.  The company was developing software for

20   interactive video games under a -- this is my

21   life -- back, I don't know, late '80's, early '90's

22   or something.  It was -- some people brought me a

23   concept of working with BNN and loral, advanced

24   military contractors who were trying to solve the

1   issue of war games for the government under the --

2   so the people who invented the Internet and the

3   original ARPANET over in Cambridge had developed a

4   system where you could get into a simulated Bradley

5   tank whether you were in Cambridge, Massachusetts,

6   or Fort Knox or Stuttgart, and they could do these

7   video things like you're all on the same battle

8   field in Boston, Massachusetts.  So some people in

9   the gaming business came to me and they formed that

10   company, Entertainment Systems Corp., and tried to

11   get those engineers to build a game utilizing the

12   high speed graphics and technology that the

13   military was doing, so where the Segas and

14   Nintendos were down here in low technology, these

15   guys were using very high speed graphic engineering

16   for silicon graphics, and those guys would just at

17   night try to develop games, so we entered into a

18   formal contract with Advanced Distributed

19   Simulations, which was a division of BBN.

20    Q.  Bolt, Beranek and Newman?

21    A.  Yeah, and then they got bought out by

22   Schwartz, the guy who owned loral, which is one of

23   the big military contractors, and after that

24   acquisition, it was difficult to get them to focus

1   They never finished the game.  It was a monster

2   truck game.  It's coming back to me now.

3       Q.   Did you spend a considerable amount of time

4   trying to make that project work?

5            MR. PETERS:  Objection.

6       A.   I spent time.

7       Q.   (BY MR. KATZ)  In your own mind, a

8   considerable amount of time?

9       A.   Yeah.  I spent some time on that.

10      Q.   And is it a fair statement that you never

11  made any money on that project?

12      A.   Yes.

13      Q.   You never brought that product to market?

14           MR. PETERS:  Asked and answered.

15      Q.   (BY MR. KATZ)  Is that right?

16           MR. PETERS:  Objection.  Answer it.

17      A.   Well, right.  The answer is the product

18  never got finished, not because of what we were

19  doing.

20      Q.   (BY MR. KATZ)  Okay.

21      A.   Because of [oral].

22      Q.   Somebody else's fault?

23      A.   That's a generalization.

24      Q.   But not your fault?

1       A.   The game didn't get finished into a

2   commercial viable form.  We actually had gone out

3   and created the interest and had the buyers ready

4   to go.

5       Q.   Let me turn to another entity for which you

6   were listed as the secretary, or had been listed as

7   the secretary at the Massachusetts Secretary of

8   State's office.  That entity's name is Kedron

9   Company, Inc., K-E-D-R-O-N Company, Inc.  What's

10  your recollection of Kedron Company, Inc.?

11      A.   I don't have any.

12      Q.   You don't remember Kedron Company at all?

13      A.   K-E --

14      Q.   K-E-D-R-O-N?

15      A.   No.

16      Q.   You don't remember any involvement on your

17  part with Kedron Company?

18      A.   Not today.  Do you have something to

19  refresh my recollection?

20      Q.   The Secretary of State's office also lists

21  you as the secretary, or as having been the

22  secretary of a company called Novations, Inc.  Do

23  you have any recollection of Novations, Inc.?

24      A.   No.

1       Q.   The Secretary of State's office lists you

2   or has listed you as the president of an entity

3   called Pixel Systems, Inc.  Do you have any

4   recollection of Pixel Systems, Inc.?

5       A.   The name means something, and it may be

6   around the same time we were in the game -- the

7   Entertainment Systems. Pixel Systems.  Don't

8   remember what it was, though.

9       Q.   Okay.  The Secretary of State's office also

10  lists you as the secretary, or as having been the

11  secretary of an entity called PTI Insurance Agency,

12  Inc.  Do you have any recollection of PTI Insurance

13  Agency, Inc.?  You have to articulate your answer.

14      A.   No.  I don't.

15      Q.   The Secretary of State's office lists you

16  as the secretary, or as having been the secretary

17  of an entity called U.S.A. Realty Corporation.  Do

18  you have any recollection of U.S.A. Realty

19  Corporation?

20      A.   No.

21      Q.   The Secretary of State's office lists you

22  as the president of SmartSource Direct, Inc.  Have

23  you ever been the president of SmartSource Direct,

24  Inc.?

1       A.   No.

2       Q.   Do you have any idea as --

3       A.   Oh.  I know.  Well --

4       Q.   -- as to why the Secretary of State's

5   office would have listed you as the president of

6   SmartSource Direct, Inc.?

7       A.   Well, I was the president of CCMI, whose

8   name was changed to SmartSource Direct, but I

9   didn't handle that, so I assume -- I can only

10  surmise that when they changed it to SmartSource,

11  no one put in a new president, but it was a

12  Delaware -- I thought it was a Delaware

13  corporation, so I don't understand it.

14      Q.   Okay.  Mr. Fireman, you've been involved as

15  a party in over ten lawsuits or other legal

16  proceedings since 1980; isn't that correct?

17      A.   I don't recall.

18      Q.   Okay.  Let me show you a document we've

19  marked as Exhibit 62 --

20           (Exhibit 62 marked for identification.)

21      Q.   And let me ask you if it's correct that in

22  1982 you sued Michael Gross and others for legal

23  fees.  Isn't that correct?

24      A.   It purports -- yes.  I don't have any

1    recollection, but it looks to me like we sued them
2        Q.  Do you remember that one or more of the
3    defendants counterclaimed contending that you had
4    committed malpractice?  And I call your attention
5    to the document that we've marked as Exhibit 63
6                (Exhibit 63 marked for identification.)
7            MR. PETERS:  Objection
8        Q.  (BY MR. KATZ)  Do you remember the
9    counterclaim against you for malpractice?
10       A.  No, I do not
11       Q.  Okay.  In 1984, Mr. Fireman, you sued --
12       A.  But it doesn't say malpractice.  You're
13   categorizing.  Fail to incorporate or inform, fail
14   to incorporate counterclaim.  It does not talk
15   about malpractice.  You're categorizing it.
16           MR. PETERS:  Bob, that was the nature
17   of my objection.  The document speaks for itself,
18   so I covered that with the objection
19       A.  Okay.  I'm sorry
20           MR. PETERS:  Any categorization or
21   classification that Mr. Katz makes of a document,
22   you'll hear me say objection.  I'm not sure where
23   we'll go with this question at the time of trial,
24   but I've got that covered

1        A.  If I read it, I may.  I don't, as you ask
2    the question, but I'm going to read through and --
3        Q.  You don't have to spend any more time on
4    it.  Let me bring to your attention our next
5    exhibit, which is Exhibit 66, and ask you is it not
6    true, Mr. Fireman, that judgement entered against
7    you in the amount of approximately $30,000 in the
8    Presidential Financial Corporation case?
9                (Exhibit 66 marked for identification.)
10       Q.  And here's Exhibit 66
11       A.  Are you testifying or are you asking me if
12   I remember?
13       Q.  I'm asking if you remember
14       A.  I do remember what this is about now.
15       Q.  Tell us, please
16       A.  That's a long time ago.  My family had been
17   involved in the development of technology that
18   would purify and destroy PCB's and dioxins in the
19   environment.  A company here in Whitman,
20   Massachusetts had developed something, and there
21   was a technology that was developed at the
22   University of Tennessee Space Institute in
23   Tullahoma, Tennessee, and we raised some money and
24   we put together a venture that would take these --

1        Q.  (BY MR. KATZ)  In 1984, Mr. Fireman, you
2    sued an entity called Duke C. Limited.  And let me
3    call your attention to a document we've marked as
4    Exhibit 64
5                (Exhibit 64 marked for identification.)
6        Q.  Do you remember your suit of Duke C
7    Limited?
8        A.  No.
9        Q.  So you don't remember what that lawsuit was
10   about?
11       A.  No, I have no memory
12       Q.  Okay
13       A.  But I'll read it
14       Q.  No, let's turn to the next lawsuit.  In
15   1985, you were sued by a company called
16   Presidential Financial Corporation, which sued you
17   for failure to pay a debt, correct?
18       A.  I don't remember
19       Q.  Let me show you a document we've marked as
20   Exhibit 65 and let me ask you if that refreshes
21   your recollection
22               (Exhibit 65 marked for identification.)
23       Q.  Do you remember the Presidential Financial
24   Corporation suit against you?

1    they were working there under Regan, had developed
2    these antiballistic -- the Star Wars, and in these
3    cylinders, they could get the temperature up to
4    5,000 degrees Fahrenheit.  We did a deal with them
5    and developed a product where these controlled
6    rockets could go on to flat beds and go to where
7    the poison was and destroy the waste that had just
8    been the major factor of the Superfund.  So we took
9    over a facility in Tennessee and in Georgia and we
10   were utilizing this technology.  They had had some
11   financing and we entered into a work-out, I
12   believe, with these people.  We took over a
13   facility that had some debt because they had a
14   license to operate, and we had an incinerator that
15   was licensed but no place to put it.  So we did
16   some work-outs and that's what this was all about.
17       Q.  Okay
18       A.  We paid these people
19       Q.  In 1990, suit was brought against you by
20   National Business Services -- Imaging Systems,
21   Inc., and let me show you Exhibit 67 and just ask
22   if you're the defendant in that lawsuit
23               (Exhibit 67 marked for identification.)
24       Q.  It's just a yes or no question.  All I'm

1    asking is whether you're the defendant in -- in the
2    suit brought by National Business Services Imaging
3    Systems, Inc.
4              MR. PETERS:  I think the question is
5    deceptively simple, but misleading.  You know what
6    this is about, Gordon.  Bob was to be a witness in
7    another lawsuit.  Objection.
8         A.   And I was being sued to be a deponent.
9         Q.   (BY MR. KATZ)  Okay.
10        A.   But not for the elements in it.
11        Q.   Let's turn to the next suit.  In 1990,
12   BayBank -- excuse me; Middlesex sued you for
13   failure to pay a debt, correct?
14        A.   Don't recall.
15        Q.   Let me show you Exhibit 68.
16             (Exhibit 68 marked for identification.)
17        A.   Yes.  I remember this now.
18        Q.   And you owed the debt that
19   BayBank/Middlesex was seeking here, correct?
20        A.   No.  We had -- I guaranteed -- I guaranteed
21   some notes for a client.  I think my father had
22   too.
23        Q.   Indeed, your father did, right?
24        A.   Yeah.

54

1         Q.   And you forged your father's signature on
2    certain documents in connection with the
3    transaction with BayBank, did you not?
4              MR. PETERS:  Objection.
5         A.   No, that's not true.
6         Q.   (BY MR. KATZ)  Let me show you
7    Exhibit 69 --
8              (Exhibit 69 marked for identification.)
9         Q.   -- which is a report on Robert N. Fireman
10   contained at 10 Mass. Attorney Discipline Reports
11   97, 1994.  And you're very familiar with this
12   exhibit, are you not, Mr. Fireman?
13        A.   No.
14        Q.   You don't remember this attorney discipline
15   matter against you from 1994?
16        A.   I remember it, but you're asking me if I'm
17   familiar with this document.  The answer is no.
18        Q.   Now, the matter that involves you came
19   before the board on a petition for discipline, and
20   a stipulation of the parties was filed waiving
21   hearing and requesting that the matter be resolved
22   by the imposition of a public reprimand, correct?
23        A.   The document speaks for itself.
24        Q.   It says, does it not, that the matter came

55

1    before the board on a petition for discipline and a
2    stipulation of the parties was filed waiving
3    hearing and requesting that the matter be resolved
4    by the imposition of a public reprimand?
5              MR. PETERS:  The question is did he
6    read that correctly.  You can answer that question,
7    Bob.
8         A.   I'm reading this, if I could.
9         Q.   (BY MR. KATZ)  The language I quoted is on
10   page 99, and it comes right under the heading order
11   of public reprimand.  And to take your counsel's
12   question, I read the language correctly, did I not?
13        A.   Well, which language?
14        Q.   The matter came before the board on a
15   petition for discipline and a stipulation of the
16   parties waiving hearing and requesting that the
17   matter be resolved by the imposition of a public
18   reprimand.
19        A.   Yes, we entered into a stipulation, but
20   this matter had nothing to do with the BayBank
21   matter.
22        Q.   Well, what did it have to do with?
23        A.   Something else.  I don't really recall, but
24   someone was trying to do something bad to my dad.

56

1    and I stood up for him and that's all, but it had
2    nothing to do with the bank.
3         Q.   Didn't have anything to do with the
4    BayBank/Middlesex lawsuit?
5         A.   No, nothing.
6         Q.   The board found that your conduct in
7    signing your father's name to certain loan
8    guarantees and in adopting a refinancing commitment
9    without specific authority from your father and
10   without any disclosure to the lender violated Canon
11   1 and DR 1 hyphen 102A4 and A6, did it not?
12             MR. PETERS:  Objection.
13        Q.   (BY MR. KATZ)  If you have any doubt about
14   that, take a look at the next to last paragraph on
15   page 98 of Exhibit 69.
16        A.   We entered into a stipulation to get this
17   gone.  I -- I did some things to protect my dad
18   that made me sign the stipulation.
19        Q.   What things?
20        A.   I don't remember, but some -- these guys
21   were trying to do something bad to my father and I
22   stood up, so I mean --
23        Q.   Signing your father's --
24        A.   But because I was an attorney, I had to

57

1   agree to the stipulation

2       Q   So is it your testimony that signing your

3   father's name as a guarantor to loan documents was

4   standing up to help your father?

5       A   No, that's not --

6           MR. PETERS:  Objection

7       A   I don't remember what happened, but that's

8   not what happened

9       Q   (BY MR. KATZ)  But you'll agree with me

10  that you agreed to the board's finding that your

11  conduct in signing your father's name to loan

12  guarantees and adopting a refinancing commitment

13  without specific authority from your father and

14  without any disclosure to the lender violated Canon

15  1 DR 1 hyphen 102A4 and A6, right?

16      A   No.

17      Q   Isn't that what you agreed to when you

18  filed the stipulation --

19      A   I agreed to sign the stipulation, but

20  that's not what happened

21      Q   -- that's embraced in Exhibit 69?

22      A   That's what it looks like, but that's not

23  what happened

24      Q   Wouldn't you agree that the conduct that's

---

1       Q   (BY MR KATZ)  You exposed the lender to

2   significant risk and could have caused substantial

3   harm absent your father's subsequent ratification,

4   right?

5       A   No, not true  And I paid the lender

6           MR. PETERS:  Do we have another

7   question on 69?

8           MR KATZ:  No  we're done with that

9           MR. PETERS:  Okay  You have seven

10  hours, which I'm going to keep you to to the

11  minute

12          MR. KATZ:  Well, you can take your

13  position and if we need to challenge it, we'll in

14  due course challenge it   And we're going to move

15  as quickly as we possibly can   That's why I'm

16  asking the witness to answer questions with a yes

17  or no or an I don't know if --

18      A   No, please  You said did I forge

19  documents, Counsel, you said did you forge

20  documents on this signature, and the answer is no

21  That's a categorization and it's offensive, and

22  really  I'm surprised at you, Gordon   I am

23  surprised at you

24      Q   (BY MR KATZ)  We don't need to get into a

---

1   described in Exhibit 69 and attributed to you was

2   dishonest?

3           MR. PETERS:  You know what?  You're

4   going to have to start telling me how this is

5   germane, because I've noted my objections as to

6   relevance, but I'm pretty close to suspending the

7   deposition and getting a protective order  and

8   Gordon  I'm dead serious   Tell me why you think

9   this is admissible in federal court

10          MR. KATZ:  I'm not going to answer the

11  question, but --

12          MR. PETERS:  Well, I'm going to let him

13  answer this last question  If we don't move on.

14  we'll suspend and we'll see Judge Wolfe

15          MR KATZ:  Okay

16      Q   (BY MR. KATZ)  Do you need to hear the

17  question read back?

18      A   I've answered this, Gordon  I was part of

19  the stipulation  It involved my father  The facts

20  in it are probably not accurate, but I did it

21      Q   You didn't appeal the decision that's

22  embraced in Exhibit 69, did you?

23          MR. PETERS:  Yes or no

24      A   No

---

1   debate  but I asked you at the beginning of the

2   deposition to answer questions with a yes or no or

3   an I don't know in that fashion, and I'm not -- for

4   all of our benefit. I think we'll all get out of

5   here sooner if that's the case   But let's turn to

6   another lawsuit  In 1995  you were sued by

7   American Investment Fund; isn't that right?

8       A   Don't remember

9       Q   And you just need to answer the question

10  yes or no  Let me show you Exhibit 70

11          (Exhibit 70 marked for identification.)

12          MR  PETERS:  Do you have a copy of

13  that, Gordon?

14          MR  KATZ:  Oh, I'm sorry

15      Q   (BY MR. KATZ)  You can admit you were a

16  defendant in the suit --

17      A   That's correct

18      Q   -- by American Investment Fund?

19      A   I was a defendant in the suit

20      Q   And you entered into an agreement for

21  judgement with American Investment Fund; isn't that

22  correct?

23      A   I guaranteed a note for a client and I

24  ended up paying for it, because I guaranteed it.

1    and I paid it all in full

2          (Exhibit 71 marked for identification )

3    Q.  And Exhibit 71 is a copy of the agreement

4    for judgement, is it not?

5    A.  Yes

6    Q.  And the agreement for judgement is in the

7    amount of $162,661; isn't that right?

8    A.  The document speaks for itself.

9    Q.  And I quoted it correctly, did I not?

10    A.  I didn t -- I don t know.

11    Q.  Just take a look   Do you see the number

12    $162,661 51?

13    A.  Against me and Entertainment Systems Corp.

14    yes

15    Q.  Okay   Thank you   Now, in 1999, a company

16    called Interpros Consulting brought suit against

17    CCMI for its failure to pay recruiting fees  right?

18    A.  Do not recall.

19    Q.  Let me show you Exhibit 72 and ask you if

20    that refreshes your recollection

21          (Exhibit 72 marked for identification )

22    Q.  Is your memory refreshed?

23    A.  Vaguely

24    Q.  Okay.  You made the decision not to pay

---

1    A.  I don't know how it got settled  but it

2    did

3    Q.  And ultimately, Interpros was paid,

4    correct?

5    A.  Don't know.

6          (Exhibit 74 marked for identification.)

7    Q.  In 2004, you brought an NASD arbitration

8    against Morgan Stanley Dean Witter, correct?

9    A.  Correct

10    Q.  And the joint petition and motion to

11    confirm Arbitrator's award which includes a copy of

12    the Arbitrator's award is contained in Exhibit 74

13    is it not?  Let me call your attention -- well,

14    strike that question for the moment, but can you

15    answer my question  that the joint petition and

16    motion to confirm the Arbitrator's award includes a

17    copy of the Arbitrator s award?

18        MR  PETERS:  Objection

19    A.  Are you asking me if the document that says

20    --

21    Q.  (BY MR  KATZ)  Yeah, go to page nine,

22    please

23    A.  They're not numbered

24    Q.  I know they're not numbered, but the ninth

---

1    Interpros, correct?

2    A.  Don't remember

3    Q.  Do you remember that Interpros obtained a

4    trustee process attachment for the amount sought?

5    A.  Do not remember

6    Q.  Let me show you Exhibit 73 and ask you if

7    that refreshes your recollection

8          (Exhibit 73 marked for identification )

9    A.  It appears here

10    Q.  So that s a yes?

11    A.  I was trying to remember the substance of

12    this  Gordon   It was someone that didn't work out

13    for the company and we were disputing a head hunter

14    fee

15    Q.  And Interpros brought suit and they got a

16    trustee process attachment for the amount sought

17    correct?

18    A.  They got an ex parte trustee  I assume

19    Q.  And to the best of your knowledge  that

20    trustee process attachment was never dissolved

21    correct, prior to the resolution of the case?

22    A.  Well  then it was resolved

23    Q.  But prior to the resolution of the case,

24    the trustee process attachment was not resolved?

---

1    page of -- of the exhibit is a document titled

2    stipulated award, correct?

3    A.  Yes  it is

4    Q.  And you signed the stipulated award on June

5    14th, 2004, correct?

6    A.  Yes

7    Q.  And in the stipulated award it says that

8    you requested compensatory damages in the amount of

9    $1 million, treble damages in the amount of

10    $2 million, interest  cost and fees  attorney fees

11    and such further equitable and/or other relief as

12    the NASD deems just and proper, right?

13    A.  That's what it says

14    Q.  And you asserted causes of action for

15    churning, violation of federal and state securities

16    laws, breach of fiduciary duty, negligence  NASD

17    rule violations and failure to supervise, right?

18    A.  That's what it says

19    Q.  And the award indicates that you received

20    no monetary amount on any of your claims; isn t

21    that correct?

22        MR  PETERS:  Objection

23    A.  No, I believe we got some money

24    Q.  (BY MR  KATZ)  Okay   How much money did

1    you receive?

2        A.   A nominal amount, but it was  I don't know

3    20, $30,000  We didn't get the --

4        Q.   You're sure about that?

5        A.   That s my memory.

6        Q.   Okay.  In the arbitration, you asserted a

7    claim for breach of fiduciary duty; do you remember

8    that?

9        A.   Yes.

10       Q.   What does the term fiduciary duty mean?

11       A.   According to Black's Law Dictionary?

12   Fiduciary duty is the duty of trust.

13       Q.   When you were working at CCMI after it was

14   acquired by News America Marketing, did you have a

15   fiduciary duty --

16            MR. PETERS:  Objection

17       Q.   (BY MR. KATZ)  -- according to your own

18   understanding?

19            MR. PETERS:  Objection  We will

20   stipulate to a fiduciary duty if you will stipulate

21   that the duty runs in both directions as fiduciary

22   duties do  Will you stipulate to that?

23            MR. KATZ:  We're not doing any

24   stipulations of a legal nature during the course of

1    this deposition.  I'm just asking for the witness

2    understanding

3            MR. PETERS:  Well, the witness is a

4    lawyer but he's here as a lay person and he's not

5    going to answer legal questions for you

6            MR. KATZ:  Well, I'm only asking his

7    understanding  His understanding happens to be

8    informed by the fact that he s been practicing law

9    since 1974, but whatever his understanding is, it

10   is, and I'm just asking for what his understanding

11   is, so let me ask the question again

12       Q.   (BY MR. KATZ)  When you were working for

13   News America Marketing after the acquisition of

14   CCMI, did you believe yourself to have any

15   fiduciary duties to News America Marketing?

16            MR. PETERS:  Objection

17       A.   Fiduciary duties in a legal sense or in my

18   understanding?  You're saying in my understanding

19   and you're asking a legal word, which is different

20   So I feel like you re trying to trick me into

21   saying something that s not true  I mean, are you

22   asking me -- I trust and deal in honesty and loyal

23   with the human race, including people I work for,

24   people I work with

1        Q.   (BY MR. KATZ)  Okay   Again  I'm not asking

2    --

3        A.   So if you want me to define fiduciary duty,

4    give me a dictionary and I ll read it into the

5    record

6        Q.   I'm only asking for your understanding, and

7    again, my question is only a yes or no question

8    Did you believe that you had a fiduciary duty to

9    News America Marketing while you were working for

10   News America Marketing?

11            MR. PETERS:  Objection

12       A.   I don't know.

13       Q.   (BY MR. KATZ)  Okay  let s turn to

14   September 16th, 2004  Were you still employed by

15   News America Marketing on that date?

16       A.   Don't know

17       Q.   Okay  Wasn't it just about towards the end

18   of your employment with News America Marketing?

19       A.   Don't know

20       Q.   Now, on that date, you signed under oath a

21   verified complaint which your counsel filed in

22   Suffolk Superior Court on the following day,

23   September 17th, 2004  Isn t that correct?

24       A.   Don't know

1        Q.   let me show you the document we've marked

2    as Exhibit 75

3            (Exhibit 75 marked for identification.)

4        Q.   You remember the case that you filed,

5    Mr  Fireman  against Blythe, Selby and Seltech

6    Inc.?

7        A.   Yes

8        Q.   In that complaint, you sought money from

9    Blythe Selby and a company called Seltech, Inc

10   correct?

11       A.   Yes

12       Q.   And you claimed in paragraph seven of that

13   complaint that you loaned money to Mr  Selby and

14   Seltech for the purpose of Seltech s operating a

15   business that would sell gift and prepaid card

16   products to Wal-Mart and other retailers; isn t

17   that correct?

18       A.   Yes

19       Q.   And you also claimed that -- in paragraph

20   ten that Mr  Selby on his behalf and on behalf of

21   Seltech agreed to repay you the principle together

22   with interest and a success fee related to

23   Seltech's business?  Isn t that correct?  Take a

24   look at paragraph ten

1      A   That's what it says

2      Q   And if you take a look at paragraph 11 in

3   the verified complaint -- and by the way, you

4   signed this verified complaint, did you not?  Take

5   a look at the last page

6      A   That's my signature

7      Q   And you signed it under the pains and

8   penalties of perjury, correct?

9      A   Correct

10     Q   And in the verified complaint, on paragraph

11  11, you claim that beginning in July 2001 and

12  ending in August 2003 you made 17 payments to

13  Seltech and Selby totaling $193,461  correct?

14     A   Yeah

15     Q   Now, you were under contract to News

16  America Marketing between August 1999 and

17  August 2004; isn't that correct?

18     A   Yes

19     Q   Okay   And I'm going to show you Exhibit 76

20  and ask you if you could confirm for us that that's

21  a copy of your employment agreement with News

22  America Marketing

23        (Exhibit 76 marked for identification )

24     A   Yes

1      Q   And you had a non-compete in your five-year

2   employment agreement with News America Marketing?

3      A   The document speaks for itself

4      Q   And you generally remember that there's a

5   non-compete provision in your employment agreement,

6   do you not?  Take a look at paragraph six,

7   paragraph numbered six

8      A   Okay

9      Q   Do you agree with me there was a

10  non-compete in your employment agreement with News

11  America Marketing?

12     A   Yes

13     Q   Okay   And you also had a non-compete

14  provision in the Stock Purchase Agreement which you

15  entered into with News America Marketing on August

16  13th, 1999; isn't that correct?

17     A   I don't know

18     Q   You don't remember?  Is that what you're

19  saying?

20     A   Could have been

21     Q   Okay   Now, do you remember that Mr  Selby

22  complained, or rather claimed in an affidavit that

23  in early 2001 you dissuaded him from becoming an

24  independent contractor for a company called Fiala?

1   Do you remember Mr  Selby making that claim?

2      A   I have general knowledge of all the claims

3   in there   They were not true  but go ahead

4      Q   I'm going to show you Mr  Blythe Selby's

5   affidavit dated August ninth  2004, which we've

6   marked as Exhibit 77

7        (Exhibit 77 marked for identification )

8      Q   And at paragraph five of Exhibit 77,

9   Mr  Selby says that you, Mr  Fireman, in your role

10  as an attorney, you reviewed the proposed agreement

11  with Fiala, you annotated the agreement and you

12  recommended against his entering into the agreement

13  with Fiala   Isn't that what he says?

14        MR  PETERS:  Objection

15     A   The document speaks for itself

16     Q   (BY MR  KATZ)  Okay   Well, I read it

17  correctly, did I not?

18     A   Which paragraph?

19     Q   Paragraph five

20     A   That's what it says

21     Q   Okay   And then, paragraph six says the

22  plaintiff, referring to you  Mr  Fireman, instead

23  suggested that I go into business with him and

24  indicated that he had sources of funding   He told

1   me that through his contacts he could raise in

2   excess of $2 million   Isn't that what paragraph

3   six --

4      A   That's correct

5      Q   -- of Mr  Selby's affidavit says?

6      A   Yeah

7      Q   Now, the Fiala business involved gift

8   cards, right?

9      A   No

10     Q   What did the Fiala business involve?

11     A   Fiala was a manufacturer of paper products

12     Q   And were the paper products used for gift

13  cards?

14     A   They could be used for anything   They

15  manufactured corrugated boxes and they manufactured

16  gift -- they had a gift card application  yes   You

17  could put cards -- they had a patent to put cards

18  on a backer  and that's what they had

19     Q   And that's what Mr  Selby was interested

20  in  was he not?

21     A   Mr  Selby?  You'd have to ask him

22     Q   Mr  Selby never told you that he was

23  interested in a gift card application?

24     A   No   No   He didn't have to tell me   I had

1    been to Fiala's business   I -- I've been to every
2    manufacturer of -- card manufacturer in the United
3    States looking for the best in value and process
4    for our business
5        Q.  But if we go back to paragraph five --
6        A.  But I never advised Mr. Selby or
7    represented him, and he never did an agreement with
8    Fiala.  I mean, Mr. Selby is a very nefarious
9    character who, you know, is presently in federal
10   prison for not telling the truth to a lot of
11   people   I wasn't partners with him   None of what
12   is in this affidavit is true   He made these wild
13   accusations and then folded the case and settled
14   the case, so if you're getting all excited about
15   it, Gordon, there's no validity to anything that's
16   in there and you re going -- we're getting far
17   afield for why we're here   The bottom line is I
18   didn't invest in Mr. Selby   I didn't represent
19   him   There are certain vendors that I used that I
20   befriended, and he was a guy that I tried to help
21   because he was having some problems, and he was a
22   strategic vendor for us if he could ever deliver on
23   some of the things that we were working on
24       Q   Now, in Exhibit 75, you're seeking money

1    against Mr. Fiala -- from Mr. Selby?
2        A.  Yeah. I wanted money back   Yeah
3        Q   And you told us earlier that the company
4    Seltech was in the gift card business, right?
5        A.  I -- no.  Seltech was Selby
6        Q   But I think you told us in my earlier
7    questions that -- that you said in your verified
8    complaint that Seltech was going to operate a
9    business that would sell gift and prepaid card
10   products to Wal-Mart and other retailers   Isn't
11   that what's in Exhibit -- in paragraph seven of
12   Exhibit 75?
13       A   Yes
14       Q   Okay.  Now, let me ask you, did you ever
15   discuss the gift card business opportunity proposed
16   by Mr. Selby with anyone at News America Marketing?
17           MR. PETERS:  Objection to form of the
18       question   Gift card business opportunity?
19       A   Let me just cut to the chase here
20       (BY MR. KATZ)  No, please just answer my
21   question   It's a yes or no --
22       A   Oh, yes, I discussed Blythe Selby and
23   introduced him to everybody in News Corp, and told
24   him about -- he's from Arkansas -- and his

1    relationship with the people at Wal-Mart
2        Q   Did you discuss with anyone at News America
3    Marketing the specific gift card business
4    opportunity proposed by Mr. Selby and which is
5    discussed in your verified complaint?  That's a yes
6    or no question.
7        A   Yes.
8        Q   Who did you discuss it with?
9        A   Everybody
10       Q   Who is everybody?
11       A   Everybody I introduced Blythe Selby to
12       Q   So everybody you introduced Blythe Selby to
13   you also said he has an idea to sell gift cards to
14   Wal-Mart?
15       A   No, no, no   He had   He had the Wal-Mart
16   agreement to sell plastic products   Not just gift
17   cards   All cards   He had a relationship   I met
18   Blythe Selby through one of our manufacturers who
19   said he has some ideas; maybe you can do some
20   things together   So I mean, he had a contract with
21   Wal-Mart that he would deliver to a factory and he
22   was getting a fee, and he had that relationship
23   with Arthur Blank, so he was -- if Blank sold cards
24   to Wal-Mart, Selby was getting a fee   That had

1    nothing to do with us   That was not an opportunity
2    that we had participated in or had an opportunity
3    to do   I mean, he was getting a milli something
4    from the manufacturer as a rep   He was a rep of
5    the manufacturer, not a competitor of ours   There
6    was no concept of usurping a corporate opportunity
7    He was in trouble   He was bringing some good ideas
8    of what we could grow at CCNI or SmartSource
9    Direct, and I thought those ideas would pan into
10   revenue for us
11           The personal problems he had, he duped
12   -- he said I need this to continue and I personally
13   gave him some money and he was going to pay me out
14   of his commissions and he didn't pay me, but it had
15   nothing to do with us   I mean, he was sort of a
16   resource for us that I kept alive, unfortunately.
17       Q   Did you ever receive permission from anyone
18   at News America Marketing to be personally involved
19   with Seltech in the manner you described in your
20   verified complaint?
21       A   I wasn't personally involved with Seltech
22   I had nothing to do with Seltech   I gave Blythe
23   Selby money personally   I had my mother give him
24   money   I wasn't investing in an opportunity   I

1   was helping this poor guy who told me that his son
2   was in an accident and his father was dying.
3   whatever. The answer is people aware of my
4   relationship. professional relationship. with Selby
5   or whatever company he was using. on a personal
6   level. I helped him. which had nothing to do with
7   the company
8       Q   Who did you introduce Mr. Selby to at News
9   America Marketing?
10      A   He would come -- Mr. Lellouche. everybody
11  Mr. Selby would come to Boston and spend time in
12  the Boston office   He would meet me in the News
13  America Marketing office at 1211 Avenue of the
14  Americas   He probably met me in the Wilton office
15  of NAM
16      Q   But who besides Mr. Lellouche did you
17  introduce Mr. Selby to?
18      A   Ms. Raider knew him  Coughlin. whoever was
19  working in the company
20      Q   So you can't think of anybody?
21      A   Michael Cleary   Mr. Selby visited us at --
22  all the secretaries. all the people in the office.
23  all the salespeople. everybody knew Blythe Selby
24      Q   Okay.  Are you familiar with something

1   called the Business Software Alliance?
2       A   Is that the Microsoft thing?
3       Q   Yeah. it's -- Microsoft is part of the BSA
4       A   Yeah
5       Q   Now. prior to its acquisition by NAM. CCMI
6   had been contacted by the BSA because it had
7   pirated the Office software; is that not correct?
8           MR. PETERS:  Objection
9       A   That's not correct   Gordon. you know --
10  why do you have to characterize it as pirating?
11          MR. PETERS:  Let's get through this.
12  Bob
13      Q   (BY MR. KATZ)  You had told others in your
14  office. did you not. to copy existing copies of
15  Microsoft Office because it was cheaper to do that
16  than to go out and obtain additional licenses;
17  isn't that true?
18      A   Untrue   Absolutely totally untrue
19      Q   Do you know who the employee was who
20  informed the BSA of CCMI?
21      A   No idea
22      Q   And how much did CCMI have to pay to BSI --
23  how much did CCMI have to pay the BSA in order to
24  resolve the issues that had been raised?

1       A   De minimus. as far as I know   As far as I
2   remember. we bought some computers from some
3   private vendors that said it was licensed  and some
4   of these issues came up because the computer comes
5   with a set of Office   I don't remember. but if it
6   was more than three or four or 5.000  I'd be
7   surprised
8       Q   I'm going to hand you what's already been
9   marked as Exhibit 38   It is the Stock Purchase
10  Agreement between Robert Fireman. Ann Raider.
11  Curtis Smith. John H. Boyles and News America
12  Marketing In-Store. Inc . dated August 13th. 1999
13  This agreement was entered into almost eight years
14  ago. correct?
15      A   August 13th. 1999
16      Q   And on page 52. you signed it?  And there
17  is a counterpart page 52. so don't be confused
18      A   Yes
19      Q   Both Ms. Raider and you were advised by
20  counsel at Goodwin. Procter & Hoar throughout the
21  preparation of the document?
22      A   Yes
23      Q   Goodwin Procter reviewed drafts of the
24  agreement. made comments and gave you advice.

1   right?
2       A   Correct.
3       Q   And you believe you received very good
4   advice from Goodwin Procter in connection with the
5   agreement. right?
6       A   I don't know.
7       Q   You have some questions as to whether the
8   advice you received from Goodwin Procter was good?
9       A   Yes
10      Q   What are the issues that concerned you with
11  respect to the advice that you got from Goodwin
12  Procter?
13      A   Oh. I don't know   I think it should have
14  been written stronger in our favor. but whatever
15      Q   Okay.  You also received advice regarding
16  the agreement from Les Charm. one of your
17  directors. right?
18      A   Correct.
19      Q   And Mr. Charm negotiated on your behalf
20  with Mr. DeVoe from News America Marketing. right?
21      A   Yes
22      Q   And Mr. Coughlin also had discussions with
23  representatives of NAM prior to the agreement being
24  signed. right?

1      A.  Yes.
2      Q.  Okay.  Do you know whether the other two
3   shareholders of CCMI, Curtis Smith and John Boyles,
4   had any discussions with representatives of NAM
5   prior to the agreement being signed?
6      A.  I don't recall.
7      Q.  And the purpose of the agreement was to
8   document the terms of the sale of your stock in
9   CCMI to NAM, right?
10     A.  I would say so.
11     Q.  Okay.  The Stock Purchase Agreement of
12  August 13th, 1999 was a very important agreement
13  for you, correct?
14     A.  It was an agreement.
15     Q.  Okay.  Had you ever been a party to an
16  agreement that was as important to you as this one?
17     A.  Many, yes.
18     Q.  Okay.  At what time?
19     A.  Over the course of time.
20     Q.  Have you been a party to any agreement
21  other than this that enabled you to receive over a
22  million dollars?
23     A.  Yes.
24     Q.  Identify them, please.

1      A.  I'm going to -- I was -- I mean, there
2   would be -- I can't answer on attorney/client
3   privilege.
4      Q.  No, I'm asking about agreements where you
5   were a party, not agreements where you were the
6   attorney for the party, but --
7      A.  Well, agreements where I was to get fees of
8   more than a million dollars, yes.
9      Q.  So --
10     A.  But I was acting as an attorney in those
11  transactions.
12     Q.  But you've had such agreements --
13     A.  Yes.
14     Q.  -- where you received fees of over a
15  million dollars?
16     A.  Yes.
17     Q.  And how many such agreements have you had?
18     A.  I don't recall.
19     Q.  More than five?
20     A.  I don't recall.
21     Q.  More than ten?
22     A.  I don't recall.
23     Q.  Okay.  In any event, you read the agreement
24  very carefully, did you not?

1      A.  Yes.  I read --
2      Q.  And by that, I mean Exhibit 38.
3      A.  Yes.
4      Q.  And as a lawyer, you had seen formal
5   agreements like this many, many times before,
6   correct?
7      A.  Yes.
8      Q.  Okay.  And you've already told us that you
9   represented sellers of business -- businesses
10  before, right?
11     A.  Yes.
12     Q.  And you've represented sellers of
13  businesses before where they were transferring
14  their stock in the business, right?
15     A.  Yes.
16     Q.  And you've also represented sellers of
17  business where they're transferring assets of the
18  business, right?
19     A.  Yes.
20     Q.  Now, let's turn to page 41 of Exhibit 38,
21  and let me call your attention to paragraph 8.1.
22  You fully understood the meaning of paragraph 8.1,
23  did you not?
24             MR. PETERS:  Objection.  You can answer

1   as to your understanding.  My objection is to the
2   extent it calls for a legal conclusion.
3             MR. KATZ:  I'm only asking for his
4   understanding.
5             MR. PETERS:  I just wanted that clear
6   on the record.  I understand your question that
7   way, but when you see the transcript, it may not
8   read that way, so that's the nature of my
9   objection.
10     A.  I mean, I know -- I know what the clause
11  means.
12     Q.  (BY MR. KATZ)  Okay.  You have seen clauses
13  of this kind many, many times before --
14     A.  Yes.
15     Q.  -- in your over 30 years of practice of
16  law, right?
17     A.  Yes.
18     Q.  And you're aware that this kind of clause
19  is termed an integration clause, right?
20     A.  No.  I'm not familiar with integration
21  clause.
22     Q.  You've never heard the term integration
23  clause --
24     A.  Just in your last deposition.

1    Q    -- in your more than 30 years of law
2    practice?
3    A    No.
4    Q    Okay.  You'd agree with me, though, that
5    provisions like paragraph 8.1 are commonplace in
6    formal written contracts, are they not?
7    A    Yes.
8    Q    Okay.  And when you were preparing
9    agreements, you often put clauses of the nature of
10   8.1 in the agreements that you wrote; is that not
11   correct?
12   A    Yes.
13   Q    Okay.  And could you tell us what the
14   purpose of a clause like paragraph 8.1 is?
15            MR. PETERS:  Objection.
16   A    No.
17            MR. PETERS:  He's not here to provide
18   you legal opinions.
19            MR. KATZ:  Well, what's his
20   understanding of --
21   A    I don't know.
22            MR. PETERS:  Same objection.
23   Q    (BY MR. KATZ)  Why do you think it was
24   included in Exhibit 38?

1    A    I don't know.  It's boilerplate.
2    Q    Okay.  Now, the provision states that this
3    agreement, together with the schedules hereto
4    contain and are intended as a complete statement of
5    all the terms of the arrangements between the
6    parties with respect to the matters provided for
7    and supercedes any previous agreements and
8    understandings between the parties with respect to
9    those matters.  Did I read that correctly?
10   A    You read it correctly.
11   Q    Did you understand what the word supercede
12   meant when it was used in paragraph 8.1?
13   A    I didn't -- I didn't focus on what it
14   meant.  It didn't matter.
15   Q    But you do know what the word supercede
16   means, correct?
17   A    Yes.
18   Q    What do you think supercede means?
19   A    I'm not going to speculate.  It means what
20   it means.
21   Q    Okay.  Let me show you Exhibit 78.
22            (Exhibit 78 marked for identification.)
23   Q    And 78 is an excerpt from Black's Law
24   Dictionary.

1    A    Which version is this?
2    Q    And this is seventh edition.  It's the
3    latest edition that we have in our law library.
4    And do you see on page 1452, which is the second
5    page of Exhibit 78, the definition of supercede?
6    Do you see that?
7    A    Yes.
8    Q    And supercede says -- supercede is defined
9    as to annul, make void or repeal by taking the
10   place of.  Do you see that?
11   A    I see where you read.
12   Q    Okay, and you'd agree with that as a
13   definition of supercede, would you not?
14   A    It's not mine to agree or disagree with
15   Mr. Black.
16   Q    You would take Black as a sufficient
17   authority for the definition of supercede, would
18   you not?
19   A    I haven't met Mr. Black.
20   Q    I just need a yes or no answer.
21   A    It depends.
22   Q    Do you have any reason to disagree with the
23   Black's Law Dictionary of supercede?
24   A    No.  I'm not going to fight with Black's Law

1    Dictionary.
2    Q    Okay.  So you would agree, would you not,
3    that the Stock Purchase Agreement of August 13th,
4    1999 annuls or makes void any previous agreements
5    and understandings between the parties with respect
6    to the matters treated in the agreement; isn't that
7    right?
8            MR. PETERS:  Objection.
9    A    I don't know if that's right.
10   Q    (BY MR. KATZ)  Okay.  Returning your
11   attention to Section 8.1, you understood that the
12   provision meant that the terms of the agreement
13   superceded any oral promises that you or Ms. Raider
14   might have made to Mr. DeVoe or anyone else at NAM
15   about CCMI?  You understood that, did you not?
16   A    No.  I didn't.
17   Q    Okay.  You understood that Section 8.1
18   meant that the terms of the agreement superceded
19   any oral promises that Mr. Charm might have made to
20   Mr. DeVoe or anyone else at NAM about CCMI, did you
21   not?
22   A    No.
23   Q    You understood, did you not, that Section
24   8.1 meant that the terms of the agreement

1    superceded any promises, any oral promises that
2    Mr. Coughlin might have made to Mr. DeVoe or anyone
3    else at NAM about CCMI, right?
4        A.  No.
5        Q.  You understood that the provision in 8.1
6    meant that the terms of the agreement superceded
7    any oral promises that Curtis Smith or John Boyles,
8    the other two directors and stockholders of CCMI,
9    might have made to Mr. DeVoe or anyone else at NAM
10   about CCMI, right?
11       A.  No.
12       Q.  And you also understood that this
13   provision, Section 8.1, meant that the terms of the
14   agreement superceded any oral promises that you
15   thought Mr. DeVoe or anyone else from NAM might
16   have made to you or Ms. Raider, did you not?
17       A.  No.
18       Q.  You understood that the provision in 8.1
19   meant that the terms of the agreement superceded
20   any oral promises that you thought Mr. DeVoe or
21   anyone else from NAM might have made to Mr. Charm
22   when he was negotiating on your behalf, did you
23   not?
24       A.  No.

1    Q.  I'm just saying you don't have any doubt --
2    A.  Are you asking me if they slipped it in?
3    Q.  You're not contending that they slipped it
4    in, are you?
5    A.  Well, now that you raised it, maybe I
6    should look. It's part of the document.
7    Q.  And it was always part of the document?
8    A.  It appears to be part of the document.
9    Q.  And it was part of the document in its
10   initial forms back in June and July of 1999; isn't
11   that right?
12   A.  You'd have to show me the documents in
13   July.
14   Q.  And as you said yourself, it was
15   boilerplate?
16   A.  That's not the question you asked me. You
17   asked me if it was in the prior documents, so show
18   me those and I'll answer.
19   Q.  Right. You said show me, and I said that
20   part of the agreement, Section 8.1, was
21   boilerplate. That was a term that you used?
22   A.  You just asked me if it was part of the
23   earlier versions of those documents.
24   Q.  Right.

1    Q.  But there's no doubt that you read Section
2    8.1 before you signed the agreement; isn't that a
3    fact?
4        A.  No.
5        Q.  Well, I think you told us before, did you
6    not, that you read the agreement?
7        A.  It's boilerplate, Gordon. I don't think I
8    -- I might not have read that clause.
9        Q.  But it was certainly there for you to read?
10       A.  You asked me if there was a doubt that I
11   read it and I answered there could be.
12       Q.  So you may have overlooked reading it? Is
13   that what you're saying?
14       A.  I may have.
15       Q.  But you don't have any doubt that it was
16   included in the document itself before you were
17   asked to sign it?
18       A.  No. It's right there on page 41.
19       Q.  Okay. It wasn't slipped into the document
20   after you signed it, right? You're not suggesting
21   that?
22       A.  You are.
23       Q.  No. I'm not.
24       A.  Oh.

1    A.  And I say if you show me those documents, I
2    will try to locate it.
3    Q.  But I'm moving on to another question, and
4    the other question is Section 8.1 was boilerplate,
5    right?
6    A.  It is a boilerplate clause in lots of
7    agreements, as you asked me before.
8    Q.  Okay. We don't disagree.
9    A.  Well, we do disagree, as I answered no to
10   eight other questions.
11   Q.  Now, you also knew that the agreement could
12   not be amended except by an instrument in writing,
13   right?
14   A.  Are you asking me what the document says --
15   Q.  Yes.
16   A.  -- or what I think it meant?
17   Q.  Well, I'm asking you what you knew, first
18   of all. You knew that this agreement could not be
19   amended except by an instrument in writing; isn't
20   that right?
21       MR. PETERS:  Was that your
22   understanding, I think is Mr. Katz's question, not
23   what the law is, which is not that.
24   A.  I understood that. Yes.

1    Q.    (BY MR. KATZ)  Okay.  That's at Section
2    8.6, right?
3    A.    I don't know.  Do you want me to go to 8.6?
4    Q.    Please.
5    A.    That's what it says.
6    Q.    Okay.  Now, the four sellers of CCMI agreed
7    to sell their stock for $2.8 million in cash,
8    right?
9    A.    No.
10   Q.    Okay.  $2.8 million in cash and the other
11   provisions of the agreement; will you go along with
12   that?
13   A.    Yes.
14   Q.    Okay.  And do you know how the $2.8 million
15   was arrived at?
16   A.    Our request -- we were looking for --
17   Q.    It's just a yes or no question.
18   A.    Yes.
19   Q.    You do know how the $2.8 million was
20   arrived at?
21   A.    I believe so, yes.
22   Q.    Okay.  The $2.8 million was not a multiple
23   of CCMI's earnings from some prior period, right?
24   A.    No.

1    Q.    The $2.8 million had no relation whatsoever
2    to CCMI's prior earnings, right?
3    A.    I don't know.
4    Q.    CCMI in fact had a loss in 1998, right?
5    A.    No.  I think we made money.
6    Q.    Take a look at Schedule 4.6 of Exhibit 38.
7    A.    Of which?  This one?
8    Q.    Of the Stock Purchase Agreement.  Take a
9    look at Exhibit 4.6
10   A.    Schedule or --
11   Q.    It's a schedule, yes.  And I'm going to
12   walk over, because I don't have my schedules with
13   me.
14   A.    I don't see 4.6
15   Q.    Okay.  Maybe it's 4.16.  No.  I was right
16   the first time.  It's Schedule 4.6, titled
17   financial statements, and we're looking at the page
18   that says Consumer Card Marketing, Inc. income
19   statement for the year ended December 31, 1998.  Do
20   you see where I'm reading?
21   A.    Yes.
22   Q.    And so this was the income statement for
23   the year ended December 31, 1998?  That's a yes?
24   A.    I see it.  It's right here.

1    Q.    And this was the income statement that you
2    represented as accurately reflecting the income for
3    Consumer Card Marketing, Inc. for the period ended
4    December 31, 1998?
5    A.    If it is here as an exhibit, that's what we
6    represented.
7    Q.    Okay.  And if we go to the line which says
8    net operating income, at the bottom of the page,
9    you'll see that it shows a loss of $268,143 for the
10   year ending December 31, 1998; isn't that correct?
11   A.    Well, the loss is here at 169.
12   Q.    Okay.  So the net operating loss was
13   $268,143, and the net loss, the loss before taxes,
14   was $169,000 -- $169,066, correct?
15   A.    That's correct.
16   Q.    So there's no doubt that there was a loss
17   on CCMI's part in 1998, right?
18   A.    Correct.
19   Q.    Not a gain, right?
20   A.    From an accounting standpoint, you're just
21   giving me numbers and the numbers show a loss.  If
22   you're asking me what the assets were worth, that's
23   a different question.
24   Q.    Now, do you have a copy of the document

1    that we marked as Exhibit 16?
2    A.    No.
3    Q.    Okay.  Let me hand you a copy of the
4    document we've marked as Exhibit 16
5    A.    I haven't marked anything
6    Q.    No, we've previously marked this at
7    Mr. Coughlin's deposition, and this is a memorandum
8    to you from Mr. Coughlin dated July sixth, 1999.
9    You've previously seen this document before, have
10   you not, Mr. Fireman?  Right?
11   A.    I saw it at the last deposition for
12   Ms. Raider, but I --
13   Q.    Okay.  And if I could call your attention
14   to the numbers that are on Bates stamp page FR
15   2677, would you take a look at that page?  Do you
16   see that page?
17   A.    Yes.
18   Q.    And do you see the column of actuals that
19   are on the left side of the page?
20   A.    I see where it's titled actuals
21   Q.    And these are actuals with respect to
22   revenue and expenses and gross profit for CCMI,
23   right?
24   A.    I don't know.

1    Q   Isn't that what the document purports to
2   be?
3            MR. PETERS:  Objection to the form of
4   the question.
5    Q   (BY MR. KATZ)  Okay.
6    A   I don't -- I don't know what these
7   documents purport to be, and I don't know that they
8   were always together like you have them here.  I
9   mean, this seems to be a series of different
10  documents that someone has tied together.
11   Q   Right.  They were -- they were put together
12  as they were produced.  You'll see that the numbers
13  --
14   A   It does not mean they were part of this
15  original memorandum.
16   Q   Do you have any doubt that FR 2677 was not
17  prepared by Mr. Coughlin?
18   A   Yes, I do have doubts.
19   Q   You think Mr. Coughlin didn't prepare 2677?
20   A   I don't think he did.
21   Q   Who do you think did?
22   A   I think Julie Openshaw did.  Mr. Coughlin
23  was working with the person at News America to come
24  up with some numbers we could all live it.  While

1    Q   Would you agree with me that CCMI's revenue
2   in 1997 was approximately $7.9 million?
3    A   $8 million.
4    Q   $8 million?
5    A   By these numbers, yes.
6    Q   And you don't have any reason to dispute
7   that, right?
8    A   No.
9    Q   And do you believe that in 1997, CCMI had a
10  profit of approximately $403,000?
11   A   I don't know.
12   Q   Okay.  In 1996, CCMI's gross revenue was
13  just barely over 2.5 million, right?
14   A   By this document.
15   Q   Okay.  Do you have any reason to doubt it?
16   A   No.
17   Q   And according to this document, in 1996,
18  CCMI had a loss of $72,000.  Do you see that?
19   A   Yes.
20   Q   Okay.  Do you have any reason to doubt that
21  CCMI had a loss of $72,000 in 1996?
22   A   Well, I don't -- I would ask you who wrote
23  those numbers and why are they here?  They don't --
24   Q   I'm just asking a yes or no question.

1   -- she's talking.  I couldn't create Julie's
2   spreadsheet.  I mean, the memo talks like these are
3   her numbers and he was raising some issues within
4   it.
5    Q   Okay.  Well, irrespective of the answer to
6   that question, let me ask you a few other
7   questions.
8    A   And obviously, the earn-out summaries that
9   are attached here from years later were not part of
10  the memo.
11   Q   No question.  We don't disagree.
12   A   So you've attached a lot of documents that
13  aren't germane to the memo.
14   Q   Well, let's go to my questions, because
15  they're less related to the memo than they are to
16  some facts.  In 1997, according to the documents
17  here, CCMI's earnings were just barely $400,000 on
18  gross revenue of $7.9 million.  Do you see where
19  that's reflected on FR 2677?
20   A   I see the number 403K on the bottom, if
21  that's what you're referring to.
22   Q   Okay.  And you see on the total revenue
23  line the number of 7,916,762?  Do you see that?
24   A   Yes.

1    A   Well, I don't know.
2    Q   Okay.  How much cash did you receive from
3   the $2.8 million?
4    A   I don't remember.
5    Q   You received $1.3 million; isn't that
6   right?
7    A   Approximately.
8    Q   Okay.  And did you or Ms. Raider share any
9   of your up-front cash with Mr. Adam or Mr. Coughlin
10  or anyone else from CCMI?
11   A   I don't remember.
12   Q   Okay.  Now, Mr. Adam expected that he was
13  going to receive something from the proceeds of the
14  sale of the company, did he not?
15   A   You'd have to ask him.
16   Q   Yeah, he discussed this with you, did he
17  not?
18   A   I don't remember.  I know that he had some
19  options and there was some discussion, but I don't
20  really remember what happened.
21   Q   Did you ever write Mr. Coughlin or Mr. Adam
22  a check out of the approximately $1.4 million you
23  received --
24   A   I might have.

1    Q.   -- in consideration of his options --

2    A.   I might have.

3    Q.   -- or their options?

4    A.   I might have.

5    Q.   You don't remember as you sit here today?

6    A.   No.

7    Q.   Now, you had a five-year employment

8    agreement with News America Marketing, right?

9    A.   Correct.

10   Q.   And you began with a salary of $163,000

11   under your News America Marketing employment

12   agreement, right?

13   A.   If that's what it says, yes.

14   Q.   You don't have any reason to doubt that?

15   A.   No.

16   Q.   And News America Marketing gave you a

17   salary increase every year, right?

18   A.   Don't remember.

19   Q.   And these increases were all discretionary,

20   right?

21   A.   I don't remember.  I think we were supposed

22   to get treated commensurate to how senior

23   executives in the company were being treated.

24   Q.   And salary increases for senior executives

1    were discretionary, right?

2    A.   I assume, yes.

3    Q.   Now in fact, your salary went up

4    immediately upon News America Marketing's

5    acquisition of CCMI, right?

6    A.   Don't remember.

7    Q.   You were only making $153,000 at the time

8    of the acquisition in 1999, right?

9    A.   I don't remember.  I mean, I was -- I put

10   up lots of money invested into CCMI.

11   Q.   Take a look at Schedule 4.13 of Exhibit 38.

12   A.   If it says that was my salary, then that's

13   probably true.

14   Q.   Okay, so --

15   A.   Whether --

16   Q.   Take a look at it and just confirm for me

17   that what you represented that you were making

18   prior to the acquisition was $153,000.

19   A.   What number?

20   Q.   Schedule 4.13.

21   A.   I can't find it.

22   Q.   4.13 of the Stock Purchase Agreement.

23   A.   I'm listed at 153,000, correct.

24   Q.   Now, besides the $153,000 salary which you

1    were receiving from CCMI, did you receive anything

2    else from CCMI prior to the acquisition as

3    compensation?

4    A.   I don't remember.

5    Q.   Back to your employment agreement with News

6    America Marketing, you received discretionary

7    bonuses under your News America Marketing

8    employment agreement under all but the last of the

9    five years of your employment agreement, right?

10   A.   I don't recall.

11   Q.   You don't recall NAM granting you as much

12   as about $30,000 as a discretionary bonus in one or

13   more years under your employment agreement?

14   A.   No.

15   Q.   News America Marketing was not obligated to

16   grant you any discretionary bonuses under your

17   employment agreement, was it?

18   A.   I don't know.

19   Q.   But you do remember getting bonuses under

20   your employment agreement?

21   A.   There was a personal bonus, there was a

22   corporate bonus, there was an annual review, and I

23   participated in it until the end, or until the last

24   year.  I think there was another year that I got a

1    questionable mark or something.

2    Q.   Now, you received formal written

3    evaluations by your superiors at News America

4    Marketing during each of the years of your

5    employment at News America Marketing, right?

6    A.   Formal written what?

7    Q.   Formal written evaluations.

8    A.   There was an appraisal, self-appraisal

9    process, yes.

10   Q.   And you received evaluations from your

11   superiors --

12   A.   Yes.

13   Q.   -- regarding your performance, right?

14   A.   Yes, except the last year when I wasn't

15   afforded the process.

16   Q.   Okay.  For the most part, the reviews News

17   America Marketing gave you were very favorable,

18   were they not?

19   A.   Yes.

20   Q.   And while you were employed at News America

21   Marketing, you were a managerial employee part of

22   the time, right?

23   A.   I was supposed to be.

24   Q.   And as a managerial employee, did you

1    believe that you had fiduciary duties to News
2    America Marketing.
3              MR. PETERS:  Objection.
4    Q.  (BY MR. KATZ)  It's a yes or no
5    A.  I don't know
6    Q.  Were you bound by a code of ethics while
7    you were at News America Marketing?
8    A.  A code?
9    Q.  Yes
10   A.  A News America code?
11   Q.  Yes.
12   A.  That's -- if there was a code of ethics in
13   an employee journal. I don't know  I don't recall
14   Q.  You don't remember reading a code of ethics
15   provided by News America Marketing?  Is that what
16   you're saying?
17   A.  I don't recall a specific code of ethics
18   document right at this moment, no
19   Q.  But you can't say one way or the other
20   whether or not you actually read it?  Is that what
21   you're saying?
22   A.  I can't recall actually reading a specific
23   document.
24   Q.  Do you ever remember seeing a specific

1    (1:02 )
2    Q.  (BY MR. KATZ)  We're back on the record
3    Apart from the cash that you received as part of
4    the sale of CCMI to News America Marketing. you
5    also received the opportunity to receive earn-out
6    payments as part of the 1999 Stock Purchase
7    Agreement. correct?
8    A.  Yes
9    Q.  And you also received the opportunity to
10   receive a bonus on top of the earn-out if the gross
11   margin exceeded certain benchmarks in years one and
12   two after the acquisition. right?
13   A.  Yes
14   Q.  What is the purpose of an earn-out from a
15   buyer's prospective?
16   A.  Well. the purpose was to --
17   Q.  From the buyer's perspective
18   A.  -- make additional money for the sale of
19   your business
20   Q.  No. no  That's the seller's perspective
21   From the buyer's perspective. what's the purpose of
22   an earn-out?
23   A.  Make additional money from the sale of your
24   business  Two and two equals six  The purpose of

1    document relating to a code of ethics coming from
2    News America Marketing?
3    A.  Not today
4    Q.  If you as an employee of News America
5    Marketing saw someone in the company taking
6    advantage of what could be a corporate opportunity.
7    did you believe that you had a duty to report it to
8    News America senior executives?
9    A.  Yes
10   Q.  Have you ever traded in stock or stock
11   options of News Corp.?
12   A.  No. only there was some warrants given some
13   employees.
14   Q.  Okay
15   A.  Other than that. no
16   Q.  And did you exercise your warrants?
17   A.  I think at the end I did  yes  I had to or
18   I'd lose them or something
19   Q.  But apart from the exercise of your
20   warrants  you've done no other trading in News
21   Corp  Stock or News Corp. options?
22   A.  Not to my knowledge.
23        (Off the record )
24        (Lunch recess taken from 12:16 to

1    -- it's the buyer's perspective as well
2    Q.  Okay
3    A.  The -- the deal was structured -- I mean.
4    we were looking for eight million in down payment.
5    so if you -- it's the ability -- David DeVoe says I
6    can only pay three in cash  That was his capital
7    available  And he structured two two-and-a-half
8    million dollar bonuses for year one and year two --
9    that's the super bonus -- giving us the chance to
10   get the $8 million  The balance of the earn-out
11   was a formula that he created for additional
12   earn-outs. growing the plan. as you so know. to
13   $50 million in four or five years
14   Q.  Okay.  But there was no guarantee of any
15   earn-out payment in the agreement. right?
16   A.  No. there was no guarantee
17   Q.  And there was no guarantee of any bonus if
18   the gross margin exceeded the stated benchmarks
19   right?
20   A.  Exceeded?
21   Q.  There was no guarantee of a bonus regarding
22   the super bonus that you just mentioned before; the
23   super bonus wasn't guaranteed. right?
24   A.  Well. the first number for the first year

1  was so easily attainable if the company just
2  followed the plan that we laid out and that was
3  agreed upon between News America and CCMI. We were
4  just achieving a number that we had already
5  obtained in an exploding emerging marketplace. I
6  mean, I understand your questions, and you keep
7  mentioning gross, whether we earned money or lost
8  money. This acquisition wasn't based on the
9  earnings or the revenue of CCMI. It was based upon
10 the emerging marketplace in loyalty marketing that
11 was about to explode, and every supermarket in the
12 country and then every retailer in the country was
13 about to either enter into or consider seriously a
14 loyalty program, and CCMI was one of one or two
15 companies in the country that had the expertise and
16 the ability to execute those programs. So I mean,
17 we were a development stage company and ready to
18 explode. The achieving of the revenue was a given
19 if we could just maintain a market share. If we
20 could have the three things that we needed; the
21 sales force, some funding to expand the software,
22 and some capital.
23    Q    Okay. The earn-out and the bonus were
24 contingent on how well CCMI performed after the

110

1  acquisition of your stock, right? You'd agree with
2  that?
3     A    The earn-out was a factor of how well the
4  two companies executed the plan --
5     Q    Okay.
6     A    -- that was agreed upon, which was implicit
7  in the agreement. I mean, you've got a clause
8  there that says bonus. The reason for the bonus is
9  the plan.
10    Q    And -- but the plan is nowhere mentioned in
11 the Stock Purchase Agreement, is it?
12    A    It's implicit in the stock agreement. It's
13 all about the plan.
14    Q    But the word plan is never mentioned in the
15 Stock Purchase Agreement itself, right?
16    A    Yes.
17    Q    Where?
18    A    It refers to --
19    Q    Let's get out Exhibit 38 and show me where
20 the plan is mentioned.
21    A    The whole document is about the plan.
22         MR. PETERS: You're asking the witness
23 to find the word plan?
24         MR. KATZ: Yes.

111

1         MR. PETERS: Okay.
2     A    Well, I'll be here all day to do that.
3     Q    (BY MR. KATZ) And the reason for that is
4  you could go through all of the many pages of the
5  documents and you'll never find reference to any
6  particular business plan, correct?
7     A    But the numbers that are in the document as
8  far as the earnings -- which section is it? Two?
9     Q    2.3?
10    A    Yeah. These numbers are from the plan.
11 The plan is implicit in the numbers. When they say
12 16.8 or 14.5, it's based on the plan. It might as
13 well say 850 percent, so shall be increased by an
14 amount equal to 16.8 --
15    Q    Of what?
16    A    Of the gross margin based on the plan. In
17 the exhibit you showed me --
18    Q    It doesn't say based on the plan, does it?
19    A    Well, it's based on the earnings of the
20 company, which is based on the plan. Fine.
21    Q    But it never says anything about based on
22 any plan, right?
23    A    The word is not there, but it's so
24 implicit. It's incorporated. It's what the deal

112

1  was. If you're saying that this agreement is not
2  the agreement. I mean, these are just numbers.
3  They referred to a business deal, a basis of a
4  bargain that was created between two companies, and
5  these are just the numbers that reflected the
6  numbers.
7     Q    Let's go to paragraph 6.8 of Exhibit 38.
8     A    Sure.
9     Q    You're familiar with paragraph 6.8 of
10 Exhibit 38?
11    A    Yes.
12    Q    You were not happy with the inclusion of
13 this paragraph in the Stock Purchase Agreement,
14 were you?
15    A    I don't think I was happy or unhappy.
16    Q    Read it carefully.
17    A    I understand this.
18    Q    You've read paragraph 6.8?
19    A    Yes.
20    Q    You objected to the inclusion of paragraph
21 6.8 in the Stock Purchase Agreement, did you not?
22    A    We negotiated the contract. I mean, Les
23 Charm negotiated the contract.
24    Q    But when paragraph --

113

1     A    6.8 was discussed
2     Q    And when it was first -- when paragraph 6.8
3   was first proposed, you or Mr. Charm on your behalf
4   objected to it, correct?
5     A    Well, I don't think it was in this form
6   when it was first presented.
7     Q    What form was it in?
8     A    Let's just cut right to the chase.  There
9   was -- this bit about sole and unfettered judgement
10  was the issue.
11    Q    And --
12    A    And the issue was discussed and I think
13  this case was modified and there was discussion,
14  you know, and the discussion was that yes, we would
15  agree on a plan and we would discuss issues and
16  budgets and personnel and how to run the company,
17  and if there had to be a disagreement after
18  everything that was done, they get an extra vote.
19  They had the judgement.  It was their money.  We
20  worried about the clause and they added -- I
21  believe they added this beginning saying that yeah,
22  there's a plan and the plan was it's the intention
23  of the current -- of the company to utilize the
24  buyer's sales force, assist the company in the

1   creation of the relationships, and invest in the
2   software.  Those were the three keys of what we
3   needed.
4     Q    Okay.
5     A    And that was put in there to say yes, well,
6   we're not just saying we're not going to do
7   anything.  I mean, it wasn't like in their sole and
8   unfettered judgement they could walk in the next
9   day and close the company, fire the people, shoot
10  everybody.  I mean --
11    Q    And of course they didn't do that, did
12  they?
13    A    Well, they did some of it.  They --
14    Q    They didn't close the company, right?
15    A    Well, they broke up the company.  They
16  broke up the creative core of the company.
17    Q    In your opinion.
18    A    They fractionalized people's
19  responsibilities, including my own, and they took
20  apart something that was the most young and
21  exciting company in its field just at the time when
22  the critical nature of the expansion was there.
23    Q    Okay.  Now, in the first sentence of
24  paragraph 6.8, the paragraph which -- or the

1   sentence which you just read, News America
2   Marketing did not guarantee that it would provide
3   any particular level of support to the CCHI
4   business, did it?
5     A    Well, David DeVoe guaranteed that he was
6   honest, that he would execute the plan, and that he
7   would do what we agreed to do, but he told me, and
8   when Ann got back to him on this thing, he told her
9   that that was just a bunch of legalese and it meant
10  he could integrate the company somewhere else.  And
11  I said to Ann, do you trust David DeVoe?  And she
12  says I trust him.  But you know, the words were
13  inserted here, and I don't remember the full level
14  of the negotiations, but to offset that final vote
15  sort of thing, NAM put in here that they -- we
16  could utilize their sales force, we could take
17  those 200 manufacturers representatives and empower
18  them with our products, that we could utilize the
19  -- their relationships and use the money in a way
20  that we agreed we needed to do.  It was our plan.
21  A million and a half dollars in capital was what I
22  was going to spend in our discretion as we saw fit
23  to build the business.  The marketplace was just
24  changing.  I mean, the -- EFT's supermarkets did

1   not have terminals.  To really -- the questions --
2   I mean, if I can explain --
3     Q    Well, we'll get a chance to do that.
4     A    Okay.
5     Q    But I really just want you to answer my
6   questions yes or no or I don't know, and if my
7   questions are open-ended, you can expound, but
8   please keep to the questions -- please keep your
9   answers to the questions, because we don't have all
10  the time in the world.  Do you understand?
11    A    Yes.
12    Q    And I'm going to ask you one more time.
13  The first sentence of paragraph 6.8 does not
14  guarantee that NAM is going to provide any
15  particular level of support to the business of
16  CCHI, right?
17    A    Wrong.
18    Q    Okay.  This first sentence in paragraph 6.8
19  does not say that NAM must provide support for the
20  business of CCHI, right?
21    A    Wrong.
22    Q    Okay.  Now, you have heard, have you not,
23  that it's NAM's policy to add head count only after
24  the -- after the business materializes?  You've

1  heard that before. have you not?

2      A.  No.

3      Q.  Have you ever heard the expression head

4  count follows business?

5      A.  Yes.

6      Q.  Used at NAM?

7      A.  No.

8      Q.  You've never heard that expression used at

9  NAM?

10      A.  I have no recollection of that.

11      Q.  Okay.

12      A.  We weren't asking for head count.  We were

13  asking for the existing head counts.  The intent of

14  this thing was to utilize the existing head count.

15  What else did we need them for?

16      Q.  When I asked you a moment ago whether NAM

17  was guaranteeing a particular level of support to

18  the business of CCMI. you suggested the answer was

19  yes. correct?

20      A.  Yes.  We had a deal.

21      Q.  Okay.  Where in the language of the first

22  sentence of 6.8 do you infer that NAM was

23  guaranteeing some level of support -- some

24  particular level of support to the business of

118

1  CCMI?

2      A.  NAM added the language that was just the

3  basic of a lot of things they promised as the basis

4  of the bargain of the deal. that they were going to

5  do this in good faith and that we were going to

6  grow the business together. and it says right here.

7  utilize buyer's sales force in order to promote the

8  sale of the company's products. assist the company

9  in the creation of long-term relationships with

10  retailers. invest in the software and hardware as

11  needed to expand the company's business.  Those

12  were the core.  That was the core of the basis of

13  the bargain and there were other promises as part

14  of it.  I mean. they were taking talents

15      Q.  Let me come back.  Again. Mr. Fireman. we

16  will do a lot better if you just answer my

17  questions yes or no when it calls for a yes or no

18  answer.  This one. let me just rephrase the

19  question and see if you can answer it.  Can you

20  show me the word guarantee in the first sentence of

21  paragraph 6.8?

22      A.  No.

23      Q.  Can you show me the word required in the

24  first sentence of paragraph 6.8?

119

1      A.  No.

2      Q.  Can you identify to me any doors of

3  customers which were opened for CCMI's products by

4  NAM's sales forces?

5      A.  When?

6      Q.  During the period of time you were at NAM?

7      Q.  Over five years?

8      Q.  Yes.  Mm-hmm.

9      A.  What sales forces?  I mean --

10      Q.  Well. the sales force that's referred to in

11  the first sentence of paragraph 6.8

12      A.  We never got them.

13      Q.  There was no one from the NAM sales force

14  that assisted the business of CCMI?

15      A.  When we made the deal. NAM had --

16      Q.  I'm not talking about the deal.  I'm

17  talking about the five years in which the earn-out

18  applied

19      A.  Sure.  There was some people here or there.

20  Go ahead.

21      Q.  So you agree that there were people in the

22  sales force at NAM who opened doors of customers

23  for CCMI products?  Isn't that right?

24      A.  De minimus.

120

1      Q.  Okay.  Did you have any customer meetings

2  whether they led to a sale or not. which came about

3  because someone in the CCMI or the SSD division --

4  I'm sorry: someone other than those in the CCMI or

5  SSD division was able to open a door for you?

6      A.  Gordon. there were lots of things that

7  happened over five years.  If you really want to

8  understand what 6.8 means --

9          MR. PETERS:  He's asking you a

10  different question.

11      Q.  (BY MR. KATZ)  I'm asking you a different

12  question right now.

13      A.  The answer is of course I would meet with

14  somebody from time to time.

15      Q.  Right.  So the sales force at NAM was

16  successful in facilitating sales meetings which you

17  and other members of the CCMI or SSD division

18  participated in?

19          MR. PETERS:  Objection.

20      A.  No.

21      Q.  (BY MR. KATZ)  There weren't?

22      A.  Not this sales force. not those kinds of

23  meetings.

24      Q.  You're sure about that?

121

1    A.  This clause meant to us that a 240-man
2   existing firm's salespeople would be utilized to
3   represent that to the packaged goods world and it
4   was supposed to start immediately.  They -- they
5   fired half their people, merged the forces and
6   never told us, and that happened prior to this
7   closing and they didn't represent it.  They
8   fraudulently induced us into this agreement with no
9   intent of good faith implementing it.
10   Q.  But you had no claim for fraud in this
11  case, correct?
12   A.  Only because the statute of limitations
13  ran, or else this is the biggest fraud case that we
14  could ever have.
15   Q.  But the statute of limitations --
16   A.  Within three months of this deal, they
17  broke every promise they ever made.
18   Q.  And notwithstanding that, you never brought
19  suit within the limitations period, right?
20   A.  Not within the limitations for fraud, but
21  we did bring suit.  We brought suit earlier.
22   Q.  Prior to the 2005 suit?
23   A.  We did file a suit back in --
24   Q.  When did this occur?  When was the first

1  suit?
2   A.  After we were reprimanded and threatened by
3  the chairman, after they were breaking up the
4  company, after we sent letters of protest and we
5  got nowhere, we believed that they were going to
6  sue us and throw us out, and that they had so
7  turned around this thing, that they had so little
8  intent on building our plan, that their focus was
9  on other businesses that we engaged counsel and we
10  entered a complaint fearing that we were going to
11  be sued in New York by News Corp., News America
12  Marketing.
13   Q.  And did you file that complaint?
14   A.  Yes.
15   Q.  Where?
16   A.  Suffolk Superior Court.
17   Q.  When did you file that report?
18   A.  Sometime in 1999 or 2000, early 2000.  I
19  don't remember.
20   Q.  Did you ever serve the complaint?
21   A.  No.  We had to bring suit in New York,
22  which we couldn't afford to defend.
23   Q.  So you weren't sued in New York?
24   A.  No.

1   Q.  You were never sued by NAM in New York,
2  right?
3   A.  Our people were being threatened.  Our
4  people were being forced to leave.  We had been
5  reprimanded for protesting that they're not doing
6  the bargain.  We were called to the chairman of the
7  board's office and he says behave or you're through
8  here.  And we felt like they were just -- they
9  tried to take our technology and our know-how and
10  throw us out the door.  We engaged counsel, and
11  part of that is privileged, but we did enter a
12  lawsuit, and when we weren't sued by News, we tried
13  to make the best and execute the plan and hope that
14  they would change their mind.
15   Q.  And you voluntarily withdrew your suit?  Is
16  that what happened?
17   A.  Yes.  I believe we left it or we -- I don't
18  remember.
19   Q.  Did you inform anyone at NAM that you had
20  filed suit?
21   A.  No, we did not.  We didn't serve anybody
22  and we wanted to make the deal work.  I mean, Ann
23  Raider -- Ann Raider was -- her father was ill, her
24  son was ill.  She had a kid in college

1   Q.  What SmartSource Direct product was the CPG
2  national sales force supposed to be selling?
3   A.  All of it.
4   Q.  Everything?
5   A.  To ask the question means you don't really
6  understand the business we were in.  I mean, let me
7  explain, okay?  Supermarkets had just gotten credit
8  card -- electronic funds transfer.  The ability to
9  take a check cashing card and put a mag stripe or a
10  bar code and identify someone's customer base was
11  about to emerge in 2,000 in 40,000 supermarkets.
12  Coca-Cola had just done a study validating that
13  every retailer should be going to one to one
14  marketing and understanding its business.  There
15  was parity in the supermarkets.  They had to retain
16  their customers and they didn't know who they were.
17      For years, Ann and I had gone around
18  and were singing the message and we had a
19  relationship hopefully with every retailer in the
20  country.  They were about to make the decision.  And
21  for us to execute, we needed a sales force to go
22  and tell the packaged goods people that we could
23  deliver --
24   Q.  I'm going to ask --

1    A   I'm going to answer the question.  You said
2    not to interrupt you.  You should not interrupt me.
3    Q   Okay.  Well, I don't think you're answering
4    the question.  Since we have limited time, we have
5    limited time.  I want to move and I want to again
6    ask you to just answer the question.  If you don't,
7    we're going to stay here as long as necessary
8    because it's not our fault that it's taking longer
9    for you to answer the question.  Your speeches are
10   on your time, not on our time.
11   A   You asked me a question.  I gave you my
12   best answer.
13   Q   Okay.  Well, just listen to the question
14   and answer the question.  Don't give me speeches
15   that are unrelated to the question I ask.  Do you
16   agree?
17   A   Well, I don't agree that that's what I was
18   doing a minute ago.
19   Q   Okay.  Now, you would agree, would you not,
20   that News America Marketing made efforts to help
21   News America Marketing -- or rather help CCMI
22   establish long-term relationships with retailers;
23   isn't that right?
24   A   No.

1    Q   Didn't NAM help CCMI land Giant?
2    A   No.
3    Q   Didn't NAM help CCMI land Kroger?
4    A   You're asking a general question.  We had
5    relationships with Kroger and with Ahold prior to
6    NAM.
7    Q   But didn't NAM help to some degree?
8    A   Sometimes it helped and sometimes it hurt.
9    They didn't have the best reputation with the
10   supermarkets.
11   Q   Now you're making a speech.  I asked for
12   just a yes or no answer.
13   A   I answered it.
14   Q   Didn't NAM make efforts to assist you to
15   land K-Mart as a client?
16   A   I was working for NAM a hundred percent.
17   If I was going to K-Mart, I was going to K-Mart as
18   NAM, so did NAM -- did my employer -- I don't
19   understand the question.
20   Q   Didn't others at NAM besides those in the
21   SSD division assist you in reaching out to K-Mart?
22   A   The K-Mart situation -- K-Mart was in
23   bankruptcy.
24   Q   I just want a yes or no.

1    A   No, no.  No.  There was a NAM office in
2    K-Mart and yes, through that person, I reached
3    somebody.
4    Q   Okay.
5    A   One of the few.
6    Q   Now, NAM assisted you in making a marketing
7    alliance with Airtime Technologies, correct?
8    A   No.
9    Q   Okay.  Let's mark as Exhibit 79 a press
10   release from News America Marketing titled News
11   America Marketing announces alliance with Airtime
12   Technologies to distribute next generation in
13   stored value and prepaid products.
14       (Exhibit 79 marked for identification.)
15   Q   NAM publicized the making of the marketing
16   alliance with Airtime Technologies, did it not?
17   A   Yes.
18   Q   And didn't the legal department of NAM
19   assist CCMI?
20   A   No.
21   Q   Never?
22   A   The legal department?
23   Q   Yes.  Didn't Mr. Lippner assist even you on
24   legal matters which came up during your employment

1    with News America Marketing?
2        MR. PETERS:  Which -- do we have
3    another question now?
4        MR. KATZ:  I think I just asked the
5    question.  I said didn't Mr. Lippner --
6        MR. PETERS:  I think you had a question
7    pending when you asked another question, Gordon.
8    That's the only reason I mention it.
9    Q   (BY MR. KATZ)  I asked didn't Mr. Lippner
10   assist even you in legal matters which came up
11   during your employment.
12   A   Yes, I worked with Mr. Lippner and
13   Ms. Constantine, but they didn't -- I mean --
14   Q   And there's no doubt that News America
15   Marketing invested in software and hardware for
16   CCMI, right?
17   A   Yes, there's a doubt, and it has nothing to
18   do with this here.
19   Q   I didn't say it did.  I'm asking you a
20   different question.
21   A   Do you want to know what happened with
22   Airtime?
23   Q   No, I'm asking a different question.
24   There's no doubt that News America Marketing

1 invested in software and hardware for CCMI, right?

2     A   The investment in software and hardware was

3 totally mismanaged, mishandled. The answer is I

4 don't believe they did. The answer is no.

5     Q   They didn't invest? Is that your answer?

6     A   No. That's my answer.

7     Q   So you're saying under oath that News

8 America Marketing never spent a dime for hardware

9 or software for CCMI?

10     A   No. I'm not saying that.

11     Q   Okay. You remember the Epiphany software

12 system?

13     A   Oh. I do very well.

14     Q   Okay, and you remember the hardware that

15 went with it, right?

16     A   No. I had nothing to do with the hardware

17 that went with it.

18     Q   You just know about the software? Is that

19 what you're saying?

20     A   I know what happened with the purchase of

21 Epiphany and the development of the Aspen system.

22     Q   Okay. And the Epiphany software and the

23 related hardware were a $2 million investment on

24 News America Marketing's part, right?

1     A   Don't know. I wasn't involved. I was

2 taken off of that assignment.

3     Q   Okay, so you don't know that the investment

4 was in the neighborhood of $2 million for the

5 Epiphany software and related hardware?

6     A   I know it was totally unnecessary.

7     Q   Again, you have to answer --

8     A   I don't know. I have no personal knowledge

9 of what they spent other than what they showed me

10 in the earn-out.

11     Q   Okay, and they showed you, did they not,

12 that the total amount that was spent for the

13 Epiphany software and hardware was approximately

14 $2 million?

15     A   No, they showed me that they applied 900 or

16 a million one of it to CCMI --

17     Q   And that wasn't --

18     A   -- because they bought unlimited seats for

19 other NAM purposes of the software.

20     Q   But that wasn't the entire cost of the

21 Epiphany software and related hardware, was it?

22     A   But it wasn't for SmartSource Direct. It

23 was for News America Marketing's other systems and

24 businesses.

1     Q   Okay. Well, let's go back. You and Bill

2 Adam first discovered the Epiphany system, right?

3     A   We were asked -- what do you mean

4 discovered?

5     Q   Well, you brought it to News America

6 Marketing's attention, the Epiphany system, right?

7     A   CCMI had developed millions of dollars of

8 marketing analysis system. We were either going to

9 expand it or we were going to look at building or

10 buying a system.

11     Q   I have to ask you to just answer my

12 question.

13     A   Bill Adam and I went to look at different

14 softwares that were in the space for what they call

15 customer relationship marketing.

16     Q   And you found Epiphany?

17     A   We benchmarked Epiphany.

18     Q   And you brought it to the attention of

19 others at News America Marketing, right?

20     A   Yes.

21     Q   Okay. And you proposed that your

22 supervisors at News America Marketing recommend

23 that it be purchased, right?

24     A   No.

1     Q   And News America bought it with its funds

2 to develop the Aspen program for CCMI, correct?

3     A   Aspen is a small part of it.

4     Q   But it was part of it?

5     A   Supposedly. Was supposed to be.

6     Q   Now let's go to the second sentence of 6.8.

7 Okay? Are you with me? Second sentence of

8 paragraph 6.8, are you with me?

9     A   Yeah.

10     Q   Okay. It says notwithstanding the

11 foregoing, the buyer shall be free to operate the

12 company and its affiliates in its sole and

13 unfettered judgement and seller shall have no claim

14 against buyer in connection therewith as a result

15 of the preceding sentence. We can agree that this

16 language is not ambiguous, right?

17     A   No.

18     Q   You believe it's ambiguous?

19     A   Yes.

20     Q   What do you think is ambiguous about it?

21     A   It doesn't really state the substance of

22 what the judgements are. I mean, it -- it's --

23 implicit in this contract, as I've told you, is the

24 basis of the bargain that we made, and when we got

1   to negotiate those terms  it meant that they would
2   execute the business plan  provide us with the
3   sales force --
4        Q.  Again  Mr  Fireman  it was just a yes or no
5   question.
6        A.  I answered it.
7             MR  PETERS:  No.  No.  Didn't you ask
8   the question what's ambiguous about this?
9             MR  KATZ:  You're right   I stand
10  corrected.
11       A.  I'm telling you.  It's ambiguous in that it
12  meant all those things to us and to them
13       Q.  (BY MR  KATZ)  Okay   let's take a look at
14  the second part of the second sentence   It says
15  that sellers shall have no claim against buyer in
16  connection therewith as a result of the preceding
17  sentence  Do you see that?  Hello?  Do you see
18  that?
19       A.  I'm looking   I'm looking
20       Q.  I'm focusing on the words sellers shall
21  have no claim against buyer in connection therewith
22  as a result of the preceding sentence
23       A.  Okay   I see it
24       Q.  Okay   By entering the Stock Purchase

1   meant that after debate and good faith negotiations
2   we couldn't come to some understanding about how we
3   were going to execute the plan  they would get the
4   final vote  only after they exercised good faith
5   and did it   They didn't do it   So this clause is
6   related to that
7        Q.  (BY MR  KATZ)  But where does it say
8   there's going to be a vote?
9        A.  I'm telling you what it meant to us
10       Q.  But where in the language does it say there
11  was going to be a vote?
12       A.  It's implicit in the language  sir
13       Q.  And what effect  if any  do you think
14  paragraph 8 1 has on your contention that it's
15  implicit in the language?
16             MR  PETERS:  Objection
17       A.  None
18       Q.  (BY MR  KATZ)  Do you remember getting a
19  release from Mr  Adam and Mr  Coughlin in
20  connection with their claim relating to their stock
21  options in CCMI?
22       A.  No
23       Q.  Now  the second sentence gave News America
24  Marketing the freedom to operate the CCMI business

1   Agreement  you promised not to sue CCMI -- not to
2   sue NAM from any -- with respect to any future
3   claim regarding how it ran the CCMI business.
4   right?
5        A.  Wrong
6        Q.  We can agree  can we not  that the second
7   sentence that you as the buyer signed was language
8   which could be -- which could be viewed as a
9   covenant not to sue  can we not?
10             MR  PETERS:  Objection
11       A.  Absolutely not
12       Q.  (BY MR  KATZ)  You've seen covenants not to
13  sue in your practice of law  right?  Right?
14       A.  Probably  yes
15       Q.  Okay   Now  tell me why the language in the
16  second sentence of paragraph 6 8 is not a covenant
17  not to sue
18             MR  PETERS:  Objection   You can
19  answer
20       A.  In the agreements I've seen covenants not
21  to sue  they're big headers  covenants not to sue
22  and big language and a whole paragraph   This
23  sentence relates to the sole and unfettered
24  judgements -- I've testified here that this clause

1   in its sole and unfettered discretion   We can
2   agree on that  can we not?
3        A.  No
4        Q.  Isn't that what the language of the
5   agreement clearly says?
6        A.  I answered what I think it says
7        Q.  You don't think the second sentence gives
8   NAM the freedom to operate the CCMI business in its
9   sole and unfettered discretion?
10             MR  PETERS:  Asked and answered
11       A.  We had an agree--
12       Q.  (BY MR  KATZ)  It's a yes or no
13       A.  The answer is no  I don't believe it is
14       Q.  So far as the agreement was concerned  NAM
15  management was free to make mistakes in its
16  management of the CCMI business  was it not?
17       A.  Good faith mistakes
18       Q.  NAM was free to set the budget of the CCMI
19  business  right?
20       A.  No
21       Q.  NAM was free to decide where to make
22  capital expenditures  right?
23       A.  No
24       Q.  NAM was free to decide when to make capital

1  expenditures, right? Just yes or no
2      A.  No
3      Q.  NAM was free to decide when to make
4  additional hires, right?
5      A.  No
6      Q.  NAM was free to terminate personnel?
7      A.  No
8      Q.  NAM was free to choose who would be your
9  supervisors?
10     A.  No
11     Q.  NAM was free to determine who, if anyone,
12 you would supervise?
13     A.  No
14     Q.  NAM was free to decide how to brand its
15 business?
16     A.  No
17     Q.  NAM was free to determine where its
18 personnel would be located?
19     A.  No
20     Q.  NAM was free to choose what areas of CCMI's
21 business would be pursued in the future?
22     A.  No
23     Q.  NAM was free to discontinue business
24 activities of CCMI that were no longer profitable?

1      A.  No
2      Q.  NAM was free to discontinue business
3  activities of CCMI even if they were profitable?
4      A.  No
5      Q.  NAM was accountable only to its directors
6  and shareholders for whatever mistakes it might
7  make in operating the CCMI business?
8      A.  Absolutely not
9      Q.  NAM was not accountable to you or
10 Ms. Raider for how it operated the business of CCMI
11 after it acquired the stock?
12     A.  Absolutely not
13     Q.  NAM did not need to consult with you or
14 Ms. Raider before making a decision regarding the
15 operation of the CCMI business?
16     A.  Absolutely not
17     Q.  If NAM did consult with you regarding the
18 operation of the CCMI business, it didn't need to
19 accept your opinion, did it?
20     A.  Not if it was acting in good faith
21     Q.  In point of fact, NAM did consult with you,
22 and neither you nor Ms. Raider were bashful in
23 letting the senior executives of NAM know your
24 views on the operation of CCMI, right?

1      A.  Wrong
2      Q.  You clearly expressed your views, did you
3  not?
4      A.  Only to what I was involved in  Some
5  things were done without my knowledge, consent  My
6  role as general manager -- what's a general manager
7  with to one to manage?
8      Q.  You've answered the question  Let me ask
9  you the next one
10     A.  So how could I be consulted?  If they asked
11 me a question, I gave them an answer, but after
12 three months, it was clear that they had no
13 intention of doing the deal we had agreed to in
14 good faith
15     Q.  Okay  And you made many phone calls
16 complaining about how the CCMI business was being
17 operated, right?
18     A.  We objected to the lack of attention to our
19 business  Yes, whenever we could, we wrote letters
20 of protest
21     Q.  That's a yes?
22     A.  Okay
23     Q.  Just answer my question  We'll get a lot
24 further a lot quicker

1      A.  Absolutely protested
2      Q.  You sent numerous e-mails complaining?
3      A.  We sent letters
4      Q.  Complaining, right?
5      A.  Raising the issues of how to execute the
6  plan that was the basis of our deal --
7      Q.  Okay  You sent --
8      A.  -- and the assets we needed to do it
9      Q.  You sent many letters complaining, right?
10     A.  We sent letters objecting and asking for
11 help, yes
12     Q.  You complained in person to Mr. Lellouche
13 and to other senior management at News America
14 Marketing, right?
15     A.  Whenever we had an opportunity
16     Q.  You complained so much that Mr. Lellouche
17 said Bob, please, complain only on Fridays so we
18 can get some work done; isn't that right?
19     A.  Henri Lellouche said a lot of things to me
20 that if you want to go through all of them --
21     Q.  I've just asked you that one  Do you
22 remember Mr. --
23     A.  After years of disappointment, Henri used
24 to joke about the complaints, but it was the

1  complaints in the first three, four months of this
2  contract that made it clear that News America
3  Marketing intended to never execute the plan and
4  defrauded us in this deal
5      Q   Now, sometimes your opinion was accepted,
6  right?
7      A   Rarely
8      Q   And sometime it is wasn't, right?
9      A   Opinion as to what?
10     Q   On any issue that you raised
11     A   I'm the general manager of the division,
12  I'm not allowed to know what personnel, review
13  budgets, approve anything  I have no idea whether
14  they accepted or rejected my views
15     Q   We can agree, can we not, that all of NAM's
16  business decisions were designed to maximize NAM's
17  profit; isn't that right?
18     A   No  NAM made a --
19     Q   What other purpose did NAM have?
20         MR PETERS:  Objection
21     A   NAM had a core business that they make
22  money on  NAM -- Paul Carlucci, the chairman of
23  this company, has no business --
24         MR PETERS:  Sorry  Gordon  You said

142

1  what other --
2      Q   (BY MR KATZ)  What other purpose?  I'm
3  getting a speech  I just want an identification of
4  any other purpose besides profit maximization
5      A   Yeah, we were a nuisance  Mr Carlucci
6  said he didn't agree to direct marketing
7  Mr Carlucci never gave access to the sales force
8  Mr Carlucci marginalized everything we did and he
9  had to do it intentionally
10     Q   You never heard him say you were a
11  nuisance, did you?
12     A   Yes  Mr Carlucci said he didn't like us
13  that he didn't believe in our business  When he
14  was coming to the Boston office, Mr Iellouche
15  would instruct me to not be there when he would
16  come visit, the chairman, to talk about a town
17  meeting  I was instructed to leave the premises
18  And ultimately, I was instructed to leave my own
19  office with my employment contract and work at home
20  and work anywhere you want
21     Q   And why was that?
22     A   No explanation  And I could only imagine
23  it's because Mr Carlucci in his -- just told him
24  get him gone, and everyone, in fear of this man, is

143

1  a little tin solder, and they just were in fear of
2  him  I dealt with Marty Garofalo off site  Why?
3  No reason why  Just because someone said it was,
4  and we all knew who it was, so I was asked to
5  vacate back in '03, '04  Finally, it's like we
6  want to buy you out of your contract or we're going
7  to force you out of the office
8      Q   Did anybody say that to you directly?
9      A   Yes
10     Q   Who said that?
11     A   Marty Garofalo
12     Q   What did he tell you?
13     A   He showed up in Boston with a release in
14  his pocket  First we went out and we laughed and
15  we talked about the business and all the good
16  things ongoing  We come upstairs and he looked at
17  me and he said I have a terrible thing to do today
18  I believe in you, but you have to leave  When?
19  Today  What do you mean today?  I've got all this
20  business going on  I've got all these things going
21  on  He says I'm sorry  but I have instructions
22  You have to leave the office  I have an employment
23  agreement  I have an earn-out thing  How can you
24  throw the general manager out of the thing for no

144

1  reason at all?  Do you have a reason?  No
2      Q   When did this consider occur?
3      A   '03, '04
4      Q   And where did it occur?
5      A   In the Hancock Tower
6      Q   You said you went out to dinner with
7  Mr Garofalo?
8      A   I went down for lunch, told him about all
9  the stuff going on  He got excited about
10  everything I was doing  He knew I knew what I was
11  doing, but he couldn't do anything about it
12     Q   It's your testimony that Mr Garofalo came
13  back to the office and then said I have something
14  bad that I have to do?  Is that what he --
15     A   Wanted buy me out of my employment
16  agreement with no consideration for the earn-out
17     Q   So tell --
18     A   I said I'm here trying to get money for the
19  company  He says I know it doesn't make any sense
20  but I have to do it  And then he got HR on the
21  phone in New York and got me a extension  An
22  extension why?  And he said just lay low and do the
23  stuff and try to pull these deals in  At that
24  point in time, I had been completely marginalized

145

1  from the operation. I had no secretary. I had no
2  support. I had no creative. And I was forced to
3  do all these stored value things with strategic
4  partners and on my own. If I needed something, I
5  could try to get Henri to get me some support. I
6  was completely a one-man operation as part of this
7  $40 billion gorilla, and I was doing pretty good.
8  In fact, that's this news release you tell me. I
9  got -- with people like Airtime, we landed a
10 $50 million contract with Ahold in the other
11 emerging marketplace. We were the pioneers --
12    Q. I'm going to cut you off here, because I'm
13 just interested in your conversation with
14 Mr. Garofalo. So it's your testimony that
15 Mr. Garofalo came to Boston to attempt to persuade
16 you to leave News America Marketing? Is that
17 right?
18    A. First to attempt to sign it and they would
19 prepay me through the September employment
20 agreement.
21    Q. Through September 2004?
22    A. I don't know. It was the last year. And
23 sign a release. And when I said I'm not doing that
24 because I have a contract and an earn-out, he

---

1  inaccurate, and at our expense other people were
2  trying to raise themself within the company.
3    Q. That's what you suspect?
4    A. Well, that's what happens. Mr. Lellouche
5  told me many times that Jon Rubin was out to take
6  my job from the beginning, from day one. Before
7  there was Mr. Lellouche working for Mr. DeVoe,
8  there was Mr. Rubin. Mr. Lellouche told me on
9  several occasions Jon Rubin wanted your job, he
10 wanted to get control of that division, and that I
11 was lucky he left.
12    Q. He left within three months of the
13 acquisition, right?
14    A. Right. And then Mr. Lellouche warned me
15 about Mr. Rubin and then Mr. Lellouche did the
16 exact same thing as Mr. Rubin. He undermined me
17 with my staff, he worked to break up the
18 organization, he took over the management of the
19 company, and he left me a card that said general
20 manager managing nobody. If you looked at his
21 card, it says general manager, SmartSource Direct.
22 No conversation, no reason, no explanation, just a
23 complete embarrassment to everybody that worked
24 there, and all our customers and all the

1  initially got me a -- they waived it. He says I'll
2  work with you alone and let's get some of these
3  things going.
4    Q. Okay.
5    A. At a subsequent period of time, they called
6  and said you have to be out today. I mean, just
7  embarrassing, humiliating, no reason, no reason. No
8  -- no anything other than get out or security will
9  have to take you to the door. And then I was told
10 to work -- I didn't even know on what basis. I
11 didn't sign the release. I didn't sign the
12 contract. I was completely humiliated within the
13 company. And I was told -- Marty said don't worry
14 about it; we'll do some stuff. You can come to the
15 New York office but you just can't come to the
16 Boston office.
17    Q. Did he say why?
18    A. No. Just do it. Do some good stuff; I'll
19 get you reinstated. And I already knew why. I
20 knew why, because it was Paul Carlucci. Now,
21 Mr. Carlucci and I didn't have a lot of dialog, but
22 I'm sure that other people in the company were
23 casting Ann and I in a bad light, you know, and
24 what was getting back to higher-ups was probably

---

1  relationships that I had put in place, completely
2  undermined, and not so much personal, but I mean,
3  it goes back to your question about profit.
4    Q. Okay. Have you told us of every
5  interaction that you ever had with Mr. Carlucci?
6         MR. PETERS: Objection.
7    A. No. I haven't.
8    Q. (BY MR. KATZ) Okay. How many times did
9  you meet with Mr. Carlucci?
10   A. I don't know. Not a lot. Ten. Well, and
11 at parties I've seen him.
12   Q. How many subsequent conversations do you
13 recall with Mr. Carlucci, if any, do you remember
14 as you sit here today?
15   A. As I sit here today? I can think of the
16 first one.
17   Q. Can you think of any others?
18   A. I can think of three or four or five.
19   Q. Tell me about the first one. What did you
20 say; what did he say?
21   A. The first one is when we were being -- are
22 you ready?
23   Q. Mm-hmm.
24   A. First one was when David DeVoe was trying

1   to finalize the acquisition of the company. He had
2   just purchased two other companies and he invited
3   us to meet Mr. Carlucci and Mr. Porco. Chris
4   Mixson, the executive group.
5       Q. Okay. Let me rephrase my question. Did
6   Mr. Carlucci ever express to you directly a
7   negative view of either yourself or Ms. Raider?
8       A. Yes.
9       Q. When?
10      A. When we objected to the break-up of our
11  core unit of Bill Adam, Ann and I.
12      Q. Was that the only time?
13      A. I don't remember.
14      Q. And going back to the time when you
15  expressed concern about what you called the
16  break-up of your group of you, Ann and Bill Adam,
17  what specifically did Mr. Carlucci say to you?
18      A. At that time?
19      Q. Yes.
20      A. We were called to go to the chairman's
21  office in New York.
22      Q. And can you date that time?
23      A. November '99.
24      Q. Okay. And what did Mr. Carlucci say?

1       A. I mean, I don't know.
2       Q. What did Mr. Carlucci say to you?
3       A. He said that they shouldn't protest what the
4   company is doing; it's not good for you. Just do
5   what you're told and don't ever put anything in
6   writing and it wouldn't look good if we protested,
7   but he would see what he could do, but it wasn't
8   looking good that we were fighting for our rights
9   under the agreement.
10      Q. Is that all he said that you remember as
11  you sit here today?
12      A. That's the gist of what -- the most
13  important thing. He was there watching horse
14  racing in his office as he had Aqueduct Live at all
15  times.
16      Q. Now, you met with counsel before the
17  complaint was filed, right; the complaint in this
18  action, right?
19      A. Yes.
20      Q. And the complaint was filed on or about
21  August eighth of 2005, right?
22      A. Correct.
23      Q. But I think you've already told us that you
24  in your own view began experiencing the problems

1   you relate in the complaint as early as 1999,
2   right?
3       A. Incredibly, yes.
4       Q. Right after the acquisition took place,
5   right?
6       A. Yes.
7       Q. Okay. Now, you know that the business
8   world from all your experience was a rough and
9   tumble world, right?
10          MR. PETERS: Objection.
11      A. Anything's possible in the business world.
12  Some things go good and some things don't.
13      Q. (BY MR. KATZ) Right. And you knew that
14  the 1999 Stock Purchase Agreement was the result of
15  hard bargaining, right?
16      A. No.
17      Q. You didn't think it was the result of hard
18  bargaining?
19      A. No.
20      Q. Well, you had two high powered law firms
21  that were involved in negotiating the agreement,
22  right?
23      A. But there wasn't a lot of hard bargaining.
24  It was a very simple deal. I mean, the issues were

1   not voluminous. The choice for us was which
2   partner to take the opportunity to, and when Ann
3   and David felt they could do it together, the
4   bargaining was not hard.
5       Q. You had concerns regarding paragraph 6.8 in
6   the agreement, right?
7           MR. PETERS: Asked and answered.
8       Q. (BY MR. KATZ) That's why you had
9   discussions?
10          MR. PETERS: Asked and answered.
11      Q. (BY MR. KATZ) Right? You can answer.
12      A. We had concern -- we negotiated that
13  paragraph.
14      Q. Okay.
15      A. And it was -- okay.
16      Q. You didn't get everything included in the
17  agreement that you wanted, correct?
18      A. I -- I wasn't -- I think it's too broad a
19  question, Gordon. I mean, I could have asked for a
20  hundred million dollar check attached to it.
21      Q. Right. You didn't get the amount of money
22  as the cash purchase price that you would have
23  liked, right?
24      A. We accepted a way we could get our eight

1  million if things were done as we wanted.

2      Q.  But you would have liked more cash, right?

3      A.  Yes, of course

4      Q.  Okay.  If you wanted a guaranteed level of

5  support -- that is, support from News America

6  Marketing for CCMI's business -- don't you think as

7  an attorney that you should have expressly insisted

8  that it be put in the Stock Purchase Agreement?

9      A.  It was

10     Q.  Expressly?

11     A.  Yes

12     Q.  Where?

13     A.  Right here.  6.8.  They're going to give us

14  the sales force, the 200 man sales force so that we

15  can sell our products

16     Q.  Where does it say that?

17     A.  They're going to assist me in the

18  development of the software according to my budget.

19  I could have bought Epiphany for $250,000,

20  everything I needed from Epiphany, not $2 million.

21  And they were going to help us with the

22  relationships.  They were going to take the magic

23  that Ann and Bill Adam and I had together and

24  relationships we had established over four, five

1  years with every major packaged good and retailer

2  and allow us to take advantage of the opportunity

3  that was right there in 1999.

4      Q.  Let me ask you another question.  At the

5  time of the closing of the deal, how many contracts

6  did you have with packaged goods manufacturers?

7      A.  It wasn't contracts.  You would sell access

8  to it

9      Q.  I just asked you the question

10     A.  The answer is I don't know

11     Q.  Isn't the answer three?  You had three

12  contracts with packaged goods manufacturers at the

13  time?

14     A.  I don't know

15     Q.  Well, let's take a look at the schedule

16     A.  But it doesn't matter

17         MR. PETERS:  Well, wait.  Let's wait

18  for the next question

19     Q.  (BY MR. KATZ)  Well, the agreement will

20  speak for itself, but after the deal took place and

21  you received your approximately $1.4 million, you

22  had a celebration with Ms. Raider; isn't that

23  right?

24     A.  I don't remember

1      Q.  You went to dinner with Ms. Raider; isn't

2  ha right?

3      A.  It's possible.  Sure

4      Q.  She testified to that; isn't that right?

5      A.  If she did, we did.

6      Q.  You had champagne; isn't that right?

7      A.  We were on verge of a new opportunity with

8  hopefully a partner that would keep their word.  We

9  were celebrating the wrong thing.

10     Q.  You popped a bottle of champagne at the

11  celebration, right?

12     A.  No.  We had a partner --

13     Q.  Please answer the question

14     A.  I don't remember having champagne

15     Q.  Did you receive a statue from your lawyers

16  commemorating the closing?

17     A.  No.  That's for public offerings.  I think

18     Q.  You read the complaint before it was filed,

19  right?

20     A.  Yes

21     Q.  And you familiarized yourself before it was

22  filed?

23     A.  Yes.

24     Q.  You understood that it was a serious step

1  to file a lawsuit?

2      A.  Absolutely.

3      Q.  It's not something that you do casually,

4  right?

5      A.  It's one of the most serious things to do

6      Q.  Right.  And as an attorney, you're aware

7  that almost all of NAM's cost and attorneys' fees

8  could be assessed against you if the Court were to

9  find under Rule 11 of the Federal Rules of Civil

10  Procedure that your claims were not warranted under

11  the provisions of that rule?

12         MR. PETERS:  Objection

13     A.  I'm not here to give legal advice

14     Q.  (BY MR. KATZ)  But you're aware of Rule 11,

15  right?

16     A.  I've heard of that rule, yes.

17     Q.  And you're aware that NAM's costs could be

18  over a million dollars before this is over, right?

19     A.  Could be anything

20     Q.  Now, the first count of your complaint is

21  for breach of the covenant of good faith and fair

22  dealing, right?

23     A.  Yes.

24     Q.  And you allege that this breach was

1 committed by the NAM executives who ran CCMI after
2 the acquisition, right?
3     A.  I allege it's been done by NAM.
4     Q.  Yeah, and it was being done by executives
5 who ran CCMI after the acquisition, right?
6     A.  No.  They ran NAM, CCMI, whatever.  There
7 was no CCMI.  This was a hundred percent
8 acquisition.
9     Q.  Right.
10     A.  CCMI became a wholly owned --
11     Q.  Division.
12     A.  -- division or group of the corporation.
13 I'm surprised about your other questions.
14     Q.  The NAM executives who made the decisions
15 relating to CCMI were located in either New York or
16 Wilton, Connecticut, right?
17     A.  Yes.
18     Q.  None of them were located in Boston or
19 elsewhere in Massachusetts, right?
20     A.  Not that I know.  I mean, Paul Carlucci I
21 think was doing something at The Herald for News
22 Corp., but I don't know of anyone else.
23     Q.  Now, the third count in your complaint is
24 for declaratory judgement.  Are you familiar with

1 SmartSource Direct, when they took the CCMI
2 know-how, intelligence, IP and technology and put
3 it into the NAM IT group, CIO group, whatever you
4 call it, when we could see that they really were
5 doing that to support their dot com, SmartSource
6 dot com, SmartSource I-Group, or whatever
7 SmartSource name they were throwing, when Ann's
8 time was being marginalized by beginning to go and
9 do core business and other sales things, then it
10 was -- it became too hard to differentiate.  The
11 concept that we agreed to, that they would be
12 running this as an independent group got destroyed
13 after the sale.
14     Q.  Where does it say that they would be
15 running it as an independent group in the Stock
16 Purchase Agreement?
17     A.  Well, the Stock Purchase Agreement says
18 they're going to put up a million and a half
19 dollars of capital under the formula.  That million
20 and a half capital was my request where I had
21 200,000 for software and I had 300,000 for this and
22 400,000 for this and I was going to spend that
23 within my expertise to make the plan.
24     Q.  But they have the right to make the

1 that, with that count?
2     A.  Yes.
3     Q.  And you claim that News America business
4 units including the I-Group are successors to CCMI
5 and the revenues generated by them must be included
6 in the calculation of gross margin that determines
7 the amounts due to you and Ms. Raider under the
8 earn-out provision?
9          MR. PETERS:  Objection.
10     Q.  (BY MR. KATZ)  Are you aware of that part
11 of your complaint?
12          MR. PETERS:  Objection.
13     A.  Yes.
14     Q.  (BY MR. KATZ)  Do you still make that claim
15 as you sit here today?
16     A.  Yes.
17     Q.  Is there revenue from other NAM business
18 units of which you were aware which should have
19 been included in any of the five earn-out
20 calculations?
21     A.  We're alleging there is.
22     Q.  And I'm asking you what NAM business units
23 are successors to CCMI.
24     A.  Well, when they changed the name CCMI to

1 spending decisions, don't they?
2     A.  But the number came from the plan, which is
3 implicit in the agreement, and that's the answer to
4 the question.
5     Q.  They made -- they spent more than a million
6 and a half dollars on CCMI?
7     A.  I have no idea.  I'm only the general
8 manager.  I have no idea what was being spent, who
9 was being hired, or what was being done.
10     Q.  Didn't you see the amounts that were being
11 spent in the earn-out calculations each year?
12     A.  No.  I didn't even find out.  In one, we
13 found out there were $2 million in accounts
14 receivable that weren't collected, that no one even
15 told us, that took us over the gross and cost of
16 hundreds of thousands of dollars, and they didn't
17 care.
18     Q.  And each year you had a chance to look at
19 the financials for what had been CCMI, right?
20     A.  Gordon --
21     Q.  Wasn't that part of the earn-out
22 discussions every year?  Yes or no, please.
23     A.  No, there was no discussions.  They would
24 send us something with the numbers in it, and then

1   we could try to get information to see if we could
2   protest
3       Q   And you did, did you not?
4       A   But we were not provided the information
5   all along   It was always after the fact
6       Q   But after the fact, you received
7   information, right?
8       A   Right   They could have gone out and spent
9   a hundred million
10      Q   And you know as you sit here that they
11  spent more than a million and a half dollars on
12  capital improvements for CCMI, so why are we
13  talking about this?  You know that they spent over
14  a million and a half dollars; isn't that right?
15      A   They broke the deal   They didn't --
16      Q   I'm just talking about the million and a
17  half dollars.
18      A   No.   They didn't spend it on CCMI   They
19  spent it on Epiphany and what they built, and they
20  spent a million and a half, two million dollars,
21  and they did it without my knowledge, without my
22  consent, and they ruined the company   They never
23  finished it   They didn't get the right people on
24  it.  They delivered it 18 months late and we lost

162

1   all our clients   They fractionalized the business,
2   and you know what?  They didn't care
3       Q   And you raised these issues --
4       A   Paul Carlucci said what do I care about
5   another hundred million dollars?
6       Q   Just answer the questions   And you raised
7   these issues each year in your discussions with the
8   financial people at New America Marketing regarding
9   your earn-out; isn't that right?
10      A   Each year we protested the amount of money
11  that had been spent and how the million and a half
12  dollars had been put against our earn-out and how
13  it was unfair.
14      Q   Can you identify any client of CCMI that
15  ceased being a CCMI or SmartSource Direct client
16  after the acquisition?
17          MR. PETERS:  At any time after?
18          MR. KATZ:  Yes
19      A   Well, we lost Duane Reade because of the
20  incompetency of what happened, taking away our
21  technology
22          MR. PETERS:  Right now he just wants a
23  list of companies
24      A   I don't remember.  Nash Finch we lost

163

1   because NAM made a decision not to support the
2   legacy system   Sullivan   We dropped companies
3   They didn't care   We just dropped people   They
4   didn't care about them   When we were CCMI, we
5   cared about our clients
6       Q   (BY MR. KATZ)  Now  we'll come back to some
7   of these things that we've been talking about
8   briefly, but let me ask you a few other questions
9   When you were working for News America Marketing
10  under your employment agreement, you were also
11  involved in the practice of law, right?
12      A   No.
13      Q   Okay   You kept your bar membership active,
14  right?
15      A   I kept my bar membership
16      Q   Right?
17      A   Yes
18      Q   And Ms. Raider said last week that you
19  continued to do legal work for family and friends
20  after the acquisition   You heard her make that
21  statement, right?
22      A   I heard her
23      Q   And she was accurate, right?
24      A   I don't know.

164

1       Q   Okay.
2       A   I don't -- you know
3       Q   You kept your malpractice insurance up to
4   date?
5       A   No
6       Q   You let your malpractice insurance lapse?
7       A   Yes   I had no active professional
8   practice
9       Q   You listed your -- your name in the lawyers
10  book at the News America Marketing address at 200
11  Clarendon Street?
12      A   I believe I did, yes
13      Q   And you did that for several years, right?
14      A   I listed where my office was, yes
15      Q   Right.   You didn't list your home, right?
16      A   No
17      Q   You could have?
18      A   I never have
19      Q   Okay   And so is it your testimony that you
20  did not do any legal work during the period of time
21  you were employed by News America Marketing?
22      A   I don't believe I was hired as an attorney
23  by anybody.  I mean  did I help my father with his
24  will or his trust or --

165

1     Q   Hadn't your father passed away by the time
2   you were working for News America Marketing?
3     A   Well, during   During
4     Q   Didn't he pass away in 1997?
5     A   No   It was '99   It was just in the middle
6   of all this   New Year's Eve   '99
7     Q   New Year's Eve just before year 2000?
8     A   Yeah
9     Q   So after that point in time, did you do any
10  work for anyone, any legal work for anyone or any
11  legal entity while you were still on the News
12  America Marketing --
13    A   My mother's -- I did personal stuff
14    Q   Did you receive any fees from any client?
15    A   I don't -- I don't believe so, no
16    Q   You're not sure?
17    A   You're asking about five years did I do
18  anything for someone?   I don't believe so
19    Q   Did you participate in any business
20  ventures while you were under contract with NAM?
21    A   No   I invested in some things
22    Q   What did you invest in?
23    A   I don't remember   I was investing in the
24  stock market

1   result of that?
2     A   I don't know   If you show me something, I
3   could refresh my recollection
4     Q   Did you have a lawsuit involving Lucky
5   Stores?
6     A   No
7     Q   Did you have a lawsuit regarding any
8   customer in 1997 or 1998?
9     A   You showed me one that I didn't remember
10    Q   As you sit here today, you don't recollect
11  a lawsuit that CCMI brought, perhaps outside of
12  Massachusetts, regarding monies that you were
13  seeking from a customer?
14    A   A supermarket?
15    Q   Yes
16    A   I hope we didn't do that   That's not what
17  we do
18    Q   But you're not sure?
19    A   I don't have any present recollection of
20  that right now
21    Q   We're going to talk a little bit about
22  consulting marketing programs   You remember that
23  as being one of the three parts of the CCMI
24  business, right?

1     Q   Apart from publicly-traded securities, what
2   did you invest in?
3     A   I -- nothing
4     Q   Nothing?
5     A   I have no recollection   I mean, I sold the
6   family property   I don't believe I participated in
7   anything else
8     Q   In 1997, you had a -- you, I mean CCMI, had
9   a big spike in its revenue   You went from
10  $1.8 million in loyalty card revenue to 6.6 million
11  dollars in loyalty card revenue, right?
12    A   Okay
13    Q   You don't remember 1997 as having a
14  significant spike in CCMI revenue?
15    A   All the revenue was insignificant to the
16  opportunity
17    Q   Just answer my question
18    A   I don't know   If you show me something, I
19  could say yes or no   I don't know
20    Q   Do you remember there being a spike due to
21  the roll-out of the Lucky Stores loyalty
22  card program?
23    A   That was a good venue for us
24    Q   How much money did CCMI bring in as a

1     A   Yes
2     Q   In 1998, to recap, you had $72,000 in
3   consulting marketing revenue, right?
4     A   Right
5     Q   Okay   But in year one after the
6   acquisition, you projected that that revenue was
7   going to jump to $3.5 million   Sound right?
8     A   That's correct   Yes
9     Q   And in year two it was going to jump to
10  $13.2 million, right?
11    A   If that's what it says
12    Q   Okay   We can look at Exhibit 16   Do you
13  have Exhibit 16 in front of you?
14    A   I have a document that says something, page
15  one
16    Q   And you see --
17    A   I see what it says   I don't know if it's
18  ours or who did it
19    Q   Okay   The second page   it says Consumer
20  Card Marketing, Inc   Doesn't that look like the
21  font that you used to use at Consumer Card
22  Marketing, Inc   prior to the acquisition?
23        MR PETERS:   Objection
24    A   Don't know

1    Q.  (BY MR KATZ)  Okay  But in year one  your
2  revenue for consulting and marketing programs was
3  to be 3 5 million  We can agree on that  right?
4  Do you see it?
5    A   Revenue  consulting  3 531
6    Q   Okay
7    A   Okay
8    Q   And then year two  13 274 000  right?
9    A   Yes
10   Q   Year three  19 635 000?
11   A   Yes
12   Q   Year four  23 622 000  right?
13   A   Yes
14   Q   And then year five  we top out at 33
15 million  right?
16   A   Yes  that s correct
17   Q   In other words  you projected that you were
18 going to grow your business that you hardly had in
19 1998 to a $33 million business in five years
20 right?
21   A   Yes
22   Q   Okay
23   A   But you re --
24   Q   You ve answered the question

1    A   Yes  Absolutely yes
2    Q   And Ms  Raider testified that she expected
3  that News America Marketing would have its sales
4  force use 15 percent of its time to sell CCMI s
5  products  Remember hearing her testify to that
6  last week?
7    A   Yes
8    Q   Did you share that opinion?
9    A   I didn t have an opinion
10   Q   Okay  There is  of course  nothing in the
11 Stock Purchase Agreement saying that NAM s sales
12 force was required to use any percentage of its
13 time to sell CCMI s products  was there?  And
14 that s a yes or no question
15   A   Are you saying it s not -- repeat the
16 question
17   Q   There is nothing in the Stock Purchase
18 Agreement saying that the NAM sales force was
19 required to use any percentage of its time to sell
20 CCMI s products?
21   A   The answer is of course there is  It s
22 implicit in the language when it says utilize sales
23 force --
24   Q   Stop right there  Stop right there

1        MR  PETERS:  Wait until the next
2  question
3    Q   (BY MR KATZ)  There s nothing explicit in
4  the Stock Purchase Agreement saying that the News
5  America Marketing sales force was required to use
6  any percentage of its time to sell CCMI s products
7  right?  Nothing explicit  right?
8    A   As to the percentage of the --
9    Q   Yes
10   A   -- use of the sales force?
11   Q   Yes  Nothing explicit?
12   A   Well  I would think that if it says
13 utilizing  maybe it infers a hundred percent unless
14 it s delineated to be less  tacitly to be less
15   Q   But nothing explicit  right?
16   A   There s no language in there that talks
17 about percentage
18   Q   Correct  Okay  Did you ever discuss with
19 anyone the percentage of NAM s sales force time
20 that might be used selling CCMI s products?  That s
21 a yes or no question
22   A   I think it was discussed  but not by
23 percentage  It was discussed by --
24   Q   You ve answered the question  You ve

1  answered the question
2        MR  PETERS:  When you have an easy
3  break  I d like to use the men s room
4        MR  KATZ:  Okay
5    Q   (BY MR KATZ)  What were the sales of News
6  America Marketing  to the best of your
7  understanding  in 1999 prior to your acquisition?
8    A   I don t know  700 million  800 million  a
9  billion  I don t know
10   Q   Could we agree that it was approximately a
11 billion in 1999?
12   A   Yeah
13   Q   Okay  So you would agree  would you not
14 that if you redeployed 15 percent of News America
15 Marketing s sales force s time  you would be
16 talking about taking about a $150 million off NAM s
17 income statement?
18   A   No  I don t agree to that
19   Q   Isn t that right?
20       MR  PETERS:  Objection
21   Q   (BY MR KATZ)  Just a yes or no
22   A   The answer is no  you don t redeploy
23 There s no redeployment required
24   Q   So they were going to be able to do all the

1    sales that generated a billion dollars of sales for
2    the existing News America Marketing products and
3    without any additional expenditure of time. also be
4    able to sell your products so that you could earn
5    the earn-out to the extent you anticipated?  Is
6    that what you're saying?
7        A    Yes.  That product was a complete adjunct
8    to what they were already doing.
9        Q    And it wasn't going to take any additional
10   time on their part --
11       A    Just to learn it
12       Q    -- in order to sell the product?
13       A    Just to learn it
14       Q    Once they learned it. they were going to be
15   able to sell it?
16       A    And it would help sell their other products
17   --
18       Q    That's your view?
19       A    -- because that s a --
20       Q    Just a yes or no
21       A    Yes
22       Q    Prior to the acquisition. what size sales
23   force did you believe you needed to have in order
24   to meet the post-acquisition projections you had

1    set for CCMI?
2        A    I don't know.
3        Q    And you'd agree with me that there was
4    nothing in the Stock Purchase Agreement requiring
5    any size of a particular amount specified?
6        A    No. I won't agree.
7        Q    There is a particular number that's
8    identified with respect to the sales force that's
9    called for under the Stock Purchase Agreement?
10       A    Yes
11       Q    Where in the Stock Purchase Agreement?
12       A    It's in the business plan that's implicitly
13   made.  Ann Raider and David DeVoe -- should I
14   answer. or are you busy?
15       Q    I just want to know where expressly do you
16   find it.
17       A    Ann Raider and David DeVoe did a business
18   plan to talk about all the head count that we would
19   need to grow the business.  The head count was left
20   out
21       Q    Please.  Let me stop you right there.
22   Please show me where the business plan is appended
23   to the complaint.  I'm sorry: to the agreement
24   Let me rephrase the question.  Please show me where

1    the business plan that you've been referring to is
2    attached to the agreement
3        A    It is part of the agreement.  It's
4    implicit.  It's the -- this -- the agreement is
5    about the implementation of the plan and these
6    clauses and these numbers are what it's referring
7    to.
8        Q    You cannot point to any express words. any
9    explicit words in the business -- in the Stock
10   Purchase Agreement where the business plan to which
11   you refer are referenced. correct?
12       A    Yes
13            MR. PETERS:  Asked and answered
14       A    Yes. I can.  Right here
15       Q    (BY MR. KATZ)  And what you're pointing to
16   is the first sentence of Section 8 6?
17       A    6.8. and I can refer to the earn-out of
18   2 3.  Those numbers are based on the business plan
19   and the numbers that were created by News America
20   Marketing as the basis for this contract.  This was
21   just the formula behind the agreement --
22       Q    Okay.  Just so long as I understand your
23   position.
24       A    -- if they want to do it in good faith.

1            (Off the record )
2            (Recess taken )
3        Q    (BY MR. KATZ)  Mr. Fireman. could you tell
4    me. what specific products were to be sold by the
5    CPG sales force at News America Marketing?
6        A    Yes
7        Q    Just identify them. the products. and I'm
8    referring to the CCMI products
9        A    Targeted marketing products
10       Q    Direct mail. right?
11       A    Either individually or in concert with
12   supermarkets. yes
13       Q    And there were no products other than that.
14   right?
15       A    Well. yeah. there were promotions and other
16   types of thing. but all these products are tied
17   together
18       Q    It was all direct mail. right?
19       A    No. it was not all direct mail  It was to
20   start with direct mail  It could be in-store
21   promotions: it could be tied to the loyalty cards
22   It's all around the cards  The cards are connected
23   to the analytical tool to the promotion.  When
24   somebody knows who bought Ivory and who bought

1  Dial, who bought Skippy and who bought Peter Pan,
2  the whole world of micro-marketing was available:
3  direct mail, in-store, point of sale, e-blast,
4  Internet, it all tied around clubs
5      Q   So the idea was that you were going to take
6  the information that you had about consumer
7  preference that was gleaned either from the loyalty
8  cards or from other data that the retailer would
9  provide you and -- correct?
10     A   Yes.
11     Q   And you were going to use that information
12 to interest CPG manufacturers on some kind of
13 promotional program for customers, right?
14     A   Yes.
15     Q   And that's the idea?
16     A   The ability -- the ability to be in a Star
17 Market -- for an Ivory coupon to be in a Star
18 Market envelope going to a Dial soap user, the
19 ability to track that that person actually used the
20 coupon and the ability to watch your soap purchases
21 over the next two weeks, four weeks to know you
22 could get her to buy it once or twice or three
23 times, and once someone bought it three times, Dial
24 has a lifetime customer, because how often does

1  someone change their soap
2      Q   It was all direct -- it was all targeted
3  marketing, right?
4      A   But it was based on actual purchase
5  behavior, which was available for the first time
6      Q   And that's what permitted you to target?
7      A   Yes
8      Q   And there were no products that CCMI
9  offered other than this targeted marketing feature,
10 right?
11     A   No
12     Q   No products to CPG manufacturers other than
13 the targeted marketing?
14     A   Well, there was participation in the clubs
15 that were being formed around the loyalty programs,
16 kids clubs, promotions  We now know who had kids
17 and who didn't have kids  We now could segment
18 best shoppers from no shoppers  We now could show
19 retailers where their best shoppers were and how
20 much money they spent and how profitable they were
21 on a basket  We now could show them that their
22 worst customers were in express lines getting good
23 service while their best customers were sitting ten
24 lines deep waiting to be served.

1      Q   But it all boiled down to targeted
2  marketing of retail customers?
3      A   One-to-one marketing and getting to an
4  actual consumer based on who they are and what they
5  buy.  That was the dynamic of what was happening
6  And Gordon, when you look at the numbers --
7      Q   Okay   There's no question pending
8      A   All right
9      Q   Let me ask you this question   You're
10 familiar with the Aspen system, right?
11     A   I know what it is.
12     Q   Okay
13     A   Familiar?
14     Q   How many retailers signed on to the Aspen
15 system?
16     A   I don't know of any
17     Q   How many?
18     A   It was -- it was a disaster.  It never
19 worked   I don't know of any   I was removed from
20 that aspect of the business, no one reported to me
21 and it was 18 months late and it didn't work.  And
22 nobody was responsible
23     Q   Mr  Fireman, I'm showing you a document
24 marked as Exhibit 46   It is a summary of the

1  earn-out payments which you and Ms. Raider
2  received.  Do you remember seeing this document
3  last week?
4      A   No.
5      Q   Take a look at it now.  You don't have any
6  reason to question the numbers on Exhibit 46
7  accurately reflect the earn-outs that you received
8  over the five-year earn-out period, right?
9      A   I have no knowledge   I don't have any
10 reason to question it if you're telling me that's
11 what they say
12     Q   Each of you and Ms. Raider received an
13 earn-out payment each year, right?  Right?
14     A   I don't know   One, two, three, four, five
15 -- according to the document, yes.
16     Q   Okay   And when we look back at the five
17 years of earn-out discussions, you'd agree with me
18 would you not, that you and Ms. Raider's exchanges
19 about your disagreements with NAM executives about
20 the earn-out were always professional, right?
21     A   My dealings with News --
22     Q   Yes
23     A   -- or their dealings with me?
24     Q   Everyone's dealings were on a professional

1    basis?

2        A.   I don't believe that they were fair.  I

3    don't believe that they were open.  I believe that

4    if there was an accounting error within one of the

5    small numbers, they made some adjustments.  I

6    believe that their --

7        Q.   Adjustments in your favor?

8        A.   No, there were adjustments against us.  I

9    believe that they were using the accounts

10   receivable that were outstanding --

11       Q.   Just answer the question.

12       A.   The answer is no.  I don't believe they were

13   fair.

14       Q.   They were always courteous to you, they

15   being the NAM executives who you dealt with on your

16   earn-out; isn't that right?

17       A.   You mean it wasn't courteous?

18       Q.   Yeah.  They were courteous?

19       A.   They just did what they wanted to do, they

20   took the positions they wanted to take, and they

21   were inflexible on the issues that were important

22   to us.  Did they yell at us?  I don't remember any

23   screaming sessions.  Courteous?  They politely blew

24   a lot of money for themselves and us.

---

1    calculation, you never brought suit, right?

2        A.   Not until the present day.

3        Q.   Until the present day?

4        A.   Right.

5        Q.   You never brought suit against NAM until

6    after your five-year employment agreement was over,

7    right?

8             MR. PETERS:  Inconsistent with his

9    testimony.

10       A.   I didn't --

11       Q.   (BY MR. KATZ)  Apart from the 1999 suit,

12   which was never served?

13       A.   I testified Ann Raider had two kids in

14   college and we waited until she was out of harm's

15   way.

16       Q.   Okay.  And you've retained every dollar

17   paid you by NAM, correct?

18       A.   I don't understand the question.

19       Q.   You didn't offer to give back any of the

20   money that NAM paid you --

21       A.   No, I didn't give NAM back any money.

22       Q.   -- if they would undo the deal, right?

23       A.   It never was discussed.

24       Q.   You personally never offered to give back

---

1        Q.   Now, you never engaged an accountant to

2    discuss disputed issues with NAM's accountant

3    pursuant to the Stock Purchase Agreement's earn-out

4    dispute resolution procedure, right?

5        A.   Engage an accountant?

6        Q.   Yes.

7        A.   No.

8        Q.   And of course, there was never a need to

9    engage a third accountant to resolve any disputes

10   between the accountants, right?

11       A.   Right.  The issues were settled, but they

12   weren't according to GAAP.  I mean, if we worked

13   according to GAAP --

14       Q.   You've answered the question.  And you

15   never brought suit against NAM regarding any of the

16   complaints which you expressed in your letters

17   following the years one and two earn-out

18   calculations?

19       A.   I've already testified I did bring suit.  I

20   just didn't serve it.

21       Q.   But that was before the year one earn-out

22   calculation, right?

23       A.   Yes.

24       Q.   Okay.  So after the year one earn-out

---

1    what you received in stock, or received for your

2    stock if they would undo the deal?  Just yes or no.

3        A.   I would have done that in a heartbeat if

4    they could undo the deal.  They couldn't give me

5    back what I gave them.

6             MR. PETERS:  Just yes or no.

7        A.   No.

8             (Exhibit 80 marked for identification.)

9        Q.   (BY MR. KATZ)  Okay.  I'm going to show you

10   a document marked Exhibit 80, and can you identify

11   this document for us?  Is this your handwriting?

12   Hello?

13             MR. PETERS:  He's reading.

14             MR. KATZ:  Okay.

15       Q.   (BY MR. KATZ)  Is this your handwriting?

16       A.   Yes.

17       Q.   Okay.

18       A.   I believe so.

19       Q.   And when did you prepare this document?

20       A.   No idea.

21       Q.   Do you remember why you prepared this

22   document?

23       A.   No.  I mean, I think I wrote this down

24   because I was just general manager of a division

1   that's about to be changed into another whole
2   organization and I have no knowledge and consent.
3   and I guess when Henri told me that -- this is the
4   first time. one of the few times he was honest with
5   me -- there's a conflict and he couldn't tell me
6   what it was
7      Q   Could you read this into the record?
8      A   On Monday. executive conference.  I don't
9   know the date   4/3   I don't know the year.  I
10  learned that the broadcast -- every Monday they had
11  a --
12      MR  PETERS:  Just read it
13     A   SmartSource Interactive had been formed as
14  a division to pursue the original CCMI plan and
15  that Chris Mixson had been appointed president  I
16  asked Henri Lellouche why I was learning about this
17  key strategic decision when announced to the press
18  It was only one week earlier that I had told Henri
19  that we needed the support of Chris Mixson and the
20  manufacturers sales force to be successful   Henri
21  told me at the time that Chris was busy making the
22  company plan of -- it says 370 million or -- I
23  can't read it -- and our business was not a
24  priority  I guess that wasn't true a week ago

1   Accordingly. I asked Henri why something were not
2   involved -- why Ann and I were not involved in the
3   management decisions that affect the original CCMI
4   business   Henri told me that we had a conflict of
5   interest with the company.  I asked him what that
6   was.  He told me it was our earn-out from the sale
7   of the company  I told him it was based upon a
8   mutual effort to maximize sales and profits; how
9   could that be a conflict  He wouldn't say   I
10  asked him if there was a conflict why didn't NAM
11  sit down  discuss how to fix it  I asked him if
12  our earn-out would be based upon the whole sales of
13  SmartSource Interactive I-Group  He said yes. it
14  would be   I told him Paul Carlucci in the meeting
15  the week before said that he would make sure that
16  our earn-out was addressed  End of memo
17     Q   (BY MR  KATZ)  And you don't remember when
18  you prepared this?
19     A   Well. it's -- it would be tied to the
20  formation of the S S I  group. so --
21     Q   And when do you think that occurred?
22     A   I don't remember
23     Q   Let me ask you another question  Going
24  back to the CPG sales force. what did Kevin Tripp

1   do?  What was his job?
2      A   Kevin Tripp was -- I think he was hired
3   about the time of the sale.  We were looking to --
4   we needed expertise on how to formulate the
5   materials and the plan and the products to go to
6   the CPG force.  It wasn't that he could call --
7   being 240 places at once  His role was to organize
8   the products and the coordination of that effort to
9   the sales force  When we got no sales force. he
10  was the sales force. and from time to time. he
11  would get someone added to help him
12     Q   Was he successful?
13     A   Yes   Well. the whole thing -- I don't
14  know.  I don't know how you're going to gear
15  success
16     Q   In your view. was he successful?
17     A   No. he wasn't successful  because we didn't
18  get the cards out there   We lost our card
19  business.  We didn't get our software working.  We
20  lost our market share.  We lost our wind  And him
21  with a couple guys was a Band-Aid on an artery.
22        (Exhibit 81 marked for identification.)
23     Q   Let me show you a document we've marked as
24  Exhibit 81   And when was this prepared?  Do you

1   know?
2      A   I don't know
3      Q   Can you read this document into the record.
4   because again. I can't read your handwriting.
5      A   On 5/2  May fifth. executive meeting day. I
6   learned that Kevin Tripp and our manufacturers
7   sales effort for CCMI was reporting to Marty
8   Garofalo at S S I  and not to Ann over the
9   objection of Kevin himself -- over the objection of
10  Kevin himself   We were not asked our opinion as to
11  this act.  We were not told how it would affect our
12  earn-out   We still have no revenue numbers.  We do
13  not know where or when our decisions are being
14  made   Bill Adam and our tech team are not
15  providing us any information about their
16  Connecticut move.  Henri -- I don't know   Henri
17  Lellouche and Rick Rossman are working them
18  directly and intentionally leaving us out of the
19  loop.  At the meeting. I learned that Bill had his
20  house up for sale   I was told that Charles Pappas
21  would be terminated and four weeks notice.  I asked
22  who would do his job and got no response   I was
23  told that the -- the -- I can't read that word --
24  something would be done by Mark in Connecticut.  I

1  said how would he know how to do what Bill with the
2  system other than Robert Coughlin in place   I was
3  told that it would be handled   I asked Henri for
4  Bill s help on the e-gift RFP   He said that Bill
5  would have no time to help   I asked what technical
6  support would replace Bill   There was none at this
7  time   I said we need to grow the manufacturing
8  consulting account support to deliver service to
9  our clients   Henri refused to offer support   I
10  said that our business was being steamrolled
11  That s the way it is   No response  that s the way
12  it is was the answer   At the meeting  we learned
13  that NAM was negotiating for an office space in
14  downtown Boston   I told them that our employees
15  who were on the South Shore most likely won t come
16  Henri said he would get one admin person -- we
17  would get one admin person   I said to run what I
18  did not know who would be left when he was
19  finished   Henri has completely undermined our
20  authority  our ability to manage and our ability to
21  close business  develop new products or drive
22  revenue or manage our business
23      Q   And did you show this memo to anyone?
24      A   Not that I remember

1  retailers had their own loyalty marketing groups
2  This business cycle had now become a hundred
3  million dollar business and the people that knew
4  something about it weren t going to work for us any
5  more
6          (Exhibit 84 marked for identification )
7      Q   Let me show you Exhibit 84   This came from
8  your file  right?
9      A   I don t know
10      Q   Well  it has the Bates stamp FR 3401 on it?
11      A   All these are from my files?   Yeah
12      Q   Well  because it has FR in the corner means
13  it came from your file  right?
14      A   Right
15      Q   And this was an organizational chart that
16  was prepared after the acquisition  right?
17      A   Do not know
18      Q   Well  it lists -- it identifies Kevin
19  Tripp?  Do you see Kevin Tripp listed?
20      A   I m not sure if he just came with our --
21  I believe we contacted Kevin directly before the
22  acquisition
23      Q   Kevin Tripp didn t start until after the
24  acquisition was over   You know that  don t you?

1          (Exhibit 82 marked for identification )
2      Q   Let me show you a document that we ve
3  marked as Exhibit 82   This is an e-mail from
4  Ms  Fireman to you
5      A   Ms  Raider
6      Q   I m sorry; Ms  Raider to you   Do you
7  remember when this e-mail was prepared?
8      A   No   There s no date on it
9          (Witness reading )
10      A   I don t remember   I mean  it obviously
11  talks four years  so probably sometime in  03  and
12  speaks to the fact that people in the core business
13  didn t really understand our business or want to
14          (Exhibit 83 marked for identification )
15      Q   I m going to show you a document we ve
16  marked as Exhibit 83   This is another e-mail which
17  Ms  Raider sent to you?
18      A   Purports to be  yes
19      Q   Do you know why she sent it to you?
20      A   She was venting
21      Q   Okay
22      A   I mean  she was -- the expertise that we
23  had with the people who called on retailers was
24  important to keep the retailers -- by this time

1      A   I just said I don t know that   He s
2  somebody that I believe we got before
3      Q   But this is -- do you see anyone listed on
4  this organizational chart that was not with you
5  when the acquisition took place?
6      A   I don t understand the -- what this
7  document is or the question
8      Q   Do you see anyone listed on this
9  organizational chart who was not with you when the
10  acquisition took place?
11      A   Who was not with us?
12      Q   Yes
13      A   So everybody on here was with us?
14      Q   You think everybody --
15      A   I don t remember   I don t remember all the
16  names
17      Q   You re not sure whether Kevin Tripp was
18  right?
19      A   I believe that we got -- Kevin moved here
20  -- he was from Campbell sales   He was a friend of
21  somebody and we had him before the sale   Maybe he
22  started just after  but it was a process
23      Q   What office did he operate out of?
24      A   He came from Boston   His wife was from

1    Walpole.  He used to work for Campbell Soup down in
2    Maryland someplace
3                (Exhibit 85 marked for identification )
4        Q.  Let me show you a document that we've
5    marked as Exhibit 85  This is a May 27th, 1999
6    memo from Julie Openshaw, and in the memo, she
7    recounts a visit on May 24th and 25th, 1999  Do
8    you see that?
9        MR  PETERS:  You have to read the
10   document
11       A  I see the document  It's to David DeVoe,
12   Heather Harde from Julie Openshaw
13       Q.  (BY MR  KATZ)  And this was a memo that was
14   being prepared at News America Marketing for its
15   due diligence purposes?  Would you agree with that?
16               MR  PETERS:  Objection
17       A  Don t know
18       Q.  (BY MR  KATZ)  Okay  The memo shows that
19   CCMI was having a very poor first quarter in 1999,
20   correct?
21               MR  PETERS:  Does the document say
22   that?  Objection to any question other than that
23       A  I don t see that.
24       Q.  (BY MR  KATZ)  Okay  Could you take a look

1    at the second -- or make that the third bullet
2    point?
3        A  In the number -- which number?
4        Q.  Under number one  It says in quarter one,
5    '99, CCMI has completed one new implementation for
6    Wegman's which generated $383,000 or 67 percent of
7    the total $574,000 revenue for the quarter  Do you
8    see that?
9        A  Yes
10       Q.  Okay  And if -- during 1998  I think we
11   already established that your revenue for the
12   entire company was $3 7 million, right?  Right?
13       A  I don t remember
14       Q.  Do we need to go back to Exhibit 16?
15       A  Assuming it's 3 8 million  what's the
16   question?
17       Q.  Okay  If you take $574,000 as your first
18   quarter revenue and you annualize it for the whole
19   year, you're talking about revenue that's under
20   $2 5 million for the entire year  right?
21       A  If it stays the same
22       Q.  Right
23       A  Why would you assume it would?
24       Q.  Well  let s assume it did  If you

1    annualized $574,000 as your quarterly revenue and
2    annualized it  you would be under $2 5 million,
3    right?  Correct?
4        A  Assuming -- yes
5        Q.  Okay  And that would be about a 50 percent
6    drop in terms of your gross revenue as measured in
7    1998, right?
8                MR  PETERS:  Objection
9        A  No  it would not
10       Q.  (BY MR  KATZ)  Well  what's your
11   explanation --
12       A  2 5 as opposed to 3 8 is more than
13   50 percent by the math.
14       Q.  Okay  So what percentage of a reduction in
15   revenue --
16       A  I don't know if it was.
17       Q.  -- would the annualized number be from your
18   -- your annualized number for 1999 be with respect
19   to your 1998 revenue?
20               MR  PETERS:  I'm afraid I don't
21   understand the question
22       Q.  (BY MR  KATZ)  You don't understand the
23   question?
24       A  You would divide 2 5 by 3 8  Give me a

1    calculator
2        Q.  All right  I don t know if we need to do
3    the math, but we do know that 2 5 is less than 3 8,
4    right?
5                MR  PETERS:  We'll stipulate.
6                MR  KATZ:  All right
7        Q.  (BY MR  KATZ)  And we know that your
8    revenue in 1998 of 3 8 was less than the revenue
9    that you had in 1997  right?
10       A  Yes.
11       Q.  Okay  Now  the -- Exhibit 85 indicates
12   that there was a rent payment of $72,000 a year
13   that was being made to your father s estate by
14   CCMI; was that correct?
15               MR  PETERS:  That s on page two  bullet
16   point number four?  Is that where he should look
17   Gordon  under building lease?
18               MR  KATZ:  Yes  I think it s bullet
19   point five
20               MR  PETERS:  Under number four.
21               MR  KATZ:  Under number four on page
22   two of the memo
23               MR  PETERS:  Your question was was CCMI
24   paying 72,000 a year to --

1      MR. KATZ:  That's right.

2      MR. PETERS:  -- Harry Fireman or some

3   Fireman entity?

4      MR. KATZ:  Right.

5   A.  I don't remember.  Six thousand a month,

6   that's probably right.  I remember my father --

7   that was the day he died.

8   Q.  (BY MR. KATZ)  And you were a beneficiary

9   of the estate?

10  A.  No.

11  Q.  You were not a beneficiary of the estate?

12  A.  No.

13  Q.  Was any entity of which you were a

14  beneficiary a beneficiary of the estate?

15  A.  I don't know what you said.

16  Q.  Let me reask the question.  Did you have

17  any interest in that $72,000 a month rent?

18  A.  No.

19  Q.  Who was getting the $72,000 a month rent?

20      MR. PETERS:  $72,000 a year.

21  Q.  (BY MR. KATZ)  I'm sorry.  $72,000 a year.

22  A.  At the time of this document?

23  Q.  Yes.

24  A.  My father.  Subsequent to that, it went to

1   my mother.

2   Q.  Okay.  And so your mother was -- your

3   mother received all the rent from the building

4   after your father passed away; is that right?

5   A.  Until we left, yes.

6   Q.  Until you left.  And you personally never

7   received any --

8   A.  No.

9   Q.  -- of the money that came from the rent?

10  A.  We were paying like $3 a foot.  We moved

11  into space that was $48 a foot.

12  Q.  But you weren't paying for it?  News

13  America Marketing was paying for it; right?

14  A.  Well, I paid for it up until the closing of

15  the sale, and then I don't know how they -- I don't

16  know if I paid for it, Gordon, because we didn't

17  get any of the financials of what was being paid

18  for.  Yeah, I believe that CCMI was paying a

19  division of the $48,000 a month in rent that was

20  being charged at the Hancock.

21      (Exhibit 86 marked for identification.)

22  Q.  Let me show you Exhibit 86.  Exhibit 86 is

23  a June 23, 1999 e-mail, actually two e-mails, one

24  from Mr. Charm to Mr. DeVoe and the other from

1   Mr. DeVoe back to Mr. Charm.  And you are copied on

2   this e-mail; correct?

3   A.  It purports to send a copy to me.

4      MR. PETERS:  Gordon, just for my

5   clarification, there's no document control number

6   on this.  Is this a document that was produced or

7   are you just producing it now?

8      MR. KATZ:  No, this was a document that

9   we produced, but was not copied.

10     MR. PETERS:  Oh, we, we had this

11  conversation already in the Coughlin deposition.

12     MR. KATZ:  Right.  You may find

13  documents here that -- and there probably are other

14  documents, that were among the documents that were

15  in the files which --

16     MR. PETERS:  We reviewed but didn't

17  take.

18     MR. KATZ:  -- your client reviewed but

19  didn't take.

20     MR. PETERS:  I understand.  Thank you.

21  Q.  (BY MR. KATZ)  And I call your attention to

22  first the e-mail from Mr. Charm to Mr. DeVoe.  Do

23  you see where he says we need a statement that News

24  America will invest at closing $1.5 million as

1   hinted at in the definitions?

2   A.  I see it.

3   Q.  And then Mr. DeVoe says back 1.5 million

4   will not be infused into the building at closing.

5   Capital spending is managed centrally and funds are

6   distributed when approved.  Do you see that?

7   A.  Yes.

8   Q.  Were you concerned when you saw Mr. DeVoe

9   taking this position?

10  A.  No, not at all.  David and I agreed on how

11  we were going to spend the 1.5.  I didn't need it

12  at the closing.

13  Q.  Okay.  In addition, Mr. Charm says salaries

14  of $175,000; do you see that?

15  A.  No.

16     MR. PETERS:  11.

17  Q.  (BY MR. KATZ)  In number 11?

18  A.  Okay.

19  Q.  Do you see that?

20  A.  Yes.

21  Q.  And then Mr. DeVoe says salaries, if you

22  refer to initial LOI, base is 160; do you see that?

23  A.  Yes.

24  Q.  Do you have a copy of the initial LOI?

1    A.   No
2    Q.   Do you know what he s referring to when he
3  says --
4    A.   Letter of intent
5    Q.   But you don't have a copy of it?
6    A.   No.  I mean.  I don't have a copy of
7  anything. not even my own memos
8    Q.   Okay.  Item number 12. Mr. Charm says
9  lastly. Bob and Ann need a statement that News
10  America and the new CCMI will undertake a best
11  efforts to have its salespeople at no cost to CCMI
12  sell for CCMI and that News America will not hinder
13  CCMI and the shareholders from earning additional
14  purchase price.  Do you see that?
15    A.   Yes
16    Q.   Okay.  You'd agree with me that there s
17  nothing in the stock transfer -- the Stock Purchase
18  Agreement about News America Marketing using best
19  efforts to have its salespeople sell for CCMI.
20  right?
21    A.   No.  Don't agree
22    Q.   The words best efforts are nowhere used in
23  the Stock Purchase Agreement. are they?
24    A.   No. no. but I don't --

1    Q.   Just yes or no. please.  Yes or no
2    A.   Well. you're just taking best efforts?
3    Q.   I'm just taking best efforts
4    A.   Using the sales force is in the agreement
5    Q.   Just best efforts. yes or no?
6    A.   I don't see best efforts in 6 0
7    Q.   Thank you.
8         (Exhibit 87 marked for identification.)
9    Q.   Let me show you a document that we're
10  marking as Exhibit 87.  What was the Personix
11  settlement?  What was the Personix settlement?
12  P-E-R-S-O-N-I-X
13    A.   Don't know.  Personix was a card
14  manufacturer.
15    Q.   What's the remaining liability that's being
16  discussed in this memo?
17    A.   I don't remember
18    Q.   Did you sue them or they sue you?
19    A.   Oh. Personix?  No.  We settled
20    Q.   What did you have to settle?
21    A.   I think they must have not produced some
22  products correctly and we were looking for some
23  credit. but we owed them some money.  I think that
24  was resolved.  I don t think we ever sued Personix

1  They're a company down in Houston
2    Q.   So you withheld payment and --
3    A.   I don't remember.  I m just speculating
4    Q.   Do you think you withheld payment to
5  Personix?
6         MR PETERS:  Don't speculate.  Testify
7  to the best of your knowledge
8    A.   I don't remember
9    Q.   (BY MR. KATZ)  Paragraph four. that is
10  located on the second page of the memo. says News
11  wants the right to cancel CCMI's real property
12  lease without penalty on 30 days notice to
13  landlord.  Do you see that?
14    A.   Yes.
15    Q.   Did you ask why News wanted that provision?
16    A.   Did I ask why?
17    Q.   Yes
18    A.   I don't remember if I asked why.
19    Q.   You knew. did you not. that there was a
20  good chance that News America Marketing was going
21  to have CCMI move to other space?
22    A.   Yeah. we were -- yes. I did.  I knew there
23  was discussion about consolidating the sales with
24  their other office that was downtown and they had

1  to relocate
2    Q.   And you knew that prior to the Stock
3  Purchase Agreement being signed. right?
4    A.   I didn't object to this.  I mean. I was
5  charging below market rent
6    Q.   I'm just saying you know it in advance of
7  the sale?
8    A.   Yes
9    Q.   So it didn't come as a surprise to you when
10  News America Marketing decided that it wanted to
11  move to the Hancock building. right?
12    A.   Yes. it did. to the Hancock building
13  That's a different question
14    Q.   Let me show you Exhibit 88
15         (Exhibit 88 marked for identification.)
16    Q.   And Exhibit 88 is a memo -- two memos.
17  actually.  The second page is a memo of July 9th.
18  1999 to Les Charm from Dave DeVoe and the first
19  page is a July 12th. 1999 e-mail from Les Charm to
20  Dave DeVoe.  And if I can call your attention to
21  the July 9th. 1999 e-mail. if you would take a look
22  at --
23    A.   Which one is that. Gordon?
24    Q.   That's the second page

1      A.  Yeah.  Okay.  This is from Charm to DeVoe
2  and this is from --
3      Q.  And the subject is margin.
4      A.  Yeah.
5      Q.  Do you see it?  And it says paragraph
6  three. intentions language. not comfortable. will
7  be worked through  I believe I provided a fair
8  offer. a free look for Ann and Bob at the end of
9  year two that would enable them to leave the
10  company and collect one year of base compensation.
11  forfeit earn-outs in years three through five.
12  non-compete list after that year. continuation of
13  employment in years four and five at News' option;
14  do you see that?
15      A.  Yes
16      Q.  And had you seen this e-mail at or about
17  the time it was sent?
18      A.  No
19      Q.  You don't think Mr. Charm forwarded it to
20  you at or about --
21      A.  I don't believe he did
22      Q.  -- the time it was sent in July of 1999?
23      A.  I don't know
24      Q.  Wasn't it Mr. Charm's practice to keep you

1  and Ms. Raider in the loop on all of his
2  discussions with Mr. DeVoe?
3      A.  No.
4          MR. PETERS:  Gordon. it doesn't appear
5  to me that this page one goes with two and three
6  I'll obviously take you at your word. but they look
7  like different documents  One looks like it's
8  faxed. page two and three. but the first page
9  doesn't look like it's part of the fax  Maybe it
10  is
11          MR. KATZ:  Yeah. I think they go
12  together. so that's why they're grouped
13          MR. PETERS:  Okay
14          MR. KATZ:  Okay?
15          MR. PETERS:  As one document. as some
16  e-mail string?
17          MR. KATZ:  Yes
18      Q.  (BY MR. KATZ)  Were you aware of
19  Mr. Charm's e-mail back to Mr. DeVoe on July 12th.
20  1999 with the subject CCMI?
21      A.  No
22      Q.  You were copied on this e-mail. correct?
23      A.  It shows it. but I have no present
24  recollection of this e-mail.

1      Q.  And so was your attorney at Goodwin.
2  Procter & Hoar?
3      A.  Yes
4          (Exhibit 89 marked for identification.)
5      Q.  And Exhibit 89 is an e-mail. subject CCMI.
6  from les Charm to Dave DeVoe with a copy to
7  Mr. Fireman and Mr. Duggan at Goodwin Procter?
8          MR. PETERS:  I just -- I want the --
9      Q.  (BY MR. KATZ)  Do you remember seeing this
10  e-mail?
11          MR. PETERS:  -- the record to reflect
12  that I'm going to reserve my objection on 88 unless
13  someone can authenticate this as an e-mail that
14  belongs together.  I'm not doubting you. Gordon.
15  but I'm in the document business. too. and things
16  get stapled together that don't necessarily belong
17  together and I don't want my silence to be some
18  kind of indication that I think this as produced is
19  authentic  I'm not suggesting anything nefarious
20  It's more or less a reminder to myself
21          MR. KATZ:  Okay
22          MR. PETERS:  Do you have 89 for me?
23          MR. KATZ:  Yes
24      A.  Is there a question?

1      Q.  (BY MR. KATZ)  Do you remember receiving
2  this e-mail?
3      A.  No.  I have no present recollection.
4      Q.  There is language in here which says it
5  seems clear where we are headed  Not a lot of
6  protection to Ann and Bob.  Do you see that?
7      A.  Yes
8      Q.  Okay.  What -- do you have any recollection
9  as to having seen that language before?
10      A.  No
11      Q.  Do you remember ever having a discussion
12  with Mr. Charm as to why he used that language in
13  this e-mail?
14      A.  No.
15      Q.  It then goes on and says so give us as much
16  as you will now and let's not spend a long time
17  talking about -- with respect to the 1.5 --
18  $1.500.000 clause as I call it; do you see that?
19      A.  Well. that's what it says  I mean
20  obviously --
21      Q.  Do you remember having any discussion with
22  Mr. Charm or anyone else about what he meant in
23  using those words?
24      A.  He wanted -- I mean. I don't remember

1  anything specific  It looks like he and David were
2  trying to figure out how to get this done  It
3  looks like they were exploring alternatives to
4  gross margin  It looks like he wanted the 1 5 at
5  least delineated somehow  but they were working
6  this out
7     Q  It goes on to say words from you would be
8  helpful like some words about good faith  no
9  diverting business from CCMI to other divisions or
10 taking elsewhere  State that the plans are to use
11 salespeople of other divisions  no allocation of
12 cost or purchasing profits ending up elsewhere  et
13 cetera  Do you see that?
14    A  Yes
15    Q  You would agree with me  would you not
16 that the words good faith do not appear in
17 paragraph 6 8 of the Stock Purchase Agreement?  Yes
18 or no?
19    A  But I believe they re implicit
20    Q  I said you would agree with me  yes or no
21 that the words good faith do not appear expressly
22 in paragraph 6 8?
23    A  Explicitly  they don t appear
24    Q  And there s no language in paragraph 6 8

1  about no diverting business from CCMI to other
2  divisions or taking elsewhere  correct?
3     A  That s correct
4     Q  It goes on to say  Mr  Charm does  state in
5  the agreement that you think the budgets are fair
6  and reasonable from what you know about other
7  companies in the News America package and that they
8  are reasonable given the growth rate that everybody
9  is expecting  Do you see that?
10    A  Yes
11    Q  Okay  And you d agree with me  would you
12 not -- again  please answer yes or no -- that there
13 is nothing in the Stock Purchase Agreement that
14 discusses the budgets being fair and reasonable
15 from what you know about other companies in the
16 News America package and that they are reasonable
17 given the growth rate that everybody is expecting?
18         MR  PETERS:  Is that language in the
19 contract; that s Mr  Katz s question
20    A  It s not in the contract  I don t even
21 know what it means
22    Q  (BY MR  KATZ)  I m going to show you a
23 document that we re marking as Exhibit 90
24         (Exhibit 90 marked for identification )

1     Q  And it is two e-mails  one from you
2  Mr  Fireman  to Mr  DeVoe dated Thursday  July
3  29th  1999  and then a response from Mr  DeVoe
4  dated Saturday  July 31  1999  Do you remember
5  sending this e-mail to Mr  DeVoe?  Have you
6  finished reading the document?
7     A  No
8     Q  I m not going to ask you many questions
9  about it  so let me -- in fact  I m only going to
10 ask you one or two  In your e-mail of Thursday
11 July 29th  1999  you were making some suggestions
12 as to how you thought gross margins should be
13 defined in the Stock Purchase Agreement  right?
14    A  No  I think we were trying to define what
15 expenses should come off the top and how GAAP would
16 apply
17    Q  And that all related to how gross margin
18 was going to be defined in the stock purchase
19 agreement  right?
20    A  No  just in general  I mean  this was more
21 of a business -- get clarity on the basis of the
22 bargain is what I m talking about today
23    Q  In any event  isn t it a fact that
24 Mr  DeVoe in his e-mail back to you on Saturday

1  July 31  1999  basically said no to all your
2  suggestions?  He said I believe the margin
3  definition as worded is accurate and represents the
4  deal structure that NAM is willing to close on with
5  CCMI  isn t that right?
6     A  That s what he said at this moment in time
7     Q  And you interpreted that as a rejection of
8  all the requests that you were making in your
9  e-mail of July 29th  1999; is that right?
10    A  No  This was everybody working to try to
11 come to an acceptable arrangement  I mean  les was
12 making suggestions  we were making suggestions  and
13 David was making suggestions  Maybe not here
14         (Exhibit 91 marked for identification )
15    Q  Let me show you a document that we ve
16 marked as Exhibit 91  This is a letter from you to
17 Mr  DeVoe dated October 22  1999  The deal had
18 just recently closed  right?
19    A  Yeah
20    Q  And you wanted more support from NAM more
21 quickly because you wanted to maximize your
22 earn-out numbers  right?
23    A  No  We wanted to build the business and
24 maximize our earn-out numbers  When we made good

1    numbers. they were making good numbers

2       Q    And you know that the hardware for Duane

3    Reade had been ordered, right?  I call your

4    attention to the third paragraph  It says the

5    hardware for Duane Reade was finally all ordered on

6    October 18th  right?

7       A    That's what it says.  I don t remember

8    exactly what they were talking about. but if you

9    let me read the letter. I'll try

10      Q    You signed this letter, right?

11      A    Yes.

12      Q    And again. I'm just going to ask you some

13   specific questions   You say that the hardware for

14   Duane Reade was finally all ordered on October

15   18th. right?

16      A    That s what the document says

17      Q    And the document was a document which you

18   wrote. right?

19      A    Right.  Obviously. I was concerned it

20   should have been ordered two months earlier. but

21   whatever

22      Q    But from your standpoint  it was a good

23   thing that NAM had in fact ordered the hardware for

24   Duane Reade  right?

1    working hard to help find qualified sales

2    candidates. right?

3       A    Not at this time

4       Q    Okay  And that was a good thing from your

5    standpoint. right?

6       A    No.  Getting people in place was a better

7    thing  Having HR people looking is a positive

8    thing. but not result-oriented

9       Q    Just answer the questions yes or no. or

10   we're going to be here longer than we have to be

11          (Exhibit 92 marked for identification )

12      Q.   let me show you what we've just marked as

13   Exhibit 92  This is an e-mail from Mr. DeVoe dated

14   November 12th. 1999  Now. in this e-mail.

15   Mr. DeVoe summarizes the status of CCMI personnel.

16   right?  Right?

17      A    Yes

18      Q    He discusses organization. new hires and

19   terminations?

20          MR. PETERS:  Objection

21      Q.   (BY MR. KATZ)  Right?

22      A    He discusses a lot of things.  Yes

23      Q    Okay  And he says at the bottom of the

24   letter. we will not be able to facilitate any

1       A    Only if it got used.

2       Q    Okay

3       A    That server came and sat for months   No

4    one fixed it  No one put the software on it   So

5    hardware was no good without the software   That's

6    why I say below Dave Benson s group  It never got

7    done

8       Q.   let's move to my next question  You note

9    in your letter that Kevin Tripp had just started.

10   right?

11      A    Yes. I see that now.

12      Q    From your standpoint. this was a good

13   thing  right?

14      A    Yes   Kevin was a great guy

15      Q    And you note that Stephanie Nix was working

16   hard to help find qualified candidates. right?

17      A    I know she was stating she was. yes

18      Q    Okay. well. you state it as an affirmative

19   fact   While Stephanie Nix is working hard to help

20   find qualified candidates. she's just now

21   contacting recruiters   That's what you said.

22   right?

23      A    Right

24      Q    So you didn t have any doubt that she was

1    additional head count increases at this time.  Do

2    you see that?

3       A    Yeah

4       Q    And then under Ann s group  manufacturing

5    sales. it says hold firm and look to hire

6    additional head count as sales develop.  Do you see

7    that?

8       A    No.

9       Q    look under manufacturing sales hyphen Kevin

10   Tripp.  It says hold firm and look to hire

11   additional head count as sales develop  Do you see

12   that?

13      A    Yes

14      Q    And this was consistent with NAM's policy

15   that head count follows sales. right?

16      A    Wrong

17          MR. PETERS:  Objection

18      Q.   (BY MR. KATZ)  And under the stock purchase

19   --

20      A    But this is not accurate.

21      Q    Just yes or no   You answered the question.

22      A    No. I --

23      Q    You answered the question.  We're going to

24   be here all night unless you just answer the

1  question

2      A.  You're confusing the record. counsellor.

3      Q.  Well, your counsel will have an opportunity

4  to set the record straight if he feels it

5  necessary.  Now, under the Stock Purchase

6  Agreement, News America Marketing senior management

7  had the power to make head count decisions, right?

8          MR. PETERS:  Objection.

9      A.  No.

10         (Exhibit 93 marked for identification.)

11     Q.  (BY MR. KATZ)  Let me show you a document

12  we've marked as Exhibit 93.  Exhibit 93 is two

13  e-mails, one from you to Mr. DeVoe and others dated

14  Monday, November 15th, 99, 1999, and then another

15  e-mail from Mr. DeVoe to you and others dated

16  Monday, November 15th, 1999, later in the day.

17  Now, your e-mail of Monday, November 15th, 1999,

18  responds to Mr. DeVoe's e-mail of November 12th,

19  1999, correct?

20     A.  Are you asking if his is a response to

21  mine?

22     Q.  I'm saying that your e-mail that begins in

23  the middle of the first page of the exhibit is a

24  response to the previous exhibit. Mr. DeVoe's

1  e-mail to you of November 12th, 1999.

2      A.  Of this one?

3          MR. PETERS:  No.  Does 92 -- does 93

4  respond to 92?

5      A.  92, 93 --

6      Q.  (BY MR. KATZ)  And let me see if I can help

7  you.  Your e-mail begins Dear Dave and John.

8  You're sending it to Jon Rubin as well as

9  Mr. DeVoe.  And you say in the first line, I have

10  reviewed your e-mails of Friday and Saturday; do

11  you see that?

12     A.  Yes, I see it.

13     Q.  And the e-mail of Friday that you're

14  referring to is Mr. DeVoe's e-mail that was our

15  previous exhibit, right?

16     A.  Right, but I don't see Saturday's.  I

17  assume that's the one.

18         MR. PETERS:  Well, don't assume.

19     A.  I don't know.

20         MR. PETERS:  Don't speculate.

21     Q.  (BY MR. KATZ)  In any event, in the next

22  sentence you say although we agree to the changes

23  in general for present budgetary and operational

24  issues, the timing and tactics you are suggesting

1  do not work for us.  Did I read that correctly?

2      A.  That's what it says.

3      Q.  And the beginning of the sentence, just to

4  emphasize the point, you say that you agree to the

5  changes in general, right?

6      A.  Are you reading the letter --

7      Q.  I'm just asking you a question.

8      A.  -- or are you asking what I meant?

9      Q.  No, I'm just asking to say that those

10  are the words that you used.

11     A.  Those are the words.  That's not what I

12  meant.  You're taking it out of context.

13         (Exhibit 94 marked for identification.)

14     Q.  Let me show you Exhibit 94.  94 is a memo

15  dated 11/17/99 titled summary and next steps.  Do

16  you see this document?

17     A.  Yes.

18     Q.  This document reflects that you

19  participated in a strategy session presentation on

20  -- in New York on November 17th, 1999?

21     A.  Yes.

22     Q.  Do you see that?  And -- and if you go to

23  the second page of the document, do you see where

24  it says the issues raised by Paul and Dominick

1  included, and then it lists a number of bullet

2  points?  Do you see that?

3      A.  Yes.

4      Q.  And Paul was Paul Carlucci?

5      A.  Yes.

6      Q.  Right?  He was the chairman of the company?

7      A.  Yes.

8      Q.  And Dominick was Dominick Porco, right?

9      A.  Yes.

10     Q.  He was the president of the company, right?

11     A.  Yes.

12     Q.  And among the issues raised by the two of

13  them was need to educate NAM's sales force on the

14  product; do you see that?

15     A.  Yes.

16     Q.  And he's referring there to your product,

17  right?

18     A.  Yes.

19     Q.  And next, it says need to have NAM's sales

20  force assist in setting up calls at key retailers

21  and manufacturers; do you see that?

22     A.  Yeah.

23     Q.  Both of these items were recognized by NAM

24  senior management, right?

1      A.  They were part of the business deal
2      Q.  Right
3      A.  They just never did it.
4      Q.  Well  that s your opinion  But from your
5  perspective  it was a good thing that Paul and
6  Dominick were raising these issues  right?
7      A.  No   At that time  we were beginning to get
8  a feel or were trying to work within the new
9  organization  We were very concerned that it
10  wasn t happening   And we d go to these meetings
11  and we d try to participate and we tried to get
12  them back on track  but it wasn t working
13          (Exhibit 95 marked for identification.)
14      Q.  Let me show you a document we ve marked as
15  Exhibit 95  Exhibit 95 is a December 7th  1999
16  letter from Ms  Raider to Mr  DeVoe and then an
17  e-mail from Mr  DeVoe on the same date responding
18  to Ms  Raider s letter with a copy to you and to
19  Ian Moore  correct?
20      A.  That s what it purports to be.
21      Q   Okay   And in her letter of December 7th
22  1999  Ann asked to change the terms of the Stock
23  Purchase Agreement to extend the first year
24  earn-out period  correct?

1      A   Where?  Where are you looking?  At the
2  letter?
3      Q   Yes.
4      A   There s three documents in this document
5          MR  PETERS:  Objection
6      A   Hold on here   Which one?
7          MR  PETERS:  Take a look at it   Unless
8  Mr  Katz wants to direct you to a particular place,
9  you ll have to read it
10      Q   (BY MR  KATZ)  Take a look at the next to
11  the last paragraph before the signature
12      A.  On what page?
13      Q.  Bates stamp NAM 03593
14          MR  PETERS:  The paragraph begins in
15  closing  Your question is directed to that
16  paragraph  Mr  Katz?
17          MR  KATZ:  Correct   Mm-hmm
18      Q   (BY MR  KATZ)  Ann was asking Mr  DeVoe to
19  change the terms of the Stock Purchase Agreement to
20  extend the first year earn-out period  correct?
21      A   That s what it says
22      Q   Okay   And then let s go to the e-mail that
23  Mr  DeVoe sent back to Ann with a copy to you  and
24  if you look at the last line of the e-mail  it says

1  deal   I understand your request   NAM is not
2  amenable to changing the terms of the agreement
3  Do you see that?
4      A   Yes
5      Q   Do you remember receiving that e-mail from
6  Mr  DeVoe?
7      A   There s a lot of substance in these
8  e-mails  but the answer is he did not agree at that
9  time to extend
10      Q   Right  and he was pretty decisive in his
11  response  was he not?
12      A   No   I think later on he offered to change
13  it  There were lots of discussions   You re
14  pulling this out of --
15      Q   This response was a very decisive response.
16  was it not?
17      A   He said we re not going to extend it in
18  that one   Later  he said he did
19          (Exhibit 96 marked for identification.)
20      Q   Let me show you a document we ve marked as
21  Exhibit Number 96   Exhibit 96 is a January 13th,
22  2000 e-mail from Mr  DeVoe to Mr  Fireman and
23  Ms  Raider   And in this e-mail  in the second
24  paragraph  Mr  DeVoe says the fact that News

1  America is actively involved in the division
2  strategy and management and is not seen as simply a
3  means of obtaining financial resources is
4  important   The hands-on style of News America will
5  create additional opportunities for employees
6  within the division to be promoted into other areas
7  of News America   Do you see that?
8      A   Yes.
9      Q.  Did you agree with this statement?
10      A   No   It wasn t true.
11          (Exhibit 97 marked for identification.)
12      Q   Let me show you a document we ve marked as
13  Exhibit 97
14      A.  He was justifying breaking up a winning
15  team
16      Q   You ve answered the question   Exhibit 97
17  is an e-mail from Mr  Fireman to Jon Rubin at News
18  America   Was this e-mail written in response to
19  Mr  DeVoe s January 13th e-mail to you?
20      A   This was heartthrob   This is telling him
21  --
22          MR  PETERS:  No  his question is
23  whether 97 responds to 96.
24      A   I have no idea   I don t think so   This is

```
 1    more of the same.  This is just a company policy
 2    thing.  This -- I was asking -- I was begging Jon
 3    Rubin to please make something happen.  We had a
 4    show.  We had no technology.  There were people --
 5    Rick Rossman, who was hired to help us, finally
 6    learned our business and was being taken off our
 7    account and was given to strangers who were not
 8    even hired.  We had a time critical business that
 9    was falling apart and no one cared.
10        Q.  Now, do you remember working with the NAM
11    logistics group to make a presentation on an
12    American Express project in 1999?
13        A.  No.
14        Q.  You don't remember that?  Do you remember
15    --
16        A.  What kind of project?  I mean --
17        Q.  Well, I'm asking you.
18        A.  We were working the Visa, MasterCard,
19    American Express, Discover.  I had relationships
20    with everybody.
21        Q.  And you worked with the NAM logistics group
22    to --
23        A.  I don't know what a NAM logistics group is.
24        Q.  Did you work with other people to assist
```

```
 1    you on any of those projects?
 2        A.  You've got to define the product.  What's a
 3    NAM logistics group?
 4        Q.  Well, let me ask you this question.  You
 5    remember the Toshiba project?
 6        A.  Yes.
 7        Q.  When did that first start?
 8        A.  I don't recall.
 9        Q.  And that started because you got a lead
10    from News Corporation, right?
11        A.  Yes.
12        Q.  And that project closed, right?
13        A.  Yes.  That project closed.
14        Q.  And the Toshiba project was the most
15    substantial piece of business CCMI had during the
16    five years after NAM's acquisition of CCMI, right?
17    Just yes or no.
18        A.  I don't know, but there was a --
19        Q.  Can you think of anything that was more
20    substantial than that during your five years with
21    News America Marketing?
22        A.  Seeing our core business was not done, that
23    looked pretty good.  I don't know.  I didn't have
24    access to the records.
```

```
 1        Q.  Okay, but as far as you -- as far as you
 2    know, in your own personal experience, the Toshiba
 3    business was the best piece of business that you
 4    received during the five years after the
 5    acquisition?
 6        A.  You me or you CCMI or SmartSource Direct or
 7    who?
 8        Q.  Well, we'll start with you, Mr. Fireman.
 9    It was the best piece of business that you were
10    successful in bringing in?
11        A.  No.  The best piece of business was the
12    Ahold prepaid cellular contract.  That was a $50
13    million piece of business.
14        Q.  But that contract was never signed?
15        A.  Sure it was.
16        Q.  Do you have a copy?
17        A.  No.
18        Q.  Where would you find a copy?
19        A.  In the records of News America Marketing.
20        Q.  And if I told you there was no such signed
21    contract, would you agree with me that none
22    existed?
23        A.  No.
24        Q.  But you don't have a copy yourself?
```

```
 1        MR. PETERS:  Asked and answered.  The
 2    answer is no.
 3        Q.  (BY MR. KATZ)  You don't have personal
 4    knowledge that the contract was signed?
 5        A.  Yes, I do.
 6        Q.  You weren't there at the time it was
 7    signed?
 8        A.  We rolled out a division of the -- so I
 9    assume we had a contract.  I negotiated the
10    contract.  I think Jordan even helped, and it was
11    signed by -- I believe it was signed and we rolled
12    out the first division, so if it wasn't signed, we
13    had a full implementation going on with a major
14    retailer and we were waiting to roll out the whole
15    other groups.
16        Q.  The Toshiba project was a very good thing
17    from your perspective, right?
18        A.  The Toshiba project was a part of card
19    marketing and we were the experts in the country.
20        Q.  Please just answer the question.
21        A.  Yes, of course it was a good thing.
22        Q.  And you found it because of a lead from
23    NAM's parent corporation, no?
24        A.  We found it because it was either Citibank
```

1    in New York or Citibank in Tokyo were looking for
2    someone to do a coupon delivery to solve a very
3    major problem that Toshiba was having.  And
4    obviously News America Marketing was coupon
5    driven but --
6        Q  Please just answer the question.  You found
7    it because of a lead that was provided you from
8    News America Marketing s parent, correct?
9        A  Don't know.  Could have been from News
10   America Marketing.
11       Q  Okay.
12       A  Don't know.
13       Q  But you wouldn't have found it if you were
14   just left to your own devices, right?
15       A  I didn't find it.  It found me.
16       Q  Thank you.  That answers the question.
17       A  It found us because we were the only ones
18   in the country that could do it.
19            (Exhibit 98 marked for identification.)
20       Q  Let me show you a document which we've
21   marked Exhibit 98.  Exhibit 98 is an April 6th,
22   2000 e-mail from Henri Lellouche to -- to Bill Adam
23   and others, or the subject of it is Bill Adam and
24   it's to a number of recipients.  And the e-mail

230

1    begins -- well, let me ask first, you received a
2    copy of this e-mail, right?
3        A  I don't know.
4        Q  I mean, it says to News America Marketing
5    all.  You would have been included in that?
6        A  Should have been, but I don't know what
7    they did.  The answer is -- I know about this.
8    Yes.
9        Q  Okay.  What was your e-mail address when
10   you were at News America Marketing?
11       A  R Fireman at News America dot com.
12       Q  Okay.  And the beginning of this e-mail
13   says I am sure that you have all read about our
14   multi-million dollar investment in the Epiphany
15   software and the host at ASP.  This represents a
16   major commitment by NAM through the SmartSource
17   Direct division to be a major player in the
18   customer relations marketing, CRM, business and we
19   expect it will generate significant revenue for
20   SmartSource Direct.  Do you see that?
21       A  Yes.
22       Q  Did you agree with this statement in
23   April 2000?
24       A  No

231

1        Q  Why not?
2        A  Because it wasn't true.  They signed a
3    contract to do it but the people to do it -- Bill
4    Adams wasn't the person to do this.
5        Q  Why?
6        A  Because he was a -- he wasn't an IT guy.
7    Bill Adams was a creative, consultative guy with
8    knowledge of technology.  He would die and did die
9    in that environment.  I mean, there wasn't the
10   staff or the dedication or the focus to do this
11   correctly.  I was disappointed that it cost multi
12   millions of dollars.  I could have bought it for
13   less than 300,000.  They spent millions, wiped out
14   my ability to spend any other money under our
15   earn-out.  So this e-mail
16   dated April 2000, I don't think they delivered the
17   product in working fashion ever and they didn't
18   show it to clients for at least a year or so later,
19   and the marketplace moved without us.
20            (Exhibit 99 marked for identification.)
21       Q  Let me show you Exhibit 99, but before I
22   get to that, let me ask what you meant when you
23   said the marketplace moved without us.
24       A  Other people were actually growing the

232

1    space.  We -- when we started with them, probably
2    in -- you could talk about the numbers, but we were
3    -- everyone was just about to go to card programs.
4    We were 50, 60 percent of the marketplace.
5        Q  CCMI was?
6        A  Yes.  I mean, if we could just -- Catalina
7    -- there was one other company in America that had
8    the expertise to issue.  We invented the key tags.
9    We invented the process of how applications are
10   done and how they're done off-shore.  We invented
11   the concept of stored value in the applications for
12   Toshiba.  We had software that could analyze the
13   program and do it.  And at that time, Catalina,
14   Valassis were acquiring companies and getting into
15   the business and they were investing in trade
16   shows, they were investing in technology, they were
17   actually doing stuff.  Instead of keeping our core
18   unit together, we were broken up and destroyed.  We
19   were destroyed.  So while we're building Aspen for
20   a year and a half, you know, companies with --
21   Market Expert was another software company.
22       Q  You said you had retailers that made up 50
23   to 60 percent of the market share?
24       A  At one time, yeah.

233

1   Q    Please name them for me

2   A    Lucky Stores. I mean --

3   Q    Name all of them.

4   A    Shaw's, Lucky -- I mean, we were talking to

5   every retailer in the country.

6   Q    But who did you have under contract on an

7   ongoing basis?

8   A    I don't recall

9   Q    Okay

10  A    But of the card programs that were out

11  there, we had to have 30 to 60 percent of all those

12  customers, and we had talked to the rest.  It was

13  all about to happen.  All we had to do is get into

14  a place and do it, and that's a fact

15  Q    Let's go back to Exhibit 99.  Can you

16  identify that for us?

17  A    I can't read it.  It's Ann's writing

18  Q    Have you seen it before?

19  A    April 14th --

20  Q    Well, can you read this?

21  A    I can read parts of it

22  Q    Okay.  Please read it into the record

23  A    I can't read all of it

24  Q    Well, read as much as you can, because I

1   have trouble reading her handwriting

2   A    Okay.  On Friday, April 14th -- I think it

3   says '00, 2000, we, Bob and I, met with Paul

4   Carlucci   The meeting was to say we were not liked

5   or getting along with the management or -- of NAM

6   and he was giving us advice.  He provided the forum

7   to present our concerns.  His comments were

8   interesting.  Several times during the meeting he

9   said oh, you should go see a lawyer.

10  Q    Doesn't it say or you could go see a

11  lawyer?

12  A    Can you read her writing better than me?

13  Q    It doesn't say should; it says could,

14  doesn't it?

15  A    I can't read it

16  Q    Okay

17  A    He showed us a copy of e-mails with the --

18  expressed extreme frustration on Henri -- actions

19  Henri was taking.  He said don't e-mail.  No needs

20  for a deposition.  No something.  Talk to the

21  manager.  He takes no notes during any meeting and

22  he was disposed -- he would not have any record of

23  our conversation.  He purported to have no

24  knowledge of our formal -- funeral -- there's a

1   slip -- financial deal of the earn-out.  He could

2   not believe no one has weekly meetings and us

3   alone.  Bob and I gave him concrete examples of how

4   our issues -- Bob something denial manager --

5   title -- Bob's title, general manager, with no

6   authority, no responsibilities.  Ann writes

7   something with no control over who -- marketing

8   person -- she's the marketing person with no

9   control over who is hired for her staff on the --

10  or the expenses.  Plan is presented   I do not even

11  have a copy.  Bill Adam is pulled from the meeting

12  at Pathmark at 10:30 the night before.  The meeting

13  is a failure.  He -- he something -- already

14  discussing -- he -- I can't read that.  All ready

15  to discuss.  Had Kevin Tripp, my VP, was assigned

16  to somebody else.  We were put in a box.  NAM was

17  implementing the CCMI plan.  The next step, Paul

18  said he would voice our concern to the others and

19  renew our financial something.  Over the next few

20  weeks we will see what happens.

21  Q    Do you remember being present at this

22  meeting that's recounted?

23  A    Yes, I recall that meeting

24  Q    Is there anything that you remember that's

1   not included in the memo that you just read?

2   A    Well, I testified before.  I mean --

3   Q    You don't have to repeat.  Just anything --

4   anything new that's not in this memo

5   A    Anything that happened at the meeting

6   that's not in the memo?

7   Q    Correct

8   A    No, I think it's a generalization of the

9   meeting

10  Q    Okay.  And do you know why Ann prepared

11  this memo?

12  A    At that point in time, we were concerned

13  that News was crushing our business and going to

14  force us out and file some sort of lawsuit against

15  us to crush us in the deal and throw us out of our

16  own deal.  That's why I testified previously we

17  considered filing a lawsuit here, because we

18  couldn't afford to fight them in New York.  We

19  thought that they were preemptively with

20  premeditation wiping out our company, taking our

21  database knowledge for their other businesses, and

22  blowing us out of the marketplace that we so

23  happily created, and we were scared

24           (Exhibit 100 marked for identification.)

1     Q   Let me show you Exhibit 100

2     A   Concerned   Scared is probably --

3     Q   Did you receive a copy of this document,

4   which is a memo from Ann Raider to Mr  Lellouche

5   dated May 3rd, 2000?

6     A   No

7     Q   And at the bottom of this, the document

8   says -- Ms  Raider writes Henri, we will not

9   achieve the planned sales goals for CCMI, now SSD,

10  for NAM and certainly not the earn-out promised by

11  NAM to Bob and I which is due in five short months;

12  do you see that?  Do you see that paragraph at the

13  end of the letter?

14    A   Yeah, I mean, we re -- we re a broken

15  record   Please help   Please get us some staff

16  Please improve the quality

17    Q   Please   We're going to be here way over

18  time unless you just answer the questions yes or

19  no

20    A   Yes

21    Q   I've been saying that all day   And you

22  would agree with me that there was no specific

23  dollar amount earn-out promised in the 1999 Stock

24  Purpose Agreement, correct?

1     A   No  incorrect

2     Q   There is no specific dollar amount

3   explicitly stated as being promised in the 1999

4   Stock Purchase Agreement, correct?

5     A   No  incorrect

6         (Exhibit 101 marked for identification )

7     Q   Let me show you Exhibit 101, and this is a

8   very simple exhibit   Take a look at the second

9   page   Actually, take look at the last page   This

10  document reflects, does it not, that you received a

11  $3 000 merit increase in 2000?  Right?

12    A   Yes

13    Q   And you also received a $16 300 bonus in

14  2000, right?

15    A   That s what this purports   Less than the

16  30 000 I thought I had

17        (Exhibit 102 marked for identification )

18    Q   Let me show you a letter dated September

19  11th, 2000 from you and Ms  Raider that we've

20  marked Exhibit 102   And the first paragraph of the

21  letter says we are encouraged NAM through your

22  efforts made the commitment to the SmartSource

23  I-Group and included products  services  concepts,

24  and remains of CCMI as its core strategy   loyalty

1   marketing and building customer relationships will

2   be the bridge for the bricks to clicks and will

3   become a competitive advantage for SS dot com   We

4   are pleased Chris and Henri are now including us in

5   some of the strategic discussions with the I-Group

6   executive management team   Did I read that

7   correctly?  Right?

8     A   Yes

9     Q   And you wrote that?

10    A   Well  it's a preamble to other content in

11  this letter

12    Q   Right   You were most concerned about

13  getting NAM to agree to a modification of the Stock

14  Purchase Agreement so you could, quote, earn your

15  money; isn't that right?

16    A   We were dedicated to anything that made

17  positive sense, but yes, we were concerned that we

18  had a chance to make the money we bargained for

19  when we sold the business

20        (Exhibit 103 marked for identification )

21    Q   Okay   Let me now show you Exhibit 103

22  It s an e-mail by Mr  DeVoe to you and Ms  Raider

23  dated September 12th, 2000   In it he says I

24  received your letter dated September 11th, 2000

1   He said that it was his understanding that both you

2   and Ms  Raider were playing an integral role in the

3   development of SmartSource Direct; do you see that?

4     A   I'm sorry   Where is that?  What paragraph?

5         MR  PETERS:  Paragraph three  second

6   sentence

7     A   Additionally --

8         MR  PETERS:  That Mr  Katz accurately

9   quoted that sentence I think is his question.

10  unless it's not your question

11    Q   (BY MR  KATZ)  He says second sentence,

12  third paragraph, my understanding was that both of

13  you play an integral role in the development of

14  SmartSource Direct   Do you see that?

15    A   Yeah   It's nice words

16    Q   And he did not agree to any modification to

17  the purchase agreement  right?

18    A   I didn't see that mentioned here

19    Q   At the beginning of the letter he says I

20  received your letter dated September 11th  2000   I

21  respectfully disagree with many of the observations

22  included in your letter as regards News America s

23  performance against any commitments outlined in the

24  Purchase Agreement   Do you see that?

1     A   Yes. but it doesn't talk about objecting to
2   anything specific
3     Q   And he doesn't agree to any modification of
4   the Purchase Agreement?
5     A   It doesn't say that   It says -- I mean.
6   you want me to read these documents together?
7     Q   No. I'm just saying if you take a look at
8   his September 12th. 2000 e-mail --
9     A   It doesn't talk about extensions to the
10  Purchase Agreement   It talks about observations in
11  the letter   David DeVoe was almost gone
12        (Exhibit 104 marked for identification )
13    Q   Exhibit 104 is an e-mail from Ms. Raider to
14  you. subject. Chris meeting   What was the purpose
15  of this e-mail?
16    A   I don't know
17    Q   Okay   There's a discussion of the deal?
18  Do you see that in the middle of the page?  Do you
19  see that?
20    A   This is sort of broken up in the e-mail
21    Q   That's how it was produced
22    A   What is the question. sir?
23    Q   The question is there's no reference to any
24  particular paragraph section of the Stock Purchase

---

1   Agreement in this memo. correct?
2     A   Well. these are the elements that are
3   implicit --
4     Q   Just yes or no. please   Just yes or no.
5     A   No. this is a memo he --
6     Q   Just yes or no   There is no number
7   referencing a particular section of the Stock
8   Purchase Agreement --
9     A   No.
10    Q   -- in this memo?
11    A   No.
12    Q   Right?
13    A   No
14    Q   You're agreeing with me?
15    A   Yeah
16        (Exhibit 105 marked for identification )
17    Q   Exhibit 105 is an e-mail from you to
18  Mr. Lellouche and others   It is dated October
19  11th. 2000   Subject is Giant letter   What was the
20  problem with the Giant project?
21    A   I can only -- I don't remember   I mean.
22  DEPS. I believe. was a data entry house that Giant
23  wanted us to use a domestic -- our normal process
24  was to use off-shore. cheaper. faster. had a

---

1   system   They insisted that the applications not be
2   sent off-shore. so we -- someone in Connecticut
3   sourced some companies to do it domestically   DEPS
4   I believe was a referral from Giant and I don't
5   think that they were getting the applications
6   processed fast enough. so we had to put some
7   pressure on them   And I think someone in the
8   operations. Michael Cleary or Coughlin. came to me
9   for help   That's my recollection
10    Q   That's all you remember?
11    A   Yeah
12    Q   Who in your view was responsible for the
13  problem with the Giant project?
14    A   Michael Cleary and Henri took it to
15  Connecticut   I mean. I don't know   We did a lot
16  of Giant projects   I assume this was one of the
17  roll-outs of the card program division at Giant
18    Q   Don't you remember that at the time the
19  roll-out occurred. there was a major problem with
20  Giant?
21    A   No   We had an excellent relationship with
22  Giant   I think it was that we weren't turning --
23  there was a promotion they wanted to do with the
24  roll-out and the key entry house wasn't getting it

---

1   turned around fast enough.
2     Q   Wasn't it your responsibility to have the
3   cards processed correctly at the point in time that
4   the Giant roll-out occurred?
5     A   No   I think it was already taken from me
6   But these were my friends at the manufacturer. so
7   DEPS wasn't making the card   DEPS was a key entry
8   place
9     Q   Is it your testimony that you had no
10  responsibility whatsoever for the problems that
11  occurred in connection with the Giant roll-out?
12    A   You know. I used to say as general manager
13  I'm responsible for everything in the company. but
14  as the general manager of this company. everyone
15  had been taken from me. no one reported to me. and
16  they only asked me to help when there was a
17  problem   I stepped into this. gave my best advice
18  If there was a problem at a card factory. I stepped
19  in because I probably still knew the owners or
20  people that respected me. and that's it   So if you
21  tell me the specific problem with Giant and who did
22  it. I would try to remember what my involvement
23  was. but if you're saying that I was the head of
24  operations. not true

1    Q.  Prior to Mike Cleary's arrival, weren't you
2  responsible for operations?
3    A.  I was responsible for everything if I was
4  the true general manager.
5    Q.  But putting aside your view --
6    A.  No, I wasn't.  I wasn't.  From the
7  beginning, I was taken off of everything.
8    Q.  Didn't Mr. Coughlin report to you for a
9  significant period of time?
10    A.  Before the acquisition?
11    Q.  Before Mr. Cleary came on board.
12    A.  When did Mr. Cleary come on board?
13    Q.  Well, when do you think he came on board?
14    A.  I don't remember.  When did he come on
15  board?
16    Q.  No, you have to answer the question to the
17  best of your ability.
18    A.  Oh, I don't know.
19    Q.  So in your view, you had no responsibility
20  whatsoever for anything that went wrong in
21  connection with the roll-out of the Giant program?
22        MR. PETERS:  Objection to the form of
23  the question.  I think he's answered it and I think
24  he's asked you to point to a particular program.

1    Q.  (BY MR. KATZ)  The particular program was
2  the roll-out and the particular problem was the
3  fact that the cards weren't being inputted quickly
4  enough, and then when the cards were inputted, they
5  were inputted incorrectly.
6        MR. PETERS:  With that --
7    Q.  (BY MR. KATZ)  Do you remember that
8  occurring?  There's been testimony from a couple of
9  deponents and you've been present at their
10  depositions.
11    A.  You've given me an e-mail.  You're talking
12  about the key --
13    Q.  Put the e-mail aside.
14    A.  No, I don't remember the problem with the
15  manufacture of those cards and I don't remember
16  when, because there were orders and reorders and
17  reorders and reorders.  I do remember there was a
18  fact that they wanted DEPS, if I'm correct -- and I
19  may be incorrect -- was a key entry place someplace
20  in the midwest.  And they weren't doing it fast
21  enough.  It had nothing to did with the card
22  manufacturer.  I was not responsible.  I didn't
23  visit them.  I only assisted, and if you want to
24  blame it on me, blame it on me.

1    Q.  Well I'm asking if you blame it on you.
2    A.  No, I blame it on Mr. Tellouche and the way
3  he managed the business, and by October of 2000 he
4  had broken up and moved all the responsibility
5  elsewhere.  But let me tell you, I work seven days
6  a week and I assist anybody with any problem that
7  came up.
8        (Exhibit 106 marked for identification.)
9    Q.  Let me show you Exhibit 106.  Now, you
10  wrote the document we've marked as Exhibit 106,
11  which is a letter from you to Mr. Mixson dated
12  October 17th, 2000, correct?
13    A.  Yes.
14    Q.  Okay.  And this letter was written at about
15  the same time that the Giant problem was occurring?
16        MR. PETERS:  The Giant problem
17  reflected in Exhibit 105?
18        MR. KATZ:  Yes.
19    A.  I don't know.  You've got to tell me more.
20  Refresh my recollection about the Giant problem.
21    Q.  (BY MR. KATZ)  The Giant problem was I
22  think as you stated that the cards weren't being
23  produced quickly enough.
24        MR. PETERS:  No, I don't think he said

1  that.
2    A.  I didn't say that at all.  The applications
3  weren't being processed.
4    Q.  The data entry wasn't quick enough.
5    A.  But tell me when.
6    Q.  I think it was in the fall of 2000.
7    A.  I don't know.
8    Q.  And the problem was at Giant they had all
9  kinds of promotions and give-aways for which they
10  needed the information so that their card members
11  could participate.  Does that ring a bell?  Are you
12  with me?
13    A.  I'm with you.  I'm looking at this memo.
14    Q.  No, that's the Giant problem.  Do you
15  remember that Giant problem?
16    A.  I testified to my knowledge of that
17  problem.
18        MR. PETERS:  Giant with a capital G?
19        MR. KATZ:  Capital G.
20    A.  I don't know when or how widespread.  I
21  don't have any recollection of the specifics of the
22  problem or who was responsible or who was involved.
23    Q.  (BY MR. KATZ)  Okay.
24    A.  Obviously, I made a recommendation how to

1    fix it and I was making it to Henri, so if I was
2    making it to Henri, he was obviously in charge and
3    not me.  Why would I be asking him?
4        Q.  Okay.  With respect to the October 17th,
5    2000 letter that you wrote to Mr. Mixson, you wrote
6    in the first paragraph we ask that you investigate
7    what NAM is prepared to do so that we might protect
8    our rights; do you see that?
9        A.  Yes.
10       Q.  And you do not cite any provision of the
11   Stock Purchase Agreement in your memo of
12   October 17th, right?
13       A.  Right.  Well, not right.  I mean -- it has
14   -- relates to the bonus in 2.3 and it relates to
15   the earn-out in 2.4 and it relates to the numbers
16   that are in the gross margin section and it overall
17   relates to the good faith of what we were trying to
18   accomplish and wasn't being done against the
19   competition that we made the deal to fight.
20       Q.  Okay.  And you say any action by us to
21   object was considered action against the company
22   and we were isolated and even reported to the
23   chairman for reprimanding; do you see that?
24       A.  Yes.

1        Q.  And what did you refer to -- what were you
2    referring to when you said that?
3        A.  That was the meeting with Paul Carlucci
4    when I fought to keep Bill Adam as part of our
5    consulting and management team in Boston.
6        Q.  Is that the same meeting that Ann Raider is
7    memorializing in her memo of 4/16?
8        A.  I believe, to the best of my memory at this
9    time, yes.
10       Q.  Okay.  And you say somewhere here that as a
11   result of NAM's action, NAM and us are a year
12   behind in the development of the required staff,
13   technology and resources to grow this business into
14   a $100 million plus business.  Do you see that on
15   the next to the last paragraph of page two?
16       A.  Yes.
17       Q.  Do you see that?  Wasn't the deal to build
18   the business into a $50 million business?
19       A.  That's how the earn-out was calculated.
20       Q.  Okay.
21       A.  The industry grew -- the industry's north
22   of 500 million, a billion.
23       Q.  Didn't you just embellish the $50 million
24   number to a $100 million in this memo?

1        A.  That was my goal, a hundred million.  50
2    was easily attainable if we just held the market
3    share and what happened.  It's not like we had to
4    go out and find the business; the business
5    happened.  It just happened to everyone else but
6    us.
7            (Exhibit 107 marked for identification.)
8        Q.  Let me show you what we've marked as
9    Exhibit 107.  This is an e-mail from Ann Raider to
10   Mr. DeVoe with a copy to you dated November 17th,
11   2000.  There is a reference here to the
12   $2.5 million earn-out; do you see that?
13       A.  Yes.
14       Q.  What was that?  Do you know?  If you don't
15   know, that's okay.  Just tell me yes, no, or I
16   don't know.
17       A.  I was just confirming conversations she had
18   with David.
19       Q.  No.  I'm just asking if you know what the
20   $2.5 million earn-out referred to.
21       A.  Well, it's one of the -- it's the bonus for
22   one of those years.
23           (Exhibit 108 marked for identification.)
24       Q.  Let me show you the document we've marked

1    as Exhibit 108, and Exhibit 108 is a letter dated
2    December 13th, 2000 from you and Ms. Raider to
3    Mr. DeVoe.  And in the letter, you and Ms. Raider
4    wanted to be paid a $2.5 million bonus amount,
5    right?  Bottom of the second page, you say we
6    respectfully request that you make payment in full
7    of the 2.5 million first year bonus amount, right?
8        A.  Yes.
9        Q.  How likely did you think it was that NAM
10   would grant you the $2.5 million bonus?
11       A.  We were looking for some good faith.  We
12   were looking for someone to fix the wrongs that
13   were happening for the breach of faith and the bad
14   execution of what we hoped would have been a joint
15   venture.  We were hoping that it wasn't an
16   intentional fraudulent situation.
17       Q.  You're not answering my question.  How
18   likely do you think it was?
19       A.  I don't know.  I don't know.
20       Q.  You -- you say in the letter we were to be
21   paid 2.5 million with a gross margin of 3.1 million
22   as -- inasmuch as CCMI had achieved this benchmark
23   prior to the acquisition.  If we had merely run
24   CCMI as we had in the past with the promised

1    assistance from NAM. the 2.5 million was virtually
2    guaranteed. Do you see that?
3         A.   Yes.
4         Q.   CCMI had never had a $3.1 million profit
5    margin in the past, correct?
6         A.   Where does it say that?
7              MR. PETERS:  It says gross margin. 3.1
8    million. Is that what you're referring to.
9    Mr. Katz?
10        Q.   (BY MR. KATZ)  Yes. but my question was
11   CCMI had never had a $3.1 million profit margin in
12   the past, right?
13             MR. PETERS:  Objection to the form of
14   the question.
15        A.   Wrong.
16        Q.   (BY MR. KATZ)  It had?
17        A.   The gross margin was before expenses. so
18   it's not the number you're thinking of.
19             MR. PETERS:  He's asking -- 3.1 appears
20   in the document. but he wants to know whether you
21   ever had a profit of 3.1 million. I think he's
22   referring to that.
23        A.   With a gross margin of 3.1. I believe. if
24   you went back to the year we did the $8 million and

1         A.   But the calculation was different than that
2    --
3              MR. PETERS:  He's just asking you what
4    the document says.
5         A.   Yeah.
6         Q.   (BY MR. KATZ)  I'm just asking a question.
7    Just asking a question. So it's a fair statement
8    that that's not $3.1 million. right?
9         A.   I don't know. I think if you went to the
10   document --
11             MR. PETERS:  I'm going to object to the
12   form of the question. Are you suggesting that
13   Exhibit 108 says that they list a profit margin of
14   3.1 million?
15             MR. KATZ:  I'm saying the document --
16   the language speaks for itself. It says that
17   inasmuch as CCMI had achieved this benchmark and
18   the benchmark is a gross margin of 3.1 million.
19   I'm just asking the question that based on 19-- I
20   know they're different items. but in 1997 I think
21   we've just established that the total revenue was
22   7.9 million.
23             MR. PETERS:  Gross margin is what?
24             MR. KATZ:  I don't know what the gross

1    just deducted the cost of goods --
2         Q.   (BY MR. KATZ)  From the gross revenue?
3         A.   Yeah.
4         Q.   You think would be over 3.1?
5         A.   I assume.
6         Q.   But you're not sure?
7         A.   Well. when we made the deal. this was a
8    lay-up. and that's what this letter meant.
9         Q.   Let's see. Do you have Exhibit 16 in front
10   of you?
11             MR. PETERS:  1-6?
12             MR. KATZ:  Yes.
13        Q.   (BY MR. KATZ)  Can you -- do you have a
14   piece of paper? Well. we don't need a piece of
15   paper. If we take a look at Exhibit 16 and we look
16   at the actuals that are contained on page FR 2677.
17   you have for 1997 total revenue of 7.9 million; do
18   you see that?
19        A.   Yeah.
20        Q.   Okay. And then. we have your gross profit
21   as identified as 2.618.507. so 2.618.507; do you
22   see that?
23        A.   Yes.
24        Q.   Okay.

1    margin was. but the gross profit was only 2.6
2    million. and that's really just a deduction of
3    total revenue minus cost of goods sold.
4              MR. PETERS:  All I'm saying. Gordon. is
5    that 108 talks about gross margin. not gross
6    profit.
7              MR. KATZ:  Oh. I understand. I think
8    gross profit is even a more expense laden number.
9         A.   No. it's less.
10        Q.   (BY MR. KATZ)  We can discuss that at a
11   later time.
12        A.   There's a schedule that David DeVoe
13   prepared every year and he showed us how we could
14   attain that number.
15        Q.   Do you have that document?
16        A.   No. but it's in some of these documents.
17   But the letter was written.
18             MR. KATZ:  Off the record.
19             (Off the record.)
20        Q.   (BY MR. KATZ)  In any event. we can agree
21   that you had a loss in 1998? We've been through
22   that before? It's in your financial statement?
23        A.   Yes. we had a loss in '98.
24        Q.   And your annualized revenue for 1999. based

1   on your first quarter performance. was under 2 5
2   million?  Isn t that right?
3       A.  Oh. I don't know that
4       Q.  I think we went through that before earlier
5   today  Don't you remember?
6       A.  Yeah. but you can find in the documents the
7   actual closing balance sheet for '99
8           (Exhibit 109 marked for identification )
9       Q.  Okay  let me show you a document we've
10  marked as Exhibit 109.  You received Exhibit 109.
11  which is a January 2. 2001 letter from Mike Racano
12  responding to your December 13th letter to
13  Mr  DeVoe. correct?
14      A.  Yes
15      Q.  And in the letter. Mr  Racano says there's
16  no representation on the Stock Purchase Agreement on
17  which the seller can support the claim asserted in
18  your second objection?  Do you remember seeing
19  that?
20      A.  Yes
21      Q.  And did you disagree with this statement?
22      A.  Yes
23      Q.  On what basis did you disagree with this
24  statement?

1   reference to a representation in the Stock Purchase
2   Agreement on which the seller can support the claim
3   asserted in your second objection of your December
4   13th. 2000 letter to Mr  DeVoe  and I then asked.
5   is your answer to that question going to be the
6   first sentence of paragraph 6 8?
7           MR  PETERS:  I object.
8       A.  That and the whole agreement.
9       Q.  (BY MR  KATZ)  Okay
10      A.  It's implicit in the agreement that we had
11  a deal. as we said. to provide financial. sales.
12  marketing. administrative  They didn't help us
13          (Exhibit 110 marked for identification )
14      Q.  let me show you a document we've marked as
15  Exhibit 110  Exhibit 110 is an e-mail to
16  Mr. Fireman and Ms. Raider from Mr  DeVoe dated
17  Thursday. January 4th  2001  and you'd agree with
18  me that in his e-mail. Mr. DeVoe answers your
19  request for a $2 5 million bonus by saying no?  Is
20  that a fair statement?
21      A.  Well  I think he extends it for another six
22  months if we waive year four
23      Q.  Right   He then goes on to propose or he
24  goes on to say that NAM would consider extending

1           MR  PETERS:  Well  I'm going to lodge
2   an objection that it's been asked and answered  but
3   you can go through it again
4       A.  You want one of my speeches?
5       Q.  (BY MR  KATZ)  I don't want a speech   I
6   want you to make reference to a representation in
7   the Stock Purchase Agreement on which the seller
8   can support the claim asserted in your second
9   objection of your December 13th. 2000 letter to
10  Dave DeVoe
11          MR  PETERS:  And I'm going to --
12      Q.  (BY MR  KATZ)  Just point to a provision.
13  That's all I'm asking you to do.
14          MR  PETERS:  And I'm going to object to
15  the question to the extent that it is a
16  reiteration. albeit relying on a different
17  document. but a reiteration of questions asked
18      Q.  (BY MR  KATZ)  let me see if I can just cut
19  to the quick on this   Will you just point me to
20  the first paragraph sentence of paragraph 6 8?
21          MR  PETERS:  Well  objection.
22      A.  I've forgotten what the question was.
23  there's been so much discussion
24      Q.  (BY MR  KATZ)  Okay  I want you to make

1   the period relating to the second bonus opportunity
2   from a 12-month period beginning October 1. 2000 to
3   18 months beginning October 1. 2000 in exchange for
4   a reduction of the earn-out period from five years
5   to four years. correct?
6       A.  Correct.
7       Q.  And you did not take him up on that --
8       A.  Right.  At the time --
9       Q.  -- possibility. correct?
10      A.  -- we had no sales force  we had no
11  software.  We were forbidden to go to trade shows
12          (Exhibit 111 marked for identification )
13      Q.  Anyway. let me show you the next exhibit
14  It's Exhibit 111  And this is your response  It's
15  dated January eighth. 2001  It came from
16  Ms Raider to Mr DeVoe. and it's your response to
17  the 18-month bonus proposal  right?  Right?
18      A.  We reject your current offer to extend
19      Q.  So you rejected that proposal. correct?
20      A.  Yes
21      Q.  Okay
22      A.  It made no sense
23          (Exhibit 112 marked for identification )
24      Q.  Okay  And let me show you what we've

1  marked as Exhibit 112.  It's a January 11th, 2001
2  letter to Mike Racano from you and Ms. Raider
3  titled News Stock Purchase Agreement.  And he says
4  in the letter we can remember discussions with
5  David DeVoe, Junior, at the negotiation when he
6  capped NAM's investment at 15 million?
7      A  Where are you?
8      Q  Do you remember that?
9         MR. PETERS:  This is page 5868, in the
10  middle of the first paragraph.  He's asking you
11  whether or not he's read that correctly, that one
12  sentence.
13     Q  (BY MR. KATZ)  Right?
14     A  Yes.
15     Q  Okay.  What do you remember -- well, do you
16  have an independent memory of the discussion with
17  Dave DeVoe, Junior at the negotiation when he
18  capped NAM's investment at 15 million?  And that's
19  just a yes or no answer.
20     A  Do I have a present memory or --
21     Q  Yes.
22     A  -- did I have a memory then?
23     Q  Do you have a present memory?  Memory then
24  doesn't do us any good.

1      A  Well, I think in one of the things you
2  showed me --
3      Q  Just yes or no.  Do you have a present
4  memory?
5      A  I have a present memory that there was a
6  15 million cap.
7      Q  And do you remember why Mr. DeVoe wanted an
8  investment cap?
9      A  Because that was the cash that I requested
10  and that's all he was going to commit to putting
11  in, but he --
12     Q  You've answered the question.
13     A  But he wasn't going to spend it all on
14  this.
15        (Exhibit 113 marked for identification.)
16     Q  Let me show you Exhibit 113.  Exhibit 113
17  is an e-mail from you to Mr. Lellouche with copies
18  to Jim Mumm and Bill Adam and others, and the topic
19  is Food Lion sales team.  Do you see that?
20     A  Yeah.
21     Q  Food Lion was a new retail client for
22  SmartSource Direct?
23     A  Food Lion is a chain in the Southeast
24  United States.

1      Q  Right.  And you as CCMI prior to the
2  acquisition had never done business with Food Lion,
3  correct?
4      A  Food Lion hadn't agreed to a card program
5  until after the acquisition.
6      Q  Okay.  So that was a client that came on
7  only after your stock was sold to News America
8  Marketing, right?
9      A  The marketplace came on.  That's why we
10  made the deal.
11     Q  Okay.
12     A  The marketplace -- all these supermarkets
13  decided to do it.  They just didn't do it with us.
14     Q  And there were some major competitors out
15  there trying to get the business, right?
16     A  Not at the time.
17     Q  Who were the competitors that you had in
18  the 1999 to 2005 time frame?
19     A  There was just one.
20     Q  And who was that?
21     A  It was a guy from New Jersey, Paul Corliss.
22  I don't know the name of the company.  He
23  eventually got bought by Catalina.
24        MR. PETERS:  His question goes right

1  through 2005.
2      A  Well, once Market Techniques was competing
3  with us on the software and they got acquired --
4  well, we almost acquired them.  After Henri had
5  this Epiphany fiasco, Market Techniques, that had
6  some application, was in Kroger and other
7  supermarkets.  Henri was tasked with a -- a
8  committee to go and buy them because they were for
9  sale.  News America did an analysis of the
10  marketplace and I think Henri shared me at one
11  meeting, because I had a relationship with the
12  principals, and I think they were asking for 16 or
13  $18 million for their software.  And Henri did an
14  analysis of the marketplace that hasn't been
15  produced.  It would be very relevant to some of
16  your questions.  So they got bought by Valassis and
17  Catalina, so when I was active, it was
18  Valassis/Catalina that had bought that company and
19  then Valassis bought that company and they just
20  kept growing.
21     Q  But it's your testimony that News America
22  Marketing did an investigation to determine whether
23  it would be in its best interest to acquire Market
24  Analysis, correct?

1    A    Right, because our software -- we had not
2    supported the legacy system, which cost us clients,
3    and our Epiphany was a disaster because it was
4    totally mismanaged and overspent.
5        (Exhibit 114 marked for identification.)
6    Q    Okay, let me show you a document that
7    we've marked as Exhibit 114. This is an e-mail
8    dated March 30th, 2001, from you to Mr. Lellouche
9    regarding Harris Teeter. What was the purpose of
10   this e-mail?
11   A    As I told you, only when there was problems
12   did they come to me. News America had a different
13   business than SmartSource Direct. They had margin
14   levels that they claim as minimum in their
15   business, they applied them to ours, so when
16   Connecticut got control of the production of cards,
17   we were putting out bids that couldn't win. They
18   wouldn't believe us that the cards were a loss
19   leader against the other business, which is really
20   the consulting and the software, so I was asking
21   Henri to bend the rules to get us in the door at
22   Harris Teeter to win this three-year contract.
23   That's the purpose of the memo.
24   Q    What ultimately took place?

266

1    A    I don't remember. I'm saying take a profit
2    of nine percent, because any profit is good, and
3    the ancillary business will make a difference. I
4    don't know if he did it or he didn't.
5        (Exhibit 115 marked for identification.)
6    Q    Let's go to our next exhibit, which is
7    Exhibit 115 and it is your evaluation for the year
8    2000. And you've seen this document before, right?
9    A    I don't know. I've seen my evaluation for
10   2000, but this is really -- is this it?
11   Q    You signed it, right?
12   A    I signed receipt of it, yes.
13   Q    And you're identified as a managerial
14   employee; do you see that on page one?
15   A    Yes.
16   Q    Okay. And --
17   A    That changed. In subsequent years when
18   there was no one reporting to me, I asked Henri why
19   I had to do that.
20   Q    Okay, let me just ask the questions. You
21   don't need to answer questions that I don't ask,
22   okay? Are you with me?
23   A    Yes.
24   Q    Okay. If you go to page NAM 815, in the

267

1    box work history current assignment it says, among
2    other things, Bob supervises all card and data
3    entry functions through his direct report, Robert
4    Coughlin; do you see that?
5    A    Yes.
6    Q    That was a correct statement at the time,
7    correct?
8    A    Well, it was correct for the year.
9    Q    That's what I'm saying.
10   A    Yeah, until Bob Coughlin was moved.
11   Q    Now, it also says in the overall
12   achievements box, worked diligently with Citibank
13   on the Toshiba class action settlement which will
14   result in an unexpected windfall of business for
15   SSD in the area of card-based stored value.
16   A    Yes.
17   Q    And that statement was correct, right?
18   A    Yes.
19   Q    And in the areas of improvement it says
20   that much work is needed on moving from a
21   stand-alone mentality to a collaborative mentality
22   as part of the I-Group NAM organization. Bob needs
23   to learn how to develop internal support for his
24   views and learn to accept and embrace company

268

1    decisions that may or may not support his views on
2    business, less broad sweeping rhetoric and more
3    detailed focus on assigned tasks. Did you consider
4    that statement to be correct?
5    A    No.
6    Q    In overall performance summary, it says Bob
7    had a very difficult year as did the former CCMI
8    overall. The on boarding of the company was
9    complicated by a reluctance to embrace the NAM
10   business philosophy and culture. At times, Bob is
11   extremely insightful on many topics covering our
12   businesses; however, his approach to addressing
13   insights and concerns has left many in management
14   very concerned. Bob would be a very big
15   contributor if he's willing to take direction and
16   work within the system to effect change and
17   development of the business; do you see that?
18   A    Yes.
19   Q    Did you agree with that?
20   A    No. I was being chastised --
21   Q    You've just answered the question. You
22   don't need to say any more.
23       (Exhibit 116 marked for identification.)
24   Q    Let me show you Exhibit 116. Exhibit 116

269

1   is a copy of SSD executive minutes dated April
2   24th, 2001   And you were at the meeting for which
3   those minutes were taken, correct?
4       A.   Does it say anything?
5       Q.   Take a look under attendees
6       A.   Yeah  there I am
7       Q.   How often did SSD executive committee
8   meetings take place?
9       A.   Weekly
10      Q.   And you were always included in these, were
11  you not?
12      A.   No.
13      Q.   Why would you be excluded from them?
14      A.   Henri said there was no reason for me to
15  come
16      Q.   When did he say that?
17      A.   At some point in time.
18      Q.   Can you give me a year?
19      A.   Well, probably sometime after the -- I
20  don t know
21           (Exhibit 117 marked for identification )
22      Q.   Let me show you Exhibit 117   Exhibit 117
23  is an e-mail dated May 24th, 2001 with some
24  documents that are attached to it   The title of it

1   is K-Mart next steps   Fair statement that you and
2   Henri pitched K-Mart, right?
3       A.   I don t know the question   Did we pitch --
4       Q.   Is it a fair statement that you and Henri
5   pitched K-Mart?
6       A.   Well, hold on a second here   Is this from
7   me?  Okay
8       Q.   Diana Fontaine was your executive
9   assistant, right?
10      A.   At the -- after the acquisition, and then I
11  -- she was given to someone else and then she was
12  terminated   She was too expensive   Ann testified
13  she was getting over 40,000 and they --
14      Q.   Just a yes   She was your executive
15  assistant at the time this document was prepared,
16  correct?
17      A.   Yeah
18      Q.   And the e-mail which she sent is attached
19  is a document Bob has created which outlines the
20  next steps resulting from the recent meeting he,
21  Bob, and Henri had with K-Mart, right?
22      A.   No   Where does it say that?
23      Q.   The first page
24      A.   Oh, the cover page   Yes   I had Diana

1   Fontaine send this
2       Q.   So there s no mystery here; you and Henri
3   pitched K-Mart, right?
4       A.   Henri came with me to the initial meeting
5   at K-Mart   I was having all sorts of problems.
6       Q.   Okay   You ve answered the question.  And
7   you say in your attached memo that I believe that
8   we impressed the K-Mart team with our knowledge and
9   experience to assist in all aspects of this new
10  core marketing campaign for K-Mart?
11      A.   Yes, we could do it
12      Q.   Did you get any business from K-Mart?
13      A.   No
14      Q.   Okay   Now, Diana Fontaine, again, you told
15  us that she was your executive assistant for some
16  period of time, correct?
17      A.   Yes
18      Q.   Did you have any personality problems with
19  Diana Fontaine?
20      A.   No
21      Q.   Did she have any problems with you?
22      A.   No
23      Q.   Are you sure about that?
24      A.   Oh  we had our differences and I know she

1   called Henri upset one day, but she and I were
2   fine
3       Q.   Why did she call Henri?
4       A.   Because Henri was undermining everybody in
5   the office and wanted to goody goody call me   So
6   one day she probably didn t do something right and
7   I reprimanded her and she called Henri.
8       Q.   Do you remember any more details regarding
9   this event?
10      A.   No   I don t remember the time, but it was
11  all about undermining us with our own people, which
12  Henri did a very good job of
13           (Exhibit 118 marked for identification )
14      Q.   Let me show you a document we ve marked as
15  Exhibit 118   It s an e-mail from you to Michael
16  Cleary and others regarding Giant data entry  entry
17  misspelled Brown name
18      A.   Okay   So here s DEPS
19      Q.   And in this e-mail, you say that you were
20  incredulous that this happened so many times   Do
21  you see that?
22      A.   Absolutely
23      Q.   And what was it that happened so many
24  times?

1    A.  This has got to do with the data entry
2  firm.  This confirms that Michael Cleary was
3  running the project, and when it ran into problems,
4  they came back to me.  So again, we had been
5  isolated, but someone had to make a decision on how
6  to handle it and how to look before the client.  So
7  this was my message to everybody: let's take a
8  positive thing and let's get it fixed.
9    Q.  When was DEPS engaged?
10    A.  I don't know.  That was the question we had
11  before.
12    Q.  Okay.  If you don't know, that answers the
13  question.
14    A.  Obviously, it's sometime going on in 2001.
15        (Exhibit 119 marked for identification.)
16    Q.  Okay, let me show you the next exhibit.
17  It's Exhibit 119.  And it's an e-mail from you on
18  Wednesday, June 27th, 2001 to Gary I. Franco at
19  Citicorp RE:  Contract extension.  Would you agree
20  with me, Mr. Fireman, that this e-mail pertains to
21  the Toshiba project?
22    A.  Yes.
23    Q.  Okay.  And in this e-mail, you say at the
24  bottom, Gary, my company works within budgets; do

1  dated August 21, 2001 titled organizational change.
2  Do you remember receiving this e-mail?
3    A.  No.
4    Q.  Have you read this e-mail before?
5    A.  I don't remember.
6    Q.  Is there anything in this e-mail that you
7  disagree with?
8        MR. PETERS:  Off the record.
9        (Off the record.)
10    A.  I mean, I didn't think it was right that
11  Ann should lose her position to Henri.
12        MR. PETERS:  He's asking you is there
13  anything you disagree with that Ann says.  It
14  sounds like what you just said is you agree with
15  what Ann says.  Is Ann wrong in any way?  Is that
16  your question, Gordon?
17        MR. KATZ:  I will adopt that question.
18    A.  I believe it's somewhat accurate.
19    Q.  (BY MR. KATZ)  Somewhat to me means not, so
20  --
21    A.  No, it's accurate.  I mean, Henri -- Henri
22  has his own style of doing things and sometimes he
23  doesn't understand how people are perceiving him.
24  I don't believe he was -- Ann was a rainmaker at

1  you see that?
2    A.  Yes.
3    Q.  What did you understand regarding your
4  company working within budgets?  Or let me rephrase
5  it.  What did you mean when you said my company
6  works within budgets?
7    A.  I meant in the generic sense.  I was saying
8  that we had expense and he needed to renew -- I was
9  trying to force a renewal of the contract because
10  there was some stuff going on after the roll-out.
11  I was trying to get him -- he was trying to get
12  Toshiba to reup for another few hundred thousand
13  dollars if not more, so I was saying we're still
14  doing stuff even though the contract is over; give
15  us some more money, and he did.
16    Q.  Okay, but what did you mean when you said
17  my company works within budgets?
18    A.  Meaning we allocate expense against income,
19  so give us some income, and I got him to do it,
20  which is, I don't know, another half a million
21  dollars or something.  The contract has expired and
22  there's no budget, meaning we're still doing work.
23        (Exhibit 120 marked for identification.)
24    Q.  This is an e-mail from Ms. Raider to you

1  these places and News America Marketing wasn't so
2  well-liked at some of these retailers.  They --
3  they ran their other business hard and sometimes
4  didn't give people fair counts and was in all sorts
5  of issues trying to throw out other competitors and
6  doing stuff that some people considered unethical.
7    Q.  Who considered News America Marketing
8  unethical to the best of your recollection?
9    A.  A variety of supermarkets that told us that
10  they were --
11    Q.  Please tell me who you have in mind.
12    A.  I don't remember the names.
13    Q.  You don't remember any?
14    A.  Well, I knew we weren't giving such a fair
15  count to K-Mart when they were in the bankruptcy.
16  I know that they were trying to force Floor
17  Graphics out of Safeway and K-Mart.  News America
18  is being sued for tens if not hundreds of millions
19  of dollars at the present time for stuff that they
20  were doing in retail.
21    Q.  But what retailers?  That's who I want you
22  to identify.
23    A.  Kroger, Pathmark.  I mean, I don't remember
24  who or when, but it was a theme.

1    Q.  Did these concerns exist prior to the
2    acquisition --
3        A.  No.
4        Q.  -- of CCHI by News America Marketing?
5        A.  No.  We learned about it afterwards.  We
6    were shocked.  The atmosphere at News America
7    Marketing -- you were either inside with
8    Mr. Carlucci's group or you were outside.  Most of
9    the people working there were not happy.  Resumes
10   were on the street by most of -- a lot of people.
11       Q.  What due diligence did you do about the
12   culture of News America Marketing prior to the
13   acquisition of your stock?
14       A.  Unfortunately, not enough.  We trusted them
15   at their word.  They romanced us hard.  We had a
16   relationship with Henri.  I thought he was terrific
17   at the time.  And they -- I mean, I know they were
18   hard core and tough, but I thought that they would
19   use that toughness with us, not against us.
20       Q.  So you know prior to the acquisition that
21   News America Marketing was hard core and tough?  Is
22   that --
23       A.  No, I knew afterwards.  In fact, Henri told
24   me.

1        Q.  You didn't know that before?  Is that what
2    you were saying?
3        A.  We weren't a threat to them.  We were a
4    resource.  I wasn't looking at them.  All I needed
5    was that sales force and a little help and we could
6    have built that $100 million business.  We didn't
7    get it and the rest is incredible.
8        Q.  So is it a fair statement that the sales
9    force was the single most important thing that you
10   wanted from News America?
11       A.  That was one of them.  News America had
12   just bought Planet U for $23 million, which was
13   part of our group.  They had just spent $7 million
14   for the Softcard cards.  And I looked at those two
15   deals and, you know, they were waste.  They were
16   duped.  I told David, I mean, David DeVoe, you just
17   wasted 23 million for Planet U.  They cannot
18   deliver what they say they have.  And I turned out
19   to be right.  All that money was lost.  I told
20   Henri the deal in South Carolina or wherever it was
21   was no good because that card was economically
22   unviable.
23       Q.  This is the Softcard?
24       A.  Yeah, and that deal never happened.

1    Whatever.  So there was issues that we found out
2    that we really were sold that News was a company
3    that would exercise good faith and really would
4    support us and we really believed it was a
5    strategic fit with them.  What I didn't understand
6    is Paul Carlucci's total -- it seemed he did this
7    as a favor for the Murdochs who were focused on dot
8    com and new technologies, but when Planet U went
9    out and the company in Athens went out and David
10   DeVoe lost enough to make him interested and was
11   going back to News Corp., we were toast.  We
12   weren't going to get what we bargained for and it
13   seemed like the whole thing was a set up to get our
14   database for the dot com, for their core business.
15   They sold coupons in the Sunday paper.  They sold
16   coupons in-store.  The next avenue was to sell it
17   online and they didn't have the technology or the
18   know-how, and we brought that to them.
19       Q.  What database did you bring to them?
20       A.  The ability of -- the knowledge of how to
21   build a database and do targeted marketing,
22   retrieve data, analyze data.  That's what we
23   brought; the ability to issue cards, which would
24   create a database of shoppers for the first time

1    both for retailers to know their own customers and
2    manufacturers to target.  Heretofore, it never
3    exists.
4        Q.  Although there were others in the same
5    business at the same time you were, correct?
6        A.  The business was just evolving.  No one had
7    the relationships in the country or the expertise
8    to deliver the products like we did.  Why would a
9    company like Lucky Stores, a $50 billion company --
10       Q.  If that were the case, then why did you
11   have only a half million dollars in gross revenue
12   in the first quarter of 1999?
13       A.  Because we were so -- we were so involved
14   in the sale that we lost -- we weren't a lot of
15   people.  The acquisition of finding a strategic
16   partner was a digression that affected us.  That's
17   why we pushed for a fast agreement to get right
18   into the marketplace, and that's why we freaked
19   when all of a sudden we're part of this company and
20   everything we thought was going to happen timely,
21   nothing's timely.  Instead of helping us do the
22   job, HR people, instead of giving us the sales
23   force, they said the sales force doesn't have the
24   time and they cut out half the sales force.  They

1   somehow decided to cut expenses and they merged the

2   retail with the manufacturer, and the 300 people we

3   thought were going to help us were now cut loose

4   for some other reason.  And they knew about it

5   before the sale and they didn't tell us

6       Q   How do you know that they knew about it

7   before the sale?

8       A   Because it happened just after

9       Q   When did it happen?

10      A   I don't know.  Just after the sale.  I

11  can't tell you when

12      Q   How do you know that they knew before --

13      A   Because they told us, because of that, they

14  can't do it  There was a hiring freeze.  We were

15  supposed to run as an independent unit.  We were

16  supposed to grow it, feed it.  We weren't -- we

17  were making a technical consultative sale, not

18  selling coupons and machines.  We thought they

19  understood that dynamically we were a different

20  entity and we had different needs and

21  responsibilities, that the people that worked for

22  us had to have a broader understanding of what was

23  happening.  And it was happening.  And Gordon, it

24  happened.  It's a 500 million to billion dollar

1   business.  The stored value card grew to 55

2   billion  It didn't exist in '99.  We were there.

3   The use of cards, of prepaid debit, I mean, it's

4   huge.  The window was lost

5       Q   Let me show you --

6           (Off the record.)

7           (Recess taken.)

8           (Exhibit 121 marked for identification.)

9       Q   (BY MR. KATZ)  Exhibit 121 is an e-mail

10  from Ann Raider to you, Mr. Fireman, dated August

11  23rd, 2001.  And in this e-mail, Ms. Raider says

12  the corporation's plan is obvious  Consolidate all

13  work  New York City, Connecticut, and eliminate the

14  Boston office  Do you see that in the next to last

15  paragraph of the e-mail?  Do you see it?

16      A   Yes

17      Q   Okay.  And you can't point to anything in

18  the Stock Purchase Agreement which prevented News

19  America Marketing from making such a consolidation,

20  can you?

21          MR. PETERS:  I think it's been asked

22  and answered  Objection

23          MR. KATZ:  I don't think we've ever

24  discussed consolidation

1       A   Well  I think in the employment agreement

2   they had to keep an office in Boston for us, for

3   Ann

4       Q   (BY MR. KATZ)  But there's nothing in the

5   Stock Purchase Agreement --

6       A   It's implicit in the agreement that we were

7   going to build this business in Boston and only use

8   our parent for what we needed  So I mean, this was

9   -- this -- the memo, it's a good memo

10          (Exhibit 122 marked for identification.)

11      Q   Exhibit 122 is an e-mail from Ann Raider to

12  you, Mr. Fireman, dated October tenth, 2001.  In

13  it, Ms. Raider refers to a letter which Henri did

14  not send to John K. at Ahold.  Do you see that?

15      A   Yes

16      Q   Do you know why Ann sent this e-mail to

17  you?

18      A   She was devastated

19      Q   About what?

20      A   She had prepared something, she probably

21  knew they were going to do it, and for some reason,

22  Henri didn't send it

23      Q   Do you know what she was referring to?

24      A   She was just venting that she couldn't

1   believe it

2       Q   But I'm asking you, do you know what

3   specifically she was referring to?

4       A   Monthly mailers, so there must have been a

5   direct -- what you're calling a direct marketing

6   program that they were doing  Ann was very close

7   with the people at Ahold  That's how we won the

8   last -- the big contract you said we didn't have,

9   but this was part of direct marketing  I assume

10  monthly mailers is that they wanted to do something

11  to their database, so if their database was ten

12  million customers, there would be ten million

13  pieces of mail sent monthly, so if you belong to

14  the Ahold card club, you got a mailer with

15  something in it, so there would be a document there

16  and they probably would solicit manufacturers to

17  come in and participate

18      Q   But you don't have any direct personal

19  knowledge with respect to the matter which

20  Ms. Raider is discussing in Exhibit 122, correct?

21      A   Well, I know what monthly mailers are.  I'm

22  testifying to that

23      Q   Okay.  But nothing else?

24      A   Right.  She's saying --

1    Q   Beyond that you don't know?

2    A   No. do not know

3            (Exhibit 123 marked for identification.)

4    Q   Exhibit 123, let me hand it to you, is an

5    e-mail from Ms. Raider to you regarding company

6    demise dated October 17th, 2001?  And in the second

7    paragraph she says we invested over $2 million to

8    build software and cannot tell, show the industry;

9    do you see that?

10   A   Yes

11   Q   You don't disagree with that statement

12   right?

13   A   I don't know what she meant, so maybe the

14   general -- I don't know what she meant

15   Q   You don't have any reason to believe she's

16   incorrect in that statement?

17   A   Oh, I think it's a generalization she's

18   making.  She doesn't know what they spent

19   Q   You think it was less than $2 million?

20   A   Well, she's voicing two frustrations in

21   this letter; one frustration, we can't go to trade

22   show, which was our core relationship builder, and

23   two, that the Epiphany deal went over the million

24   and a half dollars, which blew our investment in

1    other opportunities, and we had no say in it

2            (Exhibit 124 marked for identification.)

3    Q   Let me show you a document from Ann Raider

4    to Mr. Tellouche  You received a copy  It's

5    marked as Exhibit 124.  Actually, let me go back to

6    Exhibit 42 before we go to Exhibit 43.  In Exhibit

7    -- if you could go back to Exhibit -- I'm sorry;

8    not 42, but 123, do you have Exhibit 123?

9    A   Yes.

10   Q   That's the e-mail that's titled company

11   demise; do you see that?

12   A   Yes.

13   Q   Okay  It says -- the e-mail does --

14   instead of helping us grow the business, the

15   management of the company in a very calculated way

16   is causing our demise  Do you see that?

17   A   Yes

18   Q   This statement is an exaggeration, is it

19   not?

20   A   No

21   Q   Her statement is overly dramatic, is it

22   not?

23   A   Well, the death of the company is a

24   metaphor

1    Q   All right

2    A   Though it is a legal -- not a living

3    person; it's a legal person

4    Q   Would you agree that Ms. Raider had a

5    tendency to speak in hyperbole?

6        MR PETERS:  Objection

7    A   No  Gordon, the woman works a hundred

8    hours a week  Her soul is in this thing.  They

9    clipped her wings and broke her knees

10   Q   (BY MR. KATZ)  There was no demise of CCMI.

11   was there?

12   A   Yes

13   Q   You received earn-outs every year, right?

14   A   In '01, the industry was probably 200

15   million --

16   Q   Just yes or no; you received earn-outs

17   every year, right?

18   A   Not from CC-- well, yes. I received

19   earn-outs

20   Q   And you received earn-outs after CCMI was

21   rebranded as SSD, right?

22   A   There was -- it didn't go to zero

23   Q   And in fact, NAM helped you grow the

24   business prior to October 17th, 2001 in some

1    respects; isn't that correct?

2    A   No

3    Q   In no respects did NAM help you grow the

4    business, right?

5    A   NAM crushed this business

6    Q   Okay

7    A   They destroyed its personnel.  They

8    demoralized people.  They insulted us, demised us,

9    and the magic that we had slowly evaporated.  They

10   didn't give us the sales force  They didn't give

11   us the technology  They broke up a group that was

12   success, and it -- it feels intentional  You know,

13   it happened so fast after the sale that it doesn't

14   even feel like bad business  It feels like it's

15   intentional, it was bad faith, and in a way fraud

16   Q   But you'd agree with me that NAM got the

17   lead for you for the Toshiba business, right?

18   A   NAM didn't.  Those people were seeking for

19   somebody, somebody had heard about us and it got

20   through to me.

21   Q   Through NAM?

22   A   Through Citibank

23   Q   From Citibank to NAM to you?

24   A   Who is the electronic coupon man?  That was

1    me alone
2        Q.   But it came through NAM, right?
3        A.   Yes, the Toshiba deal came through NAM.
4        Q.   Okay.  NAM assisted you in landing new
5    retailers such as Giant, right?
6        A.   No. we had Giant
7        Q.   You had Giant prior to the acquisition?
8        A.   We had relationships with Giant, with
9    Kroger, with everybody that we had been developing
10   for four or five years.  They knew we were the card
11   guys, and we had talked to them about the aspects
12   of loyalty marketing, card marketing, stored value,
13   and when they decided to make that move, we were in
14   that and running
15       Q.   So you didn't need anybody from NAM to help
16   you with the retailers because they already knew
17   about you?
18       A.   Right
19       Q.   And all they had to do was make a phone
20   call and they could sign you up, right?
21       A.   I needed NAM to help me with the
22   manufacturers sales force.  I needed them to take
23   the 240 people and fill the funnel with promotions
24   Not one at a time   I needed someone to help me

1    either expand my software, scale it up a little bit
2    or help me with some support, and I needed a
3    strategic partner to help us grow
4        Q.   You didn't need their help with the
5    retailers?  Fair statement?
6        A.   We were -- yeah  I didn't need their help
7    with the retailers.  Well, I needed their help with
8    everything.  It wasn't as though I didn't want
9    their help
10       Q.   No. but you didn't need their help with
11   retailers, right?
12       A.   We had a pretty good thing with retailers
13   We had been to every city on the planet, met with
14   every person   I mean, we met with CFO's and IT
15   people and we talked at trade shows and Ann was
16   giving speeches   This was so big that the Food
17   Market Institute separate -- it couldn't fit in
18   their McCormick s Place   They had to have a
19   special show called Market Techniques to say about
20   the explosion of the technology into retail and the
21   opportunity that was there   This was exploding and
22   all we had to do was hold our own and we could have
23   done 50 to a hundred million dollars
24       Q.   And NAM put together a manufacturing

1    marketing group led by Kevin Tripp, right?
2        A.   No.
3        Q.   Kevin Tripp didn't lead a manufacturing
4    marketing group?
5        A.   Kevin Tripp got a few guys from time to
6    time to call on some people   Henri helped out
7    himself   They went around   It wasn't the plan
8        Q.   It wasn't what you wanted?
9        A.   It wasn't what they agreed to do   There
10   was supposed to be no head count on the
11   manufacturers sales force.  That was agreed even by
12   David DeVoe.
13       Q.   Where in the agreement does it say that
14   expressly?
15       A.   In the gross margin number, no head count
16   And he agreed to it.  Head count, because we were
17   going to get the free use of 200 people already
18   calling every day
19       Q.   Where does it say that in the Stock
20   Purchase Agreement?
21       A.   That was the deal that s implicit in the
22   agreement   It's not laid out   The business plan
23   was agreed to   The numbers were done by David
24   DeVoe and Julie.  We talked about how we would run

1    the business, and when we made the deal, it all
2    changed.
3        Q.   Okay.  And you would agree with me that
4    News America Marketing hired new retail salespeople
5    in Chicago and New York, Los Angeles, isn't that
6    right?
7        A.   There were people hired over the course of
8    five years to try to do something, but at that
9    point in time, the vision of the business was
10   mundane.  I mean, how can you -- Kevin Tripp was
11   hired to organize the materials that could be
12   provided to 200 people   Packaged goods companies
13   were all over the country
14       Q.   I think you have Exhibit 124 in front of
15   you.  This is a Raider to Henri Iellouche e-mail
16   dated 11/15/2001 that refers to the Duane Reade
17   contract status and the fact that Duane Reade was
18   not going to go forward with Aspen   Do you
19   remember that?
20       A.   Sure
21       Q.   And it's a fair statement that you and
22   Ms  Raider felt betrayed by Duane Reade's failure
23   to go forward with Aspen?
24           MR  PETERS:  Betrayed by whom?

1    Q.   (BY MR. KATZ)  By Duane Reade

2    A.   No.  It was embarrassing, the performance

3    that News America was doing at Duane Reade.  I

4    mean, here was a guy that thought we were smart,

5    bought into our vision, gave us the business, and

6    the execution from the Wilton office of the data

7    and their program and the ability to get Aspen up

8    and going, they just blew us off nicely.

9    Q.   Duane Reade did?

10   A.   They said look it.  We was going to modify

11   our proposed contact to include Aspen, but we

12   couldn't show it to him.  Every month it would be

13   next month, next month, and then Bill Adam couldn't

14   go.  Ann was -- she was heartsick about this.  We

15   rolled out the Duane Reade card program.  They

16   loved us.  We had a wonderful relationship.  Gary

17   Scharbino, who was the head of merchandising or

18   whatever, he loved us.  When we went to do the

19   rest, nothing was ready, nothing was presented.

20   She couldn't get any support.  We couldn't demo the

21   software.  We promised month after month after

22   month.  And I was totally out of the loop.  I had

23   been completely not allowed.  I'm not even in

24   there.  It was tragic.

1    Q.   How did Duane Reade ultimately decide to

2    handle its management of customer data information?

3    A.   I don't remember, but I know that we -- it

4    was ours to lose.  I don't know if they started

5    with our original system, our marketing analysis

6    system.  I don't remember.

7    Q.   But you don't ascribe any responsibility

8    for the loss of the -- or I should put it

9    differently; the failure to obtain Duane Reade's

10   going forward with Aspen on yourself or on

11   Ms. Raider?

12   A.   Absolutely not.

13   Q.   Okay.

14   A.   I mean, it says --

15   Q.   You've answered the question.  We'll be

16   here all day.

17   A.   I mean, listen --

18         (Exhibit 125 marked for identification.)

19   Q.   Let me give you what we marked as

20   Exhibit 125, and 125 is your performance appraisal

21   for the fiscal year 2001.  This document was

22   completed sometime in 2001, correct?

23   A.   Yes.

24   Q.   Okay.  And it says in overall achievements,

1    through Bob's efforts, the company now sells e-gift

2    and stored value products and services and is

3    looking further to expand the utility of this

4    platform for other CPG marketing programs; do you

5    see that?

6    A.   Where are you?

7    Q.   Under overall achievements, item two.

8    A.   Yes.

9    Q.   Do you see that?

10   A.   Absolutely.

11   Q.   And you'd agree with that statement?

12   A.   Yeah.  I did it all alone.

13   Q.   And Bob's relationship -- it goes on to say

14   in item number four, Bob's relationships with card

15   manufacturers and letter shops has enabled SSD to

16   remain competitive in the marketplace and shorten

17   deadlines, which helped SSD win business on short

18   notice; do you see that?

19   A.   Yes.

20   Q.   And you'd agree with that statement?

21   A.   It's a long time ago.  I mean, I had the

22   relationships at the factories because I helped

23   develop the --

24   Q.   Just yes or no.

1    A.   They ran into a problem.  I tried to get

2    them a better deal.

3    Q.   What business do you recall as being won on

4    short notice?

5    A.   I don't remember which one.

6    Q.   Okay.

7    A.   But I could get factories to do things

8    faster for --

9    Q.   Okay.  Let's go to areas for improvement,

10   and there are three items listed.  Do you see

11   those?

12   A.   Yes.

13   Q.   Do you agree with any one of them?

14   A.   I mean, they were just general areas.

15   Q.   Did you disagree with these areas for

16   improvement?  Yes or no?

17   A.   Well, I wasn't happy with --

18   Q.   Yes or no, please.

19   A.   No.  I disagreed.  Yes, I disagreed.

20   Q.   Let's turn to the block that says special

21   job objective, and that's -- it's -- it actually is

22   abbreviated to SJO and it's under fiscal year 2002

23   accountabilities and special job objective.  Do you

24   see that?  It's on page 809.

1    A    Yeah

2    Q    Do you see that?

3    A    Yeah

4    Q    It says secure a significant new client
5    using the expanded card marketing utility coupled
6    with SSD stored value back end partner.  Do you see
7    that?

8    A    What number?  Oh.  SJ--

9    Q    Did I read that correctly?

10   A    Yes

11   Q    In other words, what's being stated here is
12   that you were being asked to come up with another
13   Toshiba, correct?

14   A    Well, no

15   Q    How did you interpret the special job
16   objective part of your appraisal?

17   A    Stored value could be a variety of
18   different things.  The Toshiba product was the
19   ability to figure out how to trick the financial
20   networks -- cards -- cards -- stored value is
21   basically containing a value like a prepaid phone
22   card, okay?  So you could do it within one
23   retailer.  What I figured out on the Toshiba deal
24   was how to do it in different retailers that had

1    different systems that weren't connected, so we --
2    I figured out how to do a non-financial transaction
3    over the financial network, which allowed me to do
4    that at Best Buy, Comp U S A., Circuit City and
5    nowhere else.  The other use of stored value is
6    coming into gift cards.  And we had a chance to
7    really pioneer gift cards in the supermarket world
8    and a company had asked us to do that back in 1999
9    and Jon Rubin wouldn't let me do it, and then
10   everybody in the supermarket was doing gift cards.
11   It could have been a gift card program.  I think I
12   was going after the Long Strugg business.  They're
13   400 stores out in California.  I mean, there was
14   talk in the company about going after another class
15   action suit and using this as a vehicle, and I
16   researched the law firms involved and talked to
17   people, but I -- I had no marketing support.  I
18   couldn't get a rate card.  I couldn't get anything
19   printed.  I was isolated, so that's why I agree
20   with one.  Just do it yourself; you're not going to
21   get any help from this company.  So the answer is
22   yeah, I went out and I did it.  I think I achieved
23   that SJO

24   Q    How did you achieve it?

1    A    I think I got the Long Strugg business all
2    by myself

3    Q    Did you do anything else?

4    A    I did a ton of stuff.  I mean, I was
5    developing card programs, new relationships

6    Q    With who?

7    A    With anyone I could

8    Q    Identify who, please

9    A    Well, I set up the whole prepaid
10   activation.  I realized that prepaid telephone was
11   coming into this country.  Where in this country,
12   most everyone has cell phones on contract.  In
13   Europe, 85 percent is prepaid, no contract.  So I
14   realized if we were doing point of sale activation
15   for gift cards, we could do point of sale for
16   phones, and we were now bidding against companies
17   like the Ahold contract we didn't bid and the gift
18   card business and I was looking for new
19   applications with prepaid games and prepaid cards
20   and prepaid books and trying to link Internet sales
21   to bricks.  The dot com bust had happened.  It was
22   all about databases in the supermarkets and how
23   could we drive more business to those people, so I
24   was all over prepaid and stored value and point of

1    sale activation, and where I thought we could -- I
2    could possibly say hey, I'm News Corp., and bring
3    some people together, but I had to develop all my
4    outside vendors.  I had to do all the work myself.
5    We mentioned Afectivo the last time.  I built that
6    all on my own creativity.  I'd fly to California.
7    I tried to get game companies.  We worked very
8    hard

9    Q    And you were working on a lot of different
10   projects simultaneously?

11   A    All around card marketing.  We were the
12   card marketing guys.  The core business had been
13   destroyed, so I was trying to say okay, who knew
14   more about electronic funds transfer and point of
15   sale than I did; who had the relationships with
16   Visa and MasterCard and Citibank

17   Q    Fair statement that you believe nobody
18   knows more about those subjects than you?

19   A    I just know enough to get something done

20   Q    Besides Longs and Toshiba, tell me what
21   else you got done

22   A    Oh, I don't remember.  We got programs
23   done.  The Ahold contract came that year or the
24   year after

1    Q.  Did that result in actual revenue?

2    A.  Sure.  We rolled out Bi-Lo stores, which

3  was a division of Ahold.

4    Q.  What was the name of the stores?

5    A.  B-I dash L-O-W.

6    Q.  And where are they located?

7    A.  Carolinas.

8    Q.  And you were doing stored value cards for

9  them?

10    A.  No.  We were doing prepaid phone

11  activations in partners with -- I don't know,

12  probably with lots of companies, but I was there

13  competing with people who were in the business,

14  winning the business because I could get it done.

15    Q.  Your testimony is that you won the

16  business?

17    A.  Oh, we won the business.  We had an RFP

18  with everybody in the country.

19    Q.  Besides Bi-Lo, besides Longs, besides

20  Toshiba, what other business did you get?

21        MR. PETERS:  He said Ahold.

22        MR. KATZ:  Yes, the Bi-Lo division of

23  Ahold.

24    Q.  (BY MR. KATZ)  What else were you

1  successful in actually bringing to conclusion?

2    A.  A lot of things were in development when

3  the thing blew up, so I don't remember, but we were

4  talking to Longs about prepaid and then I got taken

5  out of the prepaid business.  Henri went behind our

6  back against all the vendors that had given years

7  of time and money and told Ahold that we were no

8  longer in the business after we won the contract

9  and he gave it to Safeway.

10        (Exhibit 126 marked for identification.)

11    Q.  Let me show you a document that we've

12  marked as Exhibit 126.  And Exhibit 126 is an

13  e-mail from Mike Racano to you, Mr. Fireman, titled

14  earn-out review dated February fourth, 2002.  And

15  actually, below it is another e-mail, which I'm

16  more interested in, and that is an e-mail from you

17  to Mike Racano, again also dated February fourth,

18  2002, again with the subject earn-out review.

19    A.  What's the question?

20    Q.  My question is this.  In your e-mail to

21  Mr. Racano, you make the statement in the fourth to

22  last line I do not know what you plan to show Ann

23  at a meeting.  She, Ann, has no accounting

24  background.  Did I read that correctly?

1    A.  That's correct.

2        (Exhibit 126 marked for identification.)

3    Q.  Let me show you a document we've marked as

4  Exhibit 127.  This is an e-mail from Ms. Raider to

5  you, subject, Dominick.  Do you remember seeing

6  this e-mail before?

7    A.  No.

8    Q.  And there's a word after Dominick.

9  Dominick's name; do you see that?

10    A.  Dominick --

11    Q.  C-H-I-C-A-C-A-O?

12        MR. PETERS:  Chicago?

13    A.  Chicago.

14    Q.  (BY MR. KATZ)  Is that supposed to be

15  Chicago?

16    A.  Yeah.

17    Q.  What is the connection between Dominick and

18  Chicago?

19    A.  Dominick Porco was the president of NAM.

20  He must have gone to Chicago and called everybody

21  together as a town meeting for the office, and in

22  the meeting, he told everyone that they wrote off

23  50 million in the I-Group, so that is just what Ann

24  is advising me.  Someone in Chicago must have told

1  her and the thing looked like a big loss and we

2  were associated with the I-Group.  And they shut

3  the I-Group down and then brought it back in-house.

4  They went out and they hired offices in Lexington

5  Avenue and did all this stuff for this I-Group and

6  the dot com.

7    Q.  And it didn't work out, correct?

8    A.  Destination website for coupon does not

9  work.  It still hasn't worked.

10    Q.  That's your view?

11    A.  Yes.

12    Q.  Okay.

13    A.  Unless you tie it to the card.  If you tied

14  it to the loyalty card, it would have worked.

15    Q.  Okay.

16    A.  That's what people use every day.

17        (Exhibit 128 marked for identification.)

18    Q.  Let me show you Exhibit 128, and this is an

19  e-mail chain with the top e-mail being from you

20  Mr. Fireman, to Mr. Lellouche dated March 29th,

21  2002.  And can you tell us what this e-mail chain

22  is all about?

23    A.  Where does it start?  Are these pages

24  connected?

1    Q.  I believe so.  I think it begins on March
2   28th  2002 and ends on March 29th  2002
3    A    Okay   Well  I was involved in the
4   development of a money transfer card to aid the --
5   the big Hispanic population that was using Western
6   Union to transfer money back to Mexico or Guatemala
7   or Santa Domingo  and at the time  it was costing
8   about $50 for them to send $300 worth of pesos to
9   Guadalajara  and these people would go to the check
10  cashing places and pay to cash their employment
11  checks up to ten percent  and then the guy would
12  put his Western Union hat on and say you want to
13  send money back to mama  and they would charge them
14  $50   I said why can t we -- these people go to
15  Wal-Mart and they go to K-Mart and they go to the
16  supermarket   They trust their grocers   They just
17  won t go to the banks because they re afraid the
18  banks are going to arrest them and put them into
19  jail   So if we could create two stored value
20  cards  provide a debit network  and they would buy
21  two together  send one to their mother in
22  Guadalajara   They could load their money in Stop &
23  Shop and the mother could pick up the money from an
24  ATM machine  because the network of ATM machines

1   has grown to 20 000 in Mexico
2          So we put this program together with
3   some people I met and some partners  again  in the
4   stored value world  and we tried to market it and
5   we -- Henri loved it that I took him to the White
6   House and we had some fun   The issue is we had a
7   lot of support from the Republican Party that was
8   very interested in the Hispanic vote   And part of
9   our team was a bunch of very powerful and public
10  Hispanic people  and we put a figurehead of the
11  former -- a Democrat  but the former head of the
12  U S  -- CFO of the U S  Treasury  a guy named
13  George Munios
14         So we had a winning product   The
15  problem was now we had to show it to retailers
16  And as I went around to retailers  we found out
17  that Western Union had some exclusive on money
18  transfer  and even though we were on the shelf and
19  not a money transfer depo  they were giving us some
20  trouble  so that s what this is about  the issue of
21  Western Union having -- and there were ways around
22  it and we just didn t keep our wind   And it
23  happened after we stopped doing this   I mean  it
24  became a very big business

1    Q   Who ultimately did it  if anybody?
2    A   Well  a lot of companies got into it  in
3   pockets  but there s a company out in California I
4   met with that has set up a network that s called
5   the Green Dot Network  but In-Com  some of my
6   partners in this deal like In-Com that was in the
7   prepaid market originally with Safeway and other --
8   In-Com did a billion eight hundred million dollars
9   last year  and when I knew them in  99  they were
10  doing 10- $15 million and they ve exploded into the
11  gift card  money transfer  prepaid cards   What we
12  were doing here was  the beginning of like the Visa
13  debit cards   We were ahead of that  which now are
14  commonplace  but back then was avant garde   It was
15  first generation   It was looking for customer and
16  consumer acceptance and we were filling a need in
17  the marketplace  so Henri must have thought I was
18  doing good
19   Q   And he says that you re going to be the Don
20  Quixote of the unbanked?
21   A   Yes  could have been
22   Q   To which you said I deserve it?
23   A   I put a lot of work into this   I dragged
24  --

1    Q   Yeah   What percentage of your time did you
2   put into it?
3    A   When?  I mean  I don t -- I don t even
4   remember a time
5    Q   2002  that s the date of this memorandum
6    A   Yeah  I was deep into this   I would say at
7   least 40- 50 percent of my time  but it was all
8   about the same thing   Whether I was doing a
9   prepaid card as a gift card  an Afectivo card over
10  a debit network  talking to people about prepaid
11  Visa cards or networks or gift cards or this  the
12  concept of CCMI was card marketing   It was right
13  in our sweet spot   So as long as I had all these
14  partners and friends  let s try to create marketing
15  programs   Technology is only the enabler   It s
16  marketing and business solutions is what this
17  business was about   The software alone didn t do
18  it  the cards didn t do it   The revenue was from
19  the people in the manufacturing side
20         (Exhibit 129 marked for identification )
21   Q   Let me show you a document we marked as
22  Exhibit 129  and this is a memo from Ms  Raider
23  again to you  dated April 26th  2002  and in it she
24  says hello  I spoke to Henri today and was

1  complaining about a lack of support from IS.
2  What's IS?
3      A.  IT.  The technology group in NAM.
4      Q.  What was interesting is that Henri said to
5  me that he has raised the issue to Paul again and
6  Carlucci has acknowledged that there were mistakes
7  but that we needed to determine how to move
8  forward.  Do you remember receiving this e-mail?
9      A.  No, but it's more of a she was probably
10  complaining about how Aspen didn't get done and IS
11  was not giving us the people and Bill Adams wasn't
12  supporting -- same thing, and sometimes --
13      Q.  Same stuff?
14      A.  -- Henri took off his corporate whatever
15  and realized that it was true, so obviously, he
16  says he went to Paul and said help.
17          (Exhibit 130 marked for identification.)
18      Q.  Let me show you a document we've marked as
19  Exhibit 130, and this is an e-mail from Ms. Raider
20  to you dated June tenth, 2002, and it says, toward
21  the end, he wants us to fail.  Do you see that?
22      A.  The --
23      Q.  Just answer the question.
24      A.  Yes, I see it.

1      Q.  And who is the he?
2      A.  Benson.  David Benson was the CIO of News
3  America Marketing.
4      Q.  And when did Mr. Benson join the company,
5  to the best of your knowledge?
6      A.  He joined it after the acquisition.
7      Q.  And what evidence do you have, if any, for
8  the conclusion -- well, let me ask you this
9  question.  Did you share Ms. Raider's view that
10  Mr. Benson wanted you to fail?
11      A.  It's lack of focus.  I don't know if it was
12  -- he was so intentionally to destroy us.  He had a
13  lot of other things to do, but after the
14  acquisition, we had to wait until they got a new
15  CIO, and all the people we trained when he came in
16  were taken to other places, and then when he got
17  here, he said he was busy.  And she's just saying
18  -- this is in 2002 -- that the people on his staff
19  that were doing our work were released and that our
20  -- they were doing the internal work on the Ahold
21  situation.  And we probably were in the middle of
22  bidding on the prepaid business.  I don't know.
23  Did I answer the question?
24      Q.  You did.  You can stop now.

1      A.  Reckless conduct, when does it become
2  intentional?  Gross, reckless, willful stuff.
3          (Off the record.)
4          (Exhibit 131 marked for identification.)
5      Q.  Let me show you Exhibit 131.  And you've
6  already talked about the Longs situation, so I
7  don't think I'm going to ask you anything about
8  this -- about this exhibit.
9          (Exhibit 141 marked for
10  identification.)
11      Q.  I'm going to show you a document that we've
12  marked as Exhibit 141.
13      A.  This one first?
14      Q.  Yeah.  And it is an e-mail from Ms. Raider
15  to you dated December 4th, 2002.  The subject is
16  Mike Cleary's operational team.  And in this
17  letter, Ms. Raider is expressing her being upset at
18  hiring decisions made by NAM in Connecticut, right?
19      A.  Appears to be.  No justice.
20      Q.  More venting on Ms. Raider's part?
21      A.  No, more frustration.
22      Q.  What's that?
23      A.  More frustration.
24      Q.  And the e-mail is her venting to you?

1      A.  No, it's just advising me.  She wasn't
2  venting.  She's telling me facts that would affect
3  the company's business.
4          (Exhibit 132 marked for identification.)
5      Q.  And let me show you Exhibit 132, which is
6  your performance appraisal for 2002.  And in
7  overall achievements, there is a long paragraph
8  about you that's very favorable.  Do you see it?
9      A.  Yes.
10      Q.  Do you agree with it?
11      A.  Yes, that's accurate.
12      Q.  Okay.  And in areas for focus, improvement,
13  it says Bob needs to focus in on two or three
14  specific solutions and bring them to completion.
15  While reviewing new products and talking with
16  developing companies is interesting, the business
17  needs to get deliverables into the hands of the
18  sales team.  Bob has spent a disproportionate
19  amount of time on the Afectivo program that has
20  cost the company an enormous amount of T and E and
21  time.  In addition, Bob needs to continue to
22  develop his office interpersonal skills.  Do you
23  agree that?
24      A.  No.

1    Q   In overall performance summary, it says

2  Bob's efforts this year has not developed as fast

3  as all would have hoped   While the successful

4  extension of the Toshiba program was clearly a huge

5  win for the company, the balance of his efforts did

6  not materialize into marketable products   Some of

7  these issues were beyond his control due to funding

8  issues for SSD's marketing partners; however, this

9  has nonetheless resulted in a shortage of products

10  while our competition continues to launch new

11  products   Do you agree with that?

12    A   Some of it

13    Q   What part of it do you agree with?

14    A   Well, our -- the competition wasn't

15  launching the products I was working on   My stuff

16  was right up there first pass, so I mean, I

17  couldn't control the acceptance of some of the

18  stuff, but I mean -- I mean, I don't remember what

19  this funding of marketing partners was

20    Q   That was my question   What were the

21  funding issues for SSD's marketing partners?

22    A   I don't remember

23    (Exhibit 133 marked for identification )

24    Q   Okay   Let me hand you the document that

1  we've marked as Exhibit 133   It is an e-mail from

2  you to Ms. Raider titled two issues

3    A   Did we do 131?

4    MR. PETERS:  We did   We marked it, but

5  there was no questions

6    A   Oh, okay   I didn't get it   What was the

7  purpose of this e-mail?

8    MR. PETERS:  He doesn't have it

9    A   133?

10    MR. PETERS:  Yes, 133

11    A   Okay

12    Q   (BY MR. KATZ) Let me ask you a question

13  Do you see where it says now that the company has

14  made the decision to dismantle Aspen?

15    A   Yeah

16    Q   Do you see that toward the middle of the

17  page?

18    A   Yeah

19    Q   Do you know when the decision was made to

20  dismantle Aspen?

21    A   No, I don't

22    Q   Okay   It's a fair statement, is it not,

23  that the decision was made to dismantle Aspen

24  because NAM had not had success in selling Aspen,

1  correct?

2    A   Well --

3    Q   Just yes or no

4    A   No   NAM didn't have a product to sell   It

5  was late to the marketplace, but it says we weren't

6  told

7    (Exhibit 134 marked for identification )

8    Q   Let me show you a document that we've

9  marked as Exhibit 134   And this is an e-mail from

10  Henri to Ms. Raider, which she ultimately forwarded

11  to you on September 14th, 2003   Remember?

12    A   No

13    Q   But you see it now?

14    A   I'm reading it

15    Q   You don't remember receiving it?

16    A   No, not today

17    Q   Tell me when you've read it

18    A   I've read it

19    Q   Henri's e-mail outlines some of the

20  problems with the loyalty card business as it

21  existed as of that date, correct?

22    A   No   He outlined what the loyalty card

23  business was for News America Marketing and

24  SmartSource Direct   The industry had exploded

1  Millions of cards, hundreds of millions cards were

2  being bought and sold   Every supermarket had a

3  20 percent attrition and 20 percent growth   It was

4  just an ongoing business and it got you in the

5  door   We weren't getting those big orders and it

6  wasn't big enough for Henri   We weren't getting

7  the orders because we weren't -- I wasn't involved

8  and that's it   I mean --

9    Q   Simple as that?

10    A   They were saying CCMI, we're shutting down

11  your business because we can't do it properly

12  because we broke you up and didn't give you any

13  salespeople and destroyed your place in the

14  marketplace

15    (Exhibit 135 marked for identification )

16    Q   Let me show you a document we've marked as

17  Exhibit 135   It is your 2003 performance

18  appraisal   You would regard this as a good review,

19  would you not?

20    A   My personal performance, yeah, I was doing

21  everything I could humanly possibly do to make

22  money for the company

23    Q   And what was your special job objective?

24    A   This year he noticed that I was

1  non-managerial -- he noticed  I was the general
2  manager of the division  but I managed nobody
3  Let's see  It's backwards
4     Q.  It's on the last page  page 796.
5     A.  Yeah
6     Q.  So tell us  what was your special job
7  objective in 2003?
8     A.  To sell more stored value sales  product
9  sales
10    Q.  And this was an appropriate special job
11  objective for Mr  Lellouche to give you  correct?
12    A.  Well  I had been marginalized out of the
13  core business and they just said just do this and
14  that's what I was doing  Was it what I wanted to
15  do?  No   I wanted to run this company as the basis
16  of the bargain on which I made the deal and now I
17  was just put on the sidelines and doing the best I
18  could to create new things
19    Q.  And you remember that in your employment
20  agreement  which you signed  you agreed to
21  do whatever jobs that News America Marketing
22  assigned to you, correct?
23    A.  No
24    Q.  Okay   Did you accept the special job

1  objective that you were given in your 2003
2  performance appraisal?
3     A.  By signing this  you didn't accept or
4  reject.  You just acknowledged receipt of it
5     Q.  Okay.  But apart from your signature  did
6  you accept the special job objective that you were
7  given?
8     A.  Yeah  I worked -- I went after this and I
9  achieved it
10    Q.  Did you achieve it?
11    A.  Yes.
12    Q.  What did you deliver in terms of dollars in
13  sales for the -- for the next fiscal year?
14    A.  I don't remember the years  but I think
15  this was I went out and finished the Ahold deal.
16  which you say didn't happen  Maybe we should ask
17  Ahold  There's people over in Quincy that know the
18  contract was done
19           (Exhibit 136 marked for identification )
20    Q.  Okay   I've just given you a document which
21  we've marked as Exhibit 136  and it's an e-mail
22  from Robert Coughlin to himself  but it also
23  contains in the middle of the page an e-mail from
24  you to Robert Coughlin  and the subject of the

1  e-mail is EO year four  and I take it that means
2  earn-out year four?
3     A.  Yes
4     Q.  Okay   And you have an e-mail here that you
5  sent to Robert Coughlin on March 8th  2004 at 5:44.
6  correct?
7     A.  Yes   Wait a minute   Which one?
8     Q.  It's right in the middle of the page on RC
9  431
10    A.  The last one?
11    Q.  No  first page right in the middle.   You
12  see -- it's part of a chain
13    A.  Okay   I got it.
14    Q.  Do you see it?  I'll just read the e-mail
15  Robert  doesn't look like Ann did much at all
16  Meanwhile  Louise's account is in trouble
17  fountains, BHCC, Accuware  etc  are months behind
18  I am home tomorrow   Please discuss   Bob   Do you
19  see that?
20    A.  Yes
21    Q.  You are the Bob  right?
22    A.  I'm Bob and he's Robert
23    Q.  And Robert is Robert Coughlin   And you
24  said in the first line doesn't look like Ann did

1  much at all  right?
2     A.  Yes
3     Q.  And you're referring to Ann's sales in
4  earn-out year four?
5     A.  No.  No.  Not at all
6     Q.  What are you referring to?
7     A.  You left my mother out  Louise
8     Q.  We'll get to Louise.
9     A.  I was talking about we got this sheet and
10  she was supposed to review the calculations in the
11  earn-out to lay out issues of where they are off
12  and what we needed to do  like we did every year
13    Q.  Raise rate questions?
14    A.  Yeah  and she didn't do it   She just sent
15  it to me; you do it this year
16    Q.  So you're not referring to Ann's
17  productivity; you're referring to the fact that she
18  didn't do the kind of review of the earn-out
19  calculations?
20    A.  Right   And he was no longer with the
21  company and he was helping me at home with some
22  personal stuff  and he knew how to do this because
23  he had helped us over the course of time
24    Q.  Had you paid him for the help that he had

1    provided you during the previous earn-out years

2    when he was working or News America Marketing?

3      A.  No.  He was doing it as a favor.

4      Q.  And did he do this work on company hours or

5    did he do it on his own time?

6      A.  He did it -- what he did for us he did on

7    his own time.

8      Q.  And did he do it at the office or did he do

9    it at home?

10     A.  He did it at home.

11     Q.  You're sure about that?

12     A.  I'm not positive, but this is, what, an

13   hour.

14     Q.  And the reference to Louise is a reference

15   to your mother?

16     A.  Yes.

17     Q.  And the reference to all these other things

18   have to do with personal things?

19     A.  Family business, yes.

20        (Exhibit 137 marked for identification.)

21     Q.  And let me show you a document that we've

22   marked as Exhibit 137, and Exhibit 137 is your 2004

23   performance appraisal, right?

24     A.  I don't know.  I never received this.

1      Q.  You've never seen it before?

2      A.  No.  I never received it.

3      Q.  Okay.

4      A.  In the normal process, an employee fills

5    one in and he sends it to his supervisor and then

6    they come back and there's a review and an

7    interchange.  This is about the time when Henri

8    just -- I sent it to Henri and there was no

9    response.  And then I told you about the meeting

10   with Marty Garofalo.  And while every employee of

11   the company got a review, I wasn't given a review

12   or a meeting or the right process followed, and I

13   was the only one in the corporation.  And I saw

14   this in one of the documents produced, but I never

15   know that this was even done, so I filled this in

16   -- so every year you fill it in and you write your

17   own stuff and then your advisor looks at it and

18   talks it over and comes back and you agree on what

19   it is and you sign it, both people sign it.  Mine's

20   never been signed.  It was never reviewed.  They

21   locked me out of my own office.  That's why none of

22   this is filled in and no one's ever signed it.

23     Q.  When was it that you think you were locked

24   out of your own office?

1      A.  Oh, it was about -- I don't know  January

2    or February of '04.

3      Q.  And was it about that time that you had the

4    meeting with Mr. Garofalo that you had mentioned

5    earlier?

6      A.  Yeah, that I would meet with Marty.  When

7    he came to Boston, I'd have to meet him outside the

8    office.

9      Q.  But there was a meeting that you recounted

10   earlier in which I think you told us that

11   Mr. Garofalo had come to Boston to try to convince

12   you to leave the company?

13     A.  No, no.  Right.  He was -- he was told to

14   try to do that and then he tried to work with me

15   and then they tried to just keep me quiet, just

16   come up with a big deal, and I only assumed that

17   Mr. Carlucci said get him gone.  I don't care if

18   he's got a contract.  I don't care.

19     Q.  I'm just trying to date that meeting.  Did

20   that occur about the same time as you left your

21   office at the John Hancock building?

22     A.  I was ordered out of the building.

23     Q.  Okay.

24     A.  I was constructively -- not constructively.

1    Evicted from my --

2      Q.  I'm just trying to determine whether your

3    meeting with Mr. Garofalo took place at the same

4    time -- at or about the same time as when you left

5    the office at the Hancock building.

6      A.  No.  I met with Marty, and everything was

7    fine for weeks or a month or so after that, and all

8    of a sudden he called up and said you've got to

9    leave today.  So the appraisal -- there's no date

10   on this appraisal; there's no signature on this

11   appraisal.

12     Q.  There's a cover page to it which gives a

13   date.

14     A.  So this was sent from Henri.

15     Q.  But I'm just -- I'm trying to get the date

16   of your conversation with Mr. Garofalo.  Do you

17   think that the meeting with Mr. Garofalo that you

18   referenced took place --

19     A.  Prior to this date.

20     Q.  Took place prior to this date, but it also

21   -- it took place prior to January of 2004?

22     A.  I don't remember.  I don't know how long

23   Henri held this before he sent it to them and not

24   back to me.  I'm sure Henri was in a dilemma of

1  whether he should be doing it at all in light of
2  Harty trying to have some direct thing. but you
3  know. as far as giving me the respect of any other
4  employee in the company. for no reason. I was --
5  because I wouldn't sign the termination and release
6  and leave. I wasn't appraised and then I was just
7  for no reason. no written or oral reason. I was
8  asked not to go to the Boston office any more
9      Q    And this -- I'm just trying to date it
10  This happened sometime in --
11     A    Sometime in '04
12     Q    And your meeting with Mr Garofalo took
13  place a few months before that event?
14     A    Yeah. I'm going to say it's February or --
15  I don't know.  I don't remember
16     Q    But it was in your final year with News
17  America Marketing?
18     A    There was like six or seven or eight months
19  left.  I was trying to get something done
20     Q    I'm just trying to identify when the
21  meeting took place
22          (Exhibit 138 marked for identification )
23     Q    I'm going to show you a document marked as
24  Exhibit 138.  This is a letter that you received

1  respond to NAM this week or lose right to appeal
2  Have you figured anything?  Are you around?  Do you
3  remember sending this e-mail to Mr. Coughlin?
4      A    No
5      Q    But you don't have any doubt that you did?
6      A    No  I did  I was again asking him to help
7  with the analysis of the numbers
8      Q    When you said lose right to appeal. what
9  did you mean?
10     A    I think we had so many days to just raise
11  issues within the -- send something that could
12  raise issues and then discuss it  I think we had
13  so many days to give an answer
14          (Exhibit 140 marked for identification.)
15     Q    Let me show you a document that we've
16  marked as Exhibit 140  It's an e-mail from you
17  dated November 24th. 2004; subject. no subject
18  Did you write this document?
19     A    I don't recall  Yeah. I forgot about
20  Spartan's
21     Q    Well. what is this document?
22     A    I have no idea
23     Q    Do you believe you wrote it?
24     A    I don't recall  Where did it go?  Who is

1  from Mr. Garofalo dated November 19. 2004   Do you
2  remember receiving this?
3      A    Yes
4      Q    And in it he states that your employment
5  terminated on September 30th. 2004?
6      A    Right
7      Q    And he also says that you could contact him
8  or another NAM executive committee member if you
9  have a business idea that you would like to pursue
10  with News America Marketing. right?
11     A    Yes
12     Q    And have you contacted him or any other
13  News America Marketing executive committee member
14  since receiving the November 19th. 2004 letter from
15  Mr Garofalo?
16     A    No. I haven't
17          (Exhibit 139 marked for identification )
18     Q    Let me show you a document that we'll mark
19  as Exhibit 139. and I want to call your attention
20  to the e-mail at the bottom of the page from you to
21  Robert Coughlin dated November 22. 2004   Do you
22  see that?  It says subject. FYI?
23     A    Yes
24     Q    Okay  And you write Robert. we need to

1  it -- I don't remember this document  I remember
2  some of the things in it
3      Q    Okay  You say at the bottom we are
4  reviewing this matter with our attorneys and make
5  demand upon you. blah. blah. blah  Do you see
6  that?
7      A    Yes
8      Q    Do you know what you were referring to?
9      A    No
10     Q    In the middle of the page. there's a
11  paragraph that says finally. even after Safeway
12  Marketing Services tried to politically influence
13  that contract. Ahold. through Stop & Shop Stores.
14  advised our team that they would deliver the
15  contract document that would memorialize the
16  agreement and order their tech group to finish the
17  link to a processing pub  Did you write that
18  sentence?
19     A    I don't remember
20     Q    There's a reference here to Stop & Shop
21  Stores advising our team  Do you know what the
22  reference to our team is?
23     A    Well. it would be SmartSource Direct
24  Well. the team  It might be Airwaves  SmartSource.

1  In-Com, whoever was providing the infrastructure to
2  deliver the contract  It was mostly Airtime and
3  us
4      Q  And this is the contract that you contend
5  News America Marketing backed away from in order to
6  curry favor with Safeway?
7      A  Yes, absolutely
8      Q  Okay  And in this sentence  you're saying
9  that Stop & Shop Stores advised our team  right?
10     A  Yes, we found out from Stop & Shop that --
11     Q  And who at Stop & Shop did you receive
12  information from?
13     A  I didn t  Ann did
14     Q  And who did Ann receive information from?
15  Do you know?
16     A  I don't remember the name
17     Q  Okay  And what was advised  according to
18  this document  is that they would deliver the
19  contract document that would memorialize the
20  agreement?
21     A  That's what it says
22     Q  Okay  So it's a fair statement  is it not
23  that as of this writing there was not a signed
24  contract document  correct?

1      A  I don't remember
2      Q  Okay
3      A  I mean  I think there was a --
4          MR  PETERS:  Where are you referring to
5  now, Gordon?
6          MR  KATZ:  I'm still referring to the
7  first sentence in the third full paragraph  but let
8  me go on and ask my next question
9      Q  (BY MR  KATZ)  It says when the contract
10  was not delivered and no good answer coming from
11  your company  do you see those words?
12     A  No  Where is it?
13     Q  It's the next sentence in paragraph three
14  When the contract was not delivered and no good
15  answer coming from your company  do you see those
16  words?
17     A  Yes
18     Q  Okay  And what you're referring to here is
19  that the contract was not delivered by Stop & Shop
20  to News America Marketing?
21     A  I don't know what it's referring to   I
22  mean  it s saying --
23     Q  Well  let me read the whole sentence
24     A  Sure

1      Q  When the contract was not delivered and no
2  good answer coming from your company  I called Stop
3  & Shop directly and was told by them that the News
4  America Marketing and its division SmartSource
5  Direct had withdrawn from the contract award  Have
6  I read that correctly?  Right?
7      A  That s what it reads
8      Q  And this is from an e-mail that you
9  generated?
10     A  I don't remember  It may have been someone
11  else  It may have been from Airwaves  I mean  it
12  seems like they were the ones that --
13     Q  But this document says from Bob Fireman,
14  R  Fireman, STV Partners dot com?
15     A  Well  it must have been sent to me or it's
16  on my thing  whatever  I don't remember
17     Q  Well  it wasn't sent to you  It was a
18  document you generated?
19          MR  PETERS:  You're representing in
20  your question that he sent it to --
21          MR  KATZ:  I'm not representing he sent
22  it to anybody
23     Q  (BY MR  KATZ)  I m just saying you wrote
24  it  You may have sent it to no one

1      A  Oh  I don't know if I wrote it  I don t
2  remember
3      Q  Who else would have written it?
4      A  I don't know  Maybe Airtime wrote it
5      Q  So you think that Airtime might have had
6  access to your e-mail account and written an e-mail
7  under your name?
8      A  I don't know why it's on my e-mail  but it
9  looks to be true
10     Q  And what is it that looks to be true?
11     A  The facts in it
12     Q  And the fact is that the contract was not
13  delivered by Stop & Shop to New America Marketing
14  right?
15     A  I don't know if that was that  We were
16  working under --
17     Q  Just answer my question yes or no
18     A  I don't know
19     Q  Okay  That's an answer  Let me ask my
20  next question  You then say that I called Stop &
21  Shop directly  You write that  correct?
22     A  I didn't say I wrote it and I didn t call
23  Stop & Shop
24     Q  Okay  So you don t remember ever calling

1    anybody at Stop & Shop regarding this issue?

2        A.   Right.  I never did.

3        Q.   Okay.  So it's untrue, the statement that

4    is contained in paragraph three where you say I

5    called Stop & Shop directly?

6            MR. PETERS:  Objection to the form of

7    the question.

8        A.   I didn't say it.  I didn't say I did, and I

9    didn't write I did.

10       Q.   (BY MR. KATZ)  So you don't think -- the I

11   that's referred to here is someone other than

12   yourself?  Is that what you're saying?

13       A.   It's not me.

14       Q.   It's not you?  Okay.  Even though this is

15   an e-mail that is on its face authored by you?

16       A.   Well, it's got my web address up there.

17       Q.   It's got your e-mail address, right?

18       A.   Yes.

19       Q.   And this was a document that was produced

20   by your counsel, right?

21       A.   I don't know where it came from.

22       Q.   Well, if you take a look at the lower

23   right-hand corner, it says FR 583, and you'd agree

24   with me that that is a Bates stamp that indicates

1    that it came from documents that were in your

2    possession, right?

3        A.   Yes.  That appears to be correct.

4        Q.   Okay.  And what is being said in this

5    e-mail, which appears to have come from -- from

6    your files, is that you called Stop & Shop directly

7    and was told by them that News America Marketing

8    and its division SmartSource Direct had withdrawn

9    from the contract award, right?

10       A.   That's what it says.

11       Q.   And withdrawn from the contract award means

12   that they withdrew from the competitive bidding

13   process for the contract award, correct?

14       A.   No.

15       Q.   Well, it means that they withdrew from

16   consideration being awarded the contract?

17       A.   No, no, no.  The RFP was finished.  We had

18   won.  We spent a year or two.  Airtime -- this

19   seems to be something that Airtime did.  The

20   contract was delivered.  It was being negotiated.

21   Ahold had just consolidated some stuff and the work

22   of this was centered around Stop & Shop.  I worked

23   with the attorney at Stop & Shop.

24       Q.   Which attorney?

1        A.   I don't remember his name.  I think I

2    worked with Jordan on this, too.  And it was a long

3    time before.

4            What happened is we finished the

5    contract and everything was agreed, and Ahold was

6    going through some consolidations on their

7    technical thing and they couldn't implement it

8    until they finished something in their IT group

9    and so Bi-lo, which is one of the divisions, said I

10   don't care about implementing it on the server.

11   We'll roll it out right now.  So we had Bi-lo up

12   and running in all stores, its program.

13           Finally, the software was done and they

14   were ready to roll it out to do it online, all

15   divisions, and Ann -- I don't know.  Ann found out

16   and then Henri got Ann on a call, and she

17   testified, as we know, that -- that basically,

18   there was a call and News America and Henri and the

19   powers that be decided that they were telling them

20   we were going out of the business and to give it to

21   Safeway Marketing Systems, and that's what

22   happened.

23           Now, this looks to be something that

24   Airtime might have called and confirmed that.

1    because Airtime had bought displays and they had

2    invested infrastructure and partners and had deals

3    with TracPhone and Alltime and AT&T and this was a

4    $50 million contract.  And Henri, you know, behind

5    the scenes just did this.

6        Q.   Are you suggesting that News America

7    Marketing breached a contract that it had with

8    Ahold?

9        A.   No, they got Ahold to release them from the

10   contract and they took the business elsewhere.

11   They breached the contract to take the revenue out

12   of our agreement.  They absolutely cost our

13   partners a year and a half and tens of thousands of

14   dollars, and they were trying to throw Floor

15   Graphics, I think, out of Safeway, and they were

16   going to do anything for Safeway they can at the

17   expense of SmartSource Direct or anybody.  And I

18   believe Safeway was sued subsequently and paid

19   $10 million that NAM probably reimbursed them for

20   and NAM's being sued now and K-Mart is being sued

21   for like $60 million.

22       Q.   Who sued Safeway?

23       A.   Floor Graphics.  Floor Graphics is suing

24   K-Mart for, again, wrongful intervention.  I think

1  News has guaranteed that case. It's in the state

2  -- federal court in Chicago, and there's a suit

3  going on in Trenton, in the federal court in

4  Trenton for wrongful and unethical conduct by News

5  America Marketing

6      Q   Have you been involved in any of those

7  suits?

8      A   No

9      Q   Have you spoken to counsel representing any

10  of the parties in any of those suits?

11     A   I don't know if I can answer that question

12  Yeah. I've spoken to counsel

13     Q   Who have you spoken to?

14     A   I spoke to Phil Isaacson

15     Q   And who does he represent?

16     A   Floor Graphics

17     Q   And when did you speak to him?

18     A   Oh, months ago

19     Q   And have you provided him with any of the

20  documents that have been disclosed in discovery by

21  News America Marketing in this case?

22     A   No. The -- no

23     Q   Did you want to say something more?

24     A   The facts are different. The documents are

1  different

2      Q   Did you -- let me ask this question. Did

3  you provide Mr. Isaacson with any documents

4  whatsoever?

5      A   No

6      Q   How long did you speak to Mr. Isaacson?

7      A   Oh, I don't know; 45 minutes

8      Q   Have you met with him in person?

9      A   Yeah, he was in Boston

10     Q   Did he come to Boston specifically to meet

11  with you?

12     A   I don't know

13     Q   And have you spoken to any attorney who

14  represents any of the parties that are in

15  litigation with News America Marketing other than

16  Mr. Isaacson?

17     A   No

18     Q   He's the only attorney you've spoken to?

19     A   Yes

20     Q   And have you been identified as a witness

21  in any case where News America Marketing is a party

22  other than this one?

23     A   No

24     Q   Has Mr. Isaacson told you that he intends

1  to call you as a witness in this case?

2      A   No

3      Q   Did Ms. Raider speak to anyone representing

4  a party adverse to News America Marketing in any

5  pending litigation other than this one?

6      A   I don't know

7      Q   Was she with you when you met with

8  Mr. Isaacson?

9      A   I believe she was, now that I think about

10  it

11     Q   Okay. And where --

12     A   We had a lunch

13     Q   Where did the meeting take place?

14     A   In the Marriott

15     Q   Which Marriott?

16     A   Newton

17     Q   Did you reveal only information about News

18  America Marketing to Mr. Isaacson?

19         MR. PETERS: Objection

20     Q   (BY MR. KATZ) Let me rephrase that

21  question. Did Mr. Isaacson take notes during your

22  meeting?

23     A   No

24     Q   And to the best of your recollection -- did

1  you take notes during your meeting?

2      A   No

3      Q   Did you have an outline during your

4  meeting?

5      A   Did I have an outline? No

6      Q   And how did Mr. Isaacson find you?

7          MR. PETERS: Well, objection. I mean,

8  I guess your -- your question is did he tell you

9  how he located you?

10     Q   (BY MR. KATZ) Did he tell you how he

11  located you?

12     A   I know how he located me

13     Q   Tell me, please

14     A   Through the people at Floor Graphics

15     Q   And did someone at Floor Graphics contact

16  you before your meeting with Mr. Isaacson?

17     A   Yeah. No, I spoke with --

18     Q   Who did you speak to at Floor Graphics

19  prior to your meeting with Mr. Isaacson?

20     A   Well, I spoke to the principals of Floor

21  Graphics

22     Q   Can you identify them by name, please?

23     A   George and Richard Rebh

24     Q   And how long -- and they called you, or did

1  you call them?

2     A.  We didn't meet over this issue.

3     Q.  Well, no.  I'm just asking you --

4     A.  No, no.  I've spoken to them, and I've

5  spoken to them --

6     Q.  Did you initiate the call to the principals

7  of Floor Graphics?

8     A.  No.  They -- I met them through a business

9  venture that I was doing.

10    Q.  What business venture was that?

11    A.  Looking to develop a new kind of technology

12 for authentication.

13    Q.  And how was it that you found -- that you

14 connected with the principals of Floor Graphics

15 over this project?

16    A.  I met them through -- through a friend of

17 mine.

18    Q.  And what is your friend's name?

19    A.  Seth Epstein.

20    Q.  And how was it that Seth Epstein brought

21 you together?

22    A.  Because we were thinking of building a

23 business over some technology.

24    Q.  And so what does Mr. Epstein do for a

1  living generally?

2     A.  Mr. Epstein runs a company in Connecticut

3  called Tactical Res-- I don't know.  TRS

4     Q.  Okay.  And did Mr. Epstein suggest to you

5  that you should call the people at Floor Graphics

6  regarding this project?

7     A.  No, no.  He had them -- he had them invest

8  in some stuff we were doing.  He thought they would

9  be a good partner as a sales group and a potential

10 investor and we put some money into a new venture.

11    Q.  And what's the name of the venture?

12    A.  It's called Me For Sure.

13    Q.  And you put money into it?

14    A.  Yes.

15    Q.  How much?

16        MR. PETERS:  Why is that germane?  I

17 mean, now we're just asking questions as the time

18 fritters away.

19    Q.  (BY MR. KATZ)  I'm just trying to figure

20 out the dimension of the project.

21    A.  Oh, it's in infancy.  It's just been in

22 conversation --

23    Q.  And how much --

24    A.  I put in, I don't know, $50,000 or

1  something.

2     Q.  And how much has Floor Graphics put in?

3     A.  Floor Graphics has put in nothing.  This

4  has nothing to do with Floor Graphics.  Individuals

5  put in some money.

6     Q.  Okay.  And the idea was you'd try to get

7  Floor Graphics to be an investor in this project?

8     A.  No, no, no.  The individuals of Floor

9  Graphics.  It had nothing to do with Floor

10 Graphics.  I don't know Floor Graphics.  I've never

11 been to Floor Graphics.  I have nothing to do with

12 Floor Graphics.  These guys are -- I looked at as

13 investors who may have some sales acumen.  It has

14 nothing to do with any of this.  When that

15 happened, I found out they were in a lawsuit also

16 against News America Marketing, and that's it.

17    Q.  Were you the one who approached the

18 principals of Floor Graphics --

19    A.  No.

20    Q.  -- to see if they would be interested --

21    A.  No.

22    Q.  -- in investing in this project?

23    A.  No.

24    Q.  Was it Mr. Epstein who approached them?

1     A.  Yes.  Seth thought they would be a

2  candidate.

3     Q.  So tell me how we get from Mr. Epstein

4  approaching the principals of Floor Graphics for

5  investment in the project that you and Mr. Epstein

6  are participating in to you having a meeting with

7  Floor Graphics' attorney.

8     A.  Oh, because we shared a common irony that

9  we were both suing News America Marketing.

10    Q.  And how did you learn that?

11    A.  I don't know.  I just think they told me,

12 you know.  Obviously --

13    Q.  Did you have a meeting with them at some

14 point?

15    A.  I met them a few times in Washington about

16 the project, but I was -- became aware of their

17 lawsuit and I became aware of some of the things

18 about it.

19    Q.  When did you first meet them?

20    A.  Oh --

21    Q.  When?

22    A.  I want to say four or five months ago.

23    Q.  Okay.  And how many times have you met them

24 since?

1    A    Twice, three times
2    Q    Where?
3    A    I don t know   We meet in Washington where
4  the project is
5    Q    And who is running the project?
6    A    No one right now
7    Q    Okay.  And they've yet to invest any money
8  in the project?
9    A    They have   They've put money in.  We're
10  working on it.
11    Q    As principals they've invested?
12    A    Yeah, as principals.
13    Q    And approximately how much have they
14  invested?
15    A    I don t know   Probably 50, 60, 70,000.
16    Q    And through these meetings, you came to
17  discuss the irony, as you called it, that you both
18  are adverse to News America Marketing?
19    A    Yes.  We found out we were both suing News
20    Q    And again, how did we get from the
21  discovery of that irony to you and Ms. Raider
22  meeting with their attorney at the Newton Marriott?
23    A    Oh, because they asked me if I would talk
24  to their attorney and I said I would be happy to

1  that arbitration and, you know, it made me --
2  reminded me of things that, you know, why I was
3  taken to Safeway to entice Safeway Marketing
4  Systems to develop my stored value cards, but I
5  know that Henri and Marty's sole purpose was to get
6  the core business back, the Floor Graphics
7  business, and I knew there was a general sense in
8  the company to do anything to get the Floor
9  Graphics business back   And that's what I knew at
10  Safeway and I knew that at K-Mart.
11    Q.   Did you discuss your understandings of the
12  strategic direction that News America Marketing
13  had?
14         MR. PETERS:  Objection to the form of
15  the question.
16    A    No   I don't know them
17    Q.   (BY MR. KATZ)  Okay
18    A.   I knew that everybody -- everybody in the
19  world --
20         MR. PETERS:  You answered no
21    A.   Okay
22    Q.   (BY MR. KATZ)  What else do you remember
23  telling Mr  Isaacson?
24    A.   That's all I told him about the situation

1    Q    And tell me everything you remember that
2  was stated in your meeting with the attorney at the
3  Newton Marriott.
4    A    I just gave some general background into
5  what we did and our experience with News America
6  Marketing and our lawsuit  and I said if -- if we
7  could share some information about -- help each
8  other, it would be good
9    Q    Well, what did you discuss insofar as the
10  business plans of News America Marketing with
11  Mr  Isaacson?
12    A    Nothing
13    Q    What questions did he ask you?
14    A    I don't know the business plans   I didn't
15  know the business plans of News America when I
16  worked there, and we're talking years later
17    Q    What questions did Mr  Isaacson ask you?
18    A    I don t remember
19    Q    You don't remember any question he asked
20  you?
21    A    Generally  we talked about Safeway   That s
22  why this thing refreshed my recollection   We
23  talked about Safeway   That s how I learned about
24  his arbitration thing at Safeway and how he won

1  at Ahold, but I don t think it was relevant to
2  them.
3    Q.   What other situations did you tell him
4  about?
5    A.   That's it
6    Q.   You spent the whole time in your meeting
7  talking about the Ahold and Safeway situation?
8    A.   No   I told him about my situation --
9    Q    Okay   So you talked about --
10    A    -- to see if there was anything he could
11  add to help me
12    Q    Did he have anything to help you?
13    A    He might have some evidence of bad conduct
14  by News America Marketing in its dealings
15    Q    Did he state anything specifically?
16    A    He stated some people were studying it and
17  he might make it available to me, but he hasn t as
18  of yet
19    Q    Was he any more specific than that?
20    A    No   He mentioned there was another company
21  suing News as well   I don't remember their name
22    Q    So you discussed your situation, you
23  discussed that he might be able to provide some
24  information to help you, correct?

1   A   Some evidence of bad conduct in business --

2   Q   Okay.

3   A   -- unethical conduct.

4   Q   You discussed what you perceived to be the

5   Ahold situation, correct?

6   A   Yes.

7   Q   Okay.  And do you remember discussing

8   anything besides those two subjects?

9   A   No.

10  Q   Nothing else?

11  A   No.

12  Q   Have you had any conversations on the

13  telephone with Mr. Isaacson or anyone from his

14  office since that meeting?

15  A   No.

16  Q   Have you had any e-mails with Mr. Isaacson

17  or anyone from his office since your meeting at the

18  Newton Marriott?

19  A   Not that I recall.

20  Q   And to the best of your recollection, you

21  think that the meeting with Mr. Isaacson took place

22  about three months ago?  Is that what you told us?

23  Do I have the date wrong?

24      MR. PETERS:  I thought he said four.

1   between Safeway and Ahold.  That's all.  Believe

2   me.  I'm not a major portion of his activity.  I

3   wish I was, but I'm not.

4   Q   Did you tell him about what you perceived

5   to be Mr. Lellouche's involvement with Safeway and

6   Ahold?

7       MR. PETERS:  Specifically?

8       MR. KATZ:  Yes.

9       MR. PETERS:  Using Mr. Lellouche's

10  name?

11      MR. KATZ:  Yes.

12  A   Yeah.  I may have.  Mr. Lellouche I believe

13  was -- he's the guy that pulled the rug.  He's the

14  guy that had the relationship with Safeway

15  Marketing Systems.  I don't know what he did.  He

16  pulled the rug on everybody, he didn't care who he

17  hurt, and he did it for the benefit of News America

18  Marketing or himself.

19  Q   (BY MR. KATZ)  And you told Mr. Isaacson

20  all of the facts as you knew them related to the

21  Ahold and Safeway situation?  Is that --

22  A   Well, there's not a lot of facts I know.

23  Q   But whatever you know, you told him?

24  A   I think I just told you.  What I've told

1   but the record will say what it says.

2   Q   (BY MR. KATZ)  Okay.  What's your

3   recollection?

4   A   I don't remember.  It was a while ago.

5   I'll find out and I can provide that to you.

6   Q   Was it in the winter; was it in the fall?

7   A   No, no, no.  It's only been in the last

8   three or four months.

9       MR. PETERS:  I'm now at the point where

10  I'm running to get the train.

11      MR. KATZ:  We're in the final --

12  Q   (BY MR. KATZ)  Just so that I'm clear,

13  could you summarize for us what again you told

14  Mr. Isaacson about the Ahold situation?

15      MR. PETERS:  No.  I mean, I'm not going

16  to instruct him not to answer, but you're going to

17  get my strong objection at this late hour when you

18  know I'm running to get the train.  He told you

19  what he said.

20  Q   (BY MR. KATZ)  I'm just wondering, is there

21  anything that you can add to what you've already

22  said about what you told Mr. Isaacson?

23  A   No.  I gave him a general sense of what

24  this lawsuit was about and the situation that I had

1   you now --

2   Q   And everything that you believed to be true

3   you told Mr. Isaacson?

4   A   That's the only way I know how to do things

5   is to tell the truth.

6   Q   Okay.  Thank you.

7       (Off the record.)

8       (Whereupon the deposition was adjourned

9   at 6:32.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    COMMONWEALTH OF MASSACHUSETTS

 2    MIDDLESEX, ss

 3

 4         I, Marianne R. Wharram, Certified Shorthand

 5    Reporter, Registered Professional Reporter and

 6    Notary Public in and for the Commonwealth of

 7    Massachusetts, do hereby certify that

 8    ROBERT N. FIREMAN, the witness whose deposition is

 9    hereinbefore set forth, was duly identified and

10    sworn by me and that such deposition is a true

11    record of the testimony given by the witness.

12         I further certify that I am neither related to

13    or employed by any of the parties in this action,

14    nor am I financially interested in the outcome of

15    this action.

16         In witness hereof, I have hereunto set my hand

17    this fourth day of June, 2007.

18

19                   _____

20                   Marianne R. Wharram, CSR/RPR

21                   Notary Public

22                   CSR No. 142689G

23    My commission expires:

24    August 7, 2009
```

354

```
 1              C E R T I F I C A T E

 2         I, ROBERT N. FIREMAN, do hereby certify

 3    that I have read the foregoing transcript of my

 4    testimony, and further certify under the pains and

 5    penalties of perjury that said transcript is a true

 6    and accurate record of said testimony, with the

 7    exception of the following corrections listed

 8    below:

 9    Page  Line            Correction

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22                   _____

23                   ROBERT N. FIREMAN

24       Dated this ____ day of _____, 2007
```

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT FIREMAN and ANN RAIDER,<br><br>Plaintiffs,<br><br>v.<br><br>NEWS AMERICA MARKETING IN-STORE,<br>INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 05-1740MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ROBERT FIREMAN'S ANSWERS TO FIRST SET OF INTERROGATORIES
## PROPOUNDED BY THE DEFENDANT

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Robert Fireman

("Mr. Fireman") hereby objects and responds to Defendant News America Marketing In-

Store, Inc 's ("NAM") First Set of Interrogatories as set forth below.

### GENERAL OBJECTIONS

The following General Answers and Objections are applicable to, and are hereby

incorporated by reference into, each and every one of Mr. Fireman's Specific Answers

and Objections to each Interrogatory:

1.    Mr. Fireman objects to the interrogatories to the extent that they seek

information which is protected by the attorney-client privilege, which constitutes work

product, or which is otherwise protected from discovery.

2.    Mr. Fireman objects to the interrogatories to the extent that they seek

information that is not relevant and/or not reasonably calculated to lead to the discovery

of admissible evidence

3.      Mr. Fireman objects to the interrogatories on the grounds that they are overly broad and unduly burdensome and/or duplicative.

4.      Mr. Fireman objects to the interrogatories, including without limitation the definitions and instructions, to the extent that they purport to impose obligations on him beyond those included in Mass. R. Civ. P. 26 and 33.

5.      Mr. Fireman objects to the interrogatories on the grounds that they are vague, ambiguous, and confusing.

6.      Mr. Fireman's willingness to answer any particular Interrogatory is not a concession that the subject matter of the particular Interrogatory Answer is relevant to this action or that the answer is admissible at trial

7.      The information disclosed below has been provided after a diligent search. Mr. Fireman reserves the right to supplement these answers.

8.      Mr. Fireman reserves the right to rely at the time of trial or in other proceedings in this action upon documents, things, and evidence in addition to that disclosed in these answers regardless of whether any such documents, things, or evidence are newly discovered or currently in existence.

## ANSWERS TO INTERROGATORIES

### INTERROGATORY NO.: 1

State the name and current address of each and every expert witness that you intend to call at the trial of this matter, including in your answer:

(a)      the subject matter of the facts and opinions to which each person is expected to testify;

2

(b)    the substance of the facts and opinions to which each person is
       expected to testify;

(c)    a summary of the grounds for each opinion, and

(d)    the education, business, professional or other experience, as well as
       any other facts that will be offered at trial to prove the
       qualifications of each expert

## ANSWER NO.: 1

Mr. Fireman has not determined which expert(s), if any, he intends to call as
witness(es) on his behalf at the trial in this matter. Mr. Fireman agrees to supplement this
answer in compliance with any Pre-Trial Order or Rule of Court.

## INTERROGATORY NO.: 2

Describe in detail any and all contracts, agreements or understandings between
you and NAM.

## ANSWER NO.: 2

Mr Fireman objects to this Interrogatory as it is overbroad, vague and neither
relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman further
objects by noting that there were countless "contracts, agreements or understandings
between me and NAM." It is impossible to recount, in the form of an interrogatory
answer, all "contracts, agreements or understandings" reached over several years. Mr.
Fireman also incorporates by reference his interrogatory responses 5-7 and 10-12.
Subject to this, as well as the above listed General Objections, which are specifically
incorporated herein by reference, Mr Fireman responds as follows:

Consumer Card Marketing, Inc. ("CCMI") was operating as a profitable

company generating over $8 million dollars in sales in 1999 with a national reputation in the supermarket and other channels as a leader in loyalty marketing. To accelerate its growth and continue to maintain a leadership position, CCMI sought a business relationship with a highly visible national company which could provide sales and financial and other support to deliver on CCMI's five (5) year business plan. NAM approached CCMI, reviewed CCMI's business plan (which was designed to achieve $50 million in sales growth within five years) and NAM agreed to purchase CCMI with the agreement that it would commit its resources and run CCMI in such a way as to permit it to execute the plan.

NAM agreed to provide CCMI with the use of its expansive retailer and manufacturer sales force who was selling their current products, and expose CCMI to NAM's relationships with worldwide affiliates of News Corporation and the Fox Entertainment Network. The entire premise upon which CCMI entered into the August 13, 1999 Stock Purchase Agreement with NAM was NAM's express agreement, commitment and representation to use its sales force and relationships to support CCMI and sell CCMI's product line to reach the $50 million sale figure.

NAM represented and agreed that CCMI would continue to operate as an autonomous division of NAM and benefit from its operational and financial support. NAM agreed that Mr. Fireman and Ms. Raider would continue to manage the CCMI's business unit including sales, operations, personnel, and budgets. By way of example only, in a letter dated October 13, 1999, Ms. Raider wrote to Jennifer Jane confirming the parties' agreement that the CCMI name would be maintained and operate as a separate division. This document is incorporated herein by reference pursuant to Fed

4

R. Civ. P 33(c).

According to a press release issued by NAM on August 19, 1999, "Consumer Card Marketing, Inc. represents an exciting opportunity for New America . . not only does it complement our existing in-store marketing services but provides retailers with the foundation to build customer loyalty and aid them in increasing profits through targeted loyalty programs." This message was delivered loudly and publicly by Paul Carlucci but NAM never delivered on its promises and commitments.

Further responding, various agreements and contracts were executed by the Plaintiffs in connection with the August 13, 1999 Stock Purchase Agreement and the Stock Purchase Agreement and subsidiary agreements executed in connection with the Stock Purchase Agreement are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 3**

Describe in detail any and all prospects or actual clients of CCMI, SmartSource Direct, or SmartSource iGroup.

**ANSWER NO.: 3**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr Fireman also objects to this request because this information is already within NAM's files and therefore the request is unreasonable and harassing. Upon a narrowing of this Interrogatory, Mr Fireman will reconsider and respond appropriately.

5

**INTERROGATORY NO.: 4**

Describe in detail all sales forecasts, budgets, or projections; financial statements; annual gross, net sales and/or profit; customers; and business plans for CCMI, SmartSource Direct and/or SmartSource iGroup.

**ANSWER NO.: 4**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Mr. Fireman also objects to this request this information is already within NAM's files and therefore the request is unreasonable and harassing. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference NAM's annual business plans, which have been produced by both NAM and the Plaintiffs in this matter. Further responding, NAM's business plans demonstrate conclusively NAM violated its agreement to grow CCMI's business consistent with CCMI's business plan. The business plans have been produced in discovery and are within the files of NAM. These documents are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

**INTERROGATORY NO.: 5**

Describe in detail any differences in the manner in which CCMI was operated, funded, or managed once it was acquired by NAM versus the way in which it was operated, funded or managed prior to the acquisition.

**ANSWER NO.: 5**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Mr.

6

Fireman also incorporates by reference his interrogatory responses 2, 6-7 and 10-12.

Subject to these, as well as the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman states as follows:

Prior to the sale, CCMI was operated by Mr. Fireman and Ms. Raider with advice

from its Board Members. Upon the sale, control of the business was lost. Mr. Fireman

and Ms. Raider wrote the business plan. They hired the staff, built relationships with

clients, attended trade shows, created products, developed a relationship with the press

and advertised to the market place the value of its products and services. All actions of

the company were designed to generate sales and profits based upon the market needs, to

update the product lines and to expand market segments. CCMI had no debt

Upon sale of the company, the business plan was ignored by NAM. NAM

consciously elected not to "run" CCMI at all, but rather to use CCMI's parts to enhance

and promote other aspects of NAM's business

NAM dictated to CCMI all decision concerning staffing and salary and imposed

their hiring freeze on CCMI's group  NAM set CCMI's budget, then fired staff and

consolidated jobs to NAM, thus taking key pieces of CCMI's business and moving them

to make NAM's other divisions more profitable. NAM took these actions while leaving

no dedicated, trained staff in place for CCMI  NAM dictated how CCMI could interact

with NAM's sales staff, who CCMI could hire as consultants, how to negotiate with

vendors, the development plan for software, how and when CCMI could attend trade

shows, on changing the company name and on CCMI's annual budgets. NAM provided

little or no support for finance, dictated when and how speaking engagements would run

and the roles and responsibilities for Mr. Fireman and Ms. Raider.

7

**INTERROGATORY NO.: 6**

Describe in detail each business decision that NAM made relating to CCMI that
you assert caused injury to you.

**ANSWER NO.: 6**

Mr. Fireman objects to this Interrogatory as there are literally hundreds of
business decisions made by NAM which caused injury and these decisions were made
literally on a daily basis. Mr. Fireman also incorporates by reference his interrogatory
responses 2, 5, 7 and 10-12. Subject to these, as well as the above listed General
Objections, which are specifically incorporated herein by reference, Mr. Fireman
provides the following examples of instances where NAM's decision caused the
Plaintiffs harm:

- <u>NAM marginalized the role of Mr. Fireman and Ms. Raider</u> - Within a few
  months of the sale, NAM modified the CCMI's reporting structure. CCMI went
  from reporting to David DeVoe Jr., the CFO to Henri Lellouche, Vice President,
  then promoted Mr. Lellouche to Senior Vice President. Mr. DeVoe then created
  the Smart Source iGroup. By the end of the year, NAM had taken away much of
  CCMI's sales staff and support structure. Shortly thereafter, CCMI's General
  Manager Fireman had no direct reports, no ability to control CCMI's budget and
  numerous projects.

- Ms. Raider and Mr. Fireman were excluded from strategy sessions about the
  business. On more than one occasion Paul Carlucci declared that he saw no
  future in targeted direct mail, which was the backbone of CCMI's business
  and the key to achieving the $50 million dollar plan. His comments and

8

actions were consistent with the marginalization of Mr. Fireman and Ms. Raider's roles and responsibilities and NAM's intent not fulfill CCMI's business plan, but rather to break off CCMI's valuable pieces and use them to develop NAM's business elsewhere.   Mr. Carlucci's comments also had the practical effect of sending a strong message to the sales staff that CCMI was not an important aspect of NAM's business and that others within the company would be ill served to support CCMI and assist in growing the business.

- NAM eliminated Ms. Raider and Mr. Fireman's position as a "thought leader" for loyalty marketing - CCMI spent years developing a reputation as a leader in loyalty marketing. Ms. Raider and Mr Fireman attended trade shows, built client relationships and spoke at domestic and international conferences on the subject. Within one year after the sale, all trade shows were eliminated and all speaking engagements cancelled. Ms. Raider and Mr. Fireman were silenced in the marketplace and the brand equity and name recognition which CCMI had built over the preceding eight (8) plus years simply evaporated. Then NAM changed CCMI's name.

- NAM cancelled any and all trade advertising - As early as October 1999, CCMI was precluded from placing any trade advertising about its products under the CCMI name. NAM informed CCMI that there was no budget. Ms. Raider raised this issue with the Executive Vice President of Marketing who said CCMI would have support through their Public Relations firm. The Public Relations firm provided no assistance

9

- <u>NAM did not provide the sales support to grow the business</u> - The NAM sales force was reorganized in 1999. Chris Mixon directed the sales force to focus on NAM's sales goals which did not include CCMI products. Human Resources did not provide the required assistance to locate CCMI salespersons to call upon retailers. For example, CCMI was only provided with one new sales person after seven months of joining NAM. This failure caused CCMI to lose the ability to identify opportunities and close business transactions because there was no sales support to perform the sales function.

- For at least the first year after the purchase, the NAM sales force received little or no training concerning CCMI's product lines. NAM sales management refused to provide the time for the sales force to be trained and, as a result, the sales force had no knowledge (or financial incentive) to sell CCMI products.

- In the year 2000, NAM set in place a hiring freeze which precluded CCMI from hiring staff

- Other than a few individuals for at least one year, the duties of CCMI's manufacturer sales force were performed by the SmartSource.com sales force. The SmartSource.com sales force was directed to focus its selling their products as a priority, to their manufacturer clients and not CCMI's core clients.

- Without input from CCMI, the CCMI retail sales force was eliminated by NAM.

- CCMI was never permitted by NAM to be part of NAM's sales tracking

10

data base.

- <u>CCMI did not have the required financial administrative support</u> – The finance department was initially run by CCMI's Controller. While he was reassigned to the position of Vice President of Operations, for the following year he remained responsible for executing CCMI's accounts receivable and accounts payable function. NAM refused to provide additional personnel to CCMI to perform these functions. When the function was finally turned over to the NAM organization, they paid little attention to CCMI's accounts receivable and as a result they did not collect all the funds (or funds on time) and did not bill properly for items, resulting in decreased revenue.

- <u>NAM controlled CCMI's staffing and salaries</u> - All technical jobs at CCMI in Boston were eliminated and two employees were relocated to Connecticut. One individual was, in theory, to continue to help CCMI, but the other was to work on NAM projects. This resulted in a loss of CCMI's intellectual capital. NAM hired consultants to do this work instead of full time staff and this expense was charged against CCMI's allotted consulting fees. It was clear and agreed between CCMI and NAM that the consultant fees were to be used for marketing consulting. This misallocation of fees caused CCMI to be unable to retain proper marketing consultants necessary to expand the business. It was also used as a charge to CCMI causing Plaintiffs harm in the earn out calculation.

- In addition, CCMI's Vice President of Information Services was paid a salary of approximately $80,000. After the sale, and upon conducting a review of salary levels, CCMI determined that this employee's salary was

11

too low and should be adjusted to reflect the market rate for an employee of his skill. NAM refused to adjust his salary. However, within 30 days, NAM offered this individual a $50,000 salary increase to move to Connecticut to work for NAM's Information Services department. He accepted. This void left CCMI with no senior technical person in Boston. Within a few short months, this Vice President of Information Services was spending less than 50% of his time on CCMI projects and focusing the majority of his time for SmartSource.com This is just one of many examples of NAM effectively taking valuable resources of CCMI and utilizing them to grow other aspects of NAM's business, all the while not making any effort whatsoever to replace the resources usurped from CCMI's operations.

- Ms. Raider and Mr. Fireman were prevented from hiring the sales staff they wanted. They were likewise precluded from determining when staff could be added and the salary necessary to attract quality employees. In fact, the personnel shortage was so substantial that CCMI was forced to "borrow" sales people from SmartSource com to call on CCMI's manufacturer clients. Clearly, these sales people's focus was their own products and CCMI's sales objectives were never achieved.

- The company's reporting functions were divided so there was not one group driving the plan - The CCMI retailer and manufacturer sales forces were divided within NAM Ms. Raider was in fact the only sales person on the retail sales force from CCMI remaining after one year and she reported to various people in

NAM such as Henri Lellouche, Pat Crock and Marty Garofolo. The CCMI

manufacturer sales force continued to report to NAM's Henri Lellouche and then

onto Marty Garofolo. There was no focus to drive the CCMI business plan as one

company and as a result, the company suffered.

- <u>NAM eliminated the Marketing Analysis (MAS) tool with no other product to</u>
  <u>replace it</u> – CCMI had over 1,000 supermarkets using the MAS software to track
  their loyalty card holder programs. NAM unilaterally decided that CCMI would
  no longer support the software although CCMI had no other internal product to
  offer clients. CCMI spent the next sixty (60) days directing clients to other
  companies. CCMI lost client relationships and income as a result of NAM's
  decision not to "run" CCMI.

- NAM also delayed in funding software development and then mismanaged it. In
  particular, NAM refused to allow CCMI move forward with completing
  negotiations to upgrade its proprietary Customer Relationship Marketing
  Software. NAM required CCMI to wait until they hired a new Chief Information
  Office and Vice President of Information Services before proceeding. NAM
  eliminated all technology staff in Boston and forced the move of several technical
  people to Connecticut to work on NAM's base business and not CCMI.

- The contract to expand the software for CCMI was integrated into NAM's
  overall plans. As a result, CCMI was required to purchase more "seats" for
  the software than CCMI required. Nevertheless, CCMI was required to
  bear an unfair burden of the cost without the benefit. NAM's management
  of the project was inadequate, since no one at NAM had ever performed

13

support software, the integration of CCMI's product to the new platform
was delayed eighteen (18) months. Thereafter, the software possessed
numerous technical issues. The delay left CCMI without a primary tool for
its core loyalty management services resulting in a huge loss of business to
its competitors Catalina Marketing and Valassis .

- NAM's Senior Management seemed to have little or no interest in assisting CCMI
  to thwart competition – For example, when CCMI faced competition from
  Catelina at Pathmark, CCMI requested that Mr. Porco assist in scheduling a
  meeting with the President of Pathmark to defuse competition. He refused to do
  so but instead sent a sales representative days later. By this time, the business
  was already lost

- NAM did not fund the expansion of the business to keep pace with market trends
  – CCMI was prevented from expanding the gift card program for retailers. Even
  when CCMI identified a large market trend in "retailers" gift cards and prepaid
  products and services, and even where there was no capital outlay required.
  NAM refused to support CCMI. By way of example, when CCMI was awarded
  a $30 million dollars, five (5) year contract to Ahold, NAM ordered CCMI to
  withdraw from that business as an accommodation to Safeway Marketing
  Services to secure other business opportunities for NAM, all to the detriment of
  CCMI and its strategic vendors.

- The Hispanic Market was large and growing and the community had a real
  need for a stored value money card  Even when CCMI fostered
  relationships with the White House, built relationships with major banks to

14

process the transactions and the Mexican business leaders who would

promote the product, NAM refused to provide the internal resources or sales

support to launch the program.

There are numerous other examples and Mr. Fireman reserves the right to

supplement this response or otherwise discuss them in response to questions during

deposition

**INTERROGATORY NO.: 7**

Describe in detail your job at CCMI (or its successor(s)) after it was acquired by

NAM and how that job description differed from what you expected that job to be before

you started it.

**ANSWER NO.: 7**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Mr.

Fireman also incorporates by reference his interrogatory responses 2, 5-6 and 10-12.

Subject to these, as well as the above listed General Objections, which are specifically

incorporated herein by reference, Mr. Fireman states as follows:

Robert Fireman was the President and CEO of CCMI prior to the acquisition.

NAM agreed that Mr. Fireman would continue to be the General Manager of the CCMI

business unit  His employment contract confirms this position.  Notwithstanding these

indisputable facts, without discussion or agreement, Mr. Fireman's authority to manage

the business, sales, personnel, finance, technology, strategy was removed and taken

over by other NAM employees  Major business decisions were made without his

knowledge or consent  Other employees were even given business cards similar to Mr.

Fireman's, listing the same job title  Mr. Fireman was not allowed to continue to work

on the core businesses of CCMI  He was provided no budget, his administrative staff was removed, and at some point he was ordered not to be present in his Boston office.

Ann Raider was the co-founder of CCMI and the Executive Vice President.  All of Sales Staff and Marketing reported to her  Her role included managing the retailer and manufacturer sales forces  All product development, creative services, client services, public relationships and strategic business relationships were led by her  Ms Raider also managed the P&L  After being acquired, Ms Raider no longer had any sales or marketing staff reporting to her and no P&L responsibility.  She no longer managed any public relations and had no control over strategic business relationships to lead the sales and marketing for CCMI  Given NAM's commitments to her made in the context of the CCMI acquisition, Ms Raider was supposed to manage an expanded sales force and interact with the national NAM and News Corp sales teams  She was to be actively involved in the product development and marketing execution  She was to continue to develop the consultative technological sales strategy of CCMI  She was to continue to support the Supermarket and Drug Chain Store associations with strategies to reach CCMI's retail base  After the sale, Ms Raider's authority in all of these matters was either removed or marginalized to the point of irrelevance  Her consulting team was separated  She never got the time or the attention of any of the NAM's sales forces  Ms Raider was not allowed to hire the sales people, and all these decisions were made by NAM  As budgets continued to be cut, Ms Raider did not receive any of the staff necessary to implement the business plan  She was then directed to spend her time supporting the NAM retail sales team to sell products other than those of CCMI  To the marketplace, Ms Raider was the Senior Vice President of News

16

America as witnessed in her business cards, but she was given essentially none of the attendant job functions or autonomy

## INTERROGATORY NO.: 8

Describe in detail any efforts by Plaintiffs to build a sales force for CCMI.

## ANSWER NO.: 8

Mr Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his Interrogatory Responses 2, 5-7 and 10-12. Further responding, and as discussed in the preceding interrogatory responses, the Plaintiffs were not allowed to hire their own sales team and NAM's promised sales force was directed to focus their efforts on selling products other than CCMI's products and services. Any effort to argue for more support from NAM resulted in threatened reprimands

## INTERROGATORY NO.: 9

Describe in detail any communications relating to any offers to form an alliance or business relationship with CCMI or to acquire or merge with CCMI, including but not limited to any and all terms of any such offers, the identify of the parties making such an offer, and CCMI's reasons for accepting or rejecting any such offers.

## ANSWER NO.: 9

Mr Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman responds as follows:

17

CCMI was being sought for acquisition by companies looking to move into direct marketing and customer loyalty business sectors. They included First Data Corporation, Valasis, Catalina Marketing, Donnelly, RL POLK, GUS, Experian, and a venture group organizing a public company rollup

The Plaintiffs broke off negotiations and discussions with these groups when NAM made their commitments, promises and agreements with CCMI

**INTERROGATORY NO.: 10**

Describe in detail any assertions, promises, commitments, assurances, statements, representations, declarations or communications (collective as used in this interrogatory, "promises") that NAM made to CCMI, Raider or Fireman, as alleged anywhere in the Complaint or elsewhere, including but not limited to any promises made by NAM relating to a plan to operate CCMI as an autonomous division; to allow Fireman or Raider to continue to manage CCMI from Boston; Raider's or Fireman's role after the acquisition of CCMI, including but not limited to Raider's and/or Fireman's involvement in budgeting, projections, sales goals, making decision, management, strategy, technology purchase, hiring/firing/relocation of employees, or otherwise, including in your response, as to each promise, where such promise was made, to whom it was made, in what medium was it made, and whether there were any witnesses to such a promise.

**ANSWER NO.: 10**

Mr. Fireman objects to this Interrogatory as it is overbroad. Further objecting, it is unreasonable and harassing to require Mr. Fireman to identify "any assertions, promises, commitments, assurances, statements, representations, declarations or communications" between CCMI and NAM. Subject to these, as well as the above listed

18

General Objections, which are specifically incorporated herein by reference, Mr. Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12 which identify numerous "assertions, promises, commitments, assurances, statements, representations, declarations or communications." These "assertions, promises, commitments, assurances, statements, representations, declarations or communications" were made numerous times at CCMI's office in Braintree, Massachusetts, on the telephone and in New York and Connecticut's NAM offices. These assertions, promises, commitments, assurances, statements, representations, declarations or communications were made by, among others, NAM's acquisition team, including but not limited to David Devoe Jr., Henri Lellouche and John Rubin. The assertions, promises, commitments, assurances, statements, representations, declarations or communications were confirmed several times by phone and at meetings and luncheons in New York at NAM's corporate offices attended by Paul Carlucci, Dominick Porco, Christopher Mixon, Jennifer Jenn, Wayne Campanelli, among others.

The financial plan approved by NAM upon the purchase of the business and specifically the budget developed in October 1999 demonstrate conclusively that CCMI was to be run separately, with CCMI using NAM's sales force. This is evidenced by, among other things, the lack of a large manufacturer sales force head count in the budget.

**INTERROGATORY NO.: 11**

Describe in detail what would have been necessary for CCMI to make an $8.2 million sales goal from August 1999 to October 2000, as alleged in paragraph 10 of the Complaint, as well as your alleged reasons that CCMI did not make that goal.

19

**ANSWER NO.: 11**

Mr Fireman objects to this Interrogatory as it is overbroad. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. Further responding, CCMI could have met its sales goals of $8.2M if NAM had provided the sales and financial support as set out in the plan and run CCMI's business in good faith and as promised. Instead NAM stripped CCMI of its resources and further bogged down CCMI's remaining personnel with unnecessary corporate interference. Among other things, NAM immediately sought to move CCMI's corporate offices, offered CCMI's technical team jobs in Connecticut or terminated them without providing replacement personnel, limited the amount of trade shows and conferences CCMI could attend, refused to hire personnel the Plaintiffs requested, focused the Plaintiffs and CCMI's personnel on the problems of other business units within NAM, and refused to allow CCMI to have the support of the NAM sales force. These and other actions threatened most of the CCMI personnel causing loss of focus and performance. Efforts to argue to keep the CCMI's unit cohesive and together were met with reprimands from NAM executive management. The earnout numbers were negotiated and agreed upon based upon CCMI's historic earnings trajectory. The numbers were chosen as easy targets because the money was intended to be the second half of the purchase price for the business.

By way of example only, per Ms Raider and Mr Fireman's letter to David DeVoe Jr dated October 22, 1999, CCMI was not attaining its goals that CCMI set out to achieve and as promised by NAM. By its letter of December 7, 1999, CCMI sought an

20

extension of the earnout date based upon NAM's admitted failure to provide the support

promised and required. NAM admitted the problem and extended the earnout date.

NAM's misconduct is further evidences by Mr. Fireman and Ms. Raider's January 25,

2000 letter to David DeVoe Jr. These documents are incorporated herein by reference

pursuant to Fed. R. Civ. P 33(c).

**INTERROGATORY NO.: 12**

Describe in detail your allegations, in paragraphs 13 and 15 of the Complaint,

that NAM dismantled CCMI and/or made it impossible for Fireman and Raider to earn

their bonuses; withheld the resources CCMI needed to grow its business; overpaid for

software; used software purchased for the use of CCMI (or its successor(s)) to support

other computer systems within NAM; refused input from Fireman and Raider relating to

software or technology; "ostracized" Raider and Fireman; agreed to pursue new

products but did not; assimilated CCMI into its other businesses; undermined Raider's

and Fireman's role in managing CCMI, either by not including them in strategy

decisions or budget approvals, or otherwise; and/or that NAM "forbade" Raider and

Fireman from working on products.

**ANSWER NO.: 12**

Mr Fireman objects to this Interrogatory as it is overbroad. Subject to this, as

well as the above listed General Objections, which are specifically incorporated herein by

reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and

10-12 and further responds as follows:

CCMI was among a very few nationally known leaders of Card Marketing in the

supermarket industry. Initial efforts to support the marketing of electronic gift cards into

21

the supermarket industry were rejected by NAM. This became a multi-million dollar win for CCMI competitors. CCMI tried to salvage some of this marketplace when it won the Ahold Contract for prepaid goods and services. NAM, without the Plaintiffs' knowledge and consent, pulled this business from CCMI in an unethical and possibly illegal side deal with a CCMI's competitor to the direct advantage and benefit of NAM's other business units. This is an example of how NAM cast aside and ignored CCMI's business interests for the benefit of NAM. The details of the events set forth herein are described in memoranda dated October 16, 2000 and January 24, 2001 to Chris Mixon. These memoranda are incorporated herein by reference pursuant to Fed. R. Civ. P. 33(c).

Further responding, rather than expand the proprietary software that was developed by CCMI, NAM made the decision to buy an off-the-shelf CRM software, Epiphany. David Benson, NAM's Chief Information Officer, made this decision, not because it would assist CCMI's business (which it did not), but rather because it supported the interests of NAM in that the software had numerous applications which would support and assist NAM. These applications were of no value to CCMI.

Mr Fireman was not allowed to be involved in the negotiations for the software. Without the Plaintiffs' knowledge or consent, NAM purchased the software from Epiphany for an exorbitant price so the software would have unlimited users and licenses. This was totally unnecessary for CCMI's needs. More importantly, it utilized virtually the entire budget allowance for CCMI's business plan as set forth in the Acquisition Agreement. This also put CCMI in a negative cash position within the Acquisition Document and cost the Plaintiffs hundreds of thousands of dollars on their annual earn out formula.

22

**INTERROGATORY NO.: 13**

Describe in detail your allegation in paragraph 15 (ii) of the Complaint that "CCMI's key personnel were relocated or fired," including in that description the identity of such person, their current address and telephone number, and whether you believe that NAM "relocated or fired" them in bad faith, arbitrarily or irrationally.

**ANSWER NO.: 13**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12 Further responding, other than Bill Adam, Mr. Fireman is currently endeavoring to recall the names of the individuals and will supplement this response.

**INTERROGATORY NO.: 14**

Describe in detail any and all conduct of NAM relating to the allegations of your Complaint, that you assert were undertaken in bad faith, arbitrarily, irrationally or with any intent to injure Raider or Fireman.

**ANSWER NO.: 14**

Mr. Fireman objects to this Interrogatory as it is overbroad. It is unduly burdensome and arguably vexatious to seek a detailed description of all of the bad faith conduct that took place over the years NAM employed Mr. Fireman in an interrogatory response. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr Fireman incorporates by reference his interrogatory responses 2, 5-7 and 10-12. These interrogatory responses provide

23

substantial detail concerning NAM's arbitrary irrational and bad faith conduct, conduct which caused Plaintiffs substantial damages.

**INTERROGATORY NO.: 15**

Describe in detail whether you assert that you performed satisfactorily, after CCMI was purchased by NAM, your job responsibilities at CCMI (or it successor(s)), including but not limited to whether you met sales targets or quotas

**ANSWER NO.: 15**

Mr. Fireman objects to this Interrogatory as it is overbroad and vague. Subject to this, as well as the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states that both he and Ms. Raider performed exemplary in their job responsibilities. To the extent sales targets or quotas were not achieved, it was due to the breaches and bad faith of NAM.

**INTERROGATORY NO.: 16**

Any and all documents relating to your allegation, in paragraph 15(v) of the Complaint, that changing CCMI's name resulted in losses of CCMI's good will

**ANSWER NO.: 16**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states as follows:

Partnerships are created to achieve better business results than would otherwise be accomplished alone. They accelerate time to market and expedite expansion which would result in increased sales and profits. NAM took CCMI's people, trade relationships and market intelligence for their best interest and not a partnership to drive CCMI  The market statistics demonstrate conclusively that repetition improves

24

overall ability to recognize brand claims and brand is associated with memory. A brand is an asset of a company which drives value to the corporation itself.

The CCMI brand was eliminated by NAM. CCMI was an independent company that had achieved an international reputation as a leader in loyalty marketing and had earned the respect of the retailers and manufactures as a company they could trust in executing programs and holding customer data. The changing of CCMI's name caused at least two events to occur. First, CCMI no longer had a presence in the market place so the customers in the marketplace were not sure our entity even existed in the loyalty marketing industry. Plaintiffs missed out on sales opportunities since NAM refused to provide sales force and did not allow Plaintiffs to retain their presence at trade shows. Competitors aggressively built their businesses and took market share. The name change added confusion because Smart Source Direct was perceived as part of NAM, not an independent company with all the integrity and reputation as an industry leader.

**INTERROGATORY NO.: 17**

Describe in detail the basis for your assertion, in paragraph 17 of the Complaint, that NAM miscalculated CCMI's "Gross Margin" and/or Earn Out" or bonus payments pursuant to the Stock Purchase Agreement.

**ANSWER NO.: 17**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman does not contend in this lawsuit that there was an error in the mathematical formula by which the earnout was calculated. The Plaintiffs contend that NAM's bad faith, deception and breach of the covenant of

25

good faith and fair dealing precluded and prevented them from achieving the earn-out figures. Further responding and among other things, Plaintiffs do contend that NAM added expenses to the calculation which caused the earnout thresholds to be missed.

**INTERROGATORY NO.: 18**

Describe in detail the value of CCMI, including but not limited to any appraisals or studies, prior to its sale to NAM.

**ANSWER NO.: 18**

Mr. Fireman objects to this Interrogatory as it is overbroad, vague and neither relevant nor likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO.: 19**

Describe in detail any and all payments you received from NAM, including but not limited to salary, bonus payments, "earn out" payments, commissions, other payments, including payments made for the acquisition of CCMI.

**ANSWER NO.: 19**

Mr. Fireman objects to this Interrogatory inasmuch as this information is already within the possession of NAM. To seek information from the Plaintiffs which NAM already possesses is harassing.

**INTERROGATORY NO.: 20**

Describe in detail any and all damages you seek in this lawsuit.

**ANSWER NO.: 20**

Subject to the above listed General Objections, which are specifically incorporated herein by reference, Mr. Fireman states that CCMI had established itself as the industry leader in an emerging marketplace. If NAM had proceeded in good faith,

26

the Plaintiffs would have achieved each and every threshold necessary to achieve the maximum amount possible under the earnout formula. The NAM projection developed to determine the earn out percentages was presented by NAM's CFO as a conservative guestimate of revenue that would be paid to Plaintiffs. This projection was over Fifteen Million ($15m) dollars. Plaintiffs' damages also include an additional payment (up to a cap) on revenues above a certain point.

**INTERROGATORY NO.: 21**

Describe in detail all communications between Raider and/or Fireman and NAM, including, but not limited to, communication relating to NAM's calculation of CCMI's (or that of its successor(s)) Gross margin, as that term is used in the Stock Purchase Agreement; either Plaintiffs' job performance; goals, benchmarks, sales targets or the measures of performance of CCMI (or its successor(s)); terms and/or duration of Plaintiffs' employment at NAM, CCMI or CCMI's successor(s); "Fireman and Raider's requirement of no less than $8 million for the sale of CCMI," as alleged in paragraph 13 of the Complaint; or payments to Raider or Fireman.

**ANSWER NO.: 21**

Mr. Fireman objects to this Interrogatory as unduly burdensome and vexatious. He also objects to the extent it purports to seek the disclosure of conversations he had with counsel. Further responding, in conversations with David DeVoe it was made clear that Plaintiffs would have "no trouble" reaching the earn out in the two years yielding the $8 million for the company based on NAM delivering its obligation.

27

Signed under the pains and penalties of perjury this _____ day of November,

2006

Robert Fireman

Attorney as to Objections

Kevin T. Peters (BBO#550522)
David H. Rich (BBO#634275)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated:  November 27, 2006

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on_ 11/27/06

28

# EXHIBIT H

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

                Plaintiff,

                               Civil Action No.

       -against-          05-1740MLW

NEWS AMERICA MARKETING IN-STORE,

INC.,

                Defendant.

----------------------------------------x

                    July 18, 2007

                    11:43 a.m.

      Deposition of CHRISTOPHER MIXSON, taken

by the Plaintiffs, pursuant to Notice, at the

offices of News Corp, 1211 Avenue of the

Americas, New York, New York, before David

Levy, CSR, a Notary Public of the State of New

York.

Mixson, Christopher                                    July 18, 2007
                          New York, NY

160

1    corporation.

2          Q.   They weren't allowed to direct the

3    business activities of SmartSource Direct.  You

4    would agree with that.

5          A.   I think -- no, I -- well, if your

6    question is, were they empowered to contribute to

7    that enterprise?  I would say the answer is yes.

8    If the question is, were Bob and Ann given

9    indiscriminate authority to do as they pleased

10   with a company that had just been purchased by

11   News America Marketing, the answer so that is no.

12         Q.   Was Bob Fireman allowed to be the

13   general manager of SmartSource Direct?

14         A.   I think for a limited period of time,

15   Bob served as the general manager.  I think as

16   time progressed, and the company continued to

17   develop, you know, bigger and bigger doubts about

18   his leadership skills, I think that Bob had that

19   general manager, what you'd normally associate

20   with general manager responsibilities

21   successively withdrawn.

22         Q.   Do you remember when that happened?

# EXHIBIT I

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

                 Plaintiff,

                        Civil Action No.

       -against-        05-1740MLW

NEWS AMERICA MARKETING IN-STORE,

INC.,

                 Defendant.

----------------------------------------x

                July 17, 2007

                10:02 a.m.

      Deposition of MARTIN GAROFALO, taken by

the Plaintiffs, pursuant to Notice, at the

offices of News Corp, 1211 Avenue of the

Americas, New York, New York, before David

Levy, CSR, a Notary Public of the State of New

York.

Garofalo, Martin                                    July 17, 2007

New York, NY

40

1      A.  It's hard to evaluate.  I'd probably

2  say no.

3      Q.  Did Seth Epstein?

4      A.  I'd say, looking back, no.

5      Q.  So who within News America Marketing

6  other than Ann Raider and Bob Fireman had

7  expertise in card distribution and card

8  marketing?

9      A.  At the time of the acquisition, it

10  would be those two individuals you just

11  mentioned.

12      Q.  Did anyone during your

13  year-and-a-half with the IGroup develop expertise

14  in card marketing other than Ann Raider and Bob

15  Fireman?

16      A.  I think the answer is yes.

17      Q.  Who would that person be, or people

18  be?

19      A.  To an extent, myself and definitely

20  Henry, would be my thinking.

21          MR. KATZ:  Ken, could we take a break

22          when you have --

# EXHIBIT J

# SmartSource Direct Strategies
## March 14, 2002
## Management Overview



FY 2002 Year In Review

- Supervisory re-organization relieves Fireman of Operations and Raider of Retail Sales responsibilities.
- Re-organization of the Operations Team and knowledge transfer of CCMI operational expertise is complete.
- Full Staffing (short of headcount freeze positions) was achieved in October 2001 for the first time since acquisition of CCMI in 1999.
- Henri Lellouche becomes direct supervisor of individual Retail Sales Staff. Lellouche manages Tripp, the three retail AD's and Raider directly.
- Average tenure of the Retail and Mfr. AD's is approaching seven months. Sales data suggests that sales productivity becomes meaningful after six months of individual service.
- Sales Performance Statistics
  - Average Manufacturer Sales Calls/Week – 9.4 for AD's; 6.3 for Tripp
  - Average Retail Sales Calls/Week – 3.4

FR3740

# EXHIBIT K

EXHIBIT NO. _7_

_5-25-07_ c

**hlellouche@newsamer, 04:58 PM 6/1/00 -, SSD Recognition**

To: hlellouche@newsamerica.com
From: Ann Raider <araider@smartsourcedirect.com>
Subject: SSD Recognition
Cc:
Bcc:
Attached:

Dear Henri:

I would like to share with you again my concern about the lack of internal (inside NAM) and Marketplace recognition SSD is receiving, or rather, not receiving. Our sales are not mentioned at Monday executive meetings; the senior managers across NAM still do not know what we do, and we are the last company mentioned in the SmartSource iGroup website, looking like an afterthought.

The purchase of E.Piphany software and the expansion of our database management capabilities has gone unnoticed in the Marketplace. NAM's PR firm has not secured editor attention on what we now have to offer. Our competitors have continuous press about their accomplishments.

Henri, we desperately need to build awareness of what we can offer retailers and manufacturers.

Ann

FR0248

# EXHIBIT L

hlellouche@newsamer, 04:50 PM 6/1/00 -, Retailer Summit Meeting

To: hlellouche@newsamerica.com
From: Ann Raider <araider@smartsourcedirect.com>
Subject: Retailer Summit Meeting
Cc:
Bcc:
Attached: H:\Ann\DailyCorrespondence\Budget Items for June 1 meeting.doc;

Dear Henri:

The June 1, 2000 Retail Summit Meeting to gain Retailer insight/commitment for our ASP has been cancelled five days before it was scheduled and three weeks after the initial invitations went out. Senior management made the decision. The issues/hurdles SSD faces as a result of the decision include:

- A question as to the quality of our product
- The time/money it will take to reschedule 7 individual meetings
- Delay in securing sales for 500 stores (in the Plan)
- Question of my and SSD's integrity and credibility

There are significant benefits in conducting a Retailer Summit:

- Showcase the new product in a controlled environment
- Gain insight from the Retailers about the product.
- Positioning Retailers to purchase it asap
- Accelerate the sales process 7 Retailers at once
- Cost effective sales approach (see Exhibit 1 attached)
- Reinforce our Retail relationships for other business

We have prepared a summary of the travel costs to conduct the Summit (Exhibit 1), for the Retailers who were scheduled to attend. Although, today, I am unclear as to who would attend in the future, the costs would be about the same. *Consider: for a minimal $5,000 investment, we could realize sales of millions.*

Henri, could we please seek management approval

Ann

FR0252

# EXHIBIT M



October 22, 1999



Mr. David DeVoe, Jr.
Executive Vice President, Chief Financial Officer
News America
1211 Avenue of the Americas, 5th Floor
New York, NY 10036

Dear David:

As we develop the Consumer Card Marketing, Inc. (CCMI) plan for FY 2000 we are gravely concerned that CCMI is not attaining timely the goals we had set out to achieve in this merger. We built a three month cushion in our earn out period to enable CCMI to hire three Vice Presidents, train the NAM sales force and work through the various operational issues of the merger so that we would be in full stride by the first of October. We are now approaching November and have not significantly accomplished any of these tasks.

At our August 25, 1999 meeting in Braintree we further set priorities for the next 30 days.
- Purchase of equipment for Duane Reade project
- Staffing – hire three (3) Sales Vice Presidents and Database Executive
- Establish policy – integration with NAM
- Implement CCMI information sessions at NAM
- Develop sales/profit budget and plan by product line

The process is taking far too long. The hardware for Duane Reade was finally all ordered on October 18th. NAM did not approve two of the three key hires we proposed and now the third, for personal reasons, is no longer a candidate. Kevin Tripp has just started. While Stephanie Nix is working hard to help find qualified sales candidates; she is just now contacting recruiters. While we have discussed scheduling meetings with the NAM manufacturer sales management team, we are told they are too busy or committed to other NAM ventures. Only in the last few weeks have we had support from Jeff Jensen and his group.

David, the negotiation of the deal was a major digression for the company. We wanted to come out of the closing at full speed. We want CCMI to be the leader of News America Marketing's initiative into loyalty marketing and customer specific marketing. We need to utilize NAM's expertise, personnel, and relationships to drive our business to the levels we seek. Instead, we have not added the people we need, and against our wishes are still discussing the separation of people and systems we use to run our business and service our clients. These discussions have taken place around us, undermining our authority with our own staff, while intimidating our employees and their families.

We knew it would be a process but we didn't know it would take so long and with limited staff we are spending a major share of time doing inter-corporate functions. However, we are not where we wanted or planned to be at this time, and we need you to know it. Please see if the NAM Human Resource group can be more aggressive in finding the key people or possibly retaining a recruiter to go after people not in the market. Please continue to get us timely support quickly from Dave Benson's group. Please continue to help us find the solutions we need so that CCMI can move forward faster. We need to have a powerful, clear message at Marketechnics 2000 with people and systems in place.

Thank you,

---

Consumer Card Marketing, Inc. • 165 Wood Road, Braintree, MA 02184
(781) 356-7080          FAX (781) 843-6741

# EXHIBIT N

**SmartSource Direct**
*A Division of News America Marketing*

*Lellouche*

EXHIBIT NO. **3**

5-25-07   e

# Memo

**To:**   Henri Lellouche

**From:** Ann Raider

**CC:**

**Date:** 05/18/00

**Re:**   A Review of Outstanding Items of Concern

I remain very concerned about my ability to drive the sales for SSD.  My concern is founded in 3 issues:

1.   **No Staff** – It has been weeks since I have seen a resume for the two open Director positions and I have yet to see a resume for Account Coordinator.  Last Wednesday, Denise told me that due to the lifting of the hiring freeze (which I was not aware of), she had far too many positions to fill and could not service my positions.  Rather she was referring my requests to someone in NYC.  No one in NYC has contacted me. Precious time continues to pass and weeks are months with inadequate staffing.

   We have greater than 200 opportunities we could pursue.  These are opportunities created from all of the trade shows and conferences we have attended this year and include businesses with current customers.

2.   **Retailer Marketing Program** – With no staff, I focus all my energy into pursuing sales opportunities and maintaining current customer relationships.  As a result, I do not have time to develop products/services to sell to the retailers (e.g.) Kids Club.  We are a marketing company but have no marketing products to offer.

3.   **Public Relations Support** – CCMI had a marketplace leadership position in loyalty marketing.  We built this reputation with customers and through recognition in the press – catalogs and trade publications  which focus on loyalty marketing.

Henri, I would like to spend time with you and Chris discussing these issues as soon as possible.

FR4745

# EXHIBIT O



# MEMO

<u>Confidential</u>

TO:        Chris Mixson

FROM:     Bob Fireman

SUBJ:

DATE:      October 17, 2000

I am writing this memo to provide you an overview of the situation Ann and I are now facing with News America. The first period of our earnout was completed this October first. We ask that you investigate what NAM is prepared to do so that we might protect our rights.

With the time to market being critical in light of aggressive competitive actions by Catalina and Valassis, Ann and I agreed to sell Consumer Card Marketing Inc. (CCMI) to NAM. We made it a complete sale rather than other forms of loan, investment, or alliance because we wanted the full commitment of the NAM organization and believed CCMI becoming NAM would be the most powerful message to the marketplace.

Ann and I were going to run the business. NAM would provide capital to expand all our resources: new hires, technology, Sales, Marketing.

The price requested was $8MM cash and a five year earnout based upon the results we could drive. David DeVoe Jr. negotiated the final deal to about $3 million cash and the earnout and replaced the other $5MM cash with earnout bonuses of $2.5 MM in each of the first two years. A three month ramp up period to get the resources together was built in so that the sale in August had the first earnout period ending October 1, 2000 and then annually. Based upon the agreed financial plan this was a $15mm+ deal.

The earnout included 16.8%, 14.5%, 13.75%, 13.3% and 12.9% of the defined gross margin of the Company in each of the following five (5) years beginning October 2000.

The issues:

- NAM never provided the resources it promised that were necessary to grow the business.

- NAM never empowered us to run the business.

FR0041

- NAM divided and assimilated CCMI's technology, personnel, resources, and know how.

- NAM seldom included our input into any key decision relative to the business.

- We have had no involvement in the approval of budgets or projections and, to this date, have never seen financials sufficient to calculate our earnout.

- NAM removed all control and ability for us to drive the business and make the agreed upon Plan or earnout.

- We had to fight to keep our presence at our Industry Trade Shows. All our advertising and public relations was stopped.

- NAM created its own Financial Plan for revenue and resources. This Plan will not allow us to make our bonuses or projected earnout.

- Any action by us to object was considered action against the Company and we were isolated and even reported to the Chairman for reprimanding.

- The Company as defined in our agreement is now the SmartSource iGroup ; our name was changed; our new products never built; our technology removed; key personnel of CCMI have been relocated and terminated. Our ideas were placed on hold.

As a result of NAM's action, News America Marketing and us are a year behind in the development of the required staff, technology and resources to grow this business into a $100M+ business. Our ability to make our earnout to complete the sale has been denied us. Our competitors such as Catalina, Valassis and others have made significant investments and acquisitions in this timeframe and have made a full effort to expand into areas of Loyalty Marketing, CRM technology, database marketing, Internet and In-Store delivery systems. Therefore, our competitors are more formidable than they would have otherwise been.

When we spoke the other day you asked me to lay out the issues. I hope that this memo gives you sufficient background and insight to bring this to a speedy resolution. If there is any other information that you need please ask,

Bob

EXHIBIT P





**NEWS AMERICA MARKETING**
——SMARTSOURCE DIRECT——

165 Wood Road, Braintree, MA 02184
781/356-7080 FAX 781/843-6741
www.smartsourcedirect.com

September 11, 2000

Mr. David Devoe Jr.
Executive Vice President, Chief Financial Officer
News America Marketing
301 Merritt 7
Norwalk, Connecticut 0685

Dear Dave:

We are encouraged News America, through your efforts, made the commitment to the SmartSource I Group and included the products, services, concepts, and remains of Consumer Card Marketing (CCMI) as its core strategies. Loyalty Marketing and building customer relationships will be the bridge for the bricks to clicks and become a competitive advantage for SmartSource Com. We are pleased Chris and Henri are now including us in some of the strategic discussions with the I Group executive management team.

We believe in this company and remain convinced with the right tools we can grow the business. In fact, as you well know, we felt so strongly about CCMI's potential we agreed to structure a significant amount of the purchase prices in the form of an earnout on future income. We were convinced that CCMI's alliance with News America Marketing (NAM), and the resources available by virtue of that alliance would virtually guarantee we would meet our targets.

Unfortunately, the commitments, which led us to sell CCMI to NAM, have not yet materialized. Rather than reinforce and supplement CCMI's resources NAM has taken our essential talent and marginalized our roles in directing the growth of the business. Instead of letting us build upon our business with NAM's support, NAM took a course to assimilate CCMI concepts, products, and personnel into NAM business units.
The intent of the deal was for us to lead this division of NAM. NAM was to assist us with capital for immediate key hires and expanding our technologies. NAM was also to accelerate our growth through the immediate use of its retailer and manufacturer experienced sales forces. Time to market was essential. Bob was to be General Manager with everyone reporting to him. Ann was to hire new groups of marketing and sales executives.

In the immediate months that followed the sale, attempts to get essential new hires were unsuccessful due to NAM policies, procedures, hiring freezes, and the integration of NAM sales forces. As of today, we still do not have hired key sales people to support our original sales plan. We continue to lack technical support to properly support our clients. Notwithstanding, our substantial knowledge of our business, we were simply kept off the management team and not allowed to be involved with any of the essential business decisions. Today, only two operation employees report to Bob. Until last week, Ann had only one salesman reporting to her. Kevin Tripp, our only key hire and the person we trained to sell programs to manufacturers, has been removed from our management and now reports to Marty in the I Group. Moreover, we have been removed from all financial, technical, and personnel decisions. We only have limited knowledge of and imput into the budget, and have never seen the P&L's for our division. We are told that the revenue from the I Group and commercial applications group will go to our earnout, but have yet to see its P&L so we can gauge where we are in terms of our earnout targets. We have been told that our earnout created a conflict of interest and on that basis we have been excluded from decision making and management. However, no one from NAM has offered to resolve what they consider a conflict or looked to find any resolution. To compound the issue



A News Corporation Company

FR0033

September 11, 2000
Page 2



**NEWS AMERICA MARKETING**
——SMARTSOURCE DIRECT——

165 Wood Road, Braintree, MA 02184
781/356-7080   FAX 781/843-6741
www.smartsourcedirect.com

when we objected to actions we believed directly contradicted our deal and our personal return of our earnout; we were labeled as problem employees and removed further from managing our business. This has now become more apparent as we reviewed the comments in our annual self-appraisals.

We are concerned about the effect NAM's actions have had, and will have, on the Gross Margin of CCMI and its successors SmartSource Direct, the I Group, and other NAM business units. We have discussed this with Jon, Henri, and Paul. Paul advised us to accept corporate decisions and things would work out. In the meantime , he would have someone get back to us. We have complied with his advice. No one has ever gotten back to us. We rededicated ourselves to do whatever we could to assist Chris , Henri, and the NAM organization to grow the business and be successful. We do whatever we are asked and accept management decisions. We work long hard hours networking our industry relationships each day to generate positive results for News America. Giant Foods, Epiphany, Toshiba, CompUSA, EMS, Upromise, Marsh, and others will add value to the company.

Dave, as CFO and the person who made this deal with us as head of the NAM New Ventures Group, we are asking you to address and resolve our concerns. We do not want these issues to impact the good working relationship we now have within the Igroup and the Company. There are two issues:
1. Employment Contract
2. Earnout and Bonuses

It is apparent that the negative comments in our self-appraisals originate from our resistance to NAM actions or inaction that we believed were inconsistent with the terms and spirit of the Purchase Agreement. Yes, we resisted the breakup of our business unit. Yes, we were concerned when management action was taken directly without our knowledge or imput that embarrassed and undermined us with our staff. Yes, it was disturbing to learn that Jon Rubin was working to replace Bob as the manager of our business unit and he was our link to the NAM organization. The issue here is that NAM did not separate our performance as employees from our personal issues, and accordingly, unfairly hurt our professional record and reputation within the organization. In the negotiation of our employment agreements it was represented that NAM could not increase our beginning base because of internal standards already set but that we would receive 20% bonus and annual base consistent with the top management executives of News America. We may have fought for what we contracted to get from NAM, but we also have worked long and hard as senior managers for the company. It is not fair to penalize us for the issues of the Purchase Agreement. We ask that our appraisals be reviewed again , and our bonus and raises be reconsidered.

Under the Stock Purchase Agreement our purchase price for the first payment period is to be increased by 16.8% of the companies Gross Margin plus either $2.1 million or $2.5 million depending on the amount of the Gross Margin on October 1, 2000. In, addition, there are sales incentives for four additional years for millions of dollars. These dates and the amounts are obviously very important to us. Given NAM's approach to our business, our ability to earn what we are entitled to under our agreement has been substantially eroded.

In fairness to us, NAM needs to modify our agreement and commit itself to living up to the obligations that lead us to sell it CCMI. As NAM has restructured our business over a variety of business units, and NAM

A NEWS CORPORATION COMPANY

*September 11, 2000*
*Page 3*



**NEWS AMERICA**
**MARKETING**
SMARTSOURCE DIRECT

165 Wood Road, Braintree, MA 02184
781/356-7080  FAX 781/843-6741
www.smartsourcedirect.com

needs to recognize that it is taking significantly longer than anticipated to provide appropriate resources. In addition, it needs to confirm how they are booking revenue from what business units in what time frames to fairly allow us to earn our money. We also continue to require resources to manage and grow the business.

We are talented and experienced business executives with the dedication and loyalty to take the business to a level we all know it is capable of reaching. We built the deal on the mutuality of interest to work for the success of the business. We want to be included in the management team, and want NAM to capitalize on our vision and hard work. We do not want any conflicts with the organization. If NAM has conflicts let us identify them and correct them. We share the same goals to build sales and profits. We are not only prepared but also enthusiastic about making News America Marketing and the IGroup the leader in this emerging marketplace. We are committed to NAM, and are simply requesting that NAM reciprocate that commitment, live up to the commitments that lead us to sell our company, and resolve our personal issues.

Thank you,

Robert Fireman

Ann Raider

cc: C. Mixson

A NEWS CORPORATION COMPANY

FR0035

# EXHIBIT Q



<u>CONFIDENTIAL</u>

December 7, 1999                                                    <u>e-mail message</u>

Mr. David DeVoe
News America Marketing

Dear David:

In August 1999, NAM acquired CCMI with the mutual goal of driving profits through the use of technology and customer specific purchase data. Our contract was consummated based on the commitment of NAM to provide CCMI with capital to hire the required staff, enhance the technology, and leverage the NAM retailer manufacturers sales force – time to market being critical. With that in place, CCMI would expand rapidly and drive sales and profits to new levels.

Over the past 120 days, the specific objectives set by NAM to accelerate CCMI's growth are not being met. I am gravely concerned CCMI will be unable to achieve our sales or profit objectives within the timeframes we agreed.

This memo, written in the early morning hours on my way to Buffalo, will outline the details of the missed objectives, as I have already shared with Jon and Ian, and proposed recommended actions.

- **Sales/Marketing Staff**

    It was agreed that building the sales force was to be a top priority in August 1999. However as of today, we are operating without key people.

    - CCMI was prevented from hiring a West Coast sales person because his residence is San Francisco. Notwithstanding, it took NAM 45 days to begin an aggressive search process for another West Coast person. To date we have only a few candidates with whom we can arrange second phone interviews with, let alone a personal interview.

    - CCMI recently, as a final resort, selected a NAM employee to fill the East Coast sales role. Even though you and I agreed on salary and I thought, title, three weeks after our original conversation, the offer presented by me was changed resulting in the individual not taking the position. This is a person who, while not having the total skills required for the job, had good trade relations and a willingness to learn. More importantly, he would have helped me start an aggressive sales initiative, even at this late date. My credibility and CCMI's may have been tarnished within the NAM organization and we are most likely missing sales opportunities in the marketplace.

- **Leverage the NAM Sales Force**

    The NAM Sales organization is under siege. The company is behind its profit plan and has suffered the loss of several key sales executives. In addition, the workload for current Sales staff has increased with the recent reorganization. They have been more focused on the products of the companies in which NAM has made limited investments (i.e. Planet U, Softcard). The support promised by NAM and required by CCMI has not been provided timely. We were told to wait until January to get help from the manufacturer sales force and we have only recently made some progress with the retail sales force. This is not to say

FR0043

executives responsible for these businesses do not believe in our opportunity and have the desire to help. Rather, to point out CCMI is suffering from a NAM problem beyond our control.

- **Technology Support**

    NAM made the decision to move the responsibility for the maintenance of our software products and the future development of the next generation of software products and services to the new NAM Technology Group. This change was made after our closing. However, the assumption of these responsibilities has not significantly begun.

    Dave Benson has no one in place to help design or manage the process. While NAM has instructed CCMI personnel that they will not be performing these functions in the future, today it is necessary to assume other responsibilities. This is not helping us move forward but only keeping the status quo for our existing clients. CCMI is facing its industry show without a clear plan of its future products or capabilities.

- **New Product Development**

    I spent my weekend outlining a new product offer. You and I had shared the vision that this could be a great opportunity... the Kids Club. This program, as outlined, has been with Julie and John for 4 weeks. They promised to help me quantify the opportunity and, to date, I still have no response and Kroger will surely do this project with someone else.

David, January 2000 is days away. To be prepared to strive toward the $750M plan you had developed, to attempt to make our mutual sales and profit goals, I am suggesting specific actions be taken in the next thirty days and CCMI become NAM's top priority.

- **Recommended Actions**

1. Ian Moore, as he has already graciously offered, become actively involved in the hiring process for West Coast and East Coast sales people. He will be meeting with a few candidates next week in California. The goal is to find and hire these people by the end of the month. Ian must make this his priority.

2. Deliver a list of the new manufacturer sales force and its divisional leaders and request Chris Mixson to call all of his VIPs and have them work directly with Kevin to set up multiple meetings, immediately.

3. Arrange for CCMI to present to the entire NAM Sales organizations what we do. . our benefits so all sales staff will identify and refer opportunities to our business right now.

4. The manufacturer product line materials be completed by January 20, 2000. This means one person from marketing should have this assigned as a top priority and complete the name change.

5. John and Julie work with me to determine the financial viability of The Kids Club program.

6. David Benson hire the people to satisfy our technology requirements and spend a day at CCMI *immediately* to work with us to build a plan for completing CCMI software

development and production maintenance. Marketechnics is in February 22, 2000 and we need to announce our plan to the marketplace.

7.     Establish a CCMI Executive Group consisting of you and I, Dave Benson, Jon Rubin, Bob Fireman, Bill Adam and Jennifer and that we meet or conference every two weeks to review our progress.

In closing, I have one final and personal request: that NAM modify the company Purchase and Sales Agreement to extend the earn-out bonus periods from October 2000 to December 2000 to compensate for the issues outlined in this letter.

David, we are in this deal together. You know I am committed to achieving our mutual success. We need to win, together, right now. The marketplace is open to companies with our experience and skill. I will call you on Wednesday to discuss my recommendations.

Sincerely,

*Ann M. Raider*

Cc: I. Moore
    R. Fireman

FR0045