UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

        Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE, INC.,

        Defendant.

Civil Action No. 05-11740-MLW

**NEWS AMERICA MARKETING IN-STORE, INC.'S REPLY
<u>MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: December 14, 2007
       Boston, Massachusetts

# 4987942_v2

**Table of Contents**

Introduction ...................................................................................................................................1

Argument ......................................................................................................................................1

    A.    The Plain Language of §6.8 Establishes That Fireman and Raider Bargained Away The Right to Contest NAM's Decision Making Relating to the Post-Acquisition Support of the CCMI Business. ..........................................1

    B.    Even if a "Good Faith" Claim Were Possible Against NAM, Plaintiffs Have Failed to Demonstrate Any Competent Evidence of "Bad Faith." ..................8

    C.    Plaintiffs' Challenge to NAM's Estoppel Argument Is Unpersuasive and Unsupported by Authority. ......................................................................................14

    D.    Plaintiffs' Chapter 93A Responses Misperceive NAM's Chapter 93A Arguments. ...............................................................................................................14

    E.    Count III's Declaratory Judgment Claim was Required to be Arbitrated. .............15

Conclusion ..................................................................................................................................16

**Introduction**

News America Marketing In-Store, Inc. ("NAM") hereby responds to the Opposition of Robert Fireman ("Fireman") and Ann Raider ("Raider") to NAM's motion for summary judgment.

As discussed below, plaintiffs point to no material facts -- and cite no applicable legal authority -- disturbing the conclusion that summary judgment should be granted in NAM's favor for each of the reasons stated in NAM's opening brief.

**Argument**

**A.    The Plain Language of §6.8 Establishes That Fireman and Raider Bargained Away The Right to Contest NAM's Decision Making Relating to the Post-Acquisition Support of the CCMI Business.**

New York's highest court has held that implied obligations -- such as those sought by plaintiffs here -- are not permitted if they would be "inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prod.*, 58 N.Y.2d 293, 304 (1983). In this case, the implied "good faith" obligation plaintiffs seek would *write out* of the Stock Purchase Agreement the plain language of §6.8, which gives NAM the right to use its "sole and unfettered judgment" to operate the CCMI business and bars Fireman and Raider from suing NAM for how it "supports" the CCMI business.

Section 6.8 is a prudent clause in a complex business transaction between, as here, sophisticated parties. Eliminating the costs associated with the possibility of being sued for, *inter alia*, breach of the duty of good faith is a proper issue for bargaining. As Justice (then Judge) Scalia wrote in a case plaintiffs themselves cite (Opposition at 13): "It is possible to draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is *irrelevant*." *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (*quoting MacDougald Constr. Co. v. State Highway Dep't.*, 188 S.E.2d

405, 407 (Ga. 1972) (emphasis added)). The parties here drew such a contract, and for that reason plaintiffs' good faith claim is not viable.

Notably, the plaintiffs do *not* contend that there exists ambiguity in §6.8, the provision of the Stock Purchase Agreement which insulates NAM's CCMI-related decision-making from attack. Thus, the Court must give meaning to §6.8's plain language. That section, as the Court is now familiar, is entitled "Conduct of the Business" and states:

> It is the Buyer's [NAM's] current intention to provide support to the business of the Company [CCMI] by, among other things, (i) utilizing Buyer's sales force in order to promote the sale of the Company's products, (ii) assisting the Company in the creation of long-term relationships with retailers, and (iii) investing in software and hardware as needed to expand the Company's business. Notwithstanding the foregoing, Buyer [NAM] shall be free to operate the Company [CCMI] and its affiliates in its sole and unfettered judgment and Sellers [Fireman and Raider] shall have no claim in connection therewith as a result of the preceding sentence.

In other words, Fireman and Raider, in executing the Stock Purchase Agreement, *agreed* (1) that NAM was "free to operate" CCMI in its "sole and unfettered [*i.e., unrestricted*] judgment" and (2) that they, Fireman and Raider, would "have no claim in connection therewith [*i.e., in connection with NAM's exercise of its "sole and unfettered judgment . . . to operate" CCMI*] with respect to NAM's "provid[ing] support to the business of" CCMI.

Thus, §6.8 not only gives NAM "sole" judgment regarding operation of the CCMI business. It also gives NAM the "unfettered -- *i.e., unrestricted* -- judgment to operate the CCMI business. In addition to all this, §6.8 contains the agreement of Fireman and Raider that *they will not challenge* how NAM exercises its "sole and unfettered" judgment regarding NAM's "support to" the CCMI business.

Indeed, there could be no broader grant of managerial control to NAM than the combination of the three expressly agreed elements of §6.8 -- "sole" judgment; "unfettered"

judgment; and immunity from any lawsuit brought by Fireman and Raider to challenge the exercise of that sole and unfettered judgment.[1] To imply an obligation of good faith on NAM in the exercise of its unfettered (unrestricted) judgment as to CCMI's operations, as plaintiffs seek, would violate *Murphy* because such an implied restriction would be "inconsistent with other terms of the contractual relationship" -- namely, NAM's express contractual right to use its unfettered (i.e., unrestricted) judgment and to be free from suit in so doing.

Plaintiffs, in their Opposition, overlook the significance of the word "unfettered," as it is contained in §6.8. Moreover, they make no serious challenge to §6.8's covenant not to sue. Without factual or legal support, plaintiffs advance two contentions regarding §6.8's covenant not to sue. First, plaintiffs claim that the covenant is not an "explicit, unmistakable and unequivocal" statement, as required by the *Joao* decision. (Opposition at 19-20).[2] As to this argument, plaintiffs are simply wrong; plainly, the language *is* such a statement. Second, plaintiffs suggest that claims regarding NAM's exercise of its "sole and unfettered judgment" in the operation of CCMI's business are not covered by the covenant. (Opposition at 20). In this regard, plaintiffs overlook the important word, "therewith." As noted above, the covenant states that plaintiffs "shall have no claim against [NAM] in connection *therewith* [referring to NAM's exercise of its sole and unfettered discretion in the *operation* of CCMI's business] as a result of the preceding sentence [referring to NAM's current intention "to support" the CCMI business]."

---

[1] While it is not necessary to plumb the genesis of §6.8 -- since there is no dispute as to the meaning of the provision's plain language -- the record shows that NAM insisted on §6.8 because it "enabled News America to have significant flexibility on how [it] ran the business." Depo. Tr. of David F. DeVoe, Jr., at 93 appended to Supp. Affidavit of Gordon P. Katz ("Supp. Katz Aff."), at Exh. A. Notably, Fireman and Raider's advisers (including lawyers from Goodwin Procter and a Babson business professor) cautioned the plaintiffs that, from their standpoint, the provision "was problematic . . . and that it could impact their ability to run the business." *Id.* at 93. Ultimately, Fireman and Raider agreed to NAM's having total management control of CCMI: they accepted §6.8 (and the $2.8 million upfront cash payment) and also accepted employment agreements providing that each would "perform such duties . . . as *are assigned* to you [by NAM] from time to time." Fireman and Raider, Emply. Agreements, ¶2 appended as Exh. 3 and 4 to the Affidavit of Gordon P. Katz (emphasis added).

[2] Plaintiffs do not point out, however, what part of § 6.8's covenant not to sue they believe is not "explicit, unmistakable and unequivocal."

In a nutshell: §6.8's language means that Fireman and Raider gave up any right to challenge a NAM decision regarding NAMs's "support" of the CCMI business.

Plaintiffs, without offering any comment on the majority of cases cited by NAM in its opening brief,[3] rely almost exclusively on the case of *Zilg v. Prentice-Hall, Inc.*, 515 F. Supp. 716 (S.D.N.Y. 1981) as support for their contention that the implied covenant of good faith operates even in circumstances where one party to a contract is granted sole discretion. This reliance is misplaced.

To begin with, the quantum of discretion granted in the *Zilg* contract was far less than the §6.8 firewall to which plaintiffs agreed in this case. The contractual clause in *Zilg* granted the defendant-publisher the right to (1) publish the plaintiff's book "in such style as it deems best suited to the sale of the work"; (2) "fix or alter the prices at which the work shall be sold"; and (3) "to determine the method and means of advertising, publicizing, and selling the work, the number and destination of free copies, and all other publishing details, including the number of copies to be printed, if from plates or type or by other process, date of publishing, form, style, size, type, paper to be used, and like details." 515 F. Supp. at 718. Unlike NAM, however, the *Zilg* defendant did not bargain for a clause expressly granting it *sole and unfettered* discretion to make publishing decisions. Nor did the *Zilg* defendant bargain for a *covenant not to sue* that would preclude the plaintiff-author from challenging its discretion in court. For this reason alone, the §6.8 firewall in this case is distinguishable from the contractual language in *Zilg*.[4]

---

[3] In their only comment on NAM's cited cases, plaintiffs misfire when they attempt to distinguish the contract in *VTR, Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 775 (S.D.N.Y. 1969) from the contract here on the ground that the defendant's discretion in *VTR* pertained to "specified activities" while the contract here pertains broadly to "operat[ion] of the Company." (Opposition at 14). Section 6.8's breadth underscores its purpose as an *absolute* firewall from suits such as this one.

[4] The contractual grants of discretion in the other cases cited by the plaintiffs are similarly distinguishable from the "sole and unfettered" discretion and covenant not to sue bargained for by NAM in §6.8. *See, e.g., Travelers Int'l v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1572, 1575 (2d Cir. 1994) (contract grants defendant "ultimate power" to determine level of marketing, but required defendant to consult with plaintiff, give "full

Plaintiffs' reliance on *Zilg* is misplaced for another reason. Plaintiffs' Opposition fails to note, much less discuss, the subsequent appellate history of *Zilg*, in which the Second Circuit characterized the logic and reasoning of the district court opinion as "troubling." *See Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679 (2d Cir. 1983), *cert. denied*, 466 U.S. 938 (1984).[5] More specifically, plaintiffs fail to report that the Second Circuit determined that the district court *erred* in *Zilg*; on appeal, the Circuit Court determined that the defendant was *not* subject to a "continuing obligation to use 'its best efforts ... to promote the Book fully and fairly'" that would empower "a trier of fact to second guess a publisher's judgments as to the soundness of the decisions made." 717 F.2d at 681. Instead, the Second Circuit held that once the defendant had discharged its initial contractual obligation to publish the book, any further decisions regarding marketing were left "to the business judgment of the publisher, the author's protection being in the publisher's experience, judgment and quest for profits." *Id.* at 682. *See also Doubleday & Co., Inc. v. Curtis*, 763 F.2d 495, 500 n.3 (2d Cir. 1985) ("In [*Zilg*], we reversed a judgment entered against a publisher for failing to promote a book adequately. In that case, the contract left the number of copies to be printed and the level of advertising expenses within the unfettered discretion of the publisher. Accordingly, we required only that the publisher make an initial good faith effort to promote the book and exercise good faith business judgment in evaluating

---

consideration" to plaintiff's recommendations and produce and distribute a volume of brochures "deemed appropriate" to generate a minimum number of customers); *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230-231 (2d Cir. 1991) (contract grants defendant "considerable discretion with regard to advertising, store location, wholesale sales, and other matters..."); *TIG Ins. Co. v. Newmont Mining Corp.*, 413 F. Supp. 2d 273, 276 (S.D.N.Y. 2005) (contract grants defendant "the sole right, without interference" to settle contract claims, but does not include covenant not to sue or any statement as to the sole right being unfettered); *deCiutiis v. Nynex Corp.*, 1996 WL 512150, at *3 (S.D.N.Y. 1996) (contract grants defendant "sole, exclusive and complete discretion," but does not include "unfettered" discretion or a covenant not to sue); *Hirsch v. Food Resources, Inc.*, 24 A.D.3d 293, 296 (N.Y. App. Div. 1st Dep't 2005) (simple contract contains no express provision conferring discretion, much less unfettered discretion, or a covenant not to sue); *Richbell Information Servs., Inc. v. Juniper Partners, L.P.*, 309 A.D.2d 288, 301 (N.Y. App. Div. 1st Dep't 2003) (contract grants defendant right to veto initial public offering).

[5] After the District Court denied the defendant summary judgment, the case went to trial, and ultimately, upon appeal, the trial court judgment was affirmed in part and reversed in part by the Second Circuit. *See Zilg*, 717 F.2d at 682.

promotional decisions ... Any greater obligation, we cautioned, would hamper the 'publisher's ability to rely upon its own experience and judgment in marketing books.'") (internal citations omitted).

The Second Circuit's *Zilg* opinion also highlights a key distinction between the facts in that case and those present here. As noted by the Second Circuit, the operation of the implied covenant of good faith has particular significance in the context of *publishing* cases, where an author often receives nothing "up front" or only a nominal advance – $6,500 in the case of the *Zilg* plaintiff – and must rely upon the publisher's exercise of good faith in promoting their book. *See Zilg*, 717 F.2d at 679 (observing that "acquisition of publishing rights is [often] virtually costless and [without some protection for the author] firms would acquire those rights without regard to whether or not they had truly decided to publish the work").

That distinction also explains the decision in *deCiutiis v. Nynex Corp.*, 1996 WL 512150 (S.D.N.Y. 1996), another case relied upon by plaintiffs. There, the plaintiff had received nothing for his submission of an idea pursuant to an employer incentive program. The employer's program offered its employees a monetary reward for the submission of "suggestions that might benefit the company," while retaining discretion "as to the eligibility of a suggestion and the amount of any award." *Id*., at *3. The plaintiff in *deCiutiis*, as noted above, received nothing and alleged that his employer had productively used his idea. The Court, being concerned that Nynex had benefited from, without paying for, the plaintiff's idea, refused to dismiss the case on a Rule 12(b)(6) motion. *Id*., at *4.

In short, both *Zilg* and *Nynex Corp.* involved situations where there was no firewall comparable to §6.8 (i.e., no "unfettered" language; no covenant not to sue), and in which a defendant (1) acquired a useful asset from a plaintiff for little or no "up-front" money, and (2)

claimed that it retained the ultimate discretion as to whether the plaintiff would be compensated *at all* on the "back-end." In each instance, New York courts were understandably wary of enforcing an absolute firewall against good faith claims lest such parties use their discretion to avoid paying for actual benefits received.

There can be no such concern in the circumstances of this case, where sophisticated plaintiffs, advised by counsel, received an "up-front" cash payment from NAM of *$2.8 million* and other consideration as part of a complex stock sale[6] and, most important, where the right to contest NAM's sole and unfettered discretion to operate CCMI was freely and knowingly[7] bargained away. Accordingly, there is nothing in the equities of this situation that should lead this Court to hesitate in enforcing the §6.8 firewall that was bargained for by NAM and accepted by the plaintiffs.[8]

To hold otherwise, as noted above, would violate the New York Court of Appeals stricture that a Court not imply terms that are inconsistent with express contractual provisions.

---

[6] Plaintiffs also received earn-out payments in the amount of $771,985, and were compensated handsomely for the entirety of their five-year employment agreements with NAM.

[7] *See* Footnote 1, *supra*.

[8] Plaintiffs also allude to *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 765 N.Y.S. 2d 575, 587 (N.Y. App. Div. 1st Dep't 2003) in their Opposition, but this case, too, is off point. For two reasons, plaintiffs' reliance on *Richbell* fails. First, the language plaintiffs cite from *Richbell* is the Court's discussion of a breach of fiduciary duty claim -- which was the focus of that case. *Id.* at 587. Plaintiffs do not and could not make a fiduciary duty claim in this action. Moreover, the *Richbell* claim did not involve an express contractual *covenant not to sue*, as here. It is also worth noting that the *Richbell* decision has been distinguished twice by the same court that issued the decision. *See Sterling Fifth Assoc. v. Carpentille Corp., Inc.*, 779 N.Y.S. 2d 485, 487 (N.Y. App. Div. 1st Dep't 2004) ("This case, however, differs from *Richbell,* where there existed a 'secret agreement' and the court found that the defendant exercised a right malevolently for his own gain and to deprive plaintiffs of the benefit of a joint venture.. .Here, there was no 'secret agreement'" and the terms of the governing agreement allowed for the action at issue) (finding no breach of fiduciary duty); *O'Neill v. Warburg, Pincus & Co.,* 833 N.Y.S. 2d 461, 463 (N.Y. App. Div. 1st Dep't 2007) (in *Richbell,* "under a 'secret agreement,' the defendant exercised a right malevolently for his own gain and to deprive plaintiffs of the benefit of a joint venture. Here, by contrast, Warburg exercised its contractual right in exactly the manner contemplated by the parties.").

**B.    Even if a "Good Faith" Claim Were Possible Against NAM, Plaintiffs Have Failed to Demonstrate Any Competent Evidence of "Bad Faith."**

Plaintiffs do not dispute that, in the absence of a firewall provision such as §6.8 here, *Keene Corp. v. Bogan*, 1990 WL 1864 (S.D.N.Y. 1989) (Mulkasey, J.) would be the controlling authority with respect to determining the existence of "bad faith" in the earn out context. Under the *Keene Corp.* standard, plaintiffs, to prove "bad faith," are required to show that the defendant, NAM, "intended to lose money or acted in reckless disregard in obtaining profits." *Id.* at *15. *See also TIG Ins. Co. v. Newmont Mining Corp.*, 413 F. Supp. 2d 273, 284-285 & 284 n.105 (S.D.N.Y. 2005) (holding that plaintiffs alleging bad faith must make an "*extraordinary* showing of a disingenuous or dishonest failure ... Bad faith requires a showing of culpability amounting to at least gross negligence or recklessness.") (internal citations omitted) (emphasis in original). Plaintiffs cannot -- and do not -- make any such showing.

To begin with, a review of the <u>undisputed</u> gross revenue figures during the earn out years shows that NAM's post-acquisition management of CCMI <u>produced in every earn out year greater revenue than that produced in plaintiffs' last year of CCMI management</u>.[9]

---

[9] The revenue numbers in the chart below are admitted. *Compare* Defendant's Rule 56.1 Statement, ¶¶ 29, 41 *with* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶¶ 29, 41.



Further, plaintiffs do not dispute that NAM brought CCMI the highly successful Toshiba stored value card project -- a new area of business for CCMI -- and permitted this new revenue to count towards plaintiffs' earn out.[10]  Plaintiffs also do not dispute or challenge with record

---

[10] Plaintiffs do not dispute that the Toshiba project came via a lead from News Corporation, NAM's parent, and admit that the stored value business did not pre-exist the acquisition, but "was an extension" of CCMI's business.  *See* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶36.

In their Rule 56.1 response to ¶36, as well as in their responses to other Rule 56.1 paragraphs, plaintiffs, contrary to Rule 56.1's express requirement, either deny without citation to specific, competent record evidence or improperly "add argumentative and often lengthy narrative … the object of which is to 'spin' the impact of the admissions plaintiff is compelled to make."  *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. 2002).  As Rule 56.1 itself provides, where the plaintiffs' "opposition fails to comport with Local Rule 56.1, the

evidence that NAM staffed CCMI (Opposition at 17) or spent over $1 million to "implement" new software "selected by" Fireman (Opposition at 10).[11]  Nor do plaintiffs dispute that NAM informed members of NAM's existing sales force of CCMI products, instructed them to be alert to cross-selling opportunities, and rewarded them when such sales closed.  *Compare* Defendant's Rule 56.1 Statement, ¶32(e) *with* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶32(e).

Plaintiffs focus their factual "bad faith" case on what they term the location "shifting of a key [CCMI] asset," Bill Adam -- an employee who focused on computer technology work.[12]  Plaintiffs claim that Adam was wrongfully given the opportunity to change his work location from Boston to Connecticut.  Plaintiffs' characterization of the Bill Adam situation could not be further from the truth.  Putting aside whether "an employee" may properly be viewed as a CCMI "asset," Adam, in his own words, states that he "intended to resign" his position shortly after the 1999 acquisition because he "was unhappy with the working environment" at CCMI in Boston.  Affidavit of Bill Adam ("Adam Aff."), ¶3, filed herewith.  It was only because NAM offered him the opportunity to move to its Connecticut office that he remained with NAM, where he "continued to perform computer-related work for SmartSource Direct (CCMI)."  *Id.*, ¶4.[13]

---

facts proffered by [the defendant] in its motion for summary judgment are deemed admitted." *GE Capital Healthcare Financial Servs. v. Fall River Walk-In Emergency Med. Ctr.*, 2004 WL 40522 *3 (D. Mass. 2004).

[11] The plaintiffs do not dispute that NAM invested $1 million to implement this software. *Compare* Defendant's Rule 56.1 Statement, ¶43 *with* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶43.

[12] Plaintiffs point to no other alleged shifting of assets out of CCMI.  As indicated above, the contrary is true:  NAM directed potential assets, like the Toshiba project, *into* CCMI.

[13] Plaintiffs also claim that NAM denied Adam a deserved raise.  (Opposition at 8).  There is no support to this claim.  Neither of the two record citations to which plaintiffs point, Lellouche Depo., at 202 (Roumeliotis Aff. Exh. C) and DeVoe Depo., at 75 (Roumeliotis Aff. Exh. E), contain any testimony at all about Adam being denied a raise by NAM.

Indeed, plaintiffs are telling in how they describe their "bad faith" claim: "whether NAM was *unreasonable* . . . in marginalizing all of the expertise that existed in CCMI,[14] failing to use

---

[14] Contrary to this claim, NAM's treatment of Fireman and Raider was both proper and reasonable. To begin with, Fireman and Raider had agreed that decisions regarding the conduct of the CCMI business were to be left to NAM's "sole and unfettered judgment." Stock Purchase Agreement, §6.8. Second, Fireman and Raider each had employment agreements which obligated them to do whatever tasks NAM assigned him or her. Empl. Agreements, ¶2. Further, neither Fireman or Raider exhibited the managerial skills NAM required, as the following NAM executives testified at deposition:

> *Henri Lellouche*
>
> "Q. Why did you take over the retail sales effort from Ann Raider?
>
> A. Lack of performance, lack of ability to manage, lack of deliverables.
>
> Q. How did performance improve once you took over?
>
> A. Ann was able to focus on her sales as opposed to management, which was not her strength, and I was able to devote more energy to direct supervision of the sales force."

Lellouche Depo. Tr., at 102, appended to Supp. Katz Aff. at Exh. B.

> Q. Do you think you might have been able to run CCMI without Bob Fireman's guidance?
>
> A. I think that almost immediately when I became involved with the business, it became clear that while Bob had experience at this that he was obstructionist; that he was uncooperative; that he was out for himself; that he no intention of integrating with the News America Marketing Organization; that his contributions were counterproductive in so many cases that his presence at times was the complete opposite of being instructive or constructive.

*Id.* at 109-110.

> *Christopher Mixson*
>
> "Q. The next bullet point, "NAM seldom included our input into any key decisions relative to the business." Do you dispute that?
>
> A. Absolutely
>
> Q. You think they were included, Ann and Bob in key decisions relative to the business?
>
> A. I think they were included in key decisions early in my tenure at the IGroup. I think that their failure to bring value to those conversations and our business development efforts increasingly made them less important in that process."

Mixson Depo. Tr., at 163-164, appended to Supp. Katz Aff. at Exh. C.

> "Q. Should they have been involved in the approval of budgets and projections?
>
> A. No. They don't own the business. News America Marketing owns the business. The risk at this juncture in terms of, you know, making that investment pay out is News America Marketing's. And therefore, it's our responsibility to determine budgets and things along those lines."

*Id.* at 164-165.

its large scale sales force to leverage CCMI products,[15] shifting key assets to other divisions, and refusing to let CCMI use trade shows and advertising to build the business."[16] (Opposition at 19).[17]

---

[15] This claim, too, is wrong. As indicated above, plaintiffs have no evidence *to dispute* NAM's executives' testimony that it (NAM) instructed the sales force to sell CCMI products and rewarded them for doing so. *See* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶32(e).

[16] NAM had good reason for not expending resources on trade shows or trade advertising, as NAM executive Marty Garofalo testified:

> "Q.  Is trade advertising something that News America Marketing does, in your experience?
>
> A.  No.
>
> Q.  They do not?
>
> A.  They do not.
>
> Q.  Do you know why?
>
> A.  Since I have been here, I think the overall philosophy is that you'll go out and make the sales calls to the appropriate people and we don't spend our money on trade advertising."

Garofalo Depo. Tr., at 136, appended to Supp. Katz Aff. at Exh. D.

[17] In their passion to spin a story of their victimization by NAM, plaintiffs either ignore record facts or make up facts out of whole cloth (e.g., the reason for Bill Adam's relocation to Connecticut). The following are two additional examples of plaintiffs' playing fast and loose with the facts:

(1) Plaintiffs claim that no one but Fireman and Raider had expertise in loyalty marketing. (Opposition at 16). They ignore the facts (which they admit, *see* Plaintiffs' Response to Defendant's Rule 56.1 Statement, ¶33) that Christopher Mixson, NAM's current president and former head of the iGroup (of which CCMI was part), had been Vice President, National Accounts Director of Citicorp POS ("Point of Sale") Information Services, and that Citicorp POS was "the pioneer in database marketing." Defendant's Rule 56.1 Statement, ¶33. In this position, Mixson:

> helped oversee the creation of unique marketing programs and implemented those programs at a variety of retailers including Jewel and Dominick's ... in the Chicago metro area ... We [also] had numerous divisions of Safeway on line, including Vaughn's in California, including Safeway Denver, Safeway Balt-Wash, Safeway Seattle, and a number of other retailers across the country. So as far as back as that ... there was significant penetration ... on the frequent-shopper front.

Mixson Depo. Tr., at 75.

(2) Plaintiffs also complain that NAM "destroyed the brand equity CCMI had built up" by changing its name to SmartSource Direct, in order that it be identified with NAM's other "SmartSource" brands. (Opposition at 5). This was a prudent decision designed to improve the business. As Mixson testified:

> The fact of the matter is that part of the value that News America Marketing brings to the marketplace and the advantage of having a suite of products recognized as coming from one company has been proven to be a highly successful way to market our services. So, you'll notice most of our products and services have the word "smart" in them . . . [T]he SmartSource family of products is who we are.

These were the same kind of arguments made in *Keene Corp.* and rejected by the Court as insufficient to create a triable issue of bad faith. "Without a showing that Keene adopted the policies with the *purpose of or with reckless disregard for losing money*, the mere failure to adopt the opinions of veteran employees does not prompt a rational inference that Keene intended to deprive Bogan of the fruits of the contract. . . . That Keene's policies were misguided or ignorant or even negligent does not show a breach of the implied covenant of good faith." *Id.* at *15-16.[18]

Judge Mulkasey's decision is well-grounded in common sense. If a court were charged with "micro-analyzing" for reasonableness *every* managerial decision over a five year earn out period, it would consume an inordinate amount of judicial and legal resources and would undermine expectations of contractual certainty. *See, e.g., Zilg*, 717 F.2d at 680 ("Were courts to impose rigorous requirements as to promotional efforts, publishers would of necessity undertake to publish fewer books with unpredictable futures.")  The latter effect (erosion of contract certainty) would cause great confusion among transactional attorneys and the public in light of the Stock Purchase Agreement's provision here that clearly granted NAM "sole and <u>unfettered</u> judgment" to operate CCMI with Fireman and Raider "hav[ing] no claim against NAM" in connection with "support to the business of CCMI."

---

Mixson Depo. Tr. at 112.  Notably, plaintiffs admit that NAM is recognized as the leading national marketing servicing company in its industry.  Plaintiffs' Response to Defendant's Rule 56.1 Statement, at ¶1.

[18] Notably, plaintiffs have neither disclosed nor offered any *expert* testimony opining that these alleged acts or omissions were negligent, much less, as *required* by the *Keene Corp.* standard, intentional or reckless as to earning profits.  Moreover, plaintiffs do not even *attempt* to argue that their allegations satisfy the level of proof required under the *Keene Corp.* standard.  Indeed, their claims (and the scant record behind them) fall far short of making a *prima facie* case that NAM was *even close to negligent* in running the CCMI business.  As the First Circuit has oft stated: "conclusory allegations, improbable inferences, and unsupported speculation are entitled to no weight in the summary judgment calculus." *Alliance of Auto Mfrs. v. Gwadosky*, 430 F.3d 30, 41 (1st Cir. 2005) (*quoting Medina-Manoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

### C. Plaintiffs' Challenge to NAM's Estoppel Argument Is Unpersuasive and Unsupported by Authority.

Plaintiffs offer two arguments in an attempt to defeat NAM's estoppel defense. First, plaintiffs attempt to distinguish the *Sarasota* and *Banque Nationale* cases on the ground that Fireman and Raider, unlike the estopped parties in those cases, are not seeking to terminate their contracts. This distinction has no legal significance, and plaintiffs cite no legal authority suggesting otherwise.

Second, plaintiffs attempt to distinguish the *El Reda* case by stating that, unlike the party seeking relief in *El Reda*, "plaintiffs strenuously objected to NAM's actions nearly immediately." (Opposition at 21). This fact does not help plaintiffs' cause. What the record shows is that plaintiffs identified their discontent, yet accepted without reservation between 2000 and 2004 the over $700,000 in earn out payments made to them. Plaintiffs provide no documents in their Opposition submission showing that they accepted their earn out payment under protest. They remained silent about their intention to sue until bringing this action in 2005.

### D. Plaintiffs' Chapter 93A Responses Misperceive NAM's Chapter 93A Arguments.

The two cases cited by the plaintiffs do not disturb the conclusion that the New York choice of law provision in the Stock Purchase Agreement, §8.2, bars plaintiffs' c. 93A claims. Here, §8.2 states not only that the agreement is to be "governed by" New York law, but also that it is to be "*enforced* in accordance with New York law." (emphasis added) This language is different from that referenced in *Jacobson v. Mailboxes, Etc., U.S.A.*, 419 Mass. 572, 580 n.9 (1995), upon which plaintiffs rely.[19] Moreover, in *Jacobson*, the Supreme Judicial Court did not *permit* a c. 93A claim in the face of another state's choice of law provision; rather, it expressly

---

[19] The choice of law language referenced in *Jacobson*, unlike that here, did not say that the contract was to be *enforced* in accordance with the foreign state's law.

did "*not* decide whether, if [an] agreement purported to contract away any claims under G.L. c. 93A, we would decline to enforce the provision on public policy grounds." (emphasis added) The second case cited by plaintiffs, *Stagecoach Transp., Inc. v. Shuttle*, 50 Mass. App. Ct. 812 (2001), is also of no help to them. In that decision, the alleged c. 93A violation was not, as here, based upon an alleged contract violation, but was instead premised on a tort-based fraud claim. *Id.* at 819.

Plaintiffs also fail to recognize the breadth of the "intra-enterprise" exemption to c. 93A exposure. The exemption is not limited to employer-employee disputes. It is not limited to disputes involving parties to formal joint ventures. It encompasses all disputes where "trade or commerce" is not part of the controversy. For instance, a dispute between a group of anesthesiologists, on the one hand, and a second group of anesthesiologists and a hospital, on the other, over the propriety of an exclusive contract between the latter two parties (where both groups previously serviced the hospital) is *not* c. 93A material. *Saint Louis v. Baystate Medical Ctr., Inc.*, 30 Mass. App. Ct. 393, 404 (1991). So, too, here -- plaintiffs' claim that "NAM was unreasonable in its actions" in managing CCMI (a small unit of a large company) is not the stuff upon which c. 93A claims are made.

      E.    <u>**Count III's Declaratory Judgment Claim was Required to be Arbitrated**</u>.

There is no basis for Count III's declaratory judgment claim. Plaintiffs contend that Count III has life by suggesting that it is for the Court, rather than the earn out arbitrators, to define the contractual term "Company" for purposes of calculating what revenue and expenses are to be used in the earn out calculations.

This argument is meritless. It is well-established that "an arbitrator is charged with the interpretation and application of the agreement." *New York City Transit Auth. v. Transp. Workers' Union of America, Local 100*, 6 N.Y. 2d 332, 336 (2005). "Interpretation of

# 4987942_v2                15

contractual terms is within the province of arbitrators, and their factual findings will not be overruled because a court disagrees with that interpretation." *R.S.G. Caulking & Waterproofing, Inc. v. J.P. Morgan Chase*, 2006 WL 2851625, at *6 (N.Y. Sup. Ct. 2006).[20] But, in the big picture, this question is moot, and has been for several years. The time has long come and gone for any earn out arbitration. *See* Stock Purchase Agreement, §§2.3(c) and 2.2(b).

Moreover, even if the term "Company" were to be defined by the Court, there remains no controversy regarding actual earn out calculations. The earn outs were all discussed, then paid -- and there is "no definite, competent evidence" as required by *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) that there was *any miscalculation* of any of them. That being the case, there is no substantive earn out calculation issue to resolve.

## Conclusion

For the reasons stated above, and those in our opening brief, summary judgment should enter in defendant's favor on all three counts of the complaint.

NEWS AMERICA MARKETING IN-STORE, INC.

By its attorneys,

/s/ Gordon P. Katz
Gordon P. Katz (BBO# 261080)
Ieuan G. Mahony (BBO# 552349)
Benjamin M. McGovern (BBO# 661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: December 14, 2007
        Boston, Massachusetts

---

[20] We point out that in their Response to Defendant's Rule 56.1 Statement (at ¶ 27), "plaintiffs admit that they needed to follow the Stock Purchase Agreement's dispute resolution procedures to dispute issues related specifically to the calculation of the earn out . . . ."

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 14th day of December, 2007.

                                                     /s/ Gordon P. Katz
                                                     Gordon P. Katz