UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT FIREMAN and ANN RAIDER,

Plaintiffs,

v.

NEWS AMERICA MARKETING IN-STORE,
INC.,

Defendant.

Civil Action No. 05-11740-MLW

## SUPPLEMENTAL AFFIDAVIT OF GORDON P. KATZ

I, Gordon P. Katz, on oath depose and state as follows:

1.      I make this Supplemental Affidavit in connection with defendant's reply to plaintiffs' opposition to defendant's motion for summary judgment.

2.      Appended hereto as Exhibit A is a true copy of the minuscript deposition of David F. Devoe, Jr.

3.      Appended hereto as Exhibit B is a true copy of the minuscript deposition of Henri Lellouche.

4.      Appended hereto as Exhibit C is a true copy of the minuscript deposition of Christopher Mixson.

5.      Appended hereto as Exhibit D is a true copy of the minuscript deposition of Marty Garofalo.

Signed under the pains and penalties of perjury this 14th day of December, 2007.

Gordon P. Katz

# 4998233_v1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 14th day of December, 2007.

/s/ Gordon P. Katz
Gordon P. Katz

**EXHIBIT A**

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-1740 MLW


- - - - - - - - - - - - - - - x

ROBERT FIREMAN and ANN RAIDER,   :

            Plaintiffs,          :

     v.                          : Deposition of:

NEWS AMERICA MARKETING           : DAVID F. DeVOE, JR.

IN-STORE, INC.,                  :

            Defendant.           :

- - - - - - - - - - - - - - - x


        TRANSCRIPT of testimony as taken by and before

MARGE TEILHABER, Certified Shorthand Reporter

(NJ License No. XI00856; CT license No. 446), NCRA

Registered Diplomate Reporter, and notary public of

the states of New York, New Jersey, and Connecticut,

at the offices of NEWS AMERICA, INC., 1211 Avenue of

the Americas, 3rd Floor, New York, New York, on

Wednesday, June 13, 2007, commencing at 10:10 in the

forenoon.

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
                              New York, NY

---

Page 2

1   A P P E A R A N C E S:
2
3       TODD & WELD LLP
4       28 State Street
5       Boston, Massachusetts 02109
6       BY: DAVID H. RICH, ESQ.
7       Attorneys for plaintiffs
8       617-720-2626    drich@toddweld.com
9
10      HOLLAND & KNIGHT
11      10 St. James Avenue
12      11th Floor
13      Boston, Massachusetts 02116
14      BY: GORDON P. KATZ, ESQ.
15      Attorneys for defendant
16      617-523-2700
17      617-573-5839    gordon.katz@hklaw.com
18
19
20
21
22

---

Page 3

1   A P P E A R A N C E S (continued):
2
3       NEWS AMERICA INCORPORATED
4       1211 Avenue of the Americas
5       New York, New York 10036
6       BY: J. JORDAN LIPPNER, ESQ.
7          Vice-President, Associate General Counsel
8          News America Publishing and Marketing Group
9       212-852-7166    jlippner@newscorp.com
10
11  ALSO PRESENT:
12      Robert Fireman
13      Sarah Chopnick
14
15
16
17
18
19
20
21
22

---

Page 4

1                   I N D E X
2   WITNESS                          PAGE
3   DAVID F. DeVOE, JR.
4       Examination by Mr. Rich        9
5       Examination by Mr. Katz      198
6       Examination by Mr. Rich      199
7
8               E X H I B I T S
9   NUMBER        DESCRIPTION        IDENT.
10  DeVoe-12  2-page document entitled Notice    12
11      of Taking Deposition, two copies
12      of 2-page Schedule A, and 1-page
13      subpoena
14  DeVoe-13  1-page memo dated 5-14-99 and     31
15      6-page attachment entitled
16      Acquisition of Consumer Card
17      Marketing, Inc., Bates
18      NAM01474-01480
19  DeVoe-14  Memo dated 6-17-99, Bates         62
20      NAM03611-616
21
22

---

Page 5

1           E X H I B I T S (continued)
2   NUMBER        DESCRIPTION        IDENT.
3   DeVoe-15  Printout of PowerPoint            80
4      presentation entitled Three
5      Essential Elements, Bates
6      FR4897-4901
7   DeVoe-16  Document entitled SG&A Expenses,   81
8      Bates FR3461
9   DeVoe-17  Document entitled Revenue         81
10     Assumptions, Bates FR4889
11  DeVoe-18  1-page fax transmittal sheet      97
12     dated 7-7-99, 1-page document
13     entitled CCMI Acquisition Open
14     Business Issues, and four fax
15     log reports
16  DeVoe-19  Email dated 6-23-99, Bates       109
17     NAM01298
18  DeVoe-20  1-page email dated 7-9-99 and    113
19     1-page attachment entitled
20     CCMI's Baseline Projections,
21     Bates NAM01391-1392
22

                                   2 (Pages 2 to 5)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                  June 13, 2007
New York, NY

---

**Page 6**

1          E X H I B I T S (continued)
2  NUMBER          DESCRIPTION          IDENT.
3  DeVoe-21  Stock Purchase Agreement dated    117
4        8-13-99, Bates NAM04566-4623,
5        and 37-page attachment entitled
6        CCMI Disclosure Memorandum to
7        Stock Purchase Agreement as of
8        August 13, 1999
9  DeVoe-22  1-page letter dated 10-22-99,    163
10        Bates FR0315
11  DeVoe-23  1-page email dated 11-12-99,    168
12        Bates FR0413
13  DeVoe-24  3-page letter dated 12-7-99,    169
14        Bates FR0043-045
15  DeVoe-25  1-page email dated 12-7-99,    173
16        Bates NAM03590
17  DeVoe-26  3-page document entitled Summary    180
18        and Next Steps, CCMI Strategy
19        Session 11/17/99, Bates NAM03585-3587
20
21
22

---

**Page 7**

1          E X H I B I T S (continued)
2  NUMBER          DESCRIPTION          IDENT.
3  DeVoe-27  3-page letter dated 9-11-00,    189
4        Bates FR0033-35
5  DeVoe-28  5-page email dated 11-15-99,    194
6        Bates FR0415-0419
7  DeVoe-29  1-page email dated 1-13-00,    197
8        Bates FR0021
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**Page 8**

1        IT IS HEREBY STIPULATED AND AGREED by
2  and between counsel for the respective parties
3  hereto that filing, sealing and certification be and
4  the same are hereby waived.
5
6        IT IS FURTHER STIPULATED AND AGREED
7  that all objections, except as to the form of the
8  question, are reserved to the time of trial.
9
10        IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be subscribed and
12  sworn to before any notary public with the same
13  force and effect as though subscribed and sworn to
14  before this Court.
15
16
17
18
19
20
21
22

---

**Page 9**

1  D A V I D  F.  D e V O E, JR.,
2      conducting business at
3      Fox Entertainment Group, Inc.,
4      101 West Pico Boulevard,
5      Building 100, Room 5120,
6      Los Angeles, California 90035-0057,
7      residing at 51 Colony Road,
8      Westport, Connecticut 06880,
9      having been first duly sworn by the notary
10      public, was examined and testified as follows:
11  EXAMINATION BY MR. RICH:
12      Q.    Good morning, Mr. DeVoe.  Could you
13  state and spell your name for the record, please?
14      A.    It's David DeVoe.
15          MR. RICH:  Gordon, going forward,
16      the same stipulations?
17          MR. KATZ:  Yes.  Why don't we just
18      recite them for the record.
19          MR. RICH:  Sure.  For the record the
20      parties have agreed that all objections except
21      as to form will be reserved until the time of
22      trial as will motions to strike.

3 (Pages 6 to 9)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                            New York, NY

---

Page 10

1       The witness will have the opportunity
2   to read and sign the transcript and the
3   parties have waived the requirement of a
4   notary.
5       Q.    Mr. DeVoe, have you ever been deposed
6   before?
7       A.    Yes.
8       Q.    So I take it you're familiar broadly
9   with what's going to happen today?
10      A.    I'm familiar with the deposition
11  process.
12      Q.    Okay.
13          Well, just a couple very broad
14  general instructions I tend to provide witnesses at
15  the outset of a deposition.
16          If at any time you need to take a
17  break for any reason to use the men's room, to
18  stretch your legs, to clear your head, please speak
19  up. I'm happy to take as many breaks as you'd like
20  to take throughout the day. I don't anticipate this
21  will go all day, but nevertheless feel free to speak
22  up. We're happy to break at any point in time you'd

Page 11

1   like. Okay?
2       A.    Yes.
3       Q.    The second instruction I like to give
4   to witnesses is obviously the court reporter can
5   only take down words and can't take down gestures,
6   visual cues. So I will try to use words. I'm sure
7   it will be helpful to her to use words and we'll try
8   not to speak over each other. I'm sure it will make
9   her happy or happier. Okay?
10      A.    I understand.
11      Q.    And lastly, to the extent I ask a
12  question that you don't understand, it's inartful,
13  please speak up. I'm happy to try and rephrase it
14  in a way that conforms to the English language.
15  Okay?
16      A.    Okay.
17      Q.    Now, Mr. DeVoe, where do you
18  currently reside?
19      A.    I live in Westport, Connecticut.
20      Q.    What address?
21      A.    51 Colony Road.
22      Q.    And for how long have you resided in

Page 12

1   Westport, Connecticut?
2       A.    Since 1995.
3             MR. KATZ:  Off the record for just a
4   second.
5          (Whereupon, a discussion was held off
6   the record.)
7          (Exhibit DeVoe-12, 2-page document
8   entitled Notice of Taking Deposition, two
9   copies of 2-page Schedule A, and 1-page
10  subpoena, received and marked for
11  identification.)
12      Q.    Mr. DeVoe, I hand you a document
13  which we've marked for the record as
14  DeVoe-Exhibit 12 and I can represent to you that
15  there is a stapling error but this represents a
16  notice of taking your deposition and the subpoena,
17  which is the last page.
18          Have you seen any of the documents
19  which I've marked as Exhibit 12 before today?
20      A.    Have I seen the document?
21      Q.    Yes, or any page of the document.
22      A.    I don't recall seeing it.

Page 13

1       Q.    Okay.
2          How about the last physical page that
3   reads subpoena in a civil case? Have you seen that?
4       A.    I don't recall seeing it.
5       Q.    Okay.
6          The two pages which precede the last
7   page is a document entitled Schedule A.
8          Do you see that?
9       A.    Yes.
10      Q.    Have you ever seen Schedule A before?
11      A.    (Examining document.)
12          I don't recall seeing this.
13      Q.    Okay. Have you undertaken any
14  independent search for records which may relate to
15  this matter?
16      A.    Yes. I received a notice to check my
17  files and I didn't have anything in my files.
18      Q.    When did you receive that notice?
19      A.    I don't recall.
20      Q.    Was it in the last month?
21      A.    I don't recall when Gordon and I
22  talked about it. I imagine it was in the last few

4 (Pages 10 to 13)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                          June 13, 2007
                              New York, NY

---

Page 14

1  months.
2      Q.    Okay.
3          And what, if anything, did you do to
4  look for documents?
5      A.    I went through, reviewed my files in
6  Los Angeles, which had no documents in them related
7  to this company, and reviewed the hard drive on my
8  computer which had no documents relating to this
9  company.
10     Q.    Anything else?
11     A.    No.
12     Q.    Are you currently employed?
13     A.    Yes.
14     Q.    And by whom are you currently
15 employed?
16     A.    News America Incorporated.
17     Q.    And do you hold a position with News
18 America Incorporated?
19     A.    Yes.
20     Q.    What's your position?
21     A.    The executive vice-president and
22 deputy chief financial officer of Fox Entertainment

---

Page 15

1  Group.
2      Q.    And for how long have you held the
3  position of deputy chief financial officer of Fox
4  Entertainment Group?
5      A.    I was in that position either in
6  September or October of 2001.
7      Q.    And you've held that position
8  continuously since then?
9      A.    Yes.
10     Q.    Prior to taking that position, what
11 did you do?
12     A.    The title was executive
13 vice-president and chief financial officer of
14 News America Marketing.
15     Q.    And for how long did you hold that
16 position?
17     A.    I don't recall exactly when I started
18 with -- it was sometime before 1998 and I was in
19 that position until I started the job with Fox
20 Entertainment Group.
21     Q.    Would it be fair if I throughout the
22 day refer to News America Marketing In-Store, Inc.

---

Page 16

1  as NAM or News America Marketing?  Is that fair if
2  we use those words interchangeably?
3      A.    Yes.  News America Marketing is fine.
4      Q.    Okay.
5          What were your duties and
6  responsibilities as executive vice-president and
7  chief financial officer of News America Marketing?
8      A.    The duties and responsibilities
9  included financial planning and analysis and
10 strategic planning and financial reporting as well
11 as a general involvement in the overall business.
12     Q.    Did you hold any other positions or
13 titles for News America Marketing between 1998 and
14 October of 2001?
15     A.    That was my only title.
16     Q.    During the time that you were
17 executive vice-president and chief financial officer
18 of New America Marketing, did New America Marketing
19 have a new ventures group?
20     A.    There's a group we referred to as new
21 ventures group.  I don't know if it was an actual
22 legal entity.

---

Page 17

1      Q.    Okay.  What did you understand this
2  new ventures group, whether it was a formalized
3  entity or not, to be?
4      A.    New ventures group was an opportunity
5  for us to evaluate expanding into new businesses.
6      Q.    And were there individuals who
7  participated in the new ventures group?
8      A.    Yes.
9      Q.    And who were those individuals?
10     A.    The primary individuals working in
11 that area were Henry Lellouche, Jon Rubin, and
12 Heather Harde.
13     Q.    How about yourself?
14     A.    And myself.
15     Q.    And was this new ventures group more
16 of an ad hoc group that discussed various
17 opportunities that New America Marketing might wish
18 to explore?
19     A.    I'd say it was similar to a business
20 development group looking at new opportunities.
21     Q.    The individuals who participated in
22 the new ventures group, their involvement with the

---

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

**Page 18**

1  new ventures group was in addition to their regular
2  duties and responsibilities that they had for New
3  America Marketing.  Correct?
4         MR. KATZ:  Objection.  You can answer
5      if you understand the question.
6      A.   Can you rephrase the question?
7      Q.   Sure.  What was Mr. Lellouche's title
8  in, say, 1998/1999?
9      A.   I don't recall.
10     Q.   How about Mr. Rubin's?
11     A.   I don't recall.
12     Q.   How about Ms. Harde's?
13     A.   I don't recall the specific titles.
14     Q.   What did Mr. Lellouche do for New
15  America Marketing in 1998/1999?
16     A.   I don't recall the exact time frame.
17  There was a period in which Henry, Jon, and Heather
18  worked with me looking at new business opportunities,
19  and that was primarily what they did if I recall it
20  correctly.
21     Q.   Okay.
22         So to the best of your memory

**Page 19**

1  Mr. Lellouche had no other duties and
2  responsibilities beyond evaluating business
3  opportunities for New America Marketing
4      A.   During what time frame?
5      Q.   Let's talk about 1998/1999.
6      A.   I can't be positive related to the
7  second half of 1999.
8      Q.   Okay.
9         You would agree with me that
10  News America Marketing entered into a stock purchase
11  agreement with Consumer Card Marketing, Inc. in
12  August of 1999.  Correct?
13     A.   Yes.
14     Q.   Okay.
15         Prior to August of 1999 was
16  Mr. Lellouche's sole duties and responsibilities for
17  News America Marketing evaluating, analyzing
18  business opportunities for News America Marketing?
19     A.   At some point after I joined
20  News America Marketing -- I'm not sure exactly
21  when -- Heather, Jon, and Henry reported to me
22  looking at these new opportunities.  I don't know

**Page 20**

1  exactly when that was, so there was a period prior
2  to that date where they reported to me where they
3  performed other functions.
4      Q.   Okay.
5      A.   I just don't recall the exact
6  chronology.
7      Q.   And I take it from your last answer
8  that you, for lack of a better word, ran the new
9  ventures group?
10     A.   Yes, up until the iGroup.
11     Q.   When did it become the iGroup?
12     A.   I don't recall.
13     Q.   Was it before or after the CCMI
14  acquisition?
15     A.   It was subsequent to that.  Can I
16  clarify that?
17     Q.   Yes, please do.
18     A.   We purchased three businesses or
19  invested in three businesses.  Those three
20  businesses then became part of an entity we called
21  SmartSource iGroup, I believe.
22         Subsequent to that, I continued to

**Page 21**

1  look at new business opportunities, but those
2  specific businesses became part of I believe it was
3  the iGroup.  Again, I'm not sure if I have the name
4  correctly.
5      Q.   Now, were there particular duties and
6  responsibilities that you had as the leader of the
7  new ventures group?
8      A.   None other than what I previously
9  talked about.
10     Q.   Did Mr. Lellouche have any particular
11  duties and responsibilities other than broadly
12  bringing potential business opportunities to your
13  and the group's attention?
14     A.   For a period of time -- again, up
15  until the acquisitions -- they were looking at
16  specific business opportunities.  Once the
17  investments and acquisitions were made, each of
18  those individuals spent some time, more direct time
19  within those different entities that either we
20  invested in or purchased.
21         So again the time frame, I don't
22  recall the time frame between kind of when this

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
                          New York, NY

Page 22

1  business development group, when we kind of coined
2  it new ventures group and when it became something
3  else. I just don't recall the time frame.
4       Q.    Now, we're going to be talking a lot
5  obviously about an entity called Consumer Card
6  Marketing, Inc. Is it okay if we use the term CCMI
7  to refer to that group going forward?
8       A.    Yes.
9       Q.    It'll save some pages of transcript.
10 Okay?
11      A.    Yes.
12      Q.    Now, you're familiar with a company
13 called CCMI. Correct?
14      A.    Yes.
15      Q.    When did you first become aware of
16 CCMI's existence?
17      A.    I'm not sure exactly when I became
18 aware.
19      Q.    Are you able to identify a year?
20      A.    The time when I became most familiar
21 was 1999.
22      Q.    And how is it that you became aware

Page 23

1  of CCMI initially?
2       A.    Initially it was a company that Jon
3  Rubin mentioned.
4       Q.    So Jon Rubin brought this potential
5  opportunity to your attention?
6       A.    Yes.
7       Q.    What do you remember him telling you
8  initially about CCMI?
9       A.    I don't recall.
10      Q.    Do you recall whether Mr. Rubin had
11 prepared any documentation to present to you
12 concerning CCMI?
13      A.    I don't remember.
14      Q.    After Mr. Rubin brought CCMI's
15 existence to your attention, what did you do next
16 relative to CCMI?
17      A.    Can you rephrase that?
18      Q.    Sure.
19           Mr. Rubin brings an entity, CCMI, to
20 your attention and you don't remember specifically
21 what he said to you or what you said to him.
22 Correct?

Page 24

1       A.    Yes.
2       Q.    And I take it something happened
3  after that discussion with Mr. Rubin which led to
4  ultimately the acquisition. Correct?
5       A.    Yes.
6       Q.    In fact a whole series of things
7  happened. Correct?
8       A.    Yes.
9       Q.    And my question to you is after
10 Mr. Rubin brought this potential opportunity to your
11 attention, what did you do with that information, if
12 anything?
13      A.    I don't recall exactly what we did.
14      Q.    Okay.
15           Did you undertake a study of CCMI?
16      A.    We did visit CCMI.
17      Q.    Okay.
18      A.    I don't recall exactly what happened
19 between the time Jon spoke to me and --
20      Q.    What did you understand the business
21 of CCMI to be?
22      A.    I understood the business of CCMI to

Page 25

1  be a company that supplied frequent shopper cards to
2  retailers, a company that did some retailer data
3  management, not a lot of it but had some data
4  management capabilities, and it was a company that
5  also performed direct marketing functions.
6       Q.    In this early time frame did you do
7  anything to study the market for any of these
8  functions that CCMI was undertaking?
9       A.    It's reasonable we did that.
10      Q.    But you have no memory of what was
11 done?
12      A.    It's been a long time. I'm sorry.
13      Q.    Was the business of CCMI something
14 that was of interest to you?
15      A.    Yes.
16      Q.    Why?
17      A.    We were interested in evaluating
18 opportunities to expand into targeted marketing
19 services.
20      Q.    As a definitional term, what do you
21 understand targeted marketing to be?
22      A.    We were hoping to provide product

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
                          New York, NY

Page 26

1  where we would be able to send specific mailings or
2  reach out to specific customers with offers.
3       Q.     Was that something that News America
4  Marketing was doing at the time, in this 1999 time
5  period?
6       A.     No.
7       Q.     So you were looking to expand the
8  business base of News America Marketing?
9       A.     Yes.
10           MR. KATZ:  Objection.
11      Q.     Did you do anything to -- and by you,
12  I mean your group -- do anything in this early time
13  period to obtain an understanding of CCMI's stature
14  in the target marketing industry?
15      A.     What time frame?
16      Q.     I want to focus you on the early time
17  period when Mr. Rubin first brought this potential
18  opportunity to your attention.
19      A.     I don't recall.
20      Q.     Did you at some point, at any point
21  in time obtain or seek to obtain an understanding as
22  to what CCMI's stature was in the targeted marketing

Page 27

1  industry?
2       A.     What do you mean by stature?
3       Q.     What their reputation was.
4       A.     Yes.
5       Q.     And how did you go about doing that?
6       A.     I don't recall.
7       Q.     What did you learn of CCMI's
8  reputation in the targeted marketing industry?
9       A.     As I recollect, we didn't find
10  anything regarding their reputation that was
11  extremely positive or extremely negative.
12      Q.     And sitting here today, you don't
13  know what it was you did to acquire that
14  information?
15      A.     I don't.
16      Q.     Was part of your interest in CCMI
17  based on an understanding by you or your group that
18  supermarkets and drug stores and other retail chains
19  were getting ready to initiate or expand loyalty
20  cards and similar type programs?
21      A.     I believe the loyalty card programs
22  were fairly prevalent at the time we evaluated the

Page 28

1  company.
2       Q.     Did you see it as a burgeoning field
3  in the marketing industry?
4            MR. KATZ:  Objection.
5       A.     What do you mean by burgeoning?
6       Q.     Well, did you see that there was an
7  opportunity for growth in the loyalty card business?
8            MR. KATZ:  Objection.
9       A.     What part of the loyalty card
10  business?
11      Q.     Any part of the loyalty card
12  business.
13      A.     I don't understand exactly what
14  market you're identifying.
15      Q.     Okay.
16           Well, I think you referenced the fact
17  that CCMI was a company that supplied frequent
18  shopping cards.  Correct?
19      A.     Yes.
20      Q.     And do you understand that those are
21  sometimes referred to as loyalty cards?
22      A.     Yes.

Page 29

1       Q.     I think you testified that your
2  understanding of the 1999 time frame is that these
3  loyalty cards were fairly prevalent.  Is that your
4  recollection of the industry at the time?
5       A.     To the best of my knowledge, yes.
6       Q.     And at that time did you or your
7  group see an opportunity for that market to expand?
8            MR. KATZ:  Objection.  You can answer
9       the question if you understand it.
10      A.     As I recollect, we did not see a
11  large opportunity in regards to the issuance of
12  frequent shopper cards.
13      Q.     Were any studies in that regard done
14  for News America Marketing?
15      A.     Studies in regard to the issuance of
16  frequent shopper cards?
17      Q.     Yes.
18      A.     I don't recall.
19      Q.     Okay.
20           How about studies concerning retailer
21  data management?
22      A.     I don't recall.

8 (Pages 26 to 29)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

Page 30

1    Q.    How about studies done concerning a
2 direct marketing function which was the other item
3 that you said CCMI was doing at the time?
4    A.    I don't recall.
5    Q.    Do you remember any studies done on
6 any of these issues at any time prior to August
7 of 1999?
8    A.    I don't recall any studies.  It's
9 reasonable to assume some evaluation was made.  I
10 just don't recall.
11    Q.    But you have no memory of seeing any
12 such studies sitting here today?
13    A.    No.
14    Q.    So it's reasonable to assume that
15 someone did an analysis of the market and the
16 industry generally?
17    A.    Yes.
18    Q.    Because New America Marketing
19 wouldn't in your experience have made an investment
20 had a determination been made that this was a good
21 business or a business with potential?
22    A.    At the time of the investment if we

Page 31

1 made a -- we had a viewpoint as it related to the
2 company we purchased.
3    Q.    And what was the viewpoint?
4    A.    The viewpoint was it was a company
5 that was making little to no money and we thought
6 the business had strong software that would enable
7 it to interact with retailer data, and we thought
8 there was the potential to grow the business.
9    Q.    We'll come back to that.
10        Now, you would agree with me that
11 according to your analysis, CCMI had a value of 40.7
12 to 58.4 million dollars.
13    A.    No, I would not agree with that.
14        MR. RICH:  Mark this, please, as
15 the next exhibit.
16        (Exhibit DeVoe-13, 1-page memo dated
17 5-14-99 and 6-page attachment entitled
18 Acquisition of Consumer Card Marketing, Inc.,
19 Bates NAM01474-01480, received and marked for
20 identification.)
21    Q.    Mr. DeVoe, I'm showing you a document
22 which we have marked for the record as DeVoe

Page 32

1 Exhibit 13, which has been Bates stamped -- and you
2 can see it in the lower right-hand corner -- as NAM
3 01474 to 01480.
4        Do you see that?  Do you see this
5 document?
6    A.    Yes.
7    Q.    This is a memo that you prepared in
8 May of 1999?
9    A.    Yes.
10    Q.    Who is John Nallen?
11    A.    He's the deputy chief financial
12 officer of News Corporation.
13    Q.    And Lon Jacobs?
14    A.    At the time Lon was the -- I don't
15 recall Lon's exact title.  It may have been deputy
16 general counsel of News Corporation.
17    Q.    And Paul Carlucci?
18    A.    Paul was the CEO of News America
19 Marketing.
20    Q.    What was the purpose in preparing
21 DeVoe Exhibit 13?
22    A.    It was to alert them to an

Page 33

1 opportunity for us to acquire CCMI.
2    Q.    Now, by the time the memo was
3 prepared a verbal offer had been extended to CCMI.
4        Correct?
5    A.    It mentions that in the document.
6    Q.    Is that consistent with your memory?
7    A.    Yes.  If I wrote it down, I assume
8 it's correct.
9    Q.    And in fact CCMI had accepted the
10 verbal offer by the time this memo was prepared.
11        Correct?
12    A.    In general terms, yes.
13    Q.    If you could flip to the third
14 physical page, the bottom of the page, paragraph 4,
15 which is titled Timing and Next Steps, you
16 write, "New America Marketing made a verbal offer to
17 CCMI on May 7th, 1999, which was verbally agreed to
18 by the company on 5/10/99."
19        Correct?
20    A.    Yes.
21    Q.    Now, on the third physical page where
22 you have model assumptions, the fourth bullet point

9 (Pages 30 to 33)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                              June 13, 2007
New York, NY

---

Page 34

1   from the bottom, "News America's model assumes a
2   valuation range of $40.7 million to "58.4 million."
3          Do you see that?
4      A.    That's not the value of the business
5   at the time we bought it.
6      Q.    Okay.
7          What do those numbers correspond to?
8      A.    That corresponds to if for some
9   reason we were fortunate enough to hit the
10  projections noted above roughly what we think the
11  business, the potential for the business could be
12  worth.
13     Q.    Okay. Who prepared the projections?
14     A.    I don't recall.
15     Q.    Was it someone from News America
16  Marketing?
17     A.    May I look at the appendix?
18     Q.    Sure. Take all the time you need.
19     A.    (Examining document.)
20          Yes. Those would have been
21  projections made from someone at News America
22  Marketing.

---

Page 35

1      Q.    What, if anything, did you do prior
2   to sending this memo to confirm that the numbers set
3   forth in the projections were realistic?
4          MR. KATZ: Objection.
5      A.    What do you mean by realistic?
6      Q.    Well, I take it that this memo you
7   prepared on May 14th, 1999 was intended to provide
8   information to Mr. Nallen and Mr. Jacobs and
9   Mr. Carlucci. Correct?
10     A.    Yes.
11     Q.    And I take it it's your practice to
12  provide to anybody but particularly these
13  individuals information which is accurate and
14  well-founded. Correct?
15     A.    Yes.
16     Q.    And your memo contains a series of
17  projections.
18          Is that correct?
19     A.    The memo contains a series of
20  assumptions and a best guess what the business may
21  or may not become.
22     Q.    So Exhibit 13 was a guess?

---

Page 36

1      A.    Exhibit 13 as it relates to the
2   financial results and the projections were the best
3   estimate at the time looking at where the business
4   maybe could lead to, where it could potentially go.
5          But as far as looking at specific --
6   I guess at the time the degree of confidence in
7   hitting these projections was not high.
8      Q.    Okay.
9          And is that mentioned anywhere in the
10  memo?
11     A.    Well, I would refer you to the second
12  paragraph in the memo where it states that "most of
13  the asset value is inherent in software development
14  utilized to interface with retailer point of sale
15  systems to segment consumer purchase histories
16  enabling targeted marketing programs."
17          So at that time essentially after
18  looking at that, the understanding is what
19  essentially you're acquiring is primarily that
20  asset. As it relates to the future projections of
21  the business, I think there's an understanding that
22  that may or may not happen.

---

Page 37

1      Q.    Okay.
2          But if you keep reading, the next
3   paragraph says, "Attached is an overview of the
4   company along with estimated financial projections
5   of the business over the next five years."
6          Is that correct?
7      A.    These were estimates.
8      Q.    Correct. But nowhere in here did you
9   say -- strike that.
10          Were these estimates prepared by
11  financial individuals at News America Marketing?
12          MR. KATZ: Objection.
13     A.    I don't recall.
14     Q.    I take it you reviewed the financial
15  projections before signing your name to this memo.
16  Correct?
17     A.    Yes.
18     Q.    And you have a financial background?
19     A.    That's true.
20     Q.    What is your background in finance
21  and accounting?
22     A.    I'm a CPA.

---

10 (Pages 34 to 37)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                      June 13, 2007

New York, NY

---

Page 38

1    Q.    When did you become a CPA?
2    A.    I don't recall the exact date.  It
3 was either 1989 or 1990.
4    Q.    Working as a CPA you worked for a
5 large accounting firm?
6    A.    That's correct.
7    Q.    Ernst & Young I believe?
8    A.    Yes.
9    Q.    What did you do for Ernst & Young?
10    A.    I was on the audit staff.
11    Q.    As part of your duties and
12 responsibilities on the audit staff you would
13 analyze financial information?
14    A.    Yes.
15    Q.    And did you use your background and
16 experience as a CPA to review and consider the
17 information that you were providing to Mr. Nallen
18 and Mr. Jacobs and Mr. Carlucci?
19    A.    Yes.
20    Q.    And you felt comfortable doing so?
21    A.    Yes.
22    Q.    Now, on the first page of Exhibit 13,

---

Page 39

1 the second sentence, you write, "The acquisition is
2 strategic in nature."
3    Do you see that?
4    A.    Yes.
5    Q.    What did you mean by the acquisition
6 being strategic in nature?
7    A.    It was an opportunity to get into a
8 new business.
9    Q.    And it was a strategy of News America
10 Marketing to get into a new business such as the
11 business of CCMI?
12    A.    It's our strategy to evaluate many
13 opportunities, and during that time frame we were
14 evaluating opportunities in the targeted marketing
15 areas.
16    Q.    Were there other targeted marketing
17 companies that you considered in this 1999 time
18 period?
19    A.    Yes.
20    Q.    Are you able to identify any of them
21 by name?
22    A.    The other two companies we invested

---

Page 40

1 in we kind of saw as opportunities in the targeted
2 marketing area as well.
3    Q.    And that would be SoftCard and
4 PlanetU?
5    A.    Yes.
6    Q.    Okay.  And we'll talk about those in
7 a moment.
8    Are there other entities, companies,
9 or opportunities that News America Marketing
10 investigated in the 1999 time period?
11    A.    I don't recall.
12    Q.    What about Catalina Marketing?
13    A.    Catalina Marketing we reviewed I
14 believe it was 1998 perhaps.  I don't recall the
15 exact date.
16    Q.    Did News America Marketing engage in
17 substantive negotiations with Catalina Marketing?
18    A.    No.
19    Q.    Any reason why?
20    A.    We did an internal proposal looking
21 at the business and at that time we weren't able to
22 proceed.

---

Page 41

1    Q.    Is there any reason why you weren't
2 able to proceed?
3    A.    Yes.  News Corporation didn't agree
4 with the direction at the time.
5    Q.    So I take it a memo similar to
6 Exhibit 13 was prepared concerning a potential
7 interest in Catalina Marketing?
8    A.    I don't recall the documents that
9 were prepared.
10    Q.    But nevertheless in 1998 it's your
11 memory that a decision was made by News Corp. that
12 Catalina wasn't for whatever the reason a good fit?
13    MR. KATZ:  Objection.
14    A.    It was determined that the -- it was
15 determined not to proceed with negotiations with
16 them.
17    Q.    Now, a decision was made to proceed
18 with CCMI.  Correct?
19    A.    Yes.
20    Q.    And are you able to identify the
21 reason why discussions proceeded with CCMI but
22 didn't proceed with Catalina Marketing?

11 (Pages 38 to 41)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

Page 42

1    A.    They're two very different
2  opportunities.
3        Q.    Any other reason?
4        A.    As I said before, at the time the
5  Catalina Marketing acquisition would have been a
6  more substantial investment for the company and the
7  company chose not to proceed.
8        Q.    Okay.
9            Now, were there any other entities or
10  opportunities that News America Marketing was
11  looking into relative to the business of CCMI in
12  this 1999 time period other than those that you
13  mentioned previously?
14        A.    News America Marketing evaluates
15  many, many different businesses.  I don't recall a
16  specific opportunity.  We may have looked at other
17  companies.  It's likely we did look at other
18  companies, but I don't recall a specific
19  opportunity.
20        Q.    Okay.
21            Now, your memo actually mentions
22  Catalina Marketing and its acquisition of two

---

Page 43

1  companies in the prior nine months, Market Logic and
2  DCI Card Marketing.
3            Do you see that?
4        A.    Yes.
5        Q.    Do you remember News America
6  Marketing being involved in any way in potentially
7  acquiring Market Logic or DCI Card Marketing?
8        A.    I do not.
9        Q.    Your memo -- and I apologize because
10  I'm bouncing back up to the sentence before -- notes
11  that "CCMI is the only full service retail loyalty
12  marketing company that has not been acquired over
13  the past year."
14            Do you see that?
15        A.    Yes.
16        Q.    Where did that information come from?
17        A.    That most likely was an opinion, an
18  evaluation.  It was probably information, again,
19  from my group that this was probably at the time the
20  only company in that area that hadn't been acquired
21  over the past year.
22        Q.    And your group defined CCMI as a

---

Page 44

1  full-service retail loyalty marketing company.
2            Is that how you characterized them?
3        A.    It's how it's characterized in this
4  memo.
5        Q.    Okay.  Beyond this memo, is that how
6  your group characterized it?
7        A.    I don't recall.
8        Q.    Now, the last sentence of the first
9  paragraph says, "The acquisition is also a strategic
10  fit with two other investments that are in
11  negotiation, SoftCard and PlanetU."
12            Do you see that?
13        A.    Yes.
14        Q.    Why was the CCMI acquisition a
15  strategic fit with these two other companies?
16        A.    The initial premise was we were
17  trying to expand the business into the targeted
18  marketing area.
19            PlanetU at the time was hoping to
20  enable targeted marketing programs via the Internet.
21  SoftCard Systems was looking at doing some type of
22  targeted marketing in store.

---

Page 45

1            Both of those companies' programs
2  were focused around providing these opportunities
3  and interacting with the frequent shopper card.
4            MR. KATZ:  Dave, whenever you come
5    to a free moment, if we could take a break
6    for a few minutes.
7            MR. RICH:  Let's take a break right
8    now.
9            (Break taken from 10:55 a.m. to
10    11:01 a.m.)
11        Q.    When we broke, we were talking about
12  the acquisition of SoftCard and PlanetU and the
13  strategic fit as referenced in Exhibit 13.
14            Did you in analyzing the strategic
15  fit see an opportunity for CCMI's database
16  management to be helpful in assisting and supporting
17  PlanetU and SmartSource?
18        A.    No.  Each had their own -- at the
19  time of the investments we were prepared to go
20  forward with each one of these investments based on
21  their own merits.  If one didn't go through, we were
22  prepared to do the other.

12  (Pages 42 to 45)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                              June 13, 2007
                        New York, NY

Page 46

1        Both of those companies if I recall
2  at the time were trying to build out some data
3  management system, PlanetU I believe in particular
4  more than SoftCard.
5        Q.   So you don't recall that CCMI's data
6  management unit could conceivably have been of any
7  assistance to these two entities?
8             MR. KATZ:  Objection.
9        A.   Prior to the acquisition, that wasn't
10 a consideration of either of the investments.
11 Subsequent to the acquisition I believe we tried to,
12 I believe there was an attempt to get the different
13 principals from those entities to talk to each other
14 and discuss to see if there were different
15 opportunities to work together.  And I don't recall
16 what happened after that.
17       Q.   What was the business of PlanetU?
18       A.   PlanetU was interested in
19 distributing offers over the Internet to consumers.
20 It was essentially couponing offers.
21       Q.   How did that strategically fit with
22 the business of CCMI?

Page 47

1             MR. KATZ:  Objection.  You can
2        answer.
3        A.   The strategic fit as you reference
4  it -- again I'm referring to strategic fit -- I'm
5  looking at businesses that are all working with
6  loyalty cards in some respect have some targeted
7  aspect to the program.  That's the strategic fit.
8  They were all in that respect.
9        Q.   What was the business of SoftCard
10 Systems?
11       A.   SoftCard had patents that enabled it
12 to distribute coupons via SmartCards.
13       Q.   And I take it that you at least saw
14 the potential for SoftCard's business to complement
15 CCMI's business?
16            MR. KATZ:  Objection.
17       A.   No.  Again, each one of those
18 investments we would have done without the other.
19       Q.   Did you have the idea of the iGroup
20 prior to acquiring CCMI?
21       A.   I don't recall.  I believe the iGroup
22 was formed subsequent to the investment.

Page 48

1        Q.   Well, I'm talking about the idea or
2  the concept of having an iGroup.  Was that part and
3  parcel of your thinking prior to the acquisition?
4        A.   I don't recall.
5        Q.   The second paragraph of page 1 of
6  Exhibit 13 says, "The economics of the business are
7  forecasted to improve as a result of new electronic
8  distribution channels that were not available on a
9  wide scale three years ago."
10            Do you see that?
11       A.   Yes.
12       Q.   What new electronic distribution
13 channels were you referring to in this memo?
14       A.   I don't remember what it was
15 specifically referring to.  I don't want to
16 speculate.
17       Q.   Would the Internet be part of that?
18       A.   The Internet may be part of it.
19       Q.   Anything else?
20       A.   I'm not sure.  It may have included
21 the concept of doing couponing via television or
22 something like that, but it never really took off.

Page 49

1        Q.   Okay.  Anything else?
2        A.   Nothing I can recall.
3        Q.   If we can get back into Exhibit 13,
4  between the time Mr. Rubin came to you and May 14th,
5  1999, are you able to estimate in any manner the
6  length of time that window was?
7        A.   I can't.
8        Q.   Was it a year?
9        A.   You'd have to check when Jon first
10 started working for me.  I don't know when he first
11 started working with me.
12       Q.   Was CCMI one of the first
13 opportunities that he brought to your attention?
14       A.   No.
15       Q.   Okay.
16            Now, for whatever period of time that
17 occurred between Jon Rubin coming to you and
18 May 14th, 1999, did you have any interaction
19 directly with Ann Raider or Bob Fireman?
20       A.   The first interaction I had that I
21 recall was when Jon and I went up to Braintree and
22 met with them.  I don't recall the exact date.

13 (Pages 46 to 49)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                          June 13, 2007
New York, NY

---

Page 50

1    Q.    Are you able to estimate a time
2 period relative to May of 1999?
3    A.    No. I don't know when the meeting
4 was.
5    Q.    Okay.
6          And who was at this meeting?
7    A.    I don't recall who was at the
8 meeting. I know Jon and I were at the meeting. I'm
9 not sure if anyone else attended from News America.
10   Q.    Okay.
11         And Ms. Raider and Mr. Fireman were
12 present?
13   A.    I believe so. I believe we toured
14 their office and talked to them.
15   Q.    Did they make a presentation for you?
16   A.    They may have.
17   Q.    Do you remember a PowerPoint
18 presentation?
19   A.    I don't.
20   Q.    Do you remember the specifics about
21 what was discussed?
22   A.    I believe at the meeting we discussed

Page 51

1 the price at which we would be interested in
2 purchasing the company for.
3    Q.    Prior to this meeting had anybody
4 from News America Marketing done an independent
5 analysis of CCMI's business?
6    A.    I don't recall.
7    Q.    Okay.
8          Had anybody done an independent
9 analysis of the market or the industry that CCMI was
10 in?
11   A.    I don't recall a specific industry
12 study.
13   Q.    Were you aware as of this meeting as
14 to who CCMI's competitor were?
15         MR. KATZ: Objection.
16   Q.    If any.
17   A.    I don't recall.
18   Q.    It's possible that such an analysis
19 had been done whether in writing or not but you just
20 don't remember?
21   A.    I don't remember.
22   Q.    Do you remember what price you told

Page 52

1 them, Ms. Raider and Mr. Fireman, that News America
2 would be interested in purchasing CCMI for?
3    A.    I don't remember the exact price. I
4 know the price that I thought was lower than the
5 price that they thought.
6    Q.    Okay.
7          Are you able to be any more specific
8 than that?
9    A.    I would be guessing at what the
10 initial offer was other than the information that I
11 have in my memo which cites a price and the general
12 assumption that I may have gone in at a lower price
13 than that to start. I don't recall the specific
14 price.
15   Q.    Do you remember telling Ms. Raider or
16 Mr. Fireman that you only had $3 million to spend?
17   A.    No.
18   Q.    At any time?
19   A.    I don't remember that.
20   Q.    Do you remember the specifics of any
21 discussion that you had with Ms. Raider and
22 Mr. Fireman during this initial meeting in

Page 53

1 Braintree?
2    A.    Yes. We had two different views of
3 the evaluation. We thought the company was worth a
4 certain amount of money. They thought it was worth
5 more money. They had projections I think that they
6 may have done on the business where they thought
7 their business was headed and I think we talked
8 about paying the price for the business, and to the
9 extent the business was able to do better than we
10 expected, we worked out something where they would
11 get a percentage of the gross profit of the
12 business.
13   Q.    Do better than who expected?
14   A.    We had a value for the business and I
15 guess we agreed that the business was worth
16 $3 million. That was our view of the valuation of
17 the business.
18         I believe Ann and Bob believed that
19 the business had growth opportunity and up side
20 beyond that, and we weren't going to pay them any
21 more money based on those projections. However, to
22 the extent that those projects materialized, we

14 (Pages 50 to 53)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

Page 54

1  would pay them additional money for the company.
2      Q.    Can you take a look back to
3  Exhibit 13?
4      A.    Same one?
5      Q.    Yes, sorry.  On page 3 under model
6  assumptions, the third bullet point from the bottom
7  of that paragraph says, "Based on the deal structure
8  outlined below" -- and by below, I take it you meant
9  the deal structure for subparagraph 3?
10     A.    I'm sorry.  Where are you?
11     Q.    The opening line of the sentence
12  reads, "Based on the deal structure outlined below,"
13  and then there is a deal structure in the paragraph
14  below that.
15          Do you see that?
16          MR. KATZ:  I'm searching for your
17     first sentence.  Okay.
18     Q.    Do you see model assumptions three
19  bullet points from the bottom?
20     A.    Yes.
21     Q.    It begins by saying, "Based on the
22  deal structure outlined below."

---

Page 55

1      A.    Yes.
2      Q.    The deal structure you were referring
3  to is the deal structure listed in the paragraph
4  below?
5      A.    Yes.
6      Q.    "News America's model assumes a cost
7  to acquire CCMI is 9.8 million in total cash
8  payments."
9          Do you see that?
10     A.    Yes, I see that.
11     Q.    Okay.
12          So the model that you were preparing
13  and presenting to Mr. Nallen and Mr. Jacobs and
14  Mr. Carlucci assumed a cost to acquire CCMI of
15  9.8 million.  Correct?
16     A.    (Examining document.)
17          Yes, assuming a significant amount of
18  revenue growth over that time.
19     Q.    Well, this was News America's model.
20  Correct?
21     A.    Yes.  I believe the CCMI model was
22  higher.

---

Page 56

1      Q.    Correct.  In fact if you look two
2  bullet points below, you do an analysis of CCMI's
3  model which assumes 70 million in gross margins,
4  which was a greater margin than News America had
5  estimated.
6      A.    I guess they had greater confidence
7  in the business.
8      Q.    But at least as of May of 1999 you
9  were informing your superiors that the cost to
10  acquire CCMI, according to the models that you were
11  running, was 9.8 million in cash, present value
12  6.6 million?
13          MR. KATZ:  Objection.
14     A.    No.  They understood the cost of the
15  acquisition to be $3 million and then there may be
16  more money paid out and it all depended how the
17  business performed.  It could be 3 million and
18  that's it.  It could be a lot more than that.
19          The numbers on the sheet could be
20  higher or lower.  It all depended on how the
21  business performed.  So they understood it as a
22  $3 million investment, and based on how the business

---

Page 57

1  performed, there would be an opportunity for
2  additional money earned.
3      Q.    Well, your memo doesn't say
4  News America model assumes the cost to acquire CCMI
5  as $3 million in cash.
6          Is that correct?
7      A.    The deal structure states an upfront
8  payment of 3 million and everything else is
9  projections.  The assumption of the company is that
10  these are estimates.  The company may do better.  It
11  may do worse.
12          So their assumption is it's
13  $3 million, and depending on how the business
14  performs, it may be more than that.
15     Q.    But we can agree that in May of 1999
16  you were informing your superiors that the model
17  prepared by News America assumed a cost to acquire
18  the business of $9.8 million?
19          MR. KATZ:  Objection.
20     A.    We can agree that the math resulting
21  from the projections that we did would have ended up
22  in that amount being paid.

15  (Pages 54 to 57)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

|  | Page 58 |
|---|---|
| 1 | Q.      Now, isn't it a case that Julie |
| 2 | Openshaw, can we agree that -- strike that. |
| 3 |         Ms. Openshaw worked for you? |
| 4 | A.      Yes. |
| 5 | Q.      And can we agree that she was the one |
| 6 | that prepared these models and projections? |
| 7 | A.      I believe she did most likely |
| 8 | working -- she may have received feedback from |
| 9 | others. |
| 10 | Q.      And what is Ms. Openshaw's |
| 11 | background? |
| 12 | A.      I don't recall her specific |
| 13 | background.  She worked I believe as a financial |
| 14 | analyst and did business development for me. |
| 15 | Q.      Back to the meeting in Braintree, you |
| 16 | said there were two views on valuation and you |
| 17 | talked about paying a price. |
| 18 |         Is there anything else you recall |
| 19 | about this initial meeting? |
| 20 | A.      No. |
| 21 | Q.      Were there discussions about the |
| 22 | manner in which CCMI would be integrated into |

**Page 60**

1  Mr. Fireman?
2      A.      I don't know the specific next time
3  we met.
4      Q.      Was there a next time?
5      A.      I know we had dialogue on negotiating
6  a deal.  I don't know if we met in person.  A lot of
7  it was done on the phone.  I just can't recall the
8  specific meeting.
9      Q.      Okay.
10         Well, after the verbal offer was
11  extended and agreed, as I understand it there was a
12  period of due diligence.
13         Is that correct?
14     A.      Yes.
15     Q.      Were you involved in the due
16  diligence?
17     A.      I believe I had, individuals from our
18  organization were involved in the due diligence.
19     Q.      Did you participate in any direct way
20  in the due diligence efforts?
21     A.      I would have received updates and
22  reports on the diligence.

**Page 59**

1  News America at this initial meeting?
2      A.      I don't recall.
3      Q.      Were there discussions about any
4  aspect of Ms. Raider or Mr. Fireman's
5  responsibilities discussed at this initial meeting?
6      A.      I don't recall.
7      Q.      Is there anything that might help
8  refresh your memory about this initial meeting?
9      A.      From the initial meeting I understand
10  the dialogue and value.  As it relates to everything
11  else, I guess I would be most helped by looking at
12  the final agreement, where we ended up.
13     Q.      Okay.
14         Now, was there a subsequent meeting
15  that you participated in with Ms. Raider or
16  Mr. Fireman prior to May 14th of 1999?
17     A.      Prior to May 14th?
18     Q.      Yes.
19     A.      I don't recall.
20     Q.      Okay.
21         When was the next time after this
22  initial meeting that you met with Ms. Raider or

**Page 61**

1      Q.      How long did the due diligence go on
2  for?
3      A.      I'm not sure.  I don't know how far
4  it extended up to the point we closed.  I assume up
5  until that process we continued to evaluate and
6  tried to obtain information but I can't be sure.
7      Q.      Okay.
8         Does anything stand out in your mind
9  during the due diligence process that is memorable?
10     A.      No.
11     Q.      During the due diligence period were
12  you communicating with anybody from CCMI?
13     A.      I may have been.
14     Q.      If you were communicating with
15  anyone, with whom would you have been communicating?
16     A.      Only to the extent that if we had
17  outstanding items on the list we were looking at
18  that may have been communicated either with the
19  attorneys that were working on the deal for CCMI.
20         I don't specifically recall an exact
21  communication or phone call or a note regarding due
22  diligence but that would be a way that I may have

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

| Page 62 | Page 64 |
|---|---|

**Page 62**

1  been involved.
2      Q.    Do you know a gentleman by the name
3  of Gary Beck?
4      A.    I don't recall.
5          MR. RICH:  Mark this, please, as
6  the next exhibit.
7          (Exhibit DeVoe-14, memo dated
8      6-17-99, Bates NAM03611-616, received
9      and marked for identification.)
10     Q.    Mr. DeVoe, I show you what's been
11 marked for the record as DeVoe Exhibit 14, which is
12 Bates stamped NAM03611 to 03616.
13         Do you see that?
14     A.    Yes.
15     Q.    Does looking at Exhibit 14 refresh
16 your memory as to who Mr. Beck is?
17     A.    It doesn't.
18     Q.    Okay.
19         Do you have a memory of receiving
20 this memo?
21     A.    I don't.  I see it's addressed to me.
22 I assume I did receive it and I looked at it at the

**Page 63**

1  time.
2      Q.    This document is entitled CCMI
3  Credentials Meeting.
4      A.    I see that.
5      Q.    Are you familiar with what a
6  credentials meeting is?
7      A.    I don't know why he used that word.
8      Q.    Okay.
9          Generally flipping through this
10 document, do you see it as a memo summarizing his
11 analysis and discussions with various CCMI people?
12         MR. KATZ:  Can we have the question
13     read back, please?
14         MR. RICH:  I'll withdraw it and ask a
15     new one if you want.
16         MR. KATZ:  Okay.
17     Q.    Flipping through DeVoe Exhibit 14, do
18 you generally understand it to be a memo provided to
19 you concerning Mr. Beck's observations in meetings
20 with various folks at CCMI?
21         MR. KATZ:  Objection.  I think he
22     testified that he doesn't recall ever

**Page 64**

1      seeing it.
2          MR. RICH:  I'm asking him to look
3      at it now.
4          MR. KATZ:  Okay.
5      A.    (Examining document.)
6          Yes, it appears to be a summary of --
7  it looks to be notes and his viewpoints on the
8  meeting he had at the company.
9      Q.    Turning to the second physical page,
10 he writes at the top, "The most valuable asset this
11 firm brings to the table is potentially their equity
12 in the marketplace.  Their collective relationships
13 could be carefully assessed as part of the due
14 diligence process."
15         Did you share his opinion?
16     A.    No.
17     Q.    Did you ever create a document or a
18 memo agreeing with that?
19     A.    No.
20     Q.    Are you aware of any such document?
21     A.    No.
22     Q.    Why do you disagree that the most

**Page 65**

1  valuable asset of CCMI is their equity in the
2  marketplace?
3      A.    What I stated as, to go back to
4  Exhibit 13, in my note the most valuable asset at
5  least that I viewed at the time was the software
6  development.  It was essentially a good investment,
7  almost like a research and development investment in
8  some respects.
9      Q.    Did you agree, putting aside whether
10 it was the most valuable asset, did you agree in
11 1999 that a valuable asset of CCMI was their equity
12 in the marketplace?
13     A.    We didn't assign much value to the
14 CCMI brand.
15     Q.    Okay.
16         What, if anything, did you do to
17 assess CCMI's brand equity?
18     A.    I don't recall.
19     Q.    Now, the next paragraph says, looking
20 at page 2, "Overall an acquisition of CCMI is
21 totally consistent with the e/Direct initiative."
22         Are you familiar with an e/Direct

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

Page 66

1  initiative?
2      A.    I don't recall the e/Direct
3  initiative.
4      Q.    Do you agree that the acquisition of
5  CCMI was consistent with --
6      A.    I don't know because I don't remember
7  the e/Direct initiative.
8      Q.    Okay.
9            Do you have any idea how Mr. Beck
10  would have been familiar with, using the terminology
11  e/Direct initiative?
12           MR. KATZ: Objection.
13      A.    I don't remember Gary Beck.
14      Q.    Okay.
15           Well, do you understand generally
16  whether you've heard the term e/Direct, you
17  understand that part of -- strike that.
18           Direct marketing through electronic
19  means, are you familiar with that concept?
20      A.    Yes.
21      Q.    And that was what PlanetU was
22  proposing to do.  Correct?

Page 67

1      A.    Yes.
2      Q.    Do you agree that CCMI's, the
3  acquisition of CCMI was consistent with an attempt
4  or an effort to enter into the e-marketing field?
5           MR. KATZ: Objection.  You can
6  answer.
7      A.    I think, again, the main benefits,
8  one of the areas we were evaluating was the
9  opportunity to become more involved in targeted
10  marketing.  Whether that marketing was delivered
11  through direct mail as historically was done or
12  potentially being able to do that and deliver it
13  through some other means, I think in that respect if
14  it was able to be delivered through some other means
15  electronic, then I guess it would be similar, yes.
16      Q.    Okay.
17      A.    But I think initially the foundation
18  was focused on the targeted marketing aspect of the
19  business, being able to do that.
20      Q.    Was Lockland Murdock involved in
21  discussions concerning the acquisition of CCMI?
22      A.    I don't remember.

Page 68

1      Q.    What was Lockland Murdock's position
2  at News Corp. in the late 1990s?
3      A.    I don't know his exact title.  I
4  believe at the time the acquisition was completed
5  that Paul Carlucci reported to Lockland.
6      Q.    And you have no memory one way or
7  another whether Mr. Lockland Murdock was involved in
8  discussions relative to the acquisition of CCMI?
9      A.    I don't remember.
10      Q.    Were there other individuals from
11  News Corp. or News America Marketing who were
12  involved in discussions concerning the decision to
13  go forward with the acquisition of CCMI?
14      A.    I don't remember.
15      Q.    How about discussions with Mr. Nallen
16  and Mr. Jacobs?  Do you remember discussing your
17  memo with them at any point in time?
18      A.    I don't remember discussing the memo
19  or the acquisition with them, but clearly I sent
20  them a note on it.  I just don't remember.
21      Q.    But you don't remember receiving any
22  feedback either orally or in writing from either of

Page 69

1  these individuals?
2      A.    No.  I don't remember where the
3  feedback came from to receive.  It may have gone
4  directly to Paul.  I just don't recollect.
5      Q.    Well, what feedback, if any, did you
6  get from Mr. Carlucci concerning your memo?
7      A.    I don't remember the exact feedback.
8      Q.    How about generally?  Do you remember
9  the general feedback you received?
10      A.    Generally we were allowed to proceed.
11      Q.    Did he place any restrictions on your
12  ability to proceed?
13      A.    I don't remember.  I don't remember
14  the exact conversation we may have had on the deal.
15      Q.    Did you have free reign to negotiate
16  a deal with CCMI?
17      A.    No.
18      Q.    Okay.
19           Who was the ultimate decision-maker
20  or decision-makers relative to the transaction?
21      A.    I would state that we received
22  approval to move ahead with the offer generally as I

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                          New York, NY

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  outlined in the memo of May 14th.
2          To the extent that we were going to
3  move forward and close generally on those terms,
4  this would have been something that Paul and I would
5  have discussed and moved forward with.
6          To the extent the terms changed
7  substantially, we would have had to go back and most
8  likely discuss it again with someone at the News
9  Corp. office.
10     Q.    Whose permission did you need to have
11 the ability to extend a verbal offer?
12     A.    I don't recall.  I most likely
13 discussed it with Paul.
14     Q.    And Paul was in agreement that you
15 could extend a verbal offer?  And by Paul I mean
16 Paul Carlucci.
17     A.    I don't remember.
18     Q.    Well, I take it you wouldn't have
19 extended a verbal offer to CCMI on May 7th, 1999
20 without some approval.
21          Is that correct?
22     A.    Correct.

**Page 71**

1     Q.    And my question to you is who
2  provided you with the approval?
3     A.    I don't recall.
4     Q.    How was the approval provided to you?
5     A.    I don't recall.
6     Q.    In your experience with News America
7  Marketing or News Corp. is there a manner in which
8  approvals to make, potentially make a $3 million
9  investment, is there a manner in which approvals are
10 sought and obtained?
11     A.    I don't recall exactly the timing of
12 the approvals, how it related to this entity.
13 Before I would have made a verbal offer, Paul and I
14 would have discussed it.  Whether we discussed it
15 with anyone at News Corporation at that time I just
16 don't recall.
17     Q.    Okay.  My question was a little
18 different.  Was there a practice -- strike that.
19 I'm going to ask you a different question.  I
20 withdraw the one from two before.
21          Was there a practice or procedure
22 which News America Marketing or News Corp. follows

**Page 72**

1  in situations where a substantial investment is
2  proposed to be made in an asset?
3          MR. KATZ:  Objection.
4     A.    When?
5     Q.    Let's say in the 1999 time period.
6     A.    I don't recall.
7     Q.    How about now?
8          MR. KATZ:  Objection.
9     A.    I don't recall the exact levels.
10 There are certain levels of investments where it
11 gets reviewed by News Corporation.
12     Q.    And I take it by virtue of the fact
13 that you were sending this memo to Mr. Nallen and
14 Mr. Jacobs that this type of investment required
15 some form of assent from News Corp.
16     A.    Yes.
17     Q.    Are you aware of an actual
18 presentation that was made to News Corp. for the
19 CCMI investment?
20     A.    I don't recall.
21     Q.    Do you remember a presentation that
22 was made to News Corp. which concerned PlanetU,

**Page 73**

1  SoftCard, and CCMI?
2     A.    I don't recall.
3     Q.    Is there a typical practice employed
4  by News Corp. as to how their assent to move forward
5  with a particular proposal is articulated either in
6  writing or verbally?
7          MR. KATZ:  Objection.
8     A.    What do you mean by typical practice?
9  I only have relevance to the divisions I work in so
10 I can't propose to understand what happens in other
11 parts of the company I have no exposure to.
12     Q.    That's a fair comment.
13          Given your experience and the
14 projects that you have been involved with, is there
15 a typical practice or procedure that News Corp.
16 follows when its approval to proceed with a
17 prospective transaction is provided?
18     A.    In investments that I'm involved in,
19 I typically will discuss those with whoever my boss
20 is at the time.  And depending on the size of the
21 investment and the nature of the investment and kind
22 of where we are in the process, there's a dialogue

                                    19 (Pages 70 to 73)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

|  | Page 74 |
|---|---|

```
 1   at a certain level that occurs with certainly some
 2   individuals of News Corporation.
 3         Q.     And does that approval or disapproval
 4   manifest itself in writing?
 5         A.     No, not always.
 6               MR. KATZ:  Dave, you're obviously
 7   free to ask relevant questions and all that,
 8   but I'm just suggesting that you're getting
 9   pretty far afield with this piece.
10               MR. RICH:  I am simply trying to
11   ascertain whether there was a written
12   communication between News Corp. and
13   News America Marketing relative to this
14   transaction, and he testified that he didn't
15   know so I'm inquiring as to whether there
16   is a protocol or procedure in place at
17   News Corp. as to how this is done.
18               MR. KATZ:  And I think he's pretty
19   much answered.
20         Q.     Focusing back to Exhibit 14, at the
21   middle of the page it says, "Bill Adams seems like a
22   key asset within the company."
```

|  | Page 75 |
|---|---|

```
 1               Do you see that?
 2         A.     Yes, I see it.
 3         Q.     Do you know who Bill Adams is?
 4         A.     Yes, I know who Bill Adams is.  He
 5   was the, I don't know his exact position but I
 6   believe he was head of the software development, the
 7   IT area of the company.
 8         Q.     Did you share Mr. Beck's opinion that
 9   Bill Adams was a key asset of CCMI?
10         A.     I believe Bill was an important
11   asset.
12         Q.     I promised we'd return to Exhibit 13.
13   Let's get back to that.  The middle of page 2 of
14   Exhibit 13, do you see the reference to the
15   management team?
16               Do you see that?
17         A.     Yes.
18         Q.     And you note that Mr. Fireman and
19   Ms. Raider both have developed strong relationships
20   with retailers and packaged good manufacturers based
21   upon their expertise in data management and targeted
22   marketing?
```

|  | Page 76 |
|---|---|

```
 1               Do you see that?
 2         A.     Yes.
 3         Q.     From where did you obtain that
 4   information?
 5         A.     I don't know from where we obtained
 6   that information.  That was our opinion as of the
 7   time we wrote this.
 8         Q.     At the bottom of the page in section
 9   2, you write, "CCMI's consulting and marketing
10   services are strategically important because the
11   company offers highly tangible promotion services
12   not readily available in the marketplace today."
13               Do you see that?
14         A.     Where is that?
15         Q.     Paragraph 2, first bullet point.
16         A.     Number 2, full service provider.
17         Q.     Exactly.  Let me ask the question
18   again.
19         A.     I see it.
20         Q.     Why don't you just read that section
21   and then tell me when you're ready.
22         A.     (Examining document.)
```

|  | Page 77 |
|---|---|

```
 1               I've read it.
 2         Q.     You'd agree with me that it was your
 3   view in May of 1999 that CCMI was offering services
 4   that weren't readily available in the marketplace?
 5         A.     That was our view.
 6         Q.     And you felt that that was
 7   strategically important to News America Marketing?
 8               MR. KATZ:  Objection.
 9         A.     (Examining document.)
10               Again I would look at that as
11   something that's strategically important as we
12   looked at the business trying to expand it to the
13   targeted marketing business.
14         Q.     The next bullet point talks about
15   News America's strong relationship with supermarket
16   retailers and consumer packaged goods manufacturers
17   and the fact that those relationships offer
18   significant expansion opportunities for CCMI.
19   Right?
20         A.     That's what it says.
21         Q.     And that was your belief?
22         A.     That was our hope.
```

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

Page 78

1      Q.    Now, the fourth bulleted paragraph
2   states, "By leveraging a coordinated sales effort,
3   New America's sales force will be trained to
4   incorporate CCMI's products into its single source
5   portfolio."
6          First of all, what CCMI products were
7   you referring to in this bullet point?
8      A.    I don't remember.  I don't know if
9   those products existed or if those products were
10  going to be created.
11     Q.    Okay.
12         Well, your memo doesn't speak to
13  products.  It speaks in the present tense.
14         Is that correct?
15     A.    I don't recall what those products
16  are.
17     Q.    Okay.
18         And was it your intention in May
19  of 1999 that the News America sales force would be
20  trained to incorporate CCMI's products into their
21  portfolios?
22     A.    That was the opportunity we

Page 79

1   highlighted, yes.
2      Q.    And that was your expectation?
3          MR. KATZ:  Objection.
4      A.    I think that was the opportunity.
5      Q.    Well, what's the difference between
6   an opportunity and an expectation from your
7   perspective?
8      A.    These are opportunities that we
9   thought we were going to move forward with.  Whether
10  we were going to be successful at doing some of
11  these things or not is open to interpretation.
12     Q.    But I take it these were
13  opportunities that you expected to take advantage of
14  in moving forward.
15     A.    These were opportunities that we
16  looked at attempting to pursue, yes.
17     Q.    Did you ever tell anyone that you saw
18  CCMI as a $100 million business?
19     A.    I don't recall saying that.
20     Q.    Do you remember Ms. Raider or
21  Mr. Fireman providing you with a business plan?
22     A.    I don't remember.

Page 80

1      Q.    Okay.
2          And do you remember them providing
3   you with proposed projections, financial
4   projections?
5      A.    Yes.  I believe I stated that at our
6   first meeting they had projections that they were
7   hoping the business would grow to.
8          MR. RICH:  Let me mark this as
9   the next exhibit.
10         (Exhibit DeVoe-15, printout of
11   PowerPoint presentation entitled Three
12   Essential Elements, Bates FR4897-4901,
13   received and marked for identification.)
14     Q.    We've marked as DeVoe Exhibit 15 a
15  document which is Bates stamped FR4897 through 4901.
16         Do you see that?
17     A.    Yes.
18     Q.    Do you have any memory of seeing this
19  document?
20     A.    I don't.
21     Q.    Is it your testimony that you don't
22  have any memory one way or the other as to whether a

Page 81

1   PowerPoint presentation was made to you in your
2   initial meeting?
3      A.    I don't remember.
4      Q.    You do remember that Ms. Raider was
5   big into PowerPoint presentations I take it?
6          MR. KATZ:  Objection.
7      A.    I don't remember.
8      Q.    Flipping through Exhibit 15 doesn't
9   refresh your memory that at least these materials
10  were provided to you in the initial portion of
11  your --
12     A.    I just don't remember.
13         MR. RICH:  Mark this, please, as
14   the next exhibit.
15         (Exhibit DeVoe-16, document entitled
16   SG&A Expenses, Bates FR3461, received and
17   marked for identification.)
18         MR. RICH:  Mark this, too, please.
19         (Exhibit DeVoe-17, document entitled
20   Revenue Assumptions, Bates FR4889, received
21   and marked for identification.)
22     Q.    Mr. DeVoe, I'm showing you two

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

Page 82

1   documents, one which we've marked as DeVoe Exhibit
2   16 and the second is DeVoe Exhibit 17, Bates stamped
3   FR3461 and FR4889 respectively.
4        Q.    Do you have any memory of seeing
5   these documents before?
6        A.    I don't.
7        Q.    Do you have any memory of receiving
8   documentation reflecting financial forecasts on both
9   the revenue side and the expense side from CCMI?
10       A.    No, I don't recall the specific
11  documentation.  I know when we were negotiating the
12  earn-out, there was dialogue on the gross profit
13  percentage.  I don't specifically recall this.
14       Q.    You recognize these, recognizing that
15  you don't have a specific memory, as being forecast
16  or projections going forward.  Correct?
17       A.    Yes.  They look to be projections.
18       Q.    You don't have a memory of ever
19  receiving any kind of forward-looking projections
20  from folks at CCMI in the 1999 time period?
21            MR. KATZ:  Objection.
22       A.    I remember they had the, when we

---

Page 83

1   first met they had a projection of the business
2   where they thought the business was going to develop
3   and grow to what their forecast was for.  I just
4   don't remember the specific level of detail that was
5   provided or the information that was provided along
6   with that.
7        Q.    Do you recall ever telling Ms. Raider
8   or Mr. Fireman that you thought News America could
9   deliver on their business plan?
10            MR. KATZ:  Objection.
11       A.    No, I don't recall.
12       Q.    Did you have any discussions with
13  them to the best of your recollection about their
14  business plan or their business model?
15            MR. KATZ:  Objection.
16       A.    I don't remember specifically
17  discussing their business model with them.
18       Q.    Okay.
19            You would agree with me that the
20  earn-out component of the stock purchase agreement
21  has a five-year earn-out?
22       A.    I would have to go back and look.

---

Page 84

1        Q.    We'll come back to that.
2             I apologize if I asked this before
3   but sitting here today you don't have any
4   independent memory of what you did to study the
5   industry that CCMI was in before you undertook
6   the --
7        A.    I don't.
8        Q.    But generally you understand that
9   some industry knowledge was acquired by your group
10  in moving forward?
11       A.    I would suggest that given the size
12  of the investment, relatively small investment for a
13  company of our size and previously I talked about
14  this as potentially maybe an R&D investment in some
15  respects because we were buying software and we were
16  hoping that this business could grow into something
17  larger that I'm not really sure exactly how much
18  industry information or study was completed.
19       Q.    Did you put any value in CCMI's
20  knowledge of gathering data from the retailer's
21  point of sale?
22       A.    We put $3 million of value on the

---

Page 85

1   company and we were certainly prepared to pay more
2   than that if the business performed certainly how
3   CCMI hoped it would perform and how we were hopeful
4   it would perform.
5        Q.    What, if anything, did your due
6   diligence team do to verify the finances and the
7   financial documentation of CCMI?
8        A.    I don't recall the specific
9   information that was evaluated.  I do remember
10  sending individuals from the News America Marketing
11  finance group to go up and perform due diligence
12  procedures, which I assume we provided them with a
13  due diligence list, and they provided us with
14  information.  And we went through that and certainly
15  typically in the process you may have things that
16  are unresolved or resolved and I don't know what the
17  end result of that diligence process was.
18       Q.    Do you have any memory of a specific
19  issue that arose during the due diligence process,
20  something you weren't receiving that you thought you
21  needed?
22       A.    I don't recall a specific issue.

---

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

---

Page 86

1  Clearly we felt we were comfortable to close the
2  deal based on the information that we had or didn't
3  have and we were prepared to take the risk to the
4  extent there was information out there that we did
5  receive.
6       Q.    Did Mr. Rubin have an opinion as to
7  whether to go forward with the acquisition?
8       A.    Yes.  Jon was supportive of the
9  acquisition.
10      Q.    Did he explain to you why he was
11 supportive of the acquisition?
12      A.    I don't recall his exact rationale or
13 his reasons.
14      Q.    What about in a general sense?
15      A.    I just don't remember.
16      Q.    How about Mr. Lellouche?  Was he
17 supportive of the idea?
18      A.    I don't recall Henry's opinion.
19      Q.    Did you have an opinion as to the
20 projected finances prepared by CCMI?
21      A.    Can you clarify?
22      Q.    Sure.  Let's go back to Exhibit 13.

---

Page 87

1  On page 3 there's a reference in the middle of the
2  page to CCMI's model and the assumptions that CCMI
3  was making.
4       A.    Yes.
5       Q.    Did you have an opinion about their
6  model?
7            MR. KATZ:  Objection.
8       A.    I don't recall a specific opinion.
9  I know the results we had were less than what they
10 had.
11      Q.    So you have no memory of feeling as
12 if their model was unrealistic or realistic or
13 somewhere in between?
14      A.    I would say my general feeling of
15 their model and our model was progressive.  We were
16 talking about a business that was not making much
17 money growing into a much larger business making
18 more money, so those were aggressive assumptions.
19      Q.    And did you articulate the fact that
20 you believed the assumptions to be aggressive in any
21 document?
22      A.    Unless it's in the documents that are

---

Page 88

1  here, I just don't recall.
2       Q.    Do you remember having any
3  communications with any representative of CCMI in
4  which you informed them that their model was
5  aggressive?
6       A.    I don't remember that.
7       Q.    How much did News America pay for
8  PlanetU?
9       A.    I don't recall the specific amount.
10      Q.    Was it in excess of $20 million?
11      A.    I don't recall the specific amount,
12 but I believe the total amount was in excess of
13 20 million, yes.
14      Q.    And SoftCard was about 7 million?
15      A.    Again I don't recall the specific
16 amount.  I believe it was higher than 5 million,
17 though.
18      Q.    Okay.
19            And as part of the overall strategies
20 you described generally in Exhibit 13 to start an
21 Internet coupon site?
22      A.    I think we were evaluating doing

---

Page 89

1  that, yes.
2       Q.    And that ultimately became
3  smartsource.com?
4       A.    Sounds right.  It sounds correct.
5       Q.    You have no memory of having any
6  discussions with Ms. Raider or Mr. Fireman about
7  funding their business plan?
8       A.    What do you mean by funding?
9            MR. KATZ:  Objection.
10      Q.    Well, providing them with the
11 financial resources necessary as set forth in their
12 business plan.
13      A.    All I can remember is what we set
14 forth -- I mean the only thing I would suggest is
15 what was set forth in the final agreement, what we
16 agreed to.
17      Q.    Okay.  But beyond what was set forth
18 in the final agreement, you have no independent
19 memory sitting here today of discussions that may
20 have occurred relative to the business plan or the
21 funding of the business plan?
22      A.    No.  Any commitment or funding would

---

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  have been negotiated in the final agreement.
2      Q.    My question is a little different.
3          I'm asking about communications that
4  you may have had separate and distinct from what may
5  or may not have ended up in the final agreement.
6      A.    I don't remember. I don't remember
7  the communication of me -- there was communication,
8  discussion, and negotiation regarding the topic of
9  what they thought they needed to run the business.
10     Q.    Okay.
11         And are you able to recall the
12  details of any of those conversations?
13     A.    No.
14     Q.    Did those communications typically
15  occur over the telephone or in person?
16         MR. KATZ: Objection.
17     A.    I don't remember.
18     Q.    Okay.
19         Were there multiple communications to
20  the best of your memory?
21     A.    To the best of my knowledge there was
22  a lot of dialogue with Mr. Les Charms.

**Page 91**

1      Q.    Okay. And I think it's actually
2  singular, Charm.
3          (Whereupon, a discussion was held
4      off the record.)
5      Q.    You understood Mr. Charm to be whom?
6      A.    I understand he was representing Ann
7  and Bob along with Goodwin Procter, I believe.
8      Q.    Was he your primary contact on the
9  CCMI side relative to negotiating business terms?
10     A.    Yes.
11     Q.    Were there other people with whom you
12  discussed and negotiated business terms?
13     A.    I believe we had calls where Les was
14  on the call along with Ann and Bob and I would be on
15  the phone with Jon Rubin, and there were other
16  calls, I guess, where our respective outside
17  counsels also were involved in dialogue.
18     Q.    Do you remember having any -- and
19  this is leading up to the August 13th, 1999
20  execution of the stock purchase agreement -- did you
21  have private communications with either Ms. Raider
22  or Mr. Fireman?

**Page 92**

1      A.    I don't recall.
2      Q.    You don't recall one way or another?
3      A.    No.
4      Q.    I take it from your previous answer
5  there were a number of conversations that you
6  participated in relative to the business terms?
7      A.    Conversations and email if I
8  remember.
9      Q.    We'll get to the documentation
10  shortly but does anything stand out in your mind as
11  being particularly memorable relative to your
12  discussions with Les Charm concerning business
13  terms?
14     A.    The only thing I would point out is
15  because we were getting near the end of the deal and
16  we were going to make a decision on whether we were
17  going to proceed or not to go forward with the -- we
18  were in the process and we had been negotiating for
19  a while and we just had to decide if we were going
20  to get the deal done or not.
21         There was a term that Les objected to
22  fairly strongly in the document that enabled

**Page 93**

1  News America to have significant flexibility on how
2  they ran the business and I remember Less stating to
3  Ann and Bob that he thought this was problematic and
4  letting them know that he wasn't sure if they should
5  go forward under this because he thought it could
6  impact their ability to run the business.
7          I think at the time we talked about
8  why we needed it, and at the time I think our view,
9  we told him, is that we were trying to move forward
10  on the business and we were hopeful that we were
11  able to build the business together going forward
12  but ultimately we were buying the business and we
13  needed flexibility and in how we were going to run
14  the business.
15         That was a critical point as we got
16  near the end of the deal and it's just memorable
17  because I think it was kind of it was either we were
18  going to do the deal or we weren't going to do the
19  deal. That in particular was a concern for them.
20     Q.    Now, was this a single conversation
21  to your memory or was it a series of conversations?
22     A.    The conversation I remember was a

24 (Pages 90 to 93)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                          June 13, 2007
New York, NY

---

Page 94

1  conference call.  I think it was Jon Rubin and
2  myself in my office in, I think it was in Norwalk,
3  Connecticut at the time, and I believe Les, Ann, and
4  Bob.  I don't know, again, the locations, if they
5  were together or not.
6       Q.    Okay.
7            And this is when the conversation as
8  you described it where Mr. Charm was objecting
9  fairly strongly to a provision that provided NAM
10  significant flexibility.
11            Is that correct?
12       A.    Yes.  His issue was that issue.  A
13  lot of the other time was really focused on the
14  gross profit calculation.  Those were the two
15  points, as I remember, spending time on with him.
16       Q.    And I think you said that Les
17  objected fairly strongly and told Ann and Bob this
18  was problematic?
19       A.    Yes.
20       Q.    And he told them that in your
21  presence or he told you that he had told them that
22  prior to the conference call?

Page 95

1       A.    On the phone.  It was an issue.  It
2  was an issue from a negotiation point that he was
3  representing that it may be a very difficult one to
4  get over.
5       Q.    Okay.
6            And was he having -- and I apologize
7  for what may be a mundane question -- was Mr. Charm
8  having this discussion with Ms. Raider and
9  Mr. Fireman while you were on the phone or was he
10  recounting to you a prior conversation he had
11  had with them?
12       A.    While we were on the phone.
13       Q.    And what was Ms. Raider and
14  Mr. Fireman's response to Mr. Charm's comment that
15  this was problematic?
16       A.    I remember them taking a break to
17  talk about it.
18       Q.    Okay.
19            And did the conference call
20  terminate?
21       MR. KATZ:  Ever?
22       A.    I don't recall exactly.  I believe

Page 96

1  that we did get back on the phone.  It was an
2  outstanding issue.
3       Q.    So ultimately when the conference
4  call resumed, what, if anything, did Mr. Charm,
5  Ms. Raider, or Mr. Fireman say about this concern
6  that Mr. Charm had raised?
7       A.    I think they were going to -- it
8  wasn't something that they could resolve at that
9  point.  It was something that they had to take under
10  further consideration.
11       Q.    Okay.
12            And do you remember any follow-up
13  conversations substantively about this point with
14  anybody on the CCMI side?
15       A.    No.
16       Q.    You never heard back from them one
17  way or the other as to whether --
18       A.    We did hear back because it ended up
19  the term was accepted in the agreement.  I just
20  don't recall any specific -- I'm certain there must
21  have been conversations after that point regarding
22  that particular language in the document.  I just

Page 97

1  don't recall specific conversations.
2       MR. RICH:  Mark this, please, as
3  the next exhibit.
4       (Exhibit DeVoe-18, 1-page fax
5  transmittal sheet dated 7-7-99, 1-page
6  document entitled CCMI Acquisition Open
7  Business Issues, and four fax log reports,
8  received and marked for identification.)
9       Q.    Mr. DeVoe, I show you what's been
10  marked as Exhibit 18.  It references a
11  teleconference going forward on July 8, 1999 and
12  then identifies some open business issues on page 2.
13            Seeing this document, does this
14  refresh your memory that the conference call which
15  you were referring to was a conference call held on
16  July 8 or could it have been another?
17       A.    I'm not certain.
18       Q.    Paragraph 5 of the open business
19  issues identifies conduct of business post-closing
20  and the buyer's obligation to support the business
21  during the earn-out period.
22            Do you see that?

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

Page 98

1    A.    Yes.
2    Q.    And seeing this open issue, is
3   this -- it seems this issue doesn't refresh your
4   memory that the conversation which you were
5   recounting was the conversation held in the
6   conference call on July 8?
7    A.    I don't remember.
8    Q.    What, if anything, do you remember
9   discussing on the conference call on July 8
10   concerning the buyer's obligation to support the
11   business during the earn-out period?
12    A.    I don't remember any details from
13   this particular call.  I can't recall if it was the
14   same call I'm referring to or not.  I just don't
15   know.
16    Q.    Putting aside whether there was a
17   conference call or not a conference call or the date
18   of the conference call, do you have a recollection
19   of having discussions with any individuals on CCMI's
20   side relative to the buyer's obligation to support
21   the business during the earn-out period?
22    A.    My recollection is there were areas

Page 99

1   that we were going to attempt to, areas in which we
2   were hoping to support the business, yes,
3   post-closing.  I think from the point of keeping the
4   business moving and where we wanted to head with the
5   business, I think there were a variety of different
6   areas we wanted to explore.
7    Q.    Okay.
8         What were those?
9    A.    I think if I recall one area was,
10   again, utilizing the sales force in News America
11   Marketing to promote the product.  And as follow-up
12   to that, I think there were going to be areas where
13   I think primarily Ann on that one was going to try
14   to take the lead working with the News America sales
15   force to see what kind of progress we could make.
16         There was another area, again which I
17   think was referenced in the other memo, where we
18   were trying to from a retail standpoint see what we
19   could do on a retailer standpoint to have better
20   relationships to get access to their data, manage
21   their data, and look at opportunities to utilize
22   that data for marketing solutions, utilize the data

Page 100

1   for marketing solutions.
2         And I think there was an area where
3   the business needed further investment from a
4   software standpoint.  I think we looked at investing
5   in the business from a capital, investing capital in
6   the business.
7    Q.    These were areas of discussion that
8   went on leading up to the execution of the stock
9   agreement?
10    A.    That was an ongoing dialogue, yes.
11    Q.    And I take it that was an issue that
12   was of some importance to Ms. Raider and
13   Mr. Fireman?
14         MR. KATZ:  Objection.
15    A.    You have to ask them.
16    Q.    Okay.
17         And did they tell you that these were
18   important aspects of the deal from their perspective
19   going forward?
20    A.    I don't recall.
21    Q.    Squadron, Ellenoff was acting as
22   counsel to News America?

Page 101

1    A.    Yes.
2    Q.    And particularly Ms. Wolfe?
3    A.    Yes.
4    Q.    The open business issues document
5   prepared by her reflected the conduct of the
6   business post-closing?
7    A.    That's right.
8    Q.    And so it was a concern to at least
9   someone how the business was going to be conducted
10   post-closing?
11    A.    Yes.  As I stated earlier, there were
12   a lot of areas which we wanted to work with CCMI in
13   building the business.
14         We also stated as we were finalizing
15   the agreement that ultimately we needed flexibility
16   to manage the business and run the business
17   ultimately as we saw appropriate.
18    Q.    Who did you tell that to?
19    A.    I believe it was in the final
20   agreement.
21    Q.    Okay.
22         Who did you tell that to other than

26 (Pages 98 to 101)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  having it listed in the final agreement?
2      A.    That subject came up on the same
3  conference call that I referenced earlier.
4      Q.    Did it come up any other times?
5      A.    I don't remember any other specific
6  other time.
7      Q.    Okay.
8          The issues about supporting the
9  business that you mentioned, the sales force and the
10  other two items, were those issues that recurred
11  throughout these negotiations?
12      A.    I don't know how often they were
13  discussed.  I believe they may have been in the
14  agreement at some point.
15      Q.    Okay.
16          Do you remember them being discussed
17  orally between and among CCMI and News America?
18      A.    I remember them being discussed as
19  part of the negotiation of the business and I know
20  in some of those areas we discussed them as it
21  impacted the gross profit calculation if I recall.
22      Q.    The discussions about further

**Page 103**

1  investment in the form of capital, do you remember
2  the specifics of what was being discussed or
3  contemplated?
4      A.    I remember that CCMI wanted a
5  specific amount of capital for us to agree to spend,
6  and I don't recall if we ever agreed to spend that
7  in the -- I don't recall if we ever agreed in the
8  document to do that or not.
9          I think my position during the
10  negotiation was, you know, capital has to get
11  approved through the company as we move forward and
12  CCMI might want a specific commitment.
13          I do not know how it ended up
14  manifesting itself in the agreement, if ultimately
15  News America Marketing agreed to spend a certain
16  amount or if CCMI agreed that capital would be spent
17  as approved going forward
18      Q.    Do you have any memory of CCMI
19  indicating to you how they would like the capital
20  expended?
21      A.    I don't remember.
22      Q.    Do you remember them talking about

**Page 104**

1  spending money to enlarge their staff?
2      A.    I don't remember that.  I primarily
3  recall, I remember the specific request for capital
4  investment.
5          I don't recall any specific request
6  on staff other than there may have been projections
7  as we calculated the percentage of gross profit what
8  we thought staffing levels might be as it impacted
9  the gross profit calculation.
10      Q.    But just to close the loop, you don't
11  have a specific memory about communications with
12  Ms. Raider or Mr. Fireman beyond just wanting
13  capital, how that capital would be spent?
14      A.    I don't recall the specifics of how
15  they proposed to spend it.
16      Q.    Okay.
17          How about communications with CCMI
18  prior to the execution of the stock agreement about
19  CCMI being run as an autonomous division?
20          Do you remember having any
21  conversations with Ms. Raider and Mr. Fireman about
22  that?

**Page 105**

1      A.    No, I don't recall us ever agreeing
2  to or having a conversation about being autonomous
3  from News America Marketing.
4      Q.    Okay.
5          Do you have any recollection of
6  discussing with Ms. Raider or Mr. Fireman or
7  Mr. Charm Ms. Raider or Mr. Fireman running and
8  managing CCMI going forward?
9      A.    I recall that part of the agreement
10  that we executed employment agreements that Ann and
11  Bob wished to stay in Boston.
12          I recall having dialogue as it
13  relates to kind of the business and the structure
14  and where there may be efficiencies as it relates to
15  doing certain functions out of Connecticut.
16          And I think the employment agreements
17  that were done suggested that Ann and Bob were going
18  to be involved in running the business.
19      Q.    My question is a little bit different
20  and I want to focus you on communications that you
21  had with Ann or Bob or Les Charm prior to executing
22  the stock purchase agreement concerning their roles

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

Page 106

1  in CCMI going forward.
2      A.    I don't remember specific
3  conversations.
4      Q.    As long as you mentioned the issue
5  about staying in Boston, do you remember that
6  specifically coming up in conversations prior to the
7  stock agreement being signed?
8      A.    I remember they, I believe, as I
9  mentioned before, we talked about, I believe there
10 was dialogue about having some of those functions
11 and doing certain functions in Connecticut.
12        And the issue did come up that Ann
13 and Bob wanted to make sure that they were going to
14 stay in Boston.  They didn't want to be in a
15 position where they had to be moved to Connecticut.
16     Q.    And what was the response from
17 News America's side?
18     A.    We agreed to let them I believe
19 operate out of, Ann and Bob operate out of Boston.
20        MR. RICH:  Why don't we break for
21     lunch.
22        (Luncheon recess taken from

Page 107

1      12:19 p.m. to 1:09 p.m.)
2        (Rest of page intentionally left
3  blank.)

Page 108

1        A F T E R N O O N   S E S S I O N
2  D A V I D  F.  D e V O E, JR.,
3      conducting business at
4      Fox Entertainment Group, Inc.,
5      101 West Pico Boulevard,
6      Building 100, Room 5120,
7      Los Angeles, California 90035-0057,
8      residing at 51 Colony Road,
9      Westport, Connecticut 06880,
10     having been previously duly sworn by the notary
11     public, continued to be examined and testified
12     as follows:
13 CONTINUED EXAMINATION BY MR. RICH:
14     Q.    Good afternoon, Mr. DeVoe.
15     A.    Good afternoon.
16     Q.    When we broke, we were in the midst
17 of discussing communications that were ongoing
18 relative to the negotiation of the stock purchase
19 agreement.  Do you remember that testimony
20 generally?
21     A.    Yes.
22     Q.    Okay.

Page 109

1        I want to show you a few email
2  communications that you had.
3        (Exhibit DeVoe-19, email dated
4      6-23-99, Bates NAM01298, received and
5      marked for identification.)
6      Q.    Mr. DeVoe, I show you what's been
7  marked as Exhibit 19, which is Bates stamped
8  NAM01298, an email exchange between yourself and
9  Mr. Charm on June 23rd, 1999.
10        Do you see that?
11     A.    Yes.
12     Q.    And specifically I draw your
13 attention to number 12 of Mr. Charm's email, which
14 is about three-quarters of the way down his email at
15 the bottom of the page.
16     A.    Yes.
17     Q.    It says, "Lastly Bob and Ann need a
18 statement that News America and the new CCMI will
19 undertake a best efforts to have its salespeople at
20 no cost to CCMI sell for CCMI and that New America
21 will not hinder CCMI and the shareholders from
22 earning additional purchase price."

28 (Pages 106 to 109)

DeVoe, Jr., David F.                                        June 13, 2007
                              New York, NY

Page 110

1          Do you see that?
2     A.    Yes.
3     Q.    And was that a discussion you recall
4  having with Mr. Charm either orally or via email?
5     A.    No, I remember not agreeing to it.
6     Q.    Okay.
7          And how was that disagreement
8  manifested?
9     A.    I don't think there's anything in the
10 agreement that states there's a best efforts -- I
11 mean I don't think there's anything in the agreement
12 that outlines what he's asking for.
13    Q.    Okay.
14         Do you remember having any
15 discussions about it?
16    A.    I remember them requesting it.  I
17 remember us rejecting it.  It doesn't appear I
18 addressed it up above when I responded to it.
19    Q.    Okay.
20         So do you recollect the manner in
21 which your refusal to provide these -- strike that.
22         Do you have a memory as to how you

Page 111

1  communicated to Mr. Fireman and Ms. Raider or
2  Mr. Charm that News America was unwilling to agree
3  to these terms?
4     A.    No.
5     Q.    Why was News America unwilling to
6  undertake to use its best efforts to have its
7  salespeople sell for CCMI?
8          MR. KATZ:  Objection.
9     A.    It was just at a point where we were
10 not going to agree to it.
11    Q.    Is there any reason why?
12    A.    We never agree to under a deal to
13 undertake best efforts.
14    Q.    So it's a matter of policy that
15 News America will never agree to use its best
16 efforts as a provision of a contract?
17         MR. KATZ:  Objection.
18    A.    I can't speak to that.  I don't know.
19    Q.    Okay.
20         Now, why wouldn't News America agree
21 that they wouldn't hinder CCMI and its shareholders
22 from earning the additional purchase price?

Page 112

1          MR. KATZ:  Objection.  You can
2  answer.
3     A.    I don't believe that's a clause that
4  we'd agree to under the deal.  As I mentioned
5  before, there are certain things that we had
6  aspirations to do, and ultimately we were pretty
7  clear we needed flexibility to operate the business.
8  And I believe these asked to be sufficient asked
9  that we would not agree to the -- I believe they
10 were sufficient asked.
11    Q.    I'm sorry.  I didn't understand you.
12    A.    He's asking for best efforts.
13    Q.    Okay.
14    A.    And we didn't agree to that.  And
15 then as far as what he meant, I don't believe I ever
16 got to the conversation with him as to what he meant
17 by not hinder CCMI and its shareholders from earning
18 an additional purchase price.  That would have been
19 a dialogue I guess we would have to have had with
20 him.
21    Q.    But you don't remember it?
22    A.    No.

Page 113

1     Q.    Was it News America's intent to
2  hinder CCMI and its shareholders from earning the
3  additional purchase price?
4          MR. KATZ:  Objection.
5     A.    No.
6     Q.    Okay.
7     A.    And we never did.
8     Q.    Okay.
9          MR. RICH:  We'll mark this as
10 the next exhibit.
11         (Exhibit DeVoe-20, 1-page email
12 dated 7-9-99 and 1-page attachment entitled
13 CCMI's Baseline Projections, Bates
14 NAM01391-1392, received and marked for
15 identification.)
16    Q.    Mr. DeVoe, I'm showing you a document
17 we've marked as DeVoe Exhibit 20, which is Bates
18 stamped NAM01391-1392.
19         Do you recognize this document as an
20 email with an attachment you sent to Mr. Charm on
21 July 9, 1999?
22    A.    Yes.

29 (Pages 110 to 113)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                        New York, NY

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    Q.    And this attaches a spreadsheet?
2    A.    Yes.
3    Q.    Was this a spreadsheet that you
4  prepared or someone in your office prepared on your
5  behalf?
6    A.    I'm not sure.
7    Q.    Okay.
8          But plainly you're attaching it?
9    A.    Yes.
10   Q.    And you're making some comments about
11 the net effect.  That's your word.  Yes?
12   A.    (Examining document.)
13         Yes.
14   Q.    Do you have a memory sitting here
15 today of where the information that was used to
16 prepare this spreadsheet came from?
17   A.    No.
18   Q.    Okay.
19         There's a reference under sales and
20 marketing for head count.
21         Do you see that?  It's the third
22 block down.

**Page 115**

1    A.    Yes.
2    Q.    What is head count?
3    A.    Those would be employees.
4    Q.    Okay.
5          And there's a reference in sales and
6  marketing, an expense item for trade shows.
7    A.    Yes.
8    Q.    And so would you agree with me that
9  you were at least contemplating through the
10 provision of this spreadsheet that the projections
11 in the budgets were as reflected in this document?
12   A.    These are projections.  I'm not sure
13 these are projections that my group did or
14 projections that CCMI proposed that are summarized
15 below.
16         I mean they're not agreed-upon
17 budgets.  They were projections used to negotiate
18 the earn-out percentage, the gross profit
19 percentage.
20   Q.    And so regardless of where the data
21 came from, these were numbers that were being used
22 to determine what certain gross margin numbers

**Page 116**

1  should be so that people would understand and
2  appreciate what the earn-out potential was?
3          MR. KATZ:  Objection.  You can
4  answer if you understand the question.
5    A.    (Examining document.)
6          I believe it's a document as a result
7  of a negotiation we had whereby what I recollect, I
8  believe in the Exhibit 13 document I may have
9  referenced a 12 percent earn-out and apparently in
10 this document we've agreed to increase the earn-out
11 for a specific reason.  I don't recollect the
12 specific reason.
13         It seems like it's part of a
14 negotiation where there's baseline projections
15 above.  It appears that selling and marketing costs
16 have been added with some projection of detail
17 below, and because of the addition of those costs
18 and the gross margin calculation that there is a
19 dialogue about increasing the earn-out percentage.
20 That's what it appears to be
21   Q.    Okay.
22         Nows, the first page references

**Page 117**

1  selling -- it says attached is the documents in
2  incorporating the selling and marketing as discussed
3  today.
4          Do you see that?
5    A.    Yes.
6    Q.    What were those discussions about
7  selling and marketing?
8    A.    I don't recall.
9    Q.    Okay.
10         Is it fair to say based upon the
11 exhibit attached that the selling and marketing that
12 you were discussing with Mr. Charm are reflected in
13 the exhibit that you attached to your email entitled
14 selling and marketing and margin?
15         MR. KATZ:  Objection.
16   A.    I'm not sure exactly what I talked
17 about with Mr. Charm exactly.
18   Q.    Okay.
19         MR. RICH:  Mark this, please, as
20 the next exhibit.
21         (Exhibit DeVoe-21, Stock Purchase
22 Agreement dated 8-13-99, Bates NAM04566-4623,

                                    30 (Pages 114 to 117)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                            New York, NY

Page 118

1    and 37-page attachment entitled CCMI
2    Disclosure Memorandum to Stock Purchase
3    Agreement as of August 13, 1999, received
4    and marked for identification.)
5       Q.    Mr. DeVoe, I show you what's been
6    marked as DeVoe Exhibit 21. Do you recognize this?
7       A.    Yes.
8       Q.    Okay.
9             And what is it?
10      A.    It's the stock purchase agreement
11   between CCMI and News America Marketing.
12      Q.    And if you look at NAM04623, is that
13   your signature?
14      A.    Yes.
15      Q.    And you were signing on behalf of
16   News America Marketing In-Store, Inc.?
17      A.    Yes.
18      Q.    Now, paragraph 6.8 which is on
19   NAM04604 --
20            Do you see that?
21      A.    Yes, I'm there.
22      Q.    And when we were speaking earlier

Page 119

1    about your discussions with Mr. Charm and others on
2    a conference call, is this the provision to which
3    you were referring?
4       A.    (Examining document.)
5             Yes.
6       Q.    Now, the first sentence of 6.8
7    states, "It is Buyer's current intention to provide
8    support to the business of the company by, among
9    other things, (i) utilizing Buyer's sales force in
10   order to promote the sale of the company's
11   products."
12            Do you see that?
13      A.    Yes.
14      Q.    What was your understanding of this
15   provision?
16      A.    Of 6.8 (i)?
17      Q.    Yes.
18      A.    That provision was an attempt to have
19   our larger sales force be able to communicate the
20   product offerings of CCMI to our manufacturing
21   lines.
22      Q.    And what did you understand the term

Page 120

1    sales force to mean?
2       A.    It's a generic term for our selling
3    organization.
4       Q.    Okay.
5             And was it News America's intention
6    at the time it signed this agreement to provide
7    support for CCMI by utilizing the sales force to
8    promote the sale of the company's products?
9       A.    Yes. The current intention at that
10   time was to promote the sale of the company's
11   products being CCMI's.
12      Q.    When did the intention change?
13            MR. KATZ: Objection.
14      A.    I'm not aware it changed.
15      Q.    So it's your understanding that it
16   was and remains News America's intention to provide
17   support for the business for utilizing New America's
18   sales force in order to promote the sale of the
19   company?
20      A.    Up until I left the company. I can't
21   speak to after that.
22      Q.    And that's a fair limitation.

Page 121

1             What to your knowledge did
2    News America do to promote the sale of CCMI's
3    products through its sales force?
4       A.    I don't remember.
5       Q.    Is there anyone who would know that
6    from News America?
7       A.    I'm not positive. The individuals
8    would be Jon Rubin, Henry Lellouche, and Chris
9    Mixson.
10      Q.    How many salespeople in 1999 were in
11   New America's manufacturing sales force?
12      A.    I'm not sure. I'd approximate 50 to
13   100. Maybe there's more. I'm maybe being
14   conservative. I just can't recall.
15      Q.    Okay.
16            And were there other parts of
17   News America's sales organization in addition to the
18   manufacturing sales force?
19      A.    I'm sorry. Were there different
20   selling groups within News America Marketing?
21      Q.    Yes.
22      A.    Yes.

31 (Pages 118 to 121)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 122

1    Q.    And what were those groups?
2    A.    I believe there's a sales force that
3  sold to direct response clients.
4    Q.    And how many people were in that
5  sales force?
6    A.    I'm not sure.
7    Q.    Less than 100?
8    A.    Yes.
9    Q.    Less than 50?
10   A.    Yes.
11   Q.    Less than 10?
12   A.    I'm not sure.
13   Q.    Okay.
14        Any other components of
15  News America's sales force?
16   A.    At the time we entered into the
17  agreement?
18   Q.    Yes.
19   A.    I'm not sure.
20   Q.    Now, do you recollect having any
21  discussions with Ms. Raider or Mr. Fireman or
22  Mr. Charm about CCMI having immediate access to

Page 123

1  NAM's sales staff to market CCMI products?
2    A.    I recollect discussion of needing to
3  work with the sales force and try to update them on
4  the products and give them information or training.
5    Q.    Did you talk with Ms. Raider or
6  Mr. Fireman or both?
7    A.    I don't recall.
8    Q.    And there was agreement reached on
9  both sides that that was something that needed to be
10  done?
11        MR. KATZ:  Objection.
12   A.    I'd say there was an acknowledgement
13  that in order for our sales force to be helpful at
14  all, they would need to have a better understanding
15  of the product.
16   Q.    Was there any discussion about the
17  manner in which that would happen?
18   A.    No.
19   Q.    Not that you recall or no, there were
20  not?
21   A.    I don't recall.
22   Q.    Now, was NAM's sales force being

Page 124

1  reorganized before the acquisition?
2    A.    I don't remember.
3    Q.    Okay.
4        Do you remember that there was a
5  reorganization somewhere around the time of the
6  stock purchase?
7    A.    I'm sorry I don't.
8    Q.    You don't remember one way or
9  another?
10   A.    I don't.
11   Q.    And I apologize for asking the
12  questions that way.
13   A.    That's okay.
14   Q.    I'm just trying to determine whether
15  you don't know or whether the answer is no.
16   A.    Okay.
17   Q.    And I take it, then, you don't have
18  any recollection one way or the other of talking to
19  Mr. Fireman or Ms. Raider about a sales
20  reorganization?
21   A.    No, I don't have that recollection.
22   Q.    The agreement talks about promoting

Page 125

1  the sale of CCMI's products.
2        Do you see that?
3    A.    Yes.
4    Q.    What products did you contemplate
5  were being referred to by this provision?
6    A.    I don't remember.
7    Q.    Okay.
8        Now we'll talk about (ii).  It says
9  News America would assist the company in the
10  creation of long-term relationships with retailers.
11  What understanding, if any, did you have as to what
12  this provision was designed to do?
13   A.    It was a discussion that, if I
14  recall, CCMI saw some potential opportunity in the
15  future to get involved in helping the retailer
16  manage some of its frequent shopper data, some of
17  its data from its loyalty cards, and in order to
18  have access to that data, if I remember in a lot of
19  cases when CCMI ran a marketing program, they'd go
20  in and ask for specific authorization to go to the
21  retailer's data for a specific program.
22        Here we were looking at potential

32 (Pages 122 to 125)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

| Page 126 | Page 128 |
|---|---|
| 1  could we enter into longer-term relationships so we | 1  English, that would be a good start. |
| 2  had more consistent access to data with the retailer | 2         In Exhibit 13, the last bullet point |
| 3  than if we were able to gain that access and were | 3  under opportunities for News America Marketing and |
| 4  able to put it into some type of software program or | 4  CCMI there is a reference to leveraging CCMI's |
| 5  analytic tool that we could then utilize that | 5  database management and marketing programs. |
| 6  information hopefully then to go out and sell | 6         Do you see that? |
| 7  different programs. | 7     A.   Yes. |
| 8     Q.   And did you have any particular | 8     Q.   Was any aspect of that opportunity |
| 9  retailers in mind? | 9  reflective of 6.8 (ii)? |
| 10    A.   No. | 10    A.   It certainly wouldn't have been kind |
| 11    Q.   Examples of types of retailers that | 11  of a priority.  Whether it was any aspect or not, I |
| 12  were contemplated by this provision? | 12  don't know.  It was primarily focused on the grocery |
| 13    A.   I don't know if there were any | 13  channel with our core consumer packaged good |
| 14  specific retailers contemplated by the provision. | 14  manufacturing clients. |
| 15    Q.   What about types of retailers? | 15    Q.   Did you contemplate that 6.8 (ii) |
| 16    A.   I don't know the span of it.  It | 16  would be designed in part to expose CCMI to |
| 17  would have included grocery retailers. | 17  News Corp.'s affiliates' retailers? |
| 18    Q.   I take it this is something that was | 18    A.   What do you mean by News Corp.'s |
| 19  discussed with Ms. Raider and Mr. Fireman prior to | 19  affiliates' retailers? |
| 20  signing this agreement? | 20    Q.   Like Fox Television, for example. |
| 21       MR. KATZ:  Objection. | 21    A.   What retailers? |
| 22    A.   As I guess I talked about before, we | 22    Q.   Any of their retailers. |

| Page 127 | Page 129 |
|---|---|
| 1  discussed the items that we have in the agreement. | 1        MR. KATZ:  Objection. |
| 2     Q.   Okay. | 2     A.   I don't understand where retailer |
| 3        Do you have any memory in addition to | 3  fits in with Fox Television. |
| 4  what you've already testified about discussions | 4     Q.   Maybe I used a bad example.  Let's |
| 5  relative to 6.8 (ii)? | 5  try this one more time. |
| 6     A.   No, I don't recall any discussions. | 6        Do you have Exhibit 13 in front of |
| 7     Q.   Okay. | 7  you? |
| 8        And did this provision, did 6.8 (ii) | 8     A.   Yes. |
| 9  have anything to do with the reference in DeVoe | 9     Q.   I'm sorry for flipping around.  I |
| 10  Exhibit 13 about leveraging CCMI's database | 10  know it's confusing. |
| 11  management and marketing programs to enhance | 11    A.   I have it. |
| 12  affinity programs -- Fox Sports, Fox Family, | 12    Q.   Page 2, paragraph 2 under |
| 13  HarperCollins and so forth -- and or is that a | 13  opportunities, the second bullet point, not the last |
| 14  different reference altogether?  And just for your | 14  bullet point but the second bullet point which |
| 15  edification, I'm on page 2 of Exhibit 13, your memo, | 15  references News America's strong relationships with |
| 16  the last bullet point. | 16  supermarket retailers and consumer packaged goods |
| 17       MR. KATZ:  Dave, maybe you should | 17  manufacturers offering significant expansion |
| 18  rephrase the question. | 18  opportunities. |
| 19       MR. RICH:  Maybe I will.  That's a | 19        Do you see that? |
| 20  fair point. | 20    A.   Yes. |
| 21    Q.   The reference in 6.8 (ii), was any of | 21    Q.   Is the opportunity reflected in |
| 22  the -- strike that.  If I asked the question in | 22  Exhibit 13 the same assistance which is reflected in |

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
                          New York, NY

Page 130

1   6.8 (ii)?
2       A.    I don't know if it's speaking to a
3   level of assistance, but generally yes, I think
4   that's the market, that's generally the market.  It
5   was referring generally to the market, yes.
6       Q.    I apologize.  I misread my notes and
7   went down a road which was unnecessary.  So my
8   apologies.
9             Let's talk about 6.8 (iii), which
10  talks about the buyer's current intention to provide
11  support by investing in software and hardware as
12  needed to expand the company's business.
13            Do you see that?
14      A.    Yes.
15      Q.    What was your understanding of this
16  provision?
17      A.    That we would invest in the software
18  and the hardware as needed to expand the company's
19  business as we would evaluate any of our businesses.
20      Q.    Was there particular software or
21  hardware that was discussed prior to August 13th,
22  1999?

Page 131

1       A.    I don't recall.
2       Q.    Okay.
3             Was there specific funding amounts
4   discussed prior to August 13th, 1999
5       A.    Yes.
6       Q.    What was discussed?
7       A.    I believe what was requested by CCMI
8   was for us to agree on 1 and a half million dollars
9   of funding.
10            I believe I testified earlier that I
11  don't recollect whether we agreed to do that or we
12  didn't agree to do that.
13            I know my point at one point was that
14  we'll invest the capital as needed consistent with
15  our other policies and if we think we need to put it
16  in.
17      Q.    If you go back to Exhibit 19, your
18  email, it talks about the 1.5 million will not be
19  infused into the business at closing.  Is that the
20  same 1.5 million?
21      A.    It's the same I'm recollecting, yes.
22      Q.    Okay.

Page 132

1             And your email talks about capital
2   spending as managed centrally and the funds are
3   distributed when approved.  Right?
4       A.    Yes.
5       Q.    And is that consistent with the
6   protocol for News America more broadly?
7       A.    For News America Marketing, yes.
8       Q.    And so it was contemplated by 6.83
9   and your discussions that CCMI would seek approval
10  for the disbursement of funds, and if approved, the
11  funds be disbursed?
12            MR. KATZ:  Objection.
13      A.    And if they were not, they would not
14  be.
15      Q.    6.8 (iii), was that something that
16  CCMI's side requested be included in the agreement?
17      A.    May I refer back to the other
18  exhibits?
19      Q.    You can refer back to whatever you'd
20  like.
21            MR. KATZ:  Can we have the question
22  back again?

Page 133

1             MR. RICH:  I'll strike the question.
2             MR. KATZ:  Can we take a short break?
3             MR. RICH:  Sure.
4             (Break taken from 1:40 p.m. to
5   1:47 p.m.)
6       Q.    Was 6.8 (ii) and 6.8 (iii) included
7   in this agreement at the request of CCMI?
8             MR. KATZ:  Objection.
9       A.    I believe CCMI requested the
10  information to be in the agreement and we agreed as
11  of the close of the contract that it was our current
12  intention to do (i), (ii), and (iii) at the time of
13  the agreement.
14      Q.    Do you know whether News America
15  Marketing assisted CCMI in the creation of long-term
16  relationships with retailers?
17      A.    I don't know.
18      Q.    The next sentence states,
19  "Notwithstanding the foregoing, the buyer shall be
20  free to operate the company and its affiliates in
21  its sole and unfettered judgment and sellers shall
22  have no claim against buyers in connection therewith

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                          New York, NY

Page 134

1   as a result of the preceding sentence."
2          Right?
3   A.     Yes.
4   Q.     What is the reference to affiliates
5   in this sentence?
6   A.     I'm not sure.  I have to see how it's
7   defined in the agreement.
8   Q.     Okay.  Well, why don't you do that.
9   A.     (Examining document.)
10  Q.     It's on page 6412.
11  A.     (Examining document.)
12         MR. KATZ:  Is there a question?
13         MR. RICH:  I'm asking what his
14  understanding of the term affiliate meant
15  in the context of 6.8.
16  A.     Just as it's in the agreement.
17  Q.     Okay.
18         Any further elaboration on that?
19  A.     No.
20  Q.     You have no other understanding
21  beyond what's written in the agreement?
22  A.     That's correct.

Page 135

1   Q.     Now, what did you understand this
2   sentence to mean?
3   A.     Which sentence?
4   Q.     The sentence that begins
5   "Notwithstanding the foregoing," 6.8, page 36.
6   A.     It essentially meant that
7   News America Marketing could operate the company as
8   it saw fit.  It could basically make decisions and
9   operate the company as it determined was in the best
10  interests of the business.
11  Q.     Based on your understanding, could
12  News America Marketing have simply abandoned CCMI's
13  business according to this provision?
14         MR. KATZ:  Objection.  You're asking
15  for his understanding?
16         MR. RICH:  Right, as the person who
17  signed the agreement on behalf of News America
18  Marketing.
19  A.     The way I interpret the agreement is
20  yes.
21  Q.     Okay.
22         And based on your understanding,

Page 136

1   News America Marketing could have laid off every
2   employee of CCMI the day the agreement, the day
3   after the agreement was signed?
4   A.     With the exception of Ann and Bob.
5   Q.     Well, those rights would have derived
6   from the employment contract.  Correct?
7   A.     Yes.  That's what I'm referring to.
8   Q.     Okay.
9          So simply within the four corners of
10  the stock purchase agreement News America was within
11  its right, according to your understanding of 6.8,
12  to lay off and reassign every employee of CCMI?
13  A.     The way I understand it, the buyer
14  shall be free to operate the company and its
15  affiliates in its sole and unfettered judgment.
16  Q.     And how about Ms. Raider and
17  Mr. Fireman?  Could they have been reassigned to
18  work in another area of News America Marketing?
19  A.     I'm not sure.  I'd have to look at
20  the employment contracts.
21  Q.     Okay.
22         Well, ignoring the existence of the

Page 137

1   employment contract and focusing solely on the stock
2   agreement, was that something you understood
3   News America Marketing had the right to do based
4   upon 6.8?
5          MR. KATZ:  Objection.  Do you
6   understand the question?
7   A.     It seems like the question is similar
8   to the last question.  I think I answered that, that
9   the buyer again shall be free to operate the company
10  and its affiliates in its sole and unfettered
11  judgment, so it essentially could do as it saw fit
12  with the business.
13  Q.     Okay.
14         Was News America Marketing obligated
15  under 6.8, based on your understanding, to act in
16  good faith relative to CCMI?
17         MR. KATZ:  Objection.
18  A.     I'd have to get consultation of one
19  of our lawyers.  I don't see the words good faith in
20  there.  So I'd have to ask them to help me interpret
21  the question.
22         MR. KATZ:  You've answered the

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 138

1    question.
2    Q.    So you had no understanding when you
3    signed Exhibit 20 as to whether News America
4    Marketing was obligated to act in good faith
5    relative to the provisions of 6.8?
6         MR. KATZ:  Objection.  I think
7    he's answered.  He said that he'd need
8    to get legal counsel on that question.
9         MR. RICH:  Well, I'm asking
10   something different.  I'm asking about his
11   understanding, if he had one, at the time he
12   signed this agreement, not now.
13   A.    At the time I signed the agreement
14   especially as it relates to 6.8 I think I had been
15   pretty clear that it was our current intention to do
16   the items listed in (i), (ii), and (iii), and that
17   despite all that, that we had complete flexibility
18   to run and operate the business as we determined was
19   necessary.
20   Q.    Can you try and answer my question?
21   A.    Define good faith.
22   Q.    Well, what is your understanding of

Page 139

1    good faith?
2         MR. KATZ:  You're really trying to
3    examine him on a legal subject and I'm going
4    to object to this.
5         I think he's already answered the
6    question that he would need to get guidance
7    from counsel and so I think it's time to move
8    on to a different subject.
9         MR. RICH:  I disagree he's answered
10   the question.  I disagree that I don't have
11   the right to ask him as to what his
12   understanding was of the agreement at the time
13   he signed the agreement.
14        MR. KATZ:  Well, why don't you first
15   ask him if he has an understanding of what
16   good faith means in a legal context, and then
17   if he did, maybe you could ask him more.
18        But you're asking him legal
19   questions.  You might as well ask him what the
20   definition of promissory estoppel is because
21   it's something that's outside of his domain
22   and he's already told you that.

Page 140

1    Q.    Mr. DeVoe, do you have an
2    understanding of what good faith means?
3    A.    I ask you to explain it to me.
4    Q.    I'm asking for your personal
5    definition of good faith.  Do you have one?  I'm not
6    asking for a legal definition.  I'm asking for your
7    personal definition.
8    A.    I need to take a break.
9    Q.    Well, I can't let you take a break
10   while a question is pending.  As soon as you answer
11   the question, you can take a break.
12        MR. KATZ:  Just so that I'm clear,
13   are you asking him for a legal definition of
14   good faith?
15        MR. RICH:  I'm asking for his
16   personal definition of the word good faith as
17   he understands it.
18        MR. KATZ:  Are you asking him first
19   does he have a definition of good faith that
20   he thinks of?  He may not have one.
21        MR. RICH:  He can answer that.  If
22   he doesn't have a personal definition of

Page 141

1    faith, he can answer it that way.
2    A.    My view as it relates to good faith
3    in this agreement is that News America Marketing
4    would operate under the terms agreed to in the
5    document.  That's what I would understand, at least
6    what I'm talking about as good faith.
7    Q.    Okay.
8         Why don't you start by answering my
9    question, which is do you believe that News America
10   Marketing had an obligation to act in good faith
11   relative to paragraph 6.8 as you define the word
12   good faith to mean as a layperson and the person who
13   signed this document?
14        MR. KATZ:  Objection.
15   A.    I thought I answered the question.
16        MR. KATZ:  I believe you did answer
17   the question.
18   Q.    Can you answer it for me again?
19   A.    Yes.  That News America Marketing
20   would live up to the terms in the agreement.
21   Q.    And what terms would it live up to?
22   A.    The terms as outlined in the document

36 (Pages 138 to 141)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                           June 13, 2007
                              New York, NY

Page 142

1  dated August 13th, 1999.
2          MR. KATZ:  We'll take a break.
3          MR. RICH:  Okay.
4          (Break taken from 1:57 p.m. to
5  2:02 p.m.)
6      Q.    We discussed this very briefly
7  earlier.  The earn-out time period was five years.
8  Correct?
9      A.    Is there something in a document?
10     Q.    Yes.  I will direct you precisely.  I
11 think it's section 2.3.
12     A.    (Examining document.)
13          Yes.
14     Q.    Do you know how it was that the
15 earn-out period was determined to be five years as
16 opposed to some other benchmark?
17     A.    It was negotiated.
18     Q.    Isn't it the case that the five-year
19 time period was selected because Fireman and
20 Raider's business plan projected out five years?
21     A.    I don't believe so.
22     Q.    Do you have any memory of why the

Page 143

1  five years was utilized?
2      A.    No.
3      Q.    Was it your understanding as the
4  individual who signed Exhibit 20 that NAM had an
5  obligation to assist Fireman and Raider to maximize
6  their potential to earn the earn-out?
7      A.    Can you rephrase?
8      Q.    Yes.
9          Is it your understanding as the
10 individual who negotiated and signed Exhibit 20
11 that News America Marketing had an obligation to
12 assist Fireman and Raider to maximize their
13 potential to earn the earn-out?
14         MR. KATZ:  Objection.
15     A.    No.  Because we previously testified
16 that it was our sole, again going back to the other
17 paragraph, if in our sole and unfettered judgment we
18 decided to make changes to the business, modify the
19 business or shut the business down, we had the right
20 to do that.
21     Q.    So News America Marketing based on
22 your understanding was under no obligation to help

Page 144

1  Fireman and Raider maximize the potential to meet
2  the earn-out?
3      A.    Yes.
4      Q.    Do you remember having a discussion
5  with either Ms. Raider or Mr. Fireman concerning
6  6.8, telling them it was boiler plate?
7      A.    No.
8      Q.    Do you remember having any
9  discussions specifically with them about 6.8?
10     A.    Only the one I referenced earlier
11 when we had the conference call which I believe Les
12 was on as well.
13     Q.    Okay.
14          And you don't have any recollection
15 of any other communications with them concerning
16 6.8?
17     A.    No.
18     Q.    Now, are there any communications
19 that you had with any representative of CCMI
20 concerning the negotiation or execution of
21 Exhibit 20 that you haven't told me about today or
22 have you exhausted your memory?

Page 145

1          MR. KATZ:  Can we have the question
2  back?
3          MR. RICH:  Sure.  Let me rephrase it.
4      Q.    You've testified for the past several
5  hours about your interactions with representatives
6  of CCMI.  Correct?
7      A.    Yes.
8      Q.    And you've discussed communications
9  which led up to the execution of Exhibit 21.
10 Correct?
11     A.    Yes.
12     Q.    Have you exhausted your memory and
13 told me about every communication that you recall
14 sitting here today that you had with any
15 representative of CCMI that you haven't previously
16 told me about?
17     A.    During what time frame?
18     Q.    Pre August 13th, 1999.
19     A.    I would need you to go back through
20 and remind me of the ones I've mentioned, if you can
21 mention them to me.
22     Q.    Well, beyond what you've already

37 (Pages 142 to 145)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                        New York, NY

Page 146

1  testified to, does any experience or interaction or
2  communication with any representative of CCMI stand
3  out in your mind as being particularly memorable
4  that you haven't told me about today?
5      A.    I'm not sure.  I remember the initial
6  meeting in Boston.  I recall again generally the
7  negotiations and I recall generally two main
8  concepts of negotiation, one being what ended up
9  being 6.8 and the other one being a dialogue on the
10  earn-out as well as -- those were the two main
11  points I remember.  I was going to say as well as
12  the other items but they're already included in 6.8.
13          I'm not sure if I mentioned any other
14  ones.  Those were the ones leading up to the
15  agreement were the main points.
16          We initially met and there was
17  dialogue about a deal and there was negotiation for
18  a deal and there were some particulars as it relates
19  to the deal that we were negotiating.  At least
20  that's what I can recall.
21      Q.    Okay.  Thank you.
22          Now, after August 13th, 1999, what

Page 147

1  was your supervisory role relative to CCMI?
2      A.    I think for a period of time -- and
3  I'm not sure how long it was -- I was involved as a,
4  as I was with both PlanetU and SoftCard, I was
5  responsible for working with those businesses and
6  trying to work with different individuals within our
7  company to bring them into our broader News America
8  Marketing business.
9      Q.    Were you the direct report for CCMI,
10  PlanetU, and SoftCard for that period of time?
11      A.    SoftCard and PlanetU were both
12  investments.  CCMI, I believe I was responsible for
13  working with Ann and Bob as we tried to move the
14  business forward.  I believe I asked Jon Rubin to
15  help me in that regard.
16      Q.    What position did Jon Rubin have?
17      A.    He was a senior vice-president.
18      Q.    And was he brought in on the
19  hierarchical chart between yourself and Ms. Raider
20  and Mr. Fireman?
21      A.    I don't recall.
22      Q.    Who did Mr. Rubin report to directly?

Page 148

1      A.    I believe he reported to me.
2      Q.    And who did Mr. Fireman and
3  Ms. Raider report directly to?  And I'm focused on
4  this initial time period as you defined it.
5      A.    I think right after the agreement
6  they reported to me.
7      Q.    Now, Mr. Fireman was the general
8  manager of CCMI?
9      A.    I believe so.
10      Q.    And do you know what his duties and
11  responsibilities were?
12      A.    I don't recall.
13      Q.    Okay.
14          Do you know whether his duties and
15  responsibilities, whatever they were, changed at
16  some point in time?
17      A.    I don't recall how his duties may
18  have changed when we formed this, I think it was the
19  SmartSource iGroup and Chris Mixson was announced to
20  run that business.  Up until that time I believe he
21  was just continuing to work on building the CCMI
22  business.  I'm not aware of any change in his

Page 149

1  responsibilities.
2      Q.    At some point was Mr. Lellouche
3  brought in to be the general manager of CCMI?
4      A.    I don't know what his title was.  At
5  some point I think he was involved.  I don't
6  remember the exact time frame.
7      Q.    Do you remember that he assumed all
8  of Mr. Fireman's responsibilities?
9      A.    No.  I don't recall.
10      Q.    You don't recall one way or another?
11      A.    I don't.
12      Q.    Do you know what Mr. Lellouche's
13  responsibilities were relative to CCMI when he first
14  got involved in CCMI?
15      A.    I don't specifically recall.
16      Q.    Do you recall hearing complaints from
17  Mr. Fireman and Ms. Raider about Mr. Lellouche's job
18  responsibilities for CCMI?
19          MR. KATZ:  Objection.
20      A.    I don't recall Henry's job
21  responsibilities and I just don't recall the
22  complaints.

38 (Pages 146 to 149)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                        June 13, 2007
                            New York, NY

Page 150

1    Q.    Were there complaints?
2          MR. KATZ: Objection.
3    A.    There may have been but I just don't
4    recall them.
5    Q.    You mentioned SmartSource iGroup. Do
6    you know when the plan for SmartSource iGroup was
7    developed relative to the stock purchase?
8    A.    I don't remember.
9    Q.    Do you remember whether it was before
10   or after?
11   A.    I don't remember whether it was
12   before or after.
13   Q.    Do you know why it was that the
14   SmartSource iGroup was formed?
15   A.    I don't specifically recall. I know
16   it was formed and the investments in PlanetU and
17   SoftCard as well as the operation in CCMI were all
18   put underneath that umbrella group.
19   Q.    And do you know why this was done?
20   A.    I don't recall.
21   Q.    Were any studies or surveys done
22   about forming this group?

Page 151

1    A.    I don't recall.
2    Q.    Now, prior to August 13th, 1999, do
3    you remember having any discussions with
4    Mr. Fireman, Ms. Raider, Mr. Charm concerning
5    changing CCMI's name?
6    A.    I don't recall a specific discussion.
7    Q.    Do you know who made the decision to
8    change CCMI's name?
9    A.    I don't know that there is a
10   particular individual who made that decision.
11   Generally that decision would have been made with
12   the input of various people including the,
13   ultimately you'd include the chairman of the
14   business as well in that discussion.
15   Q.    Do you know whether Mr. Fireman and
16   Ms. Raider were consulted with regard to the name
17   change?
18   A.    I don't know.
19   Q.    Would it surprise you to know that
20   they weren't?
21   A.    I don't have a reaction.
22   Q.    Okay. Can you think of any reason

Page 152

1    why they weren't consulted with, assuming they
2    weren't?
3          MR. KATZ: Objection. Don't
4    speculate. Either you know or you don't
5    know.
6    A.    I don't know.
7    Q.    Now, you mentioned for a period of
8    time Fireman and Raider were reporting to you and
9    that has changed. Correct?
10   A.    Yes.
11   Q.    And they began reporting to
12   Mr. Lellouche or Mr. Rubin?
13   A.    I'm not sure of the exact reporting
14   structure and when it changed. I'm focusing more on
15   the -- I recall when they definitely reported to
16   Chris Mixson. I'll say this. I remember when Chris
17   assumed responsibility for the business. Whether
18   they were reporting to someone else before that or
19   not, I just don't recall.
20   Q.    But we can agree that they went from
21   reporting directly to you to not reporting directly
22   to you?

Page 153

1    A.    Yes.
2    Q.    And are you able to identify a year
3    when that happened?
4    A.    No.
5    Q.    Okay.
6          Were you involved in any meetings or
7    discussions about the fact that Ms. Raider and
8    Mr. Fireman would no longer be reporting to you
9    directly?
10   A.    I don't recall a meeting.
11   Q.    Okay.
12         How about general discussions?
13   A.    I don't recall the discussions.
14   Q.    Okay.
15         I take it these things, you don't
16   just wake up one morning and things have changed at
17   News America. Correct?
18         MR. KATZ: Objection.
19   A.    That's correct. I don't want to
20   speculate for you.
21   Q.    I'm not asking you to speculate.
22   Things tend to happen by consensus at News America,

39 (Pages 150 to 153)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 154

1  is that your experience?
2          MR. KATZ: Objection.
3      A.    An issue as it relates to the
4  reporting structure if there was a change, it's
5  conceivable that I would have had a discussion on
6  that. I just do not recall.
7      Q.    Okay.
8          And do you have a memory of
9  Mr. Lellouche being promoted to senior
10 vice-president at any point in time?
11     A.    I don't have that recollection.
12     Q.    Do you know whether Mr. Lellouche at
13 any point in time was involved in the management of
14 CCMI's business?
15     A.    Yes.
16     Q.    Okay.
17          And do you know what his position
18 was?
19     A.    I don't recall his position.
20     Q.    Do you know what his duties and
21 responsibilities were?
22     A.    I don't recall his specific duties

Page 155

1  and responsibilities.
2      Q.    What about general duties and
3  responsibilities?
4      A.    Generally Henry was responsible
5  working with Ann and Bob helping to build the CCMI
6  business.
7      Q.    Do you know what experience
8  Mr. Lellouche had, if any, in targeted marketing?
9      A.    No, I don't recall his experience.
10     Q.    How about loyalty programs? Do you
11 know if he had any experience?
12     A.    I don't recall his experience in
13 loyalty marketing.
14     Q.    How about store value?
15          MR. KATZ: Objection.
16     A.    I don't recall his experience in
17 store value.
18     Q.    Now, it was Mr. Lellouche who created
19 the SmartSource iGroup and SmartSource Direct.
20 Right? Or it was under his auspices. Let's say
21 that.
22          MR. KATZ: Objection.

Page 156

1      A.    The determination for SmartSource
2  iGroup was made I believe at a senior level where
3  Chris was put in operation of the business units.
4      Q.    Okay.
5          Now, when Mr. Mixson was put in the
6  position that he was put in that you've referred to,
7  did you continue to have any involvement in the
8  day-to-day operations of CCMI on a management level?
9      A.    No. I only would have been as
10 supportive as necessary from a financial standpoint.
11     Q.    Well, how about after the stock
12 purchase in August of 1999? Did you continue to
13 have any role or responsibility on the management
14 side of CCMI?
15          MR. KATZ: Objection.
16     A.    I believe I had supervisory
17 responsibility for a period of time.
18     Q.    I apologize for asking this already.
19 You're not able to pin down whether it was a month,
20 a week, six months, or a year?
21     A.    I'm not able to pin it down. A year
22 seems long but I just don't recall.

Page 157

1      Q.    Okay. Six months is probably more of
2  a --
3      A.    It's hard to guess.
4      Q.    Do you know whether Mr. Fireman was
5  relieved of all of his operational responsibilities
6  at any point in time?
7      A.    I don't recall.
8      Q.    How about Ms. Raider? Was she
9  relieved of all of her retail sales responsibilities
10 at any point in time to your knowledge?
11     A.    I don't recall.
12     Q.    Were you involved in any discussions
13 relative to the scope of their duties and
14 responsibilities?
15     A.    I would have been involved in the
16 scope of responsibilities at the time of the
17 agreement. Subsequent to that, I just don't recall.
18     Q.    Well, what was your involvement in
19 the period that you were involved relative to Raider
20 and Fireman's responsibilities?
21     A.    Initially it would have been as the
22 duties are, however they're outlined in the

40 (Pages 154 to 157)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

Page 158

1    employment agreement that they've signed.
2        Q.    Okay.
3              Did you have any discussions with
4    them about the scope of their duties or
5    responsibilities?
6        A.    I don't recall.
7        Q.    After the first year of operations
8    did CCMI have the ability to control its own
9    budgets?
10       A.    No business unit has the ability to
11   control its own budget. The budget is proposed and
12   that budget is reviewed by senior staff, which would
13   include myself and Mr. Carlucci, and eventually a
14   budget is proposed and there's an operating plan
15   that's agreed to for News America Marketing.
16             But they wouldn't have had the right
17   to say this is our budget and we're operating off
18   this budget. If that's what you're asking, they
19   wouldn't have had that right.
20       Q.    Do you know whether they proposed
21   budgets?
22       A.    I don't recall a specific budget.

Page 159

1        Q.    Do you know whether the budgets were
2    provided, dictated to them? By them I mean CCMI.
3        A.    What do you mean by dictated?
4        Q.    Given to them saying, "This is your
5    budget."
6        A.    I don't recollect exactly how that
7    worked. A budget is a process where the different
8    groups ask for their different needs, the department
9    asks for their needs, and then they're provided a
10   budget which they can operate off of and as well as
11   sales calls. So I can't really comment on exactly
12   how it was done.
13       Q.    For the period of time that you were
14   Ms. Raider and Mr. Fireman's direct report, was CCMI
15   receiving sales staff?
16             MR. KATZ: Objection. What do you
17   mean by receiving sales staff?
18       Q.    Did CCMI have the opportunity to hire
19   sales staff?
20       A.    My recollection is there were
21   attempts made at hiring sales staff. I don't know
22   how many. But I recollect Ann needing to go and

Page 160

1    interview people and we were trying to hire sales
2    executives, yes.
3        Q.    When did News America's hiring freeze
4    go into effect?
5        A.    I'm not aware of a hiring freeze.
6        Q.    So you're unaware of any time when
7    there was a hiring freeze in the late 1990/2000 time
8    period for News America?
9        A.    I don't recall.
10       Q.    Okay.
11             Do you have a recollection that
12   shortly after August of 1999 News America was in the
13   process of combining sales forces?
14       A.    Which sales forces?
15       Q.    Any sales forces.
16       A.    I don't have a recollection of the
17   exact time frame. At one point in time we made a
18   decision -- I don't know exactly when it was -- to
19   combine the sales force with News America and what
20   was formerly ACT Media. I don't recall the time.
21       Q.    Okay. And are you aware of Chris
22   Mixson directing the sales force to focus its sales

Page 161

1    on News America's sales goals rather than CCMI
2    products?
3        A.    No. You'd have to speak with Chris.
4        Q.    You weren't in any meetings where you
5    understood that that was asked?
6        A.    No.
7        Q.    Do you know what Mr. Mixson did to
8    promote CCMI's product?
9        A.    I don't recall.
10       Q.    Do you know which sales staff was
11   trained concerning CCMI's products?
12       A.    I recall there were attempts at
13   training sessions and there may have been training
14   sessions. I don't know how effective they were or
15   how often they were held, but I believe there were
16   attempts to do that.
17       Q.    What do you mean by there were
18   attempts?
19       A.    I believe there may have been
20   training sessions but I don't recollect exactly when
21   that may have happened.
22       Q.    Do you know when these would have

41 (Pages 158 to 161)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                        June 13, 2007
New York, NY

| Page 162 | Page 164 |
|---|---|

**Page 162**

1  taken place?
2      A.    No, I don't recall.
3      Q.    Or how many there were?
4      A.    I don't recall.
5      Q.    And you personally didn't participate
6  in those if they took place?
7      A.    No, I would not have participated.
8      Q.    Is it consistent with your memory
9  that CCMI was only permitted to hire one salesperson
10 the first seven months after Exhibit 21 was
11 executed?
12     A.    I don't recollect.
13     Q.    In the 1999/2000 time period do you
14 have any understanding as to which sales force, if
15 any, was selling CCMI's products?
16     A.    I don't recall.
17     Q.    The duties of CCMI's manufacturing
18 sales force were being performed by the dot com
19 sales force in the first year or so after the stock
20 purchase agreement.
21         Is that correct?
22     A.    I don't remember.

**Page 163**

1      Q.    Was CCMI allowed to become a part of
2  NAM's sales tracking database?
3      A.    I don't remember.
4      Q.    Who would know that, if anyone?
5      A.    I'm not sure if he would know it or
6  not. Chris Mixson may know.
7          MR. RICH: This will be the next
8      exhibit.
9          (Exhibit DeVoe-22, 1-page letter
10     dated 10-22-99, Bates FR0315, received and
11     marked for identification.)
12     Q.    Mr. DeVoe, I'm showing you a document
13 entitled Deposition Exhibit 22 which is Bates
14 stamped FR0315.
15         Do you recognize this letter?
16     A.    I'm not sure who sent the letter. I
17 could guess by the signature but I'm not sure who
18 sent it.
19     Q.    Okay.
20         So you understand this letter to have
21 been sent by someone at CCMI?
22     A.    Yes.

**Page 164**

1      Q.    And it looks to me like it says Bob
2  in script at the bottom next to thank you.
3      A.    Okay. I can see that, yes.
4      Q.    And so seeing this, do you generally
5  understand this to be a letter that Mr. Fireman sent
6  to you in October of 1999?
7      A.    Yes.
8      Q.    And this was about eight weeks after,
9  eight or nine weeks after the stock purchase
10 agreement had been signed?
11     A.    Yes.
12     Q.    Now, did you get this letter? Did
13 you receive this letter?
14     A.    I don't recall receiving the letter.
15     Q.    Okay.
16         Skimming through the contents of the
17 letter do you generally recall these issues being
18 raised by CCMI in the fall or winter of 1999?
19     A.    I don't remember the specifics that
20 are included in the letter.
21     Q.    Okay.
22         Do you know what action, if any, you

**Page 165**

1  took in response to this letter?
2      A.    I don't recall the action I took.
3      Q.    Okay.
4          Did you have a practice in 1999
5  relative to receiving letters outlining issues and
6  concerns?
7          MR. KATZ: Objection.
8      A.    Can you rephrase the question?
9      Q.    Sure.
10         I take it in your capacity as
11 executive vice-president and chief financial officer
12 in 1999 at News America that business issues were
13 brought to your attention from time to time?
14     A.    Yes, sir.
15     Q.    And from time to time those business
16 issues would be sent to you more formally like in
17 the form of a letter.
18         Correct?
19     A.    They could come in a letter.
20     Q.    Did you have a practice or procedure
21 as to how you would deal with letters that would
22 come to your attention or that were sent to you

42 (Pages 162 to 165)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                          June 13, 2007
New York, NY

Page 166

1 raising certain business issues?
2     A.    I didn't have a specific practice or
3 procedure.  Again I'd be assuming, but I assume if I
4 received a letter such as this, I would have thought
5 I would have responded to it.
6     Q.    Okay.  But you have no independent
7 memory sitting here today of responding?
8     A.    No.
9     Q.    Please look at the third physical
10 paragraph of the letter, fifth line down, which
11 begins "While we have discussed scheduling
12 meetings."
13     A.    Yes.
14     Q.    I'll just read it for the record.
15 "While we have discussed scheduling meetings with
16 the NAM manufacturer sales management team, we are
17 told they are too busy or committed to other NAM
18 ventures."
19         Do you see that?
20     A.    Yes.
21     Q.    Do you remember taking any action in
22 response to this particular statement?

Page 167

1         MR. KATZ:  Objection.
2     A.    I don't remember the specific action
3 taken.
4     Q.    Would it have been your practice to
5 delegate to someone to look into issues such as the
6 ones raised in this letter?
7         MR. KATZ:  Objection.
8     A.    I don't believe I have a specific
9 practice.  I may have asked someone to look at it or
10 I may have evaluated it myself.
11     Q.    Okay.
12         Now, the next paragraph, the end of
13 the fourth line says, "Instead, we have not added
14 the people we need and against our wishes are still
15 discussing the separation of people and systems we
16 use to run our business and service our clients."
17         Do you see that?
18     A.    Yes.
19     Q.    Do you remember doing anything
20 particularly in response to this concern?
21     A.    I don't remember a specific response.
22         MR. RICH:  Mark this, please, as

Page 168

1 the next exhibit.
2         (Exhibit DeVoe-23, 1-page email
3     dated 11-12-99, Bates FR0413, received
4     and marked for identification.)
5     Q.    Mr. DeVoe, I show you what's been
6 marked as Exhibit 23.  Do you recognize it?
7     A.    I recognize it as an email I sent.
8     Q.    Do you know what the email concerns?
9     A.    (Examining document.)
10         It appears to discuss staffing.
11     Q.    Under Bob, you note that Mr. Pappas
12 is terminated.  Reva Hill and Craig Joress's
13 positions have been moved to Connecticut.  Michele
14 Semar is terminated.  Michael Hughes's position at
15 CCMI terminated.  And at the bottom you note, "We
16 will not be able to facilitate any additional
17 headcount increases at this time."
18         Correct?  Did I read that correctly?
19     A.    The parts that you've read you read
20 correctly.  I'm looking at an email that I
21 apparently have done in very brief format that
22 there's another email below it that I may be

Page 169

1 responding to so I'm not sure -- I see factual
2 information that's there.  I'm not really sure what
3 I may or may not have responded to from Jon.  I'm
4 just not really sure what it was.
5     Q.    Okay.
6         What did you mean by "We will not be
7 able to facilitate any additional headcount
8 increases at this time"?
9     A.    I'm not sure if I'm responding to a
10 request for headcount or not.
11     Q.    Okay.
12         So the answer is you don't know?
13     A.    I'm not sure again what I'm
14 responding to.  Taking that sentence by itself, it
15 essentially states again we're not looking to add
16 headcount.  Again, as far as what areas, I'm not
17 really sure of the context of it.
18         MR. KATZ:  Are we done with that
19     exhibit?
20         MR. RICH:  Yes.  This will be the
21     next exhibit.
22         (Exhibit DeVoe-24, 3-page letter

43 (Pages 166 to 169)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                        New York, NY

| Page 170 | Page 172 |
|---|---|

**Page 170**

1    dated 12-7-99, Bates FR0043-045, received
2    and marked for identification.)
3    Q.    Mr. DeVoe, I'm showing you a document
4  we have marked as Exhibit 24.
5        Do you recognize this letter?
6    A.    It's a letter to me from Ann Raider
7  copying Ian Moore and Bob Fireman in December of
8  1999.
9    Q.    Do you remember receiving this
10  letter?
11    A.    I don't recall receiving the letter.
12    Q.    Can you take a look at the letter and
13  see if any of the issues raised in this letter were
14  brought to your attention in the latter half of
15  1999?
16    A.    (Examining document.)
17        I don't recall the specific issues.
18  I see them outlined in the letter.
19    Q.    Okay.
20        So you simply have no recollection of
21  taking any action in response to any of the issues
22  listed in the letter?

**Page 172**

1    MR. KATZ:  Don't speculate.  If you
2  can answer the question, fine.  If you can't,
3  you can't.
4    MR. RICH:  I'm asking him the
5  question.
6    MR. KATZ:  The same instruction.
7  Don't speculate.
8    A.    I'm not sure how I'd respond to it.
9    Q.    I think we talked earlier about a
10  gentleman named Bill Adam.  Do you remember that?
11    A.    Yes.
12    Q.    News America Marketing moved him to
13  Connecticut.  Do you remember that?
14    MR. KATZ:  Objection.
15    A.    I recall Bill moving down to
16  Connecticut.  I recall an opportunity was discussed
17  with him.  I don't remember the specific opportunity
18  but I believe, I understand he was proposed with I
19  believe a larger role potentially in the company in
20  Connecticut.
21    Q.    Were you involved in the decision to
22  offer him this opportunity?

| Page 171 | Page 173 |
|---|---|

**Page 171**

1    A.    I don't recall the recommended action
2  that I may have taken or may have discussed.
3    Q.    Okay.
4        Had you been asked in December of
5  1999 to arrange for CCMI to present to the entire
6  NAM sales organization what CCMI does, would that
7  have been something you would have been in favor of
8  doing?
9    MR. KATZ:  Can we have that question
10  read?
11    MR. RICH:  Sure.
12    (Whereupon, the requested portion is
13  read back by the reporter as follows:
14    "QUESTION:  Had you been asked in
15  December of 1999 to arrange for CCMI to
16  present to the entire NAM sales organization
17  what CCMI does, would that have been
18  something you would have been in favor of
19  doing?")
20    MR. KATZ:  You're asking him to
21  speculate?
22    MR. RICH:  Yes.

**Page 173**

1    A.    I believe I was in the dialogue.  I
2  don't recall my specific view on it at the time.
3    Q.    Who else was in the dialogue?
4    A.    I don't recall.
5    Q.    Do you have a memory of Ms. Raider or
6  Mr. Fireman expressing concern over this fact?
7    A.    I don't recall.
8    Q.    Do you remember Ms. Raider or
9  Mr. Fireman telling you that Mr. Adam was one of
10  their most valuable people and he was being taken
11  from them and not properly replaced?  Do you
12  remember that?
13    A.    No, I don't remember them stating
14  that.
15    MR. RICH:  Mark this, please, as
16  the next exhibit.
17    (Exhibit DeVoe-25, 1-page email
18  dated 12-7-99, Bates NAM03590, received
19  and marked for identification.)
20    Q.    Mr. DeVoe, I show you a document that
21  has been marked as Exhibit 25.  If I can have you
22  turn back to Exhibit 24, do you recognize Exhibit 25

44 (Pages 170 to 173)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
                        New York, NY

Page 174

1    as your response to Exhibit 24?
2        A.    Yes, and I can see my initials on it.
3        Q.    Where are your initials?
4        A.    DFD, upper right corner.
5        Q.    So that means that this came from
6    your file?
7        A.    It came, yes, it must have come from
8    a CCMI file.
9        Q.    You had a file in your office
10   entitled CCMI?
11       A.    I'm not sure. I had many files in
12   the office. I'm just looking at what it says.
13       Q.    These are your initials that appear
14   in the upper right-hand corner of the document?
15       A.    Yes.
16       Q.    And then the words "file CCMI."
17          Do you see that?
18       A.    Yes.
19       Q.    Does that lead you to believe that
20   you had a file labeled CCMI or a series of files
21   labeled CCMI?
22       A.    I'm not sure. It depends on the -- I

Page 175

1    may have signed it and handed it over to my
2    assistant. From there I can't tell.
3        Q.    If there was such a file of CCMI
4    materials, what would have been in it?
5        A.    I'm not certain.
6        Q.    Now, under recommended actions which
7    is about halfway down the page, in number 3 you say,
8    "Let's arrange ASAP."
9        A.    Yes.
10       Q.    And this is a response to the
11   recommended action for CCMI to present the entire
12   News America Marketing sales organization with what
13   CCMI does?
14       A.    Yes.
15       Q.    And then there's the word Rubin next
16   to it?
17       A.    Yes.
18       Q.    Is that Jon Rubin?
19       A.    Yes.
20       Q.    And so is it fair to say that you
21   thought this was something worth doing and asked Jon
22   Rubin to arrange for it to be done?

Page 176

1            MR. KATZ: Objection.
2        A.    From the response, "Let's arrange
3    ASAP," it's something I did, I believe was worth
4    doing. Whether I had Jon help me on it or not, I
5    can't recall.
6        Q.    Do you recall whether a meeting was
7    arranged?
8        A.    I don't recall.
9        Q.    Do you know whether a meeting was
10   arranged ASAP?
11       A.    I don't recall.
12       Q.    Have you ever been in Mr. Carlucci's
13   presence where he stated that he saw no future in
14   targeted direct mail?
15       A.    I don't recall that statement.
16       Q.    Do you remember him making any
17   statements similar to that?
18       A.    I don't recall.
19       Q.    Did he ever express to you or --
20   strike that.
21          Did he ever express to a group of
22   people of which you were part of the group

Page 177

1    discussing his views about targeted direct mail?
2        A.    Not that I remember.
3        Q.    Now, were you involved in the
4    decision to preclude CCMI from placing trade
5    advertising?
6            MR. KATZ: Objection.
7        A.    Can you rephrase?
8        Q.    Sure. Let's start with the basic
9    proposition.
10          Are you aware of whether or not CCMI
11   was permitted to place trade advertisements
12   concerning its products once the stock purchase
13   agreement was signed?
14       A.    I don't remember.
15       Q.    You have no memory one way or the
16   other?
17       A.    No.
18       Q.    Were you involved in the Epiphany
19   transaction?
20          MR. KATZ: Objection.
21          MR. RICH: Let me withdraw the
22   question and ask it this way.

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
                        New York, NY

| Page 178 | Page 180 |
|---|---|

**Page 178**

1    Q.    Are you familiar with a computer
2  software program called Epiphany?
3    A.    I'm not very familiar with the
4  program. I'm aware the Epiphany product was
5  something that it was invested in.
6    Q.    And News America invested in the
7  Epiphany product?
8    A.    News America Marketing, yes.
9    Q.    And were you involved in that
10 process?
11        MR. KATZ: Objection.
12    A.    I would have been involved in the
13 process from the review standpoint because I assume
14 it was involving capital spending. I'm pretty sure
15 it was. So like with all capital projects, I would
16 have the ability at least to review the proposal.
17    Q.    Did you have any involvement in
18 negotiating the purchase?
19    A.    No. I don't recollect being
20 involved.
21    Q.    How about Mr. Benson? Was he
22 involved?

**Page 179**

1    A.    Yes, I believe Dave was involved.
2    Q.    And you were not?
3    A.    I don't recall being involved.
4    Q.    Was Mr. Fireman involved?
5    A.    I don't remember.
6    Q.    Do you remember an issue arising as
7  to the number of seats that were going to be
8  purchased?
9    A.    No, I don't remember that issue.
10   Q.    Okay.
11        Do you remember an issue arising as
12 to the capital allocation of the purchase to CCMI's
13 business?
14   A.    I don't remember.
15   Q.    Okay.
16        Did you participate in business
17 meetings concerning the management and operation of
18 CCMI?
19        MR. KATZ: Objection.
20   A.    What time period?
21   Q.    Let's start from August of 1999 until
22 September of 2001.

**Page 180**

1    A.    I would have been involved in August.
2  I don't know how often I was involved again because
3  that group began reporting to another individual.
4    Q.    Did you participate in strategy
5  sessions concerning CCMI?
6    A.    I don't recall.
7        MR. RICH: Mark this, please, as
8  the next exhibit.
9        (Exhibit DeVoe-26, 3-page document
10        entitled Summary and Next Steps, CCMI
11        Strategy Session 11/17/99, Bates
12        NAM03585-3587, received and marked for
13        identification.)
14   Q.    I'm showing you a document entitled
15 Summary and Next Steps, CCMI Strategy Session,
16 November 17th, 1999.
17        Do you see that?
18   A.    Yes.
19   Q.    You're listed as one of the attendees
20 of the meeting?
21   A.    Yes.
22   Q.    Do you have a memory of attending

**Page 181**

1  strategy sessions in the fall and winter of 1999
2  relative to CCMI?
3    A.    I don't recall attending. From the
4  document I did attend but I don't recall it.
5    Q.    Were there executive meetings in
6  News America Marketing in 1999 and 2000?
7    A.    Yes.
8    Q.    Did you participate in those
9  executive meetings?
10   A.    Yes, I did.
11   Q.    And were there a group of people who
12 typically would attend executive meetings?
13   A.    What executive meetings?
14   Q.    Well, were there different types of
15 executive meetings held by News America Marketing?
16   A.    I'm just trying to understand how
17 you're referring to executive. There's lots of
18 meetings among executives in News America Marketing.
19 I just want to make sure I'm responding to your
20 request properly.
21   Q.    Were there formal executive meetings
22 held by News America Marketing, not a meeting

46 (Pages 178 to 181)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                      June 13, 2007
                            New York, NY

Page 182

1  amongst executives but executive meetings that were
2  called for and held at a particular time?
3      A.    Yes.
4      Q.    Okay.
5            And were they typically held on
6  particular days of the week or days of the month?
7      A.    Yes. We had an executive committee
8  meeting Monday mornings which was followed by a
9  management committee meeting. I forget exactly when
10 that started. Both on Monday if I remember.
11     Q.    Were typically minutes created for
12 those meetings?
13     A.    Yes.
14     Q.    What would happen to those minutes
15 after the meeting was concluded?
16     A.    I'm not sure what happened to the
17 minutes.
18     Q.    Would you periodically receive after
19 the fact minutes summarizing what was discussed
20 during meetings?
21           MR. KATZ: Objection.
22     A.    I don't remember.

Page 183

1      Q.    Do you ever remember receiving
2  minutes after a meeting?
3      A.    I don't remember if I received
4  minutes or not.
5      Q.    Okay.
6            Did you personally have a practice
7  regarding note-taking at executive committee
8  meetings?
9            MR. KATZ: Objection.
10     A.    I may have taken notes. I didn't
11 have a practice of maintaining or keeping the notes.
12     Q.    So your practice was to take notes
13 and, if you took notes, discard the notes after the
14 matters reflected in the notes were addressed or
15 dealt with?
16           MR. KATZ: Objection.
17     A.    I would take my notes and then
18 respond or do whatever I saw fit with them.
19     Q.    Okay.
20           And how about management committee
21 meetings? Were minutes circulated from those
22 meetings? Strike that.

Page 184

1            Were minutes maintained at those
2  meetings?
3      A.    I don't remember.
4      Q.    Who participated in the executive
5  committee meetings on Monday?
6      A.    It would have been the senior
7  executives of the company.
8      Q.    Who would that include?
9      A.    What time period?
10     Q.    Let's take 1999 and 2000.
11     A.    Okay. I'll preface it. I'm just
12 going to provide the names I feel those individuals
13 were there. I'm not certain of the -- I can't
14 remember exactly the committee in that time period.
15           It would have been Paul Carlucci,
16 Dominick Porco, Dave Benson, Ian Moore, Chris
17 Mixson. There were other members. I'm just not
18 certain at this point who they were.
19     Q.    Did CCMI's business, the management
20 of CCMI's business come up at any executive
21 committee meeting in 1999 or 2000?
22     A.    I don't recall.

Page 185

1      Q.    Do you recall whether Ann Raider or
2  Bob Fireman came up at any executive committee
3  meeting in 1999 or 2000?
4      A.    I don't recall if they specifically
5  came up.
6      Q.    Okay.
7            How about management committee
8  meetings? Who participated in those?
9      A.    There were a number of individuals.
10     Q.    Okay.
11           Are you able to identify them with
12 any precision?
13     A.    No. There were probably fifty or
14 more individuals who participated in that meeting
15 which was generally a brief update of what was going
16 on in the business.
17     Q.    To your knowledge did Mr. Fireman or
18 Ms. Raider attend any executive committee meetings?
19     A.    I don't recall.
20     Q.    Do you recall them ever attending
21 one?
22     A.    I don't recall if they presented at

47 (Pages 182 to 185)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 186

1  the executive committee or not.
2      Q.   How about the management committee
3  meetings? Did Ms. Raider and Mr. Fireman ever
4  attend those meetings?
5      A.   I'm not sure. If they did, they
6  would have done it via phone and I'm not certain if
7  they did or not.
8      Q.   So people participated in the
9  management committee meetings by teleconference from
10  time to time?
11      A.   Every week there were a number of
12  individuals at all of our outside sales offices and
13  potentially our field offices who would participate
14  in that meeting. I don't know the exact number.
15          MR. KATZ: Can we take a break?
16          (Break taken from 2:57 p.m. to
17      3:13 p.m.)
18      Q.   Mr. DeVoe, showing you Exhibit 25 for
19  one moment, showing you your email again, the 7th
20  recommended action item, going back to Exhibit 24,
21  Ms. Raider is suggesting a CCMI executive group.
22          Do you see that?

Page 187

1          MR. KATZ: I'm sorry. Where are
2      they?
3          MR. RICH: Exhibit 24, action item
4      number 7.
5          MR. KATZ: 24 is the December 7, 1999
6      letter.
7      Q.   The third physical page talks about
8  establishing a CCMI executive group and you respond
9  to that by saying, "Let's discuss" and then go on to
10  say, "Minutes would be maintained as requested by
11  Paul and Dom."
12          Do you see that?
13      A.   Yes.
14      Q.   Paul is Paul Carlucci?
15      A.   Yes.
16      Q.   And Dom is Dominick Porco?
17      A.   Yes.
18      Q.   So is it fair to say that you would
19  run at least that item in Ms. Raider's letter by
20  Mr. Carlucci and Mr. Porco?
21      A.   No, I may not have run that by them.
22      Q.   Okay.

Page 188

1          Then why would you request that
2  minutes be maintained as requested by Paul Carlucci
3  and Dominick Porco?
4      A.   Generally, I forget the timing, there
5  was different groups that would have departmental
6  meetings or updates. The finance group, this would
7  be an opportunity for them if there was a meeting
8  just to read the minutes and be updated on what's
9  happening with the business.
10          So it would have been something I
11  don't know if I talked to them about it but
12  something that I probably would have thought would
13  be helpful for them.
14      Q.   Okay.
15          And is Paul Carlucci an individual
16  who liked minutes to be maintained at meetings to
17  memorialize what was said?
18          MR. KATZ: Objection.
19      A.   You'd have to ask Paul.
20      Q.   Is that your experience with him?
21          MR. KATZ: Objection.
22      A.   My experience is we took minutes at

Page 189

1  some of the meetings.
2          MR. RICH: Let's mark this as
3      the next exhibit.
4          (Exhibit DeVoe-27, 3-page letter
5      dated 9-11-00, Bates FR0033-35, received
6      and marked for identification.)
7      Q.   Mr. DeVoe, I show you what's been
8  marked Deposition Exhibit 27.
9          Do you recognize this document?
10      A.   It's a letter from Ann and Bob with a
11  copy to Chris Mixson and it was sent to me.
12      Q.   Do you have a memory of receiving
13  this letter in the early part of September of 2000?
14      A.   I don't recall receiving the letter.
15      Q.   September 11th, 2000 was about three
16  weeks after the stock agreement was executed.
17  Sorry. It was thirteen months. I'm sorry.
18      A.   Yes.
19      Q.   Now, reading through Exhibit 27, do
20  you recall any of these issues being brought to your
21  attention?
22      A.   I see the issues raised in the

48 (Pages 186 to 189)

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 190

1  letter. I don't specifically recall receiving a
2  letter or any action taken.
3      Q.    Do you recall responding to this
4  letter?
5      A.    I don't remember responding to the
6  letter. I may have responded. I just don't recall.
7      Q.    The third paragraph, the second
8  sentence says, "Rather than reinforce and supplement
9  CCMI's resources, NAM has taken our essential talent
10 and marginalized our role in directing the growth of
11 the business. Instead of letting us build upon our
12 business with NAM's support, NAM took a course to
13 assimilate CCMI's concepts, products, and personnel
14 into NAM's business units."
15         Do you see that?
16     A.    Yes, I see it.
17     Q.    Do you agree with that statement?
18     A.    No, I wouldn't agree.
19     Q.    Is there any aspect of that sentence
20 and a half that you would agree with?
21     A.    (Examining document.)
22         I'm not sure exactly what's being

Page 191

1  referred to in the bottom half of it. If there is
2  some assimilation of products and personnel, that
3  I'm not sure.
4      Q.    Well, you know, for example, that
5  Bill Adams was assimilated into NAM's business
6  units. Correct?
7      MR. KATZ: Objection.
8      A.    I don't recall him exactly being
9  assimilated. I recall him being offered an
10 opportunity.
11     Q.    And he then moved to Connecticut?
12     A.    He did move to Connecticut. Again
13 I'm not really sure if his responsibility as it
14 relates to what he was doing or what he was doing
15 while he was still supporting CCMI or not. I just
16 don't recall his exact role.
17     Q.    On the fourth physical paragraph, the
18 8th line, the sentence at the end of the line
19 beginning with moreover, Ms. Raider and Mr. Fireman
20 write, "Moreover we have been removed from all
21 financial, technical, and technical decisions. We
22 only have limited knowledge of an input into the

Page 192

1  budget and have never seen the P&Ls for our
2  division."
3         Do you know whether as of September
4  of 2000 Ms. Raider or Mr. Fireman had been provided
5  access to the P&Ls for CCMI?
6      A.    I don't recall when they received or
7  what they were provided as it relates to CCMI.
8      Q.    Okay.
9      A.    I mean I understand there was an
10 obligation to provide financials as it related to
11 the end-of-year calculation but I'm not sure what
12 they received or didn't receive on a daily basis or
13 monthly basis.
14     Q.    Is it consistent with your memory
15 that Ms. Raider and Mr. Fireman were removed from
16 all financial, technical, and technical decisions as
17 of September of 2000?
18     A.    I don't recall.
19     Q.    Now, skipping the next sentence but
20 starting with the sentence, "We have been told that
21 our earn-out" --
22         Do you see that?

Page 193

1      A.    Yes.
2      Q.    It says, "We have been told that our
3  earn-out created a conflict of interest and on that
4  basis we have been excluded from decision-making and
5  management."
6         Were you ever made aware that because
7  Fireman and Raider's earn-out created a conflict
8  that they were excluded from decision-making and
9  management?
10     A.    No, I don't recall that.
11     Q.    Do you have any memory of
12 participating in a meeting where anybody else
13 indicated that Fireman and Raider were being
14 excluded from decision-making and management because
15 their earn-out created a conflict of interest?
16     A.    I don't recall being at such a
17 meeting.
18     Q.    Do you believe that Fireman's and
19 Raider's earn-out created a conflict of interest for
20 them vis-a-vis decision-making and management?
21     A.    No.
22     MR. RICH: Mark this, please, as

49 (Pages 190 to 193)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                    June 13, 2007
New York, NY

Page 194

1    the next exhibit.
2         (Exhibit DeVoe-28, 5-page email
3    dated 11-15-99, Bates FR0415-0419, received
4    and marked for identification.)
5    Q.    Mr. DeVoe, I show you what's been
6    marked as Deposition Exhibit 28.  Do you recognize
7    this as an email exchange between yourself and
8    Mr. Fireman and Mr. Rubin?
9    A.    And others as well.
10   Q.    I'm just focused for now on the
11   people to whom the text of the email was addressed
12   but you're correct.
13   A.    Okay.
14   Q.    Do you have any recollection of
15   receiving the email which begins on the second
16   physical page at the top from Mr. Fireman on
17   November 15th, 1999?
18   A.    I don't remember receiving it.
19   Q.    Do you remember any discussion
20   concerning the contents of Mr. Fireman's email?
21   A.    Let me take a moment to read it.
22   Q.    Absolutely.

Page 195

1    A.    (Examining document.)
2         I don't remember the specific content
3    in the email.  I do remember the general discussion
4    about staffing and relocation of employees.
5    Q.    With whom did you have these
6    communications?
7    A.    I remember having conversations I
8    believe with Ann and Bob receiving their opinion.  I
9    believe Ian Moore from our human resource group.
10   Q.    What do you remember Ann and Bob
11   saying to you about those issues?
12   A.    I think they had some concerns over
13   the integration of some of those jobs into
14   Connecticut.
15   Q.    What was your response, if any?
16   A.    I don't recall my exact response.
17   Q.    Do you remember your general
18   response?
19   A.    Just from reviewing Exhibit 28, it
20   appears my response is we planned to move forward
21   with the personnel changes.
22   Q.    Over Fireman and Raider's objections

Page 196

1    for lack of a better word?
2    A.    With contemplating the concern
3    they've had and still determining that the staffing
4    decisions we thought we should make were still in
5    the best interests of the business.
6    Q.    In the best interests of whose
7    business?
8    A.    News America Marketing.
9    Q.    Now, Mr. Fireman's response to your
10   email states on the third line, "The problem is that
11   these actions will leave no trained, experienced
12   staff at CCMI to service our clients.  This coupled
13   with no available or trained support at NAM will
14   critically affect the CCMI business."
15        Do you see that?
16   A.    Yes.
17   Q.    And the next paragraph, picking up
18   in the middle of the sentence but you can certainly
19   read the whole thing, it states that these issues
20   will "jeopardize CCMI's ability to service our
21   clients or products."
22        Was that a concern to you?

Page 197

1    A.    I don't recall.
2    Q.    Do you know what was done in response
3    to Mr. Fireman's response to your email?
4    A.    No.  I don't remember if there was a
5    response.
6         MR. RICH:  Mark this as the next
7    exhibit, please.
8         (Exhibit DeVoe-29, 1-page email
9    dated 1-13-00, Bates FR0021, received and
10   marked for identification.)
11   Q.    Mr. DeVoe, Exhibit 29 is an email
12   that you sent to Ms. Raider and Mr. Fireman on
13   January 13th of 2000.
14        Do you see that?
15   A.    Yes.
16   Q.    Do you remember sending this email?
17   A.    I don't remember sending it.
18   Q.    Do you remember the context in which
19   this email was sent?
20   A.    No, I don't.
21   Q.    Okay.
22        You say in the second line of your

50 (Pages 194 to 197)

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                                June 13, 2007
New York, NY

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  email, "News America will be taking a hands-on role
2  in helping to create the overall strategy and
3  execute such strategy for the division."
4      What overall strategy were you
5  referring to?
6      A.    The overall strategy of looking at
7  the document, interpreting the document. I can't be
8  exactly sure but it appears to me that the overall
9  strategy being referenced is the strategy to grow
10 CCMI.
11     Q.    And it was your expectation that
12 News America personnel would be taking a hands-on
13 role in helping to do that?
14     A.    I believe that was a benefit, yes.
15         MR. RICH: With that, Mr. DeVoe,
16 I thank you for your time this afternoon.
17         MR. KATZ: I just want to take a
18 second. We may have a question or two.
19         (Break taken from 3:31 p.m. to
20 3:34 p.m.)
21 EXAMINATION BY MR. KATZ:
22     Q.    Mr. DeVoe, do you remember this

**Page 199**

1  morning Mr. Rich asked you some questions regarding
2  your searching for documents responsive to the
3  subpoena that had been issued for you in this case?
4      A.    Yes.
5      Q.    And you told Mr. Rich that you had
6  searched your hard drive and you had searched your
7  paper records and you had not found any documents?
8      A.    Yes.
9      Q.    And do you remember that sometime in
10 2006 someone from my office contacted you to ask you
11 to search for any documents relevant to the issues
12 in this lawsuit?
13     A.    Yes.
14     Q.    And can you tell us what you did in
15 response to that request?
16     A.    I reviewed the hard drive of my
17 computer, reviewed the files in my office, and I
18 didn't find any documents.
19         MR. KATZ: Thank you. That's it.
20 EXAMINATION BY MR. RICH:
21     Q.    Did you undertake any search of your
22 email?

**Page 200**

1      A.    The email on my computer?
2      Q.    Yes.
3      A.    Yes.
4      Q.    What did you do to search your email
5  on your computer?
6      A.    The email, I think I looked at my
7  computer, went through my historical files. I
8  didn't have any documents relating to CCMI.
9      Q.    Do you have an Exchange, Microsoft
10 Exchange email server?
11     A.    I believe so.
12     Q.    And within that server you have
13 certain folders, like an inbox folder. Right?
14     A.    Yes.
15     Q.    A sent items folder?
16     A.    Yes.
17     Q.    A deleted items folder?
18     A.    Yes.
19     Q.    And various archived folders?
20     A.    Yes.
21     Q.    Okay.
22         Did you do anything to search those

**Page 201**

1  individual folders?
2      A.    Yes, I did.
3      Q.    What did you do?
4      A.    I went through my archived folders
5  which are mostly Fox Entertainment Group-related
6  information.
7      Q.    How far back did your archived emails
8  go?
9      A.    I'm not sure how far. The emails
10 were related to ever since I've been at my position
11 at Fox. I'm not sure how far certain information
12 went. I go through my email generally daily.
13     Q.    Now, when you were at News America,
14 you had a newsamerica.com email address?
15     A.    Yes.
16     Q.    Do you continue to have a
17 newsamerica.com email address?
18     A.    No.
19     Q.    You have a Fox?
20     A.    I have a newscorp.com email address.
21     Q.    Do you still have access to your
22 newsamerica.com email?

Henderson Legal Services
202-220-4158

b2320001-7ff2-4ea3-a05c-c835dca86506

DeVoe, Jr., David F.                        June 13, 2007
                     New York, NY

Page 202

1    A.    No.
2    Q.    When you went to search on your
3 Exchange server, you didn't have access to any email
4 that was sent to ddevoe@newsamerica.com?
5    A.    No.
6    Q.    But you independently searched for
7 your newscorp.com emails for potentially relevant
8 emails?
9    A.    My active email account, I'm not sure
10 what happened with that email account.  I imagine it
11 was closed at one point.
12          MR. RICH:  That's all I have.
13          MR. KATZ:  Thank you.
14          (Deposition proceedings concluded at
15      3:58 p.m.)
16
17
18
19
20
21
22

Page 203

1
2
3    _____
4        SIGNATURE OF THE WITNESS
5
6 Subscribed and sworn to and before me
7 this _____ day of _____, 20_____.
8
9
10 _____
11      Notary Public
12
13
14
15
16
17
18
19
20
21
22

Page 204

1            C E R T I F I C A T E
2    I, MARGE TEILHABER, a Certified Shorthand
Reporter and Notary Public of the States of New
3 Jersey and New York, do hereby certify that prior to
the commencement of the examination, the witness was
4 sworn by me to testify to the truth, the whole truth
and nothing but the truth.
5    I do further certify that the foregoing is a
true and accurate 204-page transcript of the
6 testimony as taken stenographically by and before me
at the time, place and on the date hereinbefore set
7 forth.
8    I do further certify that I am neither of
counsel nor attorney for any party in this action
9 and that I am not interested in the event nor
outcome of this litigation.
10    Pursuant to Federal Rule of Civil Procedure
30(e), the witness/attorney has requested review of
11 the transcript, and if any changes are made, they
will be appended to the transcript.
12
13    _____
14    Notary Public of the States of NJ, NY, and CT
15
16 New Jersey I.D. No. 64424
17 New Jersey commission expires August 7, 2011
18 New York registration No. 01TE4741157
19 New York commission expires February 28, 2010
20
21
22

52 (Pages 202 to 204)

b2320001-7ff2-4ea3-a05c-c835dca86506

**EXHIBIT B**

LELLOUCHE-5/25/07                     CondenseIt™

```
1                    Volume:    I
                     Pages:     1 to 255
2                    Exhibits:  1 to 11

3

4          UNITED STATES DISTRICT COURT
5        FOR THE DISTRICT OF MASSACHUSETTS

6   . . . . . . . . . . . . . . .
    ROBERT FIREMAN and ANN RAIDER,
7                       Plaintiffs,

8       vs.                    Civil Action
                               No. 05-1740 MLW
9   NEWS AMERICA MARKETING IN-STORE,
    INC.,
10                      Defendant.
11  . . . . . . . . . . . . . . .

12

13

14        DEPOSITION OF HENRI F. LELLOUCHE, a
    witness called on behalf of the Plaintiffs, taken
15  pursuant to the applicable provisions of the
    Massachusetts Rules of Civil Procedure before Cynthia A.
16  Powers, Shorthand Reporter and Notary Public in and for
    the Commonwealth of Massachusetts, at the law offices of
17  Todd & Weld, LLP, 28 State Street, Boston,
    Massachusetts, on Friday, May 25, 2007, commencing at
18  8:07 a.m.

19

20
               . . . . .
21

22

23           KACZYNSKI REPORTING
         72 CHANDLER STREET, SUITE 3
23        BOSTON, MASSACHUSETTS 02116
              (617) 426-6060
24
```

```
1                    I N D E X
    Examination by:   Direct   Cross   Redirect   Recross
2   Mr. Peters          4

3

4

5

6

7

8

9

10

11

12              E X H I B I T S
13  Exhibit                                  Page

14     1       Memorandum, 5/14/99            90

15     2       E-mail, 4/4/00               211

16     3       E-mail, 5/18/00              215

17     4       Memorandum, 4/10/00         219

18     5       Memorandum, 4/12/00         222

19     6       E-mail, 6/1/00              233

20     7       E-mail, 6/1/00              234

21     8       E-mail, 8/25/00             238

22     9       E-mail, 9/13/01             240

23    10       E-mail, 11/24/04            244

24    11       E-mail, 6/23/04             251
```

```
1   APPEARANCES:

2   TODD & WELD, LLP
    Kevin T. Peters, Esquire
3   28 State Street
    Boston, Massachusetts 02109
4   (617) 720-2626
    Representing the Plaintiffs
5
    HOLLAND & KNIGHT LLP
6   Gordon P. Katz, Esquire
    10 St. James Avenue
7   Boston, Massachusetts 02116-3889
    (617) 573-5839
8   Representing the Defendant

9   ALSO PRESENT:

10     Robert Fireman
       Ann Raider
11     Jordan Lippner

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1              P R O C E E D I N G S
2        MR. PETERS: Gordon, I propose we have
3   the same stipulations we had:  Reserve objections,
4   except to the form of the question, until the time of
5   trial or use of the transcript in a dispositive motion;
6   reserve motions to strike; we'll have the witness read
7   and sign under penalty, waive notary.
8        MR. KATZ: Agreeable.
9          HENRI F. LELLOUCHE,
10
11     having been satisfactorily identified
12      and duly sworn by the Notary Public,
13      was examined and testified as follows:
14
15          DIRECT EXAMINATION
16  BY MR. PETERS:
17     Q.  Good morning, Mr. Lellouche.  My name is
18  Kevin Peters.  I represent Robert Fireman and Ann
19  Raider.  Would you introduce yourself to us, please, for
20  the record?
21     A.  My name is Henri Lellouche.  I work for
22  News America Marketing.  I'm the general manager of the
23  SmartSource iGroup.
24     Q.  Where do you live?
```

**CondenseIt**™                                              **LELLOUCHE-5/25/07**

Page 5

1    A.  I live at 70 Flax Road in Fairfield,
2    Connecticut 06824.
3        Q.  Would you give us a brief description of
4    your education?
5        A.  I have a bachelor of science degree from
6    Cornell University, 1983.
7        Q.  What is your concentration?
8        A.  Hotel administration.
9        Q.  Once you graduated in '83 from Cornell,
10   could you take us through your job path?
11       A.  Oh, sure.  I left school and I
12   immediately went into the hotel business.  I worked for
13   Sheraton Hotels until 1986, at which time I left the
14   hotel industry and went to work for a small startup in
15   Star Marketing Company called Act Media, and I worked at
16   Act Media until 1992.  I left there as vice-president of
17   retail sales to go work for an investment firm that
18   was investing in product development specifically
19   related to in-store marketing which was called ARM.  I
20   worked there until 1996, at which time I joined News
21   America FSI with the intent of starting an in-store
22   division on their behalf, and I've been there since.
23       Q.  What were your job responsibilities at
24   Sheraton?

Page 6

1        A.  I was a food and beverage manager working
2    my way up through the ranks.
3        Q.  Food and beverage manager at a hotel?
4        A.  Yes, sir.
5        Q.  Which hotel?
6        A.  I worked at the Sheraton New York, the
7    Sheraton Washington, the Sheraton Dallas Hotel and
8    Towers, Sheraton Greensboro, that's it.
9        Q.  Always with the same job?
10       A.  Different levels.
11       Q.  Okay, but food and beverage purchasing?
12       A.  Yes.
13       Q.  Managing?
14       A.  Managing restaurants, bars, catering
15   functions, things of that nature.
16       Q.  At Act Media what were your job
17   responsibilities?
18       A.  I started out as the southeast retail
19   manager for Act Media where I was in charge of enlisting
20   retailers into the various Act Media in-store programs
21   by buying up real estate rates.
22       Q.  Give me a little bit more of a detailed
23   description about what those job responsibilities
24   included.

Page 7

1        A.  It was very simply buying up the rights
2    to advertise exclusively on shopping carts, buying up
3    the rights to advertise exclusively on the shelves;
4    couponing on the shelves, on the aisle directories;
5    doing in-store demonstrations, things like that.
6        Q.  What job experience did you have in
7    Sheraton that allowed to you step into the position at
8    Act Media?
9        A.  I had none.
10       Q.  How did you learn the trade?
11       A.  I'm not sure I understand.
12       Q.  Well, you were buying and managing or
13   buying and selling -- let me start again.
14           Your work in managing restaurants,
15   et cetera, at Sheraton, was there any experience at that
16   job that allowed you to do the work that you undertook
17   at Act Media?
18       A.  None.
19       Q.  So how did you acquire the skills at Act
20   Media?
21       A.  Act Media had a close affiliation with
22   the Cornell staff.
23       Q.  How did that help you learn your trade?
24       A.  They recruited -- it didn't help me learn

Page 8

1    my trade.
2        Q.  What did the Cornell staff do?
3        A.  They were looking for graduates of
4    Cornell to go work for this small startup company and I
5    among several others were recruited.
6        Q.  Did you receive any training?  At Act
7    Media did you receive any training?
8        A.  On-the-job training.
9        Q.  Any formal training in advertising?
10       A.  No.
11       Q.  Marketing?
12       A.  No.
13       Q.  Did you have any marketing experience
14   prior to taking the position at Act Media?
15       A.  No.
16       Q.  Did you take any marketing classes at
17   Cornell?
18       A.  Basic marketing classes.
19       Q.  And you went from Act Media to an
20   investment firm in 1996?
21       A.  1992.
22       Q.  You were in Act Media in '92; correct?
23       A.  I left Act media in --
24       Q.  You left Act Media in '92.  I apologize,

Page 9

1   my notes are confusing to me. You left Act Media in
2   '92. You went to an investment firm. You stayed there
3   until '96?
4        A. Yes.
5        Q. What was the name of the investment firm?
6        A. Advanced Retail Marketing.
7        Q. What was your position there?
8        A. I was the vice-president of retail sales
9   and operations.
10       Q. Okay, and how big was that firm?
11       A. It was very small, maybe five or six
12  people.
13       Q. How did you get the job?
14       A. The investor who was also the head of the
15  organization recruited me from Act Media.
16       Q. Who was that person?
17       A. Norton Garfinkle, G A R F I N K L E.
18       Q. Where does Mr. Garfinkle live these days?
19       A. In Manhattan.
20       Q. Did you still correspond with him?
21       A. No.
22       Q. Let's go back briefly to Act Media. How
23  big was that company?
24       A. When I joined it was in the thirty to

Page 10

1   fifty million dollar range.
2        Q. When you left how big was it?
3        A. Something in the neighborhood of one
4   hundred million.
5        Q. Is it still in business?
6        A. It was purchased by News America
7   Marketing, actually News Corporation.
8        Q. Now, were you involved in that
9   acquisition?
10       A. Yes.
11       Q. What was your role in the acquisition of
12  Act Media?
13       A. I was recruited to start an in-store
14  division for News America Marketing that was to compete
15  head to head with Act Media.
16       Q. And were you involved in the due
17  diligence in the Act Media acquisition?
18       A. None.
19       Q. Did you have any role in the acquisition
20  of Act Media?
21       A. Only in that I was deposed by the justice
22  department as it related to the acquisition.
23       Q. For what reason?
24       A. The justice department was inquiring as

Page 11

1   to the details of the acquisition. I'm not sure of the
2   correct word.
3        Q. Do you know why; is it antitrust or
4   otherwise?
5        A. It was antitrust.
6        Q. Okay. Do you know what happened in that
7   investigation?
8        A. The justice department passed and allowed
9   the acquisition to occur.
10       Q. Now, at the time Act Media was acquired
11  you were already working for NAM?
12       A. Yes.
13       Q. Between Act Media and NAM you worked for
14  the investment firm Advanced Retail Marketing; is that
15  correct?
16       A. Yes.
17       Q. And can you tell me your job
18  responsibilities at Advanced Retail Marketing?
19       A. To develop products.
20       Q. What products did you develop?
21       A. I developed a product called the super
22  end aisle, which was an coupon device that was
23  positioned at the display points at the end of a
24  shopping aisle that issued coupons in connection with

Page 12

1   products on sale and on display.
2        Q. So some device in the store itself that
3   had coupons?
4        A. Yes.
5        Q. A red flashing light or otherwise that
6   I've seen?
7        A. LED.
8        Q. And did you have any experience doing
9   direct marketing at Act Media?
10       A. I'm not sure I understand the question.
11       Q. Targeted marketing, do you know what that
12  is?
13       A. I do.
14       Q. Did you do any targeted marketing at Act
15  Media?
16       A. It depends on your definition of target.
17       Q. What's your definition?
18       A. We are reaching people that are shopping
19  in the aisles on the shelves.
20       Q. Did you do any work at Act Media to
21  identify buying trends of consumers?
22       A. Yes.
23       Q. Tell me about that.
24       A. We looked at various IRI data and other

CondenseIt™                                   LELLOUCHE-5/25/07

**Page 13**

1  types of available information to understand shopping
2  dynamics.
3      Q. What's IRI?
4      A. Information Resources, Incorporated
5  produces reports and information based on aggregated
6  information from retailers' data.
7      Q. Did you do any research -- let me the
8  strike that.
9          When you were at Act Media did you do any
10 research to determine specific buying trends of specific
11 consumers?
12     A. No.
13     Q. Was it available; in other words, was
14 that being done at the time you were at Act Media from
15 '92 to '96?
16     A. It was not being done by Act Media.
17     Q. Was it being done by any other company
18 that you worked with?
19     A. Yes, I believe so.
20     Q. Which company or companies?
21     A. I believe Ukrops was the first or among
22 the first to start utilizing purchase behavior data if I
23 recall correctly.
24     Q. U C R --

**Page 14**

1      A. U K R O P S.
2      Q. And where was this company based?
3      A. In Virginia.
4      Q. How did they do their work as best you
5  know?
6      A. Through loyalty cards collecting
7  information based on purchase behavior.
8      Q. Did you do any of that type of work when
9  you were at the investment firm Advanced Retail
10 Marketing; in other words, purchase behavior analysis?
11     A. No.
12     Q. Was the first time you were ever involved
13 in purchase behavior analysis at News America Marketing?
14     A. Yes.
15     Q. And was that in connection with your work
16 at CCMI?
17     A. Yes.
18     Q. Prior to CCMI had you done any purchase
19 behavior analysis?
20     A. No.
21     Q. Had News America?
22     A. I don't know.
23     Q. How did you go -- take me from the
24 Advanced Retail Marketing firm to News America. How did

**Page 15**

1  that come about?
2      A. Advanced Retail Marketing, we developed a
3  coupon machine concept that was designed to compete with
4  Act Media, and we were going to market it ourselves;
5  however, we were rebuffed in the marketplace, saying
6  that we were too small, saying that we needed a partner,
7  at which point we went out and sought partners in the
8  marketing community. News America Marketing showed
9  interest and opted not to partner but to acquire the
10 intellectual property, and I went along with the deal.
11     Q. So there was some type of stock
12 acquisition?
13     A. I don't believe so.
14     Q. How do you think the transaction
15 occurred?
16     A. It was a pay out in dollars based on
17 milestones achieved.
18     Q. Was Advanced Retail Marketing a
19 corporation?
20     A. I don't know.
21     Q. Were you a shareholder or partner or
22 otherwise have an interest in Advanced Retail Marketing?
23     A. No.
24     Q. Do you know what the terms of the deal

**Page 16**

1  were between News America and Advanced Retail Marketing
2  in a general way?
3      A. Only as I've described to you.
4      Q. Did you tell Bob Fireman that you
5  believed you were screwed in that acquisition; your
6  words, not mine?
7      A. I can't recall.
8      Q. Do you remember saying anything about
9  that acquisition, NAM's treatment of you in that
10 acquisition that was derogatory in any way?
11     A. I knew I could have made more money had I
12 had better foresight.
13     Q. What did you tell him in that regard?
14     A. Probably just that.
15     Q. Was there a lawsuit involving Advanced
16 Retail?
17     A. Yes.
18     Q. Was it against News America?
19     A. Yes.
20     Q. Were you deposed in that case?
21     A. Yes.
22     Q. What was the basis of the lawsuit?
23     A. The basis was that News America Marketing
24 had not paid out the full monies that ARM believed they

LELLOUCHE-5/25/07                    CondenseIt™

---

**Page 17**

1  were due.
2      Q. And was this some type of earn out?
3      A. I don't know the definition of earn out
4  as it relates to this.
5      Q. Well, what was the money that ARM claimed
6  that it was due that it didn't get?
7      A. It was money due to milestones reached
8  that they believed that they had reached.
9      Q. Was any of that money due to you?
10     A. No.
11     Q. What happened with the lawsuit?
12     A. ARM prevailed.
13     Q. Do you remember the causes of action?
14     A. No.
15     Q. Do you remember where it was pending?
16     A. I don't understand the question.
17     Q. Where was the lawsuit brought?
18     A. In New York.
19     Q. State court or federal court?
20     A. I don't know.
21     Q. Who represented ARM?
22     A. I don't know.
23     Q. Who represented News America?
24     A. Hogan & Hartson.

**Page 18**

1      Q. Do you have a copy of your deposition?
2      A. No.
3      Q. Were you represented at the deposition?
4      A. Yes.
5      Q. Were you represented by the attorneys
6  that represented ARM?
7      A. Yes.
8          MR. KATZ: Off the record just for a
9  moment.
10         (Discussion held off the record)
11 BY MR. PETERS:
12     Q. Were you represented by the attorneys
13 that represented ARM?
14     A. Was I --
15     Q. Let me back up, Mr. Lellouche, to clear
16 up any confusion. You were deposed in the ARM
17 litigation; correct?
18     A. Correct.
19     Q. ARM was represented by a lawyer, right
20 in the litigation?
21     A. Yes.
22     Q. And News America was represented by a
23 lawyer in the litigation?
24     A. Yes.

**Page 19**

1      Q. And when you were deposed was there a
2  lawyer there like Mr. Katz is here today sitting next to
3  you?
4      A. Yes.
5      Q. Was that ARM's lawyer?
6      A. No.
7      Q. Was it your personal lawyer?
8      A. My personal lawyer, no.
9      Q. Who was it? Who sat next to you at your
10 deposition in the ARM litigation?
11     A. I don't recall.
12     Q. Do you recall his or her affiliation to
13 the litigation?
14     A. Affiliation in what sense?
15     Q. Let me ask it in my native tongue, which
16 is English: Why was he there?
17     A. I would imagine the same reason that
18 Gordon is here, to advocate me.
19     Q. Do you know who paid this attorney?
20     A. I don't know that.
21     Q. Was it a man or a woman?
22     A. I don't recall.
23     Q. When was the deposition, what year?
24     A. I don't know.

**Page 20**

1      Q. Do you recall in substance the reason you
2  were deposed?
3          MR. KATZ: Objection.
4      A. For my knowledge of the ARM transaction
5  and subsequent activities.
6      Q. Which you deposed upon oath?
7      A. Of course.
8      Q. And you testified truthfully?
9      A. Of course. I will volunteer that the
10 lawyer representing me was not from ARM's side. It was
11 from our side.
12     Q. You said our side?
13     A. Yes. I just don't know whether it was a
14 Hogan & Hartson lawyer or a News America lawyer. That's
15 my quandary.
16     Q. I understand. They're all about the
17 same, so it's not a problem. At the time you were
18 deposed you were a witness for News America versus a
19 witness for ARM; is that a fair statement?
20     A. Yes.
21     Q. How much money did ARM win?
22     A. I don't know what the final pay out was.
23     Q. Did it go all the way through trial?
24     A. I don't know.

---

CondenseIt™                                          LELLOUCHE-5/25/07

Page 21

1    Q. Did you testify at a trial?
2    A. I did.
3    Q. So after the deposition you testified
4    again at trial?
5    A. I did.
6         MR. KATZ: Let me add one thing.  To be
7    honest I don't know anything about this case, and what I
8    don't know is whether there's a confidentiality order
9    regarding a confidentiality stipulation regarding the
10   final resolution of that.  I just don't want the witness
11   to violate what may be a confidentiality stipulation.
12        MR. PETERS: I am not -- at the risk of
13   sounding flip, but the record should reflect I'm not
14   trying to be, I'm not concerned about that
15   confidentiality's provision.  In this case we have a
16   confidentiality provision.  And I think under our
17   confidentiality stipulation you can designate portions
18   of this transcript as confidential if you believe that
19   it is confidential.  I think you have some time after
20   the transcript is delivered to make those designations.
21   We would of course abide by them absent, you know, some
22   intervention by the court.  But for the purposes of the
23   deposition I'm going to ask all the questions I can ask,
24   and the witness should be as forthcoming as possible.

Page 22

1    We can deal with confidentiality after the fact, I
2    think.  In fact, I know.
3    Q. Who were the principals of ARM?
4    A. I'm not sure I understand what principal
5    means.
6    Q. Who were the guys in charge?
7    A. Norton Garfinkle was the investor.  My
8    superior was Walter Wilson, who was the president at the
9    end.  Early on though the president was John Scopa.
10   Q. Can you spell Scopa?
11   A. S C O P A.
12   Q. Thank you.  Are these gentlemen still in
13   New York to the best of your knowledge?
14   A. No.
15   Q. Do you know where they are?  Start first
16   with Mr. Garfinkle.
17   A. Yeah, I'm sorry, Garfinkle is in
18   Manhattan.
19   Q. And Mr. Wilson, do you know where he
20   resides?
21   A. He resides in Chicago.
22   Q. Did you correspond with Mr. Wilson?
23   A. Once a year maybe.
24   Q. Do you know where he lives?  Other than

Page 23

1    the Windy City, can you be more precise?
2    A. My last address for him was Palatine.
3    Q. Spell that.
4    A. P A L A T I N E.
5    Q. Okay, thank you.  That's in the city?
6    A. 'Burbs.
7    Q. That's the suburb?
8    A. Yes.
9    Q. That's the suburb, okay.  Thank you.  And
10   Mr. Scopa?
11   A. Yes.
12   Q. Where does Mr. Scopa live, if you know?
13   A. In Connecticut.
14   Q. Do you know what town?
15   A. I don't.
16   Q. Do you correspond with Mr. Scopa?
17   A. No.
18   Q. Do you maintain a professional
19   relationship with either three of these or any of the
20   three of these gentlemen?
21   A. No.
22   Q. Is it fair to say that they harbor or
23   they have expressed to you that they harbor some
24   hostility against you?

Page 24

1         MR. KATZ: Objection.
2    A. I have no idea.
3    Q. They have never spoken to you about the
4    litigation after the litigation; is that true?
5    A. Not once.
6    Q. Were you involved in the acquisition of
7    Consumer Card Marketing, Inc., CCMI?
8    A. Yes.
9    Q. What was your role in the acquisition?
10   A. I initiated the dialogue when I met with
11   Bob I believe at a trade show.  Then I went up and made
12   a subsequent visit to Braintree to do some early due
13   diligence.
14   Q. So what trade show did you meet Bob at?
15   A. I'm not sure.
16   Q. Do you remember when it was?
17   A. No, I don't.
18   Q. What was Mr. Fireman doing at the trade
19   show?
20   A. Exhibiting.
21   Q. And you initiated the conversation?
22   A. I believe so, yes.
23   Q. Prior to going to the trade show, did you
24   have in mind that you were going to approach CCMI about

Page 25

1  exploring an acquisition?
2        A.  No.
3        Q.  Was this something that occurred to you
4  just at the time?
5              MR. KATZ:  Objection.  You can answer.
6        A.  I was working in the trade show looking
7  for opportunities as part of my role in the venture
8  group.
9        Q.  What group was this and what was its job
10  responsibility?
11        A.  The venture group was an entity that was
12  composed of myself, John Rubin, and Heather Harde.  We
13  worked directly for the CFO of the company.
14        Q.  Who is that?
15        A.  David Devoe, Jr.  And our job was to
16  identify opportunities, investments, acquisitions, on
17  behalf of News America.
18        Q.  What about News America made it
19  interesting to you in terms of a potential acquisition?
20              MR. KATZ:  Objection.
21        Q.  Pardon me.  Thank you.  What about CCMI
22  was interesting to you and made it a company worth
23  exploring from your perspective?
24        A.  We had interest in working in new

Page 26

1  technologies and emerging technologies.  It was clear to
2  us that loyalty marketing was an emerging technology,
3  marketing technology.
4        Q.  Did you have a list of companies that
5  were involved in loyalty marketing at the time you
6  approached Bob Fireman at the trade show in Chicago?
7        A.  I didn't have a list.  I knew of some.
8        Q.  You knew of CCMI prior to the show in
9  Chicago?
10        A.  No.
11        Q.  So it was introduced to you, the concept
12  or the company was introduced to you in Chicago?
13        A.  I believe John Rubin suggested that I
14  meet with Bob.  I think John Rubin had known Bob and/or
15  Ann and suggested I stop by and learn more about them.
16        Q.  What other companies did you know of at
17  the time that were involved in loyalty marketing?
18        A.  Of course there was Catalina Marketing
19  and there was RMS and a host of other small companies
20  that did segments of the industry be they database
21  marketing or card manufacturing or application
22  processing.
23        Q.  What companies at the time that you
24  approached Bob Fireman in Chicago did card programs?

Page 27

1        A.  The one that Bob mentioned yesterday in
2  New Jersey was one of them.  I can't remember the name
3  of them now.  It was owned by the Corilus [PHONETIC]
4  family.  I don't remember of name of them, but that was
5  one.  By the time we got to them, I believe they were
6  well on their way with Catalina.  They were absorbed by
7  Catalina.
8        Q.  Card marketing programs was something you
9  thought the company should explore at the time you
10  approached Bob Fireman in Chicago?
11        A.  Yes.
12        Q.  Did Mr. Rubin and Ms. Harde share that
13  view?
14        A.  I don't think Ms. Harde did.  She was not
15  aware of this segment.  I think Mr. Rubin did.
16        Q.  What about Mr. Devoe, did you discuss
17  card marketing with Mr. Devoe prior to approaching Bob
18  Fireman in Chicago?
19        A.  Yes.
20        Q.  Can you tell me the substance of that
21  conversation?
22        A.  I can't tell you anything specifically.
23        Q.  Did it go sort of like this:  This is
24  something we should explore and Mr. Devoe said good

Page 28

1  idea?
2              MR. KATZ:  Objection.
3        A.  I don't know.
4        Q.  Did Mr. Devoe think it was a good idea to
5  look into?
6        A.  Mr. Devoe's mandate to us was to find
7  opportunities.  It wasn't a narrow scope.
8        Q.  But he didn't have any specific
9  understanding about the power or profitability of card
10  marketing prior to the CCMI acquisition; is that
11  correct?
12        A.  I don't think he had ever heard of CCMI
13  prior to our approach.
14        Q.  What about the concept of loyalty
15  marketing by using data collected from cards scanned at
16  the point of sale, is that something he knew about and
17  spoke with you about prior to acquiring CCMI?
18              MR. KATZ:  Objection.
19        Q.  Is that something that you and he had a
20  conversation about?
21        A.  Yes.
22        Q.  More than one?
23        A.  Several.

Condenselt™                                                    LELLOUCHE-5/25/07

Page 29

1      Q. And limiting your response to the times
2  prior to acquiring CCMI, can you tell me what Mr. Devoe
3  said in that context?
4      A. Well, our first interest was buying
5  Catalina Marketing, and that's what spawned the entire
6  subject of loyalty and database marketing. So I think
7  that is where many of us got the education about that
8  segment was pursuant to that proposed acquisition.
9      Q. Now let's talk about the exploration of
10 acquiring Catalina. When did News America Marketing
11 first approach Catalina about acquiring them?
12     A. Approximately a year after the
13 acquisition of Act Media or Heritage Media.
14     Q. Give me a year.
15     A. Late '98, early '99.
16     Q. Who did the -- let me start a little bit
17 earlier. What about Catalina made it an attractive
18 acquisition from your perspective?
19     A. It was the next big opportunity for News
20 America Marketing.
21     Q. The next big opportunity according to
22 whom?
23     A. According to the consensus of the group,
24 the venture group.

Page 30

1      Q. So you, Mr. Rubin, and Ms. Harde all
2  agreed that card programs were the next big opportunity
3  for NAM?
4      MR. KATZ: Objection.
5      A. No.
6      Q. What's wrong about my question?
7      A. Card programs were ancillary.
8      Q. What were you interested in?
9      A. We were interesting in tapping into
10 purchase behavior data.
11     Q. Why?
12     A. Because Catalina had developed a passive
13 tap into a large number of retailers and they had direct
14 access to data which enabled them to execute very
15 powerful programs.
16     Q. How did Catalina acquire purchase
17 behavior data?
18     A. Oh, through the passive tap.
19     Q. What was the passive tap?
20     A. Literally as you would think of a tap,
21 they were listening in to every transaction in every
22 lane in every store they were installed in.
23     Q. How did they do that?
24     A. I don't know.

Page 31

1      Q. What type of information was generated,
2  digital?
3      A. Data.
4      Q. How was the data acquired, do you know?
5      A. Through the passive tap.
6      Q. Can you describe this for me?
7      A. I can't.
8      Q. Did you look into it in the context of
9  acquiring Catalina; in other words, prior to approaching
10 Catalina about possibly acquiring it, did you and your
11 group try to determine how they did what they did?
12     A. Not really.
13     Q. At any time after determining that you or
14 News America might be interested in acquiring Catalina,
15 did you do anything to try and figure out how Catalina
16 did what they did?
17     A. No.
18     Q. Do you have any understanding as you sit
19 here today as to how Catalina acquired purchase behavior
20 data at the time you were interested in acquiring the
21 company?
22     A. As I've described, through the passive
23 tap.
24     Q. But you can't tell me what the passive

Page 32

1  tap is? You can't tell me whether it's a machine, tape
2  recorder, person, video camera, do you know?
3      A. I don't know the details of that at all.
4      Q. You don't know whether or not someone was
5  there with index cards writing information down?
6      A. I'm pretty certain that wasn't the case.
7      Q. You think this was information that was
8  processed on a realtime basis by some kind of digital
9  media?
10     A. I don't know that it was realtime.  I
11 presume that it's digital because they have a data
12 warehouse in Saint Petersburg where the information was
13 transported to.
14     Q. What about purchase data behavior was
15 interesting to you and your team at the time you were
16 considering acquiring Catalina?
17     A. Enable targeted marketing on a large
18 scale.
19     Q. Talk to me about targeted marketing,
20 Mr. Lellouche. What does that mean in NAM's context?
21     A. Targeting based on purchase behavior data
22 is a powerful tool that we anchor the SmartSource Direct
23 business in today.
24     Q. How do you do it?

Page 29 - Page 32                                    KACZYNSKI REPORTING - (617) 426-6060

LELLOUCHE-5/25/07                CondenseIt™

Page 33

1      A.  We submit requests for data to retailers;
2   queries, if you will, associate universal product codes
3   with them, and they send us back lists of households
4   that qualify under those query requests.
5      Q.  Coupons are sent to specific houses based
6   on purchase behavior?
7      A.  Coupons, samples, other information are
8   sent to those households.
9      Q.  Different programs, different products
10  all tied to purchase behavior; is that correct?
11     A.  Yes.
12     Q.  That's something that News America was
13  interested in as early as late '98?
14     A.  Yes.
15     Q.  Was anyone doing it at the time, anyone
16  utilizing purchasing behavior to do targeted marketing?
17     A.  Catalina Marketing.
18     Q.  What about CCMI?
19     A.  Just from my due diligence I found out
20  they were doing it on a very small scale.
21     Q.  Now, what happened to the approach to
22  Catalina?
23     A.  No approach was made.
24     Q.  Was anyone from Catalina ever contacted

Page 34

1   about Catalina's interest in being acquired?
2      A.  Not by me.  I can't speak for others.
3      Q.  Do you know if others did?
4      A.  I don't know.
5      Q.  So what inspired your team to move on
6   from Catalina?
7      A.  Move on?  I'm not sure I understand.
8      Q.  To greener pastures, to companies that
9   can be acquired, to CCMI ultimately?
10        MR. KATZ:  Objection.
11     Q.  What happened with Catalina that inspired
12  you not to pursue a potential acquisition?
13     A.  Presentations were made internally to
14  News America Management, and they rejected the proposal.
15     Q.  Who made the presentations?
16     A.  Myself, Heather Harde, John Rubin, David
17  Devoe, Jr.
18     Q.  Were these presentations in the nature of
19  PowerPoints?
20     A.  PowerPoints, probably more like Excel
21  spreadsheets than PowerPoints.  There may have been some
22  PowerPoints.
23     Q.  Was this something that you were trying
24  to convince the board to pursue, an acquisition that you

Page 35

1   were trying to convince the board to pursue?
2      A.  Yes.
3      Q.  You believed Catalina was a worthwhile
4   company to pursue?
5      A.  Yes.
6      Q.  Do you recall why the board rejected your
7   suggestion to acquire Catalina?
8      A.  Yes.
9      Q.  Why?
10     A.  They rejected it for two specific
11  reasons.  One was that given our difficulty in the
12  Heritage acquisition with the justice department, they
13  felt that it was going to be rejected.  Secondly, we had
14  just absorbed the former Act Media business into our
15  organization just one year earlier and that still needed
16  to be fully integrated.
17     Q.  What type of marketing was Act Media
18  doing at the time?  Was it the company that was still
19  doing the coupons at the point of sale?
20     A.  Yes.
21     Q.  And so when had Act Media been acquired?
22     A.  The acquisition began in '97 and --
23  pardon me, I'm just reflecting on time lines.  It began
24  in early '97 and closed in late '97.

Page 36

1      Q.  So more than a year later Act had not
2   been integrated into News America's business?
3      A.  It had been integrated; but work flows,
4   sales force allocation, duplication of efforts, other
5   things that you would see happening in a large merger
6   like that were ongoing.
7      Q.  How big was the Act acquisition?  How
8   much did you pay for it?
9      A.  I don't know.
10     Q.  Was it a larger acquisition than CCMI?
11     A.  Much.
12     Q.  And the sales force that was to be
13  utilized to promote Act's products, was that NAM's sales
14  force?
15     A.  No.
16     Q.  What sales force was going to be used to
17  promote Act's products?
18     A.  Act.
19     Q.  Act came with its own sales force?
20     A.  Yes.
21     Q.  When you used the phrase sales force
22  allocation in response to one of my questions a moment
23  ago, what are you referring to?
24     A.  Elimination of duplication of effort was

CondenseIt™                                LELLOUCHE-5/25/07

---

Page 37

1  an interest of ours. If you have one organization, one
2  sales group calling on Unilever and then another sales
3  group following them later that day with just a
4  different portfolio of products, it was a duplication of
5  effort.
6      Q. So the idea was if you have a sales rep
7  that's at a manufacturer -- let's use the word Hershey.
8  If you have a sales rep that is a sales rep with Hershey
9  and does marketing to Hershey of News America programs,
10 then it doesn't make sense to put another person in
11 there doing the same type of work, fair statement?
12     A. No.
13     Q. How have I gone wrong?
14     A. It depends on the complexity of the
15 program. It depends on the complementary nature of the
16 products. Even to this day we have separate sales
17 forces calling on the same companies because of the
18 either specific or complex nature of the product.
19     Q. Take me through if you can, unless I'm
20 going to keep you here for twenty minutes with a
21 recitation, take me through News America products from
22 simplest to most complex so I can understand how you
23 might break down products by sales force.
24         MR. KATZ: Objection to the

---

Page 38

1  characterization, but answer the question to the best of
2  your ability.
3      Q. Gordon, I think I'm going to be counseled
4  by your objection just a little bit. How many products
5  does News America Marketing sell, products and services,
6  presently?
7      A. Many. We have FSIs, freestanding inserts
8  that are newspaper based. A subset of that, there are
9  many flavors of those, solos, blow-ins.
10     Q. Let's keep it in large categories. FSI
11 is a large category?
12     A. FSIs.
13     Q. Okay.
14     A. We have a host of ad shelf based
15 advertising products. We have ad shelf based
16 promotional products. We have floor advertising
17 products. We have merchandising services. We have
18 Internet couponing. We have SmartSource Direct database
19 marketing. At the highest level I believe that's
20 everything.
21     Q. Let me see if I was able to get it down.
22 You have FSIs, which is freestanding inserts?
23     A. Yes.
24     Q. And those are in newspapers?

---

Page 39

1      A. Yes.
2      Q. You have shelf based ads; right?
3      A. Yes.
4      Q. You have shelf based promotions?
5      A. Yes.
6      Q. Those are both in stores; correct?
7      A. Yes.
8      Q. You have floor advertising?
9      A. Yes.
10     Q. You have merchandising services?
11     A. Yes.
12     Q. You have Internet couponing?
13     A. Yes.
14     Q. And you have SmartSource Direct database
15 marketing?
16     A. Yes.
17     Q. Okay. Now, of the -- and I understand
18 these are categories and that under each of these
19 categories would be different products and services; is
20 that a fair statement?
21     A. Yes.
22     Q. So of the seven categories that you've
23 articulated which of those categories did CCMI fill or
24 belong to?

---

Page 40

1      A. The very last, SmartSource Direct.
2      Q. Database marketing?
3      A. Mm-hmm.
4      Q. Okay. Now, how many sales forces does
5  News America Marketing have presently?
6      A. There's a sales force for SmartSource
7  Direct. There is a sales force for the merchandising
8  group. There's a sales force for what we called core,
9  which is really the in-store and the FSI products. I
10 would also add that there is a retail trade sales force
11 that works with the retailers and the trade
12 organizations to sell the above products.
13     Q. Which of these sales forces call on
14 manufacturers?
15     A. All.
16     Q. Now, the four sales forces that you just
17 listed for me, is that how News America Marketing has
18 been set up since 2000 or have you, for example, added
19 or taken away sales forces?
20     A. The retail sales force has changed, the
21 last one that I mentioned. Initially it was two
22 organizations. One was simply securing retail contracts
23 for the rights to advertise in the store and there was
24 another one that was called the co-marketing group.

---

Page 41

1    Q.  Sorry, co-marketing?
2    A.  Co-marketing group that would sell many
3  of the core products including FSI on the local level.
4  They were separate.  They've merged.
5    Q.  In the context of the merger were
6  redundant jobs removed?
7    A.  No.
8    Q.  Same number of salespeople?
9    A.  To my knowledge.
10    Q.  Just managed by one group versus two?
11    A.  Yes.
12    Q.  We were talking about the Catalina
13  exploration.  The board listened to you and determined
14  that News America Marketing would not pursue the
15  acquisition of Catalina; correct?
16    A.  News Corporation.
17    Q.  News Corporation, okay.  How shortly
18  after that decision did you begin to explore or your
19  team to begin to explore the acquisition of CCMI?
20    A.  I can't say.
21    Q.  Okay.  Was your consideration of Catalina
22  contemporaneous with your exploration of CCMI?  Were you
23  looking at them both at the same time?
24    A.  No.

Page 42

1    Q.  Did anyone head up the team that explored
2  the potential acquisition of CCMI?
3    A.  Well, Dave Devoe was the head of the
4  venture group.
5    Q.  Was he involved in the day-to-day effort
6  to determine whether or not it was a good fit?
7    A.  Only in terms of supervisory.
8    Q.  As between you, Mr. Rubin, and Ms. Harde
9  who led the team, if anyone?
10    A.  I believe it was mostly John Rubin.  I
11  did some early work.  I don't know that Heather Harde
12  did any to my knowledge.
13    Q.  When did Ms. Harde come into the picture?
14    A.  Around the formation of the venture
15  group, if I'm answering your question correctly.
16    Q.  You may be, but that's not the question I
17  intended to ask.  In terms of CCMI when did Ms. Harde
18  first get involved in exploring the acquisition?
19    A.  I don't know.
20    Q.  But Mr. Rubin was more or less heading up
21  the effort?
22    A.  Yes.
23    Q.  Did your role and his role break in any
24  neat way you can describe for me?

Page 43

1    A.  My role was early stage.  I was really
2  focused on another investment which was consuming most
3  of my time.  I was also involved in work on the PlanetU
4  investment.
5    Q.  At the time you were exploring the
6  potential acquisition of CCMI, were you also looking at
7  acquiring other companies that you thought would be
8  synergetic with CCMI, PlanetU being one of them?
9    MR. KATZ:  Objection.
10    A.  I was involved in the due diligence and
11  analysis of review of Softcard Systems and PlanetU.
12    Q.  This was at the same time that the
13  company was exploring the potential acquisition of CCMI?
14    A.  They were approximately concurrent.
15    Q.  Was there a plan to roll together
16  PlanetU, Softcard Systems, and CCMI once all three were
17  acquired?
18    A.  Not that I was aware of other than
19  organizationally under the iGroup.
20    Q.  What is the iGroup?
21    A.  The iGroup is an entity within News
22  America Marketing that was managed by, after the
23  acquisition that was managed by Chris Mixon, who was the
24  first president of the iGroup, and it was designed to

Page 44

1  roll these three investments under one umbrella.
2    Q.  What was the reason for rolling them
3  under one umbrella; what is the business strategy, in
4  other words?
5    A.  It was new media.
6    Q.  What's that mean in the context of what
7  you were trying to accomplish?  What is new media?
8    A.  It was not core.  It was not FSI or
9  in-store related.  It was very specialized and it was
10  evolving.  At the time, this was during the Internet
11  boom prior to its bust, there was going to be a great
12  deal of focus dedicated to this effort, which is why
13  they brought Mr. Mixon and Mr. Garofalo into the
14  organization.
15    Q.  Because they had Internet expertise?
16    A.  No, they have sales and management
17  expertise.
18    Q.  Who were the Internet marketing experts
19  at News America Marketing at the time of the acquisition
20  of CCMI, PlanetU, and Softcard?
21    A.  Really didn't have any.
22    Q.  The iGroup, did that name exist prior to
23  CCMI's acquisition?
24    A.  No.

Page 45

1    Q. Was it discussed with Mr. Mixon -- strike
2    the question.
3         Did you have any conversations with
4    Mr. Mixon about forming the iGroup or some entity that
5    would subsequently be named the iGroup prior to
6    acquiring CCMI?
7    A. I was not part of that discussion.
8    Q. Did you know whether or not there was one
9    under way?
10   A. I did not.
11   Q. Have you learned subsequently that prior
12   to acquiring CCMI the plan was to roll these three new
13   media companies together into the iGroup or something
14   else aptly named?
15   A. I don't know of any discussion like that.
16   Q. Okay. So the roll up or the -- I'll
17   leave it there, the roll together, the putting together
18   of CCMI, PlanetU and Softcard, that's something that
19   happened after the companies were acquired?
20   A. Well, we didn't acquire all three of
21   them. We invested in two and acquired one.
22   Q. And my question was poor in any event.
23   I'm going to ask it again in another way. The idea of
24   these three companies being put together in one group,

Page 46

1    do you know of any conversations, any documents,
2    anything at all that suggests to you that that was the
3    plan prior to News America Marketing's acquisition of
4    CCMI?
5    A. I know of no discussion of that kind.
6    Q. When did the idea of rolling these three
7    companies together first occur as best you know?
8    A. Subsequent to the investments and
9    acquisitions and at a time when the notion of the
10   venture group was not necessary anymore and that these
11   businesses needed to be managed and fleshed out.
12   Q. You mention that the venture group became
13   unneeded; my words, not yours. When did that happen and
14   why?
15   A. After the investments and acquisitions
16   were made.
17   Q. There was no further discussion about
18   acquiring additional companies?
19   A. Not through an organized group. We look
20   at businesses week in and week out.
21   Q. What was the specific charter of the
22   venture group?
23   MR. KATZ: Objection.
24   A. I don't know, the charter?

Page 47

1    Q. In other words, what were you trying to
2    accomplish?
3    A. We were trying to, we were trying to
4    simply identify opportunities in new media, look to the
5    future.
6    Q. So it was a new media focused group?
7    A. Yes.
8    Q. How did Mr. Carlucci feel about the new
9    venture group? Did he ever speak with you about it?
10   A. No.
11   Q. Do you know if he ever expressed an
12   opinion about the ventures, venture group?
13   A. No.
14   Q. Now, you mentioned that you were focused
15   on other investments. Were those the PlanetU and
16   Softcard investments?
17   A. Yes.
18   Q. Your professional energy was
19   substantially taken up in those transactions?
20   A. No, mostly on Softcard.
21   Q. Can you describe for me the Softcard
22   investment?
23   A. Softcard Systems was an engineering firm
24   that had a large portfolio of issued and pending patents

Page 48

1    utilizing smart card technology, chip cards, for the
2    purposes of marketing solutions.
3    Q. Did you see any synergies between
4    Softcard and CCMI when you were looking into the
5    Softcard investment?
6    A. Yes.
7    Q. Can you describe those for me?
8    A. Well, card based marketing -- CCMI was
9    card based marketing. Softcard was card based
10   marketing. One involved intelligent cards. The other
11   involved simple striped magnetic cards. It was hard to
12   tell where the industry was doing. We opted to do some
13   R&D investment there.
14   Q. So you thought it might be possible that
15   cards used to acquire data for targeted marketing might
16   be smart cards versus cards with mag strips or codes?
17   A. We didn't know. We were investing on the
18   come because it was unknown what was going to happen in
19   the future; and we wanted to have our bit of experience,
20   or our toe in the water if you will, in these different
21   areas.
22   Q. But the idea was you wanted to collect
23   data at the point of sale ultimately?
24   MR. KATZ: Objection.

Page 49

1   A.  Not specifically related to Softcard.
2   Q.  What's the value of a Softcard then?  If
3 not collecting purchasing trends or purchasing behavior,
4 what value would Softcard have to News America?
5   A.  It was more utilizing data; not
6 collecting data, leveraging data.
7   Q.  And did soft cards have any capability
8 for utilizing or leveraging data?
9   A.  Through the intelligent cards, yes.
10   Q.  In addition to having intelligent cards,
11 they also had applications that could analyze the data?
12   A.  Lightly, yes.  Most of the heavy work had
13 to be done separately.  It wasn't their expertise.
14   Q.  Mostly they were a company that had a
15 technology that could acquire data versus analyze it; is
16 that correct?
17   A.  Not acquire data but utilize, the ability
18 to hold coupons or offers or incentives on a chip card
19 and then utilizing segmentation techniques, which was
20 not their field, to approach one-on-one marketing.
21   Q.  So the cards wouldn't -- your conception
22 was that the cards wouldn't simply be used to acquire
23 data; they would also store data?
24   A.  Light, light data.

Page 50

1   Q.  What's that mean?
2   A.  Just that Bob is different from you is
3 different from Gordy.  It wasn't your entire purchasing
4 history on this little chip card.
5   Q.  What happened with Softcard ultimately?
6 Was there an investment made?
7   A.  Yes.
8   Q.  How much?
9   A.  I believe the initial was seven and a
10 half million.
11   Q.  Was there additional money invested?
12   A.  I believe so, yes.  I don't know the
13 details though.
14   Q.  What happened with Softcard ultimately?
15   A.  They still operate.
16   Q.  Is it still a company that News America
17 invests, News America Marketing invests in?
18   A.  We're passive investors.
19   Q.  Do you know the nature of the
20 investments; in other words, are you getting return on
21 your investment?
22   A.  I don't know.
23   Q.  Does News America Marketing have any
24 stock interest in Softcard?

Page 51

1   A.  Can you say that one more time, I'm
2 sorry?
3   Q.  Does News America Marketing have any
4 equity interest in Softcard?
5   A.  Yes.
6   Q.  Are they a controlling -- do they have a
7 controlling interest in Softcard?
8   A.  No.
9   Q.  And is Softcard Systems or their
10 technology being used presently in any News America
11 Marketing programs?
12   A.  No.
13   Q.  Why not?
14   A.  The performance of the products that they
15 delivered in test did not perform to commercial
16 expectations.
17   Q.  When was that?  How long ago is a better
18 question?
19   A.  Years, early 2000s.
20   Q.  So not long after the investment was made
21 News America determined that the technology was not
22 going to be commercially viable; is that a correct
23 statement?
24   A.  I think not long is an unfair statement.

Page 52

1   Q.  All right, some period of time after the
2 investment, News America determined that the technology
3 that they invested in was not commercially viable for
4 News America Marketing's purposes; is that true?
5   A.  Yes, after exhaustive testing.
6   Q.  And you were involved also in the PlanetU
7 investment?
8   A.  Only tangentially in terms of due
9 diligence and visits to their offices.  The Internet
10 really wasn't my area.
11   Q.  And PlanetU is a company that markets
12 Internet coupons?
13   A.  They did.
14   Q.  What else did they do?
15   A.  That's all I know of.
16   Q.  What did your due diligence involve in
17 terms of the PlanetU investment?
18   A.  Visiting their office, reviewing some
19 processes and procedures, just getting a general feel
20 for the management team.
21   Q.  Were you trying to determine if there
22 were any synergies between PlanetU and CCMI in the
23 context of conducting your due diligence on PlanetU?
24   A.  No.

Page 53

1   Q. Were there any ultimately?
2   A. No.
3   Q. So there was no overlap or business
4   synergy that you could determine between PlanetU and
5   CCMI; is that correct?
6   A. No.
7   Q. I'm wrong?
8   A. There is no -- they operate as completely
9   separate businesses even to this day.
10  Q. What happened with PlanetU? Was it
11  successful?
12  A. No.
13  Q. Is it still a division -- strike that.
14  Is it a company that News America Marketing still
15  invests in?
16  A. No, we purchased the intellectual
17  property.
18  Q. How much did you purchase it for?
19  A. I don't know.
20  Q. By you, I mean News America Marketing,
21  but you don't know that either?
22  A. I don't know either.
23  Q. When was the purchase?
24  A. Very recent.

Page 54

1   Q. Was the investment in PlanetU back in
2   1999-2000?
3   A. Yes.
4   Q. So after investing in PlanetU ultimately
5   you or I should say News America Marketing acquired the
6   IP?
7   A. No.
8   Q. What happened?
9   A. It went through a series of ownerships,
10  ended up with a company called Q Interactive, also known
11  as Cool Savings, and we recently purchased the software
12  and technology for grocery printed home couponing from
13  Q Interactive, and along with that deal came the PlanetU
14  directed card functionality solution.
15  Q. Until the acquisition of the PlanetU IP
16  through Cool Savings recently, was News America
17  Marketing using the PlanetU IP in its business?
18  A. No.
19  Q. Had it ever used PlanetU's IP in
20  business?
21  A. I don't know.
22  Q. Did it do Internet coupon marketing?
23  A. I don't know that it ever got off the
24  ground.

Page 55

1   Q. So of the three entities that were
2   ultimately rolled into the iGroup being CCMI, PlanetU,
3   and Softcard, two of them never got off the ground,
4   Softcard and PlanetU; is that correct?
5   A. Off the ground?
6   Q. Off the ground enough to be revenue
7   generating?
8   A. No, they did not.
9   Q. Was the initial investment in PlanetU $23
10  million?
11  A. I don't know.
12      MR. PETERS: Off the record.
13      (Recess taken)
14  BY MR. PETERS:
15  Q. Mr. Lellouche, when you were -- let me
16  start over again. We were talking about NAM's interest
17  in acquiring CCMI. You spoke with me briefly about
18  meeting Bob Fireman at a trade show in Chicago. What
19  was the next step in exploring acquiring CCMI?
20  A. I believe I contacted either Bob or Ann,
21  I don't recall, and asked for an invite to come in to
22  see what was going on.
23  Q. Okay.
24  A. And I did do that.

Page 56

1   Q. Did you speak with anyone about CCMI,
2   anyone on your team?
3   A. I can't recall specifically anything like
4   that.
5   Q. And when you visited CCMI did you meet
6   with both Bob and Ann?
7   A. Yes.
8   Q. Were you trying to find out about the
9   nature of the business?
10  A. Yes.
11  Q. How long did the meeting take?
12  A. I believe I was there for a day.
13  Q. And at that time did you find out that
14  CCMI was in the business of doing loyalty marketing?
15  A. I did.
16  Q. Did you come away with the view that they
17  were one of the pioneers in loyalty marketing?
18  A. I wouldn't say pioneers, no.
19  Q. Do you believe they were one of the
20  pioneers in loyalty marketing?
21  A. Pioneer is a strange word. I believe
22  that they worked in it for a fairly long period of time.
23  Q. By pioneers, I mean those that break
24  ground. Were they one of the ground breakers in loyalty

LELLOUCHE-5/25/07    CondenseIt™

Page 57

1  marketing using information collected at the point of
2  sale?
3      A.  No.
4      Q.  You think there were others that broke
5  that ground before them?
6      A.  Certainly.
7      Q.  Catalina?
8      A.  Without a doubt.
9      Q.  Who else?
10     A.  Catalina was the behemoth.  They
11  overshadowed everyone else.
12     Q.  Doing the same type of work that CCMI was
13  doing?
14     A.  I don't know they were doing all the same
15  kind of work they were doing, but in terms of collecting
16  data and using that data for the purposes of remarketing
17  it back to consumers, they were well in advance of CCMI.
18     Q.  What did you learn about CCMI's business
19  that day?
20     A.  I learned the different segments in which
21  they operated.  I had the opportunity to visit their
22  facility.  I had the opportunity to observe a
23  presentation that I believe Ann made on their
24  capabilities.  I think that's the extent of it at that

Page 58

1  point.
2      Q.  What did you believe prior to acquiring
3  CCMI were CCMI's core competencies?
4      A.  I believe the core competencies were in
5  the retailer side of the business which is relating to
6  card marketing, card production, application processing,
7  some very modest data hosting, and expertise and
8  understanding of the marketplace.
9      Q.  What about the marketplace made them
10  experts; their knowledge, that is?
11     A.  Through the presentation I came to
12  understand that they had launched several loyalty
13  programs and that they had ongoing relationships with
14  several retailers, several name plate retailers.  They
15  had launched the Lucky program in California, but it
16  was -- most of this was new to me, so I was listening
17  more than commenting.
18     Q.  I don't want to necessarily limit you to
19  this one meeting, although I have so far.  Let me ask
20  you this.  How many meetings did you have to acquire
21  information about CCMI prior to acquiring it?
22     A.  I couldn't tell you.  As I said, I really
23  passed it on to John Rubin and I exited the process to
24  my recollection.  I may have had some, a few more

Page 59

1  meetings, but it was not my deal.  It was not my due
2  diligence responsibility.
3      Q.  It was really John Rubin's?
4      A.  Yes.
5      Q.  So the information that you're giving to
6  me now really is information you learned in the early
7  part of exploring the potential acquisition?
8      A.  Right now, yes.
9      Q.  And I'm limiting it to you now, what you
10  knew before acquiring the company.
11     A.  Yes.
12     Q.  My questions will be directed to that
13  level of knowledge whether it's information determined
14  at this meeting or subsequently.  Did you learn that
15  CCMI had met with virtually every supermarket chain in
16  the country all over the country?
17     A.  No, I did not know that they met with
18  every supermarket chain across the country, which is a
19  pretty tall order.  I knew that they had met and had
20  relationships with a number of retailers.  We shared
21  names, just identified different key contacts at
22  different key chains.
23     Q.  When I say every supermarket chain, of
24  course there are many, many, many, but the largest

Page 60

1  supermarket chains in the country, do you know whether
2  or not Bob Fireman and Ann Raider had met with them to
3  discuss what they had to offer prior to the time that
4  CCMI was acquired by NAM?
5      A.  I think they had met with a number of
6  them.
7      Q.  And did you talk with Bob and Ann about
8  which grocery store chains those were?
9      A.  I'm sure I did.
10     Q.  Same question with respect to drug
11  stores, all the major drug stores Ann and Bob met with,
12  did you know that?
13     A.  My specific recollection is focused on
14  Duane Reade and the NACDS, National Association of Chain
15  Drug Stores.  Beyond that I don't recall any other
16  specific drug chain meetings.
17     Q.  And did you do any work to try to figure
18  out where the market was going for the types of services
19  that News America, I should say CCMI, provided?
20     A.  We were relying on CCMI's vision and
21  expertise to give us an idea of where the marketplace
22  was going.
23     Q.  This is prior to the acquisition?
24     A.  Yes.

## Page 61

1    Q. Did your due diligence in acquiring
2  Catalina provide you with any insights in that regard?
3        MR. KATZ: Objection.
4    A. In what regard?
5    Q. Well, before looking to acquire CCMI, you
6  looked into acquiring or investing in Catalina; correct?
7    A. Correct.
8    Q. Your testimony, they were the behemoth in
9  this business?
10   A. Yes.
11   Q. Prior to deciding whether or not this was
12 a good idea of pitching to the board of News America
13 that it was a good idea, did you do any due diligence
14 where Catalina's market was going?
15   A. We did a lot of due diligence on the
16 Catalina investment or proposed investment and its
17 direction.
18   Q. Right, and is that the same market
19 ultimately that you expected CCMI to fill?
20   A. No.
21   Q. How was it different?
22   A. Well, Catalina had patents. Catalina had
23 hardware installed. Catalina had integrated into the
24 point of sale system. What they were able to accomplish

## Page 62

1  was beyond the reach of CCMI.
2    Q. In the final analysis both companies were
3  involved in loyalty marketing; correct?
4    A. Correct.
5    Q. And the market for loyalty marketing
6  programs whether it's to Catalina or to CCMI is the same
7  market, isn't it?
8    A. Would you say that one more time, please?
9    Q. Sure. They were catering to the same
10 market, CCMI and Catalina?
11       MR. KATZ: Objection.
12   A. I don't think so.
13   Q. How was CCMI marketing to a different
14 segment of the loyalty marketing, loyalty program
15 market?
16   A. CCMI's business was heavily focused on
17 card manufacturing, on application processing, and those
18 areas. For Catalina that was an afterthought. They
19 were basically driving promotions through the point of
20 sale. They were really more in the business of purchase
21 behavior data utilization than loyalty marketing. To
22 compare the two is, it's not -- it's really not
23 comparable.
24   Q. Well, when you spoke with Bob Fireman

## Page 63

1  about his vision for CCMI, didn't he tell you that the
2  future was in substance going to be in loyalty marketing
3  using information generated at the point of sale?
4    A. Yes.
5    Q. And that's what Catalina did?
6    A. Yes.
7    Q. So you expected the direction of CCMI to
8  be the direction that Catalina was already going in,
9  loyalty marketing based on point of sale data; correct?
10   A. Loyalty marketing based on point of sale
11 data, correct.
12   Q. Therefore, when you were exploring the
13 possibility of acquiring Catalina, when you were
14 developing enough information to allow you to tell the
15 board of directors of News America it was a good
16 investment, you had already done some work to determine
17 what the market was for that type of service, hadn't
18 you?
19   A. We had done extensive work to determine
20 the potential of Catalina.
21   Q. So when you say you were relying
22 exclusively on CCMI's vision and expertise, that's not
23 really true, is it? You were also relying on what you
24 learned when you explored Catalina?

## Page 64

1        MR. KATZ: Objection.
2    A. That's not true. Catalina's business,
3  their metrics were evaluated based on number of stores
4  they could install, number of salespeople they could
5  have in place, number of coupons they could push through
6  their printers at the checkout. Their business model
7  was completely different.
8    Q. But their market was the same ultimately;
9  that is, loyalty marketing relying on customer data
10 acquired at the point of sale; correct?
11   A. That was the -- the focus of the business
12 was on purchase behavior data.
13   Q. Right, and so too was the future of CCMI;
14 right?
15   A. Yes.
16   Q. Did you learn that Coca-Cola had done a
17 study validating consumer relationship marketing; that
18 that was the next great thing? Did you ever see that
19 study?
20   A. I never saw the study. I'm vaguely
21 familiar with it.
22   Q. Did you see any studies in the context of
23 either acquiring CCMI or exploring the acquisition of
24 Catalina that gave you some confidence that loyalty

LELLOUCHE-5/25/07                    CondenseIt™

Page 65

1  marketing based on data collected at the point of sale
2  was where your market was going to ultimately go?
3        A. My market?
4        Q. The market you were hoping to get into by
5  acquiring CCMI.
6        A. I believe that the marketplace for
7  purchase behavior data had great promise.
8        Q. Did you see any studies or other
9  documents from third parties that facilitated that
10 confidence, that gave you additional confidence?
11       A. At the time?
12       Q. Prior to acquiring CCMI?
13       A. I can't recall.
14       Q. Have you seen any since?
15             MR. KATZ: At any time since 1999?
16             MR. PETERS: Yes, sir.
17       A. I've seen documents and reports that just
18 show that the penetration of loyalty cards in consumers'
19 hands has grown. I've seen documentation that shows
20 that the percentage of information collected on loyalty
21 cards as a percentage of total transaction has grown.
22       Q. Do you know how big the market is
23 presently?
24             MR. KATZ: Objection. Market for what?

Page 66

1        Q. Loyalty marketing programs in which money
2  is generated in loyalty marketing these days using
3  information collected at the point of sale?
4             MR. KATZ: Objection. By what category
5  of seller?
6        A. Are you talking about direct mail or are
7  you talking about point of sale?
8        Q. I'm talking about all programming done by
9  using information collected at the point of sale whether
10 it be targeted marketing, programming, or otherwise; is
11 there any study that you've seen that shows the size of
12 that collective marketing?
13            MR. KATZ: Objection.
14       A. I haven't seen any study like that.
15       Q. Is it fair to say that the market for
16 loyalty marketing programs is significantly bigger than
17 it was in 1999?
18       A. Yes.
19       Q. One hundred times bigger?
20            MR. KATZ: Objection.
21       A. No.
22       Q. Less than one hundred?
23       A. Substantially less.
24       Q. Can you put a number on it without

Page 67

1  devolving into speculation?
2        A. Well, the direct mail business, which is
3  really the only segment that we have opted to work in,
4  is approximately today, without postage, something in
5  the neighborhood of $35 million, maybe $40 million in
6  total, total industry.
7        Q. How much of that market does News America
8  have?
9        A. This year we'll do eight million.
10       Q. Are there other programs that News
11 America explored using data collected at the point of
12 sale other than direct mail that you know of?
13       A. Yes.
14       Q. Can you articulate them, list them?
15       A. We looked at other contact points,
16 certainly we looked to see whether kiosks, entrance
17 kiosks were going to be a viable opportunity, but they
18 are, they are and they continue to show to be failures,
19 over and over again. Then of course there was the soft
20 card technology where we were going to literally target
21 at the shelf utilizing the information on the chip
22 cards. Of course the Internet at some point with the
23 PlanetU technology linked into the purchase behavior
24 data was another way of doing that, but that was really

Page 68

1  unrelated to CCMI. They were not necessary to that
2  solution.
3        Q. You listed three things in addition to
4  direct mail that are the only sources of revenue that
5  News America explored to generate revenue from
6  information collected at the point of sale?
7        A. That I recall right now.
8        Q. We'll get into stored value later on in
9  the deposition, but is that also something that News
10 America looked into, generating income by stored value?
11       A. Stored value is separate from the
12 purchase behavior database marketing solution. It can
13 be used as a reward and integrated into it. But even to
14 this day we operate the Long's gift card program, and
15 they don't have a loyalty program. So they are not
16 dependent on each other by any means.
17       Q. My question is a little narrower than
18 that. I'm making sure that I understand that in
19 addition to these four potential sources of revenue
20 generation using cards --
21       A. Oh.
22       Q. -- using card, card programs, that
23 another way to generate revenue that News America has
24 explored and used is stored value?

Page 69

1     A. You're going to have to give me that one
2 more time.
3     MR. KATZ: Try it again.
4     Q. I will. Does News America make money
5 using stored value cards?
6     A. Yes.
7     Q. Okay. That's all I need to know. I'll
8 move on from there. Did you try to determine how much
9 market share CCMI had in card programs prior to
10 acquiring CCMI?
11     MR. KATZ: Can you run this by me again?
12 Do you understand the question?
13     THE WITNESS: I don't understand the
14 question.
15     MR. PETERS: I'll withdraw it. That's
16 the objection, sustained.
17     Q. CCMI generated revenue by providing card
18 programs to grocery stores, drug stores, and other
19 companies; correct?
20     A. Correct.
21     Q. And CCMI was not the only company doing
22 that at that time; is that right?
23     A. Correct.
24     Q. So that's the market I'm interested in.

Page 70

1     A. Okay.
2     Q. Did you try to determine how much of that
3 market CCMI had, existing market CCMI had serviced prior
4 to the acquisition?
5     A. Only through review of their financial
6 statements did we have any understanding of what they
7 were doing currently. It was really more -- they didn't
8 really have very much.
9     Q. I'm more interested in the overall market
10 and their percentage of the market. Did you try to
11 determine the size of the overall market, existing
12 market, prior to acquiring CCMI?
13     A. We believed that there was a big upside
14 in terms of the retailers that had not yet deployed card
15 marketing, and we believed that we had an opportunity to
16 bid on those programs; in other words, card marketing
17 was still very much a niche and it was not a nationwide
18 phenomenon.
19     Q. That's something you thought there was
20 substantial growth in?
21     A. Yes.
22     Q. Of those retailers that had card
23 marketing or had gone to card marketing, did you try to
24 determine what size of the market, what the size of the

Page 71

1 existing market was?
2     A. My recollection of it is that it was
3 nominal.
4     Q. Of that nominal market do you know what
5 percentage of the market CCMI had developed?
6     A. I don't know the answer to that question.
7     Q. Did Bob Fireman or Ann Raider try to give
8 you an order of magnitude; in other words, did they say
9 to you in the context of your conversations with them,
10 We have developed more than a third of this market
11 already?
12     A. I don't recall any conversation like
13 that.
14     Q. I think you may have answered this, but
15 prior to acquiring CCMI, News America Marketing had no
16 one in-house with expertise in card programs; correct?
17     A. Correct.
18     Q. It had no expertise in targeted
19 marketing; correct?
20     A. Depends on your definition of targeted
21 marketing.
22     Q. Using information generated at the point
23 of sale to analyze purchasing behavior and market
24 specifically to consumers?

Page 72

1     A. We did not have expertise in that area.
2     Q. Did CCMI?
3     A. Yes.
4     Q. Did News America Marketing have any
5 expertise in loyalty programs?
6     A. No.
7     Q. Did CCMI have those expertise?
8     A. Yes.
9     Q. Did News America Marketing have any
10 expertise in stored value programs prior to the CCMI
11 acquisition?
12     A. No.
13     Q. Did CCMI?
14     A. Prior to the acquisition?
15     Q. Yes, sir.
16     A. I don't recall any stored value programs
17 that they operated prior to the acquisition.
18     Q. Did you discuss the concept of stored
19 value with Bob Fireman prior to the acquisition?
20     A. I can't remember anymore now.
21     Q. Do you remember any discussions among
22 your team prior to the acquisition about the possibility
23 of generating revenue using stored value cards?
24     A. Yes.

LELLOUCHE-5/25/07     CondenseIt™

**Page 73**

1     Q. And was that in the context of the
2 acquisition of CCMI?
3     A. I don't think so.
4     Q. What do you recall about it in a general
5 way?
6     A. I don't recall -- I recall it as much
7 more of a post-acquisition discussion when stored value
8 gift cards, whatever you want to call them, started to
9 really hit the radar screen.
10    Q. I think you've testified that as between
11 CCMI and News America, CCMI had the expertise in
12 targeted marketing and loyalty programs; right?
13    A. Yes.
14    Q. Do you think it made good business sense
15 to allow CCMI to use that business expertise once NAM
16 acquired CCMI?
17    A. Yes.
18    Q. Do you think NAM was obliged to allow
19 CCMI to use that expertise in order to develop the
20 business?
21      MR. KATZ: Objection.
22    A. I don't know what obliged means.
23    Q. From a business standpoint do you think
24 they had an obligation to use CCMI expertise to help

**Page 74**

1 drive sales?
2      MR. KATZ: Objection.
3    A. I believe they relied on them to drive
4 sales.
5    Q. Do you believe that it made business
6 sense to allow CCMI to use its expertise in directing
7 the business?
8    A. I'm not sure if direct -- you're going to
9 have to define directing the business for me. That
10 means a lot of different things to me.
11    Q. Determining what direction the business
12 should go in given its expertise versus NAM's expertise?
13      MR. KATZ: Objection.
14    A. I believe that CCMI's obligation was to
15 recommend and advocate directions to go in and seek
16 consent of management.
17    Q. Do you think News America Marketing had
18 an obligation to listen to those recommendations and to
19 listen to Bob and Ann advocate for certain positions?
20      MR. KATZ: Objection.
21    A. I believe that they listened.
22    Q. Do you believe they had an obligation to
23 listen?
24      MR. KATZ: Objection.

**Page 75**

1    A. An obligation to listen?
2      MR. KATZ: Do you understand the
3 question?
4      THE WITNESS: I really don't.
5    Q. You don't understand my question. Do you
6 think News America Marketing had an obligation to listen
7 to Ann Raider and Bob Fireman in areas where they had
8 expertise and News America did not? That's my question.
9 If you don't understand it, I won't ask it again.
10      MR. KATZ: Objection. It sounds like
11 you're asking --
12      MR. PETERS: Don't coach, please. I have
13 a question, and if he says I can't answer it, my
14 commitment to you, Gordon, is I'm going to move on.
15      MR. KATZ: And my objection is duly
16 noted.
17      (Record read)
18    A. I don't understand the question.
19    Q. Okay. I'll move on like I said I would.
20 Prior to the purchase of CCMI, was it NAM's goal to grow
21 CCMI's business?
22    A. Of course.
23    Q. Do you think NAM had an obligation to act
24 in good faith to accomplish that goal?

**Page 76**

1      MR. KATZ: Objection.
2    A. Again with the obligation, I don't really
3 understand how that -- I don't understand the legal
4 meaning of it. I don't understand what that means.
5    Q. You don't understand what obligation
6 means?
7    A. Not, not in, not in this sense.
8    Q. Do you have your own definition?
9    A. Of obligation?
10    Q. Right.
11    A. Being obliged, it sounds like it's
12 mandated to me.
13    Q. So is that what your definition of
14 obliged or obligation would be, a mandate?
15    A. When you say that that's what I think.
16    Q. So I want you to use that definition.
17    A. I think the answer is no.
18    Q. So let me ask the question again just to
19 make sure I understand your answer in the context of our
20 definition, or your definition I should say. Do you
21 think News America Marketing had an obligation to act in
22 good faith to accomplish the goal of growing CCMI's
23 business?
24      MR. KATZ: Objection.

## Page 77

1   A. I think News America had the obligation
2 to profitably grow CCMI's business where it saw fit.
3   Q. My question is different. My question
4 is, do you think that News America Marketing had an
5 obligation to act in good faith to accomplish the goal
6 of growing CCMI's business?
7   A. I think they --
8   MR. KATZ: Objection.
9   Q. Can you answer the question yes or no?
10   A. Say it again so I can make sure I'm
11 clear.
12   Q. Do you think News America Marketing had
13 an obligation to act in good faith to accomplish the
14 goal of growing CCMI's business?
15   A. Yes.
16   Q. Do you think News --
17   MR. KATZ: Note the objection.
18   Q. Do you think News America Marketing had
19 an obligation to make rational business decisions?
20   A. Yes.
21   Q. Do you believe that News America
22 Marketing had an obligation to be fair to Ann Raider and
23 Bob Fireman?
24   MR. KATZ: Objection.

## Page 78

1   A. No.
2   Q. Do you believe that News America
3 Marketing invariably acted in good faith toward Ann
4 Raider and Bob Fireman?
5   A. Absolutely.
6   Q. Do you believe that all of the decisions
7 News America Marketing made regarding CCMI's business
8 had business justifications?
9   A. To the best of the knowledge at the time.
10   Q. So the answer is yes?
11   A. Yes.
12   Q. Do you believe News America Marketing had
13 an obligation to try in good faith to increase CCMI's
14 revenue?
15   MR. KATZ: Objection.
16   A. No.
17   Q. Do you believe that News America
18 Marketing was obliged to provide support to CCMI?
19   MR. KATZ: Objection.
20   A. Support commensurate with the performance
21 of the business.
22   Q. Do you believe that News America
23 Marketing had an obligation to act in good faith to help
24 Ann Raider and Bob Fireman maximize their potential to

## Page 79

1 earn their earn out?
2   MR. KATZ: Objection.
3   A. Say that to me one more time.
4   Q. Yes, sir. Do you believe that News
5 America Marketing had an obligation to act in good faith
6 to help Ann Raider and Bob Fireman maximize their
7 potential to earn the earn out in the stock purchase
8 agreement?
9   MR. KATZ: Objection. Don't speculate.
10   A. I don't know.
11   MR. PETERS: You were so good until the
12 very last question, I'll let it go.
13   Q. Did you ever see any memoranda that
14 described the value CCMI could have to News America
15 Marketing prior to the acquisition?
16   A. I saw marketing plans. I saw business
17 plans I should say.
18   Q. Who generated the business plans?
19   A. CCMI.
20   Q. Can you describe them for me?
21   A. They were profit and loss statements
22 going out into the future. They were delineated by
23 product line and assumptions associated with them.
24   Q. Did your team discuss the business plans?

## Page 80

1   A. We did.
2   Q. Do you recall in substance what your team
3 said regarding business plans of CCMI?
4   A. I don't recall.
5   Q. Did your team discuss the business plans
6 with CCMI?
7   A. I don't know.
8   Q. Do you remember any discussions at all
9 about the business plans? In other words, you testified
10 you saw them. Do you remember any dialogue at all about
11 them?
12   A. I remember dialogue about the opportunity
13 for magazines. I remember the discussion about moving
14 into different trade classes. I remember certainly the
15 data hosting opportunity, discussions about that. So
16 yes, I do remember talking about those elements.
17   Q. The business plans listed projected
18 revenue; is that correct?
19   A. Yes.
20   Q. And was that information important to
21 your team in determining whether or not to recommend the
22 acquisition?
23   A. Yes.
24   Q. By the way, am I correct that that really

LELLOUCHE-5/25/07                 CondenseIt™

## Page 81

1  was your mandate to try to determine good acquisitions?
2        A.  Yes.
3        Q.  You were not making the decision on
4  whether or not to acquire a company; you were in the
5  role of recommender?
6        A.  Correct.
7        Q.  And I take it you looked at companies and
8  looked at companies' business plans and financials and
9  determined that they were bad investments?
10        MR. KATZ:  Could I have that question --
11        A.  Yes.
12        MR. PETERS:  I'll rephrase it or ask it
13  again so you have it for your notes.  I asked him
14  whether or not they looked at other companies' business
15  plans and financial records and came to the conclusion
16  that they were not a recommended acquisition, or a bad
17  investment, and the answer to that question is yes;
18  correct?
19        A.  Yes.
20        Q.  There were how many of these companies
21  where you vetted them and determined they were bad
22  investments?
23        A.  I couldn't say how many.
24        Q.  A number?

## Page 82

1        A.  A number.
2        Q.  Right.  Kissing a lot of frogs; right?
3        MR. KATZ:  Objection.
4        Q.  Frogs.
5        A.  Is that a legal term?
6        Q.  As a matter of fact it is.
7        A.  We met with many inventors.  We met with
8  many people who had various stages of realistic notions
9  to business and many different meetings.
10        Q.  In the context of these meetings one of
11  your goals was to determine whether or not they were
12  financially viable businesses; correct?
13        A.  Among other evaluation points.
14        Q.  And you looked at their financials?
15        A.  As much as they had them.
16        Q.  Right, and you looked at business plans
17  if they had them as well?
18        A.  Yes.
19        Q.  And you tried to determine whether or not
20  the plans were viable?
21        A.  Yes.
22        Q.  And based on those analyses you either
23  made a recommendation to acquire or never made a
24  recommendation at all?

## Page 83

1        A.  Almost in every case we would make a
2  recommendation to move forward or to not move forward.
3        Q.  And you'd make that in a presentation to
4  the board?
5        A.  Some of them weren't even worthy of it.
6  Some of them were just a note.
7        Q.  And were there always documents generated
8  of your opinion on the matter?
9        A.  Not always.
10        Q.  It wasn't uncommon?
11        A.  It depended on who brought us the deal.
12  It depended on the size of the deal versus the strategic
13  fit.
14        Q.  My last series of questions are really
15  targeted at this question:  You had expertise on reading
16  financial records; correct?
17        A.  Yes.
18        Q.  And you had expertise on looking at
19  business plans; correct?
20        A.  Yes.
21        Q.  And you had expertise on determining
22  whether or not a business plan was a viable business
23  plan from your perspective and opinion?
24        A.  Viable is a big word.  I couldn't say

## Page 84

1  that that was the base case.
2        Q.  But the only acquisitions you ever
3  recommended were viable acquisitions; correct?
4        MR. KATZ:  Objection.
5        A.  Obviously not.
6        Q.  Well, sometimes they prove not to be;
7  like Softcard, for example, proved not to be a viable
8  acquisition, but you believed when you made the
9  recommendation it was right?
10        A.  I believe that the foundation for
11  production of the financial statements and the business
12  plans, the assumptions, the calculations, the sizing of
13  the marketplace, basic fundamentals were what I was
14  looking at.  Because in many cases, such as with CCMI,
15  we were going on good faith that we were being presented
16  with a valid, legitimate, and plausible outcome.
17        Q.  And you undertook that analysis in terms
18  of CCMI's business plan?
19        A.  I did not.
20        Q.  Who did?
21        A.  John Rubin.
22        Q.  Were you involved at all in the process
23  of looking at the business plan?
24        A.  As I said before, early on I saw

Page 85

1  documents, but it was not my deal.
2      Q.  Did you and John and Heather Harde round
3  table different companies to share views, concerns,
4  questions?
5      A.  We spoke frequently.
6      Q.  In other words, you really acted as a
7  team, didn't you?
8      A.  We did.
9          MR. KATZ:  Objection.
10     Q.  And although John Rubin was the lead on
11  this acquisition, he relied on your insight, on your
12  expertise, on your experience in helping him understand
13  that this was a good acquisition; isn't that a fair
14  statement?
15     A.  Relied on me is not a good statement.  I
16  was a contributor.
17     Q.  Used you as a sounding board?
18     A.  I was more involved in terms of
19  discussions and I was involved in presentations to
20  senior management relative to CCMI.
21     Q.  So let's talk about those senior
22  management presentations.  To whom was the opportunity
23  to acquire CCMI presented?
24     A.  Well, it certainly was presented to the

Page 86

1  News America Marketing management and then on either one
2  or more occasions I flew to California to present to
3  Mr. Chernin and Locklin Murdoch, in New York to Dave
4  Devoe, Sr.  I think that's the extent of it.
5      Q.  You presented both to News America
6  Marketing and to News Corporation?
7      A.  Correct.
8      Q.  And by you, I mean your team?
9      A.  Correct.
10     Q.  And these presentations, did they involve
11  documents?
12     A.  Yes.
13     Q.  Can you describe the documents that were
14  used to present the opportunity to News America
15  Marketing?
16     A.  Very high level documents talking about
17  the business of Softcard, the business of CCMI, the
18  business of PlanetU.
19     Q.  Why were all three of these companies
20  being vetted to News America Marketing simultaneously?
21     A.  They were the three recommendations we
22  were making for moving forward.
23     Q.  There were independent recommendations?
24     A.  They were independent recommendations,

Page 87

1  yes.
2      Q.  These high level materials, were they
3  Excel spreadsheets?
4      A.  I doubt it.
5      Q.  Were they PowerPoints?
6      A.  Yes.
7      Q.  Who prepared them?
8      A.  The venture group.
9      Q.  One of you three; by you three, I mean
10  Rubin, Harde --
11     A.  Yes.
12     Q.  -- Lellouche?
13     A.  Yes.
14     Q.  Did you have administrative support?
15     A.  I can't recall.
16     Q.  Do you know who presented the PowerPoints
17  that were used to describe the opportunity to News
18  America Marketing?
19     A.  I can't recall that either.
20     Q.  Okay.
21     A.  It was more than one meeting.  It was a
22  continuum.
23     Q.  I take it you don't have a copy on your
24  laptop or otherwise?

Page 88

1      A.  I may have a copy of it.
2      Q.  On a laptop or hard drive or --
3      A.  If I didn't produce it, then that is my
4  error.
5      Q.  Okay.  Let's just digress briefly.  Where
6  do you have documents that describe this transaction?
7      A.  I have one deck that I'm specifically
8  recalling now called Venture Group Update, which I
9  thought that I produced, but I can't be certain.
10     Q.  When you say deck, what's that?
11     A.  A PowerPoint deck.
12     Q.  Oh, thank you.  Venture Group Update,
13  PowerPoint deck, okay.  So sometime just after Memorial
14  Day would you look, maybe even on the weekend --
15     A.  Oh, absolutely.
16     Q.  -- and just send it off to Gordy so he
17  can take a look at it and get it to me?
18     A.  Sure.
19     Q.  Was this PowerPoint deck also used to
20  present the opportunity to News America?
21     A.  Maybe.
22     Q.  Were there other documents used to
23  describe the opportunity to News America?
24     A.  Possibly in that same Venture Group

LELLOUCHE-5/25/07                    CondenseIt™

Page 89

1    Update, which is in that same deck, that same set of
2    documents which I can, which I will provide.
3        Q.  Okay.  Did you discuss in these
4    presentations to senior management of either entity
5    CCMI's business plan?
6        A.  In broad terms, yes.
7        Q.  And did you tell senior management that
8    this was a business plan that you believe should be
9    supported?
10           MR. KATZ:  Objection.
11       A.  Yes.
12       Q.  And did senior management respond to your
13   recommendation that the business plan be supported by
14   agreeing with your recommendation?
15          MR. KATZ:  Objection.
16       A.  Again, you're getting into a field that
17   was more John Rubin's than me.
18       Q.  Well, what's your memory?
19          MR. KATZ:  Well, hold on.  Stop for a
20   minute.  Why don't we have the question phrased again
21   and then what is your memory of whatever the particular
22   subject matter of the question is.
23       Q.  I can do that, but let me ask you,
24   Mr. Lellouche, have I succeeded already in confusing

Page 90

1    you?
2        A.  Yes.
3        Q.  All right, then I'll start again.  It's
4    easier to confuse Mr. Katz typically.  For our cold
5    record, that's a joke.
6           You testified that your team told senior
7    management that CCMI's business plan should be
8    supported.  My question to you, sir, was did senior
9    management respond in substance that they agreed with
10   your recommendation.  You told me that's John Rubin's
11   bag.  My question to you is, what do you remember?
12       A.  My recollection is that in this one
13   senior management presentation, the PowerPoint deck, the
14   Venture Group Update was accepted, but it was not a
15   technical document.  Beyond that it was really out of my
16   area.
17       Q.  Okay.
18          (Marked Exhibit 1; Memorandum, 5/14/99)
19          MR. KATZ:  Off the record.
20          (Discussion held off the record)
21   BY MR. PETERS:
22       Q.  Mr. Lellouche, I'm showing you a
23   document.  It has a document control number on it of
24   NAM 01474 through 01480.  I'll note for the record that

Page 91

1    you're not shown as a copy on this memoranda and
2    attached materials, but I'd like you to take a look at
3    it long enough to tell me whether or not you recall
4    seeing the document or any part of the document before I
5    just handed it to you a moment ago?
6        A.  I have not seen this document.
7        Q.  Okay.  Let me just get some context for
8    the record.  The document starts, quote, News America
9    Marketing has reached a verbal agreement to acquire
10   CCMI, a company specializing in database marketing and
11   providing customer loyalty programs for retail chains
12   through the frequent shopper programs.
13          Is that sentence ostensibly written by
14   David Devoe, the author of the document, is that
15   something you agree with; in other words, the
16   description of CCMI?
17       A.  Yes.
18       Q.  If you take a look at the third page,
19   NAM 1476, you'll see projected results listing a total
20   revenue for year five at $32,220,000, see that?
21       A.  I do.
22       Q.  Do any of these numbers look familiar to
23   you, ring a bell at all, in the context of your work and
24   due diligence?

Page 92

1        A.  No.
2        Q.  Do you know where the number came from?
3        A.  I don't.
4        Q.  Do you recognize any of the handwriting
5    on the document?
6        A.  I don't.
7        Q.  Take a look at the model assumptions
8    which is under projected results.  It's on the page we
9    were just looking at.
10       A.  Okay.
11       Q.  And I'm going to give you a minute to
12   read them, sir.  I'm going to ask then whether or not
13   any of these assumptions were discussed among your team
14   prior to the acquisition.
15       A.  Okay.
16       Q.  Do you recall discussing any of these
17   model assumptions with John Rubin or Heather Harde prior
18   to the acquisition of CCMI?
19       A.  No.
20       Q.  So none of these model assumptions
21   presently look familiar to you at all?
22       A.  No.
23       Q.  Were you involved in discussing with Bob
24   Fireman or Ann Raider what News America Marketing could

Page 93

1  do, would do, to grow CCMI's business post acquisition?
2      A. Say that to me one more time, please.
3      Q. Were you involved in any conversations
4  that in substance dealt with the topic of what News
5  America Marketing would do for CCMI post acquisition to
6  help grow the business?
7      A. Yes.
8      Q. Can you tell me what you recall saying
9  News America Marketing would do for CCMI to help grow
10  CCMI's business post acquisition?
11          MR. KATZ: Before you answer, this is my
12  err, is your question asking for discussions that
13  Mr. Lellouche had prior to the closing?
14          MR. PETERS: Yes.
15          MR. KATZ: Or at any time?
16          MR. PETERS: Prior to closing.
17      A. Oh, I did not have any.
18      Q. So just so we have the question now
19  clarified, you have no recollection of talking to Bob
20  Fireman or Ann Raider about what News America Marketing
21  would do for CCMI to help grow revenue prior to the time
22  that the company was acquired?
23      A. I had none.
24      Q. Do you have a memory of talking to John

Page 94

1  Rubin about that topic?
2      A. I don't have any memory of that at all.
3      Q. Do you have any memory of talking to
4  Heather Harde about that?
5      A. No.
6      Q. Do you remember anything about the level
7  of funding for CCMI's business prior to the time it was
8  acquired? I'm going to give you the number of a million
9  and a half to see if it refreshes a recollection.
10          MR. KATZ: Objection to the form of the
11  question.
12      A. The first time I heard a million and a
13  half dollars was yesterday.
14      Q. Do you recall any discussions with Bob
15  Fireman or Ann Raider about synergies between News
16  America Marketing and CCMI; in other words, how News
17  America Marketing could help CCMI develop as a company?
18          MR. KATZ: objection, time period.
19      Q. Prior to the closing?
20      A. No.
21      Q. Did you talk to Bob Fireman at this
22  meeting that you spoke about a while back about News
23  America Marketing and what News America Marketing does?
24      A. Which meeting?

Page 95

1      Q. The one that occurred prior to your
2  recommendation to the boards or to the companies that
3  CCMI be acquired?
4      A. No, there was no discussion like that at
5  all.
6      Q. Did you ever try to market News America
7  Marketing to CCMI; in other words, tell CCMI why News
8  America Marketing would be a good partner?
9      A. No.
10      Q. There was never any discussion about News
11  America Marketing and its capabilities prior to the
12  acquisition that you can recount for me?
13      A. I cannot recount any for you.
14      Q. Were you involved at all in the
15  negotiations that led to the execution of a stock
16  purchase agreement for CCMI?
17      A. No.
18      Q. Did you read the stock purchase agreement
19  prior to the execution?
20      A. No.
21      Q. Had you ever read the stock purchase
22  agreement?
23      A. Only recently.
24      Q. So not in the context of your work with

Page 96

1  Bob Fireman or Ann Raider; is that correct?
2      A. Correct.
3      Q. Following the acquisition of CCMI what
4  was your role with the company; and by the company, sir,
5  I should say CCMI, now a division or entity within News
6  America Marketing?
7      A. Initially it was none. John Rubin was
8  overseeing the business. I was working on the Softcard
9  program/product/company. However, when John Rubin left
10  the company Dave Devoe, Jr. asked me to take on both
11  responsibilities, Softcard as well as CCMI.
12      Q. Why did John Rubin leave NAM?
13      A. He left to go for another opportunity.
14      Q. Where did he go?
15      A. He went to Greenfield Online.
16      Q. What kind of company is that?
17      A. Online research.
18      Q. Is that where he is presently?
19      A. No.
20      Q. He's back with News Corp.?
21      A. News America Marketing.
22      Q. What's his position these days?
23      A. He is a manager or a VP of the
24  co-marketing group.

LELLOUCHE-5/25/07    CondenseIt™

Page 97

1    Q. Co-marketing?
2    A. Yes.
3    Q. Can you tell me what that is?
4    A. I described it earlier. That's the group
5    that secures the contracts with the retailers as well as
6    executes programs on an account-specific basis utilizing
7    our core products.
8    Q. And tell me about the conversation, if
9    you would, between you and Mr. Devoe where he asked you
10    to take on the responsibilities both for Softcard and
11    for CCMI?
12    A. I really don't recall any specifics of
13    it. It was an assignment.
14    Q. Were you told how much time you should
15    devote to CCMI or Softcard?
16    A. No.
17    Q. How much of your time was taken up on
18    Softcard at the time you were asked to take on CCMI?
19    A. I don't recall.
20    Q. Immediately prior to taking on the
21    responsibility for heading up CCMI, how much time were
22    you spending on a weekly basis on Softcard?
23    A. It varied at times; some more, some less,
24    depending on whether we were in the midst of testing in

Page 98

1    Albuquerque or whether we were still in developmental
2    stages.
3    Q. What was your job title at the time you
4    were asked to take on responsibilities for heading up
5    CCMI?
6    A. I was senior vice-president of News
7    America Marketing.
8    Q. What were your job responsibilities
9    immediately prior to taking on the responsibilities for
10    heading up CCMI?
11    A. I was responsible for oversight of CCMI
12    as well as oversight of Softcard.
13    Q. No, I mean immediately prior to taking on
14    CCMI?
15    A. Oh, I'm sorry. Say it again, please.
16    Q. Immediately prior to taking on the
17    responsibilities for overseeing CCMI, what were your job
18    responsibilities as a senior vice-president for News
19    America Marketing?
20    A. I was managing the Softcard investment.
21    Q. Anything else?
22    A. Not that I can recall.
23    Q. At the time you were asked to take on
24    oversight of CCMI, had the Softcard investment reached

Page 99

1    some point where it was requiring less time to oversee?
2    A. No, no, it was about the same. We hadn't
3    launched the test in Albuquerque yet. Things were still
4    developmental at the time.
5    Q. For what period of time did you devote
6    your professional energies to trying to get the Softcard
7    investment off the ground? So 1999 to when?
8    A. 2002, 2003, something along those lines.
9    Q. Then at that point the determination was
10    made to pull the plug on Softcard?
11    MR. KATZ: Objection.
12    A. I don't really know what pull the plug
13    means.
14    Q. It's like kissing a frog except
15    backwards. It means no longer devoting your energies to
16    trying to get this failed undertaking to succeed.
17    MR. KATZ: Objection.
18    Q. Then I'm going to go back to pulling the
19    plug. That's what I mean. What I'm getting at, all
20    kidding aside, because there is very little opportunity
21    for that typically, what I'm asking you is this: Was
22    2003 when News America Marketing finally made the
23    determination that your energies were not, should not be
24    utilized to try to continue to get Softcard to be a

Page 100

1    successful investment?
2    A. It may have been earlier than that, but
3    it was on or around that time when I, my activity with
4    Softcard diminished dramatically.
5    Q. And until that time you were working
6    diligently to try to get Softcard to succeed?
7    A. Of course.
8    Q. And simultaneously you were overseeing
9    CCMI?
10    A. Yes.
11    Q. Prior to taking on the responsibility for
12    overseeing CCMI, all of your professional energy was
13    dedicated to Softcard?
14    A. Yes.
15    Q. And you did not diminish your
16    professional energy to try to get Softcard off the
17    ground after taking on CCMI, did you?
18    MR. KATZ: Objection.
19    Q. You worked just as hard on Softcard,
20    didn't you?
21    A. The amount of work that was required by
22    me relative to Softcard ebbed and flowed. It wasn't an
23    all-consuming activity.
24    Q. Ever?

Page 101

1    A. At times it was. At times it wasn't.
2    Q. When you took over CCMI did you take over
3 any of Ann Raider's responsibilities?
4        MR. KATZ: Objection.
5    A. Not initially.
6    Q. When you took over CCMI did you take over
7 any of Bob Fireman's responsibilities?
8    A. Not initially again.
9    Q. Why, sir, were you the logical choice to
10 take over CCMI when Bob Fireman and Ann Raider had the
11 expertise in running that business?
12    A. I was the News America Marketing
13 representative to a CFO, so I was the one who was
14 reporting in to management about the activities of the
15 business.
16    Q. You said initially you didn't take over
17 any of Ann Raider's responsibilities for CCMI. Did that
18 change?
19    A. Over time, yes.
20    Q. Can you describe the genesis of that?
21    A. Well, initially, and if I'm getting this
22 out of chronological order, Kevin Tripp moved into,
23 moved under working with Marty Garofalo, who was in
24 charge of the iGroup's manufacturing sales effort. So

Page 102

1 that was not my doing. That was done separately from
2 me. And I believe he initially worked for Ann. And
3 then subsequent to that I took over the management of
4 the retail sales effort, which was Ann's responsibility.
5    Q. Are there other responsibilities that
6 were once Ann Raider's and then assumed by you besides
7 the two that you just articulated?
8    A. None that I can recall.
9    Q. Why did you take over the retail sales
10 effort from Ann Raider?
11    A. Lack of performance, lack of ability to
12 manage, lack of deliverables.
13    Q. Anything else?
14    A. No.
15    Q. How did the performance improve once you
16 took over?
17    A. Ann was able to focus on her sales as
18 opposed to management, which was not her strength, and I
19 was able to devote more energy to direct supervision of
20 the sales force.
21    Q. And did --
22    A. Several of whom were in New York right
23 outside of my office. So it became much easier to have
24 to interface with them.

Page 103

1    Q. There were sales reps that reported to
2 Ann Raider?
3    A. Mm-hmm, yes.
4    Q. And then they reported to you?
5    A. Yes.
6    Q. And that improved sales?
7    A. Somewhat.
8    Q. How much?
9    A. I don't recall.
10    Q. De minimus?
11    A. I don't recall.
12    Q. That's a legal term for meaning not a
13 whole lot.
14    A. Not a whole lot.
15    Q. And the responsibilities that you took
16 over from Bob Fireman, can you describe those for me and
17 when they were removed from him?
18    A. Bob was managing the operations of the
19 business and he was managing all the card production,
20 all the data processing, data hosting, all the
21 operational elements. On or around July of 2001 we
22 moved all of that activity, except for the data hosting,
23 over to Mike Cleary who had joined the group as VP of
24 operations. He had actually joined the group in January

Page 104

1 2001.
2    Q. And I take it Mr. Cleary had had
3 extensive experience in loyalty marketing?
4    A. No.
5    Q. I take it he had extensive experience in
6 card programs?
7    A. No.
8    Q. I take it he had some experience in card
9 programs?
10    A. No.
11    Q. I take it he had some experience in
12 loyalty marketing?
13    A. No.
14    Q. How did it make business sense to take
15 away those responsibilities from someone who you've
16 articulated was an expert as compared to anyone else at
17 NAM?
18    A. Did I articulate as an expert?
19        MR. KATZ: I'm not sure he said that.
20    Q. As between you and Bob Fireman who had
21 expertise in loyalty marketing?
22    A. Say that to me one more time.
23    Q. As between anyone at NAM and Robert
24 Fireman, in July of 2001 who had the expertise, who was

LELLOUCHE-5/25/07                CondenseIt™

## Page 105

1 the expert, in loyalty marketing relying on data
2 acquired at the point of sale?
3        A. I wouldn't call it expertise. I would
4 call it ineptitude.
5        Q. I would call that nonresponsive. My
6 question is -- I'm making a comparison. I'm asking you
7 to tell me who had more expertise than Bob Fireman at
8 News America Marketing in July of 2001 on loyalty
9 marketing relying on data acquired at the point of sale?
10       A. And I'm saying that expertise is
11 debatable because performance proved the latter; he was
12 not an expert.
13       Q. Who had more experience in loyalty
14 marketing relying on information generated at the point
15 of sale in July of 2001, who? Was it Mike Cleary?
16       A. Bob Fireman had more experience.
17       Q. Did anyone at News America have more
18 experience than Bob Fireman?
19       A. No.
20       Q. Let's go back earlier to you and your
21 efforts in terms of taking over CCMI. Do you think it
22 made sense to take a senior manager like yourself who
23 was one hundred percent occupied on Softcard and give
24 him responsibilities for overseeing CCMI?

## Page 106

1        MR. KATZ: Objection.
2        Q. Do you think that made sense?
3        MR. KATZ: Objection. You can still
4 answer the question if you understand it.
5        A. It made perfect sense to me.
6        Q. How much of your business week was
7 devoted to working on CCMI in 2000 when you first took
8 over?
9        A. I don't know.
10       Q. Half?
11       A. At least.
12       Q. So you went from one hundred percent
13 Softcard to at least fifty percent CCMI?
14       A. I wouldn't say that's the case. I think
15 that, you know, often times at News America you're asked
16 to do more.
17       Q. Is that what happened here? Did your
18 hours increase, for example?
19       A. Hours increased, support increased,
20 breadth of coverage increased.
21       Q. How many hours a week were you working in
22 2000?
23       A. Oh, anywhere from ten to twelve per day,
24 not per week.

## Page 107

1        Q. You sound like one of my associates. I
2 mean per week. Ten to twelve hours a day?
3        A. Sure.
4        Q. Work on CCMI on a daily basis?
5        A. There was never a -- it wasn't, okay,
6 here's Softcard's day, here's CCMI's day, here's
7 Softcard's day.
8        Q. My question is, did you work on CCMI
9 business on a daily basis do you think?
10       A. Of course.
11       Q. What were your job responsibilities for
12 CCMI?
13       A. At what time?
14       Q. In 2000 when you first took over, what
15 were you tasked with doing?
16       A. I was tasked with supervising the
17 activities of the business.
18       Q. What did that involve?
19       A. Attending executive committee meetings,
20 providing feedback to management, giving direction to
21 the senior management of CCMI, guiding them through a
22 name change, guiding them through a location change,
23 liaising with the organization.
24       Q. Prior to taking over the role as the lead

## Page 108

1 person at CCMI, what did you do to familiarize yourself
2 with the business?
3        A. Well, I had been attending meetings, and
4 I had been learning as we went along, but I was quite
5 reliant on the direction that Bob and Ann were providing
6 in terms of the strategic plans of the company, vendor
7 recommendations, retailer opportunities, manufacturer
8 opportunities.
9        Q. Okay. So you learned on the job like you
10 did back in the days when you went from Sheraton to Act
11 Media; right?
12       A. Yes.
13       Q. You didn't sit down with Bob Fireman or
14 Ann Raider and get sort of a download of information
15 over a period of weeks, did you?
16       A. Oh, we had constant conversations back
17 and forth.
18       Q. How long after the acquisition did you
19 become the head of CCMI, period of months; right?
20       A. Period of months, probably on or around
21 the time it became SmartSource Direct.
22       Q. So we're talking seven or eight months
23 later?
24       A. That sounds about right.

Page 109

1    Q. Okay. Did John Rubin leave after October
2  of '99?
3    A. I don't know.
4    Q. Did you take the position right after
5  John Rubin left?
6    A. I did.
7    Q. So if Rubin left in October of '99 it's
8  about what, three, four months after the acquisition
9  that you became the head of CCMI?
10    A. Yes.
11    Q. In that three or four months you believe
12  you learned enough about CCMI's business to run it?
13    A. From the level that I was running it with
14  the principals, Bob and Ann, really running the
15  day-to-day, it was enough to get started.
16    Q. But you couldn't run the company without
17  Bob's input, could you?
18    MR. KATZ: Objection. I mean, that's a
19  hypothetical.
20    A. I don't know that to be the case.
21    Q. You think you might have been able to run
22  CCMI without Bob Fireman's guidance?
23    A. I think that almost immediately when I
24  became involved with the business, it became clear that

Page 110

1  while Bob had experience at this that he was
2  obstructionist; that he was uncooperative; that he was
3  out for himself; that he had no intention of integrating
4  with the News America Marketing organization; that his
5  contributions were counterproductive in so many cases
6  that his presence at times was the complete opposite of
7  being instructive or constructive.
8    Q. Do you think you could run the business
9  without Bob's insight as to what he had done for the
10  past ten years to develop this market?
11    A. Certainly as well as it was being run.
12    Q. That's what you think?
13    A. Absolutely.
14    Q. You think you could do the business of --
15  strike that.
16    Do you think that you could do what Ann
17  Raider was doing for this business without Ann Raider's
18  guidance?
19    A. They were doing very little, so.
20    Q. So the answer is my question is yes?
21    A. Absolutely.
22    Q. You didn't need Ann's help to do what Ann
23  was doing; right?
24    A. No.

Page 111

1    Q. You didn't need Bob's help to do what Bob
2  was doing; right?
3    A. No, once the vendors were identified and
4  the subcontractors were identified we could proceed.
5    Q. You were ready to run this business after
6  four months?
7    A. We were able to assume management control
8  of the business.
9    Q. Let me just ask you this question from
10  the highest level. Do you think you succeeded?
11    MR. KATZ: Objection. Succeeded at what?
12    Q. Do you think you grew this business?
13  That was your goal, wasn't it?
14    A. The evidence is yes.
15    Q. Do you think that that has been a success
16  for News America Marketing?
17    A. Yes.
18    Q. The acquisition of CCMI?
19    A. I think that -- hum, I think that the
20  answer to that question is no.
21    Q. Okay.
22    A. I believe that we could have done this on
23  our own and saved ourselves a lot of money and
24  aggravation.

Page 112

1    Q. Now, you mentioned that Bob did not want
2  to integrate with News America Marketing; that's your
3  perspective?
4    A. Yes.
5    Q. Were you involved in any of the
6  conversations that he had with John Rubin about the way
7  CCMI would be run post acquisition?
8    A. No, I was not.
9    Q. So you don't know what they spoke about?
10    A. I don't know what they spoke about.
11    Q. You did rely on information from --
12  strike that.
13    Do you think you had an obligation to
14  listen to Bob Fireman when it came to running the side
15  of the business that he had run for ten years?
16    MR. KATZ: Objection. Here we go again.
17    A. I believe that -- the answer is no.
18    MR. PETERS: Off the record.
19    (Discussion held off the record)
20    MR. PETERS: Let's go back on the record.
21    MR. KATZ: My objection to the word
22  obligation is now well known at this point.
23    Q. Do you think, sir, it made business sense
24  to listen to Bob Fireman and how he had run the business

Page 113

1  over the past ten years after taking over CCMI after
2  four months?
3      A. Initially I would say yes, but very
4  quickly I would say no.
5      Q. And don't you think, sir, that it made
6  business sense to listen to Ann Raider and what she had
7  done for the past decade for this business so that you
8  knew what to do after only four months into the
9  acquisition?
10     A. I'll say again initially I would say yes,
11 but very quickly it became clear that that was not the
12 case.
13     Q. Very quickly you believe you knew more
14 about their business than they did; is that a fair
15 statement?
16     A. No.
17     Q. Very quickly you believe that you could
18 do a better job running their business than they had for
19 the past ten years; is that correct?
20     A. Yes.
21     Q. Now, was News America successful in
22 competing against the other companies in the market,
23 like Catalina?
24         MR. KATZ: Objection. What areas are you

Page 114

1  referring to, what area of competition?
2      Q. Targeted marketing.
3      A. It wasn't even a goal of being able to
4  compete directly with them. They were monstrously
5  larger than we were.
6      Q. News Corporation is a multi-billion
7  dollar company?
8      A. It is not a multi-billion dollar company.
9      Q. News America?
10     A. Yes.
11     Q. How big is News America Marketing?
12     A. About a billion.
13     Q. News America Marketing is a billion a
14 year?
15     A. Yes.
16     Q. How big is Catalina?
17     A. I would say that they're about three
18 hundred fifty to four hundred million.
19     Q. You didn't think that News America
20 Marketing had the ability to compete with Catalina?
21         MR. KATZ: Objection.
22     Q. In direct marketing?
23     A. No.
24     Q. Did you try?

Page 115

1      A. We tried to compete in certain segments
2  that we thought made sense.
3      Q. What segment?
4      A. We tried to compete with them in the data
5  hosting area. We tried to compete with them in
6  application processing. We tried to compete with them
7  in card production.
8      Q. Were you successful in competing on any
9  of these, in any of those fields?
10     A. Modestly successful.
11     Q. Do you attribute your modest success to a
12 lack of effort?
13     A. I attribute our modest success to a
14 misjudgment of the marketplace by the principals, Bob
15 and Ann, and to ineptitude.
16     Q. How did they misjudge the marketplace
17 from your perspective?
18     A. Well, if you refer to their business
19 plan, virtually none of the elements in the business
20 plan even today be it News America Marketing or by third
21 parties have actually come to fruition. They simply
22 made an error.
23     Q. So no one is making money in the places
24 where CCMI said that there was money to be made?

Page 116

1      A. I am simply saying that several of their
2  main businesses; card production, application
3  processing, data hosting as a third-party function,
4  completely evaporated.
5      Q. Wasn't card production the segue to
6  generating income by doing other things for a company?
7      A. Card production was a revenue line for us
8  and profit line.
9      Q. Let me use an analogy for you, okay. If
10 a company sells a camera at a loss so that they can sell
11 film, would you consider that a bad business judgment?
12         MR. KATZ: Objection.
13     A. I don't see any, any relation to that to
14 our business in your analogy.
15     Q. You don't see card production as a way to
16 generate relationships with customers that you can then
17 do additional business with?
18     A. News America doesn't operate on loss
19 leaders. Everything has to stand on its own to make a
20 profit and a substantial profit.
21     Q. If News America sees something as a loss,
22 a potential loss leader, they don't invest it in any
23 longer?
24     A. They wouldn't invest in it to begin with.

Page 117

1    Q. Once they determine that it's a loss
2  leader they no longer invest; that's your experience?
3    A. Absolutely.
4    Q. And that accounts for Softcard; did they
5  think Softcard was a loss leader?
6    A. They didn't think Softcard was a loss
7  leader. It was an R&D investment.
8    Q. Did they continue to put investment into
9  Softcard?
10    A. No.
11    Q. Did they continue to invest resources
12  such as Henri Lellouche in Softcard?
13    A. After the Albuquerque test I virtually
14  devoted no attention to that business.
15    Q. Were you privy to any conversations with
16  Bob Fireman or Ann Raider where the profitability of
17  card production was discussed --
18    A. Certainly.
19    Q. -- prior to the acquisition?
20    A. Oh, I'm sorry. I answered too quickly.
21  No.
22    Q. Was the profit margin on card production
23  approximately ten percent, nine percent? Do you
24  remember that?

Page 118

1    A. No, it was more than that.
2    Q. What do you remember the profit being on
3  card production?
4    A. It ranged. Well, right now it's about
5  fifteen, sixteen percent on the little bit of card
6  activity that we do still. It had been higher.
7    Q. Is fifteen percent considered a loss
8  leader by News America Marketing?
9    A. Fifteen percent is nothing to brag about.
10    Q. Is that fifteen percent to the bottom
11  line?
12    A. Fifteen percent is the operating profit
13  before overhead, so if you consider overhead allocation
14  it probably was a loss.
15    Q. Did News America Marketing during your
16  tenure as head of CCMI have any conversations about the
17  wisdom of investing in card production as a way to
18  develop relationships with customers; grocery stores,
19  drug store chains?
20    A. Say that one more time.
21    Q. Did you explore the production of cards
22  as a way to engender relationships with supermarket
23  chains and drug store chains?
24    A. It wasn't necessary. We had the

Page 119

1  relationships. We didn't need to engender goodwill by
2  selling at a loss.
3    Q. And fifteen percent is a loss?
4    A. Fifteen percent does not meet the profit
5  hurdles of News America Marketing as a company.
6    Q. What are the profit hurdles?
7    A. Higher.
8    Q. What are they?
9    A. Currently News America Marketing -- I
10  don't know if this is confidential information.
11    Q. We can deal with this. We can treat it
12  as confidential.
13    A. It's not published.
14    Q. I won't disclose it.
15    MR. KATZ: You know what, could we go off
16  the record for a moment.
17    (Discussion held off the record)
18    MR. PETERS: We had a brief conversation
19  off the record. There is sensitivity, maybe significant
20  sensitivity, to disclosing this information. I'm not
21  taking a position on the record whether or not I opt
22  that as a legitimate concern obviously, but it's been
23  articulated and I'm going to respect that they're going
24  to explore getting me the information perhaps in

Page 120

1  response to an interrogatory or even informally if it
2  can be provided in a way admissible at the time of
3  trial. I accept that for the purposes of this
4  deposition, but I want to explore a little more about
5  this notion fifteen percent is an inadequate profit for
6  News America Marketing.
7    Q. The next question is this: Have the
8  minimum profit targets changed over time?
9    A. No.
10    Q. Has --
11    A. I'm sorry, can you define for what
12  business?
13    Q. News America Marketing, has News America
14  Marketing always had profit targets? Has News America
15  Marketing said in substance, If we can't make this kind
16  of income, we're not interested in pursuing this line of
17  business?
18    A. Yes.
19    Q. Has that always been a number, a specific
20  number?
21    A. I don't know that it's been a specific
22  number, but it is well north of a gross profit of
23  fifteen percent. If you understand what I mean by gross
24  profit versus net profit.

LELLOUCHE-5/25/07                    CondenseIt™

Page 121

1    Q. Okay. So a gross profit prior to any
2  overhead allocation, for example?
3    A. Correct.
4    Q. And I take it that prior to acquiring
5  CCMI, News America Marketing disclosed this to Ann
6  Raider and Bob Fireman so that they could make an
7  intellectual decision about whether or not to sell their
8  company?
9      MR. KATZ: Objection.
10    A. We certainly didn't buy this company to
11  print cards.
12    Q. Yeah, you see, I asked a different
13  question.
14    A. Go ahead. I apologize.
15    Q. My question is this: Prior to
16  negotiating to acquiring Ann Raider's and Bob Fireman's
17  company, do you know whether or not News America
18  Marketing disclosed to them that unless a certain profit
19  level, a specified profit level was reached News America
20  Marketing would not pursue a line of business?
21    A. I don't know the answer to that question.
22      MR. KATZ: That's a yes or no.
23    Q. And did you explore the profitability of
24  the card production? Did you explore the profitability

Page 122

1  of card production prior to acquiring NAM?
2    A. Yes, it was substantially higher prior to
3  the acquisition than it was post acquisition, which was
4  indicative of the demise of that product line.
5    Q. What was it prior?
6    A. It was probably about twenty percent.
7    Q. And then it went to fifteen?
8    A. Then it went down to ten, five, zero, out
9  of the business.
10    Q. Well, you gave me the number of fifteen
11  percent. Where does that number come from?
12    A. Oh, fifteen percent is what we're, is our
13  profit margin on some activity we do at Long's, which is
14  really our only legacy activity on the card and card
15  processing side of the business.
16    Q. Did the profit margin of twenty percent
17  prior to the acquisition of CCMI meet News America
18  Marketing's threshold for investment?
19    A. As a standalone probably not. As a mix
20  of business it was -- as long as the mix of business
21  ended up in a favorable position it was okay, but it was
22  not something that was a feather in our cap.
23    Q. Did you ever disclose or did anyone at
24  News America ever disclose to Bob Fireman and Ann Raider

Page 123

1  that even at twenty percent profit margin card
2  production would not be undertaken?
3    A. It was undertaken.
4    Q. When did News America Marketing stop
5  producing cards by virtue of profitability?
6    A. We have not stopped producing cards.
7      MR. KATZ: Can we take a break whenever
8  it's a convenient point for you?
9      MR. PETERS: Sure.
10      MR. KATZ: Is now a convenient time?
11      MR. PETERS: Sure.
12      (Recess taken)
13  BY MR. PETERS:
14    Q. Mr. Lellouche, was there a business plan
15  in place for CCMI when you took over as its head?
16    A. There was an existing business plan.
17    Q. Was that the business plan that Ann and
18  Bob had prepared?
19    A. Yes.
20    Q. What did it call for?
21    A. It called for increases in card
22  production, retailer activity. It called for increases
23  in application processing. It called for increases in
24  data hosting. It called for increases in marketing

Page 124

1  programs.
2    Q. Were you committed to executing that
3  business plan?
4    A. Yes.
5    Q. Did you have an idea as to how to achieve
6  the increases discussed in the business plan?
7    A. Yes.
8    Q. Did it involve using resources of News
9  America Marketing?
10    A. Yes.
11    Q. Did it involve using News America
12  Marketing's sales force?
13    A. Where necessary and where appropriate.
14    Q. Did you believe that the name Consumer
15  Card Marketing, Inc., had goodwill associated to it,
16  with it, at the time you took over as its head?
17    A. I don't know.
18    Q. Did you undertake any effort to evaluate
19  whether there was goodwill associated with the name
20  CCMI?
21    A. No.
22    Q. The name was changed at some point,
23  wasn't it? Tell me about the name change. When did
24  that happen and what was the reason for it?

Page 125

1  A. I don't recall when the name change
2  happened, but we changed the company name to SmartSource
3  Direct as part of a corporate rebranding of our entire
4  organization.
5  Q. Was there any discussion in the context
6  of changing CCMI's name to SmartSource Direct as to
7  whether or not there was goodwill associated with CCMI?
8  A. I don't -- I was not involved in any
9  discussion to that end.
10  Q. Do you know whether or not Ann Raider or
11  Bob Fireman were consulted about the name change?
12  A. I don't know the answer to that question.
13  Q. Do you believe they should have been
14  consulted?
15  A. No.
16  Q. There was a change in the reporting
17  structure very shortly after the acquisition. We began
18  to talk about that. You took over for David Devoe; is
19  that correct, in terms of heading up the iGroup?
20  MR. KATZ: Objection.
21  A. That's incorrect.
22  Q. When was the iGroup formed?
23  A. The iGroup was formed on or around 2000
24  and it was headed up by Chris Mixon.

Page 126

1  Q. Who was in the iGroup?
2  A. I can't name every person that was in the
3  iGroup.
4  Q. I mean entities?
5  A. Oh, Softcard, SmartSource.com, and
6  SmartSource Direct.
7  Q. And who headed up Softcard, you?
8  A. I oversaw Softcard. They had their own
9  management organization. We were a minority investor.
10  Q. Was there any discussion prior to
11  acquiring CCMI about investing in it instead of
12  acquiring it?
13  A. I don't recall any conversation like
14  that.
15  Q. Back to the iGroup. Who headed up
16  SmartSource.com?
17  A. Heather Harde, H A R D E.
18  Q. Ms. Harde reported to Mr. Mixon?
19  A. Yes.
20  Q. And you headed up SmartSource Direct?
21  A. Yes.
22  Q. And you reported to Mr. Mixon?
23  A. Yes.
24  Q. So there are e-mail between you and Mixon

Page 127

1  discussing the business of SmartSource Direct, I take
2  it?
3  MR. KATZ: Objection.
4  A. Yes.
5  Q. Did you communicate with Mr. Mixon by
6  e-mail?
7  A. Yes.
8  Q. Frequently?
9  A. I don't know.
10  Q. Did you communicate with Mr. Mixon by
11  e-mail back in 2000?
12  A. Minimally.
13  Q. Did Mr. Mixon communicate with you by
14  e-mail?
15  A. Yes.
16  Q. Back in 2000?
17  A. Yes.
18  Q. Was CCMI operated as a standalone
19  business unit at any time after the acquisition?
20  A. I'm not sure I understand the question.
21  Q. In other words, a unit that was
22  autonomous, that was run within News America Marketing
23  as a division?
24  A. Yes.

Page 128

1  Q. But was run the way it had been run prior
2  to the acquisition?
3  A. No.
4  Q. How did the management of News America
5  Marketing -- pardon me. How did the management of CCMI
6  change in the first year after the acquisition?
7  A. Well, certainly I became involved in
8  SmartSource Direct. Mike Cleary joined the group and
9  eventually headed up operations. The IT or the better
10  part of the IT group moved down to co-locate with our IT
11  organization down in Wilton. Much of the accounting
12  function was absorbed into the News America Marketing
13  accounting organization. That's all I can recall.
14  Q. You testified earlier that you were
15  committed to trying to follow the business plan of CCMI;
16  is that correct?
17  MR. KATZ: Objection.
18  A. You're going to have to read it back to
19  me. I don't know what I said then.
20  Q. You knew there was a business plan at
21  CCMI; right?
22  A. Yes.
23  Q. And that it was an existing business plan
24  that included increasing card production?

LELLOUCHE-5/25/07                     Condenselt™

---

Page 129

1      A. Yes.
2      Q. Included increasing work with retailers?
3      A. Yes.
4      Q. Included work on data hosting?
5      A. Yes.
6      Q. Included a variety of marketing programs?
7      A. Yes.
8      Q. Okay, and you were going to follow that
9  plan, that was your goal or your intention; right?
10      A. That was the initial goal, yes.
11      Q. When did that change?
12      A. It changed as the marketplace changed. I
13  don't know the dates.
14      Q. Which of these goals were abandoned?
15      MR. KATZ: Objection.
16      A. Goals?
17      Q. Yeah, which of these plans were
18  abandoned?
19      MR. KATZ: Objection.
20      A. I'm not sure I understand and I want to
21  answer clearly.
22      Q. Did News America ever abandon any part of
23  CCMI's business plan as best you know?
24      A. Yes.

---

Page 130

1      Q. What aspects of CCMI's business plan did
2  News America Marketing abandon?
3      A. We abandoned the data -- I'm sorry, we
4  abandoned or began to walk away from the application
5  processing business, because it was literally
6  evaporating before our eyes as retailers decided to go
7  directly to the data entry facilities themselves. We
8  were desecrated out of the process. We abandoned the
9  ASP-type data hosting program because it became clear
10  that we had, or I should say Bob and Ann had misjudged
11  the marketplace and the aptitude for ASP-type hosted
12  data solutions. We slowly walked away from the card
13  business for much the same reason as the applications
14  transactions because that business essentially
15  evaporated also as retailers went direct to the
16  factories.
17      Q. Would you take a look at Exhibit 1 and
18  turn to the second page of the document?
19      A. Yes.
20      Q. The second bullet point from the bottom
21  says, Sales force economies. Do you see that?
22      A. Yes.
23      Q. It reads, By leveraging a coordinated
24  sales effort, News America's sales force will be trained

---

Page 131

1  to incorporate CCMI's products into its single source
2  portfolio. CCMI will be substantially more profitable
3  and demonstrate increased growth as a subsidy of News
4  America Marketing.
5      Do you understand what that means in the
6  context of the transaction with CCMI?
7      A. Yes.
8      Q. Did that occur?
9      MR. KATZ: Objection. Did what occur?
10      Q. The bullet point I just read, did it come
11  to pass?
12      MR. KATZ: Whoa, whoa, whoa, time out.
13  There are a number of different things that are
14  indicated in the bullet. That's my question. Are you
15  asking did all of these events occur?
16      Q. Yes, sir. Did all of them happen?
17      A. No.
18      Q. Which part of this bullet point did not
19  occur?
20      A. CCMI -- News America's sales force is
21  predominantly the CPG sales force. And the fact of the
22  matter is that CCMI had no product. There was nothing
23  for them to sell. There was nothing for them to go out
24  and integrate into a single source portfolio; hence, no

---

Page 132

1  impact on profitability, no increase in growth.
2      Q. Well, this document which was authored by
3  and produced by News America Marketing states, News
4  America's sales force will be trained to incorporate
5  CCMI's products into a single source portfolio.
6      Is it your testimony that at the time
7  this document was prepared CCMI had no products?
8      A. They had no manufacturing products.
9      Q. Did they have services that could be
10  sold?
11      A. Not that I know of.
12      Q. What were you buying, what did you think
13  you were buying when News America Marketing bought CCMI?
14      A. We were buying the promise of being able
15  to have products to be sold.
16      Q. And I take it your testimony would be
17  once there were those products they would then be sold
18  by a trained sales force; that was the plan?
19      A. Say again, please.
20      Q. I take it your testimony is that once
21  CCMI had products then the sales force would be trained
22  on those products and would sell them?
23      A. And --
24      Q. Was that the plan?

---

Page 133

1  A. And they have been trained on those
2  products and they are selling them.
3  Q. How many sales reps?
4  A. For SmartSource Direct there are five
5  sales reps plus an account coordinator; however, the
6  entire sales force is out representing the direct mail
7  capability that is now meaningful on a nationwide basis
8  but was virtually meaningless at the time of this
9  authored document.
10  Q. Help me understand that. What do you
11  mean?
12  A. Well, we're in the business of mass
13  marketing. We're in the business of impacting
14  billion-dollar brands' impact on sales, market share,
15  volume. At the time of this document, 1999, loyalty
16  marketing was very niche. Kroger hadn't rolled out.
17  Albertson's hadn't rolled out. Winn-Dixie hadn't rolled
18  out. Wal-Mart never rolled out. Publix never rolled
19  out. And conversely, our core products were in
20  virtually all of these companies, these retailers'
21  locations. So the idea that we were going to have our
22  150 percent sales force go out and represent that you
23  can do a great direct mail program at Stop & Shop when
24  these people are out there trying to drive a billion

Page 134

1  dollar business is ludicrous.
2  Q. Why?
3  A. Because these people have ten, fifteen,
4  twenty million dollar goals individually.
5  Q. It would have been ludicrous to represent
6  to Ann and Bob that that's what News America Marketing
7  intended to do; right?
8  A. Not the case at all. If they came up
9  with products that could have been sold to the entire
10  sales force, it would have been turned over to the
11  entire sales force. We're in the business of making
12  money.
13  Q. Your testimony is had there been products
14  to sell, News America Marketing would have turned it
15  over to the entire sales force?
16  A. Had their business plan panned out, there
17  would have been products to sell. It did not.
18  Q. Now, did you believe that News America
19  Marketing had an obligation to try to develop that
20  market?
21  MR. KATZ: Objection.
22  A. No.
23  Q. Did you understand that it was an
24  emerging market?

Page 135

1  MR. KATZ: Objection.
2  A. What market?
3  Q. The market for loyalty programs relying
4  on data generated at the point of sale, was that an
5  emerging market?
6  A. It was and it is.
7  Q. And is it a market that other companies
8  have developed?
9  A. Yes.
10  Q. Is it a market that News America
11  Marketing has developed?
12  A. Yes.
13  Q. Is it a market that has been developed by
14  using a sales force to educate manufacturers?
15  A. Yes.
16  Q. And when we read the bullet point in
17  Exhibit 1 about training a sales force to incorporate
18  CCMI's products into a single source portfolio, was part
19  of the idea to get that sales force to educate
20  manufacturers about this emerging market?
21  A. They're not in the business of education.
22  MR. KATZ: Objection.
23  A. They're in the business of selling.
24  Q. Isn't sales education on some level?

Page 136

1  A. Only if it converts into revenue.
2  MR. KATZ: Objection.
3  Q. When you see a salesman out there or
4  sales woman out there selling a product, don't they have
5  to educate the potential buyer about the wisdom of
6  acquiring the product or service?
7  A. What product, what service?
8  Q. Any product, isn't that the job of a
9  salesman is teacher, isn't it, in part?
10  MR. KATZ: Objection.
11  A. No.
12  Q. You don't think salesmen are supposed to
13  be out there trying to educated the buyers about the
14  wisdom of acquiring a product or service?
15  MR. KATZ: Objection.
16  A. That's not their principal job.
17  Q. You don't think that has a role in sales?
18  A. No.
19  Q. Trying to describe to the end-user why
20  News America Marketing is the company to go with?
21  A. That is not their job.
22  Q. That's not their job, okay.
23  MR. KATZ: Just hold on one second.
24  (Counsel conferred with witness)

Page 137

1    MR. PETERS: I'm going to ask you,
2  Gordon, not to correspond with the witness in the middle
3  of an examination unless it's about privilege issues or
4  issues such as the threatened disclosure of proprietary
5  information.
6    Q. Mr. Lellouche, what reports were removed
7  from Ann Raider and Bob Fireman in the first six months
8  of CCMI's acquisition?
9    A. The first six months, I don't know.
10   Q. Prior to removing any report, any
11 employee who reported to Ann Raider or Bob Fireman, did
12 you consult with them about the decision to do that?
13   A. I had many consultations with Ann and Bob
14 over performance, lack thereof.
15   Q. So every time someone was removed from
16 CCMI or working directly I should say with Ann Raider
17 and Bob Fireman, it was a performance issue?
18   A. It was either a performance or an
19 effectiveness issue.
20   Q. What's the difference between the two?
21   A. Well, we were trying to align the
22 business to be most effective and most profitable and
23 utilize our resources that we had available to us.
24   Q. In doing that or in endeavoring to do

Page 138

1  that did you first consult with Bob Fireman to get his
2  opinion about the wisdom of your decisions?
3    A. No.
4    Q. And before doing that did you consult
5  with Ann Raider to solicit her views on the wisdom of
6  your decision?
7    A. No.
8    Q. Who controlled CCMI's budget once you
9  took over?
10   A. News America Marketing.
11   Q. And was Ann Raider or Bob Fireman
12 consulted on expenditures that were to be charged
13 against CCMI's budget prior to expending the money?
14   MR. KATZ: Objection.
15   A. I don't know.
16   Q. Did you have any budget -- strike the
17 question. Did you have any autonomy over CCMI's budget?
18   MR. KATZ: Can I have that again?
19   Q. Did you have any autonomy over CCMI's
20 budget as the head of CCMI?
21   MR. KATZ: Objection.
22   A. I submitted budget proposals to News
23 America Marketing.
24   Q. And did you solicit Ann Raider's input on

Page 139

1  those budget proposals?
2    A. I asked them for projections on revenue.
3    Q. Did you seek Bob Fireman's input before
4  submitting these proposed budgets to News America
5  Marketing?
6    A. Only on revenue assumptions.
7    Q. So prior to sending these budgets in to
8  News America Marketing, I take it you didn't run them by
9  Ann Raider or Bob Fireman?
10   A. No.
11   Q. Did you discuss the budgets specifically
12 with them before submitting them to News America
13 Marketing for approval?
14   A. No.
15   Q. Were there strategy sessions for the
16 iGroup -- actually let me make that smaller. Were there
17 strategy sessions for SmartSource Direct that occurred
18 on a regular basis?
19   A. There were annual strategy sessions,
20 formal strategy sessions.
21   Q. When did they take place?
22   A. Typically in the spring.
23   Q. Who attended?
24   A. Chris Mixon, possibly Bill Christie who

Page 140

1  succeeded Chris Mixon as president of the iGroup, other
2  representatives of NAM, HR, finance.
3    Q. Did Ann Raider attend?
4    A. Ann Raider presented.
5    Q. She was there at the strategy sessions?
6    A. She presented strategy sessions.
7    Q. She was there from the beginning to the
8  end, I take it?
9    A. I don't know that.
10   Q. Was Bob Fireman at the strategy sessions
11 that took place on an annual basis?
12   A. He presented.
13   Q. Did he present at all of them?
14   A. I don't know.
15   Q. Did Ann Raider present at all of them?
16   A. I don't know.
17   Q. Was Bob Fireman in attendance from the
18 beginning to the end of these strategy sessions or was
19 he there as a presenter?
20   MR. KATZ: Objection.
21   A. He was there as a presenter.
22   Q. Were Ann Raider and Bob Fireman invited
23 to these strategy sessions to help participate in the
24 development of a strategy for SmartSource Direct?

Page 141

1    A. As presenters.
2    Q. But not as participants?
3    A. They participated as presenters.
4    Q. But only as presenters?
5    A. Yes.
6    Q. Were you there as a presenter?
7    A. I presented an overview of the state of
8    the business initially at the outcome, at the onset of
9    these presentations.
10    Q. And then you would stay in attendance at
11    these meetings?
12    A. Yes.
13    Q. What was your role following your
14    presentation?
15    A. Note-taker, listener.
16    Q. Facilitator?
17    A. No.
18    Q. No. Who did that type of work?
19    A. That was done by people above me.
20    Q. Mr. Mixon, for instance?
21    A. Mr. Mixon, yes.
22    Q. And were there PowerPoints generated for
23    these strategy sessions?
24    A. Yes.

Page 142

1    Q. Were there other documents generated to
2    outline the existing business and future business of
3    SmartSource Direct?
4    A. I don't know that to be the case, no.
5    Q. What documents do you remember were
6    generally presented at these annual strategy sessions?
7    A. A strategy deck, PowerPoint.
8    Q. Do you still have them on your computer
9    or any computer?
10    A. I may have some.
11    Q. Have you produced them to your attorney?
12    A. I don't know.
13    Q. Would you?
14    A. Of course.
15    Q. Were there other meetings other than
16    these annual meetings where the future direction of
17    SmartSource Direct was discussed; and I'm talking about
18    organized, planned meetings, not water cooler stuff?
19    A. There was the annual budget presentation.
20    There was, as you said, the strategy session. That's
21    the extent of it.
22    Q. So the strategy session is what we've
23    just finished talking about; right?
24    A. Yes.

Page 143

1    Q. And the annual budget presentation, was
2    that a presentation to the board of News America
3    Marketing?
4    A. Yes.
5    Q. And who presented --
6    A. Or the executive committee of the board.
7    Q. Or the executive committee. And that --
8    I'm sorry. Who presented at the annual budget
9    presentation?
10    A. I did.
11    Q. Anyone else from SmartSource Direct?
12    A. No.
13    Q. Were there strategy sessions that Ann
14    Raider and Bob Fireman were not invited to attend?
15    A. Not that I can recall.
16    Q. Did you attend executive committee
17    meetings on a regular basis with Mr. Carlucci and
18    others?
19        MR. KATZ: Objection.
20    A. No.
21    Q. Prior to the acquisition did you
22    understand that all of the sales staff and the marketing
23    staff of CCMI reported to Ann Raider?
24    A. Yes.

Page 144

1    Q. Did you understand that Ann Raider's role
2    at CCMI prior to the acquisition included managing the
3    retailer and manufacturer sales force of CCMI?
4    A. Yes.
5    Q. And after the acquisition she did not
6    have sales staff reporting to her; correct?
7    A. Yes.
8    Q. And after the acquisition she did not
9    manage the retailer and manufacturer sales force; right?
10    A. Sometime after the acquisition.
11    Q. What was the business justification for
12    the decision to remove those areas of responsibilities
13    from Ann Raider?
14    A. At our discretion we opted to reorganize
15    the group.
16    Q. What was the justification other than
17    whim?
18        MR. KATZ: Objection.
19    A. I don't think whim would be a word I
20    would use in any business case.
21    Q. That would be an improper thing to do;
22    right?
23        MR. KATZ: Objection.
24    Q. Make a business decision based on whimsy?

LELLOUCHE-5/25/07                                    CondenseIt™

---

**Page 145**

1    A. I don't think it's a relevant term to use
2  in this context.
3    Q. Well, the reason I mention it is because
4  you said at our discretion we changed the
5  responsibilities. That's what you told me; right?
6    A. Correct.
7    Q. My question was, what's the business
8  justification? There must be a business justification
9  other than discretion. What was the business
10 justification?
11   A. Marty Garofalo came over to our group.
12 He was heading up manufacturer sales for both the
13 Internet business as well as the SmartSource Direct
14 business. So it made sense to have Kevin Tripp, who was
15 the sole manufacturing salesperson for SmartSource
16 Direct, report to him. He had twenty years of
17 experience calling on packaged goods companies.
18   Q. Mr. Garofalo did?
19   A. Oh, yeah, and on the retail side it just
20 was a similar situation. I had extensive background in
21 retail sales, and it was just a direction we chose.
22   Q. Did Mr. Garofalo have any experience in
23 loyalty programs, the types of things that you were
24 trying to sell for CCMI?

---

**Page 146**

1    A. No.
2    MR. KATZ: Objection, but you can
3  proceed.
4    Q. And I think you've already told me you
5  didn't have any experience either in loyalty programs,
6  meaning programs relying on data generated at the point
7  of sale; is that correct?
8    A. That is correct.
9    Q. Prior to removing these responsibilities
10 from Ann Raider, did you have any conversation with her
11 about the plan to do so?
12   A. I don't recall.
13   Q. Do you think it made sense to talk to Ann
14 Raider prior to taking these responsibilities away from
15 her to solicit her input or insight?
16   A. I think that the decision to move the
17 sales force supervision to me was a decision that was
18 conveyed to Ann, not discussed with her.
19   Q. My question was, do you think it made
20 sense to discuss this decision with Ann Raider prior to
21 executing it to solicit her insights?
22   A. No, I don't.
23   Q. Get her thoughts?
24   A. No, I don't.

---

**Page 147**

1    Q. Didn't make sense?
2    A. No.
3    Q. Why not?
4    A. Well, we were rapidly coming to the
5  realization that Ann was not capable of managing people.
6  She was a very good salesperson, a very good solo
7  contributor, and having a discussion of whether she's a
8  good manager or not didn't seem to make sense because it
9  was self-evident.
10   Q. I take it that's reflected in all her
11 evaluations?
12   A. I couldn't say.
13   Q. Were you her manager?
14   A. Yes.
15   Q. Did you fill out her evaluations?
16   A. I did.
17   Q. I'm not going to run through them with
18 you now, but you can tell me that once I do run through
19 them I will find that you made this observation in her
20 evaluation because it was an important observation;
21 right?
22   A. I don't know.
23   Q. Well, did you make all important
24 observations in Ann Raider's evaluations?

---

**Page 148**

1    A. I don't know that that's included in a
2  performance evaluation.
3    Q. Is it an important critique that you're
4  not a good manager of people? Isn't that something
5  that's important?
6    A. It is important.
7    Q. As a manager and someone who does
8  evaluations, isn't it your view that all important
9  insights should be included in an evaluation?
10   A. Yes.
11   Q. So we would find them in there, wouldn't
12 we, Mr. Lellouche?
13   A. I don't know.
14   Q. But in any event, that's why you took the
15 sales responsibility away from Ann Raider because she
16 was a poor manager; is that a fair statement?
17   A. Yes.
18   Q. Was Ms. Raider responsible for product
19 development, creative services; client services -- you
20 know what, sir, too many moving parts. Take it in
21 smaller bites. Was Ms. Raider responsible for product
22 development prior to the acquisition?
23   A. She supervised the creative person within
24 the organization.

---

KACZYNSKI REPORTING - (617) 426-6060                    Page 145 - Page 148

Page 149

1  Q. What's your understanding of what that
2  involved?
3  A. Producing presentations.
4  Q. Presentations to potential clients?
5  A. Yes.
6  Q. Did that change after the acquisition?
7  A. I don't recall.
8  Q. Did Ms. Raider have P&L responsibilities
9  prior to the acquisition?
10  A. I don't know.
11  Q. Did she manage the P&L for CCMI prior to
12  the acquisition?
13  A. I don't know.
14  Q. Did Ms. Raider stay involved in product
15  development after the acquisition?
16  A. Attempted to, yes.
17  Q. Who oversaw product development for CCMI
18  following the acquisition?
19  A. Myself, Bob Fireman, Ann Raider.
20  Q. Who headed it up?
21  A. I did.
22  Q. Did you continue to consult with Ann
23  Raider and Bob Fireman about product development
24  following the acquisition?

Page 150

1  A. Yes.
2  Q. Did that change over time?
3  A. No.
4  Q. Did you think it was a rational business
5  practice to consult with Ann Raider and Bob Fireman on
6  product development?
7  A. Say that again.
8  MR. PETERS: Can you read it back.
9  (Record read)
10  A. Yes, where appropriate.
11  Q. When was it inappropriate?
12  MR. KATZ: Objection.
13  A. At times it was difficult to engage in a
14  discussion, a meaningful discussion on product
15  development because of certain attitudes and viewpoints.
16  Q. Can you give me an example?
17  A. Well, if you refer to the performance
18  appraisal for Mr. Fireman, we had clearly exhausted our
19  efforts on the Effectivo product, yet he continued to
20  pursue it. I had implored him to go after more of the
21  Toshiba-like deals, and he ignored that recommendation.
22  I implored him to get out on the road, get out of the
23  office and sell, develop, and he ignored that.
24  Q. Anything else? And I'll refocus you.

Page 151

1  The question was, when did it not make sense to talk to
2  Ann Raider or Bob Fireman about product development?
3  And you've given me a couple of instances.
4  A. That's all I can think of right now.
5  Q. Now let's take a look at your statement
6  that you implored Bob Fireman to get out on the road and
7  sell, but he ignored your directive.
8  A. Yes.
9  Q. I take it that your testimony is that Bob
10  Fireman did not develop new products while he was at
11  News America Marketing or did not endeavor new products
12  when he was at News America Marking?
13  A. That's not my testimony at all.
14  Q. How did he fall down on the task of
15  selling? Where did he fail you?
16  A. He didn't sell.
17  Q. Did he try?
18  A. Unsuccessfully.
19  Q. Did he develop a whole lot of different
20  programs that he shared with you?
21  A. He identified a number of programs and
22  virtually none of them converted into success.
23  Q. Now back to Ann Raider. Ann Raider was
24  someone who had product development responsibilities

Page 152

1  prior to the acquisition. You consulted with her on
2  product development following the acquisition?
3  A. Yes.
4  Q. You thought that was a important thing to
5  do, didn't you?
6  A. Yes.
7  Q. And did you stop consulting with her on
8  product development?
9  A. No.
10  Q. Did your consultations change over time?
11  A. I'm not sure I understand what that
12  means.
13  Q. Did you consult with her less, did you
14  consult with her more, or did you consult with her about
15  the same from the beginning of the time you began
16  managing her until the time she left the company?
17  MR. KATZ: Objection.
18  A. I discussed with her many new product
19  developments, virtually every single one that they would
20  bring in over time. This is Bob and Ann.
21  Q. And that didn't change over time; right?
22  A. No.
23  Q. So your testimony is that you always
24  consulted with Ann and Bob about product development,

LELLOUCHE-5/25/07                    CondenseIt™

Page 153

1  and you thought that was an important thing to do?
2      A. I'm saying that when they surfaced
3  products we discussed them. We pursued them if they
4  were, if they held promise. That was the extent of it.
5      Q. On the product development side did you
6  oversee the development of Aspen?
7      A. From a nontechnical standpoint, yes.
8      Q. What were your responsibilities in terms
9  of overseeing Aspen?
10     A. Observing it in its development from an
11 IT point of view, sitting in on meetings where the
12 product was being considered for use as a CRM tool after
13 Bob had recommended it, and contributing where I could.
14     Q. Was it successful?
15     A. No.
16     Q. What happened?
17     A. Bob and Ann misjudged the marketplace.
18 There was no appetite in the marketplace amongst the
19 larger retailers for an ASP-hosted solution. In fact,
20 they all built, all the large retailers to the CPG
21 companies built their own data warehouses, bought or
22 licensed or developed their own software, and it was
23 just a miss by a mile compounded by the fact that the
24 tool recommended and selected was inadequate and not

Page 154

1  capable of managing the data sets involved in
2  supermarket transactions. So it had two strikes against
3  it before it even hit the marketplace.
4      Q. Prior to acquiring or beginning the Aspen
5  development program, did anyone from News America
6  Marketing take a look at Aspen's capability to see
7  whether or not it was robust enough to do what was hoped
8  it could?
9      A. Yes.
10     Q. Who?
11     A. The CIO.
12     Q. Who was that?
13     A. David Benson.
14     Q. Did Mr. Benson come to the conclusion
15 that Aspen was robust enough to perform and function as
16 you hoped it would?
17         MR. KATZ: Objection.
18     A. I don't know.
19     Q. Well, you bought it; right?
20     A. Yes.
21     Q. And you don't believe you would have
22 bought it unless Mr. Benson cleared the way; right?
23         MR. KATZ: Objection.
24     A. I don't know.

Page 155

1      Q. So it's possible that Mr. Benson looked
2  at this as the CIO, said it was no good, but it was
3  acquired any way? You leave room for that possibility?
4      A. I don't, I don't know.
5      Q. What's RMS? Is that acronym meaningful
6  to you?
7      A. Yes.
8      Q. What is it?
9      A. I believe it stands for Retail Marketing
10 Systems.
11     Q. Is it an application?
12     A. It's a company.
13     Q. Company that has an application that
14 hosts data?
15     A. It does not host data.
16     Q. What does it do?
17     A. It's a software that sits on top of a
18 database providing analytic capability.
19     Q. Does it do what Aspen was supposed to do?
20     A. No.
21     Q. Is it a successful software?
22     A. Yes.
23     Q. Did you look to acquire RMS?
24     A. Yes.

Page 156

1      Q. Was it acquired?
2      A. No.
3      Q. Was there an evaluation done in the
4  context of your evaluation as to whether -- strike that.
5          Was there any evaluation done in the
6  marketplace in your effort to acquire RMS?
7      A. The marketplace?
8      Q. Right. A market for the RMS software,
9  did you look at the marketplace before endeavoring to
10 acquire AMS?
11     A. Yes.
12     Q. Did you consult any analysis of the
13 marketplace in the context of determining to acquire
14 RMS?
15     A. Yes.
16     Q. Who conducted the marketplace analysis?
17     A. I'm not certain who specifically
18 conducted the analysis.
19     Q. Was it an outside consultant?
20     A. Internal.
21     Q. Was there a document created that
22 reflected the results of this analysis?
23     A. Yes.
24     Q. Do you remember in substance what the

Page 157

1  document concluded?
2       A. It concluded that while they had a
3  substantial market share they weren't making any money.
4  They were losing money.
5       Q. Was that subsequently -- I should say was
6  RMS subsequently acquired by Valassis?
7       A. Yes.
8       Q. That's one of NAM's competitors?
9       A. Yes.
10      Q. Based on your experience in the
11  marketplace, do you know whether Valassis has profitably
12  used RMS?
13      A. I have no idea.
14      Q. Do you have a copy of this report that
15  was generated on RMS, this evaluation we've been
16  discussing?
17      A. Yes.
18      Q. Could you give that to Mr. Katz?
19      A. Yes.
20      Q. Thank you. Was Ms. Raider allowed to
21  hire employees?
22      A. Yes.
23      Q. She had the autonomy to make job offers?
24      A. She had the autonomy to recommend

Page 158

1  candidates.
2       Q. Were there any hires made for CCMI?
3       A. Yes.
4       Q. Were all open positions filled during
5  your tenure as the head?
6       MR. KATZ: Can I have that question back?
7       (Record read)
8       Q. You can say I don't know.
9       A. I don't know.
10      Q. Were there open positions that Ann Raider
11  had that were never filled?
12      A. I don't know.
13      Q. Were you satisfied that all of the
14  positions that you wanted filled were filled in a timely
15  manner?
16      A. I don't know.
17      Q. We'll talk about Mr. Fireman. He was the
18  president and chief executive officer of CCMI prior to
19  the acquisition; right?
20      A. Yes.
21      Q. News America Marketing agreed that
22  Mr. Fireman would continue as the general manager of the
23  CCMI business unit; correct?
24      A. No.

Page 159

1       Q. Have you ever seen his employment
2  contract?
3       A. Yes.
4       Q. Does his employment contract list his
5  position as general manager?
6       A. Yes.
7       Q. Did he have business cards?
8       A. Yes.
9       Q. Did his business card say general
10  manager?
11      A. Yes.
12      Q. Was he the general manager?
13      A. No.
14      Q. So when you were telling Mr. Fireman to
15  go out and market to companies and sell and develop
16  programs, did you expect that he would be handing out
17  business cards to potential customers and clients?
18      A. Yes.
19      Q. Did you expect that his customers and
20  clients would see him based on his business card as the
21  general manager of CCMI?
22      A. I don't know.
23      Q. Maybe they just wouldn't believe the
24  business card; you didn't leave room for that

Page 160

1  possibility?
2       MR. KATZ: Objection.
3       A. I don't know.
4       Q. But you also had a business card saying
5  general manager, didn't you?
6       A. I did.
7       Q. And you were the general manager of CCMI
8  notwithstanding what Mr. Fireman's business card said;
9  right?
10      A. Yes.
11      Q. Was there ever any discussion within News
12  America Marketing about the wisdom of having two general
13  managers?
14      A. There was discussion about the
15  appropriateness of having Bob's title as general
16  manager.
17      Q. Was it ever changed?
18      A. Couldn't be changed.
19      Q. Why not?
20      A. It was mandated by the contract.
21      Q. So he had the title but not the job
22  responsibilities; is that correct?
23      A. Correct.
24      Q. The employment contract that you read,

Page 161

1  did it suggest -- start that again.
2          You read Mr. Fireman's job employment
3  contract?
4      A.  I did.
5      Q.  And you saw that he would have the title
6  general manager?
7      A.  Yes.
8      Q.  Do you know whether or not Mr. Fireman
9  was told prior to the acquisition he would, in fact,
10  have the job responsibilities of general manager?
11      A.  I have no idea.
12      Q.  You've never spoken to anyone about that?
13      A.  No.
14      Q.  And as general manager of CCMI, what were
15  your job responsibilities?  You may have told them all
16  to me already in which case you can tell me that.
17      A.  I was responsible for the overall
18  business, profit and loss.
19      Q.  That was to have been Bob Fireman's job;
20  right?
21      A.  I don't know that to be the case.
22      Q.  Okay.  Even though he has an employment
23  contract that lists him as general manager, you don't
24  know whether or not Bob Fireman was to be the general

Page 162

1  manager of CCMI?
2      A.  I do not know that.
3          MR. KATZ:  Asked and answered.
4      Q.  Did you or anyone else at NAM have any
5  conversation with Bob Fireman before taking the role of
6  general manager away from him and giving it to you?
7      A.  Say that again, please.
8      Q.  Before you took Bob Fireman's job as
9  general manager, did you talk to him about it?
10          MR. KATZ:  Objection.
11      A.  I did not talk to him about it.
12      Q.  Before you took Bob Fireman's job as
13  general manager, did anyone else at News America
14  Marketing talk to him about that decision?
15      A.  I don't know.
16      Q.  Do you know whether anyone at News
17  America Marketing ever got Bob Fireman's permission to
18  take away his job responsibilities as general manager?
19          MR. KATZ:  Objection.
20      A.  I don't know.
21      Q.  Do you think News America had an
22  obligation to speak with Bob Fireman about taking away
23  his job responsibilities as general manager before doing
24  that?

Page 163

1      A.  No.
2          MR. KATZ:  Objection.
3      Q.  I don't mean to have you go back over
4  testimony.  Have you told me the circumstances that lead
5  to the decision to make you general manager?
6      A.  There was never a point in time where
7  there was a ceremonial transfer of one general manager
8  to another general manager.  So to say that there was
9  some discussion is not accurate.  It was an evolutionary
10  process.
11      Q.  It wasn't evolutionary when the business
12  card showed up on your desk that said Henri Lellouche,
13  general manager.  That was instantaneous; right?  You
14  took the title as soon as Dave Devoe left the company?
15          MR. KATZ:  Objection.
16      A.  I don't know that to be the case.
17      Q.  How early on in your tenure with News
18  America Marketing did you become the general manager of
19  CCMI, or SmartSource Direct as it later became?
20      A.  I don't know.
21      Q.  When you came on board to head up CCMI,
22  were there already complaints about Bob Fireman as a
23  manager?
24      A.  I don't know.

Page 164

1      Q.  In the context of conducting due
2  diligence on acquiring CCMI, was it important to
3  understand the human capital you were acquiring; in
4  other words, understand who Bob Fireman was as a person,
5  who Ann Raider was as a person?
6      A.  As much as you can do so in a due
7  diligence process, yes.
8      Q.  So in that context you talked to
9  employees?
10      A.  I did not.
11      Q.  Do you know whether or not Mr. Rubin or
12  anyone else did on behalf of News America Marketing?
13      A.  I don't know.
14      Q.  Do you think that would have been a
15  prudent thing to do?
16      A.  I don't know.
17      Q.  You don't know whether or not the
18  employees thought Bob Fireman was a good and fair man
19  and an excellent manager, do you?
20      A.  I don't know.
21      Q.  What was the business justification for
22  taking Bob Fireman's title as general manager away from
23  him and giving it to you?
24      A.  It never taken away from him.

CondenseIt™                                    LELLOUCHE-5/25/07

Page 165

1    Q. What was the business justification of
2    giving you the title of general manager when Bob Fireman
3    continued to have that title at least on his employment
4    contract and business card?
5    A. I was, in fact, the general manager.
6    Q. What was the business justification for
7    making you the general manager rather than Bob Fireman
8    remaining general manager?
9    A. It was the discretion of the company to
10   put me in charge of the entire business.
11   Q. Other than discretion can you justify it
12   from a business perspective; how did it make sense?
13   A. You'd have to ask people above me about
14   that.
15   Q. Did you ever talk to them before it
16   occurred?
17   A. Certainly through discussions I intimated
18   to them how I felt the business was being run.
19   Q. This was before you took the general
20   manager title or after?
21   A. I'm not sure.
22   Q. Is the job of general manager of CCMI a
23   job that you lobbied for?
24   A. No.

Page 166

1    Q. It was thrust upon you?
2    A. I was asked to do it.
3    Q. You didn't inquire ahead of time about
4    whether or not the job was or could be open?
5    A. No.
6    Q. When you say you discussed the management
7    of or the management skills/style of Bob Fireman, with
8    whom did you discuss them above you?
9    A. With my supervisors.
10   Q. Mr. Mixon?
11   A. Mr. Devoe.
12   Q. Those two?
13   A. At the very least.
14   Q. But you can't place those discussions in
15   time?
16   A. I cannot.
17   MR. PETERS: Go off the record.
18   (Recess taken)
19   BY MR. PETERS:
20   Q. Mr. Lellouche, are you aware that
21   Mr. Carlucci said at some point that he saw no future in
22   targeted direct mail?
23   MR. KATZ: Objection.
24   A. I was not present at any conversation

Page 167

1    like that.
2    Q. Have you heard from anyone that
3    Mr. Carlucci had said in substance that he does not see
4    a future in targeted direct mail?
5    MR. KATZ: Objection.
6    A. Only from Bob and Ann.
7    Q. Not from any other News America employee?
8    A. No.
9    Q. At some point the CCMI offices moved to
10   the Hancock Tower?
11   A. Yes.
12   Q. Was that after you took over as the head?
13   A. On or about.
14   Q. Were you involved in that decision?
15   A. No.
16   Q. Who made that decision?
17   A. Senior management.
18   Q. Did you participate in any way in that
19   decision?
20   A. No.
21   Q. Was it just something that was told to
22   you at one time?
23   A. Yes.
24   Q. In other words, senior management said

Page 168

1    we're going to move?
2    A. Yes.
3    Q. Did they give you the business
4    justification for moving?
5    A. No.
6    Q. Was there one that you know of?
7    A. I'm not aware of any.
8    Q. Was that space that News America
9    Marketing already occupied?
10   A. I don't know.
11   Q. Do you know whether or not Ann Raider or
12   Bob Fireman were consulted by the wisdom of moving
13   space?
14   A. I don't know.
15   Q. Do you know whether or not any part of
16   the overhead at the Hancock Tower was charged against
17   CCMI's revenue?
18   A. It was charged against CCMI's P&L, yes.
19   Q. Okay. That affected the earn-out
20   potential?
21   A. I don't know.
22   Q. Did News America Marketing entertain
23   potential clients at the office space?
24   A. Yes.

LELLOUCHE-5/25/07                    CondenseIt™

Page 169

1     Q.  At the Hancock building?
2     A.  Yes.
3     Q.  How often were potential clients
4  entertained/met with/solicited at the Hancock Tower?
5     A.  I don't know.
6     Q.  Did you have office space there?
7     A.  No.
8     Q.  Where was your office space?
9     A.  My office space was in Connecticut.
10     Q.  So you were running --
11     A.  And Manhattan.
12     Q.  You were running the Softcard and the
13  CCMI businesses from those places?
14     A.  Yes.
15     Q.  Do you know whether or not prior to the
16  acquisition CCMI attended trade shows and had speaking
17  engagements, specifically Ann Raider and Bob Fireman, to
18  promote their business?
19     A.  I do know.
20     Q.  You do.  Did they?
21     A.  Yes.
22     Q.  After the acquisition was Ann Raider
23  allowed to go to trade shows?
24     A.  Yes.

Page 170

1     Q.  Was there any curtailment on the trade
2  shows that she could attend in order to promote CCMI's
3  business?
4     MR. KATZ:  Objection.
5     A.  No.  In fact, she served on the FMI
6  Women's Council which met, I believe, in concurrence
7  with the trade shows.
8     Q.  So you don't remember any complaints that
9  Ann Raider had about the inability to exhibit at shows?
10     A.  Well, that's two different questions.
11     Q.  It may be which is why my client just
12  passed me a note.  Was Ann Raider and Bob Fireman, more
13  specifically CCMI, allowed to exhibit at trade shows?
14     A.  We exhibited in 2001 at Marketechnics,
15  and that was the last opportunity we had to exhibit at a
16  trade show.
17     Q.  You don't recall Ann Raider complaining
18  that she wanted to exhibit at trade shows but was
19  precluded from doing so?
20     A.  No, that was not the question.
21     Q.  But that's the question I'm asking now.
22  Do you remember Ann Raider complaining that she was
23  precluded from exhibiting at trade shows?
24     A.  Frequently.

Page 171

1     Q.  What was the business justification from
2  precluding CCMI from exhibiting at trade shows?
3     A.  News America's policy is not to exhibit
4  at trade shows or participate in trade associations.
5     Q.  Do you know the justification for that
6  policy?
7     A.  I do not.
8     Q.  Have you ever inquired?
9     A.  No.
10     Q.  When Ann Raider asked to exhibit at trade
11  shows your response in substance was what you just told
12  me, which is it's the policy?
13     A.  Yes.
14     Q.  Did you ever explore with senior
15  management the idea that it might be prudent in this
16  emerging market to allow CCMI to exhibit at trade shows?
17     A.  No.
18     Q.  Do you think that would have been a
19  rational thing to do to explore whether or not News
20  America Marketing's policy made sense in the context of
21  emerging technologies?
22     A.  No.
23     Q.  You don't think that made sense?
24     A.  No.

Page 172

1     Q.  Why not?
2     A.  It was a News America policy that was
3  explained very clearly to me, and it was
4  counterproductive for me to challenge management on this
5  decision.
6     Q.  Every time someone asks for some
7  additional consideration on the matter, do you consider
8  that to be a challenge?
9     A.  No.
10     Q.  There is a way for you to go to senior
11  management and maybe we should revisit this policy
12  in light of the fact that we're dealing with an emerging
13  technology and have that not be a challenge; right?
14     MR. KATZ:  Objection.
15     A.  I can't speak generally about it.
16     Q.  But you didn't approach senior management
17  because you didn't want to challenge senior management;
18  right?
19     A.  That's not the case.
20     Q.  I'm using the word challenge because it
21  came up in the response that you just gave me.  Did you
22  consider raising the issue but declined to raise the
23  issue because you were afraid or concerned that it would
24  be viewed as a challenge to an existing policy?

KACZYNSKI REPORTING - (617) 426-6060                Page 169 - Page 172

**CondenseIt™**

Page 173

1    A. I did not challenge it because I believed
2 it was the policy of the company. It was stated clearly
3 to me and did not need to be reinforced.
4    Q. And you thought it made sense in this
5 context?
6    A. That's not relevant.
7    Q. Whether or not it makes sense is
8 irrelevant to you?
9    A. I follow the policies of News America
10 Marketing, and I expected the people that work for me to
11 follow those policies as well.
12    Q. Did you ever inquire into the
13 justification of the policy?
14    A. No.
15    Q. You didn't think that was a prudent thing
16 to do to try to find out whether or not the
17 justifications that supported the policy applied in this
18 context?
19    A. It was a longstanding policy that had no
20 exception.
21    Q. That you know of?
22    A. I'll stipulate to that.
23    Q. And speaking engagements, we'll talk
24 about those in a minute, but you mentioned that News

Page 174

1 America allowed CCMI to exhibit at a trade show in 2001;
2 correct?
3    A. Hold on a second. I'm trying to think of
4 the last trade show that we exhibited at and I'm losing
5 track of my time line. I can't remember if the last one
6 we attended was in 2000 or 2001.
7    Q. Was that an exception to the policy
8 you've been testifying to?
9    A. Yes.
10    Q. How did you get the exception?
11    A. It was part of the, it was part of the
12 plan to exhibit at the trade show. It was a situation
13 where we were launching this Aspen product where we
14 wanted to get a large amount of exposure, and we did
15 attend that trade show.
16    Q. Who gave you permission?
17    A. Upper management.
18    Q. Did you ask for it?
19    A. No.
20    Q. Who did?
21    A. That was prior to my taking over.
22    Q. So that would have been Mr. Rubin?
23    A. I would say yes, he would have been
24 involved at the budget time.

Page 175

1    Q. So as best you can put it together,
2 Mr. Rubin asked senior management to make an exception
3 to the NAM policy that otherwise precluded exhibiting at
4 trade shows?
5       MR. KATZ: Objection.
6    A. I don't know that to be case.
7    Q. But you do know that you exhibited at
8 this one trade show?
9    A. I do know that we exhibited at this trade
10 show.
11    Q. And you never inquired of anyone as to
12 why an exception to the rule or policy was made, did
13 you?
14    A. No.
15    Q. You mentioned it was part of a plan.
16 What plan are you referring to?
17    A. To introduce the Aspen product to the
18 marketplace.
19    Q. Didn't that come about a year after
20 Mr. Rubin left, the introduction of Aspen?
21    A. Say again.
22    Q. The introduction of the Aspen product
23 into the marketplace was about a year after Mr. Rubin
24 left; right?

Page 176

1    A. I don't know if it was exactly a year,
2 but it was after he left.
3    Q. But the trade show introducing Aspen was
4 before; is that your testimony or recollection?
5    A. The trade show was after he left but
6 before the product was released to the marketplace. It
7 was on display at the trade show.
8    Q. So when this trade show took place and
9 when CCMI exhibited you were heading up CCMI as general
10 manager?
11    A. No, Bob was still running the group.
12    Q. So this was sometime within the four,
13 sometime within the four months after the acquisition of
14 CCMI?
15    A. Well, this was a Marketechnics trade
16 show, I believe, that took place in New Orleans if my
17 recollection is correct. The reason I say that Bob was
18 still running the operations was that Mike Cleary was on
19 board just to orchestrate the details of the trade show.
20 He was not running the operations group.
21    Q. Did you have the title general manager of
22 CCMI or SmartSource Direct at the time the trade show
23 took place?
24    A. I don't know.

LELLOUCHE-5/25/07                     CondenseIt™

Page 177

1     Q.  Did News America Marketing have a policy
2  on speaking engagements?
3     A.  I don't know that there's a formal
4  policy.
5     Q.  Did Ms. Raider or Mr. Fireman complain
6  about not being able to undertake speaking engagements
7  so that they could raise visibility about CCMI's
8  products and services?
9     A.  Yes.
10    Q.  And were those complaints justified in
11  your view?
12    A.  I can't say.
13    Q.  Did you consider whether or not their
14  complaints had merit?
15    A.  Ann did speak at trade show events.
16    Q.  But she nevertheless complained to you
17  about the inability to speak at various engagements?
18    A.  She did speak at various engagements.
19  She did join the FMI Women's Forum.  I don't understand
20  the question.
21    Q.  Let me put a finer point on it.  Did she
22  complain about being curtailed from speaking
23  engagements?
24    A.  I don't know that she complained about

Page 178

1  being curtailed because she was doing them.
2     Q.  That's my question.  You don't have a
3  memory of that being an issue to Ann Raider?
4     A.  No.
5     Q.  That's my question.  You don't remember
6  that being an issue to Bob Fireman?
7     A.  I never knew of Bob to speak at any
8  engagement.
9     Q.  So that's no, too?
10    A.  Pardon me?
11    Q.  That's also no?  In other words, no, you
12  don't remember Bob complaining; no, you don't remember
13  Ann complaining; right?
14    A.  Right.
15    Q.  Would you agree that exhibiting at trade
16  shows is consistent with the goal of growing CCMI's
17  business?
18        MR. KATZ:  Objection.
19    A.  No.
20    Q.  Would you believe that exhibiting at
21  trade shows is inconsistent with the goal of growing
22  CCMI's business?
23        MR. KATZ:  Objection.
24    A.  No.

Page 179

1     Q.  It's irrelevant, in other words, one way
2  or the other?
3     A.  Yes.
4     Q.  Same question with speaking engagements,
5  you don't think those have any relevance to growing
6  CCMI's business; is that a fair statement?
7     A.  I never said that.
8     Q.  Do you believe it?
9     A.  I don't.
10    Q.  You think it's relevant to growing a
11  business?
12    A.  I think that speaking engagements
13  properly utilized are productive.
14    Q.  Were there any speaking engagements that
15  you declined to allow Ann Raider to participate in or
16  engage?
17    A.  None that I can recall.
18    Q.  Now, trade advertising is an important
19  part of growing a business in your experience?
20        MR. KATZ:  Objection.  You're talking
21  about any business?
22    Q.  Yes, in his experience, his long
23  experience in a variety of businesses, is trade
24  advertising one of the ways that an emerging business

Page 180

1  develops?
2     A.  Not necessarily.
3     Q.  Not necessarily.
4     A.  No.
5     Q.  Was CCMI allowed to advertise in trade
6  publications?
7     A.  No.
8     Q.  Why not?
9     A.  News America doesn't advertise in trade
10  publications.
11    Q.  News America Marketing, News America,
12  News Corp.?
13    A.  News America Marketing.
14    Q.  That's a policy?
15    A.  Yes.
16    Q.  And that policy was explained to Ann
17  Raider and Bob Fireman prior to the acquisition?
18    A.  I don't know.
19    Q.  Did Ann Raider approach you about
20  advertising in trade publications?
21    A.  I don't have any specific recollection of
22  that.
23    Q.  Do you have any specific recollection of
24  Bob Fireman approaching you about advertising in trade

KACZYNSKI REPORTING - (617) 426-6060                    Page 177 - Page 180

Page 181

1  publications?
2      A. I don't have any specific recollection of
3  that either.
4      Q. Did you ever go to senior management to
5  try to determine whether or not in this particular case;
6  that is, the case of CCMI or SmartSource Direct, it made
7  sense to raise awareness about the company and its
8  offerings by publishing advertising in trade journals?
9      A. Say it again, please.
10     Q. Did you ever approach senior management
11 and say in substance maybe we should advertise?
12     A. No.
13     Q. And that's because of this existing
14 policy that was explained to you?
15     A. Yes.
16     Q. Did you think it made sense in the
17 context of CCMI's business to keep it out of trade
18 journals?
19         MR. KATZ: Objection to form.
20     A. Can you say that again, please.
21     Q. Did you think it made sense in this
22 particular context, the context of CCMI, to preclude it
23 from advertising in trade journals?
24     A. It wasn't my call to make. It was a

Page 182

1  senior management call to make.
2      Q. But you were running CCMI; right?
3      A. On behalf of News America Marketing.
4      Q. I understand, but I'm asking you, sir, as
5  a senior vice-president, which was your title?
6      A. Right.
7      Q. Did you think as a senior vice-president
8  that policy made sense in this context?
9      A. My role as a senior vice-president was to
10 follow the judgment of senior management.
11     Q. And not to question?
12     A. No.
13     Q. Am I right?
14     A. You're right.
15     Q. So you don't have an opinion as to
16 whether or not it made sense to advertise this emerging
17 technology in trade journals?
18     A. I have no opinion about that.
19     Q. And you never considered the wisdom of
20 doing it because of the policy that you say was in place
21 at News America Marketing; right?
22     A. Right.
23     Q. Let's talk a little bit about the sales
24 force at News America Marketing. Let me put a sharper

Page 183

1  point on that, the sales force at the iGroup. Was there
2  an entity called Sales Force.com? Sales Force.com.
3  SmartSource.com, thank you, Ann.
4      A. Yes.
5      Q. SmartSource.com had its own sales force?
6      A. Initially, yes.
7      Q. And what were they selling?
8      A. They were selling Internet couponing.
9      Q. At some point did SmartSource.com sales
10 representatives sell CCMI products and services?
11     A. Not that I can recall.
12     Q. Do you recall --
13     A. Again, there were no services to be sold
14 to speak of other than very small niche opportunities
15 around the country. It was not that there was this
16 plethora of products that Ann or Bob had created for the
17 CPG sales force to sell. Nothing existed except the ad
18 hoc direct mail program every now and then or the ad hoc
19 film promotion that Ann would generate that would
20 generally speaking produce little to no revenue.
21     Q. Take a look at Exhibit 1 where it says,
22 Opportunity for News America Marketing and CCMI.
23     A. Are we still on this document?
24         MR. KATZ: We're coming back to it.

Page 184

1  Which page of the document?
2      Q. Page two.
3      A. Page two.
4          MR. KATZ: What are we looking at?
5      Q. Opportunity for News America Marketing
6  and CCMI. First bullet point says, Full service
7  provider. CCMI's consulting and marketing services are
8  strategically important because the company offers
9  highly targetable promotion services not readily
10 available in the retail marketplace today.
11         So when Mr. Devoe wrote this document and
12 sent it to Mr. Carlucci, among others, did you think
13 that was not true?
14         MR. KATZ: Objection. Did Mr. Devoe
15 think it was not true; is that what you're asking?
16     Q. I'm asking whether or not you, sir, based
17 on what you now know of CCMI's business believe that
18 what Mr. Devoe is representing in this memorandum is
19 inaccurate, and I'm reading one bullet point that says,
20 Full service provider, that first sentence which you can
21 read to yourself, was that accurate when you
22 presented --
23     A. Slow down. I really don't know what
24 context Mr. Devoe is writing in here. If I had authored

Page 185

1 this I could give you more insight. It's hard for me to
2 say what he was speaking of.
3          Q. Who is John Nallen?
4          A. John Nallen is the deputy CFO of News
5 Corporation.
6          Q. And who's Lon Jacobs?
7          A. Lon Jacobs is the corporate counsel for
8 News Corporation.
9          Q. And Mr. Carlucci is who?
10         A. He's the --
11         Q. Or was at the time?
12         A. At the time he was, he is and was the
13 chairman and CEO of News America Marketing.
14         Q. And David Devoe at the time was on your
15 team?
16         A. David Devoe was a CFO of News America
17 Marketing.
18         Q. And you don't know therefore when we take
19 a look at the first bullet point whether or not the
20 things Mr. Devoe says to News America and News America
21 Marketing, News Corp. and News America Marketing, are
22 true?
23         A. I did not author this document. I don't
24 know what was in his head when he was writing it. I

Page 186

1 don't know what he was trying to convey.
2          Q. Did CCMI have consulting and marketing
3 services that were strategically important?
4          A. To the CPG community?
5          Q. Generally.
6          A. They had consulting services where they
7 worked with retailers and marketing services where Ann
8 worked with retailers. They did small, very low revenue
9 highly niche direct mail programs at the time and that
10 was the extent of it.
11         Q. Did they offer highly targetable
12 promotion services not readily available in the retail
13 marketplace?
14         A. Yes.
15         Q. At the time they did. Under retail
16 expansion opportunities, did you think it was the case
17 that News America's strong relationships with
18 supermarket retailers and customer packaged goods
19 manufacturers offered significant expansion
20 opportunities for CCMI; did you think that was a true
21 statement to News Corp.?
22         MR. KATZ: Wait a minute. He didn't
23 author this document.
24         MR. PETERS: I didn't say he did. I'm

Page 187

1 asking whether or not he thinks it's a true statement.
2 You're coaching and this witness doesn't need it.
3          MR. KATZ: Are you asking him now as he
4 sits here in 2007 what he thinks or what he thought in
5 1999?
6          MR. PETERS: I'll ask it this way.
7          Q. At the time this document was ostensibly
8 prepared in May of 1999, do you believe it was true that
9 News America's strong relationships with supermarket
10 retailers and consumer packaged goods manufacturers
11 offered significant expansion opportunities for CCMI?
12 Do you think that was a true statement?
13         A. Yes.
14         Q. And do you think that News America has
15 strong relationships with -- do you presently believe
16 that News America has strong relationships with
17 supermarkets?
18         A. Yes.
19         Q. Do you presently believe that News
20 America has strong relationships with consumer packaged
21 goods manufacturers?
22         A. Yes.
23         Q. The next bullet point speaks of targeted
24 market expertise. It says, CCMI's management expertise

Page 188

1 and specialized software will be an asset to News
2 America Marketing as it attempts to grow its in-store
3 portfolio of highly-targeted promotion services.
4          When that statement was drafted and sent
5 off to News Corp. and the chairman of News America
6 Marketing, do you think that that was true?
7          MR. KATZ: Objection.
8          A. I don't know what Mr. Devoe was referring
9 to here. I didn't author this document.
10         Q. You don't know what he means where he
11 writes management expertise? That's not a concept
12 familiar to you?
13         A. I don't know what he's referring to there
14 specifically.
15         Q. Do you believe that CCMI had management
16 expertise?
17         A. When?
18         Q. May 14, 1999.
19         A. I wasn't involved in this business then.
20         Q. Did you pitch this opportunity to the
21 board of directors for News Corp.?
22         A. As I said before, this was David
23 Devoe's -- this was John Rubin's deal. I was involved
24 in the Softcard business.

Condenselt™                    LELLOUCHE-5/25/07

Page 189

1    Q. There was a presentation to the board of
2  News Corp., wasn't there?
3    A. Yes, there was.
4    Q. There was a presentation to the board of
5  News America Marketing, wasn't there?
6    A. Yes.
7    Q. You attended both of those?
8    A. Mm-hmm.
9    Q. And nothing that was said to either board
10  was false, correct, as best you can recall?
11    A. Yes.
12    Q. Now, did CCMI have management expertise
13  at the time you pitched them --
14    A. I did not speak to their management
15  expertise at these meetings.
16    Q. Well, sir, when your team pitched this to
17  two boards, did you believe that CCMI had management
18  expertise?
19    A. Certainly was represented that way.
20    Q. What did you believe?
21    A. I believed that they had been in business
22  for quite a while.
23    Q. And that's what you said to the boards?
24  You said this is a good opportunity because Bob Fireman

Page 190

1  and Ann Raider, they have been in business for a while;
2  is that how you pitched it?
3    A. I don't know that I referred to Bob and
4  Ann. I referred to CCMI.
5    Q. Didn't you say to the boards that were
6  expecting to invest in this opportunity that CCMI had
7  management expertise; isn't that what you said and your
8  team said?
9    MR. KATZ: Objection.
10    A. I don't recall ever saying anything like
11  that.
12    Q. And you didn't believe it?
13    MR. KATZ: Objection.
14    A. I didn't know.
15    Q. You didn't know. This bullet point
16  continues on Exhibit 1 that CCMI's specialized software
17  will be an asset to News America Marketing. Is that
18  something that you recall representing to the board of
19  News Corp. and the board of News America Marketing?
20    A. No.
21    Q. Did you believe it?
22    A. No.
23    Q. Do you think that notwithstanding the
24  fact that it's contained within this Exhibit 1 that is

Page 191

1  false?
2    MR. KATZ: Objection.
3    A. I don't know what Mr. Devoe was referring
4  to here. So I can't, I can't represent what he's
5  discussing.
6    Q. You don't know what he means by
7  specialized software; right?
8    A. What is that?
9    Q. You don't know; right? I guess that's my
10  question.
11    A. It's not identified. I don't know.
12    Q. Given the work you did on this
13  transaction and given your effort to have a level of
14  understanding sufficient to allow you to recommend this
15  as an investment, you still can't tell me what
16  specialized software CCMI had at the time News America
17  Marketing acquired it; right? That's your testimony?
18    MR. KATZ: I think that's a different
19  question.
20    A. Please say that again because I'm going
21  to stay with what I said before. I don't know what
22  specialized software is. I didn't make the ultimate
23  recommendation on acquiring this business. I did not do
24  the due diligence on this business except for in the

Page 192

1  initial phase.
2    MR. PETERS: Can you read the last
3  question, please, and if you can answer it yes or no I'd
4  appreciate that.
5    (Record read)
6    A. What is the question?
7    Q. I just read it. Do you want to hear it
8  again? If you don't understand the question, sir, I'll
9  ask it again.
10    A. Please ask it again.
11    Q. Okay. Notwithstanding the fact that you
12  presented this opportunity to the board of News Corp.
13  and the board of News America Marketing, you with me so
14  far; right?
15    A. Yes.
16    Q. Notwithstanding that are you telling me
17  that you don't have enough knowledge or didn't have
18  enough knowledge about CCMI's business to tell me what
19  specialized software they had?
20    MR. KATZ: Objection.
21    A. I do not.
22    Q. Okay. Did any part of the News America
23  Marketing sales force ever receive training in CCMI's
24  products or services?

Page 193

1      A.  Through Kevin Tripp's efforts perhaps,
2  yes.
3      Q.  Do you know of them?
4      A.  I know that he went out and did joint
5  calls with the sales force.
6      Q.  Was there ever any information package
7  put together so that the sales force of News America
8  Marketing could understand CCMI's product lines?
9      A.  Again, there was no product.  Tell me
10  what product that the CPG sales force was to represent.
11      Q.  No, actually, sir, the way this process
12  works is I ask you questions.
13      A.  I understand that.
14      Q.  That's not clear to me, so I wanted to
15  make that point.  What I'm asking you, sir, is -- and
16  you may answer no -- was there an effort, an organized
17  effort made to train the sales force about what CCMI had
18  to offer?
19      A.  If they had anything to offer it would
20  have been represented.  They had nothing to offer.
21      Q.  From what are you generating eight
22  million dollars of revenue today at CCMI?
23      A.  Direct mail.
24      Q.  Using what?

Page 194

1          MR. KATZ:  Objection.
2      A.  I don't understand the question.
3      Q.  You're making eight million dollars doing
4  targeted direct mail --
5      A.  Yes.
6      Q.  -- using the CCMI business model; in
7  other words, information generated at the point of sale
8  and used for targeted marketing?
9      A.  I would not agree to call it the CCMI
10  business model.  I certainly didn't need CCMI to get
11  into the direct mail business.
12      Q.  You weren't in the business of using
13  information generated at the point of sale to do
14  targeted marketing until you acquired CCMI; right?
15      A.  Yes.
16      Q.  And the eight million dollars in revenue
17  that you testified to earlier in your deposition, that's
18  eight million dollars in revenue generated by targeted
19  direct mail?
20      A.  Yes.
21      Q.  Based on information generated at the
22  point of sale?
23      A.  Yes.
24      Q.  Which was CCMI's business?

Page 195

1      A.  I would say that that was not their
2  business, direct mail predominantly, during the term of
3  their agreement.
4      Q.  Sir, generating the information that
5  allows you to put a flier, a coupon, and program in an
6  envelope and mail it to a specific customer based on
7  that customer's specific buying habits, that was CCMI's
8  business, generating the data that allows or now allows
9  News America Marketing to do direct marketing, wasn't
10  that their business?
11          MR. KATZ:  Objection.
12      A.  I disagree.
13      Q.  Where do you think News America Marketing
14  gets its data that allows it to do targeted direct
15  marketing?  Does it get it from the point of sale?
16      A.  Yes.  No, we don't.  We get it from the
17  retailer.
18      Q.  Where do the retailers get it from?
19      A.  The point of sale.
20      Q.  And that's an eight million dollar
21  business today to News America?
22      A.  Yes.
23      Q.  Was that one of CCMI's products?
24      A.  Yes.

Page 196

1      Q.  When you say over and over and over again
2  that CCMI had no products, have we justified at least
3  one?
4      A.  Not that I would have a 150 percent sales
5  force represent in 1999 when you had a handful of
6  retailers with data available.  As I said, it's
7  emerging.  It hadn't emerged.
8      Q.  It was News America's hope that they
9  would develop that market further?
10      A.  I wouldn't say that's true.
11      Q.  Okay.  News America as far as you know
12  wasn't really concerned about developing the market that
13  now generates eight million dollars?
14      A.  No, they were not.
15      Q.  How many stores had card programs in
16  2001?
17      A.  I haven't the slightest idea.
18      Q.  Isn't that something that's important for
19  you to know before you run a business?
20      A.  You're asking me 1999?
21      Q.  I'm asking 2001, right now, eighteen
22  thousand stores?
23      A.  I have no idea.
24      Q.  How many stores have loyalty cards

Condenselt™                                    LELLOUCHE-5/25/07

Page 197

1  presently?
2      A. Tens of thousands.
3      Q. All of them generating data?
4      A. Not all of them.
5      Q. Most of them?
6      A. Many.
7      Q. That allow for direct market programs?
8      A. Yes, mm-hmm.
9      Q. We spoke a little bit about the E.Piphany
10  software earlier in your deposition. How much was CCMI
11  charged for the E.Piphany software that was ultimately
12  acquired?
13      A. I don't know.
14      Q. Were you involved in allocating the
15  expenses?
16      A. No.
17      Q. Who was?
18      A. Finance.
19      Q. Pardon me?
20      A. Finance and accounting and possibly the
21  CIO.
22      Q. Were you involved in collecting accounts
23  receivable for CCMI?
24      A. No.

Page 198

1      Q. That wasn't one of your responsibilities
2  as general manager?
3      A. No.
4      Q. Who was responsible for that?
5      A. The collections department.
6      Q. Were there complaints registered by Ann
7  and Bob about the efforts to collect receivables for
8  CCMI?
9      A. Not to me.
10      Q. Do you know anything about that issue,
11  the issue of accounts receivable?
12      A. No.
13      Q. And the collection thereof?
14      A. (Shaking head).
15      Q. Was there a hiring freeze in 2000?
16      A. Yes.
17      Q. Did that impact CCMI's business?
18      A. In terms of hiring people?
19      Q. Yes.
20      A. Obviously, yes.
21      Q. Well, it's only obvious if there were
22  people that needed to be hired. Were there people that
23  needed to be hired that couldn't be hired because of a
24  freeze?

Page 199

1      A. Yes.
2      Q. Who and for what positions?
3      A. I don't remember.
4      Q. How many?
5      A. I don't know.
6      Q. Did it impact the bottom line of CCMI?
7      A. Doubtful.
8      Q. Do you know whether it did?
9      A. I don't know.
10      Q. Was a part-time sales staff used to make
11  up the lack of a sales force incident to a hiring
12  freeze?
13      A. I have no recollection of that.
14      Q. Did Ann Raider or Bob Fireman complain
15  about a lack of administrative support to you?
16      A. Yes.
17      Q. Did you think their complaints were
18  justified?
19      A. No.
20      Q. Why not?
21      A. I thought that the head count -- I
22  thought that the staffing was commensurate with the
23  performance of the division.
24      Q. Did NAM commit to hiring people

Page 200

1  sufficient to grow CCMI's business?
2      A. I don't know.
3      Q. Do you know a gentleman by the name of
4  Bill Adam, A D A M?
5      A. I do.
6      Q. Was he employed by CCMI when it was
7  acquired by News America Marketing?
8      A. Yes.
9      Q. Did you speak with Mr. Adam when you met
10  with Bob Fireman to learn about his business prior to
11  the acquisition?
12      A. When I visited the Braintree office I did
13  meet Bill Adam.
14      Q. What was your understanding about his
15  role at CCMI?
16      A. He was a technical person.
17      Q. Was he held out to you by either Ann
18  Raider or Bob Fireman as one of the three creative team
19  members at CCMI, the other two being Ann and Bob?
20      A. They spoke very fondly of him.
21      Q. Did you understand that he was an
22  integral part of CCMI's business?
23      MR. KATZ: Objection.
24      A. I did not understand that.

Page 201

1    Q. Did you ever come to the conclusion that
2  Bill Adam was an integral part of CCMI's business?
3         MR. KATZ: Objection.
4    Q. Either prior to or after the acquisition?
5    A. No.
6    Q. Did you believe he was?
7         MR. KATZ: Same objection.
8    A. No.
9    Q. Do you remember that he was making eighty
10  thousand or approximately eighty thousand dollars a year
11  at CCMI?
12    A. I don't know.
13    Q. Was there any conversation that you had
14  with Ann Raider about getting Bill Adam a pay raise?
15    A. I don't recall.
16    Q. Do you remember that Bill Adam was moved
17  to Connecticut at some point?
18    A. Yes.
19    Q. Were you involved in the decision to move
20  him to Connecticut?
21    A. Yes.
22    Q. What was your role?
23    A. My role was to get him closer to the IT
24  people who were developing the Aspen product so he could

Page 202

1  be co-located with them to facilitate the deployment of
2  that product.
3    Q. Did you discuss that decision with Ann
4  Raider or Bob Fireman before implementing it?
5    A. I don't recall.
6    Q. Do you recall ever soliciting their input
7  of the wisdom or insight of breaking up that team?
8         MR. KATZ: Objection.
9    A. No.
10    Q. Did Ann Raider tell you that Bill Adam
11  was a critical part of the CCMI team in words or
12  substance?
13    A. No.
14    Q. Did Bob Fireman tell you that Bill Adam
15  was a critical part of the CCMI team in words or
16  substance?
17         MR. KATZ: At any point in time?
18    Q. Prior to moving him off to Connecticut?
19    A. He may have.
20    Q. Did you explore whether or not he was a
21  critical part of the CCMI team?
22    A. I observed that he was a critical part of
23  the CCMI team. One of the reasons I wanted to get him
24  out of that is that I feared flight.

Page 203

1    Q. You feared flight because of something
2  Bill Adam said to you?
3    A. Yes.
4    Q. What did he say?
5    A. He didn't want to be there anymore.
6    Q. When did he say this to you?
7    A. Probably concurrent with the time we were
8  having discussions about moving him.
9    Q. What did he say as best you can recall?
10    A. I don't think he enjoyed being in that
11  environment anymore.
12    Q. He said, I don't enjoy being in this
13  environment?
14    A. You're asking me what I thought.
15    Q. I'm asking you what he said?
16    A. I don't know what he said.
17    Q. He told you he was going to leave?
18    A. I was getting the impression that he was
19  looking and that he was going to move on.
20    Q. Well, you knew he wanted a raise; right?
21    A. I don't remember that.
22    Q. What did he say to you that made you
23  believe that he was tired of working with Ann and Bob
24  and wanted to leave them?

Page 204

1    A. I think he had a lot of things that he
2  had issues with. I think he was upset about the
3  acquisition and how he got shortchanged on that.
4  Apparently he mentioned to me that there was some cars
5  that were going to be given out, there was some options,
6  there was some reward that was going to be paid out as a
7  result of this, none of which was forthcoming according
8  to him. I think that he was looking for professional
9  growth, and I think he saw a big opportunity with
10  working with News America.
11    Q. And he told you all this?
12    A. Yes.
13    Q. And he told you that he didn't want to
14  work with Ann and Bob anymore?
15    A. I wouldn't say that he said it
16  specifically about them. I think he was just tired of
17  the environment.
18    Q. Is that what encouraged you to move him
19  to Connecticut?
20    A. No, it was twofold. First of all, I
21  wanted to retain him. Second, we had a strong need in
22  having somebody who could develop the Aspen product that
23  understood that area because our core IT group had not
24  worked in that area and we did not want him to leave.

CondenseIt™                                    LELLOUCHE-5/25/07

Page 205

1  Q. Did you talk to Ann and Bob about this
2  beforehand?
3     A. I don't recall.
4     Q. How long after the acquisition did this
5  move take place?
6     A. I don't recall that either.
7     Q. Was it fairly soon after?
8        MR. KATZ: Objection.
9     A. I don't know.
10    Q. Don't you think it made good business
11 sense to talk to Ann Raider and Bob Fireman about
12 breaking up the three of them?
13    A. You know, frankly he wanted to get away
14 from them.
15    Q. So I guess the answer to my question is
16 no, you don't think it was a good idea?
17    A. I didn't think it was a good idea.
18    Q. You didn't think that talking to Ann and
19 Bob and saying this is what we have planned for Bill
20 Adam before you undertook it was a good way to run the
21 business?
22    A. Well, he was working for the benefit of
23 the business now just in a different location.
24    Q. Do you think it was a good idea to talk

Page 206

1  to Ann and Bob beforehand and say in substance this is
2  what I plan to do?
3     A. No.
4     Q. You didn't think that was a good idea,
5  okay.
6        MR. KATZ: Objection.
7     Q. Now, there was no Aspen product when Bill
8  Adam was moved to Connecticut, was there?
9     A. In the marketplace?
10    Q. NAM hadn't acquired Aspen?
11       MR. KATZ: Objection.
12    A. I don't know.
13    Q. He wasn't moved to Connecticut to work on
14 Aspen, was he, because you didn't have Aspen yet?
15       MR. KATZ: Objection.
16    A. I don't know that to be the case either.
17    Q. Do you remember telling Bill Adam that he
18 would not get a raise if he stayed in Boston?
19    A. I have no recollection of that.
20    Q. Now, do you understand that Bill Adam
21 used to go on sales calls with Ann Raider to help pitch
22 the technical side of their business?
23    A. Yes.
24    Q. And after he was moved to Connecticut,

Page 207

1  how did that impact those sales calls, if you know?
2     A. I think he made several calls that were
3  appropriate. We were between products. We were no
4  longer selling the old product, the old software
5  product, the MAS, and we were in a migration to a new
6  product. So I don't know that it was that meaningful.
7  Honestly, I don't know why Ann couldn't have sold it
8  herself --
9     Q. Do you --
10    A. -- given her experience and expertise.
11    Q. Do you leave room for the possibility
12 that the reason she had a hard time selling the
13 technical side of the business is because she's not a
14 technical person?
15    A. I don't leave room for that.
16    Q. When the sales pitches occur does the
17 customer usually have a technical person attend in your
18 experience?
19    A. If they get serious about it.
20    Q. When they get serious about it, which of
21 course is the goal, don't technical people in your
22 experience want to talk to technical people?
23    A. Yes.
24    Q. And Bill Adam was that technical person

Page 208

1  of the three of them?
2     A. For which product?
3     Q. MAS.
4     A. We were not selling MAS anymore.
5     Q. Answer my question for the moment.
6     A. What product are you referring to?
7     Q. I just I thought answered the question.
8  Notwithstanding I wouldn't answer questions I answered
9  one. MAS.
10    A. They were not selling it. There was no
11 need to go out there and support it.
12    Q. What about Aspen?
13    A. As you said, it was not in the
14 marketplace yet.
15    Q. Bill Adam had no role in sales calls?
16    A. His role was in selecting and developing
17 this product and bringing it to the marketplace. When
18 he moved he was given a title that, if I recall
19 correctly, was director of APS Services or
20 vice-president of ASP Services, which goes specifically
21 to the Aspen product. He was moved to work on the
22 SmartSource Direct business.
23    Q. The Aspen product was used by more than
24 SmartSource Direct, wasn't it?

Page 209

1    A. No.
2    Q. That was just a SmartSource Direct
3  product?
4    A. Absolutely.
5    Q. It wasn't an enterprise-wide product or a
6  product that at least bled over into other aspects of
7  News America's business?
8    A. Not at all.
9    Q. You mentioned the MAS tool. That was the
10  application that CCMI used to track customer behaviors?
11        MR. KATZ: Objection.
12    A. Say that again.
13    Q. What was MAS for?
14    A. MAS was an analytic tool that I know. I
15  didn't know much about it though.
16    Q. At some point that was eliminated from
17  the CCMI product offerings?
18    A. It was determined, frankly I think by the
19  principals, not to be scalable to large retailers. They
20  were mostly working with third- and fourth-tier
21  retailers on that product that really were not
22  particularly relevant to anybody.
23    Q. Why not relevant?
24    A. Too small. I think Bob referred to

Page 210

1  Sullivan Supermarkets yesterday. If I recall correctly
2  they have three stores, hardly something that's going to
3  make General Mills get excited.
4    Q. What was the biggest company that had MAS
5  implemented?
6    A. I don't know.
7    Q. Foodline, Nash Finch?
8    A. Nash Finch is a wholesaler in the
9  Midwest.
10    Q. Did they have MAS?
11    A. Yes.
12    Q. How big are they?
13    A. I don't know.
14    Q. Thousands of stores?
15    A. Maybe.
16    Q. But you don't know?
17    A. I don't know.
18    Q. Certainly not a key retailer in the
19  country?
20    A. Well, they think so, don't they.
21        MR. KATZ: Objection.
22        MR. PETERS: Withdrawn.
23    Q. When the MAS tool was eliminated was
24  there another product put in place to take its

Page 211

1  functionality over?
2    A. I missed that.
3        MR. KATZ: Kevin, can we have that back?
4  I think the witness might want to take a break when it's
5  a convenient time.
6        MR. PETERS: We can take a break now.
7        (Recess taken)
8        (Marked Exhibit 2; E-mail, 4/4/00)
9  BY MR. PETERS:
10    Q. We've marked as Exhibit 2 a document with
11  document control numbers FR 304 and 305. This is a
12  document to you from Ann Raider, an e-mail. Take a
13  moment and review it. Sir, you recognize the e-mail?
14    A. Yes.
15    Q. Do you remember it?
16    A. No.
17    Q. In a general way?
18    A. No.
19    Q. Do you have any reason to doubt it was
20  sent to you?
21    A. I don't have any reason to doubt it.
22    Q. In this e-mail from Ann Raider to you
23  from April 4th, 2000, she lists a series of problems
24  that she is having or issues that are making it

Page 212

1  difficult to manage her staff. She lists Bill Adam
2  which we've discussed. Do you see that?
3    A. Yes.
4    Q. She lists an issue with Rick, inviting
5  Rick to New York City. Do you know what that refers to?
6    A. I do not.
7    Q. She states that he set a start date with
8  Jim Mumm without asking her. Do you see that?
9    A. Yes.
10    Q. So there are a series of complaints that
11  she articulates here or problems she articulates here.
12  Do you have any reason to believe that any of them are
13  not true or didn't occur?
14    A. I have no reason to believe they are not
15  true.
16    Q. Did you respond to these complaints?
17    A. I think I wrote above here that she was
18  requested to be in an executive committee meeting.
19    Q. Your response to her e-mail reads, quote,
20  Ann, you were instructed to be in the office on Monday
21  for the executive committee meeting. You were not in
22  the office on Monday. You are further jeopardizing your
23  credibility as an effective manager by intentionally
24  ignoring instructions from management.

## Page 213

1    Is that the response that you gave her in
2  response to these very specific concerns articulated in
3  her April 4th e-mail?
4        MR. KATZ: Objection.
5     A. It's an e-mail that I wrote back. I
6  don't think I was directing any kind of response to the
7  note below.
8     Q. That's my question really, you didn't
9  respond?
10     A. I did not respond.
11     Q. Why not?
12     A. The overriding concern in my mind was she
13  was not at a mandatory meeting on Monday, our executive
14  committee meeting, and her credibility. And this goes
15  to the whole notion of following News America's policies
16  and procedures. This was just another demonstration
17  that they had no intention of integrating into the News
18  America community.
19     Q. Isn't Ann asking you in substance in this
20  April 4th e-mail to include her in these decisions that
21  you made without her participation?
22        MR. KATZ: Objection.
23     A. I don't know --
24     Q. Isn't that the sense you take from the

## Page 214

1  e-mail?
2     A. It sounds like she's venting.
3     Q. Well, she says, You made an offer to Bill
4  Adam without discussing it with me. You don't see that
5  as a problem?
6     A. I did not --
7     Q. She's saying you should have talked to me
8  about Bill Adam. You see that in the first bullet
9  point; right?
10     A. Yes.
11     Q. And you don't disagree with that, do you?
12        MR. KATZ: Objection.
13     A. I don't feel like I was compelled to
14  discuss it with her.
15     Q. You don't think it would have been a good
16  faith thing to do when you're trying to integrate a
17  business unit to rely on the input or at least solicit
18  the input and insight from the managers of that company
19  before undertaking major business decisions?
20        MR. KATZ: Objection, asked and answered.
21     A. I do not.
22     Q. Did you ever respond to Ann Raider about
23  the concerns articulated in this Exhibit 2?
24     A. I don't recall.

## Page 215

1        (Marked Exhibit 3; E-mail, 5/18/00)
2     Q. We've marked as Exhibit 3 a document with
3  control number FR 4745. It's from Ann Raider to you,
4  Mr. Lellouche. Would you take a look at the document,
5  please? Do you recall receiving this memorandum from
6  Ann Raider?
7     A. No.
8     Q. Do you have any doubt you did?
9     A. I don't doubt it.
10     Q. Have you had a chance to review the
11  concerns she articulates in this memorandum?
12     A. I have read it.
13     Q. Point one she discusses no staff. That's
14  what it's entitled. Do you agree with the statement she
15  makes in point one?
16        MR. KATZ: In their entirety?
17        MR. PETERS: If he agrees with anything
18  I'll explore it. If he doesn't, I won't.
19     A. I have issues with item one.
20     Q. Could you tell me what you disagree with?
21     A. I don't know that no staff is accurate.
22  I don't recall that. We were at zero staff count
23  according to her stipulation here.
24     Q. Where she does say zero staff count?

## Page 216

1     A. No staff.
2     Q. Okay.
3     A. I don't know that to be true. She's
4  saying that she's the only person on staff that could
5  sell. Seems unlikely.
6     Q. Where does she say she's the only person
7  on staff that could sell?
8     A. No staff.
9     Q. Let's move off of no staff. You disagree
10  with that.
11     A. Oh, fine.
12     Q. What else did you disagree with?
13     A. We have greater than two hundred
14  opportunities we could pursue.
15     Q. That's false in your mind?
16     A. In my mind that is completely false.
17     Q. What's the basis of your disbelief?
18     A. I just don't believe that to be remotely
19  true.
20     Q. But you can't give me a specific reason
21  why you think it's not true, can you?
22        MR. KATZ: Objection.
23     Q. Can you tell me why you don't believe Ann
24  was being honest here with you when she wrote, We have

Page 217

1  greater than two hundred opportunities we could pursue?
2      A.  I've never seen anything that listed, or
3  if you can show me something that listed these two
4  hundred opportunities I'll go through them line by line.
5      Q.  But as you read this now, you don't
6  believe it's true because you don't recall the
7  opportunities?
8      A.  No, Ann was prone to exaggerate.
9      Q.  What else about this point one do you
10  think is inaccurate?
11      A.  All the trade shows and conferences we
12  have attended this year.  I don't remember -- I mean,
13  all is implying that there were multiples and I don't
14  recall that happening, unless there are ones that I
15  don't remember.
16      Q.  But other than what you've articulated,
17  when we take a look at the first point and we leave the
18  title no staff out, you don't have any issues with the
19  first paragraph?
20      A.  I can't verify it.  I don't have any
21  issues, but I can't verify it.  I don't know.
22      Q.  Let's move on to point two of this
23  Exhibit 3 which is entitled, Retailer Marketing Program.
24  Read that, please, and tell me whether or not there's

Page 218

1  information stated in this that's inaccurate from your
2  perspective?
3      A.  Again with no staff, I take issue with
4  that.
5      Q.  Who was her staff?
6      A.  Account directors.  Is she saying she had
7  no account directors working on her team or that no one
8  could sell; Bill Adam, Bob Fireman?  I focus all my
9  energies into pursuing sales opportunities, maintaining
10  current customer relationships.  We are a marketing
11  company but have no marketing products to offer.  They
12  have plenty of products to offer the retailers.
13      Q.  CCMI did?
14      A.  Sure.
15      Q.  What about point three?
16      A.  I don't see what there is to refute or
17  deny on that.
18      Q.  Well.
19      A.  Looks like a statement to me.
20      Q.  Do you agree with it?
21      A.  Marketplace leadership, no.  They were a
22  player in the marketplace, a minor one at best.  They
23  built this reputation through recognition in the press.
24  I don't believe that either.  Catalogs, no.  Trade

Page 219

1  publications, no.
2      Q.  You generally disagree with point three?
3      A.  Yes.
4      Q.  And then she says, Henri, I would like to
5  spend time with you and Chris discussing these issues as
6  soon as possible.  Do you know whether or not that
7  meeting ever took place?
8      A.  I don't know.
9          (Marked Exhibit 4; Memorandum, 4/10/00)
10      Q.  I've given you a document, Exhibit 4,
11  control number FR 0353, a memo from Ann Raider to you
12  from April 10th, '00.  Would you review that, please,
13  and I'll have a question or two.
14      A.  Okay.
15      Q.  First question is, do you remember the
16  memorandum?
17      A.  No.
18      Q.  Do you doubt that you received it?
19      A.  I don't doubt it.
20      Q.  Ms. Raider writes in the first paragraph,
21  I have received your e-mail informing me that Bill Adam
22  would not attend the sales appointment at Big Y.  This
23  meeting had already been rescheduled twice and cannot be
24  changed.  By NAM's authority and your direction Bill no

Page 220

1  longer reports to Bob and I.
2          Do you recall in substance what she's
3  referring to in this paragraph?
4      A.  I do not.
5      Q.  Do you recall precluding Bill Adam from
6  attending a sales call or a sales appointment at Big Y?
7      A.  I do not.
8      Q.  Do you remember the Big Y business at all
9  or the pitch to them?
10      A.  I don't recall doing any business with
11  Big Y of any substance.
12      Q.  Do you recall endeavoring to?
13      A.  I don't.
14      Q.  The next paragraph reads, Bob and I have
15  long told NAM of the value the three of us together
16  bring to the marketplace.
17          Do you recall talking to Ann and Bob
18  about that, the value of the three of them, the third
19  being Bill Adam?
20      A.  No.
21      Q.  Next sentence reads, The breakup of this
22  dynamic will affect our effort to do business in the
23  marketplace.  Do you know whether it did?
24      A.  No.

Page 221

1    Q. Did you evaluate whether it would before
2   undertaking it, before breaking the three of them up?
3    A. I didn't believe it was the case and
4   which was one of the reasons I supported moving him to
5   the other office.
6    Q. What happened to Bill Adam, by the way,
7   ultimately?
8    A. He ultimately left to go to work for
9   another company.
10    Q. Was he fired?
11    A. I don't know.
12    Q. Back to our Exhibit 4. The next sentence
13   reads, NAM has no backup in place to support our
14   business. Totally unclear as to what continued support
15   Bill will give me, if any, and the ramifications of any
16   adverse sales initiatives for the list of prospects we
17   already have in place.
18         My simple question is, do you remember
19   seeing a prospect list from Ann?
20    A. No.
21    Q. Do you remember ever seeing a prospect
22   list from Ann?
23    A. No.
24    Q. Do you remember asking for a prospect

Page 222

1   list from Ann?
2    A. I used to get weekly updates from Ann
3   about her progress in the marketplace.
4    Q. Including prospects?
5    A. Prospects, yes.
6         (Marked Exhibit 5; Memorandum, 4/12/00)
7    Q. The document we've marked as Exhibit 5
8   has control number FR 0239. It is a memorandum stamped
9   draft from Ann Raider to you. Please review it and
10   please respond to the first question, which is do you
11   recall seeing it before today?
12    A. I do not.
13    Q. Kindly read it in any event.
14    A. Okay.
15    Q. I want to take a look at the first point.
16   Ann writes in this draft memorandum under FY 2001 plan,
17   When you and I worked together to build the revenue side
18   of the P&L last week, I asked you about costs and in
19   particular my head count/staff. You said don't worry
20   about it. At the meeting yesterday you stated you made
21   the decision (without any input from me) on how many
22   people should be in our team and for what positions.
23         Does that statement correspond to your
24   memory?

Page 223

1    A. I have no recollection of that document.
2    Q. Do you remember building a P&L with Ann
3   Raider for 2001?
4    A. No.
5    Q. Did you make the decisions on head count?
6    A. No.
7    Q. Who made head count decisions?
8    A. Senior management.
9    Q. Did they solicit your input in making
10   these decisions?
11    A. They would. They would discuss with me
12   requests for head count increases, at which point I
13   would have to demonstrate with great clarity and great
14   confidence where the revenue is going to come from to
15   justify these head counts and then they would make a
16   decision as to whether that was credible or not, and
17   they would agree or not agree on head count increases or
18   decreases.
19    Q. Did you advocate for increased head
20   counts for CCMI?
21    A. No, I doubt it.
22    Q. Did you believe that head count was
23   necessary to develop this emerging market?
24    A. No, I did not.

Page 224

1    Q. Did anyone ever tell you about promises
2   that were made to Ann and Bob, Ann Raider and Bob
3   Fireman, about head count and about staffing prior to
4   the acquisition?
5    A. Again, News America's policy is that head
6   count follows revenue.
7    Q. Yeah, but see my question was did anyone
8   ever tell you about promises made to Ann Raider and Bob
9   Fireman about head count, about staffing prior to the
10   acquisition?
11    A. No.
12    Q. Now, she says in the second paragraph of
13   this point one, I am a senior vice-president. That was
14   true; right?
15    A. In title.
16    Q. But not in responsibilities?
17    A. Depends on the time. I'm not sure about
18   in '00.
19    Q. Did she report to you?
20    A. Yes.
21    Q. You were a senior vice-president?
22    A. Yes.
23    Q. So you had Ann Raider as senior
24   vice-president reporting to you as a senior

LELLOUCHE-5/25/07                                  CondenseIt™

Page 225

1    vice-president at some point or another?
2        A.  Yes.
3        Q.  Is that typical at News America Marketing
4    to have senior vice-presidents report to senior
5    vice-presidents?
6        A.  No, it's not.
7        Q.  Are there any other senior
8    vice-presidents other than Ann Raider?
9        A.  I don't know.
10       Q.  She writes, I am a senior vice-president.
11   If I am to be accountable for driving sales, I should
12   have the opportunity to present my plan on staffing
13   requirements and at least have the forum to discuss it
14   with management.  Do you disagree with that statement?
15       A.  Yes.
16       Q.  Then she writes, This is an appropriate
17   business practice used in all the other billion-dollar
18   companies I have worked at; e.g., Gillette.  Do you
19   disagree that that is a true statement?
20           MR. KATZ:  Objection.
21       A.  I haven't the slightest idea.
22       Q.  You don't know whether or not it's an
23   appropriate business practice to solicit the input of
24   senior vice-presidents about staffing needs?

Page 226

1           MR. KATZ:  That's not what the sentence
2    says.
3        A.  I can't comment about what happened at
4    Gillette.
5        Q.  And you don't really have an opinion as
6    to whether or not generally speaking it's an appropriate
7    business practice to give a senior vice-president the
8    opportunity to present a plan on staffing requirements
9    and have a forum to discuss it with management?
10       A.  I've already explained how staffing is
11   added within News America Marketing once.  I'll be happy
12   to explain it again.
13       Q.  Well, in this context we know that it was
14   done without Ann Raider's input; right?
15           MR. KATZ:  Objection.
16       A.  I disagree with what is written here
17   completely.
18       Q.  You completely disagree, okay.
19       A.  With the second sentence I should say
20   which is I believe what we're referring to.
21       Q.  Sentence which reads, If I am to be
22   accountable for driving sales, I should have the
23   opportunity to present my plan on staffing requirements.
24   You think she was given an opportunity to present her

Page 227

1    plan on staffing requirements?
2        A.  No, I think there was an existing
3    staffing situation involved, and there was a revenue
4    call set against it and that was that.
5        Q.  Did you believe she had a forum to
6    discuss her plan and staffing requirements?
7        A.  She may have discussed it with me, and I
8    may or may not have perked up.
9        Q.  We'll move on to two.  On two Ms. Raider
10   writes in this memorandum, When CCMI was acquired we had
11   a commitment from NAM to build turnkey programs for
12   retailers; e.g., Baby Cub, and leverage NAM's
13   properties.
14           Do you know whether or not that statement
15   is correct?
16       A.  I have no knowledge of such commitment.
17       Q.  No one ever told you about such a
18   commitment; right?
19       A.  I don't know of any commitment that
20   existed.
21       Q.  Let's go on to the third point entitled,
22   Robert Coughlin's Responsibilities.  I'm not going to
23   read it.  I'm going to ask you to read it and tell me if
24   you understand the issues that she's articulating?

Page 228

1        A.  I've read it already.
2        Q.  And she's talking about Bob Coughlin,
3    Robert Coughlin; right?
4        A.  Yep.
5        Q.  And she's talking about the elimination
6    of the accounting function at CCMI; right?
7        A.  Yes.
8        Q.  What about the statements she makes in
9    paragraph three are inconsistent with your recollection,
10   if any?
11       A.  I don't know that Bill Adam was forced to
12   do several jobs anymore than he was doing multiple jobs
13   on an ongoing basis.  So I guess I'm not disputing that.
14   I'm just saying that that's not an exception.  I don't
15   know what work Robert did to support Ann in sales as an
16   operations person.  So I don't know what, the relevancy
17   of that.  No financial information from NAM, which was
18   available at request.  I can't imagine why it was
19   withheld.
20       Q.  Should it have been?
21       A.  No.  They had more -- they were privy to
22   more information than I was.
23       Q.  Financial information?
24       A.  Of course.  I never saw any of their

KACZYNSKI REPORTING - (617) 426-6060                    Page 225 - Page 228

Page 229

1   earn-out calculations. I had no idea about any of that
2   stuff until just recently.
3       Q. What else about this paragraph is
4   inconsistent with your personal knowledge or else you can't speak to
5   from personal knowledge?
6       A. I have no idea about this invoice from
7   Sullivan Stores, again a three- to five-store chain. If
8   Robert is not supported he will become forced to resign,
9   like Bill. I don't believe that Bill resigned. So I
10  think that's a false statement here. Robert did not
11  resign. He was released. And I don't know that Robert
12  was a valuable company asset. I think he was an
13  employee.
14      Q. The issues that are raised in this
15  memorandum that you can't speak to that you don't know
16  about, did you look into any of them so that you could
17  understand what the issues were and then perhaps address
18  them?
19          MR. KATZ: Can I have that back?
20          MR. PETERS: The witness testified that
21  in reading paragraph three there were a number of things
22  that he didn't know about. For example, he didn't know
23  whether Bill Adam was forced to do several jobs. He
24  didn't know whether Robert supported Ann. He didn't

Page 230

1   know these things.
2       A. I don't know.
3       Q. Right. And my question to you is, what
4   did you do to learn?
5          MR. KATZ: Objection. I'm not sure
6   that's an accurate characterization of the testimony,
7   but --
8       A. That's not what I was saying. I'll be
9   happy to repeat it.
10      Q. What about this paragraph three contains
11  information that you can't speak to because you don't
12  know?
13      A. Um.
14      Q. And the next question to save you a
15  little bit of time, what did you do to learn?
16      A. Well, in terms of --
17          MR. KATZ: Objection.
18      A. In terms of the 2001 plan, Ann was
19  advocating something that was a fate accompli. We had
20  already sized the staff.
21      Q. I'm just talking about paragraph three.
22      A. Paragraph three.
23      Q. Just three.
24      A. The accounting function was moved to News

Page 231

1   America Marketing because it was redundant. There was
2   nothing for me to discover about that. I knew it to be
3   redundant.
4       Q. I'm asking what you didn't know that's
5   stated in this memorandum, what didn't you know. My
6   next question will be, what did you do to learn?
7       A. It's not that I don't know. I don't
8   believe a good chunk of this is true.
9       Q. So?
10      A. There is no call to action here. This is
11  another venting note.
12      Q. She's not asking for any help from you?
13      A. Do you see any request for action? I'm
14  sorry to ask you a question, but I don't see any request
15  for action.
16      Q. How about simply raising a problem with
17  one's manager so that the problem can be addressed? Do
18  you think it's typical in your business for people to
19  raise problems without any expectation of a resolution?
20      A. I don't see any call to action.
21  Especially with Bob being copied, I see it as another
22  one of their archive items in preparation for future
23  activity.
24      Q. That's how you viewed it at the time?

Page 232

1       A. That's how I view it now.
2       Q. No, sir. At the time when Ann Raider
3   raised issues with you, did you take them seriously
4   enough to take action?
5       A. When there was something actionable,
6   certainly.
7       Q. Did you expect Ann to always suggest the
8   resolution or do you think that as the general manager
9   of CCMI that it was your responsibility to look into a
10  resolution?
11          MR. KATZ: Objection.
12      A. I look at this note, I look at this note
13  now, I can't tell you what I thought at the time, but --
14      Q. You don't see her as soliciting any
15  assistance from you? I guess that's the last question
16  I'll ask you on that document.
17          MR. KATZ: Asked and answered.
18      A. I have nothing else to add.
19      Q. You can add a response to my last
20  question. You don't see this document, this statement,
21  these statements to you as a call by Ann Raider to help
22  resolve issues that were concerning?
23      A. I think they may have been concerning to
24  her. I don't believe that they were concerning to me.

Page 233

1              (Marked Exhibit 6; E-mail, 6/1/00)
2         Q. Exhibit 6, would you take a look at it?
3    It's an e-mail from Ann Raider to you. Have you had an
4    opportunity to read it?
5         A. Okay.
6         Q. Do you remember it?
7         A. No.
8         Q. Document control FR 0252 begins, Dear
9    Henri: The June 1, 2000 retail summit meeting to gain
10   retailer insight/commitment for our APS has been
11   cancelled five days before it was scheduled and three
12   weeks after the initial invitation went out. Do you
13   recall what that was about?
14        A. We had invited retailers into our offices
15   to discuss the ASP development to try and gain their
16   insights before we solidified the Aspen product.
17        Q. Why was it canceled?
18        A. It was canceled because senior management
19   disagreed that we were taking the approach -- I think we
20   were paying for the retailers to come into town and
21   possibly entertainment. When they caught wind of that
22   they shut it down.
23        Q. When she asks in the last sentence,
24   Henri, could we please seek management approval, you

Page 234

1    didn't do that?
2         A. Well, I was the one, I was advocating
3    this and management overrode me, which was their
4    privilege.
5              (Marked Exhibit 7; E-mail, 6/1/00)
6         Q. Exhibit 7 is document control number
7    FR 0248. Please take a look at it and tell me whether
8    you've seen it prior to this afternoon?
9         A. I don't recall this note.
10        Q. Do you have any reason to doubt you
11   received it?
12        A. I have no reason to doubt that.
13        Q. Tell me when you've had a chance to read
14   it.
15        A. Okay.
16        Q. She starts out by stating, I would like
17   to share with you again my concern about the lack of
18   internal (inside NAM) and marketplace recognition SSD is
19   receiving or, rather, not received. Our sales are not
20   mentioned at Monday executive meetings. The senior
21   managers across NAM still do not know what we do. We
22   are the last company mentioned in the iGroup web site,
23   looking like an afterthought. Do you disagree with
24   those statements?

Page 235

1         A. I disagree with several.
2         Q. Which ones?
3         A. Looking like an afterthought, I don't
4    agree with that. It was simply our position on the
5    iGroup web site, if that's true. I don't know that our
6    sales weren't mentioned at the Monday meeting. If they
7    were not it was internal, not intentional. It may have
8    been a system issue because the sales reports were
9    generated through our systems but may not have been
10   designed to incorporate the specialty groups. In fact,
11   I know that they weren't. It wasn't until later on that
12   there was flexibility to give you special group sales in
13   the corporate reporting. Any lack of internal or
14   marketplace recognition of SSD was our own doing. It's
15   our responsibility to get out there and talk with the
16   packaged goods community and the retail community.
17        Q. You were responsible for facilitating
18   that; right?
19        A. The sales force?
20        Q. Yes.
21        A. Yes.
22        Q. The last statement reads, Henri, we
23   desperately need to build awareness of what we can offer
24   retailers and manufacturers. Do you disagree with that

Page 236

1    statement?
2         A. I disagree with that statement.
3         Q. It wasn't important to build awareness?
4              MR. KATZ: Objection.
5         A. You know what I should say -- I'd like to
6    rephrase that. Certainly building awareness is
7    important of what we can offer, but it does not need to
8    be done through trade journals and trade shows and all
9    these feel-good things that don't really do anything
10   effectively to generate sales. Certainly on the
11   manufacturers' side I'll reiterate again that we had
12   nothing to offer the manufacturers of substance that
13   they would redirect a 150 person sales force.
14        Q. That's your opinion?
15        A. Isn't that what you're asking?
16        Q. Yes, I'm asking your opinion.
17        A. That is my opinion.
18        Q. You're just stating it as a matter of
19   fact. It's not a matter of fact. That's your view?
20             MR. KATZ: Objection.
21        A. Oh, were you asking for my opinion or my
22   view? I'm confused.
23        Q. Yes, you appear to be. I'm asking for
24   the truth.

## Page 237

1  A. Are you suggesting that I'm lying?
2  Q. I'm suggesting that you testified earlier
3  that there were products that were sold. In fact, the
4  transcript will read about ten minutes ago you said that
5  they had a lot of products to offer.
6       MR. KATZ: Objection.
7  A. I stand by what I just said.
8  Q. Now, your competitors, did they build
9  awareness --
10  A. Are we still on this page?
11  Q. Your competitors, did they build
12  awareness by publishing in trade publications; that is,
13  the competitors to CCMI?
14  A. You'll have to name some.
15  Q. Well, what about Catalina, Valassis?
16  A. They participated in trade shows. They
17  participated in advertisements.
18  Q. Do you have any sense about how effective
19  that was in building awareness about what they had to
20  offer?
21  A. I have no sense of it at all.
22  Q. Did you ever look into what made your
23  competitors successful?
24       MR. KATZ: I'm sorry?

## Page 238

1  Q. Did you ever look into what made your
2  competitors successful?
3  A. No.
4       (Marked Exhibit 8, E-mail; 8/25/00)
5  Q. Exhibit 8 is an e-mail to you, document
6  control FR 0054. Please take a look at it and tell me
7  if you remember it.
8  A. Okay, go.
9  Q. Do you remember the issues that she's
10  articulating in this exhibit?
11  A. Yes.
12  Q. In general what do you recall about it?
13  A. Can you give me something specific to
14  speak to?
15  Q. She's talking about Valassis acquiring
16  RMS; right?
17  A. Yes.
18  Q. And how that is going to affect the
19  ability to compete, isn't she?
20  A. Yes, that's her concern.
21  Q. Right, and she says in the third
22  paragraph, Henri, we say NAM has relationships with
23  thirteen hundred manufacturers. SSD needs NAM's help to
24  capitalize on those relationships now.

## Page 239

1       Do you disagree with that? More
2  specifically, did you disagree at the time?
3  A. I disagree completely.
4  Q. And then she asks, I suggest we assemble
5  an executive team to discuss where we think Valassis
6  will go first and present the biggest threats in what
7  will be our plan to contain their efforts.
8       Did the executive team that she asked to
9  be assembled ever assemble?
10  A. Well, we assembled each week for our
11  executive committee. I don't recall any specific task
12  force event if that's what you're referring to.
13  Q. Was there anything specifically done to
14  address the issues articulated in Exhibit 8?
15  A. Yes.
16  Q. What?
17  A. We went to Kroger to ensure that we would
18  still have a flow of data back to us. We could still
19  execute programs there. And we did have that in place
20  as Valassis displaced Catalina. But short of that there
21  really was nothing in here that was relevant to our
22  business. Prevision went out of business.
23  Supermarket/drug trade class is a dud. RMG is out of
24  business. RMS was a software product that we passed on

## Page 240

1  because it was a loser. And that's the extent of it.
2  Q. How much revenue in loyalty products and
3  direct marketing is Catalina doing these days, do you
4  know?
5       MR. KATZ: Objection.
6  A. I don't know. I'll tell you what I said
7  before at the beginning of our session, I'll say three
8  hundred fifty to four hundred million. It's a publicly
9  traded company. It can be looked up.
10  Q. Do you know how much Valassis is doing in
11  loyalty products and direct marketing?
12  A. I don't know. They don't break it out
13  clearly in their statements.
14       (Marked Exhibit 9; E-mail, 9/13/01)
15  Q. Exhibit 9 is document control number
16  FR 0193. It's a series of e-mail to and from you from
17  September '01. Take a look, please, and tell me if you
18  recall the e-mail?
19  A. Okay.
20  Q. Do you recall the e-mail?
21  A. No.
22  Q. Do you recall in general the substance of
23  what's being discussed?
24  A. Yes.

**Page 241**

1    Q. In the e-mail from Ms. Raider to you she
2  expresses a concern about a quarterly review for Duane
3  Reade. That is to occur the following day. And then
4  she says in the last sentence of the first paragraph,
5  quote, We have not closed the sale because we are
6  understaffed in the manufacturer sales department for
7  two years now. Do you agree with that statement?
8    A. No.
9    Q. Is your response to that above where you
10  write, quote, Staffing is our responsibility on the
11  sales side and we have not brought in candidates in the
12  industry for consideration.
13    A. Will you just tell me where you are right
14  now? I'm sorry.
15    Q. I'm wondering whether or not your first
16  paragraph responds to her first paragraph?
17    A. Certainly responsibility at that time, we
18  did not have recruiters on staff at the time, and we
19  were trailing off from using headhunters because we had
20  wasted a lot of money on poor candidates. So the
21  explanation here is that we have to take it upon
22  ourselves given our experience and contacts to bring
23  people on staff.
24    Q. So your first paragraph responds to her

**Page 242**

1  first paragraph; right?
2    A. To the extent where she's talking about
3  shortage of staff, if that's what you're referring to.
4    Q. So you're saying in substance if you find
5  him we'll hire him; right?
6    A. If they were open and if there were open
7  and authorized positions, which I can't speak to.
8    Q. You don't know if there were any open and
9  authorized positions at the time she was writing this
10  e-mail?
11    A. This is 2001. I don't recall.
12    Q. I want to take you to the last paragraph
13  of your e-mail back to Ann where you write, On the IT
14  side I share your frustration, and while you can vent to
15  me, you are preaching to the choir. Bill Christie is
16  informed of our situation. We must do the best we can.
17    What are you referring to there when you
18  say you are preaching to the choir?
19    A. I knew we were shorthanded. If you'll
20  notice we're coming, a while but we're coming off of a
21  hiring freeze, and we're trying to bring this product to
22  market, and it wasn't coming to market as fast as we
23  would have liked.
24    Q. So you agree with the statements Ann

**Page 243**

1  makes in the third or fourth paragraph of her e-mail?
2    A. And begins with and? I'm sorry.
3    Q. No, we are the only division of the
4  iGroup that generates sales.
5    A. Oh.
6    Q. Let me withdraw my last question. Let me
7  read you this paragraph and then ask you questions about
8  it.
9    A. Okay.
10    Q. We are the only division of the iGroup
11  that generates sales, and it is criminal that we do not
12  get management's financial or business support. I take
13  it you disagree with that statement?
14    A. Without a doubt.
15    Q. You think there was more than sufficient
16  financial and management support?
17    A. I think that there were appropriate
18  levels of management and financial support, and I
19  certainly don't think it was criminal.
20    Q. That's hyperbolic, isn't it? She's not
21  accusing you of criminal conduct.
22    A. I'm literally responding to what you were
23  asking me.
24    Q. I didn't ask you about a crime, sir.

**Page 244**

1  Didn't I ask you whether or not there was sufficient
2  management support? Is your answer yes?
3    A. Yes.
4    Q. Anything short of criminal is sufficient;
5  is that your response?
6    MR. KATZ: Objection.
7    A. I'm advocating that it's appropriate
8  levels of business and financial support.
9    Q. I was being facetious obviously. At
10  least it was obvious to me.
11    Competition is moving to capture market
12  share that should be ours. Do you disagree with that
13  statement, which is the very last statement she makes to
14  you?
15    A. I disagree with that statement. If she's
16  referring to the IT, which it's hard to say, I shouldn't
17  have even speculated there so I'm -- I take that back.
18    Q. Pardon me?
19    A. I don't believe that there was any market
20  share lost in 2001.
21    (Marked Exhibit 10; E-mail, 11/24/04)
22    Q. Direct your attention to Exhibit 10,
23  document control number FR 0583, and specifically to the
24  paragraph that begins, Finally, even after Safeway

Page 245

1  Marketing. Please read that paragraph. I'll have a
2  question or two about it.
3      A.  Okay.
4      Q.  My first question concerns Ahold, or
5  Ahold. Was there an effort to do business with Ahold;
6  that is, NAM's effort to do business with Ahold during
7  your tenure as the general manager?
8      A.  You're going to have to clarify that.
9      Q.  This paragraph that I asked you to read
10 refers to some business with Ahold. Does the paragraph
11 refresh your recollection about any business that was
12 being done by or attempted to be done with Ahold through
13 Stop & Shop Stores?
14     A.  By whom?
15     Q.  News America Marketing selling prepaid
16 cellular?
17     A.  Yes.
18     Q.  Can you tell me about that transaction?
19 What did you hope to accomplish?
20     A.  The goal was to -- we had already secured
21 the Buy Low business for prepaid, which at the time was
22 part of Ahold. I think that they decoupled at some
23 point. I don't know whether that's concurrent with this
24 or not. I can't tell if the date on here is right.

Page 246

1  Then there was an opportunity to do a prepaid cellular
2  program at Stop & Shop and Giant-Landover. There was a
3  lengthy bidding process. We made it to the finals of
4  that bidding process.
5      Q.  Did SSD win the RFP?
6      A.  SSD was the finalist in the RFP. There
7  was never any contract executed. There was never any
8  award of business. There was never any document that I
9  saw that said that we had the business.
10     Q.  You responded to an RFP and you were
11 awarded the business?
12     A.  I never heard anyone say that. In fact,
13 I contacted Stop & Shop. And you're going to ask me who
14 I spoke to. I can't tell you for a fact. I believe it
15 was Don Sussman. I'm not certain. And I asked if this
16 was, in fact, awarded to us. And he said it was not
17 awarded.
18     Q.  Was that at about the time of the
19 business; in other words, was that about the time of the
20 RFP?
21     A.  It was about at the time of the -- it
22 related to the discussion that this paragraph refers to.
23     Q.  So there was an RFP. SmartSource Direct
24 was a finalist in the RFP?

Page 247

1      A.  Yes.
2      Q.  But your understanding is SmartSource
3  Direct was not awarded the contract ultimately?
4      A.  There was no contract on this business.
5      Q.  Did SmartSource Direct make the decision
6  not to pursue the business at any point?
7      A.  Yes.
8      Q.  When, was it before --
9      A.  I don't know exactly when. It was
10 concurrent with my discussions with Safeway Marketing
11 Services.
12     Q.  What was the business justification for
13 SmartSource Direct deciding not to pursue the business?
14     A.  The business decision was that I had a
15 meeting coming up with Safeway Marketing Services where
16 I was interested in gaining rights to access their
17 frequent shopper data which was currently held
18 exclusively or accessed exclusively by Valassis, and it
19 was hampering SmartSource Direct's business in direct
20 mail quite seriously. I met with Safeway Marketing
21 Services who expressed a great interest in the Stop &
22 Shop and Giant-Landover prepaid business, which by the
23 way we didn't have. We had some sort of a verbal
24 loosey-goosey yes-I-think-you've-got-it thing. So at a

Page 248

1  lunch that was attended by Marty Garofalo and Dan
2  Domahauske [PHONETIC] of Safeway Marketing Services, I
3  said that I would like to have access to the Safeway
4  database in exchange for withdrawing ourselves from the
5  prepaid cellular program which was for the benefit of
6  SmartSource Direct.
7      Q.  With whom at Safeway did you have this
8  conversation?
9      A.  Dan Domahauske, and you can't ask me to
10 spell that one.
11     Q.  Was there already a contract that had
12 been negotiated with Stop & Shop for this business?
13     A.  There may have been drafts going back and
14 forth.
15     Q.  Was the contract to a point where it was
16 ready to be signed as best you recall?
17     A.  I don't know that to be the case.
18     Q.  Was SmartSource Direct working with a
19 partner on this potential transaction?
20     A.  Well, if it had to do with prepaid, we
21 were working with Airtime Technologies, or AirWaves,
22 whatever d/b/a they were using for that particular
23 transaction.
24     Q.  Was the floor advertising business at

LELLOUCHE-5/25/07                           CondenseIt™

Page 249

1  Safeway discussed in your conversation with
2  Mr. Domahauske?
3       A.  Domahauske.
4       MR. KATZ:  Objection.
5       A.  Not in the least.
6       Q.  And prior to making a determination not
7  to -- let me back up.  How much time was spent trying to
8  get the business from Stop & Shop, this prepaid cellular
9  business?
10      A.  I don't know.
11      Q.  Years?
12      A.  Years, I don't think years.
13      Q.  Eighteen months at least?
14      A.  I don't know.
15      Q.  Prior to pulling out did you have a
16  conversation with the people at AirWaves?
17      A.  No.
18      Q.  You just pulled out?
19      A.  There was no contract.
20      Q.  Did AirWaves send any demand or other
21  correspondence to News America Marketing about this
22  transaction?
23      A.  Not that I saw.  I have a great working
24  relationship with AirWaves to this day.

Page 250

1       Q.  What happened with Bob Fireman's job at
2  SmartSource Direct ultimately?
3       A.  I'll have to refer that to Mr. Garofalo.
4  He was not under my supervision at the time.
5       Q.  When did your supervision of Mr. Fireman
6  end?
7       A.  Sometime during the last year of his
8  employment with us.  I can't tell you exactly when.
9       Q.  Do you know why it ended?
10      A.  The supervision?
11      Q.  Yes.
12      A.  I think it was a management decision by
13  Mr. Garofalo to move him under his direction.
14      Q.  Did you have any conversation with
15  Mr. Garofalo about that decision?
16      A.  I just was informed of it and I
17  understood it.
18      Q.  You didn't inquire as to the reasons?
19      A.  I don't recall inquiring.
20      Q.  So all you recall about the subject is
21  that Mr. Garofalo said Mr. Fireman, Bob, is going to
22  report to me in substance?
23      A.  Mm-hmm.
24      Q.  Yes?

Page 251

1       A.  Yes, I'm sorry.
2       MR. PETERS:  Give me about three minutes.
3       (Recess taken)
4       (Marked Exhibit 11; E-mail, 6/23/04)
5  BY MR. PETERS:
6       Q.  Exhibit 11 is an e-mail from you to
7  Mr. Garofalo and others.  Attached to it is an
8  evaluation, an annual performance evaluation and
9  appraisal of Mr. Fireman; is that correct?
10      A.  Yes, it is.
11      Q.  Did you prepare this document?
12      A.  Yes, I did.
13      Q.  Now, at any time prior to preparing this
14  document, did Mr. Carlucci tell you that Bob had to be
15  fired?
16      A.  No.
17      Q.  Did Mr. Carlucci say anything that you
18  construed as negative about Mr. Fireman?
19      A.  He certainly wasn't happy with the
20  result, sales result.
21      Q.  Did he say anything about Bob Fireman
22  personally that you construed to be an indication that
23  he held Mr. Fireman in anything other than high regard?
24      A.  Not that I know of.

Page 252

1       Q.  Was this performance evaluation ever
2  given to Mr. Fireman?
3       A.  I don't believe it was.
4       Q.  Why is that?
5       A.  For the reasons I articulate here.
6  Actually I don't articulate it here.  I should say
7  concurrently the supervision of Mr. Fireman was moving
8  over to Mr. Garofalo.  I prepared this and it was
9  essentially out of my hands that point.  My impression
10 was that Mr. Fireman was going to be delivered a
11 document requesting his early departure.  So it seems,
12 as I'm seeing here, to administer an APA when somebody
13 is exiting is not something we typically do.
14      Q.  Do you know why Mr. Fireman was going to
15 be asked to sign a document for early departure?
16      A.  I don't know.
17      Q.  Was he asked to leave the office, News
18 America Marketing offices?
19      A.  I don't know that answer either.
20      Q.  So you don't know what ultimately
21 transpired from firsthand knowledge or secondhand
22 knowledge?
23      A.  I know from Mr. Garofalo.  I met with him
24 one night and Marty Garofalo told me that Bob rejected

CondenseIt™                                          LELLOUCHE-5/25/07

---

Page 253

1  the offer.
2      Q. You don't know why the offer was being
3  made, I take it?
4      A. I wasn't privy to that.
5      Q. And you didn't ask?
6      A. No.
7          MR. KATZ: You've answered the question.
8      Q. Right, and again after Mr. Garofalo said
9  that Mr. Fireman rejected the offer, you don't know what
10 happened after that, I take it?
11     A. I don't know what happened after that,
12 no.
13         MR. PETERS: Thank you, nothing further.
14         (Deposition concluded at 3:00 p.m.)
15
16
17
18
19
20
21
22
23
24

---

Page 255

1  COMMONWEALTH OF MASSACHUSETTS        )
2  SUFFOLK, SS.                          )
3
4
5      I, Cynthia A. Powers, Shorthand Reporter and
   Notary Public in and for the Commonwealth of
6  Massachusetts, do hereby certify that there came before
   me on the 25th day of May 2007, at 8:07 a.m., the person
7  hereinbefore named, who was by me duly sworn to testify
   to the truth and nothing but the truth of his knowledge
8  touching and concerning the matters in controversy in
   this cause; that he was thereupon examined upon his
9  oath, and his examination reduced to typewriting under
   my direction; and that the deposition is a true record
10 of the testimony given by the witness.
11     I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the
12 parties to the action in which this deposition is taken,
   and further that I am not a relative or employee of any
13 attorney or counsel employed by the parties hereto or
   financially interested in the action.
14
       IN WITNESS WHEREOF, I have hereunto set my hand
15 and affixed my notarial seal this 17th day of June 2007.
16
17
18
19     _____
20     Cynthia A. Powers, Notary Public
       My Commission expires July 2, 2010
21
22
23
24

---

Page 254

1      I have read the foregoing transcript and the same
2  contains a true and accurate recording of my answers
3  given to the questions therein set forth.
4
5
6  _____
7  HENRI F. LELLOUCHE
8
9  On this_____day of_____, 2007, before me, the
10 undersigned notary public, personally appeared Henri F.
11 Lellouche, proved to me through satisfactory evidence of
12 identification, which were _____,
13 to be the person whose name is signed on the preceding
14 or attached document, and who swore or affirmed to me
15 that the contents of the document are truthful and
16 accurate to the best of his knowledge.
17
18
19 _____
20 NOTARY PUBLIC
21
22
23
24

---

**EXHIBIT C**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

                    Plaintiff,

                          Civil Action No.

     -against-           05-1740MLW


NEWS AMERICA MARKETING IN-STORE,

INC.,

                    Defendant.

---------------------------------------x

                  July 18, 2007

                  11:43 a.m.


     Deposition of CHRISTOPHER MIXSON, taken

   by the Plaintiffs, pursuant to Notice, at the

   offices of News Corp, 1211 Avenue of the

   Americas, New York, New York, before David

   Levy, CSR, a Notary Public of the State of New

   York.

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                        July 18, 2007
New York, NY

```
 1   A P P E A R A N C E S :
 2
 3      TODD & WELD LLP
 4      Attorneys for Plaintiffs
 5         28 State Street
 6         Boston, Massachusetts 02109
 7      BY:  KEVIN T. PETERS, ESQ.
 8
 9      HOLLAND & KNIGHT LLP
10      Attorneys for Defendant
11         10 St. James Avenue
12         Boston, Massachusetts 02116-3889
13      BY:  GORDON P. KATZ, ESQ.
14
15
16
17
18
19
20
21
22
```

```
 1   ----------------- I N D E X -----------------
 2   WITNESS            EXAMINATION BY    PAGE
 3   CHRISTOPHER MIXSON   MR. PETERS    4
 4
 5   PLAINTIFF EXHIBIT (MIXSON)      FOR IDENT.
 6   47 E-mail chain Bates numbered FR0215  143
 7   48 E-mail document Bates numbered   146
 8      FR1313
 9   49 E-mail document Bates numbered   147
10      FR0032
11   50 E-mail document Bates numbered   183
12      FR1246
13   51 E-mail with attachments, Bates   184
14      numbered FR0559 through 562
15
16
17
18
19
20
21
22
```

```
 1   C H R I S T O P H E R   M I X S O N , having been
 2      duly sworn by the Notary Public, was examined
 3      and testified as follows:
 4         MR. PETERS:  Gordon, proceeding under
 5      the same stipulations?
 6         MR. KATZ:  Yes.
 7   EXAMINATION BY
 8   MR. PETERS:
 9      Q.  Mr. Mixson, my name is Kevin Peters.
10   We met briefly while waiting for the court
11   reporter and I represent Bob Fireman and Ann
12   Raider.
13         Would you give us your name, spell it
14   and tell us where you live.
15      A.  My name is Christopher Mixson, that's
16   Christopher with a C-h, M as in Michael,
17   i-x-s-o-n, and I live in Greenwich, Connecticut.
18      Q.  Can you have your address?
19      A.  It's 30 Stagg Lane, Greenwich,
20   Connecticut, 06381.
21      Q.  Mr. Mixson, what do you do for a
22   living?
```

```
 1      A.  I'm currently president of News
 2   America Marketing.
 3      Q.  How long have you had that position?
 4      A.  Roughly three years, give or take.
 5      Q.  Can you take me through your
 6   education.
 7      A.  Yes.  I have an undergraduate degree,
 8   Bachelor of Arts degree, with an emphasis in
 9   English literature from Western Illinois
10   University, graduated in 1976.
11         I did some limited graduate work in
12   business but left prior to getting a degree.  And
13   that's about the sum of my formal education.
14      Q.  The graduate work, it was done at
15   what university?
16      A.  Same school.
17      Q.  Did you focus on any particular area
18   of business, marketing, for example?
19      A.  Yes, focused on marketing.
20      Q.  Was it an MBA program?
21      A.  Yes, it was.  I didn't complete it,
22   though.
```

2 (Pages 2 to 5)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                          July 18, 2007
                              New York, NY

| Page 6 | Page 8 |
|---|---|

**Page 6**

1    Q.  What years?
2    A.  I would have to take a guess at that.
3  Probably '8 -- roughly '81, part of '82.
4    Q.  Can you take me through your job path
5  up to the time that you joined News America
6  Marketing.
7    A.  Completely?
8    Q.  Yes, please.
9    A.  Leaving college, I took a job with a
10  publishing company in Lakewood, Colorado,
11  relatively short-lived situation.  Immediately
12  following that, I took an entry-level sales and
13  marketing position with the Quaker Oats Company
14  headquartered out of Chicago, Illinois.
15        I worked in a number of different
16  capacities with Quaker as part of their
17  management training program, including everything
18  from actually calling on retail stores to
19  developing trade promotion programs and other
20  promotional programs for multi-state sales teams
21  within Quaker, working in their human resources
22  department, working in their sales training area,

**Page 7**

1  working to some extent in their brand management
2  area, and then I was more or less spun out of
3  that program into a management situation where I
4  ran a ten-person sales team that covered --
5  headquartered out of St. Louis that covered a
6  multistate area.
7    Q.  This is still for Quaker?
8    A.  Yes, calling on primarily what we
9  would call headquarter accounts on the retail
10  side of the business.
11        After leaving Quaker, I went back to
12  school for a short period of time, left there and
13  took a job with a company called SAMI.  SAMI
14  eventually, through acquisition, became SAMI
15  Burke.  SAMI was a marketing research company,
16  one of the leading marketing research companies
17  for the packaged goods industry.  Burke Marketing
18  Research was probably the state-of-the-art
19  customer research house for the packaged goods
20  industry.  Those two companies merged.
21        I took a relatively entry-level
22  position with them, wanted to get into that side

**Page 8**

1  of the business, and growing in that side of the
2  business, I was very successful there, graduated
3  within -- was there for approximately five years,
4  graduated to one of their most senior account
5  directors.  As I recall, I was the top account
6  director in the organization the year that I was
7  recruited away by a division of Citicorp.
8        I worked for about five years for
9  Citicorp POS Information Services, eventually
10  leaving there as vice president, national account
11  director -- national accounts director, plural.
12  Sorry.
13        That business was eventually shut
14  down by Citicorp and I was picked up -- after
15  doing a little bit of consulting work with Advo,
16  which is the nation's largest direct mail
17  company -- I was recruited by News America FSI
18  and ended up running their Denver office, and
19  have progressed within the News America
20  organization in a variety of different
21  capacities, including, they formed a region
22  around me -- I had some great success early in my

**Page 9**

1  tenure in the company -- they formed a region
2  around me called the Rocky Mountain region.
3        That was relatively short-lived as
4  well, and they moved me to restage the Chicago
5  operation for News America FSI as a -- I had
6  various vice president titles here.  Some of them
7  are -- I don't know how meaningful one is versus
8  the other, but I was a vice president, group vice
9  president, senior vice president, that kind of
10  thing.
11        In Chicago, successfully restaged
12  that operation and they relocated me back here to
13  New York to head up sales for the entire company,
14  for News America FSI.  In 1997 News America FSI,
15  News Corp., acquired Heritage Media primarily to
16  incorporate the Act Media division, which was the
17  in-store marketing division of Heritage Media
18  into the News America enterprise and shortly
19  thereafter, we reintroduced ourselves as News
20  America Marketing.
21        I did that for a number of years,
22  engineered the integration of those two sales

3  (Pages 6 to 9)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                        New York, NY

Page 10

1  organizations and once that process was
2  completed, by that time we had acquired -- a
3  venture group that we had had acquired some other
4  properties that I was asked to work to develop
5  into a sustainable business. We called those
6  properties the IGroup. I was moved over to the
7  IGroup as president.
8        I was there for two years, give or
9  take, probably a little shy of that, at which
10 time the core business got into a little bit of
11 trouble in terms of our volume, both base and
12 roving during the time that I was gone. The
13 chief executive officer of News America Marketing
14 asked me to come back over and help correct that
15 situation. I was successful in doing that and,
16 shortly thereafter, was promoted to president of
17 News America Marketing. And that's the position
18 that I hold today.
19     Q. What year did you start with News
20 FSI?
21     A. I believe my anniversary is September
22 of 1992.

Page 11

1     Q. And you mentioned that you engineered
2  the merger of the sales forces between Act Media
3  and News America Marketing?
4     A. That's correct.
5     Q. When did that occur?
6     A. Well, it was a staged integration.
7  You know, it's hard for me to recall exactly when
8  we completed it. You know, I developed a plan
9  shortly after the acquisition. I guess, if you
10 wanted me to talk a little bit about how that
11 whole process worked, I was not involved in the
12 acquisition of the Heritage property. It's
13 fairly consistent with the way we operate that,
14 you know, we don't want to be unduly jeopardizing
15 the retention of key people at, you know, for
16 companies that you get involved with. You want
17 to maintain key people. Part of the reason you
18 buy organizations is not only for the products
19 but for the people.
20        So there was some concern about
21 pursuing the integration route overtly. I
22 independently put together an integration plan

Page 12

1  that I presented to the organization for
2  consideration. The chief executive officer of
3  the organization, you know, was not necessarily
4  keen on integration at that time because there
5  was a big investment in Heritage. I don't know
6  the actual size of the investment but it was
7  substantial. We decided to test the integration
8  in our smallest sales region, which was Los
9  Angeles. So we tested it for a certain period of
10 time.
11        During that period of time, other
12 influences within the marketplace dictated that,
13 unless that test was unsuccessful, it would be in
14 the company's best interest to move forward with
15 integration, and we did that in due course over
16 the matter of a number of months.
17        So I think the integration probably
18 took place over the course of, you know, after
19 the initial introduction, probably we completed
20 it sometime in 1999.
21     Q. When did you put together the
22 integration plan? You don't have to give me a

Page 13

1  month, but was that sometime in 1998?
2     A. Yeah, it was either -- either late
3  '97 or sometime in '98 that I presented the plan
4  for consideration.
5     Q. Shortly after Heritage was acquired?
6     A. Well, "Shortly" is a relative term,
7  but -- we acquired it in 1997.
8     Q. So sometime that year?
9     A. Sometime between 1997 and '99, when
10 we actually pulled the trigger on integration, I
11 had presented a plan.
12     Q. Chronologically, was that integration
13 done prior to or after the acquisition of the
14 entities that became the IGroup?
15     A. Oh, it was done -- it was done
16 before, I believe.
17     Q. Did that integration impact the sales
18 force in any adverse way for a period of time?
19 In other words, was there a ramp-up period after
20 the integration to allow people to get
21 acclimated?
22        MR. KATZ: Objection.

4 (Pages 10 to 13)

Henderson Legal Services
202-220-4158

Mixson, Christopher                                July 18, 2007
New York, NY

---

Page 14

1      A. I don't know, other than to say that
2  the integration has been wildly successful to
3  date. You know, you have peaks and valleys in
4  sales volume for a variety of different reasons.
5  Some of them not specifically associated with the
6  construction of a sales force. But generally
7  speaking, from its inception to now, you know,
8  when we first integrated the sales force, and
9  News America Marketing had had a low 40 percent
10 market share on the FSI side of the business, and
11 we had about a $200 million in-store business.
12     Today we have a 65 percent share of
13 the FSI business and approaching a $400 million
14 in-store business. So certainly some of that can
15 be attributed to the way we go to market. And we
16 go to market as a single-source organization
17 right now.
18     Q. What do you mean by that?
19     A. Well, we have one representative, who
20 primarily represents a large number of our
21 products. Not all of our products, but a large
22 number of our products.

---

Page 15

1      Q. So the rep develops a relationship
2  with a manufacturer or the retailer and that
3  person is the sales rep for most of News
4  America's products; is that the model?
5      A. Yes. Generally speaking that's the
6  model.
7      Q. And I take it, Mr. Mixson, that
8  you're the person who was at the top of the food
9  chain in terms of the sales force?
10     A. We have a national sales manager now,
11 but, you know, we run the business through an
12 executive committee. We are a sales and
13 marketing company, so that's the focus of the
14 organization, developing products that are used
15 by, you know, our advertisers. So I guess, yeah,
16 you could say that I'm at the top of the food
17 chain to some extent. Things surface to me that
18 need to surface to me and, hopefully, we do a
19 good job of delegating responsibility to those
20 people who can handle things that make decisions
21 and -- so again, it's relative.
22     Q. Would you describe the chain of

---

Page 16

1  command at News America Marketing as relatively
2  flat?
3          MR. KATZ: Objection.
4      A. Again, I don't know what "relatively
5  flat" is.
6      Q. I'm trying to understand whether or
7  not decisions on how the sales force reps a
8  product is done by committee, or are they
9  essentially done by a committee subject to a
10 final approval by a person like you?
11         MR. KATZ: Objection.
12     A. I really don't know how to answer the
13 question. There is a great deal of autonomy
14 extended to senior sales managers that we have.
15 I think there are standards that we have as an
16 organization that we expect all of our sales
17 teams to adhere to. And given the success that
18 we've had in the industry at large, we're pretty
19 convinced that the way we go to market is -- is
20 the best way to go to market and, generally
21 speaking, our sales force moves through a
22 development program where, by the time they have

---

Page 17

1  significant responsibility for, as producers
2  within the organization, they are well steeped in
3  how we go to market.
4      So there's a great deal of buy-in and
5  acceptance of standards that preclude me from
6  getting involved in lots of things that are not
7  bigger issues.
8      Q. The term you used to describe your
9  sales force or your sales reps, my notes reflect,
10 is it "single source" or "sole source"? Would
11 you remind me of --
12     A. "Single source" is -- it's not a term
13 that's unique to News America. It's, I think
14 it's a term that's widely used in industries
15 from -- for businesses that cover a wide spectrum
16 of -- provide a wide spectrum of solutions for
17 customers.
18     Q. And how is the decision made as to
19 which products the sales reps rep or sell? And I
20 think you mentioned that they sell most but maybe
21 not all. How do you make that determination?
22     A. Well, I think we would divide -- we

---

5 (Pages 14 to 17)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                  July 18, 2007
                        New York, NY

| Page 18 | Page 20 |
|---|---|

**Page 18**

1    look at our products, you know, there's a --
2    euphemistically we refer to the more mature
3    products that we have that have been in the
4    marketplace for a long time, the freestanding
5    inserts as a case in point, and the syndicated
6    in-store products, promotions, our advertising
7    and promotion products.
8           We look at those as mature concepts,
9    even though we refresh the kinds of products that
10   we may introduce in-store, that they fall within
11   that more traditional perspective of in-store
12   market -- syndicated in-store marketed promotion
13   products, those would all be managed by a sales
14   team.  And our clients, normally speaking, have
15   line item budgets year in, year out, that are
16   created to purchase and utilize those products.
17          We have other emerging businesses.
18   Emerging businesses would include certainly the
19   Internet-based businesses, the purchase
20   behavior-based targeting businesses, the -- to
21   some extent our merchandising businesses.  We
22   have custom publishing businesses, we have -- we

**Page 19**

1    have special thematic -- thematically-based
2    businesses.
3           All of those kinds of things are
4    satisfying more of a unique niche in the
5    marketplace.  And those would not be necessarily
6    part of the core sales responsibilities.  And by
7    that I mean, we wouldn't establish goals for
8    those products for the core sales force.  We
9    would have specialty salespeople who have goals
10   for those products.
11          That's not always the case.
12   Sometimes we will have a blend of specialty
13   product goals that we will also assign to the
14   core to work in concert with the specialty sales
15   teams.  We do, we modify things as we move
16   through time to best complement the growth of
17   business.
18       Q.  Let's focus on SmartSource Direct.
19   Was SmartSource what you would call an emerging
20   business segment?
21       A.  Yes.
22       Q.  And focusing on purchase behavior, or

**Page 20**

1    utilizing purchase behavior to develop marketing
2    campaigns?
3        A.  Yes.
4        Q.  Who repped SmartSource Direct's
5    sales, products and services?
6        A.  Who are the sales representatives
7    or --
8        Q.  What sales force?
9        A.  We have a sales force right now that
10   reports up to -- we have a fellow named Mr. Russo
11   who runs our direct sales force -- actually,
12   Henry Lellouche runs the IGroup and I think that,
13   if you're talking about the food chain that you
14   had mentioned before, Jim Russo reports up to
15   Henry Lellouche.  That's a relatively recent
16   change that we've made.  I think Henry ran that
17   business from the sales perspective personally
18   for, certainly the -- the time that -- up until
19   just a couple of months ago.
20       Q.  Let's focus on the year 2000.  We'll
21   go back in time.  Can you tell me what sales
22   force repped SmartSource Direct's products and

**Page 21**

1    services?
2           MR. KATZ:  In the year 2000?
3           MR. PETERS:  Yes.  In that time
4    frame.
5        A.  We --
6           MR. KATZ:  If you know.
7           MR. PETERS:  Well, look --
8        A.  We had --
9        Q.  All of these questions are if you
10   know.  You don't need him to coach you on that
11   point.
12       A.  I appreciate --
13       Q.  Don't answer the question if you
14   don't know.
15       A.  I appreciate his counsel.  It depends
16   which side of the business you're talking about.
17   We have a retail side of our sales force and we
18   have a manufacturing side of our sales force.
19   And I think to a large extent, we didn't have
20   much of a product to sell on the SmartSource
21   Direct side of the business.  It was, there
22   wasn't the refinement of product that, you know,

6 (Pages 18 to 21)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

---

Page 22

1  allows us to have a well-developed sales force
2  represented, certainly, on the manufacturing side
3  of the business.  There were some products and
4  services on the retail side of the business which
5  ultimately, you know, had to ultimately changed
6  as well.
7          But we had probably more
8  representation on the retail side of the business
9  than we did on the manufacturing side of the
10 business.  And I can't, you know, if you're going
11 to ask me the names of all the people who did
12 that, you're going to be disappointed because I
13 can't remember them, or most of them.
14         Q.  Well, at the moment, I'm more
15 interested in the organization.  There was a --
16 was there a separate retail sales force and a
17 separate manufacturing sales force?
18         A.  Well, again, primarily in the --
19         Q.  I should focus you, Mr. Mixson, to
20 the time period of, you know, late '99 through
21 2000; the early years, if you will, of the
22 acquisition of SmartSource Direct, then known as

Page 23

1  CCMI, at least initially.
2          A.  Okay.  Well, I can only speak to the
3  situation after I was appointed to try to figure
4  out this business.
5          Q.  Well, let's take that as a benchmark.
6  When was that?
7          A.  I think that was in -- I want to say
8  it was in 2000.
9          Q.  Okay.
10         A.  And again, we had -- we had -- Henry
11 Lellouche was involved early on.  Henry really
12 had responsibility, oversight of that business.
13 And he worked with Ann Raider and other people
14 who were largely recruited from outside the
15 organization to, I believe at the -- at the -- I
16 won't use the word "insistence," but the
17 recommendation of Ann Raider and Bob Fireman.  We
18 brought people in from outside of the business to
19 represent that business and sell on the retail
20 side, which is different from the way we normally
21 develop a sales force in our market.
22         Q.  Take me through that a little bit,

Page 24

1  please, and we're still just focusing on the
2  retail sales.  Your testimony is that Ann Raider
3  provided the identities or the names of people
4  who she thought would be good sales reps to sell
5  to retailers?
6          A.  I think there was an -- I think Ann,
7  Bob and Henry were all actively involved in
8  interviewing and extending offers and ultimately
9  hiring people to come on board to support that
10 retail sales force, is my recollection.
11         Q.  Is it your belief that the retail
12 sales force was something that needed to be
13 developed at CCMI or SmartSource Direct, back
14 when you came on board in 2000?
15         A.  When I came on board in 2000, the
16 mission was to take these properties that we had
17 acquired and grow them into sustainable
18 businesses.  So to some extent, any time you're
19 involved in an enterprise like that, you're --
20 there is a little bit of trial and error involved
21 in trying to figure out how you're going to do
22 that.

Page 25

1          I think our plan, and the plan that
2  we pursued, was to bring people on board to
3  represent products that currently existed, and
4  those products were frequent-shopper card -- that
5  we brokered frequent-shopper card relationships
6  between retailers and manufactures of frequent
7  shopper cards.
8          We attempted to sell application
9  processing and to some extent, although the
10 infrastructure wasn't really there to support it,
11 to provide some type of data hosting.  So those
12 were products that -- that existed, although, you
13 know, frankly, on a relative basis to other
14 things that were available in the industry, it
15 was a tough sale because they were much less
16 sophisticated than other businesses that were out
17 there.
18         But we did have products, so we did
19 bring people on board to try and grow that part
20 of the business.
21         On the manufacturer side of the
22 business, there really wasn't, you know, a

7 (Pages 22 to 25)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                              July 18, 2007
New York, NY

---

Page 26

1  product, per se, that, you know, you could have
2  people out peddling, although we did -- and it's
3  not inconsistent with the way News America has
4  done marketing in the past, we sometimes try to
5  sell a little -- sell products that we think we
6  can deliver to our major customers.  So if we
7  found out that a customer, major packaged goods
8  customer would be interested in a database
9  marketing product, we would try to get as much
10  information as we could on their project and then
11  determine whether or not we thought we might be
12  able to get something going there, so to speak.
13       But that was less of a focus early on
14  because you really don't have a syndicated, you
15  know, a substantial package product that you
16  could introduce into the marketplace, nor do you
17  necessarily have relationships with retailers so
18  you have a ready data stream that's of any size
19  or consequence for those advertisers.
20       So we focused our efforts, as I
21  recall, primarily on the retail side.
22       Q.  Let's talk just for a minute about

---

Page 27

1  manufacturing, the sale or lack of sales of
2  products to manufacturers.  Your testimony is
3  that you didn't think that there was a salable
4  product; does that accurately encapsulate what
5  you're telling me?
6       A.  Yeah.  Well, there's different
7  reasons for that but, yes, I think our ability
8  to, you know, you can have the best salesperson
9  in the world but if you don't have a viable
10  product, that salesperson is going to have a
11  difficult time being successful.  And I don't
12  think that we had, you know, tremendously viable
13  products at that point in time, because the
14  products were dependent upon both being able to
15  acquire the purchase behavior data you needed to
16  do targeting and being able to process it and
17  execute against it efficiently.
18       Keep in mind, this was early in our
19  development.  Today we're very successful in that
20  business.  We're growing.  But it's taken -- it's
21  taken, you know, the appropriate amount of time
22  to build that reputation, to build the data

---

Page 28

1  accession, and to develop the facility to deliver
2  those types of broad skill programs that
3  manufacturers are looking for.
4       Q.  Describe the products, please, that
5  you would have liked to have sold to
6  manufacturers back in 2000 but you believed
7  didn't exist in the CCMI suite of products and
8  sources.
9            MR. KATZ:  Objection to form.
10       You can answer the question if you
11       understand it.
12       A.  Well, I never worked with CCMI.  I
13  always -- CCMI -- I think of CCMI, that's
14  preacquisition.
15       Q.  Let's just substitute SmartSource
16  Direct within my question.
17       A.  Okay.  So the question again is?
18       Q.  The question is, what products and
19  services did you hope to sell for SmartSource
20  Direct to manufacturers but were, in your view,
21  unavailable early on, let's say in 2000?
22       A.  The types of products that we're

---

Page 29

1  selling now.  The types of products that we're
2  selling now have a high degree of customization
3  to them.  But they have -- they have scale.
4  Scale was something that we didn't have back in
5  2000.  And they have form in the sense that
6  sampling programs, highly targeted consumer
7  promotion programs, all predicated on your
8  ability to slice and dice data in a way that
9  allows you to go in and sell consultatively to
10  customers and help guide their purchase
11  decisions.
12       We didn't have that capability early
13  on in the program.  We invested heavily in some
14  technology that would assist us in getting there,
15  but we didn't have it back in 2000.
16       Q.  Let me just see if I understand what
17  would have been sold to manufacturers if you
18  thought it was available for sale and in a
19  salable form.
20       Programs designed to market a
21  manufacturer's product, that are designed using
22  information developed at the point of sale that

8 (Pages 26 to 29)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                              July 18, 2007
                              New York, NY

Page 30

1  tracks customer behavior or customer purchase
2  habits; is that --
3       A.  Yes.
4       Q.  -- correct?
5       A.  Yes.
6       Q.  So back when you first came on to the
7  IGroup, you were integrating these three business
8  units, and we'll talk about that in a minute.
9  Your perspective was that there wasn't a product
10 sufficiently developed to sell to manufacturers?
11      A.  To sell -- we certainly could cobble
12 together small programs but manufacturers
13 generally are going to be going to vendors who
14 can -- versus customers who can satisfy their appetite for scale.
15          We couldn't provide the scale early
16 on in the enterprise, so we had a difficult time
17 competing against that.  We really didn't have a
18 sale of a product on a relative basis with other
19 vendors in the market, vendors like RMS, and
20 ultimately VRMS --
21      Q.  Catalina?
22      A.  Catalina had a totally different

Page 31

1  delivery system.  So, you know, Catalina had
2  emerged as the gold standard, I think, of
3  marketing on some levels, primarily due to their
4  sophisticated electronic delivery system and
5  their access to streaming purchase behavior data
6  where they could slice and dice that at will and
7  come back to manufacturers with real consultative
8  recommendations.
9          We didn't have access to streaming
10 date to do that.  We had to submit queries to
11 retailers to generally even have access to data.
12 So it was a much more cumbersome, much more
13 difficult to compete.
14      Q.  Am I correct that the manufacturing
15 sales force was not given the SmartSource Direct
16 suite of products and services to market to
17 manufacturers?
18      A.  There was no suite of products and
19 services --
20      Q.  That's my --
21      A.  -- on the manufacturer's side of the
22 business.

Page 32

1       Q.  So manufacturers were not marketed
2  to.
3          MR. KATZ:  Objection.
4       A.  No, I don't think that's -- I don't
5  think that's fair.  I think that, you know, we're
6  opportunists.  As sales -- as a sales
7  organization, if we have a customer where we have
8  an excellent relationship who has communicated to
9  us that they would like to investigate a
10 targeting initiative, you know, we may have the
11 opportunity to satisfy that request at some level
12 and, if we could do it, we would.
13      Q.  But that process is a reactive
14 process, versus proactive --
15      A.  Well, it's really a combination of
16 the two.  I think you have some salespeople who
17 are, you know, I cast myself in that role when I
18 was a youngster out there selling.  I would
19 actively pursue opportunities and if I -- if I
20 thought I hit a resonant chord with a client, I
21 would be selling on the outside of the envelope
22 coming back to my business and saying, "Hey, I

Page 33

1  think I have this opportunity, can we do this?"
2  Okay?
3          You have other salespeople that are
4  not risk-takers who are going to be less prone to
5  do that.  So it's, you know, we have a very large
6  sales organization.  We have some people who are
7  very good at certain things.  We have other
8  people that are very good at other things.  So,
9  you know, it's -- it's all -- it's not cut and
10 dried.
11      Q.  Was there an organized focused effort
12 to sell SmartSource Direct's products and
13 services to manufacturers during the time that
14 you were with the IGroup?
15      A.  Yes.
16      Q.  Can you describe that for me?
17      A.  Well, given the abstract nature of
18 database marketing, Henry Lellouche would conduct
19 sessions in all of our sales offices where he
20 would -- we would have all of our sales teams
21 come together for education and sales training,
22 and Henry would, you know, describe the products,

                                    9 (Pages 30 to 33)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

Page 34

1  describe the process, describe the opportunities
2  as they currently existed, which at first were
3  somewhat limited, and then I guess the best way
4  to address, and we still sell that way, where we
5  try to get our -- our core sales force, our core
6  relationshipholders, stakeholders at the accounts
7  as up to speed on all of our products so that
8  they can become -- they are not experts, but I
9  would refer to them as accomplished generalists
10  who can understand our product lines, our
11  specialty product lines well enough to do a
12  competent job of representing them to clients.
13        And again, if they strike a resonant
14  chord of interest or find out that there's going
15  to be a project dedicated in that area, we reach
16  out and call the experts in and the experts come
17  in and pursue that particular opportunity.
18     Q.  So when you described early on the
19  sales force as a single-source sales force, I
20  take it, then, that the manufacturer sales force
21  was encouraged to market, to sell CCMI's or
22  SmartSource Direct's products and services back

Page 35

1  in the days when you were with the IGroup?
2     A.  Yeah.  I -- and I'd have to go back
3  and, you know, I can't really recollect all the
4  details associated with that.  It was a long time
5  ago in my work.  But that's consistent with the
6  way we go to market today, and we haven't really
7  deviated from that.  We have, you know, we have a
8  big investment in the specialty sales area, so
9  naturally we're all interested in figuring out a
10  way to make them as successful as we possibly
11  can.
12        We're not going to make them
13  successful by throwing HR resources against them
14  that weighs on the bottom line.  You're going to
15  be successful by putting -- right-sizing them out
16  of human resources you put against them, and
17  piggybacking them on the relationships we have
18  with our major packaged goods players.  They
19  worked very, very well for us.
20        We've done a good job in main
21  businesses where our competitors have failed
22  because we haven't made the mistake that our

Page 36

1  competitors have had of operating in the red.
2  We're able to operate in the black that way and
3  progressively grow our business here.  So...
4     Q.  As a general matter, am I correct
5  that your sales force is encouraged to sell all
6  products that News America Marketing has to
7  offer?
8     A.  Yes.
9     Q.  And are they compensated equally on
10  those sales?  In other words, is there a -- let
11  me take it in smaller steps.
12        How are your sales force members
13  compensated?  Salary and commission?
14     A.  Yes.
15     Q.  And the commission is based on
16  overall sales?
17     A.  It's based on, you know, reaching
18  assigned sales goals is a big part of it.  There
19  are other ways that we compensate our people.
20        I'll just cut to the chase for you.
21  I think the question that you're -- that you're
22  asking is, are they additionally compensated for

Page 37

1  representing the specialty products as well, and
2  this answer to that is yes.  They are able to
3  share in any success that is ultimately achieved
4  by fleshing out the opportunity, bringing the
5  specialty representatives in to help close the
6  sale and the core person benefits from that
7  successful sale above and beyond what they
8  benefit through reaching their own
9  personally-assigned sales goals.
10     Q.  Back in 2000 and around that time,
11  did the sales force have sales goals that
12  pertained specifically to the sale of SmartSource
13  Direct's products and services?
14     A.  I can't recall.
15     Q.  Do they presently have sales goals
16  that target specifically the sale of SmartSource
17  Direct's products and services?
18     A.  They don't -- they don't specifically
19  have sales goals, but they have compensation
20  override opportunities.  So they are strongly
21  motivated to assist in selling.  So for example,
22  if I am a core salesperson at Schick, and my

10  (Pages 34 to 37)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                         New York, NY

---

Page 38

1  day-to-day consultative selling relationship with
2  Schick -- and you have to keep in mind that we're
3  a very substantial vendor with these major
4  packaged goods players. We have a very good
5  reputation, certainly a reputation that includes
6  keeping information confidential because market
7  information is power, but we're invited in as
8  members of promotion planning and decision
9  groups.
10       When you're invited in to those types
11 of sessions, you become privy to future plans.
12 They might include a database marketing program.
13 We would then -- we don't really have to, you
14 know, be too aggressive in our efforts to get in
15 there because we now have a reputation of
16 executing quality programs, so we're invited in.
17       But we would -- the core salesperson
18 would then alert the specialty salesperson, the
19 SmartSource Direct salesperson, to come in. If
20 they are successful in closing a sale, the volume
21 would be attributed against the specialty
22 salesperson's sales goal and then we would give

---

Page 40

1        Q. And the manufacturer sales force has
2  sales goals both for core products and specialty
3  products?
4        A. No. Well --
5        Q. The manufacturer --
6        A. Your nomenclature is a little mixed
7  up. Let me help you out. We have what you
8  referred to as our core sales group. They have
9  specific goals. We have specialty areas that
10 have dedicated salespeople. They have their
11 goals. They are both selling to manufacturers.
12 So they are both manufacturer sales reps to an
13 extent.
14       Q. I'm talking now about your core sales
15 force. At least I intended to.
16       A. Yes, they have a specific sales goal
17 for their core products, and then they have an
18 opportunity to not only reach these sales goals,
19 but reach even higher compensation levels by
20 successfully partnering with the specialty
21 salespeople and assisting them in closing
22 specialty sales.

---

Page 39

1  the -- an override on the volume and also
2  dedicate -- dedicate that override to
3  accomplishment of the core person's sales goal.
4        Q. So --
5        A. So at the end of the year, the
6  salespersons successfully achieve their core
7  product sales goal, they would now be up in the
8  bonus rounds, you know, based on the additional
9  revenue that's being attributed to their
10 territory based on their success in complementing
11 the specialty sales group.
12       Q. So the sales goals are based on
13 target core products.
14       MR. KATZ: Objection.
15       A. I'm sorry, I don't understand the
16 question.
17       Q. The sales goals are set on core
18 products?
19       MR. KATZ: Objection.
20       A. Sales goals are set on all products.
21       Q. Including specialty products?
22       A. Yes.

---

Page 41

1        Q. Okay. Now, this is the way it's done
2  today.
3        A. That's correct.
4        Q. Is that also the way it was done in
5  2000?
6        A. I can't recall. I mean, the
7  compensation program normally evolves year to
8  year as we figure out ways to do things better.
9  So I'm not exactly sure the way the structure was
10 set up in 2000.
11       Q. What I'm really interested in finding
12 out is whether or not the core sales force sold
13 specialty products, and in this particular
14 instance, SmartSource Direct's products, to the
15 manufacturers in 2000 and 2001.
16       Do you recall that?
17       A. They would certainly complement
18 the -- the sale. I can't give you the specifics
19 of how we constructed the sales goals, bonus
20 plans, compensation plans around that. But, you
21 know, it's -- it's akin to, if you wanted to date
22 a girl, and you didn't know her at all but you

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                July 18, 2007
New York, NY

Page 42

1    had a close friend who knew her well, chances are
2    pretty good you'd want to use your close friend
3    to get an introduction to the girl you wanted to
4    date.
5            It's very, very similar in the way we
6    operate the business. It's the core salespeople
7    who have the most day-to-day interaction with the
8    key decisionmakers on the packaged goods side.
9    So it's only natural that our specialty sales
10   teams are going to want to piggyback on those
11   relationships to try and foster successful
12   closure on sales that they are assigned.
13       Q. Is the core sales force directed to
14   try to sell SmartSource Direct's products?
15       A. Yes. I mean, that's why Henry would
16   make, would go around doing his presentations to
17   the various sales offices on what SmartSource
18   Direct is all about, and how they can assist us
19   in successfully growing SmartSource Direct's
20   business.
21       Q. That was your expectation, in other
22   words, it was your expectation that the sales

Page 43

1    force would be directed to try to sell
2    SmartSource Direct's products and services?
3        A. Yes.
4        Q. And do you know for a fact that that
5    happened, or do you assume it happened because
6    that's what should have happened?
7        A. No. It happened with varying degrees
8    of success. Again, to be able to sell something,
9    you have to have a product to sell. You know,
10   and I think -- I can't -- well, I have to
11   speculate as to where we were at, at that
12   particular point in time, because I can't recall
13   the exact progression.
14       Q. I show you a document that we've
15   marked in Mr. Garofalo's deposition yesterday --
16       MR. KATZ: Whenever you want to take
17   a break, we can do that, and we'll resolve
18   what we want to do for lunch. I
19   personally am indifferent to what we do.
20   So -- this is off the record.
21       (Discussion off the record.)
22       Q. This is Exhibit 39. We marked that

Page 44

1    yesterday at Mr. Garofalo's deposition, and if
2    you take a look at it, Mr. Mixson, the first
3    question is if you saw this before today.
4        A. You want me to go through this?
5        Q. Yes, just take a look at it and
6    familiarize yourself sufficiently to tell me if
7    this is something you recall seeing back in the
8    day or otherwise.
9            (Witness perusing document.)
10       A. I don't recall this particular piece,
11   but I'm conversant in the topics that are
12   addressed in it.
13       Q. I will tell you the properties of the
14   document place this department in the August 1999
15   time frame. But I'll ask you whether or not my
16   observation is consistent with your memory.
17       A. Okay.
18       Q. Is it? Does it look like something
19   that you would have seen --
20       A. I have know --
21       Q. -- might have seen back then?
22       A. It certainly -- it could be something

Page 45

1    that I might have seen. I have no specific
2    recollection of this piece, though.
3        Q. Take a look at the page which is
4    third from the --
5        A. The page you're looking at?
6        Q. Third page from the end. It says,
7    "CCMI Full Service Database Marketing Services."
8    Yes, sir.
9            As you look at the PowerPoint
10   presentation that discusses these services that
11   CCMI had to offer, is it consistent with your
12   memory that first off, the program implementation
13   products and services were products and services
14   that were available?
15       A. No.
16       Q. Salable?
17       A. No. I think there's a little bit of
18   progressive thinking that goes into a lot of
19   these things. You're looking at a -- I think
20   you're looking as much as a "wannabe" chart as a
21   "currently is" chart.
22       Q. You say that why? What's the

                              12 (Pages 42 to 45)

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

| Page 46 | Page 48 |
|---|---|
| 1 basis -- | 1 side, those are manufacturer-focused components. |
| 2    A. I say that based on my experience, | 2 And if you look at the middle, those are the |
| 3 that this as much represents, you know, where we | 3 things that you need to do to bridge the two. |
| 4 hope to emerge as where we were currently at, at | 4    Q. Okay. |
| 5 the time that this slide was put together, I | 5    A. Okay? |
| 6 think. | 6    Q. Well then, let's take that |
| 7    Q. Let's take a look first at the first | 7 understanding. And I'll go with that. The |
| 8 column, "Product Implementation." | 8 retailers, were all the four issues, were all the |
| 9    A. Okay. | 9 four products listed under program implementation |
| 10    Q. Tell me what, in your view, doesn't | 10 available in 1999 and 2000 for sale to retailers? |
| 11 belong there. | 11    A. Again, you need to -- this is why I'm |
| 12    MR. KATZ: Objection. | 12 trying to make sure that you understand -- I |
| 13    A. These might be things that we had | 13 think that SmartSource Direct or, back at this |
| 14 some competency in doing. Whether or not there | 14 time, SmartSource Direct hadn't even been |
| 15 was truly a market that we could effectively | 15 unveiled, I guess this is CCMI. Let me speak of |
| 16 compete in for these things remained to be | 16 it in terms of SmartSource Direct because this |
| 17 discovered, okay, in 1999. Because it certainly | 17 predates me. |
| 18 remained to be discovered in 2000 and beyond, as | 18    Q. Right. |
| 19 we -- as we learned, as we moved through time, a | 19    A. But I'll try so we don't have to come |
| 20 lot of -- a lot of this stuff really ultimately | 20 back to this again in the future. |
| 21 wasn't salable because there wasn't a need in the | 21    We could do frequent-shopper program |
| 22 marketplace for the services that News America | 22 design. Anybody can. You know, I did that for a |

| Page 47 | Page 49 |
|---|---|
| 1 could provide here. | 1 living for -- for years. I was part of one of |
| 2    Same thing -- same thing holds true | 2 the pioneers in development of database marketing |
| 3 on the data management side of things. | 3 and frequent-shopper program creation. |
| 4    Q. Well, I just want to focus just for a | 4    Q. Was that at Citibank? |
| 5 minute, Mr. Mixson, on program implementation. | 5    A. Yes. Citicorp POS Information |
| 6 And my question is, of the four things listed | 6 Services was the pioneer in database marketing. |
| 7 under "Program Implementation," do you believe | 7    Application process and card design |
| 8 that some of them were unavailable, in other | 8 production, issuance and replenishment, I would |
| 9 words, some of them were not salable? | 9 say, yes, we could to all those things but on a |
| 10    MR. KATZ: Objection. | 10 very small scale, because we didn't have the -- |
| 11    A. I had think -- I think to some | 11 on one hand, we didn't have the systems and the |
| 12 degree, all of them were salable. The question | 12 competency to handle very large programs and on |
| 13 is to whom, to what businesses. | 13 the other hand, a lot of this stuff was, even at |
| 14    Q. Well, let's focus on, first, | 14 this time, being brought in-house to the very |
| 15 manufacturers. Do you believe -- | 15 large retailers. They had no need to continue to |
| 16    A. Well, I don't think -- I think you're | 16 go through middlemen in order to facilitate these |
| 17 heading in the wrong direction here. The -- if | 17 particular requirements. Which is one of the -- |
| 18 you look at the far left-hand side of this page, | 18 one of the unfortunate things that we discovered |
| 19 it's really not manufacturers that are being | 19 after we had had made the acquisition. |
| 20 addressed here. These are -- these are really | 20    There are a lot of things here that I |
| 21 retailer-focused components. Okay? | 21 would imagine the people who originally made the |
| 22    If you look to the far right-hand | 22 decision to buy this company had hoped would |

13 (Pages 46 to 49)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                            New York, NY

---

Page 50

1  blossom into real business opportunities but
2  there was an evolution in the business that took
3  place.  As consolidation took place on the retail
4  side of the business, these things were all being
5  brought in-house.
6        So while we did do business in these
7  areas over time, you know, you didn't have to be
8  a weatherman to know which way the wind blows.
9  We saw these businesses contracting in terms of
10 the overall future opportunities that might exist
11 against them.  So the answer to your question,
12 yes, we could do these things but do them on a
13 very small scale with a limited number of
14 retailers, which really was never going to get us
15 to the promised land, okay?
16     Q.  Let's still focus on program
17 implementation and tell me which of these
18 products and services was brought in-house.
19     A.  By retailers?
20     Q.  By retailers.
21     A.  Frequent-shopper program design,
22 application processing, the -- they eliminated

---

Page 51

1  middlemen in terms of card design, production and
2  issuance, they went right to the card
3  manufacturers, and the same holds true for
4  replenishment.
5     Q.  So all of that work now is currently
6  done in-house or by in-house retailers?
7     A.  I don't think that that's a universal
8  truth in terms that there are retailers out there
9  that still subcontract this stuff out.  But
10 largely, I think if you go to the large
11 retailers, where you really need to be, where a
12 business of our, you know, appetite would need to
13 be in order to focus resources against these
14 things, these types of things are all easily done
15 in-house, you know.  Kroger -- Kroger today is a
16 conglomerate that, you know, let's -- are you
17 familiar with the retail structure across the
18 country through your exercise here?  Have you
19 gotten more familiar with it?
20     Q.  I'm not -- "familiar" is a relative
21 term.  I'm what you called an informed
22 generalist, if I could pick up on your

---

Page 52

1  description.
2     A.  Very good.  Kroger used to be highly
3  concentrated in the East Coast.  All their
4  banners were called Kroger, okay?  They had --
5  I'll take a guess and say they had what are --
6  twelve divisions that covered a lot of the major
7  cities in the East and some Midwest and Southwest
8  cities.  But they now own Ralph's in LA, they
9  own -- they own a litany of major retailers that
10 make them truly national in scope.  They have
11 more than doubled in size.
12        So when you have an enterprise that
13 large, you -- any consolidated business is
14 looking to eliminate redundancies, find
15 efficiencies, and you get to a certain size where
16 you no longer need to go outside necessarily to
17 have somebody manage these services for you.  You
18 either invest in those services yourself or you
19 hire the people and bring them on board to do it
20 for you.
21        Kroger is a good example, Dunnhumby,
22 who is now a major database marketing force

---

Page 53

1  internationally, has been partially acquired by
2  Kroger to do all these things.  So I think that's
3  hopefully a representative analogy of the trend
4  that's taking place in the industry.
5     Q.  And those customers, those types of
6  customers are News America Marketing's core
7  business, large customers like Kroger?  In other
8  words, is that your target?
9        MR. KATZ:  Objection.
10     A.  They are part of our target.  They
11 are a big part of our target.
12     Q.  You don't go after the smaller
13 retailers, I take it?
14        MR. KATZ:  Objection.
15     A.  We have smaller retailers in our
16 network.  But, you know, it's -- it's the 80/20
17 rule, I guess, you know, 20 percent of the
18 players represent about 80 percent of the
19 network.  And that's you know, that's just a
20 colloquial statistical pronouncement that
21 probably does reflect the way our business breaks
22 out.

14 (Pages 50 to 53)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

Page 54

1      Q.  And I'll betray my ignorance by
2  suggesting the company Duane-Reade.  Where do
3  they fall in the spectrum?
4      A.  Well, Duane-Reade is a, you know,
5  Duane-Reade at that time was a fairly significant
6  retailer.  I think, and to some extent, you know,
7  they still are.  They are one of the larger drug
8  retailers.
9      Q.  Are they in the 80 or in the 20?
10     A.  They would be in the 20 on the drug
11  side of the business, yes.
12     Q.  So they were a core type of client
13  for News America Marketing back in 2000?
14     A.  Yeah, back in -- well, even Kroger
15  back in 2000 may have provided even, you know,
16  I'm giving you the Kroger analogy to tell you
17  what's happened with the evolution of the
18  business.  That same evolution has happened, by
19  the way, with Duane-Reade.  Duane-Reade has
20  gotten bigger.  CVS has gotten bigger.
21  Walgreen's has gotten much bigger.  There's been
22  consolidation there as well.

Page 55

1          All three of those players are
2  consistent with the analogy I just gave you.
3  They get to a certain point where they don't --
4  may not subcontract for services that they would
5  have at one time.  They have gotten big enough
6  that they actually develop departments internally
7  to manage those same kinds of things.
8      Q.  In the companies that are not so
9  large, so that they would outsource that type of
10  work, are they of interest to News America
11  Marketing at present or are they really outside
12  your strategic focus?
13     A.  Well, we use those other retailers to
14  round out our network.  They are more important
15  in some markets than they are in others because
16  you're looking to provide manufacturers with a
17  scale of exposure and reach in every market in
18  which you operate.  So they do have some level of
19  importance but they don't have the independent
20  scale to be of the relative importance of a
21  Kroger or Safeway or CVS or Walgreen's.
22     Q.  And the sales force, are they

Page 56

1  instructed to call on companies of all sizes or
2  are they limited in some way to whom they market?
3  I mean, I take it for example, you're not going
4  to a mom-and-pop pizza shop in Dracut,
5  Massachusetts.
6          MR. KATZ:  Objection.
7          MR. PETERS:  What's wrong with
8      Dracut, Massachusetts?  It's one town
9      over.
10         MR. KATZ:  I think you just
11     mispronounced it.
12         MR. PETERS:  I could have.
13     Q.  Is there a size, in other words, that
14  News America Marketing presently has as a cutoff
15  for its sales force to call on?
16     A.  No, not really.  I mean, I wouldn't
17  say that there's a size that cuts things off.
18  There's -- if the a retailer comes to us with
19  interest in being invited into our network, we'll
20  ascertain whether or not a retailer works within
21  our network.  This there's a lot of -- there's a
22  lot of criteria that have to be addressed prior

Page 57

1  to making that decision.
2          Do we have a -- do they fit within
3  our coverage area in terms of the ability of our
4  field force to go out and service those stores?
5  Are they, you know, are they in northwest North
6  Dakota, okay?  If you have, you know, Gordy's IGA
7  up in northwest North Dakota where it's going to
8  take a field rep all day to drive up there,
9  chances are pretty good they are not going to be
10  included in our network, although we have
11  explored ways of adding stores who want to be in
12  our network through some type of self-fulfillment
13  mechanism.  We haven't really launched that but
14  we've talked about a way to try to do that.
15         Every opportunity of generating
16  incremental profit that falls within our margin
17  guidelines is something that we give
18  consideration to.  But, you know, it's not always
19  easy to fill that bill.  So I'd say the same, you
20  know, it's generally the same for all business.
21  You look at opportunities that you think merit
22  the investment, and if you can qualify that, then

15  (Pages 54 to 57)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                          July 18, 2007
                              New York, NY

| Page 58 | Page 60 |
|---|---|

Page 58

1  you pursue it.  So the same would hold true here.
2       Q.  The description you just gave to me
3  of a retailer that may or may not fit within your
4  network is one that comes to you and looks for
5  services.  I'm really interested in whether or
6  not there's a cutoff in your sales force, and
7  maybe you've answered the question, where the
8  retailer is just too small to merit the effort of
9  your sales force to call upon those retailers.
10      A.  I'd say yes.  There are retailers
11  that are too small to merit focus by News
12  America.
13      Q.  Is that memorialized anywhere or is
14  that more or less determined on an ad hoc basis?
15  In other words, do you have some type of line
16  that says, "Less than a hundred million in sales
17  and we're not interested"?
18      MR. KATZ:  Objection.
19      A.  You know, it's not memorialized in
20  any kind of a defined document, if you will.  I
21  think that, you know, periodically, as we -- as
22  we look to refresh and improve the quality of our

Page 59

1  network, we go through exercises to review what
2  we currently have, what the opportunities may be
3  that are out there and then we make decisions
4  based on that review.
5       It's not dissimilar to the way we
6  review our distribution network for FSI.  We take
7  a look at the newspapers that are in our
8  circulation base and make decisions as to whether
9  or not there are papers out there that would make
10  sense being added to our circulation base or not.
11      Q.  Back in 2000, how small was too
12  small?
13      A.  I can't answer that.  I, you know,
14  again, I don't know the answer.
15      Q.  Was there a category that would fit
16  into my description of "too small" back in 2000?
17      MR. KATZ:  Objection.
18      A.  I don't know.  I don't know.
19      Q.  Was there any effort to look at the
20  retailers that CCMI had already secured as
21  clients, as customers, to determine whether or
22  not they fit within the strategic focus of News

Page 60

1  America Marketing at the time?
2       A.  I'm sure that that, you know, that
3  effort was undertaken.  I wasn't involved in it
4  personally.  But, you know, people reporting up
5  to me would be making those decisions.
6       Q.  That's something that should have
7  happened, in your view?
8       MR. KATZ:  Objection.
9       A.  Again, it's something that I think
10  did happen, and that's part of the way the entire
11  business operates.  You're always looking for
12  ways to profit and grow your business.
13      Q.  I'm going to go back now after that
14  digression to Exhibit 39.  Have you looked at the
15  middle column, which is "Data Management"?
16      Are the items listed under "data
17  management" items that were available for sale
18  from SmartSource Direct during your tenure with
19  the IGroup?
20      A.  I really don't know how much of this
21  stuff was truly available at that point in time.
22  I think -- I think some of it may have been

Page 61

1  available.  The bigger question really is what
2  was available, competitive in the marketplace and
3  salable.  And I think the answer to that question
4  increasingly became "no," and we needed to make
5  investments in these areas to try and get to that
6  point.
7       Q.  Is your testimony by implication that
8  if it was available and salable, News America
9  would have sold it?
10      A.  Yes.
11      Q.  What effort did you make to try to
12  determine, personally determine what was
13  available and salable back in the days when you
14  were with the IGroup?
15      MR. KATZ:  Objection.
16      A.  You took what was available and you
17  tried to sell it.
18      Q.  Well, that much I can follow.
19      A.  Okay.
20      Q.  What I'm wondering is if you did any
21  kind of diligence yourself.
22      A.  Personally?

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                July 18, 2007

New York, NY

|  | Page 62 |
|---|---|

1    Q.  Personally.
2    A.  No.
3    Q.  To look into what the company had to
4    offer.
5    A.  Well, I would be part of regular
6    weekly meetings where we'd review success against
7    products that currently existed and I would be
8    part of conversations that would be reviewing
9    recommendations that were being made by the
10   people who were managing this on what we needed
11   and where we needed to be to be competitive.
12       But, you know, in terms of doing,
13   roll up my shirt sleeves and do personal analysis
14   below that, no, I had people who worked for me to
15   do that.
16       Q.  Who was the person or who were the
17   people that were responsible for inventorying in
18   CCMI?
19       MR. KATZ:  Objection.
20       A.  I don't follow --
21       Q.  And by "inventorying," I mean, I'm
22   looking at an inventory of products and services

|  | Page 63 |
|---|---|

1    now in Exhibit 39.  When you bought the company,
2    when News America bought the company, you must
3    have conducted some kind off effort to determine
4    what CCMI had to offer and how robust it was.
5        Do you know who did that work.
6        A.  Well, we had a venture group.  I
7    mean, the process of acquisition of CCMI, what
8    was that process like?  I wasn't really involved
9    in it.
10       My first involvement with the -- with
11   the IGroup was after all of these acquisitions
12   had actually been consummated.  And I was brought
13   in after the fact and given the assignment of
14   honing them into some type of viable and
15   sustainable business.
16       So -- but we would have a venture
17   group who would go out and, you know, I think
18   they dealt more often than not with higher-risk
19   entrepreneurial-type businesses that hadn't
20   really made it big, so there was always some
21   speculative nature to that type of assignment in
22   the first place.

|  | Page 64 |
|---|---|

1        But I think they would be the people
2    that would go through the due diligence to try to
3    ascertain whether or not there was a viable
4    business opportunity there or not.
5        Q.  You don't know whether or not the
6    document we've marked as Exhibit 39 effectively
7    reflects --
8        A.  That's this document?
9        Q.  -- yes, sir, effectively reflects the
10   inventory that CCMI had to offer at the time of
11   the acquisition?
12       A.  I think it actually -- accurately
13   reflects -- I would imagine it accurately
14   reflects what we believed to be available at the
15   time of the acquisition.  I don't know that it
16   accurately describes those products and services
17   that were determined ultimately to be viable
18   after the acquisition.
19       Q.  We'll talk about that in a second,
20   but let me go back to a statement you made a
21   moment ago about your role with the IGroup.
22       A.  Um-hum.

|  | Page 65 |
|---|---|

1        Q.  My notes reflect, earlier in the
2    deposition, you were brought in to integrate the
3    IGroup as a sustainable business; is that
4    correct?
5        A.  Yes.
6        Q.  And by "integrate," that means
7    SoftCard, Planet U and what was then CCMI or what
8    soon to become SmartSource Direct, your role was
9    to find the synergy between these three companies
10   and develop a sustainable business?
11       MR. KATZ:  Objection.
12       A.  I think that was the ultimate goal.
13   I don't think you synergize right out of the box.
14   I think that, you know, each of these businesses
15   had to first and foremost gain some traction
16   independently and as they did that, we would
17   figure out a way to integrate them -- when I say
18   "integration," it's usually, "Integration"
19   usually takes place to some extent on the
20   marketing front.  How do we -- how do we
21   integrate businesses into an actionable sales
22   initiative, and then ultimately, are there other

17 (Pages 62 to 65)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                        New York, NY

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  synergies that exist that allow us to, you know,
2  create a larger business.
3      Q.  So as an initial matter, you want to
4  make sure that each of these business units is
5  independently successful so you can determine how
6  the three might work in conjunction?
7      A.  Well, it's certainly easier to create
8  a successful business out of, in this case, three
9  businesses that are of themselves independently
10  successful.
11          Now, unfortunately, in the IGroup
12  assignment, I was given three businesses that
13  independently had not proven their success.  So
14  it was a -- it was a -- an interesting challenge,
15  to say the least.
16      Q.  So in order to -- I'll make a general
17  statement -- in order to gain traction, to use
18  your words, on SmartSource Direct, you understood
19  that resources would have to be dedicated to that
20  business.
21      A.  Yeah.  I mean -- resources would
22  ultimately have to be dedicated to any business

**Page 68**

1          So it's not -- it's not a question of
2  just throwing resources against the wall and
3  seeing what sticks.  It's a question of
4  understanding the business and hopefully making
5  the right decisions in terms of how, when and
6  where you allocate those resources.
7      Q.  Part of that process includes first
8  looking at the company, in this case SmartSource
9  Direct, and determining what they had done right
10  in the past, right?
11      MR. KATZ:  Objection.
12      A.  Yeah, I -- I guess one of the things
13  you would do is evaluate, you know, in any
14  project, you evaluate, you know, where you
15  started and where you're at, and, you know,
16  hopefully through that evaluation, it gives you
17  some direction on where you go in the future.  So
18  to that extent, yes.
19      Q.  In fact, News America Marketing
20  wouldn't have bought CCMI if it thought CCMI had
21  been unsuccessful to date, right?
22      MR. KATZ:  Objection.

**Page 67**

1  for those businesses to be successful.  The real
2  question is what resources, how much resource.
3  There's different ways to reach a specific
4  objective.
5          For example, would we want to apply
6  independent accounting resources to SmartSource
7  Direct?  Probably not.  We'd probably want to
8  eliminate accounting resources if those resources
9  ended up being redundant and had an adverse
10  effect on the bottom-line profits of SmartSource
11  Direct as a consequence of that.
12          There's other resources that you are
13  going to want to invest in.  If you find that the
14  database marketing engine that they currently had
15  is inadequate and never going to get you to where
16  you need to be, that's probably, you look at it
17  and say, "Unfortunately, what we thought we were
18  getting isn't there.  We're going to have to make
19  some big investments and put some more resources
20  behind that and develop a viable product if we
21  hope to be competitive in this -- in this
22  particular area."

**Page 69**

1      Q.  Based on what you knew of the
2  company.
3      A.  I don't know that that's necessarily
4  true.  I think that there have been many
5  instances where an organization saw a potential
6  business opportunity in a business that may not
7  currently be successful but you think that you
8  can make a difference, you can get a good buy on
9  that particular company and you can grow it and
10  make it successful.  I don't know if that's the
11  particular case here with what was then CCMI,
12  'cause I wasn't part of that evaluation or part
13  of that acquisition or new ventures group.
14          For better or for worse, by the time
15  I was brought on to the scene, it was a News
16  America-owned company.  So I had to play the hand
17  that I was dealt and that's what we tried to do.
18      Q.  But in order to determine what
19  resources a company will benefit from, in this
20  case SmartSource Direct, you evaluate what the
21  company has done in your opinion correctly, and
22  what the company has done incorrectly, and where

18 (Pages 66 to 69)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                          July 18, 2007
                              New York, NY

Page 70

1  the company might benefit from additional
2  resources; isn't that the process?
3       A.  Yes.  And I would add to that what
4  the company's currently doing that is correct or
5  incorrect and also, evaluating, you know, after
6  you get more experience with the company, what do
7  you do with it now.
8       Q.  Did you learn, ever, what percentage
9  of the market in its market segment CCMI had
10 prior to acquisition?
11      MR. KATZ:  Objection.
12      A.  I can't recall.  My recollection
13 would be that it -- very small.
14      Q.  So you didn't learn and you don't
15 believe that it had a significant market share at
16 the time of the acquisition in loyalty card
17 programs?
18      A.  You have to explain to me, what
19 market share of what?
20      Q.  Well, share of selling loyalty cards
21 that are then used to develop marketing programs
22 by using information developed at the point of

Page 71

1  sale.
2       A.  I think in retrospect, they may have,
3  you know, their -- their -- I think their primary
4  profit, and I may be mistaken on this, but their
5  primary profit was simply brokering access to
6  plastic frequent-shopper cards.  I don't think
7  that a tremendous amount of their market share,
8  if you will, in terms of executing database
9  marketing programs, I think it was
10 infinitesimally small.
11      Q.  That was an emerging market back in
12 '99, wasn't it?
13      A.  It's still an emerging market.
14      Q.  It was a brand-new market
15 effectively.
16      A.  In when?
17      Q.  '99.
18      A.  Absolutely not.
19      Q.  How developed was the market compared
20 to today?
21      A.  Substantially.
22      Q.  Let's talk about your work at, was it

Page 72

1  Citicorp, or Citibank?
2       A.  Okay.
3       MR. KATZ:  You know, before we do
4  that, this is a good time, I just want to
5  take a restroom break.  Can we do that,
6  and we can come back and again, I'm
7  totally indifferent on lunch.  I can work
8  through it, but you let me know.
9       MR. PETERS:  I'm still working on
10 breakfast.  We're off.
11      (Recess taken.)
12 EXAMINATION (Cont'd.)
13 BY MR. PETERS:
14      Q.  Would you describe your work with
15 Citicorp?
16      A.  Citicorp POS Information Services,
17 perhaps the best way to describe my work is to
18 describe Citicorp POS Information Services.
19      Q.  Yes.
20      A.  Citicorp POS Information Services
21 really, at least within the grocery and drug
22 segments of the industry, invested database

Page 73

1  marketing, introduced the first loyalty programs,
2  and indeed, reached relatively significant
3  penetration in the expansion of those programs
4  prior to their ultimate closure in 1991.
5       I went to work for them in, let's
6  say, 1986.  I was on the -- I wasn't part of the
7  original start-up, but I was in one of the very
8  first early waves of hires before the company
9  ramped up over the years to eventually having
10 several hundred people in the organization.  It
11 was a company that was headquartered actually up
12 in Stamford, Connecticut.
13      Citibank had had a reputation under
14 John Reed, who was the CEO of Citibank at the
15 time, of funding what they called
16 "Intrepreneurial," that's with an I,
17 Intreprenuerial businesses where they would bring
18 on teams of talented people to take a concept,
19 they would fund it and grow that into larger and
20 substantial businesses.
21      The objective of Citicorp at the time
22 was to, one, develop the nation's largest

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                          July 18, 2007
New York, NY

---

Page 74

1  important behavior database, John Reed having a
2  small belief that we'd be able to tap into the
3  latent marketing potential of that data, and
4  remarket that information for packaged goods
5  companies and other marketers for marketing
6  purposes.
7           Secondly, there was a bit of a more
8  abstract agenda that had to do with ultimately
9  converting frequent-shopper cards into credit
10  instruments.  And Citicorp already had this
11  tremendous card base in distribution around the
12  country with frequent-shopper cards.  They would
13  certainly have a leg up on anyone else attempting
14  to make that happen, and I can't give you all the
15  details on this but, you know, that was a
16  challenge back then, still a challenge today for
17  a variety of reasons.  But, you know, included in
18  that is our rather archaic banking laws that are
19  unique to the U.S.
20           The first program that Citicorp
21  initiated was with Ukrops in Richmond, Virginia.
22  After they started Ukrops, that's when I was

---

Page 75

1  brought on board.  I helped oversee the creation
2  of unique marketing programs and implemented
3  those programs at a variety of retailers
4  including Jewel and Dominick's, which together
5  probably constitute in excess of about 65 of the
6  ACV in the Chicago metro area.
7           We had numerous divisions of Safeway
8  on line, including Vaughn's in California,
9  including Safeway Denver, Safeway Balt-Wash,
10  Safeway Seattle, and a number of other retailers
11  across the country.  So as far as back as that;
12  and there was significant penetration had already
13  started on the frequent-shopper front.
14           We had also actually built
15  applications for the data where we were actually
16  selling applications for the data back to retail
17  customers.  There was a retail sales force at
18  Citicorp POS.  There was a manufacturers' sales
19  force at Citicorp POS.
20       Q.  Why was it shut down when it was so
21  successful?
22       A.  Well, it was shut down because the

---

Page 76

1  plan that Citibank had behind Citicorp POS, they
2  realized that this business would not -- their
3  forecast for generating a profit that would
4  underwrite the huge investment that was required
5  to get this whole enterprise up and running was a
6  multiyear-payback scheme before they even started
7  to see a return on that investment.  But they
8  were willing to deal with that.  They had a lot
9  of confidence that this was going to be the next
10  big thing.
11           Unfortunately, all of us having lived
12  through that period, the country went into a
13  recession.  Citibank is the largest consumer
14  bank.  I think they were the largest lender to
15  consumers for real estate, and they were the
16  largest lender to developing nations.  And both
17  developing nations, third-world countries,
18  started defaulting an loans, and the real estate
19  market went south.
20           And, as CEOs are wont to do when
21  things like that happen, they have to figure out
22  a way to stop the hemorrhaging.  And one of the

---

Page 77

1  ways to do it was to take a look at some of these
2  businesses that they had high hopes for but
3  wouldn't see a payback for, for many years.  So
4  ultimately they pulled the plug on the entire
5  project.
6           Now, that left a number of all of
7  these retailers with a huge problem.  They had --
8  they had these very robust frequent-shopper
9  programs, and these were shopper programs that
10  were even back then, you were identifying
11  somewhere around 70 percent of all transactions,
12  close to 90 percent of all volume was actually
13  being -- you could identify down by the household
14  level through the use of frequent shopper cards.
15  So that's -- that's big.
16           Into that void stepped a company that
17  was formed by two brilliant gentleman, John
18  Schultz and Don Irion, who were two of the key
19  early players at Citicorp POS.  They had been
20  moved out of the company by senior Citicorp
21  people prior to the demise of the Citicorp POS
22  Information Services, and they immediately went

---

20  (Pages 74 to 77)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                        New York, NY

| Page 78 |
|---|
| 1   to work building, taking advantage of all of |
| 2   their learning at Citicorp, building their own |
| 3   platform.  The name of that company they formed |
| 4   was called Retail Marketing Systems.  Retail |
| 5   Marketing Systems then, unlike Citicorp, they had |
| 6   no aspirations to own the data.  Citibank |
| 7   required that they co-own the data with retailers |
| 8   so they wouldn't be restricted in the application |
| 9   of that -- of those purchase behavior databases. |
| 10  That was a problem for some retailers. |
| 11        John Schultz and Don Irion wanted to |
| 12  take the path of least resistance.  They decided |
| 13  they would become primarily a data management |
| 14  company.  They would sell software and host that. |
| 15  And they were very successful in expanding the |
| 16  RMS product, which I believe was called Market |
| 17  Expert, to many if not most of those players who |
| 18  had been dependent upon Citicorp POS previously. |
| 19        So your question is, how developed |
| 20  was the business back then?  Very developed at |
| 21  that point in time.  And frankly, up until the |
| 22  time that I was put over there, and I kept in |

| Page 79 |
|---|
| 1   touch with these people, I actually brokered |
| 2   meetings with News America and RMS at one point |
| 3   in time, as a possibility of being interested in |
| 4   partnering with them or even acquiring them up |
| 5   until the time that SmartSource Direct was |
| 6   assigned to me, I'd never heard of CCMI.  They |
| 7   weren't -- they were a non-entity in the database |
| 8   marketing business as far as I was concerned. |
| 9        I think their -- I think a lot of the |
| 10  stuff that we had was aspirational stuff, but |
| 11  they may have had some capability of differing |
| 12  on, but the -- their real -- their real business |
| 13  I think was just as the middleman in providing |
| 14  frequent-shopper cards.  So -- but my position, |
| 15  back to Citibank, my position was really to, one, |
| 16  develop and manage relationships with retailers; |
| 17  two, manage a group of people who had a similar |
| 18  assignment; three, develop, design, develop and |
| 19  implement unique marketing platforms that a |
| 20  King's Supers in Denver could use to |
| 21  differentiate themselves from Safeway Denver, and |
| 22  then ultimately to try and represent a syndicated |

| Page 80 |
|---|
| 1   one-size-fits-all program that would |
| 2   significantly reduce the company's cost |
| 3   associated with hosting all of these disparate |
| 4   platforms across multiple retailers across the |
| 5   country. |
| 6        And that program failed and |
| 7   ultimately they pulled the plug on the entire |
| 8   business.  But that is the evolution of the |
| 9   database marketing business in the United States, |
| 10  and it's that same learning that ultimately was |
| 11  exported to Europe and embraced by a company |
| 12  named Dunnhumby, who did a pretty good job of |
| 13  applying those -- that same perspective to |
| 14  businesses in Europe.  They were successful |
| 15  there.  Kroger has since taken a big piece of |
| 16  that and brought that in-house at Kroger.  Those |
| 17  people actually work on-site at Kroger now.  So |
| 18  that's kind of what's going on in the industry. |
| 19        Q.  How is customer behavior data |
| 20  collected under the Citicorp model?  In other |
| 21  words, was it at the point of sale and if so, how |
| 22  did that work? |

| Page 81 |
|---|
| 1        A.  Well, it's probably different for |
| 2   different retailers.  You know, if you -- from a |
| 3   consumer perspective, when you walk into a retail |
| 4   store and you scan an item across a scanner, |
| 5   everything looks neat and clean as long as your |
| 6   receipt comes out and shows you all the items |
| 7   that you bought and the total comes up correctly. |
| 8        In reality, retailers have highly |
| 9   bastardized systems that they have customized to |
| 10  complement whatever their specific needs are in |
| 11  any one given area, and there's an evolution that |
| 12  takes place in the hardware design for front |
| 13  ends.  Back when Citicorp first introduced the |
| 14  system, there were some front-end systems that |
| 15  could allow to you design certain marketing |
| 16  programs where you could actually do things like |
| 17  have scan-downs right at the point of sale where |
| 18  the items that normally would have been put on |
| 19  sale at shelf, you could only get those items on |
| 20  sale now if you -- if you showed your card and |
| 21  scanned the item at the front end. |
| 22        IBM had that type of competency.  NCR |

21  (Pages 78 to 81)

Henderson Legal Services
202-220-4158

Mixson, Christopher                           July 18, 2007
                        New York, NY

| Page 82 |
| --- |

1  had that type of competency, but not across all
2  generations of their equipment. And if you look
3  at a Kroger, for example, and I don't know this
4  for a fact, but my conjuncture would be that
5  Kroger across all of their stores probably has
6  multiple generations of front-end systems out
7  there. How those systems are hosted also becomes
8  an issue because the hosting competency of one of
9  their divisions is very different from the
10 hosting competency of another division.
11      So by hook or by crook, we would,
12 Citicorp would eventually get the data. Some of
13 it might be direct feed, some of it might be on
14 computer tapes, and that was part of the problem
15 of the business. The infrastructure costs of
16 trying to sort through all that was, it was very,
17 very expensive at that point in time. It's
18 gotten much better because targeting has come
19 into its own. It's a requirement of most
20 retailers now to at least have that competency in
21 the front end even if they are not capitalizing
22 on it. It comes as part of the standard

| Page 83 |
| --- |

1  software/hardware configurations that most of the
2  retailers buy and put into the front end now.
3      Q. And that wasn't available back in the
4  Citicorp days?
5      A. It was available in some instances
6  and not available in others.
7      Q. So a lot of the data you had to get
8  on purchase behavior, you had to acquire it from
9  the retailer directly.
10     A. Well, there's no difference there
11 now. I mean, the only way you're going to get
12 your data is to acquire it from the retailer.
13     Q. Right.
14     A. It has to come to you from the
15 retailer in some way, shape or form.
16     Q. What's the difference now? When I go
17 through the grocery line, there's a machine there
18 that scans my frequent-shopper card. It knows
19 who I am, it knows all the items I buy; and that
20 information is warehoused presumably somewhere,
21 whether it's at the store level or otherwise.
22 That wasn't really the way it was back in the

| Page 84 |
| --- |

1  Citicorp days, was it?
2      MR. KATZ: Objection.
3      A. Well --
4      Q. It was more primitive than that.
5      A. Well, even now you paint a little bit
6  more of a romantic picture about the data that
7  actually exist.
8      It's not that personal. To say that
9  they know who you are is a misnomer. The way the
10 data is used is for marketing application
11 purposes, they don't really care who you are
12 other than the fact that you are a component in a
13 bucket of consumers who have similar purchase
14 behavior, if that makes any sense. And the
15 bucket is very leaky. You have -- you have can
16 customers who are leaving your franchise or
17 moving out of town and there's all kinds of
18 sanitation efforts that have to go in to keep the
19 data robust and current.
20     And the different retailers have
21 different competencies in how they are able to
22 utilize real-time data. Catalina, for example,

| Page 85 |
| --- |

1  has a reactive system that, you know, you think
2  you're getting that coupon because they know who
3  you are and what you buy. When in reality you're
4  getting that coupon simply because you purchased
5  a product that anybody who scans that product is
6  going to trigger the same response.
7      So it's not, you know, it's not quite
8  as Buck-Rogerish yet as you might conceive it to
9  be, but it has the portent of getting us there
10 some day.
11     Q. Were you involved in any of the
12 technical aspects of developing the applications
13 used to track customer behavior when you were
14 with Citicorp?
15     A. The last thing you would want me to
16 do is be opening up a box and start working on
17 it. No.
18     Q. You were the business guy.
19     A. I would work on the marketing side.
20 My primary responsibility was to create marketing
21 programs, marketing applications for the data,
22 and then to represent the applications of those

                                    22 (Pages 82 to 85)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                                July 18, 2007
                              New York, NY

                                                            Page 86
 1   data to try and develop revenue streams, either
 2   direct cash payments or barter or otherwise
 3   coming back in from the retailers.
 4        Q.  So when you came on board to the
 5   IGroup, did you consider yourself to have some
 6   expertise in targeting marketing, relying on data
 7   generated at the point of sale?
 8        A.  Yes.
 9        Q.  Did you bring that expertise into the
10   office, so to speak, and help develop programs
11   and help CCMI grow, or SmartSource Direct grow?
12        A.  Well, yes.  I think one of the
13   reasons I was assigned to the project was because
14   I probably, I definitely had more expertise in
15   the area with News America Marketing, and to a
16   large extent, with -- more expertise than most
17   people in the industry.
18            But the fact of the matter is, there
19   wasn't a huge opportunity to develop applications
20   for the data, per se, because the data mining
21   engine wasn't there.  You need to have an engine
22   that allows you to -- first of all, you need to

                                                            Page 87
 1   have access to the data.  Secondly, you need to
 2   have the platform that allows you to submit
 3   queries to -- to create a universe, tangible
 4   universe of consumers that you can then take to a
 5   manufacturer and say, "I think we can do this, I
 6   think you should do this, this will provide
 7   scale.  There are line models that basically say
 8   it's going to the cost you X.  Based on our
 9   forecast, this will be the return on your
10   investment," and you sell them on that.
11            We didn't have all that.  That's what
12   News America spent a considerable amount of
13   money, frankly, a lot of it based on Bob and
14   Ann's recommendations, to build the platform that
15   would get us to the point where we could start
16   doing that.
17        Q.  Well, they were doing that when they
18   were acquired by News America Marketing, weren't
19   they?  Didn't they have retail programs that they
20   had been successful at selling, relying on data
21   generated at the point of sale?
22        A.  Yes.  They had some stuff up but they

                                                            Page 88
 1   weren't able to -- they weren't able to scale it
 2   in a way that, using what they had, would have
 3   any hopes of growing and being successful.
 4   Ultimately, it was a decision of the
 5   organization, which Bob and Ann concurred in, to
 6   make a significant investment in a, what was
 7   perceived to be a state-of-the-art platform.
 8        Q.  Do you remember the name of that
 9   platform?
10        A.  I believe the name of the platform
11   was Epiphany.
12        Q.  Do you know how long it took to get
13   Epiphany up and running?
14        A.  I can't recall.  I mean, any time you
15   get involved in these highly sophisticated
16   platforms, you know, we have a tendency, if our
17   head of IT says that he'll have something up
18   in -- in the third quarter, it's never the first
19   day of the third quarter, it's always the last
20   day of the third quarter.  And oftentimes, it's
21   the third quarter of the following year.
22            So it's very, very difficult, you

                                                            Page 89
 1   know, it's all projected best thinking whenever
 2   you get your hands into one of these highly
 3   complex software platforms that have to be highly
 4   customized for your business.  It's, you know,
 5   it's an educated guess on how long it's going to
 6   take to get it up, and I think that's the truth
 7   with Epiphany, it's the truth in our experience
 8   with Seibel.  All of these big systems have, you
 9   know, have a major challenge in getting them to
10   where you want.
11        Q.  Do you remember the name of the
12   application that CCMI was using or SmartSource
13   Direct was using at the time you came on board?
14        A.  I don't.
15        Q.  "POS," is that familiar?
16        A.  "POS" is a generic term referring to
17   "point of sale."  So I doubt that's it.  But
18   maybe I can't recall.
19            MR. PETERS:  Can I go off the record?
20            (Discussion off the record.)
21        Q.  Was there an effort made to use what
22   was in existence, scalable or otherwise, until

                                              23  (Pages 86 to 89)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher

July 18, 2007

New York, NY

| | |
|---|---|
| Page 90 | Page 92 |

Page 90

1  such time as Epiphany or some other application
2  that was scalable was available?
3      A.  Well, I believe there was, to the
4  extent that we were satisfying any existing
5  customers that may be there.  But in terms of --
6  in terms of looking at the platform that existed
7  and saying, "This is something that we want to
8  build around, because we can scale it," I think
9  the decision from our, you know, from our team
10  managing that business was, it's not going to get
11  us there.  We have to, you know, we are willing
12  to make that bigger investment in a system that
13  would get us there.
14          There was a lot of -- a lot of work
15  went into defining that system, you know,
16  modeling how that, you know, how that system
17  would preferably work and then researching
18  options for us which resulted ultimately in
19  the -- in the purchase of Epiphany.
20      Q.  Were you involved in the decision to
21  acquire Epiphany?
22      A.  Well, I was involved in it to the

Page 92

1  acquiring Epiphany?
2      A.  I think the -- the purpose in terms of
3  of SmartSource Direct was to use Epiphany as a
4  data mining tool that would allow us to query the
5  database and come up with, you know, solutions in
6  the sense that we had that universe of households
7  that corresponded to a criteria that went into
8  the machine and resulted in our having a salable
9  product.
10      Q.  Were you involved in the negotiations
11  that led to the acquisition of these Epiphany
12  licenses?
13      A.  No.
14      Q.  Was that Dave Benson?
15      A.  I don't know.
16      Q.  Do you know if Bob Fireman was
17  involved?
18      A.  I don't know.
19      Q.  Do you know if he should have been
20  involved, from your perspective?
21      A.  Wouldn't have been -- wouldn't have
22  been my -- my decision.  You know, I can't really

Page 91

1  extent that, you know, I guess ultimately the
2  decision is mine to some extent along with the
3  other executive committee members who are
4  normally, have to step up and comment on
5  investments of that size.
6          But I think we would rely on, you
7  know, our chief technical officer who, at that
8  time, I believe was Dave Benson, who is a highly
9  qualified individual who is now the chief
10  information officer for all of News Corp.  So I
11  think with those credentials, if Dave told me,
12  out of everything that's out there, this is the
13  one that holds the most promise, as you probably
14  would, I would say, "Dave, I don't understand any
15  of the engineering aspects of this thing; but if
16  you say, let's do it, let's do it."
17      Q.  Was Epiphany used in any other
18  business segments other than SmartSource Direct?
19      A.  Yeah, I think Epiphany had some added
20  utility, as I recall, but I can't tell you
21  exactly what that utility was.
22      Q.  What was the effective purpose for

Page 93

1  comment on that.
2      Q.  Did anyone else at News America
3  Marketing have any in-house expertise in loyalty
4  marketing, relying on data developed at the point
5  of sale?  We've spoken about yours.  Is there
6  anyone else on your team that had such
7  experience?
8      A.  Um -- it's not that difficult a
9  concept to grasp.  You know, you're -- if you're
10  involved in the world of marketing, you
11  understand the significance of being able to
12  refine your target based on, you know, known --
13  based on information, more information and less
14  information.
15          So to that extent, I would say yeah,
16  there's a number of people within the team that
17  fully grasp the concept of database marketing
18  and, like any business, you know, this was a
19  business that didn't have a lot of people, that
20  had hands-on experience with it, anyway.
21          But, you know, Citicorp POS
22  Information Services had very few people when we

24  (Pages 90 to 93)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                      July 18, 2007
                          New York, NY

| Page 94 | Page 96 |
|---|---|

Page 94

1  started and we'd bring qualified marketing people
2  on board and they were expected to and did ramp
3  up within a matter of weeks, so -- and gain, you
4  know, a high degree of competency in that length
5  of time.
6          So to that extent, were there people
7  that had a history of database marketing at the
8  time that I was assigned to SmartSource Direct?
9  I would say yeah, by that time, Henry Lellouche
10  had -- had had quite a bit of experience with it,
11  and was probably approaching the point where he
12  would be considered expert relative to the
13  general marketing population.
14      Q.  I take it you had no role in
15  negotiating the contract between News America
16  Marketing and Ann Raider and Bob Fireman?
17      A.  Not whatsoever.  Never even seen it.
18      Q.  You have not spoken to anyone other
19  than perhaps Mr. Katz or someone from his law
20  office about that contract?
21      A.  I've heard bits and pieces about it.
22  But, you know, not enough to even really have any

Page 95

1  real, to be able to fathom how it's constructed
2  or how it works.  It's my understanding in
3  retrospect, and I didn't -- I didn't know this
4  until recently, that there was a contest over
5  some kind of compensation provision or earn-out,
6  I believe it was called, in the agreement.
7          But that's relatively new information
8  to me.  I know very little about it.
9      Q.  You don't recall any discussion with
10  Ann Raider or Bob Fireman or communication with
11  either of them during your tenure with the IGroup
12  about their concern over their earn-out?
13      A.  If they raised it with me, I really
14  have very little -- no recollection on it.  My
15  focus at the IGroup was, I really wasn't too
16  concerned about individual compensation.  I was
17  concerned about it being a successful business.
18  Maybe my personal compensation.
19      Q.  Let me show you a document that was
20  marked -- don't let that 39 go too far, I'm going
21  to have one more column to discuss -- but let's
22  take a look at Exhibit 33 for a moment.

Page 96

1          (Handing document to witness.)
2      Q.  These are notes of an executive
3  committee meeting that took place in September of
4  1999.  You're shown among the people present, at
5  least you're listed on the first page.  And at
6  the time, your title was "In-Store" -- your
7  agenda was "In-Store Sales Issues."  I need to
8  focus on that.  What I want you to look at,
9  please, is the page that's stamped NAM 5090.
10      A.  Okay.
11      Q.  Take a look at the discussion and see
12  if you recall Ann Raider pitching the CCMI
13  business to the executive committee.
14      A.  I have no recollection of it.  This
15  is -- this is four hundred executive committee
16  meetings ago.  So it's, you know, we have an
17  executive committee meeting every Monday.  And
18  unless there's some seminal event that happened
19  at that meeting, I'd be hard pressed to recall --
20      Q.  You don't mind if I ask, though, do
21  you?
22      A.  Certainly, ask.

Page 97

1      Q.  So now you've taken a look at it.  Is
2  any of the information contained in this
3  discussion information that you recall either
4  from the meeting or otherwise?
5      A.  Well, yeah, otherwise, these are all
6  just, you know, this is the business that we were
7  involved in.  So to some extent, I would say yes
8  to that, that --
9      Q.  Do you remember learning that CCMI
10  had issued about half of all of the loyalty cards
11  that had been issued in the industry, fifty
12  million out of a hundred million?
13      A.  I think -- if I look at that, I think
14  it's probably a bad number.  I don't think
15  it's -- I don't think it's correct.  No, I don't
16  recall that.
17      Q.  And the notes reflect that there are
18  80 million cardholders that represent fifty
19  million households and that CCMI has access, or
20  "we," I suppose News America Marketing, has
21  access to all that data, is that consistent with
22  your memory back then in 8/99?

                                    25  (Pages 94 to 97)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

---

Page 98

1    A. Absolutely not.  I don't think
2    it's -- I don't think it's correct information.
3    The fact that it was presented by these two
4    people at this meeting doesn't necessarily make
5    the information correct.  I don't think it is
6    correct.
7    Q. What did you do to learn about CCMI's
8    business when you came on board?  I take it it
9    was important to do.
10   MR. KATZ:  You're referring to when
11   he came on board the IGroup?
12   MR. PETERS:  Yes.
13   A. Well, I had numerous meetings with
14   Bob Fireman and Ann.  I had -- I had regular
15   reviews with Henry.  I visited Braintree on
16   numerous occasions and subsequently, our Boston
17   office after we relocated Bob and Ann there, on
18   numerous occasions.  So I mean, I can't tell
19   you -- it wasn't a course that we offered on it.
20   So it was whatever you normally do to, you know,
21   we just go through a process of discovery,
22   working with the people who are assigned to that

---

Page 99

1    business.
2    Q. Planet U and SoftCard were also on
3    your plate.
4    A. That's correct.
5    Q. Let me take it some smaller pieces.
6    Was a hundred percent of your professional time
7    during the time you were with the IGroup
8    dedicated to the IGroup, or did you have other
9    roles and responsibilities within News America
10   Marketing?
11   A. I was still a member of News America
12   Marketing's executive committee, which would
13   require that I spend about four hours of most
14   Monday mornings involved with that committee.
15   But beyond that, I was totally
16   dedicated to the IGroup.
17   Q. And you were working 40, 50 hours a
18   week?
19   A. Oh, I wish I could only -- I would
20   only have to work 40, 50 hours a week.  No, we
21   put in long hours here.  On any given week, if
22   I'm traveling, you know, then and now, I would

---

Page 100

1    say the normal work week is closer to 80 hours if
2    not more.  It's totally dedicated to the
3    business.  There really isn't much downtime when
4    you're traveling.  You're either working with
5    clients, working in the office or personalizing
6    the business with staff.
7    The same applies to the IGroup.  Days
8    where I'm in town at the office, it wouldn't be
9    unusual to be in the office by seven or 7:30 in
10   the morning and my wife would have dinner on the
11   table for when I got home about 8:30 at night.
12   So that gives you an idea of what kind of
13   schedule we kept.
14   Q. Can you divide up your time among the
15   SoftCard, Planet U and SmartSource Direct
16   business units within the IGroup?
17   A. Difficult to do, because we would
18   have different initiatives in place on each one
19   of those businesses that at times would require
20   me to spend a disproportionate amount of my time
21   on one versus the other.
22   But I think over the course of time,

---

Page 101

1    there would be a fairly equal distribution across
2    all three of those -- those different issues,
3    direct, SoftCard and Planet U.
4    I was on the board of Planet U and on
5    the board of SoftCard.  We didn't acquire those
6    companies.  So I had to spend at times a little
7    bit more time as a consequence of those
8    responsibilities, but I think it probably evened
9    out over time.
10   Q. And some of the time you spent on
11   SmartSource Direct's business, was spent talking
12   to Ann Raider and Bob Fireman, I take it?
13   A. Sure.
14   Q. Was there input and insight solicited
15   by you in making business decisions about that
16   business?
17   MR. KATZ:  Objection.
18   A. Yes.
19   Q. And did you encourage Henry Lellouche
20   to solicit Ann Raider's input was Henry was
21   making decisions about that business?
22   A. I think Henry did solicit their

---

26 (Pages 98 to 101)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                        July 18, 2007
                                New York, NY

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  input, as did I.  Probably relied on their input
2  less and less as time progressed, because their,
3  frankly my own personal point of view is, their
4  credibility became more and more suspect as we
5  moved through the process.
6        I think that, you know, their -- Bob
7  especially has some eccentricities that guide his
8  judgement and I think the judgement often ends up
9  being flawed and, as a consequence, it's like
10  anything else, if you have somebody whom you
11  believe repeatedly brings you valued counsel that
12  helps you form an intelligent opinion that's
13  going to help you successfully drive the
14  business, and their motivation is primarily for
15  the success of the business, you're not only
16  going to invite them into that decision process
17  but encourage them in that process.
18        I think that was probably the
19  relationship that I had with Bob and Ann early in
20  the process.  I think they failed to bring value
21  to the proposition to the extent that I would
22  rely on them as much later in the process.

**Page 103**

1        Q.  Can you give me specific examples
2  that highlight that?
3        A.  I don't know that I can.  You know,
4  it's something that just occurs on an
5  evolutionary scale as you move through time.
6        Bob, you know, Bob and Ann, as I
7  recall, I think one of their problems is they
8  refused to embrace the standards of the
9  organization.  I know Henry had -- had some
10  problems in terms of getting Ann to adhere to
11  things like call frequency standards; and people
12  that were brought on board who worked for Ann
13  wanted to march to a drummer that was very
14  different than the drummer that beat the beat
15  that News America's sales forces generally
16  followed and were successful doing it.  I think
17  that was frustrating.
18        I know Bob Fireman, you know, Bob had
19  ideas that, as I recall, that were often so far
20  afield of where we wanted to go that, you know,
21  they would not ever be seriously considered as
22  part of an eventual solution for the business.

**Page 104**

1        Q.  Can you give me an example of that?
2        A.  There -- as I recall, there was a
3  project that he wanted us to get more involved
4  in.  This was going to be a surrogate for
5  traditional Wells Fargo-type money transfers to
6  foreign countries and things like that, taking us
7  in a direction that was far afield from where we
8  wanted to go as an organization.
9        I think there were some instances
10  where Bob worked on projects that were
11  successful.  They were predicated on ideas that
12  didn't originate with Bob Fireman.  They came
13  from other sources, like our Toshiba, there was a
14  settlement for Toshiba, a lawsuit against Toshiba
15  Computers, as I recall, that we ended up
16  facilitating through a card-based program.
17        We -- we had hoped to get -- seemed
18  to be a fairly appealing proposition.  We
19  assigned Bob to try and, you know, take that to
20  the next level.  He wasn't able to do that.  He
21  never gained much traction with that.
22        He -- I can't recall a lot of

**Page 105**

1  instances, you know, specifically to tell you
2  now, it's been so many years.  But, you know, I
3  just -- let it suffice to say that my reliance on
4  Bob's counsel, you know, waned as we moved
5  through time.
6        Q.  The foreign banking issue that you've
7  referenced briefly in that last response, did
8  that have to do with the Hispanic community?
9        A.  Yes, I believe it did.
10        Q.  And your view was that that was
11  outside of the core business for News America and
12  therefore really was a bad idea?
13        A.  I think we took a look at it and I
14  think we decided to pass on it.
15        I think, you know, it wouldn't be
16  unusual for us to give direction to both Bob and
17  Ann that they would believe they still had, you
18  know, was still under their authority to accept
19  or not accept.  I think Bob and Ann had a hard
20  time dealing with the fact that they worked for
21  News America Marketing and didn't have the
22  independence that they may have craved as owners

27 (Pages 102 to 105)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                          New York, NY

Page 106

1  of their own company.
2      Q. Early on, when you first came on
3  board with the IGroup, was there some type of
4  protocol for consulting with Bob Fireman and Ann
5  Raider about decisions that affected the
6  business? In other words, was that something
7  that was expressly encouraged?
8          MR. KATZ: Objection.
9      A. I'm not sure I understand your
10 question.
11     Q. Let me give you a specific example so
12 as not to be disembodied.
13         There was a guy named Bill Adam,
14 remember him?
15     A. Yes.
16     Q. Bill was removed from, or I should
17 say, he left SmartSource Direct and went and
18 started working on the Epiphany project.
19         Do you remember that in a general
20 way?
21     A. I don't know that you'd say he left
22 SmartSource Direct. I mean, SmartSource Direct

Page 107

1  ultimately was a product of News America
2  Marketing. I think Bill Adam went to work on the
3  Epiphany project in part due to his SmartSource
4  Direct expertise to help guide the development of
5  that project.
6      Q. Well, let's take that as an instance.
7      A. Okay.
8      Q. Was Ann Raider or Bob Fireman
9  consulted about that decision to take Bill Adam
10 from the SmartSource Direct team, and working
11 directly with that team, and ship him off to
12 another aspect of the IGroup's business?
13         MR. KATZ: Objection.
14     A. I have no idea if they were contacted
15 or if there was any real requirement to, you
16 know, contact them. Get their approval, you
17 mean?
18     Q. Talk to them about it. Find out
19 whether or not they thought it was a good idea.
20 Do you know whether it happened?
21     A. I have no idea.
22     Q. Was that something that should have

Page 108

1  happened?
2          MR. KATZ: Objection.
3      A. I can't really comment on it. I
4  don't know.
5      Q. Were you involved in the decision?
6      A. I was aware that the Bill Adam was
7  moving to complement the Epiphany project, so,
8  yeah, I was aware of the move. I didn't -- if I
9  had disagreed with it, it wouldn't have happened.
10     Q. You didn't talk to Ann Raider or Bob
11 Fireman about this decision?
12     A. I can't recall if I did or not.
13     Q. You didn't try to get their buy-in, I
14 take it?
15     A. I can't recall if I did or not.
16     Q. And you can't recall whether Henry
17 Lellouche or anyone else did, either.
18     A. No.
19     Q. And in terms of hiring employees for
20 the SmartSource Direct company business unit
21 within the IGroup, is that something that you
22 would have sought Ann Raider's and Bob Fireman's

Page 109

1  participation in?
2      A. It depends upon what time during the
3  evolution of the business. If it was early in
4  the evolution of the business, yeah, I think Bob
5  and Ann would probably have been consulted. I
6  think as time progressed, we probably would have
7  been less dependent upon their opinion.
8      Q. If there was a question about
9  spending money on technology, Epiphany or
10 otherwise, is something that you would have got
11 Ann Raider's input on and Bob Fireman's input on?
12     A. I believe their input was obtained.
13 I believe Bob Fireman was a big proponent of
14 Epiphany.
15     Q. Do you remember that he was
16 interested in only acquiring, or thought that it
17 was only necessary to acquire a few licenses?
18     A. No.
19     Q. Do you remember how much money was
20 charged to the SmartSource Direct business unit
21 for the acquisition of Epiphany?
22     A. No.

28 (Pages 106 to 109)

Henderson Legal Services
202-220-4158

Mixson, Christopher                                                July 18, 2007

New York, NY

Page 110

1      Q.  $900,000 sound, or refresh in any
2  way?
3      A.  I have no idea.
4      Q.  In terms of developing budgets, is
5  that something that Ann Raider should have been
6  consulted on or Bob Fireman should have been
7  consulted on?
8          MR. KATZ:  Objection.
9      Q.  Talking about budgets for CCMI or
10  SmartSource direct.
11     A.  Well, the budgetary responsibility
12  for SmartSource Direct was practically Henry
13  Lellouche's.  So to the extent to which Henry
14  needed their assistance in developing that
15  budget, he would reach out to them.  If he didn't
16  need their assistance, he wouldn't.
17     Q.  Understanding the business as you do,
18  early on, don't you think Henry was almost
19  required to speak with Ann Raider and Bob Fireman
20  to understand the business with sufficient
21  precision to develop an accurate and achievable
22  budget?

Page 111

1          MR. KATZ:  Objection.
2      A.  Henry's pretty good with numbers.
3  He's a, you know, he's got a strong financial
4  background.  So I would have to say the answer to
5  that is, not necessarily.  If Henry had questions
6  that he needed resolved, and the only place to
7  get those questions answered was Ann or Bob
8  Fireman, I think he would go to them.
9          If Henry could come up with the
10  answer sans their involvement, that's his --
11  that's his election to do or not to do.  So
12  that's the best way I can answer the question.  I
13  don't know.
14     Q.  Do you recall encouraging Henry to be
15  more inclusive of Ann and Bob?
16     A.  I think Henry was very inclusive of
17  Ann and Bob.  So I don't see any reason why he
18  would give him that direction.
19     Q.  You think he was inclusive based on
20  your work with him or because that's the way it
21  should have been?
22     A.  I think he was inclusive based on my

Page 112

1  work with him.  I think that -- you know, I think
2  if -- it's -- I think it was inclusive based on
3  my work with Henry.
4      Q.  Did the name change from CCMI to
5  SmartSource Direct, is that something that should
6  have involved Ann Raider and Bob Fireman's input?
7      A.  No.
8      Q.  Do you know whether or not they were
9  consulted about changing the name?
10     A.  I don't.  The fact of the matter is
11  that part of the value that News America
12  Marketing brings to the marketplace and the
13  advantage of having a suite of products
14  recognized as coming from one company has been
15  proven to be a highly successful way to market
16  our services.  So you'll notice most of our
17  products and services have the word "smart" in
18  them.  And, you know, the -- you know,
19  SmartSource family of products is who we are.
20         You know, we're not -- we're not
21  necessarily recognized around the world by
22  SmartSource, but we're recognized enough to bring

Page 113

1  value and equity behind that name.  We try to
2  bring value to the database marketing business by
3  including it in that broader suite of products as
4  SmartSource Direct.
5      Q.  Did you or anyone on your behalf try
6  to market to News America Marketing affiliates
7  such as Fox, the NFL, Major League Baseball, in
8  other words, these relationships, I should say,
9  that News America has, did you market SmartSource
10  Direct's products and services to them?
11     A.  Yes.
12     Q.  Can you tell me to whom and by whom?
13     A.  Well, the NFL, we have a -- we have a
14  longstanding relationship with.  And we have
15  published the Superbowl Savings Spectacular
16  program for many, many years now in SmartSource
17  magazine.  That program now has in-store
18  components that uses SmartSource shelf talk,
19  SmartSource coupon machines, SmartSource floor
20  talk.  It may even include components from our
21  custom publishing business that actually is
22  delivered at home as well.

29  (Pages 110 to 113)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

Page 114

1    We do -- we do programs and have done
2  programs in the past with our sister companies
3  where we utilize the SmartSource products to
4  promote their products, and --
5    Q.  If I interrupt you just briefly, I am
6  just focused for the moment on SmartSource
7  Direct, not --
8    A.  Oh, that wasn't your question, but go
9  back.
10    Q.  Then let me rephrase it.
11    A.  Okay.
12    Q.  And I'll save us both a couple of
13  minutes.
14    A.  Okay.
15    Q.  Did you or anyone on your behalf
16  market SmartSource Direct's products, services,
17  to the affiliated companies that we've been
18  discussing?
19    A.  I really don't know the answer to
20  that.
21    Q.  You didn't direct that to happen, I
22  take it, that you can recall?

Page 115

1    A.  Well, it would be consistent with the
2  way we go to market that, if there is a
3  particular solution that one of our partners is
4  looking for that would include that particular
5  component, then yes, we definitely would have
6  recommended it.
7    If that solution didn't seem to be
8  germane to that particular assignment, then you
9  wouldn't.  We don't -- we don't go with things
10  and throw everything against the wall to see what
11  sticks.  You fine-tune what, you know, we have
12  lots of different products.  You try and
13  custom-design the best solution for your
14  customers.
15    If SmartSource Direct provided an
16  element of that solution set, then yes, we would
17  include it.
18    Q.  Was there an effort to determine
19  whether or not that was the case, whether or not
20  SmartSource Direct did have products that should
21  be marketed to these partners?
22    A.  In -- in --

Page 116

1    Q.  Back when --
2    A.  In 2000?
3    Q.  Yes.
4    A.  There wasn't -- there wasn't much of
5  a product at that point in time that could really
6  be overlayed because all of these products that
7  we're talking about, generally speaking, have
8  scale associated with them.  They are big
9  national programs.  And we didn't have the
10  ability to do big national database marketing
11  programs back then.
12    Q.  Did you state to Henry Lellouche or
13  anyone else on your team that you thought that
14  Bob Fireman and Ann Raider had some kind of
15  conflict of interest because of the earn-out
16  component of their contract?
17    A.  Not that I recall.
18    Q.  Do you remember anyone suggesting
19  that there was a conflict of interest?
20    A.  Not that I recall.  The only conflict
21  of interest that I recall that I became concerned
22  about because it didn't make any sense

Page 117

1  whatsoever, we were housed in a -- like most
2  businesses, what we try and do is improve the
3  profitability of our business by eliminating
4  redundancies.
5    I'll use our Canadian operation as a
6  case in point.  A few years ago, we were
7  generating about two million dollars in profit
8  from our Canadian operation.  Our Canadian
9  operation had its own finance department, its own
10  marketing department, et cetera, et cetera.
11    We modified that.  We brought all of
12  those -- all of those areas and incorporated them
13  into the mother company's departments, if you
14  will, and we've grown our profit from two million
15  to 15 million.
16    The same focus is going to be placed
17  on any business that we have to try and get it to
18  the point where it's as profitable as possible.
19  That's what we did with the SmartSource Direct
20  business.
21    Where we found redundancies, and
22  where we found we could provide efficiencies and

                              30 (Pages 114 to 117)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                July 18, 2007
                        New York, NY

Page 118

1    improvements, we incorporated those businesses --
2    those components into the master business.  What
3    that left us with up in Braintree is being housed
4    in a dilapidated building that you would never
5    think about bringing clients to.  It was a gray,
6    dark place to work, not nice at all.
7            The alternative that we offered was
8    to have a state-of-the-art building on top of the
9    John Hancock Center in Copley Square in Boston,
10   one of the nicest locations -- you're from
11   Boston, both you gentleman are from Boston -- one
12   of the nicest locations that you can imagine,
13   creating a tremendous quality-of-work environment
14   and providing the opportunity to actually bring
15   clients into our office to engage them, entertain
16   them and to complement our selling efforts.
17           Bob Fireman, for no real reason that
18   I was aware of, was very much opposed to the
19   move, and I found out after the fact he was
20   opposed to the move because his family owned the
21   building.  So to me, that's a conflict of
22   interest.  It means that somebody's putting their

Page 119

1    own personal interests in front of the interests
2    of the company.  That's the quintessential
3    example of conflict of interest in my book.  And
4    that's, you know, that one instance, I would say
5    yes, that's where it came to my attention.  But
6    beyond that, no.
7        Q.  How was the space on the Hancock
8    building amortized against or charged to, is
9    probably the better word, against SmartSource
10   Direct's budget?
11       A.  Like all of our -- like all of our
12   facility, it's charged on a -- on an equitable
13   share of the base being utilized by the people
14   that are in that office, I would think.  You
15   know, I don't have the specific formula before me
16   for that in Boston, but generally speaking, you
17   know, that's how we would do it.
18       Q.  So that space in Boston on the
19   Hancock building is substantially more expensive
20   than the space in Braintree, do you agree with
21   that, on a square-foot basis?
22       A.  On a square-foot basis possibly.  But

Page 120

1    the square feet that were being allocated to the
2    now-reduced head count for Massachusetts because
3    we moved that other head count into Wilton,
4    Connecticut, and elsewhere, it was a reduced
5    square footage, I would imagine.
6            So I don't know how the two shape up.
7    I can tell you that News America Marketing, if
8    you want to look at them as a stand-alone company
9    from the IGroup, was extremely generous in the
10   way we accounted for resources provided by the
11   mother company; marketing resources, finance
12   resources, operations resources, that should have
13   been charged back to the IGroup more heavily than
14   they actually were.
15           We were very interested in incubating
16   these businesses to be successful, and it's, you
17   know, there's a certain intercompany marketing
18   that may go on where you want to you, know, you
19   want to paint as positive a picture as you
20   possibly can.
21           We had the wherewithal to do that.
22   There was a high interest, at the highest levels

Page 121

1    of the organization, in seeing that they were
2    successful.
3        Q.  How did SoftCard's failure come
4    about?
5        A.  Well, we can say that it failed in
6    the sense that it has not successfully been on
7    the market yet.
8        Q.  How did SoftCard's failure impact the
9    IGroup?
10       A.  Well, it's like everything we were
11   doing with the IGroup.  You have to interest
12   that, all of these businesses that we bought,
13   Planet U, CCMI, and SoftCard, that we either
14   bought outright or bought a stake in, were all
15   entrepreneurial high-risk businesses.  You know,
16   none of them had had a proven business
17   proposition.  And so any time you're engaged in
18   that kind of effort, you're going to have
19   failures.  You're going to have products that,
20   you know, you think are going to provide a
21   potential big profit opportunity for the future
22   but you don't know until you test them.  You

31 (Pages 118 to 121)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                              July 18, 2007
                         New York, NY

| Page 122 | Page 124 |
|---|---|
| 1  don't know until you challenge your assumptions. | 1  types of awards. |
| 2  You don't know until you roll your shirt sleeves | 2       If you were a -- if the demographics |
| 3  up and, you know, try to -- try and make it work. | 3  suggested that you were a head of household with |
| 4  SoftCard was that kind of a situation. | 4  six people in the household, it would give you an |
| 5       We actually had a very successful | 5  offer, higher-value offer that required multiple |
| 6  test of SoftCard at a chain called Furrs in | 6  items to be purchased. |
| 7  Albuquerque, New Mexico.  The consumer response | 7       If it showed that you were a |
| 8  to it was significantly within our tolerance | 8  bachelor, single-person household, it would give |
| 9  range for success.  The problem was, similar to, | 9  you a coupon value of a lesser amount but only |
| 10  you know, aspects of the SmartSource Direct | 10  for a single item.  Those types of things. |
| 11  infrastructure, it wasn't scalable.  As smart as | 11  Consumers responded very, very well to it.  Furrs |
| 12  we think we are sometimes, you get to a certain | 12  responded very, very well to it.  They would have |
| 13  point where you think you have something and then | 13  liked us to have rolled the program out. |
| 14  when you're ready to take to it the next level | 14       No most instances, that would |
| 15  you look at it and say, "This isn't going to | 15  constitute a success.  But we're not a |
| 16  work." | 16  philanthropic organization.  We're here to |
| 17       And the SoftCard proposition wasn't | 17  generate profit, and when you looked at the |
| 18  going to work, not because consumers didn't like | 18  capital investment that would be required to roll |
| 19  using the SmartCards as instruments for redeeming | 19  this program out nationally, we finally came to |
| 20  promotions.  It's because the cost, the capital | 20  the conclusion that it was too expensive and so, |
| 21  investment required to distribute millions of | 21  to that extent, yeah, it failed.  It failed to |
| 22  SmartCards was so intensive and the risk factor | 22  the point that we did not roll this program out. |

| Page 123 | Page 125 |
|---|---|
| 1  associated with it so extreme, we didn't have an | 1       Q.  And SoftCard never was a profitable |
| 2  appetite for it. | 2  acquisition. |
| 3       Q.  I spoke with Mr. Garofalo about this | 3       A.  Well, it remains to be seen.  We |
| 4  test yesterday.  My memory of his testimony is, | 4  still -- we still have a piece of SoftCard.  They |
| 5  he said it failed.  And that's not consistent | 5  still exist.  They are still doing, to the best |
| 6  with what you recall of the Furrs test? | 6  of my knowledge, experimental work with -- on the |
| 7       A.  No, it's not consistent.  Marty's | 7  information technology side of things.  So they |
| 8  definition of failure is, we tested something | 8  hold several patents that govern the movement of |
| 9  that we couldn't -- we couldn't ultimately take | 9  data onto and off of SmartCards.  So never say |
| 10  to market and to that extent, I would agree with | 10  never.  You know, we have hope that some day down |
| 11  him.  If you break the component pieces down as | 11  the road maybe that investment pays off. |
| 12  to what constitutes failure, the failure wasn't a | 12       But to date, we have no profit stream |
| 13  consequence of the consumer response that we had | 13  coming from SmartCard. |
| 14  with the test. | 14       Q.  When I said "acquisition" I should |
| 15       The consumer response was very, very | 15  have said "investment," because that's what it |
| 16  good.  To the degree that coupon delivery systems | 16  was. |
| 17  can be sexy, this was pretty sexy.  You know, the | 17       A.  That's right. |
| 18  machine sat on shelf, you didn't have any paper | 18       Q.  How did that lack of success impact |
| 19  come out, you took your SmartCard, you plugged it | 19  the IGroup? |
| 20  into the machine and pulled it out and it would, | 20       A.  Well, I mean, it would have been nice |
| 21  based on your purchase behavior history, it would | 21  to have been successful there.  You know, in the |
| 22  be able to selectively give you one of numerous | 22  sense that we now had a program that was scalable |

                                                32 (Pages 122 to 125)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                              July 18, 2007
                              New York, NY

| Page 126 |
|---|
| 1  and we could roll out.  It didn't.  We were |
| 2  working on a number of different projects.  And |
| 3  you know, to the extent that we -- I mean, it |
| 4  impacted us to the extent that we didn't have a |
| 5  product to roll out that we had high hopes for. |
| 6        Q.  It impacted your charge of trying to |
| 7  roll these three companies together and develop a |
| 8  sustainable, single business, correct? |
| 9        MR. KATZ:  Objection. |
| 10       A.  No, I wouldn't say that.  You know, I |
| 11  think you're trying to take that someplace that, |
| 12  you know, that's not -- |
| 13       Q.  I'm just trying to ask a question. |
| 14       A.  No, not really.  I mean, the entire |
| 15  IGroup proposition was, you know, obviously, |
| 16  experimental by nature.  There were new things |
| 17  that we were trying here.  We were exploring new |
| 18  avenues for competing in, you know, interactive |
| 19  space.  So, yeah, that particular product didn't |
| 20  pan out. |
| 21       But SoftCard worked on having |
| 22  different types of delivery systems based on |

| Page 127 |
|---|
| 1  other technology that they were involved in that |
| 2  we continued to explore after the -- after the |
| 3  SmartCard test was done -- |
| 4        Q.  But you didn't explore any further |
| 5  potential synergy or interaction between SoftCard |
| 6  and CCMI, right, once you learned that SoftCard |
| 7  was really not going to be scalable in a |
| 8  cost-effective way? |
| 9        A.  No, that's not true. |
| 10       Q.  You continued to work in that |
| 11  direction? |
| 12       A.  Yeah.  There -- all three of those |
| 13  businesses, you know, this was a common |
| 14  denominator behind all three of those businesses |
| 15  to some extent.  SoftCard had other competencies |
| 16  that may have allowed them to assist us in the |
| 17  streaming of customer-identified data where we |
| 18  could actually have that data move from the front |
| 19  end and passively be collected and viewed, |
| 20  massaged, worked with outside of the retail |
| 21  environment. |
| 22       They had that technology competency. |

| Page 128 |
|---|
| 1  So you can probably see that to some extent, if |
| 2  we could do that and we would have better access |
| 3  to data and could come up at least with |
| 4  analytical sets of information that would give us |
| 5  some guidance in our efforts to sell database |
| 6  marketing programs to customers, a lot of synergy |
| 7  there between the direct business and the |
| 8  SoftCard business. |
| 9        To the extent that the Planet U |
| 10  enterprise allowed us to take purchase behavior |
| 11  data, overlay it into an electronically-delivered |
| 12  system that would deliver data from the Internet |
| 13  directly to the front end of retail stores that |
| 14  was activated with the frequent-shopper card, |
| 15  synergies there. |
| 16       So that was all still very much in |
| 17  our mind throughout that time, is there a way to |
| 18  make that happen.  At the same time, we were |
| 19  independently trying to get traction for those |
| 20  businesses as freestanding entities. |
| 21       Q.  Was Planet U successful? |
| 22       A.  No. |

| Page 129 |
|---|
| 1        Q.  What happened? |
| 2        A.  Well, ultimately, their technology |
| 3  just didn't work.  It -- I'll say that it worked |
| 4  to the extent that they could have a very sexy |
| 5  demonstration with an interested acquirer that |
| 6  had significant promise that would get you |
| 7  excited and make you want to play. |
| 8        It wasn't until you actually owned it |
| 9  and attempted to market it and scale it that the |
| 10  limitations of their system became known.  And as |
| 11  a matter of fact, we have reacquired the same |
| 12  technology to date, after it's gone through |
| 13  several iterations; there was the assets of |
| 14  Planet U were ultimately purchased by a |
| 15  consortium of companies under a single umbrella |
| 16  called Transora, and that business failed. |
| 17  Totally independent of the IGroup. |
| 18       Transora's assets, part of Transora's |
| 19  assets, that portion of it, the Planet U portion |
| 20  of it was then purchased by a company called |
| 21  QInteractive, commonly known by consumers, maybe, |
| 22  maybe not, as Cool Savings.  Cool Savings |

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                         July 18, 2007
New York, NY

| Page 130 | Page 132 |
|---|---|
| 1 attempted to get into the on-line coupon | 1 round out or discussion on this. Please take a |
| 2 distribution business. And then QInteractive | 2 look at that page we were discussing regarding |
| 3 over the last year sold those assets back to News | 3 CCMI'S database marketing services. |
| 4 America and we are currently right now in the -- | 4 A. This page? |
| 5 in the introductory phase of the printed home | 5 Q. Right. We had discussed the first |
| 6 solution and will be moving back into the | 6 two columns. Let's look at the last column, |
| 7 electronic delivery platforms again in the very | 7 "Data Marketing." "Data marketing" refers to |
| 8 near future. | 8 marketing to manufacturers, as best you know? |
| 9 Q. Did the failures of SoftCard and | 9 A. Well, you could have some, there are |
| 10 Planet U have no impact at all on the running of | 10 applications for retailers as well. Those |
| 11 SmartSource Direct? | 11 applications on the retail side are actually a |
| 12 A. Well, the impact it would have is, as | 12 little bit easier to do in a way, because they |
| 13 we had less focus and emphasis on Direct and | 13 are -- they are easy to compartmentalize. You |
| 14 Planet U, there was certainly more focus and | 14 know, you would have things like, you'd set a |
| 15 emphasis on, how do we take elements of the | 15 criteria for determining a convenience shop or |
| 16 assets that we have purchased and turn them into | 16 you would set a criteria for identifying a lapsed |
| 17 profitable business enterprises, and that's what | 17 shopper. You would have a criteria for |
| 18 we're still engaged in today. | 18 determining top shoppers. Then you'd probably |
| 19 Q. You said SmartSource Direct, and I | 19 break the universe up into quintiles, something |
| 20 want to make sure you meant to say that. | 20 like that, and have a different type of reward |
| 21 MR. KATZ: Why don't we have the | 21 coming in, dependent upon where you were nested |
| 22 answer read back. I think you might have | 22 as a consumer. |

| Page 131 | Page 133 |
|---|---|
| 1 meant to say Soft -- | 1 So, and those kinds of applications, |
| 2 MR. PETERS: Well, let's let him | 2 there's more of a cookie-cutter approach to it. |
| 3 figure out what he meant to say. I just | 3 If you build them, you can layer them in for, you |
| 4 want to make sure I have a record. | 4 know, most retailers. |
| 5 MR. KATZ: Right. But I think we | 5 Q. And that would be the retailer |
| 6 both heard the same thing. Not a big | 6 promotion program which is the second column, |
| 7 deal. | 7 right? The second one? |
| 8 MR. PETERS: No. | 8 A. Yes. |
| 9 MR. KATZ: And while we're off -- | 9 Q. Let's -- |
| 10 MR. PETERS: Why don't you read it | 10 A. And then on the brand promotion side, |
| 11 back and we'll just continue down the | 11 usually, you have marketers who are -- they |
| 12 road. | 12 establish their own criteria for what it is they |
| 13 (Record read.) | 13 want to go after. So it requires a lot more |
| 14 A. You're correct. I meant to say | 14 effort on the front end to customize queries and |
| 15 SoftCard. | 15 go through the analysis and do all of those |
| 16 MR. KATZ: Off the record for a | 16 things. So a bit more complicated. |
| 17 minute. | 17 Q. From your perspective at the time, |
| 18 (Discussion off the record.) | 18 that is, late '99 through 2000, was that |
| 19 (Recess taken.) | 19 SmartSource Direct did not have the technical |
| 20 EXAMINATION (Cont'd.) | 20 capacity to develop brand promotion programs? |
| 21 BY MR. PETERS: | 21 A. Well, there was probably a technical |
| 22 Q. Take a look back at Exhibit 39, and | 22 capacity there. But whether or not it was |

34 (Pages 130 to 133)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

Page 134

1  sufficient to compete with other services that
2  were out there, I would say the answer is no to
3  that.
4      Q.  Do you know whether they had
5  successfully competed up to that time with other
6  companies in that space?
7      A.  I think -- I don't know the answer to
8  that specifically.  I can't recall.
9      Q.  Did you look into it to determine
10 whether or not they had successfully competed
11 against companies like Catalina or --
12     A.  Yeah, I believe that there had been
13 some modest applications done in the past but
14 nothing of any consequence, and certainly not --
15 we're not in a condition to effectively compete
16 against the, the other businesses that are out
17 there, certainly not Catalina.
18     Q.  Is there a market analyst out there
19 that is keeping track of this market.
20     A.  Independent market analyst someplace?
21     Q.  Right, exactly.  Someone who at the
22 time was tracking the market.

Page 135

1      MR. KATZ:  Objection.
2      A.  I'm not sure.
3      Q.  Did you ever hear of a woman, Carlene
4  Theissen?
5      A.  Sure.
6      Q.  What was she doing in this space?
7      A.  Carlene, as I recall, wasn't
8  necessarily tracking database marketing programs.
9  I think Carlene Theissen, who was actually
10 involved in some way, shape or form, with
11 Citicorp POS, I think Carlene's role was more of
12 a -- she may have been an employee of the Food
13 Marketing Institute or have run a small business
14 that did a lot of complementary work for the Food
15 Marketing Institute.
16         There was a woman who worked for
17 Carlene, as I recall, named Betsy Tucker who used
18 to work for Citicorp POS.  So that would be one
19 of the things that they would probably want to be
20 able to comment on.  But if you're suggesting
21 that they were the industry watchdog on database
22 marketing and providing services to the database

Page 136

1  marketing companies in terms of selling --
2  selling data, like Wally Marx does for the rest
3  of the promotion business, I think the answer is
4  no, that didn't exist.  I don't know if it exists
5  today.
6      Q.  The other items on data marketing
7  listed in Exhibit 39, can you recall from your
8  experience whether --
9      A.  Which buckets are you pointing to
10 here?
11     Q.  On the data marketing.  We spoke
12 about brand promotion and we spoke about retail
13 promotion programs.  Do you recall whether
14 SmartSource Direct had technical capacity and
15 skill to do event fulfillment and co-marketing
16 systems?
17     A.  I don't recall.  Again, everything is
18 on a relative basis.  You can always make an
19 argument that you don't need any system to do
20 event fulfillment.  You can get a phone call from
21 somebody who says, "I want a sampling project put
22 into these twenty stores."  I don't have a

Page 137

1  database marketing system to do that.  But to the
2  extent that -- were we actually doing event
3  fulfillment work and co-marketing work?  That's
4  very -- very hard to say.
5      Q.  I show you a document that was marked
6  in Henry Lellouche's deposition as Exhibit 1.
7          (Handing document to witness.)
8      Q.  Would you take a look at that and
9  tell me if you've seen this memorandum or any
10 part of this memorandum before today?
11     A.  I don't recall seeing this.
12     Q.  Do you know all the players listed on
13 the memorandum?
14     A.  I do.
15     Q.  Are they you a News America or News
16 America Marketing folks?
17     A.  No.
18     Q.  Who is who?
19     A.  Well, John Nallen and Lon Jacobs are
20 high-level financing, legal people, respectively,
21 working for News America.  Paul Carlucci is the
22 CEO of News America Marketing.  And David DeVoe,

35  (Pages 134 to 137)

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                          July 18, 2007
                        New York, NY

| Page 138 |
|---|
| 1  Jr., is another high-placed financial person |
| 2  working for News Corporation. |
| 3      Q.  Take a look at the second page of the |
| 4  business overview. |
| 5      A.  Um-hum. |
| 6      Q.  And I won't read it.  I'll just have |
| 7  you read "Business Overview" and the bullet |
| 8  points under "Business Overview," and tell me if |
| 9  there's anything in this section of Exhibit 1 |
| 10 that is inconsistent with your memory and |
| 11 experience? |
| 12     A.  Well, I think that the answer is -- |
| 13 I'm going to give you a yes-and-no answer here -- |
| 14 I think as I've stated before, they can do these |
| 15 things.  But the level to which they can do these |
| 16 things isn't scalable.  It's not -- it wasn't |
| 17 sophisticated to the point where we believed we |
| 18 could effectively compete using their platforms |
| 19 in the marketplace at large.  And I think, you |
| 20 know, beyond Duane-Reade, who was the largest |
| 21 customer that CCMI worked with, they were |
| 22 effective in selling Duane-Reade.  I think they |

| Page 139 |
|---|
| 1  were less effective ultimately in satisfying |
| 2  Duane-Reade. |
| 3          And I don't believe there was any |
| 4  other major customer of consequence that was part |
| 5  of the CCMI stable.  At least not, you know, of |
| 6  consequence based on what I was used to working |
| 7  with when I was based at Citicorp. |
| 8      Q.  Does that round out your answer? |
| 9      A.  Yes. |
| 10     Q.  The issue of scalability, Mr. Mixson, |
| 11 I take it, then, that as far as you know, News |
| 12 America Marketing acquired CCMI, understanding |
| 13 that its technology was not scalable? |
| 14     A.  I didn't say that. |
| 15     Q.  Do you know whether that's true or |
| 16 not? |
| 17     A.  I don't know whether that's true or |
| 18 not.  I know the conclusion that we reached, as |
| 19 we became more intimate after the acquisition of |
| 20 CCMI and its transformation to SmartSource |
| 21 Direct, was that it did not have scalability; |
| 22 that we would have to introduce different |

| Page 140 |
|---|
| 1  data-mining engines in order to take this |
| 2  business anywhere. |
| 3      Q.  And that was not something that you |
| 4  knew about beforehand, as far as you knew? |
| 5      A.  No. |
| 6      Q.  Do you know what commitments were |
| 7  made to CCMI about growing its business prior to |
| 8  the acquisition? |
| 9      A.  No. |
| 10     Q.  You've had no conversations with |
| 11 anyone to learn about what commitments were made |
| 12 to CCMI prior to the acquisition? |
| 13     A.  No. |
| 14     Q.  Would you take a look again at |
| 15 Exhibit 1.  And take a look at the model |
| 16 assumptions on this third page. |
| 17     A.  The page marked page -- this page |
| 18 (indicating)? |
| 19     Q.  No, the page -- |
| 20     A.  The page marked page 2? |
| 21     Q.  Yes.  It's marked page 2, but it's |
| 22 the third page of the document. |

| Page 141 |
|---|
| 1          Under, "Model assumptions," if you |
| 2  look at the bullet point 5, begins, "News |
| 3  America's model assumes," do you see that? |
| 4      A.  I'm not following you. |
| 5          (Counsel indicating.) |
| 6      A.  Okay. |
| 7      Q.  "News America's model assumes a |
| 8  valuation range of 40.7 million to 58.4 million |
| 9  based on a 15 percent discount rate and an 8X to |
| 10 12X EBITDA multiple." |
| 11         Is that information that was ever |
| 12 discussed with you, that valuation of the |
| 13 company? |
| 14     A.  No. |
| 15     Q.  Do you have any reason to disbelieve |
| 16 the information? |
| 17     A.  Yes. |
| 18     Q.  What's your basis to believe that |
| 19 what Mr. DeVoe wrote to senior executives at News |
| 20 Corp. is inaccurate? |
| 21     MR. KATZ:  Objection. |
| 22     You can answer. |

                                    36  (Pages 138 to 141)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                            New York, NY

Page 142

1      A. I --
2      Q. You don't know whether it's -- is
3  that your response?
4      A. Yeah. I don't know what would lead
5  them to -- I don't know what would lead them to
6  make these projections. Obviously they were made
7  in good faith. But I think they were obviously
8  erroneous projections.
9      Q. Well, do you have any reason to
10 believe that the projections were made having in
11 mind that there would be significant investment
12 in the company, CCMI, that would allow those
13 projections to be realized?
14     A. I don't know.
15     Q. Do you know whether or not all the
16 investments that News America Marketing
17 contemplated making in SmartSource Direct were
18 made, or whether or not it pulled back on
19 investing in the company at some point?
20         MR. KATZ: Objection.
21     A. I -- I don't know how to answer that.
22 I think you -- you make investments that are

Page 143

1  required and that you believe are going to result
2  in success. So you make whatever the investments
3  necessary to get from one point to the next are.
4  You can't determine what you're going to invest
5  until you understand what you're investing in.
6      Q. I understand that as a general rule.
7  I'm wondering whether or not you can think of a
8  specific instance where a contemplated investment
9  was withdrawn.
10     A. No.
11         MR. PETERS: I think this is our
12 Exhibit 45.
13         MR. KATZ: No, I think it's 47.
14         MR. PETERS: 47, Gordon?
15         THE WITNESS: Am I done with these?
16         MR. PETERS: Yes.
17         MR. KATZ: Yes.
18         (A pause in the proceedings.)
19         MR. KATZ: Exhibit 47. Whatever that
20 would be.
21         MR. PETERS: Yes, sir.
22         (Plaintiff Exhibit (Mixson) 47,

Page 144

1      e-mail chain Bates numbered FR0215, marked
2      for identification, as of this date.)
3      Q. Just take a look at Exhibit 47,
4  Mr. Mixson.
5          (Handing document to witness.)
6      Q. Do you recall this as one of your
7  e-mails back in April of 2000?
8          (A pause in the proceedings.)
9      A. I'm sorry, what was the question?
10     Q. I want you to just, as we say in the
11 business, authenticate this as one of your own
12 e-mail --
13     A. Yes.
14     Q. Okay. Is the content familiar to
15 you?
16     A. Uh -- yeah.
17     Q. What are you discussing in this
18 e-mail with Bob Fireman, this e-mail exchange?
19     A. Well, I think this is a, on the one
20 hand, a response to his e-mail below,
21 reciprocating his thanks for having me up and my
22 thanks for being hosted by the SmartSource Direct

Page 145

1  team up in Braintree.
2          And I think that, you know, Henry --
3  trying to put this into context, I think one of
4  the problems with Bob is that he was, you know,
5  his idea generation was somewhat frenetic. We
6  need to have more focus. And that at the end of
7  the day we were most interested in dealing with
8  database marketing enterprises, and you can't do
9  that without the data. You have to have access
10 to data. You have to be developing relationships
11 with retailers and you have to be privy to the
12 information stream because, if you don't have it,
13 you don't have a product to sell.
14         So this was actually a quote that
15 used to be used at Citicorp POS, "It's about the
16 data. You have to get the data." "It's the data
17 stupid." That wasn't meant as a derogatory
18 comment, anyway. That was just the mantra that I
19 want everybody to be, on the SmartSource Direct
20 side of the business, to have as their mantra.
21 It's all about getting data, being able to manage
22 the data and being able to compartmentalize and

37 (Pages 142 to 145)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                      July 18, 2007
New York, NY

Page 146

1  analyze the data and then ultimately sell the
2  data for targeted applications.
3      Q.  The personal issues referenced in the
4  second paragraph, do you have in mind what those
5  are, or were?
6      A.  No.
7      Q.  And you request more resources.  Do
8  you know what request that refers to?
9      A.  No.
10      (Plaintiff Exhibit (Mixson) 48,
11      e-mail document Bates numbered FR1313,
12      marked for identification, as of this
13      date.)
14      Q.  Exhibit 48 is an e-mail from you to
15  Ann Raider.  It's Bates numbered FR1313.
16      Do you recall the issues that are
17  discussed briefly in this e-mail?
18      A.  Not really.  I'm just -- I'm trying
19  to, you know, piece that together after rereading
20  it here.  But it looks like Ann had, just from
21  reading the e-mail, it looks like Ann had
22  appealed to me for some type of assistance in

Page 147

1  increasing a bonus payment or delivering a bonus
2  payment to her and that she had gone directly to
3  Dave DeVoe on, and I was just responding to that.
4      Q.  Do you remember there being issues
5  and concerns expressed to you about bonuses that
6  they had received or not received?
7      A.  Not really.
8      Q.  This e-mail doesn't refresh any
9  particular recollection, I take it?
10      A.  Well, it refreshes the recollection
11  as I'm reading this e-mail and seeing that there
12  was a problem with that.
13      Q.  But you don't have a memory
14  independent of the e-mail.
15      A.  No.
16      (Plaintiff Exhibit (Mixson) 49,
17      e-mail document Bates numbered FR0032,
18      marked for identification, as of this
19      date.)
20      Q.  Exhibit 49 is a one-page e-mail dated
21  September 12th, 2000.  You're shown as a copy.
22      Do you remember seeing it?

Page 148

1      A.  Never.
2      Q.  Do the issues discussed in the e-mail
3  look familiar to you in any way?
4      A.  No.
5      Q.  In the third paragraph where
6  Mr. DeVoe writes, "My understanding was that both
7  of you play an integral role in the development
8  of SmartSource Direct."  Is that consistent with
9  your understanding?
10      A.  I can't comment.  I really don't have
11  any recollection of this -- this document.
12      Q.  I understand.  But where Mr. DeVoe
13  writes, "My understanding was that both of you
14  play an integral role in the development of
15  SmartSource Direct," my question, Mr. Mixson, is,
16  is that also, or was that also your
17  understanding?
18      A.  Less so, perhaps.  You'd have to
19  really, you know, Dave DeVoe's interpret -- why
20  he would make that statement, you'd have to ask
21  David about.  I think that we hoped that Bob and
22  Ann would play an integral role in the

Page 149

1  development of SmartSource Direct.  I think our
2  experience was, they were increasingly playing
3  less and less of an integral role in the
4  development of the -- of the business.
5      So this is in September of 2000.
6  It's hard for me to put this in terms of that
7  timeline I was talking about earlier where my
8  reliance on them was weakening as we moved
9  through time.  So I'm not sure where we're at.
10      Q.  Take a look at what was marked
11  yesterday as Exhibit 43.  And I'll ask you first
12  if you have seen it before.
13      (Handing document to witness.)
14      A.  I can't recall.
15      Q.  The bullet points listed under "FY
16  2002 Year in Review," remind me of your
17  chronology.  Were you gone by then, March of
18  2002?
19      A.  I'm not sure.  It was right around
20  the time -- right around the cusp of when I would
21  be leaving, I believe.
22      Q.  The top of this chart is Bill

                          38  (Pages 146 to 149)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                        New York, NY

Page 150

1   Christie.
2       A. Well, that would suggest I wasn't
3   there then.
4       Q. I think that's probably -- relatively
5   new.
6       A. I think I anniversary my return in
7   April. But it may have been earlier by a few
8   weeks.
9       Q. In any event, if we look at the
10  bullet points, supervisory -- I'm sorry, bullet
11  point I, "Supervisory reorganization relieves
12  Fireman from operations and Raider of retail
13  sales responsibilities."
14      Do you recall that happening?
15      A. I -- vaguely.
16      Q. Do you remember why it happened?
17      A. Yeah. I believe that there were
18  serious issues with their ability to manage, and
19  because their -- their personal conduct in the
20  business was inconsistent with the way, you know,
21  we conduct ourselves in business. It's very
22  difficult to put somebody running, managing other

Page 151

1   people when they are not displaying the effective
2   behavior you are looking for themselves. So I
3   think that had a lot to do with it.
4       Q. Do you have a memory of what
5   misbehavior you're thinking of in response to my
6   question?
7       MR. KATZ: Objection.
8       A. Yes.
9       Q. Could you articulate it?
10      A. Just simple -- simple things that
11  would be simple to correct that aren't. I mean,
12  Bob -- I think Bob had a history of coming in to
13  work late. You know, he would come into a formal
14  business environment consistently dressed very
15  casually. And I think he just -- he just went
16  out of his way to, you know, be exclusive instead
17  of inclusive. You know, one of our operating
18  principles here at News America Marketing is
19  inclusive management.
20      So I think that certain employees, as
21  I recall, had issues. Former CCMI employees were
22  anxious to try and get out from underneath the

Page 152

1   management of both Ann and Bob. I think Bill
2   Adams is a case in point. As I recall, Bill
3   Adams was enthusiastic about the opportunities of
4   relocating from Braintree to Wilton and getting
5   involved in projects that would exclude him from
6   being under their management.
7       Q. Did you leave room for the
8   possibility that Bill Adams was more interested
9   in an $80,000 raise?
10      A. Certainly, that would play a role
11  there, no doubt. But I think that there were
12  other elements of it as well. You might know
13  better than I do. Maybe you've deposed Bill
14  Adams. I don't know. That's just my personal
15  recollection. That's all I can tell you.
16      Q. I understand.
17      A. In Ann's case, I think, you know, I
18  think, you know, we had a minimum requirement of,
19  and we still do, that salespeople will make a
20  minimum of ten preplanned sales calls a week.
21      Every sales manager at the group
22  sales manager level and below, and this would

Page 153

1   really be a group sales manager type job based on
2   the number of people that are reporting in, are
3   expected to adhere by that standard and everybody
4   they work for are expected to be managed to reach
5   that standard.
6       I think there was very little
7   compliance with those expectations. So you're
8   not going to be put into a sales management
9   situation for very long at News America if you're
10  not successful in growing sales and if you
11  personally, through your own conduct, are
12  demonstrating that you don't adhere to the
13  company's sales management discipline and are
14  able to lead people to achieve those same kinds
15  of goals.
16      I think those are the kinds of
17  reasons that Bob and Ann were removed from
18  management responsibility and I think it reflects
19  a real interest on the part of the organization
20  to make this enterprise successful.
21      Q. Did you review any documents in
22  preparing for today's deposition?

                        39 (Pages 150 to 153)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                            July 18, 2007
                        New York, NY

| Page 154 | Page 156 |
|---|---|

Page 154

1      A.  There were some documents that I
2  reviewed yesterday.
3      Q.  Can you tell me what they are?
4      A.  No.  This wasn't one of them.
5      Q.  Do you remember, were they e-mail,
6  were they charts, can you describe them for me?
7      A.  They were a few -- e-mails mostly I
8  looked at.  One of the documents we looked at
9  today, I think I recall seeing yesterday.  We
10  moved through them very quickly.  I didn't study
11  them.
12      Q.  Do you remember the substance of any
13  of the e-mail you reviewed?
14      A.  No, not really.
15      Q.  The criticisms that you just
16  articulated, these are criticisms that would be
17  reflected in their, Ann and Bob's reviews?
18      A.  Yeah.  I think that, you know, the --
19  we go through an annual appraisal process here,
20  and I think News America in its evaluations of
21  employees is generous to a fault.  I think the
22  normal -- the normal way, you know, we try and

Page 155

1  engage employees -- you try to personalize the
2  business with employees, you know, rather than
3  crucify employees for shortcomings and exaggerate
4  those, which some companies do.  I've worked for
5  companies that do that.
6          We have a tendency to accentuate the
7  positives here.  We touch on things that we have
8  concern about, and usually we see, that's usually
9  sufficient to get people to start moving in a
10  progressive, positive way.
11          With employees that -- some employees
12  you don't make any -- so the issues that were,
13  you know, treated relatively with kid gloves
14  early on become more pronounced as you move
15  through time and the appraisals have a tendency
16  to get very, very much more direct.  And I think
17  that's probably what, you know, if you looked at
18  that trend, you'd probably see it, although I
19  can't tell you for certain that's what you're
20  going to find, but I think if you look at their
21  performance appraisals over time, you'll probably
22  find that type of sentiment expressed in those

Page 156

1  appraisals.
2      Q.  And bonuses can be affected by
3  appraisals?
4      A.  Yes.
5      Q.  Bonuses are discretionary?
6      A.  Bonuses at a certain level in the
7  organization are discretionary, yes.
8      Q.  Were Ann Raider and Bob Fireman's
9  bonuses discretionary?
10      A.  I don't recall, other than what I've
11  just seen in the correspondence that you've
12  handed me, which would suggest that they are.
13      Q.  Do you know whether or not they were
14  penalized in bonuses for any of the conduct
15  you've described for us in response to one of my
16  questions a bit ago?
17          MR. KATZ:  Objection.
18      A.  I don't know that.
19          MR. PETERS:  This next document is
20      one that's already been marked in the case
21      as Exhibit 106.  It's FR03041 and 42.
22          MR. KATZ:  So you're not going to

Page 157

1      mark it again.
2          MR. PETERS:  Right.
3          MR. KATZ:  That would have been
4      Defendant's Exhibit 106.
5      Q.  Would you take a look at this exhibit
6  and tell me whether you recall seeing it before?
7          (Handing document to witness.)
8      A.  Sorry?
9      Q.  Tell me if you remember the exhibit,
10  please.
11      A.  I don't.
12      Q.  Could you read it and tell me if,
13  generally, you recall the substance of the issues
14  that Bob Fireman raises in his memo to you on
15  October 17th.
16          (A pause in the proceedings.)
17      A.  Okay.  What's your question?
18      Q.  Do you remember receiving this?
19      A.  No.
20      Q.  Do you remember talking to Bob
21  Fireman about the issues that he discusses in
22  this memorandum?

                                    40  (Pages 154 to 157)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                          July 18, 2007
New York, NY

Page 158

1     A. I never spoke to Bob Fireman where,
2  you know, he wasn't always complaining about
3  something. So I really don't recall the specific
4  issues. Everything from Bob was a complaint.
5        What you get when you read this memo
6  is the fact that, you know, there -- I look at
7  this and, you know, this is -- this is an
8  individual who, you look at this as -- as his --
9  his business. He doesn't look at this as a News
10 America Marketing business where we're making
11 decisions in the best interests of the business.
12       My tendency on this would have been
13 to refer this to the -- this kind of stuff to the
14 finance department and -- that was currently
15 managed by Dave DeVoe. Because Dave was part of
16 the -- he was the guy leading the acquisition
17 effort, now running our finance department. He
18 was intimate with the details of the contract
19 with Bob Fireman and Ann Raider.
20    Q. Well, let's look at the bullet
21 points.
22    A. Okay.

Page 159

1     Q. The first bullet point you can't
2  comment on because you don't know what promises
3  were made prior to the acquisition, right?
4     A. Presumably those promises would be
5  codified in an agreement and I've never seen the
6  agreement.
7     Q. You don't know what commitments were
8  made.
9     A. I do not.
10    Q. The second bullet point, "NAM never
11 empowered us to run the business."
12       You disagree with that?
13    A. Well, again, that is a relative term.
14 Everybody is empowered to some extent, dependent
15 upon the degree to which they are perceived as
16 contributing to the success of the enterprise.
17 So I wouldn't agree with that.
18    Q. Ann and Bob were not allowed to be
19 autonomous in this --
20    A. No.
21    Q. -- company?
22    A. No one is autonomous in a

Page 160

1  corporation.
2     Q. They weren't allowed to direct the
3  business activities of SmartSource Direct. You
4  would agree with that.
5     A. I think -- no, I -- well, if your
6  question is, were they empowered to contribute to
7  that enterprise? I would say the answer is yes.
8  If the question is, were Bob and Ann given
9  indiscriminate authority to do as they pleased
10 with a company that had just been purchased by
11 News America Marketing, the answer so that is no.
12    Q. Was Bob Fireman allowed to be the
13 general manager of SmartSource Direct?
14    A. I think for a limited period of time,
15 Bob served as the general manager. I think as
16 time progressed, and the company continued to
17 develop, you know, bigger and bigger doubts about
18 his leadership skills, I think that Bob had that
19 general manager, what you'd normally associate
20 with general manager responsibilities
21 successively withdrawn.
22    Q. Do you remember when that happened?

Page 161

1     A. No, it was an evolutionary process.
2     Q. Was Bob the general manager when
3  Henry Lellouche came into the IGroup?
4     A. I believe he was.
5     Q. Do you know that Henry Lellouche had
6  the title of general manager?
7     A. Yes. As I indicated about before,
8  you know, the titles -- the titles -- don't get
9  confused on titles. We have people that we have
10 been giving vice presidents' titles because we
11 believe it empowers them with customers more than
12 it reflects specific responsibilities that are
13 unique to vice-presidents.
14       So, you know, I -- that's the best
15 answer I can give you on that.
16    Q. Titles aren't necessarily meaningful,
17 or at least that's your testimony?
18    A. I think titles are generally
19 meaningful, but I think there are instances where
20 titles are not necessarily completely
21 commensurate with job responsibilities.
22    Q. Let's look at the next bullet point.

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                        July 18, 2007
New York, NY

| Page 162 |
|---|
| 1  "NAM divided and assimilated CCMI's technology, |
| 2  personnel, resources and knowhow." |
| 3      Do you recall talking to Bob about |
| 4  that criticism, ever? |
| 5      A. Yeah, I believe I had conversations |
| 6  about it. What Bob would define as dividing and |
| 7  assimilating, I would take a look at and say what |
| 8  we basically have done is improve your bottom |
| 9  line by reducing cost overheads because that's |
| 10  now being assumed by existing infrastructure at |
| 11  News America Marketing. |
| 12      So, you know, this is a similar |
| 13  complaint to the Canadian example I gave you |
| 14  earlier. We had people in Canada telling us that |
| 15  we would destroy their business if we had |
| 16  eliminated their finance and marketing |
| 17  department. Instead, we've taken it from a $2 |
| 18  million business to a $15 million profit |
| 19  business. They don't have the overhead |
| 20  associated with those areas anymore. We already |
| 21  had the competency and the capability within the |
| 22  News America Marketing organization. I don't |

| Page 163 |
|---|
| 1  need two finance departments. I don't need two |
| 2  collections departments. |
| 3      Bob would look at that as our having |
| 4  assimilated their personnel. That's, you know, |
| 5  it's -- it depends upon your perspective here. |
| 6  As someone charged with taking these assets that |
| 7  were acquired by News America Marketing and |
| 8  developing a sustainable and profitable business |
| 9  from them, I look at them from the exact opposite |
| 10  position from Bob Fireman. |
| 11      Q. The next bullet point, "NAM seldom |
| 12  included our input into any key decisions |
| 13  relative to the business." |
| 14      Do you dispute that? |
| 15      A. Absolutely. |
| 16      Q. You think that they were included, |
| 17  Ann and Bob, in key decisions relative to the |
| 18  business? |
| 19      A. I think they were included in key |
| 20  decisions early in my tenure at the IGroup. I |
| 21  think that their failure to bring value to those |
| 22  conversations and our business development |

| Page 164 |
|---|
| 1  efforts increasingly made them less important in |
| 2  that process. |
| 3      Q. Well, this memo on its face is from |
| 4  October 17, 2000. |
| 5      A. Um-hum. |
| 6      Q. By October 17 of 2000, had the |
| 7  decision been made internally to marginalize Ann |
| 8  Raider and Bob Fireman's role in key decisions? |
| 9      MR. KATZ: Objection. |
| 10      A. I can't answer that. I don't know. |
| 11      Q. The next bullet point where it says, |
| 12  "We have had no involvement in the approval of |
| 13  budgets or projections and to this date, have |
| 14  never seen financials sufficient to calculate our |
| 15  earn-out." |
| 16      Do you know whether that's true or |
| 17  not true? |
| 18      A. I don't know if that's true. And I |
| 19  doubt that it is. |
| 20      Q. Should they have been involved in the |
| 21  approval of budgets and projections? |
| 22      MR. KATZ: Objection. |

| Page 165 |
|---|
| 1      A. No. They don't own the business. |
| 2  News America Marketing owns the business. The |
| 3  risk at this juncture in terms of, you know, |
| 4  making that investment pay out is News America |
| 5  Marketing's. And therefore, it's our |
| 6  responsibility to determine budgets and things |
| 7  along those lines. |
| 8      Q. Well, they -- |
| 9      A. Yes, to the extent to which you bring |
| 10  value to an enterprise dictates the degree to |
| 11  which you're going to be included in the |
| 12  enterprise. |
| 13      Q. It's not your testimony that the only |
| 14  people at risk were News America Marketing. You |
| 15  understand, don't you, at least in retrospect, |
| 16  that a significant part of the purchase price of |
| 17  this business was in the form of an earn-out. |
| 18  You know that, don't you? |
| 19      MR. KATZ: Objection. |
| 20      A. I do now, yes. |
| 21      Q. So do you think it's appropriate not |
| 22  to -- I'm not saying to give them complete |

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                     July 18, 2007
                            New York, NY

---

Page 166

1  autonomy, but not to involve them in the approval
2  of budgets and projections, do you think that's
3  appropriate?
4       MR. KATZ:  Objection.
5       A.  I think there's a responsibility on
6  the part of Bob and Ann to bring value to the
7  enterprise to the point where you want to include
8  them in those discussions.
9       If they were not, and I don't know
10 that they were not, but if they were not, I think
11 what you need to question is, why were they not.
12 And they wouldn't be because they weren't
13 bringing value to the process.
14      Q.  The next bullet point discusses, "NAM
15 removed all control and ability for us to drive
16 the business and make the agreed-upon plan or
17 earn-out."
18      I take it you disagree with that?
19      A.  Yes.
20      Q.  Do you think they still had control
21 over the business?
22      A.  It doesn't say that.  It says

Page 167

1  "removed all control."
2       Q.  Do you still they had control over
3  the business so that they could drive the
4  business and get the earn-out?
5       A.  I think they had -- they had a share
6  of control and a share of ability to, you know,
7  to cooperate and contribute.
8       Q.  The next bullet point states, "We had
9  to fight to keep our presence at the industry
10 trade shows.  All advertising and public
11 relations was stopped."
12      Is that consistent with your memory?
13      A.  News America Marketing has grown to
14 be the industry leader in FSI and arguably the
15 industry leader in in-store based on a totally
16 different philosophy in driving the business,
17 which generally precludes that any of our
18 businesses participate in trade shows.  And that
19 we don't engage in a lot of advertising and
20 public relations.
21      I think a lot of that -- we think a
22 lot of that stuff is basically feel-good stuff

Page 168

1  for a company.  It doesn't do anything to drive
2  your ball in or to improve your bottom line.
3  Just the opposite usually is the impact.
4       So generally speaking, we don't
5  participate in those kinds of functions and I
6  think there were exceptions actually made for the
7  SmartSource Direct team who did participate in
8  some industry trade shows.  But personally having
9  participated for numerous companies in many trade
10 shows, I can't tell you of one instance where
11 I've ever closed a piece of business as a
12 consequence to participation in a trade show.  So
13 I happen to subscribe to that philosophy.
14      Q.  Well, isn't the idea not necessarily
15 to close a piece of business directly correlated
16 to meeting somebody at a trade show, isn't part
17 of the idea to have presence, to let the industry
18 know that you're out there and that is what you
19 are and this is what you have available?
20      A.  The industry will know you're out
21 there much better if you have dedicated
22 salespeople being led by competent sales

Page 169

1  management teams where you're making those
2  minimum number of ten sales calls a week and
3  having personal one-to-ones with people where you
4  have private time to talk about your business.
5       That's our philosophy.  Not to be out
6  wining and dining and whooping it up in some
7  convention town over a trade show.  And that's
8  usually what goes on.  I've been to many of them
9  of okay?  I've probably been to a few more than
10 the other people in this room today.  And that's
11 not what we do.  That's not how we go to market.
12 You can't argue with how successful News America
13 Marketing is, based on how we go to market.  So I
14 would refute this completely.
15      Q.  So you go to market in part by having
16 a large sales force.
17      A.  We go to market by having --
18      Q.  Just answer that question first.
19      A.  Yes.  We have a large and robust
20 sales force.
21      Q.  That's one of the ways that you are
22 visible to your customer base, is that you have a

43  (Pages 166 to 169)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                          New York, NY

Page 170

1    large sales force that developed personal
2    relationships with your clients.
3        A. I think we have a large sales force
4    and we have a -- we have a relatively assertive
5    and energetic sales force that, you know, minimum
6    ten sales calls a week across ten salespeople is
7    a hundred sales calls a week, okay? Over ten
8    weeks, you've made a thousand sales calls. Now,
9    you can develop a lot of business and get a lot
10   of exposure in ten weeks engaging in that
11   approach, where you're going to be one hell of a
12   lot more effective using that approach to the
13   business than you are contributing to somebody
14   else's profit center by spending money to be in
15   trade shows.
16       Q. So one of the ways to increase
17   SmartSource Direct's visibility within the
18   industry is, rather than attend trade shows, have
19   your sales reps talk about, sell, promote
20   SmartSource Direct, right?
21       A. Part of the way, I would say that's
22   correct, yes.

Page 171

1        Q. The next bullet point says, "NAM
2    created its own financial plan for revenue and
3    resources. This plan will not allow us to make
4    our bonuses or projected earn-out."
5            Do you understand what Mr. Fireman is
6    driving at in that bullet point?
7        A. I can't comment on it. I have no
8    knowledge about that. I don't know if it's
9    directionally accurate or inaccurate. I have no
10   idea.
11       Q. Well, let's just assume for the
12   purposes of my question that NAM did create its
13   own financial plan for revenue and resources and
14   that that plan could not allow either Ann Raider
15   or Bob Fireman to make their bonus and projected
16   earn-out. Is that something that you -- --
17           MR. KATZ: Objection.
18       Q. -- would think is fair?
19           MR. KATZ: Objection.
20       A. I can't comment on it. I didn't put
21   together the deal so I don't know the elements of
22   the deal.

Page 172

1        Q. Might be fair and might not be fair?
2        A. Might be fair and might not be fair.
3        Q. The next bullet point, "Any action by
4    us to object was considered action against the
5    company and we were isolated and even reported to
6    the chairman for reprimanding."
7            Do you recall what he's discussing in
8    that bullet point?
9        A. No.
10       Q. Do you remember Mr. Carlucci ever
11   reprimanding Bob Fireman?
12       A. No.
13       Q. Do you remember raising Bob Fireman's
14   complaints to anyone at the executive committee
15   level?
16           MR. KATZ: Objection.
17       A. Bob -- Bob created a -- I think
18   unfortunately, I think this memo is symptomatic
19   of the constructive input that you would
20   basically get from Bob. It was a very, "Me, me"
21   oriented conversation.
22           There was unfortunately limited focus

Page 173

1    on what was going to make the business successful
2    and so in instances, there may be instances
3    where, you know, when we're talking about
4    personnel, whether it's -- whatever meeting,
5    which we do periodically have conversations about
6    our human resources, Bob Fireman may be
7    discussed. But, you know, as far as his being
8    reprimanded by the chairman or anything like
9    that, I have no recollection of it.
10       Q. Do you have any recollection of
11   discussing it or are you --
12       A. Not specifically.
13       Q. You're theorizing.
14       A. Yes. We have senior -- any -- any
15   senior-level manager is going to spend an
16   inordinate amount of time, as you move up the
17   food chain, your words, not mine, spending more
18   and more time on human resources. So to the
19   extent that, you know, Bob represented, you know,
20   one of our human resources, yes, he would be
21   discussed.
22       Q. The last bullet point, "Company as

44 (Pages 170 to 173)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                   July 18, 2007

New York, NY

Page 174

1  defined in our agreement is now the SmartSource
2  IGroup. Our name was changed. Our new products
3  never built."
4        I'm going to stop right there and ask
5  about new products. Do you know what he's
6  referring to here when he says "new products have
7  not been built as of October 2000"?
8      A. No.
9      Q. "Our technology was removed." Do you
10  know what he means?
11      A. No.
12      Q. "Key personnel of CCMI have been
13  relocated and terminated." That's Bill Adam and
14  anyone else, right?
15      A. Well --
16      MR. KATZ: Objection.
17      A. -- I think some of the people that
18  they recruited, that Ann Raider recruited, you
19  know, some of the people that they recruited that
20  worked for Ann Raider were terminated. Some of
21  them left of their own volition. So, yeah, I
22  mean, if somebody doesn't perform well here, they

Page 175

1  are not going to stay on board here. We
2  terminate them.
3      Q. Do you recall there being a problem
4  with filling positions at SmartSource Direct?
5      A. Not any more of a problem that there
6  is filling positions anyplace we look to fill
7  positions.
8      Q. Was there a hiring freeze at some
9  point?
10      A. Periodically there have been hiring
11  freezes as we moved through time.
12      Q. Was there a hiring freeze when you
13  were with the IGroup?
14      A. I can't recall.
15      Q. Do you remember a hiring freeze
16  impacting staffing at SmartSource Direct?
17      A. Well, this memo was dated October.
18  You know, if I started with the IGroup in early
19  2000, let's say it's January, that's ten months.
20  You know, we staffed, we put a lot of people in
21  place in the IGroup in that ten months. So if
22  there was a hiring freeze, I'm not sure that it

Page 176

1  affected the IGroup. There may have been a
2  hiring freeze at News America Marketing, in our
3  core business areas. But I don't have any
4  recollection of a hiring freeze impacting the
5  IGroup.
6      Q. You don't remember there being any
7  issue with filling positions at SmartSource
8  Direct?
9      A. Well, there's always issues filling
10  positions. It's --
11      Q. I'm looking -- I'm looking for any
12  specific recollection that you have that it was a
13  problem articulated to you, elevated to you, that
14  key positions weren't filled.
15      A. I'm always having, you know, people
16  involved in the business lamenting over key
17  positions that are open for even a modest period
18  of time. So the possibility exists that the
19  answer is yes. But that's, you know, that's my
20  cross to bear. I hear that from managers every
21  single day when they have positions open that
22  haven't been filled.

Page 177

1      Q. He discusses in the text paragraph,
2  "As a result of NAM's actions, News America
3  Marketing and us are a year behind in the
4  development of the required staff, technology and
5  resources to grow this to a hundred million-plus
6  business."
7      Do you dispute that? And if so, tell
8  me why.
9      A. I think it's nonsense. You know,
10  number one, where did he get the hundred million
11  dollars from? I think that's a nice round
12  arbitrary number he pulls out of nowhere here.
13      And I think we dedicated inordinate
14  efforts to try and make this business successful
15  as evidenced by the fact that we are successful
16  today.
17      Q. The hundred million dollar number is
18  ridiculous?
19      A. I think it's ridiculous in the sense
20  that looking at October of 2000, we've been in
21  this -- even over at the IGroup for a matter of a
22  few months. I don't even know what were CCMI's

45 (Pages 174 to 177)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                         New York, NY

| Page 178 | Page 180 |
|---|---|

**Page 178**

1 sales when we bought them. Can you tell me that?
2     Q. Yes, I can. Take a look at Exhibit 1
3 and it will tell you.
4     A. Exhibit --
5        MR. KATZ: I don't think we have it
6     anymore.
7        (A pause in the proceedings.)
8     A. So, he wants us to take his business
9 from a $4 million business in 1998 to a hundred
10 million dollar business by October of 2000?
11     Q. Is that how you read this memorandum?
12     A. Yeah. How do you read it?
13     Q. To grow the business to a hundred
14 million at some point. Do you think that was a
15 reasonable goal?
16     A. I think two hundred million dollars
17 is a goal. I think three hundred million dollars
18 is a goal. Reasonableness is in the eye of the
19 beholder. At some point in time, maybe in thirty
20 years, maybe in forty years, the entire industry
21 could have transformed itself into a highly
22 actuated database marketing-driven business. Who

**Page 179**

1 knows?
2        But jumping from a base of $4 million
3 in 1998 to making a claim of growing the business
4 into a $100 million business in October of 2000,
5 yeah, I think you could say that is a bit of a
6 leap, give the fact that you just showed me
7 documents that I'd never seen before from News
8 Corp. where they were projecting at best they
9 were looking at a $40 million business.
10        These are highly competent, you know,
11 financial people at senior levels of major
12 corporations. So, yeah, I think there's a -- I
13 think it would not be a stretch to say that
14 there's a high degree of hyperbole, not only in
15 that sentence, but in general, most of the things
16 that are being communicated in this memo. That's
17 my interpretation of this memo.
18     Q. I'm not going to get it for you now
19 but I'll tell you, and Mr. Katz can get it for
20 you, that in one of Mr. Fireman's evaluations, it
21 says that his goal should be to grow the business
22 to a hundred million dollars.

**Page 180**

1     A. Okay.
2     Q. You don't have any reason to think
3 that was an unachievable goal, do you?
4     A. I think a hundred million dollars is
5 an admirable goal. I think for Bob to basically
6 be saying, less than two years after they have
7 achieved a total sales of $4 million, I think
8 that, you know, anybody who reads this is going
9 to say, "Yeah, there's a fair amount of hyperbole
10 in this thing. I think there's an underlying
11 sentiment of exaggeration throughout this entire
12 memo.
13        Now, what is he trying to accomplish?
14 He's trying to get me excited and influence me to
15 take some kind of action on his behalf. But it's
16 exaggerated from the first bullet point all the
17 way through. So -- that's how I -- you're asking
18 me how I interpret the memo, that's --
19     Q. No, I'm asking you not to interpret
20 the memo and it's at times like these where we
21 regretfully reserve motions to strike. What I'd
22 like --

**Page 181**

1        MR. KATZ: Why don't we have the next
2     question.
3     Q. What I'd like to do is to talk about
4 what you agree and disagree with.
5     A. Okay.
6     Q. And I think that we are getting
7 somewhere on that regard. The sentence that
8 begins, "Our competitors, such as Catalina,
9 Valassis and others, have made significant
10 investments in acquisitions in this time frame
11 and have made a full effort to expand into the
12 areas of royalty marketing."
13        Is that something you agree with?
14     A. I can't comment on it. I don't know
15 what investment Catalina made. Valassis made an
16 acquisition of RMS, yeah, that would be a
17 significant investment. As far as what, you
18 know, CRM technology investments they made, I
19 don't know. As far as what database marketing
20 investments they made beyond that, I don't know.
21 As far as Internet in-store delivery systems,
22 Valassis, similar to News America, invested in an

46 (Pages 178 to 181)

Henderson Legal Services
202-220-4158

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                  July 18, 2007
                        New York, NY

| Page 182 | Page 184 |
|---|---|

**Page 182**

1   Internet business that failed. Ours succeeded.
2   Catalina invested in an Internet business that
3   failed and ours succeeded.
4       Q. Yours succeeded the second time
5   around?
6       A. Ours succeeded the second time
7   around.
8       Q. You're talking about Planet U?
9       A. I'm talking about SmartSource.com.
10  We never owned --
11      Q. It was an investment.
12      A. We had an investment in Planet U
13  independent of SmartSource.com.
14      Q. And SmartSource.com was part of the
15  IGroup?
16      A. Yes.
17      Q. And that was successful?
18      A. Yes, it's still successful today.
19  It's one of the largest on-line promotion
20  enterprises on the web today.
21      Q. It was successful back in October of
22  2000?

**Page 183**

1       A. No, it was not in the black in
2   October of 2000. It was a developing business.
3       Q. Mr. Fireman says in the final
4   paragraph, "When we spoke the other day, you
5   asked me to lay out the issues."
6           Do you remember asking Mr. Fireman to
7   lay out his concerns, his issues?
8       A. No.
9       Q. Do you remember the conversation that
10  this memorandum references at all?
11      A. No.
12          (Plaintiff Exhibit (Mixson) 50,
13          e-mail document Bates numbered FR1246,
14          marked for identification, as of this
15          date.)
16      Q. Mr. Mixson, Exhibit 550 is a one-page
17  e-mail. You're copied on it. It's FR1246.
18          Tell me please if you remember at any
19  point reading this e-mail.
20          (Handing document to witness.)
21      A. I have no recollection.
22      Q. Do the contents seem familiar in any

**Page 184**

1   way?
2       A. Not really.
3       Q. Nothing about this is resonating?
4       A. No.
5           (Plaintiff Exhibit (Mixson) 51,
6           e-mail with attachments, Bates numbered
7           FR0559 through 562, marked for
8           identification, as of this date.)
9       Q. Would you take a couple of minutes
10  and look at Exhibit 51 and I'll have a few
11  questions.
12          MR. PETERS: Go off the record
13          briefly.
14          (Discussion off the record.)
15          (Recess taken.)
16  EXAMINATION (Cont'd.)
17  BY MR. PETERS:
18      Q. You have Exhibit 51. Have you had a
19  chance to review it?
20      A. Yeah, this was one of the documents
21  that I reviewed yesterday.
22      Q. Okay. Is it an e-mail you received

**Page 185**

1   and an attachment you received from Ann Raider?
2       A. Apparently so, yeah.
3       Q. And in the e-mail, she talks about
4   hurdles in selling and implementing database
5   management programs as of January 2001.
6           Did you discuss this e-mail with Ann?
7       A. I don't recall.
8       Q. Did you discuss it with anyone else?
9       A. I have no recollection of doing
10  anything with it.
11      Q. Did you look at the attachment and
12  try to understand the issues she'd articulated?
13      A. Yeah, I glanced through it. I didn't
14  read them all in detail, either. But --
15      Q. I'm more interested in what you did
16  at the time. You have --
17      A. I have no idea what we did at the
18  time.
19      Q. Let me just get a question out. Ann
20  Raider then was an EVP of sales, right?
21      A. Uh -- I'm not even sure. Was that
22  her title?

47 (Pages 182 to 185)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
                        New York, NY

| Page 186 | Page 188 |
|---|---|
| 1    Q.  You don't remember? | 1   and a one-year delay in the release of the Aspen |
| 2    A.  No. | 2   product. |
| 3    Q.  Okay.  In any event, somebody | 3       A.  I see that. |
| 4   involved in the sales cycle for SmartSource | 4       Q.  Do you disagree with that assessment, |
| 5   Direct, right? | 5   either completely or in part? |
| 6    A.  Yes. | 6           MR. KATZ:  Objection. |
| 7    Q.  An important person in SmartSource | 7       A.  I would disagree with it.  I, you |
| 8   Direct in terms of sales? | 8   know, I think from my perspective, if I was |
| 9    A.  Yes. | 9   trying to identify people who weren't qualified |
| 10    Q.  She articulated a number of very | 10  to be in the positions that they were in, based |
| 11  specific issues with identified customers in this | 11  on what I know now, I would say that those two |
| 12  e-mail to you, didn't she? | 12  people would predominantly be Bob Fireman and Ann |
| 13    A.  Yes. | 13  Raider.  So to the extent that I, you know, I |
| 14    Q.  Did you undertake any investigation | 14  agree with it to that extent, because I think |
| 15  to try to determine whether or not the issues | 15  that Ann Raider ultimately was unqualified to be |
| 16  that she had raised were either correct and, if | 16  leading a sales team. |
| 17  correct, correctable? | 17      Q.  Did you come to that conclusion while |
| 18    A.  Presumably we took action on it, if | 18  you were with the IGroup? |
| 19  action was to be taken on it.  I have no | 19      A.  I am coming to the conclusion right |
| 20  recollection. | 20  now in retrospect having had the time that I |
| 21    Q.  On any given issue, you don't | 21  spent with Ann.  And I think by January of '01, |
| 22  remember what happened? | 22  yeah, I had probably gotten close to believing |

| Page 187 | Page 189 |
|---|---|
| 1    A.  Normally in this situation, I would | 1   that. |
| 2   give this to Henry Lellouche to follow up on. | 2       Ann could be an effective independent |
| 3   These are specific, isolated operational issues. | 3   salesperson, not an effective sales manager. |
| 4   I rarely would get involved at this level. | 4       Q.  The next sentence she writes, "In |
| 5   Oftentimes, you know, my experience with Ann and | 5   addition, SSD is faced with a culture and a |
| 6   Bob is, when they didn't like the answers that | 6   mindset issued from the NAM staff who are not |
| 7   they were getting from the people they reported | 7   used to selling database management services." |
| 8   to, they would try and elevate it to me and I | 8       I'll stop myself there and ask you, |
| 9   would give it back down to the people that they | 9   did NAM sell database management services up to |
| 10  reported to. | 10  the time of the acquisition of SmartSource |
| 11      I'd take a look at it, I'd have | 11  Direct? |
| 12  conversations with my people, I'd understand to | 12      A.  No.  I had.  So to the extent that, |
| 13  the best of my ability whether my involvement was | 13  you know, we had people on board who had sold |
| 14  required, and if it was, I got involved, and if | 14  database marketing services, employed by News |
| 15  it wasn't, I didn't. | 15  America Marketing, the answer would be yes.  But |
| 16      Q.  And you don't recall this being | 16  News America Marketing involved in the database |
| 17  something that occupied your time to try to parse | 17  marketing business up to that point, the answer |
| 18  out and correct? | 18  would be no. |
| 19      A.  I have no recollection. | 19      Q.  Were you not selling database |
| 20      Q.  See the second sentence of | 20  management -- |
| 21  Exhibit 51, Ms. Raider writes, "The issues are | 21      A.  No. |
| 22  the result of limited and qualified staff at NAM | 22      Q.  So your experience was not |

                                        48  (Pages 186 to 189)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

Mixson, Christopher                                    July 18, 2007
New York, NY

Page 190

1  translating into sales, was it?
2      A. Yes. I mean, I went on client calls
3  with the sales staff so to the extent that, was I
4  out there selling? Yeah, you bet I was out there
5  selling. You know, it was my primary
6  responsibility having an account list and going
7  out and calling on those accounts, the answer is
8  no.
9      Q. How many sales calls did you attend
10 with Bob Fireman or Ann Raider?
11     A. I don't know that I attended any
12 sales calls with Bob Fireman. That's not really
13 what he was doing. Bob I think was more
14 comfortable in an operations role early on. I
15 think later in his tenure, I think we may have
16 asked him to get out and make some business
17 happen because not much was happening.
18     With Ann Raider I think I was out on
19 several calls.
20     Q. During these calls, did she
21 articulate the concerns that she had about the
22 way the business was being operated?

Page 191

1      A. I don't recall.
2      Q. You don't recall any discussions with
3  Ann Raider during these sales calls, I take it?
4      A. I don't recall any specific
5  discussions. This was -- this was seven years
6  ago. I don't recall that.
7      MR. PETERS: Why don't you give me a
8      few minutes.
9      (Recess taken.)
10     MR. PETERS: I have nothing further.
11     THE WITNESS: Good. Thanks.
12     (Time noted: 3:33 p.m.)
13
14
15
16
17
18
19
20
21
22

Page 192

1  STATE OF NEW YORK )
2             ss:
3  COUNTY OF NEW YORK)
4
5      I, CHRISTOPHER MIXSON, the witness
6  herein, having read the foregoing testimony of
7  the pages of this deposition, do hereby certify
8  it to be a true and correct transcript, subject
9  to the corrections, if any, shown on the attached
10 page.
11          oOo
12
13
14     _____
15          CHRISTOPHER MIXSON
16
17
18
19
20
21
22

Page 193

1          C E R T I F I C A T E
2  STATE OF NEW YORK   )
3             : ss.
4  COUNTY OF NEW YORK  )
5      I, DAVID LEVY, CSR, a Shorthand
6  Reporter and Notary Public within and
7  for the State of New York, do hereby
8  certify:
9      That CHRISTOPHER MIXSON, the
10 witness whose deposition is hereinbefore
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by the witness.
14     I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I
17 am in no way interested in the outcome
18 of this matter.
19     IN WITNESS WHEREOF, I have
20 hereunto set my hand this 29th day of
21 July, 2007.
22          DAVID LEVY, CSR

49 (Pages 190 to 193)

0f468835-78f9-40c0-8ea9-9d3a46eeb13d

**EXHIBIT D**

Garofalo, Martin                                    July 17, 2007
                        New York, NY

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------x

ROBERT FIREMAN and ANN RAIDER,

                    Plaintiff,

                                Civil Action No.

        -against-            05-1740MLW


NEWS AMERICA MARKETING IN-STORE,

INC.,

                    Defendant.

---------------------------------------x

                            July 17, 2007

                            10:02 a.m.


        Deposition of MARTIN GAROFALO, taken by

    the Plaintiffs, pursuant to Notice, at the

    offices of News Corp, 1211 Avenue of the

    Americas, New York, New York, before David

    Levy, CSR, a Notary Public of the State of New

    York.

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

<table>
<tr><td colspan="2">

Page 2

```
1    A P P E A R A N C E S:
2
3        TODD & WELD LLP
4        Attorneys for Plaintiffs
5            28 State Street
6            Boston, Massachusetts 02109
7        BY:  KEVIN T. PETERS, ESQ.
8
9        HOLLAND & KNIGHT LLP
10       Attorneys for Defendant
11           10 St. James Avenue
12           Boston, Massachusetts 02116-3889
13       BY: GORDON P. KATZ, ESQ.
14
15   ALSO PRESENT:
16       JORDAN LIPPNER, ESQ.,
17               In-house Counsel, News Corp.
18
19
20
21
22
```

</td><td>

Page 4

```
1    M A R T I N   G A R O F A L O, having been duly
2        sworn by the Notary Public, was examined and
3        testified as follows:
4    EXAMINATION BY
5    MR. PETERS:
6        Q.  Good morning, Mr. Garofalo.  I'm
7    Kevin Peters.  We met briefly a moment ago.
8    Before you and I start our question-and-answer
9    session, let me ask your attorney --
10           MR. PETERS:  -- if we should be
11   proceeding under the same stipulations as
12   we have in the previous depositions.
13           MR. KATZ:  Yes.
14           MR. PETERS:  Mr. Reporter, want us to
15   repeat those?  We will reserve objections
16   except as to the form of the question
17   until the time of trial, or use of the
18   transcript in a dispositive motion.
19           We will reserve motions to strike
20   until the time of trial, or use of the
21   transcript in dispositive motion.
22           The witness will read and have thirty
```

</td></tr>
<tr><td>

Page 3

```
1    ------------------ I N D E X -----------------
2    WITNESS      EXAMINATION BY        PAGE
3    MARTIN GAROFALO  MR. PETERS        4
4
5    PLAINTIFF EXHIBITS (GAROFALO)      FOR IDENT.
6    39 Presentation entitled,          67
7        "SmartSource, a View of the
8        Future, Two Paces Ahead"
9    40 E-mail dated 3/7/03, Raider to  100
10       Garofalo
11   41 E-mail chain Bates numbered FR1318  150
12   42 Set of presentation documents   156
13   43 Organization chart Bates numbered  164
14       FR3740, previously marked as
15       Exhibit 34
16   44 Six-page document Bates numbered  157
17       NAM 828 through 833
18   45 Single-page document Bates       157
19       numbered FR3461
20   46 Single-page document Bates       157
21       numbered FR4889
22
```

</td><td>

Page 5

```
1        days to fill out an errata sheet and sign
2        the errata sheet under the penalty of
3        perjure, but we will waive notary.
4        Q.  Mr. Garofalo, would you introduce
5    yourself to us, give us your name, spelling and
6    where you live.
7        A.  Sure.  It's Martin Garofalo.  It's
8    M-a-r-t-i-n, and the last name is
9    G-a-r-o-f-a-l-o, and I currently live at 37
10   Gramercy Avenue in Rye, New York.
11       Q.  Are you employed, Mr. Garofalo?
12       A.  I am.
13       Q.  Where do you work?
14       A.  News America Marketing.
15       Q.  What's your position with the
16   company?
17       A.  Executive vice president of trade.
18       Q.  Can you tell me about your education?
19       A.  Sure.  Graduated from high school in
20   Pascack Hills in New Jersey, attended Georgetown
21   University, and had a major in marketing and
22   finance there.
```

</td></tr>
</table>

                                        2 (Pages 2 to 5)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                July 17, 2007
                        New York, NY

---

Page 6

1    Q. When did you graduate from
2  Georgetown?
3    A. 1980.
4    Q. Do you have any additional formal
5  education?
6    A. No.
7    Q. Once you graduated from Georgetown,
8  would you take me through your job path?
9    A. Sure. After graduation, I went to
10 work at Procter & Gamble out in Cincinnati. I
11 spent about three years there, and then I worked
12 three years approximately at Nestle Foods, and
13 spent about two years or so at the National
14 Football League before joining what is now News
15 America Marketing.
16    Q. What was it called at the time you
17 joined?
18    A. Product Movers.
19    Q. When was that?
20    A. I believe 1987.
21    Q. What did you do at Procter & Gamble?
22    A. Product management, promotion work

---

Page 7

1  initially and then product management work.
2    Q. How about Nestle?
3    A. Brand management, market management.
4    Q. What did you do at the NFL?
5    A. Marketing manager.
6    Q. So you've been in marketing ever
7  since getting out of Georgetown.
8    A. Yeah.
9    Q. And are you presently in marketing?
10 Is that a component of your job responsibilities?
11    A. Yes.
12    Q. Well, let's start at Product Movers
13 and move up to the present. Can you take me
14 through your job path at News America Marketing
15 or whatever it was once known as.
16    A. Yes. I started as a sales rep at
17 Product Movers, and the company was acquired by
18 News Corporation and then I had, you know, a
19 succession of sales jobs leading to sales
20 management, everything from national sales
21 manager, member of the executive committee, and I
22 then moved over to the IGroup when it was formed

---

Page 8

1  back in, I think, 2000, spent a year-and-a-half,
2  almost, there, I believe, and then came on board
3  back to the core part of the business, and
4  working in the current area that I'm in now.
5    Q. What was your position immediately
6  prior to joining the IGroup?
7    A. I believe it was eastern division
8  manager, so it was an EVP, eastern division
9  title.
10    Q. So your title was executive vice
11 president of what? Prior to --
12    A. Eastern division, I believe.
13    Q. Okay. And was it in marketing, was
14 it in sales?
15    A. Sales.
16    Q. Would you tell me what your job
17 responsibilities were at the time.
18    A. Basically generating sales from the
19 eastern portion of the United States.
20    Q. Did you have a sales force that you
21 managed?
22    A. Yes.

---

Page 9

1    Q. Could you describe the sales force
2  for me; in other words, to whom did they market?
3    A. Sure.
4    Q. And how were they comprised?
5    A. Yes. It was a typical sales
6  structure, I believe, in that we had several
7  group sales managers, then account directors
8  reporting to them, and account associates below
9  that, and the entry-level position below that.
10 And basically, we would go out and call on
11 predominantly packaged goods manufacturers to run
12 in the FSI.
13    Q. FSI meaning freestanding insert
14 business?
15    A. Yes. And then we had in-store as
16 well.
17    Q. How large was the sales force that
18 you managed?
19    A. I don't recall specifically. It was
20 fairly large.
21    Q. Over a hundred?
22    A. Probably.

3 (Pages 6 to 9)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

---

Page 10

1    Q.  Did you have a counterpart that
2   handled, or counterparts that handled other parts
3   of the country?
4    A.  Yes.
5    Q.  How many EVPs of sales were there
6   when you, just prior to the time you joined the
7   IGroup?
8    A.  I think there were three of us at the
9   time, yes.
10   Q.  Who were they?
11   A.  On the West Coast, I believe it was
12  Mel Liebergall, and I believe that the central
13  region manager was Wes Naze.
14   Q.  How do you spell Mr. Naze's --
15   A.  N-a-z-e.
16   Q.  And Liebergall is spelled how?
17   A.  L-i-e-b-e-r-g-a-l-l.
18   Q.  Did Mr. Liebergall and Mr. Naze have
19  sales forces roughly comparable to yours in size?
20   A.  Basically.
21   Q.  So the sales force that were calling
22  on the manufacturing clients, packaged good

---

Page 11

1   clients, was about, what, three or four hundred
2   sales reps?
3    A.  Probably around 250 at the time,
4   would be my best recall.
5    Q.  What were your responsibilities in
6   terms of your sales force?  Can you describe them
7   for me?
8    A.  Basic management, setting budgets and
9   overseeing sales activities.
10   Q.  Did you have control over what
11  products the sales force sold?
12   A.  Control -- I guess in combination
13  with the marketing department and the executive
14  committee, yes.
15   Q.  Would you take me through the process
16  of determining what the sales force, products the
17  sales force would sell at the time you were the
18  EVP of sales for the east.
19   A.  Yes.  I believe at that time, we had
20  the FSI product, and there's, you know, several
21  variations on that, but it's basically putting
22  coupons or advertisements on the printed page

---

Page 12

1   that is distributed in newspapers.  And then we
2   had several in-store programs at the time as well
3   as FSI.
4    Q.  When you joined the IGroup in 2000,
5   what was your position with the IGroup?
6    A.  I was again EVP, sales for the
7   IGroup.
8    Q.  How did your job responsibilities
9   change?
10   A.  Well, it was a start-up operation.
11  So it changed quite a bit.
12   Q.  Could you describe what your job
13  responsibilities were as the EVP of sales for the
14  IGroup?
15   A.  As the programs were being developed,
16  it was my responsibility to see if we could sell
17  them into the marketplace.
18   Q.  What programs are we talking about
19  now?
20   A.  Well, we had the purchase of a
21  company that was now in the Internet coupon
22  arena, so my responsibilities were going out and

---

Page 13

1   seeing if we could sell that product in the
2   marketplace.  And that was -- that was primarily
3   it.
4    Q.  So most of your job responsibilities
5   centered on SmartSource.com?
6        MR. KATZ:  You have to say yes.
7    A.  Yes.
8    Q.  And what were your job
9   responsibilities with SmartSource.com?  You
10  described them as trying to sell SmartSource's
11  products.
12   A.  Um-hum.
13   Q.  Could you be more specific or precise
14  than that?
15   A.  There was a suite of products that,
16  when we purchased the company, that allowed us to
17  finish the business that we took over, and we
18  were trying to fine-tune and find programs that
19  would really resonate in the marketplace.  So my
20  responsibilities were meeting with clients and
21  helping to develop that process, and also
22  developing a sales force behind that effort.

4  (Pages 10 to 13)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                July 17, 2007
New York, NY

Page 14

1      Q.  So you were really still in the
2  development stage in terms of refining
3  SmartSource.com's products when you joined the
4  IGroup in 2000; is that correct?
5      A.  Yes.
6      Q.  Can you describe what products
7  SmartSource.com had to offer when you were with
8  SmartSource.com or with the IGroup for that
9  year-and-a-half starting in 2000.
10     A.  Yeah, we had a program that was
11 essentially FSI online.  So the consumer was able
12 to click on to the website and then actually have
13 a coupon mailed to them if they gave their name
14 and address, and they selected their selections
15 of what coupons they wished to get, Gillette
16 Razor, Tide Detergent, and they would be mailed
17 to them.  That was the initial product offering
18 that we had.
19     Q.  Did this require you to work with
20 manufacturers to describe the products that you
21 had to offer?  In other words, folks like
22 Gillette?

Page 15

1      A.  Yes.
2      Q.  Is that something your sales force
3  did, went out and tried to sell this concept to
4  manufacturers?
5      A.  Yes.
6      Q.  How many sales -- let me ask it
7  again.  How large was the sales force for
8  SmartSource.com?
9      A.  It varied at different times,
10 probably from two people to -- my best
11 recollection would be maybe five or six.
12     Q.  Why didn't News America Marketing use
13 the 250-person or so sales force that you and
14 Mr. Liebergall and Mr. Naze were managing just
15 prior to you joining the IGroup?
16     A.  I think the offering was sufficiently
17 different in terms of the expertise in selling
18 the opportunity.  However, the -- some contacts
19 were provided by the sales force.  They knew of
20 this division and we would rely on them to open
21 doors and help us set up meetings.
22     Q.  Was there discussion that you can

Page 16

1  recall for me about whether it made sense from a
2  business perspective to use, let's call it the
3  large sales force, the national sales force, to
4  market SmartSource.com's products?
5      A.  I don't have any specific recall in
6  that kind of discussion.
7      Q.  I'm following up on your observation
8  or testimony that the products were sufficiently
9  different that some decision was made to use a
10 much smaller sales force for SmartSource.com's
11 products.
12         Can you take me through the reasoning
13 that led to that conclusion?
14         MR. KATZ:  Objection to form.
15         You can answer.
16     A.  It was a new program for the company.
17 And it was a new way to, you know, totally new
18 medium to distribute coupons and offerings and
19 advertising, really.  The vernacular that we used
20 in terms of "clicks" was brand-new at the time.
21 So it required, I believe, a little bit different
22 expertise.

Page 17

1      Q.  What kind of training did the sales
2  force get, the two- to six-person sales force
3  get, in SmartSource.com's products so that they
4  were able to market that concept to
5  manufacturers?
6      A.  We held, you know, several smaller
7  seminars with the company that we acquired in
8  terms of what the offering was and how they had
9  gone about their sales effort to date.  And that
10 was primarily it.  We were learning the programs
11 ourselves.
12     Q.  So there were a couple of seminars?
13         MR. KATZ:  Objection.
14     A.  Yes.
15     Q.  Were written materials generated by
16 News America Marketing to help educate this small
17 sales force?
18     A.  Yes.
19     Q.  Were they PowerPoints?  Could you
20 describe them for me in a general way?
21     A.  Yeah.  In general -- yeah, I really
22 can't recall exactly what we put out in the

5  (Pages 14 to 17)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                      July 17, 2007
                          New York, NY

| Page 18 | Page 20 |
|---|---|
| 1  marketplace. | 1     Q.  Do you know how much News America |
| 2     Q.  Is it correct -- that's fine, and if | 2  Marketing invested in Planet U? |
| 3  it comes to you, just let me know -- is it | 3     A.  I don't know offhand. |
| 4  correct to state that the training that the sales | 4     Q.  Do you have a general recollection? |
| 5  force received was done over a couple-of-day | 5     MR. KATZ:  Objection. |
| 6  period? | 6     Q.  Thousands or millions? |
| 7     MR. KATZ:  Objection. | 7     A.  I think it was in the millions. |
| 8     A.  I would think it was almost a | 8     Q.  Tens of millions? |
| 9  constant in terms of calling and asking questions | 9     MR. KATZ:  Objection. |
| 10  of the tech people that were working on the West | 10     A.  I really -- I don't recall -- I |
| 11  Coast and meetings and people going back and | 11  wasn't involved with that.  So... |
| 12  forth. | 12     Q.  Do you know how much News America |
| 13     Q.  And the tech people are people that | 13  Marketing invested in SoftCard? |
| 14  came over with SmartSource.com? | 14     A.  No. |
| 15     MR. KATZ:  Objection. | 15     Q.  Do you know how much News America |
| 16     A.  Came over from -- | 16  Marketing paid for CCMI? |
| 17     Q.  Planet U. | 17     A.  I don't recall. |
| 18     A.  Planet U, yes. | 18     Q.  Were you involved in the acquisition |
| 19     Q.  Okay.  Let's make sure we have the | 19  of CCMI? |
| 20  chronology here.  Planet U was acquired by -- | 20     A.  No. |
| 21  excuse me, there was an investment made in | 21     Q.  Were you involved in any of the |
| 22  Planet U, correct? | 22  discussions that led to the acquisition of CCMI? |

| Page 19 | Page 21 |
|---|---|
| 1     A.  Yes, my understanding is yes. | 1     A.  Not that I recall. |
| 2     Q.  And that investment ultimately turned | 2     Q.  Were you part of any due diligence |
| 3  out to be the SmartSource.com component of the | 3  team that evaluated CCMI as a potential |
| 4  IGroup. | 4  opportunity? |
| 5     A.  Yes. | 5     A.  No. |
| 6     Q.  And then there was another company | 6     Q.  Were you involved in any of the |
| 7  called SoftCard? | 7  discussions that led to the contract between CCMI |
| 8     A.  Yes. | 8  and News America Marketing? |
| 9     Q.  And that was an investment as well? | 9     A.  Not that I recall. |
| 10     A.  Yes. | 10     Q.  Other than your attorney or any |
| 11     Q.  And then there was, of course, CCMI, | 11  attorneys that work with Mr. Katz, have you had |
| 12  and those three entities comprised the IGroup. | 12  any conversations about the process that led to |
| 13     A.  To my knowledge, yes. | 13  the acquisition of CCMI that you can recall for |
| 14     Q.  And when you say there was a constant | 14  us? |
| 15  communication with the West Coast, you're talking | 15     A.  Not in any detail, no. |
| 16  about communications with the people at Planet U; | 16     Q.  Do you remember having any |
| 17  is that -- | 17  conversations with Mr. Carlucci about the |
| 18     A.  Yes.  And additionally, we had -- my | 18  acquisition? |
| 19  understanding, my recollection is, we had a | 19     A.  No. |
| 20  person that was kind of the liaison to that group | 20     Q.  Have you ever spoken to Mr. Carlucci |
| 21  named Talbott Roche, so I was contacting with her | 21  about this litigation? |
| 22  as well.  She was helping us. | 22     A.  Yes. |

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Page 22

1    Q.  When?
2        A.  In the hallway, just -- Gordon and I
3  just ran into him.
4    Q.  It was the three of you together?
5        MR. KATZ:  It was.
6    Q.  Have you spoken to anyone other than
7  Mr. Carlucci about the litigation?
8        A.  I'd say yes.
9    Q.  Are you married?
10       A.  Yes.
11   Q.  I'll exclude your wife.
12       A.  Okay.
13   Q.  With whom have you spoken about this
14 litigation other than Mr. Carlucci and Mr. Katz?
15       A.  Chris Mixson and, my recollection is,
16 Henry Lellouche.
17   Q.  Can you tell me when you spoke to
18 Mr. Mixson?
19       A.  I'd say probably two weeks ago.
20   Q.  How many conversations did you have
21 about the case?
22       A.  I believe it's a couple.

Page 23

1    Q.  Can you tell me in substance what you
2  discussed with Mr. Mixson?
3        MR. KATZ:  Just to advise, these are
4        conversations that I wasn't part of or
5        Jordan wasn't part of.  They would have to
6        be just you and Chris.
7        THE WITNESS:  Yes.
8        A.  Chris was having some scheduling -- I
9  think for two days in a row and we were trying to
10 figure out who can do which day.  So that was the
11 extent.
12   Q.  So it was really a scheduling issue,
13 you didn't talk about the case in any substance?
14       A.  Yes.
15   Q.  Mr. Lellouche, could you tell me
16 about your conversation or conversations with
17 him?
18       A.  Just the fact that he was deposed.
19 He reports to me now.  So he, again, would tell
20 me that he went to the deposition.
21   Q.  Did he say anything else?
22       A.  No, not that I can recall.

Page 24

1    Q.  Nothing sticks in your mind about
2  that discussion and what he said?
3        A.  The only thing that does stick in my
4  mind is, he said that Ann and Bob were present.
5    Q.  Okay.
6        A.  But that's it.
7    Q.  But nothing beyond that --
8        A.  No.
9    Q.  -- that's memorable to you.
10       A.  No.
11   Q.  We were talking about the
12 SmartSource.com start-up and I was asking
13 questions about the use of the sales force.
14       Did any other IGroup member -- by
15 that I mean CCMI and SoftCard -- have a sales
16 force?
17       A.  Yes.
18   Q.  Who?
19       A.  The SmartSource Direct had a sales
20 force as well.
21   Q.  Did you oversee that sales force?
22       A.  Not directly.

Page 25

1    Q.  Who did?
2        A.  I believe it was Henry Lellouche.
3    Q.  What was your job responsibility or
4  job responsibilities in terms of the SSDI sales
5  force?
6        A.  I believe it was, you know, broad
7  oversight of what was going on there.
8    Q.  How big was the sales force?
9        A.  Again, no specificity, but I think at
10 different times around the same size as the
11 dot-com.
12   Q.  Did the dot-com sales force also
13 market CCMI's sales force?
14       A.  Did the SmartSource dot-com
15 represent --
16       MR. KATZ:  Objection to form.
17       A.  I don't specifically recall that, no.
18   Q.  The only sales force that sold
19 SmartSource direct's products and services was
20 the sales force that Mr. Lellouche oversaw; is
21 that a correct statement?
22       MR. KATZ:  Objection.

7 (Pages 22 to 25)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
                              New York, NY

| Page 26 | Page 28 |
|---|---|

Page 26

1    A.  I would say yes, and that -- and the
2  same situation with -- set up with the core sales
3  force of the two hundred or so salespeople, when
4  possible, to open doors.
5    Q.  Could you describe that for me?  The
6  interaction, in other words, between the small
7  SmartSource Direct sales force and the national
8  sales force of News America Marketing.
9      MR. KATZ:  Objection.
10    A.  Okay.  If I can, and my memory serves
11  me well, in general, the way that we would go to
12  market is, we try to be as valuable as we can to
13  the companies that we call on.  So if we could
14  satisfy their needs in various areas, it's our
15  desire to do so.
16      So for instance, you know, one of my
17  previous jobs was heading up what we called the
18  partnership group, which was sports affinities
19  and cause-related marketing.  And we would put
20  together a sales piece so when the general sales
21  force were selling, they would get into a
22  discussion, "Oh, I would like to do something

Page 27

1  around the Superbowl or the World Series or the
2  All-Star game," they could pull out a one-page
3  sales sheet essentially and say, "Oh, this is our
4  capabilities in this area; if you're interested I
5  could set you up with a person from the
6  partnership team."  And my understanding is that
7  at this time, we developed and had similar
8  materials that the sales force would have for our
9  IGroup portfolio.
10    Q.  So there was some type of one-page or
11  two-page overview of what SmartSource Direct had
12  to offer that was provided to the national sales
13  force?
14    A.  That's my understanding, yes.
15    Q.  how would we describe that piece of
16  paper as between us in this deposition?
17    A.  A sales brochure.
18    Q.  Sales brochure.  Who developed the
19  sales brochure?
20    A.  Again, I don't recall the specifics
21  on who did this particular one.
22    Q.  Do you know that it happened in this

Page 28

1  case?  In other words, was there a SmartSource
2  Direct sales brochure that was provided to the
3  250 or so sales representatives?
4    A.  Yes, there was one.  And again, I'm
5  not sure on the exact timing of it, or who put it
6  together.
7    Q.  Let me ask this:
8      Was it during your time with the
9  IGroup?
10    A.  My understanding is yes.  My
11  recollection is yes.
12    Q.  Do you remember seeing it?
13    A.  I do remember vaguely seeing a piece
14  but, again, I don't have any specific
15  recollection of it.
16    Q.  Is it fair to say that the vast
17  majority of your attention was spent on
18  SmartSource.com?
19      MR. KATZ:  Objection.
20      You can answer.
21    A.  I would say the majority of my time
22  was yes, and then trying to develop other

Page 29

1  programs between the three different entities.  A
2  large part of the time was spent on a test that
3  we had done at Furrs that was a SoftCard product,
4  and that was a huge amount of time as well.
5    Q.  F-u-r-s?
6    A.  F-u-r-r-s, I believe.
7    Q.  And what was the test, can you
8  describe it for me?
9    A.  Sure.  It was a coupon machine in the
10  store that would distribute coupons specifically
11  for the shopper.
12    Q.  So by -- let me see if I understand
13  this conceptually.  SoftCard was intended to be
14  some type of intelligent card; in other words, a
15  card that could store data?
16    A.  Exactly.
17    Q.  And there were machines that were
18  intended to read that card and provide
19  customer-specific couponing that tracked buying
20  habits; is that a high-level description of what
21  you were trying to accomplish?
22    A.  That is a good description, yes.

8 (Pages 26 to 29)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

| Page 30 | Page 32 |
|---|---|

**Page 30**

1    Q.  And there was a test at Furrs?
2    A.  Yes.
3    Q.  Is that a store?
4    A.  Yes, it is.
5    Q.  How did it work?
6    A.  I don't think it worked too well.
7    Q.  Do you know what ultimately happened
8    to SoftCard, in other words, whether News America
9    Marketing ultimately went with the investment?
10    A.  I don't have any recall on what we
11    did with it.
12    Q.  It failed; is that --
13    A.  Yes.
14    Q.  -- a fair-enough statement?
15    A.  Yes.
16    Q.  There is no present use of SoftCard
17    within News America Marketing, is there?
18    A.  No.
19    Q.  And there's no present use of
20    SmartSource.com; is that true?
21    A.  SmartSource.com is an ongoing --
22    Q.  Is ongoing.  But the nexus between

**Page 31**

1    SmartSource.com and SoftCard, that never came
2    together; is that true?
3         MR. KATZ:  Objection.
4    A.  That is true, yes.
5    Q.  So your time as the EVP of sales at
6    the IGroup was taken up mostly with
7    SmartSource.com and putting together this test
8    for Furrs, is that true?
9         MR. KATZ:  Objection.
10    A.  My time?
11    Q.  Yes.
12    A.  Yes.
13    Q.  How much time did you spend on CCMI's
14    business or SmartSource Direct, as it was then
15    known?
16    A.  I think it varied greatly from week
17    to week.
18    Q.  Sometimes it was 40 hours a week?
19    A.  Um -- hum.  Conceivably.  I'm trying
20    to think back in those days and there was, you
21    know, heavy discussions in terms of what we were
22    trying to do in -- with the entire unit.

**Page 32**

1         So I can't recall if it was 40 hours,
2    but we were working many more hours than 40
3    during the week.  So it's conceivable that that
4    would be true.
5    Q.  But all the work that you were doing,
6    Mr. Garofalo, was to try to develop a business
7    that integrated SmartSource.com, SmartSource
8    Direct and SoftCard; is that true?
9    A.  At various times, yes.  We were
10    exploring that possibility.
11    Q.  Let me back up a little bit.  Were
12    you involved in the formation of the IGroup or
13    were you brought in after it already existed?
14    A.  I was brought in and told that they
15    were forming an IGroup and they would like me to
16    join.
17    Q.  Were you involved in any of the
18    discussions that led to the decision to form the
19    IGroup?
20    A.  No, not that I can recall.
21    Q.  Did anyone explain to you why the
22    IGroup was formed and, if so, who?

**Page 33**

1    A.  There was never any explicit purpose
2    given overall that I can recall.  No one sat me
3    down and said, "Here's what we're going to do and
4    this is why we're doing it."
5    Q.  Was CCMI ever viewed during your
6    tenure with the IGroup as a stand-alone entity
7    with its own products, apart from SoftCard and
8    apart from SmartSource.com?
9         MR. KATZ:  Objection.
10    A.  I would say yes.
11    Q.  So let me explore it another way.
12    Did the effort to develop the IGroup and to get
13    products that the IGroup sold, did that really
14    consume your attention or were you working
15    independently to sell these different things?
16         MR. KATZ:  Objection.
17    A.  I'd say both.  I think what we were
18    trying to do was make money from each of the
19    different entities as best we could while trying
20    to come up with an even bigger plan ultimately,
21    if that would work.
22    Q.  How did your time break down in

9  (Pages 30 to 33)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                July 17, 2007

New York, NY

---

Page 34

1    percentages between the different components of
2    the IGroup?
3        A. Again, it's hard to recall any given
4    week during that time period of that
5    year-and-a-half. I know we would schedule
6    business reviews with the entities that we had
7    acquired; we would set up sales meetings with
8    clients to do both exploratory and actually try
9    to make some sales, and then we had a lot of
10   internal meetings with the people we were hiring
11   and bringing on staff.
12       And I was helping out in both the
13   management and the key guy from being out in the
14   field, trying to sell the properties as well.
15       Q. What were CCMI's products?
16       A. Basically at that point, they had,
17   best of my recollection again is, the card
18   distribution, frequent shopper card distribution,
19   and data management entity.
20       Q. Did you evaluate those two aspects of
21   CCMI's business to determine how to market them?
22       A. What do you mean --

Page 35

1        MR. KATZ: Objection.
2        A. -- by did I evaluate them?
3        Q. Let's me take it in smaller steps.
4    In order to sell a product you have to know what
5    you're selling.
6        A. Exactly.
7        Q. In order to market a product, you
8    have to know how to market it and therefore, you
9    have to understand what all the moving pieces
10   are, what the components are.
11       A. Yes.
12       Q. And the two pieces that you've listed
13   for me at CCMI are card distribution and data
14   management. And those are the only two that you
15   can recall right now?
16       A. Yes.
17       Q. As your, or in your role as the EVP
18   of sales, did you evaluate the card distribution
19   component of CCMI's business so that you could
20   learn enough about it so that you could sell it?
21       A. Yes.
22       Q. Market it?

Page 36

1        A. Yes.
2        Q. Can you tell me what you did to learn
3    about CCMI's card distribution business.
4        A. Again, I recall going with others
5    from the team that assembled early on and to
6    meet, from my first recollection, up to Boston
7    for -- to the CCMI offices at the time where we
8    were kind of given a tutorial about what the
9    programs were, who did what, what kind of
10   applications in the marketplace they had
11   endeavored to do at that point, and then it was
12   an ongoing process from there.
13       Most of that was done by the
14   individual who headed that unit up at the time,
15   and not by myself.
16       Q. Who was that?
17       A. Henry Lellouche.
18       Q. So you would agree that in order to
19   sell the card distribution aspect of CCMI, the
20   sales force would have to learn about it,
21   correct?
22       A. Um-hum.

Page 37

1        Q. Yes?
2        A. Yes.
3        Q. Mr. Lellouche would have to learn
4    about it.
5        A. Yes.
6        Q. But it wasn't your expectation that
7    either Mr. Lellouche or the sales force would
8    develop expertise that were superior to Ann
9    Raider and Bob Fireman's expertise in card
10   distribution; is that correct?
11       A. Not initially no.
12       Q. Pardon?
13       A. Not initially
14           MR. KATZ: Objection.
15           You can answer.
16       A. Not initially, no.
17       Q. Let me see if I can answer your "no."
18   You didn't expect the sales force and you didn't
19   expect Mr. Lellouche to know more about card
20   distribution than Ann Raider and Bob Fireman?
21       A. Not initially, no.
22       Q. You expected them to learn more about

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
New York, NY

---

Page 38

1  card distribution as time went by?
2      A.  Yes.
3      Q.  And that eventually they would have
4  equal or superior knowledge about card
5  distribution to Ann Raider and Bob Fireman; is
6  that your expectation?
7      A.  I think that is --
8      Q.  If not your expectation, your hope.
9      A.  Yes.
10     Q.  That's what you say.  And in order to
11 learn about card distribution, other than
12 speaking with Ann Raider and Bob Fireman, do you
13 know if you or Mr. Lellouche did anything other
14 than that?
15     A.  I think speaking to the -- various
16 clients, and that was the other way of being
17 educated, I think.
18     Q.  Those two ways, speak with Bob and
19 Ann, and speak with clients?
20     A.  Yes.
21     Q.  Any other ways that you brought
22 yourself up to speed sufficiently to be able to

Page 39

1  market that aspect of CCMI's business?
2      A.  There were other people that were
3  willing to give advice, I remember, back then,
4  and trying to figure out, you know, who actually
5  was credible.  But there was other people we were
6  we were speaking to as well.
7      Q.  Can you tell me who?
8      A.  One was Seth Epstein, and then a lot
9  of people that -- of the other entities we had
10 acquired were offering a lot of advice, I
11 remember, at the time as well.
12     Q.  People from SoftCard, people from
13 SmartSource.com?
14     A.  Yes.
15     Q.  They had expertise in card marketing?
16     A.  Supposedly.  Some people said they
17 did.
18     Q.  Who?
19     A.  One particular individual is Tom
20 Hinse, and Ken Powell, are the two that I recall.
21     Q.  Did they have expertise in card
22 marketing?

Page 40

1      A.  It's hard to evaluate.  I'd probably
2  say no.
3      Q.  Did Seth Epstein?
4      A.  I'd say, looking back, no.
5      Q.  So who within News America Marketing
6  other than Ann Raider and Bob Fireman had
7  expertise in card distribution and card
8  marketing?
9      A.  At the time of the acquisition, it
10 would be those two individuals you just
11 mentioned.
12     Q.  Did anyone during your
13 year-and-a-half with the IGroup develop expertise
14 in card marketing other than Ann Raider and Bob
15 Fireman?
16     A.  I think the answer is yes.
17     Q.  Who would that person be, or people
18 be?
19     A.  To an extent, myself and definitely
20 Henry, would be my thinking.
21         MR. KATZ:  Ken, could we take a break
22     when you have --

Page 41

1         MR. PETERS:  Let me just chase this
2     down just a little bit.
3      Q.  In the year-and-a-half that you were
4  the EVP of sales at the IGroup, you believe that
5  Henry Lellouche became an expert in card
6  distribution?
7      A.  Yes.
8      Q.  Do you believe his expertise were
9  superior to Ann Raider and Bob Fireman's?
10     A.  I think different skillsets in terms
11 of how to try to sell the proposition.
12     Q.  What about yourself, do you know in
13 the year-and-a-half that you developed expertise
14 that were superior to Ann Raider and Bob
15 Fireman's in this one segment of CCMI's business,
16 card distribution?
17     A.  I'd say no.
18     Q.  You mentioned when we were talking
19 about SmartSource.com, that there was constant
20 discussion with California; in other words, the
21 people that were from Planet U, so that you could
22 understand Planet U's business, is that correct?

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

---

Page 42

1    A. Yes.
2    Q. And that's a prudent business
3  practice, isn't it, to make sure that you keep
4  the lines of communication open with people who
5  are expert in their field?
6    A. Yes.
7    Q. The same would go here; to the extent
8  Ann Raider and Bob Fireman had expertise in card
9  distribution and card marketing, they should have
10 been consulted?
11   MR. KATZ: Objection.
12   A. Yes.
13   Q. Did anyone in the year-and-a-half
14 that you were with the IGroup develop expertise
15 in all aspects of card distribution other than
16 Ann Raider and Bob Fireman?
17   MR. KATZ: I'm sorry, what --
18   MR. PETERS: Other than -- let me
19   back up.
20   MR. KATZ: Okay.
21   Q. In the year-and-a-half that you were
22 the EVP of sales for the IGroup, did anyone

---

Page 43

1  within News America Marketing or the IGroup
2  develop card distribution expertise that were
3  superior to Ann Raider's and Bob Fireman's?
4    A. Again, it's hard to tell who had
5  superior, you know, knowledge. But the intention
6  was to develop a sales force under Henry that
7  would be able to sell that proposition in the
8  marketplace. You know, working with Ann and Bob.
9    Q. Are you satisfied that that sales
10 force was ever developed?
11   A. To the extent that it was operating
12 and trying to make business happen, yes.
13   Q. Was it a sales force that you were
14 satisfied with by the time you left the IGroup?
15   A. I think, yes, the sales force was
16 adequate.
17   Q. There was nothing about the sales
18 force that you found lacking or wanting by the
19 time you left the IGroup, is that a fair
20 statement?
21   MR. KATZ: Objection.
22   A. I think we were always looking to get

---

Page 44

1  the best salespeople in there and across the
2  board in my experience, but they were the people
3  that were hired by the group, yes.
4    Q. Were the 250 or so person sales force
5  directed to sale CCMI's products?
6    A. I'm trying to think if, back at that
7  time, what programs we had to sell. And to the
8  extent that we had programs to sell, I really
9  can't recall at that time because it morphed into
10 other things at different times.
11   Q. When CCMI was acquired, it had
12 salable products, correct?
13   A. Yes.
14   Q. Was the sales force directed to sell
15 those products during your tenure?
16   A. Yes.
17   Q. The whole 250 or so?
18   A. Again, I don't recall. I wasn't
19 involved with that selling piece of it. But yes.
20   Q. Well -- I'm sorry, sir, go ahead.
21   A. No, and again, I'm trying to get my
22 chronology right. I'm going back to my timing

---

Page 45

1  after I left the IGroup and I had people that
2  sold for me and I know that they were directed to
3  assist in the sale of those products. So in
4  terms of the -- my recollection of who was
5  responsible for selling those then, I don't have
6  an exact recollection.
7    Q. You don't know, in other words,
8  whether or not in the first year-and-a-half, the
9  sales force, the large national sales force, was
10 directed to sell the CCMI products; is that a
11 fair statement?
12   A. Again, not with perfect recall, no.
13   MR. PETERS: You want to take a short
14   break, Gordon?
15   (Recess taken.)
16   MR. KATZ: Are we on the record?
17   THE WITNESS: One thing I did want to
18   mention here, you were talking about
19   expertise, and the more I think about it,
20   is that Chris Mixson, who, I don't know if
21   you know Chris, he's the --
22   MR. PETERS: No.

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Page 46

1        THE WITNESS: -- you're going to meet
2    him anyway, but Chris I think was with the
3    entity that first launched a frequent
4    shopper card program through Citibank.  So
5    Chris knew an awful lot about it as well.
6    EXAMINATION (Cont'd.)
7    BY MR. PETERS:
8        Q.  He didn't come to mind prior to the
9    break, he's just coming to mind now after a cup
10   of coffee?
11       A.  Yes.  I mean, it should have come
12   into mind, obviously.
13       Q.  What was his role with Citibank in
14   terms of card marketing?
15       A.  I don't recall exactly what he was
16   doing, but he was involved, as he tells the
17   story, when they first initiated their card
18   program, reward card.
19       Q.  Was this a card used to track
20   purchasing habits so that loyalty programs could
21   be established?
22       A.  That's my understanding, yes.

Page 47

1        Q.  And therefore, was Mr. Mixson a
2    resource in running SmartSource Direct?
3        A.  I believe so, yes.
4        Q.  Was he a resource to you --
5        A.  Yes --
6        Q.  -- about SmartSource Direct products
7    and how to market them?
8        A.  Again, I worked for Chris at the
9    time, so he was a definite resource.
10       Q.  Did you remember consulting with
11   Mr. Mixson to try to evaluate the best way to
12   sell CCMI's products and services?
13       A.  Yes.
14       Q.  How frequently did you do that?
15       A.  It was during that year-and-a-half,
16   constant, you know, we would take the train in
17   the morning together, come home together, travel
18   together.  Unfortunately vacation together.  So
19   it was a large part of our discussion, was
20   talking about the, how we were going to try to
21   get the entity up and running.
22       Q.  And the entity is the IGroup?

Page 48

1        A.  Yes.
2        Q.  Did you and Mr. Mixson discuss how to
3    sell CCMI's products apart from the products you
4    were trying to collectively develop for the
5    IGroup?
6        A.  Yes.  My recollection is, we were
7    trying to make money for each of the individual
8    products that we had at the time.
9        Q.  I take it you and Mr. Mixson and your
10   families are friendly?
11       A.  Yes.
12       Q.  You mentioned you vacation together.
13   So you spent a lot of time together?
14       A.  Yes.
15       Q.  But prior to the break, he's not
16   someone that came to mind as an expert in card
17   marketing?
18       A.  No.  The way you're asking the
19   question, I think, it was focused on Ann and Bob
20   and then people who would be reporting to me.  I
21   wasn't thinking --
22       Q.  As between Mr. Fireman and

Page 49

1    Mr. Mixson, who would you rank first in knowledge
2    about card distribution and card marketing?
3        A.  I never thought about ranking them
4    prior to this -- this minute.  So -- in my mind,
5    probably equal.  I really don't know.
6        Q.  That's --
7        A.  I think their experiences are a
8    little different, but --
9        Q.  How were they different?  What did
10   Citibank do that CCMI didn't, and vice versa?
11       A.  Again, I think you'd have to talk to
12   an expert about that, you know.  I don't know --
13       Q.  Well --
14       A.  -- exactly.
15       Q.  -- well, you told me that you were an
16   expert after the end of a year-and-a-half, or at
17   least you had developed some expertise, is that
18   correct?
19       A.  Yes, I think that is true.
20       Q.  So relying on those expertise, can
21   you recall back and tell me what Citibank did
22   that CCMI did and vice-versa if you have a

13 (Pages 46 to 49)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

---

Page 50

1  memory?
2      A.  Again, my recollection is that I
3  don't have any knowledge of, you know, I have
4  broad knowledge but no specific knowledge about
5  the card program but, you know, I --
6      Q.  The card program at Citibank, you
7  mean?
8      A.  Yes.
9      Q.  So you didn't, you and Mr. Mixson
10 didn't talk about what he had done for Citibank
11 so that you could draw on his experience?
12     A.  No, we did talk about it.  But again,
13 my recall in specifics on that, I wouldn't be
14 able to recall that.
15     Q.  But your understanding is that
16 Citibank developed a program where they tracked
17 purchase behavior?
18     A.  Yes.
19     Q.  And then did direct targeted
20 marketing, is that correct?
21     A.  Reward programs, yes.
22     Q.  And Mr. Mixson was someone who had

---

Page 51

1  worked on that program?
2      A.  Yes.
3      Q.  But you don't recall specifically
4  what his role was?
5      A.  Again, my recollection, he was the
6  head sales guy for that.
7      Q.  We were talking about CCMI's
8  products.  We had been through card distribution,
9  using your categories now.  The second category
10 you gave me, data management, what did you mean
11 by data management?  What did CCMI do to manage
12 data?
13     A.  After the purchases were made by a
14 consumer, then they'd have a repository of that
15 information and then would be able to target back
16 information about those individuals who made
17 those purchases.
18     Q.  And CCMI had that capability?
19     A.  It -- my understanding was yes, they
20 did.
21     Q.  Did you look into what that
22 capability involved?  How robust it was, for

---

Page 52

1  instance?
2      A.  I know we were trying to expand it.
3  So I think it was -- it was not as robust as it
4  could have been.
5      Q.  Well, was anything ever -- I mean,
6  your goal was to improve, right?
7      A.  That is exactly right.
8      Q.  When you acquired, or News America
9  Marketing acquired the company, it understood,
10 you understood that CCMI had data management
11 capability.
12     A.  Yes.
13     Q.  And that they had been selling that
14 capability in the marketplace.
15     A.  Yes.
16        MR. KATZ:  Objection.
17     Q.  And you evaluated CCMI's customer
18 base for that service, correct?
19     A.  As an organization, yes.
20     Q.  And your goal, as the EVP of sales,
21 among others, was to, you will tell me, maintain
22 that customer base?

---

Page 53

1      A.  And try to expand it, I believe.
2      Q.  So therefore you have to know about
3  CCMI's data management capabilities with some
4  precision in order to market, correct?
5      A.  Yes.
6      Q.  What did you do to learn about that?
7      A.  Again, constant discussion with the
8  team.  Mostly Henry, and obviously had meetings
9  with Bob at the time as well.  And then in
10 talking to clients in terms of what their needs
11 were.  Most of the grocery entities.
12     Q.  Was CCMI's system a legacy system?
13        MR. KATZ:  Objection.
14     A.  Meaning what?
15     Q.  In other words, was it an
16 off-the-shelf product?  Their application used to
17 manage data, was it an off-the-shelf product?
18     A.  I really don't know that.
19     Q.  Do you know the name of the product
20 that was used to manage data?
21     A.  I'd be speculating.  I may know it.
22        MR. KATZ:  If you don't remember it,

---

14 (Pages 50 to 53)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

---

Page 54

1    it's perfectly fine to say that.
2       A. Okay, sorry.
3       Q. Well, I'll save your lawyer, you
4   know, all sorts of time making his statement. I
5   don't want you to speculate. I want you to tell
6   me what you know.
7       A. Yeah.
8       Q. That's the oath.
9       A. Okay. Yes.
10      Q. You're under oath and --
11      A. Yeah. Okay. No, I --
12      Q. The truth is what you know.
13      A. I appreciate that, thank you.
14      Q. So he doesn't have to tell you that.
15  I just did.
16      A. Okay.
17      Q. You don't remember the name of the
18  system used or the application used to manage
19  data?
20      A. No.
21      Q. Do you remember what you did to learn
22  about the application used to manage data?

---

Page 55

1       A. Yeah. As I've described, when we
2   first met with the individuals who were running
3   the company prior to the purchase, we went in and
4   spoke to them and various other people to learn
5   about the --
6       Q. So you spoke with Ann Raider and Bob
7   Fireman?
8       A. Yes.
9       Q. And did you speak with anyone else?
10  I'll give a name. Bill Adam?
11      A. Yes. And we did speak to Bill as
12  well, obviously.
13      Q. How much time did it take you to
14  learn enough about CCMI's data management
15  capabilities so that you were able to effectively
16  market it?
17          MR. KATZ: Objection.
18      A. Again, I think it was ongoing and my
19  role was more on the, again, the selling side and
20  others in the organization were responsible for,
21  you know, continuing to develop that application.
22      Q. All right. But again, you'd agree

---

Page 56

1   with me that in order to sell it, you need to
2   understand what the capabilities are.
3       A. Yes.
4       Q. And so my question to you is, how
5   much time did you take to learn the capabilities
6   so that you could talk intelligently about the
7   product?
8       A. I'd say over the year-and-a-half, it
9   was constant. I'd be, you know, either talking
10  to somebody internally or externally and if I
11  needed information, I'd make the call to the
12  appropriate person. And sometimes, they would
13  come on a call with us.
14      Q. Did Bob Fireman have expertise about
15  CCMI's data management system?
16          MR. KATZ: Objection.
17      A. I believe he did.
18      Q. Did Ann Raider?
19          MR. KATZ: Objection.
20      A. I think less so.
21      Q. But as between them, Bob Fireman had
22  more knowledge about CCMI's data management

---

Page 57

1   system, is that fair?
2          MR. KATZ: Objection.
3       A. My belief would be yes.
4       Q. Did you consider Mr. Fireman a
5   resource to learn about CCMI's data management
6   application sufficient to talk productively about
7   it in your marketing efforts?
8       A. Again, I think that that area, if I
9   remember the organizational chart, was mostly
10  through Henry. But I did speak to Bob on an
11  ongoing basis, yes.
12      Q. Would you agree with me that Bob
13  Fireman was a necessary resource to learn about
14  that application?
15          MR. KATZ: Objection.
16      Q. And that capability?
17      A. I think depending on the
18  circumstances and at different times, different
19  aspects, yes.
20      Q. Well, let me explore the qualifiers.
21  You mentioned at different times, Mr. Fireman was
22  a necessary resource to learn about the data

---

15  (Pages 54 to 57)

85d36eb8-9df6-4476-b435-8ed61512af8b

---

**Page 58**

1    management application and capabilities.
2        What times?
3        A.  Especially initially, when we were
4    just acquiring -- we had acquired the company.
5    In fact, well, I should say, when my involvement
6    started, there was a lot of time being spent and
7    we would go to Bob for the -- for the answers on,
8    you know, what the system does, what we hope it
9    can do, what the application is in the
10   marketplace.
11       Q.  Did there ever come a time when Bob
12   Fireman was, in your opinion, superfluous to your
13   effort to learn about the data management
14   capabilities of CCMI?
15       A.  One more time?  I'm sorry.
16       Q.  Did there come a time when, in your
17   view, when Bob Fireman became superfluous to your
18   necessary effort to learn about CCMI's data
19   management capabilities?
20       A.  To me personally?
21       Q.  To you personally.
22       MR. KATZ:  Objection.

---

**Page 59**

1        A.  I really can't recall.  And the
2    reason is, he was in and out over his continuum
3    with the company and I didn't have management
4    responsibilities or -- during different times.
5    So I, you know, to me, though, I would ask Bob
6    questions if I thought he could provide an
7    answer, obviously.
8        Q.  Did there come a time when you
9    determined that Bob Fireman was not a valuable
10   resource to News America Marketing?
11       MR. KATZ:  In general?
12       MR. PETERS:  Yes.
13       A.  Yeah, I think toward the end of his
14   employment, I think that was the understanding,
15   yes.
16       Q.  That was sometime in 2004?
17       MR. KATZ:  Objection.
18       A.  Is that the year that he left, 2004?
19       Q.  I'm asking you when.  Maybe I'll ask
20   in a non-leading way.  When did it occur to you
21   that Bob Fireman was no longer, in your view, a
22   valuable resource to the IGroup?

---

**Page 60**

1        A.  I think for the last, and again, I
2    don't have specific dates, the last year or so of
3    his involvement with the company, there wasn't a
4    lot of productivity from his area.
5        Q.  Well, we'll explore that as we get
6    deeper into the deposition.  Back to the issue of
7    data management.
8        Was it your expectation that Henry
9    Lellouche would learn about CCMI's data
10   management capabilities and develop an expertise
11   in that?
12       A.  Yes.
13       Q.  Did he?
14       A.  I believe he did, yes.
15       Q.  Was that something you required of
16   him, to become an expert in CCMI's data
17   management capabilities?
18       A.  Yeah.  I can't -- at that point in
19   time, I can't say that I required it because he
20   didn't report to me.  My understanding, he
21   reported to Chris.  But I think for the
22   organization to benefit, that was the overall

---

**Page 61**

1    belief, yes.
2        Q.  And in order to do that, you
3    obviously had to consult with Bob Fireman,
4    correct?
5        MR. KATZ:  Objection.
6        A.  On certain aspects of the business,
7    yes.
8        Q.  Do you have in mind what aspects of
9    the business those would be?
10       A.  I think some of the technical things
11   about how the system was running, or he would go
12   to Bill or he would go to Chris, you know, those
13   guys, to try to further his knowledge, yes.
14       Q.  Did you ever do any investigation
15   into the market for CCMI's products and services?
16       A.  No, not specifically that I can
17   recall.
18       Q.  No market research, for example?
19       A.  Not that I can recall.
20       Q.  Did you see any reports, for example,
21   a study done by Coca-Cola in customer
22   relationship marketing?  Did you ever see that or

16  (Pages 58 to 61)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007

New York, NY

Page 62

1    any like data?
2        A.  I don't -- I don't recall.
3        Q.  Did you task anyone with the job of
4    looking into the scope, size and nature of the
5    market for the products that CCMI had available
6    for sale?
7        A.  Not specifically that I can recall.
8        Q.  Do you remember anything in that
9    regard, doing anything like that?
10           MR. KATZ:  Objection.
11       A.  I remember doing a lot of of reading
12   at the time trying to, you know, learn more about
13   the business myself, obviously.  And we had a
14   couple of competitors and we were looking at
15   their business as well.
16       Q.  Catalina?
17       A.  Catalina is one that I was thinking
18   of, yes.
19       Q.  And what have you reviewed in terms
20   of Catalina's business, just to sort of inform of
21   you what the market was?
22       A.  Yeah, again, just -- I don't recall

Page 63

1    specifically.  I just know that I was looking
2    into the information.  But I don't recall if it
3    was annual reports or publications or Internet
4    stuff.  I just don't recall.
5        Q.  Did you do any evaluation of where
6    the market was heading?
7            MR. KATZ:  Objection.
8        A.  Again, not that I can recall in terms
9    of specific numbers of -- metrics we wanted to
10   grow to, no.
11       Q.  Did you have an expectation that the
12   market for loyalty programs was going to grow in
13   the five years following the acquisition of CCMI?
14           MR. KATZ:  Did he personally?
15           MR. PETERS:  Yes.
16       A.  Again, sitting here now, I can't
17   recall.  I'm sure at the time I might have had
18   expectations, yes.
19       Q.  Do you recall expecting programs in
20   stored value -- let me ask a more basic question.
21   Do you understand what stored value is in terms
22   of cards?

Page 64

1        A.  I believe so, yes.
2        Q.  Like gift cards and other types of
3    stored value.
4        A.  Yes.
5        Q.  Was that something that CCMI had the
6    capability to deliver?
7            MR. KATZ:  Objection.
8        A.  I believe we were trying to develop
9    that, yes.
10       Q.  Did you expect the market for stored
11   value to grow when you were an EVP of sales for
12   the IGroup?
13       A.  Again, I can't recall exactly what my
14   expectations were then.
15       Q.  Were there any business plans
16   developed by you or people on your team to
17   predict the market for loyalty programs?
18       A.  I -- I can't recall.
19       Q.  Same question for stored value.
20       A.  I'm trying to think.  Um -- again,
21   that would be a different branch reporting to
22   Henry.  So I can't recall.

Page 65

1        Q.  Did you know how big CCMI's market
2    was or market share was in card programs at the
3    time it was acquired?
4        A.  I do not.
5        Q.  Did you ever hear or learn that it
6    had at least a thirty percent market share?
7        A.  I don't recall that number, no.
8        Q.  Did News America Marketing have any
9    expertise in targeted marketing prior to
10   acquiring CCMI?
11       A.  Um -- and the other entities as well?
12   No.
13       Q.  Okay.
14       A.  The targeting I mentioned -- to be
15   more specific, the targeting in an FSI is
16   obviously self-targeted, so if you -- but in
17   terms of stored value or in terms of loyalty
18   cards, that's a whole different type, yes.
19       Q.  And News America had no experience in
20   that area of marketing --
21           MR. KATZ:  Objection.
22       Q.  -- at the time it acquired CCMI,

17 (Pages 62 to 65)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
New York, NY

Page 66

1  right?
2       A.  I'd say again, I wouldn't be able to
3  answer that fully in that there's an acquisition
4  team that had done that.  I know that Chris, as
5  we discussed, had a lot of understanding of that
6  business, and again, I can't speak to the other
7  people who were involved with the team and their
8  expertise, but I think that there was a good
9  understanding of it from that team, which is why
10 they made the purchase, but...
11      Q.  But that the not something that News
12 America Marketing was doing.  They weren't, for
13 example, doing any loyalty programs using
14 information developed at the point of sale.
15      A.  Yes, you're right.
16      Q.  And they weren't doing any stored
17 value.
18      A.  That is also right.
19      Q.  Do you know when the plan to roll
20 together these three entities, CCMI, SoftCard and
21 Planet U, came about?
22      A.  Can you just repeat that?

Page 67

1       Q.  Sure.  The plan to role together
2  CCMI, SoftCard and Planet U into the IGroup as it
3  was then known, do you know when that came about?
4       A.  I do not.
5       Q.  Do you know if it was prior to the
6  acquisition?
7       A.  I don't -- I don't know.
8          MR. PETERS:  Mark this, please, as
9  Exhibit 39.
10         (Plaintiff Exhibit (Garofalo) 39,
11         presentation entitled, "SmartSource, a
12         View of the Future, Two Paces Ahead",
13         marked for identification, as of this
14         date.)
15      Q.  Mr. Garofalo, we've marked as
16 Exhibit 39 a document that's titled,
17 "SmartSource, a View of the Future, Two Paces
18 Ahead."
19         Have you seen this document before?
20 Take a look at it and take your time.
21         (Witness perusing document.)
22      A.  The question is, have you seen this

Page 68

1  before?
2       Q.  Right.
3       A.  And I don't recall seeing this.  It
4  looks familiar.
5       Q.  Do you recall seeing PowerPoints at
6  around the time you started that described CCMI's
7  business?
8          MR. KATZ:  Started at the IGroup?
9          MR. PETERS:  Yes.
10      A.  I don't recall seeing a PowerPoint.
11      Q.  Do you have any present memory of
12 what you looked at to --
13      A.  I don't --
14      Q.  -- let me just get the question out,
15 it's fine.  Do you have any present memory of
16 what you looked at to inform you about what
17 CCMI's products were?
18      A.  Yeah, I'm thinking back to -- to the
19 first recollection I have of when we first met
20 with those guys, but I can't remember what the
21 presentation format was, if -- you know, I
22 don't -- I just don't recall.

Page 69

1       Q.  Would you flip to the page that is
2  three from the end.
3       A.  Three from the end, yes.
4       Q.  It says, "CCMI full Service Database
5  Marketing Services"?
6       A.  Right.
7       Q.  As you looked at those products and
8  services, program implementation, data management
9  and data marketing, is that consistent with your
10 memory of what CCMI had to offer?
11         MR. KATZ:  Any particular point in
12         time?
13         MR. PETERS:  During the
14         year-and-a-half that he was executive vice
15         president of sales for the IGroup.
16      A.  Yeah, again, this is consistent with
17 my recollection, but this looks new to me.  I
18 don't recall seeing this piece.
19      Q.  I'm more interested in learning if
20 the substance of the document, specifically this
21 page, is consistent with what you recall CCMI had
22 for products and services.

18  (Pages 66 to 69)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
                        New York, NY

| Page 70 | Page 72 |
|---|---|

**Page 70**

1    A.  Yeah, and again, my recall is -- I
2  don't recall seeing this.  But, you know, I --
3    Q.  We're talking past each other, and
4  I'm going to take the blame.  I know you don't
5  recall seeing this.  I'm not asking that.
6    A.  Okay.
7    Q.  I'm asking you to look at it now as
8  though it was given to you to for the first time
9  ever, and read it and tell me if the information
10  contained on this page reflects or is consistent
11  with your memory of CCMI's business during the
12  time you were the EVP of sales for the IGroup.
13    A.  Okay.  All right, thank you.
14      (Witness perusing document.)
15    A.  Yeah, I think portions of this, yes.
16  And other parts, I don't remember as well.
17    Q.  I'm going to tick them off on mine.
18  Tell me what you recall that CCMI had to offer in
19  items of products and services.  Go down the
20  boxes.
21    A.  Sure.  Under the program
22  implementation, the application processing, I

**Page 71**

1  remember that's something that we did.  Card
2  design and issuance production is something that
3  we, you know, sourced for our clients and
4  certainly, replenishment.  The software licensing
5  doesn't ring a bell.  The data warehousing does.
6  The data warehousing outsourcing, I'm not
7  familiar with that, you know, as I sit here.  And
8  the data marketing.  The retail promotion
9  programs rings a bell.  And that would be it.
10      But in general, it's an
11  understanding, yes, that this is -- this is what
12  the opportunity was.
13    Q.  So the page that we're looking at now
14  on Exhibit 39, you have to reason to doubt that
15  this reflects the products and services that CCMI
16  had available at the time News America Marketing
17  acquired it; is that correct?
18    A.  That is correct.
19    Q.  But of the twelve listed, you have a
20  memory of four of them, or five of them.
21    A.  Yes.  Specifically, yes.
22    Q.  So the other products and services,

**Page 72**

1  although you don't doubt that CCMI had them, you
2  don't -- you can't speak to them.  You don't know
3  about them.
4    A.  Right.  I'd have a hard time
5  explaining them.  Fulfillment, for instance.  I
6  could speculate but I wouldn't know what that
7  would -- as I sit here today, I can't recall
8  that.
9    Q.  Are there products and services that
10  CCMI had to offer that you know of that are not
11  reflected on this page of Exhibit 39?
12    A.  No.
13    Q.  Can you tell me whether there are
14  aspects of the business perhaps reflected on this
15  page of Exhibit 39 that News America Marketing
16  decided to abandon?
17    A.  At what point in time?
18    Q.  Well, during your year-and-a-half as
19  the EVP.  We'll start there.
20    A.  Um -- I think right -- oh, just that
21  time period?  Did we decide to abandon?  Of the
22  ones, again, that I can recall, no.

**Page 73**

1    Q.  At any point, did News America
2  Marketing decide to abandon any of the services
3  and products that CCMI had available for sale?
4      MR. KATZ:  Objection.
5    A.  I'd say yes.
6    Q.  Which ones?
7    A.  Well, we still do some, on a periodic
8  basis, card fulfillment.  But over the course of
9  time, again, my understanding is that there could
10  be retailers who use the cards, source them
11  themselves, and the data hosting, the same thing,
12  kind of went the same way, that the retailers
13  much -- did not want to outsource their
14  databases.
15      So I think over time, you know, we've
16  pulled away from these programs.
17    Q.  Which ones, the five that you listed?
18    A.  What were the -- the application
19  process -- yeah, I don't think we do any of this
20  right now.
21    Q.  You don't --
22      MR. KATZ:  You have to identify what

19 (Pages 70 to 73)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                          July 17, 2007
New York, NY

| Page 74 |
|---|

1        you're pointing to.
2        A. I'm sorry, the application process, I
3  don't think we're doing any of that right now, to
4  my knowledge.
5        Q. Let me stop you there. We'll go
6  through them one at a time.
7        A. Okay.
8        Q. The application processing was
9  something that was done during your tenure with
10 the IGroup?
11       A. Yes.
12       Q. But that has since been abandoned?
13          MR. KATZ: If you know.
14       A. I believe it has been, yes.
15       Q. And can you tell me when?
16       A. I don't -- I don't -- I can't recall
17 any specific dates on that.
18       Q. Can you tell me why, if you know?
19       A. I just don't think there was any
20 business coming to us from that opportunity any
21 longer.
22       Q. Is it something that you marketed

| Page 75 |
|---|

1  during your year-and-a-half at the IGroup?
2        A. Yes.
3        Q. Who had expertise in application
4  processing on your -- in other words, who was an
5  available resource from a personnel perspective?
6        A. My understanding that I would go to
7  Henry on that. Henry would be the person if I
8  had a question on it.
9        Q. Did Henry have a background in
10 application processing?
11       A. Um --
12          MR. KATZ: At what point in time?
13       A. Yeah -- um -- that was a good
14 question.
15       Q. Did Henry have a background in
16 application processing when he took over as head
17 of the -- let's get some context here for your
18 benefit and for mine.
19       A. Okay.
20       Q. What was Henry's position within the
21 IGroup?
22       A. He was the head of SmartSource

| Page 76 |
|---|

1  Direct, is my understanding, over the time that
2  we had the group formed.
3        Q. You recall that he was the general
4  manager of SmartSource Direct?
5        A. Now that you've said those words,
6  I -- he was the business leader of that group,
7  yes.
8        Q. And when he became the general
9  manager of SmartSource Direct, did he have any
10 experience in application processing?
11       A. Again, I don't know for sure if he
12 did or didn't.
13       Q. And then Henry reported to you as the
14 head of the IGroup, I take it?
15       A. He reported to Chris directly.
16       Q. To Chris, directly?
17       A. He reported to Chris, I think for
18 that entire time period, yes.
19       Q. Card designing, production and
20 issuance, that's --
21       A. Yes.
22       Q. -- a program that CCMI sold but that

| Page 77 |
|---|

1  News America Marketing no longer sells; is that
2  correct?
3        A. Um -- I think between these two,
4  which is replenishment and card design, we do on
5  a very sporadic basis. I don't believe we're
6  selling it, and again Henry would know.
7        Q. Do you know why?
8        A. Again, I don't think we were able to
9  generate sales in that area. The retailers
10 themselves were sourcing the cards for a better
11 price than we could offer it. That's my
12 understanding.
13       Q. Were you involved in the decision to
14 abandon those lines?
15       A. I think -- yes, I think I was.
16       Q. What was your role?
17       A. I think, again, my recollection is,
18 over a period of time, Henry came in and said,
19 "You know, we're not able to make money in this
20 area," and a decision was made to focus on
21 this -- the other areas of this opportunity that
22 we could make money on.

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
New York, NY

| Page 78 |
| --- |

1    Q.  What areas?
2    A.  Using the card information from the
3  retailers to do direct-mail programs.
4    Q.  Where does that appear on our
5  Exhibit 39?
6    A.  Okay.  I guess it would be right here
7  (indicating).
8        MR. KATZ:  You have to identify --
9    A.  I'm sorry, "Retailer promotion
10 programs."
11   Q.  Well, we'll get to that, thank you,
12 we'll get to that in a moment.
13       So when did News America Marketing
14 abandon card design, production and issuance and
15 replenishment?
16   A.  I really don't recall.  It was over a
17 continuing time of trying to sell it.  I believe
18 for the time we were talking about, the 18 months
19 we were actively selling that.
20   Q.  So in order to sell it, you had to
21 learn about the businesses, right?
22   A.  Yes.

| Page 79 |
| --- |

1    Q.  And you learned about the businesses
2  from Henry Lellouche?
3        MR. KATZ:  Objection.
4    A.  I think the whole group was kind of
5  learning together, you know, and -- yeah.
6    Q.  And Ann Raider and Bob Fireman were
7  indispensable assets in learning the business
8  sufficiently to sell the products, correct?
9        MR. KATZ:  Objection.
10   A.  Again, they were sources but not the
11 only sources for that.
12   Q.  Sources that couldn't be ignored.
13 Sources that you had to pay attention to in order
14 to learn CCMI's business, correct?
15       MR. KATZ:  Objection.
16   A.  Well, I think especially early on,
17 that's the way we set it up, yes.  I mean --
18 that's not the way we set it up.  That was the
19 understanding, we would go and get information
20 from those two.
21   Q.  Data warehousing and design is one of
22 the areas that you recall CCMI selling.  Does

| Page 80 |
| --- |

1  News America Marketing currently do data
2  warehouse design?
3    A.  No.  Not...
4    Q.  When did News America Marketing
5  abandon data warehouse design?
6    A.  Again, I don't recall exactly when
7  there was a decision to exit that business.
8    Q.  Was it during your 18-month tenure?
9    A.  I don't believe so, no.
10   Q.  Were you involved in a decision to
11 abandon data warehouse design?
12   A.  I don't recall during those 18 months
13 being involved with abandoning anything.  That's
14 my recollection.
15   Q.  So to sell it, you had to learn about
16 it?
17   A.  Um -- to an extent, yes.
18   Q.  And to learn about it, you had to
19 deal with Bob Fireman?
20       MR. KATZ:  Objection.
21   A.  Again, my -- again, my position
22 within the organization is, I would probably go

| Page 81 |
| --- |

1  to my boss, Chris, and to Henry, who is the head
2  of the group, and also to Bob and Ann at
3  different points in time.  And again, I can't
4  recall who I went to at which -- what particular
5  time.
6    Q.  I'll take the point.  So --
7    A.  Yeah.
8    Q.  -- Henry, for example, or
9  Mr. Lellouche, he would also provide you with
10 insight on data warehousing design, right?
11   A.  Yes.  Over the -- over the course of
12 the 18 months, yes.
13   Q.  Sure.  And he learned about it, as
14 best you know, from what sources?
15       MR. KATZ:  Objection.
16   A.  Again, I don't know exactly --
17 sorry -- his -- I don't know exactly his
18 background, now that I think of it.  But the --
19 the team would be Ann and Bob and then there's
20 others, Bill Adams and others, and he would go to
21 that group in consultation with Chris, his boss,
22 as well.  And then I would go to them and get

                                    21  (Pages 78 to 81)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

Page 82

1  answers. But Henry would be the person that I
2  would speak to more often than not.
3       But other times, I would talk to
4  Bill. And again, I have no specific recall of
5  talking to Bill, but I know I did, you know.
6       Q. In any event, it was your expectation
7  that, in order to have the team learn
8  sufficiently about data warehouse design to sell
9  that service, the team would have to have an
10 information download, would have to get
11 information, in other words, from Bob Fireman and
12 Ann Raider.
13      MR. KATZ: Objection.
14      A. And Bill. And again, the way I'm
15 looking at it is, if we were able to develop a
16 sales lead, and the sales for this particular
17 part of the equation reported to Henry, but there
18 was people on that staff, and I think it was Bill
19 and -- and Bob at different times, would actually
20 meet with the clients as well. So is that
21 answering your question?
22      Q. In a general way it is. I'll maybe

Page 83

1  put a finer point on it.
2       A. Okay.
3       Q. You really could not learn -- when I
4  say "you" I mean the IGroup -- could not learn
5  everything it needed to learn in order to
6  effectively sell data warehouse design unless it
7  relied on Bob Fireman's knowledge of that segment
8  of CCMI's business; is that correct?
9       MR. KATZ: Objection.
10      A. As it pertained specifically to Bob's
11 knowledge of CCMI, and what they could do at the
12 time we acquired them, I'd say yes. Other people
13 had, you know, like we talked about, had
14 knowledge, you know, in -- in the -- in the
15 group.
16      Q. I have the same question about retail
17 promotion programs.
18      A. Yeah.
19      Q. The baseline is this:
20      At the time CCMI was acquired, News
21 America Marketing had no in-house expertise in
22 retail promotion programs; correct?

Page 84

1       A. Yes.
2       MR. KATZ: Objection.
3       A. I think that's true.
4       Q. Okay. And in order to sell retail
5  promotion programs -- you want to correct
6  something or --
7       A. Well, you know, there's individuals
8  that were on staff that reported to -- I'm trying
9  to think of at what point in time; and at this
10 point in time they didn't report to me but they
11 were in -- they were on -- on the payroll, and
12 that was the retail group that was in-house.
13      So we had several people that came
14 from the retailers themselves, two in particular,
15 that would be very well versed in retailer
16 promotional programs because they ran retail
17 stores themselves.
18      So I -- so they -- there was some
19 understanding and expertise in the company. But
20 as you -- it's...
21      Q. Okay. And were those people brought
22 on to the team to, you know, impart their wisdom

Page 85

1  and knowledge about retail promotion programs?
2       A. Later they were, yes.
3       Q. When?
4       A. Um -- I'm trying to think if it was
5  during this 18 months, and then I exited the
6  business, and other people ran it and I came back
7  in later. But I don't recall when they were
8  brought on board to help out.
9       Q. Was it right away?
10      A. I really can't recall.
11      Q. And these people, did they have
12 expertise in developing retailer promotion
13 programs using information developed at the point
14 of sale?
15      MR. KATZ: Objection.
16      A. Yeah, again, I don't know exactly. I
17 know what type of programs they were involved
18 with. I don't know if exactly it falls into the
19 way you stated it.
20      Q. Who are these people?
21      A. Pat Kroc and Ed Wogan are two that I
22 can think of.

22 (Pages 82 to 85)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
                        New York, NY

| Page 86 | Page 88 |
|---|---|
| 1    Q.  Can you give me a general way their | 1  approach the client for either a new product and |
| 2  general experience level in retail promotion | 2  they would wish to get the top ten percent of |
| 3  programs so I can understand it in context? | 3  coffee drinkers, and they have a certain budget |
| 4    A.  Yeah, and again, my understanding is | 4  and they have a certain target, and then we |
| 5  that Pat, he ran several stores for Super Value, | 5  approach the retailers and get the names and then |
| 6  so anything that went on in the store, he would | 6  fulfill that mailing for them. |
| 7  be responsible for.  And Ed is very similar | 7    Q.  So this is information that is kept |
| 8  background.  I just don't think it was as large a | 8  by retailers? |
| 9  store group, but he owned a couple of stores | 9    A.  Yes. |
| 10  themselves and would be, they used to talk about | 10    Q.  It's not your own database? |
| 11  loyalty programs from time to time. | 11    A.  No. |
| 12    Q.  But you don't have any specific | 12    Q.  You don't have any database anymore |
| 13  memory of their contribution to the IGroup, do | 13  of information generated at the point of sale? |
| 14  you? | 14    A.  Not to my knowledge, no. |
| 15    A.  No.  No. | 15      MR. KATZ:  Kevin, can we take a |
| 16    Q.  Let's -- | 16    break?  I think it's unrelated to this. |
| 17    A.  Not at this point.  That -- as I | 17      MR. PETERS:  Sure. |
| 18  recall. | 18      (Recess taken.) |
| 19    Q.  Let's go back to just discussing | 19  EXAMINATION (Cont'd.) |
| 20  retail program promotion.  This is an area of the | 20  BY MR. PETERS: |
| 21  business, CCMI's business, that News America | 21    Q.  Prior to the break, we were |
| 22  Marketing is still involved in? | 22  discussing retailer promotion programs.  The |

| Page 87 | Page 89 |
|---|---|
| 1      MR. KATZ:  I'm sorry, what are you | 1  retailer promotion programs that are referenced |
| 2    pointing to, Kevin? | 2  in this Exhibit 39, as best you know, involved |
| 3      MR. PETERS:  Retail promotion | 3  developing programs using information generated |
| 4    programs. | 4  at the point of sale; correct? |
| 5    A.  Are we still doing this today? | 5    A.  Yes. |
| 6    Q.  Yes. | 6    Q.  And it's information that was |
| 7    A.  Yes.  In -- it's kind of like in | 7  collected based on the cards that were produced |
| 8  combination with the manufacturers as well, if | 8  and sold by CCMI? |
| 9  I'm viewing this the right way. | 9      MR. KATZ:  Objection. |
| 10    Q.  Well, tell me what News America | 10    A.  Yes. |
| 11  Marketing does in retail promotion programs today | 11    Q.  All right.  And that, at least, the |
| 12  that relies on information generated at the point | 12  contemplation -- |
| 13  of sale. | 13      MR. KATZ:  What point in time are we |
| 14    A.  We have a business that approaches | 14    talking about? |
| 15  the retailers and gets the name -- the names from | 15      MR. PETERS:  Well, Exhibit 39 I can |
| 16  them of certain people, or not actually the | 16    represent to you was generated August of |
| 17  names, but the identifiers of these people that, | 17    1999. |
| 18  based on their shopping history, will remarket on | 18      MR. KATZ:  That I understand, but |
| 19  behalf of, typically, the packaged goods | 19    talking about a brand promotion program -- |
| 20  community. | 20      MR. PETERS:  I'm not talking about |
| 21    Q.  How does that work? | 21    brand promotion programs.  He doesn't know |
| 22    A.  A client will come to us or we'll | 22    what that is. |

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
New York, NY

---

Page 90

1       MR. KATZ:  Retail promotion program,
2   are you talking about a retail promotion
3   program at any particular point in time?
4       MR. PETERS:  Talking about the 18
5   months that he was executive vice
6   president of the IGroup.
7       MR. KATZ:  So these are retail
8   promotion programs during that period.
9       MR. PETERS:  Right.
10      MR. KATZ:  Okay.
11      Q.  In your understanding of what retail
12  promotion programs were at the time, you
13  understood that retail promotion programs
14  contemplated were retail promotion programs using
15  information generated at the point of sale.
16      A.  Yes.
17      Q.  And information collected using cards
18  designed and produced by CCMI.
19      MR. KATZ:  Objection.
20      Q.  Right?
21      A.  As relates to this sheet of paper,
22  yes.

---

Page 91

1       Q.  So, but News America Marketing now
2   does not collect that data.  It goes directly to
3   the retailers, that information?
4       MR. KATZ:  Objection.
5       A.  Yes, I think that's true.
6       Q.  When did it abandon the effort to
7   collect that information, warehouse it and use it
8   to develop retail promotion programs?
9       MR. KATZ:  Objection.
10      A.  I -- I don't -- I'm not aware.
11      Q.  You don't know when?
12      A.  No, I don't know when.
13      Q.  Okay.  The other products and
14  services that we have listed on Exhibit 39 that
15  you don't have knowledge of, you don't doubt that
16  CCMI had those products and services, do you?
17      A.  I'm not sure -- I could agree we were
18  trying to develop a lot of stuff in conjunction
19  with the acquisition so I'm not sure exactly what
20  these mean and I'm not sure exactly what we had.
21  Hang on a second.
22      (Witness perusing document.)

---

Page 92

1       MR. KATZ:  You've answered the
2   question.
3       THE WITNESS:  Okay.
4       Q.  Well, I'll tell you, and you can take
5   my word for it if you choose, that this document
6   was generated in August of 1999, which is just
7   shortly after the -- in fact, it was a couple of
8   days before the acquisition was finalized.
9       A.  Okay.
10      Q.  And as you look at this and based on
11  your experience, can you tell me whether or not
12  you think this represents a combination of
13  existing products and services and contemplated
14  products and services, or existing products and
15  services?
16      A.  I really don't know.
17      Q.  What did you do to try to learn about
18  what CCMI had to offer?  I'm curious as to why
19  you don't know about the products and services
20  that are on this list.
21      A.  Well, I think there was a lot of
22  development going on and trying to develop a

---

Page 93

1   database engine and again, I'm having trouble
2   recalling what was there and what was being
3   developed.
4       Q.  The software licensing, let's just
5   take that for instance.  You understood that CCMI
6   had proprietary software that it licensed to
7   retailers?
8       A.  Again, I don't have any recall of
9   that now.
10      Q.  Do you remember trying to learn what
11  CCMI had to offer in terms of selling software
12  licensing at any time?
13      MR. KATZ:  Objection.  I mean, I
14  think the witness has answered that he
15  doesn't recall.  I mean, I don't know what
16  more you can ask him.
17      MR. PETERS:  Well, I know he doesn't
18  know about it.  I'm wondering whether or
19  not, you know, he ever tried to learn.
20      MR. KATZ:  Well, I think he's told
21  you he doesn't recall.
22      Q.  Is that, is what you're lawyer's

24 (Pages 90 to 93)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                              July 17, 2007
                          New York, NY

| Page 94 | Page 96 |
|---|---|

Page 94

1  saying true?
2      A.  Yeah.  I'm trying to recall and I
3  don't know, again, looking back at the situation,
4  I don't recall.
5      Q.  Were you the EVP of sales for the
6  IGroup when the Furrs test was undertaken?
7      A.  I believe yes.
8      Q.  And following the failure of that
9  test, how did that impact the running of the
10  IGroup?  In other words, what impact did that
11  have on the IGroup?
12      A.  I don't recall if it had any impact.
13      Q.  In other words, was there any effort
14  to regroup and try to evaluate the viability of
15  the business model you were pursuing?
16      A.  I can't recall.
17      Q.  Was there any discussion among your
18  group about refocusing the energies and efforts
19  of the group to more productive and profitable
20  offerings?
21      A.  I don't recall anything specifically
22  at that time regarding the --

Page 95

1      Q.  Did the failure of SoftCard impact
2  CCMI in any way that you can articulate for me?
3      A.  Not that I can recall.  Not that I
4  can remember.
5      Q.  Did the failure of -- let me not put
6  a word on it just yet.  Was SmartSource.com
7  successful?
8      A.  Guess you have to define what
9  success --
10      Q.  What was the plan for it?
11      A.  Again, I don't know -- I think we
12  were trying to evaluate what the plan was for.
13  It's making -- it's making money now.  So I
14  guess -- I think it was successful.
15      Q.  The original intention was to roll
16  SmartSource.com and Planet U together, correct?
17      A.  I think that was a vision that we
18  were going to see if it would work.
19      Q.  And it didn't work.
20      A.  Well, we never combined everything.
21  We couldn't get that to function.
22      Q.  That's what I'm saying.  That's what

Page 96

1  I'm asking.  The plan to combine SmartSource.com
2  and SoftCard, it didn't pan out.
3      A.  Yes.
4      Q.  And when that concept didn't pan out,
5  did that have any impact on the IGroup?
6      A.  Not that I can recall.
7      Q.  Was the IGroup disbanded at any
8  point?
9          MR. KATZ:  During his tenure?
10          MR. PETERS:  No.  At any point.
11      A.  Um -- the -- the IGroup entity, it
12  was -- the group that I referred to as the
13  IGroup, that -- so was it ever disbanded at any
14  time?  And I'd say that the individual pieces
15  that we thought we could make business from or
16  make money from, it was never disbanded.  But
17  think there was always some type of continuity.
18      Q.  So the IGroup still exists?
19      A.  Yes.
20      Q.  And the three entities that we've
21  mentioned, SmartSource Direct, SmartSource.com,
22  and SoftCard, are they still entities within the

Page 97

1  IGroup?
2      A.  I would say with the exception of
3  SoftCard.
4      Q.  So it's just the two?
5      A.  Yes.
6      Q.  And the funding for the IGroup, was
7  it ever impacted or affected by the lack of
8  success in putting together these three companies
9  into some type of program or model?
10      A.  The funding, meaning the --
11  meaning --
12          MR. KATZ:  Objection.
13      Q.  Well, in your experience, was News
14  America Marketing's willingness to invest in the
15  IGroup affected by the failure that the IGroup
16  had on the Furrs test?
17      A.  I don't know.
18      Q.  Do you know whether or not the
19  funding for the IGroup was affected at all by the
20  failure of Planet U?
21      A.  I don't recall anything specific on
22  that.

25 (Pages 94 to 97)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

---

Page 98

1    Q.  Do you recall any impact on the
2  willingness to fund the IGroup initiatives and
3  companies when SoftCard failed?
4    A.  I don't have any knowledge that I can
5  recall on that.
6    Q.  Have you ever spoken with anyone at
7  News America Marketing about commitments that
8  were made to Ann Raider and Bob Fireman prior to
9  the sale of their company to News America
10  Marketing?
11    A.  Not that I recall.
12    Q.  Do you recall any conversations with
13  anyone at News America Marketing about the
14  resources that News America Marketing committed
15  to use prior to acquiring CCMI?
16      MR. KATZ:  Objection.
17    A.  Not -- not that I'm -- I don't know
18  anything about that.
19    Q.  Do you know whether there were any
20  representations made about the use of a sales
21  force prior to the acquisition?
22    A.  I'm not -- I'm not aware of that.

---

Page 99

1    Q.  You have never spoken to anyone about
2  that, that you can recall?
3    A.  No.
4    Q.  Do you recall ever speaking with Ann
5  Raider or Bob Fireman about the commitments News
6  America Marketing made prior to acquiring CCMI?
7    A.  No.
8    Q.  Did Ann Raider or Bob Fireman
9  complain to you about the resources that News
10  America Marketing was dedicating to CCMI?
11    A.  Not -- not specifically, sitting here
12  today.
13    Q.  You don't remember any conversations
14  with Ann Raider, for example, complaining about a
15  lack of a sales force to market CCMI's products
16  and services?
17    A.  Not that I can recall.
18      MR. KATZ:  Kevin, I'm assuming you're
19    going to go past lunch, so I'm wondering
20    how you want to schedule that.
21      MR. PETERS:  Well, however you want
22    to break.

---

Page 100

1      MR. KATZ:  Do you have any sort of
2    general idea of how long you're going to
3    be?  'Cause that may influence, you know,
4    how long we want to go before taking a
5    lunch break.
6      MR. PETERS:  I don't.  But it will
7    be, you know, probably another couple of
8    hours anyway.
9      THE WITNESS:  Okay.
10      MR. PETERS:  Would you mark this as
11    Exhibit 40.
12      (Plaintiff Exhibit (Garofalo) 40,
13    e-mail dated 3/7/03, Raider to Garofalo,
14    marked for identification, as of this
15    date.)
16    Q.  Mr. Garofalo, the exhibit I just put
17  before you has a document control number at the
18  bottom right-hand side, FR1536.  It's an e-mail
19  from Ms. Raider to you, subject, personal.
20      Would you read this and tell me first
21  off if you recall seeing it before today.
22      (A pause in the proceedings.)

---

Page 101

1    A.  Okay, I've looked at it.
2    Q.  Remember it?
3    A.  I do not.
4    Q.  This is in March of 2003.  Did you
5  reenter the SmartSource Direct business at some
6  point after leaving the IGroup?
7    A.  Yes.
8    Q.  Can you describe that transition?
9    A.  You said reenter the IGroup --
10    Q.  Let me ask you what happened rather
11  than suggest to you what happened.
12    A.  Again, my recollection is that the
13  IGroup -- Chris and I came back to work in the
14  core business and then the IGroup reported to
15  Bill Christie.  And I went over to run the trades
16  out of our business.
17    Q.  But at some point you had further
18  interaction with Ann Raider?
19    A.  Yes.
20    Q.  What was the nature of that?  How did
21  it come about?
22    A.  I'm trying to recall, I don't know

26 (Pages 98 to 101)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

---

Page 102

1  specifically what the relationship is here.  But
2  she's saying, "Reporting directly to you," and my
3  recollection is, in my going back and trying to
4  remember, it was in relation to my involvement
5  with the retailers.
6       Q.  What was your position at the time at
7  the company?
8       A.  EVP, trade.  The current position I'm
9  in.
10      Q.  Why did you leave the IGroup and go
11  back to the core business?
12      A.  Again, my recollection is, we were
13  having difficulties on the core business and I
14  was asked to come and head up the area back in
15  the core.
16      Q.  Was the sales force reorganized at
17  some point in 2000-2001?
18          MR. KATZ:  Which sales force are you
19  talking about?
20          MR. PETERS:  The big one.  The 250 or
21  so.
22      A.  I can't recall specific dates.  But I

---

Page 103

1  think it was reorganized around that time.
2       Q.  It was a consolidation of the sales
3  force?
4       A.  My understanding is yes.
5       Q.  How did that impact the sales force's
6  efforts to sell products?
7          Let me ask you a better question.
8  Was the sales force refocused or redirected in
9  any way that you can articulate?
10      A.  Again, that -- I wasn't operating in
11  that area.  So I'm -- I don't have intimate
12  knowledge of that.
13      Q.  But you were brought out of the
14  IGroup and put into the core business because
15  there was some --
16      A.  Yeah.
17      Q.  -- lack of success on the sales force
18  that they wanted you to address?
19      A.  I should be more specific.  I was
20  brought in to head up our retail relationships
21  which had suffered some losses.  So when you talk
22  about the selling side, that's -- that's -- that

---

Page 104

1  wasn't my domain at the time.
2       Q.  So when Ann Raider was writing to you
3  in March of 2003, you still had the same position
4  that you had when you left the IGroup.  You were
5  still the EVP of trade.
6       A.  That's my understanding, yes.
7       Q.  When Ann says, "I'm excited about the
8  opportunity to be reporting to you directly,
9  developing a strategy and plan for the retail
10  group, which has been lacking these past few
11  years," do you know what she's referring to?
12      A.  I don't have any recall.
13      Q.  Did Ann Raider ever report to you
14  directly?
15      A.  Not -- in reading this, it appears --
16  I can't recall if she did or she went through
17  another person that reported to me.
18      Q.  Well, did you have any managerial
19  responsibility for Ann Raider in the March 2003
20  time frame?
21      A.  Again, I don't recall specifically.
22  Reading this thing, it looks like it -- it is the

---

Page 105

1  case, but I don't recall that.
2       Q.  Do you recall working with Ann on
3  anything after leaving the IGroup?
4       A.  Yes, I do.
5       Q.  What types of things did you work on
6  with Ms. Raider after leaving the IGroup and
7  while you were the EVP of trade?
8       A.  My recollection is that we were
9  trying to develop retailers to do the card
10  issuance and the frequent shopper program and
11  that Ann was, that was her major focus, as I
12  recall; and we were working through the other
13  members of the group to make the -- open doors
14  and make introductions for Ann.
15      Q.  Did you meet directly with Ann Raider
16  in that context?
17      A.  Again, I can't specifically recall at
18  that time period.
19      Q.  Do you recall ever working directly
20  with Ms. Raider to develop a strategy and plan
21  for the retail business as stated in this
22  Exhibit 40?

27 (Pages 102 to 105)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

Page 106

1      A.  Again, I don't have any specific
2  recall, no.
3      Q.  When she says in the second
4  paragraph, "I share your vision.  We do need to
5  clearly define what business we are going to be
6  in and then secure the right products/partnership
7  for targeting key accounts with our unique
8  offer," did that refresh any recollection about
9  conversations you had with her?
10      A.  It does not.
11      Q.  The next sentence states, "Thus far,
12  our loyalty product offering has been diminishing
13  and our stored value product line is still under
14  development."
15          Is that consistent with your memory
16  in 2003?
17      A.  Again, I don't have any recall.
18      Q.  And she says in the sentence, "To add
19  to the challenges of what to sell is, who would
20  sell it."  Do you remember that being a challenge
21  that you and Ann Raider discussed?
22      A.  I do not -- I don't recall.

Page 107

1      Q.  Do you know who Kevin McKenna is?
2      A.  I remember he was an employee, yes.
3      Q.  What was his position or title?
4      A.  Again, I don't know his specific
5  title.  It --
6      Q.  Do you remember his job
7  responsibilities?
8      A.  Only in general.
9      Q.  When she writes in the second
10  paragraph, "Now the sales responsibility resides
11  with the retail sales force, who is busy, and
12  loyalty is something they are just learning," is
13  that consistent with your memory about the retail
14  sales force?
15      A.  Again, I don't recall specifically at
16  this point in time what their knowledge was.
17      Q.  Do you have any reason to doubt what
18  she says in this sentence?
19      MR. KATZ:  Objection.
20      A.  Yeah, I don't know, you know, I -- I
21  don't have reason to doubt or -- or acknowledge
22  what she's saying is true or not.  I just don't

Page 108

1  recall.
2      Q.  When she writes, "In addition, the
3  sales cycle for our products has been about six
4  months," do you recall that?
5      A.  I do not.
6      Q.  And the last sentence of the first
7  paragraph, she writes, "Finally, SSD in its
8  desire to achieve sales goals, set the direction
9  to focus on non-food retailers in order to
10  achieve the revenue number."
11          Do you remember that to be the case?
12      A.  I do not.
13      Q.  Do you have in mind what she's
14  saying?  In other words, is that a familiar
15  concept to you?
16      A.  No.  I'm trying to -- go back in my
17  memory bank, and I just don't have a knowledge of
18  it.
19      Q.  I'm not going to go through all the
20  bullet points.  There are five of them.  Have you
21  had a chance to read those bullet points?
22      A.  I have not.  I just read the body,

Page 109

1  but if you like, I'll read them now.
2      Q.  You can read them and the question I
3  have is this:
4          Can you tell me about those bullet
5  points?  Do you have any memory of any of the
6  information that she discusses in these bullet
7  points in Exhibit 40?  If you do, then I'll ask.
8  If you don't, then I'll move on.
9          (Witness perusing document.)
10      A.  The same as the above.  I don't
11  recall any specifics in any of these particular
12  instances.
13      Q.  You don't have any knowledge about
14  anything stated in any of those bullet points?
15      MR. KATZ:  Objection.
16      A.  I don't have any specific knowledge
17  about this, no.
18      Q.  Okay.  I'm interested in any
19  knowledge.  "Specific" is such a --
20      MR. KATZ:  Well, let me ask this:
21      Could you break it out?  What are you
22      specifically asking?

28 (Pages 106 to 109)

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

Page 110

1        MR. PETERS: I'm asking him --
2        Q. -- do you know anything about
3   anything in those bullet points? I'm not sure I
4   can be more general than that.
5        MR. KATZ: Anything of the bullet
6        points?
7        Q. Do you know anything about anything
8   Ann Raider is saying in those bullet points?
9   Anything at all.
10       A. I remember talking to Ann about
11  her -- her coaching and supporting the retail
12  sales force. But again, nothing specific, Kevin.
13       Q. So just to round this out, you have a
14  general memory of addressing that with Ann, but
15  no specific memory of what was said.
16       A. Right.
17       Q. And that exhausts your knowledge of
18  anything stated in those bullet points by Ann
19  Raider, right?
20       MR. KATZ: Objection.
21       A. Yes.
22       Q. We discussed a moment ago, or maybe

Page 111

1   ten moments ago, the reorganization of the News
2   America Marketing sales force. I'm not sure I
3   asked you, did you participate in that
4   reorganization?
5        MR. KATZ: What's the date on this,
6        as you phrased your question?
7        MR. PETERS: I believe it's 2000.
8        Early 2000.
9        A. Yeah, prior to moving to the IGroup,
10  there was a test on the West Coast and the person
11  who was running the test reported to me. So --
12  and then I left for the IGroup. So, you know, I
13  was involved from hearing how it was going, but
14  that was it.
15       Q. The test was to determine how to
16  reorganize?
17       A. Yes.
18       Q. Did you formulate the test?
19       A. I couldn't say that I formulated the
20  test, no.
21       Q. How long was the test?
22       A. Again, my recollection was about a

Page 112

1   year.
2        Q. Can you tell me in a very general
3   way -- I don't need to get the details, but in a
4   very general way -- what the test involved?
5        A. Yes. We had two separate sales
6   forces after the acquisition of Act Media, and we
7   wanted to explore having one group representing
8   both lines of portfolios.
9        Q. What was Act Media's product or
10  products?
11       A. Their in-store portfolio.
12       Q. And after this test, there was a
13  determination to consolidate the sales force?
14       A. Yes.
15       Q. So there was something that went on
16  on the West Coast to figure out whether or not
17  this consolidation made sense.
18       A. (Witness nodding).
19       Q. And when was Act Media acquired?
20       A. Again, I'm not sure of this -- of the
21  time. But it was certainly prior to the
22       Q. But it was certainly prior to the

Page 113

1   acquisition of CCMI?
2        A. Yes.
3        Q. And the test took about a year?
4        A. That's my recollection, yes.
5        Q. And the determination to consolidate
6   the sales force, that was prior to the CCMI
7   acquisition in the summer of '99?
8        A. I'm not -- I'm not sure.
9        Q. In your capacity as the EVP of sales
10  for the IGroup, did you make any approaches to
11  any of News America's -- let's call it
12  affiliates, Fox, 20th Century Fox, Fox Sports, to
13  try to sell CCMI's products?
14       A. Not that I can specifically remember.
15       Q. Did you consider the possibility of
16  synergies between CCMI and other aspects of News
17  America's business?
18       A. Again, that -- not -- looking back, I
19  could theorize, but not that I recall now.
20       Q. Do you recall there being any
21  problems getting a sufficient staff for CCMI to
22  run its business and market its products?

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                           July 17, 2007

New York, NY

---

Page 114

1    A. Not that I can recall.
2    Q. Do you recall there was a hiring
3  freeze in the 2000 time frame?
4    A. I do not.
5    Q. Do you recall Ann Raider or Bob
6  Fireman complaining to you about the lack of key
7  positions being filled?
8    A. I cannot recall that, no.
9    Q. You don't know whether it happened or
10 not? You don't have a memory?
11   A. I don't.
12   Q. Do you recall any complaints about
13 the funding of CCMI's businesses or products and
14 services?
15   A. No -- not that I recall.
16   Q. You don't remember any conversations
17 one way or the other with Ann Raider or Bob
18 Fireman about that issue?
19   A. No.
20   Q. Do you remember Bob Fireman ever
21 complaining to you about being marginalized in
22 the business?

---

Page 115

1    A. Uh -- I have a memory of him
2  complaining but I can't recall what it was about,
3  'cause -- but I do remember him complaining.
4    Q. What do you remember about that?
5    A. We were out visiting Safeway, I do
6  remember this, we were in a car, he and I, and he
7  was driving, and he was kidding around, I think,
8  and saying, "Listen, it's not my day to complain,
9  but here are some complaints."
10        But again, I can't recall exactly
11 what he talked about, but he was joking around
12 and he was complaining, I know that.
13   Q. All right. He was articulating
14 concerns to you, he didn't want to look like he
15 had trapped you in a car in order to complain.
16        MR. KATZ: Objection.
17   Q. But that was your impression.
18   A. Yes, that was my impression.
19        MR. KATZ: Objection.
20   Q. And you don't remember what his
21 complaints were.
22   A. I really cannot recall.

---

Page 116

1    Q. Do you remember the date or year?
2    A. I -- I really don't.
3    Q. Were you the EVP of sales for the
4  IGroup at the time?
5    A. You know, I really do not remember.
6    Q. Do you remember what you were trying
7  to sell to Safeway? Maybe that will provide some
8  context.
9    A. We were talking about card issuance
10 for those guys. And I believe we were also
11 talking about stored value cards. That's my
12 recollection.
13   Q. Is there any reason you would have
14 been accompanying Bob on a sales call to Safeway
15 if you migrated to the EVP of trade?
16   A. Yes.
17   Q. That's still something you would have
18 done?
19   A. Yes.
20   Q. Do you remember doing that, in other
21 words, do you remember participating in the sales
22 cycle after you'd gone back to News America

---

Page 117

1  Marketing's core business?
2        MR. KATZ: Objection.
3    A. Again, I'm not sure of the timing but
4  like I said, it could have been either prior to
5  or after my hiatus, yes.
6    Q. Other than this conversation with Bob
7  Fireman in the car on the way to pitch Safeway,
8  do you remember any other conversations with Bob
9  Fireman where he complained about the way News
10 America Marketing was running SmartSource Direct?
11   A. Again, I have no specific
12 recollection other than that.
13   Q. Do you remember him being happy?
14   A. I -- we -- Bob and I laughed a lot so
15 I do remember him being happy. I thought he was
16 very entertaining individual.
17   Q. What did you think of him as a
18 businessperson? And let me just limit your
19 recall to the 18 months or so that you were the
20 EVP of sales for the IGroup.
21   A. As a businessperson? Again, Bob
22 didn't report to me during that time period. But

---

30 (Pages 114 to 117)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                          New York, NY

---

Page 118

1   the feeling I had was that he was not a great
2   businessman, just from my recollection of that
3   time period.
4       Q.  What were his deficiencies, in your
5   view?
6       A.  Again, this is a recollection.  Lack
7   of focus, management deficiencies.  Again, I
8   don't recall anything specific.
9       Q.  Is this information that was coming
10  to you more or less from Henry Lellouche or
11  information that you developed on your own?
12      A.  I think a little bit of both.
13      Q.  How much time did you spend around
14  Bob Fireman to allow you to come to these
15  conclusions?
16      A.  Again, I couldn't say with any
17  specificity how much time I was spending with him
18  directly or alone or in a group.  But, you know,
19  during that time period, there was sufficient
20  time to get to, to be with him, yes.
21      Q.  Were you involved in an evaluation
22  process?

Page 119

1       A.  Not that I can recall in any specific
2   way.
3       Q.  Is it News America Marketing's
4   practice to note weaknesses in its employees, in
5   its evaluations, so that the employees can work
6   on those?
7       A.  My understanding is yes.
8       Q.  And do you know who evaluated Bob
9   Fireman during your 18 months as the EVP of sales
10  for the IGroup?
11      A.  Again, my understanding would be
12  either Henry or Chris.
13      Q.  Did you form any view of Ann Raider
14  as a businessperson during the 18 months you were
15  the EVP of sales?
16      A.  Yes.
17      Q.  What was that evaluation?
18      A.  I thought that she lacked a little
19  credibility.
20      Q.  Why do you say that?  What was the
21  basis of that opinion?
22      A.  I remember a lot -- several general

Page 120

1   conversations where we'd be talking about a
2   potential opportunity and she would go, say, "I'm
3   meeting with such-and-such a person," and then
4   she couldn't even remember the name or the title
5   or when the meeting was or whatever.  And this
6   was in a relatively short period.  So it always
7   made me question, "Well, who are you meeting with
8   and what's going on?"  That's my general
9   recollection.
10      Q.  Did you raise that with her?
11      A.  I don't know if during that time
12  period, I don't think so.  I do not -- I don't
13  think that I did.
14      Q.  Is that a view that you maintained or
15  did it evolve over time?
16      A.  I think at the time that -- I think
17  there are certain things that Ann did well, and
18  there's things on the recollection and work ethic
19  that I found lacking.
20      Q.  Tell me about the work ethic that you
21  found notable and problematic.
22      A.  Again, it's more general because I

Page 121

1   can't remember any specifics.  But just, "Where
2   are you going to be on this date?"  And, "I'm
3   going to be visiting D.C. but I'm also seeing my
4   son," because he was going to school I think down
5   there at the time or whatever, and it just was
6   not a standard -- uh -- you know, practice to be
7   doing that.  If you wanted to go do that and
8   combine it, then you'd mention it beforehand.
9   That type of stuff.
10      Q.  Do you have any reason to believe she
11  didn't work hard?
12      A.  I felt that she could work harder, in
13  my estimation.
14      Q.  Can you tell me why you believe that
15  with any kind of precision?
16      A.  I, again, looking back, call plans
17  not being filled out as robustly as I would
18  probably like to see from other people that had
19  reported to me.
20          But again, nothing more specific that
21  I can recall.
22      Q.  Did you share those observations with

31 (Pages 118 to 121)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  any of Ann's direct managers so that they could
2  be put in an evaluation?
3      A. Not that I can -- not that I can
4  specifically recall, no. But...
5      Q. In other words, were the issues
6  concerning enough to you that you raised them
7  with anyone else so that they might be
8  memorialized in an evaluation?
9      A. Not that I can specifically recall,
10 again.
11     Q. Is part of News America's culture to
12 share information among executive vice-presidents
13 about others within the organization?
14     A. Yeah, I would think -- uh -- I know
15 that when we do evaluations, that the heads of
16 each of the groups would be there. So at the
17 annual performance appraisal there would be a
18 forum to discuss that.
19         So I'm sure that was part of it.
20     Q. And that forum would include you?
21     A. Not for the time I was outside the
22 group, again. But for the time that I was

**Page 123**

1  responsible for the IGroup or the time that I
2  was -- that 18 months within the IGroup, yes.
3      Q. So these were observations that you
4  would have shared with the group that was
5  evaluating Ann Raider?
6      A. Again, I don't have any specific
7  recall, but the forum would be available to do
8  such, yes.
9      Q. If it were serious enough to you to
10 mention, you would mention it?
11     A. I think so, yes.
12     Q. And then it would appear in her
13 evaluations?
14     A. I think so, yes.
15     Q. Okay. So if it's not in her
16 evaluations, can we infer that it wasn't serious
17 enough to you to mention?
18         MR. KATZ: Objection.
19     A. Again, I wouldn't know, you know.
20     Q. Were you involved in the decision to
21 make Henry Lellouche the general manager of
22 SmartSource Direct?

**Page 124**

1      A. During this 18-month period we're
2  talking about?
3      Q. Yes, sir.
4      A. No.
5      Q. He was the general manager during
6  your tenure with the IGroup?
7      A. General manager of the --
8      Q. Of SmartSource Direct.
9      A. Over those 18 months?
10     Q. Yes.
11     A. No, but I wasn't responsible.
12     Q. Let me -- I think I understand what
13 you're saying. Let me see if I can get it all
14 lined up.
15     A. Okay.
16     Q. During the 18 months you were the EVP
17 of sales for the IGroup, Henry Lellouche was the
18 general manager of SmartSource Direct.
19     A. Okay.
20     Q. Right?
21     A. Yes.
22     Q. But you didn't have any role in

**Page 125**

1  putting him in the position of general manager.
2      A. That's exactly right, yes.
3      Q. You don't remember anything about the
4  process that led to Henry Lellouche taking over
5  as general manager of SmartSource Direct.
6      A. Only -- it was presented to me, this
7  would be the team, by Chris Mixson; and again, my
8  recollection is that Henry was involved with the
9  venture group in evaluating the opportunities
10 that came in to be part of the IGroup.
11     Q. Did you ever see Bob Fireman's
12 employment contract?
13     A. No.
14     Q. Do you know whether Bob Fireman was
15 hired with the title of general manager?
16     A. I don't -- I'm not aware of that.
17     Q. Did anyone ever talk to you about
18 removing responsibilities from Bob Fireman and
19 giving them to other people within News America
20 Marketing, whether it be Mr. Lellouche or others?
21     A. Was it ever discussed with me? No,
22 not that I can recall.

32 (Pages 122 to 125)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007
New York, NY

| Page 126 | Page 128 |
|---|---|

Page 126

1    Q.  Do you know whether or not Bob
2  Fireman's responsibilities as general manager for
3  CC -- let me take it in smaller steps.  You knew
4  that Bob Fireman had been the general manager for
5  CCMI, correct?
6    A.  I thought he was an owner of the
7  company.
8    Q.  But he also ran it --
9    A.  Okay.
10    Q.  -- he was the --
11      MR. KATZ:  Are you asking what he
12    knew?
13    Q.  I'm asking if you know that Bob
14  Fireman ran CCMI with Ann Raider.
15    A.  I was aware that the two of them ran
16  the company, yes.
17    Q.  Did you have any understanding of
18  what Bob Fireman's responsibilities were in CCMI?
19    A.  Again, I didn't have any
20  understanding of that prior to coming on board
21  and even after that, I wasn't -- like, I was
22  never aware that -- you just mentioned he was the

Page 127

1  general manager.  I wasn't aware of that.
2    Q.  You have no memory of any
3  responsibilities being removed from Bob Fireman,
4  I take it, and given to others?
5    A.  Not to my knowledge.
6    Q.  Did you know what Ann Raider's
7  responsibilities were at CCMI before the
8  acquisition?
9    A.  I wasn't aware.
10    Q.  Did you know that she was in a sales
11  capacity in CCMI?
12    A.  Now that you mention it, it made
13  sense, but again, I have no recall of that, no.
14    Q.  And what was her position at
15  SmartSource Direct, as you can recall?
16    A.  I think she helped in the sales of
17  the SmartSource Direct portfolio of items that --
18    Q.  Do you recall -- I'm sorry, I jumped
19  on the end of your response.  She was involved in
20  the portfolio of items, the sale of that
21  portfolio?
22    A.  Um-hum.

Page 128

1    Q.  Right?
2    A.  Yes.
3    Q.  Do you recall that she had the title,
4  executive vice president?
5    A.  I don't recall.
6    Q.  Do, in your experience, titles at
7  News America Marketing have specific -- I'm not
8  sure how I can articulate this -- is there an EVP
9  level at News America Marketing marketing that is
10  consistent throughout the different business
11  units?
12      MR. KATZ:  Objection.
13    A.  I think in general, yes.
14    Q.  In other words, it's not just -- let
15  me just put it more in the vernacular -- it's not
16  just a title handed out.  An EVP, executive vice
17  president, has a specific meaning within the
18  organization, as far as you know.
19    A.  I'd say yes.
20    Q.  It's part of a reporting structure.
21    A.  Again, yes.
22    Q.  Okay.  And in your experience, do

Page 129

1  executive vice-presidents report to -- let me ask
2  you, not tell you -- to whom in the reporting
3  structure do executive vice-presidents report?
4      MR. KATZ:  Objection.
5    A.  My current understanding is, they
6  would report to either a president, another EVP,
7  or the CEO.
8    Q.  Okay.  So an EVP can report to the
9  president or another EVP?
10    A.  Yes.
11    Q.  Or the CEO?
12    A.  Yes.
13    Q.  And to whom do you report?
14    A.  Currently?
15    Q.  Yes.
16    A.  I report to Paul Carlucci.
17    Q.  The CEO.
18    A.  The CEO, yes.
19    Q.  Ann Raider was an EVP who reported to
20  an EVP, right?  Do you recall that?
21    A.  You know, I don't recall that.
22    Q.  Well, that's an unfair question

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                              New York, NY

| Page 130 | Page 132 |
|---|---|
| 1 because you don't recall that she was an<br>2 executive vice president, either, right?<br>3    A. Yes, I do not recall that.<br>4    Q. Okay.<br>5    MR. KATZ: Time for lunch?<br>6    MR. PETERS: Oh, sure. Why not?<br>7    (Luncheon recess: 12:23 p.m.)<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 1    A. I don't.<br>2    Q. Okay. The same questions for Ann<br>3 Raider. First question, do you remember Ann<br>4 Raider's job responsibilities changing during<br>5 your 18-month tenure with IGroup?<br>6    A. I don't.<br>7    Q. And when you left the IGroup, do you<br>8 recall hearing that Ann Raider's responsibilities<br>9 had changed?<br>10    A. Not until she reported to me.<br>11    Q. Not until she reported those changes<br>12 to you or reported to you?<br>13    A. As per that document, at some point<br>14 she came over and was working with the retail<br>15 group, which was the trade group.<br>16    Q. I may now no longer have memory of<br>17 that testimony. I thought you said you don't<br>18 remember Ann Raider specifically reporting to<br>19 you.<br>20    A. I don't, other than that memo saying,<br>21 "Now that I'm reporting directly to you," working<br>22 directly with me. |

| Page 131 | Page 133 |
|---|---|
| 1    A F T E R N O O N  S E S S I O N<br>2    (1:28 p.m.)<br>3 M A R T I N  G A R O F A L O,  having been<br>4    previously sworn, resumed the stand and<br>5    testified further as follows:<br>6 EXAMINATION (Cont'd.)<br>7 BY MR. PETERS:<br>8    Q. Mr. Garofalo, before we broke for<br>9 lunch, I was discussing, we were discussing,<br>10 changes in Bob Fireman and Ann Raider's job<br>11 respondents or job functions.<br>12    I'll ask you in a general way, do you<br>13 remember there being any specific changes or<br>14 general changes in Bob Fireman's responsibilities<br>15 during your 18 months as the EVP of sales for the<br>16 IGroup?<br>17    A. I do not remember any.<br>18    Q. And after you left the IGroup and<br>19 went back to News America Marketing's core<br>20 business as the EVP of trade, do you remember<br>21 learning that Bob Fireman's job responsibilities<br>22 at SmartSource Direct had changed? | 1    Q. But you don't have any specific<br>2 memory of her job responsibilities and you don't<br>3 remember interacting with her.<br>4    A. No.<br>5    Q. Am I correct?<br>6    A. Yes.<br>7    Q. Did Mr. Carlucci have any involvement<br>8 in the business, day-to-day business of the<br>9 IGroup during your tenure?<br>10    A. No.<br>11    Q. Did you discuss the IGroup or any of<br>12 the business units within the IGroup with<br>13 Mr. Carlucci?<br>14    A. Yes.<br>15    Q. Can you tell me the types of things<br>16 that you would have elevated to him that pertain<br>17 to SmartSource Direct?<br>18    A. I don't recall any specifics.<br>19    Q. How frequently did you speak with<br>20 Mr. Carlucci about SmartSource Direct during your<br>21 tenure as EVP of sales?<br>22    A. I don't recall any specific reporting |

34 (Pages 130 to 133)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                July 17, 2007
                        New York, NY

Page 134

1  on those...
2      Q. Did you attend executive board
3  meetings?
4      A. Executive committee, yes.
5      Q. Executive committee meetings. And
6  did you do that on a regular basis?
7      A. Yes.
8      Q. How frequently did those meetings
9  take place?
10     A. Each Monday.
11     Q. Who was tasked with discussing
12 SmartSource Direct at these meetings?
13         MR. KATZ: Objection.
14     A. My recollection would be Chris.
15         MR. KATZ: Do you have a time period,
16 Kevin?
17         MR. PETERS: During the time that he
18 attended the executive committee meetings.
19     A. It's the distinction, I guess -- the
20 18 months, it would be Chris. And then various
21 people as the reporting structure changed.
22     Q. After Mr. Mixson left the IGroup,

Page 135

1  where did he go?
2      A. He rejoined the core organization to
3  run, head up sales.
4      Q. Who took over his job
5  responsibilities with the IGroup?
6      A. My recollection is, Bill Christie.
7      Q. Did Bill Christie then report at the
8  executive committee meetings?
9          MR. KATZ: Objection.
10     A. I don't recall him doing that. But
11 it would have been his responsibility.
12     Q. Did you get the impression that the
13 IGroup was less and less the topic of discussion
14 at the executive committee meetings as time went
15 on?
16         MR. KATZ: Objection.
17     A. I don't have any recollection of
18 that.
19     Q. Did senior management lose interest
20 in SmartSource Direct?
21         MR. KATZ: Objection.
22     A. No.

Page 136

1      Q. That's not consistent with your
2  experience?
3      A. No.
4      Q. Was SmartSource Direct allowed to
5  advertise in trade journals, trade publications
6  during your 18 months?
7      A. I don't recall so.
8      Q. Do you recall Ann Raider asking for
9  permission to advertise?
10     A. I don't recall that, no.
11     Q. Is trade advertising something that
12 News America Marketing does, in your experience?
13     A. No.
14     Q. They do not?
15     A. They do not.
16     Q. Do you know why?
17     A. Since I've been here, I think the
18 overall philosophy is that you'll go out and make
19 the sales calls to the appropriate people and we
20 don't spend our money on trade advertising.
21     Q. Did you ever speak with Ann Raider
22 about that?

Page 137

1      A. Not that I can recall.
2      Q. Do you remember Ann Raider ever
3  discussing that with anyone who then reported her
4  concern to you?
5      A. Again, not that I can recall.
6      Q. Was there a group called
7  Salesforce.com, is that a name familiar to you?
8      A. Not that I can recall.
9      Q. Were you involved in any way in the
10 purchase of Epiphany software?
11     A. No.
12     Q. Were you involved in any way in
13 transferring Bill Adam from SmartSource Direct to
14 work in Connecticut?
15     A. No.
16     Q. You had no role in that whatsoever?
17     A. No.
18     Q. Do you remember an acronym M-A-S, or
19 MAS, as it applies to CCMI?
20     A. I do not.
21     Q. Do you remember that ever being
22 suggested to you, that that was the marketing

                                  35 (Pages 134 to 137)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

Page 138

1  analysis tool?  Does that refresh any
2  recollection?
3      A.  No.
4      Q.  Do you remember what the marketing
5  analysis tool was that CCMI used?
6      A.  No.
7      Q.  Do you recall how many supermarkets
8  were using CCMI's software to track loyalty data?
9      MR. KATZ:  Objection.
10     A.  No.
11     Q.  Is that something you ever looked
12  into, to see how strong CCMI's market share was
13  in loyalty cards?
14     A.  I don't recall doing that.
15     Q.  Did CCMI expand into the gift card
16  segment of the market, card programs, during your
17  tenure as EVP of sales?
18     A.  I know that they were attempting to.
19  But I can't recall if they were successful at
20  that time.
21     Q.  Were you involved in a pitch to Ahold
22  to sell cards?

Page 139

1      A.  I was not.
2      Q.  Were you involved in an effort to
3  develop a stored value money card to be marketed
4  specifically to the Hispanic community?
5      A.  No.
6      Q.  Do you remember having dinner with
7  Ann Raider and Bob Fireman at some point?
8      A.  I do.
9      Q.  Do you remember that they expressed
10  to you that they were dismayed about the way
11  SmartSource Direct had been run?
12     A.  I do not.
13     Q.  What do you remember about the
14  dinner?
15     A.  I believe it was in conjunction to
16  our first meeting and it was up in Boston.  We
17  went to a restaurant with brick on the walls and
18  I think it was just Bob and Ann and Chris and I,
19  Chris Mixson and I.
20     Q.  And that was at the very beginning of
21  your tenure?
22     A.  Yes.

Page 140

1      Q.  And that's the last and only dinner
2  you had with Ann and Bob?
3      A.  I don't recall another time.
4      Q.  Do you remember either of them
5  complaining to you about lack of financial
6  support?
7      A.  I don't.
8      Q.  Do you recall either of them
9  complaining to you about a lack of technical
10  support?
11     A.  I do not, no.
12     Q.  Do you recall either of them
13  complaining to you about a lack of administrative
14  support?
15     A.  No, I do not.
16     Q.  Do you recall any complaints
17  whatsoever that they made to you other than what
18  you may have testified to so far?
19     A.  I -- I don't have any specific
20  recollection of that, no.
21     Q.  How many sales calls did you attend
22  with Ann Raider or Bob Fireman?

Page 141

1      A.  I can remember being out with each of
2  them one time specifically.
3      Q.  What companies did you pitch?
4      A.  With Bob, it was with Safeway.  And
5  with Ann, I believe it was Winn-Dixie.
6      Q.  Did you pitch KMart?
7      A.  Yes.
8      Q.  With Ann?
9      A.  I was going to say Bob.  So -- you
10  know.
11     Q.  Okay.  Were you impressed with the
12  products that had been built when you made those
13  pitches with Bob Fireman and Ann Raider?
14     MR. KATZ:  Objection.
15     Do you understand the question?
16     A.  I guess -- do I think that they
17  were -- I don't know --
18     Q.  I'll withdraw it.  Let me withdraw it
19  and I'll ask you another way.
20     Didn't you tell Bob Fireman in
21  substance that you were impressed with the
22  products that CCMI had built and that you told

36 (Pages 138 to 141)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                           July 17, 2007

New York, NY

| Page 142 | Page 144 |
|---|---|

Page 142

1  him they were in substance good, smart products?
2      A.  Yeah, again, I can't recall that.
3      Q.  Were you involved in the decision to
4  terminate Bob Fireman?
5          MR. KATZ:  Objection.
6      A.  Yes.
7      Q.  Can you tell me your role?
8      A.  My recollection is that Bob's
9  contract was coming to an end, and I believe
10  that, although he wasn't directly reporting to
11  me, that I volunteered to go speak to him about
12  not renewing the agreement.
13      Q.  Do you remember that he was removed
14  from the office some period of months prior to
15  the expiration of his contract?
16      A.  Yes.
17      Q.  Were you involved in that decision?
18      A.  Yes.
19      Q.  Can you tell me what the motivation
20  was or the inspiration was to remove Mr. Fireman
21  from News America Marketing's offices before the
22  end of his contract?

Page 143

1      A.  Yes.  My general recollection was
2  that, the feeling was, we weren't going to pick
3  up the -- his agreement to go any further and
4  that there wasn't a lot of sales, if any, over
5  the last time period.  Again, he was reporting to
6  someone else.  But that was my recollection.
7          And that we were a very structured
8  sales organization and we wanted to have the more
9  senior people setting good examples.  And we felt
10  that it was time for Bob to finish out his
11  employment without being in the office.
12      Q.  What about Bob did you think was a
13  bad example, or setting a bad example?
14      A.  I think just, again, in the areas of
15  work ethic and amount of time spent in the
16  office, and being accountable for where he was,
17  it was a general recollection.
18      Q.  What was said on that topic and by
19  whom?
20      A.  I remember a couple of specific
21  things.  One, trying to reach Bob and looking at
22  his call schedule and he was going to be with a

Page 144

1  client, but then it turns out he answered me from
2  the golf course.  I don't remember exactly when
3  that was, but I needed information, I can't
4  remember what, but I caught him on the golf
5  course, which, you know, wasn't in his call plan
6  and is not something that is typically done.
7          And then another time, I got a call
8  from one of his people in the office and saying,
9  "I was trying to find Bob, he's not here, where
10  is he supposed to be?"  And we checked and we
11  couldn't find him.  He was supposed to be in the
12  office.  Those are the two specific things I
13  recall.
14      Q.  Who was he reporting to at the time?
15      A.  I believe it was Henry.
16      Q.  Are those the types of things that
17  should be noted in Bob Fireman's evaluations?
18          MR. KATZ:  Objection.
19      A.  Yes.
20      Q.  Did you know that part of the
21  purchase price for CCMI was in the form of an
22  earn-out?

Page 145

1      A.  At some point, I -- that's my
2  understanding now, at some point, but not at the
3  time I was there.  It's my recollection.
4      Q.  Did you learn that there were bonuses
5  in the first and second year that Ann Raider and
6  Bob Fireman could achieve if they met certain
7  sales levels?
8      A.  Not -- I wasn't aware of that.
9      Q.  When did you learn about the earn-out
10  component of the purchase price for CCMI?
11      A.  I believe it was -- it was at certain
12  times during each of those years that they would
13  come in and talk to the finance group, what would
14  they talk about, and it was about this earn-out.
15  But that was my understanding of it, or...
16      Q.  Whom did you learn of it from?
17      A.  I can't recall.
18      Q.  Did you participate in any
19  conversations regarding the earn-out?
20      A.  Not that I -- I'm aware.
21      Q.  When Bob Fireman was removed from
22  News America's offices prior to the end of his

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
New York, NY

| Page 146 | Page 148 |
|---|---|
| 1 employment contract, do you recall any | 1    Q. Tell me the substance of the |
| 2 conversation internally about the impact that | 2 conversation between you and Bob Fireman on the |
| 3 that would have on his ability to achieve | 3 day he was told that he had to leave the offices. |
| 4 earn-out? | 4    A. Again, I don't have any specific |
| 5    A. Not that I recall. | 5 recollections. I believe, as I stated, that I |
| 6    Q. That wasn't discussed at all, that | 6 volunteered to do it 'cause I enjoy Bob as a |
| 7 you remember? | 7 person and felt that I would be the best person |
| 8    A. Not that I remember, no. | 8 to deliver the message, the news. |
| 9    Q. Who was involved in the discussions | 9    Q. But you don't remember the |
| 10 that led to the decision to remove Bob Fireman | 10 conversation? |
| 11 from News America's offices prior to the end of | 11    A. No. I know he did not want to leave, |
| 12 his contract? | 12 you know, the office. |
| 13    A. My recall is, it was done by | 13    Q. Did he tell you in substance, "How am |
| 14 committee, and the person that I remember | 14 I going to achieve earn-out if I don't have, you |
| 15 speaking to was Rita Meyer. | 15 know, I'm undercut even further"? |
| 16    Q. Who was on the committee? | 16       MR. KATZ: Objection. |
| 17    A. That would be Chris Mixson, Bill | 17    A. Again, I don't recall the |
| 18 Christie, Joe Trainor, Paul Carlucci, John | 18 conversation in detail. |
| 19 Linguiti -- | 19    Q. What did Rita Meyer say at the |
| 20    Q. Sorry, the last name? | 20 executive committee meeting that resulted in the |
| 21    A. John Linguiti. Gene Klein. Gene | 21 decision to remove Bob Fireman from News America |
| 22 Klein, sorry. It was the executive committee at | 22 Marketing's offices? |

| Page 147 | Page 149 |
|---|---|
| 1 the time. | 1    A. I don't recall. |
| 2    Q. Who is Rita Meyer? | 2    Q. Do you recall what any of these |
| 3    A. Rita is the head of human resources | 3 executive committee members said on the topic? |
| 4 at News America Marketing. | 4    A. I really do not. |
| 5    Q. What was her role in the discussions? | 5    Q. How long was the conversation among |
| 6 Was she heading them up? | 6 the executive committee? |
| 7    A. Again, I can't recall if she was | 7    A. I don't recall a specific discussion |
| 8 heading them up. But she prepared the paperwork. | 8 on it. |
| 9    Q. Paperwork being a release, for | 9    Q. Did it come up more than once at |
| 10 example? | 10 executive committee meetings that you attended? |
| 11    A. Yes. | 11    A. My recollection is, it did come up |
| 12    Q. Did you give Bob Fireman a copy of a | 12 more than once. |
| 13 release to sign? | 13    Q. Do you recall the discussion at any |
| 14    A. I think I did, yes. | 14 of the committee meetings regarding removing Bob |
| 15    Q. Can you tell me the discussions that | 15 Fireman from the office before his contract |
| 16 led to the decision to try to get Bob Fireman to | 16 expired? |
| 17 release News America Marketing from whatever | 17    A. I don't have recall on the |
| 18 claims he had? | 18 conversations. |
| 19    A. I don't recall. | 19    Q. Do you recall anyone at News America |
| 20    Q. Did Bob Fireman sign the release? | 20 Marketing ever suggesting that removing Bob |
| 21    A. I don't -- I don't believe he signed | 21 Fireman from his office prior to the expiration |
| 22 anything the day that I spoke with him. | 22 of his contract might have impact on his ability |

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                                July 17, 2007
                            New York, NY

---

Page 150

1  to achieve earn-out?
2      A.  I don't recall that.
3      MR. PETERS:  The next exhibit,
4  please.  41.
5      (Plaintiff Exhibit (Garofalo) 41,
6  e-mail chain Bates numbered FR1318, marked
7  for identification, as of this date.)
8      Q.  Would you take a look at Exhibit 41
9  and tell me if you remember seeing this.
10     (A pause in the proceedings.)
11     A.  Yeah, I don't have any recall of
12  seeing this prior to now.
13     Q.  You are shown as a cc on these two
14  e-mails, correct?
15     A.  Yes.
16     Q.  So I take it you have no reason to
17  doubt you received it.
18     A.  No.
19     Q.  You just don't remember seeing it.
20     A.  Yes.
21     Q.  Okay.  In the bottom e-mail from
22  Laura Frauenhofer, she writes, "Bob, please be

---

Page 151

1  notified that your computer access, building
2  access, et cetera, will be shut down.  Marty will
3  speak to you on Tuesday to sort out further
4  details of your exit from the company, Laura."
5      Do you remember that that in fact
6  happened, that his computer access and building
7  access was shut down?
8      A.  I don't recall.
9      Q.  Do you remember discussions among the
10  executive committee about doing that?
11     A.  No.
12     Q.  The response from Mr. Fireman, he
13  writes, "Laura, Marty only told me that I could
14  not continue to work out of the office in Boston
15  and that I could continue to work with our
16  accounts and finish the work I was doing to
17  generate new revenue for the company.  This will
18  be hard to do without access to the company
19  server and my phone access as well.  Please check
20  with him."
21     Did Laura check with you on that
22  point?

---

Page 152

1      A.  I don't recall.
2      Q.  Do you remember if Bob Fireman was
3  effectively excluded from working for News
4  America Marketing as of May, late May 2004?
5      A.  My recollection is that we did allow
6  him to use his phone and I cannot recall what
7  happened with the computer access, but I think
8  that, my recollection is that we reinstated the
9  use of the computer.
10     Q.  The computer or the phone or both?
11     A.  Both.  That's my recollection.
12     Q.  Did you see any of CCMI's business
13  plans when you took over as the EVP of sales for
14  the IGroup?
15     A.  Not that I recall.
16     Q.  Do you recall ever discussing CCMI's
17  business plans that existed at the time of the
18  acquisition?
19     A.  Again, not that I recall.
20     Q.  Do you now know that CCMI did have
21  business plans that existed at the time of the
22  acquisition?

---

Page 153

1      A.  Only through you stating such.  I
2  mean, I had no knowledge of that.
3      Q.  Okay.  Do you believe that no one --
4  let me -- this is clumsy so let me just start.
5      I know you don't remember talking
6  about or seeing the business plans for CCMI; is
7  that a correct statement?
8      A.  Yes.
9      Q.  Do you believe that you didn't?  In
10  other words, do you believe you never saw those
11  business plans?
12     A.  I don't think I ever saw them, no.
13     Q.  And do you believe you never spoke
14  about CCMI's business plans while you were the
15  EVP of sales?
16     A.  I don't recall ever sitting down and
17  discussing the business plans, no.
18     Q.  So there was no effort to follow, I
19  take it, CCMI's business plans.
20     A.  I'm -- I wouldn't be the one to be
21  able to judge that because I wasn't involved with
22  all the things that came prior to me being

---

39 (Pages 150 to 153)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                        July 17, 2007

New York, NY

---

Page 154

1  involved.
2        Obviously, I had very much a vested
3  interest in seeing the entity be successful
4  because my bonus was wrapped up in how we did in,
5  all along, hitting benchmarks. So I wanted him
6  to have a great success.
7        Q. Was your bonus wrapped up in how
8  successful SoftCard did as well? Maybe I should
9  ask -- withdraw it and ask this question more
10 generally.
11       A. Okay.
12       Q. How was your bonus comprised?
13          MR. KATZ: Point in time?
14          MR. PETERS: The 18 months that he
15 was the EVP of sales for IGroup.
16       A. Basically hitting an overall budget
17 number based on what the sales would be for the
18 entire unit and then at a certain level, most
19 everybody's bonus at the EVP level is
20 discretionary. But it's based on those numbers,
21 though.
22       Q. But the budget number was the number

---

Page 155

1  for the whole IGroup, right?
2        A. I can't re -- I can't recall.
3        Q. In other words -- let me ask you
4  this:
5        Did the three business units within
6  the IGroup have separate targets?
7        A. I don't -- I don't remember.
8        Q. If CCMI met its targets and SoftCard
9  did not and you did not, do you know whether or
10 not you'd be compensated for a bonus just on one
11 of the three?
12       A. Probably not. I think it's in its
13 totality.
14       Q. Right. So in order to get a bonus
15 during the 18 months that you were EVP of sales
16 for the IGroup, the IGroup's number had to be
17 met.
18       A. Yeah. I don't recall specifically
19 what it was but that was my understanding.
20       Q. Did you get a bonus?
21       A. Uh -- I don't recall ever not
22 receiving a bonus.

---

Page 156

1        Q. Do you recall if the IGroup's targets
2  were achieved during your tenure?
3        A. I do not -- I don't know the
4  disposition at the end of the year, no.
5        Q. You don't know whether you met them
6  or not.
7        A. I don't remember.
8           (A pause in the proceedings.)
9           MR. PETERS: Could you mark this as
10 Exhibit 42.
11          (Deposition Exhibit (Garofalo) 42,
12 set of presentation documents, marked for
13 identification, as of this date.)
14          (A pause in the proceedings.)
15       Q. Take a look at what we've marked as
16 Exhibit 42, Mr. Garofalo, and tell me if you have
17 seen that at any time before today.
18          (Witness perusing documents.)
19       A. I don't recall seeing this prior to
20 now.
21       Q. Okay. Do you recall seeing anything
22 like that, in other words, some kind of

---

Page 157

1  PowerPoint presentation that discussed or
2  describes CCMI's business and business plans?
3        A. I don't recall.
4           MR. PETERS: The next document we'll
5  mark is Bates-stamped NAM 828 through 33.
6  In fact, I'll mark that and we'll mark
7  these next two pages as well which I'll
8  then describe for the record.
9           (Plaintiff Exhibit (Garofalo) 44,
10 six-page document Bates numbered NAM 828
11 through 833, marked for identification, as
12 of this date.)
13          (Plaintiff Exhibit (Garofalo) 45,
14 single-page document Bates numbered
15 FR3461, marked for identification, as of
16 this date.)
17          (Plaintiff Exhibit (Garofalo) 46,
18 single-page document Bates numbered
19 FR4889, marked for identification, as of
20 this date.)
21       Q. Please take a look at Exhibits 44
22 through 46. 44, I've discussed the Bates label.

Henderson Legal Services
202-220-4158

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

---

Page 158

1    45 is FR3461 and 46 is FR4889.
2            My question is, do any of these three
3    exhibits look familiar to you, are they something
4    you recall seeing in the context of your work for
5    the IGroup?
6            (Witness perusing documents.)
7        A.  I don't recall seeing them.
8        Q.  Did you ever see financial
9    predictions generated by News America Marketing
10   for SmartSource Direct's business?
11       A.  I don't recall seeing them.
12       Q.  Are those the type of documents that
13   you would have seen if they existed in your
14   capacity as EVP of sales?
15       A.  I think yes.
16       Q.  Okay.  We were discussing the fact
17   that you were compensated, at least could have
18   been partly compensated on a bonus basis, based
19   on achieving targets.  Those targets would have
20   been financial projections that were prepared by
21   News America Marketing?
22       A.  Yes.

---

Page 159

1        Q.  Okay.  So you believe you did see
2    those at some point?
3        A.  Yes.
4        Q.  Did you help generate them?
5        A.  Again, not that I can recall.
6        Q.  Who in your experience would have
7    been responsible for generating the sales targets
8    for CCMI or SmartSource Direct?
9        A.  Chris, Henry, myself, finance,
10   Heather Harde.  I think that would be it.
11       Q.  Do you remember involving Ann Raider
12   and Bob Fireman in the process of generating
13   sales targets?
14       A.  I don't have any specific
15   recollection of that.
16       Q.  Is that something you would have
17   expected to happen?
18       A.  I would have, yes.
19       Q.  Why?
20       A.  As we bought these companies, we were
21   taking a look at what we could do and I'm sure we
22   looked at the background information.  But I

---

Page 160

1    don't recall doing it.
2        Q.  So that would have been something
3    that would have made sense from your perspective,
4    get the participation of Ann Raider and Bob
5    Fireman in developing sales calls?
6        A.  At some point, yes.
7        Q.  I show you a document that was marked
8    in Mr. Lellouche's deposition as Exhibit 1.
9            (Handing document to witness.)
10       A.  Okay.
11       Q.  I ask you if you have a memory of
12   seeing any version of that document.
13           (A pause in the proceedings.)
14       A.  I can tell you I haven't seen this.
15       Q.  You recognize the names on the first
16   page, though, I take it?
17       A.  Yes.
18       Q.  These are all people within News
19   America or News America Marketing?
20       A.  News Corporation.
21       Q.  News Corp.  I'm just going to ask you
22   one question.  You might want to look at this to

---

Page 161

1    reference --
2        A.  Okay.
3        Q.  -- take a look at the third page.
4        A.  Page 3.
5        Q.  Yes, sir.  Take a look under, "Model
6    Assumptions."
7        A.  Yes.
8        Q.  See, one, two, three, four, five
9    bullet points down?  Begins, "News America's
10   model assumes"?
11       A.  Yes.
12       Q.  My basic question is this:
13           Do you remember anyone discussing
14   with you News America's valuation of CCMI?
15       A.  Never.  No.
16       Q.  Okay.
17           MR. KATZ:  Can we take a break?
18           MR. PETERS:  Sure.
19           (Recess taken.)
20   EXAMINATION (Cont'd.)
21   BY MR. PETERS:
22       Q.  Let me show you an exhibit that was

---

41 (Pages 158 to 161)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

| Page 162 | Page 164 |
|---|---|
| 1  marked as Exhibit 34 in a prior deposition.  It | 1      MR. KATZ:  Objection. |
| 2  is titled, "SmartSource Direct Strategies, March | 2  A.  I do not.  I do not. |
| 3  14, 2002, Management Overview," Bates-stamped | 3      MR. PETERS:  Why don't you just give |
| 4  FR3740. | 4  me five minutes.  I may be done. |
| 5      First question is this:  Where were | 5      THE WITNESS:  Okay. |
| 6  you as of March 14, '02?  Were you still with the | 6      (Recess taken.) |
| 7  IGroup? | 7      MR. PETERS:  Just a couple more. |
| 8      A.  I'm not certain.  But according to | 8      (Plaintiff Exhibit (Garofalo) 43, |
| 9  this, I was not. | 9  organization chart Bates numbered FR3740, |
| 10      Q.  Bill Christie was then the president | 10  previously marked as Exhibit 34, marked |
| 11  of the SmartSource IGroup, you see that listed in | 11  for identification, as of this date.) |
| 12  this chart, right? | 12  EXAMINATION (Cont'd.) |
| 13      A.  Yes, I do. | 13  BY MR. PETERS: |
| 14      Q.  So you can place it in time that by | 14      Q.  Just a few more questions, |
| 15  then you'd gone back to the core business? | 15  Mr. Garofalo. |
| 16      A.  Yes, that's my understanding. | 16      MR. PETERS:  But I will note for the |
| 17      Q.  I take it you haven't seen this | 17  record that we have marked Exhibit 43 this |
| 18  organization chart? | 18  org chart with Bates label FR3740.  The |
| 19      A.  I hadn't, no. | 19  reason I marked it separately as |
| 20      Q.  Okay. | 20  Exhibit 43 is, somehow we just skipped |
| 21      MR. KATZ:  Can we mark this? | 21  one.  So in order just to keep a place, I |
| 22      MR. PETERS:  It was Exhibit 34 in a | 22  stuck it in. |

| Page 163 | Page 165 |
|---|---|
| 1      previous dep. | 1      MR. KATZ:  And the others begin with |
| 2      MR. KATZ:  Oh. | 2  44, 45 and 46? |
| 3      Q.  Under the FY 2002 year in review, you | 3      MR. PETERS:  No -- yes, that's |
| 4  see the bullet points, and the first one says, | 4  correct.  42, 43, 44, 45 -- |
| 5  "Supervisory reorganization relieves Fireman of | 5      THE WITNESS:  42 to 44. |
| 6  operations and Raider of retail sales | 6      MR. PETERS:  Right.  So now we have |
| 7  responsibility." | 7  the complete sequence of exhibits. |
| 8      Is that something that you knew about | 8      MR. KATZ:  Okay. |
| 9  in or about the March '02 time frame? | 9      Q.  Did you ever have any conversations |
| 10      A.  Not that I recall. | 10  with Mr. Carlucci about how he saw the future of |
| 11      Q.  Do you recall at any time up to the | 11  targeted direct mail? |
| 12  time that Bob Fireman was removed from News | 12      A.  Not that I can recall. |
| 13  America's offices, that he was relieved of | 13      Q.  Was there ever a philosophical shift |
| 14  operational responsibilities? | 14  that you can point to, or a business shift that |
| 15      A.  I don't remember -- I presently have | 15  you can point to, where the products that CCMI |
| 16  no recall of that, no. | 16  had to offer in loyalty marketing products and |
| 17      Q.  Next bullet point says, | 17  services were no longer of interest to or of |
| 18  "Reorganization of the operations team and | 18  lesser interest to News America Marketing? |
| 19  knowledge transfer of CCMI operational expertise | 19      A.  No.  Not to my knowledge. |
| 20  is complete." | 20      Q.  How long after the acquisition of |
| 21      Do you remember that effort underway | 21  CCMI did you join the IGroup? |
| 22  when you were the EVP of sales? | 22      A.  Again, not certain what time we |

                                    42  (Pages 162 to 165)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                      July 17, 2007
New York, NY

Page 166

1   acquired the CCMI as an entity.
2       Q.  Summer of '99.
3       A.  Summer of '99.  And I think the group
4   was formed, the IGroup was formed and I was there
5   when it was put in place, which was April of
6   2000.
7       Q.  Okay.  So there were operations in
8   place and the company was running CCMI before you
9   got involved with CCMI.
10      A.  Yes.
11      Q.  Who was running CCMI?
12      A.  I don't know for sure.
13      Q.  Was there an information exchange so
14  that you could learn what had gone on to date at
15  CCMI?
16      A.  Again, I don't recall such a meeting.
17      Q.  Were you effectively starting from
18  scratch when you joined the IGroup?
19          MR. KATZ:  Objection.
20      A.  Um --
21          MR. KATZ:  If you need an
22      explanation, you can ask --

Page 167

1       A.  -- no, I don't remember them other
2   there being an overall meeting saying, "This is
3   what's transpired over this course of time."  I
4   remember the initial meeting that we had that I
5   spoke to you about earlier.
6       Q.  That's really what I'm getting at.
7   You didn't get the sense that you were coming
8   into an ongoing operation.
9           MR. KATZ:  Objection.
10      A.  Well, obviously, there were
11  activities going on but the sense was, this was a
12  whole new start, as I saw it, anyway.
13      Q.  So you didn't spend time with the
14  people that had been running the businesses
15  beforehand to figure out what they had been able
16  to accomplish because you were effectively
17  starting over.
18          MR. KATZ:  Objection.
19      A.  Actually, the more we talk about it,
20  I think that Henry was involved, so to that
21  degree I believe he was involved.  So to that
22  degree, we were getting insights from him.  But

Page 168

1   for me, it was a whole new role for me.
2       Q.  Okay.
3       A.  Yeah.
4       Q.  And you didn't have anyone, for
5   example, to take the baton from because you were
6   starting from scratch.
7           MR. KATZ:  Objection.
8       A.  There was no dedicated sales
9   management prior to that, to my knowledge.
10      Q.  Ann Raider, for example, wasn't
11  running sales?
12      A.  Not for the breadth of the
13  organization, no.
14          MR. KATZ:  Objection to the form.
15          MR. PETERS:  I have nothing further.
16          (Time noted:  2:38 p.m.)
17
18
19
20
21
22

Page 169

1   STATE OF NEW YORK )
2                    ss:
3   COUNTY OF NEW YORK)
4
5          I, MARTIN GAROFALO, the witness
6   herein, having read the foregoing testimony of
7   the pages of this deposition, do hereby certify
8   it to be a true and correct transcript, subject
9   to the corrections, if any, shown on the attached
10  page.
11          oOo
12
13
14          _____
14          MARTIN GAROFALO
15
16
17
18
19
20
21
22

43 (Pages 166 to 169)

85d36eb8-9df6-4476-b435-8ed61512af8b

Garofalo, Martin                                    July 17, 2007
                        New York, NY

```
                                        Page 170
 1              C E R T I F I C A T E
 2    STATE OF NEW YORK   )
 3              : ss.
 4    COUNTY OF NEW YORK  )
 5         I, DAVID LEVY, CSR, a Shorthand
 6       Reporter and Notary Public within and
 7       for the State of New York, do hereby
 8       certify:
 9         That MARTIN GAROFALO, the
10       witness whose deposition is hereinbefore
11       set forth, was duly sworn by me and that
12       such deposition is a true record of the
13       testimony given by the witness.
14         I further certify that I am not
15       related to any of the parties to this
16       action by blood or marriage, and that I
17       am in no way interested in the outcome
18       of this matter.
19         IN WITNESS WHEREOF, I have
20       hereunto set my hand this 29th day of
21       July, 2007.
22              DAVID LEVY, CSR
```

                                        44 (Page 170)

85d36eb8-9df6-4476-b435-8ed61512af8b