# Holland & Knight

Tel  617 523 2700
Fax  617 523 6850

Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116-3889
www.hklaw.com

Gordon P. Katz
617 573 5839
gordon.katz@hklaw.com

July 17, 2008

## ELECTRONIC FILING

The Honorable Mark L. Wolf
United States District Court
District of Massachusetts
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA  02210

Re: *Fireman, et al. v. News America Marketing In-Store, Inc.*
Civil Action No. 1:05-cv-11740

Dear Judge Wolf:

As your Honor will recall, we represent defendant News America Marketing In-Store, Inc. ("NAM") in the above action.  We last appeared before Your Honor on April 8, 2008 for oral argument on NAM's motion for summary judgment, which is now pending.

I write now to bring to the Court's attention three decisions of New York courts relevant to the pending summary judgment motion and rendered after the April 8, 2008 summary judgment motion hearing.

As your Honor is aware, one of NAM's central arguments is that New York courts will *not* enforce obligations of good faith and fair dealing that are *inconsistent* with other terms of a contractual relationship.  *Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 304, 448 N.E.2d 86 (1983).[1]

In recent months, this principle has been applied on three separate occasions by New York courts.  In each instance, the court concluded that a claim for breach of the implied covenant of good faith and fair dealing could *not* be sustained in the face of inconsistent contract

---

[1] With respect to the importance of the *Murphy* decision (as compared against any competing lower federal court authority, such as that cited by the plaintiffs), we note that the First Circuit has ruled that "[w]hen the highest court of a state disposes of an issue of state law contrary to the resolution of the issue theretofore suggested by a federal court, the latter ruling must give way."  *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 429 n.12 (1st Cir. 1996). *Accord TwoRivers v. Lewis*, 174 F.3d 987, 996 (9th Cir. 1999).

Honorable Mark L. Wolf
July 17, 2008
Page 2

terms. *See Martindale v. Gleasman*, 2008 WL 2627457, at *9 (W.D.N.Y. 2008) (granting motion to dismiss, and holding "[a] defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract") (Attachment A); *In re Musicland Holding Corp.*, 386 B.R. 428, 438 (S.D.N.Y. 2008) ("The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms.") (Attachment B); *Phoenix Capital Investments v. Ellington Management Group, LLC*, 859 N.Y.S. 2d 46, 48 (N.Y. App. Div. 1st Dep't 2008) (affirming trial court's allowance of motion to dismiss, concluding that it would "unjustifiably frustrate the expectations of the parties as made explicit in the contract" if plaintiff were allowed to plead a "conclusory claim" for breach of the implied covenant of good faith and fair dealing) (Attachment C).

Copies of the *Martindale, Musicland Holding Corp.* and *Phoenix Capital Investments* opinions are enclosed for the Court's reference and consideration. Thank you again for your attention to this matter.

Very truly yours,

/s/ Gordon P. Katz
Gordon P. Katz

GPK/me-b
Attachments

cc:    Kevin T. Peters, Esq.

# 5473168_v1

EXHIBIT A

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
**(Cite as: 2008 WL 2627457 (W.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Michael MARTINDALE, Jacob H. Brooks, and
David K. Marshall, Plaintiffs,
v.
Keith GLEASMAN, Morton Polster, Torvec, Inc.,
and Ice Surface Development,
Inc., Defendants.
No. 07-CV-6517.

June 27, 2008.

Jerauld E. Brydges, Harter, Secrest and Emery, LLP,
Rochester, NY, Philip G. Spellane, Harris Beach
LLP, Pittsford, NY, for Plaintiffs.

Warren B. Rosenbaum, Woods Oviatt Gilman LLP,
Rochester, NY, for Defendants.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

### INTRODUCTION

**\*1** Plaintiffs Michael Martindale ("Martindale"),
Jacob H. Brooks ("Brooks") and David K. Marshall
("Marshall") (collectively "plaintiffs") allege four
causes of action in their Complaint. The first cause of
action asserts a shareholder derivative action under
New York Business Corporation Law § 720 against
defendants Keith Gleasman ("Gleasman"), Morton
Polster ("Polster") (together referred to as "G-P
defendants"), and Torvec, Inc. ("Torvec")
(collectively "defendants"). The second allegation
sounds in breach of common law fiduciary duty owed
to defendant Ice Surface Development, Inc. ("ISDI")
and its shareholders. It is also asserted derivatively
against Gleasman, Polster and Torvec. Further, the
third cause of action, which is alleged directly against
Gleasman, Polster and Torvec sounds in breach of
fiduciary duty based upon plaintiffs' alleged status as
creditors of ISDI. Finally, the fourth cause of action
asserts a direct claim solely against Torvec for
tortious interference with plaintiffs' employment
contracts.

Defendants Torvec, ISDI, Gleasman and Polster
move to dismiss plaintiffs' complaint against them
pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure or, alternatively, to stay the
remaining portions of this action insofar as they are
dependent upon the resolution of a related arbitration
proceeding and plaintiffs' status as creditors of ISDI.
Plaintiffs opposed the motion to dismiss and/or stay
and filed a cross-motion for a preliminary injunction
requesting that the Court enter an order restraining
Torvec from dissipating or transferring monies
received from Ice Engineering, LLC ("Ice
Engineering") pursuant to ISDI's sale of the
Dartmouth License to Ice Engineering.

For the reasons set forth below, the defendants'
motions to dismiss are granted and plaintiffs' cross-
motion for preliminary injunction is denied as moot.

### BACKGROUND
**I. *Defendants Torvec, ISDI, Gleasman and Polster
and Plaintiffs Martindale, Brooks and Marshall***

Torvec is a publicly owned developmental-stage
automotive technology company based in Rochester,
New York. [FN1] Gleasman and Polster are officers
and shareholders of both Torvec and ISDI. Moreover,
Torvec is the majority shareholder of ISDI. Torvec
acquired ISDI on November 20, 2000 from Utek
Corporation of Plant City, Florida. As a result of this
transaction, Torvec acquired a twenty-year exclusive,
worldwide license granted by the Trustees of
Dartmouth College for land-based motorized and
non-motorized applications to a novel ice adhesion
modification system which was developed by
Professor Victor Petrenko at Dartmouth College (the
"Dartmouth License"). *See* Complaint, ¶ 22. As
Torvec's subsidiary, ISDI was to develop Professor
Petrenko's novel ice adhesion modification system.
Specifically, ISDI was to develop technology
allowing for the rapid de-icing of vehicles.
Accordingly, the principal asset of ISDI was the
Dartmouth License. Plaintiffs are all former officers
and current minority shareholders of ISDI. *See id.,* ¶
10. At all relevant times including through June
2007, Martindale, Brooks and Marshall were
directors of ISDI and controlled ISDI's Board of
Directors, which meant they controlled ISDI.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN1. Torvec was organized in 1996 and its mission is the creation and maximation of shareholder value through the commercialization of its Full Terrain Vehicle ("FTV"). The FTV incorporates the key patented technologies contained in Torvec's product portfolio.

## II. *Plaintiffs' Employment Agreements with ISDI*

**\*2** Plaintiffs executed Employment Agreements with ISDI dated April 1, 2002. *See* Complaint, ¶¶ 14-16. According to the Complaint, as of 2002, ISDI failed to pay plaintiffs compensation amounting to $480,000, which was allegedly due under the Employment Agreements. [FN2]*See id.,* ¶ 18. As a result, in October 2002, ISDI, Torvec, members of Torvec's Board of Directors and plaintiffs executed a Memorandum of Understanding regarding Third Quarter Financials ("MOU") and Individual Amendments ("Amendment No. 1") wherein plaintiffs agreed to contribute $480,000 in compensation as capital to ISDI. In addition, plaintiffs agreed to forgo future compensation under their Employment Agreements "until such time as ISDI's Board of Directors determined that ISDI had the requisite funds to pay such amounts." *See id.,* ¶ 20. Plaintiffs allege that they continued their employment and provided services to ISDI under the Employment Agreements even though they did not receive any salary, bonuses or benefits to which they were entitled. Plaintiffs assert that the unpaid compensation owed to them totaled, in the aggregate, $1,405,000, which included plaintiffs' $480,000 capital contributions to ISDI. *See id.,* ¶ 21.

FN2. Martindale as CEO and Brooks as COO were to receive annual equivalent base salaries of $260,000 for the remainder of 2002, and base salaries of $280,000 for 2003 and $300,000 for 2004. Marshall as Vice President of Manufacturing was to receive an annual equivalent base salary of $160,000 for the remainder of 2002, base salary of $190,000 for 2003 and $220,000 for 2004.

## III. *The Liquidation of ISDI*

In December 2006, ISDI and Torvec commenced discussions with Ice Engineering concerning Ice Engineering's acquisition of the Dartmouth License. *See* Complaint, ¶ 23. According to the Complaint, Ice Engineering was willing to pay $3.5 million for the License and both ISDI and Torvec became aware of this fact. *See id.,* ¶ 24. In the Spring of 2007, ISDI designed a Liquidation Plan and notified its shareholders. A "Notice of Special Meeting of the Shareholders of Ice Surface Development" ("Notice of Special Meeting") was mailed to plaintiffs on May 26, 2007, which explained that the shareholders would "consider and vote upon a Plan of Liquidation and Dissolution" on June 7, 2007 [.]" Attached to the Notice of Special Meeting was a copy of the Liquidation Plan for each shareholder, including plaintiffs to review in advance of the June 7 meeting and a form of proxy whereby each of the plaintiffs could approve or disapprove the proposed Liquidation Plan.

The terms of the Liquidation Plan provided for an assignment of the Dartmouth License to Ice Engineering in exchange for a royalty equal to 5% of the gross revenues generated by the commercialization of the ice adhesion technology. In addition, Ice Engineering would reimburse Torvec for a portion of the costs paid by Torvec for the acquisition and maintenance of the Dartmouth License and the development and marketing of the technology. Further, upon assignment of the Dartmouth License, ISDI would liquidate and dissolve, transferring to each ISDI shareholder his/her proportionate share of the right to receive royalty payments from Ice Engineering. Plaintiffs contend that the value of the consideration given by ISDI in the transaction was far in excess of the value of the consideration given by Ice Engineering. Plaintiffs argue that despite Ice Engineering's willingness to pay $3.5 million for the Dartmouth License, ISDI would not receive any cash in the deal, instead ISDI received only the 5% royalty payments. *See* Complaint, ¶¶ 25-27.

**\*3** On June 4, 2007, Torvec received an e-mail from the plaintiffs stating in pertinent part that plaintiffs "are in agreement with the main elements of the proposal and think this may have a reasonable chance to create value for our joint investments. We do not want to hold up the process, but would like you to consider addressing some unfinished business as follows." Plaintiffs then requested to be reimbursed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

for any unpaid compensation under their respective Employment Agreements.  [FN3] In response to plaintiffs' request, as described in the June 7 Shareholder Meeting Minutes, ISDI agreed to "increase Plaintiffs' record ownership interest in ISDI" thereby entitling plaintiffs to "a greater share of the 5% royalty" to be paid by Ice Engineering in exchange for assignment of the Dartmouth License. [FN4] There were no further communications between plaintiffs, ISDI and/or Torvec during the June 7, 2007 meeting. Despite knowledge of the shareholder meeting on June 7, 2007, none of the plaintiffs attended and none of them submitted a proxy vote either in favor or opposing the Liquidation Plan. On June 8, 2007, plaintiffs sent an e-mail to ISDI and confirmed that they "simply expect to participate in the royalty interest and the cash portion of the transaction on a proportionate basis." *See* Declaration of Philip G. Spellane ("Spellane Decl."), Ex. D.

> FN3. Plaintiffs asserted that the "unpaid wages" owed to them from the fourth quarter of 2002 to the end of 2003 amounted to $925,000. In addition, they indicated their belief that the unpaid wages should be treated in the same category as the $5 million in funds that Torvec had expended and a portion of which was to be reimbursed by Dr. Petrenko as part of the proposed transaction as disclosed in the Plan.

> FN4. The shareholders of ISDI ultimately determined that a fair method of resolving plaintiffs' asserted claims for alleged "back wages" (including $480,000 contributed as capital and the alleged $925,000 accumulated during the period up to 2003) was to convert the same, as permitted by the terms of the Employment Agreement into additional shares of ISDI common stock. According to defendants, as a result of the conversion of plaintiffs' alleged claims into additional ISDI shares as permitted by the terms of the Employments Agreements, plaintiffs, in the aggregate were to receive 42% of such future royalty stream in cash instead of only 27% per the original distribution.

**IV. *Arbitration***

On July 13, 2007, the plaintiffs, as petitioners, commenced a special proceeding in the Supreme Court of the State of New York, Monroe County against ISDI and Torvec seeking, among other things, to enjoin ISDI and Torvec from selling, assigning, transferring or otherwise alienating any of ISDI's assets and from taking any other action to dissolve or liquidate ISDI pending the resolution of plaintiffs' claims in arbitration against ISDI. Both ISDI and Torvec opposed that application. On or about September 12, 2007, Monroe County Supreme Court Justice Thomas A. Stander issued an order preliminarily enjoining ISDI from selling, assigning, transferring or otherwise alienating any of its assets and from taking any action to dissolve or liquidate, pending the resolution of plaintiffs' claims against ISDI in arbitration, provided that such arbitration be commenced within thirty days of the date of the Supreme Court's Order. Judge Stander also denied plaintiffs' claims for injunctive relief to restrain the transfer of the Dartmouth License previously owned by ISDI.

On October 8, 2007, plaintiffs filed a Demand for Arbitration with the American Arbitration Association ("AAA"). In their demand, they claim ISDI breached their Employment Agreements "by failing to pay salaries due and owing for the years 2002-2004." The arbitration proceeding is pending in Monroe County, New York and is scheduled to be heard on July 15-17, 2008. Even though the arbitration proceeding is still pending, plaintiffs commenced this action in Federal Court on October 19, 2007.

### *DISCUSSION*
**I. *Motions to Dismiss Standard***

**\*4**Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See*Fed. R.Civ.P. 8(a). Specific facts are not necessary and the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under Rule 12(b)(6), a plaintiff's complaint will be dismissed if it fails to state a claim upon which relief can be granted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
(Cite as: 2008 WL 2627457 (W.D.N.Y.))

See Fed.R.Civ.P. 12(b)(6). When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. See Bell Atl. Corp., 127 S.Ct. at 1965 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. See Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

In ruling on a motion to dismiss, the court is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." See Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985) (citing Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984)). Therefore, after interpreting the complaint in favor of the plaintiff, if it is determined that the plaintiff has failed to allege a set of facts which, if proven to be true, would entitle him to relief, the complaint will be dismissed. See Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d. Cir.1993), cert. denied, 513 U.S. 1121, 115 S.Ct. 925, 130 L.Ed.2d 804 (1994); Sworn v. Western New York Children's Psychiatric Ctr., 269 F.Supp.2d 152, 155 (W.D.N.Y.2003) (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

On a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

## II. Waiver and Estoppel of Plaintiffs' Claims

Defendants' argue that plaintiffs took several actions that effectively waived their rights by not only failing to oppose the adoption of the Liquidation Plan, but in

fact consented to it. Defendants rely on the June 4, 2007 e-mail sent by plaintiffs after the Notice of Special Meeting was mailed and the subsequent adoption of the Liquidation Plan, which states in pertinent part that plaintiffs "are in agreement with the main elements of the proposal and think this may have a reasonable chance to create value for our joint investments[.]" Although the e-mail goes on to discuss the plaintiffs' desire to have their "unpaid wages" treated in the same category as Torvec's $5 million expenditure to acquire and maintain the Dartmouth License, defendants argue that plaintiffs made no objection to the value of the consideration to be received by ISDI from Ice Engineering in exchange for the Dartmouth License, based on 5% of future royalties. Accordingly, defendants argue that plaintiffs' assertions that there was some breach of fiduciary duty resulting from ISDI's sale of the Dartmouth License "for substantially less than its true value" is refuted by their own acceptance. Defendants claim that based on the e-mail exchanges and documents sent, plaintiffs were fully aware of the value to be received in exchange for the Dartmouth License and unequivocally approved of that exchange.

*5 Furthermore, defendants claim that even after being informed of ISDI's decision to not treat plaintiffs' claim for "unpaid compensation" in the same category as Torvec's $5 million expenditure to acquire and maintain the Dartmouth License, plaintiffs still did not appear at the June 7, 2007 special meeting of the shareholders, nor did they vote their shares in opposition to the adoption of the Plan, or voice their objection to the adoption of the Plan in any way. Plaintiffs argue that the notice mailed out on May 26, 2007 did not disclose that Torvec would be receiving $3.5 million in connection with the Liquidation Plan. Rather, the notice indicated only that "Torvec would have to be at least partially reimbursed for its costs." According to plaintiffs, this communication is crucial because it demonstrates that plaintiffs were not aware and could not have known that Ice Engineering in fact agreed to pay $3.5 million in cash in connection with the transaction. Notwithstanding this information, plaintiffs argue that the pleadings and documents show that they did object to being "shut out" of the cash portion of the transaction, even before they became aware of the full extent of defendants' actions. See Pls. Memo. at 10.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
(Cite as: 2008 WL 2627457 (W.D.N.Y.))

Page 5

The Court notes the general principle that a shareholder who participated in the challenged activity or "did not oppose the challenged actions" is estopped and "may not subsequently challenge its legality in a derivative suit." *See Pinnacle Consultants, Ltd. v. Leucadia Nat. Corp.,* 94 N.Y.2d 426, 433, 706 N.Y.S.2d 46, 727 N.E.2d 543 (2000); see also *Diamond v. Diamond,* 307 N.Y. 263, 266, 120 N.E.2d 819 (1954); *Blake v. Blake,* 225 A.D.2d 337, 638 N.Y.S.2d 632 (1st Dept.1996) (plaintiff in shareholder derivative action was "estopped personally from complaining about the transaction, in light of his knowledge of and acquiescence to the sale"); *Winter v. Bernstein,* 149 Misc.2d 1017, 1020, 566 N.Y.S.2d 1012 (N.Y.Sup.1991), affd as mod on other grounds 177 A.D.2d 452, 576 N.Y.S.2d 549 (1991) ("A shareholder is estopped to challenge a corporate policy which he or she affirmatively approved, or of which the shareholder had knowledge but to which no objection was interposed"). Accordingly, the law is clear that a shareholder is estopped from challenging, either individually or through a derivative action, any corporate policy which he approved or which the shareholder had knowledge but to which no objection was put forth. *See Diamond,* 307 N.Y. at 266, 120 N.E.2d 819;see also *Jacobson v. VanRhyn,* 127 A.D.2d 743, 744, 512 N.Y.S.2d 135 (2d Dept.1987) (director and shareholder waved any right to challenge corporation action where he "abstained from voting" upon that action).

As to the issue of waiver, the Court agrees with the defendants' arguments that plaintiffs' claims concerning their objections to the relevant components of the Liquidation Plan, [FN5] were waived by their failure to object to the Liquidation Plan, and their clear approval and "agreement with the main elements" of the Liquidation Plan. *See Travellers Int'l AG & Windsor, Inc. v. Trans World Airlines, Inc.,* 722 F.Supp. 1087, 1098 (S.D.N.Y.1989), aff'd. 41 F.3d 1570 (2d Cir.1994) ("Waiver is the intentional relinquishment of a known right ... [which] unlike equitable estoppel, does not require a showing of detriment by a party claiming to have been misled."); see also *Winter,*149 Misc.2d at 1020, 566 N.Y.S.2d 1012. Here, it is clear that plaintiffs never objected to the value of the consideration that was to be received by ISDI under the Liquidation, which was 5% of future royalties. A

review of the e-mails exchanged between the parties prior to the June 7, 2007 shareholder meeting shows that plaintiffs indicated a desire to participate in the cash portion of the Liquidation Plan as individuals and not as shareholders of ISDI or on behalf of ISDI. The plaintiffs never objected to the adoption of the Liquidation Plan either on behalf of ISDI or as ISDI shareholders.

> FN5. Plaintiffs claim to have objected to their exclusion from the cash portion of the Liquidation Plan and that their ignorance of the specific dollar amount of $3.5 million excuses their failure to act.

*6 Three days before the June 7 shareholder meeting, plaintiffs informed defendants by e-mail that "[we] are in agreement with the main elements of the proposal and think this may have a reasonable chance to create value for our joint investments. We do not want to hold up the process, but would like you to consider addressing some unfinished business." Not only were plaintiff in agreement with the Liquidation Plan, they explicitly indicated that they had no intention of "holding up the process" because the assignment of the Dartmouth License to Ice Engineering had a "reasonable chance to create value for [their] joint investment." By e-mail dated June 7, 2007, plaintiffs were advised that the Liquidation Plan involved, not only a 5% royalty to be paid by Ice Engineering, but also a reimbursement to Torvec for certain out of pocket costs. Despite the e-mail exchange and having full knowledge of the Liquidation Plan, none of the plaintiffs attended the June 7, 2007 shareholder meeting presumably because their interests were satisfied. Further, by e-mail dated June 8, 2007, a day after the shareholder meeting, plaintiffs confirmed their expectation to be treated in the same way as the major shareholders stating "[a]s shareholders we simply expect to participate in the royalty interest and the cash portion of the transaction on a proportionate basis."

It is undisputed that each plaintiff received a copy of the Liquidation Plan, the notice of the June 7, 2007 shareholder meeting and were provided with the opportunity to vote in favor or in opposition to the Liquidation Plan. However, none of the plaintiffs attended the June 7, 2007 shareholder meeting, nor did any of them exercise their right to vote by proxy. Plaintiffs' only input prior to the vote was their June 4

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                Page 6
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
(Cite as: 2008 WL 2627457 (W.D.N.Y.))

e-mail in which they confirmed their "agreement with the main elements" of the Plan, including reimbursement to Torvec for a portion of the costs paid by Torvec for the acquisition and maintenance of the Dartmouth License. Moreover, plaintiffs were aware that ISDI would not be receiving a lump sum cash payment, but instead future royalties.

**III. *The First and Second Causes of Action are Barred Under <u>BCL § 623</u>.***

Plaintiffs allege a shareholder derivative claim under <u>Business Corporation Law ("BCL") § 720</u> on behalf of ISDI in the first cause of action and a common law breach of duty claim on behalf of ISDI in the second cause of action. <u>BCL § 623</u> recognizes a shareholder's right to object to corporate action and establishes procedures for a dissenting shareholder to elect and demand payment of the fair value of his or her shares. If the corporation fails to make a written offer to each electing shareholder to pay for his or her shares at a specified price that the corporation considers fair, or if any dissenting shareholder or shareholders disagree with the price offered, a special proceeding may be instituted in state court to determine the rights of the dissenting shareholders and to fix the fair value of their shares. *See <u>id. § 623</u>*(g), (h). To the extent that plaintiffs had the right to dissent and seek appraisal under <u>BCL § 623</u>, it was their exclusive remedy and they failed to avail themselves of this remedy, thereby barring the first and second causes of action. *See <u>Norte & Co. v. New York & Harlem Railroad Co.,</u> 222 A.D.2d 357, 358, 635 N.Y.S.2d 629 (1st Dept.1995)*, citing <u>Schloss Assocs. v. Arkwin Indus.,</u> 61 N.Y.2d 700, 472 N.Y.S.2d 605, 460 N.E.2d 1090 (1984), [FN6] reversed on dissenting opn., 90 A.D.2d 149, 455 N.Y.S.2d 844 (2d Dept.1982) ("The Court of Appeals has squarely held that where the appraisal proceeding is available and merely not exercised, the exclusivity [of <u>BCL § 623</u>] applies.")

> FN6. In its decision in *Schloss Assoc.,* the New York Court of Appeals reversed the lower court's denial of a motion to dismiss the minority shareholders' complaint which sought appraisal pursuant to <u>BCL § 623</u>. *See* <u>61 N.Y.2d at 703.</u> That complaint contained allegations of self-dealing by the majority shareholders. The basis for the Court of Appeals' decision was the

dissenting opinion of Justice Mangano in the case when it was previously decided by the Appellate Division. *See id.* "There must be a request for equitable relief which, in fact, must be the primary relief sought. Money damages are only available, if at all, as ancillary or incidental to such equitable relief." *See <u>Schloss Assoc.,</u> 90 A.D.2d at 159, 455 N.Y.S.2d 844* (Mangano, J., dissenting); *see also <u>Breed,</u> 54 N.Y.2d at 87, 444 N.Y.S.2d 609, 429 N.E.2d 128* ("any monetary recovery, if available at all, can only be ancillary to a grant of some form of equitable relief").

*\*7*<u>BCL § 623</u>(k) provides, in pertinent part:
> The enforcement by a shareholder of his right to receive payment for his shares in the manner provided herein shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share ownership, ... except that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent *as to him.* (Emphasis added)

To qualify for the exclusivity exception outlined in <u>BCL § 623</u>(k), "it is not merely enough to plead a cause of action over which equity would take jurisdiction, e.g., one based on constructive fraud for breach of fiduciary duty," the primary relief sought must be equitable in nature. *See <u>Schloss Assocs.,</u> 90 A.D.2d at 158-159, 455 N.Y.S.2d 844*. In addition, derivative claims brought by shareholders on behalf of the corporation, and not in their individual capacities, do not fall under the exception to the exclusivity rule in <u>§ 623</u>(k). *See <u>Norte & Co.,</u> 222 A.D.2d at 358, 635 N.Y.S.2d 629;see also <u>Breed v. Barton,</u> 54 N.Y.2d 82, 86, 444 N.Y.S.2d 609, 429 N.E.2d 128 (1981)* ("It is evident from the express language of subdivision (k) that this exception to the general rule of exclusivity of the appraisal remedy permits a shareholder to pursue an appropriate action only in his individual capacity and not as the instigator of a derivative suit.")

Here, none of the plaintiffs exercised their appraisal rights pursuant to <u>BCL § 623</u> and accordingly failed to avail themselves of any remedy under <u>BCL § 623</u>. Moreover, both of plaintiffs' shareholder derivative

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claims request that Torvec "be ordered to pay over to ISDI any funds which Torvec has received or will receive from Ice Engineering pursuant to the 'reimbursement' agreement...." *See* Complaint ¶¶ 46, 53. As a result, plaintiffs' claim against defendants for breach of fiduciary duty is derivative in nature. *See Norte & Co., 222 A.D.2d at 358, 635 N.Y.S.2d 629;see also Abrams v. Donati, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 489 N.E.2d 751 (1985)* ("[A]llegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually.") Thus, plaintiffs derivative claims are barred by the statute as they are asserted on behalf of ISDI and not on behalf of plaintiffs in their individual capacities.

Plaintiffs argue that they have alleged sufficient facts as to have satisfied the First and Second Causes of action "as to them." *See* Pls. Memo at 15-16. However, the only equitable relief requested in the Complaint is on behalf of ISDI. *See* Complaint, ¶¶ 36, 43, 46, 51, 53. To the extent that relief as to the plaintiffs individually is sought, it is strictly monetary in nature, that is, plaintiffs rely upon the alleged breach of their Employment Agreements to satisfy the "as to them" requirement of *BCL § 623*(k). *See* Pls. Memo at 15. However, no such allegation appears in the First or Second Causes of Action. *See* Complaint, ¶¶ 38-55. Furthermore, plaintiffs rely on *Beard v. Ames, 96 A.D.2d 119, 468 N.Y.S.2d 253 (4th Dept.1983)* to support their claim. However, the *Beard* case is distinguishable since it involved the attorney-client privilege issue in the "context of an equitable action brought by shareholders against a corporation." *See id.* at 120, 468 N.Y.S.2d 253. In that case, the plaintiffs were dissenting shareholders who started an action to rescind a merger between two corporations. Unlike the plaintiffs here, the *Beard* plaintiffs began a judicial appraisal action under *BCL § 623* and were not simply seeking to circumvent that statute's exclusivity requirement. In this case, the only remedies that plaintiffs seek "as to them" are compensatory damages. Therefore, the first and second causes of action must be dismissed for this reason as well, since plaintiffs do not fall within the "equitable action" exception to the exclusivity of *BCL § 623*.

**IV. *The Third Cause of Action***

**\*8** Plaintiffs' Third Cause of Action alleges a claim for breach of common law fiduciary duty owed to plaintiffs as creditors of ISDI. *See* Complaint, ¶¶ 56-63. [FN7] In support of plaintiffs' claim to creditor status, plaintiffs contend that the adoption of the Liquidation Plan amounts to a forfeiture of their wages in violation of public policy. *See* Pls. Memo at 13. However, no forfeiture has occurred in this situation since plaintiffs are merely being compensated by different means. Instead of cash, plaintiffs' "unpaid wages" are to be paid in additional share ownership of ISDI stock which were immediately converted into a right to receive an increased percentage of future royalty payments. Such a payment structure is pursuant to the express terms of the plaintiffs' Employment Agreements. [FN8] Accordingly, plaintiffs were compensated pursuant to the terms of the Employment Agreements and no forfeiture or breach occurred. Thus, because the express terms of the Employment Agreements permit the very action that plaintiffs now challenge, plaintiffs' Third Cause of Action is dismissed. [FN9]

> FN7. Although the Third Cause of Action is allegedly based solely upon plaintiffs' claimed creditor status, their waiver and consent to the adoption of the Liquidation Plan is equally applicable. As previously discussed, plaintiffs did not object to ISDI being excluded from the cash portion of the transaction and only receiving 5% of future royalties. At most, plaintiffs expressed a desire to participate in the cash portion of the transaction as individuals, i .e. seeking to have their individual interests served and not those of ISDI.

> FN8. Section 3.5 of the Employment Agreements state "compensation owed, accrued and/or to be paid under the Agreement as herein set forth shall, in the discretion of the Board of Directors, be paid either in shares of the Company's capital stock, in cash or in a combination of both stock and cash at such time(s) as may be determined by the Board."

> FN9. Defendants argue that if plaintiffs' Third Cause of Action is not dismissed outright, it should be stayed pending

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 8
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
**(Cite as: 2008 WL 2627457 (W.D.N.Y.))**

resolution of the arbitration proceedings. The Court need not address the stay issue since it has dismissed the plaintiffs' Third Cause of Action.

### V. *The Fourth Cause of Action*

#### A. Tortious Interference With Contract

In the Fourth Cause of Action, plaintiffs allege that Torvec tortiously interfered with their contractual relations, i.e. Employment Agreements with ISDI by causing ISDI to breach the Employment Agreements. In order to establish tortious interference under New York law, plaintiffs must show: (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.' " *See Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401 (2nd Cir.2006) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370, (1996)); *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001); *Pelosi v. Schwab Capital Markets, L.P.,* 462 F.Supp.2d 503, 516 (S.D.N.Y.2006); *see also NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 620-21, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996). There is no dispute that a valid agreement existed between plaintiffs and ISDI and that Torvec had knowledge of the Employment Agreement. However, plaintiffs have failed to allege that Torvec intentionally procured the breach of the Employment Agreements held with plaintiffs by ISDI, without justification. *See Kirch,* 449 F.3d at 401.

The express terms of the Employment Agreements allowed the Board of ISDI to compensate plaintiffs, in its sole discretion, with either cash or stock. In addition, the amendment to the Employment Agreements made it permissible that the Board of ISDI delay payment of plaintiffs' wages to when, in its sole discretion, ISDI acquired the required funds to pay plaintiffs such amounts. Plaintiffs were paid amounts owed to them by receiving the value of the ISDI stock shares in an amount equal to their claimed "unpaid wages." Accordingly, there could be no breach and no tortious interference of a contractual relationship. Thus, plaintiffs have failed to state a

cause of action for tortious interference with contract. Accordingly, 1 grant defendants' motion to dismiss the Fourth Cause of Action of plaintiffs' Complaint. [FN10]

> FN10. Defendants argue that if plaintiffs' Fourth Cause of Action is not dismissed outright, it should be stayed pending resolution of the arbitration proceedings. The Court need not address the stay issue since it has dismissed the plaintiffs' Fourth Cause of Action.

#### B. Covenant of Good Faith and Fair Dealing

**\*9** In New York, implicit in every contract is a promise of good faith and fair dealing, which is breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under the agreement. *See Skillgame, LLC v. Brody,* 1 A.D.3d 247, 767 N.Y.S.2d 418 (1st Dept.2003); *see also 511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002) ("all contracts imply a covenant of good faith and fair dealing in the course of performance.") (citation omitted). The Court of Appeals has held that "no obligation can be implied ... which would be inconsistent with other terms of the contractual relationship." *See Horn v. New York Times,* 100 N.Y.2d 85, 92, 760 N.Y.S.2d 378, 790 N.E.2d 753 (2003). A defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract. *See DCMR v. Trident Precision Mfg.,* 317 F.Supp.2d 220, 226 (W.D.N.Y.2004); *Assoc. Capital Serv. Corp. of New Jersey v. Fairway Private Cars, Inc.,* 590 F.Supp. 10, 16 (S.D.N.Y.1982).

In the instant case, Torvec's alleged tortious interference with plaintiffs' Employment Agreements arises not from ISDI's breach of those agreements, rather, from its compliance with the expressed terms with those Employment Agreements. Plaintiffs are alleging a breach of the covenant of good faith and fair dealing to try to create rights under the Employment Agreements to which they were not entitled. However, plaintiffs' cause of action fails since the implied covenant of good faith and fair dealing will not imply an obligation that is not consistent with the express terms of the Employment

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2627457 (W.D.N.Y.)
**(Cite as: 2008 WL 2627457 (W.D.N.Y.))**

Agreements. Furthermore, as previously discussed, contrary to plaintiffs' contentions no forfeiture occurred. Plaintiffs received the value and benefits of ownership of the permitted ISDI stock-based compensation when they were allotted an increased proportionate share of future royalty payments. The express terms of the Employment Agreements made it permissible for the plaintiffs to be compensated either in cash or in stock and plaintiffs received the value of ISDI stock shares in an amount equal to their alleged "unpaid wages." Thus, the covenant of good faith and fair dealing cannot convert ISDI's compliance with the express terms of the Employment Agreements into a breach of those very same agreements.

## VI. *Preliminary Injunction*

Plaintiffs filed a cross-motion for a preliminary injunction requesting that the Court enter an order restraining Torvec from dissipating or transferring monies received from Ice Engineering pursuant to ISDI's sale of the Dartmouth License to Ice Engineering. Plaintiffs contend that Torvec is "technically insolvent" since its liabilities grossly exceeds its assets. Defendants oppose the cross-motion arguing that plaintiffs have neither a legal nor equitable interest or lien with respect to any specific fund of money at issue in this case and plaintiffs have failed to demonstrate that Torvec is insolvent or is likely to be insolvent at the conclusion of this litigation. For the reasons stated in this Decision and Order, I determine that plaintiffs cross-motion for preliminary injunction is rendered moot since plaintiffs' causes of action in their Complaint have been dismissed.

### *CONCLUSION*

**\*10** For the reasons set forth above, defendants Torvec, ISDI, Gleasman and Polster's motions to dismiss plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) are granted. Plaintiffs' Complaint is dismissed with prejudice. Plaintiffs' cross-motion for preliminary injunction is denied as moot.

**ALL OF THE ABOVE IS SO ORDERED.**

Slip Copy, 2008 WL 2627457 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT B

Westlaw.

386 B.R. 428

Page 1

386 B.R. 428
**(Cite as: 386 B.R. 428)**

**H**United States District Court,
S.D. New York.
In re MUSICLAND HOLDING CORP., et al.,
Debtors.
Buena Vista Home Entertainment, Inc., a California
corporation; Cargill
Financial Services International, Inc., a Delaware
corporation; Hain Capital
Group, LLC, a Delaware limited liability company;
Paramount Pictures
Corporation, a Delaware corporation; Twentieth
Century Fox Home Entertainment
LLC, a Delaware limited liability company; UBS
Willow Fund, LLC, a Delaware
limited liability company; and Varde Investment
Partners, L.P., a Delaware
limited partnership, Appellants,
v.
Wachovia Bank, N.A., a national banking
association, in its capacity as Agent;
and Harris N.A., a national banking association,
Appellees.
**No. 07 Civ. 8423.**

May 22, 2008.

**Background:** Chapter 11 debtors' trade creditors
brought adversary proceeding against agent for
debtors' revolving credit lenders and term loan
lender, asserting claims for breach of contract, breach
of covenant of good faith and fair dealing, tortious
interference with contractual relations, conversion,
aiding and abetting conversion, and unjust
enrichment. The United States Bankruptcy Court for
the Southern District of New York, Stuart Bernstein,
Chief Judge, 374 B.R. 113, granted defendants'
motion to dismiss. Trade creditors appealed.

**Holdings:** The District Court, Sweet, J., held that:
(1) intercreditor agreement permitted amendment to
revolving credit agreement allowing new lender to
provide term loan to debtors and extending priority of
revolving credit lenders' liens to that new lender;
(2) court could not employ covenant of good faith
and fair dealing to impose on parties to intercreditor
agreement obligations inconsistent with that
agreement's provisions;
(3) term loan was not affiliate financing;

(4) allegations failed to state claim for conversion;
and
(5) claim for tortious interference with contract was
impermissible restatement of claim for breach of
contract.
Affirmed.

West Headnotes

**[1] Bankruptcy** ⟐3782
51k3782Most Cited Cases

**[1] Bankruptcy** ⟐3786
51k3786Most Cited Cases
District court reviews a bankruptcy court's
conclusions of law de novo, while findings of fact are
reviewed for clear error. Fed.Rules Bankr.Proc.Rule
8103, 11 U.S.C.A.

**[2] Bankruptcy** ⟐3782
51k3782Most Cited Cases
Contract interpretation is generally a matter of law,
subject to de novo review.

**[3] Bankruptcy** ⟐2970
51k2970Most Cited Cases
Intercreditor agreement between debtors' revolving
credit lenders and trade creditors permitted
amendment to revolving credit agreement allowing
new lender to provide term loan to debtors and
extending priority of revolving credit lenders' liens to
that new lender, given that intercreditor agreement
contained no restrictions, other than prohibited
affiliated financing, on who or how one could
become lender, recognized that revolving credit
agreement could be amended, and contained trade
creditors' consent to amendments respecting loans
that could be provided or who could provide them,
notwithstanding trade creditors' assertion that such an
amendment was not contemplated and was
inconsistent with their alleged expectation that
amendments would be only for "routine" matters.

**[4] Contracts** ⟐176(2)
95k176(2)Most Cited Cases
Whether or not a contract is ambiguous is a matter of
law, properly decided on a motion to dismiss.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

Page 2

**[5] Contracts** 143(2)
95k143(2)Most Cited Cases
An "ambiguity" exists when the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

**[6] Contracts** 147(2)
95k147(2)Most Cited Cases
In the absence of any ambiguity, a contract must be construed according to the expressed intent of the parties.

**[7] Contracts** 147(2)
95k147(2)Most Cited Cases
Under New York law, before looking to evidence of what was in the parties' minds, a court construing a contract must give due weight to what was in their contract.

**[8] Contracts** 143(2)
95k143(2)Most Cited Cases
An omission or mistake in a contract, such as a failure to include a specific contingency, does not itself create an "ambiguity" under New York law.

**[9] Contracts** 143(3)
95k143(3)Most Cited Cases
Courts may not, by construction of contract, add or excise terms or distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.

**[10] Contracts** 168
95k168Most Cited Cases
Under New York law, duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms.

**[11] Bankruptcy** 2970
51k2970Most Cited Cases
Under New York law, court could not employ covenant of good faith and fair dealing to impose on parties to intercreditor agreement obligations that were inconsistent with that agreement's provisions allowing agent for debtors' revolving credit lenders to amend revolving credit agreement to include term loan and extending priority of revolving credit lenders' liens to that new lender.

**[12] Bankruptcy** 2970
51k2970Most Cited Cases
Term loan extended to debtors pursuant to amendments to revolving credit agreement was not affiliate financing, so as to fall within restrictions on who could become lender or how one could become lender under agreement that were imposed by intercreditor agreement between debtors' revolving credit lenders
and trade creditors, given absence of allegation that term loan lender was in any way related to debtors or their corporate parent, in terms of corporate structure, so as to be considered affiliate, and given lack of factual basis for trade creditors' conclusory assertion that term loan was "charade."

**[13] Trover and Conversion** 25
389k25Most Cited Cases
To allege a claim for aiding and abetting a conversion under New York law, plaintiffs must sufficiently allege that a conversion has occurred.

**[14] Trover and Conversion** 4
389k4Most Cited Cases
Under New York law, a "conversion" is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.

**[15] Trover and Conversion** 1
389k1Most Cited Cases
To state a claim for conversion under New York law, plaintiff must allege (1) legal ownership or an immediate superior right of possession to a specific identifiable thing, and (2) that defendant exercised an unauthorized dominion over the thing in question, to the exclusion of plaintiff's rights.

**[16] Bankruptcy** 2162
51k2162Most Cited Cases
Allegations that debtors' term loan lender was improperly paid from proceeds of inventory constituting collateral of debtors' trade creditors did not state claim for conversion under New York law, given failure to identify specific proceeds that were allegedly converted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

**[17] Trover and Conversion** 🔑➔2
389k2Most Cited Cases
Under New York law, an action for the conversion of monies is insufficient unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession; in other words, the money must be part of a separate, identifiable, segregated fund to bring an action for conversion.

**[18] Bankruptcy** 🔑➔2162
51k2162Most Cited Cases
Trade creditors' claim for aiding and abetting conversion against agent for debtors' revolving credit lenders and against term loan lender, to which lien priority under revolving credit agreement was extended by agent's amendment of agreement, was restatement of trade creditors' breach of contract claim against agent and term loan lender, warranting dismissal of aiding and abetting claim under New York law; claim was based upon amendment of revolving credit agreement and debtors' resulting payment of term loan pursuant to that agreement, which was alleged predicate for contract claim, and trade creditors alleged no independent facts sufficient to give rise to tort liability.

**[19] Trover and Conversion** 🔑➔13
389k13Most Cited Cases
Under New York law, a cause of action for conversion cannot be predicated on a mere breach of contract.

**[20] Bankruptcy** 🔑➔2162
51k2162Most Cited Cases
Trade creditors' claim for tortious interference with contract against agent for debtors' revolving credit lenders and against term loan lender, to which lien priority under revolving credit agreement was extended by agent's amendment of agreement, was restatement of trade creditors' claim for breach of contract, warranting claim's dismissal under New York law, given that both claims rested on factual premise that agent interfered with trade creditors' intercreditor agreement with revolving credit lenders by entering into amendment and permitting repayment of term loan.

**[21] Torts** 🔑➔114

379k114Most Cited Cases
Simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated, and this legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.
*431 Pachulski Stang Ziehl & Jones LLP, by: Robert J. Feinstein, Esq., New York, NY, for Appellants.

Otterbourg, Steindler, Houston & Rosen, P.C., by: Richard G. Haddad, Esq., New York, NY, for Appellee.

*OPINION*

SWEET, District Judge.

 The Appellants, trade creditors of Musicland, have appealed from the August 24, 2007 Memorandum Decision and Order Granting Motion to Dismiss Complaint (the "Memorandum Order") of Chief Judge Stuart Bernstein of the Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") dismissing their complaint in the above-captioned adversary proceeding (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

 The Complaint asserted seven causes of action, including a breach of contract claim arising out of an agreement (the "Intercreditor Agreement") between senior and junior secured creditors of the bankrupt debtor, Musicland Holding Corp. (together with its affiliates, "Musicland"). The Appellants, as junior creditors, alleged in their Complaint that Appellee Wachovia Bank, N.A. ("Wachovia"), as agent for the senior creditors, improperly amended the Intercreditor Agreement to include a term loan to Musicland by Appellee Harris N.A. ("Harris").

 Upon the record presented and the conclusions set forth below, the Memorandum Order is affirmed.

***Prior Proceedings***

 On January 25, 2007, Appellants filed a complaint (the "Original Complaint") in the United States District Court for the Southern District of New York

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(the "District Court") alleging the same claims as in this action. After Wachovia moved to dismiss the Original Complaint, the Appellants voluntarily dismissed the action and re-filed their claims as an adversary proceeding in the Bankruptcy Court, alleging federal question jurisdiction. The Complaint, filed in the Bankruptcy Court on May 15, 2007, asserts multiple claims for relief against Wachovia.

On June 15, 2007, Wachovia and Harris filed motions to dismiss the Complaint for failure to state a cause of action under Federal Rule of Civil Procedure 12(b)(6). The motions were heard on August 9, 2007, and on August 24, 2007, the Memorandum Order was issued. Final Judgment was entered against the Appellants on August 27, 2007.

This appeal from the Memorandum Order was heard on January 16, 2008.

### The Complaint

Pursuant to a loan and security agreement dated August 11, 2003 (the "Revolving Credit Agreement"), Fleet Retail Finance, Inc. and Congress Financial Corporation (Wachovia's predecessor-in- *432 interest), as the agent for the Revolver Lenders, agreed to provide Musicland with revolving credit of, at that point, up to $200 million (the "Revolving Credit Facility"). The obligations thereunder were secured by a first priority lien in substantially all of Musicland's assets, including inventory and proceeds (the "Revolver Lien"). Compl. ¶ 23, Ex. A.

The Revolving Credit Agreement provided exclusively for revolving credit. It defines the "Credit Facility" as, in relevant part, the "Loans," and "Loans" are, in turn, defined as "the loans now or hereafter made by or on behalf of Lenders or by Agent for the account of Lenders on a revolving basis pursuant to the Credit Facility ...." Compl. Ex. A §§ 1.29, 1.70. The Revolver Lien secured the "Obligations," id. § 5.1, which are defined as "[a]ny and all Loans, Letters of Credit accommodations and all other obligations, liabilities and indebtedness of every kind, nature and description ... arising under this Agreement or any of the other Financing Agreements ....," id. § 1.80.

In 2003, Musicland was experiencing substantial financial difficulties. To induce Appellants to

continue to supply music CDs, DVDs and similar inventory, Musicland granted them a lien on inventory and proceeds thereof (the "Inventory Lien"), pursuant to a security agreement dated November 5, 2003 (the "Security Agreement"). The Bank of New York acted as Appellants' collateral agent. Compl. ¶ 25, Ex. B.

Pursuant to the Security Agreement, the Inventory Lien was "subject only to the terms of that certain Intercreditor and Subordination Agreement, dated as of November 5, 2003 ...." Compl. Ex. B § 2. The Inventory Lien was junior only to "Permitted Encumbrances," id. § 4(b), which include only "the security interests and liens of Congress for itself and the benefit of the Lenders pursuant to the Congress Facility" and certain other limited, inapplicable liens, id. § 1(i).

Concurrently with the Security Agreement, Wachovia, as agent for the Revolver Lenders, and Bank of New York, as Appellants' collateral agent, entered into the Intercreditor Agreement. Compl. ¶ 28, Ex. C.

The definitions of the Intercreditor Agreement provide for the subordination of the Inventory Lien solely to the loans made under the Revolving Credit Agreement. Section 2.2 of the Intercreditor Agreement states that the Inventory Lien is subordinated only to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." Compl. Ex. C. § 2.2. "Revolving Loan Creditors" are defined as parties to the Revolving Credit Agreement, id. § 1.15. "Revolving Loan Debt" is defined as "any and all obligations ... arising under the Revolving Creditor Agreements ...." Compl. Ex C § 1.16.

"Revolving Creditor Agreements" are defined as the original revolving loan documents, as they "now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured (in whole or in part and including any agreements with, to or in favor of any other lender or group of lenders (which lenders or group of lenders shall not be affiliates of Debtors, except that Trade Agent and Trade Creditors shall have no objection to any Permitted Affiliate Refinancing) that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Debt or is otherwise a party to the Revolving Creditor Agreements)." *Id.* § 1.11. Under Section 1.9, a "Permitted Affiliate Refinancing" is one in which an affiliate, *inter alia*, "makes Revolving Loan Debt available to the Debtors ... *provided, that,* (a) such affiliate does not own or hold more than **\*433** twenty-five (25%) percent of the Revolving Loan Debt subject to such Refinancing ...." Compl. ¶ 31, Ex. C § 1.9.

"Lenders," as defined in the Revolving Credit Agreement, comprised (a) the original Revolver Lenders, and (b) lenders that acquired a participation interest in the Credit Facility from an original Lender. Compl. Ex. A §§ 1.66, 13.6.

Finally, the Intercreditor Agreement provides, in relevant part, under the heading "Waivers":

The Trade Creditors also waive notice of, and hereby consent to, (a) any amendment, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral, (b) the taking, exchange, surrender and releasing of Trade Collateral or guarantees now or at any time held by or available to Revolving Loan Agent or any of the Revolving Loan Creditors for the Revolving Loan Debt .... Any of the foregoing shall not, in any manner, affect the terms hereof or impair the obligations of Trade Creditors hereunder.

*Id.* § 4.3.

In the fall of 2005, Musicland asked the Revolver Lenders to increase availability under the Revolving Credit Facility, but they refused. Musicland's parent, Sun, also refused to provide additional capital on a subordinated debt or equity basis. Compl. ¶ 32.

Harris had a banking relationship with Sun. At Sun's request, Harris agreed to make a $25 million term loan to Musicland (the "Harris Term Loan"), on materially different terms from those of the existing credit facility: (i) it was a term loan, not revolving credit; (ii) Sun guaranteed repayment to Harris (but not to the Revolver Lenders); and (iii) it was short-term financing designed to meet Musicland's liquidity needs during the peak shopping season and would be

repaid shortly, regardless of its stated maturity date, whether or not other Revolver Lenders were paid. Compl. ¶ 33.

The Security Agreement prohibited Musicland from granting any lien encumbering Appellants' collateral, other than the Revolver Lien. Compl. ¶ 34. Wachovia and Harris devised Amendment No. 8, dated August 31, 2005, to the Revolving Credit Agreement, to incorporate the Harris Term Loan into the Revolving Credit Facility for the purpose of affording it a senior lien, superior to Appellants' Inventory Lien. Compl. ¶ 35, Ex, D.

The definition of "Obligations" in the Revolving Credit Agreement, which effectively limited the scope of the security interest to revolving loans, was amended so that "[a]ll references to the term 'Obligations' herein and in the Loan Agreement and the other Financing Agreements shall be deemed ... to include ... indebtedness of Borrowers in respect of the Term Loan." Compl. ¶ 36, Ex. D. § 1(b)(ix). Whereas before there had been only "Lenders" and all nomenclature ultimately referred to revolving loans and revolver lenders, Amendment No. 8 changed: (1) the definition of Loan (to mean the Revolving Loans and the Term Loan), *id.* § 1(b)(vii); (2) the definition of "Lenders" (to mean the Revolving Loan Lenders and the Term Loan Lender), *id.* § 1(b)(vii); and (3) the definition of "Commitments" (to mean the Revolving Loan Commitments and the Term Loan Commitment), *id.* § 1(b)(v).

The Harris Term Loan had its own interest rate, *id.* § 1(b) (ii), and was not paid *pari passu* with the revolving loans. Rather, loan payments were applied first **\*434** to the Revolving Loan Debt, including all interest and principal, and only then to interest and principal on the Harris Term Loan. *Id.* § 4 (amending § 6.4 of the Intercreditor Agreement). Although the stated maturity date of the Harris Term Loan was co-terminous with the Revolving Credit Facility, Amendment No. 8 permitted early prepayment at anytime after November 2005, provided that Musicland then had certain excess availability under the Revolving Credit Facility (*i.e.,* if it presented no risk to the Revolver Lenders). Compl. ¶ 35, Ex. D.

The maximum amount of the Revolving Loan Debt was limited under Section 2.1 of the Revolving Credit Agreement to the amount of the borrowing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

Page 6

base, regardless of the stated maximum amount of the credit facility (and thus there would normally be an equity cushion in the collateral). Compl. Ex. A § 2.1(c). Amendment No. 8 retains that limitation. Compl. Ex. D § 2. The Harris Term Loan, however, was limited by the maximum credit limit of the Revolving Credit Facility. *Id.*

On December 5, 2005, the Harris Term Loan was repaid in full. Shortly thereafter, the Revolver Lenders changed the borrowing base calculations and/or reserve requirements under the Revolving Credit Facility, and Musicland was thrust into a liquidity crisis. On January 12, 2006, Musicland filed for relief under Chapter 11 of the Bankruptcy Code. Compl. ¶ 37.

The Appellants' claims were substantially under-secured by their Inventory Lien. Pursuant to an order dated March 24, 2006, the Court approved the sale of substantially all of Musicland's remaining assets to a third-party purchaser, which sale was consummated on or about March 27, 2006. Out of the sale proceeds, the Revolver Lenders' claims were paid in full, and pursuant to a subsequent Court order entered on August 11, 2006, approximately $26 million was paid by Musicland to certain secured trade creditors on account of their secured claims, which aggregated to no less than between $170-$173 million (as estimated by Musicland). As of November 27, 2006, Musicland held $28.35 million in cash. By order entered December 2, 2006, the secured trade creditors were authorized to foreclose on $15.7 million of such funds. Based on information and belief, and the Debtor's filed Monthly Operating Statement for January 2007, Musicland holds no more than approximately $11.9 million in cash, with combined current assets (including cash) totaling approximately $22.1 million. Compl. ¶ 38.

Based on these allegations, the Complaint alleges seven causes of action: (i) breach of the Intercreditor Agreement, Compl. ¶¶ 39-43; (ii) breach of the covenant of good faith and fair dealing arising out of the Intercreditor Agreement, *id.* ¶¶ 44-48; (iii) tortious interference with contractual relations, with regard to the Intercreditor Agreement, *id.* ¶¶ 49-54 and (iv) with regard to the Security Agreement, *id.* ¶¶ 55-60; (v) conversion, *id.* ¶¶ 61-66; (vi) aiding and abetting conversion, *id.* ¶¶ 67-70; and (vii) unjust enrichment, *id.* ¶¶ 71-75.

### *The Opinion Below*

The Bankruptcy Court held that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." *Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.),* 374 B.R. 113, 121 (2007). There being no breach of the Intercreditor Agreement, the Court also dismissed the conversion and tortious interference claims, which were related to the breach of contract claim. *Id.*

In reaching its decision, the Bankruptcy Court looked to Section 2.2 of the Intercreditor Agreement, which provides for the subordination of the Appellants' liens *435 to the "Liens of the Revolving Loan Creditors therein to the full extent of the Revolving Loan Debt." *Id.* at 116. Next, the Bankruptcy Court turned to the agreements' definitions, "the net effect of which," observed the Bankruptcy Court, "provided that the Lenders' priority extended to debts under the current Revolving Credit Agreement, and any amended agreement, including any new loans of any type made under any amended agreement." *Id.* Beginning with the definition of "Revolving Loan Creditors," the Bankruptcy Court traced the language of the Intercreditor Agreement to support its conclusions:

For example, the "Revolving Loan Creditors" referred to the Lenders under the Revolving Creditor Agreement, their successors and assigns and 'any other lender or group of lenders that any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise a party to the Revolving Loan Creditor Agreements.' ([Intercreditor Agreement] at § 1.15). The 'Revolving Creditor Agreements' meant the 'Revolving Loan Agreement' and all agreements subsequently executed by 'the Debtors or any other person to, with or in favor of Revolving Loan Creditors in connection therewith or related thereto' as now exist 'or may hereafter be amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured,' (*Id.* at § 1.11.) The 'Revolving Loan Debt' referred to 'any and all obligations, liabilities and indebtedness of every kind, nature and description' owed by the Debtors 'whether now or existing or hereafter arising' under the Revolving Creditor Agreements.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

Page 7

*Buena Vista,* 374 B.R. at 116. Based on these definitions, the Bankruptcy Court concluded that the Intercreditor Agreement contemplated future amendments to the Revolving Credit Agreement that could include loans or obligations of any kind.

The Bankruptcy Court further relied upon Section 4.3 of the Intercreditor Agreement, which stated that the Appellants and/or their predecessors gave their prior consent to all amendments of the Revolving Credit Agreement and placed only one restriction on what the Lenders could and could not do with respect to amendments. Specifically, the Debtors' affiliates could not be made Lenders under the Revolving Credit Agreement, except in certain instances. *Id.* at 117 (citing § 1.1 of the Intercreditor Agreement).

Construing the above-cited provisions as a whole, the Bankruptcy Court concluded that there was no restriction in the Intercreditor Agreement limiting the obligations to revolving debt. The Bankruptcy Court observed that the Appellants consented to any amendments to the Revolving Credit Agreement and, accordingly, the Bankruptcy Court ruled that "the Intercreditor Agreement unambiguously authorized Wachovia to amend the Revolving Credit Agreement to bring in a term lender." *Id.* at 121.

The Bankruptcy Court rejected the contention that the Appellants " 'bargained for a lien that was subordinate only to obligations under Musicland's existing revolving credit facility.' " *Id.* "That bargain," ruled the Bankruptcy Court, "is not reflected in the terms of the Intercreditor Agreement, which gave Wachovia a broad right to amend the Revolving Credit Agreement to cover any type of loan. If the Plaintiffs harbored such an expectation, it remained a secret one, contradicted by the language they agreed to in their contract." *Id.*

### *Standard of Appellate Review*

[1][2] A district court reviews a bankruptcy court's conclusions of law *de novo,* while findings of fact are reviewed for **\*436** clear error. *Gulf States Exploration Co. v. Manville Forest Prods. (In re Manville Forest Prods. Corp.),* 896 F.2d 1384, 1388 (2d Cir.1990); Fed. R. Bankr.P. 8013. The dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is subject to *de novo* review. *See Mosello v. ALI, Inc. (In re Mosello),*

193 B.R. 147, 149 (S.D.N.Y.1996) (*citing In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir.1990), *cert. denied, Air Line Pilots Ass'n, Int'l, AFL-CIO v. Shugrue,* 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991)). Contract interpretation, in particular, is generally a matter of law, subject to *de novo* review. *United States v. Barrow,* 400 F.3d 109, 117 (2d Cir.2005); *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996) ("[W]hether a written contract is ambiguous is a question of law for the trial court whose determinations will be reviewed de novo "); *cf. In re Ionosphere Clubs, Inc.,* 922 F.2d at 988 ("This court exercises the same review over the district court's decision that the district court may exercise [over the bankruptcy court's decision].") (citation omitted).

### *Amendment No. 8 Was Authorized by the Intercreditor Agreement*

[3] The Bankruptcy Court accurately centered on the principal issue, the propriety of Amendment No. 8 in extending the Lenders' priority to the Harris Loan. In concluding that that Amendment No. 8 was proper, the Memorandum Opinion properly construed the Intercreditor Agreement.

In Section 2.2 of the Intercreditor Agreement, the Appellants and/or their predecessors agreed that their liens would always be "subordinate to the Liens of Revolving Loan Creditors ... to the full extent of the Revolving Loan Debt." Section 1.16 of the Intercreditor Agreement stated:

> Revolving Loan Debt shall mean any and all obligations, liabilities and indebtedness of every kind, nature and description owing by Debtors to Revolving Loan Creditors and/or their respective affiliates or participants ... arising under the Revolving Creditor Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Creditor Agreements ... whether direct or indirect, absolute or continent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Revolving Loan Creditors. Compl. Ex. C § 1.16.

Other than prohibiting affiliated financing, the Intercreditor Agreement contained no restrictions on

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

Page 8

who could become a lender or how one could become a lender. Indeed, Section 1.15 of the Intercreditor Agreement defined "Revolving Loan Creditors" as:

Each of the financial institutions from time to time party to the Revolving Loan Agreement as lenders, and their respective successors and assigns (and including any other lender or group of lenders that at any time refinances, replaces or succeeds to all or any portion of the Revolving Loan Debt or is otherwise party to the Revolving Creditor Agreements).

Compl. Ex, C § 1.15.

The Intercreditor Agreement states: "As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below." Compl. Ex. C at 2. Furthermore, Section 5.10 of the Intercreditor Agreement acknowledges that it is a fully-integrated agreement whose terms prevail over any conflicting provision in the Revolving *437 Credit Agreement or any related contract. Compl. Ex. C at 14.

Section 1.13 of the Intercreditor Agreement recognized, without limitation, that the underlying loan agreement could be "amended, modified, supplemented, extended, renewed, restated, refinanced, replaced or restructured." Compl. Ex. C § 1.13.

Under Section 4.3, the Appellants and/or their predecessors consented to all amendments to the Revolving Credit Agreement without any limitation on the loans that could be provided or who (other than an affiliate) could provide them:

Trade Creditors also waive notice of, and hereby consent to, (a) any amendments, modification, supplement, extension, renewal, or restatement of any of the Revolving Loan Debt or the Revolving Creditor Agreements, including, without limitation, extensions of time of payment of or increase or decrease in the amount of any of the Revolving Loan Debt, the interest rate, fees, other charges, or any collateral.

Under these provisions, the Revolving Credit Agreement and the Intercreditor Agreement permitted an amendment allowing a new lender to provide funds such as those provided by Harris.

The Appellants contend that Amendment No. 8 was

not contemplated by the use of the term "amendment" or any other term in Section 4.3 and urge a construction of the Intercreditor Agreement based upon their alleged expectation that the Revolving Credit Agreement would not be amended except for "routine" matters, Appellants' Br. at 8, 35, since the "fundamental purpose" of the Intercreditor Agreement was the "protection of Appellants' lien priority," *id.* at 25, and preservation of an "equity cushion in the collateral," *id.* at 15.

However, the Intercreditor Agreement fails to express such an intent or purpose. Instead, the Intercreditor Agreement sets forth the purpose of the agreement as to (i) confirm the relative priority of the security interests of Wachovia and the Appellants, and (ii) provide for the orderly sharing of collateral proceeds among Wachovia and the Appellants. Compl. Ex. C. at 1.

Section 1.16 of the Intercreditor Agreement defines the priority "Revolving Loan Debt" to include, among other things, all obligations owed to Wachovia and the other Lenders by Musicland under the Revolving Credit Agreement, whether "secured or unsecured." Wachovia and the Lenders were free to extend credit to Musicland beyond the value of the collateral securing Musicland's repayment obligations.

[4][5][6] As the Bankruptcy Court noted, "if the unambiguous terms of the Intercreditor Agreement gave Wachovia the right to enter into Amendment No. 8, both defendants are entitled to an order dismissing the complaint." *Buena Vista,* 374 B.R. at 120. Whether or not a contract is ambiguous is a matter of law, properly decided on a motion to dismiss. *See Crane Co. v. Coltec Indus., Inc.,* 171 F.3d 733, 737 (2d Cir.1999). "An ambiguity exists where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Alexander & Alexander Servs. v. These Certain Underwriters atLloyd's,* 136 F.3d 82, 86 (2d Cir.1998) (*quoting Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997)). In the absence of any ambiguity, it is a maxim of contractual construction that a contract must be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428
386 B.R. 428
**(Cite as: 386 B.R. 428)**

Page 9

construed according to the expressed intent of the parties. *See, e.g., *438British Int'l Ins. Co. v. Seguros La Republica, S.A.,* 342 F.3d 78, 82 (2d Cir.2003).

[7][8][9] Under New York law, "before looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract." *Van Kipnis v. Van Kipnis,* 43 A.D.3d 71, 840 N.Y.S.2d 36, 41 (App.Div.2007) (*quoting W.W.W. Assocs., Inc., v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). "An omission or mistake in a contract, such as a failure to include a specific contingency, does not itself create an ambiguity." *Id.* (*citing Reiss v. Financial Performance Corp.,* 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001)). While Appellants could have, and perhaps should have, included language specifically restricting Wachovia's ability to incorporate a term loan into the Revolving Credit Agreement by amendment, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Reiss,* 97 N.Y.2d at 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (internal quotation marks and citations omitted).

The Appellants have cited *Illco Toy Co. U.S.A. v. Block,* No. 90Civ.1919(CSH), 1991 WL 64203 (S.D.N.Y.1991) and *Stone v. Golden Wexler & Sarnese,* 341 F.Supp.2d 189 (E.D.N.Y.2004) to support their assertion that the terms of the contract are ambiguous. In *Illco,* the Court construed a provision that could reasonably be understood as a "descriptive term and not one of limitation" in a two paragraph letter agreement that the Court recognized was not "a detailed manifestation of the parties' intent." *Illco,* 1991 WL 64203, at *4. The Intercreditor Agreement, unlike the letter agreement in Illco, is a fully-integrated agreement representing the "final expression" of the parties' agreement, which was negotiated by sophisticated parties with the assistance of skilled counsel, and its terms allow Wachovia to enter into Amendment No. 8.

In *Stone,* decided under Virginia law, the Court rejected a credit card company's argument that a "change-in-terms" provision allowed it to unilaterally change the terms of a consumer's credit card as it saw fit. *Stone,* 341 F.Supp.2d at 197-98. Wachovia did not change the terms of its contract with the

Appellants. The changes to the Revolving Credit Agreement were made with the consent of Musicland, consistent with the Revolving Credit Agreement and the Intercreditor Agreement. The Intercreditor Agreement did, in fact, place a limitation on Wachovia's ability to amend the Intercreditor Agreement, indicating that the parties knew how to restrict Wachovia's ability to amend if they so desired.

Appellants have failed to establish that the Bankruptcy Court was in error with respect to its construction of the agreements relating to the authority to enter into the Amendment. The Bankruptcy Court correctly concluded that the language of the Intercreditor Agreement was unambiguous and according to its express terms, the Intercreditor Agreement authorized Wachovia to amend the Revolving Credit Agreement as it did in Amendment No. 8.

### Good Faith and Fair Dealing Requirements Do Not Alter the Intercreditor Agreement

[10] The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms. *Metropolitan Life Ins. Co. v. RJR Nabisco,* 716 F.Supp. 1504, 1519 (S.D.N.Y.1989); *see also Frutico S.A. v. Bankers Trust Co.,* 833 F.Supp. 288, 300 (S.D.N.Y.1993) ("[T]he duty of good faith ... cannot be used to create new contractual rights between the parties"); *439Banco Espanol de Credito v. Sec. Pac. Nat'l Bank,* 763 F.Supp. 36, 44 (S.D.N.Y.1991) ("The implied covenant does not 'operate to create new contractual rights.' ") (*quoting Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990)). Thus, **"[c]ourts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a new term or when alleged misconduct is expressly allowed by the contract."** *Keene Corp. v. Bogan,* No. 88 Civ. 0127(MBM), 1990 WL 1864, *14, 1990 U.S. Dist. LEXIS 220, at *43 (S.D.N.Y.1990).

[11] As correctly noted by the Bankruptcy Court, and as set forth above, the Intercreditor Agreement's interlocking definitions allowed Wachovia to amend the Revolving Credit Agreement to include a term loan, since the Appellants agreed to be subordinate to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

all obligations "of every kind, nature and description" owing to the Lenders by Musicland under an amended Revolving Credit Agreement. The Court cannot employ the covenant of good faith and fair dealing to impose on the parties obligations that are inconsistent with the express terms of the Intercreditor Agreement. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 394-95 (2d Cir.2002).

*Carvel Corp. v. Baker,* 79 F.Supp.2d 53 (D.Conn.1997), *Bank of China v. Chan,* 937 F.2d 780 (2d Cir.1991), and *Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351 (7th Cir.1990), cited by Appellants, do not require a different result. In none of those cases did the contracts at issue permit the conduct allegedly breaching the implied covenant of good faith and fair dealing. Those cases demonstrate that where a contract is "silent," the court may, in a proper case, fill a gap. *See Carvel Corp.,* 79 F.Supp.2d at 62 & n. 6;*Bank of China,* 937 F.2d at 789;*Kham & Nate's Shoes No. 2,* 908 F.2d at 1357. Here, the Intercreditor Agreement was not silent, but rather, it permitted Wachovia to enter into amendments, as provided in Section 4.3.

### *Affiliated Refinancing Has Not Been Established*

[12] Appellants have contended that the Harris Loan was an improper "Affiliated Refinancing." Appellants did not allege that Harris is an affiliate of Musicland or of its corporate parent Sun. While Harris is alleged to have had a working relationship with Sun, Compl. ¶ 8, the Complaint alleges no facts to establish that Harris was, in any way, related to Musicland or Sun in terms of its corporate structure so as to be considered an affiliate.

The Appellants have also failed to sufficiently plead a factual basis for the conclusory allegation that the Harris Loan was a "charade." As was recognized by the Bankruptcy Court, a plaintiff must plead more than "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do." *Buena Vista,* 374 B.R. at 119 (*citing Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Instead, the plaintiff "must amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d

Cir.2007). Here, the only fact asserted in the Complaint to support the alleged "charade" is that Sun guaranteed the Harris Loan. The Appellants, however, expressly consented to the "taking" of "guarantees" in Section 4.3 and, while affiliate loans may have been limited, there is no such limitation in the Intercreditor Agreement against guarantees. Numerous Musicland affiliates, including Suncoast Holding Corp., guaranteed the Obligations arising thereunder. If the Appellants wanted to limit guarantees in the future, they could and should *440 have expressly done so, as they did with respect to affiliate loans. *See, e.g., RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 315 (2d Cir.2003) (concluding that the inclusion of certain requirements in one section of a contract but not another manifested the intention that such requirements would not be part of the latter section). Instead, in Section 4.3 of the Intercreditor Agreement, the Appellants agreed that the Lenders could share guarantees.

The Appellants have failed to establish that the Harris loan was affiliated financing.

### *The Bankruptcy Court Did Not Err in Dismissing the Tort Claims*

[13][14][15][16] To allege a claim for aiding and abetting a conversion, Appellants must sufficiently allege that a conversion has occurred. *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 493 (S.D.N.Y.2003). A "conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' " *Vigilant Ins. Co. v. Housing Auth.,* 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995) (*quoting Employers' Fire Ins. Co. v. Cotten,* 245 N.Y. 102, 105, 156 N.E. 629 (1927)). Thus, to state a claim for conversion, a plaintiff must allege (1) legal ownership or an immediate superior right of possession to a specific identifiable thing; and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the exclusion of the plaintiff's rights. *See Independence Disc. Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 46 (App.Div.1975).

Appellants have alleged that Harris was improperly paid from proceeds of inventory constituting Appellants' collateral. Compl. ¶ 63. The allegation,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

386 B.R. 428                                                                                    Page 11
386 B.R. 428
**(Cite as: 386 B.R. 428)**

even if assumed to be true, is insufficient on its face to state a claim for conversion, because it fails to identify the specific proceeds that were allegedly converted.

[17] It is well-settled New York law that an action for the conversion of monies is "insufficient as a matter of law unless it is alleged that the money converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession." *Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994). In other words, the "money must be part of a separate, identifiable, segregated fund in order to bring an action for conversion." *United Republic Ins. Co. v. Chase Manhattan Bank,* 168 F.Supp.2d 8, 19 (N.D.N.Y.2001) (citing *High View Fund L.P. v. Hall,* 27 F.Supp.2d 420, 429 (S.D.N.Y.1998)). The Complaint contains no such allegations (perhaps because Harris was not repaid with inventory proceeds but rather with a $25,000,000 advance by the Lenders under the Revolving Credit Agreement), as claimed by Appellees. Appellees' Br. at 40. The tort claims, together with their aiding and abetting allegations, were appropriately dismissed.

[18][19] In addition, Appellants' aiding and abetting claim is a restatement of its breach of contract claim. Appellants allege that Wachovia aided and abetted Harris' conversion by "the devising and implementing of Amendment No. 8 and participation in causing Musicland to pay off the Harris Term Loan," which is the alleged predicate for the breach of contract claims. Compl. ¶ 68. Under New York law, "a cause of action for conversion cannot be predicated on a mere breach of contract." *Fesseha v. TD Waterhouse Investor Servs., Inc.,* 305 A.D.2d 268, 761 N.Y.S.2d 22, 24 (App.Div.2003). Here, Appellants' conversion claim "allege[s] no independent facts sufficient to give rise to tort liability." *Yeterian v. Heather Mills, N.V. Inc.,* 183 A.D.2d 493, 583 N.Y.S.2d 439, 440 (App.Div.1992). Accordingly, the \*441 claims for conversion and aiding and abetting a conversion were appropriately dismissed.

[20][21] Similarly, the claim for tortious interference is essentially a restatement of the breach of contract claim, relying upon the same factual premise, namely, that Wachovia interfered with the Trade Security Agreement by entering into Amendment No. 8 and permitting repayment of the Harris Loan. "It is

a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *MCI WorldCom Commc'ns, Inc. v. HSG/ATN, Inc. (In re WorldCom, Inc.),* 361 B.R. 697, 719 (Bankr.S.D.N.Y.2007) (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)). Here, the tortious interference claim "adds nothing by way of legal liability, and only seeks to explain the possible motives of defendants" for their alleged breach of contract. *Miller v. Vanderlip,* 285 N.Y. 116, 125, 33 N.E.2d 51 (1941). Appellants "may not split [their] causes of action based upon a single grievance." *Id.*

### Conclusion

For the reasons set forth above, the Bankruptcy Court's Order and Judgment is affirmed in its entirety, with costs.

It is so ordered.

386 B.R. 428

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT C

Westlaw.

859 N.Y.S.2d 46                                                                                    Page 1
51 A.D.3d 549, 859 N.Y.S.2d 46, 2008 N.Y. Slip Op. 04617
**(Cite as: 859 N.Y.S.2d 46)**

H

Supreme Court, Appellate Division, First
Department, New York.
PHOENIX CAPITAL INVESTMENTS LLC,
Plaintiff-Respondent-Appellant,
v.
ELLINGTON MANAGEMENT GROUP, L.L.C.,
Defendant-Appellant-Respondent.

May 22, 2008.

**Background:** Hedge fund broker brought action
against hedge fund manager, alleging claims for
breach of contract, quantum meruit, unjust
enrichment, tortious interference with prospective
business relations, breach of the covenant of good
faith and fair dealing, violations of the Connecticut
Unfair Trade Practices Act (CUTPA) for interference
with prospective business relations, and violations of
CUTPA for bad faith termination of the agreement.
The Supreme Court, New York County, Karla
Moskowitz, J., granted in part manager's motion to
dismiss, and parties cross-appealed.

**Holdings:** The Supreme Court, Appellate Division,
held that:
(1) broker was not contractually entitled to annual fee
as consequence of bank's investment;
(2) broker's claim for breach of the covenant of good
faith and fair dealing was invalid substitute for
nonviable breach of contract claim;
(3) manager did not act wrongfully, as would support
broker's CUTPA claim; and
(4) broker failed to state claim for tortious
interference with its prospective business relations.
 Affirmed as modified.

West Headnotes

**[1] Brokers** 🔑**56(3)**
65k56(3)Most Cited Cases
Hedge fund broker was not contractually entitled to
annual fee as a consequence of bank's investment,
although it had introduced bank to hedge fund
manager, where manager terminated his agreement
with broker several weeks after introductory meeting,
and bank did not invest with manager until two years

later.

**[2] Brokers** 🔑**56(3)**
65k56(3)Most Cited Cases
Introduced
Hedge fund broker's claim for breach of the covenant
of good faith and fair dealing, alleging that hedge
fund manager caused bank to purposely delay its
investment until after lapse of one-year tail period, so
as to impede broker's recovery of its fee, was an
invalid substitute for its nonviable breach of contract
claim, where manager, in terminating its agreement
with broker, acted entirely within the agreement
termination provision.

**[3] Contracts** 🔑**168**
95k168Most Cited Cases
The implied covenant of good faith and fair dealing
will be enforced only to the extent it is consistent
with the provisions of the contract.

**[4] Antitrust and Trade Regulation** 🔑**219**
29Tk219Most Cited Cases
Hedge fund manager, by adhering to precise terms of
his negotiated contract with hedge fund broker, did
not act wrongfully, as would support broker's claim
against manager under the Connecticut Unfair Trade
Practices Act (CUTPA). C.G.S.A. § 42-110b(a).

**[5] Torts** 🔑**255**
379k255Most Cited Cases
Hedge fund broker's allegation that in some
unelaborated manner hedge fund manager directed
bank, which had several hundred million dollars to
invest in manager's funds and elsewhere, to cease all
communications with broker, thus freezing broker out
of unrelated business opportunities with bank, was
conclusory and failed to adequately plead a claim that
manager tortiously interfered with its prospective
business relations with bank involving other potential
investment opportunities from which broker might
have realized additional fees.
*47 Williams & Connolly LLP, Washington, D.C.
(Tobin Joe Romero of counsel), for appellant-
respondent.

Sullivan & Cromwell, LLP, New York (David B.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

859 N.Y.S.2d 46                                                                                                    Page 2
51 A.D.3d 549, 859 N.Y.S.2d 46, 2008 N.Y. Slip Op. 04617
**(Cite as: 859 N.Y.S.2d 46)**

Tulchin (of counsel), for respondent-appellant.

LIPPMAN, P.J., ANDRIAS, NARDELLI, ACOSTA, DEGRASSE, JJ.

 Order, Supreme Court, New York County (Karla Moskowitz, J.), entered November 13, 2007, which granted defendant's dismissal motion only to the extent of dismissing part of the first cause of action and the entire fourth and sixth causes of action, unanimously modified, on the law, **48 the fifth and seventh causes of action dismissed as well, and otherwise affirmed, with costs in favor of defendant payable by plaintiff.

[1] The 2000 agreement and its 2003 revisions, when read together, made clear that plaintiff was entitled to a fee for bringing defendant and prospective investors together only if the actual investment was made within one year of either the last contact between plaintiff and a particular investor on defendant's behalf, or one of the parties providing the other with a written termination of the agreement, whichever occurred earlier. Plaintiff claims it introduced defendant to a prospective investor, Norges Bank, and expended considerable time and expense encouraging Norges Bank to invest in the funds managed by defendant. Several weeks after an introductory meeting, defendant terminated the agreement with plaintiff. Norges Bank did eventually invest with defendant, but two years later. Under the explicit terms of the contract, which plaintiff negotiated and, in 2003, renegotiated, plaintiff was not entitled to an annual fee of 1% as a consequence of the Norges Bank investment. Plaintiff's claim that the 2003 amendment omitted--and thus eliminated--this one-year "tail" provision is belied by the terms of the 2003 amendment, which provided that the original fee schedule would continue, with exceptions not applicable herein, and even expanded the tail provision.

[2][3] Plaintiff's claim that defendant caused Norges Bank to purposely delay its investment until after the lapse of the one-year tail period, so as to impede plaintiff's recovery of its fee, is an invalid substitute for its nonviable breach of contract claim (*Triton Partners v. Prudential Sec.,* 301 A.D.2d 411, 752 N.Y.S.2d 870 [2003] ). The claim is defeated since defendant, in terminating its agreement with plaintiff, acted entirely within the agreement termination

provision (*id.*). Plaintiff actively negotiated the tail provision, with all its risks and benefits to both parties, and cannot nullify that provision on the basis of a bare allegation that defendant acted unfairly, both in terminating the agreement and in exercising its rights pursuant to the tail provision (*Gallagher v. Lambert,* 74 N.Y.2d 562, 567, 549 N.Y.S.2d 945, 549 N.E.2d 136 [1989] ). We adhere to the well-established principle that the implied covenant of good faith and fair dealing will be enforced only to the extent it is consistent with the provisions of the contract (*Murphy v. American Home Prods. Corp.,* **58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 [1983]**;*SNS Bank v. Citibank,* 7 A.D.3d 352, 354-355, 777 N.Y.S.2d 62 [2004] ). To allow plaintiff to plead a conclusory claim that defendant contrived with Norges Bank to delay its investment of hundreds of millions of dollars for two years so as to avoid paying plaintiff its fee, thereby breaching an implied covenant of good faith and fair dealing, would unjustifiably frustrate the expectations of the parties as made explicit in the contract. The stark inconsistency between the claim and the negotiated terms of the contract requires that the claim be dismissed.

[4] For similar reasons, plaintiff's claim under the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110b[a] ) must be dismissed. The claim is defeated because defendant, by adhering to the precise terms of the negotiated contract, did not act wrongfully (*Ramirez v. Health Net of Northeast,* 285 Conn. 1, 21, 938 A.2d 576, 590 [2008];*Edmands v. CUNO, Inc.,* 277 Conn. 425, 451, 892 A.2d 938, 955 [2006] ).

[5] Finally, plaintiff has failed to adequately plead a claim that defendant tortiously interfered with its prospective business **49 relations with Norges Bank involving other potential investment opportunities from which plaintiff might have realized additional fees. Initially, the claim that in some unelaborated manner defendant directed Norges Bank, which had several hundred million dollars to invest in defendant's funds and elsewhere, to cease all communications with plaintiff, thus freezing plaintiff out of unrelated business opportunities with Norges Bank, fails as entirely conclusory (*Jacobs v. Continuum Health Partners,* 7 A.D.3d 312, 776 N.Y.S.2d 279 [2004];*Herman v. Greenberg,* 221 A.D.2d 251, 634 N.Y.S.2d 99 [1995] ).Moreover, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

859 N.Y.S.2d 46
51 A.D.3d 549, 859 N.Y.S.2d 46, 2008 N.Y. Slip Op. 04617
**(Cite as: 859 N.Y.S.2d 46)**

Page 3

complaint fails to allege the requisite malice-that defendant acted solely to harm plaintiff, or that the conduct constituted a crime or independent tort or was otherwise egregious (*Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359, 818 N.E.2d 1100 [2004] ).

 51 A.D.3d 549, 859 N.Y.S.2d 46, 2008 N.Y. Slip Op. 04617

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.